I9DHScoC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                              17 Cr. 630 (ER)

5    MARK SCOTT,

6                                              Conference
                   Defendant.
7    ------------------------------x

8
                                              New York, N.Y.
9                                             September 13, 2018
                                              10:30 a.m.
10

11   Before:

12                        HON. EDGARDO RAMOS,

13                                            District Judge

14                            APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     TIMOTHY HOWARD
17        Assistant United States Attorney
     JULIETA V. LOZANO
18        Special Assistant United States Attorney

19   COVINGTON & BURLING LLP
          Attorneys for Defendant
20   BY:  ARLO DEVLIN-BROWN

21   ALSO PRESENT:   RON SHIMKO, FBI Agent

22

23

24

25

I9DHScoC

```
 1          (Case called)
 2          MS. LOZANO:  Good morning, your Honor.  Special
 3   Assistant U.S. Attorney Julieta Lozano.
 4          MR. HOWARD:  AUSA Timothy Howard.
 5          MR. SHIMKO:  And Ron Shimko with the FBI.
 6          THE COURT:  Good morning.  You can be seated.
 7          MR. DEVLIN-BROWN:  Good morning, your Honor.  Arlo
 8   Devlin-Brown of Covington and Burling, for Mark Scott.  We
 9   appeared in magistrate's court and will file a notice of
10   appearance today.  We've been engaged to handle bail and
11   release and preliminary proceedings and have every hope and
12   expectation of being able to represent Mr. Scott all the way
13   through.  As you know, this is a case where accounts were
14   seized, so we have to sort that out, but we'll let the Court
15   know in short order if there's any issue with that.
16          THE COURT:  I take it, Mr. Scott, you have no
17   objection to my proceeding this morning with Mr. Devlin-Brown
18   representing you?
19          THE DEFENDANT:  No objection, your Honor.
20          THE COURT:  This matter is on for an initial
21   conference.  I guess it's in a bail appeal.  Let me start with
22   the government.  Tell me a little bit about this case.
23          MS. LOZANO:  Yes, your Honor.  The defendant is
24   charged with participating a vast money laundering conspiracy
25   that lasted between 2016 and 2018.  He engaged with his
```

1    coconspirators and he laundered approximately $400 million of

2    proceeds of a fraudulent cryptocurrency.  This fraud scheme was

3    international in scope and brought in approximately $4 billion

4    worldwide from victims.

5          The defendant's role in this scheme was he's a

6    licensed attorney, and he joined the coconspirators and formed

7    hedge funds, international hedge funds, with accounts in the

8    Cayman Islands as well as Ireland.  And through those hedge

9    funds, he laundered the proceeds of the cryptocurrency fraud

10   scheme.

11         THE COURT:  Can I just ask a question about that.  Is

12   that cryptocurrency fraud scheme in the nature of a pump and

13   dump or Ponzi, or do you know?

14         MS. LOZANO:  It is hybrid Ponzi pyramid scheme.  It is

15   a fraudulent cryptocurrency that does not have, as far as the

16   investigation has determined, a true blockchain, and most

17   investors have not been able to recoup or take their money out

18   of the scheme once they invest in these coins.  There is some

19   degree of Ponzi scheme here simply because there are

20   commissions paid to promoters and recruiters in order to bring

21   in more victims.

22         THE COURT:  OK.

23         MS. LOZANO:  So the defendant's role was laundering

24   these funds and sending the majority of these funds back to the

25   founders of the scheme.  In order to do that, he lied to banks,

1  he lied to fund administrators, and he misrepresented where the

2  funds were coming from.  As we set out in our letter submission

3  yesterday, he represented that the moneys that were coming into

4  the hedge funds were moneys from a select group of European

5  families and entities that were investing who he had known for

6  many years.  In fact, our investigation has revealed that the

7  money that was coming into the hedge funds that he formed were

8  solely the proceeds of this fraud scheme.

9          THE COURT:  That's why it's money laundering.

10          MS. LOZANO:  Correct.

11          THE COURT:  That's the nature.  OK.  Go ahead.

12          MS. LOZANO:  Correct.  That is why he is charged under

13  the object crimes of concealment, both domestic and

14  international.

15          THE COURT:  Tell me about that.  There's one count in

16  the indictment, correct?

17          MS. LOZANO:  There is, yes.

18          THE COURT:  What is the international concealment?

19  I'm unfamiliar with those terms, domestic and international

20  concealment, at least in the criminal context.

21          MS. LOZANO:  Well, your Honor, there are two different

22  theories.  And the international is for money that was sent

23  either from inside the United States to a place outside or vice

24  versa --

25          THE COURT:  OK.

I9DHScoC

1          MS. LOZANO:   -- versus within accounts in the United

2     States.

3          THE COURT:  OK.

4          MS. LOZANO:  The defendant also transferred

5     approximately $15.5 million in fees for this money laundering

6     to his own personal accounts and used that money to buy

7     beachfront property, luxury vehicles, luxury watches.

8          THE COURT:  How many personal accounts did he have, if

9     you know?

10          MS. LOZANO:  I don't have the exact number.  He had

11     multiple in terms of personal in his name.  He also had many

12     accounts in corporate names where he was the sole director and

13     the person who controlled the account, but it was a corporate

14     account.

15          THE COURT:  With respect to the $15 million, not that

16     this is dispositive one way or the other, did that $15 million

17     go into his personal accounts or into corporate accounts?

