IBFVSCOC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                            17 CR 630 (ER)

5   MARK S. SCOTT,

6              Defendant.                    CONFERENCE

7   ------------------------------x

8                                            New York, N.Y.
                                             November 15, 2018
9                                            11:03 a.m.

10
    Before:
11
                        HON. EDGARDO RAMOS,
12
                                             District Judge
13

14                         APPEARANCES

15
    GEOFFREY S. BERMAN,
16       United States Attorney for the
         Southern District of New York
17  CHRISTOPHER DiMASE
    NICHOLAS FOLLY
18       Assistant United States Attorneys
    JULIETA V. LOZANO
19       Special Assistant United States Attorney

20  DAVID M. GARVIN
    JAMIE NOBLES
21       Attorneys for Defendant

22

23

24

25

IBFVSCOC

1           (Case called)

2           MR. DiMASE:  Yes.  Good morning, your Honor.

3           Christopher DiMase, for the government.

4           Also present at counsel table are Special Assistant

5    United States Attorney Julieta Lozano from the Manhattan DA's

6    office, and AUSA Nicholas Folly.

7           THE COURT:  Good morning.

8           MS. LOZANO:  Good morning.

9           MR. FOLLY:  Good morning.

10          MR. GARVIN:  Good morning, your Honor.

11          David Garvin, on behalf of Mr. Scott, who is present

12   to my far right.

13          MR. NOBLES:  And James Nobles, also present for

14   Mr. Scott.

15          THE COURT:  And good morning to you all.

16          I take it that Covington & Burling is out?

17          MR. NOBLES:  Judge, we've both been fully retained and

18   will be in the matter for the rest of the case.

19          MR. GARVIN:  Yes, your Honor.

20          THE COURT:  Okay.

21          This matter is on for a status.  So Mr. DiMase, did I

22   pronounce that correctly?

23          MR. DiMASE:  Yes, you did, your Honor.

24          THE COURT:  Why don't you tell me where we are.

25          MR. DiMASE:  Your Honor, we've produced a significant

IBFVSCOC

1    quantity of discovery to counsel; it was first produced to Arlo

2    Devlin-Brown at Covington when he was counsel of record.  More

3    recently we've been producing the materials to Mr. Garvin.

4         Ms. Lozano is prepared to speak about the general

5    categories of evidence that we've already turned over.  There

6    are a couple of additional significant pieces still remaining,

7    and we're getting them out on a rolling basis.

8         In particular, there was a substantial amount of

9    digital evidence that was recovered pursuant to search warrants

10   at the time of Mr. Scott's arrest back in September, both from

11   the Florida residence and from the Massachusetts residence.  I

12   believe the Florida residence amounted to somewhere in the

13   vicinity of two terabytes of data on a number of devices and

14   computers; and in Massachusetts it's three terabytes of data.

15   So these are really large productions.

16        We've gotten a two-terabyte drive from counsel; we are

17   copying the Florida data down to that drive and expect to

18   produce it back to counsel very soon.

19        With the Massachusetts data, it took a little bit

20   longer to process that, but we now have it all imaged.  And we

21   have asked for a three-terabyte drive from counsel to copy that

22   data onto the drive and return it to them.

23        So we are in the process of producing those materials

24   to the defense as we speak.

25        THE COURT:  And assuming you get the drive from the

4

IBFVSCOC

1    defendants on a fairly quick basis, when will they have that

2    back?

3              MR. DiMASE:  Well, we already have the two-terabyte

4    drive.  I anticipate that will probably go back out to them

5    with the discovery -- with the electronic data from Florida

6    probably next week.

7              THE COURT:  Okay.

8              MR. DiMASE:  Although with the Thanksgiving holiday,

9    it's possible it could be early the following week.  But we'll

10   make our best efforts to get it out for Thanksgiving.

11             The three-terabyte drive, we don't have the drive yet.

12   We can probably turn it around in a week or two once we have

13   the drive, but we are waiting on the drive from counsel; I

14   expect that they'll get that to us soon.  It is a substantial

15   amount of data; my understanding is it does take some time to

16   actually copy it over.

