J2kWscoC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                       17 Cr. 630 (ER)

MARK S. SCOTT,

          Defendant.

                                     Conference
------------------------------x

                                     New York, N.Y.
                                   February 20, 2019
                                   11:30 a.m.

Before:

                     HON. EDGARDO RAMOS,

                                 District Judge

                     APPEARANCES

GEOFFREY S. BERMAN
    United States Attorney for the
    Southern District of New York
BY:  CHRISTOPHER J. DIMASE
    LISA P. KOROLOGOS
    Assistant United States Attorneys
    -and-
    JULIETA V. LOZANO
    Special Assistant United States Attorney

DAVID M. GARVIN
    Attorney for Defendant
    -and-
NOBLES & DECAROLIS
BY:  JAMES NOBLES

J2kWscoC

1          (Case called)

2          MR. DIMASE:  Good morning, your Honor.  Christopher

3    Dimase, for the government.  I'M joined at counsel table by

4    Special Assistant U.S. Attorney Julieta Lozano, from the

5    Manhattan D.A.'s office, and AUSA Lisa Korologos, from the U.S.

6    Attorney's Office.  Also in the courtroom are several agents

7    who are working on the case:  Special Agent Ron Shimko, from

8    the FBI; and IRS Agents John Abram and Andrew Grammatikos.

9          THE COURT:  Good morning.

10          MR. GARVIN:  Good morning, your Honor.  David Garvin,

11    on behalf of Mark Scott.  I'm joined by Mr. James Nobles,

12    cocounsel, and Mr. Scott is present here at the table.

13          THE COURT:  And good morning to you all.

14          Everyone can be seated.

15          This matter is on for status conference.

16          Mr. Dimase, bring me up to date, if you would.

17          MR. DIMASE:  Yes, your Honor.

18          There are, I think, four different issues that we

19    anticipate addressing today.

20          One is the status of discovery and various related

21    requests.  The second is the privilege review process.  The

22    third is the pending motion to quash, which we, the government,

23    submitted something this morning in response to a motion filed

24    yesterday by the defendant.  I don't know that the Court or the

25    defense has had sufficient opportunity to digest what we

J2kWscoC

1    submitted, but it certainly may be on the radar for today's

2    conference.  And finally, scheduling going forward.  I think

3    those are the primary issues.

4          With respect to discovery, since the last time we were

5    here, we have produced a substantial additional amount of

6    discovery materials, including numerous MLAT responses

7    containing bank records, emails and other materials relevant to

8    the case; U.S. bank records, email correspondence.

9          The defendant, I think, by the last conference,

10   already had a copy of his postarrest statement.

11         A number of OneCoin-related materials, including

12   screenshots of the website and back-office environment and

13   videos showing claims made by OneCoin promoters, and audit

14   reports and legal opinions that have been obtained by OneCoin

15   in the course of the scheme; seizure warrants; search warrants,

16   inventories related to those warrants, and substantial amount

17   of ESI and hard-copy records recovered from both the

18   defendant's Florida and Massachusetts residences.

19         Last time we were here, that particular category of

20   discovery, the ESI, was something that we were still working on

21   obtaining from the agencies and copying and producing to the

22   defense.  They now have terabytes, literally, of data that were

23   recovered from those two locations.

24         We did speak with Mr. Garvin this morning, and we

25   learned for the first time that they are having some trouble

J2kWscoC

1    accessing the data on a hard drive that we produced, so that's

2    something that we have to address going forward.

3            Materials from Locke Lord, which is the law firm that

4    Mr. Scott was working for at the outset of the charged offense;

5    various phone records and other phone-related data; records

6    from the Bureau of Prisons; records received from the other

7    director of Mr. Scott's companies, David Pike.

8            That's kind of an overview.  It's not every single

9    thing, but it should give the Court some sense of the materials

10   that have been produced and the voluminous nature of those

11   materials.

12           There are a few things that, for various reasons, we

13   are still in the process of producing.  One example is

14   materials from a Germany mutual legal assistance treaty

15   request.  We have produced a bunch of materials received from

16   Germany, but there are some emails and other documents that are

17   in German that are still being translated in an effort to

18   determine whether those items are, in fact, discoverable or

19   even relevant.  There is a set, relatively small set, of emails

20   and documents that we have determined are relevant and are

21   planning to produce this week.

22           There are some additional Locke Lord materials that we

23   received last week that we are planning to turn over in short

24   order.  We have identified some additional OneCoin-related

25   materials in the District Attorney's Office files that we plan

1    to turn over as well.  And we are continuing to search our

2    database to determine whether there are other emails that are

3    relevant to the matter, in particular, emails involving

4    Mr. Scott.

5            As we've told counsel, and I think we may have told

6    the Court in the past, we have searched our database and turned

7    over every email we can find that one of the email addresses we

8    have from Mr. Scott is in the header of the email; in other

9    words, he's either sending the email, receiving the email or

10   copied in some way on the email.  There may be emails in the

11   database that are sent or received by Mr. Scott that are lower

12   down in an email thread, where he is not ultimately in the

13   header of that email, and we believe the majority of those

14   emails, to the extent they exist, would be duplicative of the

15   emails we've already produced, because the person who had that

16   email likely received it from Mr. Scott in the first instance

17   before forwarding it or responding to other parties.

