1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK

2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                    v.                        17 Cr. 630 (ER)

5   MARK S. SCOTT,

6                                              Conference
                    Defendant.

7   ------------------------------x

8                                              New York, N.Y.
                                               March 18, 2019

9                                              2:00 p.m.

10

11  Before:

12                        HON. EDGARDO RAMOS,

13                                             District Judge

                              APPEARANCES
14

15  GEOFFREY S. BERMAN
         United States Attorney for the
         Southern District of New York

16  CHRISTOPHER DiMASE
    NICHOLAS FOLLY

17  LISA KOROLOGOS
         Assistant United States Attorneys

18

19  NOBLES & DECAROLIS
         Attorneys for Defendant

20  JAMIE NOBLES

21  Also Present:  Julieta V. Lozano, New York County District .
                   Attorney's Office

22

23

24

25

1          (Case called)

2          MR. DIMASE:  Good afternoon, your Honor.  Christopher

3     Dimase for the government.  I'm joined here at counsel table by

4     AUSA Nicholas Folly, Special Assistant United States Attorney

5     Julieta Lozano, and AUSA Lisa Korologos, who is the

6     government's filter team in this case.

7          THE COURT:  Good afternoon.

8          MR. NOBLES:  Good afternoon, Judge.  James Nobles here

9     on behalf of Mr. Scott.  It's my understanding that Mr. Scott's

10     appearance was waived, and given the short turnaround time of

11     this appearance, Mr. Garvin was unable to be here today and I'm

12     certainly here and able to engage in whatever business needs to

13     be done.

14          THE COURT:  Very well.  No one on the phone?

15          MR. NOBLES:  No one on the phone, no.

16          THE COURT:  I called this matter for a conference

17     because I've gotten the letters from the parties.  Last time we

18     were together there was some dispute as to when the trial of

19     this case should start.  The government wanted to start on or

20     after September.  Mr. Scott wanted to start in July.  I advised

21     the parties that I was available starting July 15.  However,

22     since we could not come to agreement, I asked the parties to

23     further consult with each other, confer, and see if they could

24     come to some sort of agreement.  I received the government's

25     letter dated March 8 indicating that the parties could not come

1    to agreement in requesting a September trial date, and a letter

2    from Mr. Garvin indicating that part of what the government

3    said in its March 8 letter was not accurate and that Mr. Scott

4    was very desirous of starting his trial sooner rather than

5    later.

6         I know that since our last conference certainly there

7    has been some additional movement in the investigation that may

8    affect the matters here.  I don't know, but let me look to  in

9    the first instance to Mr. Dimase and tell me where we are.

10        MR. DIMASE:  Your Honor, I would just note that the

11   government also submitted a letter dated March 12.

12        THE COURT:  I did receive that letter.

13        MR. DIMASE:  Very good.

14        In addition to that, just before the conference today,

15   we submitted a very brief letter regarding -- and I don't

16   expect to get deeply into this today, but the attorney list and

17   the client list that has been the subject of some

18   back-and-forth between the parties as well.

19        THE COURT:  I did not get that letter.

20        MR. DIMASE:  OK.  We submitted it.  Actually I have it

21   right here if you'd like a copy.  It's very brief.  I'll hand

22   it up to the deputy clerk now.

23        THE COURT:  I should also note for the record that I

24   did receive a letter under seal as I was just two minutes ago

25   in robing room from Mr.  Nobles.  So I think I have everything,

1    correct?

2         MS. KOROLOGOS:  Yes, your Honor.  And the letter from

3    Mr. Nobles is just the cover letter from the attorney-client

4    list that you provided to the privilege team.

5         It's requested to be filed under seal because the

6    defense's request that it not be disclosed to the prosecution

7    team and it has not been disclosed yet.

8         THE COURT:  So this letter came from Ms. Korologos to

9    me.

10        MS. KOROLOGOS:  I attached that in an e-mail.  It

11   originally came from the defense and I just forwarded it to the

12   Court at the request of the prosecution team in the letter that

13   was filed a few minutes ago.

14        THE COURT:  Very well.

15        So Mr. Dimase or someone from the prosecution team,

16   why don't you tell me what, if any, effect the recent

17   superseding indictment has with respect to what we're about to

18   discuss this afternoon?

19        MR. DIMASE:  Judge, so there's been a complaint filed

20   against Mr. Ignatov, I presume that's what the Court's

21   referring to as privilege.

22        THE COURT:  Correct.

23        MR. DIMASE:  There's also been an indictment charging

24   Ms. Ignatova, who remains at large that was unsealed.  As far

25   as the charges against her at this point she's not been

1    apprehended and she's not here before the Court to potentially

2    be joined in the trial with Mr. Scott, at least not today.

3    　　　　　As far as Mr. Ignatov, it's too early for the

4    government at this stage to say whether or not it will be

5    superseding Mr. Ignatov into an indictment that charges

6    Mr. Scott.  Mr. Ignatov has been charged by a complaint.  He's

7    not even here in the district yet.  He hasn't seen a judge in

8    the district yet.  So we have not made any final decisions

9    about whether he may be superseded in this case, but it is a

10    definite possibility.

