UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

  UNITED STATES OF AMERICA      :
                                     :

          - v. -             :

                                     :   S6 17 Cr. 630 (ER)

  MARK S. SCOTT,            :

                                     :

             Defendant.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

## THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT MARK S. SCOTT'S PRETRIAL MOTIONS

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York
Attorney for the United States of America

Christopher J. DiMase
Nicholas Folly
Assistant United States Attorneys

Julieta V. Lozano
Special Assistant United States Attorney

*- Of Counsel –*

# **Table of Contents**

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ..................................................................................................... 1

   I.    Offense Conduct ........................................................................................... 1

   II.   Procedural History ....................................................................................... 2

   III.  Production of Discovery Materials ............................................................... 3

ARGUMENT ........................................................................................................... 4

   I.    The Court Should Deny the Defendant's Motion to Suppress Certain Evidence ............... 4

     A.   Relevant Facts ......................................................................................... 5

     B.   The Search Warrants were Supported by Probable Cause, and Sufficiently
Particularized and Narrow ................................................................................. 11

     C.   The Defendant's Motion to Suppress Fails Because the Search and Seizure Were
Reasonable and Executed in Good Faith ............................................................. 22

     D.   The Seized Property was Properly Retained and Some Seized Items were Returned ... 24

     E.   Potentially Privileged Materials were Handled in a Manner Consistent with the
Procedures set Forth in the Search Warrants ....................................................... 25

   II.   The Court Should Deny Scott's Motion to Dismiss the S6 Indictment ........................... 27

     A.   Applicable Law ......................................................................................... 27

     B.   Discussion ................................................................................................ 29

   III.  The Defendant's Request for Purported *Brady* Material Should be Denied ................ 32

     A.   Relevant Facts ......................................................................................... 32

     B.   Applicable Law ......................................................................................... 33

     C.   Discussion ................................................................................................ 35

   IV.   The Defendant's Motion to Compel Disclosure of Witness and Exhibit Lists Two
Weeks Before Trial is Premature and Should be Denied Without Prejudice to Future Renewal
      39

   CONCLUSION ................................................................................................ 41

## PRELIMINARY STATEMENT

The Government respectfully submits this Memorandum of Law in Opposition to a series of motions filed by defendant Mark S. Scott ("Scott" or the "defendant") on or about May 14, 2019, specifically, motions to: (i) suppress certain evidence recovered pursuant to judicially authorized search warrants executed at his residences in Massachusetts and Florida (Dkt. Nos. 69-71); (2) dismiss the S6 Indictment on the grounds that it fails to state an offense and to provide Scott with sufficient notice (Dkt. Nos. 75-77); (3) compel the Government's disclosure of certain allegedly exculpatory materials pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny (Dkt. Nos. 78-80); and (4) compel the Government's production of witness and exhibit lists two weeks prior to trial in this matter (Dkt. Nos. 72-74) (collectively, the "Motions").  For the reasons that follow, the defendant's Motions should be denied in their entirety.

## BACKGROUND

### I.      Offense Conduct

OneCoin Ltd. was founded in or about 2014 by two co-conspirators not named herein ("CC-1" and "CC-2").  OneCoin Ltd. markets a purported digital cryptocurrency called "OneCoin" through a global multi-level-marketing ("MLM") network of OneCoin members. OneCoin members receive commissions for recruiting others to purchase cryptocurrency packages.  This multi-level marketing structure appears to have influenced the rapid growth of the OneCoin member network.  OneCoin Ltd. has claimed to have over three million members worldwide.  OneCoin Ltd. continues to operate to this day.

Evidence gathered in the course of the Government's investigation demonstrates that OneCoin Ltd. is not a legitimate business and is instead an illegal pyramid fraud scheme.  For

example, in contrast to public representations made to investors by OneCoin Ltd., OneCoins are not "mined" by members, nor is the value of OneCoin determined by market supply and demand. Beyond these misrepresentations, OneCoin Ltd. exhibits a variety of other features—including the fact that OneCoins have never been tradable on a public exchange—indicating that it is a fraud scheme and not a legitimate business.

As a result of misrepresentations made by CC-1, CC-2, and other OneCoin Ltd. representatives, victims throughout the world wired investment funds to OneCoin-controlled bank accounts in order to purchase OneCoin packages.  Records obtained in the course of the investigation show that, between the fourth quarter of 2014 and the third quarter of 2016, OneCoin Ltd. generated €3.353 billion in sales revenue and earned "profits" of €2.232 billion. Proceeds of the OneCoin scheme have been laundered through a sophisticated global network of financial accounts, a number of which were controlled by the defendant.

The defendant—a U.S. citizen and attorney, employed for a portion of the relevant time period as a partner at an international law firm—organized, owned, operated a series of investment funds known as the "Fenero Funds," which he used for the purpose of laundering OneCoin fraud proceeds.  After being introduced in or about September 2015 to CC-1, Scott engaged in a scheme to launder approximately $400 million of OneCoin proceeds through the Fenero Funds and related entities between approximately 2016 and 2018.  Ultimately, Scott transferred millions of dollars of OneCoin proceeds into the United States for his own personal use, including to purchase multi-million dollar homes, a yacht, and luxury cars.

## II.   Procedural History

On August 21, 2018, a Grand Jury sitting in the Southern District of New York returned a sealed one-count indictment, S6 17 Cr. 630 (ER) (the "S6 Indictment"), charging the defendant

with conspiracy to commit money laundering in violation of Title 18, United States Code,

Section 1956(h).  (*See* Dkt. No. 6.)  The S6 Indictment alleges that from at least 2016 through

2018, the defendant conspired to conceal the nature, location, source, ownership, or control of

"approximately $400 million in proceeds of a pyramid scheme involving a purported

cryptocurrency known as 'OneCoin.'"  (Dkt. No. 6 at 1, 2).[1]  On September 5, 2018, federal

agents arrested the defendant in Barnstable, Massachusetts, and the S6 Indictment was unsealed.

The same day, filter team agents executed judicially authorized search warrants at the

defendant's residences in Massachusetts and Florida, and recovered numerous electronic devices,

hard copy documents, watches, handbags, and jewelry, among other items, pursuant to those

search warrants.

> Trial in this matter is scheduled to commence on October 7, 2019—over four months

from now.

## III.    Production of Discovery Materials

> Pursuant to its obligations under Rule 16, the Government has made numerous

productions of discovery to the defendant, totaling nearly 200,000 items.  Some of those items

are images of data recovered from the various electronic devices recovered from the defendant's

residence, on which many more documents are located.[2]  The discovery materials also include,

among other items, a video recording of the defendant's post-arrest statement, the defendant's

phone and WhatsApp records, international travel records related to the defendant, applications

---

[1]  By letter dated January 15, 2019, in response to request for a bill of particulars, the Government informed the defendant's attorneys that the OneCoin pyramid scheme referred to in the S6 Indictment is a wire fraud scheme, in violation of Title 18, United States Code, Section 1343.

[2]  Although it has been fully produced to the defendant, none of the data contained in these electronic devices has been made available to the prosecution team as a result of the ongoing privilege review process.

for various search warrants and restraining orders in this case, email evidence obtained pursuant to search warrants, materials obtained from the law firm at which the defendant was employed during the relevant period, OneCoin promotional videos and other marketing materials, photographs and videos depicting OneCoin's online back-office environment, OneCoin-related audit reports and legal opinions, voluminous records from domestic and international financial institutions and fund administrators, and various other materials obtained pursuant to Mutual Legal Assistance Treaty requests to foreign countries.

As noted above in footnote one, the Government also provided detailed responses to two separate letters requesting information, one seeking a bill of particulars as to four discrete issues and the other seeking the production of alleged *Brady* material.

## ARGUMENT

The defendant's Motions are meritless and should be denied in their entirety for the reasons stated below.

## I.  The Court Should Deny the Defendant's Motion to Suppress Certain Evidence

The defendant moves this Court to suppress all evidence seized pursuant to a series of search warrants executed on his properties in September 2018 on the grounds that: (i) the affidavits failed to establish probable cause; (ii) the affidavits were insufficiently particularized; (iii) the search warrants were unconstitutionally overbroad; (iv) the seizures exceeded the scope of the warrants; (v) electronic devices have been retained in an unconstitutionally unreasonable manner; and (vi) privileged information was seized without following established procedures (the "Defendant's Suppression Motion").[3]  (*See* Dkt. No. 70).  The Defendant's Suppression

---

[3]  The Defendant's Suppression Motion incorrectly alleges that the warrants were executed in August 2018.  As set forth below, the execution of all search warrants on defendant Scott's properties occurred in the month of September 2018.

4

Motion is meritless and the Court should deny it in its entirety.  As discussed below, the search warrants executed on the defendant's properties were: (i) supported by ample probable cause, in the form of detailed affidavits submitted by case agents personally involved in the investigation; (ii) sufficiently particularized; and (iii) not overbroad.  Moreover, the agents executed the search warrants in a reasonable manner, with knowledge of and regard for the warrants, and the Government seized and has retained the resulting evidence, including electronic devices, in a lawful and appropriate manner.  Finally, the Government seized potentially privileged information consistent with previously established procedures designed to protect attorney-client and any other applicable privileges, including the use of a taint team to search, seize, and review materials subject to the search warrants.

