J7gWscoC

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                           17 Cr. 630 (ER)

5   MARK S. SCOTT,

6              Defendant.
                                            Conference
7   ------------------------------x

8                                           New York, N.Y.
                                            July 16, 2019
9                                           3:30 p.m.

10  Before:

11
                        HON. EDGARDO RAMOS,
12
                                            District Judge
13
                          APPEARANCES
14
    GEOFFREY S. BERMAN
15       United States Attorney for the
         Southern District of New York
16  BY:  CHRISTOPHER J. DIMASE
         NICHOLAS S. FOLLY
17       LISA P. KOROLOGOS
         Assistant United States Attorneys
18       -and-
         JULIETA V. LOZANO
19       Special Assistant United States Attorney

20  DAVID M. GARVIN
         Attorney for Defendant
21       -and-
    NOBLES & DECAROLIS
22  BY:  JAMES NOBLES

23  RASKIN & RASKIN
         Attorneys for David Pike
24  BY:  MARTIN R. RASKIN
         JANE SERENE RASKIN
25       (appearing telephonically)
```

1          (Case called)

2          MR. DIMASE:  Good afternoon, your Honor.  Christopher

3   Dimase, for the government.  I'm joined at counsel table by

4   Special Assistant U.S. Attorney Julieta Lozano, prosecutor from

5   the Manhattan D.A.'s office, Nick Folly, from the U.S.

6   Attorney's Office, and Lisa Korologos, who is on the

7   government's filter team.

8          THE COURT:  Good afternoon to you all.

9          MR. GARVIN:  Good afternoon, your Honor.  James Nobles

10  and David Garvin, for Mr. Scott.

11         THE COURT:  And good afternoon to you.

12         This matter is on for a status conference.  There are

13  a number of things outstanding and a number of motions that are

14  now fully briefed.

15         What I want to do this afternoon, and then I'm happy

16  to do whatever you folks want to discuss, is I want to give you

17  my opinion on certain of the motions, on the four that were

18  submitted by Mr. Scott.  I want to talk to you a little bit

19  more, so that I understand the issue a little bit more,

20  concerning the July 10 and July 12 letters that were submitted

21  concerning the review and what is being done and what should be

22  being done.  And the other motion I will take under advisement,

23  the other motion concerning the fraud exception.

24         With that, let me give you the opinion on the first

25  four of the motions.  What I'm doing is I'm denying three of

3

1    the motions.  I'm denying the motion to suppress.  I'm denying

2    the motion to dismiss the indictment.  I'm denying the *Brady*

3    motion.  But I am granting the motion on the witness list and

4    exhibit list.  And I'll be reading this.

5           The defendant has moved to suppress all evidence

6    seized pursuant to a series of search warrants executed on his

7    properties in September 2018 on the grounds that the affidavits

8    failed to establish probable cause; the affidavits were

9    insufficiently particularized; the search warrants were

10   unconstitutionally overbroad; the seizures exceeded the scope

11   of the warrants; electronic devices have been retained in an

12   unconstitutionally unreasonable manner; and that privileged

13   information was seized without following established

14   procedures.

15          The Court finds that the search warrants were more

16   than adequately supported by probable cause, were sufficiently

17   particularized and not overbroad.  In addition, the warrants

18   were executed in a reasonable manner, and the government

19   seized, reviewed and has retained the evidence appropriately.

20          The Florida and Massachusetts warrants directed that

21   the items to be seized -- and these are Mr. Scott's two

22   residences, one in Florida and one in Massachusetts -- include

23   the evidence, fruits and instrumentalities of violations of

24   Title 18 of the United States Code, Sections 1956 and 1344,

25   related to the OneCoin business, and each set forth an itemized

1    list of particular evidence.

2              This evidence list included, among other things, the

3    documents and communications related to OneCoin; the documents

4    and communications referencing numerous specific individuals

5    and entities; financial agreements and records; and

6    communications constituting crimes, or with coconspirators, all

7    this covering the period July 2015 to the date of the warrant.

8    The list of items to be seized also included evidence

9    concerning the identity or location of any coconspirators;

10   evidence concerning the occupancy or ownership of the two

11   premises; and evidence sufficient to identify Mr. Scott's --

12             MR. DIMASE:  Your Honor, actually, I was going to say

13   Mr. Pike's attorneys -- I didn't know if they were on the line.

14             THE COURT:  I was going to ask.  Has anyone

15   communicated with them?  Because I haven't heard anything.

16             THE DEPUTY CLERK:  Mr. Raskin is on the line now.

17             THE COURT:  Mr. Raskin is on the line?

18             MR. RASKIN:  Yes, I'm here, and so is Jane Raskin.

19             THE COURT:  Good afternoon to you both.

20             By the way, you haven't filed anything, correct?

21             MR. RASKIN:  I have not.

22             THE COURT:  OK  I just wanted to make sure, because I

23   saw your name on the letter and I didn't think that I'd seen

24   anything from you.

25             I am about half of a page into a three-and-a-half-page

1    decision, Mr. and Ms. Raskin.

2              MR. RASKIN:  Fine.

3              MR. DIMASE:  Your Honor, for the record, because I

4    don't know if this was said on the record, the two lawyers on

5    the phone represent Mr. David Pike, who was copied on the

6    crimes fraud and motion to compel application made by the

7    government and responded to by Mr. Scott's attorneys.  That's

8    why they were invited to participate today.  I actually think

9    that the search warrant motion you've been addressing is

10   necessarily relevant to them, so you're welcome to repeat

11   anything that's been said so far.

12             THE COURT:  I'm not going to repeat anything.

13             MR. DIMASE:  OK.

14             THE COURT:  The list of items to be seized in the

15   Florida warrant additionally included any items purchased by or

16   for Mr. Scott with funds originating from OneCoin, including

17   particular pieces of jewelry, handbags, watches and clocks.

18   The Massachusetts warrant also identified particular items,

19   including certain pieces of jewelry, handbags, again, watches

20   and clocks.

21             The warrants authorized the seizure of computers and

22   other electronic devices and storage media that may contain any

23   electronically stored information that constituted relevant

24   evidence that was otherwise defined in the warrant.

25             After the warrants were executed, the defendant was

provided with copies of all hard-copy documents and electronic

materials and communications stored on the electronic media

seized from the defendant.

        With respect to probable cause, again, the law is well

established in this circuit.

        Probable cause is a "flexible, common-sense standard,"

which requires a case-by-case analysis of the totality of the

circumstances.  In considering a request for a search warrant,

"[t]he task of the issuing magistrate is simply to make

practical common-sense decisions whether, given all the

circumstances set forth in the affidavit...,there is a fair

probability that contraband or evidence of a crime will be

found in a particular place," *Illinois v. Gates*, 462 U.S. 238

(S.Ct. 1983).  In this regard, the training and experience of

law enforcement officers may bear significantly on probable

cause determinates.  Inferences drawn by law enforcement agents

based on facts known to them, the totality of the

circumstances, and their training and experience may all

support a probable cause finding.

        Moreover, where a search has been conducted pursuant

to a court-authorized warrant, "great deference" is due to a

magistrate judge's probable cause determination.  *U.S. v. Leon*,

468 U.S. 897, 914.  "The task of the issuing magistrate is

simply to make a practical, common-sense decision whether,

given all the circumstances set forth in the affidavit before

1   her...there is a fair probability that contraband or evidence

2   of a crime will be found in a particular place.

3         To be sufficiently particular under the Fourth

4   Amendment, a warrant must satisfy three requirements.  It must,

5   first, "identify the specific offense for which the police have

6   established probable cause"; second, "describe the place to be

7   searched', and third, "specify the items to be seized by their

8   relation to designated crimes."  The Fourth Amendment does not

9   require a perfect description of the data to be searched and

10  seized, and indeed "[s]earch warrants covering digital data may

11  contain 'some ambiguity....'"  (quoting *United States v.*

12  *Galpin*, 720 F.3d at 446).  The particularity requirement is

13  satisfied if the warrant, including its attachments, enables

14  the executing officer to identify with reasonable certainty

15  those items that the magistrate judge has authorized him or her

16  to seize.

17        In light of the foregoing, and construing the

18  circumstances in their totality, the facts set forth in the

19  affidavits provide ample probable cause to believe that

20  Mr. Scott engaged in the crimes articulated in the search

21  warrants, including conspiracy to commit money laundering.

