UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

   - v. -

MARK S. SCOTT,

                Defendant.

No. S6 17 Cr. 630 (ER)

---

# MEMORANDUM OF LAW IN SUPPORT OF
# MOTION TO SUPPRESS PORTION OF POST-ARREST STATEMENT FOLLOWING REQUEST FOR COUNSEL

Arlo Devlin-Brown
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1046

*Counsel for Mr. Scott*

**Introduction**

Mark Scott moves to suppress the portions of his videotaped post-arrest statement that occurred following two clear requests to speak with an attorney. Mr. Scott said at the outset of his interrogation that he was "willing to say a few things" but "want[ed] a lawyer involved."[1] The agents assured him that if "at any point you want to stop answering questions, you know, you just let us know and tell us that you want your lawyer, and we'll be willing to stop and continue at a later date with your lawyer present." But that is not what happened. After approximately thirty minutes of questioning, Mr. Scott told the agents, "I'd like to make sure that I call a lawyer soon." The agents responded, "[W]e'll definitely take care of that in a few minutes," before stepping out of the room. But when they returned to the room six-and-a-half minutes later, the questioning resumed. Mr. Scott again asked for a lawyer as the questions became increasingly specific, stating, "[i]f we get this detailed, then I really should should um get a lawyer involved….because I just don't remember and I don't want to say anything wrong." The agents paused for nearly a minute, and then simply resumed the questioning, ignoring Mr. Scott's request entirely. The continued questioning after not one but two clear requests to speak with a lawyer violated Mr. Scott's rights under the Fifth Amendment, and the portions of the interrogation following the first of such invocations should be suppressed.

Because the entire encounter was recorded on video, Mr. Scott does not believe an evidentiary hearing is necessary to resolve this motion.

---

[1] A transcript of the portions of the video recording of the interrogation referred to in this motion is attached as Exhibit A. The transcript was shared in advance with the Government, which agrees the transcript is accurate. A video of the recording provided by the Government in discovery from which the transcript was made is submitted on a DVD as Exhibit B and will be sent to Chambers and the Government.

1

**Relevant Background**

Mr. Scott was arrested at 6:55 a.m. in Barnstable, Massachusetts on Wednesday, September 5, 2018. While detained, Mr. Scott was interrogated by Special Agent James Eckel of the Federal Bureau of Investigations ("Agent Eckel") and Special Agent Kristine Fata of the IRS Criminal Investigation division ("Agent Fata"). The interview commenced at 7:24:45 a.m. and was captured on a time-stamped video recording.

Mr. Scott was read his *Miranda* rights by Agent Eckel, who then asked Mr. Scott, "[a]re you willing to talk to us?" Mr. Scott's response was tentative: "I'd be willing to say a few things now I mean I do want a lawyer involved." (7:26:18) . Agent Eckel reassured Mr. Scott that he could end the interview at any time:

> 7:27:10 (Agent Eckel): If you're willing to speak to us for, you know, a little bit right now, I just want you to sign this and you can read it over real quick, sign it, and like we said, at any point you want to stop answering questions, you know, you just let us know and tell us that you want your lawyer, and we'll be willing to stop and continue at a later date with your lawyer present.

Mr. Scott again expressed some hesitancy in speaking to the agents without an attorney present, and sought further affirmation that questioning would stop when he asked for a lawyer:

> 7:27:39 (Scott): Well you know I'd love to be transparent, but I also recognize the fact that I should have an attorney present when I go through this. And I really don't, like I said, I really don't understand quite yet what this is about.
>
> 7:27:49 (Agent Eckel): Okay.
>
> 7:27:50 (Scott): So I'd really like to have somebody that knows better than I do give me advice on how, how to answer things, and…
>
> 7:27:58 (Agent Eckel): Okay, are you, uh, I mean, originally you said you were willing to speak to us a little bit.
>
> 7:28:00 (Scott): I can speak to you a little bit, I mean, yeah sure that's okay. I'll say stop, and we stop.
>
> 7:28:05 (Agent Eckel): And that's fine, that's fine.

2

7:28:07 (Agent Fata): At any point you want to stop.

Having received this assurance, Mr. Scott signed the waiver form and handed it to the agent.

