UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
|     - v. - | : |
| | :   S6 17 Cr. 630 (ER) |
| MARK S. SCOTT, | : |
| | : |
|     Defendant. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS HIS POST-ARREST STATEMENT

### PRELIMINARY STATEMENT

On September 5, 2018, the defendant Mark Scott, who is a lawyer, was arrested for conspiring to launder $400 million in proceeds of a pyramid scheme involving a purported cryptocurrency known as "OneCoin." In a videotaped post-arrest interview, law enforcement agents read Scott his *Miranda* rights. Scott then signed a form stating that he had read his rights, understood them, and was willing to answer questions without a lawyer present. He then proceeded to answer questions. Scott admits that he told the agents he understood his rights and that he executed the waiver. There is also no suggestion that the waiver was coerced or involuntary. But Scott now claims, in an untimely motion to suppress, that after waiving his right to counsel, he later invoked his right to counsel on two occasions and the agents nonetheless continued the interview. Scott's first purported invocation, which involved a statement about placing a call to a civil attorney, was not a clear invocation and was unrelated to custodial interrogation and therefore outside the scope of *Miranda v. Arizona*, 384 U.S. 436 (1966). Scott's second purported invocation was at best ambiguous and did not constitute an invocation under controlling law. Finally, at the end of the interview, when Scott clearly invoked his right to

1

counsel, the agents immediately ended the interview and did not ask him any additional substantive questions. Scott's untimely motion should accordingly be denied.

## BACKGROUND

On August 21, 2018, a Grand Jury sitting in the Southern District of New York returned a sealed one-count indictment, S6 17 Cr. 630 (ER) (the "S6 Indictment"), charging the defendant with conspiracy to commit money laundering in violation of Title 18, United States Code, Section 1956(h). *See* Dkt. No. 6. The S6 Indictment alleges that from at least 2016 through 2018, the defendant conspired to conceal the nature, location, source, ownership, or control of "approximately $400 million in proceeds of a pyramid scheme involving a purported cryptocurrency known as 'OneCoin.'" Dkt. No. 6 at 1, 2. Specifically, the defendant—a U.S. citizen and attorney, employed for a portion of the relevant time period as a partner at an international law firm—organized, owned, and operated a series of investment funds known as the "Fenero Funds," which he used for the purpose of laundering OneCoin fraud proceeds. After being introduced in or about September 2015 to Ruja Ignatova—one of the co-founders of OneCoin— Scott engaged in a scheme to launder approximately $400 million of OneCoin proceeds on Ignatova's behalf through the Fenero Funds and related entities between approximately 2016 and 2018. Ultimately, Scott transferred millions of dollars of OneCoin proceeds into the United States for his own personal use, including to purchase multi-million dollar homes, a yacht, and luxury cars.

On September 5, 2018, federal agents arrested the defendant in Barnstable, Massachusetts, and the S6 Indictment was unsealed. Scott was transported to the Barnstable Police Department for questioning. The entire interview, which lasted approximately an hour and ten minutes, was recorded on video. FBI Special Agent James Eckel and IRS-Criminal Investigation Special Agent Kristine Fata conducted the interview of Scott.

At the beginning of the interview, Special Agent Eckel read Scott his *Miranda* rights. GX A at 7:25:36.[1] Scott stated that he understood his rights. *Id.* at 7:26:14. The agents then gave Scott a written "Advice of Rights" form. *See* GX B. The form stated, among other things, "Before we ask you any questions, you must understand your rights," including the fact that "You have the right to talk to a lawyer for advice before we ask you any questions," and, "You have the right to have a lawyer with you during questioning." *Id.* The form also stated, "If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time." *Id.*

Below these enumerated rights was a section titled, "Consent." Here, Scott signed his name indicating he agreed with the following statement: "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." *Id.* Scott then proceeded to answer the agents' questions. Although the interview was being video-recorded, Special Agent Eckel took notes in a notebook throughout the interview.

After approximately thirty-four minutes, the agents prepared to take a break in the interview and stood up to exit the interview room. GX A at 7:59:16. As the agents got up to leave, Scott stated to the agents, "One question I have for you though. Uhh…[inaudible]...right now, but if I have to go to Boston and go in front of a judge, I'd like to make sure that I call a lawyer soon so I have somebody there." *Id.* at 7:59:22. When Special Agent Eckel asked Scott if he had a lawyer, Scott replied, "Well, I don't have a criminal lawyer because I never needed one. But I have a, I have a few law firms, I have one in particular I would call. The litigators at least, I'm sure they know somebody." *Id.* 7:59:37. Scott added, "I just want to know, like, where I'm going, so I can tell them, and so they can prepare for me to be there." *Id.* at 7:59:58 (collectively with Scott's statements at 7:59:22-8:00:03, "Scott's First Statement"). Special Agent Eckel informed Scott that

---

[1] In order to assist the Court in its review of the video of Scott's post-arrest interview, *see* Def. Exhibit B, the Government has attached as Exhibit A a draft transcript of the full interview.

he would be permitted to make this phone call later. *Id.* at 8:00:02; 8:00:11. The agents then left the room for approximately six-and-a-half minutes. When the agents returned to the room, the interview continued. *Id.* at 8:07:12.

