UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

   - v. -                                                    :                    S6 17 Cr. 630 (ER)

MARK S. SCOTT,

                                 :

                Defendant.

                                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# MOTION TO OFFER THE TESTIMONY OF WITNESSES VIA LIVE CLOSED-CIRCUIT TELEVISION DURING TRIAL OR, IN THE ALTERNATIVE, FOR A DEPOSITION PURSUANT TO RULE 15 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE


                                        GEOFFREY S. BERMAN
                                        United States Attorney
                                        Southern District of New York

Christopher DiMase/Nicholas Folly
        Assistant United States Attorneys
Julieta V. Lozano
        Special Assistant United States Attorney
      - Of Counsel -

## TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ....................................................................................1

II.    RELEVANT BACKGROUND……………………………………………………………2

     A. The Indictment ..............................................................................................2

     B. The Witnesses' Anticipated Testimony ......................................................3

III.   MOTION FOR LIVE CLOSED-CIRCUIT TELEVISION TESTIMONY OR, IN THE ALTERNATIVE, FOR A RULE 15 DEPOSITION ............................................................................3

     A.     Applicable Law .........................................................................................3

         1.     Live Closed-Circuit Television Testimony at Trial: *Gigante* .........................3

         2.     Rule 15 Deposition: The *Johnpoll* Test .........................................................6

         3.     District Court Decisions Supporting the Government's Request…………..9

     B.     The Government's Proposed Witnesses Offer Material, Inculpatory Testimony That Cannot Reasonably Be Put Before the Jury in Any Remotely Comparable Way—But the Witnesses Are Unavailable Because They Are Beyond Its Subpoena Power and They Refuse to Travel .........................................................10

         1.     The Witnesses' Testimony is Material Evidence That the Defendant Utilized BOI Accounts to Launder Hundreds of Millions of Dollars of OneCoin Proceeds and Misled BOI Regarding the Origin of those Funds .................11

         2.     The Witnesses are Unavailable ................................................................14

     C.     Any Testimony from the Witnesses Would Be Taken in Accord with Rule 15 and is Necessary to Prevent a Failure of Justice .......................................................15

IV.   CONCLUSION...................................................................................................18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA  :

   - v. -  :  S6 17 Cr. 630 (ER)

MARK S. SCOTT,  :

            Defendant.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MOTION TO OFFER THE TESTIMONY OF WITNESSES VIA LIVE CLOSED-CIRCUIT TELEVISION DURING TRIAL OR, IN THE ALTERNATIVE, FOR A DEPOSITION PURSUANT TO RULE 15 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

### I. PRELIMINARY STATEMENT

By this memorandum of law, the Government respectfully moves to offer the testimony of four witnesses (the "Witnesses") during trial via two-way closed-circuit television from a remote location in the Republic of Ireland or—in the alternative—for depositions of the witnesses prior to trial pursuant to Rule 15 of the Federal Rules of Criminal Procedure.  The Witnesses are all present or former employees of the Bank of Ireland, where the defendant maintained corporate bank accounts through which he is alleged to have laundered over $300 million in OneCoin fraud proceeds, accomplished through, among other means, misrepresentations made by the defendant to the Witnesses.  As discussed below, the Court should grant the Government's motion because the Witnesses provide material, inculpatory testimony about Scott and are unavailable to testify in Court.

## II. RELEVANT BACKGROUND

**A.     The Indictment**

The defendant is charged in a one-count indictment with conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h).  *See* Indictment ¶¶ 1-3. At trial, the Government will show that the defendant laundered approximately four hundred million dollars of proceeds from OneCoin—a complex international fraud scheme resulting in billions of dollars in loss to victims—through a series of purported private equity funds registered in the British Virgin Islands ("BVI") with accounts at banks located in the Cayman Islands (the "Fenero Funds").  The Government will also establish that Scott transferred a significant portion of the funds to related bank accounts at the Bank of Ireland ("BOI") in the Republic of Ireland.  At trial, the Government will present evidence of misrepresentations made to banks—including BOI—and fund administrators by Scott and his co-conspirators in connection with the transfer of funds, in order to disguise the fact that the funds were derived from the OneCoin scheme.

Through testimonial and documentary evidence, the Government will prove that the defendant misrepresented the source of monies received by the Fenero Funds to a fund administration firm, at least one of the Cayman Islands banks, and BOI.  For example, through testimonial and documentary evidence, the Government will establish that the Fenero Funds Cayman bank accounts funded approximately €273 million in wire transfers benefitting three accounts held at BOI, each with a Fenero-related name and controlled by Scott.  The evidence will establish that these funds consisted of OneCoin proceeds.  At trial, the Government will also establish additional transfers of funds from the Fenero Funds Cayman accounts to the Fenero accounts at BOI.

