UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :    S6 17 Cr. 630 (ER)

                                            :

    - v. -                                    :    **DECLARATION OF JULIETA**

                                            :    **V. LOZANO IN SUPPORT OF**

MARK S. SCOTT,                              :    **MOTION TO OFFER THE**

                                            :    **TESTIMONY OF WITNESSES**

        Defendant.                       :    **VIA LIVE CLOSED-CIRCUIT**

                                            :    **TELEVISION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

      JULIETA V. LOZANO, pursuant to 28 U.S.C. § 1746, declares the following under penalties of perjury:

      1.      I am a Special Assistant United States Attorney in the office of Geoffrey S. Berman, United States Attorney for the Southern District of New York, and I am one of the prosecutors assigned to the prosecution of Mark S. Scott, the defendant.

      2.      I am submitting this declaration in support of the Government's Motion to Offer the Testimony of Witnesses Via Live Closed-Circuit Television ("CCTV") During Trial or, in the Alternative, for a Deposition Pursuant to Rule 15 of the Federal Rules of Criminal Procedure.

### BACKGROUND

      3.      This matter is scheduled for trial on November 4, 2019.

      4.      At trial, the Government intends to offer testimonial evidence from four (4) current or former employees of the Bank of Ireland ("BOI"): Deirdre Ceannt ("Ceannt"), Diane Sands ("Sands"), Derek Collins ("Collins"), and Greg Begley ("Begley"), (collectively, the "Witnesses"), who each possess material, relevant, and discrete evidence.

      5.      The Witnesses are residents of, and located in the Republic of Ireland.

6.     The Witnesses have informed the Government that, for unspecified personal reasons, they will not travel to the United States to testify at trial; however, the Witnesses have also indicated that they are willing to provide testimony in this matter in Ireland.

7.     As detailed below, there is no legal mechanism in either the United States or the Republic of Ireland to compel the Witnesses to travel to the United States to testify in person.

8.     Because the Witnesses are unavailable, the Government seeks to offer at trial the testimony of the Witnesses via CCTV during trial or, in the alternative, via depositions pursuant to Rule 15 of the Federal Rules of Criminal Procedure.[1]

## WITNESS TESTIMONY[2]

### A. Deirdre Ceannt

9.     In March 2019, I and other attorneys with the United States Department of Justice met with Ceannt in the Republic of Ireland.  Based on my interview with Ceannt, my review of a report of that interview, and my review of her emails, I believe that Ceannt will testify, *inter alia,* as set forth in the accompanying memorandum of law and as follows:

  a.  Between 2014 and 2017, Ceannt worked in the Foreign Direct Investment ("FDI") team at BOI.  In 2016, she served as the primary point of contact at BOI for the defendant.

  b.  Ceannt will testify to the defendant's introduction to BOI, and the misrepresentations he made regarding the funds he was operating (the "Fenero Funds").  Specifically, Ceannt will testify that, during the introductory

---

[1] The Government is communicating with additional witnesses in foreign jurisdictions and may seek similar relief in connection to those witnesses, as soon as it becomes apparent that such a motion is warranted.

[2] The Government herein highlights the material and relevant evidence that each witness is uniquely qualified to provide.  As such, these summaries are not complete descriptions of the testimony to be provided by the Witnesses.

meeting, and on-boarding process at BOI, the defendant represented to BOI

that (i) he would be investing the Fenero Funds' assets in financial services

companies, real estate, and startup companies, through investment vehicles

formed in Ireland ("Fenero Ireland"), holding bank accounts at BOI (the "BOI

Fenero Accounts"); (ii) his client-investors were wealthy European families;

(iii) he would secure investments in the future; (iv) he intended to set up a

physical office in Ireland; and (v) that the Ireland office would employ 100

employees within 5 years, but would have a physical presence and 10

employees to manage the company in Ireland initially.

c.  Ceannt will also testify that the defendant's mission statement for his private

equity funds indicated that he was the 100% ultimate beneficial owner

("UBO") of Fenero Ireland, with the intention that investors would be brought

in at a later date. Ceannt will also testify that based on the defendant's

representations, BOI expected that the receipt of investor money into the BOI

Fenero Accounts would alter the beneficial ownership of Fenero Ireland.

