UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

   - against -

MARK S. SCOTT,

                 Defendant.

No. S8 17 Cr. 630 (ER)

---

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO OFFER
THE TESTIMONY OF WITNESSES VIA LIVE CLOSED-CIRCUIT TELEVISION
DURING TRIAL OR, IN THE ALTERNATIVE, FOR A DEPOSITION PURSUANT TO
RULE 15 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE**

Arlo Devlin-Brown
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1046

David M. Garvin
Law Offices of David M. Garvin, P.A.
200 South Biscayne Boulevard
Suite 3150
Miami, FL 33131
(305) 371-8101


*Counsel for Mr. Scott*

## PRELIMINARY STATEMENT

One month before trial, the Government proposes that the parties journey to Ireland so the Government can depose four employees of a large international bank whose proffered testimony is of marginal relevance.  Perhaps recognizing the request for a deposition comes far too late, the Government asks the Court to use a rare procedure heretofore reserved for mobsters and terrorists so that these bankers can appear via CCTV.  These extraordinary and untimely requests should be denied for three principal reasons.

*First*, these Bank of Ireland ("BOI") employees are a far cry from the crucial witnesses the Government makes them out to be.  The Government did not even interview these witnesses until March 2019, over seven months after the Government charged Mr. Scott in a sealed indictment and seized his assets.  And while the Government asserts the bankers would testify about statements Mr. Scott made concerning his investors and the purpose of his accounts, the Government ignores that *all of the relevant statements were made or repeated by Mr. Scott in admissible e-mails Mr. Scott sent to the Bank of Ireland.*  Indeed, two of the four witnesses the Government asserts are vital to proving Mr. Scott lied to the Bank of Ireland have never met or spoken to him.  Mr. Scott will not contest the authenticity of these e-mails or of BOI account records generally.  In short,  Government can prove the statements made to BOI and their falsity or otherwise without the need for out-of-court testimony.

*Second*, any adverse impact this may have on the Government – minimal at most – is entirely of its own making.  It should have been clear when the Government was first required to travel to Ireland to meet these bankers in March that their testimony could not be assured.  The Government sought to confirm that these witnesses would appear at trial in April *and apparently got no response then*, which should have prompted a request for a deposition or other judicial relief

much earlier.  Indeed, in a March 18, 2019 court appearance the Government argued that a trial date in July was infeasible in part due to the time needed to "arrange and participate in a Rule 15 deposition." *See* Dkt. #62, Tr. of Mar. 18, 2019 Conf. at 28.  If four months was not enough then, four weeks is not enough now.

*Third*, and crucially, the proposed depositions would impermissibly hamper Mr. Scott's ability to prepare for trial, while the CCTV alternative would impermissibly interfere with his right to confront the witnesses against him.  The Government waited until literally the last day possible under the Speedy Trial Act before filing a superseding indictment.  It produced over 100,000 pages of additional discovery in September, and more is coming.  Mr. Scott and his counsel cannot take a multiday trip to Ireland (which Mr. Scott too would be entitled to attend) while also preparing for a trial the Government has consistently sought to delay.  The CCTV alternative would deprive Mr. Scott of his right to confront the witnesses against him in open court entirely, which is why the procedure to date has been used only to accommodate mobsters in witness protection and Al Qaeda operatives, not bankers from the European Union who for unspecified personal reasons would simply prefer to avoid the inconvenience of appearing.

This trial is not about the convenience of these bankers or any other witnesses.  Mr. Scott's liberty is on the line and he is entitled both to prepare a defense to the upcoming trial and cross-exam in open court the witnesses against him.  Accordingly, the Government's motion should be denied.

## RELEVANT BACKGROUND

Status of the Proceedings

Since his arrest on September 5, 2018 Mr. Scott has consistently demanded a Speedy Trial, pushing for a July 2019 trial date when the parties first discussed setting a date back in February.

