# EXHIBIT E



# DEPARTMENT OF THE TREASURY
## Internal Revenue Service
## Criminal Investigation

## Memorandum of Interview

---

| | | | |
|---|---|---|---|
| **Investigation #:** | ███████ | **Location:** | Bank of Ireland |
| **Investigation Name:** | MARK SCOTT | | 2 Burlington Plaza, Burlington Rd |
| **Date:** | March 29, 2019 | | Dublin 4, Ireland |
| **Time:** | Approximately 2:06 PM – 5:20 PM | | |
| **Participant(s):** | Derek Collins, Executive Vice President | | |
| | Carol Sinclair, Assurance & Risk | | |
| | Christopher Di Mase, Assistant United States Attorney | | |
| | Julieta Lozano, Special Assistant United States Attorney | | |
| | Nicholas Folly, Assistant United States Attorney | | |
| | John Abram, Special Agent | | |
| | Leo Rovensky, Special Agent | | |
| | Ron Shimko, Special Agent | | |

On the above date and approximate time, AUSAs Christopher Di Mase, Nicholas Folly and Julieta Lozano, IRS-CI Special Agents John Abram and Leo Rovensky, and FBI Special Agent Ron Shimko, met with Derek Collins (Collins) and Carol Sinclair at the Bank of Ireland (BOI).  Collins provided the following information:

1. The first time Collins met MARK SCOTT (SCOTT), was at a meeting that his employee, Dierdre Ceannt (Ceannt), had set up with SCOTT.  Collins did not know that SCOTT was a "high risk" client at that point.  Collins took notes as usual on a yellow pad.  Collins shared his notes with the prosecutors and agents.  The notes are attached to this memorandum.  The meeting took anywhere from 50 minutes to one hour.

2. SCOTT described his business as an equity fund with a total of five funds at €100 million each.  None of the funds are based in the United States, all are European based.  The equity fund will have an office in Dublin, Ireland.  SCOTT stated that he needed to be in Ireland because he was conducting business and setting up investments in Europe.  SCOTT was advised there was a €10,000 cost for a Special Purpose Vehicle or SPV.  SCOTT seemed familiar with the Enhanced Due Diligence or EDD process that Ceannt spoke to him about. Collins felt that SCOTT was starting a new business and possibly leaving his profession as an M&A Lawyer at Locke Lord.  SCOTT told Collins that financial services and telecom were the investments.  The investors were all European families.

3. Collins was shown tab # 1 in the evidence binder containing an email.  Collins mentioned that neither him nor anyone at BOI had contact with SCOTT before

the email was received.

4. Collins was shown tab # 2 in the evidence binder containing an email with opening documents and a questionnaire.  Collins commented that 100 employees listed on the questionnaire was a lot for a fund to employ.  Collins stated that he reviewed and scanned over the documents because he was on the email.  SCOTT was the shareholder of the entity.  There was a BVI entity involved.  Because it is labor intensive to open account such as these, a fee would be assessed.  SCOTT stated that he would have investor funds that he would be controlling.  Collins was not aware if SCOTT had money from investors.  Collins was under the impression that the acquisition of funds was a work in process.  SCOTT stated that he dealt with the European Families (investors) in the past and they were clients.  SCOTT was to start the investment funds and the European families were investing in the funds.  SCOTT was made aware that when ownership / investor are over 10%, BOI needs to be notified.  Collins noticed the relationship would be high risk when he saw BVI.  EDD was discussed at the initial meeting with SCOTT.

5. Collins asked Ceannt and Greg Begley (Begley) if they were content with the documents they received, and they both were happy with them and Collins in turn was happy with them because he met SCOTT in person.

6. Collins only spoke to SCOTT one time at the initial meeting and never met him again.  Collins never emailed, texted, or chat messaged with SCOTT.  Collins never heard of or spoke to David Pike (Pike).  SCOTT never mentioned Pike at the initial meeting.

7. Collins never checks KYC Net to see where the account opening was in the process.  Collins signed off before MLRO got approved then proceeded.  Collins never had discussions with Eoghan Howe (Howe) about SCOTT.  Collins logs into KYC Net to approve.  Collins would scan the information and check with the bankers.  Collins would not conduct a "deep dive" as he relies on his employees.

8. Collins was told by a banker that SCOTT made a smaller deposit at first to pay expenses.  Collins never inquired if SCOTT opened an office in Ireland.

9. Collins was shown tab # 60 in the evidence binder containing an email form SCOTT to Begley concerning an international payment.  Collins explained that there is risk with manual payments such as a forgery, so they require various approvals.  Ceannt and Collins approved the payment.  Collins was okay with the payment because the funds were in the account.  Collins did not take note of the Bulgarian Bank listed on the payment.

10. Either Ellen or Ceannt told Collins that there was a Deutsche Bank issue.  Collins did not know if Ceannt was in touch with SCOTT as he was told the issue was taken care of.

11. Collins was not familiar with Phoenix Investments. Transaction Monitoring picked out two (2) payments for Finero and there were Suspicious Transaction Reports (STR) filed as told by Pat Collins.

12. Collins was shown tab # 128 in the evidence binder containing an email concerning large balances due to negative interest being applied. Collins knew the accounts were the top 5 or 6 in the BOI.

13. Collins was shown tabs # 249 - 253 in the evidence binder containing a series of emails concerning the closure of accounts with Howe and SCOTT. Ceannt was no longer in the department at this point and time, she moved on. SCOTT stated that he was closing the accounts down due to Brexit.

14. Collins was not aware of the statements requested by SCOTT. Collins does not get involved with statement requests.

15. Collins is not aware of the following concerning SCOTT: OneCoin, Cryptocurrency, Ruja Ignatova, IMS, BNN Consultants, Star Merchant Group, ████████████████████ Collins never learned the source of funds coming into SCOTT's accounts.

16. Collins found out about the Treaty Request from Pat Collins' department. Howe told Collins that the request came in for Finero. Collins was away when the request came in. Howe started searching for files and Pat Gaynor assisted since Collins was away. They also looked to see if anything was overridden on the account. No one reached out to SCOTT as it was kept internally.

Collins stepped out at 3:59 PM to take a prescheduled appointment. Collins returned at 4:50 PM.

17. Collins has no other documents to share that are pertinent.

18. If SCOTT wasn't referred into the bank as he was, he could have taken other avenues to enter the bank. The law firm gave SCOTT a "golden key". The initial email that came in concerning SCOTT had two (2) high level partners copied on them. Collins viewed Ailish from Arthur Cox as "top notch". If SCOTT came to the bank "off the street" they would have checked to see who his law firm was. Collins had no suspicion of SCOTT or Finero. SCOTT accounts moved from High Risk to Medium Risk.

19. Special Agent Abram asked Collins and Carol Sinclair to preserve the notes that Collins had in front of him so they would be available to him for future use.

John Abram
Special Agent

Fenero Equity                    Mark Scott                    Apr 2016

- M+A lawyer

- Equity Fund    - will/pl To run 5 funds $100m each

No US cos/ investor will be subscript       2 Fund Series
                                            1 Telecom

Will be European based - UK/ German

Equity fund will have its office here

Require
* operational accounts              - BVI Rpt
- Escrow / deposit                  - SPC cost
-                                   - Balances

- 10k    Cost pe SPC
- 10k
- 10k

c ██████████████

**Locke Lord**

Mark S. Scott
Partner

Locke Lord LLP
801 Brickell Avenue
Miami, FL 33131
T: 305-722-4909
F: 866-955-9060
mark.scott@lockelord.com