JAAAASCOC                          Conference

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4             v.                              17 CR 630 (ER)

5   MARK SCOTT,

6             Defendant.

7   ------------------------------x

8                                            New York, N.Y.
                                             October 10, 2019
9                                            2:00 p.m.

10
    Before:
11
                        HON. EDGARDO RAMOS,
12
                                             District Judge
13

14                         APPEARANCES

15  GEOFFREY S. BERMAN
         United States Attorney for the
16       Southern District of New York
    CHRISTOPHER J. DIMASE
17  NICHOLAS FOLLY
         Assistant United States Attorney
18
    NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE
19  JULIETA V. LOZANO

20  COVINGTON & BURLING LLP
         Attorneys for Defendant Scott
21  ARLO DEVLIN-BROWN
    KATRI STANLEY
22

23

24

25
```

JAAAASCOC                          Conference

1          (Case called)

2          MR. DIMASE:  Good afternoon, your Honor.

3          Christopher DiMase, for the government.  I'm joined at

4     counsel table by AUSA Nick Folly and from the New York County

5     District Attorney's Office, Julieta Lozano.

6          MR. DEVLIN-BROWN:  Good after, your Honor.

7          Arlo Devlin-Brown, for Mark Scott, who is seated to my

8     right.

9          With your Honor's permission Katri Stanley to my left

10    is a 2019 law school graduate who is not yet admitted to the

11    bar but if your Honor is all right with that --

12          THE COURT:  She is more than welcome.  Good afternoon

13    to you all.

14          This matter is on for a conference.  I understand that

15    the parties have a number of items that they want me to rule

16    on.  Let me just ask where we are in terms of scheduling.  I do

17    have the government's letter of October 3, on which they set

18    forth a, an on concept pretrial schedule.

19          How are we doing on these dates, Mr. DiMase?  I notice

20    that one date is passed, the date for the government to put

21    forth its expert notice disclosure.  Are we on schedule?

22          MR. DIMASE:  Your Honor, we are abiding by the terms

23    of that schedule.  We did disclosure expert notice to the

24    defense.

25          THE COURT:  Are you calling an expert?

JAAAASCOC                    Conference

1        MR. DIMASE:  Your Honor, we have noticed three

2   different sort of individuals or groups of, general groups of

3   people.  Two of them we don't believe would constitute an

4   expert but we've disclosed them anyway and one of those, a fact

5   witness, one or more fact witnesses from banks who would

6   testify about the facts that are relevant to the case.  But in

7   the course of their testimony we expect them to also address

8   things like the procedures in place at banks to combat money

9   laundering, the way in Swift messages are used in order to send

10   money through corresponding banks and things of that nature or

11   that would place the remainder of their testimony in context.

12        THE COURT:  Swift messages?

13        MR. DIMASE:  A Swift message is basically a message

14   directing banks to transfer funds through a network of bank

15   accounts.

16        THE COURT:  Is this person a United States individual?

17        MR. DIMASE:  With respect to the one person that we've

18   identified and there may be a couple of others but he is an

19   employee of the Bank New York Mellon here in New York, yes.

20        THE COURT:  He'll be testifying generally as to KYV

21   procedures and money laundering procedures at banks.

22        MR. DIMASE:  Those things along with Swift message

23   procedures.  But we also will have relevant testimony specific

24   to this case about because that bank served as the

25   correspondent bank for Mr. Scott's bank accounts in the Cayman

1   Islands.  So he is handling inbound and outbound wire transfers

2   in euros and in dollars.  So it would have seemed, the Swift

3   messages there was actually a point where the bank posed due

4   diligent questions to the bank in Cayman Island or BNY Melon

5   and eventually terminated or put on the lists some of its

6   entities that sending money to Mr. Scott's account.

7            THE COURT:  Because it may be relevant to our

8   discussion in a little bit, will the procedures that he would

9   describe, are they essentially the same as the bank of Ireland

10  as they are here in the United States?

11           MR. DIMASE:  Your Honor, we have not had a full

12  opportunity to meet with mim and understand exactly what the

13  balance of his testimony will be.  So I can't say that they

14  would be exactly the same.  There are some particular details

15  around the testimony of Ms. Sands that I think are specific to

16  the case and the proof at trial.  That go beyond sort of

17  generic testimony about how procedures work.  I think if that's

18  where you are headed with the question --

19           THE COURT:  Yes.

20           MR. DIMASE:  -- the issue with Mr. sands and

21  Ms. Lozano is prepared to address the Rule 15 motion.

22           THE COURT:  OK.

23           MR. DIMASE:  Maybe can we defer that point until we

24  get to that motion?

25           THE COURT:  Sure.

JAAAASCOC                    Conference

1          MR. DIMASE:  One moment, your Honor.

2          The second person that we noticed in the expert notice

3     which we did so in an abundance of caution is an individual

4     from a fund administrator that administers some of these

5     private equity funds for Mr. Scott for a period of time.  We

6     expect that he'll testify about the factual context of their

7     relationship the way that it developed and the ultimate

8     termination of that relationship once the fund administrator

9     noticed a connection to one -- became very concerned about

10    processing further transactions.  But the course of his

11    testimony we also anticipate that he would testify more

12    generally about how private equities funds work to place

13    Mr. Scott's alleged private equity funds into some context.

14          In other words, another fact witness who will be

15    testifying about interactions with Mr. Scott and his funds but

16    also provide some level of background about how private equity

17    funds generally operate.  So those were the two individuals we

18    noticed as nonexpert experts.

19          And then the third person falls more in the bucket of

20    a typical expert, a money laundering expert who would testify,

21    among other things, about the use of shell companies, the use

22    of layering of funds through accounts to hide its source, the

23    use of Swift messages in the context of money laundering, the

24    use of documents to paper over transactions that might

25    otherwise represent money laundering.

1          To be clear, as we mentioned in our notice to the

2     defense, we would not ask that witness if the conduct of

3     Mr. Scott was or was not money laundering.  He would simply

4     testify at a higher level about these various different

5     practices, an area of testimony that has been repeatedly upheld

6     by the exhibit and we actually cited cases that have upheld

7     that sort of testimony in the expert notice that we've provided

8     to Mr. Devlin-Brown.

9          So those are the three that we've noticed

10         THE COURT:  Thank you.

11         Mr. Devlin-Brown, as you sit here are you able to

12    share with the Court whether or not you will be providing

13    expert testimony?

14         MR. DEVLIN-BROWN:  I'm not yet, your Honor.  We didn't

15    have any idea that there would be a money laundering expert

16    until we got notice on Monday.  So we're obviously giving that

17    some thought.  I'd add that the disclosure didn't identify any

18    particular experts.  So it's sort of a broad statement that

19    they may call a money laundering expert.  We're going to look

20    at that and evaluate it.

21         With respect to the bankers and the lay witnesses, I

22    think generally we are not going to object to bankers

23    testifying about things they know a lot about through their own

24    duties and employment at the bank or financial service

25    industries, as long as that testimony is otherwise relevant.

JAAAASCOC                    Conference

1    So I appreciate notice on it but I don't think that's going to

2    be a point of major contention as longs the testimony is

3    relevant.

4              MR. DIMASE:  We're in the process of identifying a

5    particular person and we'll disclose that obviously as soon as

6    we've identified that person on the money laundering expert

7    front and we'll provide biographical information or a CV to the

8    defense.

9              THE COURT:  OK.  How do we want to take the two

10   motions since the defense filed their motion first?

11             MR. DIMASE:  Your Honor, I was just going to note, we

12   have to arraign the defendant on the S10 indictment.

13             THE COURT:  Mr. Devlin-Brown, has your client received

14   a copy of the superseding indictment?

