JASKCOC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                          17 CR 630 (ER)

5   MARK S. SCOTT,

6                 Defendant.

7   ------------------------------x

8                                       New York, N.Y.
                                        October 28, 2019
9                                       2:35 p.m.

10  Before:

11                     HON. EDGARDO RAMOS,

12                                      District Judge

13
                          APPEARANCES
14

15  GEOFFREY S. BERMAN,
         United States Attorney for the
16       Southern District of New York
    CHRISTOPHER DiMASE
17  NICHOLAS FOLLY
    JULIETA V. LOZANO
18       Assistant United States Attorneys

19  COVINGTON & BURLING LLP
         Attorneys for Defendant
20  BY:  ARLO DEVLIN-BROWN
         KATRI STANLEY
21       -AND-
         DAVID M. GARVIN
22

23

24

25

JASKCOC

```
1              (Case called)

2              MR. DiMASE:  Good afternoon, your Honor.  Christopher

3   DiMase, for the government.  Also joining me at counsel table

4   are AUSA Nicholas Folly and Special Assistant United States

5   Attorney Julieta Lozano.

6              THE COURT:  Good afternoon.

7              MR. DEVLIN-BROWN:  Good afternoon, your Honor.  Arlo

8   Devlin-Brown, for Mr. Scott, who's seated one step over from my

9   right, and Katri Stanley, also with Covington & Burling.

10             MR. GARVIN:  Good afternoon, your Honor.  David

11  Garvin, on behalf of Mr. Scott, also.

12             THE COURT:  Good afternoon to you all.

13             This matter is on for a final pretrial conference.  My

14  clerk will be handing to you my draft of the voir dire form.

15  It is what I will be giving to the venire.  I still expect from

16  the parties the Appendix A, which lists the individuals,

17  entities, and locations, so as soon as you have that document

18  ready, just send it over to chambers.  I would also ask that

19  you read this document very carefully.  No pride of authorship,

20  so any grammatical errors, any typos, any misspellings, bring

21  to my attention.  This is a document that will be given to the

22  venire, and I want them to be under the impression that we know

23  what we're doing around here.  So I welcome any comments that

24  you have.

25             Let me just make sure that the parties understand that
```

JASKCOC

1    the trial itself will not be taking place in this courtroom,

2    but, rather, Courtroom 318 in this building.  I don't know

3    what, if any, technology you are going to be using.  I can

4    assure you that I am unfamiliar with the technology in

5    courtrooms generally and completely ignorant of any technology

6    that there may be in Courtroom 318.  So, again, I will put on

7    the parties the burden of figuring out what technology they are

8    going to use, whether it exists, whether you need to bring it,

9    and how to use it.  So that's that.

10        I do have the parties' motions in limine and their

11   responses to the respective parties' motions, and we can go

12   through that.  What I also want to do today is just make sure

13   we go over, at least at some level, the mechanics of jury

14   selection.

15        Is it still the parties' view that this case will take

16   approximately three weeks?

17        MR. DiMASE:  Yes, your Honor, I think two to three

18   weeks, depending on the length of the defendant's case.

19        THE COURT:  Because if it goes beyond that, then we're

20   into Thanksgiving week.  I'm happy to come in and sit, though I

21   don't know that the jurors will be that thrilled.

22        Also, I don't think that we will be sitting on

23   Veterans Day, which is November 11, so that is a day that we

24   will have off.  We will be sitting Fridays, and I do use the

25   truncated trial day, which many of my colleagues use, so that

JASKCOC

we will be going with the jury from 9:30 until 2:30 in the

afternoon, we'll have two 15-minute breaks, and we'll break at

2:30.  And we will be sitting on Fridays.

          I find that that schedule gives us almost as much time

as with -- one half hour short of the same -- standard

schedule, which is 9:30 to 5:00, Monday through Thursday.  So

we will have as much time, generally speaking, as a standard

day.

          Obviously, we will have standard days for jury

selection because the jury will expect to work normal business

hours while the jury is being chosen.  In my experience, it

takes me approximately three-quarters of a day to pick a

criminal jury.  I don't know that this one will raise

particularly controversial issues from a juror perspective, so

I do expect to have a jury that first day.  And depending on

how much time we have, the parties should be prepared to open

on Monday.

          Again, I don't put time limits on these things, but it

would seem to me that a trial that's going to take two, perhaps

three, weeks should not take more than 20, 25 minutes to open,

but, again, unless there is going to be abuse of that range,

I'm not going to put any limits on counsel.

          Yes, Mr. DiMase.

          MR. DiMASE:  Just on the scheduling point, your Honor,

if we have enough time Monday, should we be prepared to open?

JASKCOC

1    Is it fair to say the first witnesses would not, then, go on

2    until Tuesday, or should we be prepared to call a witness on

3    Monday?

4              THE COURT:  You should be prepared to call a witness

5    on Monday, but, in my experience, in criminal trials, I don't

6    think that I've ever gotten to a witness on opening day.

7              MR. DiMASE:  Fair enough, your Honor.

8              THE COURT:  So that's that, on sort of the very

9    general things.

10             You have the voir dire form and get any comments to me

11   as you have them.

12             So let's go to the motions in limine.  I guess the

13   government can go first with respect to its motions.

14   Mr. DiMase, Mr. Folly, Ms. Lozano, I'm happy to hear you on

15   your first motion.

16             MR. DiMASE:  Your Honor, would you like -- are there

17   particular motions you'd like us to focus on, or would you like

18   us to go through them one at a time?

19             THE COURT:  Some are obviously easier than others.

20   Let's talk about the coconspirator statements that you want

21   admitted at trial.

22             MR. DiMASE:  Yes, your Honor.  Mr. Folly is prepared

23   to address that.

24             THE COURT:  Very well.

25             MR. FOLLY:  Yes, your Honor.

JASKCOC

1          So, as your Honor is well aware, the basic rule under

2     801(d)(2)(E) is that if there was a conspiracy, and that

3     conspiracy included the declarant of the statement at issue as

4     well as the defendant, and the statement was made during and in

5     furtherance of that conspiracy, then that statement is

6     admissible at trial.  Each of those requirements is clearly met

7     as to the statements that are at issue in this case.

8          The defendant is charged in two conspiracies, and

9     there will be overwhelming evidence at trial that he joined

10    those conspiracies.  The statements at issue here are also

11    clearly in furtherance of those conspiracies, and I'll speak in

12    a little more detail as to what some of those particular

13    statements are in just a moment.

14         So, the real issue that we're really left with is

15    whether the defendant withdrew from the conspiracy prior to

16    those statements being made.  If he did, obviously the

17    statements could not be admitted against him.  Here, there is

18    clear evidence that he did not withdraw from the conspiracy.

19    And on that last point, the law is very clear that the burden

20    is on the defendant to demonstrate that he withdrew from the

21    conspiracy.  And the law on withdrawal is also very clear.  He

22    has to show he took affirmative steps to withdraw.  There's not

23    a shred of evidence in this case that he took a single

24    affirmative step to withdraw.  All the way through the moment

25    in time when he was arrested, and even his postarrest

1    statement, is further evidence that he had not withdrawn from

2    the conspiracy.  He deliberately, in his postarrest statement,

3    covers up for other coconspirators.  He says things like Ruja

4    Ignatova and OneCoin had nothing to do with the Fenero Funds.

5    It's patently false.  He says things like he didn't remember

6    who the name of Irina Dilkinska was, one of the core

7    coconspirators at this trial.  Again, clearly false.

8    Supposedly, Irina Dilkinska was one of the investors who put in

9    hundreds of millions of dollars into his so-called investment

10   funds.  So, again, that's just further evidence that all the

11   way through the moment he was arrested, he was still in this

12   conspiracy.

13           Now I want to turn to some of the specific statements

14   that are at issue.  There's a series of statements, which are

15   primarily contained in text messages in June of 2018, which

16   show that there was a coordinated effort by some of the other

17   coconspirators, such as Irina Dilkinska, who, again, was one of

18   the core coconspirators from OneCoin, who was working directly

19   with the defendant to help launder the OneCoin proceeds and who

20   was still an employee of OneCoin in June 2018, as well as

21   another high-ranking member at OneCoin, they were communicating

22   directly with Mark Scott.  Irina Dilkinska says in one of the

23   statements that she is, quote, talking to Mark Scott.  He wants

24   to know what's up with Phoenix, so to help.  He says he may

25   help.

JASKCOC

1      To add context to that statement, Phoenix is an entity

2   that was controlled by another coconspirator named Amer

3   Abdulaziz.  And Mark Scott, during the conspiracy, sent nearly

4   approximately $200 million of OneCoin fraud proceeds to the

5   Phoenix investment fund, which was controlled by that

6   coconspirator.

7      So, again, this text message demonstrates Irina

8   Dilkinska, as of June of 2018, is talking to Mark Scott and

9   coordinating his assistance to help with the money that Mark

10  Scott had sent to Phoenix, which the folks at OneCoin had run

11  into some trouble getting that ultimately to the company.

12     Again, as part of that same text message exchange,

13  Dilkinska reported that Scott had stated it is better to let me

14  know what is going on.  We -- I think it should have said we

15  have, but it says:  "We are audits going on in BVI and will

16  submit to the financial commission."

17     Again, a deliberate effort to coordinate, to make sure

18  everyone is in the loop as to what's going on with respect to

19  these funds, which the trial evidence will clearly show were

20  being laundered and were proceeds from the OneCoin fraud

21  scheme.

22     So those text messages showed just the opposite of

23  withdrawal.  They show Scott being directly still involved in

24  that conspiracy.  He's actively working with OneCoin members to

25  help get the money back to the company, and he's asking that

JASKCOC

they keep him in the loop about things that are going on, so that he can make sure this audit that's coming up goes smoothly.

Then, about a week later, Irina Dilkinska gives an update about these conversations that she's having with Mark Scott, and says, "Can you tell FS," which stands for Frank Schneider, who is another key coconspirator, as the evidence will show at trial. She says:  "Can you tell Frank Schneider that Mark himself will try to push Phoenix to release funds, too?"  Again, this is clear evidence that Mark Scott is remaining actively involved and that he is making an effort to try to get the Phoenix entity, which had received approximately $200 million from OneCoin proceeds directly from Mark Scott's Fenero Funds to help get that money back to OneCoin.  And, again, that is in the summer of 2018, that's in June.

THE COURT:  What about the statement attributed to your cooperating witness that he or she was told prior to the summer of 2018 by Dilkinska and Ignatova that Scott was a money launderer?  Are you able to place more definitively in time that statement?

MR. FOLLY:  Your Honor, that statement -- my recollection is that statement takes place after that cooperating witness has risen to a position of prominence within the company, and it takes place prior to June 2018.  So it takes place during a time period when this cooperating

JASKCOC

witness was in a position of power at OneCoin.  And in addition

to that, it's before, clearly, as the evidence shows, there's

any indication whatsoever Mark Scott had withdrawn from this

conspiracy.  There's not a shred of evidence in the record he

ever withdrew from this conspiracy.

The last point connected to this string of text

messages is:  It's within this context of Irina Dilkinska

communicating with Mark Scott that the cooperating witness

receives an update from Frank Schneider, who alerts him about a

problem that they may have in communicating with Mark Scott and

in enlisting Mark Scott's help to get the money back from

Phoenix, and that problem, as you saw set out in the papers, is

that during law enforcement -- U.S. law enforcement

presentation, which identified Fenero, which identified key

coconspirators, such as Ruja Ignatova, Sebastian Greenwood, and

others, there was no mention of Mark Scott, and it makes Frank

Schneider concerned that Mark Scott may be a high-placed U.S.

informant.

THE COURT:  Can you explain to me what that is, that

law enforcement presentation?  Is that a press conference?

MR. FOLLY:  That was not a public presentation.

THE COURT:  It was not a public presentation?

MR. FOLLY:  No, your Honor, it was not.  It was a

private law enforcement to law enforcement presentation.

THE COURT:  And how did the coconspirators -- alleged

JASKCOC

1    coconspirators get a hold of it, if you know?

2             MR. FOLLY:  Your Honor, our understanding is that this

3    coconspirator has high-placed contacts with -- that have access

4    to confidential law enforcement information, and that was one

5    of his roles in the OneCoin conspiracy, was to provide

6    information to Ruja Ignatova and others about current and

7    confidential ongoing law enforcement investigations into those

8    coconspirators.

9             THE COURT:  Do you know when that presentation was

10   prepared?

11            MR. FOLLY:  I'm sorry?

12            THE COURT:  Do you know when it was prepared?

13            MR. FOLLY:  Just a moment?

14            (Counsel confer)

15            THE COURT:  It's not a major point.  I'm just trying

16   to see if I can work out some timeline.

