**COVINGTON**

BEIJING   BRUSSELS   DUBAI   FRANKFURT   JOHANNESBURG
LONDON   LOS ANGELES   NEW YORK   PALO ALTO
SAN FRANCISCO   SEOUL   SHANGHAI   WASHINGTON

Arlo Devlin-Brown

Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
T +1 212 841 1046
adevlin-brown@cov.com

November 14, 2019

By ECF & Electronic Mail
Honorable Edgardo Ramos
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    *United States v. Mark S. Scott*, S10 17 Cr. 630(ER)

Dear Judge Ramos:

      We write to request admission of two exhibits, marked as Defense Exhibits 550 and 552, which directly relate to cooperating witness Konstantin Ignatov's ("Konstantin") dramatic and almost certainly erroneous testimony regarding Irina Dilkinska's presence at the *sole* meeting Konstantin witnessed between Mr. Scott and his sister Ruja Ignatova ("Ruja"). The exhibits – emails between Mr. Scott and Dilkinska produced by the Government and relating to travel plans– are highly compelling evidence that Dilkinska was *not* in Sofia on the date of the meeting in question. That, in turn, indicates that Konstantin either fabricated or incorrectly recalled his sole encounter with Mr. Scott, at minimum with respect to the highly inculpatory ?? relating to Dilkinska's alleged presence. Defense Exhibit 550 is clearly admissible under Federal Rules of Evidence 803(3) and *United States v. Best*, 219 F.3d 192, 198 (2d Cir. 2000). Defense Exhibit 552, entirely consistent with 550, can be admitted based on FRE 803(3) and 807(a). The admission of these exhibits into evidence is necessary to correct what is almost certainly false testimony by the Government's sole cooperating witness. The Government, while initially e-mailing the defense that it did not oppose the introduction of Defense Exhibit 550, now opposes the introduction of both exhibits.

<u>Konstantin's Testimony That Irina Dilkinska Joined a Meeting With Mr. Scott on July 20, 2016</u>

      During Konstantin's direct examination, the Government established through travel records and a related stipulation that Mark Scott arrived in Sofia on July 20, 2016 (having traveled from Miami via Frankfurt) and left Sofia the very next day. (GX 62; Tr. 243-44). The Government then published and read from WhatsApp records showing that Mr. Scott texted his wife at 2:10 PM Sofia time "Just showered. Off to see R." (GX 3025-S; Tr. 245). At 4:49 PM he sent another text to his wife stating that he was "driving to Hilton soon." (GX 2025-S; Tr. 245).

**COVINGTON**

Konstantin testified that this meeting between Mark Scott and Ruja – clearly taking place during the afternoon of July 20 based on the Government's evidence— was the only meeting Konstantin had with Mark Scott, and proceeded to describe it in detail. (Tr. at 45-247). The following exchange took place:

> Q. Was there anyone else present in Ruja's office when you brought Mark Scott there?
> A. In the beginning nobody except Ruja.
> Q. What happened after you brought Mark Scott to Ruja's office?
> A. Ruja called me to bring Irina. Again I brought Irina and then again I left.
> Q. What happened at that point?
> A. Ruja called me again and told me to make sure that everybody on this floor leaves and goes home so that Irina, Mark, and Ruja are alone.
> Q. Was it common or rare for Ruja to tell everyone in the office to leave and go home?
> A. This was the only time in the time I was working for Ruja.
> Q. Did you stay in the office or did you leave at that point?
> A. I left with everyone others did.
>                             ***
> Q.  After that meeting in Sofia did you have any discussions with Irina about her meeting with Mark Scott?
> A. The week after she told me that she had to stay a long time -- for a long time to stay until Mark Scott understood everything that has to be done or he has to do.

(Tr. 245-47).

