COVINGTON

BEIJING BRUSSELS DUBAI FRANKFURT JOHANNESBURG
LONDON LOS ANGELES NEW YORK PALO ALTO
SAN FRANCISCO SEOUL SHANGHAI WASHINGTON

**Arlo Devlin-Brown**

Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
T +1 212 841 1046
adevlin-brown@cov.com

November 19, 2019

By ECF and E-Mail
Honorable Edgardo Ramos
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

**Re: *United States v. Mark S. Scott*, S10 17 Cr. 630(ER)**

Dear Judge Ramos:

We write on behalf of our client, Mark Scott, to request that the Court admit Defense Exhibits 1000, 1001, and 1002 (attached hereto) into evidence. These exhibits are official SEC documents reflecting *two* June 2016 enforcement actions against Apex relating to Apex's failure to monitor misuse of funds by fund managers for private equity funds it was then administering. These exhibits provide a compelling explanation as to Apex's motives in reviewing and ending its relationship with the Fenero Funds six weeks later based on its own desire to reduce risk, rather than specific concerns about the Fenero Funds. Mr. Scott was not permitted to cross-examine Mr. Spendiff as to the extent this may have influenced the decisions of the Apex funds, even though Mr. Spendiff apparently had at least some familiarity with the enforcement action. Permitting the introduction of these exhibits would help remediate what Mr. Scott believes is an erroneous evidentiary ruling.

Relevant Facts

On June 16, 2016, the SEC announced and settled two enforcement actions against Apex Fund Services (US) Inc., a corporate affiliate of Apex UK. The SEC alleged that Apex had "failed to live up to its gatekeeper responsibility" and "essentially enabled" the managers of funds it was administering to misuse funds invested by limited partners. *See* GX 1000. In one action, involving a fund called Equity Star, Apex "failed to account for more than $1 million in undisclosed withdrawals" by the fund manager, despite no evidence the manager "was able or willing to pay the withdrawals." In the second matter, involving a fund called ClearPath, Apex failed to act appropriately after identifying transfers made pursuant to loan agreements and between fund accounts. In both cases, these failures led to Apex calculating and providing investors with an inflated NAV and enabling the fund managers / owners to perpetrate fraud. *Id.*

Apex settled the matter, paying a $352,499 financial penalty and agreeing to retain an "independent consultant" who would review Apex's compliance practices and report to the SEC. *See* DX 1002, at 6 (the settlement of the other action, reflected in DX 1001, likewise required engagement of a compliance consultant). The consultant was to be engaged within 45 days of the order – i.e. late July 2016 – and evaluate Apex's policies and procedures with respect to "due diligence prior to adding new clients," "whether to retain or dismiss clients who engage in conduct possibly detrimental to the client's investors" and "detecting and addressing fraud," among other mandates. *Id.* Within three months of conducting the review, the compliance consultant would report its finding and recommendations to the SEC. *Id.*

In his direct testimony, Paul Spendiff stated that on Friday, July 29, 2019, Mr. Spendiff and his team decided to conduct "enhanced due diligence" on the Fenero funds because they were "uncomfortable with the investment manager making loans to himself," among other reasons. (Tr. 607, 608.) Notably, this was *prior* to Apex noticing any connection between the Fenero Funds and OneCoin. Mr. Spendiff and his team spent the weekend "doing a complete review of the funds and the relationship with Mr. Scott," (Tr. 611), joined by "Nitin Khanapurkar," (Tr. 612), Apex's Head of Risk (Tr. 720). It was only *after* this process started that the Apex team identified any connection to OneCoin (Tr. 615).

On cross-examination, Mr. Spendiff discussed the same Friday, July 29 meeting, noting it was attended both by Muzammil Koyratty, Head of Compliance, and Nitin Khanapurkar, Head of Risk. (Tr. 720). When asked whether Apex was at the time going through a process of identifying high-risk customers, Mr. Spendiff gave an ambiguous answer: "I'm not aware of that per se." (Tr. 721). After Mr. Spendiff acknowledged that Apex was regulated in the U.S. by the SEC, the Government called for a sidebar.

