UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

INVESTMENT ADVISERS ACT OF 1940
Release No. 4428 / June 16, 2016

ADMINISTRATIVE PROCEEDING
File No. 3-17299

| | |
|---|---|
| In the Matter of<br><br>APEX FUND SERVICES (US), INC.,<br><br>Respondent. | ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 203(k) OF THE INVESTMENT ADVISERS ACT OF 1940, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER |

I.

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 203(k) of the Investment Advisers Act of 1940 ("Advisers Act") against Apex Fund Services (US), Inc. ("Respondent" or "Apex").

II.

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over Respondent and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 203(k) of the Investment Advisers Act of 1940, Making Findings, and Imposing a Cease-and-Desist Order ("Order"), as set forth below.

III.

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

---

[1] The findings herein are made pursuant to Respondent's Offer and are not binding on any other person or entity in this or any other proceeding.

DEFENSE
EXHIBIT
1001
17 Cr. 630 (ER)

### Summary

1.    These proceedings arise out of the role of Apex Fund Services (US), Inc. ("Apex), a fund administrator that provided accounting and administrative services to four private funds managed by ClearPath Wealth Management, LLC ("ClearPath") and its president, Patrick Churchville ("Churchville").  On May 7, 2015, the Commission filed a civil complaint against ClearPath and Churchville in the United States District Court for the District of Rhode Island alleging securities fraud violations relating to their misappropriation scheme involving the funds.

2.    During the course of Apex's engagement as ClearPath's fund administrator, Apex ignored or missed red flags including undisclosed brokerage and bank accounts, related party transactions, inter-series and inter-fund transfers in violation of fund offering documents, and undisclosed margin or credit agreements.  Despite the existence of the red flags, Apex failed to correct previously issued accounting reports and capital statements it had prepared for ClearPath and continued to provide to ClearPath reports and statements that were materially false.  Apex's reports and statements were used by ClearPath to communicate financial positions and performance to the ClearPath funds' investors and were provided to the funds' independent auditor.

3.    As a result of the foregoing, Apex was a cause of ClearPath's and Churchville's violations of Sections 206(2) and 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

### Respondent

4.    **Apex** is a fund administration company based in Red Bank, New Jersey.  Apex is the United States subsidiary of Apex Fund Services Holdings, Ltd., which is registered in Bermuda.

### Other Relevant Entities

5.    **ClearPath** is a Delaware limited liability company ("LLC") and an investment adviser that was licensed by the State of Rhode Island with its principal place of business in Barrington, Rhode Island.  ClearPath was registered with the Commission as an investment adviser beginning January 3, 2008 through November 16, 2012 (SEC File No. 801-68715).  ClearPath is the manager of several LLCs that were the general partners of five private funds.  ClearPath was also the adviser to these private funds pursuant to management agreements between ClearPath and each of the funds.  On May 7, 2015, the Commission filed a civil complaint alleging fraud charges against ClearPath and its owner, Patrick Churchville, in the United States District Court for the District of Rhode Island.  *Securities and Exchange Commission v. ClearPath Wealth Management, LLC, Patrick Evans Churchville, as Defendants, and ClearPath Multi-Strategy Fund I, L.P., ClearPath Multi-Strategy Fund II, L.P., ClearPath Multi-Strategy Fund III, L.P., and HCR Value Fund, L.P., as Relief Defendants*, Civil Action No. 15-cv-00191 (D.R.I. May 7, 2015).

2

6.      **Patrick Evans Churchville**, age 47, lives in Barrington, Rhode Island.  He was the sole owner and President of ClearPath.

7.      The four private funds managed by ClearPath and Churchville for which Apex provided fund administration services were (collectively, the "**Funds**"):

     a.  **ClearPath Multi-Strategy Fund I, L.P.** ("MSF I"), formerly known as ClearPath Private Equity Fund, L.P., is a Delaware limited partnership formed in 2008.

     b.  **ClearPath Multi-Strategy Fund II, L.P.** ("MSF II") is a Delaware limited partnership formed in 2011.

     c.  **ClearPath Multi-Strategy Fund III, L.P.** ("MSF III"), formerly known as the ClearPath Healthcare Receivables Investments Fund L.P., is a Delaware limited partnership formed in 2009.

     d.  **ClearPath Alternative Investments Fund, L.P.** was a Delaware limited partnership formed in 2009.  As of January 1, 2012, this fund was merged into MSF I.

