UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

Investment Advisers Act of 1940
Release No. 4429 / June 16, 2016

ADMINISTRATIVE PROCEEDING
File No. 3-17300

| | |
|---|---|
| **In the Matter of**<br><br>APEX FUND SERVICES (US), INC.,<br><br>Respondent. | ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 203(k) OF THE INVESTMENT ADVISERS ACT OF 1940, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 203(k) of the Investment Advisers Act of 1940 ("Advisers Act") against Apex Fund Services (US), Inc. ("Respondent" or "Apex").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over Respondent and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 203(k) of the Investment Advisers Act of 1940, Making Findings, and Imposing a Cease-and-Desist Order ("Order"), as set forth below.

**III.**

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

---

[1] The findings herein are made pursuant to Respondent's Offer and are not binding on any other person or entity in this or any other proceeding.

1

DEFENSE EXHIBIT 1002
17 Cr. 630 (ER)

## Summary

1.      These proceedings arise out of the role of Apex Fund Services (US), Inc. ("Apex"), as fund administrator that provided accounting and fund administration services to Global Partners Fund, LLC ("Global Partners") and Momentum Growth Fund, LLC ("Momentum"), two private funds managed by EquityStar Capital Management, LLC ("EquityStar") and Steven Zoernack ("Zoernack").

2.      EquityStar and Zoernack made materially false and misleading statements to investors and prospective investors of Global Partners and Momentum. Among other things, EquityStar and Zoernack made undisclosed withdrawals of more than $1 million directly from the funds. From May 2012 through June 2014, Apex performed accounting and fund administration services for EquityStar and Zoernack. During its engagement, Apex accounted for the withdrawals as receivables (assets of the funds) without evidence that EquityStar and Zoernack were able or willing to repay the withdrawals. Apex also provided monthly statements to the Global Partners and Momentum investors on behalf of Zoernack and EquityStar that did not state the existence and amounts of the withdrawals. The statements therefore materially overstated the value of the investors' holdings in the funds because Apex incorrectly characterized the withdrawals as receivables due to the funds. By the time Apex disclosed to investors the existence of the withdrawals, almost two years after it began working with EquityStar and Zoernack, investors had suffered significant losses.

3.      As a result of the foregoing, Apex caused EquityStar's and Zoernack's violations of Sections 206(2) and 206(4) of the Advisers Act and Rule 206(4)-8.

## Respondent

4.      **Apex** is a fund administration company based in Red Bank, New Jersey. It has approximately 15 employees and less than $700 million of assets under administration. Apex is the U.S.-based subsidiary of Apex Fund Services Holdings, Ltd., which is registered in Bermuda.

## Other Relevant Entities

5.      **Steven Zoernack**, age 53, resides in Nokomis, Florida. He is the managing member and sole employee of EquityStar. Zoernack is also the managing member for both the Momentum and Global Partners funds. On June 26, 2007, Zoernack was convicted after pleading guilty to one count of wire fraud.[2]

6.      **EquityStar Capital Management, LLC**, is a Delaware limited liability company formed May 20, 2010. Zoernack is the managing member and sole employee of EquityStar. During all relevant periods, EquityStar's principal offices were located in Newport Beach,

---

[2]     *U.S. v. Zoernack*, Case No. 01:04cr868(LTS) (S.D.N.Y., June 26, 2007). In 1999, Zoernack was also convicted in New York state court of possessing a forged instrument, also in connection with a commercial mortgage. *The People of the State of New York v. Steven Zoernack*, Superior Court Information #98-1489 (Westchester County, September 18, 1999).

California, and Washington, D.C.  EquityStar is an unregistered investment adviser for Global Partners and Momentum.

7.      **Momentum Global Growth Fund, LLC**, is a Delaware limited liability company formed July 10, 2012.  Zoernack is its managing member.  During all relevant periods, its principal offices were located in Newport Beach, California.  Momentum is an unregistered investment fund.

