JB49SCO1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                 v.                           17 CR 630 (ER)

MARK S. SCOTT,

                    Defendant.

------------------------------x

                                          New York, N.Y.
                                          November 4 , 2019
                                          9:30 a.m.

Before:

                    HON. EDGARDO RAMOS,

                                          District Judge


                        APPEARANCES


GEOFFREY S. BERMAN,
     United States Attorney for the
     Southern District of New York
CHRISTOPHER DiMASE
NICHOLAS FOLLY
JULIETA V. LOZANO
     Assistant United States Attorneys

COVINGTON & BURLING LLP
     Attorneys for Defendant
BY:  ARLO DEVLIN-BROWN
     KATRI STANLEY
     -AND-
     DAVID M. GARVIN

JB49SCO1

1          THE COURT:  OK folks.  It's 9:30.

2          (Case called)

3          MR. DIMASE:  Good morning, your Honor.  Christopher

4    DiMase for the government.  Also present at counsel table with

5    me are AUSA Nicholas Folly, Special Assistant United States

6    Attorney Julieta Lozano, paralegal specialist Nick Barile and

7    Special Agent Ronald Shimko from the FBI.

8          THE COURT:  Good morning.

9          MR. DEVLIN-BROWN:  Good morning.  Arlo Devlin-Brown

10    for Mark Scott.

11          MR. GARVIN:  Good morning.  David Garvin on behalf of

12    Mark Scott who is also present.

13          THE COURT:  Good morning to you all.  Everyone can be

14    seated.

15          MR. DIMASE:  Your Honor, I would also note there are

16    two IRS CI case agents in the courtroom as well, John Abram and

17    Rich Reinhart.

18          THE COURT:  OK.  This is a rather cavernous courtroom.

19    Already I noted that Mr. DiMase, who I don't usually have

20    trouble hearing, was standing away from the microphone.  So,

21    please, when you speak in this room speak close to a

22    microphone.  Please direct the witnesses to speak loudly,

23    clearly and into the microphone so that I'm not constantly

24    berating you and them.

25          I just wanted to very quickly go over again some of

3

JB49SCO1

1   the mechanics.  As we discussed last week, we're going to have

2   twelve jurors obviously and four alternates.  If everyone uses

3   all of their peremptories, that means that we should have 28

4   potential jurors in the box at any given time.  And I will give

5   you one peremptory for the alternates.  So that's another six.

6   So we'll have 34 people potential jurors in the box at any

7   given time.

8          There are 18 seats in the jury box.  So we'll use

9   these 18 and then we'll use the first two benches.  So you

10  gentlemen are going to have to move at some point.  There will

11  be 16 in the first two benches; eight in the first bench and

12  eight in the second bench.  So you can mark your charts

13  accordingly.  And it will be potential juror no. 1 through

14  potential juror no. 34.

15         There are a number of motions that are still open.

16  I'm happy to go over those now.

17         As I understand from the government, they are not

18  looking at this point to proffer the particular excerpt from

19  the tape of Mr. Scott's postarrest statement that is the

20  subject of continuing controversy.  So given that

21  representation we can hold that decision in abeyance.

22         And how do the parties wish to proceed otherwise with

23  respect to the open motions?

24         Mr. DiMase?

25         MR. DIMASE:  Your Honor, we're happy to address them

JB49SCO1

1    in whichever order you'd like.  I believe the two pending

2    motions now are the motion to suppress the WhatsApp messages

3    recovered from Mr. Scott's now wife's cellphone and the issue

4    regarding the cross-examination of a case agent on the

5    authenticity of certain recordings.

6            THE COURT:  Let's do the case agent one first.  First

7    of all, can someone tell me what happened here in terms of the

8    investigation?

9            Did Ms. Ignatova have inside information about an

10   investigation?  What can you tell me in that regard so that I

11   understand the context.

12           MR. DIMASE:  One moment, your Honor.

13           (Counsel confer)

14           MR. DIMASE:  There are a couple of facts that I think

15   I can shed some light on for the court that may help.  Much of

16   this we anticipate that the cooperating witness will testify

17   about at the trial, your Honor.

18           So Ms. Ignatova had a corporate espionage-type person

19   on retainer, for lack of a better word, and she utilized that

20   person to obtain information about pending law enforcement

21   investigations all over the world and also to conduct

22   essentially espionage against people within her own

23   organization when she suspected that they might be up to

24   something.

