JB79SCO1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                        17 CR 630 (ER)

MARK S. SCOTT,

                Defendant.

------------------------------x

                                   New York, N.Y.
                                   November 7, 2019
                                   9:00 a.m.

Before:

                   HON. EDGARDO RAMOS,

                                       District Judge


                        APPEARANCES


GEOFFREY S. BERMAN,
     United States Attorney for the
     Southern District of New York
CHRISTOPHER DiMASE
NICHOLAS FOLLY
JULIETA V. LOZANO
     Assistant United States Attorneys

COVINGTON & BURLING LLP
     Attorneys for Defendant
BY:  ARLO DEVLIN-BROWN
     KATRI STANLEY
     -AND-
DAVID M. GARVIN
```

JB79SCO1

```
 1              (Jury not present)

 2              THE COURT:  So let's get started.

 3              MR. DiMASE:  Your Honor, do you have a copy of the

 4    filing from the government last night?  I do have an extra

 5    copy.

 6              THE COURT:  I do have it.  I am on page three.

 7              MR. DiMASE:  OK.

 8              THE COURT:  So tell me about Apex.  What is Apex?

 9              Close to a microphone.

10              MR. DiMASE:  One moment.

11              (Counsel confer)

12              MR. DiMASE:  So Apex is a fund administration company,

13    one of the several fund administration companies that Mr. Scott

14    engaged to administer his purported investment funds.  And

15    Mr. Spendiff was a high-level executive at that entity.  That

16    was really the main point of contact for Mr. Scott with Apex.

17              Mr. Scott actually reached out to Apex very early on

18    to help set up the bank accounts for his funds.  Apex was the

19    entity that actually had the relationship with DMS bank in the

20    Cayman Islands and facilitated the opening of the bank

21    accounts.  And Apex also had the responsibility over the course

22    of the brief period where they served as fund administrator to

23    do due diligence on the various transactions that Mr. Scott was

24    attempting to effectuate into and out of the Fenero Funds.

