JB89SCO1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                      17 CR 630 (ER)

MARK S. SCOTT,

          Defendant.

------------------------------x

                              New York, N.Y.
                              November 8, 2019
                              9:00 a.m.

Before:

                  HON. EDGARDO RAMOS,

                              District Judge

                    APPEARANCES

GEOFFREY S. BERMAN,
     United States Attorney for the
     Southern District of New York
CHRISTOPHER DiMASE
NICHOLAS FOLLY
JULIETA V. LOZANO
     Assistant United States Attorneys

COVINGTON & BURLING LLP
     Attorneys for Defendant
BY:  ARLO DEVLIN-BROWN
     KATRI STANLEY
     -AND-
DAVID M. GARVIN

JB89SCO1

1              (Jury not present)

2              THE COURT:  Good morning everyone.  Any business for

3    me to take care of?

4              MR. DiMASE:  Judge, the government wanted to update

5    the Court regarding the recording, the call recording.

6              THE COURT:  OK.

7              MR. DiMASE:  We attempted to come to some compromise

8    last night regarding the timing of questioning of this witness

9    and the call coming into evidence and the way that both sides

10   can use it appropriately and the witness could be guaranteed to

11   get out of here by the end of the day.  We weren't able to

12   reach an agreement on that.  But, nonetheless, the government

13   has decided to admit the entire call and to let the defense do

14   with it what it wants.  We're planning to play portions of it

15   during the testimony today.  Certainly not all of it.  We may

16   ask the witness if he needs to leave today and -- so and then

17   say we're only going to play short portions of this today, we

18   may play more later, and we may play more later in the trial,

19   but we're planning to put the entire call in which I think

20   moots the issue that we were discussing yesterday.

21             THE COURT:  So you're going to put the entire tape in

22   today?

23             MR. DiMASE:  We're going to put it into evidence.

24   We're going to only play during the witness's testimony today

25   short excerpts of the call.  Obviously we may play more pieces

JB89SCO1

1     of the call later in the trial when the witness is not on the

2     stand.  It's in evidence.  Either side can use it.

3              THE COURT:  Very well.

4              MR. DEVLIN-BROWN:  That sounds fine.  I have a couple

5     of requests.  One is if the government has a version of the

6     transcript that -- no -- that shows times, that would

7     obviously --

8              MR. DiMASE:  We don't.  Unfortunately, we don't.

9              MR. DEVLIN-BROWN:  The second is the statement

10    Mr. DiMase just said is we may ask the witness if he has to

11    leave today.  I don't think that's appropriate because I don't

12    know if we're going to be jammed towards the end of the day in

13    terms of cross-examination and I don't want the jury to think

14    it's because I'm keeping him long or anything like that so I

15    don't think that's an appropriate question.

16             THE COURT:  I agree with that.  I didn't understand

17    you to mean that you would ask him on the stand if he needs to

18    leave today.

19             MR. DiMASE:  That's fine.  We won't ask him that

20    question.

21             MR. DEVLIN-BROWN:  Is the government's plan still to

22    finish within an hour-and-a-half, by the first break?

23             MR. DiMASE:  Yes.

24             MS. LOZANO:  Yes, your Honor.  That is the hope and

25    desire and the direct examination has been edited and revised

569

JB89SCO1

1    to accomplish that goal and I'm fairly confident I'll be able

2    to do that.

3            THE COURT:  Wonderful.

4            MR. DiMASE:  Your Honor, with the defense -- so we are

5    expecting this witness to take the full day today given the

6    representations made by Mr. Devlin-Brown.  If we for some

7    reason end early, which I don't think is likely, but if that

8    happens we may request that we end for the day early at that

9    point and resume on Tuesday morning given the representations

10   made by Mr. Devlin-Brown that he would need three hours to

11   cross this witness.

12           THE COURT:  I guess that's fine.  I'm sure the jury

13   would appreciate it.  But I don't want to be in a position

14   where we have an hour-and-a-half at the end of the day.

15           MR. DiMASE:  Understood.  I think that is highly

16   unlikely, your Honor.  We will likely have substantial redirect

17   if there is remaining time after Mr. Devlin-Brown so I don't

18   see that as an issue.

19           THE COURT:  OK.

20           MR. DEVLIN-BROWN:  I would just echo that, your Honor.

21   Preparing last night we do have I believe a lengthy

22   cross-examination.  It's going to depend in part on whether

23   this witness is good answering yes-or-no questions but I think

24   that's entirely the appropriate way to go is let us start with

25   three hours to go and if we get through it quick you'll be able

JB89SCO1

1      to redirect -- I'm sure we'll have broad cross.

2             MR. DiMASE:  To be clear the hour-and-a-half is

3      obviously approximate.  It's not exact as far as the

4      government's direct.

5             THE COURT:  Understood.

6             MR. DiMASE:  I do have one other issue I wanted to

7      raise, your Honor, which is related to certain metadata

8      connected to a government exhibit already in evidence.  Two

9      exhibits, Government Exhibits 1205 and 1206, are Word

10     documents, Microsoft Word documents in native form, not in PDF

11     form, and they were recovered from the defendant's computer,

12     one of his electronic devices from one of his two residences.

13     And the import of these two exhibits is that Mr. Scott received

14     contracts from Ms. Dilkinska and then shortly thereafter sent

15     falsified versions, edited versions of those contracts to Apex,

16     to Mr. Spendiff and folks at Apex.  1205 and 1206 are the Word

17     versions of those documents on Mr. Scott's computer that show

18     that they were modified after he received them from

19     Ms. Dilkinska and contain the falsified information that is

20     thereafter sent to Apex.

21            So this is part of the government's evidence that

22     Mr. Scott falsified these agreements before sending them to

23     Apex.  And so it is our intention today to not only admit or I

24     should say publish 1205 and 1206 but to have the paralegal also

25     publish very limited metadata showing when the document was

JB89SCO1

1    lost modified and the person listed as the individual who last

2    modified the document, which is Mark Scott.  And the timing

3    fits within this period between when he received the documents

4    and when he sent them to Apex.

5              THE COURT:  What's the substance of the changes that

6    he made?

7              MR. DiMASE:  The key changes that he made were around

8    the percentage of fees that IMS was going to allegedly earn

9    from OneCoin for the services it rendered which in the

10   government's theory is IMS was effectively laundering, helping

11   to launder OneCoin money by taking it in to IMS accounts on

12   OneCoin's behalf.  There are actual documents reflecting an

13   agreement that one percent of those incoming monies would go to

14   IMS in order to make it look like this was actually IMS's money

15   and not OneCoin's money.  Mr. Scott increased those percentages

16   from one percent up to 20 or 22 percent and then sent those

17   agreements to Apex.

18             THE COURT:  Is there an objection to that?

19             MR. DEVLIN-BROWN:  Yes.  Just to let you know we

20   dispute that they were falsified and I think actually the

21   evidence will show 20 percent is more likely to be correct.

22   But we do dispute putting metadata recovered from devices into

23   evidence today, don't see why it's necessary or why we'll have

24   time to be calling a paralegal today to do that.  We haven't

25   looked at the devices themselves.  There can be questions of

JB89SCO1

1   when metadata is modified, what it means when you copy things

2   from one thing to another.  We'd like to explore that issue and

3   maybe have a witness from the government explain the concept.

4   So I just don't think we need to do it today.  And I don't

5   think Word documents should come in that were not, the PDF

6   exhibits without that.

7                MR. DiMASE:  Your Honor, just to be clear.  We didn't

8   plan to call a paralegal as a witness.  We planned to have

9   Mr. Barile, the person I was referring to, simply click in to

10  the metadata of the exhibit that is already in evidence and

11  show the metadata during Mr. Spendiff's testimony.  And I can

12  hand up to the Court what that will look like.  We have screen

13  shots.

14               Your Honor, again, we were prepared to go forward with

15  a stipulation.  I understand the way Mr. Devlin-Brown wants to

16  look at this more closely.  We may reach a stipulation at some

17  point.  But these exhibits are already in evidence.  And the

18  data that is going to be shown to the jury is self-explanatory.

19  It's not something that requires testimony.  We will highlight

20  the last-modified field and highlight the last-modified-by

21  field and that is essentially the sum total of what we would

22  show to the jury on this point.

23               For the record I'm showing exhibits that have been

24  marked but have not been admitted into evidence as Government

25  Exhibits 1205A and 1206A to the Court.  I've provided them to

JB89SCO1

1    defense as well.  As well, we previously provided these to --

2    marked exhibits to the defense.

3         THE COURT:  The evidence will show that Dilkinska sent

4    them to Mr. Scott on August 8?

5         MS. LOZANO:  Yes, your Honor.  The evidence will show

6    that the original IMS OneCoin agreements were sent to Mr. Scott

7    on August 8 at 9:23 a.m. from Ms. Dilkinska and the attachments

8    had the original one percent fee included.  Those were the

9    originals.  Then the evidence will show these two documents,

10   1205 and 1206, with the fees modified to reflect 20 percent for

11   one of the IMS companies and 22 percent fee for another one of

12   the companies.

13        THE COURT:  I'm just looking at these screen shots.

14   You said that Dilkinska sent them at 9:23 a.m.  There is no

15   9:23 a.m. on here.

16        MR. DiMASE:  I think what the evidence will show is

17   the e-mail from Dilkinska attaching the actual agreements.

18        MS. LOZANO:  Yes.

19        MR. DiMASE:  Which would show the fee of one percent

20   in two different agreements.  That was sent to Mr. Scott at

21   around 9 something a.m. on August 8.  These two documents are

22   Word documents, Microsoft Word documents on the defendant's

23   computer that contain all of the same language that was in the

24   two documents Mr. Scott received from Ms. Dilkinska except that

25   the percentages have been altered.  And you can see from these

JB89SCO1

1     two documents that Mr. Scott modified these documents

2     subsequent to receiving the materials from Ms. Dilkinska at

3     1:22 p.m. in 1206A and 1:36 p.m. in 1205A.  Subsequent to 1:36

4     and 1:22 Mr. Scott then turned around and sent PDF versions of

5     these Microsoft Word documents with the higher percentages to

6     Mr. Spendiff at Apex.  So this is evidence of his falsification

7     and alteration of these documents between when he received them

8     from Ms. Dilkinska and when he sent them to Mr. Spendiff.

9     That's the essence of the argument.  And what we would show is

10    the last-modified times and the last-modified-by.  This is

11    simply, if you click properties on the Microsoft Word document

12    to see the data related to the Microsoft Word document, that's

13    what this is showing.

14              MR. DEVLIN-BROWN:  A couple of things, your Honor.

15    One is the metadata is actually the underlying electronic data,

16    not a screen shot that is taking some of it.  So I think

17    there's issues there.

18              But more to the point this was just put on us now.

19    This doesn't need to be resolved today.  Mr. Spendiff was sent

20    PDFs.  He wasn't sent Word documents with electronic metadata.

21    And while the government had a number of exhibits that

22    Mr. Spendiff was not on on their exhibit list for him, I don't

23    think they're going to have the luxury of time today to be

24    putting things on the screen that he didn't see and that we

25    don't need him for a witness as.

JB89SCO1

```
 1              THE COURT:  I don't think that this needs to go in
 2      through Spendiff and obviously they have raised issues
 3      concerning what all this means, and I don't pretend to
 4      understand all of it -- I don't understand she sent it at 9:23
 5      and those numbers don't appear here.  But I mean I think
 6      ultimately it comes in.  We'll just see how it goes.  I'm
 7      inclined to let the government put it in if there's time to do
 8      it but I don't think it needs to come in through Mr. Spendiff
 9      but that's neither here nor there.
10              MR. DEVLIN-BROWN:  Just very briefly, I know there
11      have been cases where the government has called an expert,
12      someone from Microsoft or someone who has some knowledge of
13      what it means, these fields mean.  Maybe we'll ask for that.
14      Maybe we won't.  But I just think --
15              THE COURT:  I don't know if you want that.  If you
16      want to insist on that, then they can call an expert.
17              MR. DiMASE:  That's what we'll do if we need to do it,
18      your Honor.  But this data does seem pretty self-explanatory
19      that it doesn't seem in anyone's interests --
20              MR. DEVLIN-BROWN:  It may well be.  I don't know that
21      at 9:20 a.m. today.  I just don't think it needs to be resolved
22      today.
23              THE COURT:  Right.  Anyway I'm inclined to let it in.
24      It doesn't have to come in.  I'm inclined to let it in today.
25              So anything else?
```

JB89SCO1

| | |
|---|---|
| 1 | MR. DiMASE:  Your Honor, we'll -- if we can fit it in, |
| 2 | there's an appropriate time, we may do it; otherwise we may -- |
| 3 | obviously, we're trying to streamline this testimony. |
| 4 | THE COURT:  Yep. |
| 5 | MR. DiMASE:  Thank you. |
| 6 | THE COURT:  He's here, right? |
| 7 | MR. DiMASE:  He is here. |
| 8 | MS. LOZANO:  Yes, he is. |
| 9 | MR. DiMASE:  We'd love to start right at 9:30. |
| 10 | (Pause) |
| 11 | THE COURT:  We're still waiting on a couple of jurors. |
| 12 | (Pause) |
| 13 | THE COURT:  Folks, apparently received a couple of |
| 14 | messages from alternate juror no. 3, Ms. Reena Mathew.  She |
| 15 | apparently is in the emergency room and will not be coming in. |
| 16 | My recommendation is that she be excused. |
| 17 | MR. DEVLIN-BROWN:  No objection. |
| 18 | MS. LOZANO:  No objection. |
| 19 | THE COURT:  Very well.  OK.  Everyone is here.  So |
| 20 | let's get Mr. Spendiff. |
| 21 | (Continued on next page) |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

JB89SCO1

```
 1              (Jury present)

 2              THE COURT:  Good morning everyone.  Ladies and

 3    gentlemen of the jury, good morning.  I trust you had a

 4    pleasant evening.  Unfortunately, as you might have learned,

 5    one of our members of the jury has fallen ill and will not be

 6    able to continue with us.

 7              So Ms. Zhang you are now alternate no. 3 and you can

 8    move over one seat or you can stay there if you're comfortable

 9    there.

10              With that we will continue with the direct examination

11    of Mr. Spendiff.

12              Mr. Spendiff, you are reminded that you are still

13    under oath.

14              Ms. Lozano.

15              MS. LOZANO:  Thank you, your Honor.

16              At this time the government offers exhibits 1128,

17    1130-T, 1131, 1380-T, 1141-T, 1172, 1177, 1175, 1184, 1190,

18    1193, 1194, 1209, 1205, 1206, 1207-T, 1208, and 1214 into

19    evidence.

20              THE COURT:  Any objection?

21              MS. LOZANO:  And I'm sorry, your Honor --

22              MR. DEVLIN-BROWN:  Sorry.

23              MS. LOZANO:  In addition, GX61, which is a stipulation

24    regarding translated e-mails.

25              THE COURT:  Very well.
```

JB89SCO1                          Spendiff - Direct

1            MR. DEVLIN-BROWN:  No objection.

2            THE COURT:  All those exhibits will be received.

3            (Government's Exhibits 61, 1128, 1130-T, 1131, 1380-T,

4    1141-T, 1172, 1177, 1175, 1184, 1190, 1193, 1194, 1209, 1205,

5    1206, 1207-T, 1208, and 1214 received in evidence)

6     PAUL SPENDIFF,

7          called as a witness by the Government,

8          having been previously sworn, testified as follows:

9    DIRECT EXAMINATION

10   BY MS. LOZANO:

11   Q.  Good morning, Mr. Spendiff.

12   A.  Good morning.

13   Q.  When we ended yesterday we were speaking about a person by

14   the name of Irina Dilkinska.  I'd like to look at Exhibit 2201

15   again, the second -- the sixth page, and remind us what the

16   defendant described as its investor group.

17   A.  It was a select group of European families and the

18   companies that he had been doing business with for a long

19   period of time, three to twelve years.  He had already

20   conducted, in his legal profession, a number of transactions on

21   their behalf.

22            MS. LOZANO:  Mr. Barile, if we could put up 2209.

23   Q.  Did you eventually receive due diligence documentation

24   regarding the investor B&N and Ms. Dilkinska?

25   A.  Yes, we did.

JB89SCO1                              Spendiff - Direct

1          MS. LOZANO:  What is this exhibit, if we could publish

2     it.

3          THE WITNESS:  This is an e-mail from Mark Scott to

4     Muzammil the head of -- it lists a series of attachments which

5     are the due diligence documents that had been requested and

6     provided by Mr. Scott.

7     Q.  And upon receipt of those documents connected with

8     Ms. Dilkinska and B&N what type of review did Apex conduct on

9     this investor?

10    A.  Standard due diligence was conducted on Irina and the

11    company B&N.

12    Q.  After that review was Apex satisfied with the due diligence

13    that had been provided?

14    A.  Broadly, yes.

15    Q.  A few weeks later did Apex receive documents related to a

16    second investor for the Fenero Funds?

17    A.  Yes.

18    Q.  Who was that purported investor?

19    A.  It was for an entity called IMS.

20    Q.  And who was the UBO of IMS?

21    A.  Manon Hubenthal.

22         MS. LOZANO:  Mr. Barile, could you please publish

23    2212.

24    Q.  Mr. Spendiff, tell me:  When is this e-mail dated?

25    A.  This was dated June 4.

1   Q.  And the substance of the e-mail, can you summarize that for

2   us, please?

3   A.  Yes.  So this was an e-mail outlining a new investor who

4   would be coming into the fund and there were some attachments

5   for due diligence purposes.

6   Q.  And the investor was coming in with how much of an

7   investment?

8   A.  14 million euros.

9   Q.  And the investor's name was?

10  A.  Manon Hubenthal.

11  Q.  And the company?

12  A.  IMS.

13  Q.  Who was this e-mail from?

14  A.  This e-mail was from Mark Scott.

15  Q.  To people at Apex?

16  A.  Directly to Muzammil, the head of compliance, who reviewed

17  these sort of documents and cc'ed myself and David Pike.

18          MS. LOZANO:  Mr. Barile, if you can scroll through

19  this document so with can look at the types of paperwork that

20  was submitted.

21  Q.  Mr. Spendiff, can you describe for us what sorts of

22  documents were submitted by Mr. Scott in connection with

23  IMS and Manon Hubenthal?

24  A.  It was a certificate of incorporation for the company

25  itself, IMS; and identifying documents for Manon Hubenthal; so

JB89SCO1                         Spendiff - Direct

1    a copy of her passport which had been notarized.

2    Q.  In his communications to Apex did Mr. Scott indicate that

3    IMS or Hubenthal was connected to OneCoin or Ignatova?

4    A.  Not at all.

5    Q.  Describe the review that Apex conducted of the IMS due

6    diligence documents submitted by the defendant?

7    A.  So Muzammil conducted the initial review, world checks,

8    background checks on the individuals and then a series of

9    queries specifically asking for the wedding copies of the

10   documents, so the original certified copies to the sent and

11   also more information on the ultimate beneficial owner of IMS.

12            MS. LOZANO:  Mr. Barile, if we could go to 2228,

13   please, and publish that.

14   Q.  Were additional documents supplied to you by Mark Scott in

15   connection with IMS?

16   A.  Yes, they were.

17   Q.  And what is this e-mail?

18   A.  This is an e-mail from Mark again to Muzammil outlining

19   some information on IMS specifically, IMS Singapore, and

20   provided one of the directors of that business.

21            MS. LOZANO:  If we can scroll through, Mr. Barile.

22   Q.  And if you could tell us who the director of that

23   IMS entity was.

24   A.  A gentleman called Frank Ricketts.

25            MS. LOZANO:  Stop right there.

JB89SCO1                       Spendiff - Direct

```
 1    Q.   What is that?

 2    A.   That's a notarized copy of passport of Frank Ricketts.

 3    Q.   Just to be clear.  You mentioned IMS Singapore.  Is that

 4    distinct from the IMS entity that you were describing related

 5    to Ms. Hubenthal?

 6    A.   It was -- it's a separate legal entity.  So the information

 7    provided from Mark Scott was that Manon Hubenthal was the

 8    ultimate beneficial owner of both entities.

 9              MS. LOZANO:  Mr. Barile if we could put this image of

10    page five of 2228 on the left and then if we can put Exhibit

11    127 on the right.

12              We can take that down.

13    Q.   Now by the point you had received -- Apex had received due

14    diligence paperwork for IMS the GmbH and Singapore entities had

15    Fenero Equity Investments already received money from IMS?

16    A.   Yes.  It had received a number of payments.

17    Q.   Now you mentioned that you had, when you first received due

18    diligence paperwork regarding IMS, you had gone back to

19    Mr. Scott to request additional information about the

20    corporation and the UBO?

21    A.   Yes.

22    Q.   Did you ever receive that information?

23    A.   No.

24              MS. LOZANO:  Mr. Barile, could you please publish

25    2214.
```

1    Q.  Mr. Spendiff, what is this?

2    A.  This is an e-mail from Mark Scott again to Muzammil, CC

3    myself and David Pike.

4    Q.  Let me backup then and just ask with respect to the IMS

5    entities, the IMS GmbH was based where?

6    A.  In Germany.

7    Q.  And you mentioned an IMS Singapore.  What was the name of

8    that IMS entity?

9    A.  I think simply IMS Singapore PT, I think was the --

10   Q.  So let's now move to this Exhibit 2214.  This is an e-mail

11   from whom?

12   A.  This is an e-mail from Mark Scott to Muzammil.

13   Q.  Are you copied on it?

14   A.  Yes.

15   Q.  And who else?

16   A.  David Pike.

17   Q.  What's the date?

18   A.  June 7.

19   Q.  2016?

20   A.  Yes.

21   Q.  And can you describe please -- you don't need to read

22   verbatim but can you summarize what is communicated in this

23   e-mail by Mr. Scott regarding the monies that came into Fenero

24   from IMS?

25   A.  It's stating that rather than those monies coming in as

JB89SCO1                          Spendiff - Direct

1    subscriptions now of IMS that actually those monies would now

2    count against liabilities that were owed, money that was owed

3    to B&N by IMS and therefore could be allocated as investments

4    to B&N rather than to be held on the share registry of IMS.

5    Q.  So, to be clear, that communication meant that who would

6    be -- who would be the investor for the money that had been

7    sent by IMS?

8    A.  B&N.

9    Q.  And was there -- lower down in this e-mail at the bottom

10   paragraph, the bottom two paragraphs if we could, of that page,

11   if we could highlight that.  There is a reference to Fenero

12   Financial Switzerland.  What was your understanding about who

13   the investors were going to be in Fenero Financial Switzerland?

14   A.  That ultimately IMS would now instead invest into the

15   second fund.  The first one would be primarily used most

16   exclusively for B&N.

17   Q.  Did that ever happen?

18   A.  Did we ever receive documentation --

19   Q.  Did --

20   A.  Not when we were administrator.

21   Q.  Had Fenero Financial Switzerland been implemented as a fund

22   by Apex?

23   A.  It had been incorporated by Mark Scott and his lawyers and

24   we had opened a bank account for them.

25            MS. LOZANO:  Let's publish 2217.

JB89SCO1                           Spendiff - Direct

1    Q.  What is this, Mr. Spendiff?

2    A.  This is a limited partnership agreement from an investor

3    into the Fenero Equity Investments LP.

4            MS. LOZANO:  Scroll down to page.

5    Q.  Who provided this to Apex?

6    A.  Mark Scott.

7            MS. LOZANO:  Let's scroll down to page 17.

8    Q.  And explain to me --

9            MS. LOZANO:  If we could highlight capital commitment.

10   That's perfect.

11   Q.  Could you read to me how much capital commitment was being

12   subscribed with this agreement?

13   A.  65 million euros.

14   Q.  What's the date of this subscription agreement?

15   A.  June 9.

16   Q.  Who is the subscriber?

17   A.  B&N Consultant on behalf of Irina Dilkinska.

18   Q.  Now in parentheses after the 65 million, could you please

19   read that language?

20   A.  Sorry.  From where?

21   Q.  The parentheses after the --

22   A.  "In the event this fund --

23   Q.  No.  The parentheses.

24   A.  "Already transferred on our behalf by International

25   Marketing Services.."

JB89SCO1                         Spendiff - Direct

1              THE COURT:  I'm sorry sir, slow down, please.

2              THE WITNESS:  "Already transferred on our behalf by

3     International Marketing Services. PTE Limited and IMS

4     International Marketing Services. GmbH."

5     Q.  So what was your understanding about the money -- based on

6     this agreement the money that was being sent to Fenero by the

7     IMS entities?

8     A.  The legal ownership of that was now for B&N.

9     Q.  Because IMS owed money to B&N?

10    A.  That was how it was explained to us.

11    Q.  So did this subscription agreement contain any reference to

12    the fact that IMS or B&N were connected to OneCoin or Ruja

13    Ignatova?

14    A.  No, it did not.

15             MS. LOZANO:  Let's now publish 2220.

16             Can we go to the second page please.  Actually let's

17    go to the first page, the bottom of it.

18    Q.  What is this e-mail chain, Mr. Spendiff?

19    A.  So this is an e-mail -- initially from Mark to myself and I

20    think Muzammil as well and a number of other Apex staff and

21    just outlines a number of operational issues with the funding

22    services, so there's information about investment into an

23    entity called PCT.  There's information about whether we had

24    sufficient information regarding the subscription from Irina

25    Dilkinska.

1    Q.  I'm going to stop you right there.

2              MS. LOZANO:  Can we go down to page two in the middle

3    of the page.  Initial subscription 65 million.  Can we

4    highlight -- zoom in on all of that.

5    Q.  The black font questions are posed by whom?

6    A.  So in response to Mark's e-mail Muzammil posed a series of

7    questions for Mark on the outstanding -- on the issues he had

8    raised.  And then Mark then replied subsequently in red bold.

9    Q.  And how does the defendant respond to the inquiry:  What is

10   international marketing?  Please can you confirm?

11   A.  He claims that IMS is based in Germany and provides sales

12   and marketing and collection services for sold product that

13   regularly works for B&N and states he believes they've

14   committed 70 million euros into the fund to date.

15   Q.  And if we can go to the top of that page.  You mentioned

16   that there were also inquiries about an investment into a

17   company called PCT?

18   A.  So Mark requested an investment.  And we raised queries

19   about the entity that was going to receive those monies before

20   it moved to PCT.

21   Q.  And how much was that investment for.

22   A.  7.3 million euros.

23   Q.  The 7.3 million euros was to be sent to where?

24   A.  To an entity which was Fenero Equity Investments Ireland

25   Limited.

JB89SCO1                          Spendiff - Direct

1    Q.  Was that an entity that you were familiar with?

2    A.  It had been on the original structure charts provided on

3    the initial discussions with Mark and would show as being owed

4    by MSSI in BVI.

5    Q.  How does Mr. Scott respond to the question:  Who controls

6    this bank account?

7    A.  Mark said he does and that he's the owner of Fenero.

8             MS. LOZANO:  We can take that down.

9    Q.  Very briefly.  What was your understanding about what was

10   being acquired?

11   A.  A financial car payments company, small financial,

12   75 percent interest in a small financial car payments company

13   in the United Kingdom.

14   Q.  What was that company's name?

15   A.  PCT.  Payment Car Technologies.

16   Q.  What was your understanding of the mechanism by which the

17   investment fund was going to purchase 75 percent of PCT?

18   A.  So there was a contract between the fund and -- the Fenero

19   Ireland and the company itself and it was to be held on behalf

20   of Fenero Equity Ireland into a special purpose vehicle.

21   Q.  And do you remember what the name of the special purpose

22   vehicle was?

23   A.  I think it was Fenero PCT Holdings.

24   Q.  And who was the investor on this deal?  Whose money was it?

25   A.  It was the fund, so the Fenero Equity Investments LP would

1    be the investor.

2    Q.  At that point who was the sole investor in Fenero?

3    A.  Irina Dilkinska.

4    Q.  And who served as the director of the STV Fenero PTC

5    Holding?

6    A.  Irina Dilkinska was one of the directors.

7            MS. LOZANO:  Could we please publish 2218.

8    Q.  Mr. Spendiff, what is this e-mail?

9    A.  This is an e-mail again just touching on the subscriptions

10   into the fund from Mark Scott to myself and Muzammil.

