JBC7SCO1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          17 CR 630 (ER)

5    MARK S. SCOTT,

6              Defendant.

7    ------------------------------x

8                                         New York, N.Y.
                                          November 12, 2019
9                                         9:00 a.m.

10   Before:

11                    HON. EDGARDO RAMOS,

12                                         District Judge

13
                          APPEARANCES
14

15   GEOFFREY S. BERMAN,
          United States Attorney for the
16        Southern District of New York
     CHRISTOPHER DiMASE
17   NICHOLAS FOLLY
     JULIETA V. LOZANO
18        Assistant United States Attorneys

19   COVINGTON & BURLING LLP
          Attorneys for Defendant
20   BY:  ARLO DEVLIN-BROWN
          KATRI STANLEY
21        -AND-
     DAVID M. GARVIN

22

23

24

25
```

JBC7SCO1

1          (Trial resumed; jury not present)

2          THE COURT:  OK.

3          MR. DIMASE:  So, there are a couple of matters.  One

4    was briefed over the weekend, your Honor.  I'm sure you've seen

5    the letters from the government and the defendant regarding the

6    Spendiff redirect and the materials the government attached

7    regarding state of mind evidence in the case, so that's one

8    issue I think we need to address.

9          The government also has some concerns to flag about

10   exhibits that it believes Mr. Scott will attempt to introduce

11   through government witnesses today.

12         Finally, I believe that Mr. Scott has an objection to

13   one particular line of direct examination on a witness today

14   that it probably makes sense to discuss.

15         THE COURT:  OK.

16         MR. DIMASE:  So I guess I will take those in that

17   order.  Starting with the government's letter and the exhibits

18   attached thereto, I think the starting point should be the two

19   exhibits that were offered and admitted on Friday.  I don't

20   think this is a key issue at this stage, but I would note that

21   Mr. Devlin-Brown did have several opportunities to object

22   before the evidence was admitted, but I think the point now is

23   to determine whether or not the evidence should stay in or

24   should be stricken or a limiting instruction should be given,

25   so I will focus on that.

JBC7SCO1

1          One of the areas of cross-examination of Mr. Spendiff,

2     and one we expect to continue throughout the trial, is

3     questions designed to demonstrate that Mr. Scott had a

4     non-guilty or an innocent state of mind in operating the Fenero

5     Funds, and one particular albeit brief line of

6     cross-examination focus on the connection between the Fenero

7     funds and quote unquote premiere law firms.  And the exhibit is

8     Government Exhibit 2201.  Mr. Devlin-Brown pointed the witness

9     to the text "The fund manager has engaged the premiere law

10    firms Ogier and both Mason Hayes & Curran and Arthur Cox in the

11    British Virgin Islands and Ireland."

12          THE COURT:  I'm having difficulty hearing you.  Slow

13    down.

14          MR. DIMASE:  Yes.  The language that he put up in

15    front of Mr. Spendiff was from the mission statement attached

16    to Government Exhibit 2201, which says "The fund manager has

17    engaged the premiere law firms Ogier and both Mason Hayes &

18    Curran and Arthur Cox in the British Virgin Islands and Ireland

19    respectfully to assist in the fund's structuring, registration

20    and regulatory compliance and to act as general legal counsel

21    going forward."

22          And Mr. Devlin-Brown highlighted that portion of the

23    exhibit and asked a couple of questions of the witness, saying

24    "Do you see the reference to the fund manager engaging premiere

25    law firms?  You had some dealings with Mason Hayes."  To which

JBC7SCO1

1    Mr. Spendiff said, "I think Apex may have done."

2         And he said you see Ogier on some of the documents,"

3    and Mr. Spendiff says, "yes, I know Ogier is a law firm.

4    "Q.  A reputable law firm?

5    "A.  Yes."

6         Bottom line the import of the questioning was to show

7    that these funds were using very high level law firms to do

8    their work and that that shows a non-guilty or innocent state

9    of mind in operating the funds, the he would hire these

10   premiere law firms.  It was a theme of the cross, he hired

11   Apex, a stand-up fund administration company; why would he do

12   that if he had a guilty state of mind, so on and so forth.

13        The exhibits -- including the two exhibits the

14   government offered on Friday -- undercut those arguments.  They

15   go directly to the state of mind on the other side, and they

16   paint a full picture of what happened here not for the truth

17   but as to the defendant's guilty knowledge.  He wants to rely

18   on these law firms and the connection to them, these premiere

19   law firms, to show a non-guilty state of mind, but he doesn't

20   want the evidence coming in that shows those very law firms

21   later terminated him, which goes to that same state of mind,

22   that same reliance on these organizations.

23        And a limiting instruction would be proper in the

24   government's view to tell the jury that it should only be

25   considered for that purpose; it should not be considered for

1   the truth of the contents but simply the effect on the

2   listener, the effect on Mr. Scott, the knowledge that Mr. Scott

3   gained that these same service providers were terminating their

4   relationships with him.

5          So the same argument applies to many of these

6   documents the government submitted along with the letter.  I

7   want to make one more point about the timing of the criminal

8   conduct, and I did hand up a couple of charts, one of which is

9   relevant to this point.

10         I think we really need to dispense with the fiction

11  that Mr. Scott's criminal conduct ended in April of 2017, which

12  is something that defense continues to lark on and harken back

13  to.  The fact is that Mr. Scott sent almost $8 million back in

14  the summer of 2017, so even the large flows of money were still

15  going on later into 2017.  He was engaged with he

16  coconspirators as demonstrated by Mr. Ignatov's testimony and

17  corroborating text messages in the summer of 2018 to help these

18  coconspirators.  He lied to F.B.I. agents when he was arrested

19  in September and did not withdraw.  And after that, your Honor,

20  the document that I handed up shows that Mr. Scott was

21  utilizing his lawyers' accounts to effectively launder OneCoin

22  money in the states.  He sent $1.7 million into an attorney's

23  account and said that that was a retainer.  That was on

24  11/28/18.  He sent a number of transfers through an attorney's

25  account and back to himself on the other hand, which as the

JBC7SCO1

1   Court will hear testimony from the testimony of Locke Lord was

2   a common practice of the defendant to launder firms as part of

3   this scheme, and that happened again after he was arrested,

4   into 2019 even.  And the indictment charges a conspiracy

5   running through 2018.

6       So he was continuing to engage in this conduct.  He

7   learned that these fund administrators and other providers were

8   terminating his services.  That goes directly to his state of

9   mind, whether it was innocent or not, in running these funds

10  from both a money laundering perspective and a bank fraud

11  perspective.

12      THE COURT:  OK.

13      MR. DEVLIN-BROWN:  Thank you, your Honor.  So I think

14  a couple of points on this.  First of all, just in terms of how

15  those documents happened to come into evidence, I recognize

16  that the Court has a lot of discretion in terms of what to

17  permit and in terms of cross-examination and direct and what

18  documents should or shouldn't be shown to a witness when the

19  witness has no knowledge of the documents.

20      But I think what happened on redirect just wasn't

21  redirect at all.  It was not something the witness had personal

22  knowledge of; it was not anything that he was asked about.  And

23  I don't think redirect is coextensive with anything the

24  government might want to show to rebut a point that they think

25  the defense made some headway on in cross.  So that's our first

JBC7SCO1

1    concern.

2            Second -- and I don't want to dwell on how this

3    document got before the jury and whether we had proper notice

4    of that or not.  You do have our letter, I think, your Honor,

5    we filed last night.  But, you know, we have been trying hard

6    not to disrupt the flow of the government's case, and there

7    have been times when they read ten documents, and we sort of

8    assumed they're the same ten documents we saw on a list the

9    night before.  We have been trying to move things along.

10           I just wanted to alert the Court I don't think we can

11   keep doing that at this pace.  Not to get us too much on a side

12   issue, but the government has, as we understand it, four

13   witnesses today.  We got between 9:30 last night and 12:20 in

14   the a.m. the list of exhibits, which is probably in excess of

15   100 that the government is planning to offer through those

16   witnesses, and a request that the defense indicate their own

17   exhibits.  In fact with respect to the back of Ireland

18   exhibits, I got an e-mail at 12:20 in the morning from Mr.

19   DiMase saying here is our Bank of Ireland exhibits, the defense

20   should identify its by 8 a.m.  And I had our only paralegal

21   stayed up all night trying to do that.  And it's a difficult

22   task because the government has identified a broad range of

23   exhibits, as we did for Bank of Ireland.  They are all on a

24   stipulation as to authenticity but then selected a smaller

25   number to offer into evidence, and so we have to go through

1    each one that the government left off what it's going to offer,

2    and see if it's marked a defense exhibit and see if we want it.

3    I don't know well enough too much now, but we're going to have

4    to slow that down today, because there is just sort of too

5    much, and I don't I don't want mistakes like that to occur.

6          More to the point on this one.  One question was asked

7    of the witness about Mason Hayes, whether the fund

8    administration did any work with it.  The answer was I think

9    Apex may have done, not from my office.  There was no vouching

10   for Mason Hayes.  There was no statement from Mason Hayes as to

11   why they took on the Fenero funds.  I think it was beyond the

12   scope of redirect.

13         To the more substantive issue of do these e-mails have

14   relevance and significance in the case, we stand by what we

15   said in court before and what we put in through our letter.

16   The fact that Mason Hayes -- where you're not going to have a

17   witness testify -- terminated Mr. Scott's relationship in

18   October 2017 is much to do about nothing.

19         And I do want to push back a little bit on the timing,

20   because I do think it's actually quite important.  With a money

21   laundering case I suppose the government can always say it goes

22   on because people are spending money and buying a Porsche and

23   there are transfers that go on, but in terms of what is

24   relevant to Mr. Scott's state of mind about OneCoin, in July of

25   2017 all of the funds -- save a legal reserve litigation

JBC7SCO1

1    reserve of 1.25 million euro are returned.  October 2017

2    Mr. Scott is not using these Irish entities anymore.  He

3    actually has shut them down.  The email indicates they have

4    been put on the strike-off list shortly before.  And then Mason

5    Hayes responds that it's terminating this relationship.

6            Mr. Scott is not involved in any more transactions

7    with the individuals at OneCoin.  And the government keeps

8    saying that people reached out in the summer of 2018.  There is

9    almost no evidence of that.  And to the extent there is, it's

10   that there was a reach out to Mr. Scott, and he pushed them

11   away.  And he may have signed a form or something with respect

12   to a prior transfer, but that's it.

13           So, the idea that this has great relevance or any real

14   relevance on his state of mind with respect to OneCoin in

15   October 2017 I just think is not there.

16           And then there is a number of other concerns with the

17   e-mails.  I'm not sure if the government's view is that this is

18   crime fraud and that's why an e-mail from Mr. Scott's counsel

19   to him terminating the relationship, you know, doesn't have any

20   privilege issues.  I don't think the termination of the

21   relationship would be in furtherance of any criminal activity,

22   and that wouldn't be a basis for it.

23           But more to the point, your Honor -- these are the

24   issues we raised on Friday in our letter -- you are taking this

25   isolated somewhat inflammatory language, you don't have the

1   whole story, you don't have witnesses who will testify.  The

2   government can keep saying it's not offering it for the truth,

3   but then I'm not really clear what the significance is of it,

4   because you have the Mason Hayes people saying we have money

5   laundering concern, Mr. Scott saying we have done everything

6   right.  If it's not offered for the truth, I think it has even

7   less relevance.  And that's clearly the link the government is

8   seeking to draw.

9          Look, we have no problem with witnesses from any

10  entity, Apex or otherwise, taking the stand and talking about

11  their decisions to end relationships with Mr. Scott.  But just

12  putting in e-mails from the broad searches to try to make that

13  same point, where there is no opportunity to cross the witness,

14  really doesn't strike us as fair.  So, we think those exhibits

15  should be removed from evidence, the testimony should be

16  struck, and that's our request that the Court provide a brief

17  instruction to the jury.

18          MR. DIMASE:  In response, on the exhibits point I just

19  want to make clear that all the exhibits that were provided in

20  response to defense request to identify particular exhibits --

21  we which we don't usually do in advance of witness testimony --

22  were marked weeks ago.  So, it's not as if they're getting

23  these for the first time.  I just want to make that clear.

24          I do think there are just a couple of small points

25  here.  One, it's not just any one particular letter or e-mail;

1    it's the cumulative effect of all of these documents over time

2    that shows the defendant's state of mind and his knowledge that

3    this Fenero fund operation was acting in a legal manner.

4         I do think it's important to focus on the particular

5    things that are being told to Mr. Scott in the Mason Hayes term

6    letter, which is one of just a number of such communications.

7    The third page it says, "given your failure to provide the

8    information and documents requested by us to identify the

9    beneficial owners of the companies for our anti-money

10   laundering purposes and the information required by us to

11   understand the nature of the activities of the companies ... we

12   are resigning as lawyers to the remaining companies with

13   immediate effect."

14        So, this goes again to this essential issue in this

15   case, the defendant's state of mind and the fact that these

16   companies, these service providers, are terminating him because

17   it shows that he is operating in an illegal manner.  And it's

18   the repeated receipt of these e-mails and letters over the

19   course of almost two years that presents a pattern of evidence

20   that is critical to show the defendant's state of mind.

21        And as far as the hearsay issues, your Honor, those

22   can be addressed with a limiting instruction.  These are not to

23   be considered for the truth, they are only to be considered for

24   state of mind.  And obviously the government would be unable to

25   argue them for the truth in any jury argument as well.

JBC7SCO1

1          THE COURT:  OK.  I guess there have been a number of
2     arguments made, legal and otherwise, Concerning the two
3     exhibits in particular on Mr. and Mr. Spendiff.  And as I
4     indicated on Friday, I was a little concerned about how all
5     that happened, concerned in particular about the potential
6     prejudice to Mr. Scott as a result.  And reading the transcript
7     it's clear -- and I'm not ascribing any bad motive to anyone --
8     but it's clear that there was some confusion as to whether or
9     not those documents were in evidence.
10          At page 752 Ms. Lozano offered 1333 and 1344 -- 34,
11     rather -- and then withdraw withdrew the offer.  She later
12     indicated again on page 752, "I have offered them into
13     evidence.  I don't know that there has been a ruling.
14          I asked are they in evidence.  You said they were in
15     the stipulation.
16          You said, yes, they were in the stipulation.  And I
17     said so they're in evidence.
18          And I was wrong apparently.  Now the government have
19     on any number of occasions last week read off a long list --
20     read a stipulation, reading off a long list of exhibits,
21     indicating that there is a stipulation not only as to
22     authenticity but as to admissibility.  When I said are they in
23     the stipulation and the response was, yes, they're in the
24     stipulation without the further admonition but the stipulation
25     is only as to authenticity, I did not see the need to go to the

JBC7SCO1

1    defense table.  As we do, we have this little catechism of

2    exhibits offered.  I ask to see if there is an objection.  If

3    there is no objection, it comes in; if there is an objection,

4    we talk about it.

5         But clearly my belief, based on the government's

6    representation, is that it was in the stipulation and that the

7    stipulation concerned admissibility as well.

8         Thereafter the exhibit was shown, was published to the

9    jury, including the "Dear Dechlin, I have received your voice

10   mail and I'm outraged by your decision by Mr. Scott.  That

11   message by Mr. Scott at page 753, and it's only on page 754

12   that Mr. Devlin-Brown indicates I don't think this document is

13   in evidence.  At that point it's been published.  I think it is

14   improper that it was published to the jury at that point, and

15   on that basis I will strike those two exhibits.

16        And I'm not striking them for all time.  If the

17   government has some other basis upon which they can come in,

18   they can come in, and I'm not now ruling on the other state of

19   mind evidence, although it appears to me on its face that if

20   think there is an adequate basis to admit those exhibits, it

21   seems to me they can be admitted.

22        On the legal issue as to whether or not the redirect

23   examination was appropriate redirect, I believe that arguably

24   it was.  The defense has made an argument through its

25   questioning that Mr. Scott did not or should not -- was not in

JBC7SCO1

1    the position to know that OneCoin was a fraud, because if he

2    knew it was a fraud he would not have engaged various inspected

3    service providers including fund administrators, law firms,

4    etcetera.

5         With that, I am happy to instruct the jury along the

6    lines that Mr. Devlin-Brown indicated.  I would tell them,

7    however, that at the end of the day they were shown an exhibit,

8    it was inadvertent, and because of that they are not to

9    consider it.

10        MR. DEVLIN-BROWN:  That's fine, your Honor.  We

11   appreciate the court's ruling.

12        On the other documents in the government's letter, we

13   would just like an opportunity to go through them individually,

14   because I think there are different circumstances for different

15   documents, and I don't know which ones if any the government

16   believes need to come into evidence today or what the witness

17   order is today and how that ranks among the other evidentiary

18   disputes we may have.  But we would like to address them.

19        THE COURT:  That's fine.  That's fine.  I understand

20   that there are stipulations concerning authenticity, but that

21   doesn't get you across the finish line; you still have to get

22   someone to make sure that it comes in.

23        MR. DIMASE:  Just clarifying the points.  Is the Court

24   striking both the exhibits and the portion of the redirect

25   testimony regarding the exhibits?  Is that the Court's

JBC7SCO1

1   intention?  Just so that we're clear.

2                   THE COURT:  Yes.

3                   MR. DIMASE:  OK.  But the portion regarding -- the

4   remainder of the redirect will not be stricken.

5                   THE COURT:  Correct.

6                   MR. DIMASE:  Only the portion regarding those two

7   exhibits.

8                   THE COURT:  Correct.

9                   MR. DIMASE:  Very good.

10                  I would say that the government does intend to

11  introduce those exhibits again for the same reasons that we

12  articulated today.  If the Court wants to defer a ruling until

13  the government offers them, obviously that's fine, but I just

14  want to put the Court and defense on notice that we intend to

15  introduce all the exhibits that were attached to our letter,

16  and it will likely not be today, depending on how things go.  I

17  may even be probably tomorrow.

18                  THE COURT:  That's fine.  That's fine.

19                  MR. DIMASE:  So one other brief issue that maybe we

20  can deal with before the jury comes in, your Honor, relates to

21  certain testimony from a Locke Lord witness, and this other

22  chart I handed up with the color flags on it is related.

23                  Mr. Devlin-Brown has indicated that he is going to

24  object to certain testimony from the Locke Lord witness really

25  in the form of e-mail exhibits.  It's not a lot of personal

JBC7SCO1

1  knowledge on this transaction, that $5 million was transferred

2  into a Locke Lord escrow account and back out to a different

3  account, which the government asserts is part of the money

4  laundering conduct in this case.  And what the evidence will

5  show is on the left of this chart the money originates from

6  OneCoin sources, it's layered through two accounts that are

7  held by Gilbert Armenta in the name of Zala Group.  It is then

8  sent into Locke Lord in two separate transfers from two

9  separate banks totaling around $5 million, and within two weeks

10  it's sent back out in a single transfer to another Zala Group

11  account, this one in Dubai where the money originated from

12  OneCoin.  So, it goes from Dubai OneCoin accounts to Armenta

13  U.S. accounts, and then in a space of two weeks into a Locke

14  Lord escrow account with Mr. Scott's direction, and then back

15  out to a different Zala Group account bank in Dubai.  And this

16  is core evidence of the charged crimes, your Honor, that Mr.

17  Armenta, who has been established a key co-conspirator in this

18  case, another money launderer for OneCoin, the money is coming

19  from OneCoin in the first instance, and it's our position that

20  this is core direct evidence of the charged crimes and that is

21  absolutely admissible.

22          MR. DEVLIN-BROWN:  Your Honor, we are aware of a I

23  believe $33 million payment that Ruja Ignatova or people

24  associated with her pay into Locke Lord and that the government

25  has an argument with respect to that.

1              This was sort of new to us.  You know, Gilbert Armenta

2     had been a long-time client of Mr. Scott's.  The e-mails on

3     their face relate to other legal work that Mr. Armenta is doing

4     with Mr. Scott.  Mr. Armenta is not going to be testifying.

5     So, you have these e-mails, some of which may have hearsay in

6     them as well that, you know, talk about some unrelated

7     transfer.  Now, I guess the government wants to trace the money

8     there, but I should also point out it looks like one of those

9     transfers, JPMC to Northern Trust -- one of those transfers

10    from JPMC to Northern Trust, that's still within Locke Lord,

11    and then it goes out to another account of Zala Group.

12             But I just don't know what the government's basis is

13    to say this is part of the criminal conduct since Gilbert

14    Armenta is not going to be testifying.  I haven't seen e-mails

15    or other documents in which this transaction is discussed in a

16    criminal sense.  It looks like just a transfer for another

17    legal project into the Locke Lord escrow account.

18             MR. DIMASE:  Your Honor, we do e-mails connecting this

19    with Armenta that we intend to put in as well where they're

20    talking about this transfer on the back end.  It's OneCoin

21    money and it's flowing through a coconspirator's account into

22    Locke Lord and out to another account at Mr. Scott's direction.

23    I can't imagine a more relevant set of evidence than showing

24    money, criminal proceeds went through accounts at the direction

25    of Mark Scott.

THE COURT: I will allow it. The jury is here, so I'm going to get dressed and come right back out.

(Continued on next page)

JBC7SCO1

1          (Jury present)

2          THE COURT:  Everyone can be seated.  I trust everyone

3   had a wonderful weekend.  Thank you as always for being so

4   prompt.  There is just a little bit of work I need to do with

5   you before we get another witness on the stand.

6          At the end of the day on Friday on redirect

7   examination Mr. Spendiff was questioned concerning two

8   exhibits, Exhibits 1333 and 1334, having to do with a law firm.

9   Those exhibits were put before you inadvertently.  I should not

10  have allowed those exhibits to go before you, so accordingly

11  you should disregard those exhibits and all of the testimony

12  concerning those exhibits.  OK?

13         And with that, government please call your next

14  witness.

15         MS. LOZANO:  The government calls Linda Cohen.

16         MR. GARVIN:  Your Honor, I apologize.  May I request a

17  very brief side bar before there witness commences?

18         THE COURT:  Sure.

19         (Continued on next page)

20

21

22

23

24

25

JBC7SCO1

1          (At the side bar)

2          MR. GARVIN:  Your Honor, I apologize, but I was

3     reading over this witness's 3500 material, and I noticed that

4     this witness made a statement during her interviews that her

5     husband passed away and that there were no insurance proceeds.

6     I don't know if the government actually addressed that issue,

7     but we would ask that those two statements be avoided because

8     they just elicit sympathy and prejudice Mr. Scott, and so

9     that's our position.

10          MS. LOZANO:  I am not planning to elicit that

11     testimony.  I wasn't going to ask any questions about that.  I

12     was simply going to ask whether she was married.

13          MR. GARVIN:  OK, thank you.

14          (Continued on next page)

JBC7SCO1                          Cohen - direct

1              (In open court)

2      LINDA COHEN,

3            called as a witness by the government,

4            having been duly sworn, testified as follows:

5              THE COURT:  Ma'am, you can be seated.  Please speak

6      directly into the microphone.  And if I could ask to you begin

7      by stating your full name and spelling your first and last

8      name.

9              THE WITNESS:  Linda Cohen, L-i-n-d-a C-o-h-e-n.

10             THE COURT:  And if you could also keep your voice up

11     because it's a cavernous room and it's sometimes difficult to

12     hear.

13             Ms. Lozano.

14             MS. LOZANO:  Thank you, your Honor.  At this time the

15     government offers Exhibits GX 731A, consisting of HSBC records,

16     and GX 723A, 723B, 723C, 723D, 723E and 723F, consisting of a

17     TD Bank records into evidence.

18             THE COURT:  Any objection?

19             MR. GARVIN:  No objection.

20             THE COURT:  Those exhibits will be received.

21             (Government Exhibits GX 731A,GX 723A, 723B, 723C,

22     723D, 723E and 723F received in evidence)

23     DIRECT EXAMINATION

24     Q.  Good morning, Ms. Cohen.

25     A.  Good morning.

JBC7SCO1                        Cohen - direct

1    Q.   Where do you live?

2    A.   I live in Manhattan, Upper West Side.

3    Q.   And if you could keep your voice up and speak into the

4    microphone.  The courtroom is a little bit echoey.  And how old

5    are you, Ms. Cohen?

6    A.   I'm 76.

7    Q.   Are you currently married?  Are you currently married?

8    A.   No, I'm a widow.

9    Q.   Do you have any children?

10   A.   Yes, I have two sons.

11   Q.   Do you have any grandchildren?

12   A.   Yes, I have four grandchildren.

13   Q.   Do your sons live in New York?

14   A.   Know, they don't.  One lives in Seattle, Washington, and my

15   other son just moved back to St. Thomas, Virgin Islands.

16   Q.   Are you currently working?

17   A.   Yes, I am.

18   Q.   What kind of work do you do?

19   A.   I teach.

20   Q.   What do I teach?

21   A.   I teach art.

22   Q.   To whom?  What age level?

23   A.   I teach junior high school and high school students that

24   are presently at Bellevue hospital.

25   Q.   How long have you been doing that?

JBC7SCO1                    Cohen - direct

1    A.  I have been teaching in New York since I returned in 1998.

2    Q.  You say when you returned.  Where did you return from?

3    A.  I used to live in St. Thomas, U.S. Virgin Islands.

4    Q.  Are you familiar with an entity called OneCoin?

5    A.  Yes, I am.

6    Q.  How did you first become aware of OneCoin?

7    A.  My older son told me about it.

8    Q.  What did your older son do for a living?

9    A.  Well, right now they just moved.  He does massage, and I'm

10   not sure at this time what he is doing.  I haven't spoken to

11   him about it.

12   Q.  OK.  When did your son introduce you to OneCoin,

13   approximately what year?

14   A.  It was about four years ago approximately.

15   Q.  So would that make it 2015?

16   A.  2015 or '16.  Something like that.

17   Q.  And how did your son introduce you to OneCoin?

18   A.  He told me that a good friend had introduced him to it and

19   thought it would be good for me to retire.

20   Q.  Do you know what your son's friend do for a living?

21   A.  No, I don't.

22   Q.  Have you heard the term multi-level marketing?

23   A.  Yes.

24   Q.  And has your son been involved in any multi-level marketing

25   enterprises?

JBC7SCO1                          Cohen - direct

