JBD3SCO1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                v.                          17 CR 630 (ER)

MARK S. SCOTT,

                Defendant.

------------------------------x

                                        New York, N.Y.
                                        November 13, 2019
                                        9:00 a.m.

Before:

                    HON. EDGARDO RAMOS,

                                        District Judge

                        APPEARANCES

GEOFFREY S. BERMAN,
        United States Attorney for the
        Southern District of New York
CHRISTOPHER DiMASE
NICHOLAS FOLLY
JULIETA V. LOZANO
        Assistant United States Attorneys

COVINGTON & BURLING LLP
        Attorneys for Defendant
BY:  ARLO DEVLIN-BROWN
        KATRI STANLEY
        -AND-
DAVID M. GARVIN

JBD3SCO1

1              (In open court; jury not present)

2              THE COURT:  Good morning, all.  Were the parties able

3     to make any progress yesterday in terms of documents?

4              MR. DiMASE:  Judge, the defense helpfully provided us

5     with a number of exhibits that it may introduce through the

6     government witnesses on cross, and we do have a series of

7     objections.  Some on the Bank of Ireland materials, but more on

8     the Locke Lord materials.

9              THE COURT:  Okay.

10              MR. DiMASE:  So, I don't know, there are, there are

11     nine exhibits that have been identified as likely to be

12     introduced on cross.  Obviously the defense reserves the right

13     to admit others, depending on the remainder of the direct.

14     But, of those nine, we object to the majority of them on mostly

15     hearsay grounds, that they, we believe they are being offered

16     so that the defense can argue the contents of them for their

17     truth, and they are basically, the majority of them are the

18     defendant's own statements in e-mails with Locke Lord.

19              So, our concern is that, obviously, they don't have an

20     equivalent ability to introduce the defendant's statements for

21     the truth.  The way the evidence should come before the jury is

22     in the form of the defendant's own testimony, if that's what he

23     chooses to do.  It would not be proper to admit those e-mails

24     for their truth, because the rules of evidence don't allow

25     that.  That's what it boils down to.

JBD3SCO1

1          MR. DEVLIN-BROWN:  Yes.  I think we might have to do

2     it on a more granular basis, your Honor.  But some of the

3     exhibits are things like Locke Lord invoices, his engagement

4     letter with the OneCoin related entities, his bills, those are

5     not offered for -- they're not declarations, for one thing, of

6     a person.

7          In terms of the e-mails, the problem with the

8     government's view is there is obviously lots of e-mail chains

9     that go back and forth, so there is sometimes statements in

10    them by Mr. Scott.  The particular e-mails that we know at this

11    point we want to put in are communications that Mr. Scott has

12    with Robert Courtneidge, who is the attorney at the firm who

13    handles cryptocurrency matters, and Ruja.  And the relevance of

14    these is not any statement that Mr. Scott makes in them.

15         There's a couple of things that are relevant.  One is

16    Ruja is giving instructions in some cases to Mr. Scott and/or

17    Robert Courtneidge about what each of them should be focused

18    on.  There is the assignment she gives to Mr. Scott, which

19    involves restructuring her corporate entities.  So that's the

20    understanding Mr. Scott has of what he's supposed to be doing

21    as a legal assignment.

22         The communications with Robert Courtneidge are

23    important, your Honor, for the very same state of mind reasons

24    that the government uses as a rationale for any time any

25    service provider or entity working in any way with Mr. Scott

1      says something negative, that should go to his state of mind.

2             So Robert Courtneidge is a cryptocurrency expert, he's

3      working on these same issues with Ruja and Mr. Scott, and he's

4      communicating things to Mr. Scott about what he's doing.  So

5      that gives Mr. Scott some understanding of what Mr. Courtneidge

6      is doing and if he's -- sort of an absence of evidence.  He's

7      not communicating in any of these six or eight communications

8      red flags or warnings or anything that would put Mr. Scott on

9      notice that he ought to be weary of OneCoin.

10            THE COURT:  Can those communications be put in in such

11     a way that Mr. Scott's statements can be redacted out?

12            MR. DEVLIN-BROWN:  We're certainly happy to redact

13     things.  And, I mean, the hearsay rule does not mean any words

14     coming out of anyone's mouth.  For example, a question is not

15     hearsay.  A statement of I am going to do X is not hearsay.  In

16     e-mail chains it is common, your Honor, for multiple parts of

17     the e-mail chains to be included so that the answer say from

18     Robert Courtneidge as to what he's doing can be understood.  If

19     we start redacting out every other line, it becomes a mess.

20            We have no problem in an appropriate case for either

21     redaction be made or the jury to be instructed it is not

22     offered for the truth of the matter asserted.  But I think

23     there is a lot that's relevant in the e-mails.  I think we're

24     happy to, if they are all objected to, we could hand up copies

25     to the Court.  You could have them while the direct continues,

and maybe that would put the Court in better position to make a

ruling before cross starts.  Happy to do whatever your Honor

wants.

MR. DiMASE:  Your Honor, I think it is not all of

them.  I tend to agree, the government tends to agree that a

contract would not fall into the category of hearsay.  The

billing records, as a general matter, we are not objecting to

those.  But the descriptions within them of the work performed

we believe was filled out by Mr. Scott, and it is self-serving

non-illegal descriptions of what he was doing.  That is core

hearsay, which we anticipate the defense will argue, hey, look,

he's doing restructuring work.  That's not illegal, so, you

should rely on that.  And I think that is core offering for

material offered for the truth, that is a defendant's

statement, and it is exactly what the hearsay rule is meant to

prevent.

I agree with Mr. Devlin-Brown it probably makes sense

for the Court to look at them.  So far we have nine exhibits.

It is not a voluminous amount.  I think we can address them as

we go.  And I agree as well that certain things are not

hearsay, depending on whether they are offered for the truth.

The concern we have, two concerns about the e-mail

threads, one is they're mixed up together.  There are

statements that may well be offered for the truth in the middle

of e-mails where there are other things that are discussed that

1    may not be hearsay.  It is a little more delicate than

2    introducing an entire e-mail or even a portion of it.

3              The second real concern we have with these Courtneidge

4    communications is that we have some e-mails with

5    Mr. Courtneidge and Ruja that Mr. Scott is not on suggesting

6    that he understood what was going on with OneCoin.  And --

7              THE COURT:  Suggesting?

8              MR. DiMASE:  That he understood that OneCoin,

9    effectively, was a fraud scheme and they needed to launder

10   money.  We don't want to make this a trial about Courtneidge.

11   But if the defense is going to start relying on communications

12   with him, then the government should be able to put these

13   e-mails in showing that he had some knowledge of what was going

14   on.  It is not really appropriate for the defendant to rely on

15   another co-conspirator's alleged lack of knowledge when there

16   is evidence that he knew.

17             THE COURT:  "He" being Courtneidge?

18             MR. DiMASE:  Courtneidge.  And the issue is we are

19   going to have a little mini trial then on Courtneidge's state

20   of mind.  Which is exactly kind of what we meant to prevent in

21   our motions in limine.  Just a distraction from the core issue

22   here.  That's another concern we have.

23             MR. DEVLIN-BROWN:  That raises a couple of questions,

24   maybe not all of which we need to answer right now.  But, the

25   government's provided long, long lists of co-conspirators.  I

966

JBD3SCO1

1    don't believe Robert Courtneidge was on it.  This is the first

2    I'm hearing another Locke Lord senior lawyer is alleged to be a

3    co-conspirator.

4              To be clear, there is lots of e-mails with Courtneidge

5    and Ruja that we have marked for identification, we actually

6    think could be appropriate.  There are e-mails in which

7    Mr. Courtneidge is told about the blockchain and has

8    communications with Ruja about an audit.  We are not trying to

9    offer those in evidence right now.  We don't he think we need

10   to do it through this witness.  We recognize that creates

11   different issues if Mr. Scott isn't on it.

12             But what e-mails Mr. Scott isn't on that either the

13   government wants to offer, we want to offer, I think that can

14   be taken up separately.  I think right now we are just focused

15   with this witness on communications Mr. Scott's involved in.

16             MR. DiMASE:  We're not alleging at this point that

17   Mr. Courtneidge is a member of the conspiracy.  I am just

18   saying there are e-mails that show some knowledge on his part

19   that it seemed relevant to the argument that the defense is

20   making that Mr. Scott somehow relied on Mr. Courtneidge's

21   advice.  I'm not saying that they would come in as

22   co-conspirator statements.  I think they would be needed for

23   the jury to understand Mr. Courtneidge's role.  And especially

24   if the defense is relying on his advice as part of their

25   defense.

JBD3SCO1

1          That's really the crux of the problem here, is that

2     even if Mr. Scott is on an e-mail with Mr. Courtneidge, we're

3     now getting into an area of what Mr. Courtneidge knew or didn't

4     know.  I'm very concerned this drags us in into a sideshow.

5          THE COURT:  I take it Mr. Courtneidge will not be

6     called as a witness.

7          MR. DEVLIN-BROWN:  He's not available to us.  He lives

8     in the U.K.  He is no longer with Locke Lord.

9          MR. DiMASE:  I don't think that he's in London means

10    he's not available.  We had a witness come from London.

11         MR. DEVLIN-BROWN:  We don't have the MLAT.

12         And there is other Locke Lord witnesses, James Channo,

13    who we explored whether he would be available.  The

14    government's interviewed him.  He is not available to us.

15         In any event, I don't think the Courtneidge would

16    become a sideshow.  If the government is correct and there is

17    evidence that Mr. Courtneidge was suspicious, that's fine with

18    us.  We don't particularly care about that one way or the

19    other.  But again, I don't know we need to resolve it right

20    now.

21         MR. DiMASE:  There may be an e-mail, I'm not

22    100 percent sure, that Mr. Courtneidge is on in the

23    government's exhibits, but we are not intending to focus on him

24    at all.  The direct is about Mr. Scott and his involvement in

25    this while he was at Locke Lord.  That's what the trial is

JBD3SCO1

about.

THE COURT:  I'll see the e-mails.

MR. DEVLIN-BROWN:  I'll confer with them to see if I
have the list.

MR. GARVIN:  There is one other matter.  The
government has stated that they intend to call a witness to put
a timeline in today.  And the timeline has been provided, but
the defense objects to calling a witness for this particular
timeline.  Because while we recognize that summary witnesses
are absolutely permissible, in this particular case, it's not a
question of taking let's say a large volume of bank records and
then adding up all of the deposits or all the checks and
reporting back the total number is X or Y.

In this particular case, the timeline relies upon over
100 different e-mails.  And what the person is testifying to,
or we expect, is a brief summary as to the date and the subject
matter of each or many of these e-mails.  The totality of that
testimony and the exhibit is the equivalent of closing
argument.  It's not a summation of all bank records or a
summation of all tax returns or a similar type of voluminous
records being summarized for the jury so they don't have to
wade through a quagmire of documents.

So, we are placing the government on notice, and we
would ask that this timeline not be admitted, and the witness
who is being called, I believe it is Mr. Kroll who is an agent,

JBD3SCO1

1    not be permitted to testify, and treat this timeline as a

2    summary exhibit of a summary witness.

3           MR. FOLLY:  Your Honor, it might be helpful if I could

4    pass up the exhibit that's being referred to.

5           THE COURT:  Sure.

6           MR. FOLLY:  So we first produced the timeline, your

7    Honor, last week.  We've heard nothing from defense counsel

8    until right now that they had any objection to any testimony

9    connected to this timeline.

10          Our next witness is Nicholas Kroll who we intend to

11   have testify, he's an FBI agent, who we intend to have testify

12   about the contents and creation of the timeline, as well as the

13   exhibits referenced on the timeline.

14          So, the timeline encompasses a broad range of

15   evidence.  It includes summaries of voluminous bank records,

16   wire transfers, it includes incorporation dates, it includes

17   travel dates, and it also includes e-mails.

18          And it's, in our view, a helpful summary exhibit in a

19   case that is quite complex and has a large volume of bank

20   transactions, e-mail correspondence, travel, and is quite

21   frankly difficult without seeing it in one place to track.

22          In addition to that, we've tried our best, and this is

23   why we provided to defense counsel to get their view on it,

24   we've tried our best to keep this far from what a closing would

25   be.  The entries on the timeline are generic.  They state

JBD3SCO1

1  things like e-mail correspondence between so-and-so, Ruja

2  Ignatova and Mark Scott, or e-mail correspondence re and

3  include what the subject line of the e-mail was.  Or in some

4  cases, they quote directly from the actual e-mail

5  communication, which obviously will be in evidence and

6  available to the jury.  So, it's not intended to be a closing.

7  There's no argument on it.

8          It is helpful because it illustrates a broad range of

9  records that would otherwise be difficult for the jury to

10  compile and put together.  And we view this as an appropriate

11  exhibit, we have used similar exhibits in other white collar

12  trials fairly routinely.

13          And for those reasons, we believe it is admissible and

14  should come in through this witness when he testifies as our

15  next witness.

16          THE COURT:  Obviously this is a complex case, the

17  alleged conspiratorial actions took place over a number of

18  years, involving several continents, and hundreds of e-mails

19  and a lot of financial transactions, so the concept of a

20  summary chart in a case like this is not surprising.

21          I note that for a summary chart, it is pretty

22  complicated itself.  But, particularly on page two, the

23  6/22/2016 e-mail, Scott e-mail, quote, let's not e-mail over

24  stuff.

25          That's argument, presumably.  Arguably, rather.

1            MR. FOLLY:  That's a direct quote from an e-mail.

2            THE COURT:  I understand.  I understand.  But it's a

3       little bit more than what was represented, at least in respect

4       to summaries.

5            At base, I think it's admissible in a case like this.

6       I'm inclined to let it in.  But I would caution the government

7       in terms of how much they plan to do with the witness on the

8       stand.

9            MR. DEVLIN-BROWN:  Your Honor, we understand the

10      Court's ruling.  We do understand there is going to be a

11      summary bank witness records person, and that makes perfect

12      sense.  We have thousands of pages, let's just see what the

13      bank records show.

14           Our real objection to this, in addition to the point

15      your Honor noted that there are characterizations in here, is

16      it is just a selection of let's take a few trips we like of

17      Mr. Scott's.  Let's take some e-mails that we like and let's

18      piece it together in to a narrative that we like.  It is not a

19      summary of all of the government's documents or all of the

20      trips that Mr. Scott took in evidence.  It is a selection.  And

21      that's why it really does seem more in the nature of summation.

22           Our other concern, Mr. Folly is right that we did get

23      a draft of this last week.  There was maybe going to be a

24      witness last week testifying about it.  We didn't hear anything

25      further.  Last night, actually probably in the wee hours of

JBD3SCO1

1    this morning, we got the, quote unquote, final e-mailed to us,

2    and then this morning another, quote unquote, final e-mailed to

3    us, which we don't have a printed copy of it yet.  It is going

4    to be hard for us to effectively cross this witness today, when

5    we're getting the piece of evidence he's testifying about this

6    morning.  We'll do it, but it's going to be a little bit

7    plodding as we go document by document through it.

8            I would suggest if there is leeway in the government's

9    schedule, to maybe swap the order a little bit and do something

10   else first.

11           THE COURT:  I don't know how much substance the agent

12   is going to have with respect to all these e-mails beyond --

13   presumably, all of these e-mails, all of these documents are in

14   evidence at this point.  Everything that's on this chart?

15           MR. DEVLIN-BROWN:  I'll leave that to the government.

16           MR. FOLLY:  Your Honor, many of these documents are

17   going to be offered pursuant to stipulations between the

18   parties contemporaneous with his testimony.

19           THE COURT:  So then by the time he testifies about

20   this document, they'll all be in evidence?

21           MR. FOLLY:  Our intention is to offer those documents

22   at the start of his testimony.

23           THE COURT:  Okay.  The answer to my question is yes,

24   when he testifies about this chart, it will all be in evidence.

25           MR. FOLLY:  That's our intention, your Honor, yes.

JBD3SCO1

1        MR. DEVLIN-BROWN:  Okay.  We'll have to obviously look

2    at which things on the chart are not in evidence and see, we'll

3    do that.

4        THE COURT:  Anything that's not in evidence should not

5    be in the summary chart.  Obviously the summary chart is a

6    summary of evidence.  Okay.  Anything else?

7        MR. DiMASE:  Just one moment, your Honor.

8        MR. GARVIN:  There was one very slight matter we

9    noticed this morning that Exhibit 1032 inadvertently was not

10   redacted to remove Mr. Scott's personal cell phone number.  So,

11   I have spoken with Mr. DiMase and to remind him not to publish

12   that so that the public can see his personal telephone number.

13       MR. DiMASE:  We will make sure to do that, your Honor,

14   not to publish it to the audience.  And I asked Mr. Garvin to

15   remind me when I mention that exhibit number in case I forget.

16   And I'd like to hand up to the Court four exhibits regarding

17   the issue around Robert Courtneidge we discussed earlier.  The

18   Court can look at them along with the exhibits provided by the

19   defense.

20       THE COURT:  Okay.

21       MR. DiMASE:  These are not in evidence.  These are

22   just marked.

23       MR. DEVLIN-BROWN:  The one thing I'll say about these,

24   your Honor, that Mr. DiMase has just handed up.  Again, we

25   hadn't intended especially through this witness to do things

1    that don't involve Mr. Scott.  These e-mails between

2    Courtneidge and others do, as Mr. DiMase suggests, reflect that

3    at least at an early stage perhaps Mr. Courtneidge had some

4    questions or concerns.  There are a bunch of e-mails later that

5    totally undercut this and suggest he's comfortable with it.  We

6    can hand up some of those as well.

7            Again, I don't know how much we really need to resolve

8    the non-Mark Scott e-mails with this witness.  I'll hand up the

9    ones that we mentioned earlier.  And before Courtneidge takes

10   the stand, I'll make sure your Honor has essentially every

11   exhibit we may get into in case we have to offer more.

12           MR. DiMASE:  Judge, one other very quick point.  With

13   the Court's permission, we'd like to offer and publish one

14   exhibit before beginning with the witness this morning that's

15   not directly relevant to the witness's testimony.  So in other

16   words, before he begins testifying, publish this exhibit.  I've

17   already let the defense know that we plan to offer this

18   exhibit.  I'll check with Mr. Devlin-Brown to see if they have

19   any objection.  It will take two minutes.

20           THE COURT:  Okay.  Any objection?

21           MR. DEVLIN-BROWN:  Which exhibit?

22           MR. DiMASE:  1242.

23           Mr. Devlin-Brown tells me that the defense will not

24   object to that exhibit.

25           THE COURT:  Okay.

JBD3SCO1

1            (Recess)

2            MR. FOLLY:  Your Honor, could we quickly flag one

3    issue about the timeline?  Your Honor was inquiring about

4    whether all of the exhibits that were on it will be in evidence

5    before he testifies.

6            THE COURT:  At the time he testifies about the chart.

7            MR. FOLLY:  Yes, your Honor.  Right.  There are a

8    couple of select exhibits he will actually be introducing based

9    on his personal knowledge.  He went and basically verified the

10   contents of certain web pages that he will be introducing, so

11   those will come in through his testimony, not before he starts

12   testifying.  Just to clarify.

13           THE COURT:  Is Mr. Reeder here?

14           MR. FOLLY:  Yes, your Honor.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

JBD3SCO1

```
 1            (Jury present)

 2            THE COURT:  Good morning, everyone.  Ladies and

 3   gentlemen, I hope you had a wonderful evening, thanks for

 4   always being so prompt.

 5            Mr. DiMase.

 6            MR. DiMASE:  Thank you, Judge.  Before we resume with

 7   Mr. Reeder's testimony, the government would like to offer

 8   Government Exhibit 1242 into evidence.

 9            MR. DEVLIN-BROWN:  No objection.

10            THE COURT:  That exhibit will be received.

11            (Government's Exhibit 1242 received in evidence)

12            MR. DiMASE:  Mr. Barile, could you publish Government

13   Exhibit 414, please, already in evidence.  This is an e-mail

14   from Giselle Valentin to Ashley Yates entitled Swift.  Asking

15   "Would you be able to get us the Swift confirmation for the

16   wire we did yesterday?  Please advise."  Dated September 13,

17   2016.

18            And you could now take that down, and pull up

19   Government Exhibit 417.  This is an e-mail from Ashley Yates,

20   senior service representative at Sabadell United Bank dated

21   September 13, 2016 to Giselle Valentin or GValentin@ZalaGroup.

22   "this is the only thing I have to send you."

23            If you could go down to the attachment, Mr. Barile.

24   And if you could, thank you.  The originator listed on this

25   attachment is Fates Group LLC and the amount 4,990,185.
```

1           Mr. Barile, could you pull up Government Exhibit 1242

2   now in evidence on the right side of this screen.  The bottom

3   of this chain there is an e-mail from Dave Van Duynhoven to

4   Mark S. Scott and David Pike.  Incoming funds, subject line,

5   "incoming funds from Fates Group LLC."  Dated September 13,

6   2016.  "Hi Mark, details below.  Mellon United Bank in Miami.

7   Regards Dave."

8           Could we go to the next page of this exhibit.  Could

9   you focus in on the ordering customer and the amount.  Ordering

10  customer is listed as Fates Group LLC.  And the amount

11  $4,990,185.

12          Could you please go back to the first page,

13  Mr. Barile.  At the top, could you -- this is an e-mail from

14  David Pike to MSScott@MSICBVI.com.  Tuesday, September 13,

15  2016.  Subject line "incoming funds from Fates Group LLC."  And

16  Mr. Pike writes:  "Is it an issue that he's sending money from

17  the U.S.?"

18          We can take that down.

19   CHARLES REEDER,

20      called as a witness by the Government,

21      having been previously sworn, testified as follows:

22  DIRECT EXAMINATION (Continued)

23  BY MR. DiMASE:

24  Q.  Mr. Reeder, good morning.

25  A.  Good morning.

JBD3SCO1                          Reeder - Direct

1   Q.  Sorry for that interruption.  Yesterday, you were

2   testifying regarding some wire transfer documents and bank

3   records.  Do you recall that?

4   A.  Yes.

5   Q.  And also some e-mails?

6   A.  Yes.

7   Q.  And those regarded a transfer into the firm's escrow

8   account in approximately February of 2016?

9   A.  Yes.

10  Q.  And that was for somewhere approximately around $5 million?

11  A.  Yes.

12  Q.  And you testified yesterday that the individual who signed

13  the form approving the inbound transfer into the account was

14  Mr. Scott.  Do you recall that?

15  A.  Yes.

16  Q.  Why don't we pull up just to situate ourselves, Government

17  Exhibit 2035 again in evidence.

18          This is the form that you were testifying about

19  yesterday, Mr. Reeder?

20  A.  Yes.

21  Q.  And just to situate ourselves again, the client name here

22  was Zala?

23  A.  Yes.

24  Q.  The matter name was iCard?

25  A.  Yes.

JBD3SCO1                          Reeder - Direct

1    Q.  And the amount again $5,116,458?

2    A.  Yes.

3    Q.  And the listed purpose of this inbound transfer was

4    retainer?

5    A.  Retainer, yes.

6    Q.  You testified yesterday about what that means.  You

7    remember that?

8    A.  Yes.

9    Q.  And again, it's signed at the bottom on February 2nd, 2016,

10   by Mark Scott.

11   A.  Yes.

12          MR. DiMASE:  Okay.  So, we then I think covered page

13   four of this document.  If you could zoom in, Mr. Barile, on

14   the bottom, actually the entire e-mail if you wouldn't mind.

15   The entire bottom e-mail.  Thank you.

16   Q.  The two separate transfers constituting the $5 million and

17   change.  Do you recall this?

18   A.  Yes.

19   Q.  Did these two transfers came from Zala Group LLC?

20   A.  Yes.

21   Q.  And where did you say, based on your review of the records,

22   you understand these transfers were deposited, into what

23   account?

24   A.  Our operating account.

25   Q.  I think where we left off yesterday was I was asking you

1    would it be typical for client funds of this sort to be

2    transferred into the operating account.

3    A.   Typically, retainers would go into the trust account, not

4    the operating account.

5    Q.   You said yesterday the operating account is the account

6    used for the daily expenses of the firm, right?

7    A.   That's correct.

8    Q.   And so, one sort of client that could come into the

9    operating account would be fees for legal services?

10   A.   Correct.

11   Q.   I think you testified that a retainer was sort of an

12   upfront payment for future fees that would go into typically

13   the trust account instead?

14   A.   Yes.

15   Q.   And I think you testified that the trust account is an

16   account for holding client funds for various different

17   purposes?

18   A.   Yes.

19            MR. DiMASE:   Why don't we go to page nine I believe.

20   And maybe it's page 11.  If you can scroll down a few more

21   pages, Mr. Barile.  At the bottom there, this is page 11 of

22   Government Exhibit 2035.

23   Q.   Again, who is Ms. Trivitt?

24   A.   Oh, she works in the accounting department.  Specifically

25   receipt of funds.

