JBE7SCO1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                           17 CR 630 (ER)

5    MARK S. SCOTT,

6                   Defendant.

7    ------------------------------x

8                                    New York, N.Y.
                                     November 14, 2019
9                                    9:00 a.m.

10   Before:

11                   HON. EDGARDO RAMOS,

12                                        District Judge

13                        APPEARANCES

14

15   GEOFFREY S. BERMAN,
          United States Attorney for the
16        Southern District of New York
     CHRISTOPHER DiMASE
17   NICHOLAS FOLLY
     JULIETA V. LOZANO
18        Assistant United States Attorneys

19   COVINGTON & BURLING LLP
          Attorneys for Defendant
20   BY:  ARLO DEVLIN-BROWN
          KATRI STANLEY
21        -AND-
     DAVID M. GARVIN

22

23

24

25

JBE7SCO1

```
 1              (Trial resumed; jury not present)

 2              THE COURT:  Good morning, all.  Is there anything that

 3    we need to do?

 4              MR. DEVLIN-BROWN:  There are two e-mails from

 5    yesterday relating to Robert Courtneidge.  I have narrowed it

 6    down to two I think that hopefully don't have any sort of

 7    hearsay problem and I think are sufficient to make the point we

 8    need.  So, I wonder if your Honor might take another look at

 9    those, and I can offer an explanation.

10              THE COURT:  OK.

11              MR. DEVLIN-BROWN:  I don't know if you still have your

12    binder from yesterday.

13              THE COURT:  Which ones?

14              MR. DEVLIN-BROWN:  One is Defense Exhibit 505.  And I

15    can hand you a copy if you would like, your Honor.

16              THE COURT:  I have it.

17              MR. DEVLIN-BROWN:  I don't particularly care about the

18    text in the exhibit.  This is a different crypto memo, a

19    shorter version of the crypto memo from Robert Courtneidge; he

20    sends it to Mark Scott.  I don't care if all of the text is

21    redacted in between.  Basically there is some confusion as to

22    whether it was attached or not and whether it was going to be

23    billed or not.  I don't particularly think those are hearsay

24    issues, but I'm happy to have it in without the text if the

25    Court or government would prefer.
```

JBE7SCO1

1          I just think the fact of this memo being sent to him

2     is, you know, certainly consistent and I think within the four

3     corners of the issue that if something is sent to Mark Scott

4     relating to his knowledge of cryptocurrency issues -- or in

5     this case his knowledge that a colleague is working on that

6     subject -- it should come in.

7          THE COURT:  So, what you want is the memorandum from

8     Locke Lord.

9          MR. DEVLIN-BROWN:  Yes.  And I guess at least the top

10    e-mail from Charlie Clarence-Smith, Dear Mark, please find

11    attached.

12         THE COURT:  Government?

13         MR. DIMASE:  Your Honor, actually can I suggest that

14    we address these once we have had a full opportunity?  Because

15    I don't know we have focused on this particular e-mail, and

16    there is no witness who is going to testify today about these

17    e-mails, so I would just like the chance to read this

18    attachment in more detail.

19         THE COURT:  OK.

20         MR. DEVLIN-BROWN:  OK, that's fine.  I will tell the

21    Court and the government just the other exhibit number, which

22    is just Exhibit 519, which is a document sent by Robert

23    Courtneidge to Mark Scott entitled "OneCoin Road Map v1.0.

24    v.1.0.docs," and the header e-mail that says, "Mark, great to

25    chat earlier; I just thought I would share this initial draft

JBE7SCO1

1    with you."  And it's a draft of a OneCoin road map document

2    that Robert Courtneidge has worked on.  Again, nothing in here

3    is being offered for the truth.  This is just a nice example --

4    and we can do with this just one document -- that shows that

5    Mark Scott has some awareness that Robert Courtneidge was

6    working on OneCoin issues relating to the cryptocurrency and

7    that the branding of it and that sort of thing.

8              THE COURT:  OK.

9              MR. DIMASE:  Your Honor, two things:  I mean this does

10   get back to this issue about level of knowledge and some of the

11   e-mails that we provided to the Court but did not admit

12   yesterday, so these may trigger our desire to admit those sorts

13   of e-mails to show Mr. Courtneidge's knowledge of what was

14   going on at OneCoin -- if these come in.

15             I also note there is a longer version of this chart

16   that I have seen that's attached to Defense Exhibit 519, and

17   some other information.  I don't know that Mr. Scott is copied

18   on that one, but if he was and this is going to be admitted, I

19   think the fuller version of it would be appropriate.  We will

20   look into that.

21             MR. DEVLIN-BROWN:  My memory is it's not copied on the

22   later one.  And as to the broader point of putting in things

23   that just Robert Courtneidge got, I have no problem either way

24   with that.  I think the most core stuff was obviously what

25   Scott knows and that's what we're focused on, but I don't

JBE7SCO1

1    particularly care one way or the other about communications

2    Courtneidge had.

3         THE COURT:  OK.  I take you folks got the e-mail or

4    the letter yesterday from Mr. Gerber?

5         MR. DIMASE:  Yes.

6         THE COURT:  Apparently he is on a plane, and he will

7    be here this afternoon, so if he is here we will deal with it

8    at 2:30.

9         MR. GARVIN:  Yes, your Honor.  We would respectfully

10   ask that that be done on an in camera basis, because we're

11   going to have to disclose defense logic with regard to the

12   subpoenaing of Mr. Bush, and we don't think that would be

13   appropriate for the government to sit there and listen to our

14   strategy.

15        THE COURT:  Very well.

16        MR. DIMASE:  Your Honor, we would object.  I mean

17   we're in the middle of the trial; all of the government

18   witnesses and their anticipated testimony and the exhibits have

19   been argued in open court.  I mean the defense should proffer a

20   legitimate reason for calling this witness, just like the

21   government would have to for the relevancy of its witnesses.  I

22   don't see why that needs to be in camera.  This is not

23   impeachment or cross-examination kind of material that's

24   supposed to be a surprise.  This is the relevance of a witness

25   who has been called to testify in this trial, so I just don't

JBE7SCO1

1    see a basis for an in camera proceeding.

2            THE COURT:  I will see them in camera in the first

3    instance, and anything that can be discussed in open court will

4    be discussed in open court.

5            MR. DIMASE:  Very good.

6            THE COURT:  Anything else?

7            MR. DIMASE:  We may have some disagreements over some

8    Bank of Ireland materials.  I don't know if Mr. Devlin-Brown

9    wants to raise that now.  That isn't the first witness today,

10   so ...

11           MR. DEVLIN-BROWN:  We could, but what gave us a little

12   more pause last night looking at the latest version of the

13   government chart 2701 is that it actually seems like there is a

14   substantial number -- maybe half or more -- of the exhibits are

15   not yet in evidence.  I don't know if all of them were on

16   stipulation; that wasn't a hundred percent clear to us.  But I

17   think making sure there are no issues there and getting those

18   into evidence properly is a priority.

19           MR. DIMASE:  That's fine.  I think it's a limited

20   number of e-mails for which there are disputes which may

21   require a witness, so we can tend to that later.

22           THE COURT:  OK.  Anything else?

23           MR. DIMASE:  Nothing from the government, your Honor.

24   Thank you.

25           THE COURT:  OK.  In that event, we will await the

JBE7SCO1

1    jury.

2                (Recess)

3                (Jury not present)

4                MR. DEVLIN-BROWN:  One more thing after conferring

5    with the government, and it relates to the chart -- the summary

6    chart -- which is 2701 that I understand the government is

7    going to have their summary witness testify to.

8           The concern that the Court raised, or the issue the

9    Court raised yesterday, the question are all of these in

10   evidence, a large number of them are not in evidence.  I don't

11   think there will be an objection to them, but my understanding

12   of how the government planned to approach this was essentially

13   to say here's -- and they can correct me -- here's the chart --

14   which, I don't know, maybe there are a hundred exhibits or

15   more; to the extent they're not in evidence, we move them into

16   evidence.

17          I don't think that's the best practice, frankly.  I

18   think having a list of which ones the government is tracking

19   these are not in evidence, if they're not on stipulation or

20   not, I think that would be easier.  If that's not possible in

21   the next ten minutes, we will try not to slow it down, but if

22   I'm concerned the issue that happened Friday afternoon is going

23   to happen again, I would at least want the right to, as this

24   goes on, if we see something we have a concern about, being

25   able to approach at side bar and address it and move it out of

1    evidence if necessary, edit the chart if necessary.

2              THE COURT:  Absolutely.  And I take it, Mr. Folly you

3    will take care not to show the jury anything that's not yet in

4    evidence.  I mean it may be listed on a chart so long as they

5    don't have the actual exhibit.

6              MR. FOLLY:  Your Honor, our intention is at the outset

7    of Mr. Kroll's testimony to, before admitting the timeline, is

8    to offer -- and the only reason -- we're trying to be careful

9    that we're not omitting any exhibit we thought we had offered

10   because it's quite voluminous, so our intention was to offer

11   into evidence and actually list each exhibit that is going to

12   be -- that is included as part of the chart.

13             THE COURT:  Do you have that list?

14             MR. FOLLY:  I have that list as part of the chart

15   itself.

16             THE COURT:  I'm sorry.  So, do you intend to list all

17   the exhibits on this chart out loud?

18             MR. FOLLY:  Your Honor, that was our intention, so

19   that there is a record of what is being offered.  We could also

20   to save time simply reference the chart and reference that we

21   are offering the exhibits listed on the chart.

22             THE COURT:  But I guess Mr. Devlin-Brown's concern is

23   if he doesn't know -- and I take it that he doesn't know --

24   which exhibits exactly are not in evidence, and you list off

25   however many, 40 or 50 exhibits that are not in evidence, he is

JBE7SCO1

1    not going to know which ones he may actually have a concern

2    about, and that puts him at a distinct disadvantage.

3              MR. FOLLY:  And I understand that concern, and I think

4    maybe the solution to that is before each of those particular

5    exhibits is published during Mr. Kroll's testimony, we can

6    briefly publish it to defense counsel only so that they can

7    view the document before it is published to the jury, and if it

8    turns out they have an objection they want to discuss, then we

9    can do that before it's shown to the jury.

10             THE COURT:  I mean that's fine, but I thought based on

11   what you just said that what you intended to do was to move at

12   the outset to have all of the exhibits put into evidence

13   without giving the defense an opportunity to review them first.

14             MR. FOLLY:  Well, your Honor, we did give them that

15   opportunity; we produced the timeline last week.  And our

16   intention was to make sure that they had the chance to identify

17   what they have objections to.

18             I don't know if they have identified any objections;

19   they haven't communicated any objections to us.  So, now we're

20   at the point where he is testifying and we don't have a clear

21   understanding of whether there are such objections.

22             But I guess what I'm saying is, yes, we intended to

23   offer all of those exhibits.  We would be fine giving Mr.

24   Devlin-Brown the additional opportunity before the particular

25   exhibits are shown to the jury --

JBE7SCO1

1          THE COURT:  But based on what you plan to do, will it

2     already be in evidence when you show it to Mr. Devlin-Brown?

3          MR. FOLLY:  I don't see any way around that, in order

4     for us to offer the timeline into evidence, which the exhibits

5     are based on, and publish that to the jury, which is the entire

6     point of this witness's testimony.

7          THE COURT:  Do you know how many exhibits on this list

8     are not in evidence?

9          MR. FOLLY:  The majority of them are not in evidence.

10    Many of them are bank records, and obviously many of them are

11    e-mails, and they're being offered pursuant to stipulations

12    between the parties as to authenticity, but the parties do

13    still have the right to raise separate objections.

14         THE COURT:  I suppose a quick fix would be that I

15    could admit the exhibit subject to connection and then withdraw

16    them later.

17         MR. DEVLIN-BROWN:  Yeah, I think that's a solution.

18         Look, I'm not aspiring gamesmanship or anything at all

19    like that.  I think the ideal practice, given that the

20    government is tracking their exhibits, would be a list of which

21    ones are not in evidence and for the government to offer those,

22    and if they're on a stipulation, we'll know that; and, if not,

23    we won't.  I mean because there are some I don't like,

24    obviously, but they are in evidence and there is nothing I can

25    do about it.  There are a couple that I know we have a concern

JBE7SCO1

1      about, and maybe we should raise those now.

2                     THE COURT:  OK.

3                     MR. DEVLIN-BROWN:  Just to save time.

4                     One of them, Exhibit 1006 -- Government Exhibit

5      1006 -- I don't know if your Honor has a copy of that handy.

6                     MR. FOLLY:  We will publish it in just one moment,

7      your Honor.

8                     THE COURT:  OK.

9                     MR. DEVLIN-BROWN:  So, as I understand this document,

10     it's an entry from the Outlook calendar that at the time

11     Mr. Scott had at Locke Lord, and I think it carried over onto

12     his computer.  This is the first call that Mark Scott has with

13     Ruja Ignatova.  The only reference in their contents is "TC to

14     discuss money transfer/laundering issues."  The government can

15     speak for itself, but I think even on the government's theory

16     the introductory call with Ruja Ignatova is not let's talk

17     about money laundering; I think that is almost certainly an

18     abbreviation for a call relating to money transfer/laundering

19     issues as to how to avoid them.  But just standing alone

20     obviously it's a deeply prejudicial thing, which I don't think

21     is accurate.  There are e-mails with Mr. Scott and Ms. Ignatova

22     after this call which certainly don't suggest it was about a

23     money laundering discussion, and I think even on the

24     government's own theory sort of the relationship evolves over

25     time, so I think this is pretty inflammatory for the government

JBE7SCO1

1    to put this up and then argue perhaps to the jury the very

2    first call, it's right there on Mr. Scott's calendar, they talk

3    about money laundering.

4              THE COURT:  Mr. Folly?

5              MR. FOLLY:  Your Honor, the government agrees that

6    it's prejudicial in the sense it tends to show it's more likely

7    than not that Mr. Scott committed the crimes he is charged

8    with, but not unduly prejudicial in any other way under 403.

9              Just to put this in context, this calendar invitation

10   is shortly after Gilbert Armenta, the coconspirator and

11   international money launderer who was Ruja's boyfriend had made

12   the introduction between Mark Scott and Ruja Ignatova.

13             The calendar invitation says "solid referral" which

14   refers to Gilbert Armenta, the money launderer and long-time

15   client of Mark Scott, who had known him for many years.  It

16   says "TC"-- which we believe means teleconference -- "to

17   discuss money transfer/laundering issues."  The government's

18   view is that Mark Scott designed the Fenero Funds from the

19   inception as a money laundering vehicle.  That's exactly the

20   problem that was faced by Ruja Ignatova, that she was having

21   substantial issues transferring money because bank accounts

22   were freezing it; any connection between Ruja Ignatova and

23   OneCoin that was discovered put those bank accounts in

24   jeopardy.  And Mark Scott was hired, and his role was to try to

25   fix that problem with her.

1           That's the government's theory of this case.  If

2    defense counsel wants to argue something else to the jury about

3    what it means, they're more than entitled to, but back to the

4    403 analysis, there is simply is no prejudice here beyond the

5    fact that tends to show that Mr. Scott is guilty with the

6    crimes he is charged with.

7           THE COURT:  I think that within the context of the

8    case it's a little dramatic, I suppose, though they had put on

9    there telephone calls to discuss our conspiratory scheme.  But

10   I think it should come in.

11          MR. DEVLIN-BROWN:  I understand your ruling, your

12   Honor.  I think if it's going to come in, then an exhibit that

13   the government objected to yesterday really certainly should

14   come in, and we're happy to put in a letter on this if you

15   want.  But it really is quite core.  It's Defense Exhibit 103.

16   We can hand it up if you like.

17          THE COURT:  I have it.

18          MR. DEVLIN-BROWN:  Mr. Scott's defense theory, we said

19   it right in the opening, your Honor, is that Ruja Ignatova

20   lied, the government is going to prove.  Well, guess what, she

21   lied to Mark Scott too.  And particularly if you have this

22   reference to a telephone call, here is the first e-mail

23   communication after the call.  This is what Ruja tells Mark

24   Scott.  We're not offering it for the truth.  We think Ruja is

25   a liar about many things, but that is what she told Mark Scott

JBE7SCO1

1    after that call, and that is the instruction he got as a lawyer

2    to act for her, and it's core to his state of mind and what he

3    understood her to be saying.

4           The government is free to argue that they were -- you

5    know, Ruja was just saying that on an e-mail because she knew

6    it would be caught or whatever.  But this is the instruction

7    that this client gave to her lawyer, and particularly if you're

8    going to have a reference to this being a money laundering

9    transfer call, the actual document relating to what she said on

10   the call and told Mr. Scott, whom she had never met before, to

11   do.

12          THE COURT:  But isn't it clear to the jury at this

13   point that Ruja Ignatova was a client of Locke Lord for the

14   legitimate reasons of establishing legitimate channels of

15   corporations and ways of moving the monies that were generated

16   by OneCoin?

17          MR. DEVLIN-BROWN:  I don't know if some of the stuff

18   she did with Locke Lord later was legitimate.

19          THE COURT:  I mean to the outside world.  I mean

20   certainly to a lot of the Locke Lord lawyers.  I mean she went

21   to Locke Lord for purportedly legitimate reasons even if she

22   used that advice for her own illegal ends.  So, I think the

23   jury understands that, but, Mr. Folly or Mr. DiMase?

24          MR. DIMASE:  Your Honor, we stand by the argument we

25   made yesterday.  If Mr. Devlin-Brown wants to write on it,

JBE7SCO1

1    maybe that's the appropriate way.

2              THE COURT:  Mr. DiMase, you need to get near a

3    microphone.

4              MR. DIMASE:  I apologize.  Should I repeat that?

5              THE COURT:  Yes.

6              MR. DEVLIN-BROWN:  I said the government maintains the

7    same position regarding hearsay that it articulated earlier

8    about there exhibit, and, you no he, if Mr. Devlin-Brown wishes

9    to write on this, obviously that's fair.

10             THE COURT:  We will see what you have to say.  It's

11   9:30.  Is your next witness available?  Who is your next

12   witness?

13             MR. DIMASE:  The witness who would admit the timeline

14   and the associated exhibits, your Honor, he is here.

15             THE COURT:  Let's get the jury.

16             MR. FOLLY:  Can we just have two minutes to work

17   something out with counsel?

18             THE COURT:  Two minutes.

19             MR. FOLLY:  Your Honor, just to go back to the

20   timeline, is it your Honor's preference that we list each

21   exhibit or that we just refer to each exhibit that's listed in

22   the timeline?

23             THE COURT:  I mean I think it will be deadly for

24   everyone if you were to read out every exhibit that's listed

25   here.  I'm sure that Mr. Scott would be more than happy to have

JBE7SCO1

1    you kill the jury in that fashion, but ...

2              MR. FOLLY:  We will refer to the exhibits listed in

3    the timeline exhibit and then provide it to the court reporter

4    so that it's documented.

5              THE COURT:  OK.  We are bringing out the jury.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (Jury present)

2            THE COURT:  Good morning, ladies and gentlemen.  I

3    thank you always for your promptness and for your patience.  At

4    this point we will continue with the government's case.

5            Government, please call your next witness.

6            MR. FOLLY:  Your Honor, the government calls Nicholas

7    Kroll.

8     NICHOLAS KROLL,

9          called as a witness by the government,

10          having been duly sworn, testified as follows:

11           THE COURT:  You may be seated.  Please pull the seat

12    up to the microphone.  Please speak directly into the

13    microphone and begin by stating your full name and spelling

14    your first and last name for the record.

15           THE WITNESS:  Nicholas Kroll, N-i-c-h-o-l-a-s

16    K-r-o-l-l.

17           THE COURT:  And please keep your voice up.

18           MR. DIMASE:  Your Honor, may I approach with some

19    water for the witness?

20           THE COURT:  You may.

21           THE WITNESS:  Thank you.

22    DIRECT EXAMINATION

23    BY MR. FOLLY:

24    Q.  Good morning, Mr. Kroll.

25    A.  Good morning.

1  Q.  Where do you work?

2  A.  For the Federal Bureau of Investigation.

3  Q.  What is your title there?

4  A.  Special agent.

5  Q.  How long have you been a special agent for the F.B.I.?

6  A.  Approximately two years.

7  Q.  What are your duties and responsibilities as a special

8  agent?

9  A.  Primarily investigate violations of federal criminal law,

10  with a concentration in complex financial crimes, using various

11  investigative techniques and collecting evidence.

12  Q.  Did there come a time when you began to assist in preparing

13  for the trial of Mark Scott?

14  A.  Yes.

15  Q.  How did you assist in preparing for that trial?

16  A.  I was given exhibits from the government throughout the

17  course of their investigation, and I was tasked with taking

18  those exhibits and placing them in a relative timeline.

19  Q.  I'm going to ask you to make sure you speak into the

20  microphone and keep your voice up.

21      Prior to reviewing those exhibits and assisting with

22  the timeline, did you have any involvement with the Mark Scott

23  case?

24  A.  No.

25  Q.  If we could show the witness only what has been marked as

1    Government Exhibit 2701.

2              Your Honor, if we can just have a minute.  The

3    computer is having some technical issues.

4              THE COURT:  OK.

5              MR. FOLLY:  Your Honor, may I approach?

6              THE COURT:  You may.

7              MR. FOLLY:  I'm handing the witness Government Exhibit

8    2701.

9    Q.  Special Agent Kroll, do you recognize that document?

10   A.  I do.

11   Q.  What is it?

12   A.  It is the timeline that I described earlier.

13   Q.  Did you help to prepare that timeline?

14   A.  I did.

15   Q.  Have you reviewed each entry on the timeline and the

16   corresponding government exhibit?

17   A.  I have.

18             MR. FOLLY:  At this time, your Honor, the government

19   would offer Government Exhibit 2701 and each of the government

20   exhibits referenced on it, subject to connection, as we

21   discussed earlier.

22             MR. GARVIN:  No objection, your Honor.

23             THE COURT:  Very well.  The exhibit will be received

24   as all of the exhibits listed therein, and to the extent

25   they're not already in evidence they will be admitted subject

1   to connection.  You may proceed.

