JBF3SCO1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                        17 CR 630 (ER)

MARK S. SCOTT,

          Defendant.

------------------------------x

                                New York, N.Y.
                                November 15, 2019
                                9:00 a.m.

Before:

                  HON. EDGARDO RAMOS,

                                  District Judge

                     APPEARANCES

GEOFFREY S. BERMAN,
    United States Attorney for the
    Southern District of New York
CHRISTOPHER DiMASE
NICHOLAS FOLLY
JULIETA V. LOZANO
    Assistant United States Attorneys

COVINGTON & BURLING LLP
    Attorneys for Defendant
BY:  ARLO DEVLIN-BROWN
     KATRI STANLEY
    -AND-
DAVID M. GARVIN

JBF3SCO1

1                (In open court; jury not present)

2                THE COURT:  Good morning, folks.  I received the

3    midnight message from Mr. Devlin-Brown.  Are folks prepared to

4    discuss it?

5                MR. FOLLY:  Your Honor, we are prepared to discuss it.

6    I would just note, I think the microphones at our table aren't

7    on.

8                THE COURT:  Just speak up.

9                MR. FOLLY:  We're happy to.  Since it's

10   Mr. Devlin-Brown's motion, I'll let them start things off.

11               THE COURT:  Mr. Devlin-Brown.

12               MR. DEVLIN-BROWN:  Good morning, your Honor.  So, as

13   you can see from our letter, we're seeking the movement into

14   evidence of government -- Defense Exhibits 550 and 552.  I

15   think 550 really, and we can do whatever redactions the

16   government wants, I think there is no question that that

17   statement is within the 803(3) hearsay exception of Best,

18   United States v. Best.  "I'll be traveling all this week."  And

19   I think it's important.

20               Mr. Konstantin, it wasn't sort of told that way

21   through his 3500 material.  But by the time of trial, there was

22   a dramatic story.  The meeting itself is not that interesting.

23   Mr. Scott met with Ms. Ignatova.  But the fact that

24   Mr. Konstantin says that the person that he understood to be

25   the one involved in money laundering with Mark Scott joined the

JBF3SCO1

1    meeting midway through, causing Ruja to come out and clear the

2    office for the first time ever, and then leading to a

3    subsequent conversation where Ms. Dilkinska tells Konstantin

4    that they had to stay a long time to make sure Mr. Scott

5    understood everything.  I mean, that's compelling evidence for

6    the government.  Particularly as it's the sole encounter that

7    Mr. Konstantin can testify to.

8            So I think that e-mail as well as 552 raise very

9    substantial questions as to whether Irina Dilkinska attended

10   the meeting.

11           We've asked the government if they have anything

12   further, we found these documents, we've asked if they have

13   anything further in their files that would reflect where Irina

14   Dilkinska was.  They've said not that they have been able to

15   identify.

16           We think that's proper for the jury to have this

17   substantial impeachment that goes both to Mr. Konstantin's

18   credibility broadly, and also to whether this meeting in fact

19   happened.

20           MR. FOLLY:  Your Honor, as to the first statement,

21   your Honor ruled on this first statement while the witness was

22   on the witness stand, and that ruling was correct.  Looking at

23   the primary case that the defendant is relying on, this United

24   States v. Best case, and if your Honor wants I have an extra

25   copy.  Would your Honor --

JBF3SCO1

1            THE COURT:  Sure.

2            MR. FOLLY:  Okay.  Your Honor, the Best case, the

3    ruling there was not nearly as broad sweeping as defense

4    counsel has stated that it was.  And focusing on the actual

5    analysis in that opinion, which starts on page six, the court

6    says in prior cases they've discussed whether a declarant's

7    out-of-court statement of intent was admissible in evidence

8    against a person other than the declarant, which here that's

9    precisely the posture we're in.  It's not Mr. Ignatov's

10   statement; it is a statement of Irina Dilkinska.

11           And the court says in each of these cases we concluded

12   that admissibility turned on whether there was independent

13   evidence that connected the declarant's statements with the

14   non-declarant's activities.

15           In other words, whether there was independent

16   corroborating evidence that the statement, the out-of-court

17   statement that was made as to future intent was in fact true

18   and happened.  And what the court explains in these other cases

19   that it relies on in Best is that there needs to be some

20   independent evidence.  And the type of evidence they cite are,

21   for example, law enforcement surveillance observing the event

22   that happens that the out-of-court statement of future intent

23   is referring to.  So someone saying I'm going to have a meeting

24   with so-and-so, and then law enforcement agents actually

25   surveil that meeting, and you put those two things together.

JBF3SCO1

1   The holding in Best suggests that, yeah, that might be a

2   situation where such a statement would be admissible.

3          And then if you look further down, on page seven, the

4   first full paragraph there, in the case that they distinguish

5   where they found that such a statement is not admissible, they

6   say we held that the informant's statement was not admissible

7   to prove that was Delvecchio attended the meeting, because

8   there was no independent evidence that he had done so.

9          So, your Honor, this case actually illustrates the

10  exact concern we have, which is relying on an out-of-court

11  hearsay statement, for its truth, without any sort of

12  independent corroborating evidence such as law enforcement

13  surveillance about Ms. Dilkinska being out of the country,

14  traveling in some other location.

15         So, this seems clearly under the law and under the law

16  that the defendant cites in their own brief, this seems clearly

17  inadmissible.  Your Honor's ruling on this e-mail that you made

18  last week while this witness was on the stand should stand.

19         As to the second e-mail, that one is even more

20  problematic.  And that e-mail the defense is actually relying

21  on the seldom used residual exception to hearsay, to try to get

22  that e-mail into evidence.  And your Honor, the problem with

23  that e-mail is in that e-mail, there is reference on July 20 to

24  Mr. Scott's travel, in that same e-mail chain, and there is

25  reference on July 20 to Irina Dilkinska referencing travel.

1          The fact that Irina Dilkinska references travel does

2     not establish that she could not have been in Sofia for the

3     meeting.  Mr. Scott references his own travel, in that meeting,

4     I mean in that e-mail, and obviously, no one is disputing that

5     he himself ended up in Sofia, Bulgaria, and attended a meeting.

6     So, the very e-mail illustrates that referencing travel on the

7     same date of the meeting does not mean that one did not in fact

8     attend a meeting.

9          So, for those reasons, both of these statements are

10    clearly inadmissible hearsay, and should not come into evidence

11    at this trial.

12         MR. DEVLIN-BROWN:  You know, I just want to step back

13    for a second.  Because perhaps the government has other

14    evidence we're not aware of.  But, I think just stepping back,

15    this raises a very substantial question as to whether

16    Mr. Ignatov was correct about a key detail and whether that was

17    false testimony willfully or just an incorrect memory, but

18    conveniently a very incorrect memory for Mr. Scott.  It's very

19    problematic.  And I haven't heard the government say, oh, no,

20    there is some independence evidence Ms. Dilkinska was there.

21         The first e-mail, which of course there is no

22    incentive for anyone to be fabricating some alibi in case

23    Ruja's brother testifies years later.  She lives in Sofia, she

24    says I'm traveling all next week.  The meeting is a couple of

25    days later.

1    I don't care about 552 as much, your Honor.  Partly

2    why I presented that to the Court is it sure seems consistent

3    that they are in fact traveling.  There is e-mails after that

4    date, which we could provide if it was going to be helpful,

5    because the e-mail context was they're trying to get a

6    signature on a contract or on some document for banks.  There

7    is e-mails after that date, where they're still sort of back

8    and forth about finalizing.  That wouldn't really make sense

9    if, oh, we actually just bumped into each other in Sofia and

10   took care of this.

11        So I think 551, just to go to the evidentiary question

12   in Best.  This is a doctrine that apparently goes back to a

13   Supreme Court case in the late 18 -- no, 19th century, and it

14   is still cited in the federal rules of evidence.  A statement

15   of intent is admissible, I mean a statement of plan is

16   admissible as to what someone's plans are and that can be

17   part -- that can be some evidence that the plan likely took

18   place.

19        The suggestion that the government has raised that,

20   you know, the only way we could possibly get that in is if we

21   had law enforcement surveillance, or the equivalent, to prove a

22   negative, by the way, because this is different than cases

23   where you are trying to confirm the declarant's testimony.  We

24   are not trying to confirm the declarant's testimony.  We are

25   trying to impeach the declarant's testimony.  So no, we don't

1     have access to law enforcement surveillance in Sofia showing

2     she didn't attend the meeting.

3         THE COURT:  It doesn't need to be law enforcement

4     surveillance.  It can be any other kind of independent

5     evidence, including circumstantial evidence.

6         MR. DEVLIN-BROWN:  I think these e-mails are

7     circumstantial evidence.  The government has gotten a vast

8     trove of e-mails from not just Mr. Scott, but from the search

9     warrants in Bulgaria, from search warrants in Germany, from all

10    sorts of other sorts of cooperating witnesses.

11        We have I think a lot of it, probably not all of it

12    because it's not all relevant to Mr. Scott, even if it has been

13    offered to be made available.  When we search the records for

14    that week, it strongly suggests Irina Dilkinska is not there.

15    Just as she said pretty clearly in that e-mail.

16        So, look, if the first e-mail is in, the government

17    can still argue, you know, maybe that plan didn't take place,

18    or Konstantin had a good-faith memory that it was wrong, but,

19    we should be permitted to argue that he was mistaken about this

20    meeting.

21        THE COURT:  Well, the text of 803(3) would appear to

22    clearly establish the admissibility of 550.  I don't think 552

23    comes in at all because of the way that the e-mail is phrased

24    because it's not a statement of intent.  But 803(3) says that

25    the following statement would not be excluded under the rule

JBF3SCO1

against hearsay.  Then existing mental emotional or physical

condition, a statement of the declarant's then-existing state

of mind such as intent or plan.

However, the case law, as Mr. Folly indicates,

requires more.  And in the case that was cited by the defense,

where such statements were admitted, the court concluded that

admissibility turned on whether there was independent evidence

that connected the declarant's statement with the

non-declarant's activities.  Here there is not that independent

evidence.  Accordingly, the ruling will stand.

Anything else?  The microphone is on now?

MR. FOLLY:  Your Honor, I think they're working.  Yes.

Just one issue I want to flag, I don't think it really requires

any ruling or anything.  But the parties have been discussing

the exhibits that were referenced on the timeline.  And we want

to make sure that there is a clear record of what was admitted

into evidence.  Yesterday certain exhibits, as we mentioned,

were not published to the jury.  In fact, probably about half

of the exhibits referenced on the timeline were not.

I think at this stage to give defense counsel an

appropriate amount of time, we would prefer to wait until

Monday so they can thoroughly check the list and make sure that

there are in fact no objections to exhibits that have not yet

been published to the jury.  And then on Monday we just ask

that we formally provide those to the court reporter so that

JBF3SCO1

1    they can be part of the record.

2         THE COURT:  Okay.

3         MR. DEVLIN-BROWN:  That certainly sounds good to us,

4    so we appreciate that.

5         MR. DiMASE:  There is one other issue, your Honor, but

6    could I have just one moment to discuss it with my colleagues?

7         THE COURT:  Okay.

8         MR. DiMASE:  Your Honor, apologies.  One other issue

9    we wanted to raise.  This is something we disclosed to the

10   defense last night.  After the testimony of Mr. Kishore from

11   Iberia Bank, formerly Sabadell Bank, we took a letter which was

12   attached to Government Exhibit I believe it was 4101.

13        One moment so I can make sure that is the correct

14   exhibit number.

15        MR. DEVLIN-BROWN:  That's correct.

16        MR. DiMASE:  Okay.  So Government Exhibit 4101, which

17   was an e-mail sent by somebody who worked for Zala Group to

18   Mr. Scott attaching a letter from Sabadell Bank dated August 17

19   of 2016.  The witness testified that he wasn't certain that he

20   had written that letter.  I don't know if the Court recalls

21   that.

22        But, after the testimony, we decided to reach out to

23   the Iberia Bank to ask them to do a search of their records to

24   determine whether or not that letter was in the files of Iberia

25   Bank.  And what we have learned, actually yesterday, was that

JBF3SCO1

1    they cannot find a copy of that particular letter within the

2    files at Iberia Bank.  That's really all they're able to say.

3    But they are also able to say that three of the entities listed

4    on that letter that was attached to Exhibit 4101 never held

5    bank accounts at Sabadell United Bank to the best of their

6    knowledge.

7             So, we've disclosed this information to the defense.

8    The e-mail and the attached letter were located on an e-mail or

9    within an e-mail account that was obtained pursuant to a search

10   warrant.  That e-mail account belonged to Mr. Scott.  So it was

11   an e-mail sent by an employee of Zala to Mr. Scott's e-mail

12   account.  The e-mail itself is authentic and was sent to the

13   defendant.  That's the point.

14            And so, we just wanted to raise that with the Court to

15   let the Court know.  Obviously, the defense is free to proceed.

16            THE COURT:  Remind me the substance of that letter.

17            MR. DiMASE:  Yes, your Honor.  As you may recall,

18   there was a letter which was authenticated by the witness as a

19   true and accurate letter from Sabadell Bank to Mr. Armenta

20   stating that the accounts of Zala Group and Fates Group were

21   going to be closed, and giving them a 30-day period to I guess

22   figure out their affairs before the accounts were shut down.

23            There was a subsequent e-mail from an employee of Zala

24   Group to Mr. Scott on or about August 17 attaching what appears

25   to be a second letter from Sabadell Bank dated August 17 of

JBF3SCO1

1    2016, which indicated that all accounts of the following

2    entities were being closed.  Zala and Fates Group, which was in

3    fact accurate, those were being closed.  And then the accounts

4    of three other entities which were apparently not holders of

5    bank accounts at Sabadell Bank.

6            THE COURT:  Because I can be dense, what's the

7    gravamen of that?  Why would, if the government's theory or the

8    the assumption is it was fabricated, why would that have been

9    fabricated?

10           MR. DiMASE:  That is unclear.  We can -- and I am a

11   not sure it is relevant particularly to this trial either.  In

12   terms of why, whoever --

13           THE COURT:  Is it helpful to Zala Group and Fates?

14           MR. DiMASE:  Your Honor, first of all, I stand

15   corrected.  The exhibit number is 4108.  Not 4101, so that

16   should be reflected.  One moment, your Honor.

17           THE COURT:  You don't have to speculate, by the way.

18   Just curious.

19           MR. DiMASE:  I think that's the concern is speculating

20   about it.  Mr. Armenta and his employees, none of them are

21   anticipated to testify at this trial.  So, we've disclosed the

22   information, the defense can use it how they see fit.  We just

23   wanted to let the Court know.

24           THE COURT:  Okay.

25           MR. DEVLIN-BROWN:  So, we obviously appreciate the

disclosure, and I don't know if you're set up yet, Mr. Barile,
but it might be helpful to put it on the screen.

          I don't know if we can get that on the screen or not.
But I think the significance is actually pretty important for
the defense.  And here's why, your Honor.  Much of the
government's case with respect to Gilbert Armenta is premised
on Gilbert Armenta, what the government would probably say is
circumstantial evidence of Gilbert Armenta keeping Mr. Scott in
the loop about various fraudulent or money laundering plans,
and part of their evidence to that, which they pushed to get in
actually over the defense objection, is Mr. Armenta's sending
Mr. Scott various pieces of information.  And you remember the
defense would sometimes put in information like, look, here is
a response that suggests they're not really getting along all
that well.

          But this is very significant.  Because, the original
letter to -- from the bank to Gilbert Armenta mentions the two
businesses, Fates and Zala, who actually had accounts closed
who had done work with Mr. Scott before.  And it appears at
minimum, that Gilbert Armenta or someone he was working with
altered the letter, added three other companies, they actually
altered the text at the bottom of the letter as well, and sent
that to Mr. Scott.

          So, I don't know exactly what to make of that yet
either.  But, there is certainly significance to the fact that

JBF3SCO1

1    it's not real.  And that Gilbert Armenta, alleged to be a

2    cooperating witness, I mean a co-conspirator with Mr. Scott,

3    sent him actually false information about that account.

4         In terms of what the defense would seek at this point,

5    again, because I think it's hard to know what to make of it.

6    But we're a day or two from the trial ending.  I would hope

7    that the government would be willing to stipulate to those

8    facts in terms of the contact with Sabadell Bank and they don't

9    have records of this letter or these accounts.  And then I

10   think we can go from there.  But I think having that would be

11   important.

12        MR. DiMASE:  We'll discuss appropriate stipulations

13   with the defense.  And obviously, the defendant is free to

14   attempt to call some witness from one of Mr. Armenta's

15   companies to testify if he would like.  But I don't think the

16   government is going to be able to stipulate to any facts beyond

17   what Sabadell Bank would say.

18        THE COURT:  Sure.

19        MR. DiMASE:  But we'll address that with

20   Mr. Devlin-Brown.

21        THE COURT:  Okay.  We have four minutes.  Anything

22   else?  And we still have Agent Kroll, correct, on the stand?

23        MR. FOLLY:  That's correct, your Honor.  I believe

24   someone is coming over to fix an issue with the monitors.  The

25   feed doesn't seem to be working.

JBF3SCO1

1          MS. STANLEY:  Nor on this side.

2          MR. FOLLY:  It is not the computer today.

3          THE COURT:  Your monitors?

4          MR. FOLLY:  I don't think any of them are working as

5     far as publishing exhibits right now.

6          THE COURT:  Someone is coming when?

7          MR. FOLLY:  Ms. Rivera indicated someone was coming

8     over.

9          (Recess)

10         THE COURT:  Okay.  Can we get Mr. Kroll.

11         MR. DiMASE:  Yes.

12         THE COURT:  The government has more witnesses,

13    correct?

14         MR. FOLLY:  Yes, your Honor.

15         (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  Good morning, everyone.  Please be seated.

3           Ladies and gentlemen, good morning.  I trust you all

4   had a pleasant evening, and some of you will be happy to know

5   we've finally gotten it to a temperature that makes me

6   uncomfortably warm, but these are the sacrifices that I make

7   for you.

8           We can now continue with the cross-examination of

9   Agent Kroll.

10          Agent Kroll, you are reminded that you are still under

11  oath.

12          THE WITNESS:  I understand.

13          MR. GARVIN:  Good morning, counsel.  Good morning,

14  your Honor.

15          THE COURT:  Good morning.

16          MR. GARVIN:  Good morning ladies and gentlemen.

17   NICHOLAS KROLL,

18        called as a witness by the Government,

19        having been previously sworn, testified as follows:

20  CROSS-EXAMINATION

21  BY MR. GARVIN:

22  Q.  Good morning, sir.

23  A.  Good morning.

24  Q.  I'd like to pick up if we could by talking about

25  Government's Exhibit 1004.

JBF3SCO1                          Kroll – Cross

1           If Mr. Barile would be kind enough to pull it up.

2           This is one of the documents that's in the timeline

3    that is Government's Exhibit 2701, correct?

4    A.  Yes.

5    Q.  And it is one of the documents that actually starts the

6    timeline, correct?

7    A.  I believe so, yes.

8    Q.  If you would be kind enough to enlarge the top portion,

9    sir.  We see that this is from Gilbert Armenta, correct?

10   A.  Correct.

11   Q.  And it's dated September 30, 2015, to MarkScott@LockeLord

12   and Ruja Ignatova at a OneCoin e-mail address.  Correct?

13   A.  Correct.

14   Q.  Now, sir, when you were putting this together, you stated

15   that you were provided the information by government's counsel,

16   correct?

17   A.  Correct.

18   Q.  In part.  There may have been agents also, correct?

19   A.  That's correct.

20   Q.  And, we're starting the timeline with 2015.  But, this

21   would show that Mark Scott is working at Locke Lord at the

22   time, correct?

23   A.  Judging by the e-mail address, you can make that inference.

24   Q.  And the outline does not state when Mark Scott became a

25   lawyer, does it?

1    A.  No.

2    Q.  And it does not state how long he has been a lawyer,

3    correct?

4    A.  Correct.

5    Q.  And it does not show, when you look at 2701, that Mark

6    Scott's practice related to any specific area such as mergers

7    or acquisitions or any other type of reference, correct?

8    A.  I don't believe in the timeline.

9    Q.  So the person who is reading this, looks at this and there

10   is no background as to why is there a communication between

11   Gilbert Armenta and Mark Scott.  Correct?

12   A.  Correct.  This document starts the timeline.

13   Q.  And it also does not say what or who Gilbert Armenta is in

14   relation to Mark Scott and Locke Lord.  Correct?

15   A.  In this document?

16   Q.  Yes.

17   A.  No, sir.

18   Q.  Or in our timeline, 2701.  Correct?

19   A.  Perhaps in the underlying documents it may explain more.

20   But in the descriptions in the narrative field of the timeline,

21   it does not go into that detail.

22   Q.  So, the reader of 2701 doesn't know whether or not Gilbert

23   Armenta is a longtime client of Mark Scott's, for instance;

24   isn't that correct?

25   A.  That's correct.

JBF3SCO1                         Kroll - Cross

1    Q.  And it does not know whether or not they had worked on

2    large transactions in the past, correct?

3    A.  Yes.

4    Q.  Now, you advised us that you've started the timeline on

5    this date, but when you read the particular document, it

6    appears clear on the face that this is an introduction via

7    e-mail, and that Mark Scott has never met Ruja Ignatova prior

8    to this date.  Isn't that true?

9    A.  Perhaps on its face, yes.

10              MR. GARVIN:  Mr. Barile, would you be kind enough to

11   take that down and put up Government's Exhibit 1005, sir.  And

12   would you be kind enough to enlarge the top portion, please.

13   Q.  We saw that the first e-mail was from September 30.  And

14   our second entry or our second e-mail now shows that Mr. Scott

15   responds and says hi to Ruja, and explains that he's on his way

16   to Germany, and he provides his cell phone number.

17              MR. GARVIN:  Would you kind be kind enough to take

18   that down, because I didn't realize the cell phone number was

19   there.  Thank you, Mr. Barile.

20              MR. FOLLY:  Can we just take this down for a moment?

21              THE COURT:  It is down.

22              MR. GARVIN:  Your Honor, at this time we would move

23   into evidence Government's Exhibit 105.

24              THE COURT:  1005?

25              MR. GARVIN:  Yes, I'm sorry.

1          MR. FOLLY:  Your Honor, can we just have a moment to

2     review it.

3          THE COURT:  Sure.  Did you take it down, Mr. Barile?

4          MR. FOLLY:  No objection, your Honor.

5          THE COURT:  1005 will be received.

6          (Government's Exhibit 1005 received in evidence)

7          THE COURT:  Do you have a defense number?

8          MR. GARVIN:  Your Honor, we would number it Defense

9     Exhibit 900 to prevent confusion.

10          THE COURT:  Okay.

11    Q.  Sir, you have it back up in front of you, the exhibit?

12    A.  I see 1005.

13    Q.  Okay.  That's all I wanted to ask.  All right, so it

14    appears that he responded, meaning Mr. Mark Scott, to the

15    introduction by Gilbert Armenta.  Is that correct?