18          MS. LOZANO:  Both.

19          THE COURT:  OK.

20          MS. LOZANO:  Both.  And in connection with Mr. Scott's

21     arrest, we also seized approximately and restrained

22     approximately 25 international and domestic accounts over which

23     he had control, both in a corporate name and his own personal

24     name.  We also seized a yacht and a Porsche pursuant to the

25     seizure warrants signed by the court.

I9DHScoC

1          THE COURT:  And these are vehicles -- they're both in

2     his name, in Mr. Scott's name?

3          MS. LOZANO:  They are in the name -- they're

4     registered, the car is registered in his name.  However, I

5     believe both the yacht and the Porsche are also owned by an

6     entity, as are many of his real properties.  They're owned by

7     corporate entities, and he is the sole director of those

8     entities.

9          THE COURT:  OK.

10          MS. LOZANO:  As a result of his conduct, the defendant

11     was indicted by grand jury sitting in the Southern District of

12     New York, but he was arrested in the District of Massachusetts

13     last Wednesday, September 5.  He was ordered returned to this

14     district.  He was, as the Court is aware, arraigned before

15     Magistrate Judge Fox on Monday.

16          Would the Court like me to give a brief overview of

17     the discovery we have in this case at this point?

18          THE COURT:  Yes, please.

19          MS. LOZANO:  OK.  We have voluminous discovery

20     materials, which include both hard copies and voluminous

21     electronic evidence.  Those categories are broadly defined as

22     bank and financial records, emails, fund administration

23     records, pen register records, phone records, WhatsApp and

24     email account records, GPS records, the cryptocurrency

25     promotional materials, and the cryptocurrency account

I9DHScoC

materials.  We opened an undercover account in the

cryptocurrency scheme, and so we have materials from that.

     We have purchase invoices of purchases made by

Mr. Scott.  We have real estate records, corporate entity

organization records.  He is the director of multiple entities,

both in Massachusetts and Florida as well as abroad in the

Caymans.  We have photos of a phone of his and information on

that phone.  We have FBARs that he filed with the IRS this past

summer.  We have a list of accounts that were seized or

restrained which I have already provided to counsel.  I

provided that last week.

     As I informed the Court, at the time of the arrest, we

executed search warrants both at his Massachusetts residence

and the Florida residence, so we have search warrant materials

from both of those locations.  I have already turned over to

counsel copies of the actual warrants and copies of the actual

seizure warrants as well.  I'll get to the materials from the

search warrant in a moment.

     We also have a postarrest statement made by the

defendant that was recorded.  That statement has been provided

to counsel in an unredacted form.  And there are many privilege

issues implicated by discovery in this matter because the

defendant is an attorney.  So from the inception of this

investigation and Mr. Scott's focus -- focus on Mr. Scott, we

have implemented a privilege review team.  And we, during this

I9DHScoC

1    search warrants, had a taint team conduct both searches, and we

2    have a taint team procedure for review of all of those

3    materials.

4              THE COURT:  Are you in a position to tell me whether

5    in connection with this investigation the government has

6    determined that Mr. Scott at least purported to represent any

7    coconspirators, that he was their lawyer?

8              MS. LOZANO:  There is a suggestion that that may have

9    been the case, and for that reason, the investigative team does

10   not have all of the materials that are now in the possession of

11   the privilege review team.  That is under review by that

12   unit --

13             THE COURT:  OK.

14             MS. LOZANO:  -- because there is a belief that

15   Mr. Scott may have represented one of the coconspirators.

16   During the search warrants -- so that is the reason that the

17   defendant's statement has been turned over to counsel in an

18   unredacted form, and the investigative team will only see it in

19   its redacted form.

20             During the search warrants, we obtained hard copies of

21   documents, corporate documents, as well as multiple electronic

22   devices, including ESI.  There is the potential of an enormous

23   amount of data because we recovered at least 17 phones, six

24   laptops, two iPads and three memory cards and five flash

25   drives.  We are in the process, we have already started the

I9DHScoC

1    process with the taint teams and the investigative agencies to

2    process, mirror that material, and to filter it through our

3    privilege review and taint team.  We will work with counsel to

4    address privilege issues and production issues.

5         THE COURT:  They were all seized last week?

6         MS. LOZANO:  Correct.

7         THE COURT:  So that process is just beginning?

8         MS. LOZANO:  Correct, because, of course, that

9    material had to be shipped to New York.  It is all now in New

10   York, and we are beginning the process of copying what needs to

11   be copied so that our review teams can begin reviewing the

12   materials.

13        Given that volume -- one moment.

14        (Counsel confer)

15        MS. LOZANO:  So we will work with counsel to address

16   the privilege issues, and we will work with the Court to the

17   extent that protective orders may be appropriate for certain

18   materials as well.

19        THE COURT:  OK.

20        MS. LOZANO:  That is, broadly speaking, the discovery

21   material that the government has.

22        THE COURT:  When do you anticipate you can begin to

23   provide to Mr. Scott the stuff that can be easily duplicated,

24   hard copy documents, etc.?

25        MS. LOZANO:  We will be doing that on a rolling basis.

I9DHScoC

1    We have already produced, as I noted to the Court, some

2    materials, and we are at this point processing and copying what

3    we can to produce to Mr. Scott.  So it will be an ongoing

4    process.