17             THE COURT:  Does it take as long as a week or two?

18             MR. DiMASE:  Well, the data is currently in the

19   possession of the FBI, not the U.S. Attorney's Office.  So I'm

20   building in a little bit of time to get the drive to the FBI,

21   get them to copy it, give it back to us, and then get it to

22   counsel.  And I should note, importantly, that these materials

23   were recovered from his residence.  Mr. Scott, as the Court

24   well knows, was a practicing attorney, still remains barred in

25   at least one state, and our position is that these materials

IBFVSCOC

1    also need to be produced to counsel through our privilege

2    filter review team, so that adds an additional step.  Not that

3    our review of it will have anything to do with the production

4    of it to counsel, but there are going to be issues around

5    reviewing it through the privilege review team and discussing

6    with counsel various different privilege issues as we go

7    forward.

8            In addition to those drives, your Honor, there is a

9    set of around 6500 emails that either were sent by, received

10   by, or in one way or another copied Mr. Scott that we have in

11   our databases.  Again, there's a mix of potentially privileged

12   materials and nonprivileged materials.  We expect to get that

13   production out to counsel later today.  And the materials that

14   are potentially privileged will be marked as such, and the

15   nonprivileged materials marked as such, so that that will

16   enable and facilitate the parties discussing the privilege

17   issues, knowing what's what.

18           THE COURT:  How long do you anticipate that that

19   process will take?

20           MR. DiMASE:  You know, your Honor, I don't know

21   exactly what the defense position is going to be on these

22   privilege issues, so it's very hard for me to provide an

23   estimate in that regard.

24           THE COURT:  Okay.  But that process is ongoing and

25   you're communicating with defense counsel in that regard?

IBFVSCOC

1      MR. DiMASE:  The one other piece of privileged

2  material that's already been turned over is I think

3  approximately eight boxes of documents that were recovered from

4  the Florida residence that are also in the filter team review

5  process.  They already have the scanned copies of those

6  documents.  They also have a full copy of the post-arrest

7  statement made by Mr. Scott, whereas the government case team

8  has only received a copy of the filter-reviewed version of that

9  statement.

10      So those are the potentially privileged materials that

11  have already been turned over.  I'll be frank with the Court,

12  we have not yet engaged with counsel regarding privilege issues

13  around those materials, in part because counsel was only

14  recently retained in place of Covington & Burling, and that

15  process took some time.  It wasn't clear who exactly was going

16  to be representing Mr. Scott.

17      I think now that Mr. Nobles and Mr. Garvin are on the

18  case, we can have a discussion around those documents and the

19  statement.  And as we produce these drives and the emails, we

20  will obviously have further discussions around those issues as

21  well.

22      THE COURT:  So discovery in this case will likely take

23  at least a couple more months?

24      MR. DiMASE:  I think that's right.  And the privilege

25  issues will complicate some of these discovery questions, but

IBFVSCOC

1   we will work as quickly as we can through them, your Honor.

2                THE COURT:  Okay.

3                MR. DiMASE:  I did want to say that there are a couple

4   of other pieces of evidence.  I want to be clear, and

5   Ms. Lozano is prepared to address this, if necessary, we have

6   produced a massive amount of discovery already; and there just

7   is a very substantial amount of discovery in this matter.  I

8   think it's fair to say it's more than enough to keep counsel

9   busy, but we are getting discovery out on a rolling basis as

10  quickly as we can.

11               In addition to the items I've described, the drives

12  and the emails that are in process, there are some other

13  emails -- not, I think, a massive quantity, but a quantity of

14  other emails not copying Mr. Scott or sent or received by

15  Mr. Scott -- that we intend to produce, along with a larger

16  collection of bank records.  What we've done is to produce the

17  bank records that are really most pertinent to Mr. Scott, the

18  accounts that he controlled or controlled through his

19  companies.  And so that, in and of itself, is a very large

20  production.

21               THE COURT:  I forget, what was Mr. Scott's practice?

22               MR. DiMASE:  In terms of his law practice, your Honor?

23               THE COURT:  Yes.

24               MR. DiMASE:  I believe he was a transactional lawyer

25  who largely dealt with private equity issues and other legal

1    issues around that practice area.  But he has not been -- he

2    was employed by Locke Lord LLP until approximately August of

3    2016.  And since then, he has not been employed by a law firm.

4    Our belief, based on the investigation, is that since then he's

5    primarily been operating these, quote/unquote, hedge funds or

6    private equity funds that were used to facilitate the money

7    laundering scheme.  But that has been his main employment, for

8    lack of a better word, since that time.

9              THE COURT:  But the government is acknowledging that

10   even with respect -- or is the government acknowledging that

11   even with respect to those clients, there are privilege issues

12   that need to be addressed?