18           That being said, there may be instances where somebody

19   takes an email that's sent to some other person by Mr. Scott

20   that the government does not have that particular individual's

21   email account, and then a person who the government has the

22   email account for forwards it to someone else.  So, we're

23   looking through our database for those emails.  The problem is

24   there are also privilege issues there, because if somebody

25   forwards an email from Mr. Scott to his own attorney and asks

J2kWscoC

1    for legal advice, obviously that creates problems.

2            We've produced a substantial number of emails that

3    Mr. Scott's known email addresses are in the header, and that

4    was produced back in November.  But we are continuing to look

5    at whether there are additional emails in our database and

6    whether and how we can produce those documents, given the

7    privilege concerns that we have.

8            That's sort of a summary of the status of discovery.

9    I'm happy to move on, but I imagine that Mr. Garvin and

10   Mr. Nobles may have some comments on the discovery issues as

11   well.

12           I do want to note one other important thing before

13   turning over the floor to Mr. Garvin.

14           We also have responded to a couple of specific

15   requests for discovery from the defense.  They sent a letter

16   asking for essentially a bill of particulars on several issues,

17   including venue; the identity of coconspirators; the underlying

18   specified unlawful activity and forfeiture matters.  We

19   responded to that letter both in writing and as part of an oral

20   telephone call, and based on our communications with the

21   defense, we believe that they were satisfied with those

22   responses.

23           The one outstanding issue from that letter is

24   forfeiture.  We are attempting to file a forfeiture bill of

25   particulars.  It's mostly prepared, and we're hoping to

J2kWscoC

| | |
|---|---|
| 1 | finalize it and file it today or, at a minimum, by the end of |
| 2 | this week, but we think we should be able to do that today. |
| 3 | THE COURT:  Very well. |
| 4 | MR. DIMASE:  The last issue is there was a request for |
| 5 | what Mr. Garvin and Mr. Nobles have indicated may constitute |
| 6 | *Brady* materials in the case.  We responded with a letter |
| 7 | identifying documents we've already produced that might be |
| 8 | responsive to that letter.  Although we don't necessarily view |
| 9 | the materials that we've identified as *Brady*, because they |
| 10 | seemed responsive to the letter, we have identified them for |
| 11 | counsel.  And we've also turned over as part of that response |
| 12 | full reports of a number of interview statements that address |
| 13 | some of the issues raised in the letter, in full, which would |
| 14 | normally be 3500 material and, actually, which largely address |
| 15 | issues beyond what the defense had asked for in the letter; we |
| 16 | still felt in an abundance of caution it made sense to turn |
| 17 | over the full statements, so we did that as well. |
| 18 | Also, there was a discovery production that apparently |
| 19 | was encrypted and not able to be opened, which counsel let us |
| 20 | know about earlier this week, either late last week or earlier |
| 21 | this week.  And I do have a copy of that that is unencrypted, |
| 22 | and I'm going to hand over a copy of that to the defense.  It |
| 23 | was originally produced on the 13th of February, so I'm going |
| 24 | to do that now. |
| 25 | THE COURT:  OK. |

J2kWscoC

1          MR. GARVIN:  Thank you.

2          MR. DIMASE:  Your Honor, that was all I had.  I know

3     you might have had a question.

4          THE COURT:  Mr. Garvin, Mr. Dimase indicates that

5     although some items are outstanding, you have enough to keep

6     you busy for now.

7          MR. GARVIN:  Yes, that would be accurate, your Honor.

8          Your Honor, I do think we've made, meaning the

9     defense, good progress with what has been turned over, and

10    those documents have been organized and are being prepared in

11    anticipation of trial.

12         The little problem is here that Mr. Scott maintained

13    his office in his residence.  He had a residence in Florida,

14    Miami, and a residence in Massachusetts.  At the time that the

15    arrest took place, search warrants were executed for both

16    locations, and all computers were physically removed.  And

17    many, if not all, of the relevant hard documents were removed.

18         The government has provided what we anticipate to be

19    most, if not all, of the relevant hard documents that it

20    removed, and we've supplied some large drives, one to carry

21    four terabytes and another to carry two terabytes, to get the

22    data that was on the physical computers.  We understand that

23    the government has made a mirror image of those two computers,

24    but we're not 100 percent certain on that.

25         We received back the hard drives for the four

J2kWscoC

terabytes and two terabytes, but we sent it out to IT people,

and we were advised that they were unable to open it because of

the type of program that was used.  But we've discussed that

with the government, and we are hopeful that we'll be able to

work through that in the next few days.

          Those documents really are most of the universe of

Mr. Scott's documents, and it's necessary for us to be able to

open those terabytes or, if that ultimately proves to be

impossible, to get the machines back once the government has a

complete copy of everything that they want from those

computers.

          Those computers and the data that they contain is

being held by the taint team because of potential privilege

issues, so our trial team from the United States has not even

looked at that data yet, and neither has the defense looked at

it because we couldn't get it opened, nor has the prosecution

looked at it, but we anticipate that there will be materials

that are relevant and should be provided as reciprocal

discovery if the defense intends to use it at trial.