11    　　　　　THE COURT:  Even if he is, is there any thought that

12    Mr. Ignatov's lawyer or lawyers would come up to speed in this

13    case, which by all accounts has an incredible amount of

14    documents and time for Mr. Scott to see a trial any time soon?

15    　　　　　MR. DIMASE:  Your Honor, I think what this boils down

16    to is an issue about proper joinder and the potential of a

17    severance motion based on speedy trial issues.  That's sort of

18    where I think it goes legally speaking.  So I believe that the

19    offenses would be properly joined.  We can have that argument

20    another day, but they relate to the same underlying wire

21    conspiracy.  The money laundering is directly related to that

22    offense.  I think they would be properly joined under the rules

23    of federal criminal procedure.

24    　　　　　Then the question is would the Court after hearing the

25    parties out grant a severance motion for Mr. Scott to have his

1    trial earlier than Mr. Ignatov based on speedy trial concerns.

2    And this is all hypothetical obviously.  That's, I think, the

3    way it plays out.  And I think the government's arguments would

4    be fairly strong that the two should be tried together, that if

5    anybody has really a more substantial speedy trial argument

6    it's Mr. Ignatov, who at least at present is detained and in

7    custody, whereas Mr. Scott is not and that there would be

8    substantial efficiencies for the Court, for the public in

9    trying the two defendants together because of the substantial

10    overlap in evidence.

11        That being said, it would be the Court's decision

12    after reviewing the parties' arguments whether to grant such a

13    severance motion.  That would depend in the first instance on

14    government deciding to bring Mr. Ignatov into the same

15    indictment.  So that's the lay of the land, as I see it.

16        THE COURT:  Now, I believe that I had e-mailed you all

17    a request that the parties be prepared to discuss the speedy

18    trial clock.  So what can you tell me about where we are there?

19        MR. DIMASE:  We are prepared to address that.  I just

20    want to make one very, very brief point on the letter that was

21    submitted today, the cover letter that you just read, your

22    Honor, that was handed up, it pertained to the list and letter

23    that Ms. Korologos submitted to the Court.  And by the way, as

24    I said, that letter was originally sent by Mr. Nobles to

25    Ms. Korologos and she submitted it to the Court.  So it's

1    clear.  This really underscores our concerns about the

2    privileged litigation in this case, the complexity and the

3    time-consuming nature of it.  The parties aren't able even to

4    come to agreement on the basic issue like sharing a list, which

5    we believe it's pretty black letter law, there is no basis to

6    withhold it from the prosecution team.  We have not seen it

7    because we have so far adhered to the defense request that it

8    not be shared.  And we'd now ask the Court to intercede.

9            But the reality is the government cannot effectively

10    litigate crime-fraud motions and other important motions that

11    may well necessitate the in camera review the documents by the

12    Court without having a privilege log that contains the names of

13    the individual with whom Mr. Scott is in contact.  And

14    privilege logs are pretty standard.  There's nothing unusual

15    about them, they contain clients and attorneys name and some

16    information about the date, the time and so forth of the

17    e-mail.  And that information is critical, not just to the

18    taint team, but to the prosecution team to make arguments about

19    crime-fraud, and I think there's really no basis to be withheld

20    under the law.

21            I say all that not to ask the Court to render a

22    decision today, but we're at the very first step of this in

23    terms of even getting an agreement on the client list, and at

24    the same time Mr. Scott is attempting to push a trial in July.

25    I just don't think those two things are consistent with one

1    another.  There's going to be a lot of litigation over

2    privilege.  It's not just Mr. Scott's privilege, it's the

3    privilege of other people including his clients.  These are

4    serious matters that need close attention and a July trial date

5    for, among other reasons, is unrealistic with the current state

6    of play here on privilege issues.  We are fully prepared to

7    address the speedy trial concern that your Honor raised, but I

8    wanted to make that clear.

9              THE COURT:  Let me ask this, mechanically, and

10   hopefully I won't have to get into this, at least not for a

11   little bit, but mechanically, how does this process work?

12             Ms. Korologos, if you can just explain to me the

13   significance of the inability to share the information with the

14   prosecution team.

15             MS. KOROLOGOS:  Yes, your Honor.

16             We have right now approximately almost 200,000

17   documents on the database and I think four or five phones and

18   iPad.

19             THE COURT:  Could you move closer to a microphone.

20             MS. KOROLOGOS:  So with regard to the defendant, the

21   search warrant proceeds right now we've loaded them on the

22   Relativity database.  There's almost 200,000 files, documents.

23   In addition, we have a number of devices.  We plan to review

24   those and produce those as UFED Reports, meaning, there will be

25   around 400,000 or so documents.  What we typically do is we

1    take the list of attorney and clients, we run the names and we

2    try to segregate out the ones that could be potentially

3    privileged because they hit on those terms from the ones that

4    don't hit.