### A.    Relevant Facts

#### 1.    The Search Warrants

The Government obtained four separate search warrants involving the defendant's properties.  Those warrants authorized the search and seizure of the following: (i) Scott's Florida residence located at 600 Coral Way, Suite/Floor 12, Coral Gables, Florida (the "Florida Residence"); (ii) three safety deposit box keys located at the Florida Residence; (iii) Scott's Massachusetts residence located at 133 Sunset Lane, Barnstable, Massachusetts (the "Massachusetts Residence," and together with the "Florida Residence," the "Scott Residences"); and (iv) Safe Deposit Box Number 220 in the Yarmouth, Massachusetts branch of Cooperative Bank of Cape Cod located at 121 Main Street, Yarmouth Port, Massachusetts (the "Safe Deposit Box Warrant").[4]  In connection with the search warrant applications, the Government submitted

---

[4]  No items were seized pursuant to the Safe Deposit Box Warrant, so there is no evidence subject to suppression in connection with that warrant.  Accordingly, this response will not address the Safe Deposit Box Warrant.

lengthy affidavits from two different case agents.  In particular, the affidavit supporting the search warrant for the Florida Residence was sworn to by Special Agent Kurt Hafer of the United States Attorney's Office, who had been assigned to the investigation for a period of over two years (the "Hafer Affidavit").[5]  (*See* Dkt. No. 71, Exhibit A).

On August 27, 2018, United States Magistrate Judge John O'Sullivan of the United States District Court for the Southern District of Florida authorized a search warrant for the Florida Residence, and any closed containers/items contained therein (the "Florida Warrant"). (*See* Dkt. No. 71, Exhibit B).  On September 4, 2018, United States Magistrate Judge Judith G. Dein of the United States District Court for the District of Massachusetts authorized a search warrant for the Massachusetts Residence, and any closed containers/items contained therein (the "Massachusetts Warrant") (*See* Exhibit 2, attached).  The Florida and Massachusetts Warrants were both executed on September 5, 2018, the day of Scott's arrest.

The Florida and Massachusetts Warrants authorized the Government to search and seize electronically stored information ("ESI"), including copying "any computer devices and storage media that may contain any electronically stored information, including, but not limited to, desktop and laptop computers, disk drives, modems, thumb drives, personal digital assistants, smart phones, digital cameras, and scanners" for later review.  (Dkt. No. 71, Exhibit B at Attachment A(I)(B); Exhibit 2, attached hereto, at Attachment A(B)).  The Florida and Massachusetts Warrants also authorized the Government to review ESI contained on seized

---

[5]  While counsel submitted the Hafer Affidavit in connection with the Defendant's Suppression Motion, that affidavit related to the search warrant for the Florida Residence only.  The Government's application for a search warrant for the Massachusetts Residence contained a sworn affidavit from Special Agent Ronald Shimko of the Federal Bureau of Investigation, who had been assigned to the investigation for a period of approximately one-and-a-half years (the "Shimko Affidavit," and together with the "Hafer Affidavit," the "Agent Affidavits").  (*See* Exhibit 1, attached).

computer devices and storage media, and/or forensic images thereof for information responsive to the warrant.  (*See* Dkt. No. 71, Exhibit B at Attachment A(I)(C); Exhibit 2 at Attachment A(C)).

Because defendant Scott is an attorney, the Florida and Massachusetts Warrants specifically incorporated provisions relating to procedures established to protect any attorney-client or other applicable privileges.  (*See* Dkt. No. 71, Exhibit B at Attachment A(I)(C); Exhibit 2 at Attachment A(C) ("Additionally, review of the items described in this attachment shall be conducted pursuant to established procedures designed to collect evidence in a manner reasonably designed to protect any attorney-client or other applicable privilege.  Because the owner and resident of the Subject Premises is an attorney, the procedures shall include use of a designated "filter team," separate and apart from the investigative team, in order to address potential privilege issues."))[6]  Consistent with these directives, the Florida and Massachusetts Warrants were executed by filter teams comprised exclusively of federal agents not assigned to the investigation of the criminal charges against Scott (the "Filter Team Agents").  The Filter Team Agents were responsible for searching and seizing items from the Florida and Massachusetts Residences, and no members of the investigative team were involved in the execution of the Florida and Massachusetts Warrants.

The Florida and Massachusetts Warrants directed that the items to be seized "include the following evidence, fruits, and instrumentalities of Title 18, United States Code, §§ 1956(a)(1)(B)(i), 1956(a)(2)(B)(i), 1956(h), and 1344 (money laundering, conspiracy to commit money laundering, and bank fraud), related to the OneCoin business and derived funds (the

---

[6]  Prior to the execution of search warrants at the Scott Residences, the Government established evidence collection procedures designed to protect attorney-client and any other applicable privileges.  Those procedures are more fully described in Section I(A)(2), *infra*.

"Subject Offenses")," and each set forth an itemized list of the particularized evidence.  (Dkt. No. 71, Exhibit B at Attachment A(II)(A); Exhibit 2 at Attachment B(A)).[7]  This evidence list included, among other things, documents and communications related to OneCoin; documents and communications referencing numerous specific individuals and/or entities; financial agreements and records; and communications constituting crimes, or with co-conspirators; all covering the period of July 2015 to the date of the warrant.  (*See* Dkt. No. 71, Exhibit B at Attachment A(II)(A)(a)-(e); Exhibit 2 at Attachment B(A)(a)-(e)).  The particularized list of items to be seized set forth in the two warrants also included evidence concerning the identity or location of any co-conspirators; evidence concerning occupancy or ownership of the premises; and evidence sufficient to identify Mark S. Scott's use of electronic accounts.

The list of items to be seized in the Florida Warrant additionally included "any items purchased by or for Mark S. Scott with funds originally sourced from OneCoin-derived or OneCoin-related proceeds, including particular pieces of jewelry, handbags, watches, and clocks. (Dkt. No. 71, Exhibit B at Attachment A(II)(A)(f)-(i)).  The Massachusetts Warrant similarly identified particular physical property for seizure, including certain pieces of jewelry, handbags, watches, and clocks.  (Exhibit 2 at Attachment B (A)(f)-(i)).

Finally, both the Florida and Massachusetts Warrants authorized the seizure of "any computers, cellphones, electronic devices, and storage media that may contain any electronically stored information ("ESI") falling within the categories set forth above, including, but not limited to, desktop and laptop computers, cellphones (including iPhones and other smartphones), tablets (such as iPads), external hard drives, and thumb drives.  In lieu of seizing any such computer devices or storage media, this warrant also authorizes the copying of such devices or

---

[7]  While the Florida and Massachusetts Warrants contain identical language for the most part, provisions regarding the items to be seized differ somewhat.

media for later review."  (Dkt. No. 71, Exhibit B at Attachment A(II)(B); Exhibit 2 at Attachment B(B)).

Pursuant to the Florida and Massachusetts Warrants, the Filter Team Agents recovered property, including documents and communications related to the specific individuals and/or entities identified in the search warrants, investment agreements, financial documents, documents related to money laundering, yacht and property documents, Buchwald Jewelers receipts, various Hermes bags, luxury watches, jewelry, credit cards, four handguns, various electronic devices, and ESI, which were memorialized in a separate inventory forms.  (*See* Exhibit 3, attached; Exhibit 4, attached).  In particular, the Filter Team Agents seized 28 electronic devices and storage media from the Florida Residence and eight electronic devices and storage media from the Massachusetts Residence.  (*See* Exhibit 3, Exhibit 4).

## 2.        Search Warrant Filter Team Procedures

Prior to the executions of the Florida Warrant and the Massachusetts Warrant (collectively, the "Residence Warrants"), the U.S. Attorney's Office established procedures for handling any potentially privileged materials recovered from defendant Scott's residences (the "Filter Team Procedures").[8]  The Filter Team Procedures provided instructions and guidance for the Filter Team Agents and Filter Team Attorneys (together, the "Filter Team") to follow in the execution of the Residence Warrants.  The Filter Team Procedures required, among other things, that the Filter Team be familiar with the search warrant affidavits and orders, as well as with the legal elements of the attorney-client privilege.  The Filter Team Procedures strictly prohibited the Filter Team Agents from disclosing to the investigative team any potentially privileged materials

---

[8]  In the early stages of the investigation, and well before the execution of the Residence Warrants, the U.S. Attorney's Office established an internal filter team made up of attorneys who are not part of the investigative team (the "Filter Team Attorneys").  The Filter Team Attorneys are responsible for reviewing and segregating all potentially privileged materials in this matter.

seized until and unless that material had been reviewed by the Filter Team Attorneys and determined to be not privileged.