22  Indeed, on August 21, 2018, before the Hafer affidavit was

23  signed and the Florida warrant was authorized, a grand jury

24  issued the S6 indictment, concluding, based on the evidence

25  collected in this investigation, that reasonable cause existed

1   to believe that Mr. Scott committed the crime of conspiracy to

2   commit money laundering.  While the defendant argues that the

3   fact of the indictment is irrelevant, and in certain cases it

4   certainly may be, as search warrants generally come before an

5   indictment, here, the magistrate was provided with a copy of

6   the indictment which establishes, as a matter of law, probable

7   cause that the named defendant committed the charged offense.

8   But even if the indictment was not included with the affidavit,

9   the affidavit is nonetheless sufficient.

10          Even if a warrant lacks probable cause or

11  particularity, or is overbroad, "[t]he fact that a Fourth

12  Amendment violation occurred...does not necessarily mean that

13  the exclusionary rule applies."  Thus, suppression will not be

14  warranted where the evidence at issue was "obtained in

15  objectively reasonable reliance on a subsequently invalidated

16  search warrant."

17          I find that the warrants here were not general

18  warrants authorizing the seizure of all documents.  The

19  warrants specifically list the specific offenses for which

20  probable cause has been established; provided a detailed

21  description of the subject premises; and contained a list of

22  specified items, including categories of materials and

23  illustrative lists, and their relation to the designated

24  offenses.  The warrants contained a detailed of evidence to be

25  seized, including 15 separate categories of materials, and a

1    list of dozens of individuals and entities.  The warrants were

2    thus sufficiently particular.  As such, the warrants enabled

3    the agents to identify with reasonable certainty the items that

4    the magistrate judge had authorized the agents to seize.

5              Counsel for Mr. Scott also argues that the affidavits

6    fail to establish probable cause that Mr. Scott specifically

7    engaged in criminal activity.  I disagree.  First of all, the

8    defendant does not appear to argue that the description of

9    OneCoin and its activities probably constitute fraudulent

10   conduct.  The question is what Mr. Scott knew.  In a section of

11   Agent Shimko's affidavit, which is the one included in the

12   government's response, entitled "Scott's use of Fenero hedge

13   fund to launder OneCoin proceeds," the government describes how

14   Mr. Scott lied to a fund administration firm and the bank about

15   the origin of the moneys passing through this accounts.  The

16   Court finds that those allegations provide very strong

17   circumstantial evidence that Mr. Scott knew that the proceeds

18   were part of a fraudulent scheme.  In fact, in paragraph 21(n)

19   of the Shimko affidavit --

20             Could I ask Mr. and Ms. Raskin to stop moving.  You're

21   coming through with a lot of noise, at least on my microphone.

22   If you can put it on mute, that would be helpful.

23             In paragraph 21(n) of the Shimko affidavit, after the

24   fund administration firm first learns about the link between

25   OneCoin and Mr. Scott's firm, it is quoted as communicating

1    with Mr. Scott as follows:

2              "The first mention of OneCoin [to the fund

3    administration firm] was only yesterday morning as the

4    counterparty to a contract with IMS, Mr. Scott's firm.  This

5    now opens more enhanced due diligence questions around the flow

6    of money from IMS to OneCoin, particularly as there is a large

7    amount of information on the Internet raising concerns about

8    OneCoin, its beneficial owners and the number of investigations

9    by different regulators."

10             The affidavit then notes that Mr. Scott terminated his

11   relationship with the fund administration firm that very day.

12   That communication and Mr. Scott's reaction to it, again,

13   provide strong circumstantial evidence that Mr. Scott knew, or

14   consciously avoided knowing, about the fraudulent nature of

15   OneCoin's business.

16             There's also in the affidavit particular procedures

17   that were to be used by the taint team, knowing that Mr. Scott

18   was an attorney, in order to prevent the prosecution team or

19   the investigative team from coming across any information that

20   might be attorney-client privileged.  While the defendant notes

21   that those procedures may not have been followed, I find no

22   basis for that determination, as it is also the case that

23   according to the government's representations, items which were

24   seized that were not directly relevant to the items that were

25   specified in the affidavit were returned, or attempts were made

1    to return them, to Mr. Scott and his attorneys.

2            With respect to the motion to dismiss, it is well

3    settled in this circuit that "an indictment is sufficient if

4    it, first, contains the elements of the offense charged and

5    fairly informs the defendant of the charge against which he

6    must defend; and second, enables him to plead an acquittal or

7    conviction in bar of future prosecutions for the same offense,"

8    (quoting *Hamling v. United States*, 418 U.S. 87 (S.Ct. 1974)).

9            The Sixth Amendment guarantees a defendant's right "to

10   be informed of the nature and cause of the accusation" against

11   him.  And Rule 7 of the Federal Rules of Criminal Procedure

12   provides only that an indictment "must be a plain, concise and

13   written statement of the essential facts constituting the

14   offense charged."

15           The S6 indictment comfortably meets this pleading

16   standard in that it tracks the language of the applicable

17   statute, and it provides notice of the applicable time period

18   and place of the offense that is alleged to have taken place;

19   that is, the indictment alleges that certain acts in

20   furtherance of a conspiracy to launder money were committed in

21   the Southern District of New York.  Nothing more is required.

22           with respect to the *Brady* motion, pursuant to *Brady v.*

23   *Maryland*, the government has a constitutional obligation to

24   disclose evidence that is materially favorable to the defendant

25   as to either guilt or punishment, including information that

could be used to impeach a government witness.  "The rationale

underlying *Brady* is not to supply a defendant with all the

evidence in the government's possession which might conceivably

assist the preparation of his defense, but to assure that the

defendant will not be denied access to exculpatory evidence

only known to the government."  Evidence is "material" under

*Brady* only if disclosure of the evidence will lead to "a

reasonable probability of a different result" in the outcome of

a trial.  Courts have denied specific discovery orders of *Brady*

material where the government has made a good faith

representation that it understands its discovery obligations

and will comply with these obligations going forward.  The

government has made such a representation here and has, in

addition, answered fully, in the Court's view, certain

questions that were put to them by defense counsel, which were

included as exhibits to Mr. Garvin's motion.

          And finally, there is the motion concerning an exhibit

list and a witness list, which the defendants have requested,

reasonably, I believe, on the facts of this case, two weeks

prior to trial.  Both sides appear to agree that it is within

my discretion to order that such discovery be made and when

such discovery should be made.  I find that given the size of

this case, its complexity and the issues that we will be

dealing with going forward and probably up to the day of trial

will require that the defendant get these materials two weeks

1    prior so that trial can begin and proceed without any undue

2    disruption.

3              That constitutes the decision of the Court concerning

4    those four motions.  I will issue a short order either later

5    today or tomorrow for the record.

6              Now, if we could, Mr. Garvin or Mr. Nobles, I'm happy

7    to hear you first, since you wrote first, on the issue of the

8    review as it is currently taking place.

9              MR. GARVIN:  Thank you, your Honor.

10             Your Honor, we're talking about the privilege review

11   at this point.  I did want to mention to this honorable Court

12   that there was also an issue that was pending for the Court's

13   determination regarding the subpoena.  The Court may recall

14   that there was a subpoena issued to the entities that Mr. Scott

15   had formed --

16             THE COURT:  MSSI.

17             MR. GARVIN:  Yes.

18             THE COURT:  OK.

19             MR. GARVIN:  -- designating Mr. Scott as the records

20   custodian and designating Mr. Pike as the records custodian for

21   at least one of the entities, the subpoenas being identical, so

22   there is that matter also, if the Court were inclined, since we

23   are here, at some point today we might spend a few moments

24   addressing.

25             THE COURT:  I'm happy to do that also.

1          MR. GARVIN:  Going to the issue of privilege, your

2     Honor, we have a situation, as the Court is well aware, and as

3     counsel for the government has reflected as early as our last

4     hearing and perhaps even the hearing prior to that, that there

5     are a lot of documents in this case, and it may well be, by the

6     time it's all said and done, that there are over a million

7     documents that were taken during the search warrant of the two

8     homes and have to be considered because Mr. Scott, as everyone

9     knows, has been a lawyer for over 20 years.

10          We have received from the government the first set of

11     production from the taint team.  In or about February, the

12     taint team had requested from the defense assistance by the

13     defendant's providing a list of names that Mr. Scott recalled

14     as clients and as lawyers.

15          We provided the list, even though Mr. Scott had a

16     fifth Amendment right not to say anything, with the

17     understanding that it would be kept confidential by the taint

18     team and used to assist it in doing its purging of documents

19     from the documents that were taken that are arguably privileged

20     versus those that are not.

21          We have run into a difficulty, and that difficulty is

22     that the defense does not have the resources to physically

23     inspect all of the documents, those that are contained in the

24     first batch, which are approximately 96,000 pages of documents,

25     and those that are expected to follow.  We had stated from

1    inception that we would like to see the documents that the

2    taint team believes to be not privileged before they are turned

3    over to the trial team so that we can ensure that we agree as

4    to what is privileged and what is not privileged.