After about thirty minutes of questioning, the agents indicated that they were going to briefly step out of the room. As they stood up from their chairs, Mr. Scott asked about an opportunity to call an attorney:

> 7:59:22 (Scott): One question I have for you though. Uhh…[inaudible]...right now, but if I have to go to Boston and go in front of a judge, I'd like to make sure that I call a lawyer soon so I have somebody there.
>
> 7:59:34 (Agent Eckel): Okay. Uhh, do you have a lawyer that you…
>
> 7:59:37 (Scott): Well, I don't have a criminal lawyer because I never needed one. But I have a, I have a few law firms, I have one in particular I would call. The litigators at least, I'm sure they know somebody.
>
> 7:59:44 (Agent Eckel): Okay.
>
> 7:59:45 (Scott): So that I can tell them…
>
> 7:59:46 (Agent Eckel): We can, we can let you make that call. Umm. But we would have to, you know, we would have to unlock your phone. We would have to go through your phone to do that.
>
> 7:59:54 (Scott): No, we can look them up the number, and we can call him from another phone, I don't care.
>
> 7:59:56 (Agent Eckel): That's fine. Yeah…
>
> 7:59:58 (Scott): I just want to know, like, where I'm going, so I can tell them, and so they can prepare for me to be there.
>
> 8:00:02 (Agent Eckel): And that's fine, yeah, we can definitely do that.
>
> 8:00:03 (Scott): 'Cause I have a…I have a…this is a...you're not the judge, but right [inaudible]...the hearing might also be about if I go home again or not, right?
>
> 8:00:10 (Agent Fata): Mm-hmm.
>
> 8:00:10 (Agent Eckel): Mm-hmm.
>
> 8:00:11 (Scott): Right?

3

>8:00:11 (Agent Eckel): Yeah.
>
>8:00:12 (Scott): Okay.
>
>8:00:13 (Agent Eckel): Yeah. So, well, we'll definitely take care of that in a few minutes, so we're just going to step out.  One second, just hang tight.

The agents then noted that he was being recorded, and stepped out of the room. (8:00:33).

Six-and-a-half minutes later, at 8:07:03, the agents reentered the room and immediately resumed questioning without any further acknowledgement of Mr. Scott's request for a lawyer. Initially, the new round of questions concerned the location of firearms in Mr. Scott's home, which he answered.  At 8:09:12, the agents shifted gears, telling him they wanted to talk once more about "Barta" and "Cryptoreal," presenting him with a document they described as a "share sale and purchase agreement," and asking Mr. Scott various questions about the transaction.  Mr. Scott answered a few of questions before seeking to bring the interview to a halt through a second request for an attorney:

>8:12:57 (Scott): I don't, I don't remember this transaction that well.  I would have to see more documents.  If we get this detailed, then I really should should umm get a lawyer involved.  Umm, because I just don't remember and I don't want to say anything wrong.

The agents immediately stopped questioning Mr. Scott, remaining silent for 57 seconds. Then the questions resumed, with Agent Eckel asking, "Tell me again who the investors were in Fenero," with no acknowledgment of Mr. Scott's request to "get a lawyer involved." The questioning continued for approximately 19 more minutes, running the gamut from questions about computer passwords for particular devices to further questions about the conduct with which Mr. Scott was charged.  Ultimately, Mr. Scott invoked his desire to speak with a lawyer a third time:

>8:32:50 (Scott): Yeah, I would love to discuss this further.  I really would.  But I'd like to have a lawyer help me with that.

4

At this point, the agents finally ceased their interrogation and proceeded to assist Mr. Scott with the logistics of arranging for him to call his lawyer (something they had assured him they would do, at 8:00:10, "in a few minutes").

Counsel for Mr. Scott spoke with attorneys for the Government on September 10, 2019 to raise these issues and ask whether the Government intended to potentially use the statements following Mr. Scott's requests for counsel at trial. The Government indicated that they may wish to use these portions of Mr. Scott's statements at trial. Mr. Scott thereafter prepared to file this motion, including obtaining from the Government the *Miranda* waiver and working with the Government on an agreed-to transcription of the relevant statements.

## **Applicable Law**

To safeguard the Fifth Amendment right against self-incrimination, the Supreme Court established the prophylactic rule that prior to custodial interrogation, the putative defendant must be advised that he has the right to remain silent as well as the right to an attorney. *See Miranda v. Arizona*, 384 U.S. 436, 479 (1966). If the accused indicates that he wishes to remain silent, "the interrogation must cease," and if he requests counsel, "the interrogation must cease until an attorney is present." *Id.* at 474.

For a suspect to validly waive counsel, the waiver "must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Edwards v. Arizona*, 451 U.S. 477, 482 (1981) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).

If, after receiving the Miranda warnings, a suspect effectively waives his right to counsel, law enforcement officers are free to question him. *See Davis v. United States*, 512 U.S. 452, 458 (1994).  However, if at any time during the interview the suspect requests counsel, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation. *Id.*; *Edwards,* 451 U.S. at 484-485.  As such, questioning of a suspect who has invoked the right to counsel cannot continue unless an attorney is actually present. *See Minnick v. Mississippi*, 498 U.S. 146, 153 (1990) ("[W]e now hold that when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney.").