Several minutes after the interview resumed, the agents showed Scott a binder that contained, among other things, a set of documents pertaining to a "share sale and purchase agreement" for an investment made by the Fenero Funds into "Cryptoreal Investment Trust" (the "Cryptoreal Transaction"). Special Agent Fata asked Scott a series of questions about the Cryptoreal Transaction, including, "where did the money come into," and "where did the money end up?" *Id.* at 8:12:13, 8:12:53. In response, Scott stated "I don't, I don't remember this transaction that well. I would have to see more documents. If we get this detailed, then I really should should umm get a lawyer involved. Umm, because I just don't remember and I don't want to say anything wrong." *Id.* at 8:12:57 ("Scott's Second Statement"). After Scott's Second Statement, Special Agent Eckel continued to transcribe notes from the interview into his notebook, and review his notes. *Id.* at 8:12:58–8:14:06. Special Agent Fata also took the binder away from Scott during this pause in questioning. The agents did not ask Scott any additional questions about the Cryptoreal Transaction for the duration of the interview, and Scott continued to answer the agents' questions.

After Special Agent Eckel finished transcribing his notes, and reviewing the notes in his notebook, he resumed the questioning of Scott on a new topic. *Id.* at 8:14:05. Specifically, Special Agent Eckel asked Scott to remind the agents who the investors in the Fenero Funds had been. *Id.* In response to a series of questions about Fenero's investors, Scott lied to the agents about who Fenero's investors were and where the money in the Fenero Funds was from. Scott's false statements included, among others, that OneCoin and Ruja Ignatova had nothing to do with Fenero

4

or any other funds that Scott had worked on.  *Id.* at 8:26:46.  As noted above, contrary to Scott's statements to the agents, all of the money invested into the Fenero Funds was derived from the OneCoin fraud scheme and was invested into the Fenero Funds on behalf of Ignatova.  After the agents confronted Scott about his untruthful statements, and informed him that they had evidence that Fenero was funded by proceeds from OneCoin, Scott informed the agents that "I'd like to have a lawyer help me."  *Id.* at 8:32:49.  After Scott made this statement, the agents concluded the interview, and did not ask Scott any additional substantive questions.

## ARGUMENT

As noted below, Scott's motion is untimely and was therefore waived by Scott.  Furthermore, Scott's First Statement about a lawyer was not a request for the assistance of counsel in dealing with a custodial interrogation and was therefore outside the protections of *Miranda*.  Scott's Second Statement about a lawyer was ambiguous and equivocal and therefore did not constitute an invocation of the right to counsel under controlling law.  Scott's suppression motion should be denied.

### A.   Applicable Law

"After a knowing and voluntary waiver of rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, law enforcement officers may continue questioning until and unless a suspect clearly requests an attorney."  *Davis v. United States*, 512 U.S. 452, 452 (1994).  "In general, a suspect who reads, acknowledges, and signs an 'advice of rights' form before making a statement has knowingly and voluntarily waived *Miranda* rights."  *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014).  In addition, "[w]here the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent."  *United States v. Oehne*, 698 F.3d 119, 124 (2d Cir. 2012).

5

If, after waiving his *Miranda* rights, a defendant subsequently invokes his right to counsel, "interrogation must stop and the invocation must be 'scrupulously honored.'" *United States v. Gonzalez*, 764 F.3d 159, 165 (2d Cir. 2014). But if a defendant chooses to invoke his right to counsel after a prior waiver, "he must do so through a clear, unambiguous, affirmative action or statement." *United States v. Plugh*, 648 F.3d 118, 124 (2d Cir. 2011). If "an accused makes a statement concerning the right to counsel that is ambiguous or equivocal or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." *Id.* at 123 (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010)). This "requirement of an unambiguous invocation of *Miranda* rights results in an objective inquiry that avoids the difficulties of proof and provides guidance to officers on how to proceed in the face of ambiguity." *Id.* (quoting *Berghuis*, 560 U.S. at 381).