B.      **The Witnesses' Anticipated Testimony[1]**

The Witnesses are citizens and residents of the Republic of Ireland.  As detailed below, the Witnesses would each provide material and unique testimony at trial.  This testimony is extremely important – and inculpatory.  It helps to prove: (i) Scott's establishment of accounts at BOI, which were used to launder hundreds of millions of dollars in OneCoin fraud proceeds; (ii) details related to particular transfers of funds through Scott's BOI accounts, from and to co-conspirators; and (ii) Scott's misrepresentations to BOI regarding the purpose and functioning of, and source of funds for his purported private equity funds.  *See* Declaration of Julieta V. Lozano, dated September 29, 2019 ("Lozano Decl."), ¶¶ 9 to 12.  Further, the Witnesses' anticipated testimony cannot reasonably be presented to the jury in a comparable manner.  First, while the Government intends to introduce as evidence at trial BOI records and email communications, those records contain only a subset of the material and relevant testimony that the Witnesses will provide.  Second, the Witnesses' testimony is vital to provide necessary context so that the jury can fairly understand and evaluate the BOI records and email communications.

## III. THE COURT SHOULD GRANT THE GOVERNMENT'S MOTION FOR LIVE CLOSED-CIRCUIT TELEVISION TESTIMONY OR, IN THE ALTERNATIVE, FOR A RULE 15 DEPOSITION

A.      **Applicable Law**

1.      **Live Closed-Circuit Television Testimony at Trial: *Gigante***

It is long-standing law in this Circuit that in circumstances in which an individual with material information is unavailable to physically appear as an in-court trial witness, live trial

---

[1] The summary of the Witnesses' anticipated testimony set forth herein—and included in part in the Declaration of Julieta V. Lozano, dated September 29, 2019—is based on a variety of sources, including interviews of the Witnesses conducted by the Government, and documents, including emails provided to the Government by BOI pursuant to Mutual Legal Assistance Treaty requests submitted to the Republic of Ireland.

3

testimony of that witness, appearing via close-circuit television ("CCTV"), is permissible.  The

foundational case is *United States* v. *Gigante*, 166 F.3d 75, 81 (2d Cir. 1999).

      In *Gigante*, Judge Weinstein considered a motion by the Government to offer the

testimony of a sick cooperating witness who was then located in the federal witness protection

program.  *See United States* v. *Gigante*, 971 F. Supp. 755 (E.D.N.Y. 1997).  The District Court

first determined that the Government had made the requisite showing for a Rule 15 deposition,

*id.* at 758, but concluded that, for two reasons, live CCTV testimony was preferable to a Rule 15

deposition.  First, the Court found that Rule 15's requirement of disclosure of identifying

information about the witness, Fed. R. Crim. P. 15(b)(1), in particular his location, "would be

dangerous."  *Id.* at 758-59.  Second, the Court concluded that because the defendant could not be

physically present at the deposition, live CCTV testimony during trial "afford[ed] greater

protection of his confrontation rights than would a deposition."  *Id.* at 759.  The District Court

explained:

> It is desirable that the defendant be permitted, if he wishes, to face the witness
> directly so that each sees the other and the jury sees both while the testimony is
> being given. The televising arrangements made by the government provide this full
> confrontation since the witness sees and hears the defendant while the defendant
> sees and hears the witness. The jury, court, and counsel simultaneously see both. In
> short, the arrangements proposed by the government in this case satisfy fully the
> requirements of the Constitution and the Federal Rules of Criminal Procedure.

*Id.*  Accordingly, the Court ordered that the cooperating witness be permitted to testify via

CCTV during the trial; during his testimony, the cooperating witness was visible on video

screens in the courtroom to the jury, defense counsel, Judge Weinstein and the defendant.  The

cooperating witness, similarly, could see and hear defense counsel and other courtroom

participants on a video screen at his remote location.  *See Gigante*, 166 F.3d at 80.