Ceannt will testify that the bank requires know your customer ("KYC") due

diligence documentation for UBOs.  Ceannt will also testify that when money

ultimately was sent to the BOI Fenero Accounts, Scott did not formally notify

BOI of any new investors.

d.  Ceannt will also provide a summary of the KYC processes at BOI and explain

the due diligence requests that were made in connection with the BOI Fenero

Accounts, and the rationale supporting those requests.

    e.   Ceannt will also testify about a request submitted by a correspondent bank (the "Correspondent Bank") to BOI for more information regarding a flagged payment from a BOI Fenero Account to a bank account at in the United Arab Emirates ("UAE") in the name of "Phoenix Fund Investments."  The transfer occurred in March 2016, but the inquiry from the Correspondent Bank (as a result of post-transaction monitoring) occurred in May 2016.  When Ceannt received the Correspondent Bank inquiry, she requested that defendant provide additional information regarding the transaction, including the identity of the investors and details regarding Phoenix Fund Investments. Ceannt will testify that in response to this request, the defendant requested that the transfer be retracted and the money returned to the BOI Fenero Account. Ceannt will testify that the defendant resisted providing any information about the Fenero Funds investors whose money was sent to the BOI Fenero Accounts, and in fact, never did so.  Ceannt will also testify that she was not aware of the defendant ever providing details about the UAE beneficiary of the payment, Phoenix Fund Investments.

    f.   Finally, Ceannt will testify that, as the point of contact for defendant Scott at BOI, she was never informed that Ruja Ignatova, OneCoin, or other OneCoin-related entities and individuals, were connected with the money flowing through the Fenero Funds, or the BOI Fenero Accounts more specifically.

**B.**    <u>**Diane Sands**</u>

    10.    In March 2019, I and other attorneys with the United States Department of Justice met with Sands in the Republic of Ireland.  Based on my interview with Sands, my review of a

report of that interview, and my review of her emails, I believe that Sands will testify, *inter alia,* as set forth in the accompanying memorandum of law and as follows:

    a.   Sands is currently the head of the Anti-Money Laundering team at BOI and worked closely with the FDI team in 2016 during the defendant's onboarding process with the bank.

    b.   Sands will testify about KYCNet, BOI's due diligence program, and the standards and requirements controlling KYCNet review.

    c.   Sands will testify that as because the Fenero Funds were located in the British Virgin Islands, the BOI Fenero Accounts were designated as high-risk by the bank.  Sands also will testify that as high-risk accounts, the defendant was required to identify and provide beneficial owner details for any investors holding ten percent ownership in the funds.

    d.   Sands will testify that even if the defendant was the 100% legal owner of Fenero Ireland, any investors contributing over 10% should have been identified to the bank by the defendant on a timely basis.  Despite having agreed to identify such investors, the defendant never did so.

## C. **Derek Collins**

    11.    In March 2019, I and other attorneys with the United States Department of Justice met with Collins in the Republic of Ireland.  Based on my interview with Collins, my review of a report of that interview, and my review of his emails and notes, I believe that Collins will testify, *inter alia,* as set forth in the accompanying memorandum of law and as follows:

    a.   Collins is currently a Senior Director and Vice President at BOI and in 2016, he served as Executive Vice President and Relationship Director for BOI.

    b.   Collins will testify about his initial meeting with the defendant, during which the defendant made misrepresentations regarding the Fenero Funds, including claiming that the Funds' main investments would be in the financial services and telecommunication sectors, that the investors were all European families, and that the funds needed to be in Ireland because the defendant was conducting business and setting up investments in Europe.

    c.   Finally, and significantly, Collins will testify that he took contemporaneous notes during his meeting with the defendant, reflecting the subjects that were discussed, and the defendant's representations made during the meeting.