*See* Dkt. #48, Tr. of Feb. 20, 2019 Conf. at 32.  The Government for its part has consistently resisted going to trial on a case they should have been prepared to proceed on when they indicted him, instead searching high and low for new witnesses or evidence.  On August 26, the same day the Government wrote to the Court seeking to adjourn the then-trial date of October 7 – ostensibly because they needed more time to review documents the privilege review team was only then providing – it was proffering a new potential cooperator against Mark Scott.

Since the Court granted the Government's request to adjourn the trial until November 4, the Government has engaged in a flurry of activity that has put substantial burden on the defense's preparations.  In the month of September alone, the Government produced to close to 49,000 documents, consisting of approximately 129,000 pages of materials and 357 gigabytes. On top of this, the Government produced an additional terabyte of raw data from electronic devices and servers associated with OneCoin, most of which had been in the Government's possession for some time.  On October 3, the Government added a broad and vague "Bank Fraud" charge to the indictment, apparently based on evidence the Government has long had in its possession.  The Government likewise agreed to complete its § 3500 production only three weeks prior to trial, and only Friday identified a new cooperating witness.  With four weeks to trial from the date of this filing, Mr. Scott's small defense team has its hands full.

The Bank of Ireland Evidence

The Bank of Ireland evidence has appeared to be of little if any significance to the Government's case until the Government filed the instant motion one week ago.  The Bank of Ireland played no role in the initial indictment of Mr. Scott on August 21, 2018, or in the affidavits supporting search warrants or restraining orders accompanying that filing.  Indeed, the Government did not meet with the Bank of Ireland until March 28, 2019 when the prosecution

3

team traveled to Ireland for their first (and only) meetings with BOI employees. Furthermore, details of purported interactions between Mr. Scott and BOI employees are noticeably absent from the Crime Fraud Motion that the Government filed on June 4, 2019, with the Government focusing exclusively, as it had in prior filings, on Mr. Scott's statements to "Apex Fund Services and … DMS Bank" as constituting the false statements made by Mr. Scott in connection with the offense. *See* Govt. Crime-Fraud Motion at 19.

After meeting with seven employees of the Bank of Ireland in March 2019 at their offices in Dublin, the Government represents that it communicated to BOI in "early April 2019" that the Government intended to call the witnesses to testify at what was then planned to be an October trial. *See* Lozano Decl., ¶¶ 17-18. The Government does *not* report as to how BOI responded to this April request for testimony, and there is no indication that BOI expressed agreement. The Government then let four months elapse before trying to request to make arrangements for testimony in "early August 2019." *See id.* at ¶ 19. At that point, the Government was told unequivocally by BOI counsel "that the Witnesses indicated that they did not wish to travel to New York to testify at trial." *See id.* at ¶ 21. On September 10, 2019 BOI counsel reiterated that "Ceannt, Sands, and Begley remained unwilling to travel to the United States to testify at trial," and provided an identical response with respect to Collins on September 27, 2019. *See id.* at ¶¶ 23-24.

According to the Government, BOI employees Deirdre Ceannt and Derek Collins will testify about various representations Mark Scott made to them about (1) his investors, (2) his planned investments and (3) his planned involvement in Ireland. *See* Lozano Decl., ¶¶ 9, 11. As discussed herein, these representations were made or repeated in e-mails and account opening documents sent by Mr. Scott to BOI. Greg Begley is expected to testify about requests Mr. Begley

made to Mr. Scott for various information about the accounts and Mr. Scott's responses. *See id*. at ¶ 12.  Mr. Begley in fact never met or spoke to Mr. Scott and these communications took place in emails in the Government's possession.  Finally, Diane Sands, the head of AML for BOI, would testify about various BOI KYC and AML policies but *not* any communications with Mr. Scott. *See id*. at ¶ 10.

## APPLICABLE LAW

The Confrontation Clause of the Sixth Amendment

Unmentioned in the Government's brief, the Confrontation Clause of the Sixth Amendment provides criminal defendants with the "right … to be confronted with the witnesses against him." *U.S. Const. amend. vi.*  The roots of this "bedrock procedural guarantee" date back to the [English] common-law tradition . . . of live testimony in court subject to adversarial testing." *Crawford v. Washington*, 541 U.S. 36, 43 (2004).  The Supreme Court has stated this principle even more strongly: "[T]he Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." *Coy v. Iowa*, 487 U.S. 1012, 1016 (1988).