15             MR. DEVLIN-BROWN:  He has, your Honor.

16             THE COURT:  Do you wish a public reading?

17             MR. DEVLIN-BROWN:  No.  Thank you, your Honor.

18             THE COURT:  How does Mr. Scott plead?

19             MR. DEVLIN-BROWN:  He pleads not guilty to both counts

20   One and Two, your Honor.

21             THE COURT:  Very well.  Like I said, since the defense

22   filed this motion first, we can address the motion to suppress

23   Mr. Scott's post-arrest statements.

24             Mr. Devlin-Brown, do you wish to be heard?

25             MR. DEVLIN-BROWN:  Briefly, your Honor.  This is a

1    motion that is easier for the Court to decide an motions where

2    there was no videotaped testimony because the Court has the

3    entire record before it.  This was a situation as we laid out

4    in our motion where Mr. Scott at the outset expressed some

5    hesitancy multiple times about whether or not he'd be willing

6    to speak with the agent.  He ultimately agreed that he would

7    speak a little bit, sought assurances that if he said "stop",

8    they would stop.  Then came a moment 20 or 30 minutes in where

9    Mr. Scott raised the issue of calling a lawyer in order to

10   prepare for court later that day.  He had been arrested.  The

11   agents said that they would take care of that in a few minutes.

12   And then they said hold on a second and they walked out of the

13   room for eight minutes.  Came back in.  No mention of

14   Mr. Scott's request.  They resumed questioning.

15          And then I think you get really to the key moment

16   where beyond that questioning should be suppressed.  They

17   started asking him about a particular transaction and he made

18   the statement that quote, If we get this detailed, then I

19   really should get a lawyer involved.

20          And as we outlined in the reply brief I think in

21   probably the greatest clarity, this was not a hypothetical, if

22   you in the future get detailed.  This was in response to very

23   specific detailed questions that the agents were asking him

24   about a transaction and the phrase, "I think I should get a

25   lawyer involved" has been found by the Second Circuit to be an

1    invitation of counsel.

2           So once you subtract and it wasn't really a

3    hypothetical he is talking about something happening then and

4    then says "I think I should get a lawyer involved", on top of

5    that, your Honor, you then have the fact that the agents paused

6    for 57 seconds, nearly a minute.  They're, as pointed out in

7    the government's opposition, there's some people taking notes

8    and moving papers.  But they pause instantly when he said "I

9    think I need to get a lawyer involved" or "I think I would like

10   to get a lawyer involved" and he added because he was afraid he

11   would say something wrong.  Then after that the agents after

12   waiting a minute just resume and go back into questioning

13   again.

14          In their opposition the government suggests well they

15   didn't question him about that same topic again.  But that's

16   not how Miranda works.  Once there's actually an invocation and

17   request to speak to a lawyer for advice on the questioning.  So

18   I think by that point anyway, your Honor, the questioning

19   should have stopped and the statements beyond that point should

20   therefore be suppressed.

21          THE COURT:  Thank you.

22          Who is going to speak on behalf of the government,

23   Mr. Folly?

24          MR. FOLLY:  Yes, your Honor.

25          Also, just briefly because I think our brief hits on

JAAAASCOC                    Conference

1    many of the key points here.  But the first point is that this

2    is an objective test and what we're looking at is the language

3    that the defendant used during this portion of the interview.

4    The defense cites to the first purported invocation which was

5    actually a statement that pertained to the defendant making a

6    phone call to a set of litigators who in turn might have had

7    references or ideas about who might be able to represent the

8    defendant at a bail proceeding later that day.

9         The case law is very clear that the purported

10   invocation has to actually pertain to the custodial

11   interrogation.  So the first statement which defense counsel

12   points to, I think at this point he essentially concedes after

13   no legal argument as to why that statement was actually

14   pertaining to custodial interrogation.  So I think at this

15   point that statement is not really being advocated as far as

16   the protections of Miranda.

17        As for the second statement, again it's an objective

18   test and the defense cites to the Wood case.  In the Wood case

19   the defendant said "I think I should get a lawyer involved".

20   That was the actual statement.  Here, the statement is

21   something to the effect of "If we are going to get this

22   detailed then I should get a lawyer involved".  It's anything

23   but clear.  It's anything but lacking in ambiguity.  It's

24   precisely the type of statement that the Wood case actually

25   compared the statement at issue in Wood to.  It compared it to

1    statements such as "perhaps I should get a lawyer", "maybe I

2    should get a lawyer".  Statements that evidence some sort of

3    ambiguity for, quote/unquote, internal debate on behalf of the

4    declarant.  And that is what the statement is here.  It's a

5    statement that has a very clear level of ambiguity.

6            The defendant also points to the agents' response

7    after the statement was made and says, well, we should sort of

8    look at the larger context here.  To the extent that the larger

9    context is really relevant here, what was clear to these agents

10   was this was a lawyer.  This was someone who was well educated,

11   would have to speak clearly, said at the outset of the

12   interview, if I say "stop" this interview should stop.  Never

13   for the rest of the interview ever uttered the word "stop".

14   Never used that word.

15           And then what's also clear if you are watching the

16   tape, at the very end of the interview, when the defendant

17   actually makes a much more clear statement about wanting to

18   speak with the lawyer, the agents immediately end the

19   interview.  There is no hesitation at that point in time.  They

20   thanked the defendant for speaking with them.  And again, to

21   the extent that these additional surrounding circumstances

22   should go into the analysis, they actually cut the opposite

23   direction of what defense counsel just advocated for here.

24           So, what it really boils downs to is under the

25   objective test this was not a clear and unambiguous statement.

JAAAASCOC                    Conference

1    It was just the opposite.  It was couched in hypotheticals and

2    language that was anything but clear.  And this is what the law

3    is designed to protect against.  I'm not putting agents in a

4    position where they have to immediately end interviews any time

5    the word "lawyer" is mentioned.  That's simply not what the law

6    is.

7                 THE COURT:  Thank you.

8            I am not going to suppress the statement.  The

9    statements made after the second purported invocation of right

10   to counsel.  I don't believe that the first one comes even

11   close to an invocation of a right to counsel.  But the second

12   one, obviously, there is an argument to be made.  However, I

13   looked, reviewed the videotape of the interrogation very

14   carefully.  I've reviewed the relevant cases.  In particular

15   the case with Justice O'Connor where she describes because this

16   thing, the landscape concerning ambiguous statements and the

17   Supreme Court stated very clearly that while there is a

18   prophylactic rule concerning direct clear invocations of the

19   attorney/client privilege rather, the right to counsel where

20   there is an ambiguity, where there is an ambiguous statement,

21   not only are law enforcement agents not required to stop.  They

22   are also not required to ask clarifying questions.  They can

23   simply continue to ask questions.

24           Now, it may be that the better practice should be to

25   ask clarifying questions but the Supreme Court was very clear

1   in its determination that that not be the case.  Here, we have

2   an individual who may not be a criminal lawyer but is a very

3   sophisticated business person and a lawyer, trained lawyer and

4   he had the type of conversation prior to beginning that other

5   cases I discussed where he engages with the agents and says,

6   I'm happy to answer questions but if I say stop, we'll stop,

7   right?  Right.  In other cases that have been brought to the

8   Court's attention the individual who is being interrogated,

9   much less is sophisticated individuals presumably given the

10  crimes that they were being invested for asked the same

11  questions and continued their interrogation.  So continued with

12  the interrogation.

13          Here, Mr. Scott was advised of his rights.  He

14  indicated that he understood them.  He indicated that he was

15  willing to answer questions, notwithstanding, his rights and

16  then he proceeded to answer questions after he was made, after

17  he was given some comfort that he would be able to stop at any

18  time.

19          There came a point in the interrogation when they were

20  questioning him concerning particular documents and his

21  testimony was or his statement was -- and I'll read it for the

22  record so that it's clear.  "I don't remember this transaction

23  that well.  I would have to see more documents.  If we get this

24  detailed, then I really should get a lawyer involved."

25          So again, it was stated in a hypothetical, if we are

JAAAASCOC                    Conference

going to get this detailed, then I am going to want a lawyer

involved.  That is certainly not the kind of direct, clear

invocation that one would expect from an individual who is as

sophisticated as Mr. Scott.  I believe that the agents were

within their rights to consider that statement to be an

ambiguous one.  From my perspective based on the totally of the

circumstances on the videotape, I considered that to be an

ambiguous statement.