17            MR. FOLLY:  Your Honor, what I just wanted to point

18   out is that the -- we don't believe it to be appropriate to

19   comment on the specific nature of what presentation that was,

20   but the message itself does specify that it was a presentation

21   that occurred in January of 2017.

22            THE COURT:  Okay.

23            MR. FOLLY:  Which, again, is right in the middle of

24   when Mark Scott is actively working in connection with this

25   conspiracy.

JASKCOC

1      So, it's in that context that Frank Schneider sends

2  this update about the ongoing efforts on behalf of Irina

3  Dilkinska and others at OneCoin to coordinate with Mark Scott

4  and is basically saying be very, very careful with anything

5  that you are doing right now with Mark Scott because he may

6  actually be a highly placed U.S. informant.

7      Just to zoom back out to the question we started with,

8  there's no question there was a conspiracy here.  There's no

9  question Scott joined it.  That's going to be clearly

10  established at trial.  There's also no question that these

11  statements were directly in furtherance of the conspiracy.

12  Again, the only question is whether Scott withdrew.  And this

13  evidence that's going to be presented at trial shows he

14  absolutely did not withdraw.  The only argument that he

15  withdrew is that he had, quote-unquote, returned the purported

16  investor money back to the investors.  But --

17      THE COURT:  When did that happen?

18      MR. FOLLY:  I think the bulk of the money was returned

19  probably in spring of 2017, the bulk of the money at that

20  point.

21      But, again, this completely -- this point about

22  returning the money -- first of all, he actually held onto

23  approximately a million dollars, which he was claiming he was

24  going to use in case there was any legal disputes connected to

25  the investments, so he hadn't returned all the money.  That's

JASKCOC

1   one point.

2          But the more important point is that after that point

3   in time, he is actively coordinating and working with members

4   of OneCoin to get fraud scheme proceeds from the same money

5   launderer he had sent additional fraud scheme proceeds to

6   directly back to the company.

7          THE COURT:  Talk to me, if you would, about the

8   postarrest Scott statements that you're looking to put in.

9          MR. FOLLY:  Again, the postarrest statement, there

10  were statements that were made by Irina Dilkinska to the

11  cooperating witness within days of Mark Scott's arrest, again,

12  that were clearly -- that conspiracy was ongoing.  The only

13  limited question there is whether Scott is still a part of it

14  or whether the conspiracy -- his participation ended just

15  because he was arrested.  His statements themselves in his

16  postarrest suggest he did the exact opposite of what the Second

17  Circuit requires, he lied to the authorities about numerous

18  connections to the very coconspirators at issue here.  He did

19  not make any sort of noisy withdrawal, as is required under the

20  law.  There's not a shred of evidence that he disavowed his

21  criminal association with this conspiracy, as the law requires.

22  Here, the evidence shows just the opposite; he deliberately

23  intends to cover up for Ruja Ignatova and Irina Dilkinska in

24  his postarrest statement.  So, again, we cited in our brief

25  cases that make it clear that just by nature of being arrested,

14

JASKCOC

1      it's not sufficient to show that you've withdrawn from a

2      conspiracy.  The Second Circuit case law on this is very, very

3      clear, and there's no evidence in this record that suggests

4      that the defendant can show, as is required here, that he

5      actually withdrew from this conspiracy.  And it's his burden.

6      The evidence we've proffered shows the opposite.

7                 THE COURT:  Assuming all that is true, how is

8      Ms. Dilkinska's statement that she was going to be the next one

9      to get arrested, and she didn't know what to do, et cetera, how

10     is that in furtherance of the conspiracy?

11                MR. FOLLY:  It's in furtherance of the conspiracy

12     because there is a direct threat that is presented through Mark

13     Scott's arrest to those coconspirators who are still in it,

14     including Dilkinska and the cooperating witness who she's

15     speaking with.  They are trying to figure out what should we do

16     now, how should we respond to this, how do we make sure this

17     threat doesn't come to our doorstep, what do we do as to

18     certain records that are tied to Mark Scott, should we be

19     destroying them.  That is one of the proposals that is proposed

20     by Irina Dilkinska in response to this incident.

21                So, all of those things suggest that this is a

22     deliberate attempt to cover up the conspiracy, and that is what

23     the law makes clear are the types of statements that are in

24     furtherance of the conspiracy.

25                THE COURT:  So let me ask you about that.  What

JASKCOC

conspiracy are you talking about?

MR. FOLLY:  Your Honor, this is directly connected to all the charged conspiracies as well as the uncharged wire fraud conspiracy.  And that might be a good place for us to turn next, is Mark Scott's involvement in that conspiracy.

Your Honor, just to reemphasize this point, which I think is clear in our briefs, is that Irina Dilkinska is a key coconspirator that Mark Scott communicates with on a regular basis through the entire conspiracy.  At trial, there's going to be numerous emails showing their tight relationship with each other and their coordinated actions as to the charged conspiracies on trial in this case.

The other conspiracy, the uncharged wire fraud conspiracy, again, all the government needs to show there is that by a preponderance of the evidence, Mark Scott was a member of that conspiracy.  And there's numerous pieces of evidence that demonstrate that.

First and foremost, the evidence at trial will show that OneCoin, in order to continue its operation as a criminal enterprise, relied on money launderers just like Mark Scott. They had banking issues very early on in their existence, where, because of the information in the public domain suggesting OneCoin was a fraud scheme, banks would not continue to process money that was coming from OneCoin investors into those accounts, and once banks caught wind that that's where

1    the money was coming from, they would shut it down.

2            So the solution to that problem was a network of money

3    launderers, which included the defendant.  They -- when they

4    were receiving OneCoin deposits from the investors into bank

5    accounts, those bank accounts were not OneCoin bank accounts;

6    they relied on third-party companies, such as IMS, which was a

7    company that received a large portion of OneCoin investor money

8    and then sent that money directly to Mark Scott's accounts, so

9    that he could launder it and get it back out the other side.

10           So the conspiracy, the wire fraud conspiracy, could

11   not operate without this money laundering network.  There was

12   no way for them to function because they could not bank, they

13   could not get investor money back to the company to pay for

14   basic operations, to pay for the coconspirators' employment at

15   OneCoin --

16           THE COURT:  Well, let me ask you this:  Are you

17   proving too much by proving that he was a member of this

18   uncharged conspiracy?  Why can't you just get these statements

19   in on the basis of the charged conspiracies?

20           MR. FOLLY:  Your Honor, some of these statements, on

21   their face -- there is an argument that they are also in

22   furtherance of the money laundering conspiracy, but some of

23   these statements, early on, are between key coconspirators like

24   Ruja Ignatova and Sebastian Greenwood.  They are the emails

25   that they were sending to each other as they were basically

JASKCOC

1    designing this fraud scheme.  It's some of the most core

2    evidence of the existence of the fraud scheme.

3              THE COURT:  Let me hear from the defense.

4              MR. FOLLY:  Yes.

5              MR. DEVLIN-BROWN:  Thank you, your Honor.  Unless your

6    Honor prefers otherwise, I could start, please, with the

7    uncharged conspiracy issue?

8              THE COURT:  Sure.

9              MR. DEVLIN-BROWN:  That issue is very troubling for

10   the defense, because, obviously, Mr. Scott was not charged with

11   that crime.  There's never been any indication by any

12   proceeding before the most recent motion that he's alleged to

13   be an unindicted coconspirator.  And all the government has

14   said, both in their filing and today in court, is the

15   conspiracy needed money launderers, and, therefore, Mr. Scott

16   is part of the wire fraud conspiracy.  To be part of the wire

17   fraud conspiracy, your Honor, you need to have an agreement

18   about the purpose of the conspiracy.  And the wire fraud

19   alleged here is a scheme to rip off investors in OneCoin by

20   selling them a reported cryptocurrency that actually doesn't

21   have a blockchain that isn't mined based on various

22   misrepresentations.  They've offered no evidence whatsoever,

23   even today, that Mr. Scott was ever part of any conspiratorial

24   agreement to do that.  And, obviously, they've said they won't

25   argue it to the jury, but it's a deeply troubling notion that

JASKCOC

1   they would suggest that.

2          THE COURT:  The government is correct, though, is it

3   not, that he doesn't need to be charged with a conspiracy -- a

4   particular conspiracy in order for coconspirator statements to

5   be allowed in under the rule?

6          MR. DEVLIN-BROWN:  Well, if the coconspirator

7   statements -- he's charged with a bank fraud and money

8   laundering conspiracy.  So if your Honor were to conclude that

9   by a preponderance of the evidence, he was a member of those

10  conspiracies for some period, and the particular coconspirator

11  statements that the government seems to be referring to now

12  between Ruja Ignatova and Greenwood were in furtherance of the

13  bank fraud or money laundering conspiracy, that would be -- if

14  they were in furtherance, yes, those could be admitted.  That

15  would not be a barrier.

16         The government didn't brief that issue really.  We did

17  attach one of the communications between Greenwood and Ruja

18  Ignatova.  It's a year before anyone's even met Mr. Scott, and

19  there is no indication that they're talking about banking or

20  issues like that there.  So I think you'd have to look at that

21  on a case-by-case basis.

22         THE COURT:  Okay.

23         MR. DEVLIN-BROWN:  So let me go, if you would, to the

24  coconspirator statements that the government is seeking to

25  introduce through its cooperating witness.  The government's

JASKCOC

1    correct, of course, that Rule 803 provides substantial opening

2    for the government for coconspirator statements, but that's not

3    the only issue when the Court is evaluating whether a statement

4    should be admissible.  There's relevance, there's the degree of

5    reliability, and other factors.

6             And that's why I think -- I'll go through each of the

7    statements, but I do want to step back for one moment.  All of

8    the statements the government seeks to offer through its

9    cooperating witness are through a witness who has met Mr. Scott

10   once in passing, who never interacted with Mr. Scott at all,

11   except when acting as Ruja Ignatova's personal assistant to set

12   travel reservations, and that's because this fellow didn't have

13   any role in -- he's not even accused of having any role in the

14   OneCoin operations until the summer of 2016 and doesn't take on

15   the more substantial role until well after Ruja Ignatova, in

16   October 2017, has gone missing.

17            So, these are all statements -- someone who has no

18   idea, really, about Mr. Scott, never dealt with him in any

19   coconspirator way, he's going to testify that this other woman,

20   Irina, said these statements to him.  So there's questions

21   about reliability sort of right there.  They're all multiple

22   levels of hearsay.

23            And I can go through --

24            THE COURT:  But the rule also does not require that

25   the cooperating witness even know Mr. Scott, and he, in fact,

JASKCOC

1   did meet him, but even if he never met Mr. Scott, that would

2   not be an obstacle to the government's use of that testimony.

3        MR. DEVLIN-BROWN:  Sure.  But it does still have to be

4   in furtherance of the conspiracy.  So when you're talking about

5   a cooperating witness who, prior to June 2016, played no role

6   in the conspiracy, he had a completely different job, and then

7   had a very limited role, not dealing with banking, not dealing

8   with anything like that, you have to question whether

9   statements made to him by this person are really in furtherance

10  of the conspiracy.

11       If I can just start with the statements prior to the

12  summer of 2018, that's the first category of statements the

13  government talks about, we've tried to break them down in our

14  brief, your Honor, but that's a statement that I think is a

15  perfect example because the government doesn't put a time in.

16  They say there's a statement prior to the summer of 2018 where

17  their witness was supposedly told by Dilkinska and Ignatova --

18  I'm going to practice this before trial, your Honor -- that,

19  quote, in sum and substance, Scott was a money launderer who

20  was brought into the OneCoin scheme by Armenta.  So there's

21  just not enough for the Court to go on, no date, no context.

22  Is that just gossip that he heard, your Honor, or is it told to

23  him for some conspiratorial purpose?  And if we don't even know

24  when it was said -- and I would submit further, we have no idea

25  what was said.  And this is a problem throughout the

JASKCOC

1    government's motion and why it's a bit of a moving target.  The

2    government has introduced this statement as, in sum and

3    substance, Scott was a money launderer who was brought into the

4    OneCoin scheme by Armenta.  None of their witnesses talked like

5    that in real life, as far as we can tell.

6            Looking at the 3500, it appears that the statement

7    was -- and we cite this in our brief -- Mark Scott one time

8    heard he was one of Armenta's people, he was working for or

9    with Armenta.  Ruja and Irina told him that.  So did Mya, a

10   woman from the Dubai office.

11           THE COURT:  But these are obviously oral statements

12   that were made some years ago, and some people say it

13   differently two years, three years down the line as to what

14   precisely what was said.

15           MR. DEVLIN-BROWN:  But there's no indication at trial

16   that this witness would say the words that the government just

17   put into his mouth, that he was brought into the scheme as a

18   money launderer.  There's just no indication of that.