At the outset of cross-examination, Konstantin insisted he was "almost a hundred percent" sure about Dilkinska's presence at the meeting:

> Q. And then you testified that Irina Dilkinska joined that meeting?
> A. Yes.
> Q. Are you a hundred percent sure that Ms. Dilkinska was at that meeting?
> A. I'm pretty sure seeing them that they -- I'm pretty sure that they met in Sofia because she told me the week afterwards that they spent a lot of time together.
> Q. Are you a hundred percent sure that she was at that meeting with Mr. Scott?
> A. I'm pretty sure, yes.
> Q. So I just want to be very clear because pretty sure can mean something different than a hundred percent sure. Were you a hundred percent sure or do you have some question in your mind about whether Ms. Dilkinska was there?
> A. I'm pretty sure that Ruja called me to bring her up at that meeting.
> Q. So that's not a hundred percent, right?
> A. This is almost a hundred percent.

2

**COVINGTON**

(Tr. 303-304).

On the second day of cross-examination, Konstantin asserted with still greater confidence that Dilkinska was at the meeting with Mr. Scott, this time claiming he was "one hundred percent sure." (Tr. 396). Konstantin stated that his prior day's reference to "pretty sure" (which he had said meant "almost 100% certain") referred only to his claim that Dilkinska later told him the meeting lasted a "long time until Mark understood." (*Id.*). Konstantin insisted that he was "confident" that Irina was at the meeting even after being shown DX 550, which the Court declined at the time to accept into evidence following the Government's objection.

<u>Defense Exhibits 550 and 552</u>

Between the first and second day of cross-examination, the defense identified in the Government's discovery database what has been marked as DX 550, and subsequently identified DX 552. Both exhibits strongly indicate that Konstantin's testimony that Dilkinska was at the July 20 Sofia meeting was false.

It is undisputed that Dilkinska, a native of Bulgaria, worked in the Sofia offices of OneCoin during the relevant period. Defense Exhibit 550 is an email from Ms. Dilkinska to Mr. Scott dated Sunday, 7/17/16, in which she states that she will "ask my colleagues to send the original to you this week as I am traveling for the *whole week*." (emphasis added). The meeting with Ruja on Wednesday, July 20 obviously occurred the same week. Defense Exhibit 552 is an exchange between Mr. Scott and Irina Dilkinska on July 20, *the very day of Mr. Scott's meeting with Ruja*, in which *both* Dilkinska and Mr. Scott tell each other they are currently traveling.

Defense Exhibits 550 and 552 arise in the context of Mr. Scott seeking to obtain Ms. Dilkinska's signature on documents relating to the Fenero Funds. *Mr. Scott has no objection to redacting all of this further content or including it if preferred by the Government.*

<u>Evidentiary Significance</u>

DXs 550 and 552 suggest that Irina almost certainly did not attend the July 20 meeting in Sofia between Mr. Scott and Ruja and that Konstantin's testimony to that effect was false. Demonstrating that Konstantin either lied or was at best mistaken in his memory is of significant importance to the credibility of his testimony and the defense more broadly. Mr. Scott will argue that Konstantin's testimony's testimony is largely irrelevant because he met Mr. Scott only once. If with respect to this sole meeting Mr. Konstantin's testimony is false – whether because he strained to recall details he could not, or because he fabricated it – the defense will argue it should be discounted entirely. That is particularly important given that the vivid gloss Konstantin puts on the meeting is particularly inculpatory. The mere fact that Mr. Scott met with Ruja is not disputed by the defense or of any great moment. But the meeting Konstantin describes is in many respects damning. First, the fact that Dilkinska – the person Konstantin claims he heard was Mr. Scott's money laundering partner – joins the meeting adds to its value to the Government. Second, the dramatic testimony that after walking Dilkinska into the meeting Ruja directed *all employees to leave the OneCoin offices* for the first time *ever* suggests

COVINGTON

that the meeting involved OneCoin's deepest secrets.[1]  Third, Konstantin's claim that Dilkinska told him after that the fact that the meeting lasted a long time because they had to make sure "Mr. Scott understood everything" further supports the nefarious interpretation the Government claims.  In short, casting doubt on whether Ms. Dilkinska was in fact at the meeting is highly relevant both to the credibility of the sole cooperating witness and to the evidentiary significance of the meeting itself.

Basis For Admission

Fed. R. Evid. 803(3) provides in relevant part that  "a statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed."