During the sidebar, the Government objected that the defense was going into a "totally unrelated irrelevant settlement in 2016" involving the "New Jersey office" that had "nothing to do with Mr. Spendiff, the U.K. office, and any of the fund managers there, any of the employees of Apex in the U.K." (Tr. 723). The Government asserted that this was therefore "wholly irrelevant and improper." *Id.* The defense questioned the Government's confidence in its view that the SEC action was "wholly irrelevant" to the termination of the Fenero Funds given that there was no record of Mr. Spendiff expressing a view on the subject in the § 3500 material. *Id.* The defense argued it was therefore proper to explore whether the witness "had some awareness [of the settlement,] and whether that was having impact on the fund's determination at the time to look not just at Fenero, but more broadly." *Id.* The Government once again responded with unwavering certainty: "It was entirely focused on the New Jersey office. It had absolutely nothing to do with anyone in the U.K. office. Nothing." *Id.* In some tension with this absolutism, the Government then acknowledged that Mr. Spendiff "has read press about it, and he knows that in the wake of the incident, there was rolling out of policies and procedures informed by what they had learned." *Id.* The defense made a further proffer as to relevance and offered to provide the Court with the press release relating to the settlement, but the Court determined that cross-examination on the subject would be "too attenuated."

Discussion

While the Court has considerable latitude in setting the scope of cross-examination, the defense should have been permitted to at least inquire as to whether Apex SEC settlements the month prior had some connection to Apex's decision to abruptly demand further due diligence from the Fenero Funds. Prior to the sidebar, Mr. Spendiff had provided a somewhat ambiguous answer as to whether Apex was the in the process of identifying high risk customers: "I'm not aware of that per se." (Tr. 721). This suggested that that the question might at least be coming close to the mark – that there may been some broader policy or practice changes in place that contributed to Apex's decision-making. Moreover, the Government's concession at sidebar that Mr. Spendiff knew of the settlement and that there was a "rolling out of policies and procedures" (Tr. 723) following the settlement six weeks earlier suggests that there may have been some relationship. Indeed, Mr. Spendiff had testified on direct that the enhanced diligence had occurred because Apex was "[u]ncomfortable with an investment manager making loans to himself a second time… in very short succession." (Tr. 607) Similar conduct was at issue in both SEC settlements, both of which involved self-dealing by the fund managers.

Furthermore, the Government's representations to the court during the sidebar that the "New Jersey office" had "absolutely nothing to do with anyone in the U.K. office" (Tr. 723) misstates the working relationship that the Apex offices share with one another, as the testimony in this very case makes apparent. In fact, Mr. Spendiff testified that he "first made contact with Mr. Scott" (Tr. 520) when "Deborah" (previously identified as "Deborah Buscema who was the salesperson based here in New York" (Tr. 519)) "called me in the London office and stated that there was a client that they had been in discussions with for a period of time." (Tr. 520). The § 3500 material provided by the Government further shows that the New York and London offices were in extensive early communication about bringing on Mr. Scott as a client, discussing things such as the initial paperwork required, the "proposed fee split," and the frequency and type of reporting. (*See, e.g.,* 3511-001 [Tab 1]). In other words, the kind of coordination and sharing across offices that the Government unequivocally stated did not exist occurred in the very case at hand. Thus, given company structure, there is a high probability that the "rolling out of policies and procedures" in the wake of the settlement was done across all firm offices.

Cross-examination on this subject could have elicited that Apex's abrupt decision to scrutinize the Fenero Funds was not based, or not solely based, on perceived issues with the Fenero Funds themselves, but was triggered by changes in Apex's comfort level for certain fund management practices. This in turn would have enabled the defense to argue that Fenero's practices and disclosures were not far outside the bounds of normal and that it was Apex's standards that had changed. This sudden and unannounced change in standards helps explain Mr. Scott's frustration at his fund access being frozen until he provided substantial additional KYC information.

Admitting the settlement documents themselves would partially remediate this issue. It would be particularly appropriate to admit at least the press release (DX 1000) given that the Government acknowledged that Mr. Spendiff had "read press about it" (Tr. 723). While Mr. Scott would not be able to argue that there was any evidence from Mr. Spendiff that that these

policies had an impact, he could at least point out that an SEC action based on Apex's alleged failure to police self-dealing by a fund manager may have impacted Apex UK's practices or risk-tolerance at some level.

Respectfully Submitted,

/s Arlo Devlin-Brown
Arlo Devlin-Brown