## Facts

## Apex's Relationship With ClearPath and the Funds

8.      Each of the four Funds retained Apex as its fund administrator effective December 15, 2011.  Apex contracted to provide the following services to the Funds including, but not limited to:

- "…arranging the issue, redemption and repurchase of Fund interests… including sending subscription documents to prospective investors as requested, receiving subscription applications and redemption notices, reviewing the information contained in the subscription applications and determining that such documents have been properly and fully completed as instructed by counsel…"

- "…keeping the accounts and records of the Fund and preparing, stamping and forwarding to investors all checks, statements, notices and other documents which the Manager is required or determined to issue, send or serve."

- "…preparing the monthly and annual financial statements of the Fund in conformity with United States generally accepted accounting principles ("US GAAP") and liaising with the Fund's auditor in respect of the annual financial statements and assisting to review the notes thereto…"

- "…maintenance of the Register in such form and in such manner as directed by the Fund and the Manager and specifically, the Administrator shall…iv) issue and execute statements of Fund interest relating to each partner's investment in the Fund…"

9.     At the time of Apex's engagement, the Funds' prior administrator was significantly delinquent in its fund accounting and had only prepared quarterly accounting records through March 2010.  Apex's principal role was to recreate and set up the Funds' accounting from the Funds' inception, to bring the accounting records up to date, to prepare monthly and annual financial statements of the Funds, to liaise with the Funds' auditor in preparing annual financial statements and to assist in reviewing notes to the annual financial statements.  (ClearPath retained auditors to provide audit and tax services to the Funds.)  Apex provided administrative services to the Funds from December 2011 through approximately December 2012.

10.     Apex set up each of the Funds in its fund accounting system and populated the accounting system with information received from ClearPath including bank statement activity, subscription and redemption documents, statements from portfolio investments and other sources.  Apex periodically provided ClearPath a reporting package called a net asset value package ("NAV Package") that contained financial reports including, among others, the Funds' balance sheet, profit and loss statement, and limited partners' capital account balances.  In addition, Apex periodically provided ClearPath with capital account statements for each of the Funds' limited partners that set forth the changes in, and balances of each capital account (i.e. contributions, withdrawals, management fees and profit or loss allocation).

11.     During the entirety of Apex's engagement, the Funds were audited by an independent auditor.  Apex provided general ledger trial balances for each Fund to the auditor. As the designated liaison between the Funds and the auditor, Apex was responsible for providing financial information to the auditors as requested.  For auditing purposes, Apex provided the accounting firm with many of the same financial reports it provided to ClearPath as part of the NAV Packages.

## Apex Set Up the Funds' Accounting Systems Incorrectly

12.     The ClearPath Funds were organized as series funds.   Each series within each fund generally invested in one investment (e.g., limited partnership interests, secured debt instruments, or private equity).  Limited partners, through their subscription agreements, designated in which specific series they wanted to invest.  The Limited Partnership Agreements ("LPA") for each Fund established the series structure and how each series was intended to stand alone:

"The Partnership's assets shall be divided into separate series…and each Series shall generally be accounted for as a 'sub-partnership' for purposes of this Agreement…the interests in any Series shall be considered a separate Series from interests in any other Series…the debts, liabilities and obligations incurred, contracted for or otherwise existing with respect to

4

any one Series shall be enforceable against the assets of such Series only and not against the assets of the Partnership generally or of any other Series."

13.    As part of its fund administration services, Apex prepared capital account statements for each Limited Partner reflecting the interests in each series, rather than at the Fund level.

14.    In setting up the fund accounting system for the ClearPath Funds, Apex failed to address the fact that the Funds' governing documents specified that each series was a sub-partnership and that the assets and liabilities of each series cannot be commingled with any other series. While Apex established capital accounts for each series, it did not set up its accounting system to ensure that it allocated the Funds' assets (including the portfolio investments) and liabilities to specific series. By failing to align the capital accounts with the related assets and liabilities of each series, combined with the fact that ClearPath only maintained one bank account for each Fund, the capital account statements that Apex generated for ClearPath to provide to Fund investors did not accurately reflect ClearPath's and Churchville's use of series' assets and as a result made possible ClearPath and Churchville's misappropriation and use of series assets for unauthorized investments.