8.      **Global Partners Fund, LLC**, is a Delaware limited liability company formed May 20, 2010.  Zoernack is its managing member.  During all relevant periods, its principal offices were located in Newport Beach, California.  Global Partners is an unregistered investment fund.

## Facts

### EquityStar's Investment Offerings

9.      Between approximately March 2011 and at least March 2014, Zoernack and EquityStar offered and sold interests in the two investment funds, Momentum and Global Partners.  From about March 2011 to about mid-2012, Zoernack and EquityStar offered and sold interests in Global Partners, raising at least $2.6 million from more than 20 investors in approximately 13 states and Singapore.  Between August 2012 and at least March 2014, Zoernack and EquityStar offered and sold interests in Momentum, raising approximately $3 million in interests from about 20 investors in approximately 11 states and Canada.

10.     Zoernack controlled all activities of EquityStar, Global Partners, and Momentum.  He drafted all marketing and offering materials, responded to all substantive information requests, and made all investment decisions.  Global Partners and Momentum maintained brokerage accounts at two broker-dealer firms during the relevant period.

### Apex's Role and Conduct

11.     Apex served as fund administrator for Global Partners beginning in May 2012.  In July 2012, Apex and EquityStar entered into an agreement for Apex to act as fund administrator for Momentum.  At the time Apex began working with Zoernack and EquityStar, it performed no due diligence on Zoernack's background, which could have revealed, among other things, Zoernack's felony fraud convictions.

12.     Under its contract as fund administrator, Apex was required to calculate fees and other allocations payable to EquityStar in accordance with the offering documents, prepare financial statements for the fund in accordance with generally accepted accounting principles (GAAP), determine the value of each investor's fund interest, and provide monthly account statements to investors.  While performing fund administration services for EquityStar, Apex learned, as early as May 2012, that Zoernack was withdrawing funds from Global Partners.  When Apex questioned Zoernack about the withdrawals, he said that he was making the withdrawals to cover start-up expenses.  Zoernack represented to Apex that he would repay the withdrawn amounts as the fund grew.  In fact, in September 2012, he sent Apex a letter in which

he promised to repay, with 7% interest, the amounts he had withdrawn from Global Partners (more than $200,000 at the time) by the end of 2012.[3] Based on Zoernack's representations that he would repay Global Partners, Apex treated the amount of his withdrawals as a receivable due to Global Partners. In doing so, Apex included the receivable as an asset of the fund and as part of its NAV. Apex sent monthly account statements to Global Partners' investors on behalf of Zoernack and EquityStar that did not disclose to investors that part of the NAV was a receivable due from an affiliated party.

13.     Despite Zoernack's written assurance in September 2012 that he would repay Global Partners, he continued to withdraw tens of thousands of dollars monthly from the fund. In addition, he began to withdraw money from the newly-formed Momentum fund.

14.     During November 2012, Apex received an email from the CEO of EquityStar's prior fund administrator, warning it about investor complaints he received about Global Partners' "mounting losses" and the lack of communication from EquityStar.

15.     From September 2012 through the end of year, Zoernack not only failed to repay the Global Partners receivable, but withdrew $60,000 more from Global Partners and $57,000 from Momentum. By December 31, 2012, the receivable balances totaled approximately $469,000, making up about 40% of Global Partners' NAV and about 9% of Momentum's NAV. Apex continued to account for the withdrawals from both funds as receivables that Zoernack would repay and included the receivables in the monthly investor statement NAVs, without disclosing the existence of the receivable or the amount Zoernack owed to the funds.

16.     In January 2013, Apex confronted Zoernack about his failure to disclose to Global Partners and Momentum investors the existence of the receivables. Apex told Zoernack that he needed to revise the offering materials so that the investors knew about the receivables. Zoernack told Apex that he would make the revisions and would obtain signatures from all investors on the revised disclosures. Despite Zoernack's failure to comply with his September 2012 promise to repay the Global Partners' receivable and his further withdrawals, Apex continued to account for the withdrawals as receivables to the funds based on Zoernack's repeated assurances that he would repay the amounts he had withdrawn.