25           What I expect the Court will hear is that Ms. Ignatova

1    hired this -- well, this person that she had hired arranged to

2    purchase an apartment below that of a person named Gilbert

3    Armenta who we expect the Court will hear quite a bit about at

4    trial.  Mr. Armenta was the person who introduced Mr. Scott,

5    the defendant, to Ms. Ignatova in the first instance and he was

6    also a money launder for OneCoin.  He also had an intimate

7    relationship with Ms. Ignatova.  They were essentially dating.

8            So Mr. Armenta was living in this apartment in the

9    United States with his wife.  There had been representations

10   that he would leave his wife for Ms. Ignatova.  She, through

11   this espionage person, bought the apartment below his and

12   installed a recording device -- that's what we expect the

13   cooperating witness who is going to testify at trial to say --

14   in the ceiling and then obtained recordings of what Mr. Armenta

15   was saying to his wife in the apartment.  And she learned

16   through those recordings that Mr. Armenta was telling his wife

17   he wasn't going to leave the wife but also, and more critically

18   in some ways, that Mr. Armenta was actually cooperating with

19   the government and that he was cooperating with the FBI against

20   her.

21           THE COURT:  OK.

22           MR. DIMASE:  And it's within a very short period of

23   time after that -- this is all in around September 2017.  It's

24   in October 2017 that she disappears.

25           THE COURT:  Then did she also receive information from

6

JB49SCO1

1    this person concerning actual law enforcement investigations?

2              MR. DIMASE:  Yes, your Honor.

3              THE COURT:  OK.

4              MR. DIMASE:  Among other people.  I don't know that

5    that was her only source for such information; that she -- we

6    expect that this cooperating witness who will testify at the

7    trial will talk about how she obtained information from this

8    person and others about confidential facts regarding law

9    enforcement investigations.

10             THE COURT:  Including investigations in the United

11   States?

12             MR. DIMASE:  Well, I think the -- one moment, your

13   Honor.

14             (Counsel confer)

15             MR. DIMASE:  Yes.  Including about investigations in

16   the United States through various means, one of which was the

17   installation of this recording device in the cooperating

18   witness's -- the apartment below him which --

19             THE COURT:  Where did Mr. Armenta live at the time?

20             MR. DIMASE:  Fort Lauderdale or somewhere in south

21   Florida in the vicinity of Fort Lauderdale.

22             THE COURT:  Tell me the context about these particular

23   phonecalls that you are looking to put in.

24             MR. DIMASE:  Your Honor, the first phonecall -- well

25   there are two phonecalls.  One is on September 24 and one is on

JB49SCO1

September 28.  The September 24 call, the government is seeking

to play just a very small portion of it in which Ms. Ignatova

makes clear to Mr. Armenta that she had obtained a recording of

him in which he said he was not going to be leaving his wife.

And that will corroborate the testimony of the cooperating

witness at the trial that, in fact, Ms. Ignatova had bought the

apartment below and had recorded the conversations and placed

her ultimate disappearance in important context, the idea that,

in fact, this person was being recorded and that there was a

basis for her to know that he was cooperating with law

enforcement.  So that's really the focus of the first excerpts

from the first call.

THE COURT:  And Mr. Shimko was there at that

recording?

MR. DIMASE:  Mr. Shimko was present for that

recording.  That's correct.

The second recording is on September 28.  And in that

recording there is some discussion which the government does

not intend to offer.  The Court may have seen it in the longer

version of the transcript about certain investigations that are

going on.  But to be clear the government anticipates that

there will be testimony about Ms. Ignatova and Mr. Scott and

Mr. Armenta all employing countersurveillance techniques

throughout the time period that they were engaged in this

conspiracy by using e-mail addresses that they believed were

JB49SCO1

1    harder to intercept, by using WhatsApp which is end-to-end

2    encrypted, by talking on cryptophones, by traveling to meet in

3    person, in a number of different ways.

4              The surveillance consciousness is not something that

5    developed in September of 2017.  The evidence will be clear

6    that this is a thread that runs throughout the communications

7    between these people.  And in this particular set of excerpts

8    Ms. Ignatova is telling Mr. Armenta be careful, don't use

9    e-mail, don't -- speak on encrypted lines, you have to speak on

10   encrypted phones and face-to-face meetings only, everybody is

11   watching, they can drop in and intercept us essentially.  And

12   that will corroborate the anticipated testimony of the

13   cooperating witness regarding these countersurveillance

14   techniques that were being used, including by Mr. Scott, the

15   defendant, during the course of the conspiracy.

16             THE COURT:  Was Special Agent Shimko strictly speaking

17   the case agent throughout this investigation?