25              And the import of his testimony is that in a
```

JB79SCO1

1    relatively short period of time, in part because of a mistake

2    made by Mr. Scott by forwarding an e-mail containing the word

3    OneCoin and in part --

4             THE COURT:  I'm sorry.  Forwarding an e-mail that

5    what?

6             MR. DiMASE:  That listed an e-mail address

7    OneCoin.edu.

8             In other words, Mr. Scott was not disclosing the

9    connection to OneCoin and the funds from OneCoin to Apex.

10   That's a critical part of the testimony.  At some point he

11   accidentally forwarded an e-mail which contained that word.

12   There were also a number of suspicious transactions underway.

13   And Apex at that point started asking a lot more questions.

14   Ultimately, it told Mr. Scott that it could no longer handle

15   those transactions, put them on hold and the very last day of

16   the relationship with -- between Apex and Scott there was a

17   phonecall that was recorded in which the Apex representatives,

18   including the witness we anticipate testifying, asks a number

19   of questions about the source of the funds, the investors in

20   the funds and so on and so forth.  And Mr. Scott provided a

21   number of recorded answers.  The entire call was recorded.

22   Shortly after that call the relationship is terminated and

23   Mr. Scott then finds other ways to move his money in and out of

24   the bank in the Cayman Islands.

25             Critically, this is the only witness from a bank or

JB79SCO1

1   financial institution that Mr. Scott directly dealt with in

2   connection with his management of the funds that the government

3   presently anticipates calling at this trial.  There are other

4   bank witnesses related to other banks that interacted with the

5   funds in various ways.  The Bank of Ireland witnesses were

6   going to be additional witnesses who dealt directly with

7   Mr. Scott but the Court is obviously aware of how that played

8   out.  So this is a very critical witness for the government and

9   this recording is very important evidence regarding the

10  misrepresentations that Mr. Scott made to the fund

11  administration firm.

12          The only thing I would add, your Honor, is the call is

13  an hour long.  It's not short.  An hour is a long time for a

14  jury to sit and listen to something.  So we have endeavored to

15  cut it down to the portions that we think are most relevant.

16          There's a lot of circling around on similar topics

17  several times in the course of the call so we've tried to

18  cutout the duplicative parts of it.  The main goal really from

19  our perspective is to limit this to the most relevant parts and

20  not waste the jury's time.

21          We did try to come to some sort of understanding with

22  the defense and asked them if they had particular portions that

23  they would want to introduce in addition to our portions and

24  they have indicated they want the entire call into evidence.

25          The concern we have is if the entire call is into

JB79SCO1

1    evidence then the government will likely play the entire call

2    because we don't want to be seen as hiding some portion of the

3    call from the jury, but an hour is a long time.

4            THE COURT:  So the only issue -- the only controversy

5    between the parties is not that they're keeping stuff out that

6    ought to be included under the rule of completeness but simply

7    you want to be more efficient and they want to put the entire

8    thing before --

9            MR. DiMASE:  I think that's sort of the root of the

10   disagreement.

11           But the legal basis for the government to keep out the

12   remainder of the call is really that it can't be admitted by

13   the defendant because it's his own statement.  He's not a party

14   as far as himself, as far as the government is a party to the

15   action, we can introduce the statements.  So the only remaining

16   possibility as far as the admission of the remainder of the

17   call is the rule of completeness to explain portions of the

18   call that can't be understood without the necessary context.

19   And it's our position that the remainder of the call is not

20   necessary to provide context for the portions the government

21   seeks to admit.

22           THE COURT:  OK.

23           MR. DEVLIN-BROWN:  So I'm glad this was raised, your

24   Honor, because it's been a -- I think disagreement the

25   government and defense have had for a while.  There's the

371

JB79SCO1

1    narrow issue of the call.  The government's probably selected

2    45 minutes versus an hour.

3              MR. DiMASE:  Just to be clear.  I think it's closer to

4    a half an hour.  We cut it down further from where it was at

5    the beginning.

6              MR. DEVLIN-BROWN:  But I think it's been hard to

7    negotiate with the government on this because of their position

8    that the only thing the defense has in its quiver is this rule

9    of completeness and I think that's actually a very fundamental

10   misunderstanding.

11             If I could just step back for one second before

12   getting into the rules of evidence.

13             The government's charges here, both the bank fraud and

14   the money laundering, are both broad and vague.  But the

15   gravamen of the charges, and it's been clear in the opening, is

16   that Mr. Scott lied to Apex, to financial institutions, etc.,

17   about the connection between Ruja and OneCoin and the money

18   coming into these funds.  It's not just false statements the

19   government said.  It's material omissions.  It's misleading

20   half-truths.  So that's the government's case.

21             And obviously, when the government can show through a

22   witness that Mr. Scott is not saying something about OneCoin

23   that can be very compelling evidence for the government both in

24   terms of proving the act itself.  You did not mention OneCoin

25   and therefore that's part of the fraud.  And also it's very

JB79SCO1

1    relevant to a critical issue we've been talking about the last

2    few days which is Mr. Scott's state of mind as to whether

3    OneCoin is a fraud scheme because presumably the less he's

4    willing to say about OneCoin the stronger the government's

5    circumstantial argument that he didn't want to talk about

6    OneCoin because he knew it was a fraud scheme.  And the

7    converse is true from the defense.  The more he would be

8    willing to talk about OneCoin, that's supports an argument that

9    he didn't think it was a fraud scheme.

10           So fundamentally, your Honor, this is not a situation

11   where we're talking about a postarrest statement or something.

12   This is the act of the crime.  What did Mr. Scott tell bankers,

13   tell Mr. Spendiff and others about OneCoin.  And the government

14   is trying to pursue a theory where they get to elicit

15   evidence -- here's all the things that are not OneCoin and the

16   defense is precluded from saying well here are some things he

17   did say about OneCoin.  And those are the portions of the call

18   that the government does not want the defendant to permit.

19           It would be like, your Honor, in a case involving a

20   offering prospectus where the plaintiff or the government says:

21   Look, it's a misleading prospectus because AB and C are said

22   and the other side can't say but DE and F are there as well.

23           So the government comes back to the rule of

24   completeness as the basis for their position.  And I don't

25   think that's right.

1          First of all, the government's clearly not offering

2     the statements of Mr. Scott for the truth of the matter

3     asserted.  I think they submit that all of this or much of what

4     they're going to offer is a lie.  It's the act itself they're

5     trying to prove.  What was said to Mr. Spendiff.  And then they

6     will prove whether that is true or false presumably.

7          So it's not -- and we are, therefore, not trying to

8     offer what Mr. Scott said about OneCoin, specific statements

9     for the truth of what he said about OneCoin, but simply that he

10     made these statements about OneCoin to a party that the

11     government says is being deceived about the relationship

12     between OneCoin and the funds.

13          So I think that's been the problem, is that the

14     government's position is the only avenue the defense has is

15     rule of completeness.  And I don't think that's the case.

16          As for the call, we're happy to play portions of it.

17     We think the whole thing should come into evidence.  If you go

18     line by line there's probably all sorts of other nonhearsay

19     reasons.  For example, questions are not hearsay.  Statements

20     of intention are not hearsay.  But I don't think you need to do

21     that.  I think the jury needs to decide whether Mr. Scott

22     shared all the information about OneCoin or didn't.  And they

23     should be able to have the entirety of the call.

24          MR. DiMASE:  Just briefly in response.  Sorry.

25     Mr. Devlin-Brown, are you done?

JB79SCO1

1          First of all, I just want to make clear and perhaps we

2     should push this off a little bit for the Court to review the

3     portions that the government is seeking to introduce so that

4     the Court can see.

5          The government is not extracting from this call

6     information about Mr. Scott talking about OneCoin.  That's in

7     the call, for sure.  I mean he's been caught at this point by

8     Apex and he has to explain the connection to OneCoin and that

9     is part of the portion of the call that the government fully

10    intends to admit.  So I want to make that clear, first of all.

11         But as far as the legal admissibility here.  The

12    defense is not putting these statements in to show that

13    Mr. Scott lied.  That's certainly not why they want the

14    remainder of the call in.  They want the remainder of the call

15    in to show that he told the truth, which is precisely what

16    they're not allowed to do, to admit evidence of the defendant's

17    own statements, false exculpatory statements for their truth.

18         Mr. Scott is obviously permitted to testify and make

19    representations about what he told to Apex at that time.  But

20    it's not appropriate for the defense to put the statements in

21    for their truth.  And that leaves the rule of completeness as

22    the remaining option.

23         We just have not received any suggestions from the

24    defense about which portions of the call are needed to explain

25    the portions that are admitted by the government.  Right now

JB79SCO1

1    it's just all of the call.  And I certainly don't think that

2    all of the remaining call is required to provide context.

3    That's where we are I think at this stage, your Honor.

4              MR. DEVLIN-BROWN:  Perhaps the Court should take more

5    time, if the Court wishes.  There are actually a couple of

6    issues with this witness who is on cross that it might be

7    helpful to preview to avoid a sidebar.

8              I'll just say one thing to I think, give you an

9    example.  If you look at transcript page 7.

10             The white is stuff the government says should be

11   cutout.  So Mr. Scott starts talking about OneCoin.  I mean he

12   started talking about it in the part that's included.  But then

13   he says:  If you have the internet and look up cryptocurrency,

14   look up OneCoin --

15             THE COURT:  Slow down.

16             MR. DEVLIN-BROWN:  Like this company has like four

17   hundred thousand members that pay into it.  It's basically in

18   120 countries.  OK.  It should be enough for you to say, hey,

19   profits reach a billion a year.

20             So I don't need to read the rest of it.  But the point

21   in terms of hearsay, your Honor, is we are not offering that

22   for the truth that say OneCoin has four hundred thousand

23   members or that it's profits are a billion dollars a year.

24   Those things may well be false.

25             What we're offering it for is that Mr. Scott was --

1   who has been accused of trying to hide OneCoin and who has been

2   alleged to have a guilty state of mind about whether it's a

3   fraud scheme is discussing what he has heard about OneCoin to

4   Mr. Spendiff.

5          Whether it has four hundred thousand members or ten

6   members isn't relevant.  It's that he's sharing this with

7   someone the government is saying has been misled because

8   OneCoin information has been hidden.

9          MS. LOZANO:  Your Honor, yes.  To briefly respond.

10  Taking that section specifically, Mr. Devlin-Brown points out,

11  I note that these transcripts have a lot of repetition.  And,

12  in fact, if you look on -- if the Court looks on page

13  transcript 9 there are two full paragraphs at the beginning and

14  at the end that talks about the legitimacy of OneCoin and he

15  says you have to go out and see these people have a good

16  reputation.  Have they done anything illegal?  Are there

17  business actions?  Yes.  You check all that and that's it.  But

18  you don't go to their clients and ask them, hey, did you really

19  send them these five dollars that they're giving us now.

20         And then he is asked:  Did you do due diligence on

21  OneCoin or did you do due diligence on IMS?  And Mr. Scott

22  explains that he did due diligence on IMS and B&N and that the

23  two companies are providing a service for OneCoin.  And then it

24  goes on to the next page.  And he explains that there is no

25  reason to believe that these companies are doing anything

1    illegal and it's inappropriate for Apex to be asking him to

2    provide OneCoin financials.

3           On page ten he says they are in an industry, as you

4    can see from the writeup from our board where it's very

5    detailed what's going on in crypto.  They are in some

6    countries, some regulated, some unregulated so they get paid.

7    This is not a small undertaking to go to them and say, hey,

8    just put together your financials.

9           So there are ample sections that the government has

10   included.  And we carefully reviewed these transcripts to

11   ensure that they did completely communicate the essence of this

12   phonecall.

13          If the Court reviews the transcript carefully the

14   Court will note there are many areas that are repeated.  In

15   fact, I believe both Mr. Spendiff and Mr. Scott on the call say

16   at one time we're going in circles because they repeat the same

17   things.

18          So Mr. Devlin-Brown's objection is not legitimate.

19   There are plenty of sections in which Mr. Scott's

20   representations about OneCoin, IMS and B&N are included.  The

21   remaining sections that we took out are not necessary.  In

22   fact, many of them are just repetitive of the sections that we

23   have included and they're inadmissible hearsay when offered by

24   the defendant.

25          MR. DEVLIN-BROWN:  Your Honor, this is a fraud case

JB79SCO1

1    and with all due respect to Ms. Lozano I'm not comfortable with

2    the idea that we should just trust the government to make sure

3    everything important Mr. Scott said about OneCoin is in there.

4         And, again, I reject the hearsay basis because whether

5    OneCoin has four hundred thousand members or ten members,

6    that's not the issue.  The issue is he's willing to share the

7    information about OneCoin

8         Some other issues, your Honor.  Mr. Scott gets very

9    angry and frustrated on the call.  The jury might infer wow,

10   that's because he's an unreasonable person, because he's

11   guilty, who knows.  The fact that the call goes on and that

12   things do go around in circles explains to some degree why he

13   gets upset on the call.

14        It's just such a critical piece of evidence.  There's

15   a lot of indicia of reliability, your Honor.  Mr. Scott did not

16   know he was being recorded whereas the Apex people were

17   secretly recording him.

18        We're happy to work with the government to agree to

19   portions.  But it's not a real negotiation we can have where

20   the government's view is we'll decide and you can't do anything

21   because it's hearsay.

22        THE COURT:  Is that the government's position?

23        MS. LOZANO:  The government's position is that we have

24   attempted to engage defense in eliciting from them what

25   portions they want to include and when we did not get any

JB79SCO1

1    response except we want the whole call, we went back and looked

2    and fairly excerpted -- chose excerpts for admission to -- as

3    evidence and that is our position.  Our position is that these

4    portions which by the way are significant.  They are at least I

5    would say approximately half of the call.

6            And, in fact, to Mr. Devlin-Brown's point about

7    frustration, on page transcript 18 there is a long paragraph

8    from Mr. Scott explaining why he's frustrated that every little

9    piece of paper was sent to Apex and we gave all the paperwork

10   about the underlying transactions and documents.  So that is in

11   there.  And our position is that the other portions are

12   repetitive and are not needed to explain this.

13           THE COURT:  Can I just ask one quick question.

14   There's an Exhibit A and an Exhibit B.  Is that just one

15   transcript or are those two calls?

16           MS. LOZANO:  It is one call, your Honor.  And it was

17   recorded in two portions.  The first half of the call is A.

18   The second half of the call is B.

19           THE COURT:  So I guess what I'm not hearing the

20   government say is I'm not hearing them say, Mr. Devlin-Brown,

21   that this stuff is self-interested, false exculpatory material.

22   What I hear them saying is:  Look, it's a long call they go

23   over stuff again and again.  We're just trying to make this as

24   painless as possible for the jury.  And if that's true, why

25   isn't there some basis for you folks to get together and say OK

1    this excerpt is not really discussed in any other place.  It

2    doesn't -- we don't care whether or not it comes in.  Is there

3    any basis for additional discussions between you two?

4              MS. LOZANO:  Your Honor, to answer the Court's first

5    question, there are actually portions that we have not included

6    that we believe are false exculpatories.  To give this call

7    context, at this point Mr. Scott had inadvertently forwarded an

8    e-mail to Apex revealing the OneCoin connection with

9    Ms. Dilkinska and B&N.  He knew -- we believe he knew that Apex

10   now had discovered that OneCoin was involved.  And Mr. Scott

11   was doing everything in his power to justify previously

12   concealing that information.  So there are false exculpatory

13   statements.

14             To the Court's second point, we have tried.  We have

15   been trying.  We have sent at least two different versions of

16   our excerpts to defense in an effort to reach some consensus,

17   to have them reply to us and say what portions do you want out

18   that we want in and what portions do you want in that we want

19   out.  And the response we've gotten across the board is we want

20   the whole call in.

21             MR. DEVLIN-BROWN:  Your Honor, I just don't think

22   that's quite fair.  First of all, I don't think that's what the

23   evidence is going to show about what Mr. Scott said to Apex and

24   how they discovered it was OneCoin-related.  So there's a lot

25   of disputes that will be there.

JB79SCO1

 1         But even in the government's cover letter to your
 2    Honor last night they cite rule of completeness and hearsay and
 3    that's the issue we've been hearing all along which just made
 4    it very hard to negotiate when they take the position, just
 5    like the postarrest statement, which didn't work out so well
 6    for us, all you can do is argue on rule of completeness
 7    grounds.
 8         THE COURT:  But isn't that the appropriate rubric
 9    through which I have to analyze this particular issue?  They're
10    putting in a statement.  They don't want to put in the entire
11    statement.  And then the question for me is ought I make them
12    put in at least some additional portions of the statement so
13    that the jury is not left with the mistaken impression that
14    Mr. Scott made certain representations and not others?
15         MR. DEVLIN-BROWN:  Your Honor, I think it -- there is
16    a rule of completeness issue but that's like -- that's the
17    backstop.  This is -- that's not fundamentally what it is
18    because the crime -- the crime itself is what was Paul Spendiff
19    told.
20         It would be like a bank fraud case where a loan
21    application where someone discloses their financial condition.
22    And the government says it's a misleading and false loan
23    application.  The whole loan application needs to come in.  The
24    entire -- that's the act, submitting a false application.  So
25    what's in the application is relevant to that very issue.

JB79SCO1

1          THE COURT:  I generally agree with that but we don't

2    have a business record or an application or some other form.

3    We have statements.  And the question is what ought to be put

4    in front of the jury if some part is going to be put in front

5    of the jury.  I would recommend that you folks continue

6    talking.

7          When does the government intend to put this in?

8          MS. LOZANO:  Well we intend to call Mr. Spendiff as

9    our next witness and I believe -- depending on how long

10   Mr. Ignatov's cross-examination is.  We have Mr. Spendiff ready

11   to start today.  We may put him on after a short witness after

12   Mr. Ignatov.  But the recording would come in at the end of

13   Mr. Spendiff's testimony which we expect whether he comes on

14   next or after a short witness would be tomorrow.

15         THE COURT:  OK.  How long do you expect Mr. Spendiff's

16   testimony to be?

17         MS. LOZANO:  I expect that the direct will be at least

18   two to two-and-a-half hours.

19         THE COURT:  And you'll have the opportunity to cross

20   Mr. Spendiff with respect to those portions that perhaps don't

21   get in.  So let me read it.  And it looks like I won't -- it

22   won't be proffered until for a little while.

23         I won't hold you to this, Mr. Devlin-Brown, but any

24   idea how much longer on cross with Mr. Ignatov?

25         MR. DEVLIN-BROWN:  I'm thinking perhaps an

JB79SCO1

1      hour-and-a-half, your Honor.

2              I know it's already 9:26.  There are two issues where

3      the government may object.  We can take it up at the time or we

4      can do it now.

5              THE COURT:  Why don't you at least give me a preview.

6              MR. DEVLIN-BROWN:  Certainly, your Honor.

7              Can I hand something up, your Honor?

8              THE COURT:  Absolutely.

9              MR. DEVLIN-BROWN:  So your Honor may recall that there

10     was a line of cross-examination yesterday about how certain

11     Mr. Ignatov was that Irina Dilkinska was at that meeting, the

12     single meeting she had with Mr. Scott.  And the witness had

13     testified on direct actually to some significant details about

14     this meeting with Irina Dilkinska including that Ruja told

15     everyone leave the floor, this is the only time she's ever said

16     it, so Irina, Ruja, and the defendant can speak together.

17             Well, we went on the computer database of the

18     government's discovery last night and based on information we

19     believe that she was not there and found an e-mail from Irina

20     Dilkinska to Mark Scott saying in relevant part I am traveling

21     for the whole week.  She sends that Sunday, July 17.  The

22     meeting is on July 20.

23             So I intend to do two things with this, your Honor.

24     First, I'm going to show it to the witness.  It's not in

25     evidence so I'm not going to ask him to read it.  But after

JB79SCO1

1    setting this up I am going to ask him:  Isn't it true that she

2    was not at that meeting?  So we'll see how he answers to that.

3            THE COURT:  OK.

4            MR. DEVLIN-BROWN:  But the evidentiary issue is "I am

5    traveling for the whole week" is admissible.  It's not hearsay.

6    It's a statement of a plan.

7            And I apologize.  I just e-mailed cases to your Honor

8    and the government.  Our entire computer network, including

9    e-mail, was down from 12 a.m. to early this morning.  So I

10   apologize for that.  And we don't necessarily need to decide it

11   when the witness is on the stand but I think this is

12   admissible.

13           THE COURT:  OK.

14           MR. DEVLIN-BROWN:  That's the first issue.

15           MR. FOLLY:  Your Honor, obviously we're hearing this

16   as you are hearing this for the first time and we have not

17   reviewed any of the cases that were sent after we started court

18   today.

19           Your Honor, this statement does not contradict the

20   witness's testimony.  There is no evidence that she actually

21   did travel anywhere.  For that reason alone there's really no

22   basis to admit this.

23           He has already testified on this.  This question has

24   been asked and answered I think three -- at least two times if

25   not three times because Mr. Devlin-Brown was obviously trying

JB79SCO1

1    to set this up.

2            So there is no reason to revisit this.  Our objection

3    would be the witness's testimony is in on this.  There is no

4    need to ask additional questions.  There is no reason to show

5    him the document that he's never seen in his life and he was

6    not cc'ed on and that does not have any bearing on his

7    testimony.  And there's certainly no basis to admit this

8    hearsay e-mail.

9            THE COURT:  Well there's a certain basis to allow

10   Mr. Devlin-Brown to attempt to refresh Mr. Ignatov's

11   recollection as to whether or not she was there.  As I recall

12   his testimony, he never bought into the hundred percent sure

13   but that he was pretty sure and was pretty close to a hundred

14   percent.

15           This might jog his memory in some fashion.  That

16   doesn't necessarily mean that the document comes in but it can

17   be used for that purpose; then whether or not it comes in is a

18   different story.  I guess, again, depending on what he says.

19           MR. FOLLY:  Your Honor, I just would flag one thing.

20   This is not a prior inconsistent statement of the defendants.

21   There would be no basis -- of the witnesses.  There would be no

22   basis for its admission on that basis.

23           I'm also unclear just how this statement would refresh

24   the witness's recollection.  He's never -- it's an e-mail

25   without him on it that he has never seen in his life.  If

JB79SCO1

1    Mr. Devlin-Brown wants to ask him would something refresh your

2    memory and he says, yes, an e-mail with Irina Dilkinska would,

3    then maybe that would make sense.

4           THE COURT:  As I recall from the Irving Younger tapes

5    that I watched when I was a law student, you can refresh a

6    witness's recollection with anything, a plate of fettuccini, he

7    said.

8           MR. FOLLY:  If they are testifying that they don't

9    remember something that's accurate, your Honor.  But that's not

10   the witness's testimony.  That was clear yesterday.

11          MR. DEVLIN-BROWN:  I do remember the pizza box I think

12   is what I learned.  But you don't have to approach it as

13   refreshing a recollection.  You can attempt to impeach a

14   witness and his direct testimony.  And it's obviously improper

15   for me to read a document that's not in evidence.  But I can

16   put something before him and ask him a question and that's all

17   I'm planning to do.

18          In all candor, I did not know this e-mail existed last

19   night.  I'm not going to reveal privileged communications with

20   my client.  But I did not believe that she was likely at that

21   meeting and, lo and behold, found this on the database last

22   night.  So I think he testified -- I mean he testified in great

23   detail about this meeting and I think it's false.

24          THE COURT:  It's 9:30.  There's another issue?

25          MR. DEVLIN-BROWN:  The other is very quick, your

JB79SCO1

1    Honor.  One of the things produced to us in 3500 material is

2    Mr. Ignatov's diary.  We are going to ask him -- we're going to

3    show him his diary.

4            THE COURT:  He has a diary?

5            MR. DEVLIN-BROWN:  He has a diary.  He kept a journal.

6    We are going to ask him questions.  There's a doctrine -- we

7    may not seek to admit it but there's a doctrine of a prior

8    recollection recorded where if someone does not recall a

9    statement and they made it contemporaneously it could be

10   admitted or portions could.  So that's the final one.

11           THE COURT:  Ms. Rivera, is the jury here?

12           THE DEPUTY CLERK:  Yes.

13           THE COURT:  We'll get started -- let's get Mr. Ignatov

14   out.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1            (Jury present)

2     KONSTANTIN IGNATOV,

3          called as a witness by the Government,

4          having been previously sworn, testified as follows:

5            THE COURT:  Ladies and gentlemen, good morning.  Thank

6     you again for being so prompt.  We will now continue with the

7     cross-examination of Mr. Ignatov.

8            Mr. Ignatov you are reminded that you are still under

9     oath.

10           Mr. Devlin-Brown.

11    CROSS-EXAMINATION

12    BY MR. DEVLIN-BROWN:

13    Q.  Good morning, Mr. Ignatov.

14    A.  Good morning.

15    Q.  So you were arrested on March 6 of 2019; is that correct?

16    A.  Correct.

17    Q.  You were at the L.A. Airport I think when you were

18    arrested?

19    A.  Yes.

20    Q.  And you've been detained ever since, right?

21    A.  Yes.

22    Q.  You've been living at the MCC since I believe March; is

23    that right?

24    A.  End of March.

25    Q.  End of March.

1          You made a bail application as you testified

2    yesterday?

3    A.  I did.

4    Q.  That was denied?

5    A.  Yes.

6    Q.  And that was pretty upsetting to you, I imagine?

7    A.  Yes.

8    Q.  And the MCC is a pretty terrible place, right?

9    A.  Yes.

10   Q.  And you have a fiancee who you're having a baby with not

11   with you, obviously, right?

12   A.  Yes.

13   Q.  And it's been a big priority to get out of jail as soon as

14   you can so you can be with them, right?

15   A.  Yes.

16   Q.  So after your bail application was denied you started

17   proffering with the government; is that right?

18   A.  Yes.

19   Q.  And the proffering essentially means as you understand it

20   sitting down with agents and prosecutors and answering their

21   questions; is that right?

22   A.  Yes.  Providing information.

23   Q.  Providing truthful information?

24   A.  Yes.

25   Q.  And you met with them between July of this year and

1    September maybe ten or more times when you were doing these

2    proffers, right?

3    A.  Yes.

4    Q.  And at some point you became aware that they had a trial

5    coming up against Mark Scott, right?

6    A.  Yes.

7    Q.  So on October 4 of 2019 you pled guilty to a cooperation

8    agreement, right?

9    A.  Yes.

10   Q.  And you testified about that agreement a little bit

11   yesterday on direct examination?

12   A.  Yes.

13   Q.  And the big advantage of a cooperation agreement is there's

14   a possibility of the government writing what's called a 5K

15   letter to the judge before sentencing, right?

16   A.  If I testify truthfully, yes.

17   Q.  And the 5K letter gives you a potential, right, for a much

18   lower sentence?

19   A.  Yes.

20   Q.  You could be sentenced to as little as time served, right?

21   A.  Yes.

22   Q.  No guarantees, of course?

23   A.  No.

24   Q.  It's up to the judge?

25   A.  Yes.

JB79SCO1                         Ignatov - Cross

1   Q.  But that's what you would be hoping for, right?

2   A.  Yes.

3   Q.  And as you mentioned, the cooperation agreement requires

4   you to do certain things, right?

5   A.  To testify truthfully.

6   Q.  You've mentioned a few times it requires truthful

7   testimony?

8   A.  Yes.

9   Q.  It also requires you to sit down and meet with the

10  government when they want, right?

11  A.  Yes.

12  Q.  And to appear as a witness at trial?

13  A.  Yes.

14  Q.  And the only trial that you know about where you may have

15  to testify is this one, right, Mark Scott's trial?

16  A.  Yes.

17  Q.  So I think you testified -- well after you've signed the

18  cooperation agreement and pled guilty you continued to meet

19  with the prosecutors, right?

20  A.  Yes.

21  Q.  As I believe you said on direct examination it wasn't just

22  about Mark Scott you were meeting with them, right?

23  A.  No.

24  Q.  But it was maybe 20 or more times you met with them?

25  A.  Around 20 times.

1   Q.  And some of it was certainly about Mark Scott?

2   A.  Yes.

3   Q.  Fair to say as the trial got closer and closer more of the

4   discussion at a particular meeting was about Mark Scott?

5   A.  It was always more or less the same amount of time we

6   discussed.

7   Q.  And you the prosecutors went over the kinds of questions

8   that Mr. Folly would ask you on direct examination, right?

9   A.  We went over different types of questions.  In most cases

10  every time he showed me, for example, new evidence that I did

11  not see before my arrest and also parts of my discovery, every

12  time it was something different.

13  Q.  But the questions you were asked on direct by Mr. Folly

14  yesterday, none of them were surprising to you, were they?

15  A.  Well it wasn't a role play if you mean this.  We had some

16  types of questions.  But not all exactly of them.

17  Q.  I didn't suggest it was a role play.  But my question was

18  none of his questions surprised you, did they?

19  A.  A few things were a little bit unexpected but most of them

20  did not surprise me.

21  Q.  And when you would go do these preparation sessions

22  sometimes the prosecutors would suggest different ways of

23  phrasing your answer; is that fair to say?

24  A.  The only time this happens was when I asked for an English

25  word because I don't know it.

1   Q.   So the prosecutors never suggested a different way of

2   phrasing your answer.