11   Q.  What date?

12   A.  On June 13.

13   Q.  Does it attach several documents?

14   A.  Yes.  It has some attachments regarding the acquisition

15   vehicle.

16           MS. LOZANO:  If we could turn to page 32 of this

17   document.

18           THE COURT:  Is the jury unable to see it?

19           MS. LOZANO:  I'm sorry.  Could we publish it.

20           So let's go back to the first page so we can all see

21   the e-mail.

22           Let's zoom in on the top.  And highlight the date.

23   Q.  And the highlighted attachments are all what, Mr. Spendiff?

24   A.  They are PDF, but they're due diligence documents.

25   Q.  And are they documents relating to the PCT acquisition?

JB89SCO1                          Spendiff - Direct

1    A.   Yes.

2    Q.   Let's turn to page 32 of this exhibit.  Do you know where

3    this page came from.

4    A.   It came from the 90 -- it came from the legal document

5    related to the acquisition of the company.

6    Q.   Between Fenero and PCT?

7    A.   Correct.

8    Q.   And here could we actually go up one page so we see what

9    paragraph we're talking about.  So 29.2.  What does that

10   paragraph read?

11   A.   It says the address for services of notices are.

12   Q.   And what do you understand that to mean?

13   A.   That if specific notification, legal notifications need to

14   be served, that they need to be served to these individuals or

15   corporations.

16           MS. LOZANO:  Scroll down to page 32 and if we could

17   highlight (d) please.

18   Q.   Now (d) reads "The Investor."  Who is the investor in this

19   agreement?

20   A.   It states that notices for the investor --

21   Q.   Who is the investor?

22   A.   Address for -- the attention of Najib Kassis.

23   Q.   I'm asking you not on this document.  Who was the investor

24   for the acquisition --

25   A.   As in the fund itself?

JB89SCO1                          Spendiff - Direct

1   Q.  Yes.

2   A.  We understood it to be Fenero Equity Investments.

3   Q.  So under paragraph (d) notice to the investor went to whom?

4   A.  To someone called Najib Kassis.

5   Q.  What was his e-mail address?

6   A.  At RavenR.com.

7   Q.  With a copy to whom?

8   A.  Dr. Ruja Ignatova.

9   Q.  With an e-mail address at?

10  A.  Ruja.Ignatova at RavenR.com.

11  Q.  Did you notice this portion of the agreement, the

12  acquisition agreement, when you received it and reviewed it?

13  A.  No, we did not.

14  Q.  When is the first time you noticed that?

15  A.  On Wednesday of this week.

16       MS. LOZANO:  We can take that down.

17  Q.  Ultimately did Apex make the payment requested by the

18  defendant for PCT investment?

19  A.  Yes, we did.

20  Q.  Now I'd like to ask you about the second purported

21  investment that the defendant made with the funds.  Can you

22  give me -- have a drink of water.

23       Please give me a very broad general description of

24  what that investment was about.

25  A.  It was a loan to be made to a German individual.

1   Q.  For what?

2   A.  For 30 million euros.

3   Q.  And do you know -- were you told what the loan was going to

4   be used for?

5   A.  Eventually it was -- we were informed the loan was to be

6   used subsequently to purchase an interest in a -- or make a

7   loan to a -- related to an oil and gas field.

8   Q.  An oil field in Madagascar?

9   A.  It was an oil and gas field.  It was ultimately in

10  Madagascar.

11  Q.  Who gave you that information?

12  A.  It was provided by Mark Scott.

13          MS. LOZANO:  Let's publish please 2233.

14  Q.  Mr. Spendiff, what is this?

15  A.  So this is a series of questions --

16          MS. LOZANO:  Can we publish it to the jury too,

17  please.

18  Q.  From the top, who is this e-mail from?

19  A.  From Mark to myself.

20  Q.  What is the date?

21  A.  Wednesday, July 6.

22  Q.  What does it say on the top?

23  A.  New transaction.

24  Q.  And what does Mr. Scott write to you?

25  A.  Mr. Scott's answering a series of questions either posed or

JB89SCO1                          Spendiff – Direct

1   relating to the transaction in question.

2   Q.  And his responses are in what?

3   A.  In red.

4   Q.  What did he tell you about where the money -- the loan

5   money, the 30 million was going to go?

6   A.  (No response).

7   Q.  In terms of being literally transferred?

8   A.  At this stage it would just be transferred to the bank

9   account of the borrower, so Martin Breidenbach.

10  Q.  Did you believe that this loan was consistent with the

11  mission statement of the fund?

12  A.  I think it was on the very edge of what was outlined in the

13  original mission statement.

14          MS. LOZANO:  We can take this down.

15  Q.  What sort of documentation did Mr. Scott provide you

16  regarding Mr. Breidenbach's knowledge about this deal?

17  A.  He sent a letter from Breidenbach to himself regarding the

18  transaction.

19  Q.  If we could publish right now -- we've already admitted

20  GX61.  So could we please publish -- well, first, 1128.

21          Let's read from the bottom up.  If we could just zoom

22  in on the exchanges at the bottom and going up.

23  Q.  And this is from whom?

24  A.  Mark Scott.

25  Q.  On what date?

JB89SCO1                        Spendiff - Direct

1   A.  8th of July 2016.

2              MS. LOZANO:  We can go up.

3   Q.  By the way are you anywhere on this e-mail?

4   A.  No.

5   Q.  Who is it from and to let's start with the one that is now

6   zoomed in on.

7   A.  From Dr. Ruja Ignatova.

8   Q.  To whom?

9   A.  To Mark Scott, CCing Martin Breidenbach and Irina

10  Dilkinska.

11  Q.  So let's go up to the top message.  And who is that from?

12  A.  This is from Mark to Dr. Ruja Ignatova.

13  Q.  Copying?

14  A.  Martin Breidenbach and Irina Dilkinska.

15             MS. LOZANO:  Can you please, Mr. Barile, highlight in

16  the first paragraph the second sentence.

17  Q.  And Mr. Spendiff read that.

18  A.  "I have the loan agreement almost final and will tweak the

19  SPA a bit."

20  Q.  And the last paragraph can you please read to me the first

21  sentence?

22  A.  "I will also ask Martin for a letter to me stating that the

23  is fully responsible for the SPA and that he has conducted due

24  diligence on the asset."

25  Q.  What is the next sentence.  Read the next two sentences.

1   A.  "Need this for the fund admin.  My draft should be coming

2   later tonight or tomorrow morning."

3          MS. LOZANO:  So let's take that down and then

4   Mr. Barile if we could put side to side 1130T and 1131.  And

5   1130T if we can zoom in on the to and from and.

6   Q.  Who is it from?

7   A.  From Mark Scott.

8   Q.  To?

9   A.  Martin Breidenbach.

10  Q.  On what date?

11  A.  Saturday, 7 of July 2016.

12  Q.  Was the subject line?

13  A.  Letter from CryptoReal UBO to MSIC.

14  Q.  So let's look at the substance of the e-mail.  Can you read

15  to me starting, "Hi Martin."

16  A.  "Hi Martin.  Please send me the following letter on your

17  letterhead tomorrow (Saturday) as a PDF.  We will also still

18  need the original.  This letter only serves as a supplement to

19  the oil field's sales contract, which is really too short.  I

20  need this for my fund/trust administration file."

21          MS. LOZANO:  Let's look now at 1131 –- I'm sorry.

22  Let's minimize that and look back.

23          In this e-mail 1130T at the bottom can you highlight,

24  Mr. Barile, what is contained in the bottom?

25  Q.  And Mr. Spendiff if you could just generally describe what

JB89SCO1                          Spendiff - Direct

1    this is?

2    A.   This is a letter purporting to be from Martin Breidenbach

3    to Mark outlining the background to the transaction that he's

4    planning to enter into.

5    Q.   So let's go to 1131.  Who is that from and to?

6    A.   That's to Mark Scott from Martin Breidenbach.

7    Q.   With a copy?

8    A.   To Ruja Ignatova.

9    Q.   And what is the subject?

10   A.   CryptoReal oil.

11   Q.   Are there attachments?

12   A.   Yes.  There's one attachment.

13        MS. LOZANO:  Mr. Barile, are the attachments connected

14   to that.  Yes.

15   Q.   So if we're looking at page two.  What is that?

16   A.   This is the letter that was sent to me by Mark purporting

17   be to have been sent to him by Martin Breidenbach.

18   Q.   Mr. Spendiff, had you ever seen Exhibits 1128, 1130T and

19   1131 before today?

20   A.   These were the e-mails you just showed me?

21   Q.   Yes.

22   A.   No.  I have not seen them before today.

23        MS. LOZANO:  Let's put up 2235, please.

24   Q.   What is this e-mail?

25   A.   This is an e-mail from Mark Scott to myself and a couple of

1    members of the Apex team.

2    Q.  And subject line is what?

3    A.  Oil deal transaction docs supplemental letter from UBO

4    attached.

5    Q.  And what's the date?

6    A.  July 9, 2016.

7            MS. LOZANO:  Can we scroll down to the attachment.

8    Q.  What is that?

9    A.  This appears -- this was the letter that we received from

10   Mark Scott in that e-mail.

11   Q.  And you received this from Mr. Scott?

12   A.  Yes.

13   Q.  So based on this letter what was your understanding of

14   Mr. Breidenbach's role in the CryptoReal deal?

15   A.  That he was the ultimate beneficial owner.  And they had

16   done due diligence on the asset they were using the money to

17   buy.

18   Q.  And what was CryptoReal's relationship to Fenero?

19   A.  So the -- CryptoReal was the borrower of the 30 million

20   euros from Fenero.

21           MS. LOZANO:  Can we minimize that.

22   Q.  Can we please read the second paragraph, so that we

23   understand what Mr. Breidenbach is representing.

24   A.  "First, let me assure you, as your legal colleague and the

25   ultimate beneficial owner of the borrower (UBO) that we have

JB89SCO1                        Spendiff - Direct

1    conducted extensive due diligence on the selling group of the

2    oil field, which as you know, includes Neil Bush, your friend

3    Jeb Bush's brother and son and brother to two former US

4    presidents.  He is actually signing the share purchase

5    agreement.  Nevertheless, we have conducted confidential

6    background checks on the other principals and have investigated

7    the cost and feasibility of extracting oil from the site.  We

8    feel very comfortable based on what our advisers tell us.  In

9    order to conserve expenses, we have opted not to expend monies

10   on lengthy reports and drilling probes."

11   Q.  So your understanding was Fenero was lending money to

12   CryptoReal for this oil field?

13   A.  Yes.

14   Q.  Had the defendant -- and Mr. Breidenbach was the UBO for

15   CryptoReal?

16   A.  As purported to us, yes.

17   Q.  Had the defendant mentioned the involvement of Neil Bush

18   before?

19   A.  I think he may have in an e-mail.  I can't recollect.  Or

20   an e-mail subsequent to this.

21         MS. LOZANO:  We can take this down.

22   Q.  Did the defendant inform you or anyone at Apex that

23   Breidenbach was connected with OneCoin or Ruja Ignatova?

24   A.  No.  Not at all.

25   Q.  Did the defendant request that you wire -- first of all,

1    was it 30 million euros or 30 million dollars?

2    A.  I think it was 30 million dollars was the ultimate contract

3    so about 27 million euros I think at the time.

4    Q.  And did the defendant ultimately request that you transmit

5    that 30 million dollars on behalf of -- for this deal?

6    A.  Yes.

7    Q.  And where was the money coming from?

8    A.  It was money -- it came from monies that had been cleared

9    in the Fenero -- in the bank account Fenero Equity Investments

10   LP bank account.

11   Q.  Where did the defendant request that you send the money?

12   A.  To a bank in Hong Kong.

13   Q.  In whose name?

14   A.  An entity called Barta Holdings.

15   Q.  What did you know about Barta Holdings from the defendant?

16   A.  At this stage nothing; though subsequent information was

17   provided.

18   Q.  Did that request to send money to Barta deviate from your

19   original understanding of this deal?

20   A.  Yes.

21   Q.  Why is that?

22   A.  Because the original deal was to move the money directly to

23   Breidenbach.

24   Q.  Were you concerned about that?

25   A.  Yep.

JB89SCO1                          Spendiff - Direct

1    Q.  Why was that?

2    A.  Because it deviated from the original mandate that was

3    presented to us.

4    Q.  Did you -- so you said you wanted more information?

5    A.  Yes.

6    Q.  Did you receive more information?

7    A.  Yes.

8         MS. LOZANO:  Let's look at 2247 and please publish it

9    to the jury as well.

10   Q.  Mr. Spendiff, to whom is this e-mail directed?

11   A.  It's addressed from Mark Scott to myself.

12   Q.  What's the date?

13   A.  Wednesday, July 13, 2016.

14   Q.  And where -- according to the body of the e-mail what are

15   the attachments?

16   A.  I think these are attachments relating to Barta Holdings

17   and the executed agreement between them and CryptoReal.

18   Q.  By the way what does SPA stand for?  We keep saying that.

19   A.  I don't know.

20   Q.  OK.

21   A.  I'm assuming -- I wouldn't know.

22        MS. LOZANO:  So let's look at page two.  Three.

23   Q.  So at the top what --

24        MS. LOZANO:  Highlight share sale and purchase

25   agreement.

JB89SCO1                          Spendiff - Direct

1    A.  Yes.

2    Q.  Who is party A?

3    A.  Barta Holdings.

4    Q.  Who is party B?

5    A.  CryptoReal investment trust.

6    Q.  Who is the the authorized representative of Barta?

7    A.  Dr. Hui Chi Ming.

8    Q.  And who is the authorized representative of CryptoReal?

9    A.  Dr. Ruja Ignatova.

10   Q.  Was Mr. Breidenbach on this SPA?

11   A.  No.

12   Q.  Was Neil Bush on this SPA?

13   A.  No.

14   Q.  Did you review this SPA carefully?

15   A.  No.  It was provided to me.  It wasn't directly related to

16   the transaction that we were involved in.

17   Q.  Did you know --

18           MS. LOZANO:  Well, scroll down and see who signs.

19   Q.  So at the bottom of this page there is a signature in blue.

20           MS. LOZANO:  We can go down to the bottom.  Yes.

21   Q.  The signature in blue?

22   A.  (No response).

23   Q.  What does that read?

24   A.  R. Ignatova.

25   Q.  Did you know who R. Ignatova or Ruja Ignatova was?

JB89SCO1                          Spendiff - Direct

```
 1   A.  We assumed a representative appointed by the beneficial

 2   owners of the contract.

 3              MS. LOZANO:  Can we scroll to page 3 please and in the

 4   middle.  Actually it might be page 5.  I'm sorry.  Yes.  The

 5   top paragraph.

 6   Q.  There is a reference to $340 million at a price of $7 per

 7   OneCoin.  Equivalent to a lot of OneCoins.  Did you -- do you

 8   remember seeing that reference?

 9   A.  No.

10   Q.  Did you know what OneCoins were at this time?

11   A.  No.

12   Q.  After you received that -- we can take it down.

13              After you received that did Apex send the money upon

14   the defendant's instructions to Barta?

15   A.  We executed at Mark's instruction, yes.

16   Q.  Did you eventually speak to Mr. Breidenbach to confirm?

17   A.  Yeah.  I mean this is quite a succinct version of a series

18   of tos and fros between us relating to the transaction.  So we

19   reached out to Mr. Breidenbach to understand that he was

20   comfortable with us moving the money to a third party because

21   ultimately he would be liable for the loan.  So if it went to

22   somebody else and he wasn't party to that and couldn't confirm

23   that bank account, then he can say that that we'd sent the

24   money to another individual even though he had the liability

25   for it.
```

JB89SCO1                           Spendiff - Direct

1          MS. LOZANO:  So let's look at 2253 please and publish

2     it.

3     Q.  Mr. Spendiff we can -- if we can maximize or zoom in on the

4     top part.

5     Q.  Who is this from and to and what does it state?

6     A.  So it's from Martin Breidenbach to myself and Mark Scott.

7     Q.  What's the date?

8     A.  Wednesday, July 13, 2016.

9     Q.  What's does Mr. Breidenbach communicate to you in this

10    e-mail?

11    A.  He specifically asked him to wire 30 million U.S. dollar

12    loan.  Directly to the seller.  And then there's the bank

13    details that had been previously provided Barta Holdings

14    Limited.

15         MS. LOZANO:  Mr. Barile, you can take that down and

16    could you please publish side by side 1380T and 1141T.

17    Q.  So on 1380T if we can scroll down to the second page and

18    zoom in on that.

19    Q.  Briefly, Mr. Spendiff, tell me what that e-mail is?

20    A.  It's an e-mail from me to Martin Breidenbach.

21    Q.  And you're asking to contact him?

22    A.  Yes.

23    Q.  So let's scroll up 1380T, if you can read -- what does

24    Mr. Breidenbach do with that e-mail that you sent him?

25    A.  He forwards it to Mark Scott asking who is this.

604

1    Q.  And Ruja Ignatova?

2    A.  Yes.

3    Q.  And then how does Mr. Scott respond at the top?

4    A.  Our fund administrator.  They just want to make sure you

5    exist and that Fenero loans you 30 million.  I am happy to join

6    in conversation.

7    Q.  Please continue.

8    A.  Please send Ruja as blind copy toward the outside and if

9    possible not with the OC e-mail.  When you have time.  I write

10   him and coordinate it.

11           MS. LOZANO:  So now let's look at 1141T and at the top

12   if we could zoom in on that.

13   Q.  This e-mail is from whom to who?

14   A.  It's from Mark Scott to Ruja Ignatova.

15   Q.  Well --

16   A.  Sorry.  It's from Martin Breidenbach to Mr. Scott and cc'ed

17   Dr. Ruja Ignatova.

18   Q.  And what does -- what is the substance of this e-mail?

19   A.  That Martin said that he's spoken to me, he sends the

20   requisite information required by Apex that we would then

21   transfer the money as well.

22           MS. LOZANO:  Thank you.  We can take those down.

23   Q.  By the way, had you seen those two e-mails previously?

24   A.  Not before today.

25   Q.  So you eventually spoke with Mr. Breidenbach and sent the

1    money upon the instructions of the defendant?

2    A.   Correct.

3    Q.   Very briefly.  Were there additional requests from the

4    defendant to transfer money out of the funds in connection with

5    loans?

6    A.   Yes.  There was a request relating to a loan to be made

7    directly to Fenero Equity Investments Ireland, the beneficiary

8    of which would be Mark Scott.

9    Q.   And who was to give -- how much money was that?

10   A.   I can't recollect.  Between two and three million euros.

11   Q.   Who was providing that money?

12   A.   The loan was technically from B&N Consultant to Fenero --

13   to Mark Scott Fenero.

14   Q.   How did Mr. Scott describe the purpose of these funds?

15   A.   To build back office infrastructure for his expanding

16   financial services business.

17          MS. LOZANO:  Mr. Barile, could you please publish 2255

18   and publish it to the jury.

19   Q.   What is this?

20   A.   This is a standard document completed by Apex staff prior

21   to making a wire payment.

22   Q.   And this is a request from whom?

23   A.   This is --

24   Q.   Who was the client?

25   A.   The client is MSSI.

606

JB89SCO1                        Spendiff - Direct

1    Q.   And the wire request amount is how much?

2    A.   Is 2.675 euros.

3    Q.   Is this in connection with the loan that you were just

4    referencing?

5    A.   Yes.

6            MS. LOZANO:   So if we could go to page 6, please.

7    Q.   What is this?   Was this submitted in connection with those

8    loans?

9    A.   This is letter outlining, giving permission from the

10   primary investor in the fund to use some of the monies to go

11   directly to a vehicle which is owned by Mark Scott.

12   Q.   And the top paragraph, the second sentence, how does

13   Ms. Dilkinska -- is this letter from Ms. Dilkinska?

14   A.   Yes.

15   Q.   How does she describe the purpose of the loan?

16   A.   I would like -- in the letter it states:   I would like to

17   formalize our several discussions with the expedited expansion

18   of the support services for the Fenero series of funds and

19   MSIC's capital needs therefore.

20   Q.   With respect to these loans what was the practical effect

21   of the transfers from Fenero Equity Fund to Fenero Equity

22   Ireland?

23   A.   It moved the money from an account that was -- payments

24   were controlled by Apex as third party to an account directly

25   controlled and operated by Mark Scott and David Pike.

JB89SCO1                        Spendiff - Direct

1          MS. LOZANO:  We can take that down.  Thank you.

2     Q.  Did Mr. Scott make a second request for monies to be lent

3     from Fenero Equity to Fenero Equity Ireland?

4     A.  Yes.  About two weeks later.

5     Q.  And did Apex transmit that money?

6     A.  No, we did not.

7     Q.  Why not?

8     A.  The request came in with a series of other outstanding

9     issues.  There was a meeting of the team in Apex.  We decided

10    to hold transactions until we conducted in-house due diligence

11    on some of the entities, particularly Irina Dilkinska because

12    she seemed to be heavily involved in structuring the firm.

13    Q.  What triggered the enhanced due diligence?

14    A.  We were uncomfortable with the investment manager making

15    loans to himself a second time kwg in very short succession and

16    we were uncomfortable with the amount of money coming in from

17    IMS still purport be to be on the beneficiary of B&N so we felt

18    it was reasonable to do additional due diligence.

19    Q.  And what did the enhanced due diligence entail?  What were

20    you searching for?

21    A.  Just more information particularly around the source.

22    Q.  What did request the defendant provide you with as part of

23    the enhanced due diligence into the source of WETSDZ?

24    A.  So I think Muzammil cry AET sent an e-mail to Mr. Scott

25    requesting a series of additional documents or information

JB89SCO1                          Spendiff - Direct

1    which would allow us to understand better the source of WETSDZ.

2    Q.  And after enhanced due diligence was underway and those

3    requests were sent did the defendant send Apex another

4    subscription agreement for B&N?

5    A.  Yes.  Over I think it was the Friday and then over the

6    weekend we received information about a new investor who would

7    be coming in to Fenero financial Switzerland limited.

8    Q.  Well let me backup and ask?

9            MS. LOZANO:  Mr. Barile can you please publish and to

10   the jury 2257 and have you take a look at that, Mr. Spendiff.

11   Q.  What does that e-mail relate to?  First of all what is is

12   it dated?

13   A.  This is dated Friday July 29.

14   Q.  And it's from?

15   A.  Mark Scott.

16   Q.  To?

17   A.  Muzammil.

18   Q.  And are you copied?

19   A.  Myself.

20   Q.  So -- and had enhanced due diligence already been started?

21   A.  Yeah I think we -- I think it had started or we were

22   kicking it off that point so I can't remember the exact timing

23   of when we instigated the start of enhanced due diligence.

24   Q.  Briefly describe what is the purpose of this e-mail.  What

25   is he sending?

JB89SCO1                          Spendiff - Direct

1    A.  This is a new subscription document for B&N for $50 million

2    euros.

3    Q.  Can we please scroll to -- well no actually let's go to --

4    exhibit 2259 and publish that.

5            What was the defendant's response to your inquiries

6    important enhanced due diligence of B&N?

7            MS. LOZANO:  We can go to the top of that.  Thank you.

8            THE WITNESS:  The request were from Mr. Scott.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JB83SCO2                         Spendiff - Direct

1   Q.   Can you please read the second and third sentences of his

2   message.

3   A.   "I'm not good dealing with new and unexpected rules.   This

4   type of audit would affect our relationship with the investor

5   tremendously."

6   Q.   This is in response to, what's the subject line?

7   A.   Fenero Financial Switzerland LP B&N subscription agreement.

8   Q.   What is his reference to new and unexpected rules?

9   A.   It was the response to this e-mail by Muzammil requesting

10  additional documentation relating to the source of wealth of

11  B&N.

12  Q.   We can take that down.

13       Did Mr. Scott indicate that he would provide

14  additional data and documentation regarding B&N?

15  A.   We had a call and went through the e-mail from Muzammil

16  outlining some the documentation that might help, and he

17  instigated he would endeavor to try to get that information for

18  us.

19  Q.   Let's look at 2260, please.   Go to the second page.   And if

20  we can zoom in on the second paragraph after "thank you for the

21  attached subscription document."

22       So in the black font is whose question?

23  A.   It's from Muzammil Koyratty.

24  Q.   In red, whose response is in red?

25  A.   They're from Mark Scott.

JB83SCO2                    Spendiff - Direct

```
1    Q.  Let's see.  Could you please read the -- first summarize
2    the response in red is regarding what?
3    A.  I'm sorry?
4    Q.  Is he responding to enhanced due diligence questions about
5    B&N?
6    A.  No, he's asking questions about the amounts of money in the
7    accounts.
8    Q.  Okay.  The last sentence in that paragraph, would you
9    please read that.
10   A.  "We are just about to introduce another investor out of
11   Hong Kong, documents coming your way later today, to subscribe
12   for the majority of the remaining financial Fenero Switzerland
13   Fund in tranches."
14   Q.  We can take that down.  You mentioned that at this time, I
15   think you said it was the Friday, July 29?
16   A.  Yeah.
17   Q.  Internally at Apex, you had decided to conduct enhanced due
18   diligence on B&N.  Did you decide to do anything else with
19   respect to the Fenero Fund accounts?
20   A.  Yes.  We made the decision to do a complete review of the
21   funds and the relationship with Mr. Scott.  So actually over
22   the weekend, I was reviewing, as were a number of other
23   individuals at Apex, all of the documentation we'd previously
24   received and in some detail and all of the individuals on
25   those.
```

1    Q.  Why was that decision made?

2    A.  We just, you know, enhanced due diligence, we just felt we

3    wanted to get -- we still didn't feel we had a complete

4    understanding of the complicated relationships between the

5    different parties.  We felt we needed to understand that

6    better.

7    Q.  Who was involved in this review?

8    A.  It was myself and a gentleman called Nitin Khanapurkar.

9    Q.  Let's look at 2261, can we please publish that.  And the

10   front is an e-mail from whom to whom?

11   A.  It's from Mark Scott to Muzammil, cc'ing myself and David

12   Pike.

13   Q.  The date is?

14   A.  Saturday, July 30.

15   Q.  On that day, what were you doing?

16   A.  Later on in the day, I'd planned to start my review of some

17   of the documentation.  But, I'd actually received this, these

18   e-mails, a number of e-mails overnight, which kind of guided

19   the direction of my -- that led my research.

20   Q.  From the defendant?

21   A.  Correct.

22   Q.  This one, just briefly tell me, what is he sending you in

23   this?

24   A.  He's stating that he's going to -- he's attached a

25   subscription package for the previously referenced investor.

JB83SCO2                        Spendiff - Direct

1  Q.  From Hong Kong?

2  A.  Sorry?

3  Q.  From Hong Kong?

4  A.  From Hong Kong.

5  Q.  Let's scroll down to page 12, please.  So this is the

6  subscription agreement and who is the subscriber?

7  A.  A gentleman called Zhoulong Cai.

8  Q.  What is the name of the subscriber?

9  A.  Star Merchant Incorporated Limited.

10  Q.  In where?

11  A.  Hong Kong.

12  Q.  If we can scroll down to page 15 now, and let me know how

13  much was the subscription agreement for?

14  A.  8 million euros.

15  Q.  We can take that down.

16       In this e-mail, or subscription agreement, did

17  Mr. Scott indicate that there was any connection between this

18  investor, Mr. Cai, and OneCoin?

19  A.  Not in this document, no.

20  Q.  You mentioned you received additional e-mails from the

21  defendant.  Was it right around same time?

22  A.  The time stamps on them were within about 10 minutes of

23  each other.  So three e-mails within 10 minutes.

24  Q.  Let's look at the next one.  2262.  And let's publish that.

25  Up at the top, let me know the date and time.

1    A.  12:51:49 a.m.

2    Q.  What does Mr. Scott send you?

3    A.  A series of attachments relating to an entity called Star

4    Merchant Inc. Limited.

5    Q.  Let's go down to -- what was your reaction, first of all,

6    receiving this e-mail in due diligence about a new investor

7    from Hong Kong?