```
 1   A.   One other through this same gentleman.  I think it was
 2   called Trinan.
 3   Q.   So through the same friend who introduced him to OneCoin?
 4   A.   Correct, yes.
 5   Q.   So what did your son tell you about OneCoin?
 6   A.   That it was cyber currency And that it was at the
 7   beginning, pretty much the start of it, and that it seemed to
 8   be increasing in value.
 9   Q.   Did you have an understanding about what cyber currency
10   meant, what that was?
11   A.   Just a little.  I had heard of bitcoin.
12   Q.   And what had you heard?
13   A.   Just that it was cyber currency and that it was valuable,
14   that it had started at very low and now it was worth thousands
15   of dollars or whatever at the time.
16   Q.   What did your son tell you about his participation with the
17   OneCoin?
18   A.   Well, his friend had given him a coin.
19   Q.   A coin?
20   A.   No, I think it was about $2,000 worth of OneCoin.
21   Q.   So what did you do -- well, did you ask your son any
22   questions about OneCoin?
23   A.   Well, I told him that I really disliked multi-level
24   marketing but I would be interested if he would take care of
25   it.  I would give him the money to deal with it and he would
```

1    take care of it.

2    Q.  What do you mean by take care of it?

3    A.  He would do all the paperwork, and all I wanted to know is

4    did it increase in value, how would I be able to get my money

5    out of it.

6    Q.  Did you get answers to those questions?

7    A.  As time went on a little bit.

8    Q.  OK.  So before we get to that, after your son introduced

9    you to OneCoin, did you ultimately purchase a package?

10   A.  I did.

11   Q.  Do you remember how much that package was?

12   A.  It was a lot.

13   Q.  The first.

14   A.  Initially I gave him $5,000.

15   Q.  How did you give that to him?

16   A.  I sent him a check.

17   Q.  And what did you tell him to do with that?

18   A.  To start it for me.

19   Q.  Had you at that point done any independent research about

20   OneCoin?

21   A.  No, I depended on what I heard from him.  My son wouldn't

22   try to lead me astray.  Had he known, I'm sure he wouldn't have

23   suggested I do this.

24   Q.  At that point did you have a computer in your own home?

25   A.  Yes.

1  Q.  And after you sent your $5,000 to your son, what did he do

2  with it?

3  A.  Well, he invested it and told me how I could look into the

4  back office and see for myself.

5  Q.  When you use the term back office, what do you mean by

6  that?

7  A.  Well, it's suggested that you watch videos and learn a

8  little bit more about the company.  And there were a lot of

9  things in it that I really didn't understand.

10  Q.  Did you watch a video?

11  A.  I did.  I did watch videos.

12  Q.  Can you describe some of those videos?

13  A.  It's a while back.  There were a lot about this very

14  brilliant woman who started the whole OneCoin, and they showed

15  a lot of people at parties where they were so happy to be

16  making money.

17  Q.  Did you have an understanding how an investor was to make

18  money from OneCoin?

19  A.  Well, I assumed that as the coin increased in value that's

20  where the money would be made.  Whatever it started at, let's

21  say it started at $2.25, every time it went up in value that

22  was a gain; that's where you make your money.

23  Q.  What was your understanding about how the coin would

24  increase in value?

25  A.  I understand that there would be -- they were mining, and

1   it was limited to the amount of coins that would be available.

2   Q.  Where did you learn that from?

3   A.  I'm not sure if it was from the videos or how I learned it.

4   Q.  After -- now, you said your son set you up and you were

5   able to access the back office.  Can you describe to me what

6   your back office looked like, what you saw.

7   A.  No.  There was a lot in there, but a lot of it, like I

8   said, I didn't quite understand, and it just showed how many

9   coins were available.  That's why I asked my son to take care

10  of it, because he would understand better than myself.

11  Q.  Did you access the OneCoin site and your account on your

12  own?

13  A.  I did initially, but then I stopped.

14  Q.  When you did that after your initial investment, how many

15  OneCoins, if you remember, did you have?

16  A.  No.  I just would ask him what the value was, and I wanted

17  to know how I could get my initial investment back.

18  Q.  And do you remember when you first invested in OneCoin what

19  the stated value of each coin was?

20  A.  I believe it was $2.25 or $2.50, somewhere in that area.

21  It was quite reasonable.

22  Q.  Did you have an understanding at that point about the role

23  of tokens in the OneCoin mining process?

24  A.  I believe that there were tokens, some tokens to make up a

25  coin, but I don't know -- I don't -- if I knew at the time, I

JBC7SCO1                    Cohen - direct

1   don't remember right now.

2   Q.  What did you get for that initial investment?

3   A.  Just the ability to go into the back office.  Later on I

4   was able to get a card, a debit card, but I was never able to

5   use it.

6   Q.  When you made that initial investment, did you receive --

7   do you remember whether you received any token?

8   A.  I received nothing.

9   Q.  Well, I mean --

10  A.  In hand.

11  Q.  Let me rephrase.  Your account, did your account reflect

12  that you had tokens in it?

13  A.  I believe so.

14  Q.  Do you remember how many?

15  A.  No.

16  Q.  Did your account at that point reflect that there were

17  OneCoins in the account?

18  A.  Yes.

19  Q.  Do you remember?

20  A.  Well, it was one under -- I would go in under OneCoin, the

21  website, but I don't remember amounts.

22  Q.  Did you receive -- do you remember receiving any

23  educational packages with your OneCoins and tokens?

24  A.  No, I got nothing.

25  Q.  After you made -- well, what was your understanding about

1    the ability -- your ability to take out your investment once it

2    was made?

3    A.  Well, more recently --

4    Q.  At that time, I'm sorry.  At that time what was your

5    understanding about your ability to take the money out?

6    A.  I didn't have -- I didn't have a way to get it out.

7    Q.  But what was your understanding about whether you would be

8    able to get that out?

9    A.  I don't remember exactly when I was told, but they were

10   going to go public, and once OneCoin would go public at that

11   time I would be able to get my initial investment out; and the

12   time for it to go public kept changing.

13   Q.  And who was telling you these things about OneCoin?

14   A.  The person I had spoke with was my son who was getting the

15   information from other people.

16   Q.  Did you yourself go on the OneCoin site to update yourself

17   on going public?

18   A.  I know that I didn't do, no.  I listened to him.  He was

19   getting the information, so I just allowed that.

20   Q.  What was your understanding about your ability to exchange

21   OneCoins for other kind of currency?

22   A.  Well, he told me -- my son told me that there would be

23   companies that would accept cyber currency, OneCoin in

24   particular, in exchange for purchases, which I had a hard time

25   understanding.

1    Q.  Did that ever happen?  Were you ever able to do that?

2    A.  No, not for me.  I don't know about other people, but not

3    for me.

4    Q.  After you made that initial $5,000 purchase, did you make

5    another OneCoin purchase?

6    A.  Yes:  Yes, I did.

7    Q.  And when was that?

8    A.  I believe -- I looked at some of the records.  I believe --

9    was that February?  I'm not sure, but I think it was 2016.

10   Q.  Why did you make that second purchase?

11   A.  Well, being that OneCoin was increasing in value at a

12   really nice rate I was told that if I purchased by a certain

13   date I would get a lot more coin.  It was a what do you call

14   it, it was I guess a gimmick, but at the time I thought it

15   would be a good idea to do it because it was increasing in

16   value.

17   Q.  You mentioned at that point it was increasing in value.

18   How do you know that?

19   A.  Well, I would ask my son how much is it worth now, and he

20   would say I'm not sure, I'll find out; and he would let me

21   know.

22   Q.  At the time you made the second investment, what was your

23   understanding about the stated value of a OneCoin?

24   A.  That I don't remember, but it sounded like -- initially I

25   wasn't going to do it, but then I figured, well, if I want to

1  retire and it's going to be worth more money, I will invest the

2  money.  It was sitting in my bank, and I thought let it work

3  for me.  I didn't know it was not working.

4  Q.  And who told you about this offer that you then decided to

5  pursue?

6  A.  Well, the person that I have been speaking to is my older

7  son, and he was looking out for my well being, my benefit, and

8  he wanted me to retire.

9  Q.  What was your understanding about your ability to purchase

10  OneCoin under that kind of special offer period?

11  A.  I'm sorry.  Could you repeat?

12  Q.  When you purchased the second package, was there a time

13  limit in which you could take advantage?

14  A.  Yes, there was a time limit.

15  Q.  What was that time limit, do you remember?

16  A.  I think I purchased it like the day before the time was up.

17  Q.  And who told you about that time limit on the special

18  offer?

19  A.  Well, like I said, the person I was speaking with was my

20  son, so it was through him.

21  Q.  How much did you invest in that second?

22  A.  It was $18,000 purchase but with bank costs it was 22,000.

23  Q.  Dollars?

24  A.  Um-hum.

25  Q.  Now, your understanding when you made that investment was

1   what would happen with the OneCoins you had in your account?

2   A.  I thought I would just be adding to it.

3   Q.  Have you heard the term split?

4   A.  No. Split?

5   Q.  Split.

6   A.  Well, in terms of IBM stocks and splitting?

7   Q.  No, in terms of OneCoin.

8   A.  No.  No, I didn't.

9   Q.  How did you send the payment for the $22,000 package?

10  A.  It's a blur.  I do not remember.  I followed instructions

11  but I don't remember the instructions.

12  Q.  Who gave you those instructions?

13  A.  I think I spoke to a friend of my son's, but she didn't

14  have a lot of time.  I think she just gave me the information.

15  Q.  And was that payment made in the same way you made the

16  other payment of a check to your son?

17  A.  No, this was not sent through my son.

18  Q.  How was it sent?  Well, did you send it through your bank

19  account?

20  A.  I think I had to get -- I'm not sure -- I had to get a

21  certified check?  I'm not sure how it was done.

22          MS. LOZANO:  I'd like to publish Exhibit GX 731A in

23  evidence and publish to the jury, and that's the first page.

24  Q.  Ms. Cohen, if you could take a look at the first page and

25  let me know.  Did you look at this exhibit earlier this

JBC7SCO1                          Cohen - direct

1   morning?

2   A.  Yes, you showed it to me this morning.

3   Q.  And what are these records?  Whose records are they?

4   A.  They're mine.

5   Q.  For your HSBC Bank account?

6   A.  Yes.

7   Q.  If we could go to page 35, please, Mr. Barile.

8           And, Ms. Cohen, there is an entry dated February 17,

9   2016 which I'm going to highlight.  Do you recognize that

10  entry?

11  A.  Sort of.  Sort of.

12  Q.  What do you recognize it to be?

13  A.  It's obviously the amount that I approved to send.

14  Q.  Well, what is the amount there?

15  A.  I'm sorry?

16  Q.  What is the amount?

17  A.  $22,577.29.

18  Q.  Do you see the second highlighted portion of the

19  description after the letters BNF?

20  A.  The SecurePoint.

21  Q.  And then on the second line is -- well, does SecurePoint

22  ring a bell to you?

23  A.  No.

24  Q.  How about in the second line, the reference that is

25  highlighted US2 moon invoice, does that ring a bell?

JBC7SCO1                        Cohen - direct

1   A.  No, not really.  It's vague.  It's very vague in my mind.

2   Q.  When you say it's very vague in your mind, what does it

3   vaguely remind you of?

4   A.  I don't remember.  I really don't remember.

5   Q.  One last highlighted portion of this entry is the last line

6   where there is a number EF.  Can you read that number that's

7   highlighted?

8   A.  048442142.

9   Q.  And I believe the EF is connected to the line before with

10  the R, so it actually should read REF.  Do you remember whether

11  this transaction was a certified check or a wire?  Do you

12  remember how the money was sent?

13  A.  I really don't.

14  Q.  And when you sent the payment, were you instructed to

15  include any sort of comment about what the payment was for?

16  A.  I don't remember.  This is like a blur in my mind.  I don't

17  remember what I was instructed to do.

18  Q.  OK.  We can take that down, Mr. Barile.  And I'd like now

19  to show to the witness and publish to the jury what is in

20  evidence as Exhibit GX 723E, page 452 to 453, so if we can put

21  them right next to each other.

22          So, Ms. Cohen, you have not seen this exhibit before,

23  right?

24  A.  No.

25  Q.  OK.  So I'd like to direct your attention to the bottom of

JBC7SCO1                          Cohen - direct

1    the page on the left, and I am going to highlight this an

2    amount.  That amount, is that the amount that you sent in

3    connection with your OneCoin package?

4    A.  I believe so.

5    Q.  And at the top of this zoomed-in portion there is a date, a

6    wire date, February 17, 2016.

7    A.  Yes.

8    Q.  Is this the date that you sent money in connection with

9    your OneCoin purchase?

10   A.  Must have been.

11   Q.  Well, do you remember in the previous exhibit your HSBC

12   account, do you remember the date on that?

13   A.  I didn't look at the date.  It probably was -- could you

14   show it to me?

15   Q.  Yes, of course.

16          Can we just pull that up quickly on 731A, and we are

17   looking at page 35.

18   A.  Yes.

19   Q.  It's actually the top transfer there.

20   A.  Yes.

21   Q.  Transaction.

22   A.  This is the same thing.

23   Q.  So let's go back now to 723E, 452, and if we could zoom in

24   to the bottom section again.  Perfect.  And who is the

25   beneficiary of this $22,577.29 transfer?

JBC7SCO1                          Cohen - direct

1    A.  SecurePoint 360.

2    Q.  And the fourth line from the bottom there is a name.  Is

3    that your name?

4    A.  Yes.

5    Q.  And above that, two lines, there is a reference to US2 moon

6    invoice.

7    A.  That was probably where I was supposed to send it to.

8    Q.  So if we could zoom out and then go to the top of the next

9    page and zoom in to that.  And there is a field that says

10   originator.  Is that you?

11   A.  Yes.

12   Q.  And there is a reference number, and that reference number

13   is 048442142, right?

14   A.  Yes.

15   Q.  And the sender bank is HSBC, your banker.  Then I'm going

16   to highlight the last field that says wire date February 17,

17   2016.  Does that refresh your recollection about how you made a

18   payment for your second OneCoin package?

19   A.  I remember sitting doing it, but I do not remember anything

20   else about it.

21   Q.  Does that refresh your recollection that it was a wire

22   versus a certified check?

23   A.  Yes.

24   Q.  We can take that down.  Thank you.

25            Now, why did you buy that package?

1    A.  Why did I buy it?

2    Q.  Yes, what was your goal in buying that package?

3    A.  Well, I thought it would make more money for retirement.

4    Q.  How much money did you think you were going to earn?

5    A.  It depended on the value of the coin, so I would have to do

6    multiplication, but it sounded reasonable, and it sounded good,

7    otherwise I wouldn't have done it.

8    Q.  Did you subsequently buy another package?

9    A.  I thought -- I don't know if it was subsequent or prior

10   to -- but my younger son, I thought, well, if it's going to be

11   so good, I would like him to have something as well, and so I

12   got some for him.

13   Q.  And to be clear, when you purchased that package for your

14   son, you did not earn a commission for doing that.

15   A.  No.

16   Q.  How did you make that payment?

17   A.  I sent a check to my older son to sign him up.

18   Q.  How much was that package worth?

19   A.  I don't think it was a package; it was just to purchase

20   coin.  I think it was around 5.

21   Q.  5,000?

22   A.  Yeah.

23   Q.  So your understanding is that you could send money in just

24   to purchase coin?

25   A.  Yes, to open up an account for him.

1   Q.  And where did you get that understanding?

2   A.  Well, I had done it for myself through -- my son did it for

3   me, but I thought he would be able to do it for my son, his

4   brother.

5   Q.  During the period of time that you had this OneCoin

6   account, what did you notice about the value of the coin in

7   your account?

8   A.  You mean did I notice if it was going -- I didn't keep

9   track, but I heard from my son the value of it.

10  Q.  Well --

11  A.  I told you I didn't really want anything, I didn't want to

12  have to do anything as far as the business part of it.

13  Q.  What did you notice about the value of the OneCoin in your

14  account?  Was the value going up or down, or did it vacillate?

15  A.  I really didn't look at it.  I didn't quite understand how

16  they were dealing with the back office, all the information, so

17  I allowed my son to do that for me.

18  Q.  Were you ever told --

19  A.  I was just going to use the money to live.

20  Q.  Were you ever told that the value of a OneCoin went down?

21  A.  No.

22  Q.  Were you ever told that the value of OneCoin went up?

23  A.  Yes.

24  Q.  How often were you told that?

25  A.  When I asked.

1    Q.   Every time you asked?

2    A.   Yeah.  I would ask how it was doing, what was the value.

3    Q.   What was your understanding about the value of your entire

4    account?  How much did you think you had in there?

5    A.   Well, based on the investment at that time -- the last time

6    I heard it was $25 a coin, so I never did the multiplication,

7    but I did try to find out how to get -- get my initial

8    investment back and then whatever was left, let it work itself.

9    Q.   Why did you want to do that?

10   A.   Because I wanted my initial investment back.  As long as it

11   was making money, let it continue with what was left, and I

12   would have my money back in my account.

13   Q.   What did you do in order to try to get your initial

14   investment back?

15   A.   Well, I asked how I could do that, and at the time, even

16   with the card that I received, I was not able to put any money

17   on it or any coin on it.  And, like I said, I was told it was

18   going to go public, and once that happened then I would have

19   more flexibility.

20   Q.   So let's back up a little bit.  Approximately when did you

21   decide that you wanted to withdraw your initial investment?

22   How many months after you paid the 22,000 and change?

23   A.    In the last two years, so probably a year or two after

24   approximately.

25   Q.   What efforts did you make to get the money back?

1    A.  I just asked how I could do it.

2    Q.  Who did you ask?

3    A.  My son.  He was the one I had the most, you know,

4    information from.

5    Q.  And what was your understanding about the efforts he took?

6    A.  Like I said, he told me it was going to go public, and then

7    once it went public then I would be able to get it.  But the

8    time it was going to go public kept changing.

9    Q.  So it's your understanding that you were unable to withdraw

10   your initial investment until it went public?

11   A.  Right.

12   Q.  And in that period of time when were you waiting to

13   withdraw your money you referenced a card you received.  Please

14   describe that card.

15   A.  I can't find it, but it was like a credit card or debit

16   card.

17   Q.  Who gave you that card?

18   A.  I sent for it.

19   Q.  How did you send for it?

20   A.  I was given the information, and I followed the

21   information.  I received it, but I don't remember who I sent it

22   to.

23   Q.  So, in order to get the card, did you work through your

24   online account and the back office?

25   A.  I don't think so.  I don't think so.

1   Q.  What was your understanding about what the card

2   represented?

3   A.  It represented ability to put a coin on it and use it for

4   purchases.  I really didn't want to do that; I wanted to get

5   cash out of it.

6   Q.  So when you received the card, what did you do with it?

7   A.  I held onto it, but there was nothing I could do with it.

8   Q.  Did you try to load it with your OneCoin?

9   A.  At the time I wasn't able to.

10  Q.  How did you try to do that?

11  A.  I said how can I do this?  And I don't remember receiving

12  any information on that.

13  Q.  So, what did you do with that card?

14  A.  I put it away, but I can't find it.

15  Q.  Were you ever able to exchange any of your OneCoin into

16  cash?

17  A.  No.

18  Q.  Were you ever able to exchange any of your OneCoin into

19  other currency?

20  A.  No.

21  Q.  You ever able to exchange any of your OneCoin and purchase

22  something of value?

23  A.  No.

24  Q.  Now, you mentioned that when you first heard about OneCoin

25  you became familiar with the person who started it, the founder

1    of OneCoin, a woman?

2    A.   Please ask me that again.

3              (Continued on next page)

JBC3SCO2                          Cohen - Direct

1    Q.  Let me back up.  Are you familiar with a person by the name

2    of Ruja Ignatova?

3    A.  Just through the videos.

4    Q.  Who is she?

5    A.  She was supposed to be this brilliant woman who started the

6    OneCoin.

7    Q.  What did you learn -- where did you learn about her?

8    A.  Just on the videos.

9    Q.  Did you ever -- you mentioned that you viewed some other

10   OneCoin videos.  Did you actually ever attend a OneCoin event?

11   A.  No.

12   Q.  Are you able to -- currently, are you able to access your

13   OneCoin account?

14   A.  I haven't tried.

15   Q.  What was the total then that you had invested into OneCoin,

16   including for your son?

17   A.  Other than the bank charges, it would have been a lot.

18   $28,000, plus the bank charges.

19   Q.  Did there come a time when you came to believe that OneCoin

20   was not a good investment and was in fact fraudulent?

21   A.  When I received a call from the FBI.

22   Q.  When was that?

23   A.  About a month ago.

24   Q.  How has your inability to withdraw your investments and the

25   loss of that money affected you?

 1    A.  Well, I'm 76 years old and I'm still working.  I would love

 2    to retire.

 3          MS. LOZANO:  One moment.  I have nothing further for

 4    this witness.  Thank you, Ms. Cohen.

 5          THE COURT:  Cross-examination.

 6          MR. GARVIN:  Yes, your Honor.  Thank you.

 7    CROSS-EXAMINATION

 8    BY MR. GARVIN:

 9    Q.  Good morning, Ms. Cohen.

10    A.  Good morning.

11    Q.  My name is David Garvin.

12    A.  David what?

13    Q.  Garvin.

14          Ms. Cohen, I'd like to go over some of the things that

15    you said this morning, if I may.

16    A.  Okay.

17    Q.  So, if I understand you correctly, you actually learned

18    about OneCoin from your son; is that correct?

19    A.  Correct.

20    Q.  And this occurred some time at the end of 2015 or maybe

21    beginning of 2016, correct?

22    A.  I believe it was the end of 2015.

23    Q.  Your son explained to you a little bit about what

24    cryptocurrency was, correct?

25    A.  Well, he just explained more of the benefits for me.

JBC3SCO2                          Cohen - Cross

1   Q.   He said or told you that it was cryptocurrency, was like

2   bitcoin, correct?

3   A.   Well, they were both cryptocurrency, but I don't remember

4   him saying that.

5   Q.   Well, at the time, you had heard of bitcoin, right?

6   A.   Yes, I had.

7   Q.   At the time, it was your understanding that OneCoin was

8   similar to bitcoin in that they were both cryptocurrencies,

9   correct?

10  A.   Correct, hmm-hmm.

11  Q.   And at that time, you had never heard of OneCoin, right?

12  A.   That's correct.

13  Q.   So, the only thing that you knew, back in December of 2015,

14  was that OneCoin was similar to bitcoin, right?

15  A.   That it was cryptocurrency.

16  Q.   Okay.  And at the time, you believed that bitcoin was a

17  legitimate company, right?

18  A.   Bitcoin had nothing to do with this.  But, yes.

19  Q.   Okay.  And I think that you said on direct examination that

20  bitcoin had started low and went high in value, right?

21  A.   Right.  That's what I had been told.

22  Q.   You were hoping that OneCoin would do the same thing,

23  right?

24  A.   Yes, yes.

25  Q.   This was just an opportunity to get a return on your

1    investment, right?

2    A.  Yes.

3    Q.  Now, counsel had asked you if you had ever attended a

4    OneCoin event.  Have you ever attended a OneCoin event in

5    Idaho?

6    A.  No, I don't think so.  I attended a Trenant event, but not

7    a OneCoin.  It was a group of people that had purchased

8    Trenant, which was another multilevel marketing company.

9    Q.  Oh.  I see.  Ma'am, do you remember being interviewed by a

10   special agent in this case back in October?

11          Do you remember being interviewed by one of the

12   special agents in this case in October?

13   A.  October what?

14   Q.  In 2019.

15   A.  Well, this is -- that's when I was first called.

16   Q.  Yes, ma'am.

17   A.  Yes.

18   Q.  At that time, did you tell him that you and your son

19   attended a OneCoin event in Idaho?

20   A.  I don't remember telling him that.  Because I don't

21   remember attending one.

22   Q.  Well, the one thing we know is that some time in or about

23   December 2015, you invested $5,000, correct?

24   A.  Yes.  I don't know the exact date, but I did invest 5,000.

25   Q.  At the time, it would be fair to say that you understood

JBC3SCO2                        Cohen - Cross

1    that OneCoin operated on a multilevel marketing basis; is that

2    correct?

3    A.   If you wanted to do it that way, yes.  You didn't have to.

4    Q.   You said that you had or your son had some of limited

5    experience with multilevel marketing company in the past,

6    right?

7    A.   Right.

8    Q.   You also told the ladies and gentlemen of the jury that you

9    watched some videos about OneCoin on the internet, right?

10   A.   Through the -- yes.  Through the back offices.

11   Q.   What you would see on those videos is that you would see

12   people who were excited; isn't that right?

13   A.   Yes.

14   Q.   And they appeared to be enthused because they were making

15   money with OneCoin, right?

16   A.   That's correct.

17   Q.   So that gave you the impression that there were other

18   people who were successfully making money with this company,

19   correct?

20   A.   Yes, I guess so.

21   Q.   So, in February as we've just seen, you spoke with your son

22   about OneCoin, right?

23   A.   I don't have dates, but yes.

24   Q.   After speaking with your son, you decided to send in an

25   additional approximately $22,000, right?

1   A.  Yes.

2   Q.  We've seen that this morning, right?

3   A.  Correct.

4   Q.  Prior to sending in that $22,000, you had seen a video that

5   described Ruja Ignatova's qualifications, correct?

6   A.  Her qualifications for what?

7   Q.  That she was the inventor of OneCoin, the founder; is that

8   right?

9   A.  Yes.

10  Q.  And I think you described it as the video said that she was

11  brilliant, right?

12  A.  I understood that, yes.

13  Q.  And so, the combination of your son's advice and what you

14  saw on these videos, that is what led you to make the

15  additional investment of $22,000, right?

16  A.  Well, it was also a special deal where you got more for

17  your money.  More coin for your money.

18  Q.  That's right.  There was a type of promotion that was going

19  on?

20  A.  Promotion, that's correct.

21  Q.  It was those three things, together, that led you to make

22  the additional investment, correct?

23  A.  I don't think she had anything to do with it.

24  Q.  All right.  Now, it would be accurate to state that you

25  have never spoken with my client, Mr. Mark Scott; is that

1    right, ma'am?

2    A.   That's correct.

3    Q.   In fact, it would be fair to say that you never saw

4    Mr. Scott in any of those OneCoin videos that you watched;

5    isn't that true?

6    A.   I wouldn't know.  I don't know him.

7    Q.   Well, you never communicated with Mr. Scott by e-mail,

8    correct?

9    A.   Correct.

10   Q.   The same thing would be true that you've never received or

11   sent any text message or any other type of communication with

12   Mr. Scott; isn't that true?

13   A.   I don't -- I don't know who he is.  I don't know who

14   received the money.

15   Q.   Okay.  So, you saw the records that were introduced, the

16   bank records, showing today where your money went, right?

17   A.   Yeah.

18   Q.   It would not surprise you that Mr. Scott's name is not on

19   any of those records; is that right?

20   A.   That's correct.

21   Q.   So, in fact -- Mark, could you please stand up.

22          This is Mr. Mark Scott.  Today is the first time that

23   you've ever laid eyes on him; isn't that true, ma'am?

24   A.   I don't know the man.

25   Q.   So, it would be fair to say that my client, Mark Scott, did

1   not influence your decision to invest in OneCoin in any way;

2   isn't that true?

3   A.  I assume it would be true.

4   Q.  So, sitting here today, you do not have any personal

5   knowledge of Mark Scott, my client, doing anything improper;

6   isn't that true?

7   A.  I have no -- I cannot say that.