JBD3SCO1                        Reeder - Direct

1    Q.  At the bottom she says to Mr. Scott, we received these two

2    wires below should these be put into -- sorry.  Put in trust

3    account.  And Mr. Scott responds, "Yes, please.  Adriana has

4    the paperwork.  Thanks."

5          What do you understand this communication to be about?

6    A.  To move the funds from the operating account to the trust

7    account.

8    Q.  If we could go to page nine of this exhibit.  Mr. Scott

9    says to Ms. Trivitt in connection with a question about these

10   funds correct approved.  Thanks, all.

11         Why don't we now go to page two of the same exhibit.

12   And if you could just zoom in -- thank you.  What does this

13   document show?

14   A.  It shows a movement of funds from the Chase or JPMorgan

15   Chase operating account to the trust account.

16   Q.  So, the operating account was held at JPMorgan Chase?

17   A.  Yes.

18   Q.  And the trust account was held at what bank?

19   A.  I think it was Northern Trust.

20   Q.  Why on the right does it say Edwards Wildman Palmer LLP

21   instead of Locke Lord?

22   A.  We merged with -- or I should say Locke Lord merged with

23   Edwards Wildman Palmer in January of 2015.  And we were in the

24   process of moving things around at this point in time.  This is

25   obviously an account that had not been changed yet.

JBD3SCO1                          Reeder - Direct

1   Q.  What was the amount that was moved over from the operating

2   account to the trust account?

3   A.  $5,116,458.

4   Q.  That was the same amount originally sent in by Zala Group?

5   A.  Yes.

6   Q.  It says at the bottom "client advance."  Do you see that?

7   What does that refer to?  What does that mean?

8   A.  I am -- yeah, the client had advanced these funds, but

9   they're client funds.

10  Q.  Does that, does "client advance" have a similar meaning to

11  retainer or not necessarily?

12  A.  I would say that's more of a general term for any funds

13  that are moved into the trust account.

14  Q.  Okay.  By the way, you saw the name Adriana Salcedo in some

15  of these e-mails?

16  A.  Yes.

17  Q.  Was she an employee at Locke Lord?

18  A.  Yes.

19  Q.  Do you know exactly what role?

20  A.  I do not know.

21  Q.  Do you know what office she worked in even?

22  A.  It's my understanding she was in the Miami office.

23  Q.  Do you know if she was a lawyer versus a support person?

24  A.  I don't know for sure.

25          MR. DiMASE:  At this point, your Honor, I would offer

1      two additional exhibits, Government Exhibits 1374 and 1375 into

2      evidence.

3                 THE COURT:  Any objection?

4                 MR. DEVLIN-BROWN:  Just one moment, your Honor.

5                 MR. DiMASE:  Mr. Barile, could you pull up 1374 just

6      for the parties.

7                 MR. DEVLIN-BROWN:  I got it.  Thank you.  No

8      objection.

9                 THE COURT:  Those exhibits will be received.

10                (Government's Exhibit 1374, 1375 received in evidence)

11                MR. DiMASE:  Mr. Barile, you can go ahead and publish

12     this since it's now in evidence.

13     Q.  Mr. Reeder, the e-mail at the bottom of this exhibit.

14     That's the same e-mail -- sorry.  Mr. Barile, if you could

15     actually include the from and to.

16                That's the same e-mail we were reviewing a moment ago

17     showing the two inbound wire transfers from Zala Group?

18     A.  Yes.

19     Q.  If we can zoom out.  At the top, it shows that this e-mail

20     is from Mark Scott to Gilbert Armenta dated February 3, 2016.

21     Subject forward Zala Group.  And Mr. Scott writes "See below.

22     Wires in.  You can also send some to my PL account in escrow if

23     you like."  It's signed by Mark S. Scott.

24                MR. DiMASE:  Mr. Barile, can you pull that down.  And

25     put up 1375, please.  You can publish this to the jury as well.

JBD3SCO1                    Reeder - Direct

1   Q.  To be clear, Mr. Reeder, had you ever seen the top e-mail

2   in that thread that we just looked at, Government Exhibit 1374,

3   before today?

4   A.  I'm sorry, the top of 1374?

5   Q.  The top e-mail between Mr. Scott and Mr. Armenta, had you

6   ever seen that e-mail?

7   A.  I don't remember seeing that.

8             MR. DiMASE:  Let's now look at Government Exhibit

9   1375.  And the bottom e-mail in this thread which is on page

10  one.  If you could scroll all the way down to the bottom,

11  Mr. Barile, briefly.  Go up to the top, the second e-mail which

12  begins on page one, please.  If you could expand the bottom

13  portion.

14  Q.  This is an e-mail from business banking Manu Mishra e-mail

15  Mishram@emiratesNBD.com dated February 3, 2016.  It says to

16  local service agent.  Subject re Emirates NBD Bank MS Zala

17  Group Limited.  It is states:

18            Dear sir.  Greetings.  Please provide below mentioned

19  documents/certification to process account opening of M/S Zala

20  Group Limited.  Please provide few names of clients, provided

21  one are in the field of legal firms.

22            And at the bottom of this page one of the clients in

23  red is Mark S. Scott PL, partner, country U.S.A. and

24  international, Locke Lord LLP.  And it provides an address here

25  for the firm.

1          If you could go up to the top, Mr. Barile, of this

2     e-mail.  The top e-mail is from Diane Cook to Younes, I'm not

3     going to try to pronounce his last name, A-B-D-U-L-K-A-R-I-M,

4     and it copies Gilbert Armenta at two different addresses.  It

5     is dated February 3 of 2016 and the subject line is "Zala Group

6     KYC for Emirates NBD, responses."  It states, "Dear Younes,

7     please find responses to the questions in red and supporting

8     documents attached.  Best regards, Diane Cook Zala Group."

9          Let's now turn to Government Exhibit 2037.  This is in

10    evidence so it can be published to the jury.

11    Q.  Directing your attention -- what is this document,

12    Mr. Reeder?

13    A.  It is a bank statement for the trust account from Northern

14    Trust.

15    Q.  The Edwards Wildman account?

16    A.  Yes, the Edwards Wildman account.

17    Q.  What does it show down in the transaction section, the

18    transaction of February 5?

19    A.  $5,116,458 deposited.

20    Q.  So this is the same money moving from the operating account

21    to the trust account.  Is that right?

22    A.  Yes.

23          MR. DiMASE:  At this stage, your Honor, the government

24    offers Exhibits 1376, 1378 and 1405 in evidence.  Give

25    Mr. Devlin-Brown a moment to look at those.  Mr. Barile, if you

JBD3SCO1                          Reeder - Direct

1    can make sure not to publish these to the jury at this stage.

2              MR. DEVLIN-BROWN:  No objection.

3              THE COURT:  Very well.  They'll be received.

4              (Government's Exhibit 1376, 1378, 1405 received in

5    evidence)

6              MR. DiMASE:  Starting with Government Exhibit 1376.

7    This is an e-mail from Mark S. Scott dated February 15, 2016 to

8    Gilbert Armenta, subject line "And maybe best not to

9    communicate on this line about banks, etc."

10             MR. DEVLIN-BROWN:  Objection.  That was misread I

11   believe.

12             THE COURT:  Reread that.

13             MR. DiMASE:  I apologize.  Mr. Devlin-Brown is right.

14   "And maybe best to communicate on this line about banks, etc."

15   And that's an e-mail from MSScottlaw@gmail.com.

16             Can we zoom out.  And let's go to 1378, please.  Could

17   we scroll to the bottom of this to the e-mail, thank you.  All

18   the way down underneath.

19             This is an e-mail from GValentin@Zalagroup to

20   MarkScott@LockeLord.  Copying mio6303@gmail dated February 16,

21   2016.  Subject "engagement letter for Germany and funds

22   returned to Zala Group LLC."  It states:  "Hi Mark.  Spoke to

23   Gilbert.  He doesn't mind signing the engagement letter but

24   it's not addressed to him.  If you can get the letter addressed

25   to Gilbert we can sign/return today.  Also, please note Gilbert

1    would like to funds Zala wired to Locke Lord returned.  The

2    total funds wired are 5,116,458 USD.  This is a total of two

3    separate wires completed on February 2 in the amount of

4    3,644,346 USD and another for 1,472,112 USD.  Please note our

5    wire instructions below."  And it indicates account of Emirates

6    NBD Business Banking, account name Zala Group Limited.  And it

7    contains an IBAN number, customer ID, a branch at Sheikh Zayed

8    Road, branch 4111, and a Swift code.

9            The second e-mail in the thread is from

10   MarkScott@LockeLord.com.  "Hi Giselle, whom was it addressed

11   to?  JSC?  If so please make them sign.  G controls the bank

12   and is on the board.  As to the escrow refund, do these amounts

13   include the funds for the iCard1 purchase price?  If we do

14   this, I have to inform them of those fact.  Just want you to be

15   aware.  Also, where did the funds originate from when we

16   received them?  Same bank we are sending the back to?"

17           And let's go up to the top.  This is an e-mail from

18   Gilbert Armenta to Mark Scott copying Giselle Valentin on

19   February 16, 2016.  Gilbert writes, "Mark, really, you are

20   asking these questions regarding iCard and bank information,

21   really?" With five or six exclamation points.  "All the best,

22   Gilbert Armenta."

23           Let's now turn to Exhibit 1405.  If you can scroll

24   down, Mr. Barile.  So, the bottom e-mail is February 16, 2016

25   from MSScottlaw@gmail.  And it does not appear to have any

JBD3SCO1                         Reeder - Direct

1    content.

2              If you could, Mr. Barile, go to the very top of the

3    e-mail and just indicate what the subject line of this thread

4    is.  "Re call with this wire stuff.  Don't have your assistant

5    give me vague instructions.  My ass on the line on this."

6              Let's go down to e-mail above the bottom e-mail.  This

7    is from GArmenta@ZalaGroup to MSScottlaw@gmail.com dated

8    February 16, 2016.  "On the line for what, Mark, you make sound

9    like there is issue.  There was not vague instructions."

10   Exclamation point, exclamation point.

11             If we can go to the top and we can expand the top

12   e-mail here.  And just focusing on the third paragraph.  "As to

13   other funds I can't have an assistant instruct me to wire

14   millions of dollars.  Need for you to e-mail me that says you

15   need to deploy them differently than expected."

16             Okay.  If you could pull that down and we can go to

17   the next, just the next paragraph.  "We should speak generally

18   about legal sometime as well.  Things are often being rushed

19   from my perspective and I am not given an opportunity to

20   provide you with advice.  Bill has taken over as the amateur

21   attorney on LOIs and you are overlooking potential pitfalls in

22   some cases.  You wanted things as clean as possible going

23   forward.  Would love to help."

24             And then if you can pull that down.  Please read,

25   expand the very first paragraph of this e-mail.  "Not sure why

1   you are treating me like the enemy lately.  I am trying to help

2   so we have clean documentation.  It is an internal firm thing.

3   Same as when you deal with a bank."

4              And then the very final paragraph or sentences of this

5   e-mail.  "will work on escrow.  Please send appropriate

6   instructions even replaying to Giselle's e-mail and confirming

7   it."

8              Let's go to GX Government Exhibit 2042.

9   Q.  Have you seen any of those e-mails we just went through,

10  Mr. Reeder, prior to today?

11  A.  No.

12  Q.  Are you familiar with Government Exhibit 2042?

13  A.  Yes.

14  Q.  What is the first page of this exhibit?

15  A.  Pardon?

16  Q.  What is the first page of the exhibit?

17  A.  Oh.  Trust account withdrawal form.

18  Q.  What is the client matter name?

19  A.  Zala iCard.

20  Q.  What is the amount listed here?

21  A.  $5,116,458.

22  Q.  That's the same amount that came into the operating account

23  and then was transferred to the trust account?

24  A.  Yes.

25  Q.  At the bottom it says "Partner or CMA signature" and

JBD3SCO1                         Reeder - Direct

1    underneath it is a printed name.  What's the name listed there?

2    A.  Mark Scott.

3    Q.  There is a place underneath Mr. Scott's name that says

4    second partner signature.

5    A.  Correct.

6    Q.  Do you know who Mark David Adams is?

7    A.  Yes, he's an attorney in Florida.

8    Q.  Is there a requirement for certain outbound transactions

9    for a second lawyer at the firm to approve?

10   A.  Yes.

11   Q.  This is dated February 18 of 2016?

12   A.  Yes.

13   Q.  Let's go to page eight of this document.  The e-mail here

14   at the bottom, that's the same e-mail from Ms. Valentin

15   requesting the transfer that we saw in earlier e-mails; is that

16   right?

17   A.  Okay.

18   Q.  Is that right?

19   A.  Yes.

20   Q.  Mr. Reeder, were the funds requested to be returned to the

21   region's bank accounts from which they were sent?

22   A.  No.

23   Q.  Where were they, where did the client ask for the funds to

24   be sent?

25   A.  It was a bank in Emirates.

JBD3SCO1                          Reeder - Direct

1   Q.  I'm sorry?

2   A.  It was a bank in the Emirates.

3   Q.  United Arab Emirates?

4   A.  Yes.

5   Q.  Do you know in what place within the UAE?

6   A.  I don't see it listed.

7   Q.  And the bank was Emirates NBD Business Banking or Emirates

8   NBD Bank?

9   A.  Yes.

10          MR. DiMASE:  Let's go up from here.  Scroll up.  The

11  next e-mail in the chain at the bottom Mr. Scott writes

12  Ms. Salcedo on February 16 "Please see below.  Where did we

13  receive the money from.  Let's prepare and let me see first."

14  And then he says "We still have the original iCard funds after,

15  correct" question mark.

16          Let's go up and let's focus in on the next e-mail.

17  Ms. Salcedo responds in part "I'm not aware of the money

18  received.  I'm not kept in the loop of this unless you yourself

19  let me know.  I've forwarded to Sue to look into.  I'll get

20  back to you."

21          Let's go up to the next e-mail.

22  Q.  And Mr. Scott responds to Ms. Salcedo.  Could you read what

23  Mr. Scott said?

24  A.  "We spoke about these funds and you forewarned them that it

25  was coming.  Don't scare me now."

1    Q.   There is a smiley face at the end?

2    A.   Smiley face, yes.

3         MR. DiMASE:   You can pull that one down and continue

4    up.  Ms. Salcedo responds, "Okay, phew, you're scaring me.  Yes

5    two wires came in on February 2, see attached and below amount.

6    They came in from Zala Group LLC.  Total $5,116,458.  Please

7    confirm where we're reversing these funds and wiring back to

8    Zala as per their instructions."

9         So, go up.  Adriana writes again "Mark, per the below

10   please confirm we are reversing this wire."  Mr. Scott says in

11   response "yes, please."  And that's on February 17.

12        Can you zoom in on the next e-mail.  The next two, I

13   guess.  Ms. Salcedo says, "Hi Sue.  As per Mark's confirmation

14   and approval, let's reverse these funds."  And in response Sue

15   Neary writes, "Please call me as soon as you get back.  This

16   may not get out today.  It requires two authorized signatures

17   to send the wire and Mark Adams has some questions.  On the

18   bank side over a million dollars requires special authorized

19   signers and then it will go through the international

20   department."

21        If you go up.  This is an e-mail on February 17, 2016

22   from Ms. Salcedo.  In part, "Mark Adams and Rick Miller would

23   like a little bit of more information as to why this is being

24   sent back out to the client. "

25        We can go up.  And this is an e-mail from Mr. Scott to

1    Ms. Salcedo dated February 17.

2    Q.  Mr. Reeder, can you read Mr. Scott's response?

3    A.  "Thanks.  Not sure why funds are bring pulled back?  I have

4    to assume that the financial requirements of the purchase

5    target have changed or will simply be used for another

6    transaction that is more urgent.  I can forward the client

7    request as well."

8    Q.  Okay.  Pull that down.  Just the top e-mail there.  This is

9    an e-mail from Ms. Salcedo to Ms. Neary dated February 17,

10   2016.  "FYI his response as to why wiring funds out."

11            By the way, who is Ms. Sue Neary if you know?

12   A.  She worked in the accounting department.

13   Q.  Let's now go to page nine of 2042.  Mr. Reeder, what is

14   this document?

15   A.  I'm sorry, what?

16   Q.  What is this document here, page nine.

17   A.  Oh.  Looks like the credit and debit information on a wire

18   transfer.

19   Q.  This is the five million and change going out of the trust

20   account?

21   A.  Yes.

22   Q.  And what date is it?

23   A.  This is, oh, February 18, 2016.

24   Q.  Beneficiary party is Zala Group Limited.  And do you see

25   where it says where the bank is located?

1    A.  Yes.  Dubai.

2    Q.  Did this money in fact get transferred out to the Dubai

3    account based on what you're seeing here?

4    A.  Yes.

5    Q.  Are you familiar with the procedures in place at Locke Lord

6    regarding transfers in and out of trust accounts, policies and

7    procedures as deputy COO?

8    A.  At this moment in time I was not deputy COO, so I was not

9    aware of all the procedures at that time.

10   Q.  Today, are you in your role as deputy COO?

11   A.  Yes.

12   Q.  Is there anything about this particular transaction that

13   would give you concern in your current role, based on the

14   policies and procedures at Locke Lord?

15   A.  It would raise questions that the funds came in from one

16   entity and are going out to another entity.

17   Q.  Well, just to be clear, the entity is the same, Zala Group,

18   on either end.  So is it the entity or is it the bank account

19   that it was reversed into?

20   A.  Well, I'd say a little bit of both.  But the other entity

21   was Zala something LLC this is Zala Group Limited.  That would

22   raise questions.

23   Q.  So the fact that the two entities have different names and

24   the fact that they are in different banks?

25   A.  Yes.

1   Q.  Would give concern?

2   A.  Yes.

3   Q.  What kind of concern would that raise?

4   A.  That it's being wired properly and we're carrying out the

5   request of the client.

6   Q.  What would be the nature of the underlying concern about

7   money coming from one entity and one bank into the trust

8   account and going out to another entity and bank account?

9   A.  Misuse of the trust accounts.

10  Q.  Misuse in what fashion?  What are the underlying concerns?

11  A.  Well, all of this is dealing with money laundering.

12  Q.  Were there additional e-mails several months later

13  regarding this $5 million transaction that you've reviewed?

14  A.  Yes.

15          MR. DiMASE:  Let me ask you to look at Government

16  Exhibit 2038.  We can just scroll down to the bottom.  This is

17  in evidence.  Mr. Barile, if there is a way to sort of show the

18  bottom -- yeah.  Page one and the top of page two.

19          This is an e-mail from Sue Neary to Adriana Salcedo

20  dated May 17, 2016.  Sue writes, "Adriana, Northern Trust Bank

21  just called me and the have a few questions regarding big Zala

22  wire back in Feb for 5,116,458 as part of audit.  They are

23  asking what line of business that Zala is in."  At the bottom

24  the address for Zala and it says purpose of the transaction.

25  If we can go up.

1          On May 17, Ms. Salcedo forwards the e-mail to

2    Mr. Scott.  "Hi Mark.  Please see below re the Zala wire(s)

3    back in February.  I went ahead and filled out the business

4    address on file for them.  Thanks."

5          If we can go up.  And Mr. Scott responds "thank you."

6          Let's turn to 2039 in evidence.  Just going to the

7    e-mail there at the bottom of page one.  This is on May 17 from

8    Adriana Salcedo to Mark Scott.  "The bank called again.  Can

9    you please let me know the below.  The line of business that

10   Zala is in.  The purpose of the transaction.  Thank you."  Go

11   up.

12   Q.  And what did Mr. Scott respond to that e-mail, Mr. Reeder?

13   A.  "Have them contact me.  Would like to know what the issue

14   is here."

15   Q.  Above that e-mail Ms. Salcedo says in response "It is an

16   audit, no real issue.  Sue will have them call you directly."

17          MR. DiMASE:  Let's turn to Exhibit 2040.  If you

18   can -- sorry, Mr. Barile, if you can make sure to capture

19   bottom with the signature line.  This is an e-mail from Corinne

20   Seitz who is listed in the signature line as senior vice

21   president at MTRS.com.  She writes to Mark Scott, "Mr. Scott, I

22   was given your name by Sue Neary in the hopes you can help me

23   with an audit I am working on.  On February 18, 2016 Locke Lord

24   LLP originated a $5,116,458 wire transfer that benefited the

25   account of Zala Group Limited.  In order to complete the audit

1    I need to answer the following questions."  And it sets forth a

2    series of questions.  "Any information that you can provide

3    would be beneficial in understanding this transaction or wire

4    party would be greatly appreciated."

5              Let's pull this down and look at Government Exhibit

6    2041.  In middle of the e-mail there, Ms. Salcedo writes to

7    Mark Scott on May 24, "Did you ever return the Northern Trust

8    call?  I believe today is the deadline.  They are running an

9    audit and just have a few questions.  Please call them back."

10   Lists a number for Corinne.  Go to the top.

11   Q.  What does Mr. Scott say in response to that e-mail?

12   A.  "Yes.  Called."

13   Q.  Mr. Reeder, I'm going to ask you to now look at Government

14   Exhibit 2004.  If we can go down to the bottom.  This is an

15   e-mail from Ruja@OneCoin to MarkScott@LockeLord.com and

16   RCourtneidge@LockeLord.com.  Subject line "question."  Dated

17   March 4, 2016.

18             Could you read what Ruja says in this e-mail.

19   A.  "I have some cash with me.  Abt 220,000 GBP.  Can you store

20   it for me in London?"

21   Q.  It ends "Best, R"?

22   A.  Yes, "Best, R."

23   Q.  Let's go up.  And this is a response from Mr. Scott to

24   Ms. Ruja Ignatova and Robert Courtneidge.  What did Mark write

25   back?

JBD3SCO1                          Reeder - Direct

1    A.  "Hi Ruja.  Let's discuss during our call today."

2    Q.  Let's go up.  This is an e-mail from Mr. R. Courtneidge at

3    Locke Lord to Mark Scott dated March 7 of 2016.  What did

4    Mr. Courtneidge say?

5    A.  "Mark, did you resolve this?"

6    Q.  Go to the top e-mail.  This is from Mark to Robert.  What

7    did Mark say in response?

8    A.  "Yes.  Thanks."

9    Q.  Let's now turn to Government Exhibit 2005 in evidence.

10   Going to the -- withdrawn.

11        So the e-mails we just went through were in early

12   March of 2016, is that right?  The e-mail chain with Ruja,

13   Robert, and Mark, that was in early March of 2016?

14   A.  Yes.

15   Q.  And so that would have followed the transfer of $5 million

16   into the trust account and back out by a couple of weeks; is

17   that fair to say?

18   A.  Yes.

19   Q.  Have you reviewed documents related to another attempted

20   transfer of funds into a Locke Lord escrow account in late

21   March of 2016?

22   A.  Yes.

23   Q.  We're going to turn to those documents in a moment.  By the

24   way, did you have any involvement in any of the -- in the $5

25   million transaction or the cash e-mails that we've just

JBD3SCO1                          Reeder - Direct

1    described?

2    A.   No.

3    Q.   Were you aware of those things at the time?

4    A.   No.

5    Q.   You were not in your current role at that time, correct?

6    A.   Yes.

7    Q.   And you were working in the Dallas office of Locke Lord; is

8    that right?

9    A.   Yes.

10             MR. DiMASE:   At this point I'm offering two additional

11   exhibits into evidence.   Government Exhibit 1041 and Government

12   Exhibit 1047.

13             MR. DEVLIN-BROWN:   Just one moment.

14             MR. DiMASE:   If we cannot publish them to the jury.

15   Actually, one moment.

16             MR. DEVLIN-BROWN:   No objection.

17             THE COURT:   Very well.   They'll be received.

18             MR. DiMASE:   I think for the record 1041, I believe

19   it's already in evidence.

20             (Government's Exhibit 1047 received in evidence)

21             MR. DiMASE:   Mr. Barile, you can publish these.

22   Mr. Barile, if you could just focus in on the bottom e-mail on

23   1041.   Sorry.   Above that.   Sorry.   I apologize.   The bottom

24   e-mail on page one.   Focus in on the first two paragraphs.

25   Q.   This is an e-mail from MSScottlaw@gmail.com to Dr. Ruja

1   Ignatova.  "Attorney client privileged" is the subject.

2   February 19 of 2016.

3         And Mr. Reeder, would you mind helping me read the

4   first two paragraphs here.

5   A.  "Hi Ruja.  I am setting up your transfers as investments

6   into registered investment funds offshore.  Can you wait for

7   about 10 days?  We have started the paperwork.  If you need to

8   transfer quicker, we should send to escrow at my law firm and

9   it will have to be there for a few weeks to not cause any

10  noise.  However, I recommend that you wait if you can."