2            (Government Exhibit 2701 received in evidence)

3            MR. FOLLY:  Thank you, your Honor.

4   Q.  Mr. Kroll, in helping to prepare that timeline, did you

5   choose particular exhibits and entries on that timeline, or

6   were those chosen by the prosecutors in this case?

7   A.  Those were chosen by the prosecutors in the case.

8            MR. FOLLY:  Your Honor, may we have a brief side bar?

9            THE COURT:  OK.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JBE7SCO1                      Kroll – direct

1           (At the side bar)

2           MR. FOLLY:  Your Honor, the paralegal is trying to

3    restart the computer, and we're also bringing over a backup

4    loptop.  Unfortunately, this is kind of unfortunate for this to

5    happen because everything is dependent on having these

6    exhibits.

7           THE COURT:  So we will take a break.

8           MR. FOLLY:  Yes, thank you.

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           THE COURT:  Ladies and gentlemen, we have some

3   technical issues.  Rather than having you sit here, we will

4   send you back to the jury room, and we will bring you back out

5   as soon as we're ready to go.  Don't discuss the case.

6           Agent Kroll, you may step down.

7           (Recess)

8           THE COURT:  Do you have an estimate?

9           MR. DIMASE:  I think a couple more minutes.  It

10  appears not to be totally dysfunctional.  It's just in the

11  final stages of rebooting.

12          (Pause)

13          THE COURT:  The verdict form in this case won't be

14  anything but a very simple guilty/not guilty on Count One,

15  guilty/not guilty on Count Two, correct?

16          MR. DIMASE:  I think that's right, your Honor.  We

17  haven't really discussed it with defense, but I think that's

18  right.

19          MR. DEVLIN-BROWN:  We will check.  I don't think that

20  they would necessarily have to identify which aspect of the

21  bank fraud statute or money laundering conspiracy charge, but

22  we will just check on the law.

23          MR. FOLLY:  Your Honor, I believe we are ready to

24  proceed.  We are going to bring in the witness.

25          THE COURT:  OK.  Let's get the jury.

1           (Jury present)

2           THE COURT:  Thank you, ladies and gentlemen.  Please

3    be seated.  And thank you for your patience.

4           Mr. Folly.

5           MR. FOLLY:  Thank you, your Honor.

6    BY MR. FOLLY:

7    Q.  Mr. Barile, can you please publish for the witness and for

8    the jury the top portion of Government Exhibit 2701.  And if

9    you could expand it down to the middle of the page.

10          Special Agent Kroll, you testified a few minutes ago

11   about the timeline that you created.  Is that shown on the

12   screen here?

13   A.  Yes, it is.

14   Q.  And it appears that there are some different colors shown

15   here.  Can you explain what the different colors are.

16   A.  Sure.  So, the white pertains to the e-mail-related

17   communication.  The orange color would relate to transactional

18   level or cash transfers.  The blue would relate to what I would

19   refer to as entity-related documentation.  And the green

20   relates to travel.

21   Q.  And if we could focus on the first entry there, Armenta

22   e-mail introducing Scott to Ruja.

23          And, Mr. Barile, if you could please publish for the

24   witness Government Exhibit 1004.

25          Counsel, may we receive and publish this to the jury?

1       MR. DEVLIN-BROWN:  No objection.

2       THE COURT:  Very well, it will be received.

3       (Government Exhibit 1004 received in evidence)

4  Q.  This is an e-mail dated September 30, 2015 from Gilbert

5  Armenta to Mark Scott.

6       Special Agent Kroll, can you read the subject in the

7  body of the e-mail?

8  A.  "Subject:  Introduction."

9       The body states:  "Hello, Mark, please be introduced

10 to Ruja Ignatova, she is a friend and client.  Based on our

11 discussion this morning please support her as our family.  All

12 the best, Gilbert Armenta."

13 Q.  Mr. Barile, if you could put this side by side with

14 Government Exhibit 1006, and if we could just zoom out on the

15 top.

16      This appears to be a calendar entry it says from Mark

17 Scott at the top.  Special Agent Kroll, could you read the

18 remainder of the calendar entry.

19 A.  Sure.  "Location:  Firm, BD - Zala referral - TC to discuss

20 money transfer/laundering issues.  Importance:  Normal.

21 Subject:  TC Ruja Ignatova, with a subsequent telephone

22 number."  Would you like me to read that out?

23 Q.  You don't need to read the phone number.

24 A.  "Start date:  Sunday, October 4, 2015 at 8:30 p.m.  End

25 date and time, Sunday, October 4, 2015 at 9 p.m.

JBE7SCO1                     Kroll - direct

1   Q.  Take these down and publish for the witness Government

2   Exhibit 1022.  May we proceed to publish it to the jury?

3            THE COURT:  You may.

4   Q.  This is an e-mail dated January 29, 2016.  Special Agent

5   Kroll, can you please read the parties and the subject of the

6   e-mail.

7   A.  The parties, to Gilbert Armenta, garmenta@zala-group.com,

8   from Mark S. Scott.  Subject:  Can we connect on Ruja please?

9   "Would like to start.  Thanks."

10  Q.  Take down that exhibit and show for the witness first

11  Government Exhibit 1025.  And can we publish that to the jury?

12           THE COURT:  You may.

13  Q.  It's an e-mail dated January 31, 2016 from Dr. Ruja

14  Ignatova to Mark Scott and Gilbert Armenta, cc'ing Denitza

15  Godeva and cindy@onecoin.eu.  The subject is next step please.

16           Special Agent Kroll, can you read that e-mail?

17  A.  "Hi, Mark.  As time is ticking, what are the next steps and

18  how do we move please?  If we want to meet, I am in London from

19  5.2 to 15.2.  Then for a month in Hong Kong and China.  Cindy

20  has sent you the phone - contact me when you have it.  Thx, Dr.

21  Ruja."

22  Q.  And if we could publish this side by side first just for

23  the witness with Government Exhibit 1032.  And if we could just

24  scroll down.  Let's stay where we were.  Scroll it down.  And

25  if we could publish this to the jury.

1          This is an e-mail from January 31, 2016 from Mark

2    Scott.  If you could read that e-mail there, Special Agent

3    Kroll.

4    A.  "Dear Ruja.  As discussed, please attached the requisite

5    invoice for our new project.  For purposes of this

6    restructuring matter, please use this e-mail address

7    exclusively for our communications, unless I send you a request

8    from my Locke Lord LLP address.  I look forward to getting

9    started.  All the best, Mark."

10   Q.  If we could scroll up, and this is a response from Ruja to

11   msscottlaw@gmail.com and cc'ing d.godeva@onecoin.eu.  If you

12   could read that.

13   A.  "Subject:  Attorney/client privileged communication.

14          "OK.  I just send the money.  Will come from

15   Singapore.  How do we move now.  You want to see me in London?

16   Or brief G?  Whatever we do.  Think about that structure needs

17   to be able to bank and get accounts.  R."

18   Q.  And scroll up and read the next e-mail there, Special Agent

19   Kroll.

20   A.  "Dear Ruja, thanks.  Need to meet with you personally.

21   However, I am coordinating with G on bankability.  He is fine

22   with what I outlined.  They funds come in being vetted twice

23   before deposit.  Again, at the end only you and I will know the

24   entire structure however.  I have your dates for London and

25   will plan accordingly.  We will need to meet on two separate

1    days.  Best to have one day gap so I can prepare follow up

2    etcetera.  Where do you stay usually?  All the best, Mark, Mark

3    Scott, managing member."

4    Q.  And scroll up.  And we can take these down.  And put up

5    just for the witness only 4089.  And we can publish that to the

6    jury starting at zooming in on the bottom e-mail from Mark

7    Scott.  It appears to be from Mark Scott to Ruja Ignatova,

8    January 31, 2016.

9         Special Agent Kroll, can you read this one.

10   A.  "Dear Ruja, will do.  I am ready to move.  Gilbert informed

11   me that he has talked to you about my plans for total

12   restructure.  Him and I are meeting tomorrow or on Tuesday to

13   discuss a couple of more comments he wanted to share.  I am

14   ready to go immediately and have the team ready.  You need to

15   simply approve the budget of about $425,000 for all attorneys

16   and CPAs I would require in different jurisdictions, plus

17   travel and entity formation and dissolution expenses.  This

18   would protect all of your assets" --

19   Q.  You can pause there.

20        And if you can just scroll up to the next e-mail right

21   there.  It's from Ruja to Mark Scott, it says, "How much should

22   I wire?  Yes, we move please.  I copy my assistant Denitza

23   here, so she can coordinate schedules."  And Ruja's e-mail is

24   listed as ruja@onecoin, and Denitza is listed as

25   d.god@onecoin.eu.

1    If we could go back to Government Exhibit 2071 and

2    zoom in on the February 1, 2016 orange box there.

3    Can you read that, Special Agent Kroll?

4    A.  "February 1, 2016, Scott receives $425,000 wire at City

5    National Bank from International Marketing Strategies (IMS)"

6    Q.  If you can just scroll down on that timeline here to the

7    next, the blue entry right below this, and if you could read

8    those, Special Agent Kroll.

9    A.  "MSS International Consultants (BVI), Ltd., Inc. in British

10   Virgin Islands.  Fenero Equity Investments Ltd. name reserved

11   with the BVI financial services commission.  Application for

12   bank account submitted to FCIB."

13   Q.  And, Mr. Barile, if you could zoom back out and just zoom

14   in on the following entry in green.

15   If you can read that allowed, special agent.

16   A.  "Scott travels to London and meeting scheduled with Ruja in

17   London at Four Seasons Hotel."

18   Q.  If you could publish for the witness 1035, and if we could

19   now publish it to the jury and zoom in on the top two e-mails.

20   The bottom e-mail is from d.godeva@onecoin to

21   msscottlaw@gmail.com.  "Everything is blocked until 8 p.m.

22   Regardless, I will ask her if she would like me to cancel

23   anything or shorten time.  She knows she has to discuss things

24   with you and she will make time."

25   Special Agent Kroll, if you could read Mark Scott's

JBE7SCO1                    Kroll - direct

1    response.

2    A.  "Keep at 10 a.m.  Let's not mess up her entire day.  I can

3    discuss remainder once we get crypto cell going.  Smiley

4    face."

5    Q.  Let's go to 1037 first just for the witness.

6            Can we publish that to the jury.

7            Special Agent Kroll, read aloud the top e-mail there.

8    A.  "This looks good.  Will send you a new phone so I can start

9    speaking with Ruja directly.  Will need more and more contact

10   over the next month."

11   Q.  And publish for the jury 1038 from MSS Law to Dr. Ruja

12   Ignatova.  "Subject:  Wheels are in motion on structure.

13   Should have solid results later next week.  When back from

14   Asia?"

15           If we go to Government Exhibit 1040 for the witness

16   first.  If you could blow up -- if we could publish that to the

17   jury.

18           The bottom e-mail is from Mark Scott.  Can you read

19   that aloud, Special Agent Kroll.

20   A.  "Hi Ruja.  New developments.  Speaking to attorneys in all

21   relevant countries, I can get the basic structure for transfers

22   and signing authority in place for within eight business days.

23   With that you can sign contract, hire agents, etcetera.  The

24   remainder for protection and autonomy will be four to six

25   weeks.  This will afford you with complete privacy, but needs

1    an additional layer that with admin etcetera will cost a

2    material amount.  Much less" --

3    Q.  Can you read the response from Ruja Ignatova above that.

4    A.  "Hi.  If I want to keep abt 50 m eur on your accounts.  How

5    much will you charge me?  Money is in Europe.  R."

6    Q.  Zoom back out.  Take that down.

7            Let's show 1041 to the witness first.  We can publish

8    that to the jury.  If we can zoom in on the bottom e-mail

9    first, from msscottlaw@gmail to Dr. Ruja Ignatova.  Special

10   Agent Kroll, can you read aloud that.

11   A.  "Hi Ruja.  I am setting of up your transfers as investments

12   into registered investment funds offshore.  Can you wait about

13   ten days?  We have started the paperwork.  If you need to

14   transfer quicker, we should send to escrow at my law firm and

15   it will have to be there for a few weeks to not cause any

16   noise.  However, I recommend that you wait if you can."

17   Q.  Pause there.  If we could go to the last sentence in the

18   next paragraph.

19   A.  "Your name never appears and all shares held through a

20   trustee."

21   Q.  And continuing down.

22   A.  "How much comes from G?  Timing on that?  Whenever we are

23   ready?"

24   Q.  You can take that down.  We can go to 1042.  And if we

25   could scroll to the second page first, zooming in on the top

1    half of that page -- the full top half of the page.

2              And there is an e-mail dated February 20, 2016 from

3    MSS Law it says, "Any favorite names for the entities in

4    Europe?  One should be ..... holdings, Ltd.  The other ...

5    services Ltd.  Euro offshore I will just name for now.  Can be

6    changed when you take over by assignment of shares."

7              The response from Ruja, can you read that aloud?

8    A.   "RavenR is how I run my family office – but not needed to

9    be called like this.  Any suggestions from you?  R."

10   Q.   Keep scrolling up.  Can you read aloud the response from

11   Mark S. Scott.

12   A.   "Can be anything ... anything not associated with sales or

13   OC should be as neutral as possible.  I will give all entities

14   that are holding funds very sterile names.  You can change them

15   later."

16   Q.   If you could zoom back out to show the whole page.  If you

17   could go to the last sentence on the top e-mail, which is an

18   e-mail from Mark Scott to Dr. Ruja Ignatova, February 20, 2016.

19   Can you read that aloud.

20   A.   "Again to remember, as soon as this is done, you can rely

21   fully on yourself with your deposits, etcetera.  You will have

22   one or more fully registered investment companies under your

23   full control with your name not showing up anywhere."

24   Q.   Take that down and go to 1043-T.  The bottom e-mail is from

25   Mark Scott.  "Hi, Ruja, please let me know from which company

JBE7SCO1                          Kroll - direct

```
 1    and in what country the first $50 million are paid.  I must
 2    prepare here a basic KYC and a preliminary subscription
 3    agreement for the shares, which I have to submit to the bank."
 4          Zoom back out.  Ruja's response:  "The funds come from
 5    Bulgaria and Germany.  What documents do you need?"
 6          Can you read Mark Scott's response to that e-mail?
 7    A.  "I will send you the preliminary agreement as soon as it's
 8    done.  And then mini KYC.  Does all the money originate from
 9    one company or several or private?"
10    Q.  Go to Government Exhibit 1048.  If you could first read the
11    header, the two prongs and subjects.
12    A.  To Gareth Thomas cc'ing Jeffrey Kirk, from Mark Scott,
13    Wednesday, February 24, 2016.  Subject:  Application package
14    for CIBC.  With an attachment FCAPPKYC.pdf.
15    Q.  Just zoom back out.  First sentence says, "I have attached
16    the completed corporate questionnaire from First Caribbean
17    International Bank, and I am also providing for your and their
18    benefit the following KYC materials."
19          Go to page 2 and zoom in on the company name, which is
20    "Fenero Equity Investments, Ltd. (to be formed)."
21          If we go to page 3, a description of main activities.
22    Can you read that aloud.
23    A.  "Please provide a full description of the main activities
24    of the company, including, for example, goods traded or goods
25    provided.
```

1           The company will be set up as an investment fund for

2    two or three very select clients that I have been representing

3    as an attorney in major international law firms for many years.

4    This fund will be managed for a fee and a profit participation

5    by a second entity that is also located in the BVI (owned 100

6    percent by me)."

7    Q.  Pause there.  Going further in that same paragraph it says,

8    "This fund will mainly be looking to participate in investments

9    with other private equity funds and European investment banks

10   in opportunities located in Europe and Asia.  The focus

11   strategy really is co-investment with financial institutions in

12   the industries of telecom, real estate, financial services and

13   energy."

14          If we could just highlight the first sentence of this

15   section again:  And if we could put this side by side 1004.

16          Special Agent Kroll, can you just read aloud the date

17   of that e-mail?

18   A.  The date?  September 30, 2015.

19   Q.  And then going back to the 1048, go to the top of the page.

20   What's the date there of that e-mail?

21   A.  February 24, 2016.

22   Q.  If we go back to 2701.  Go to the timeline entry of

23   3/1/2016.  If you could read that aloud.

24   A.  "Fenero Equity Investments L.P. formed in British Virgin

25   Islands."

1           MR. FOLLY:  We go to 1055.  If we could zoom in on the

2       top half.  From Mark S. Scott to Dr. Ruja, and looking at the

3       bottom of the e-mail it says, "Any funds you have with him and

4       you want to transfer should be sent either through my escrow in

5       U.S. or BVI.  We can do immediately.  Also your other funds if

6       you want.  Let me know."

7           If we can go back to the timeline, go to the entry on

8       March 2 to 3.

9       Q.  Can you read that aloud, Special Agent Kroll?

10      A.  "Scott travels to British Virgin Islands."

11          MR. FOLLY:  Take that down.  You can show for the

12      witness first Government Exhibit 1056-T.  We can publish this

13      to the jury.  Zoom in on the lower portion.  Can you actually

14      zoom back out to see if there is any text on the next page.  We

15      can zoom in on the first e-mail, the March 2nd, 2016, e-mail.

16      Is there additional text or is this the end -- if we could go

17      to the -- if we can go all the way to the end of the e-mail.

18      If you can scroll up to include the to field.

19          From Mark S. Scott, it says:  "Hello Ruja, looking at

20      the first paragraph, you have to tell me how much money you

21      wish to deposit in the coming months and before December 2016.

22      I have created a structure, on the one hand, which creates a

23      super creditworthiness towards the outside, which is needed

24      while at the same time can be operated internationally as

25      required."

1        Then going to the last paragraph of this same chain.

2   The same e-mail, scrolling down.  Stopping there.  "Please let

3   me know how much is coming from G and where it is.

4   Unfortunately, he keeps having continuously problems with

5   accounts and I would like to ensure from where he will be from

6   where he will pay back your deposits in order to prepare the

7   banks."

8        If we can scroll up to Ruja's response.  "Tomorrow

9   evening I am in London and we can use the magic phone."

10       Scroll up.  There is an e-mail from Ruja to

11  MSScottlaw@gmail.  "Perfect.  I see G next week and I will see

12  about his concerns."

13       Scroll up the next full e-mail.  Starting with "Hi

14  Ruja."  Looking at the third paragraph down.  "We should

15  discuss this as you will not have the any more problems

16  shortly.  I don't know what agreements you have with regard to

17  investments but starting next months, you can freely dispose at

18  least of your profits and no longer need custodian accounts at

19  G."

20       Next paragraph:  "The bank with which we do business

21  has operations in Hong Kong, Zurich, Liechtenstein, Baduz, and

22  the island."  He goes on to say:  "They are okay in a sense as

23  we only indicate the beneficial owners in a restricted manner,

24  we do not show you at all."

25       Further down he writes:  "As I said, I do not know

1    what kind of deal you have but you no longer need him for

2    simple deposits."

3           And continuing down.  "I don't want to get in the

4    middle but I want you to know about it.  Last week, he gain has

5    lost a large account and the moneys are frozen."  And he adds

6    "I hope none of yours is part of it.  But please don't say

7    anything."

8           We can keep scrolling up.  Pause there.  Zooming in on

9    the paragraphs "understood" and the one below that.  This one

10   is from Dr. Ruja Ignatova.

11   Q.  Special Agent Kroll, can you read aloud those paragraphs.

12   A.  "Understood.  We will discuss this all personally by phone.

13   We agreed with G that he holds the money for us in the interim.

14   That's all.  We do not have joint projects -- I have some

15   MasterCards with him.  I do not believe that he and I would

16   invest well together -- personality clash.  I thought he uses

17   some of our money -- he has quite a lot of our money.  More

18   than 150 and I told him that I will get it home over the next

19   months.  Thanks for your trust R."

20          MR. FOLLY:  You can take that down.  We could publish

21   Government Exhibit 1411 for the witness only first and scroll

22   through that so the parties can see it.  If we can go back to

23   the first page, and publish this for the jury.  We could zoom

24   in on the top portion.

25   Q.  Special Agent Kroll, can you read aloud what's listed

1    there.

2    A.   From Mark Scott, sent Sunday, March 6, 2016, at 7:51 p.m.

3    UTC.   Subject attachment, and the attachment listed is Fenero

4    miss statement.docx.

5            MR. FOLLY:   Can you continue down to publish what's

6    attached there.   You can just scroll through for now.   If we

7    could go to government exhibit, put side by side with this

8    exhibit, first for the parties only and the witness, 1407.   And

9    on 1411, if you could scroll up to the top just highlight the

10   date and time.   Publish this to the jury, please.

11   Q.   Special Agent Kroll, can you focus on 1407 on the right

12   side of the screen and read what's shown there.

13   A.   "To Mark S. Scott PL from Scott, Mark.   Sent Sunday,

14   March 6, 2016, subject starting a family office/family office

15   exchange."

16           Shall I read?

17   Q.   If you could read the website there.

18   A.   Website http://www.family

19   office.com/knowledge-center/starting-family-office.

20           MR. FOLLY:   Mr. Barile, are you able to do a third

21   side by side with Government Exhibit 1410?   It's 1407, 1410,

22   and 1411 and if you're able to zoom in on the headers of all of

23   those.

24   Q.   Special Agent Kroll, focusing on the box in the

25   upper-right-hand corner, which is Government Exhibit 1410, if

JBE3SCO2                         Kroll - Direct

1   you could read aloud what's shown there.

2   A.   From Mark Scott to Mark Scott, sent Sunday, March 6, 2016.

3   Subject:  What is a family office?  What are its benefit?

4   Aafmindia, with a web address in the body of the e-mail

5   https://Aafmindia.wordpress.com/2012/03/12/what-is-family-office

6   /.

7   Q.   It appears that each of these e-mails is from Sunday,

8   March 6, 2016, 1407 is at 5:02 p.m., 1410 is at 5:10 p.m., 1411

9   is at 7:51 p.m.  Those are the dates listed in each of these

10  exhibits?