16    A.  Correct.

17    Q.  And he stated at that time that he was on his way to

18    Germany, but that they could talk on Sunday.  Correct?

19    A.  Asking if they could speak on Sunday, yes.

20    Q.  All right.

21          MR. GARVIN:  May we take that down, sir, and put up

22    1006.  If you could please enlarge the top, sir.  Thank you.

23    Q.  You made reference to this during your direct examination

24    yesterday.  This is Government's Exhibit 1006, right?

25    A.  Correct.

JBF3SCO1                      Kroll - Cross

1   Q.  It is actually the second entry on your exhibit list?

2   A.  Correct.

3   Q.  It's described as "Scott meeting invitation re Ignatov TC

4   to discuss money transfer/laundering issues."  Is that

5   accurate?

6   A.  Correct.

7   Q.  Now, sir, it would be fair to say that Mark Scott has not

8   spoken with Ruja Ignatova; isn't that right?

9   A.  I can't make that assumption.

10  Q.  Well, you did see the introduction from Exhibit 104, right?

11  A.  What appeared to be an introduction, yes.

12  Q.  1004.  And did you see Mark Scott's response in 1005,

13  right?

14  A.  Correct.

15  Q.  And now you see that he's placed in the calendar that he's

16  going to have a TC.  Do you understand that to be shorthand for

17  telephone call?

18  A.  It may be.

19  Q.  And that he's going to have a telephone call with Ruja

20  Ignatova, that's put into his calendar starting Sunday at

21  8:30 p.m. and ending anticipated at 9 p.m.  You see that,

22  right?

23  A.  Yes, sir.

24  Q.  That is consistent with 1005, that we just saw, that said

25  let's try to talk on Sunday, right?

JBF3SCO1                    Kroll - Cross

1    A.  Yes.

2    Q.  And it's consistent with 104, because when we look at 104,

3    it makes a reference that it was Wednesday, and it was

4    September 30, so, that would make the 3rd, which is 1005,

5    Saturday, and this would be the 4th, which would be Sunday.  So

6    it's right chronologically; isn't that correct?

7    A.  Correct.

8    Q.  Let's look at the words "telephone call to discuss money

9    transfer/laundering issues."  At this point in time, all we

10   know is that Mark Scott is a lawyer at Locke Lord, correct?

11   A.  Judging by his e-mail address, it's a Locke Lord e-mail

12   address.

13   Q.  And based on the e-mails that we see, he has never met face

14   to face Ruja Ignatova, correct?

15   A.  Again, I can't make that assumption.

16   Q.  Well, the e-mails say that Mark Scott's on his way to

17   Germany, do they not?

18   A.  Yes.

19   Q.  Sir, when you see this, would you agree that it would be

20   reasonable to -- let's say it would be reasonable to interpret

21   this shorthand as meaning that these are legal matters that a

22   lawyer plans on discussing with a future client?

23   A.  I can't make that assumption.  I could judge from the Locke

24   Lord e-mail address just that he may or may not work for Locke

25   Lord.

JBF3SCO1                        Kroll - Cross

1  Q.  Would it be fair to -- would it be consistent with your

2  common sense, and your training as a special agent, that

3  somebody that you never knew, that you just got introduced by

4  e-mail two or three days earlier, that a lawyer would be having

5  a conference and place it into his calendar, saying that

6  they're going to discuss money laundering in an improper way?

7  A.  I'm afraid I can't make that assumption.

8  Q.  Well, let's go to where it says "location firm BD."

9            Sir, do you understand that lawyers are required to

10  keep their time on time sheets when they work in a major law

11  firm?

12  A.  It's best practice to do so.

13  Q.  And do you know that it's pretty tedious to always be

14  writing down every six minutes what is you are doing, so they

15  develop shorthand or abbreviations?

16  A.  It's likely.

17  Q.  So when you see things here like BD, you understand that to

18  mean business development?

19  A.  It could.

20  Q.  And business development means getting a new client.  You

21  understand that, right?

22  A.  It may.

23  Q.  And TC means telephone call.  Correct?

24  A.  In this instance it could.

25  Q.  There is nothing about this entry that would suggest that

JBF3SCO1                          Kroll - Cross

1    Mark Scott was doing anything improper, other than being a

2    lawyer; is that right?

3    A.  On its face, it says what it says.

4    Q.  Thank you, sir.

5              MR. GARVIN:  Mr. Barile, if you would be kind enough

6    to put up Government's Exhibit 101.  I believe it's already in

7    evidence.

8    Q.  Sir, do you see the picture on the screen now?

9    A.  I do.

10   Q.  Do you recognize that as Ruja Ignatova, the founder of

11   OneCoin?

12   A.  I do.

13   Q.  Your timeline, does it state when Ruja Ignatova founded

14   OneCoin?

15   A.  With respect, counsel, I reviewed hundreds of documents in

16   this review, so I'm not certain it explicitly stated that.

17   Q.  Is there an entry at all showing when OneCoin began the

18   multilevel marketing strategy?

19   A.  Again, I would have to revert to my previous comment.

20   Q.  You have made reference in your timeline to a great deal of

21   money and its movement, correct?

22   A.  Yes.

23   Q.  And there are underlying documents in the form of bank

24   records that support that, correct?

25   A.  Correct.

1    Q.  Does your timeline reflect the gross sales during this

2    period of time of OneCoin?

3    A.  I'm not certain if they do.

4    Q.  Did you see anything in all those bank records that were

5    given to you that showed that the gross sales of OneCoin,

6    cumulatively, were in excess of $4 billion?

7    A.  The scope of my review is relatively narrow, so, it could

8    have been within the substance of those documents, but that was

9    not part of my review.

10            MR. GARVIN:  All right.  Could we please, Mr. Barile,

11   can we please take that down and put up Government's Exhibit

12   1012.  Could you please enlarge the bottom portion.  The bottom

13   half.  Thank you.

14   Q.  Sir, you see on December 9, you made reference to this

15   exhibit on direct examination, but Mr. Scott is writing to Ruja

16   Ignatova on December 9; is that correct?

17   A.  It appears so, yes.

18   Q.  Now, I want to talk about Ruja Ignatova and the amount of

19   money that she has made with OneCoin.

20            Is it common that people who have -- I would say huge

21   amounts of money, the über wealthy amongst us, do those people

22   often have security concerns?

23   A.  I would have to assume that's a possibility.

24   Q.  And for instance, are those types of people, do they have a

25   potential or possibility of being targets of kidnapping, for

JBF3SCO1                          Kroll - Cross

1    example?

2    A.   They may.

3    Q.   And in addition to that, is it also widely recognized that

4    people can hack, meaning computer hackers, can cause problems

5    for people who are very wealthy, like trying to get into their

6    computers to get their banking information?

7    A.   Hackers can cause issues to anyone of any wealth.

8    Q.   Okay.  So, is it common that people that have those

9    concerns are very motivated to have the best security possible?

10   A.   Sure.

11   Q.   And this is something that is just widely recognized; is

12   isn't that true?  It's common sense, right?

13   A.   You can make that assumption, sure.

14   Q.   All right.  So let's go back to our exhibit, and it says

15   "How is today for our call?  I had on my calendar that you may

16   be with Gilbert today.  In the meanwhile, I would need a list

17   of how exactly your material assets are each held and have some

18   more questions.  I am looking for bank accounts, IP," do you

19   understand that to be lawyer's abbreviation for intellectual

20   property?

21   A.   It could be.

22   Q.   "Real estate including leases.  Where are key employees

23   paid from?  Where do you interface with the internet?

24   Jurisdiction of key employees and board members."

25            Do you see that, sir?

1     A.   Yes.

2     Q.   That information, are you familiar with the work of a

3     person who is doing trust work, that is legal work that's

4     called trust?  Do you understand what I'm saying?

5     A.   I'm not -- I understand what you are saying, but I am not

6     intimately familiar with the work that's done for trust.

7     Q.   Well, do persons who have extraordinary wealth often do

8     estate planning and corporate planning by using trusts?  Isn't

9     that true?

10    A.   They may.

11    Q.   Is it also true that one of the advantages of using a trust

12    is that it permits anonymity.  In plain words, the person who

13    is wealthy does not have to put his name on the trust.  You

14    understand that, right?

15    A.   Again, I'm not familiar.

16    Q.   Well, when you look through these documents, weren't there

17    references that Scott, Mark Scott, was working on a trust?

18    A.   Yes.

19    Q.   And he's working on a trust and he has to have some basic

20    information to work on the trust.  Isn't that true?

21    A.   I've seen that in the documents, yes.

22    Q.   And part of the information that's being asked now are

23    those things that we just read.  Isn't that true?

24    A.   This is what's being asked, yes.

25    Q.   Now, does your timeline show where Robert Courtneidge is

1   introduced to Ruja?

2   A.  An exact point in time, I'm not certain.

3   Q.  And you understood that Robert Courtneidge also was

4   associated with the law firm of Locke Lord?

5   A.  He may have been.

6   Q.  Well, the documents that you've included in your timeline

7   say that, don't they?

8   A.  It would suggest so, yes.

9   Q.  And isn't it also true that Ruja Ignatova flatout tells

10  Mark Scott, listen, you're going to do the legal corporate

11  structure and Robert's going to do whatever I need done with my

12  cryptocurrency business.  Isn't that true?

13          MR. FOLLY:  Objection.

14          THE COURT:  Overruled.

15  A.  There may have been e-mails where that type of thing is

16  discussed.

17          MR. GARVIN:  Would you be kind enough to move up,

18  Mr. Barile, on the same document.

19  Q.  Now it says "I figured she would bring it to me in FFM or

20  send via fax.  She and I spoke about security issues."

21          Now, sir, when you're talking about security issues,

22  isn't part of security issues that you don't want someone who

23  is unauthorized, like a hacker, to have your confidential bank

24  information.  Isn't that true?

25  A.  Security issues can mean different things depending on the

JBF3SCO1                          Kroll - Cross

1    circumstance.

2    Q.  Well, below, you have Gilbert Armenta saying "Don't have

3    her send any bank or cash information to e-mail, all

4    discoverable."

5           The last thing that you would want is a hacker to

6    discover your banking information, including the amounts in

7    your account, and the account numbers, correct?

8    A.  I'm not certain if it would be the last thing you want.

9    But, you wouldn't want a hacker to have any of your

10   information.

11          MR. GARVIN:  Thank you, sir.  You may take that down,

12   please.  Could you please now put up 1022, sir.  Enlarge the

13   top.

14   Q.  So now we have something at the top from Mark Scott, and

15   we're now at the end of January, correct, sir?

16   A.  Yes.

17   Q.  And it says "Can we connect on Ruja please?  Would like to

18   start."

19          Would you agree, sir, that that suggests that Mark

20   Scott had now, in the end of January, hasn't even started his

21   representation of Ruja Ignatova?

22   A.  I can't make that assumption that he started anything.

23   Q.  You included several payments to Mark Scott.  Did you see

24   any payments that were made before January 29, 2016?

25   A.  May I review it?

1   Q.  Certainly.

2   A.  Not in the timeline.

3   Q.  Would that suggest to you, sir, that he had not been

4   retained yet?

5   A.  I can't make that assumption.

6            MR. GARVIN:  Can we please scroll down on this

7   particular exhibit.  Thank you.  We can take it down.

8            Mr. Barile, can we please have 1025 placed on the

9   screen.

10  Q.  Sir, you read this yesterday during direct examination,

11  correct?

12  A.  Yes.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

JBF7SCO2                        Kroll - cross

1    BY MR. GARVIN:

2    Q.  And Ruja Ignatova two days later answers Mark Scott saying

3    that the time is ticking, she wants to know what are the next

4    steps and how can we move, please.  If WE want to meet, I'm in

5    London from 5.2 through 15.2.

6              Do you understand that to be February 5 through

7    February 15, sir?

8    A.  It would appear so.

9    Q.  So would it be fair to say that Ruja Ignatova now is at the

10   very end of January and she is stating how can we move, please.

11   Is that right?

12   A.  Yes.

13   Q.  Would you be kind enough to take that down.  I would like

14   to talk about secure telephone communications.  You have

15   included in your timeline several references to K phones or

16   Krypto phones as they're commonly referred to, but these are

17   secure telephone devices; is that correct?

18   A.  Yes.

19   Q.  And they're supposed to -- unlike a cell phone, which is

20   easily hacked into, these telephones are supposed to be more

21   difficult to hack into; isn't that correct?

22   A.  You keep referring to hacking, but correct.

23   Q.  In this case I'm saying someone hacking into -- if there is

24   someone unauthorized who figures out electronically how to get

25   into either your computer or your telephone, right?

1    A.  OK.

2    Q.  Now, sir, now we are into February of 2016.  There is a

3    reference subject re:  AW:  Phones.  And the statement says,

4    "Keep at 10 a.m.  Let's not mess up her entire day.  I can

5    discuss remainder once we get crypto cell going.  Smiley

6    face."  Do you see that?

7    A.  Yes.

8    Q.  Now, does that suggest to you, sir, that the crypto cell

9    phone had not been used up to that point?

10   A.  I can't assume that it hasn't been used prior.

11   Q.  Well, how do you interpret, sir, the statement "I can

12   discuss remainder once we get crypto cell going?"

13   A.  Sure, if I was to draw an inference, I would say so, yes.

14   Q.  Now, what inference do you draw from someone placing a

15   smiley face at the end of a statement?

16   A.  There could be many varied reasons someone would do so.

17   Q.  Well, would one of those reasons be that it's what someone

18   would call tongue in cheek, or it's someone not taking the

19   statement as seriously as it might sound?

20   A.  I personally don't use smiley faces.  It could be used I'm

21   sure a number of ways.

22   Q.  You wrote that to me with a smiley face.  OK, fair enough.

23        So, we will please take that down:  And if we could

24   please place up Government Exhibit 1037.

25        All right.  In this particular e-mail -- which is now

1    the middle of February, subject is Passp copy.  Do you

2    understand that to be passport copy?

3    A.   It likely means passport, yes.

4    Q.   OK.  And Mr. Scott writes, "This looks good.  Will you send

5    a new phone so I can start speaking with Ruja directly.  Will

6    need more and more contact over the next month."

7            Sir, on the plain meaning of this e-mail, does it

8    appear that Mr. Scott has not started speaking with Ruja

9    directly on one of these secure phones?

10   A.   I can't make that assumption.  It says a new phone, so it

11   may not make reference to a previous phone of that nature.

12   Q.   Is there anything in Government Exhibit 2701 that would

13   suggest that there was a previous phone?

14   A.   In the timeline?

15   Q.   Yes.

16   A.   Again, there may have been.  I'm not certain.

17   Q.   Would you be kind enough to bring down and place up 1056-T.

18           MR. FOLLY:  Your Honor, if we could just have a

19   moment.  I don't think this is in evidence.

20           THE COURT:  OK.

21           MR. FOLLY:  No objection, your Honor.

22           THE COURT:  Very well.  Do you have a number for that,

23   Mr. Garvin?

24           MR. GARVIN:  Yes, your Honor, I believe the last one

25   was 800.  This one would be 801.

JBF7SCO2                          Kroll - cross

 1                THE COURT:  900.

 2                MR. GARVIN:  Then 901.

 3                (Defendant's Exhibit 901 received in evidence0

 4   Q.  OK.  This is an e-mail back and forth between Ruja Ignatova

 5   and Mark Scott.  Do you see that, sir?

 6   A.  Yes.

 7   Q.  And in the middle --

 8                If we could please enlarge the portion in the center

 9   section.  Thank you.

10                In the middle there is a discussion as to a person

11   named G.  Do you see that, sir?

12   A.  Yes, it appears to be an individual.

13   Q.  And did you understand that that is an abbreviation for

14   Gilbert, meaning Gilbert Armenta?

15   A.  It may be.

16   Q.  And, sir, if we could, let me read this to you.

17   "Understood.  We will discuss this all personally by phone.  We

18   agree with G that he holds the money for us in the interim.

19   That's all.  We do not have joint projects -- I have some

20   Mastercards with him.  I do not believe that he and I would

21   invest well together -- personality clash.

22                "I thought he uses some of our money -- he has quite a

23   lot of our money.  More than 150 and I told him that I will get

24   it home over the next months.  Thanks for your trust.  R."

25                Now, sir, doesn't it say in the document that the 150

JBF7SCO2                        Kroll - cross

```
 1   is being held by Gilbert and it is what Ruja Ignatova describes

 2   as our money?  Isn't that true?

 3   A.  It appears on its face that this is being held by G, yes.

 4   Q.  And did you understand that 150 means $150 million?

 5   A.  I couldn't make that assumption.

 6   Q.  Now, when you see references --

 7           Well, thank you.  We can take that down, please.  OK.

 8   So let's go to the top third portion.

 9           "Great.  We talk Friday.  And thanks for your

10   patients.  But we do have to do it right ..."

11           Now, is it fair to say that Mark Scott is writing to

12   Dr. Ruja Ignatova and he is telling her that what they're going

13   to be doing has to be done right?

14   A.  That's what it says.

15   Q.  He also tells her, "Notify G slowly when you want your

16   monies.  He is just undertaking numerous transactions and I

17   don't want to participate in it non-voluntarily.  Your company

18   and banking structure is nearly finished."

19           Does that tell you, sir, that Mark Scott is working on

20   corporate and banking structures for Ruja Ignatova?

21   A.  Company and banking structure.  It doesn't necessarily say

22   that he is working on it, but it does mention that it is nearly

23   finished.

24   Q.  So you're saying it may not be him that's working on it,

25   but somebody is working on it and it's nearly finished,
```

JBF7SCO2                        Kroll - cross

1    correct?

2    A.  On its face that's what this e-mail suggests.

3    Q.  Well, let's read on.  "We now have to deal with your trust

4    so that we can transfer to it the ownership of the island

5    registered fund after formation."

6           Is this one of the documents that refer to the fact

7    that Mr. Scott is working on a trust for Ruja Ignatova?

8    A.  It may.

9    Q.  Well, the words "your trust" are a hint, right?

10   A.  Your trust can be interpreted as your personal trust or the

11   trust itself, the actual entity of the trust.

12   Q.  "We have to meet for this purpose.  We will discuss it.  Do

13   you have a crypto number?"

14          We are now in March and Mark Scott is asking Ruja

15   Ignatova if she has a crypto number; is that correct?

16   A.  Yes.

17   Q.  Thank you, sir.  If we can please take that down, sir.

18   Please revisit Government Exhibit 1012 for one moment.  Thank

19   you, sir.  We can take that down.

20          If we can please now go to 1038.  This is another

21   e-mail that says. "Wheels are in motion on structure.  Should

22   have solid results later next week.  When back from Asia?"

23          Do you see that, sir?

24   A.  Yes.

25   Q.  You can take that down, Mr. Barile.  Please put up 1040.

1    If you could please enlarge the bottom portion.

2              All right.  It says, "Hi Ruja.  New developments."

3              Do you see that?

4    A.  Yes.

5    Q.  It says, "Speaking to attorneys in all relevant countries,

6    I can get the basic structure for transfers and signing

7    authority in place for within 8 business days."

8              Is that correct?

9    A.  That's what it says, correct.

10   Q.  "With that you can sign contracts, hire agents, etcetera

11   ..."

12             Now, does this statement still relate to the structure

13   that had been previously discussed?

14   A.  It may.  I can't draw that conclusion.

15   Q.  "The remainder for production and autonomy will be 4-6

16   weeks.  This will afford you with complete privacy, but needs

17   an additional layer with admin etcetera will cost a material

18   amount.  Much less" -- it appears to have been cut off.

19   Correct?

20   A.  Correct.

21   Q.  Now Mark Scott says, "when transferring funds going

22   forward, I will need to know name of account holder and where

23   the funds originate."

24             Do you see that, sir?

25   A.  Yes.

JBF7SCO2                         Kroll - cross

1    Q.   Now, he is writing this to Ruja Ignatova, correct?

2    A.   Yes.

3    Q.   Do you know what other places funds may originate from

4    other than Ruja Ignatova?

5    A.   I do not know.

6    Q.   In other words, when you put together your timeline, did

7    you question why is he asking Ruja Ignatova where do the funds

8    originate?

9    A.   No.

10   Q.   "We can communicate that via fax or K. phone."

11           Now, when you avoid an e-mail and you send by fax,

12   isn't it generally known that fax machines are much more

13   difficult to hack into than an e-mail or a computer?

14   A.   Sorry.  Fax machines are more difficult to hack into than

15   e-mail or computer?

16   Q.   Yes, more difficult.

17   A.   I'm not certain, but I would assume so.

18   Q.   Well, doesn't the United States government, in particular

19   the Internal Revenue Service, refuse to accept e-mails; they

20   have to be faxed because people are sending in their Social

21   Security number on tax returns and tax matters?  Isn't that

22   true?

23   A.   That's possible.  I'm not familiar with the IRS practices.

24   Q.   There is nothing improper with wanting to go keep the

25   amount of money you have and bank account numbers confidential,

JBF7SCO2                          Kroll - cross

1    is there?

2    A.  Nothing improper about that.

3    Q.  Let's move on.  "Each party will have to sign a

4    subscription agreement to the investment fund and provide some

5    KYC.  Will be simple process."

6           At this point did you understand that Mr. Scott is

7    telling Ruja Ignatova that each person that invests in the

8    private equity fund is going to have to sign a subscription

9    agreement and provide "know your customer" supporting

10   documentation?  Isn't that right?

11   A.  I'm not certain if it's each party that invests in it, but,

12   yes, it would suggest the latter part of that.

13   Q.  Well, sir, does it make any sense to have somebody sign the

14   subscription agreement and provide KYC if they're not going to

15   place funds in an investment fund?

16   A.  No.

17   Q.  OK.  Thank you, sir.

18          We can take that down.  If we could please put up

19   1043-T.

20          Now, we have a question asked by Mark Scott to Ruja

21   Ignatova that says, "I will send you the preliminary agreement

22   as soon as it's done.  And then mini KYC.  Does all of the

23   money originate from one company or several or private?"

24          Do you see that, sir?

25   A.  Yes.

1   Q.  Now, let's look at the subject.  It says "Re:

2   Attorney/Client Privileged Communication.

3        Do you see that?

4   A.  Yes.

5   Q.  So does that indicate to you that Mark Scott writing this

6   has designated it as a legal document between a lawyer and his

7   client?

8   A.  How he designates it I can't assume, but it is in fact the

9   subject of the e-mail.

10  Q.  I'm sorry?

11  A.  It is in fact the subject of the e-mail.

12  Q.  Right, the attorney/client privileged communication.

13  A.  Yes.

14  Q.  Is it also clear that Mr. Scott is once again asking where

15  does all of the money originate from?  He says does all the

16  money originate from one company or several or private.  Do you

17  see that?

18  A.  Yes.

19  Q.  So once again he is asking about the source of funds,

20  right?

21  A.  Yes.

22  Q.  And did you interpret private to mean individually as

23  opposed to in the form of an entity?

24  A.  It appears so.

25  Q.  If we could please put up Government Exhibit 1048.  If you

1   could please enlarge the top third.

2           There was some discussion about this yesterday.  This

3   particular bank is FirstCaribbean International Bank; is that

4   correct?  Do you recall that?