5              THE COURT:  Are those materials voluminous?

6              MS. LOZANO:  Yes.

7              THE COURT:  OK.

8              MS. LOZANO:  Yes.

9              THE COURT:  Very well.  Tell me about the bail issue.

10             MS. LOZANO:  Well, your Honor, as set out in the

11   letter that we filed yesterday evening, there are multiple

12   reasons why Mr. Scott is a flight risk, and we believe that no

13   combination of bail conditions will assure his return and

14   appearance in court.

15             First, the significant foreign ties -- and I'm not

16   going to repeat everything that we put in the letter --

17   significant foreign ties.  He is a German national, a dual

18   citizen, and he has significant ties there.

19             THE COURT:  What significant ties does he have there?

20             MS. LOZANO:  He has a mother there, and he has

21   traveled there over the last several years.  Between two to

22   three years, he has traveled to Germany nine times.

23             THE COURT:  OK.

24             MS. LOZANO:  He also has traveled to other foreign

25   jurisdictions, including the Cayman Islands, Puerto Rico,

I9DHScoC

London, Turkey.  He has the ability and he has the experience

that he does travel internationally.  The ties in Germany are

corroborated by phone records and WhatsApp records that

indicate regular communication with individuals in both Germany

and the UK.

                THE COURT:  What do you know about his legal practice?

                MS. LOZANO:  Our understanding, your Honor, is that up

until 2016 he was a practicing lawyer, and he served in the

capacity as a partner at Locke Lord for a period of time.  He

worked in many different law firms, but as of 2016 we can see

no evidence that he worked as a lawyer, that he represented

folks as his employment.

                THE COURT:  Where is he licensed, if you know?

                MS. LOZANO:  Florida.

                THE COURT:  OK.

                MR. DEVLIN-BROWN:  And New York.

                THE COURT:  He's registered in New York as well?

                MR. DEVLIN-BROWN:  Yes, he is.

                THE COURT:  In good standing?

                MR. DEVLIN-BROWN:  Yes.

                MS. LOZANO:  The second reason that -- the second

point regarding his flight risk, his extensive resources.  As I

mentioned, we were able to seize, identify, and restrain

approximately 25 accounts, both domestic and international, on

the basis that those accounts had illicit funds flowing through

I9DHScoC

1    them.  It is entirely possible and it is likely that we have

2    not identified all of his accounts, and in fact, we know that

3    he was not fully truthful when he reported in July to the IRS

4    the status of his foreign accounts.  He identified multiple,

5    approximately over ten foreign accounts, both in the Cayman

6    Islands and Switzerland.  All of those accounts together had

7    approximately $60 million in them, but he failed to identify

8    several accounts that we know from the investigation he holds

9    in the Bank of Ireland.

10             THE COURT:  He holds in his name or in corporations?

11             MS. LOZANO:  Corporations.  Corporation names, yes.

12             THE COURT:  For which he's the only director?

13             MS. LOZANO:  Yes.

14             THE COURT:  OK.

15             MS. LOZANO:  And that is similar to what he reported

16    on the FBAR were multiple accounts in corporation names where

17    he was a director.  So it's analogous, and those should have

18    been reported, but they were not.

19             So he has evidenced the ability to withhold

20    information about where his assets are.  We are fairly

21    confident that he has other assets that we have not identified,

22    and they're likely significant given the amount of money that

23    he has in the accounts we have identified.  Were he to be

24    released and not detained, he would have access to those moneys

25    and be able to travel internationally and flee to a

I9DHScoC

jurisdiction, possibly Germany, possibly another jurisdiction.
There are many jurisdictions that do not have either treaties
with the United States for extradition or have their own
internal laws, for instance, Germany, about extradition of
nationals.  So there is a risk that we would not, significant
risk, that we would not be able to return him to the United
States.

He also has a strong motive to flee.  As set forth in
the letter yesterday, the sentence guidelines range for his
conduct based on the amount of money that he laundered is so
high that it exceeds the statutory maximum for the crime
charged here.

The evidence is extremely strong and includes
extensive financial tracings; his own lies, documented lies, to
bank and fund administrators about the origin of the funds and
the purposes of the transactions.  We also have email evidence
with the communication among the coconspirators about the
conduct here.  So the defendant has a strong motive to flee,
and in fact, the defendant's coconspirators would be in a
position to help him flee.  And the investigation has revealed
that one of the coconspirators most likely has fled to a
jurisdiction where there is no extradition treaty with the
United States.

So for those reasons, the government believes that
detention is warranted because Mr. Scott poses a significant

I9DHScoC

1   flight risk, he has the means and he has the motivation, and if

2   he were to flee to a jurisdiction where there is no extradition

3   treaty, we would not have an ability to bring him back and try

4   him on these charges.

5          THE COURT:  As I understand it, he's married and has

6   one child or more than one child?

7          MS. LOZANO:  As I understand it, he is married and has

8   one child.  I believe a 15-month-old.

9          THE COURT:  And the wife, is she an American citizen,

10  if you know?

11         MS. LOZANO:  I do not know that.

12         MR. DEVLIN-BROWN:  Yes, your Honor, she is.

13         THE COURT:  OK.  Thank you, Ms. Lozano.

14         Before we go to Mr. Devlin-Brown, I'll kick myself if

15  I don't correct the record, and only because I have some

16  personal insight into this.  Puerto Rico is not a foreign

17  jurisdiction.