13             MR. DiMASE:  When you say "clients," your Honor,

14   you're referring to --

15             THE COURT:  The hedge fund.

16             MR. DiMASE:  -- the people who worked with him at the

17   hedge fund?

18             So I think that, by and large, the government's

19   position is that those transactions were financial in nature

20   and largely not privileged.  That being said, there do appear

21   to be occasions where Mr. Scott is either acting in a sort of

22   quasi attorney capacity or connecting members of this fraud

23   scheme with other attorneys who then potentially provide legal

24   advice.

25             There is a very serious question that we may raise to

1    the Court at some point, depending on our conversations with

2    counsel, about whether the crime fraud exception applies to

3    those communications.  The privilege review team on our end has

4    already identified a number of emails that may fall into that

5    category; and I think there is an intention, once these emails

6    and other materials are produced, to begin a conversation about

7    defense counsel's position with respect to the privilege and

8    decide whether there is a live issue to bring to the Court or

9    not.

10            THE COURT:  Okay.

11            MR. DiMASE:  But to answer the Court's question more

12   directly, I think largely the answer is no, we believe he was

13   acting primarily as a financial adviser and hedge fund manager,

14   as opposed to a lawyer.  But we have reviewed these materials

15   on an individual basis, and the privilege team has made

16   decisions where they view Mr. Scott as acting in a legal

17   capacity, kept those on the other side of the wall from the

18   case team.

19            THE COURT:  Okay.

20            MR. DiMASE:  So as I was saying with respect to

21   remaining discovery, there are some additional emails, some

22   additional bank records.  I don't mean this to be an exhaustive

23   list, but the main categories, along with there are some

24   outstanding Mutual Legal Assistance Treaty requests, some of

25   which are particularly pertinent to Mr. Scott.  We just don't

IBFVSCOC

1    have the materials yet, so we are unable to produce them.  We

2    are doing everything we can to expedite those responses.  But

3    we're at the mercy of the foreign jurisdictions.

4              THE COURT:  Those MLATs were sent out when

5    approximately?

6              MR. DiMASE:  They vary.  The one that is probably most

7    pertinent was to Ireland.  And I think that was probably like

8    early 2018, but I don't know the exact date, your Honor; I

9    don't have that in front of me.  And I think that there will be

10   a number of emails that are not privileged, because Mr. Scott

11   is communicating with people at the bank, so they are not going

12   to be privileged in any way.  Somewhere between 800 and

13   possibly 1,000 emails with that bank that are likely to be

14   quite relevant and we're working to get those as quickly as we

15   can.

16             THE COURT:  When you say "that bank," you mean a bank

17   in Ireland?

18             MR. DiMASE:  The Bank of Ireland --

19             THE COURT:  Bank of Ireland, okay.

20             MR. DiMASE:  Is the bank in question.

21             So just to give the Court a tiny bit more context, our

22   investigation has demonstrated that Mr. Scott used these hedge

23   funds or private equity funds in the Cayman Islands to receive

24   a lot of these fraud proceeds, and then moved a substantial

25   amount of that money to accounts held by similar entities,

IBFVSCOC

1    similar private equity fund/hedge fund entities with the same

2    name, Fenero, at the Bank of Ireland.  And that is why that

3    evidence may be particularly relevant.

4           We've turned over all of the records that we've gotten

5    from the Cayman Islands so far that deal with the accounts, his

6    correspondence with the bank and so forth.  We've turned over

7    all of the records that we've received from the fund

8    administrator that managed those funds.  So defense has all of

9    those records.  But we don't have a full production from the

10   Bank of Ireland at this stage.

11           THE COURT:  Okay.  Thank you.

12           MR. DiMASE:  You're welcome.

13           THE COURT:  Mr. Garvin or Mr. Nobles?

14           MR. GARVIN:  Yes, your Honor.

15           THE COURT:  Is it Nobles?

16           MR. NOBLES:  It's Nobles, your Honor.

17           THE COURT:  Nobles.  Thank you.

18           Mr. Garvin.

19           MR. GARVIN:  Your Honor, I would concur with counsel

20   on most everything that counsel just reported to this Court.

21           Just for clarity's sake, we are not in possession, to

22   my knowledge, of the 6500 emails that relate to Mr. Scott.

23   That is going to be forthcoming in the near future.

24           MR. DiMASE:  We anticipate producing that probably

25   later today or tomorrow morning, so very soon.

IBFVSCOC

1          THE COURT:  Okay.

2          MR. GARVIN:  But I do concur with what counsel

3    reported to this Court concerning the importance of those

4    emails and, in fact, that they are likely to raise issues

5    concerning privilege.