          Having said that, because the government has provided

all of the hard documents, the defense feels that it is in a

position to reasonably request this honorable Court to set a

date for trial and to request a schedule for the defense to

file appropriate motions, which we think we're in a position

that we can file based upon what I believe to be over a hundred

J2kWscoC

1    thousand pages of hard documents that have been produced to

2    date, many of them which are relevant.

3         Respectfully, the weight of this prosecution, hanging

4    like a sort of Damocles over our client's head, is taking its

5    toll, and he would like very much to go to trial this summer,

6    if possible.  And so we would ask that, before we leave here

7    today, this honorable Court give us some guidance as to what

8    its busy calendar looks like and give us a target that we can

9    be shooting for in preparation in the hopes that we will not

10   have delays, that the United States and the defense will be

11   able to work through our issues together.  That doesn't mean,

12   as the Court recognizes, that we won't be arguing over motions

13   tooth and nail, which we anticipate, but that's commonplace for

14   this honorable Court.

15        I think that we, meaning the defense, were hopeful for

16   a trial date commencing in, perhaps, as early as mid-August,

17   but we have no idea what the Court's calendar looks like.

18        I think counsel mentioned that there was a pending

19   motion to quash the subpoena that was sent to Mr. Scott.  The

20   return date on that was this coming Friday, and so we filed

21   that motion because the return date was so close, but we

22   appreciate the government working diligently to get us a reply

23   so quickly, but I haven't even had a chance to read it.  We'd

24   respectfully ask that we not address that today, because I

25   haven't even had a chance to read the reply.

J2kWscoC

1            THE COURT:  OK.

2            MR. GARVIN:  But the other point is a return date on

3    that subpoena two days from now probably would have been an

4    exercise in futility because we don't have the hard drives to

5    go through to look for the documentation that would be, in

6    part, an answer to that subpoena.

7            THE COURT:  OK.  Let's do this.  If you don't want me

8    to decide that today, I won't, but let me just ask the

9    government some questions.

10           MR. DIMASE:  Yes, your Honor.

11           THE COURT:  What are these companies?

12           MR. DIMASE:  Sure.

13           THE COURT:  Go ahead.

14           MR. DIMASE:  I just want to make one point on the

15   timing clear.

16           We did respond.  We served a subpoena.  Mr. Garvin

17   sent a letter saying that defendant intended to exercise his

18   Fifth Amendment privilege.  We're responded with a letter

19   saying that the subpoena doesn't require him to appear and

20   testify; it requires him to provide documents related to these

21   companies in his capacity as a corporate custodian, and the

22   Fifth Amendment privilege does not apply in that context.  And

23   then we went on to say if you require more time to respond to

24   the subpoena, please let us know.

25           THE COURT:  OK.

J2kWscoC

1          MR. DIMASE:  I just want to be clear that the

2    government has offered to extend that deadline and we continue

3    to be willing to extend that deadline to allow Mr. Scott to

4    respond appropriately once the motion to quash is decided.

5          THE COURT:  So tell me about these companies.

6          MR. DIMASE:  Yes, your Honor.

7          As we note in footnote 1 to the letter that we filed

8    this morning, which obviously the defense and the Court may not

9    have had a chance to review yet, Mr. Scott owns -- fully

10   owns -- a company in Florida called MSS International

11   Consultants LLC.  That company owns another company, which is

12   called MSS International Consultants (BVI) Ltd.  That company

13   ran, essentially administered, the Fanaro quote/unquote

14   investment funds which the government alleges were used to

15   launder OneCoin proceeds.  The sort of organizational chart is

16   the MSS International Consultants LLC company over the MSS

17   International Consultants (BVI) company, which then

18   administered the Fanaro funds.

19         THE COURT:  OK.

20         MR. DIMASE:  And the subpoena was directed to

21   Mr. Scott in his capacity as custodian for both of the MSS

22   companies.  He is the owner of one of them and he owns the

23   other fully through the first one.  He is one of the two

24   directors of the second company, along with an individual named

25   David Pike.

J2kWscoC

1        THE COURT:  Are there any other individuals with

2   interests in either of these companies beyond Mr. Pike?

3        MR. DIMASE:  First of all, to my understanding,

4   Mr. Pike does not have an ownership interest in either of the

5   companies.  He's merely a director of the second company.

6   Mr. Scott is the only other director of the second company, and

7   we believe he effectively owns both companies.  He fully owns

8   the first company and, through that company, owns the second

9   one.

10        THE COURT:  OK.  Do these companies have physical

11   presences outside of Mr. Scott's home?

12        MR. DIMASE:  Not that I'm aware of, your Honor.  Not

13   that the government is aware of.

14        THE COURT:  Were his homes searched as a result of and

15   in connection with his arrest?

16        MR. DIMASE:  That is correct, your Honor, yes.

17        THE COURT:  So you took everything.

18        MR. DIMASE:  Well, the issue is we believe that some

19   documents and digital records in particular, which may exist on

20   cloud-computing devices or servers outside of those locations,

21   are still out there in the world and have not been responded

22   to.  And I would say in that regard that Mr. Pike had a

23   substantial number of hard-copy documents, which he did produce

24   to the government, and appears to have additional records on a

25   laptop that he utilized in connection with the company that he

J2kWscoC

1    intends to produce and has indicated to us that there is a

2    server somewhere that contains additional materials related to

3    these companies that Mr. Scott has deactivated Mr. Pike from so

4    that Mr. Pike can no longer access those records.