5              In this case, defense counsel has requested that

6    before any documents out of these 400,000 or so are turned over

7    to the government, they have an opportunity to review them and

8    decide whether or not they're privileged, which is a big ask

9    and very time-consuming. In the *Cohen* case, there were 400,000

10   documents. And Michael Cohen's lawyers were able to review

11   them all working 24 hours a day overnight, very, very intense,

12   by using the attorney-client list. The government endeavors to

13   make it more efficient for defense as well as for the

14   government by focusing in on those documents most likely to be

15   privileged that we need to determine and also potentially

16   responsive.

17             There are a number of clients on the defense counsel's

18   client list that may not have anything to do with the issues in

19   this case. If the government knows about those clients and

20   they agree, yes, those clients have nothing to do with those,

21   we would keep those as potentially privileged. We wouldn't be

22   required to review them, because they would be arguably

23   nonresponsive. And although it's not the privilege team's role

24   to decide responsiveness, in that type of a situation, we can

25   negotiate certain types of documents are put to the side.

1       THE COURT:  So in other words, if you have a client

2   list from Mr. Scott that has 50 names on it and you're able to

3   share that list with the prosecution team, they could tell you,

4   yeah, there's 50 names, we only care about these five.

5       MS. KOROLOGOS:  That's correct.  And if you look at

6   the list, there are names that could be completely unrelated,

7   but I don't know that.

8       The other issue in this case that really makes a big

9   difference with regard to the privilege review is the

10  crime-fraud motion.  We're talking hundred of thousands of

11  documents.  Rather than go document by document, if there's a

12  crime-fraud motion, if the government makes a crime-fraud

13  motion that any communications with respect to blank company,

14  if privileged are subject to the crime-fraud motion, we're able

15  to identify those and create a crime-fraud log and we would

16  then -- this is what we do in the other cases I have in this

17  district we create a crime-fraud log which I then share with

18  defense counsel, and we then try to negotiate sometimes with

19  the Court's help, which documents we believe are covered by the

20  court ruling, should the Court rule in the government's favor

21  this category is excluded.

22      Judge Castel did that in *United States v. Fisher*.  He

23  found that any communications regarding the litigation that was

24  at issue in this case, if privileged, were subject to the

25  crime-fraud motion.  That allowed a great volume of documents

1   to go over the wall, be declared nonprivileged without a

2   case-by-case basis.  If that's going to happen, the government

3   has indicated they do intend to make a crime-fraud motion, they

4   the sooner they to that the better.  It avoids a lot of the

5   reviewing piece-by-piece

6           THE COURT:  And they won't be able to do that without

7   knowing the names on that list.

8           MS. KOROLOGOS:  It will be much more difficult for

9   them.  They'll have to guess at what may be on the list.  And

10  under the leading Supreme Court case, *United States v. Zolin*,

11  the prosecution team's needs to make a *prima facia* case that

12  there's a crime of fraud and that the communications at issue

13  are in furtherance of the fraud, of the crime.  And in order to

14  argue that these communications are in furtherance, they need

15  to know who's communicating with who in a situation where they

16  could be subject to privilege, because they don't need to make

17  a crime-fraud motion if there's no subject of privilege.

18          And this case is made a little more both difficult and

19  then potentially less difficult in that the defendant for a

20  period of time after he left Locke Lord stopped, at least with

21  the activities involved that are charged, doesn't appear to

22  have been practicing law.  So again, there are areas where we

23  maybe able to categorize certain types of communications as not

24  legal advice and have those deemed either upon negotiation with

25  defense or with the Court's assistance.

1          THE COURT:  This is so you pick a date when he stopped

2     practicing law, let's say, say, OK, these communications going

3     forward are not subject to the privilege.

4          MS. KOROLOGOS:  And with respect to certain subjects.

5     Perhaps he's helping out somebody on a trusts and estates

6     matter on the side, but with regard to let's say the Fenera

7     funds, which are alleged to be one of the vehicles for money

8     laundering in the indictment, if there's either a determination

9     that those communications are not privileged, but if privileged

10    are subject to the crime-fraud motion, that takes away a lot of

11    the document by document review.

12          And some Courts, if possible, like Judge Castel did,

13    will make a subject matter determination, everything with

14    regard to, let's say the Fenera funds.  In some cases, the

15    judges will want to go through and do an in camera case,

16    document by document.  And again, that is something where the

17    privilege team would create a crime-fraud log, circulate it to

18    the prosecution team, who often can look and see, oh, on that

19    date and that date, those two people communicating, that was

20    the same day as a wire transfer, that would arguably within the

21    crime-fraud exception that they're articulating.

22          I realize that's a long winded explanation, but there

23    is -- given that defense wants to look at every single document

24    before its release to the government, anything we can do to

25    move the efficiency forward and allow the government to ask

1   questions about responsiveness and, in addition, the

2   overbreadth of the list that I sent to the Court, there are a

3   number of –– it appears very overbroad.  We have asked them to

4   narrow it down.  They said they're not inclined to do that.