### 3. Post Execution Review and Return of Seized Materials

#### a. Electronically Stored Information

After the Residence Warrants were complete, and as part of discovery, the Government provided to defendant Scott, copies of all hard copy documents and electronic materials and communications (including emails, chat messages, and text messages) stored on electronic media seized from the defendant, or pursuant to the search warrants executed at the Scott Residences.[9]

In March 2019, counsel for defendant Scott requested that the Government return two electronic devices seized from the Florida Residence: one Surface Pro (Exhibit 3, control #26) and one Dell laptop computer (Exhibit 3, control #24).  Counsel identified these devices as belonging to the defendant's wife.  The Filter Team Attorneys reviewed these devices and determined that they appeared to belong to, and/or primarily be used by the defendant's wife, and should therefore be returned.  On March 11, 2019, a Filter Team Agent located in Florida called counsel and left a message regarding the return of these items, but did not receive a response.  On April 1, 2019, the Government contacted counsel via email and informed them that agents were ready to return to them the Surface Pro and Dell laptop computer.  On that same day, the same Filter Team Agent sent counsel an email request that counsel contact him regarding coordinating the return of the electronic devices.  The Filter Team Agent did not receive a response from counsel.  On April 23, 2019, the Filter Team Agent was copied on an email between counsel and the Government attorneys, relating to the return of property; counsel

---

[9]  The Government informed defendant Scott that the agents were unable to image 16 of the electronic devices seized from the Florida Residence.  The Government further informed defendant Scott that those 16 devices were in the custody of IRS-CI in West Palm Beach, Florida, and would be made available to him for inspection upon request.

requested the Filter Team Agent's telephone number.  The Filter Team Agent has received no

phone calls or emails form counsel regarding the return of defendant Scott's property.

### b.      Return of Personal Property

On October 24, 2018, Scott's counsel sent the Government a letter requesting the return

of jewelry and other personal property seized pursuant to the Residence Warrants.  Counsel

argued that the seizure of certain items was not authorized by the warrants.  After reviewing

counsel's letter, the Government determined that certain items should be returned to the

defendant, and contacted counsel to make arrangements for the return of property to Scott.  On

November 13, 2018, the Government returned to Scott, and had counsel sign a receipt for 16

items, including handbags, watches, and jewelry seized from the Massachusetts Residence

pursuant to the Massachusetts Warrant.  (*See* Exhibit 5, attached).  On November 21, 2018, the

Government returned to Scott, and had Scott sign a receipt for 24 items, including handbags,

scarves, watches, and jewelry, seized from the Florida Residence pursuant to the Florida

Warrant.  (*See* Exhibit 6, attached).  On December 18, 2018, the Government returned to Scott,

and had counsel sign a receipt for an additional two Hermes handbags seized from the Florida

Residence.  (*See* Exhibit 7, attached).  Also on December 18, 2018, the Government returned to

Scott, and had counsel sign a receipt for two Hermes purses seized from the Massachusetts

Residence.  (*See* Exhibit 8, attached).

### B.      The Search Warrants were Supported by Probable Cause, and Sufficiently Particularized and Narrow

#### 1.      Applicable Law

##### a.      Probable Cause

Probable cause is a "flexible, common-sense standard," *Texas v. Brown*, 460 U.S. 730,

742 (1983), which requires a case-by-case analysis of the totality of the circumstances, *see*

*Illinois v. Gates*, 462 U.S. 213, 230 (1983).  In considering a request for a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. at 238.  Moreover, the training and experience of law enforcement agents bear significantly on probable cause determinations.  *Id*. at 232.  Inferences drawn by law enforcement agents based on facts known to them, the totality of the circumstances, and their training and experience may all support a probable cause finding.  *Id.* at 231-32; *see also United States v. Gaskin*, 364 F.3d 438, 457 (2d Cir. 2004) ("[C]ourts recognize that experience and training may allow a law enforcement officer to discern probable cause from facts and circumstances where a layman might not.") (collecting cases).

Where a search has been conducted pursuant to a court-authorized warrant, "great deference" is due to a magistrate judge's probable cause determination.  *United States v. Leon*, 468 U.S. 897, 914 (1984) (internal citations omitted); *see also, Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007) ("[A] reviewing court must accord considerable deference to the probable cause determination of the issuing magistrate.").  "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. at 238.  "A magistrate's finding of probable cause is itself a substantial factor tending to uphold the validity of the warrant." *United States v. Jackstadt*, 617 F.2d 12, 13 (2d Cir. 1980) (per curiam).  "A reviewing court must accord substantial deference to the finding of an issuing judicial officer that probable cause exists. . . . The reviewing court's determination should be limited to whether the issuing judicial officer had

a substantial basis for the finding of probable cause." *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993) (internal citations omitted).

### b.      Particularity

The particularity requirement of the Fourth Amendment "guards against general searches that leave to the unguided discretion of the officers executing the warrant the decision as to what items may be seized." *United States v. Riley*, 906 F.2d 841, 844 (2d Cir. 1990).  The requirement seeks to ensure that the warrant enables "the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize." *United States v. George*, 975 F.2d 72, 75 (2d Cir. 1992).  "[C]ourts may tolerate some ambiguity in the warrant so long as 'law enforcement agents have done the best that could reasonably be expected under the circumstances, have acquired all the descriptive facts which a reasonable investigation could be expected to cover, and have insured that all those facts were included in the warrant.'" *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013) (quoting *United States v. Young*, 745 F.2d 733, 759 (2d Cir. 1984)).

"To be sufficiently particular under the Fourth Amendment, a warrant must satisfy three requirements." *United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017).  It must (i) "'identify the specific offense for which the police have established probable cause,'" (ii) "'describe the place to be searched,'" and (iii) "'specify the items to be seized by their relation to designated crimes.'" *Id.* (quoting *Galpin*, 720 F.3d at 445).  "The Fourth Amendment does not require a perfect description of the data to be searched and seized." *Id.* at 100.  Indeed, "[s]earch warrants covering digital data may contain 'some ambiguity. . . .'" *Id.* (quoting *United States v. Galpin*, 720 F.3d at 446).  In fact, "[w]here, as here, complex financial crimes are alleged, a warrant properly provides more flexibility to the searching agents," *United States v. Dupree*, 781 F.

Supp. 2d 115, 149 (E.D.N.Y. 2011), and "it may be appropriate to use more generic terms to

describe what is to be seized," *United States v. Gotti,* 42 F. Supp. 2d 252, 274 (S.D.N.Y. 1999)

(Parker, J.). "[A] search warrant does not necessarily lack particularity simply because it is

broad." *United States v. Ulbricht,* 858 F.3d at 100. When a search warrant limits the scope of the

search to evidence of particular federal crimes, and gives an "illustrative list of seizable items,"

the search warrant is sufficiently particular. *United States v. Riley*, 906 F.2d 841, 844-45 (2d Cir.

1990).

The crime or crimes under investigation generally should be apparent from the face of the

warrant; a warrant cannot, for example, call for seizure of all "records," or all evidence "relating

to the commission of a crime," without further particularization.  *United States v. Bianco*, 998

F.2d 1112, 1116 (2d Cir. 1993) (warrant permitting seizure of all "papers," "records," and other

items, without any "more particular limiting language" or tethering "to particular crimes," was

insufficiently particularized); *United States v. George,* 975 F.2d 72, 76 (2d Cir. 1992).  However,

a warrant for seizure of "all evidence" of a given crime or crimes is sufficiently particular if it

offers a list of illustrative items.  *See Riley*, 906 F.2d at 844-45 (warrant containing list of

illustrative items to seize was sufficiently particular notwithstanding provision allowing, as well,

seizure of "other items that constitute evidence of the offenses" identified); *United States v.

Young*, 745 F.2d at 759-60 (warrant allowing seizure of listed items plus "other evidence of" the

specified crimes was sufficiently particular); *United States v. Lustyik*, 57 F. Supp. 3d 213, 227-28

(S.D.N.Y. 2014) (warrant permitting seizure of all "evidence, fruits, or instrumentalities" of

specified crimes was sufficiently particular because it contained "an illustrative list of items to be

seized," even though illustrative list was preceded by phrase "including but not limited to");

*United States v. Jacobson*, 4 F. Supp. 2d 515, 524 (E.D.N.Y. 2014) ("The reference to particular

14

offenses and the use of an illustrative list of items to seize sufficiently particularized the warrants.").  The requirement is satisfied if the warrant, including its attachments, enables the executing officer to ascertain and identify with reasonable certainty those items that the magistrate judge has authorized him or her to seize.  *See Groh v. Ramirez*, 540 U.S. 551 (2004); *United States v. Rosa*, 626 F.3d 56, 58 (2d Cir. 2010).

A warrant may leave some matters to the discretion of the executing officer.  "Once a category of seizable papers has been adequately described, with the description delineated in part by an illustrative list of seizable items, the Fourth Amendment is not violated because the officers executing the warrant must exercise some minimal judgment as to whether a particular document falls within the described category."  *Riley*, 906 F.3d at 845.  Moreover, "[c]ourts tend to tolerate a greater degree of ambiguity where law enforcement agents have done the best that could reasonably be expected under the circumstances, have acquired all the descriptive facts which a reasonable investigation could be expected to cover, and have insured that all those facts were included in the warrant."  *United States v. Young*, 745 F.2d 733, 759 (2d Cir. 1984).