5          To date, the taint team did follow that protocol and

6    did supply to us the first batch of documents, which are the

7    96,000 pages, broken into two categories: one category which is

8    a category that ran the names as a filter on the computer that

9    we provided with a couple of other key words, such as "lawyer"

10   and "law" and "attorney."  That stack that did not have any

11   hits by the computer we are now told that the taint team never

12   visually inspected; they just segregated and took the position

13   that those are not privileged documents and are ready to be

14   turned over to the trial team once the defense reviews them

15   all.

16         THE COURT:  I'm sorry.  Your understanding was that

17   that initial bucket that you described was documents that were

18   filtered through the names and key words that you supplied to

19   the government and were not hit on.

20         MR. GARVIN:  That was not our understanding.  That is

21   what has happened that the government is proposing.

22         Our understanding was that, from the defense point of

23   view, the taint team would conduct the procedures it felt

24   necessary to satisfy itself that the documents it was going to

25   produce to the trial team were not privileged.  Now we have

1   learned, subsequent to that fact, that the list that we

2   provided was used to scrub the first production, the first

3   batch, these 96,000 pages of documents, but that if there was

4   no positive hit for any of the words, the key words used, that

5   the taint team did not visually inspect those documents.  It

6   just segregated them and took the position that they're not

7   privileged.

8              THE COURT:  Let me, just so that I don't get lost in

9   all of this, just ask the government.

10             Ms. Korologos, is that accurate?

11             MS. KOROLOGOS:  It probably could be more accurate if

12   I could just clarify.

13             THE COURT:  OK.

14             MS. KOROLOGOS:  Based on what the government did is we

15   took the terms.  We created terms based on the list of

16   attorneys and clients and entities that Mr. Scott's counsel

17   indicated that he had an attorney-client relationship with.  So

18   I have terms, addresses, names that we ran through the

19   documents that were seized during the search warrants.  There

20   are approximately 100,000 documents online, electronic copies.

21             THE COURT:  And did you use only the terms that were

22   provided by the defense, or did you include terms as well?

23             MS. KOROLOGOS:  We didn't use generic terms.  We only

24   took a name and the first name within a couple of the letters

25   of law firm domains.  If they didn't provide a law firm domain,

1    we went in and looked through the July emails and found out the

2    law firm domain, so we did add terms, but based on every

3    entity, individual or law firm or attorney, we went in and we

4    tried to do the best we could to make sure that we had search

5    terms that would capture those communications or documents.

6              THE COURT:  And did you share with Mr. Garvin the

7    universe of names or returns that you used to scrub the

8    documents or not?

9              MS. KOROLOGOS:  No, he didn't request those.  We do

10   have those.  Normally, I would share those with the prosecution

11   team as well.

12             THE COURT:  Right.

13             MS. KOROLOGOS:  So that when they are produced, but we

14   haven't done anything.  But I have those reports.

15             THE COURT:  And you also haven't shared them with the

16   prosecution team.

17             MS. KOROLOGOS:  I have not, your Honor.

18             THE COURT:  OK.

19             MS. KOROLOGOS:  Then we have the universe of hits and

20   nonhits.  And the ones that hit -- in this case approximately,

21   about 8,000 of the 25,000 did hit, and those were individually

22   reviewed.  And then approximately 20,000 did not hit.  With

23   that group of documents we would go in and we spot-check.  We

24   quality control check it, so we run, we first want to focus on

25   the attorneys and the clients that the defendant has

1    identified.  So we run first names, for instance, just to make

2    sure that we don't need to broaden the terms at all, because

3    the goal is to have everything that hits on any of the

4    identified clients or attorneys fold into the review bucket.

5    And we did actually broaden some of the terms, because when I

6    ran some terms, I could see that some of the terms were a

7    little too narrow, so we broadened those.

8             Then we also run generic terms, and this is a standard

9    protocol that we do with regard to our ESI search warrants,

10   particularly when there's an attorney.  We run terms like

11   "esquire," "attorney," "lawyer," and in the case where there's

12   an older attorney, you have to be a little more creative and

13   try to pull in and make sure that you're doing as many of the

14   possibly privileged documents in the bucket that's going to be

15   reviewed.  And so we did that, and again, we broadened some of

16   the terms, moved more documents into the hits bucket, which was

17   then individually reviewed.

18             THE COURT:  OK.  So, now you have two buckets, one of

19   documents that hit on the terms and one with documents that did

20   not hit.  The documents that did not hit were the approximately

21   20,000 documents you said?

22             MS. KOROLOGOS:  That's correct.

23             THE COURT:  And those were spot-checked.

24             MS. KOROLOGOS:  Spot-checked, that's correct.

25             And so when we produced these documents to the

19

1    defense, we clarified these were the documents, the first

2    documents that did not hit on any of the attorneys or clients

3    that they identified.

4           THE COURT:  Was it your intention then to provide

5    those 20,000 documents assuming no further review by Mr. Garvin

6    and his crew to the prosecution team?

7           MS. KOROLOGOS:  Yes.  We then have them do their

8    responsiveness review and with the goal of then producing the

9    nonprivileged responsive documents to the search warrant to

10   defense counsel.  And in most cases we would have just released

11   those documents to the prosecution team, but in this case,

12   based on defense counsels' request and the prosecution team's

13   granting that request, we produced these documents.  And we

14   designated different buckets so that the defense counsel could

15   know these were ones that did not go through individual review,

16   did not hit on their clients in the hope that because they were

17   produced in electronic format -- again, these were documents

18   that were originally produced back in November 2018.  We have

19   re-produced them in electronic format so defense counsel could

20   run searches and perhaps identify -- which, in fact, they

21   did -- a client that they hadn't previously identified.

22          THE COURT:  Let me ask you this, Ms. Korologos, if I

23   could, and I hope I'm using the right terminology.  With

24   respect to the 20,000 documents that you spot-checked, did you

25   use a statistically significant method that's commonly used?

1          MS. KOROLOGOS:  I've been a privilege review logistics

2     coordinator for a little over two years, and I'm working with

3     my counterpart at the D.A.'s office, who has been focusing on

4     privilege reviews, I think, even a little bit longer than me,

5     so both of us did our QCs, and what we tend to do is we each

6     run the terms until we don't hit on any privileged documents.

7     I'm not even reviewing it for documents.  I'm just trying to

8     get any hit on documents that look like they could be

9     privileged, so I really just keep going until I don't hit on

10    any more.

11         THE COURT:  OK.

12         MS. KOROLOGOS:  And the 20,000 is actually -- in some

13    cases there are hundreds of thousands of documents and you

14    can't do an effective quality control check at that number;

15    it's not going to be statistically relevant.  But with 20,000

16    documents, which are a subset of -- there are a large volume of

17    documents in this case, which we've been reviewing in addition

18    to the documents seized from Mr. Scott, so we do have a pretty

19    good sense of who are these attorneys that we're presented

20    with, certainly the most relevant ones.

21         THE COURT:  Thank you.

22         Mr. Garvin, you got those two buckets.

23         MR. GARVIN:  Yes, sir.

24         THE COURT:  And what problem do you see?

25         MR. GARVIN:  Yes, your Honor.

1        What we have is two buckets.  The total is 96,000

2   pages in this first batch of which in one bucket we have

3   roughly 80,000 pages.  That is in the so-called bucket that was

4   nonresponsive.

5        THE COURT:  Can I stop you for a second --

6        MR. GARVIN:  Yes.

7        THE COURT:  -- because it's going to be easy for me to

8   get confused.  When you say 90,000 pages and she says 20,000

9   documents, are we talking about the same pile?

10       MR. GARVIN:  Yes, sir.

11       THE COURT:  OK.  Go ahead.

12       MR. GARVIN:  So there's 96,000 pages in this universe

13  of the first batch.  Approximately 80,000 pages are in group A,

14  which did not hit for the key words basically that Mr. Scott

15  provided, although Mr. Scott's list was not exclusive.

16       We were also told that the government supplemented

17  those key words, as just described, and with generic terms such

18  as "lawyer," or there were certain lawyers that they knew of

19  that they added.

20       OK.  No one, to our knowledge, and I think I attempted

21  to confirm this, no one visually eyeballed the 80,000 documents

22  in group A.

23       MR. DIMASE:  I did want to clarify pages versus

24  documents.