To validly invoke *Miranda* protections, a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459.  Cessation of questioning is not required when a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking his right to counsel, wherein his reference to an attorney is ambiguous or equivocal.  *See id.*; *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991).

In *Davis v. United States*, the Supreme Court found that the accused's remark to federal agents – "Maybe I should talk to lawyer" – was not a valid request for counsel, and therefore that the agents were not required to cease their questioning. *See Davis,* 512 U.S. at 462.  The Second Circuit interpreted the *Davis* petitioner's choice to preface his request with the word "maybe" as "indicat[ive] [of] an internal debate about whether or not to invoke his right to counsel." *See Wood v. Ercole*, 644 F.3d 83, 92 n.6 (2d Cir. 2011).  In contrast, it determined that the statement, "I think I should get a lawyer" "evidences no internal debate whatsoever," *see id.* at 91, relying on an Eleventh Circuit decision that previously considered this issue and reached the same conclusion.

6

*See Cannady v. Dugger*, 931 F.2d 752, 755 (11th Cir. 1991) (concluding that the phrase "I think I should call my lawyer" was "an unequivocal request for counsel"). Thus, in finding this to be a proper invocation, the Second Circuit found that the suspect's videotaped statement was inadmissible at trial because law enforcement "had an obligation to stop all questioning" after the suspect stated that he thought he should call his lawyer. *Wood*, 644 F.3d at 92.

"It is axiomatic that a statement obtained in violation of *Miranda* is ordinarily inadmissible at trial." *United States v. Morales*, 788 F.2d 883, 885 (2d. Cir 1986). When the government seeks to admit such statements at trial, it has the burden to prove a valid waiver of *Miranda* rights by a preponderance of the evidence. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *United States v. Gaines*, 295 F.3d 293, 297 (2d. Cir. 2002). The court's determination must be made upon consideration of "all relevant circumstances, employing a presumption that the defendant did not waive his rights." *United States v. Scarpa*, 897 F.2d 63, 68 (2d Cir. 1990).

## Discussion

The videotape of Mr. Scott's interrogation by federal agents on the morning of his arrest shows that after an initial waiver of his *Miranda* rights, Mr. Scott later invoked his right to speak with an attorney on three separate occasions (7:59:22, 8:12:57, and 8:32:50). All three of these invocations were sufficient to trigger the protections of *Miranda*, but it was not until the third invocation that questioning ceased. Therefore, the portion of the videotaped statement made after Mr. Scott first invoked his right to speak with an attorney (at 7:59:22) was obtained in violation of his constitutional rights. The portion after the second invocation (at 8:12:57) certainly was.

As an initial matter, Mr. Scott expressed concern about speaking to the agents without a lawyer at the outset of the interrogation, commenting, "I do want a lawyer involved" (7:26:19), and later, "I'd love to be transparent, but I also recognize the fact that I should have an attorney present when I go through this" (7:27:39). He agreed to proceed only after the agents assured him

7

that "at any point you want to stop answering questions, you know, you just let us know and tell us that you want your lawyer, and we'll be willing to stop and continue at a later date with your lawyer present." (7:27:10).  While Mr. Scott does not dispute that his initial discussions with the agents were sufficient to initiate questioning, these discussions put the agents on notice that while Mr. Scott would talk to them for a "little bit," he would seek to involve a lawyer at some point. Indeed, just prior to providing the agents with his written *Miranda* waiver Mr. Scott sought one final assurance from the agents that he could end the questioning at any time: "I can speak to you a little bit, yeah sure, that's okay.  I'll say stop and we stop." (7:28:00).  "And that's fine, that's fine," Agent Eckel responded (7:28:05), with Agent Fata adding, "At any point you want to stop." (7:28:07).

Particularly given this backdrop, Mr. Scott's first invocation at 7:59:22 should have ended further questioning. Mr. Scott stated: "[I]f I have to go to Boston and go in front of a judge, I'd like to make sure that I call a lawyer soon so I have somebody there." (7:59:22). This was "sufficiently clear that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney," *see Davis*, 512 U.S. at 459.  It is even less ambiguous than the statement found by the Second Circuit to be an unequivocal request for counsel: "I think I should call my lawyer."   *Wood*, 644 F.3d at 92.

Indeed, the agents took Mr. Scott's request to call a lawyer exactly as Mr. Scott intended. They just sought to dissuade Mr. Scott from making the call and then falsely promised that they would take care of it "in a few minutes" before returning to the interrogation as if the request had never been made.  Agent Eckel first told Mr. Scott that his request to call a lawyer would only be possible if he permitted agents to "unlock [his] phone," adding "we would have to go through your phone." (7:59:46).  Mr. Scott persisted: they could look up the number for the law firm he had

8

worked with and "call him from another phone." (7:59:54). Agent Eckel responded, "that's fine," and "we can definitely do that," adding, "we'll definitely take care of that in a few minutes, so we're just going to step out. One second, just hold- hang tight." (8:00:13). Both agents then left the room, and were gone for nearly six-and-a-half minutes before returning, which would have left anyone in Mr. Scott's position with the understanding that his request to call counsel was being addressed.