If a defendant waives his *Miranda* rights, but later refers to a lawyer in a way that "is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," the law does not require that the agents stop questioning the defendant. *Davis*, 512 U.S. at 452 (holding that statement "Maybe I should talk to a lawyer" was not a request for counsel); *see also Diaz v. Senkowski*, 76 F.3d 61, 63 (2d Cir. 1996) (statements "I think I want a lawyer" and "Do you think I need a lawyer?" were not a request for counsel); *United States v. Lights*, 208 F. Supp. 3d 568, 576 (S.D.N.Y. 2016) (statement "Can I call a lawyer?" was not a request for counsel); *United States v. Banki*, 2010 WL 11606510, at *1 (S.D.N.Y. Mar. 24, 2010) (statement "I think I need a lawyer" was not a request for counsel).

Furthermore, the *Davis* protection against further police-initiated interrogation "applies only when the suspect has *expressed* his wish for the particular sort of lawyerly assistance that is

6

the subject of *Miranda*." *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991) (emphasis in original). In other words, "[i]t requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." *Id.* (emphasis in original). Conversely, a "request for the assistance of counsel in some manner that does not involve assistance in responding to questions by the police" does not trigger the *Miranda-Davis* prohibition on further questioning. *United States v. Pinto-Thomaz*, 357 F. Supp. 3d 324, 338 (S.D.N.Y. 2019) (quoting *United States v. Chavez*, No. 14-cr-00185(JAM), 2015 WL 1650838, at *5 (D. Conn. Apr. 14, 2015)).

**B.     Discussion**

As an initial matter, any argument that Scott's post-arrest statement should be suppressed is untimely and has been waived by Scott. Here, the Federal Rules are explicit; any such motion must be raised by the date set by the court, and the failure to do so constitutes a waiver. *See* Fed. R. Crim. P. 12(b)(3), 12(c); *see also United States v. Howard*, 998 F.2d 42, 52 (2d Cir. 1993) (finding that defendant failed to show cause for failure to file timely motion to suppress evidence). Defendant's pre-trial motions were due more than four months ago on May 14, 2019. The Government produced Scott's post-arrest statement to defense counsel over a year ago, on September 14, 2018. Scott has articulated no basis for his failure to file his motion by the Court's deadline. Nor could he. Accordingly, Scott's right to bring a motion to suppress at this stage has been waived.

Procedural defects aside, there is no basis to grant Scott's motion on the merits. The video of Scott's post-arrest interview makes clear that the agents read Scott his *Miranda* rights; Scott stated that he understood his rights; Scott signed a written form stating that he understood his rights and was waiving them; and Scott then proceeded to answer the agents' questions. Those facts establish a knowing and voluntary waiver, which Scott concedes in his Motion. Accordingly, to

then invoke the right to counsel, Scott's invocation would have to be clear, unambiguous, and unequivocal. The first two purported invocations that the defendant has identified do not satisfy that test.

In Scott's First Statement, Scott asked the agents if he could make a phone call to a civil law firm to ask the civil attorneys if they had any recommendations for a criminal attorney who could appear at Scott's bail proceeding later that day. *See* GX A at 7:59:22-7:59:45. Scott's request to speak with a civil attorney, who might in turn have a recommendation for a lawyer who could assist Scott at his bail proceeding, was clearly not a request for an attorney to assist him in dealing with the interrogation with the agents. Such a request to speak with an attorney for a purpose other than dealing with a custodial interrogation does not trigger the protections afforded by *Miranda-Davis*. *See McNeil*, 501 U.S. at 178.

Later in the interview, the agents referred Scott to documents in a binder and asked Scott a series of questions about a particular transaction that the Fenero Funds had engaged in (*i.e.*, the Cryptoreal Transaction). After Special Agent Fata asked where the money from that transaction ended up going, Scott stated "I don't, I don't remember this transaction that well. I would have to see more documents. If we get this detailed, then I really should should umm get a lawyer involved. Umm, because I just don't remember and I don't want to say anything wrong." GX A at 8:12:57. Scott's Second Statement was far from a clear, unambiguous, and unequivocal invocation as he now claims. In his motion, Scott claims that he said "I really should get a lawyer involved." Def. Mot. at 10. However, this was not what Scott actually said. Scott stated, "*if* we get this detailed, *then* I really should . . . get a lawyer involved." GX A at 8:12:57. Ambiguous statements such as this do not constitute a clear invocation of counsel. *See Davis*, 512 U.S. at 452 ("Maybe I should talk to a lawyer" was not a clear invocation); *Diaz*, 76 F.3d at 63 ("I think I want

8

a lawyer" was not a clear invocation).[2]