The Court of Appeals affirmed.  It observed that "[t]he closed-circuit television procedure utilized for [the cooperating witness]'s testimony preserved all of these characteristics of in-court testimony: [the witness] was sworn; he was subject to full cross-examination; he testified in full view of the jury, court, and defense counsel; and [the witness] gave this testimony under the eye of [the defendant] himself."  *Id.*

The Court of Appeals went on to hold that the standard for use of live CCTV testimony at trial is the same as that applied to a Rule 15 deposition—namely (1) that the witness must be unavailable and (2) that his testimony must be material to the case.  *See id.* at 81 (citing *United States* v. *Johnpoll*, 739 F.2d 702, 708 (2d Cir. 1984)).  The Court of Appeals agreed with Judge Weinstein that "the closed-circuit presentation of [the witness]'s testimony afforded greater protection of [the defendant]'s confrontation rights than would have been provided by a Rule 15 deposition.  It forced [the witness] to testify before the jury, and allowed them to judge his credibility through his demeanor and comportment."  *Id.*  Among other things, the Court of Appeals observed that live CCTV testimony allowed the defense attorney to "weigh the impact of [the witness]'s direct testimony on the jury as he crafted a cross-examination."  *Id.*[2]

---

[2] The Court of Appeals approved Judge Weinstein's identified bases for his authority to permit live CCTV testimony during the trial, which included his "inherent power" under Rules 2 and 57(b) of the Federal Rules of Criminal Procedure to structure a criminal trial in a just manner. *Gigante*, 971 F.Supp. at 758–59; *Gigante*, 166 F.3d at 80.  One other District Court in this District has questioned whether such authority exists.  *See United States* v. *Banki*, No. 10 Cr. 08 (JFK), 2010 U.S. Dist. LEXIS 27116, at *3-4 (Mar. 23, 2010) (observing that Rule 26's provision that "[i]n every trial the testimony of witnesses must be taken in open court, unless otherwise provided by a statute or by rules adopted under 28 U.S.C. §§ 2072–2077" would be violated by CCTV testimony at trial because there is no such provision in law or rule, and pointing to the 2002 Supreme Court rejection of a proposed revision to Rule 26 which would have explicitly permitted trial testimony via two-way videoconferencing (citing Order of the Supreme Court of the United States, 207 F.R.D. 89, 93–96 (2002)), *rev'd on other grounds United States v. Banki*, 685 F.3d 99 (2d Cir. 2011).  But the Supreme Court's rejection of a proposed Rule of Criminal Procedure did not presume to diminish the *inherent* power of District Courts, or to *sub silentio* overrule *Gigante*.  Moreover, in *Banki,* the Court largely based its denial of the defendant's motion for witnesses located in Iran to testify via videoconference on

The Sixth Circuit has also permitted live trial testimony of a witness, appearing via CCTV, when that witness possesses material information and is unavailable to physically appear as an in-court trial witness. *See United States v. Benson,* 79 Fed. Appx. 813, 2003 U.S. App. LEXIS 22315 (6th Cir. 2003) (unpublished). In *Benson,* the Court upheld a District Court ruling allowing an elderly, infirm witness to appear from another state via two-way videoconference in a case involving mail fraud, wire fraud, and tax evasion charges emanating from a multi-level-marketing pyramid scheme. *Id.* The Court found that the witness's testimony was material and not cumulative because "unlike other witnesses, [the witness] dealt solely with [defendant] and only she could testify regarding specific contacts." *Id.* at 821.

### 2.     Rule 15 Deposition: The *Johnpoll* Test

Rule 15 authorizes a party to "move that a prospective witness be deposed in order to preserve testimony for trial," and a "court may grant the motion because of exceptional circumstances and in the interests of justice." Fed. R. Crim. P. 15(a)(1). In this Circuit, it has been "well-settled" for thirty years that "the 'exceptional circumstances' required to justify the deposition of a prospective witness are present if that witness' testimony is material to the case and if the witness is unavailable to appear at trial." *Johnpoll*, 739 F.2d at 709. The burden of satisfying the *Johnpoll* test is on the party seeking a Rule 15 deposition. *See United States* v. *Whiting*, 308 F.2d 537, 541 (2d Cir. 1962); *see also United States* v. *Kelley*, 36 F.3d 1118, 1124

---

three factors not present in this matter. First, the *Banki* Court noted that as a result of the lack of diplomatic relations between the United States and Iran, there was "no way to ensure truth-telling as the Government cannot prosecute the witnesses for perjury or for the making of false statements." *Banki,* No. 10 Cr. 08 (JFK), 2010 U.S. Dist. LEXIS 27116, at *7 (Mar. 23, 2010), *rev'd on other grounds United States v. Banki,* 685 F.3d 99 (2d Cir. 2011). The Court's second concern was that the Government would not be able to cross-examine the witnesses in person. *Id.* at *7-8. Third, the Court noted that there was "no realistic way for officers of the United States to travel [to Iran] to administer the oath or otherwise monitor the proceedings. *Id.* at *9.