**D.**    **<u>Greg Begley</u>**

12.    In March 2019, I and other attorneys with the United States Department of Justice met with Begley in the Republic of Ireland.  Based on my interview with Begley, my review of a report of that interview, and my review of his emails, I believe that Begley will testify, *inter alia,* as set forth in the accompanying memorandum of law and as follows:

    a.   In 2016, Begley worked in the FDI group at BOI.  He is currently an employee of KBC Bank in Ireland.

    b.   Begley will testify that while at BOI, he was responsible for assisting customers in opening accounts, and that he assisted the defendant in collecting, processing, and inputting the defendant's account opening information and KYC documents into KYCNet.

    c.   Begley will describe receiving and processing the paperwork submitted by the defendant for the BOI Fenero Accounts; that paperwork included the defendant's mission statement describing the investors as wealthy European

families whom the defendant had known for many years, and the prospective investments as distressed financial services companies.

d. Begley also will testify about the multiple requests he received from the bank's compliance department for KYC and anti-money laundering (AML) documentation in connection with Scott's accounts, which Begley asked the defendant to provide.

e. Begley will testify that, based on a request from the compliance department in connection with enhanced due diligence, he asked defendant Scott to confirm that Scott would notify BOI of any seed investors that would be considered beneficial owners or controllers on the basis of a 10% or greater ownership stake, within a month of such investment. Begley will further testify that Scott confirmed he would report this information to the bank on a regular basis, and that Begley shared the defendant's response with the compliance department.

f. Begley will testify that while the defendant provided some documentation in response to the bank's requests, the defendant also indicated that fund administrators were responsible for the AML oversight of his funds.

## GOVERNMENT'S EFFORTS TO SECURE TESTIMONY

13.    For over two and a half years, the Government has diligently sought evidence from the Bank of Ireland, seeking records as well as evidence provided by witnesses.

14.     The Government submitted a Mutual Legal Assistance Treaty Request ("MLAT") to the Republic of Ireland in March of 2017, requesting records, including emails, relating to accounts held at BOI by the defendant in connection with the Fenero Funds.

15.     In April 2018, the Government submitted a supplement MLAT to the Republic of Ireland for records, including email correspondence, relating to additional accounts held at BOI by the defendant in connection with the Fenero Funds.

16.     In October 2018, after reviewing the records received from BOI in response to the original and supplemental MLAT requests, the Government submitted a second supplemental MLAT request seeking the testimony of various BOI employees, including Ceannt and Begley, who managed the bank's relationship with, or worked on behalf of the defendant.

17.     In March 2019, pursuant to the second supplemental MLAT request, the Government travelled to Ireland and interviewed BOI employees, including the Witnesses. Based on those interviews, the Government determined that the Witnesses would provide material and discrete evidence of the defendant's relationship with and dealings with BOI, including the opening of the BOI Fenero Accounts, and misrepresentations made by the defendant relating to those accounts and the Fenero Funds.

18.     In early April 2019, the Government notified BOI of the original October 2019 trial date.  The Government also notified BOI that it intended to call the Witnesses to testify at trial.

19.     In early August 2019, the Government contacted BOI and requested to make arrangements for trial preparations and testimony in New York, indicating that the Government would pay all travel and lodging expenses for the Witnesses.

20.     BOI informed the Government that BOI counsel would coordinate communications with the Witnesses, who had retained individual counsel.[3]

21.     BOI additionally informed the Government that the Witnesses indicated that they did not wish to travel to New York to testify at trial, but that they were willing to provide testimony in Ireland.

22.     Over the next month, the Government communicated repeatedly with BOI counsel to resolve the issue and make accommodations for the Witnesses to travel to New York to testify.  During a September 6, 2019 phone call between the Government and BOI counsel, the Government explained the importance of live testimony in New York, informed BOI counsel that the Government would pay for the Witnesses' travel and lodging expenses, suggested that appearance dates could be flexible, and indicated that safe passage letters could be provided.