The Rule 15 Exception

While the Confrontation Clause generally mandates live in-person testimony at a criminal trial, a court has discretion under Rule 15 to permit the deposition of witnesses in the defendant's presence who are likely to be legally "unavailable" at trial.  Specifically, Rule 15 provides that "[a] party may move that a prospective witness be deposed in order to preserve testimony for trial," and that a "court may grant the motion because of exceptional circumstances and in the interest of justice."  Fed. R. Crim. P. 15(a)(1).  Furthermore, "a defendant who is not in custody has the right upon request to be present at the deposition." Fed. R. Crim. P. 15(c)(2).  "[N]either a defendant

nor counsel need attend, but failure to do so would waive the defendant's rights under the Confrontation Clause." *United States v. Stein*, 482 F. Supp. 2d 360, 363 (S.D.N.Y. 2007).

The Second Circuit has held that to establish exceptional circumstances under Rule 15, the "movant must show that (1) the prospective witness is unavailable for trial, (2) the witness' testimony is material, and (3) the testimony is necessary to prevent a failure of justice." *See United States v. Cohen*, 260 F.3d 68, 78 (2d Cir. 2001) (citing *United States v. Singleton*, 460 F.2d 1148, 1154 (2d Cir. 1972)); *see also United States v. Fawwaz*, 694 Fed. Appx. 847, 851 (2d Cir. 2017).[1] Deposition "testimony is material if it is 'highly relevant to a central issue in the case.'" *United States v. Yousef*, 2012 WL 691325, at *2 (S.D.N.Y. March 5, 2012) (quoting *United States v. Drogoul*, 1 F.3d 1546, 1556 (11th Cir. 1993)). *See also Johnpoll*, 739 F.2d at 709 (affirming district court permitting deposition testimony when it was "unlikely that [defendant] could have been convicted without [the proposed witnesses'] testimony"). The requirement that the testimony must be "necessary to prevent a failure of justice" requires that "there are no substantial countervailing factors militating against the taking of the deposition." *United States v. Vilar* 568 F. Supp. 2d 429, 442 (S.D.N.Y. 2008) (quoting *United States v. Grossman*, 2005 WL 486735, at *3 (S.D.N.Y. March 2, 2005)).

A district court is "well within its allowable discretion in denying a motion made only after considerable delay…and on the eve of trial." *United States v. Whiting*, 308 F.2d 537, 542 (2d Cir. 1962) (internal citations omitted). *See* also *United States v. Spencer*, 362 Fed. Appx. 163, 164 (2d Cir. 2010) (district court within its discretion to deny deposition 18 days before trial); *United States v. Cohen*, 260 F.3d at 78 (affirming district court's refusal to move trial one week to permit late

---

[1] In *United States v. Johnpoll,* the Second Circuit omitted the third prong of this test, which had been articulated in both prior (*Singleton*) and later (*Cohen*) Second Circuit precedent. *See* 739 F.2d 702, 709 (2d Cir. 1984).

request to depose foreign witness).  In addition, "[a] court may 'properly deny [a]motion [to depose] if the proposed testimony would be cumulative." *United States v. Wey*, 2017 WL 237651, at *24 (S.D.N.Y. January 18, 2017) (quoting *United States v. Stein*, 482 F. Supp. 2d 360, 365 (S.D.N.Y. 2007)).