          Accordingly, the motion to suppress will be denied.

          Now with respect to the Rule 15/CCTV, Ms. Lozano, do

you wish to be heard?

          MS. LOZANO:  Yes, your Honor, briefly.

          In order not to reiterate everything that the

government raised in its brief, I will highlight certain points

and also direct the Court to the letter recently filed with the

Court that gives further information and more recent

information about the government's effort to secure this

testimony.

          THE COURT:  I'm sorry.  What letter filed?

          MS. LOZANO:  It was filed at about 12:15 this

afternoon.

          THE COURT:  I have not seen it.

          MS. LOZANO:  I have a copy for the Court.

          THE COURT:  OK.

          (Pause)

1           THE COURT:  OK.

2           MS. LOZANO:  Your Honor, the law is clear that in

3    circumstances where witnesses have material evidence and are

4    unavailable, they may be allowed to testify remotely via CCTV

5    or Rule 15 deposition.

6           THE COURT:  Under exceptional circumstances?

7           MS. LOZANO:  Yes, your Honor.  And we have exceptional

8    circumstantial here.

9           As is set forth in today's letter and our motion, the

10   government has for months communicated with the Bank of Ireland

11   in an effort to secure the testimony of witnesses whom we

12   interviewed in March of this year and whom provided material

13   evidence for this case or will provide material evidence for

14   this case.  We have negotiated with the Bank of Ireland in an

15   effort to have the witnesses travel here.  When we originally

16   spoke with the witnesses in Ireland, it was the government's

17   understanding that they would be willing to travel here to

18   testify.  We have had conversations with the witnesses while we

19   are interviewing them and articulated our desire to have some

20   of them testify at trial.  And at no time during the period

21   that we were in Ireland were we were told that would not

22   happen.

23          In addition, after our trip and for several months up

24   until the beginning of September, we had been in communication

25   with both the Bank of Ireland and one individual counsel for

1    one of the witnesses.  All of the witnesses ultimately obtained

2    their own individual counsel as well.

3              In an effort to schedule trial preparation sessions

4    and make arrangements to have them travel to the United States.

5    It was clear that that was the government's intention.  And

6    until the beginning of September we did not have an

7    understanding from the Bank of Ireland that the witnesses would

8    not travel to the United States to provide this testimony.

9              THE COURT:  And then what happened?

10             MS. LOZANO:  After September we attempted to negotiate

11   with the government with the Bank of Ireland in order to secure

12   that testimony and convince the witnesses that they should

13   travel here.  We made offers of safe passage letters.  We

14   explored options.

15             THE COURT:  Did there come a time where they said, no,

16   we're not going?

17             MS. LOZANO:  We don't know the answer to that, your

18   Honor.  It's unclear to us but it does appear that all

19   witnesses simultaneously and with the bank right at the

20   beginning of September if I'm remembering correctly,

21   September 3rd, communicated to the government that for personal

22   reasons they would not travel to the United States.  But they

23   were still willing to cooperate with the government and provide

24   testimony in Ireland.  Therefore, we engaged in negotiations

25   and communications with the Bank of Ireland and through them

1    with the witnesses in order to figure out whether there was a

2    way that we could secure this testimony in Ireland and what

3    process we would use.

4              Although we had been told on numerous occasions

5    repeatedly that the witnesses were willing to provide

6    assistance in Ireland, it had become abundantly clear in the

7    last week and several days that in fact that was not the case.

8    If witnesses agree to give testimony voluntarily in Ireland

9    there is no requirement that the government submit a request

10   through the Mutual Legal Assistance treaty.  However, it has

11   become clear now that and we have statements from all the

12   witnesses through their counsel and or the Bank of Ireland

13   saying they will not provide any testimony unless they are

14   compelled to do so pursuant to the Mutual Legal Assistance

15   treaty between the United States and Ireland.

16             THE COURT:  And do you know why that is?

17             MS. LOZANO:  We don't know why that is.  We have asked

18   that question and we have been told that it is for unspecified

19   personal reasons that the bank does not feel at liberty to

20   divulge to the government.

21             THE COURT:  Are any of these individuals anything

22   other than fact witnesses from the government's perspective?

23             MS. LOZANO:  In terms of whether they're expert

24   witnesses?

25             THE COURT:  No.  As to whether they have any exposure

JAAAASCOC                       Conference

1    either regulatory or criminal exposure?

2            MS. LOZANO:  At this point that is not something that

3    the government believes.  But certainly that is a possibility,

4    which is one of the reasons why in order to secure the

5    testimony we offered a safe passage letter.

6            THE COURT:  What is the safe passage letter?

7            MS. LOZANO:  It means if they were to agree to come to

8    the United States to testify at trial they would not be

9    subjected -- they would be allowed safe passage to come,

10   testify in court and leave.  During the period of tie they were

11   here, they would not be subjected to the U.S. Government

12   process for any other case or for this case.

13           THE COURT:  Why do we need to do this?  I understand

14   that it's a little bit unusual but I've never seen this done in

15   any case I've ever been involved with where there should be

16   testimony by closed-circuit television in a criminal case.  I

17   know that's been done and as the defendant points out where

18   it's been done, it's been in connection with cases involving

19   individuals in the Witness Protection Program, individuals

20   aligned with terrorist organizations or would have substantial

21   criminal exposure.  It's not to say that only in those very

22   high profile criminal cases should it be allowed.  It is

23   frequently the case in this courthouse that there are witnesses

24   that would rather not come or that are not cooperative and we

25   don't make them appear on closed-circuit television.  It's

JAAAASCOC                    Conference

1    not -- from the respected of defendant.

2              MS. LOZANO:  Your Honor, in response, I do want to

3    point out that although counsel attempted to distinguish this

4    case from other cases where CCTV testimony has been allowed by

5    saying it's only with organized crime or under circumstances of

6    a terrorism case, that outside of the circuit that is not the

7    case.  In the Sixth Circuit, in fact in the Benson case that is

8    cited in our brief -- our motion, I'm sorry -- that CCTV

9    testimony was permitted for a witness who was infirmed in a

10   wire fraud and mail fraud case.  It was not a terrorism case

11   and had no organized crime.

12             THE COURT:  So that's four or five examples.

13             MS. LOZANO:  I just wanted to clarify the record

14   because counsel raised that in his response.

15             The reason that it should be allowed here is because

16   these witnesses are material.  They, although we do have

17   records and we have e-mails that we intend to introduce, these

18   witnesses, each one of them, will provide unique testimony that

19   is broader than the documentary evidence.  And moreover, an

20   example of that was mentioned in our letter of this afternoon

21   where in order to prove that, that the documents will not prove

22   that the defendant never alerted the bank to the fact that One

23   Point and Ruja Ignatova proceeds and funds were flowing through

24   the accounts.  The documents won't show that because he never

25   informed them.  The witnesses will be able to testify to that.

1      THE COURT:  Well, it seems that the defense is willing

2  to work with you in terms of getting that information before

3  the jury.  Why not agree on stipulated testimony or stipulated

4  facts?  I mean if there is going to be no dispute that

5  Mr. Scott did not advise the Bank of Ireland of the Ignatova

6  interests in the Minero funds, why do you need anyone to appear

7  by CCTV to say that?

8      MS. LOZANO:  That is not something that we have even

9  discussed with counsel.  It is not an offer that counsel made

10  and it is not included in the defendant's response.  In fact,

11  the defendant's position is that everything that these

12  witnesses say and their relevant evidence is included in the

13  documents.  Our position is that is not correct.  The relevant

14  evidence is also outside --

15      THE COURT:  But what you are telling me is that what's

16  not included in the document is what he didn't say.  And if he

17  didn't say it, then they won't know about it any way, right?

18      MS. LOZANO:  That is one example.  I was pointing to

19  the one example that is in our letter today.  There are

20  multiple examples.  There are witnesses who will testify that

21  Mr. Scott told one witness at the Bank of Ireland what the

22  intended investments of the Minero funds were and told a

23  different person at the Bank of Ireland different investments.