19           But, anyway, our position, really, with this

20   pre-June 2018 statement is there's no indication of when it was

21   told to him, for what purpose it was told to him.  The witness

22   appears to have no real specific memories of that.  So to offer

23   that without context, the Court can't really conclude it was

24   made in the context and for the purpose of furthering the

25   conspiracy.

JASKCOC

1          Let me move to the statements in June of 2018, your

2    Honor.  That's the next category of statements.  And this is

3    where the government has alleged that, essentially, Irina was,

4    in some way, working with Mr. Scott again and filling the

5    cooperating witness in on that.

6          It's just not true, for one thing.  That was not the

7    case at all.  And the government has lots of other evidence in

8    this case, including lots of emails during this period.  That's

9    just not true.  Mr. Scott did, in fact, return the bulk of the

10   money to the investors by March or April of 2017.  By that

11   summer, all he had was this legal reserve.  And there are

12   almost no communications with Irina at all from the summer of

13   2017.  Really, there may be one or two in the summer of 2018,

14   but they basically had stopped their relationship.

15         If you look at the statements the government wants to

16   offer, they don't actually show that Mr. Scott was agreeing in

17   any way to help out with anything in the conspiracy.

18         THE COURT:  Well, except he kept a million dollars of

19   potential future legal fees, correct?

20         MR. DEVLIN-BROWN:  He did keep a reserve when he

21   severed the relationship with the investors in his fund, and as

22   time went on, your Honor, he did, frankly, have more concerns

23   about whether he was going to need to keep that money, given

24   news reporting after he had left the relationship.

25         THE COURT:  So to put it in terms the government might

1    use:  He continued to hold out the possibility that he would

2    continue to do work in furtherance of the conspiracy?

3              MR. DEVLIN-BROWN:  No.  It would be that -- this is an

4    adversarial relationship at this point, your Honor.  When

5    business partners break up, for example, there might be money

6    held in escrow for disputes that may arise.

7              THE COURT:  Is there evidence that the business

8    partners broke up?

9              MR. DEVLIN-BROWN:  Yes.  The evidence is that he had

10   communications with his investors, including Irina, to return

11   all of the funds, save for 1.25 million euro legal reserve,

12   which he explained the reason he needed to keep that, to see

13   whether there would be problems that would require him to spend

14   money, he wanted to have that available.

15             So, looking at the statements the government has

16   offered in June 2018, it's true, there is an email that says --

17   or text message chain, talking to Mr. Scott, he wants to know

18   what's up with Phoenix so to help.  That's what Irina texts the

19   CW.  But then in the very same chain, rather than quoting this

20   offer to help, she writes:  "This is his last message just now.

21   It's better that we know what is going on.  We have our audits

22   going on in BVI, and we will submit to the financial

23   commission."

24             So that doesn't sound like an offer to help.  It

25   sounds like an offer for Mr. Scott to have some understanding

JASKCOC

1      as to what may still be going on because he has a legal reserve

2      pending.

3             And what further proves that, your Honor, if you look

4      at the rest of the text chain and the other evidence in that

5      period, Mr. Scott doesn't do anything to help.  And, in fact,

6      one reason he doesn't, and one piece of evidence showing how

7      estranged he is from these alleged coconspirators, is that this

8      individual, Frank Schneider, the supposed investigator for the

9      scheme, warns Irina and the cooperating witness not to have

10     dealings with Mr. Scott because they believe erroneously that

11     he could be a cooperating witness.  That shows how far apart

12     the relationship is at that point.  And it adds another problem

13     with that statement, your Honor:  I don't think it's

14     appropriate for the jury to hear a statement that is abjectly

15     false.  He was not a cooperating witness during this period.

16            THE COURT:  But the government is not putting that in

17     for its truth, obviously, since he was not cooperating with the

18     government.  Isn't that statement, strictly speaking, very much

19     in furtherance of the conspiracy?

20            MR. DEVLIN-BROWN:  It may be in furtherance of the

21     conspiracy -- of whatever conspiracy is existing with the

22     remaining members expressing their concern about Mr. Scott, who

23     has not had any involvement with them for over a year.

24            THE COURT:  But, I mean, in giving your understanding

25     of case law, assuming that there is no evidence or assuming

JASKCOC

1    that I determine that he had not withdrawn from the conspiracy

2    at this point, it's admissible against him.

3            MR. DEVLIN-BROWN:  Yes, if your Honor were to

4    determine that.  And maybe let me pivot, then, to the third set

5    of statements, because it's a fact-specific inquiry when

6    someone leaves a conspiracy, and, frankly, the case law doesn't

7    always provide very clear guidance.  But the way you heard the

8    government characterize it, they could have a statement someone

9    says tomorrow about Mr. Scott that he's apparently still a

10   member of the conspiracy.  When does it exactly end, your

11   Honor?  He is arrested.  That should certainly be a point when

12   it ends.  Even if not always, when you consider that he had

13   returned all the money except for the legal reserve some 18

14   months earlier, that he had almost no communication with his

15   alleged coconspirators since that summer, when they talked

16   about enlisting his help and declined to do so.  So I think the

17   arrest at that point -- there's no allegation that he did

18   anything to further the conspiracy, that he sent anything to

19   the conspirators, that he made plans with any of them.

20           THE COURT:  Yes, but that's not the test, though,

21   right?  The test doesn't look to what he was doing, assuming

22   that he had withdrawn; the test looks to whether the statements

23   were in furtherance of the conspiracy or in furtherance of

24   covering up an historical conspiracy, right?  So what Mr. Scott

25   was doing, necessarily, is not probative.

JASKCOC

1        MR. DEVLIN-BROWN:  Right, but Mr. Scott was no longer

2   involved in the conspiracy -- any conspiracy at that point.

3   That's our position, your Honor.

4        THE COURT:  Okay.  I understand your position, and I

5   am going to grant the government's motion to use these

6   statements as statements in furtherance of the conspiracy.

7   Even without any greater detail with respect to the statement

8   that was made to the cooperating witness prior to the summer of

9   2018, it's clear that the conspiracy had started and that he

10  was described -- "he" being Mr. Scott -- as an individual who

11  was assisting the conspiracy with money laundering services.

12  Again, the particular language that was used, we'll see how it

13  plays out at trial, but, certainly, it does appear to me,

14  certainly to a preponderance, that these comments were in

15  furtherance of the conspiracy.

16        Moreover, I do find that nothing has been presented

17  here today that indicates to me that Mr. Scott withdrew from

18  the conspiracy in the manner that the case law requires, you

19  know, some more affirmative step to indicate that he was

20  disavowing the objectives of the conspiracy.  The comments that

21  have been put before me show that as late as the summer of

22  2018, he was still offering to help assist with the

23  conspirators.  And the fact that he was arrested, while an

24  interesting factoid, does, also, not affect the analysis that

25  comments made, in particular by Ms. Dilkinska, indicating what

JASKCOC

1    they should do in the face of Mr. Scott's arrest in order to

2    continue to cover up the conspiracy, et cetera, will be

3    admitted.

4              Next issue.  Shall we turn to the experts?

5              MR. FOLLY:  Your Honor, just on that last set of

6    issues with respect to the coconspirators statements:  What is

7    your Honor's ruling at this time as to the wire fraud, the

8    statements connected to the wire fraud conspiracy, the

9    uncharged wire fraud conspiracy?

10             THE COURT:  I think the case law is clear that the

11   particular conspiracy does not have to be alleged so long as I

12   find by a preponderance, I believe, that the conspiracy did

13   exist and that the statements were made in furtherance of the

14   conspiracy.  From my perspective, with respect to this issue,

15   whether it's the wire fraud conspiracy or the money laundering

16   conspiracy, it's all of a piece.  There was a scheme to defraud

17   individuals by investing in this cryptocurrency.  That scheme

18   involved several activities, including the use of the wires,

19   including the laundering of the proceeds, including the use of

20   banks to launder the proceeds.  So, clearly, from my

21   perspective, if the government is able to prove the money

22   laundering and bank fraud conspiracies, then the wire fraud

23   conspiracy is comfortably encompassed within those.

24             Next?

25             MR. DiMASE:  Your Honor, I think you had mentioned

JASKCOC

1    experts.  I think you're referring to the defense experts?

2                THE COURT:  Both, actually.  So the government wants

3    to use an expert on money laundering?

4                MR. DiMASE:  Yes, your Honor, the government noticed

5    an expert on money laundering.  As indicated in its briefing,

6    provided substantial information regarding the expected

7    testimony of that witness, including a number of transcripts of

8    his prior testimony.

9                The circuit and the Supreme Court are clear that there

10   isn't a particular type of expertise that is required for

11   somebody to be designated an expert.  Anything that might help

12   a lay juror understand a complex area can fit within the

13   confines of expert testimony.

14               As the government made clear in its motion, first of

15   all, Mr. Semesky has substantial experience as an expert in

16   this area.  He served for decades as a federal law enforcement

17   officer working on money laundering matters.  He's testified in

18   upwards of 50 trials as an expert in the area of the means and

19   methods of money laundering.  And the bottom line is that the

20   means and methods of money laundering, particularly in a white

21   collar case involving the use of such things as shell

22   companies, papering, in other words, using complex financial

23   agreements to cover the movement of criminal proceeds, layering

24   through a series of bank accounts located at different

25   financial institutions, those means and methods of money

JASKCOC

1   laundering are not within the ken of the average juror, and the

2   way that money laundering generally works is not within the ken

3   of the average juror, particularly in the white collar space.

4          As we made clear, your Honor, Mr. Semesky is not going

5   to be testifying as to any specific opinion regarding whether

6   Mr. Scott's conduct constitutes money laundering.  He would

7   simply be testifying about how -- the means and methods of

8   money laundering, particularly in the area of white collar

9   cases, and we laid out some examples of what we expect that

10  testimony to look like.

11         The Second Circuit has repeatedly upheld the

12  admissibility of such testimony, and, in point of fact,

13  Mr. Semesky's testimony itself has been upheld by the circuit

14  in a case involving money laundering, and by a number of other

15  circuits as well, so we think that the use of money laundering

16  expert in this trial, given these complicated issues of fact,

17  and the fact that this area in general is outside of the ken of

18  the jury, is appropriate, and that the testimony of that expert

19  should be admitted in this trial here.

20         THE COURT:  I agree that this expert's testimony is

21  appropriate and should be before the jury; however,

22  Mr. Devlin-Brown, if you wish, I'll give you an opportunity to

23  make a record.

24         MR. DEVLIN-BROWN:  We stand by the position in our

25  papers, your Honor.  It's not an objection to Mr. Semesky

personally.  We recognize that it's permitted in some cases.
We just don't think it's necessary here.

THE COURT:  Let me talk about your expert while you're
standing up, the expert on cryptocurrency.  For many of the
reasons that Mr. DiMase just described, I think that expert
would also be appropriate.  On any number of occasions, I've
had people smarter than me try to explain to me what blockchain
is and what cryptocurrency is and have not met with much
success in my understanding.  I hope to do so during this
trial.  So I do believe that the expert you propose appears to
be qualified to do that.  The timing issues concerning
disclosure notwithstanding, I will grant defense the ability to
use that expert, over the government's objection.

Now, with respect to the other expert, however, am I
to understand that you still have not identified someone who
would be able to testify in connection with the legal ethics?

MR. DEVLIN-BROWN:  We have identified a likely
candidate, your Honor.  The individual doesn't wish that we
name him unless we have some indication as to whether this
would be permitted or not.  And, frankly, Mr. Scott has
financial considerations, so we don't want to hire someone
without knowing whether testimony along these lines would be
accepted or not.

Our reasoning for it, if I could just briefly explain
that, is that, as we understand it, a lot of the government's

argument and evidence will be that, although Mr. Scott revealed

certain things about investors in the Fenero Funds, including

the companies that directly invested with him, he did not share

details about his awareness of the ties to those companies and

Ruja Ignatova, who ran OneCoin.  And I think the evidence will

be clear that Ruja Ignatova and companies associated with her

were legal clients of Mr. Scott both at Locke Lord and after he

left Locke Lord.

          THE COURT:  But, as I understand it -- and correct me

if I am wrong -- the omissions allegedly made by Mr. Scott were

precisely in connection with the requirement that banks and

other financial institutions do due diligence to establish

those connections, because that's what determines whether or

not something is going to be determined to be legitimate or

poses a huge red flag.  Are you suggesting that you're going to

have someone come in here and say that, well, sure, these

financial institutions have these legal obligations, but they

have to take a back seat to a lawyer's obligation to keep

certain information about their clients secret?  Is that what

you propose?