Dilkinska's statement in DX 550 that "I am traveling for the whole week" is plainly admissible for the truth that this was her plan on Sunday, July 17, three days before the meeting in Sofia.  The Second Circuit has expressly held that a declarant's "statement as to his intent to perform a certain act in the future is not excludable on hearsay grounds." *United States v. Best*, 219 F.3d 192, 198 (2d Cir. 2000) (citing Fed.R.Evid. 803(3)).  *See also Shelden v. Barre Belt Granite Employer Union Pension Fund*, 25 F.3d 74, 79 (2d Cir. 1994) ("[U]nder [Rule 803(3)], the existence of the plan or intention may be proven by evidence of the person's own statements as to its existence." (citation and internal quotation marks omitted)).  Indeed, the statement can be considered not only for the proposition that this was Dilkinska's intent three days before the meeting but also as evidence "that the declarant thereafter acted in accordance with the stated intent."  *See United States v. Best*, 219 F.3d at 198.  This principle dates back to an 1892 Supreme Court case that serves as a staple of law school evidence courses:  *Mutual Life Insurance Co. v. Hillmon*, 145 U.S. 285, 295-96 (1892) (holding that a declarant's letters stating that he planned to go to Witchita as evidence "that he went away, he had the intention of going, and of going with [a specific person], which made it more probable both that he did go and that he went with [that person] than if there had been no proof of such intention" are admissible).  *See also*, Fed. R. Evid. 803 Advisory Committee Note to Paragraph (3) (1972) ("The rule of [*Hillmon*], . . . allowing evidence of intention as tending to prove the doing of the act intended, is . . . left undisturbed.").

The statements that both Mr. Scott and Dilkinska make in DX 552 that they are then traveling (Scott: "I will look this up when I land tomorrow….already on my way to Europe" and Dilkinska "I am traveling too") are likewise admissible under 803(3) as statements of a plan.  While Dilkinska's statements are framed in the present tense, it reflects future plans as well, and in any event is admissible under Rule 807(a), which states that a hearsay statement "not specifically covered by a hearsay exception" should be admitted if:

---

[1] Furthermore, Konstantin's testimony that Ruja instructed all OneCoin employees to leave the office at the time of the meeting with Mr. Scott goes far beyond what Konstantin indicated in his proffer session with the Government, when he said only that his sister had asked *him* to leave when Scott was there.  (See 3524-017, p. 9)

4

**COVINGTON**

> (1) the statement has equivalent circumstantial guarantees of trustworthiness;
> (2) it is offered as evidence of a material fact;
> (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and
> (4) admitting it will best serve the purposes of these rules and the interests of justice.

As previously described, these e-mails are highly probative on the material issue of whether Konstantin provided accurate testimony regarding his sole meeting with Mr. Scott, especially with respect to the details of the meeting that make it most compelling for the Government. The emails are also highly trustworthy: simply put, there is no reason to think that Dilkinska was lying to Mr. Scott about planned and ongoing travel.

      The Government is free to argue, of course, that perhaps things worked out differently than these e-mails indicate. Perhaps Irina unexpectedly returned to Sofia and was surprised to run into an arriving Mr. Scott (though other e-mails shortly after July 20 strongly indicate that unexpected encounter did not occur). But the most likely scenario is that the Government's cooperating witness either lied about or falsely remembered his sole meeting with Mr. Scott. It is far more likely that Dilkinska was not there at all, casting further doubt on Konstantin's claim that Ruja sent everyone home once Dilkinska entered. DX 550 is plainly admissible under *United States v. Best* and other precedent and the interests of justice support the admission into evidence of both exhibits. Redactions can be made to address any other content in the e-mails beyond references to planned travel

Respectfully Submitted,

/s Arlo Devlin-Brown
Arlo Devlin-Brown

**To:** Mark S. Scott[msscott@msicbvi.com]
**From:** Irina Dilkinska
**Sent:** Sun 7/17/2016 6:41:17 PM
**Subject:** Re: Please sign as BN Manager on letterhead and scan to me.  Original will let you know.

Hi Mark, this has already been done.
Will ask my colleagues to send the original to you this week as I am traveling for the whole week.