## Apex Ignored Red Flags and Was a Cause of ClearPath's Records' Failure to Account for a Margin Loan

15.    One of the series in MSF I was called the Oppenheimer Public Markets series. ClearPath raised approximately $4.9 million from various limited partners in August 2011 and established a brokerage account at Oppenheimer & Co. ("OPCO") where the cash was deposited. ClearPath used the cash to purchase short-term U.S. government and agency bonds. As of December 31, 2011, the OPCO account had a balance of $4.8 million which represented 23% of total partners' capital in MSF I.

16.    The ClearPath Funds' auditor confirmed the existence and valuation of portfolio investments as of December 31, 2011 by contacting representatives of the portfolio companies or portfolio investment managers. OPCO responded to the confirmation request and identified two previously undisclosed brokerage accounts – one in the same name as the Fund, and one in the name of MSF I's general partner. The brokerage account in the name of the Fund had a negative balance of $4.1 million generated by margin borrowing against the government bond account dating back to the inception of the OPCO relationship in August 2011.[2]  As alleged in the Commission's complaint against ClearPath and Churchville, Churchville used $2.5 million of the margin loan proceeds to purchase Churchville's personal residence overlooking Narragansett Bay in Barrington, Rhode Island and $1.6 million of the proceeds to cover-up losses from misappropriation in MSF III as outlined in the following sections.

---

[2] The account in the name of MSF I's general partner did not have a balance at December 31, 2011. That account was simply used to process wire transfers from the margin account to ClearPath in August 2011.

17.     The auditor sent the December 2011 statements for the government bond and margin accounts to an Apex employee by email on July 2, 2012 and asked Apex for information about the margin account.  A week later, on July 9, 2012, Apex responded to the auditor that it was not aware of the margin account and it would have to follow up with ClearPath because, "This might change everything for the OPCO class."  That same day, Apex reached out to ClearPath's managing director of fund operations, who responded that she was similarly unaware of the margin account and that she needed to follow up with Churchville.

18.     There is no further mention of the margin account by Apex, the auditor or ClearPath following the July 9, 2012 communications above.  Apex had previously issued NAV Packages to both ClearPath and the Funds' auditor that reflected only the invested balance of $4.8 million.  Even after learning of the existence of the margin balance that showed 85% of the OPCO series value had been margined, Apex did not make any adjustments to the previously issued NAV Packages or capital account statements to reflect the margin loan.  In addition, Apex continued to issue NAV Packages for the Funds reflecting the overstated balance in the OPCO series through Q3 2012.

19.     Apex also failed to correct the financial statements previously provided to ClearPath for preparation of investor capital account statements, and to the auditors, to reflect the margin loan balance.  The auditors issued unqualified opinions in January 2013 on the MSF I financial statements, which did not include the margin loan balance or disclose its existence and so reflected the OPCO investment with a balance of $4.8 million when the balance, offset by the margin loan, was less than $650,000.

### Apex Ignored or Missed Red Flags and Was a Cause of ClearPath's Records' Failure to Account for a Line of Credit

20.     The largest investment holding in MSF I, and the only investment holding in ClearPath Alternative Investments Fund, were interests in the Feingold O'Keeffe Distressed Loan Fund, L.P. ("Feingold O'Keeffe").  In January 2012, ClearPath provided Apex with capital account statements from Feingold O'Keeffe reporting the balances for MSF I and the ClearPath Alternative Investments Fund as of December 31, 2011.  Both statements differed from the prior months' statements in one significant way: the title of each statement clearly indicated that the interests were "pledged" by ClearPath.

21.     Apex continued to receive capital account statements from Feingold O'Keeffe in successive months through June 2012.  Every statement clearly indicated that the Feingold O'Keeffe investments were "pledged."

22.     Apex failed to reflect in Fund accounting records that ClearPath had pledged Feingold O'Keeffe, which was the largest investment in MSF I and the only investment in the ClearPath Alternative Investments Fund, and Apex never discussed the pledge agreement with ClearPath.  Had Apex made an inquiry about the pledge agreement, as part of its duty to accurately keep the accounts and records for the Fund, it would have found that MSF I had entered into a line of credit agreement with Commerce Bank in December 2011 that was collateralized by the Funds' investment in Feingold O'Keeffe and that, in January 2012,

ClearPath borrowed $3.75 million against the line of credit and used the proceeds for investments that were not recorded in the books and records of any of the Funds.

23.     Apex failed to recognize the pledge agreement and failed to properly account for the loan balance in the Funds' NAV Packages and Limited Partner capital account statements.