17.     In March 2013, Apex received another email from EquityStar's prior administrator. This time the prior administrator told Apex about "numerous issues that made them [EquityStar and Zoernack] too risky to have as clients."

18.     After receiving the March 2013 email from EquityStar's prior administrator, Apex asked Zoernack again to obtain investors' signatures on revised disclosures and set up a payment plan for the receivables. Zoernack again agreed that he would do everything Apex asked. At the same time, Apex ran a background check on Zoernack, learning for the first time about Zoernack's 2007 wire fraud conviction. With that information, Apex's Global Compliance Office became involved. Over the course of several days of communication with Apex's U.S. management, the Global Compliance Office asked questions about the EquityStar engagement and ultimately left the decision of whether to continue with Zoernack as a client to U.S.

---

[3]     There was never any signed loan agreement between Global Partners and Zoernack.

management. Apex decided to continue to provide administrative services to Zoernack's funds, continue to account for Zoernack's mounting withdrawals as receivables, and continue to send monthly investor statements to investors on behalf of Zoernack and EquityStar that did not disclose the receivables.

19. For several more months, Apex provided fund administration services for Global Partners and Momentum with no change in Apex's accounting or disclosures in its monthly statements to investors. Zoernack had neither repaid the receivables, nor provided Apex with any evidence that he had revised the investor disclosures. In fact, Zoernack continued to make withdrawals directly from the funds and, by the end of July 2013, the receivables had grown to nearly 50% of the Global Partners NAV, and nearly 15% of the Momentum NAV, with a total balance of over $850,000.

20. In early August 2013, Apex determined that Zoernack would not be able to repay the receivables. Apex also learned, at this time, that Zoernack had not provided Apex with investors' signature pages showing that they had received any revised disclosures. Apex, continued to provide fund administration services to Zoernack in the same manner, and continued reporting in monthly statements to investors NAVs on behalf of Zoernack and EquityStar that were materially inaccurate by virtue of the illiquid and growing receivables. By the end of 2013, the receivables totaled more than $1 million, over 52% of the Global Partners NAV and about 22% of Momentum's NAV.

21. It was not until March 2014 that Apex first sent monthly investor account statements on behalf of Zoernack and EquityStar that disclosed a significant portion of investors' account values was made up of a receivable from an affiliate. By the end of March 2014, the total amount withdrawn by Zoernack was $1,020,000, representing nearly 54% of Global Partners and more than 26% of Momentum. After this disclosure, many EquityStar investors sought to redeem their interests in the funds. Apex also pushed Zoernack to implement a repayment plan, threatening to resign if he did not. Ultimately, Zoernack fired Apex, ending the relationship in June 2014.

22. Apex knew or should have known that Zoernack was unwilling or unable to repay the receivables and, therefore, it failed to account properly for them. In addition, Apex knew or should have known that the monthly account statements it sent to investors on behalf of Zoernack and EquityStar were materially misleading because Zoernack and EquityStar did not identify the existence and amount of the receivables and because the monthly account statements materially overstated the value of the investors' holdings in the funds.

## **Violations**

23.. Under Section 203(k) of the Advisers Act, the Commission may impose a cease-and-desist order upon, among others, any person that is, was, or would be a cause of another's violation, due to an act or omission the person knew or should have known would contribute to such violation of any provision of the Advisers Act.

24. Section 206(2) of the Advisers Act prohibits any investment adviser from engaging in any transaction, practice, or course of business which operates as a fraud or deceit

upon any client or prospective client. A violation of Section 206(2) may rest on a finding of negligence. *SEC v. Steadman*, 967 F.2d 363, 643 n.5 (D.C. Cir. 1992) (citing *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963)). Proof of scienter is not required to establish a violation of Section 206(2) of the Advisers Act. *Id.*

25.     Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder make it unlawful for any investment adviser to a pooled vehicle to make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle, or to otherwise engage in any act, practice, or course of business that is fraudulent, deceptive or manipulative with respect to any investor or prospective investors in the pooled investment vehicle. A violation of Section 206(4) of the Advisers Act and the rules thereunder does not require scienter. *Steadman*, 967 F.23d at 647.