18             MR. DIMASE:  There were several case agents but he is

19   the lead case agent from the FBI, yes, your Honor.  And he was

20   present for both of the calls.  And the only testimony that we

21   intend to introduce at the moment is simply that he was present

22   on those particular days with Mr. Armenta who placed a call and

23   agreed to the recording of the call and that these excerpts are

24   true and authentic portions of the call that Mr. Shimko

25   witnessed Mr. Armenta make.  That is the -- that is basically

JB49SCO1

1    the testimony.  And we did try to get a stipulation on the

2    authenticity of the calls and the defense has declined to

3    stipulate.

4                    THE COURT:  OK.

5                    MR. DIMASE:  That's the only reason that we intend to

6    call Mr. Shimko.

7                    THE COURT:  OK.

8                    Mr. Devlin-Brown.

9                    MR. DEVLIN-BROWN:  Thank you, your Honor.

10                   I'd just like to provide one more piece of context

11   that I think might be helpful in addition to what Mr. DiMase

12   just said about the relationship between Mr. Armenta and Ruja

13   and what's going on when these calls occur in September 2017.

14   And that additional piece of context is I believe -- and the

15   government can correct me if I'm wrong -- but the last evidence

16   of any communications between Mr. Scott and Ms. Ignatova would

17   have been February 2017; so, many months before.  As we talked

18   about at the last conference, Mr. Scott had returned all of the

19   money to investors save for a litigation reserve in July.  And

20   I understand the Court's ruling about the admissibility of

21   coconspirator statements.  That's not what we're contesting

22   here.  But it will be part of the defense that Mr. Scott was

23   gone by then and anything people are doing in September 2017

24   has nothing to do with Mr. Scott.

25                   So, our concern with the excerpts standing alone

1    anyway without either a case agent to give it a little context

2    or playing more of the excerpt, that could potentially do it,

3    is that you're going to hear in the excerpt Ruja Ignatova sound

4    very alarmed.  And she says things in this excerpt that I'm not

5    even sure the jury will thinks means alarmed about hacking.  I

6    mean she says in the excerpt, "You have to be F'ing careful

7    what these Russian guys can do.  You cannot imagine."  The

8    government's represented that's about hacking but I'm not sure

9    that's what a jury thinks when they first hear something like

10   that.

11              And what's left out of that call, your Honor, is the

12   context.  This is as she's starting to discover something is

13   going on with Armenta.  She seems to know that Mr. Armenta went

14   into his office to look for bugs.  He comes back with:  Oh, I

15   was imaging my computers.  And she says in that call, "Someone

16   called me this morning saying F'er has got a bug in their

17   office.  We think it's the feds.  Nobody else uses bugs."

18              So this is not ordinary dialogue between

19   coconspirators.  This is a very alarming situation.  And what

20   we would like to argue is the defense, and I think it's a

21   reasonable argument, is:  Juror, you shouldn't infer that

22   Mr. Scott and Ms. Ignatova had such extreme

23   surveillance-conscious conversations.  Sure, there's reference

24   to them using cryptophone.  There's also -- there's a lot of

25   e-mails about can't get them to work.  So we want to argue to

JB49SCO1

1    the jury don't take that as a sign of what these conversations

2    were like.  If we can't put some context in there either from

3    the case agent or a call, I think we're deprived of that

4    argument.

5              Again, we're not looking to turn this into a field day

6    of let's talk about the case and everyone you interviewed.

7    We're talking about putting a little context in here.

8              THE COURT:  Mr. DiMase -- obviously, you'll be able to

9    do that in your case in any event.  I don't think Mr. Shimko is

10   going to go anywhere.  He'll be here to call him in your case.

11             But, Mr. DiMase, why can't we get him on and off in

12   one fell swoop; Mr. Shimko, that is?

13             MR. DIMASE:  Your Honor, I -- well one quick point.  I

14   agree with the Court.  Ultimately this is a weight, not

15   admissibility question.  The calls are admissible and relevant.

16   The arguments that Mr. Devlin-Brown has made he can make to the

17   jury just as well as he can make to the court about the fact

18   that they were not in touch anymore.  And I think that there is

19   a reasonable inference to be drawn about why she's agitated

20   because she's found out that Mr. Armenta is cooperating against

21   her with the FBI.  So obviously there are reasons -- I think

22   other reasons that she is reasonably likely to be agitated.

23   Anyway, the bottomline is these are really jury arguments, not

24   about the admissibility of the evidence.