3   A.   Not if I didn't ask explicitly because I don't know how to

4   express myself.

5   Q.   So you only met, as you testified yesterday, with Mr. Scott

6   one time in your life, right?

7   A.   Yes.

8   Q.   The prosecutors asked you in the preparation sessions lots

9   of questions about that meeting, right?

10  A.   Yes.

11  Q.   Because it was the only meeting about Mr. Scott?

12  A.   Yes.

13  Q.   And you did your best to remember everything about the

14  meeting, right?

15  A.   Yes.

16  Q.   It was more than three years ago but you tried really hard,

17  right?

18  A.   I tried about everything that I testified to.

19          MR. DEVLIN-BROWN:  If we could put, Mr. Barile,

20  Government Exhibit 62 on, which is in evidence, on the screen.

21  And specifically paragraph -- page 2, paragraph L.

22          It's not on my screen.  Is it on the jurors' screen?

23          Mr. Barile.

24          THE DEPUTY CLERK:  Everything seems fine from here.

25          MR. DEVLIN-BROWN:  It's not working, I gather?

JB79SCO1                        Ignatov – Cross

1              Go to page 2, paragraph L, Mr. Barile.

2    Q.  So I'm just going to read page 2, paragraph L:  Scott

3    traveled from Miami to Frankfurt on July 19, 2016, and traveled

4    to Frankfurt and Sofia, Bulgaria on July 20, 2016; Scott

5    returned from Sofia to Frankfurt on July 21, 2016.

6              So the meeting was July 20 or July 21, 2016, right,

7    Mr. Ignatov?

8    A.  Yes.

9              MR. DEVLIN-BROWN:  Will you leave that on the screen,

10   please, Mr. Barile.

11             Thank you.

12   Q.  So you testified on direct about a lot of details about

13   this meeting from more than three years ago, right?

14   A.  There weren't that many details as I did not attend it but

15   on some details I was there, yes.

16   Q.  Do you remember testifying on direct examination that after

17   Mr. Scott arrived there was small talk such as how was your

18   travels, do you want something to drink?  Do you remember

19   testifying to that?

20   A.  As this was part of my job.  I did this to everybody that

21   came to visit Ruja.

22   Q.  So you didn't actually specifically remember --

23   A.  Yes, I did.

24   Q.  If you could just let me finish for the court reporter.

25             Sitting here today do you specifically remember in

1   your mind's eye that when Mr. Scott arrived you asked him how

2   his travel was and if he wanted something to drink or is it

3   just that's what you normally do so you assume you did it with

4   Mr. Scott?

5   A.  I remember definitely the drinking question.

6   Q.  OK.  And you also testified on direct I think I made him

7   coffee or gave him water or something.  Is that just something

8   that you assume you did because you usually do or you have that

9   memory of giving him coffee or water or something?

10  A.  I don't know exactly what he drank.

11  Q.  Sorry?

12  A.  I don't recall exactly what he wanted to drink.

13  Q.  You testified on direct, didn't you, that the meeting with

14  Mr. Scott was initially just with Ruja, right?

15  A.  The first minutes, yes.

16  Q.  And then Ruja called you, you testified, and asked you to

17  bring in Irina.  Do you remember that?

18  A.  Yes.

19  Q.  And you brought in Irina, you testified?

20  A.  Yes.

21  Q.  Did you walk her into the office with Ruja?

22  A.  Not with Ruja.  I walked Irina alone as Ruja was sitting

23  with Mr. Scott in the office.

24  Q.  But that's what you remember.  You walked Irina in to Ruja?

25  A.  Yes.

JB79SCO1                          Ignatov - Cross

1    Q.   And then you testified on direct that Ruja asked you at
2    that same occasion to make sure everybody on the floor left and
3    went home so that Irina, Mark and Ruja could meet together.  Do
4    you remember testifying to that?
5    A.   Yes.
6    Q.   And you also testified that that was very unusual, right?
7    A.   It was the only time it happened.
8    Q.   So that memory must be clear if that's the only time it
9    happened?
10   A.   This memory is clear.
11   Q.   OK.  You remember I asked you -- one more thing.  You also
12   testified on direct, didn't you, that after the meeting in
13   Sofia the following week Irina told you that during that
14   meeting with Mr. Scott she had to stay a long time until Mark
15   Scott understood.  Do you remember testifying to that on
16   direct?
17   A.   This was the part I told you yesterday I'm pretty sure
18   about it.  Yes.
19   Q.   So you're pretty sure after the meeting Irina told you she
20   had to stay a long time until Mark Scott understood.  That's
21   the part you were pretty sure about?
22   A.   Yes.
23   Q.   The part about Irina being at the meeting, are you a
24   hundred percent sure about that?
25   A.   Yes.

1  Q.  You're a hundred percent sure?

2        Because I did ask you a number of questions on

3  cross-examination about whether you were a hundred percent sure

4  or pretty sure, right?

5  A.  Yes.

6  Q.  And I think you settled on you were almost a hundred

7  percent sure.  That's what you testified yesterday on

8  cross-examination?

9  A.  Yes.  I think I'm pretty sure so I don't -- I recall this

10 happening.

11 Q.  Now this is the only meeting you had with Mr. Scott?

12 A.  Yes.

13 Q.  This is an important trial for Mr. Scott, right?

14        MR. FOLLY:  Objection.

15        THE COURT:  Overruled.

16        THE WITNESS:  Yes.

17 Q.  It's important that you testify to things you have a great

18 deal of confidence in about the one meeting you had with

19 Mr. Scott, right?

20        MR. FOLLY:  Objection.

21        THE COURT:  Overruled.

22        THE WITNESS:  Yes.

23        MR. DEVLIN-BROWN:  May I approach, your Honor?

24        THE COURT:  You may.

25 Q.  Mr. Ignatov, I'd like you to just look by yourself at

JB79SCO1                              Ignatov - Cross

1    what's been marked for identification as Defense Exhibit 550.

2    Once you look at the top of that exhibit -- do you see the top?

3    A.  Yes.

4    Q.  Do you see the date of that, that's on that document?

5    A.  Yes.

6    Q.  And if you could just to yourself read the first two lines.

7    A.  Hi Mark.

8              THE COURT:  No, no.

9              MR. DEVLIN-BROWN:  To yourself.

10             THE WITNESS:  Sorry.

11   Q.  Mr. Ignatov, Irina Dilkinska was not at that meeting with

12   Mr. Scott was she?

13   A.  I'm pretty sure she was.

14   Q.  You're still confident that she was?

15   A.  Yes.

16   Q.  She wasn't even in Sofia, was she?

17   A.  As I told you I'm pretty sure she was.

18             MR. DEVLIN-BROWN:  We'd offer Defense Exhibit 550.

19             MR. FOLLY:  The same reasons we discussed earlier for

20   the objection.

21             THE COURT:  The offer is denied.

22             MR. DEVLIN-BROWN:  We can take that off the screen,

23   Mr. Barile.

24   Q.  So I want to ask you, Mr. Ignatov, a few more questions

25   about your cooperation agreement.  So, you have been meeting

JB79SCO1                          Ignatov - Cross

1   for proffer sessions a number of times as you've said before in

2   July and August and September with the government, right?

3   A.  Yes.

4   Q.  And in late September they provided your attorney with a

5   plea agreement, right?

6   A.  Yes.

7   Q.  And originally you had just been charged with wire fraud;

8   is that right?

9   A.  Yes.

10  Q.  And I believe you testified on direct that was the crime

11  of, as you understood it, lying to people to get them to buy

12  OneCoin, right?

13  A.  Yes.

14  Q.  Now the plea agreement that you received as a part of your

15  cooperation agreement had four counts, right?

16  A.  Yes.

17  Q.  They also, as part of the cooperation agreement, required

18  that you plead guilty to a money laundering conspiracy and a

19  bank fraud conspiracy, right?

20  A.  Yes.

21  Q.  And this was not subject to negotiation which counts you

22  were pleading to if you wanted to cooperate, right?

23  A.  Can you rephrase the question.

24  Q.  Well it was a take-it-or-leave-it deal, wasn't it,

25  Mr. Ignatov?

JB79SCO1                          Ignatov - Cross

1   A.  Well, I discussed this with my lawyer and he --

2   Q.  I don't need to know what your lawyer said.

3   A.  OK.

4   Q.  If you can answer the question without saying what you

5   discussed with your lawyer.  The question is:  As you

6   understood, it was it a take-it-or-leave-it deal?

7   A.  But the discussion with my lawyer might be important for

8   this so he explained to me what exactly this means for me.

9               MR. FOLLY:  Objection, your Honor.

10              THE COURT:  Sustained.

11  Q.  I don't want to know what your lawyer said.  But after your

12  lawyer said things to you, what's your understanding that you

13  either had to accept this offer to plead guilty to four counts

14  or there would be no cooperation agreement?

15  A.  Well it was nothing about accepting.  I am guilty about

16  these counts because this is part of what I did.

17  Q.  You didn't try to reduce the number of counts you had to

18  plead guilty to as part of the cooperation agreement?

19  A.  I wanted to have it explained why this happened.

20  Q.  So on direct examination Mr. Folly asked you I believe two

21  times what made you guilty of the bank fraud and money

22  laundering crimes that you pled guilty to.  Do you remember

23  that?

24  A.  Yes.

25  Q.  And he asked you the questions together, bank fraud and

1    money laundering crimes.  Do you remember that?

2    A.   Yes.

3    Q.   Those are two separate crimes, aren't they?

4    A.   They are.

5    Q.   And you also made statements about what made you guilty of

6    those crimes when you actually pled guilty before the judge,

7    right?

8    A.   Yes.

9    Q.   And that was in a courtroom much like this one where you

10   had to answer questions the judge was asking, right?

11   A.   Yes.

12   Q.   And with respect to the bank fraud account in court you

13   said --

14             MR. FOLLY:  Objection.

15             THE COURT:  Overruled.

16   Q.   We lied to banks regarding --

17             MR. FOLLY:  Your Honor, may we approach.

18             THE COURT:  You may.

19             (Continued on next page)

20

21

22

23

24

25

JB79SCO1                        Ignatov – Cross

1          (At sidebar)

2          MR. FOLLY:  Your Honor, Mr. Devlin-Brown has not laid

3   any foundation for any inconsistency as to what the defendant

4   is testifying to on this subject.  He can't simply start

5   reading into the record prior statements of this witness

6   without first establishing that he is making the statement now

7   on the stand that is inconsistent with the prior out-of-court

8   statement.  There's simply no other basis to do that.  That's

9   how impeachment works.

10          MR. DEVLIN-BROWN:  Thank you, Mr. Folly.

11          I'm not attempting to impeach the witness.  I'm

12   attempting to elicit what he understood he was pleading guilty

13   to.  He made a statement in open court which has presumably

14   some indicia of reliability about what he did and I want to ask

15   him a question or two about that.

16          THE COURT:  OK.  That's fine.

17          MR. DEVLIN-BROWN:  Thank you.

18          (Continued on next page)

19

20

21

22

23

24

25

JB79SCO1                          Ignatov - Cross

1           (In open court)

2           MR. DEVLIN-BROWN:  May I continue, your Honor?

3           THE COURT:  Yes.

4    Q.  So you made statements before a judge in court as to why

5    you were guilty of the various crimes charged, right?

6    A.  Yes.

7    Q.  And with respect to the bank fraud count you said:  We lied

8    to banks regarding the unlawful sources of funds and the

9    purposes of wire transfers from the accounts causing banks,

10   including those insured by the U.S. Government, to transfer

11   OneCoin proceeds in and out of accounts on behalf of OneCoin.

12          Do you remember saying that?

13   A.  Something like this.  I don't remember every word but, yes.

14   Q.  Do you remember saying that the bank fraud count included

15   accounts at banks insured by the U.S. Government?

16   A.  No.  I don't remember it exactly.

17   Q.  You didn't actually write the statement yourself you read

18   in court when you pled guilty, right?

19   A.  My lawyer helped me with it.

20   Q.  You understand, don't you, that a bank fraud count requires

21   there to be --

22          MR. FOLLY:  Objection.

23          THE COURT:  Overruled.

24   Q.  You understand, don't you, that a bank fraud count requires

25   there to be deceit that causes some influence on a bank that is

1    insured by the U.S. Government, right?

2              MR. FOLLY:  Objection.

3              THE COURT:  Overruled.

4              THE WITNESS:  I don't understand this question really.

5    Q.  I'll rephrase it.

6    A.  Thank you.

7    Q.  You understand the bank fraud count has to involve banks

8    that are in the United States to some degree, right?

9    A.  I think so.

10   Q.  Do you know of any banks in the United States that you

11   conspired with others to deceive or to obtain money from?

12   A.  I never seen all the bank accounts.

13   Q.  So you don't know of any banks in the United States?

14   A.  No.

15   Q.  Moving to another topic, Mr. Ignatov.  You testified on

16   direct examination yesterday to a number of things that Irina

17   Dilkinska told you about Mark Scott, right?

18   A.  Yes.

19   Q.  And, in fact, you testified that it was based on what Irina

20   Dilkinska told you that caused you to conclude that Mr. Scott

21   was, in your words, a money launderer, right?

22   A.  Yes.

23   Q.  In fact, you testified that after Ruja disappeared you were

24   searching for sources or you and Irina were searching for

25   sources where other companies that had some funds, right?

1   A.  Yes.

2   Q.  And Irina told you there were funds that were available

3   with Mark Scott among other people, right?

4   A.  Yes.

5   Q.  You had no personal knowledge of that, right?

6   A.  No.

7   Q.  It was just something Irina told you?

8   A.  Yes.

9          MR. DEVLIN-BROWN:  Could we put up Government Exhibit

10  3003-S which is in evidence.

11  Q.  So you remember yesterday Mr. Ignatov speaking --

12  testifying about text messages you and Irina Dilkinska

13  exchanged in June 2018, right?

14  A.  Yes.

15  Q.  And these text messages are the basis for why you concluded

16  or why you testified that Mr. Scott was a money launderer,

17  right?

18  A.  Not only as I was sitting almost everyday with Irina in the

19  office and we had discussions.

20  Q.  But you testified yesterday about these text messages,

21  didn't you?

22  A.  Yes.

23  Q.  So I'd like to go over a few things here.  Let's start at

24  the beginning.  Irina Dilkinska says:  Hey.  Talking to Mark

25  Scott.

JB79SCO1                        Ignatov - Cross

1          You don't know if she was actually talking to Mark

2     Scott at that time, right?

3     A.  No.

4     Q.  And you ask:  What does he say?

5          Now, this is June 14, 2018, right?

6     A.  Yes.

7     Q.  The last time you were in any communication with Mark Scott

8     was early 2017, right?

9     A.  I think so.

10    Q.  And he hadn't been involved in anything relating to OneCoin

11    to your knowledge since that time, right?

12    A.  In that gap I don't know what anything he did.

13    Q.  So you don't know anything that Mr. Scott had to do with

14    OneCoin between early 2017 and this period June 14, 2018,

15    right?

16    A.  I don't know if or what happened.

17    Q.  But you were at OneCoin that entire time, right?

18    A.  Yes.

19    Q.  And since October 2017 when Ruja left you played a

20    leadership role in OneCoin, right?

21    A.  It took some time until I took this role.

22    Q.  But you became a leader of OneCoin, right?

23    A.  Yes.

24    Q.  And you didn't have any dealings with Mark Scott since

25    early 2017?

1   A.  No.

2   Q.  Then Irina Dilkinska says:  He wants to know what's up with

3   Phoenix so to help.

4           We'll stop right there.

5           You don't know if Mark Scott had offered to help Irina

6   with anything having to do with Phoenix, right?

7   A.  No, I don't.

8   Q.  That's just what Irina Dilkinska said there?

9   A.  Yes.

10  Q.  And Irina Dilkinska asks:  Shall I tell him?

11          What did you understand her to be asking about what

12  should be told to him?

13  A.  Maybe that Amer Abdulaziz stole the money.

14  Q.  Because you hadn't told him that so far, as you know,

15  right?

16  A.  I don't know if she did.

17  Q.  Well she's asking you:  Shall I tell him, right?

18  A.  Yes.

19  Q.  And you understood that at the time to be a reference to

20  the fact that Amer Abdulaziz stole the money?

21  A.  It might be, yes.

22  Q.  And Irina Dilkinska says:  He says he may help.

23  A.  Yes.

24  Q.  And you have no idea whether he, in fact, said that to

25  Irina Dilkinska?

JB79SCO1                          Ignatov - Cross

1    A.   No.

2    Q.   Now your response was:  Ruja was not happy with him.

3         By that you are referring to the fact that Ruja and

4    Mark Scott separated ways by early 2017, right?

5    A.   By that I refer to the telephone call that I overheard

6    where she was pretty upset about him.

7    Q.   She said Mark, I think you used curse words, was an idiot

8    or something like that, right?

9    A.   Yes.

10   Q.   But they stopped doing business as far as you know by early

11   2017?

12   A.   This is the last time I heard from Mark Scott but I don't

13   know if they continued doing business.

14   Q.   And you said:  I don't see him as much trustworthy, right?

15   A.   Yes.

16   Q.   In the text message.

17        So you weren't sure whether it was a good idea or a

18   bad idea to share with Mark Scott that this money had been

19   stolen by Abdulaziz, right?

20   A.   The thing is I was referring to what I heard from Ruja and

21   Ruja said that somebody messed it up.  Then when she was not

22   happy I don't know if we should continue with this gentleman

23   this way.

24   Q.   So you didn't know if you could trust Mark Scott?

25   A.   Yes.

JB79SCO1                        Ignatov – Cross

1    Q.  Because you hadn't dealt with him since early 2017?

2    A.  Yes.

3    Q.  And Irina Dilkinska says:  Also true, right?

4    A.  Yes.

5    Q.  And then she says:  At least I have asked him to send all

6    relevant agreements.

7            Do you see that?

8    A.  Yes.

9    Q.  And by that you understood her to be referring to whatever

10   agreements or documents he had put together with Irina

11   Dilkinska or others back when he had been involved with OneCoin

12   investors, right?

13   A.  Honestly I don't know exactly which agreements are involved

14   in here.

15   Q.  OK.  Let's go to the second page of this exhibit.

16           So this is the continuation of the same what's

17   WhatsApp exchange, right, Mr. Ignatov?

18   A.  Yes.

19   Q.  So Irina Dilkinska says:  This is his last message just

20   now.

21           Do you see that?

22   A.  Yes.

23   Q.  And then she puts something in quotes.  Let me just read

24   that.

25           First of all she puts something in quotes.  You

1    understood that to be her quoting Mark Scott's last message to

2    her, right?

3    A.  Yes.

4    Q.  And Irina Dilkinska writes, "It is better to let me know

5    what is going on.  We have our audits going on in BVI.  And

6    will submit to the financial commission."

7           That's not an offer to help, right?

8    A.  Actually I don't understand it because I don't understand

9    what a BVI is.

10   Q.  But let's just try just the first sentence then.  "It's

11   better to let me know what's going upon."

12          That's a request to know what is going on, to know

13   what is happening, right?

14   A.  Yes.

15   Q.  It's not -- you don't interpret "let me know what's going

16   on" as "I am here to help you," right?

17   A.  Well this is the last message.  I don't know which messages

18   were being exchanged before.

19   Q.  Understood.  I'm just asking you to -- what your

20   understanding is of what's on the screen before you.

21   A.  Yes.

22   Q.  You don't know what the BVI is, you said?

23   A.  No.

24   Q.  But audits, you know what an audit is, right?

25   A.  Yes.

JB79SCO1                         Ignatov - Cross

1  Q.  So according to Irina's message here Mark Scott says he has

2  audits going on and they have to submit to the financial

3  commission.

4           Do you know what financial commission he was referring

5  to?

6  A.  Not which but I know what a financial commission is.

7  Q.  Did you know that the Fenero Funds were registered in the

8  British Virgin Islands?

9  A.  I heard about it after my arrest.

10 Q.  And did you understand that the British Virgin Islands has

11 a financial commission that regulates funds?

12           MR. FOLLY:  Objection.

13           THE COURT:  Overruled.

14           THE WITNESS:  Well I think every country has it but I

15 don't understand much of financial commissions to be honest.

16 Q.  Did you learn that when Mark Scott separated from OneCoin

17 he held back some money in case there was litigation with the

18 people who had sent it to him.  Did you know that?

19 A.  No.

20 Q.  So then Irina Dilkinska writes:  Assuming this may cause

21 issues for him too, right?

22 A.  Yes.

23 Q.  So she's indicating some assumption about Mark Scott?

24 A.  Yes.

25 Q.  And then she says:  I will ask him to send me the

JB79SCO1                         Ignatov – Cross

1    agreements and then we talk again, right?

2    A.  Yes.

3    Q.  And you agreed:  Yes than let's decide again.

4    A.  Yes.

5    Q.  So based on this text exchange the decision is to just ask

6    him to send some agreements, right?

7    A.  Yes.

8    Q.  Not to do anything else?

9    A.  Yes.

10            MR. DEVLIN-BROWN:  We can take this one off the

11   screen.

12            But if we could put on from the same day Government

13   Exhibit 3005-S.

14            I guess, sorry, not from the same day.  It's from

15   June 22, 2018.

16   Q.  This is another text message exchange between you and

17   Ms. Dilkinska?

18   A.  Yes.

19   Q.  And she writes:  Can you tell FS that Mark himself will try

20   to push Phoenix to release funds.

21            FS is Frank Schneider you talked about yesterday?

22   A.  Yes.

23   Q.  You have no idea if Mark Scott has ever had any dealings

24   with Frank Schneider, right?

25   A.  I seem to recall that Frank Schneider told me that they had

1   communication but I don't know exactly.

2   Q.  But you don't know what?

3   A.  Exactly when this was.

4   Q.  So Frank Schneider at some point told you that he had some

5   communication with Mark Scott?

6   A.  It was part of an e-mail, I think.

7   Q.  But you don't remember anything beyond that, right?

8   A.  No.

9   Q.  Then Irina says:  Mark is Fenero.

10  A.  Yes.

11  Q.  Do you see that?

12          Because prior to June 22, 2018 you didn't have any

13  understanding of Mark's relationship with this entity Fenero,

14  right?

15  A.  Yes.

16  Q.  Yes, you did not have any understanding?

17  A.  I did not have understanding because Irina was in charge of

18  all the subcompanies and everything else.  I had no access to.

19  Q.  So you respond to that:  OK.  Will do.

20          Irina Dilkinska says:  He will send him e-mail.

21          Let's see what will happen, etc.

22          MR. DEVLIN-BROWN:  If we could go to -- I think

23  there's a second page of that.  Right.  And if you could,

24  Mr. Barile, just scroll.  That's good.

25  Q.  So on June 25, 2018 there is another posting -- actually,

1   sorry.

2           MR. DEVLIN-BROWN:  Just go back to the bottom of the

3   last page.  I thought there might be something missing.  Sorry.

4   Go to the second page is fine.

5   Q.  So this is a message -- an e-mail you had gotten from Frank

6   Schneider; is that right?

7   A.  Yes.

8   Q.  And you posted a screen shot to WhatsApp in your

9   communication with Irina?

10  A.  Yes.

11          MR. DEVLIN-BROWN:  Could we zoom in on that,

12  Mr. Barile.

13  Q.  So Frank Schneider responds to some message that was sent

14  to him:  Sorry, I answered a little too quick.

15          Do you see that?

16  A.  Yes.

17  Q.  And what he had answered too quick was you can reach out to

18  Mark Scott?

19  A.  Excuse me.

20  Q.  The thing that he had responded to too quickly telling you

21  and Irina it was OK to reach out to Mark Scott?

22  A.  I don't remember what he wrote before.

23  Q.  Well you hadn't, in fact, reached out to Mark Scott by

24  then, right?

25  A.  This I don't know.  I didn't reach out to him at all; if,

JB79SCO1                          Ignatov - Cross

1   Irina.

2   Q.  You never reached out to him in June 2018 or any other

3   time, right?

4   A.  No.

5   Q.  So, Frank Schneider says there's a potential problem with

6   Mark that you need to know.

7            Do you see that?

8   A.  Yes.

9   Q.  And he talks about seeing a presentation that US

10  authorities gave to international working group called

11  Operation Satellite.

12           Do you see that?

13  A.  Yes.

14  Q.  You understood that to mean some kind of law enforcement

15  presentation that Mr. Schneider probably wasn't supposed to

16  know anything about, right?

17  A.  Yes.

18  Q.  And this presentation is in January 2017 it says, right?

19  A.  Yes.

20  Q.  And Frank Schneider reports that the presentation mentioned

21  GA.  That's Gilbert Armenta, right?

22           SG.  That's Sebastian Greenwood?

23           R.  That's Ruja?

24           You have to answer audibly just so the court

25  reporter --

1    A.  Yes.

2    Q.  But there was no mention of Mark Scott, he tells you,

3    right?

4    A.  Yes.

5    Q.  And he then tells you that based on this January 2017

6    presentation R and I concluded that the highly placed informant

7    might be Mark Scott, right?

8    A.  Yes.

9    Q.  So based on this e-mail after Frank Schneider saw a

10   presentation in January 2017 he and Ruja determined they

11   couldn't trust Mark Scott, right?

12   A.  Seems like, yes.

13   Q.  And after early 2017 is, in fact, when you stopped having

14   any communications with Mark Scott?

15   A.  Yes.

16           MR. DEVLIN-BROWN:  We can zoom back out.  Thank you.

17   Q.  So after reading this you say you don't trust Mark Scott,

18   right?  Do you see that towards the bottom?

19   A.  I was talking about Frank Schneider, not about Mark Scott.

20   And then she answers me that she doesn't trust Mark Scott too.

21   Q.  Well you didn't trust Mark Scott either, right?  In terms

22   of being able to share information with him about what was

23   going on at that point --

24   A.  At that point I didn't trust anybody, to be honest, but

25   Mark Scott included, yes.

JB79SCO1                         Ignatov - Cross

1    Q.   And if we could go --

2              MR. DEVLIN-BROWN:   Is there another page, Mr. Barile?

3    Or is that the end of it?

4    Q.   The bottomline, Mr. Ignatov, is that at this point in

5    June 25, 2018 you hadn't been in touch with Mark Scott for a

6    very long time?

7    A.   Yes.

8    Q.   And there were concerns that he might be an informant,

9    right?

10   A.   Yes.

11   Q.   And you didn't think along -- you and Irina agreed that it

12   didn't make sense to share any information about OneCoin with

13   Mark Scott, right?

14   A.   But I don't know how continued -- I don't know if she

15   shared it or not.

16   Q.   Well your belief was based on what Frank Schneider has said

17   you shouldn't share information with Mark Scott?

18   A.   That it was risky, yes.

19   Q.   It was risky because you couldn't trust Mark Scott not to

20   tell the information to law enforcement, right?

21   A.   Yes.

22             MR. DEVLIN-BROWN:   We can take that off the screen.

23   Q.   You also testified a little bit about Irina's reaction to

24   Mark Scott's arrest, right?

25   A.   Yes.

1    Q.   You testified that she seemed panicked, right?

2    A.   Yes.

3    Q.   You testified that she burned documents, right?

4    A.   Yes.

5    Q.   And you understood from Irina that one of the things she

6    had done with Mr. Scott is send him money that was linked to

7    OneCoin for investments, right?

8    A.   She never said it explicitly.

9    Q.   But that was what you ultimately understood?

10   A.   Not ultimately but with the information I got in the last

11   months this was my conclusion, yes.

12   Q.   So that's your understanding today?

13   A.   Yes.  Not today.  At this time.

14   Q.   So given that back then you didn't even really understand,

15   it sounds like, that she had sent money to Mark Scott -- let me

16   stop there.

17          Before you were arrested you didn't really have a

18   clear understanding of whether she sent money to Mark Scott?

19   A.   I know that they were involved in a company that was in

20   charge of sending money or moving money.

21   Q.   Sounds like your knowledge was very vague.  Is that fair to

22   say?

23   A.   I don't know who sent money to this company, for example.

24   Q.   So you also then don't know if Irina ever told Mark Scott

25   that OneCoin was a fraud, right?

1   A.  No.  I don't know.

2   Q.  Now Irina Dilkinska at this point in June 2015 knew OneCoin

3   had no blockchain, right?

4   A.  If she told him this?

5   Q.  No.  She -- you understood in June 2015 that Irina

6   Dilkinska knew OneCoin had no blockchain?

7           MR. FOLLY:  Your Honor, just objection.

8   Mr. Devlin-Brown keeps say June 2015.  I'm not sure that's

9   the --

10          MR. DEVLIN-BROWN:  No.  That's totally fair.  Can we

11  change to 2018.

12  Q.  You understand I'm talking about 2018?

13  A.  I don't know if she told him about it.

14  Q.  But we're all clear, the questions I'm asking you are about

15  June 2018.

16  A.  OK.

17  Q.  So you understood in June 2018 that Ms. Dilkinska new that

18  OneCoin does not have a real blockchain?

19  A.  As far as we had our understanding, it is not what it

20  should be.

21  Q.  Well you had testified, I believe, yesterday that it was I

22  think May of 2015 where Irina had been drinking and told you

23  that they were not really mining coins.  Do you remember that?

24  A.  May 2018.

25  Q.  Am I doing the 2015 thing again?

JB79SCO1                          Ignatov - Cross

1   A.   Yeah.

2   Q.   Sorry.  May 2018 is when she told you they weren't really

3   mining coins?

4   A.   She told me that more coins are sold than actually mined

5   and that coins within the blockchain can be moved so that the

6   problem doesn't exist anymore.

7   Q.   So you have no idea whether she ever said anything like

8   that to Mark Scott?

9   A.   No.

10  Q.   You have no idea what she told Mark Scott about the money

11  that OneCoin or OneCoin-affiliated companies may be sending to

12  him, right?

13  A.   I was never part of the discussion so I don't know.

14  Q.   Exactly.

15          So you have no reason to know whether Mark Scott had

16  any reason -- strike that.

17          So we've just spoken about a bunch of things that

18  Irina Dilkinska has communicated to you about Mark Scott,

19  right?

20  A.   Yes.

21  Q.   And that has helped form your opinion that Mark Scott is a

22  money launderer, right?

23  A.   Yes.

24  Q.   Now, Irina Dilkinska is not an honest person, is she?

25  A.   No.

JB79SCO1                          Ignatov - Cross

1    Q.  She's extremely dishonest.  Is that fair to say?

2    A.  Yes.

3    Q.  By April 2018, which is before June 2018 you were pretty

4    convinced Irina Dilkinska was stealing money from OneCoin,

5    right?

6    A.  Yes.

7    Q.  In fact, you believe she was stealing it with Amer

8    Abdulaziz, right?

9    A.  At this time, yes.

10   Q.  And that's the guy that bought the horses?

11   A.  Yes.

12   Q.  And you also believed she was working with someone named

13   Adrienne Tulari from Dubai to set up companies to steal money?

14   A.  Yes.

15   Q.  And you had observed she had been spending wildly on travel

16   expenses, right?

17   A.  Yes.

18   Q.  And in fact ever since Ruja left she had been acting like

19   she should be in control of OneCoin, right?

20   A.  Yes.

21   Q.  And she had access to all sorts of information about cash

22   coming in and cash going out that she wasn't sharing with

23   people, right?

24   A.  Yes.  This was the main problem for her.

25   Q.  And you also testified that you believe she had forged not

JB79SCO1                          Ignatov - Cross

1    one but two powers of attorney?

2    A.  Yes.

3    Q.  And a power of attorney, so we understand that, is a

4    document that gives whoever has the power of attorney the right

5    to do things as if they were the person who gave them the

6    power, right?

7    A.  Yes.

8    Q.  So if you have a power of attorney that says you can access

9    Ruja Ignatova's bank accounts that could give you huge amounts

10   of money, right?

11   A.  I don't know how much money she has in these bank accounts

12   but I could have access to her money.

13   Q.  It's a pretty serious thing to forge, wouldn't you agree?

14   A.  Yes.

15   Q.  So you couldn't trust really a word that Ms. Dilkinska was

16   telling you in June 2018, right?

17   A.  I had serious doubts about it.

18   Q.  You certainly couldn't trust her about anything important

19   in your life?

20   A.  No.

21   Q.  I have just a few questions about Mr. Gilbert Armenta.

22   A.  Yes.

23   Q.  Do you remember testifying about Mr. Armenta yesterday?

24   A.  Yes.

25   Q.  I believe you testified you met him six or seven times or

1   so; is that right?

2   A.  Something around this, yes.

3   Q.  Which would be five or six times more than Mr. Scott met

4   him?

5   A.  Yes.

6           MR. DEVLIN-BROWN:  If we can put up Government Exhibit

7   118, if you don't mind.

8   Q.  So I believe you testified yesterday that this was some

9   sort of resort house that Ms. Ignatova had?

10  A.  Yes.

11  Q.  And you were there for a christening of her daughter?

12  A.  Yes.

13  Q.  Mr. Armenta was there as well?

14  A.  Yes.

15  Q.  Sebastian Greenwood was there?

16  A.  Yes.

17  Q.  Irina Dilkinska was there?

18  A.  Yes.

19  Q.  Mark Scott was not there?

20  A.  No.

21  Q.  And you stayed there for five days or so?

22  A.  Yeah.

23  Q.  You talked with Gilbert Armenta almost everyday?

24  A.  Yes.

25  Q.  But almost never about business, right?

JB79SCO1                         Ignatov - Cross