8    A.  This wasn't the first of the e-mails that I read.  So, I

9    read, as one does, the last e-mail first.

10   Q.  So let's go through this.  If we can go to, yes.  Right

11   there.  The second, the second e-mail down in the thread.  Who

12   is that to and from?

13   A.  So it's from Irina Dilkinska, and it's from

14   Irina@OneCoin.eu address to Mark.

15   Q.  Okay.  She's, according to this e-mail chain in your

16   understanding, did the documents that he was sending you come

17   from her?

18   A.  No.  They were purporting to be directly or provided by the

19   investor.

20   Q.  So when you read this, what was your reaction?

21   A.  We, we wanted to understand why Irina Dilkinska was

22   involved in a transaction which he purported would be -- had

23   not indicated was anything to do with her.  And this was the

24   first time we saw that she had a new e-mail address which was

25   at OneCoin.eu.

JB83SCO2                        Spendiff - Direct

1          MS. LOZANO:  If we can go, I think it's the last of

2     the pages of the exhibit.  There is a passport photo I believe.

3     If we can scroll to that, Mr. Barile.

4     Q.  Who is that?

5     A.  That's Mr. Cai, Zhoulong Cai.

6     Q.  At the time, what is his date of birth?  I'm not going to

7     make you do the math.

8     A.  16 of December 1988.

9     Q.  So, let's take that down.  When you saw the Irina Dilkinska

10    at OneCoin.eu e-mail that had been forwarded to you, what did

11    you do?

12    A.  I started researching OneCoin.

13    Q.  Had you even heard of OneCoin at that point?

14    A.  No.

15    Q.  So what kind of research did you do?

16    A.  I looked on the Internet.

17    Q.  Where did you look?

18    A.  So, when I say -- I looked at the OneCoin website and saw

19    references to Ruja Ignatova.  I Googled Irina Dilkinska, who it

20    mentions being the legal counsel on some other websites.  I

21    subsequently, there was a lot of, there was a website, Daily

22    Mirror had a scathing article from earlier that year stating

23    that OneCoin was a Ponzi scheme.  There was another article

24    from a website LM -- MLM Insider, I think, which had a series

25    of articles and information relating to OneCoin.

1   Q.  After the defendant sent you that e-mail, forwarded that

2   e-mail with the OneCoin.eu address, did he send you any other

3   e-mails regarding the relationship between B&N and Star

4   Merchant?

5   A.  Yes, so the third e-mail, which I read first, which led me

6   to pick up on the OneCoin address.

7   Q.  I'm sorry.  I'm not sure when you mentioned the investor as

8   Mr. Cai, did you -- can you tell us what the entity was that he

9   was involved with?

10  A.  Star Merchant.

11  Q.  So let's publish 2263 to the jury.  What, when did this

12  come?

13  A.  This came about six minutes after the second e-mail with

14  all the Star Merchant attachments had come.

15  Q.  It's from Mr. Scott to you?

16  A.  Yes.

17  Q.  Okay.  What is he saying here?

18  A.  He's stating that it's clear from the e-mail trail and the

19  other documents that B&N have actually been involved in this --

20  in this investor.

21  Q.  Okay.  And what was your reaction to that?  Had you been

22  previously told that there was a relationship?

23  A.  No.

24  Q.  You mentioned that you had read one of the e-mails sent

25  during this period first.  Was this one?

1    A.   I read this e-mail first.  And then, as is often the way,

2    then proceeded to understand why -- what mistake had been made

3    or what this related to.  So I then went down through the full

4    e-mail trail, saw the references to Dr. Ruja Ignatova, saw the

5    e-mail from Irina, I think we had been trying to contact

6    anyway, so I took a particular interest in her e-mail address

7    because it was different to those we previously received.

8    Q.   When you returned to the office on Monday, what action did

9    you take?

10   A.   We had an emergency meeting of the risk and compliance team

11   at Apex.

12   Q.   What decision did you make?

13   A.   We decided to, well, there were a number of meetings as you

14   can imagine, and discussions, and we decided to make a number

15   of notifications to government agencies.

16   Q.   When were those notifications made?

17   A.   Quite complicated to make, so it might take some time.  I

18   think probably on Tuesday, the Tuesday of that week.  So I

19   guess maybe the August the 1st to August the 3rd we completed a

20   number of notifications.

21   Q.   Based on these notifications, was Apex constrained in any

22   way with respect to the discussing the Fenero Funds?

23   A.   There is some phrase "tipping off" which forbids, once

24   you've made one of these types of notifications, from

25   discussing or notifying the parties involved in the

JB83SCO2                          Spendiff - Direct

1    transactions about the fact that you have notified these

2    agencies.

3    Q.  After the weekend e-mails from the defendant regarding Star

4    Merchant, did he continue sending you due diligence

5    documentation about B&N?

6    A.  Yes.

7          MS. LOZANO:  Let's publish, Mr. Barile, Exhibits 1177

8    on the left, and 1172 on the right.  1177.

9    Q.  For the sake of time, I'm just going to ask you to read it

10   to yourself and we're just going to publish to the jury.  And

11   well, actually, I am going to ask you, 1177, are you on that

12   e-mail?

13   A.  No.

14   Q.  Who is to and from?

15   A.  To Martin Breidenbach from Mark Scott cc'ing David Pike.

16   Q.  What's he asking?

17   A.  Hi Martin, can you put this letter in with your KYC.

18   Q.  Was something attached to it?

19   A.  Yes, there is a series of attached documents.

20   Q.  1172 is to and from whom?

21   A.  This is from Mark -- from David Pike to Mark Scott.

22   Q.  What does it say?

23   A.  "I think we should standardize the use of commas versus the

24   use of decimals in euro figures, unless you are trying to

25   emphasize different authors."

JB83SCO2                          Spendiff - Direct

1              MS. LOZANO:  Can you scroll down to the attachments on

2      both of those exhibits so we see what the attachments were.  We

3      can take that down.  Let's publish 2275.  And tell me -- and we

4      can scroll through that.

5      Q.  Is that e-mail from Mr. Scott to you?

6      A.  Yes.

7      Q.  The second paragraph references what?

8      A.  "One of my partners at Locke Lord."

9      Q.  You don't need to read it.  What does it reference, does he

10     send you something?

11     A.  Yes, he sends an outline regarding cryptocurrency.

12     Q.  Let's scroll through this and take a look and see if you

13     recognize that's what it is.  So who is the preparer of this?

14     A.  It's a gentleman called Robert Courtneidge.

15     Q.  What was your reaction to this report?

16     A.  Well, it was the first time that cryptocurrency or

17     information about cryptocurrency had been sent by Mark Scott to

18     us.  Though, it didn't reference OneCoin in the e-mail.  It's

19     just a broad research note on primarily bitcoin, in fact,

20     rather than cryptocurrencies per se.

21             MS. LOZANO:  So let's take that down.  Can we please

22     pull up 1175.

23     Q.  And tell me who is that to and from and do you know those

24     people?

25     A.  It's to Mark Scott from a gentleman called Victor Rashev.

JB83SCO2                          Spendiff - Direct

1    Q.  Do you know who Mr. Rashev, do you know who that is?

2    A.  It was, we received -- Apex received a letter from

3    Mr. Rashev regarding B&N Consult.

4              MS. LOZANO:  All right.  Let's put up 2267, please.

5    Q.  Is this a letter you received from Mr. Rashev?

6    A.  Yes, it is.

7              MS. LOZANO:  Can we go down to the attachment.  All

8    right.  Actually, if we can go back to 1175 and look at the

9    attachment there because I don't think we did that.  There's no

10   attachment.  Okay.  Let's move on.

11             I would like, Mr. Barile, if you could please publish

12   2276.

13   Q.  What is this?

14   A.  This is an e-mail sent from Mark Scott to myself cc'ing

15   Muzammil Koyratty and David Pike.

16   Q.  What is attached, if we can scroll down, what's the subject

17   matter?

18   A.  IMS service agreements Germany and Singapore.

19   Q.  What is attached?

20   A.  A service agreement between the two IMS entities and

21   OneCoin limited in Dubai.

22   Q.  So let's go down to the third page of this.  The first

23   provision there indicates how much of a fee would be charged

24   the provider being whom?

25   A.  The provider being IMS.

JB83SCO2                         Spendiff - Direct

1    Q.   And the client being whom?

2    A.   OneCoin.

3    Q.   So 22 percent?

4    A.   Yeah.

5    Q.   For what?

6    A.   For all funds coming in weekly.

7    Q.   Then let's go to the next contract or agreement.  That's

8    further down.  So this one is between whom and whom?

9    A.   From IMS in Germany and OneCoin in Dubai.

10   Q.   We can go to the second page.  And what was IMS, what was

11   this agreement purporting to reflect about IMS's fees for

12   OneCoin work?

13   A.   That this entity would get 20 percent of all incoming fees.

14   Q.   So, what did you, when you received these from Mr. Scott,

15   what -- how did you understand that they fit into the context

16   of the enhanced due diligence for B&N?

17   A.   It was the first time we received any reference or

18   documentation about OneCoin or involving OneCoin in the

19   transaction as a party.  And we understood this explained why

20   the money was coming into the IMS accounts, it was for these

21   services that were being provided to OneCoin.

22   Q.   Did you understand the connection to B&N at all?

23   A.   No.  They stated that they were independent companies prior

24   to this.

25             MS. LOZANO:  Mr. Barile, if we can show on the left

1   1193 and 1184 on the right.  1193.  I mean 1209 on the left and

2   125 on the right.  What is 1205?

3              THE WITNESS:  Are you asking me?

4              MS. LOZANO:  No, I am asking Mr. Barile.  Sorry.  1209

5   first.  We're not going to be able to put them side by side.

6   Q.  What is this?

7   A.  It is an e-mail from Irina Dilkinska to Mark Scott.

8   Q.  What are the attachments?

9   A.  They appear to be two attachments.  One

10  FinancialHandlingAgreementSingapore.PDF and the other one is

11  FinancialHandlinggmbH.PDF.

12  Q.  What does she, what does Ms. Dilkinska say?

13  A.  Regarding his other requests, there are no agreements

14  between IMS and B&N.

15  Q.  Let's scroll down and see the agreements.  This is dated

16  August 8th, 2016?

17  A.  Yes.

18  Q.  At 9:23 in the morning?

19  A.  Yes.

20  Q.  Let's scroll down and let's look at this.  The agreement is

21  between whom and whom?

22  A.  This is the agreement between IMS PT and OneCoin Limited.

23  Q.  If we go to the second page, what are the fees in that

24  agreement?

25  A.  The provider will charge a fee of 1 percent that will be

JB83SCO2                        Spendiff - Direct

1   invoiced on all incoming client funds weekly.

2   Q.  Next, could we scroll down and see the next agreement.  And

3   between who is that?

4   A.  Between IMS Marketing Services and OneCoin Limited.

5   Q.  What's the fee to be charged by IMS gmbH to OneCoin?

6   A.  1 percent.

7   Q.  Let's pull up 1205.  And that is an agreement between IMS

8   gmbH, OneCoin, let's scroll down to there.  And in that

9   document, the 1205 document, what is the percentage?

10  A.  20 percent.

11          MS. LOZANO:  And if we now go to 1206.  Can we go back

12  to 1205.  Is that 1205?  So, Mr. Barile, could you please right

13  click on this document, and reveal the metadata of the author

14  and the properties of this document.

15          MR. DEVLIN-BROWN:  Objection.

16          THE COURT:  Overruled.

17  Q.  Mr. Spendiff, can you tell me the date created?

18  A.  The 8th of August.

19  Q.  And the date last modified?

20  A.  The 8th of August, 2016.

21  Q.  At what time?

22  A.  1:36 p.m.

23  Q.  And the author?

24  A.  Mark Scott.

25  Q.  Well, last modified by?

1    A.  Last modified by Mark Scott.

2    Q.  So let's go back to 1206.  1206.  I'm sorry.  So this is

3    IMS PTE and OneCoin Limited.  Let's go down to bullet point

4    one, how much is that fee?

5    A.  22 percent.

6            MS. LOZANO:  Mr. Barile, can you right click and so he

7    show the properties of this document.

8    Q.  Who is the last modified by person?

9    A.  Appears to be Mark Scott.

10   Q.  And last modified date?

11   A.  The 8th of August, 2016.

12   Q.  Okay.  We can take those down.  Let's look at 2270.

13           What is this e-mail?

14   A.  It is an e-mail from David to myself cc'ing Mark Scott.

15   Q.  What is attached?

16   A.  It's a wire orders to date.

17   Q.  What's the substance of this e-mail; what is he sending

18   you?

19   A.  These are attachments of instructions from Irina Dilkinska

20   to IMS to wire money owed to her into the Fenero account on her

21   behalf.

22   Q.  What is the purpose of those wire directives?

23   A.  It's an effort to show the legal ownership of the money as

24   money owing to Irina that she's instructed to be paid to Fenero

25   Funds rather than directly to her.

1    Q.  Had you requested these wire directives?

2    A.  We'd requested an understanding of why IMS was wiring the

3    money, and the source of the money.

4    Q.  So can we scroll down and just see one example of what the

5    wire directives look like.  So that, what is that; is that one

6    wire directive?

7    A.  Yeah, it looks like one wire directive, yes.

8    Q.  It's from whom to whom?

9    A.  It's to IMS Marketing Services is Frank Ricketts, and it's

10   from B&N Consult.

11   Q.  For how much?

12   A.  50 million euros.

13   Q.  Do you remember how many you received of these?

14   A.  I think in the attachment there were perhaps 20 to 30 of

15   these different instructions.

16   Q.  And each wire directive corresponded to what?

17   A.  With an attachment that had been received into the DMS bank

18   account for Fenero.

19   Q.  Each directive goes with one transfer?

20   A.  Correct.

21        MS. LOZANO:  Mr. Barile, can we publish, please, 1193

22   on the left and 1184 on the right.  1193.

23   Q.  Have you seen that e-mail before?

24   A.  No, I haven't.

25   Q.  Who is it to and from?

JB83SCO2                              Spendiff - Direct

1    A.   It's from David Pike and it's to Mark Scott.

2    Q.   What is the subject?

3    A.   Regarding e-mailing the letter instructions B&N IMS

4    Germany, and B&N IMS Germany.

5    Q.   Letter of instruction is what?

6    A.   I am assuming they're referring to each of those

7    attachments that we saw on the previous e-mail.

8    Q.   So is that a wire directive?

9    A.   I am assuming, yeah.

10   Q.   So let's look down at the body of this e-mail.  And can you

11   read the first line.  The first two sentences.

12   A.   "Mark, here's my take.  We are in pretty good shape.  I

13   think we should ignore the differences between what they sent

14   and what you asked for and focus on what they sent versus what

15   we need."

16   Q.   And then below is a grid.  Can you read that?

17   A.   Sure.  "Below is a grid comparing actual deposits to

18   letters they have sent us.  My recommendation is that we ask

19   them to change the two Germany letters that are more than 10

20   days prior to deposit to something more reasonable and we're

21   done."

22   Q.   Then there is a chart underneath.

23   A.   Yeah.

24   Q.   One chart reads what?

25   A.   "Actual."

JB83SCO2                          Spendiff - Direct

1   Q.   At the top?

2   A.   Yeah.

3   Q.   "Germany"?

4   A.   Yes.

5   Q.   And the other one reads what?

6   A.   It says "BN."

7   Q.   No, I mean the charts.

8   A.   Sorry.  The table Singapore.

9   Q.   Yes, I'm sorry.  And then, okay.  So now let's look at 1184

10  quickly.  Who is that to and from?

11  A.   It's from David Pike to Mark Scott.

12  Q.   And if we can actually go to the e-mail, the message right

13  before so we see what he's responding to.  And what's the date

14  of this?

15  A.   It's from Mark to David on Wednesday, August 3, 2016.

16  Q.   What does Mr. Scott say?

17  A.   "Please reconcile against the actual wires."

18  Q.   What is Mr. Pike's response?

19  A.   "I'm trying but it's messy."

20          MS. LOZANO:  Take those down.  And two more exhibits

21  one on the left, one on the right.  1190 and 1194, please.

22  Q.   1190 is from whom to whom?

23  A.   Sorry, which one?

24  Q.   1190?

25  A.   It's from someone called -- from Mark Scott.  Sorry.  To

1    Stoyna Kyrazova.

2    Q.  Okay.  What's the subject line?

3    A.  "Wire authorization letters" and then "Fenero Equity

4    Investments Limited LP."

5    Q.  Let's look at the body of the e-mail.  Let's read the first

6    paragraph.

7    A.  "We have reviewed the wire authorization letters you have

8    sent and have changes to suggest.  Please flip through every

9    page and make every change we have made by hand.  Very

10   important.  All letters have the wrong wire information with

11   the funds going to Fenero Cayman I.  All need to be changed as

12   the funds were paid into the account of Fenero Equity

13   Investments LP."

14   Q.  At the bottom of that message, if we can minimize that,

15   there is a paragraph, that paragraph, the last paragraph,

16   actually, if you can read that.

17   A.  "It would be great if you could sign some of the letters

18   with a different pen so they do not look so mechanically

19   produced.  Maybe Irina can print them wherever she is and sign

20   and scan them back to you one at a time.  Maybe you can sign

21   others in the office with her automatic signature."

22   Q.  Okay.  Then quickly let's look at 1194.  The bottom message

23   is from Mr. Scott to David Pike.  What does he say?

24   A.  It's from Mark to David.  "I want them scanned for a

25   particular reason.  Are you at the office and can please do

JB83SCO2                         Spendiff - Direct

1     that?"

2     Q.  Can we scroll down and just see what the message before

3     what he's referring to.  So the attachments are what, that are

4     sent?

5     A.  These are the letters of instruction from B&N to IMS with

6     the corresponding dates for the wire transfer.

7     Q.  So then if we just go to the top, what is Mr. Pike's

8     response?

9     A.  "Yes and no problem.  I get what you want, you want them to

10    look scanned and sent to us, I'm on it."

11    Q.  Okay.  Thank you.

12              THE COURT:  It's 11 o'clock so we'll take our first

13    break.  Ladies and gentlemen, do not discuss the case, we'll

14    start again in 15 minutes.

15              (Jury excused)

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

JB83SCO2                          Spendiff - Direct

1             THE COURT:  Sir, you may step down.

2             THE WITNESS:  Thank you.

3             THE COURT:  Any issues?

4             MR. DEVLIN-BROWN:  Just with timing on this witness.

5    Maybe he should be excused.

6             THE COURT:  Yes.

7             (Witness not present)

8             MR. DEVLIN-BROWN:  So, the government has now spent

9    three hours and 20 minutes with this witness, leaving the

10   defense three hours if we were to start cross now.  They've

11   elected to spend a lot of their time having him read documents

12   he was not on.  That's their prerogative.  I have a lot of

13   questions about documents he was on.  I would ask that the

14   government indicate when cross will begin, and I'd suggest that

15   the government, if they want to play any portions of tapes at

16   this point, they should do it on redirect if time permits.

17            MR. DiMASE:  Your Honor, we have about 10 minutes of

18   direct and about seven minutes of the entire one-hour audio

19   recording to play.  We started about 10 minutes late this

20   morning, that's playing into this a little bit.  But we're

21   doing our best to streamline this, and we are not playing a

22   substantial portion.

23            THE COURT:  Do what you can.

24            MR. DiMASE:  Thank you.

25            (Recess)

JB83SCO2                          Spendiff - Direct

1                 THE COURT:  Everyone ready?

2                 MS. LOZANO:  Yes.

3                 (Jury present)

4                 THE COURT:  Ms. Lozano.

5                 MS. LOZANO:  Thank you, your Honor.

6    BY MS. LOZANO:

7    Q.  Mr. Spendiff, Mr. Barile has pulled up Exhibit 2281.  Do

8    you recognize that?

9    A.  Yes.

10   Q.  What is that?

11   A.  It's an e-mail from Mark Scott to myself.

12   Q.  Attaching what?

13   A.  A series of bank statements.

14   Q.  From?

15   A.  The bank records of IMS in Germany.

16   Q.  At Deutsche Bank?

17   A.  Yes.

18   Q.  Were these bank records provided to you in response to a

19   request?

20   A.  Yes, they are in response to a phone call we had.

21   Q.  When was the phone call?

22   A.  I think earlier that day.

23   Q.  Tuesday, August 9?

24   A.  I think so.

25   Q.  Let's publish 1214 on the right, next to this exhibit,

1    please.  And 1214 is an e-mail from whom to whom on what date?

2    A.  From Dr. Ruja Ignatova to Mark Scott, dated the 9th of

3    August of 2016.

4    Q.  This is Exhibit 1214.  Correct, yes.  And attached to this

5    exhibit are what?

6    A.  It appears to be identical attachments.

7    Q.  Below those attachments, who sent those to Ruja Ignatova?

8    A.  They were sent by Manon Hubenthal.

9    Q.  If we could quickly scroll 2281 to 2281-TA1.  Is that one

10   of the account records for IMS?

11   A.  Yes, it is.

12           MS. LOZANO:  If we could highlight page 207, I'm

13   sorry.  Did I not say that?  If we can zoom in on the

14   first three entries there and highlight the transaction payment

15   details for each of them.

16   A.  So the first one seems to have a reference number, then

17   states "Tycoon Plus.  Reason buying educational packages."

18   Q.  The next one?

19   A.  "Tycoon Plus."

20   Q.  And the next one?

21   A.  "Package Tycoon Plus."

22   Q.  We can take that down.

23           How did the relationship between Apex and Mr. Scott

24   end?

25   A.  We were fired by Mr. Scott.

633

1    Q.  Please pull up and publish 2288.  What is that?

2    A.  That's an e-mail from Mark Scott to myself and a number of

3    other at Apex, subject "termination of relationship."

4    Q.  What is attached, if we can scroll down.

5    A.  The termination letter.

6    Q.  Why didn't Apex terminate Mr. Scott?

7    A.  We had a legally binding contract, and we couldn't do any

8    action.  We had to wait for seven days from the notification to

9    the agencies before we did any action which might be

10   constituted as tipping off.

11   Q.  Okay.  All told -- we can take that down Mr. Barile.  Thank

12   you.

13        All told, what fees did Apex earn for administering

14   the Fenero Funds?

15   A.  I think just the set up fees, so $3,500.

16   Q.  Why didn't you earn the yearly fee?

17   A.  We only received our fee after the completion of each of

18   the NAVs, which would have been each quarter.

19   Q.  Did you discuss your termination by the defendant with any

20   other financial institution?

21   A.  Yes.

22   Q.  Describe the circumstances very briefly.

23   A.  We notified DMS Bank that we were no longer acting as

24   administrator on the fund.

25   Q.  Did you notify DMS Bank that Fenero Funds had been

1   receiving money that you believed came from OneCoin?

2   A.  No, we did not.

3   Q.  Why did you not do that?

4   A.  We could not under the contract we had with the fund detail

5   those, that information to DMS, unless it had been requested by

6   them.

7   Q.  Directing your attention to August 9, 2016.  Did you speak

8   with the defendant on that telephone that day?

9   A.  Yes, we did.

10  Q.  Why?

11  A.  He had requested a call to try to expedite a number of

12  payments that were outstanding which he had requested.

13  Q.  This is the day before he terminated you?

14  A.  Yes.

15  Q.  Do you have -- who was on that call?

16  A.  It was myself, Sonja Marie Hilkhuijsen, and Muzammil

17  Koyratty, and present but not speaking, Nitin Khanapurkar.

18  Q.  Was the defendant on the phone?

19  A.  Mark Scott was on the call.

20  Q.  Do you have a record of that call?

21  A.  We do have record of that call.

22  Q.  Was it an audio recording?

23  A.  Yes.

24  Q.  Why was it audio recorded?

25  A.  We recorded it to protect ourselves so if it was ever

1   queried that we had tipped off the client, that we had evidence

2   that we did not mention during that call anything that would

3   constitute notifying him about the notifications we had made.

4   Q.  Did you mention OneCoin during that call?

5   A.  We did.  Because we'd received -- by that stage we'd

6   received information from the client specifically about

7   OneCoin.  So we were able to discuss that.

8             MS. LOZANO:  May I approach, your Honor?

9             THE COURT:  You may.

10  Q.  I'm going to show you a disc that is marked GX 2200-C and

11  ask you if you recognize it, Mr. Spendiff?

12  A.  Yes, I do.

13  Q.  What is that?

14  A.  It's a disc which holds a recording and translated, written

15  translation of the phone call recording we just discussed.

16  Q.  How do you know -- how many recordings are on there?

17  A.  There's two files for the recordings and two Word

18  documents.

19  Q.  Was it one call?

20  A.  Yes, it was just too big.  It had to be split into two.

21  Q.  The transcripts that you reference, is there one transcript

22  per recording?

23  A.  Yes.

24  Q.  How do you know that that's what's on this disc?

25  A.  Because I listened to the disc on Wednesday.

JB83SCO2                         Spendiff - Direct

1    Q.  Did you do anything with the disc so you could identify it?

2    A.  I signed and dated it, or initialed and dated it.

3    Q.  On the disc are two recordings identified by Exhibit Number

4    2302 and 2303.  Are those recordings fair and accurate

5    recordings of the August 9, 2016, conversation with members of

6    Apex and the defendant?

7    A.  Yes.

8    Q.  Also on that disc are Exhibits 2302-TR and 2303-TR that are

9    transcripts of those recordings.  Are those transcripts fair

10   and accurate transcriptions of the actual recordings in, on

11   that CD?

12   A.  Yes.

13            MS. LOZANO:  Your Honor, at this point the government

14   offers Exhibits 2200-C containing 2302 and 2303, and 2302-TR

15   and 2303-TR.

16            THE COURT:  Any objection?

17            MR. DEVLIN-BROWN:  No, your Honor.

18            THE COURT:  Those exhibits will be received.

19            (Government's Exhibit 2200-C, 2302, 2302-TR, 2303,

20   2303-TR received in evidence)

21   Q.  How long was that call?

22   A.  About 55 minutes, 50 minutes.

23   Q.  Did you tell the defendant that you were recording the

24   call?

25   A.  No, we did not.

JB83SCO2                        Spendiff - Direct

1    Q.  So, you mentioned that there were two files on that CD.

2    How long is each file approximately of that one hour --

3    A.  Roughly 25 minutes, half an hour.

4    Q.  So the entire call is recorded?

5    A.  Correct.

6    Q.  And it lasts about an hour?

7    A.  Yeah.

8    Q.  Okay.  And you have listened to the entire hour?

9    A.  Every word.

10   Q.  Okay.

11             MS. LOZANO:  I have nothing further in terms of

12   questions, your Honor.  However, the government is going to

13   play a selection of clips from 2302 and 2303 in evidence for

14   approximately a total of seven minutes of clips out of the

15   hour-long call.

16             THE COURT:  Very well.

17             MS. LOZANO:  Mr. Barile has put, has published for

18   each clip, he is going to have the transcript up for the jury.

19             (Audio recording playing)

20             MS. LOZANO:  Your Honor, it appears we are having

21   technical difficulties with a clip.  Since we're probably going

22   to be playing more of this during the trial, I think at this

23   point we're just going to forgo the last clip.

24             THE COURT:  Have you concluded with your direct

25   examination?

1          MS. LOZANO:  Yes, your Honor.  Thank you.

2          THE COURT:  Cross-examination.

3    CROSS-EXAMINATION

4    BY MR. DEVLIN-BROWN:

5    Q.  Good morning, Mr. Spendiff.

6    A.  Good morning.

7    Q.  I'm Arlo Devlin-Brown, and I'm an attorney for Mark Scott.

8    How are you today?

9    A.  Good, thank you.

10   Q.  We haven't met before, right?

11   A.  No.

12   Q.  Or spoken at all?

13   A.  No.

14   Q.  So during the time period you just testified about, you

15   were managing director of Apex Funds Services U.K. Limited,

16   right?

17   A.  Correct.

18   Q.  You basically ran the London office for Apex?

19   A.  Correct.

20   Q.  And I think you said that was the operations office where

21   people actually did the fund administration work; is that

22   right?