8   Q.  You have no knowledge of him at all.  Correct?

9   A.  I have no knowledge of him at all.  I don't know if he's

10  done anything good or bad.

11          MR. GARVIN:  Thank you, ma'am.  I have no further

12  questions.

13          THE COURT:  Redirect?

14  REDIRECT EXAMINATION

15  BY MS. LOZANO:

16  Q.  Ms. Cohen -- if we can put up, Mr. Barile, 731A, page 35.

17          Ms. Cohen, on cross-examination, you were asked about

18  the 22,577.29 wire that you sent to -- in connection with your

19  purchase of OneCoin.  Were you instructed to indicate on that

20  wire what the purpose of purchase was?

21  A.  I believe so.

22          MR. GARVIN:  Excuse me.  Objection, your Honor.

23  Exceeds the scope of direct or, excuse me, cross.

24          THE COURT:  Overruled.

25  Q.  You can answer.

JBC3SCO2

A.   I believe so.  In thinking about it, there was no mention

of OneCoin.  It was a mention of an educational package.

          MS. LOZANO:  I have nothing further.  Thank you, your

Honor.

          THE COURT:  Ms. Cohen, you may step down.

          THE WITNESS:  Thank you.

          (Witness excused)

          THE COURT:  Government please call your next witness.

          MS. LOZANO:  The government calls Senem Firuz.

          At this point, the People are offering exhibits GX

710A, 710B, 710C, 710D, 710E, GX 711A, 711B, 711C, 711D, 711E,

which are Morgan Stanley account records into evidence.

          THE COURT:  Any objection?

          MR. GARVIN:  Just finishing reviewing those, your

Honor.  It will take two seconds.  No objection.

          THE COURT:  The people's exhibits will be received.

          (Government's Exhibit 710A, 710B, 710C, 710D, 710E

received in evidence)

          (Government's Exhibit 711A, 711B, 711C, 711D, 711E

received in evidence)

          MS. LOZANO:  Additionally, the People are offering at

this time exhibits GX 2901, 2902, 2903, 2905, 2906, which are

Morgan Stanley e-mail records into evidence.

          MR. GARVIN:  Your Honor, we need a moment to review

those because we haven't seen those previously.

1              THE COURT:  Very well.

2              MR. GARVIN:  We can come back to that in a little bit.

3       SENEM FIRUZ,

4          called as a witness by the Government,

5          having been duly sworn, testified as follows:

6       DIRECT EXAMINATION

7       BY MS. LOZANO:

8       Q.  Good morning.

9       A.  Good morning.

10      Q.  Where do you work?

11      A.  Morgan Stanley.

12      Q.  How long have you worked at Morgan Stanley?

13      A.  About 10 years.

14      Q.  For those of us who don't know, what does Morgan Stanley

15      do?

16      A.  We are a brokerage firm.  So we help clients' investment

17      accounts.

18      Q.  What is your position currently at Morgan Stanley?

19      A.  I'm part of risk and control right now, which is a project

20      manager role.

21      Q.  What are your current duties and responsibilities in that

22      role?

23      A.  I work on multiple projects, so things that we want to do

24      in the firm, anything we want to change, whether it be manager

25      roles, it could be training manuals we need to create.  I also

1    handle, if there are things we realize on the field, like

2    there's training needed in a certain area, I would be

3    responsible for creating that.

4    Q.  How long have you been in your current role?

5    A.  Actually about two months.

6    Q.  Before then, what were you doing?

7    A.  I was a business service manager in the downtown Miami

8    branch of Morgan Stanley.

9    Q.  What is your educational background?

10   A.  I went to school at Ohio State, and I received my degree in

11   finance and accounting.

12   Q.  What year did you graduate from Ohio State?

13   A.  Oh God.  I'm dating myself.  It's such a long time ago.  I

14   think it was 2006.

15   Q.  Did you immediately go to work after graduating or did you

16   study more?

17   A.  I did not study more.  I did have a couple of other jobs

18   prior to Morgan Stanley.  But my first financial firm job would

19   have been Morgan Stanley.

20   Q.  Directing your attention to June of 2016.  Where were you

21   working at that time?

22   A.  In downtown Miami branch of Morgan Stanley.

23   Q.  Describe your duties and responsibilities at the Miami

24   branch.

25   A.  I was an operations manager, which means, we call it a

JBC3SCO2                          Firuz - Direct

1   business service manager, so anything that deals with service

2   at the branch, I would be responsible for.  That could be

3   anything from an approval standpoint, whether it be

4   transactions, or it could be an operational function like

5   covering a trader, as well as I manage the support staff which

6   are the assistants to the financial advisors.

7   Q.  I want to talk to you a little bit about Morgan Stanley's

8   policies and requirements.  Are you familiar with Morgan

9   Stanley's policies regarding wire transfers?

10  A.  I am.

11  Q.  Please describe the wire process, wire request process at

12  Morgan Stanley.

13  A.  Currently or in 2016?

14  Q.  In 2016, and then you can then tell me how it's changed.

15  A.  Okay.  So, in 2016, any wire that was over $100,000 would

16  have required a signed request from the client, and that cannot

17  be an electronic signature.  It would need to be signed by the

18  client and sent to us.  Currently that has changed to a lower

19  amount.  It's 50,000 now.

20  Q.  What is the method by which Morgan Stanley gets that

21  authorization from the client?

22  A.  It could be via e-mail, certain clients will fax it, it

23  could be through mail technically.  But generally, clients will

24  forward those documents to us via e-mail.

25  Q.  Do those documents have a specific special name?

1    A.  Letters of authorizations.

2    Q.  Who is authorized to send a letter of authorization in

3    terms of account holders?

4    A.  So, any authorized individual on the account.  That said, a

5    lot of times with high net worth clients, especially if you're

6    dealing with entity accounts, you might have an assistant that

7    sends the letter of authorization and they'll actually cc the

8    authorized individual on the e-mails.

9    Q.  Where does the wire request first come when it is sent to

10   Morgan Stanley?

11   A.  It goes to the team, that could be the financial advisor or

12   the assistant to the financial advisor.

13   Q.  What is a financial advisor?

14   A.  He is the person that handles client accounts and client

15   portfolios.  So ultimately he is the relationship manager for

16   that relationship.

17   Q.  After receiving that request, what are the responsibilities

18   for the financial advisor?

19   A.  Generally, when they receive a request via e-mail, they're

20   required to do a callback and verbally confirm the instructions

21   that are on that letter of authorization with the authorized

22   individual on the account.

23   Q.  What is the reason for Morgan Stanley's policy requiring a

24   signed letter of authorization and callback?

25   A.  Well, I think the main reason is to make sure that the

1   authorized individual in fact requested this wire.  That's why

2   we generally perform the callback.

3   Q.  You mentioned that Morgan Stanley, you described it as a

4   brokerage.  Is it FDIC insured?

5   A.  It is.

6   Q.  Aside from the wire amount limits that require letters of

7   authorization, is there a difference between the policies that

8   were in place in June of 2016 versus now?

9   A.  Aside from the amount, we do have additional ways in which

10  a wire can be processed.  But from a policy perspective, if you

11  send a letter of authorization today, our policy is still the

12  same.

13  Q.  Let's go back to June 2016 and Miami downtown Morgan

14  Stanley branch.

15          I'd like to please publish Exhibit 711A, pages 18 and

16  23 next to each other.

17          Now, as a branch manager at Morgan Stanley, are you

18  familiar with the account records that Morgan Stanley keeps?

19  A.  I am.

20  Q.  Okay.  Those records include what kinds of documents?

21  A.  So in this case this is a client account agreement.  It is

22  the basic account agreement you would have to have on file to

23  have what we call an active assets account at Morgan Stanley.

24  Q.  What is an active assets account?

25  A.  It is a brokerage account still.  So it is an account where

1    you hold your investments, but you can also have some banking

2    capabilities within it, like debit cards and checks.

3    Q.  And this Exhibit 711A is for what account number?

4    A.  So, originally, this was the 658046484.  And it is for

5    Fates Group LLC and it looks like it was shared across two

6    accounts that are same name.  Also for 658047250.

7    Q.  What does that mean if the account is shared?

8    A.  If I have a personal account just under my name and I

9    decide to open a second account also under my name, I can share

10   the documents between the two, so I wouldn't have to re-sign a

11   client account document.  Assuming that they're opened within a

12   reasonable amount of time within each other.

13   Q.  So, for these accounts, the numbers that you just read off

14   that are on the top of page 18, who is the account holder for

15   both of the accounts?

16   A.  So, the account is Fates Group LLC, and the authorized

17   individual is Gilbert Armenta.

18   Q.  What is the address for Fates Group LLC?

19   A.  110 East Broward Boulevard, Number 1900, Fort Lauderdale,

20   Florida 33301.

21   Q.  What type of entity is Fates Group identified to be on this

22   account, on this document?

23   A.  It's an LLC, limited liability corporation.

24   Q.  What date is this account application and client agreement

25   signed?

JBC3SCO2                          Firuz – Direct

1   A.  February 8, 2016.

2   Q.  As branch manager of the Miami branch at Morgan Stanley,

3   were you familiar with a customer by the name of Gilbert

4   Armenta?

5   A.  Not personally, no.

6   Q.  Have you reviewed records in connection with customer

7   Gilbert Armenta?

8   A.  I have reviewed the wire requests, yes.

9   Q.  Have you reviewed account records connected with the two

10  accounts reflected on this, page 18?

11  A.  I would have reviewed it at the time of the wire.  I may

12  have reviewed it prior to that, because I also approve account

13  documents, so it's possible that I have.

14  Q.  Are you aware of whether Mr. Armenta had other accounts at

15  Morgan Stanley at the same time that he had these accounts?

16  A.  Yes, he did.

17  Q.  He did?

18  A.  Hmm-hmm.

19  Q.  Do you know approximately how many?

20  A.  I don't know off the top of my head.  I do believe there

21  were other LLCs in the same grouped accounts, what we call a

22  household.  And I wouldn't be surprised if there were personal

23  accounts, there are probably maybe six, seven.

24  Q.  What do you mean by the term "household"?

25  A.  It's all accounts that are in a -- well, we do have certain

1     rules as to how they need to be related to each other.  But

2     ultimately accounts that are related to each other that could

3     be they have the same authorized individual, in some cases same

4     beneficial owner, or it could be, you know, a relationship.  So

5     grandfather, son, grandson.

6     Q.  What you mentioned that there were other LLCs in this

7     household.  Do you remember any of the names of those other

8     LLCs?

9     A.  I remember the name in conjunction with what I reviewed for

10    this, and that would be Zala Group I believe.

11    Q.  Zala Group?

12    A.  Yeah, I believe so.

13    Q.  If we could publish what is in evidence as 710A, pages one

14    and six next to each other, please.

15          Ms. Firuz, take a look at those two pages of this

16    exhibit.  What is this?

17    A.  The client account agreement.

18    Q.  For which account?

19    A.  46484.  Fates Group LLC.

20    Q.  Who is the signatory on this account?

21    A.  Gilbert Armenta.

22    Q.  How does this exhibit relate to the exhibit that was just

23    in front of you, 711A, pages 18 and 23, with the handwritten

24    account number on the left-hand corner?

25    A.  It's the same document.

1   Q.  So, do you know, this exhibit relates to what kind of

2   account?

3   A.  It would be an active assets account, from just looking at

4   the client account agreement.  So it is a non-retirement

5   account if you will.

6   Q.  What does an active assets account mean?

7   A.  An investment account, but it also has banking

8   capabilities.  And from this I can say it is an entity account,

9   clearly it is an LLC, because it's listed on the form.

10  Q.  If we can go back now to 711A, pages 18 and 23 side by

11  side.  What is your understanding about the kind of account

12  that 047250 was or is?

13  A.  From just this document, I can only deduce that it is a

14  same name account.  It is going to be under the name of Fates

15  Group LLC with Gilbert Armenta as the authorized individual,

16  and it is an account that has banking capabilities of some

17  sort.

18  Q.  Aside from this exhibit, have you reviewed other exhibits

19  in connection with these two accounts?

20  A.  I have.

21  Q.  Do you have an understanding of what kind of account 047250

22  was?

23  A.  I do.

24  Q.  What was that?

25  A.  It is an express credit line account, which is a loan

1   account that's offered at Morgan Stanley.

2   Q.  Describe to me how that works.

3   A.  So, you essentially have an account that holds the assets,

4   which in this case are securities, and based off of those

5   assets, the firm will release an amount that you can borrow

6   against.  And that will be your express credit line account

7   which is the loan account.  They're connected to each other.

8   Q.  Do you know who the financial advisor -- well.  Did

9   Mr. Armenta have a financial advisor assigned to him and his

10  accounts?

11  A.  Yes.

12  Q.  Who was that?

13  A.  Luis Mercado.

14  Q.  Was Mr. Mercado based in the Miami office?

15  A.  Yes, he was.

16  Q.  Did you work with him?

17  A.  I did.

18  Q.  I'm going to direct your attention to June 29 of 2016.  We

19  can take those exhibits down.  Thanks, Mr. Barile.

20          June 29, 2016.  What, if anything, did Mr. Armenta

21  request on that date?

22  A.  There were two wire requests.  One for 2 million and the

23  other one for $3 million, and that was sent to the team, I

24  believe to Luis as well as the assistant at the time, which

25  would have been Ivette Colon.

1          MS. LOZANO:  May I approach the witness, your Honor?

2          THE COURT:  You may.

3    Q.  Ms. Firuz, if you can take a look at the exhibits that are

4    marked in that Redweld, exhibits GX 2901, 2902, 2903, 2905, and

5    2906.  And tell me if you recognize them.

6    A.  I do recognize them now, yes.

7    Q.  What are they?

8    A.  These are e-mail communications between the financial

9    advisor and Mr. Armenta as well as on some of them his

10   assistant as well as who I assume to be an employee of Zala

11   Group.

12   Q.  Were those exhibits, were those e-mails produced by Morgan

13   Stanley to the government?

14   A.  Yes.

15   Q.  Were those exhibits kept in the regular course of Morgan

16   Stanley's business?

17   A.  Yes, these would have been in the correspondence that the

18   financial advisor had with the client so, yes.

19   Q.  Was it the standard practice of Morgan Stanley to make and

20   keep these records?

21   A.  Yes.

22   Q.  Was the information that's contained in those exhibits, in

23   those e-mails, recorded at or near the time of the events or

24   transactions described in the records?

25   A.  I'm sorry.  Could you repeat that?

JBC3SCO2                          Firuz - Direct

1   Q.  Was the information that's recorded in those e-mails,

2   that's memorialized in those e-mails, recorded at or near the

3   time of the transactions that are detailed in the e-mails?

4   A.  Most of them, yes.

5   Q.  What do you mean by most of them?

6   A.  There is one e-mail from April, it looks like, from the

7   assistant of Luis Mercado just confirming our policies

8   regarding wires.

9   Q.  Right.  So, but that e-mail specifically, the information

10  that's contained in that exhibit, was recorded at the time that

11  he was providing that information?

12  A.  Correct.

13  Q.  And that he was communicating that policy?

14  A.  Yes.

15  Q.  Was the person or persons who kept these records under a

16  business duty to do so accurately?

17  A.  Yes.

18          MS. LOZANO:  I now offer GX 2901, 2902, 2903, 2905 and

19  2906 into evidence.

20          MR. GARVIN:  No objection.

21          THE COURT:  Those exhibits will be received.

22          (Government's Exhibit 2901, 2902, 2903, 2905, 2906

23  received in evidence)

24          MS. LOZANO:  Thank you.  If we could publish 2902.

25  Q.  Ms. Firuz, you can put it down.  It's going to be on the

JBC3SCO2                          Firuz - Direct

1   screen.

2              Now, what is that?  What is this e-mail?

3   A.  This looks -- so Ivette colon, who was the assistant at the

4   time to Luis Mercado which was the financial advisor on the

5   account, sent an e-mail to Mr. Armenta as well as who I believe

6   to be maybe his assistant.

7   Q.  Who is that?

8   A.  Giselle Valentin.

9   Q.  You mentioned that -- well.  Rather than repeating what you

10  mentioned.

11             Can you please tell me what it is Mr. Mercado is

12  informing Giselle in terms of policy?

13  A.  So all letters of authorization need Gilbert's original

14  signature, no digital signature accepted.  This is a precaution

15  for security reasons to protect the client.  Also, all wires

16  over 500,000 require we speak to Gilbert.

17  Q.  Are these the policies that you mentioned earlier in your

18  testimony?

19  A.  It's part of them, so all wires require that we talk to

20  clients.  I believe what she's trying to convey here is that if

21  it's 500,000 or above, it's not enough or sufficient that the

22  team talks to them.  I would also have to talk to them or

23  another manager at my level.

24  Q.  We can take that down, and let's go to exhibit GX 2903 in

25  evidence.  Take a look at that and let me know if you recognize

1   that.

2   A.  I do.

3   Q.  What is this document?

4   A.  This is an e-mail from the financial advisor to the

5   assistant Giselle, with Mr. Armenta cc, and it's letting her

6   know that we have received the requests for the 2 million and

7   the $3 million wires, but that most likely the valid date of

8   those wires will be delayed until next day.

9   Q.  What is the date that this e-mail is received by Morgan

10  Stanley or sent by Morgan Stanley, I'm sorry?

11  A.  June 29, 2016.

12  Q.  At what time?

13  A.  3:37 p.m.

14  Q.  Mr. Mercado references where the wires are to be sent.

15  Where is that?

16  A.  Fenero Equity Investments.

17  Q.  Is there something at the end of that?

18  A.  Yes, it's Fenero Equity Investments II LP.

19          MS. LOZANO:  I think we can move on now to Exhibit

20  2906.

21  Q.  Ms. Firuz, the top e-mail, when is that dated?

22  A.  June 29, 2016.

23  Q.  From whom is it?

24  A.  It's from Giselle Valentin.

25  Q.  To?

1   A.  To Luis Mercado.

2   Q.  Is there an attachment?

3   A.  Yes, it looks like she attached a wire request.

4   Q.  If we can scroll down to the attachments please.  This is

5   page two.  Please describe what this document is.

6   A.  This is a letter of authorization from the client that we

7   would request when a wire of this amount is being sent out, and

8   it will include the amount and other pertinent details to the

9   wire.

10  Q.  How much was this request for?

11  A.  $3 million.

12  Q.  From what account was it to be sent?

13  A.  658047250.

14  Q.  Do you recall --

15  A.  I do.  It is the loan account for Fates Group LLC.

16  Q.  Where was the money, the $3 million, to be wired?

17  A.  Looks like the final beneficiary is Fenero Equity

18  Investments II LP Deutsche Bank Cayman.

19  Q.  Who is it signed by?

20  A.  Gilbert Armenta.

21  Q.  Let's scroll down one more.  Now, what is this?

22  A.  This is a letter of authorization essentially with the same

23  information, but it is a different dollar amount, which is $2

24  million.

25  Q.  To be clear on that day, June 29, Mr. Armenta sent two

1    letters of authorization?

2    A.  Correct.

3    Q.  For different amounts?

4    A.  Correct.

5    Q.  And what did these letters of authorization direct Morgan

6    Stanley to do?

7    A.  It requested two wires, one in the amount of 2 million and

8    the other 3 million to be sent to Fenero Equity Investments II

9    LP, in Deutsche Bank Cayman Limited.

10   Q.  So, after receiving that -- we can put that down.

11           After receiving that, what did Morgan Stanley do?

12   What steps did you take?

13   A.  So, the team would have received it, and when they receive

14   it, they'll generally do a callback confirmation with the

15   client.  They would have to notate whom they spoke, to the

16   number they spoke to them at, the date and the time.  Once that

17   happens, generally the assistant to the advisor will enter that

18   into our wire processing system, and they'll create the

19   transaction based on these instructions.  And after that, it

20   will come for my approval or any other manager's approval, at

21   which point, I would actually also give Mr. Armenta a call to

22   confirm the details of the wire.

23           MS. LOZANO:  Could we publish, please, Exhibit 2905.

24   Q.  What is this?  The top e-mail.  I'm sorry.

25   A.  It looks like they've requested documentation for the loan

1    account, that's the guaranty of account form that the assistant

2    is sending to Luis Mercado at Morgan Stanley, on June 29, 2016.

3    Q.   Okay.  What is the significance of that attachment, the

4    guaranty of account form?

5    A.   It's -- I need to actually see the document.

6    Q.   I'm sorry.  Let's scroll down, I'm sorry.  So I think we

7    can page, to turn to page three of the exhibit.  Go ahead.

8    A.   Sorry.  When you have an account that's not the same name

9    account, and you actually want to pledge the assets in that

10   account for a loan under a different name, you would have to

11   fill this out.

12         So in this case, it looks like Zala Group was going to

13   be a pledge account for the loan of Fates Group LLC.

14   Q.   All right.  And for which account, which Fates Group

15   account, the 47250?

16   A.   Yes, the loan account, correct.

17   Q.   All right.  Could we scroll down to page five of this

18   exhibit.  Who signs on behalf of Zala Group?

19   A.   Gilbert Armenta.

20   Q.   When is this signed?  When is this guaranty of account

21   signed?

22   A.   June 29, 2016.

23   Q.   If we can scroll down one more page to six.  What is this

24   now?

25   A.   The guaranty of account document.

JBC3SCO2                        Firuz - Direct

1   Q.  Well, if we go up to I believe three, if we go up to three.

2   Zala --

3   A.  I'm sorry.  I see.

4   Q.  Fates is on the bottom.  So if we scroll to five, explain

5   to me why the account accounts are inverted?

6   A.  It seems that they cross collateralized the accounts.  If

7   you want to scroll down one more I can take a look.

8   Q.  Six.

9   A.  So, this you would need if Fates was also going to be a

10  guarantor for Zala Group LLC account.

11  Q.  Is that what happened here?

12  A.  I'd have to look into the account to see.  My guess would

13  be no.  Because this is the loan account, I would assume that

14  the Zala Group actually was the pledge.

15  Q.  One last page on this exhibit, then we're done with this

16  exhibit.  Page eight.  Who signs on behalf of the Fates Group?

17  A.  Gilbert Armenta.

18  Q.  On what date?

19  A.  June 29, 2016.

20          THE COURT:  Ms. Lozano, it is now 11 o'clock so we'll

21  take our morning break.  15 minutes, ladies and gentlemen.  Do

22  not discuss the case.

23          (Jury excused)

24          (Continued on next page)

25

1          THE COURT:  Ms. Firuz, you may step down.

2          Any issues for me?

3          MR. DiMASE:  Judge, I did want to raise an issue

4    regarding the attachments to the government's letter that we do

5    intend to offer today.

6          THE COURT:  Okay.

7          MR. DiMASE:  It is Exhibit B to the letter.  The next

8    witness is going to be a Sabadell Bank witness who I expect is

9    going to testify that Mr. Armenta opened accounts at Sabadell

10   in March of 2016.  Other evidence will show that they were

11   funded with OneCoin derived proceeds.  Ultimately, in August of

12   2016, Sabadell notified Mr. Armenta that they were shutting

13   down all four of his accounts in a month.  Mr. Armenta's

14   assistant Giselle sent that letter to Mr. Scott.  That's

15   basically what Exhibit B to our letter shows.  This is one of

16   the letters indicating that Mr. Scott had knowledge that

17   OneCoin related bank accounts were being shut down.

18          It is also particularly relevant in the course of this

19   witness's testimony because the evidence will show, the

20   testimony will show that shortly before the accounts were

21   closed, that's when Mr. Armenta wired $5 million from one of

22   these accounts that was about to be closed into the Fenero

23   Funds.

24          THE COURT:  Who is Diane Cook.

25          MR. DiMASE:  Diane Cook is another employee -- I

1    apologize.  This one is from Diane Cook, not from Giselle.  She

2    is an employee from Zala Group.  There will be other e-mails

3    with her signature line establishing she works at Zala or

4    Fates, and the actual e-mail itself which can be considered by

5    the Court in making this determination says please find

6    attached a scanned letter that is sent to you at the direction

7    of Gilbert.  So, she's really acting as an agent on behalf of

8    Gilbert at this point sending this letter.

9            In any event, the letter itself is not being offered

10   for the truth.  It is being offered for its effect on

11   Mr. Scott.

12           THE COURT:  And there will be an employee or

13   representative of Sabadell Bank testifying?

14           MR. DiMASE:  Yes, that witness is going to testify

15   that this very letter, which will be an exhibit that he admits,

16   was sent to Mr. Armenta.  And then we intend to introduce this

17   e-mail showing that it was forwarded at Mr. Armenta's direction

18   to Mr. Scott.

19           MR. GARVIN:  We object to this particular document on

20   several grounds.  The first is that Sabadell Bank and Mr. Scott

21   had no banking relationship.  And that this letter was not sent

22   to Mr. Scott, this was sent to Zala Group and Fates Group,

23   which Mr. Scott had no connection with whatsoever.

24           Gilbert Armenta had been Mr. Scott's client for over

25   10 years.  And the fact that he told his secretary to send a

1    copy of the letter to Mr. Scott was in that relationship of

2    attorney-client.  Mr. Scott did nothing with this document,

3    never contacted Sabadell Bank, and there are several pieces of

4    evidence in this case that show that Mr. Scott's relationship

5    with Mr. Armenta had deteriorated to the point where they were

6    no longer speaking directly.

7          This document, as it sits, is one step further removed

8    from the documents that was introduced on Friday.  At least

9    that document went from Mason Hayes to Mr. Scott.  This

10   document doesn't go from the bank to Mr. Scott.  It goes from

11   the bank to Gilbert Armenta, and at some time later goes from

12   Gilbert Armenta to Mr. Scott.

13         So, your Honor, we object as both on the grounds of

14   hearsay, but also on the grounds that it violates Mr. Scott's

15   Sixth Amendment right to confront his witnesses, because he has

16   no way to cross-examine Mr. Armenta who is not available.

17         MR. DiMASE:  Mr. Armenta is a co-conspirator.  His

18   statements are admissible at the trial.  To the point that

19   this, there is no relationship, the evidence has established

20   that Mr. Armenta was a key co-conspirator in the money

21   laundering conspiracy, and in fact that one of the accounts

22   referenced in this letter subsequently sent $5 million into the

23   Fenero Funds, just before the account was closed pursuant to

24   the letter.  So I think it is highly relevant evidence of

25   Mr. Scott's state of mind.

1            THE COURT:  I'll allow it.  Anything else?

2            MR. GARVIN:  No, sir.

3            THE COURT:  Don't be late.

4            (Recess)

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                (Jury present)

 2                THE COURT:  Ms. Lozano.

 3                MS. LOZANO:  Yes, your Honor.  At this point the

 4     government is offering the following e-mail exhibits that are

 5     contained in GX 55, the electronic evidence device stipulation,

 6     various different exhibits.

 7                THE COURT:  Can you get closer to the microphone.

 8                MS. LOZANO:  Yes.  The exhibits are GX 1041, 1055,

 9     1099, 1140, 1116, 1317, 1325, 1360, 1133, 1437, 1438, and 1439

10     into evidence.

11                MR. GARVIN:  We have no objection.

12                THE COURT:  Those exhibits will be received.

13                (Government's Exhibit 1041, 1055, 1099, 1140, 1116,

14     1317 received in evidence)

15                (Government's Exhibit 1325, 1360, 1133, 1437, 1438,

16     1439 received in evidence)

17     Q.  Ms. Firuz, when we broke we were discussing Mr. Armenta's

18     requests for two different wires.  Did you have any idea about

19     whose money that was?

20     A.  Whose money the wire amounts were?

21     Q.  Correct.

22     A.  Where it was coming from?

23     Q.  Correct?

24     A.  It was a loan.  It was based off of the assets held in the

25     collateral account.  So it was Morgan Stanley's money,
```