11  Q.  Let's now look at 1047.  Can you just start reading at the

12  top of this e-mail -- actually, withdrawn.

13        This is an e-mail from Mark Scott to Ruja Ignatova,

14  dated a couple of days later on February 22 of 2016.  "Attorney

15  client privileged communication" is the subject.  Could you

16  just start reading from the top of this e-mail, Mr. Reeder.  We

17  can blow that up.

18  A.  "Hi Ruja.  The generic name for the fund has just been

19  declared available and has been reserved.  The lawyers are

20  going through my KYC right now to comply with their obligations

21  and to optimize it for the banks.  I expect to be in the

22  offshore jurisdiction a few days from now and to sign on

23  accounts, etc.  As soon as you provide me with the name of the

24  transferees of the funds, I will prepare the subscription

25  documents for signature.  As stated, if companies are sending,

1    I need a copy of incorporation papers and a certified copy of

2    the passport of any signatory.  In the event you require to

3    wire funds more quickly, we can do so through our escrow

4    account at Locke Lord as a capital contribution for the new

5    investment fund."

6    Q.  We can stop there for now.  And you can take that down.

7    Have you ever seen these two e-mails before today, Mr. Reeder?

8    A.  No.

9    Q.  Let me now direct your attention to some e-mails in late

10   March of 2016 and ask you to look at Government Exhibit 2006 in

11   evidence.

12            Actually, let me back up.  Let me show you 2005 first.

13            MR. DiMASE:  Can you zoom in on the bottom,

14   Mr. Barile.  This is an e-mail from LucyKirby@KnightFrank to

15   RujaIgnatova@RavenR copying Tina@RavenR, D.Godeva@RavenR,

16   MarkScott@LockeLord and another attorney or another person at

17   Knight Frank.  Subject line "The penthouse Abbots House, 23 St.

18   Mary Abbots Terrace."  Sent on March 23, 2016.  And it reads

19   sent on behalf of Sammy Robertson, "Dear Dr. Ignatov, and I'm

20   pleased to confirm that our clients have come back to us this

21   morning to advise you that your offer of 13.6 million pounds

22   for the above mentioned property has been accepted.  However,

23   subject to a reservation fee."

24            So why don't we go and that's part of that e-mail.

25   Let's go to the top of Government Exhibit 2005.  This is an

JBD3SCO1                        Reeder - Direct

1    e-mail from Mark Scott to Rebecca Watkins regarding the

2    penthouse.  Abbots House 23 St. Mary Abbots Terrace dated

3    March 22, 2016.  Appears there is some time change issues here

4    with the two e-mails.

5    Q.   Who is Rebecca Watkins?

6    A.   She's an attorney at the firm in the London office.

7    Q.   What area was she specialized?

8    A.   Real estate.

9    Q.   Do you know if she was a partner or an associate at the

10   time?

11   A.   I do not know.

12          MR. DiMASE:  It attached the form.  Could we scroll

13   down to the bottom.  Why don't we move on to Government Exhibit

14   2006.  Going to the bottom.  Keep going, please.  So at the

15   very bottom there appears to be an out of office e-mail from

16   Ms. Watkins, go up.  So, this bottom e-mail here is from

17   Ruja@OneCoin.eu to Rebecca Watkins and Mark Scott.  Subject

18   "escrow account details" sent on March 29, 2016.

19          "Dear Rebecca, can you please send me your escrow

20   account (eur) as I would like to make a transfer for the

21   apartment as agreed with Mark?  Best regards Dr. Ruja."

22          Scroll up.  Mr. Scott responds "Hi Ruja.  Adriana is

23   working on this.  Likely you will wire the funds in euro to our

24   escrow and they get converted to pounds automatically."

25          This is an e-mail from Ruja Ignatova to Mark Scott

JBD3SCO1                         Reeder - Direct

1    dated March 31, 2016.  Subject "escrow account details."  And

2    Ruja writes "Hello.  As I indicated, Mark, we send about 33M

3    euro yesterday to the U.K. account.  Let me know when money

4    makes it.  Also, how far are we with penthouse?  They should

5    have received the 150K."

6    Q.  Go up and what does Rebecca Watkins say back to Mr. Scott?

7    A.  "Do you know what account the 33 million pounds has been

8    sent to?  Ruja has mentioned a U.K. account below."

9                 (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JBD7SCO2                      Reeder - direct

1    BY MR. DIMASE:

2    Q.  OK.  Let's go to Government Exhibit 2007.  And in this

3    e-mail Dr. Ruja Ignatova writes to several people including

4    Ms. Watkins and Mr. Scott on March 31, 2016.  "Please reconfirm

5    all bank details for UK account.  STH is apparently wrong."

6            Ms. Watkins responds, "Mark, further to earlier

7    e-mails, I will leave this e-mail with you."

8            That's entitled transfer.  OK.  Let's look at

9    Government Exhibit -- pull out of that one.  I believe we're on

10   2009.  If we could go down.

11           This is an e-mail from Ms. Watkins.  Could you read

12   the top e-mails, this e-mail from Ms. Watkins to Mr. Scott and

13   others on March 31, 2016.  Mr. Reeder?

14   A.  You want me to read it?

15   Q.  Please.  Starting at the top.

16   A.  "Mark.  Further to my e-mail below and on the basis that

17   the UK account Ruja refers to is the London office trust

18   account, please note we are not permitted to accept these funds

19   until we have complied with the usual firm trust policies.

20           "Whilst it is not totally clear if the monies are

21   being sent to the London office trust account, as Ruja has

22   stated she has already transferred funds, I have had to speak

23   with Caroline Havers, the London office's compliance and money

24   laundering officer, who confirmed this and stated any transfer

25   must be stopped."

1   Q.  Why don't we stop there.  So could you help the jury

2   understand who some of the folks on this e-mail are.  Who is

3   Mr. J Channo?

4   A.  James Channo is a partner in the London office.

5   Q.  And the e-mail makes reference to Caroline Havers.  There

6   is also an e-mail address chavers.  Who is that?

7   A.  Caroline is the London office compliance and money

8   laundering officer.

9   Q.  And mcomiskey, who is that?

10  A.  Mike Comiskey, he was the general counsel of the firm at

11  this time.

12  Q.  MHolsworth?

13  A.  Miles is the executive director and chief operating officer

14  of the firm.

15  Q.  At that time?

16  A.  At that time.  Well, currently too.

17  Q.  Miles Holsworth?

18  A.  Yes.

19  Q.  And finally JCotter?

20  A.  Julie Cotter, office manager for the London office.

21  Q.  You can scroll up.  What does Mark say?

22  A.  "Hi, Rebecca.  I was not aware of this and nobody told us

23  of the policy when we requested the wire information.  In the

24  US we do not have these issues usually to accept money in

25  escrow to fund a deal or a purchase of real estate."

Q.  And this is from Mike Comiskey.  What did Mike say in
response?
A.  "Mark, I echo what Rebecca has told you.  We may not accept
those funds without having done at least proper AML
investigation and there are additional requirements before we
could release such funds if we do receive them."
Q.  Let's go up.  And Mr. Scott says, "I understand.  We were
simply not aware."
A.  Yes.  Go up.
        And Mr. Comiskey writes, "Thank you, mark.  How or
where did you get the account information to pass on to Dr.
Ruja?  What do you know about her?  How did she come to be a
client?  What do you know about OneCoin?
A.  Yes.
Q.  Go up.  And what does Mr. Scott respond in the e-mail?
A.  "Ruja, i.e., a related company, has been a client for
months.  Robert Courtneidge has been advising her since the
outset on currency and cart issues.  I know her fairly well
through another client I have been working with for a decade.
I also know attorneys from Germany that have been with her for
a long time.
        "Robert would know more about OneCoin, but I am
familiar.  We do not represent that entity, however.  I deal
exclusively with her family office and related portfolio
companies.

1    "I am in London next week and hope to see you on

2    Friday.

3    "As to how we receive the wire details, I must defer

4    to Adriana into who did."

5    Q.  Go to 2009, please.  I'm sorry, 2010.

6    So if you could zoom in on the middle two e-mails

7    here.  This is the e-mail that Mike Comiskey wrote about the

8    proper AML investigation, correct?

9    A.  Yes.

10   Q.  And Mr. Holsworth responds, "I would concur as well."

11   A.  Yes.

12   Q.  If we can go up, Mr. Scott writes, "Folks, just to be

13   clear, I am not doubting that the requirement exists but how

14   are we supposed to know until it is pointed out by someone?

15   Each firm handles escrow intake and disbursement differently."

16   Go to 2012.  If we could just zoom in on the bottom

17   two e-mails.  And this is an e-mail we have seen already from

18   Mr. Scott at the bottom.  Miles responds, "Actually we do have

19   similar policies regarding the receipt of monies into the U.S.

20   (client fund) accounts B."

21   Go up.  And what does Mr. Scott say to Miles?

22   A.  "I was not aware and never have been made aware.  As long

23   as I received funds from a client's account from a reputable

24   bank, I never had a concern.  None of my prior firms required

25   this additional information.

JBD7SCO2                          Reeder - direct

1              "We will work on pulling it together.  Next time I

2       will be better able to handle this to not inconvenience the

3       client.

4              "May be best we have our clients pay the seller

5       directly?"

6       Q.  Go up.  And what does Miles say in response?

7       A.  "since 9/11 there have been very strict anti-laundering

8       rules in the UK.  We have adopted similar regs in the U.S."

9       Q.  Can we pull up 2013.  What did Mike say in response to that

10      e-mail?  Mike Comiskey.

11      A.  "That would absolutely be the preferred method, that is, to

12      have the client-buyer pay the seller directly.

13             "Or to make payment through a trust company or a

14      bank/escrow agent, which is what we would certainly urge in the

15      U.S.

16             "I understand that the custom and practice in the UK

17      is not the same as here, but the less we have to handle client

18      funds anywhere, the better.

19             "And the rules on law firms accepting client or

20      counter-party funds in the UK (and Hong Kong for that matter)

21      are much stricter and more comprehensive than they are in the

22      U.S.

23             "The process is indeed easier if funds come "from a

24      client's account at a reputable bank" or from another firm of

25      solicitors in the UK, but we still want to know.  As a matter

1009

1    of law in the UK (and HK).  As a matter of policy in the U.S.,

2    at least for amounts above some threshold."

3    Q.  Go up.  And what does Ms. Havers say in response?

4    A.  "Dear Mike, if we are involved as the legal advisor in the

5    acquisition of the property on behalf of the client,

6    International Strategies Ltd., the reality is that we will have

7    to hold the funds to complete the transaction.  The property

8    acquisition process in England does not provide for funds to

9    pass from buyer to seller directly.  However, we would only

10   expect to receive the amount required to complete (and our

11   costs) usually the day before completion from a reputable and

12   AML checked source.  We will accept a sum of money that is not

13   directly related to the transaction several weeks in advance of

14   the completion date."

15   Q.  And just to be clear, the amount that was referenced for

16   the penthouse purchase was 13.6 million pounds?

17   A.  Correct.

18   Q.  And the amount that was attempted to be transferred into

19   the escrow account was 33 million euros?

20   A.  Yes.

21   Q.  So those two numbers obviously didn't line up.

22   A.  Yes.

23   Q.  The non-company was much more than the amount for the

24   penthouse transaction.

25   A.  Yes.

JBD7SCO2                    Reeder - direct

1    Q.  And it was also coming much earlier than any actual

2    transaction.  Is that the important take from this e-mail?

3    A.  Yes.

4    Q.  Let's go up.

5            So Mr. Comiskey says, "Caroline, I understand how it

6    works in real estate transactions in the UK and that it is

7    different (somewhat regrettably) from in the U.S."

8            Going down it says, "The specific problem here is that

9    we don't have any idea where these funds are supposed to come

10   from and there is no showing (yet anyway) that a proper AML

11   check has been done on either the source of the intended

12   recipient of the 33 million pounds in question.

13           "And now I read in one of the e-mails that there may

14   be other transactions like this one in the queue.

15           "I just wanted to make sure that we have properly

16   checked out the parties involved here, including whoever the

17   client is, who apparently is not identical to the Courtneidge

18   client."

19           Go up.  And Miles responds to everyone, "Mike, I

20   strongly concur."

21           And, by the way, Mr. Scott is on all of these e-mails

22   that we are looking at, correct?

23           Mr. Reeder, Mr. Scott is copied on all of these

24   e-mails that we just reviewed?

25   A.  Yes.

JBD7SCO2                        Reeder - direct

1    Q.  Why don't we turn to Government Exhibit 2014.  If we could

2    just go to the top.  Mr. Scott responds in this e-mail "We are

3    handling.  This issue is mostly due to a delay in forming

4    entities in Ireland because by bonding requirements for the

5    directors that are not Irish citizens and residents.  Should be

6    handled shortly and funds likely to come through BOI, where

7    they are of course also vetted.  As to other transactions, we

8    will try our best not to involve any LL accounts."

9            Let's look at Exhibit 2015.  And this is actually some

10   of the same e-mails we've already seen before, correct,

11   involving Mr. Comiskey and others?

12   A.  Yes.

13   Q.  Now, Mr. Reeder, to your knowledge, were these funds ever

14   received into Locke Lord's escrow account?

15   A.  No.

16   Q.  So after the series of e-mails the funds did not actually

17   come into the account?

18   A.  That's my understanding.

19   Q.  Let me turn to subsequent transactions.  Now, you saw the

20   name of the client listed in the penthouse e-mail and in other

21   places with International Marketing Strategies Limited?

22   A.  Yes.

23   Q.  And, to your knowledge, was International Marketing

24   Strategies limited a client of the firm?

25   A.  Yes.

1   Q.  And have you reviewed records related to transactions that

2   Locke Lord engaged in on behalf of that client in 2016?

3   A.  Yes.

4   Q.  And did those transactions take place before or after the

5   33 million euro attempted transfer?

6   A.  I think they were after.

7   Q.  OK.  And what kind of transactions were they?

8   A.  There was one purchase of real estate and two lease he is

9   of real estate.

10  Q.  Are you sure it wasn't two purchases and one lease?

11  A.  I'm sorry, yeah, two purchases, one lease.  Sorry.

12  Q.  And was one of the purchases the penthouse that we were

13  already discussing?

14  A.  Yes.

15  Q.  And who was the relationship partner, in other words, the

16  partner who had the relationship with the clients for those

17  transactions?

18  A.  Mark Scott.

19  Q.  And did those transactions happen between approximately

20  April and July of 2016?  Does that sound right to you?

21  A.  Yes.

22  Q.  And did the firm in fact handle some funds in connection

23  with those transactions?

24  A.  Yes.

25  Q.  And Mr. Scott was involved in all of those transactions in

1    some way?

2    A.  Yes.

3    Q.  Do you have any personal knowledge of any of the three

4    transactions from the time they were occurring?

5    A.  No.

6    Q.  Any involvement in them at all?

7    A.  No.

8    Q.  Again you were working in the Dallas office at this point,

9    correct?

10   A.  Yes.

11           MR. DIMASE:  One moment, your Honor.

12   Q.  Mr. Reeder I'm going to ask you about a few additional

13   e-mails.  Would you take a look, please, at Government Exhibit

14   2025.

15           Can we go to the bottom, Mr. Barile.

16           So this e-mail chain is dated May 4, 2016 from

17   James -- or jchanno to msscottlaw@gmail.  James writes, "Mark,

18   this looks much better but they will want to know (as will we)

19   where the Euros 20 million is coming from and how it got there.

20   It is question D3 that needs more explanation please."

21           Can we go to the next e-mail up.  Can you read

22   Mr. Scott's -- well, first of all, this is an e-mail from

23   Mr. Scott to Irina Dilkinska copying Dr. Ruja Ignatova on the

24   same date.  What did Mark say?

25   A.  "Hi Irina, Please see below my partner's comment on the Kyc

JBD7SCO2                         Reeder - direct

1    for Ruja.  I understand the funds will be wired in by Martin.

2    We can always say he held the money in escrow for Ruja.  But

3    need an explanation where funds stemmed from.  Either this can

4    be a loan again from an affiliate or we declare it some sort of

5    profit from somewhere.  We already vetted IMS, so maybe

6    easiest.  Let us know what's most comfortable."

7    Q.  OK.  Can you go up two e-mails here, Mr. Barile.

8         And does Mr. Scott say in that e-mail?  This is from

9    Mark Scott to Irina Dilkinska and Ruja Ignatova.  Again, what

10   does he say here?

11   A.  "You need to reasonably explain the source of the funds

12   used for the acquisition ... "

13   Q.  Go up to the next e-mail.  And Irina responds, "Proof of

14   funds I am aware of are:

15           "Bank statement with funds available on account;

16           "Declaration for the origin of funds;

17           "Financial statement of companies."

18           And to the third one she says "non preferable".

19           Go up.

20           And Mark says, "That works.  Also would be good to

21   have a statement from Martin as escrow agent to those facts."

22           Go up.

23           Then someone at mb@br-rae.de writes to Ruja and Mark,

24   "What kind of statements do you need?  That I am the escrow

25   agent?  Origin of the funds?"  And it's signed Martin

1   Breidenbach.  And what does Mr. Scott respond?  Can you read

2   that?

3   A.  "Correct.  Both of that should be in the letter.  The funds

4   need to be tied to Ruja."

5   Q.  Go up.  And what does Martin say?

6   A.  "Mark, sorry for my delay.  Could you help me with the

7   wording, please?  What do we need?"

8   Q.  And go to the top e-mail.  This is from Mark to Martin.

9   Mark says, "Hi Martin, something like this addressed to James

10  Channo:"  And then he appears to propose language for

11  Mr. Breidenbach.  Do you see that?

12  A.  Yes.

13  Q.  Do you see where it says "the funds have been generated by

14  the company by providing consultancy and management services to

15  international clients"?

16  A.  Yes.

17  Q.  Let's go to 2026 now.  And if you could go down to this

18  e-mail in the middle.  It's from Martin to mb@br-rae.de, dated

19  May 12, 2016 to irina@onecoin, mark.scott@lockelord,

20  ruja@onecoin.  It says, "Which company?  IMS?  Which business?

21  Internet Marketing?  Company is regulated?  Which register?

22  Ruja is director and sole shareholder?"

23          Next go up, Mr. Scott responds.  Could you read this,

24  Mr. Reeder?

25  A.  "Whichever company works best for you.  We have Ruja

JBD7SCO2                         Reeder - direct

cleared.  As the attorney you can confirm her being a

shareholder, director etc."

Q.  And so above Mr. Breidenbach responds "Address?  LockeLord

James Channo?"  At the very top of the e-mail thread Mark

writes to Martin Breidenbach and Ruja and Irina:  "Yes,

please."

          Go to 2030.  It's an e-mail dated May 20, 2016 from

Irina to Ruja and Mark.  The bottom e-mail, this is actually

from Ruja to Irina and Mark, and it says, "Can I have the

update on the kyc procedure — where we stand on bn and ims.

Please speed up.  Best regards, Dr. Ruja."

          And in response Irina writes "IMS — Kindly asked Frank

related to all agreements we have to provide me with those

documents — waiting for his answer.

          "B & N — in process; also requested — my KYC documents

—finishing — only bank statement will take time til next week

          "@ Mark — will e-mail you shortly."

          Let me turn now to Government Exhibit 2017.  All right

so the bottom e-mail is an e-mail from Denitza Godeva,

d.godeve@onecoin.eu.

          "Dear gentleman,

          "Dr. Ruja would like to have a meeting with all of you

while you are in London."

          This is dated May 25, 2016.

          "I have worked around everyone's schedules and best

JBD7SCO2                         Reeder - direct

option for the meeting would be Tuesday the 31st at ..."

          Mr. Barile, could you zoom out and go to the very top
of this e-mail.

          The title of this e-mail is meeting.  The top chain is
between Mark Scott and Ms. Godeva.

          Go back down.  This is an e-mail from Sebastian K
Greenwood, dated May 25.

          "Dear Denitza,

          "Noted and participating.

          "Best, Sebastian.

          And an e-mail from d.godeva in response.  Go to the
bottom.

          Here she writes, "Thank you all.  Meeting confirmed."
And on that e-mail we have 8888asialtd@gmail, pmaloy, Mark
Scott, maxvonarnim@hotmail.com and ruja@onecoin eU.

          Can we just go down a little bit.  The 8888asialtd
e-mail, if you can go down a little bit, and that's the e-mail
there associated with Mr. Greenwood.

          Go up.  Can you just focus on the middle two e-mails.
Mr. Scott on May 31, 2016 writes to Ms. Godeva, "Don't want to
bother you at the B-day party.  You look upset.  Let's meet for
a drink this week.  Text me."  And she provides a number.

          Let's go to Exhibit 2019.  Scroll down.  Focus on the
bottom e-mail.  This is an e-mail entitled "PCT - investment
documents," copying a number of people including several

JBD7SCO2                              Reeder - direct

1    between one RavenR e-mail address, najib@ravenr, and it

2    discusses a meeting and some documents.  Can we go to the top.

3    And what did Najib -- the top e-mail is from Najib Kassis

4    between Mark Scott and Irina Dilkinska, copying Ruja Ignatova.

5            What did Najib say?  Can you read that?

6    A.  "Hi Mark, Irina.  Please see attached the investment

7    agreement for signing.  Do not date the signature please, as

8    that will occur later, after a shareholder has written off

9    their loan."

10   Q.  Let's look at 2029.  Let's go to the bottom e-mail.  This

11   is from Najib Kassis to Dr. Ruja Ignatova on June 15, 2016,

12   subject line Zimbabwe - NMB.

13           "Hi Ruja, things have progressed with the Zimbabwe

14   Bank and they have agreed to offer 9 percent interest rates on

15   deposits with 90 day lockups."

16           Going to the second paragraph:

17           "I think this is a good place to park some cash versus

18   Europe with negative interest rates."  I would say $10 million

19   is the absolute max that is reasonable to do, but I would

20   probably start with a lower amount initially to see how it

21   works."

22           Let's go to the top, the next two e-mails.

23           THE COURT:  Actually, before you go there, it's 11

24   o'clock, we're going to take our morning break.  Ladies and

25   gentlemen, we will take 15 minutes; do not discuss the case.

JBD7SCO2                          Reeder - direct

1              (Jury not present)

2              THE COURT:  Mr. Reeder, you may step down.  Everyone

3    can be seated.

4              Anything that the parties wanted to discuss now?

5              MR. DIMASE:  Your Honor, I will just say I have a

6    couple more exhibits and then I will go back to the questioning

7    we had started with yesterday that brought objection, and then

8    I will be finished.  I don't expect to be much longer with this

9    witness.

10             THE COURT:  OK.  Don't be late.

11             (Recess)

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

JBD7SCO2                           Reeder - direct

1              (Jury present)

2              THE COURT:  Mr. DiMase.

3              MR. DIMASE:  Thank you.

4    CHARLES REEDER, resumed.

5    DIRECT EXAMINATION (Continued)

6    BY MR. DIMASE:

7    Q.  Mr. Barile, please pull up Exhibit 2029.  So prior to the

8    break we were looking at the bottom e-mail in this chain where

9    Mr. Najib Kassis at RavenR.com wrote, "I think this is a good

10   place to park some cash versus Europe with negative interest

11   rates."

12             We can go up to the top two e-mails then.  The subject

13   of this is "Zimbabwe Bank – NMB."  And Ruja Ignatova writes to

14   Najib and Mark Scott on June 15, 2016:

15             "Hi, Mark.  I want to park 2.5 M USD there.  Please

16   touch base with Najib.  R."

17             And what does Mr. Scott say in response?

18   A.  "And bes to take this off-line to WApp or BVI."

19   Q.  Let's now turn to Exhibit 2043.  If you can scroll down,

20   Mr. Barile.  Let's just focus on the bottom e-mail from

21   ruja@onecoin to Mark.Scott@lockelord, copying irina@onecoin,

22   sent June 20, 2016, subject OneLife.  Ruja writes, "I will find

23   a "nominee" that can be used.  But we need a good jurisdiction.

24   My feel is as far outside EU as possible.  R."

25             Can you go up.  And this is a response from Mark Scott

1    just to Ruja.  What did Mark say in response?

2    A.  "OK to be in EU.  All about owher and nominees being

3    outside."

4    Q.  Go up.  There is an e-mail below that one, Mr. Barile, as

5    well.  The two e-mails together.  Thank you.

6           At the bottom Ruja writes, "I can give you only a BG

7    nominee."

8           And Mr. Scott responds.  What does he say, Mr. Reeder?

9    A.  "Whatever works ... Please send to WApp or

10   mscottlaw@gmail.com.  Need certified passport copy and bank

11   statement or utility bill."