11            MR. DEVLIN-BROWN:  May we have a sidebar, your Honor.

12            THE COURT:  Sure.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1           (At the sidebar)

2           MR. DEVLIN-BROWN:  Okay.  So, as best we can tell,

3   these three exhibits, 1407, 1410, and 1411 are not on the

4   summary chart.  They're not in evidence either.  I mean, if

5   they are at least entries on the chart, we can kind of keep

6   track.  You really shouldn't be reading or publishing e-mails

7   that are not in evidence and are not in the chart.

8           THE COURT:  Are they in the chart?

9           MR. FOLLY:  Your Honor, it's possible -- your Honor,

10  as an accommodation and to make this go smoothly, my

11  understanding was I was publishing first to you and I was

12  pausing and waiting to make sure there was no objection.  And I

13  want to continue doing that, but that was my mistake.  I

14  thought those were in evidence.

15          THE COURT:  So to the extent they are not in evidence,

16  take them down, and I was working under the assumption that all

17  of the exhibits that you were putting up before the witness

18  were on the chart.

19          MR. FOLLY:  Your Honor, nearly every single one of

20  them is.

21          THE COURT:  That's not -- that's not --

22          MR. FOLLY:  There are some that are definitely not,

23  because he will actually be offering them himself now, is the

24  issue I raised yesterday.  He will be from personal knowledge

25  offering some exhibits.

1            THE COURT:  Then you have to identify those and

2    highlight those so we are aware that they're not on the chart.

3            MR. FOLLY:  Absolutely.  And these were not in that

4    category.  This was a mistake on our part.

5            THE COURT:  Okay.

6            MR. FOLLY:  It would be helpful if there is an

7    objection, we could handle it now so we don't just come right

8    back here.

9            MR. DEVLIN-BROWN:  Objection to what?  I'm not sure.

10           MR. FOLLY:  To the two exhibits we came over here to

11   discuss.

12           MR. DEVLIN-BROWN:  I mean, you've already gone through

13   them.  I think we can take them off the screen and move to the

14   next and we'll see if we want any further relief.

15           THE COURT:  Okay.

16           MR. FOLLY:  I am going to offer them.

17           (Continued on next page)

18

19

20

21

22

23

24

25

1           (In open court)

2           MR. FOLLY:  Your Honor, the government offers, to the

3   extent not in evidence, 1411, 1407, and 1410.

4           MR. DEVLIN-BROWN:  Objection, your Honor, for the

5   reasons just expressed.

6           THE COURT:  Very well.  That objection will be

7   sustained without prejudice.

8           MR. FOLLY:  Your Honor, may we have another sidebar?

9           THE COURT:  No.  Keep going.  The objection is

10  sustained without prejudice, you can revisit it later.

11          MR. FOLLY:  All right.  So to be clear, 1411 was -- it

12  might be easier to discuss this at the sidebar, your Honor.

13  Some of these exhibits were already in evidence.

14          THE COURT:  Please move forward, Mr. Folly.

15          MR. FOLLY:  All right.

16  Q.  We will come back to this section of the timeline a little

17  bit later.

18          If we can go back to Government Exhibit 2701.  Go to

19  March 10, 2016, and read aloud the entry on that date.

20  A.  The first entry, March 10, correct?

21  Q.  Yes, the orange entry there.

22  A.  Okay.  "Scott receives $149,980 at City National Bank

23  Florida (1754443008) from International Marketing Services

24  account at United Overseas Bank in Singapore.

25  Q.  You can zoom back out staying on the timeline.  And go to

JBE3SCO2                        Kroll – Direct

1    the next blue entry there.  You can read those aloud.

2    A.   "Fenero Equity Investments (Ireland) Limited, Fenero

3    Tradenext Holding Limited, Fenero Equity Acquisition 1 Limited

4    Incorporated in Ireland.  Fenero Equity Investments (Cayman) I

5    LP, and MSSI International Consultants (BVI) Ltd. are

6    registered in Cayman Islands.  Application submitted to

7    Deutsche Bank Cayman Islands for Fenero Equity Investments LP."

8               MR. FOLLY:  You can zoom back out.  If we can go to

9    Government Exhibit first publishing only for the witness

10   Government Exhibit 1119.

11              MR. DEVLIN-BROWN:  Just a moment, your Honor.  We have

12   an objection on this one, your Honor.

13              THE COURT:  Okay.  Come on up.

14              (Continued on next page)

1            (At the sidebar).

2            MR. DEVLIN-BROWN:  This is an objection that we raised

3    before.  It is one of the letters the government submitted, it

4    is Appleby's firing of Mark Scott based in part of statements

5    he didn't fulfill his obligations.  There is no witness from

6    Appleby that will testify.  It is more prejudicial than

7    probative.  That's our objection.

8            MR. FOLLY:  This is what we briefed in our letter

9    motion.  We think it's fully appropriate to be entered into

10   evidence.  It is probative of Mr. Scott's state of mind.  It's

11   one of numerous instances where he was informed by third

12   parties that they had concerns about his Fenero Funds, concerns

13   about due diligence, concerns about money laundering.  And he

14   nevertheless, obviously, continued to participate in the

15   conspiracy after all of those concerns were raised.

16           THE COURT:  I'll allow it.  I have a question.  I

17   don't know that I have the most up-to-date version of this.  On

18   the screen, what it says is 4-2016.  I have April 08, 2016.  I

19   don't know it makes such a difference.  I want to make sure I

20   have the most up-to-date one.

21           MR. FOLLY:  I believe you do but let me consult with

22   Mr. Barile.  There may be some formatting that's going on

23   that's causing that discrepancy.

24           MR. DiMASE:  One other thing, your Honor, if the

25   defense wants a limiting instruction on this letter that it

1   should only be considered for state of mind and not for the

2   truth of the contents, the government won't object to that kind

3   of instruction.

4              MR. DEVLIN-BROWN:  Not at this time.

5              THE COURT:  Okay.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          MR. FOLLY:  Mr. Barile, if you could publish that now

3     to the jury.  Government Exhibit 1119.  If we could actually

4     start by going to the third page.  If you can keep scrolling

5     down.  And scroll up, sorry, if you can scroll down.  If you

6     can go to the e-mail from April 6, 2016.  Sorry, the one

7     directly below that.

8     Q.  Special Agent Kroll, starting with the header, if you can

9     read who is listed there.

10    A.  From GThomas@applebyglobal.com to MSScottlaw@gmail.com sent

11    April 6, 2016.  Cc'ing Nmenezes@applebyglobal.com.

12    Q.  Subject "new entity."  There is an Appleby sort of letter

13    numbers listed there.  If you read aloud the body of the

14    e-mail.

15    A.  "Mark, as mentioned to you on several occasions now,

16    Appleby Corporate Services BVI Limited's requirements grew in

17    line with our understanding of the size of investments that you

18    were looking to attract (and had lined up), and the type of

19    vehicle formed.

20         "As a regulated entity, we need to have complete

21    transparency on how the limited partner and her family came to

22    accumulate such wealth as to be able to warrant such a level of

23    investment in a new fund.

24         "Our concern remains that we have not been provided

25    anything material to explain, and evidence, how Irina Dilkinska

1   has accumulated sufficient wealth in order for her company to

2   make the level of contribution that is intended as a limited

3   partner to Fenero LP.

4          "In your letter on Locke Lord letterhead, you have

5   indicated that the investors for the various Fenero Funds will

6   be four HNW European families.  We have not been able to

7   corroborate by our internet checks which HNW family Irina

8   Dilkinska is part of, and you have not provided any information

9   on this.

10         "We would require significantly more detail to

11  evidence Irina Dilkinska's source of wealth and which European

12  family she is a party of.  As mentioned previously, we believe

13  you will find that any bank offshore or onshore would also be

14  asking the same type of questions in relation to the UBO's

15  source of funds.

16         "Accordingly, at this stage we will not be able to go

17  on as authorized representative to the approved manager or

18  approved fund.  Further, if our compliance requirements are not

19  satisfied by 29 April 2016, we will need to take steps to

20  resign as registered agent to the approved manager and approved

21  fund, and you will need to find a new agent for the entities to

22  be transferred to.  Regards, Gareth."

23  Q.  If you can scroll up to the response.  If you can read

24  aloud the response from Mark Scott.

25  A.  "Gareth, I am traveling and will respond in length when I

1    return.  In the meanwhile I am working on a transition.  You

2    are asking far more than most banks I am currently

3    communicating with.  I am also at a loss that the managing

4    partner of your legal division has failed to respond to my many

5    requests for a call to discuss the current situation.  There

6    should be some professional courtesy.  I am an equity partner

7    in the 35th largest U.S. firm and I feel I have been treated

8    like a walk in.  You guys contacted us for business and I took

9    a chance.  You should take the time to ask more questions and

10   better understand the business wed are initiating before taking

11   a position that is more extreme than any regulatory body.

12   Also, I would expect advice more so than constant questioning.

13   We will sort this out quickly, including the fees and funds I

14   have I already have paid.  Best regards, Mark."

15            MR. FOLLY:  You can take that down and show to the

16   witness only Government Exhibit 1067.  Show that to the jury.

17   An e-mail from Mark Scott dated April 8th, 2016, to Gilbert

18   Armenta, subject meeting.  Importance high.

19   Q.  If you could read aloud the e-mail, Special Agent Kroll.

20   A.  "Hi Gilbert.  Not sure if you missed my previous e-mail?

21   Please let me know when we can possibly meet to catch up and

22   have our talk about future plans.  Also, Ruja asked me to

23   discuss future process with you."

24            MR. FOLLY:  You can pause there.  We can take that

25   down and publish to the witness only Government Exhibit 1069.

1    Publish that to the jury.  An e-mail from Dr. Ruja Ignatova to

2    Mark S. Scott and GArmenta@ZalaGroup.com dated April 13, 2016.

3    Q.  If you can read that aloud, Special Agent Kroll.

4    A.  "Gentlemen, I spoke to both of you over the last days on

5    the topic of getting some things done.  I trust that the both

6    of you will handle without me -- as the frame is quite clear.

7    If any issues let me know in time so the three of us can find a

8    slot to sit together in person and sort out.  Mark, we use the

9    secure line to talk about this if needed -- prepare after

10   coordination schedule and structure ASAP.  First 25 percent

11   should start next week if no major preparation or issues.

12   Mark, also check my separate mail to you sent this morning.

13   Thanks R."

14   Q.  Go back to the timeline entries for April 20 through 21 and

15   the one directly below that at the bottom of page one.  If you

16   can read both of those aloud.

17   A.  From April 20 to April 21 Scott travels to Cayman Islands.

18   4/22/2016 Scott travels to British Virgin Islands.

19           MR. FOLLY:  If we can go to Government Exhibit 1072,

20   just for the parties first.  If we can publish that to the

21   jury.  An e-mail from David Pike to BMarler@DMSbank.com dated

22   April 25, 2016.  Subject DBT banking.

23   Q.  If you can read the e-mail aloud.

24   A.  So the e-mail also contains several attachments.

25           "Good afternoon, Benjamin.  Please find attached your

1  account applications for both the investment manager and the

2  fund."

3  Q.  You can pause there.  If we can go to page three.  And read

4  aloud the nature where it says describe what the business does.

5  If you can read aloud what's listed there.

6  A.  "The fund will invest into distressed European companies

7  that are active in the financial services sector.  Examples are

8  trading platforms, financial services companies, investment

9  banks and processors and issuers of closed loop debit cards,

10 focusing on MasterCard and Visa licenses.  The fund --"

11 continue?

12        "The fund will focus on acquiring minority controlling

13 positions to better leverage its capital.  Value will be added

14 by the know-how of the general partner, strategic

15 relationships, efficiencies in back office operations through

16 shared services and improved IT systems and the various

17 industry experts the GP has relationships with and will place

18 into the various portfolio companies."

19        MR. FOLLY:  Go to page five.  It lists there the two

20 connected parties being Mark S. Scott and David R. Pike.  If we

21 can go to just for the parties Government Exhibit 4109.

22        MR. DEVLIN-BROWN:  Your Honor, this one might require

23 a sidebar or when the jury is on a break.

24        THE COURT:  Actually it is 11 o'clock so let's take

25 our morning break.  Don't discuss the case.

1              (Jury excused)

2              THE COURT:  Yes.

3              MR. DEVLIN-BROWN:  So, this is one that the government

4      had mentioned in their --

5              MR. FOLLY:  I would ask to let the witness step down.

6              THE COURT:  Yes.

7              MR. DEVLIN-BROWN:  So this is a document the

8      government -- sorry.

9              (Witness not present)

10             MR. DEVLIN-BROWN:  Okay.  So, your Honor, this is one

11     of the documents the government mentioned in its letter of

12     November 11, 2019 in terms of the various exhibits they wanted

13     to offer in terms of the state of mind.  We have general

14     objections to this document as it's hearsay and I think its

15     prejudice -- its probative value is outweighed by the

16     prejudice.

17             But in addition to that, which your Honor will rule

18     on, the government had referenced in a footnote to that letter

19     that there were two different versions of the attachment, one

20     of which had been preserved by an agent who could testify to

21     that, I guess, on the day the article was posted, another who

22     preserved a version of the website shortly after this was

23     forwarded to Mr. Scott.  There are some minor variations.  I am

24     not sure what the government is intending to do as to whether

25     they are putting up an attachment, and if so, what's the

1    foundation that that's correct.

2          MR. DiMASE:  Your Honor, so, on the first point,

3    particularly in a case where the defendant is asserting he did

4    not know that OneCoin was a fraud scheme, a website being sent

5    to him entitled "OneCoin is a scam," and then the contents of

6    that website and what it reports about the reasons why OneCoin

7    is a scam is highly probative evidence, and it's certainly not

8    the kind of prejudice that is contemplated by 403.  It's

9    prejudicial only in that it shows the defendant did have

10   knowledge about OneCoin's fraudulent nature, which is a key

11   issue at this trial.  So I don't think there is any basis to

12   exclude it under 403.

13         I would note we intend to show the jury the e-mail as

14   well, in which there are some false exculpatory statements by

15   the sender that these are false allegations, and the jury will

16   of course see that as well at the same time.

17         With respect to the attachment or the -- 401 -- 4109-A

18   on the right of the screen, Mr. Devlin-Brown was a little bit

19   inaccurate about the footnote.  What we said is a version of

20   this website was preserved on December 30, 2015, which is, by

21   the way, the date that's listed on the website to this day.

22   It's the date that the post was uploaded to the internet.  It

23   was then preserved again on April 29 of 2016, three days after

24   this e-mail was sent.  And the variations are just a couple of

25   additions which we do not intend to show the jury, on the

1    chance that those additions were made between April 26 and

2    April 29.  But the two preserved versions show this is the

3    website that was up on April 26.

4             THE COURT:  What relevance does the April 26 version

5    have if the version that was sent to Mr. Scott I assume was the

6    December 30?

7             MR. DiMASE:  Your Honor, just to be clear, these are

8    two moments in time for the website.  One preserved on

9    December 30, one on April 29.  We do not intend to introduce

10   the April 29 version into evidence.  We only prepared it and

11   showed it to the parties and the Court because it shows that

12   the same text is in both, except for a couple of additions at

13   the very end, demonstrating that this was the text that was up

14   throughout the period.  In other words, there isn't a

15   preservation from the date the e-mail was sent.

16            THE COURT:  What?

17            MR. DiMASE:  There was no preservation on the day that

18   the e-mail was sent.  So the preservation three days later just

19   goes to show that the same text was there as was there on the

20   30th of December.  That's really the only reason we attached

21   that.  We do not intend to use the April 29 version.  We would

22   be prepared to obtain evidence regarding the way these websites

23   were preserved.  In fact, that's why we fronted this in our

24   letter, and we're only now getting an objection as we put the

25   exhibit up, on that issue.  So it's --

1            THE COURT:  So, what Ms. Dilkinska sent to Mr. Scott

2      was a link.  And presumably, if he clicked on the link when he

3      received the e-mail, he would have gotten the December 30

4      version?

5            MR. DiMASE:  That's right, your Honor.  It's dated,

6      the website post is dated December 30 of 2015.

7            THE COURT:  Okay.  So, what's the objection with

8      respect to that, Mr. Devlin-Brown?

9            MR. DEVLIN-BROWN:  Well, I mean, your Honor, we

10     obviously don't know if he clicked on the link or he didn't or

11     what time.  The government is asking us to stipulate that if

12     one clicked on the link on a historical version when they

13     preserved it on April 29 this is what that would say.  It is

14     not an attachment to the e-mail.  It is some work an agent did.

15     I can't stipulate to that.

16            THE COURT:  Okay.  On the 403 issue, I think that this

17     exhibit is not more prejudicial than probative, so it will not

18     be kept out on that basis.

19            With respect to the issue of what version Mr. Scott

20     saw or not, I think this can go to the jury, and you can argue

21     as to its weight.  But it also could be cured by putting in the

22     April 29 version as well.  I don't know how you want to deal

23     with that.

24            MR. DiMASE:  There is a third option which is the

25     agent can testify to what's on the website today.  It still

1    says December 30 of 2015.  The preservations, if we needed to

2    authenticate them, we'd need to call a witness from the company

3    that is involved in authenticating or preserving these websites

4    on the dates in question.  Maybe we can --

5              THE COURT:  I didn't understand the objection to be an

6    authenticity objection.  Am I wrong about that,

7    Mr. Devlin-Brown?

8              MR. DEVLIN-BROWN:  Well, we've stipulated to many,

9    many things.  I don't believe this is one we were asked to

10   stipulate to.  I think if an agent clicked on it and that's

11   what it says now or if an agent went to the Way Back Machine

12   and clicked on it and says that's what it says, then that's

13   fine to the agent to testify to this.  This is not a good

14   document for Mr. Scott, so I am not going to stipulate.

15             MR. DiMASE:  To be clear, the name of the company is

16   the Way Back Machine.  It is an internet provider that

17   preserves websites and that's where the two preservations from

18   December 30 and April 29 come from.  And if needed, we can call

19   a witness from that company to testify to the authenticity of

20   the two preservations.

21             THE COURT:  I don't think that's going to be necessary

22   but the agent can testify to it.

23             MR. DiMASE:  Okay.

24             THE COURT:  Don't be late.

25             (Recess)

 1            MR. FOLLY:  Your Honor, before we bring the jury back

 2     in, I just wanted to revisit the two exhibits that the

 3     government inadvertently did not offer.  We would like to offer

 4     those.  I'm not sure if there is an objection beyond what

 5     happened as to their admissibility.  There are some questions

 6     associated with them that only this witness is in a position to

 7     answer.  And therefore we would like to do that as part of his

 8     testimony.

 9            MR. DEVLIN-BROWN:  We're talking about the exhibits we

10     objected to earlier, right, 1407 and 1410?  The witness is

11     going to talk about he clicked on the links because the only

12     thing we have offered into evidence is the links to the

13     website.

14            MR. FOLLY:  Yes, your Honor.  Special Agent Kroll is

15     going to testify to the contents of the links.  And those are

16     going to be offered based on his personal knowledge having

17     visited the links.  While he is testifying, I will offer those

18     exhibits.  The relevance of the exhibits is that they pertain

19     to information that was ultimately copied, essentially copied

20     and pasted into the mission statement document that we have

21     looked at a number of times.  And Special Agent Kroll is in a

22     position to authenticate the website content.

23            THE COURT:  You can get the jury.

24            If you are going to object, the objection will be

25     overruled.

1          (Jury present)

2          THE COURT:  Mr. Folly.

3          MR. FOLLY:  Thank you, your Honor.  If we could

4    publish Government Exhibit 4109 to the witness and to the jury.

5    Q.  It is an e-mail from Irina Dilkinska, Irina@OneCoin.eu to

6    MSSScottlaw@gmail.com.  The subject is "media and false

7    accusations."  It's dated Tuesday, April 26, 2016.

8          Special Agent Kroll, if you could read aloud the body

9    of the e-mail including the link at the top.

10   A.  The link is https://www.tyracpa.com/OneCoin-is-a-scam/.

11         The body of the e-mail reads:  "Morning Mark.  In the

12   light of our conference call yesterday and further discussions,

13   please see the link above.  Let's discuss at your earliest

14   convenience because this guy is writing such stupid things for

15   a second time.  He is based in U.S.  As per the other aspect of

16   our previous conversations regarding -- "

17         I'm sorry.  There is some text there.

18   Q.  It looks like it says "the template."

19   A.  "The template letter as answer of such allegations.  I will

20   send you some materials we have prepared for EU as regulations

21   are mostly similar in definitions for your assessment.  Thank

22   you very much, kind regards, Irina."

23   Q.  If we can show only for the witness Government Exhibits

24   4109-A and 4109-B.

25         And Special Agent Kroll, can you describe what these

1    two exhibits are?

2    A.   Government Exhibit 4109-A is a screen capture of the

3    website from a date prior to that.

4    Q.   Was that December 30, 2015?

5    A.   December 30, 2015, correct.  Using the Way Back Machine.

6    Q.   Is that a website that stores historical versions of

7    websites on the internet?

8    A.   Yes, it is.

9    Q.   We saw a link in Government Exhibit 4109.  Correct?

10   A.   Correct.

11   Q.   What is the relationship between the link that was in the

12   e-mail, 4109, and these two exhibits?

13   A.   Yes.

14   Q.   What -- sorry.  What is that relationship?

15   A.   Between these two exhibits is one was captured December 30,

16   2015, and the other was captured on April 29, 2016.

17   Q.   Focusing now on the actual e-mail we just looked at a

18   moment ago, if we could just pull that up still for the

19   witness, 4109.  In that e-mail -- we can actually publish it to

20   everyone.

21        In that e-mail, there is a website listed there

22   Tyracpa.com.  And OneCoin is a scam is the rest of the website.

23   What is the relationship between that website and the two

24   exhibits, 4109-A and 4109-B, that we just looked at?

25   A.   That is the website address that was linked, that was

JBE3SCO2                          Kroll - Direct

1    entered into the Way Back Machine.