5   A.  Where are you referencing, sir?

6   Q.  Yes, the first sentence, sir.  I'm sorry, I should have

7   tried to guide you.

8   A.  Yes.

9   Q.  I apologize.  "I have attached the completed corporate

10  questionnaire from FirstCaribbean International Bank and am

11  also providing for your and their benefit the following KYC

12  materials."  And Mr. Scott lists quite a few things afterwards.

13  Do you see that?

14  A.  That's correct.

15  Q.  If we could please go to page 2.  All right.  And you will

16  remember, I hope, that there was some issues about this

17  document.

18          In particular, if we can enlarge the middle.

19          The statement says, "The purpose of the business is to

20  establish and manage a family office for a few select existing

21  clients of mine.  I have been a private equity and mergers and

22  acquisitions attorney..."

23          Do you remember earlier, sir, I asked you if there was

24  anything in the timeline that would show that Mr. Scott was in

25  private equity mergers and acquisitions?  Does this refresh

1    your memory, sir?

2    A.  Yes.

3    Q.  OK.  Let me read on.  "I have been a private equity and

4    mergers and acquisitions attorney for more than 20 years and a

5    few of my major clients have asked me to work for them

6    personally now to consult them on investments.  The BVI is tax

7    advantageous to all of the investors and none of them has a

8    connection to the United States.  I am the only party with tax

9    reporting requirements on my earned fees in the U.S.  Further,

10   the investment focus will be in Europe and the BVI is

11   recognized as a transparent and regulated jurisdiction, which

12   will make conducting business easier."

13            Do you see, that sir?

14   A.  Yes.

15   Q.  And did you in fact find that Mr. Scott did file his tax

16   returns for these years that are in issue?

17   A.  It may be within the documents that were provided.

18   Q.  Sir, in preparing this document, 2701, have you seen the

19   tax returns that were filed by Mr. Scott?

20   A.  Again, there were hundreds of documents that were viewed.

21   I did see tax returns as part of some of the account set-ups

22   and the KYC, but to state for certain what's listed on those

23   tax returns, I can't say for sure.

24   Q.  Well, let me see if I can refresh your memory, if at all.

25   Let me give it one shot.  Did you see that Mr. Scott reported

1   millions and millions of dollars on his tax returns?

2   A.  I can't say for certain, no.  I apologize.

3   Q.  Did you see that he also reported as income the legal fees

4   that you have listed in 2701?

5   A.  Say again.  I'm sorry.

6   Q.  Yes.  You have listed in 2701 Mr. Scott receiving funds on

7   several occasions, correct?

8   A.  That's correct.

9   Q.  You're not telling the ladies and gentlemen of the jury

10  that Mr. Scott didn't report that on his tax return, are you?

11  A.  The scope of my review did not go into depth into the tax

12  returns.

13  Q.  OK.  But in fact you did see tax returns that were filed in

14  this case, correct?

15  A.  As I said before, I saw some tax returns in the account

16  opening documents and some of the KYC paperwork as well.

17  Q.  Mr. Barile, you can take that enlargement down and take us

18  back to the first page, please.  I'm sorry.  Can we go to the

19  second page, upper right-hand corner.  Yes, sir.  Thank you.

20          Sir, do you see this particular FirstCaribbean

21  International Bank is located in the British Virgin Islands,

22  Road Town?

23  A.  Yes.

24  Q.  Now, there were some issues discussed yesterday, and this

25  document I believe was included in your timeline, correct?

JBF7SCO2                          Kroll - cross

1   A.  I believe so.

2   Q.  Sir, isn't it a fact -- well, let me ask it a different

3   way.  Did you ever see a bank statement from FirstCaribbean

4   International British Virgin Islands?

5   A.  I can't recall.

6   Q.  Would it be fair to say that this bank account was never

7   opened at this bank in the British Virgin Islands?

8   A.  I can't say for certain.  If there is perhaps a document

9   that I can review, it might help.

10  Q.  There is a lack of documents.  You do understand that there

11  is a similarly named bank in the Cayman Islands, correct?

12  A.  Similarly named to what?

13  Q.  FirstCaribbean International Bank.

14  A.  I believe so.

15  Q.  But this application for this account never resulted in an

16  account being opened; did you know that?

17  A.  I don't believe that was part of my review.  I don't

18  recall.

19  Q.  But don't you feel that it would be important to know that

20  if the bank account was never opened using this application,

21  that would be something you would want to know, right?

22          MR. FOLLY:  Objection, your Honor.

23          THE COURT:  Overruled.

24  A.  It's not for me to want to know or not.  My part is very

25  objective.

JBF7SCO2                          Kroll - cross

1    Q.  OK.  So sitting here, as we sit here, we don't know one way

2    or the other whether this actually resulted in an account being

3    opened in the British Virgin Islands.

4    A.  I can't say for certain, no.

5    Q.  OK.  Thank you.  Fair enough.

6            Can you take that down and please go to Government

7    Exhibit 1055, and if we could please enlarge the top.

8            All right, we're in March 2016.  Again the subject is

9    listed as attorney/client privileged communication.  Do you see

10   that, sir?

11   A.  Yes.

12   Q.  And Mr. Scott says, "Hi Ruja.  For your information,

13   Gilbert asked me about your new structure."

14           Now, we have seen through other documents that

15   Mr. Scott -- or someone at Locke Lord -- is working on her

16   structure; is that correct?

17   A.  It would appear so.

18   Q.  "I gave nothing away, but stating that you will be

19   operating through Ireland mainly.  I am not sharing that you

20   will be banking off-shore and where.  He still thinks that you

21   need to make changes.  Trust me, you don't.  What I am creating

22   is best for you."

23           Is it fair to say that this would show -- or tends to

24   show -- that Mark Scott is keeping the information of his

25   client confidential from Gilbert Armenta even though Gilbert

JBF7SCO2                          Kroll - cross

1    Armenta was the one who introduced Ruja Ignatova?

2    A.  If you say so, yes.

3    Q.  And that would be the proper thing for a lawyer to do,

4    isn't it?

5    A.  Yes.

6    Q.  OK.  Can we please put up 1407, sir.

7         Yesterday there was some discussion about links and

8    articles written on family office.  Do you recall that, sir?

9    A.  Yes.

10   Q.  And the first one that was discussed was Government Exhibit

11   1407 from March of 2006, and we see that Mr. Scott is sending

12   himself an e-mail with this particular link; is that correct?

13   A.  Yes.

14   Q.  And let's talk about that for a second.  Family offices, in

15   particular, there is nothing wrong with that type of corporate

16   set-up, is there?

17   A.  As far as I know, no.

18   Q.  And lawyers, when they're asked to do something, there is

19   nothing wrong with them doing some research and double checking

20   if they don't do something routinely or regularly; isn't that

21   correct?

22   A.  Can you rephrase?

23   Q.  Yes.  There is nothing wrong with a lawyer doing research,

24   correct?

25   A.  Correct.

JBF7SCO2                         Kroll - cross

1   Q.  And in fact you would want a lawyer who does not have a

2   great deal of experience in something to do some research

3   before he set out to accomplish a project; isn't that true?

4   A.  That's true.

5   Q.  Could we please go to 1408.

6            1408 is another e-mail sent from Mark Scott to

7   himself, and the subject matter is alignment with L.P.s.

8            Did you understand L.P. to be limited partnerships?

9   A.  Most likely.

10            MR. GARVIN:  Your Honor, I have just been told that

11   this particular document was not moved in, so we would move it

12   in as Defendant's 902.

13            THE COURT:  Any objection?

14            MR. FOLLY:  No objection.

15            THE COURT:  902 will be received.

16            (Defendant's Exhibit 902 received in evidence)

17   Q.  You see on this particular document that the link goes

18   directly to Bain Capital Private Equity.  Is that right?

19   A.  Yes, the web address says so.

20   Q.  You know that Bain Capital is a well known business that

21   deals in the private equity circles; is that correct?

22   A.  I do know that, yes.

23   Q.  All right.  May we please go to the next exhibit number,

24   which is 1409, and if we could enlarge it.

25            And we would move 1409 into evidence as defendant's

1    next exhibit which I think is 903, your Honor.

2              THE COURT:  Any objection?

3              MR. FOLLY:  No objection.

4              THE COURT:  Defendant's 903 will be received.

5              (Defendant's Exhibit 903 received in evidence)

6    Q.  We see yet again Mr. Scott sending an e-mail to himself and

7    it attaches a link, and the subject matter is private equity;

8    is that correct?

9    A.  That's correct.

10   Q.  Now let's make it clear, private equity funds are

11   commonplace, correct?

12   A.  Commonplace is relative, but --

13   Q.  Well, there is a substantial portion of the financial

14   sector that deals in private equity funds; isn't that true?

15   A.  That's true.

16   Q.  I mean not too far from here we could walk to Wall Street

17   and there is a lot of people who work on private equity funds;

18   isn't that true?

19   A.  That's true.

20   Q.  And we have a situation here where the link is to

21   Blackstone, and anybody who does private equities knows that

22   they are one of the biggest and best; isn't that true?

23   A.  I can't say that anyone who works in private equity, but I

24   can attest to the fact that they are big, yes.

25   Q.  And there is nothing wrong with a lawyer doing research and

1   logging in to Black Stone.com to see if he can get any

2   pointers, to make sure that he is doing things properly and

3   right; isn't that true?

4   A.   There is nothing wrong with research.

5   Q.   We can take that down and put up 1410, please.

6           OK, sir.  This is the last one, but this is another

7   e-mail to Mark Scott, the subject "What is a family office?

8   What are its benefits?"  Do you see that?

9   A.   Yes.

10  Q.   Now, yesterday I believe that you showed the ladies and

11  gentlemen of the jury that Mr. Scott answered some questions --

12  questionnaires -- and that when describing the benefits of a

13  family office and the family office that he was proposing, he

14  literally took the language that he found from this website.

15  Isn't that correct?

16  A.   It appeared that there were some similarities, yes.

17  Q.   And there is nothing wrong with Mr. Scott researching,

18  finding out what the benefits are, and then repeating those

19  benefits as accurately as possible to the financial institution

20  that he is sending the answered questionnaire, is there?

21  A.   As you just said it, no, there is nothing wrong with that.

22  Q.   Now, even if he copied it word for word, if he believed

23  that those were the benefits, that's all that matters, isn't

24  it?  I mean we're not talking about, oh, this is some type of

25  copyright violation because he paraphrased the benefits of a

JBF7SCO2                         Kroll - cross

1   family office, are we?

2   A.  I'm not at liberty to say whether or not it was a copyright

3   infringement.

4   Q.  Thank you.  We can take that down.  If we could please put

5   up 1411.  If you would be kind enough to go to page 2.

6        Yesterday you were shown this document 1411-2, the

7   Fenero Equity Investments mission statement.  Do you recall?

8   A.  I recall.

9   Q.  Put up Government Exhibit 2201, page 7.  If we can enlarge

10  the top paragraph.

11       Now, this is from Government Exhibit 2201, page 7, and

12  it says that "The fund manager receives a (i) management fee of

13  one percent per deposit in the fund, (ii) one percent on the

14  average annual remaining cash balance of the fund and (iii) an

15  eight percent carried interest pari passu with the investors

16  upon any exit."  That would be a total of 10 percent, correct,

17  sir?

18  A.  Yes.

19  Q.  We can take that down, please.

20       Now, sir, in putting together Government Exhibit 2701,

21  and the movement of the funds, would it be accurate to say that

22  there was an excess of 350 million euros that were used to fund

23  the Fenero equity funds?  Isn't that correct?

24  A.  If that's in the timeline, yes.

25  Q.  And you would agree with me that 10 percent -- just simple

JBF7SCO2                        Kroll - cross

1   math -- of 350 million would be about 35 million, correct?

2   A.  Correct.

3   Q.  And that as the manager of the fund, if that written

4   document was accepted by the investors, that Mr. Scott would

5   have earned through the life of these particular funds a

6   minimum of $35 million, correct?

7   A.  Contingent on the language of the agreement.

8   Q.  And it is pretty well recognized that those percentages are

9   not out of line; isn't that true?

10  A.  I am not familiar with the industry.

11  Q.  And isn't it also true that Mr. Scott reported every penny

12  on his tax returns that he filed here in the United States?

13  A.  I can't say for certain.

14  Q.  If we could please put 2701, the actual timeline, up.

15  3/10/2016.  Thank you.

16         You have placed in your timeline "Scott receives

17  $149,980."  What really appears to have happened here is it's

18  $150,000, but there is a $20 runner wire fee somewhere along

19  the line, correct?

20  A.  That could very well be.

21  Q.  And when you look at all your numbers throughout, you will

22  see, as we look at them, that they are always a slight amount

23  off because the bank has made a charge; isn't that true?

24  A.  In many cases, yes.

25  Q.  All right.  So you did note that Mr. Scott received in

JBF7SCO2                          Kroll - cross

1    March $150,000, but isn't it also true that Mr. Scott was

2    acting as a lawyer for Ruja Ignatova for several months before

3    he received that money?

4    A.  It would appear so based on the e-mail chain.

5    Q.  Thank you, sir.

6            We can take that down.  Thank you.  If we could please

7    place up Government Exhibit 1118.  If you could please increase

8    the top third.

9            Sir, do you know who Max von Amim is?

10   A.  I do not.

11   Q.  And do you know what JV, joint venture, he is referring to?

12   A.  Not based on this document.

13   Q.  All right.  Take that down.

14           Government Exhibit 2701, did you have a reference to

15   the entity Apex and/or Paul Spendiff?

16   A.  There is an entity Apex that's referenced.

17   Q.  And can you please tell the ladies and gentlemen of the

18   jury the date and what do you describe it as?

19   A.  The date that it's first referenced, sir?

20   Q.  Yes.

21           THE COURT:  Can you help him out, Mr. Garvin?

22           MR. GARVIN:  Yes.  The dates Apex would be between

23   June and August 2016.

24   Q.  Let me ask a question so we can move it forward.  Isn't it

25   fair to say that there is no entry on your timeline regarding

JBF7SCO2                          Kroll - cross

1  |  the Madagascar -- the loan that was being made by the Fenero
2  |  Equity Fund of $30 million?  Would it be fair to say that?
3  |  A.  Say that again.  I'm sorry.
4  |  Q.  Yes.  Let me rephrase.  During the summer of 2016 you
5  |  understood that Apex was appointed by Mr. Scott as a fund
6  |  manager for the Fenero Equity Investment Funds, correct?
7  |  A.  I believe so.
8  |  Q.  OK.  And during the summer of 2006 the Fund, Fenero Fund,
9  |  was approached to make a large loan to an entity called
10 |  Cryptoreal; isn't that correct?
11 |  A.  It may have been, if there is a document to refresh my
12 |  recollection.
13 |  Q.  Sir, what I am trying to point out is you do not have an
14 |  entry on the timeline relating to this transaction; isn't that
15 |  true?
16 |  A.  What would be the date of that transaction, sir?
17 |  Q.  July or August of 2016.  Apex was fired on August 10, 2016,
18 |  so it is unlikely it would be after that date, sir.  You have
19 |  here August 10, 2016 Scott sends letter terminating engagement
20 |  to Paul Spendiff at Apex Fund Services.  Listed as the letter
21 |  for that is Exhibit 2288.  Does that refresh your memory sir?
22 |  A.  OK.
23 |  Q.  What I'm trying to ask you about is before those services
24 |  were terminated, isn't it a fact that there was a $30 million
25 |  loan that went from the Fenero Fund to Cryptoreal, who was

JBF7SCO2                          Kroll – cross

1    buying an oil field in Madagascar from an entity called Barta

2    Holdings?

3    A.   It's very possible.  If there is a document that reflects

4    that, I would appreciate seeing it.

5    Q.   OK.  You were provided documents to make this timeline,

6    right?

7    A.   I was, yes.

8    Q.   And there is no reference to lead the ladies and gentlemen

9    of the jury to the fact that this loan took place, correct?

10   A.   If it's not in the timeline, then no.

11   Q.   In fact, the timeline does not have the business

12   transactions that the funds entered into, does it?

13   A.   Which funds, sir?

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1   Q.   The Fenero Fund?

2   A.   The business transactions may be on the list of

3   transactions.

4   Q.   Well, I'm giving an example.  The first transaction that

5   we're talking about is the loan.  Perhaps this will refresh

6   your memory.

7           The seller of the oil field was Dr. Hui and --

8           MR. FOLLY:  Your Honor, may we approach and have a

9   sidebar?

10          THE COURT:  Why don't we take our first break.  It's

11  almost 11 o'clock.  15 minutes.  Please do not discuss the

12  case.

13           (Jury excused)

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Yes, sir, Mr. Folly.

2          MR. FOLLY:  Yes, your Honor.  I am just going to wait

3     for the witness to exit.

4          Your Honor, the last 15 to 20 minutes of

5     cross-examination has been entirely inappropriate.  This

6     witnesses had no involvement in this case beyond constructing

7     this timeline.  He has reviewed documents that relate to this

8     timeline.  He has assisted in the creation of the timeline.

9          At this point, Mr. Garvin is essentially trying to

10    testify himself, by repeatedly making assertions and just

11    asking the witness isn't it true, isn't it true, isn't it true.

12         This is not a fact witness.  This witness did not have

13    any involvement in any of these transactions.  If Mr. Garvin

14    wants to direct him to a particular exhibit, and ask him

15    whether a particular document or e-mail reflects certain

16    information, he is free to do so.  But to continue to ask him

17    questions that suggest he has personal knowledge of anything

18    relevant to this case beyond the limited participation he had,

19    which was to create the timeline, and to do some screen grabs

20    of some web pages, it is entirely inappropriate.  And it's very

21    misleading to this jury to suggest that this witness has

22    personal knowledge of these events.  He doesn't.

23         There are documents which Mr. Garvin can refer him to.

24    And many times, your Honor, the questions relating to those

25    documents, again, have far exceeded this witness's personal

1    knowledge.  They're calling for speculation repeatedly.  And

2    that's just not an appropriate cross-examination of this

3    witness who on direct examination was very limited in his

4    testimony.  He testified he reviewed certain documents, he put

5    them on the timeline, and then we asked him to read them, and

6    that was the extent of it.

7              THE COURT:  I understand.

8              Mr. Garvin?

9              MR. GARVIN:  Yes, your Honor.  I have been working

10   through the exhibits, and I apologize, it's been a little bit

11   more tedious than I had hoped, but I've been trying to stick as

12   closely as possible to the exhibit numbers that they went over

13   yesterday, and the exhibit numbers that are listed in the

14   timeline, which is 2701.

15             Now, I do believe that it is also fair for

16   cross-examination to point out that there are key documents

17   that are not in this timeline at all.  And I think that it's

18   appropriate to determine if he knew about those documents, and

19   chose not to put them in his timeline, or if he simply didn't

20   know about the documents, I move on from there.  I accept his

21   answer.

22             But, I do believe that this timeline is skewed to make

23   Mr. Scott look as bad as possible.  It is the greatest hits of

24   the worst, and that it's fair to set the record straight that

25   there are other documents that are simply not included.

1     This Apex is the one that drew the objection.  They

2   have in their timeline list that Mark Scott terminated Apex and

3   Paul Spendiff.  But they did not put in that Apex authorized

4   $30 million to be transferred for a deal.  Now, it seems to me

5   that --

6          THE COURT:  I understand what's going on.  So, I think

7   it's appropriate for Mr. Garvin to impeach the timeline such as

8   it is.  I believe that the questions he's been asking can be

9   characterized as testifying.  The jury will be told that the

10  questions, and have been told and will be told again, that the

11  questions that lawyers ask are not evidence.  So, he's not --

12  so the jury will be so instructed.  So, I think this is

13  perfectly appropriate cross-examination.  As Mr. Garvin points

14  out, it is a little tedious, but so was the direct with respect

15  to this timeline.  It is what it is.  Anything else?

16         MR. GARVIN:  No, sir.

17         THE COURT:  Don't be late.

18         (Recess)

19         THE COURT:  Can we get the agent back in, please.  And

20  let's get the jury.

21         (Continued on next page)

22

23

24

25

1           (Jury present)

2                 THE COURT:  Mr. Garvin.

3                 MR. GARVIN:  Thank you, your Honor.

4     BY MR. GARVIN:

5     Q.  Sir, we were talking about Apex when we took our morning

6     break, so I'd like to go back to Apex.  We have located the

7     Apex entry that is on the timeline and it's dated August 10,

8     2016.  Is that correct, sir?

9     A.  Correct.

10    Q.  That actually is the date Mark Scott terminated Apex; isn't

11    that true?

12    A.  Yes.

13    Q.  But as we were discussing previously, the timeline is

14    missing at least what could be argued to be two important dates

15    in relation to Apex.  The first is a $30 million loan that Apex

16    approved.  Correct?

17    A.  That could have been.

18    Q.  Well, did anybody give you the documents on Apex that

19    showed that Apex had indeed approved a $30 million loan from

20    Fenero Funds to, as I said earlier, Cryptoreal?

21    A.  It must have been in that production.

22    Q.  And the other important date is there is no reference here

23    to the meeting that took place in Hong Kong between the seller

24    Dr. Hui and Neil Bush being on the board of directors or being

25    a personal friend of Mr. Hui, and Ruja Ignatova, is there?

1   A.  I can't say for certain that that was produced or not.

2   Q.  Well, if you would have been given a document with Neil

3   Bush, you would recognize that name as the son of a United

4   States president and a brother of a United States president.

5   You would have remembered that, right?

6   A.  If the name is Bush, I wouldn't have said that there was a

7   family relation per se.  It is the same name.

8   Q.  Ultimately, neither that meeting nor the $30 million loan

9   approved by Apex are on your timeline, correct?

10  A.  That's correct.

11  Q.  I want to talk a little bit about internet web articles,

12  because you talked a little bit about them yesterday.  Do you

13  recall that?

14  A.  Yes.

15          MR. GARVIN:  In particular, Mr. Barile, if you would

16  be nice enough to put up 4109, sir.  If you could please

17  enlarge the top.  Thank you, sir.

18  Q.  You discussed this particular e-mail yesterday, right?

19  A.  Yes.

20  Q.  And can you please read the subject line to the ladies and

21  gentlemen of the jury.

22  A.  "Media and false accusations."

23  Q.  So this is coming from Irina Dilkinska at OneCoin, correct?

24  A.  Correct.

25  Q.  And it's being written to Mark Scott Law, correct?

1    A.  Yes.

2    Q.  And the subject is "media and false accusations."  Now,

3    when you discussed this yesterday, you talked about the link

4    that was there.  Do you recall that?

5    A.  Yes.

6    Q.  Let's read the first sentence.  It says "Morning Mark.  In

7    the light of our conference call yesterday and further

8    discussions, please see the link above.  Let's discuss at your

9    earliest convenience because this guy is writing such stupid

10   things for a second time.  He is based in U.S."

11          From that sentence, it sounds like they had been

12   discussing this guy the day before.  Isn't that right?

13   A.  Possibly, yes.

14   Q.  Well, it says "In the light of our conference call

15   yesterday."  Right?

16   A.  Yeah.

17   Q.  Now, you know that one of the problems with the internet is

18   that you can write most anything on the internet, somebody

19   reads it, they might think it's true; isn't that true?