18         But anyway, Mr. Devlin-Brown.

19         MR. DEVLIN-BROWN:  Thank you very much, your Honor.

20         Magistrate Judge Fox heard substantially the same

21  arguments from the government that there were no conditions

22  that could be met in this case and rejected those.  Pretrial

23  also rejected that argument and recommended release on

24  conditions.  We got the papers, obviously, last night, shortly

25  after 7:00.  I was only able to speak to my client about them

I9DHScoC

1   20 minutes before the conference.  So we haven't had a chance,

2   obviously, to put in a written submission, but I don't think we

3   need to, your Honor, unless you request one.  I will, though,

4   probably spend a little more time, therefore, going through

5   some of the arguments that the government has offered.

6          THE COURT:  Certainly.

7          MR. DEVLIN-BROWN:  So I'd like to start, actually,

8   with strength of the case.  And I know strength of the case is

9   sometimes something defense lawyers get into at their peril,

10  because who knows, right?  It's early on.  But I think in a

11  case like this, it's actually pretty important to get into it,

12  partly because the government's proffered it as a reason, but

13  also everyone is presumed innocent.  Everyone is presumed

14  innocent, but when people are charged with hundreds of millions

15  of dollars of money laundering, if their case is, well, look,

16  we have multiple wiretaps, here's the conversation, we have

17  three cooperators, people are presumed innocent under the law,

18  but people sitting right here can see writing on the walls.

19  And the risk in cases like that to flee can be much more

20  significant.  So I think we need to peel the layers back a

21  little from what the government has said their case is based on

22  what we know now, because it's nothing like that, your Honor,

23  nothing at all.

24         The government's had an opportunity to proffer the

25  strength of their case.  Usually in a case like this, a major

I9DHScoC

1    white-collar case, there's some significant starting point that

2    the Court can go on.  There's either one of two things:

3    There's a detailed complaint which is going to, of course, lay

4    out some of the evidence and sources of evidence, or there's a

5    speaking indictment.  Here, the indictment is bare bones, says

6    really nothing beyond the statutory language.  So we can't take

7    much from the charging document at all in terms of indicia of

8    strength.

9            There's one thing, though, I think we can take from

10   the charging document that's significant, and that's what the

11   conspiracy is not alleged to be.  He's charged with laundering

12   funds through his private equity firm for individuals involved

13   with some alleged cryptocurrency scam.  He's not charged with

14   conspiracy with those people to commit wire fraud or bank fraud

15   or whatever the cryptocurrency fraud is.  And based on

16   everything I've learned from speaking with the prosecutor so

17   far from their papers, there's no allegation that he is part of

18   some effort to dupe people in cryptocurrency.  Instead, he's

19   charged with being the private equity person that took money

20   that is allegedly dirty and made financial transactions with

21   it, which is money laundering if the person in his seat, in the

22   private equity position, knows that the money is dirty, of

23   course.

24           So I think that frames the issue when we're thinking

25   about the strength of the case in a case where someone's not

I9DHScoC

1    charged with the underlying SUA or the cryptocurrency fraud.

2    We're looking at what is the evidence that this person who was

3    moving money through a private equity firm knew that the money

4    he was moving is dirty?  That's what a case like this boils

5    down to most significantly.

6          And what have we heard from the government on that?

7    What has been their proffer of evidence on that?  It's been

8    extraordinarily thin, your Honor, I submit, extraordinarily

9    thin.  They lead with, in their proffer of evidence, they have

10   bank records and financial transaction records and corporate

11   documents, and they've traced money.  It's far too early for

12   the defense to concede anything in this case, but I seriously

13   doubt that's what a case like this is going to rise and fall

14   on, money moved through accounts of a private equity investor.

15   Great.  That doesn't prove too much.

16          Second, they point to communications between people in

17   the conspiracy, and I think the quote was about the conduct

18   here.  It wouldn't surprise me if Mr. Scott is doing private

19   equity investments for people that there might be some

20   communications, but they haven't outlined what those

21   communications are, your Honor.  They haven't provided these

22   emails.  You can't take anything from this vague reference to

23   communications.

24          So then they get to what I think is actually a really

25   revealing point in terms of strength of the case.  They say

I9DHScoC

1    it's the lies to the banks.  And the quote from their brief in

2    terms of the lies to the bank is he said he had investments

3    from a "small" -- from a "small investor group of European

4    families the defendant had represented for many years."

5            For one thing, the defendant did meet people that he

6    was investing in his cryptocurrency firm from Locke Lord.  They

7    were Locke Lord clients who vetted for Locke Lord and who the

8    defendant was doing corporate deals with, as well as other

9    people at Locke Lord.  So there's actually, I think, as an

10   aside, some truth in that statement right there, but the main

11   point here, the government's statement that they have evidence

12   of lies to the bank because the defendant said this money was

13   from a small investor group of European families, that's not

14   evidence of a lie to the bank.  That's evidence of what

15   Mr. Scott said to the bank.  Evidence that it would be a lie is

16   evidence that he knew the money was dirty, that he knew the

17   money was something else.  And they've offered nothing there,

18   again, to show that Mr. Scott had knowledge that the money came

19   from an illegal cryptocurrency scheme.