6          With regards to the two-terabyte drive, I also concur

7    that we have provided that upon request, and that it's in the

8    process.  And we agree that it seems like the government has

9    been more than reasonable with regard to the production of the

10   two-terabyte drive.

11         With regard to the three-terabyte drive for the

12   Massachusetts documents, counsel has discussed this issue with

13   me on more than one occasion.  And it was only recently that

14   apparently the government was able to determine the actual

15   size, voluminous production.  And once they were able to

16   determine that, this week, I believe, on Tuesday they were able

17   to notify me that do not send another two-terabyte drive, you

18   better send a three-terabyte drive.

19         So I understand, contacting my office this morning,

20   they were in the process of acquiring that and sending it out

21   Federal Express today.  So I would hope that it arrives at the

22   United States Attorney's Office tomorrow, but, at the latest,

23   on Monday.

24         THE COURT:  Okay.

25         MR. GARVIN:  Respectfully, your Honor, I also -- I see

IBFVSCOC

1  coming in the horizon, not just the snowstorm for today, but

2  any arguments that may take place regarding extra territorial

3  jurisdiction.  And I do think that that would probably be best

4  served to be addressed by this Honorable Court as a primary

5  item before we get into what other types of motions the defense

6  might feel are appropriate in this case.

7          Respectfully --

8          THE COURT:  Extraterritorial issues involving the laws

9  of those particular jurisdictions?

10          MR. GARVIN:  Well, in particular in this case, the

11  application of our laws to transactions that occurred in

12  Ireland, the Cayman Islands, and other locations.  I think that

13  there is a dearth of activity in the United States, and I think

14  it may appear that there is less than a *de minimis* amount of

15  intentional activity.  So it may be something that has to be

16  addressed.

17          Also we need to research into the underlying activity

18  upon which the money laundering charge is based.  And in this

19  case, if it is wire fraud, which we anticipate it's likely to

20  be, then we get into an argument perhaps as to the

21  extraterritorial nature of Congress's intent with regard to the

22  wire fraud statute.  We've been looking at that tangentially,

23  because we haven't had the discovery to make a determination

24  whether a good-faith basis exists for making these types of

25  arguments.

IBFVSCOC

1      THE COURT:  I haven't looked at the indictment in a

2  little bit, but isn't the specified unlawful activity indicated

3  in there?

4      MR. GARVIN:  I'm sorry, your Honor?

5      THE COURT:  Isn't the specified unlawful activity

6  indicated in the indictment?

7      MR. GARVIN:  Your Honor, I would say it does summarily

8  state specified unlawful activity, but it doesn't indicate what

9  unlawful activity, that is, with the specificity that we

10  believe at this stage we need to look into so as to not waive

11  any of Mr. Scott's rights as to that issue.

12      MR. DiMASE:  Your Honor, I'd like to address a couple

13  of those issues.

14      THE COURT:  Why don't we let Mr. Garvin finish.

15      MR. DiMASE:  Of course.

16      MR. GARVIN:  Yes, your Honor.

17      There are no pending motions other than one that I

18  very recently filed with regard to a request to modify the

19  condition of bond from a requirement of home detention to a

20  requirement of curfew.  But that matter was only recently

21  filed.  And I did note in the motion that counsel for the

22  United States has discussed this with me and has expressed that

23  they oppose any such modification.

24      THE COURT:  Let me ask you, since we are all here, why

25  do you need the modification?  It seems to me that what he's

1    allowed to do is fairly expansive.  He can do other things, as

2    long as the pretrial officer approves it.  What more do you

3    need?  Why do you need more?

4              MR. GARVIN:  Yes, your Honor.

5              The reason why, honestly, one of the main factors was

6    to attempt to protect Mr. Scott from violating the order

7    unintentionally.  I will tell you that, for example, the

8    battery on his monitor went dead the other day and he didn't

9    have a replacement battery, and it created much concern on his

10   part.  And he has to contact his pretrial services officer, who

11   has a very large quantity of other defendants that he has to

12   monitor.  And it makes it sometimes difficult for Mr. Scott to

13   accomplish the contact, get the approval prior to the meeting

14   that is scheduled.