5            THE COURT:  When did that happen?

6            MR. DIMASE:  We were not told when that happened, your

7    Honor.  We're in communication with Mr. Pike's counsel about

8    the subpoena that was served on him, one of the subpoenas that

9    was attached to the defense motion.

10           THE COURT:  What is Mr. Pike's status in connection

11   with this case?

12           MR. DIMASE:  When you ask that question, your Honor,

13   specifically what do you mean?

14           THE COURT:  Is he an unindicted coconspirator?  Is he

15   a codefendant?

16           MR. DIMASE:  He has not been charged.  The government

17   continues to investigate his involvement in these offenses.

18           THE COURT:  Very well.

19           MR. DIMASE:  And he is represented by counsel, as I

20   mentioned already.

21           Those are some of the bases for our request to produce

22   additional documents above and beyond what was recovered from

23   the defendant's two residences.

24           When I say the government is not aware of other

25   locations, that's precisely what I mean.  There may be other

J2kWscoC

1    locations from which Mr. Scott did business in connection with

2    these companies, but the government is not presently aware of

3    those locations.

4              THE COURT:  So there may be documents responsive to

5    these subpoenas or there may not.

6              MR. DIMASE:  There may be.  We believe that there are

7    documents on a server at least that would be responsive to the

8    subpoena, which the government does not have.  There may be

9    other documents, and the government, as you said, does not know

10   whether or not those exist.

11             THE COURT:  Let me ask you this question.  Did you,

12   strictly speaking, have to identify Mr. Scott as the custodian

13   of records in connection with the subpoenas?

14             MR. DIMASE:  The answer to that question is no, we

15   didn't have to, but I don't think the law draws any distinction

16   between a subpoena that is addressed to a corporate custodian

17   specifically or one addressed more generally to a company.

18             There is some language at the end of the Second

19   Circuit case that, in dicta, mentions that distinction.  But

20   the case itself says very clearly it is irrelevant whether the

21   subpoena is addressed to the custodian or to the company.  And

22   *Braswell*, the Supreme Court case, also specifically addresses

23   subpoenas that are served on corporate custodians, so I don't

24   think the law draws any distinction.

25             We would be happy to re-serve a subpoena that names

J2kWscoC

1    just the company.  I think that's form over substance,

2    ultimately, because these are companies that Mr. Scott and to

3    some extent Mr. Pike are the only people who could even respond

4    to these subpoenas.

5         THE COURT:  And you indicated that you were willing to

6    sit down with Mr. Garvin and Mr. Nobles to discuss some greater

7    focus with respect to the subpoenas.  Is that right?

8         MR. DIMASE:  Yes.  I think the subpoenas are pretty

9    narrowly tailored in terms of the people and entities that they

10   relate to.  I think the main issue that we need to discuss with

11   Mr. Garvin and Mr. Nobles and that they have already expressed

12   interest in discussing is helping us to identify the records

13   and computer equipment that may already contain the responses

14   to the subpoena in our possession and obviously that we have

15   produced back to them.  There are some issues with reading some

16   of those materials, but I think that might be the first step.

17   Mr. Garvin and Mr. Nobles have indicated they think we may have

18   the majority of these materials already based on our search

19   warrant executions.

20        One issue with that, as Mr. Garvin mentioned, they

21   haven't been able to access the digital files, and all of this

22   data, with the exception of a very limited set of hard-copy

23   documents that has been released to the taint team, is still on

24   the other side of the wall and we have not even seen it.

25        THE COURT:  OK.

J2kWscoC

```
 1              MR. DIMASE:  That's the main issue.

 2              THE COURT:  Mr. Garvin.

 3              MR. GARVIN:  Your Honor, first, I'd like to say my

 4      understanding is the documentation that Mr. Pike turned over,

 5      which I understand was significant, was turned over before

 6      either a subpoena was issued to Mr. Pike or to Mr. Scott.

 7              MR. DIMASE:  That is correct, your Honor.

 8              MR. GARVIN:  And so, yes, we have one issue, which is

 9      that the government may already be in possession of all

10      documentation, but again, a big portion of this is in the taint

11      team's hand, not in the trial team's hands.

12              The Court has identified one of our issues, which is

13      the fact that it was not necessary to identify Mr. Mark Scott

14      as the records custodian.  We believe that the entity can name

15      a person to diligently search and to certify that the records

16      being produced are responsive; it doesn't have to be the owner

17      of the company.

18              THE COURT:  Well, let me ask you this, Mr. Garvin.  If

19      I direct the government to reissue the subpoenas directed to

20      the companies --

21              MR. GARVIN:  I think that solves one big problem, your

22      Honor.

23              THE COURT:  -- will you withdraw your motion to quash?

24              MR. GARVIN:  Not entirely.  That would solve half of

25      it.
```

J2kWscoC

1      If I may address the other half as to unduly

2  burdensome and overly broad, your Honor?

3      THE COURT:  Mr. Dimase has indicated that he's willing

4  to sit down and speak with you and maybe have you direct him to

5  where in what they have currently he may find these documents.

6  That sounds like something that could be subject to a

7  meet-and-confer on the part of the parties before I muck things

8  up.