5   The broader it is, the more hits they're going to be, and

6   there's going to be more litigation requiring more review,

7   especially with regard to some of the clients' names that are

8   potentially involve in the litigation here.

9          There's also issues that there –– although sometimes

10  it's unclear what the defense is really arguing here, because

11  with regard to the attorney list, the government –– I'm not

12  aware of a basis to withhold any of the attorneys.  There's a

13  very limited Fifth Amendment right to withhold the name of an

14  attorney, but that situation has not been articulated here and

15  it doesn't seem to be applicable.

16         MR. DIMASE:  Your Honor, just to be clear, that's the

17  *Vingelli* case that we cite in our letter.  It's a Second

18  Circuit case.  It was relied on by Judge Wood in *Cohen*.  There

19  have been special, unique circumstances to justify withholding

20  an attorney list.  We just haven't been apprised.

21         MS. KOROLOGOS:  There needs to be –– the standard is

22  that the disclosure would disclose privileged, confidential

23  information?  And that just doesn't seem to be –– I don't see

24  any of the clients attorneys listed that would ––

25         THE COURT:  So is it your belief that any name of an

1    individual or entity on the list that Mr. Nobles has provided

2    to you is not privileged?

3         MS. KOROLOGOS:  It's our position, yeah, that none of

4    the names are privileged.  I'm aware of no basis why there

5    should be a privilege for any of those names.

6         THE COURT:  Anything on the list?

7         MS. KOROLOGOS:  Anything on the list.

8         THE COURT:  Mr. Nobles, I'm told by the government

9    that it's fairly settled black letter law that the list be

10   provided which Ms. Korologos says not privileged.

11        MR. NOBLES:  Judge, I haven't seen any black letter

12   law that says this type of list should be provided.  We're not

13   necessarily arguing that the list itself is privileged, but I

14   think this is a unique situation in which the only person who

15   could create this list is Mr. Scott.  His lawyers don't know

16   who his clients were, don't know who some of the lawyers were,

17   and they couldn't have obtained this information from my client

18   by compelling him to testify about it.  He's a defendant in

19   this action.

20        THE COURT:  Could I stop you there.  He was a partner

21   at Locke Lord, right?

22        MR. NOBLES:  Correct.

23        THE COURT:  My recollection from big firm practice was

24   there was a computer database with every client, every attorney

25   who was responsible for that client and every attorney who

1   worked for that client, why necessarily would it have to come

2   from Mr. Scott and not his former partners?

3         MR. NOBLES:  Judge, the relationship between Mr. Scott

4   and Locke Lord is a little strained at the moment, given the

5   fact that he's been indicted and that their firm also

6   represented at least Ruja Ignatov who's also been indited here.

7   I think it's a pretty chilly relationship between the two of

8   them.

9         In addition to that, the thought or suggestion that

10  Mr. Scott stopped practicing law after that is inaccurate.

11  He's not practicing now, but mostly because all of his clients

12  are aware that he's under federal indictment.

13        THE COURT:  When did he leave Locke Lord?

14        MR. NOBLES:  He left Locke Lord, I don't know if I can

15  tell you exactly, Judge.

16        MR. DIMASE:  I know, your Honor.  It was about, I

17  think he left in August 16 and officially was separated in

18  September and it took a couple weeks.

19        THE COURT:  Of 2016?

20        MR. DIMASE:  Correct.

21        MR. NOBLES:  Judge, they initially, just by way of

22  information, we had been contacted about this in early February

23  about a list.  We provided a list.  We were then contacted and

24  said -- we tried to make it very thorough because obviously we

25  thought they probably would want to know who all the clients

were and who all the lawyers were, that's what they had asked
for.  They responded back with a request for more information
as it related to the relationships that he had with some of the
lawyers, whether he was cocounsel or whether he actually
represented individuals or was represented by those lawyers,
which we provided.

They also asked for information relative to the
clients.  And I don't know what list you have, Judge.  It
sounds like you might have the list with just names, but
there's a secondary list that gives a little bit more
information about two who those lawyers are representing, and
it also gives information relative to which of the clients
Mr. Scott either did or does have a business interest in.  We
provided that information as well.

Judge, obviously at some point in time there's going
to be a privilege log that's going to give information to the
government about what documents are privileged.  And I think at
some place down the road it may make sense and we may agree if
the Court doesn't order it prior to that, to disclose the list,
but at this point in time, Judge, we take the position that
this is the government's responsibility, we've been as
cooperative as we can be, I can't disclose exactly why we don't
want to disclose the list.  We don't have to do that with the
defense.

But Judge, I've not seen any law that says that the

1    trial team is entitled to the list.  In all of our early

2    negotiations or discussions, it was posed to us that the taint

3    team needed the list.  And based on conversations with

4    Ms. Korologos, that made sense, we understand they need to

5    search these terms and do these things.