### c.     Overbreadth

The probable cause and particularity requirements intersect in the doctrine of overbreadth.  As to each category of evidence identified for seizure in the warrant, there must exist probable cause to believe it is relevant to the investigation at issue.  *See Galpin*, 720 F.3d at 448 (warrant was overbroad where it allowed seizure of items related to crimes as to which no probable cause showing had been offered or made); *United States v. Lustyik*, 57 F. Supp. 3d at 228 ("the overbreadth inquiry asks whether the warrant authorized the search and seizure of items as to which there was no probable cause") (quotation marks and citation omitted); *United States v. Hernandez*, No. 09 CR 625 (HB), 2010 WL 26544, at *7-8 (S.D.N.Y. Jan. 6, 2010)

(framing overbreadth inquiry as "whether the magistrate judge authorized search warrants that were constitutionally overbroad because they provided for the seizure of specific items for which there is no probable cause") .  Naturally, the broader the crime or crimes under investigation, the broader the categories of documents and records that may properly be seized.  *See, e.g., Jacobson*, 4 F. Supp. 2d at 522 (breadth of warrant, which contained no timeframe limitation, was justified because "the crimes under investigation were complex and concerned a long period of time, not simply one or two dates of criminal activity"); *United States v. Levy*, 2013 WL 664712, at *8 (S.D.N.Y. Feb. 25, 2013) (in pump-and-dump case, broad warrant with no timeframe limitation was justified by breadth and complexity of fraud described in underlying affidavit); *United States v. Dupree*, 781 F. Supp. 115, 149 (E.D.N.Y. 2011) ("The nature of the crime . . . may require a broad search," such as where "complex financial crimes are alleged"); *United States v. Hernandez*, 2010 WL 26544, at *9 (S.D.N.Y. Jan. 6, 2010) (broad warrant with no timeframe limitation justified by complexity of investigation); *United States v. Cohan*, 628 F. Supp. 2d 355, 362 (E.D.N.Y. 2009) ("the degree to which a warrant must state its terms with particularity varies inversely with complexity of the criminal activity investigated") (quotation marks and citation omitted).

> **2.** **The Search Warrant Affidavits Set Forth Probable Cause that the Items to be Seized Contained Evidence of Crime**

The Residence Warrants are supported by comprehensive agent affidavits, replete with details of Scott's involvement in the charged crimes, including: his relationship and communications with his co-conspirators; his establishment of the Fenero funds to move OneCoin proceeds; his extensive efforts to hide the origin of the money flowing through the Fenero funds; the lies he told both banks and fund administrators in order to perpetuate the laundering of OneCoin proceeds; and his use of encrypted communications.  (*See, e.g.,* Dkt. No.

71, Exhibit A).  Nonetheless, Scott claims that the abundant allegations in the Hafer Affidavit fail to establish probable cause because they do not establish that Scott participated in the underlying fraud or knew that the funds he was transferring were criminal proceeds.  The defendant is wrong.  Taken as a totality—as they must be—the circumstances established in the Agent Affidavits provide ample probable cause to believe that Scott engaged in the crimes articulated in the search warrants, including conspiracy to commit money laundering.  *See Illinois v. Gates*, 462 U.S. 213, 238 (1983).  Indeed, on August 21, 2018, before the Hafer Affidavit was signed and the Florida Warrant was authorized, a Grand Jury issued the S6 Indictment, concluding, based on the evidence collected in this investigation, that reasonable cause existed to believe that Scott committed the crime of conspiracy to commit money laundering.

Moreover, Scott has failed to advance any grounds for rejecting the "great deference" due to a magistrate judge's probable cause determination where, as here, a search has been conducted pursuant to a court-authorized search warrant.  *See United States v. Leon*, 468 U.S. 897, 914 (1984); *see also, Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007) ("[A] reviewing court must accord considerable deference to the probable cause determination of the issuing magistrate."). "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  "A magistrate's finding of probable cause is itself a substantial factor tending to uphold the validity of the warrant."  *United States v. Jackstadt*, 617 F.2d 12, 13 (2d Cir. 1980) (per curiam).

Even if a warrant lacks probable cause or particularity, or is overbroad, "[t]he fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140 (2009). In fact, exclusion should be a "last resort" rather than a "first impulse." *Id.* Thus, suppression will not be warranted where the evidence at issue was "obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *United States v. Leon*, 468 U.S. 897, 922 (1984).

While it is the Government's burden to establish good faith, "[s]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Id.* Accordingly, "[m]ost searches will be upheld." *United States v. Rickard*, 534 F. App'x 35, 37 (2d Cir. 2013) (summary order). Only under the following limited circumstances will the searching officers' good faith fail to be established:

> (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.

*United States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011) (quotation marks and citations omitted). The "so lacking in indicia of probable cause" concern "most frequently arises when affidavits are bare bones, i.e., totally devoid of factual circumstances to support conclusory allegations." *Id.* at 103. "At the opposite end of the spectrum are cases in which a defective warrant issued based on an affidavit providing detailed factual allegations in support of probable cause." *Id.* "Such cases almost invariably demonstrate reasonable reliance." *Id.*

18

### 3.    The Search Warrants were Sufficiently Particularized and Not Overbroad

Scott claims that that the Residence Warrants were insufficiently particularized and overbroad.  Specifically, Scott claims that the warrants and affidavits failed to establish that the seizable electronic devices were used to further unlawful activity or contained evidence.  (*See* Dkt. 70 at 9).  The defendant is wrong.  The Agent Affidavits supporting the Residence Warrants established that Scott routinely used email to communicate with his co-conspirators, domestic and international banks, and fund administrators, in an effort to further the criminal conspiracy to launder funds. (*See* Dkt. No. 71, Exhibit A; Exhibit 1).  These communications frequently involved the transmission of documents, including wire records, financial agreements, and due diligence paperwork.  As a result, it is reasonable to conclude that these documents, records, and communications would be stored in electronic format, providing probable cause to seize and search any electronic device capable of holding or storing ESI *for responsive materials*.  Thus, the Residence Warrants appropriately authorized the seizure of electronic devices that may contain ESI falling within the particularized categories of seizable materials.

Contrary to the defendant's claim, the Residence Warrants are not general warrants authorizing the seizure of all documents.  Notably, the warrants do not call for the seizure of "all records" or "all evidence" of a given crime.  Rather, the Residence Warrants specifically articulated: (i) the specific offenses for which probable cause has been established, *i.e.*, Title 18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(a)(2)(B)(i), 1956(h), and 1344; (ii) provided adequate guidance as to the places to be searched, including a detailed description of the subject premises; and (iii) contained a list of specified items, including categories of materials and illustrative lists, and their relation to the designated offenses.  *See United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017) (internal quotations omitted).  In determining whether a search warrant provides adequate

guidance, courts construe the language of a warrant in light of the entire warrant.  *United States v. Riley*, 906 F.2d 841, 844-45 (2d Cir. 1990) ("In upholding broadly worded categories of items available for seizure, we have noted that the language of a warrant is to be construed in light of an illustrative list of seizable items.").  The Residence Warrants contained a detailed list of evidence, fruits, and instrumentalities to be seized, including fifteen separate categories of materials, most with illustrative lists of seizable items; and a list of dozens of entities and individuals, which, if contained or referenced in documents, communications, or ESI, constituted seizable items.  Given this level of detail and guidance, the Residence Warrants were sufficiently particular.  *See United States v. Riley*, 906 F.2d 841, 844-45 (2d Cir. 1990) (when a search warrant limits the scope of the search to evidence of particular federal crimes, and gives an "illustrative list of seizable items," the search warrant is sufficiently particular).[10]  As such, the Residence Warrants enabled the executing agents to ascertain and identify with reasonable certainty the items that the magistrate judge had authorized the agents to seize.  *See Groh v. Ramirez*, 540 U.S. 551 (2004).

Additionally, and relatedly, the Residence Warrants were not overbroad.  As the agent affidavits established, this investigation involved a complex, financial money laundering scheme spanning multiple years, implicating numerous co-conspirators, and involving sophisticated international and domestic financial transactions.  Even so, the Residence Warrants limited the time frame for seizable materials to a reasonable three-year period, from July 2015 to the execution of the warrants, encompassing the entire money laundering conspiracy with which

[10]  The defendant's reliance on *United States v. Rosa*, 626 F.3d 56 (2d Cir 2010), is inapposite.  In that case, the Court found that a warrant for electronic media was defective where it did not set forth the nature of the suspected criminal activity, and "provided no guidance as to the type of evidence sought."  *Id.* at 62.  Significantly, even under those circumstances—none of which are present here—the Court declined to suppress the evidence.

Scott is charged.  Scott's assertion that "the warrant's authorization for the seizure of electronic information is overbroad because it contains no date restriction" is simply wrong.  (Dkt. No. 70 at 12).  In fact, the Residence Warrants include the following language:

> The items to be seized from the Subject Premises include any computers, cellphones, electronic devices, and storage media that may contain any electronically stored information ("ESI") *falling within the categories set forth above,* including, but not limited to, desktop and laptop computers, cellphones,(including iPhones and other smartphones), tablets (such as iPads), external hard drives, and thumb drives.