25       THE COURT:  Right.

1              MR. DIMASE:  Again, it's pages.

2              THE COURT:  Right.

3              MR. GARVIN:  I stand corrected.  Pages, your Honor.

4     The 80,000 pages in group A.

5              So we endeavored to start to look at those, and within

6     a day or two, we had amassed another 15 names of lawyers and

7     documents that did not relate to this case at all, health

8     records of people and Mr. Scott's mother's cancer treatment

9     documents.  And it was obvious to us that this task was going

10    to be a huge task, and the government had to at least eyeball

11    these documents, not simply run a key word check with a

12    computer, because it put all the onus on the defense to eyeball

13    these documents.

14             THE COURT:  Mr. Garvin, now we have a representation

15    from Ms. Korologos that they were, in fact, eyeballed.  They

16    weren't individually eyeballed, but they did a spot-check of

17    these documents.  And as I understand your letter, once you

18    went through however many documents or pages you went through,

19    you identified ten documents that you believe were improperly

20    put in the nonprivileged bucket.  Correct?

21             MR. GARVIN:  Not exactly, your Honor.

22             We sent ten samples of what we thought -- as we

23    continued this process, there were many documents that were

24    arguably privileged, and what we thought would happen was that

25    we would identify the documents that were privileged and then

1    we would have a discussion with Ms. Korologos to see what the

2    government's proposal was and we would resolve it ultimately

3    without this Court's intervention.

4            But what is becoming clear to us is that in the bucket

5    of the documents which did not respond to the key words they

6    used -- and we haven't seen a list of the key words they've

7    used.  When we went in there and started looking,

8    unfortunately, we started finding a substantial amount of

9    documents that related to lawyers and a substantial amount of

10   documents that were arguably privileged, and it became clear

11   that now the onus was going to be placed on the defense to look

12   at this set of documents that I'm being told that the

13   government spot-checked, but prior to today, I was not under

14   the belief that they were spot-checked at all.  But there is a

15   considerable amount.

16           Now let's shift to bucket 2.

17           THE COURT:  OK.

18           MR. GARVIN:  Or bucket B.  In that group, it is a much

19   smaller amount of pages because these are the ones that

20   actually did hit with the key words that were used.  Again, the

21   defense doesn't know which key words were used in totality,

22   because we didn't have the complete list, only what Mr. Scott

23   supplied, which he said from inception were nonexhaustive.  But

24   when we went into those documents, we were disappointed to see,

25   for example, Nicole Huesmann, who is known to be the lawyer for

1    Mr. Scott and for several of these entities that are in this

2    case.  She has been interviewed by the government.  There were

3    numerous documents and emails between Mr. Scott and

4    Ms. Huesmann on a number of issues still in the stack of

5    documents that hit and that the government was proposing to

6    turn over to the trial team.

7           THE COURT:  Let me do this, Mr. Garvin, because I do

8    want to arrive, if we can, at sort of a practical, pragmatic

9    solution to this.  Again, as I understand your letter, you

10   found ten documents that should have been marked as

11   attorney-client privileged.  The government tells me that of

12   those, nine they have re-reviewed and they stand by their

13   determination that those documents are not attorney-client

14   privileged.  It's one thing to say that the documents of 96,000

15   pages are replete with pages that have attorney names, it's one

16   thing to have an attorney name, but is it attorney-client

17   privileged?

18          MR. GARVIN:  I understand that, your Honor, and that's

19   why I thought we would have a discussion to work it out.

20   Again, I want to emphasize because I sent ten didn't mean we

21   only found ten.  We found binders of documents that we need to

22   discuss with Ms. Korologos.

23          Your Honor, this is the proposal.  I don't want to

24   just come with a problem to the Court.  I wanted to come with a

25   proposed solution, and this is the solution that we think could

1   work.

2          If the government is going to give us a great deal of

3   documents that nobody has ever eyeballed and now the defense is

4   going to be given the burden of looking at those documents, we

5   need to at least filter out of that mountain of documents

6   documents that don't relate to this case at all.  This case

7   relates to OneCoin, and the United States served subpoenas and

8   listed the entities and names, and it's a lengthy list of over

9   30 entries, of the names and entities that relate to this case.

10  We should not have a million documents to go through.  If they

11  ran a scrub based upon the relevant names and entities that the

12  government has listed in those subpoenas, which are all of the

13  relevant names, because when they're issuing a subpoena, they

14  want everything relevant -- they've been investigating this

15  case for two years -- it would remove a very large percentage

16  of these documents.

17         Again, this indictment covers a period of 2016 to

18  2018.  Mr. Scott's been a lawyer for 20 years.  We shouldn't be

19  required to be doing the privilege search, but if we were going

20  to have to double-check what the taint team has done and then

21  bring forward the ones that we think are privileged and try to

22  work it out with the taint team, we should not be saddled with

23  the burden of looking at hundreds of thousands of pages of

24  documents by the time this process is over that don't relate to

25  the trial in any manner.

THE COURT:  Let me ask you this.  Didn't you ask specifically to be able to do that, to double-check what the taint team has done?  That's why you're getting them before the prosecution team, right?

MR. GARVIN:  I asked, and I was told by the United States that the scrub that I'm now suggesting will be done by the trial team after they receive all the documents from the taint team.  And to me, that is closing the barn door after the horse has left, so we're respectfully asking to change the order, and we think that that will make this more manageable and will make it feasible, and then we can do this without the Court's intervention unless we can't agree on particular documents as to whether they're privileged or not.

THE COURT:  Believe me, I'm happy to send you folks away to talk some more, but what is your request?

MR. GARVIN:  Once again, my request, your Honor, is that the United States scrub the data with the key words that they believe are relevant to this case, names and entities and key words that are relevant, such as the word "OneCoin," for example, "cryptocurrency," "crypto," "Ruja," "Ignatova," "Konstantin," "Irina."

THE COURT:  I understand all that, but you just want a more robust list of terms.

MR. GARVIN:  Well, that's not the list of terms that we're claiming attorney-client privilege.  We're saying if it

1    doesn't hit those terms that they've listed on those two

2    subpoenas, then the odds are those documents are irrelevant,

3    and to force the defense to wade through those documents, which

4    will be a mountain of paper, to determine if there are any

5    privileged documents in there is not feasible.  We just don't

6    have the resources to accomplish that.

7            THE COURT:  I'll just note for the record that you

8    wanted to start trial yesterday, July 15.

9            MR. GARVIN:  Yes, we did, your Honor, and that was

10   before this presented itself.

11           But I would say, your Honor, that if the trial team

12   provides the list to the taint team, we expect that a majority

13   of the documents, perhaps even an overwhelming majority,

14   although I'm not certain, because I haven't seen them all, will

15   be separated and so we would be focusing on documents that are

16   relevant, and that would make the search manageable.

17           THE COURT:  Let me do this.  I don't know whether this

18   question should be answered by Ms. Korologos or by Mr. Dimase

19   or even by Mr. Folly, who's standing.

20           That has some sort of facial reasonableness to it.

21   What's wrong with that suggestion?

22           MR. FOLLY:  Your Honor, there are several issues with

23   that suggestion, but just to sort of take a step back, there

24   really is a simple solution to this.  Defense counsel has asked

25   to be allowed to review the documents that the taint team deems

to be nonprivileged before they are given to the prosecution
team.  That was their request.  They have no right to do that.
There's no authority that grants them that right.  The search
warrant grants the prosecution team the right to review all
responsive documents that are not privileged.  So after asking
to get access and the ability to review the documents, they're
now saying, No, no, no, we're overwhelmed and we have a burden
that is being placed on us to review these documents, the
solution to that is what we do in most cases, which is that the
taint team reviews the documents in the first instance and then
all of the documents they deemed to be nonprivileged are
released to the prosecution team and the prosecution team
reviews them to determine whether or not they're responsive.
And then they provide to defense counsel the list of the
documents that are deemed to be responsive.

          Here, defense counsel wants to completely invert the
process and actually have the privilege review team conduct a
responsiveness review, and that creates a number of challenges.
One is it potentially removes the ability for the prosecution
team, the people actually handling the case, who know the facts
and are directly involved in the review of all the other case
materials, to assess on a document-by-document basis which
documents are responsive, because all we would get at the end
of this process would be the documents that hit on those search
terms, and there could very well be responsive documents that

1    are not included in that that we are entitled, under the search

2    warrant, to review at some point in this process.

3                THE COURT:  Let me ask you this.  Now, as I

4    understand, as I recall from my reading of the papers,

5    Mr. Scott was introduced to CC-1 or CC-2 on some definite date

6    in the not too distant past.  I assume that the universe of

7    documents that Ms. Korologos and her colleagues are going

8    through are 20 years worth of his records.  Would a time limit

9    on the review be workable?  If he didn't meet the

10   coconspirators until, whenever it was, 2015, 2016, why are we

11   reviewing documents going back to 2009?