The reaction of the agents to Mr. Scott's request confirms not only that they understood he wanted to talk to an attorney ("[W]e'll definitely take care of that") but that he wanted to do so quickly. Mr. Scott stated that he would like to speak with an attorney "soon," and the agent ended this portion of the interrogation by telling him that this request would be addressed "in a few minutes." The agent's statement instructing Mr. Scott to "hang tight" for "one second" further set out an expectation of immediacy of action with respect to Mr. Scott's request. However, no such imminent action followed. Instead, after a break of approximately six-and-a-half minutes, the agents returned and promptly resumed questioning Mr. Scott as if he had never mentioned an attorney at all. It was not for another half-hour – and two more requests to limit questioning without counsel – that the agents finally ended the interrogation and permitted Mr. Scott to contact an attorney.

Mr. Scott's second request for an attorney, at 8:12:57, certainly should have led to the termination of questioning. Only six minutes passed between when the agents resumed questioning Mr. Scott after he first asked for an attorney and when he invoked his right to counsel a second time. These six minutes are telling. Upon reentering the room initially, the agents asked Mr. Scott a series of questions about the location of firearms in his home rather than about the case itself. Mr. Scott readily answered these firearm safety questions, without objection. At 8:09:12,

9

however, the agents asked Mr. Scott to "go back to" a discussion of an investment relating to the charges that Mr. Scott had discussed prior to his first request for a lawyer. Mr. Scott answered a few further questions on this transactions before asking that the questioning cease. "I don't, I don't remember this transaction that well. I would have to see more documents," Mr. Scott stated. "If we get this detailed, then I really should should umm get a lawyer involved." (8:12:57).

This statement – even in isolation – reflected a request that the questioning end. Mr. Scott's statement, "I really should should umm get a lawyer involved," "evidences" even less "internal debate" than the statement that the Second Circuit found was *already sufficien*t for a successful invocation: "I think I should get a lawyer involved." *See Wood,* 644 F.3d at 91. Mr. Scott's use of the word "if" in his statement ("If we get this detailed…") was not a reference to something that *might* happen, but to the series of detailed questions that the agents *were then asking him* regarding the particulars of one of the financial transactions made through his funds. Mr. Scott was plainly communicating that since the agents were now asking him specific questions about the activities of the funds, he wanted a lawyer involved before he would answer. After saying he "really should … get a lawyer involved," he added, "because I just don't remember and I don't want to say anything wrong," emphasizing that Mr. Scott wished to speak with counsel before questioning continued.

And of course, Mr. Scott's statement that he "really should … get a lawyer involved" – while plainly an invocation on its own – should not be viewed in isolation. Rather, the Court should take into account "all relevant circumstances" in examining "whether a defendant waived his constitutional rights." *See Scarpa*, 897 F.2d at 68. Mr. Scott had said at the outset of the interrogation that he would only speak a "little bit" and at some point wanted to get a "lawyer involved," and had specifically sought assurances from the agents he could stop at any time. Mr.

10

Scott had asked to call an attorney once at this point already, and the agents had assured him that they would arrange for this "in a few minutes" before leaving the room and returning to question him further.

Perhaps the most compelling evidence that Mr. Scott was clear in his request to end the interview is that the agents *did* stop questioning Mr. Scott. After Mr. Scott said he "really should … get a lawyer involved," the room went suddenly quiet. The agents didn't speak a single word to Mr. Scott for the next 57 seconds. Then, inexplicably, they continued, starting with more questions about the investors in his fund and then quickly moving to ask him for his computer passwords. In total, 19 minutes of questioning passed between Mr. Scott's second invocation and when the agents finally ceased the interrogation.

Mr. Scott is a lawyer, but a corporate lawyer not a criminal lawyer. He had never previously been arrested. He had no experience with *Miranda*. Mr. Scott agreed to sign a *Miranda* waiver only after the agents repeatedly agreed he could end the questioning at any time. "I'll say stop and we stop," Mr. Scott posed to the agents. "At any point you want to stop," Agent Fata confirmed. And yet, the agents did not do what they agreed to do and were legally obligated to do: they did not stop when he wanted to stop. Accordingly, the statements made by Mr. Scott after the 7:59:22 timestamp on the video recording should be suppressed

Respectfully submitted,

/s/ Arlo Devlin-Brown

Arlo Devlin-Brown
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1046