The defendant's reliance on *Wood v. Ercole*, 644 F.3d 83, 91 (2d Cir. 2011) is entirely misplaced. In *Wood*, the defendant stated, "I think I should get a lawyer involved." *Wood*, 644 F.3d at 87. In holding that Wood's statement was unambiguous, the court compared his statement to other statements that evidenced an internal debate on behalf of the declarant, such as "perhaps I should get a lawyer," and "maybe I need a lawyer." *Id.* Scott's statement evidences the exact internal debate and ambiguity that Wood's statement lacked: "*if* we get this detailed, *then* I really should . . . get a lawyer involved." GX A at 8:12:57. Far from making an unequivocal statement, Scott's statement was framed as a hypothetical that referenced something that *might* happen, at which point Scott might then want a lawyer. Ambiguous statements such as this do not require law enforcement officers to terminate the interview. As the Court found in *Diaz*, "'when the officers conducting the questioning reasonably do not know whether or not the suspect wants a lawyer, a rule requiring the immediate cessation of questioning would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity.'" *Diaz*, 76 F.3d at 64 (quoting *Davis*, 512 U.S. at 458). Therefore, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances

---

[2] The defendant notes in his brief that Scott is a trained corporate lawyer and not a criminal lawyer, and therefore he lacked experience and familiarity with *Miranda*. If anything, Scott's training as a lawyer and his high intelligence and education, rendered him more capable of communicating in a clear and unambiguous way that he wished to speak with a lawyer before continuing with any questioning. In fact, Scott demonstrated during the interview that he understood how to communicate clearly that he wanted to end the interview and/or speak with a lawyer. At the outset of the interview, Scott stated "I can speak to you a little bit, I mean, yeah sure, that's okay. I'll say stop, and we stop." GX A at 7:28:00. Then, at the end of the interview, Scott stated "I'd like to have a lawyer." *Id.* at 8:32:49. Scott's status as a well-educated lawyer, and the statements he made during the interview, make it clear he understood how to clearly communicate a desire to end the interview and to speak with a lawyer before answering any additional questions.

would have understood only that the suspect might be invoking the right to counsel, [Second Circuit] precedents do not require the cessation of questioning." *Id.* Because Scott did not clearly invoke his right to counsel, Special Agents Eckel and Fata were entitled to continue the interview.

Furthermore, contrary to Scott's claim in his motion, *see* Mot. at 11, the agents' response to the Second Statements, and remainder of the interview, demonstrate that Scott's Second Statement was far from an unambiguous request for counsel. Rather than end the interview, Special Agent Eckel briefly paused to transcribe notes in his interview notebook, and review the notes he had already taken, as he did at other points throughout the interview. *See*, *e.g.*, GX A at 7:58:47 – 7:59:09. After Special Agent Eckel finished updating and reviewing his notes, he resumed asking Scott questions. *Id.* at 8:14:05. Notably, for the duration of the interview, the agents did not ask Scott any additional questions about the Cryptoreal Transaction; in other words, the agents did not ask Scott the detailed type of questions that Scott had indicated he *might* want to have a lawyer present for. Instead, Special Agent Eckel resumed asking Scott questions on a new topic. *Id.* Scott immediately continued to answer the agents' questions without any hesitation. *Id.* at 8:14:15. Finally, when Scott stated later in the interview that he'd "like to have a lawyer" before discussing anything further, the agents ended the interview immediately, and thanked Scott for talking to them. *Id.* at 8:32:49.[3] This sequence of events shows that the agents reasonably did not understand Scott's Second Statement to be a clear request for counsel. Further, when the agents *were* faced with a clear invocation of counsel, they immediately stopped questioning Scott.[4]

---

[3] Although the agents continued to speak with Scott, they did not ask him any substantive questions after this.

[4] The defendant is not requesting an evidentiary hearing, and here, where the relevant facts are contained within the post-arrest video itself, a hearing is unnecessary. *See United States v. Watson*, 404 F.3d 163, 167 (2d Cir. 2005); *see also United States v. Rosa*, 2018 WL 722857, at * 3 (S.D.N.Y. Feb. 6, 2018) (denying suppression motion without evidentiary hearing where post-arrest interview was on video).

10

## **CONCLUSION**

For the foregoing reasons, the Court should deny Scott's motion to suppress his post-arrest statements.

Dated: New York, New York
September 27, 2019

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

by: ⁣⁣⁣⁣⁣⁣ /s/
Nicholas Folly /Christopher J. DiMase
Assistant United States Attorneys
(212) 637-1060 / 2433

Julieta V. Lozano
Special Assistant United States Attorney
(212) 335-4025