(D.C. Cir. 1994).[3]  "The decision to grant or deny a motion to take a deposition rests within the sound discretion of the trial court, and will not be disturbed absent clear abuse of discretion." *Johnpoll*, 739 F.2d at 708.

While depositions are not—and should not be—part of most trials, it is also true that "the shrinking size of the globe means that certain criminal activities increasingly manifest an international cachet and, because federal courts frequently lack the power to compel a foreign national's attendance at trial, Rule 15 may offer the only practicable means of procuring critical evidence."  *United States* v. *McKeeve*, 131 F.3d 1, 7-10 (1st Cir. 1997) (upholding admissibility of foreign deposition); *see also* Fed. R. Crim. P. 15(a)(1) (granting of Rule 15 deposition permissible when doing so is "in the interest of justice"); *United States* v. *Vilar*, 568 F. Supp. 2d 429, 442 (S.D.N.Y. 2008) ("[W]hen a substantial likelihood exists that the prospective deponents will be unavailable for trial and their testimony is highly relevant to a central issue in the case, *justice generally requires preservation of that testimony*." (emphasis added)) (internal citations omitted).

The first prong of the *Johnpoll* inquiry is the materiality prong.  *Johnpoll*, 739 F.2d at 709.  Materiality is a fact-based inquiry that turns on the relevance of the proposed testimony to the elements of the charged crimes.  *See*, *e.g*., *id.* (in trial related to transport of stolen securities, testimony of Swiss witnesses involved in arranging the transport was material); *United States v. Benson,* 79 Fed. Appx. 813, 819-821, 2003 U.S. App. LEXIS 22315 (6th Cir. 2003) (unpublished) (testimony of an elderly, infirm out-of-state witness regarding specific contacts with defendant in case involving pyramid fraud scheme was material where defendant claimed

---

[3] Some courts have also said that the testimony must be "necessary to prevent a failure of justice."  *United States* v. *Cohen*, 260 F.3d 68, 78 (2d Cir. 2001); *United States* v. *Stein*, 482 F. Supp. 2d 360, 363 (S.D.N.Y. 2007).

he was "merely a salesman" for [his co-defendant], but the evidence indicated that his role

included dealing with investors' concerns); *United States* v. *Drogoul*, 1 F.3d 1546, 1553-54

(11th Cir. 1993) (in bank fraud trial involving bank employee, testimony of defendant's

superiors that they had not authorized the allegedly fraudulent transaction was material because

it rebutted an expected defense); *see also United States* v. *Cohen*, 260 F.3d 68, 78 (2d Cir. 2001)

(holding that the proposed testimony was not material because it was not relevant to the question

of the defendant's guilt or innocence).

The second prong of the *Johnpoll* inquiry is the unavailability prong.  *Johnpoll*, 739 F.2d

at 709.  A witness located outside the United States who cannot or will not travel to testify in the

United States is unavailable, because the government cannot secure the witness's testimony at

trial through its subpoena power.  *See id.* (four Swiss nationals were all "unavailable" pursuant to

Rule 15, including one who refused to come to the United States and three others who refused to

come unless the Government agreed to pay them); *see also* Fed. R. Evid. 804(a)(5) (declarant is

unavailable if proponent of a statement "has been unable to procure the declarant's attendance . .

. by process or other reasonable means"); *Drogoul*, 1 F.3d at 1551 (government should have been

permitted to take depositions in Italy because it could not subpoena the witnesses); *United States*

v. *Kelly*, 892 F.2d 255, 262 (3rd Cir. 1989) (government had no power to compel foreign

witnesses to attend trial in United States); *United States* v. *Moon*, 93 F.R.D. 558, 559-560

(S.D.N.Y. 1992) (granting defense application to depose witnesses in Japan who were

unavailable because they were "neither presently residing in the United States nor subject to the

[Court's] subpoena power" and they would not travel to the United States); *United States* v.