23.     On September 10, 2019, BOI counsel informed the Government that, notwithstanding the Government's offers to cover travel costs, make scheduling accommodations, and provide safe passage letters, Ceannt, Sands, and Begley remained unwilling to travel to the United States to testify at trial.  However, BOI indicated that Ceannt, Sands, and Begley were willing to provide testimony and evidence in the Ireland.

24.     On September 27, 2019, BOI counsel informed the Government that, notwithstanding the Government's offers to cover travel costs, make scheduling accommodations, and provide a safe passage letter, Collins was also unwilling to travel to the

---

[3] The Government has requested contact information for the Witnesses' individual attorneys in order to communicate with them directly, but BOI has declined to provide that information. Begley's individual attorney did contact the Government, indicating that Begley would not appear to testify in New York, and requesting that the Government coordinate further arrangements though BOI counsel.

United States to testify at trial. However, BOI indicated that Collins was willing to provide testimony and evidence in Ireland.

25.     The Government has been informed by the Department of Justice Office of International Affairs ("OIA") that, under the Mutual Legal Assistance Treaty Between the Government of the United States of America and the Government of Ireland, the Republic of Ireland lacks the ability to compel the Witnesses to appear in the United States to testify at trial. *See* Instrument as contemplated by Article 3(2) of the Agreement on Mutual Legal Assistance Between the United States of America and the European Union signed 25 June 2003, as to the application of the Treaty Between the Government of the United States of America and the Government of Ireland on Mutual Legal Assistance in Criminal Matters signed 18 January 2001, U.S.-Ir., July 14, 2005, S. TREATY DOC. NO. 109-13 (2006) ("U.S.-Republic of Ireland MLAT"), Article X.

## RULE 15 PROCEDURES

26.     The Government envisions the Witnesses providing live testimony in the Republic of Ireland, at a location to be determined by the parties, in consultation with the Irish Central Authority.

27.     The Government has been informed by OIA that under Article XIII of the US-Republic of Ireland MLAT, the Witnesses can be compelled to provide Rule 15 testimony in Ireland, at a location to be agreed upon by the parties, or determined by the Central Authority.

28.     The Rule 15 examinations will include the provision of a United States oath and a Republic of Ireland oath, with penalties of perjury attaching to both, to be sworn by each of the Witnesses.

29.     The Government has been informed by OIA that under the extradition treaty between the United States and the Republic of Ireland, the crime of perjury (Title 18 U.S.C. § 1621) is an extraditable offense.  *See* Instrument as contemplated by Article 3(2) of the Agreement on Extradition Between the United States of America and the European Union signed 25 June 2003, as to the application of the Treaty on Extradition Between the United States of America and Ireland signed 13 July 1983, U.S.-Ir, July 14, 2005, S. TREATY DOC. NO. 109-14 (2006).

30.     Additionally, the Government has been informed by OIA that false testimony could subject the Witnesses to prosecution in the Republic of Ireland for the crime of perjury if the testimony was provided under a Republic of Ireland oath.

31.     Assuming that the Witnesses maintain their position of voluntary cooperation in providing testimony in Ireland, neither live testimony at trial via closed-circuit television nor a Rule 15 deposition should have any effect on the presently scheduled trial date.  The Government has already provided the defendant with the vast majority of the relevant materials for the Witnesses.  Should the Court grant the Government's motion, the Government will provide any outstanding material to the defense well in advance of the Witnesses' testimony.

I declare under penalties of perjury that the foregoing is true and correct, pursuant to 28 U.S.C. §1746

Dated:  September 29, 2019
        New York, New York

                    _____/s/ Julieta V. Lozano
                    JULIETA V. LOZANO
                    Special Assistant United States Attorney
                    (212) 335-4025