The Limited CCTV Exception

While Rule 15 provides a process for dealing with witnesses who are not available for trial at all, the Supreme Court has made clear that any witness testifying at trial must do so live and in person absent extraordinary circumstances.  Federal Rule of Criminal Procedure 26 states that "[i]n every trial the testimony of witnesses must be taken in open court, unless otherwise provided by a statute or by rules adopted under 28 U.S.C. §§ 2072-2077." Fed. R. Crim. P. 26.  Congress has approved the use of videoconference technology, with the defendant's consent, to conduct initial appearances and arraignments.  Fed. R. Crim. P. 5(f), 10(c).  Furthermore, in 2002, the Supreme Court rejected a proposed revision to Rule 26 which would have allowed trial testimony via two-way videoconferencing.  *See* Order of the Supreme Court of the United States*,* 207 F.R.D. 89, 93-96 (2002). The Confrontation Clause demands no less, absent extraordinary circumstances.  In *Maryland v. Craig*, for example, the Supreme Court upheld a Maryland statute that permitted child victims to testify by one-way closed-circuit television (CCTV) outside the presence of the defendant upon a case-specific finding of necessity, citing to the important state interest in "protecting child witnesses from the trauma of testifying in a child abuse case." 497 U.S. 836, 855 (1990).

The Second Circuit has permitted unavailable material witnesses to testify via two-way closed circuit television in extraordinary circumstances.  In *United States v. Gigante*, the Second Circuit upheld the decision of Judge Weinstein to permit two-way CCTV testimony of a mafia

associate in the Federal Witness Protection Program who was in "the final stages of an inoperable, fatal cancer at an undisclosed location" and who was too ill to travel to the trial of a mafia boss. *See* 166 F.3d 75, 83 (2d Cir. 1999).  While the Second Circuit upheld Judge Weinstein's ruling to allow the CCTV testimony under these extreme circumstances, borne out by specific factual findings revealed at an evidentiary hearing, it cautioned that "the use of remote, closed-circuit television testimony must be carefully circumscribed." *Id* at 80.  Although the *Gigante* court "decline[d] to adopt a stricter standard for its use than the standard articulated by Rule 15," *see id.* at 8l, it warned that "[c]losed-circuit television should not be considered a commonplace substitute for in-court testimony by a witness," as "[t]here may well be intangible elements of the ordeal of testifying in a courtroom that are reduced or even eliminated by remote testimony." *See id.*

The *Gigante* Court's suggestion that CCTV testimony is permissible if the Rule 15 standards are met relies on a narrow reading of *Craig*.  In *Craig*, the Supreme Court explained that "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial *only where denial of such confrontation is necessary to further an important public policy*." *Craig*, 497 U.S. at 850 (emphasis added).  The *Gigante* court declined to apply this standard on the grounds that *Craig* pertained to *one*-way CCTV testimony, while *two*-way video conferencing was at issue in *Gigante*.  Therefore, it reasoned, it was not necessary for the Government to articulate an important public policy interest to persuade the court to allow it.

The Second Circuit, however, stands alone in its interpretation of *Craig*, as *five* other circuits have acknowledged that *Craig* supplies the proper test for admissibility of two-way video conference testimony at trial.  In *United States v. Bordeaux*, the Eighth Circuit explicitly rejected the argument that the *Craig* test does not apply to testimony presented by means of two-way video conferencing, declining to follow *Gigante* and finding that "'confrontation' via two-way closed

8

circuit television is not constitutionally equivalent to a face-to-face confrontation." *See* 400 F.3d 548, 554-55 (8th Cir. 2005) (noting that "two-way systems share with one-way systems a trait that by itself justifies the application of *Craig*: the 'confrontations' they create are virtual, and not real in the sense that a face-to-face confrontation is real"). *See also United States v. Yates*, 438 F.3d 1307, 1313-14 (11th Cir. 2005); *United States v. Moses*, 137 F.3d 894, 897-98 (6th Cir. 1998); *United States v. Quintero*, 21 F.3d 885, 892 (9th Cir. 1994); *United States v. Carrier*, 9 F.3d 867, 869 (10th Cir. 1993). Thus, when defendants are "denied a physical face-to-face confrontation with the witnesses against them at trial," *see Yates*, 438 F.3d at 1314, and the Government seeks to depart from "usual procedures," the court "generally must (1) hold an evidentiary hearing and (2) find: (a) that the denial of physical, face-to-face confrontation at trial is necessary to further an important public policy and (b) that the reliability of the testimony is otherwise assured." *See id.* at 1315.