24  They were both misrepresentations and they were different

25  misrepresentations.  That is important.

1          THE COURT:  Isn't that in the document?

2          MS. LOZANO:  Not all of the misrepresentations are in

3     the documents, your Honor.

4          Your Honor, just to further explain the lack of

5     documentary evidence of the defendant's failure to notify the

6     bank that one point funds were flowing through the accounts.

7     That is not something that the government has the ability to

8     prove with the e-mails.  There is just no way to put in all the

9     e-mails and say he never notified them about this because there

10    could be an errant e-mail that was deleted that we don't have

11    from a different account.

12         However, a witness, the person who was his

13    representative at the bank is the person that the defendant

14    communicated with most at the bank, will be able to say, I was

15    never notified about this.  He never notified me and he didn't

16    notify other people about the bank that the Minero funds and

17    therefore the accounts that Bank of Ireland was holding were

18    moving and laundering

19         THE COURT:  Did those individuals know that?

20         MS. LOZANO:  Did the Bank of Ireland individuals know

21    that?

22         THE COURT:  Yes.

23         MS. LOZANO:  No.  What they're going to say is that

24    they were never notified that one point and Ruja Ignatova and

25    funds related to them were flowing through the accounts.

1    THE COURT:  As I recall from the defense papers, two

2    of these four individuals never even communicated with

3    Mr. Scott; is that correct?

4    MS. LOZANO:  That's correct, your Honor.  That is

5    correct.

6    THE COURT:  So, what are they going to bring to the

7    table?

8    MS. LOZANO:  Well, they never met him in person.

9    Mr. Bently did have communications with the defendant.  And in

10   fact, significantly, he had one communication that only he and

11   Mr. Scott were on, only he from the side of the Bank of Ireland

12   regarding the defendant's commitment to notify the bank about

13   any investors holding ten percent more of in his funds.  And I

14   just want --

15   THE COURT:  But if the entirety of their

16   communications were through e-mail or whatever other platform,

17   what more could Begley possibly say beyond those

18   communications?

19   MS. LOZANO:  It's very, it's qualitatively different

20   to have an e-mail read to the jury out of context for them to

21   kind of interpret as they will versus a witness who will say

22   this is the response I got.  And by the way, the reason I asked

23   for it was I received a request from whatever -- for this

24   information because it related to KYC and ANL procedures about

25   the UVOs are the ultimate beneficial owners of the funds.  And

1    so it is important for all of the witnesses.  There's just a

2    qualitative difference having e-mails read in a vacuum to the

3    jury versus having a person --

4            THE COURT:  Let's talk about Begley.  If Begley didn't

5    testify aren't you already going to have someone from the Bank

6    of Ireland say, we were concerned.  Obviously, this was a high

7    risk account.  We were concerned about the UVOs and he never

8    told us about the Ignatovas.  So this also sounds a little

9    cumulative, doesn't it?

10           MS. LOZANO:  No.  As we we've set forth in our motion,

11   each witness has unique information to provide and we, the

12   government, will endeavor to keep the testimony of each of the

13   witnesses narrowed so that it is not cumulative one of the

14   other.

15           To answer the Court's question, yes, if we were able

16   to have another witness testify about the reasoning for the

17   request of the ten percent UVO in the identification, that

18   would be something that would replace, could replace

19   Mr. Begley's testimony.  However, Mr. Begley is the only one on

20   that e-mail with the defendant when the defendant commits to

21   doing just that.

22           THE COURT:  There is no objection to those e-mails

23   coming in and is it Ceannt that is how you pronounce her name,

24   that's senior to Mr. Begley?

25           MS. LOZANO:  Yes.

1          THE COURT:  But in the same function who also has

2     testimony about Mr. Scott's failure to provide information to

3     Ruja Ignatova?

4          MS. LOZANO:  She was the primary point of contact.

5     But to be clear, every one of these witnesses take the same

6     position.  They are all in Ireland.  They are refusing to come

7     here and they are in fact refusing to do anything except

8     provide testimony that is compelled pursuant to an MLAT.

9          and I just want to make one thing clear in case it

10    wasn't before.  Based on everything we know now, we believe

11    they are only fact witnesses.  There isn't -- and that is why

12    we offered them a safe passage letter.  We believe they are

13    fact witness and we want them to come testify.

14         THE COURT:  OK.  Is the other individual that never

15    communicated or --

16         MS. LOZANO:  Ms. Sands.  To correct the record, we

17    looked back and I believe Ms. Sands, her correct title is the

18    head of AML advisory at the bank which is a little bit

19    different than the way it was described in the motion as the

20    bank's head of AML.

21         THE COURT:  And what does, remind me what her

22    anticipated testimony would be.

23         MS. LOZANO:  Well, her anticipated testimony would be

24    to talk about the, will describe the bank's internal KYC system

25    and the Know Your Customer system and AML system and Anti Money

1  Laundering system and what kinds of information are required,

2  is required for certain kinds of bank accounts.  She would set

3  the context for the requests that were made of the defendant's

4  bank accounts and describe the rationale from the bank's

5  perspective for requesting identification of UBOs over ten

6  percent.

7           THE COURT:  Now, I imagine, although, I've never met

8  any of these people that both Ms. Ceannt and and Mr. Collins

9  would be able to testify about that stuff as well.

10          MS. LOZANO:  They would have knowledge about it, but

11  they --

12          THE COURT:  That is what they do everyday, right?

13          MS. LOZANO:  Well, they are in a different position.

14  So, they certainly, in their positions need to be knowledgeable

15  about that.  But in terms of who is the person who actually

16  works with the bank's internal KYC system, who is the person

17  who understands what kind of accounts need what kind of due

18  diligence, that would be Ms. Sands because that's her function

19  at the bank.

20          And to go back to one of the Court's questions

21  previously, if the defendant were willing to consider some kind

22  of stipulation about this testimony that we have been talking

23  about, the unique testimony outside of the e-mails and

24  documents, we're certainly willing to consider it.  But the

25  government hasn't seen any indication that the defendant would

1    be willing to do that.  And in fact, his position and his

2    response is that the witness testimony and the e-mails and

3    documents are one in the same.

4            THE COURT:  Let me ask you this.  Do you have a

5    preference as between the Rule 15 depositions or close-circuit

6    television?  Are you asking in any particular order?

7            MS. LOZANO:  Yes.  We are asking for the

8    closed-circuit television --

9            THE COURT:  OK.  Thank you.

10           MS. LOZANO:  -- as priority.

11           (Recess)

12           THE COURT:  Please be seated.

13           So was an agreement reached while I was away?

14           Mr. Devlin-Brown.

15           MR. DEVLIN-BROWN:  Thank you, your Honor.

16           In our response we basically had two arguments as to

17   why the government should not be permitted to use this really

18   extraordinary step in a motion they filed a month before trial.

19   And the two arguments were basically that this was going to

20   be -- sorry.  One moment, your Honor.

21           The two arguments were basically going to be that this

22   was going to be something the government should have handled

23   much earlier on in the process.

24           And the second argument made as to why this was unfair

25   and unwarranted is that the testimony was not nearly as

1    material as the government had represented in its motion.

2              And the thing about this, your Honor, is reading the

3    submission filed just before court, both of those arguments are

4    now considerably stronger.  I want to touch on both of them.

5    We've you talked mostly about the materiality point.  But the

6    point about the government not taking the appropriate steps in

7    a timely fashion is even more clear if you look at the letter

8    that Ms. Lozano submitted.  In the original submission, your

9    Honor, from the government, they had represented that they've

10   reached out to the Bank of Ireland in April to ask that these

11   witnesses be available for trial in October.  They've now

12   clarified in a footnote -- this is Footnote One on page two of

13   their motion -- that they did not in fact in April ask for any

14   specific individuals as witnesses.  They made a general

15   statement to the Bank of Ireland that they wanted witnesses.