          MR. DEVLIN-BROWN:  So an expert would not testify to

that, of course, your Honor.  An expert, though, would testify

that while Mr. Scott, as an attorney, could not lie on behalf

of a client, ever, if it's not a lie, he has a duty of loyalty

to the client even when he's representing the client in a

JASKCOC

1    nonlegal transaction, provided it's a current client, under

2    Rule 1.6 of the Rules of Professional Conduct, not to do

3    anything that's adverse to that client's interests, including

4    causing embarrassment, causing unwanted attention.  So that's

5    what an expert would testify to, as to an obligation Mr. Scott

6    had as an attorney, which wouldn't excuse any lies, or

7    deliberate fault statements, or half truths, but it would

8    explain his state of mind as to whether he was not going beyond

9    that, because, as the government will argue, he knew that the

10   money he was taking was criminal or not going beyond that

11   because he had certain obligations as an attorney.

12           THE COURT:  Okay.

13           MS. LOZANO:  Initially, the government objects to this

14   expert because there is absolutely no way for this Court to

15   evaluate the propriety of this testimony because we have no

16   name, we have no bases for the opinion, and we have no opinion.

17   So we really -- there is nothing for the Court to evaluate in

18   terms of what issue at trial this expert would provide

19   testimony about.  So the notice is deficient, and the

20   government objects, initially, on that basis.

21           Secondly, the government objects because this

22   testimony appears to suggest that somehow their withholding

23   information that is required to be provided to financial

24   institutions and fund administrators is somehow a legal

25   defense.  And there's no authority on that.  There is no

JASKCOC

authority, and, in fact, the professional rules of
responsibility that counsel cites specifically prohibit
attorneys from hiding behind the duty in providing false
information or lying.  So they're not allowed to lie or provide
false information.  And, in fact, what is important here are
the facts, which is why we need to know what this expert is
going -- a proffer about what he or she is going to testify to.
Because what we have here is not simply Mr. Scott declining to
provide further information and providing truthful information,
in the first instance.  In fact, what he is doing, and what the
allegations are, and what the evidence will show is that he is
intentionally misleading; he is providing information about
entities that are shell companies and individuals that are
nominees for companies that aren't actually the investors.
This money was Ruja's money, it was OneCoin's money, and any
statements by the defendant that the money belonged to Irina or
that the money belonged to IMS are simply not true.  And the
professional rules of responsibility would not allow and permit
an attorney to make such false statements.

          So, given what counsel has said, it does not appear
that this evidence is going to be directly relevant to any
issue at trial, because we are talking about deliberately
misleading and providing false information, not withholding
confidential information that may embarrass a client.  And for
that reason, the testimony absolutely risks misleading the

JASKCOC

1    jury.  And there is no basis in law or in fact for the Court to

2    admit it because we don't actually know what the testimony is

3    going to be.

4              THE COURT:  Okay.  The motion to admit the unknown

5    testimony of the unknown expert is denied.

6              Just to be clear, Mr. Devlin-Brown, with respect to

7    your cryptocurrency expert, I assume that, like the

8    government's expert, he will be testifying generally as to what

9    cryptocurrency is and will not be providing an opinion as to

10   whether or not OneCoin, whatever it is, is an appropriate

11   example of cryptocurrency, correct?

12             MR. DEVLIN-BROWN:  That's absolutely right, your

13   Honor.

14             THE COURT:  Okay.

15             MS. LOZANO:  Your Honor, if I may, the government

16   would like to make a record of its objection specifically to

17   that point and the notice that the defense gave, which includes

18   a number 3, that describes the testimony as explaining the

19   challenges in the relevant time period in identifying which

20   cryptocurrencies are legitimate and which are not.  That is

21   precisely what experts should not be testifying to, because

22   from that testimony, it risks the jury interpreting that

23   testimony and concluding whether OneCoin was legitimate or not

24   and whether the representations that it made were false or not.

25   And that is invading the province of the jury.

JASKCOC

1          THE COURT:  Okay.

2          MR. DEVLIN-BROWN:  On the third point, just to give

3     your Honor some greater clarity, it's not that the expert would

4     sort of say, in a conclusory way, it's impossible to tell, you

5     know, the good from the bad.  What the expert would explain is

6     how you had some -- I'm not an expert either, so you'll have to

7     forgive me if the actual expert is more clear, but the expert

8     would explain that you had some early cryptocurrencies, like

9     Bitcoin, that took off, the whole concept became very popular,

10    the regulations around the world took some time to catch up to

11    that.  So you had a period of time, which we may still be in,

12    your Honor, where there was a proliferation of

13    cryptocurrencies, and it was difficult for someone to determine

14    whether they were good or not because there were very limited

15    regulations in the space.  That would really be the nature of

16    it.

17          THE COURT:  Okay.  Very well.

18          Let's turn now to the motion in limine concerning

19    Mr. Scott's possession of a loaded semiautomatic handgun at the

20    time of his arrest.  I will give the government an opportunity

21    to make its record, but that evidence is not coming in.  Given

22    that the nature of this case, as I understand it, that evidence

23    inserts a level of violence and thuggery that I believe is not

24    appropriate on the facts of this case, but I will let whoever

25    one of you wants to make a record make a record.

JASKCOC

1          MR. FOLLY:  Your Honor, we'll rest on what was in our

2     submission.

3          THE COURT:  Very well.

4          Next:  The government's motion concerning that the

5     defendant shall be precluded from offering any evidence for the

6     purpose of establishing its state of mind absent proof that he

7     was aware of such evidence during the relevant time period, is

8     there specific information that the parties are aware of that

9     someone is going to try to put in?

10         MR. DiMASE:  Your Honor, first of all, I think the

11    parties largely agree on this point.  I think that the defense

12    concedes, on page 13 of their response, that the government's

13    legally correct that evidence that the defendant was not aware

14    of cannot be introduced to show a state of mind.  So I don't

15    know that there's a particular dispute to be resolved here.

16         THE COURT:  There's the flip side of that dispute,

17    which is --

18         MR. DiMASE:  Yes.  And that, we are prepared to talk

19    about.

20         THE COURT:  Okay.

21         MR. DiMASE:  But just as far as some potential areas

22    where this first issue may arise, one is obviously audit

23    reports or legal opinions that somebody has access to, but that

24    Mr. Scott never saw, that would be one example.

25         THE COURT:  Okay.

JASKCOC

1          MR. DiMASE:  We asked counsel to provide us with any

2     such records they intended to rely on at trial, and we were

3     told in response that they were not prepared to give those

4     materials to us at the time we asked.  Their exhibits are due

5     today, so to the extent that there are any there that raise

6     concerns, we can obviously bring those to the Court's

7     attention.

8          Another area is this generic concept that merely

9     because some third-party business conducts business with

10    OneCoin after doing some form of diligence on OneCoin, that

11    that somehow shows that Mr. Scott had a particular state of

12    mind.  And that is troubling because, as we note in our motion,

13    third parties can do whatever level of due diligence they want,

14    and it's a subjective determination whether, after doing that

15    diligence and learning whatever they learn, that they want to

16    continue engaging in business.  Unless Mr. Scott is part of

17    that due diligence process and is learning the same facts, and

18    he can show that, it doesn't seem to us that what some third

19    party decides to do in terms of business of OneCoin is relevant

20    to his state of mind.  So that's another area where we have

21    raised some level of concern that this issue may sprout up.

22         THE COURT:  Okay.

23         MR. DiMASE:  The second piece category that we

24    discussed here on the flip side was that it's not offered for

25    its truth, but is offered to show the defendant's state of

JASKCOC

<pre>
 1   mind.  I don't think there's a dispute on this either, but to

 2   give the Court an example:  Some service provider writes

 3   Mr. Scott and says, we are not satisfied with your due

 4   diligence responses to our questions, or you failed to provide

 5   us these documents, or we have concerns about your funds, and

 6   we're terminating business with you going forward, and the

 7   government's position is, those communications with Mr. Scott

 8   are offered for the purpose of showing his state of mind, that

 9   he understood that other parties around the world who were

10   directly interacting with him terminated their business with

11   him because of red flag concerns about the funds, failure to

12   provide due diligence, responses, things of that nature.  I

13   don't think there's any real dispute on that issue based on

14   what the defense wrote in its brief.

15         The third issue, I think, centers around a motion made

16   by the defense regarding the testimony of Mr. Hatley, and

17   Mr. Folly is prepared to address that issue.

18         THE COURT:  This is the gentleman who said that he had

19   done some research on OneCoin and decided not to invest?

20         MR. DiMASE:  Right.  There's one particular attempted

21   victim, we'll call the person, who we would plan to call, and

22   Mr. Folly is prepared to address that.

23         THE COURT:  Okay.

24         MR. FOLLY:  Your Honor, that's correct, your

25   characterization of who that witness is.  And the main argument
</pre>

JASKCOC

1    and the main reason that that witness' testimony is admissible

2    at trial is it's direct evidence of the fraud scheme.  It shows

3    the fraud scheme in action.

4            This particular victim was -- or attempted victim was

5    recruited to join the fraud scheme by someone who had recruited

6    numerous other individuals to invest in OneCoin.  This was in

7    the fall of 2015, the same time period the defendant joined the

8    conspiracies.  And this witness, after doing his own research,

9    ultimately decided not to invest in OneCoin.

10           At trial, we intend to introduce a very limited set of

11   witness testimony.  At present, we're intending to introduce

12   the testimony of three victims/attempted victims of the OneCoin

13   fraud scheme.  This testimony is limited in nature.  And the

14   purpose of it is to establish and show the OneCoin fraud scheme

15   in action.

16           THE COURT:  What does that gentleman do?

17           MR. FOLLY:  I'm sorry?

18           THE COURT:  The gentleman, the attempted victim, as

19   you're describing, what does he do?

20           MR. FOLLY:  His profession?

21           THE COURT:  Yes.  Because here is my concern:  My

22   concern is you're saying, well, this is just part of the

23   scheme, but what I think the argument will be, or what I think

24   the jury will take from that, is that if this guy, whoever he

25   is, conducts ten or fifteen minutes' worth of research and is

JASKCOC

1    able to see right through this, then certainly Mr. Scott, who

2    was a sophisticated international transactional lawyer, should

3    certainly have known at least as much as that guy, right?

4    Isn't that what this is about?

5          MR. FOLLY:  Your Honor, that's not what this is about.

6    It's about having an additional victim explain how the fraud

7    scheme worked in action.  As I mentioned, there's only going to

8    be three such witnesses at trial.  We're not putting on ten

9    witnesses here to show how this fraud scheme worked in action.

10         Any concern on that front, I think, could be

11   appropriately solved through a limiting instruction to the jury

12   which says that this particular witness' conclusion about

13   OneCoin is not to be considered by you as to what the defendant

14   on trial knew or did not know about OneCoin's fraudulent

15   nature.

16         THE COURT:  Mr. Devlin-Brown or Mr. Garvin?

17         MR. GARVIN:  Good afternoon, your Honor.

18         THE COURT:  Good afternoon.

19         MR. GARVIN:  Your Honor, I think the Court has zeroed

20   in on the concern of the defense, and, that is that Mr. Hatley

21   purports that he spent as little as 30 minutes and was able to

22   determine that OneCoin was a scheme to defraud, and that the

23   implication from that is that Mr. Scott must have known it was

24   a fraud because Mr. Hatley was able to figure it out in what he

25   described as 30 minutes of research.

JASKCOC

1          Your Honor, the prejudicial effect of that is

2     staggering, and I think the Court recognizes that.  There

3     should be evidence as to what Mr. Scott did in this case, not

4     what a complete stranger did in this case.

5          I would also note that in the fall of 2015, when

6     Mr. Hatley is doing the things that he's doing and deciding

7     whether or not to join OneCoin, Mr. Scott has not even met Ruja

8     Ignatova at that point, and could not have possibly been a part

9     of any conspiracy at that point.

10          Your Honor, as the government has just said, that they

11     have many other witnesses in this same area, including at least

12     two, if not three, other alleged victims.  What Mr. Hatley

13     brings to the table, other than what the Court has questioned,

14     is duplicitous, at best.  We would respectfully suggest that

15     Mr. Hatley not be permitted to say that in a matter of 30

16     minutes of research, he was able to determine that OneCoin was

17     a fraud.

18          Now, if the government is true to their representation

19     that that is not their purpose, if they want to put Mr. Hatley

20     on to say he was approached, of course, we would have no

21     objection to that, but that's not what this is really about.

22     This is really about the fact that he's -- at the end of the

23     day, he's going to say that if he could have found in such a

24     short period of time that it was a scheme to defraud, then

25     Mr. Scott should have.

1          So, for those reasons, we would ask the Court to deny

2     Mr. Hatley or prevent Mr. Hatley from doing that.

3          THE COURT:  Okay.  Yes, I'm going to -- Mr. Folly?

4          MR. FOLLY:  Yes, just very, very briefly, just three

5     quick points in response.