Regards
Irina

Sent from my iPhone

On 11 Jul 2016, at 10:29 AM, Mark S. Scott <msscott@msicbvi.com> wrote:


July 11, 2016

Mark S. Scott
Chief Executive Officer
MSS International Consultants (BVI), Ltd.
Ritter House
Wickhams Cay II, PO Box 3170
Road Town, Tortola
British Virgin Islands, VG1110

VIA E-MAIL (msscott@msicbvi.com)

**RE: Loan Facility for Expansion to MSS International Consultants (BVI), Ltd. (the "Borrower" or "MSIC")**

Dear Mark,

Herewith I would like to formalize our several discussions about the expedited expansion of the support services for the Fenero Series of funds and MSIC's capital needs therefore. After some further deliberation, I agree with your suggestion to purchase properties where back office services will be provided for MSIC and the new portfolio companies in Ireland and Bulgaria.  I have decided to grant you an immediate interest free 5 year loan (including fees and expenses) of Euro 2,675,000 (the "Loan Amount"), which may be disbursed in your sole discretion.

I would like to interrupt my current payment process into the Fenero funds as little as possible, so please have the Loan Amount  transferred out of either of the two funds I have invested into by Apex, or just subtract it from my last payment of Euro 5,000,000 last week.

DEFENSE EXHIBIT 550
17 Cr. 630 (ER)

MSCF_USAO_00011967

The principal Loan Amount, plus a $200,000 lump sum, shall be payable to B&N Consult at dissolution of Fenero Equity Investments L.P.  MSIC shall have no responsibility of repayment until such dissolution and shall only pay back this debt out of proceeds of such fund.

Any security interests taken in any property directly or indirectly shall be registered in the name of the Borrower.

Based on the already consummated and targeted opportunities, we continue to feel confident about our investments and output future cooperation with you.

Best regards,

Irina Dilkinska
Manager
B&N Consult EOOD



**Mark S. Scott**
Chief Executive Officer

MSS International Consultants (BVI), Ltd.
BVI Registered and Approved Fund Manager
Sent from my iPad. Please excuse typos.

**To:**      Mark S. Scott[msscott@msicbvi.com]
**From:**    Irina Dilkinska
**Sent:**    Wed 7/20/2016 5:18:50 AM
**Subject:** Re: Question

Hi Mark,
Thank you for your answer first. Please be informed that I must file the report today as today is the deadline. Sorry for this but I am traveling too and because of this there is the present delay of my request to you.

No more transfers I mean from BN for the moment. As you know I have prepared the instructions to IMS and waiting for confirmation to send it to Frank, so we continue from that company. However will coordinate this with Boss once again and revert so you to know how to proceed further.

Please update me on the OLN company. Do we have any progress there, as I have been informed you will take care of this.

Thank you once again
Regards
Irina

Sent from my iPhone

> On 20 Jul 2016, at 12:18 AM, Mark S. Scott <msscott@msicbvi.com> wrote:
>
> Hi Irina,
>
> I will look this up for you when I land tomorrow. This is no problem for us. Already on my way to Europe.
>
> What do you mean there will be no more transfers? You mean from the bank in Bulgaria only? If there is no more money being sent, I would have to close the unfilled funds and send back the money in Fund Nr.2 as it has not closed.
>
> Let's discuss.
>
> Best,
>
> Mark
>
>
>   Original Message
> From:irina@onecoin.eu
> Sent:July 19, 2016 14:43
> To:msscott@msicbvi.com
> Subject:Question
>
> Hi Mark, in relation to the transfers made and necessary regular reporting to the bank regarding then BN investment please tell me how much is the main capital of Fenero to 1 April and 30 June?
> Also what is the financial result to 31.12.2015 and 30.06.2016. Nothing to worry about....this will be reported once and as we do not intend to do more transfers I think same information will be provided every time.
> Please update me if you are still dealing with OLN please as we need to move there.
>
> Thank you
> Regards

DEFENSE EXHIBIT 552
17 Cr. 630 (ER)

MSCF_USAO_00012070

\> Irina
\>
\> Sent from my iPhone

MSCF_USAO_00012071