#### Apex Failed to Account for Prohibited Inter-Series and Inter-Fund Commingling

24.     In December 2010, ClearPath sold the largest investment in MSF III, referred to as the Managed Futures series.  This redemption resulted in a $6.6 million cash deposit into the MSF III bank account on December 22, 2010.  This transaction initiated a series of transfers between series and between Funds in clear violation of the Funds' offering documents and unsupported accounting entries to cover up the misconduct.  Apex failed to properly account for the transactions and failed to correct investors' capital account statements to reflect the true economic condition of their investments.  The cash transactions included:

| | |
|---|---|
| **December 2010** | • Churchville misappropriated approximately $1 million of the Managed Futures sale proceeds for a private equity investment in a pharmaceutical development company.  While Managed Futures investors' money was used for this investment, neither ClearPath nor Apex allocated equity in the investment to the Managed Futures series investors, or any other investors.<br>• Churchville transferred $400,000 to ClearPath to cover its administrative expenses in violation of the Fund's LPA.  Apex improperly recorded this as a receivable "Due from Investment Manager." |
| **January 2011** | • ClearPath distributed approximately $5 million of the Managed Futures sale proceeds to limited partners in the series.  After making these payments the cash balance in the MSF III account was less than $400,000 even though ClearPath was obligated to distribute the remaining $1.6 million. |
| **July 2011** | • ClearPath raised $2.1 million from a different set of investors for a healthcare receivables investment in MSF III but used $1.6 million of this cash to pay the remaining distributions for the Managed Futures series. |
| **September 2011** | • ClearPath borrowed $1.6 million against the OPCO investment in MSF I on August 31, 2011, transferred the proceeds into MSF III's account on September 2, 2011, and then used the cash to purchase the healthcare receivables investment on behalf of the limited partners that contributed cash in July. |

25.     The preceding transactions were significant cash flows between series and between Funds in violation of the Funds' offering documents, which prohibited commingling.

All of the cash flows were reflected on ClearPath's bank statements and schedules provided to Apex. Apex failed to properly account for inter-series transactions to reflect the transfer of economic interests between series. For example, as of July 2011, Apex's accounting records showed that certain limited partners held an equity position in the above-referenced healthcare receivables series, but there was no investment underlying this equity at the time because ClearPath and Churchville had stolen the cash to fund the final Managed Futures distribution.

26.     In addition to improperly accounting for cash commingling transactions, Apex's accounting records included unsupported journal entries that further enabled ClearPath to mask the misappropriation scheme. Apex posted four unsupported journal entries with effective dates of March, April, May and August 2011 to MSF III's general ledger to credit ClearPath with equity ownership in the pharmaceutical development company series. These entries increased ClearPath's ownership in the series by approximately $1.2 million but were not tied to contemporaneous cash investments in the series by ClearPath and were not accompanied by any subscription documents evidencing the investment. Since there was no cash received by the Fund for each of these ClearPath "investments," Apex increased the "Due from Investment Manager" receivable balance for each entry. By August 2011, the "Due from Investment Manager" account had increased by $1.6 million due to the accounting entries above. Apex improperly recorded this balance as "repaid" when ClearPath transferred the $1.6 million of OPCO money it took from MSF I to cover the hole ClearPath created in MSF III in September 2011.

27.     Apex knew or should have known about the inter-series and inter-Fund misappropriation, but Apex failed to properly account for the economic substance of the transactions. As a result, Apex created accounting records and capital account statements that reflected inaccurate equity balances for many of the ClearPath Funds' series.

## **Violations**

28.     Section 206(2) of the Advisers Act prohibits any investment adviser from engaging in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client. A violation of Section 206(2) may rest on a finding of negligence. *SEC v. Steadman*, 967 F.2d 363, 643 n.5 (D.C. Cir. 1992) (citing *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963)). Proof of scienter is not required to establish a violation of Section 206(2). *Id.*

29.     Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder make it unlawful for any investment adviser to a pooled vehicle to make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle, or to otherwise engage in any act, practice, or course of business that is fraudulent, deceptive or manipulative with respect to any investor or prospective investors in the pooled investment vehicle. A violation of Section 206(4) of the Advisers Act and the rules thereunder does not require scienter. *Steadman*, 967 F.2d at 647.