26.     EquityStar and Zoernack violated Sections 206(2) and 206(4) of the Advisers Act, and Rule 206(4)-8 thereunder, by making false and misleading statements to Global Partners and Momentum investors, and by making undisclosed withdrawals of more than $1 million from the funds.

27.     As a result of the conduct described above, Apex was a cause of EquityStar's and Zoernack's violations of Sections 206(2) and 206(4) of the Advisers Act, and Rule 206(4)-8 thereunder.

## **Undertakings**

28.     Independent Consultant

    a. Apex has undertaken to retain, within 45 days of the date of the issuance of this Order, the services of an Independent Consultant ("Consultant") not unacceptable to the staff of the Commission. The Consultant's compensation and expenses shall be borne exclusively by Apex. Apex shall require the Consultant to conduct a comprehensive review of, and recommend corrective measures concerning, Apex's compliance and other policies and procedures with respect to:

        i) due diligence prior to adding new clients;

        ii) whether to retain or dismiss clients who engage in conduct possibly detrimental to the client's investors and who at Apex makes that decision

        iii) determining the appropriate accounting for clients' funds;

        iv) determining what Apex should disclose to investors in periodic account statements, and

        v) detecting and addressing fraud;

    b. Apex shall provide to the Commission staff, within thirty (30) days of retaining the Consultant, a copy of an engagement letter detailing the Consultant's responsibilities, which shall include the review described above in paragraph 27.a.

    c. At the end of the review, which in no event shall be more than three months after the date the Consultant is retained by Apex, Apex shall require the Consultant to submit an Initial Report to Apex and to the Commission staff. The Initial Report shall address the issues in paragraph 27.a., and shall describe the review performed, the conclusions reached, the Consultant's recommendations for changes in or improvements to Apex's policies and procedures, , and a procedures for implementing the recommended changes in or improvements to those policies and procedures.

    d. Apex shall adopt all recommendations contained in the Initial Report within ninety (90) days of receipt; provided, however, that within thirty (30) days of Apex's receipt of the Initial Report, Apex may, in writing, advise the Consultant and the Commission staff of any recommendations that it considers unnecessary, unduly burdensome, impractical or inappropriate. With respect to any such recommendation, Apex need not adopt that recommendation at that time but shall proposed in writing an alternative policy, procedure or system designed to achieve the same objective or purpose. The Consultant shall evaluate any alternative procedure proposed by Apex. As to any recommendation on which Apex and the Consultant do not agree, such parties shall attempt in good faith to reach an agreement within thirty (30) days after Apex provides the alternative procedures described above. In the event that Apex and the Consultant are unable to agree on an alternative proposal, Apex and the Consultant shall jointly confer with the Commission staff to resolve the matter. In the event that, after conferring with the Commission staff, Apex and the Consultant are unable to agree on an alternative proposal, Apex will abide by the recommendations of the Consultant.

    e. Within nine months after the date of issuance of this Order, Apex shall require the Consultant to complete its review and submit a written final report to Commission staff. The Final Report shall describe the review made of Apex's compliance policies and procedures relating to the publication, circulation, or distribution of performance reports; set forth the conclusions reached and the recommendations made by the Consultant, as well as any proposals made by Apex; and describe how Apex is implementing the Consultant's final recommendations;

    f. Apex shall take all necessary and appropriate steps to adopt and implement all recommendations contained in the Consultant's Final Report. The date of completion of the undertakings shall, in no event, be later than one year from the date of issuance of this Order;

    g. For good cause shown and upon timely application by the Consultant or Apex, the Commission's staff may extend any of the deadlines set forth in these undertakings;

    h. To ensure the independence of the Consultant, Apex (i) shall not have the authority to terminate the Consultant or substitute another consultant for the initial