25             With respect to calling Mr. Shimko all at once.  So

JB49SCO1

```
1    it's not clear to me exactly what it is that the defense

2    intends to question him about.  Much of -- the letter we

3    received about why Mr. Shimko should be available to testify

4    refers to impeachment of government witnesses.  It would be

5    premature.  Because Mr. Shimko, the government intends to call

6    him as the second witness.  The people that he could

7    potentially provide impeachment information about wouldn't have

8    testified yesterday.  So it would be impossible to impeach

9    them.

10            So I think it's premature to have the defense

11   questioning Mr. Shimko about those areas.  And if they'd like

12   to call him again he'll be here the entire trial.  He can be

13   recalled in the defense case.  It's not like he's traveling

14   from out of town.

15            THE COURT:  Well, look, Mr. Devlin-Brown, you can call

16   him in your case.  I will give you some leeway in terms of

17   garden variety cross-examination.  We'll see what he says and

18   what all you can get into.  But if you want to put him on for

19   those additional purposes, you'll have to call him in your

20   case.

21            MR. DEVLIN-BROWN:  That's fine, your Honor.  Just to

22   clarify one thing Mr. DiMase said about our letter for saying

23   we might call Mr. Shimko for impeachment purposes, we did

24   provide a Touhy request maybe a month back listing all of the

25   case agents and saying we want you to be available in case a
```

JB49SCO1

1    witness testifies differently than your notes.  So it sounds

2    like the Court is directing Mr. Shimko to be available for this

3    broader line of questioning.

4                THE COURT:  Absolutely.

5                MR. DEVLIN-BROWN:  Thank you, your Honor.

6                MR. DIMASE:  Judge, just to be clear.  We intend only

7    to ask probably two or three minutes of questions to Mr. Shimko

8    regarding the authenticity of these recordings.

9                And I just want to be clear about what the Court is

10   ruling regarding cross because I am a little concerned that

11   depending on what Mr. Devlin-Brown is allowed to do on cross it

12   may look like the government is trying to hide some facts from

13   the jury when all we're really trying to do is keep his

14   testimony short and limited to the issue of authenticity.

15               THE COURT:  I understand that but the rule allows for

16   cross-examination of the subject matter of the testimony and

17   issues concerning bias.

18               MR. DIMASE:  Issues concerning?  I didn't hear.

19               THE COURT:  Bias.  Impeachment of the person himself.

20               MR. DIMASE:  Of Mr. Shimko, the agent?

21               THE COURT:  Yes.  Yes.

22               Rule 611(b) states that cross-examination should not

23   go beyond the subject matter of the direct examination and

24   matters affecting the witness's credibility.  So, again, I

25   don't know how Mr. Devlin-Brown wants to conduct his

JB49SCO1

1     cross-examination but he's certainly not limited to the two or

2     three questions that you intend to ask.  OK.

3             OK.  What's next?

4             MR. DIMASE:  Your Honor, I think we're on to the

5     motion to suppress and perhaps it makes sense to have

6     Mr. Devlin-Brown speak to that first since they filed the

7     motion.

8             THE COURT:  Or Mr. Garvin.

9             MR. GARVIN:  Good morning, your Honor.

10            Your Honor, we had filed a motion to suppress in

11    particular the Samsung Galaxy cellphone of Lidia Kolesnikova.

12    That is the spouse of Mr. Scott.  In the last few weeks we had

13    been advised by the United States that a second search warrant

14    had been sought and obtained and that the cellphone of

15    Mr. Scott's spouse was the subject of that, at least one of the

16    devices of that search warrant.  And the defense objects

17    because our reading through the affidavit and the documents

18    shows that the original affidavit was relied upon for probable

19    cause.  However, at this point when the second warrant was

20    requested in September of 2019 it is the position of the

21    defense that by that time the government realized that that

22    Samsung phone was not the phone of Mr. Scott but was the phone

23    that was used by his spouse.  In particular, his wife is

24    Russian and the keyboard had been changed to Russian.

25    Mr. Scott does not speak Russian and did not use the phone as a

JB49SCO1

1   result of that.

2           The United States has filed papers in opposition to

3   the motion suggesting that they never looked at the Samsung

4   phone and that they, therefore, did not know that the Samsung

5   phone was Mrs. Scott's phone.  However, when we looked at the

6   affidavit -- the original affidavit that was executed, we found

7   that, in fact, Special Agent Shimko stated that the contents of

8   the seized devices were accessed and extracted in the affidavit

9   on page 5, paragraph 12.  That seems to be inconsistent.  When

10  we read that we felt that the common meaning of that was that

11  the government had, in fact, extracted the data from the phone

12  and was able to realize that they have the wrong person's

13  phone.

14          So respectfully, your Honor, we take the position that

15  the magistrate in approving the second search warrant for this

16  particular item was never notified that it was not Mr. Scott's

17  phone and, therefore, probable cause for that particular phone

18  was never established properly and that the chat that is back

19  and forth between Mr. Scott and his wife that the government

20  now seeks to introduce as evidence should be suppressed.