```
1    A.  In most cases we were talking about dogs and his cats,
2    about sports and women.
3    Q.  And you talked very little about business?
4    A.  Yes.
5    Q.  He never mentioned Mark Scott?
6    A.  No.
7    Q.  He did say, as I believe you testified on direct, quote,
8    Ruja is following me like a black shadow.
9              Do you remember that?
10   A.  This I did not say.  I said that he said the work he did
11   for and with Ruja is following him like a big black shadow.
12   Q.  So you didn't say yesterday Ruja -- you didn't say he said
13   to you yesterday Ruja is following him like a black shadow?
14   A.  No.  I said the work he did with and for Ruja.
15   Q.  I think -- that's fine.
16              And the prosecutors asked you what you understood that
17   to mean, following him like a black shadow, right?
18   A.  Yes.
19   Q.  And you responded that Ruja did not ask -- did not allow
20   you to ask a lot of questions or details of her friends or
21   business associates, right?
22   A.  Yes.  Otherwise I would get fired.
23   Q.  But despite that you testified yesterday that based on his
24   reference to black shadow as to what you understood it meant, I
25   assume that Gilbert had a bank in Georgia, the European Georgia
```

1    and Ruja has a lot of funds that might get frozen and I was

2    pretty sure Gilbert is involved in moving funds.

3            Do you remember saying that yesterday?

4    A.  Well the thing is Ruja told me that they got to know each

5    other with this bank in Georgia.  And at the time various times

6    money got frozen all over the world.  So I think if you got

7    problematic funds it wouldn't be a problem having a boyfriend

8    who has a bank.

9    Q.  But that's not what I asked you, right, just now?

10   A.  Then please repeat it.

11   Q.  I asked you about your testimony yesterday.  When the

12   prosecutors asked you what you understood following him like a

13   black shadow to mean.  And your answer was this long answer

14   that I just stated, wasn't it, about him having some bank in

15   Georgia and frozen funds, etc.?

16   A.  Yes.

17   Q.  That's what you understood him to mean from the phrase

18   black shadow?

19   A.  I thought so.  That's what I assumed.

20   Q.  So you testified early on direct yesterday that

21   Ms. Ignatova, Ruja, your sister, was very well educated, right?

22   A.  That she was what?

23   Q.  Very well educated.

24   A.  Yes.

25   Q.  She went to Oxford in the U.K.?

JB79SCO1                          Ignatov - Cross

1    A.   Yes.

2    Q.   She had a Ph.D., right, or two?

3    A.   I don't know exactly what a Ph.D. is.  I don't know the

4    English word.

5    Q.   Like a doctorate?

6    A.   Yes.  She had a doctor in law and a degree in economics.

7    Q.   And she worked as McKinsey is what you understood?

8    A.   Yes.

9    Q.   Which is a big international consulting company?

10   A.   Yes.

11   Q.   You idolized Ruja, right?

12   A.   Yes, I did.

13   Q.   She had an impressive background and credentials to be a

14   business leader, right?

15   A.   I didn't idolize her because of this.

16   Q.   She also would exaggerate her background at times, right?

17   A.   This I wouldn't say to be honest.  Because about her

18   education she was always truthful.

19   Q.   Do you remember before joining OneCoin seeing a Forbes

20   article about Ruja Ignatova?

21   A.   Which was fake, yes.

22   Q.   But you remember seeing an article from Forbes, a cover

23   that had her photo on it, right?

24   A.   Yes.  I remember it.  I thought it was real because I even

25   showed this on my Facebook page.

JB79SCO1                    Ignatov - Cross

1   Q.  At the time you actually believed she had been in Forbes,

2   right?

3   A.  Yes.

4   Q.  But it turned out to be some paid promotion with Forbes?

5   A.  Yes.

6           MR. DEVLIN-BROWN:  Do we have that exhibit,

7   Ms. Stanley?

8           MS. STANLEY:  827.

9           MR. DEVLIN-BROWN:  827.  Could we show just the

10  witness and the attorneys Government Exhibit -- Defense Exhibit

11  827 for identification.

12          May I approach, your Honor?

13          THE COURT:  You may.

14  Q.  Is that is the Forbes magazine cover you were referring to?

15  A.  Yes.

16          MR. DEVLIN-BROWN:  We'd offer Exhibit 827.

17          MR. FOLLY:  No objection.

18          THE COURT:  827 will be received.

19          (Defendant's Exhibit 827 received in evidence)

20          MR. DEVLIN-BROWN:  Given the technological difficulty

21  may I just briefly show it to the jury, your Honor?

22          THE COURT:  Sure.

23  Q.  So Mr. Ignatov -- there we go.  You can show it to the

24  jurors.

25          I think we've all seen it now.  So let me move on to

JB79SCO1                         Ignatov - Cross

1    one more topic.

2              So you've testified now for a number of hours, between

3    the government and me, with respect to your dealings with

4    OneCoin over the years, right?

5    A.  Yes.

6    Q.  And the government has asked you lots of questions about

7    OneCoin and whether certain activities it was engaged in were

8    fraudulent, correct?

9    A.  Yes.

10   Q.  Do you remember answering a lot of those questions saying

11   well I learned later such and such was a fraudulent practice?

12   A.  Some of them, yes.

13   Q.  And I think the government asked you did you learn

14   everything all at once or was it something over time and I

15   think you answered over time, right?

16   A.  Yes.

17   Q.  Mr. Ignatov, you kept a journal, right?

18   A.  Yes.

19   Q.  Sort of a diary?

20   A.  Yes.

21   Q.  And I believe Dreamer Doer was the title on the page of the

22   diary?

23   A.  This was the book, when you buy it, is called.  This was a

24   present from a friend of mine.

25             MR. DEVLIN-BROWN:  May I just show it to the witness

JB79SCO1                    Ignatov – Cross

1    for identification, your Honor?

2                THE COURT:  Yes.

3                MR. DEVLIN-BROWN:  It's Defense Exhibit 734.

4                Shall I hand one up to your Honor as well?

5                THE COURT:  Sure.

6    Q.  Is that the diary you kept to yourself?

7    A.  Yes.  First of all, excuse my handwriting.

8    Q.  No one is looking at it yet.

9                So this diary you started in around April 2018?

10   A.  Yes.

11               (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JB77SCO2                         Ignatov - cross

1   BY MR. DEVLIN-BROWN:

2   Q.  And you finished it around March of 2019 when you were

3   arrested, or near that time, right?

4   A.  Yes.

5   Q.  And you made dated entries on the pages of the diary,

6   right?

7   A.  Yes.

8   Q.  Not every day but some days you would make a dated entry.

9   A.  These were days when I was traveling.  I was in an

10  airplane.

11  Q.  And you wrote those entries in the diary on the days that

12  you wrote them at a time when memories were fresh of what

13  happened that day and what you were feeling that day, right?

14  A.  Yes.

15  Q.  You wrote them down shortly after they happened, right?

16  A.  Not shortly after they happened.  Some of them might be

17  longer.

18  Q.  But it was while your memory of the day in question or what

19  what you were feeling that day was still fresh?

20  A.  This is exactly what I felt.  As I said to you, I wrote

21  them when I was sitting in an airplane, and this is what I was

22  thinking about at that moment.

23  Q.  So when you wrote a date and then you wrote what you were

24  thinking or feeling at that moment, that was sort of in almost

25  real-time, right?

1   A.  It was what I was feeling that moment, but it's not

2   guaranteed that it happened on this day.

3   Q.  Now, you wrote this diary just for yourself, right?

4   A.  Yes.

5   Q.  You didn't think anyone would ever necessarily read these

6   private thoughts?

7   A.  Not in a courtroom, no.

8   Q.  Certainly not in this situation, right?  In fact, when the

9   F.B.I. or the government asked you for the diary, you asked if

10  you really had to turn it over, right?

11  A.  I don't recall asking this question.

12  Q.  You were a little reluctant to turn it over, right?

13  A.  I don't recall.

14  Q.  You don't recall whether you were reluctant to provide the

15  diary to the government?

16  A.  When I got arrested I gave everything that I had without

17  making any trouble.

18  Q.  OK.  So, I want to ask you about some of the experiences

19  you've had with OneCoin in your final year.  You don't

20  necessarily have to look at that, but we can come to it if

21  necessary.  So, in 2018 and up to 2019 you were traveling a

22  lot, right?

23  A.  Yes.

24  Q.  You were doing OneCoin presentations?

25  A.  Yes.

JB77SCO2                          Ignatov - cross

1    Q.   Do you remember traveling to Africa and Mozambique among

2    other places?

3    A.   Yes.

4    Q.   Mozambique is in Africa.   Do you remember traveling within

5    Africa and to Mozambique?

6    A.   Yes.

7    Q.   And in May of 2018 you spent a couple of days in

8    Mozambique; is that right?

9    A.   One or two days, yes.

10   Q.   And you remember seeing some of the poorest places but the

11   happiest people that you have ever seen in your life; do you

12   remember that?

13   A.   Yes.

14   Q.   And do you remember thinking at the time that seeing how

15   people went crazy for giving balls and toys to kids in the

16   villages could even bring a tear to your eye, right?

17   A.   Could make what?

18   Q.   Could bring a tear to your eye to see that.

19   A.   Yes.   Actually when I didn't work, this is what I was -- I

20   brought to villages some balls and toys, and when you see how

21   the kids -- I had gave out something like a toy, it was an

22   emotional moment.

23   Q.   So it was very moving to see the children and people when

24   you were in Africa, right?

25   A.   Yes.

JB77SCO2                        Ignatov - cross

1   Q.  And you were there for a OneCoin presentation, right?

2   A.  Yes.

3   Q.  Mr. Ignatov, in May of 2018 when you were there in Africa

4   for a OneCoin presentation you didn't think you were ripping

5   these people off, did you?

6   A.  I know I am doing something wrong because I know for which

7   company I was working.

8   Q.  So even in May of 2018 when you talked about -- when you

9   reflected on people's smiles and their love of life and the

10  beautiful things in it, you believed you were ripping those

11  people off?

12  A.  At the events of OneCoin investors, yes.

13  Q.  And the events for OneCoin investors involved people from

14  these countries, right?

15  A.  Yes.

16  Q.  Do you remember going to Africa again in October of 2018?

17  A.  I think this was Uganda.

18  Q.  And do you remember having similar reactions to visiting

19  Africa?

20  A.  This time it was even a little bit harder, yes, but I

21  remember it.

22  Q.  You remember people from the whole continent coming to see

23  you and knowing people would spend days on busses to meet you

24  and get to hear the OneCoin presentation?

25  A.  Yes.

1    Q.  You believed in October 2018 you were ripping these people

2    off?

3    A.  Yes.

4    Q.  Well, in February 2019 -- that's just a few -- that's a

5    month or so before you were arrested, right?

6    A.  Yes.

7    Q.  Do you remember thinking or feeling at the time that there

8    is no guilty conscience working to make people rich?

9    A.  Did I say this?

10   Q.  Do you remember thinking that at the time?

11   A.  At that moment I don't remember it because I wanted to

12   possibly very fast leave the company.  But may I have a look?

13   Q.  Yeah.  If you could look at the page in there, if you can

14   find it -- if not, I will find a copy for you -- of February 4,

15   2019, and it's marked as 734-4 for identification.  But you

16   have it in front of you, Mr. Ignatov?

17   A.  Yes.

18   Q.  So just read that to yourself, please.  You can read as

19   much as you want but towards the bottom of the page especially.

20          So, does this refresh your memory that even on

21   February 4, 2019 you didn't feel a guilty conscience in making

22   people rich?

23   A.  If we take it within the context, maybe.

24   Q.  Sure.  Don't read it but --

25   A.  No, it is just me mentioning how exhausting meetings are,

1    that actually going to a meeting is not a place where you can

2    expect something but only where people want something want from

3    you, where they expect something from you.  And the thought

4    behind it was that people -- that I don't get any money for

5    these events, for all these travels, the only thing that's

6    offered to me that they pay for the flight and the hotel.  And

7    I was talking the day before to my mother about it, and I

8    thought with my travels, I help people getting rich, so why

9    should I have a guilty conscience making them pay for the

10   flight.

11   Q.  The bottom line is you didn't feel a guilty conscience in

12   February for making people rich, right?

13   A.  This is again -- this is what I said, but if you take it in

14   the context what I said before then...

15   Q.  Mr. Ignatov, you didn't go into OneCoin thinking it was a

16   fraud, right?

17   A.  No.

18   Q.  And until June of 2018 you believed that the blockchain

19   could be real.

20   A.  I heard there were issues with it in Germany.

21   Q.  And when you heard there were issues, you thought it was

22   possible to fix the issues.

23   A.  This is what I was told, yes.

24   Q.  And when you took over more of a leadership role of

25   OneCoin, you wanted to try to make it a good honest company,

1   right?

2   A.  I wanted to try it, but you can't fix a fraud scheme to an

3   honest company.

4   Q.  And you only -- that was a gradual process once you took it

5   over, learning just how fraudulent OneCoin was, right?

6   A.  Well, from the very beginning I seen a lot of red flags.

7   Q.  But it was a gradual process, right?

8          MR. FOLLY:  Your Honor, I ask that he be allowed to

9   answer the question.

10          THE COURT:  You can answer the last question Mr.

11   Devlin-Brown asked.

12          MR. DEVLIN-BROWN:  Which I think was a gradual

13   process.

14   A.  It was a process until I learned everything, yes.  It

15   wasn't a moment where it happened.

16   Q.  And you are still learning even more about that even today,

17   right?

18   A.  Yes.

19          MR. DEVLIN-BROWN:  One moment.  Nothing further.

20          THE COURT:  Redirect?

21   REDIRECT EXAMINATION

22   BY MR. FOLLY:

23   Q.  Mr. Ignatov, do you recall yesterday and today you were

24   asked some questions on cross-examination about OneCoin's

25   blockchain?

1    A.  Yes.

2    Q.  And specifically you were asked some questions about when

3    you learned that there were some problems with OneCoin's

4    blockchain.  Do you remember that?

5    A.  Yes.

6    Q.  Now, Mr. Ignatov, prior to learning that there were

7    problems with OneCoin's block chain, did you have an

8    understanding that OneCoin involved fraud?

9    A.  Well, as I said, from the very beginning there were various

10   red flags for me.  For example, seeing the presentations, this

11   was the biggest thing.  People were promised to become

12   millionaires very quickly.  Promises were made to the investors

13   that weren't kept.  I've seen bags of cash.  I heard bribes

14   were being paid.  This is all things that I did not hear, for

15   example, in connection with Coca-Cola and Nike.

16   Q.  And prior -- again, prior to learning about these specific

17   issues with OneCoin's blockchain, did you have an understanding

18   that OneCoin was making promises that were not true?

19   A.  Yes.

20   Q.  And those promises were being made to the investors; is

21   that right?

22   A.  Yes.

23   Q.  And to be clear, did your sister Ruja Ignatova ever tell

24   you that OneCoin was a fraud scheme?

25   A.  No, exactly the opposite, she always tried to justify

1    everything and tell me that everything is a legitimate

2    business.

3    Q.  And did you, nevertheless, reach an understanding that it

4    was a fraud scheme?

5    A.  Yes.

6    Q.  Can you publish what is in evidence as Government Exhibit

7    102 and highlight the top half of that e-mail chain.

8            Now, Mr. Ignatov, do you recall yesterday being asked

9    some questions about what happened after this time period of

10   October 2016 between Mark Scott and Ruja?

11   A.  Yes.

12           MR. FOLLY:  Your Honor, the government offers

13   Government Exhibit 1270 at this time.

14           MR. DEVLIN-BROWN:  No objection.

15           THE COURT:  1270 will be received.

16           (Government Exhibit 1270 received in evidence)

17   Q.  If we publish that and zoom in on the top half.

18           Now, Mr. Ignatov, the e-mail we looked at a moment ago

19   involving the discussion of the London city police

20   investigation, that was in October, correct?

21   A.  Yes.

22   Q.  Now, this e-mail is in November; is that right?

23   A.  Yes.

24   Q.  And this is an e-mail from Mark Scott to you dated November

25   1, 2016, and it says, "Hi Konstantin.  No problem at all.  I am

JB77SCO2                          Ignatov - redirect

1    working out when I can go.  My fiancee is pregnant and has many

2    doctoral appointments over the next few weeks that I should

3    attend with her."  Some other discussion of travel logistics.

4    And then Mr. Scott says, "I would prefer not meeting in Sofia

5    as I don't want too many travels there on my flight list."

6              Now, Mr. Ignatov, is this the e-mail you were

7    referring to yesterday when you indicated that Mr. Scott had

8    said that he would prefer not to come to Sofia at times?

9    A.  Yes.

10   Q.  Mr. Ignatov, you were asked some questions on

11   cross-examination about whether you participated in certain

12   meetings between Mark Scott and Ruja.  Do you recall those

13   questions?

14   A.  Yes.

15   Q.  Mr. Ignatov, at the time Mark Scott came to Sofia,

16   Bulgaria, how long had you worked at OneCoin?

17   A.  Two or three weeks maybe.

18   Q.  And just to be specific -- because that question wasn't

19   clear -- when he came for the July 2016 meeting, how long had

20   you worked at OneCoin?

21   A.  Yes, around two or three weeks.

22   Q.  And what was your position at OneCoin at that time?

23   A.  I was Ruja's personal assistant.

24   Q.  And were you in that same position through the fall of 2017

25   when she disappeared?

JB77SCO2                          Ignatov - redirect

1    A.   Yes.

2    Q.   What were your main responsibilities in that position?

3    A.   Logistics.  For example, take care of her travels, to

4    arrange her flights, to schedule meetings for her.  And Ruja

5    loved shopping.  When she ordered something from the Internet,

6    to make sure that everything goes to the right address.

7    Q.   Would you attend meetings between Ruja and the other top

8    members at OneCoin management?

9    A.   The only moment I entered this is when she called me to

10   bring some notebooks or something to drink.

11   Q.   Who was the number one person at OneCoin?

12   A.   Ruja Ignatova.

13   Q.   Who was number two?

14   A.   Sebastian Greenwood.

15   Q.   Were you one of the managers before Ruja disappeared?

16   A.   No.

17   Q.   Did you have any involvement with the company's finances

18   before Ruja disappeared?

19   A.   No.

20   Q.   Did you use a crypto card?

21   A.   No.

22           MR. DEVLIN-BROWN:  Objection.

23           THE COURT:  Overruled.

24   Q.   Who were the people who used the crypto cards?

25   A.   Ruja, Sebastian, Gilbert, Mark Scott and Irina.

1    Q.  I'm going to ask you a couple of questions about what

2    happened after Ruja disappeared.  Let's focus on the time

3    period immediately after she disappeared.  Can you describe

4    what happened during that time period?

5    A.  The first two weeks, to be honest, everybody in the office

6    was happy she's not there because she is a very demanding

7    person.  But then very fast panic broke out, speculations.

8    There were many anonymous blogs on the Internet who were

9    writing a lot of dirt.  For example, there were articles that

10   my sister got executed, stuff like this, and a big panic in the

11   network broke out.  Everybody thought that she is either dead

12   or that she got arrested.

13            Then at this time people from the network approached

14   me if I could present an event in Bangkok so that people see a

15   familiar face because I was traveling with her and people knew

16   that I am her brother, and people are not worried that much,

17   and so that I can dispel some of their concerns.

18   Q.  What was your understanding of why the people at OneCoin

19   approached you to help dispel some of the concerns surrounding

20   Ruja's disappearance?

21   A.  It was only because I was her brother and had the same

22   name, not that I had a special role in the company.  After this

23   event the management even started printing me business cards so

24   that I appear more important than just as a personal assistant.

25   Q.  Did you start communicating with some of the leaders at

1   OneCoin with more frequency after Ruja disappeared?

2   A.  Yes.

3   Q.  Who became the face of OneCoin after Ruja's disappearance?

4   A.  I.

5   Q.  Was it after the time that Ruja disappeared that you began

6   to learn more about Mark Scott?

7   A.  Yes.

8   Q.  If we can go to Government Exhibit 3005 and turn to the

9   final page.

10          Mr. Ignatov, you were asked some questions on

11  cross-examination about this e-mail.  Do you recall that?

12  A.  Yes.

13  Q.  And in particular Frank Schneider in this e-mail wrote to

14  you that there is a potential problem with Mark that you need

15  to know.  What was your understanding of why he was informing

16  you about this potential problem with Mark.

17  A.  Because I did not know it before.

18  Q.  And what was the significance or the importance of the fact

19  that Mark might in fact be a highly placed U.S. informant?

20  A.  They were giving him information about the company now, and

21  the ongoing fraud might lead to more prosecution.

22  Q.  Mr. Ignatov --

23          You can take this exhibit down.

24          Mr. Ignatov, you were asked a question on

25  cross-examination about your guilty plea to bank fraud

1    conspiracy.  Do you recall that?

2    A.  Yes.

3    Q.  Now, during the time period that you were working for

4    OneCoin did you have an understanding that OneCoin was having

5    difficulties banking?

6    A.  Yes.

7    Q.  And I believe you testified on direct examination that they

8    were having accounts that were getting frozen; is that correct?

9    A.  Yes.

10   Q.  And you also testified that to solve that problem they were

11   using shell companies; is that correct?

12   A.  Yes.

13   Q.  Who managed those shell companies at OneCoin?

14   A.  Irina Dilkinska.

15   Q.  Did yourself manage any of those companies?

16   A.  No.

17   Q.  Did you yourself know what banks those companies had

18   accounts at?

19   A.  No.

20   Q.  But did you have an understanding that there were lies that

21   were being told to banks connected with those accounts?

22   A.  Yes, they were under different names so they are not

23   connected to OneCoin.

24   Q.  And did you have an understanding that lies were being told

25   about where the money was coming from into those accounts?

JB77SCO2                          Ignatov - recross

1    A.  Yes.

2    Q.  And did you have an understanding that lies were being told

3    about where the money was going out of those accounts?

4    A.  Yes.

5              MR. FOLLY:  No further questions, your Honor.

6              THE COURT:  Anything more, Mr. Devlin-Brown?

7              MR. DEVLIN-BROWN:  Just a brief recross.

8    RECROSS EXAMINATION

9    BY MR. DEVLIN-BROWN:

10   Q.  You just testified a moment ago, Mr. Ignatov, that you

11   eventually -- you learned at some point that bank accounts were

12   being shut down, right?

13   A.  Yes.

14   Q.  And that you learned from Irina Dilkinska, right?

15   A.  From Maya Antonova.

16   Q.  Maya Antonova the accounting person for OneCoin, right?

17   A.  Exactly.

18   Q.  And you learned that around the summer of 2018, right?

19   A.  Before.

20   Q.  A few months before, right?

21   A.  No, I learned that money got frozen constantly from almost

22   the very beginning since I started with OneCoin.

23   Q.  You were just testifying at the beginning of redirect

24   examination about how you were just a personal assistant until

25   Ruja Ignatova left, right?

JB77SCO2                        Ignatov - recross

1    A.   Yes.

2    Q.   So, you're now testifying that when you were just a

3    personal assistant before Ruja Ignatova left that you knew

4    about banks accounts being frozen?

5    A.   If you open Google and put up OneCoin, this was one of the

6    first things you saw.

7    Q.   I'm not asking what someone might see if they go into

8    Google.  I'm asking if when you were her personal assistant

9    someone -- Maya or someone else -- told you bank accounts were

10   being frozen for OneCoin.

11   A.   Maya told me over the time that they were frozen, but I

12   knew from the very beginning.  And I also heard once Irina or

13   Maya getting screamed at from Ruja because money got frozen.  I

14   think it was in Germany.

15   Q.   You just said you learned from the very beginning.  So when

16   you first went to the Coin Rush in 2016 you knew bank accounts

17   were being frozen?  Is that what you're saying?

18   A.   Not from the beginning, but when I started working with the

19   company I started to Google.

20   Q.   You never applied for any bank accounts, right, from

21   OneCoin?

22   A.   No.

23   Q.   You never saw any account opening documents, right?

24   A.   Only the one, Phoenix Investment.

25   Q.   Phoenix is not a bank account, right?

JB77SCO2                     Ignatov – recross

1    A.   This was the bank accounts opening statement.

2    Q.   What bank?

3    A.   That wean even saw here.

4    Q.   Do you remember what bank it is?

5    A.   United Bank of Dubai.

6    Q.   You saw the account opening documents for United Bank of

7    Dubai?

8    A.   Yes.

9    Q.   Did you see any other bank statements at any time working

10   for OneCoin?

11   A.   No.

12   Q.   Do you know what people at OneCoin told the banks about

13   what their business was?  You don't, right?

14   A.   I know that it was not OneCoin.

15   Q.   Well, you told the agents during debriefings that you

16   assumed the banks were told it was not OneCoin because

17   otherwise they would be shut down, right?

18   A.   Yes.

19   Q.   That was an assumption you made.

20   A.   Yes.

21          MR. DEVLIN-BROWN:  No further questions.

22          MR. FOLLY:  No further questions, your Honor, for this

23   witness.

24          THE COURT:  OK.  Ladies and gentlemen, it's five

25   minutes to the hour, so we're going to break now; we're going

JB77SCO2                        Ignatov - recross

1    to break until ten minutes after the hour, so please be

2    prepared to come out then.  Do not discuss the case.

3              OK, Mr. Ignatov, you may step down.

4              Thanks to the marshals service.

5              (Jury not present)

6              THE COURT:  So, who is next?

7              MR. DIMASE:  Your Honor, the government plans to call

8    Donald Semesky.  Mr. Devlin-Brown's cross was much shorter than

9    the government anticipated, so Mr. Semesky is in a cab, but I

10   expect he will be here by the time the break is over.

11             THE COURT:  You do?

12             MR. DIMASE:  I do.

13             THE COURT:  OK.

14             MR. DEVLIN-BROWN:  Could I just raise one concern

15   based on conversations with the government yesterday?  Because

16   as I understand it, Mr. Paul Spendiff of Apex has to be done

17   testifying by the end of the day tomorrow; he is going on some

18   travel arrangements.  And I just want to be certain --

19   particularly given that the estimate for the direct of

20   Mr. Konstantin Ignatov went longer -- that we're not going to

21   run into a situation by calling Mr. Semesky first and the

22   defense is not going to have sufficient time to cross him

23   tomorrow.  That's just my concern about the witness order.

24             THE COURT:  Is that a basis for concern?

25             MR. FOLLY:  Your Honor, we believe we will be able to

1    accomplish that objective, and based on Mr. Devlin-Brown's

2    representations, he doesn't think he will cross longer than the

3    direct will be, as I understand it, and if that's the case I

4    think we will be able to complete everything on that schedule.

5              Mr. Devlin-Brown's cross today went more quickly than

6    anticipated, and that made us more comfortable proceeding in

7    this order of calling these witnesses.

8              THE COURT:  OK.

9              MR. DIMASE:  For what it's worth, I think the next

10   witness will be somewhere in the ballpark of 45 minutes on

11   direct.  Mr. Devlin-Brown has indicated a similar length of

12   cross, which would give us some time today to put Mr. Spendiff

13   on the stand and then all of tomorrow.

14             THE COURT:  OK, it sounds like it should not be a

15   problem.

16             MR. DEVLIN-BROWN:  It's the government's call.

17             THE COURT:  OK.  Don't be late.

18             (Recess)

19             (Continued on next page)

20

21

22

23

24

25

1        (Jury present)

2            THE COURT:  Will the government please call your next

3   witness.

4            MR. DIMASE:  Yes, your Honor.  The government calls

5   Donald Semesky.

6    DONALD SEMESKY,

7        called as a witness by the government,

8        having been duly sworn, testified as follows:

9            THE COURT:  Please bring your seat up to the

10  microphone.  Please speak directly into the microphone.  And if

11  you can begin by stating your full name and spelling your first

12  and last name.

13           THE WITNESS:  My name is Donald Charles Semesky, Jr.

14  First name is spelled D-o-n-a-l-d.  Last name S-e-m-e-s-k-y.

15           THE COURT:  Mr. DiMase.

16           MR. DIMASE:  Thank you, your Honor.

17  DIRECT EXAMINATION

18  BY MR. DIMASE:

19  Q.  Good morning, Mr. Semesky.

20  A.  Good morning.

21  Q.  What do you do for work?

22  A.  I'm currently self-employed as an independent consultant

23  providing anti-money laundering compliance and investigative

24  services.

25  Q.  How long have you been working as an independent

1  consultant?

2  A.  Since June of 2008.

3  Q.  I'm going to take a moment to go back a little bit and ask

4  you about your educational background and your employment

5  background.  Let's start with your educational background.  Did

6  you attend college?

7  A.  Yes, I did.

8  Q.  Were you awarded a degree?

9  A.  Yes, I was.

10  Q.  AND what college and what degree?

11  A.  I attended Villanova University and was awarded a Bachelor

12  of Science degree in accounting.

13  Q.  And after graduation where did you go to work?

14  A.  I went to work for the Internal Revenue Service.  The

15  division was then known as the Intelligence Division.  I was a

16  special agent, law enforcement criminal investigator.  The

17  division later became known as the Criminal Investigation

18  Division.

19  Q.  So the IRS is the Internal Revenue Service, correct?

20  A.  That's correct.

21  Q.  Many people know that as the organization that collects

22  taxes.  What was the criminal division within the organization

23  that you worked for?

24  A.  The Criminal Investigation Division investigates alleged

25  offenses of the Internal Revenue laws.  I started in 1973, and

1    that was the division's sole authority at that point in time.

2    Later when we gained authority to investigate what is known as

3    the Bank Secrecy Act or the currency reporting requirements of

4    the United States, and then in 1986 the money laundering

5    statutes were enacted and the IRS was given authority along

6    with a number of other agencies to investigate alleged offenses

7    of those statutes as well.

8    Q.   So you said you started in the IRS as a special agent in

9    1973?

10   A.   That's correct.

11   Q.   How many years have you served in that role?

12   A.   A little over 30 years, to October 2003.

13   Q.   And as a special agent working for the IRS in the Criminal

14   Investigations Division, could you describe for the jury some

15   of the various duties and responsibilities you had over that 30

16   year period, particularly with any focus during that time in

17   the area of money laundering.

18   A.   Yes.   In 1973, as I said, we investigated tax crimes

19   solely, and I was a field investigator for the first seven

20   years of my career, until 1980.   At that point in time I

21   received a promotion to a position which was called the

22   investigative report reviewer.   In that position I reviewed

23   other special agents' reports recommending prosecution and made

24   a decision whether those reports were ready to be forwarded to

25   the Department of Justice for prosecution.

JB77SCO2                          Semesky - direct

1              In 1982 I was assigned to the financial -- Maryland

2       Investigative Task Force, and that was a multi-agency task

3       force headed up by the U.S. Attorney's office for the District

4       of Maryland.  It consisted of IRS, the F.B.I., the Drug

5       Enforcement Administration and the United States Customs

6       Service.  And the mission of that task force was to identify

7       individuals that were handling large amounts of currency and

8       then make a decision and try to determine whether that currency

9       came from illegal activity.  And if we had indication that it

10      had, then we would open up investigations and pursue that line

11      of inquiry.

12             In 1984 I was assigned as a regional coordinator

13      representing IRS on the Organized Crime Drug Enforcement Task

14      Force.  It's commonly known by its acronym OCDETF.  In that

15      capacity I oversaw all of IRS's investigative activity on major

16      narcotics investigations for the mid Atlantic region.  And like

17      the financial task force that I mentioned, it was a

18      multi-agency.  This actually was nine different agencies

19      involved again under the U.S. Attorney's office and in the core

20      city which was Baltimore for the region.  I held that position

21      until 1994, and then I was assigned back to the field as a

22      field investigator again on the financial task force, and in

23      that capacity investigated primarily money laundering offenses.

24             As I mentioned, money laundering statutes were passed

25      in 1986, so at that point I was the OCDETF coordinator for the

453

1  Mid Atlantic region, so I oversaw all of the money laundering

2  investigations -- drug-related investigations that the IRS was

3  conducting within the region during that period of time and

4  conducted investigations of my own once I went back to the

5  financial task force.

6           In 2000 I was promoted and reassigned to IRS criminal

7  investigation headquarters and was assigned as the liaison to

8  the Office of National Drug Control Policy.  And that office is

9  an agency of the Executive Office of the President.  It's

10 commonly referred to as the Drug Czar's office.  And my primary