23   A.  It was one of the operation offices, yeah.

24   Q.  Apex is not a bank, right?

25   A.  Correct.

JB83SCO2                         Spendiff - Cross

1    Q.  You don't take deposits, right?

2    A.  No.

3    Q.  You're not insured by the FDIC or anything like that,

4    right?

5    A.  I don't believe so.

6    Q.  You know what the FDIC is?

7    A.  No.

8    Q.  Okay.  I want to start with the phone call we just heard

9    and we'll come back to it later in some detail.  But is it fair

10   to say that Mark Scott kept repeating himself on that call?

11   A.  Yes.

12   Q.  He kept telling you, in essence, that he had provided

13   enough information for your due diligence, right?

14   A.  Sorry.  Can you repeat the question?

15   Q.  He kept telling you he had provided enough information for

16   the diligence you needed to do?

17   A.  Yes.

18   Q.  And he also told you multiple times that he had payments

19   due that he needed Apex to clear the investments for, right?

20   A.  Yes.

21   Q.  And you talked in circles for most, for much of that

22   hour-long call, right?

23   A.  Yes.

24   Q.  Mark Scott never in that call agreed with your position,

25   did he?

640

1   A.  No.

2   Q.  And your position was that they needed to provide

3   additional source of wealth information on Irina Dilkinska, if

4   I understand, right, among other things?

5   A.  Yes.

6   Q.  But he never agreed to that at all?

7   A.  I think at the end of the call he did agree to provide more

8   information.  And, but that was the last of the information he

9   was willing to provide.

10  Q.  Well, actually, after the call, doesn't he send you bank

11  statements from Deutsche Bank?

12  A.  Yes.

13  Q.  So he did provide some more information after the call?

14  A.  Yes.

15  Q.  But he never agreed with you on the call, did he, that he

16  was required to provide more information or needed to provide

17  more information for you to do your jobs?

18  A.  No.

19  Q.  So, sitting here today, you were shown a number of

20  documents and e-mails that you were not part of, right?

21  A.  Yes.

22  Q.  Some of them I think you probably saw for the first time

23  today?

24  A.  Yes.

25  Q.  Obviously you can only testify about what you have

641

1    knowledge of, of course, right?

2    A.  Yes.

3    Q.  So, you don't really have any idea what Mark Scott was told

4    by anyone about what the business of IMS or B&N was, right?

5    A.  Correct.

6    Q.  You don't know what he was told about Irina Dilkinska's

7    source of wealth?

8    A.  Correct.

9    Q.  You don't know whether he was told IMS and B&N serve only

10   OneCoin or serve multiple customers, do you?

11   A.  No.

12   Q.  You don't know what Irina Dilkinska may have told him about

13   any of the subjects that you saw e-mails about, right?

14   A.  Correct.

15   Q.  You don't know if she has a reputation for being an honest

16   person or dishonest person, do you?

17   A.  No.

18   Q.  You also don't know what Mark Scott was told about OneCoin,

19   right?

20   A.  Correct.

21   Q.  You testified on direct that you were skeptical about

22   OneCoin based on internet research you did, right?

23   A.  Correct.

24   Q.  But Mark Scott on the call, on portions we'll play later,

25   doesn't suggest he has any doubts about OneCoin, does he?

642

1    A.  No.

2    Q.  So, I want to follow up on this with a couple of the

3    e-mails that the government showed you that you were not on.

4    Do you remember seeing some e-mails within the last half hour

5    or so, at least half hour before the break, where there were

6    communications between Mark Scott and others about wire

7    authorizations and transfers between B&N and IMS?

8    A.  Yes.

9    Q.  To be clear, those documents, those wire transfer documents

10   were for wires you had already received at Apex, right?

11   A.  Apex, no, Apex had not received any wire transfers.

12   Q.  Ah.  You got me.  DMS, the bank that Apex was working with

13   in connection with the Fenero Funds?

14   A.  Yes, the bank had received a number of things.

15   Q.  But for the funds that were under Apex's administration,

16   right?

17   A.  Yes.

18   Q.  The point is, in those e-mails, which I believe, maybe we

19   can put it back up if you have any doubt, but I believe were in

20   late July or early August, you had already received those wire

21   transfers into DMS?

22   A.  The bank account had received payments, yes.

23   Q.  Correct.  Before those e-mails?

24   A.  Yes.

25   Q.  And you don't have any idea whether Mark Scott did or

1  didn't have authority from IMS or B&N to modify those

2  documents, right?

3  A.  Sorry, which documents are you referring to?

4  Q.  Well, some of the e-mails Ms. Lozano showed you referred to

5  changes being made to those wire transfer documents, right?

6  A.  Yes.

7  Q.  And you don't know whether Mr. Scott had authority or

8  didn't have authority from IMS or B&N to make those changes?

9  A.  I can't comment why he made those changes.

10  Q.  Right.  You were also shown, weren't you, a couple of

11  documents that were contracts between IMS and OneCoin, right?

12  A.  Yes.

13  Q.  And one of them I believe was a contract between IMS and

14  OneCoin that showed IMS received fees of approximately

15  20 percent to 22 percent, right?

16  A.  I think one was 22 and one was 20, yes.

17  Q.  And the government also showed you a document you had not

18  seen before, where that same contract showed fees that IMS

19  would receive of only 1 percent, right?

20  A.  Yes.

21  Q.  You have no idea whether 1 percent is the right amount or

22  20 percent is the right, right?

23  A.  I have some idea.

24  Q.  Well --

25  A.  I have an opinion, but, I could --

644

1   Q.   You have an opinion.  Did you understand that IMS was in

2   the multilevel marketing business?

3   A.   No.

4   Q.   Okay.  Well, do you understand that in a multilevel

5   marketing sales program, commission rates are often quite high?

6   A.   I couldn't comment.

7   Q.   Okay.  So, you don't really have an understanding, do you,

8   as to whether the 20 percent or 1 percent would be accurate, if

9   you don't understand the business that IMS was necessarily

10  doing?

11  A.   Are you asking about the contract or are you asking me

12  about the percentage?

13  Q.   About the percentage.

14  A.   No, I couldn't comment on the percentage.

15  Q.   You don't have any understanding, do you, as to whether

16  Mr. Scott received authority from IMS to change the number from

17  1 percent to 20 percent or whether he didn't have authority,

18  right?

19  A.   Correct.

20  Q.   And sometimes lawyers receive permission from clients to

21  change documents that are incorrect, right?

22              MS. LOZANO:  Objection.

23              THE COURT:  Overruled.

24  A.   Yes, they may, I don't know.

25  Q.   Well, just in your own work as a fund administrator or in

JB83SCO2                        Spendiff - Cross

1    finance, I'm sure there have been occasions in your life where

2    an assistant or someone says to you, oh, there is a mistake on

3    the letter I signed.  And you direct the person to go ahead and

4    fix it, and that's fine, your signature can stay on it.  That's

5    happened before, I'm sure?

6    A.  Not in my experience, but --

7    Q.  That's never happened to you?

8    A.  Nobody's corrected one of my documents that I've signed

9    without my permission.

10   Q.  Okay.  So, you testified on direct just now I believe that

11   the first time you saw any reference or documentation relating

12   to OneCoin was on July 30, 2019, when an e-mail chain had Irina

13   Dilkinska's e-mail address and it said something like

14   @OneCoin.edu, didn't you testify to that?

15   A.  Sorry.  Can you repeat the beginning of that question for

16   me.

17   Q.  Sure.  I believe you testified earlier today that the first

18   time you saw any reference or documentation relating to OneCoin

19   was with respect to that July 30 -- 2016 e-mail, that had

20   Ms. Irina Dilkinska's OneCoin.edu address?

21   A.  That is incorrect.

22   Q.  That's not what you testified to?

23   A.  I believe I said it was the first time I registered or

24   noticed that there was a OneCoin address.

25   Q.  The transcript is what it is or the jurors' recollection.

JB83SCO2                        Spendiff - Cross

1   But that is in fact correct, right?  That's the first time you

2   noticed a OneCoin e-mail address or any association with

3   OneCoin?

4   A.  Yes.

5   Q.  Because I believe you testified also this morning that the

6   way you discovered that there might be a OneCoin relationship

7   with the Fenero Funds is you Googled the name Irina Dilkinska,

8   right?

9   A.  Irina Dilkinska and OneCoin together.

10  Q.  Ah.  In one sentence.

11  A.  Correct.

12  Q.  Because you had Irina Dilkinska's name from the very getgo,

13  right?

14  A.  Yes, we would have previously Googled Irina Dilkinska, and

15  no hits had come up.

16  Q.  So your testimony is originally you just Googled her name,

17  and didn't see anything relating to OneCoin.  But then later

18  on, July 30, 2019, or thereabouts, you Googled Irina Dilkinska

19  and OneCoin?

20  A.  I remember I Googled Irina Dilkinska because that initial

21  search would have been done by one of the members of my staff

22  where it didn't show up anything.  And only subsequently, when

23  I Googled Irina Dilkinska on its own and then with the OneCoin

24  moniker, did it come up as a relationship between the two.

25  Q.  I see.  So you are saying that on July 30, you Googled

1    first just her name, and then you Googled her name and OneCoin

2    and you saw them together?

3    A.  Yeah.

4    Q.  Okay.  You or Apex -- you're no longer working at Apex,

5    correct?

6    A.  Correct.

7    Q.  But Apex produced documents to the government in this case,

8    right?

9    A.  We turned over all the documents on receipt instruction to

10   do so.

11   Q.  You turned them over through a treaty between the United

12   Kingdom and the United States, right?  You didn't just send

13   them to these prosecutors?

14   A.  Correct.

15   Q.  First they went to a U.K. law enforcement type authority,

16   and then they were sent to the prosecutors, right?

17   A.  Correct.

18   Q.  Were you responsible partially for gathering the documents

19   responsive to the request of the prosecutors?

20   A.  I was aware of the process.  I wasn't involved in the

21   collection of them.

22   Q.  Was any Internet search history provided for Apex?

23   A.  I can't remember.  There was a lot of documents.

24   Q.  Were all of the internal communications between people at

25   Apex, not just with Mr. Scott, provided?

JB83SCO2                           Spendiff - Cross

1    A.   Again, I can't, it was three years ago.  I'm not aware,

2    there was a huge number of documents.  I couldn't comment what

3    was in them.

4    Q.   Do you recall whether any notes from meetings Apex may have

5    had internally about Mr. Scott or the Fenero Funds were

6    produced to the government?

7    A.   I don't know.

8    Q.   Do you recall if that was a request?

9    A.   I'm not sure if it was requested or not.

10   Q.   In any event, putting Irina Dilkinska aside, Mr. Scott

11   didn't hide Ruja Ignatova's name from you, right?

12   A.   No.

13   Q.   He did not, right?

14   A.   No.

15            MR. DEVLIN-BROWN:  If we could display, Mr. Barile, if

16   you don't mind, Government Exhibit 2218, please, at page 32.

17   If we could blow up the investor, please.

18   Q.   So, Ruja Ignatova was listed on this document, right?

19   A.   Correct.

20   Q.   And I believe your testimony is you just noticed that this

21   Wednesday, right?

22   A.   Correct.

23   Q.   So, it was and the date of this document I believe -- if we

24   could zoom out for a second.  Go to the top I guess.  Is that

25   the top of it, Mr. Barile?  Okay.  There we go.  Just the

JB83SCO2                          Spendiff - Cross

1    cover, that's great.  Thank you.

2            So this was an e-mail dated June 13, 2016, right?

3    A.  Correct.

4    Q.  That's pretty early on in your relationship with Fenero and

5    Mr. Scott, right?

6    A.  Correct.

7    Q.  And this document relates to one of the two transactions or

8    two investments, aside from the loan to Fenero, but one of the

9    two investments that Apex did for the Fenero Funds, right?

10   A.  Yes.

11   Q.  I think you testified there was the oil field related

12   transaction, right?

13   A.  There was the loan, yes.

14   Q.  A loan that related to an oil field transaction, right?

15   A.  Yes.

16   Q.  And the second was an investment in a credit card processor

17   or credit card related company, Payment Card Technology, right?

18   A.  Yes.

19           MS. LOZANO:  Objection.

20           THE COURT:  Overruled.

21   Q.  And part of your responsibility as fund administrator was

22   to look at the appropriateness of payments out to potential

23   investments as well as the source of investments coming into

24   the fund, right?

25   A.  Yes.

1    Q.  In fact, you testified about diligence you did do on the

2    Payment Card Technologies transaction?

3    A.  Yes.

4            MR. DEVLIN-BROWN:  We can take that one down.  If you

5    don't mind, Mr. Barile, could you also put up Government

6    Exhibit 2247.

7    Q.  So you remember seeing this July 13, 2016 e-mail on your

8    direct examination?

9    A.  Yes.

10   Q.  I believe this refers to an executed SPA.  And if you turn

11   to the next page, Mr. Barile, that's a share -- or the page

12   after.  A share purchase agreement.  We can leave it on if you

13   don't mind just the -- the first page of that.

14           So, this was a document relating to the oil field loan

15   that you talked about a few moments ago, right?

16   A.  Yes.

17   Q.  Or earlier this morning?

18   A.  Yeah.

19   Q.  You also did due diligence on this transaction, right?

20   A.  Yes.

21   Q.  I believe you testified that you didn't notice this

22   document back in July 13, 2016 either.  You only saw it

23   recently?

24   A.  No, we only understood the significance of Ruja Ignatova

25   recently.  We had seen the document prior to now.

JB83SCO2                        Spendiff - Cross

1    Q.  Did you see the document back in July of 2016?

2    A.  Whenever it was sent.

3    Q.  Ah.  And this I believe was July 13, 2016.  So, if we could

4    zoom in on just the very first box, Mr. Barile.  You see the

5    name there authorized representative Dr. Ruja Ignatova?

6    A.  Yes, I do.

7    Q.  Did you ever Google her name back during July, August,

8    2016?

9    A.  No.

10   Q.  You never Googled her name?

11   A.  No.

12   Q.  When you Googled OneCoin, her name must have popped up,

13   right?

14   A.  Yes.

15           MR. DEVLIN-BROWN:  If we could take that down, please.

16   And if we could go now to the next page.  The same exhibit.

17   It's Government Exhibit 2247.  Thank you, Mr. Barile.  Let's

18   stop there for a moment.

19   Q.  So, just zooming in on the bottom part, it says 30 million

20   and 30 million.  Do you see that?

21   A.  Yes.

22   Q.  Great.  I'll just blow it up for the jury.  So, this is a

23   underlying share purchase agreement that refers to not one, but

24   two $30 million payments, right?

25   A.  Correct.

JB83SCO2                         Spendiff - Cross

1   Q.  And the second payment due 20 days after signing the

2   agreement?

3   A.  Correct.

4   Q.  This is the oil field related deal that Mr. Scott told you

5   Neil Bush was involved with, right?

6   A.  Correct.

7   Q.  In fact, his name is on some of the documents Apex

8   received, isn't it?

9   A.  I believe there was a reference to him on Mark Scott's CV.

10  A Bush, I couldn't recollect which one.

11          MR. DEVLIN-BROWN:  We can make the call out go away if

12  possible.  Thank you.  If we can go to the next page of this.

13  If we can zoom in on the first paragraph, please.

14  Q.  So, Mr. Spendiff, not only does this share purchase

15  agreement that you looked at in July of 2016 reference Ruja

16  Ignatova, it also references that this deal is going to be paid

17  for in part with OneCoin.  Right?

18  A.  Correct.

19  Q.  You saw that at the time?

20  A.  No.

21  Q.  So you read the document at the time, but you didn't

22  appreciate the significance of OneCoin or you didn't see

23  OneCoin was there?

24  A.  The financial terms of the contract weren't of relevance to

25  us as the administrator.

653

1    Q.  Okay.  But Mr. Scott provided you with both of the deals

2    you executed, documents with either Ruja Ignatova's name, or

3    OneCoin or both.  Right?

4    A.  Correct.

5            MR. DEVLIN-BROWN:  We can take that off the screen.

6    Q.  Now, Apex had the at the relevant time a policy of not

7    handling cryptocurrency related investments, right?

8    A.  No, that's incorrect.

9    Q.  Well, what policy did it have with respect to

10   cryptocurrency at the time?

11   A.  It wouldn't accept cryptocurrencies into the funds

12   themselves as an investment by an investor.

13   Q.  So investments coming in couldn't be cryptocurrency, but

14   transactions related to cryptocurrency were permissible?

15   A.  If the funds was permitted to and in a jurisdiction that

16   allowed it to invest into cryptocurrency, then, yes.

17   Q.  Cryptocurrency was considered then a high-risk area, right?

18   A.  Yes.

19   Q.  There is a lot of regulatory requirements that vary around

20   the world, right?

21   A.  Yes.

22   Q.  And it was sort of a fast-moving thing, where the

23   technologies and the regulations kept changing, right?

24           MS. LOZANO:  Objection.

25           THE COURT:  Overruled.

654

Spendiff – Cross

A.   I'm not an expert on cryptocurrency regulations, so I can't

comment.

              (Continued on next page)

JB89SCO3                        Spendiff - Cross

1  Q.  But it was considered a high-risk area, right?

2  A.  Correct.

3  Q.  And so Apex, for an investment that related to

4  cryptocurrency, wouldn't they do some extra diligence on that?

5  A.  I don't know.

6  Q.  This oil-field-related deal I believe it was called

7  CryptoReal?

8  A.  Correct.

9  Q.  So "crypto" is right in there, in the title?

10          MS. LOZANO:  Objection.

11          THE COURT:  Overruled.

12          THE WITNESS:  Yes.  Crypto is in CryptoReal.

13  Q.  You also saw a number of e-mails that had a RavenR.com

14  address.  Do you remember seeing those?

15  A.  Yes.

16  Q.  Did you ever Google RavenR?

17  A.  No.

18  Q.  Are you aware that RavenR is the family office or was the

19  family office of Ruja Ignatova?

20  A.  No.

21  Q.  Located -- RavenR was located in London.  Did you know

22  that?

23  A.  No.

24  Q.  And you did testify though before I believe when you were

25  giving some explanatory background yesterday that family

1  offices often invest wealth on behalf of high-net-worth

2  individuals, right?

3  A.  Correct.

4  Q.  Now when you did some diligence on OneCoin after July 30 of

5  2016 when you saw that -- when you did some diligence on

6  OneCoin after July 30 of 2016 when you saw the OneCoin.eu

7  e-mail, you did some Googling, right?

8  A.  Correct.

9  Q.  And you saw some blog postings, I believe you said?

10  A.  Yes.

11  Q.  And there were rumors essentially that it could be a Ponzi

12  scheme?

13  A.  Correct.

14  Q.  There was nothing definitive on that at all, right?

15  A.  No.

16  Q.  And you didn't come to the conclusion at Apex that it was a

17  Ponzi scheme, right?

18  A.  We believed with the weight of evidence that it was a Ponzi

19  scheme.

20  Q.  Well, Mr. Spendiff, you talked about regulatory disclosures

21  earlier in your testimony, right?

22  A.  Correct.

23  Q.  And you did not say in those regulatory disclosures that

24  Apex had determined that OneCoin was likely a Ponzi scheme, did

25  you?

1    A.   In the notifications?

2    Q.   Yes.

3    A.   I think we stated that we believed that there may be some

4    illegality around the transactions.

5    Q.   But it was rather vague, right?

6    A.   Correct.

7    Q.   And it didn't just note OneCoin; it noted other things

8    relating to some of the people involved, right?

9    A.   We noted every transaction and every individual who had

10   been referenced in the transaction.

11   Q.   But you also sort of reported issues about Irina Dilkinska,

12   for example?

13   A.   Correct.

14   Q.   And whether she had a high net worth or didn't have a high

15   net worth and whether you -- sorry.  Are you going to answer?

16   A.   No.

17   Q.   Or what her source of wealth was, right?

18   A.   I can't remember the exact content of the notifications.

19   Q.   So I'll move away from that OneCoin subject for now and I

20   want to actually go back to some of the stuff that Ms. Lozano

21   was talking about yesterday, basic sort of the background

22   information about funds and how they work.

23          So Apex is a fund administrator, right?

24   A.   Correct.

25   Q.   And you provide administrative services to a number of

1    funds?

2    A.   Correct.

3    Q.   One of those services is doing anti-money laundering and

4    KYC or know your customer work, right?

5    A.   Correct.

6    Q.   And I think that you testified doing that AML work and KYC

7    worked involved both looking at investments coming into a fund

8    and also looking at what is being invested by the fund, right?

9    A.   Not always.

10   Q.   But it did in the case of Fenero Funds, right?

11   A.   I think it just did AML KYC on the investors.  I don't

12   think it referenced the contract.  I don't think it referenced

13   AML and KYC on the investments.

14   Q.   Well you did do AML and KYC on your investments, right?

15   A.   Because we, as a financially-regulated organization, have

16   responsibilities to do that for our purposes.  It would be the

17   investment manager's responsibility to do the AML and KYC on

18   the investments they had elected to invest into.

19   Q.   Apex did do it on the investments in this case, right?

20   A.   On the?

21   Q.   On the investments?

22   A.   We did some due diligence.

23   Q.   So your testimony is you just did that on your own in this

24   case?  It wasn't a service that related to your agreement with

25   the Fenero Funds or with MSSI?

JB89SCO3                          Spendiff - Cross

1    A.  Correct.

2    Q.  And, in fact, I guess on your own without that being part

3    of the agreement with the Fenero Funds or MSSI you refused

4    certain investments based on your own KYC and due diligence?

5    A.  That's incorrect.

6    Q.  That's incorrect?

7           Well, Mr. Scott asked you to make the second 30

8    million dollar payment on the CryptoReal deal, right?

9    A.  Correct.

10   Q.  And you refused, right?

11   A.  Correct.

12   Q.  And that was based on anti-money laundering and KYC

13   concerns right?

14   A.  Because we had asked for further information before we

15   could make the payment which hadn't been received.

16   Q.  And you never got in your mind satisfactory information to

17   make that payment?

18   A.  Correct.

19   Q.  So is it fair to say that you didn't make that payment

20   based on AML and KYC concerns?

21   A.  That and the notification we had made to the regulators

22   would prohibit from making a transaction which we perceived may

23   be illegal.

24   Q.  OK.  So there is -- not all private equity funds use fund

25   administrators, do they?

1  A.  Correct.

2  Q.  And it's not required of all British Virgin Islands funds

3  to use that?

4  A.  Correct.

5  Q.  In fact, the Fenero Funds were not required by law or

6  regulation to use a fund administrator?

7  A.  I think maybe they actually were.

8  Q.  You believe they actually were?

9  A.  Yes.

10  Q.  Well, it's a good practice in any event right?

11  A.  No.  I think under the BVI Approved Funds Act they do have

12  to appoint an administrator but they don't have to appoint

13  other service providers like an auditor or custodian.

14  Q.  You've been interviewed by the prosecutors and the

15  government officials a number of times before your testimony

16  today?

17  A.  Correct.

18  Q.  Didn't you tell them on one occasion that Fenero was what

19  was called an unregulated fund and as such did not actually

20  need an administrator for the fund?

21  A.  Correct.

22  Q.  So you're now saying you're mistaken about that?

23  A.  Correct.

24  Q.  Don't some private equity funds go directly to banks and

25  have the banks do the due diligence rather than hire fund

JB89SCO3                         Spendiff - Cross

1     administrators?

2     A.   No.

3     Q.   No private equity funds go directly to banks and skip the

4     fund administrator?

5     A.   If the bank only -- define what you mean "skip the fund

6     administrator."

7     Q.   I thought you said that private equity funds were not

8     required to have fund administrators?

9     A.   Correct.

10    Q.   So that would mean a private equity fund could work

11    directly with the bank instead of having an administrator

12    between themselves and the bank?

13    A.   A private equity company can open a bank account directly

14    if it so wishes.

15    Q.   So there are presumably a lot of companies that offer fund

16    administration services?

17    A.   Literally hundreds.

18    Q.   Literally?

19    A.   Hundreds.

20    Q.   And Apex had a good reputation, didn't it, at the time you

21    worked there?

22    A.   I believe it still does.

23    Q.   And you believe you were a good fund administrator,

24    certainly?

25    A.   Yes.

JB89SCO3                         Spendiff - Cross

1    Q.  You thought the people around you were good?

2    A.  Yes.

3    Q.  And there are some fund administrators that are, to use the

4    technical term, a little sketchy?

5    A.  I don't have an opinion on that.

6    Q.  You must have an opinion that some are not as good as Apex?

7    A.  I have an opinion that some aren't as good as Apex.

8    Q.  And Mr. Scott and Fenero Funds chose you?

9    A.  Correct.

10   Q.  I would now like to talk a little bit more about the Fenero

11   Funds themselves.  So as you understood it the Fenero Funds

12   were set up under BVI law, right?

13   A.  Correct.

14   Q.  They were registered at the British Virgin Islands?

15   A.  Correct.

16   Q.  And as far as you were aware everything was done normally

17   and properly with respect to registering those funds?

18   A.  Correct.

19   Q.  You certainly never saw any irregularities in that regard?

20   A.  No.

21   Q.  And, in fact, it was apparent to you from the documents you

22   received that Mr. Scott had or the Fenero Funds or MSSI had

23   engaged outside counsel and other advisers in establishing

24   those funds, right?

25   A.  Correct.

JB89SCO3                          Spendiff - Cross

1    Q.  And that same is true in terms of drafting the subscription

2    agreement, the limited partnership agreement and other sorts of

3    agreements you testified about?

4    A.  Correct.

5    Q.  And in fact there were some exchanges you had during the

6    course of the relationship with the Fenero Funds where drafts

7    would come back from Mr. Scott or the Fenero Funds that were

8    forwarded changed from his legal counsel, right?

9    A.  Yes.

10   Q.  So the British Virgin Islands is a fairly commonplace for

11   private equity funds to register, isn't it?

12   A.  Yes.

13   Q.  And it's particularly common for private equity funds that

14   handle principally non-U.S. investors, right?

15   A.  It's not uncommon.

16   Q.  Is it also popular in some cases for funds to handle U.S.

17   investors?

18   A.  Yes, they will.  U.S. nontaxables.

19   Q.  U.S. nontaxables?  What do you mean by that?

20   A.  U.S. pension funds or trustees accounts, insurers will

21   typically invest.

22   Q.  So is it then I guess fair to say it's a popular location

23   for investors that are not subject to U.S. taxation?

24   A.  Correct.

25   Q.  And the British Virgin Islands has well developed laws and

1    regulations with respect to private equity funds, right?

2    A.   Yes.

3    Q.   A lot of in your experience funds choose the BVI because

4    the legal contracts and -- it's from the English and American

5    tradition and the English language?

6    A.   Correct.

7    Q.   The BVI reports foreign financial accounts to other

8    countries, right?

9              MS. LOZANO:   Objection.

10             THE COURT:   Overruled.

11             THE WITNESS:   I believe so, yes.

12   Q.   Well it reports U.S. taxpayers who have bank accounts in

13   the BVI to U.S. authorities, right?

14   A.   Yes.

15   Q.   As does the Cayman islands?

16   A.   Yes.

17   Q.   Is it fair to say that the reputation of both BVI and

18   Cayman Islands in terms of how stringent their financial

19   systems are has improved greatly over the last decade or so?

20   A.   Yes.

21             MR. DEVLIN-BROWN:   So, if we could put up, if you

22   don't mind, Mr. Barile, Government Exhibit 2202.  At page 21.

23   Q.   So this -- we can look back at the cover e-mail, if you

24   need to, Mr. Spendiff, but this was in the packet of due

25   diligence materials that -- or other materials that the Fenero

JB89SCO3                        Spendiff - Cross

 1   Funds and MSSI provided you?

 2   A.  Yes.

 3   Q.  And does this appear to you to be a certificate for MSS

 4   International Consultants BVI Limited as an approved investment

 5   manager?

 6   A.  Yes, it does.

 7   Q.  As an approved investment manager, MSS International

 8   Consultants was responsible to certain obligations it had with

 9   the BVI authorities, right?

10   A.  I believe so.

11   Q.  You mentioned earlier in your testimony, and we'll come

12   back to it, NAV calculations that are done by Apex?