1    essentially.

2    Q.  Let's please publish 1055, GX 1055 in evidence.  And

3    Ms. Firuz, you've never seen this e-mail before, have you?

4    A.  I haven't.

5    Q.  So who is it to and who is it from?

6    A.  Looks like from Dr. Ruja Ignatova to Mark Scott.

7    Q.  Is it to --

8    A.  I'm sorry.  To Dr. Ruja Ignatova from Mark Scott.

9    Q.  What is the date?

10   A.  March 2, 2016.

11   Q.  What is Dr. Ruja Ignatova's, what's her e-mail address?

12   A.  Ruja@OneCoin.eu.

13   Q.  Could you please read to me the first sentence of the first

14   paragraph.

15   A.  Sure.  "For your information, Gilbert asked me about your

16   new structure."

17   Q.  Then could you please read the first sentence of the second

18   paragraph.

19   A.  "Any funds you have with him and you want to transfer

20   should be sent either through my escrow in U.S. or BVI."

21   Q.  Can you finish that paragraph, please?

22   A.  "We can do immediately.  Also, your other funds if you

23   want.  Let me know."

24   Q.  Who is it signed by?

25   A.  Mark Scott.

1   Q.  Do you know the defendant Mark Scott?

2   A.  I do not.

3   Q.  Do you know a person by the name of Ruja Ignatova?

4   A.  I do not.

5   Q.  We can take that down.  And we could now publish what is in

6   evidence as exhibit GX 1099, and if we could please publish

7   that on the left-hand side of the screen side by side with what

8   is in evidence as GX 2906, page two.

9           The left-hand side, GX 1099.  Have you ever seen this

10  e-mail before?

11  A.  I haven't.

12  Q.  Who is it to and who is it from?

13  A.  It's from Mark S. Scott to Gilbert Armenta.

14  Q.  On what date?

15  A.  June 2, 2016.

16  Q.  Could you please read the first sentence of the first

17  paragraph.

18  A.  "In furtherance of my earlier message to you, please find

19  below the wire details for one of the investment funds as

20  announced."

21  Q.  And please read the second paragraph.

22  A.  "Any wire that can be accepted must have a 5 million euro

23  minimum value.  Funds can be accepted without having received

24  prior KYC, which should be delivered within a reasonable time

25  thereafter together with the executed subscription package."

1    Q.   Then if we can zoom out, and then zoom back in to the

2    beneficiary bank field.  The one above that.  Beneficiary bank.

3    What is the beneficiary bank here?

4    A.   Deutsche Bank International Limited.

5    Q.   In the field below that if we zoom out.  Who is the

6    beneficiary identified in this e-mail?

7    A.   From there it goes to the Deutsche Bank Cayman Limited

8    where the Fenero Equity Investments II LP account is held at.

9    Q.   If we could zoom out.  And who is sending this information

10   to Mr. Armenta?

11   A.   Mark Scott.

12   Q.   If you could compare, please, Exhibit 1099 on the left with

13   2906, page two on the right, are the beneficiary banks and

14   beneficiaries identified in both documents the same?

15   A.   Yes.

16   Q.   We can take those down.  And turn to exhibit -- let's get

17   back to the wire requests at this point and if we can publish

18   1438 at this point.

19            Do you recognize this?

20   A.   I do.

21   Q.   What is this?

22   A.   It's an e-mail from Giselle Valentin at Zala Group to Luis

23   Mercado.

24   Q.   What is the date of this e-mail?

25   A.   June 29, 2016.

1   Q.  Can you please read to me what Ms. Valentin writes to

2   Mr. Mercado on the top e-mail.

3   A.  "Hi there.  I hope you get this.  Attached are the two

4   signed wire request and please make sure the reason is as

5   follows.  3 million wire for investment into ZIIXI, 2 million

6   wire for investment into XIII.

7   Q.  Are you familiar with the entities ZIIXI or XIII?

8   A.  I'm not.

9   Q.  What do you understand this -- what do you understand

10  Ms. Valentin to be telling Mr. Mercado about the purpose of

11  these two wires?

12  A.  He's making investments in two separate funds, it looks

13  like.

14  Q.  If we can go now, move to 1437 perhaps.  Yes.  So do you

15  recognize this, 1437?

16  A.  I do.

17  Q.  What is this?

18  A.  It is an e-mail from Giselle Valentin to Luis Mercado with

19  his assistant Ivette Colon cc'd for the wire instructions.

20  Q.  Again, what does it relate to?  What wires?

21  A.  In regards to the two wires, one for 3 million, one for 2

22  million, that are supposed to be sent from Fates Group LLC

23  account.

24  Q.  So if you can go down to the bottom of the wire -- of the

25  e-mail.  Can you read to me the reason for the wires.

1   A.   "Reason for wires are below as well.  3 million wire for

2   investment into ZIIXI, 2 million wire for investment into

3   XIII."

4   Q.   Are those the same reasons as were given in the prior

5   e-mail we just saw, 1438?

6   A.   They are.

7   Q.   So we can take that down.  Why was that information, the

8   reasons for the wires, provided to Morgan Stanley?

9   A.   Generally, when clients are sending large wires or even

10  when you're sending small wires, you would provide a reason for

11  what it's for if it is going to a third party.

12  Q.   Why is it important for Morgan Stanley to understand the

13  purpose of wire transfers?

14  A.   Well, we want to make sure it's in line with account

15  activity.  We want to make sure there is nothing, for lack of a

16  better word, fishy about the wires.

17  Q.   Let's now take a look at 711E.  I'm going to ask you, in

18  response to Mr. Armenta's requests for wires, you indicated

19  that there was a callback.  Who did the callback to

20  Mr. Armenta?

21  A.   Well, two people would have done the callback.  In this

22  case, it looks like from the team Luis Mercado, the financial

23  advisor, spoke to him at 1 p.m. on June 29, 2016.  The phone

24  number they talked to him on is listed on the letter of

25  authorization, which also would have been on the account.

1   Q.  So let's slow down.  711E, this is page one of the exhibit.

2   What is this?

3   A.  Spoke to Gilbert Armenta.

4   Q.  No, what is this document?

5   A.  Oh, I'm sorry.  This is a letter of authorization.  So when

6   we request a letter of authorization from clients that are

7   signed due to the amount, this is essentially what we would

8   receive.  It would have to include the amount, the from account

9   that it's coming out or the account name and the beneficiary

10  information.

11  Q.  This is the same letter of authorization that we saw

12  earlier?

13  A.  Yes.

14  Q.  But, there are handwritten notes on this letter of

15  authorization?

16  A.  Yes, so the assistants can either print out and write down

17  the confirmation notes on there or we do have a wire system in

18  which you can enter the notes.

19  Q.  Here, according to the notes, you indicated that

20  Mr. Mercado spoke to Mr. Armenta?

21  A.  Yes.

22  Q.  Who whose handwriting is that?

23  A.  Ivette Colon, the assistant.

24  Q.  If we can go to -- this letter of authorization was for

25  which wire, the 2 million or the 3 million?

JBC3SCO2                          Firuz – Direct

```
 1   A.  $2 million.
 2   Q.  So now you indicated that then further confirmations and
 3   approvals need to be done and you were involved in that?
 4   A.  Correct.  So I would have had to do a callback as well.
 5   Q.  Are those reviews or approvals logged in any way in the
 6   Morgan Stanley record system?
 7   A.  Yes.  It would be in the wire system, and it would include
 8   verification information for client, the phone number, the
 9   time, the date, and who we spoke to.
10   Q.  Is there some kind of record keeping log that you enter
11   that information into?
12   A.  Yes.
13   Q.  What is that called?
14   A.  It's called workflow dashboard.
15   Q.  Workflow dashboard?
16   A.  Correct.
17   Q.  How does the workflow dashboard work?
18   A.  So when you have a letter of authorization, essentially you
19   scan it and workflow is what it goes to.  And then you would
20   have to put it under a category, in this case it will be funds
21   transfer.  Once it is submitted into the system, it will have a
22   checklist that will allow me to enter information such as the
23   callback confirmation.
24   Q.  If the checklist is not completed, can the wire go out?
25   A.  No, the system will stop you.
```

1    Q.  I think you mentioned before that part of this review

2    process is to understand if there is something fishy going on

3    with wire requests?

4    A.  So you would essentially want to make sure that it matches

5    account activity.  It makes sense.  You would look at the other

6    related accounts for the client a lot of the times to see

7    whether it's invested accounts.  We are a brokerage firm, like

8    I said, so we shouldn't have accounts sitting in cash, having

9    money come in and out.  So those are a couple of things.  We do

10   also have enhanced due diligence on the accounts when they get

11   open.  You will have the reason, the purpose of the account

12   actually listed on there.  So if you don't feel the activity

13   makes sense, you can take a look at that as well.

14   Q.  What steps do you take if you are not satisfied that the

15   activity looks normal or that you're comfortable with the

16   activity?

17   A.  The first thing I would do, and this is prior to ever

18   reaching out to the client, would be to reach out to the risk

19   officer at my branch.

20   Q.  To do what?

21   A.  To inform them that the activity does not make sense, at

22   least to me, based on my review.

23   Q.  Okay.  So, let's talk about this $2 million wire and its

24   process through the workflow system.  Let's go to page four of

25   this exhibit.  What is this?

1   A.   This looks like a trail from workflow dashboard.

2   Q.   The top-left-hand corner is there an indication that says

3   branch workflow request detail report?

4   A.   Yes.

5   Q.   In the note section, there is a note and when is it dated?

6   A.   June 29, 2016.

7   Q.   Who is the person who is inputting the notes?

8   A.   It's the assistant to the financial advisor.

9   Q.   Who is that?

10  A.   Ivette Colon.

11  Q.   Please read to me what Ivette colon indicated on the notes

12  section at 2:34 on June 29, 2016?

13  A.   "Confirm LOA moneys are capital investment by the account

14  owner in a new company."

15  Q.   Explain to me what that means.

16  A.   That means that client wants to send money as an investment

17  to a new company.

18  Q.   What does "confirm on LOA" mean?

19  A.   That means that somebody did the callback, and the

20  confirmation notes of that callback are actually on the letter

21  of authorization which she wrote by hand.

22  Q.   LOA is letter of authorization?

23  A.   Correct.

24  Q.   What is your understanding of who provided the information

25  "moneys are capital investment by the account owner in a new

JBC3SCO2                          Firuz - Direct

1    company"?

2    A.  That would have been the client.

3    Q.  As part of the work flow review of these wire requests,

4    does Morgan Stanley look at the purpose of purported

5    investment?

6    A.  Yes.

7    Q.  Why?

8    A.  Well, a lot of the times they look at where the money --

9    I'm sorry.  Can you repeat the question, actually?

10   Q.  Yes.  Why does Morgan Stanley review the purpose of the

11   purported investment for a wire that's going out?

12   A.  There are multiple reasons.  Fraud being one of them.  I

13   would review it for that purpose.  But also you want to make

14   sure that it is within our guidelines.  There are also multiple

15   other departments that will generally have eyes on certain

16   wires going to certain jurisdictions.  And that's generally to

17   make sure that -- that's generally the AML department.

18   Q.  If you are not satisfied and you have concerns related to

19   AML or the propriety of a transfer, could the transfer be

20   blocked?

21   A.  Yes.

22   Q.  Let's go down now to -- before we move on from that.  Why

23   do you believe that the -- the information inputted by

24   Ms. Colon was provided by Mr. Armenta?

25   A.  It would have come up in the conversation, I assume, with

1    the financial advisor as to the purpose of the wire.  And they

2    would have had to provide it to us so that we know why it's

3    going.

4    Q.  What I'm saying is how do you know that that was provided

5    by Mr. Armenta, and not one of his employees?

6    A.  Because Luis Mercado directly talked to the client, would

7    have had to talk to the client about the wire.

8    Q.  Because of the policy?

9    A.  Yes.

10   Q.  Then you mentioned the term AML.

11   A.  Anti money laundering.  Sorry.

12   Q.  Let's move down to page seven of this work flow report on

13   the $2 million transfer.  What is that?

14   A.  This is a Swift message that gets generated once a wire is

15   executed and confirmed.

16   Q.  What does a Swift message mean?

17   A.  It is a transmission message between the financial

18   institutions that shows the details of a wire transfer.

19   Q.  Who gets that Swift message?

20   A.  We get it as the sending firm.  I expect the receiving firm

21   will have a Swift message as well.

22   Q.  What information is contained in a Swift message?

23   A.  Generally the account number, the date, the amount, the

24   beneficiary account, and the firm account information.

25   Q.  Here, can you tell me what account was sending the money?

JBC3SCO2                          Firuz - Direct

1    A.   Yes.

2    Q.   What field is that in?

3    A.   50K658047250, Fates Group LLC account.

4    Q.   Where on this Swift payment can you find the amount of the

5    wire?  What field is that in?

6    A.   Right above that.  It's 33B as well as 32A.

7    Q.   All right.  That's the 2 million?

8    A.   Hmm-hmm.

9    Q.   The notation in 32A, those six first numbers, what do they

10   relate to?

11   A.   32A.  That's the date.

12   Q.   So this is, what, June 29, 2016?

13   A.   Correct.

14   Q.   The recipient of this wire is identified as what?

15   A.   It's line 70 and that's Fenero Equity Investments II LP.

16   Q.   Do you know where the -- can you tell from this Swift

17   payment how the money moved from the Fates account to the

18   Fenero account?

19   A.   Yes.  Through the Morgan Stanley benefit account which is

20   on 53B, which is in New York, has our New York Swift on top

21   MSNYUS33.  Line one.

22   Q.   So let's just stop right there.  In line one, you noted

23   MSNYUS33AD.  What is that?

24   A.   MSNYUS33 would have been our Swift.

25   Q.   What does that mean?

1    A.  If you put it in the system, it should automatically come

2    up with Morgan Stanley.  Very much like the Citi Swift, you

3    will see to the right of that, Citi U.S. 33, if you put that in

4    the system it will come up with Citibank.

5    Q.  How do you know that this Swift payment relates to a

6    payment that was sent from Morgan Stanley?

7    A.  Yeah.  So that's how I would know that, and the benefit

8    account number listed on the -- in the middle.

9    Q.  And you indicated the benefit account is 43B?

10   A.  53B.

11   Q.  I'm sorry.  53B.  Where is that benefit account located?

12   A.  New York.

13   Q.  Let's now go to page 13 of this exhibit and we can walk

14   through the approval steps for this 2 million.  Before I do

15   that.  If we can go back to -- well.  We don't need to go back

16   to the Swift.

17        For the benefit account, the Morgan Stanley benefit

18   account, you indicated it was located in New York.  What part

19   of New York?

20   A.  I do not know what part of New York, I'm sorry.

21   Q.  Well, Manhattan?

22   A.  I'm not sure.  All of our wires process through New York.

23   So, what I would know is that you will see that MSNY33 because

24   of that benefit account being housed in New York.

25   Q.  So New York State?

JBC3SCO2                        Firuz - Direct

1    A.  Yeah.

2    Q.  If we could zoom in on the first several entries in the

3    work flow report there.

4           How do we read this report, Ms. Firuz, does it -- you

5    tell me what is reflected in these different fields.

6    A.  So, this is our transfers portal system which is connected

7    to the workflow dashboard.

8    Q.  Okay.

9    A.  And the initial entry will see the person who is submitting

10   the wire request or any transaction request, and the comments

11   they would have entered on the right.

12   Q.  Who is that?

13   A.  That's Ivette Colon.

14   Q.  What date was it entered?

15   A.  June 26, 2016.

16   Q.  If we can just zoom out for a minute.  This relates just to

17   the $2 million wire?

18   A.  I believe to see the amount I would have to see --

19   Q.  If we go down.  Stay on that page.  And we go down to the

20   entry, sixth entry.  Is there a reference to how much the

21   amount is?

22   A.  Yes, it looks like the margin department actually put a

23   note that it's for the $2 million wire.

24   Q.  Let's go back up to Ms. Colon's first entry and please

25   indicate to me what comments she noted in that entry.

1    A.  "Confirm on the LOA moneys are working capital infusion by

2    the account owner in a new company."

3    Q.  Who provided that information?

4    A.  That would have had to come from the client.

5    Q.  So if we can zoom out.  After Ms. Colon enters that in, if

6    we can go down to the banking opps rep -- no.  Stay on that

7    page.  In the middle of the page if we can zoom in on those --

8    the bottom half of the page.  Starting with approved the $2

9    million wire.

10         What does this entry reflect?

11   A.  So because this is coming out of the loan account, they

12   need to make sure that there is enough collateral at which

13   point it will go to banking opps department, who will then

14   reach out to margin, and that refers to the margin clerk

15   approving for $2 million and his name is Paul Chung.

16   Q.  We can zoom out.  We can scroll down.  Move to page 17 of

17   this exhibit.  What is that?

18   A.  This is the letter of authorization for the $3 million

19   wire.

20   Q.  Are there handwritten notes on that?

21   A.  Yes, there are.

22   Q.  What do those handwritten notes indicate?

23   A.  "Confirmed with Gilbert A 6/29/2016 at 1 p.m."  Phone

24   number listed underneath with Luis Mercado.

25   Q.  Given that notation, what is your understanding of whether

1    Mr. Mercado spoke to Mr. Armenta to confirm the purpose of this

2    wire?

3    A.   Right.  So, given the note, he would have called, he would

4    have gone over the details of the wire, the amount of the wire,

5    as well as the reason for the wire.

6    Q.   You mentioned there would also be a call from you.  When in

7    the process would that happen?

8    A.   That would be after.  First, the team, either the assistant

9    or the advisor will talk to the client.  Then it has to go

10   through the system so it would have been submitted into system.

11   Once it's submitted, then it reaches my desk, at which point I

12   would have reviewed the wire and then afterwards done a

13   callback.

14   Q.   You would call the customer?  You would call Mr. Armenta?

15   A.   Any authorized individual on the account, yes.

16   Q.   In this case it was Mr. Armenta?

17   A.   Yes.

18   Q.   What questions would you ask about the wire?

19   A.   Well, first I would have to verify his identity.  There are

20   certain set questions by Morgan Stanley that I would use to do

21   that.  After that, we would talk about the amount, the

22   instructions that were provided, and most likely the reason of

23   the wire would have come up as well.

24   Q.   Sitting here today, do you have a specific recollection

25   about any phone calls you had with Mr. Armenta regarding these

JBC3SCO2                         Firuz - Direct

1   two wires?

2   A.   I do not.

3   Q.   We can go to page 23, please, Mr. Barile.

4          What is that, Ms. Firuz?

5   A.   This is the Swift message for the $3 million wire.

6   Q.   How do you know that?  What field does the $3 million show

7   up?

8   A.   32A and 32B.  33B, I'm sorry.

9   Q.   In line 32A, what is the date of this wire?

10  A.   June 30, 2016.

11  Q.   Now, Mr. Armenta, you told us, sent this request in for the

12  3 million also on the 29th of June.  Why did it go out one day

13  later?

14  A.   It looks like it would have been, it's possibly stuck at

15  the margin department and did not move through the same day.

16  It was past cutoff.

17  Q.   And this Swift payment order, what does it reflect

18  regarding the sender and the recipient of the $3 million?

19  A.   The same as the 2 million.  The sender is listed on 50K,

20  the account number is the loan account for Fates Group LLC, and

21  the recipient is line 70, Fenero Equity Investments II LP.

22  Q.   Where was this money sent from out of Morgan Stanley?

23  A.   From the Fates Group LLC account in Miami.

24  Q.   Through what benefit account?

25  A.   Oh.  Through Morgan Stanley benefit account which is

1    40611172 on line 53B.

2    Q.  And what Swift code is reflected here to show that Morgan

3    Stanley's benefit account sent that money?

4    A.  It's line one, you have MSNYUS33, which is where the

5    account would have been housed.

6    Q.  Again, that benefit account is located in New York?

7    A.  Yes, correct.

8    Q.  We can scroll down to page 30 and again we'll walk through

9    some of the approval steps and the $3 million wire.  If we

10   could go down to the bottom of the page, starting with

11   Ms. Colon's entry, we can just highlight the four bottom boxes

12   or rows on that page.

13           When was this wire, $3 million, entered by Ms. Colon?

14   A.  June 29, 2016.

15   Q.  At what time?

16   A.  2:54 p.m.

17   Q.  What are the comments she inputted regarding this wire?

18   A.  "Confirm on LOA moneys are capital infusion in new

19   company."

20   Q.  Based on that, what did you think the $3 million was being

21   used for?

22   A.  For an investment in a new company.

23   Q.  Did you know what company?

24   A.  From the wire details I could see where it was going, yes,

25   Fenero Investments.

1   Q.  How does that relate to the exhibits you saw earlier with

2   references to the companies ZIIXI and XIII?

3   A.  I believe those are different funds that the money would be

4   invested in.

5   Q.  That was based on what Mr. Armenta told you?

6   A.  That was, that's based on -- because I don't recall the

7   conversation we've had.  It would have come up the reason for

8   the wire, but it's based on the e-mail communication I got.

9   Q.  So we can scroll down to page 31 and in the top half of the

10  page, the first four rows, we can highlight those.  And

11  Ms. Firuz, I want you to take a look at the bottom one.  The

12  second one.  Is that you?

13  A.  Yes, that's me.

14  Q.  What does that row reflect?

15  A.  It means that it was approved at branch level.

16  Q.  Then the last row that's zoomed in on there, can you please

17  explain to me the significance of the comments in that row.

18  A.  On the last row?

19  Q.  Hmm-hmm.

20  A.  $3 million wire is approved.  Paul Chung, who is the margin

21  clerk, it seems that there was sufficient collateral to approve

22  $3 million.  On the bottom of that it's "the client is not

23  buying equity in the company.  The beneficiary is a private

24  equity firm that invests, among other things, in renewal

25  energy.  Our client is providing working capital to buy."

1    Q.  After renewable energy does it say in parentheses "i.e.
2    windmills"?
3    A.  It does.
4    Q.  Based on that entry, what did you believe the money was
5    being used for?
6    A.  For an investment in a company that invests in renewable
7    energy sources.
8    Q.  Who provided that information to Morgan Stanley?
9    A.  That would have come from the client.
10   Q.  In this case it's Mr. Armenta?
11   A.  Correct.
12   Q.  Ultimately -- we can take this down.  Ultimately, were
13   these two wires approved, the 2 million and the 3 million?
14   A.  Yes.
15   Q.  If we could show for the jury what's in evidence as GX
16   2901.  Do you recognizes that, Ms. Firuz?
17   A.  Yes.
18   Q.  What is that?
19   A.  It's an e-mail from Luis Mercado to Giselle Valentin and
20   Mr. Armenta.
21   Q.  When is it dated?
22   A.  June 29, 2016.
23   Q.  What does it say?
24   A.  "Good evening Giselle.  The wire for 2 million went out."
25   The wire reference number.  "The 3 million is scheduled to go

1    out first thing in the morning, and I will provide the

2    reference number as soon as I have it."

3    Q.  After the money was wired from Mr. Armenta's account to

4    Fenero, did you have any contact with the beneficiary account

5    holder, the Fenero Funds?

6    A.  I did not.

7    Q.  If we can publish, please, what's in evidence as exhibit GX

8    1360.  Ms. Firuz, have you ever seen this e-mail before?

9    A.  I have not.

10   Q.  Who is it from?

11   A.  Mark Scott.

12   Q.  Who is it to?

13   A.  Dave Van Duynhoven.

14   Q.  What is the date?

15   A.  It's June 30, 2016.

16           Looks like a second person as well, David Pike.

17   Q.  David Pike.  Okay.  Can you read to me, please, the

18   first two sentences?

19   A.  "I have just confirmed with the Fates Group again that 5

20   million euros have been sent in tranches as tester.  By the

21   way, this investor has decided to bring some of the funds from

22   the U.S."

23   Q.  One more sentence, please.

24   A.  "Hopefully this is not a problem from your end."

25   Q.  And it is from whom?

JBC3SCO2                      Firuz - Direct

1   A.  It's from Mark Scott.

2          MS. LOZANO:  If we can scroll down just to see the

3   e-mail before it.  And at the top of that second page.  Can you

4   tell me -- can we highlight actually the signature line of Dave

5   Van Duynhoven.

6   Q.  Are you familiar with an entity called JP Fund

7   Administration Cayman Ltd.?

8   A.  I am not.

9          MS. LOZANO:  Mr. Barile, please publish what's in

10   evidence as Exhibit 1116.

11   Q.  Ms. Firuz, do you recognize this?

12   A.  I do not.

13   Q.  Have you ever seen this e-mail before?

14   A.  No.

15   Q.  It is from whom to whom?

16   A.  It's from Dave Van Duynhoven to M.S. Scott and David Pike.

17   Q.  When is it dated?

18   A.  July 1st, 2016.

19   Q.  If you could, please, read to me the first three sentences

20   of this e-mail.

21   A.  "We have received notification of $3 million coming in from

22   Fates Group LLC.  As I understand it, the communication comes

23   in advance of the funds.  While the $2 million is in the

24   account, the $3 million is not appearing as yet."

25   Q.  And the top of that e-mail reads "Hello Mark and David."

1    And it is signed by Dave Van Duynhoven?

2    A.  Yes.

3    Q.  You can take that down.  If you can please publish exhibit

4    GX 1140, which is in evidence.

5           Have you seen this e-mail before?

6    A.  No, I haven't.

7    Q.  Who is on it?

8    A.  Mark Scott, looks like it was send to Dave Van Duynhoven,

9    cc David Pike.

10   Q.  On what date?

11   A.  July 13, 2016.

12   Q.  What is the subject line?

13   A.  Executed subscription package Fates Group LLC attached

14   original to follow via FedEx by Friday.