12   Q.  It's actually msscottlaw.

13   A.  Msscottlaw.

14   Q.  Thank you.  And let's finally turn to Government Exhibit

15   2033 in evidence and scroll down here.  Bottom e-mail is from

16   Ruja Ignatova on June 27, 2016 from ruja.ignatova@ravenr.com.

17   "Hi, Mark.  Please be introduced to Anatoly who is the one in

18   charge of our hedge funds (set up etcetera).  Ivan is one of

19   the traders in the funds.  Anatoly and I have discussed how we

20   want to do the setup etcetera and we want to employ a local law

21   firm in Lux.  Please both of you connect.  He will brief you on

22   our structure and deal - so you can move.  Best, R."

23          Go up.  Mr. Scott responds on June 28, 2016, and what

24   does he say?

25   A.  "Can you start hiring folks with western names soon please?

1    Smiley face."

2    Q.  Go up.  And Dr. Ruja Ignatova responds on June 28, 2016.

3    "No.  These are my golden Russian boys.  You will love them.

4    Make their shit work please."

5          How did Mr. Scott respond to that e-mail?

6    A.  "Of course ... smiley face.  Bank of Ireland and DB not

7    fans of this ..."

8    Q.  Thank you, Mr. Barile.

9          And Dr. Ruja Ignatova responds on June 28, 2016, "This

10   is why the kids go to Lux where they have their own

11   relationships. "

12         And looking at the top, the final e-mail in this chain

13   is from Mark Scott to Dr. Ruja Ignatova dated June 27, 2016,

14   and the subject is RavenR edge funds or Re:  RavenR hedge

15   funds."  And what does Mr. Scott say in response to the prior

16   e-mail from Dr. Ignatova?

17   A.  "Lux is fine for trading, not to send and collect funds.

18   OVER ..."

19         MR. DIMASE:  You can take that down, Mr. Barile.

20   Thank you.

21   Q.  Let me turn back now to a topic that we were discussing

22   yesterday afternoon.  Do you recall testifying about the

23   partnership agreement at Locke Lord?

24   A.  Yes.

25   Q.  And I think you said that the operative agreement at the

1    time of Mr. Scott's employment at Locke Lord is in the January

2    10, 2015 agreement; is that right?

3    A.  Yes.

4    Q.  And since it's been a while since you talked about it, can

5    you just briefly again describe what in general terms the

6    partnership agreement covers.

7    A.  Yes.  The partnership agreement covers the partner's

8    original capital contribution to the partnership, what is the

9    partnership's business, how operating profits are determined

10   and distributed, how a partner joins the partnership, how a

11   partner leaves the partnership, also our executive committee

12   which is the governing body for the partnership, also the board

13   of directors for the partnership and other matters.

14   Q.  And does each person who is hired as a partner at the firm

15   get a copy of the partnership agreement?

16   A.  Yes.

17   Q.  Is there any requirement they sign a copy of the agreement?

18   A.  No.

19   Q.  And does the partnership agreement also contain some

20   policies and terms relating to the conduct of the partners

21   while they are at that firm?

22   A.  Yes.

23   Q.  Does the agreement provide one way or another for lawyers

24   at the firm or partners at the firm earning legal fees for work

25   performed sort of outside the firm while at the firm?

1    A.   Yes, there is Article 9 in the partnership agreement which

2    prohibits partners from engaging in business activities outside

3    of the partnership agreement without the consent of the

4    executive committee.

5    Q.   And specifically with respect to legal work, would the

6    partnership agreement allow partner to perform legal work while

7    employed as a partner in the law firm but outside of the law

8    firm itself?

9    A.   Not for -- not for compensation.

10   Q.   And where -- I think we've covered this already, but where

11   are fees for work performed by lawyers at the firm paid?  Into

12   what account should they be paid?

13   A.   The operating account.

14   Q.   Would fees for work performed by lawyers at Locke Lord be

15   paid anywhere else other than the law firm's operating

16   accounts?

17   A.   No.

18   Q.   Would payment for work performed by a lawyer at Locke Lord

19   to a non-firm account be permitted?

20   A.   No.

21            MR. DIMASE:  At this point I would offer three

22   additional exhibits -- Exhibits 1026, 1032 and 4089 -- into

23   evidence.

24            MR. DEVLIN-BROWN:  No objection.

25            THE COURT:  Very well, they will be received.

JBD7SCO2                         Reeder - direct

1              (Government Exhibits 1026, 1032 and 4089 received in
2     evidence)
3              MR. DIMASE:  Mr. Barile, could you please publish
4     Exhibit 1032.
5              Your Honor, apologies, there are some personal
6     identifying information in this particular exhibit that we're
7     going to black out or otherwise redact before showing it.
8              THE COURT:  All right.
9     Q.  "Dr. Ruja, as discussed" -- this is from Mark Scott January
10    31, 2016.  "As discussed, please attached the requisite invoice
11    for our new project.  For purposes of this restructuring
12    matter, please use this e-mail address exclusively for our
13    communications, unless I send a request from my Locke Lord LLP
14    address.  I look forward to getting started."
15             Go up.  Here it says -- this is from ruja@onecoin to
16    msscottlaw@gmail and to d.godeve@onecoin January 31.  It says,
17    "OK.  I just sent the money.  Will come from Singapore.  How do
18    we move now.  You want to see me in London?  Or brief G?
19    Whatever we do.  Think about that structure needs to be able to
20    bank and get accounts."
21             Go up a little bit more.  Show Exhibit 4089 now.  And
22    can you focus in -- actually scroll down a little bit more, Mr.
23    Barile, and just focus on the bottom e-mail.  This is from
24    ruja@onecoin to mark.scott@lockelord and garmenta@zala-group,
25    copying d.godeva@onecoin and cindy@onecoin, dated January 31,

1    2016.  Subject:  Next step please.

2           "Hi, Mark.  At time is ticking, what are the next

3    steps and how can we move please?  If we want to meet I am in

4    London from 5.2 to 15.2, then for a month in Hong Kong and

5    China -- anc China.  Cindy has sent you the phone.  Contact me

6    when you have it.  Thanks.  Dr. Ruja."

7           Go up here.  Actually go to the second paragraph of

8    this e-mail from Mark Scott to Ruja Ignatova, January 31.  "I

9    am ready to go immediately and have the team ready.  You need

10   to simply approve the budget of about $425,000 for all

11   attorneys and CPAs I would require in different jurisdictions,

12   plus travel and entity formation and dissolution expenses."

13          You can pull out of that and to the fourth paragraph

14   and the information below.  All the way down.

15          "If you like to move forward, which based on what I am

16   hearing from Gilbert and Robert, you should do as ASAP, I would

17   need you to wire me the retainer so that I can get all the

18   parties started globally.  The wire details for my private law

19   firm are:"  And he provides City National Bank of Florida, an

20   address, account number, and then it says "Beneficiary:  Mark

21   S. Scott, P.L.  Purpose:  Legal fees."

22          Go to 1026, please.

23          By the way, Mr. Reeder, in January of 2016 Mr. Scott

24   was employed as a partner at Locke Lord, correct?

25   A.  Correct.

JBD7SCO2                          Reeder - direct

1   Q.  And he was working in the Miami office at that time?

2   A.  Yes.

3   Q.  Can you scroll down, please.  Scroll to the top of this

4   e-mail, please.

5           And this is a message from Mark Scott -- I'm sorry --

6   the bottom -- to Stephanie Voell from Mark Scott at

7   msscottlaw@gmail, and he writes "See below.  All in order?"

8           OK.  And if we scroll down, "Dear Customer:  Mark S.

9   Scott PL.  From:  City National Bank Wire Transfer Department.

10          "This email notification serves as immediate

11  notification of the following incoming wire transfer."  It says

12  Mark S. Scott, PL for $425,000.  And it says "Received from:

13  DBS Bank LTD Singapore by order of International Marketing

14  Services PTE" with an address.  And the name of receiver is

15  listed as City National Bank of Florida."

16          OK  Take that down.  Oh, wait, go up, please.  Could

17  you zoom in on the top two e-mails, so that is Stephanie.Voell@

18  citynational.com writes to msscottlaw@gmail on February 1,

19  2016.  "Received, is your client International Marketing

20  Services?  If otherwise please advise so I can note in the file

21  in case an inquiry comes up later.  Thanks."

22          And what does Mr. Scott say in response, Mr. Reeder?

23  A.  "Correct.  That company is my client."

24  Q.  And just to be clear, have you seen any of these three

25  e-mails we just went through before today?

1   A.  No.

2   Q.  Let me turn to another -- take that down -- another series

3   of questions about the partnership agreement.  Does the

4   partnership agreement also contain provisions regarding outside

5   positions at other companies or outside interests that partners

6   might hold while working at the firm?

7   A.  Yes.

8   Q.  And what does the partnership agreement provide for in that

9   respect?

10  A.  A partner can invest their own assets, but in terms of

11  outside directorships and things like that, it has to be

12  approved by the executive committee.

13  Q.  Would that also include running companies while working as

14  a partner at the law firm?

15  A.  Getting compensated, yes, it would be.

16  Q.  So any compensation outside of work while being a partner?

17  A.  Right, right.

18  Q.  So, is there a process by which partners would be able to

19  make a disclosure about those outside interests or work?

20  A.  Sure.

21  Q.  How would that work?

22  A.  There is actually two.  If they want to get executive

23  committee approval for an outside activity, they make

24  application to the general counsel's office, and then from the

25  general counsel's office it would go up to the executive

committee for approval.  Also for purposes of our annual

professional liability insurance renewal there is a place where

you identify your individual outside activities.

Q.  And would this -- as far as the first category, applying to

the executive committee, is that a one-time obligation or would

a partner have a continuing obligation to notify and seek

approval from the executive committee for any new outside

interests that they may become involved with?

A.  It would be one time for each activity that they engage in.

Q.  Understood.  In other words, it's not one time in the sense

that when you start working you only need to report as of that

date.

A.  Correct.

Q.  You have a continuing obligation to make the report but you

only need to report on it once for each outside activity.

A.  Correct.

Q.  And what can the executive committee -- what is the

function of the executive committee in considering those sorts

of disclosures?  What would they do?

A.  It depends on the position, but if it's a board position,

they will look at the insurance coverage or the members of the

board.  They will look at the indemnification provisions in the

bylaws of the corporation.  But there are some other activities

like teaching a class at a university that gets approved, that

doesn't have those same sorts of considerations.

1    Q.  So there would be some level of diligence performed in

2    connection -- or investigation of some kind performed in

3    connection with whatever a person has reported?  Is that fair

4    to say?

5    A.  Yes.

6    Q.  And would the executive committee have the ability to

7    approve or reject that application?  In other words, could the

8    executive committee say, thank you for letting us know, we're

9    not approving this?

10   A.  Yes.

11   Q.  And you mentioned teaching.  Would something even that

12   minor need to be disclosed to the executive committee before

13   for a partner to engage in it?

14   A.  Yes, yes.

15   Q.  And that would be something like teaching at a law school,

16   like a class, while they're a partner at the law firm?

17   A.  Yes.

18   Q.  Withdrawn.  One more question on this process.  What are

19   some -- some -- of the reasons why this process is in place for

20   the executive committee to review these kinds of outside

21   interests and either approve or reject?

22   A.  Largely professional liability.  The concern is that if the

23   lawyer is on the board of a corporation, that the role of the

24   attorney either as a board or as an attorney gets confused, and

25   in our deliberations in this regard we want to make it clear

1  that when an attorney serves on the board they are serving as a

2  member of the board and not as legal counsel for the board of

3  the corporation.

4  Q.  And are there other reasons beyond just the insurance issue

5  that the executive committee wants to know what the partners

6  are doing on the outside?

7  A.  Sure.  There is also reputation to the firm we're trying to

8  protect, and on the revenue side we just want to make sure

9  we're capturing all the revenue from the services of the

10  partner.

11  Q.  And are you familiar with the concept of conflicts of

12  interest -- of a potential conflict of interest?

13  A.  Oh, yes.

14  Q.  And does that factor into this analysis as well?

15  A.  Conflicts of interest, checking to make sure that you don't

16  have conflicts of interest with the company that the partner

17  wants to go sit on the board for.

18  Q.  In other words, a potential situation where a lawyer at the

19  firm is working at some external company and the firm is also

20  involved with some level of representation by the firm?

21  A.  Yes.

22  Q.  And that could create a potential conflict of interest.

23  A.  Yes.

24  Q.  So that's one of the other purposes of engaging in this

25  review process; is that fair to say?

JBD7SCO2                      Reeder - cross

```
1    A.  Yes.

2    Q.  Now, have you performed -- along with other executives at

3    Locke Lord -- a diligent search of Locke Lord's records to

4    determine whether or not Mark Scott ever filed any paperwork

5    disclosing involvement with other companies while he was

6    employed at Locke Lord?

7    A.  Yes.

8    Q.  And what was the result of that search of the records of

9    Locke Lord?

10   A.  We did not find any record that Mr. Scott had applied for

11   serving in another position outside of the firm.

12            MR. DIMASE:  One moment.

13            Nothing further, your Honor.

14            THE COURT:  Cross-examination.

15   CROSS EXAMINATION

16   BY MR. DEVLIN-BROWN:

17   Q.  Good morning, Mr. Reeder.  How are you?

18   A.  Just fine.  Good morning.

19   Q.  Great.  So, the government asked you a number of questions

20   yesterday both about documents that Locke Lord was involved

21   with in some way and also documents that had nothing to do with

22   Locke Lord as far as you can tell, right?

23   A.  Yes.

24   Q.  Meaning they showed you, for example, communications

25   between Mark Scott and Gilbert Armenta that were not from Locke
```

JBD7SCO2                           Reeder - cross

1    Lord e-mail addresses.

2    A.  Yes.

3    Q.  And to the extent you were shown documents that involved

4    people outside of Locke Lord and didn't necessarily involve

5    firm e-mail addresses, you didn't necessarily know what was

6    going on, right?

7    A.  Yes.

8    Q.  And you don't know what other documents may have existed on

9    the same subjects besides the ones the government showed you,

10   right?

11   A.  Yes.

12   Q.  So I'm going to spend most of today talking about documents

13   that have something to do with Locke Lord, but I do want to go

14   through just a couple of things that the government showed you.

15            Could we please put up Government Exhibit 2029, Mr.

16   Barile.

17            So, do you remember Mr. DiMase showing you this chain

18   earlier this morning?

19   A.  Yes.

20   Q.  And at the bottom of the chain -- and maybe we could just

21   blow that up for a second, Mr. Barile -- you have someone named

22   Najib Kassis e-mailing Dr. Ruja Ignatova talking about how

23   things have progressed with the Zimbabwe Bank.  Do you see

24   that?

25   A.  Yes.

JBD7SCO2                          Reeder - cross

1    Q.  And if we could just zoom out and show the top e-mail --

2    the top two e-mails actually.  Thanks.

3            So then you see an e-mail from Ruja Ignatova to

4    najib@ravenr, copying Mark Scott, saying, "Hi, mark.  I want to

5    park 2.5 M USD there.  Please touch base with Najib."  And then

6    you see Mark Scott's response:  "And best to take this off line

7    to WApp or BVI."  Do you see that.

8    A.  Yes.

9    Q.  And you don't know if Ruja Ignatova quote unquote parked

10   $2.5 million in this proposed investment, right?

11   A.  Yes.

12   Q.  You don't know if they in fact took this offline to

13   WhatsApp?

14   A.  Yes.

15   Q.  And you don't know if they spoke about it on -- I think you

16   saw one of the e-mails on Kryptophone with complicated

17   instructions.  You don't know if that happened.

18   A.  Correct.

19   Q.  And you don't know if in fact this very e-mail thread

20   continued.

21   A.  Yes.

22   Q.  And you don't know whether Mark Scott did or didn't reject

23   this offer from Ms. Ignatova.

24   A.  Yes.

25   Q.  Can you take that down, Mr. Barile.

JBD7SCO2                              Reeder – cross

1              If we could show not the jurors, but the witness and

2       the parties what has been marked for identification as

3       Government Exhibit 321 –– I'm sorry, Defense Exhibit 321.

4              MR. DIMASE:  Can we approach briefly, your Honor?

5              THE COURT:  Sure.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (At the side bar)

2         MR. DEVLIN-BROWN:  So, your Honor --

3         MR. DIMASE:  Just so that I can raise the concern.

4    This is part of a series of concerns we have regarding e-mails

5    potentially being hearsay if offered by the defendant for the

6    truth.  And this appears to be a relatively lengthy document

7    here with many different parts, so I'm not clear on exactly

8    what the nonhearsay purpose of admitting the defendant's own

9    statements in this e-mail are.

10        MR. DEVLIN-BROWN:  Well, I think, number one, it

11   prevents people from being grossly mislead about what may have

12   been discussed.  At the bottom of the thread, your Honor, you

13   see the same e-mail that was in the government exhibits we just

14   saw -- I want to park 2.5 million USD there -- and this is not

15   a version of the thread that discusses going to WhatsApp.

16   Instead there is some back and forth with Najib, and then we

17   get to --

18        THE COURT:  And who is Najib?

19        MR. DIMASE:  He works at RavenR, Ruja's private law

20   office.

21        THE COURT:  OK.

22        MR. DEVLIN-BROWN:  So then Mr. Scott communicates to

23   Ruja and Najib that he will not do this deal, he has grave

24   concerns that will cause flags to go up on still very young

25   accounts in Europe; under no circumstances can I make this a

JBD7SCO2                       Reeder - cross

1    direct investment.

2              So, it's not offered for the truth; it's offered in

3    terms of this relationship between alleged coconspirators that

4    this deal that's been proposed he doesn't want to do, and he is

5    letting his alleged coconspirators know that he is not going to

6    do deals of this sort.  So, that's the nonhearsay basis.

7              And I think it's also necessary just to avoid

8    presenting to the jury this implication that there was some

9    off-line discussion.

10             MR. DIMASE:  Your Honor, the only thing I would say in

11   addition is I think there is a hearsay concern about the other

12   e-mails in between the defendant's e-mails even if the e-mails

13   that Mr. Devlin-Brown is referring to are not for some hearsay

14   purpose.  There are other interstitial e-mails here.  I mean

15   the e-mail from Max above, "this is not a private equity

16   investment," that seems to me to be a statement that would be

17   offered for the truth.

18             MR. DEVLIN-BROWN:  I don't need it certainly for the

19   truth.  But just like many of the chains the government has

20   shown, this is what Mark is being told about the deal.  Again,

21   whether it's true or not, I don't know, but here deals are

22   being described in a certain way, and after hearing this

23   description he is rejecting it on a certain basis.

24             So, I don't think it makes sense to redact those

25   things or anything like that.  I'm not going to call attention

JBD7SCO2                        Reeder - cross

1    to it other than there is some more discussion about the deal

2    or something of that nature.

3              THE COURT:  I will allow it.

4              MR. DIMASE:  I would just ask it seems this top e-mail

5    is really not -- it has a lot of facts in it that look like

6    they might be potentially offered for the truth.  So I think to

7    the extent this is coming in, it probably should be for the

8    portion below that.

9              MR. DEVLIN-BROWN:  The very top e-mail?

10             MR. DIMASE:  Yes.

11             MR. DEVLIN-BROWN:  That's fine.  If you don't mind if

12   we can just make the redaction later on.

13             MR. DIMASE:  Yeah, or just show this portion of the

14   exhibit here, and we can redact it later.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           MR. DEVLIN-BROWN:  Can we put that up on the screen.

3    Defense offers Defense Exhibit 321.

4           MR. DIMASE:  Your Honor, with the understanding we

5    discussed at side bar.

6           THE COURT:  Very well, it will be received.

7           (Defendant's Exhibit 321 received in evidence)

8           MR. DEVLIN-BROWN:  Before you publish it, Ms. Stanley,

9    could you just go to the fourth page of the exhibit.

10          And if we can publish that, please.

11   Q.  So, Mr. Reeder, this is at the very bottom the same e-mail

12   you just saw in the government Exhibit, right, discussing a

13   Zimbabwe bank and Ruja Ignatova proposing to park 2.5 M USD

14   there, right?

15   A.  Yes.

16   Q.  The portion on top of this thread does not say anything

17   about taking it to WhatsApp, right?

18   A.  I do not see it.

19   Q.  Yeah.  Instead it says "Hi, Najib.  Can you please send me

20   background on the bank."

21          And if we could now move to the third page of the

22   exhibit, Ms. Stanley.

23          And I don't want to go through this in any detail, Mr.

24   Reeder, but just glancing at it it appears that Najib Kassis at

25   the very bottom provides a link to a drop box folder about the

JBD7SCO2                        Reeder - cross

1    bank deal and then sends another e-mail describing the bank

2    deal right above that.  Do you see that?

3    A.  I see those.

4    Q.  And then if we could go to page 2 of the exhibit,

5    Ms. Stanley.  And if we could blow up the e-mail at the bottom

6    of the page, which is from Mark Scott.

7                And I will just read part of it.  "As I mentioned

8    before, I see this as a loan play or some sort from my end to

9    get you the funding.  Although I have grave concerns this will

10   cause flags to go up on our still very young accounts in

11   Europe, under no circumstances can I make this a direct

12   investment from offshore.  The risk is too high.  The returns

13   are not believable and the institutions are undercapitalized."

14               Do you see that?

15   A.  Yes.

16   Q.  And if we could just -- go to the first page of the exhibit

17   and just blow up the bottom e-mail before we publish it.

18               So, in this e-mail on the same thread Mark Scott

19   writes, "I just can't doc African elements to what is in

20   existence on my end.  It will raise many red flags due to the

21   jurisdiction and unlikely business case."

22               Do you see that?

23   A.  Yes.

24   Q.  So we can take this off the screen.

25               So, Mr. Reeder, that wasn't part of the thread that

JBD7SCO2                      Reeder - cross

1    the government showed you about this transaction, right?

2    A.  Yes.

3    Q.  And you don't have any idea what other thread may be on

4    other transactions that the government showed you, do you?

5    A.  Yes.

6    Q.  Yes meaning you don't, right?

7    A.  I don't, correct.

8    Q.  Thank you.

9           May I approach, your Honor?

10          THE COURT:  You may.

11   Q.  So, Mr. Reeder, since 2017 I believe you have been the

12   deputy COO; is that right?

13   A.  Yes.

14   Q.  And part of that position involves I guess things of this

15   nature, responding to requests -- whether it's from the

16   government or other parties -- to gather information on behalf

17   of the firm?

18   A.  Yes.

19   Q.  And in order to do that you must have access to records of

20   client matters, and billings and other sorts of firm

21   administration records; is that right?

22   A.  Yes.

23   Q.  And I assume when it's warranted you are able to review

24   e-mails of firm personnel and things like that.

25   A.  Yes.

JBD7SCO2                         Reeder - cross

1  Q.  So I put a binder of documents before you -- and don't
2  worry, we're not going to go through all of them -- but I
3  believe you saw this when I provided it to your counsel
4  yesterday; is that right?
5  A.  Yes.
6  Q.  And looking through those documents -- with the exception
7  of 154, which I've removed -- do those all appear to be Locke
8  Lord records?
9  A.  I can't say all of them were.  I would say the majority of
10  them were.
11  Q.  OK.  Why don't you look just for your own reference to --
12  and we don't need to publish it -- Defense Exhibit 154.
13  A.  OK.
14  Q.  So, this one before you, if I have it right, the front page
15  is a bio from the Locke Lord website.
16  A.  It appears to be, yes.
17  Q.  And then behind it though there are various articles and
18  other materials about Mark Scott, right?
19  A.  Yes, I see that.
20  Q.  And you I believe did not recognize that to necessarily be
21  a Locke Lord record document.
22  A.  Correct.
23  Q.  When Locke Lord produced documents to the government in
24  this case it often did so with a Bates stamp on the bottom,
25  right?

JBD7SCO2                         Reeder - cross

1    A.  Yes.

2    Q.  And that's just basically -- you have seen it on some of

3    the exhibits -- some kind of code name and number that follows,

4    right?

5    A.  Yes.

6    Q.  That was in this case LLSDNY?

7    A.  Yes.

8    Q.  And presumably you were able to recognize all of the

9    documents in here that has a Locke Lord Bates stamp on it.

10   A.  Yes.

11   Q.  And there were a few documents that may not have had the

12   Bates stamp on it but that were billing records from Locke Lord

13   or other of Locke Lord business records, right?

14   A.  Yes.

15   Q.  Other than the exhibits I just showed you on 154, did you

16   recognize all of those documents in here as Locke Lord records?

17   A.  I either saw the Bates stamp or recognized most of the

18   documents in here.  I did not look at all of them to go just to

19   make sure they are all Locke Lord documents.