2    Q.  Did you yourself view those two historical versions from

3    December 30, 2015, and April 29, 2016?

4    A.  Correct.  So I can't first-hand state that those two

5    exhibits were taken during those periods of time, but I

6    personally went into the Way Back Machine and checked for those

7    dates where Way Back -- what it refers to is crawled a screen

8    shot of the website on those dates.

9              MR. FOLLY:  The government offers 4109-A and 4109-B.

10             MR. DEVLIN-BROWN:  No objection pursuant to your

11   Honor's ruling.

12             THE COURT:  Very well.  Those exhibits will be

13   received.

14             (Government's Exhibit 4109-A, 4109-B received in

15   evidence)

16             MR. FOLLY:  Mr. Barile, if we can publish side by side

17   with 4109, 4109-A.  And at the top it says OneCoin is a scam.

18   The very, very, very top actually.  All the way at the top of

19   the page.  OneCoin is a scam-Jason M. Tyra CPA, PLLC, and then

20   it says Killeen, Texas.  And the title of the posting is

21   OneCoin is a scam.  It's from December 30, 2015, by Jason Tyra.

22   Q.  Starting at the top, can you please read this aloud.

23   A.  "Update:  If OneCoin still participating in "voluntary

24   monthly audits," Semper Fortis isn't doing them.  According to

25   Georgi Kaloyanov, the firm's managing partner, Semper Fortis

JBE3SCO2                        Kroll - Direct

performed just two monthly audits "regarding the consistency of

the block regarding OneCoin" (sic) and hasn't worked with the

company since August of 2015."

Q.  We can continue.  Just blow up the whole bottom portion all

the way down.

A.  "I had an unusually long conversation recently with a

potential client regarding tax consequences of virtual currency

mining and trading.  This particular individual was heavily

invested in OneCoin, which I had not heard of prior to her

call.  I am always excited to learn about something new, so I

asked for more details.  However, as this person told me more

about OneCoin, my auditor's fraud warning antenna began to

twitch.  I have been working in the virtual currency space for

several years which is about three lifetimes for the virtual

currency ecosystem.  I have seen many virtual currency startups

come and go for a variety of reasons, but very often due to

theft and fraud.  Before that, I worked in public accounting,

consulting and retail banking.  In my experience, no one likes

to be told that they have been suckered, even less so by

someone that they don't know and trust.  I think I will not get

any new business from the potential client who explained

OneCoin to me.  Nevertheless, I wanted to offer my current

impression of OneCoin and point out a few things to potential

investors.

        "What is OneCoin?  OneCoin is a proprietary digital

1   currency created by OneCoin Limited, a Gibraltar-based company.

2   Unlike bitcoin, which is based on an open source nonproprietary

3   platform and mining network in which anyone can theoretically

4   participate, OneCoin is currently owned and controlled by just

5   one organization of related party affiliates.  Users who want

6   to invest in OneCoin must first purchase a "package" that

7   claims to show them how to make money trading assets such as

8   gold and cryptocurrencies online.  The lower packages also

9   include books such as Napoleon Hill's "Think and Grow Rich"

10  that are either in the public domain or can be obtained at a

11  very low cost from other sources.

12          "Users who want to participate in mining must be

13  inducted by another user who is already a member of the network

14  and then purchase tokens that are exchanged for mining

15  activity.  Earlier users share in the profits earned by users

16  they recruit.  OneCoin is not actively traded on any known

17  exchange or trading platform that handles digital currencies.

18  The only place it appears to be listed at all (besides

19  OneCoin's own website and its affiliates) is xcoinx, a

20  seemingly defunct or perpetually incomplete website.  The

21  xcoinx website contains several "coming soon" sections and

22  content referencing a hack that appears to be lifted straight

23  from another well known trading platform's website.  In fact,

24  all of the sites pushing or promoting OneCoin have the same

25  anonymous amateurish feel to them, as if they were thrown

JBE3SCO2                          Kroll - Direct

1     together quickly/cheaply and have not been well maintained.

2              "U.S. participants in OneCoin's program received a

3     note by e-mail last fall explaining that U.S. trading and

4     withdrawals to U.S. customers have been suspended pending

5     registration with the relevant regulators.  OneCoin balances

6     remain inaccessible with no clear timeline as to when they will

7     be available to U.S. users.  It isn't clear what regulators

8     OneCoin (a non-U.S. company) believes itself beholden to or

9     why, but the Securities and Exchange Commission and the

10    Commodities Futures Trading Commission were both cited in the

11    e-mail as regulators with whom the company may need to register

12    before reopening to U.S. persons.

13             "What do scams look like?  The Association of

14    Certified Fraud Examiners, of which I am a member, has

15    identified the following indicators of common scams:

16             "The investment opportunity promises "guaranteed"

17    returns.

18             "The opportunity is described as a "once in a life

19    time" or pressures you to buy immediately "before it is too

20    late."

21             "The deal sounds too good to be true.  Compare any

22    promised return with the returns on well known stock indexes.

23             "The investment offer was unsolicited.  You are unable

24    to find any public information about the investment

25    opportunity.  Often, this is explained away as the investment

JBE3SCO2                          Kroll - Direct

 1    being "by invitation only" and a "secret that is best kept,

 2    lest too many people get involved."

 3              "The opportunities or people touting them are located

 4    outside of the United States.  This particular point gives the

 5    scam an exotic feel and includes the idea (real or implied)

 6    that profits can be squirreled away offshore and away from the

 7    taxing authorities.

 8              "You do not know the person who is contacting you or

 9    they are just an acquaintance.

10              "OneCoin provides a once-in-a-lifetime opportunity,

11    revolutionizing the business world of today's digital economy.

12    The OneCoin concept is born out of the success of the

13    pioneering cryptocurrency, bitcoin.  It all started back in

14    2009 when a new digital currency was introduced to the internet

15    and financial world.  Only in 2013 this currency has seen a 75

16    times increase in its starting price.  And it started at a

17    price of only ten cents USD per coin and has been traded for

18    over 1.100 USD per coin.  Through its success, bitcoin

19    popularized cryptocurrency paved the way for more innovative

20    and better concept.  The opportunity has now opened for you to

21    be part of the next big winner in digital currency, OneCoin.

22    OneCoin has the ambition to become the next big cryptocurrency

23    as it uses the latest technology, provides long term value to

24    its investors, and has a well thought through concept.  This

25    opportunity is only available through a strict invitation

1    basis, providing you with the knowledge you need to schedule in

2    the world of cryptocurrency."

3            "Notice any similarities between ACFE's list and

4    OneCoin's model and marketing materials?  Also, note the

5    numerous references to bitcoin which is not affiliated with or

6    even terribly similar to OneCoin.  You may have noticed that

7    OneCoin associates itself with bitcoin at every possible

8    opportunity in its marketing materials and on its website.

9            "The verdict.  Unfortunately, frauds are often

10   difficult to prove, even when losses start to add up.  There is

11   a fine line between a bad investment or a bad management and an

12   operation whose intent was to dupe unsuspecting investors all

13   along.  However, OneCoin shows many of the hallmarks of at

14   least two types of common frauds, the pyramid scheme and the

15   Ponzi scheme.

16           "If you've made it this far, then you have likely done

17   a little research on your own and are looking for confirmation

18   for your own conclusion (either for or against).  With an

19   operation as vague and opaque as OneCoin, we may not know for

20   sure for many months or even years, but I think it will be

21   likely sooner than that.

22           "For what it's worth, here are my thoughts on OneCoin:

23   Assuming for a moment that you could withdraw or trade them,

24   which at least U.S. users are unable to do for the moment, with

25   whom would you trade?  Where would you send them?  They aren't

1    accepted anywhere as payment.  No known entity makes a market

2    for OneCoin or offers the ability to cash out to fiat currency

3    which will be a requirement in order to implement the payment

4    card functionality promised by the company's marketing

5    materials.  Today, it looks like your only potential counter

6    parties are other OneCoin users.  This is a great deal for

7    early adopters who are in a position to sell their appreciated

8    holdings, but not so much for later ones who buy in as an

9    investment.

10         "OneCoin's recruitment model clearly meets the

11   definition of a multilevel marketing program.  The problem with

12   multilevel marketing schemes is that they are mathematically

13   unsustainable, there aren't enough potential recruits for the

14   pyramid to go more than a few levels deep.  Once again, this is

15   a great setup for early adopters, but few others should expect

16   to earn much, if anything, from downstream recruits.

17         "OneCoin's materials are heavy on jargon and

18   rhetorical hand waving, but light on substantive technical or

19   financial details.  The company heavily promotes itself by

20   citing the distinguished but uncorroborated résumé of its

21   founder and association with others rather than standing on its

22   own history or accomplishments.

23         The company proudly points out that an independent

24   auditor reviews its blockchain and issues a report on a monthly

25   basis, but this hardly conclusive evidence for or against

1    OneCoin as a scam.  Semper Fortis appears to be a reputable

2    firm actually in operation in Bulgaria.  They probably do

3    quality work, but their work doesn't prove what OneCoin says it

4    does.  Even if it did, OneCoin has deliberately misrepresented

5    the existence and frequency of Semper Fortis' attest work.  The

6    report addresses only the claims made by the company in

7    reference to the OneCoin blockchain, which was created by and

8    is controlled by OneCoin Limited.  It does not address the

9    solvency, financial structure or business model of the company

10   specifically or OneCoin more generally.  It is not an auditor's

11   report within the legally accepted meaning in the United States

12   or as generally understood with respect to the financial

13   statement audits.  The auditor was not engaged and makes no

14   attempt to evaluate anything about OneCoin except whether

15   technical representations made by the company are an accurate

16   reflection of the way its blockchain works.  This is important

17   because the report can be true and correct in every aspect and

18   OneCoin can still be a scam.

19        "The big picture.  In my professional opinion, OneCoin

20   is a sophisticated example of a classic pyramid and/or Ponzi

21   scheme with just enough of a sheen of respectability and

22   legitimacy to make it a longish con.

23        "Here is how I think it works:  The first phase of the

24   con is the sale of basically worthless self help type investor

25   education materials while building hype around OneCoin and

perhaps seeking outside investment in the company itself.  The

perpetrators also use this method to build up OneCoin's legend

with public appearances (see the conference talk given by

OneCoin's founder at the link below), paid advertising (the

fake profile in Forbes cited by Coin Telegraph), and fake or

massively overstated trading and price appreciation history

(the whole xcoinx website).  The user pyramid fills out during

this phase with early adopters aggressively recruiting

downstream users.  If investors are involved, they are likely

of the small, non-accredited type.  Venture capitalists and

institutions will be put off by opaque or incomplete business

plans or by due diligence work that says that the founders have

checkered histories and will stay away.

        "In phase two, the cash taken in by some parts of

OneCoin's operations will likely be used to fund limited

withdrawals by early adopters.  This fuels the hype, since

early users who make money (and don't know they are the

beneficiaries of a Ponzi scheme) become OneCoin's most vocal

supporter.  The most important aspect of this phase is to

control withdrawals through a combination of greed ("you'll

miss out on future gains") and lies ("regulators/hackers/banks

have disrupted withdrawals at present") to ensure that the scam

isn't brought down early by a run.  Exposure driven by people

unaffiliated with the scam will bring in new money and also

encourage ambivalent or dubious investors to stick around in

1    the fear that they might miss out on "the next bitcoin."

2            "In the final phase, OneCoin will collapse as the

3    founders take their profits and disappear.  With no one

4    supporting the scam, OneCoin will begin to crumble.  The

5    percentage of trading activity that wasn't fabricated may

6    continue on its own momentum for some time before users realize

7    that something has changed.  Trading volumes will fall and

8    withdrawals will slow down before stopping all together.  Tech

9    support and customer service will become unresponsive.  If the

10   founders don't disappear outright, then the company may falsely

11   claim that an outside influence is preventing them from making

12   good and pledge to work diligently to restore operations.

13   However, normal operations will never be restored.

14           "The key aspect of the final phase is that it must

15   occur before users start to realize that OneCoins can't be used

16   anywhere, are illiquid, and actually kinda suck as an

17   investment.  That is why I believe the life cycle of this

18   operation is likely to be measured in months, rather than

19   years.  I believe that OneCoin is somewhere between late phase

20   two and early phase three."

21   Q.  Just scroll down.  The final section is other sites that

22   discuss OneCoin.

23   A.  Shall I read that?

24   Q.  No, that's okay.

25           MR. GARVIN:  Your Honor, may we request a brief

1    sidebar please?

2             THE COURT:  Okay.

3             (At the sidebar)

4             MR. GARVIN:  Your Honor, at the time that the Court

5    asked us if we wanted to have a limiting instruction, we did

6    not and we told the Court at a later point.  We did not realize

7    that the witness was going to read the entire article.  So, at

8    this time, we would respectfully request the Court to give a

9    limiting instruction on this article.  That is limited to state

10   of mind, because we don't know whether Mr. Scott even read this

11   article.  So, we would ask the Court to give a limiting state

12   of mind instruction.

13            THE COURT:  I'll do that.

14            MR. DiMASE:  We don't object.  And say it's not

15   offered for the truth, it's offered for state of mind, that's

16   fine.

17            (Continued on next page)

18

19

20

21

22

23

24

25

JBE3SCO2                          Kroll - Direct

1              (In open court)

2              THE COURT:  Ladies and gentlemen, the exhibit, the

3    article that was just read to you by the agent on the stand is

4    in evidence and may be considered by you.  However, the article

5    was not offered for its truth.  That is to say you are not to

6    assume that everything in the article is true.  However, it was

7    offered to show what effect, if any, it had on Mr. Scott's

8    state of mind.  Okay?  Very well.  Mr. Folly.

9              MR. FOLLY:  Thank you, your Honor.  We can go back now

10   to Government Exhibit 1411.

11   Q.  Special Agent Kroll, you were testifying about this

12   earlier, this was the Fenero mission statement.  E-mail that

13   had the attachment with the mission statement itself.  March 6,

14   2016.

15             MR. FOLLY:  At this time the government offers

16   Government Exhibits 1407 and 1410.

17             MR. DEVLIN-BROWN:  Subject to your Honor's prior

18   ruling, no objection.

19             THE COURT:  Received.

20             (Government's Exhibit 1407, 1410 received in evidence)

21             MR. FOLLY:  If we can just briefly publish those to

22   the jury.  If we can do them all side by side and blow up the

23   headings, it's 1407, 1410 and 1411.  Series of e-mails, they're

24   all from Mark Scott, all dated March 6, 2016.  1407 is

25   5:02 p.m.  1410 is 5:10 p.m.  1411 is 7:51 p.m.  1407 has the

1    familyoffice.com website link.  1410 has the

2    Aafmindia.wordpress link, and 1411 has the Fenero mission

3    statement document.

4          Mr. Barile, if you could show to the witness only what

5    has been marked as Government Exhibit 3302.

6    Q.  Special Agent Kroll, do you recognize this?

7    A.  Yes.

8    Q.  What is it?

9    A.  It is a screen capture from the website listed in the

10   e-mail.

11   Q.  That's the screen capture of the Aafmindia website that was

12   listed in the e-mail; is that correct?

13   A.  That's correct.

14         MR. FOLLY:  The government offers Government Exhibit

15   3302.

16         MR. GARVIN:  No objection.

17         THE COURT:  It will be received.

18         (Government's Exhibit 3302 received in evidence)

19         MR. FOLLY:  If we could publish this to the jury.

20   Q.  Special Agent Kroll, have you compared the contents of this

21   document to the Fenero mission statement that was in Government

22   Exhibit 1411?

23   A.  Yes.

24   Q.  And in comparing those two documents, what, if anything,

25   did you observe?

1    A.   There were some direct quotes from the article that are

2    listed in the misstatement.

3              MR. FOLLY:  If we can publish side by side page three

4    of 1411 -- actually, before we get to that, I just want to show

5    the witness two other exhibits and offer those in evidence.  If

6    we can show the witness Government Exhibit 3301.

7    Q.   Special Agent Kroll, do you recognize that?

8    A.   Yes.

9    Q.   What is it?

10   A.   A screen capture from one of the websites listed in the

11   e-mails we referenced earlier.

12   Q.   Have you compared the content of this screen capture with

13   the content of the mission statement?

14   A.   I have.  It may not be in this -- this screen capture here,

15   but on the website itself.

16   Q.   Sorry, I didn't hear you.  Can you say that again?

17   A.   It may not be from this screen capture here, but from the

18   website itself.  I did see similarities in what was referenced

19   in the mission statement.

20             MR. FOLLY:  The government offers Government Exhibit

21   3301.

22             MR. GARVIN:  No objection.

23             THE COURT:  It will be received.

24             (Government's Exhibit 3301 received in evidence)

25             MR. FOLLY:  Mr. Barile, if you could publish for the

1    witness only Government Exhibit 3305.

2    Q.  Special Agent Kroll, do you recognize this exhibit?

3    A.  Yes.

4    Q.  What is the nature of the exhibit?

5    A.  A screen capture from one of the websites listed in the

6    e-mails earlier.

7    Q.  Have you compared the contents of this screen capture to

8    the contents of the mission statement?

9    A.  I have.

10   Q.  What, if anything, did you observe?

11   A.  Similarly, some of the content either directed or

12   paraphrased from this website was used in the drafting of the

13   mission statement.

14       MR. FOLLY:  If we could pull up Government Exhibit

15   3302 on the third page.  If we can pull up 3302 on the third

16   page.

17   Q.  Special Agent Kroll, we are going to highlight some of the

18   sections of the mission statement as well as 3302.  First one

19   is from the mission statement, on the top portion is "advice is

20   provided with the complete understanding of each family's

21   assets and liabilities."  And the second portion from the

22   website appears to state the same thing.

23       Another portion of the mission statement says "ensures

24   all advisors work together in a coordinated manner toward an

25   integrated wealth strategy."  And then the portion from the

1    website says "ensures all advisors work together in a

2    coordinated manner toward an integrated wealth strategy."

3           Special Agent Kroll, have you compared additional

4    sections between 1411 and 3302 to each other?

5    A.  I have.

6    Q.  Are there additional sections that appear to be the same in

7    3302 as 1411?

8    A.  Yes.

9           MR. FOLLY:  We're publishing side by side 1411, which

10   is in evidence, with 3301, which is in evidence.

11          Mr. Barile, you can take those down.  If you can go

12   back to Government Exhibit 2701 and go to the portion of the

13   timeline dated April 27, 2016.  The following page.  At the

14   very top if you can highlight the orange and the blue.

15   Q.  Special Agent Kroll if you can read the entry on 4/27/2016

16   as well as the entry from May of 2016?

17   A.  April 27, 2016, Scott receives 425,000 in his account at

18   City National Bank Florida.  1754443 --

19   Q.  You don't have to read the account number.

20   A.  Okay.  From International Marketing Services account at

21   Commerzbank in Germany.

22          And then the May 2016 line:  Fenero Equity Investments

23   II LP registered in British Virgin Islands, Fenero Financial

24   Switzerland LP formed in British Virgin Islands, Fenero Equity

25   Acquisition 2 Limited in Ireland.  Applications for bank

JBE3SCO2                          Kroll - Direct

1   account for Fenero Equity Investments submitted to DMS. Account

2   opening documents submitted to Bank of Ireland for Fenero

3   Equity Investments Ireland Limited, Fenero Tradenext Holdings

4   Limited.  Applications submitted to Deutsche Bank Cayman

5   Islands for Fenero Equity Investments II LP.

6           (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  Go to Government Exhibit just for the witness 4099.  Can we

2   publish that?

3                MR. GARVIN:  No objection.

4                THE COURT:  All right.  It's received.

5                (Government Exhibit 4099 received in evidence)

6   Q.  An e-mail from MSSLAW to Dr. Ruja Ignatova.  Subject:

7   OneCoin change banks again, now using U.S.-based bank.  Then

8   the e-mail reads, "This already shows the relationship.  In

9   need to arrest someone to figure this out ....."  And then

10  there is an article link copied and pasted into the e-mail from

11  behind

12  mlm.com/companies/onecoin/onecoin-change-banks-again-now-using-a

13  -U.S.-bank.

14               If we go back to 2701, the timeline, to the entries on

15  May 4 and all of them below that actually.

16               Focusing on the May 4 through 6, what's shown there?

17  A.  "Scott travels to Cayman Islands."

18  Q.  And the entry directly below that, just read the entry line

19  there?

20  A.  "may 10, 2016, "Scott engages Apex Fund Services Ltd. of

21  London as fund administrator of Fenero Equity Investments L.P.

22  Q.  Let's show to the witness only Government Exhibit 1090.

23  Publish to the jury, please.  This is an e-mail from David Pike

24  to Mark Scott dated May 21, 2016.  Subject:  IMS and INNOIN.

25               It says, "For Innoin I assume a controlling part of

1    Ruja Ignatova as secretary/director as she is listed as such in

2    the KYC Irina sent us.  I can replace her if Irina gives us a

3    different person to use."

4         Can we go back to the timeline and focus on May 18

5    through 20.  "Scott travels to Cayman Islands."

6         If we could publish for the witness only 1093.

7    Publish this to the jury now.  It's from Mark S. Scott to Dr.

8    Ruja Ignatova dated May 24, 2016.  Subject:  Fenero Equity

9    Investments L.P. - wire details.  It says, "Hi, Ruja, here are

10   the details I promised.  Any of the intended investors may wire

11   their funds to this account immediately.  In order to release

12   them for further use, a complete subscription package,

13   including the requisite KYC, will have to be submitted and

14   approved on our end."

15        I'm going to show the witness only Government Exhibit

16   1094.

17        MR. GARVIN:  No objection.

18   Q.  You can publish that to the jury.  This e-mail is from Mark

19   Scott to David Pike March 27, 2016, it appears to be a forward

20   on May 27, 2016.  Re:  Fenero Equity Investments wire details.

21        If you can just scroll down.  Keep scrolling all the

22   way to the end.  Directly above Mark Scott's May 24, 2016

23   e-mail is an e-mail from Dr. Ruja Ignatova, it says, "Ladies,

24   please as discussed with Frank we reduce the balance on the

25   German and Singapore account.  Send to the account below.  Best

1   is to send 5 m (not less).  Keep a balance of abt 3-4 m at the

2   accounts left."