20   A.  Of course.

21   Q.  So, just because something gets on the internet, does not

22   necessarily mean that what the person placed on to the internet

23   is accurate.  Isn't that true?

24   A.  That's fair to say.

25   Q.  Isn't it also true that some people that get on the

1    internet, they have an agenda.  Isn't that true?

2    A.  There is a number of people that get on the internet.

3    Q.  Well, I want to talk about one specific person.  I want to

4    talk about the person who wrote the article that has that link.

5    Did you make any effort to find out who he was?

6    A.  No.

7    Q.  Would it surprise you if one of his e-mail addresses is

8    usebitcoins.info?

9    A.  Would it surprise me?

10   Q.  Yes.

11   A.  No.

12   Q.  Sitting here today, having placed this on your timeline,

13   did you make any effort to find out if the gentleman who wrote

14   that actually is affiliated with bitcoin, a perceived

15   competitor?

16   A.  I did not.

17           MR. GARVIN:  Could you please put 4109-A on the

18   screen.  Could you please enlarge the bottom portion where it

19   say "what is OneCoin."

20   Q.  Sir, this says "OneCoin is a proprietary digital currency

21   created by One Coin Limited, a Gibraltar based company."  Do

22   you know if that statement is true?

23   A.  No.

24   Q.  Do you know if OneCoin is or ever has been a Gibraltar

25   based company?

JBF3SCO3                           Kroll - Cross

1   A.  I don't know for certain.

2            MR. GARVIN:  Thank you.  You can take that down,

3   please.

4   Q.  Sir, you read yesterday that article.  Do you remember

5   literally the entire article was read yesterday?  Do you recall

6   that?

7   A.  Almost the entire article, yes.

8   Q.  It said a number of not so the pleasant things about

9   OneCoin; is that correct?

10  A.  That's safe to say.

11  Q.  But, in fairness, here in the United States, it's not what

12  somebody puts on the internet that determines whether something

13  is a proper business or a fraud, it's what a United States

14  court says; isn't that true?

15  A.  Well, it's definitely not up to the internet.  But --

16  Q.  There is nothing on your timeline that any United States

17  court had declared the business or the business model of

18  OneCoin to be improper or illegal.  Isn't that true?

19  A.  I don't believe that's included in the timeline.

20  Q.  And the reason why it's not on your timeline is because

21  that did not occur during this period of time.  Isn't that

22  true?

23  A.  The reason why it's not in the timeline is because it

24  wasn't in the scope of what was produced to me.

25  Q.  Well, if there had been a court that had made such a

JBF3SCO3                          Kroll - Cross

1    determination, you would have certainly included it in your

2    timeline, right?

3              MR. FOLLY:  Objection, your Honor.

4              THE COURT:  Sustained.

5              MR. GARVIN:  I'd like to please go to Exhibit 1110.

6    Thank you.  If you could please enlarge the top, sir.

7    Q.  You have an e-mail that you went over yesterday to David

8    Pike from Mark Scott in June of 2016, and he says "let's not

9    e-mail this stuff."  Do you see that?

10   A.  Yes.

11   Q.  What stuff was he referring to, sir?

12   A.  Can we expand this e-mail?

13   Q.  Certainly.  Absolutely.

14             MR. GARVIN:  Mr. Barile, if you could, please, enlarge

15   the bottom.

16   A.  So the stuff that's being referred to can be any number of

17   things that were discussed between those two parties.

18   Q.  Sir, would it be a more readily or less strained

19   interpretation to say that he's referring to confidential bank

20   information, including reference numbers, SWA numbers, dates

21   and amounts and some of the amounts are in excess of $100

22   million?

23   A.  I think that's safe to say.

24   Q.  And he's saying let's not be putting this stuff in an

25   e-mail, this is confidential bank information.  Isn't that

1    right?

2    A.  It appears to be confidential bank information.

3    Q.  Thank you, sir.  You can take that down, please.

4         In your timeline you made reference to Mark Scott

5    returning funds; isn't that correct?

6    A.  May I review?

7    Q.  Yes, sir.  I will try to assist on this if I can be of

8    help.  We're talking about Government Exhibits 810-A and

9    1705-A, the time period is approximately April through August

10   of 2017.  We can focus on the very first one, which would be

11   1702 B.

12        Mr. Barile, if you can please put that up.  Date

13   April 10, 2017.

14   A.  Okay.

15   Q.  Do you see this document, sir?

16   A.  I do see it.  It's very small on my screen.

17   Q.  Sorry.

18        On your timeline, is there a reference that there was

19   returned $185 million to Phoenix?

20   A.  Yes.  It just says returned.

21   Q.  This was going from Mr. Scott's funds and to Phoenix, which

22   he is not an authorized signature authority to.  Isn't that

23   correct?

24   A.  You said it's going from Mr. Scott's funds?

25   Q.  Yes.  The Fenero Funds?

1    A.  It's going from Fenero Securities Trading Limited.

2    Q.  Okay.  And in addition to those funds -- thank you, we can

3    take that down, please.  810-A on April 13, 2017.  Do you see

4    that?

5    A.  Yes.

6    Q.  How do you have that described?

7    A.  For April 13, 2017?

8    Q.  Yes.

9    A.  It's stated as "Fenero Equity Investments II LP at Deutsche

10   Bank Cayman Islands returns $9,990,110 to Fates Group account

11   at Global Bank of Commerce."

12   Q.  And did that close the account?

13   A.  Did that action in fact close the account?

14   Q.  I'm asking because on your entries -- if you would be kind

15   enough and perhaps, Mr. Barile, I think maybe the better way to

16   do this is to put up 2701, please, sir, and enlarge the portion

17   from 4/10 to 8/22 of 2017.  Thank you, sir.  Let's see if this

18   helps us a little bit.  Let's start at the top, sir.

19           You see 4/10/2017?

20   A.  Yes.

21   Q.  You've described that as the last transfer from Fenero

22   Securities Trading Limited account and then an account number,

23   correct?

24   A.  That's correct.

25   Q.  And that was at the Bank of Ireland, to Phoenix Fund, and

JBF3SCO3                          Kroll - Cross

1    that Phoenix Fund has a bank account in Dubai, and they sent

2    185 million over 11 separate wire transfers, right?

3    A.  Yes.

4    Q.  That was the last one, correct?  That's why it says last

5    transfer?

6    A.  Yes.

7    Q.  Now, the next entry is the one that we were just talking

8    about, Fenero Equity Investments II, and it is sending

9    9,990,110 to Fates Group.  Do you recognize that, sir, as a

10   refund of the exact same amount that Fates Group sent to the

11   Fenero Equity Investments II Fund?

12   A.  Is that referencing an earlier payment?

13   Q.  Yes.  Earlier there was a payment in, and now the exact

14   amount is getting paid back.

15   A.  I don't see that here.

16   Q.  All right.  You have several transfers after that, and each

17   one of them, you state that the Bank of Ireland account is

18   closed.  That would be on April 30, 2017, in Exhibit 1705-A.

19   Correct?

20   A.  I see that, yes.

21   Q.  You also have placed on your timeline on 6/21/2017 that

22   Fenero Securities Trading Limited at the Bank of Ireland was

23   closed.  Correct?

24   A.  Correct.

25   Q.  These are all voluntary closures by Mr. Scott.  He has

1    chosen to remove all the funds and close the account.  Correct?

2    A.  I can't say for certain if it was Mr. Scott making those

3    decisions.

4    Q.  Well, you have not seen any document from any of these

5    banks suggesting otherwise, have you?

6    A.  Neither for or against.  I can't say for sure.

7    Q.  Let's go to 7/14/2017, Fenero Equity Investments LP,

8    another account number, this time it's at DMS Bank and you also

9    wrote "closed."  Right?

10   A.  Yes.

11   Q.  Can we please notice that date is in 2017.  Correct?

12   A.  Yes.

13   Q.  Did you see any documentation from DMS Bank in 2016, or

14   excuse me, 2018?

15   A.  I don't believe so as part of the scope of my task.

16   Q.  If we can just transfer down slightly.  The last one is a

17   Fenero Financial Switzerland account at DMS Bank, also closed.

18   Right?

19   A.  Yes.

20   Q.  And you've added in a little note.  Approximately 14 months

21   after Scott applies to open account.  Right?

22   A.  I see that note.

23   Q.  You don't see it in parenthesis on 8/22?

24   A.  I see that note.

25   Q.  By this time, 2017, it would be accurate to say that with

1    the exception of $1 million that was held back for a litigation

2    fee, and 250,000 held back for expenses, all of the funds that

3    Mr. Scott had in the Fenero accounts had been transferred out.

4    Isn't that true?

5              MR. FOLLY:  Your Honor, we just ask that we specify a

6    date.  It's unclear what time period.

7              THE COURT:  Mr. Garvin.

8              MR. GARVIN:  Yes.

9    Q.  As of August 22, 2017, which is the last entry on your

10   chart.  Right?

11   A.  As of August 22, 2017, it's fair to say that the entities

12   listed on each of the lines preceding that were closed.

13   Q.  Okay.  Can you please take that down, sir.  Can we put up

14   1344.

15             I'm showing you 1344, which was shown to you

16   yesterday.  Do you recall that, sir?

17   A.  Yes.

18   Q.  Now, can we please enlarge the middle, please.  There is a

19   discussion here that Malena Fahient writes to Mark Scott, and

20   they're talking about -- she wants to know when she's going to

21   get the $1 million back.  Do you see that?

22   A.  Perhaps not she personally, but it references we.  Yes.

23   Q.  So, Mr. Scott says, let me rephrase.  Malena says, "So

24   after two months we will receive the 1 million back to where we

25   instruct, right?"

1          Do you see that, sir?

2     A.   Hmm-hmm, yes.

3     Q.   So she's telling Mark Scott, she is going to instruct him

4     where to transfer that $1 million back to.  Isn't that true?

5     A.   Say again?

6     Q.   That she's -- she told Mr. Scott that she was going to

7     instruct him where they wanted the $1 million returned to.

8     Isn't that true?

9     A.   I'm actually not so sure that she is telling him where to

10    instruct or asking him where to instruct.

11    Q.   All right.  Well let's read what on Thursday, the 7th of

12    June, 2018, at 16:05, Mr. Scott said, "Yes, however we have two

13    months waiting period for the financial commission to accept

14    our financials.  But they are accurate of course with backup.

15    Should be fine."

16          Mr. Scott is telling her that he is waiting for the

17    BVI Financial Commission to accept the funds', meaning Fenero

18    Funds', financial statements.  Isn't that true?

19    A.   It says the financial commission.  Whether or not it's BVI,

20    I can't say for certain.

21    Q.   All right.  We can take that down.  Thank you.

22          Sir, in putting your timeline together, and we are

23    getting very near the end, you have an entry on June of 2018

24    and there is a, I would say, a text message or a Snapchat.  In

25    3005, 3005-S.  But, we don't have to put it up.  But thank you.

1      Do you recall that Irina Dilkinska and Konstantin

2 Ignatov were having communications between the two of them?  Do

3 you recall that?

4 A.  The timeline seems to suggest that, yes.

5 Q.  Okay.  And do you recall that they were talking about the

6 fact that, amongst other things, that Mark Scott wanted to know

7 what was going on, and they were reluctant to tell him

8 anything, because Ruja didn't trust MS.  Do you recall that?

9 A.  I don't recall.  May I see the document?

10 Q.  Yes.  Certainly.

11      MR. GARVIN:  Mr. Barile, if you can please put it back

12 up.  3005 and we're looking for the part, sir -- not that.  The

13 part that says "Totally not.  Ruja didn't trust MS."  There it

14 is.  The second one.  If you can please enlarge that at 3:40.

15 Q.  The one that's in blue, sir.  Konstantin Ignatov states

16 "Totally not.  Ruja didn't trust MS."

17      Does that refresh your memory, sir?

18 A.  It states exactly that.

19 Q.  You can take that down, sir.  So did you find, in making

20 your timeline, that Ruja Ignatova was a, in general, a very

21 private and secretive person?

22 A.  I can't make that inference.

23 Q.  All right.  The last entry you have is Mr. Scott is

24 arrested in September of 2018.  Do you have, sir, any details

25 in your timeline, other than that?  It does not appear, sir, is

JBF3SCO3                          Kroll - Cross

1   that correct?

2   A.  Any details in the timeline?

3   Q.  The timeline, are there any details about the day that

4   Mr. Scott was arrested?  Mine does not appear to be.  It seems

5   that's the last entry?

6   A.  That is the last entry.

7   Q.  All right.  Were you given any information about what

8   occurred that day, such as it occurred at 5 o'clock in the

9   morning and Mr. Scott was not home?

10  A.  The extent of my information that I received is in

11  Government Exhibit 60.

12          MR. GARVIN:  Is Exhibit 60 in evidence?

13          MR. FOLLY:  Via stipulation.

14          MR. GARVIN:  We can take that down, please.

15  Q.  So you don't know whether or not there was any problems at

16  that time, no knowledge whatsoever?

17  A.  Outside, I have no outside knowledge besides Government

18  Exhibit 60.

19  Q.  Sir, has anybody told you whether there was an argument

20  about turning off all the security cameras, anything --

21  A.  No.

22  Q.  Do you know if the law enforcement did turn off all the

23  security cameras?  Do you know?

24  A.  I don't know.

25  Q.  All right.  Let me move on.  Now, you have listed numerous

JBF3SCO3                          Kroll - Cross

1   banks in your outline, your timeline; isn't that correct?

2   A.  Yes.

3   Q.  Would it be fair and accurate to say that there is no

4   documentation from any bank that's involved, that's listed in

5   this timeline, that any bank lost one penny in any of these

6   transactions is there?

7           MR. FOLLY:  Objection, your Honor.

8           THE COURT:  Sustained.

9           MR. GARVIN:  Your Honor, may I have one moment?  I'd

10  like to confer.

11          THE COURT:  Sure.

12  Q.  Sir, I'm at the very end.  In going through your timeline

13  and the documentation, you did realize that the Fenero Equity

14  Funds were approved funds in the BVI; is that correct?

15  A.  When the accounts were established, I assume they were

16  approved to some degree.

17  Q.  We just read, did we not, when they were talking about the

18  return of the million dollars, that the commission had to

19  approve the financial statements?  You saw that, right?

20  A.  There was some e-mails that reference the commission.

21  Q.  But in your timeline, you do not have an entry each year

22  where the funds, meaning Fenero Funds, are applying for renewal

23  and are approved by the commission.  You don't have that in

24  your timeline, do you?

25  A.  Correct, I don't believe that's in the timeline.

1          MR. GARVIN:  I have no further questions.  Thank you,

2     sir.

3          THE COURT:  Redirect?

4          MR. FOLLY:  Yes, your Honor.  Very briefly.

5     REDIRECT EXAMINATION

6     BY MR. FOLLY:

7     Q.  Mr. Barile, if you could go back to Government Exhibit

8     3005-S.  And if we could go to the third page we were just

9     looking at.

10         So Special Agent Kroll, if you'll recall on

11    cross-examination, you were asked some questions about this and

12    you were referred to the second blue bubble here that says

13    "Ruja didn't trust MS."  Do you recall that?

14    A.  I do.

15    Q.  Could you just read the bubble that's directly below that?

16    A.  "But worker with him ..."

17         MR. FOLLY:  You can take that down.  Mr. Barile, if

18    you could pull up for the witness and the jury Government

19    Exhibits 1411 side by side with 3301.  If you could scroll down

20    to the section of the mission statement pertaining to track

21    record.

22    Q.  Special Agent Kroll, if you could just starting with the

23    section that references our track record.  If you could read

24    that section there.

25    A.  "Our track record, prior to the fund, has included many

1    successful startups, turnarounds and carve-outs from larger

2    corporate partners.  Our strategy is base on five key elements:

3    High quality people, vertical expertise, value added support,

4    global integration, and aligned incentives."

5    Q.  Is it fair to say that that reference to the track record

6    is identical to the reference in the Dale Ventures document?

7    A.  It's fair to say if not identical, a paraphrase of such,

8    yes.

9    Q.  And the Dale Ventures one says "Our track record includes

10   startups, turnarounds, and carve-outs from larger corporate

11   partners."

12   A.  Correct.

13   Q.  And the other one from the mission statement says "Our

14   track record prior to the fund has included many successful

15   startups, turnarounds and carve-outs from larger corporate

16   partners."

17   A.  That's correct.

18   Q.  Then also the key elements, is it fair to say, that those

19   are, if not identical, substantially similar?

20   A.  That's fair to say.

21   Q.  If you could go back to Government Exhibit 4109-A.  Special

22   Agent Kroll, you were asked some questions about your knowledge

23   about Jason Tyra and various e-mail accounts and things like

24   that.  You don't have any personal knowledge about Jason Tyra,

25   do you?

1    A.  No.

2    Q.  If you look at the top of this document, there is a

3    reference to Jason Tyra, CPA.  Do you see that?

4    A.  Yes.

5    Q.  And based on your training and experience, you understand

6    that CPA means certified public accountant, correct?

7    A.  Yes.

8    Q.  We can take that exhibit down.

9         Special Agent Kroll, you were asked some questions on

10   cross-examination regarding crypto phones and encrypted forms

11   of communication.  Do you recall that?

12   A.  Yes.

13   Q.  Special Agent Kroll, are you familiar with the term

14   "countersurveillance techniques"?

15   A.  Yes.

16   Q.  Can you explain what countersurveillance techniques are and

17   what some of those particular techniques are?

18   A.  Countersurveillance techniques are, essentially, could be

19   described as hacking but within a legal manner.

20   Q.  I'm sorry.  Can you say that again?

21   A.  So, essentially, what could be described as hacking, but

22   within the bounds of the law.

23   Q.  Within the bounds of the law?  Is that what you said?  And

24   are you familiar that it's common for individuals engaged in

25   criminal activity to take steps to avoid law enforcement?

1    A.  Yes.

2    Q.  Do some of those steps include, for example, the use of

3    so-called burner phones?

4    A.  Quite often.

5    Q.  Do some of those steps also include the use of encrypted

6    forms of communication?

7    A.  Quite often.

8    Q.  Is the reason for that so law enforcement cannot intercept

9    those communications?

10   A.  Quite often.

11           MR. FOLLY:  No further questions, your Honor.

12           MR. GARVIN:  Your Honor, I have one subject.  It will

13   be two or three questions on.

14           THE COURT:  Okay.

15   RECROSS EXAMINATION

16   BY MR. GARVIN:

17   Q.  Would you be nice enough to put 1411 page two back up that

18   was just on the screen.  Could you highlight the same portion

19   that was highlighted a few moments ago.

20           Sir, just a few moments ago, you were read and

21   compared this statement -- give us one moment to put it up.

22   You were given or read and compared this statement to another

23   statement that was made.

24           But, I want to go back, there was some slight

25   differences between the two statements; isn't that true?

1    A.  Slight, yes.

2    Q.  And so let's go to whether or not the statement is

3    accurate.  "We provide capital and experience to help companies

4    in all phrases of development achieve their full potential and

5    our track record, prior to the fund."

6              So in this case that would be prior to the Fenero

7    Funds, correct?

8    A.  I can't assume they're referring to the Fenero Funds.

9    Q.  "Has included many successful startups, turnarounds and

10   carve-outs from large corporate partners."

11   A.  "Larger corporate partners."

12   Q.  "Our strategy is based on five key elements:  High quality

13   people, vertical expertise, value added support, global

14   integration, and aligned investments."  Isn't it --

15   A.  "Incentives."

16   Q.  Isn't it a fact, sir, every one of those words fits Mark

17   Scott while he was working at Locke Lord and other

18   international law firms?

19   A.  Whether they fit what, sir?

20   Q.  They fit, meaning that accurately describes what Mark Scott

21   did at Locke Lord, an international law firm, and other

22   international law firms that he previously was associated with?

23   A.  I can't speak to his previous associations nor what he was

24   doing at the time.

25             MR. GARVIN:  I have no further questions, your Honor.

1              THE COURT:  Agent Kroll, you may step down.

2              THE WITNESS:  Thank you, your Honor.

3              (Witness excused)

4              THE COURT:  Government, please call your next witness.

5              MR. DiMASE:  May we have a brief sidebar?

6              THE COURT:  Okay.

7              (At the sidebar)

8              MR. DiMASE:  Judge, we've got two Bank of New York

9    Mellon witnesses coming up.  One I anticipate being quite short

10   and one much longer.  It's possible the one who is longer will

11   bleed into Monday, depending on the length of the cross.  The

12   shorter witness is not available next week.  He's traveling

13   internationally.

14             There are several exhibits that I'd like to introduce

15   for the shorter witness's testimony that I anticipate the

16   second witness will authenticate as business records.  So what

17   I'd like to do is introduce them subject to connection during

18   the first witness's testimony so we can get him on and off the

19   stand, and authenticate them as business records at the

20   beginning of the second witness's testimony.  I wanted to flag

21   that for the Court.

22             THE COURT:  That's fine.

23             MR. DiMASE:  They're non-controversial.  Bank of New

24   York Mellon records.

25             MR. DEVLIN-BROWN:  That's fine.

JBF3SCO3                          Kroll - Recross

1              THE COURT:  Okay.

2              MR. DiMASE:  There may be other evidentiary objections

3      but I don't think authenticity is the issue.

4              MR. DEVLIN-BROWN:  We can raise them.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           MR. DiMASE:  Your Honor, the government calls

3    Jean-Pierre Saint Victor.

4           The government would offer a number of exhibits at

5    this point subject to connection.

6           THE COURT:  Very well.

7           MR. DiMASE:  Those exhibits are 504, 513, 517, 518,

8    519, 531, 532, 536, and 536-A.

9           THE COURT:  Okay.  They will be admitted subject to

10   connection.

11          (Government's Exhibit 504, 513, 517, 518 subject to

12   connection received in evidence)

13          (Government's Exhibit 519, 531, 532, 536, 536-A

14   subject to connection received in evidence)

15          MR. DiMASE:  And the government is also offering at

16   this stage three other exhibits, Government Exhibits 1296, I'm

17   sorry.  1295, 1296 and 1297.  Let me consult briefly with

18   counsel.

19          Your Honor, I'll offer those at their appropriate time

20   in the testimony and give defense counsel an opportunity at

21   that time to object.

22          THE COURT:  Very well.

23    JEAN-PIERRE SAINT VICTOR,

24       called as a witness by the Government,

25       having been duly sworn, testified as follows:

1    DIRECT EXAMINATION

2    BY MR. DiMASE:

3    Q.  Mr. Saint Victor, where do you work?

4    A.  I work for BNY Mellon.

5    Q.  What is BNY Mellon?

6    A.  Could you repeat the question again?

7    Q.  What is BNY Mellon?

8    A.  Bank of New York Mellon.

9    Q.  Where is that located?

10   A.  At 240 Greenwich Street in Manhattan.

11   Q.  Is it fair to say the bank also has locations all over the

12   world?

13   A.  Yes, the bank has locations all over the world.

14   Q.  What's your current position at Bank of New York Mellon?

15   A.  Right now I am a director responsible for the Caribbean

16   region.