20           And that's a huge leap if the government wants to sort

21   of -- we should just sort of fill that in and assume people

22   discuss that.  Because typically criminals, when they make a

23   lot of money in their scheme and they want to, say, launder

24   their money, let's assume that for now, when they go to a

25   financial institution or a bank or whatever, they do not

I9DHScoC

typically say:  Here is my dirty money.  Would you please do

financial transactions with it?  They say as little as they

need to say to get the person handling the finances to take

that on.  That's a default assumption, I think, as to how

criminals with dirty money work.  And the government has

offered no evidence, no evidence in their proffer, that

Mr. Scott had some knowledge that this money was from some

other source.

        I don't want to go on and on about the evidence.  It's

early.  You know, that there are lots of accounts, by the way,

and that he made a lot of money, I mean, that's what people in

private equity do, I understand.  He wouldn't be the first

person who made money doing private equity and bought things

from it.

        THE COURT:  I don't know how private equity folks

work, but is it typical, if you know, that they should create X

number of different entities?

        MR. DEVLIN-BROWN:  Yes.  I'm a very limited expert

here, but it is typical when you have different transactions,

different investments, to protect them from one and the other,

that there are different entities created.  And a much more

simple example, your Honor, when the government mentions he has

properties in the names of different companies, that's a

hundred percent typical.  He has a number of investments and

residential real estate properties in Massachusetts which he

I9DHScoC

1    had -- it's transparent that he's on the LLCs.  He's not hiding

2    any of that.  He lives in one of them.  But that's a way that

3    people who have funds often purchase assets.  It's totally

4    common.

5          Anyway, I think I'm sure the government has answers

6    to, you know, we have this evidence or that.  They had a chance

7    in the case where they're seeking detention under all

8    conditions to lay out a proffer of what their evidence is, and

9    I don't think, to get back to where I started here, your Honor,

10   this is the sort of case where people are presumed innocent,

11   but a defendant hearing this and seeing this says my goose is

12   cooked.  It's not.  There's no evidence that this is that kind

13   of case where someone has those kind of incentives.

14         THE COURT:  There's at least the suggestion, given the

15   amount of money that's involved -- Ms. Lozano has indicated

16   that Mr. Scott had approximately $400 million go through his

17   hands -- that that is at least some evidence of his knowledge

18   that this was not all legitimate.

19         MR. DEVLIN-BROWN:  I don't find that persuasive at

20   all, your Honor.  He was a partner at a number of law firms

21   doing international corporate work, private equity firms.  You

22   find wealthy investors.  You invest for them.  You earn a fee.

23   If he has 400 million in investments, I don't think that number

24   by itself means there's some knowledge that the money is dirty.

25         But I'll move on from the strength-of-the-case point

I9DHScoC

1    to a related point, though, and that is the government's point

2    about vast financial resources and the suggestion that he has

3    the means to flee, because I actually think this argument is

4    quite unfair.  The government's done a meticulous financial

5    investigation.  They've seized 25 accounts, by their own

6    counting at least, accounts in the U.S.  They've gotten

7    restraining orders on accounts overseas.  They're going through

8    an MLAT process.  There are accounts in the U.S., by the way,

9    they haven't seized, and of course, he has funds that predate

10   this from his involvement in Locke Lord and other law firms.

11           But they've done this financial tracing, but then they

12   sort of, despite being rigorous about that, sort of say:  We

13   assume there's something more.  There's probably stuff we

14   missed.  It's hard to prove a negative, it really is, but let's

15   look at the couple of examples that they've given as to why

16   your Honor should sort of conclude there's other stuff out

17   there that he's trying to hide.

18           The first argument, I think, is a very curious one,

19   and that's the FBARs argument.  Because they make the argument

20   that this defendant, who's presumably trying to hide money

21   offshore and has a consciousness of guilt and may be hiding all

22   sorts of assets, reported, I think they said, more than ten

23   accounts totaling more than $60 million on his FBARs, in other

24   words, telling the IRS he had accounts in Cayman and

25   Switzerland and everywhere else.  So then their evidence is,

1    aha, he forgot a couple in Ireland.

2           He provided his material to accountant to prepare the

3    FBARs.  I don't know at this point what the state of those

4    Irish accounts were, if they actually had money in them at that

5    point, if it was a mess up.  I don't know.  It's too early to

6    say that.  But just looking at that argument generally that he

7    discloses all this stuff on the FBARs from countries where it

8    might be hard to get information from but leaves off Ireland,

9    therefore we assume he's hiding money, it just doesn't ring as

10   persuasive.

11          The other argument that they make in their letter, and

12   I think this one is completely unfair as well, is they say, as

13   the only example they give, really, of some money that they

14   know that is out there that they have not been able to get,

15   they say there's some bank accounts in the UAE.  By the way,

16   these accounts were moneys that his investment fund transferred

17   funds to and are no longer under his control.  They're under

18   control of the investors.  So he doesn't have access to those

19   accounts.

20          But the government's argument is the UAE is not

21   playing nice in the MLAT process.  That's hardly a reason to --

22   that's hardly Mr. Scott's fault, and that's hardly a reason to

23   detain him.  They haven't asked -- they haven't served a

24   restraining order on him for the UAE accounts.  They could do

25   that.  They puts some jeopardy on him if he does anything with

I9DHScoC

1     those funds which he doesn't have access to.  You could ask him

2     to execute something, but you can't blame him for another

3     country not playing nice with the UAE accounts.  You have

4     information about the last he knew what was in the UAE

5     accounts.  So I don't think these financial resources arguments

6     ring true, and I fundamentally think it's unfair for the

7     government to say there probably is stuff out there.  We just

8     don't know what it is even though we've been very thorough.