15             Mr. Scott discussed this with his pretrial services

16   officer.  And between the two of them, they said, Well,

17   unfortunately the way that your bond appears, we have to go

18   through this process.  And while it may not make a huge amount

19   of difference -- and I did come to the same conclusion that

20   this Honorable Court just raised, there doesn't seem to be a

21   big difference here when you read them carefully -- it does

22   free up both the supervised release officer -- or, excuse me,

23   the pretrial services officer and Mr. Scott as far as the

24   constant notice and constant waiting for a reply.

25             I don't think that it jeopardizes the government much,

1    because, as this Court has observed, the way it is written, the

2    pretrial service officer's discretion controls now and would

3    continue to control if the modification was made.  So we do not

4    believe it increases any risk of flight; it does not cause

5    prejudice to the United States.  And it does relieve the

6    pretrial services officer of having to reply back.

7        THE COURT:  I'm not concerned about the pretrial

8    services officer's workload.

9        MR. GARVIN:  Yes, sir.

10       Well, that would make it more convenient for

11   Mr. Scott.

12       And I would say this, your Honor:  As counsel has set

13   out for the Court, there is a mountain of discovery in this

14   particular case.  And I envision that Mr. Scott is going to be

15   spending an awful lot of time going back and forth to my

16   office.

17       THE COURT:  But as the bond currently exists or as it

18   currently states, he doesn't need approval in order to go to

19   your office.

20       MR. GARVIN:  Well, I can tell you, your Honor, he has

21   been required to seek approval, and I've been filling out the

22   emails and sending them in and waiting for the approval.  A

23   position has been taken by the pretrial services office that he

24   needs approval.  Even though those items, they are enumerated

25   in the bond, would appear to me to be expressly permitted,

IBFVSCOC

1    unfortunately, that is what is occurring.

2            THE COURT:  So the pretrial services officer is

3    reading this provision to require advanced approval of him to

4    leave the house to do any of these things?

5            MR. GARVIN:  I believe that is the case, but I can

6    only speak directly to the legal visits, because I've had to

7    prepare the emails requesting permission that he come to my

8    office.

9            THE COURT:  Let me ask Mr. DiMase about this, because

10   this seems to be an easy fix.

11           Mr. DiMase?

12           MR. DiMASE:  Judge, I think that is the way that the

13   order is intended, actually, to require the pre-approval.

14           And this speaks to the risk of flight.  The idea is

15   that the pretrial officer should know where Mr. Scott is at all

16   times.  And it doesn't seem like a huge imposition for

17   Mr. Scott to inform the pretrial officer by email or phone or

18   text message that he's going to meet with his attorney.

19   Otherwise, the home detention isn't -- or home -- I forget if

20   it's -- home detention isn't really home detention.  The point

21   of home detention is to know where Mr. Scott is.  So he is

22   either home or the pretrial officer knows where else he might

23   be.

24           So we would argue that that was the original intent of

25   the order, and that it should remain in place that way.

IBFVSCOC

1   Mr. Garvin hasn't really expressed any changed circumstance

2   here.  I don't think the fact that he needs to charge his

3   battery more regularly represents a changed circumstance that

4   would support a change in bail conditions.

5        And I do think it increases a risk of flight, I

6   disagree with Mr. Garvin on that point.  Home detention is some

7   assurance that we all know where Mr. Scott is.  A curfew is

8   just he can do whatever he wants all day long without any

9   approval or pre-approval, and then come home at the end of the

10  day, and he's unaccounted for during that time in between.

11       I would note also that the battery -- I think the

12  battery and the curfew would be the same problem; he would

13  still have to wear the same GPS device.

14       THE COURT:  I'm not concerned at all about the issue

15  that Mr. Garvin raised about inadvertent violation.  At least

16  as far as I'm concerned, if he comes in and he says that he

17  violated for a reason like that, I'm not going to violate him.

18  This can all be handled in a very rational, straightforward,

19  intelligent way.  So I'm not concerned about that at all.

20       I do think that this is an easy fix.  As Mr. DiMase

21  has indicated, there's been no change in conditions.  As I

22  recall from the bail arguments that were made previously, given

23  the nature of the offense, the amount of money that was

24  involved, and Mr. Scott's contacts in places other than the

25  United States, I'm not going to change the conditions as they

1   currently stand.

2            Mr. DiMase, you said you wanted to address some other

3   issues?

4            MR. DiMASE:  Just very briefly, your Honor.

5            I don't think we've actually had any conversations

6   with Mr. Garvin and Mr. Nobles yet about the jurisdictional

7   issues that were raised today, and that's obviously fine.