9      MR. GARVIN:  It may be possible.

10     I'd like to explain to the Court on the record the

11 issue.  Really, the way the subpoena is addressed, it requests

12 all documents that pertain to -- quote, pertain to -- over 50

13 entities and 12 individuals.  So Mr. Scott has to -- it's not

14 in the documents that were sent to this company or sent back by

15 this company or in the body mentioned in this company.  These

16 are documents that, quote, pertain to.  And in those 50

17 entities, the very entities that are being subpoenaed -- that

18 is, MSS International Consultants LLC and MSS International

19 Consultants (BVI) Ltd. as well as Mark Scott -- are on the

20 list.  So what we have here is we have a subpoena made to two

21 entities to provide all documents that pertain to those same

22 two entities, which obviously, your Honor, would encompass

23 every document that either entity ever created.

24     The way that it is formatted now, it's just

25 unreasonable, and perhaps counsel made a laundry list for all

J2kWscoC

1    subpoenas and didn't realize that in that list are the entities

2    that they are subpoenaing, as well as Mr. Scott who they are

3    designating as the custodian.

4              THE COURT:  Mr. Garvin, there maybe some logical force

5    to your argument, but like I said, this is subject to

6    additional discussions.

7              MR. GARVIN:  Yes, sir.

8              MR. DiMASE:  Two points.

9              I don't want to belabor this issue, but I agree with

10   the Court that there is some logical force to that argument,

11   and we are willing to discuss the entities on the subpoena.  I

12   would say that all the entities, carving out for now the ones

13   that are the actual subject of the subpoena, based on the

14   government's investigation, were associated with the use of the

15   Fanaro funds to launder OneCoin money.  This is not a

16   hodgepodge.  It's based on the government's investigation to

17   date.

18             THE COURT:  Let me ask you this.  Are there other

19   entities with whom these companies did business beyond the

20   40-some that are listed here?

21             MR. DIMASE:  Say that again, your Honor.

22             THE COURT:  Are there other entities with which the

23   MSS companies did business beyond the list that is attached to

24   the rider?

25             MR. DIMASE:  There may be.  There may be, your Honor.

1   I don't know that we know every company that MSS International

2   has done business with.

3              THE COURT:  OK.

4              MR. DIMASE:  And I would note that some of these

5   companies are companies that received what we believe are the

6   criminal proceeds after the laundering was done and then were

7   used to invest Mark Scott's proceeds here in the United States,

8   the buying of houses and things of that nature.

9              THE COURT:  OK.

10             MR. DIMASE:  I guess the bigger point on this issue of

11  the overbreadth, or potential overbreadth, of the subpoena is,

12  based on the government's investigation, these funds were used

13  for the purpose of laundering OneCoin money.  So far, we have

14  not seen evidence that these funds were used for any legitimate

15  purpose.  It may be that every record that is kept by these

16  entities is relevant insofar as the companies were utilized in

17  order to set up these hedge funds or investment funds that were

18  used for laundering money.

19             That being said, we are, of course, willing to speak

20  with and try to come to some agreement on the scope of the

21  subpoena with counsel.

22             As far as addressing it to a custodian as opposed to

23  addressing it to the company, I would note that there is a

24  distinction between those two not in terms of whether they're

25  lawful but in terms of what they might call for.  Focusing on a

J2kWscoC

1    bigger company as an example, like IBM, an employee of IBM

2    could be subpoenaed as a custodian for records they possess

3    relating to the company's business.  They may have those

4    records at home.  They may have them on their personal laptop.

5    They may have them on their personal cell phone.  They may have

6    them in their home office.  Those are records that the company

7    may not have on site at the company, and so there is a reason

8    to subpoena the individual and not just the company to obtain

9    those business records.  Obviously, the government is not

10   entitled to obtain personal records, because the person may

11   have a Fifth Amendment right to assert in that regard, but a

12   person may possess business records.

13          THE COURT:  But a custodian would be required to

14   undertake that due diligence; no?

15          MR. DIMASE:  Certainly, the government could ask the

16   company to attempt to recover from the individual employees

17   documents that are responsive to the subpoena, but there isn't

18   any legal prohibition on the government seeking directly from

19   the corporate employee records that they have in their

20   possession that are corporate in nature, and so I do think

21   there is a slight difference.  It may be a distinction without

22   a difference here, where Mr. Scott is sort of the company, and

23   vice versa, but I do think that there are reasons for subpoenas

24   to be served on custodians and not just the company more

25   broadly.

1          THE COURT:  OK.

2          MR. GARVIN:  Your Honor, there's one last item.  I

3   have more of an inquiry on this, and that is the United States

4   has issued two subpoenas, one to Mr. Pike as records custodian

5   of MSS International and one to Mr. Scott as records custodian

6   of MSS International, the same entity, the same attached rider

7   listing all related entities, virtually identical subpoenas.

8          Our position on that is that there should be one

9   subpoena to the entity that a records custodian selected by the

10  entity is responsible to reply to, not that the government

11  names a person and says, You are the records custodian, and Oh,

12  at the same time you are the records custodian, as to name more

13  than one individual.  But as I said before, I am fully

14  cognizant of the point the Court made, and I absolutely will

15  follow up and we will have discussions with counsel to try to

16  resolve this.