6            To the extent the government wants to argue that they

7    can't make a crime-fraud motion at this point because they

8    don't have the list really doesn't make a lot of sense to me

9    given the fact that they investigated this case for what

10   appears to be a year and a half before Mr. Scott's arrest, it's

11   been six months since his arrest, anyone they're making a

12   crime-fraud motion with would have to be the company or person

13   that they're aware of already.  So I don't really see the need

14   for that information for a crime-fraud exception motion.

15           Judge, I also learned, and I think this is an

16   important note, they seized, as you know, all of its papers,

17   all of his computers back on September -- I don't know if it

18   was 4th or 5th, but one of those days.  And they never

19   requested any information from us until the beginning of

20   February.  Again, I've outlined what we've complied with.  And

21   I may have misunderstood this, but when I was speaking with

22   Ms. Korologos today, it's now my understanding that the taint

23   team hasn't begun to review Mr. Scott's information.  So the

24   government's had a vast amount of time here to be working on

25   this issue.  They've never requested our help until about five

1    weeks ago.  We've attempted to help the taint team in the ways

2    that we can, but Judge, I just don't feel as though it's

3    necessary for the trial team to have a list that gives them

4    other information, potentially other witnesses they want to go

5    talk to.  It's not our responsibility to give them that

6    information, in my opinion.  Obviously if the Court feels

7    differently and orders disclosure, then we'll deal with that

8    and comply with any order that the Court makes, but I just

9    don't see that it makes sense for us to be doing the

10    government's job for them.

11        THE COURT:  Ms. Korologos, do you need anything else

12    from Mr. Nobles, other than what he's already provided from the

13    defense team?

14        MS. KOROLOGOS:  Well, what would be helpful, again,

15    our job we're taxed with and we generally working with defense

16    counsel to work together to protect the defense -- the

17    client -- the defendant's privilege as well as those of his

18    clients.  So it is helpful when we have a list that is -- that

19    makes sense.  And it's hard for me because I don't want to

20    disclose some of the entities on the list in front of the

21    prosecution team because they've requested that I do not, but

22    there are entities and individuals on the list, the very long

23    list that will make it hard for us to determine the scope of

24    the privilege.  There is -- and to make this go -- to be

25    effective, I need to understand, there's situations there where

1    it appears that the client is representing himself.  And that's

2    not generally, you know, that's not a privilege that -- I would

3    negotiate with defense counsel, but it's difficult to do, so

4    when we are sort of at the stand -- but I will be running this

5    very broad list of terms and producing documents to defense

6    counsel and endeavoring to engage with them, but it will slow

7    down our ability to get the documents to the government and I

8    think their ability to know which attorney-client relationships

9    they need to address in their crime of fraud motion, which I

10   think is important for them to be able to articulate a *prima*

11   *facia* case in their crime-fraud motion.

12          THE COURT:  Is it the case that the taint team has not

13   begun the process of reviewing work?

14          MS. KOROLOGOS:  That's not accurate.  As the Court is

15   aware, this is a very broad case that's been investigated for

16   quite a while.  There are approximately a million documents

17   that we've been reviewing and we have produced -- and we are

18   still reviewing now to Mr. Scott, all the e-mails from all the

19   other search warrants that the government has done that involve

20   Mr. Scott.  We have to then review those.  Before we disclose

21   them to Mr. Scott we have to make sure and redact them if they

22   then contain privileged information for a different entity.

23          So we're not just protecting Mr. Scott's privilege,

24   but all the different defendants, witnesses, everybody in the

25   case.  So we are -- we have been -- this privilege review has

1   been ongoing.  We just -- and before we Bates stamp and produce

2   and segregate these documents, we want to do it in a way that's

3   most effective.  At this stage, if we run all these documents

4   most of the documents are going to be deemed as potentially

5   privileged and will require defense counsel to review them

6   carefully for litigation.  We were hoping to narrow that down.

7   If not, then we'll just have to proceed with the broad list.

8           With regard to defense's arguments, there may be

9   certain of those attorneys or clients that he could make some

10  sort of argument with.  I don't know.  I don't have any reason

11  to believe they have a compelling argument, but just to take

12  four pages of clients and attorneys and say that he shouldn't

13  have to disclose any of those without any sort of

14  particularity, I haven't had that happen in any other cases.

15  Generally defense counsel do give me a list of their client --

16  their client's lawyers, any irrelevant litigation they want the

17  government privilege team to segregate out.  We are trying to

18  move forward on this with what we have, but it's going to be

19  very slow and labor intensive, especially for the defense.

20          MR. DIMASE:  Judge, just a couple of points.  I take

21  the defense position about the execution of the search warrants

22  being the government's responsibility.  The law is very clear

23  that it is the defendant's burden to demonstrate privilege.

24  And without the case team being able to even see the list, it's

25  difficult for us to assess and help -- provide information

1    needed by the privilege team to litigate the overbreadth of the

2    list.