(Dkt. No. 71, Exhibit B at Attachment A(II)((B); Exhibit 1 at Attachment B(B), emphasis added).  The reference to "the categories set forth above" indicates that the same July 2015 to present timeframe limitation corresponding to the categories of materials in the warrant (*e.g.*, document, communications, agreements, etc.) applies to seizable ESI.  Given the complexity and breadth of the money laundering scheme described in the agent affidavits, and the date restriction contained in the Residence Warrants, the warrants cannot be considered overbroad.  *See United States v. Levy*, 2013 WL 664712, at *8 (S.D.N.Y. Feb. 25, 2013) (in pump-and-dump case, broad warrant with no timeframe limitation was justified by breadth and complexity of fraud described in underlying affidavit).[11]

Based on the foregoing reasons, Scott's motion to suppress should be denied.

---

[11]  Additionally, even if the Court were to determine that the warrants were insufficiently particularized or overbroad—which, the Government submits they are not, for the reasons set forth above—suppression would not be warranted because the agents acted in "objectively reasonable reliance" on the warrants.  *United States v. Leon*, 468 U.S. 897, 922 (1984).  No circumstances exist here that would undermine a finding that the agents acted in good faith.  *See Clark*, 638 F.3d at 103-05.

C.      **The Defendant's Motion to Suppress Fails Because the Search and Seizure Were Reasonable and Executed in Good Faith**

1.      **Applicable Law**

Where a search warrant authorizes the seizure of certain items, additional items outside the scope of the warrant may be seized if they constitute a valid exception to the Fourth Amendment's warrant requirement.  *See Andreson v. Maryland,* 427 U.S. 463 (1976).  During the execution of a search warrant, items to be seized are often intermingled with items that the warrant does not grant authority to seize, making seizure determination difficult, and resulting in inadvertent seizure of items exceeding the scope of the warrant.  This is especially true in the context of ESI, where the content of files and documents are not necessarily readily apparent from their location or file names, and where a multitude of data may be saved in the same location or on the same device.  *See United States v. Ganias,* 824 F.3d 199 (2d. Cir. 2016).

Thus, absent "flagrant disregard" for the warrant, where items exceeding the scope of the warrant are seized, and do not fall into an exception to the warrant requirement, the remedy is return of and suppression of those items.  *United States v. Shi Yan Liu,* 239 F.3d 138, 140 (2d Cir. 2000) ("Government agents 'flagrantly disregard' the terms of a warrant so that wholesale suppression is required only when (1) they effect a 'widespread seizure of items that were not within the scope of the warrant, and (2)  do not act in good faith") (internal citations omitted); *see also, Doane v. United States,* 2009 U.S. Dist. LEXIS 61908 *30 (S.D.N.Y. June 1, 2009) ("where voluminous items responsive to a search warrant are intermingled with non-responsive items, the Government may seize all containers holding responsive items without rendering the entire search unlawful").  Thus, where the agents acted in good faith and did *not* flagrantly disregard the search warrant, seizures exceeding the scope of the warrant will result not result in the suppression of evidence and items whose seizure was authorized by the search warrant.  *See*

*Andreson v. Maryland,* 427 U.S. 463 n.11 (1976) ("to the extent such papers were not within the scope of the warrants or were otherwise improperly seized, the State was correct in returning them voluntarily and the trial judge was correct in suppressing others"); *United States v. Matias,* 836 F.2d 744 (2d Cir. 1988).

>        **2.      The Search Warrants were Properly and Reasonably Executed, and
>                 Items Outside the Scope of the Warrant were Returned**

The Residence Warrants authorized the agents to search for and seize broad categories of materials, including ESI.  The agents were aware of the nature of the crimes being investigated, and familiar with the search warrants and affidavits.  The warrants were lawfully executed, with regard for the instructions and directions contained in the Residence Warrants.  The vast majority of the seized materials constituted evidence and items whose seizure was authorized by the search warrants, including documents relating to Fenero, MSSI, and OneCoin; investment agreements; corporate and financial documents; notebooks; identification cards; electronic devices; and Hermes bags, watches, and jewelry.  (*See* Exhibits 3 and 4).

While certain items not specified in the Residence Warrants were seized, those seizures were inadvertent and the Government has returned, or attempted to return the majority of those items to Scott, as explained above.  (*See* Exhibits 5-8).  To the extent that certain seized items exceeded the scope of the search warrants, those seizures were not the product of a widespread seizure of items that exceeded the scope of the warrants, and the agents acted in good faith.  *See United States v. Shi Yan Liu,* 239 F.3d 138, 140 (2d Cir. 2000); *Matias,* 836 F.2d at 747 ("[W]hen items outside the scope of a valid warrant are seized, the normal remedy is suppression and return of those items, not invalidation of the entire search." (internal quotation marks and citations omitted)).  Thus, there are no valid grounds for suppression of the evidence and items lawfully seized pursuant to the Residence Warrants.  *See Matias,* 836 F.2d at 747 ("[T]he drastic

remedy of the suppression of all evidence seized is not justified unless those executing the warrant acted in flagrant disregard of the warrant's terms."); *Doane,* 2009 U.S. Dist. LEXIS 61908 *30.[12]

**D.     The Seized Property was Properly Retained and Some Seized Items were Returned**

**1.     Applicable Law**

Rule 41 of the Federal Rules of Criminal Procedure provides that, absent any limitation in the warrant itself, the Government may seize "electronic storage media or . . . electronically stored information" for "a later review of the media or information consistent with the warrant." Fed. R. Crim. P. 41(e)(2)(B).  Rule 41 also explicitly authorizes the Government to retain a copy of electronic media seized pursuant to a warrant.  *See* Fed. R. Crim. P. 41(f)(1)(B) ("The officer may retain a copy of the electronically stored information that was seized or copied."); *United States v. Ganias*, 824 F.3d 199, 231-32 (2d Cir. 2016) (en banc).

**2.     The Government has Properly Retained the Seized Evidence**

The Government is not required to return the electronic devices that remain in its possession or divest itself of electronically stored information.  The Government promptly agreed to return to defendant Scott the two electronic devices that appear to belong to his wife,

---

[12]  The defendant purports to provide authority for his assertion that where seizure exceeds the scope of the warrant, the appropriate remedy is suppression of all the evidence seized pursuant to the warrant.  However, these cases—none of which emanate from this Circuit—do not stand for this proposition, and are not instructive here.  For example, in *Leveto v. Lapina*, 258 F.3d 156 (3d Cir. 2001), the Court held that a search warrant for a premises alone is not sufficient to justify a pat-down of the owner of the home); in *United States v. Medlin*, 842 F.2d 1194 (10th Cir. 1998), the Court found that the defendant could not have consented to the search due to an inherently coercive environment; in *Marks v. Clark*, 102 F.3d 1012 (9th Cir. 1997), the Court found the search warrant invalid on its face; and in *United States v. Schroeder*, 129 F.3d 439 (8th Cir. 1997), the Court determined that the officers did not act reasonably when they assumed that the property they searched was the same as the property described on the search warrant, notwithstanding a clear distinction.

but, despite repeated efforts made by the Government, over a three-month period, the defendant

has yet to avail himself of this opportunity.  The Government is permitted to retain the remaining

electronic devices for purposes of introducing data thereon at trial.  *See Ganias*, 824 F.3d at 215

("Preservation of the original medium or a complete mirror may therefore be necessary in order

to safeguard the integrity of evidence that has been lawfully obtained or to authenticate it at

trial."); *United States v. Carpenter*, No. 13 Cr. 226 (RNC), 2015 WL 9461496, at \*6-7 (D. Conn.

Dec. 24, 2015) (Government had a "legitimate interest in retaining the documents for review and

possible use as evidence at a trial" where review was still ongoing).  The Government's

legitimate interest in maintaining custody of the devices, coupled with the fact that Scott has

received mirror images of the ESI contained on the devices, makes their continued retention

eminently reasonable.[13]

### E.      Potentially Privileged Materials were Handled in a Manner Consistent with the Procedures set Forth in the Search Warrants

Without any basis in fact or law, Scott moves to suppress evidence seized from the Scott

Residences on the basis that "the government has knowingly seized privileged information

without following established procedures."  (Dkt. No. 70 at 14).  Scott also asserts that no such

procedures were ever put in place to begin with.  (*Id.* at 15).  Scott's assertions, based "upon

information and belief," are entirely unfounded.  (*Id.* at 14).