12               That's just one suggestion.

13               The other suggestion is that Mr. Garvin, obviously,

14   and his client have a very strong interest in making sure that

15   the privilege review is as thorough as possible, and it appears

16   as though the list that is currently being used could be

17   enhanced or enlarged in order to possibly capture more

18   potentially privileged documents.

19               Is there a way that we can further refine or you can

20   further refine the parameters of the search?

21               MS. KOROLOGOS:  Your Honor, I can address that.

22               THE COURT:  Can you get closer to a microphone.

23               MS. KOROLOGOS:  I'm sorry.

24               Some of the documents we can't ascertain a date, and

25   that is something that -- generally, that is a way that we can

1    narrow a search warrant, where it's not the filter team doing

2    the responsiveness review that is subjective in any way.  But a

3    lot of documents, the hard-copy documents, a lot of them don't

4    have dates, but for the ones that do have dates, that can be a

5    parameter that I think we can impose to try and limit

6    documents.

7              Turning to the issues raised with regard to the filter

8    review, the filter team produced these documents to defense

9    counsel on May 6.  These were 25,000 documents in electronic

10   format that when you do searches, to refer to them as pages is

11   misleading.  These are documents that you can do searches, and

12   you can sometimes tell immediately, usually, whether or not

13   it's privileged.  If it's a 100-page document that's a publicly

14   available document, you don't have to read every single page.

15   You can tell what it is.  Like medical reports, you can tell

16   that it's not an attorney-client communication that's

17   confidential for the providing of legal advice.

18             So when we said this, we were hoping that defense

19   counsel, as they asked, would actually look at the documents.

20   As Mr. Garvin just said, they didn't even look at these

21   documents until sometime in July when they looked at it for one

22   day and they found these two documents, these ten documents

23   that they've now brought to the Court's attention.  I have

24   copies here with me.

25             Five of the documents were in the bucket that did not

1    hit on any terms, and I have the terms.  They never asked me

2    for the terms.  I have these terms.  I'll be happy to give them

3    to them.  They can run the terms and they can see if more

4    documents come up at issue to run.

5            As I said, when they gave us the name of this client

6    that I can't tell you, we ran the full document -- all of the

7    documents seized and we'll review those.  If defense counsel

8    actually showed me something in my process that's wrong or that

9    can be better, we'd totally do that.

10           With regard to the second batch, when Mr. Garvin just

11   told you there were communications with Ms. Huesmann, we looked

12   at those.  Those were communications with Ms. Huesmann that had

13   no substantive content.  They were literally of the caliber of

14   "let's meet tomorrow"; "did you send the document out"?  They

15   were not confidential communications in furtherance of legal

16   advice.

17           One of the documents was a contract that was sent to

18   Mr. Scott from opposing counsel.  It only identified the

19   attachment.  The cover email made it clear that this came from

20   opposing counsel.  It wasn't privileged in any way.  Those were

21   five documents that we did look at, and we determined they

22   weren't privileged, and I'm happy to engage -- in our response

23   we told Mr. Garvin I'll sit down with him with those five

24   documents.  I'll sit down with him with any documents that he

25   thinks, and I will be open to improvements in our system.  But

1    it's certainly -- you know, we produced these in May.  For two

2    months they didn't even look at them.  And as Mr. Folly said,

3    we stand by our review.  If we've released these nonprivileged

4    documents to the prosecution team, they will then go through

5    and they will do the responsiveness review that is required

6    under the warrant and the law.  They'll go through and they'll

7    create a subset of nonprivileged responsive documents which

8    they will produce to defense counsel.  This will be a useable

9    number.  If any documents slip through that are potentially

10   privileged, the defense counsel can alert us, we can claw those

11   back and we'll take whatever remedial steps are necessary.

12        If it's something with a Sixth Amendment issue, we'll

13   have to deal with that when it comes, but we are very careful

14   with what we've gone through, and at most, it could be that

15   some of these nonresponsive, like the one that was identified

16   in group 1 that was a client that wasn't identified to us but

17   was an issue that is completely irrelevant to the indictment,

18   and that will likely just get purged out as nonresponsive, once

19   they're allowed to do their responsiveness review.

20        THE COURT:  Mr. Garvin.

21        MR. GARVIN:  Please.

22        First, your Honor, I'm sorry, but Ms. Korologos is

23   misstating.  We didn't just look at this stuff one day in July.

24   We've been working on it periodically throughout the entire

25   period of time once they got it to us on or about May 6.  They

1    didn't ask us for our list until February.  They had it for

2    seven months and didn't do anything for seven months.

3         THE COURT:  From February to May is three months, if

4    that's what you're referring to.

5         MR. GARVIN:  No.  I'm talking before.  They executed

6    the search warrants in September, your Honor, and they asked us

7    in February for the list of names, so there could not have been

8    a scrub of the list of names until we provided the list.  And

9    that's what I'm referring to that they didn't do anything for

10   seven months.

11        With all due respect, this gets us back to the same

12   place, and that's why I keep on making the offer to solve it.

13   Where we're at is that we're going to end up with bucket A, a

14   tremendous amount of pages of documents.  I know that the

15   government doesn't want to look at each and every page, but

16   their spot-check is woefully inadequate.  We've gone through it

17   and we've found, as I told you before, 14 more lawyers who are

18   in this.  Their names never hit, which means they couldn't have

19   been on the search list.

20        We do not trust -- not because of their integrity but

21   just because of their work product, we no longer have

22   confidence in the taint team's ability to provide documents

23   that are nonprivileged.  And quite frankly, the trial team has

24   no confidence either, because our solution is, OK, you, the

25   trial team, know the list of names, the entities, you put them

34

1   on your subpoenas, which you served upon us, you have the

2   ability to trim this down to only relevant documents if you

3   wanted to and you won't do it.  Why won't you do it?  Because

4   they don't have confidence in the taint team scrubbing it with

5   a computer either.  They're afraid that maybe they'll miss

6   something.  As counsel just said, we'd like to see each

7   document.

8           Well, by them exercising their right to see each

9   document, what they're doing is they're placing upon the

10  defense the burden of having to inspect every document,

11  including years of documents that are irrelevant, and we

12  shouldn't be placed under that burden.

13          THE COURT:  Mr. Folly.

14          MR. FOLLY:  Your Honor, your Honor's proposal with

15  respect to the date range is a point very well-taken and we

16  think would be entirely appropriate here to ensure that it's

17  precisely narrowed, that there are no documents, to the extent

18  we can narrow it to the time period at issue within the

19  confines of the search warrant, we'll absolutely do that.

20          THE COURT:  That cuts out 17 years of 20 years of

21  documents, right?

22          MR. FOLLY:  Your Honor, I don't think that's accurate.

23  I don't think it would substantially decrease the documents,

24  but of course, we have not been able to review any of them, so

25  I can't directly speak to that.

1          MS. KOROLOGOS:  I could just address it briefly.

2          So much of it is actually electronic off of a date,

3    off of the computers and such, and a lot of those are not that

4    old, so it's not substantial.

5          THE COURT:  OK.

6          MR. FOLLY:  But your Honor, the core proposal of

7    defendant to essentially have the filter team be doing a

8    responsiveness review before the documents are turned over to

9    the prosecution team is just fundamentally flawed.  There's not

10   a burden that's getting placed on defense counsel here.  If

11   they do not have the time or if they choose to spend their time

12   doing other things, they do not have to review these documents

13   before they move on to the prosecution team.

14         We are more than happy to update the list on a

15   periodic basis.  That's what happens routinely in just about

16   over single case where there's a privilege review.  As

17   responsiveness review is unfolding, you come across new

18   attorney names.  You come across new terms.  You claw back

19   those documents, once you send them back to the filter team,

20   and they do an additional sweep and take them out of that

21   universe of documents.

22         THE COURT:  I think that's right, and I think that's

23   why it may be a little premature for me to step in, because I

24   think what needs to happen is certainly Ms. Korologos and

25   Mr. Garvin need to get together and talk about what the list

1    is.  And again, I don't know exactly what the communications

2    are between Ms. Korologos and the prosecution team, but would

3    it be appropriate for the prosecution team to be part of that

4    conversation, Ms. Korologos, in terms of what the search list

5    should consist of?

6         MS. KOROLOGOS:  I think so, but in this case --

7    generally, the prosecution team is involved.  One of the ways

8    the prosecution team can be helpful in this manner is that they

9    can let me know if certain types of attorneys are clearly not

10   involved and certain clients are not involved.