*Varbaro*, 597 F. Supp. 1173, 1181 (S.D.N.Y. 1984) ("Although the rule does not necessarily

require a showing of certainty that a witness will be unavailable, surely it requires a showing of a

specific reason why the witness might not be available."), *rev'd on other grounds*, *United States* v. *Riccardelli*, 794 F.2d 829, 834 (2d Cir. 1986); *cf. United States* v. *Ismaili*, 828 F.2d 153, 160 (3d Cir. 1987) (observing that the mere fact that a putative witness resides in another country, without any further showing, is insufficient to demonstrate unavailability); *United States* v. *Chusid*, No. 00 Cr. 263 (LAK), 2000 WL 1449873, *1 (S.D.N.Y. Sept. 27, 2000) (holding that "[c]onclusory statements of unavailability by counsel are insufficient" to meet a movant's burden).  Moreover, a party can establish that it has taken "'good faith' efforts to obtain the witnesses' presence at trial by indicating that it had repeated contact with the witnesses and had promised 'to pay all expenses of the witnesses' in traveling to the United States."  *Vilar*, 568 F. Supp. 2d at 438 (quoting *United States* v. *Sindona*, 636 F.2d 792, 804 (2d Cir.1980)).

### 3.    District Court Decisions Supporting the Government's Request

Two relatively recent District Court decisions out of this district support the Government's request for the introduction of testimony via CCTV.  In *United States* v. *Sulaiman Abu Ghayth*, 2014 U.S. Dist. LEXIS 5318 (S.D.N.Y. Jan. 14 2014), the Government moved to introduce testimony at trial from a confidential witness via CCTV, on similar grounds and under the *Johnpoll* standard.  The Government proffered that the witness would testify that, among other things, he was involved in an al Qaeda plot to down U.S. airplanes with suicide bombs during the fall of 2001.  In granting the Government's motion to offer the witness's testimony through CCTV, Judge Kaplan found that the witness's testimony would be material, inculpatory evidence against defendant Ghayth because the testimony was "probative of Abu Ghayth's knowing involvement in a conspiracy to kill Americans and provision of material assistance to terrorism."  *Id.* at *7.[4]  The Court also found that the Government sustained its burden of

---

[4] In a later proceeding in this same case, denying the defendant's request for a Rule 15 deposition of a witness, the Court found that the defense witness's testimony would not have been material,

showing the witness's unavailability despite good faith efforts to secure his presence because the witness could be arrested if he came to the United States. *Id*. at *7-8.

Similarly, In *United States v. Mostafa,* 14 F. Supp. 3d 515 (S.D.N.Y, Apr. 12, 2014), the Government also moved to introduce testimony at trial via CCTV from the same witness in *Ghayth* who refused to travel to the United States to testify out of a concern that he would be arrested.  Judge Forrest granted the Government's motion to offer the witness's testimony through CCTV, finding that the witness's testimony would be "plainly material and relevant" to the charges in the case. *Id.*  The Court also found that the Government sustained its burden of showing the witness's unavailability despite reasonable and good faith efforts to secure his presence because the witness could be arrested if he came to the United States. *Id.* at 524. Additionally, the Court found that the granting the Government's motion furthered the interest of justice:

> It is important that the Government be able to present the material and relevant evidence in its search for truth.  The Government has characterized [the witness's] testimony as critical to its truth-seeking function.  This evidence therefore furthers the process of a fair trial and is therefore plainly in the interests of justice.

*Id.*

**B.     The Government's Proposed Witnesses Offer Material, Inculpatory Testimony That Cannot Reasonably Be Put Before the Jury in Any Remotely Comparable Way— But the Witnesses Are Unavailable Because They Are Beyond Its Subpoena Power and Refuse to Travel**

As set forth above, the *Johnpoll* standard for offering the testimony of a witness, whether via live CCTV during trial or a Rule 15 deposition, is that (1) the witness's testimony is material and that (2) the witness is unavailable.  The Government has comfortably met that standard here with respect to the Witnesses.  As to the first prong of the test, the Witnesses offer material and

---

and that the application was untimely as relief was sought during trial and after the Government had rested. *United States* v. *Abu Ghayth*, 17 F. Supp. 3d 289, 300-304 (S.D.N.Y. Apr. 22, 2014).

inculpatory testimony that cannot be presented to the jury effectively in a comparable way.  And as to the second prong of the *Johnpoll* test, the Witnesses clearly are unavailable insofar as they refuse to travel to the United States, and the Government has no way to compel them to appear.

> **1.      The Witnesses' Testimony is Material Evidence That the Defendant Utilized BOI Accounts to Launder Hundreds of Millions of Dollars of OneCoin Proceeds and Misled BOI Regarding the Origin of those Funds**

The Witnesses will provide direct testimony of the defendant's guilt on Count One of the Indictment.  And each of the Witnesses will offer material and inculpatory testimony that is distinct from the testimony to be provided by other witnesses at trial.