Additionally, the instances in which district courts in this Circuit have followed *Gigante* and allowed CCTV by Government witnesses have been similarly exceptional as were the *Gigante* facts, and have occurred *exclusively* within the context of cases relating to the terrorist attacks of September 11, 2011. In *United States v. Sulaiman Abu Ghayth,* Judge Kaplan permitted CCTV testimony of an Al Qaeda operative who would not (unsurprisingly) willingly travel to the United States where the witness's testimony would demonstrate that the defendant, "*knowingly* participated in al Qaeda's overall conspiracy to kill Americans." *See* 2014 WL 144653, at *1 (S.D.N.Y. Jan. 15, 2014) (emphasis in the original). In *United States v. Mostafa*, Judge Kaplan again permitted the testimony of a terrorist by CCTV who was unwilling to come to the United States "because he would be arrested, and understood that the U.S. Government would not provide safe passage." *See* 14 F. Supp. 3d 515, 523 (S.D.N.Y. 2014).

9

Even in instances where the *defendant* has requested to obtain the testimony of foreign witnesses via live videoconferencing, where the Government has no corresponding constitutional interest in requiring in-court testimony, courts in this Circuit have not routinely granted this procedure.  In *United States v. Banki*, in denying a request by the defendant to allow witnesses to testify at trial from Iran via videoconferencing, the court cited "the lack of opportunity for in-person cross-examination and observation" as one of the factors making it "extremely difficult to assess the reliability of the proposed witnesses' testimony." 2010 WL 1063453, at *1 (S.D.N.Y. Mar. 23, 2010), *rev'd on other grounds United States v. Banki*, 685 F.3d 99 (2d. Cir. 2011).  *See also United States v. Buck,* 271 F. Supp. 3d 619, 624 (finding that the anticipated testimony of Swiss bank employees that they had advised the defendant that his conduct was legal was not material because it did not negate the defendant's alleged intent to assist U.S. taxpayers to evade their tax obligations under U.S. law).

## ARGUMENT

1. <u>The Testimony of the Proposed Witnesses Is Of Minimal Evidentiary Significance</u>

As a threshold mater, Rule 15 permits deposition of unavailable witnesses whose testimony is "material" and "necessary to prevent a failure of justice." *United States v. Cohen*, 260 F.3d at 78.  At minimum, this means testimony that is "highly relevant to a central issue in the case.'" *See Yousef*, 2012 WL 691325, at *2.

The proffered testimony by the BOI witnesses falls far short of these standards.  The Government outlines three broad areas on which its witnesses will testify: "(i) Scott's establishment of accounts at BOI…; (ii) details related to particular transfers of funds through Scott's BOI accounts; and (iii) Scott's misrepresentations to BOI regarding the purpose and function of, and source of funds for his purported private equity funds." Govt. Mot. at 12.  As a

brief analysis of each of the anticipated testimony of the four proposed witnesses will show, *there is very little to which they could testify to on these points that is not already well-established through clear and admissible documentary evidence.* This is hardly surprising as only two of the four employees *ever even met Mr. Scott*, and the two that did met him on only on one occasion.

Deirdre Ceannt

The Government asserts that Ms. Ceannt will testify to five representations about his clients and purposes of opening an accounting at BOI that the Government claims are false. Specifically:

> that (i) he would be investing the Fenero Funds' assets in financial services companies, real estate, and startup companies, through investment vehicles formed in Ireland …, holding bank accounts at BOI …; (ii) his client-investors were wealthy European families; (iii) he would secure investments in the future; (iv) he intended to set up a physical office in Ireland; and (v) that the Ireland office would employ 100 employees within 5 years, but would have a physical presence and 10 employees to manage the company in Ireland initially. *See* Lozano Decl. ¶9(b).