16   And they in fact, specifically, identified the four individuals

17   they're talking about now, three of them in August and one in

18   September.  And shortly after they identified the

19   individuals -- and it sounds like the individuals got

20   counsel -- those individuals came back and said no.  So this is

21   not a request that the government pursued in a timely fashion.

22   They should have pursued this much, much earlier.

23              There's another point though on the government's

24   efforts to pursue this that we saw from the reply letter that

25   they have any more concern.  Because in the government's

JAAAASCOC                     Conference

1    filing, your Honor, they represented that these witnesses would

2    voluntarily agree to testify in Ireland or have their

3    depositions taken.  They would do this voluntarily.

4           If you look now at rely submission, it's quite clear

5    that at all times that we can tell -- and I invite the

6    government to correct me -- but that at all times the Irish

7    witnesses said they wanted it done pursuant to an a MLAT which

8    is different than a purely voluntary step.

9           I direct the Court the first sentence on page three of

10   their letter.  It said:

11          In early September DOI counsel communicated to the

12   government that Ceannt, Sands and Begley were willing to

13   provide further assistance in Ireland in accordance with the

14   MLAT procedures.

15          And then they go on to say, you know, of course, it's

16   voluntary in spirit.  The MLAT process can be much easier.  But

17   the fact of the matter is these witnesses have always said they

18   need an MLAT and the MLAT was filed on Monday by the government

19   seeking closed-circuit testimony it seems, not even seeking a

20   deposition.

21          So, for the government to pursue these steps so late

22   in the game, your Honor, I think really does have to be

23   factored into it given the prejudice this could cause

24   Mr. Scott.

25          But now I'd like to go to the second point because I

1    actually think it's really fundamentally the most important

2    point, and that is the materiality of the witness testimony

3    compared to the evidence that will already be available from

4    documents.

5            And I want to stress, I mean this is not a question of

6    whether it's relevant evidence, whether it should be excluded

7    under the rules of evidence as being too cumulative for that

8    purpose.  It's not about whether the government's case might be

9    a little bit, have a little bit more color if they had some eye

10   witnesses in the courtroom or on video describing what the

11   e-mails say.  It's not about that.  The Second Circuit has made

12   clear that it has to be material.  And this is a problem then

13   that the government ignores really when they cite the law.  It

14   has to be necessary to prevent a failure of justice.

15           And materiality, that concept has different meanings

16   in different areas of the law.  But we cited a case to you in

17   the Southern District court that that means it's highly

18   relevant to a central issue.  And what the government's

19   argument now boils down to again, articulated in the letter of

20   today is what they think is highly relevant still is the

21   failure of Mr. Scott to say certain things, the failure of

22   Mr. Scott to tell them that in fact the money supposedly came

23   from one point and the failure of Mr. Scott supposedly again to

24   identify new investors in his fund as he had according to the

25   government committed to do.  And his agreement to do it is in

JAAAASCOC                    Conference

1    one of the e-mails.  So it's the absence of evidence.

2          And if that's what the record is of the evidence at

3    trial, your Honor, Mr. Scott cannot argue in defense that oh,

4    of course, he told the bankers that this money all came from

5    one point.  There would be zero evidentiary basis for it.  And

6    the same thing with respect to whether he provided that

7    information on new investors.  If it's not in the e-mails, if

8    Mr. Scott doesn't testify to it and whether or not he

9    testifies, we can represent right now he will not make those

10   statements that he provided that information on One Coin or

11   identified new investors.  There's no evidentiary basis for a

12   party to take a position other than this information was not

13   provided.

14         So that what you're left with, your Honor, I think in

15   terms of both the government's delinquency really in pursuing

16   this as aggressively as they should have and the significance

17   of the testimony on top of the documents.  So now here we are

18   three weeks and change before trial and MLAT has been submitted

19   to the Central Authority in Ireland, I guess, on October 8.

20   We, of course, haven't seen the MLAT.  It sounds like this

21   would be touch and go for a while if it could even happen

22   during the trial.  How it would happen, I have no idea.  The

23   government has previously suggested that if this was granted

24   then, of course, one of the prosecutors could go out and ask

25   the questions in Ireland wheres, we would be asking them from

1   here and that strikes us as completely unfair because Mr. Scott

2   if he is not going to have the direct right to be in front of

3   the party, then the government shouldn't either.

4           But the government's raised a fair response to that

5   just in our conversation.  That is, how are you going to deal

6   with all these documents then?  I don't know.  I guess we could

7   have a special master, maybe a law clerk, court personnel, but

8   these are complicated things.  And for the Court to now grant

9   the government's motion even in part, it's still going to be a

10  touch and go situation depending on what Ireland does.  And we

11  may not know about it until the very last minute.

12          I'm happen to address any other questions but I really

13  don't think this extraordinary remedy --

14          THE COURT:  Now, you've indicated in your papers I

15  believe, that you are not going to object to these various

16  documents from the Bank of Ireland coming in as business

17  records; is that right?

18          MR. DEVLIN-BROWN:  So any of the documents that have

19  Mr. Scott's statements to a Bank of Ireland person or their

20  response to Mr. Scott which would be relevant to his state of

21  mind, we are not going to object to anything like that at all.

22  As to any of their personal communications between people in

23  the Bank of Ireland, we may object on relevance or other

24  grounds but we are not going to challenge the authenticity of

25  these documents.  We have no reason to believe they're anything

1   but that.

2              So I can assure the Court we will never say those

3   documents shouldn't come into evidence because we don't have a

4   Bank of Ireland records custodian testifying as authentic.  And

5   I also think the MLAT procedures that they used to get the

6   documents self-authenticate anyway.  But that's not going to be

7   an issue.

8              THE COURT:  What about the suggestion that I floated

9   that the parties agree to stipulated testimony from one or more

10  of these witnesses; that something you are willing to pursue?

11             MR. DEVLIN-BROWN:  I am willing to discuss it with the

12  government and I actually do take a little bit of an issue that

13  the defense was never willing to do this because actually on

14  the very cause first call we had about this several weeks back

15  with Mr. DiMase -- I don't know what else was on it -- we said

16  would a stipulation be possible and that was essentially

17  brushed off with words to the effect of "wouldn't you like

18  that" or something to that effect.

19             So the lack of discussion of stipulations, it's never

20  been proposed by the government.  The government has wanted

21  these witnesses live.  We'd be willing to discuss the

22  stipulation, your Honor, but I think that gets to a point where

23  it starts to become a little unfair to the defense because we

24  never had a chance to question those individuals.  We've seen

25  notes.  I think one we attached to the motion.  But the notes

1    are often vague and it's a little unclear.  So to ask us to

2    agree to stipulate here is exactly what this person would say,

3    I don't know that we could promise that but we'd certainly talk

4    to the government about it.

5          THE COURT:  Are you talking about handwritten notes by

6    any of those individuals?  If so, I don't believe I've seen

7    them.

8          MR. DEVLIN-BROWN:  The agent or some government

9    personnel took handwritten notes over there and then they were

10   produced to in some cases, maybe all cases, typed memoranda.

11         THE COURT:  Is this when they go to the binder and go

12   through each tab?

13         MR. DEVLIN-BROWN:  Yeah.  Then they also wrote-up 302s

14   or the equivalent for what these witness would say.

15         THE COURT:  I don't believe that I've seen that.

16         Thank you, Mr. Devlin-Brown.

17         Ms. Lozano, how is this supposed to work?

18   Technically.

19         MS. LOZANO:  Your Honor, as we noted in the letter,

20   submitted the MLAT yesterday and we have not yet received a

21   response from the Central Authority of Ireland.  So it is not

22   clear to us exactly how it would work.  But we do know that

23   there is the ability, if the MLAT is granted and the request is

24   granted, there is no specific venue in which this testimony

25   needs to be taken.  It can be taken in a courtroom.  It can be

JAAAASCOC                    Conference

1    taken in an office.  It can be taken in a different venue.  So

2    that is open to negotiation and as is the scheduling.  We just,

3    we don't have clarity because we haven't heard back from the

4    Central Authority.

5         THE COURT:  By "technically" I meant technologically.

6    How is this supposed to happen technologically?  I mean, will

7    there be a split screen?  And who is on the split screen?  Will

8    there be cameras in the courtroom?  How is the jury supposed to

9    see this?  Have you thought about technologically how this

10   happens?