6          One is we have an obligation to meet the elements of

7     the crime in this case.  This is direct evidence on one of

8     those elements.  Mr. Garvin, maybe he's a little off on the

9     timing.  Scott was recruited into this conspiracy in September

10    of the same year that this witness' testimony took place.

11         But the last point, your Honor, is that there will be

12    direct evidence at this trial that the defendant was in

13    possession of information that was very similar to this same

14    witness.  So it's not a situation in which, absent this

15    witness' testimony, the jury is not going to be presented with

16    that type of evidence in this case.  So we believe this is

17    direct evidence.  There's nothing particularly prejudicial

18    about it, other than that it helps show that this was a fraud

19    scheme, and that on that basis, it should be allowed at trial.

20         THE COURT:  I'm going to keep it out on all three

21    grounds.  I think it's cumulative.  Look, if you want to put on

22    another actual victim or another two actual victims, go ahead

23    and do that, but I think, on 403 grounds, this comes very close

24    to putting information before the jury that is likely to

25    mislead the jury or cause confusion as to what the government

JASKCOC

needs to prove or what the evidence is.

        Again, I'm not going to prevent you from putting on
actual victims, or some reasonable number, but this is just too
close for comfort for me in my discretion, and I will keep it
out under 403.

        Next.  I think we've taken care of the government's
motions, correct?

        MR. DiMASE:  Yes.  The only remaining motion the
government made was regarding 3505, which I think is not ripe
for any Court intervention at this stage, and then several
arguments about certain personal information regarding the
defendant and evidence regarding the defendant that should not
be admitted, which I don't think are controversial or opposed
by the defense.  So you're right, your Honor, that there are
several additional issues raised by the defendant.

        THE COURT:  So let's first get to those.  The first
one is, I think -- and these are a little easier -- as to
whether the government will be allowed to refer to victims as
victims.  So let's deal with that.

        Mr. Devlin-Brown, why shouldn't the government be
allowed to call a victim a victim?

        MR. DEVLIN-BROWN:  Well, your Honor, the government
does point to a number of cases where that's been permitted,
but I think the big difference here -- and I haven't had an
opportunity to check all of the government's cases, but the big

difference here is that Mr. Scott is not accused of any crime

in which these people could be victims.  They're victims, if

they're victims, of a wire fraud scheme of which Mr. Scott is

not accused of, and that sort of motivates a bunch of our

motions, your Honor.  I think there's a real risk of danger

that a jury is going to -- it's a natural point of feeling for

victims who lost their money.

THE COURT:  But isn't an element of the money

laundering offense, the money laundering conspiracy, that there

be some underlying enumerated felony?

MR. DEVLIN-BROWN:  Yeah.  The government certainly has

to prove that there was a wire fraud, and that's why we

understand they're going to put on witnesses who say they saw

these materials and they invested.  They're going to put on

other evidence that the representations were false.  They have

to prove that.

With respect to Mr. Scott and the money laundering

scheme, as your Honor probably knows, the state of mind for

someone accused of money laundering isn't that they

participated in the actual scheme or knew exactly what it was,

or a wire fraud; they just have to know that the money is

criminal in origin.  So since he has not been charged with the

wire fraud scheme, there's just a danger in the jury hearing

victims and thinking they could be victims of Mr. Scott's.

And, legally, they're not victims of Mr. Scott's.  There's no

JASKCOC

conceivable way in which they could be.  Money laundering for

restitution, for other purposes, does not have victims, at

least not victims of an underlying crime, as far as I know.

The only victims conceivably, I guess, could be for the bank

fraud count.  Banks, under some theories of bank fraud, that

were insured by the FDIC could be victims.

      That's what our motive really is in asking for them

just to be described -- I don't see why it's necessary to

describe them as victims, essentially.

      THE COURT:  Someone want to respond?

      MS. LOZANO:  Yes, your Honor, just briefly.

      As the Court rightly pointed out, one of the elements

that the government is going to have to prove is that the money

laundering conspiracy involved moving proceeds of the

underlying crime.  And, in this case, it's the OneCoin wire

fraud scheme.

      And the term "victim" is a neutral, nonpejorative way

to accurately describe a collection of people, some of whom

will testify here, some of whom will not, and it does not risk

prejudicing the defendant.  The case law is clear.  The term

"victim" has been used in myriad circumstances, and it is

neutral and appropriate, and the government believes it's

entirely appropriate to call them victims.  That's what they

are; they're victims of the OneCoin scheme.

      THE COURT:  Very well.

JASKCOC

1        The government will not be precluded from referring to

2   them as victims.

3        Mr. Devlin-Brown, if you have some language that you

4   want me to charge the jury with, or you guys come up with

5   language on consent, I'm happy to consider it, but as it

6   stands, they can refer to the victims of the wire fraud scheme

7   as victims before the jury.

8        I believe we've covered the testimony from OneCoin

9   victims, including their purported investment and testimony

10  from the attempted victim.  So the next one is the defendant's

11  use of OneCoin proceeds.

12        MR. DiMASE:  Your Honor, I think there is a related

13  point, actually, regarding the testimony of the victims --

14        THE COURT:  Okay.

15        MR. DiMASE:  -- itself; in other words, the fact

16  that -- the story that they will tell about investing in

17  OneCoin.  Perhaps Mr. Devlin-Brown should address this issue

18  first, since he made the motion, but it's regarding the scope

19  of their testimony.

20        THE COURT:  Okay.

21        Mr. Devlin-Brown?

22        MR. DEVLIN-BROWN:  Yes, certainly, your Honor, and I

23  can be brief.  This is in our motion, at pages 3 to 4.

24        The concern, again, that Mr. Scott not being charged

25  with the wire fraud scheme, the Court needs to carefully

JASKCOC

monitor and impose limits, where appropriate, where the

evidence could be unduly prejudicial, particularly as he's not

charged with wire fraud.  And one concern we have about victim

testimony is a couple of things that are really completely

irrelevant to whether there was a wire fraud and really only

relevant to sympathy for the victims, and that is, number one,

how much the person invested, if they invested their life

savings versus if they invested $5,000, but had plenty more

where that came from, that's not relevant to it, and the same

degree -- the hardship these individuals suffered by not

getting a return on their investment, that has no relevance to

wire fraud, whether it was no big deal to them, whether they've

now had to move out of their homes.

        And while we understand, again, for a defendant

charged with wire fraud, the Court should provide more leeway

to prosecutors in that regard.  The line of what's relevant

versus what's unduly prejudicial, I think, permits a fair

amount more.  When you have someone who is not charged with

that as participating in the underlying wire fraud scheme,

things like that that don't really add to the relevance, have

the capacity to really cause unfair prejudice.

        THE COURT:  Okay.

        MR. DiMASE:  Your Honor, very briefly, I think we laid

out our arguments as well, but as far as the proof required at

this trial, again, the government's required to prove the wire

JASKCOC

1    fraud scheme.  I think this idea of OneCoin versus a generic

2    knowledge of criminality is a distinction without a difference

3    in this case.  It's really about the defendant's knowledge of

4    OneCoin itself, that's what the trial is going to focus on, not

5    whether the defendant was aware of some vague criminal

6    enterprise that was funding his Fenero Funds.

7              But more to the point, we do not anticipate there is

8    going to be testimony of the sort that a victim lost their

9    entire life savings and attempted to commit suicide or anything

10   of that nature.  The evidence that we expect to come in through

11   these witnesses is information regarding how they were

12   approached to invest, the amounts they invested, as reflected

13   in certain cases, wire receipts showing where they sent the

14   money, very basic evidence that ties directly to the scheme.

15   And as the government noted, some of the money at least one of

16   these victims sent was sent directly to a company,

17   International Marketing Services, which then funded the

18   defendant's money laundering -- or, sorry, the defendant's

19   purported investment funds, which were used to launder money.

20   So it is a very direct connection between these victims'

21   investments and ultimately the funds that Mr. Scott was

22   running.

23             And we also expect some level of testimony regarding

24   the financial harm that was caused to them as a result of

25   losing the money they invested in OneCoin.  That is part of the

JASKCOC

1   narrative of their testimony.

2           As I said, we don't expect this to go off into an area

3   of calamitous events that these investments caused in these

4   victims' lives.  So I think there is no danger of unfair

5   prejudice, it's part of the narrative of the case, and it

6   should be admitted, your Honor.

7           THE COURT:  I will allow that testimony to come in,

8   again, subject to any appropriate objection at trial.

9           Finally, I think the defendant's use of the OneCoin

10  proceeds?

11          MR. DEVLIN-BROWN:  Yes, your Honor.

12          THE COURT:  Mr. Devlin-Brown?

13          MR. DEVLIN-BROWN:  So we raised this again in our

14  papers and don't need to belabor the point, but there are a

15  number of courts that have made, I think, the excellent

16  observation that whether a defendant, facing a financial

17  profit, goes and spends his money on a Porsche, or goes and

18  spends his money on investments into a 401(k), or whatever is

19  not probative of whether he got those monies from a crime.

20  Mr. Scott, in this case, opened up a private equity fund.  He

21  took in a lot of money into that fund, made substantial profits

22  himself from that fund.  The key issue at trial is whether or

23  not Mr. Scott knew that money coming into that fund was from

24  some crime.  And how he spent his money, that he bought cars,

25  just isn't probative of that.  He bought cars before the

JASKCOC

1    alleged scheme ever occurred.

2                And after this motion --

3                THE COURT:  Did he buy quarter million dollar cars?

4                MR. DEVLIN-BROWN:  No, he didn't buy as expensive

5    cars.  But, again, your Honor, he's presumed innocent.  He made

6    a lot of money from this private equity fund, there were fee

7    agreements in place.  It doesn't prove it's legitimate or not

8    on what he did with his windfall.

9                And the government has shown some of their exhibits

10   now.  They produced exhibits last Monday.  There are exhibits

11   with Mr. Scott by a yacht, and there are exhibits, photos, of

12   nice cars.  What does that have to do with the issues at trial?

13   And it really does raise, when you sort of add all of that

14   detail, the chance that some jurors may assume, if he's

15   spending money like that, he's got to be a criminal.  So it

16   just is not probative.

17               I would like to address one point in the opposition

18   that the government filed.  And they've made a suggestion that,

19   well, actually, a lot of this is very relevant because it's

20   money laundering, in and of itself, perhaps the way he bought

21   these things and the way he hid them.  We haven't heard that

22   before this opposition, that that was the money laundering, how

23   he bought things, but it really doesn't add up.  And without

24   getting too bogged down in detail, your Honor, the Fenero

25   Funds, Mr. Scott listed himself as the universal beneficial

JASKCOC

1    owner.  He filed taxes on that, he reported that to the IRS.

2    Those funds are managed by companies he's had, which are

3    registered in his name.  MSSI, your Honor probably remembers

4    that from the subpoenas.  And that when the government talks

5    about the various transfers of monies from the Fenero Funds to

6    his purchases, what the transfers are is from the funds,

7    Fenero, to MSSI, again to him in his name, to his attorney, in

8    some cases, for escrow, which is not unusual, he's had this

9    personal attorney for a long time, to buy expensive things.  So

10   I don't want there to be a suggestion that that, too, needs to

11   come in to prove an effort to cover up the source of the funds.

12            MR. FOLLY:  Your Honor, we set forth in our brief

13   three distinct reasons why this evidence is admissible at

14   trial.  And I will touch on all three of them here.

15            One, it is direct evidence of these charged

16   conspiracies to commit money laundering.  It's further evidence

17   of money laundering.  The actual ways that he was moving this

18   money are, in fact, very similar to what he was doing

19   throughout the conspiracy.

20            The second is that it's necessary to show he actually

21   controlled these particular funds and that these funds were

22   indeed his cut for participating in this money laundering

23   conspiracy.  Absent our ability to show that he has funded

24   purchases for himself, it would give the jury a very misleading

25   view about how much money he actually earned through these

1    funds, which is particularly important because he did not earn

2    a dime for his, quote-unquote, investors, and yet got paid

3    outsized fees that were well beyond what anyone would get paid

4    for managing private equity funds that actually earned money

5    for their investors, which, here, there was no evidence of.

6            And then, lastly, it's directly relevant on

7    consciousness of guilt as well as motive.  So I want to just go

8    through those very, very quickly.

9            We set forth some examples in our brief of the

10   particular ways that he was routing the money to make these

11   purchases.  And consistent with all the other evidence in this

12   case, it's clear he was deliberately attempting to conceal the

13   actual source of the money.  There's instances where the money

14   goes directly from the purported investment funds to his lawyer

15   and then directly to fund the purchase of, for example, houses

16   and vehicles.  That's different than what was just described by

17   Mr. Devlin-Brown, describing money going from Fenero back to

18   Mr. Scott's own company, and then on to a lawyer, and then on

19   to make some of these purchases.  And that happened as well.