30.     As a result of the conduct described above, Apex was a cause of ClearPath's and Churchville's violations of Sections 206(2) and 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

## **Undertakings**

31.     Independent Compliance Consultant.

a.  Apex has undertaken to retain, within 30 days of the date of the issuance of this Order, the services of an Independent Compliance Consultant ("Consultant") not unacceptable to the staff of the Commission.  The Consultant's compensation and expenses shall be borne exclusively by Apex. Apex shall require the Consultant to conduct a comprehensive review of, and recommend corrective measures concerning, Apex's compliance and other policies and procedures with respect to:

i) setting up fund administration and accounting to comport with client fund governing documents,

ii) ensuring administration and accounting systems correctly account for fund margin or other borrowing, intra-fund borrowing or other fund transactions,

iii) preparing accurate capital account or other fund or investor account statements,

iv) communicating with clients, auditors and others about clients' possible failure to comport with fund governing documents, and

v) detecting and addressing fraud.

b.  Apex shall provide to the Commission staff, within thirty (30) days of retaining the Consultant, a copy of an engagement letter detailing the Consultant's responsibilities, which shall include the review described above in paragraph 31.a.

c.  At the end of the review, which in no event shall be more than three months after the date the Consultant is retained by Apex, Apex shall require the Consultant to submit an Initial Report to Apex and to the Commission staff.  The Initial Report shall address the issues in paragraph 31.a., and shall describe the review performed, the conclusions reached, the Consultant's recommendations for changes in or improvements to Apex's policies and procedures, and a procedure for implementing the recommended changes in or improvements to those policies and procedures.

d.  Apex shall adopt all recommendations contained in the Initial Report within ninety (90) days of receipt; provided, however, that within thirty (30) days of Apex's receipt of the Initial Report, Apex may, in writing, advise the Consultant and the Commission staff of any recommendations that it considers unnecessary,

9

unduly burdensome, impractical or inappropriate.  With respect to any such recommendation, Apex need not adopt that recommendation at that time but shall proposed in writing an alternative policy, procedure or system designed to achieve the same objective or purpose.  The Consultant shall evaluate any alternative procedure proposed by Apex.  As to any recommendation on which Apex and the Consultant do not agree, such parties shall attempt in good faith to reach an agreement within thirty (30) days after Apex provides the alternative procedures described above.  In the event that Apex and the Consultant are unable to agree on an alternative proposal, Apex and the Consultant shall jointly confer with the Commission staff to resolve the matter.  In the event that, after conferring with the Commission staff, Apex and the Consultant are unable to agree on an alternative proposal, Apex will abide by the recommendations of the Consultant.

e.  Within nine months after the date of issuance of this Order, Apex shall require the Consultant to complete its review and submit a written final report to Commission staff.  The Final Report shall describe the review made of Apex's compliance policies and procedures relating to the publication, circulation, or distribution of performance reports; set forth the conclusions reached and the recommendations made by the Consultant, as well as any proposals made by Apex; and describe how Apex is implementing the Consultant's final recommendations;

f.  Apex shall take all necessary and appropriate steps to adopt and implement all recommendations contained in the Consultant's Final Report. The date of completion of the undertakings shall, in no event, be later than one year from the date of issuance of this Order;

g.  For good cause shown and upon timely application by the Consultant or Apex, the Commission's staff may extend any of the deadlines set forth in these undertakings;

h.  To ensure the independence of the Consultant, Apex (i) shall not have the authority to terminate the Consultant or substitute another consultant for the initial Consultant, without the prior written approval of the Commission's staff; (ii) shall compensate the Consultant and persons engaged to assist the Consultant for services rendered pursuant to the Order at their reasonable and customary rates; and (iii) shall not invoke the attorney-client or any other doctrine or privilege to prevent the Consultant from communicating with or transmitting any information, reports or documents to the Commission's staff.

i.  Apex shall require the Consultant to enter into an agreement providing that for the period of the engagement and for a period of two years from completion of the engagement, the Consultant shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with Apex, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such.  The agreement will also provide that the Consultant will require that any firm with which he/she is affiliated or of which he/she is a member, and

any person engaged to assist the Consultant in the performance of his or her duties under this Order shall not, without prior written consent of the Commission staff, enter into any employment, consultant, attorney-client, auditing or other professional relationship with Apex, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

32.     Apex shall certify, in writing, compliance with the undertakings set forth above. The certification shall identify the undertakings, provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance. The Commission's staff may make reasonable requests for further evidence of compliance, and Apex agrees to provide such evidence. The certification and supporting material shall be submitted to Robert B. Baker, Assistant Director, Asset Management Unit, Boston Regional Office, Securities and Exchange Commission, 33 Arch Street, 24th Floor, Boston, MA 02110, with a copy to the Office of the Chief Counsel of the Enforcement Division, no later than sixty days from the date of completion of the undertakings.

## IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondent's Offer.

Accordingly, pursuant to Section 203(k) of the Advisers Act, it is hereby ORDERED that:

A.     Apex shall cease and desist from committing or causing any violations and any future violations of Sections 206(2) and 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

B.     Apex shall comply with the undertakings enumerated in paragraphs 31 and 32 above.

C.     Apex shall pay disgorgement of $96,800 and prejudgment interest of $8,813, for a total payment of $105,613. Payment shall be made to Stephen F. Del Sesto, Esq., the court-appointed receiver for ClearPath pursuant to Rule 1102 of the Commission Rules of Fair Fund and Disgorgement Plans [17 C.F.R. § 201.1102]. Payment shall be made in the following installments: $26,403.25 within 10 days of the issuance of the Order, $26,403.25 within 180 days of the issuance of the Order, $26,403.25 within 270 days of the issuance of the Order, and $26,403.25 within 360 days of the issuance of the Order. If timely payment is not made, additional interest shall accrue pursuant to Rule 600 of the Commission Rules of Practice [17 C.F.R. § 201.600]. Payment must be: (A) made by United States postal money order, certified check, bank cashier's check or bank money order; (B) made payable to Stephen F. Del Sesto, Esq.; (C) hand-delivered or mailed to Stephen F. Del Sesto, Esq., Donoghue Barrett & Singal, P.C., One Cedar Street, Suite 300, Providence, RI 02903; and (D) submitted under cover letter that identifies Apex as a Respondent in these proceedings, the file number of these proceedings, and *Securities and Exchange Commission v. ClearPath Wealth Management, LLC, Patrick Evans Churchville, as Defendants, and ClearPath Multi-Strategy Fund I, L.P., ClearPath Multi-*

*Strategy Fund II, L.P., ClearPath Multi-Strategy Fund III, L.P., and HCR Value Fund, L.P., as Relief Defendants*, Civil Action No. 15-cv-00191, a copy of which cover letter and money order or check must be sent to Robert B. Baker, Assistant Director, Asset Management Unit, Securities and Exchange Commission, 33 Arch Street, 24th Floor, Boston, MA 02110.

       D.      Apex shall pay a civil money penalty of seventy-five thousand dollars ($75,000). Payment shall be made to Stephen F. Del Sesto, Esq., the court-appointed receiver for ClearPath pursuant to Rule 1102 of the Commission Rules of Fair fund and Disgorgement Plans [17 C.F.R. § 201.1102]. Payment shall be made in the following installments: $18,750 within 10 days of the issuance of the Order, $18,750 within 180 days of the issuance of the Order, $18,750 within 270 days of the issuance of the Order, and $18,750 within 360 days of the issuance of the Order. If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717. Payment must be: (A) made by United States postal money order, certified check, bank cashier's check or bank money order; (B) made payable to Stephen F. Del Sesto, Esq.; (C) hand-delivered or mailed to Stephen F. Del Sesto, Esq., Donoghue Barrett & Singal, P.C., One Cedar Street, Suite 300, Providence, RI 02903; and (D) submitted under cover letter that identifies Apex as a Respondent in these proceedings, the file number of these proceedings, and *Securities and Exchange Commission v. ClearPath Wealth Management, LLC, Patrick Evans Churchville, as Defendants, and ClearPath Multi-Strategy Fund I, L.P., ClearPath Multi-Strategy Fund II, L.P., ClearPath Multi-Strategy Fund III, L.P., and HCR Value Fund, L.P., as Relief Defendants*, Civil Action No. 15-cv-00191, a copy of which cover letter and money order or check must be sent to Robert B. Baker, Assistant Director, Asset Management Unit, Securities and Exchange Commission, 33 Arch Street, 24th Floor, Boston, MA 02110.

       E.      Pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002, as amended, a Fair Fund is created for the disgorgement, prejudgment interest penalties referenced in paragraphs IV.B. and IV.C. above. The Fair Fund will be distributed by the court-appointed receiver. Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, it shall not argue that it is entitled to, nor shall it benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that it shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a

private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.


By the Commission.


Brent J. Fields
Secretary