Consultant, without the prior written approval of the Commission's staff; (ii) shall compensate the Consultant and persons engaged to assist the Consultant for services rendered pursuant to the Order at their reasonable and customary rates; and (iii) shall not invoke the attorney-client or any other doctrine or privilege to prevent the Consultant from communicating with or transmitting any information, reports or documents to the Commission's staff.

i. Apex shall require the Consultant to enter into an agreement providing that for the period of the engagement and for a period of two years from completion of the engagement, the Consultant shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with Apex, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such. The agreement will also provide that the Consultant will require that any firm with which he/she is affiliated or of which he/she is a member, and any person engaged to assist the Consultant in the performance of his or her duties under this Order shall not, without prior written consent of the Commission staff, enter into any employment, consultant, attorney-client, auditing or other professional relationship with Apex, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

29. Apex shall certify, in writing, compliance with the undertakings set forth above. The certification shall identify the undertakings, provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance. The Commission's staff may make reasonable requests for further evidence of compliance, and Apex agrees to provide such evidence. The certification and supporting material shall be submitted to Antonia Chion, Associate Director, Enforcement Division, Securities and Exchange Commission, 100 F Street, N.E., Washington, D.C. 20549, with a copy to the Office of the Chief Counsel of the Enforcement Division, no later than sixty days from the date of completion of the undertakings.

### IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondent's Offer.

Accordingly, pursuant to Section 203(k) of the Advisers Act, it is hereby ORDERED that:

A. Apex shall cease and desist from committing or causing any violations and any future violations of Sections 206(2) and 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

B. Apex shall comply with the undertakings enumerated in paragraphs 28 and 29 above;

C. Apex shall pay disgorgement of $89,050 and prejudgment interest of $7,786, for a total payment of $96,836, to the Securities and Exchange Commission. Payment shall be made

in the following installments: $24,227.75 on within 10 days of the issuance of the Order, $24,227.75 within 180 days of the issuance of the Order, $24,227.75 within 270 days of the issuance of the Order, and $24,152.75 within 360 days of the issuance of the Order. If timely payment is not made by the date the payment is required by this Order, the entire outstanding balance of disgorgement, plus any additional interest accrued pursuant to SEC Rule of Practice 600, shall be due and payable immediately, without further application.

        D.        Apex shall pay a civil money penalty of seventy-five thousand dollars ($75,000) to the Securities and Exchange Commission. Payment shall be made in the following installments: $18,750 within 10 days of the issuance of the Order, $18,750 within 180 days of the issuance of the Order, $18,750 on within 270 days of the issuance of the Order, and $18,750 within 360 days of the issuance of the Order. If timely payment is not made by the date the payment is required by this Order, the entire outstanding balance of disgorgement, plus any additional interest accrued pursuant to SEC Rule of Practice 600, shall be due and payable immediately, without further application.

        E.        Payments must be made in one of the following ways:

        (1)        Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

        (2)        Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

        (3)        Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

> Enterprise Services Center
> Accounts Receivable Branch
> HQ Bldg., Room 181, AMZ-341
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

Payments shall be submitted under cover letter that identifies Apex as a Respondent in these proceedings, the file number of these proceedings, a copy of which cover letter and money order or check must be sent to Antonia Chion, Associate Director, Enforcement Division, Securities and Exchange Commission, 100 F Street, Washington, D.C. 20549.

        F.        Pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002, as amended, a Fair Fund is created for the disgorgement, prejudgment interest penalties referenced in paragraphs IV.C. and IV.D. above. Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, it shall not argue that it is entitled to, nor shall it benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that it shall, within 30 days after entry of a final order

granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

By the Commission.

Brent J. Fields
Secretary