21          I do know that the United States has also taken the

22  position that there is a standing issue.  In response to that

23  standing issue, as this Court well knows, the defense filed the

24  telephone bill for the phone reflecting that it is a phone that

25  is under Mr. Scott's name and that he pays for but he does not

JB49SCO1

1    use.  And then the United States filed a surreply stating that

2    the affidavit was self-serving and, therefore, should be

3    discarded or rejected.  However, in reality the affidavit was

4    based -- or was necessary to attach the telephone record itself

5    from AT&T which establishes standing, your Honor.

6           For those reasons, we would respectfully request this

7    honorable court to suppress those chat messages on Mrs. Scott's

8    Samsung Galaxy telephone.

9           THE COURT:  Let me ask you this question.  Whose phone

10   was it?

11          MR. GARVIN:  The person who used that phone

12   exclusively was Mrs. Scott but the person who paid for the

13   phone and was responsible for the AT&T service on the phone was

14   Mr. Scott.  So it's our position, your Honor, that both persons

15   had an interest in this phone.  Mr. Scott had an interest

16   because he is the one who paid for it and he is the one who was

17   named with the AT&T service.  Mrs. Scott used the phone

18   exclusively.

19          THE COURT:  When the government, as I understand it,

20   asked you some months ago whether there were any devices that

21   did not belong to Mr. Scott which they were willing to consider

22   returning why didn't you at that point state that, yes, you

23   have his wife's phone.

24          MR. GARVIN:  Your Honor several months ago there was a

25   written request by us and I believe it was in response -- it's

JB49SCO1

1    in my pleadings, that we, in fact, did put the government on

2    notice that they were in possession of several devices and

3    that, I quote, "The government seized and has provided an image

4    of at least fifteen devices, many of which contain no relevant

5    evidence, including devices only used by Mr. Scott's wife."

6    That is at docket 70 at page 13.

7              We had at the time Mr. Nobles was one of the lawyers

8    who was representing Mr. Scott and he was assigned the task of

9    retrieving those items that could be retrieved with the consent

10   of the government that were seized from the Massachusetts home.

11   It's our understanding that this phone was indeed seized from

12   the Massachusetts home and as the Court may well know

13   Mr. Nobles had withdrawn from the case and I guess he simply

14   just didn't follow up to see where is the status -- what was

15   the status of the Samsung phone.

16             THE COURT:  OK.

17             MR. DIMASE:  Judge, as a threshold matter I mean I

18   think the Court sort of narrowed the question.  Whose phone is

19   it?  It's Mrs. Scott's phone.  I mean that's who has reasonable

20   expectation of privacy in the phone.  The fact that Mr. Scott

21   paid the bills for the service doesn't really seem to alter

22   that ultimate fact.  The whole point of the initial motion was

23   that this is her phone and that it shouldn't fall within the

24   scope of the second search warrant or that the government

25   failed to properly inform the judge of that fact.  I think this

1    can be easily decided on the standing issue alone.  But I do

2    think it's important on the merits to be clear.  We were

3    never -- the government was never told that this was her phone.

4    The photographs of the search warrant execution show clearly

5    that nobody would have been able to tell from where it was

6    recovered that it was her phone.  I think it's very important,

7    as the Court knows well in this case, there was a filter team

8    involved between the prosecution team and the evidence in this

9    case.  And so I mean, first of all, when the CART folks

10    extracted the data from the phone that's not a process where

11    they're looking at the actual data from the phone.  They're

12    extracting it onto a computer.  That data is then sitting with

13    the filter team, as we've made clear in our letter to the

14    court, and ultimately the only review they did of it was to see

15    if certain individuals were being communicated with by that

16    phone.  And because the person that was clearly communicating

17    with that phone was Mr. Pike, the person who ran these funds

18    with Mr. Scott, it appeared again that it was Mr. Scott's

19    phone.  The defense never told the government that this was the

20    wife's phone.  And for all of those reasons the defense simply

21    cannot meet the very high burden they have under Franks v.

22    Delaware which is a substantial --

23           THE COURT:  Showing.

24           MR. DIMASE:  -- preliminary showing that the affiant

25    knowingly and intentionally and with reckless disregard for the

JB49SCO1

1    truth made a false statement in the affidavit or falsely

2    omitted information from the affidavit.  That showing just

3    simply is not being made here.

4              THE COURT:  So the prosecution team, did Mr. Shimko in

5    particular swear out the second warrant before the prosecution

6    team learned that the phone was Mrs. Scott's?