11 responsibility in that office was to act as the money

12 laundering policy advisor to the Drug Czar and his staff.  I

13 held that position until July 2003 when I went to the DEA.

14 Q.  And about how many investigations during the 30 years you

15 worked at IRS were you personally involved in some way money

16 laundering?

17 A.  In some capacity probably several hundred.

18 Q.  You said that in 2003 you moved to the DEA.  And that's the

19 Drug Enforcement Administration?

20 A.  That's correct.

21 Q.  And what role did you take on there?

22 A.  I was assigned to DEA headquarters, and I was tasked with

23 standing up the Office of Financial Operations which is the

24 headquarters level division within the Drug Enforcement

25 Administration, and I became the first chief of that division.

1    In that capacity I oversaw all of the DEA's financial

2    investigations and money laundering investigations globally.

3    The DEA has a global presence in 86 countries around the world.

4    And I assisted -- I set policy and strategy and designed

5    programs to help accomplish the DEA's counter drug mission

6    through financial investigations.

7    Q.  And how long did you hold that position for, Mr. Semesky?

8    A.  I held that position through May of 2008, when I retired

9    from the DEA and became an independent consultant.

10   Q.  And did you continue to have a relationship with the DEA

11   after you left in 2008?

12   A.  Yes, I did.  I was about two months from retirement --

13   mandatory retirement -- and the administrator at the time,

14   Michelle Linhart, asked me to stay on with the DEA, and we

15   worked out a consulting agreement, and I stayed with the DEA

16   providing policy, strategic and investigative consulting for

17   the Agency up until the end of September of this year.

18   Q.  In what area?

19   A.  The primary area was money laundering investigation.

20   Q.  Mr. Semesky, during your career have you had association

21   with any advisory board or anti-money laundering groups?

22   A.  Yes.  I am a member of the advisory board for an

23   association known as the Association of Certified Financial

24   Crime Specialists.  I am also on the board of advisors of a

25   publication service in Bogota, Colombia known as INFOLAFT.

1   It's an acronym basically meaning anti-money laundering -- or

2   the laundering of illegal powers.

3   Q.   And have you also served on any joint government working

4   groups involving federal agencies on the area of money

5   laundering?

6   A.   Yes.   In my capacity with both IRS at the Drug Czar's

7   office and then later with DEA I sat on a number of working

8   groups in the Washington -- interagency working groups in the

9   Washington area.   The black market peso exchange working group

10  which was -- the black market peso exchange is a mechanism by

11  which the drug cartels sell their drug proceeds to other

12  parties as a means of laundering the money.

13          I was also a member of the High Intensity Financial

14  Crime Area Working Group; the Money Laundering Working Group;

15  and I was also DEA's representative on the King Pin Committee

16  which was chaired by the Office of Foreign Assets Control, and

17  that is the office of the Treasury Department that sanctions

18  through designation of high-level drug traffickers, money

19  launderers, and then also they have sanctions jurisdiction for

20  terrorism and weapons of proliferation.

21  Q.   Mr. Semesky, have you been involved in the drafting and

22  issuance of national money laundering threat assessments?

23  A.   Yes, I have.

24  Q.   Have you published articles regarding money laundering?

25  A.   Yes.

1    Q.  Have you taught in your field?

2    A.  Yes, I have taught extensively both domestically to

3    virtually every federal investigative agency that has

4    jurisdiction for money laundering, as well as probably most of

5    the states in the U.S., law enforcement, prosecutorial and

6    judicial officials.

7            I have also trained the same types of categories of

8    officials for foreign countries, I would estimate over a

9    hundred different foreign countries.

10   Q.  And have you been involved in the design of money

11   laundering training programs yourself?

12   A.  Yes.

13   Q.  Have you testified in court before regarding the

14   techniques, means and methods of money laundering?

15   A.  Yes, I have.

16   Q.  About how many times have you testified in court?

17   A.  I've testified I believe in 53 trials and 23 federal

18   judicial districts in the areas of money laundering, financial

19   investigation and methods and techniques used to hide income or

20   to launder money.

21   Q.  Have you been qualified as an expert some of the times that

22   you've testified?

23   A.  Yes, I would estimate probably about two thirds of the

24   trials that I testified in I was offered and qualified as an

25   expert witness.

1   Q.  Was there ever a time when you were offered as an expert

2   but the court declined to qualify you as an expert?

3   A.  No, there was not.

4           MR. DIMASE:  Your Honor, the government requests that

5   Mr. Semesky be qualified as an expert in the techniques, means

6   and methods of money laundering.

7           THE COURT:  Any objection?

8           MR. DEVLIN-BROWN:  No, this won't break his record.

9           THE COURT:  Very well.  So his testimony will be

10  allowed as expert testimony on the techniques, means and

11  methods of money laundering.

12          Mr. DiMase.

13  Q.  Mr. Semesky, of the cases in which you previously testified

14  have you testified on behalf of the United States?

15  A.  Yes, I have.

16  Q.  Have you also in some cases consulted on behalf of criminal

17  defendants?

18  A.  Yes, I have.  And one criminal defendant in the United

19  States, one in Colombia and one in Peru.

20  Q.  Are you being compensated in connection with your work

21  involving this case?

22  A.  Yes, I am.

23  Q.  What's your hourly rate?

24  A.  It's $150 an hour.

25  Q.  Is your rate for testifying any different from your rate

1     for preparing to testify?

2     A.   No, it's the same.

3     Q.   And is the rate you charge the U.S. government the same or

4     a different rate than you charge other clients?

5     A.   It's less than I charge other clients.

6     Q.   What do you charge other clients ballpark?

7     A.   It can range anywhere from $175 an hour to $325 an hour.

8     Q.   And why do you offer a different rate to the government?

9     A.   I figured the government employed me for 46 years and

10    provides me with a pension, so I can give them a discount.

11    Q.   Have you met with the government previously to prepare for

12    your testimony today?

13    A.   Yes, I have.

14    Q.   Have you been paid yet for your work?

15    A.   No, I have not.

16    Q.   Let's talk briefly about your involvement in this

17    particular case.  Have you been asked to review any materials

18    related to this particular case?

19    A.   No, I have not.

20    Q.   Have you even reviewed the charges or the indictment in

21    connection with this case?

22    A.   No.

23    Q.   Do you have any personal knowledge regarding particular

24    facts of this case?

25    A.   No, I do not.

1    Q.  Have you been asked to render any kind of opinion whether

2    the conduct of the defendant in this case constitutes money

3    laundering or any other offense?

4    A.  No, I have not.

5    Q.  What kind of information are you here to testify about

6    today for the jury?

7    A.  As far as I've been told, just general information on money

8    laundering methods and techniques.

9    Q.  So let's start with the concept of money laundering.  Could

10   you briefly describe to the members of the jury what money

11   laundering is.

12   A.  OK.  Simply put, money laundering is the taking of proceeds

13   or money earned through illegal activity, and then through one

14   or more financial transactions or physical movements, or

15   combination of the two, distancing that money from its original

16   illegal source, and also giving the money the appearance of

17   coming from a legal source, which could also include either the

18   complete concealment of the funds or the appearance of legal

19   source income that can then be spent by the true beneficial

20   owner without any connection to the illegal activity.

21   Q.  You use the word beneficial owner.  What does that mean?

22   A.  Beneficial owner is the person who derived the money from

23   illegal activity.

24   Q.  The real owner.

25   A.  The real owner of the money.

JB77SCO2                          Semesky – direct

1   Q.  Mr. Semesky, in your experience can the act of money

2   laundering be broken down into different stages?

3   A.  The money laundering cycle is typically broken down into

4   three separate stages.  The first stage is known as the

5   placement stage.  And by placement stage that is where illegal

6   funds are placed into the financial system, and that enables

7   the money launderer, or the person, or the criminal that

8   generated the money, to do other types of transactions to

9   further conceal or launder the money and to move the money very

10  quickly around the world if need be.

11  Q.  Let me stop you there.  When you say financial system,

12  basically what do you mean?

13  A.  Financial system is primarily banks but could also be

14  investment brokerage houses.  It can be wire transmission

15  companies, any other type of financial institution.

16  Q.  And so after placement, what is the second stage?

17  A.  The second stage is known as layering.  By layering in the

18  money laundering cycle that is –– and again it's dependent on

19  the sophistication and desired end game or goal of the money

20  laundering –– to put the money through a number of different

21  transactions or movements to again, as I said, distance the

22  money, to disguise the nature of the money as if it came from a

23  legal source instead of an illegal source, and to also conceal

24  the true ownership of the money.

25  Q.  And you said there was a third face.  What is the third

 1   stage?

 2   A.   The third stage is the integration stage.  By integration I

 3   mean at the point where the money, to the satisfaction of the

 4   true owner and the money launderer, has gone through enough

 5   layering that it has lost its connection to the illegal source.

 6   Then the money can be brought out as legally earned funds and

 7   used however the true owner or beneficial owner sees fit.

 8   Q.   For example, to buy things?

 9   A.   To buy assets, to invest, to make deposits into other bank

10   accounts.

11   Q.   Mr. Semesky, are all three of those stages necessary

12   components of money laundering?

13   A.   No, they are not.  The money laundering can be accomplished

14   or fall short in any one of those stages but still has entered

15   the cycle.

16   Q.   Is there any one way to launder money?

17   A.   No, not at all.  Money laundering is really an art form

18   more than a science, and it's really dependent on the financial

19   sophistication, the creativity and the connections that the

20   money launderer has enabling it to set up primarily the

21   placement and then the layering stages.

22   Q.   Let me turn to a different topic.  Are you familiar with

23   the term white collar crime?

24   A.   Yes, I am.

25   Q.   And generally speaking, what does that term refer to?

A.   White collar crime is generally the term used for illegal

proceeds or illegal activity that is more in the business

nature rather than crimes of violence such as drug trafficking,

prostitution, human trafficking.   White collar is more

associated with businesses, tax evasion.   Tax evasion is

considered a white collar crime.   Fraud is considered a white

collar crime.   And there are a number of other activities.

Fraud covers a very wide range of illegal activity, and it's

all considered white collar.

Q.   And can you tell the jury in the context of money

laundering in general what is the difference between money

laundering in the white collar crime context versus the

narcotics violent crime context?

A.   The primary difference is the form that the money is at the

time it's generated.   In crimes of violence -- as I mentioned

narcotics trafficking being a primary one -- the money is

generated in the form of cash, and cash, as you can imagine,

presents an added burden on a money launderer or narcotics

trafficker if they try to place that cash into the financial

system.

     White collar crime -- as I mentioned, tax evasion is

considered a white collar crime, fraud is considered a white

collar crime -- and typically that money is placed into --

especially in the area of fraud -- is placed into the banking

system or the financial system by the victim.   So at the time

1   the money is involved in the fraud it's already in the banking

2   system as opposed to a typical narcotics money laundering

3   scenario.

4   Q.   And why would there be a need in your experience for

5   individuals involved in white collar crime to launder the

6   proceeds of their criminal activity?

7   A.   Because it's still generated by criminal activity, and at

8   that first stage, especially when it's placed by a victim, the

9   victim knows where they sent the money, so that money has to be

10  moved, and the further and the more layering and further away

11  from the original placement by the victim into the banking

12  system, the better and more sophisticated the laundering cycle.

13  Q.   Let's turn now, Mr. Semesky, to some of the common methods

14  and techniques of laundering money that you observed in your

15  experience, particularly in the area of white collar crime.

16       Are you familiar with the use of shell companies for

17  the purpose of laundering criminal proceeds?

18  A.   Yes, I am.

19  Q.   What is a shell company?

20  A.   A shell company or a shell corporation is a company that

21  has no physical presence; it exists on paper.  And usually a

22  shell company is incorporated for the purpose of opening up a

23  bank account and being a legal owner of that bank account or

24  legal name on the account for acquiring an asset.  For the same

25  reason the legal owner would be the shell corporation.  Or

1    entering into a business endeavor where everything would be

2    under that shell company name, and the purpose for that is

3    typically to limit legal liability to that one business.

4    Q.  So to be clear, in your experience can there be legitimate

5    reasons for people in business to utilize shell companies?

6    A.  Yes.

7    Q.  And in your experience are there also illegitimate reasons

8    for people to use shell companies in the context of money

9    laundering?

10   A.  Yes.

11   Q.  Mr. Semesky, in your experience, can you describe how

12   people involved in money laundering can utilize shell company

13   structures?

14   A.  Well, it all kind of blends together, but the use of shell

15   companies initially when the money is placed, if it's in a

16   shell corporate name, number one, the corporation -- and even a

17   shell company -- will have some kind of corporate

18   organizational papers or articles which will be presented to a

19   bank for purposes of opening an account or presented during the

20   acquisition of an asset.

21           The shell companies and probably the major technique

22   that is used is to layer the shell companies and layer them in

23   different jurisdictions.  What I mean by that is that if shell

24   company A is the first site of deposit of illegal funds, if

25   those funds are then transferred to a bank account, say shell

1    company A in the United States, shell company B is in the

2    Cayman Islands.  So you transferred the money to an offshore

3    jurisdiction that has bank secrecy and historically has not

4    been a friendly jurisdiction for gaining information as to the

5    true owner of that company.  And that company may be owned by

6    then yet another shell company in Panama.  And to get to the

7    true owner you have to first go to the Cayman Islands and then

8    once -- and it could take a year or two at least to get that

9    information.  Then you have to go to Panama to get the

10   information on the owner of that, which could then be owned by

11   yet another company.  Those companies all will have bank

12   accounts, and the money can be transferred between all of those

13   accounts for various reasons.  There is usually business

14   transactions, supposed business transactions, to again give the

15   appearance of those funds being generated by legal activity.

16   Q.  Let me turn to a second concept, the concept of a nominee.

17   Are you familiar with the word nominee?

18   A.  Yes, I am.

19   Q.  What does that refer to?

20   A.  A nominee is a person who allows the use of their name and

21   identifying information and possibly business to stand in as

22   the true owner of illegal money or an illegally acquired asset.

23   The nominee is usually compensated for this activity, or they

24   may act as a nominee due to a close personal relationship with

25   either the criminal or the money launderer, or they can be

1    both; they could have that relationship and also be

2    compensated.

3         Typically what you will see is a nominee -- if a

4    nominee is going to be used one time or maybe twice for their

5    information to be used to open up an account or to conduct a

6    transaction there will not be that close relationship.  The

7    close relationship is more needed by the money launderer and

8    the criminal when the asset is going to be in their name for a

9    long period of time or there will be a continuing number of

10   transactions where they have to depend on that relationship to

11   make sure that the nominee will, number one, stand up to

12   scrutiny and, number two, be loyal to them and to remain the

13   front person or as the true owner of the property.

14   Q.  I think you have basically answered this question, but just

15   to be clear, what is the purpose of using the nominee in the

16   context of money laundering?

17   A.  Again, like I said, the purpose is to act as the true

18   owner, to stand in place of the real true owner and to act as

19   the true owner with the purpose being to conceal the true

20   ownership of the money or the asset.

21   Q.  A moment ago I think you also mentioned something about the

22   ability to stand up to scrutiny or withstand scrutiny.  What

23   did you mean by that?

24   A.  If government authorities -- or even the banks now have

25   anti-money laundering compliance requirements.  I will start

1    with the banks -- and other financial institutions as well --

2    not just in the United States but around the world, they look

3    at money coming into and going out of their institution to see

4    if the transaction makes sense, makes business sense, and if

5    their customer can justify the amount of funds being received

6    or transferred.

7             That is more of a new phenomenon in law enforcement,

8    which for decades has been chasing criminally derived money.

9    So, the scrutiny has to be on the front end with the bank now

10   and then on the back end with law enforcement should the scheme

11   or the illegal activity be discovered and the investigation

12   started.

13            So, when the money gets to a certain point in time

14   when the audit trail is followed, law enforcement gets to a

15   certain transaction, there will be a lot of scrutiny, and a

16   nominee that can justify the amount of money and has the

17   paperwork to justify why that money has come to them will be

18   able to withstand the scrutiny of law enforcement.

19   Q.   And going back to the nominee concept, in what role might a

20   nominee serve for a shell company, for example?

21   A.   Well, the roles could be in the initial incorporation, it

22   would be the directors of the corporation or listed as the

23   beneficial owner.  A number of states in the U.S. require the

24   disclosure of beneficial ownership, but virtually no state in

25   the United States verifies that ownership.  And it's the same,

1   many countries around the world do not require the disclosure

2   of beneficial ownership.

3   Q.  In other words, in that case the nominee would be listed

4   as the beneficial owner even though they would not the true

5   owner.

6   A.  That's correct.

7   Q.  In your experience, Mr. Semesky, are there times when a

8   money launderer might move funds through companies registered

9   in their own name?

10  A.  Yes.

11  Q.  And under what sort of circumstances?

12  A.  Again, that gets to the scrutiny.  If the money launderer

13  has the wherewithal, the business activity and the wealth to

14  justify the amount of criminal funds being introduced in their

15  bank accounts, that is actually a very effective means of

16  laundering money.  In those occasions their company would be

17  known more as a front company rather than a shell corporation.

18  A front company actually has a physical presence, actually

19  conducts business, and has a justifiable reason to be receiving

20  money into their bank accounts and dispersing money.

21  Q.  Let's move on to the topic you've discussed, the concept of

22  layering.  In terms of layering involving various bank

23  accounts, how does that process work in the context of money

24  laundering?

25  A.  Well, bank accounts, again with money laundering the bank

1    accounts are going to be in different names and different

2    owners, different corporations, and each of those bank accounts

3    would be set up with, you know, a justification to the bank as

4    to who the owner of the account is, and the expected volume of

5    money going through the account, as well as the purpose of the

6    business.  And usually that is satisfied by the production of

7    the corporate organizational papers to the bank.

8    Q.  And so what is the purpose of moving money through, for

9    example, more than one bank account or more than one company

10   bank account in the process of laundering money?

11   A.  Because if money moves between bank accounts it changes

12   ownership, so if the money moves from company A, when it's

13   sitting in company A's bank account it belongs to company A.

14   When it moves to company B, it belongs to company B.

15          So, say company A comes under scrutiny or the audit

16   trail leads the government to company A, unless they can then

17   prove, number one that company A was complicit -- and even if

18   they can, then when the money transfers to company B, that's a

19   new ownership, and if the government cannot prove that company

20   B was involved in the money laundering cycle or conspiracy,

21   they would have a very difficult time seizing or forfeiting

22   those funds and assigning ownership to the funds.

23   Q.  And is there any other reason to move money to a series of

24   bank accounts as opposed to just one account?

25   A.  Well, again, especially in layering among multiple

1    jurisdictions it takes the government a long time to get the

2    information needed to assign ownership and be able to locate

3    the funds, and during that period of time the money can be

4    taken out and moved somewhere else during that cycle of the

5    investigation.  What they're buying is time, and they're buying

6    time to move the money, to disperse the money where it cannot

7    be found.

8    Q.   And how does each movement to another bank account distance

9    the funds from the original owner?

10   A.   Again, it's because of the names on the accounts,

11   especially when you're using nominees to open up the accounts

12   or shell corporations.  As I said, it's different owners.

13   Every time it moves it distances it from illegal activity and

14   further distances it from the true owner.

15   Q.   Let me now move to another area.  Are you familiar with the

16   term offshore bank or offshore financial institution?

17   A.   Yes, I am.

18   Q.   What does that refer to?

19   A.   Offshore is a name that's been given to jurisdictions.  It

20   can mean any country outside the United States as far as the

21   U.S. authorities, but it's typically used as a classification

22   of jurisdiction that historically have had strict bank secrecy

23   laws and at times -- although there are very few anymore --

24   numbered accounts where the true owner is not even listed on

25   the account or even the nominee owner, or has very lacks

1    oversight of its financial system.  As I said, many countries

2    don't require the disclosure of a beneficial owner of a company

3    or a bank account.

4    Q.  What are some of those jurisdictions?

5    A.  The ones that are typically named are, as I mentioned, the

6    Cayman Islands before, British Virgin Islands, Antigua, St.

7    Kitts and Nevis in the Carribean, and then there are others.

8    In Europe it would be Switzerland has always been a prime

9    country known as an offshore jurisdiction.  Lichtenstein,

10   Luxembourg.  The United Kingdom is actually known as a place to

11   launder money.  If you go to the Far East in Asia, Hong Kong,

12   Singapore.  In the Pacific, countries, small islands like

13   Nauru.  Off the coast of Africa there is an island called

14   Mauritius.  They are all known as money laundering havens or

15   offshore jurisdictions.

16   Q.  In your experience, why do people who are involved in money

17   laundering activities utilize offshore banks and offshore

18   financial institutions to engage in money laundering?

19   A.  It makes it harder to track down the money itself.  It

20   makes it harder to identify the true ownership.  And, as I

21   said, it gives the money launderer and the true owner time to

22   move the funds if they become aware of an investigation.

23   Q.  And are there other reasons that people engaged in money

24   laundering might choose to avoid banking institutions here in

25   the United States?

1  A.  I'm sorry?

2  Q.  Are there other reasons why individuals involved in money

3  laundering might choose to avoid the use of banks and financial

4  institutions here in the United States?

5  A.  Yes, there are.  The United States law enforcement agencies

6  are by far the most aggressive and have the most robust

7  jurisdiction and resources to investigate money laundering, to

8  take down illegal assets and to seize illegal assets, and also

9  have the wherewithal and the connections globally to work with

10  foreign counterparts to gain their cooperation.  So, the more

11  the United States can be avoided for purposes of laundering

12  money, usually the better for the money launderer or the

13  criminal.

14  Q.  In your experience, is it easy or difficult for individuals

15  involved in money laundering to entirely avoid the United

16  States?

17  A.  It's usually very difficult, because any transfer in United

18  States dollars has to transit the United States, and most

19  foreign banks are underwritten, their monetary instruments like

20  their cashiers checks or bank checks are underwritten and held

21  in U.S. dollars in the United States, so they clear here.  So,

22  in some way a financial transaction, any financial transaction

23  in U.S. dollars, is going to touch the United States.

24  Q.  Let me move to another area which is representations made

25  to banks and financial institutions.  Are you familiar with the

1    representations made to those entities in the process of

2    opening accounts plays in the laundering of funds through such

3    financial institutions?

4    A.   Yes.

5    Q.   Are you familiar with the term onboarding?

6    A.   Yes, I am.

7    Q.   What does that term mean?

8    A.   Onboarding is a term given by financial institutions to new

9    customer application and acceptance.  So they are actually

10   onboarding or bringing a new customer into the bank, into the

11   brokerage service, into the wired remission service.  That's

12   all known as the onboarding process.

13   Q.   And how might representations made during the onboarding

14   process as a financial institution relate to the laundering of

15   funds through such an institution?

16   A.   OK.  Well, as I mentioned, banks now have anti-money

17   laundering compliance requirements, and part of those

18   requirements means that new customers get a much harder look

19   and much deeper scrutiny than they did in years past.  So

20   during the onboarding process many institutions will inquire as

21   to, as I said, the expected volume.  They also run a credit

22   check on a new customer.  They will look for expected volume to

23   go through the account, and then also the purpose of the

24   account, why are you opening this account.  Is it personal?  Is

25   it business?  What type of business do you have?

1          So, the representations made by the money launderer at

2     the time of onboarding are very important to explain the

3     expected activity that will be going through the account and

4     also to give the bank a comfort level that the money that they

5     will see go through the account is coming from a legal source.

6     Q.   In other words, to give the bank the impression that the

7     funds flowing through the account are legitimate.

8     A.   That's correct.

9     Q.   And let me turn to a related topic.  Are you familiar with

10    the role that representations made in connection with wire

11    transfers might play in the laundering of funds through

12    financial institutions?

13    A.   Yes, I am.

14    Q.   Are you familiar with the term payment message?

15    A.   Yes.

16    Q.   What is a payment message?

17    A.   A payment message is the direction that a customer gives to

18    his or her bank to make a wire transfer, so to transfer money

19    by electronic means from their account to another account.

20         And in a wire transfer scenario the customer that's

21    wiring the money is known as the originator, and the customer

22    or the person receiving the money or the company receiving the

23    money is known as the beneficiary.  So, it's the originator,

24    the originator's bank, the beneficiary and the beneficiary

25    bank.

JB77SCO2                        Semesky - direct

1              A message, a typical wire transfer message, will

2       contain all of the details of the originator, the originator's

3       bank, to include the account number and the amount of money

4       involved, as well as usually it will have a notation for the

5       receiver, meaning that this the purpose of this transfer is to

6       pay invoice number 123.  OK?  And they may send it to the

7       attention of John Doe.  That will all be in the notation

8       section of a wire transfer message.

9              The receiving bank will when they receive that

10      message, once the account -- once the money is settled, they

11      will credit the beneficiary's account for the amount of money

12      in the wire transfer based on the instructions given in the

13      wire message.

14      Q.  And is that true both domestic and international wire

15      transfers?

16      A.  That's true, yes.

17      Q.  And without getting into the details, are there times when

18      there are intermediary banks involved in the middle of a

19      transfer between the originating bank and the receiving bank?

20      A.  Yes.  And I'll put this as simple as possible.  If the

21      originating bank and the beneficiary bank do not have a

22      relationship -- and they call it a correspondent

23      relationship -- then they will use other banks as

24      intermediaries that do have correspondent relationships with

25      either both of those banks or one or the other.  So you may

1   have at least four and sometimes more banks involved in a

2   single wire transfer.

3   Q.  And have you heard the term swift message or swift payment

4   message?

5   A.  Yes.

6   Q.  Is that one form of a wire payment message?

7   A.  Yes.  Swift is a clearing process which involves messaging

8   between banks.

9   Q.  Now going back to the original question I asked in this

10  area, how might representations made in connection with wire

11  transfers in such payment messages relate to the laundering of

12  funds through the wire transfers?

13  A.  It could be done in several ways.  Information could be

14  withheld, which would not give the true purpose of the

15  transaction, or false information may be given as to the

16  purpose of the transfer, or the attention or the name again of

17  the receiving party, again if it's a nominee, it's false

18  information.

19  Q.  When you say -- could you explain the last part.

20  A.  Yes.  If the recipient or the beneficiary of the wire

21  transfer is not the true owner of the company, say the shell

22  corporation who owns the account, again by inserting their name

23  into the wire messaging or the payment message, that's again

24  false information that again distances the money from the

25  original source and the true owner.

1   Q.  And is that equally true with respect to the originating

2   party as well?

3   A.  Yes, it is.

4   Q.  Let me turn to -- one moment.

5           So, just two final areas, Mr. Semesky.  You were

6   testifying earlier about layering.  Are you familiar with the

7   use of law firm escrow accounts in the process of layering

8   funds for the purpose of laundering the funds?

9   A.  Yes, I am.

10  Q.  And in what way might a person involved in money laundering

11  utilize a law firm escrow account as part of the layering

12  process?

13  A.  OK.  There are a number of ways that an escrow account may

14  be used.  One of the primary reasons is to acquire an asset, so

15  the purpose of the laundering is to acquire an asset either

16  domestically or in a foreign jurisdiction.  Typically that

17  money would first go to a law firm's escrow account, and that

18  firm would then handle the settlement on the property and

19  disperse the money.

20          The fact that the money is going into a law firm

21  account, again as far as the bank that holds -- the dispersing

22  bank, they're seeing it going to a law firm.  That is a normal

23  business transaction and will not raise any particular scrutiny

24  by the bank.  The law firm's bank, again it's a normal way of

25  doing business; they receive funds into the account all the

1  time, so it will raise no suspicion on the part of that bank.

2  And then the disbursement for either to settle a real estate

3  transaction or to make an investment on behalf of a client

4  again should not set off any alerts in the bank's anti-money

5  laundering software.

6          The law firm escrow account can be used to -- as I

7  said, it's an escrow account so it's holding money, it's

8  holding money for a purpose, and the purpose could be for a

9  business deal.  And if the business deal falls through, if it's

10 in fact supposed to fall through and set up to look like a

11 business deal, once it falls through the client can then

12 redirect the money or the law firm to send the money to yet

13 another third-party account that would be a further layering of

14 the transactions.  And again that third-party account, their

15 bank is going to see the money coming in from a law firm

16 account.  Again, it raises the comfort level and lessens the

17 risk associated with that transaction so the bank is less

18 likely to alert and look at that and scrutinize that

19 transaction.

20          (Continued on next page)

21

22

23

24

25