13   A.  The manager wouldn't have had to have -- the fund would

14   have supplied those.  The manager complies with whatever the

15   rules are in the BVI.

16   Q.  Sorry.  The Fenero Funds you had testified about entity

17   does?

18   A.  Yes.  Correct.

19   Q.  In addition to whatever calculations a fund administrator

20   does for NAV, isn't it true that approved investment managers

21   such as MSS International Consultants have to report audited

22   financials to the BVI authorities?

23   A.  I don't know actually.

24   Q.  Well you did take comfort, didn't you, that MSSI was a BVI

25   registered and approved investment manager?

1   A.  Yes, we did.

2           MR. DEVLIN-BROWN:  We can take that off the screen.

3   Q.  I believe you also testified that Apex has relationships

4   with various banks in the Caribbean and elsewhere; is that

5   right?

6   A.  Apex opens bank accounts on behalf of the funds it

7   administers at multiple banks.

8   Q.  But you have personal and business relationships with

9   bankers at a number of banks, right?

10  A.  As you mean Apex?

11  Q.  As Apex?

12  A.  Yes.

13  Q.  For example, there might be a client that approaches Apex

14  for fund administration work and Apex refers business to a bank

15  or makes some recommendations as to potential banks?

16  A.  Correct.

17  Q.  And it probably happens the other way around as well, where

18  sometimes banks say you could use a fund administrator and

19  here's the number for Apex.

20  A.  Yes.  That's not uncommon.

21  Q.  And I think you testified in this case you weren't sure

22  which way it went, whether you referred Fenero to Apex or vice

23  versa -- sorry.  Whether you referred Fenero to DMS or DMS

24  referred Fenero to you?

25  A.  I'm not aware that Fenero had a relationship with DMS prior

JB89SCO3                        Spendiff - Cross

1   to dealing with Apex.  We were asked to open a bank account for

2   the fund.  And it was asked what bank accounts we would be able

3   to open for this type of fund.  And of the banks that Apex had

4   a relationship with, it was only DMS that would have considered

5   opening the type of account.  So we completed the forms in the

6   normal manner.  Whether Mr. Scott had any engagement with DMS

7   prior to this or whether DMS had -- DMS had mentioned Apex to

8   Mark Scott to introduce Deborah Buscema, I couldn't comment.

9   Q.  Just so everyone is clear.  Deborah Buscema --

10  A.  Was the person who says I've been speaking to Mr. Scott.

11  He wants a fund in euro.

12  Q.  I understand.

13           But in any event your memory in your own dealings with

14  Mr. Scott is that Apex suggested DMS as a bank that might be

15  appropriate for a fund of this sort?

16  A.  Yeah.

17  Q.  And I think you did testify on direct and maybe repeated

18  just now that different banks have different requirements in

19  terms of funds they will administer?

20  A.  That they will open bank accounts for, yes.

21  Q.  That they will open banks accounts for?

22  A.  Correct.

23  Q.  For example, would some of the factors be the size of the

24  fund, experience of the fund manager, types of investments,

25  types of investors, that sort of thing?

JB89SCO3                        Spendiff - Cross

1    A.  Correct.

2    Q.  And you believed that DMS would be a good match with

3    Fenero, right?

4    A.  Correct.

5    Q.  You didn't have any concerns at the time or doubts about

6    DMS's commitment to anti-money laundering, did you?

7    A.  No, not at all.

8    Q.  You didn't have any doubts about their commitment to

9    complying with laws and regulations governing that sort of

10   thing?

11   A.  No.  Not at all.

12   Q.  So I want to move now to the Fenero Funds itself.

13            MR. DEVLIN-BROWN:  So if we could put up, if you don't

14   mind, Mr. Barile, Government Exhibit 2201.

15   Q.  So you testified on direct examination about various

16   materials the Fenero Funds or MSSI sent you -- I guess it's

17   really MSSI that's sending you things, is the legal entity?

18   A.  Correct.

19   Q.  I will try to say that.

20            You testified about things that MSSI sent you in

21   connection with establishing a relationship with it and the

22   Fenero Funds, right?

23   A.  Yes.

24   Q.  And is it fair to say that when you first opened the --

25   first started -- when you agreed to administer these funds that

1   you didn't have any concerns about Fenero?

2   A.   No.

3   Q.   You had no concerns in other words?

4   A.   No.

5   Q.   If we could look at this exhibit which you probably

6   recognize from before.

7            MR. DEVLIN-BROWN:  If we could go to page 5, please.

8   And if we're able to just zoom in on that page.

9   Q.   So Mr. Spendiff this is an organization chart that was

10  submitted to you in connection with the diligence or the

11  opening work on the Fenero Funds relationship?

12  A.   Correct.

13  Q.   And you see at the very top of the chart on the right there

14  is a reference to Mark Scott as an individual with his date of

15  birth and citizenship, right?

16  A.   Correct.

17  Q.   And according to what Mr. Scott provided to you on this

18  chart through various entities he's the hundred percent owner

19  of all of the Fenero Funds -- that's probably technically

20  incorrect.

21  A.   Every entity in there appears to be ultimately owned by

22  Mr. Scott.

23  Q.   Thank you.

24            And you also see he has a Florida company MSS

25  International Consultants LLC?

1   A.  Correct.

2   Q.  So a Florida LLC wouldn't be able to become an approved BVI

3   investment manager, right?

4   A.  Sorry.  Could you ask that question.

5   Q.  I'll guess I'll rephrase it.  For Mr. Scott's MSS

6   management company to obtain the authorization that we showed

7   you a few minutes ago on the screen he had to have a corporate

8   entity in the BVI, right?

9   A.  I don't know.

10  Q.  So I'm going to ask you about some of the green boxes

11  towards the bottom.  You had an understanding, didn't you, that

12  some of what Mr. Scott indicated he wanted to do with the

13  Fenero Funds was make investments in European assets?

14  A.  Correct.

15  Q.  And you understood that he was planning to set up companies

16  in Ireland?

17  A.  Yes.  I think he did mention that.

18  Q.  And Ireland, in fact, is a common location to establish

19  corporate entities for the purpose of investments by a private

20  equity fund, right?

21  A.  Yeah.

22  Q.  And that's because Ireland has very favorable tax laws,

23  right?

24  A.  I'm not in a position to comment why tax investment

25  managers pick specific jurisdictions.

JB89SCO3                      Spendiff - Cross

1    Q.  I'm not either.  Your understanding is that --

2    A.  There are advantages of which -- there are advantages as I

3    understand it.  I'm not fully aware of explicitly what those

4    advantages would be.

5    Q.  And you see at the bottom of the chart the green boxes

6    there are three separate companies listed, right?

7    A.  Correct.

8    Q.  Have you heard of the term SPV or special purpose vehicle?

9    A.  Yes.

10   Q.  And is it common when a private equity fund makes an

11   investment in a particular company for the private equity fund

12   to create a separate legal entity that would just handle

13   investment in that particular company?

14   A.  Yes.

15   Q.  And that's to keep it separate from other investments it

16   may have elsewhere, right?

17   A.  Yes.

18   Q.  So there's nothing suspicious, is there, about a private

19   equity company that has an organization chart with lots of

20   different boxes on it?

21   A.  No.

22   Q.  And I imagine in your experience you've seen some that have

23   plenty more boxes than this, right?

24   A.  Yes.

25   Q.  Maybe wouldn't fit on the page?

JB89SCO3                          Spendiff - Cross

1    A.  Correct.

2              MR. DEVLIN-BROWN:  If we could go down to the next

3    page.  Page 6, please, Mr. Barile.

4              So we can leave the whole thing on for a moment and

5    then we'll zoom in.

6    Q.  But I believe you testified about this document on direct

7    that was submitted by Mr. Scott, the Fenero Equity Investment

8    Mission Statement?

9    A.  Yes.

10   Q.  I wasn't a hundred percent clear on your direct as to

11   whether that was a requirement for PE funds or a best practice

12   or what?

13   A.  There's a requirement for these types of funds to have term

14   sheets which we -- which outlines the type of fund, what funds

15   are going to invest into, determines the fund target

16   investment; so very brief outline the terms that the fund will

17   be operating under.  Because it's a requirement we always say

18   this is a term sheet for the fund.

19   Q.  This isn't what you would technically consider a term sheet

20   or is it?

21   A.  Yes.  Because it's a legal requirement we assume that is a

22   term sheet.

23   Q.  Are there some term sheets you get that are more formal

24   legal-looking documents?

25   A.  You get prospectuses for some funds that run into hundreds

1   of pages.

2   Q.  And a prospectus, to be clear, is a document that funds

3   send to potential investors in some circumstances about what

4   the investment will be?

5   A.  Yes.

6   Q.  And there was no prospectus for the Fenero Funds that

7   you're aware of?

8   A.  No.

9   Q.  Nor required that they issue a prospectus that you're aware

10  of?

11  A.  No.

12  Q.  So you treated this mission statement as essentially a term

13  sheet?

14  A.  Correct.

15  Q.  So mission statements to a degree are forward looking,

16  right?

17  A.  Yes.

18  Q.  They are sort of a plan that is written at the moment it's

19  written as to what the goals and mission of the fund is?

20  A.  Correct.

21  Q.  Sometimes they're optimistic in your experience?

22  A.  Yes.

23  Q.  And sometimes things don't work out exactly as planned for

24  every private equity fund?

25  A.  Correct.

JB89SCO3                        Spendiff - Cross

1    Q.  And I think you even said sometimes there are changes that

2    are made in terms of what the private equity fund actually does

3    versus what's on a mission statement?

4    A.  I think I said term sheet or prospectus, yes.

5    Q.  And if a significant enough variation you might have some

6    diligence or questions you need to address with the fund

7    manager, right?

8    A.  Correct.

9    Q.  But if the variations are not particularly material you

10   wouldn't have any questions or diligence?

11   A.  Possibly.

12          MR. DEVLIN-BROWN:  So if we could now zoom in just on

13   the first paragraph, please, Mr. Barile.

14          Am I able to highlight on the screen here?  It does

15   work.  I will try a little bit and then, Mr. Barile, I may have

16   to ask you.

17   Q.  Do you see the reference here that I've partly scribbled

18   over to "small investor base of wealthy families"?

19   A.  Yes.

20   Q.  And you understood from this that there were not going to

21   be a large number of investors in the fund, right?

22   A.  Correct.

23   Q.  As contemplated in the mission statement.

24          And it said they were going to be wealthy families and

25   middle market companies.

1          What are middle market companies as you understand it?

2   A.   Midsized companies.  So not very large companies.

3   Q.   Not Apple or?

4   A.   No.

5   Q.   IBM or other?

6   A.   Correct.

7   Q.   Other necessarily brand name companies that people would

8   have heard of?

9   A.   Correct.

10  Q.   There are a lot of middle market companies that people

11  haven't heard of?

12  A.   Sure.

13          MR. DEVLIN-BROWN:  OK.  We can remove that if possible

14  Mr. Barile and just go to the second paragraph.

15          Ms. Rivera, are you able to make that go away.  Thank

16  you.

17  Q.   Are we on the second paragraph now?  Right.  So the first

18  sentence says, "Fenero has been created at the request of a

19  select group of European families and companies that want to

20  take advantage of potential business synergies between them."

21  We can stop there.  There's obviously more.

22          Does this indicate to you, Mr. Spendiff, that there

23  were a group of families or companies that collectively

24  requested Mr. Scott or MSSI to create the Fenero Funds?

25  A.   Yes.

JB89SCO3                          Spendiff - Cross

1   Q.  And that would imply that these families or companies might

2   be related, right?

3   A.  Yes.

4          MR. DEVLIN-BROWN:  If we could just look at number

5   three.  You can do whatever you do, Mr. Barile.

6   Q.  "Diversify and separate a portion of their capital from

7   their individual family businesses."

8          Do you see that Mr. Spendiff?

9   A.  Yes, I do.

10  Q.  Do you understand -- well, stop for a second.

11         Is it not uncommon in your experience for family

12  businesses to create companies that perhaps become much larger

13  than they started out as?

14  A.  Yes.

15  Q.  I mean a family business is not necessarily like a

16  mom-and-pop company, right?

17  A.  Correct.

18  Q.  There could be very large privately-held companies in

19  families?

20  A.  Yes.

21  Q.  So do you understand "diversify and separate a portion of

22  their capital from their individual family businesses" to mean

23  removing some of the money that individuals invested into their

24  business and putting it into their own control in accounts

25  essentially?

1    A.   Yes.

2    Q.   Taking assets that they had in a business and putting them

3    elsewhere?

4    A.   Potentially, yes.

5    Q.   And individuals do that for all sorts of reasons, don't

6    they?

7    A.   They appear to, yes.

8    Q.   Based on your experience as a fund administrator?

9    A.   Yes.

10   Q.   Sometimes to protect assets in your experience?

11   A.   I mean I don't know the exact reason why they would choose

12   to move the money or not but they do move the money.

13   Q.   And you also see in this paragraph -- actually if we could

14   zoom out, Mr. Barile.  It's the third paragraph.

15        Do you see the reference to the fund manager engaging

16   premiere law firms Ogier, Mason Hayes & Curran, Arthur Cox?

17        You had some dealings in fund administration work with

18   Mason Hayes, right?

19   A.   I think Apex may have done.  Not from my office.

20   Q.   Do you see Ogier on some of the documents?

21   A.   Yes.  I know Ogier as a law firm.

22   Q.   A reputable law firm?

23   A.   Yes.

24        MR. DEVLIN-BROWN:  Take that off, please.

25        If you could go to page seven of this document,

JB89SCO3                                    Spendiff - Cross

1   Mr. Barile.

2   Q.  And if you see there's a list below the end of the mission

3   statement that says:  Benefits of the Fenero multi-family

4   office approach.

5            If you could look at the bullet that has the

6   underlining, the cost savings benefits of pooled purchasing

7   power with full confidentiality.  It's the one with underlining

8   there.

9   A.  Sorry.  You want me to read that.

10  Q.  I just wanted to directed your attention to it.

11  A.  OK.

12  Q.  It's not uncommon, is it, for investors in private equity

13  funds to want to be as confidential as possible?

14  A.  No.  It's not unusual.

15  Q.  It's not unusual?

16  A.  Not unusual.

17  Q.  And you're aware, aren't you, that a general partner of a

18  investment fund would have fiduciary duties to the limited

19  partners investing with it?

20  A.  Correct.

21  Q.  As would the fund manager?

22  A.  Correct.

23  Q.  And that would not excuse lying on behalf of any investor,

24  of course, right?

25  A.  No, it would not.

JB89SCO3                          Spendiff - Cross

1   Q.  But to the extent it's consistent with the law an investor

2   who wanted to keep as confidential as possible that would be a

3   duty that a fund manager should pursue, right?

4               MS. LOZANO:  Objection.

5               THE COURT:  Overruled.

6               THE WITNESS:  Sorry.  Could you repeat the question.

7   Q.  It was a bit muddled.  I'll break it into parts.

8               Obviously a desire for investors for full

9   confidentiality wouldn't excuse a fund manager in terms of

10  lying or making misrepresentations right?

11  A.  Correct.

12  Q.  However, short of that, an investor who wants full

13  confidentiality to the extent the law allows, an investment

14  manager should honor that request?

15  A.  I would think so, yes.

16              MR. DEVLIN-BROWN:  If we could also go to page 7,

17  please.  We are on page 7.  I want to zoom in on the top of the

18  first paragraph that starts with, "The fund manager receives a

19  management fee."

20  Q.  So this is the provision of the mission statement or term

21  sheet that sets out the funds that the fund manager is

22  expecting to receive for managing the funds, right?

23  A.  Yes.

24  Q.  And it refers to several different components?

25  A.  Correct.

1  Q.  There is a management fee of one percent per deposit in the

2  fund?

3  A.  Yes.

4  Q.  So if a hundred million is deposited in the fund one

5  percent would be one million dollars?

6  A.  Correct.

7  Q.  An additional one percent on average annual remaining cash

8  value of the fund?

9  A.  Correct.

10  Q.  And there's also an eight percent carried interest pari

11  passu with the investors upon any exit?

12         Do you know what that means?

13  A.  Yes.

14  Q.  What does it mean?

15         I'm not going to ask a leading question.  What does it

16  mean?

17  A.  The manager would be given an eight percent interest in the

18  fund and proportionally as each asset was sold they too would

19  receive an equal amount of that relevant to the amount that was

20  sold from the fund.  So if they hold eight percent in the fund,

21  they sold ten percent, they would get the corresponding amount

22  of that as each asset was sold.

23  Q.  Is this fee agreement or fee provision out of whack with

24  what you're used to seeing in private equity funds?

25  A.  No, it's not.

JB89SCO3                          Spendiff - Cross

1   Q.  And fund managers can make a lot of money, right?

2   A.  Yes, they can.

3   Q.  Did you have any understanding as to whether Mr. Scott's

4   fee agreements with investors changed over time or fee

5   arrangements?

6   A.  No.

7           MR. DEVLIN-BROWN:  I think we can take that off.

8   Q.  One other question.  You paid during the period when you

9   managed the Fenero Funds you paid fees to Mr. Scott, right?

10  A.  Yes.

11  Q.  And Mr. Scott and the Fenero Funds also had various

12  expenses, if I'm not mistaken?

13  A.  Yes.

14  Q.  And you would reimburse them for the expenses from the

15  fund?

16  A.  Yes, I did.  They were paid.

17          MR. DEVLIN-BROWN:  We can take that off the screen.

18          If we could -- we don't necessarily need to show a

19  document.

20  Q.  But you also did some due diligence on Mr. Scott

21  personally, right?

22  A.  Correct.

23  Q.  You saw that he had worked at Locke Lord for a number of

24  years?

25  A.  Yes.

1  Q.  And in your mind that was a well regarded international law

2  firm?

3  A.  Yes.

4  Q.  He was a partner of the law firm?

5  A.  Correct.

6  Q.  Working in the areas, according to what you saw from Locke

7  Lord, on private equity, right, and other corporate work?

8  A.  And real estate, yes.

9  Q.  And he also listed a long career as a corporate lawyer in

10  his resume, right?

11  A.  Yes.

12  Q.  Resume was also provided?

13  A.  Correct.

14         MR. DEVLIN-BROWN:  If we could put up, Mr. Barile, if

15  you don't mind, Government Exhibit 2202.

16  Q.  So I believe you saw this in your testimony yesterday, a

17  document attaching certain due diligence materials relating to

18  MSCI BVI, right?

19  A.  Yes.

20  Q.  And I think you went over some of those documents but I'd

21  like to just touch on a few more.

22         MR. DEVLIN-BROWN:  Could we go to page 22, please.

23  Q.  So, Mr. Spendiff, is this the memorandum of limited

24  partnership of Fenero Equity Investments LP?

25  A.  Yes.  It appears so.

1    Q.   It was provided to you as such anyway?

2    A.   Yes.

3    Q.   An Appleby, do you see the name there?

4    A.   Yes.

5    Q.   Is that a firm that is known to work in this area of

6    creating partnership documents for funds?

7    A.   Yes, it is.

8    Q.   You didn't notice any irregularities when you received

9    these materials, right?

10   A.   No.

11          MR. DEVLIN-BROWN:  If we could turn to page 27,

12   please, Mr. Barile.  And maybe just zoom in on the part

13   above -- until we get to the general instructions.  Including

14   the signature -- well from there until we get down to

15   instructions.  That's right.  Thank you, Mr. Barile.

16   Q.   What's a W-9?

17   A.   It's a tax form.

18   Q.   And how is a W-9 related to private equity fund

19   administration approval?

20   A.   I think you have to complete one in order to get -- it's

21   part of the approval process.

22   Q.   This lists as the name on the W-9, which is called a

23   request for taxpayer identification number and certification,

24   MSS International Consultants LLC, right?

25   A.   Yes.

JB89SCO3                          Spendiff - Cross

1   Q.  That's the entity Mr. Scott has in Florida, I believe?

2   A.  Correct.

3   Q.  And you see the U.S. address is listed there?

4   A.  Yes.

5   Q.  And DMS Bank is listed there?

6   A.  (No response).

7   Q.  Just to the right of the address.

8   A.  Yes.

9   Q.  And do you also see there is an employer identification

10  number filled out?

11  A.  Yes.

12  Q.  And as you understand it that is the number associated with

13  MSS International Consultants LLC for the IRS in the US?

14  A.  It looks -- yeah, it looks like it.

15          MR. DEVLIN-BROWN:  And if we could now go to 2202

16  at -- page 55, please, Mr. Barile.

17  Q.  Before I get there you may have mentioned this before but I

18  believe you said that both the Cayman Islands and BVI are --

19  both the Cayman Islands and BVI reports U.S. taxpayers when

20  they have that information to the IRS pursuant to tax treaties?

21  A.  They are signatories to FATCA which is the tax notification

22  to the U.S. tax authorities.

23  Q.  Through that they provide taxpayer information?

24  A.  Correct.

25  Q.  What is an entity self-certification?

1   A.   This is the basically the entity stating its tax position.

2   Q.   And this is filled out on behalf of MSS International

3   Consultants but --

4            MR. DEVLIN-BROWN:  Is it possible to remove the screen

5   from the public just because I think there's a private number

6   on there.  If that's OK with your Honor?

7            THE COURT:  Yes.

8            MR. DEVLIN-BROWN:  Page 59, please.

9            If we could just blow up the first part of that.

10  Q.   This lists EINs which are taxpayer numbers for companies as

11  well as Social Security numbers for the people involved, right?

12  A.   Yes.

13  Q.   Which included in this case Mr. Scott?

14  A.   It looks like yes.

15           MR. DEVLIN-BROWN:  We can remove that.

16  Q.   So as a result of your initial diligence on the Fenero

17  Funds you wrote letters of comfort.  Do you remember testifying

18  about that?

19  A.   As part of the application process a letter of comfort is

20  provided for each bank account opening.

21  Q.   That was I believe a letter that you provide to the bank

22  account, the bank, sort of assuring the representative of the

23  bank that you will have and will monitor investments into the

24  fund?

25           MS. LOZANO:  Objection.  That wasn't his testimony.

1          THE COURT:  Overruled.

2   Q.  Go ahead and tell me or tell us what a letter of comfort

3   is.

4   A.  I think it states that we do certain AML and KYC functions

5   for the fund and that we don't have AML and KYC on both the

6   fund and the investment management company.

7   Q.  And you only provide that once you're comfortable with the

8   application submitted by the fund manager, right?

9   A.  Yes.

10  Q.  And I believe you did that for two of the Fenero Funds,

11  right, they had?  Fenero Equity Investments LLP was the first

12  one?

13  A.  I think so.

14  Q.  And the second was Fenero Financial Switzerland?

15  A.  I think so, yeah.

16  Q.  You also didn't have any problems with Mr. Scott's

17  investors when you initially screened them, right?

18  A.  Correct.

19  Q.  You signed off on the subscription package for B&N EOOD,

20  right?

21  A.  Yes.

22          MR. DEVLIN-BROWN:  If we can put on the screen

23  Government Exhibit 2207 please at page 20.

24          If possible, just blow up the text to make it a little

25  bit bigger.

JB89SCO3                        Spendiff - Cross

1    Q.  So I believe you saw this page before.  This is information

2    on the subscription agreement being provided in connection with

3    it being submitted to you, right?

4    A.  Correct.

5    Q.  Now, this form asks certain questions.  You see that?

6    A.  Yes.

7    Q.  And this form was actually designed with or in consultation

8    with Apex, right?

9    A.  We provide standard information which is usually used in

10   the subscription documents to reflect what our requirements

11   would be.

12   Q.  So this form met your requirements, right?

13   A.  Yes.

14   Q.  It asked the information that you wanted completed in a

15   identification information form for companies and partnerships?

16   A.  Initially, yes.

17   Q.  And that is a form that you use as part of your KYC or

18   know-your-customer process, right?

19   A.  Correct.

20   Q.  And this form mentions Irina Dilkinska?

21   A.  Yes.

22   Q.  And then you see there's a section in the middle:  General

23   Nature of Company/Partnership's Operations?

24   A.  Yes.

25           MR. DEVLIN-BROWN:  Blow that up, please, Mr. Barile.

JB89SCO3                          Spendiff - Cross

1   Q.   So it says General Nature of the Company/Partnership's

2   Operations, right?

3   A.   Yes.

4   Q.   Do you remember Ms. Lozano asked you on direct if anything

5   on this form stated in substance that OneCoin was involved with

6   this business?

7   A.   Correct.

8   Q.   And it's not stated anywhere there, right?

9   A.   No.

10  Q.   Instead, in response to general nature of the

11  company/partnership's operations it says "sales and marketing

12  consulting"?

13  A.   Yes, it does.

14  Q.   And a sales and marketing consulting company could provide

15  such services for either one client or a number of clients,

16  right?

17  A.   I imagine anything falls into that description.

18  Q.   And there's nothing on here that asks that clients of the

19  company provide this information be listed, right?

20  A.   Correct.

21       MR. DEVLIN-BROWN:   Take that off the scene now.

22  Q.   I think you testified before that you as part of the

23  diligence process put information approved, I think you said

24  World-Check; is that right?

25  A.   Yes.

JB89SCO3                         Spendiff - Cross

1    Q.   What is World-Check?

2    A.   It's a background, it's a database which you put names

3    into.  And then it has a list of people who are wanted by

4    certain government agencies or have committed criminal offenses

5    or have the subject to court action and similar so.

6    Q.   So you put Irina Dilkinska into World-Check or someone at

7    Apex did in connection with this process?

8    A.   Yes.

9    Q.   And nothing came out that was problematic?

10   A.   No.

11   Q.   And did you also put in B&N EOOD?

12   A.   Yes.

13   Q.   And nothing came back that was problematic?

14   A.   No.

15   Q.   Do you do as part of your diligence searchings for negative

16   news articles?

17   A.   Yes.

18   Q.   Did you do that for Irina Dilkinska and B&N EOOD?

19   A.   Yes.

20   Q.   And nothing problematic came back?

21   A.   No.

22   Q.   So you approved this fund -- approved this investment

23   initially?

24   A.   Yes.

25   Q.   And then there was a second subscription package submitted

1    to you by IMS; is that right?

2    A.   Yes.

3    Q.   And you didn't have any issues with that subscription

4    package either, did you?

5    A.   Yes, we did.

6    Q.   Initially you did?

7    A.   We never accepted a subscription from IMS.

8           MR. DEVLIN-BROWN:   Well if I could put on the screen

9    Government Exhibit 2212, please.

10   Q.   So this contains -- you can just scroll through this, some

11   information on a second investor IMS, right?

12   A.   Correct.

13   Q.   And the date of this document was I believe June 4 of 2016?

14   A.   Correct.

15   Q.   So at this point though you didn't have any concerns about

16   IMS?

17   A.   I think we asked a series of additional questions for

18   information that we would need in order to process the

19   subscription.

20          THE COURT:   Mr. Devlin-Brown, it's 12:45 so we're

21   going to break now for fifteen minutes.  Ladies and gentlemen,

22   don't discuss the case.

23          (Jury not present)

24          THE COURT:   Any issues?

25          MS. LOZANO:   No.

1          THE COURT:  OK.

2          (Recess)

3          (Jury present)

4          THE COURT:  Mr. Devlin-Brown.

5          MR. DEVLIN-BROWN:  Thank you, your Honor.

6     BY MR. DEVLIN-BROWN:

7     Q.  So before the break, Mr. Spendiff, we had been talking

8     about the diligence on the initial investors in the Fenero

9     Funds.  I want to turn -- stay on the same subject basically

10    but direct your attention --

11         MR. DEVLIN-BROWN:  If we could put up Government

12    Exhibit 2214, please, Mr. Barile.  Go to the last page of this

13    document.

14         I may have the wrong document.  You can take that off

15    the screen.

16    Q.  Do you recall in direct examination being asked about an

17    agreement in which IMS changed its intended subscription to

18    B&N?

19    A.  Yes.

20    Q.  Actually I think that's -- nevermind.

21         And you signed off on that, right -- Apex did?  Apex

22    permitted that?

23    A.  We accepted the instruction from the investor and the

24    investment manager, yes.