15   Q.  Is there actually an attachment to this e-mail?

16   A.  It looks like there is.

17   Q.  Okay.  And that page, page two, what is on the top line,

18   what does that read?

19   A.  Fenero Equity Investments II LP.

20   Q.  Application form?

21   A.  Yes.

22   Q.  We can take that one down.

23          Are you aware, Ms. Firuz, of an entity called OneCoin?

24   A.  I am not.

25   Q.  Do you know whether the transfers that Mr. Armenta made out

1    of his Fates account from Morgan Stanley to Fenero on June 29

2    and June 30, 2016, related in any way to OneCoin?

3    A.  No.

4          MS. LOZANO:  Mr. Barile, please publish what's in

5    evidence as exhibit GX 1133.

6    Q.  Ms. Firuz, have you seen this e-mail before?

7    A.  I haven't.

8    Q.  At the bottom, well, from the top, who is it from and who

9    is it to?

10   A.  It's from Gilbert Armenta to Maya Antonova, with Diane Cook

11   and Anastasia Jankovic cc'd.

12   Q.  What is Maya's e-mail address on this?

13   A.  Maya@OneCoin.eu.

14   Q.  What is Anastasia's e-mail address on this?

15   A.  Ana@RavenR.com.

16   Q.  When is this e-mail dated?

17   A.  July 11, 2016.

18   Q.  Can you please read the messages from the bottom up, in the

19   bottom, it is an e-mail from whom to whom?

20   A.  On the bottom it seems it is an e-mail from Maya Antonova

21   to Gilbert Armenta, and it's saying "Dear Gilbert, could you

22   please confirm the transfer of $5 million from Zala to Fenero."

23   Q.  And then above that, how does Mr. Armenta respond?

24   A.  "Hello Maya, yes, it transfers of 2 million, 3 million.

25   Take care."

JBC3SCO2                          Firuz - Direct

1    Q.   From Mr. Armenta?

2    A.   From Mr. Armenta, correct.

3              MS. LOZANO:  Your Honor, may I have one moment?

4              THE COURT:  Sure.

5    Q.   Ms. Firuz, just a few more questions.  Going back to the

6    review process for wires.  At Morgan Stanley, if during that

7    process, you are not satisfied with the answers that you

8    receive, and you deem transactions inappropriate or suspicious,

9    is Morgan Stanley -- does Morgan Stanley have the ability to

10   block the wires?

11   A.   Yes.

12   Q.   And not send the money at all?

13   A.   Yes.

14   Q.   Is that in your discretion during the review process?

15   A.   It could be in my discretion, but also certain wires go

16   through review by other departments as well, and they can also

17   stop it.

18   Q.   As part of that analysis, when you're determining whether

19   to approve a wire or whether it is not going to be approved and

20   possibly blocked, is the purpose for which the money is being

21   sent part of the analysis in order to determine whether a wire

22   should be approved?

23   A.   Correct, to make sure it makes sense in line with the

24   account.

25             MS. LOZANO:  I have no further questions for this

1    witness.  Thank you Ms. Firuz.

2              THE COURT:  Cross-examination.

3              MR. GARVIN:  Yes, your Honor.

4    CROSS-EXAMINATION

5    BY MR. GARVIN:

6    Q.  Good afternoon.  I'm David Garvin, I represent Mark Scott

7    in this matter.  I don't believe we've ever met before, have

8    we?

9    A.  I don't think so.

10   Q.  I have a few questions about some of the documents that

11   were just gone over.

12             MR. GARVIN:  Maybe we could ask Mr. Barile if he would

13   be so kind as to help us.  Mr. Barile, would you be nice enough

14   to put Government's Exhibit 1133 back on the screen, please.

15   Q.  This is I believe the last document that you were asked to

16   look at; is that correct?

17   A.  Yes.

18   Q.  We see at the top of this document it is from Gilbert

19   Armenta.  Correct?

20   A.  Correct.

21   Q.  Gilbert Armenta, at the time, was a client of Morgan

22   Stanley, right?

23   A.  That is correct.

24   Q.  And Gilbert Armenta also had two associated entities.  Zala

25   Group was one of them; is that right?

JBC3SCO2                        Firuz - Cross

1   A.  Yes.

2   Q.  And what was the second group, or excuse me, the second

3   entity that he had, was it Fates Group?

4   A.  Fates Group LLC.

5   Q.  Now, in this particular document, it shows that there is a

6   carbon copy going to Diane Cook at Zala Group, right?

7   A.  Yes.

8   Q.  And to somebody named Anastasia Jankovic at Ana@RavenR,

9   right?

10  A.  Yes.

11  Q.  Finally, the main person that it went to is Maya Antonova

12  at one OneCoin, correct?

13  A.  Yes.

14  Q.  Would it be accurate to say, ma'am, that Mark Scott is not

15  listed on this document any place?  Is that right?

16  A.  Correct.

17  Q.  And there is no evidence from this document that Mark Scott

18  ever saw this e-mail, correct?

19  A.  Correct.

20  Q.  And sitting here today, it would be accurate to say that

21  you pretty much saw this e-mail for the first time while you

22  were testifying before the ladies and gentlemen of the jury,

23  right?

24  A.  That is correct.

25  Q.  So, you have no knowledge of Mark Scott ever being apprised

1   of the contents of this e-mail, correct?

2   A.  Correct.

3           MR. GARVIN:  Mr. Barile, you can take that down, and

4   thank you, sir.  Mr. Barile, would you nice enough to put up

5   Government's Exhibit 1360, sir.

6           Now I'm placing on to the -- this is another exhibit,

7   and Mr. Barile, if you would be kind enough to enlarge the top

8   portion, please.  The top third, yes, sir.  Perfect.  Thank

9   you.

10  Q.  You were asked to review this document only a few moments

11  ago.  Is that right?

12  A.  Yes.

13  Q.  And you were specifically asked to read the first sentence

14  or first two sentences.  Do you recall that?

15  A.  Yes, I do.

16  Q.  I'd like to read the entire e-mail.  So, isn't it accurate

17  to say that the second paragraph does say, "By the way, this

18  investor has decided to bring some of the funds from the U.S.

19  Hopefully this is not a problem from your end.  It fits our

20  regulations just fine, although this was not originally

21  anticipated.  Please let me know if this is an issue for you

22  and we can reject."

23          Do you see that?

24  A.  Yes, I do.

25  Q.  You were previously asked who Dave Van Duynhoven was.  Do

1   you recall that?  He was working for JP Fund Administration?

2   A.  Yes, I was asked I think if I was familiar with the JP Fund

3   Administration.

4   Q.  You do know, based upon your experience working at Morgan

5   Stanley, that often private equity funds have a fund

6   administrator, correct?

7   A.  Yes.

8   Q.  So that is not uncommon, right?

9   A.  No, it's not.

10  Q.  And we see here that we have JP Fund Administration, but

11  the fact that you are not familiar with them, there are a lot

12  of fund administrators, it would be unfair to think that you

13  would know them all, right?

14  A.  Right.

15  Q.  But here we see that Mr. Scott is offering to reject the

16  wire transfer of $5 million from Fates Group; isn't that true?

17  A.  Yes.  Based on information from Mr. Duynhoven, it seems

18  like he says he can reject.

19  Q.  Did it come to your knowledge that there were discussions

20  between Mr. Armenta and Mr. Scott about this $5 million being

21  rejected?

22  A.  I'm sorry, I don't think I saw anything between Mr. Armenta

23  and Mark Scott.

24  Q.  Okay.

25          MR. GARVIN:  Excuse me for one moment.

1   Q.  We're going to move on while we're looking for a document.

2   A.  Okay.

3   Q.  One of the questions that was asked to you was emanating

4   from Government's Exhibit 711E.

5          Mr. Barile, would you be nice enough to put 711E, page

6   17, sir.

7   Q.  Do you remember talking about this a little bit, ma'am?

8   A.  Yes, I do.

9   Q.  One of the things that you told the ladies and gentlemen is

10  that Morgan Stanley has policies that must be adhered to when

11  it comes to wire transfers, right?

12  A.  Correct.

13  Q.  And those policies are designed for at least two purposes.

14  One being to protect Morgan Stanley, correct?

15  A.  Yes.

16  Q.  And the other one to meet Morgan Stanley's obligations in

17  KYC, know your customer, correct?

18  A.  Correct.  As well as to protect the client.

19  Q.  You got ahead of me there, but that's where I was going.

20  Thank you.

21          So, when we look at this, you see that following the

22  standards of Morgan Stanley, calls were made to Gilbert

23  Armenta, correct?

24  A.  Yes.

25  Q.  And we see that Luis Mercado made one call, correct?

JBC3SCO2                        Firuz – Cross

1    A.  Correct.

2    Q.  And you know independently from these records and preparing

3    your testimony for today, that you also made a call, right?

4    A.  Correct.

5    Q.  And it would be fair to say that, and accurate, that you

6    don't remember what Gilbert told you; is that right?

7    A.  I cannot recall, no, I can only guess.

8    Q.  One thing you do know is it must have been reasonable,

9    because if he would have told you something unreasonable, you

10   would have never authorized this wire transfer, right?

11   A.  We wouldn't be able to send the wire, yes.

12           MR. GARVIN:  Thank you, sir.  We can take that down.

13   We're going to please look at Government's Exhibit 1437.  I'm

14   sorry.  We're not done.  1437.

15   Q.  This 1437 shows that there is going to be $3 million that

16   is going to be wired for an investment into ZIIXI.  Do you see

17   that at the bottom, correct?

18   A.  Yes.

19   Q.  And you have also shown us or discussed with us the 2

20   million of the wire was going to go to an investment XIII.

21   Right?

22   A.  Correct.

23   Q.  Now, again, Mr. Mark Scott is not on this e-mail anywhere,

24   correct?

25   A.  Correct.

JBC3SCO2                        Firuz - Cross

1   Q.  So, sitting here today, you have no idea, because nobody

2   supplied you with any information as to what Mark Scott knew

3   about this e-mail; is that correct?

4   A.  That is correct.

5   Q.  We have no way of telling what Mr. Armenta represented to

6   Mr. Scott, if anything.  Correct?

7   A.  I can't answer that.  There might be some e-mails.

8   Q.  Well, sitting here as we are right now, we are unaware of

9   such a thing, right?

10          MS. LOZANO:  Objection.

11          THE COURT:  Overruled.

12  Q.  That means you can answer.

13  A.  Sorry.  Correct.

14          MR. GARVIN:  If you would be kind enough to put 1055

15  up, please.

16  Q.  You were asked some questions about Exhibit 1055.  And

17  Mr. Barile has been nice enough to put it on the screen.  So

18  let's start with Ruja, Dr. Ruja Ignatova on the very first

19  line.  Do you see that, ma'am?

20  A.  Yes, I do.

21  Q.  It's Ruja@OneCoin.eu, correct?

22  A.  Yes.

23  Q.  And "eu" would suggest this is a European e-mail address,

24  right?

25  A.  It does.

1           MS. LOZANO:  Objection.

2           THE COURT:  Overruled.

3    Q.  You were asked about -- well, maybe you weren't.  You were

4    asked about OneCoin, and you said that you had no knowledge of

5    OneCoin prior to testifying here today.  Is that correct?

6    A.  Yes, that's correct.

7    Q.  Now, if you would be kind enough, ma'am.  Could you please

8    read to the ladies and gentlemen of the jury the first three

9    sentences of this e-mail.

10   A.  "Hi Ruja, for your information Gilbert asked me about your

11   new structure.  I gave nothing away, but stating that you will

12   be operating through Ireland mainly.  I am not sharing that you

13   will be banking offshore and where."

14   Q.  Now, your reading of this document, doesn't it appear that

15   Mr. Scott is not sharing information to Gilbert Armenta from

16   the -- from reading of this e-mail?

17          MS. LOZANO:  Objection.  Calls for characterization.

18          THE COURT:  Overruled.

19   A.  It seems that it does, yes, he's not sharing information.

20               (Continued on next page)

21

22

23

24

25

1          MR. GARVIN:  Thank you.  You can take that down.

2     Q.  Now, I want to talk about the Fenero Funds just for a

3     couple of seconds, if we may.

4     A.  Sure.

5     Q.  Would it be accurate to say that Fenero Equity Investments

6     did not have an account at Morgan Stanley during this period of

7     time, to your knowledge?

8     A.  To my knowledge, no.

9     Q.  And would that also be true with Fenero Equity Investments

10    number 2?  Would that also be true?

11    A.  Correct.

12    Q.  And just to refresh your memory, we saw in Government

13    Exhibit 1437 and Government Exhibit 711E there were references

14    that those wire transfers were going to go to Fenero Equity

15    Investments and Fenero Equity Investments 2; is that correct?

16    A.  Fenero Equity Investments 2 LP I believe is what was on the

17    document.

18    Q.  And so it would be fair to say -- and accurate -- that

19    Fenero Equity Investments 2 LP did not have an account at

20    Morgan Stanley?

21    A.  Not to my knowledge.

22    Q.  And so I'd like to ask you the same thing with Mark Scott.

23    Would it be accurate to say that in preparation of your

24    testimony today that you have reviewed a number of records?  Is

25    that true?

1    A.  That is correct.

2    Q.  And that in cooperation with the United States and in this

3    case Morgan Stanley has produced a great number of documents,

4    correct?

5    A.  Correct.

6    Q.  And in reviewing those documents in preparation of your

7    testimony today you saw no documentation that would suggest

8    that my client Mark Scott was a client of Morgan Stanley; is

9    that right?

10   A.  That is correct.

11   Q.  In fact there is nothing in the e-mails and the bank

12   records that Morgan Stanley produced that would suggest that

13   anyone ever spoke with Mark Scott during this period of time;

14   isn't that true?

15   A.  That is true.

16   Q.  And as a result of that it would be equally accurate to

17   state that Morgan Stanley was not influenced by Mark Scott in

18   deciding whether or not to honor any wire transfer for Gilbert

19   Armenta; isn't that true?

20          MS. LOZANO:  Objection.

21          THE COURT:  Sustained.

22   Q.  Isn't it true that -- well, let me ask it a different way.

23          To your knowledge, prior to making a decision on any

24   wire transfer for Gilbert Armenta, did Morgan Stanley have any

25   communication with Mark Scott?

1   A.  Not to my knowledge.

2   Q.  Are you aware of an entity by the name of MSS International

3   Consultants BVI LTD?

4   A.  I am not.

5   Q.  And in reviewing the records that you saw before you

6   testified today, have you ever seen that name in any of those

7   records?

8   A.  I don't believe it was referenced, no.

9   Q.  There are three entities I have to ask you about, so please

10  bear with me.  I know it's boring.

11  A.  I have all day.

12  Q.  I appreciate it.  MSS International Consultants LLC, have

13  you seen that name in any of the documents in preparation of

14  this case?

15  A.  I don't believe so, no.

16  Q.  How about Fenero Financial Switzerland LP?

17  A.  No.

18  Q.  And there is only a couple left.  Fenero Equity Investments

19  Cayman 1 LP.  Have you seen that?

20  A.  Specifically I don't believe it was Cayman 1 LP, no.

21  Q.  And Fenero Equity Investments Ireland Limited.

22  A.  No.

23  Q.  And the final one, Fenero Fintech Europe LP?

24  A.  No.

25  Q.  I'm going to wrap up, but I wanted to make one final point

JBC7SCO3                    Firuz - cross

1  clear.  Sitting here today, no one has told you anything --

2  meaning from the bank -- told you anything that they had any

3  dealings at Morgan Stanley with Mark Scott; is that correct?

4  A.  Yes, to my knowledge.

5          MR. GARVIN:  Thank you.  I have no further -- oh, one

6  second.  Maybe I do.

7          Your Honor, I'm told we need a sidebar.

8          THE COURT:  OK.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JBC7SCO3                          Firuz - cross

1          (At the side bar)

2          MR. GARVIN:  Your Honor, during the direct examination

3     the government elicited testimony from the witness that there

4     were $5 million of wire transfers sent from Gilbert Armenta to

5     the Fenero Equity investment funds.

6          THE COURT:  I do recall that may have been mentioned.

7          MR. DIMASE:  I think we may be able to cut through

8     this.  There may not be a dispute really in the end.

9          The government was planning to admit this exhibit

10    through the next witness as a government exhibit.  We do have

11    some concerns about the ability of the defendant to admit it

12    since it is his own statement and it may be offered for the

13    truth.  But since the government plans to admit it anyway, it's

14    fine with us.  We would just ask that the defense use the

15    government exhibit version that we were planning to admit

16    through the next witness.  And I can give that and it can be

17    shown.

18         THE COURT:  Do you care?

19         MR. GARVIN:  I don't mind there being a duplicate

20    number for this, but at some point the exhibits will go back to

21    the jury room and they will put the defense exhibits in one box

22    and the government exhibits in other box, and so I would really

23    like it to be a defense exhibit.

24         THE COURT:  You can use your own exhibit.

25         (Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

1              (In open court)

2              MR. GARVIN:  Thank you.  Your Honor, at this time we

3     would move into evidence Defendant's Exhibit 624, which is a

4     dual exhibit.  It's also Government Exhibit 1433.  We're going

5     to ask to please put Government Exhibit 1433 on the screen, and

6     we will using the government's exhibit number to conclude this

7     examination.

8              THE COURT:  Any objection?

9              MR. LOZARO:  Yes, your Honor, based on what we raised

10    at side bar.

11             THE COURT:  Overruled.

12             (Defendant's Exhibit 624 received in evidence)

13    Q.  Now, ma'am, you will recall while you and I have been

14    talking that we discussed the fact that the $5 million was

15    indeed transferred to the Fenero Equity Investment Fund,

16    correct?

17    A.  They were to Fenero Equity Investments 2 LP.

18    Q.  And also I went over, and we read that the e-mail in which

19    Mark Scott offered if there was a problem to return the money;

20    isn't that correct?

21    A.  Correct.

22    Q.  And so now I'm going to show you what is marked 1433, which

23    is also Defendant's Exhibit 624, and I'd like you to, if we

24    could, can we go to the second page of this document.  I stand

25    corrected.  I need to take a moment.  Can we take that down for

1  one moment, please.  Would you be kind enough to put it back

2  up.

3           You can see that this is a letter that is made out to

4  Fates Group; is that correct?

5  A.  Correct.

6  Q.  And also care of Zala Group.

7  A.  Yes.

8  Q.  And we know both of those entities are related to Gilbert

9  Armenta, correct?

10  A.  That's correct.

11  Q.  And if we move a little bit further down to the first

12  paragraph it talks about -- reference is made to the

13  subscription documents of the fund executed by you on July 13,

14  2016.  The subscription agreement and our letter of April 3,

15  2016 (the letter), rejecting your subscription and terminating

16  the subscription agreement.

17           Do you see that?

18  A.  Yes, I do.

19  Q.  It continues to say, "As stated, as of the issue date of

20  the letter, we had only obtained the initial U.S. $10 million

21  payment from you.  As per your request, dated April 10, 2017,

22  we have since returned the initial payment to the account of

23  Fates Group LLC at Global Bank of Commerce via Deutsche Bank

24  Trust Company Americas in New York as intermediary (the Fates

25  account)."

1           Do you recall now that when you sent your wires

2    whether or not Deutsche Bank was involved?

3    A.  Yes, they were the intermediary bank as well as final

4    beneficiary.

5    Q.  And to your knowledge do you know one way or the other

6    whether the $5 million was part of a $10 million payment?

7    A.  I do not know.

8    Q.  Finally on this document it states, "By signing below, you

9    acknowledge and confirm that the initial payment has been

10   received in full by you in the Fates account."  Do you see

11   that?

12   A.  I do see that.

13           MR. GARVIN:  I have no further questions.  Thank you.

14           THE COURT:  Redirect?

15           MS. LOZANO:  Just briefly, your Honor.

16   REDIRECT EXAMINATION

17   BY MS. LOZANO:

18   Q.  Can we put 1433 back up.  Mr. Firuz, counsel -- counsel was

19   asking about this exhibit.  If we could turn to page 2 of the

20   exhibit.  This reported rejection letter is dated when?

21   A.  April 24, 2017.

22   Q.  Remind us again when the $2 million and $3 million out of

23   the Fates account to the Fenero account occurred.

24   A.  On June 29, 2016 and June 30, 2016.

25   Q.  So this letter dated April 24, 2017 is approximately ten

1   months after the Fates wires to Fenero, right?

2   A.   Correct.

3   Q.   And in the body of this letter, the second paragraph, is it

4   fair to say that the reported rejection resulted in the money

5   being sent to yet another Fates Group account at Global Bank of

6   Commerce?

7   A.   Correct.

8   Q.   I'd like to now pull up Exhibit 1055, which counsel also

9   asked you about, and I would like to highlight the second

10  paragraph.  Now, again, who is this from?

11  A.   It's from Mark Scott.

12  Q.   To who?

13  A.   Dr. Ruja Ignatova.

14  Q.   And in the first sentence it references Mr. Armenta by his

15  first name, is that right, Gilbert?

16  A.   Yes.

17  Q.   Is it fair to say that the highlighted second paragraph is

18  Mr. Scott telling Ruja that if you have money with Mr. Armenta

19  and you want to transfer that money, send it through my --

20  Mr. Scott's -- escrow in the U.S. or BVI and we can do it

21  immediately?  Is that fair?

22  A.   Yes.

23  Q.   And the date of this e-mail?

24  A.   March 2, 2016.

25          MS. LOZANO:  Thank you, Ms. Firuz.  I have nothing

1    further.

2              MR. GARVIN:  I do have one question with regard to

3    that document.

4              THE COURT:  OK.

5    RECROSS EXAMINATION

6    BY MR. GARVIN:

7    Q.  Now, with regard to the letter, counsel just asked you if

8    there was yet a different entity that the funds were returned

9    to.  Do you remember that question?

10   A.  Yes.

11   Q.  But in fairness, did this document also make reference to

12   compliance and efforts to adhere to compliance?  In particular

13   let me read --

14   A.  Yes, it does.

15   Q.  OK.  So, Mr. Scott is saying, "For compliance reasons, and

16   as mentioned previously, we need to obtain written confirmation

17   that the initial payment (minus reasonable wiring expenses both

18   ways) has found its way into the Fates account."  Does it not

19   provide that?

20   A.  Yes, it does.

21   Q.  And, ma'am, for compliance purposes the Fates account would

22   have been the Fates account at Morgan Stanley?

23   A.  I don't believe so.

24             MS. LOZANO:  Objection.

25             MR. GARVIN:  Thank you.  I have no further questions.

1          THE COURT:  OK.  Nothing further.  Mr. Firuz, you may

2     step down.

3          And, ladies and gentlemen, my record is still perfect.

4     Every time a lawyer says he has just one more question, he also

5     has more.

6          Government, call your next witness.

7          MR. DIMASE:  May I just have one moment to consult

8     with defense counsel about a couple of exhibits?

9          THE COURT:  Sure.

10         MR. DIMASE:  Your Honor, the government calls

11    Mr. Moshe Kishore.

12         THE COURT:  Sir, please step up to the witness stand

13    and remain standing.

14     MOSHE KISHORE,

15         called as a witness by the government,

16         having been duly sworn, testified as follows:

17         THE COURT:  Sir, you may be seated.  Please speak

18    directly into the microphone, and if I could ask you to begin

19    by stating your full name and spelling both your first and last

20    name.

21         THE WITNESS:  Moshe Kishore, M-o-s-h-e K-i-s-h-o-r-e.

22         THE COURT:  Mr. DiMase.

23         MR. DIMASE:  Thank you, your Honor.  May I approach to

24    give the witness a binder?

25         THE COURT:  You may.

1   DIRECT EXAMINATION

2   BY MR. DIMASE:

3   Q.  Good afternoon.

4   A.  Good afternoon.

5   Q.  I will just ask you to use the microphone.

6   A.  Can you hear me now?

7   Q.  That's great.  Mr. Kishore, where do you work?

8   A.  I work for Iberia Bank.

9   Q.  What is your current position at Iberia Bank.

10  A.  A commercial relationship banker.

11  Q.  And what are your duties and responsibilities in that

12  position?

13  A.  Primarily business development and commercial lending.

14  Q.  Do you work at a particular location of Iberia Bank?

15  A.  Yes, I do.

16  Q.  With is that?

17  A.  Plantation, Florida, Broward County.

18  Q.  Broward County you said?

19  A.  Yes.

20  Q.  Where is that in relation to Fort Lauderdale, Florida?

21  A.  Fort Lauderdale is in Broward County.

22  Q.  How far is Plantation?

23  A.  Plantation is say about ten miles, 15 miles west of Fort

24  Lauderdale.

25  Q.  Let me go back just a little bit and discuss your

1   background briefly.  Did you attend college?

2   A.  Yes.

3   Q.  Where you earned your degree?

4   A.  No.

5   Q.  And where did you go after you finished?

6   A.  I finished -- it was an associates course.  After I

7   finished I went to work for a mortgage company for a year.

8   Then after that I joined Washington Mutual Bank.

9   Q.  How long were you there?

10  A.  Nine years.

11  Q.  In what position?

12  A.  I was in various positions, as a branch manager, a

13  commercial banker.

14  Q.  Where did you go after Washington Mutual?

15  A.  I moved to -- I relocated to Florida.  I came here for the

16  Wells Fargo and Wachovia merger.

17  Q.  And go on.  You were working at Wells Fargo in what

18  capacity?

19  A.  As a branch manager.

20  Q.  For how long?

21  A.  I believe two years.

22  Q.  Where did you go after that?

23  A.  After that I went to Regents Bank.

24  Q.  And how long were you there?

25  A.  I believe three years.

1    Q.  In what capacity?

2    A.  As a branch manager.

3    Q.  And where did you go after that?

4    A.  Sabadell United Bank.

5    Q.  When was that?

6    A.  I started Sabadell in November 2014.

7    Q.  Does Sabadell have any relationship to the bank you work

8    for now, Iberia?

9    A.  Yes, Sabadell Bank was acquired by Iberia Bank.

10   Q.  So you've basically worked for the same entity since 2014;

11   is that accurate?

12   A.  Yes.

13   Q.  And is Iberia Bank currently in an acquisition as well?

14   A.  Yes, as of last Monday First Horizon Bank of Tennessee has

15   agreed to buy Iberia Bank.

16   Q.  So you will be working for a third bank.

17   A.  Yes.

18   Q.  So let me direct your attention to around March of 2016.

19   What was the name of the bank you were working for at that

20   time?

21   A.  Sabadell United Bank.

22   Q.  And what was your position with Sabadell at that time?

23   A.  I was a branch manager.

24   Q.  Was that also in Plantation, Florida?

25   A.  Yes.

1    Q.  And what were your duties and responsibilities in that

2    position as a branch manager?