20            (Continued on next page)

21

22

23

24

25

JBD3SCO3                         Reeder - Cross

Q.  Well, I mean, I do hate to take the jury's time with it,
Mr. Reeder, but it is important for the defense as well as the
government that we're able to establish the authenticity of
these documents.  So maybe we'll have, if you don't want to do
it now, maybe we'll have a break before the cross-examination
is over and you can do it then.  Does that sound fair?
A.  Okay.
Q.  All right.  So, do you recall the government asking you a
number of questions about a $33 million deposit into a Locke
Lord escrow account?
A.  Yes.
Q.  I believe you said, as far as you knew, the money never
actually made its way into the escrow account?
A.  That's my understanding.
Q.  There were a number of e-mails the government showed you, I
believe, suggesting there were potential AML or anti-money
laundering concerns about the transaction, right?
A.  Yes.
        MR. DEVLIN-BROWN:  And Mr. Barile, I would just like
to show a few of those.  If you could show Government Exhibit
2009, please.  If we could blow up -- I'm trying to see it
myself.  The very bottom e-mail from Mr. Comiskey.  Thank you.
Q.  That's M. Comiskey, that's Mike Comiskey; is that right?
A.  Yes.
Q.  I think you said he was the general counsel of the firm at

1  the time?

2  A.  Yes.

3  Q.  And that means sort of like the lawyer for the law firm,

4  right?

5  A.  Yes.

6  Q.  He's, I imagine responsible for, among other things, making

7  sure that Locke Lord is complying with anti-money laundering

8  rules and regulations?

9  A.  Yes.

10  Q.  So here he writes, "Mark, I echo what Rebecca has told you.

11  We may not accept those funds without having done at least

12  proper AML investigation."  You see that part?

13  A.  Yes.

14        MR. DEVLIN-BROWN:  Mr. Barile, we can take that down.

15  And if we can put up Government Exhibit 2010, please.

16  Actually, I think that's the same.  Never mind, we can take

17  that one off.  If you can put up Government Exhibit 2013,

18  please, the first page.  And if you can blow up the e-mail, the

19  middle e-mail, again it's from Michael Comiskey.

20  Q.  And you see there he writes that the AML rules are much

21  stricter in the U.K. than in the U.S.

22        Do you see that?

23  A.  Yes.

24  Q.  Is that true to your knowledge as well?

25  A.  Yes.

JBD3SCO3                              Reeder - Cross

1    Q.  Then he write "The specific problem here is we," I assume

2    that means "we" meaning Locke Lord the firm?

3    A.  Yes.

4    Q.  "Don't have any idea where these funds are supposed to come

5    from and there is no showing, yet anyway, that a proper AML

6    check has been done on either the source or the intended

7    recipient of the 33 million pounds in question."

8         Do you see that?

9    A.  Yes.

10   Q.  And then he writes "And now I read in one of these e-mails

11   that there may be other transactions like this one in the

12   queue."  Do you see that with the exclamation point there?

13   A.  Yes.

14   Q.  So is it fair to say that in connection with this $33

15   million transaction, that Mr. Comiskey was raising concerns

16   about whether the proper anti-money laundering checks had been

17   done with respect to this client or potential client?

18   A.  Please repeat that?

19   Q.  Is it fair to say that with respect to this $33 million

20   transaction, Mr. Comiskey was raising concerns about whether

21   proper AML checks had been done?

22   A.  Yes.

23   Q.  Now, isn't it true, Mr. Reeder, that ultimately, AML checks

24   were done on this client?

25        MR. DiMASE:  Objection.

JBD3SCO3                    Reeder - Cross

1              THE COURT:  Overruled.

2    A.  I don't know.

3    Q.  Well, you have reviewed records in preparation for your

4    testimony today, right?

5    A.  Yes.

6    Q.  Isn't it true, Mr. Comiskey, that -- sorry.  Mr. Reeder.

7              MR. DiMASE:  May we have a sidebar?

8              THE COURT:  Sure.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (At the sidebar)

2    MR. DiMASE:  Your Honor, I think Mr. Reeder answered

3    the question that he does not know about compliance checks that

4    were performed.  There are other people at Locke Lord who may

5    have the answer to that question and may be called as

6    witnesses, but Mr. Devlin-Brown is now trying to basically get

7    him to say he read an e-mail that's not in evidence and he has

8    some understanding of some point.  That's the concern, that's

9    the path we are going to down right now.  I don't think he

10   knows anything about any compliance checks that were done in

11   connection with these transactions from any sort of personal

12   knowledge.

13   MR. DEVLIN-BROWN:  Well, he is not here today just

14   testifying about his personal knowledge.  He's testifying as a

15   records custodian.  Most of the e-mails, if not all of the

16   e-mails that the government put in evidence through him when he

17   testified about, he had no personal knowledge of.  And the

18   government has raised a suggestion through the $33 million

19   transaction that Mr. Scott was ignoring significant AML

20   concerns about the client.  What I think the evidence will

21   show, and I don't necessarily need to offer these documents

22   into evidence, but I think I am going to have to show the

23   witness, he's seen them, is that the firm approved Ruja

24   Ignatova and did business with her through 2018 after she

25   passed AML checks, even though there was references to OneCoin.

1     And Mr. Scott was in continual touch with Locke Lord and

2     partners at Locke Lord, even when he was at the Fenero Funds.

3     And it's quite significant, both to correct the misimpression I

4     think that the government made that there were these tremendous

5     AML concerns and because Locke Lord, one of the many service

6     providers Mr. Scott continued to deal with, was not troubled

7     continuing to do business with Ruja Ignatova and related

8     entities.

9          MR. DiMASE:  As an initial matter, this goes back to

10    the government's motions in limine concern that the fact that

11    some service provider conducts business with Ruja, particularly

12    after Mr. Scott has left, seems wholly irrelevant to his state

13    of mind.  But more to the point on this particular witness,

14    your Honor, the government did read him a number of e-mails.

15    But, we didn't elicit personal knowledge from the witness about

16    those e-mails.  Maybe there is a witness who can provide the

17    kind of testimony that Mr. Devlin-Brown is looking for.  This

18    witness is not that person.  He's asking the witness to testify

19    about things he doesn't have any knowledge about.  That's the

20    concern I have.

21         MR. DEVLIN-BROWN:  Well, Mr. DiMase himself elicited

22    that there were transactions that Locke Lord engaged in with

23    Ruja Ignatova affiliates after this 33 million, including

24    several real estate transactions.  There was more beyond that.

25    And there are e-mails that show it, and he is a record

1    custodian.  I would also add --

2              THE COURT:  That's fine.  He is a records custodian.

3    But records custodian don't necessarily testify to the

4    substance of the documents that they put into evidence.  So, if

5    you can get the e-mails into evidence in some fashion, then you

6    can put it before the jury.

7              MR. DEVLIN-BROWN:  Okay.  I thought perhaps the

8    government would prefer to avoid that, but that's what I'll do.

9    I'll just add one other thing so your Honor knows.  We've been

10   in discussions with Locke Lord for some time.  Their preference

11   has been that they not be recalled in the defense case, that

12   they have one witness who would know essentially what the

13   parties want to ask them about.  I am getting the feeling that

14   Mr. Reeder may not be actually as cooperative in practice as

15   that may have been represented in theory, but that's all we are

16   trying to do here.

17             THE COURT:  He seems to me to be trying to answer the

18   questions as best as he can based on the information he has.

19   So again, I don't know the case as well as you do, so I don't

20   know specifically what you are talking about.  But he seems to

21   me to be responsive to your questions thus far.

22             MR. DEVLIN-BROWN:  Thank you.

23             (Continued on next page)

24

25

1          (In open court)

2     BY MR. DEVLIN-BROWN:

3     Q.  So, Mr. Reeder, after this $33 million wire transfer that

4     the government asked you about, you testified that there were

5     in fact other projects involving Locke Lord and Ruja Ignatova

6     or affiliated entities.  Do you remember that?

7          MR. DiMASE:  Objection.  Misstates the testimony, your

8     Honor.

9          THE COURT:  Overruled.

10    A.  The IMS transactions?

11    Q.  The IMS transactions.

12    A.  Yeah.

13    Q.  Those related to various property purchases or leases; is

14    that fair to say?

15    A.  Yes.

16    Q.  Those were after the $33 million wire transfer that was

17    discussed earlier in your testimony, right?

18    A.  Yes.

19    Q.  And the firm didn't block those transactions with IMS and

20    those properties, right?

21    A.  No.

22    Q.  Aren't you aware -- just yes or no -- from reviewing

23    materials, Locke Lord business records, that Locke Lord

24    continued to do business with Ruja Ignatova affiliated entities

25    into 2018?

JBD3SCO3                          Reeder - Cross

1    A.  No.

2              MR. DEVLIN-BROWN:  Well, let me show you then

3    what's -- if we just put it on the witness's screen what's been

4    marked for identification as Defense Exhibit 729.  That's just

5    for the witness, right, Ms. Stanley?

6    Q.  So Mr. Reeder, I don't want you to read anything on the

7    document yet.  But do you see there is a Bates stamp on the

8    bottom that says LLSDNY?

9    A.  Yes.

10   Q.  You can confirm, can't you, that this is a Locke Lord

11   business record?

12   A.  Yes.

13   Q.  Locke Lord has a practice of running conflicts checks on

14   new clients; isn't that right?

15   A.  Yes.

16             MR. DiMASE:  Your Honor, can we have another sidebar?

17   I apologize --

18             THE COURT:  Okay.

19             MR. DiMASE:  -- for the delay.

20             (Continued on next page)

21

22

23

24

25

1      (At the sidebar)

2          MR. DiMASE:  Your Honor, two separate concerns.  The

3   second one being the primary one.  The first one is the witness

4   said no.  He doesn't know.  So it's not really proper to

5   refresh the memory of someone who does not know.  If they don't

6   remember, you can refresh their recollection.

7          Putting that aside, the bigger issue here is that

8   Mr. Scott is not on this e-mail.  It's long after he's left the

9   firm.  It doesn't bear on his state of mind.  These are exactly

10  the sorts of issues we've been bringing to the Court's

11  attention through our motions in limine and during trial.  The

12  fact that Locke Lord is running some sort of diligence on Ruja

13  Ignatova in 2018, long after Mr. Scott is out, without copying

14  him and there is no evidence that he knew about it, is just

15  completely irrelevant.  Has no bearing on the facts in issue in

16  this case.

17         THE COURT:  I don't know what he's going to ask.  What

18  are you going to ask?

19         MR. DEVLIN-BROWN:  I'm not trying to refresh his

20  recollection.  At this point I am just trying to lay a

21  foundation for it being a business record.  I would offer it.

22  Even in the government's exhibits and their e-mails about the

23  $33 million transaction, they redacted a portion that showed

24  that the firm had done a similar check on OneCoin.  Mr. Scott

25  actually saw the results there were concerns at the time raised

1    that it was a Ponzi scheme or could be.  And the firm continued

2    to do work and Mr. Scott saw that, and knew the firm continued

3    to do work.  And had continuing communications, even when he

4    was working with Fenero with James Channo, a senior partner in

5    the firm, about IMS and Ruja Ignatova related matters.

6         I'm hoping not to spend a huge amount of time on this,

7    but I think that's an important point.  I think it's fair that

8    the jury know that the firm continued to do that sort of

9    business.

10        MR. DiMASE:  Just to respond to that.  With respect to

11   the redactions, we redacted those portions of the e-mail

12   because Mr. Scott was not copied on those portions of the

13   e-mail.  That's why I redacted them.  We can look back at them.

14   There may be subsequent e-mails where those portions are sent

15   to Mr. Scott.  But the portions of the e-mails we redacted

16   Mr. Scott was not on, so that is the reason we redacted those

17   particular portions of the e-mail.

18        But, more to the point, on this, we can debate about

19   whether that stuff is admissible and maybe we will be back up

20   here to do that.  Maybe it is.  Certainly this isn't.

21   Mr. Scott's not on it.  It's long after he's left.  It is not

22   relevant to any issue in this trial about his state of mind.

23   It is to James Channo.  It just doesn't involve Mark Scott.

24   So, it's not clear how it bears on his state of mind or has

25   anything to do about what he knows or thinks about OneCoin or

JBD3SCO3                        Reeder - Cross

Locke Lord.

          MR. DEVLIN-BROWN:  The government's state of mind
position for all evidence they tried to offer in is, oh, the
conspiracy continued probably to the arrest and after.
Mr. Scott was in communication with James Channo about Locke
Lord matters.

          MR. DiMASE:  There is no evidence of those
communications, that's one of the problems, in 2018, that this
was shared with Mr. Scott.  All of the evidence that the
government has offered is sent to Mark Scott.  That's sort of
the point.  This doesn't involve him.

          MR. DEVLIN-BROWN:  We would not argue that this showed
Mr. Scott knew that there was a conflicts check on Ruja
Ignatova.  But I think it is relevant for the other issues that
we've already addressed.

          THE COURT:  The government put all of this in to
contention the fact that there were substantial money
laundering concerns and vetting concerns, concerning Ignatova
and the other individuals and entities, so I'll allow him to do
some cross-examination concerning the fact that the firm
continued doing work with those entities.

          MR. DiMASE:  Your Honor, we don't, it would be
appropriate perhaps to do that with e-mails that Mr. Scott is
on in the time frame he is working for Locke Lord.  But we
would just strongly object to the admission of evidence not

1    copying him, not involving him, not showing he was aware.  I

2    think there is a distinction between the types of evidence.

3              THE COURT:  This is just rebutting a particular point

4    that you're making.  It is not rebutting a point concerning

5    anything that Mr. Scott was aware of or not aware of, so I'll

6    allow it.

7              MR. DEVLIN-BROWN:  Thank you.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2                MR. DEVLIN-BROWN:  May I proceed, your Honor?

3                THE COURT:  You may.

4     BY MR. DEVLIN-BROWN:

5     Q.  Mr. Reeder, before the sidebar there I was asking you if

6     you recognized this document to be a conflicts check from Locke

7     Lord.  Do you recall that?

8     A.  Oh.  Okay.

9     Q.  Sorry, yes, it's reappeared.  Defense Exhibit 729.

10    A.  Yes.

11               MR. DEVLIN-BROWN:  The government offers Defense

12    Exhibit 729.

13               MR. DiMASE:  The government objects to this particular

14    exhibit.

15               THE COURT:  I think you misspoke.  You said the

16    government offers.

17               MR. DEVLIN-BROWN:  The defense offers, the government

18    objects, the Court rules.

19               THE COURT:  Over the government's objection it will be

20    received.

21               MR. DEVLIN-BROWN:  Thank you.  Can we publish Defense

22    Exhibit 729, please, for the jury.

23               (Defendant's Exhibit 729 received in evidence)

24    Q.  If we could just blow it up to try to delete the white

25    space just as much as we can to make it a little easier.  But

... 

```
1    I'll start asking questions while we do that.
2              This is from Melissa Hall.  Do you see that?
3    A.  Yes.
4    Q.  And who is Melissa Hall, if you know?
5    A.  She worked in the conflicts area, client intake.
6    Q.  She runs checks like this, conflict checks?
7    A.  Yes.
8    Q.  Who is James Channo on the to line?
9    A.  James is a partner in the London office.
10   Q.  Didn't he manage the London office, at one point anyway?
11   A.  Yes.
12   Q.  He is on the firm's executive committee, was he?
13   A.  At one point, not currently.
14   Q.  You can see that the subject line says "Conflict results
15   rush. Ruja Ignatova/acting in respect of certain real estate
16   matters and potential regulatory issues."
17             Then you see there is various attachments referred to
18   there, right?
19   A.  Yes.
20   Q.  I'd just like to read the first paragraph.  Why don't you
21   read it, Mr. Reeder.
22   A.  "The conflict check and the client due diligence are clear
23   for Ruja Ignatova, please proceed with collecting the AML
24   documentation for this individual.  I've included the relevant
25   information for an individual from the A memorandum and also
```

1    attached the full version for your reference.  Please note that

2    one of the standard verification documents from category A and

3    from category B are sufficient to fulfill the requirements."

4    Q.  Okay.  Then the part below that, actually the first

5    sentence says "the conflict check and client due diligence is

6    clear."

7              What is client due diligence?

8    A.  I don't know what was being undertaken at this time for

9    client due diligence.

10   Q.  You were deputy COO at the time.

11   A.  Oh.  At this time, okay.  Yeah, well, it would be a check

12   of various sources about the background of the individual, or

13   if there is negative press.

14   Q.  Okay.  And the second paragraph here says "Please note Ruja

15   Ignatova was previously searched for you (original request

16   attached) and there was negative news to report for OneCoin,

17   the company Ruja Ignatova serves as the CEO.  As OneCoin nor

18   its parent company, One Life Networks Limited, is not a party

19   in your search attached, Laura Wilkinson is include for her

20   input on whether the attached negative news and the World Check

21   reports require PGL approval."

22             What is PGL, Mr. Reeder?

23   A.  Practice group leader.

24   Q.  We can take that off the screen.  One moment.

25             If I can show you what's been marked as Defendant's

1    Exhibit 542 for identification.  Just look at this if you could

2    just look -- if you could just take a look at this.  This one

3    also has an LLSDNY Bates number on it, right?

4    A.  Yes.

5    Q.  And this, if you look at the second page, just for the

6    benefit of the witness, please, or sorry, it would be on the

7    fourth page.

8             And this is an engagement letter, isn't it,

9    Mr. Channo?  I'm sorry.  Mr. Reeder?

10   A.  Yes.

11   Q.  From Locke Lord?

12   A.  Yes.

13   Q.  And it's dated October 2017, 2016?

14   A.  '16, yes.

15   Q.  And it's for International Marketing Strategies Limited?

16   A.  Yes.

17   Q.  The company you testified about before, I believe?

18   A.  Yes.

19             MR. DEVLIN-BROWN:  The government, I mean the defense

20   offers Defense Exhibit 542.

21             MR. DiMASE:  Objection.  May we have another sidebar,

22   your Honor?

23             THE COURT:  Sure.

24             (Continued on next page)

25

1          (At the sidebar)

2          MR. DiMASE:  Judge, this is illustrating the same

3    point we made before.  Mr. Devlin-Brown is now putting in

4    another document on which Mr. Scott is not copied.  Prior to

5    trial, we briefed this and the defense agreed that anything

6    that Mr. Scott did not see or they could not show he saw would

7    not be admissible as to his state of mind.  We have the same

8    objection to this exhibit as we did to the last one.  And we

9    may want to brief this issue again.  It seems like if it

10   doesn't involve Mr. Scott, it's not clear how it's relevant to

11   the issues here.

12         MR. DEVLIN-BROWN:  State of mind is a big issue at the

13   trial, your Honor, but it is not the only issue, and it is not

14   the only reason to offer documents.  I have this engagement

15   letter, one other engagement letter, that's all I really intend

16   to do.  I just want to make it clear that the firm did, which

17   it did, continue to do work for these entities.

18         MR. FOLLY:  What is the non-hearsay purpose that you

19   are attempting to offer this into evidence for if it's not

20   state of mind as to Mark Scott?

21         MR. DEVLIN-BROWN:  It's for the fact that Locke Lord

22   continued to do business with these entities, despite the clear

23   implication that was left in direct examination that Locke Lord

24   viewed there to be the significant money laundering risks, that

25   general counsel Michael Comiskey said they had concerns because

JBD3SCO3                         Reeder - Cross

1    there were other transactions in the queue.  Well, they did the

2    other transactions in the queue.

3          MR. DiMASE:  We brought that out on direct.  But, the

4    fact is Mark Scott was involved in all of the things that the

5    government addressed on direct.  Now we are getting into things

6    that Mr. Scott is not involved with at all.  He's not copied

7    on.  They just don't show anything about.

8          This also goes back to the original other issue in the

9    government's briefing, the fact that Locke Lord, some third --

10   some other company does business with these people is not

11   relevant to Mr. Scott, especially after he leaves.  And he's

12   not copied on any of the diligence or anything else that's

13   being discussed.

14         MR. DEVLIN-BROWN:  I forget the date of this

15   engagement letter.

16         THE COURT:  October 2016.

17         MR. DiMASE:  That is after he's gone.

18         MR. DEVLIN-BROWN:  His last day of the firm is

19   September 30.  He's in communication with James Channo after

20   that.

21         MR. DiMASE:  There's been no evidence of connection

22   between these documents.

23         MR. DEVLIN-BROWN:  He is in communication with James

24   Channo after that point.  It's not being offered for his state

25   of mind.  It's being offered that, talk about service

1    providers, it is offered that his own firm continued to do

2    business with Locke Lord.  And that's basically it.  To rebut

3    the implication from the prior testimony.  That's just this

4    document, one more.  I think we can leave the rest.

5            MR. DiMASE:  I am not aware of the evidence

6    Mr. Devlin-Brown is describing regarding the contact between

7    Channo and Scott after he left.  I don't know that there is

8    that evidence in the record right now.  And so, that's an

9    issue.

10           MR. FOLLY:  There is certainly no evidence that James

11   Channo communicated anything of substance of these

12   communications to Mark Scott.  We've never seen one iota of

13   evidence on that issue.  That's really the heart of the issue.

14   If it wasn't communicated back to Mark Scott what was going on

15   at Locke Lord, that he wasn't involved in, it's irrelevant.

16           MR. DEVLIN-BROWN:  I don't know exactly when Channo

17   communications ended.  Because he had sort of left Locke Lord

18   even before he formally separated.  But, it's not just for --

19   the issue isn't just what James Channo told, it's what he

20   didn't tell.  James Channo is working directly with Frank

21   Ricketts -- sorry.  Frank Ricketts, Schneider, that private

22   investigator at one point, he is working with, he is in

23   communications with Ruja and Konstantin about transferring

24   Ruja's assets to Konstantin.  So, there clearly are

25   communications he is having with the relevant parties.

JBD3SCO3                           Reeder - Cross

1              MR. DiMASE:  A lot of people are working with those

2      people all over the world.  That doesn't make it relevant to

3      this trial.

4              MR. DEVLIN-BROWN:  These are not --

5              THE COURT:  How much more do you have on this?

6              MR. DEVLIN-BROWN:  Absent further sidebars, this

7      document, one other, that's all I would need to do with this

8      witness.  There is a Konstantin issue that I think is for

9      Konstantin's impeachment, but we don't need to do it in front

10     of this witness right now.

11             THE COURT:  I'll allow it.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

JBD3SCO3                          Reeder - Cross

 1              (In open court)

 2              MR. DEVLIN-BROWN:  The defense offers Defense Exhibit

 3     542.

 4              MR. FOLLY:  Objection.

 5              THE COURT:  Over the government's objection it will be

 6     received.

 7              (Defendant's Exhibit 542 received in evidence)

 8              MR. DEVLIN-BROWN:  If we can publish that exhibit,

 9     Ms. Stanley, and publish it where it is right now which is the

10     engagement letter.

11     Q.  Mr. Reeder, this is dated October 27, 2016?

12     A.  Yes.

13     Q.  And it's directed to International Marketing Strategies

14     Limited.  Do you see that?

15     A.  Yes.

16     Q.  It describes an engagement for the firm, right?

17     A.  Yes.

18     Q.  And that can only happen if a matter is approved from a

19     conflicts perspective, right?

20     A.  Yes.

21              MR. DEVLIN-BROWN:  If we could just blow up,

22     Ms. Stanley, the bottom after real estate.

23     Q.  It's common for engagement letters to describe the scope of

24     the engagement, right?  The matter that will be undertaken?

25     A.  Yes.

1  Q.  This reads here "Your objectives are to complete the

2  assignment of the lease of part one first floor, One

3  Knightsbridge London to RavenR Capital Limited as soon as

4  possible."

5          And if we could zoom out, that's fine.  Then if we can

6  go to the second page, Ms. Stanley.  just I can probably read

7  it.

8          You see under corporate there, Mr. Reeder?

9  A.  Yes.

10 Q.  And that's a continuation of the discussion of scope of

11 engagement, right?

12 A.  Yes.

13 Q.  It says "We will provide corporate and commercial legal

14 advice as and when required."

15 A.  Yes.

16 Q.  I'd like you to look at one more of these sorts of

17 documents, so if we can show just the witness, Ms. Stanley,

18 Defense Exhibit 543.

19          Do you recognize this to be another Locke Lord

20 engagement letter, Mr. Reeder?

21 A.  Yes.

22          MR. DEVLIN-BROWN:  The defense offers 543.

23          MR. DiMASE:  We object for the same reasons we've

24 discussed.

25          THE COURT:  Over the government's objection.

1       (Defendant's Exhibit 543 received in evidence)

2       MR. DEVLIN-BROWN:  If we can publish that,

3   Ms. Stanley.

4   Q.  So, this is another engagement letter, is it not,

5   Mr. Reeder, and this one is addressed to RavenR Capital

6   Limited.  Do you see that?

7   A.  Yes.

8   Q.  Sitting here today, do you know who RavenR Capital Limited

9   is?