3           Then if you scroll up.  Keep scrolling up all the way.

4           The bottom e-mail there is from Maya Antonova,

5   maya@onecoin.eu, to msscott@msicbvi.com.  It says, "Dear all,

6   second transfer has been initiated today.  Confirmation below."

7           To the witness only 4101.  We can publish that to the

8   jury.  And in the bottom e-mail from Maya Antonova to Mark S.

9   Scott says, "Hi, mark, what payment reference should we use for

10  the transfers?"  And in response Mark Scott writes, "Partial

11  payment for subscription."

12          If we could go back to the timeline. to the entry for

13  May 28 through June 3, 2016 -- actually the May 30 entry.

14  Special Agent Kroll, what does the timeline read?

15  A.  "Scott travels to London.  Meeting set with Scott, Ruja and

16  Greenwood in London at Four Seasons Hotel in London."

17  Q.  Just zoom back out on the timeline still to the entry

18  directly below that.  This is June 2016.  "Fenero Equity

19  Acquisition 3 Ltd. incorporated in Ireland, Fenero Equity

20  Acquisition 1 Ltd. changes names to Fenero PCT Holdings

21  Limited; Fenero Fintech Europe L.P. registered in British

22  Virgin Islands.  Fenero Tradenext Holding Limited and Fenero

23  Equity Limited Ireland limited.  Bank accounts opened at the

24  Bank of Ireland.  Bank account application for Fenero Financial

25  Switzerland L.P. submitted to DMS.

1          And directly below that the timeline entry there,

2     "Fenero Equity Investments account" and there is a number

3     listed "at DMS Bank in Cayman Islands receives first wire from

4     International Marketing Services for euro 4,999,985."

5          For the witness only Government Exhibit 1106.  If you

6     can just scroll through that so counsel can see it.  We can

7     publish that to the jury.  It starts at page 5 of this exhibit.

8     There is an e-mail at the bottom from Peter Mallon at MJ

9     Hudson, it's to Mark Scott and other individuals.  It says,

10    "Dear Mark, thank you for the below.  Can you advise on the

11    timeline for receiving the company number, please?  Can you

12    assist with our KYC on this entity?  Chiefly, we will need the

13    following documents for Fenero PCT Holding Ltd. (Fenero)."

14         And if we could scroll up.  There is an e-mail from

15    Mark Scott in response.  Now the parties on the e-mail change

16    it's only to Najib Kassis and Dr. Ruja Ignatova.  He says, "Hi,

17    Najib.  We will not be able to show Ruja as UBO.  Where did

18    this originate?"

19         "Need to discuss.  The chain stops at the equity fund

20    for which I sign as GP."

21         If you could scroll up.  There is a response directly

22    above that from Najib Kassis.  "As I have said before, send

23    them what you have and we will see what they say."

24         Go to the response and zoom in on the two e-mails

25    above that, both of them.  Najib also adds, "Also, FYI, when my

1   previous fund was being onboarded/KYCed by Standard Chartered

2   we had to reveal all of our L.P.s.  So they are definitely

3   required to ask this, but I don't think they actually care.

4   This system will not work all the time; only in cases where

5   they don't really care.  Such as this."

6          In response Mark Scott writes, "Will do.  And we can't

7   reveal L.P.s under any circumstance.  If that comes up in the

8   future deals, we need to find different structures.  So far

9   nobody has pushed, not even large institutional banks.  This is

10  a government registered and approved investment fund."

11         And we can scroll up, keep scrolling.  And we can take

12  that down.  And if we could publish what is in evidence as

13  Government Exhibit 3025-S, at page 7.

14         This is a message Mark Scott to Lidia Kolesnikova,

15  June 2, 2016.  Special Agent Kroll, starting with the message

16  at 3:26:49, can you read that and the following message.

17  A.  "My message to Gilbert last night.  The follow message

18  reads:  Hi, Gilbert, Ruja filled me in on your agreement

19  regarding timing of 2 months.  Should not be backloaded.  It's

20  been a week and a half regarding the KYC.  Happy to help if you

21  need me too.  R told me you handed it to your attorneys.  Not

22  getting in the middle but told her that I have not heard from

23  you.  I am sending you wire details via e-mail shortly.  No

24  limits to transfer amounts from my end.  Also hope we can meet

25  and talk to clear up things.  Last text from you was uncalled

1    for.  I am sticking my neck out for you at LL.  Hope all is

2    well.  Mark."

3    Q.  If we could put this side by side with Government Exhibit

4    1099.  And that's an e-mail dated June 2, 2016 from Mark Scott

5    to Gilbert Armenta, the same date as the text message.

6    Subject:  Wire details.

7             And, Special Agent Kroll, could you just read the top

8    paragraphs.

9    A.  "In furtherance of my earlier message to you, please find

10   below the wire details for one of the investment funds as

11   announced.  Wires in euro denomination are preferred, although

12   I have provided you with account information for both euro and

13   U.S. dollars.  See under "further credit to" below."

14   Q.  If we could take this down and publish for the witness

15   first Government Exhibit 1103.  If we can just scroll through

16   that.  If we can publish that to the jury.  You can actually

17   scroll down to the bottom, a little further up.

18            This is an e-mail from Manon Hubenthal to Frank

19   Ricketts, titled "Subject:  Fenero Equity Investments L.P. -

20   missing data for subscription IMS Singapore."  If we can just

21   scroll up a little bit.  Zoom in right there.  It's an e-mail

22   from Frank at 4you2XL.come to a number of individuals including

23   drpike@cagables.com and msscott@msicbvi.com.

24            It says, "Hi, David, we are not aware of any

25   subscription agreement etcetera.  Also we don't know who Juat

1    is.  Can you please elaborate on what this is about."

2           If you can scroll up to the top, just the next e-mail

3    in the chain.  The response from Mark Scott.  "Hi, Frank.  We

4    need documentation to take in the fund you were instructed to

5    wire.  As to Juat, he is registered as a director of IMS

6    Singapore and therefore some of his data is required."

7           Keep scrolling up.  Next e-mail in the chain.  It's a

8    response from Frank Ricketts.  "Hi Mark, I would like to see

9    the documentation that is related to this as the original doc's

10   showed IMS as the investor. Without knowing the name of Juat

11   consciously this would be the corp.sec provided from TMF who is

12   the management service company for a number of my companies out

13   of Singapore."

14          If we can scroll up.  The response from Mark S. Scott

15   who Irina Dilkinska.  "I will let you coordinate as per Ruja's

16   request.  Smiley face."

17          Publish for the witness only Government Exhibit 1129.

18   We can publish that for the jury.

19          And this appears to be an e-mail chain.  At the very

20   top the subject of e-mail chain is Re:  Zimbabwe Bank, From

21   Mark Scott to Max von Amim with an e-mail address at

22   RavenR.com.  And Mark Scott writes, "Max, unfortunately these

23   structures are harder to set up in a way to accept money than

24   even paying it out.  Let's brainstorm a bit next week.  I know

25   Ruja not happy, but my main goal on my end, and this is what

1    she ultimately tasks me with, is to be able to take money in

2    and keep the structure sterile and on course, which sometimes

3    means to turn down some efforts, no matter how promising."

4           To the witness only Government Exhibit 1110.  Publish

5    that to the jury.  Just scroll down.  Actually scroll up a

6    little so we can see the e-mail project there.  That e-mail is

7    from David R. Pike to msscott@msicbvi.com.  Subject:  Quick

8    view.  It's dated June 22, 2016.  If you could just scroll down

9    a little bit so that some of the entries in the e-mail are

10   shown.  There appears to be debit and credit listings there

11   with balances and then narrative.  And some of the narratives

12   include International Marketing, IMS International, which both

13   have credits shown there of just under $5 million.  There is

14   additional International Marketing, EI END EN KONSULT EOOD.

15   And then if you just scroll back up to the top, the first

16   entry, balance carried forward, balance appears to be $101,630,

17   565.01.  And then if you could go to the top e-mail from Mark

18   Scott to David Pike dated June 22, 2016, subject:  Quick view.

19          Special Agent Kroll, what was the e-mail?

20   A.   "Let's not e-mail this stuff ....."

21   Q.   If we go back to the timeline briefly.  Go to 6/22 and the

22   entry below that as well.  These entries are between June 23,

23   2016 and June 30, 2016.  The first one is Fenero Equity

24   Investments L.P. at the DMS Bank in Cayman Islands, sends just

25   under 2 million euros for capital contribution.

1        Special Agent Kroll, what's the second entry?

2    A.  Between June 29, 2016 and June 30, 2016, $2 million and $3

3    million wires from Fates Group LLC Morgan Stanley account to

4    Fenero Deutsche Bank account.

5    Q.  Let's show the witness only first Government Exhibit

6    1118-T.  Scroll through.  We can publish that to the jury.  If

7    we could start scrolling down just slightly so that the top of

8    page 2 is shown.  We can blow up the bottom e-mail from Ruja,

9    Dr. Ruja Ignatova.  "Mark, we need a pof for 100 m.  The entity

10   does not matter.  Until tomorrow.  R."

11        If we could just scroll up slightly.  The response

12   from Mark Scott, "Kevin problem.  To whom should it be

13   addressed?  What's the deal?  And please do not use LL e-mail

14   for these matters."

15        And what's the response, Special Agent Kroll, from Max

16   von Amim?

17   A.  "it is about the oil deal in VZ.  Addressee is PDVAS.

18   Thank you."

19   Q.  If you could just scroll up to the top e-mail.  And what

20   was Mark Scott's response?

21   A.  "please send me a complete addressee.  And is it OK to

22   write that we potentially would like to establish a JV with you

23   (RavenR) or should it be a fund deal?  I hope not.  Smiley

24   face."

25   Q.  Take that down.  And if we could publish just for the

1221

JBE7SCO3                              Kroll - direct

1   witness Government Exhibit 1120.  We can publish that to the

2   jury.  And if we could publish the bottom e-mail first.

3           Special Agent Kroll, can you read aloud the first

4   paragraph of the e-mail.

5   A.  "Please deal with me and not Ruja regarding getting funds

6   to you to get started.  Unfortunately, your deal, which is less

7   than original, will not work for us and it subjects the funds

8   source to U.S. jurisdiction.  There are many other ways to do

9   this."

10  Q.  I believe it says "will not work for us as it subjects the

11  funds source to U.S. jurisdiction."

12          You can take that down.  And if we can show the

13  witness only Government Exhibit 1122.  You can publish that to

14  the jury.  We can zoom in on the bottom e-mail first from Irina

15  Dilkinska.

16          Special Agent Kroll, read that aloud.

17  A.  "Dear Boss and Mark, please find attached the draft of the

18  letter instruction for the transfers from IMS.  Please let me

19  know at your earliest convenience if:  Text is OK; of what

20  amount shall be each transfer; as soon as I have this will

21  sign, stamp and send the letter to Frank for initiation of

22  payments.

23          "@ Mark.  Original documents of Frank with me - let me

24  know at which address to courier.

25          "@ Mark.  I have sent you the data necessary for the

JBE7SCO3                          Kroll - direct

1   OLN company.  Please proceed as soon as possible.

2              "Let me know if I can be of any further assistance.

3   Thank you very much.  Kind regards, Irina."

4   Q.  If you can read the response from Ruja.

5   A.  "Always do 5.  Best regards Dr. Ruja."

6   Q.  If we could publish for the witness only 1123.  We can

7   publish that to the jury.  It's from Irina Dilkinska to

8   msscott@msicbvi.com and Dr. Ruja Ignatova,.  "Dear Boss and

9   Mark, attached hereto is the final version of the letter of

10  instructions.

11             "@ Mark.  Please check if the wording is in compliance

12  with the previous arrangements (instruction from OC to IMS to

13  accept instructions from B & N and payment from IMS forward on

14  behalf of B & N) - after confirmation we will send this for

15  execution."

16             Go to the witness only Government Exhibit 1133.

17  Publish that to the jury.

18             The bottom e-mail, Special Agent Kroll, appears to be

19  from Maya.  Can you read that?

20  A.  "Dear Gilbert, could you please confirm the transfer of 5

21  MIO USD from Zala to Fenero.  Thanks, Maya."

22  Q.  What's above that e-mail?

23  A.  E-mail from Gilbert Armenta cc'ing Diane Cook and Anastasia

24  Jankovic, and it's to Maya Antonova in response.

25             "Hello Maya, yes, it transfers of:  2 million, 3

million.  Take care.  All the best, Gilbert Armenta."

Q.  Take that down and publish to the witness only 1142.  I

believe this is in evidence.  Publish this to the jury.  This

is an e-mail dated July 13, 2016 from Dr. Ruja Ignatova to

garmenta@zala-group.com and Mark Scott, cc'ing Konstantin

Ignatov.  Subject:  Urgent.  Meeting next week.

Special Agent Kroll, can you read aloud the body of

the e-mail.

A.  "Gentlemen, as I am having a lot of "she said, he said,"

new issues popping up daily - and unfortunately no visible

results or clear schedule on what is happening on our project -

this is why I would like to meet you both in person next week.

I am from Tuesday on in Sofia.  We all know that this is an

issue of importance and urgency for me - and the 25.7 is

approaching.  A "couple of months" is no option for me.

Konstantin, schedule please.  Best regards, Dr. Ruja."

Q.  If we can go back to the timeline, July 13, 2016, on July

13, 2016 there is a Fenero Equity Investments L.P. account at

DMS Bank in Cayman Islands which sends $30 million to Barta

Holdings Ltd. account at DBS Bank in Hong Kong.  If you could

just blow that back up.  And the entry below as well.  Sorry,

the entry below that as well.  All three of those.

The next entry is July 20, through 21.  "Scott travels

to Sofia, Bulgaria and meeting scheduled with Ruja and

Armenta."

1          Then on July 25, 2016, Fenero Equity Investments

2     (Ireland) account, the number, at Bank of Ireland sends

3     2,500,000 euros to Vida Home at Piraeus Bank in Bulgaria.

4          Sorry.  If you could just put this side by side with

5     Government Exhibit 3025-S, pages 10.

6          Special Agent Kroll, this is, this is a WhatsApp

7     message between Mark Scott, Lidia Kolesnikova on July 20, 2016.

8     If you could read the messages there in the far right column.

9     A.  "Just showered.  Off to see R.  If G there?  In the

10    morning.  Nothing yet.  And G tomorrow.  I'll e-mail them

11    again.  How is Sofia?  Busy ... driving to Hilton soon and then

12    dinner at 8 p.m. pick up.  Getting used to driver and security.

13    I like it.  Ha ha ha ha ha now you are boss.  Funny how people

14    look at you that way.  They can't carry guns on belt so they

15    all have a sleek type of man purse hanging around their necks

16    with weapons.  Everyone know.  Even police is polite.  LOL.

17    And X6, Cheyenne turbo S class.  And always two guys.  Ruja

18    more.  And they stay outside of hotel."

19    Q.  And if you go to that next page.  If you could read aloud,

20    Special Agent Kroll, the right column once again from July 21,

21    2016.

22    A.  "Earned another $175K today.  And hanging without with Ruja

23    may be about 25 mio in next 18 months.  Meeting over.  All went

24    well.  She did quite a job on him."

25    Q.  Mr. Barile, if you could publish for the witness only

1    Government's Exhibits 1163 side by side with 1164.  And if we
2    can publish this, please, for the jury.
3            The first is an e-mail July 28, 2016 from Irina
4    Dilkinska to Mark S. Scott.  Subject:  E-mailing Fenero
5    Financial Switzerland application form.  And then looking at
6    the e-mail from July 29 on the right it's from Mark S. Scott to
7    Irina Dilkinska, cc'ing Stoyna Kyrazova.
8            Further down in the e-mail Mark Scott writes, "What
9    does Star company do??"
10           If we could pull up for the witness only 1165.
11   Publish this for the jury.
12           Special Agent Kroll, if you could read aloud the
13   parties in the e-mail, the date and the subject.
14   A.  "To Irina Dilkinska from Mark S. Scott, sent on 7/29/2016
15   at 4:50 p.m.  Subject:  Need to talk.  Due to high amounts
16   administrator wants more information.  We can handle, but need
17   to coordinate."
18   Q.  Take that down and go to the witness only 1178.  Publish
19   this to the jury.  Blow up the entire upper portion starting
20   with -- the body of the mail appears to be from Mark S. Scott.
21   "Please send me the subscription signed by Star and the other
22   documents as a scan and then follow the originals to me."
23           Then if we can go to the top e-mail from Stoyna
24   Kyrazova to msscott@msicbvi.com.  Subject:  Subscription
25   application, Starz HK.  Special Agent Kroll, if you could read

1    aloud the e-mail there.

2    A.  "Dear Mark.  The nominee director and technical UBO of Star

3    Merchant, like many people in China does not have his own house

4    therefore does not receive a utility bill in his name and does

5    not have a personal bank account.  For proof of address he can

6    provide his ID card.  This would be translated into English and

7    notarized.  Passport copy notarized is not an issue.  Please

8    confirm that this is acceptable.  Kind regards, Stoyna."

9    Q.  Take this down and publish to the witness only 1190:  We

10   can publish that to the jury.  Highlight the first paragraph

11   and the final paragraph, an e-mail from Mark S. Scott.  "We

12   have reviewed the wire authorization letters you have sent and

13   have changes to suggest.  Please flip through every page and

14   make every change we have made by hand.  Very important – all

15   letters have the wrong wire information with the funds going to

16   Fenero Cayman I.  All need to be changed as the funds were paid

17   into the accounts of Fenero Equity Investments L.P."

18           Special Agent Kroll, if you could read the bottom

19   paragraph of the e-mail enlarged there.

20   A.  "It also be great if you could sign some of the letters

21   with a different pen so they do not look so mechanically

22   produced.  Maybe Irina can print them wherever she is and sign

23   and scan them back to you one at a time.  Maybe you can sign

24   others in the office with her automatic signature."

25   Q.  Leave that up for a moment.  Take that down and publish for

JBE7SCO3                        Kroll - direct

1    the witness only 1194.  Publish that to the jury.  If we could

2    zoom in on the bottom up, if possible, the first e-mail on the

3    first page, from Mark Scott, August 4, 2016, to David Pike.

4              Can you read aloud the e-mail?

5    A.  "David, I want them scanned for a particular reason.  Are

6    you at the office and can you please do that?  Thanks, Mark."

7    Q.  Let's scroll up to the response.

8              If you can read that aloud, Agent Kroll.

9    A.  "Yes, and no problem.  I get what you want, you want them

10   to look scanned and sent to us.  I'm on it.  David Pike."

11             THE COURT:  Mr. Folly, it's now 12:45 so we will take

12   our second break.  Ladies and gentlemen, please do not discuss

13   the case.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

JBE7SCO3                          Kroll - direct

1           (Jury not present)

2           THE COURT:  You may step down.

3           Anything to discuss?

4           MR. GARVIN:  Your Honor, I would just like to explore

5     as to where we might think we are with this particular witness

6     so as to decide what we need to prepare for later this

7     afternoon.

8           THE COURT:  Mr. Folly?

9           MR. FOLLY:  Your Honor, I believe we're about two

10    thirds or three quarters of the way through.  I hope that we

11    will finish and that there may be even a little time for cross,

12    but I would imagine we will not get started on another witness

13    after this witness today, based on the pace we are on.

14          THE COURT:  Based on the number of pages, it looks as

15    though you are halfway through.

16          MR. FOLLY:  Your Honor, I know it looks that way, but

17    my sense, having prepared this, is that we're further than

18    halfway absolutely.

19          THE COURT:  OK.  Don't be late.

20          (Recess)

21          THE COURT:  We should plan on having the charge

22    conference Monday afternoon. We can do it right after the end

23    of the day.  We can take a brief break.

24          MR. DEVLIN-BROWN:  That's fine, your Honor.  The only

25    issue I think we have is we had defense witnesses lined up to

JBE7SCO3                          Kroll - direct

1    come on Friday because we were told Friday or earlier.  Now,

2    you know, I think Friday is impossible, so they have agreed to

3    fly in on Monday, and if the government's case runs into

4    Monday --

5              THE COURT:  Will the government's case run into

6    Monday?

7              MR. FOLLY:  I think it's pretty likely, your Honor.

8              MR. DEVLIN-BROWN:  I mean we could pencil it in if

9    that works for your Honor, but I think we may have a problem

10   with a couple of witnesses.

11             THE COURT:  I mean we're not going to go beyond 2:30

12   in any event.

13             MR. DEVLIN-BROWN:  Oh, of course.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Everyone may be seated.  Mr. Folly.

3      NICHOLAS KROLL, resumed.

4      DIRECT EXAMINATION (Continued)

5              MR. FOLLY:  Thank you, your Honor.

6              Publish to the witness only Government Exhibit 1203.

7      Publish to the jury as well.

8              Counsel, may we publish this to the jury?

9              OK.  We can actually start carrying over to page 2 so

10     we can see that very first bottom e-mail from Ruja Ignatova at

11     RavenR.com, August 5, 2016 to msscott.  Subject:  In the air

12     and WhatsApp off - please tell me news on 30 m via mail."

13             If we could scroll up.  Special Agent Kroll, can you

14     read Mark S. Scott's response?

15     A.  "Hi Ruja.  Rest assured that I will let you know as soon as

16     it's cleared.  We are doing what we can.  We have sent

17     everything asked for to Admin 1 and I hope he gives us

18     clearance shortly.  Then problem gone.  On the other hand we

19     are working new KYC from G into sub agreements.  He says wires

20     out.  If true, we should be able to send wire order Monday.

21     Tristan wrote to me and said he can't deliver docs until Monday

22     the earliest as well."

23     Q.  Scroll up.  Ruja responds, "Just landing.  Did he give

24     clearance or still issues?"

25             Scroll up.  Mark Scott responds?

1   A.  "I am not sure how much they work over the weekend.  Pushe

2   them to buy have not heard anything since I sent them last docs

3   and answers requested this morning my time.  May all be good.