17   Q.  How long have you been in that position?

18   A.  Well, I been in that position for the past 37 years.

19                (Continued on next page)

20

21

22

23

24

25

1    BY MR. DIMASE:

2    Q.  In that particular position or just employed by Bank of New

3    York?

4    A.  Employed by Bank of New York.  In that particular position

5    25 years.

6    Q.  So you have been employed by the bank for a total of 37

7    years?

8    A.  37 years.

9    Q.  And you have been in your present position or equivalent

10   position for approximately 25 years?

11   A.  25 years.

12   Q.  And what are your duties and responsibilities in your

13   current position?

14   A.  I am responsible for the Caribbean region, which means that

15   I keep the existing relationship for banks in the Caribbean,

16   and I also try to expand the relationship of the bank in the

17   Caribbean.  Also I try to bring all the banks in the Caribbean

18   prospects, as we call them, to sell them the services and

19   products of the Bank of New York.

20   Q.  I will ask you to keep your voice up and use the

21   microphone.  It's very hard to hear.  You say you try to bring

22   them the products of Bank of New York Mellon and sell those

23   products to the customer banks?

24   A.  Correct.

25   Q.  And is it fair to say that the majority of your customers

1    are actually banks?

2    A.   99 percent of the clients are banks.

3    Q.   And so BNY Mellon customers are largely banks and financial

4    institutions.

5    A.   Correct.

6    Q.   Not individuals hoping to open a bank account?

7    A.   No, I don't do private banking.

8    Q.   Have you ever met a person named Mark Scott?

9    A.   No.

10   Q.   Have you ever spoken to him?

11   A.   No.

12   Q.   Now you mentioned that the region that you handle is the

13   Caribbean.  Does the Cayman Islands fall within your portfolio

14   or geographic region?

15   A.   Yes, it is.

16   Q.   Are you familiar with a bank named DMS Bank & Trust?

17   A.   Yes, I am.

18   Q.   And where is that bank located?

19   A.   The bank is located in Georgetown, Cayman Islands.

20   Q.   And when did DMS Bank -- I will refer to it for short as

21   DMS Bank -- when did they first become a client of Bank of New

22   York Mellon approximately?

23   A.   Approximately 15 years ago.

24   Q.   Let me direct your attention to approximately January of

25   2017.  Was there a compliance inquiry related to DMS Bank at

JBF7SCO4                       Saint Victor - direct

1   around that time?

2   A.   Yes.

3   Q.   How did you learn about that compliance inquiry?

4   A.   Under the internal procedures of BNY Mellon, the compliance

5   sector of BNY Mellon would send us an inquiry saying that we

6   would like you to forward this to your client for further

7   clarification.

8   Q.   And so when you say forward to the client, you're referring

9   to DMS Bank?

10  A.   DMS Bank.

11  Q.   And so you were asked by the compliance department to send

12  certain questions to DMS Bank; is that correct?

13  A.   Correct.

14  Q.   Let me show you Government Exhibit 536, which has been

15  admitted subject to connection.  And this can be published to

16  the jury as well.  Let me go to page 4.  Mr. Saint Victor, this

17  is an e-mail from Yenny Valentiner.  Could you tell the jury

18  who that is.

19  A.   Yenny Valentiner is one of my staff members responsible for

20  the customer services.

21  Q.   And you are copied on this mail as well?

22  A.   Correct.

23  Q.   This is sent on January 12, 2017 to a person named Nanalie.

24  Nanalie Cover, DMS Bank & Trust Ltd.  Who is Nanalie Cover?

25  A.   Nanalie Cover at that time was the compliance officer for

1    DMS.

2    Q.  And she worked at DMA Bank in the Cayman Islands?

3    A.  Correct.

4    Q.  And could you read the e-mail.

5    A.  "Good afternoon Nanalie and DMS compliance.  We require

6    your support with this compliance request.  Please assist in

7    answering the questions regarding the nature of the activity

8    related to the items attached in this e-mail.  Please note that

9    compliance requires this information to be provided by January

10   28.  Thank you for your usual support."

11             MR. GARVIN:  Your Honor, may we have a brief side bar?

12             THE COURT:  OK.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1           (At the side bar)

2           MR. GARVIN:  It appears we have to object because it

3    seems like they're repeating what DMS said, so there is hearsay

4    contained in the business record documents.  It's not the

5    hearsay of BNY -- because that's excepted by the business

6    record exception -- but they're now apparently going to be

7    reading what DMS said, and to the extent that it's hearsay

8    within hearsay, we object.

9           MR. DIMASE:  Well, your Honor, this is the first time

10   that I've heard this, despite producing these exhibits weeks

11   ago.  It was very clear what exhibits we would be admitting

12   through this witness, and these e-mails are part of them.

13          These are business records maintained by the bank that

14   contain correspondence back and forth with their client, which

15   is DMS Bank, and there is going to be evidence what they asked

16   DMS Bank and the answers that were provided in response to

17   those compliance questions that were made part of the

18   compliance inquiry that we expect this witness to testify

19   about.

20          So, it's our position that they are business records

21   and their contents fall within the business records exception

22   and that they should be admitted.

23          This seems like something that should have been

24   addressed earlier if there was a real concern about hearsay,

25   because there are a number of e-mails that are going to be

1    admitted of this type back and forth between DMS Bank and BNY

2    Mellon.

3              THE COURT:  I will accept they don't necessarily know

4    what exhibits you're going to use weeks advance of the trial,

5    but, in any event, it will be overruled without prejudice to

6    make the application after the other gentleman testifies.

7              MR. DEVLIN-BROWN:  Can we just say same objection if

8    there are other hearsay documents, or does this cover sort of

9    the whole scope?

10             THE COURT:  Just say same objection.

11             MR. DIMASE:  Your Honor, and just to clarify one other

12   point for the record.  Another basis for the admissibility of

13   these statements from DMS being made to BNY Mellon is to

14   explain the actions that BNY Mellon took in the course of its

15   compliance inquiry.  It obtained this information, and then

16   there will be testimony about the ultimate decision that was

17   made and the actions that were taken by BNY Mellon; and without

18   understanding the responses that are provided, it's impossible

19   to understand the ultimate decision that's taken.

20             THE COURT:  The objection is overruled without

21   prejudice.

22             (Continued on next page)

23

24

25

1      (In open court)

2   BY MR. DIMASE:

3   Q.  Mr. Barile, please republish Exhibit 536.  Could we

4   actually scroll down further.

5           Could you read the top of that page, please.

6   A.  "BNY Mellon is unable to determine the business practices

7   of Fenero Equity Investments/Fenero Financial Switzerland/Apex

8   Fund Services UK Ltd. or the purpose of the wire transfer

9   activity for benefit to or by order of various entities and

10  individuals."

11  Q.  And then is it fair to say that on this page there are a

12  number of transactions that are listed?

13  A.  Correct.

14  Q.  And there are six items involving Apex Fund Services for a

15  total of approximately 55 million euros?

16  A.  Correct.

17  Q.  And then there are four items involving Fenero Equity

18  Investments totaling $30 million; is that right?

19  A.  Correct, sir.

20  Q.  And 12 items involving Fenero Equity Investments totaling

21  approximately 102 million euros?

22  A.  Correct, sir.

23  Q.  And 14 items related to Fenero Financial Switzerland

24  totaling approximately 127 million euros?

25  A.  Correct, sir.

1  Q.  And if we continue scrolling down, could you read -- I

2  think we have already read the top paragraph here.  It says:

3  "Request:  KYC/due diligence/purpose of transactions involving

4  the above customer of DMS Bank Ltd.  The following questions

5  may be used as a guide for discussion."

6          Would you read those questions.

7  A.  "What is the nature of business of your customer?  How long

8  has the customer maintained a relationship with your

9  institution?  If the activity is business related, is the

10  business a sole proprietorship and who is the beneficial owner?

11  If the customer is a holding company, who are the beneficial

12  owners?  What is the physical address of your customer?  Are

13  you required to visit the customer as part of your KYC?  What

14  is your understanding of the purpose of this transaction?  Does

15  the customer's transactions appear to be reasonable and

16  consistent with your knowledge of the customer?

17          "If the transactions involve dollar trending multiple

18  fund transfers for the same dollar amount ($9900 etcetera), is

19  the trending related to country's currency restrictions, tax or

20  commerce advantage?  Please explain."

21  Q.  Then it concludes "See attached sample transactions."  Do

22  you see that?

23  A.  Correct, sir.

24  Q.  Can we look at Government Exhibit 536-A, which is in

25  evidence subject to connection.  And is this the attachment

1    that was referenced at the bottom of the page we just read?

2    A.  Yes, sir.

3    Q.  And does this show the same transactions that were actually

4    identified in the e-mail in a spreadsheet format?

5    A.  Correct.

6    Q.  Could we just go to the first one, the first tab, and then

7    scroll to the right.  And so the Apex transactions that are the

8    focus of this inquiry involved Fenero Financial Switzerland; is

9    that right?

10   A.  Correct, sir.

11   Q.  And then also at the bottom there are other tabs which

12   reflect transfers involving Fenero Equity Investments USB,

13   Fenero Equity Investments euro, or EUR?

14   A.  Yes.

15   Q.  And then Fenero Financial Switzerland EUR, so euro

16   denominated transactions for that entity.

17   A.  Correct.

18   Q.  We can go back to 536 and scroll down.  Scroll up again.

19   Page up.  So, this e-mail, next up in the chain, if we can

20   highlight or make that bit larger, Mr. Barile.

21        That's a response from Ms. Cover to Yenny Valentiner?

22   A.  Yes, sir.

23   Q.  That was on January 13, 2017?

24   A.  Correct.

25   Q.  Were you copied on this e-mail as well?

1   A.  Yes.

2   Q.  Can you read the response.

3   A.  "Good morning Yenny.  We confirm receipt of the below

4   request.  Have a great day.  Kind regards, Nanalie."

5   Q.  OK, let's now take this down for a moment.

6           At this point, your Honor, the government -- well, can

7   we show Government Exhibit 1295 just to counsel and the court

8   and the witness.  And can we go down.

9           MR. GARVIN:  No objection.

10          MR. DIMASE:  The government offers this exhibit into

11  evidence.

12          THE COURT:  There being no objection, it is received.

13          (Government Exhibit 1295 received in evidence)

14  Q.  Can we go down to the bottom e-mail.  If we could include

15  the header.

16          Have you ever seen this e-mail before?

17  A.  No, sir.

18  Q.  It's an e-mail from n.cover@dmsbank.com.

19  A.  Yes.

20  Q.  It's sent to msscott@msicbvi.com, copying

21  drpike@msicbvi.com.

22  A.  Yes.

23  Q.  And it's dated February 1, 2017, correct?

24  A.  Yes, correct.

25  Q.  And its subject line is "Fenero – request for information."

1          Let's go down to the text.  Could you read the e-mail,

2    please.

3    A.  "Good afternoon Mr. Scott, I appreciate the time taken,

4    yesterday, to discuss the Fenero entities.  As promised, I have

5    a few questions which will require a response and/or

6    supplemental information:

7          "Number one, please could you confirm the relationship

8    with Barta Holdings and provide due diligence to support the

9    transaction to Cryptoreal in the attached spreadsheet, tab

10   labeled "Fenero Equity Investments-USD".

11         "Number two, please could you confirm the relationship

12   with International Marketing Services and provide due diligence

13   to support the transactions in the attached spread sheet, tab

14   labeled "Fenero Equity Investments EUR."

15         "Number three, please could you confirm the

16   relationship with MS International and provide due diligence to

17   support the transactions in the attached spreadsheet, tab

18   labeled "Fenero Equity Investments EUR."

19         "Number four, provide due diligence to support the

20   transactions in the attached spreadsheet under tab labeled

21   "Apex Fund Services."  Who is B & N Consultants Ltd.?

22         "Mr. Pike has been copied as requested.  Please do not

23   hesitate to contact me should you have further questions.  Many

24   thanks.  Kind regards, Nanalie."

25   Q.  Thank you.  Can we scroll up, Mr. Barile.

JBF7SCO4                          Saint Victor - direct

1              So this is an e-mail from Ms. Cover to Mr. -- I'm

2      sorry -- from Mr. Scott to Nanalie Cover, copying David Pike.

3      Do you see that?

4      A.  Yes, sir.

5      Q.  It also copies a person named Colm O'Driscoll?

6      A.  Mr. Colm O'Driscoll is managing director of DMS.

7      Q.  DMS Bank?

8      A.  DMS Bank.

9      Q.  And this is dated February 1, 2017, and it's a response to

10     the e-mail below; is that right?

11     A.  Correct.

12     Q.  Could we just read that e-mail.  Or could you just read

13     that e-mail, please.

14     A.  "My team will start pulling together the pertinent

15     information.  We will get back to you my the middle of next

16     week.  Unfortunately, I am traveling and want to see the entire

17     packet before it goes out to you.  I have not yet viewed the

18     attachments, but I hope some of the issues raised in your

19     e-mail, such as "describe your relationship with" is a bit more

20     defined.

21              "Your questions also vastly expanded from what we

22     discussed on our call.  Let's please connect on a call on

23     Friday or Monday to talk about this further.  I am a little

24     concerned about the scope of your inquiry and why it was

25     triggered.

JBF7SCO4                          Saint Victor - direct

1              "If DMS has any concern about us suddenly, I recommend

2       that it pays its debt to us in full within the next few days

3       and we move our funds to one of our many other banking

4       partners."

5       Q.  Thank you.  Mr. Barile, you can take that exhibit down.

6       Could we now show Government Exhibit 1296 just to counsel and

7       the Court, please.  And scroll down, please.

8              The government offers Government Exhibit 1296.

9              MR. GARVIN:  No objection.

10             THE COURT:  1296 will be received.

11             (Government Exhibit 1296 received in evidence)

12             MR. DIMASE:  Please publish that to the jury, Mr.

13      Barile.

14      Q.  Going down to the bottom e-mail in this chain, is that the

15      same e-mail from Ms. Cover to Mr.  Scott seeking information

16      about various transactions that we just read a moment ago?

17      A.  Yes.

18      Q.  And, to be clear, you have never seen this e-mail either,

19      correct?

20      A.  No?

21      Q.  Just focusing now on the middle e-mail, this is from

22      drpike@msicbvi.com to codriscoll@dmsbank.com, copying

23      msscott@msicbvi.com.  Forward:  Fenero request for information.

24      Dated February 1, 2017.  Please read this e-mail for the jury.

25      A.  "Colm, it appears we could really use your help here.

JBF7SCO4                    Saint Victor - direct

1    Please read below and tell me what's going on.  It is as if we

2    are starting over.  Every entity and every transaction

3    supported by DMS has been vetted by Apex or you and Trinity

4    well into the onboarding process.  This is very disturbing.  I

5    would very much appreciate your intervention."

6    Q.  Thank you.  We can pull that back down.  And go up to the

7    top e-mail.  This is from Mr. Scott to Mr. Pike dated February

8    2, 2017, the same subject line.  What did Mr. Pike write back

9    to Mr. Scott?

10   A.  "very good".

11   Q.  By the way, is Mr. O'Driscoll copied on this particular

12   e-mail?

13   A.  No, I don't see it.

14   Q.  Is anyone from DMS Bank copied on this particular e-mail?

15   A.  No, I don't see that.

16   Q.  Apologies.  I meant to say, is this an e-mail from

17   Mr. Scott to Mr. Pike?

18   A.  Yes, it is.

19   Q.  And it was Mr. Scott who wrote "Very good."  Is that right?

20   A.  Could you pretrial your question again.

21   Q.  It's Mr. Scott who wrote "very good" in that he was the

22   author the e-mail.

23   A.  Apparently it's from Mr. Scott.

24   Q.  All right.  Let me now turn back to Government Exhibit 536.

25   Just focusing here on this top e-mail, this is from Ms. Cover

JBF7SCO4                          Saint Victor - direct

1    to Yenny Valentiner.

2    A.  Yes, sir.

3    Q.  And are you copied on this e-mail as well?

4    A.  Yes, I am.

5    Q.  And let's scroll down to the content.  Before we get to

6    this, let me go back to Government Exhibit 1297.  Just show

7    that to the Court and the parties for now.  You can take that

8    down for now.

9            Let's go back to Exhibit 536.  What is the date on

10   this e-mail?

11   A.  This is an e-mail from Nanalie Cover to --

12   Q.  On what date?

13   A.  On February 2, 2017.

14   Q.  And that's after the two e-mails that we just reviewed

15   together?

16   A.  Correct.

17   Q.  And what is contained in this e-mail?

18   A.  Well, these are the replies of DMS of the questions to them

19   regarding the inquiry.

20   Q.  Could you please read this e-mail starting at the top.

21   A.  "What is the nature of the client?  Fenero Equity

22   Investments L.P. and Fenero Financial Switzerland (the client)

23   is the first of a series of $100 million open-ended investment

24   funds located in the British Virgin Islands, focusing on

25   investments in the financial services industry in Europe.  The

client expects to continue to raise additional capital and

start a series of approved funds with the same parameters.  Due

to its small investor base of wealthy families and middle

market companies and its narrow investment strategy, the client

requires limited staff which will be primarily located in

subsidiaries in Ireland and will rely in part on third-party

service providers in the areas of accounting, legal and

business due diligence to identify appropriate investment

opportunities, prior to activating its in-house teams to

further investigate and negotiate such opportunity.

           "The primary objective of the client is to invest into

controlling positions of distressed companies in the financial

services industry, for example, trading platforms community

banks, debit card processors and issuers, and to improve, grow

and build great companies through equity and limited debt

financing."

Q.  Let's scroll down to the next page.  Can you continue

reading.

A.  "The administrator of the client was Apex Fund Services

(UK) Ltd., a large global institution that retains a focus on

high client service levels delivered locally.

           "The client is currently administered and managed by

MSS International Consultants LLC, which is ultimately owned by

Mark S. Scott, Esq., an international expert in mergers and

acquisitions, private equity and U.S. securities law.  Mark

JBF7SCO4                        Saint Victor - direct

Scott has confirmed to DMS Bank & Trust that the client is in

the negotiation stages of securing a new administrator, namely

Trinity Fund Administration Ltd.

          "How long has the client maintained a relationship

with your institution?  The client has been a customer since 16

of June 2016.

          "If the activity is business related, is the business

a sole proprietorship or who is the beneficial owner?  The

activity of the client is business related, and it is a hedge

fund vehicle, not a sole proprietorship.  Mark S. Scott is the

beneficial owner of the investment manager.  See attached."

Q.  Keep going, please.

A.  "If the client is a holding company, who are the beneficial

owners?  Not applicable.

          "Are you required to visit the client as part of your

KYC process?  No, a site visit is not a requirement of the KYC

process.  However, the Fenero Group is well known to the

executive management team of DMS, whom have met with Mark

Scott.  In addition, members of the executive management team

have visite the Miami based office of Mr. Scott and met with

him on his various trips to the Cayman Islands.  In keeping

with the relationship management aspect of the business, DMS

Bank has undertaken to reach out to clients on a monthly basis.

The latter was previously implemented with the Fenero Group.

          "What is the physical address of the client?  The

1    registered office address of the fund is Ritter House, Wikhams

2    Case II, Road Town, Tortola British Virgin Islands.

3              "What is your understanding of the purpose of this

4    transaction?  The transactions listed on the BNY spreadsheet

5    appear to be in accordance with the stated activity of the

6    client, in that it is a master feeder structure with payments

7    being made into other Fenero fund, a loan to a distressed

8    company and fee payments to the IM."

9    Q.  OK.  By the way, was there any mention at all of

10   International Marketing Strategies in that description that you

11   just provided?

12   A.  No.

13   Q.  Any description of Barta Holdings there?

14   A.  No.

15   Q.  Please continue.

16   A.  "Does the customer's transaction appear to be reasonable

17   and consistent with your knowledge of the customer?  Yes, the

18   transactions appear to be reasonable and consistent with DMS

19   Bank & Trust's knowledge of the client in volume and frequency.

20             "If the transaction(s) involve(s) dollar trending

21   (multiple funds transfers for the same dollar amounts ($9900

22   etc.), is the trending related to country currency

23   restrictions, tax or commerce advantage?

24             "Please explain.

25             "Not applicable."

JBF7SCO4                    Saint Victor - direct

1   Q.  In addition to the Barta and International Marketing

2   Services was there any reference to B & N Consulting in this

3   response?

4   A.  No.

5   Q.  So it ends "Please do not hesitate to contact me should you

6   have further questions."  Do you see this e-mail?

7   A.  Yes.  Yes, that's right.

8   Q.  And if you could scroll down to the bottom, Mr. Barile,

9   where the questions are again.  And this -- I'm sorry.  Just go

10  back.  Let's move on now.  Actually we can take this exhibit

11  down now.

12          What did you and Mr. Valentiner do with the

13  information that Ms. Cover provided in this e-mail?

14  A.  Under the procedure, we take all the information that DMS

15  sent to us and we sent it to the compliance center of the bank.

16  Q.  To be clear, in your role in the relationship area, do you

17  have any part in decisions made regarding anti-money laundering

18  or compliance issues?

19  A.  No, I don't have any.

20  Q.  You are simply tasked with going to the client banks and

21  obtaining information to give back to the compliance

22  department?

23  A.  Yes.

24  Q.  Among other responsibilities that you have; is that

25  correct?

1   A.   That's correct.

2   Q.   Let me show you Government Exhibit 513.  This is from Yenny

3   Valentiner to Nanalie Cover, copying you and other people,

4   dated February 3, 2017.  Could you read the e-mail.

5   A.   "High Nanalie.  Good day.  Thank you for providing this

6   information.  I have forwarded the information to our FTSI

7   compliance unit who originated the request for them to update

8   their case.  Have a nice weekend."

9   Q.   So this is when you were describing communicating this

10  information to compliance.  That's what's going on here?

11  A.   Yes, sir.

12  Q.   And after the exchange with DMS Bank, did you participate

13  in any meetings related to this compliance inquiry?

14  A.   Yes, sir.

15  Q.   Can I show you Government Exhibit 531 admitted subject to

16  connection –– as was 513 a moment ago.  This is an e-mail from

17  John Gurtowski to you copying other people on February 10,

18  2017?

19  A.   Yes, sir.

20  Q.   And it says "AMLOC action required Re:  Fenero Equity

21  Investments L.P., Fenero Financial Switzerland L.P. and Apex

22  Fund Services UK Ltd. with DMS Bank & Trust."

23  A.   Yes, sir.

24  Q.   And AMLOC, is that a committee that overseas anti–money

25  laundering compliance at the bank?

JBF7SCO4                     Saint Victor - direct

1    A.   It's Anti-money Laundering Committee, AMLOC.

2    Q.   Can we scroll down.  And could you read this e-mail.

3    A.   "JP, in accordance with the recommendation made at

4    pre-AMLOC on January 17, 2017, please note the committee

5    requires your attendance at an upcoming pre-AMLOC to discuss

6    the relationship involving Fenero Equity Investments L.P.,

7    Fenero Financial Switzerland L.P. and Apex Fund Services UK

8    Ltd. with DMS Bank & Trust Ltd. (Georgetown, Cayman Islands)

9    2540459710 through BNY Mellon.  Please note that the attached

10   documents are classified as "highly confidential" and should

11   not be shared with the customer."