9            Now, though, I'd like to come to my final point which

10    really links to assets as well, but it's ties to the community,

11    because the government sort of paints a pictures of Mark Scott

12    as an international man of mystery.  He's in Bulgaria on Monday

13    and he's in Zurich on Friday.  And, yes, he traveled a lot

14    doing his international private equity work for international

15    clients.  I'd hate to know what the government would think of

16    me if they looked at my passport for the last two years:

17    Argentina and then Egypt and then Zurich.  I mean, it's all

18    very, very sketchy, but my feet are planted firmly in the U.S.

19    and so are Mr. Scott's.

20           And this German identity/nationality thing, that, I

21    think, is the most unfair thing.  He was born to a solider who

22    was serving in Germany, and so his dad was on the Army base.

23    He met a German woman, his mom, who's now unfortunately dying

24    from terminal cancer in Germany.  He's been in the United

25    States his entire adult life.  He want to college here.  He

1  went to law school at BU.  He's been a practicing lawyer in

2  Florida for 20 years.  His entire life has been here.

3          I think it's been unfair what the government suggested

4  with Germany.  I'll give you one example.  I don't hold this

5  against Ms. Lozano, but I think it's an unfair example.  They

6  point out not only did he have a German passport, your Honor,

7  but that he had a driver's license that they seized, right,

8  like maybe he's about ready to get in the BMW over there and

9  take off to the country side.  The driver's license, based on

10 what I've been able to learn so far this morning, was issued

11 when he was 17 years old.  He's 49 years old now.  He collects

12 stuff.

13          THE COURT:  Was it expired?

14          MR. DEVLIN-BROWN:  I don't know how long German

15 driver's licenses last, but I will bet that it had expired.  It

16 was issued when he was 17.

17          THE COURT:  OK.

18          MR. DEVLIN-BROWN:  I've asked Ms. Lozano if she has

19 that information, and she doesn't right now.  But I think it's

20 a little misleading to cite a driver's license that someone got

21 when they were a kid that they needed, by the way —— he was

22 still living over there as a kid —— to drive like a teenager

23 wants to do.  So I think that was unfair.

24          But more to his roots here, not only has he built a

25 life here, he's married to a non-German national U.S. citizen.

I9DHScoC

He has a 15-month-old.  They're trying to have more kids.  He's

brought all his assets here.  He's someone who's made a lot of

money in the last couple of years, and what has he done with

the money?  He has bought real estate that's clearly traceable

to him in a -- some for him some to develop into various

project.  He also sells a product for babies on Amazon.  He has

got multiple business ventures.

He has property in Florida.  He's bought cars, which

can't be easily taken out of the U.S.  He has bank accounts in

the U.S.  This is not someone who has a foot out the door, who

has some life they're building as a plan B.  This is someone

who's been living openly in the U.S. his entire adult life.  He

did some international business, but I don't think there's

anything about foreign ties that suggests a desire to flee.

One other point about foreign ties, your Honor, about

Germany in particular, there was a suggestion the prosecutor

made that one of the people involved in the crypto scheme, the

alleged crypto scheme, which again Mr. Scott is not accused of

being part of, seems to have gone on the lam somewhere.  I

don't know where she's gone on the lam to, but I bet that it is

not Germany because Germany is a country that has an active

criminal investigation of this crypto scheme, the BaFin, the

German SEC, has shut down the accounts of OneCoin, the name of

the crypto company there.

So the idea that Mr. Scott, because he has a German

I9DHScoC

1    passport and, of course, that old driver's license, would leave

2    everything here and leave his suretors on the hook and go to a

3    country that, extradition or not, is actively investigating

4    what he would have "fled" from this court, it just doesn't add

5    up.

6            So, your Honor, I'll stop in just a moment.  I think

7    Judge Fox heard these arguments.  Of course it's a big case.

8    Of course it's a case where there needs to be a bond.  It was a

9    million-dollar bond secured, I think, by 200,000.  We'd be fine

10   if it was secured by 750,000.  If there's something that needs

11   to be done there, I think that's fine, but this is not, we

12   submit, a case for detention.

13           THE COURT:  How much is his personal residence worth?

14           MR. DEVLIN-BROWN:  His personal residence in Coral

15   Gables, Florida, is worth about 1.8 million, and he has some

16   homes in Cape Cod as well.

17           THE COURT:  That's it?

18           MR. DEVLIN-BROWN:  That's it, unless your Honor has

19   questions.  I'll address discovery, but maybe you want to

20   address this first.

21           THE COURT:  Let's deal with this first.

22           Ms. Lozano, did you want to say anything else on this

23   point?

24           MS. LOZANO:  Yes, your Honor, just briefly a few

25   points.  In response to counsel's argument regarding the

strength of the case, I would note that we do have

communications among Mr. Scott and the coconspirators that

establish that he knew that the money that was coming into his

funds were the proceeds from the cryptocurrency scheme.

Notwithstanding that, he represented that it was money coming

in from European family investors or from technology licensing

fees.

Secondly, to address counsel's point about the UAE,

the only reason that we mention the transfers from Mr. Scott to

the UAE is to explain that we do not have the full visibility

of where all of Mr. Scott's money may have gone since we cannot

get records from the UAE.