8            Just to be clear -- and we can litigate this in motion

9   practice -- Mr. Scott is living here in the United States

10  during the entirety of this conspiracy and committed the crimes

11  from the United States.  There are many, many instances of

12  money flowing through these accounts, out and into these

13  accounts from the United States and into the United States.

14           Actually, I don't think the indictment alleges this,

15  but there's also evidence that he brought a substantial amount

16  of the proceeds of the crime into the United States, and then

17  used those monies to make purchases, fund bank accounts, and so

18  on and so forth.  So it is our position that there is ample

19  jurisdictional evidence here.

20           But to the extent that this is -- and briefly on wire

21  fraud, your Honor, the government makes the same argument.

22  There are ample -- there are many, many instances of U.S.

23  victims wiring money to this fraud scheme from within the

24  United States and being defrauded as a result.

25           THE COURT:  Is that the specified unlawful activity?

IBFVSCOC

1          MR. DiMASE:  That's what I was going to address, your

2     Honor.

3          So we looked at the indictment.  The indictment does

4     very specifically indicate that the Ponzi scheme, the pyramid

5     scheme at issue here is the underlying specified unlawful

6     activity, but doesn't say specifically "wire fraud."  And we're

7     happy to send an email or a bill of particulars to Mr. Garvin

8     and Mr. Nobles indicating that our theory at this stage is that

9     it is a wire fraud.  We may obviously go back and add some

10    additional theory, but that is the theory that we are relying

11    on in the indictment as charged now.

12         THE COURT:  Okay.

13         MR. DiMASE:  And I do think that it may make sense, to

14    the extent that there is a jurisdictional argument here, for

15    that to be litigated relatively early on in a motion to

16    dismiss.  And we are happy to -- once they've had a chance to

17    review the discovery materials -- make a determination on these

18    different fronts.

19         THE COURT:  Right.  It's probably not going to be

20    quick.

21         MR. DiMASE:  But I take Mr. Garvin's point that it

22    makes sense to try to resolve this early on, because it seems

23    to be a threshold matter that we need to address.

24         THE COURT:  Sure.

25         MR. DiMASE:  But I would submit to the Court that

IBFVSCOC

1    there is ample evidence here of U.S. jurisdiction on both the

2    money laundering offense itself and the underlying specified

3    unlawful activity.

4            THE COURT:  Mr. Garvin, anything else you wanted to

5    address?

6            MR. GARVIN:  No, your Honor, other than I was going to

7    respectfully ask the Court if perhaps we could have another --

8    roll this status over or have another status scheduled sometime

9    in the near future.  But I was going to specifically ask the

10   Court -- because I did have the benefit of hearing the case in

11   front of us being rescheduled -- if the case could be -- or the

12   status could be after February 4th.  Both myself and

13   independently Mr. Nobles have trials in January.

14           THE COURT:  I'll see you as soon as you want to be

15   seen.  So after February 4th?

16           MR. GARVIN:  Yes, sir.

17           THE COURT:  Okay.  Ms. Rivera?

18           And I'm sure you'll all be very busy between now and

19   then.

20           THE DEPUTY CLERK:  February 20 at 11:30 a.m.

21           MR. DiMASE:  That's fine with the government, your

22   Honor.  Thank you.

23           THE COURT:  Does that work for you all, Mr. Garvin?

24           MR. GARVIN:  It works for me.

25           MR. NOBLES:  Yes.

IBFVSCOC

```
1              THE COURT:  Very well.

2              Mr. DiMase, anything else that we need to do today?

3              MR. DiMASE:  Just one moment, your Honor, if you

4     would.

5              THE COURT:  Sure.

6              MR. DiMASE:  Thank you.

7              (Pause)

8              MR. DiMASE:  Your Honor, just one final matter.

9              The government would request the exclusion of speedy

10    trial time from today until February 20th, to enable the

11    parties -- or the government to continue producing discovery to

12    the defense, for the defense to review those materials, make

13    determinations regarding potential motions, and to allow the

14    parties to engage in possible discussions regarding resolution

15    of the case.  And finally, I would add, to discuss the ongoing

16    potential privilege issues in this matter as well.

17             THE COURT:  Mr. Garvin?

18             MR. GARVIN:  There is no objection, your Honor.

19             THE COURT:  Very well.

20             I will exclude the time between now and February 20

21    under the Speedy Trial Act.  I find that Mr. Scott's interest

22    outweigh the interests of the public in a speedy trial for the

23    reasons set forth on the record by Mr. DiMase.

24             And unless there's anything else, we're adjourned.

25                            *    *    *
```