17         THE COURT:  Very well.

18         MR. DIMASE:  I will just say Mr. Pike has already

19  indicated that he does have records in his possession that are

20  responsive, so I think this proves the point of why it is

21  important for the government to serve multiple custodians, and

22  the law does not prohibit it.  The defense has cited their law

23  prohibiting it.  And on top of all that, I think the law is

24  pretty clear that Mr. Scott does not really have standing to

25  challenge a issue subpoenaed to Mr. Pike.

1          THE COURT:  OK.

2          I know that the defense is going to want an

3    opportunity to read the government's submission.  Based on my

4    quick review, it appears that the law does favor the

5    government's position.  However, there appears to me at least

6    some basis for the parties to meet and confer concerning the

7    scope, so do have those conversations.

8        Mr. Garvin, did you want an opportunity to respond to the

9    government's submission?

10         MR. GARVIN:  Your Honor, having not read it, I don't

11   know if I want the opportunity to respond, but in an abundance

12   of caution, may I have seven days to respond?

13         THE COURT:  Certainly.

14         MR. GARVIN:  I will talk with counsel about trying to

15   resolve this.  I see that one of the issues we have, based upon

16   counsel's last remarks, is whether or not the subpoena is to

17   Mr. Pike or if the subpoena is to MSS International.

18         THE COURT:  I think the subpoena is to MSS

19   International.

20         MR. GARVIN:  And there should be only one subpoena to

21   MSS International, and the records custodian is then tapped

22   with the task of getting all of the records, whether that be

23   Mr. Pike, Mr. Scott or some other person.  But that is the

24   gravamen of the argument.

25         THE COURT:  Very well.

1          MR. GARVIN:  Thank you, your Honor.

2          THE COURT:  OK.

3          MR. DIMASE:  Judge, before we address scheduling, I

4     think there's a privilege issue that we wanted to bring to the

5     Court's attention as well.

6          THE COURT:  OK.

7          MR. DIMASE:  Ms. Lozano is prepared to address that,

8     if the Court doesn't mind.

9          THE COURT:  Absolutely.

10          MS. LOZANO:  Your Honor, we received, the government

11     received, a letter from counsel on February 2 specifically

12     asking about the privilege review being undertaken for the

13     materials obtained pursuant to search warrant in both the

14     Massachusetts and Florida residences of Mr. Scott.

15          We have, since last October, produced, up through last

16     week, all of materials which comprise ESI as well as hard-copy

17     documents that the government seized pursuant to those search

18     warrants.  As a footnote, that seizure and those search

19     warrants were executed by taint agents, not the case agents.

20     So we have produced all of that through our privilege review

21     team.  That material has been segregated from the prosecution

22     team, and it is currently under the privilege review team's

23     review.

24          The government responded, and the Court has a copy of

25     the letter.  I'm sorry.  Actually, I don't think -- no, the

J2kWscoC

1    Court does not have a copy of the letter.

2            We responded to counsel regarding the questions of how

3    privilege review was going to be undertaken for these

4    materials.  And in that letter, we indicated that all the

5    materials, which are voluminous, are now segregated from the

6    prosecution team except for a few select, limited documents

7    that we identified by Bates range and item number that had been

8    reviewed by the privilege review team and determined not to be

9    privileged.  They were obviously not privileged.  They were

10   inventories of the search warrant, photographs from the search

11   warrant, photographs of items that were recovered, things like

12   that.  But defense counsel now has a full list of that limited

13   universe of documents.

14           At this point we have asked defense counsel to engage

15   with our privilege review team in order to expeditiously and

16   efficiently identify potentially privileged materials.  And

17   that is something that is routinely done.  We have asked them

18   to identify Mr. Scott, any clients or attorneys or individuals

19   with whom Mr. Scott alleges -- asserts -- that he has an

20   attorney-client relationship, and also to identify for us, if

21   possible, specific folders or devices where potentially

22   privileged materials may be found.

23           Mr. Garvin responded to that request by indicating

24   that Mr. Scott is willing to provide a list of attorneys with

25   whom he believes he has an attorney-client relationship, but he

1    is not at this point willing to provide a list of individuals,

2    clients, with whom he's asserting an attorney-client

3    relationship, nor has counsel provided any sort of indication

4    of what devices, what computers, what folders may contain

5    potentially privileged material.

6          Mr. Garvin has previously asked to move forward with

7    this case quickly and to set an August trial date.  In order to

8    move forward, we have to have counsels' cooperation in terms of

9    identifying clients, attorneys, possible folders, files.  And

10   the prosecution team will not be involved in that obviously.

11   That will be with the privilege review team, led by AUSA Lisa

12   Korologos, and counsel.  So we are renewing that request and

13   emphasizing that it is going to be very difficult to move

14   forward and review this voluminous material without some

15   guidance and participation from counsel.

16         THE COURT:  I'm sorry.  Are you asking me to direct

17   the defense to help you review the documents?

18         MS. LOZANO:  I'm alerting the Court to the request

19   that we have made of counsel in order to give the Court some

20   context about our privilege review process and to respond to

21   counsels' concern that it appears to be taking a long time,

22   which is one of the concerns raised in the letter to us.  And

23   at this point, as is routine in cases when we have potentially

24   privileged materials and this amount of them, it is routine to

25   engage counsel in that process with our privilege review team.