3           And with a crime-fraud motion, we're kind of shooting

4    in the dark not knowing whether we even need to make a

5    crime-fraud argument, if we don't know that that individual or

6    entity is being designated as a client or an attorney.  And if

7    the end, it really isn't a matter of will Mr. Scott wants to

8    turn it over or not, it's whether or not there is a valid Fifth

9    Amendment privilege that allows him not to turn it over, and

10   the answer is, if it's an attorney of his, he has to point to

11   some special circumstance, which we've not heard as to why that

12   information would be privileged.  That's the *Vingelli* case and

13   *Michael Cohen*.

14          And with clients who would have -- it's not even his

15   privilege, it's somebody else's privilege.  And again, he would

16   have to articulate some reason why, some special circumstance

17   on behalf of that client for why it's covered by the Fifth

18   Amendment.  I guess the *Vingelli* standard would apply there,

19   but he's now doing it on behalf of a third party, not himself,

20   and there hasn't been any articulation other than he doesn't

21   want to provide it.  That's not a basis to withhold it under

22   the Fifth Amendment.

23          THE COURT:  But if it's a third party and it's his

24   client, wouldn't he have an obligation to attempt to preserve

25   the privilege for the client?

1          MR. DIMASE:  Your Honor, I'm not arguing that he

2     couldn't make the argument that there's some special

3     circumstance, but he hasn't done that, there isn't -- he's

4     provided no basis for withholding the information for himself

5     with respect to his attorneys and for his clients with respect

6     to his capacity as an attorney.  There's been no articulation

7     of the special circumstance.  The law says otherwise, these

8     names are simply not covered by the Fifth Amendment privilege.

9     And it's not his statement when he gives us what his attorneys

10    give us a list of the attorneys and the clients.  It's his

11    attorneys and his attorneys giving us that information.  So

12    it's not a statement made by the defendant himself.

13         Bigger picture, I think this all just underscores the

14    nature of the privileged litigation in this case, the

15    complexity of it, and how it's likely to proceed.  And given

16    the voluminous nature and materials, as I said before, I think

17    this is one reason why a July trial date is unrealistic in this

18    matter.

19         THE COURT:  Well, on the privilege issue, obviously I

20    was just given a letter from the government as I took the bench

21    which cites to some cases.  I was also handed a case, I guess

22    from the government, *United States v. Bilzerian* reported at 926

23    F.2d 1285 (2d Cir. 1991). I remember the name of the case.  I

24    don't recall whether I read it, but if I read it it was some

25    years ago.  I don't know, Mr. Nobles, have you had an

1    opportunity to review either this case or the government's

2    letter?

3          MR. NOBLES:  Judge, I was handed the letter in court

4    by your clerk.  I did read it briefly.  I have not had any

5    opportunity to look at the case.

6          Can I back up for just one moment and say one more

7    thing about the list because I think it's important?

8          THE COURT:  Sure.

9          MR. NOBLES:  Judge, we're not taking the position that

10   this information is privileged and the government shouldn't hey

11   it.  We're taking the position that we gave it to the

12   government, we have it to the taint team.  We've complied with

13   the request.  We're trying to help them in this process.  I

14   think it's a different question as to whether or not it should

15   be disclosed to the trial team.

16         THE COURT:  I guess, Mr. Nobles, I'm not understanding

17   the distinction you're making.  You gave to the taint team and

18   it's up to the taint team to make sure that the government

19   doesn't receive any privileged information that it ought not

20   get.  It's the government's view and I don't know that you have

21   a different one that the list itself is privileged information

22   that the prosecution team ought not get.  And if that's the

23   case and that's going to move -- look, I'm going to give you

24   some time just so that you comply with your obligation to read

25   these cases and make an analysis.  Why don't you just agree to

 1   give them the list?

 2         MR. NOBLES:  Judge, the other point I wanted to make

 3   as it relates to the list, they continue to say they believe

 4   it's overbroad.  This goes for a period of four years.  There's

 5   24 clients on the list.

 6         THE COURT:  If that's many clients, it's that many

 7   clients, that's going to determine the breadth of it.

 8         MR. NOBLES:  The reality is and the reason there's so

 9   many lawyers is that Mr. Scott engaged a number of people.

10   This is an international business transactions that did

11   business deals in the UK and Ireland and Germany and other

12   places.  And there was compliance and a lot of lawyering that

13   needed to be done involved in those processes.  So I don't

14   think that the length of the list should be a surprise.

15         THE COURT:  I think that's right, and I think it might

16   also help not only the taint team, but your client, Mr. Nobles,

17   if the prosecution team were able to look at the list and say,

18   OK, look, we're not interested in most of these people, so

19   let's just concentrate on these five or ten names and entities

20   and we'll go from there.

21         But like I said, did you want to submit something over

22   the next day or two?

23         MR. NOBLES:  Judge, absolutely.  I need to speak to my

24   client and also my cocounsel about what took place today and

25   what we're going to do from here.  Again, I've just been given

1   this case.  I haven't had a chance to look it.

2            MR. DIMASE:  Just to be clear, the Bilzerian is on

3   point.  It's about the use of the attorney-client privilege as

4   a "sword and shield."  That's the only point.  Obviously

5   Mr. Nobles should have a chance to review it and write in

6   response to it if he sees fit.