As Scott acknowledges in his motion, the Residence Warrants expressly set forth the

procedures for the collection of potentially privileged material during the searches.  For example,

---

[13]  To the extent that the defendant is arguing that the length of time it has taken the Government
to review the electronic evidence is unreasonable, such an argument is entirely without merit
given the complexity of this case and the ongoing litigation of privilege issues.  *See, e.g.*, *United
States v. Jarman*, 847 F.3d 259, 267 (5th Cir. 2017) (noting that "'numerous cases hold that a
delay of several months' or even years 'between the seizure of electronic evidence and the
completion of the government's review of [it] . . .  is reasonable'" and upholding a 23-month
long review of electronic evidence).

the rider for the Florida Warrant states that, "review of the items described in this attachment shall be conducted pursuant to established procedures designed to collect evidence in a manner reasonably designed to protect any attorney-client or other applicable privilege.  Because the owner and resident of the Subject Premises is an attorney, the procedures shall include use of a designated 'filter team,' separate and apart from the investigative team, in order to address potential privilege issues."  (Dkt. No. 71-2 at 3).  Contrary to Scott's assertions, the Filter Team, and the Filter Team Procedures, were established *prior* to the execution of the search warrants. As Scott is aware, the designated filter team agents responsible for the search and seizure of items from Scott's residences were comprised of federal agents not assigned to investigating the criminal charges against Scott, and no members of the investigative team were involved in the execution of the search warrants for the Scott Residences.[14]  Furthermore, as noted above, the Filter Team Procedures required, among other things, that the Filter Team be familiar with the search warrant affidavits and orders, as well as with the legal elements of the attorney-client privilege.  The Filter Team Procedures strictly prohibited the Filter Team Agents from disclosing to the investigative team any potentially privileged materials seized until and unless that material had been reviewed by the Filter Team Attorneys and determined to be not privileged.

In addition, not only did the Government ensure that a separate team of federal agents executed the search warrants on Scott's residences, but the Government also utilized the Filter Team Attorneys to handle all of the potentially privileged materials obtained from those searches.  With respect to the hard copy documents and electronic materials and communications (including emails, chat messages, and text messages) stored on electronic media seized from the defendant, or pursuant to the search warrants executed at the Florida and Massachusetts

---

[14]  Scott is well aware of these procedures—the Government informed defense counsel of these procedures by letter dated February 15, 2019.

Residences (collectively, the "Seized Materials"), all such materials were segregated as potentially privileged.  As the Government has informed defense counsel, the Seized Materials are in the possession of the Filter Team Attorneys and will not be released to the prosecution team until and unless that material has been reviewed and deemed non-privileged (or subject to some other exception to privilege, such as the crime-fraud exception).

For all of the reasons set forth above, there is no support for Scott's argument that the Government seized privileged information without following adequate procedures, or that the Government failed to put such procedures in place.  To the contrary, the Government put in place robust procedures to safeguard against any inadvertent disclosure of privileged material to the prosecution team, and has followed all such procedures throughout this case.  Scott's motion to suppress on this basis should be denied.

## II.      The Court Should Deny Scott's Motion to Dismiss the S6 Indictment

### A.      Applicable Law

It is well-settled that "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956); *United States v. Goodwin*, 141 F.3d 394, 401 (2d Cir. 1997) ("The precision and detail formerly demanded are no longer required, imperfections of form that are not prejudicial are disregarded, and common sense and reason prevail over technicalities.").  Instead, a defendant must wait until after the close of the Government's case-in-chief at trial or after the jury's verdict before contesting the sufficiency of the evidence, except in the rare circumstance where "the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial."  *United States v. Alfonso*, 143 F.3d 772, 777-78 (2d Cir. 1998).

Federal Rule of Criminal Procedure 12(b) provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."  Fed. R. Crim. P. 12(b)(1).  In other words, Rule 12 authorizes defendants to challenge the lawfulness of a prosecution on purely legal, as opposed to factual, grounds.  *See United States v. Aleynikov*, 676 F.3d 71, 75 (2d Cir. 2012).  Although the sufficiency of an indictment is reviewable on a motion to dismiss, "it is well settled that 'an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'"  *Alfonso*, 143 F.3d at 776 (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)).  In considering such a motion, the Court "accepts as true all allegations in the indictment" and its review is limited to the four corners of the indictment.  *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985); *Alfonso,* 143 F.3d at 776-77 (2d Cir. 1998).

The Sixth Amendment guarantees a defendant's right "to be informed of the nature and cause of the accusation" against him.  U.S. Const. Amend. VI.  This guarantee is given effect, in part, by Rule 7 of the Federal Rules of Criminal Procedure, which provides only that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1); *see also United States v. Pirro*, 212 F.3d 86, 98 (2d Cir. 2000) ("The Sixth Amendment's notice protection is implemented by the requirement of Rule 7(c)(1).").  An indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events.  *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992).

28

### B.      Discussion

The defendant's primary argument is that the allegations set forth in the S6 Indictment are insufficient to provide him with adequate notice of the crime he has been charged with.  (*See* Dkt. No. 76).  The defendant also argues that the S6 Indictment fails to contain sufficient detail to allow him to determine whether there has been a constructive amendment or variance, and that the S6 Indictment fails to allege facts establishing jurisdiction and venue.  As set forth below, the defendant's motion to dismiss is without merit and should be denied.

The defendant's main argument is that the allegations in the "bare bones" S6 Indictment fail to provide adequate notice to the defendant "to satisfy the purposes of an indictment."  (*Id.* at 6).  Among other things, the defendant asserts that the S6 Indictment does not reasonably provide notice of the time of the alleged offense, and that the Government's allegation that the specified unlawful activity "was a Ponzi scheme involving OneCoin does not provide adequate notice to satisfy the purposes of an indictment."  (*Id.* at 5-6).[15]  The level of detail that the defendant seeks is neither required by statute nor by case law.  In effect, the defendant is asking for a Rule 29 dismissal before any evidence has been offered at trial, let alone admitted.  The Government need not detail all of the evidence in the S6 Indictment that it will present at trial to establish the defendant's guilt.  Rather, for the S6 Indictment to be sufficient, it must plead the "elements of the offense[s] charged" and fairly inform the defendant "of the charge against which he must defend."  *Alfonso*, 143 F.3d at 776.  The S6 Indictment amply meets this basic pleading standard: it tracks the language of the applicable statutes, and it provides notice of the

---

[15]  As the defendant acknowledges, the Government provided the defendant with a bill of particulars on or about January 15, 2019.  Among other things, the bill of particulars provided the defendant with information regarding the specified unlawful activity referred to in the S6 Indictment, and the basis for venue in the Southern District of New York.  The Government has also provided orally to the defendant's attorneys a non-exhaustive list of individuals it considers to be co-conspirators of the defendant.

applicable time period and place the offense is alleged to have taken place—*i.e.*, the Southern

District of New York.  No more is required.  *See United States v. Flaharty*, 295 F.3d 182, 198

(2d Cir. 2002) (an indictment is sufficient so long as it "track[s] the language of the statute

alleged to have been violated and, if necessary, states the time and place of the offense in

approximate terms.").

       The defendant next argues that "[t]he Indictment fails to contain sufficient detail to allow

Mr. Scott and ultimately this Court to determine whether there has been a constructive

amendment or variance."  (Dkt. No. 76 at 5).  Specifically, the defendant argues that "it would be

impossible to determine whether Mr. Scott might be convicted of an offense other than [the

offense] presented to the Grand Jury because we cannot tell the 'essential facts' presented to the

Grand Jury."  (*Id.*).  The defendant offers no case law in support of this novel argument which

would seemingly apply to every indictment that is not a detailed speaking indictment.  "To

prevail on a constructive amendment claim, a defendant must demonstrate that the terms of the

indictment are in effect altered by the presentation of evidence and jury instructions which so

modify essential elements of the offense charged that there is a substantial likelihood that the

defendant may have been convicted of an offense other than that charged in the indictment."

*United States v. D'Amelio*, 683 F.3d 412, 416 (2d Cir. 2012) (citations omitted).  "By contrast, a

variance occurs when the charging terms of the indictment are left unaltered, but the evidence at

trial proves facts materially different from those alleged in the indictment."  *Id.* at 417 (citations

omitted).  Given that there has been no trial, and therefore no evidence has been presented to a

jury and no jury instructions provided to the jury, there is no basis for the defendant to allege that

there has been a constructive amendment or variance at this stage.

Finally, the defendant argues that "no facts establishing jurisdiction and venue are contained in the Indictment" and that the S6 Indictment should therefore be dismissed. (Dkt. No. 76 at 6). Like the defendant's other arguments for dismissal, this argument is contrary to the facts and the law. First, the S6 Indictment *does* allege venue. Specifically, it alleges that the defendant committed the alleged money laundering conspiracy offense "in the Southern District of New York and elsewhere." (Dkt. No. 6 at 1).[16] Here, at the motion to dismiss stage, the Government's burden is satisfied with regard to pleading venue by alleging that criminal conduct occurred within this district, as the Government has alleged here. *See United States v. Murgio*, 209 F. Supp. 3d 698, 721 (S.D.N.Y. 2016) ("Generally, the Government need only allege that criminal conduct occurred within the venue, even if phrased broadly and without a specific address or other information, in order to satisfy its burden with regard to pleading venue.") (citations omitted); *United States v. Ohle*, 678 F. Supp. 2d 215, 231 (S.D.N.Y. 2010) (same); *United States v. Szur*, 97-CR-108, 1998 WL 132942, at *9 (S.D.N.Y. Mar. 20, 1998) ("[O]n its face, the Indictment alleges that the offense occurred 'in the Southern District of New York and elsewhere,' which is sufficient to resist a motion to dismiss"); *United States v. Bellomo*, 263 F. Supp. 2d 561, 579 (E.D.N.Y. 2003) ("[T]he indictment, alleging on its face that the offenses occurred 'within the Eastern District of New York and elsewhere,' suffices to sustain it against this pretrial attack on venue").