11        In this case, we're hampered because defense counsel

12   is refusing to let me share their attorney-client list with the

13   prosecution team, so that I can't confer with defense counsel,

14   I can't confer with the prosecution team in a meaningful way

15   about what attorneys or clients may or may not be responsive to

16   the warrant.  And as I understand, the prosecution team has

17   repeatedly asked the Court to allow the filter team to share

18   the attorney-client list with the prosecution team.  There is

19   no basis, there is no Fifth Amendment right or interest in

20   sharing the name of the attorneys.  Mr. Scott has indicated

21   these people represented him.  I'm not aware of any precedent

22   or authority for keeping that information privileged or Fifth

23   Amendment, and much like clients, client lists, similarly, if

24   any of the clients had a Fifth Amendment interest, they would

25   need to assert it, and it certainly can't be that all of

1    Mr. Scott's clients through the years shared this.

2            THE COURT:  But it's certainly the case, I think, that

3    Mr. Garvin turned over that list on the understanding that it

4    would not be turned over to the government, and so I would

5    hesitate to do that, at least at this juncture.

6            Mr. Folly.

7            MR. FOLLY:  On that last point, we want to renew our

8    motion as to that list.  We set forth case law both, I believe,

9    by letter as well as in our crime-fraud motion as to why the

10   contents of that list are not privileged and that information

11   should therefore be made available to the prosecution team.

12   For the reasons that we've seen here today at this conference,

13   it would facilitate moving this process forward more quickly,

14   which is a very significant concern that the government has.

15           We provided the clean 5,000 documents to defense

16   counsel in May.  It's now July, and they've essentially

17   obstructed our ability on the prosecution team to actually look

18   at any of those documents.  We have a trial in less than three

19   months, and they're continuing by basically refusing to engage

20   in the process that they proposed to impede everyone on the

21   prosecution team from actually reviewing these documents.

22           THE COURT:  This is what I am inclined to do.  I am

23   inclined to direct the parties to meet and confer to determine

24   how the current process can be enhanced, either by providing a

25   more robust set of terms which are more likely to pick out the

1    privileged documents to the extent that they're not being

2    picked out sufficiently thoroughly, according to Mr. Garvin,

3    and maybe limit the time period for documents.

4            Again, Ms. Korologos, you know a lot more about this

5    than I do, but based on my understanding, a computer will

6    always tell you when a document was last edited or when it was

7    last looked at.

8            MS. KOROLOGOS:  Some of these documents have been

9    scanned, but they were hard-copy documents, so that's not an

10   issue; that was some of the process, so we will try to do that.

11           But your Honor, I do want to make the point that to

12   date, having produced 25,000 documents to Mr. Garvin, he's only

13   identified one document that we proposed was nonprivileged and

14   is privileged, and of course, we will confer with Mr. Garvin

15   about how to make the process better.  But if only one document

16   out of 25,000 has been identified to us that we think -- we

17   didn't know about it, now we know about it, we're re-reviewing

18   those and we're addressing those.

19           With regard to the other five, like with Ms. Huesmann,

20   we can talk about whether or not there's a privilege, but we

21   looked at those documents, all 4,200 of them, and determined

22   them not to be privileged.  Again, until Mr. Garvin identifies

23   even one document out of that bucket that's privileged, I'm

24   hard-pressed to how do I make my system better?

25           MR. GARVIN:  Your Honor, we will certainly meet with

the taint team.  We would definitely not be going through this

if there was only one document that we believed was privileged

that was missed.  I think that everyone would recognize that we

wouldn't do that.

We are happy to list, enhance the list of lawyers that

we previously supplied, because now that we've gone through the

nonhit bucket, bucket A, we've identified approximately 14

more, but we think that if the trial team were to participate

in this, there are two ways that they could help.

The first is they could provide their own list of

names.  The defense won't ask to see that list.  They can give

it to the taint team the same way we were giving our

confidential list to the taint team, and that would help.  And

then the second way, obviously, is that if the trial team would

provide the taint team with a list of names that are relevant,

that would assist the trial team -- excuse me, the taint team

to eliminate the nonrelevant data so we won't be with the

burden of inspecting it.

THE COURT:  I do want to move on, but let me ask

Mr. Folly.

Why not provide Ms. Korologos with a list of terms,

OneCoin and other individuals involved in the investigation?

MR. FOLLY:  Your Honor, I think this is the core

proposal of defense counsel, which is the prosecution team

provides a set of search terms to the taint team.  The taint

team then runs those search terms through all of the documents and only does a quick review of the ones that hit on those search terms.

Our concern is that, first and foremost, we're authorized under the warrant to review all responsive material not limited to documents that just hit on specific search terms, and at some point, we are going to need to also review those additional documents that don't hit on the search terms for responsiveness.  There could be issues with spellings, coded language, any of those things.  We're entitled to look at those documents and determine whether they are responsive, irrespective of whether they hit on a search term, and in order to do that we would still have to go through this process.

THE COURT:  Yes, but my understanding, and correct me if I'm wrong, is that you give them a term, let's say you give them OneCoin, so every document that hits on OneCoin gets isolated.  That's not then put in a privileged pile, right; that's reviewed to determine whether or not it's privileged?  Or am I wrong about that?

MR. FOLLY:  That is correct, your Honor.  That is to determine whether or not it's privileged, but then all of the documents that do not hit on search terms, we're still left with those, and we, as the prosecution team, are still entitled to review them at some point.  There could be very, very responsive communications that are in code or that are

misspelled that would still need to go through the process of

having the taint team look at them to determine whether they're

privileged.  And then if defense counsel is still being granted

that opportunity, they would look at them as well.  So it would

not change the ultimate end point here, which is that if

defense counsel is insisting on reviewing every document that

the taint team determines to be nonprivileged, they will still

need to end up reviewing documents that wouldn't hit on the

search terms.

          THE COURT:  OK.  Go meet and confer and come back to

me as soon as you're ready, if you need to.  By the way, just

so you know, I am gone next Thursday and Friday.  If you need

to see me on a quick basis, come back before then and I'll

accommodate you.

          MR. FOLLY:  Your Honor, the government would just

request that we impose some deadlines on the parties, just

because of the trial date being less than three months away.

We would ask that we be required to meet and confer by the end

of this week and put something in writing to your Honor within

one week of today's conference.

          THE COURT:  What's today, Tuesday?

          MR. FOLLY:  Yes.

          THE COURT:  That works for me.

          MR. GARVIN:  Your Honor, I apologize, but I'm going on

a very short family vacation at the end of this week, so if we

1    could make it perhaps Wednesday of next week.

2              THE COURT:  We can do Wednesday of next week.

3              MR. GARVIN:  OK.  Thank you.

4              THE COURT:  OK.  Mr. Garvin, you said you had

5    something else to discuss, the subpoenas.

6              MR. GARVIN:  Yes.

7              Your Honor, we have a situation in which we have two

8    subpoenas that were made, one that listed Mr. Scott as the

9    records custodian -- these are for the entities -- and the

10   second subpoena listed Mr. Pike as the records custodian for

11   the entity.  It's the position of the defense that the

12   government is circumventing the application of the Fifth

13   Amendment by designating an individual and by then tagging that

14   individual with the words "records custodian."  There is no

15   objection to producing the records requested by the subpoena,

16   but the subpoena, in the defense point of view, should be

17   addressed and served upon the entity, which we'll accept

18   service of.  But then the entity gets to determine the records

19   custodian, and that records custodian and the entity together

20   have the obligation of producing all of the records that are

21   responsive to the subpoena.

22             If they then say, well, we want to get records from

23   Mr. Pike, if he's not the records custodian, Mr. Pike would

24   have a Fifth Amendment right with regard to the production of

25   his personal records.  The same would be true for Mr. Scott,

1    and so our position is that you can't circumvent these

2    individuals' Fifth Amendment rights by putting their name but

3    after their name putting the words "records custodian."  So, we

4    would respectfully ask that those subpoenas be quashed and that

5    the government serve a subpoena on the entity records custodian

6    without designating whether it is Mr. Pike or Mr. Scott.

7            THE COURT:  OK.

8            Ms. Lozano.

9            MS. LOZANO:  Your Honor, the law is well settled in

10   this area, and to correct Mr. Garvin, there are actually three

11   subpoenas at issue, because initially, the government served

12   one subpoena on Mr. Scott and one subpoena on Mr. Pike.