Between 2014 and 2017, Deirdre Ceannt ("Ceannt") worked in the Foreign Direct Investment ("FDI") team at BOI.  In 2016, she served as the primary point of contact at BOI for the defendant.  *See* Lozano Decl. at ¶9(a).  As the defendant's primary point of contact at BOI, Ceannt is uniquely positioned to provide relevant testimony about the defendant's portfolio of Fenero Funds accounts at BOI (the "BOI Fenero Accounts"), which he used to launder OneCoin proceeds, and the defendant's various misrepresentations made to BOI in connection with those accounts and the Fenero Funds, including, among other things, the purpose of the Fenero Funds, the intended structure and functioning of the Funds, the identity of his client-investors, and the intended investments the Funds would make.  *See* Lozano Decl. at ¶9.  Notably, some of the defendant's lies to Ceannt differed from representations made to others at the bank, and to other financial institutions.  These misrepresentations are evidence of the defendant's deliberate intent to mislead BOI about the source of the funds, and to conceal the true source of the money flowing through the Fenero Funds.

In addition, Ceannt will provide a summary of the KYC processes at BOI and explain the due diligence requests – including that the defendant identify the investors sending money to the

funds – that were made in connection with the BOI Fenero Accounts, as well as the rationale

supporting those requests.  Ceannt's testimony is also vital proof of (i) the bank's understanding,

based on the defendant's representations, of the Fenero Funds' operation and the function of the

BOI Fenero Accounts; and (ii) the discrepancies between the actual operation of the Fenero

Funds and connected accounts, and the defendant's representations of the same.  *See* Lozano

Decl. at ¶9.

Lastly, Ceannt will provide material testimony regarding the defendant's transfer of funds

to an account at bank in the United Arab Emirates ("UAE") held in the name of Phoenix Fund

Investments—which the evidence will establish was controlled by a co-conspirator directly

associated with OneCoin—including the fact that a correspondent bank raised post-transaction

monitoring questions about the transfer.  *See* Lozano Decl. at ¶9(e).  In this regard, Ceannt is

singularly positioned to provide material, inculpatory evidence of defendant Scott's transfer of

the funds to a co-conspirator's bank account, his attempts to recall the funds when faced with

due diligence questions, and his failure to respond to Ceannt's request for additional information

about the investor and counterparty to the transfer.

A second BOI witness, Derek Collins, who served as Executive Vice President and

Relationship Director for BOI in 2016, provides material and inculpatory evidence establishing

that during his initial meeting with the defendant, the defendant made multiple, critical

misrepresentations to BOI about the Fenero Funds, including that the Funds' main investments

would be in the financial services and telecommunications sectors.  *See* Lozano Decl. ¶11.

Again, these misrepresentations are powerful evidence of the defendant's guilt, as they reveal his

deliberate intent to mislead the bank about the source of the funds, and to hide the fact that the

Fenero Funds and the BOI Fenero Accounts were being used to move OneCoin proceeds.

Moreover, because Collins—unlike Ceannt, who also attended the meeting—took contemporaneous notes, he vividly recalls this meeting.

Diane Sands, as the head of the bank's Anti-Money Laundering (AML) team, will provide material testimony about the bank's AML review process, the requirements for on-boarding clients, and KYCNet's role in reviewing the documentation submitted by the defendant. *See* Lozano Decl. at ¶10.  Sands additionally will provide evidence that because the BOI Fenero Accounts were designated as high-risk by the bank, the defendant was obligated to identify to the bank, on a timely basis, any investors contributing over 10% of holdings in the BOI Fenero Accounts.  The evidence is significantly inculpatory, as the defendant failed to identify to BOI that virtually all of the "investments" into the Fenero Funds were from Ruja Ignatova and OneCoin-related.

Greg Begley will provide material and relevant evidence that he received and processed the paperwork submitted by the defendant for the BOI Fenero Accounts. *See* Lozano Decl. at ¶12.  For that reason, Begley will provide unique testimony about each of the defendant's accounts, the information submitted by the defendant to BOI in connection with the opening of those accounts, and the signatories on the accounts.  Begley will also provide testimony regarding the multiple requests for KYC and anti-money laundering (AML) documentation in connection with the BOI Fenero accounts that Begley received from the bank's compliance department, which he forwarded to the defendant.  Critically, Begley will testify that the defendant represented in communications sent only to Begley that the defendant would notify BOI when investors contributed above a 10% threshold of holdings in the BOI Fenero Accounts. *See* Lozano Decl. at ¶12(e).  Such a notification would have required the defendant to then provide appropriate KYC and due diligence materials for those investors.  The evidence at trial

13

will demonstrate that Scott never identified such investors, thereby concealing the true source of funds from BOI.