These representations, however, were included in documents Mr. Scott sent to the Bank. The Fenero Equity Investments Mission Statement provided to BOI states the fund "focus[es] on investments in the financial services industry"; that Fenero has a "small investor base of wealthy families," and was "created at the request of four (4) European based families"; that the fund's staff, in conjunction with third party service providers, would "identify appropriate investment opportunities"; that the Fund's "very little staff" "will be located primarily in subsidiaries in Ireland." *See Exhibit A*, *attached*, which was an exhibit shown to the BOI during the March 2019 interviews in Ireland. On the BOI-provided "Company Questionnaire" that Mr. Scott filled out and returned to BOI, Mr. Scott answered the question "Number of employees expected in 5 years" with the response "For all entities under the holding structure about 100." *See id.* The Government also asserts that Ms. Ceannt will testify about questions the Bank put to Mr. Scott about a March

2016 transaction and his responses. *See* Lozano Decl. ¶9(e).  These communications, too, were entirely over e-mail.  *See, e.g., Exhibits B and C, attached.*

Greg Begley

The proffered testimony of Greg Begley is even more limited.  Begley will testify that he "assisted the defendant in collecting, processing and inputting the defendant's account information and KYC documents" and what "paperwork submitted by the defendant included" as well as back and forth communications Begley had with Scott to get additional information over the course of the relationship. *See* Lozano Decl., ¶ 12.  As was the case with Ceannt, these communications were in writing and are admissible as evidence by the Government at trial.  Moreover, the Government's interview notes with Mr. Begley from their meeting in March 2019 confirm that his role in the process was largely ministerial, and that he was unable to offer substantive comments on the documents being submitted. For example, the interview memo prepared by the Government indicates: "Begley would upload [the KYC documents] into KYC Net….Begley did not review the documents for substance," *See* 3501-001, *attached hereto as Exhibit D*, ¶ 11.   Regarding an additional request for information that he made of Mr. Scott during the due diligence process, the Government notes: "Begley does not recall understanding what the requests for information were about.  He thinks Ceannt may have asked him to reach out to Scott and he just did as she asked him." *See id.,* ¶ 17.  Since Begley already has, at multiple points, informed the Government that he is unable to provide any additional context for the documents it seeks to introduce, there appears to be little basis for the Government's assertion that  "the Witnesses' anticipated testimony…is broader than the information contained in these records and cannot be substituted by introduction of the records alone." *See* Govt. Mot. at 14.

Derek Collins

The Government claims that Mr. Collins "will testify about his initial meeting with the defendant, during which the defendant made misrepresentations regarding the Fenero Funds" adding that "significantly, Collins will testify that he took contemporaneous notes during his meeting with the defendant." *See* Lozano Decl., ¶11.  The "notes" the Government points to however are no more than a few fragmented handwritten notes on a single sheet of paper. *See 3503-002, attached hereto as Exhibit E,* at p. 4.  And during his interview with the Government Mr. Collins confirmed that he "only spoke to SCOTT at one time at the initial meeting and never met him again," and that he "never emailed, texted, or chat messaged with SCOTT." *See id.,* ¶6.

Diane Sands

The proffered testimony of Diane Sands is not only immaterial; it is so irrelevant as to be objectionable.  Ms. Sands, the "head of the Anti-Money Laundering team at BOI" is apparently prepared to testify about BOI's "due diligence program, and the standards and requirements controlling KYCNet review," including the process by which some accounts are designated as "high risk."  *See* Lozano Decl., ¶ 10.  Her testimony about BOI's AML processes and how it viewed accounts linked to the Mr. Scott are entirely irrelevant to Mr. Scott's innocence or guilt. Whatever steps BOI was taking behind the scenes to review Mr. Scott's accounts or views it may have had of them is entirely irrelevant to what representations Mr. Scott made to the bank or whether they were false.  Testimony along these lines only becomes relevant if Mr. Scott was informed of or made aware of such policies, and the extent to which he was or was not is reflected in the emails sent to him requesting compliance documentation.  Ms. Sands never met Mr. Scott or communicated with him.  Broad statements on bank policy by someone who admittedly had little to no contact with Mr. Scott falls far short of the materiality standard.