11        MS. LOZANO:  My understanding is that there would be a

12   feed and it would be live.  I'm not sure whether it would be a

13   split screen.  To be honest, we hadn't really gotten into that

14   level of detail about the practicality of what the screen would

15   look like.  We do know that it -- obviously, we would want to

16   have a prosecutor there and we never suggested that defense

17   couldn't attend.  We simply said it was our intention to send

18   someone there were the Court to grant the motion.

19        THE COURT:  Easy for you to say we'll have a

20   prosecutor there but my understanding is the defense team is

21   three and they are going to be busy enough here.  A little bit

22   unfair to have a prosecutor in the room with the witness and

23   whether it's going to be Mr. Devlin-Brown or Ms. Stanley or

24   Ms -- cross-examine from across the pond --

25        MS. LOZANO:  The prosecution team is also three.  And

1    like I said, we didn't opine or suggest that the defense

2    couldn't attend.  We said what our intention was, and that is

3    our intention.

4              I would like to, if the Court would allow me, like to

5    address Mr. Devlin-Brown's two main page points very, very

6    briefly.

7              One, he is correct that we clarified in our letter

8    that our April request to the Bank of Ireland didn't

9    specifically identify the witnesses.  What we said was we had

10   interviewed eight witnesses and we were considering which ones

11   to call.  So we notified the Bank of Ireland that we did intend

12   to call witnesses and we wanted to discuss with them

13   arrangement for preparation and for travel to New York in the

14   United States to testify.  That was clear as of April.  We

15   never at that point or through September received any sort of

16   communication that any of the witnesses, any of the eight

17   witnesses was unwilling to travel to the United States to

18   testify.  And then we got to September.  That is our first

19   notification that they were unwilling to travel.

20             THE COURT:  Have you received documents from the Bank

21   of Ireland prior to the indictment?

22             MS. LOZANO:  Yes, your Honor.  Prior to the

23   indictment?  I believe so.

24             MR. DEVLIN-BROWN:  And your Honor may wish to clarify

25   if it's by MLAT in which case the Bank of Ireland probably had

1    no choice other than to comply which --

2                MS. LOZANO:  I do know that we submitted multiple

3    MLATs to Ireland and received documents in response to those

4    MLATs.  Whether we had received all of the records before

5    Mr. Scott's indictment, I don't know.  I would have to go back

6    and look at our requests and what we got in response to those

7    requests.  But we had received some records from Bank of

8    Ireland via MLAT before the indictment.

9                THE COURT:  And answer this if you would.  I don't

10   know all the facts in this case.  How central is the role of

11   the Bank of Ireland in this alleged scheme?

12               MS. LOZANO:  OK.  And that was the second point I am

13   glad you asked that question.  This is a $400 million money

14   laundering scheme.  The heart of the case against Mr. Scott is

15   the fact that he hid from financial institutions and fund

16   managers the fact that the $400 million constituted criminal

17   proceeds, specifically, the -- proceeds.

18               And the bank itself, Bank of Ireland was involved in a

19   large portion of that $400 million in some transaction or

20   another because there were multiple different financial

21   institutions through which Mr. Scott laundered these funds.

22   The bank of Ireland had a large proportion of the $400 million

23   flow through their accounts.

24               THE COURT:  The largest?

25               MS. LOZANO:  Approximately three hundred million.  So,

1   three quarters approximately.

2           The fact that the defendant chose to commit this crime

3   internationally or these crimes internationally and in fact,

4   the other evidence shows he deliberately avoided the United

5   States and engaging in conduct in the United States should not

6   be rewarded by preventing the government from producing

7   material evidence that is located abroad because he chose to

8   commit his crimes abroad.

9           THE COURT:  Very, very many cases in this and other

10  courthouses around the country involve international

11  transactions.  So far as I know, I've not been, not one has

12  been brought to my attention that included closed-circuit TV

13  testimony.

14          MS. LOZANO:  Yes, your Honor.  This is a unique case.

15  This is an enormous money laundering scheme with an

16  international wire fraud underpinning it that involves dozens

17  of countries, many co-conspirators.  This is a unique case

18  where most of our evidence is located abroad.

19          THE COURT:  That's not so unique.  But let me ask you

20  this.  Why did you wait until April of this year to talk to

21  these folks?

22          MS. LOZANO:  March of this year.

23          THE COURT:  Three quarters of the four hundred million

24  dollars flow through the Bank of Ireland.

25          MS. LOZANO:  I do know that we had received as I said

1    multiple productions from the Bank of Ireland.  Once we

2    received the e-mails that we were able to go through, we

3    decided that we wanted to speak to certain witnesses, the

4    witnesses who dealt with this account and who had knowledge

5    about this account and we actually were able to specifically

6    identify certain people that we wanted to speak with.  At that

7    point and if memory serves me correctly, I believe it was in

8    October of 2018, we submitted supplemental MLAT requests to the

9    Irish government in order to obtain interviews with these

10   witnesses.  It is unclear to me how long the processing of that

11   request took but I do know that it was a somewhat lengthy

12   process because just the logistics involved, the Central

13   Authority in Ireland contacted the bank.  The bank expressed a

14   willingness to provide these witnesses and make them available

15   for our interviews in their offices and the Central Authority

16   of Ireland then stepped back and allowed us, the government, to

17   talk directly and make arrangements directly with the Bank of

18   Ireland about how to do these interviews and where, the

19   scheduling of the interviews, the people that would be

20   interviewed.  And so that was a somewhat lengthy process.  But

21   we did as soon as we identified the witnesses submitted an MLAT

22   requesting the interviews.  And then when we were given the

23   ability to negotiate with the Bank of Ireland about setting up

24   the interviews, we did that.

25              THE COURT:  Do you know whether the Department of

JAAAASCOC                    Conference

1    Justice and state I believe it's state whether it's expediting

2    your MLAT request?  Assuming I say OK.  Go ahead and provide

3    the testimony of these folks via CCTV, is it ever going to

4    happen?

5             MS. LOZANO:  We don't have a response yet.  That will

6    would inform us whether this request if granted by the Central

7    Authority could happen within our timeframe.  We are hopeful

8    and optimistic and we made to clear to the Office of

9    International Affairs person who was handling our request what

10   our timeframe is and that we have a trial and we specifically,

11   included the trial date, the MLAT request and asked for the

12   testimony to occur during the trial.

13            And your question, I do have an answer somewhat about

14   the technology.  We have been informed that there would be a

15   camera here that would beam and transmit a feed to Ireland and

16   then Ireland would --

17            THE COURT:  Who is on the camera?

18            MS. LOZANO:  Well, that I don't have an answer to

19   that.  I imagine that it would be, on the Irish side it would

20   be the witness and whatever attorney asking questions.  And on

21   this end I believe it have to be the entirety of the courtroom

22   so that the jurors could see the testimony and defense counsel,

23   if defense counsel stayed back, as well as the Court could view

24   the testimony.

25            And this is the way that the CCTV set up worked in

1    both cases cited in our motion, the Homsa and the Guyant case.

2         THE COURT:  Don't you more specifically normally with

3    respect to Ms. Ceannt and Mr. Collins, tell me with some

4    specificity what they would say in addition to what's in the

5    documents that presumably would come in.

6         MS. LOZANO:  Yes.  Contrary to what counsel suggested

7    that the most important piece of the testimony is going to be

8    failure to notify the bank about one point funds.  In fact, as

9    we set out in our motion, that is just one example of testimony

10   that will not be, that is not available in the documents.