20           So as set forth on page 10 of our brief, there's

21   numerous ways that he moved the money in a pattern that looked

22   deliberately designed to conceal the origin of the funds

23   consistent with what he did throughout the money laundering

24   conspiracy.

25           The second point is just that -- and it's very

1   simple -- without being able to show that these funds actually

2   funded purchases for Mr. Scott, the jury would be left with a

3   very -- with a total misimpression about how much money Scott

4   actually earned through his participation in this conspiracy,

5   which is important because the government's theory of the case

6   is he got paid an outsized fee because he was engaging in

7   criminal conduct.  If we can't show that he actually controlled

8   this money, then we can't present to the jury just how outsized

9   that fee actually was.

10          And then the last reason is motive and, also,

11   consciousness of guilt.  I'll go in reverse order, with

12   consciousness of guilt.  Again, the way he moves these funds,

13   evidence that he is deliberately trying to hide where they come

14   from, and that demonstrates his consciousness of guilt that

15   these are criminal proceeds.

16          And then on motive, the defense actually kind of

17   glosses over this, but, in this case, motive is particularly

18   important.  This is a lawyer who, at the time he joined the

19   conspiracy, was a partner at a prominent law firm here in the

20   United States.  The jury will rightly ask themselves, why would

21   he risk his entire livelihood, everything he had worked

22   throughout his career for, to join this very, very significant

23   conspiracy, and one of the answers to that is that it enabled

24   him to buy these things which he clearly wanted, and the

25   evidence of what he purchased with the fraud scheme proceeds

JASKCOC

1   will allow the jury to understand that.

2           So those are three separate grounds, each of which

3   independently show that this evidence is admissible at trial.

4           THE COURT:  Anything further, Mr. Devlin-Brown?

5           MR. DEVLIN-BROWN:  Just very briefly, very briefly,

6   your Honor.

7           On the point of this is the only way to show the

8   amount of money he made, except for his tax returns, he paid

9   4-1/2 million in taxes in 2016, these monies, again, were all

10  in his name through his companies, nothing was hidden.  So it's

11  not necessary for that purpose.

12          The only other thing I'd ask your Honor is if you're

13  inclined to permit some proof of this, there's a big difference

14  between having a financial analyst, which they will be calling,

15  testify to money going to particular places, and this is a car,

16  this is a house, and having start of gratuitous photos of

17  expensive Hermès bags and other things which the government has

18  shown in its exhibits that doesn't really add anything other

19  than to sort of inflame the jury.  So if any of this comes in,

20  I think there should be some limits on it.

21          THE COURT:  Well, I don't know what all the government

22  is intending to offer, but I think it is appropriate that they

23  be allowed to offer evidence of the way in which the amount of

24  money that Mr. Scott received and the way in which he used it.

25  By the way, this is garden-variety testimony and evidence in

JASKCOC

1  white collar trials, as I'm sure all the parties are well

2  aware, and the Second Circuit has, on any number of occasions,

3  indicated that it is appropriate in these types of cases to

4  show how it was that the defendants put their money to use.

5  And I do agree with the government that this is direct evidence

6  of the offense that is charged.  It shows the proceeds of those

7  offenses.  I also credit their argument that the jury, if not

8  told what all Mr. Scott did with at least some of this money,

9  they would be left with a question of why someone with his

10  solid career and solid reputation, I assume, would ensnare

11  themselves with an international criminal conspiracy.

12         So, again, we'll see at trial whether the government

13  tries to put too much of this type of evidence in, but they

14  certainly are allowed to put some of it in.

15         And I think that takes care of all the motions in

16  limine, correct?

17         MR. DiMASE:  Yes, your Honor.

18         THE COURT:  Okay.

19         So why don't we talk about, first of all, the MCC

20  subpoena, and then the statements from his postarrest statement

21  that the defense wants to put in.

22         MR. DiMASE:  Yes, your Honor.

23         We can start with the MCC subpoena, as you suggested.

24  Your Honor, the defendant is essentially attempting to go on a

25  fishing expedition to find a bunch of what he believes to be

JASKCOC

impeachment material in a voluminous amount of cooperator phone

calls and emails.  And the case law is very clear that the

Nixon standard for trial subpoenas under 17(c) applies to both

pretrial and to trial subpoenas, and that there has to be some

degree of specificity, which is entirely lacking in the motion

that has been made by the defense in this case.  And there are

a number of cases in this district where district courts have

denied similar or quashed similar subpoenas for phone calls and

for emails when they were not narrowly tailored in some way.

         The only limitation that the defendant has proposed to

place on his subpoena rider since first issuing the subpoena is

to limit the time frame to July rather than to March, but he in

no other way limits the scope of the subpoena or specifies in

particular what communications he is looking for among a vast

trove of what are very likely to be private and personal

communications with friends and family.

         I did hand up, prior to today's proceeding, a copy of

the Percoco decision from Judge Caproni in 2018, in which Judge

Caproni lays out the standard that is applicable to these

subpoenas, confirming that the Nixon standard does apply to

Rule 17 trial subpoenas and also denying a similar request made

by the defense in that case for cooperator phone calls, emails,

and other similar records without any level of specificity in

what was being requested.

         The defendant has tried to draw the distinction

JASKCOC

1    between pretrial and trial subpoenas, your Honor, but there are

2    a number of cases cited by the government, including the

3    Percoco case, that do address this issue in the context of

4    trial subpoenas.  And the bottom line is they do not allow this

5    exact sort of fishing expedition for potential impeachment

6    evidence.

7            THE COURT:  Thank you.

8            Mr. Devlin-Brown?

9            MR. DEVLIN-BROWN:  Thank you, your Honor.

10           This is not a fishing expedition.  The government, as

11   we set out, had, while their cooperating witness was not as

12   cooperative, obtained these materials.  His emails, in

13   particular; I don't know if they obtained his calls.  They

14   provided them to the defense.  They then, after he began

15   proffering and ultimately pled to a cooperation agreement,

16   appeared to have stopped seeking that material.  We filed, in

17   our response today, an ex parte attachment, which we will defer

18   to the Court, but we believe is appropriate because I think it

19   gives away defense strategies, but there is material in what

20   was produced that does suggest that if those sorts of

21   statements were repeated -- and there's no reason to assume

22   suddenly they would not be -- that that would be very powerful

23   impeachment evidence against the cooperating witness.

24           THE COURT:  I'm sorry, did I understand you to say

25   that you submitted something today ex parte?

JASKCOC

1          MR. DEVLIN-BROWN:  Yes.  We filed something this

2    morning.  First sent it to the Court, copying the government,

3    the submission without the attachment, and then moments later,

4    sent, just to the Court, the submission with the ex parte

5    attachment.  I'm happy to provide a copy.

6          THE COURT:  I haven't seen it.

7          MR. DEVLIN-BROWN:  Okay.

8          You did see our submission, though, I gather?

9          THE COURT:  I believe I did, but if something came in

10   today, I haven't seen it.

11         MR. DEVLIN-BROWN:  Oh, it's this morning, yeah.  Do we

12   have that extra?

13         So this is the submission.  There's a blue sheet

14   behind it with the ex parte submission.

15         THE COURT:  Yes, I haven't seen this.  And I am not

16   going to read the entire thing now.  So, based on what is

17   before me, the subpoena, certainly as submitted or as

18   represented in the government's letter of October 24, is

19   quashed.  That is without prejudice for me to consider these

20   additional materials further, and if I change my mind, I will

21   let the parties know.

22         Okay?

23         MR. DEVLIN-BROWN:  Thank you, your Honor.

24         THE COURT:  And quashed, by the way, for the reasons

25   set forth in the government's letter concerning the Nixon

JASKCOC

1    standard and Judge Caproni's decision in Percoco, in which she

2    notes, amongst other things, as Judge Nathan explained in Pena,

3    another case, courts in this district routinely quash subpoenas

4    for "all records of detained cooperators," and citing Pena 2016

5    WL 8735699, at *3, and the subpoena that I saw was of that ilk,

6    and, accordingly, it is quashed pending further notice of the

7    Court.

8            Next, the statements that the defense wishes to put in

9    in addition -- the postarrest statements that the defense

10   wishes to put in.  So, who will speak first?

11           MR. DiMASE:  Your Honor, it may make sense for defense

12   to speak first.  We have obviously noted in our submission the

13   portions of the statement that we intend to introduce, and

14   they're clearly party admissions that are admissible under the

15   rules of evidence.

16           THE COURT:  Okay.

17           Mr. Devlin-Brown?

18           MR. DEVLIN-BROWN:  Your Honor, this may require going

19   through it step by step --

20           THE COURT:  Sure.

21           MR. DEVLIN-BROWN:  -- but our general position is

22   that, as you've heard even today, the government has repeatedly

23   alleged that Mr. Scott lied in the postarrest statement, that

24   he lied about his relationship with Ruja Ignatova and her

25   connection to the funds, but what the government has done

JASKCOC

1    through its selections has put in some of Mr. Scott's answers

2    to questions about dealings with Ruja Ignatova, some of his

3    answers to questions about what he knew about OneCoin, but

4    omitted others.  And perhaps the most egregious example is

5    where they omit something -- he says three sentences:  One is

6    to the effect of, yes, he had heard about OneCoin beyond the

7    press; the second sentence is that's why he got a legal opinion

8    about it; and then the third sentence is there were rumors it

9    was a Ponzi Scheme.

10            So, the way the government has pieced these things

11   together, it presents a very misleading picture of what the

12   defendant actually said.  And we propose eight additions.  We

13   can go -- whatever your Honor pleases, we can go through them

14   one by one, argue them one by one.

15            THE COURT:  We can go through them one by one quickly.

16            MR. DEVLIN-BROWN:  Okay.

17            So, the first proposed addition --

18            THE COURT:  By the way, can I ask a question?

19            MR. DEVLIN-BROWN:  Of course.

20            THE COURT:  Is there a difference between the document

21   filed at 164, which is your letter of October 27, and document

22   165, which I think is an identical letter?

23            MR. DEVLIN-BROWN:  We got an error notice from ECF,

24   although I don't remember if it was related to that.

25            THE COURT:  Okay.

JASKCOC

1          MR. DEVLIN-BROWN:  What you should have, your Honor,

2     is a letter that says on the front page:  "Opposition to the

3     government's motion to preclude the defense from offering

4     additional portion of Mr. Scott's postarrest statements."

5          THE COURT:  Yes.

6          MR. DEVLIN-BROWN:  Okay.

7          And accompanying that is a transcript of the

8     postarrest statements with what the government wants to include

9     in yellow and proposed additions from the defense in green.

10    Each one of these points, I think, stands alone, but, really,

11    it's sort of in the totality where the prejudice to the

12    defendant is most clear.

13         So, the first addition, your Honor, is on page 7 --

14    sorry, it's on page 10, starting at 7:39 and running through

15    7:40:37.

16         THE COURT:  Yes.

17         MR. DEVLIN-BROWN:  So, if you can see, in the answer

18    right before, Mr. Scott explains that Irina was introduced to

19    him by Ruja, very famous because she does the crypto stuff now,

20    Ruja and she, and the agent then asks, is it -- that's her

21    first name, and then he goes on to explain Ruja and what he

22    knows about Ruja and the nature of that introduction, including

23    stating, quite openly, that he knew that she was connected with

24    OneCoin.  So we think that statement needs to come in for that

25    purpose of allowing a complete discussion there of what he knew

JASKCOC

about Ruja.

There's another aspect of this statement, your Honor, where he talks about the role Akbor played in looking at OneCoin.  That should be admitted based on, in addition to this, because it's connected to Ruja, other portions that the government has offered where they choose to put in some of what Mr. Scott knew about and told the agents about OneCoin, but omitted other things.

THE COURT:  Okay.

MR. DiMASE:  Your Honor, just to start with the legal principle at play here, the question isn't whether it would be helpful to the defendant.  That is simply not the question. The only question is whether it is necessary to understand fairly the admitted portion of the recording.

So if we look at what is being discussed here, the question is how much was received and who are the investors, and the last question is tell us about Irina.  He answers that question, arguably.  I mean, the government would not object to the next question and the first sentence of the following answer being admitted, if the defendant wishes to have that question admitted.  The rest is a self-serving statement, not even an answer to the detective's or agent's question, you know, where Mr. Scott is offering up sua sponte justifications for his involvement with these people.  It's not necessary to understand the admitted portion, and it should not be admitted,

JASKCOC

1      and it's inadmissible hearsay if offered by the defendant.