7              MR. DIMASE:  Yes, your Honor.  Essentially shortly

8    before the second warrant was sworn out a member of the filter

9    team did a couple of very limited searches in the phone and

10   determined that David Pike was in communication with that

11   phone.  Even the filter team did not understand at that point

12   that the phone belonged to Mr. Scott's wife.  Then the search

13   warrant was sworn out by Mr. Shimko who is on the prosecution

14   team.  And it was in the review of the resulting WhatsApp

15   messages from that phone that the filter team notified the

16   government and provided the messages saying these appear to be

17   messages with Mr. Scott's wife between him and his wife on her

18   phone.  And that's the first time, frankly, that the filter

19   team or the prosecution team became aware that this phone

20   belonged to the wife.

21             THE COURT:  The information extracted from that phone

22   will not be suppressed.  I find that the defense has failed to

23   establish that Mr. Scott himself had an expectation of privacy

24   in that phone.  Even if he was paying the bills for the wife's

25   use of the phone, it is clearly apparent, as the defense now

JB49SCO1

1    indicates, that it was the wife's phone.  And even if that

2    showing were not made more conclusively, I do find that the

3    defense has failed to make a substantial showing as required by

4    Franks a hearing should be held as to whether or not the agent

5    was reckless.  That will not be suppressed.

6              What's next?

7              MR. DEVLIN-BROWN:  I don't think there is anything

8    outstanding given the decision to put off discussion on the

9    postarrest statement.

10             THE COURT:  OK.  So then let's see where we are with

11   the venire.  In my experience we probably won't get one until

12   around 10:30.  But we'll see where we are with the jury.

13             It will be at least another 30 minutes.  So be here no

14   later than 10:30.

15             MR. DEVLIN-BROWN:  Thank you, your Honor.

16             MR. DIMASE:  Thank you, Judge.

17             (Jury selection followed)

18             THE COURT:  OK.  Ms. Rivera, swear the jury.

19             (A jury of twelve and four alternates was impaneled

20   and sworn)

21             THE COURT:  We're going to try to go no later than

22   five o'clock.  I think we'll make that comfortably but we need

23   to give you some instructions now in terms of how we're going

24   to conduct the trial and some instructions about how to get in

25   and out of the jury room, etc.  So please do bear with us.

JB49SCO1

1            Ladies and gentlemen, you are now a jury.  There is no

2     higher function in our legal system.  From now on whenever you

3     enter or leave the courtroom as a jury the parties and the

4     audience will rise the same as they do for any judge because

5     you are every bit as important to this process as any judge.

6            Again, my name is Edgardo Ramos.  My deputy is

7     Ms. Jazmin Rivera.  And my law clerk is Daily Guerrero.  You'll

8     be dealing primarily mostly with Ms. Rivera.  We have a court

9     reporter here whose job it is to take down every word that's

10    said and you'll notice that there's a tag team of court

11    reporters that come in very unobtrusively throughout the day to

12    help each other.

13           I want to give you some preliminary instructions now.

14    In the American system of justice the judge and the jury have

15    separate roles.  My job is to instruct you as to the law that

16    governs the case and I will give you some instructions now and

17    from time to time during the trial.  At the end of the trial I

18    will give you detailed instructions about the law you will need

19    to apply when you deliberate.  Your job as jurors is to

20    determine the facts based on the evidence presented at the

21    trial.  You are the only triers of fact and your decisions on

22    the factual issues will determine the outcome of this case.

23           You must not take anything that I may say or do during

24    the trial as indicating what my opinion is or what your verdict

25    should be.  It's not my job to even have such an opinion and if

JB49SCO1

I did it shouldn't influence you in any way.

With respect to the evidence, you must pay close attention to all of the evidence that was presented.  Evidence consists of the testimony of witnesses, exhibits that are admitted as evidence and stipulations agreed to by the attorneys.  A stipulation is simply an agreement between the lawyers about facts or testimony.

Certain things are not evidence in this case and must not be considered by you.  For example, statements or arguments by the lawyers are not evidence.  They are simply arguments in which they tell you what they think the evidence proves and how they think you should analyze the evidence.

My statements are not evidence either.  Questions by the lawyers are not evidence.  Only the answers given by the witnesses are evidence.

For example, if a witness is asked:  It was raining that day, wasn't it?  And the witness says no, it wasn't.  Then based on that question and answer there is no evidence in the case that it was raining that day, no matter how convinced the lawyer sounded when he or she was asking the question.

Objections to questions are not evidence.  The lawyers are obligated to make an objection when they believe evidence is being offered for an improper basis under the rules of evidence.  You should not be influenced by the objection or the Court's ruling on it.