```
 1   Q.  And is it fair to say, Mr. Semesky, that that kind of
 2   activity could take place with or without the knowledge of the
 3   lawyer or the law firm that was in charge of the account?
 4   A.  That's correct.
 5   Q.  Let me turn finally to the concept of papering or papering
 6   a transaction.  Are you familiar with that term?
 7   A.  Yes, I am.
 8   Q.  What does the term papering refer to?
 9   A.  Papering is a term given to the creation of business
10   documents to justify the transfer of money.  So what I mean by
11   that is if money is going to be transferred from shell
12   corporate account A to shell corporate account B, a contract or
13   an investment agreement or a debt obligation or a loan could be
14   created.  The paperwork could be created to -- that would
15   require a payment to leave the account of company A and be
16   transferred to the account of company B.  It would -- again,
17   this gives a comfort level to the bank that the money is
18   involved in a legal transaction and is far less likely to cause
19   an alert in their anti-money laundering software.
20            Some countries require any amounts over a certain
21   let's say ten thousand dollars, just to pick an amount, that
22   the company receiving the money actually produce the documents
23   associated with the transaction.  There are types of
24   transactions in any country such as the sale or purchase of
25   commodities, trade goods, that require -- that are financed
```

1    through some type of trade finance agreement such as a letter

2    of credit where the bank holds the money basically in escrow, a

3    bank does, and it requires the production of custom documents

4    and bills of lading to show that the goods were actually

5    shipped and received by the party that purchased them before

6    they will release the funds to the beneficiary or to the seller

7    of the goods.

8              Again, this is done in business all the time.  It's a

9    very normal transaction.  The banks see these types of

10   documents all the time.  If this type of paperwork is created

11   to justify a completely fictitious transaction, again, if the

12   paperwork is not completely identifiable as fictitious or phony

13   and is done somewhat professionally it will probably pass the

14   scrutiny of the bank.

15   Q.  And you mentioned one particular example at the end of that

16   answer regarding bills of lading.  Is it fair to say that's

17   just one of many potential ways to paper a transaction?

18   A.  That's correct.

19   Q.  And I think you've basically spoken to this but what is the

20   purpose of papering a transaction?  Is it just with respect to

21   the bank or is it also with respect to other entities?

22   A.  Again, the purpose of papering a transaction is to show

23   that the money was involved in a legal transaction or a legal

24   business transaction.

25             Again, it raises the comfort level of the banks

1   involved in the transaction and it could also stall or

2   completely stop a government investigation as far as being able

3   to identify illegal funds that can be seized and forfeited.

4   Q.  Mr. Semesky, one last question for you.  Is there any one

5   way to paper a transaction in the money laundering context?

6   A.  No.  No.  It would depend on the parties involved, their

7   ability to create the documents, the banks, what they feel the

8   banks need and the purpose they are giving the bank to justify

9   the transfer of the funds.

10              MR. DiMASE:  One moment.

11              (Counsel confer)

12              MR. DiMASE:  Thank you very much.  No further

13   questions.

14              THE COURT:  Cross-examination.

15              MR. DEVLIN-BROWN:  Thank you, your Honor.

16   CROSS-EXAMINATION

17   BY MR. DEVLIN-BROWN:

18   Q.  Good afternoon, Mr. Semesky.  How are you?

19   A.  I'm doing fine, sir.  Thank you.

20   Q.  I'm Arlo Devlin-Brown.  I represent Mark Scott.  I'm not

21   sure we know each other but we might have been on a panel or

22   something?

23   A.  Possibly.

24   Q.  I'm maybe not memorable.  Anyway, I don't have a lot of

25   questions for you but I want to clarify a few points you made.

JB79SCO3                          Semesky - Cross

1            First, as I believe Mr. DiMase asked you, you're not

2     testifying at all here about the facts of this case, right?

3     A.  No, sir.

4     Q.  In fact, you don't know anything about the facts?

5     A.  No.

6     Q.  That's going to be for the jury later, right?

7     A.  That's correct.

8     Q.  And equally important you're not purporting to provide

9     guidance on what the law of money laundering is, right?

10    A.  No.  Not at all.

11    Q.  That will be up to Judge Ramos to instruct the jury?

12    A.  That's correct.

13    Q.  You are aware there are specific criminal statutes in the

14    United States that make it a crime to engage in some forms of

15    what you've just described as money laundering, right?

16    A.  That's correct, yes.

17    Q.  But not everything that bank professionals or other

18    financial experts might describe as money laundering is

19    necessarily criminal under the U.S. criminal laws, right?

20    A.  I'm not quite sure I follow that.

21    Q.  Well, I don't want to again get into too many legal issues

22    but to clarify the question, the money laundering statutes

23    require money to come from a specified unlawful activity,

24    right?

25    A.  That's correct.

1    Q.   That's not every crime out there, right?

2    A.   No.   It's over two hundred crimes to include certain

3    foreign crimes as well but that's correct.

4    Q.   Exactly.   But within the community you're in, the expert

5    community on money laundering, people might describe money

6    laundering that includes other crimes that aren't specified

7    unlawful activities?

8    A.   It's not out of the realm of possibility I guess but there

9    are very few crimes that -- most economically -- economic

10   crimes, crimes of greed, are included in the statute and I'm

11   just having a hard time thinking of any that aren't.

12   Q.   Sure.   I don't want to put you on the spot.

13            Tax evasion.   A lot of people do things to hide their

14   money and not pay taxes, right?

15   A.   That's correct.

16   Q.   That's not actually money laundering under U.S. law, right?

17   A.   Tax evasion is a little different the way it's handled in

18   the law.   It is not a specified unlawful activity as you stated

19   but it is, his Honor will instruct the jury, but it can be a

20   designed purpose behind the money laundering.   So it is -- it's

21   included but it's not included as a source of funds for -- as a

22   specified unlawful activity.

23   Q.   So maybe we should leave it at the law can be complicated

24   and Judge Ramos will instruct the jury on it later, fair

25   enough?

 1   A.  I'm sure he will.

 2   Q.  And you've testified about various techniques that you said

 3   can be used to money launder, right?

 4   A.  That's correct.

 5   Q.  Including various sources of complex financial

 6   transactions, right?

 7   A.  Yes.

 8   Q.  And some of those techniques can also be used for

 9   legitimate activity, right?

10   A.  Yes.  That's the purpose of it, to make it look normal.

11   Q.  Right.  So some of the things that could be done to make

12   something look normal might in some cases be because it is

13   normal, right?

14   A.  Yes.

15   Q.  And just to give one example.  I think at the end of your

16   testimony you were discussing papering?

17   A.  That's correct.

18   Q.  And that was the idea -- and please correct me if I didn't

19   have it exactly right -- but that's the notion of making lots

20   of documents around a fake transaction so that the bank or

21   someone else looks at it and says:  Oh, it's a real

22   transaction, because there are lots of documents around it?

23   A.  Either a fake transaction or a transaction that occurred

24   that isn't as represented.

25   Q.  But there can also, of course, be a real transaction that

1    has lots of papers and documents around it because it's a real

2    transaction, right?

3    A.   Real –- real legal or real illegal?

4    Q.   Like a normal business transaction, particularly if it's a

5    complicated transaction, might have a lot of paperwork and

6    documents relating to it, right?

7    A.   Absolutely would.

8    Q.   But to your same point if you have a fake transaction you

9    might go out of your way to have fake documents to make it look

10   real?

11   A.   That's correct.

12   Q.   So the fact that there are a lot of documents by itself

13   won't tell you one way or the other if a transaction is legal

14   or illegal?

15   A.   No, sir.

16   Q.   You talked about shell companies during your direct

17   examination?

18   A.   Yes, sir.

19   Q.   And shell companies can be used for illegal purposes

20   certainly, right?

21   A.   That's correct.

22   Q.   And they can also be used for legal purposes?

23   A.   Yes.

24   Q.   And would it be fair to say they can be used for purposes

25   that are legal and –- well let me scratch that question for

1    now.

2              So a shell company is just a company that I think the

3    definition is doesn't have a building or facilities or

4    full-time employees, right?

5    A.  That's correct.

6    Q.  And someone could set up a shell company right here in

7    New York, right?

8    A.  Any state in the union.

9    Q.  In fact, the United States has some of the most open laws,

10   shall we say, allowing people to set up corporations?

11   A.  Some states are more open than others.  But that's correct,

12   yes.

13   Q.  I believe there's one or two states that you can set up a

14   corporation and they won't even report the owners to the IRS?

15   They don't cooperate with the IRS; is that right?

16   A.  At this point there is no reporting to the IRS or the

17   Treasury Department of the owners by any state.

18   Q.  OK.  Are you familiar with the Financial Secrecy Index?

19   A.  As far as countries, all sorts of jurisdictions.

20   Q.  You're aware that there are various organizations that

21   often rank countries in terms of how secretive their financial

22   systems are?

23   A.  That's correct.  I don't know.  Is that transparency?

24   Q.  Sorry?

25   A.  Go ahead.  I'm sorry.

1   Q.  But you're aware of ranking of that sort, right?

2   A.  Yes.

3   Q.  And the U.S. often comes near the top of the list in terms

4   of financial secrecy, right?

5   A.  Yes, it does.

6   Q.  And you talked before about offshore jurisdictions that

7   could be used for money laundering, right?

8   A.  That's correct.

9   Q.  And I believe you named a number of countries all around

10  the world, right?

11  A.  Yes.

12  Q.  The countries that are most used for offshore money

13  laundering change all the time, right?

14  A.  Yes.  They change because as countries -- it's usually a

15  reaction to enforcement and scrutiny or new laws by a

16  government.  So money will -- illegal money will flee a

17  jurisdiction if it's put under more scrutiny.  And so they

18  change for a number of reasons.  That can be governmental

19  change.  It can be pressure from outside jurisdictions.

20  Q.  Right.  So a country that might be a top money laundering

21  haven one year, a few years later may not be if the laws change

22  in that jurisdiction, right?

23  A.  Yeah.  The organization that judges that is known as the

24  Financial Action Task Force or the acronym FATF F-A-T-F and

25  they evaluate countries' anti-money laundering programs and

1  grade them as complying or noncomplying or somewhere in

2  between.  And, yes, they do what -- a country that they judge

3  is not compliant one year by the next evaluation may not be

4  judged that way.

5  Q.  And I don't want to put you on the spot about where a

6  country is ranked, what numbers or anything like that, but is

7  it fair to say that a decade or so back the Cayman Islands were

8  sort of one of the worst jurisdictions for money laundering?

9  A.  That's correct.

10 Q.  Meaning money launderers favored the Cayman Islands for

11 various reasons?

12 A.  Yes.

13 Q.  And that's changed since then, hasn't it?

14 A.  The Caymans have enacted much better anti-money laundering

15 laws.  Again, if -- and the United States is no different here.

16 Shell corporations, unless there's a lead to a shell

17 corporation, it's a dead end.  There is no registry that

18 associates a shell corporation to the true owner in any country

19 that I know of.  So the government authorities could not go

20 into a database and check shell corporations that are owned by

21 their target in virtually any country.

22 Q.  So the shell company problem is a problem almost around the

23 world?

24 A.  It is.

25 Q.  Are you familiar with the Foreign Account Tax Compliance

1    Act, FATCA?

2    A.   FATCA, yes.

3    Q.   And that's a law in the United States that requires

4    foreign -- requires financial institutions to report

5    information about offshore assets connected to U.S. persons,

6    right?

7    A.   That's correct.

8    Q.   And the United States has treaties with various foreign

9    countries where they agree to have their own banks comply with

10   FATCA?

11   A.   Yes.

12   Q.   And some foreign countries have such treaties and others do

13   not, right?

14   A.   That's correct.

15   Q.   Just a couple more things on shell companies I want to come

16   back to.  You said they could also be used for legal purposes,

17   right?

18   A.   Yes, sir.

19   Q.   And, in fact, there are -- Fortune 100 companies often have

20   shell companies all over the place, right?

21   A.   That's correct.  As I said, it will be done for a

22   particular business endeavor or to have subsidiaries around the

23   world that conduct business in other countries.

24   Q.   If a country has operations around the world it's likely to

25   have a more complicated corporate structure, right?

JB79SCO3                          Semesky – Cross

1    A.  That's correct.

2    Q.  Which may include shell companies?

3    A.  Yes.

4    Q.  You can have a shell company, for example, that owns

5    intellectual property, right?

6    A.  Yes, sir.

7    Q.  And a lot of U.S. companies have shell companies in

8    Ireland, don't they?

9    A.  Yes, they do.

10   Q.  And that's because there's ways to avoid U.S. taxes by

11   setting up companies in Ireland?

12   A.  Yeah.

13   Q.  And taxes in other jurisdictions as well, right?

14   A.  That's correct.

15          Ireland is an example of a country that has a very low

16   tax rate for foreign -- those types of holding companies they

17   call them, so businesses conducted out of that holding company

18   for jurisdictions around the world.  So the income is not taxed

19   in the United States.  It's taxed in Ireland.  If the other

20   country required a tax, it would be paid there.

21   Q.  And periodically there's sort of public outrage about that

22   and pressure to change the law, right?

23   A.  That's correct.

24   Q.  But currently setting up such a company to avoid taxes can

25   be legal even if, you know, some people don't like it, right?

1   A.   That's correct.

2   Q.   There's a difference between tax avoidance and tax evasion,

3   right?

4   A.   Correct.  Tax avoidance complies with the law.  Tax evasion

5   violates the law.

6   Q.   Thanks.  I'm almost done.  I just want to come to one more

7   topic.

8             And I believe you testified before that criminal

9   organizations can launder money through all sorts of different

10  companies, right?

11  A.   That's correct.

12  Q.   They can use investment houses, brokerage houses, financial

13  institutions, banks, securities dealers, law firms, right?

14  A.   That's correct.

15  Q.   Real estate companies, I guess we should add to that,

16  right?

17  A.   Yes.

18  Q.   And the companies that have money launder through them are

19  not always aware that the money is criminal, right?

20  A.   That's correct.  They can be witting, they know and they're

21  complicit; or unwitting where they don't know.

22  Q.   For example, law firm escrow accounts, as you mentioned,

23  can be used for laundering criminal money, right?

24  A.   That's correct.

25  Q.   Hopefully they can also be used for like the legitimate

1    work of a law firm?

2    A.   Absolutely.

3    Q.   And they can be used for, for example, making real estate

4    purchases where money comes into the escrow account and then

5    once there's a transaction it leaves the escrow account?

6    A.   That's correct.

7    Q.   And the clients can of course lie to the law firms about

8    what the purpose of sending the funds is, right?

9    A.   Absolutely.

10   Q.   Just like they can lie to banks or investment companies or

11   private equity funds or any one of those, right?

12   A.   That's right.

13   Q.   And you've done some consulting work for banks, right?

14   A.   I have.

15   Q.   And advising them on anti-money laundering programs and the

16   like?

17   A.   Yes, sir.  Consulting work and also training during my time

18   with the government.

19   Q.   And is it fair to say a lot of the money from criminal

20   activity that you see from your experience going through banks

21   comes without the banks being aware of what's going on?

22   A.   That's correct.

23            MR. DEVLIN-BROWN:  Just check with my colleague.

24            (Counsel confer)

25            MR. DEVLIN-BROWN:  No further questions.  Thank you.

 1              THE COURT:  Any redirect?

 2              MR. DiMASE:  No, your Honor.

 3              THE COURT:  All right.  Mr. Semesky, you may step

 4     down.

 5              THE WITNESS:  Thank you, your Honor.

 6              (Witness excused)

 7              THE COURT:  Will the government please call your next

 8     witness.

 9              MS. LOZANO:  The government calls Paul Spendiff.

10              THE COURT:  Sir, please step forward.  Go towards your

11     right and come to the witness stand here on my left.  Please

12     step up into the witness stand and remain standing.

13       PAUL SPENDIFF,

14          called as a witness by the Government,

15          having been duly sworn, testified as follows:

16              THE COURT:  Ms. Lozano.

17              MS. LOZANO:  Thank you.

18     DIRECT EXAMINATION

19     BY MS. LOZANO:

20     Q.  Good afternoon, Mr. Spendiff.

21     A.  Hi.

22     Q.  How old are you?

23     A.  45 next week.

24     Q.  And where do you live?

25     A.  I live in the UK, in England.

1    Q.   If you could pull up the microphone just a little bit.

2    A.   Sure.  Is that better?

3    Q.   Perfect.  Thank you.  What kind of work do you do?

4    A.   Currently I'm what's called a third-party management

5    company.  I work for a third-party management company.

6    Q.   And where is that company located?

7    A.   Based in London.

8    Q.   How long have you been with that third-party management

9    company?

10   A.   Almost 18 months.

11   Q.   What is your position there?

12   A.   I'm the group head of global sales.  I'm also what's called

13   a CF1 which means I'm the director of their UK business.

14   Q.   Very briefly what does a third-party investment management

15   company do?  What kind of work?

16   A.   Particularly when a foreign investment manager wishes to

17   set up a European fund they typically -- so the UK, Luxembourg

18   or Ireland, they may not have the requisite staff regulatory

19   ability to open an office and so they use a service provider, a

20   third-party management company to provide the risk and

21   oversight responsibilities and then they will have the

22   investment management of a selling or distribution of their

23   products given back to them.

24   Q.   So you have been doing that you said for approximately a

25   little over a year, a year-and-a-half?

1    A.  Yes.  So since mid July 2018.

2    Q.  What is your educational background?

3    A.  I went to what you would call high school here until I was

4    18.  I then took four what I call advance levels.  Then went

5    on to do university where I got a bachelor, a B.A. bachelor of

6    arts economic geography.  So I was a major in geography and a

7    minor in economics I think is probably how you would describe

8    it here in the U.S.

9    Q.  After university did you work or did you continue with your

10   education?

11   A.  No.  Sadly, I had to work.  So I joined a company called

12   Thomson Financial, which was headquartered in Boston.  But I

13   worked from their London office.

14   Q.  What kind of work did they do?

15   A.  Thomson Reuters.  So it's a data and financial services

16   company.

17   Q.  How long were you there?

18   A.  Approximately six years.

19   Q.  And then where did you go?

20   A.  I left there to join an oil and gas, it was called TWC Oil

21   and Gas data and events company.

22   Q.  What was your role there?

23   A.  I ran the publishing and data information group.

24   Q.  After you left there where did you go?

25   A.  I started my own business with a business partner, which we

1    ran for approximately eight years.

2    Q.  Was this in London?

3    A.  Again in London.

4    Q.  And what kind of business was it?  What did you do?

5    A.  Financial publishing, conferences and events.

6    Q.  After you left your own firm where did you go?

7    A.  I joined the Apex Group.

8    Q.  Where is the Apex Group located?

9    A.  The headquarters of Apex is in Bermuda.  But it has over 25

10   offices around the world.  And I worked in the London office.

11   Q.  What type of work does Apex do?

12   A.  Broadly as a group we are what we called a fund

13   administrator.

14   Q.  And I'm just going to ask you to slow down just a little

15   bit and speak into the microphone.

16   A.  Sure.

17   Q.  How long all in all were you at Apex?

18   A.  Just short of six years.

19   Q.  What were your different roles at Apex?

20   A.  So my first role was managing director of what was called

21   Apex Technologies.  And that was a business unit set up by Apex

22   to encourage the clients to use what we call third-party

23   portfolio management systems.  So technology which would help

24   investment managers run their portfolios more effectively.

25   Q.  After that position did you have another position at Apex?

1    A.  Whilst I was doing that I became simultaneously the

2    European head of sales for all of Apex's products.

3              And then for the final three years I stepped away from

4    the technology group but I became managing director of Apex

5    Fund Services UK Limited, which just shy of three years, which

6    was the UK office of Apex and I ran that office.

7    Q.  And as the managing director there of the UK office of Apex

8    what were your responsibilities?

9    A.  Well I was the director of a business what was called a

10   CF1, again, which was a regulatory designation.  I was

11   responsible for all the operational team reports into me, human

12   resources, accounts, finance director.  I was responsible for

13   what's called the P&L, it's the profit and loss of that office.

14   And also I sat on the European executive board so I represented

15   the UK office at the European level for -- with the other

16   managing directors.

17   Q.  You mentioned that Apex had offices worldwide.  What kind

18   of services did Apex offer out of the UK office where you were

19   the managing director?

20   A.  So the UK office was what was called an operation office,

21   which meant it actually had staff in the office doing fund

22   administration.  So we had other offices which were just sales

23   or were just offering directorships.  But in the UK we had an

24   operation office which meant we actually did the fund

25   administration of a variety of funds, over a hundred funds,

1    from the UK office itself.

2    Q.   During your time at Apex, did Apex, and were you involved,

3    with the administration of funds managed by a person by the

4    name of Mark Scott?

5    A.   Yes, we were.

6    Q.   Did you ever meet Mr. Scott?

7    A.   Yes, I did.

8    Q.   When did you meet him?

9    A.   Towards the end of May 2016.

10   Q.   And this is meeting in person?

11   A.   Yes.  I met him in person.

12   Q.   And what was the purpose of that meeting?

13   A.   Mark Scott had been due to visit our offices.  Due to a

14   change in his circumstance he couldn't make it over.  But he

15   had a packet of information that he was required to give to us.

16   So I had a meeting in the West End.  So I stopped into the

17   hotel to pick that up and although I was supposed to pick it up

18   from the concierge, he was actually still in the hotel so I met

19   him briefly.

20   Q.   Do you see Mr. Scott, Mr. Mark Scott, in the courtroom

21   today?

22   A.   Yes, I do.

23   Q.   Can you please identify him by describing an article of

24   clothing he's wearing and where he's sitting?

25   A.   The gentleman over there with a white handkerchief in his

1    upper left-hand breast pocket.

2              MS. LOZANO:  Your Honor, indicating the defendant.

3              THE COURT:  The record will reflect that Mr. Scott has

4    been identified.

5              MS. LOZANO:  Thank you, your Honor.

6    Q.  Mr. Spendiff what were the names of the defendant's funds

7    that Apex administered?

8    A.  The initial fund, they were called the Fenero Funds

9    generically.  And then each fund had a slightly different

10   misnomer; so the equity, Fenero Equity Investment LP was one

11   fund.

12   Q.  During the period of time that Apex administered these

13   funds did the defendant tell you that the money that was coming

14   into the funds originated from an entity called OneCoin?

15   A.  No, he did not.

16   Q.  During that period did he disclose to you that the funds

17   in -- sorry, that the money in the funds belonged to a person

18   called Ruja Ignatova?

19   A.  No, he did not.

20   Q.  Now, let's turn back to your work at Apex.  As managing

21   director of the Apex UK office were you familiar with the books

22   and records kept and maintained by Apex?

23   A.  Yes, I was.

24              MS. LOZANO:  May I approach the witness, your Honor?

25              THE COURT:  You may.

JB79SCO3                          Spendiff - Direct

1   Q.  Mr. Spendiff, I've just handed you two exhibits.  One is

2   marked Government Exhibit 2200-A and it is CD containing the

3   following exhibit numbers on it.  These are exhibit numbers

4   2203, 2204, 2207, 2225, 2229, 2232, 2245, 2255, 2289, 2290,

5   2291, 2292, 2298, 2299, 2300, 2301, 2304 through 2310.

6           Mr. Spendiff, do you recognize that CD, Exhibit

7   2200-A?

8   A.  Yes, I do.

9   Q.  What do you recognize it to be?

10  A.  A CD-ROM DVD of the records provided from Apex.

11  Q.  And how do you recognize that that exhibit contains Apex

12  records?

13  A.  I reviewed this disk yesterday.  And then I signed with my

14  initials and dated it.

15  Q.  When you reviewed the disk where were you when you reviewed

16  the disk?

17  A.  I was in your offices.

18  Q.  And after looking through -- well what did you do when you

19  reviewed the disk?  Did you look through every exhibit that's

20  on that disk?

21  A.  I looked through every exhibit, yes.

22  Q.  Were the records that are marked on that exhibit the list

23  that I just dictated that are on that disk recorded and

24  maintained -- were they recorded and maintained by someone with

25  knowledge at Apex?

1    A.  Yes.  Our head of IT.

2    Q.  Were they made and kept in the regular course of Apex's

3    business?

4    A.  Yes, they were.

5    Q.  Was it the regular practice of Apex's business to make the

6    records that are contained on that exhibit?

7    A.  Yes.  We have to make and keep them for seven years.

8    Q.  And were the records on that exhibit made at or near the

9    time that the activity reflected in the records took place?

10   A.  Yes.  They were.

11              MS. LOZANO:  Your Honor, the government offers

12   Government Exhibit 2200-A with all of the exhibits contained on

13   that exhibit into evidence.

14              THE COURT:  Any objection.

15              MR. DEVLIN-BROWN:  Can I just have one moment, your

16   Honor?

17              THE COURT:  Sure.

18              MR. DEVLIN-BROWN:  No objection.

19              THE COURT:  All those exhibits will be received.

20              (Government's Exhibits 2200-A, 2203, 2204, 2207, 2225,

21   2229, 2232, 2245, 2255, 2289, 2290, 2291, 2292, 2298, 2299,

22   2300, 2301, 2304 through 2310 received in evidence)

23   Q.  Mr. Spendiff I've also handed you a disk that is marked

24   GX2200-B and this exhibit contains the following documents and

25   e-mails on the disk and those are exhibits marked GX2201, 2202,

1    2205, 2206, 2208 through 2224, 2226 through 2228, 2230, 2231,

2    2233, through 2244, 2246 through 2254, 2256 through 2288 and

3    2311.

4              Do you recognize that disk?

5    A.  Yes, I do.

6    Q.  And what do you recognize that disk to contain?

7    A.  These are e-mails between Apex and mostly Mark Scott

8    relating to the administration of the Fenero Funds.

9    Q.  How do you know that that's what is on that disk?

10   A.  I reviewed this disk yesterday in the offices.

11   Q.  How do you know that that's the disk that you reviewed?

12   A.  Because I signed and dated it at the time.

13   Q.  Are the records contained on that disk -- were they

14   recorded and maintained by someone with knowledge of Apex?

15   A.  Yes.  Our head of IT.

16   Q.  Are the records contained on that disk made and kept in the

17   regular course of Apex's business?

18   A.  Yes, they are.

19   Q.  Was it the regular practice of Apex's business to make and

20   maintain these records?

21   A.  It was a regulatory requirement for seven years.

22   Q.  Were the records on that exhibit made at or near the time

23   that the activity reflected in those records took place?

24   A.  Yes, they were.

25              MS. LOZANO:  At this time the government offers

1     Government Exhibit 2200-B with all of the list of exhibits

2     contained thereon into evidence.

3            MR. DEVLIN-BROWN:  No objection.

4            THE COURT:  Very well.  Those exhibits will be

5     received.

6            (Government's Exhibits 2200-B, GX2201, 2202, 2205,

7     2206, 2208 through 2224, 2226 through 2228, 2230, 2231, 2233,

8     through 2244, 2246 through 2254, 2256 through 2288 and 2311

9     received in evidence)

10    Q.  Mr. Spendiff you described Apex funds services as in the

11    business of fund administration.  Can you please briefly

12    describe for the jury what that means?  What kind of work does

13    that entail?

14    A.  It was often described as the back office of the fund.

15    There are two primary functions.  The first is the valuation of

16    the fund.  Typically it's the valuation of the net asset value

17    of the fund.  And this gives an indication of what the assets

18    within the fund are typically worth.

19           The second is what would be considered we call

20    transfer agency.  And that's the movement and collection of

21    investor data moving in and out of the fund.

22    Q.  And with respect to the transfer agent function, what are

23    the responsibilities and function of the fund administrator?

24    A.  So it varies a little bit depending on whether it's a

25    close-ended fund or open-ended fund, whether it's a regulated

JB79SCO3                          Spendiff - Direct

1    or unregulated fund.  But atypically it will be to review and

2    collect the subscription or redemption form from -- either

3    directly from the client or an agent of theirs or an investment

4    manager; to review that information; check for AML and KYC; and

5    review the source of wealth; and then move the money into the

6    fund or its investments on the instructions of the investment

7    manager.

8    Q.  You just mentioned that there may be differing roles based

9    on the kind of fund that it is.  Can we step back and I would

10   like you to describe what -- when you use the term "funds,"

11   what are you referring to?  Are there many different kinds of

12   funds?

13   A.  See, you get different types of funds.  So they might be

14   different types of funds because of the way they invest.  So

15   they might be private equity funds, hedge funds, mutual funds

16   as you with would see here in the U.S.  They might be also

17   different types of regulations.  So they might be considered

18   onshore funds or '40 Act funds here in the U.S. or UC funds in

19   Europe or they may be offshore funds, Cayman Islands, British

20   Virgin Islands.

21   Q.  Did Apex administer all types of funds?

22   A.  Yes.  It administered all types of asset classes.

23   Q.  What types of funds were defendant's Fenero Fund?

24   A.  They were a British Virgin Island approved fund.

25   Q.  Were they --

1    A.  It was a private equity fund.

2    Q.  Can you briefly describe just what a private equity fund

3    means.  What are the characteristics?

4    A.  So it would be easier to describe what it's not.  A public

5    equity would be shared, that are available to the general

6    public, which you can buy and sell regularly or exchange

7    through other intermediaries.  Private equity are typically

8    investing in private equities, so these are privately-owned

9    companies of which shares are readily available.  So they will

10   normally buy these companies.  And they will look to perhaps

11   restructure them and/or add businesses to them and then

12   typically sell them in the lifetime of the fund to realize a

13   gain which they'll return to their investors.

14   Q.  Who were the investors in private equity funds?

15   A.  Private equity funds are usually set up for sophisticated

16   investors.  So they may be for retail.  So general public

17   typically aren't able to buy them.  So they'll probably have a

18   very large initial subscription, at least north of usually a

19   million dollars.  And so it's usually bought by high net-worth

20   individuals, family offices, pension plans, insurance

21   companies, government funds, would all typically buy into

22   private equity funds.

23   Q.  You mentioned a term subscription.  What do you mean by

24   that term?

25   A.  A private equity fund, a subscription is when you commit

1    to, or the investor commits to investing in the fund.  So

2    they'll sign either what would be considered to be a

3    subscription agreement.  Or if the fund was a partnership, that

4    may also be called a limited partnership agreement.

5    Q.  You also described -- you also explained that some funds

6    may be close ended and some may be open ended.  Can you explain

7    what the difference between close ended and open ended is?

8    A.  Sure.  With an open-ended fund you can buy and sell shares

9    according to -- every fund in theory lasts forever.  So shares

10   are bought and sold on a dealing date.  That may be daily,

11   weekly, monthly or even annually.  But you can get a valuation

12   typically from your fund administrator.  You can sell your

13   shares at that value because normally the underlying assets are

14   readily sellable so that when an a investor decides they want

15   to redeem, to sell their shares the investment manager can sell

16   the underlying assets easily to meet that redemption and pay

17   out money to the investor.

18        In a close-ended fund which is how a private equity

19   company is typically set up, the underlying assets are hugely

20   illiquid.  So to investors don't have the ability to redeem

21   because it's not possible.  If ten percent of investors decided

22   to sell, it's not possible to sell ten percent of a company.

23   The investment manager would have to sell all of the company.

24   It's a private company.  It may take a lot of time.  So usually

25   investors are committed to the lifetime of the fund, which may

1    be anywhere between five to ten, twelve years.

2    Q.  And to keep it very simple, when you refer to redeem, an

3    investor redeeming, does that just mean an investor takes out

4    his or her money?

5    A.  Yeah.  They sell their shares.

6    Q.  What is the role of an investment manager in a private

7    equity fund?

8    A.  The investment manager, we usually have two primary

9    functions.  One is to run the money, so to make investment

10   decisions about what is and isn't a good asset for them to buy;

11   and secondly, to raise money for the fund; so to sell, to sell

12   the fund to investors.

13   Q.  Can you give a brief description, please, of the life cycle

14   of a private equity fund in terms of collecting the money,

15   earnings, profit on your investment, and then sending money

16   back to the original investors?

17   A.  Sure.  So I mean private equity funds are quite esoteric so