25    Q.  You didn't stop accepting investments or anything like

JB89SCO3                          Spendiff – Cross

1    that?

2    A.  No.

3    Q.  And that's not totally uncommon, right, for something like

4    that to occur where one investor transfers something to another

5    related investor?

6    A.  It's quite uncommon.

7    Q.  It's quite uncommon?

8           Didn't you tell the government when you met with them

9    in August of 2016 that things like that do happen from time to

10   time?

11   A.  They do happen from time to time.

12   Q.  I mean it wasn't so uncommon that it raised serious red

13   flags for you, right?

14   A.  Correct.

15   Q.  So Mr. Scott initially was happy as far as you could tell

16   with the due diligence protocols you were following for

17   screening investors, right?

18   A.  Yes.

19   Q.  Do you recall that he questioned you as to whether it was

20   appropriate to put a bank account number for investors to send

21   money before you had signed off on them?

22   A.  Correct.

23          MR. DEVLIN-BROWN:  If we could show Government Exhibit

24   2208, please.  And highlight the middle paragraph.

25   Q.  This is from Mark to various people at Apex including you

1    on May 24, 2016, right?

2    A.  Yes.

3    Q.  And Mark Scott writes, "We are now facing the scenario that

4    I predicted.  Investors are starting to wire funds before all

5    KYC has been delivered and/or approved.  Based on Paul letting

6    us know last week that this is fine, we are not pushing back

7    with investors."

8            When he writes "based on Paul letting us know last

9    week this is fine," he's referring, as you understand it, to

10   your prior discussion as to whether it was OK to put the

11   account number on before you did due diligence?

12   A.  He asked what would happen if money arrived that hadn't

13   passed due diligence and I explained the circumstances.

14   Q.  And you explained you would --

15   A.  The money would stay in the account subject to receiving

16   the requisite due diligence or if that didn't arrive but there

17   was no indication of illegality.  The money would simply be

18   returned to the investor from the account from which it came.

19   Q.  That's the standard practice, right?

20   A.  If money is received that doesn't -- and the AML and KYC is

21   completed, correct.

22   Q.  So Mark Scott would sometimes pushback on some of Apex's

23   due diligence requests, right?

24   A.  Yes.

25   Q.  And that's not uncommon, right?

1    A.  No, it's not.

2    Q.  In fact, is it your experience that clients tend to like as

3    little due diligence as possible?

4    A.  Sometimes, yes.

5    Q.  Because it can be intrusive or delay investments or other

6    reasons they convey to you at the time?

7    A.  Yes.

8    Q.  And he did follow up on due diligence you made at least

9    initially, right?

10   A.  Correct.

11           MR. DEVLIN-BROWN:  If we could put on the screen

12   Government Exhibit 2220, please.  And we can leave it where it

13   is for a moment.

14   Q.  But you see this is an e-mail from June 13, 2016 from Mark

15   Scott to people at Apex?

16   A.  Yes.

17   Q.  Including yourself.  And he indicates he has some comments

18   to questions in red, right?

19   A.  Yes.

20           MR. DEVLIN-BROWN:  If you could page through it.  We

21   can stop there.  And maybe zoom in on that portion.

22   Q.  So there are questions being asked of the subscribers in

23   black and answers that Mr. Scott is providing in red, right?

24   A.  Yes.

25   Q.  So IMS, for example, he described in red here, as being

1  headquartered in Germany, right?

2  A.  Yes.

3  Q.  Being a global provider of sales, marketing and collection

4  services?

5  A.  Yes.

6  Q.  And he says it regularly works for B&N?

7  A.  Yes.

8  Q.  It doesn't say it works for OneCoin here, right?

9  A.  No.

10  Q.  But it does provide further information that you had

11  requested about IMS?

12  A.  Yes.

13          MR. DEVLIN-BROWN:  We can take that exhibit off the

14  screen.

15  Q.  In fact, Mark sometimes communicated to you that he

16  appreciated your due diligence, right?

17  A.  Yes.

18          MR. DEVLIN-BROWN:  Is Government Exhibit 2227 in

19  evidence, I believe?  Don't publish it yet.

20          MS. LOZANO:  Yes.

21          MR. DEVLIN-BROWN:  OK.  You can publish it then.

22          So you could just page quickly through the e-mail

23  chain, Mr. Barile.

24  Q.  So there is some back and forth, fair to say, between you

25  and Mark Scott about diligence that's being done?

JB89SCO3                            Spendiff - Cross

1    A.  Yes.

2    Q.  And I don't know if you noticed at the bottom of that

3    e-mail there was another RavenR address.  Did you see that?

4    A.  I just saw it just now.

5    Q.  And we can just look at it at the very bottom.

6            MR. DEVLIN-BROWN:  Go back up one page, Mr. Barile.

7    Q.  So in the e-mail that's at the top here, you're generally

8    explaining why you had to make certain calls for -- or a call

9    anyway to do due diligence on this investment, right?

10   A.  We -- not on the investment per se but we contacted the

11   finance director of the FCA-regulated company in question to

12   confirm there was a transaction that the bank account -- the

13   route the monies were taking to complete that transaction were

14   as described to us by Mr. Scott.

15   Q.  And this is the PCT, the payment car transaction?

16   A.  Correct.

17   Q.  And that was as you understood the regulated company in the

18   UK?

19   A.  Yes.

20   Q.  Involved in credit card processing or related services?

21   A.  Yes or similar.

22           MR. DEVLIN-BROWN:  And you wrote in this e-mail, if

23   you could just highlight the "under the circumstances"

24   paragraph, Mr. Barile.

25   Q.  So you wrote that, "mindful of the need to safeguard the

JB89SCO3                        Spendiff - Cross

investors' interests at all times it is wholly appropriate to

check the facts received by MJ Hudson and to follow the DD

trail from the transaction all the way to the fund."

          And MJ Hudson was a law firm involved in the

transaction, right?

A.   They drafted the legal agreement between the parties.

Q.   Including MSSI or the Fenero Funds, right?

A.   Correct.

Q.   And by follow the DD trail you mean due diligence trail?

A.   Just the flow -- yes.  In this case, the flow of money

between the different entities before it eventually ended up in

the company.

Q.   DD being due diligence?

A.   Due diligence, yes.

          MR. DEVLIN-BROWN:  If we could just page up to the top

e-mail then.  And zoom in on the top e-mail.

Q.   And Mark writes to you here, "I have no issues with you

doing your due diligence at all and appreciate it frankly.  I

would just prefer if you make me aware of issues prior to

reaching out to third parties.  In some cases you may find

issues we overlooked and that may impact a transaction.  All

worked out fine and thanks for the swift handling of

everything."

          MR. DEVLIN-BROWN:  I think we can take that off the

screen now.

1              If we could also show Government Exhibit 2229, please.

2     Q.  So this is the wire request checklist for the payment card

3     technologies deal; is that right?

4     A.  Correct.

5     Q.  If we could page down to page 8.  Basically there's

6     supporting documents behind these wire transfer requests?  Is

7     that how it works?

8     A.  Yes.

9              MR. DEVLIN-BROWN:  And if you could zoom in on the

10    e-mail at the bottom, please.

11    Q.  So Mark Scott says to you hear, "I would like to avoid for

12    you to call the people we are paying and investing with to

13    confirm the authenticity of my capital requests, but please

14    move ahead and do so in this matter so that we can get them

15    funded."

16             Do you see that?

17    A.  Yes.

18             MR. DEVLIN-BROWN:  I think we can take that off the

19    screen as well, Mr. Barile.

20    Q.  So let's stay with the payment card technologies investment

21    just a little bit longer.  Fair to say you had some back and

22    forth with Mr. Scott and others doing due diligence on that

23    transaction?

24    A.  Yes.

25    Q.  And ultimately you were comfortable that everything

1   appeared to be in order?

2   A.   Correct.

3   Q.   And you, therefore, approved the wire request that we just

4   saw to make a payment towards the transaction?

5   A.   We acted on the instruction of Mark Scott to move the

6   money, yes.

7   Q.   But if Mark Scott had provided that instruction and you had

8   not been satisfied you could have stopped it, right.

9   A.   We could have not made the payment until we were satisfied.

10  Q.   Right.  Which, in fact, later happened with respect to the

11  second payment on the oil-field-related deal, right?

12  A.   Correct.

13  Q.   You're familiar with Brexit?

14  A.   Yes.

15  Q.   Probably very much so by comparison.  But all the way back

16  in 2016 that was when Brexit it first happened, right?

17            MS. LOZANO:  Objection.  Relevance.

18            THE COURT:  Overruled.

19            THE WITNESS:  Yes.  That summer.

20  Q.   And through a referendum of the people in the UK?

21  A.   Yes.

22  Q.   And is it fair to say that that had a negative impact or

23  caused some friction in investments in Europe and the UK

24  following Brexit it –– following the vote?

25  A.   I'm not in a position to comment.

JB89SCO3                          Spendiff - Cross

1   Q.  Well are you aware at that time that some banks began

2   charging negative interest to hold euros outside of European

3   countries anyway?

4   A.  That wasn't related to Brexit.  That was related to the

5   interest rates at the European Central Bank for euros.  So it

6   applied wherever you held euros globally.

7   Q.  So it applied across the world?

8   A.  Yeah.  If you owned euros, yes.

9   Q.  So if I understand the negative interest rate correctly,

10  that means if I put a thousand dollars in the bank and, in my

11  savings account, it doesn't grow over time; it goes down over

12  time?

13  A.  Correct.

14  Q.  And that was the situation facing some investment funds at

15  that time, right?

16  A.  Anyone holding euro cash, yes.

17  Q.  In fact, you recall that Mark Scott's funds had negative

18  interest rates because they were holding euros?

19  A.  Correct.

20  Q.  And those were fees that the fund had to pay out, right?

21  A.  The bank deducted that money so that they could

22  subsequently pay the Central Bank for holding the euros.

23  Q.  I want to ask you a few questions about the NAV that you

24  discussed yesterday and earlier this morning?

25  A.  Sure.

1   Q.  That stands for net asset valuation?

2   A.  Correct.

3   Q.  And I believe you testified on direct that Mr. Scott had

4   terminated his relationship with Apex shortly before the NAV

5   calculation was due?

6   A.  Sure.

7   Q.  Now, Mr. Scott's funds were what's known as closed-end

8   funds, right?

9   A.  No.

10  Q.  They were known as open-end funds?

11  A.  Correct.

12  Q.  Why don't you explain the difference between an open-end

13  fund on and a closed-end fund?

14  A.  So an open-end fund has no date by which it will have to be

15  wound up.  A closed-end fund does have a date by which it would

16  have to be wound up.

17  Q.  You understood that Mr. Scott's funds were not going to be

18  traded among investors, right?

19  A.  Correct.

20  Q.  So there's some funds that you have that are essentially

21  securities, right, where someone can buy into that fund or sell

22  an interest in the fund to someone else?

23  A.  Correct.

24  Q.  And that wasn't the case with the Fenero Funds as far as

25  you knew?

1    A.  Not from the documentation provided to us.

2    Q.  And for funds that are regularly traded it's important that

3    NAV always be accurate and up to date?

4    A.  On the dealing day, yes.

5    Q.  The what day?

6    A.  The day that you're due to trade the interest in the fund,

7    yes.

8    Q.  And having calculations as consistently for a fund that is

9    not trading is less important, right?

10   A.  Correct.

11   Q.  Do you recall that you had some negotiations with MSSI,

12   Mr. Scott about the fee structure for Apex?

13   A.  Correct.

14   Q.  And in fact there were no fees charged by Apex relating to

15   NAV calculation, right?

16   A.  I'm not sure that is correct.

17   Q.  Well let's put up Government Exhibit 2204 if we could,

18   please.  I'm not certain -- it might be page 20.  There's a

19   fee --

20   A.  Fee schedule.

21   Q.  Fee schedule.  Exactly.

22            MR. DEVLIN-BROWN:  If we could maybe zoom in on the

23   text.

24   Q.  So this is the complete fee schedule for Apex and the

25   Fenero Funds, right?

JB89SCO3                          Spendiff - Cross

1    A.  Correct.

2    Q.  And there is no fund that -- there is -- no payments are

3    due for NAV, based on NAV?

4    A.  Portfolio -- fund and portfolio accounting is what goes in

5    to constitute NAV.  So there is no explicit -- so if you are

6    the fund and portfolio accountant of the -- that's generating

7    the NAV, operating the bank account, providing all the other

8    services listed in a service schedule; and then investor

9    servicing is the transfer agency piece so there is -- that

10   would be included in that $50,000 fee.

11   Q.  I do see there's a $50,000 fee.  I don't see mention of

12   NAV.  And the fee here, according to this document anyway,

13   doesn't vary based on the NAV of the fund, right?

14   A.  No, it doesn't.

15           MR. DEVLIN-BROWN:  If we could go to section 5.5,

16   please, of the agreement which I'm sorry, Mr. Barile, I don't

17   know the page number.

18           MS. LOZANO:  Nine.

19           MR. DEVLIN-BROWN:  Nine.

20   Q.  So this is the provision in the fund administration

21   agreement relating to that net asset value, right?

22   A.  Correct.

23   Q.  I believe you testified that you were required to calculate

24   it on a quarterly basis?

25   A.  Correct.

JB89SCO3                          Spendiff - Cross

1   Q.   This doesn't say that, right?

2   A.   No, it doesn't.

3   Q.   In fact, nothing in this document says you're to calculate

4   it on a quarterly basis?

5   A.   No, it doesn't.

6   Q.   So why do you believe that you were required to do so in

7   terms of the arrangements with Mr. Scott?

8   A.   Because it was a -- I think you'd have to go back up.

9   Because it was a quarterly reporting, we would get paid

10  quarterly and we would do the NAV.  So I mean that was widely

11  agreed by both parties.  Certainly as far as I was aware.

12  Q.   That's your understanding anyway that that was what your,

13  your duties?

14  A.   I think it was everyone's understanding.

15  Q.   Well, we'll talk more about the events leading up to the

16  termination of the relationship between MSSI and Apex.  But is

17  it fair to say in all of the communications and back and forth

18  you had with Mr. Scott in that period there was never a

19  suggestion that he was concerned about an NAV calculation?

20  A.   He wasn't concerned, no.

21  Q.   He wasn't concerned?

22  A.   No.

23  Q.   You may have been concerned?

24  A.   Well we were implementing the fact that we would have done

25  a quarterly NAV calculation as we perceived to be our

1   agreement.

2   Q.  He never expressed that though, Mr. Scott or MSSI, that you

3   had a concern about being able to do your quarterly NAV?

4   A.  I'm not sure we started the process.  You do it at the end

5   of the quarter.  And it's typically not that time sensitive.

6   So you normally have, on a quarterly fund, perhaps a month in

7   order to do the NAV.  So we were well within the time scales

8   that would have been required.

9   Q.  But in any event this was your concern not expressed to

10  Mr. Scott?

11  A.  I don't -- I'm not aware of what discussions he may have

12  had with the operational members of the staff regarding the

13  NAV.  I wouldn't have been directly involved.

14  Q.  But you're not personally aware of any?

15  A.  No.

16  Q.  And you've reviewed a number of e-mails, etc. in

17  preparation for your testimony; is that right?

18  A.  Yes.

19  Q.  And you haven't seen anything like that, have you?

20  A.  No.

21  Q.  One other minor point to cover.  Do you remember being

22  asked early in the day or earlier in your testimony yesterday

23  about corresponding banking?

24  A.  Yes.

25  Q.  And that was in connection with how money might be wired or

1    transferred from an investor in the funds to the bank account

2    of the funds at DMS, right?

3    A.  Correct.

4              MR. DEVLIN-BROWN:  Could we go to Government Exhibit

5    2216, please.  And if we could go to page 4, please.  Take the

6    section 1.6 of the agreement.

7    Q.  I think this is what you testified about before yesterday,

8    right, Mr. Spendiff?

9    A.  Yes.

10   Q.  And that is that the subscribers to the fund are directed

11   to send their funds through SWIFT listing intermediary bank as

12   Bank of New York Mellon, right?

13   A.  Yes.

14   Q.  And Mr. Scott didn't provide this information, right?

15   A.  No, he did not.

16   Q.  It came from DMS?

17   A.  Correct.

18   Q.  And you, working with Mr. Scott's team to put the

19   subscription document together, inserted these wire

20   instructions, right?

21   A.  Correct.

22   Q.  Mr. Scott had no say, as far as you know anyway, as to

23   whether the intermediary bank would be the Bank of New York

24   Mellon or anywhere else, right?

25   A.  No.

707

1   Q.  And Mr. Scott's investors invested in euro, right?

2   A.  Correct.

3   Q.  And there is no reason, to the extent you understand it,

4   that a transfer of euros to DMS bank would have to go through

5   the United States, right?

6               MS. LOZANO:  Objection.

7               THE COURT:  Overruled.

8               THE WITNESS:  I'm not aware of DMS's banking

9   arrangements with their subsidiaries and clearing banks, I'm

10  afraid.

11  Q.  Understood.

12          Do you have an understanding that if there are

13  dollars, U.S. dollars going to be transferred from say Europe

14  to the Cayman Islands, the dollars are almost certainly going

15  to clear through a correspondent bank in the U.S.?

16  A.  Yes.  That's my understanding.

17  Q.  You don't have the same understanding with respect to

18  euros, right?

19  A.  There is no -- it doesn't have to be cleared through the

20  U.S. I think, but.

21  Q.  And the Bank of New York Mellon, in fact, operates outside

22  of the U.S. as well, right?

23  A.  Yes, it does.

24              MR. DEVLIN-BROWN:  We can take that off the screen.

25  Q.  So I'd like to turn now, Mr. Spendiff, to the second

708

JB89SCO3                        Spendiff – Cross

1    investment that the fund made that you approved at least the

2    initial payment for and that is the oil-related transaction?

3    A.  Correct.

4            MR. DEVLIN-BROWN:  Is Government Exhibit 2233 in

5    evidence?

6            MS. LOZANO:  It is.

7            MR. DEVLIN-BROWN:  Can we display that please.

8    Q.  So perhaps you saw this on direct examination?

9    A.  Yes.

10   Q.  So this document relates to the proposed investment or

11   proposed loan that would be connected to an oil deal in

12   Madagascar, right?

13   A.  I think this e-mail relates specifically to the loan to

14   Martin Breidenbach.

15            (Continued on next page)

16

17

18

19

20

21

22

23

24

25

JB83SCO4                          Spendiff - Cross

1    Q.  Tell me how you understand the transaction was structured.

2    A.  So, well, I think it changed over time.

3    Q.  As it ultimately occurred.

4    A.  We were given, asked to make a loan that was an initial

5    e-mail outlining a new investment which would be a loan to a

6    German national for $30 million or 30 million euros.  I forget

7    the explicit amount in the initial e-mail.  There was no

8    reference to what he may or may not do with that money.

9    Q.  Mr. Scott communicated to you that Neil Bush was involved

10   in the deal, right?

11   A.  I'm not sure if that was when in that process, but I think

12   he stated at some point that some Bush was acting as an advisor

13   to the deal.

14          MR. DEVLIN-BROWN:  Could we put up Government Exhibit

15   2234, please.  Just zoom in on the top part.

16   Q.  On July 6, 2016, he lets you know in this e-mail that the

17   authorized representative for the seller for the underlying

18   deal was Neil Bush.  Do you see that?

19   A.  Yes.

20   Q.  And I think you testified before the deal structure changed

21   and the documents changed over time, right?

22   A.  Correct.

23   Q.  But you did ultimately, after getting your questions

24   answered, sign off on the transaction.

25   A.  We made the payment as instructed by Mark Scott, yes.

1    Q.  That was after you had done some diligence on it?

2    A.  After we reviewed the documents, yes.

3           MR. DEVLIN-BROWN:  Okay.  I think that's a single-page

4    document or can we just zoom out for a second.  We can take it

5    off screen.  Thank you.

6    Q.  So, this was not sort of within the core of what the

7    mission statement of the Fenero Funds was that you saw, right?

8    A.  The loan to a German national?

9    Q.  Right.

10   A.  No.

11   Q.  But it was sort of -- I think you had it phrased well on

12   direct -- sort of towards the outer boundaries of it?

13   A.  Yes.

14   Q.  In fact, it was a loan to a European beneficiary, right?

15   A.  Yes.

16   Q.  So it was not a million miles away from the original term

17   sheet?

18   A.  Correct.

19   Q.  And in any event, it didn't at that point raise a red flag

20   for you?

21   A.  No.

22   Q.  So, Mr. Scott sent you some documents in response to your

23   diligence questions, right?

24   A.  Yes.

25   Q.  Could we show Government Exhibit 2236, please.  So this is

JB83SCO4                        Spendiff - Cross

```
 1   an e-mail from Mark Scott to you and others dated July 9, 2016,
 2   with describes attachments loan agreement Fenero Cryptoreal
 3   version 3.  Do you see that?
 4   A.  Yes.
 5           MR. DEVLIN-BROWN:  If we could zoom out for a moment
 6   and page down, Mr. Barile.  Just sort of page through.
 7   Q.  So, this was some of the material that Mr. Scott provided
 8   to you on the loan deal, on the Cryptoreal?
 9   A.  Yes.
10   Q.  If we could also show Government Exhibit 2238, please.
11   This is an e-mail dated July 9, 2016, in which additional
12   documents are attached relating to Cryptoreal.  Do you see
13   that?
14   A.  Yes.
15           MR. DEVLIN-BROWN:  If we could just page through this
16   a little bit, Mr. Barile, to show the documents.  Hold on, slow
17   down a second.  Keep going, please.  Thank you, Mr. Barile.
18           Ms. Stanley, is it possible to show just Mr. Spendiff
19   and the attorneys and the Court, not published to the jury,
20   Defense Exhibit 332.
21           Just a moment, your Honor.  If we can just scroll
22   through it for a minute, Ms. Stanley, just for the witness.
23   Q.  Do you recognize this document as a document sent to you by
24   Mr. Scott containing some corporate registry information
25   relating to the transaction?
```

JB83SCO4                          Spendiff - Cross

1   A.  Yes.

2               MR. DEVLIN-BROWN:  The government offers Defense

3   Exhibit 332.

4               MS. LOZANO:  The defense.

5               MR. DEVLIN-BROWN:  Defense Exhibit 332.

6               MS. LOZANO:  We don't object, your Honor.

7               THE COURT:  Defense 332 will be received.

8               (Defendant's Exhibit 332 received in evidence)

9               MR. DEVLIN-BROWN:  If we could publish that the jury

10  now, Ms. Stanley.

11  Q.  Mr. Spendiff, this is, as you see it, a search on -- just

12  page out one more, Ms. Stanley.  A search of the register of

13  companies in the British Virgin Islands for Barta Holdings

14  Limited?

15  A.  Yes.

16  Q.  Mr. Scott provided this to you as part of the information

17  you were looking for, right?

18  A.  Yeah, he provided it to us, yeah.

19              MR. DEVLIN-BROWN:  May I have just a moment, your

20  Honor.  I just want to confer about one document.

21              THE COURT:  Sure.

22              MR. DEVLIN-BROWN:  It's already in evidence as

23  Government Exhibit 2247, so Mr. Barile, could you put 2247,

24  publish it to the jury.

25  Q.  We looked at this earlier this morning, Mr. Spendiff, in a

JB83SCO4                    Spendiff - Cross

1    different context.  But this is the share purchase agreement,

2    is it not, that was sent to you by Mr. Scott in connection with

3    this transaction?

4    A.  Yes.

5            MR. DEVLIN-BROWN:  If we could just page down to the

6    bottom of this, or just page through it so the jurors can see

7    it.  You see at the bottom of this page -- sorry.  One

8    previous, Mr. Barile.

9    Q.  Do you see at the bottom here two $30 million payments, one

10   the same day as the signature and the one $30 million after?

11   A.  Yes.

12           MR. DEVLIN-BROWN:  We can take that down, please.

13   Could we show just the witness, Ms. Stanley, Defense Exhibit

14   334, please.

15           MS. LOZANO:  For the record, the government has no

16   objection.

17           MR. DEVLIN-BROWN:  Well then, I guess we'll just offer

18   Defense Exhibit 334, please.

19           THE COURT:  Is it in evidence?

20           MR. DEVLIN-BROWN:  No, but I think there was no

21   objection.

22           THE COURT:  It will be received.

23           (Defendant's Exhibit 334 received in evidence)

24           MR. DEVLIN-BROWN:  If we can publish that,

25   Ms. Stanley.

JB83SCO4                         Spendiff - Cross

1    Q.  This is an e-mail Mark Scott sends you on the 12th of July,

2    2016, with an oil field valuation report.  Do you see that?  We

3    can page through the document.

4    A.  Yes.

5                MR. DEVLIN-BROWN:  If you wouldn't mind just paging it

6    through for the jury.  It can be available later but I'm

7    sensitive to the time.  So I think we can remove it.  Thank

8    you.

9    Q.  Okay.  So in any event, after receiving various documents

10   and reviewing them in connection with this oil related

11   transaction, Mr. Scott instructed you to make a $30 million

12   payment, right?

13   A.  Correct.

14   Q.  You approved the payment?

15   A.  We made the payment on instruction from Mr. Scott.

16   Q.  Pursuant to the share purchase agreement, it looked like

17   under the underlying transaction, there was a second 30 million

18   payment due in about 20 days?

19   A.  Not due by the fund.

20   Q.  Due in connection with the underlying --

21   A.  Sorry.  The fund loaned the money to Mr. Breidenbach and

22   the Cryptoreal Trust.  The Cryptoreal Trust entered into an

23   agreement for which it would be entirely responsible.  The fund

24   would have no liability for the second payment.

25   Q.  Understood.  But in the shareholder purchase agreement

JB83SCO4                        Spendiff - Cross

1    there was reference, I think we just saw it, right, to a second

2    $30 million payment 20 days after the first?

3    A.  There is, between the borrower, not related to the fund,

4    and, yes there is.

5    Q.  In any event, Mr. Scott did ask you in early August of 2016

6    to make a second $30 million payment, a loan to

7    Mr. Breidenbach?

8    A.  Breidenbach.

9    Q.  Is that right?

10   A.  I only met him once.

11   Q.  Let's put up Government Exhibit 2271, please.  If we could

12   just zoom in on the top part.

13           So this is an e-mail from Mr. Scott to yourself dated

14   Friday, August 5, 2016.  "Hi, Paul.  Attached is the latest

15   version of the loan agreement pursuant to which we need to pay

16   an additional $30 million as soon as possible."  And then he

17   notes that he's also included BVI governance documents

18   regarding the underlying U.S. $560 million purchase by

19   Cryptoreal.  This also shows the transfer of shares from Barta

20   to Cryptoreal which haven't pledged to us.

21           So in any event, Mr. Spendiff, Mr. Scott asked you to

22   make a second $30 million payment on August 5, 2016, relating

23   to this transaction, right?

24   A.  Correct.

25   Q.  Apex declines to make it?

1   A.  Apex did not make this payment, correct.

2   Q.  This is August 5 of 2016.  He does communicate, Mr. Scott,

3   this is a time sensitive matter, right?

4   A.  Correct.

5   Q.  If we could publish Government Exhibit 2273, please.  This

6   one is dated Sunday, August 7.  He's attaching the original

7   loan facility, which I believe you had requested, right?

8   A.  I'm sorry, pardon?

9   Q.  I believe you had requested a copy of the original loan

10  facility?

11  A.  Yes, correct.

12  Q.  We'll go back to that e-mail in a second.  But in this one

13  Mr. Scott says at the end "I really need to get this out

14  tomorrow, Monday.  The original closing date for the second

15  tranche was August 4, 2016."

16          Do you see that?

17  A.  Correct.

18          MR. DEVLIN-BROWN:  And now if we could go to

19  Government Exhibit 2272, please.  If we go -- sorry, the e-mail

20  at the bottom.  The second page is good.  Page up a bit.  If we

21  could see Mr. Spendiff's response as well.

22  Q.  So, the bottom e-mail is the one I showed you a few moments

23  ago, 2271, August 5, Mr. Scott's asking you to make another $30

24  million payment, right?