3    A.  Branch management, oversight and business development.

4    Q.  Are both Sabadell -- withdrawn.

5              At the time was Sabadell United Bank insured by the

6    FDIC?

7    A.  Yes, it was.

8    Q.  And is Iberia Bank today insured by the FDIC as well?

9    A.  Yes.

10   Q.  As a branch manager and business development personnel, are

11   you familiar with Sabadell Bank's policies regarding wire

12   transfers?

13   A.  Yes.

14   Q.  And what if any policy did Sabadell have regarding asking

15   the bank customers for the purpose of a wire transfer prior to

16   making a transfer?

17   A.  It was the requirement of the bank to make sure that the

18   purpose of the wire needs to be stated by the client.

19   Q.  Can you say again?

20   A.  It was the requirement of the bank that the purpose of the

21   wire needed to be stated before processing the wire request.

22   Q.  And what were some of the reasons for that policy?

23   A.  We just want to make sure that we're in compliance, and we

24   don't want to do anything against the law, and we want to make

25   sure that the purpose is a legitimate and legal purpose.

JBC7SCO3                           Kishore - direct

1    Q.  Now, did you receive training as to money laundering and

2    compliance procedures while at Sabadell Bank?

3    A.  Yes.

4    Q.  What was Sabadell's policy back in 2016 regarding the

5    reporting of suspicious activity in connection with wire

6    transfers at the branch?

7    A.  Any suspicious activities would be reported to our

8    compliance department, which was handled through our back

9    office that was away from our branch offices.  And we would

10   make sure that our management folks are alerted.  And also we

11   have a regional operations field person who will also be

12   informed of any red flags.

13   Q.  Regional?

14   A.  An operations officer.

15   Q.  What was that person's role?

16   A.  That person's role was a support role for five to six

17   offices on things compliance-related.  They were the person.

18   Q.  So they didn't work -- that person didn't work in the

19   branch with you.  They would have been assigned to more than

20   one branch?

21   A.  Yes.

22   Q.  Did all staff at the branch level at Sabadell have

23   discretion to report any suspicious activity in connection with

24   a wire transfer?

25   A.  All employees.

1   Q.  And what kinds of suspicious activity might a branch

2   employee who has received a wire request from a customer be

3   looking for?

4   A.  Looking, first of all, to make sure that it is a client who

5   is requesting the wire transfer, verification of the compliant,

6   and, secondly, they want to make sure that it's not being sent

7   to a sanctioned country, and we also look to see what the

8   purpose of the wire transfer is.

9   Q.  And again what is the reason for asking for the purpose?

10  A.  The purpose is to make sure that all of the transfers that

11  we do are in compliance and there is no illegal activities.

12  Q.  Would that include fraud, money laundering and other such

13  criminal activity?

14  A.  Yes.

15          THE COURT:  Mr. DiMase, it's now 12:45 so we're going

16  to take our afternoon break.  Ladies and gentlemen, do not

17  discuss the case.

18          You may step down.

19          (Jury not present)

20          THE COURT:  Is there anything the parties wish to

21  discuss?

22          MR. GARVIN:  No, your Honor.

23          THE COURT:  Anything from the government?  Anything to

24  bring up?

25          MR. DIMASE:  We did want to flag a potential concern.

1    I don't know that we'll get to it today.  We received I think

2    it was either late last night or this morning a list of

3    exhibits that the defense may seek to introduce through the

4    Locke Lord witness, and we have likely objections to a number

5    of those exhibits on at least two different grounds:  One, that

6    they are inadmissible hearsay when offered by the defendant, to

7    the extent they are his own statements and offered for the

8    truth.  Then the second concern is a number of them don't copy

9    the defendant at all; they're just e-mails between another

10   attorney at Locke Lord and Ruja, and we just don't see how

11   they're relevant or how they're admissible as nonhearsay.

12           So, we wanted to flag those concerns for the Court

13   now.  We can go through them one by one, or we can wait until

14   the defense attempts to admit them, but we wanted to put that

15   on the record.

16           MR. DEVLIN-BROWN:  Yes, I think unless we're going to

17   get to the cross-examination today, that might be productive

18   for us to talk.  Mr. DiMase can let us know which ones he

19   objects to, the basis.  We have included more than we will

20   offer frankly because we want to refresh the witness's memory

21   and otherwise some professional questions, but we're happy to

22   work that out.

23           MR. DIMASE:  We may or may not get to cross today of

24   that witness.

25           THE COURT:  OK, very well.  Don't be late.

1              (Recess)

2              (Jury present)

3              THE COURT:  Everyone please be seated.

4              Mr. DiMase.

5              MR. DIMASE:  Yes, your Honor.

6   MOSHE KISHORE, resumed.

7   DIRECT EXAMINATION (Continued)

8   BY MR. DIMASE:

9   Q.  Mr. Kishore, before the break we were discussing the

10  concerns that might cause a branch employee to report to other

11  compliance employees at the bank.  Do you recall that?

12  A.  Yes.

13  Q.  OK.  And to be clear, when this sort of concern is reported

14  up, is that at the time the customer is attempting to make a

15  wire or send a wire?

16  A.  Yes.

17  Q.  And what are the potential outcomes of a report by a branch

18  level employee to the field officer at the compliance

19  department at the bank?

20  A.  Additional information will be requested by our back office

21  compliance.

22  Q.  From the customer?

23  A.  From the customer, the specific nature of the wire,

24  depending on the situation, and the bank could refuse to do the

25  wire if it finds whatever, the cause of the wire could not be

1    sent.  That could be a possible outcome.

2    Q.  And is it also possible they could be satisfied with the

3    additional information and agree to send the wire?

4    A.  Yes.

5    Q.  In addition to this real-time reporting by branch level

6    employees, are you aware of additional monitoring that is done

7    after the wire transfer is sent?

8    A.  Yes.

9    Q.  Generally speaking, what's the nature of that monitoring?

10   A.  Typically our back office would request the specific

11   nature.  They would give us a list of questions to be asked of

12   the client regarding that particular transaction.  And we would

13   update that from the client, and we would report that to our

14   BSA compliance department, our wire department, and depending

15   on the answers that they received, if it's satisfactory then

16   there won't be any further action.  If the bank office feels

17   that this was a wire or a transaction that they they're not

18   comfortable with, they would ask us to exit the relationship,

19   close the account.

20   Q.  With that customer?

21   A.  With that customer.

22   Q.  To be clear, is it fair to say not every single wire that

23   the bank processes is subject to this post-transaction

24   monitoring?  Just certain wires?

25   A.  Certain wires.

JBC7SCO3                          Kishore - direct

1   Q.  And do you have any personal knowledge about how the

2   compliance department picks the particular wires to focus on

3   after the fact?

4   A.  No.  No, I don't.

5   Q.  And you mentioned BSA, an the BSA department?

6   A.  Bank Secrecy Act.

7   Q.  And the Bank Secrecy Act department that's the same as the

8   compliance department?

9   A.  Correct.

10   Q.  Let me now direct your attention back to March of 2016.

11   You said that you were a branch manager at the Sabadell branch

12   in Plantation, Florida; is that right?

13   A.  Correct.

14   Q.  As a branch manager at the bank at that time, were you

15   familiar with the books and business records kept by Sabadell

16   Bank as a part of its usual recordkeeping procedures?

17   A.  Yes.

18   Q.  Do those records include things like bank records, bank

19   account opening statements, correspondence with bank customers,

20   wire transfer documents and other similar materials?

21   A.  Yes.

22   Q.  I'm going to ask you to take a look at that binder that's

23   sitting to your left.  And that binder contains what have been

24   marked as Government's Exhibits 401 through 409, and 411

25   through 422.  Did you have a chance to review the documents in

1    that binder prior to your testimony today?

2    A.  Yes.

3    Q.  What are they?

4    A.  These are bank communications specifically between myself

5    and my service manager at that time to Mr. Gilbert Armenta from

6    the Zala Group and Fates Group and his assistant at that time

7    Ms. Giselle Valentin and communications regarding what types of

8    accounts to be set up, wire transfer agreement and the

9    signature card that we require from all clients to be kept on

10   file.

11   Q.  And are those -- were those records kept in the normal

12   course of Sabadell's business?

13   A.  Correct.

14   Q.  Was it the standard practice of Sabadell Bank to keep those

15   kinds of records?

16   A.  Yes.

17   Q.  Was the information contained in the records recorded or

18   kept at the time of the transactions described on the record?

19   A.  Yes.

20   Q.  And did the person who kept the records have a duty to keep

21   them?

22   A.  Yes.

23           MR. DIMASE:  We offer 401 through 409 and 411 through

24   422.

25           MR. DEVLIN-BROWN:  No objection.

1          THE COURT:  Those exhibits will be received.

2          (Government Exhibits 401 through 409 and 411 through

3     422 received in evidence)

4     Q.  Mr. Kishore, in your capacity as a branch manager at the

5     bank, did there come a time when you met a customer named

6     Gilbert Armenta?

7     A.  Yes.

8     Q.  And when was that approximately?  What month?

9     A.  March of 2016.

10    Q.  I will ask you to look at Government Exhibit 102 already in

11    evidence.

12          And please publish it for the jury as well.

13          Do you recognize the individual in that photo?

14    A.  That's Mr. Armenta.

15    Q.  I'm going to ask you now to look at Government Exhibit 420.

16          Mr. Barile, if we could publish that.

17          Directing your attention first -- well, let's look at

18    the very top of this e-mail.  Who is it between?

19    A.  It's between myself and Mr. Armenta.

20    Q.  And the subject line is what?

21    A.  Accounts.

22    Q.  And it's dated March 8, 2016?

23    A.  It's dated -- yes.

24    Q.  Let's go to the bottom e-mail here.  Who wrote that e-mail?

25    A.  I did to Mr. Armenta.

1   Q.  And it starts out, "Per our discussion yesterday, we have

2   established the requested accounts and treasury services."

3           With respect to the discussion referenced in this,

4   what kind of discussion was that?  In other words, was it on

5   the phone?  In person?

6   A.  It was an in-person meeting.

7   Q.  Where was the meeting?

8   A.  It was at Mr. Armenta's office.

9   Q.  And what did you -- who else was at the meeting besides you

10  and Mr. Armenta?

11  A.  It was me, Mr. Armenta, and his assistant Giselle came in

12  and was in and out.

13  Q.  And can you briefly summarize for the jury what you

14  discussed with Mr. Armenta I guess it was March 7, 2016 at his

15  offices?

16  A.  It's customary for me to meet with clients that I bring

17  into the bank to make sure that they understand our products

18  and services.  And we also discuss their particular needs of

19  what they want to do, and based on their direction we establish

20  the accounts based on the company needs and the client

21  requests.

22  Q.  How many companies did Mr. Armenta speak with you about

23  during the conversation?

24  A.  Two companies.

25  Q.  And what were the names of the company?

1    A.   Zala Group and Fates.

2    Q.   Fates Group?

3    A.   Yep.

4    Q.   And to your understanding, were they physically located in

5    the same office space where you were meeting with Mr. Armenta

6    that day?

7    A.   Yes.

8    Q.   Where was that; do you remember?  Generally speaking what

9    town?

10   A.   Downtown Fort Lauderdale, Florida.

11   Q.   Did Mr. Armenta talk to you about the business that those

12   two companies were in?

13   A.   Yes.

14   Q.   Could you summarize what he said about the Zala Group and

15   Fates Group?

16   A.   Zala Group was a company that was investing in renewal

17   energies; that's their business.  Fates Group he had mentioned

18   was a family owned investment private equity type of company.

19   Q.   And this is all information that he provided to you at that

20   time.

21   A.   Yes.

22   Q.   And do you recall how Mr. Armenta was dressed that day when

23   you met with him?

24   A.   Yes, he was wearing a designer shirt, and I happened to

25   recognize the logo, it was a Salvatore Ferragamo shirt he was

1    wearing.

2    Q.   Anything else you noticed about what he was wearing?

3    A.   He had a very expensive watch.

4    Q.   Do you remember the kind of watch?

5    A.   It could have been a Patek Phillipe or a Elonge & Suna.

6    Q.   Sorry.  I'm not sure I'm familiar with those brands.  Are

7    those luxury watch brands?

8    A.   Very high-end luxury watch brands.

9    Q.   Do you recall anything else about your interaction with Mr.

10   Armenta at his office that day, anything that sticks in your

11   mind?

12   A.   The initial meeting I remember him giving me a very, very

13   firm handshake, which was very excruciating to a point.

14   Q.   Was that the only time you saw Mr. Armenta in 2016?

15   A.   I believe I saw him once -- once more when I was coming

16   from his office.  I had just met with the secretary, and I

17   believe I saw him drive from his -- they have underground

18   parking garages in the high-rise buildings where his offices

19   were.  I may have seen him in I thought it may have been either

20   a Bentley or Rolls Royce he was driving out.

21   Q.   That he was driving?

22   A.   Driving out.  And was in the opposite direction.

23   Q.   Other than -- well, let me go back to Government Exhibit

24   420.  Just could you read the next two sentences after the

25   first sentence that you focused on?

1    A.   420?

2    Q.   The one that's up on the screen.

3    A.   "For Zala Group we have set up an operating payroll and a

4    money market savings account with yourself and Giselle as

5    signers.  For the Fates Group we have established one main

6    account and designated you as the sole signer."

7    Q.   You go on to say?

8    A.   "I spoke to Giselle and scheduled to meet with her tomorrow

9    and go over the paperwork/disclosures/wiring instructions."

10   Q.   And Giselle?

11   A.   Mr. Armenta's assistant.

12   Q.   That's Giselle Valentin.

13            Mr. Armenta responds:  We look forward to working with

14   you and Sabadell again.

15            You ultimately respond "You are very welcome.  Thank

16   you."

17            So was there a meeting with Giselle subsequent to this

18   initial meeting with Mr. Armenta?

19   A.   Yes.

20   Q.   And who at the bank attended that meeting?

21   A.   Myself and my service manager Cecila Stagg.

22   Q.   Ms. Stagg worked with you at the Plantation branch?

23   A.   Yes.

24   Q.   I'm going to show you Exhibit 401 in evidence.

25            If you could publish it to the jury.

1    And this is from Ms. Stagg to G Valentin.  What date

2    is it?

3    A.  March 10, 2016.

4    Q.  And in it Ms. Stagg says, "It was a pleasure meeting with

5    you yesterday."  Is that a reference to the meeting you are

6    describing?

7    A.  Yes.

8    Q.  Was Mr. Armenta at that meeting or just Ms. Valentin?

9    A.  Just Ms. Valentin.

10   Q.  And what was discussed -- withdrawn.  You said during that

11   meeting you discussed the account opening and account opening

12   documents?

13   A.  Yes, where the documents need to be signed and so forth.

14   Q.  Let me ask you to look at Exhibit 422 in evidence.  What is

15   the date on this e-mail?

16   A.  March 11, 2016.

17   Q.  And this is from Giselle to you and Ms. Stagg?

18   A.  Yes.

19   Q.  And the subject line is what?

20   A.  New account docs.

21   Q.  What did Giselle say?

22   A.  "Hi team.  Attached please find the signed documents needed

23   in order to complete the process for our new accounts.  Please

24   review them and advise if we need anything further.  Thanking

25   you in advance."

1   Q.  If we could scroll down to page 2.  This is a treasury

2   management master implementation form.  What does that mean?

3   A.  This is a document that explains to the client.  It's one

4   of the services we offer to our credit management regarding

5   wire transfers and the type of account that we've established

6   for the client.

7   Q.  And who is the main point of contact for this customer

8   relationship, according to the document?

9   A.  Mr. Gilbert Armenta.

10  Q.  And does this also refresh your memory as to where this

11  company was located?

12  A.  Yes.

13  Q.  Where is that?

14  A.  110 East Broward Boulevard, Suite 1900, Fort Lauderdale,

15  Florida, 33301:

16  Q.  And if we could scroll down to page 3.  Keep going down,

17  please.  Let's talk on this page of the exhibit, 422.  What

18  account is this listing?

19  A.  This is an account for Zala Group, and this is the

20  signature card on the account a.

21  Q.  And who were the signators on the account?

22  A.  Mr. Armenta and Giselle Valentin.

23  Q.  Were those two individuals -- how many accounts in total

24  were set up for Mr. Armenta at the time?

25  A.  I would have to refer back to the e-mail, but whatever I

JBC7SCO3                          Kishore - direct

1    put in my e-mail.

2    Q.  Was it four accounts?

3    A.  I believe three for Zala and one for Fates.

4    Q.  And with respect to the signatories, who were the

5    signatories on those four accounts, if you recall?

6    A.  Anything that was Zala related Giselle and Mr. Armenta were

7    the signatures; for Fates Group it was just Mr. Armenta.

8    Q.  And who was listed as the beneficial owner of the accounts?

9    A.  On both companies the final beneficial owner was

10   Mr.  Gilbert Armenta.

11   Q.  If we can just scroll down to the next page.  So this is

12   the Fates Group account agreement?

13   A.  Yes.

14   Q.  And that was just Gilbert Armenta as signatory?

15   A.  Yes.

16   Q.  Let me now turn to Government Exhibit 421.  Is this also an

17   e-mail?

18   A.  Yes.

19   Q.  And it's from Cecila Stagg?

20   A.  This is from Cecila Stagg, my service manager, to Giselle

21   Valentin and a copy to me.  Subject was new account.  And the

22   date of the e-mail was Friday, March 18, 2016.

23   Q.  And does this refresh your memory about how many accounts

24   were opened?

25   A.  Four.  Three for Zala and one for Fates.

1  Q.  And based on the e-mail, is it fair to say those are

2  payroll operating and money market accounts for Zala Group?

3  A.  That's correct.

4  Q.  And a general account for Fates Group?

5  A.  Yes.

6  Q.  Were the accounts that Mr. Armenta set up in March of 2016

7  ultimately funded?

8  A.  Yes.

9  Q.  And without getting into the specific dollar figures, could

10  you give the jury a sense of the volume of money coming in?

11  Was it thousands?  Tens of thousands?  Hundreds of thousands?

12  Millions?

13  A.  Millions.

14  Q.  Do you recall the particular issues with wire transfers

15  from the accounts between March 2016 and August 2016?

16  A.  No.

17  Q.  Do you remember a time when you or other employees saw a

18  wire timing cut-off?

19  A.  Yes.

20  Q.  Can you please describe that for the jury?

21  A.  There was a time there was a wire that was requested by Mr.

22  Armenta, but we have to call the client to personally verify

23  they have a phone before we can send the wire.  And from the

24  time we got the request from the time we were actually able to

25  speak to Mr. Armenta there was a delay, so the wire went up

1   late and Mr. Armenta was not available, so I had to speak to
2   another member in their office to apologize for the delay, and
3   I stated that the wire was processed now since we got the
4   confirmation to send from Mr. Armenta.
5   Q.  Do you remember where that was going to?
6   A.  I could be wrong.  It was going someplace to Europe and
7   Georgia.
8   Q.  The country of Georgia?
9   A.  Yes.
10  Q.  And when you say they were going to someplace, a bank?
11  A.  Yes, it was going to a bank.
12  Q.  Was that the only wire transfer you recollect going to a
13  bank in Georgia, or were there other wires that also went to a
14  bank?
15  A.  No, that's the only thing I can recall.
16  Q.  Directing your attention to August 2016, what, if anything,
17  happened with respect to the accounts, these four accounts, at
18  that point?
19  A.  August 2016?
20  Q.  Yes.
21  A.  We were informed by our compliance office to close the
22  accounts and to exit the relationship for Zala Group and Fates
23  Group.
24  Q.  Were you told why?
25  A.  At the branch level we were not given any more information.

1    They just said we were going to exit the relationship.  They

2    were exercising their right to close the account.

3    Q.  I will show you Government Exhibit 419.  What is this?

4    A.  This is a letter that I sent Mr. Armenta stating that the

5    bank has decided to close the accounts, and we have given them

6    until September the 12, 2016 to close their accounts and

7    complete their business at Sabadell United Bank.

8    Q.  And that was about a month later?  They were given about a

9    month?

10   A.  Yes, 30 days.

11           MR. DIMASE:  Your Honor, the government now offers

12   Exhibit 4108 into evidence.

13           THE COURT:  Any objections?

14           MR. GARVIN:  I am just preserving what we discussed at

15   side bar earlier.  Other than that, no objection.

16           THE COURT:  Very well.  That exhibit will be received.

17           (Government Exhibit 4108 received in evidence)

18   Q.  Can we publish that.

19           Mr. Kishore, have you ever seen this before?

20   A.  I'm sorry?

21   Q.  Have you seen this e-mail before?

22   A.  No.

23   Q.  And there is an e-mail from Diane Cook?

24   A.  Yes.

25   Q.  And it's sent to Ms.law@gmail.com on Wednesday, August 17,

1    2016.  So that would be about five days after you sent your

2    letter to Mr. Armenta; is that correct?

3    A.  Correct.

4    Q.  And it says, "Mark, please find attached a scan of a letter

5    that is being sent to you at the instruction of Gilbert.  He

6    will call you later to discuss.  Thanks.  D.

7         And if we turn to page 2, and this appears to be a

8    slightly different letter than the letter that was -- that you

9    described earlier.  Do you recall sending this letter as well?

10   A.  No.

11   Q.  This letter appears to be similar in that it indicates that

12   Sabadell is closing a series of accounts including accounts for

13   Zala and Fates Group?  Do you see that?

14   A.  Yes, but I did not send this letter.

15   Q.  OK.  You don't recall sending this particular letter?

16   A.  No.

17   Q.  In any event, what it says is, "Pursuant to our depository

18   account agreement, Sabadell has elected to close the above

19   referenced accounts."  Is that what it says?

20   A.  "For Sabadell depository account Sabadell United Bank has

21   elected to close the above-referenced named accounts effective

22   September 17, 2016."

23   Q.  And are you saying that you didn't send this letter or you

24   just don't recall sending this letter as you sit here today?

25   A.  To my knowledge, I'm only aware of Zala and Fates Group

1   LLC.  The companies Shurden Limited, Soleymew Management,

2   Water-Tidal Services, I have no idea what they are.

3   Q.  And just with respect to the letter though, would you get

4   information from the compliance department from time to time

5   and be required to reach out to the customer?  Is that common

6   practice?

7   A.  If the compliance department requires additional

8   information on any transactions.

9   Q.  So I guess what I'm asking you is are you saying you didn't

10  send this letter, or you just have no recollection sending this

11  letter as you sit here today?

12  A.  I don't recall sending this letter.

13  Q.  Let me go back to the first page.  This references an

14  e-mail address MSscottlaw.  Are you familiar with a person

15  named Mark Scott?

16  A.  No.

17  Q.  Have you ever met that person before?

18  A.  No.

19  Q.  Let me draw your attention now to September 9, 2016.  Did

20  Mr. Armenta or his companies initiate any wire transfers in or

21  around that time?

22  A.  On September 16?

23  Q.  September 9, 2016.

24  A.  Yes.

25  Q.  And I'm going to show you now Government Exhibit 402.

1              If you could publish that for the jury too.

2              Who is this from and to and what is the date?

3   A.   This is from a Diane Cook to Ashley Yates, who was a

4   relationship banker who worked for me at that time, and a copy

5   to Mr. Gilbert Armenta.  The subject was urgent wire for today

6   - Fates Group LLC.  It was sent Friday, September the 9th,

7   2016.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JBC3SCO4                          Kishore – Direct

1   Q.  Just going down to the bottom, with respect to Diane Cook,

2   did you ever directly interact with Diane Cook?

3   A.  No.

4   Q.  In the signature line at the bottom of this e-mail, what

5   does it say regarding Ms. Cook?

6   A.  Yes.  It does.

7            MR. DiMASE:  Please zoom out, Mr. Barile.  Just

8   publish the signature line.

9   Q.  Just the signature of -- it says Diane Cook Fates Group and

10  the same address for the two companies that Mr. Armenta ran; is

11  that right?

12  A.  I'm sorry?

13  Q.  It says Diane Cook, Fates Group, and then the address for

14  the companies that Mr. Armenta ran, correct?

15  A.  That's correct.

16  Q.  Who is Ashley Yates, the person?

17  A.  Ashley Yates was a former employee of the bank who worked

18  for me.  Worked for us.

19  Q.  What did Diane write to Ashley?

20  A.  "Dear Ashley, please find attached the letter authorization

21  for a $5 million wire transfer out of Fates Group LLC for

22  today.  Please urgently send this wire out and send us

23  confirmation when done.  Let us know if you need anything

24  else."

25  Q.  And at the top it says "forwarded on behalf"?

1    A.   "Forwarded on behalf of Mr. Gilbert Armenta."

2    Q.   Let's go down to the second page.  What is this document

3    that we're looking at here?

4    A.   This is a wire transfer request document from Fates Group

5    to Sabadell Bank to process a wire for $5 million.

6    Q.   Sorry.  Go ahead.

7    A.   To be sent to Fenero Equity Investments LP.

8    Q.   Fenero Equity Investments II LP?

9    A.   Yeah, II LP.

10   Q.   What was the correspondent bank referenced here?

11   A.   The correspondent bank was Deutsche Bank AG Frankfurt.

12   Q.   Which account was being used to fund this wire?

13   A.   The Fates Group accounts to be sent to Fenero Equity

14   Investments II LP.

15   Q.   So this was the same Fates Group account that was set up at

16   Sabadell?

17   A.   Correct.

18   Q.   Just go to the second page.  And beneficiary listed here is

19   Deutsche Bank Cayman Limited?

20   A.   The beneficiary is Deutsche Bank International Limited.

21   St. Pauls Gate New Street St. Helier, Jersey, Channel Islands.

22   Q.   And the beneficiary is Deutsche Bank Cayman Island Limited?

23   A.   Deutsche Bank Cayman Limited.

24   Q.   Were there additional communications regarding this wire

25   after the September 9?

1    A.  Yes, Ashley had requested for the purpose of the wire.

2    Q.  Why don't we go to Government Exhibit 403.  And this is an

3    e-mail from Giselle to Ashley copying Gilbert entitled "revised

4    wire to Fenero" and it is September 12, 2016?

5    A.  Yes.

6    Q.  And in the body, what does Giselle say?

7    A.  "Here you go."

8    Q.  Going to the second page of this document.  Does this still

9    reference the correspondent bank as Deutsche Bank Frankfurt?

10   A.  That's correct.

11            MR. DiMASE:  Let me offer into evidence Government

12   Exhibit 1412.

13            MR. GARVIN:  No objection.

14            THE COURT:  1412 will be received.

15            (Government's Exhibit 1412 received in evidence)

16   Q.  Have you ever seen this e-mail before?

17   A.  No.

18   Q.  It is an e-mail from Giselle or G. Valentin at Zala Group

19   to Gilbert Armenta entitled "forward wire details attached."