10  A.  No.

11  Q.  Do you know if it has any connection to Ruja Ignatova?

12  A.  No.

13  Q.  If we could blow up the scope and objectives, please,

14  Ms. Stanley.

15      I guess just like the last engagement letter,

16  Mr. Reeder, this one has a discussion about the scope of the

17  assignment?

18  A.  Yes.

19  Q.  And according to this engagement letter, it involves the

20  review of intra-group shareholders, loan, and certain other

21  internal corporate documentation relevant to RavenR.  Do you

22  see that?

23  A.  Yes.

24  Q.  Actually, do you remember that e-mail I showed you earlier

25  about the Zimbabwe bank deal?

1    A.   Yes.

2    Q.   That was with someone at a RavenR e-mail address too,

3    wasn't it?

4    A.   Yes.

5    Q.   We can take that off the screen.

6         I want to now talk a bit more about the particular

7    transaction that the government focused on in terms of the $33

8    million.  You remember being asked about that, right?

9    A.   Yes.

10   Q.   And do you recall before they asked you about the $33

11   million transaction, there was some e-mails that were shown to

12   you between Mark Scott and Ruja Ignatova about potential use of

13   the firm escrow account?

14   A.   Yes.

15         MR. DEVLIN-BROWN:   If we could publish, Mr. Barile,

16   Government Exhibit 1047 in evidence.  If we could just blow up

17   the top of the e-mail maybe until we get to the signature line.

18   That's fine.  Thank you.

19   Q.   So this with is one of the exhibits the government showed

20   you on direct examination, right?

21   A.   Yes.

22   Q.   And you see the portion in the exhibit where Mr. Scott in

23   the third paragraph says "We can do so through our escrow

24   account at Locke Lord as a capital contribution for the new

25   investment fund," do you see that?

1    A.  I see that.

2    Q.  You don't have any idea whether that occurred or didn't

3    occur, right?

4    A.  No.

5    Q.  And you see at the top of the e-mail second sentence

6    Mr. Scott writes "The lawyers are going through my KYC right

7    now to comply with their obligations and to optimize it for

8    banks."

9            KYC means know your customer; is that right?

10   A.  Yes.

11   Q.  Finally, in the second paragraph, in the last sentence,

12   Mr. Scott writes, "As stated, if companies are sending I need a

13   copy of incorporation papers and certified copy of the passport

14   of any signatory."

15           Do you see that?

16   A.  Yes.

17   Q.  Okay.  So, this e-mail is February 22, 2016.  If we could

18   now show Government Exhibits 2005, please, which is in

19   evidence.

20           So you recall seeing this exhibit on direct

21   examination, Mr. Reeder?

22           I guess you saw a lot.

23   A.  Oh, yes, yes.

24   Q.  So, this e-mail is one of the first e-mails I think you saw

25   about the $33 million escrow transfer, right?

JBD3SCO3                          Reeder - Cross

1    A.  I saw -- I am not sure it is first or whatever.

2    Q.  Okay.  It's a month after the February 22 e-mail,

3    Government Exhibit 1047, between Mark Scott and Ruja Ignatova,

4    about a potential use of the escrow account as a capital

5    contribution for new investment fund, right?

6    A.  Okay.

7    Q.  You don't have any idea, do you, personally, whether the

8    communications in February with Ruja Ignatova have anything to

9    do with this Abbots House penthouse reservation titled e-mail

10   or attachment title e-mail that you are seeing right now,

11   right?

12   A.  That's correct.

13            MR. DEVLIN-BROWN:  We can take that off the screen,

14   Mr. Barile.  If we could show Government Exhibit 2006, please,

15   Mr. Barile.  This is the second to last page.  Sorry.  The last

16   page is just some boilerplate stuff.  Right.

17   Q.  The bottom e-mail there, do you see it says it's from

18   Ruja@OneCoin.eu?

19   A.  Yes.

20            MR. DEVLIN-BROWN:  Actually could we put 2005 back up

21   briefly, Mr. Barile.  And blow up the bottom e-mail.

22   Q.  So I believe this e-mail was sent from, it says

23   Lucy.Kirby@KnightFrank.com.

24   A.  Yes.

25   Q.  Knight Frank is a law firm.  Is that right?

1   A.   That's my understanding.

2   Q.   The e-mail is to RujaIgnatova@RavenR.com, copying Mark

3   Scott and others.   And communicating "I'm pleased to confirm

4   our clients have come back to us this morning to advise that

5   your offer of 13,600,000 pounds for the above-mentioned

6   property has been accepted."   Do you see that?

7   A.   Yes.

8   Q.   You have no reason from the e-mails that you've seen to

9   believe that there were not in fact buyers interested in -- or

10  sellers interested in potentially selling a property to Ruja

11  Ignatova for 13.6 million pounds, right?

12  A.   Correct.

13          MR. DEVLIN-BROWN:   We can take that off the screen.

14  Could we show Government Exhibit 2008, just the top e-mail,

15  please, Mr. Barile.

16  Q.   So, do you see this e-mail from Mark Scott on March 31

17  saying "Never was asked to do this here and we had millions

18  flowing through.   Think this has to do with U.K. law."

19  A.   Yes.

20  Q.   If we can zoom out a little, Mr. Barile.

21          He's responding to an e-mail from Rebecca Watkins who

22  had written immediately below "Thanks, Mark.   My apologies to

23  you, I've been told it was a firm-wide policy."

24          Do you see that?

25  A.   Yes.

1   Q.  So, I believe you testified before, Mr. Reeder, in fact

2   U.K. law does have additional anti-money laundering

3   requirements for law firms, doesn't it?

4           MR. DiMASE:  Objection.  Mischaracterizes the

5   testimony.

6           THE COURT:  Overruled.

7   A.  Yes.

8   Q.  And that wasn't necessarily widely understood within the

9   various international offices of the firm, was it?

10  A.  I don't know.

11  Q.  Have you in your experience had partners or other Locke

12  Lord lawyers ask questions about U.K. policies for anti-money

13  laundering or KYC on clients?

14  A.  Yes.

15          MR. DEVLIN-BROWN:  We can take that off the screen,

16  Mr. Barile.  If we could show Government Exhibit 2010 at the

17  top of the page, please.

18  Q.  So you see this e-mail from Mark Scott to Miles Holsworth

19  and others stating, "Just to be clear, I'm not doubting that

20  the requirements exist.  But how are we supposed to know until

21  it's pointed out by someone?  Each firm handles escrow intake

22  and disbursement differently."  Do you see that?

23  A.  Yes.

24  Q.  Training on escrow intake and disbursement was not done

25  regularly, was it in 2016?

JBD3SCO3                          Reeder - Cross

 1   A.  Yes.

 2   Q.  It was done or was not?

 3   A.  It was -- repeat the question.

 4   Q.  I was asking you if it was not done regularly in 2016?

 5   A.  I would say yes, it was not done regularly.

 6   Q.  Thank you.  You can take that off the screen.  Do you

 7   remember the government asking you some questions about a

 8   matter related to I guess called iCard.  Do you remember that?

 9   A.  Yes.

10   Q.  If we could put up Government Exhibit 2035, Mr. Barile.

11   You remember being asked some questions, Mr. Reeder, about the

12   transaction from Zala to iCard as you see right there?

13   A.  Yes.

14   Q.  Client matter number.  Do you see line three, client matter

15   number?

16   A.  Yes.

17   Q.  What is a client matter number at Locke Lord?

18   A.  Every client has a unique number, and every matter for that

19   client has a unique number.

20   Q.  So that would mean under the conventions your firm uses

21   that this is the 11th matter for Zala?

22   A.  I don't know.

23   Q.  Well, do you usually start the matter numbers with one?

24   A.  Yes, but, I don't know.  I just don't know how they got to

25   11, but typically start with one.

JBD3SCO3                          Reeder - Cross

1    Q.  Okay.  So that would be your assumption seeing something

2    like that, that if it says 11, you can't be sure, but it's

3    probably the 11th matter?

4              MR. DiMASE:  Objection.

5              THE COURT:  Overruled.

6    A.  Yes.

7    Q.  You were asked some questions about the flows of money in

8    connection with this matter, right?

9    A.  Yes.

10   Q.  And you had never actually looked at those documents prior

11   to preparing for your testimony?

12   A.  Yes.

13   Q.  "Yes" meaning you had not looked at them, right?

14   A.  I did not, I had not looked at them before.

15   Q.  The firm has never, to your knowledge, conducted any

16   investigation into those transfers, right?

17   A.  Not to my knowledge.

18   Q.  The matter itself, the iCard matter, you don't know what it

19   involved, right, in terms of legal work?

20   A.  Yes, I do not know.

21   Q.  So, you don't know whether it involved litigation or a

22   transaction or any number of other things that I guess lawyers

23   do, right?

24   A.  Correct.

25             MR. DEVLIN-BROWN:  Just a moment, your Honor.

JBD3SCO3                          Reeder – Cross

1              THE COURT:  If you wish, Mr. Devlin-Brown, we can take

2     our afternoon break now.  It's 12:40, so 15 minutes.  Ladies

3     and gentlemen, do not discuss the case.

4                   (Jury excused)

5                   (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            THE COURT:  Mr. Reeder, you may step down.

2            THE WITNESS:  Thank you.

3            THE COURT:  Any issues for me?

4            MR. DiMASE:  No.

5            (Recess)

6            MR. DEVLIN-BROWN:  I don't believe Mr. DiMase is here

7    but we have one issue to raise.

8            THE COURT:  Okay.  Do you want to give me a preview,

9    Mr. Devlin-Brown?

10           MR. DEVLIN-BROWN:  Sure, your Honor.  So, in the

11   sidebars back and forth I neglected to admit the engagement

12   letter that corresponded with the July 12, 2018, conflict check

13   that you permitted us to admit, but didn't say that they

14   pursued an engagement.  The exhibit for the engagement letter

15   itself is 720.  So I do plan on offering that one.

16           THE COURT:  Okay.

17           MR. DEVLIN-BROWN:  And the other issue, which we don't

18   necessarily need to resolve with this witness on the stand, but

19   perhaps I can just direct your Honor to it.  Is 721.  Which

20   involves e-mails between, among others, James Channo, the law

21   firm partner Locke Lord and Konstantin Ignatov, the

22   government's witness.  And the subject matter of the e-mails

23   appears to be transferring title of properties held by Ruja to

24   Konstantin.  Which I think is quite relevant, given that

25   Mr. Ignatov testified he only received a nominal salary and the

1    power of attorney awarding him property he thought was forged

2    by Irina Dilkinska.  This seems to show efforts to at least

3    obtain access to Ruja Ignatova's properties through Locke Lord.

4              THE COURT:  That's not going to happen this afternoon.

5              MR. DEVLIN-BROWN:  I don't need it with the witness on

6    the stand.

7              THE COURT:  Okay.

8              MR. DiMASE:  Judge, just briefly.  It sounds like the

9    basis for the admissibility of this evidence is impeachment of

10   Mr. Ignatov.  The rules are very clear, you have to confront

11   the witness before you can admit any evidence.  And he did not

12   confront the witness about these e-mails or about this issue.

13   So I just don't see how they are admissible on any other basis.

14             MR. DEVLIN-BROWN:  We're happy to take that up later.

15   We can look into the record.

16             THE COURT:  Very well.  Okay.  Let's get Mr. Reeder.

17   And let's get the jury.  Do we expect to be the rest of the day

18   with Mr. Reeder?

19             MR. DEVLIN-BROWN:  I think I probably have at least an

20   hour.

21             MR. DiMASE:  An hour?

22             (Continued on next page)

23

24

25

1          (Jury present)

2              THE COURT:  Mr. Devlin-Brown.

3              MR. DEVLIN-BROWN:  Thank you, your Honor.

4    Q.  Thank you again, Mr. Reeder.  We were talking about the

5    iCard transaction a moment ago.  And I'll come right back to

6    this, but there is just a housekeeping matter I need to take

7    care of.

8              Do you recall earlier being shown a conflicts check

9    for Ruja Ignatova in July 2018?

10   A.  Yes.

11   Q.  Could I ask you to take a look at just for your own,

12   Ms. Stanley can display it or you can look in the book, Defense

13   Exhibit 720.  Do you recognize this, Mr. Reeder, to be a

14   additional Locke Lord engagement letter?

15   A.  Yes.

16             MR. DEVLIN-BROWN:  The defense offers Defense Exhibit

17   720.

18             MR. DiMASE:  As we discussed at sidebar.

19             THE COURT:  It will be received.

20             (Defendant's Exhibit 720 received in evidence)

21             MR. DEVLIN-BROWN:  If we can please publish that,

22   Ms. Stanley.

23   Q.  So this is an engagement letter from James Channo; is that

24   right, Mr. Reeder?

25   A.  Yes.

JBD3SCO3                          Reeder - Cross

1    Q.  It is addressed to Ruja Ignatova?

2    A.  Yes.

3    Q.  Dated July 12, 2018?

4    A.  Yes.

5    Q.  The first paragraph states "Further to recent discussions

6    with Mr. Schneider." Do you see that?

7    A.  Yes.

8    Q.  Do you know a Frank Schneider by any chance?

9    A.  No.

10   Q.  Then the rest of that sentence is "we believe it is

11   important that we revisit the manner in which you hold your

12   real estate interests in the U.K."  You see that?

13   A.  Yes.

14   Q.  And then if you could just blow up scope of engagement.

15   Scope and objectives, please, Ms. Stanley.  That's sufficient.

16   Thank you.

17          So, do you see under scope of work it says "Evaluating

18   most effective way for you to hold your real estate interests

19   in the U.K. factoring issues such as tax, discretion of holding

20   to the extent possible, and simplicity of structure."

21   A.  Yes.

22   Q.  Discretion of holding, does that mean anything to you?

23   A.  No.

24   Q.  It doesn't mean like confidentiality or privacy maybe?

25   A.  No, it doesn't mean anything to me.

1    Q.  That's not the plain meaning of discretion of holding to

2    you?

3            MR. DiMASE:  Objection.

4            THE COURT:  Overruled.

5    A.  It doesn't mean anything to me.

6    Q.  Okay.  If we could go to the last page of this document,

7    please.  Ms. Stanley, just if you go to the last page.

8    Actually it's not necessary.  Take it off the screen.

9            Let me go to the iCard that we were talking a little

10   bit before the break.  Do you recall being shown e-mails from

11   Mr. DiMase relating to that, that transaction?

12   A.  Yes.

13   Q.  Just like the e-mails relating to the Zimbabwe bank, you

14   didn't know one way or the other whether there are other

15   e-mails in the same chain that you hadn't seen or variations on

16   the chain?

17   A.  Yes.

18           MR. DEVLIN-BROWN:  I'd like you to take a look, first

19   we are going to have the government exhibits.  If you wouldn't

20   mind, putting up, Mr. Barile, 1317 which is in evidence.

21   Sorry.  That may not be correct.  Just give me one second.  I

22   have the wrong exhibit if you could take that off the screen.

23   Sorry.  1378, Mr. Barile.

24   Q.  Do you see the middle e-mail there from Mark Scott to

25   Giselle?

1   A.  Yes.

2   Q.  Asking some questions?

3   A.  Yes.

4   Q.  And do you see the response that I believe Mr. DiMase

5   showed you as well in which Gilbert Armenta writes to Mark

6   Scott "Really, you're asking these questions regarding iCard

7   and bank information.  Really" with the extra Ls?

8   A.  Yes.

9            MR. DEVLIN-BROWN:  We can take that off the screen,

10   please, Mr. Barile.  And I'd like to show just the witness,

11   Ms. Stanley what's been marked for identification as Defense

12   Exhibit 556.

13            Well, I'd like to offer 556 into evidence, your Honor.

14   I have an extra copy for you.

15            MR. DiMASE:  No objection.

16            THE COURT:  556 will be received.

17            (Defendant's Exhibit 556 received in evidence)

18            MR. DEVLIN-BROWN:  If we could publish that, please,

19   Ms. Stanley.  Great.  If we could just zoom for now on the

20   bottom portion of the e-mail, Ms. Stanley.

21   Q.  So, this is the same e-mail we saw at the bottom of

22   Government Exhibit 1378 a moment ago, right?  With Mr. Scott

23   asking questions of Giselle "whom is it addressed?  To JSC?"

24   Do you remember just reading that?

25   A.  Okay, yes.

JBD3SCO3                              Reeder - Cross

Q.  Okay.  If we could zoom out, please, Ms. Stanley.  And this
version of the e-mail thread doesn't contain the "really" with
the extra Ls, right?

A.  I'm sorry, what are you asking?

Q.  Do you remember we just saw a version with the same e-mail
at the bottom, but an e-mail at the top from Gilbert Armenta
saying "Really, you are asking these questions about iCard and
bank information, really?"

A.  I remember seeing that, yes.

Q.  I'll just read up from the chain from the bottom part of
the e-mail that we've seen on 1378.  There's a response from
Gilbert Armenta to Mark Scott copying Giselle Valentin.  "G
sent the letter to Georgie and copy me and him to sign it and
if he has any questions call me."  And then there is a response
which looks like it's from Ms. Valentin, writing "okay will do.
Mark, please send me the letter and note the iCard1 funds were
sent in a separate wire.  These funds are completely isolated
from any other transactions."

        Then the e-mail right above that you see that there is
no Mark Scott on that e-mail, right, that you can tell?

A.  Right.  Correct.

Q.  And Gilbert Armenta e-mails Giselle Valentin "Don't respond
to Mark."  Do you see that?

A.  Yes.

Q.  And the response from Giselle Valentin is "understood."

JBD3SCO3                          Reeder - Cross

1   A.   Yes.

2   Q.   Fair to say you frankly have no idea what these people are

3   talking about in connection with this transaction?

4   A.   Correct.

5   Q.   Okay.  We can take that off the screen.  I want to ask you

6   some biographical information about Mark Scott and how he came

7   to Locke Lord.

8           Perhaps if you would be so kind, Mr. Barile, if we can

9   put on the screen what's already in evidence as Government

10  Exhibit 2201.  And if we could page down to I believe it's

11  about 14.  It is the Locke Lord bio.  Well, actually, there we

12  go.  Thank you very much, Mr. Barile.

13          So, is it common for partners at Locke Lord to have a

14  bio on the web?

15  A.   Yes.

16  Q.   And that's so clients or potential clients can see their

17  areas of experience and expertise?

18  A.   Yes.

19  Q.   And do you see Mark Scott in the middle paragraph is

20  described as -- I'll read.  "Mark's experience in complex

21  transactions includes representing private equity funds and

22  large corporations and portfolio acquisitions, strategic

23  investments and structuring real estate investments for

24  corporate investors."  Do you see that?

25  A.   Yes.

1   Q.  The third paragraph notes he is a native German speaker and

2   assists U.S. and German clients?

3   A.  Yes.

4   Q.  And I think you actually mentioned you were part of a

5   business development project, or at least putting people in

6   touch with Mark recalling that he had spoken German?

7   A.  Yes.

8   Q.  This notes at the very top that Mark Scott is a partner in

9   the Miami and West Palm Beach office of Locke Lord.  Do you see

10  that?

11  A.  I see that.

12  Q.  Was there both a West Palm Beach office and a Miami office

13  at that time?

14  A.  Yes.

15  Q.  Were either of those acquired from one of the law firms you

16  had merged with?

17  A.  Miami was acquired from the Edwards Wildman Palmer

18  acquisition.

19  Q.  From which?

20  A.  The Edwards Wildman Palmer.

21  Q.  I believe you testified that took place in 2015 or?

22  A.  January 10, 2015.

23  Q.  That was a very small office I think you testified, right?

24  A.  I'm not sure, I think it was a small office.

25  Q.  Had you ever been there or visited?

1    A.  No.

2    Q.  In your role as deputy COO, were there, you know, issues

3    that had to be confronted when you absorbed this new firm in

4    terms of integrating everyone?

5    A.  I was not deputy COO at the time of the merger.

6    Q.  I guess just based then on your personal experience as a

7    partner at the firm at the time.  Were there sort of

8    integration issues that had to be accomplished when you bring

9    in a new law firm?

10   A.  Yes.

11   Q.  The Miami office had been part of the previous law firm,

12   right?

13   A.  Yes.

14   Q.  And part of that integration is explaining the new Locke

15   Lord policies and procedures to people in the office of the

16   firm that's being acquired, right?

17   A.  Could be.

18   Q.  If we could back up to page 15, please, Mr. Barile.  So

19   this is in evidence already as 2201-15.  This is not a Locke

20   Lord document though, so I don't know if you've seen this exact

21   version, but it's common, I imagine, when people apply to

22   become a lateral, that they provide their résumé?

23   A.  Yes.

24   Q.  And you want to investigate and make sure that they seem

25   qualified for the position?

JBD3SCO3                          Reeder - Cross

1   A.  Yes.

2   Q.  So, according to this résumé, anyway, Mr. Scott was at

3   Arnstein & Lehr before joining Locke Lord, per the résumé.  And

4   it reported that he was the co-chair of the M&A and private

5   equity practice?

6   A.  As stated in the résumé.

7   Q.  Well, you are not aware of any issues, are you, in the

8   hiring of Mark Scott where there were problems raised about

9   what he reported on his résumé, are you?

10  A.  No.

11  Q.  And the second bullet there says "represent a small group

12  of family offices in their investments in general corporate and

13  transactional matters." Do you see that?

14  A.  Yes.

15  Q.  And then just jumping down to Duane Morris, the third

16  bullet, do you see it says closed a billion dollar -- I guess

17  B-I-O is billion; is that right?

18  A.  I guess.

19  Q.  Either that or short for biological or something?

20  A.  I don't know.

21  Q.  Well, he closed a $1 bio transaction in Brazil.  Do you see

22  that?

23  A.  I see that.

24  Q.  Involving as reported 4,000 tower assets?

25  A.  Yes, I see that.

1    Q.  Okay.  You interpret that to be a billion in that context,

2    right?

3    A.  I would think so.  I would hope so.

4    Q.  We can take that off the screen, thank you.

5             Now you testified before I believe about the time

6    period of Mark Scott's employment, he was really at Locke Lord

7    for only about a year; is that right?

8    A.  From June of 2015 to September of 2016.

9    Q.  Are you aware that the firm Locke Lord had informed him in

10   early 2016 that he was not hitting the highest performance

11   target that the firm wanted?

12   A.  I am not aware of that.

13   Q.  Are you aware of any friction between Mr. Scott and the law

14   firm in that period?

15   A.  No, I am not aware.

16   Q.  I believe you testified that you searched for any record as

17   to whether Mr. Scott had authorization to work outside of Locke

18   Lord in any sort of capacity; is that right?

19   A.  That's correct.

20   Q.  And you didn't find anything?

21   A.  Didn't find anything.

22   Q.  Can I show you what's been marked for just the witness

23   Defense Exhibit 555, please.  Sorry, I apologize.  It's 554.

24   Take a look at 554.  Do you recognize this to be a Locke Lord

25   outside employment disclosure form?

JBD3SCO3                        Reeder - Cross

1    A.  Yes.

2              MR. DEVLIN-BROWN:  The government offers Defense

3    Exhibit 554.

4              MR. DiMASE:  No objection.

5              THE COURT:  554 will be received.

6              (Defendant's Exhibit 554 received in evidence)

7    Q.  So I have some questions about the form.  The first

8    paragraph says "The firm recognizes that some employees may

9    hold a job with another organization."  Do you see that?

10   A.  I see that.

11   Q.  I thought you testified on direct that partners could not

12   hold another job.

13   A.  No, they're not supposed to without the consent of the

14   executive committee.

15   Q.  Okay.  Is this form outdated to your knowledge or incorrect

16   in any way?

17   A.  I think this form was submitted at the time of his

18   employment.

19   Q.  Is it not intended for partners really but for other

20   employees?

21   A.  I don't know.

22   Q.  In any event, Mr. Scott checks the box I am -- sorry, if we

23   could leave that up.  Mr. Scott checks the box "I am not

24   currently employed by another organization nor do I intend to

25   be."  Do you see that?

1   A.  Yes.

2   Q.  And the date of this is June 8th, 2015?

3   A.  Yes.

4   Q.  So, as you would interpret that, that's a representation

5   that as of June 8th, 2015, he's neither employed by another

6   organization nor then intends to be so employed?

7   A.  Yes.

8   Q.  But other than this, you haven't found any sort of

9   employment --

10  A.  No.

11  Q.  -- disclosure.  We can take that off the screen.

12          I want to talk now a little bit about documents

13  related to work Mark Scott did while he was employed at the

14  firm.  If I could have you take a look at Defense Exhibit 104

15  for identification.  Do you see that, Mr. Reeder -- oh sorry.