4   Will let you know.  Working on G's docs now and have made KYC

5   requests from attorneys.  Your Chinese guy for Star may need a

6   bank reference.  China just not that good ... where are you now

7   in terms of time zone?"

8   Q.  Scroll up.  Ruja responds, "I'm in Europe.  In Frankfurt

9   stopover and afternoon in Sofia.  Lwt s have a call in 6 to 8

10  hours."

11          If we could go back to the timeline briefly, page 3.

12  8/8/2016.  Fenero Equity Investments (Cayman) I L.P. account at

13  Deutsche Bank Cayman Islands receives first wire from Star

14  Merchant Ltd. in Hong Kong for 8 million euros.

15          You can leave that up.  If we can pull for the witness

16  only Government Exhibit 1213.  And publish this for the jury.

17  Starting at page 2.  If we could just scroll down.  The bottom

18  e-mail from David Pike to Mark Scott.  Subject:

19  Sub-App-Prosperia-Cayman-I.

20          Scroll up.  From Mark S. Scott to Stoyna Kryazova and

21  Irina Dilkinska.  It says, "Let's discuss before you send

22  funds.  It may not be good at this point yet to intro Dr. R to

23  administrators.  Or we do it a separate fund so no issues for

24  anyone else."

25          We can scroll up.  From Irina to msscott:  "Mark, this

1    the company Ruja asked us to use explicitly, if you do not have

2    objections I must put this company in operation ASAP."

3         Scroll up.  Mark responds, "This will not work yet ...

4    Ruja is the controlling person in UBO.  I need to send KYC

5    first and see what admin says.  Do not send funds yet.  We will

6    check carefully."

7         Scroll up.  Special Agent Kroll, can you read the

8    response from Pike in that e-mail chain?

9    A.   "They are going to make a move too soon and send up flags

10   that will disrupt the delicate process of attempting to scrub

11   Ruja is they keep this up.  You are playing a very delicate

12   game quite well, I am impressed."

13   Q.   Leave that up for a moment.  This is dated August 9, 2016.

14   If we can go to the timeline on August 10, 2016.  It says,

15   "Scott sends letter terminating engagement to Paul Spendiff at

16   Apex Fund Services (UK) Ltd."

17        Leave that up for a moment.  Scroll back out to the

18   timeline to the next green and orange entries, and keep them

19   both on the screen.

20        August 15 through August 18, 2016.  "Scott travels to

21   Cayman Islands."  August 25, 2016 -- between June 2 and August

22   25, "Fenero Equity Investments L.P." lists the account number

23   there "at DMS Bank in Cayman Islands received euro 154,999,535

24   in wire transfers sourced from B & N Consult in Bulgaria and

25   International Marketing Services in Singapore and Germany."

1           We can leave that up for one moment.  We can take that

2    down and show to the witness only Government Exhibit 2229 --

3    I'm sorry 1229.  And we can publish that to the jury.  Zoom in

4    on the top portion from Mark Scott to Ruja Ignatova.  Subject:

5    Fenero Switzerland wire details.  And at the top in all bold

6    underline, Special Agent Kroll, what is stated there?

7    A.   "Euro 50 million B & N money pre-cleared.  Can be sent by B

8    & N or IMS".

9    Q.   Briefly go back to the timeline, end of September 2016.

10   "Fenero Securities Trading Ltd. registered in Ireland."

11          Go to the witness only Government Exhibit 1239.

12   Publish that to the jury.  Counsel?

13          MR. GARVIN:  Yes.

14   Q.   Blow up the whole top portion from the bottom e-mail from

15   Joanna all the way up.  The bottom e-mail from Joanna Allinson

16   to DR Pike cc Irina Dilkinska and Mark Scott.  Subject:  SM –

17   nominee director bank ref.

18          Special Agent Kroll, what does this e-mail say?

19   A.   "With regard to the pending documents requested from the

20   Star Merchant nominee director, he cannot or will not provide

21   an original bank reference letter or source of wealth.  EEG

22   have put an enormous amount of pressure on him and he will not

23   change his stance in this matter and has repeatedly declined to

24   provide.  Any suggestions??  Joanna."

25   Q.   What's the response from David Pike to Mark Scott?

1    A.   "What now?  Dave (to date) won't back down and apparently

2    Zoulong Cai won't comply."

3    Q.   Leave that up there for a moment.  Show to the witness only

4    1244.  And we'll offer this exhibit.

5              If we could publish that to the jury, please.

6              Special Agent Kroll, if you could just focus on that

7    header information there, the parties, date and the attachment.

8    A.   To Joanna Allinson, msscott@msicbvi.com, Irina Dilkinska

9    from David R. Pike, sent Tuesday 9/13/2016 at 3:26 p.m.

10   Subject:  Re KYC update.  Monthly Fenero status report –

11   master.XLSX".

12   Q.   In we could publish the Excel attachment referenced in that

13   e-mail.  Are we on the first tab now?  If we can start on the

14   first tab and just slowly scroll down:  And the total amount

15   positive on the bottom in euros, what is shown there?

16   A.   154,999,535.

17   Q.   And just looking if we could scroll up, looking at the

18   received from fund column to the right of that?

19   A.   Fenero Equity Investments L.P.

20   Q.   Scroll up to the received from company column.  Some of the

21   entities listed there, International Marketing Services, IMS

22   International, Bi End En Konsult EOOD.  And there are a number

23   of those entities repeated.  If we could go to the second tab,

24   Fenero Swiss, the total amount in euros shown there, 49,999,850

25   euros.  Received in to Fenero Financial Switzerland L.P.,

1    received from once again either IMS International, IMS

2    International Marketing Services, B&N Consult.

3            Finally go to the Fenero Cayman tab, total 22,500,000

4    euros received into Fenero Equity Investments, received from

5    International Marketing Services, B & N Consult, as well as

6    Star Merchant, Inc. Ltd.

7            Mr. Barile, take that down and publish for the witness

8    only 1246.  If we could publish that to the jury.  Go to the

9    second page first.  There is an e-mail there from

10   dave.vanDuynhoven, who is listed below as the director of

11   Jpintegra Group, September 14, 2016, to msscott@msicbvi and

12   D.R. Pike.  Subject is incoming funds from Star Merchant.

13           Special Agent Kroll, if you could read the second full

14   paragraph there "With respect to due diligence..."

15   A.  "With respect to the due diligence for Cai Zhoulong, I have

16   received independent confirmation that we can forego the

17   banking reference and source of wealth in this scenario

18   provided that:  1, the funds are coming from the Hong Kong bank

19   from an account in the name of the investor (which they are);

20   2, we have a copy of the swift details (which we do), and, 3,

21   that we have done all of the backlist checking (which we

22   have)."

23   Q.  If you can scroll up, Mr. Barile, to the response, which is

24   between Mark S. Scott and David Pike.  Mark writes, "Slam dunk.

25   Don't let the girls fuck this up with sending money on behalf

1    of others now.  Anything confusing will throw this back.  How

2    much from Star so far?"

3            Leave that up for a moment.  If you can scroll up.

4    And Pike says, "Will do what is humanly possible!  This is just

5    for the STAR money going to Cayman I, right?  It doesn't effect

6    FF Switzerland, right?

7            We can take that down.

8            Mr. Barile, publish for the witness only 1247,

9    starting at the bottom first.  And if we zoom on page 2 to the

10   e-mail on the top.  It's an e-mail from D.R. Pike to

11   msscott@msicbvi.com.  Subject:  Urgent.  "With it being true

12   that the shareholder of the company remains Dr. R in HK for all

13   banking purposes et" we will be obligated to list her as UBO on

14   self cert (sub-app) and all into implies?"

15           And then if we could go up to Mr. Scott's response,

16   Scott writes in response, "Yes.  Not good ... has problems in

17   Germany.  And this is DB."

18           And then if we could scroll up, then Pike says, "Are

19   you going to handle that conversation?"

20           Take that down and show to the witness only 1392.  If

21   we could publish that to the jury.  If we could zoom in on the

22   top e-mail from David Pike.  It's to joannaallinson@ravenr as

23   well as Irina Dilkinska and Mark S. Scott.

24           Special Agent Kroll, can you read the second paragraph

25   there.

A.   "Also, it is very important that you know that under the
current circumstances we would not have to list Dr. Ignatova as
the UBO of Innoin."

Q.   Sorry.  It actually says "we would".

A.   Sorry.  "We would have to list Dr. Ignatova as the UBO of
Innoin, and as I understand it this is unacceptable for
everyone involved.  Please discuss this internally as you
develop the Innoin profile."

Q.   Leave that up for a moment.  Go back to the timeline
briefly, to September 14.  Actually if you zoom in all the way
to the bottom of that page, September 14 through 30, 2016,
Fenero Financial Switzerland account at the DMS Bank in Cayman
Islands received 59,999,685 euros in wire transfers sourced
from International Marketing Services in Singapore.

        September 16, 2016 Scott travels to Sofia, Bulgaria
and meeting scheduled with Ruja.

        September 29, 2016, Fenero Equity Investments account
at Bank of Ireland 5,000,019 to Vida Home at Piraeus Bank in
Bulgaria.

        October 9 through October 11, 2016 Scott travels to
Cayman Islands.

        Mr. Barile, if you could put this side by side with
Government Exhibit 3025-S at page 12 first.

        Special Agent Kroll, this is WhatsApp message between
Mark Scott and Lidia Kolesnikova, September 15 through

1    September 17, 2016.  If you can just read the first message.

2    A.  "In Sofia ..."

3    Q.  And then the message on September 19, "Did a huge deal with

4    Ruja."

5             You can take that down.  I'm sorry.  Can we put 3025-S

6    back up and go to page 14 this time.

7             Special Agent Kroll, if you could read those messages

8    from Mark Scott.

9    A.  "Yes!!  I need to out money away.  Real estate the best.

10   We won't lose money ... if too much, we sell in two years but

11   have fun now.  But I am going for 50 at 50."

12   Q.  Leave that up for a moment.  And take that down.  Go to

13   page Government Exhibit 1256 just for the witness.  Just scroll

14   through that so that counsel can see it.  You can publish that

15   to the jury.

16            Go to the top of page 2 first.  Sorry, go to the top

17   of page 2 first.  It's from Ruja to msscott@msicbvi.com.  Ruja

18   writes, "All our funds are closed now?  We cannot wire anymore?

19            Let's scroll up.

20            Special Agent Kroll, if you could just read aloud Mark

21   Scott's response.

22   A.  "We have 25 left in one and just opened account for new one

23   up to 100.  Just want David to test the path today and tomorrow

24   first.  Still have G's first one.  But he wants to be

25   segregated.  85 left there."

 1   Q.  Scroll up.  And what was Ruja's response?

 2   A.  "Kalina, let's send abt 10 more from IMS-fill out the 25

 3   left.  R."

 4            MR. FOLLY:  Leave that up for a moment.  We can

 5   publish for the witness only Government Exhibit 4102.  We can

 6   publish this for the jury, if you can blow up, Mr. Barile, the

 7   top two e-mails.

 8            The e-mail in the bottom from Gary Gilford to Mark

 9   Scott cc'ing Joanna Allinson October 13, 2016.

10            "Dear Mark, as you are aware, there is currently a

11   city of London police investigation into OneCoin.  This will

12   include all companies associated with OneCoin and Dr. Ruja,

13   including Ruja's family office RavenR Capital Limited.

14   (RavenR)."

15            Then on that same date Gary Gilford sends another

16   e-mail to the same parties.  "One final point," it reads, "one

17   final point, given the history of accounts being blocked

18   globally, there is the potential that the RavenR account could

19   also be blocked.  Under no circumstances will Joanna and I will

20   allow ourselves to be personally liable and this issue needs to

21   be rectified immediately.  Regardless of your arguments for or

22   against whether or not we should have a guarantee/indemnity in

23   place."

24            You can take that down.  You can show for the witness

25   only 1388.  You can publish that to the jury.  From Mark Scott

1    to Irina Dilkinska.  10/20/2016.

2    Q.  Special Agent Kroll, what does it say?

3    A.  "Hi Irina.  There was a euro 5.0 Mio distribution made as

4    per the boss a few weeks ago.  We need to paper this deal for

5    our administrator.  Please initial each page and execute the

6    document.  Please e-mail me a scan copy and also courier the

7    original.  It would be good to use the company stamp and get

8    your signature certified.  Best, Mark."

9            MR. FOLLY:  We could just scroll through the

10   attachment.  Actually just going to the first page.  It lists

11   October 20, 2016.  B&N Consult EOOD as lender and MSS

12   International Consultants (BVI) as borrower.

13           We can publish for the witness only Government Exhibit

14   1389.  We can move actually on to a new exhibit to show to the

15   witness, 1267.

16           Counsel, may we publish that to the jury?

17           MR. GARVIN:  Yes.

18           MR. FOLLY:  If we can publish that to the jury and

19   start from the bottom, actually.  October 26, 2016.  From Ruja

20   to Karlhorsburgh@gmail.com and MSSScott.

21           "Dear Karl, Dear Mark, please be introduced to each

22   other.  I have discussed with Karl our structure and the issues

23   we have to find a trust to take over.  I would like us to meet

24   ASAP after the 7/11 in Sofia to see how we move going forward.

25   Best, R."

1            If we could go show the witness only 4103 side by side

2    with 4104.  We can publish these to the jury.  Focusing on

3    4103.  We can zoom in on the top e-mail.  From Mark Scott to

4    Ruja Ignatova.

5    Q.  Special Agent Kroll, can you read that.

6    A.  "Hi Ruja, have another trust appointment on Monday.  Will

7    fill you in.  As to Karl, I will reach out and find out what

8    structure he has in mind for you so that I can prepare the

9    transfer process.  It will have to be the sale of the assets

10   acquired by Fenero and ownership over cash.  The best way to do

11   this is a sale of the assets to your new structure with Karl.

12   The only funds we need to exclude from transfers for a long

13   while are the internal loans made and the Cryptoreal.  He would

14   need to set up accounts.  A purchase price of a few percent

15   needs be paid and of course in large part can come back through

16   service agreements etc. and pay back of loans if that ever

17   happens.  We will come back with a plan.  I assume you have

18   total faith in Karl so I can share details.  Details.  Sails?"

19   Q.  You can stop there.  We can focus on 4104, and scroll down.

20   Looks like the bottom portion is part of the same e-mail chain.

21   If you can scroll up to Ruja's response.  You can read that

22   aloud.

23   A.  "Mark, I disagree that "it will have to be."  I paid for

24   creating the funds.  So I most probably will want a transfer.

25   Best regards, Dr. Ruja."

1    Q.  In response, Mark Scott says, "You have no net effect but

2    you need to create a deal for the transfer.  You can't just

3    assign the ownership."

4              Can you read Ruja's response to that.

5    A.  "As I say.  I paid for them.  I want them."

6    Q.  If you could scroll up.  What was Mark Scott's response?

7    A.  "We are talking about the same thing, Ruja.  But you can't

8    force the banks to simply change the signatories i.e. ownership

9    of the accounts.  So two ways to do it.  One is to put new

10   banking in place or to season the existing banks by adding

11   signatories and make the transfer a longer process.  Meaning I

12   add a director/new partner to the main accounts now and over

13   time get "bought" out.  Also, you don't need all of the

14   entities any more for your purposes.  Much smoke and mirror for

15   the set up.  Can be combined now.  Mark S. Scott."

16   Q.  Leave that up for a moment.  We can take those down.  Go

17   back to the timeline to 10/28/2016.

18              Special Agent Kroll, what's shown in there on that

19   entry?

20   A.  Between August 8 and October 28, 2016, Fenero Equity

21   Investments Cayman 1 LP account at Deutsche Bank Cayman Islands

22   receives 138,999,895 euro in wire transfers sourced from Star

23   Merchant Hong Kong.

24              THE COURT:  Go slower.

25   A.  International marketing services in Singapore and B&N

JBE3SCO4                          Kroll - Direct

1   Consult in Bulgaria.

2              MR. FOLLY:  If we can zoom back out.  Staying on the

3   timeline for the next orange entry there.  This is 11/11/2016.

4   Fenero Equity Investments Ireland account at Bank of Ireland.

5   Sends 3,250,000 euros to Oceanscape Ventures at Bank Julius

6   Baer in Singapore.

7              A JUROR:  Excuse me.  Are we supposed to see this?

8              MR. FOLLY:  Yes, it should be published to the jury.

9   Mr. Barile, if you can zoom back out to show both of those

10  orange transfer lines.  And the first one reflects between

11  August 8th and October 28, 2016, Fenero Equity Investments

12  Cayman account at Deutsche Bank in Cayman Islands receives

13  138,999,895 euros in wire transfers sourced from Star Merchant

14  in Hong Kong, International Marketing Services in Singapore,

15  and B&N Consult in Bulgaria.

16             And then the next entry is the one that I just

17  referred to, the Fenero Equity Investments Ireland at Bank of

18  Ireland sending 3,250,000 euros to Oceanscape Ventures at Bank

19  Julius Baer in Singapore.

20             If we can publish for the witness only 1391.  Counsel,

21  may we publish that?

22             MR. GARVIN:  Yes.

23             MR. FOLLY:  You can publish that for jury.  Zoom in on

24  the entire first e-mail there.

25  Q.  From Mark Scott to Maya Antonova, Kalina Bahchevanova,

1    Kalina@RavenR and David R. Pike as well as Irina Dilkinska on a

2    cc.  It's Friday, 11/18/2016.  Balances and received transfers.

3    "Actually, fund an e-mail with figures.  She had asked me for

4    available cash balances.  Here are the available cash minus

5    expenses and government and admin withholds.  All loans made

6    are considered available cash for obvious reasons."  Then there

7    are totals listed at the bottom.  306,089,678 euros.

8    40,990,185 U.S. dollars.

9          We can publish for the witness only 1279.  Can we

10   publish that to the jury?  We can publish that to the jury,

11   please.  Starting on page two.  We can just go to the header

12   there.  It says from BT.Consultancy@iCloud.com.  "Hi Mark,

13   regarding the loan agreement we have to make some changes.  It

14   should be the way around.  Between 1/Daniel Borsov and 2/Fenero

15   Equity."

16         And if you could scroll up.  Mark writes in response,

17   "Hi, Bo.  Why would we be the borrower when we give you the

18   money???  That does not work.  Please advise.  Thanks.  Mark."

19         And in response, "BT.consultancy because Fenero Equity

20   are returning back the amount given to it from Daniel a year

21   ago."

22         And then the response, Mark writes to Bo Stefanova,

23   "should still be a loan from us."

24         We can publish for the witness only 1399.  Publish

25   that to the jury.  Actually we can start on the second page.

1    Keep going.  If we can capture the bottom e-mail there.  From

2    Ruja@OneCoin to MSScott and Maya@OneCoin.  Subject "straighten

3    up reporting."

4    Q.  Special Agent Kroll, what's this e-mail say?

5    A.  "Mark.  Every week we have issues with your reporting.

6    Speak to David and please report to us the same number as you

7    did to me last week.  All money that I have not spent from the

8    funds including DBS loan.  This leads to really to major

9    disruptions.  Thanks R."

10              MR. FOLLY:  If you can just scroll up and pause there.

11    If you can just blow up all the way down that e-mail.  We can

12    scroll up.  The top e-mail there all the way down to the second

13    top e-mail.  Blow that up.

14              Ruja writes "Please just report what I say.  Should

15    not be difficult.  Maya does not need eight numbers, she needs

16    real USD and real euro balance incl the loan.  That's it."

17              And then on the top response from Mark Scott to Ruja

18    and Maya Antonova, lists loans, the DMS loan, crypto loan, Vida

19    Home, Oceanscape.  And then lists cash totals, including loans.

20    303,589,678 euros and 40,990,185 U.S. dollars.

21              We can take that down.  If you go to 1401 just for the

22    witness.  And if you can publish this to the jury.  Just scroll

23    down.  And you can scroll up.  Just pause there.

24              The e-mail is between Karl Horsburgh and Mark S.

25    Scott.  And scroll up.  Scroll up.  Just can you blow up the

1    bottom e-mail there.  From KarlHorsburgh@gmail.com to MSScott

2    and cc'ing Ruja@OneCoin.  "Mark, thank you for the information

3    which I will study and come back to you on.  Ruja and Mark, can

4    you please confirm that you are coming to Sofia on Sunday 4/12

5    and Monday 5/12.  If you are, I will book my flight to be in

6    Sofia on Monday.  I can arrive at Sofia airport" and discusses

7    some additional travel plans.

8             If we can publish for the witness only, actually,

9    first if we can publish the timeline to the jury.  12/8/2016.

10   Scott travels to London and meeting scheduled with Ruja.

11            Put that side by side just for the witness for now

12   with 1434.  Counsel, may we publish that to the jury?  You can

13   publish that to the jury.

14            If we can just scroll down on 1434 to that bottom

15   e-mail including it says on December 16, December 2016, from

16   Karl Horsburgh.

17   Q.  Special Agent Kroll, can you read that e-mail aloud.

18   A.  "I have reviewed our conversation and the corporate

19   structure you gave me and have come up with the following

20   conclusions:  MSS International Consultants BVI Limited.  MSS

21   is the general partner in five Fenero Limited partnerships

22   which in turn contain exclusively RI's money.  MSS also has the

23   relationships with the banks that currently run the bank

24   accounts for the partnerships.  MSS also is the shareholder of

25   Fenero Equity Investments Ireland Limited which in turn owns

1  three other Irish companies, Fenero Tradenext which is dormant,

2  Fenero PCT which issues a credit card, and Fenero Securities

3  which is in the process of opening brokerage accounts for Anton

4  and Ivan to allow them to trade on stock exchanges.  All of

5  this has been financed by RI.  Our problem is that RI cannot

6  appear as the UBO of the structure, and any change in the

7  structure could cause the banks to close bank accounts if they

8  were to find out about RI.  However, RI would like to ensure

9  that her ownership of this structure is formalized and

10 secured."

11          You can pause there.  Mr. Barile, if we can just

12 scroll upwards in this e-mail chain to the next e-mail directly

13 above it.