12   Q.   Did you in fact attend -- withdrawn.  Pre-AMLOC, is that

13   another committee that meets in advance of the larger AMLOC

14   committee?

15   A.   Correct, sir.

16   Q.   Did you in fact attend a meeting on February 27, 2017?

17   A.   Yes, I did.

18   Q.   Let me ask you to look at Government Exhibit 532, admitted

19   subject to connection.  And this is e-mail from you to Dino

20   Sani?

21   A.   Dino Sani is my boss.

22   Q.   And this is dated February 27, 2017, and it's titled

23   "Pre-AMLOC update."  If you could go down to the body of the

24   e-mail.  And, Mr. Barile, if you could just scroll up a little

25   bit.

1       So this shows you can see there pre–AMLOC February 27,

2  2017?

3  A.  Yes.

4  Q.  And if you go down further here, number five, does that

5  show one of the items on the agenda for that meeting?

6  A.  Correct.

7  Q.  And your name is listed there?

8  A.  Correct.

9  Q.  Let's scroll up.  All the way to the top, please.  You

10  write "Did the call.  We have to follow up with DMS.  Will cc

11  both of you.  JP."

12      When you said "did the call" what were you referring

13  to?

14  A.  Well I went to the meeting scheduled February 27.  It's by

15  call, so you call the number.

16  Q.  The meeting you appeared at by phone.

17  A.  Right.

18  Q.  OK.  And that's what you're referring to.

19  A.  That's correct.

20  Q.  And you said that you had to follow up with DMS?

21  A.  Yes, that's what the committee decided to do, to ask for

22  more information about these transactions.

23  Q.  Did you or someone else from your department follow up with

24  DMS after this meeting?

25  A.  Could you repeat the question?

1   Q.  Did you or somebody else from your department follow up

2   with DMS after this meeting?

3   A.  Yes, we did.

4   Q.  Let me show you Exhibit 517, admitted subject to

5   connection.  And if we could scroll down to the bottom.  So,

6   this is an e-mail dated March 6, 2017 from Nanalie Cover to

7   you, copying Colm O'Driscoll, subject Fenero.  Do you see that?

8   A.  Yes.

9   Q.  OK.  And it says, "Good morning JP."  By the way, JP stands

10  for John Pierre?

11  A.  Everybody calls me JP.

12  Q.  It says, "Good morning JP.  Thank you for taking time out

13  of your extremely busy schedule to discuss the BNY inquiry

14  relating to Fenero Equity Investments and Fenero Financial

15  Switzerland (Fenero Group).

16          Does this paragraph here refer to a phone call that

17  you had with Ms. Cover?

18  A.  Yes, I called Ms. Cover to ask her for more information.

19  Q.  Do you recall specifics, or do you recall just calling for

20  additional information?

21  A.  I said I remember the call but I do not recall the

22  specifics of the call.

23  Q.  But you remember calling to ask her for additional details?

24  A.  Correct.

25  Q.  Could you please read the next paragraph?

JBF7SCO4                       Saint Victor - direct

A.   "As discussed, the main subject of the BNY inquiry appears

to be International Marketing Services ("IMS") which subscribed

into the Fenero Equity Investments funds.  DMS Bank & Trust

Ltd. ("DMS) has reviewed the details surrounding the

investments made by IMS into Fenero Equity Investments and can

confirm that it was a one-off investment made to facilitate the

purchase of a credit card company.  DMS was not aware of IMS's

UBO, Dr. Ruja Ignatova, or any banking issues surrounding IMS

in other regions."

Q.   OK.  Could you continue reading the next paragraph.

A.   "Colm O'Driscoll has spoken with Mark Scott, the UBO of the

Fenero group, and confirmed that the relationship with IMS was

a one-off transaction and that he was not aware of any issues

with IMS.  Mr. Scott was also informed that DMS would not

facilitate any payment to or from IMS going forward, which

Mr. Scott acknowledged would not be an issue.  Comb is also

happy to discuss this matter further with you.  However, as is

customary, please do not hesitate to contact me if you have

further questions.  Many thanks."

Q.   What did you do with the information in this e-mail?

A.   As usual, we forwarded it to BNY bank compliance center.

Q.   Let me show you Government Exhibit 504 admitted subject to

connection:  Could you just read the top e-mail there, which is

from you to the AMLOC desk on March 6, 2017, copying several

other people.

JBF7SCO4                         Saint Victor - direct

 1   A.  Correct.  It's an e-mail from myself to the AMLOC desk

 2   dated March 6, 2017.  And I copied Dino Sani my boss, Cristiane

 3   Gomes and Virgilio Torres, who at that time was support staff.

 4   Q.  And D-i-n-o S-a-n-i?

 5   A.  Yes.

 6   Q.  And is it Cristiane Gomes with an S?

 7   A.  Yes.

 8   Q.  And Virgilio Torres.

 9   A.  Correct.

10   Q.  What did you say in the e-mail?

11   A.  "Good morning.  As a follow to our discussion during

12   pre-AMLOC last Monday and as per request from the committee; we

13   reviewed and discussed this case with DMS Bank Cayman and

14   received the following feedback from customer this morning.  We

15   have a call this morning at 11:30 a.m.  Please distribute to

16   the other members of the committee.  Thanks.  JP."

17   Q.  Did you in fact attend a meeting or call on March 6, 2017

18   related to this inquiry?

19   A.  Yes, I did, sir.

20   Q.  And were certain decisions made at that meeting regarding

21   how the inquiry would be resolved?

22   A.  Yes, sir.

23   Q.  So did the committee come to some decision during that

24   meeting?

25   A.  Yes, sir.

1    Q.  Let me show you Government Exhibit 518 admitted subject to

2    connection.  Now, Mr. Saint Victor, after the meeting were you

3    instructed to do anything by the committee?

4    A.  Yes.

5    Q.  What was that?

6    A.  I was instructed to contact the client with the following

7    accommodation.

8    Q.  So this e-mail is the subsequent contact you had with the

9    client after the meeting.

10   A.  Correct.

11   Q.  And it's from you to Nanalie Cover, copying Colm

12   O'Driscoll, dated March 7, 2017.

13   A.  Correct.

14   Q.  And the subject line:  Fenero, presentation to BNY

15   compliance risk committee?

16   A.  Correct.

17           THE COURT:  Before we read anything, it's 12:45, so

18   let's take our second break.  We will be back in 15 minutes.

19   Ladies and gentlemen, please do not discuss the case.

20           You may step down.

21           (Jury not present)

22           THE COURT:  Any work for me?

23           MR. DIMASE:  No.

24           THE COURT:  OK.  Don't be late.

25           (Recess)

JBF3SCO5                          Saint Victor – Direct

 1              (In open court)

 2              THE COURT:  We're going to get started, and then when

 3     the food gets here, we'll take another brief break.

 4              (Jury present)

 5              THE COURT:  Ladies and gentlemen, I do apologize.  We

 6     are going to take another brief break when things get set up.

 7     But rather than sit around, I thought we'd get some work done.

 8     Mr. DiMase.

 9              MR. DiMASE:  Thank you, Judge.  Could we publish

10     Exhibit 504 admitted subject to connection.  I apologize.  518.

11     Q.  Mr. Saint Victor, prior to the break you were testifying

12     that committee came to a decision on March 6 of 2017?

13     A.  Yes, sir.

14     Q.  You were directed to communicate information back to DMS

15     Bank at that point?

16     A.  Yes, sir.

17     Q.  This is an e-mail from you to folks at DMS Bank on March 7,

18     2017?

19     A.  Correct, sir.

20     Q.  Could you please read your e-mail for the jury.

21     A.  "Good day Nanalie and Colm.  Thank you for the following

22     information.  As I told you, I went to BNY Mellon international

23     risk committee yesterday morning at 11:30 a.m. to review and

24     discuss the Fenero case.  After I submitted your letter and my

25     presentation, the committee took the following decision.

1      "Number one.  The committee members are not

2  comfortable with payments/transactions coming from or going to

3  International Marketing Services, One Top Team, OneCoin,

4  OneCoin cash account and Mr. Ruja Ignatova.

5      "Number two.  The committee feels that Fenero and its

6  administrator/management should have done more researches on

7  international marketing services and the other companies as

8  public information is widely available on various actions by

9  the authorities in the U.K., Italy, Belgium, and Germany

10 concerning these entities.

11     "Number three.  As a result, BNY Mellon compliance and

12 surveillance division starting this week, will insert all these

13 names in its filters and review after 90 days to confirm that

14 Fenero will no longer receive or send transactions/payment on

15 their behalf.

16     "As per your letter, I confirm to them it was one time

17 transactions and DMS and Fenero will no longer have anymore

18 transactions.

19     "Number four.  All DMS accounts are part of the

20 filters in New York, London and Frankfurt.

21     "Number five.  The committee will call upon me again

22 to review in 90 days."

23          MR. DiMASE:  Thank you.  No further questions.

24          THE COURT:  Cross-examination?

25          MR. GARVIN:  Yes.  Thank you.

CROSS-EXAMINATION

BY MR. GARVIN:

Q.  Good afternoon, Mr. Saint Victor.

A.  Good afternoon, sir.

Q.  Good afternoon, sir.

          MR. GARVIN:  Mr. Barile, can you please put back up
the last exhibit, which was 518, sir.  And highlight the very
top, please, who it is to and who it is from.

Q.  Sir, I'm looking at the last e-mail that you spoke about
only a few moments ago.  And we have highlighted the portion
where it shows who sent the e-mail and who it was sent to.  Do
you see that?

A.  Yes, sir.

Q.  Of course, it states that it was prepared by you or at
least sent by you; is that correct, sir?

A.  Correct, sir.

Q.  And it is sent to Nanalie Cover, and we know that she is a
member of DMS Bank & Trust.  Correct?

A.  Correct, sir.

Q.  And DMS Bank & Trust has a relationship with BNY Mellon,
correct?

A.  Correct, sir.

Q.  And we also see that there was a carbon copy sent to Colm
O'Driscoll, and he also is a member of DMS Bank & Trust.  Is
that correct, sir?

1  A.  Correct, sir.

2  Q.  If we could go down just a little bit to see the date.

3  Thank you, Mr. Barile.  We see that this took place on March 7,

4  2017.  Correct, sir?

5  A.  Correct, sir.

6  Q.  And the document itself does not appear to have been sent

7  to Apex; is that correct?

8  A.  Correct, sir.

9  Q.  And it does not appear to have been sent directly to

10  Fenero, even though Fenero is listed in the subject line.

11  Correct?

12  A.  Correct, sir.

13  Q.  Prior to coming here today, have you ever met Mr. Mark

14  Scott?

15  A.  Never.

16          MR. GARVIN:  Mark, would you please stand up.

17  Q.  Would you recognize Mr. Scott if perhaps you had --

18  A.  No.

19  Q.  Never had any communication with Mr. Scott in any way

20  whatsoever.  Would that be fair to say?  Correct?

21  A.  Correct.

22  Q.  Okay.

23          MR. GARVIN:  Mr. Barile, if you would be kind enough

24  to place on the board 536-A which is a spreadsheet.  And could

25  we go to -- well, we'll start here.

1  Q.  I believe this is tab A.  And sir, I direct your attention

2  if I could to column B.  And do you see the dates that are

3  written there?

4  A.  Yes, sir.

5  Q.  Would it be fair to say that the earliest date is a

6  transaction for $30 million which is by far the largest amount

7  of the transactions listed on this page?

8  A.  Correct, sir.

9  Q.  And would it also be accurate to say that that occurred on

10 or about July 13, 2016?

11 A.  Yes, sir.

12 Q.  Now, I want you to please use your memory when we were

13 talking just a few seconds ago about the prior exhibit, the

14 dates were in March of 2017; isn't that correct?

15 A.  Correct, sir.

16 Q.  So, approximately nine months had passed since this

17 transaction had taken place, right?

18 A.  Yes, sir.

19 Q.  And this particular amount, which is approximately $30

20 million, I'm looking at the debit amount column which is column

21 D, you do see the rounded $30 million, correct, sir?

22 A.  Correct, sir.

23 Q.  This transaction was a transaction that Apex gave authority

24 to transfer; isn't that correct?

25            MR. DiMASE:  Objection.  Personal knowledge.

1       THE COURT:  Overruled.  If he knows.

2    A.  Could you repeat the question again?

3    Q.  Yes.  This $30 million transfer was a transfer that Apex

4    authorized.  Is that correct?

5    A.  Okay, sir, I don't know.  Because if it is a transaction

6    authorized by Apex, it is between Apex and DMS.

7    Q.  It's between Apex and DMS?

8    A.  Most probably.

9    Q.  Okay.  And that leads to the position that, apparently,

10   that BNY Mellon would have been the correspondent bank; is that

11   correct?

12   A.  Correct, sir.

13   Q.  So, if it was a transaction between Apex and DMS, then one

14   would anticipate that Apex would have to authorize it, because

15   they would be the authorized signatory, correct?

16       MR. DiMASE:  Objection.  Calls for speculation, your

17   Honor.

18       THE COURT:  Sustained.

19       MR. GARVIN:  May we go to tab A, please.

20   Q.  I'm also showing you what is in tab A, and I would direct

21   your attention, sir, to the date.  And would it be accurate to

22   say that each and every one of these transactions occurred in

23   2016?

24   A.  Yes, sir.

25   Q.  And in fact, they each occurred in September of 2016,

1    correct?

2    A.  Yes, sir.

3    Q.  I'm asking if you could direct your attention to the debit

4    currency column which is in column F.  And do you see the

5    abbreviation EUR?

6    A.  Yes, sir.

7    Q.  Would it be accurate to state that that is an abbreviation

8    that the type of currency in that for that transaction is a

9    euro?

10   A.  Yes, sir.

11   Q.  Would it also be fair to say that if this transaction was

12   taking place outside of the United States, while it would be

13   BNY could be used as a correspondent bank, it is likely it

14   would go through one of the BNY offices outside of the United

15   States, because it deals with euros.  Is that accurate?

16   A.  No, sir.  I mean this transaction happened with the DMS

17   account in the Frankfurt office of BNY.

18   Q.  So that's why I said it might not be the United States.

19   This particular one was the Frankfurt office?

20   A.  Of BNY Mellon.

21   Q.  When we say that, for the ladies and gentlemen, we're

22   talking about Frankfurt, Germany, correct?

23   A.  Correct, sir.

24   Q.  Would it be fair to say that any time the ladies and

25   gentlemen of the jury see EUR on this particular schedule, that

1    it was likely processed in the Frankfurt, Germany office?

2    A.  Correct.

3    Q.  Okay.  Could we please look at tab B.  I guess it's the

4    Fenero Equity Investments -- yes.  Thank you.  So I am showing

5    you now the Fenero Equity Investments -- no, we did this one

6    already.  Can we please see the Fenero Equity Investments --

7    that one.  Okay.

8            So, these transactions on this page are also in 2016;

9    is that correct?

10   A.  Correct, sir.

11   Q.  And that the earliest one appears to be July 7 of 2016?

12   A.  Correct, sir.

13   Q.  And the latest one appears to be October 18?

14   A.  Yes, sir.

15   Q.  For 400,000 euros, correct?

16   A.  Yes, sir.

17   Q.  If we can please take that down.  Now, sir, sitting here

18   today, do you have any information that the Fenero transactions

19   that occurred in 2016, that any of those Fenero transactions

20   took place after your letter of March of 2017?

21   A.  No, I don't have any information.

22   Q.  Do you have any independent knowledge of whether Fenero in

23   2017 returned all of the funds that it had in its accounts and

24   closed them?

25   A.  I don't have any information.

1        MR. GARVIN:  Would you be kind enough to put 1297 back

2   on the screen, please.  And I think we need to start, because

3   this is a long one, I believe it's there is three pages to it.

4   Is that correct?

5        Your Honor, we would move 1297 into evidence.

6        THE COURT:  Any objection?

7        MR. DiMASE:  Yes, your Honor.

8        THE COURT:  There is an objection?

9        MR. DiMASE:  There is an objection, yes.

10       THE COURT:  What's the objection?

11       MR. DiMASE:  Hearsay, your Honor.

12       THE COURT:  Sustained.

13       MR. GARVIN:  Your Honor, may I have one moment?

14       THE COURT:  Yes.

15       MR. GARVIN:  May we have a brief sidebar on this one

16   exhibit?

17       THE COURT:  Sure.

18            (Continued on next page)

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. GARVIN:  Your Honor, I was under the impression

3   that this was offered in as an exhibit by the government

4   subject to connection.  I distinctly remember the language of

5   this being read during direct.  Maybe it was another, because

6   it is an e-mail string, maybe it was another exhibit number.

7   But it had the same contents, both, but perhaps save one

8   response in the e-mail.

9          And so, my argument is, the portion of the e-mail that

10  may have been objectionable is contained in an exhibit that the

11  government offered.  The one sentence that is Colm O'Driscoll's

12  response, which he tells Mr. Scott "disregard," that's the

13  essence of the statement.  "Disregard" is the part that I now

14  want to put in to offset what the government, the portion the

15  government read, which because it was an e-mail string, had a

16  different exhibit number.  And I think that under those

17  circumstances, it should be permitted.  The word "disregard" is

18  not, has no meaning, other than to explain Mr. Scott's state of

19  mind as to why he did nothing.

20         MR. DiMASE:  Your Honor, it isn't something we

21  offered.  We did not offer the top two e-mails of this chain,

22  and we would argue that it's inadmissible hearsay.

23         MR. DEVLIN-BROWN:  Was the exhibit though offered into

24  evidence subject to connection?

25         MR. DiMASE:  No.  This particular exhibit was not.

JBF3SCO5                    Saint Victor - Cross

1   The top two e-mails are not in evidence.

2            MR. GARVIN:  This particular exhibit has a string of

3   e-mails of which the government put in an exhibit with a

4   different number that had some of the e-mails in.  But, the one

5   e-mail that we want to put in is the response that says, by

6   Colm O'Driscoll, which that says "disregard."

7            We do not believe that response is hearsay, to begin

8   with.  But even if it is hearsay, the government presented that

9   these were business records, and it is attached to the same

10  e-mail string.

11           THE COURT:  Mr. DiMase, what's the relevance of the

12  direction to disregard?

13           MR. DiMASE:  Well, there is an e-mail -- in the e-mail

14  that was admitted, there are a series of questions from this

15  Cover, the compliance person at DMS Bank, to which Mr. Scott

16  sends an e-mail back to Colm O'Driscoll saying, what's going on

17  here, why all these questions; something of that nature.  And

18  then the e-mail that we introduced, we introduced that chain

19  and then another e-mail -- let me back up.

20           It is Mr. Pike who sends the e-mail saying what's this

21  all about, why all the questions.  And then Mr. Scott responds

22  at the top good work or nice job or something to that effect.

23           THE COURT:  To Mr. Pike.

24           MR. DiMASE:  Just between the two of them.  It doesn't

25  copy anybody at the bank.  We did not admit the two additional

1   e-mails with Mr. O'Driscoll thereafter where Mr. O'Driscoll

2   says something to the effect of, no, don't worry about this, or

3   disregard it.  And then let's have a call.  And Mr. Scott says

4   I'm flexible on Friday or something to that effect.  That's the

5   top of the e-mail chain.

6               THE COURT:  The objection will be sustained.

7               (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2    BY MR. GARVIN:

3    Q.  Sir, to your knowledge, would it be accurate to state that

4    Fenero Equity Fund did not have any accounts at BNY Mellon?

5    A.  To my knowledge, no.

6    Q.  And to your knowledge, it would also be accurate to say

7    that Mark Scott, the individual, did not have the any accounts

8    at BNY Mellon?

9    A.  To my knowledge, no.

10   Q.  And for that matter, whether he had an account, there is no

11   record that he had any communication with BNY Mellon concerning

12   this topic that we're discussing; isn't that true?

13   A.  That's true.  I don't have any -- any idea.

14   Q.  In preparation of your testimony today, you did review some

15   of the records to refresh your memory, right?

16   A.  Correct.

17   Q.  And would it be accurate to say that during that process of

18   reviewing the BNY Mellon records, you did not see any document

19   that purported that Mr. Scott communicated with anybody at BNY

20   Mellon regarding this topic; isn't that true?

21   A.  That's true.

22   Q.  Would it also be fair to say that Mr. Scott, neither

23   Mr. Scott nor the Fenero Equity Funds had any contact that

24   affected the decision of BNY Mellon to process these

25   transactions?

1          MR. DiMASE:  Objection.

2          THE COURT:  Sustained.

3   Q.  Do you know if Mr. Scott ever contacted anybody at BNY

4   Mellon to make or complete any transaction?

5   A.  I do not.

6          MR. GARVIN:  I have no further questions.  Thank you.

7          THE COURT:  Any redirect?

8          MR. DiMASE:  No, your Honor.

9          THE COURT:  Sir, you may step down.

10         THE WITNESS:  Thank you, sir.

11         (Witness excused)

12         THE COURT:  Ladies and gentlemen, I did receive the

13  message from Ms. Rivera that you voted.  So I'll abide by the

14  will of the people and we will carry on.

15         Government, please call your next witness.

16         MR. DiMASE:  Yes, your Honor.  The government calls

17  David Wildner.

18         THE COURT:  Mr. DiMase.

19   DAVID WILDNER,

20      called as a witness by the Government,

21      having been duly sworn, testified as follows:

22  DIRECT EXAMINATION

23  BY MR. DiMASE:

24  Q.  Mr. Wildner, where do you work?

25  A.  For the Bank of New York Mellon.

JBF3SCO5                          Wildner - Direct

1    Q.  What's your current position there?

2    A.  I'm the U.S. head of anti-money laundering and

3    counterterrorist financing.

4    Q.  Is that a position that has global reach?

5    A.  In many ways, yes.

6    Q.  What are your duties and responsibilities in that role?

7    A.  I have overall responsibility for implementing and carrying

8    out the anti-money laundering and counterterrorist financing

9    program within the bank within the U.S. legal entities that we

10   own, as well as other legal entities that process U.S. dollar

11   activity.

12   Q.  Let me just pause for a minute to ask you a couple of

13   questions about Mark Scott.  Do you know a person named Mark

14   Scott?

15   A.  No, I do not.

16   Q.  Have you ever spoken to Mr. Scott, the defendant in this

17   case, before?

18   A.  No.

19   Q.  Let's talk for a moment about Bank of New York Mellon.

20   What kind of bank is the Bank of New York Mellon?

21   A.  It is an institutional bank.  It serves other banks,

22   financial companies, financial service industries, governments,

23   foreign governments, U.S. government, states, counties,

24   municipalities, Fortune 500 companies.  Non-retail in nature.

25   Q.  Institutional bank to be distinguished from a retail bank?

1     A.  Correct.

2     Q.  What's the difference, basically?

3     A.  We have very, very few human beings as direct clients.

4     Most of our -- almost all of our clients are companies or banks

5     or financial services providers.

6     Q.  So I couldn't just walk into a Bank of New York Mellon

7     office and open an account for myself?