And lastly, with respect to the comment about Germany

having an active investigation, the fact of the matter is it

has had an active investigation.  No one has been arrested and

no one has been charged after a lengthy investigation.

THE COURT:  Are any of the participants in the

conspiracy in Germany so far as you know?

MS. LOZANO:  Yes, your Honor.

THE COURT:  Mr. Devlin-Brown, I saw you standing up.

MR. DEVLIN-BROWN:  Just one point to respond to, your

Honor.  To the extent your Honor is going to grant -- at this

stage, where the government has in a summary fashion asserted,

yes, we actually do have email action that shows the

approximate date that he knew the money was dirty, if your

I9DHScoC

1    Honor's going to base a ruling on that, I'd like to see those

2    emails and have a chance to respond.

3            THE COURT:  OK.  I think that Judge Fox got it right.

4    I don't doubt that this is a very important case, that the

5    government sees this as an important and even a strong case,

6    but we have in this district any number of cases involving

7    eye-popping amounts where -- there is no violence that's

8    involved in this particular case.  So far as I know, Mr. Scott

9    does not have any prior arrest, any criminal history

10   whatsoever.  He has strong ties to his community in Florida.

11   And despite the fact that the amounts that are involved are

12   fairly impressive, this is the type of case, I think, that an

13   adequate package can be constructed.

14           Because of Mr. Scott's apparent significant assets, I

15   do think that a million dollars and $200,000 cash or property

16   is low.  So what I would do is increase the amount to

17   $2.5 million secured by $500,000 of cash or property and two

18   financially responsible persons to sign for him and that he not

19   be released until those conditions are met, including the other

20   conditions that were imposed by Magistrate Judge Fox which

21   involve travel restriction to SDNY, EDNY, and Southern District

22   of Florida; that he surrender his travel documents; that he be

23   subject to pretrial supervision as directed by Pretrial

24   Services; that he be subject to home detention with electronic

25   monitoring; that he surrender his weapons, which -- as I

I9DHScoC

understand, are all of his weapons legally owned?

MR. DEVLIN-BROWN:  Yes, your Honor, and as I understand it from the government, they've been seized.

THE COURT:  OK.

MS. LOZANO:  That's correct.

THE COURT:  So that is the opinion of the Court on the bail issue.

Mr. Devlin-Brown, how do you want to proceed?

MR. DEVLIN-BROWN:  May I just, I appreciate your Honor's ruling.  If I could just suggest two things to consider.

THE COURT:  Sure.

MR. DEVLIN-BROWN:  One, hopefully, is not controversial.  And I haven't gone back to the transcript, so I'm relying on memory.  But Mr. Scott also has property in Cape Cod, and I believe Judge Fox had said orally that he could travel to Cape -- to the District of Massachusetts as well.

THE COURT:  I don't remember that from the transcript.

MR. DEVLIN-BROWN:  No.  Well, then maybe it's just my wishing, but I would request it, your Honor, and here's partly why.  The circumstances of the arrest are particularly sad here because he did have a gun there, and when the agents arrested him, he had a child there.  His wife was there.  His wife was taken into custody because there's a gun and a child and is dealing with that matter in Massachusetts.  She may not be able

I9DHScoC

1    to travel in the near term.  So I would respectfully request,

2    we'd have to work out arrangements with pretrial, etc., but

3    permission to travel to Massachusetts.

4         THE COURT:  I'll grant that application, even over the

5    objection of the government.

6         MR. DEVLIN-BROWN:  The other thing I just ask your

7    Honor to reconsider, and we could always come back if you're

8    not prepared to do that now, but it's been somewhat

9    challenging, even when we had a bond, finding people because

10   it's something pretty unique about Mr. Scott, right, is that he

11   until very recently was not the sort of man who had millions of

12   dollars.  He was doing fine as a lawyer.  But his old friends,

13   right, his old friends, they hear a number like 2.5 million,

14   and it's beyond comprehension.  And I don't know if the

15   government would even, they might reject some of those people

16   because they can't pay that.  His new friends maybe could, but

17   he doesn't know them as long.

18        So I don't know if the Court will be willing to

19   consider reducing it to two.  I would even suggest or giving us

20   the option of securing it with more than $500,000 because that

21   could give people more comfort in some ways if everyone's

22   jointly and severally responsible.

23        THE COURT:  I'm happy to increase that number to

24   $750,000 as you previously requested.

25        MR. DEVLIN-BROWN:  OK.  On a 2.5?

I9DHScoC

1              THE COURT:  Yes.

2              MR. DEVLIN-BROWN:  Thank you.

3              THE COURT:  OK.  And discovery?

4              MR. DEVLIN-BROWN:  Yes, I appreciate that there's one

5       tremendous category of discovery that's very difficult for the

6       government.  I remember being there and remember learning the

7       lesson, be careful what you seize, because you might have to

8       search it.  So Mr. Scott apparently does save his old phones,

9       and there will be all sorts of things we have to deal with

10      there.  I think Ms. Lozano and I can work together on figuring

11      that out.