J2kWscoC

1          THE COURT:  OK.

2          MS. LOZANO:  I also note that counsel, in their letter

3    to us, requested that any materials -- going forward, that any

4    materials that were to be released by the privilege review team

5    to the prosecution team, that those materials be identified to

6    counsel and they be given an opportunity to review those

7    materials before they are released to the prosecution team, and

8    we have agreed to do that.  Our privilege review team has

9    agreed that that is the proper way to proceed.

10          One moment.

11          Your Honor, although we are not asking the Court at

12   this point to direct counsel to provide the list of clients or

13   attorneys, because we are hopeful that their interests align

14   with ours in terms of expeditiously and efficiently moving

15   through the privilege review and protecting the defendant's

16   privilege, we may in the future return and ask the Court to

17   direct counsel to do that, if we do not feel that we are moving

18   forward and making constructive progress in this regard.

19          THE COURT:  OK.  Again, it doesn't sound like there's

20   anything for me to do now.

21          Mr. Garvin, you see the issue, or Mr. Nobles, if you

22   want a sooner-rather-than-later trial date.  The government is

23   representing that it's moving as fast as it can, but it can

24   certainly use your help in the privilege process, so what say

25   you?

1          MR. NOBLES:  Judge, just as an initial matter, this

2     request from the government about identifying clients and

3     attorneys just came five days ago, so we are in the process of

4     creating a list of information as it relates to attorneys that

5     Mr. Scott worked with.  We are actively engaged in that process

6     now, and we are continuing to work with them.  We're discussing

7     the issue of clients and anticipate responding to that in some

8     way in the near future as well.

9          I think the issue that the Court, I believe, has

10    identified is that we're more than happy to provide that

11    information, but we don't want to take on the government's

12    burden of their privilege review, essentially.  We are the

13    defense in this case, and we maintain that position, that it's

14    their responsibility to do that.

15         In terms of requests for devices that might contain

16    privileged information, Judge, it would be every one.

17    Mr. Scott was a practicing attorney who would respond to emails

18    via his phone, via his iPad, via his computer.  I mean, every

19    single item that they have in terms of electronic media

20    database devices could potentially and would likely contain

21    some privileged information.  It's just the nature of the way

22    the law is practiced in 2019.

23         THE COURT:  Sure.

24         MR. NOBLES:  To answer their question specifically, I

25    think any device is potentially and likely to contain

J2kWscoC

1    privileged information.  We are working diligently on providing

2    them with the limited information that we've agreed to provide

3    them, and we anticipate doing that probably early next week,

4    certainly sometime next week.  But really, I think the issue

5    that remains is one that the Court is sensitive to, which is us

6    taking on the burden of determining what's privileged, and I

7    think you understand that, so I'll stop at this point.

8              THE COURT:  OK.

9              Trial schedule, Mr. Dimase.  First of all, how long

10   will this case take to try?

11             MR. DIMASE:  It's very hard to say based on the

12   stipulations that the parties may enter into.  We've

13   approximated approximately three weeks, but I think the range

14   is two to four weeks, ballpark.

15             THE COURT:  OK.

16             MR. DIMASE:  Just one last point about this issue.

17   This is really not that big of a difference, but I think we did

18   email requests for attorneys and clients about two weeks ago,

19   not about five days ago.  It is relatively recent, and I

20   appreciate that counsel is trying to get us that information.

21             I would say we really need -- and when I say we, the

22   privilege review team really needs -- a list of both clients

23   and attorneys to effectively engage.  And I had not heard that

24   the defense is prepared to provide information about clients.

25             THE COURT:  OK.

J2kWscoC

1        MR. DIMASE:  Those clients are the ones that would

2   have the privilege, not Mr. Scott, to be clear, but it still is

3   relevant for the privilege team in reviewing the materials to

4   know who the clients are and who the attorneys are.

5        One moment, your Honor.

6        And I would say that in the *Cohen* matter, which

7   obviously has gotten a lot of press, I believe Judge Swain

8   ordered the defendant to provide that information about

9   clients -- I'm sorry, Wood -- about clients and attorneys in

10  order to allow the privilege review team to do its work.

11  Ms. Korologos, who is here at counsel table, has told us she is

12  simply unable to conduct an effective privilege review without

13  that information.

14       THE COURT:  OK.  Well, I'd be interested in seeing

15  Judge Wood's decision in that regard.  I'm not aware, as I sit

16  here, of any authority that would allow me to direct the

17  defense to help the government prepare its case.  But like I

18  said, I'm just anticipating an issue.

19       MR. DIMASE:  We're simply asking not for them to

20  conduct the review but to provide the names of the attorneys

21  and clients so that we can effectively conduct the privilege

22  review.

23       THE COURT:  I understand.  I'm just trying to figure

24  out what the limits of my authority are.

25       MR. DIMASE:  Fair enough.

J2kWscoC

1          And this is something that perhaps the parties can

2     come to some agreement on and won't need to involve the Court.

3          THE COURT:  I'm hopeful.

4          MR. DIMASE:  Yes.  Unless there is a need to involve

5     the Court, it's not our intention to present information to the

6     Court, but if it is necessary, we'll find that ruling and give

7     it to the Court.

8          THE COURT:  Very well.

9          MR. DIMASE:  On trial, your Honor, respectfully, there

10    are some issues with witnesses in August.