7            But the more general idea that the defendant is

8   looking to shield the government from even seeing the list of

9   attorneys and clients, let alone any of the information passing

10  between them, and then over the course of terabytes of data,

11  but also seeking to have a very quick trial date, that creates

12  this tension.

13           And I think Mr. Nobles' own explanation of this case,

14  Germany, Cayman Islands, Ireland, UK, we don't dispute that.

15  The defendant committed this crime over a long period of time

16  in many different countries with complex bank accounts, hedge

17  funds, lawyers, accountants, auditors, and it is a complex

18  case.  With the privilege issues and all of the international

19  witness issues we've raised, a July trial date is not

20  realistic.  So that was the point of *Bilzerian* case.

21           THE COURT:  OK.

22           Speedy trial.

23           MR. FOLLY:  Your Honor, the full clock remains.  So

24  there's still 70 days on a speedy trial clock.  We're happy to

25  address the reasons that we think a continuance would be

1   appropriate in this case, but I know your Honor had requested

2   through your deputy just to know how much time was left, and

3   that's how much time is left.

4           THE COURT:  Let me ask you this.  I take it we're

5   tolled even today.  What's the basis for the tolling as we sit

6   here?

7           MR. FOLLY:  Your Honor has tolled it, I believe

8   through the next June conference date in order to give defense

9   counsel adequate time to review discovery and file any

10  appropriate motions in this case.

11          THE COURT:  So you want to talk about the continuance.

12          MR. FOLLY:  Yes, your Honor.  The government's

13  position is that the Court has broad discretion in granting a

14  continuance and that the ends of justice would be served in

15  this case in granting a continuance through July, I mean

16  through September.  We've discussed at length the myriad of

17  issues that have arisen already in this case, thus far in terms

18  of the review of privileged material, the voluminous nature of

19  it, the complexity of the issues associated with the review of

20  that privilege, the government's anticipated crime-fraud

21  motion, and all of those reasons provide a basis under the

22  Speedy Trial Act for granting a continuance through September.

23          On the issue of the public interest here, not just the

24  defendant's interest, both are factors.  And there is an

25  interest for the public in having this trial occur in

1    September, in part because that will ensure that the parties

2    and the Court are able to adequately protect the

3    attorney-client privilege of clients that are not even parties

4    in this case.  And that will ensure that that review can be

5    conducted thoroughly, that there is no rushing through and

6    handing over hundreds of thousands of documents for defense

7    counsel to somehow get through in the speed at which they'd

8    have to get through those documents and provide a response to

9    the government in advance of a July trial date.

10            Your Honor, other courts have found that similar

11   circumstances did -- that the ends of justice were served in

12   similar circumstances such as those presented here.  We'd be

13   happy to follow up with the letter to your Honor after this

14   conference citing those cases.

15            THE COURT:  That would be helpful.

16            MR. FOLLY:  We'd be happy to do so, but what it really

17   boils down to is that a trial date that is in July would not

18   serve the public interest.  It would not give the parties in

19   this case adequate time to address all of the complex privilege

20   issues that exist here.  It would also not give the government

21   adequate time to ensure that the relevant witnesses, many of

22   whom, as we just discussed are not located within the United

23   States, can be here and be present at the trial.  All of those

24   reasons provide a basis to exclude time between now and

25   September.

1          THE COURT:  Thank you.

2          MR. DIMASE:  I would just add, there is a potential

3     witness in the Cayman Islands who we are trying to work to call

4     on trial.  And it may be that a Rule 15 deposition would be

5     required of him, of that witness in the Cayman Islands rather

6     than securing somebody at the trial itself.  And that alone

7     could take significant time to arrange and participate in such

8     a Rule 15 deposition.  We're not sure about that yet, but that

9     is a possibility.

10          THE COURT:  It's not that difficult to get to the

11     Cayman Islands.  Why would that take a significant amount of

12     time to prepare?

13          MR. DIMASE:  Well, in my experience, defendants often

14     fight these depositions and litigate them, but they may not

15     here.  I don't know.  But I've certainly litigated Rule 15

16     motions before the Court where the defense has aggressively

17     litigated against taking a person's deposition, and that is

18     actually the time-consuming part of it.

19          MS. LOZANO:  In addition, your Honor, we don't even

20     have an answer yet from this witness about his position on

21     whether he will come voluntarily to testify or whether we need

22     to do a Rule 15 because we need to, as with our other

23     international witnesses in the UK, Ireland, Caymans, often we

24     need to work through the central authority, through our office

25     of international affairs, sometimes through MLA requests, and

1    always keeping in mind that foreign jurisdictions have

2    different laws regarding privacy and confidentiality and we

3    have to take all of that into account.  So even getting to the

4    point where we know whether we'll need to do a Rule 15 is a

5    time-consuming process just by virtue of the fact that we're

6    dealing with foreign jurisdictions and witnesses located there.