Second, the defendant's argument that the S6 Indictment fails to allege facts establishing jurisdiction is also baseless. The "inquiry into whether an indictment charges a federal offense for the purposes of establishing subject-matter jurisdiction under § 3231 is exceedingly narrow."

---

[16] The S6 Indictment need not allege that an overt act was committed in the Southern District of New York, because the law does not require proof of *any* overt act to establish a money laundering conspiracy under 18 U.S.C. § 1956(h). *See Whitfield v. United States*, 125 S. Ct. 687, 693 (2005).

*United States v. Yousef*, 750 F.3d 254, 259 (2d Cir. 2014).  As long as an indictment sets forth all of the statutory elements of an offense, the indictment is sufficient for purposes of subject-matter jurisdiction.  *Id.*  Here, the S6 Indictment plainly sets forth the elements of the money laundering conspiracy offense for which the defendant is charged, and the defendant raises no argument to the contrary.

For all the reasons set forth above, the defendant's motion to dismiss should be denied.

**III.    The Defendant's Request for Purported *Brady* Material Should be Denied**

**A.    Relevant Facts**

On or about January 25, 2019, the defendant sent a three-page letter to the Government seeking disclosure of what he claimed represented exculpatory material under *Brady* and its progeny.  (Dkt. No. 80-1).  In a four-page responsive letter dated February 19, 2019 (the "February 19 Letter")—attached as Exhibit B to Mr. Garvin's declaration in support of the defendant's Motion for Disclosure of *Brady* Materials (Dkt. No. 80-2)—the Government provided direct and detailed responses to the defendant's various inquiries.[17]  At the outset of the February 19 Letter, the Government stated that it "fully recognizes its *Brady* obligations and is committed to providing timely disclosure of any such material in the possession of the prosecution team."  In response to the defendant's specific requests, the Government also, among other things: (1) offered to make available to the defendant interview reports of victims who believed OneCoin was a legitimate business (an offer the defendant has not availed himself of);

---

[17]  Notably, while not included as part of Exhibit B to Mr. Garvin's declaration due to valid confidentially concerns, the Government also attached to the February 19 Letter four separate interview reports, totaling approximately 30 single-spaced pages, relating to interviews of two other individuals involved in operating the private equity funds (the "Fenero Funds") at issue in this case.  Despite the fact that "these interview reports cover[ed] topic areas far exceeding the scope of the [defendant's] requests," in an abundance of caution, the Government produced the four reports in full, with the exception of very limited redactions.

(2) identified various OneCoin-related legal opinions and audit reports—alleging that OneCoin was legal and that its blockchain was legitimate—obtained by the Government and produced to the defendant in discovery; (3) described voluminous discovery materials produced to the defendant, including records from financial institutions with which OneCoin did business following various due diligence inquires and (4) informed the defendant that:

> The Government's evidence demonstrates that the defendant was aware that the monies he laundered through the Fenero Funds were the proceeds of illegal activity, specifically, the OneCoin fraud scheme. The Government is not aware of evidence establishing that the defendant believed that OneCoin was a legitimate business enterprise, or that he was provided with any particular materials or information that would have led him to that conclusion. Nor is the Government aware of any witness statement to the effect that the defendant was unaware of OneCoin's fraudulent nature.

In the February 19 Letter, the Government also made clear that much of the material requested by the defendant did not constitute *Brady* material, noting for example that: (a) "the subjective beliefs of [OneCoin] victims regarding the legitimacy of the OneCoin fraud scheme are not exculpatory as to the defendant[, because] their beliefs do not bear on the defendant's knowledge regarding the fraudulent nature of the scheme or the criminal nature of the proceeds he helped launder;" and (b) "the fact that a third party services provider engaged in business with OneCoin after conducting its own individually prescribed diligence on OneCoin does not constitute *Brady* material as to the defendant."

### B.      Applicable Law

Pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), the Government has a constitutional obligation to disclose evidence that is materially favorable to the defendant as to either guilt or punishment, *id.* at 87, including information that could be used to impeach a government witness (known more specifically as *Giglio* material). *Giglio v. United States*, 405 U.S. 150, 154 (1972).

33

"The rationale underlying *Brady* is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence only known to the Government." *United States v. LeRoy*, 687 F.2d 610, 619 (2d Cir. 1982) (citation omitted). Evidence is "material" under *Brady* only if disclosure of the evidence would lead to "a reasonable probability of a different result" in the outcome of a trial. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). "The *Brady* obligation extends only to material evidence . . . that is known to the prosecutor." *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998). Moreover, "*Brady* does not require the government to turn over exculpatory evidence if the defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence." *United States v. Grossman*, 843 F.2d 78, 85 (2d Cir. 1988).

Courts have denied specific discovery orders of *Brady* material where the Government has made good-faith representations that it understands its discovery obligations and will comply with these obligations going forward. *See, e.g.*, *United States v. Reyes*, 417 F. Supp. 2d 257, 260-61 (S.D.N.Y. 2005); *United States v. Messina*, No. 11–CR–31 (KAM), 2012 WL 463973, at *12 (E.D.N.Y. Feb. 13, 2012) ("'[P]retrial motions for discovery pursuant to *Brady* should be denied when the Government has made a good faith representation to the Court and defense counsel that it recognizes and has complied with its *Brady* disclosure obligations.'" (quoting *United States v. Cook*, 348 F. Supp. 2d 22, 30 (S.D.N.Y. 2004)); *United States v. Mitlof*, 165 F. Supp. 2d 558, 570 (S.D.N.Y. 2001) ("[B]ased on the Government representation that it is aware of its obligations under *Brady* . . . and its progeny, and that the Government will continue to provide such information to the defendant in a timely fashion, this Court will not issue an order compelling the production of such materials at this time."); *United States v. Gallo*, No. 98 Cr.

34

338 (JGK), 1999 WL 9848, at *8 (S.D.N.Y. Jan. 11, 1999) (denying defendant's motion to compel production of *Brady* material based on Government's representations that "it is aware of its obligations under *Brady* . . . and will produce any *Brady* material to the defense well before trial")

### C.    Discussion

The defendant seeks an order compelling the Government to comply with its obligations under *Brady* and its progeny, claiming that the Government's prior response to his Brady request was "non-comital" [sic].  (Dkt. No. 79 at 1).  Such an order is unnecessary.  As described above, the Government's February 19 Letter was anything but non-committal.  The Government recognizes its obligations under *Brady* and specifically acknowledged its *Brady* obligations in the February 19 Letter.  Moreover, as part of the February 19 Letter, the Government pointed to various materials already produced to the defendant as potentially responsive to the defendant's requests.  As it noted in the February 19 Letter, should the Government become aware of *Brady* material, it will produce it in a timely manner.  Accordingly, the defendant's motion to compel production of *Brady* material should be denied.  *See, e.g.*, *Green*, 2004 WL 2985361, at *3; *Messina*, 2012 WL 463973, at *12; *Cook,* 348 F. Supp. 2d at 30; *Mitlof*, 165 F. Supp. 2d at 570; *Gallo*, 1999 WL 9848, at *8.

With respect to the three particular categories of evidence identified by the defendant in his *Brady* motion, the defendant's arguments are meritless and should be rejected.  The first category pertains to "any evidence that any regulator, government body or judicial authority determined that OneCoin was engaged in legitimate business activity."  As part of its February 19 Letter, the Government broadly interpreted this request and identified a series of previously produced legal opinions disseminated by OneCoin Ltd. to its members, some of which identified

various countries in which attorneys opined that OneCoin was purportedly "legal."[18]   That said, the Government is not presently aware of any evidence in its possession establishing that a government or regulatory entity specifically determined that OneCoin Ltd. was engaged in legitimate business activity, let alone evidence that the defendant was informed of any such determination.[19]   Nor is the Government under any obligation to seek out such records from foreign authorities to the extent that they may in fact exist.   *See United States v. Connolly*, No. 1:16-CR-00370 (CM), 2017 WL 945934, at *8 (S.D.N.Y. Mar. 2, 2017) (observing that, even in the context of parallel foreign investigations, "[t]he Court has found no case suggesting that *Brady* has extraterritorial reach or ordering our Government to search through the files of some other country's government in order to locate potentially exculpatory material").

The second category pertains to "any evidence that any financial services provider, law firm, or other third-party service provider did business with OneCoin or any of its affiliates after due diligence."   As the Government stated in the February 19 Letter, such evidence does not constitute *Brady* material.   Simply put, evidence that third party entities conducted business with OneCoin Ltd. or its affiliates after conducting some level of diligence is not exculpatory; it establishes nothing about whether or not OneCoin Ltd. operated a pyramid fraud scheme, and likewise, has no bearing whatsoever on the defendant's actual knowledge of OneCoin's fraudulent nature.

---

[18]   Additional materials of this nature may be included in the potentially privileged materials that have been produced to the defendant by the Government's filter team, which have not been made available to the prosecution team.