13   Mr. Pike, for his records, as a custodian, as the director of

14   MSSI (BVI), and Mr. Scott, in his capacity as custodian of

15   records for both MSSI Florida and MSSI (BVI).  We subsequently

16   discussed with counsel, and they objected to the combination of

17   both companies on one subpoena, so we broke them up, and now

18   Mr. Scott has two subpoenas as records custodian, one issued to

19   MSSI Florida and one issued to MSSI (BVI).

20           The government also, in consultation with defense and

21   in response to their request, removed from each of those

22   respective subpoenas the name of the company as one of the

23   listed entities inside, because it would have been -- if the

24   subpoenas had been originally -- sent as originally issued,

25   then MSSI (BVI) would be asked for all records regarding MSSI

1    (BVI), and that didn't seem to make sense, so we split them up.

2            So, those are the subpoenas at issue.  They were

3    served on Mr. Pike and Mr. Scott as custodians of records, and

4    they requested relevant documents for an ongoing investigation

5    that the government is conducting.  And Mr. Scott is not

6    contesting that the subpoenas do seek relevant documents for

7    this investigation that is ongoing and looking at other

8    conspirators and also looking at Mr. Pike's involvement.  So

9    those are validly issued subpoenas.  They're served on these

10   two individuals as custodians of records.  We are not asking

11   for their testimony, and the law is clear that as such,

12   Mr. Scott and Mr. Pike do not enjoy a Fifth Amendment privilege

13   to refuse to comply with these subpoenas for producing the

14   responsive records.

15           THE COURT:  I understand that, but Mr. Garvin says,

16   look, give me the very same subpoena, just make it out to the

17   company and just put a generic custodian of records and you're

18   going to get the documents you want.  What's wrong with that

19   proposal?

20           MS. LOZANO:  Well, there's no precedent for that.

21   There's no authority that the government needs to do that.  The

22   government has issued subpoenas to valid custodians, and

23   frankly, during the process when counsel indicated that they

24   wanted to engage with the government to try to narrow the

25   subpoenas, we did have some conversations.  We ended up

splitting up the one subpoena into two and removing an entity

in each.  But after that, there were no further conversations,

and the defense showed no appetite to engage at all in any kind

of revision of the subpoenas.

THE COURT:  Let me ask you this.  I guess part of my

question, and I don't know the answer, I haven't dived into

this in some time, but I seem to recall sometimes having issued

subpoenas to an entity that just said to the custodian of

records.

MS. LOZANO:  Yes, if we knew who had the records,

because Mr. Pike indicated himself that he was a custodian of

records, because before the subpoena was issued, he delivered

voluntarily to the government records relating to Fenero and

MSSI.  So, he indicated he was a custodian of records.  We knew

that he had records.  We knew that Mr. Scott, as the owner of

both entities, would have records.  And it is appropriate in

that circumstance to serve the subpoenas on him, and the law is

clear in this circuit.  The case of *Grand Jury Subpoenas Issued*

*June 18, 2009*, out of this circuit, indicates and supports the

fact that even in the situation where a company, like

Mr. Scott's company, is wholly owned by one owner or one

shareholder, that person does not enjoy a Fifth Amendment right

that he would prevent him or allow him not to respond to the

subpoena.

The suggestion that Mr. Garvin makes now is five

1    months later, and frankly, the government fears it's another

2    dilatory tactic, because rather than engage with us during the

3    period of time they were supposed to engage to narrow the

4    subpoena, they instructed Mr. Pike -- without telling us, they

5    wrote a letter to Mr. Pike and instructed him to turn over all

6    of his responsive subpoenas to them, which he did.  So, now

7    Mr. Scott is in possession of both the responsive documents

8    that he has but also Mr. Pike's responsive documents.  Again,

9    that establishes that Mr. Pike is actually a valid custodian of

10   records for MSSI (BVI).

11          Lastly, basically, we fear that it's a dilatory tactic

12   that is putting form over substance, and we have no confidence

13   that if we reissued these subpoenas to a custodian of records

14   that we will get the documents, there will be some other

15   argument, there will be some other protest.

16          THE COURT:  But that's not what Mr. Garvin's saying,

17   as I understood it.  He said give me subpoenas for the

18   corporation and you're going to get your documents.

19          MS. LOZANO:  This is five months later.  The relevant

20   subpoenas at issue for Mr. Scott were issued in March of this

21   year.

22          THE COURT:  OK.

23          MS. LOZANO:  And lastly, the defendant's argument that

24   underpins the whole objection of the Fifth Amendment right is

25   that somehow the mental process of collecting responsive

1    documents is equivalent to testimony, and that's just not the

2    law.  That is just not the state of the law, or else every

3    record custodian would have to -- would be entitled to assert a

4    Fifth Amendment right and not produce documents, because many

5    times custodians of records in big corporations, there's

6    somebody who is a custodian of records who has no familiarity

7    with the actual documents that are being requested.  So that

8    person definitely needs to undergo some sort of mental process

9    to, first of all, familiarize him or herself with the documents

10   and figure out whether they are responsive to the subpoenas.

11   That is the same mental process.

12            Again, there is no law and there's no precedent or

13   authority that as a custodian, he -- Mr. Scott -- is entitled

14   to assert his Fifth Amendment right.

15            If we can get a commitment from counsel that if we

16   subpoena, if we re-subpoena to a generic custodian of records,

17   which of course begs the question in a solely owned company who

18   that would be.  If the records were returnable within one week

19   of that subpoena with a firm deadline of return date of all

20   responsive subpoenas for those documents, we would be willing

21   to entertain reissuing subpoenas, under those circumstances.

22            THE COURT:  Thank you.

23            Mr. Raskin or Ms. Raskin, I hear you rumbling there.

24   Is there anything that you wanted to add.

25            MR. RASKIN:  David Pike was served with this grand

1    jury subpoena as custodian of records, and we agree he is not

2    an appropriate custodian of records.  What he possessed --

3    well, let me go back.  At the time that the subpoena was served

4    on him, the company was no longer in business.  He had already

5    turned over the hard copies of the documents that he possessed

6    to the FBI.  He no longer has access to MSSI's files, either

7    hard copies or electronic.  What he possessed were simply those

8    documents contained on his personal computer hard drive, and

9    the materials he has on his hard drive represent just what he

10   received and saved on his personal computer, and nothing more.

11   That's what he has.

12        At my request, Mr. Pike copied the entirety of his

13   hard drive on an external drive and gave it to me.  I did a

14   cursory review and determined that the materials contained what

15   appear to be some attorney-client documents.  Clearly I'm not

16   in a position to determine what materials may be privileged,

17   and at the request of Mr. Scott's counsel, I provided them with

18   an exact duplicate of the hard drive containing Mr. Pike's

19   materials since, in my view, they were better situated to make

20   a privilege determination.  So Mr. Scott's lawyers now have

21   every single thing that was in the possession of Mr. Pike.

22        Mr. Scott's counsel advised that they represent MSSI

23   international consultants and that that company has not

24   designated Mr. Pike as its records custodian.  It doesn't

25   authorize him to act as its records custodian.  It doesn't

1   authorize him to disclose any of its records, and  could demand

2   the return of any of its property, which it now has.

3          Given this posture, we informed the government that we

4   wouldn't comply with the grand jury subpoena absent a court

5   order.  The government filed its motion, and that's where

6   things stand, but it's our position that Mr. Pike is not a

7   proper records custodian for MSSI.  A records custodian should

8   be someone who is in the position to gather relevant material

9   possessed by the corporation, and Mr. Pike is plainly not in a

10  position to do that.  MSSI should simply designate its own

11  records custodian, and as was pointed out a little while ago,

12  this won't prejudice the government at all since it will still

13  get all of the materials it seeks.

14         In my experience, and I've been doing this for a

15  while, a corporation gets to designate its own records

16  custodian; the government doesn't get to make that call.

17         That's Mr. Pike's position.

18         THE COURT:  The bottom line is to the extent that Mr.

19  Pike had any responsive documents, the universe of those

20  documents has been turned over to Mr. Scott's attorneys.

21         MR. RASKIN:  That's correct.

22         THE COURT:  OK.

23         Ms. Lozano.

24         MS. LOZANO:  Yes, your Honor.

25         I'd just note there is no legal definition for

1    custodian of records.  It's not as if there is some specific

2    quality of a person that makes him or her not a custodian of

3    records.  If you are in possession of corporate records and you

4    work in that company, you are custodian of at least of the

5    records that are in your possession, maybe not the entirety of

6    the corporation, but in your possession, and that's all we're

7    asking for in these subpoenas.

8            And just to clarify, if the Court is able to confirm

9    with counsel that they will respond to subpoenas that are now

10   reissued -- the government would reissue to just a generic

11   custodian of record, we would be amenable to reissuing those

12   subpoenas.  However, we do note that this is the first time

13   that the defense has made that offer, and that is why we are a

14   little bit fearful that it is simply another delay tactic.