While some of the testimony to be offered by the Witnesses of course relates to, and relies on records, including email correspondence, provided by BOI to the Government, the Witnesses' anticipated testimony is broader than the information contained in these records and cannot be substituted by introduction of the records alone.  Additionally, in the case of email evidence, the Witnesses' testimony is vital to provide necessary context so that the jury can fairly evaluate that evidence.

Taken together, the Witnesses will describe how the defendant successfully laundered hundreds of millions of dollars of OneCoin proceeds through BOI without detection, including providing untruthful information to BOI employees in order to conceal the true source of the funds.  Accordingly, the Witnesses' testimony is "highly relevant" to the offense charged in the Indictment and easily satisfies the Government's burden of materiality.

2.       **The Witnesses Are Unavailable**

As to the second prong of the *Johnpoll* test, the Witnesses are unavailable because they are located outside the United States and thus beyond its subpoena power, and because they have indicated that they each refuse to travel to the United States.  Specifically: (1) the Witnesses are all residents in the Republic of Ireland, *see* Lozano Decl. at ¶ 5; (2) the Witnesses have refused to travel to the United States to testify, *id.*at ¶6; (3) on September 10, 2019, in response to a Government request that the Witnesses travel to the United States to testify at trial, Ceannt, Sands, and Begley informed the Government that, notwithstanding the Government's offers to cover travel costs, make scheduling accommodations, and provide safe passage letters, they would not travel to the United States, but would be amenable to providing testimony and

evidence in Ireland, *id.* at ¶ 23; and (4) on September 27, 2019, in response to a Government request that the Witnesses travel to the United States to testify at trial, Collins informed the Government that, notwithstanding the Government's offers to cover travel costs, make scheduling accommodations, and provide a safe passage letter, he would not travel to the United States, but would be amenable to providing testimony and evidence in Ireland, *id.* at ¶24. There are no further reasonable steps that the Government can take to procure this testimony in the United States.

Moreover, the good faith steps taken to date by the Government to secure the Witnesses' in-court testimony are sufficient. *See Abu Ghayth*, 2014 U.S. Dist. LEXIS 5318, at *7 ("The government has sustained also its burden of showing that [the Witness] is unavailable to testify in person at the trial despite the good faith efforts to secure his presence."); *Mostafa,* 14 F.Supp.3d at 524 ("the Government has established [the witness's] unavailability by a preponderance of the evidence through its good-faith and reasonable efforts to obtain the witness's presence."); *Vilar*, 568 F.Supp.2d at 438 (quoting *Sindona*, 636 F.2d at 804) (concluding that a party can establish that it has taken "'good faith' efforts to obtain the witnesses' presence at trial by indicating that it had repeated contact with the witnesses and had promised 'to pay all expenses of the witnesses' in traveling to the United States"). Accordingly, the Witnesses are unavailable. *See generally* Fed. R. Evid. 804(a)(5) (declarant is unavailable if proponent of a statement "has been unable to procure the declarant's attendance . . . by process or other reasonable means").

**C.    Any Testimony From the Witnesses Would Be Taken in Accord with Rule 15 and Is Necessary to Prevent a Failure of Justice**

Rule 15 provides that a deposition of a witness outside the United States requires the Court to find: (1) that the witness's testimony "could provide substantial proof of a material

fact;" (2) that there is a "substantial likelihood that the witness's attendance at trial," or for a U.S.-based deposition, cannot be obtained; (3) that the defendant cannot be present either because the country "will not permit the defendant to attend," or because "secure transportation and continuing custody" of the incarcerated defendant "cannot be assured;" and (4) that "the defendant can meaningfully participate in the deposition through reasonable means." Fed. R. Crim. P. 15(c).

Each of these factors would be met here.  First, the Witnesses' testimony does, in fact, provide substantial proof of material facts; indeed, the Witnesses' testimony is direct proof that the defendant used the BOI Fenero Accounts to launder hundreds of millions of dollars of OneCoin  proceeds; that the defendant intentionally misrepresented to BOI the purpose and functioning of, and source of funds for the Fenero Funds; and that the defendant concealed from BOI the fact that the money flowing through the BOI Fenero Accounts was derived from the OneCoin fraud scheme. *See, supra*, at Part III.B.1; Lozano Decl. at ¶ ¶ 9 to 12.

Second, live, in-court testimony of the Witnesses cannot be obtained.  *See, supra*, at Part III.B.2; Lozano Decl. at ¶¶ 2, 25.