Notably, the superseding indictment returned on October 3 after the Government's motion was filed does not change this analysis one bit.  While the Government has added a Bank Fraud conspiracy charge, the only victims alleged are banks whose "deposits are insured by the Federal Deposit Insurance Corporation" (or FDIC), which BOI is not.  The Bank Fraud statute does not reach foreign financial institutions such as BOI.[2]

Ultimately, while the Government might *prefer* having BOI employees identify the largely written-record communications they had back-and-forth with Mr. Scott,  it would seem that the BOI employees would prefer not to be asked such questions in a forum where Mr. Scott can cross-examine them before a jury deciding his fate.  The very marginal additional value their deposition or CCTV testimony could add to the written record does not outweigh Mr. Scott's Sixth Amendment Confrontation Clause rights. *See Wey,* 2017 WL 237651, at *24 ("A court may 'properly deny [a]motion [to depose] if the proposed testimony would be cumulative.") (internal citations omitted).  Particularly given that defense counsel is willing to stipulate to the authenticity of emails that Mr. Scott sent and received from BOI, as well as of bank account records, an infringement on Mr. Scott's rights based on a preference by a bank allegedly deceived by Mr. Scott to avoid the inconvenience of trial should not be countenanced.

   2.  The Government's Request Is Untimely

Even if limiting the BOI evidence to the documentary record has some minimal impact on the Government's proof – itself doubtful – the Government is permitted to obtain such evidence through deposition only if that is  "necessary to prevent a failure of justice." *Cohen*, 260 F.3d at

---

[2] Even if the new charge somehow did change the analysis, the fact that the Government elected to bring it 31 days prior trial based on evidence it has long had provides no excuse for a disruptive deposition on the eve of trial.

14

78.  As previously noted, this prong is  "likely satisfied" if "there are no substantial countervailing factors militating against the taking of the deposition." *See Vilar,* 568 F. Supp. 2d at 442.

Yet, here, there are a *plethora* of substantial countervailing factors that militate against the taking of the deposition. Most notably, the  Government's delay in pursuing the BOI testimony in a timely fashion is a problem of the Government's own making, and one that provides an ample basis for the Court to deny the Government's request. *See, e.g., Whiting*, 308 F.2d  at 542; *Spencer*, 362 Fed. Appx. at 164; *Cohen*, 260 F.3d at 78.

The Government filed its motion on September 29, 2019, a little over a month before trial, knowing Mr. Scott would oppose it in papers filed today. The fact that the prosecution team was required to travel to Ireland to interview the BOI was a clear indication that measured might need to be taken to secure their testimony.  Indeed, while the Lozano Declaration asserts that "[i]n early April 2019, the Government notified BOI of the original October 2019 trial date" and that "[t]he Government also notified BOI that it intended to call the Witnesses to testify at trial," *see* Lozano Decl. at ¶ 18, there is *no mention of BOI's response*.  The logical inference is that BOI did not respond at all.  That the Government did not take immediate action in April or May when its request for trial testimony was apparently ignored is inexcusable.  There would have been ample time at that point for Rule 15 depositions.  Even in "early August," when the Government reached out to BOI again to secure testimony only to receive a disquieting non-response that the employees had retained counsel, would not have been too late.  *See* Lozano Decl. at ¶¶ 19-20.  The Government did not even act on September 10, when three of the four witnesses made clear yet that they would not come to the United States for trial under any circumstances, waiting nearly three weeks more to file its motion.

Indeed, even the Government knows its request comes far too late. On March 18, 2019, the Government argued that "a trial date that is in July," then four months away, "would not serve the public interest," *see* Dkt. #62, Tr. of Mar. 18, 2019 Conf. at 27, because among other things it anticipated that the possibility "a Rule 15 deposition would be required" of a foreign witness. *Id.* at 28. The Government argued that "that alone could take significant time to arrange and participate in such a Rule 15 deposition," because "in [the defendant's] experience, defendants often fight these depositions and litigate them." *See id.*

The Government was right. And if four months is not enough notice to "arrange and participate in a Rule 15 deposition" then one month certainly is not either. The Government should have pursued this request when, in April 2019, BOI apparently failed to confirm that its witnesses would be available to testify as the Government had requested. The loss of whatever limited incremental value these witnesses may have to the Government should be borne by the party that failed to arrange depositions when time would have permitted.