11        Also, we have evidence from both Ceannt and Collins

12   about representations made to them directly about the ultimate

13   investments that the defendant was going to make with the money

14   in the funds.  Those misrepresentations were not what in fact

15   happened with the money.  And in fact --

16        THE COURT:  Isn't that in the documents?  Doesn't it

17   say something about telecommunications --

18        MS. LOZANO:  No.

19        THE COURT:  What's not in the documents?

20        MS. LOZANO:  Well, Ms. Ceannt, as is set forth in my

21   declaration, will testify that the investments would be in real

22   estate -- well, financial services which is something that

23   Collins also heard and is also in the documents, real estate

24   which does not appear to be in the documents and companies

25   which also does not appear to be in the documents.  And

Mr. Collins understood it to include telecommunications, also
not included in the documents and obviously different than what
Ms. Ceannt understood.

        THE COURT:  But the representations that he did make,
your theory is that they were false also?

        MS. LOZANO:  Yes.

        THE COURT:  So they have told them in documents I am
going to invest in -- I am just making this up -- aluminum,
financial services companies and soy beans which your theory is
that is not the case and he also told them in person that he
not going to invest in real estate and start-up companies which
your theory is also false not and that's more of the same.

        MS. LOZANO:  No, it's not.  I think it is indicative
and material to the misrepresentations and the fact that -- the
fact that there wasn't one consistent lie means that even the
defendant couldn't keep that straight.  And it goes to the
reliability of that information and whether in fact he ever
might have intended to invest in those sectors.  Of course the
government's position is these were not investment funds.  But
it is relevant and important that the defendant made multiple
lies to different institutions, to different people within an
institution and --

        THE COURT:  Are there going to be people who will
actually come here and sit in the witness stand and say he made
multiple lies to me?

1        MS. LOZANO:  From our institutions?

2        THE COURT:  Yes.

3        MS. LOZANO:  Yes.  But this is important because the

4   testimony from these witnesses, first of all Ceannt and Collins

5   to be clear, they actually met defendant and he told them the

6   lies to their face, including the lies about having a presence

7   in Ireland of a hundred people and an office there which, of

8   course, never happened.

9        And the government's position is that that was not

10   something that the defendant intended to do.  It was simply

11   another misrepresentation.

12        THE COURT:  How is that material to this scheme, that

13   particular misrepresentation?

14        MS. LOZANO:  It is material because it provided or I

15   think it was intended to provide comfort to the Bank of Ireland

16   with another indicia of the legit payee of the defendant's

17   purported private equity funds.

18        Your Honor, just two points.  With respect to

19   materiality, the government goes back to, the heart of this

20   case is a money laundering scheme where the defendant hid the

21   fact that the money flowing through private equity funds and

22   accounts via sourced from one point.  And that the fact that he

23   did not notify, tell the bank, disclose that to the bank is at

24   the heart of our misrepresentation.  That is what he failed to

25   do.  And e-mails and documents will not be able to establish

JAAAASCOC                    Conference

1    that and --

2          THE COURT:  I believe that there has been a

3    representation by Mr. Devlin-Brown that they are not going to

4    argue that he told them that.

5          MS. LOZANO:  I didn't understand that Mr. Devlin-Brown

6    said that but he may have.  In any case it is the government's

7    burden to prove this case.  And without a witness on the stand

8    saying, no, he never called, he never e-mailed from a different

9    address, he never sent a message with somebody else about the

10   source of the funds being from one point, the government is

11   unable to establish that with simply the documents and e-mails

12   and we want to be able to argue it.  And we want to be able to

13   say, as Ms. Ceannt told you is the point of contact with the

14   Bank of Ireland.  Mr. Scott never told her in any way, in any

15   sort of phone call, e-mail, any writing, any face-to-face

16   contact about one point.

17         And just one last point regarding the why it matters

18   whether he had an Irish office or a hundred people and I

19   referenced the indicia's legitimacy that Mr. Scott kind of

20   advanced.  And that brings me to another reason why it's very

21   important for Ms. Ceannt and Mr. Collins to testify because

22   they met him in person.  And they will testify that one of the

23   reasons that they felt comfortable opening accounts at their

24   bank for him is because he was very well-spoken.  He had

25   credentials as a partner from multiple ex-partners from

JAAAASCOC                    Conference

1    multiple different law firms and he presented very well.  And

2    part of that package was and I am going to open an office in

3    Ireland.  I am going to have a hundred employees.

4            THE COURT:  I, frankly, don't know that AML, KYC

5    professional would say, you know, this otherwise was a very

6    high risk, very sketchy transaction that a particular applicant

7    presented but he said he was going to build a factory in this

8    district and therefore, you know that sort of put me over the

9    top.

10           MS. LOZANO:  I'm not suggesting that, your Honor.

11   What I'm saying is that is just an example of providing the

12   context for these e-mails and documents and explaining to the

13   jury how this process happened and what information the

14   defendant was providing to the bank in order to get what he

15   wanted which was opening accounts.  And it goes to just another

16   example of his lies and the government expects to present

17   evidence of Mr. Scott's pattern of lies to multiple different

18   institutions, to multiple people and this just is just another

19   one of those lies.

20           THE COURT:  Thank you.

21           Mr. Devlin-Brown.

22           MR. DEVLIN-BROWN:  I'll try to be brief, your Honor.

23   This is not central evidence to the government's case.  The

24   government didn't even speak to these people until late March

25   of last year.  They spoke to them after they were in a court

conference, your Honor, arguing that a July trial date was

impossible.  So this was not evidence that they had at the time

to support their indictment.

And if your Honor's concerned about my excluding

really the best live evidence of, quote/unquote, lies that

Mr. Scott made to financial services companies, absolutely,

not.  The central evidence is one thing that the government,

unlike the Bank of Ireland, has hammered on in almost every

brief they've submitted to the Court.  And that is Apex Fund

Services which was a due diligence provider that Mr. Scott and

his funds engaged to do due diligence on investors.  And that's

Paul Spendiff.  He is going to come to the courtroom, testify

live, not only about all of the things that Mr. Scott said his

funds were about, not only about some of the same documents

that went to the Bank of Ireland, but he is going to testify

that at some point he became suspicious and thought Mr. Scott

was not being credible and there's this recorded conversation

between the two of them.

Obviously, we'll dispute these points but there are

going to be live witnesses galore.  And the idea that these

Bank of Ireland employees, two of them who never met Mr. Scott,

the other two who met him once is central in any way is just

not a fair characterization.

THE COURT:  But if the government is correct in their

representation that three quarters of the purported illegal

1    ill-gotten gains traveled through the Bank of Ireland, then

2    sort of regardless of their -- which they ran -- it would seem

3    it is fairly central evidence; no?

4            MR. DEVLIN-BROWN:  I don't think so, your Honor.  The

5    government is going to allege that these funds were essentially

6    not really private equity funds but were being used to launder

7    money for one point.  And the government is going to have bank

8    records and other financial records that show money going into

9    various accounts, money going into the Bank of Ireland

10   accounts, money going out to other places.  These witnesses in

11   all the things that the government has proffered about what

12   they are going to testify to, they are not going to talk about

13   what Mr. Scott did with those funds or any of the investments.

14   That would come from other witnesses.

15           And I want to go to a couple of representations that

16   Ms. Lozano said were key because this just keeps shifting

17   what's so important about these witnesses.  The last thing we

18   heard was because Mr. Scott was there in person and he had some

19   credibility of someone -- that wasn't what they put in their

20   papers.  They just keep changing the theory.  And a couple of

21   things she did say, your Honor, very much are in documents.  I

22   know some of these exhibits were sealed, your Honor, but if you

23   have Exhibit A to our opposition --

24           THE COURT:  Hold on.  OK.

25           MR. DEVLIN-BROWN:  So the Exhibit is actually a number

JAAAASCOC                    Conference

1    of e-mails and other things shown to the witnesses.  If you go

2    part way through there's a company questionnaire.

3              THE COURT:  Yep.

4              MR. DEVLIN-BROWN:  So this is a questionnaire that

5    Mr. Scott and his team filled out and e-mailed to the Bank of

6    Ireland.  For number one, principle activities of the

7    company -- it says please see attached mission statement --

8    which we'll get to in a moment -- has lot of our information

9    filled out here including number nine, number of employees

10   expected in five years.  For all entities under the holding

11   structure about one hundred.