2                  THE COURT:  I agree.

3                  And, Mr. Devlin-Brown, I'll give you the option.  If

4      you wish, I will include the following, which is the first part

5      of what you recommend, that first named question by Agent

6      Eckel, and then this part of the answer, Ruja is her first

7      name, and she was involved in -- in some cryptocurrency.  She

8      had one of those Bitcoin or has one of those Bitcoin type

9      deals.  I'll leave it up to you.  You don't have to tell me

10     now.

11                 MR. DEVLIN-BROWN:  Yes, we'll take that, your Honor.

12                 THE COURT:  Okay.  That will be included.

13                 MR. DEVLIN-BROWN:  Okay.

14                 THE COURT:  Next.

15                 MR. DEVLIN-BROWN:  So the second proposed addition is

16     at 7:54:38, which you'll find on page --

17                 THE COURT:  20.

18                 MR. DEVLIN-BROWN:  20, exactly.  I don't want to argue

19     too much about the standard, because I think the Court fully

20     understands the standard, but the Second Circuit actually

21     issued a very helpful opinion this past July, cited in our

22     brief, United States v. Williams, and it does make clear that

23     the rule of completeness is broader than the Federal Rule of

24     Evidence, and, ultimately, the touchstone here is making sure

25     that there's not a misleading impression by anything the

1   government chooses to present.  So it's not really looking at

2   this -- I know we're going through it excerpt by excerpt, your

3   Honor, but really part of the argument is in the totality of

4   circumstances where you don't want the government to be able to

5   say in summation, you know, what did he tell the agents about

6   Ruja?  All he said was this.  And then if anything, frankly, is

7   omitted about Ruja, it would be misleading for the government

8   to make that argument.

9         So moving on, excerpt 2.  So, with this series of

10  questions, they ask about Gilbert Armenta, who is an alleged

11  coconspirator, and that's really the person who's at the center

12  of most of the bank fraud-related charges that the government

13  is pursuing.  So there's an answer where he says -- sorry, the

14  question is:  Was Gilbert an investor in Fenero or in any of

15  the other companies?  And Mr. Scott says:  Yes.  And the agent

16  then responds, in the part that's cut off:  He was?  And then

17  Mr. Scott explains that it's not an unqualified yes; in fact,

18  he returned his funds because there were red flags when that

19  investment came in.

20        So, without that addition, it creates a misleading

21  impression that, yeah, Gilbert was an investor full stop when,

22  in fact, it's not really a full stop, and that's not all that

23  Mr. Scott relayed in that answer.

24        THE COURT:  Do you know when it was, or can someone

25  tell me when it was, that the funds were returned?

JASKCOC

1      MR. DiMASE:  Yes, your Honor, I can tell you.  The

2   funds -- 5 million went in in June of 2016, 5 million went in

3   in September of 2016, and approximately 10 million was returned

4   in approximately April of 2017.  So this is many months later.

5      And it's -- I mean, the more important point, from our

6   perspective, your Honor, is it's not necessary to understand

7   the admitted portion.  Is he an investor?  Yes.  I mean, that

8   was the question.  He's answered it.  Whether he returned the

9   funds at a later date and why, those are not -- those answers

10   are not needed to understand the admitted portion or to place

11   it into context.

12      THE COURT:  And he invested $10 million, and it was in

13   at least six months, half a year?

14      MR. DiMASE:  Yes, your Honor.  I think the evidence at

15   trial will show that it was returned in approximately April of

16   2017.

17      THE COURT:  Okay.

18      I'm not going to put in any further portion of that

19   excerpt.  So that application is denied.

20      Next?

21      MR. DEVLIN-BROWN:  Okay.  3, 4, and 5, I think, can

22   kind of be looked at in context, your Honor.  I'd ask you to

23   reserve ruling until you look at all three.

24      The gist of this -- and there are various places where

25   the agents ask Mr. Scott questions about what he knows about

OneCoin and its reputation, but then they choose only portions

of his discussion about that in the course of the interview,

where he says things like, I heard it was a Ponzi Scheme or I

read that it might be a Ponzi Scheme, while omitting positive

things he said he heard about OneCoin, and that, again, creates

a misleading impression.  So go through each of these quickly.

Excerpt number 3 we propose is at 7:57:16 to 7:58:42, that's 21

to 22.  It's an entire discussion omitted by the government

relating to how Mr. Scott knew Ruja Ignatova and omitting that

she was not a client simply of Mr. Scott, but of Locke Lord,

which included an expert in cryptocurrency.

I can go to the next one, your Honor, condition 4,

which is at 8:18:21.  This is really, frankly, the most glaring

one.  The government's got a long back-and-forth discussion

about OneCoin, and the question is asked at 8:18:14:  Okay, so

you never heard of OneCoin besides reading about it in the

press?  And Mr. Scott, under the government's version, would

say:  No, I heard about OneCoin.  You know, there was rumors

that were going around, pyramid scheme and all that, and we

didn't want to be involved in that.  They're omitting a

sentence which clarifies his reference to pyramid scheme,

making clear that he had, from the beginning, when he knew the

relationship between Ruja and OneCoin, wanted an opinion of

which country or, if at all, any country where OneCoin was

illegal, or, you know, banned or, whatever, so then we wouldn't

JASKCOC

```
1    do business with them.  That relates directly back to that
2    third excerpt, your Honor, that the government left out, where
3    he's explaining that he had a partner, or a senior colleague at
4    the firm, Peter Courtneidge, who did look into these issues,
5    and that Mr. Scott says in that excerpt, excerpt 3, that he,
6    quote, relied on that when he left the firm to see if this was
7    anything he could do business with.
8             THE COURT:  Just so I understand, did Ruja go to Locke
9    Lord independently of Mr. Scott?
10            MR. DEVLIN-BROWN:  Yes, your Honor.  The evidence will
11   be that Ruja Ignatova was introduced to Mr. Scott and another
12   partner at the -- he may not be a partner, he may be like a
13   senior counsel, Robert Courtneidge, by Gilbert Armenta.
14   Mr. Courtneidge did analysis for her related data
15   cryptocurrency work because he was a payments expert, and that
16   gave Mr. Scott, frankly, some comfort.  In fact, after that,
17   the firm did a whole bunch of other work for Ruja Ignatova and
18   OneCoin going beyond the introduction, even after Mr. Scott had
19   left the firm.
20            So that's the 4, that's excerpt 4.  And then excerpt
21   5, which I think also should be seen in the same context,
22   starts at 8:22:24.  Did I get that --
23            THE COURT:  8:21:03?
24            MR. DEVLIN-BROWN:  Yes.  I must have made a mistake
25   there.
```

JASKCOC

1          So, again, there's questioning leading up to that

2     about -- where Mr. Scott says he stopped doing business with

3     them -- or he's asked:  So you stopped doing business with them

4     since you found that they were processing for OneCoin?  This is

5     a company.  He says:  Yes.  There's a question about what the

6     company was.  And then after the agents sort of give Mr. Scott,

7     this is your one opportunity, which, frankly, we're neutral

8     either way whether that stays in or out, but after that, that

9     one opportunity, there's a, is there anything else you want to

10    tell us about any of this, and he expands on the point he had

11    just made above, which is why he was comfortable dealing with

12    companies at the time and how his state of mind is different

13    now.  And he explains that he had gotten due diligence and puts

14    that earlier answer in context.  So those are 3, 4, and 5.

15          THE COURT:  Mr. DiMase?

16          MR. DiMASE:  Yes, your Honor.  May I have one second

17    just to check something?

18          THE COURT:  Sure.

19          MR. DEVLIN-BROWN:  Your Honor, I actually gave you 6

20    instead of 5.  Did I give you an extra 5?

21          THE COURT:  You gave me three.  I don't know

22    whether -- what you --

23          MR. DEVLIN-BROWN:  Yes.  The last one, I made a

24    mistake.

25          (Pause)

JASKCOC

1          MR. DEVLIN-BROWN:  No, never mind.  I stand corrected.

2          MR. DiMASE:  Your Honor, I understand the defendant's

3    argument as to the middle passage on 8:18:21, and I'd like to

4    come back to that at the end.

5          THE COURT:  Okay.

6          MR. DiMASE:  That's the one that's sort of in the

7    middle of an otherwise government-admitted passage.

8          The other two are -- I'm focusing on two for now -- on

9    Page 21.  The admitted portions are the same and don't even get

10   into the representation of Ruja by Scott, and this passage is

11   not necessary to understand any other admitted passage in the

12   statement.  So questions about representing her and the nature

13   of the representation are just not necessary to understand

14   other portions.  Again, it's not a matter of whether this would

15   be helpful to Mr. Scott, it's a matter of whether this would be

16   necessary to understand this statement in context.  And, of

17   course, Mr. Scott reserves the right to testify himself at the

18   trial and offer up his own explanation of all of these things.

19   That's not the point of this statement and the exercise we're

20   engaged in now.

21         The same can be said of the passage on 31 to 32.  It's

22   simply not relevant to understanding any of the admitted

23   passages.  It contains a bunch of self-serving and exculpatory

24   statements made by Mr. Scott sua sponte in answer to very

25   generalized questions that are not connected to the rest of the

JASKCOC

1    statements, so there's no basis for the admission of that

2    statement under the rule of completeness.

3              One moment?

4              (Pause)

5              MR. DiMASE:  If I understand correctly, it's those two

6    statements, and the third one is 8:18:21 that we're currently

7    discussing?

8              THE COURT:  Correct.

9              MR. DiMASE:  Okay.

10             Your Honor, with respect to that, our position is that

11   that portion of the answer is not responsive to the question

12   that was asked.  It's another sua sponte self-serving statement

13   being made by the defendant to justify his involvement.  And

14   the answer to the question is contained in the yellow

15   highlighted portions in which he says, I heard about OneCoin,

16   there were rumors going around, pyramid scheme and all that.

17   The middle portion is simply a self-serving statement regarding

18   why he chose to get involved with her, or whether he did get

19   involved with her or not, and is not responsive to the question

20   that was asked of him and not necessary to understand the

21   answer.

22             So those are the government's positions on those three

23   statements, your Honor.

24             THE COURT:  I'm not going to require the government to

25   put in those three statements when they play this testimony for

JASKCOC

the jury.  Again, just because Mr. Scott happens to say

something that is in conformity with his theory of the case or

the theory of the case that he is going to present to the jury

does not mean that it comes in under the rule.  The rule

requires that the portion that is being kept out render the

statements that are being put before the jury either in a

misleading way or in a way that does not allow the jury to

understand what is being put in.  And while I certainly get why

the defense wants to put this in, it is not, strictly speaking,

required under the rule, and so I will not require the

government to put it in in their case.

          Next?

          MR. DEVLIN-BROWN:  I will move on to the next, your

Honor.  And I know you've made your ruling, but I do want to

just make a record, or even better, hopefully try to persuade

you.

          The part that's cut out from the middle of the

sentence, that's going to result in being played for the jury

an edited video, which is just not what Mr. Scott said.  And

the government seems to take the position that if he says

something negative-ish about OneCoin, well, that's responsive,

but if he should say something positive that he's heard, it's

not.  The question that he's answering is:  Okay, so you never

heard of OneCoin besides reading about it in the press?

Implicit in that is:  So what else do you know about OneCoin if

JASKCOC

1    you haven't heard about it beyond the press?  And that's what

2    he's answering.  He's explaining, maybe not in the most

3    coherent way possible, but that's what he's clearly saying, and

4    it just creates -- especially when the next sentence is pyramid

5    scheme, you snip those things together and get rid of the one

6    statement that shows that Mr. Scott had some good-faith things

7    that he heard about OneCoin, it's just deeply misleading.

8            THE COURT:  I understand your argument.

9            MR. DEVLIN-BROWN:  Okay.

10           6 is really encompassing part of 5, so we can skip

11   that.

12           Defense addition 7 is at 8:26:46.  This is essentially

13   another situation where the government removes part of

14   Mr. Scott's answer.  Again, this is part of the concern, it's

15   the same questions where parts of his answer are being removed.

16   The question is:  And OneCoin and Ruja had nothing do with

17   Fenero or any funds you were involved in?  He starts the

18   answer, and then the rest of the answer is an explanation of

19   why he was comfortable and what he understood the relationship

20   of the funds to be.  So I think, again, cutting that out is

21   unfair.

22           THE COURT:  Okay.

23           Mr. DiMase?

24           MR. DiMASE:  Your Honor, again, the same argument

25   here, that the first couple of sentences of that paragraph are

1   the answer to the question.  The rest is a self-serving,

2   exculpatory statement offered up sua sponte by the defendant

3   and is not necessary to understand the remainder of the

4   statement that is being admitted.

5        THE COURT:  I agree.  So I'm not going to require the

6   government to put that portion in its case in chief.

7        MR. DiMASE:  By the way, your Honor, just so the

8   record is clear, there's an overlapping green and yellow word

9   there.