JB49SCO1

         If the objection is sustained, which is to say if I
determine that the objection is well placed, then ignore the
question and any answer that may have been given.  If the
objection is overruled, that is to say if I believe that the
objection is not well placed, then you can treat the answer
like any other.

         Any testimony that I strike or tell you to disregard
is not evidence and you must not consider it.

         If I instruct you that some evidence is only to be
considered for a certain purpose, you must follow that
instruction as well.

         And, of course, anything that you may see or hear
outside the courtroom is not evidence and should be disregarded
by you.

         In deciding the facts of the case you will have to
decide the credibility of witnesses; that is, how truthful and
believable they are.  How do you do that?  How do you decide
what to believe and what not to believe?

         Well you're going to listen to the witnesses and
observe them and then decide just as you would decide such
questions everyday in your ordinary life.  Did they know what
they were talking about?  Were they honest, open, and truthful?
Did they have a reason to falsify, exaggerate, or distort their
testimony?  Is there any reason to think they might be mistaken
about what they're telling you?  How did their testimony square

1    with the other evidence in the case?

2            So what the witness says, the way the witness says it,

3    and the rest of the evidence in the case will play important

4    roles in your reaching a judgment as to whether or not you can

5    accept the witness's testimony as reliable.

6            As the trial proceeds you may have impressions of a

7    witness or subject but you must not allow these impressions to

8    become fixed or hardened because if you do in a sense you

9    foreclose consideration of the testimony of other witnesses or

10   other evidence that may be presented after the witness you've

11   heard.  This would be unfair to one side or the other.  You

12   should not reach any conclusions until you have all of the

13   evidence behind you -- in front of you.  Please, please keep an

14   open mind throughout the evidence portion of the case.

15           I have to give you some rules so that you are not

16   influenced in any way by anything that might occur outside the

17   courtroom.  So I'm giving you the specific set of instructions.

18           First, do not discuss this case with anyone while the

19   case is going on.  That includes friends and members of your

20   own family.  You may tell your friends and family that you're a

21   juror in a case and that it is expected to last two or three

22   weeks.  But don't tell them anything else about the case until

23   after you've been discharged.  Not discussing the case includes

24   not blogging, Tweeting, posting on Instagram or Facebook or any

25   other social media.

JB49SCO1

1          My instruction that you not discuss the case also

2     includes not discussing it even amongst yourselves while the

3     trial is going on.  It will be your duty to discuss the case

4     amongst yourselves later on but that can happen only after all

5     of the evidence is in and the case is given to you to discuss

6     and decide in the jury room.

7          Next, you are not to read anything in the newspapers

8     or elsewhere about this case if that should occur.  You are

9     also not to listen or to view any reporting about this case if

10    it should be broadcast on TV, over the radio, or on the

11    internet.

12         Next, do not do any research or any investigation

13    about the case on your own.  Do not go visit any place you may

14    hear described during the trial.  Don't do any research on the

15    internet or in the library or any other reference source.

16    Don't Google anyone.

17         Next, you are not allowed to allow anyone to speak to

18    you about this case.  If you're approached by anyone to speak

19    about it, politely tell them that the judge has directed you

20    not to do so.  If any person approaches you or seeks to contact

21    you about the case, you are required to report the incident

22    promptly to me and you can do that by telling Ms. Rivera.

23         The lawyers and the parties and the witnesses are not

24    supposed to talk to the jury outside of the courtroom, even to

25    offer a friendly greeting.  So if you happen to see any of them

JB49SCO1

1    outside the courtroom they will and should ignore you.  Please

2    take no offense to this.  They will only be acting properly by

3    doing so.  Indeed, they will be following my express

4    instructions.  Courts have a hard and fast rule that the

5    lawyers, parties, and witnesses cannot speak to jurors, period.

6           Finally let me say a few words about trial procedure.

7    The trial has five parts.  First, each side will have an

8    opportunity to make an opening statement to you and they will

9    do that tomorrow morning first thing.  As I've already told

10   you, these statements are not evidence.  Their purpose is to

11   give you an idea in advance the evidence that the lawyers

12   expect you to hear from the witnesses.

13          Second, after the opening statements you will hear the

14   testimony of the witnesses.  The government's witnesses go

15   first.  Each witness will give direct testimony and then he or

16   she may be cross-examined by the other side.

17          Following the government's case, the defendant may but

18   need not present witnesses and other evidence.  If the

19   defendant does present witnesses, those witnesses will be

20   examined and cross-examined just as the government's witnesses

21   were.