18   each one is a little bit different depending on the assets, who

19   the investment manager is.  But a typical fund would have a

20   capital raising period where the investment manager will go out

21   and raise commitments.  So they'll go out and meet lots of

22   different investors, talk about strategy, talk about the fund

23   and they will get what are called soft commitments or semihard,

24   hard commit.  And that's where investors commit, if the fund is

25   set up and it goes ahead that they're going to commit this

1   capital based on the information that's been provided by the

2   investment manager.

3          Once the private equity manager has sufficient

4   commitments, there will be a first closing.  They will normally

5   launch and does what's called a first closing in the fund.

6          So they will then have what are called legally binding

7   commitments.  So each investor will commit legally by signing

8   the subscription agreement or the LPA that they will put five

9   million into the fund or ten million or whatever amount the

10  capital they have committed.

11         What then happens usually is a typical private equity

12  manager doesn't want all that money because it's very difficult

13  to spend a hundred, two hundred, three hundred million right at

14  the start.  So at the start of the fund what they'll normally

15  do is draw down perhaps 25 percent of the committed capital.

16  So perhaps they'll take one or two million from a five million

17  subscription because they normally have a couple of deals ready

18  to go which have been waiting for the fund to launch.

19         The rest of the money, as the investment manager finds

20  deals and opportunities to invest in, will have capital calls.

21  So the investors will be asked to put in the rest of their

22  investment during that period to invest on behalf of the fund.

23         And the reason they do it like that is because they

24  get paid typically a performance fee.  And if they hold cash, a

25  lot of cash, but they only hold a very few number of assets,

1    the return being generated by those assets dilutes their

2    performance, so they get paid less.

3          Also the investment -- the investors are putting money

4    into an account which doesn't pay any income.  So they

5    typically want to hang on to their cash; perhaps invest it

6    somewhere else nice and liquid so when they get the capital

7    call they will allocate that money.

8          That's usually an investment cycle in a fund.  Might

9    be anywhere up to three years.

10         That may or may not be stipulated in the prospectus,

11   the money has to be called within that period and spent and

12   used within that period.

13         You then typically have a consolidation period.  This

14   is where whatever is going to happen to those investments

15   should be happening.  They should be cutting staff.  The idea

16   is to cut costs, to close factories, to invest heavily in

17   technology, to buy other businesses which are complementary

18   which allow them to leverage their opportunities, so add value

19   to the portfolio.

20         Then you get the divestment cycle.  And as each asset

21   is sold.  Money is typically returned back to the investor to

22   reflect the fact that that investment has closed.  And that

23   normally would be -- and there's a hard close.  That may be ten

24   years or ten plus one, plus one, so you get an extra couple of

25   years.  Then the fund has to close without the agreement of the

1    investors.  They will have their money back.

2    Q.  You mentioned the divestment --

3           THE COURT:  Actually, Ms. Lozano we're going to take

4    our second break.  So we'll get back together in fifteen

5    minutes.

6           Ladies and gentlemen, don't discuss the case.

7           (Jury not present)

8           Before we break, Mr. Spendiff, I will speak only for

9    myself; not for everyone else in the room.  My Yankee ears are

10   very unsophisticated.  So it's a little hard to get my ears

11   around some of the things you're saying.  So if I could ask you

12   to slow down it will be very helpful for me.  Thank you so

13   much.

14          THE WITNESS:  No problem.

15          (Recess)

16          (Jury present)

17          THE COURT:  Ms. Lozano.

18          MS. LOZANO:  Thank you, your Honor.

19   Q.  Mr. Spendiff when we broke you had just finished describing

20   the life cycle of private equity funds and divestment.

21          With respect to the divestment and return of money to

22   the investors, are there rules or best practices that a fund

23   administrator must follow governing where the private equity

24   fund must send the money back to?

25   A.  I mean there are no -- each company has its own set of best

1    practices to reflect regulations typically in or around money

2    laundering, but also to protect the investors from theft.

3              So typical rules or processes would involve only

4    wiring money back to the bank account from which it came.  So

5    if an investor wished the money to go to a different bank

6    account, there would be certain controls or protocols to ensure

7    that that bank account was also owned by the investor and it

8    wasn't someone purporting to be them.  And if someone wanted to

9    change bank accounts, then that would be processed.

10             Something called world checks or background checks

11   would be done on the investor to make sure that when they

12   invested the money they may have been fine but actually,

13   Breaking Bad style, they've become a criminal in the meantime

14   and therefore they would have been or perhaps they hadn't been

15   sentenced or prosecuted but then they had subsequently, and so

16   that would flag so that the money couldn't then be returned

17   back to that investor.

18   Q.  And are those policies and procedures that Apex followed

19   when you were there?

20   A.  Yes, they were.

21   Q.  So let's talk a little bit more about those policies and

22   procedures at Apex.  You mentioned the two major functions of a

23   fund administrator and they were the valuation function and the

24   transfer agent function.

25             With respect to the transfer agent function, are there

 1   responsibilities surrounding due diligence as a transfer agent?

 2   A.   There's normally two.  One is anti-money laundering and

 3   know your client rules, which are typically AML and KYC, as

 4   they are usually shortened to, and those vary a little bit from

 5   country to country but they are relatively standard globally.

 6        And then you would also know source of wealth.  So

 7   that's usually understanding who the ultimate beneficial owner

 8   is, who really owns the assets and also where that money is

 9   coming from; so, has it come from criminal activity or it's

10   government funds or whatever that might be.

11   Q.   So what kinds of practices or checks do -- does a fund

12   administrator do in order to satisfy the due diligence inquiry?

13   A.   It varies a little bit from investor to investor.  So if

14   you were just investing as an individual, if you were a

15   high-net-worth, very wealthy individual you then would look for

16   a utility bill and a passport.  We will conduct what's called a

17   world check or a background check on you.

18        So the background check may pull up lots of Paul

19   Smiths who have been in trouble with the law who have been in

20   terrorist activities.  But we use the address to locate where

21   that individual has lived.  And then we'll use their passport

22   to identify their date of birth, their age, where they live.

23   And that combination allows it to narrow down as to where they

24   are on that background check, whether it comes back clean.

25   Q.   What is the purpose of the utility bill?

1   A.  So a utility bill is actually quite hard to come by these

2   days; whereas, it's quite easy to get a mobile phone bill, for

3   instance, compared to getting electricity or gas.  You normally

4   need to live there.  You normally need to have -- you normally

5   need to have a mortgage or some sort of tenancy agreement in

6   order for you to engage and it will be odd for somebody to pay,

7   frankly, somebody else's gas bill.

8   Q.  If I could ask you to slow down just a little bit and speak

9   into the microphone.

10  A.  Sure.

11  Q.  You also mentioned a term, you said ultimate beneficial

12  owner.  Define what that means.  What do you mean when you use

13  that term?

14  A.  What that means is it's not always clear who the ultimate

15  beneficiary or ultimate beneficial owner will be.  So a company

16  may be the investor in a fund but the company is not in itself

17  the ultimate beneficial owner.  If that company is a hundred

18  percent owned by another company and that company is owned a

19  hundred percent by an individual, the ultimate beneficial owner

20  is the individual who owns all of the shares of the last

21  company.

22  Q.  Why is that important to determine in the context of fund

23  administration?

24  A.  Because it gives an understanding of where the source of

25  wealth might be.  It gives an understanding of who actually

1    you're dealing with rather than the company, you're dealing

2    with a specific individual so you can do the background checks

3    on them.  And also if somebody has a significant stake in a

4    fund, they may be able to have undue influence on that fund.

5    So if you are accounting for investment, 80 percent, 90 percent

6    of an investment managing portfolio in an investor base then,

7    obviously, you can put undue pressure or pressure on them to

8    act in a specific way.

9    Q.  So let's stay a little while longer on the KYC AML checks.

10   In addition to the criminal record checks, the world checks,

11   the terrorism checks, are there other checks you do about

12   individuals on individuals?

13   A.  There are on occasion.  We may do, so we do a politically

14   exposed person check.

15   Q.  What is that again?

16   A.  A PEP or politically exposed person.

17   Q.  What is that?

18   A.  That's where someone will have -- there may be a government

19   minister.  They may be senator.  They may work a position at a

20   large state organization.  And what it means is, is that

21   they -- therefore, their actions may be the actions of that

22   state or unfortunately probably they may have taken money or

23   gained money illicitly from their activities and used that

24   for -- to put into a fund or elsewhere.  So there are --

25   enhanced due diligence takes place when we're aware of a PEP,

JB79SCO3                          Spendiff - Direct

1   for instance.

2   Q.  And we'll get to enhanced due diligence in a moment.

3        Who supplies the information given to the fund

4   administrator in order to conduct these checks?

5   A.  It varies.  So sometimes the investors will come direct to

6   the administrator.  The details of where to submit the

7   documents will usually be on the subscription or limited

8   partnership agreement.  Sometimes they'll come through an

9   intermediary; might be a financial adviser, private bank, a

10  family office.  Or finally it may -- it may come through the

11  investment manager because, obviously, they'll have an in-depth

12  relationship with the investor to persuade them to invest and

13  they'll have engaged, so they may collect documentation.

14  Q.  And typically what kinds of information or documentation is

15  provided to a fund administrator by a fund manager, for

16  example, on his or her investors?

17  A.  So, again, it varies a little bit.  So I think we've

18  outlined what it would be for an individual.

19       For a company it would be incorporation documents,

20  shareholder certificates, financial accounts, directorships,

21  company registrations and filings, so information that might be

22  publicly or privately available on a company.

23       For a trust it would be looking for details of the

24  trustees, details of the incorporation, a statement from the

25  trustees potentially on who the ultimate beneficial owner might

JB79SCO3                        Spendiff - Direct

1    be who is going to benefit from that trust.  So a charity,

2    maybe.  Charity filings, details.  Maybe details from the

3    website, all sorts of background information so that you can

4    understand what entity and how that entity is structured.

5    Q.  And then the fund administrator's job, is this correct, is

6    to perform the checks that you have described given the

7    information that has been supplied to you?

8    A.  Yes.

9    Q.  About who the investors are and who the EBOs are?

10   A.  Yes.  That's correct.

11   Q.  What is the -- what's the purpose of conducting these due

12   diligence checks and performing the customer investigations?

13   A.  Typically it's to try and prevent money from crimes being

14   laundered through, funding for terrorism are the two primary

15   purposes.  Legislation most countries in and around what's

16   expected in order to stop that.

17   Q.  Is due diligence conducted also on fund managers by fund

18   administrators?

19   A.  Yes.  We have the same responsibility.  Our client to a

20   degree is the investment manager.  And so obviously their

21   credibility, their -- in terms of whether they're a genuine

22   organization is obviously a key part of whether we as the

23   administrator would like to go into business with them.  And

24   then also to comply with the rules and regulations of us

25   engaging with the client.

1   Q.  Now, you mentioned a term, source of funds.  How does

2   source of funds play into the due diligence inquiry?

3   A.  So, again, the source of funds or the source of wealth are

4   slightly different.  So with the source of funds we just need

5   to understand where is the money coming from.

6   Q.  Literally physically where the money is coming from in

7   terms of a bank account?

8   A.  Correct.

9   Q.  And how is that different than source of wealth?

10  A.  So the source of funds may be a specific amount from a bank

11  account but that it doesn't explain how that money got there

12  which would be the source of wealth.  So the did the money in

13  the bank account come from an inheritance?  Did it come from a

14  bonus because you are a very successful asset manager?  Did it

15  come from selling another asset or some other source of income?

16  That's the source of wealth.  The source of funds is simply the

17  bank account.

18  Q.  So, is it fair to say that the source of funds is more

19  where that money is coming from and the source of wealth is how

20  that money was made?

21  A.  Correct.

22  Q.  Does or did when you were at Apex did Apex undertake the

23  same level of diligence for all investors in the funds that

24  Apex administered?

25  A.  No, we didn't.

JB79SCO3                          Spendiff - Direct

1    Q.   How did you determine what level of due diligence to

2    perform?

3    A.   Again, it varied a little bit.  So it depended a little bit

4    on what type of investor, what type of country the investor was

5    coming from, what type of entity was investing, and so what

6    type of legal entity was investing, and whether any of the

7    information provided created any concerns for us as an

8    administrator that would lead us to investigate further.  So

9    enhanced due diligence is really just investigating further.

10   Q.   What constitutes enhanced due diligence?  What steps do you

11   take?

12   A.   So it varies.  We may do an more in-depth search on a

13   specific company.  So we may go to different information

14   sources in the initial sources that we do for regular due

15   diligence.  We may ask the investor to provide us with

16   additional information or comfort so that may be -- say they

17   raise some money by an inheritance.  We may ask to -- we would

18   seek to ask for a copy of the will or perhaps we would get the

19   lawyer who arranged that inheritance to say yes, there was an

20   inheritance and that was the source of the wealth.  Or we might

21   get the family office to state that the money had come from

22   their portfolio activity and provide us with some sort of -- I

23   guess some information that would sort of confirm the

24   information that had been provided in the regular due

25   diligence.

1    Q.  Did certain circumstances automatically trigger enhanced

2    due diligence?

3    A.  There were certain circumstances such as if the investors

4    were based in Africa that would always be subject to enhanced

5    due diligence; if they were a PEP, a politically exposed person

6    they would always be subject to enhanced due diligence.  If

7    they held initially a significant stake in the fund, they may

8    be subject to enhanced due diligence.  And really it was -- it

9    was a risk-based approach.  So the risk is if at any point

10    employees or offices of Apex are uncomfortable, then they can

11    request as much information as they are required to get

12    comfortable that they understood where the money was coming

13    from, who was the beneficial owner.  And that was made out in

14    our contracts with both the investors and with the investment

15    manager in the fund administration agreement.

16    Q.  I'd like to turn now to talk a little bit more about Fenero

17    Funds and Mr. Scott.  When -- approximately when did Apex begin

18    administering Fenero Funds?

19    A.  Early May 2016.

20    Q.  And how was Mr. Scott introduced to Apex or how was Apex

21    introduced to Mr. Scott?

22    A.  I can't comment exactly how that happened.  I know he was

23    originally in contact with our Cayman office which also

24    serviced the British Virgin Islands, so a guy called Bouden and

25    Deborah Buscema who was the salesperson based here in New York.

1    Q.  So when did you first make contact with Mr. Scott?

2    A.  So Deborah called me in the London office and stated that

3    there was a client that they had been in discussions with for a

4    period of time.

5    Q.  Around when was this?

6    A.  This would be the end of April.

7    Q.  Of what year?

8    A.  It would be the end of April 2016; 27th, 28th.

9    Q.  And when -- did you eventually have a conversation with

10   Mr. Scott about fund administration by Apex?

11   A.  Yes.  So Deborah and myself and Mark I think had a call to

12   talk about his plan funds and his administration requirements.

13   Q.  Who was on that phonecall?

14   A.  I think it was Deborah and myself and just Mark.  I think

15   the other members of my team were tied up.

16   Q.  What was the purpose of that call?

17   A.  It was to introduce the London office.  Mark had originally

18   been going to engage with the New Jersey office of Apex Fund

19   Services but had decided that -- stated there was a preference

20   to have the fund administration done outside of the U.S.,

21   preferably in Europe.  And so Deborah introduced Mark to me and

22   Mark had explained his requirements for his funds.

23   Q.  What did you understand Mr. Scott's role to be in the

24   Fenero investment funds?

25   A.  He stated he would be the investment manager.

JB79SCO3                    Spendiff - Direct

1   Q.  And how was -- how was he going to be the investment

2   manager?  Was it just individually or through a corporate

3   structure?

4   A.  No.  It was through a corporate -- a company set up in the

5   BVI.

6   Q.  In?

7   A.  The British Virgin Islands.

8   Q.  What was the name of that company?

9   A.  I believe was MSSI Consultants BVI Limited.

10  Q.  Was MSSI Consultants in the BVI owned by another company?

11  A.  Yes.  The understanding was, according to the information

12  relied on by Mr. Scott, it was hundred percent owned by a

13  Florida entity with a similar name.

14  Q.  By a similar name.  I'm sorry?

15  A.  Also called MSSI but minus the BVI attachment.

16  Q.  And your understanding of who owned that Florida-based MSSI

17  company was who?

18  A.  There was a diagram provided after the call, a structure

19  diagram and on that Mark stated it was a hundred percent, that

20  foreign entity was hundred percent owned by himself.

21  Q.  Did Mr. Scott indicate that he would be managing these

22  funds on his own or was he going to have an accountant?

23  A.  So there was another individual that he mentioned, David

24  Pike, and who we understood would be doing a lot of the

25  administrative burden that needs to be done by the investment

1    management and that Mark's role was to be the investment

2    manager, portfolio manager.

3    Q.  What did you understand Mr. Pike's role to be in the Fenero

4    Funds?

5    A.  That he was the -- I believe he was a partner but I will

6    describe him as the junior partner.

7    Q.  Please tell us what the defendant said to you when you had

8    this initial conversation about his funds.

9    A.  Our plan was to set up four -- ultimately four funds in the

10   BVI.  Each of them had a maximum investment size of a hundred

11   million dollars.  That's the legal maximum that that type of

12   fund in BVI can have; that they would invest into European

13   financial services -- stressed European financial services and

14   financial technology firms within Europe.  And that the

15   investors would be wealthy European family offices that Mark

16   had made connections with in his 25 years as a private equity

17   and real estate lawyer.

18   Q.  So did the defendant give you a little bit of background

19   about himself during that call?

20   A.  Yes.  So he mentioned that he had obviously been a partner

21   at a U.S. law firearm called Locke Lord and bragged about a lot

22   of other large U.S. and global law firms.

23           And then subsequent to the conversation we received a

24   CV and a little background information about Mark's activities;

25   some of it taken from the Locke Lord website, some of it from

JB79SCO3                          Spendiff - Direct

1    his CV.

2    Q.   Did he explain why he was seeking fund administration

3    services outside of the United States?

4    A.   That's not totally uncommon if you have a fund which is

5    investing into European assets and you have investors who are

6    outside of the U.S., then there on occasion managers may seek

7    to have the administration done outside of the U.S. because

8    they don't want to create a tax issue by having investment or

9    administrative activity taking place in the United States.

10   Q.   And, again, the funds were based where?

11   A.   The British Virgin Islands.

12   Q.   You referred to a term family office.  What does that term

13   mean?

14   A.   Slightly different things.  It would be -- it's usually

15   the -- an entity set up to run the wealth of an individual or a

16   number of individuals within a family.  So maybe -- and it's

17   usually disconnected from their primary source of income.  So

18   if somebody owned a factory, obviously they would run the

19   factory and own the factory, but the money that would come off

20   of that asset would need to be invested, managed, kept safe.

21   And so rather than pay a third-party, a large Swiss bank or a

22   large asset management company, they will look to set up their

23   own family office at a small investment management company just

24   managing their assets.  And they will usually hold a more

25   interesting asset; might be real estate, they might hold fine

1  arts, their own properties they live in and other assets may

2  all be collected into and run by that family office.

3  Q.  And to be clear, family offices can be investors in private

4  equity funds?

5  A.  They often are, yeah.

6  Q.  All in all, how many funds, actual funds did Apex

7  administer for the defendant?

8  A.  Of the four, two eventually were set up in bank accounts

9  opened for them before or whilst Apex was the fund

10  administrator.

11  Q.  Do you remember the names?

12  A.  Fenero Equity Investments LP was the first and the primary

13  one.  And the second one was Fenero Switzerland Limited, Equity

14  Switzerland Limited.

15  Q.  Now, as a fund administrator for the Fenero Funds was Apex

16  responsible to ensure that the investments made by the fund

17  into private equity projects were consistent with the fund's

18  prospectus or mission statement?

19  A.  So each BVI fund has to have what's called a term sheet.  I

20  think in this case it was called a mission statement which

21  states the basic objectives of the fund.  And it's not a

22  requirement of the administrator, but it's best practice

23  because the administrator fundamentally looks after the

24  investor's interest in the fund, even though they're

25  appointed -- the fund pays for the services provided by the

1    fund administrator to try and act in their best interests.  So

2    if and when the investment starts not complying with that

3    mission statement or term sheet, then the administrator would

4    want to understand why have the investors been -- has the basis

5    on which the investors have invested changed sufficiently to

6    give them the ability to withdraw their capital because it

7    wasn't the basis on which their investment has changed.

8            So all of those things will be examined to decide and

9    perhaps understand why the investment manager had changed the

10   strategy, whether they had spoken to the investors and if so --

11   and the investors were aware and accepted that, then that's no

12   problem, the term sheet could be adjusted.

13   Q.  And how did the defendant describe the investment strategy

14   that Fenero Funds were going to pursue?  What were they going

15   to invest in?

16   A.  They were buying distressed, so companies in typically

17   financial difficulty in the financial services and financial

18   technology industries within Europe was the primary target.

19   Q.  Now, surrounding this phonecall with the defendant did he

20   send you any paperwork reiterating what he had told you on the

21   telephone about his intentions with the Fenero Funds?

22   A.  The following day I think.  I followed up the phonecall

23   with some additional questions.  And I think in response Mark

24   sends a large series of attachments outlining the fund's

25   activities, some more information about him personally.

1           MS. LOZANO:  Mr. Barile, could you put on the

2      witness's screen Government Exhibit 2201 and just scroll

3      through the document for Mr. Spendiff, please.

4      Q.  Take a look at that and let me know if you recognize that.

5      A.  Yes.  This is a series of attachments that were sent

6      initially sent on an e-mail by Mark Scott to myself and my

7      colleagues in our office.

8           MS. LOZANO:  Mr. Barile, if we could go to the first

9      page and we're there and if we can publish to the jury at this

10     point.

11     Q.  So Mr. Spendiff this is -- well you tell me.  What is this?

12     A.  This is the e-mail from Mark to myself and cc'ed in Deborah

13     Buscema and Muzammil Koyratty who was the compliance officer.

14     Q.  He was who?

15     A.  The compliance officer so head of compliance for Apex in

16     London.

17     Q.  There's another e-mail address that reads DR Pike?

18     A.  Yes.

19     Q.  Do you understand who that was?

20     A.  That was, I understand, David Pike's e-mail.

21          MS. LOZANO:  So let's go to the organizational chart,

22     Mr. Barile.

23          If we could blow that up.

24     Q.  Mr. Spendiff, what is this?

25     A.  This is a structure diagram showing the investment manager

1   and -- and the ownership structure and also the fund itself,

2   which you can see is yellow, called Fenero Equity Investments

3   LP and there was a series of what we would call SBV or special

4   purpose vehicles which are the green boxes at the bottom that

5   appear to be owned directly by the MS International Consultants

6   Limited.

7           So you can see because the line goes back to there the

8   assumption is that they're a hundred percent owned.

9   Q.  So let's walk through this.  This was provided to you by

10  the defendant?

11  A.  It was attached to the e-mail.

12  Q.  So the middle yellow box that is the -- that is what?

13  A.  That's the fund, the Fenero -- first Fenero fund.

14  Q.  And was that what Apex administered?

15  A.  Correct.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

JB77SCO4                        Spendiff - direct

1    BY MS. LOZANO:

2    Q.  And the line from the top of that goes to a box MSS

3    International Consultants BVI?

4    A.  Correct.

5    Q.  And your understanding was that based on this chart that

6    that was in turn owned by a Florida company MSSI and ultimately

7    at the top by Mr. Scott.

8               MR. DEVLIN-BROWN:  Objection to leading.

9               THE COURT:  Overruled.

10   A.  Based on my discussions with Mark and the supporting

11   evidence, yes, that was our assumption.

12   Q.  OK.  And when you had a discussion with him on the

13   telephone, did you explore the green boxes, the SPVs as you

14   have described them?

15   A.  No.

16   Q.  And, by the way, what does SPV stand for?

17   A.  Special purpose vehicle.

18   Q.  What is that?

19   A.  It's a company set up to do typically one objective, a

20   special purpose.

21   Q.  An investment objective.

22   A.  Typically, yeah.

23   Q.  Mr. Barile, if we could scroll down -- oh, let's stay at

24   that for one moment.  I'm sorry.  Let's stay back on the chart.

25               You mentioned that Mr. Scott represented himself as

1    the fund manager for Fenero Equity Investments.  What was your

2    understanding about the entity that would serve as the fund

3    manager?

4    A.  So, the agency or the general partner to the fund.  So a

5    limited partnership has no legal personality, it can make no

6    investment decisions on its own, it doesn't have a board of

7    directors to make a decision, so the decisions are all made by

8    what is called a general partner, and that's typically an

9    investment manager, and in this case the general partner, the

10   investment manager, was MSS International Consultants BVI.

11   Q.  You mentioned that the funds themselves are limited

12   partnerships.  Between who?

13   A.  Between the investors.  So the investors are the limited

14   partners, and often a general partner will also be a limited

15   partner, so they will have a stake in their own fund.

16   Q.  So here the general partner was MSS International

17   Consultants BVI?

18   A.  Yes.

19   Q.  Mr. Barile, could you scroll down to the mission statement.

20   And I believe that's at page 6 and 7.  Put the pages side by

21   side.

22        Mr. Spendiff, is this the mission statement you

23   received and reviewed in connection with the Fenero Funds?

24   A.  Yes.

25   Q.  Mr. Barile, if you can zoom in on paragraph 2.

1          Mr. Spendiff, tell me in that paragraph, can you read

2    to me the description of who the initial investors of Fenero

3    reported to be by the defendant?

4    A.  "So Fenero has been created at the request of a select

5    group of European-based families and companies that want to

6    take advantage of potential business synergies between them to

7    aggregate their funds for larger transactions and separate a

8    portion of their capital from their individual family

9    businesses."

10   Q.  And then if you could read the last sentence.

11         And, Mr. Barile, if we can highlight that, starting

12   with the initial investors?

13   A.  "The initial investors of Fenero have been represented

14   legally by Mr. Scott ranging from three to 12 years and have

15   closed in excess of $2.1 million in transactions under

16   Mr. Scott's business and legal guidance."

17   Q.  And your understanding was -- well, what was your

18   understanding about who authored this mission statement?

19   A.  This had been authored by Mark Scott.

20   Q.  We it take that down.  Thank you.

21         After this phone call, did the defendant send you

22   additional documentation in connection with the Fenero Funds --

23   the creation of the Fenero Funds?

24   A.  It was a large number of what we will call incorporation

25   documents which are the documents that are created when a fund

1   or company or partnership are formed.  And a more extensive

2   limited partnership agreement was sent.

3   Q.  Let's look now at Government Exhibit 2202, and as it's in

4   evidence we can pull it up on the witness screen and also

5   publish it to the jury.

6           Looking at the first page of this exhibit, Mr.

7   Spendiff, first of all when is this dated?

8   A.  Monday, May the 2nd, 2016.

9   Q.  And according to this e-mail -- first of all, who is it

10  from?

11  A.  David Pike.

12  Q.  And who is copied on it?

13  A.  It's from David to myself, and then copied on it is Mark

14  Scott and --

15  Q.  Other people.

16  A.  Other people.

17  Q.  Does this e-mail have multiple attachments?

18  A.  Yes, it does.

19  Q.  So let's go to the attachment that is the limited

20  partnership agreement which is at pages 23 to 26.

21          So, look at page 23 of this exhibit, Mr. Spendiff,

22  what is this?

23  A.  This is a memorandum of limited partnership.

24  Q.  For which fund?

25  A.  For the Fenero Equity Investments limited partnership.

1    Q.  Who are the parties?

2    A.  I believe the parties are on the subsequent page, I think.

3    Q.  Let's turn the page.  So we're now on page 24, I believe.

4    So, who is identified as the general partner?

5    A.  The general partner is MSS International Consultants BVI

6    Limited.

7    Q.  And if we can scroll to the next page -- and the following

8    page.  So, who signed on behalf of the general partner?

9    A.  Mark Scott.

10   Q.  And who is identified as the limited partner in this

11   agreement?

12   A.  B & N Consult Food.

13   Q.  Who signed on behalf of B & N?

14   A.  Irina Dilkinska.

15   Q.  When is this limited partnership agreement dated?

16   A.  The 29th of February, 2016.

17   Q.  What is the significance of this limited partnership

18   agreement?  Is it a subscription agreement?

19   A.  No, it's not.

20   Q.  So, how would you describe the significance of this

21   agreement?

22   A.  Earlier on I referenced getting commitments for a fund, so

23   this would typically be a commitment to invest in the fund as

24   and when the fund becomes available.

25   Q.  So there is no specific amount of money articulated in this

1  agreement.

2  A.  Not that I can see.

3  Q.  At that point, or at the point that the defendant sent you

4  this agreement, what did he tell you, if anything, about B & N

5  or Ms. Dilkinska?

6  A.  He didn't tell us anything.

7  Q.  Let's go back to the first page of the exhibit.  So if we

8  can zoom in on just the text of the e-mail.  Mr. Spendiff, can

9  you read what Mr. Pike writes in this e-mail, please?

10  A.  "Good day everyone.  Please find attached copies of the

11  ready to send due diligence for MSCI BVI, items 1-10 of 13, the

12  remaining three will follow immediately.  A am waiting for

13  mailing instructions from Debora to send originals to London.

14          "Please note, we followed your lead on the declaration

15  of trust and completed it for MSS International Consultants BVI

16  Limited.  Which had been filled in in advance however, feeling

17  this document pertained to the trust directly I have also

18  included a version completed for Fenero Equity Investments L.P.

19          "We look forward to bringing this process to a close

20  as soon as possible and completing any outstanding tasks when

21  we are there on Thursday."

22  Q.  The items 1 to 10 referenced in this e-mail, were those, to

23  your knowledge, due diligence requests that Apex made of the

24  defendant in connection with opening the funds?

25  A.  Yeah, I'm not sure whether they already had those or this

1    is the initial request for information.  But we asked of the

2    fund and the investment management company.

3    Q.  And based on the attachment, the file names there, can you

4    describe to me what documentation was sent with this e-mail?

5    A.  It was a copy of our client acceptance checklist which

6    outlined the information that we would require from them, a

7    Fenero declaration of trust, the Fenero Funds application form,

8    limited partnership agreement, the Fenero Funds approval, the

9    Fenero MLP.  I am assuming it's limited partnership, but it's a

10   bit hard to tell without looking at the document.  And then a

11   series of incorporation documents relating to the creation of

12   MSIC LLC and MSIC BVI.  So, it's the articles of association

13   drafted by Appleby,  the MSIC BVI articles of association, the

14   certificate of incorporation and statement of entity self

15   certification.

16   Q.  And these are all the documents you were referring to when

17   you testified earlier that as part of the due diligence you