25  A.  Correct.

1    Q.  And you respond to that with a question, "Thanks.  Have you

2    got a copy of the original loan agreement executed as well for

3    the transaction," right?

4    A.  Correct.

5    Q.  And as we just saw, he followed up, right?

6    A.  Yes.

7    Q.  In fact, there's questions you ask about this that go back

8    and forth for several days, right?

9    A.  Yes.

10   Q.  But Mr. Spendiff -- I'll wait for you to drink the water.

11   As of August 5 of 2016, when Mr. Scott made this request, you

12   had already decided, hadn't you, that there was no chance that

13   this money would go out?

14   A.  We were not allowed to make payment during this period.

15   Q.  Well, I'm talking about what you and Apex had decided, and

16   didn't you decide there was no chance any money would be sent

17   to Barta by Apex, there was no chance money would go anywhere

18   at that point?

19   A.  Apex decided to comply with the government regulations,

20   which we were forced to do so.

21   Q.  I understand, Mr. Spendiff, but I haven't asked you what

22   your reason was for not complying.  I just want to understand

23   that, at that point, you had made an internal decision that

24   there were no circumstances under which you would send money

25   out at that point?

JB83SCO4                          Spendiff - Cross

1    A.  That is correct.

2    Q.  But you didn't tell Mr. Scott that, right?

3    A.  We weren't allowed to tell Mr. Scott.

4    Q.  You didn't tell Mr. Scott that, right?

5    A.  No, we did not.

6    Q.  In fact, you continued to ask questions about the

7    transaction.

8           If we could take a look at Government Exhibit 2274,

9    please.  And maybe go page down an e-mail or two, please, until

10   we can get back into the chain.  We could page up.  Just you

11   can stop there.

12          So this is an e-mail on August 8th of 2016, where

13   Mr. Scott is referencing payments due.  Right?

14   A.  Correct.

15   Q.  Including the $30 million, and the third paragraph,

16   "additional $30 million today."  That's a reference to the

17   oil-related transaction, right?

18   A.  Correct.

19   Q.  If you could page up to see your response, Mr. Spendiff.

20   We can pause right there.

21          So, you respond to Mr. Scott on August 8th with an

22   e-mail asking him a number of additional questions, right?

23   A.  Correct.

24   Q.  You ask him about source of wealth information for Irina

25   Dilkinska.  You see that?

1   A.  Yes.

2   Q.  You ask him about information relating to IMS as well?

3   A.  Correct.

4   Q.  And at this point, now three days after August 5, it's

5   still Apex's view that they are not going to be making any

6   payments for Mr. Scott period, right?

7   A.  Not period.  During this period.

8   Q.  So there was a possibility Apex would pay Mr. Scott later?

9   A.  Potentially.

10  Q.  Hadn't you already decided that you didn't want to do

11  business with the Fenero Funds anymore at that point?

12  A.  No.

13  Q.  No?

14  A.  We were still waiting for instruction from the

15  notifications that we'd made.

16  Q.  So, he sends -- let me actually move to that topic then.

17          So, I think you testified a little bit on direct about

18  the timing of when you began to have concerns relating to the

19  Fenero Funds, right?

20  A.  Correct.

21  Q.  And I think that was July 29?

22  A.  Yes.

23  Q.  If we can please put up Government Exhibit 2257.  So, you

24  remember seeing this earlier today?

25  A.  Yes.

1    Q.  Friday, July 29, at 9:29 a.m.  Mr. Scott is e-mailing you a

2    new subscription package for B&N Consult.  Do you see that?

3    A.  Yes.

4    Q.  I believe you testified that earlier that same day, you had

5    had a meeting with Muzammil Koyratty; is that right?

6    A.  Yes.

7    Q.  And did you take notes during the meeting?

8    A.  I don't recollect.  Not meaningful notes.

9    Q.  Sorry?

10   A.  No, not meaningful notes, I don't think.

11   Q.  Did you take any notes?

12   A.  I genuinely don't recollect.

13   Q.  Did Muzammil take any notes during the meetings?

14   A.  No, I don't think so.

15   Q.  But the two of you met, right?

16   A.  Three of us met.  Nitin Khanapurkar as well.

17   Q.  Who is the third person?

18   A.  Nitin Khanapurkar, head of risk.

19   Q.  You discussed at that meeting concerns about the Fenero

20   Funds, right?

21   A.  Correct.

22   Q.  At Apex you weren't just -- well, stop.  You didn't just

23   discuss the Fenero Funds at that meeting, did you?

24   A.  We discussed the Fenero Funds relationship.

25   Q.  Did you discuss other funds as well, Mr. Spendiff, from

721

JB83SCO4                          Spendiff - Cross

1    other fund managers?

2    A.  No, I think it was exclusively just on Fenero.

3    Q.  Well, at that time, in late July of 2016, wasn't Apex going

4    through a process of identifying high-risk customers in Apex's

5    view and seeking to terminate relationships?

6    A.  No.  I'm not aware of that per se.

7    Q.  Well, you had a fairly senior position -- we can take this

8    off the screen.  You had a fairly senior position at Apex,

9    right?

10   A.  Correct.

11   Q.  You were managing director in the London office?

12   A.  Correct.

13   Q.  Mr. Koyratty reported to you I think you said, right?

14   A.  Yes, Muzammil.

15   Q.  Sorry.  And he handled the compliance function?

16   A.  Correct.

17   Q.  And Apex is a regulated entity, right?

18   A.  In certain jurisdictions, yes.

19   Q.  Certain jurisdictions?  In the U.K. it's regulated?

20   A.  Yes, it is.

21   Q.  In the United States it's regulated?

22   A.  Yes.

23   Q.  And in the United States, Apex is regulated, isn't it, by

24   the securities enforcement commission?

25   A.  I think so.

JB83SCO4                          Spendiff – Cross

1    Q.  That's known as the SEC?

2    A.  Correct.

3    Q.  And the SEC, as you understand it, issues rules to fund

4    administrators and spells out regulations that they are

5    required to follow, right?

6    A.  Correct.

7              MS. LOZANO:  Objection, your Honor.  May we have a

8    sidebar?

9              THE COURT:  Sure.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MS. LOZANO:  Your Honor, I believe that

3    Mr. Devlin-Brown -- and he can correct me if I'm wrong -- is

4    attempting to now venture into a totally unrelated irrelevant

5    settlement in 2016 for conduct that happened in 2015 in the

6    United States in the New Jersey office.  That has nothing to do

7    with Mr. Spendiff, the U.K. office, any of the fund managers

8    there, any of the employees at Apex at U.K. in the U.K.  And so

9    it's wholly irrelevant and improper for Mr. Devlin-Brown to be

10   cross examining this witness about it.

11         MR. DEVLIN-BROWN:  Well, first of all, I don't know if

12   he has knowledge about it or not.  I reviewed the 3500

13   materials and notes carefully, didn't see any reference to any

14   discussion with him about it at all, so I don't know if the

15   government has knowledge of what he knows about it or doesn't.

16         The fact is, your Honor, there was a settlement with

17   Apex and the SEC in June of 2015.  Mid June.  It related to

18   diligence that Apex was doing on fund managers.  It required

19   the imposition of a compliance consultant and certain

20   obligations on Apex to cooperate with the compliance

21   consultant.

22         So I want to explore whether he had some awareness of

23   that, and whether that was having impact on the fund's

24   determination at the time to look not just at Fenero, but more

25   broadly.

JB83SCO4                          Spendiff - Cross

1          MS. LOZANO:  It was entirely focused on the New Jersey

2    office.  It had absolutely nothing to do with anyone in the

3    U.K. office.  Nothing.

4          THE COURT:  What was the gravamen of the charge?

5          MS. LOZANO:  It was fund managers who were stealing

6    from investors, and so as the administrator in New Jersey, Apex

7    New Jersey was the administrator of some of these funds.  And I

8    don't know the exact details, but apparently failed in certain

9    functions to prevent the fund managers from stealing from the

10   investors.

11         THE COURT:  Let me ask, did he have any supervisory

12   authority over the New Jersey office?

13         MS. LOZANO:  Absolutely not.

14         THE COURT:  Do you know what he knows about it?

15         MS. LOZANO:  He has read press about it, and he knows

16   that in the wake of the incident, there was rolling out of

17   policies and procedures informed by what they had learned.  Not

18   unusual, because Apex updates its policies and procedures and

19   learns from every incident.

20         THE COURT:  I'm not going to let you get into this,

21   Mr. Devlin-Brown.

22         MR. DEVLIN-BROWN:  Can I make one more proffer.  I do

23   have the press release.  I don't think it's as unrelated as

24   Ms. Lozano says.  Again, I don't have any 3500 about any

25   discussion with this.  The settlement was with Apex for

1    failing -- its ultimate failure was a miscalculated NAV which

2    he has discussed having some concern about.  And the reason it

3    miscalculated it is because it didn't police the fund

4    managers -- it's two separate incidents that the SEC settled

5    with them on, where the fund managers were essentially stealing

6    from the fund, including getting a loan from the fund that was

7    unreimbursed, which Mr. Scott had taken a loan to the fund for

8    one of his entities.  It required a compliance consultant who

9    would impose duties on Apex to basically clean up its

10   processes.

11            I don't see why asking him if he knew about this and

12   whether it influenced him, at least going that far, would be

13   improper.  I do have a press release.  We weren't planning to

14   offer it, but if your Honor would like to look at it.

15            THE COURT:  It's too attenuated.  I won't let it in.

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

JB83SCO4                         Spendiff - Cross

1             (In open court)

2             MR. DEVLIN-BROWN:  Just a moment.

3   BY MR. DEVLIN-BROWN:

4   Q.  Mr. Spendiff, so, just to lock in some dates that I believe

5   you were testifying about a moment ago, but just so they're

6   fresh.  Your meeting with people internally at Apex where

7   concerns about the Fenero Fund were expressed was on July 29 of

8   2019, right?

9   A.  Yeah, a number of meetings, yes.

10  Q.  Excuse me?

11  A.  There were a number of ongoing meetings with all sorts of

12  different members of the staff.

13  Q.  That was the first discussion about concerns about the

14  Fenero Funds that you testified to on direct?

15  A.  Yeah.

16  Q.  At that point, you don't identify what the concerns are to

17  Mr. Scott, do you?

18  A.  No.  But we expressed the need for additional due diligence

19  relating to source of the funds as a response to that.

20  Q.  You didn't express why you needed additional due diligence,

21  right?

22  A.  No.

23  Q.  For example, the next day, on July 30, that's the day you

24  testified you received an e-mail that had the OneCoin.eu e-mail

25  address for Irina, right?

1   A.  Correct.

2   Q.  And you, on July 30, didn't tell Mr. Scott that that was

3   giving you some concern?

4   A.  No.

5   Q.  Was this a source of your concern?

6   A.  Yes.

7   Q.  Did you look back at that time through the two investments

8   you had already approved, one relating to oil, and one relating

9   to PCT, to see if he had in fact mentioned Ruja Ignatova in

10  those transactions?

11  A.  We looked at some of the e-mail correspondence, yeah.

12  Q.  But at least one of the documents that mentioned Ruja

13  Ignatova, I believe you said you just noticed this week that

14  her name was in it?

15  A.  Yes.

16  Q.  So, you don't tell Mr. Scott that OneCoin presents a

17  concern at that point, right?

18  A.  No.

19  Q.  In fact, what you do is ask Mr. Scott a number of questions

20  in terms of other documents that he should provide you, right?

21  A.  Correct.

22  Q.  And the requests don't relate to OneCoin?

23  A.  No.

24  Q.  So, Mr. Scott in fact provides you documents relating to

25  those requests, right?

1    A.  Yes.

2           MR. DEVLIN-BROWN:  So if we could publish for the jury

3    Government Exhibit 2274, please.  And page down to the bottom

4    e-mail.  Let's start with the bottom message, we'll go to the

5    date in a second.

6    Q.  But from Mr. Scott to you.  And he starts off --

7    A.  Sorry.  What date is this?

8           MR. DEVLIN-BROWN:  If you want to page up I think it

9    was just cut off.

10   Q.  This is on August 8th of 2016, right?

11   A.  Yeah.

12   Q.  And you had made the initial decision that Fenero Funds

13   would be subject to enhanced diligence on July 29?

14   A.  Yes.

15   Q.  You noticed yourselves for the first time some possible

16   relationship with OneCoin on July 30?

17   A.  Yes.

18   Q.  And this is August 8th, after you've asked Mr. Scott for a

19   number of followup questions for documents and information,

20   right?

21   A.  Yes.

22   Q.  So, Mr. Scott writes, "Please let me know when you're ready

23   to release the funds or to communicate with us regarding

24   whatever else you require to do so.  Our business is seriously

25   affected at this point due to our existing portfolio companies

1   have the right to further payments which we cannot satisfy

2   until you let us release the funds."

3           And then through the rest of the e-mail he's providing

4   essentially a more information about this, right?

5   A.  Yes.

6   Q.  Then if you look at the bottom paragraph, he says, "Please

7   let us know what else we can provide in the short term to get

8   this resolved."  He notes that B&N and IMS are clients of Locke

9   Lord.  Do you see that?

10  A.  Yes.

11          MR. DEVLIN-BROWN:  And if you can go up now to see

12  your response, please, Mr. Barile.

13  Q.  So this is your response.  August 8th, I hope that was 3:35

14  in the U.S. and not in the U.K., but you respond to Mark's

15  inquiry, right?

16  A.  Yes.

17  Q.  And you explain you need more detail about the source of

18  wealth for Irina Dilkinska, right?

19  A.  Yes.

20  Q.  And you ask some further questions on IMS because it is a

21  new entity.

22  A.  Yes.

23          MR. DEVLIN-BROWN:  And then if you scroll down just a

24  line or two, Mr. Barile.

25  Q.  You ask for information alternatively perhaps have them on

JB83SCO4                         Spendiff - Cross

1   file from when Locke Lord onboarded both entities.  So you are

2   asking if there is some Locke Lord information on those

3   entities, right?

4   A.  Yes.

5   Q.  If we can page up to the response e-mail.  You see

6   Mr. Scott's response that same day.  He indicates -- I'll read

7   it -- "I will work on obtaining a letter from IMS directly

8   confirming the periodic income and stating the split so B&N

9   that were now paid."  And then he provides a little bit

10  additional information.  Do you see that?

11  A.  Yes.

12  Q.  He also says he'll send some general information on Locke

13  Lord letterhead as well.  And if it turns out not to be

14  sufficient, he wants to meet ASAP.  Do you see that?

15  A.  Yeah.

16  Q.  If we can just page up.  Here you respond that a letter

17  from IMS directly would by itself not be sufficient, right,

18  unless supported by documentary evidence.

19  A.  Yes.

20  Q.  And you say the Locke Lord letterhead would be great as

21  supporting evidence as well as any due diligence you can share

22  with us when you onboarded them, right?

23  A.  Yes.

24  Q.  Nowhere in here do you say, by the way, could you let us

25  know what relationship, if any, exists with OneCoin?

JB83SCO4                          Spendiff - Cross

1   A.  No, we're not allowed to.

2   Q.  You keep saying that, Mr. Spendiff.  But nothing prevented

3   you from saying to Mr. Scott, do you have information about

4   OneCoin, did it?

5   A.  Yes, it did.

6   Q.  Well, the regulation that I believe you're referring to is

7   you can't tip someone off that you filed a regulatory report,

8   right?

9   A.  Yes, correct.

10  Q.  It doesn't say you can't ask questions about what your real

11  concern is, does it?

12  A.  No, but we believe we've been provided with fraudulent

13  documents that hid the relationship with OneCoin, and

14  therefore, because we believed Mr. Scott had never volunteered

15  the information about OneCoin, it wasn't for us to volunteer

16  that we were aware now that OneCoin money was potentially

17  coming into the fund.

18  Q.  That was what was all going on in your head at that time?

19  A.  Not in my head.  There was a discussion between the legal,

20  the risk, the compliance team, various other individuals at

21  Apex.  The position was agreed that that was the appropriate

22  course of action.

23  Q.  When you said at that point you believed that Mr. Scott had

24  not disclosed the relationship with OneCoin, we looked earlier,

25  Mr. Spendiff, at the subscription documents with B&N, right?

JB83SCO4                          Spendiff - Cross

1    A.  Yes.

2    Q.  And it asks what business it was in, generally, I think it

3    said, right?

4    A.  Yes.

5    Q.  I think the answer was sales and marketing consulting or

6    something like that?

7    A.  Yes.

8    Q.  There was no space on that form for Mr. Scott to write does

9    business with OneCoin, right?

10   A.  No, not on that form.

11   Q.  And the forged documents you say you thought you found, is

12   that the contracts that had a 20 percent rate or are you

13   referring to something else?

14   A.  Yes, those contracts.

15   Q.  You believe that was forged not because of the 20 percent

16   necessarily, but because the formatting looked really weird?

17   A.  Yes.

18   Q.  There were other documents Mr. Scott had provided in the

19   course of his relationship with you that had also had

20   formatting issues, right?

21   A.  Yes.

22   Q.  He explained in some of those cases or at least one of

23   those cases, didn't he, that there were issues with like size

24   of the paper in Bulgaria or something, and so he had made some

25   changes, or made some -- or apologized, anyway, for formatting

JB83SCO4                              Spendiff - Cross

1    issues?

2    A.   Yeah, I don't -- I think there was only one reference to a

3    formatting issue with a piece of Bulgarian letterhead was

4    missing, but I don't recollect any other comments from him

5    regarding formatting of documents.

6    Q.   You didn't go to Mr. Scott and say -- I understand you

7    can't tip him off, right?  But you didn't go to Mr. Scott and

8    say, you know, the formatting on this contract is off.  Do you

9    have a clean version?

10           Right?

11   A.   I think we did query the contract, the quality of the

12   contract, and the formatting in it.

13   Q.   Did you ask him to provide another version?

14   A.   No.

15   Q.   I believe you've testified before about wet ink contracts

16   or wet ink documents?

17   A.   Yes.

18   Q.   That means something with the actual --

19   A.   That would be the original signature on the document or a

20   wet ink.

21   Q.   You didn't ask him to provide that?

22   A.   I am assuming he wouldn't have been able to provide it.

23   Because it wasn't a contract -- it was a contract between two

24   parties.  If they gave him the wet ink, they wouldn't have had

25   the originals themselves.

JB83SCO4                          Spendiff - Cross

1    Q.  You assumed he wouldn't be able to provide the wet ink

2    contract, and therefore you didn't ask him to provide it,

3    right?

4    A.  Yeah.

5             MR. DEVLIN-BROWN:  So, if we could page up a little

6    bit further, Mr. Barile.

7    Q.  Mr. Scott writes here that "We are in the midst of

8    compiling additional information regarding the IMS B&N

9    relationship, including the third parties, for you which I'll

10   be sending later today.  Please review soon so we can get over

11   this dreadful hump."

12            MR. DEVLIN-BROWN:  We can take that off the screen,

13   Mr. Barile, but I would like to show a few other exhibits.  If

14   we can put up GX 2275, please.

15   Q.  This is later in the day or I don't believe you compared

16   time stamps, but this is on August 8th as well, right?

17   A.  Yes.

18   Q.  And that same day, when you had asked for something on

19   Locke Lord letterhead which you said would be supporting, he

20   provides you with some information from Locke Lord, right?

21   A.  Yes.

22   Q.  If we could just page down a little bit through that.  I

23   believe this is one of the things he provided, right?  A Locke

24   Lord report on cryptocurrency?

25   A.  Yes.

1   Q.  From Mr. Robert Courtneidge?

2   A.  Yes.

3   Q.  Are you familiar with track changes in writing documents?

4   A.  Yes.

5          MR. DEVLIN-BROWN:  And could we just go to a page with

6   a red line there, Mr. Barile.

7   Q.  Do you see -- let's highlight "Sweden."  Do you see the

8   right says formatted indent left .05, then there is some

9   paragraph in red?

10  A.  Yes.

11  Q.  Does that communicate to you that someone made an addition

12  to the document as part of an edit?

13  A.  Yes.

14  Q.  You are not suggesting this document is a forgery, are you?

15  A.  No.

16         MR. DEVLIN-BROWN:  If we could go to Government

17  Exhibit and take that off the screen.  2277, please.  So, could

18  you page down, make sure we're seeing the full chain.

19  Q.  This is another back and forth where Mr. Scott, using the

20  all caps, is responding to you; is that right?

21  A.  Yes, he is using all caps.

22  Q.  We can just page up.  Stop for just a second.  You see at

23  the e-mail towards the bottom August 9, he tells you "Good to

24  hear from you although I thought this would be over by now.  I

25  have a business to run."  He's getting increasingly frustrated

1    based on what you can see from the e-mail communication, right?

2    A.  Yes, he is.

3    Q.  And if we can just go back to the top of that.  So it's

4    August 9, he had originally asked you for the payment on the

5    oil deal August 5, right?

6    A.  Yes, he had.

7    Q.  And he says to you we're out $30 million -- and that's

8    pounds I guess -- $5 million plus penalties in a few hours?

9    A.  Yes.

10   Q.  We can take that off the screen.  So, ultimately, Mr. Scott

11   provides you with bank statements from IMS, right?

12   A.  Yes, he does.

13   Q.  I believe these were made part of evidence by the

14   government in Exhibit 2281, if we can just put that on the

15   screen, please.  So this is an e-mail with 16 different

16   attachments or so, right?

17   A.  Yeah.

18           MR. DEVLIN-BROWN:  Your Honor, we've made a defense

19   exhibit which is identical.  It just prints these out.  Which

20   I'd like to just represent, offer into evidence which is DX 375

21   as the e-mail, and D X 375A-1 through A-16 as the attachments.

22           THE COURT:  Any objection?

23           MS. LOZANO:  No, your Honor.  Your Honor, we haven't

24   seen it unless it is literally the same exhibit.

25           MR. DEVLIN-BROWN:  It is.  We did make a lot of

1   copies.

2          MS. LOZANO:  Your Honor, we're not going to waste the

3   Court's time looking through all of these at this point.

4   Assuming that they are the same as the exhibit that is in

5   evidence as Government 2281, we have no objection.  We will

6   inspect them later over the weekend.

7          THE COURT:  So they will be received.

8          (Defendant's Exhibit 375, 375A-1 through 375A-16

9   received in evidence)

10  Q.  Now, when you received the e-mail that the government just

11  referred to as Government Exhibit 2281, you probably didn't

12  print out the attachments, right?

13  A.  No.

14  Q.  I just want to have you take a look.  It's fair to say,

15  isn't it, that he gave you a lot of bank statements for IMS?

16  A.  Yes, he did.

17  Q.  These were bank statements that Ms. Lozano asked you about

18  earlier today, right?

19  A.  Yes, she did.

20  Q.  Some of the line headings on the bank statements as they've

21  been translated anyway?

22  A.  Yes.

23  Q.  This is a bank account from IMS, right?

24  A.  Yes, it is.

25  Q.  The bank statements appear to show, based on the question

1    earlier, references to purchases of Tycoon Packages and things

2    of that nature?

3    A.  Yes.

4    Q.  The bank here is Deutsche Bank, right?

5    A.  Yes.

6    Q.  It's a German headquartered bank.

7    A.  Yes.

8    Q.  Operates around the world?

9    A.  Yes.

10   Q.  Probably the largest bank in Germany?

11   A.  Yes.

12   Q.  One of the top two, anyway?

13   A.  Yes.

14   Q.  So, you actually have some dialogue back and forth with

15   Mr. Scott about what he sent you, right?

16   A.  Correct.

17          MR. DEVLIN-BROWN:  If we could put on Government

18   Exhibit 2282 which is in evidence.  So, just page down a little

19   bit, Mr. Barile.  Just so we can see, and let's zoom in on the

20   e-mail here.  The bottom e-mail.  No.  Sorry.  You had it right

21   there.

22   Q.  So this has a different exhibit number, 2282, but this is

23   the same cover e-mail we looked at a moment ago, right, in

24   which the bank statements are forwarded?

25   A.  Yeah.

JB83SCO4                       Spendiff - Cross

1    Q.  He says to you, "Attached please find spot checks on one of

2    the pooling accounts at Deutsche Bank where IMS collects and

3    manages the payments of the OneCoin customers."  Then he says,

4    "We only sent you one and two day excerpts of statements as you

5    can see the hundreds and hundreds of pages this very limited

6    request already creates."

7            Do you see that?

8    A.  Yes.

9    Q.  If you could then and page up.  And you write to him, "Just

10   so I understand what we're looking at, this is the OneCoin

11   client bank account that IMS runs on behalf of OneCoin?"

12   A.  Yes.

13   Q.  And he responds "Correct.  IMS runs separate account to

14   receive and manage the sale proceeds of OneCoin."

15   A.  Yes.

16   Q.  And you still have not told him at any point, and you said

17   why, but you still have not told him at any point that you have

18   serious concerns about OneCoin?

19   A.  No.

20   Q.  Or any concerns about OneCoin?

21   A.  No.

22   Q.  So I believe that same day, on -- well, the day prior,

23   August 9 which I believe is the day the bank statements were

24   sent, there was a phone call with Mr. Scott?

25   A.  Yes.

1    Q.  And that was the call that the government mentioned

2    earlier?

3    A.  Correct.

4    Q.  Now, at this point in the relationship with Mr. Scott, you

5    were hoping, weren't you, that he would quit, he would fire

6    you?

7    A.  No.

8    Q.  You wanted him to keep retaining you?

9    A.  At least until we'd received notification about the

10   situation from the regulators, yes.

11   Q.  So, I want to remind you of -- let me ask you.  Didn't

12   yesterday you testify that it's your understanding that the

13   fund administration agreement is drafted so it's difficult for

14   a fund administrator to quit?

15   A.  Yes.

16   Q.  In order to protect investors?

17   A.  That's correct.

18   Q.  Could we put up Government Exhibit 2204, please.  I believe

19   the government had asked you some questions about obligations

20   under this agreement yesterday, right?

21   A.  Yes.

22        MR. DEVLIN-BROWN:  Could we look, Mr. Barile, at

23   paragraph 2.3.

24   Q.  Mr. Spendiff, Apex also has some obligations under this

25   agreement, right?

1    A.   Yes, it did.

2    Q.   One of them was carrying out its duties and functions

3    hereunder, and it says the administrator shall at all times be

4    subject to the control of and review by the general partner and

5    shall in all respects observe and comply with the partnership

6    agreement and shall comply with and conform to all the

7    reasonable and proper orders, directions, and requirements of

8    the general partner.

9         You see that?

10   A.   Yup.

11        MR. DEVLIN-BROWN:  Could we look at 3.2.1 as well.

12   Thank you very much, Mr. Barile.  And the preceding, just the

13   header to that paragraph.

14   Q.   So as the administrator to the fund signing this agreement,

15   you warranted, didn't you, that you would perform the due

16   execution, delivery, and performance of this agreement and the

17   consummation of the transactions contemplated, right?

18   A.   Yes, we did.

19   Q.   That would include carrying out the requests or

20   instructions for payment to the extent permitted, right?

21   A.   To the extent permitted by regulation, yes.

22   Q.   Mr. Scott at this point had threatened to, by August 10,

23   had threatened to sue you, hadn't he?

24   A.   Yes.

25   Q.   Both implicitly and in more explicit terms as well?

JB83SCO4                          Spendiff - Cross

1    A.  Yes, he made a number of threats.

2    Q.  There was a provision of this contract, wasn't there, that

3    was called an indemnity clause?

4    A.  Yes.

5    Q.  And the normal version of the Apex contract requires that

6    the fund manager indemnify Apex for any mistakes Apex may make,

7    right?  Sorry.  It requires --

8    A.  Apex to indemnify the manager?

9    Q.  Yes.  Apex to indemnify the fund manager?

10   A.  Yes, there is usually some sort of indemnities and

11   notifications of such.

12   Q.  Which means Apex won't be held responsible for -- other

13   sorry.  The fund manager -- let me scratch that.  It's

14   confusing.

15          In this case, as opposed to most instances, the

16   indemnity was mutual, right?  In both directions?

17   A.  Yes.

18   Q.  If we can put up 9.2, please.  So, this is the provision in

19   which the administrator indemnifies the fund and general

20   partner and holds them harmless from and against all

21   liabilities, damages, costs, claims, expenses, etc.