20   A.  Correct.

21   Q.  It's dated September 12, 2016?

22   A.  Correct.

23   Q.  What does Giselle say to Mr. Armenta in this e-mail.

24   A.  "Please see attached new wire instructions from Mark.  What

25   should I do?  Please call."

1    Q.  Below there appears to be some information about the

2    forwarded message from Mark Scott to Giselle Valentin on

3    September 12, 2016.  Do you see that?

4    A.  Correct.

5    Q.  Let's go to the second page.  If you could just focus on

6    the correspondent bank.  What is the correspondent bank listed

7    in these attached wire instructions?

8    A.  The correspondent bank is Deutsche Bank Trust Company

9    Americas.  And U.S.A.

10   Q.  That's 60 Wall Street, New York, New York?

11   A.  10005.

12   Q.  You can take these two down.  And it again says Fenero,

13   Beneficiary Fenero Equity Investments II LP?

14   A.  Correct.

15   Q.  Let's now go to 406 in evidence.  This is from Giselle to

16   Ashley copying Gilbert entitled "revised wire to Fenero."  Also

17   sent on September 12, 2016?

18   A.  Correct.

19        MR. DiMASE:  If we go down in the e-mail further,

20   Mr. Barile.  The same page.  In the middle of the e-mail there.

21   Q.  And Ashley says, "Hi Giselle.  We also need an explanation

22   for the wire when you send the updated instructions."

23   A.  Correct.

24   Q.  Is that consistent with the policy of Sabadell to ask for

25   wire purpose?

1   A.  Correct.

2   Q.  Going to the top, Ashley -- Giselle says "Attached are the

3   revised wire instructions."

4   A.  Yes.

5   Q.  You see that?  Just scrolling down to the wire directions.

6   In this revised wire at the bottom, what is the correspondent

7   bank now listed for the transaction?

8   A.  Deutsche Bank Trust Company Americas, 60 Wall Street, New

9   York, New York 10005 U.S.A.

10  Q.  So, it's no longer listing Deutsche Bank in Frankfurt.

11  It's now listing Deutsche Bank in New York.  Is that fair to

12  say?

13  A.  Correct, correct.

14  Q.  Let me now turn to Government Exhibit 407.  This appears to

15  be an answer to the question about the explanation for the

16  wire.

17  A.  That's correct.

18  Q.  Who is it sent by?

19  A.  It's from Mr. Armenta to Ashley Yates, copying Giselle

20  Valentin, subject is "revised wire to Fenero."  Sent on

21  September 12, 2016.

22  Q.  What did Mr. Armenta say the wire was for?

23  A.  It says "Hello Ashley, it's for asset management.  Thank

24  you.  All the best, Gilbert Armenta."

25  Q.  Do you have any reason to believe that this wire was

1    alerted or raised any concerns at the branch level when

2    Mr. Armenta made the request?

3    A.  No.

4    Q.  Were you personally involved in this wire transfer?

5    A.  No.

6    Q.  That being said, is the word asset management or

7    description here consistent with the business activity that

8    Mr. Armenta had described for Fates Group?

9    A.  That's correct.

10   Q.  So it didn't raise any red flags at the time?

11   A.  No.

12   Q.  Let me turn to Exhibit 409 in evidence.  This is another

13   e-mail from Giselle to Ashley on that same date.  She says

14   "Here is the wire including Swift and ABA."

15           MR. DiMASE:  And Mr. Barile, if you could just go down

16   to the second page.  Or third page.

17   Q.  Now the correspondent bank includes Swift and ABA details.

18   Do you see that at the bottom?

19   A.  Correct.

20   Q.  Let's go to 411 in evidence.  Let's go to 412.  And here is

21   another e-mail from Giselle to Ashley same date, "here you go."

22   If we could just go to the very bottom there.  Again this has

23   the Swift and ABA number for the correspondent.  Do you see

24   that?

25   A.  Correct.

1    Q.  On the next page, there is also a Swift code now for the

2    beneficiary bank.  Do you see that?

3    A.  Correct.

4    Q.  That's Deutsche Bank Cayman Islands?

5    A.  Deutsche Bank Cayman Limited.

6    Q.  Let me now turn to Government Exhibit 414.  This is dated

7    September 13 of 2016 from Giselle to Ashley.  And the title of

8    the message is "Swift."

9            What is a Swift or a Swift message?

10   A.  Swift -- Swift is a number that's used to identify every

11   bank.  And usually when a wire is sent, they get a confirmation

12   for the wire.  And that's what she was referring to as a Swift

13   confirmation.

14   Q.  So she says "Would you be able to get us a Swift

15   confirmation for the wire we did yesterday?"

16   A.  Correct.

17   Q.  And would that confirm that the wire in fact was sent?

18   A.  I believe so.

19   Q.  Let's go to Government Exhibit 417.  The same day Ashley

20   responds saying "This is the only thing I have to send you."

21   You see that?

22   A.  Yes.

23   Q.  What's attached to this e-mail if we can scroll down to the

24   next page.

25   A.  It's our wire transfer form that we process at the branch.

1   Q.  Did this wire in fact go out to Fenero Equity Investments

2   II LP?

3   A.  Yes.

4   Q.  Just focusing again on the intermediary bank, Deutsche Bank

5   Trust Co. Americas.  Is that the same bank, correspondent bank

6   in New York that we had seen on some of the wire confirmations

7   or wire directions?

8   A.  I have to see that.  Deutsche Bank.

9   Q.  Sure.  If we can put this side by side with Government

10  Exhibit 406.  At the bottom there where it says Deutsche Bank

11  Trust Company Americas, do you see that?

12  A.  Yes.

13  Q.  That's the same bank that's listed on the wire

14  confirmation, correct?

15  A.  Correct.

16  Q.  Let me go back to Government Exhibit 419.  This is the

17  letter that you didn't recall sending to Mr. Armenta.  And

18  again, what was the date that the accounts were being closed?

19  A.  The accounts would have, based on the letter, would be

20  September 12, 2016.

21  Q.  How does that date correspond with the date of the $5

22  million wire went out to Mr.  -- to the Fenero entity?

23  A.  I'm sorry.  Repeat the question?

24  Q.  How does that date correspond to the date of the 5 million

25  wire went out to Fenero?

1    A.  It was the same date.

2    Q.  Have you had any contact with Mr. Armenta or Ms. Valentin

3    or any other employee of Mr. Armenta after September 2016 when

4    these accounts were closed?

5    A.  No.

6    Q.  By the way, on the date that you sent that letter,

7    September 12 or -- August 12 or thereabouts, did you have any

8    conversations with anyone at the companies?

9    A.  I personally went to Mr. Armenta's office to communicate

10   the news in person, rather than just sending a letter.  I

11   wasn't able to see him, but I spoke in person with Giselle to

12   let her know that the bank is closing a letter.  I just came

13   here as a courtesy to let you know in person, and you'll be

14   receiving a letter shortly.

15   Q.  How did she react?

16   A.  She was disappointed that we were exiting the relationship.

17   Not happy.

18           MR. DiMASE:  One moment.  Your Honor, I now offer into

19   evidence Government Exhibits 1317, 1430, 1323, and 1432.

20           MR. GARVIN:  Could you repeat that, please?

21           MR. DiMASE:  Yes.  1317, 1430, 1323, and 1432.

22           MR. GARVIN:  No objection.

23           THE COURT:  Those exhibits will be received.

24           (Government's Exhibit 1317, 1430, 1323, 1432 received

25   in evidence)

1          MR. DiMASE:  And the government also offers Government

2     Exhibits 716A through 716C.

3          MR. GARVIN:  No objection.

4          THE COURT:  Those exhibits will be received as well.

5          (Government's Exhibit 716A through 716C received in

6     evidence)

7          MR. DiMASE:  Thank you.  Could we publish Government

8     Exhibit 1317, please.

9     Q.  You've never seen this e-mail before, correct, Mr. Kishore?

10    A.  I'm sorry?

11    Q.  You never seen this e-mail before, correct?

12    A.  No.

13    Q.  This is an e-mail from Ruja Ignatova at RavenR.com to Mark

14    S. Scott dated April 1st, 2017, you see that?

15    A.  Yes.

16    Q.  The subject is "attorney client privileged communication"?

17    A.  Yes.

18    Q.  And in it, Mr. Scott says to Ruja Ignatova, "Maybe best you

19    sent to G.  That way you can discuss further use as he knows

20    you are aware.  Thanks."

21    A.  Yes.

22    Q.  If we could go to the attachment to this e-mail.  This is a

23    letter dated April 1st of 2017 addressed to Mr. Armenta at

24    Fates Group LLC?

25    A.  Correct.

1    Q.  And it's regarding a subscription of 90 million euros into

2    Fenero Equity Investments II LP.

3    A.  Yes.

4    Q.  And it discusses, it says "To date after having obtained

5    only an initial $10 million U.S. we have not received any

6    further funds or communications from you."  Do you see that?

7    A.  Yes.

8    Q.  And then "For this reason we would like to reject your

9    subscription in its entirety and return to you the initial

10   payment."

11   A.  Correct.

12   Q.  And then it goes on to ask for banking details for an

13   account held by the original subscriber.  Do you see that?

14   A.  Yes.

15   Q.  If we go down to the last page of this document.  This is

16   signed by Mr. Scott?

17   A.  Yes.

18   Q.  Just to be clear, going back to page one, first page of the

19   exhibit.  This is sent by Mark Scott to Ruja Ignatova at

20   RavenR.com.  Correct?

21   A.  Yes.

22   Q.  And Mr. Armenta does not appear to be on this e-mail.  Is

23   that fair to say?

24   A.  Correct.

25   Q.  Let's now go to Government Exhibit 1430.  This is an --

1    you've never seen this e-mail before either, correct?

2    A.  No.

3    Q.  This is sent from Mark Scott to David Pike.  Do you see

4    that?

5    A.  Yes.

6    Q.  It's dated April 12, 2017.  And its subject line, "for our

7    files Fates return and release letter for Fenero II"?

8    A.  Correct.

9    Q.  Go to the next page.  Is this essentially the same letter

10   that we saw in Government Exhibit 1317 that we were reading?

11   A.  Correct.

12   Q.  Going to the last page.  This is signed at the bottom

13   underneath where it says Fates Group LLC.

14   A.  Correct.

15   Q.  I've highlighted a signature there.  Looks like Gilbert

16   Armenta.  Do you agree with that, the signature, next to name?

17   A.  Looks like it.

18   Q.  To be clear, this is dated around seven months after the $5

19   million was sent from the Fates Group account at Sabadell to

20   the Fenero account on September 12 of 2016?

21   A.  Correct.

22   Q.  Going to Government Exhibit 1323.  This is an e-mail from

23   Mark Scott to RujaIgnatov@RavenR.com dated April 24, 2017,

24   entitled "attorney client privileged communication."

25   A.  Correct.

1   Q.  Again, Mr. Armenta does not appear to be on this e-mail,
2   correct?
3   A.  That's correct.
4   Q.  This letter has a later date of April 24, 2017.  Do you see
5   that?
6   A.  Correct.
7   Q.  It refers back to the earlier letter we reviewed April 3,
8   2017, in the first paragraph.  Do you see that?
9   A.  Yes.
10  Q.  And it indicates that the initial payment has been returned
11  to the account at Fates Group LLC at Global Bank of Commerce.
12  Do you see that?
13  A.  Yes.
14  Q.  That was via the Deutsche Bank Trust Company Americas in
15  New York as intermediary.
16  A.  Yes.
17  Q.  Okay.  Just going back to page one.  Again this is from
18  Mark Scott to Ruja Ignatova.  Correct?
19  A.  Yes.
20  Q.  Let's go to Exhibit 1433.  This is an e-mail from Mark
21  Scott and it goes to GArmenta@FatesGroup.com copying Giselle
22  Valentin at ZalaGroup.com.  And bcc'ing David R. Pike.  Do you
23  see that?
24  A.  Correct.
25  Q.  And in it, could you read what Mark says to Gilbert in this

1    e-mail?

2    A.  "Hi Gilbert.  I was told that you would like to receive

3    this document from me directly for signature.  Please execute

4    where indicated and send me back a scanned copy with the

5    original signature to follow via courier.  This is time

6    sensitive.  Thanks and best.  Mark S. Scott, chief executive

7    officer."

8    Q.  You haven't seen this e-mail before, correct?

9    A.  No.

10   Q.  Going down to the next page.  Does this appear to be the

11   same letter that Mr. Scott had previously sent to the Ruja

12   Ignatova e-mail address that we just reviewed?

13   A.  Yes.

14   Q.  Finally, let's look at Government Exhibit 1432.  This is an

15   e-mail from Mark Scott to David Pike dated May 8th of 2017,

16   entitled "confidential communication."

17   A.  Correct.

18   Q.  Mr. Scott says to file with termination letter and other

19   correspondence you already have in this matter.  Do you see

20   that?

21   A.  Yes.

22   Q.  He appears to be forwarding the e-mail below at the bottom.

23   A.  Yeah.

24   Q.  And that's an e-mail from Ms. Valentin to MS Scott at MSIC

25   BVI and G. Armenta.  "Hello Mark.  As per your request,

1   attached please find the signed letter, please provide address

2   for delivery of original.  Thank you, Giselle Valentin."

3           Going to the letter.  Does this appear to be the same

4   letter from the prior two exhibits, 1323 and 1433?

5   A.  Yes.

6   Q.  Going to the last page.  This again appear to be signed on

7   behalf of Fates Group by Mr. Armenta?

8   A.  Yes.

9           MR. DiMASE:  One moment.

10  Q.  One last turning to one last exhibit.  Going back to

11  Government Exhibit 1317.  This is the original e-mail in the

12  series of e-mails we just reviewed.  Is that right?

13  A.  Correct.

14  Q.  This one was from Mark Scott to Ruja Ignatova?

15  A.  Correct.

16  Q.  And what does it say again in the text?

17  A.  "Maybe best you sent to G.  That way you can discuss

18  further use as he knows you are aware.  Thanks."

19          MR. DiMASE:  Nothing further.

20          THE COURT:  Cross-examination.

21          MR. GARVIN:  Thank you, your Honor.

22  CROSS-EXAMINATION

23  BY MR. GARVIN:

24  Q.  Good afternoon, sir.  How are you?

25  A.  Good.  Good afternoon.

1          MR. GARVIN:  Mr. Barile, would you be kind enough to

2     put 1332 back up, sir.

3     Q.  You were just asked about this document a few moments ago;

4     is that correct?

5     A.  Correct.

6     Q.  It states on the document that "this is to file with

7     termination letter and other correspondence you already have in

8     this matter." Is that right?

9     A.  Correct.

10         MR. GARVIN:  If you would be kind enough, sir, to go

11    to the second page. Mr. Barile, would it be possible to put

12    side by side the second page of 1430 and the second page of

13    1432?  Thank you, sir.

14    Q.  Now, you were asked about both of these documents during

15    direct examination; isn't that correct?

16    A.  Correct.

17    Q.  But going back and forth, it almost seemed like the

18    documents said the same thing, so we've put them up side by

19    side here to confirm that these are two separate letters.  You

20    can see they're two separate letters, correct?

21    A.  I'm not understanding the question.

22    Q.  Yes.  The document on the left is dated April 24, and the

23    description in the re is identical to the description in the re

24    on the document on the right which is dated April 3.  Do you

25    see that?

1    A.  One states it's via hand delivery and the other one

2    doesn't.

3    Q.  Right.  Below it says re or regarding, "subscription of

4    euro 90 million (the subscription) into Fenero Equity

5    Investments II LP (the fund)."

6               Do you see that, sir?

7    A.  Correct.

8    Q.  And if you look to the document on the right, which is

9    Exhibit 1430, it says the exact same thing.  "Re subscription

10   of euro 90 million," do you see that?

11   A.  Hmm-hmm.

12   Q.  Okay.  Both of these documents are dealing with the return

13   of a $10 million payment; isn't that correct?

14   A.  I mean, I'm not familiar with these documents, but, you

15   know.  If that's what they're saying.

16   Q.  All right.  Fair enough.

17               MR. GARVIN:  Mr. Barile, if would be kind enough, sir,

18   to take down 1430.  And just to leave 1432.  Page two.

19   Q.  You were asked about the document, and you see that at the

20   end of the second paragraph it does say "For compliance

21   reasons, and as mentioned previously, we need to obtain written

22   confirmation that the initial payment minus reasonable wiring

23   expenses both ways has found it way into the Fates account."

24   Is that correct?

25   A.  That's what it --

1   Q.  Finally, it says "By signing below, you acknowledge and

2   confirm that the initial payment has been received in full by

3   you in the Fates account."  Did you understand, sir, that the

4   $5 million, the wire transfer that your bank made on behalf of

5   Fates Group, was an initial payment to Fenero Equity Investment

6   II?

7   A.  No.

8           MR. GARVIN:  Thank you, Mr. Barile.  If we could

9   please put up exhibit 4108.  And if you would focus on the top

10  part first.  Thank you.

11  Q.  You were asked previously if you knew what

12  MSScottlaw@gmail.com was.  Do you recall that, sir?

13  A.  I was just asked to confirm who sent the e-mail to where.

14  To whom.

15  Q.  And you're not familiar with that particular e-mail

16  address, correct?

17  A.  Correct.

18  Q.  All you can tell from that is that the word "law" appears

19  there, correct?

20  A.  On the e-mail marker?

21  Q.  Yes.  It says MS Scott Law.

22  A.  Correct.

23  Q.  It appears to be some type of law related e-mail address,

24  correct?

25  A.  I don't know.

1    Q.  Sir, let me ask you, have you ever met Mr. Mark Scott?

2    A.  No.

3            MR. GARVIN:  Mark, would you be kind enough --

4    Q.  See him standing up, sir, do you recognize him at all?

5    A.  No.

6    Q.  Have you ever communicated with him to your recollection?

7    A.  Not to my recollection.

8    Q.  This particular document, if we could please go to the

9    second page.  I believe you told counsel that you did not

10   recognize all of the names that are on this letter.  Is that

11   right?

12   A.  I only recognize Zala and Fates Group.

13   Q.  So, is it possible that someone else prepared this letter,

14   and placed your signature on it?

15   A.  I couldn't be sure.  I don't recognize the other companies.

16   To the best of my knowledge, I always dealt with Zala Group and

17   Fates Group.  And I don't know -- I have no idea what these

18   other companies are.  Shureden Services, Soleymew, Water-Tidal

19   Services Limited.

20   Q.  Fair enough.  Other than the documents that you've

21   discussed here today before the ladies and gentlemen of the

22   jury, it would be accurate to say that you are not aware of any

23   communications between Mr. Gilbert Armenta and Mr. Mark Scott;

24   is that correct?

25   A.  That's correct.

JBC3SCO4                          Reeder - Direct

1          MR. GARVIN:  Your Honor, may I have one moment to

2    confer with counsel?

3          THE COURT:  Sure.

4          MR. GARVIN:  Sir.  Thank you for your time.  No

5    further questions.

6          THE COURT:  Any redirect?

7          MR. DiMASE:  No, your Honor.  Thank you.

8          THE COURT:  Sir, you may step down.

9          THE WITNESS:  Thank you.

10          (Witness excused)

11          THE COURT:  And government, please call your next

12    witness.

13          MR. DiMASE:  Yes, your Honor.  The government calls

14    Charles Reeder.

15          THE COURT:  Mr. DiMase.

16          MR. DiMASE:  Thank you.

17     CHARLES REEDER,

18        called as a witness by the Government,

19        having been duly sworn, testified as follows:

20    DIRECT EXAMINATION

21    BY MR. DiMASE:

22    Q.  Good afternoon.

23    A.  Hello.

24    Q.  Where do you work?

25    A.  I'm with the law firm of Locke Lord LLP.

JBC3SCO4                      Reeder - Direct

1   Q.   What is your current position there?

2   A.   I am a partner of the firm, and I'm also the deputy chief

3   operating officer.

4   Q.   Could you describe for the jury what are the duties and

5   responsibilities of the deputy chief operating officer at the

6   law firm?

7   A.   I get involved with special projects, involving accounting,

8   records, tax, partner questions, some compensation issues, and

9   lateral hiring.

10  Q.   What does lateral hiring refer to?

11  A.   I'm the lateral hiring partner for the firm.  So, if there

12  are mainly partner candidates, I work with them through the

13  lateral hiring process.

14  Q.   Just to be clear, lateral hiring, that refers to when a

15  partner goes from one firm to another firm as partner?

16  A.   Yes, that's correct.

17  Q.   That's distinct from a lower-level person at the firm being

18  promoted to a partnership level?

19  A.   That's correct, that's correct.

20  Q.   When did you become the deputy COO at Locke Lord?

21  A.   March of 2017.

22  Q.   Let me go back in time for a moment and discuss your

23  background.  Did you attend law school, I assume?

24  A.   Yes, I did.

25  Q.   When did you graduate?

1   A.  I graduated in 1978.

2   Q.  Where did you go to work after you graduated from law

3   school?

4   A.  Locke, Purnell, Boren, Laney & Neely.

5   Q.  Could you say that a little slower for the court reporter?

6   A.  Sure. Locke, Purnell, Boren, Laney & Neely.

7   Q.  Is that a prior incarnation of Locke Lord?

8   A.  Yes.

9   Q.  What role did you have when you started there?

10  A.  I was an associate.

11  Q.  How long did you work as an associate at the firm?

12  A.  Seven years.

13  Q.  Which office were you working in?

14  A.  The Dallas office.

15  Q.  Where is Locke Lord headquartered, by the way?  Where is

16  its primary office?

17  A.  I would say the administrative headquarters are in Dallas.

18  Q.  What were your duties and responsibilities as an associate

19  at the firm?  What did you work on?

20  A.  I worked on legal projects, mainly tax projects and

21  corporate projects.

22  Q.  Did there come a time when you were promoted within the

23  firm?

24  A.  Yes.  I was made partner in 1985.

25  Q.  Can you just briefly describe for the jury what that means,

1    to be made a partner at the law firm?

2    A.  Sure.  Well, you become a part owner of the business.  And

3    law firms really just have two types of attorneys, partners and

4    associates, generally.  And so, partner is a very significant

5    change in your status within the legal profession and within

6    the firm.

7    Q.  Does it also change in terms of the way you're compensated

8    salary, versus other methods of compensation?

9    A.  Yes.  The compensation does change, and the benefits will

10   change, too.

11   Q.  As a partner at Locke Lord, what practice area or areas did

12   you work in?

13   A.  Tax and corporate.

14   Q.  How long did you practice in that capacity as a partner at

15   the firm?

16   A.  Oh gosh.  I've been with the firm for 42 years.  So 34

17   years, 35 years as a partner.

18   Q.  Up to today you're saying or until you became deputy COO?

19   A.  Oh, no.  Since I became a partner at the law firm.

20   Q.  Got it.  And you said that you were then given the position

21   of deputy COO in March of 2017?

22   A.  That's correct.

23   Q.  Is that in addition to your lawyer responsibilities at the

24   firm?

25   A.  Yes, yes, it is.

1    Q.  Is it fair to say that the deputy COO position is more of a

2    administrative side position?

3    A.  Yes.

4    Q.  Where are you located now, which office of the firm?

5    A.  In the Dallas office.

6    Q.  As a deputy COO at Locke Lord, are you familiar with the

7    books and business records kept by Locke Lord as part of its

8    regular record keeping procedures?

9    A.  Yes.

10   Q.  What type of records does Locke Lord make and keep?

11   A.  We have legal records, we have employee records, we have

12   client records, we have tax records, accounting records,

13   billing records.

14   Q.  Would the client records include, for example,

15   correspondence with clients of the firm?

16   A.  Yes.

17   Q.  I'm showing you in the binder to your left a series of

18   documents:  Government Exhibits 2004 through 2015, 2017, 2019,

19   2025 and 26, 2029 and 30, 2033, and 2035 through 43.

20          Did you have a chance to review the documents in the

21   binder prior to your testimony today?

22   A.  Yes.

23   Q.  What are those documents?

24   A.  I'm sorry?

25   Q.  What are the documents in the binder?

A.  Oh.  Well, there's e-mails and some firm documents or

firm-related documents in here.

Q.  Do some include financial transactions involving the firm

as well?

A.  Yes.

Q.  Were these records kept in the normal course of Locke

Lord's business?

A.  Yes.

Q.  Was it the standard practice of Locke Lord to make and keep

these kinds of records?

A.  Yes.

Q.  Was the information contained in the records recorded at or

around the time the events took place?

A.  Yes.

Q.  Was the person who kept the records under a business duty

to do so accurately?

A.  Yes.

        MR. DiMASE:  The government offers Exhibits 2004

through 2015, 2017, 2019, 2025 and 26, 2029 and 30, 2033, and

2035 through 2043 into evidence.

        MR. DEVLIN-BROWN:  Your Honor, we may have hearsay

objections to 2039 and 2040.  No objections to anything else.

I'm happy to deal with that now or later.

        THE COURT:  Why don't we deal with those two later.

The balance of those exhibits will be received.

1            (Government's Exhibit 2004 through 2015, 2017, 2019,

2       2025 received in evidence)

3            (Government's Exhibit 2026, 2029, 2030, 2033, 2035

4       through 2038 received in evidence)

5            (Government's Exhibit 2041 through 2043 received in

6       evidence)

7            MR. DiMASE:  Thank you, your Honor.  I don't know if

8       we'll end up getting to those two today.

9       Q.  Mr. Reeder, let me direct your attention back to 2015.  In

10      what capacity were you employed by Locke Lord at that time?

11      A.  2015?  A partner at the firm.

12      Q.  So you were not deputy COO?

13      A.  That's correct.

14      Q.  Did Locke Lord merge with any other firms that year?

15      A.  Yes.

16      Q.  What firm or firms?

17      A.  Edwards Wildman & Palmer LLP, and the merger was

18      January 10, 2015.

19      Q.  Where did Edwards Wildman & Palmer have offices?

20      A.  It had offices in Boston, Providence, Chicago, Miami,

21      Hartford, Stamford, New York.  I think that's it.

22      Q.  Prior to the merger, did Locke Lord have an office in

23      Miami?

24      A.  No.

25      Q.  Did Locke Lord maintain a Miami office or the Edwards

1    Wildman Palmer office after the merger?

2    A.  Yes.

3    Q.  That was integrated into the firm, in other words?

4    A.  I'm sorry?

5    Q.  That office was integrated into the law firm?

6    A.  Yes, correct.

7    Q.  How many people worked at the Miami office?

8    A.  I don't know.

9    Q.  Well, was it a large number of people?

10   A.  No, it was not a large office.

11   Q.  It was small?

12          Is that a yes?

13   A.  Yes, that's a yes.

14   Q.  Just need to get a verbal response for the court reporter.

15          Directing your attention to June 2015.  Was anyone new

16   hired to work at the Miami office at that time?