16  A.  Okay.

17  Q.  Do you recognize that to be an engagement letter for Mark

18  Scott?

19  A.  Yes.

20          MR. DEVLIN-BROWN:  The government offers Defense

21  Exhibit 104 -- defense offers Defense Exhibit 104.

22          MR. DiMASE:  No objection.

23          THE COURT:  104 will be received.

24          (Defendant's Exhibit 104 received in evidence)

25  Q.  Okay.  If you wouldn't mind publishing that to the jury,

1    Ms. Stanley.

2            So, this letter is dated October 15, 2015.  And it is

3    on Mark Scott's letterhead, right, Mr. Reeder?

4    A.  Yes.

5    Q.  It is addressed to Ruja Ignatova of One Network Services.

6    Do you see that?

7    A.  Yes.

8    Q.  And I believe you testified before that it was a

9    requirement for new matters to issue an engagement letter that

10   there had to be a conflicts check, right?

11   A.  Yes.

12   Q.  And if we could blow up scope of engagement, please,

13   Ms. Stanley.  So, as you mentioned before, this is the section

14   that's used to describe what the matter will involve, right?

15   A.  Yes.

16   Q.  And this reads "You are engaging the firm as your attorneys

17   to represent you in connection with a possible restructuring of

18   your group of companies, your business plan and other general

19   corporate matters."  Do you see that?

20   A.  Yes.

21   Q.  We can take that off the screen Ms. Stanley.

22           And you are aware, aren't you, from bills or invoices

23   issued by Locke Lord, that Mr. Scott billed time under this

24   engagement, right?

25   A.  I'm sorry.  Repeat the question?

JBD3SCO3                    Reeder - Cross

1   Q.  You are aware from invoices that Locke Lord issued that

2   Mr. Scott billed time pursuant to this engagement, aren't you?

3   A.  I don't know.

4   Q.  Well let me show you then what's been marked for

5   identification as Defense Exhibit 445.

6           MR. DiMASE:  May we have a sidebar on this briefly?

7           THE COURT:  Sure.

8           (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  Yes.

3          MR. DiMASE:  Judge, just to cut this off at the pass

4     so we don't get into it in the middle of the testimony, we

5     don't object to the overall billing records coming in, but --

6     could we show this.

7          THE COURT:  You want to redact the detail?

8          MR. DiMASE:  The details and they're substantive and

9     they appear to be things that would be offered for the truth.

10    And it is our understanding they would have come from the

11    defendant, so it seems like it's hearsay and not admissible.

12    With that portion redacted, I don't think we have an objection

13    to hours, amounts of money, things like that coming in.

14         MR. DEVLIN-BROWN:  Your Honor, I think, first of all,

15    it may fall within a hearsay exception as a business record if

16    it's prepared at or near the time of the matters taking place.

17    But, we are not offering it for the truth.  We're offering

18    that's what he sent on his bill to her.  I think redacting it

19    will just raise questions about what he did.  If your Honor

20    feels it is necessary to say it's not offered for the truth

21    this is what the bill was.  I think it is relevant that there

22    are people who are not Mark Scott who have entered time where

23    the description I think is relevant.

24         MR. DiMASE:  All of this looks like it is being

25    offered for the truth.  It is hearsay within hearsay.  The

JBD3SCO3                        Reeder - Cross

1   remainder of this as a business record the government does not

2   object to.

3              THE COURT:  You can put it in as long as you redact

4   the detail.

5              MR. DEVLIN-BROWN:  Okay.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          MR. DEVLIN-BROWN:  The defense offers Defense Exhibit

3    445 subject to the redactions that were discussed at sidebar.

4    We don't need to publish that.

5          THE COURT:  Any objection?

6          MR. DiMASE:  No, not with the redactions.

7          THE COURT:  It will be received.

8          (Defendant's Exhibit 445 redacted received in

9    evidence)

10         MR. DEVLIN-BROWN:  I don't think we will publish it

11   then at this time.

12   Q.  But you see it in front of you, don't you, Mr. Reeder?

13   A.  Yes.

14   Q.  This reflects a bill dated October 25, 2016, issued to One

15   Network Services, attention Dr. Ruja Ignatova from Locke Lord,

16   right?

17   A.  Yes.

18   Q.  And it lists a matter, a client matter number?

19   A.  Yes.

20   Q.  And I believe the total is $85,687.26?

21   A.  Yes.

22   Q.  And it lists time entries for two attorneys abbreviated as

23   M.S.S. and E.S.  Do you see that?

24   A.  I see that.

25   Q.  Any idea who -- well, do you know a Santiago, an associate

JBD3SCO3                          Reeder - Cross

1    by the name of Santiago, first initial E?

2    A.  No.

3    Q.  Do you see from the date range here that the billing

4    entries start on January 4, 2016, and then if we just flip to

5    the second page for the benefit of Mr. Reeder, and continue

6    until April 20, 2016.

7    A.  Yes.

8         MR. DEVLIN-BROWN:  Thank you.  We can take that off.

9    The defense offers Defense Exhibit 103.

10        MR. DiMASE:  Objection.  Hearsay, your Honor.

11        THE COURT:  Sustained.

12        MR. DEVLIN-BROWN:  May we approach, your Honor?

13        THE COURT:  Sure.

14        (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1      (At the sidebar)

2           MR. DEVLIN-BROWN:  So, this is one of the e-mails that

3      we had mentioned this morning.  It's, we are not interested in

4      anything Mark Scott wrote on the e-mail.  But what we are

5      interested in is Dr. Ruja Ignatova's message or e-mail to Mark

6      Scott as a request for certain type of legal work.  It's not

7      offered for the truth.  I mean, the defense's theory is largely

8      Ruja Ignatova was a liar.  It is offered to show this is what

9      she communicated with Mark Scott, and this is what she told him

10     she needed in terms of legal services.

11          Your Honor is aware that the government has put in all

12     sorts of e-mails from Ruja Ignatova to Mark Scott as to his

13     state of mind where Ruja Ignatova says something like my

14     Russian boys -- or I don't follow all of those e-mails.  But

15     this is an e-mail showing something else she's telling him,

16     which is to do certain legal work.  And I think that's relevant

17     to his state of mind, it is relevant to the relationship

18     between Ruja Ignatova and Mark Scott, and we are not offering

19     it for the truth of anything she's stating here.  It is a task.

20     It is not even declaration in large part.

21          MR. DiMASE:  Your Honor, the vast majority of this

22     e-mail, almost the only thing in it from Mr. Scott is "FYI."

23     It is all Ruja Ignatova's words, the co-conspirator at this

24     trial.  Her statements are not admissible if offered by the

25     defendant and if they are offered for the truth.  And the

1    concern is that these are not truthful statements.  These are

2    co-conspirators, and Ruja's setting forth something in a way to

3    make it look like it is legitimate when in fact it is not

4    legitimate, and Mr. Devlin-Brown argued for its truth rather

5    than the reasons that he stated here on the record.  So that's

6    the concern the government has.  This is a co-conspirator

7    statement, being offered for the truth by the defense.

8        MR. DEVLIN-BROWN:  The work that Mark Scott did for

9    Ruja Ignatova at Locke Lord is highly relevant.  She asked him

10   to do certain kinds of legal work.  We have other exhibits

11   showing what sort of legal work he was doing.  The government

12   is free to offer that that's all a cover for something else.

13   But, these are directions a lawyer is giving to her client

14   about what the -- sorry.  The client giving to her lawyer about

15   what the lawyer should do, and it is relevant for that reason.

16       THE COURT:  But the way that you are describing it

17   sounds like you are putting it in for the truth.  It is

18   relevant as direction she is giving Scott in connection with

19   some purportedly legitimate business relationship.  It is a

20   co-conspirator statement.  I'm not letting you put it in.

21       MR. DEVLIN-BROWN:  Okay.

22           (Continued on next page)

23

24

25

1           (In open court)

2    BY MR. DEVLIN-BROWN:

3    Q.  Mr. Reeder, you are aware that Mark Scott used Locke Lord

4    as a client after he separated from the firm, aren't you?

5    A.  Yes.

6    Q.  And he engaged the firm to help him on a project called

7    Blue World Voyages LLC?

8    A.  That I don't know.

9    Q.  But he engaged the firm to help on several different

10   projects; is that fair to say?

11   A.  I just know he engaged the firm after he left.

12   Q.  Could you take a quick look then at Defense Exhibit 704,

13   just for you.  First of all, do you recognize it as a Locke

14   Lord invoice?

15   A.  Yes.

16   Q.  And you see the date that is 5/20/18?

17   A.  Yes.

18   Q.  And the re line Blue World Voyages LLC?

19   A.  Yes.

20   Q.  And it's directed to MSS International Consultants, BVI

21   Ltd. attention Mark Scott?

22   A.  Yes.

23   Q.  Does this refresh your recollection that Locke Lord did do

24   some work for Mark Scott during this period in 2018?

25   A.  I knew Mark Scott used the firm after his departure, and

JBD7SCO4                        Reeder - cross

1    this is a legitimate -- this is an invoice of the firm.

2    Q.  So, based on your experience with the firm's records, is it

3    fair to say that the firm was performing legal services for

4    Mark Scott or MSS International Consultants in February of 2018

5    or thereabouts?

6    A.  Based on this -- and the timing here looks like December

7    '17 that the services were performed and billed in February

8    '18.

9    Q.  So, it's fair to say it appears from your review of this

10   record of Locke Lord's that the firm was doing some work for

11   Mark Scott in December of 2017.

12   A.  Well, for MSS International Consultants BVI Ltd.

13   Q.  With that additional qualification, the firm was doing work

14   for MSSI it appears in 2017.  And, look, we just got the second

15   page, it looks like early 2018 as well, right?

16   A.  Yes.

17   Q.  I would like to ask you some questions about another lawyer

18   who worked at Locke Lord Robert Courtneidge.  If we could have

19   Mr. Barile put on the screen and publish what is already in

20   evidence as Government Exhibit 2275.  We will blow up the

21   middle paragraph in a second, but just you can probably barely

22   make it out, but it's from August 8, 2016.  Do you see that?

23   At the top of the e-mail?

24   A.  Yes, August 8, 2016.

25   Q.  And I gather you don't know anyone on the e-mail that this

JBD7SCO4                          Reeder - cross

1   was sent to.

2   A.  No.

3   Q.  OK.  Could we just blow up the middle paragraph, please.

4   And this e-mail from Mark Scott says, "One of my partners at

5   Locke Lord is a specialist in the industry of this client and

6   we established, before accepting any subscriptions or

7   engagement with IMS or B & N, that this industry was completely

8   legitimate and regulated in Germany and Singapore, the

9   locations we were receiving funds from directly or indirectly.

10  I have attached a publicized outline by Locke Lord of how

11  cryptocurrency is treated worldwide by governments.  As marked,

12  you can see our client is supporting operations in regulated

13  legitimate markets."

14          We can remove the blow-up of that, Mr. Barile.  Thank

15  you.  But I would now like to page down to page 5 of this

16  government exhibit.  And if we could just blow up the title and

17  the authors, please, Mr. Barile.

18          So this document is entitled "Cryptocurrencies and

19  Blockchain Technology Update:  Research note."  Prepared by

20  Robert Courtneidge, who is listed as global head of cards and

21  payments.

22          Is that a position that Mr. Courtneidge held at the

23  firm, to your knowledge?

24  A.  I knew he was a consultant with the firm.  I am not sure of

25  his exact title.

JBD7SCO4                    Reeder - cross

1   Q.  Did you understand him to be an expert in payments issues?

2   A.  Yes.

3   Q.  And Charlie Clarence-Smith who is listed below Robert

4   Courtneidge, did you know him personally at all?

5   A.  No.

6   Q.  And if we could just turn to the next -- well, page 9 of

7   this exhibit, please, and blow up the first part.

8        Does that look like track changes to you, Mr. Reeder,

9   that red?

10  A.  No, it really looks like a compare write.

11  Q.  Compare write, that's a different way of comparing

12  different versions of documents?  We will just flip through it

13  but the first sentence, "The EU, as a whole, supports the use

14  of cryptocurrency, however attitudes in relation to regulation

15  vary across the member states."  You see it list various

16  companies, the USA, different states, New York.

17       We can take that off the screen, Mr. Barile.  I'd like

18  to publish what is in evidence as Government Exhibit 2013,

19  please.  And if we could blow up the message from -- downward,

20  please -- sorry.  Just one page at a time.  I'm sorry, Mr.

21  Barile.  Can you just go to the second page.  The third page,

22  please.  Fourth page?

23       Give me one moment, your Honor.  I may have the wrong

24  document.  If we can take that off the screen.

25       If you don't mind, can I just confer with my --

1    THE COURT:  Absolutely.

2    Q.  So, let me show you what has been marked -- well, not

3    yet -- Robert Courtneidge, you have become familiar with him in

4    preparing to testify, haven't you?

5    A.  I met Robert Courtneidge.

6    Q.  So you know he is an expert in cryptocurrencies.

7    A.  I know he purports to be an expert in cryptocurrencies.

8    Q.  And he was apparently good enough for Locke Lord to have

9    onboard as an expert on cryptocurrency issues for some period

10   of time.

11   A.  Yes.

12   Q.  And you are aware from your review of records, aren't you,

13   that he also did work with Ruja Ignatova and of related

14   entities?

15   A.  Yes.

16   Q.  And the subject matter of his advice related to

17   cryptocurrency, right?

18   A.  Name a file.  Can you name a file that he worked on?

19   Q.  Let me show you what has been marked for identification as

20   Defense Exhibit 483.  It's in your book as well, if that's

21   easier.  This is a Locke Lord document, right?  It's sent from

22   a Locke Lord e-mail address?

23   A.  Yes.

24   Q.  And it has a bill on it; do you see that -- or an invoice?

25   A.  Yes.

1    Q.  And, by the way, the invoice is not payable to Locke Lord

2    itself it looks like, right?

3    A.  Let me look.

4    Q.  The second page of the document.

5    A.  No.

6    Q.  Do you know if Robert Courtneidge had permission to do work

7    outside of Locke Lord?

8    A.  I don't know.

9            MR. DEVLIN-BROWN:  The government offers Defense

10   Exhibit 483.

11           MR. DIMASE:  Objection.  Can we have a sidebar?

12           MR. DEVLIN-BROWN:  I will withdraw it and ask a

13   question.

14           THE COURT:  Ask your question.

15   Q.  All right.  Based on your review of this document sent from

16   Locke Lord it's apparent that Mr. Courtneidge did work for Ruja

17   Ignatova at one point, or sent her a bill for it anyway?

18   A.  It looks like the invoice was to Ruja Ignatova.

19   Q.  OK, I don't need to offer it.  I would like you now to take

20   a look, if you don't mind, at several different documents, and

21   I will see if you can authenticate them at once.

22           So maybe it's easiest, Mr. Reeder, in your book.  I

23   will give you the numbers.  It's 107 -- Defense Exhibit 107,

24   149, 207, 486, 505 and 519.

25   A.  What was the one after 505?

JBD7SCO4                          Reeder - cross

1   Q.  519.

2   A.  OK.

3   Q.  Are these all Locke Lord -- e-mails from the Locke Lord

4   e-mail system?

5   A.  Well, they are produced by Locke Lord.

6   Q.  And you weren't producing things from other e-mail systems,

7   to the best of your knowledge?

8   A.  To my knowledge, yes.

9          MR. DEVLIN-BROWN:  The defense offers 107, 149, 207,

10  486, 505 and 519.

11         MR. DIMASE:  Your Honor, the government objects, and

12  we would just ask that this -- we can address these exhibits at

13  the next break, but for now that they not be admitted.

14         THE COURT:  OK.  Mr. Devlin-Brown, can you move on to

15  the next subject?

16         MR. DEVLIN-BROWN:  Certainly, your Honor.  I don't

17  know if we'll have another break but --

18         THE COURT:  There will always be another break.

19         MR. DEVLIN-BROWN:  I just don't want Mr. Reeder to

20  come back another time.  But I will move on.

21  Q.  I'm just going to ask you to look at a few more just to

22  determine whether they are Locke Lord documents.  I'm not going

23  to offer them at this time, but if you don't mind looking, Mr.

24  Reeder, at Defense Exhibits 110, 203 -- I'm sorry, I forgot 151

25  is in the middle of those.  110, 151.

1   A.  I'm sorry.  You're confusing me.  What were those numbers

2   again?

3   Q.  OK.  110.

4   A.  OK.

5   Q.  151.

6   A.  OK.

7   Q.  203?

8   A.  OK.

9   Q.  214?

10  A.  OK.

11  Q.  473.  Do you recognize all of those to be Locke Lord

12  documents?

13  A.  Locke Lord-produced documents.

14          MR. DEVLIN-BROWN:  May I confer with my colleagues for

15  a moment, your Honor?

16          THE COURT:  You may.

17  Q.  Let me show you what is in evidence as Government Exhibit

18  1032, please.

19          Mr. Barile, you were checking that?  Oh, sorry, can I

20  have you publish what is in evidence as Government Exhibit

21  1032, please.

22          So, if we can go to the second page of that, Mr.

23  Barile.  We can stop right there.

24          This refers to in the first bullet Kryptophone and has

25  a number of instructions.  And if you could then page up a

1    little bit for the first page.  And the e-mail from the bottom

2    from d.godeva.  It says, "Dear mark, please find the

3    instructions.  I hope you understand it better than me."  And

4    then you see the response from Mark Scott, "It seems that

5    someone already entered a password."  And then you see her

6    response, "Let me check.  What is your phone number?"

7            You don't have any idea if Mark Scott was able to get

8    this phone working or not, right?

9    A.  No, never even heard of a Kryptophone.

10   Q.  All right.  If we could go to Government Exhibit 2009.

11   It's in evidence.  If we could blow up the top e-mail.  So this

12   is another one of the e-mails the government showed you earlier

13   today in connection with the $33 million transfer issue.  Do

14   you remember that?

15   A.  Yes.

16   Q.  And from Mark Scott to Michael Comiskey.  Do you see that?

17   A.  Yes.

18   Q.  He copies James Channo and other people.  And I will just

19   read the e-mail.

20           "Ruja, i.e., a related company, has been a client for

21   months.  Robert Courtneidge has been advising her since the

22   outset on currency and card issues."

23           Do you see that?

24   A.  I see that.

25   Q.  And then the third paragraph, "Robert would know more about

JBD7SCO4                         Reeder - cross

1    OneCoin, but I am familiar."

2              Do you see that as well?

3    A.  Yes.

4    Q.  We can take that off the screen.

5              Your Honor, other than frankly the issue we might want

6    to confer about, I think we're done.

7              THE COURT:  OK.  Why don't we do this, ladies and

8    gentlemen.  Why don't we take a short break.  I don't know how

9    long it's going to be, but hopefully no longer than ten or so

10   minutes, and then we will bring you right back out.  OK?  Don't

11   discuss the case.

12             And, Mr. Reeder, you can step down.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  Be seated.  So, let me ask you, Mr.

3     Devlin-Brown, are these two distinct groupings?

4          MR. DEVLIN-BROWN:  Yeah.  The first grouping is what

5     we wanted to certainly get into evidence and go through with

6     this witness, and there is different rationales for different

7     e-mails, but what links them together is that Mark Scott is on

8     all of them, and so he is receiving information from Robert

9     Courtneidge or in some cases Ruja -- but mostly from Robert

10    Courtneidge -- as to what Robert Courtneidge is doing for Ruja

11    Ignatova and cryptocurrency.

12          So, I think this is highly relevant to Mark Scott's

13    state of mind.  He has a senior colleague who he knows is to be

14    expert in cryptocurrency, who he knows has been asked by Ruja

15    to handle cryptocurrency-related matters, and there is no

16    communication of any sort by Mr. Courtneidge to Mark Scott in

17    these or any other e-mails of any concern about Ruja Ignatova

18    or about OneCoin.

19          And that I think is extraordinarily relevant evidence,

20    your Honor.  I mean a lot of this case is going to turn on

21    Mr. Scott's state of mind.  Obviously, Mr. Scott could waive

22    his rights and testify to his state of mind, but that's not the

23    only way one is allowed to prove state of mind.  The government

24    has sought to prove state of mind repeatedly by showing all of

25    the, you know, quote unquote warning signs and red flags and

1    information from service providers that Mr. Scott may or may

2    not have any sort of close relationship with as evidence that

3    he should have been skeptical of OneCoin and should have

4    believed it to be a Ponzi scheme.

5          Here he is working with one of his colleagues who is

6    promoted at the firm as an expert in this area, and the fact

7    that his colleague in this joint matter is not saying anything

8    negative to Mr. Scott is highly relevant to his state of mind.

9    That's the basis for admission.

10         MR. DIMASE:  Your Honor, the concern is that these

11   e-mails of nontestifying witnesses are being offered for their

12   truth.  And there is a second way these could come in -- or at

13   least the sentiment in them could come in -- and that would be

14   Mr. Courtneidge could come in and testify that he didn't have

15   any concerns about OneCoin, he communicated that -- if it's

16   true -- to Mr. Scott.  That would be the proper way to get this

17   into evidence before the jury, not e-mails offered for the

18   truth of the matter asserted in place of an actual witness.

19   That's the concern here, is that Mr. Scott could testify,

20   Mr. Courtneidge could testify, but it's improper to offer

21   out-of-court statements for their truth into evidence.  That's

22   the issue.

23         THE COURT:  I agree with the government.  I mean

24   obviously they are arguably relevant, and Mr. Scott's state of

25   mind is an important issue in this case, however, any evidence

1   that gets before the jury has to be appropriate evidence and

2   properly admitted; and these are hearsay statements offered by

3   the defendant, and accordingly I will not allow it.

4          What about the second grouping, Mr. Devlin-Brown?

5          MR. DIMASE:  My understanding is that we didn't intend

6   to offer those today?  Is that right?  In which case we may we

7   might be able to deal with this at a later time.

8          MR. DEVLIN-BROWN:  Well, it's sort of two pillars with

9   respect to Mr. Courtneidge.  The second group are e-mails that

10  Mr. Scott is not on; they show that in fact Mr. Courtneidge was

11  doing legal work with OneCoin.  And that's not directly

12  relevant to Mr. Scott's state of mind, but it informs that

13  Mr. Courtneidge was doing that sort of work.  And then when you

14  link in the e-mails in which Mr. Scott is on, that provides

15  that there was a basis for Mr. Courtneidge to make whatever

16  statements he had.

17         Frankly, your Honor, the second batch of e-mails --

18  which I'm sure the government has similar concerns about --

19  they're not nearly as important as the first batch.  And I do

20  think it's not appropriate to sort of do a broad brush of

21  hearsay across all of these exhibits.

22         If we could just look at -- I'm not saying we need to

23  go through all of them now with the jury there, but if we could

24  just look at one for starters, and I think I can explain why I

25  don't think it's really offered for the truth one way or the

1    other at all.

2            So, Defense Exhibit 149.  So, this is from Robert

3    Courtneidge, it's dated November 24, 2015.  He has not been

4    identified, by the way, by the government, it sounds like, as a

5    coconspirator.  So, what he says to Mr. Scott in this e-mail --

6    and he hasn't met Mr. Scott yet, by the way.  That's clear from

7    later e-mails.

8            So, his colleague in London is saying, "Mark, I had a

9    good meeting with Ruja."  First sentence, "I had a good meeting

10   with Ruja."  Your Honor, I don't care if he had a good meeting

11   with Ruja, a bad meeting with Ruja, a conspiratorial meeting

12   with Ruja; what he told Scott is that he had a meeting with

13   Ruja.  That's not offered for the truth; it's offered for Mr.

14   Scott's state of mind.

15           "I don't think there is any legal work from UK

16   perspective currently, as it is more general advice she needs,

17   which I can help her with."

18           Again, it doesn't really matter if he had the ability

19   to help with her with that or not help her with that.  He is

20   telling his law practice client that that's what he will do,

21   that he has that capacity.  That's highly relevant again to Mr.

22   Scott's state of mind.

23           "She does, however, urgently need to do the

24   restructuring and have the OneCoin company out of Dubai and the

25   networking company out of a friendly jurisdiction."

1          That is what he is communicating the project involves

2     to Mr. Scott.  Maybe that's not what Ruja needs.  Maybe Ruja

3     needs someone to create a fake blockchain audit for her, but

4     this is what she is communicating the assignment to be to

5     Mr. Courtneidge who is communicating it to Mr. Scott.

6          So, none of these things are offered for their truth;

7     they're offered for Mr. Scott's state of mind.  And they're

8     certainly significant if not all of these are not hearsay.

9          MR. DIMASE:  Your Honor, it's pretty apparent that

10    this is all offered for the truth.  I mean the fact of the

11    meeting is being offered for the truth.  The fact of what Ruja

12    told Mr. Courtneidge during the meeting is being offered for

13    the truth.  I mean all of this is about a meeting that happened

14    and what she said during that meeting.  And it's coming in

15    through e-mail an out-of-court statement of Mr. Courtneidge who

16    is not here to be cross examined, and it's being offered for

17    the truth, so that is the concern.