14 Q.  What was Ruja's response?

15 A.  "Gentlemen, please do not copy me on e-mails like this.  We

16 discuss better personally or over the phone.  R."

17 Q.  And who is included on this e-mail chain?

18 A.  MSScott@MSICBVI.com, Frank@sandstone.lu and

19 KarlHorsburgh@gmail.com.

20          MR. FOLLY:  If we go back to the timeline briefly, to

21 12/21/2016.  Fenero Equity Investments Ireland account at Bank

22 of Ireland sends 6 million euros to LBJ AD at InvestBank in

23 Bulgaria.

24          If we can publish for the witness only 1288.  We can

25 publish that to the jury.  We can blow up that first page.  To

1    David Pike director.  Signature of the e-mail.  The bottom

2    e-mail says, "Angela, thank you, we will address this early

3    next week and will respond.  Hope you have a wonderful holiday

4    weekend."

5         Mark Scott responds just to David Pike, "Please don't

6    make promises that we will do this next week.  We have more

7    important stuff to get done and I want to drain the account

8    before they step in."

9         You can leave that up there for a moment.  Go back to

10   the timeline to the January 2017 entry and the January 12, 2017

11   entry, those two.  January 2017 application materials submitted

12   to DMS Bank Cayman Islands for Fenero Equity Investments.

13   January 12, 2017, Scott meeting with Ruja in Sofia, Bulgaria.

14        If we can publish side by side with this Government

15   Exhibit 3025S at 17.

16   Q.  Special Agent Kroll, these messages are dated January 11

17   through January 12, 2017.  Can you read them aloud.

18   A.  "By the way, please look around a bit for investment

19   property.  I ned to diversify into real estate.  Maybe a couple

20   of places for 750 to 1 Mio each.  In Sofia now.  We had stuff

21   to discuss.  I think she is nervous a little and wants to split

22   up her money.  Does not matter to me, baby, as long as I make

23   mine.  Are you guys meeting for dinner or something today?

24   Now.  Picking me up with the Bentley SUV."

25        MR. FOLLY:  You can go back to the timeline briefly.

1    If we can go to the events from 1/23/2017 through February 3

2    through 14/2017.  Including the 1/23 that's right above that.

3    The first one Scott-Konstantin e-mail re crypto cell.

4            After that, Fenero Equity Investment Ireland account

5    at Bank of Ireland sends 10 million euros to IG markets.

6            After that, Fenero Equity Investments account at Bank

7    of Ireland Fenero Financial Switzerland LP account at DMS Bank

8    in Cayman Islands and Fenero Securities Trading Limited account

9    at Bank of Ireland send 51,696,000 euros to openmark at

10   InvestBank in Bulgaria.

11           We can go to for the witness only Government Exhibit

12   1303.  Counsel, may we publish that to the jury?  You can

13   publish that to the jury now, Mr. Barile.

14           From Mark Scott to Ruja Ignatov.  February 23, 2017.

15   It says "See attached.  Will clear KYC."

16           If you can scroll down to the attachment.  And zoom in

17   on the top portion.  By and between there.  "By and between

18   Fenero Securities Trading Limited, and Phoenix Fund Investments

19   LLC."

20           Further in that same section it says "Represented by

21   Aamer Abdulaziz Ahmed Salman."

22           If you could take that down and go back to the

23   timeline.  February 24, 2017.  The transfer referenced there.

24   Q.  Special Agent Kroll, if you can read that there.

25   A.   Fenero Securities Trading Limited account at Bank of

1   Ireland sends 10 million euro to Phoenix Fund Invest at NBD

2   Bank in Dubai.

3            MR. FOLLY:  Mr. Barile, if you can publish for the

4   witness only Government Exhibit 1312.  We can publish that to

5   the jury.  If we could scroll to the bottom e-mail there from

6   shareholder services.  It's to David Pike.  Due diligence

7   request.  Leon group 7EOOD.

8   Q.  Special Agent Kroll, can you read the first paragraph

9   there.

10  A.  "Dear sir/madam.  With regards to your investment in the

11  Fenero Funds, we JP Fund Administration Cayman Limited as a

12  license and regulated fund administrator are obliged to obtain

13  certain compliance documentation from each investor and as part

14  of our license commitments.  We are required to continuously

15  review and update the documentation on file for each investor."

16           MR. FOLLY:  You can pause there.  And scroll up.  Mark

17  Scott writing to Irina.  He says, "Hi Irina.  Sorry for the

18  late reply.  Below is one of the examples of the inquiries we

19  are receiving from admin and banks for you.  This is because

20  the found you to be general counsel of OC.  We are trying to

21  block it next week.  Keep you updated."

22           In response, Irina Dilkinska writes, "Hi Mark, this

23  seems fine.  Anything more specific?"

24           And if we can go to Mark's response.  "Hi Irina.  How

25  will you show that you personally own tens of millions of

1    dollars????  And have banks verify that?  This was just for

2    your information.  Let's not e-mail too much.  Will be in touch

3    next week after financial commission meeting."

4          We can leave that up for a moment.  We can go back to

5    the timeline.  If we could go to 4/10/2017 all the way down

6    through 4/30.  Actually all the way through the end of the page

7    there.  Focusing first on 4/10/2017.

8    Q.  Special Agent Kroll, can you read that there.

9    A.  Last transfer from Fenero Securities Trading Limited

10   account at Bank of Ireland to Phoenix Fund Invest at NBD Bank

11   in Dubai, a total of sent 185 million euro sent across 11

12   separate wire transfers.

13   Q.  Can you also read the line below that.

14   A.  Fenero Equity Investments II LP account at Deutsche Bank

15   Cayman Islands returns 9,990,110 U.S. dollars to Fates Group

16   account at Global Bank of Commerce.

17          MR. FOLLY:  Below that 4/13/2017 last transaction

18   occurs in account Fenero Equities Investments II LP at Deutsche

19   Bank Cayman Islands resulting in zero balance.  Below that

20   between 4/30/2017 and 7/14/2017 there is a reference to a

21   number of the Fenero accounts being closed.

22          If we can go to for the witness only Government

23   Exhibit 1334.

24          MR. FOLLY:  Your Honor, we would just make sure.

25          MR. GARVIN:  One moment.

1          MR. DEVLIN-BROWN:  Can we have a brief sidebar, your

2    Honor?

3          THE COURT:  Okay.

4          (At the sidebar)

5          MR. DEVLIN-BROWN:  We just want -- sorry.  We just

6    wanted to note for the Court that this exhibit was one of the

7    two exhibits from Mason Hayes that were part of the Spendiff

8    direct that was struck.  We still object to it.

9          MR. FOLLY:  Your Honor, my understanding based on the

10   briefing we did and your Honor's commentary on it was that you

11   were allowing us to offer it and admit it later in the trial.

12         THE COURT:  My ruling was that you could offer it

13   later in the trial.  Not that I would admit it.

14         MR. FOLLY:  Understood.

15         THE COURT:  Any argument as to why it should be

16   admitted?

17         MR. FOLLY:  For the reasons we set forth in the

18   letter.  It references anti-money laundering concerns.  It's

19   being offered for state of mind evidence as to Mr. Scott's

20   continued involvement with these co-conspirators after

21   receiving it, and it goes to his knowledge and intent which is

22   the key issue on trial.

23         MR. GARVIN:  Counsel just stated a few moments ago

24   that these accounts were in the process of being closed.  This

25   letter comes after the accounts had already been closed.  Part

1    of the problem is the accounts that were closed is that the

2    money was taken out of the accounts before they were closed,

3    they were actually being closed by Mr. Scott.  So, this is

4    going to a period of time that is after these transactions have

5    concluded.

6            MR. FOLLY:  Your Honor, as we've discussed before,

7    there's clear evidence that Mr. Scott remained involved in the

8    conspiracy.  Your Honor has made that finding.  And therefore,

9    it goes to his continued -- his knowing and intentional

10   continuing involvement in this conspiracy after the date he

11   received the letter.

12           THE COURT:  It will be received.

13           MR. DiMASE:  Your Honor, one other thing I just want

14   to put on the record.  I don't know if -- we are offering it

15   for state of mind again here.  I don't know if counsel wants

16   another limiting instruction.

17           MR. GARVIN:  Yes, please.

18           (Continued on next page)

19

20

21

22

23

24

25

1          (In open court)

2          MR. FOLLY:  May I proceed, your Honor?

3          THE COURT:  You may.

4          MR. FOLLY:  At this time the government would like to

5   publish Government Exhibit 1334.

6          THE COURT:  That exhibit will be received.  And ladies

7   and gentlemen, this exhibit, like the one we discussed earlier

8   today, is being admitted not for its truth, however, for the

9   effect it may have had on Mr. Scott's state of mind.  So you

10  can consider it in that fashion.

11         Mr. Folly.

12         (Government's Exhibit 1334 received in evidence)

13         MR. FOLLY:  Thank you, your Honor.  We can go to page

14  four.  We can go to the second to last paragraph there.

15  Q.  Special Agent Kroll, if you can read that.

16  A.  "Information on Irish activities and transactions.  Given

17  your failure to provide both the information and documents

18  required by us --"

19         THE COURT:  Read slower.

20         THE WITNESS:  Sorry, your Honor.

21  A.  "Given your failure to provide both the information and

22  documents required by us to identify the beneficial owners of

23  the companies for our anti-money laundering and

24  counterterrorism purposes and the information required by us to

25  understand the nature of the activities of the companies, in

1    addition to resigning as company secretary, we are resigning as

2    lawyers to the remaining companies with immediate effect."

3            MR. FOLLY:  If you can scroll back up, Mr. Barile, to

4    the top of the letter.  It's to Mark Scott from Mason Hayes &

5    Curran dated October 2nd, 2017.

6            Mr. Barile, if you can go back to the timeline for the

7    April 2018 entries.  It should be on the next page.  If you can

8    zoom in there all the way at the bottom.  April 2018, Ignatov

9    Maya text messages regarding Phoenix funds.  And Ignatov

10   Dilkinska text messages re Fenero.

11           And below that, June 2018, Scott Dilkinska e-mails and

12   Ignatov Dilkinska text messages regarding Fenero, Scott,

13   Phoenix.

14           And if we can publish for the witness only 1342 and

15   1343, which we are offering into evidence at this time.  If we

16   can show those and scroll through so counsel can see them.

17           MR. GARVIN:  No objection.

18           THE COURT:  They will be received.

19           (Government's Exhibit 1342, 1343 received in evidence)

20           MR. FOLLY:  We can publish first 1342.  You can zoom

21   in on the top portion there.

22   Q.  From Mark Scott to David R. Pike.  June 7, 2018.  Special

23   Agent Kroll, can you read the subject line.

24   A.  "Super urgent -- do we have this letter counter sign by

25   Irina?" There is an attachment scan.PDF.

1    MR. FOLLY:  If we can scroll down for the attachment.

2    Dated July 17, 2017.  Appears to be a letter from MSS

3    International Consultants BVI to Irina Dilkinska.  IMS

4    International Marketing Services GmbH.  Regarding return of

5    remaining funds Fenero Funds Financial Switzerland.

6         If we can go to 1343 and publish that to the jury and

7    the witness.  You can zoom in at the top what the "to" field

8    shows there.  It says to Malena Fahient with an

9    IDilkinska@gmail.com e-mail address from Mark Scott.

10        It says, "Hi Irina.  Attached the letter with

11   notations where you need to initial on first and last page.

12   Please also sign on each line that I marked with an X.  Phoenix

13   Fund has to sign on the last page as well, but you can send me

14   a copy back immediately with Phoenix still missing okay.  Need

15   it for the file."

16        And if you can scroll down.  If you could just

17   highlight the final, highlight the section where it's crossed

18   out there.  It looks like it originally says "As per your

19   request all funds will be wired to the Adamana Group DMCC in

20   Dubai."  That's now crossed out and it says "Phoenix Fund

21   Investments LLC."

22        You can scroll down.  You can scroll down.  If we can

23   put up 1344.  Publish for the witness and the jury.  If we

24   could go down to the bottom of the e-mail chain and scroll up.

25   If you can go to the e-mail at 16:29 GMT.  Pause.  If you can

1    scroll down.

2    Q.  Special Agent Kroll, can you read Mark Scott's e-mail?

3    A.  "Not what I am saying.  We are holding the legal escrow

4    until all investigations are over.  And the funds at Phoenix

5    are held by Phoenix as custodian for all investors.  Not by

6    us."

7    Q.  Can you zoom back out.  Can you read the e-mail directly

8    above that.

9    A.  "Need full information on the investigations and status

10   ASAP please.  Also need all Swifts for all transfers to

11   Phoenix, please."

12          MR. FOLLY:  And again that's from Malena Fahient with

13   IDilkinska e-mail address.  Zoom back out and scroll up.  You

14   can zoom in on the next e-mail.  Mark Scott writes, "We have no

15   investigation at this point.  You do and we are not sure if it

16   will come our way.  You may want to fill me in on what status

17   is.  We had our funds audited and all investor funds returned."

18          If you can scroll up.  The response is "You do means

19   who?  Company or me personally?"

20          Mark Scott writes in response, "We read about the

21   issues in Bulgaria ... the company."

22   Q.  Special Agent Kroll, what was the response there?

23   A.  "Company in Bulgaria is fine -- what I was asking was the

24   matters related to Fenero companies and the investigations

25   there, where my name was involved -- is this all closed?"

1   Q.  And scroll up to the response.  What was Mark Scott's

2   response?

3   A.  "Yes.  However, we have two more months waiting period for

4   the financial commission to accept our financials.  But they

5   are accurate of course with backup.  Should be fine."

6   Q.  The response is "After two months we will receive the 1M

7   back to where we instruct, right?"

8            What's the response from Mark Scott?

9   A.  "As soon as I receive clearance from the commission and I

10  know that your problems in Europe are over."

11  Q.  What's the response above that?

12  A.  "Problems in EU are related to this?"

13  Q.  What's Mark Scott's response?

14  A.  "Any issue you have in EU can be traced to BVI ...."

15  Q.  If we can take this down and go back to the final entry on

16  the timeline.  Special Agent Kroll, can you read that date and

17  entry.

18  A.  9/2018.  Scott arrested.

19            MR. FOLLY:  Your Honor, no further questions.

20            THE COURT:  Ladies and gentlemen, there is only

21  another nine or so minutes left.  So rather than start with the

22  cross-examination, we'll end early today.  We'll see you bright

23  and early tomorrow morning.  We'll get started at 9:30.  Please

24  be safe getting home and do not discuss the case.

25            (Jury excused)

JBE3SCO4

1         THE COURT:  Agent Kroll, you may step down.

2         (Witness temporarily excused)

3         MR. GARVIN:  Your Honor, may we take a five minute

4     restroom break?

5         THE COURT:  We may.

6         MR. GARVIN:  Thank you.

7         (Recess)

8         MR. DiMASE:  Your Honor, I believe that Mr. Gerger is

9     here in court.

10        THE COURT:  Okay.  Do you want to step forward and put

11    your appearance on the record?

12        MR. FOLLY:  We do have one additional matter we can

13    either handle before or after the Mr. Gerger related stuff.  I

14    think it should be relatively quick.

15        THE COURT:  Okay.  We can do that first then.

16        MR. FOLLY:  Your Honor, on the timeline exhibit, we

17    did not read or publish to the jury every single entry on the

18    timeline.

19        THE COURT:  Thank God.

20        MR. FOLLY:  There was some that we skipped.  As we

21    said at the outset, we were still offering all of the exhibits

22    listed there.  We think it makes sense if defense counsel wants

23    to take the evening to review, if they have any objections to

24    any of the remaining exhibits, so we can take that up in the

25    morning, I think that would be a good approach.

```
 1              THE COURT:  Okay.

 2              MR. DEVLIN-BROWN:  I think it is a good approach as

 3    well.  And one further suggestion perhaps, because I'm not, we

 4    rely on the court reporter to have taken the numbers of the

 5    exhibits when we're checking what's in evidence.  Even the

 6    chart, not all the exhibits were on the chart.

 7              I think it might be helpful if the government at this

 8    point provided a list to the defense, maybe the Court as well,

 9    just what exhibits you believe are in evidence, so we can

10    compare notes and make sure, including through this chart.

11              MR. FOLLY:  We would be happy to do that.  That's a

12    great idea.

13              THE COURT:  Good.  Mr. Gerger, do you want to step

14    forward?

15              MR. GERGER:  Thank you, your Honor.  David Gerger from

16    Houston.

17              THE COURT:  There's some free seats over there.

18              MR. GERGER:  Great.  And I'm with Isabelle Kirshner

19    who has been nice enough to show me where to go.  So thank you,

20    your Honor.

21              MS. KIRSHNER:  Good afternoon, your Honor.

22              MR. DEVLIN-BROWN:  Was this going to be in camera,

23    your Honor?  Did your Honor decide?

24              THE COURT:  Well, we can go in camera whenever you

25    guys want.  Why don't you tee it up for me what's going on.
```

1    MR. GARVIN:  Your Honor, one of the potential

2    witnesses was Mr. Neil Bush in this case.  As the Court has

3    heard, one of the transactions that Mr. Scott authorized $30

4    million to be used from his fund was for a loan relating to a

5    deposit on the purchase of a block, as it's referred to, which

6    is an area that had what was potentially promising for oil and

7    gas exploration.

8        The owners of the I would say license for the block

9    was an entity from China.  The principal of that entity was a

10   gentleman by the name of Mr. Hui who is alleged to have been at

11   the time a person from Hong Kong who was extremely wealthy.

12   The person who was involved with Mr. Hui that is relevant to

13   this case is Mr. Neil Bush.  And we've subpoenaed Mr. Bush to

14   appear.  And Mr. Bush through Mr. Gerger has filed a motion to

15   quash the subpoena.  And we'd like to address this issue

16   without the presence of the government, because it may reveal

17   part of the defense's strategy prematurely.

18       THE COURT:  That's fine.  Tell me a little more about

19   the transaction.  So it was going to be a loan from a Fenero

20   Fund entity?

21       MR. GARVIN:  Actually the $30 million took place, as

22   this Court will recall the argument with Paul Spendiff and

23   Apex.  You will recall, your Honor, that the $30 million was

24   approved by Apex and there was a second part which was an

25   additional $30 million, and that's when Paul Spendiff and Apex

1    at the time declined to approve any further transfers of any

2    kind.  I'm sure the Court recalls the tape recording of

3    Mr. Scott arguing with Mr. Spendiff that you can't approve the

4    first 30 million and not the second 30 million.  It put him in

5    a bad position financially.

6          So, Mr. Scott did his due diligence on this

7    transaction.  And one of the things that he needed to do was to

8    determine who the sellers were, and if they were legitimate or

9    not.  And when he did the research to determine whether this

10   was a for-real transaction, he of course started with Mr. Hui,

11   and Mr. Hui's company, which is I believe it is pronounced

12   Hoifu, and he found that on the board of directors of Hoifu was

13   indeed Mr. Neil Bush.  In fact had been on the board of

14   directors of Hoifu for a substantial period of time.  And there

15   is some reports that he found as to the amounts of money that

16   are involved with being on the board of directors.

17         So this influenced Mr. Scott in making his decision as

18   he went through the transaction.  There are documents --

19         THE COURT:  I'm sorry.  Mr. Bush was on the board of

20   directors of the organization that was borrowing the money

21   through Mr. Hui?

22         MR. GARVIN:  No, they were the sellers, your Honor.

23   There was an entity that was borrowing the money.  I believe

24   that entity's name was Barta, and Barta was going to purchase

25   this property.

1          My understanding of the transaction is that there was

2     a portion of the purchase price that was cash, and there was a

3     very large portion of the purchase price that was going to be

4     done in OneCoin.

5          There was a meeting with Ruja Ignatova with Mr. Hui,

6     and Mr. Bush flew from the United States to be present at that

7     meeting.

8          And these things that I'm describing, together with

9     some documentation that was provided to my client, led him to

10    have comfort, and there was at least one exhibit that has been

11    placed into evidence by the United States when Mr. Spendiff was

12    on the stand, where Mr. Scott wrote an e-mail saying that to

13    Paul Spendiff, that Mr. Neil Bush is on the other side.  That

14    has affected the due diligence, because we know that he would

15    not be associated with somebody that was anything other than

16    completely legitimate.

17         THE COURT:  So there was an actual meeting with

18    Ms. Ignatova, Mr. Bush and Mr. Hui?

19         MR. GARVIN:  Yes, your Honor.

20         THE COURT:  That took place where?

21         MR. GARVIN:  My understanding is that took place in

22    China.

23         MS. LOZANO:  Hong Kong.

24         MR. GARVIN:  Hong Kong has been taken over by China,

25    so I stand by my original statement.

1           MR. DEVLIN-BROWN:  I have one gloss to add to that and

2     make clear our sort of theory.

3           This isn't just we saw the name Bush on a transaction

4     and cut a subpoena.  The government interviewed Mr. Bush twice.

5     They collected documents from him over a period of time.  He

6     had back and forth with the case agent.  I submit his story

7     evolved a little bit over time.

8           And the government produces 3500 to us, when we didn't

9     see him on the government's witness list, we put him on ours,

10    which prompted the government I think as trial was starting to

11    e-mail us and say, well, we see you put him on yours, we may

12    call him on ours.

13          This is not someone who is just out of the blue has

14    nothing to do with this.  Both sides have been obviously

15    thinking about calling him.

16          In addition to Mr. Garvin's point about Mr. Scott's

17    state of mind and him having some comfort that Mr. Bush was

18    involved in the transaction, I think the very fact that there

19    was a real oil field and there was a company that owned it and

20    had people like Mr. Bush involved, is also important because

21    the government had strongly suggested throughout this trial

22    that everything was fake.  That all of the money, you know,

23    that went out on various investments, it all really just went

24    back to Ruja, there was nothing real about any of it.  We've

25    seen some of the exhibits presented through the last witness.

1    This is an opportunity for the defense to present at

2    least one of these deals as having something substantive behind

3    it.