8     A.  No, you could not.

9     Q.  Generally speaking -- actually withdrawn.

10          Where is Bank of New York Mellon's headquarters?

11    A.  240 Greenwich Street, Manhattan, New York County, New York.

12    Q.  Does Bank of New York Mellon operate in other countries

13    around the world?

14    A.  We operate around the world in many countries.  We have

15    branches, representative offices, we own banks, companies,

16    brokerage firms.

17    Q.  Is there a bank branch of Bank of New York Mellon located

18    in Frankfurt, Germany?

19    A.  There is a branch of our New York State chartered bank in

20    Frankfurt, Germany, yes.

21    Q.  Is that branch a separate entity or are its operations

22    ultimately controlled from the New York headquarters?

23    A.  It's not a separate entity.  It is controlled from the New

24    York headquarters.

25    Q.  Are you familiar with the term roll up into the

1    headquarters?

2    A.   Yes.

3    Q.   Could you explain what that means as far as the Frankfurt

4    branch and the New York headquarters?

5    A.   So, the New York bank, the institutional bank, as I

6    mentioned earlier, is a New York State chartered bank.  We're

7    subject to the oversight of the New York State Department of

8    Finance, and the Federal Reserve Bank of New York.

9            One of the things that we do is we have branches of

10   our institutional bank outside of the United States, which we

11   are allowed to do by law.  We have them in a number of places:

12   Frankfurt, London, Brussels, Tokyo, Milan, Paris.  And those

13   branches roll up, they are under the charter of the New York

14   bank.  The institutional bank.

15   Q.   Are their finances effectively part of the finances of the

16   institutional bank headquarters in New York?

17   A.   Yes, they are covered under the financial statements of the

18   bank in New York.

19   Q.   Is Bank of New York Mellon here in the United States FDIC

20   insured?

21   A.   Yes it is.

22   Q.   Is the institutional bank that you've described during your

23   testimony just now FDIC insured?

24   A.   The institutional bank in the United States is FDIC

25   insured, yes.

1    Q.  Just to be clear, are the foreign deposits in foreign

2    branches of the bank, those deposits themselves insured by

3    FDIC?

4    A.  No.

5    Q.  But U.S. dollars that are held in the United States by the

6    bank would be insured by FDIC?

7    A.  That's correct.

8    Q.  Let me just ask you, based on your -- how long have you

9    been working in the banking industry now?

10   A.  Since December of 2004.

11   Q.  Is it fair to say you've worked in a number of positions at

12   a number of different banking institutions during that time?

13   A.  Yes.

14   Q.  Are you familiar with other banking institutions here in

15   the United States and whether or not those institutions are

16   also covered by FDIC insurance?

17   A.  Yes.

18   Q.  Do you know whether or not JPMorgan Chase here in the

19   United States is FDIC insured?

20   A.  Yes, because I have my bank account there.

21   Q.  Is HSBC Bank here in the United States FDIC insured?

22   A.  Yes.

23   Q.  Is TD Bank here in the United States FDIC insured?

24   A.  Yes.

25   Q.  Is Northern Trust Bank here in the United States also FDIC

1    insured?

2    A.   Yes.

3    Q.   Let me ask you about the term AML.  That stands for

4    anti-money laundering, correct?

5    A.   That's correct.

6    Q.   Where are Bank of New York Mellon's AML compliance

7    departments located for the institutional bank?

8    A.   Predominantly here in New York, at 240 Greenwich Street.

9    Q.   Where are the ultimate decisions made regarding AML and

10   compliance matters for the institutional bank?

11   A.   Here in New York at 240 Greenwich Street.

12   Q.   Let's talk for a moment about correspondent banking.  Can

13   you describe for the jury briefly what that means.

14   A.   Sure.  Correspondent banking is essentially the provision

15   of banking services by one bank to another, so that that second

16   bank's customers can engage in trade in whatever currency is

17   called for.  In many cases, it's the U.S. dollar.  U.S. dollars

18   is used largely for business and economic transactions around

19   the world.  It is a stable currency, but other currencies that

20   are typical in the correspondent banking space are the British

21   pound, the euro, the Japanese yen, and the Swiss franc.

22   Q.   Let me show you what's been marked for identification as

23   Government Exhibit 515.  And this is just for the witness, not

24   the jury at this point.

25             Is this a chart that lays out how some correspondent

1    banking transactions work?

2    A.   In a very simple way, yes.

3           MR. DiMASE:  The government offers Exhibit 515 as a

4    demonstrative exhibit.

5           MR. GARVIN:  No objection.

6           THE COURT:  It will be received.

7           (Government's Exhibit 515 received in evidence)

8           MR. DiMASE:  Please publish it for the jury.

9    Q.   Can you, using this chart, explain how the correspondent

10   banks would participate in this sort of transaction depicted in

11   the Exhibit 515.

12   A.   Certainly.  So, if you use the example I mentioned earlier

13   of global trade and economic business, if somebody was buying a

14   commodity or a piece of machinery, they would be the payer.

15   So, they need to pay the manufacturer who in this chart would

16   be the payee.

17           The payer and the payee might not have the same bank,

18   they might not even be located in the same country.  So the

19   payer would direct their bank, the payee's bank, to go into the

20   payment system, and enter a payment order that says pay the

21   manufacturer who is the payee X amount of money in either

22   dollars or euros.  That payer's bank would send the payment

23   instruction to one of the correspondent banks that they hold an

24   account with.  If it is a dollar payment, for example, they may

25   have three or four different banks that they hold dollar

1    accounts with.  They would send that instruction to them.

2    Correspondent bank in this chart here, correspondent bank A

3    would then determine if they hold an account for the payee's

4    bank.  They may or they may not.  If they do, they may make

5    payment themselves to the payee's bank, and tell them to pay

6    the actual manufacturer at that point in this example.

7             But if they don't, they would find out what

8    correspondent bank holds an account for that payee's bank, and

9    make the payment to that correspondent bank, and tell them you

10   need to pay your client's bank, the payee bank, so they can pay

11   their client.

12            So it's -- they're all links in a chain.

13   Q.  So, let me just go over one example.  If the payer, the

14   payer's bank and the payee's bank are both in jurisdictions

15   where dollars are generally not utilized.  Could the payer's

16   bank and the payee's bank each have U.S. dollar correspondent

17   accounts with the two correspondent banks in the middle?

18   A.  Correct.

19   Q.  In that case, the payer's bank would instruct its U.S.

20   dollar correspondent bank to move money from its correspondent

21   account to the U.S. dollar correspondent account at the second

22   bank, which is held by the payee's bank at that correspondent

23   bank.  Is that fair to say?

24   A.  Not entirely correct.

25   Q.  Go ahead.  Why don't you please correct me.

1    A.  Because, it's very infrequent that the payer's bank tells

2    the correspondent to pay the -- which correspondent to pay to

3    further the payment.  It's usually up to the correspond -- in

4    this example, it would be up to correspondent bank A to

5    determine which bank is going to be correspondent bank B.

6    Because that payee's bank may hold a number of accounts.  They

7    may hold -- for example, they may hold an account at JPMorgan

8    or Citi or the Bank of New York.  And if correspondent bank A

9    can just select JPMorgan or tomorrow they may choose Citi or

10   they may choose the Bank of New York.  So it is really

11   correspondent bank A making the decision over which

12   correspondent, if there are multiple.  If there is only one,

13   then there is only one.

14   Q.  In either case, it would send the dollars to the

15   correspondent account at correspondent bank B for further

16   payment to the payee's bank?

17   A.  That's correct.

18   Q.  How are the instructions about how the money should flow

19   communicated to the banks?  You mentioned a payment message

20   earlier.

21   A.  Predominantly through what's call a Swift messaging system.

22   Q.  Can you describe for the jury what is the Swift messaging

23   or what is a Swift message?

24   A.  Swift is an organization, international organization in

25   Belgium.  It furthers the processing of financial transactions.

1  That's its main purpose.  The messaging system is a very secure

2  messaging system that has specific message types to address

3  specific types of transactions.  And each one of those message

4  types has very specific fields to be used for individualized

5  particular pieces of information.

6  Q.  In the most basic kind of wire transfer, what details would

7  need to be included in this Swift message regarding the

8  transfer?

9  A.  The date of the transaction, the value of the transaction,

10  the currency of the transaction that's being conducted in, the

11  originator's name and the unique identifier, the originating

12  financial institution, the beneficiary's name or unique

13  identifier, an account number, the beneficiary bank's name.

14  And that's it.

15         Other information that could be in there, but that's

16  what has to be in there.

17  Q.  Say that last --

18  A.  There is other information that could be in the payment.

19  But that's the information that must be in the payment.

20  Q.  Is there a field that can be filled out, but doesn't need

21  to be, regarding the details of the payment, the purpose of the

22  payment?

23  A.  Sure.  There is a bank to bank field.  It says bank to

24  bank.  It is an open text field.

25  Q.  That message would help route the payment through the

1    appropriate banks to get it to the beneficiary?

2    A.  It could.  Yes.

3    Q.  Now, where does Bank of New York Mellon, generally

4    speaking, hold its U.S. dollar correspondent accounts?

5    A.  In New York.

6    Q.  Where does Bank of New York Mellon, generally speaking,

7    maintain its euro correspondent bank accounts?

8    A.  I'm sorry.  In Frankfurt or in London.

9    Q.  Frankfurt, Germany or London, U.K.?

10   A.  Yes.

11   Q.  Are you familiar with a bank named DMS Bank & Trust?

12   A.  I am.

13   Q.  Say it again?

14   A.  I am.

15   Q.  Okay.  And does that bank have a relationship with Bank of

16   New York Mellon?

17   A.  Yes, it does.

18   Q.  What kind of relationship?

19   A.  It has a correspondent banking relationship, a U.S. dollar

20   relationship and I believe a euro relationship still as well.

21   Q.  Where does it have its U.S. dollar correspondent bank

22   account with Bank of New York Mellon?

23   A.  In New York.

24   Q.  Where does it have its euro correspondent bank account with

25   BNY Mellon?

1   A.  At the institutional bank's branch in Frankfurt, Germany.

2   Q.  Is there any way that Bank of New York Mellon distinguishes

3   among jurisdictions or clients for correspondent banking risk

4   purposes?

5   A.  Yes.

6   Q.  What do those categories reflect?

7   A.  We do on an annual basis, or more frequently if necessary,

8   look at all of the jurisdictions around world and take into

9   account a number of data points for information.  And we

10  categorize countries as either low, medium or high.

11  Q.  Where is DMS Bank & Trust located?

12  A.  It's in the medium to high range.

13  Q.  Where is it located?  In what jurisdiction?

14  A.  Oh, I apologize.  In the Cayman Islands.

15  Q.  You said it is a medium to high risk jurisdiction?

16  A.  That's correct.

17  Q.  Back in 2016 and 2017, at that time, did DMS Bank also

18  maintain correspondent accounts for dollars in New York and

19  euros in Frankfurt?

20  A.  Yes, it did.

21  Q.  Let's turn to anti-money laundering and compliance programs

22  at BNY Mellon.

23       What infrastructure is there at BNY Mellon to handle

24  AML compliance?

25  A.  So we have a large anti-money laundering compliance program

1     staffed with approximately 115 to 120 people.  We conduct a

2     number of -- we exercise a number of the requirements under the

3     Bank Secrecy Act directly, and advise and oversee our business

4     partners conducting other parts of it.

5             It includes somewhere around 75 or 80 people who do

6     live transaction screening for sanctions and economic sanctions

7     purposes.  Another 75 to 80 people who conduct post-transaction

8     monitoring.  We have another 15 or 20 people who provide advice

9     to our business partners on things like know your customer

10    information, and risk mitigation.  And obviously this includes

11    some of the personnel of the staff at the business.  I think

12    about another 85 or 92 actually conduct the reviews from a know

13    your customer perspective for our direct customers.

14    Q.  We'll turn to some of those issues in a bit more detail in

15    a moment.  Why does Bank of New York Mellon have this robust

16    anti-money laundering compliance infrastructure?

17    A.  Well, there are a few reasons.  One is we are required by

18    law.  The Bank Secrecy Act requires that we take reasonable and

19    prudent steps to prevent, identify, and report potentially

20    suspicious or concerning activity.  That's one reason.

21            The other reason is, to be very candid, is we have to

22    be concerned about our reputation as a financial institution.

23    We want to make sure that we're not being -- we are not

24    involved in something that's potentially illegal.

25    Q.  You mentioned for a moment sanctions and the part of the

1    AML infrastructure involving sanctions.  Without going into too

2    much detail on that, can you briefly explain what you meant by

3    that.

4    A.   Sure.  There are various laws and regulations in place in

5    jurisdictions in the United States and around the world that

6    create what are called sanctions programs.  Which would mean

7    that there are certain individuals or entities that banks in

8    the United States are prohibited from doing business with or

9    conducting transactions on behalf of.  There are others that

10   the programs are more around types of activity that you can't

11   support.

12          And our responsibility is to, where appropriate,

13   reject payments that are involved in some of those activities,

14   or in other circumstances, seize the funds and hold them on

15   behalf of the government and notify the government that we've

16   done so.

17   Q.   Are you familiar with the term "filter"?

18   A.   Yes.

19   Q.   In the context of Bank of New York Mellon's AML program,

20   what does filter mean?

21   A.   So, the filter is a mechanism by which all of our

22   transactions are pushed through a filter.  So every transaction

23   comes into a system, that system looks at all, every data field

24   in a message, and tries to determine whether or not that data

25   field would be indicative of a payment that we would be

1    prohibited from processing.  Either to reject it, or to embargo

2    it and hold it on the side for the government.

3    Q.  Is that filter system something that's set up to work

4    automatically as the transactions come through?

5    A.  Yes.  So it stops them, stops them, and then a human being

6    actually reviews them to determine whether or not it was what

7    we call a true hit.

8    Q.  That's in real time as the wire is passing into the bank?

9    A.  That's correct, it would be, that's a tool for

10   interdiction.

11   Q.  Does every single wire transfer that passes through Bank of

12   New York Mellon's correspondent banking accounts go through the

13   filter system?

14   A.  Yes.

15   Q.  You said that the filters review every field in the payment

16   message.

17   A.  That's correct.

18   Q.  So, I think you mentioned before, certain fields are

19   required, for example, the originating party, the beneficiary

20   party, the amount, things of that nature.  Is all that

21   information reviewed?

22   A.  That's all, that is all run through the filter, yes.

23   Q.  Is information that is not required, but nonetheless

24   provided, for example, information in the bank to bank detail

25   section or wire purpose detail section, would that also be

1   reviewed if information was provided there?

2   A.  Yes.

3   Q.  Outside of -- we've been talking about sanctions here for a

4   moment.  Outside of officially sanctioned people and entities,

5   does Bank of New York Mellon ever add other parties, other

6   people or entities to its filter systems?

7   A.  Yes, we do.

8   Q.  Why is that?

9   A.  If there are individuals or entities that we've identified

10  of concern, that we choose to not process payments for going

11  forward, we'll enter them into our filter so we can

12  automatically reject them.

13  Q.  So your filter systems may include parties that go beyond

14  sanctioned entities and individuals?

15  A.  That's correct.

16  Q.  Do they in fact include individuals that is beyond the

17  sanctions?

18  A.  They do.

19  Q.  Let me now turn to the second area that I think you briefly

20  described.  Post transaction monitoring.  How does that differ

21  from the filter system that you've been testifying about?

22  A.  So, post transaction monitoring by definition happens after

23  the transactions have already occurred.  We, we typically look

24  at activity, week, month, or even in some cases six weeks later

25  to get a broader picture of transactional activity to look for

1    patterns, to look for situations where there could be

2    aggregation of either a transactional volume or value, or we

3    can see flows from multiple individuals to one hub or one hub

4    that is sending out many spokes.  We can look for patterns of

5    behavior regarding specific jurisdictions, if there are

6    jurisdictions concern.  It gives us a much better way to look

7    over that larger set of data.

8    Q.  What are some of the things that can lead the bank to

9    conduct post transaction monitoring on a particular transaction

10   or series of transactions?

11   A.  Well, there is lots of things.  There are red flag

12   indicators that are published in the -- in the federal exam

13   manual.  Things like round dollar transactions, multiple

14   transactions between high-risk jurisdictions where there is no

15   underlying understanding of the nature of the business, there

16   could be transactions involving tax saving jurisdictions,

17   multiple transactions involving what are termed to be offshore

18   jurisdictions.  There is, you know, as many ideas as your mind

19   can create.

20   Q.  Outside of the red flags that might pop up regarding the

21   transactions themselves, are there other sorts of information

22   that might trigger a post transaction review at the bank?

23   A.  That's correct.  We will frequently get information, either

24   from the news media, from government sources, we can share in

25   certain situations where we're legally allowed to, we can share

1  information or receive information from other U.S. financial

2  institutions that can be indicative of concerning activity.

3  Q.  What information is reviewed during the post transaction

4  monitoring process in terms of the data and the payment

5  messages?

6  A.  If we're looking at activity for an individual or an

7  entity, we're look at all of the activity that they've taken

8  part in and all of the information that's available.  So, if

9  they've done -- if they have been involved in wire transfers as

10  well as automated clearing house payments to pay bills or be

11  paid, or if they've written checks that we've cleared maybe

12  through one of our other products for a correspondent bank or

13  that bank may have issued a check on their behalf, we'll look

14  at all of that.

15  Q.  To be clear, particularly with respect to wire transfers,

16  would all of the information in a payment message be reviewed

17  and considered as part of the post transaction monitoring

18  process?

19  A.  Yes, when we review that activity, we look at all of the

20  activity so we can take it into its totality.

21  Q.  Would that include not only the originating party,

22  beneficial party, amount, but also any details provided by the

23  purpose of the wire transaction as well?

24  A.  Yes, that's true.

25  Q.  Who conducts the post transaction monitoring at Bank of New

1  York Mellon?

2  A.  We have a staff of, like I said, about 70 or 80 people,

3  many of them sit in or are employed near Syracuse.  We also

4  have people who sit just outside of London.  Some people we sit

5  in Frankfurt.  And some of the people who sit in Tokyo and

6  Singapore.

7  Q.  Are the people in New York as well, New York City?

8  A.  Yes.

9  Q.  Is that review conducted of just transactions passing

10 through the headquarters here in New York or for wires passing

11 to all of the institutional bank branches?

12 A.  It's wires passing through all of the institutional bank.

13 Q.  If suspicious activity is detected in the post transaction

14 monitoring context, what are the typical steps that might be

15 taken after some activity is first recognized?

16 A.  Well, the analysts who are reviewing activity, they don't

17 determine whether something is suspicious or not.  They

18 determine whether something is concerning or not.  In that

19 process, if they have come to that conclusion that something is

20 concerning, we have a process within our organization where

21 they'll document in what's called an incident report, and

22 document their findings and the associated information and the

23 reference materials.  That will then get forwarded to our

24 suspicious activity response team.

25         The investigators there will take that information,

1    conduct a more larger, broader, deeper dive into the activity

2    and the parties associated, and make a determination whether or

3    not something is suspicious or not.  And whether or not we have

4    any regulatory filing obligations.

5    Q.  As part of that process, are there occasions on which the

6    bank would seek additional information or documentation from

7    its customer bank?

8    A.  That's one of the investigative steps.  We can't, if we

9    can't get an understanding of the activity on its face, we very

10   often go out to our correspondent bank, our client, and ask

11   them for information about their client, and particulars around

12   the transaction specifically.

13   Q.  So not just going to the bank customer, such as DMS Bank,

14   but going further to the bank customer's customer?  Is that

15   what you're saying?

16   A.  Yes.  Except we would only go to the bank.  We would expect

17   the bank in this case, in your example DMS, to go to their

18   customer.

19   Q.  Got it.  What are some of the possible outcomes of post

20   transaction monitoring if suspicious activity is confirmed?

21   A.  A number of things can happen.  We can continue to monitor

22   it to see if it was an anomaly.  We can make a determination

23   that we don't want to see anymore.  And we can go to our client

24   bank and tell them that we don't want to see activity for that

25   party anymore through their account in our books.

1           THE COURT:  What does that mean, "see"?

2           THE WITNESS:  We don't want them to transact for that

3    individual or entity through their account on our books.

4    Q.  Okay.

5    A.  Or --

6    Q.  One was you can conduct further ongoing monitoring; two was

7    you could you go to your customer bank and tell them stop

8    transactions with these entities through our accounts.  What

9    else could happen?

10   A.  We could take the step of placing that individual or entity

11   on our filter to reject for AML compliance purposes.  And if

12   the activity was or if there was a pattern of behavior amongst

13   a number of clients, we could have a discussion with our client

14   bank to potentially terminate our relationship with them.

15   Q.  With the bank customer itself?

16   A.  Yes.

17   Q.  You said that that would happen if there was more of a

18   pattern of activity over time with that bank?

19   A.  Yeah, that's a step that usually occurs, if it does occur,

20   is over a period of time.  We will have significant discussions

21   with our clients compliance staff, AML staff, and potentially

22   their senior management to get a better understanding of why we

23   should be comfortable and what steps they're taking to mitigate

24   the risks that we think that we've identified.

25   Q.  So it's fair to say that cutting off of the entire

1  relationship with the bank is a more extreme step?

2  A.  Yes.

3  Q.  Mr. Wildner, in general, do all U.S. banks to your

4  knowledge operate more or less the same way, with respect to

5  their AML programs?

6  A.  Generally I would say yes.

7        MR. DiMASE:  One moment.

8  Q.  Mr. Wildner, are there certain committees in place at Bank

9  of New York Mellon to oversee its AML compliance activities?

10  A.  Yes.  I chair the bank's anti-money laundering oversight

11  committee.  And that committee has a number of subcommittees to

12  address specific geographies, certain business lines, and in

13  some cases, small parts of the AML program itself.

14  Q.  Are there subcommittees -- I think you said subcommittees.

15  Is one of them pre-AMLOC committee?

16  A.  Yes it is.

17  Q.  Just very briefly can you tell what the pre-AMLOC committee

18  is?

19  A.  Sure.  AMLOC consists of the senior members of the senior

20  executives of the various business lines within our firm as

21  well as representatives from AML compliance and our legal team.

22  We meet biweekly and we receive a lot of information.

23        In order to make sure that the committee is actually

24  receiving the full picture, for lack of a better term, when

25  they meet biweekly, we have a subcommittee that meets weekly

1    called pre-AMLOC.  So things or situations are escalated to

2    pre-AMLOC.  There is a group of six or seven of the voting

3    members who attend that meeting.  We give direction back to

4    either AML compliance to take other steps to gather more

5    information, or we'll interview or direct our business partners

6    to go out and obtain additional information.  Or we will

7    consult with our legal colleagues around any other requirements

8    that we may need to address, before we bring a topic to AMLOC

9    specifically.

10   Q.  Which is the higher level --

11   A.  That's correct.

12   Q.  Let me now show you what's been marked for identification

13   as Government Exhibit 500.

14        MR. DiMASE:  May I approach the witness, your Honor?

15        THE COURT:  You may.

16   Q.  Do you recognize that?

17   A.  Yes, I do.

18   Q.  What is it?

19   A.  It is a CD that contains business records from the Bank of

20   New York Mellon.

21   Q.  Does it also contain a copy of the demonstrative exhibit

22   showing the correspondent banking relationships?