12              There are two things I hope we can get earlier, one

13      thing really early, and that is the affidavits that are behind

14      the search warrants for his property and his accounts.  That

15      should be easy.  It should be a matter of asking the Court to

16      unseal them.  And it's important for two reasons:  One is there

17      could be motion practice, obviously, we can think about right

18      away on those, can we challenge the probable cause to seize his

19      property or home.  But, second, and really this is my main

20      motivation, in a case where you don't have a complaint, where

21      you don't have a speaking indictment, that will at least give

22      us some clue as to what the government's allegations really are

23      about because, presumably, they lay out some probable cause in

24      those documents.  And it's the kind of thing that we're

25      entitled to anyway.  I'd hope we can get that within a week.

I9DHScoC

1          Then the second category, which shouldn't again be

2     very difficult, is all the government -- all the evidence the

3     government had amassed to prove probable cause to get an

4     indictment and get those moneys and properties.  Presumably,

5     they have emails that they think are incriminating readily on

6     hand.  They have bank records that they've gathered a long time

7     ago.  So that sort of stuff we would hope the government could

8     provide, might be voluminous, but still in fairly short order.

9          THE COURT:  OK.  Ms. Lozano.

10          MS. LOZANO:  Yes, your Honor, we should be able to

11     promptly provide the affidavits in support of the search

12     warrants as well as the evidence presented to the grand jury,

13     which includes financial documents as well as emails.

14          THE COURT:  When can you do that by?

15          MS. LOZANO:  Well, the bulk of discovery we're

16     requesting and believe we can provide in four weeks.  We will

17     prioritize those two items and put them at the top of our list.

18          THE COURT:  And provide it on a rolling basis

19     beginning prior to the end of four weeks?

20          MS. LOZANO:  Correct, correct, yes.

21          THE COURT:  Mr. Devlin-Brown, that seem reasonable?

22          MR. DEVLIN-BROWN:  Yes, your Honor.

23          THE COURT:  OK.  Then what else do we need to do

24     today, Ms. Lozano?

25          MS. LOZANO:  Your Honor, I would like a little bit

1    more clarity about the home detention, electronic monitoring.

2    Since Mr. Scott has at least -- there are three Cape Cod homes

3    and one in Florida.  I'm not exactly sure what the Court

4    envisions in terms of home detention.  In what home?

5             THE COURT:  That's a good question.

6             Mr. Devlin-Brown.

7             MR. DEVLIN-BROWN:  I think we would have to work with

8    pretrial and then come back to the Court if there are any

9    issues, but I think if the Court orders that, it would at least

10   allow pretrial, hopefully, if he needs to visit Massachusetts,

11   to try to work out arrangements for that.

12            THE COURT:  I guess the issue would be I don't want to

13   break pretrial's bank, and we don't want them shuttling back

14   and forth on a weekly basis between Florida and Massachusetts.

15   So maybe he can pick one, and if he needs to travel on a

16   one-off basis, you can come to the Court for permission.

17            MR. DEVLIN-BROWN:  Yeah, I think the goal would be

18   Florida.  We're working on figuring out, making sure his wife

19   can come there, or it might be a more complicated question, but

20   mostly in Florida.

21            THE COURT:  OK.

22            MS. LOZANO:  So, just to be clear, it will be Florida

23   home detention, and if he intends to travel to Cape Cod, the

24   parties will communicate with the Court?

25            THE COURT:  Correct.  Should come to court and ask me

 1    in the first instance.

 2                    MR. DEVLIN-BROWN:  That's fine.

 3                    MS. LOZANO:  Thank you.

 4                    With respect to the travel documents, just to be

 5    clear, he also cannot apply for any new travel documents?

 6                    THE COURT:  That's correct, yes.

 7                    MS. LOZANO:  Yes.  Thank you.

 8                    I think the only remaining item is, your Honor, the

 9    government requests that this time be excludable from --

10                    THE COURT:  Well, when do you folks think it makes

11    sense to come back?  Mr. Devlin-Brown won't have the initial

12    wave of discovery until four weeks out.  So maybe a week or two

13    beyond that, Mr. Devlin-Brown?

14                    MR. DEVLIN-BROWN:  That would be fine, your Honor.

15    The Court can rule on whatever basis to exclude time that it

16    issues.  I don't think we're prepared to consent while he's

17    still incarcerated, until we can figure out if he is able to

18    make this bond, but we'll be happy to come back.

19                    THE COURT:  Let's get a date five weeks out.

20                    THE DEPUTY CLERK:  November 1, 3:30 p.m.

21                    MR. DEVLIN-BROWN:  That's fine, your Honor.

22                    MS. LOZANO:  That's fine for the government, your

23    Honor.

24                    THE COURT:  OK.

25                    MS. LOZANO:  We request that the time be excludable

I9DHScoC

1    between now and November 1 based on the fact that we will be

2    producing materials and that it will give counsel time to

3    review those materials and determine motions that he may want

4    to make.  It will also serve to allow the parties to discuss

5    any potential resolution, if there is one.

6              THE COURT:  The time between now and November 1 will

7    be excluded for the reasons set forth on the record by

8    Ms. Lozano and also to allow Mr. Scott to finalize his

9    situation with respect to counsel.  As I understand, it is

10   still an open issue.  I find that excluding that time will be

11   in the best interest of Mr. Scott.

12             And unless there's anything else that we need to do

13   today, Ms. Lozano?

14             MS. LOZANO:  No, your Honor.  Thank you.

15             THE COURT:  Mr. Devlin-Brown?

16             MR. DEVLIN-BROWN:  No, your Honor.

17             THE COURT:  We're adjourned.  Thank you, folks.

18             (Adjourned)

19

20

21

22

23

24

25