11         THE COURT:  There are issues with judges in August.

12         MR. DIMASE:  We understand and appreciate the

13    defendant's desire for a speedy trial.  We want to make that

14    possible.  We are prepared to move forward with the trial in

15    September, if the Court is available, or thereafter.

16         With respect to the specific date, either we could

17    pick one today or we could confer with the defense about our

18    witness availability, their availability, and propose some

19    dates in a letter to the Court, and the Court could order a

20    trial date after receiving that letter.

21         THE COURT:  OK.

22         MR. DIMASE:  But we are committed to working toward

23    setting a trial date.

24         THE COURT:  OK.  Anything further, Mr. Garvin?

25         MR. GARVIN:  Your Honor, I recognize that the parties

J2kWscoC

1  had just said that August would likely present a problem for

2  witnesses and perhaps even the Court.  Is there any possibility

3  that we could move it to July instead of back to September?

4                THE COURT:  Move it up to July?

5                MR. GARVIN:  Yes, your Honor.

6                Would that solve the issue?  I just know that

7  Mr. Scott feels an incredible amount of weight hanging over

8  him, and he's anxious to get to trial, if possible.

9                THE COURT:  Mr. Dimase.

10               MR. DIMASE:  Your Honor, I am personally away the last

11  week of July.  Obviously another AUSA could fill in for me if

12  that was needed.

13               To be clear, Mr. Scott is not in custody.  He's out of

14  custody.  That's not the most important fact, but it is a fact

15  the Court has to consider.  Realistically, the privilege review

16  process and the process of getting these materials reviewed in

17  conjunction with the defense, I think a September date is more

18  realistic, frankly.  But we understand and appreciate the

19  defendant's right to a speedy trial, and if the Court orders a

20  trial sooner than September, we will be prepared to move

21  forward.

22               THE COURT:  Let me speak with Ms. Rivera.

23               The Court is generally available July and August, so

24  why don't we get something in mid or third week in July, going

25  into August.

J2kWscoC

1          MR. DIMASE:  Your Honor, I would just renew the

2     request for the parties to confer and then send a letter maybe

3     this week to the Court about a trial date.  I just want to make

4     sure various witnesses are available.  I think we can

5     coordinate that.

6          THE COURT:  I'm happy to do that.  If you guys can

7     work something out, so much the better.

8          MR. GARVIN:  Thank you, your Honor.

9          THE COURT:  Is there anything else that we need to

10    discuss today?

11         Mr. Dimase.

12         MR. DIMASE:  No.  Nothing else from the government,

13    other than -- well, I think there may be a motion schedule that

14    needs to be set irrespective of the trial date and perhaps

15    another conference related to those motions.  And the

16    government would obviously request that time be excluded until

17    that date.  I'll leave it to Mr. Garvin to suggest a motion

18    schedule at this point.

19         THE COURT:  OK.

20         Mr. Garvin.

21         MR. GARVIN:  Yes, sir.

22         I had mentioned a little earlier about a date for

23    filing motions.  If the trial's going to take place either in

24    July or August, or even September, I think a May cutoff date

25    for the filing of motions would seem realistic.  I don't know

J2kWscoC

1    what May 1 is, but arbitrarily, just picking a number.

2                THE COURT:  OK.  It's a Wednesday.

3                MR. GARVIN:  OK.  May 1 deadline for defense filing

4    motions.

5                THE COURT:  OK.  Three weeks to respond.

6                MR. DIMASE:  That's fine, your Honor.  Thank you.

7                THE COURT:  And one week to reply.

8                MR. GARVIN:  Right.  Thank you.

9                MR. DIMASE:  Your Honor, could we schedule a

10   conference either before, probably more realistically

11   immediately after those motions are filed to determine next

12   steps, whether a hearing is necessary.

13               THE COURT:  First or second week in June, assuming no

14   adjournments.

15               THE DEPUTY CLERK:  June 12 at 11 a.m.

16               MR. DIMASE:  That's fine, your Honor.

17               THE COURT:  OK.

18               MR. DIMASE:  And the government requests the exclusion

19   of speedy trial time from now until June to allow the parties

20   to continue -- for the defense to continue reviewing discovery,

21   deal with the privilege review process, file motions and

22   consider any potential resolution to this case, though at this

23   point that seems rather unlikely.

24               THE COURT:  OK.

25               Mr. Garvin.

J2kWscoC

1          MR. GARVIN:  No objection, your Honor.

2          THE COURT:  Very well.  I'll exclude the time between

3   now and June 12.  For the reasons set forth on the record by

4   Mr. Dimase, I find that Mr. Scott's interests in having those

5   items dealt with outweigh the interests of the public in a

6   speedy and public trial, so the time will be excluded.

7          Now, we have a very quick schedule here, so I hope

8   that that will clear the parties to see their way to agree on

9   some of the outstanding discovery issues.  But I'll leave it up

10  to you all.

11         Is there anything else that we need to discuss?

12         MR. DIMASE:  Nothing from the government.  Thank you.

13         THE COURT:  Mr. Garvin.

14         MR. GARVIN:  Nothing.

15         THE COURT:  We're adjourned.

16         (Adjourned)

17

18

19

20

21

22

23

24

25