7              THE COURT:  Mr. Nobles.

8              MR. NOBLES:  Judge, there are a few points I'd like to

9    make.  First, I know the government continues to ask for a

10   September trial date.  It was my understanding, and correct me

11   if I'm wrong, but the Court is unavailable in September, and so

12   if this doesn't happen July 15, I think we're at least looking

13   at October.  I don't know exactly when even then.

14             THE COURT:  October 7.

15             MR. NOBLES:  So that's a significant period of time

16   for our client.  He's in a very difficult financial position.

17   He's been unable to get clients.  His assets have been frozen.

18   His mom has stage four cancer in Germany.  He'd very much like

19   to see her.  And quite honestly, a couple of months might make

20   a difference there.  These are real serious issues.

21             Judge, the reality of the situation is this case has

22   been going on for six months and a July 16 trial date is four

23   months from today.  I understand the arguments that the

24   government has made.  However, there's been a lot of time

25   that's gone by here that these issues could have been resolved

 1   or maybe we could be further along here.  Judge, it's our

 2   position that our client has a right to a speedy trial.  He has

 3   made his position very clear and his lawyers in terms of why he

 4   wants it and he wants it as soon as possible.

 5          And Judge, I'm not in a position, -- let me just back

 6   up to the clock for one moment as well.  It doesn't much

 7   matter, but I do think there were three days that were not

 8   excludable in the beginning of this case.  I reviewed the

 9   transcripts this morning.  I wasn't here on those court dates,

10   but between the time Mr. Scott saw the magistrate and saw you,

11   there was no consent or no stopping of the clock.  At that

12   point my client was in custody.

13          THE COURT:  So we would have 67 days.

14          MR. NOBLES:  That's not a real big difference, and I

15   understand that, but I just wanted to make the record clear.

16          But Judge, I think the position Mr. Folly put on the

17   record is not exactly accurate.  We waived the time until

18   June 15.  If the Court wanted to do motions faster and have an

19   earlier argument date, we're completely fine with, we'd be

20   prepared to do that.  Judge, I'm not in a position where I can

21   continue to consent to a waiver of the Speedy Trial Act.

22          THE COURT:  I understand that.  Back in the day, I

23   meant to read the statute again before coming up here.  I

24   didn't have the time, but there was a provision in the Speedy

25   Trial Act that allowed for the designation of a particular case

1   as complex.  I forget exactly what the outlying minutes of

2   those provision are, but it essentially takes the case law of

3   the speedy trial Law.  I was involved in several cases that

4   were designated complex, and it seems to me just from this

5   conversation that this case would probably easily pass that

6   test.

7          All this is to say, Mr. Nobles, this is a big case.  I

8   do not by any means mean to minimize what it must be for your

9   client to be under the cloud of an indictment.  I can imagine

10  that he would want to get all of this over with as soon as

11  possible, but in the scheme of things, another three or two and

12  a half or three months on a case of this size, of this

13  complexity, with these many moving parts would not seem to be a

14  severe burden on your client as it otherwise might be.

15         MR. NOBLES:  Judge, I think only he can really judge

16  what the impact is on him.  I certainly understand his

17  position, particularly as it relatings to his mother.  I mean,

18  she cannot travel here.  She's got stage four cancer.  He was

19  born in Germany, she resides in Germany, and he can't go there.

20   So I understand a month or two may make a difference in that

21  scenario.  I don't have the exact prognosis in terms of the

22  life expectancy, but I do know that there is one.  I don't know

23  exactly what it is, and I do know it's stage four cancer.  So

24  that, I think, is one of the things that is driving him, and

25  appropriately so, to be fighting to get as early a trial date

1    as possible.

2            THE COURT:  And also obviously there is not only the

3    prosecution and defense and the public interest, but there's

4    also the Court's schedule.  And as I've indicated, as I sit

5    here, Mr. Nobles, I am inclined to grant the later trial date,

6    but I'm going to await the submission by the government.  And

7    if you want to respond to their submission, you're more than

8    welcome to.

9            MR. NOBLES:  We'll certainly reserve that right.  If

10   we're not going to respond, we'll let you know.

11           THE COURT:  That will be very helpful.

12           So I guess that's where we are.  We start either on

13   July 15 or October 7.

14           Is there anything else that we needed to do today?

15           Mr. Dimase.

16           MR. DIMASE:  Your Honor, I guess what the Court was

17   referring to was 3161(h)(7)(B)(2), which talks about the

18   complexity of a case and the speedy trial clock and how that

19   interaction works.

20           I would say that under the Speedy Trial Act itself, I

21   know that the Court's schedule specifically is a factor under

22   the act, but I think we have many arguments as to why this case

23   is complex and that even October 7 date is perfectly reasonable

24   in light of the complexity of the matter.  We'll submit a

25   letter to that effect.

1             THE COURT:  Very well.

2             Anything else?

3             MR. DIMASE:  Nothing from the government, your Honor.

4             MR. NOBLES:  Nothing further.  Thank you, Judge.

5             THE COURT:  We're adjourned.  Thank you very much,

6    folks.

7             Adjourned)