[19]   The Government is aware of certain public source reporting and claims made by OneCoin Ltd. representatives that a prosecutor's office in Germany concluded an investigation of an individual OneCoin multi-level-marketer (referred to by OneCoin Ltd. as an "Independent Marketing Associate" or "IMA") without filing criminal charges.   The Government is not presently aware of any official documents related to that investigation that are in its possession.

Critically, absent the defendant's involvement in such private due diligence efforts, there is no reason to believe that the information gathered as a result of those efforts affected his personal knowledge regarding the nature of OneCoin's business.  Furthermore, the type and quality of due diligence efforts conducted by private parties is a matter within their own discretion, as is the party's level of acceptable risk, and any resulting determinations are therefore highly subjective.  In addition, such diligence inquires frequently rely on information provided by the counterparty to the transaction, which may not be reliable, particularly in the case of a criminal organization.  Indeed, based on the Government's investigation, OneCoin and its principals frequently utilized intermediary business entities, such as the Fenero Funds, to mask their involvement in financial transactions and thereby frustrate diligence efforts.  *See United States v. Bonventre*, No. 10 CR 228 (LTS), 2013 WL 2303726, at *8 (S.D.N.Y. May 28, 2013), *aff'd in part*, 646 F. App'x 73 (2d Cir. 2016) ("The fact that certain knowledge could be helpful to the defense, or that the Government's fraud case necessarily involves evidence that victims and regulators were lied to and misled and could to that extent be consistent with defense theories, does not render evidence of such third-party deception exculpatory in the *Brady*/*Giglio* sense.").  For these reasons, much like OneCoin victims' subjective beliefs that OneCoin Ltd. was operating a legitimate cryptocurrency business, any subjective views regarding OneCoin's legitimacy held by private entities engaged in business transactions with OneCoin Ltd. are not material to a determination of the defendant's guilt on the charged money laundering offense.[20]

---

[20]  While the second category of evidence does not constitute exculpatory *Brady* material, it bears noting that the Government has produced to the defendant, among other relevant materials: (a) numerous OneCoin-related legal opinions and audit reports prepared by various attorneys and auditors alleging that OneCoin is lawful and that its blockchain has been verified; (b) voluminous records obtained from financial institutions worldwide in connection with bank accounts used to transact OneCoin package purchases and to hold and transmit aggregated OneCoin fraud proceeds, including certain due diligence records if available; and (c) voluminous records received from financial institutions and fund administrators in the Cayman Islands,

The third category pertains to "any evidence tending to show that Mr. Scott was not aware that any of the funds he is alleged to have laundered were proceeds of unlawful activity." The Government does not dispute that such information would constitute exculpatory material within the meaning of *Brady* and its progeny.  However, the Government's evidence demonstrates that the defendant was aware that the monies he laundered through the Fenero Funds were the proceeds of illegal activity, specifically, funds derived from the OneCoin fraud scheme.

As noted in the February 19 Letter, the Government is not presently aware of evidence showing that the defendant believed that OneCoin was a legitimate business enterprise, or that he was provided with any particular materials or information that would have led him to that conclusion.  Nor is the Government presently aware of any co-conspirator or other witness statement to the effect that: (a) the defendant did not know about OneCoin's fraudulent nature; (b) the defendant was told that the monies transferred into the Fenero Funds were "from a legitimate source;" or (c) the defendant was unaware that "the source of funding [into the Fenero Funds] was illegal."[21]  That said, the Government has produced to the defendant  interview

---

Ireland, and the United Kingdom related to the Fenero Funds and various Fenero Fund bank accounts—including documents and communications evidencing various due diligence efforts performed by those financial institutions in connection with the Fenero Funds themselves. Though these records do not constitute *Brady* materials, the defendant is free to contact these attorneys, auditors, financial institutions, and fund managers.  Moreover, to the extent that any evidence falling within the second category constitutes impeachment material for a trial witness and has not already been disclosed, the Government will produce such material along with its 3500 production in advance of trial.  *See, e.g.*, *Morgan*, 690 F. Supp. 2d 274 at 286 & n.61.

[21]  To the extent that the defendant is seeking as *Brady* material evidence of his own self-serving statements that the monies deposited into the Fenero Funds were derived from sources other than OneCoin—for example, statements to bank representatives that the funds were derived from allegedly legitimate sources—those statements are not exculpatory and instead constitute misrepresentations made by the defendant in furtherance of the charged money laundering conspiracy.  In any event, the Government has produced a substantial quantity of email communications in which Scott makes such self-serving statements to bank representatives and others during the course of the charged conspiracy.

reports related to several individuals to whom the defendant made, among other statements, self-serving claims that his conduct in operating the Fenero Funds was generally lawful and in compliance with advice received from attorneys and auditors.[22]

Should the Government become aware of any additional evidence tending to show that the defendant was not aware that the funds he laundered through the Fenero Funds were the proceeds of criminal activity, it will promptly produce such evidence to defense counsel.

Because the Government has met its obligations under *Brady* and its progeny and has committed to producing any additional such material in a timely manner, should the Government become aware of it, the Court should deny the defendant's motion to compel production of *Brady* material.

## IV.   The Defendant's Motion to Compel Disclosure of Witness and Exhibit Lists Two Weeks Before Trial is Premature and Should be Denied Without Prejudice to Future Renewal

The defendant moves for an order compelling the Government to disclose its witness list two weeks prior to trial.  (Scott Mot. to Compel, Dkt. Nos. 72-74).  The Court should deny the motion as premature, without prejudice to future renewal by the defendant should such an application be warranted at a later date.

As an initial matter, the law is clear that defendants are not entitled to information regarding the identity of government witnesses as a matter of right and the decision as to whether they will receive such information at all rests within the discretion of the trial court.  *See United States* v. *Turkish,* 458 F. Supp. 874, 880-81 (S.D.N.Y. 1978).  Before a court can consider an application compelling disclosure of witness information, however, the defendant must make "a

---

[22]  Based in part of these statements, on February 19, 2019, the Government wrote the defendant's attorneys seeking reciprocal discovery materials related to any advice-of-counsel or advice-of-accountant defenses that the defendant may raise at trial.  To date, the Government has received no response to that letter request and no reciprocal discovery materials.

specific showing that disclosure [is] both material to the preparation of his defense and reasonable in light of the circumstances surrounding his case." *United States v. Giffen*, 379 F. Supp. 2d 337, 345 (S.D.N.Y. 2004) (quoting *United States v. Cannone*, 528 F.2d 296, 301 (2d Cir. 1975)); *see also United States v. Bejasa,* 904 F.2d 137, 139-40 (2d Cir. 1990) (finding no error where district court did not compel disclosure of witness list without a "specific showing that the disclosure was material to the preparation of the defense and reasonable in light of the circumstances"); *United States* v. *Rubin/Chambers,* 832 F. Supp. 2d 349, 353 (S.D.N.Y. 2011) (noting that there is "no requirement that the Government disclose the identity of its witnesses before trial, absent a specific showing" that disclosure is material to preparation of the defense and reasonable) (internal quotations omitted); *United States v. Russo,* 483 F. Supp. 2d 301, 309 (S.D.N.Y. 2007) (applying the same standard).

Nor does the law provide that a defendant is entitled to the production of a list identifying Government exhibits in advance of trial. *See, e.g.*, *United States v. Valerio*, 737 F. Supp. 844, 847 (S.D.N.Y. 1990) ("The defendants' request for an exhibit list should similarly be denied. The defendants are only entitled to that discovery required by Rule 16(a)(1)(C) of the Federal Rules of Criminal Procedure, and this request falls outside the scope of that rule."); *United States v. Delacruz*, No. 14 CR 815 KBF, 2015 WL 2211943, at *3 (S.D.N.Y. May 12, 2015) (denying defendant's demands for disclosure of exhibit and witness lists are premature, observing that, "[a]s to the exhibit list, there is no authority for the proposition that the Government must disclose its anticipated trial exhibits at such an early juncture").

Notwithstanding the precedent described above, the Government submits that, at this stage in the proceedings, the Court need not decide the defendant's motion to compel on the merits.  Rather, given that trial in this matter is presently scheduled to begin on October 7,

2019—over four months from now—the defendant's motion should be denied by the Court as premature, without prejudice to future renewal. *See Delacruz*, 2015 WL 2211943, at *3 (denying defendant's request for witness and exhibit lists as premature); *Russo*, 483 F. Supp. 2d at 310 (denying similar request, and providing that "[d]efendants are . . . granted leave to renew their requests for early disclosure when this matter is closer to trial"). As the October 2019 trial date in this matter approaches, the Government will engage in good faith consultations with the defendant in an effort to come to an agreement regarding the production of various materials in advance of trial. To the extent that the parties cannot come to a mutually agreeable resolution, the Government submits that the defendant may make any appropriate further application to the Court at that time.

## **CONCLUSION**

For the foregoing reasons, defendant's Motions should be denied in their entirety.

Dated: New York, New York
        June 5, 2019

                            Respectfully submitted,

                            GEOFFREY S. BERMAN
                            United States Attorney


                    by: _____/s/_____
                            Christopher J. DiMase / Nicholas Folly
                            Assistant United States Attorneys
                            (212) 637-2433 / 1060

                            Julieta V. Lozano
                            Special Assistant United States Attorney
                            (212) 335-4025