15           THE COURT:  OK.

16           Mr. Garvin.

17           MR. GARVIN:  Yes, your Honor.

18           Going back, counsel is right that they did serve,

19   there were three subpoenas.  The first time the two subpoenas

20   came, one's to Dave Pike and one's to Mark Scott.  The one to

21   Mark Scott was for two different entities, and the rider

22   attaching two of the subpoenas said provide all of the

23   following documents that pertain to, and it had a list of

24   names, but one of the names was the actual entity the subpoena

25   was being served on.  So, if the subpoena was being served on

1        MSSI (BVI), in the rider, it also had a whole list of names,

2        including MSSI (BVI).

3                 THE COURT:  But that issue was resolved, right?

4                 MR. GARVIN:  Right.

5                 So, those were resolved, and we attempted to engage to

6        resolve them and the government agreed to fix that and reissue

7        the subpoenas.  But what the government will not agree is the

8        issue of records custodian.

9                 THE COURT:  So now we have a potential agreement.

10                MR. GARVIN:  Yes.

11                THE COURT:  If you would agree.

12                MR. GARVIN:  Yes, and we would agree, but what I

13       couldn't agree is that the one-week time frame -- I've already

14       been told that would be next to impossible.  We don't want to

15       not deliver after we've entered an agreement.

16                (Counsel and defendant conferred).

17                THE COURT:  Here's the thing.  Why don't you folks

18       talk about that.

19                MR. GARVIN:  Yes.

20                THE COURT:  And if you can't come to a resolution,

21       although I can't imagine why you wouldn't, then I'll decide it.

22                MR. GARVIN:  Yes.

23                THE COURT:  I'll decide the motion.  OK?

24                MR. GARVIN:  Yes, your Honor.

25                THE COURT:  What else do we need to do today?

1              MR. GARVIN:  I think that's it.

2              THE COURT:  OK.

3              MR. DIMASE:  Your Honor, I know you mentioned at the

4    beginning of the conference that you were going to keep the

5    crime-fraud motion under advisement.

6              THE COURT:  Correct.  That was just fully briefed on

7    Friday, correct?

8              MR. DIMASE:  Yes, that's right.  And I fully

9    appreciate the timing being only two days later.  But just two

10   things.

11             One is to the extent the Court has any questions in

12   reviewing those papers and wants to see the parties, the

13   government is certainly open to another conference on the

14   specific issue of the crime-fraud motion.

15             THE COURT:  OK.

16             MR. DIMASE:  And if the Court wants to set that today,

17   we're happy to schedule that, obviously.

18             The second issue is I just want to make the Court

19   aware, obviously this was only fully briefed two days ago and

20   it's a complicated issue, we fully appreciate that.  But there

21   is a tiny flaw on the other end of it, if the Court were to

22   grant the motion insofar as there are still a number of stages

23   that are contemplated even after any exception motion might be

24   granted.  In other words, the identification based on the

25   Court's decision regarding the different categories of whether

1     certain materials fall within those categories, then the

2     production of those materials to the defendant for their

3     opportunity to review them and object, and then potentially a

4     further litigation before the Court regarding particular

5     documents over which there might be some disagreement.  That's

6     the proposal we've laid out in the motion, and I just wanted to

7     make that clear as far as the timing.

8                THE COURT:  I think I've committed to making myself

9     available to you next Wednesday.

10               MR. DIMASE:  Yes, your Honor.

11               THE COURT:  Would that be too far out?  To the extent

12    there were any issues, could I just bring you back once, or do

13    I need to bring you back twice?

14               MR. DIMASE:  Your Honor, on the date of next

15    Wednesday, I thought that that was a date for the submission of

16    some letter regarding the status of the confer and report back,

17    not necessarily a court conference.  That being said, we are

18    happy to appear next week, on Wednesday, if the Court has

19    issues or questions regarding the crime-fraud motion.  I would

20    note that the entire team is not here next week, but somebody

21    will be available.

22               THE COURT:  The entire team?

23               MR. DIMASE:  One of the many people at the front table

24    will be available.

25               MR. GARVIN:  Your Honor, I was also sharing the same

1   impression that we were going to submit documents to the Court

2   on Wednesday --

3            THE COURT:  OK.

4            MR. GARVIN:  -- as opposed to all appearing.

5            MR. DIMASE:  Your Honor, apologies.

6            Ironically, none of the members of the prosecution

7   team are available Wednesday of next week in particular, but we

8   can certainly work with the Court and find a date that does

9   work.  We're happy to meet on both issues to the extent. i

10  think it may make sense to the extent that we did --

11           THE COURT:  If you want to set a date and time now,

12  I'm happy to do that.

13           MR. DIMASE:  Can we confer with Mr. Garvin and

14  Mr. Nobles briefly?

15           THE COURT:  Sure.  I'm just gone Thursday and Friday

16  of next week.

17           MR. DIMASE:  Understood.

18           Your Honor, the parties are still conferring.

19  Apologies for the delay.

20           THE COURT:  OK.  It doesn't look like we're going to

21  reach agreement here.

22           MR. DIMASE:  Judge, we're debating next Wednesday, the

23  24th, versus the following Tuesday, the 30th, to see if we can

24  come on two different dates.

25           THE COURT:  Let me ask you this.  If it's helpful,

1   Thursday early morning I could be here.  Early.

2            MR. DIMASE:  Which Thursday.

3            THE COURT:  Next Thursday.

4            MR. GARVIN:  That would be helpful for me.  That would

5   be a date that we could come before the Court.  I could fly

6   here on Wednesday and then be here in the morning.

7            THE COURT:  By early I mean, like, 9:00.

8            MR. GARVIN:  Fine.

9            THE COURT:  But if that's going to cost another 15

10  minutes, then let's go back to where you were.

11           MR. DIMASE:  I think the date we were contemplating is

12  Wednesday morning.  However, I think Mr. Garvin is unavailable

13  because of a preexisting flight, and so the earliest, I think,

14  the parties would be able to all be available would be the

15  following Tuesday, as much as we'd like to do it sooner than

16  that, the 30th of July.

17           THE COURT:  At what time?

18           MS. LOZANO:  Whenever the Court's available.

19           MS. KOROLOGOS:  I have a conference at 11 a.m. with a

20  privilege issue I have to be at.  So other than between 11 and

21  12, that would be great.

22           THE COURT:  Tuesday afternoon, 2:00.

23           MR. DIMASE:  Perfect.

24           MS. KOROLOGOS:  Your Honor, may I note for the record

25  that Mr. Garvin and I are going to meet before next Wednesday,

1    and I just handed him the list that we used of the clients and

2    a list of the attorneys so we can be effective and talk about

3    that.  And I've requested that he identify the 14 attorney that

4    he's mentioned -- to date I don't know of any of those -- and

5    also any documents to date likely on a rolling basis that he's

6    identified that may be privileged in my production of

7    nonprivileged documents.

8              THE COURT:  OK.

9              MR. GARVIN:  Just to be clear, it's 14 attorneys or

10   search terms, and I'm providing some of those names right now.

11             THE COURT:  Very well.

12             MR. DIMASE:  Thank you, Judge.  Just one last point.

13             If the Court does have particular questions in

14   connection with the crime-fraud motion that it wants us to

15   think about in advance of that proceeding, we're obviously

16   happy to do that.

17             THE COURT:  I'll tee them up.

18             MR. DIMASE:  Thank you, your Honor.

19             THE COURT:  OK.

20             MR. DIMASE:  Your Honor, I believe the Court may have

21   already -- so, sometime back the Court ruled on the trial date.

22             THE COURT:  Yes.

23             MR. DIMASE:  In connection with that ruling, which I

24   think was communicated to the parties maybe by email, there was

25   an indication that there would be some subsequent written order

1    dealing with, I think -- maybe I'm wrong about that -- dealing

2    with both the trial date and the speedy trial issue.  But I

3    think the Court indicated in the communication to the parties

4    that speedy trial time would be excluded.

5              THE COURT:  I thought that was done.

6              MR. DIMASE:  It may have been done.  I may be

7    misremembering, but my point today is just that I believe any

8    speedy trial exclusion is granted because I believe the Court

9    has already excluded time through October 7, the date of trial.

10             THE COURT:  That's right.  I determined that under the

11   speedy trial clock all the time between now and October 7,

12   whatever the date is, would be excluded because of the

13   complexity of the trial.

14             MR. DIMASE:  Very good, your Honor.  We have nothing

15   further.

16             THE COURT:  Thank you, folks.

17             MR. RASKIN:  Thank you, Judge.

18             (Adjourned)

19

20

21

22

23

24

25