Moreover, particularly because the Witnesses' testimony is central to the charges, *see supra* at Part III.B.1, allowing the jury to consider it is emphatically in the interest of justice.  *See* Fed. R. Crim. P. 15(a)(1) (providing that a court may grant a Rule 15 motion in the interest of justice).  And there are no countervailing factors that militate against it.  *See Vilar*, 568 F. Supp. 2d at 442-43.  The Government seeks witness testimony related to the particular issues on which each individual witness is uniquely qualified to testify; the Government will ensure that the Witnesses' testimony is not merely cumulative.

Additionally, and perhaps most importantly, there are myriad factors present on the specific facts here that will help to ensure that the Witnesses testify truthfully—and those guarantees of truthful testimony very much help to insure that remote testimony will, in this instance, advance the cause of justice. *See* Fed. R. Crim. P. 15(a)(1)

First, the Witnesses will be sworn, and thus subject to criminal penalties in the United States if they testify falsely. *See*, *e.g.*, 18 U.S.C. § 1001 (providing a maximum five years sentence of imprisonment for making "any materially false, fictitious, or fraudulent statement"); 18 U.S.C. § 1621 (providing a maximum five year sentence of imprisonment for perjury). Via our extradition treaty with the Republic of Ireland, the U.S. could pursue an extradition request for the Witnesses to prosecute them here for committing perjury. *See* Instrument as contemplated by Article 3(2) of the Agreement on Mutual Legal Assistance Between the United States of America and the European Union signed 25 June 2003, as to the application of the Treaty Between the Government of the United States of America and the Government of Ireland on Mutual Legal Assistance in Criminal Matters signed 18 January 2001, U.S.-Ir., July 14, 2005, S. TREATY DOC. NO. 109-13 (2006).

Second, false testimony could subject the Witnesses to prosecution in the Republic of Ireland for the crime of perjury if the testimony also was provided under a Republic of Ireland oath, which is contemplated here. *See* Lozano Decl. at ¶ ¶ 28, 30.

Finally, the Witnesses have a complete record of prior statements, including prior reports of interviews by Government representatives of the Witnesses. Pursuant to our obligations under Title 18, United States Code, Section 3500 (as well as other constitutional obligations, such as *Giglio* v. *United States,* 405 U.S. 150, 154 (1972), and its progeny), all relevant materials have or will be provided to defense counsel for testing through effective, well-informed cross

17

examination.  In addition, whether taken via Rule 15 or live CCTV testimony, assuring that the jury is provided the testimony of the Witnesses should not have any effect on the presently scheduled trial date.  *See* Lozano Decl. at ¶ 31.  In either event, the defendant would receive the requisite disclosures well in advance of what is required.  *See id.*

*          *          *

In sum, the Witnesses should be permitted to testify remotely.  The Witnesses each are uniquely positioned to provide relevant and material testimony, which addresses questions of fact at the core of this money laundering case.  And there are forceful guarantees here that the Witnesses will tell the truth—such that allowing the jury to hear from the Witnesses, whether by CCTV or a Rule 15 deposition, is firmly in the interest of justice.

**IV. CONCLUSION**

For all of the foregoing reasons, the Government's motion should be granted.

Dated:  New York, New York
            September 29, 2019

Respectfully submitted,

GEOFFREY BERMAN
United States Attorney

By:     _____/s/_____
          CHRISTOPHER DIMASE/NICHOLAS FOLLY/
          JULIETA V. LOZANO
          Assistant United States Attorneys/
          Special Assistant United States Attorney

          212-637-2433 / -1060 / 212-335-4025

18

**AFFIRMATION OF SERVICE**

JULIETA V. LOZANO, pursuant to 28 U.S.C. § 1746, hereby declares under the penalty of perjury:

I am a Special Assistant United States Attorney in the Office of the United States Attorney for the Southern District of New York. On September 29, 2019, I caused copies of the Government's Motion to Offer the Testimony of a Witness Via Live Closed-Circuit Television During Trial or, in the Alternative, for a Deposition Pursuant to Rule 15 of the Federal Rules of Criminal Procedure to be delivered by ECF and electronic mail to counsel for defendant Mark S. Scott:

Arlo Devlin-Brown

David Garvin, Esq.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: New York, New York
　　　　September 29, 2019

　　　　　　　　　　　　　　　　　　　　　　　　_____/s/ Julieta V. Lozano_____
　　　　　　　　　　　　　　　　　　　　　　　　JULIETA V. LOZANO
　　　　　　　　　　　　　　　　　　　　　　　　Special Assistant United States Attorney