3. <u>A Late Rule 15 Deposition Would Prejudice Mr. Scott's Ability To Prepare For Trial, And CCTV Testimony Would Unfairly Curtail His Confrontation Clause Rights</u>

Granting the Government's request to secure marginal foreign deposition testimony with four weeks to trial would substantially impact Mr. Scott's ability to prepare a defense, a prejudice he should not suffer for the Government's failure to address this issue further. The four weeks leading up to trial are demanding in any case, let alone a far-flung money laundering case that the Court has designated as "complex" for Speedy Trial purposes. The Government has substantially added to those demands by filing a superseding indictment alleging for the first time a vague and sweeping bank fraud conspiracy only 31 days before trial. Likewise the Government produced close to 129,000 pages of documents in the month of September alone along with nearly a terabyte of raw data from various electronic devices, with representations that more is coming. Its

16

production of § 3500 material will not be complete for another week and it will be two more weeks

before its exhibits are disclosed.  Mr. Scott, with limited available resources, persists with a small

trial team consisting of a solo practitioner, the undersigned, and a recent law school graduate

getting more than she bargained for in her first few weeks at Covington.  To insist on taking

overseas deposition in these circumstances, when the final countdown to trial has already started

would be unreasonable imposition on Mr. Scott that this Court should not impose.  Furthermore,

Mr. Scott has and would insist upon his right to be present for such depositions, taking him away

from other pretrial preparations.

Nor is the Government's invocation of a procedure reserved for terrorist operatives or

WitSec mobsters the right answer to a challenge the Government has created for itself.  While this

is more feasible in terms of Mr. Scott's ability to prepare for trial, it is an unreasonable

infringement of his Confrontation Clause rights.  As the *Gigante* Court observed, "[c]losed-circuit

television should not be considered a commonplace substitute for in-court testimony of a witness."

*Gigante,* 166 F.3d at 81.  Surely the Second Circuit didn't contemplate use of such an extraordinary

remedy to allow the Government to secure statements from the head of a bank's AML program

unwilling to testify at a money laundering trial in which the bank was supposedly a victim.  Already

in *Gigante*, the circumstances were exceptional, as the witness was not only a terminally ill cancer

patient under the supervision of doctors (more than merely "sick," as the Government contends,

*see* Govt. Mot. at 4), he was also in the Federal Witness Protection program and a longtime

cooperator at obvious risk if his whereabouts disclosed.  Indeed, the only two cases in this district

that the Government cites to as examples of when the court permitted CCTV testimony (which, as

noted above, are the only two cases where the court ruled that such testimony could be admitted)

involved circumstances arguably even more extreme than those present in *Gigante*: defendants

charged with involvement in the 9/11 terrorist attacks and a foreign terrorist operative (the same in both cases) who would face arrest upon entry to the United States. *See Sulaiman Abu Ghayth*, 2014 WL 144653; and *Mostafa*, 14 F. Supp. 3d 515.

The circumstances present in *Gigante*, *Abu Ghayth*, and *Mostafa* that the courts deemed exceptional could not be more different than those present in the current case. Here, the witnesses that the Government would propose to have testify against Mr. Scott are not radical Islamic terrorists with ties to Al Qaeda or former mafia hitmen; they are but bank employees who dealt with Mr. Scott, mostly by email, on a routine basis for a period of limited duration.[3] As the Government cannot meet even the standard that would permit a Rule 15 deposition, it cannot justify the CCTV testimony that would abridge Mr. Scott's right to confront the witnesses against him.

---

[3] *Johnpoll* was decided in 1984, decades before email correspondence was the predominant means through which business was carried out. As such, written records of all of the interactions that Johnpoll had with the Swiss bank employees were not kept in anywhere near the same fashion as were the records in this case, where the vast majority of Mr. Scott's communications with BOI employees were by email.

## **Conclusion**

For the foregoing reasons, Mr. Scott respectfully requests that the Court deny the Government's application.


Respectfully submitted,

/s/ Arlo Devlin-Brown

Arlo Devlin-Brown
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1046

David M. Garvin
Law Offices of David M. Garvin, P.A.
200 South Biscayne Boulevard
Suite 3150
Miami, FL 33131
(305) 371-8101