12             If you then turn to the next page, the Minero Equity

13   Investments Missions Statement, Ms. Lozano had said oh, the

14   only thing that is in the writing was financial services but in

15   fact, orally other types of investments were discussed which,

16   frankly, I don't think is a particularly powerful point.  But

17   if you look at the mission statement, that's just not true

18   either.

19             The paragraph that starts at the bottom says the

20   primary objective is to invest into controlling positions of

21   company in the financial services industry.  It goes on to

22   describe some of those new currencies and to improve, grow and

23   building great companies.  I won't read the entire thing, your

24   Honor, but talks here about growing and building great

25   companies.  It talks about helping companies, quote, in all

JAAAASCOC                    Conference

1   phases of developing and achieve their full potential.  There's

2   lots here to work on if the government's theory is Mr. Scott

3   never intended do any of these things.

4          One final point and then I'll sit down.  Because I

5   respectful submit that the Court's question about technology

6   really goes much deeper than that can we set it up.  The

7   Supreme Court -- sorry -- it's the statute that Congress passed

8   permitting closed-circuit testimony permits two-way testimony.

9   Because it seems a little artificial because both are

10  infringements on the defendant's real confrontation clause,

11  right?  But the idea in these extraordinary cases is at least

12  the person being cross-examined way over there can see a

13  picture of the defendant and the defendant can look them in the

14  virtual eye while that's happening.  That would be critical and

15  that would be undermined dramatically if a lawyer for the

16  prosecution team were to go over there and do the questioning.

17         Also, by the way, with all respect to Ms. Stanley, she

18  probably doesn't want to be disbarred before she is even barred

19  and probably can't question witnesses here or any where else

20  during the trial.

21         But it's not really just a question of me or

22  Mr. Garvin.  If the government is a party to the case, right?

23  And so if one party is physically present with the witness and

24  the other party, meaning Mr. Scott, does not get to be present

25  during that testimony and of course he needs to be before the

1    jury, that's a significant infringement.

2            Your Honor, maybe there's an answer to this.  I mean

3    these start to get into complex questions of constitutional

4    law.  There's very little precedent.  It almost all comes from

5    terrorism cases.  In fact, the government's applicable law

6    section here was literally almost -- from a terrorism brief one

7    of two district court cases here.

8            Is this the case that warrants getting into these

9    conflicts, constitutional questions for some Bank of Ireland

10   employees who, frankly, the government only got documents for

11   via MLAT had to go to Ireland to meet and really should have

12   pursued earlier having a process kickoff with an MLAT that was

13   issued yesterday trying to get closed-circuit testimony is just

14   not warranted in this case.  The government has ample evidence

15   on the Bank of Ireland and in this case without the need for

16   live witnesses.

17           MR. DIMASE:  Your Honor, may I just say one very brief

18   thing?

19           THE COURT:  Sure.

20           MR. DIMASE:  I just think that this isn't a terrorism

21   case is missing the point.  Materiality has to be looked at in

22   the context of the case before the Court.  This is a money

23   laundering case.  Mr. Scott laundered approximately $300

24   million through this bank.  It's not the largest bank to be

25   victimized by laundering money through it, one of the most

1   significant.  I think probably it is the most significant.  And

2   to put the government in a position where it can't call a

3   single witness from that bank, period, full stop, to describe

4   how Mr. Scott accomplished that in a money laundering case

5   where the entire issue is the steps that Mr. Scott took to lie

6   to banks to move money through the funds.  I just don't see how

7   anyone can credibly argue that is material testimony.  There

8   are critical lies and omissions that Mr. Scott made to these

9   witnesses that are not in the documents that can't be proven

10  some other way.  It's a money laundering case and this is one

11  of the most substantial banks involved in the case.

12          I just think on the materiality point, I don't think

13  carrying it to a terrorism case is the issue.  Looking at this

14  case, it is critical testimony.

15          THE COURT:  But the point remains, right, this doesn't

16  happen everyday.  This happens almost never in every white

17  collar case involving international transactions, international

18  banking is going to have issues precisely like this.  And there

19  have been any number of such cases tried certainly in this

20  courthouse where the government didn't propose to use

21  closed-circuit television testimony.  Even if I grant you, the

22  point that it's material where are the exceptional

23  circumstances?

24          MR. DIMASE:  The fact they weren't coming.  In those

25  other cases may well be the witnesses came.  I'm not going to

JAAAASCOC                    Conference

1    comment on whether it's surprise or not that they've decided

2    not to come but they have in fact said that they're not coming.

3          THE COURT:   It seems terribly surprising to me if

4    they're the victim and they're essentially lawyering up and

5    rounding the wagons.

6          MR. DIMASE:   Judge, we have not gotten a significant

7    understanding of what the reasons are behind it.   But I think

8    that may well account for why you're not seeing it in other

9    cases.   A witness is available to come.

10          THE COURT:   OK.   Well, here is what I think.   It is

11   becoming clear to me over the course of this conversation that

12   this is perhaps something that I can't decide now.   It may well

13   be something that is trial specific.   So almost in the nature

14   of a motion in limine that can be raised at any point, I am

15   particularly concerned about how this would happen

16   technologically.   I don't think there is any -- with respect

17   that, I am very concerned about preserving Mr. Scott's

18   constitutional rights.   He has confrontation rights, testimony,

19   remote testimony and the progressive circumstances can be very

20   awkward, can be very dodgy in terms of the technology working

21   appropriately in terms of counsel's ability to properly and

22   effectively cross-examine.   I guess that's something that we

23   haven't even discussed.   I am concerned about the government's

24   suggestion that one of your team be there.   But it appears as

25   though the defense team will not have sufficient resources to

JAAAASCOC                    Conference

 1    have an individual there.  I take Mr. Devlin-Brown's

 2    representation and his take him at his word.  So there are even

 3    if I were to grant you the ability to call one or more of these

 4    witness, I may ultimately decide that the technology that's

 5    suggested would not be fair to Mr. Scott.

 6              So it is my recommendation that you pursue that

 7    question and present precisely or as precisely as you can how

 8    it is that technologically if I were to allow this testimony,

 9    it would happen.  And I would ask for further and I would also

10    recommend by way that you continue to pursue as aggressively as

11    you can, the MLAT request.  And I'm not suggesting that I will

12    grant it but, obviously, you are going to want to be ready if I

13    do.  And I would ask for further briefing from the government

14    or further information from the government concerning precisely

15    what additional testimony in addition to the records or the

16    documents would propose or suggest would be provided by these

17    witnesses.

18              I would also recommend that you pursue with

19    Mr. Devlin-Brown, alternative methods by obtaining or providing

20    this testimony to the jury.

21              So I don't know how much time you want in order to

22    submit that additional information.  I know everyone is very

23    busy.

24              MS. LOZANO:  Your Honor, we request until Monday to

25    provide the Court with briefing on the additional testimony

1    that would be provided outside of the record.  And what we can

2    learn about the technology that would be used understanding

3    that part of that may depend on the information that we get

4    from the Central Authority of Ireland and how quickly we're

5    able to get that information but we will endeavor to update the

6    Court on that on Monday as well.

7                THE COURT:  OK.

8                Mr. Devlin-Brown, anything else?

9                MR. DEVLIN-BROWN:  No.  If we could just have two days

10   to respond to theirs?

11               THE COURT:  Absolutely.

12               So again and to put the parties on notice, it may well

13   be that we start trial and I haven't decided this.  And during

14   the course of the trial you put on ten witnesses, ten different

15   financial witnesses that say we came in and he told us "A" and

16   "B" and he didn't tell us "C", there comes a point when it

17   becomes cumulative and if it's going to be cumulative and rare

18   in terms of the procedure, then it's not coming in.  But there

19   you have it.

20               OK.  Unless there's anything else, we are adjourned.

21               Thank you, folks.

22               (Adjourned)

23

24

25