10        THE COURT:  Where is that?

11        MR. DiMASE:  On page 34, "anywhere" was to be included

12   by the government.  So we would propose ending it after the

13   word "anywhere," even though it is also in green.

14        THE COURT:  That's what I assumed.

15        And next?

16        MR. DEVLIN-BROWN:  Okay.  That brings us to the final

17   one, your Honor, which is Defense Exhibit 8, and this really is

18   cutting Mr. Scott off before he's able to answer the question.

19   So you have to start on page 34, where Agent Eckel asks:  What

20   were your fees?  And fees are going to be a big deal because

21   the government essentially says he didn't deserve any fees and

22   was just taking money out of the funds.  So, Mr. Scott starts

23   to answer, he says:  We had evolving fees.  We had some like in

24   our subscription documents, which were normal, you know,

25   like -- and then the agent cuts him off, and they have a little

1    bit of a, you know, you keep saying we; who are we?  The funds.

2    Yeah, who else is there?  You're the guy.  There's a little bit

3    of this rah-rah-rah, and then Mr. Scott, trying to end that,

4    says:  No, I'm the guy.  No, yes, and then he answers in full

5    the question he had been cut off answering about what his fee

6    structure was.

7              At least a significant part of that, at least the

8    first couple of sentences, I think, clearly are, even if the

9    government has different arguments on the rest, but the first

10   couple of sentences:  So we have, you know, management fees,

11   and it varied; it would be like 2 percent.  Sometimes we bumped

12   it up to 4, 5, depending on what the underlying business was.

13   We took fees at the time that were a little lower when we had a

14   standstill.  That part, I think, and even beyond that is

15   responsive.

16             MR. DiMASE:  Your Honor, may I have one moment to

17   discuss?

18             THE COURT:  Sure.

19             (Counsel confer)

20             MR. DiMASE:  Your Honor, the government takes the same

21   position here again.  The question is:  You're the guy?

22   Absolutely, I'm the guy.  Then the next question is:  You're

23   the guy, there was no one else working with you?  And he says:

24   I'm the guy.  And then he pivots to a lengthy self-serving and

25   sua sponte exculpatory riff on his involvement, including such

JASKCOC

matters as Brexit, and tax returns, and other such irrelevant

matters that are not necessary to understand the remainder of

the statement.

        THE COURT:  What about the first three sentences

there:  No, I'm the guy.  So we have -- you know, naturally, it

varied; it would be like, you know, 2 percent, sometimes we

bumped it up to 4 or 5, depending on what the underlying

business was.  We took fees at the time that they were a little

lower when we had a standstill?

        MR. DiMASE:  Your Honor, I understand the rationale

behind cutting it there.  We would argue that that is -- it's

not responsive to the question, it's not necessary to

understand the remainder of the passage that is admitted.  So

we would argue it should be kept out, but if the Court is

inclined to admit any portion of this long, green paragraph

here, that would certainly be more appropriate than admitting

the entire thing.

        THE COURT:  I understand that the agents actually

changed the topic about fees, but I think, in fairness, you

ought to be allowed to say that, so I will allow that portion

of the testimony in unless, Mr. Devlin-Brown, you choose, for

reasons satisfactory to yourself, not to.

        MR. DEVLIN-BROWN:  We would like that portion, your

Honor.  I respectfully ask you just to look at the next two

sentences, because they are responsive.  He says:  I informed

JASKCOC

1    the investors with a letter saying we had the Brexit issue, so

2    we're going to reduce our fees for that time.  And we took a

3    large fee because at the end, I mean, I'm dramatic because the

4    investors decided to break up.  That's where he answers the

5    whole fee question.  Again, he was cut off by the agent

6    mid-answer before disagreement about singular versus plural, so

7    I do think it's fair to go that far.

8            THE COURT:  I will not --

9            MR. DiMASE:  Sorry, we would strongly oppose the

10   admission of those clearly self-serving statements.  They pivot

11   to another topic area like Brexit, and it's not necessary to

12   understand the remainder of this passage, and I think where the

13   Court originally cut is a more appropriate place.

14           THE COURT:  That's where we will cut it off.

15           MR. DiMASE:  Thank you.

16           THE COURT:  Okay?

17           MR. DiMASE:  So after the word "standstill"?

18           THE COURT:  Correct, after the word "standstill."

19           I think that covers everything.  Let me ask, just

20   because I ask at every --

21           MR. DiMASE:  Judge, there's one other thing that

22   was --

23           THE COURT:  Sure.

24           MR. DiMASE:  If you'd like to address whatever you

25   want --

JASKCOC

1          THE COURT:  No, no, we have to address some technical

2     issues concerning jury selection, et cetera.

3          MR. DiMASE:  Understood.

4          I don't know there's any court involvement needed on

5     the remaining submissions, which were about the bank fraud

6     charged in this case and the law around it.  I think that those

7     are really more accurately categorized as jury instruction

8     issues.

9          THE COURT:  I agree.

10          MR. DiMASE:  I don't know we need to take them up

11     today, but I just wanted to raise them since they are before

12     the Court.

13          THE COURT:  Right.  I was going to do those during the

14     charge conference.  Okay?

15          MR. DiMASE:  Yes, your Honor.

16          THE COURT:  Like I started to say, I ask at every

17     final pretrial conference:  Are the parties fairly confident

18     that there will be a trial starting next Monday?  I ask because

19     I'll be working on this for the remainder of the week, unless

20     you tell me otherwise.

21          MR. DiMASE:  Your Honor, as far as the government

22     knows, there will be a trial starting next Monday.  And just

23     for the record, there have not been any plea offers made in

24     this case to date, and so there's no reason the government

25     expects there to be a resolution between now and the trial

1    date.

2              THE COURT:  Very well.

3              So now let's talk about jury selection, et cetera.  On

4    the representation that this case could take as many as three

5    weeks, I thought that four alternate jurors was appropriate and

6    also because of the holidays, unless the parties have strong

7    feelings, one way or the other, on that.

8              MR. GARVIN:  Your Honor, it sounds fine with the

9    defense.

10             THE COURT:  Okay.

11             As the parties are aware, I do use the venire

12   questionnaire.  By the way, I should probably say that the

13   motion for jury questionnaire was denied since we're not going

14   to be using it.  And I do use the strike method.  In this case,

15   the government will have six peremptories and the defense ten.

16   So if everyone uses their peremptories, assuming we put X

17   number of people in the box, we'll have 28 individuals in the

18   box that are potential jurors.  And I'll give each side one

19   peremptory for alternates, so we'll have another six potential

20   alternate jurors in the box for purposes of peremptories, so

21   there will be a total of 34 people in the box.  They will be

22   numbered 1 through 34, for purposes of your charting.  What I

23   will do is I will go through with the first potential juror

24   each of the questions in part 1 of the questionnaire, and I

25   will instruct the venire to listen very carefully, because,

JASKCOC

1    starting with the second potential juror, I will only ask those

2    questions as to which he or she has a positive or an

3    affirmative response, so that we're not going through every

4    question with every potential juror.

5              We will strike for cause as we go along, so if we

6    determine that potential Juror No. 2 needs to be dismissed for

7    cause, he or she will be replaced immediately, and I will ask

8    the person who replaces him or her whether they have any

9    affirmative responses to the part 1 questions on the

10   questionnaire, and we'll go through that process until we have

11   34 people in the box that, arguably, are clean; that is to say,

12   that are not subject to being struck for cause.  And once we

13   have 34 people that fit that bill, I will start again with

14   Juror No. -- potential Juror No. 1, and then ask that person

15   every question on part 2, and ask every subsequent juror every

16   question on part 2, so that you are able to get a sense of who

17   these people are.

18             It is sometimes the case that some responses to part 2

19   elicit someone being stricken for cause.  It's unlikely, but

20   all the other jurors will be here during that process, so if we

21   need to replace a person, we can replace that person even with

22   respect to part 2.  And then if everyone uses their

23   peremptories, we will be left with 16 people in the box.  The

24   first 12 will be our jurors.  And you will separately choose

25   the main juror and then the alternate jurors.  Okay?

JASKCOC

         Like I said, opening arguments, I won't put a time
limit.  It seems to me, as I said earlier, 20-25, 25-30 minutes
is an appropriate time to open in a case like this.  Hopefully,
we'll get the openings in on Monday.  In the unlikely event
that we finish up with jury selection very quickly, I have a
witness here, to put that person in the box.  I will tell the
jury to be here every day no later than a quarter after 9:00 or
20 after 9:00, so we can start at 9:30.  I start on time every
day with the jurors.  I bring them out at 9:30; I send them
home at 2:30.

         If everything goes according to Hoyle, the day will go
as follows:  We'll start with the jury at 9:30, break at 11:00,
break for 15 minutes, start again at 11:15, go to 12:45, break
for 15 minutes, start again at 1:00, end at 2:30.  I will
expect the lawyers to be here no later than 9:00 a.m. every day
in case anything needs to be done.  Something always comes up,
and so I find we are always using that time between
9:00 o'clock and 9:30.

         In terms of -- I forget exactly how 318 or 316 is set
up.  I don't chain lawyers to the podium, so I will allow you
to have -- exhibit some of your personal style to the jurors,
such as it may be, but don't take too much advantage of that.
You don't have to ask for permission every time you approach
the witness, but you should do it early on, so that the witness
is aware of what's happening.

1          And, obviously, no speaking objections.  If there's an

2     objection, you can object, say hearsay, say asked and answered.

3     Don't argue beyond that.  If we need to argue beyond that,

4     we'll argue at sidebar.

5          Any questions on that?

6          MR. DiMASE:  I had two questions, your Honor.

7          One, with respect to publishing exhibits that are in

8     evidence, what's the Court's position on requesting permission

9     to do so versus simply doing so?

10         THE COURT:  As long as something is in evidence,

11    that's clearly in evidence, you don't have to ask permission,

12    although it's probably good form, just that the jury knows

13    what's going on, that you're showing them a document that's

14    already been admitted into evidence.

15         But, obviously, make sure that you know the technology

16    sufficiently, so that you aren't putting anything before the

17    jury that has not been admitted.

18         MR. DiMASE:  Understood, your Honor.

19         THE COURT:  Yes?

20         MR. DiMASE:  Just one question on the Court's practice

21    in jury selection and exercising peremptory challenges:  How

22    does the ordering of the exercise of challenges go?  Different

23    judges do it differently.

24         THE COURT:  We'll go back and forth.  It will be done

25    in rounds, rather than go back and forth, defense goes,

JASKCOC

1    government goes, defense goes, government goes --

2                MR. DiMASE:  I understand.

3                THE COURT:  -- until all the peremptories are

4    completed.

5                MR. DiMASE:  Thank you.

6                MR. DEVLIN-BROWN:  One other logistical question.

7                THE COURT:  Sure.

8                MR. DEVLIN-BROWN:  Your Honor, we have received the

9    government's initial set of exhibits, which are disturbingly

10   voluminous.  We haven't even attempted to print all of them yet

11   because they're bank statements and things of that nature.  We

12   will have our own exhibits.  Does the Court have preferences

13   for getting a catalog of exhibits, seeing them before each

14   witness, getting them electronically in addition?

15               THE COURT:  Don't bother sending them to me

16   electronically because I won't have that technology -- I won't

17   be using that technology on the bench, but if you have a set of

18   exhibits -- a separate set of exhibits, I'm happy to receive

19   it.

20               MR. DEVLIN-BROWN:  Thank you, your Honor.

21               MR. DiMASE:  Judge, on that point, I would just note

22   that we do have a large volume of bank records because of the

23   number of bank accounts involved in this scheme, and it's our

24   current intention to admit them in electronic format.

25   Obviously, if the Court or a witness needs a paper version for

JASKCOC

1   some reason during trial, we can always get that, but to save

2   trees and everyone's time, and not have to carry large binders

3   full of bank records, we think that the electronic way --

4           THE COURT:  That's fine.  I don't need 20 binders of

5   bank records.

6           MR. DiMASE:  Understood, your Honor.  I figured as

7   much.

8           THE COURT:  Okay.

9           Anything else?

10          MR. DiMASE:  No, nothing from the government.

11          THE COURT:  Okay.  I don't think I have anything else

12  myself.  So we will adjourn.

13          Again, you let me know if there's any movement in

14  terms of disposition, and, obviously, whatever other

15  applications are going to be made, get those papers to me as

16  soon as possible, and do get back to me on the voir dire

17  questionnaire within the next couple of days, both to point out

18  any typos, any grammatical errors, and to provide the list of

19  individuals, and entities, and locations that will be discussed

20  during the trial.

21          And I am otherwise available to you at your request.

22  We are adjourned.

23          COUNSEL:  Thank you.

24                              *  *  *

25