22          Third, after all of the evidence has been received

23   each side will have an opportunity to make closing arguments.

24   These arguments also are not themselves evidence.

25          Fourth, after the arguments or summations, as they are

1    called, I will give you detailed instructions as to the law

2    that applies and controls in this case.  And you must follow

3    those instructions.  These instructions to the jury are

4    referred to as the jury charge.

5         Finally, and most importantly, after the charge you

6    will go to the jury room to deliberate and discuss the evidence

7    in order to decide the facts and render a verdict.

8         A few housekeeping matters before we go on.

9    Ms. Rivera will show you to the jury room.  That's where you'll

10   report in the morning.  She'll also give you her telephone

11   number where you can reach her if there is an emergency.

12   Please give her your home, work, and cell numbers just in case

13   we have a last minute schedule change or other problem.

14        Our trial day will begin at 9:30 and will end at 2:30.

15   We'll start at 9:30 and go an hour-and-a-half and take a

16   fifteen-minute break; go another hour-and-a-half, followed by a

17   second fifteen-minute break; and then go another

18   hour-and-a-half.  So, as you'll note, we won't have a

19   traditional lunch break but we will have snacks for you during

20   those breaks and we'll also have breakfast for you in the

21   mornings; bagels and that type of stuff.  Don't get too

22   excited.  It's just from our cafeteria in the building.  But it

23   will be here by probably no later than nine o'clock so that

24   gives you an incentive to be here so we can get started right

25   on time at 9:30.  I have found that this shorter trial day is a

JB49SCO1

very much preferred by jurors because it gives them a large

portion at the end of the day to take care of their other

obligations.  If you need a break before the scheduled break,

just raise your hand.

          Please be on time in the morning and after the breaks.

If you're late, you'll be keeping everyone waiting.  If you

look around here, ladies and gentlemen, in addition to the

sixteen of you in the jury box, there's another fifteen or so

that are sitting either on the bench or in the well of the

court and if any one of you is late everyone else,

approximately 34 people, will be sitting here unable to do

anything waiting for you because nothing can happen in a trial

unless all of the jurors are here.  So, please, please be on

time.

          My promise to you is that I will make sure that myself

and my staff are here always on time and that the lawyers are

here and that there are witnesses ready to go.  That is my

solemn commitment to you and I would ask that you please do

that so that we can all get you back to your lives as

efficiently and as soon as possible.

          If you wish, you may take notes and Ms. Rivera will

provide you with pads and pens for that purpose.  But if you do

take notes you must leave them in the jury room when you go

home at the end of the day.  And remember that any notes you

take are for yourself only and they're not to be relied on by

JB49SCO1

1    anyone else.

2            It's completely up to you whether you want to take

3    notes.  Let me remind you that we do have a court reporter who

4    will take down every word that's said throughout the trial so

5    you don't, strictly speaking, need to take notes.  However,

6    some people find that it helps them concentrate.  And when you

7    deliberate, however, you should discuss what the evidence was

8    and not what one juror's or another juror's notes do or do not

9    say.

10           So with that, I will have Ms. Rivera take you in the

11   jury room and she'll describe to you how to get in and out of

12   the courtroom and how to get in and out of the jury room.

13           There will be breakfast tomorrow here in the morning.

14   You should endeavor to be here no later than 9:15 and we'll get

15   ready bright and early at 9:30 and I will make sure I will

16   police all of the attorneys to make sure that when we have a

17   15-minute break it is a 15-minute break and not a 16-minute

18   break or a 17-minute break.  And we'll see you tomorrow.

19           Until then, do not discuss the case amongst

20   yourselves.  Do not do any research about the case.  Do not

21   read anything in the media about the case or on the internet

22   about the case.  Have a very, very good evening.  We'll see you

23   tomorrow morning so we can get started at 9:30.

24           (Jury not present)

25           THE COURT:  I forgot to tell them that we weren't

JB49SCO1

```
1    sitting on Veterans Day.  Can you tell Jazmin to tell them that
2    we're not sitting on Veterans Day.
3              Is there any work for me to do?  Mr. DiMase?
4              MR. DIMASE:  Not that I'm aware of at this time.
5              THE COURT:  Mr. Devlin-Brown.
6              MR. DEVLIN-BROWN:  I don't think so either.
7              THE COURT:  So be here by nine or try to be around
8    especially if you know that there's something that needs to be
9    addressed.  In my experience there's always something that
10   needs to be addressed so I will be ready to go by no later than
11   9 a.m. and you should also.
12             Have a very pleasant evening, folks.
13             (Adjourned to November 5, 2019 at 9 a.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```