18   request documentation from the fund manager and that's the

19   information that you then vet.

20   A.  Correct.

21   Q.  So let's go back to page 23, the limited partnership

22   agreement, and I want you to remind us again what role does the

23   general partner play in a limited partnership.

24   A.  So, the general partner is the investment manager and

25   ultimate controller of a limited partnership.

1    Q.  And what does that mean the ultimate controller?

2    Controller of what?

3    A.  So they have executive power to make all decisions, even

4    around the limited partnership.

5    Q.  So all decisions in terms of where money is going to be

6    invested or sent?

7    A.  Correct.

8    Q.  And limited partner, the role of the limited partner is

9    simply the investor?

10             MR. DEVLIN-BROWN:  Objection.

11             THE COURT:  Overruled.

12   A.  Typically it's governed by whatever the limited role is,

13   whatever is in the limited partnership agreement, and normally

14   with this type of fund that will stipulate that they don't have

15   decision, for instance, and they are passive investors.

16   Q.  So after receiving -- well, let me ask you this:  When you

17   were at Apex you were not the one directly receiving all of the

18   documentation in connection with the Fenero Funds.

19             MR. DEVLIN-BROWN:  Objection to leading.

20             THE COURT:  Overruled.

21   A.  No, typically they would be, even if they were sent to me,

22   they would be forwarded on to compliance and the team or the

23   private equity team to process.

24   Q.  So who at Apex was the compliance person assigned to

25   process the Fenero Funds documentation and paperwork?

1    A.   A gentleman, Muzammil Koyratty.

2    Q.   What was Muzammil Koyratty's role at Apex?

3    A.   He was the compliance and onboarding manager.

4    Q.   To whom did he report?

5    A.   Ultimately to myself and the board of directors.

6    Q.   So, after -- you can take that down.

7              After the defendant and Mr. Pike send you numerous

8    documents related to the Fenero Funds, do Apex and Mr. Scott

9    enter into a fund administration agreement?

10   A.   Yes, we do.

11   Q.   And approximately when did that happen?

12   A.   Second or third week of May 2016.

13   Q.   Mr. Barile, please pull up and show the witness as well as

14   publish to the jury GX 2204.

15             Now, what is this?  This is page 1 of this exhibit.

16   A.   This is an Apex fund administration agreement between

17   Fenero Equity Investments as the fund, MSS International

18   Consultants BVI Limited as the general partner, and therefore

19   the MC paperwork went into an agreement on behalf of the fund.

20   And Apex Fund Services Limited, which is the Bermuda held of

21   Apex.

22   Q.   And we will go through this exhibit, but broadly speaking,

23   what did this agreement set forth in terms of the services that

24   Apex was going to provide the defendant?

25   A.   It outlined what services would be provided to the fund by

JB77SCO4                        Spendiff – direct

1    the administrator –– in this case Apex –– and what the

2    requirements were Apex had of the general partner as investment

3    manager to Apex in order to allow Apex to fulfill its

4    functions.

5    Q.  I'd like to now focus on the specific sections of this

6    agreement.

7              Mr. Barile, if we can scroll down to Section 4.5.

8              Mr. Spendiff, are you familiar with this section of

9    Apex's administration agreements?

10   A.  Yes, I am.

11   Q.  And what is this covenant?

12   A.  This states that the general partner has to notify ––

13   properly notify the administrator of any concerns in connection

14   with the partners, investors, introduce the administrator by

15   the fund or its delegates in the context of relevant money

16   laundering legislation/regulations in the event that they

17   become suspicious or any suspicious circumstances relating to

18   any such partners comes to its attention.

19   Q.  What does that mean?  In plain English what does that mean?

20   A.  It means if they have any concerns or doubts, or there are

21   any changes in the status of the investors in the fund that

22   they become aware of, they have a legal obligation to notify us

23   as the administrator.

24   Q.  And the reference to partners in 4.5 is a reference to who?

25   A.  To the general partner, which is MSSI.

1    Q.  The reference to partners --

2    A.  Oh, I'm sorry.  So, the partners would be the limited

3    partners, which would be the investors in the funds.

4    Q.  All right.  Let's scroll down now to Section 7.3 -- I'm

5    sorry -- 7.2.3.  Are you familiar with this section, Spendiff?

6    A.  Yes, I am.

7    Q.  And what does this section convey?

8    A.  This states -- this is one of the terms in which the fund

9    or the administrator can terminate the relationship with 30

10   days notice.  And this is one of those terms.

11   Q.  What does this term communicate about circumstances under

12   which termination is appropriate?

13   A.  One is because subject to a lawsuit, regulatory action or

14   government investigation that the non-defaulting party

15   reasonably determines could cause reputational harm.

16   Q.  But other than that -- well, let's back up.  Can we look at

17   7.2.1.  Is that also a term or circumstance under which

18   termination is appropriate?

19   A.  Yes.

20   Q.  And then let's look at 7.2.2.

21   A.  So if one of the parties then commit any material breach,

22   the provisions of this agreement, which, if capable of remedy,

23   is not fixed within 30 days, then the contract can be ended.

24   Q.  And we don't need to blow them up.  7.2.4 and 2.5 are other

25   limited circumstances under which termination is appropriate;

1    is that fair to say?

2    A.  Yes, correct.

3    Q.  So your understanding of this administration agreement is

4    that there were -- or were there certain specific and limited

5    circumstances under which Apex could terminate the

6    relationship?

7    A.  Yes.  It's to protect the investors of the fund by making

8    it difficult for the administrator or general partners to leave

9    the relationship.

10   Q.  Let's now scroll down to Section 8.2, and if we could blow

11   that up.

12        What does Section 8.2 in the administration agreement

13   say?

14   A.  "Unless required by applicable law or with the written

15   authority of the other party neither of the parties hereto

16   shall during the term of this agreement or thereafter disclose

17   to any person, firm, corporation or governmental agency

18   whatsoever any confidential information of the other party or

19   information which is proprietary in nature, of which it may in

20   the course of its duties and operations hereunder or otherwise

21   become possessed and each party shall use all reasonable

22   endeavors to prevent any such disclosure as aforesaid."

23   Q.  So this provision in the administration agreement, what did

24   that mean in terms of Apex's ability to share any confidential

25   information that the defendant may have provided to you in

JB77SCO4                          Spendiff - direct

1    connection with the Fenero Funds?

2    A.  We would not be able to share that information.

3    Q.  Lastly let's look at Section 6 of the administration

4    agreement.  That one reads -- what does that read as to the

5    number?  You don't have to read the whole paragraph.

6    A.  This just references that the fees for our services will be

7    paid out of the Fund's bank account.

8    Q.  And what were the fees?  If we can go to the third schedule

9    at the end of this exhibit.

10        What were Apex's fees that they were to earn in

11   connection with administering the Fenero Funds?

12   A.  So there was a one-off set-up fee which was $3,500 U.S,.

13   and then an annual fee which would be $50,000 per year.

14   Q.  We can take that down.

15        You mentioned previously that one of the two roles of

16   the fund administrator is to give a valuation of the fund.

17   A.  Correct.

18   Q.  And is there a term for the process by which you do that?

19   A.  Normally it's getting the net asset value, the NAV.

20   Q.  And under the administration agreement was there a

21   provision that Apex was going to deliver a NAV to the Fenero

22   Funds?

23   A.  Yes, I think it was quarterly basis, so every three months.

24   Q.  Was Apex ever able to conduct an inquiry and deliver a NAV

25   for the Fenero Funds?

1    A.  No, the contract was terminated before the first NAV was

2    delivered.

3    Q.  And to be clear, the contract was terminated by whom?

4    A.  Muzammil.

5    Q.  I'd like to turn now to talk a little bit about the

6    accounts that -- oh, I'm going to back up for a moment.

7            Net asset value, NAV, describe to me what that is.

8    A.  So, that's all of the assets of the fund, and so whatever

9    the fund owns minus all of its liabilities, so its debts, maybe

10   management fees or regulatory charges, the difference between

11   those two is the net asset value for all of the fund.

12   Q.  And to whom is the NAV delivered?  Who gets that

13   information?

14   A.  It would usually be used to create the reports and

15   accounts, and it's usually sent to the investors.

16   Q.  So now let's turn and talk a little bit about bank accounts

17   that were set up in connection with the Fenero Funds.  Did

18   Apex's administration of the Fenero Funds include setting up

19   and opening a bank account for the funds?

20   A.  Usually the set-up fee and the bank accounts are opened, so

21   it covers the opening of the bank accounts.  And the bank

22   accounts are typically opened by the fund administrator to

23   receive the monies from the investors.  And then once the AML

24   and KYC is complete, to move that money into an operating

25   account, which is controlled by the general partner, or to move

1    that money directly to investments made by the fund.

2    Q.   And did Apex do that for any of the Fenero Funds?

3    A.   We opened I think two accounts, and I think we did the

4    paperwork for a third account, but I'm not aware if that bank

5    account ever opened.

6    Q.   The two accounts that you did open, what bank did you open

7    them?

8    A.   A bank called DMS Bank in the Cayman Islands.

9    Q.   Why did you select DMS Bank to open the fund accounts?

10   A.   The bank is actually selected by the general partner, but

11   it's based on typically the ability of the administrator to

12   open a bank account with that particular bank, and also the

13   willingness of that bank to take on a specific type of fund.

14   Q.   And in whose name were these accounts that Apex opened

15   opened?

16   A.   In the name of the fund, so Fenero Equities Investment LP

17   and Fenero Limited.

18   Q.   In connection with the opening of this account did Apex

19   communicate with DMS about due diligence on the funds?

20   A.   Yeah.  So, obviously we provided a large amount of due

21   diligence to them on the funds and the investment manager.  We

22   had also provided -- Apex provided what is called a letter of

23   comfort to DMS Bank.

24   Q.   If we can pull up Government Exhibit 2203.

25              Mr. Spendiff, what is this?

1   A.   This is a letter from the compliance officer at Apex

2   addressed to DMS Bank and Trust explaining the AML and KYC

3   processes that Apex has been engaged to do on behalf of the

4   fund.  These would be a comfort letter.

5   Q.   There is the comfort letter you're referring to.

6   A.   Correct.

7   Q.   If we can highlight the fourth paragraph starting with "we

8   can confirm."

9   A.   "We can confirm that we perform the relevant AML and

10   customer due diligence checks on the investors that subscribe

11   into Fenero Equity Investments L.P."

12   Q.   And so there was in connection with which account?

13   A.   The Fenero Equity Investments account.

14   Q.   When is this letter dated?

15   A.   The 9th of May.

16   Q.   What is the purpose of a comfort letter?

17   A.   In financial services rather than each entity having to do

18   their own due diligence on each and every investor, different

19   institutions will provide a comfort letter which will outline

20   what they've done with the investors, and they will provide

21   that to another financial services firm, and that financial

22   services firm then decides whether they accept the comfort

23   letter or whether they will choose in addition to do their own

24   AML KYC client due diligence themselves.

25   Q.   So we're actually going to go through the entire letter.

1  Let's start with the first two paragraphs.  We can just leave

2  it up there for the jury to read.  And there is a reference

3  here, Mr. Spendiff, that the company is a registered company

4  authorized by Bermuda monetary authorities.  That is Apex.

5  That's a reference to Apex, right?

6  A.  Yes.

7  Q.  And then the second paragraph simply confirms that you have

8  policies and procedures and due diligence?

9  A.  Right.

10  Q.  So then let's go to the next couple of paragraphs.  OK.

11  This one I would like you to read.

12  A.  "Our AML policies, procedures and documentary requirements,

13  at a minimum, cover identification and verification of the

14  identity of the relevant investors, source of wealth, sanctions

15  screening and screening against international lists of

16  terrorists, AML training our staff, reporting of suspicious

17  activity to the relevant authorities, and recordkeeping for a

18  minimum of five years from the cessation of the relationship

19  with an investor."

20  Q.  The reference to source of wealth there, is that the source

21  of wealth inquiry that you were describing previously in your

22  testimony?

23  A.  Correct.

24  Q.  And what is sanctions screening?

25  A.  So, when we I said we do background checks, there is a list

1    of countries and individuals and companies which will be

2    subject to sanctions within a certain jurisdiction, and when we

3    put the legal entities or the names in it will flag those as a

4    possible hit, which would then lead to further investigation.

5    Q.  OK.  And we read that paragraph, and so let's move on to

6    the next two paragraphs.  And, Mr. Spendiff, what are these

7    paragraphs communicating?

8    A.  So what it states is that this is the inquiry to DMS Bank

9    that we would make available documents that we have to DMS Bank

10   in order to provide those to the relevant authorities.

11   Q.  So if somebody in authority comes from DMS Bank asking

12   about the Fenero Funds --

13   A.  So when a regulator comes -- when the regulator comes to

14   DMS Bank and asks for details of a specific investor, they

15   obviously would only be able to furnish them with a copy --

16   they don't have any of those records, so we -- Apex would agree

17   to provide those on request if there was a legal sort of

18   inquiry to DMS Bank.

19   Q.  Thank you.

20          Mr. Barile, if you can pull up the last paragraph.

21          Mr. Spendiff, can you read that.

22   A.  "Please note that the information contained in this letter

23   is highly confidential and may only be utilized by yourselves

24   in relation to satisfying your firm's anti-money laundering

25   regulations, and may not be used for any other purpose."

JB77SCO4                         Spendiff - direct

1    Q.  And so is it fair to say that that paragraph indicates that

2    if you have provided information about specific investors in

3    the Fenero Funds to DMS Bank, DMS Bank could not disclose that

4    information except for satisfying its own AML regulation?

5              MR. DEVLIN-BROWN:  Objection to leading.

6              THE COURT:  Overruled.

7    A.  Yes, that's true.

8    Q.  Who are the signatories -- or who was the signatory on the

9    DMS accounts for the Fenero Funds?

10   A.  So, the signing on the application form has to be done by

11   the general partner, so it was Mark Scott and David Pike on

12   behalf of the general partner investment manager.

13   Q.  And as the signatory on these accounts, what authority did

14   the defendant have over the money in the accounts?

15   A.  They could look at the accounts, but they couldn't move the

16   money from the account.

17   Q.  Why not?

18   A.  Because the money in the account -- the movement of money

19   from the account was controlled by Apex and the list of

20   signatures provided to the bank as to who they could let take

21   that money out.

22   Q.  So the authority to approve movement was held by Apex as

23   fund administrator?

24   A.  Yes, Apex could instruct the movement of money, but on that

25   instruction it would then act to move the money.

1    Q.  So if Apex didn't have the authority to instruct the

2    movement of money, who had that authority?

3    A.  The general partner.

4    Q.  And the defendant?

5    A.  Which would be MSSI.

6    Q.  All told, during the period of time that Apex administered

7    Fenero Funds, approximately how much money was received by the

8    Fenero Funds in this case?

9    A.  I believe it was just short of 150 million euros.

10   Q.  Over what period of time?

11   A.  Maybe eight, nine weeks.

12   Q.  Was any of that 150 million euro paid out pursuant to

13   investment agreements?

14   A.  Yes, some money was moved for investments.

15   Q.  And then please slow down just a little bit and speak into

16   the microphone.  So how much of the 150 euros was disbursed or

17   transferred out in connection with purported investments?

18   A.  Roughly 40 million euros was moved from the account.

19   Q.  So let's talk a little bit about the payments.  How many

20   investments or investment projects did Fenero Funds undertake

21   under Apex's management?

22   A.  I would say two.

23   Q.  Two?  What were they?

24   A.  One was an initial investment and then a subsequent capital

25   injection into a UK payments business.  And the second was a

1   loan made to a German lawyer -- or an entity controlled by a

2   German lawyer -- which was roughly $30 million or 26, 27

3   million euros.

4   Q.  In connection with what?  Was there a clarity about what

5   the loan was financing?

6   A.  As I understand, the loan was to be subsequently lent into

7   another entity which had an oil and gas interest in Madagascar.

8   Q.  In Madagascar?

9   A.  In Madagascar.

10  Q.  And we will come back to these in detail.  Was there

11  another category aside from investment payments?  Was there

12  another category of payments made out of Fenero Funds?

13  A.  So, there was some funds that were paid pursuant to the

14  general partner investment management agreement, so that was

15  monies that were paid to MSSI as the investment manager of the

16  fund.

17  Q.  So would those be the managers fees?

18  A.  Yes.  Yes, there was a subscription fee of one percent and

19  then some other fees associated with acting as the investment

20  manager to the fund.  And there was a loan made -- or a move of

21  money made for a loan to an entity controlled by Mark Scott

22  called Fenero Equity Island.

23  Q.  And who was loaning the money?

24  A.  The loan was from one of the investors of the fund, an

25  entity called B & N Consult.

1    Q.  Before we talk about payments out of the funds, I'd like to

2    ask you some questions about where and when the funds

3    originated.  When did Apex receive the first completed

4    subscription agreement committing a specific amount of money to

5    the Fenero Funds?

6    A.  Early May.

7    Q.  Of 2016?

8    A.  Sorry.  2016.

9    Q.  And who was the subscriber on that agreement?

10   A.  The subscriber was a company, a Bulgarian company called B

11   & N Consult EOOD.

12   Q.  And is your understanding that B & N is B ampersand N?

13   A.  Correct.

14   Q.  Who was the representative of B & N?

15   A.  A lady named Irina Dilkinska.

16   Q.  And where was she from?

17   A.  From Bulgaria.

18   Q.  Your understanding, was this the same person who was the

19   limited partner?

20   A.  Yes, correct.

21   Q.  And before we get into the details of the subscription

22   agreement, remind us again what exactly a subscription

23   agreement is.  How does it differ from a limited partnership

24   agreement?

25   A.  It's often the same thing, so in this case the subscription

1   is the same thing as the full LPA, limited partnership

2   agreement, so it outlines the basis that the investor will

3   enter into the partnership.  So it will state the terms, it may

4   state the length of period that the investment will be held

5   for, it may be certain terminology that's required to be in

6   there in terms of disclosures about the risk the investor is

7   taking.  It may include or require them to add information

8   about themselves which helps identification with AML KYC.  It

9   may include a list of the requisite due diligence that we're

10  required to provide alongside the limited partnership

11  agreement.  It will often include the bank details of the bank

12  account of the fund where we need to move the money.  So, all

13  of those things would be typical for a limited partnership or

14  subscription agreement.

15  Q.  And does it specifically articulate the amount of money

16  that is being committed to the investment?

17  A.  Yes.

18  Q.  Or to the fund?

19  A.  Yes.

20  Q.  So is it fair to say that the subscription agreements are

21  basically investment agreements between the investor limited

22  partner and the general manager?

23  A.  Sorry.  Could you repeat that?

24  Q.  Yes.  So, is it fair to say that a subscription agreement

25  is basically an agreement to invest between the investor

1    limited partner and the fund manager?

2    A.  No, I wouldn't say that.  It's the basis on which they go

3    into -- it's the basis on which they can invest into the fund,

4    so it stipulates the fund.  The agreement between the fund, all

5    the limited partners and the general partner is usually

6    included in the general partner agreement or the investment

7    management agreement between the general partner and the fund.

8    So, it's the basis on which they invest; it's not typically a

9    legal agreement between the limited partner and the general

10   partner.

11   Q.  OK.  But it is a commitment to invest by an investor into a

12   fund?

13   A.  Into a fund which is managed by the general partner,

14   correct.

15   Q.  Understood.  So, the subscription agreement from May of

16   2016 with investor B & N and Mr. Pinsker committed how much

17   money to the fund?

18   A.  I think it was it was 5 million euro was the initial

19   subscription.

20   Q.  Mr. Barile, can we put on the screen and for the jury

21   Government Exhibit 2207.

22            So what is this?  Is a page of it --

23   A.  Yes, it is.

24   Q.  And let's go to the second page.  Let's go to the last page

25   actually.  It is dated what?

1    A.  May 17, 2016.

2    Q.  And it is signed by?

3    A.  Irina Andreeva Dilkinska.

4    Q.  And if you could scroll up.

5          And here -- what does it describe next to where it

6    says role of with respect to B & N Consult?

7    A.  It states she is the sole manager.

8    Q.  And how does it describe B & N Consult?

9    A.  That it's a Bulgarian single-member limited liability

10   company.

11   Q.  Let's go -- here.

12         Can you read to me what it says with respect to the

13   capital commitment?  First of all, what is capital commitment?

14   A.  It's the amount that the investors ultimately commit to the

15   fund.

16   Q.  And what is the capital commitment here?

17   A.  25 million euro.

18   Q.  What is in parentheses?

19   A.  A minimum of 5 million euros.

20   Q.  What does that mean?

21   A.  That she would have to invest a minimum of 5 million euros,

22   but she has the capacity to invest up to 25.

23   Q.  Who is this agreement signed by on behalf of the general

24   partner?

25   A.  That's Mark Scott.

1    Q.  And the general partner is listed as?

2    A.  CEO/director?

3    Q.  Right.  You?

4    A.  I'm sorry.  Company MSS International Consultants BVI.

5    Q.  Can we go back to the front page of this exhibit.  Now,

6    highlight the Fenero Equity Investments line, first line of the

7    document.

8           Now, this subscription agreement was for which fund,

9    Mr. Spendiff?

10   A.  As what it says there?  Fenero Equity.

11   Q.  No, what it actually was.

12   A.  It was supposed for Fenero Equity Investments LP.

13   Q.  So was this a typo?

14   A.  Yes, I think so.

15   Q.  And was it later discovered and amended?

16   A.  Yes, it was.

17   Q.  And when was that?

18   A.  Perhaps four or five weeks later perhaps.

19   Q.  Did any of the other terms of the agreement change in terms

20   of the amount committed?

21   A.  I don't think so.

22   Q.  Let's look at if we could pull up Government Exhibit 2216,

23   and if we can publish -- so this is what, Mr. Spendiff?

24   A.  This is a notification to the compliance officer at Apex.

25   Q.  And could you read the first?

1  A.  "Please find attached the letter from Ms. Dilkinska

2  acknowledging the inadvertent mislabeling of the name of Fenero

3  Equity Investments LP and confirming the original subscription

4  of 25 million euro."

5  Q.  And this is dated when?

6  A.  June 11.

7  Q.  And this was sent from whom?

8  A.  From Mark Scott.

9  Q.  To who?

10  A.  To Muzammil Koyratty.

11  Q.  If we can go to the next page and highlight the title

12  there, Fenero Equity Investments LP.  Is that the correct name

13  of the fund?

14  A.  Yes, correct.

15  Q.  And if we can scroll down to page 36.  Oh, we, actually

16  let's start at page 4 for a moment.  There is a paragraph at

17  number 1.6.  Can we zoom in on that one.

18          And can you explain to the purpose of this paragraph?

19  A.  This is a swift or wiring instructions that an investor

20  would need to give to their bank to ensure the monies were

21  placed into the bank account of the investment fund.

22  Q.  And do you see that there is a line that says intermediary

23  bank?

24  A.  Yes.

25  Q.  What does that mean?

1   A.   Typically small banks will use a larger clearing or

2   intermediary bank to process their cash payments or to clear

3   that payment.  In this case the details have been provided by

4   DMS Bank say that their intermediary bank is the Bank of New

5   York Mellon.

6   Q.   If we go down to page 36 of this exhibit.  What is this,

7   Mr. Spendiff?

8   A.   I think this is the letter that Mark refers to in his

9   e-mail from Irina Dilkinska stating the typo on the original

10  agreement and recommitting the subscription to the Fenero Funds

11  equities investments.

12  Q.   You can take that down.  If we can go back to I believe it

13  was page 4.  In paragraph 1.6 again, Mr. Spendiff, do you see

14  it says free text?

15  A.   Yes, I do.

16  Q.   What does that mean?

17  A.   That's normally a description of the payment, so we move

18  money so it's correctly allocated by the recipient.  It's a

19  description of the purpose of the money.

20  Q.   Who puts that in?

21  A.   Whoever enters the money into the bank or instructs their

22  bank to move the money.

23  Q.   So the person sending the money, not the bank?

24  A.   Yeah, correct, whatever you tell them to put in that

25  section the bank will put in that section.  It's a free text

1    you can write what you wish.

2    Q.  And it's a description of what?  What is it supposed to

3    show?

4    A.  Well, it's so that the fund administrator or investment

5    manager can see what's going into the bank account and then

6    allocate it correctly.

7    Q.  And here in this subscription agreement what was the

8    instruction with respect to the free text or the purpose?

9    A.  The request was "subscription into Fenero Equity

10   Investments LP".

11   Q.  We can take that down.

12           So if we could go back actually to Government Exhibit

13   2207 and to page 2.  1.6 here, is this the same provision as

14   the other subscription agreement we saw with respect to

15   pretext?

16   A.  It would appear so, yeah.

17   Q.  And intermediary bank?

18   A.  Yes, it would appear so.

19   Q.  Let's go down to page 11, and I want to direct your

20   attention to Section 9.1.  What is this section?

21   A.  It's just the details of the name of the subscriber.

22   Q.  And who is the subscriber here?

23   A.  The subscriber is B & N Consult EOOD.

24   Q.  Located where?

25   A.  In Bulgaria.

JB77SCO4                        Spendiff - direct

Q.   And does the contact Ms. Dilkinska provide the e-mail

address?

A.   Sure, it's Irina.dilkinska@RavenR.com.

Q.   Did you know what Raven are was.

A.   No.

Q.   Is there any indication in this subscription agreement

that -- including these registration details -- that

Ms. Dilkinska was connected in any way to OneCoin?

A.   No.

Q.   Is there any indication in the subscription agreement that

B & N was in any way connected to OneCoin?

A.   No.

Q.   I'd like to show you now page 17 of the subscription

agreement and look at schedule 1.  So, take a look at that and

tell me what letter B is asking for?

A.   So, B, the investor entity type, so the type of investor.

And the related requirements that will be of those based on the

on the type of investor.

Q.   And when you say the required information that is going to

be requested, are you referencing -- are those the due

diligence documents that need to be provided?

A.   Correct.

Q.   So let's look in this agreement what type of investor is

identified.

A.   It's a private company or partnership.

1    Q.  So if we can highlighted or maximize "for a company" and
2    the bullet points.  What are those?
3    A.  So, the certificate of incorporation, which needs to be
4    certified or notarized.
5    Q.  Well, is that a list of documents?
6    A.  A list of all the documents that Apex would expect to
7    receive along with the completed subscription in order to
8    process the investor.
9    Q.  And because B & N was an entity, these requirements would
10   apply?
11   A.  Correct.
12   Q.  Lastly, let's take a look at page 20, appendix 1, of this
13   document.  If we can zoom in on the box at the top that says
14   beneficial owner and directors.  OK.  Here what does this
15   agreement indicate with respect to who the beneficial owner of
16   B & N is?
17   A.  It states that Irina Dilkinska -- Irina Andreeva Dilkinska
18   is the beneficial owner, so she owns the whole company.
19   Q.  Does this form identify Mr. Dilkinska's source of wealth?
20   A.  It states on here legal profession and private business
21   owner.
22   Q.  And how about in terms of directors, who serves as the
23   director?
24   A.  The same, Irina Andreeva Dilkinska.
25   Q.  And just one more question about there and then we will

1   done with this exhibit.  If we can zoom in on the box below

2   that says general nature of the company and partnership for B &

3   N.  How is B & N described in terms of its general nature of

4   operations?

5   A.  It says sales and marketing consulting.

6           THE COURT:  Ms. Lozano it is now 2:30, so we have

7   reached the end of the day.  Ladies and gentlemen, we will

8   reconvene tomorrow morning and we will start promptly at 9:30,

9   so please be here on time.  In the meantime have a wonderful

10  evening.  Be safe getting home and do not discuss the case.

11          (Continued on next page)

1              (Jury not present)

2              THE COURT:  Mr. Spendiff, you may step down.

3              Any business for me?

4              MR. DEVLIN-BROWN:  I was just hoping to get some sense

5       from Ms. Lozano as to how much longer the direct will be.

6       Again, I have to reiterate the concern that Mr. Spendiff can't

7       be here after Friday.  The cross-examination will be curtailed.

8       I think his direct as been at least an hour and a half so far.

9              THE COURT:  More like two.

10             MS. LOZANO:  I believe I have approximately an hour

11      and a half left.

12             MR. DEVLIN-BROWN:  If that's correct --

13             THE COURT:  Does that include the tape?

14             MS. LOZANO:  No, it does not.  But that is also the

15      tape once it's put into evidence can also be played outside of

16      his presence.  That's not our preference, but that's what is in

17      evidence.

18             THE COURT:  Why does he have to leave tomorrow?

19             MS. LOZANO:  He has a flight in the evening.

20             MR. DEVLIN-BROWN:  Your Honor, I mean I raised this

21      before for a reason.  I can understand why they would like to

22      have the money laundering expert first, but it shouldn't be

23      done at the expense of curtailing cross.  We may want to play

24      parts of the tape in front of him to ask him questions or

25      impeach him as to what was said.  So I do have a concern.  I

1    think, you know, if it's an hour and a half including whatever

2    portions they play, that gives the defense three hours, the

3    same time as the direct.  If it's anything less than that, I

4    think it would be a problem and we may need to make

5    arrangements.

6              THE COURT:  Why don't you edit your direct, Ms.

7    Lozano.

8              MS. LOZANO:  I will do that.

9              THE COURT:  I'm not going to bring him back.  I don't

10   want to unless it's absolutely necessary, so one way to avoid

11   that is for you to edit the remainder of your direct.  And I

12   think we've gotten a sense from him as to what representations

13   were made.  So anyway, anything else?

14             On the objections to leading, they were well placed

15   objections, but it was noncontroversial stuff.

16             MR. DEVLIN-BROWN:  I understand.  I probably should

17   stop at some point.

18             MS. LOZANO:  And also in an effort to move things

19   along.

20             MR. DEVLIN-BROWN:  I can understand why the Court

21   was -- periodically I made them when I thought it had gone too

22   far.

23             MR. DIMASE:  Your Honor, before the jurors leave, in

24   an effort to address there potential issue, would it be

25   appropriate or possible to request that they be able to stay

1    slightly longer tomorrow to finish the testimony of the

2    witness.

3              THE COURT:  If I know jurors, that room is empty as we

4    speak.

5              MR. DIMASE:  Say again.

6              THE COURT:  If I know jurors, that room is empty.  So,

7    you know, I did tell them this is the commitment I made to

8    you,ly keep you for there amount of time and be here on time

9    and I will send you home as I am sending you home.  Like I

10   said, this is something that can be addressed tomorrow by you

11   in the way of questioning Mr. Spendiff.

12             In terms of the tape, I have reviewed it.  I haven't

13   had time to study it all that carefully, but it seems to me

14   that the material that is included, what the government has to

15   play, substantially incorporates the stuff that is not

16   included.  There is a lot of going back and forth, a lot of

17   obviously Mr. Scott being frustrated about the demands that are

18   being played, but that is all captured in the materials that

19   the government is looking to include, so I don't see any basis

20   for adding the additional materials.

21             MR. DEVLIN-BROWN:  If you don't mind, your Honor, we

22   will look at it a little further, discuss it with the

23   government and perhaps there are things they would like to

24   remove.

25             THE COURT:  I am happy to receive whatever agreement

563

1   you guys reach.  OK, have a good night, folks.

2            (Adjourned to November 8, 2019 at 9 a.m.)

1                    INDEX OF EXAMINATION

2    Examination of:                          Page

3    KONSTANTIN IGNATOV

4    Cross By Mr. Devlin-Brown  . . . . . . . . . 388

5    Redirect By Mr. Folly  . . . . . . . . . . 436

6    Recross By Mr. Devlin-Brown  . . . . . . . 444

7     DONALD SEMESKY

8    Direct By Mr. Dimase . . . . . . . . . . . 449

9    Cross By Mr. Devlin-Brown  . . . . . . . . 481

10    PAUL SPENDIFF

11   Direct By Ms. Lozano . . . . . . . . . . . 493

12

13

14

15

16

17

18

19

20

21

22

23

24

25

565

GOVERNMENT EXHIBITS

Exhibit No.                                              Received

 1270    . . . . . . . . . . . . . . . . . 438

 2200-A, 2203, 2204, 2207, 2225, 2229, . . . . 501

        2232, 2245, 2255, 2289, 2290,

        2291, 2292, 2298, 2299, 2300,

        2301, 2304 through 2310

 2200-B, GX2201, 2202, 2205, 2206, 2208  . . . 503

        through 2224, 2226 through

        2228, 2230, 2231, 2233,

        through 2244, 2246 through

        2254, 2256 through 2288 and

        2311

DEFENDANT EXHIBITS

Exhibit No.                                              Received

 827    . . . . . . . . . . . . . . . . . 427