22          Right?  You see that?

23   A.  Yup.

24   Q.  An indemnity provision would mean that if someone sued

25   Mr. Scott, and found him liable for damages, you could be held

JB83SCO4                         Spendiff - Cross

1    responsible, right?

2    A.  Potentially.

3    Q.  And this is language Mr. Scott had insisted on being

4    included in the agreement?

5    A.  I didn't typically get involved in what language did or

6    didn't make it into the commercial agreements.

7    Q.  You knew this was in there at the time you were

8    deliberating what to do about the Fenero Funds, didn't you?

9    A.  Yeah.

10   Q.  And you know Mr. Scott from e-mail we just seen had said he

11   was soon going to be out $30 million plus 5 million euros, 5

12   million pounds, right?

13   A.  Yup.

14   Q.  So, your testimony is still that you didn't care if he

15   quit?

16   A.  That we didn't care?

17   Q.  Bad question.

18          If he quit, and was no longer instructing you to make

19   transactions, then you would no longer have to indemnify him,

20   right?

21   A.  Any indemnification clause would finish subject to the

22   agreement.  But yeah, he threatened us with suing us for 35

23   million, and we still refused to make the payment.

24   Q.  You weren't exactly upset when he sent a letter firing you,

25   right?

1    A.  I was neither upset nor upset.

2    Q.  It made things easier for Apex, didn't it?

3    A.  Potentially not.

4    Q.  Potentially not?

5    A.  Correct.

6    Q.  Okay.  So, we talked a little bit about the phone call and

7    some excerpts were played on direct examination.  Do you recall

8    that?

9    A.  Yup.

10   Q.  I believe the call is 2302, and it's 2302-TR for the

11   transcript.  So, on that call, Mark provides you with some

12   information, doesn't he, about the bank accounts of IMS and

13   notes they are at Deutsche Bank, right?

14   A.  Yes, possibly.

15   Q.  He tells you one reason you should have confidence is

16   because the money is coming from well-known banks, right?

17   A.  Yes.

18   Q.  And he also provides you with information about OneCoin; is

19   that fair to say?

20   A.  On the phone call?

21   Q.  Yes.

22   A.  Yes, I think he made some references to OneCoin in the

23   call.

24   Q.  He explains his position, doesn't he, that OneCoin is not

25   his client, but rather IMS and B&N are his client, right?

1    A.  Yes, he does reiterates that position.

2    Q.  And his basic argument that he makes many times on the call

3    is that it's unreasonable for you to ask him to get information

4    about IMS and B&N's clients, OneCoin, since OneCoin is not his

5    direct client?

6    A.  Correct.

7              MR. DEVLIN-BROWN:  If we could play a couple portions

8    of the call.  We'll just try to be selective.  Mr. Barile, are

9    you able to do it with the transcript I can tell you -- you

10   think you can do it, Ms. Stanley?  Can we show the transcript

11   if you do it or not.

12             So Mr. Barile, if you could -- I can give you the time

13   it starts but if you're able to do it.

14             If we can play the portion on the second -- actually

15   let me just stop one second.

16   Q.  This's two different recordings, right?

17   A.  Two -- it's two different files of the same call.

18   Q.  But it was just one phone call?

19   A.  Correct.

20   Q.  Was anything not recorded between when file one starts and

21   file two stops?

22   A.  No, they run straight through.

23             MR. DEVLIN-BROWN:  So in file two, can we play the

24   section starting at minute 6:45.  Transcript 22.  It's the

25   second transcript.  That's the first -- second recording.  If

1   we could play portion, I think it's at minute 6:45 and it

2   starts with you, Mr. Spendiff, while I'm sure Irina Dilkinska.

3            (Audio recording playing)

4            MR. DEVLIN-BROWN:  We can stop.  I just have a couple

5   more minutes, your Honor.

6            THE COURT:  Okay.

7   BY MR. DEVLIN-BROWN:

8   Q.  So, a day or so after this call, Mr. Scott sends a letter

9   to you terminating your services, right?

10  A.  Correct.

11  Q.  And Mr. Scott was banking at the time at DMS where the

12  Fenero Funds were?

13  A.  Yes.

14           MR. DEVLIN-BROWN:  Could we put up Government Exhibit

15  2004, the fund administration agreement.  At page 11.  And just

16  highlight the section 8.

17           2204, I'm sorry.  Page 11, and the section 8

18  provisions.  If we could blow up the Section 8, 8.1 on

19  confidentiality down through 8.1.4.  We can stop there.

20  Q.  So, Mr. Spendiff, I believe you testified on direct that

21  you had some communications with DMS bank after Mr. Scott

22  terminated the relationship with you, right?

23  A.  Correct.

24  Q.  In fact you had a phone call with Colm O'Driscoll?

25  A.  Yes.

1   Q.  He was someone you knew from DMS Bank?

2   A.  He worked at DMS Bank, yes.

3   Q.  He asked you in that phone call whether you had any

4   compliance issues related to the termination, right?

5   A.  Yes.

6   Q.  And you told him that you did not, that there was a

7   breakdown of the relationship, that it was not a compliance

8   concern, right?

9   A.  I'm not sure that was my exact words.

10  Q.  In sum and substance?

11  A.  I am not sure we explicitly discussed compliance.  He asked

12  why we ended it, and we explained we were sacked.  I think

13  Mr. O'Driscoll explained what he had been told by Mr. Scott.

14  And we did not countenance it.

15  Q.  Mr. Spendiff, you did not tell him you had compliance

16  concerns, right?

17  A.  Correct.

18  Q.  I believe on direct examination, you pointed to the

19  confidentiality provisions of the agreement as restricting what

20  you were able to say, right?

21  A.  Correct.

22  Q.  I see that this restricts -- I'm not going to read the

23  whole thing -- but financial information, investment

24  information, it restricts providing correspondence reports,

25  etc., computer programs, copies analyses, studies.  Nothing in

JB83SCO4                         Spendiff - Cross

1    here prevents you from saying simply we do have compliance

2    concerns if you had compliance concerns, does it?

3    A.   I couldn't tell you, without analyzing this, in the other

4    references to confidentiality in the document.  We certainly

5    believed at the time it did.

6    Q.   Mr. Spendiff, on direct examination yesterday, at the

7    beginning, Ms. Lozano, didn't she ask you this question and you

8    said the following:  During the period of time that Apex

9    administered these funds, did the defendant tell you that the

10   money that was coming into the funds originated from an entity

11   called OneCoin?  And you said no, he did not, right?

12   A.   Yes.

13              MR. DEVLIN-BROWN:  No further questions.

14              THE COURT:  Okay.  It is 2:30, so that will end a

15   week.

16              MS. LOZANO:  May we have a sidebar?

17              THE COURT:  Okay.  Don't go anywhere.

18              (Continued on next page)

19

20

21

22

23

24

25

JB83SCO4                    Spendiff – Cross

1              (At the sidebar)

2              MS. LOZANO:  The government is the requesting

3     approximately five minutes for redirect.  Very, very focused

4     questions that were raised on cross-examination.  And we are

5     requesting that the Court ask the jurors to stay for

6     approximately five minutes so we can finish this witness who

7     comes from United Kingdom and would have to fly back here to

8     testify for five to 10 minutes on Tuesday morning.

9              THE COURT:  He wouldn't have to come back Tuesday.

10             MR. DEVLIN-BROWN:  It's your Honor's decision.  I cut

11    some stuff I wanted to ask him about the calls because of

12    limited time, because obviously you can keep him.

13             THE COURT:  I'll ask.  If one juror says no, it's no.

14             MS. LOZANO:  Okay.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Ladies and gentlemen, I am going to ask

3     you all a question.  If anybody says nay, it's nay.

4          Do any of you have any difficulty staying an

5     additional five to 10 minutes to finish up this witness?

6     REDIRECT EXAMINATION

7     BY MS. LOZANO:

8     Q.  Mr. Spendiff, on cross-examination, counsel asked you

9     questions about the PCT agreement and the oil field SPA that

10    contained the name Ruja Ignatova.  Do you remember those

11    questions?

12    A.  Yes, I do.

13    Q.  Did either of those documents identify Ruja Ignatova as the

14    investor in the Fenero Funds?

15    A.  No, they did not.

16    Q.  Did either of those references to Ruja Ignatova identify

17    her as the UBO of any entity that was investing in the Fenero

18    Funds?

19    A.  No, they did not.

20    Q.  Did you know, based on those documents and the information

21    that Mr. Scott provided, that the funds coming into the Fenero

22    were really Ruja's money derived from OneCoin?

23          MR. DEVLIN-BROWN:  Objection.

24          THE COURT:  Sustained.

25    Q.  Did you know that the money that was coming into Fenero

1    Funds, based on the information that Mr. Scott provided, was

2    derived from OneCoin and belonged to Ruja Ignatova?

3    A.  No, we did not.

4    Q.  With respect to the oil field SPA, did you Google, at the

5    time that you received it, did you Google Ruja Ignatova's name?

6    A.  No.

7    Q.  How about Dr. Hui's name?

8    A.  Yes, I think he was Googled I think.  Because he was a

9    beneficiary -- he was a, he was noted as the beneficial owner

10   of the entity.

11   Q.  Did anything in the SPA reveal that the money that was

12   being loaned belonged to Ruja Ignatova?

13   A.  No, not at all.

14   Q.  Counsel asked you on cross-examination whether Apex had had

15   a quote unquote problem with investor B&N and Ms. Dilkinska at

16   the first screening, and you said no.  Do you remember that?

17   A.  Correct.

18   Q.  If Mark Scott had disclosed that Irina Dilkinska worked for

19   OneCoin and that the money that she was committing to Fenero

20   Funds belonged to Ruja Ignatova, would that have changed your

21   view?

22   A.  Yes, it would.

23   Q.  Would it have concerned you if you knew that the money was

24   coming from OneCoin and Ruja Ignatova and then being sent back

25   to her on the other end?

JB83SCO4                          Spendiff - Redirect

1    A.  Yes, very.

2            MS. LOZANO:  I'm now offering into evidence Government

3    Exhibit 1333 and 1334 that are contained on the stipulation.

4    Let's not publish them right now.  I'm sorry.  Or at least

5    not -- yeah.

6    Q.  Mr. Spendiff, do you remember that counsel asked you a

7    series of questions about law firms and other service providers

8    that worked with Fenero Funds and MSSI?

9    A.  Yes.

10   Q.  And Mason Hayes was one of those firms?

11   A.  Yes.

12           MS. LOZANO:  I've offered them into evidence.  I don't

13   know that there's been a ruling.

14           THE COURT:  Are they in evidence?  You said they were

15   in the stipulation.

16           MS. LOZANO:  They were on the stipulation.

17           THE COURT:  So they're in evidence.

18           MS. LOZANO:  Okay.

19   Q.  1333, let's publish it to the jury.  And Mr. Spendiff take

20   a look.  If we could zoom in on the top part, it is an e-mail

21   from Mark Scott to David Pike on what day?

22   A.  30th of September, 2017.

23   Q.  What does it say?

24   A.  "Let's discuss transferring files either to Arthur Cox or

25   maybe Ogier has a partner firm we could hire.  David, let's

JB83SCO4                        Spendiff - Redirect

1    discuss approach to Ogier."

2            MS. LOZANO:  Let's zoom back out and if we could on

3    that exhibit --

4            MR. DEVLIN-BROWN:  Your Honor, I think it is beyond

5    the scope.

6            THE COURT:  I don't know what this is.  Is there a

7    question, Ms. Lozano?

8            MS. LOZANO:  This relates to Mason Hayes.  I was going

9    to ask about Mason Hayes.

10           THE COURT:  Go ahead.

11   Q.  At the bottom of 1333, can you scroll down to the bottom.

12   Well then, I think Dear Declan.  Can you read that first

13   paragraph.  It is an e-mail from whom?

14   A.  It's from Mark Scott to Declan Black who appears to be a

15   partner or managing partner at Mason Hayes.

16           MR. DEVLIN-BROWN:  Same objection with this witness

17   especially.  He's not on these e-mails.

18           THE COURT:  I'll allow it.

19   Q.  Can you read the --

20   A.  "Dear Declan.  I have received your voicemail and am

21   outraged by your decision to terminate us as a client due to

22   money laundering concerns.  You claim that your firm has not

23   been adequately informed about our transactions, although we

24   provided explanations of our transactions every time we would

25   ask your firm to form a new subsidiary for us."

1    Q.  Okay.  So let's zoom out, move over to 1334.  And we can

2    zoom into the to from and date at the top.  And who is it from?

3    A.  It's from Mark Scott to two people called -- it's from

4    Claire Lord to Mark Scott cc'ing another two at Mason Hayes

5    individuals.

6    Q.  And the date on that is what?

7    A.  Monday, I think it would be the 2nd of October, 2017.

8    Q.  The first attachment reads what?

9    A.  "Letter to Mark Scott."

10   Q.  And if we can zoom out.  And just read, well, the e-mail.

11   The top number one, if you could read, I now attach the

12   following documents.  What is number one?

13   A.  "A letter to you in respect of the resignation of MHC as

14   your lawyers."

15   Q.  If we can scroll down to that letter and go to page four of

16   the letter.  Second to last paragraph.

17             MR. DEVLIN-BROWN:  Your Honor, I don't think this

18   document is in evidence.

19             THE COURT:  The representation was it was in pursuant

20   to a stipulation.

21             MR. DEVLIN-BROWN:  As to authenticity.

22             MR. DiMASE:  Your Honor, if there is an objection to

23   the admissibility of the document, Mr. Devlin-Brown can

24   obviously make that now.

25             THE COURT:  Do you object to the admission of the

1    document?

2              MR. DEVLIN-BROWN:  No.

3              THE COURT:  Go ahead.  It's in.

4    Q.  If we could scroll down to page four, second to last

5    paragraph.  Page four of the letter.

6              THE COURT:  You have about another minute.

7              MS. LOZANO:  Page four of the document, I'm sorry,

8    Mr. Barile.

9    Q.  Second to last paragraph there, this letter signed by

10   Claire Lord of Mason Hayes & Curran, and could you please read

11   the highlighted portion of that letter?

12   A.  "Given your failure to provide both the information and

13   documents required by us to identify the beneficial owners of

14   the companies for our anti-money laundering and

15   counterterrorism purposes, and the information required by us

16   to understand the nature of the activities of the companies, in

17   addition to resigning as company secretary, we are resigning as

18   lawyers to the remaining companies with immediate effect."

19             MS. LOZANO:  Thank you, Mr. Spendiff.  No further

20   questions.

21             THE COURT:  Mr. Devlin-Brown, do you have some very

22   limited recross?

23             MR. DEVLIN-BROWN:  Just two questions.  Can I do it

24   from here?

25             THE COURT:  You can.

1              MR. DEVLIN-BROWN:  Really two questions.

2    RECROSS EXAMINATION

3    BY MR. DEVLIN-BROWN:

4    Q.  Mr. Spendiff, the documents that were just shown to you

5    were from October 2017.  Well over a year after you had

6    terminated or Mark Scott had terminated any relationship with

7    Apex, right?

8    A.  Correct.

9    Q.  You know, literally, nothing about any of the things that

10   the prosecutor just read, right?

11   A.  Correct.

12              MR. DEVLIN-BROWN:  No further questions.

13              THE COURT:  Okay.  Ladies and gentlemen, that finishes

14   off the week.  And I apologize.  I promised you I wouldn't keep

15   you past 2:30.  I'll make it up to you.  You do not have to

16   come in on Monday at all.

17              Have a wonderful weekend.  Please do not discuss the

18   case.

19              (Jury excused)

20              THE COURT:  Mr. Spendiff, you may step down.  Safe

21   travels, sir.

22              THE WITNESS:  Thank you very much.

23              (Witness excused)

24              (Continued on next page)

25

JB83SCO4

1          THE COURT:  Any issues that either party wishes to

2     raise?

3          MR. DEVLIN-BROWN:  Your Honor, I would actually ask

4     that all of the redirect on that document be stricken.  We did

5     stipulate to the authenticity of documents.  It was represented

6     that this was in evidence, so we didn't object right away.  We

7     assumed it was.  And I can't in the middle object to the jury

8     when she's already going through the document.

9          I would also add it was not only beyond the scope, it

10    was highly confusing.  The only thing he testified to about

11    Mason Hayes was his understanding that it was a legitimate law

12    firm or something of that nature.  For that to trigger isolated

13    snippets from a letter Mason Hayes sends over a year later

14    purporting to fire Mr. Scott for anti-money laundering concerns

15    not only has nothing do with the cross, it's deeply confusing

16    and misleading.

17         THE COURT:  I know nothing about the background to all

18    this.  So Ms. Lozano, why don't you tell me, first of all, what

19    was going on there and how is it relevant to the

20    cross-examination.

21         MS. LOZANO:  What was going on in terms of Mason

22    Hayes?

23         THE COURT:  Yes.

24         MS. LOZANO:  Well, I just wanted to make the record

25    clear, I did offer it and articulated it was on the

JB83SCO4

1   stipulation, giving Mr. Devlin-Brown an opportunity to object.

2   I don't believe that I represented -- I will look -- I don't

3   believe I said it is in evidence, or I would not have offered

4   it.  I offered it and said it's on the stipulation.

5          In any case, Mason Hayes is a law firm that the

6   defendant engaged, after obviously his engagement with Apex,

7   and they, that law firm also had significant concerns about the

8   Fenero Funds and ultimately ended that relationship based on

9   similar concerns.

10          And it is relevant, because on cross-examination, one

11   of the thrusts of counsel's point, questioning, was there was

12   this legitimacy and contextual kind of backdrop for the Fenero

13   Funds that Mr. Scott had sought out legitimate law firms, and

14   looked to register the funds in places where he would be

15   regulated.  All of that to give comfort to Apex and to banks

16   that in fact he was running legitimate private equity funds,

17   and we believe, the government believes it is appropriate to

18   then redirect this witness about the circumstances under which

19   he may have -- that Mr. Scott may have engaged legitimate law

20   firms to do legitimate work for him, that then end up with a

21   terminated relationship because, in fact, the defendant is not

22   being forthright with these service providers.

23          And so, in order to -- in order to respond to

24   counsel's suggestion on cross-examination that all of these

25   indicia of reliability should mean that the defendant did not

JB83SCO4

1    intend to violate the law, that he was surrounding himself with

2    a structure for a legitimate fund, I think it is appropriate to

3    then point out that he did that, and with Mason Hayes,

4    specifically Mason Hayes, the firm that counsel raised on

5    cross-examination, and Mason Hayes did in fact terminate that

6    relationship, based on the same concerns that this witness has

7    testified to yesterday and today.

8            MR. DiMASE:  Your Honor, may I add one brief point on

9    the admissibility question outside of the scope of cross and

10   redirect.  This was, this issue was the focus of a motion in

11   limine.  The government specifically identified documents sent

12   to Mr. Scott in which service providers terminated

13   relationships with him, as stated.  The government intended to

14   introduce at the trial and the defense agreed that would be

15   admissible at the trial.

16           So there are two separate questions here, one is the

17   scope of cross and redirect, and one is the admissibility over

18   all.  I think ultimately that may be why Mr. Devlin-Brown chose

19   not to object.  Whether it comes in now or it comes in later at

20   the trial, it seems highly probative and admissible.

21           MR. DEVLIN-BROWN:  If I could just be heard briefly.

22   Of course there was an in limine motion as the types of

23   evidence that may be relevant for state of mind.  It is not a

24   carte blanche that any e-mail that Mr. Scott gets at any

25   time -- this is in October of 2017, when he has not had any

760

JB83SCO4

1    funds related to Fenero, other than the litigation reserve for

2    months.

3            I think it is also hearsay.  As far as I know, we've

4    never heard of a witness from Mason Hayes being called.  I

5    don't know the back story behind any of what was written in

6    there.  Whether there's things to explore with whoever wrote

7    those things to Mr. Scott.  I don't think just because they

8    have an e-mail where someone sends something negative to

9    Mr. Scott, that's not fair game.

10           I think issues like this need to be vetted in advance.

11   There was literally no reason this witness had to stay for

12   that.  Literally no reason.  I just think it should be

13   stricken.

14           THE COURT:  What's concerning to me is that it is

15   fairly dramatic evidence of Mr. Scott being fired by a law

16   firm.  Presumably he reacted very angry to it in e-mail, I

17   suppose.  But, we don't know what the facts are.  We don't know

18   whether Fenero deserved to be fired for failing to provide

19   information to whatever the law firm is.  We're getting a very

20   limited part of what happened, and I don't know there is an

21   appropriate way or there is only limited ways in which

22   Mr. Scott can respond.

23           So, it does appear that he is being prejudiced to that

24   extent, that there is just this allegation, and no appropriate

25   way to respond in the context of this trial.

1          MS. LOZANO:  Yes, your Honor.  To be clear, this is

2     being offered, as we articulated in the motions in limine, for

3     Mr. Scott's state of mind.  Not for, because we agree, in terms

4     of the specific facts of what happened in that relationship,

5     all we have is the letter.  But, what we do know is that

6     Mr. Scott received this letter in October 2017, and the

7     evidence at trial will show that he continued to engage, as we

8     have seen, with his key co-conspirators after that time, and

9     making it relevant.

10          THE COURT:  I don't know.  Especially there is going

11     to be no other testimony concerning that termination.

12          Mr. Devlin-Brown, I don't know that you necessarily

13     want it to be stricken and for me to instruct the jury to not

14     regard it.  I'll take it under advisement.  But I'm considering

15     some lesser action.  For example, preventing the government

16     from making any arguments from that testimony.  But I'll think

17     about it tomorrow.

18          MR. DEVLIN-BROWN:  Our view, just so it's clear, it

19     should be stricken.  The exhibit should be withdrawn.  Whether

20     we want an instruction to the jury on Tuesday morning, we can

21     think about it.  But I don't think it should be part of any

22     transcript they ever see.

23          THE COURT:  All right.

24          MR. DiMASE:  We're happy to write something on it over

25     the weekend to the Court.  One other potential resolution is if

762

JB83SCO4

```
 1    it is admissible to state of mind evidence, which is what we'll
 2    argue in our letter, then perhaps a limiting instruction about
 3    the use of the evidence, that it may be used to show the
 4    defendant's state of mind, but not for the truth of the matter
 5    asserted.  Something along those lines might be a resolution.
 6              THE COURT:  I'll look forward to seeing whatever you
 7    want to submit.
 8              MR. DEVLIN-BROWN:  One other issue that occurred on
 9    cross.  We had some understanding that Mr. Spendiff had or Apex
10    had filed a SAR.  The government has seen the SAR.  We've asked
11    several times to see it.  Generally they can't be disclosed,
12    there is some authority if it is Giglio or Brady.  We were told
13    it was not.  We did get a report of some investigative notes
14    that went into it which we do appreciate.
15              But he was holding that thing up like, oh, don't worry
16    if something I'm saying is not making complete sense because of
17    this mystery.  We haven't seen it.  I don't know how consistent
18    his testimony was with what was on there.  I'm not sure there
19    is anything do about it, but I do think it would be appropriate
20    for the government to provide the defense with a copy of that
21    SAR under strictest confidentiality.
22              MS. LOZANO:  We did provide to defense counsel
23    suspicious transaction records, three of them, that are
24    internal Apex records documenting the filing of these reports,
25    suspicious activity reports, and my understanding, and I can
```

JB83SCO4

1      confirm this since I have actually looked at the SAR.

2                  THE COURT:  You have or have not?

3                  MS. LOZANO:  I have.  I have it.  Yes, the government

4      has it.  That the narrative section contained in the records

5      that we already provided to defense was literally cut and

6      pasted into each of the forms that were filed with the

7      respective jurisdictions.  With respect to --

8                  THE COURT:  So you're suggesting he has the substance

9      of it.

10                 MS. LOZANO:  He does.  With respect to the seven-day

11     waiting period and obligations that Mr. Spendiff may have.

12     That is all information that's widely available to anyone who

13     goes on to the sites, whether it be Bermuda or the U.K.,

14     regarding the obligations of the filers and whether they can or

15     can't disclose and what constitutes tipping off.

16                 MR. DEVLIN-BROWN:  I think, at a minimum, the Court

17     should review it.  The issue was we understood that the only

18     testimony with that would be we file our regulatory reports.

19     And I'm not suggesting the government anticipated that would be

20     the reaction to cross.  But, I think probably just ideally it

21     would have been addressed before, if we had known that would

22     happen.

23                 MS. LOZANO:  We have no problem.

24                 THE COURT:  I'm about a decade removed from my money

25     laundering days.  Was Mr. Spendiff accurately relating his

1    obligations once they made a report of this type?

2                MS. LOZANO:  Yes.  With respect to the -- my

3    understanding of the obligations in the U.K., with respect to

4    the filing of SARs, there is a strict no tipping off policy.

5    You can take no actions as the filer that would tip off any

6    person who you filed against, and of course that may be open to

7    interpretation.  But certainly things like disclosing that you

8    filed a report, or raising suspicion that you filed a report.

9    And in addition, the moneys -- my understanding is the moneys

10   cannot move during the period of time where the SAR is under

11   consideration by the regulatory agency.  After seven days if

12   you do not hear anything, you can, you are free to go about

13   your regular business.

14                MR. DEVLIN-BROWN:  I absolutely think a lot of that is

15   correct, but not all of it.  I believe the seven-day period is

16   not a requirement that you don't move any funds, it's sort of a

17   safe harbor provision if you wait seven days, whereas you could

18   face risk yourself.

19                The tipping off point, I don't disagree there probably

20   is something that says that.  I just question whether the scope

21   of it would be so broad that you can't ask followup questions

22   on what your true due diligence concern is.

23                THE COURT:  I'm sorry.  Are you referring to his

24   answers to your questions or to his responses to Mr. Scott?

25                MR. DEVLIN-BROWN:  His answers to my questions.  I

765

JB83SCO4

1    don't remember exactly what I asked, but along the lines of,

2    you know, could you have asked more about OneCoin and no, we

3    didn't want to tip off.  I am also not clear the date the SAR

4    was filed.

5                THE COURT:  Why do you need the SAR for that?  You can

6    look at the regulations as to what he was or was not subjected

7    to.  And, he also indicated that he had communications or

8    meetings with legal and compliance, etc.  So, maybe he was

9    being more careful than he needed to, but I thought, anyway,

10   that he directly answered your questions concerning why he

11   didn't say certain things to Mr. Scott.  It made sense to me.

12               But, based on the representations, the understanding

13   there may be presumably obligation on the part of a reporter

14   not to or to undertake steps not to tip off the person about

15   who he or she is reported.  I don't think there is anything

16   else you need.

17               MR. DEVLIN-BROWN:  Thank you.

18               THE COURT:  Okay?

19               MS. LOZANO:  Thank you.

20               THE COURT:  Anything else?

21               MR. DEVLIN-BROWN:  No.

22               THE COURT:  Have a good weekend, folks.  I know I'll

23   be hearing from you.

24               (Adjourned until November 12, 2019, at 9 a.m.)

25

766

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                        Page

 3    PAUL SPENDIFF

 4   Direct By Ms. Lozano . . . . . . . . . . . 578

 5   Cross By Mr. Devlin-Brown  . . . . . . . . 638

 6   Redirect By Ms. Lozano . . . . . . . . . . 750

 7   Recross By Mr. Devlin-Brown  . . . . . . . 756

 8                    GOVERNMENT EXHIBITS

 9   Exhibit No.                            Received

10    61, 1128, 1130-T, 1131, 1380-T, 1141-T, . . . 578

11            1172, 1177, 1175, 1184, 1190,

12            1193, 1194, 1209, 1205, 1206,

13            1207-T, 1208, and 1214

14    2200-C, 2302, 2302-TR, 2303, 2303-TR   . . . 636

15                    DEFENDANT EXHIBITS

16   Exhibit No.                            Received

17    332  . . . . . . . . . . . . . . . . . . 712

18    334  . . . . . . . . . . . . . . . . . . 713

19    375, 375A-1 through 375A-16  . . . . . . . 737

20

21

22

23

24

25
```