17   A.  Yes.

18   Q.  Who was that?

19   A.  Mark Scott.

20   Q.  You mentioned the concept of lateral hiring.  Lateral

21   partner hiring.  Was Mr. Scott hired as a lateral from another

22   law firm?

23   A.  Yes.

24   Q.  Have you ever met Mr. Scott before?

25   A.  Not in person.

1    Q.  Have you -- to be clear, when Mr. Scott began working in

2    the Miami office, where were you located at that time?

3    A.  Dallas office.

4    Q.  Have you spoken to Mr. Scott?

5    A.  I'm not sure.  I had a request for the partnership

6    agreement when he departed, but I can't remember if that was a

7    verbal request or an e-mail request.

8    Q.  So Mr. Scott either verbally or by e-mail asked you for a

9    copy of the partnership agreement?

10   A.  Correct.

11   Q.  And so you don't recall whether you spoke to him at that

12   time or not?

13   A.  Yeah.

14   Q.  Did you provide a copy of the agreement?

15   A.  Yes, I did.

16   Q.  Did you have any communications with him while he was

17   employed at the firm?

18   A.  I may have had one communication with him about a business

19   development matter.

20   Q.  Do you recall anything about that communication?

21   A.  In the Dallas office, we had a German attorney, and I saw

22   on Mark's bio that he did work in Germany.  So, I put the two

23   together as a business development move.

24   Q.  Would you be able to recognize him if you saw him in

25   person?

1    A.  What, Mr. Scott?

2    Q.  Yeah.

3    A.  I probably recognize him because I've seen pictures.

4    Q.  Okay.  Do you see a person matching the photographs you've

5    seen from the firm directory here in court today?

6    A.  Yes, yes, I do.

7    Q.  Could you identify that person by a piece of clothing?

8    A.  Mark Scott.

9           MR. DiMASE:  Will the record indicate that the witness

10   has identified the defendant, your Honor.

11          THE COURT:  The record will so reflect.

12   Q.  So, you said that Mr. Scott was hired into the Miami office

13   in June of 2015.  How long was he employed by the firm, until

14   when?

15   A.  Employed until September 30 of 2016.

16   Q.  Do you have any personal knowledge regarding why he

17   departed the firm at that time?

18   A.  No, I do not.

19   Q.  You mentioned the partnership agreement earlier.  Are you

20   familiar with the concepts of the partnership agreement?

21   A.  Yes.

22   Q.  It sounds like Locke Lord maintains such an agreement; is

23   that fair to say?

24   A.  Yes.

25   Q.  As deputy COO, what involvement do you have with respect to

1    the firm's partnership agreement?

2    A.  I'm sorry, what was that again?

3    Q.  As the deputy COO, what responsibility do you have with

4    respect to the partnership agreement?

5    A.  I'm the keeper of the partnership agreement for the firm.

6    Q.  What does that really mean, the keeper of it?

7    A.  Well, I keep the partnership agreement.  If people want

8    copies, they go to me.  If we make any amendments, they come

9    through me.  And every once in a while, we revise the

10   partnership agreement, and that process is handled by me.

11   Q.  So, is it fair to say that the partnership agreement is a

12   document that is revised over time?

13   A.  Yes.

14   Q.  What is the current version of it?

15   A.  January 1st, 2019.

16   Q.  What is the version of it that was in place at the time

17   that Mr. Scott was employed by the firm?

18   A.  January 10, 2015.

19   Q.  Are you familiar with the terms of the January 10, 2015,

20   partnership agreement?

21   A.  Yes.

22   Q.  Can you just at a high level, without getting into the

23   weeds of it, explain for the jury what the partnership

24   agreement provides, what high-level terms it provides for?

25   A.  Sure.  The partnership agreement addresses capital

1   contributions into the partnership, the distribution of profits

2   from the partnership.  When a partner leaves, there are

3   provisions that deal with that.  We have an executive

4   committee, it governs how the executive committee is elected.

5   We have a board of directors, and it governs how the board of

6   directors are elected.  And there is some other matters in

7   there too.

8   Q.  Just to be clear, capital contributions, those are just,

9   basically, contributions of assets or money into the

10  partnership by the partners?

11  A.  Correct.

12  Q.  Is that right?  You mentioned an executive committee.  What

13  kinds of matters does the executive committee deal with?

14  A.  Our executive committee is the ultimate governing body for

15  the firm.  It consists of 15 members.  There is a chair who is

16  the equivalent of a CEO of the firm.  But, really, all major

17  decisions are made by the executive committee.

18          MR. DiMASE:  May I just have one moment to speak with

19  counsel, your Honor.

20          THE WITNESS:  I'm sorry, what?

21          MR. DiMASE:  To speak with counsel about an exhibit I

22  would like to publish.

23          THE COURT:  Okay.

24          (Pause)

25          MR. DiMASE:  Your Honor, it appears we may have one

1    issue to discuss briefly at sidebar.  Maybe it makes sense to

2    do it now.

3         THE COURT:  Can you continue for another 10 minutes

4    with another document?

5         MR. DiMASE:  I can come back to that document

6    tomorrow.  Sure.

7    BY MR. DiMASE:

8    Q.  Mr. Reeder, what does the partnership agreement provide for

9    as far as earning legal fees for work done outside of the law

10   firm?

11        MR. DEVLIN-BROWN:  Objection, your Honor.  I think

12   this might be something for a sidebar, unless he can move on.

13        THE COURT:  Can you move on to another subject,

14   Mr. DiMase?

15        MR. DiMASE:  Yes, your Honor.

16   Q.  With respect to the partnership agreement, are there also

17   terms within it relating to outside positions or interests held

18   by partners while they are employed by Locke Lord?

19        MR. DEVLIN-BROWN:  Same objection and issue, your

20   Honor.

21        MR. DiMASE:  We'll come back to this later.  Thank

22   you, your Honor.

23   Q.  Let me turn now to February of 2016.  Do you have any

24   personal knowledge regarding Mr. Scott's involvement in a

25   transfer of approximately $5 million through the firm's escrow

1    accounts in February of 2016?  Personal knowledge at the time

2    of the events?

3    A.  No.

4    Q.  Have you reviewed certain firm documents related to that

5    transfer?

6    A.  Yes.

7    Q.  Okay.  Let me ask you to look at Government Exhibit 2035.

8    A.  Which -- there we go.

9    Q.  Directing your attention to page one, do you recognize this

10   form?

11   A.  Yes.

12   Q.  What is it?

13   A.  It is a request for a deposit into the trust account.

14   Q.  When you say "trust account," can you explain what that

15   means for the jury.

16   A.  Sure.  The law firm has an operating account into which

17   revenues from clients are deposited and expenses are paid.

18   Trust accounts are maintained for client funds.  Those are not

19   funds of the firm.  Those are client funds.

20   Q.  What kinds of things would funds brought into a trust or

21   escrow account be used for?

22   A.  Sure.  Clients deposit funds in for retainers, which then

23   we pull money from the trust account when bills are sent or

24   invoices are sent and fees paid.  They could be used for

25   transactional matters.  If there's a matter that requires some

1   money, a large amount of money for closing a transaction or

2   closing a settlement, the client would deposit the funds in for

3   something like that.

4   Q.   You mentioned a retainer.  What does that mean?

5   A.   A retainer is an amount of money that a client will pay in

6   to the trust account, and that we will draw fees.  So it's

7   prepaying legal fees before they're actually incurred.

8   Q.   So, a retainer is different than money to be used for a

9   transaction?

10  A.   Clearly, yes.

11  Q.   It's really meant for payment of fees?

12  A.   Yup.

13  Q.   All right.  So with that background, let's go to Government

14  Exhibit 2035.  What is the client name listed on that form?

15  A.   Zala.

16  Q.   What is the matter name?

17  A.   ICard.

18  Q.   And directing your attention to the bottom of the two

19  amounts listed in number four.  What is the second amount

20  listed there?

21  A.   Oh, $5,116,458.

22  Q.   What is the type of escrow payment listed on the form?

23  A.   It says other.  Retainer.

24  Q.   Going down to the bottom, who is the partner who signed

25  this form?

1    A.  Mark Scott.

2    Q.  And the date?

3    A.  February 2 of 2016.

4    Q.  Let me go down to page four of this document.  If we could

5    just zoom in on the bottom piece there.  This is an e-mail from

6    STrivett@LockeLord to MarkScott@LockeLord, subject line Zala

7    Group.

8              Who is Ms. Trivett or S. Trivett?

9    A.  That's Sandra Trivett.  And she worked in the collection

10   accounts receivable department.

11   Q.  What does she say in this e-mail at the top?

12   A.  "We received these two wires below.  Should these be put in

13   trust account?"

14   Q.  Where do these wire details show that the funds originated

15   from?  If you look at the top transfer it says receipt received

16   from?

17   A.  Regents Bank in Birmingham.

18   Q.  Two lines below, who sent the money?

19   A.  Zala Group LLC.

20   Q.  There is an address listed there.  East Broward Boulevard

21   in Fort Lauderdale?

22   A.  Yeah.

23   Q.  At the top, what is the amount of this transaction, this

24   wire, where it says credit and amount?

25   A.  I'm sorry, what?  Oh, the amounts okay.  3,644,346.

1    Q.  Under customer reference it says "iCard one trends"?

2    A.  Correct.

3    Q.  This was on February 2nd of 2016?

4    A.  Yes.

5    Q.  There was a second wire below, appears to be the same

6    sending party and bank.  What was the amount of that wire?

7    A.  1,472,112.

8    Q.  Based -- that was the same date as well?

9    A.  Yes.

10   Q.  By the way, was it the same bank account?  If you look at

11   the beginning, the two Zala Group customer numbers there.  Does

12   it appear to be different bank account numbers, one ending in

13   143, and the other ending in 135.  Do you see that?

14   A.  I see it.

15   Q.  Do you know whether those are bank account numbers?

16   A.  I do not know.

17   Q.  Based on your review of this document, and other documents

18   that you've gone over, do you have an understanding of where

19   these funds came into the firm?  What account they came into?

20   A.  I think they went into the iCard, the Zala -- is that what

21   you mean?

22   Q.  Not the purpose of the funds, but the actual account into

23   which they were deposited.

24   A.  Okay.  I think they came into the Chase operating account.

25   Q.  JPMorgan Chase?

1    A.   Yeah, JPMorgan Chase.

2    Q.   Again, that's the account that would be used for the

3    operating expenses of the firm?

4    A.   Yes.

5    Q.   Is that the appropriate account for client funds to be sent

6    into?

7    A.   If a client is paying an invoice, that's where it would go.

8    Client funds would normally go first into the trust account.

9    Q.   Okay.  Is that true with respect to retainers which are

10   ultimately to be paid for fees as well?

11   A.   Yes, yes.

12            THE COURT:  Mr. DiMase, it is now 2:30, so we'll end

13   for today.

14            Ladies and gentlemen, we'll see you bright and early

15   tomorrow morning.  We'll get started at 9:30.  I do understand

16   there have been a couple of inquiries concerning whether or not

17   we're still on track.  I did speak with the attorneys and they

18   assure me we're still on track.  So we've seen almost as many

19   witnesses today as we've seen all of last week.

20            Have a wonderful evening.  Be safe getting home and

21   safe coming in tomorrow morning.  It may be wet.

22            Do not discuss the case.

23            (Jury excused)

24            (Continued on next page)

25

JBC3SCO4

```
 1              THE COURT:  Mr. Reeder, you may step down.

 2              (Witness temporarily excused)

 3              THE COURT:  What is the controversy concerning the

 4      partnership agreement?

 5              MR. DEVLIN-BROWN:  So, I'm not 100 percent certain

 6      where Mr. DiMase was going.  But, based on some 3500 I think

 7      from yesterday, and those specific questions about the

 8      agreement, a copy of which we have not seen, by the way, I was

 9      concerned Mr. DiMase might be asking questions about whether

10      Mr. Scott received -- leading to a point that Mr. Scott

11      received legal fees from Ruja Ignatova outside of his work for

12      Locke Lord while he was still working at Locke Lord.

13              THE COURT:  Outside of his work for --

14              MR. DEVLIN-BROWN:  So Mr. Scott started setting up the

15      Fenero Funds while he was still at Locke Lord.  He received

16      some payments from Ruja Ignatova affiliated companies while he

17      was still at Locke Lord.

18              If what Mr. DiMase was attempting to elicit is

19      Mr. Scott breached his fiduciary duties, broke his partnership

20      agreement, those are serious allegations.  We haven't gotten

21      404(b) notice of that.  And I don't see why that would be

22      necessary to prove the story of the crime on trial.  It just

23      seems gratuitous as to what his rules were with outside income

24      and outside employment.  I was concerned with that's where he

25      was going.
```

1      THE COURT:  Is he going to testify to the fact that

2  Mr. Scott violated his partnership agreement?

3      MR. DiMASE:  Yes.  It is highly relevant because I

4  expect the arguments that will be made is he was working for a

5  reputable law firm, he was trying to do the things the right

6  way, he was working with other partners who were on board with

7  these transactions, yet, at the same time, he's accepting a

8  million dollars into another account on the side.  Clearly in

9  violation of that agreement.

10      THE COURT:  What account?

11      MR. DiMASE:  He has an account in the name of Mark

12  Scott PL, which is I guess an account for his private firm,

13  quote unquote, and he's taking a million dollars during the

14  time he's working for Locke Lord, from Ruja, and in fact it's

15  not even coming directly from her.  It's part of the money

16  laundering evidence insofar as it's coming from IMS at her

17  direction into that account.  So that's one piece of it, is the

18  receipt of that money and not disclosing it to his firm.  And

19  then the second piece is --

20      THE COURT:  I'm sorry.  Was that money fees that he

21  earned doing legal work or ostensibly legal work?

22      MR. DiMASE:  I think "ostensibly" is the word.  They

23  are justified to the banks as legal fees for work that

24  Mr. Scott is performing for Ms. Ignatov.  In wire details that

25  is what is shown in the e-mails around these transactions.

1          THE COURT:  And that payment is proof of a violation

2     of his partnership agreement?

3          MR. DiMASE:  It would be a violation of his

4     partnership agreement.  But, let me turn to the second issue

5     that we intend to raise regarding the partnership agreement and

6     explain why they're both highly relevant at this trial.

7          The second issue is that Mr. Scott has a duty under

8     the partnership agreement to disclose outside interests,

9     membership on boards of directors, significant involvement in

10    other companies.  so during the period that he is a partner at

11    this firm, he is running these investment funds, he's setting

12    them up and running them, and taking hundreds of millions of

13    dollars into the funds.  He does not disclose that involvement

14    to the firm.

15         In fact, he has other partners at the firm doing work

16    in connection with some of these funds, while he is running

17    them and not disclosing his involvement in them.

18         And so, both of these two things, the failure to

19    disclose the fees, the failure to disclose his involvement, are

20    core consciousness of guilt evidence that go directly to,

21    again, Mr. Scott's state of mind, and his participation in

22    these crimes that he's charged with.

23         THE COURT:  What does Mr. Reeder know and what he will

24    be testifying to?

25         MR. DiMASE:  My anticipation, your Honor, is he would

JBC3SCO4

1   testify to what the partnership agreement terms are.  That you

2   are not allowed -- very briefly, it wouldn't be more than a

3   couple of questions on each area -- but you are not allowed

4   under the partnership agreement to receive money for legal work

5   you do while you are a partner at the firm outside of the firm.

6   That's number one.

7        Number two, you are obligated to disclose in forms

8   that you need to fill out any significant external interests or

9   participation in entities.  That then has to be approved by the

10  executive committee at the firm to avoid -- for any number of

11  very good reasons.  And that a diligent search of the records

12  at the firm was done.  No such form notifying the firm of his

13  involvement in Fenero was ever filed, no executive committee

14  action was ever taken on that.

15       With respect to the funds paid to Mr. Scott on the

16  side, Mr. Reeder has no personal knowledge of that.  In fact,

17  that's sort of the point.  We would prove that through e-mails

18  and bank records showing that there are moneys coming from Ruja

19  and her associated companies into his Mark Scott PL account in

20  February and March and April of 2016, while he's employed as a

21  partner.

22       MR. DEVLIN-BROWN:  Your Honor, I think the government

23  can get pretty far, again, we are not objecting to them putting

24  on evidence that while he is a partner at Locke Lord, billing

25  to some Ruja Ignatova clients.  He's starting to set up the

Fenero Funds, starting to take up money for investments and for
himself as salary at the same time.  The government's free to
show that money is criminal or whatever.

          But the gloss that is problematic and I think entirely
unnecessary, is that that's a breach of his fiduciary duties
under the partnership agreement.  I haven't seen the
partnership agreement, so I don't think he should be testifying
about that, for one thing.  There is also other law firm
partners, including Robert Courtneidge who Mr. Scott worked
with, who seemed to bill some of his work as consulting
privately to Ruja Ignatova.  I understand there are other
senior partners at Locke Lord who may have partnership income
or outside activities.  I don't know if they disclosed it or
not.

          It seems like it is a sideshow, and I don't think we
need to get into whether there is a breach of fiduciary duty
for the law firm for the government to make all the points they
need to make in terms of him receiving money from Ruja Ignatova
at the same time as he worked at the law firm.

          THE COURT:  Did the firm take any action?

          MR. DiMASE:  I don't want to speak for the firm.  I am
not sure whether they were aware of this.  This is again the
point.  Until after Mr. Scott left the firm.  Right.  So, there
wouldn't have been an ability to take action once he left.

          THE COURT:  You seem to suggest that the firm, I think

JBC3SCO4

1    it was a request of the investigators undertook a search for

2    whether or not Mr. Scott made these various representations or

3    failed to make these representations.

4            MR. DiMASE:  That was in preparation for this trial.

5    Not at the time of the event.

6            THE COURT:  I understand.

7            MR. DiMASE:  First of all, we did produce the

8    partnership agreement last night as 3500 material.  We received

9    it from Locke Lord yesterday.  They do have it.  I was not

10   planning to introduce it or otherwise use it.  I was not

11   planning --

12           THE COURT:  I would think that Locke Lord would not

13   want you to do that.

14           MR. DiMASE:  Yes.  That's accurate.  I wasn't planning

15   to mention the term "fiduciary duty" or anything like that.

16   The core issue here is he had an obligation under this

17   agreement to disclose it and he intentionally chose not to, and

18   that is consciousness of guilt evidence.  It shows he knows he

19   is doing something wrong.  The fact he has the duty is

20   important for the jury to understand that he chose not to meet

21   that duty.  And the inference to be drawn from that is he was

22   doing something wrong.  And that is why it is highly relevant

23   evidence.

24           MR. DEVLIN-BROWN:  Just briefly, your Honor.  Not only

25   did the firm not have any issues with Mr. Scott, and putting

JBC3SCO4

1    aside what they looked at or not when he left.  They continued

2    working with him as a client.  So, look, I think this really is

3    404(b).  It is not necessary to get into the whether there was

4    a breach of fiduciary duty which is serious.  It could be

5    considered theft from the firm.  To have a partnership

6    agreement come last night and this suddenly be an important

7    issue in the case, I don't think we need to do it.

8            THE COURT:  I guess it could be 404(b).  It is also

9    evidence of consciousness of guilt, and on that basis I'll

10   allow it.

11           But you need to be careful, Mr. DiMase, how you phrase

12   the questions so as not to suggest there is a violation of the

13   agreement which may or may not exist.

14           What else?

15           MR. GARVIN:  Your Honor, I think if that has been

16   decided I wanted to just address a housekeeping matter.

17           THE COURT:  Sure.

18           MR. GARVIN:  We've been trying, both the government

19   and the defense, have been trying our best to keep an eye on

20   how much time remains.  And there was some indication that the

21   government might rest as early as Friday.  If that's true,

22   because the potential amount of witnesses that Mr. Scott is

23   thinking about calling, all of them are from out of state, so

24   we're trying to see if there is any firm understanding at this

25   point as to how much of the case is left, because we are going

1    to have to fly people in.

2              THE COURT:  I understand.  Continue to talk.  I have

3    no idea, personally, who else the government is going to call

4    and how quick those witnesses will be and how long

5    cross-examination will be.  You folks seem to have been

6    discussing these issues.  I expect that you will continue to do

7    so.  My concern is for the jury.  My concern is to make sure we

8    get them back to their lives as quickly and efficiently as

9    possible.  And in connection that, I don't want there to be any

10   gaps in the evidence.  A half hour at the end of the day here

11   or there is fine.  But I don't want to lose that half a day

12   because of an inability to have witnesses present.

13             MR. FOLLY:  Your Honor, just to close the loop on that

14   issue.  We have represented we might rest as early as before

15   Friday.  Not on Friday.  I think it's within the realm of

16   possibility we'd rest on Thursday.  So, we've continually been

17   sort of sounding this alarm at defense counsel, and asking how

18   many witnesses are you putting on and how long is that going to

19   take, so we can appropriately schedule the charge conference

20   and have a sense of when closing arguments are going to be.  So

21   we would respectfully request defense counsel to give us some

22   clarity on what the scope and length of any anticipated defense

23   case will be.  And if they'll be prepared to start putting that

24   case on as early as the end of this week.

25             MR. GARVIN:  That's what I'm trying to flush out now.

1    If we're going to be expected to have people here on Friday,

2    then obviously we have to purchase their airplane tickets

3    literally today.  And I'm hearing that is in fact the case,

4    then we anticipate having people here on Friday.  At the

5    present time, your Honor, it looks like the defense case will

6    be approximately one full day.  Of course that depends greatly

7    upon whether or not Mr. Scott will testify.  At the present

8    time, I don't imagine it going much longer than a day to two

9    days maximum.  But it certainly appears we will have a case to

10   present.  So, I'm trying to see if I should have people here

11   over the weekend for Monday morning or if I should have them

12   here for Friday.

13          I can proffer to the Court two or three witnesses have

14   conflicts on Friday, and have asked me to confirm if they could

15   come on Monday.  That's why I'm trying to flesh this out now.

16   I heard that the government, the government notified us over

17   the weekend and I believe it was yesterday, actually, they may

18   be resting on Friday or possibly earlier.  I am trying to get a

19   feel here as to whether it will be appropriate for us, meaning

20   defense, to have all of our witnesses here Monday morning.

21          THE COURT:  Like I said, there is nothing I can do as

22   I sit here.

23          MR. GARVIN:  I was hoping, honestly, Judge, I was

24   hoping you would try to get the -- get the parties to give a

25   little bit more of a commitment.  I don't want to find out

Thursday we have to be calling people for Friday that are out

of the state.

THE COURT:  It sounds like you probably ought to be

prepared to put someone on the stand on Friday.

MR. GARVIN:  Yes, sir.

MR. DiMASE:  We will continue to update the defense

every day as we get closer to the end of our witnesses when we

reasonably expect to finish.  But a trial is a trial.  It is a

living thing.  Cross length can change.

THE COURT:  If there is a point where there is not a

witness to be put on the stand, we can tell them we need to

have the jury charge and we dismiss them for the day.  That's a

one shot thing.  So again, to the extent you folks can continue

to talk and have a very good idea as to when the government is

going to finish up, that would be ideal.

I also want to just raise one issue, and you folks can

think about it and you don't have to tell me now and I don't

feel strongly about it.  But on consent whether or not you want

the jury charge to go before closings or in the ordinary course

after closings.  Okay.  Unless there is anything else.

MR. DiMASE:  I do think that we're likely to have some

objections to some of the exhibits that the defense wishes to

admit on cross of this Locke Lord witness.

THE COURT:  Okay.

MR. DiMASE:  But, I think it probably makes sense for

JBC3SCO4

1   us to figure out what those are and come back to the Court

2   tomorrow morning.

3          THE COURT:  Tomorrow morning at 9.

4          MR. DiMASE:  There is also the letter that the

5   government put in regarding the cryptocurrency expert

6   testimony.  There hasn't been a response yet.  I don't think

7   it's urgent, but I wanted to flag that.

8          THE COURT:  And you're objecting to it or just certain

9   aspects of it?

10         MR. DiMASE:  We do continue to object to the

11  testimony.  But we understand the Court has permitted the

12  expert as a general matter.  What we are focusing is one

13  particular aspect of that testimony, and that's what the letter

14  is about.

15         THE COURT:  Is that cryptocurrency expert in New York?

16         MR. DEVLIN-BROWN:  He is in New York.  That's

17  obviously something we'll look at the government's letter.  It

18  came in last night.  We'll try to give a little more clarity to

19  the government and we'll send something to the Court.

20         THE COURT:  Okay.  Have a good evening, everyone.

21         (Adjourned until November 13, 2019, at 9 a.m.)

22

23

24

25

958

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                             Page

 3     LINDA COHEN

 4    Direct Q. . . . . . . . . . . . . . . . . 787

 5    Cross By Mr. Garvin . . . . . . . . . . . 810

 6    Redirect By Ms. Lozano . . . . . . . . . . 816

 7     SENEM FIRUZ

 8    Direct By Ms. Lozano . . . . . . . . . . . 818

 9    Cross By Mr. Garvin . . . . . . . . . . . 866

10    Redirect By Ms. Lozano . . . . . . . . . . 881

11    Recross By Mr. Garvin . . . . . . . . . . 883

12     MOSHE KISHORE

13    Direct By Mr. Dimase . . . . . . . . . . . 885

14    Direct By Mr. Dimase . . . . . . . . . . . 892

15    Cross By Mr. Garvin . . . . . . . . . . . 924

16     CHARLES REEDER

17    Direct By Mr. DiMase . . . . . . . . . . . 929

18                      GOVERNMENT EXHIBITS

19    Exhibit No.                            Received

20     GX 731A,GX 723A, 723B, 723C, 723D, 723E . . . 787

21             and 723F

22     710A, 710B, 710C, 710D, 710E    . . . . . . 817

23     711A, 711B, 711C, 711D, 711E    . . . . . . 817

24     2901, 2902, 2903, 2905, 2906    . . . . . . 829

25     1041, 1055, 1099, 1140, 1116, 1317   . . . . 840
```

1   1325, 1360, 1133, 1437, 1438, 1439   . . . . 840

2   401 through 409 and 411 through 422   . . . . 896

3   4108   . . . . . . . . . . . . . . . . . 906

4   1412   . . . . . . . . . . . . . . . . . 912

5   1317, 1430, 1323, 1432   . . . . . . . . . 918

6   716A through 716C   . . . . . . . . . . . 919

7   2004 through 2015, 2017, 2019, 2025   . . . . 935

8   2026, 2029, 2030, 2033, 2035 through 2038   . 935

9   2041 through 2043   . . . . . . . . . . . 935

10                          DEFENDANT EXHIBITS

11  Exhibit No.                                  Received

12   624   . . . . . . . . . . . . . . . . . 879

13

14

15

16

17

18

19

20

21

22

23

24

25