18          THE COURT:  The ruling stays the same, Mr.

19    Devlin-Brown, unless you want to make a record with respect to

20    any of the other e-mails.

21          MR. DEVLIN-BROWN:  I would like to.  I don't know that

22    it needs to be right now necessarily, if your Honor would

23    prefer --

24          THE COURT:  So we can bring the jury back out?

25          MR. DEVLIN-BROWN:  If you don't mind letting me

JBD7SCO4                          Reeder - cross

1    briefly confer.

2              THE COURT:  Sure.

3              MR. DEVLIN-BROWN:  OK, your Honor, that's fine.  And

4    we're going to -- I will end my questioning when they come

5    back.

6              THE COURT:  Very well.  Let's get the jury.  Let's get

7    Mr. Reeder back in, please.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Thank you, ladies and gentlemen, for your

3    patience.  Sometimes it can be a little more efficient if we

4    take a couple minutes with you out of the room.  With that, Mr.

5    Devlin-Brown.

6          MR. DEVLIN-BROWN:  Thank you, your Honor.  I'm going

7    to walk up here all the way, Mr. Reeder, just to collect my

8    stuff and say, thank you, no further questions.

9          THE WITNESS:  OK.  Thank you.

10          THE COURT:  Redirect examination.

11          MR. DIMASE:  Thank you, your Honor.  May I approach

12   the witness, your Honor?  May I approach the witness, your

13   Honor?

14          THE COURT:  You may.

15   REDIRECT EXAMINATION

16   BY MR. DIMASE:

17   Q.  Mr. Reeder, I am handing you what has been marked for

18   identification as Government's Exhibits 2050, 2051, 2052 and

19   2053.

20   A.  OK.

21   Q.  Do you recognize those?

22   A.  Yes, these are e-mails from the system.

23   Q.  From the Locke Lord system?

24   A.  Yes.

25   Q.  And they were all e-mails being kept in the regular course

1    of Locke Lord's business?

2    A.  Yes.

3            MR. DIMASE:  The government is not offering those

4    exhibits at this time, your Honor.

5            THE COURT:  OK.

6            MR. DIMASE:  Can we please pull up Government Exhibit

7    2004 in evidence.  Can we go down to the second page.

8    Q.  Do you remember this e-mail that Ruja sent to Mark Scott

9    about 220,000 Pounds in cash?

10   A.  Yes.

11   Q.  And storing them in London?

12   A.  Yes.

13   Q.  Is this the same Robert Courtneidge you were testifying

14   about on cross-examination, Mr. Reeder?

15   A.  Yes.

16   Q.  Let me ask you to look at Government Exhibit 2275 which you

17   testified about on cross-examination.  This was an e-mail shown

18   to you by Mr. Devlin-Brown during your cross-examination.  Do

19   you remember that?

20   A.  Yes.

21   Q.  Is there any mention in this e-mail of OneCoin?

22   A.  I don't see a mention of OneCoin.

23   Q.  And Mr. Scott in this e-mail says, "I have attached a

24   publicized outline by Locke Lord of how cryptocurrency is

25   treated worldwide by governments."  Do you see that?

1    A.  Yes.

2    Q.  Why don't we page down to that outline.  It's entitled

3    "Cryptocurrencies and Blockchain Technology Update:  Research

4    Note."  Do you see that?

5    A.  Yes, I see it.

6    Q.  And this is the same Robert Courtneidge that was up on the

7    e-mail about 220,000 Pounds?

8    A.  Yes.

9    Q.  If you want to scroll down and scan through here.  So there

10   are many mentions of bitcoin here.

11           Could you go a little slower, Mr. Barile.  I

12   apologize.

13           You can see a number of references to bitcoin in here;

14   is that fair to say?

15   A.  Yes.

16   Q.  Have you seen any references to OneCoin as you scroll

17   through the document here?

18   A.  It's going by very quickly.  I don't see any reference to

19   OneCoin.

20   Q.  And this goes on for some time, so I won't make you look

21   through it all.

22           Can we pull up Defense Exhibit 554.  And, Ms. Stanley,

23   if you wouldn't mind controlling the computer on this.  Thank

24   you so much.

25           Do you see Government Exhibit -- sorry -- Defense

JBD7SCO4                        Reeder - redirect

1    Exhibit 554 on the screen?

2    A.  Yes.

3    Q.  And you testified about this on cross-examination?

4    A.  Yes.

5    Q.  And at the top it says, "The firm recognizes that some

6    employees may hold a job with another organization.  In order

7    to ensure that such employment does not present a conflict of

8    interest or conflict with your responsibilities at the firm,

9    please answer the questions below as applicable."

10          And so is it fair to say that this is a disclosure

11   form where an employee would be required to disclose any

12   outside employment that they have or outside interests they

13   have?

14   A.  Yes.

15   Q.  And the point of the filing of the form is to notify the

16   firm so that the firm can take any appropriate action, correct?

17   A.  Yes.

18   Q.  And I think you testified on direct examination that would

19   involve generally a meeting or some sort of decision-making

20   process by the executive committee, correct?

21   A.  There is a request that's submitted, and then ultimately

22   the executive committee makes a decision.

23   Q.  And that decision can be to approve or deny the request for

24   outside employment, involvement in companies, teaching,

25   etcetera.

1    A.  Yes.

2    Q.  OK.  And this particular form is filled out in June of

3    2015, correct?

4    A.  Yes.

5    Q.  And that would have been at the time that Mr. Scott started

6    at the firm?

7    A.  Yes.

8    Q.  And I think you testified that employees are under an

9    ongoing obligation to disclose outside interests and employment

10   to the firm, correct?

11   A.  Yes.

12   Q.  So if after he started in June of 2015 Mr. Scott began

13   employment outside the firm, or running companies, or something

14   of that nature, he would have an obligation to disclose that in

15   a similar form; is that right?

16   A.  Yes.

17   Q.  And at that point the executive committee would have an

18   opportunity to review it and decide whether or not to approve

19   it, correct?

20   A.  Yes.

21   Q.  And based on a diligent search of the records that you and

22   others have done at Locke Lord, you did not find any evidence

23   that Mr. Scott ever made any such disclosure while he was

24   working at the firm, correct?

25   A.  Yes.

1    Q.   Is that correct?

2    A.   Yes.

3    Q.   Now, you said that one of the reasons that -- I think you

4    said on direct that one of the reasons that the firm conducts

5    that inquiry is because of potential conflicts of interest,

6    right?

7    A.   Yes.

8    Q.   And could you just explain quickly for the jury in the

9    legal world what is a conflict of interest.

10   A.   A conflict is that you have your legal obligation as an

11   attorney to one party, and that's very critical to the system

12   to do that, and you can't represent two parties in a litigation

13   matter; you have to represent separate parties.  So, we track

14   conflicts very, very, very carefully to avoid that problem.

15   So, that's the issue.

16   Q.   Could a conflict also arise when a lawyer is both working

17   for a company and providing it legal advice at the same time?

18   A.   Yes.

19   Q.   So it's not just about representing two parties that may

20   have different interests in the same matter.  There may be

21   other sorts of conflicts of interest that arise from a person's

22   employment or association with other people and entities; is

23   that fair to say?

24   A.   That's correct.

25   Q.   And that's one of the reasons why the firm has this

1   disclosure process in place; is that right?

2   A.  Yes.

3   Q.  So if somebody has an outside interest, or job, or position

4   that might create a conflict of interest with the legal work of

5   the firm, that could be identified and dealt with, correct?

6   A.  Yes.

7   Q.  All right.  And Mr. Scott did not disclose any involvement

8   in running a series of private equity funds while he was at the

9   firm, correct?

10  A.  Yes, based on our search we did not see anything to that

11  effect.

12  Q.  OK.  And you have seen some documents on cross-examination

13  regarding his involvement in representing various parties.  Do

14  you recall that?

15  A.  Yes.

16  Q.  And some of those parties included One Network Services,

17  Ruja Ignatova.  Do you recall seeing those?

18  A.  Yes.

19  Q.  Would it have been critically important to the firm to know

20  that Mr. Scott was handling tens and hundreds of millions of

21  dollars of Ruja Ignatova's money, outside companies, in

22  determining how to proceed with those representations?

23  A.  Yes.

24  Q.  But the firm did not have that information because

25  Mr. Scott did not provide it, correct?

1   A.  We were not aware of it.

2   Q.  He did not disclose his involvement in external companies?

3   A.  He did not submit the request.

4   Q.  And the executive committee had no ability, therefore, to

5   evaluate the propriety of his involvement in those companies,

6   correct?

7   A.  Yes.

8   Q.  Now, can we turn to Government Exhibit 2005 -- I'm sorry --

9   2008.

10          In this e-mail at the top Mr. Scott says, "Never was

11  asked to do this here and we had millions flowing through."  Do

12  you see that?

13  A.  Yes.

14  Q.  And this was e-mail communication connected to that $33

15  million -- euro -- transfer, correct?

16  A.  Yes.

17  Q.  And in fact Mr. Scott had transferred millions of dollars

18  through firm escrow accounts in February 2016, correct?

19  A.  Correct.

20  Q.  And that was the millions of dollars, over $5 million, that

21  went through the escrow accounts, correct?

22  A.  Correct.

23          MR. DEVLIN-BROWN:  Objection to leading.

24          THE COURT:  It's redirect.

25  Q.  And you testified that that money originated from bank

1    accounts in the United States; is that right?

2    A.  Yes.

3    Q.  And that that money was sent out I think about two weeks

4    later to an account in Dubai.

5    A.  Yes.

6    Q.  And I believe you testified on direct examination that that

7    kind of transaction in general raises potential concerns

8    including money laundering; is that right?

9    A.  Correct.

10   Q.  And can we show Government Exhibit 1405.  Can we just

11   highlight the top here, just the very top, the subject line and

12   to and from.

13          This is an e-mail from Mark Scott to Gilbert Armenta

14   on February 16, 2016 that you testified about on direct and

15   maybe cross as well.  Do you recall this?

16   A.  I remember this, yes.

17   Q.  Maybe you didn't testify about it.  It was shown to you and

18   published during your testimony.  And can you read the subject

19   line.

20   A.  "Call with this wire stuff.  Don't have your assistant give

21   me vague instructions.  My ass on the line on this."

22   Q.  And this was two days before the $5 million was sent to the

23   Dubai account out of the Locke Lord escrow account, correct?

24   A.  It was close.  I can't recall the exact date of the wire.

25   Q.  Do you recall it was February 18, 2016 that the funds went

JBD7SCO4                          Reeder - redirect

1  out?

2  A.  OK.

3  Q.  So this would be two days beforehand.

4  A.  OK.

5  Q.  Does that seem right to you?

6  A.  That seems right.

7  Q.  If we could just zoom out, Mr. Barile.

8       And the first paragraph of this e-mail says, "I am

9  trying to help so we have clean documentation."  Do you see

10  that?

11  A.  I see that.

12  Q.  Can we pull up Defense Exhibit 720.  And, Ms. Stanley, if

13  you wouldn't mind helping with that, please.  Can we scroll

14  down, Ms. Stanley, if you don't mind.  Second page.  If you

15  have a way, would you mind expanding number 5 there.  Actually,

16  sorry, if we could just pull out of that and go back to the

17  first page.  I'm very sorry.  Page 1.

18       So this is addressed to Ruja Ignatova, this letter?

19  A.  Yes.

20  Q.  And this is in July of 2018?

21  A.  Yes.

22  Q.  OK.  And are you aware that Ms. Ignatova disappeared from

23  public view in or about October 2017?

24  A.  No.

25  Q.  Let's now go to the second page.  Actually, if we could go

JBD7SCO4                        Reeder - redirect

1    to the last page, the signature page of this document.  And

2    this was sent by Mr. Channo at Locke Lord; is that right?

3    A.  Yes.

4    Q.  And, by the way, Mr. Scott was not working at the firm at

5    all at this stage, correct?

6    A.  Correct.

7    Q.  He had left in September of 2016.

8    A.  '16, yes.

9    Q.  And this is July of 2018.

10   A.  Yes.

11   Q.  Some nine or ten months after October of 2016, since that

12   period of time passed, correct?

13   A.  Yes.

14   Q.  And if we could just go up to number 5 again.  At the

15   bottom there, I will just read this.  "You have given us

16   instructions that we are to correspond and take instructions

17   from Frank Schneider and his company Sandstone S.A.

18   (Luxembourg) and your brother Konstantin in respect to this

19   matter by sending all notices and other documents to you by

20   post, e-mail or facsimile, using the contact details set out

21   below until such time as you provide written notice to the

22   contrary.  We will also copy in Irina Dilkinska.  We will use

23   e-mail extensively, but as you are aware e-mail is not fully

24   secure and may be intercepted by third parties."

25             Do you see that?

1    A.   Yes.

2    Q.   One moment.  I'm sorry, earlier when I was referring to

3    October, the distance of time between October and July of 2018,

4    I meant to say October 2017.  So that would still be about nine

5    months; is that fair to say?

6    A.   OK.

7    Q.   All right.  We can take that down.

8              Mr. Reeder, just turning to the question of due

9    diligence, are you familiar with the term due diligence?

10   A.   Yes.

11   Q.   What is that?

12   A.   Due diligence is doing independent research to verify facts

13   that are presented by others.

14   Q.   And is it fair to say that when information is being

15   obtained from people either individually or on behalf of the

16   company, that the information you get from them is only as good

17   as the truthfulness of the information they provide?

18   A.   Yes.

19   Q.   So when you're conducting due diligence, you gather

20   documents and records from other people often times, correct?

21   A.   Yes.

22   Q.   That includes customer information, for example; is that

23   fair to say?

24   A.   Yes.

25   Q.   If it's about money, source of funds, where the money is

1    coming from, correct?

2    A.  Yes.

3    Q.  Company-related documents, incorporation records, things of

4    that nature, correct?

5    A.  Yes.

6    Q.  And you often are getting those materials from people who

7    are involved in these companies or in their individual

8    capacities, correct?

9    A.  Yes.

10   Q.  And isn't it fair to say that people can lie?

11   A.  Yes.

12   Q.  And people can falsify documents?

13   A.  Yes.

14   Q.  People can provide inaccurate information whether that be

15   intentionally or unintentionally.

16   A.  Yes.

17   Q.  And in the case of due diligence that could include people

18   in a client capacity for the law firm, right?  They could

19   provide false information?

20   A.  Yes.

21   Q.  And in some cases it could include attorneys who are

22   working at the firm who could be involved in providing false

23   information too.

24   A.  It could.  It could.

25   Q.  And the due diligence that's done is only as good as the

1    information that the firm gets when conducting the

2    investigation, correct?

3    A.  Yes.

4    Q.  Mr. Reeder, you were asked some questions about the $5

5    million transfer on February 2016.  Do you recall answering

6    some questions about that?

7    A.  Yes.

8    Q.  And one of the questions you were asked was whether that

9    transfer -- I believe you might have been asked whether it was

10   being investigated.  Do you recall that questioning?

11   A.  Yes.

12   Q.  And I think you said you didn't have particular knowledge

13   of that transaction being subject to the investigation.  Is

14   that what you said?

15   A.  At that time.

16   Q.  OK.  And so you're clarifying now that you have an

17   understanding?

18          MR. DEVLIN-BROWN:  Objection.

19          THE COURT:  Sustained.

20   Q.  When you say at that time, what do you mean?

21   A.  At the February '16 date I was not -- I mean I don't think

22   there was any investigation at that point in time.

23   Q.  Are you aware of a subsequent investigation --

24          MR. DEVLIN-BROWN:  Objection.

25          THE COURT:  Sustained.

JBD7SCO4                           Reeder - redirect

1            MR. DIMASE:  May we approach, your Honor?

2            THE COURT:  Sure.

3            MR. DIMASE:  May we approach?

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (At the side bar)

2           MR. DIMASE:  I would like to clarify one thing.  I

3    will be more clear that I am not referencing a government

4    investigation, that I am only going to be asking questions

5    about an internal investigation at Locke Lord, and I will

6    explain why, but maybe Mr. Devlin-Brown would like to --

7           MR. DEVLIN-BROWN:  That sounds highly irrelevant

8    especially if it's been after any contact with either the

9    government or after Mark Scott was arrested.  There are

10   different reasons they would dig into those transactions.  I

11   barely touched on this on cross-examination.  It's just

12   irrelevant and prejudicial.

13          MR. DIMASE:  First of all, Mr. Devlin-Brown did ask

14   questions about an investigation, so I think it's well within

15   the scope of redirect.  But more importantly -- and this is the

16   bigger picture -- Mr. Devlin-Brown has asked many, many

17   questions and brought in many documents and agreements, and

18   even an e-mail from 2018 regarding due diligence, compliance

19   inquiries around Ruja Ignatova, and made the case or tried to

20   make the argument that the firm was happy to go along and

21   conduct business on behalf of these people despite doing such

22   compliance checks.

23          It is highly relevant that the firm has now decided to

24   do an inquiry into all of this.  It undercuts the idea that the

25   firm was just fine with all of this.  I don't intend to go into

1    great detail, simply the fact that these transactions are the

2    subject of an internal investigation of the firm and the

3    conduct of various attorneys -- I wouldn't even ask about Mr.

4    Scott -- various people at the firm are within the scope of

5    that internal investigation.  That's it.

6              MR. DEVLIN-BROWN:  I mean I think this is beyond the

7    pale.  I think Locke Lord is potentially subject to a criminal

8    investigation, or they could feel like they are in such a

9    position --

10             MR. DIMASE:  I will make very clear that no --

11             MR. DEVLIN-BROWN:  No, I mean our objection is stated.

12             THE COURT:  And the objection is sustained.  OK, move

13   on.

14             MR. DIMASE:  Your Honor, may I just say one more

15   thing?  If the jury doesn't hear this, it leaves a

16   misimpression that the firm has no problem with any of this at

17   all, and that's not true.  They have launched an internal

18   investigation to see what has happened here, and I think that

19   is highly relevant to the very issues that Mr. Devlin-Brown

20   explored on.

21             THE COURT:  When did this internal investigation

22   begin?

23             MR. DIMASE:  I think this year.

24             THE COURT:  It's irrelevant; it's not coming in.

25             MR. DEVLIN-BROWN:  I would like one minute if I can on

1    redirect.

2              (In open court)

3              THE COURT:  You have about 40 seconds, Mr. DiMase.

4              MR. DIMASE:  Yes, your Honor.

5    Q.  Mr. Reeder, if the law firm was aware that the money that

6    was being used to fund these various transactions was derived

7    from a fraud scheme, would it have handled the money to conduct

8    the transactions?

9    A.  No.

10             MR. DIMASE:  Nothing further.

11             THE COURT:  Mr. Devlin-Brown.

12             MR. DEVLIN-BROWN:  Thank you, your Honor.  I will be

13   quick.  I won't say the number of questions.

14   RECROSS EXAMINATION

15   BY MR. DEVLIN-BROWN:

16   Q.  Could we put on the screen, Mr. Barile, Government Exhibit

17   2004 that was just shown to you in redirect.  And if we go to

18   the bottom of the e-mail, please, Mr. Barile.

19             Do you remember seeing this e-mail before from Ruja

20   Ignatova to Mark Scott and Robert Courtneidge, "I have some

21   cash with me, about 220 GBP.  Can you store it in London?"

22   Correct?

23   A.  Yes.

24   Q.  And if you page up to the top of the e-mail there is a

25   question from Robert Courtneidge, "Mark, did you resolve this?"

1   And he said "yes."

2   A.  Yes.

3   Q.  You have no idea how this was resolved.

4   A.  No.

5   Q.  There may be other versions of e-mails we haven't seen?

6   A.  Yes.

7   Q.  They may have spoken on the phone.

8   A.  Yes.

9   Q.  The proper advice would be, no, you cannot store this money

10  at Locke Lord.

11          MR. DIMASE:  Objection to what would be proper advice.

12  A.  I don't know.

13          THE COURT:  Sustained.

14  Q.  If we could put on the screen, Ms. Stanley, Defense Exhibit

15  313.

16          And while she is doing that, do you remember seeing an

17  e-mail that the government has just presented -- I think it was

18  2275 -- from Mark Scott to Paul Spendiff, and you were asked a

19  number of questions about whether you see OneCoin anywhere.  Do

20  you remember that?

21  A.  Yes.

22  Q.  If we could please go to page 5 of this exhibit,

23  Ms. Stanley, also from Mark Scott to Paul Spendiff, and if you

24  could just blow up the first paragraph.

25          Well, you see a reference to OneCoin there, right?  A

1   payment of 91 -- I think a comma is missing -- $91,428,572

2   OneCoins, the fourth sentence there?

3   A.   There is a reference of OneCoin and some Chinese or

4   Japanese figures.  I believe there is an equivalent to a number

5   and then OneCoins.

6   Q.   We can take that off the screen, Ms. Stanley.

7           Do you remember just at the end of your recross --

8   your redirect examination -- Mr. DiMase asked you whether

9   people sometimes lie to their lawyers in the due diligence

10  process?

11  A.   Yes.

12  Q.   Mark Scott was a lawyer at Locke Lord, right?

13  A.   Yes.

14          MR. DEVLIN-BROWN:  No further questions.

15          MR. DIMASE:  I have just one question.

16          THE COURT:  One.

17  REDIRECT EXAMINATION

18  BY MR. DIMASE:

19  Q.   Mr. Reeder, just to be clear, Mark Scott was the

20  relationship partner involved in all of the three real estate

21  transactions that you testified about for International

22  Marketing Strategies, correct?

23  A.   That's my understanding.

24          MR. DIMASE:  Nothing further.

25          THE COURT:  Ladies and gentlemen, that takes us to the

1    end of the day.  Please have a wonderful evening.  Be safe

2    getting home.  Please do not discuss the case.  We will see you

3    tomorrow morning.

4              Mr. Reeder, you may step down.  Safe travels to you.

5              THE WITNESS:  Thank you.

6              (Witness excused)

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  Folks, you can be seated.  OK.  What fire

3    works can we expect tomorrow, if any?

4          MR. DEVLIN-BROWN:  I'm hoping none.  But I'm not sure

5    what is next, and what the estimate is at this point and all

6    that jazz.

7          MR. FOLLY:  The next witness is Nicholas Kroll.

8    That's the witness we discussed this morning who will be going

9    through the timeline and related entries on the timeline.

10         THE COURT:  And just so that I'm not missing anything.

11   Mr. Kroll is not on this witness list that the government gave

12   me, correct?  Or one or so summary witnesses.  But he is not

13   specifically named.

14         MR. FOLLY:  That's possible.  He will likely be the

15   next witness.  We're going to discuss whether we switch the

16   order.  We will inform defense counsel if we do that.

17         THE COURT:  OK.  Any further estimate as to when you

18   will be resting?

19         MR. FOLLY:  I think Friday is realistic, depending on

20   the length of cross.

21         THE COURT:  OK, very well.  Anything else?

22         MR. FOLLY:  Not from the government.

23         MR. GARVIN:  Or the defense.

24         THE COURT:  OK.  Have a good evening, everyone.

25         (Trial adjourned to November 14, 2019 at 9 a.m.)

1136

```
1                       INDEX OF EXAMINATION

2    Examination of:                           Page

3     CHARLES REEDER

4    Direct By Mr. DiMase . . . . . . . . . . . . 977

5    Cross By Mr. Devlin-Brown  . . . . . . . . .1032

6    Redirect By Mr. Dimase . . . . . . . . . . .1114

7    Recross By Mr. Devlin-Brown  . . . . . . . .1131

8    Redirect By Mr. Dimase . . . . . . . . . . .1133

9

10                      GOVERNMENT EXHIBITS

11   Exhibit No.                            Received

12    1242    . . . . . . . . . . . . . . . . . 976

13    1374, 1375   . . . . . . . . . . . . . . . 983

14    1376, 1378, 1405   . . . . . . . . . . . . 986

15    1047    . . . . . . . . . . . . . . . . . 999

16    1026, 1032 and 4089   . . . . . . . . . . .1025

17

18

19

20

21

22

23

24

25
```

1

2                              DEFENDANT EXHIBITS

3    Exhibit No.                                        Received

4    321   . . . . . . . . . . . . . . . . . .1039

5    729   . . . . . . . . . . . . . . . . . .1057

6    542   . . . . . . . . . . . . . . . . . .1065

7    543   . . . . . . . . . . . . . . . . . .1067

8    720   . . . . . . . . . . . . . . . . . .1078

9    556   . . . . . . . . . . . . . . . . . .1081

10   554   . . . . . . . . . . . . . . . . . .1088

11   104   . . . . . . . . . . . . . . . . . .1089

12   445 redacted   . . . . . . . . . . . . . .1094

13

14

15

16

17

18

19

20

21

22

23

24

25