4        MR. DiMASE:  First of all, the government does not

5    presently intend to call Mr. Bush in its case in chief.  Just

6    to tie that -- yeah.  The government does not presently intend

7    to call Mr. Bush in its case in chief.

8        Secondly, we are not taking a position on this motion.

9    This is Mr. Gerger's motion.

10       But, I would just say in terms of context to it, there

11   are a couple of things that I think were confused about the

12   explanation.  This was set up as a loan to Martin Breidenbach

13   who purportedly was involved with a company called Cryptoreal.

14   That company was going to use the loan money purportedly to buy

15   an oil field from a company called Barta.

16       So the investment being made by the Fenero Funds

17   wasn't into an oil field.  The investment, on paper at least,

18   was a loan which would be paid back with interest.  That was

19   the investment.  The loan proceeds would then be used by

20   Mr. Breidenbach and Cryptoreal to purchase a purported oil

21   field from Barta.

22       So, it isn't really fair to say that the investment

23   was an investment in an oil field.  It was a loan with an

24   expected return of interest on the loan.  It bears noting that

25   the loan was never repaid, as far as the government is aware.

1          THE COURT:  I think I heard Mr. Garvin say that the

2     loan was going to be made in bitcoin, or rather, sorry in

3     OneCoin.

4          MR. DiMASE:  There is an agreement relating to the

5     transaction, it is a little confused, but between Cryptoreal

6     and Barta.  In other words, the second leg of this transaction

7     in which Fenero was not directly involved.  Fenero loaned the

8     money, purportedly, to Martin Breidenbach of Cryptoreal who was

9     going to use it to buy an oil field from Barta.  That second

10    leg, there is an agreement that has come into evidence.  In

11    that agreement it says this will be paid for with $60 million

12    and some number of OneCoin in addition to that $60 million.

13         So, the first 30 million was sent out by Apex at

14    Mr. Scott's direction.  There were some letters authored by

15    Mr. Scott sent to Mr. Breidenbach and sent back to Apex to

16    paper this transaction.  The money was ultimately sent.  The

17    second tranche of 30 million was not sent because Apex fired or

18    Scott fired Apex.

19         There are some records suggesting that some other

20    OneCoin related entity sent the second $30 million to Barta at

21    a later date.  I don't know whether or not that will come into

22    evidence at this trial.

23         But, in any event, long story short, I mean, again, we

24    are not taking a position on this motion.  But I would say the

25    legitimacy of the deal itself doesn't really seem to be the

1    issue.  The issue is whether or not the funds were derived from

2    a criminal source, and that source was concealed as part of

3    this transaction.  And the government's evidence so far has

4    shown that Ruja's name was -- that Scott made efforts to keep

5    Ruja's name out of it and to make the UBO of the company

6    receiving the money appear to be Martin Breidenbach.

7            I'm not really sure how much legitimacy in the

8    ultimate transaction of the loan proceeds are going to be used

9    for is that relevant.  But, again, I just say that to give the

10   Court some context about this transaction.

11           THE COURT:  From the government's perspective, what

12   was Mr. Bush's involvement substantive involvement in this?

13           MR. DiMASE:  Your Honor, Mr. Bush definitely had a

14   business relationship with this gentleman Dr. Hui.  I think he

15   goes by Dr. Hui.  A lot of doctors in this case.  Anyway, and

16   he had some involvement with some of Dr. Hui's companies.

17           He did attend a meeting involving this transaction.

18   He did not sign any of the documents related to the

19   transaction, but he appeared at the meeting.  His name also

20   appears in the SPA, the share and purchase agreement.  It says

21   something to the effect of -- and maybe if Mr. Garvin has it in

22   front of him, he can say.  Actually, if you don't mind.  It's

23   in the other part of the e-mail.  We can pull it up for you,

24   your Honor, to look at.  But, in sum, it says something to the

25   effect of OneCoin or its representatives will continue to

1    search for high-quality people like Mr. Bush.  And I'm

2    butchering what it actually says in the agreement.  Long story

3    short, we will pull it up.

4          But there is some reference to Mr. Bush in the

5    agreement.  Not surrounding the loan money, but the second leg,

6    between Cryptoreal and this company Barta.  And Barta, Barta is

7    associated with Dr. Hui.  Dr. Hui is associated with Mr. Bush.

8    Mr. Bush comes to the meeting.  He does get some compensation

9    within a month or so after.

10         MR. GARVIN:  The compensation we understand was

11   approximately $300,000, so it was more than "some."

12         MR. DiMASE:  That's correct.

13         THE COURT:  So, the laundering, I take it that,

14   according to the government's theory, the laundering was that

15   the illegal, rather the illicit funds, the $60 million, was

16   being loaned to Mr. Breidenbach and that he was going to in

17   turn purchase some interest in the oil field.

18         MR. DiMASE:  Essentially the government's theory is

19   that this was a transaction, a purported loan that was not in

20   fact a loan.  In fact, some of the government's evidence today

21   said loans are available cash for obvious reasons.  The loans

22   are fake loans.  And this was a really a one-way transfer of

23   money purportedly to Martin Breidenbach, but in fact for Ruja's

24   benefit.  And whether she bought a real oil field or whether

25   she just gained access to that money in another place, either

way, the loan itself is a money laundering transaction.

THE COURT:  What's the relationship between

Ms. Ignatova and Mr. Breidenbach?

MR. DiMASE:  I think the evidence has established that

on numerous occasions, Mr. Scott and Ms. Ignatova used Martin

Breidenbach as a nominee in place of Ruja to move money around.

THE COURT:  Got it.  Okay.

MR. GARVIN:  Your Honor, in summation, you have

Mr. Hui or Dr. Hui, his company Hoifu, and you have Mr. Bush

who is a director on Hoifu.  They are selling the oil field

through a company of Mr. Hui's that was formed called Barta.

Purchasing the oil field is Cryptoreal, and Cryptoreal needs

$60 million to make the purchase.  And that $60 million is to

come from the funds of Mr. Scott.  And Mr. Scott is going to

get back a mortgage, the loan is going to be secured by the oil

field, he's given the surveys and feasibility studies, hundreds

of pages, and in doing his due diligence, he searched who the

sellers were, who stands behind Barta, and the two names that

stood behind Barta were Dr. Hui and Neil Bush.

Neil Bush he recognized immediately.  There will be

evidence that we can show the Court that our client actually

had prior experience with the Bush family, in particular Jeb

Bush.  And that the Bush name to him meant more than the

average person because he knew Jeb Bush, knew of his brother

Neil Bush.  And therefore, went forward with the transaction in

1    reliance in part that Neil Bush was part of it.

2             In addition to that, as we've previously stated, Neil

3    Bush flew from what we believe to be Houston, Texas, to Hong

4    Kong to attend the meeting with Mr. Hui and with Ruja Ignatova

5    for the purpose of culminating this transaction.

6             THE COURT:  Mr. Gerger.

7             MR. GERGER:  Your Honor, thank you for letting me

8    appearance on such short notice.  I think there are two

9    different theories of relevance that I'm hearing.  One is that

10   Mr. Scott argues that because Hui was associated with my

11   client, that gave him some comfort all by itself.  That's one

12   thing.  And the other is did Mr. Bush have anything to do with

13   the facts of this case.

14            So if I can take those in order very quickly.

15   Mr. Bush doesn't know Mr. Scott, has never met him, has never

16   talked to him that he knows, has never corresponded with him,

17   does not know about a loan, does not know this name beginning

18   with a B that I'm hearing for the first time, the German name.

19            And so to the first point, would it be relevant for

20   Mr. Scott to say, oh, Hui is associated with Bush, therefore I

21   have faith in Hui.  And I would say, not.  That that's sort of

22   like innocent by association once removed.  Whatever Mr. Bush

23   thought of Mr. Hui wouldn't say anything about what Mr. Scott

24   would think about Mr. Hui.

25            And in fact, I expect the jury would have to be told

Mr. Bush's thoughts about Mr. Hui are not relevant.  They were never communicated by Bush, certainly to Mr. Scott.  He never vouched to Mr. Scott.

So whatever, whatever Mr. Scott knew about Mr. Bush, didn't come from Mr. Bush.  And so, if it's his defense that he had faith in this deal because Mr. Bush was somehow associated with Mr. Hui, I think that would have to come from somewhere else.  My client couldn't speak to that at all.

And I think there's been some confusion, I guess, about my client's relationship here to these facts.  As I said, he did attend, as the government said, my client attended one meeting, in August of 2016, and that was it.  He was not the seller.  I don't believe that the company that he was associated with was the seller.  He wasn't the buyer.  He wasn't the lender and he didn't know anything about a loan being made --

THE COURT:  I thought that the company that he was associated with was the seller.

MR. GERGER:  So there are several companies owned by Dr. Hui or controlled by Dr. Hui.  One of them is called Hoifu Energy.  Mr. Bush is on the board of Hoifu Energy.  I don't believe that Hoifu Energy was the seller of this oil lease.  I don't believe it owned this oil lease.  I believe there is a second company called Hoifu Petroleum that might have owned this oil lease.

1          THE COURT:  But was Mr. Bush involved in that meeting?

2     Was the purpose of the meeting to discuss the sale of the oil

3     lease?

4          MR. GERGER:  I think that's fair.  Mr. Bush was

5     invited by Dr. Hui to come to a meeting, he did come to a

6     meeting, he did not meet Mr. Scott.  He did not invest in the

7     project.  He did not take an ownership in the project.  And I

8     don't know what Mr. Scott was told about his role.  It wouldn't

9     have been from my client.  I don't know what Mr. Scott believed

10    about his role.  But that can't be proved by my client.

11         But it is fair to say it's true he attended a meeting

12    in August of 2016.

13         THE COURT:  Were there other directors of the company

14    there besides Mr. Bush?

15         MR. GERGER:  I think the people there were -- I'm not

16    100 percent sure of this.  Ms. Ignatova, I don't think she was

17    a director.  Hui was there.  I don't know who else was there.

18         THE COURT:  Okay.

19         MR. GERGER:  So, again, I think the evidence would be,

20    your Honor, that what Mr. Bush was told about the transaction

21    didn't make sense to him.  I don't think that's relevant to

22    Mr. Scott.  But again, whatever he learned was completely

23    independent of Mr. Scott.  No communication with Mr. Scott.

24         So, I understand, as Mr. Scott says, he was impressed

25    that my client knew Dr. Hui.  Dr. Hui may know lots of people.

But, you can't prove Mr. Scott's intent through Mr. Bush.

MR. GARVIN:  One or two points I'd like to add.  First is that Mr. Scott did, and we have a copy of, did look at the Hong Kong Exchange when he did his due diligence, and when he ran it down, he found that Mr. Bush was listed at the second highest level and was on that board and had been on the board for approximately 10 years and had been paid during that period of time in excess of $3 million for being on the board.  He also learned that Mr. Bush was a director or on other boards of entities that were controlled or owned by Dr. Hui, including AMA Energy Group Limited.  Also, he learned that there was a subscription agreement in which Mr. Bush signed with yet another option on Madagascar Southern Petroleum, which also had a purported interest in this oil field.  And Mr. Bush was given, basically, an option in the case that the oil field would be exploited commercially, he had an option to buy in to get shares.

All of these things together, plus the knowledge of Mr. Bush actually going from Texas to Hong Kong to participate in the transaction, and finally, there was also discussions, and it is supported by the documentation, that Ruja Ignatova even discussed the possibility of Neil Bush being the spokesperson for OneCoin going in the future.  Now, Neil Bush never accepted that.  But it was also discussed.

MR. DEVLIN-BROWN:  Just one other point, your Honor.

JBE3SCO4

And there is a document I'm happy to hand up on this as well.

As you may recall, Paul Spendiff from Apex testified to sort of a chronology of events leading up to that heated phone call on August 10, I believe.  And there was a suggestion that Mr. Scott, he didn't really have payments due.  But, the fact that this transaction existed and was happening then is important to show that Mr. Scott was not blustering for no reason.  There actually was a transaction taking place.

And I can hand up an e-mail that actually has Mr. Bush communicating with a representative of Dr. Hui about when his $300,000 payment will be ready.  And asking around August 9 if, you know, he assumes there's some sort of snafu.

So the point that Neil Bush is not maybe the perfect person to prove the transaction took place because he is only on the board of a holding company and not something with a very similar name that actually owned the oil field, this is not a question right now for the defense of who is the best witness we could get to prove the transaction is real.  He's a witness who is available to us who was interviewed by the government, who was on the government's list, and it will help make the case at least to this one transaction for the jury that it was a real transaction.

The government has plenty of arguments that, you know, that they don't think it was real or Mr. Scott didn't think it was real or whatever else they want to say.  But allowing the

1    defense to prove that I think is important.  And I can hand

2    this up if your Honor wants to see it.

3              THE COURT:  Sure.

4              MR. DEVLIN-BROWN:  It is in the 3500.  3508-002.

5              MR. DiMASE:  I just want to come back to the point

6    that whether the transaction was real or not is not really the

7    issue from our point of view.  The issue is that the source of

8    the funds were being hidden, and it wasn't really a loan.  And

9    the loan is the first leg that Fenero was involved with.  The

10   second leg is one step removed from Fenero's investment.

11             If you are loaning money to somebody, you're concerned

12   about the person you're loaning the money to.  Maybe, I don't

13   know to what extent you would want to know exactly what they

14   are going to use it for.  You would want to know you are

15   getting paid the money back along with an interest rate, which

16   it's pretty clear from the evidence here that was never

17   intended.

18             So that is really the government's theory of it being

19   a money laundering transaction, along with the fact that Martin

20   Breidenbach is put being put in Ruja's place as a nominee.  But

21   anyway, the other issue I have some issue is the allegation

22   that Mr. Scott knew a bunch of things, I mean, maybe that means

23   Mr.  Scott is testifying.  I don't know exactly how that is

24   going to be proven.  I don't think Mr. Bush would be able to

25   talk about that.

1    And it's also not clear to me when Mr. Scott found out

2    these things.  We produced a lot of documents, including the

3    option agreement that was described by Mr. Garvin in discovery.

4    Certainly it's possible that was floating out in the public at

5    some point.  I just don't know how Mr. Scott is going to

6    demonstrate that he saw that at the time.  If he saw it in

7    discovery, it is irrelevant to this discussion.

8        THE COURT:  Let me ask this.  Is there something that

9    you want to discuss in camera?

10       MR. GARVIN:  Well, your Honor, I think we've aired out

11   almost everything, so I don't think that at this point that we

12   need to do that any longer.  So I'll withdraw that.

13       I do want to also bring back to home that while we

14   were talking, I found yet another company, Triumph Energy, that

15   is a Dr. Hui company that Mr. Bush is also on the board of

16   directors for.

17       And I will remind the Court that this transaction,

18   from Mr. Scott's point of view, was his private equity fund was

19   loaning $60 million, and that Apex had approved 30 million, and

20   that it was going to be fully collateralized with the oil field

21   itself, which he had received a survey and feasibility study

22   from a reputable company saying that it was worth much, much,

23   much more than the $60 million.  The balance of the purchase

24   price was supposed to be paid in OneCoins, and total price of

25   this was supposed to be in the $600 million range.  So, those

1        were all factors also.

2                  MR. DiMASE:  Just to clarify the record on that.  My

3        understanding of the evidence is that the collateral was not

4        the oil field.  But Mr. Breidenbach's purported interest in

5        another Fenero company called Tradenext, which is just part of

6        the money laundering scheme in the government's theory.  So I

7        don't believe it's true that the oil field, at least at the

8        point he got the first 30 million from Apex and out to this

9        company Cryptoreal, was the oil field.  In fact, I think the

10       letters that he drafted on behalf of Mr. Breidenbach make

11       reference to the collateral being shares in a Fenero entity

12       that Mr. Breidenbach purportedly owned.

13                  It's very confusing, but it is part of the scheme to

14       hide the true owner of the funds, that's the bottom line.

15                  THE COURT:  Mr. Gerger.

16                  MR. GERGER:  Thank you, your Honor.  I know it's dense

17       to try to figure out these facts, but I'm concerned that the

18       impression is being left that Mr. Bush was somehow aware of a

19       closing or knew that a deal happened.  So, for sure, if you say

20       to Mr. Bush, did you know about some loan?  Was it paid?  He

21       would say "I don't know what loan you're talking about."

22                  He wasn't part of any such talk of a loan.  He was on

23       the board of directors of some of Dr. Hui's companies, but it

24       is very important to pay attention to which ones.  Not the one

25       that's the seller.  And he didn't see any transaction through,

JBE3SCO4

1    and I don't think he could tell you the terms of some

2    transaction.  He had an option to participate and he did not.

3    And after he had attended a meeting on August 30 --

4             THE COURT:  Did he participate individually?

5             MR. GERGER:  He did.  And he did not exercise that

6    option and he did not invest.  And after he attended one

7    meeting, I think he asked a few more questions, and that was

8    it.

9             So, he is not aware of this $30 million loan, where it

10   came from, whether it was paid, whether it was funded.

11            (Continued on next page)

1          MR. GERGER:  So, I think that would be very confusing

2     to have him on the stand, your Honor.

3          THE COURT:  Very well.  Thank you.

4          Mr. Garvin?

5          MR. GARVIN:  Yes, your Honor.  I don't want to

6     contradict what Mr. Gerger said.  I don't know that he is

7     aware, but in the F.B.I. 302 of Neil Bush, in addition he said,

8     "Bush recalled that the head of Hui Fu Energy, Dr. Hui Chi

9     Ming, received a bunch of cryptocurrency for an oil deal in

10    Madagascar.  Bush had a residual interest in the cryptocurrency

11    from the oil deal.  Bush met the woman from the cryptocurrency

12    company, Ruja Ignatova, in Hong Kong with Dr. Hui."

13         So, he had a residual interest.  And when you flip the

14    page you find out that at the meeting Dr. Hui told Mr. Bush

15    that if there was a sale and he was able to sell the OneCoin

16    cryptocurrency, that Mr. Bush would be entitled to 10 percent.

17         So, it appears that he was not only there just to

18    support Mr. Hui which but Mr. Hui which put in a financial

19    aspect transaction also.

20         THE COURT:  Mr. Gerger, were you at the proffers?

21         MR. GERGER:  I believe no counsel was present.  No, I

22    was not there, your Honor.

23         THE COURT:  OK.  OK.

24         MR. DIMASE:  Judge, we can show you that agreement if

25    you wanted to see what we were referring to earlier.  It's up

1    to you.

2             THE COURT:  OK.  You can be seated.  Before I forget,

3    I did want to thank you for your involvement in this case, Mr.

4    Gerger, if for no other reason that I learned a new word.

5    Quashal?

6             MR. GERGER:  Right, that's a word.

7             THE COURT:  I had to look it up.  I look forward to

8    using it.

9             MR. GERGER:  I think it's a word used even by a court.

10            THE COURT:  I have never seen it.  In any event, it

11   seems to me that at base the reason Mr. Scott wants to put

12   Mr. Bush on the stand is to relay to the jury the idea that he

13   was given some level of comfort knowing that Mr. Bush was

14   associated with the transaction in some fashion and, therefore,

15   his state of mind was that, well, if Mr. Bush is involved it

16   has to be a real transaction; and I think that has certainly at

17   the very least an air of legitimacy.  However, that's already

18   before the jury.

19            The jury understands or the jury saw the e-mail that

20   Mr. Scott sent I forget to whom, in which he discusses

21   Mr. Bush's involvement as either the son and the brother of

22   former Presidents.  I don't know what Mr. Bush would say.  I

23   mean the substance -- the details of the transactions that have

24   been put on the record by Mr. Garvin are fairly irrelevant.  I

25   believe through the facts of this case Mr. Gerger does provide

1    case law tending to show -- I will read from the letter --

2    "where a witness's involvement can be established through

3    documents, and the witness has no knowledge of the defendant's

4    state of mind, quashing the trial subpoena is appropriate."

5           That's what we have here.  Mr. Bush, as far as I know,

6    as has been represented, has never met Mr. Scott.  There is no

7    indication he knows what Mr. Scott is, what if any involvement

8    Mr. Scott had with the transaction, and, therefore, he cannot

9    provide himself firsthand relevant evidence about the effect of

10   this transaction on Mr. Scott.

11          The fact that it was a real transaction or not it

12   seems to me somewhat besides the point.  What is relevant is

13   that there was going to be a transaction.  Apparently no one is

14   disputing that there was an oil field and that loan was going

15   to be made.  The government's theory is that the loan is not

16   really a loan, but if it had gone through an interest would

17   have been purchased in the oil field.  Now, what the source of

18   those funds are, and ultimately how they were used, is again is

19   what is being litigated here, not the fact that there was an

20   oil field in which an interest was going to be purchased.

21          So, I don't see how Mr. Bush can add to the relevant

22   elements of Mr. Scott's defense, and at the end of the day I

23   believe that quashal is appropriate.

24          Anything else?

25          MR. GERGER:  No, your Honor.

JBE7SCO5

1            THE COURT:  OK.  So we will see you folks tomorrow

2    morning bright and early.  And Mr. Gerger, safe travels.

3            (Trial adjourned to November 15, 2019 at 9 a.m.)

```
 1                         INDEX OF EXAMINATION

 2     Examination of:                              Page

 3      NICHOLAS KROLL

 4     Direct By Mr. Folly  . . . . . . . . . . . .1154

 5                        GOVERNMENT EXHIBITS

 6     Exhibit No.                              Received

 7      2701     . . . . . . . . . . . . . . . . .1157

 8      1004     . . . . . . . . . . . . . . . . .1161

 9      4109-A, 4109-B   . . . . . . . . . . . . .1195

10      1407, 1410   . . . . . . . . . . . . . . .1206

11      3302     . . . . . . . . . . . . . . . . .1207

12      3301     . . . . . . . . . . . . . . . . .1208

13      4099     . . . . . . . . . . . . . . . . .1212

14      1334     . . . . . . . . . . . . . . . . .1254

15      1342, 1343   . . . . . . . . . . . . . . .1255

16

17

18

19

20

21

22

23

24

25
```