23   A.  It does.

24   Q.  Were those records on the disc, aside from the

25   demonstrative exhibit, kept in the regular course of Bank of

1    New York Mellon's business?

2    A.   Yes, they are.

3    Q.   Is it the standard practice of New York Mellon to make and

4    keep those records?

5    A.   Yes.

6                   (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. DIMASE:

2    Q.  Was the information in the records recorded at around the

3    time the events or transactions described in the records took

4    place?

5    A.  Yes.

6    Q.  And was the person who kept these records under a business

7    duty to do so accurately.

8    A.  Yes.

9            MR. DIMASE:  Your Honor, the government offers Exhibit

10   500, along with its contents Exhibits 501, 502, 504, 506, 513,

11   515, 517, 537, along with 534-A and 536-A into evidence.

12           THE COURT:  Any objection?

13           MR. GARVIN:  No objection.

14           THE COURT:  They will be received.

15           (Government Exhibit 500 received in evidence)

16           (Government Exhibits 501, 502, 504, 506, 513 received

17   in evidence)

18           (Government Exhibits 515, 517, 537, 534-A and 536-A

19   received in evidence)

20   Q.  Directing your attention to approximately late December

21   2016, did you become aware of an AMLOC inquiry involving DMS

22   Bank at that time?

23   A.  I did.

24   Q.  How did the inquiry come to your attention?

25   A.  It was during the course one of our pre-AMLOC meetings.

1    Q.   And what was the client or clients at DMS Bank associated

2    with that inquiry?

3    A.   Fenero Equities, Fenero Investments.

4    Q.   Several Fenero-related entities?

5    A.   Yes.

6    Q.   I'm going to show you Government Exhibit 526 in evidence:

7    This is an e-mail from Christopher Grasso to you and others

8    dated December 30, 2016?

9    A.   That's correct.

10   Q.   Is Mr. Grasso an employee of the bank in the compliance

11   area?

12   A.   Yes.

13   Q.   Let's just scroll down to the first page.  Do you

14   recognize -- there is a redacted portion here.  Do you

15   recognize what this document is?

16   A.   Yes.  It's a summary for the investigations that are being

17   presented to pre-AMLOC every Monday.

18   Q.   Can we scroll to page 12 -- actually page 13 of the --

19   there we go.  Can we zoom in on that portion.

20        And is this the portion of the memo addressing this

21   particular compliance inquiry?

22   A.   Yes, it is.

23   Q.   And could you read what it says under Internet.

24   A.   "Internet – website located stating "possibly in an attempt

25   to avoid regulators and/or trip money laundering filters,

JBF7SCO6                    Wildner - direct

1   OneCoin are banking under the inconspicuous account name

2   "International Marketing Services PTE. Ltd."

3   Q.  And then it lists a website where that --

4   A.  There is a URL, correct.

5   Q.  Where that information is located?

6   A.  Presumably, yes.

7   Q.  And is doing public source research a common practice in

8   compliance work?

9   A.  Yes.

10  Q.  Let's go down to debits.  And the first third -- the first

11  third, fourth and fifth bullet points beneath there, is it fair

12  to say those listed a number of wire transactions involving

13  Fenero?

14  A.  Yes.

15  Q.  You can see the first one, six wires for approximately 55

16  million involving Fenero Financial Switzerland?

17  A.  That's correct.

18  Q.  The third bullet point refers to seven wires totaling 35

19  million involving Fenero Equity Investments?

20  A.  That's correct.

21  Q.  And is this why Fenero was part of the inquiry that was

22  being conducted at this stage by BNY Mellon?

23  A.  Yes.

24  Q.  And at the bottom you see where it says "recommend"?

25  A.  Yes.

JBF7SCO6                    Wildner - direct

1    Q.  What does it say there?

2    A.  "Recommend:  3 month review to monitor."

3    Q.  And were these entities discussed at one of these pre-AMLOC

4    meetings in early 2017?

5    A.  Yes.

6    Q.  Let me show you now Government Exhibit 527 in evidence.

7    This is from Kevin O'Neil to the AMLOC desk and other e-mail

8    addresses dated January 5, 2017.  Mr. Wildner, would you have

9    had access to the AMLOC desk e-mail group?

10   A.  Yes.

11   Q.  Let's go down here.  And at the bottom -- at the top here

12   it says "This matter is being referred by Matt Maggio.

13   Escalation - pre-AMLOC referral."

14        Was Matt Maggio another compliance employee at that

15   time at Bank of New York Mellon?

16   A.  Yes, he was.  Can I correct myself?  Matt Maggio worked for

17   legal, and he was in our suspicious activity response team.

18   Q.  Can you read the paragraph starting "incident report".

19   A.  "Incident report number 622896 identifies 275 concerning

20   wires, totaling approximately $222,000,467.62 (multiple euro

21   wires converted to USD), that involve International Marketing

22   Services Pte Ltd.  The wires are concerning primarily because

23   internet research indicates International Marketing Services is

24   involved with OneCoin Ltd., a company that appears to be

25   operating a pyramid/Ponzi scheme.

 1   Q.  Can we go to page 3 of this document.  And there is a

 2   section here entitled, "Research".  "Internet research provides

 3   limited information on International Marketing Services."  It

 4   then references a website and says, "The website states that

 5   the customers can send the cost of a package.  When buying your

 6   first package, please add the activation costs of 30 euros

 7   whichever package you are buying."  It also states that "under

 8   subject of the bank payment please write only your user name.

 9   No other description is needed.  The website also advises that

10   customers should never contact the banks directly."

11        "A review of the website indicates that the website

12   reveals it encourages customers to sign up for education

13   packages on how to use OneCoin.  The website describes OneCoin

14   as the future of cryptocurrency after Bitcoin and cites the

15   founder as Ruja Ignatova.  The website states that OneCoin's

16   account comes into play when you start to get bonuses from the

17   investments made by the people under you.  60 percent of this

18   bonus goes to you cash account and 40 percent to your trading

19   account."  And it goes on to describe some additional features.

20        If we can just scroll down to the next page.  And just

21   at the top of the page above, Mr. Barile, where it says

22   "Internet research" in the bottom of the page above.

23        "Internet research revealed various websites and

24   articles alleging that OneCoin is an online Ponzi scheme."  It

25   then references several websites.

1    And in the next paragraph, expand the next three

2    paragraphs.

3    Is it fair to say, Mr. Wildner, that these paragraphs

4    describe different government entities with OneCoin in one way

5    or another?

6    A.  Yes.

7    Q.  OK.  Just go to the bottom where it says recommendation

8    section.  And with respect to DMS Bank and number 3, it says

9    "Request KYC from DMS Bank & Trust regarding the aforementioned

10   transactions involving its client, Fenero Equity Investments,

11   L.P., Fenero Financial Switzerland L.P. and Apex Fund Services

12   UK Ltd."

13   A.  That's correct.

14   Q.  Were there subsequent pre-AMLOC and AMLOC meetings during

15   which these matters were discussed further by those committees?

16   A.  Yes, there were.

17   Q.  And as a result of those meetings, was any decision made

18   regarding outreach to DMS Bank?

19   A.  Yes.  We instructed our client-facing team relationship

20   manager to contact DMS and request customer information and

21   purpose of the transaction and information around the

22   transaction from DMS.

23   Q.  In this situation who was asked to make that contact?

24   A.  John-Pierre Saint Victor.

25   Q.  And other people working in his department?

JBF7SCO6                           Wildner - direct

1    A.  Yes.

2    Q.  And why did they reach out to DMS Bank rather than people

3    from the compliance department at Bank of New York Mellon?

4    A.  The business people own the relationship, so that's why

5    their relationship managers talk to their clients.

6    Q.  And is that the usual course that they do the

7    communication, not compliance people?

8    A.  Yes, unless it's a relationship issue with the bank itself,

9    the relationship managers would always be the people who talk

10   to the client.

11   Q.  Did Mr. Saint Victor or staff reach out to DMS Bank in this

12   matter.

13   A.  Yes.

14   Q.  And did DMS Bank respond with information regarding the

15   Fenero entities?

16   A.  Yes.

17   Q.  I'll show you Government Exhibit 537.  And did you

18   eventually receive the information contained in this e-mail

19   dated February 3, 2017?

20   A.  Yes.

21   Q.  If we could just scroll down.  And looking at the page in

22   front of you now, were these the responses from DMS Bank that

23   you and other compliance staff looking at this series of

24   transactions reviewed?

25   A.  Yes.

1    Q.  Was the information provided in this response sufficient

2    for the pre-AMLOC committee to decide what the next steps were?

3    A.  No.

4    Q.  Did it resolve the concerns that Bank of New York Mellon

5    had?

6    A.  No, it did not.

7    Q.  Why not?

8    A.  Well, there is a number of reasons, but primarily we asked

9    very specific questions about the purposes of the transactions,

10   and one of the answers is that it was a quote unquote one-off

11   transaction, and we had seen multiple transactions already.

12   Q.  Well, I think you may be speaking about a later e-mail.

13   Why don't we just go down to the next page.  I think as far as

14   this e-mail we can focus on 7, 8 and 9.

15          Was the information provided in response to these

16   three questions sufficient to address the concerns that the

17   pre-AMLOC committee had?

18   A.  No, it was not.

19   Q.  And why is that with respect to these particular answers?

20   A.  Well, they answered the question:  What is your

21   understanding of the purpose of the transaction?  And it says,

22   "transactions listed on the BNY Mellon spreadsheet appear to

23   be" --

24          THE COURT:  I'm sorry, sir.  Could I ask you to slow

25   down a little bit.

1    THE WITNESS:  I apologize, your Honor.

2    A.   "The transactions listed on the BNY spreadsheet appear to

3    be in accordance with the stated activity of the client, in

4    that it is a master feeder structure with payments being made

5    into other Fenero funds, a loan to a distressed company and fee

6    payments to the IM."  Investment manager, that's what I believe

7    IM stands for in that context.

8         That didn't comport very well with the transaction

9    activity we had seen.

10   Q.   And did you find it to be sufficiently detailed to respond

11   to the questions that had been posed by the bank?

12   A.   It didn't address our -- it didn't -- it didn't remove our

13   concern.

14   Q.   OK.  Why don't we take that down, and I will show you

15   Government Exhibit 529 in evidence.  This is an e-mail from

16   Matt Maggio to several people dated February 6.  Can we go to

17   the body of the e-mail.  And what does Mr. Maggio say in that

18   e-mail?

19   A.   "Amanda:  Thanks for forwarding this KYC.  Unfortunately,

20   it is vague and doesn't adequately explain the nature of the

21   activity (over $200 million in 4 months).  Therefore, I will

22   ask John to invite the RM for DMS and the RM overseas Chinese

23   Banking Corp. Ltd. (since we did not receive KYC from it) to

24   pre-AMLOC."

25   Q.   And so there Mr. Maggio is indicating that the responses

1    were vague and did not provide an adequate explanation for the

2    transactions.

3    A.   That's correct.

4    Q.   Was the relationship manager invited to a later meeting?

5    A.   Yes.

6    Q.   And who was that?

7    A.   John-Pierre Saint Victor.

8    Q.   What was he directed to do at that meeting?

9    A.   To go back to DMS Bank and obtain additional information.

10   Q.   OK.  Did he do that?

11   A.   Yes.

12   Q.   All right.  Let me ask you to look at Exhibit 512.  Does

13   this reference one of the pre-AMLOC meetings that you had

14   around that time?

15   A.   Yes.

16   Q.   Where this issue was discussed?

17   A.   That's correct.

18   Q.   And number 6 there on the agenda?

19   A.   Topic six was "IR622896 - DMS Bank & Trust Ltd, Cayman

20   Islands/Fenero Equity Investments L.P./Fenero Financial

21   Switzerland L.P./Apex Fund Services UK Ltd. (JP Saint Victor)."

22   Q.   Let me show you Government Exhibit 533. and this is an

23   e-mail that was sent to you regarding Fenero/DMS Bank Cayman

24   dated March 6, 2017?

25   A.   That's correct.

1   Q.  If we could scroll down.  Did you review the information

2   contained in this e-mail thread in connection with that March 6

3   meeting that you just described?

4   A.  Yes.

5   Q.  And this is directing your attention to the part of the

6   e-mail starting "Good morning JP.  Is this the additional

7   information that the committee received in connection with the

8   inquiry from DMS Bank?

9   A.  Correct.

10  Q.  And again who provided this to the compliance committee?

11  A.  I'm sorry?

12  Q.  Who provided this information to the compliance committee?

13  A.  Oh, John-Pierre Saint Victor.

14  Q.  What happened at the March 6, 2017 meeting?

15  A.  We took into account this information and made a decision

16  that we were not comfortable with processing payments for

17  Fenero.

18  Q.  Was it all Fenero payments, or this particular payment at

19  the moment?

20  A.  I apologize.  That we weren't comfortable processing

21  payments for Fenero, but -- let me restate that -- with

22  International Marketing Services.

23  Q.  And in what way was the committee's decision implemented

24  following the meeting?

25  A.  We directed International Marketing Services be placed on

1    our filter.

2    Q.  And, to your knowledge, were any other entities placed on

3    the filter at that point?

4    A.  There were a number of other entities placed on that filter

5    not connected with this matter.

6    Q.  Do you know if OneCoin itself was added to BNY Mellon's

7    filter list at that time?

8    A.  I don't recall that it was.

9    Q.  You said you don't recall that it was, or you don't recall

10   if it was?

11   A.  I don't recall that it was.

12   Q.  And as you sit here today, do you know why it wasn't?

13   A.  No.

14   Q.  Let me ask you to look at Exhibit 518.  And this is an

15   e-mail from Mr. Saint Victor to Nanalie Cover copying Colm

16   O'Driscoll on March 7, 2017?

17   A.  Yes.

18   Q.  This is a day after the meeting you were describing?

19   A.  Yes.

20   Q.  And can we just highlight or blow up the lower portion of

21   the body of the e-mail.

22        Now, in addition to adding an entity to the filter

23   list, was Mr. Saint Victor also instructed to discuss future

24   transactions with DMS Bank after that meeting?

25   A.  Yes, he was.

1  Q.  And what was he instructed to tell the bank about future

2  transactions involving International Marketing Strategies along

3  with other entities?

4  A.  That we did not want to see transactions for those entities

5  through their account on our books.

6  Q.  Is that distinct from adding those entities to the filter

7  list?

8  A.  Yes.

9  Q.  So you said International Marketing Strategies was the only

10  entity that was actually added to the filter list, to your

11  understanding?

12  A.  Service entities.  Yes.

13  Q.  International Marketing Services.  I apologize.

14  A.  Yes, International Marketing Services was added to the

15  filter; the others were not.

16  Q.  So, when Mr. Saint Victor stated to the folks at DMS Bank

17  all of these names will be inserted into its filters, that was

18  not technically correct.

19  A.  That is a factual statement.  Yes, you are correct.

20  Q.  I'm correct that he was wrong when he said all of these

21  entities were being added to its filters.

22  A.  Yes.

23  Q.  But the bank was being directed not to have any

24  transactions with these entities through Bank of New York

25  Mellon's accounts.

1   A.  That's correct, that was the instruction to DMS Bank.

2   Q.  Even though all of them were not being added to the filter

3   list.

4   A.  Correct.

5   Q.  And is there a reason why the filter list -- terms are

6   added sparingly to the filter list?

7   A.  Yes, because the filter is not an exact match.  There are

8   algorithms that run in the background that take words that may

9   sound like one word, take into account misspellings,

10  mispronunciations, John could be Sean, multiple spellings.

11  There could be a lot of false positives, so we need to be

12  cognizant of how we add things to the filter, because it could

13  cause some significant unintended consequences.

14  Q.  Let me show you 534 and 535.  And do these two documents

15  reflect the addition of International Marketing Services to the

16  filters at Bank of New York Mellon?

17  A.  Yes, they are instructions to load them into the filter.

18  Q.  And was there an attachment to 534?

19  A.  Yes, there was.

20  Q.  We don't have to look at it, but are you aware of a

21  spreadsheet attached to 534 that contains International

22  Marketing Services as one of the entities to be added to the

23  list?

24  A.  Yes.

25  Q.  And can we also look at 520.  And just scrolling all the

1   way to the right, this shows "outcome, OFAC filter, 3/16/17."

2   Does that show the filtering terms were added as a result of

3   the inquiry?

4   A.  Yes, that's how we closed out the item on our tracking log.

5   Q.  You indicated that -- well, withdrawn.  Mr. Saint Victor in

6   Exhibit 518 -- which we can pull up again -- indicated that

7   there would be additional review, an additional review period

8   to go along with the direction not to process transactions.

9   A.  That's correct.

10  Q.  Was there additional review conducted to identify any

11  additional transactions with these entities after this date?

12  A.  Yes, there were a number of additional reviews conducted

13  after this date.

14  Q.  For about how long did that go on?

15  A.  Approximately a year.

16  Q.  And did BNY Mellon identify and block additional

17  transactions during that period involving International

18  Marketing Services?

19  A.  We identified a number of transactions for International

20  Marketing Services that were rejected.

21  Q.  And, to be clear, did any of those transactions involve

22  Fenero?

23  A.  Not that I know of.

24  Q.  Let me just talk about a couple of other wires involving

25  Fenero, and let me --

1          Your Honor, at this point the government would offer

2     Exhibits 720A, B and C into evidence pursuant to the

3     stipulation admitted as Government Exhibit 52.

4          THE COURT:  Any objection?

5          MR. GARVIN:  One moment, your Honor.

6          MR. DIMASE:  These are Bank of New York Mellon bank

7     records.

8          MR. GARVIN]:  No objection.

9          THE COURT:  They will be received.

10         (Government Exhibits 720-A, 720-B and 720-C received

11    in evidence)

12    Q.  Can we look at 720-B, and could we go to page 27.

13         Your Honor, there seems to be an issue with the PDF

14    here not containing all the pages.  Since it's 2:29, perhaps we

15    could break at this point.

16         THE COURT:  Yes, let's do that.

17         Ladies and gentlemen, we will break for the day.

18    Unfortunately it's Friday afternoon, so we won't see you for

19    another couple days.  So have a wonderful weekend.  Be safe

20    getting home.  Don't discuss the case and don't read anything

21    about the case.

22         (Continued on next page)

23

24

25

1    (Jury not present)

2    THE COURT:  Everyone can be seated.  Anything more?

3    MR. GARVIN:  Your Honor, I have a housekeeping matter

4    that I'd like to bring up.

5    THE COURT:  OK.

6    MR. GARVIN:  I have not had a chance to discuss it

7    with counsel, but one of the witnesses for Mr. Scott is a

8    lawyer in Miami.  When we heard there was a chance the

9    government was going to rest Thursday, we arranged for him to

10   come Friday.  Then things slowed down a little bit and we

11   pushed him off until Monday, and now we see that we may not

12   have a situation in which the government rests on Monday.  So,

13   we would like to seek permission -- if we cannot move him yet

14   again to Tuesday -- to perhaps take him out of turn.  I don't

15   believe his testimony will be more than 45 minutes.

16   THE COURT:  OK.  Mr. DiMase, what can you tell us

17   about where the government stands in terms of when it might

18   rest.

19   MR. DIMASE:  Yes, your Honor.  So, I have about five

20   minutes of direct left with this witness.  Obviously, I don't

21   know how long the cross will be.  After that we have three

22   witnesses.  We have what I expect will be a 30 to 45 minute

23   summary witness regarding the Bank of Ireland materials; a

24   witness who will testify about summary financial charts --

25   which that could be longer -- and then a relatively short

1    witness regarding the post-arrest statement.

2              THE COURT:  Regarding?

3              MR. DIMASE:  The post-arrest statement, your Honor.

4              THE COURT:  OK.

5              MR. DIMASE:  So, I think it's possible that we

6    could -- the crosses are hard to anticipate, and I don't know

7    exactly how long the financial summary witness will be, because

8    there are a number of charts through that witness, but it is

9    possible we could finish at some point or by the end of the day

10   on Monday.  It is also possible we could bleed into Tuesday.

11   But I think we will be resting either by the end of the day

12   Monday or sometime early on Tuesday.

13             THE COURT:  So, I mean I'm happy to take your witness

14   out of order.  So, why don't we do this:  Why don't we see

15   where we are in the third leg of the day on Monday, and if it

16   looks as though you're not going to be able to finish, then we

17   will start your witness at 1 o'clock.

18             MR. GARVIN:  Thank you.

19             THE COURT:  OK?  Anything else?

20             MR. GARVIN:  Not from the defense.

21             THE COURT:  All right.  We will try to get you the

22   draft jury charge at some point later this afternoon, and you

23   should be prepared to discuss it at least beginning Monday

24   afternoon where we finish for the day.

25             Mr. Folly?

1    MR. FOLLY:  Your Honor, we would just ask defense

2    counsel if they can let us know who their witnesses are that

3    they intend to call at this point and who the witness is that

4    we have been discussing who may testify on Monday.

5    MR. GARVIN:  Miguel Diaz de la Portilla is the witness

6    we have been talking about.

7    MR. FOLLY:  Are there any additional witnesses you

8    plan to call?

9    MR. GARVIN:  I'm going to go through that this

10   afternoon.

11   THE COURT:  OK.  If there is nothing else, we will see

12   you bright and early on Monday morning.  Have a great weekend.

13   (Trial adjourned to November 18, 2019 at 9 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    INDEX OF EXAMINATION

2   Examination of:                        Page

3    NICHOLAS KROLL

4   Cross By Mr. Garvin  . . . . . . . . . . . . .1299

5   Redirect By Mr. Folly  . . . . . . . . . . .1357

6   Recross By Mr. Garvin  . . . . . . . . . . .1360

7    JEAN-PIERRE SAINT VICTOR

8   Direct By Mr. DiMase . . . . . . . . . . . .1365

9   Cross By Mr. Garvin  . . . . . . . . . . . .1394

10   DAVID WILDNER

11  Direct By Mr. DiMase . . . . . . . . . . . .1405

12                    GOVERNMENT EXHIBITS

13  Exhibit No.                           Received

14   1005    . . . . . . . . . . . . . . . . . .1303

15   504, 513, 517, 518 subject to connection   .1364

16   519, 531, 532, 536, 536-A subject to connection1364

17   1295    . . . . . . . . . . . . . . . . . .1375

18   1296    . . . . . . . . . . . . . . . . . .1378

19   515    . . . . . . . . . . . . . . . . . . .1411

20   500    . . . . . . . . . . . . . . . . . . .1429

21   501, 502, 504, 506, 513   . . . . . . . . .1429

22   515, 517, 537, 534-A and 536-A  . . . . . .1429

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.••
(212) 805-0300

1    720-A, 720-B and 720-C . . . . . . . . . . .1444

2                    DEFENDANT EXHIBITS

3    Exhibit No.                              Received

4    901   . . . . . . . . . . . . . . . . . . .1317

5    902   . . . . . . . . . . . . . . . . . . .1330

6    903   . . . . . . . . . . . . . . . . . . .1331

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25