JBI9SCO1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        17 CR 630 (ER)

 5   MARK S. SCOTT,

 6                  Defendant.

 7   ------------------------------x

 8                                       New York, N.Y.
                                         November 18, 2019
 9                                       9:00 a.m.

10   Before:

11                   HON. EDGARDO RAMOS,

12                                       District Judge

13                        APPEARANCES

14

15   GEOFFREY S. BERMAN,
          United States Attorney for the
16        Southern District of New York
     CHRISTOPHER DiMASE
17   NICHOLAS FOLLY
     JULIETA V. LOZANO
18        Assistant United States Attorneys

19   COVINGTON & BURLING LLP
          Attorneys for Defendant
20   BY:  ARLO DEVLIN-BROWN
          KATRI STANLEY
21        -AND-
     DAVID M. GARVIN

22

23

24

25
```

JBI9SCO1

```
1              (Jury not present)

2              THE COURT:  I see all the lawyers are here.  What

3     business can we take care of this morning?  I received the

4     government's letter at 11:20 last night.

5              MR. DiMASE:  Sorry about that, your Honor.

6              THE COURT:  I had an opportunity to read it.

7              Now, there are a couple of letters that are

8     outstanding.  One is the government's letter concerning the

9     cryptocurrency expert.

10             MR. DiMASE:  Your Honor, we've spoken to the defense

11    attorneys and they told us yesterday that they're not planning

12    to call any cryptocurrency expert at this stage.  So I think

13    that may be mooted.

14             MR. DEVLIN-BROWN:  That's correct, your Honor.

15             THE COURT:  And then the -- so can we talk about the

16    government's letter from last night or have you folks had an

17    opportunity to digest it?

18             MR. DiMASE:  Your Honor, before we address that

19    there's one other outstanding letter that we can put on the

20    record.  It's also been mooted, I believe.  The defense put in

21    a letter seeking reconsideration of the Court's ruling on a

22    portion of the postarrest statement.

23             THE COURT:  I thought that was resolved.

24             MR. DiMASE:  I don't know that we ever --

25             THE COURT:  Sorry.  Go ahead.
```

1          MR. DiMASE:  It is resolved.  We are removing that

2     question and answer entirely from the portion of the statement

3     that we are going to admit.  I believe that resolves the motion

4     but I guess we should ask Mr. Devlin-Brown.

5          MR. DEVLIN-BROWN:  Yes.  I think that was the only

6     thing we had asked for reconsideration of.

7          THE COURT:  OK.

8          MR. DEVLIN-BROWN:  With respect to the government's

9     letter of last night I did look at it.  I thought we might

10    address it at the charge conference.

11         THE COURT:  There's one charge issue.

12         MR. DiMASE:  The one issue that relates to testimony

13    is the character witness issue and I think that there may be a

14    character witness taken out of order today which is why we

15    submitted the letter.

16         Your Honor, one other point while Mr. Garvin is

17    reviewing that letter.  Our paralegal has reported that there

18    are delays on the subway this morning so he's doing his best to

19    get here on time.  We may need to have a substitute paralegal

20    fill in for him briefly.  It may affect the jury as well.  I

21    don't know which lines.

22         THE COURT:  We did get a call from one of the jurors,

23    juror no. 8, Mr. Veras, that he may be five minutes late.

24         MR. DiMASE:  OK.

25         MR. GARVIN:  Your Honor, with regard to the letter.

1    I'm not one hundred percent certain what the government seeks.

2    The witness that I intend to call today at one o'clock, Miguel

3    Diaz de la Portilla, is largely is character witness.  I do not

4    intend to introduce any e-mails through him whatsoever.  I'm

5    not certain as to the applicability of some of the arguments

6    that are raised in this letter because --

7            THE COURT:  I read the government's letter as throwing

8    down a marker as to what the state of the law is concerning

9    character witnesses and I read it as a straightforward

10   recitation of what the law is.

11           MR. DiMASE:  I agree.  And I think the import of the

12   letter for the purposes of the defense is the government would

13   object to the -- to any testimony regarding particular acts of

14   the defendant on direct and maintains that Rule 405 will only

15   permit the character witnesses on direct examination to testify

16   to the defendant's general character for truthfulness and not

17   to specific acts.

18           THE COURT:  OK.

19           MR. DiMASE:  But I don't think it's a very -- I mean

20   it's black letter law, I would say.

21           MR. DEVLIN-BROWN:  There are a couple of things on our

22   agenda still.  One is we had moved, I forget if it was Thursday

23   or Friday, for the admission of 505 and 519 which were two

24   e-mails that -- and I can hand them up, your Honor, if you'd

25   like -- that involved Robert Courtneidge.  One, Robert

JBI9SCO1

1    Courtneidge sends Mr. Scott a roadmap of OneCoin stuff he's

2    working on, just forwarding the e-mail, that's 519, forwarding

3    the roadmap; and the second is Robert Courtneidge and an

4    associate forwarding a shorter version of the cryptocurrency

5    report that of a later date and time.  Again, we don't care

6    about anything in the cover e-mail.  It is simply:  Please find

7    attached.

8            The government I believe said we'll get back to you on

9    that Thursday or Friday.  And I just want to make sure it

10   doesn't fall off the radar completely.

11           MR. DiMASE:  Your Honor, we'll review them now.

12           THE COURT:  OK.

13           MR. DEVLIN-BROWN:  So the government would like to

14   look at that and check one thing out so I guess we can table

15   that.

16           THE COURT:  OK.

17           MR. DEVLIN-BROWN:  The only other thing that we can

18   potentially address, just speaking with Mr. DiMase now, is they

19   are going to be calling a paralegal I believe to testify in

20   summary fashion about some of the Bank of Ireland exhibits.

21           There were -- I believe Mr. DiMase objects to some we

22   were planning to offer.  We have generally no objection to

23   those he plans to submit except for two.  And so if your Honor

24   wishes, we could address those.

25           THE COURT:  OK.

JBI9SCO1

1           MR. DiMASE:  What are the exhibits?

2           MR. DEVLIN-BROWN:  1742 and 1757.

3           I don't know if your Honor has copies of those.

4           THE COURT:  I don't readily available.

5           MR. DEVLIN-BROWN:  We could hand those up if you'd

6      like.

7           I can hand it up your Honor if you like; if I can just

8      describe it first in case I forget.

9           MR. DiMASE:  Your Honor -- OK.  Go ahead.

10          MR. DEVLIN-BROWN:  Generally with respect to Bank of

11     Ireland there's a testimonial stipulation we've all agreed to.

12     95 percent or more of the other e-mails are either requests

13     that Bank of Ireland personnel make to Mr. Scott or stuff that

14     Mr. Scott sends back in response to those requests.  These two

15     are a little bit different in that they appear to, at the top

16     of the e-mail anyway, simply contain internal communications

17     between BOI representatives and therefore I think would be

18     hearsay at the top of the chain anyway.  I'm happy to hand them

19     up.

20          MR. DiMASE:  What was the other one, 1742 and?

21          THE COURT:  1742 and 1757.

22          Not a whole lot of substance in either one.

23          MR. DEVLIN-BROWN:  It wasn't the most important issue

24     in the world for us but it did seem to be hearsay.

25          MR. DiMASE:  1757 is the e-mail from Deirdre.  Sorry

JBI9SCO1

1757 this is attaching the --

        MR. DEVLIN-BROWN:  Do you want me to -- 1757.

        MR. DiMASE:  Yes.  I just want to make sure that we're on the same page.

        Your Honor, we can remove 1757.  To the extent there's any hearsay concern, that's not a critical e-mail.

        But on 1742 we do seek to admit that e-mail.  And this really goes back to an agreement that the parties had about not continuing to pursue the witnesses from Ireland.  This e-mail is between people at Bank of Ireland but it describes information that came from Mr. Scott.  On the top of the second page.  Mark Scott is the initial and sole investor.  See investors have shown some interest and if they are to invest they will be identified under anti-money laundering requirements.  That is information that came from Mr. Scott.  There is really no other place it could have come from.  This is an employee at Bank of Ireland who doesn't have any personal knowledge regarding the fund.  So we would argue that that is a statement of the defendant -- basically a secondhand statement of the defendant and it is admissible as a party admission.

        The part above that about AML controls is necessary to understand the answer that -- the exchange that's in 1743, which is to say that these statements are being offered for the effect on the listener, Mr. Begley, to prompt him to ask the question to Mr. Scott in 1743 and also as context around

1    Mr. Scott's answer in 1743.

2            So for those reasons we believe that 1742 is

3    admissible.  And had we known that this was going to become an

4    issue, your Honor, we would have pressed harder to have these

5    witnesses come here to testify.  I mean these are people who

6    would explain the concerns that were animating this e-mail

7    which were the AML concerns at the outset of the relationship

8    with Mr. Scott.

9            MR. DEVLIN-BROWN:  Just a couple of notes on that,

10   your Honor.

11           Number one, I think there are other e-mails in which

12   Mr. Scott himself indicates he is the sole investor.

13           And in terms of the agreement between the parties, for

14   what would otherwise be hearsay, we've agreed to a testimonial

15   stipulation as to the key points and I don't think this point

16   is lost anywhere.  So I just think the internal discussion

17   remains hearsay.

18           If the government wants to have an understanding that

19   since the Bank of Ireland witnesses are not there, then hearsay

20   is fine, I think that would negate some of their objections to

21   things that Mr. Scott sent to these witnesses that he would

22   otherwise could cross-examine them about.  So I don't really

23   know that this is all that necessary, this e-mail and it is, as

24   we read it, hearsay.

25           MR. DiMASE:  Your Honor, as I said, I think it's a

JBI9SCO1

1    combination of the defendant's own statements coming in through

2    another party and the effect on the listener to the extent that

3    informed the decisions made by Bank of Ireland around the

4    opening of this relationship with Mr. Scott.

5              THE COURT:  I'll allow 1742.  Do you want these back,

6    Mister --

7              MR. DEVLIN-BROWN:  Yes.

8              (Government's Exhibit 1742 received in evidence)

9              MR. DEVLIN-BROWN:  I believe the government had some

10   objections to our Bank of Ireland exhibits but we can either

11   take those up now or after the government puts on its exhibits

12   if that helps put in context whatever --

13             MR. DiMASE:  We have -- of the e-mails that the

14   defense identified as likely exhibits to be offered on cross,

15   first of all, I believe that Defendant's Exhibit 239 and 240

16   are the same.

17             MR. DEVLIN-BROWN:  We're happy to just --

18             MR. DiMASE:  One of them.  OK.

19             And the other e-mails that the government objects to

20   are marked as both government and defense exhibits.  So the

21   government exhibits are 1731, 1735, 36, and 39.  And

22   Defendant's Exhibit -- I'm sorry and Government Exhibit 1815.

23   So it's a total of 5.  Five e-mails.

24             I have the Defense Exhibits if you'd like.  It's 250,

25   254, 256, 258, 300.

JBI9SCO1

1      Normally we'd put it up on the screen but Nick is not

2   here.

3           MR. DEVLIN-BROWN:  May I give your Honor a binder?

4           THE COURT:  Yes.

5           MR. DEVLIN-BROWN:  I think if we do it by defense

6   exhibit number.

7           MR. DiMASE:  I guess we can start with 200 or

8   Government Exhibit 1731.

9           THE COURT:  200.

10           MR. DEVLIN-BROWN:  250.

11           MR. DiMASE:  Apologies.  250.

12           THE COURT:  OK.

13           MR. DiMASE:  So the concern on this e-mail, your

14   Honor, is not -- I mean I don't know that the e-mail itself is

15   offered for the truth but its attachments are a bunch of

16   financial statements and information provided by Mr. Scott that

17   I feel that the defense may seek to offer for their truth.

18   They are obviously being provided by Mr. Scott to the bank and

19   so we would argue that they're inadmissible hearsay.

20           MR. DEVLIN-BROWN:  I wasn't actually thinking whether

21   the bank statements attached were true or false.  I sort of

22   assumed they were correct bank statements.

23      But just the broader issue, your Honor, and why the

24   defense wants to offer some exhibits here is the government's

25   position with respect to Bank of Ireland is that Mr. Scott

1  should have been providing further detail about the investors

2  other than himself into the Fenero companies that were set up

3  at the Bank of Ireland.  Mr. Scott's position is:  No, he was

4  not required to produce more than he did and that he produced

5  the information that answered the bank's question.  So there's

6  a lot of back and forth with the bank when Mr. Scott says

7  here's this, here's that, here's the other thing.

8          The defense wants to argue Mr. Scott gave the bank

9  these things.  That's all he was supposed to give the bank.

10  And we need a little bit of evidence in the record to support

11  that argument.  But it's not going to be for the truth or

12  falsity of any of the statements.  I don't think, hopefully,

13  that's going to be any sort of issue.

14          MR. DiMASE:  Your Honor, if the defense is not going

15  to argue the truth of the exhibits and simply is going to argue

16  that Mr. Scott provided this information, I don't think we

17  object to that, although I would ask that the second sentence

18  at a minimum of the e-mail be redacted because that is -- that

19  is inadmissible hearsay.  The defendant is claiming that the

20  funds are earned from legal or consulting fees.  I think that's

21  a factual statement being made by the defendant which could be

22  offered for the truth.  The fact that he's sending these

23  statements I don't think the government has an issue with.

24          MR. DEVLIN-BROWN:  Frankly I don't think it's

25  necessary.  Again, I think the issue is what he told the Bank

JBI9SCO1

1    of Ireland and what he didn't tell; what information he gave,

2    what he didn't.  I don't really care particularly about that

3    middle sentence.

4              THE COURT:  So you have no objection to redacting it?

5              MR. DEVLIN-BROWN:  No.

6              THE COURT:  OK.

7              We have another juror who has indicated that she might

8    be a little late.

9              MR. DiMASE:  Let's move to Exhibit 254.

10             THE COURT:  Yes.

11             MR. DiMASE:  Your Honor, this is a --

12             THE COURT:  Isn't this already in, the chart?  Or

13   something that looks very much like this.

14             MR. DiMASE:  There are a number of different versions

15   of the chart, your Honor.  I don't know if this is exactly the

16   same one that is in evidence through the Apex witness but is

17   similar.

18             To the extent -- this is really on principle.  I mean

19   the defendant's admission of this chart, which was offered to

20   show the structure of his funds by him, would be I think

21   hearsay if it's offered to show the structure of the funds.

22   And that's the government's objection.

23             MR. DEVLIN-BROWN:  This was a request from the Bank of

24   Ireland to send a chart showing your ownership of the funds and

25   Mr. Scott sent this chart.  It's offered to show he sent this

JBI9SCO1

1    and that's what he viewed the structure of his funds to be at

2    the time.  The government is free to argue they're false but

3    this is just --

4              MR. DiMASE:  The concern is that the defense is not

5    free to argue that it's true, that the contents of it -- but if

6    the defense is simply putting this in the to argue that

7    Mr. Scott did provide information in response to the Bank of

8    Ireland and is not going to argue this chart for the truth of

9    its contents, we have no objection to that.

10             THE COURT:  OK.  Isn't the government's -- even if

11   it's not identical isn't the information on here fairly

12   identical to what the government has put in?

13             MR. DiMASE:  I think that's probably fair to say, your

14   Honor.  Some of these entities on the bottom were never used to

15   set up bank accounts like Fenero Portfolio Company Two

16   Acquisition and Fenero Sales and Marketing LTD.  I'm not even

17   sure that company was ever created.  So it is different than

18   some of the other charts.

19             THE COURT:  OK.  What else?

20             MR. DiMASE:  Moving onto 1739 which is 258.

21             MR. DEVLIN-BROWN:  You may have skipped 256,

22   Mr. DiMase.

23             MR. DiMASE:  You're right.

24             MR. DEVLIN-BROWN:  It's the same basically except he

25   initials the chart this time, so presumably the same ruling.

1          MR. DiMASE:  It's the same chart with initials.  We

2     would take the same position.  We have no objection to it being

3     offered to show that Mr. Scott provided information; just not

4     the truth of the contents of the chart.

5          THE COURT:  OK.

6          MR. DiMASE:  258.  So this one presents a more

7     particular concern.  I think here this e-mail of the defendant

8     is a factual statement.  I don't know if they simply want to

9     admit the chart again for the same reason, then perhaps a way

10    to address this is to redact.

11         THE COURT:  What's the difference between 256 and 258?

12         MR. DEVLIN-BROWN:  The difference is the cover e-mail,

13    and I actually do think this is an important point, not offered

14    for the truth but offered for the fact that Mr. Scott sent this

15    information because the core issue with the Bank of Ireland, as

16    I understand it, is the government's position is Mr. Scott

17    represented to the Bank of Ireland that he would disclose

18    additional investors as they came on, right.  And then they're

19    going to argue, look, he never did.  Mr. Scott's position is he

20    never had to disclose additional investors and, therefore, here

21    is responding to the same -- you don't see an e-mail below it

22    but he's clearly responding to an inquiry about what the

23    investors are.  And he says it's still myself.  So he is being

24    responsive to their requests.  And I think if the government is

25    going to broadly be arguing that Mr. Scott ignored the Bank of

JBI9SCO1

1    Ireland's request for investor information, here he is several

2    months later sort of doubling down on it's just me.  So I think

3    it is quite relevant that that's what he said to the Bank of

4    Ireland in terms of providing them with information.

5          MR. DiMASE:  Your Honor, first of all, there will be

6    some other e-mails that are going to be admitted where the Bank

7    of Ireland asks him is the structure still the same; and he

8    says, yes, the structure is still the same.  So I think it's

9    sort of cumulative of this in any event.  I think that same

10   point can be made through the other e-mails.

11          The bottomline is to the extent that the statement in

12   this e-mail is being offered for its truth that he is the only

13   person at the moment, that it is hearsay if offered by the

14   defendant for that purpose.  So we don't have an objection to

15   the chart.  It just doesn't seem that this e-mail is admissible

16   if offered by the defendant for its truth.  Maybe we can

17   revisit this after some of the other e-mails.

18          THE COURT:  Yes.  This seems cumulative.  Let's see

19   what you put in and make sure whether or not it's unnecessary

20   for the defense to put it in.

21          MR. DiMASE:  And then Exhibit 300?  Is that the last

22   one?

23          THE COURT:  300.

24          Is Mr. Wildner here, by the way?

25          MR. DiMASE:  He's here.

JBI9SCO1

1          Do you have it in front of you, your Honor?

2          THE COURT:  I do.

3          MR. DiMASE:  Apologies.  It's actually 621.  The

4    government does not have an objection to 300.  It's Defense

5    Exhibit 621, Government Exhibit 1815.

6          THE COURT:  You do not object?

7          MR. DiMASE:  Right.

8          THE COURT:  OK.  We're still awaiting one juror as of

9    two minutes ago.

10         MR. DEVLIN-BROWN:  Do you want to see 621?

11         MR. DiMASE:  I have it.

12         MR. DEVLIN-BROWN:  If you don't mind, Mr. DiMase, I'll

13   just articulate our theory on this one.

14         MR. DiMASE:  I have it now.

15         MR. DEVLIN-BROWN:  The government has repeatedly put

16   in evidence that banks shut Mr. Scott down, etc.  This is

17   simply the offer -- there is no declaration here at all really.

18   It's a communication to the bank saying please close our

19   accounts.  It's Mr. Scott closing an account and communicating

20   that to the bank.  There is no declaration and there's nothing

21   here to be offered for the truth of the matter asserted or

22   otherwise.

23         THE COURT:  I the think he said that he doesn't

24   object.

25         MR. DEVLIN-BROWN:  Oh.

JBI9SCO1

1          MR. DiMASE:  No 1815 was where we did object.

2          MR. DEVLIN-BROWN:  621?

3          MR. DiMASE:  Yes.

4          MR. DEVLIN-BROWN:  I guess defense 621 and government

5   1815.

6          THE COURT:  Did I mishear you, Mr. DiMase?  Did you

7   say that you did or did not object to Defense Exhibit 621?

8          MR. DiMASE:  The government did object, although may I

9   have a moment consult with Mr. Devlin-Brown.

10         (Counsel confer)

11         MR. DiMASE:  Your Honor, I think I had seen another

12  account closure letter that got into some level of detail about

13  why the accounts were being closed which we believed was

14  objectionable hearsay but this is not that letter and I don't

15  think the government objects to this exhibit after all.

16         THE COURT:  OK.  Does that take care of them?

17         MR. DiMASE:  I think so.  If Mr. Devlin-Brown could

18  just show any exhibits to just the parties before offering it

19  so that we can make sure we're comfortable with it, we'd

20  appreciate that.  But otherwise I think we're fine.

21         THE COURT:  I'll be right back out.

22         (Continued on next page)

23

24

25

1           (Jury present)

2    DAVID WILDNER,

3         called as a witness by the Government,

4         having been previously sworn, testified as follows:

5           THE COURT:  Ladies and gentlemen, good morning.  I

6    understand there were some subway challenges this morning but

7    thank you, as always, for being as prompt as you are.

8           At this point we can continue with the direct

9    examination of Mr. Wildner.

10          Sir, you are reminded that you are still under oath.

11          THE WITNESS:  Yes, your Honor.  Thank you.

12          THE COURT:  Mr. DiMase.

13          MR. DiMASE:  Thank you, your Honor.

14   DIRECT EXAMINATION

15   BY MR. DiMASE:

16   Q.  Good morning.

17   A.  Good morning.

18   Q.  Welcome back.  On Friday I asked you about a series of

19   banks here in the United States and whether you knew if they

20   were covered by FDIC insurance.  Do you recall that testimony?

21   A.  Yes, I do.

22   Q.  Let me ask you about two other banks.  Is Deutsche Bank in

23   the United States FDIC insured?

24   A.  The Deutsche Bank U.S. branch is FDIC insured, yes.

25   Q.  And is Citibank here in the United States also FDIC

JBI9SCO1                          Wildner - Direct

1    insured?

2    A.   Yes.

3    Q.   Now, Mr. Wildner based on your experience -- withdrawn.

4              How long have you been in your current role as U.S.

5    head of anti-money laundering and counterterrorist financing in

6    Bank of New York Mellon?

7    A.   Just over six years.

8    Q.   How long have you been working in the AML clients area with

9    banks here in the United States approximately?

10   A.   Almost fifteen years.

11   Q.   And based on your experience in your current position and

12   the other years of experience in this area you've had what are

13   some of the common methods you've seen individuals use to

14   obstruct or evade banks' anti-money laundering procedures?

15   A.   There's a number of steps that individuals or entities will

16   take in order to mask what their true intentions are.

17   Sometimes they'll use corporate structures that are established

18   in jurisdictions that are not as transparent as you would like

19   so you might not know who the beneficial owners of a particular

20   entity are even if you researched it.  You will see sometimes

21   they'll utilize company formation organizations that collect

22   all their mail, use one mailing address for hundreds if not

23   thousands of companies around the world.  They'll have them in

24   smaller -- sorry, in a particular jurisdiction.

25              You'll also see instances where these entities will be

1    formed in one country, have an address in a second country, and

2    bank in a third country.  And sometimes see the payment

3    instructions themselves will include information in the

4    bank-to-bank details that will give you the impression that

5    it's a legitimate business transaction; like they'll say

6    payment on -- payment on an account for invoice, and a long

7    string of numbers or it will say repayment of loan obligation

8    with a long -- with a date strange, a long string of digits or

9    characters, anything to make it appear that it's an actual

10   transaction and supports a legitimate business purpose when, in

11   fact, it isn't.

12   Q.  So to effectively cover up the fact that it's a money

13   laundering transaction?

14   A.  Yes.

15   Q.  So let me turn back now to some of the transactions that

16   you were discussing yesterday and I'm going to pull up

17   Government Exhibit 533.  Page 2, please.  If you could read

18   the -- going down to the paragraph that starts Colm O'Driscoll.

19   Could you read the first sentence of that paragraph.

20   A.  Colm O'Driscoll had spoken with Mark Scott, the UBO of the

21   Fenero group and confirmed the relationship with IMS was a

22   one-off transaction and that he was not aware of any issues

23   with IMS.  Full stop.

24           MR. DiMASE:  Could you please pull up Government

25   Exhibit 536A, Mr. Barile, which is an Excel spreadsheet.

1   Q.  Is this the spreadsheet of transactions, Mr. Wildner, that

2   the -- that BNY Mellon was looking at in connection with this

3   compliance inquiry you testified about on Friday?

4   A.  Yes, it is.

5   Q.  And if we could just look at tab 1 which is Apex fund and

6   scroll over.  Just look at column G.  It lists six different

7   transactions with International Marketing Services in September

8   of 2016 of five or ten million euros each?

9   A.  Yes.

10  Q.  Let's go to tab 3.  And again there are a number of

11  transactions there in July and August involving International

12  Marketing Services?

13  A.  Yes.

14  Q.  And those involved -- those were related to Fenero Equity

15  Investments, right?

16  A.  That's correct.

17  Q.  And if you go to the last tab, again, this shows a number

18  of International Marketing Services transactions with Fenero

19  Financial Switzerland, correct?

20  A.  Yes, it does.

21  Q.  That was -- looks like in September of 2016?

22  A.  Yes.

23  Q.  So did the statement in that e-mail that we just read

24  appear to you to be accurate?

25  A.  No, it did not.

1           MR. DiMASE:  Your Honor, at this point the government

2    would offer Exhibit 4101 into evidence and I'd ask that

3    Mr. Barile just publish it just for the parties at this stage.

4           THE COURT:  Very well.

5           MR. GARVIN:  No objection.

6           THE COURT:  There being no objection it will be

7    received.

8           (Government's Exhibit 4101 received in evidence)

9    BY MR. DiMASE:

10   Q.  Mr. Wildner, could you read just going to the bottom of

11   this e-mail.  On page one.  We can just do the e-mail from Maya

12   Antonova.

13          Have you ever seen this e-mail before, Mr. Wildner?

14   A.  No.

15   Q.  It's from Maya Antonova at e-mail address Maya at

16   OneCoin.eu.

17          Do you see that?

18   A.  Yes.

19   Q.  It's send to Mark S. Scott on May 27, 2016.  Subject line

20   Re:  Fenero Equity Investments LP.  Wire details.

21          It reads:  Hi, Mark.  What payment reference should we

22   use for the transfers?  Thanks.  Maya.

23          Could we go to the top of this e-mail.  This is an

24   e-mail -- a response from Mark Scott to Maya Antonova.  Could

25   you read what Mr. Scott said in response to the e-mail?

1   A.  It says:  Partial payment for subscription.  Full stop.

2           MR. DiMASE:  Could we go back to the Excel

3   spreadsheet -- admitted at 536-A.  Could you go to tab 3.  Go

4   to column AX, please.

5   Q.  Do you see -- is that the -- is this column listing the

6   bank-to-bank details or payment details contained in the

7   payment instruction of the wire?

8   A.  Yes, they are.

9   Q.  And it says here that a number of these wires involving

10  International Marketing Services.  What does the payment detail

11  field say?

12  A.  Partial payment for subscription.

13  Q.  And what do you understand the word "subscription" to mean?

14  A.  It's an investment in a fund.

15  Q.  Now let's look at tab 2 of this exhibit.  And what is this

16  tab showing, Mr. Wildner?

17  A.  The transactions involving Fenero Equity Investments in

18  U.S. dollars.

19  Q.  And to be clear would all of the U.S. dollar transactions

20  on this tab of this spreadsheet have been transacted through a

21  corresponding account in New York?

22  A.  Yes.

23  Q.  And that would have been DMS Bank's correspondent account

24  with Bank of New York Mellon in New York?

25  A.  That's correct.

1    Q.   And specifically in Manhattan?

2    A.   Yes.

3    Q.   And looking at the transfer on September 6, do you see that

4    one?

5    A.   Yes.

6    Q.   And that's for $278,000 -- 278,850 U.S. dollars?

7    A.   That's correct.

8    Q.   Sent by Fenero Equity Investments LP?

9    A.   Yes.

10         MR. DiMASE:  If we could scroll to the right.

11   Q.   The debiting bank name is DMS Bank?

12   A.   Yes.

13   Q.   And the crediting bank is what?

14   A.   City National Bank of Florida.

15   Q.   Meaning that that's where the money was being sent?

16   A.   That's correct.

17         MR. DiMASE:  If we could continue going to the right.

18   Q.   What is the credit party name?

19   A.   Well the second credit party name is Mark S. Scott, P.L.

20   Q.   Is that the party who you understand that funds were

21   ultimately destined for in this case?

22   A.   Yes.

23   Q.   And if we could go to the right further.  And it does say

24   here under final beneficiary name, do you see that Mark S.

25   Scott P.L.?

1    A.  Yes.

2    Q.  What does the payment details field say for that particular

3    transaction?

4    A.  Fees and expenses for loan facility to and further

5    distributions.  Full stop.

6    Q.  And to be clear this transaction would have then transacted

7    through Bank of New York Mellon's U.S. dollar corresponding

8    account in New York or DMS's corresponding account at Bank of

9    New York Mellon in Manhattan?

10   A.  Yes.

11   Q.  Let's go to the first transaction.  This is a transfer

12   approximately 30 million U.S. dollars?

13   A.  That's correct.

14   Q.  On July 13 of 2016?

15   A.  Yes.

16   Q.  And the originator is again Fenero Equity Investments LP?

17   A.  Yes.

18           MR. DiMASE:  Go to the right on the spreadsheet,

19   please.

20   Q.  And again the debiting bank name is DMS Bank & Trust?

21   A.  That's correct.

22           MR. DiMASE:  Continue to the right, please.

23   Q.  And the crediting bank name is what?

24   A.  DBS Bank (Hong Kong) Limited.

25           MR. DiMASE:  Continue to the right.

1    Q.  And the second credit party name here is listed as what?

2    A.  Barta B-A-R-T-A Holdings LTD.

3            MR. DiMASE:  Continue to the right, please.

4    Q.  And that's also the name of the final beneficiary, correct,

5    Barta Holdings LTD?

6    A.  That's correct.

7    Q.  What is the -- what was listed in the payment details

8    section for this transaction?

9    A.  Loan for CryptoReal.

10   Q.  And was this transaction also processed through DMS's U.S.

11   dollar correspondent bank account at Bank of New York Mellon in

12   Manhattan?

13   A.  Yes, it was.

14   Q.  And how were the funds then moved to DBS Bank?

15   A.  If we could move to the left I can tell you.

16   Q.  To the left?

17   A.  Back to the --

18           MR. DiMASE:  Mr. Barile, could you please move to the

19   left.

20           THE WITNESS:  Stop.  They were credited to the account

21   of DBS Bank Hong Kong Limited at BNY Mellon's New York branch.

22   Q.  So DBS Bank also had a U.S. dollar correspondent account

23   with Bank of New York Mellon in New York?

24   A.  Yes.

25   Q.  And once the monies were credited -- debited from the DMS

1    correspondent account and credited to the DBS Hong Kong

2    correspondent account, would it be DBS's responsibility to then

3    get that money to the ultimate beneficiary party?

4    A.  Yes, it would.

5    Q.  And that -- in this case that would be Barta Holdings,

6    Limited?

7    A.  That's correct.

8             MR. DiMASE:  If we could just scroll to the right.

9             Just scroll over to the address for Barta Holdings,

10   please.

11            I'm going to ask you to pull up 720B which is in

12   evidence.  Go to page 24, please.

13   Q.  And Mr. Wildner does this show the same transaction you

14   were just describing regarding Barta Holdings?

15   A.  Yes, it does.

16   Q.  And is it fair to say that the document shows that Barta

17   Holdings Limited had an account with DBS Bank in Hong Kong?

18   A.  Yes, it does.

19   Q.  And that's where the money would ultimately have to be

20   credited to the bank or sharing party by DBS Bank?

21   A.  That's correct.

22   Q.  And in this case that was $30 million approximately?

23   A.  Yes.

24   Q.  Let me show you Government Exhibit 2240 in evidence.

25            You've never seen this before, correct?

JBI9SCO1                        Wildner - Direct

1    A.  No.

2    Q.  This is an e-mail from Mark Scott to a number of

3    individuals titled Urgent Wire Order for Oil Field Loan.  Dated

4    July 12, 2016.

5            If we could go to the second page.

6            This is a letter from Mr. Scott dated July 12.  You

7    see here that Mr. Scott requests that Apex wire an aggregate

8    amount of 30 million dollars U.S.D. from our above-referenced

9    account at DMS Bank to the party as follows, listed at DBS Bank

10   Hong Kong, beneficiary Barta Holdings Limited, with an address

11   in Hong Kong?

12   A.  That's correct.

13   Q.  Looks like maybe Hong Kong was misspelled there.  If we

14   could zoom out.  What was the purpose listed on this letter

15   from Mr. Scott?

16   A.  It says purpose:  Loan to CryptoReal Investment Trust LTD.

17   Full stop.  (BVI)/Martin Breidenbach for acquisition of

18   Madagascar Oil Field.  Full stop.

19   Q.  Is that first portion of that loan to CryptoReal consistent

20   with the payment instruction language, the bank-to-bank details

21   that were in the wire itself that we just reviewed?

22   A.  Yes, they are.

23            MR. DiMASE:  One moment.

24            No further questions, your Honor.

25            THE COURT:  Cross-examination.

1          MR. GARVIN:  Thank you, your Honor.

2     CROSS-EXAMINATION

3     BY MR. GARVIN:

4     Q.  Good morning, Mr. Wildner.

5     A.  Good morning.

6     Q.  My name is David Garvin.  Nice to see you.

7     A.  Nice to meet you.

8     Q.  Mr. Wildner, you told us, I believe it was on Friday, that

9     you had an opportunity at BNY Mellon to review some of the

10    transactions and BNY Mellon was concerned about what they were

11    seeing with regard to IMS; is that correct, sir?

12    A.  Generally correct, yes.

13    Q.  And as a result of that you reached out to your customer

14    which was DMS Bank; is that correct?

15    A.  The bank reached out to DMS Bank.  I didn't personally

16    reach out to DMS Bank.

17    Q.  And that your bank -- someone at your bank contacted Colm

18    O'Driscoll who is one of the people at DMS Bank, correct?

19    A.  I don't know if they reached out to Colm O'Driscoll

20    directly.  I do know that there was information supplied by

21    Colm O'Driscoll.

22    Q.  All right.  Now, just to be clear the customer of BNY

23    Mellon was DMS Bank, correct?

24    A.  That's correct.

25    Q.  And Mr. Mark Scott was not a client of BNY Mellon, correct?

1   A.  Not that I know of, no.

2   Q.  And I'm going to go down a couple of names because they are

3   related to this transaction just to make sure that we're clear.

4   But the entity MSS International Consultants BVI.  They weren't

5   a client of BNY Mellon, correct?

6   A.  Not that I know of.

7   Q.  And the Fenero Equity investment accounts, Fenero Equity

8   Investments One LP, Fenero Equity Investments Two LP, Fenero

9   Financial Switzerland LP and Fenero Equity Investments Cayman

10  LLP, none of those were BNY Mellon's clients either, correct?

11  A.  Not that I know of, no.

12  Q.  And so there's really no evidence that Mr. Mark Scott was

13  even cognizant of the fact that BNY Mellon was processing some

14  of these transactions as correspondent bank; is that correct?

15          MR. DiMASE:  Objection, your Honor.  No evidence of

16  that.

17          THE COURT:  Why don't you rephrase, Mr. Garvin?

18          MR. GARVIN:  Thank you, your Honor.  I will.

19  Q.  Sitting here today you have not seen any documentation that

20  would suggest that these entities and Mr. Mark Scott were

21  cognizant of the fact that BNY Mellon was processing these

22  transfers as a correspondent bank prior to you reaching out to

23  DMS Bank; is that correct?

24          MR. DiMASE:  Objection to personal knowledge of

25  somebody else's state of mind.

JBI9SCO1                          Wildner - Cross

1           THE COURT:  Overruled.

2           THE WITNESS:  I have no idea if he knew or didn't

3    know.

4    Q.  All right.  So -- and when I say that they were not a

5    client, that means that they would not have had a checking

6    account or a savings account to your knowledge with BNY because

7    quite frankly BNY is not -- didn't really specialize in retail

8    operation, correct?

9    A.  That's correct.

10   Q.  I'd like to go now back to a few of the things that we just

11   talked about.

12          MR. GARVIN:  Mr. Barile, would you be nice enough to

13   put 533 back onto the screen, sir.  And in particular page 2.

14   Q.  Now, this is an e-mail from one of your associates at the

15   top, Jean-Pierre St. Victor; is that correct?

16   A.  It appears to be, yes.

17   Q.  And, sir, I want to draw the date to this inquiry.  Do you

18   see at the top that this e-mail was sent on Monday, March 6 of

19   2017?

20   A.  That's correct.

21   Q.  And did you understand the transactions that were being

22   questioned had already occurred; is that correct?

23   A.  Yes.

24   Q.  And, in fact, they had occurred sometime between June and

25   October of 2016; is that correct?

JBI9SCO1                         Wildner - Cross

1   A.  I believe so, yes.

2   Q.  And so this was in actuality BNY Mellon doing its due

3   diligence but going back into history and looking at

4   transactions and trends and things like that for it's KYC and

5   anti-money laundering?

6   A.  As part of our AML program, yes.

7   Q.  And so by the time March had come the transactions that

8   were in issue were five months old or older, correct?

9   A.  Some of them, yes.

10  Q.  And so the letter is being written, and counsel directed

11  your attention -- and I would ask Mr. Barile to do the same --

12  to the bottom third of the reply e-mail where it says -- thank

13  you, sir -- Colm O'Driscoll has spoken with Mark Scott, the UBO

14  of Fenero Group, and confirmed that this relationship with IMS

15  was a one-off transaction and he was not aware of any issues

16  with IMS.

17           So let's talk about this for a second.

18           You have no personal knowledge whether Colm O'Driscoll

19  spoke with Mark Scott or not, correct?

20  A.  That's correct.

21  Q.  And you -- because you have no knowledge of whether Colm

22  O'Driscoll spoke with Mark Scott or not you don't know what

23  Colm O'Driscoll said if they did talk, correct?

24  A.  That's correct.

25  Q.  And you certainly don't know what, if anything, Mark Scott

1    replied to Colm O'Driscoll, correct?

2    A.   That's correct.

3    Q.   And so we don't know sitting here, it would be pure

4    speculation, as to whether Colm O'Driscoll properly understood

5    Mark Scott's reply or not, correct?

6    A.   That's a fair assumption.  Correct.

7    Q.   And we do know that it becomes more removed because then it

8    gets relayed somehow to Jean-Pierre St. Victor, correct?

9    A.   It gets relayed to him via this e-mail.

10   Q.   So now we're going to talk a little bit that Mark Scott

11   allegedly, according to this e-mail, said that this was a

12   one-off transaction with IMS.

13   A.   That's correct.

14   Q.   Now, I want you to think back for a few moments to

15   Government Exhibit 4101.  Do you remember there was a statement

16   there as far as the description it was a partial -- if you

17   could leave that up I'd greatly appreciate it, sir, thank

18   you -- a partial payment for the subscription.  Do you remember

19   that?

20   A.   Yes.

21   Q.   And so from this document we don't know what IMS obligated

22   itself to by executing a subscription agreement, do we?

23   A.   I have not reviewed the subscription agreement.  I haven't

24   seen it.

25   Q.   So, let's assume for an example if IMS had executed two

1   subscription agreements for a hundred million a piece, that

2   might still end up being a one-off transaction; is that

3   correct?

4          MR. DiMASE:  Objection to the characterization.

5          THE COURT:  Sustained.

6   Q.  Sir, the fact that a -- you can obligate yourself for a

7   specific amount by executing a subscription agreement; isn't

8   that true?

9   A.  That's correct.

10  Q.  And if you make partial payments on a subscription

11  agreement that would mean that there is likely to be more than

12  one payment, correct?

13  A.  I believe that would be correct.

14  Q.  Obviously that's why they call it partial, right?

15  A.  (No response).

16  Q.  So the simple fact that we see numerous transactions

17  doesn't -- is not dispositive of whether it was a one-off

18  transaction or not; isn't that true?

19  A.  That could be true, yes.

20  Q.  Now let's talk about the next phrase.  It says here he was

21  not aware of any issues with IMS.  Meaning Mr. Scott.  Did you

22  understand that that's what it meant when it says he?

23  A.  That was my understanding, yes.

24  Q.  And you certainly hadn't communicated with Mr. Scott,

25  right?

1    A.  No.

2    Q.  And to the best of your knowledge no one at BNY Mellon had

3    communicated directly with Mr. Scott, correct?

4    A.  That's correct.

5    Q.  And we are talking about transactions that occurred in

6    history at least five months prior or more, correct?

7    A.  Yes.

8    Q.  And there is no reason to think that Mr. Scott was aware

9    that there was any issue at BNY Mellon with IMS; is that true?

10             MR. DiMASE:  Objection.  Personal knowledge.

11             THE COURT:  Sustained.

12   Q.  Sir, have you seen any document in the BNY Mellon files

13   that would establish that Mr. Scott was incorrect about this

14   particular statement?

15   A.  I could tell you that contemporaneous to when we ask the

16   questions and prior to that there was publicly available

17   information that International Marketing Services was linked to

18   a number of alleged schemes.

19   Q.  Let me backup on that for a second but before we go to that

20   was there anything in your file where BNY Mellon had notified

21   Mr. Scott that there was an issue?

22   A.  Not that I'm aware of, no.

23   Q.  So now let's go back to what you just talked about that in

24   or about March of 2017 that BNY Mellon determined that there

25   were a number of things on the internet that related to IMS

1    that were troubling.  Is that fair to say?

2              MR. DiMASE:  Objection as far as timeframe there.

3              THE COURT:  Why don't you clear that up, Mr. Garvin,

4    if you could.

5              MR. GARVIN:  I thought I had but I certainly will take

6    another run at it, your Honor.

7    Q.  As of March of 2017, because this is dated March 6, 2017,

8    this e-mail, correct?

9    A.  Yes.

10   Q.  And as of that date we know that BNY had seen what it

11   perceived to be some troubling things about IMS on the

12   internet, correct?

13   A.  That's correct.

14   Q.  But we don't -- you don't know as a fact whether or not

15   Mr. Scott had seen any of the things that you're referring to,

16   correct?

17   A.  That's correct.

18   Q.  Now, we can move forward and it says:  That Mr. Scott at

19   this time, March of 2017, was informed that DMS would not

20   facilitate any payments to or from IMS going forward, which

21   Mr. Scott acknowledged would not be an issue.

22              Do you see that, sir?

23   A.  (No response).

24   Q.  At the very bottom.

25   A.  Yes, I do.

1    Q.  And I believe that you told the ladies and gentlemen on

2    Friday that a filter was placed by BNY Mellon to prevent

3    transactions of IMS, correct?

4    A.  Correct.

5    Q.  And counsel asked you did you reject any attempted

6    transactions by IMS and you said yes, correct?

7    A.  We did.

8    Q.  But also to be a hundred percent transparent none of those

9    transactions involved any of the Fenero Funds; isn't that

10   correct?

11   A.  I believe that's correct, yes.

12   Q.  So based upon the records that you have seen it appears

13   that Mr. Scott abided by the instruction he was told by DMS

14   that there would be no more facilitation of payments to or from

15   IMS; isn't that correct?

16   A.  From the records I have seen, that's correct.

17          MR. GARVIN:  Your Honor, may I confer with counsel for

18   one moment.  I think I might be done.  Give me one moment.

19   Thank you.

20          (Counsel confer)

21   Q.  Just a few more, sir.  Please bear with me.

22          Let's go back to the filter.  BNY in March of 2017

23   reached out and talked to DMS, correct?

24   A.  Yes.

25   Q.  And did some -- you can take that down, Mr. Barile.

1              And after BNY Mellon had done its complete research it

2     decided that it was going to place a filter on IMS or

3     international marketing strategies or systems, correct?

4     A.  Or services, I believe it was.  Yes.

5     Q.  Services.  Thank you.

6              But let's be clear.  BNY Mellon did not place a filter

7     on the Fenero Funds, correct?

8     A.  That's correct.

9     Q.  They did not place any type of filter on DMS Bank, correct?

10    A.  That's correct.

11    Q.  They did not place any filter on OneCoin, correct?

12    A.  Correct.

13    Q.  And, in fact, they did not place a filter on Ruja Ignatova,

14    correct?

15    A.  That's correct.

16    Q.  And it's clear that BNY Mellon at this point was alerted to

17    the issue, correct?

18    A.  Yes.

19    Q.  And did its due diligence thoroughly, correct?

20    A.  To the extent that I know of, yes.

21    Q.  And BNY Mellon, let's just be clear, they employ almost a

22    hundred people to try to make sure that they complied with

23    their obligations of KYC and anti-money laundering obligations,

24    correct?

25    A.  That's correct.

1488

JBI9SCO1                        Wildner - Cross

1   Q.  And at the end of this process what we have was a filter

2   placed on IMS but no filter placed on OneCoin, Ruja Ignatova,

3   or any of the Fenero Funds, correct?

4   A.  That's correct.

5            MR. GARVIN:  Your Honor, may we ask for a very brief

6   sidebar.  Counsel has alerted me of something.

7            THE COURT:  OK.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JBI9SCO1                         Wildner – Cross

1         (At sidebar)

2         MR. DEVLIN-BROWN:  Good morning.  I know your Honor

3   admitted 533, the exhibit that has Bank of New York Mellon sort

4   of internal discussion about their back and forth with DMS

5   because, as Mr. DiMase pointed out, it's a record of Bank of

6   New York Mellon that's relevant to how Bank of New York Mellon

7   handled this issue.  But the statement in there that has been

8   discussed by both sides repeatedly of a Colm O'Driscoll had

9   spoken to Mark Scott, Mark Scott has advised him of X and then

10  he told Mark Scott something further.  That part is hearsay.

11  Colm O'Driscoll is not a witness.  He actually was on the

12  government's witness list but late last week they said they

13  weren't calling him.

14        We would like an instruction that that statement as to

15  what Mr. O'Driscoll told Mark Scott and Mark Scott told Mr.

16  O'Driscoll was not offered for the truth but as to what Bank of

17  New York Mellon was informed by the witnesses.

18        MR. DiMASE:  Your Honor, there is some case law about

19  the communication of defendants' party statements through other

20  people that I'd like to look at briefly before taking a final

21  position on that.  I think that the instruction can be given at

22  a later time if it's appropriate and you may not object to

23  that.

24        THE COURT:  OK.

25        (Continued on next page)

1           (In open court)

2           MR. GARVIN:  Thank you, sir.  I have no further

3    questions.

4           THE COURT:  Thank you.

5           Any redirect?

6           MR. DiMASE:  Yes, your Honor, briefly.

7    REDIRECT EXAMINATION

8    BY MR. DiMASE:

9    Q.  Just a couple of follow-ups, Mr. Wildner.

10          Looking at Government Exhibit 526.  This is an e-mail

11   that you testified about on direct examination.  Do you recall

12   that?

13   A.  Yes.

14   Q.  And it's dated December 30 of 2016?

15   A.  Yes.

16   Q.  And you were on it?

17   A.  Yes.

18   Q.  If you could go down to page 12 of this.  And this is the

19   summary of information regarding International Marketing

20   Services that was part of what triggered the escalation of this

21   compliance inquiry; is that right?

22   A.  That's correct.

23   Q.  And it says internet website located stating possibly an

24   attempt to avoid regulators and/or trip money laundering

25   filters OneCoin are banking under the inconspicuous account

1    name International Marketing Services PTE LTD.  Do you see

2    that?

3    A.  Yes, I do.

4    Q.  I think you testified on cross-examination about internet

5    research showing connections between IMS and several schemes,

6    as of March 2017 it's actually the case that that information

7    was available much earlier than March 2017; is that right?

8    A.  That's correct.

9    Q.  It was available at least as early as December of 2016?

10   A.  That's correct.

11   Q.  Can I show you Government Exhibit 533.  I apologize.  We

12   can take that one down.

13          MR. DiMASE:  One moment, your Honor.  I apologize.

14          Please publish 518 for the jury.  It's in evidence.

15   Q.  Mr. Wildner, on cross-examination you testified about the

16   filter system and the fact that IMS or International Marketing

17   Services was added to the BNY Mellon filters.

18          Do you recall that?

19   A.  Yes, I do.

20   Q.  And you also testified that some other entities were not

21   added to the filter, correct?

22   A.  That's correct.

23   Q.  And just directing your attention back to 518, an e-mail

24   from Jean-Pierre St. Victor to Natale Cover and Colm O'Driscoll

25   on March 7, 2017.

JBI9SCO1                    Wildner - Redirect

1              MR. DiMASE:  Pull that out and highlight or expand the

2    middle portion.

3    Q.  This is the e-mail that Mr. St. Victor sends after the last

4    of the series of meetings regarding this compliance inquiry,

5    correct?

6    A.  That's correct.

7    Q.  And in it -- in that meeting the committee decided to add

8    IMS to the filter, right?

9    A.  That's correct.

10   Q.  And also directed Mr. St. Victor to reach out to client

11   bank which was DMS Bank, correct?

12   A.  That's correct.

13   Q.  And to tell them that certain payments or transactions

14   involving certain parties should stop through BNY Mellon's

15   correspondent account, correct?

16             MR. GARVIN:  Object to the form of question.

17             THE COURT:  Overruled.

18   A.  That's correct.

19   Q.  And those parties, could you read them in line one?

20   A.  The committee members are not comfortable with

21   payments/transactions coming from or going to International

22   Marketing Services, One Top Team, OneCoin, OneCoin Cash Account

23   and Mr. Ruja Ignatova.

24   Q.  Could you read the second paragraph as well.

25   A.  The committee feels that Fenero and its

1    administrator/management should have done more researches on

2    International Marketing Services and the other companies as

3    public information is widely available on various actions by

4    the authorities in the UK, Italy, Belgium and Germany

5    concerning these entities.  Full stop.

6         MR. DiMASE:  No further questions.

7         MR. GARVIN:  Your Honor, may I have follow-up on that

8    518 because I had not talked about 518 on cross.

9         THE COURT:  OK.

10   RECROSS EXAMINATION

11   BY MR. GARVIN:

12   Q.  Sir, the exhibit that is on the screen at this point was

13   not sent to Mr. Mark Scott, was it?

14   A.  Not that I know of, no.

15   Q.  And as far as you know sitting here today you have no idea

16   whether this was ever communicated to Mr. Scott whatsoever;

17   isn't that true?

18   A.  That's correct.

19        MR. GARVIN:  Thank you, sir.  I have no further

20   questions.

21        THE COURT:  Sir, you may step down.

22        THE WITNESS:  Thank you, your Honor.

23        (Witness excused)

24        THE COURT:  Government please call your next witness.

25        MR. DiMASE:  Yes, your Honor.

JBI9SCO1                        Wildner – Recross

1              Your Honor, the government calls Jacob Pechet.

2              THE COURT:  Step all the way forward and please when

3    you enter the witness stand please remain standing.

4              Thank you.

5              Mr. DiMase.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JBI3SCO2

1           MR. DiMASE:  Your Honor, at this point the government

2    would offer into evidence two signed stipulations, one marked

3    as Government Exhibit 54, and one marked as Government Exhibit

4    53.

5           Government Exhibit 54 relates to certain records from

6    the Companies Registration Office of Ireland contained on

7    Government Exhibit 1900.  It lists series of exhibit numbers in

8    the stipulation.

9           The government offers the stipulation itself, which is

10   Government Exhibit 54, along with Government Exhibit 1900, the

11   disc, and all of the exhibits contained on the disc set forth

12   in the stipulation into evidence.

13          THE COURT:  Very well.

14          MR. DEVLIN-BROWN:  No objection, other than the one

15   issue we may address later.

16          THE COURT:  So they will be received.

17          (Government's Exhibit 54, 1900 received in evidence)

18          MR. DiMASE:  At this point the government would also

19   offer, well, there is a second stipulation involving certain

20   records and information related to Bank of Ireland in Ireland

21   that is marked as Government Exhibit 53.  The exhibit

22   references Government Exhibit 1700, which is another disc

23   containing a series of Bank of Ireland records, which are

24   referenced in the stipulation.

25          At this point the government would offer the

JBI3SCO2                          Pechet - Direct

1    stipulation itself, which is Government Exhibit 53, Government

2    Exhibit 1700, which is the disc, and the various exhibits

3    contained on the disc that are set forth within the

4    stipulation.

5                THE COURT:  Any objection?

6                MR. DEVLIN-BROWN:  No, your Honor.

7                THE COURT:  They will be received.

8                (Government's Exhibit 53, 1700 received in evidence)

9     JACOB PECHET,

10        called as a witness by the Government,

11        having been duly sworn, testified as follows:

12   DIRECT EXAMINATION

13   BY MR. DiMASE:

14   Q.  Mr. Pechet, how are you?

15   A.  Good, thanks.

16   Q.  Where do you work?

17   A.  I work for the United States Attorney's Office for the

18   Southern District of New York.

19   Q.  What is your position there?

20   A.  I'm a paralegal specialist.

21   Q.  Were you asked to testify as a summary witness regarding

22   certain evidence in this case?

23   A.  Yes, I was.

24   Q.  Is that evidence related to the Bank of Ireland?

25   A.  Yes.

1   Q.  Are you assigned to the case team in this matter?

2   A.  No, I'm not.

3   Q.  Do you have any personal knowledge regarding the facts of

4   this case?

5   A.  No, I do not.

6           MR. DiMASE:  I would like to offer a series of

7   exhibits that are not specifically referenced in the Bank of

8   Ireland stipulation.  They are Government Exhibits 1713, 1728,

9   1730, 1742 through 1744, 1750, 1752, 1754, 1757, 1775, 1781,

10  1786, 1799, 1804, 1816 through 1818.

11          MR. DEVLIN-BROWN:  May I just have one moment, your

12  Honor?

13          THE COURT:  Yes.

14          MR. DEVLIN-BROWN:  No objection, except to 1757, which

15  I think the government is withdrawing, for now anyway.

16          MR. DiMASE:  Yes, we'll withdraw 1757 but offer the

17  remainder of those exhibits.

18          Are those received, your Honor?  Judge, are those

19  receive in evidence?

20          THE COURT:  They are received.

21          (Government's Exhibit 1713, 1728, 1730, 1742 through

22  1744 received in evidence)

23          (Government's Exhibit 1750, 1752, 1754, 1775, 1781

24  received in evidence)

25          (Government's Exhibit 1786, 1799, 1804, 1816 through

JBI3SCO2                        Pechet - Direct

1    1818 received in evidence)

2    BY MR. DiMASE:

3    Q.  Let me show you Government Exhibit 1904-E in evidence.

4    This is a companies registration office record; is that right?

5    A.  Yes.

6    Q.  From Ireland?

7    A.  Yes.

8    Q.  This relates to Fenero Equity Acquisition 1 Limited.  Do

9    you see that?

10   A.  That's correct.

11   Q.  It says underneath "In the process of changing its name to

12   Fenero PCT Holdings Limited."

13   A.  Yes.

14   Q.  Do you see there it says that Irina Andreeva Dilkinska was

15   appointed as a director in the company?  That is listed as the

16   change?

17   A.  Yes.

18   Q.  Okay.  Down below, in the certification section, who is

19   that signed by?

20   A.  Irina Andreeva Dilkinska.

21   Q.  On what date?

22   A.  June 2nd, 2016.

23   Q.  Let's look at Government Exhibit 1906-E in evidence.  Could

24   we, this is another document from the companies registrations

25   office in Ireland?

1    A.  Yes.

2    Q.  We can go to the middle and blow that up.  This one is for

3    a company called Fenero Tradenext Holdings Limited?

4    A.  Yes.

5    Q.  What is the change listed there?

6    A.  That Irina Andreeva Dilkinska was appointed as a director

7    of the company.

8    Q.  If we can go down to the certification section.  Who is it

9    signed by?

10   A.  Irina Dilkinska.

11   Q.  What date?

12   A.  June 22, 2016.

13   Q.  Let's go now to Government Exhibit 1713 in evidence.  Could

14   we go to the first e-mail.

15          Could you read that?  This is an e-mail from Mark

16   Scott,?

17   A.  At the top it says -- right -- from Mark Scott to Deirdre

18   Ceannt and Greg Begley.

19   Q.  Dated March 13, 2016?

20   A.  Yes.

21   Q.  Okay.  What does Mr. Scott say in the body of the e-mail

22   below?

23   A.  It says "Hi Deirdre.  Please find attached completed and

24   signed company questionnaire you had forwarded to me.  As

25   requested, I have made an attempt at an organizational chart

1    but have to admit that I am not an expert with PowerPoint which

2    prompted a couple of manual insertions by pen.  I think the

3    short mission statement that I am including will give your team

4    an idea of what we are trying to accomplish."

5    Q.  We can stop there.  Let's goes to page five of this

6    exhibit.  At the top, what does it say this document is?

7    A.  A company questionnaire.

8    Q.  For what entity?

9    A.  For Fenero Equity Investments Ireland Limited.

10   Q.  Going to number one, it says number one, "Principal

11   activities of the company/entity."  What does it say there?

12   A.  The answer says "Please see attached mission statement of

13   the parent company Fenero Equity Investments LP out of BVI.

14   The Irish entity would be a holding company housing our back

15   office/compliance and owning each single purpose entity created

16   for equity investment in target portfolio companies."

17   Q.  Can we go to number three.  This says what is the

18   percentage trade with these countries.

19           Actually, if we can zoom out of that.  And above that

20   in the number two, it says "What countries will the entity most

21   likely have transactions with" and it lists Ireland U.K.

22   Germany, Austria, Switzerland, Spain, France, and China?

23   A.  Yes, that's right.

24   Q.  Going to number three.  It says "What is the percentage

25   trade with these countries."

1          What does Mr. Scott say in the questionnaire?

2     A.   "There is no trade of products.  And at this point hard to

3     say where we will find viable investment targets that fit our

4     overall strategy.  At this point we really only know the

5     markets we are most interested in.  We are starting due

6     diligence on two projects in London next week."

7     Q.   Can you go to number nine.  This says "number of employees

8     expected in five years."

9          What did Mr. Scott say in that question?

10    A.   "For all entities under the holding structure about 100."

11    Q.   Go to page seven.  This is a Fenero Investments mission

12    statement?

13    A.   Yes, Fenero Equity Investments mission statement.

14    Q.   This was attached to the e-mail that we're reviewing now?

15    A.   Yes.

16    Q.   I'll leave this up for one moment.  And it says at the top

17    of the second paragraph, "Fenero has been created at the

18    request of four European based families that want to take

19    advantage of apparent and potential business synergies between

20    them," and so on and so forth.

21    A.   Yes.

22    Q.   We can take that down and go to page 11.  Can we zoom out a

23    little bit.  This is a separate e-mail chain contained within

24    the same exhibit.  Is that right?

25    A.   Yes.

1    Q.  Going to the top, going to the top two e-mails.  In the

2    bottom e-mail on March 18, 2016, Ms. Ceannt says, "Would you be

3    free on Monday to have a call."

4               Do you see that?

5    A.  Yes, I do.

6    Q.  And the e-mail above is March 18, 2016.  Mr. Scott says, "I

7    am actually in Austria at this time meeting with investors."

8               Do you see that?

9    A.  Yes, I do.

10              MR. DiMASE:  On the right of this, can you publish

11   Government Exhibit 62, Mr. Barile.  And go to paragraph 3C.

12   Q.  What does it say there?

13   A.  It says "Scott traveled from Miami to Istanbul, Turkey, on

14   March 15, 2016 and returned from Istanbul to Miami on March 26,

15   2016."

16              MR. DiMASE:  At this point the government would offer

17   Exhibit 4111 into evidence and I'd ask that Mr. Barile publish

18   this for counsel.

19              MR. DEVLIN-BROWN:  Just one moment.  No objection.

20              THE COURT:  Okay.  It will be received.

21              (Government's Exhibit 4111 received in evidence)

22              MR. DiMASE:  Mr. Barile, could you zoom in on the top

23   of the e-mail.

24   Q.  This is from Mr. Scott to Greg Begley at BOI.com.  Deirdre

25   Ceannt copying Mark Scott at gmail.  Fenero Group Bank of

JBI3SCO2                          Pechet - Direct

 1   Ireland account opening, dated Sunday, April 3, 2016.  And in

 2   the body of the e-mail he says "Please see some of my further

 3   comments below in red."

 4   A.  Yes, I see that at the bottom.

 5   Q.  Can we go to page three and paragraph five.  Could you read

 6   the portion in blue and then in red.

 7   A.  "We will require a signed and dated shareholding structure

 8   up to and including the ultimate beneficial owners with

 9   shareholding of 25 percent or more.  This includes the

10   following personal information on the UBOs:  Full name, date of

11   birth, nationality and country of residence.  I've attached a

12   guide above.  The UBOs are the investors --"

13   Q.  Apologies.  So the part that you are reading now is in red;

14   is that right?

15   A.  Sorry?

16   Q.  The part you are reading now is in red?

17   A.  Yes, correct.

18   Q.  This part is where Mr. Scott says I will respond in red to

19   the questions below?

20   A.  Yes.  So in red says:  "The UBOs are the investors limited

21   partners in the government approved and registered BVI equity

22   funds.  Fenero Equity Investments LP being the first of a

23   series.  There will not be one single investor holding more

24   than 25 percent.  Ultimately responsibility for the funds lies

25   with MSS International Consultants BVI Limited, a BVI approved

JBI3SCO2                          Pechet - Direct

1   investment manager owned solely by me."

2   Q.  Let's go to Government Exhibit 1728 in evidence.  This is

3   an e-mail from Mark Scott to Mr. Begley and Deirdre Ceannt

4   dated April 3, 2016?

5   A.  Yes.

6   Q.  It the subject is Fenero bank application?

7   A.  Yes.

8   Q.  He says "Please find attached the KYC for Irina Dilkinska."

9   A.  Yes.

10  Q.  Can we scroll slowly down through this e-mail.  The

11  attachments.  Now let's go to exhibit 1730 in evidence.  And

12  this is an e-mail on April 4 from 2016 from Mark Scott to Greg

13  Begley.  He says, "Hi Greg.  Here the missing signatures from

14  Irina."

15          Can you go to page eight.  So this says at the top

16  annex one list of authorized individuals including business

17  details.

18  A.  Yes.

19  Q.  You see the third person down.  Can you read what it says

20  there?

21  A.  It says Irina Dilkinska.

22  Q.  That's the name of authorized individual?

23  A.  Yes.

24  Q.  What does it say next to -- if you can blow this up,

25  Mr. Barile -- do you see where it says position?

1    A.  I do.

2    Q.  Does that say majority limited partner of parent company?

3    A.  Yes, it does.  That's what it looks like to me.

4    Q.  Let's go to Exhibit 53, which is the stipulation.  I'm just

5    going to ask you to read paragraph one, please.

6    A.  "On or about April 7, 2016, Mark S. Scott met Deirdre

7    Ceannt and Derek Collins, employees of the Bank of Ireland at

8    BOI offices in Dublin, Ireland.  This was their first and only

9    meeting with Scott.  Collins took notes of the meeting with

10   Scott attached as Exhibit A.  Ceannt did not take notes of the

11   meeting."

12   Q.  Could you zoom out.  Can we go to two and three.  Just the

13   top portion of the page.  Can you read those?

14   A.  "Two.  Neither Collins nor Ceannt are willing to testify in

15   person in the United States at this trial, and they cannot be

16   compelled to do so.

17         "Three.  The parties agree that if Ceannt and Collins

18   could be required to testify, they would make the following

19   statements with respect to their April 7, 2016 meeting with

20   Mark Scott.

21         "A.  Scott said he was planning to set up an Ireland

22   office for his private equity firm."

23   Q.  Okay.  Can we go to the next page.  Could you just read B

24   and C for now.

25   A.  Sure.  "B.  Scott indicated that he was considering leaving

1   his law practice.

2           "C.  Scott indicated that he was in the process of

3   identifying investors for his funds and that the investors

4   would be from European families."

5   Q.  And E.  Would you read E.

6   A.  "E.  According to Ceannt, Scott was mild compared to other

7   clients."

8   Q.  Why don't we go to Exhibit A.  Actually just going up to

9   paragraph two again.  I'm sorry, paragraph one.  It says

10  Collins took notes of the meeting attached as Exhibit A?

11  A.  Yes.

12  Q.  That's the April 7, 2016 meeting?

13  A.  Yes.

14  Q.  Let's go to Exhibit A.  So at the top do you see where it

15  says Fenero Equity Mark Scott April 2016?

16  A.  Yes, I do.

17  Q.  It says M&A lawyer below that?

18  A.  Yes, it does.

19          MR. DiMASE:  Then Mr. Barile, if you could just maybe

20  do the next four lines as far as blowing them up.

21  Q.  So it says equity fund?

22  A.  Yes.

23  Q.  And can you read what it says to the right there?

24  A.  It is a little bit difficult to decipher.

25  Q.  Do you see five funds 100 million each?

1    A.  Yes, I see that part.

2    Q.  And in the second line it says no U.S. investor?

3    A.  Yes.

4    Q.  Do you see what it says to the right of that, will be?

5    A.  I'm not certain what that says.

6    Q.  It says will be European based U.K./German?

7    A.  Yes.

8    Q.  And it says equity fund will have its office here.

9    A.  Yes.

10   Q.  Okay.  You can zoom out of that.  Then just zoom in on the

11   bottom, it says requires operational accounts escrow/deposit?

12   A.  Yes.

13   Q.  And at the very bottom, it also mentions 10K of cost per

14   SPV.  Do you see that?

15   A.  I do.

16   Q.  At the very bottom there is a business card?

17   A.  Yes, there is.

18   Q.  That shows Mark S. Scott, partner, Locke Lord LLP.  Do you

19   see that?

20   A.  Yes, I do.

21        MR. DiMASE:  You can zoom out of that.  Let's go to

22   Exhibit 1742.  If we can go to page two.

23   Q.  So, in the middle it says it is an e-mail from Diane Sands

24   to Greg Begley dated May 4, 2016.  Could you read the e-mail.

25   A.  Sure.  "Hi Greg.  Apologies for this, Owen has a last

1    question; who the seed investors are as these specifically

2    requested the offshore structure?"

3    Q.   It says "kind regards, Diane"?

4    A.   "Kind regards, Diane."

5    Q.   She is listed as risk manager group AML/CFT and sanctions.

6    Do you see that?

7    A.   Yes, I do.

8    Q.   What did Mr. Begley say in response?

9    A.   In response he said "Hi Diane, Mark Scott is the initial

10   and sole investor.  Seed investors have shown some interest and

11   if they are to invest they will be identified under anti-money

12   laundering requirements."

13   Q.   If we can go up to the top.  What did Diane say in

14   response?

15   A.   Diane responded "Hi Greg, thanks for that.  Based on the

16   below answer I know Owen is going to ask for a copy of their

17   AML controls.  Is this something we can request please?"

18   Q.   Let's go to 1743 in evidence.  Can you go to the bottom

19   e-mail.  This is an e-mail from Greg Begley to Mr. Scott on

20   May 5, 2016?

21   A.   Yes, it is.

22   Q.   What did Mr. Begley say to Mr. Scott?

23   A.   He said, "Hi Mark.  Our compliance team have requested a

24   copy of your AML controls.  Would you be able to provide us

25   with a copy?  We are also happy to sign a NDA if required."

JBI3SCO2                      Pechet - Direct

1    Q.  It says Greg Begley, Bank of Ireland corporate banking.  Do

2    you see that?

3    A.  Yes, I do.

4    Q.  Let's go up.  What did Mr. Scott write in response on May 5

5    of 2016?

6    A.  He responded "Hi Greg, our AML/FATCA/KYC is managed by

7    outside service providers.  We work with both Apex and JP Fund

8    administration.  Both are also present in Ireland.  So any time

9    funds flow into our investment fund, or corporate structure

10   generally, all documentation is handled by either company,

11   depending on the jurisdiction, and funds are not accepted until

12   we receive the appropriate sign off from the administrator.

13   Would this be enough or do we need to request procedural

14   information from the administrators?  I am not sure how easy

15   this would be.  We can send you our administration agreements

16   of course.  Best, Mark."

17   Q.  Let's go to 1744.  Can you read the bottom e-mail from

18   Mr. Begley to Mr. Scott on May 12, 2016.

19   A.  "Hi Mark.  One final request -- please see below:  Can you

20   please confirm that you will notify Bank of Ireland on a timely

21   basis, within a month of the investment, of any seed investors

22   that would, on the basis of their investment, be considered

23   beneficial owners or controllers, 10 percent or greater

24   ownership stake?"

25   Q.  Could you go up to the response from Mr. Scott.  What did

1   Mr. Scott say in response?

2   A.   He responded, "Hi Greg, we are happy to share any investor

3   information with BOI, but we can certainly focus on this

4   particular group of investors and report regularly."

5           MR. DiMASE:  Mr. Barile, on the right side of the

6   screen can you publish Exhibit 53 in evidence.  Can you go to

7   paragraph 3D, please.

8   Q.   Can you read that?

9   A.   "Scott did not identify to the Bank of Ireland the

10  particular investors in his funds or their source of wealth at

11  the April 7, 2016 meeting or at any point thereafter."

12  Q.   Can we please go to 1750.  This is an e-mail from

13  Mr. Begley to Mr. Scott and DRPike@MSICBVI.com.  If you can

14  just scroll down, and this lists several accounts.  Do you see

15  that?

16  A.   Yes.

17  Q.   And so, these accounts are, according to the subject

18  line -- you can go up.  Fenero Equity Investments Ireland

19  Limited, Bank of Ireland account opening?

20  A.   Yes.

21  Q.   And if you go down there are several accounts, a euro

22  current account, another euro current account and a GBP current

23  account.  Do you see that?

24  A.   I do see that.

25  Q.   The date of this e-mail is June 2nd, 2016?

JBI3SCO2                         Pechet - Direct

1    A.   Yes.

2    Q.   Let's go to 1752.  This is an e-mail from Mark Scott to

3    Greg Begley copying David Pike on July 11, 2016.  What did

4    Mr. Scott say?

5    A.   Mr. Scott said, "Hi Greg, I would need two to three more

6    accounts for some SPVs.  How can we get that established most

7    efficiently?"

8    Q.   Let's go to Exhibit 1754 and go to the top of page two,

9    please.  This e-mail actually, you can go down further to

10   Ms. Ceannt's e-mail.  This is an e-mail from Ms. Ceannt to Mark

11   Scott.  Could you just read -- and this is dated July 13, 2016.

12            Could you read the third paragraph here.

13   A.   "We would like to have a quick chat to discuss the

14   ownership structure and to find out if it has changed since we

15   opened the accounts."

16   Q.   That's fine.  If we can go up, please.  Could you read the

17   bottom paragraph of Mr. Scott's responsive e-mail on July 13,

18   2016?

19   A.   Sure.  Mr. Scott says "We had no ownership changes in the

20   structure."

21   Q.   Could you zoom out of that and go up.  That's fine.  Why

22   don't we go to 1781.

23            Can you read the top e-mail.  This is from Mark Scott

24   to Tracey Meade copying Ellen O'Dwyer and Deirdre Ceannt on

25   October 3, 2016.  What did Mr. Scott say?

JBI3SCO2                        Pechet - Direct

1    A.   "Hi Tracey, could you please have an eye on my $5 million

2    wire from Fenero Equity Investments to attorney Nicole

3    Huesmann?  I would love to get the funds there no later than

4    tomorrow."

5            MR. DiMASE:  Let's go to 1799, please.  Can you go

6    down to page two.  Can you zoom in on the -- go up to the -- I

7    guess it is difficult here.  You can go up to the bottom of

8    page one.  It's actually two pages above.

9    Q.   This is an e-mail from Tracey Meade on January 5, 2017, to

10   David Pike copying Mark Scott and Deirdre Ceannt.  Can you read

11   the second paragraph?

12   A.   "All that is now outstanding is the full ownership

13   structure chart showing the new entity and percentage of

14   shareholding for each owner right up to the ultimate beneficial

15   owner.  If there are any new beneficial owners we will require

16   ID and V for them.  We already hold Mark's so his is not

17   required."

18   Q.   If we can go up, please, on page one, now.  Can you go to

19   the very top e-mail.  This is an e-mail from MSS Law --

20   MSScottlaw@gmail.com to Tracey Meade copying David Pike and

21   Deirdre Ceannt on January 10, 2017.  What did Mr. Scott write?

22   A.   "Hi Tracey.  No change in the structure or as to the UBO."

23           MR. DiMASE:  Can we just pull up on the right-hand

24   side of the screen again Exhibit 53, paragraph 3D.  Can we

25   please go to Exhibit 3001-B in evidence, which I believe is a

1    spreadsheet, Mr. Barile.  Can you highlight line 85.  Just can

2    we scroll to the right.

3    Q.  So in column C you see it says Phoenix Fund Investments?

4    A.  I do see that.

5    Q.  And column G it says 10 million?

6    A.  Yes.

7    Q.  Okay.  Continuing to the right.  It indicates Fenero Equity

8    in there, in column O?

9    A.  Yes.

10        MR. DiMASE:  Can we just go down also highlight, you

11   can stay where you are.  Just scroll down to 94, 95, 97, 120,

12   121, 123, 125, 126, 130, 132.  Can we just scroll over to the

13   left.  To the left.  The other left.

14   Q.  All of these highlighted lines of this spreadsheet say

15   Phoenix Fund Investments.  Do you see that?

16   A.  Yes.

17   Q.  On line 121 in particular, that's a transfer of 30 million

18   euros.  You see that?

19   A.  Yes, I do.

20   Q.  On March 8, 2017.

21   A.  Yes.

22   Q.  Going to Phoenix Fund Investments?

23   A.  Correct.

24   Q.  Okay.  Let me go to -- we can pull this down and --

25        THE COURT:  Mr. DiMase, it's 11 o'clock, so let's take

1    our morning break.  We'll break for 15 minutes, ladies and

2    gentlemen.  Do not discuss the case.

3              (Jury excused)

4              THE COURT:  Mr. Pechet, you may step down.  Do we need

5    to do any work?

6              MR. DiMASE:  Not right now, your Honor.

7              THE COURT:  Don't be late.

8              (Recess)

9              THE COURT:  Can we get Mr. Pechet?

10             (Jury present)

11             THE COURT:  Mr. DiMase.

12             MR. DiMASE:  Thank you, your Honor.  Before we

13   continue, I just want to note for the record the exhibits

14   admitted through the stipulation are the following exhibits

15   contained on the CD marked as Government Exhibit 1700.  1701-A

16   through B, 1702-A through B, 1703-A through C, 1704-A through

17   B, 1705-A through B.

18             With respect to the paragraph listing Exhibits 1712

19   through 1826, the government is not admitting all of those

20   e-mails.  We are only admitting the ones we've already offered

21   and that the Court received.

22             THE COURT:  Very well.  They will be received.

23             (Government's Exhibit 1701A through B, 1702A through B

24   received in evidence)

25             (Government's Exhibit 1703A through C, 1704A through B

1    received in evidence)

2             (Government's Exhibit 1705A through B received in

3    evidence)

4    BY MR. DiMASE:

5    Q.  Turning back to where we left off.  You had just reviewed a

6    spreadsheet prior to the break.  Do you recall that?

7    A.  Yes, I do.

8    Q.  It showed a number of large euro transfers from a Fenero

9    account to Phoenix Fund Investments.

10   A.  Yes, I recall that.

11   Q.  One was in March of 2017 for approximately 30 million

12   euros?

13   A.  Yes, that sounds right.

14   Q.  Can I show you now Government Exhibit 1816, please.  Could

15   you go down to page two.  Sorry.  A little up.  A little

16   further up.  Could you zoom in on that.

17             This is an e-mail from businessonline@BOI.com to Mark

18   S. Scott dated May 3 of 2017.  Could you read that, please.

19   A.  "Dear customer, I'm writing in relation to payment

20   reference 98567255 to Phoenix Fund Invest LLC submitted on

21   business online.  Please be advised we have received the

22   following query from the foreign bank.  Please have the

23   customer provide the following information."

24   Q.  Can we go up now, please.  And this is an e-mail from Mark

25   Scott to business online copying David Pike dated May 4, 2017.

1    And what did Mr. Scott say?

2    A.   He said, "Dear Trish, we are in touch with our contract

3    partner and have provided written details for submission to the

4    correspondence bank.  My further comments below.  Any

5    information the correspondent bank would like about Phoenix it

6    should obtain directly and not through us."

7    Q.   If you go down, please, again.  So Mr. Scott said "my

8    further comments below."  Did you see that?

9    A.   I did.

10             MR. DiMASE:  So, I think we can just focus on what's

11   on the second page now, Mr. Barile.  And let's go up to the

12   really large lettering and not include that in the -- let's go

13   back up to the top and just focus in on the part above the

14   large lettering.  Thank you.

15   Q.   So could you read the portion in caps.  The question in

16   caps and then the answer in lowercase, please.

17   A.   Yes.  "What is the nature of the business in which your

18   customer is engaged?  Customer is a BVI approved and registered

19   fund manager in good standing.

20             "How long has the customer been in this business?  In

21   excess of 20 years.

22             "How long has the customer been a client of your

23   institution?  One year.

24             "Have you identified any unusual transactions or

25   behavior patterns in the business relationship?  BOI to answer.

1          "What is the actual business address i.e. not the

2     registered address, but rather the head office of the company?

3     There is no head office.  Executives of the company work from

4     different locations.

5          "Please provide us with information on ownership

6     structure, publicly traded or privately owned, including

7     beneficial owners, and, if the company is owned by individuals,

8     please provide us with complete names of owners, address and

9     date of birth.  Privately owned.  BOI has all information about

10    UBO.

11         "Could you supply us with any other relevant

12    information about your customer and/or their official linked

13    internet pages.  BOI to respond.  Family office has no website.

14         "Please provide the purpose of this transaction.

15    Payment made as per valid investment agreement.

16         "Is the purpose of this transaction in accordance with

17    the customer's usual activities? BOI to answer but clearly yes.

18         "What is the main business relationship/activity

19    between your customer and the counterparty Phoenix Fund Invest

20    LLC?  Existing investment agreement."

21         MR. DiMASE:  Could I ask somebody at the deputy to

22    remove the blue writing here?  I'm not sure.  There we go.

23    Great.  Okay.

24    Q.  Can we just continue down.  And could you read the big font

25    here.

1   A.   "Could you provide us with information you can obtain from

2   your customer on their counterparty?"

3   Q.   There doesn't seem to be any response to that particular

4   question here.  Is that right?

5   A.   No.

6   Q.   Okay.  Let's go to Government Exhibit 1817.  Go down to

7   page two.  This e-mail here is from Deirdre Ceannt to Mark

8   Scott dated May 19, 2017.  Subject line Fenero payment to

9   Phoenix Trust.  Can you read that, please.

10  A.   "Hi Mark.  I believe you are aware that a payment to

11  Phoenix Fund Invest LLC has been held up and the clearing bank

12  is looking for more information.  Could you provide us with the

13  details about the trade itself, flow of funds chart, and the

14  beneficiary Phoenix Fund Invest?  Please can you also confirm

15  that the ownership structure remains unchanged?"

16  Q.   You don't have to read the bottom, but the bottom lines

17  show a series of entities ultimately owned 100 percent by

18  Mr. Scott; is that right?

19  A.   Yes, that's correct.

20        MR. DiMASE:  And can we go up to the top.  Can you

21  just read the first line and, Mr. Barile, could you publish on

22  the right again Exhibit 53, paragraph 3D.

23  Q.   You can go ahead and read that it.

24  A.   "Our structures have remained the same.  We have wired the

25  funds to Phoenix as an investment at the request of the

1   investors in our investment funds as per an investment

2   agreement."

3   Q.  Please go on.

4   A.  "I am available at your convenience to discuss further.

5   Where are the funds now of they were not authorized for

6   transfer?  We are responsible for them.  As part of our fund

7   dissolution we have requested officially with the appropriate

8   parties and through a third-party administrator and

9   liquidator."

10  Q.  Let's turn to Government Exhibit 1818.  Could you go down

11  to the bottom e-mail here.  This looks like the same e-mail

12  that you just read.

13  A.  Yes.

14  Q.  Dated May 19, 2017 from Ms. Ceannt to Mr. Scott?

15  A.  Right.

16  Q.  Can we go to the top e-mail.  This is from Mark Scott to

17  Deirdre Ceannt dated May 21, 2017.  Fenero payment to Phoenix

18  Trust.  Could you read that e-mail for the jury.

19  A.  "Hi Deirdre.  Can we simplify this process by simply

20  returning the money to Fenero?  My administrator and attorneys

21  feel this may be simpler than us not being able to report the

22  flow of funds to the BVI financial commission.  We would then

23  return the capital directly to our limited partners and they

24  could send to Phoenix as desired.  Please advise."

25          MR. DiMASE:  Nothing further, your Honor.  Thank you.

1          THE COURT:  Cross-examination.

2          MR. DEVLIN-BROWN:  Thank you.

3   CROSS-EXAMINATION

4   BY MR. DEVLIN-BROWN:

5   Q.  Good afternoon.

6   A.  Good afternoon.

7   Q.  Or good morning.

8          MR. DEVLIN-BROWN:  Mr. Barile, would you mind putting

9   up Government Exhibit 53, please, the stipulation.  Just

10  reading the second paragraph, it says "Neither Collins nor

11  Ceannt are willing to testify in person in the United States at

12  this trial and they cannot be compelled to do so."

13  Q.  Do you see that?

14  A.  I do see that.

15  Q.  You have no idea why they're unwilling to testify at this

16  trial, do you?

17  A.  I do not.

18  Q.  It says here they could not be compelled to do so.  I guess

19  you were not as fortunate; you work for the prosecutors, right?

20  A.  I chose to testify, but they asked me, yes.

21  Q.  Good.  So, I want to ask you some questions, just a few

22  about some of the e-mails we went over.  If we can put on the

23  screen Government Exhibit 1713, please.  So, if we can just

24  blow up the date of the e-mail on the header information on the

25  top, please.

JBI3SCO2                    Pechet - Cross

1            So this e-mail is dated March 13, 2016, which,

2     according to the stipulation, is before they even met Mark

3     Scott, Bank of Ireland, right?

4     A.  Yes.

5     Q.  And I believe Mr. DiMase asked you a number of questions

6     about what is contained in the package.

7            MR. DEVLIN-BROWN:  If we could just scroll through it

8     slowly, Mr. Barile, maybe down to page eight but just give

9     people an idea of what's in here.

10    Q.  There was that company questionnaire, right?  And the

11    mission statement; you remember that?

12    A.  Yes, I do.

13    Q.  So we can pause there for a moment.  So, that's obviously

14    what Mr. Scott represented to the Bank of Ireland individuals

15    as of March 13, 2016, right?

16    A.  What do you mean by that?

17    Q.  Well, that's the material he sent over on March 13, 2016?

18    A.  Right.  That's attached in the e-mail.

19    Q.  So, you don't know one way or the other how plans may have

20    changed after that date, right?

21    A.  Not at all.

22    Q.  But the mission statement, which I have the second page on

23    in front of you, the third bullet from the bottom, if you want

24    to read that, "The cost savings benefits of pooled purchasing

25    power with full confidentiality."  You see that as one of the

JBI3SCO2                         Pechet - Cross

1    bullets under the benefits of the Fenero Multifamily Office

2    approach?

3    A.  I do see that.

4            MR. DEVLIN-BROWN:  If we can do what you did before,

5    Mr. Barile, and put on the screen page 11 from this exhibit on

6    one side, and then the travel records stipulation, Government

7    Exhibit 62, paragraph C on the other side.  If we could just

8    blow up 3C there.

9    Q.  So, you see it says that Scott traveled from Miami to

10   Istanbul, Turkey on March 15, 2016 and returned from Istanbul

11   to Miami on March 26, 2016.  You see that?

12   A.  I do see that.

13   Q.  Did you look through the travel stipulation yourself to see

14   if there were actual flight records or just the records of

15   coming and going from the U.S.?

16   A.  I did not review that.

17   Q.  So this is a trip that's about 11 days, right?

18   A.  Yes.

19   Q.  And Turkey is in Europe?  Actually, it's both in Europe and

20   Asia, right?

21   A.  Yes.

22   Q.  I remember that.  So, you don't know if during this trip,

23   in addition to going to Turkey, he went to other places, right?

24   A.  I don't.

25   Q.  So, you don't know if he went skiing in Austria with his

JBI3SCO2                        Pechet - Cross

1    investors at some point, including on March 18, 2016?

2    A.  I don't.

3              MR. DEVLIN-BROWN:  We can take that off the screen.

4    Q.  If we can put up Government Exhibit 53 again I just want to

5    put on the date of the meeting.  So, the actual meeting with

6    Mark Scott and the two Bank of Ireland employees described here

7    took place on April 7, 2016.  Do you see that in the

8    stipulation?

9    A.  I do see that.

10   Q.  And it was their first and only meeting with Mr. Scott?

11   A.  That's what it says.

12   Q.  It seems like, according to the stipulation, Mr. Collins

13   took notes but Ms. Ceannt did not.  And it says also that

14   Collins' notes are attached here as Exhibit A.

15             MR. DEVLIN-BROWN:  Could we go to Exhibit A,

16   Mr. Barile.  I think it might have been -- page five.

17   Q.  Are there more pages to these notes or is it just one page?

18   It looks like it's just one page, right?

19   A.  That's what it looks like.

20   Q.  Do you see at the bottom 10K, 10K, 10K?

21   A.  Yes.

22   Q.  Next to the first one of those 10Ks, cost per SPV?

23   A.  Yes.

24   Q.  And that abbreviation is special purchase vehicle?

25   A.  I don't know.

JBI3SCO2                          Pechet - Cross

1   Q.  Are those based on -- have you looked at the bank records

2   at all yourself, like the underlying?

3   A.  A bit.  I'm not sure which ones you're referring to.

4   Q.  Are you aware from the other bank records that there was a

5   $10,000 fee Bank of Ireland charged for doing its checks to

6   open up each account?

7   A.  Yes.

8   Q.  We can take that off the screen.  Do you recall a number of

9   questions on direct examination and seeing a number of

10  documents relating to questions to Mr. Scott by Bank of Ireland

11  about investors in the companies that were opening accounts at

12  the Bank of Ireland?

13  A.  I recall that.

14  Q.  For example, if we can put up Government Exhibit 1744,

15  please.  So if we could blow up just the bottom e-mail, please,

16  from Mr. Greg Begley.

17          So this e-mail is dated May 12, 2016.  And you see he

18  writes to Mr. Scott, "Can you please confirm that you will

19  notify Bank of Ireland on a timely basis within a month of the

20  investment of any seed investors that would, on the basis of

21  their investment, be considered beneficial owners or

22  controllers 10 percent or greater ownership stake."

23          Do you see that question?

24  A.  I do see.

25  Q.  Do you understand exactly what that means?

1  A.  Not really.

2  Q.  Is it fair to say that the requests and e-mails about

3  identifying investors did not always use the same language?

4  A.  More or less.

5  Q.  Okay.  Well, Mr. Begley, obviously, is not here either.

6  Right?

7  A.  I don't know.

8  Q.  If you do notice, let me know.

9        But, we have no idea what the communications were back

10  and forth with Mr. Begley and Mark Scott or anyone else on the

11  Bank of Ireland, frankly, other than what's in the stipulation,

12  and what's in these e-mails, right?

13  A.  I only know about the documents that I reviewed.

14  Q.  Right.  Okay.  I think we can zoom out for a second because

15  Mr. Scott did respond to this.  He writes back, "We are happy

16  to share any investor information with BOI, but we can

17  certainly focus on this particular group of investors and

18  report regularly."

19        Do you see that?

20  A.  I do.

21  Q.  You didn't see, through your review of documents, any

22  follow up on this chain, did you?

23  A.  Not that I recall.

24  Q.  So Mr. Begley didn't say, great, you know, send them along

25  or tell me soon or anything like that?

```
 1   A.  He may have.  I don't recall and I don't remember viewing
 2   e-mails that said that.  But he very well may have.
 3          MR. DEVLIN-BROWN:  I'd like to show you what's been
 4   marked for identification, so this might be you, Ms. Stanley,
 5   as Defense Exhibit 256.  If we could just show it to the
 6   witness and counsel.  Do you want to page down, Ms. Stanley.
 7          We'd offer 256, Defense Exhibit 256.
 8          MR. DiMASE:  With the understanding that we discussed
 9   this morning, no objection.
10          THE COURT:  Very well.  It will be received.
11          (Defendant's Exhibit 256 received in evidence)
12          MR. DEVLIN-BROWN:  If we can publish Defense Exhibit
13   256, please.  And start on the first page.
14   Q.  The bottom e-mail starts from Mark Scott to Greg Begley,
15   copying David Pike.  Subject updated org chart.  "Hi Greg,
16   please find attached the updated organizational chart for the
17   account opening.  Are you complete on your requests now or is
18   there anything else missing."  Do you see that?
19   A.  I do.
20   Q.  And then if you look up an e-mail, remove the bottom one.
21   If you look up an e-mail, you see Mr. Begley responds, "Hi
22   Mark, could you please sign and date the organizational
23   structure chart."  And Mr. Scott responds, "Sure.  Here it is."
24   Right?
25   A.  I see that.
```

1    Q.  And now if we could go to the actual organizational chart

2    attached to this e-mail, which I think is page four of the

3    exhibit.  So, the chart reads Fenero Equity Investments LP I

4    BVI organizational chart.  And do you see at the very right on

5    the top it says Mark Scott UBO?

6    A.  I see that.

7    Q.  And then below Mark Scott is a company in Florida, MSS

8    International Consultants LLC, which reports Mark Scott owns

9    100 percent of, according to the chart.  Do you see that?

10   A.  It says ownership 100 percent, yes.

11   Q.  Right.  Below that is MSS International Consultants BVI

12   Limited.

13   A.  Yes.

14   Q.  And then that goes further down on the chart to Fenero

15   Equity Investments LP.  Which goes below that to Fenero Equity

16   Investments Ireland Limited, which goes to then three different

17   other companies.  Do you see that?

18   A.  I do.

19   Q.  By the way, from your review of the records of Bank of

20   Ireland, is it clear that Mr. Scott did not use all of the

21   accounts he opened up there?

22   A.  I have no idea.

23   Q.  But in any event, this chart was submitted in April of

24   2016, right?  I think that's what the cover e-mail said?

25   A.  If that's what the e-mail said, then yes.

JBI3SCO2                         Pechet - Cross

1    Q.  Again, plans can change, right?

2              MR. DiMASE:  Objection.

3              THE COURT:  Overruled.

4    A.  Sure.  Broadly speaking, anyone's plans can change.

5              MR. DEVLIN-BROWN:  Okay.  If we could go to -- if you

6    just give me a little patience, your Honor, I just want to look

7    through the defense exhibits and see which we may need to offer

8    at this time.

9              THE COURT:  Okay.

10             MR. DEVLIN-BROWN:  And which we can skip.

11             If we can put on the screen for just the Court and

12   witness and counsel, Defense Exhibit 239.

13             And we'd offer that in evidence.  If you can scroll

14   down, Ms. Stanley.

15             MR. DiMASE:  With the understanding that we discussed

16   this morning, no objection.

17             THE COURT:  Very well.  239 will be received.

18             (Defendant's Exhibit 239 received in evidence)

19             MR. DEVLIN-BROWN:  If we can just publish it quickly,

20   Ms. Stanley, the first page.

21   Q.  So Defense Exhibit 239 is an e-mail from Mark Scott to

22   Ms. Ceannt and Mr. Begley, March 13, 2016.  And if you just

23   page quickly through it, Ms. Stanley, and so the witness can

24   see it as well, this appears to be, doesn't it, information

25   relating to the account opening process that Mr. Scott is

JBI3SCO2                          Pechet - Cross

1   providing to the Bank of Ireland, right?

2   A.   That's what it looks like, yes.

3            MR. DEVLIN-BROWN:  If we could show just to the

4   witness and counsel Defense Exhibit 258, please.  And we'd

5   offer Defense Exhibit 258.

6            MR. DiMASE:  We object to this as we discussed this

7   morning, your Honor.

8            THE COURT:  Overruled.

9            (Defendant's Exhibit 258 received in evidence)

10           MR. DEVLIN-BROWN:  Can we publish then Defense Exhibit

11  258, please.

12  Q.   So, Defense Exhibit 258 I guess at the very top it's Greg

13  Begley forwarding the whole thing to himself.  But, it's from

14  Mark Scott to Greg Begley updated org chart.  He writes, "Hi

15  Greg, it's just me for now as discussed.  We may be adding one

16  or two more during the summer after our initial acquisitions."

17  If we could just show the second page of that.

18           MR. DEVLIN-BROWN:  I'd like to now show just the

19  witness, please, Defense Exhibit 621.  If you could just scroll

20  up to the second page so the government can see it as well.

21           MR. DiMASE:  No objection, your Honor.

22           THE COURT:  It will be received.

23           (Defendant's Exhibit 621 received in evidence)

24           MR. DEVLIN-BROWN:  We can leave it on this page for

25  now since the jury has it and we can page back.

1    Q.  This is a letter dated April 24, 2017 from MSSI to Deirdre

2    Ceannt and the re line is account closure, and then there is a

3    long series of letters and numbers.  And the letter states

4    "Dear Deirdre, can you please initiate the closing of the above

5    referenced account as soon as the last wire has been

6    transferred out."

7            And if we can just now page out and go to the first

8    page.  That's April 24, 2017, I believe the letter just

9    referenced one account number, right?

10   A.  In the re line?

11   Q.  Yes.

12   A.  Yes.

13           MR. DEVLIN-BROWN:  If we can now show just the witness

14   and the government Defense Exhibit 705, please.

15           We'd offer 705.

16           MR. DiMASE:  No objection, your Honor.

17           THE COURT:  705 will be received.

18           (Defendant's Exhibit 705 received in evidence)

19           MR. DEVLIN-BROWN:  If we can publish that then.

20   Q.  So do you see this is a letter dated April 20, 2018, and

21   the re line, again, from MSSI to someone else at Bank of

22   Ireland.  And the re line is closure of BOI corporate accounts

23   of Fenero Equity Investments.  It reads "Dear Mr. Howe, by copy

24   of this letter, I would like Bank of Ireland to immediately

25   close out all the accounts Fenero holds at your bank directly

1   or indirectly through subsidiary companies."

2                Do you see that?

3   A.  I do.

4   Q.  Based on these e-mails, it's Mr. Scott who is initiating

5   closure of these bank accounts, right?  Or these letters?

6   A.  Could you scroll to the bottom?  You said it was from MSSI.

7   Q.  Yes.  Yes.  We can pan out or zoom out.

8   A.  Mark Scott's signature is at the bottom, yes.

9                MR. DEVLIN-BROWN:  If we could, Mr. Barile, one more

10  Government Exhibit, which is 1816.

11  Q.  So this is an exhibit that Mr. DiMase showed you.  If we

12  could just page -- right.  So as long as you have it, we can at

13  the top this is the header e-mail from Mr. Scott to business

14  online, which I think had been established before as an account

15  at Bank of Ireland, writing on May 4, 2017, "We are in touch

16  with our contract partner and have provided written details for

17  submission to the correspondent bank.  Any information the

18  correspondent bank would like about Phoenix it should obtain

19  directly and not through us."

20               Do you see that?

21  A.  I do see that.

22  Q.  If we can zoom out.  And this is the e-mail, as you see on

23  the second page, right, in which there had been some questions

24  put to Mr. Scott about a transaction and he responded in -- I

25  don't know if it was different color lettering, but he responds

JBI3SCO2                        Pechet - Cross

1   underneath each question.  You see that, right?

2   A.  Yes.

3   Q.  This transaction that's being inquired about had occurred

4   already, right?

5   A.  Honestly, I don't know.

6   Q.  You don't recall from seeing the e-mail traffic on this

7   that it was a past transaction?

8   A.  No, I looked at various e-mails and am more or less just

9   reading from them.

10         MR. DEVLIN-BROWN:  I am not sure if a little above

11  that helps or not, Mr. Barile, with that issue.  Let's pause

12  for a second.

13  Q.  Well, maybe we could just read the very -- the e-mail right

14  there at the bottom from the Bank of Ireland account, "Dear

15  customer, writing in relation to payment reference" a number

16  "to Phoenix Fund Investment LLC," and it then says "Please be

17  advised we have received the following query from the foreign

18  bank.  Please have the customer provide the following

19  information."

20         If we could just scroll down a little bit further

21  through that e-mail.  A little further.  I think we can all

22  agree probably, can't we, that this large font is really bad

23  e-mail etiquette?

24  A.  It is a bit difficult.

25  Q.  Presumably that was some issue in printing it out or

1   converting it or something.  Or do you know if it was like this

2   in the original?

3   A.  I have no idea.

4   Q.  Bank of Ireland is based in Ireland, right?

5   A.  I would imagine.

6   Q.  And as we talked about at the very beginning, the two

7   employees referenced in the stipulation did not want to come to

8   testify in the United States in this courtroom, right?

9   A.  I think that's what the stipulation said, yes.

10  Q.  Bank of Ireland is not, to your knowledge, or anything

11  you've seen in these e-mails, insured by the FDIC or anything

12  else in the U.S. government, is it?

13  A.  I don't know.

14          MR. DEVLIN-BROWN:  One moment, your Honor.  No further

15  questions.  Thank you.

16          THE COURT:  Any redirect?

17          MR. DiMASE:  One moment, your Honor.  Your Honor I

18  don't have any questions, thank you.

19          THE COURT:  Sir, you may step down.

20          (Witness excused)

21          (Continued on next page)

22

23

24

25

1           THE COURT:  If the government can please call its next

2     witness.

3           MS. LOZANO:  The government calls Rosalind October.

4           MR. DiMASE:  Actually, your Honor, may we approach

5     briefly?

6           THE COURT:  Sure.

7           (At the sidebar)

8           MR. DiMASE:  Your Honor, what was the defense exhibit

9     for 1739, do you recall?

10          MR. DEVLIN-BROWN:  I could perhaps go back and check.

11    But, what's the issue?

12          MR. DiMASE:  Would you mind so the record is clear

13    what we're discussing?  Because we didn't admit it as a

14    government exhibit.  It is a defense exhibit.

15          MR. DEVLIN-BROWN:  Okay.

16          MR. DiMASE:  Your Honor, this is Government Exhibit --

17    Defense Exhibit 256.  We objected in the morning, and then we

18    said we'd come back to it and I think you admitted the e-mail.

19    We don't have any issue with the chart.  But, the body of the

20    e-mail "It is just me for now as discussed.  We may be adding

21    one or more during the summer after our initial acquisitions.

22    We think that when offered by the defendant for its truth."

23    Particularly, "it is just me for now as discussed" is

24    inadmissible hearsay, and we would ask that part of the exhibit

25    be stricken and redacted.

1           THE COURT:  I thought we had agreed to that this

2     morning.

3           MR. DiMASE:  It was on a different exhibit, which

4     contained a similar concept in it, and it was a sentence within

5     the middle of a paragraph.  We objected to the entirety of this

6     particular exhibit, really based on what's in the first page.

7     We didn't get into redacting the exhibit, but we would -- maybe

8     it's too late at this stage, but nonetheless we would ask this

9     be redacted and stricken and the jury only be able to consider

10    the chart and the date and time of the e-mail here on Defense

11    Exhibit 258.

12          MR. DEVLIN-BROWN:  I don't recall exactly if it was

13    this exhibit or a different one this morning, but I think

14    basically the language seemed fine then.  I don't recall an

15    objection after we showed it to you just now.

16          Our position is the truth of it is not relevant.

17    What's relevant is he is providing information about the

18    investors as he's describing it.  The government can show

19    that's false and that Irina Dilkinska was an investor.  But

20    he's providing this information, that's how he's representing

21    it to the bank.  In a case where they've alleged Bank of

22    Ireland is being defrauded, what he's communicating to him is

23    certainly relevant.

24          MR. DiMASE:  The defense is offering it for the truth.

25    Not for its -- not because it's a lie.  It is being offered for

JBI3SCO2                          Pechet - Cross

1    the truth.  "It's just me for now."  That's inadmissible

2    hearsay when offered by the defendant.  By the way, we did

3    object at this time of this record being published.

4              THE COURT:  I thought all of these were coming in

5    subject to that redaction, so it will be redacted.

6              MR. DEVLIN-BROWN:  Okay.

7              MR. DiMASE:  Thank you.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. LOZANO:  At this time the government is offering

2     several stipulations as well as the exhibits contained therein.

3     Start with what is already signed is Government Exhibit GX52.

4     It is a stipulation regarding bank records.  And it references

5     numerous bank account record exhibits contained on the

6     following disks:  Exhibit 701, 702, 708, 710, 712, 716, 714,

7     718, 720, 721, 723, 728, 730, 731, 801, 806, 807, 809, 811,

8     812, 816, 817, 819, 820, 821, and 822.

9          At this time the people -- the government is offering

10    Government Exhibit 52 as well as all of the disks I've just

11    named as well as all of the account records marked with exhibit

12    numbers contained in Exhibit 52.

13         MR. GARVIN:  There is no objection.

14         THE COURT:  Very well.  They will be received.

15         (Government's Exhibits 52, 701, 702, 708, 710, 712,

16    716, 714, 718, 720, 721, 723, 728, 730, 731, 801, 806, 807,

17    809, 811, 812, 816, 817, 819, 820, 821, and 822 received in

18    evidence)

19         MS. LOZANO:  The government is also offering

20    Government Exhibit 68 which is a supplemental stipulation for

21    bank records and it references two disks.  One is Government

22    Exhibit 713 and the other is Government Exhibit 828.  Both of

23    those disks contain bank account records which are marked with

24    their own exhibit numbers.  And at this time the government

25    offers stipulation GX68 as well as the disks contained therein

JBI9SCO3                          October - Direct

1    and the records contained on those disks into evidence.

2              MR. GARVIN:  Also no objection.

3              THE COURT:  They will be received.

4              (Government's Exhibits 68, 713, 828 received in

5    evidence)

6              MS. LOZANO:  At this time the government -- and that

7    for the record was also signed, was a signed stipulation.

8              The next signed stipulation by the parties is

9    Government Exhibit 58 for property records, for real property

10   records that are contained on disk 3100.  And the stipulation

11   details separate exhibit numbers for all of the records

12   contained on disk 3100.

13             The government now offers Exhibit 58 as well as the

14   disk 3100 as well as all of the records contained on that disk

15   detailed in the stipulation.

16             MR. GARVIN:  No objection.

17             THE COURT:  They will be received.

18             (Government's Exhibits 58 and 3100 received in

19   evidence)

20             MS. LOZANO:  Additionally there is a signed

21   stipulation marked Government Exhibit 60, a stipulation

22   regarding searches and seizures.  This stipulation details

23   certain exhibits that are being offered in connection with

24   searches of the defendant's residences.

25             At this time the government offers Exhibit GX60 as

 1   well as the exhibits detailed therein which are GX105, 106,

 2   107, 108, 113, 114, and 115 into evidence.

 3              MR. GARVIN:  No objection.

 4              THE COURT:  They will be received.

 5              (Government's Exhibits 60, 105, 106, 107, 108, 113,

 6   114, and 115 received in evidence)

 7              MS. LOZANO:  And lastly, this exhibit which is GX55

 8   for electronic data has already been admitted into evidence.

 9   And pursuant to the stipulation the government is offering

10   three e-mails in connection with Ms. October's testimony and

11   those e-mails are Government Exhibit 1356, Government Exhibit

12   1440, and Government Exhibit 1453 into evidence.

13              MR. GARVIN:  No objection.

14              THE COURT:  They will be received.

15              (Government's Exhibits 55, 1356, 1440 and 1453

16   received in evidence)

17   ROSALIND OCTOBER,

18        called as a witness by the Government,

19        having been duly sworn, testified as follows:

20   DIRECT EXAMINATION

21   BY MS. LOZANO:

22   Q.  Good afternoon, Ms. October.

23   A.  Good afternoon.

24   Q.  Sorry about that.

25              Where do you work?

1    A.   I currently work at the Manhattan district attorney's

2    office.

3    Q.   In what capacity?

4    A.   I am a senior financial intelligence analyst in the major

5    economic crimes bureau.

6    Q.   And how long have you been the district attorney's office

7    in that role?

8    A.   Approximately six years.  Of those six years approximately

9    18 months I was a contractor with the Internal Revenue Service

10   but my location was at the district attorney's office.

11   Q.   And you said you worked at the major economic crimes

12   bureau.  Can you please describe the kind of work that the

13   major economic crimes bureau does in the district attorney's

14   office.

15   A.   Sure.  In the major economic crime bureau we handle large

16   long-term complex investigations involving white collar crimes,

17   money laundering crimes, tax fraud, various investor fraud.

18   Q.   What are your responsibilities as a senior financial

19   intelligence analyst in the major economic crimes bureau?

20   A.   Some of my responsibilities include open source research,

21   reviewing and analyzing bank records, reviewing records

22   obtained from MLATs, and conducting additional research and

23   reaching out to financial institutions for various follow-ups.

24   And that pretty much sums it up.

25   Q.   Before you worked at the district attorney's office were

1   you working or were you in school?

2   A.   I was working.

3   Q.   Where were you working?

4   A.   I worked at a few law firms.

5   Q.   What is your educational background?

6   A.   I have a bachelor's in accounting.

7   Q.   During your time at the district attorney's office have you

8   had the opportunity to receive any kind of professional

9   training or continuing education?

10  A.   Yes, I have.

11  Q.   In what areas?

12  A.   So I regularly attend financial crimes symposiums.  Several

13  of them are held throughout the year.  And those are hosted by

14  various other law enforcement agents and I –– it's a discussion

15  with law enforcement about emerging trends surrounding

16  financial crimes and just kind of like new typologies that we

17  should be looking for.

18       In addition to that I attend monthly meetings,

19  external fraud meetings held at various financial institutions

20  around the New York City area.  And at those meetings we engage

21  with the financial institutions to also learn about some of the

22  things that they're seeing in terms of money laundering and

23  other typologies that they would bring to us that we would keep

24  abreast of during our daily search.

25  Q.   I direct your attention to approximately February of 2016.

1    Where were you working at that time?

2    A.  At the Manhattan district attorney's office.

3    Q.  Did you have the opportunity to be assigned an

4    investigation related to a cryptocurrency known as OneCoin?

5    A.  Yes.

6    Q.  How did that investigation begin in your office?

7    A.  The investigation came to us from a law enforcement tip

8    from the United Kingdom concerning some suspicious transactions

9    that were originating from a Mercury Effects Account held in

10   the name of Viola Asset Management.  Those transfers were

11   coming into a Florida-based account.  The owner was Gilbert

12   Armenta and the account names in question were Fates Group and

13   Zala Group.

14   Q.  After you began working on this case did there come a time

15   where the district attorney's office and United States

16   attorney's office began working together on the investigation?

17   A.  Yes.  Approximately 13 months into our investigation we

18   were working parallel investigations and it was more useful for

19   us to pool our resources together and to be able to collaborate

20   since we were investigating the same targets.

21   Q.  What was your role on the investigative team at that point?

22   A.  At that time I participated in reviewing some of the

23   e-mails from the search warrant.  And my primary role really

24   entailed financial tracing and reviewing thousands of bank

25   records and scheduling those accounts, looking through those

1   accounts for other suspicious activity, having meetings with

2   the attorneys concerning those accounts and relaying my

3   findings to the attorneys on what are next steps if necessary

4   for additional subpoenas to be initiated and continuing the

5   financial tracing from those steps.

6   Q.  What do you mean when you use the term financial tracing?

7   Can you define for us what that means.

8   A.  Sure.  So financial tracing is really digging into the

9   records, looking for the originator.  Our concern is the source

10  of funds.  Where is the money coming from?  Who are the

11  beneficial holders of the accounts that's sending the money?

12  And where the money is ultimately going for, to the beneficiary

13  and for what purpose and the amounts of the transactions and

14  the time period of the transactions that would encompass

15  financial tracing.

16  Q.  What kind of records do you review as part of the financial

17  analysis or financial tracing that you do?

18  A.  So I generally look through the account opening documents

19  and I look through corporation records as well as bank

20  statements and the company wire details and brokerage accounts

21  as well and I look at property records.

22  Q.  When you say account records, is that for bank accounts?

23  A.  Yes.  For bank accounts that we received pursuant to

24  compliance from subpoena responses.

25  Q.  Where or do you receive also bank account records for

1   international bank accounts?

2   A.   That is correct.  We have received what's called MLATs from

3   foreign jurisdictions for bank accounts that's held overseas.

4   Q.   In the course of tracing the flow of funds how do you

5   confirm that certain financial transactions occurred?

6   A.   Well whenever possible I like to look at the records from

7   both the originator and look at the records, if it's available,

8   for the beneficiary to see if there was a withdrawal from the

9   originator and then there's a deposit of some sort for the

10  beneficiary so the transaction is completed.

11  Q.   How do you confirm who the accountholder or owner of an

12  account is?

13  A.   Generally I go to look at the account opening documents and

14  contained in the account opening documents there's usually a

15  signatory card or also corporation records to indicate who the

16  beneficial owners of the accounts are.

17  Q.   How do you memorialize or document the financial analysis

18  that you do as part of an investigation?

19  A.   So I generally use excel spreadsheets and I parse out what

20  I would consider the relevant transactions from that

21  spreadsheet and just kind of keep a running tab of transactions

22  that we want to flag for -- to pursue like our financial

23  analysis.

24  Q.   Aside from the spreadsheets do you then summarize all of

25  the data that's contained in the spreadsheets in a more concise

1    or digestible form?

2    A.   Yes, I do.  So from -- once I have the spreadsheet then I

3    use a software program to import that data into charts.  So the

4    charts are visual charts usually with a lot of arrows and icons

5    and showing the flow of funds.

6    Q.   I'd like to ask you a little bit about the investigation in

7    broad terms.  Generally speaking, kind of in a high level view,

8    what was the focus of your financial analysis in connection

9    with the investigation related to OneCoin?

10   A.   Well it -- with this investigation there were -- there were

11   multiple jurisdictions so where the funds were coming from,

12   from the various different countries was the focus and where

13   the money actually ended up.

14   Q.   In the course of that did you investigate and analyze

15   records related to any accounts held by Mark Scott?

16   A.   Yes, I did.  Extensively.

17   Q.   And in the flow of the OneCoin money that you analyzed,

18   where were Mr. Scott's accounts?

19   A.   (No response).

20   Q.   Were they recipients or were they senders or both?

21   A.   Both.

22   Q.   And we'll get into more detail about that later.

23           Did your financial tracing in this case also involve

24   tracing funds that were sent by individuals who purchased

25   OneCoin funds and where the money went when they sent it to

1   OneCoin?

2   A.   That is correct.

3   Q.   Which individuals?

4   A.   So I looked at records in connection to Linda Cohen and a

5   William Horn.

6   Q.   Now you mentioned that you did analyze and receive records

7   for accounts related to Mark Scott.   What kinds of accounts

8   were those?

9   A.   So there were private equity accounts as well as personal

10  accounts and corporate entity accounts as well.

11  Q.   And when you mentioned private equity accounts was -- did

12  the defendant's private equity funds have a name?

13  A.   Yes.

14  Q.   And what was that name?

15  A.   They were part of the Fenero group.

16  Q.   And when you say the Fenero group, why do you use that

17  term?

18  A.   Because there's multiple Fenero accounts related to the

19  Fenero records.   There's a Fenero Financial, Fenero Financial

20  I, Fenero Financial II, Fenero Financial Switzerland.

21  Q.   Are there accounts in the name of Fenero Equity

22  Investments?

23  A.   And also Fenero Equity Investments as well and securities

24  trading.

25  Q.   I'm sorry?

1   A.   And securities trading.

2   Q.   Were you able to trace money transferred into and out of

3   the defendant's fund accounts between May of 2016 and

4   approximately July of 2018?

5   A.   Yes, I have.

6   Q.   And were you able to determine how many bank accounts

7   funded the defendant's private equity fund accounts during that

8   time?

9   A.   Yes.

10  Q.   How many?

11  A.   There were nine accounts that funded the -- funded four

12  narrow accounts.

13  Q.   So those nine accounts were not controlled by the

14  defendant?

15  A.   Correct.

16  Q.   Overall, big picture, how much during that period of time

17  was transferred from those nine accounts into and through the

18  defendant's Fenero Fund accounts?

19  A.   I calculated 354 million euros and approximately 10 million

20  U.S. dollars into the four Fenero accounts.

21  Q.   Can you estimate approximately how much that is all in, in

22  dollars?

23  A.   I'm sorry?

24  Q.   Can you approximate how much that amount, both the euro and

25  dollar together is in dollars?

JBI9SCO3                          October - Direct

1   A.  Collectively close to four hundred million.

2   Q.  Were you also able to trace the money out of Fenero Funds

3   accounts?

4   A.  Yes, I did.

5   Q.  And generally speaking, in broad strokes, where did you

6   trace that known money to?

7   A.  I was able to trace those funds into intermediary accounts

8   also controlled by Mark Scott.  It was MSS International

9   Consultants as well as other Fenero Bank of Ireland accounts.

10  And that money was further traced to U.S. accounts held in Mark

11  Scott's name as well as MSS International Consultants LLC.  And

12  money was also traced to Mark Scott's attorney's account,

13  Nicole Huesmann's IOLA account.  And then there was funds

14  traced also to foreign entities which were connected to OneCoin

15  individuals.

16  Q.  Specifically, for example, which OneCoin individuals are

17  you referring to?

18  A.  So a lot of the funds were traced to Ruja Ignatova, Irina

19  Dilkinska.

20  Q.  Are you aware, based on your involvement in this

21  investigation, who Ruja Ignatova is?

22  A.  Yes.  I understand her to be the leader at one time of

23  OneCoin.

24  Q.  Now you mentioned that in general when you conduct

25  financial analysis you create spreadsheets and then develop

1    charts or visuals?

2    A.  Yes.

3    Q.  In this case did you have the opportunity to create charts

4    reflecting your financial analysis?

5    A.  Yes, I have.

6    Q.  Please describe how you compared those charts.  And not

7    each one individually but just overall how you prepared those.

8    A.  I'm sorry.  Repeat.

9    Q.  Describe overall how you prepared those charts, the process

10   through which you prepared them?

11   A.  Oh, so like I testified earlier the information is coming

12   from my spreadsheet, my excel data, and then I put those into

13   the chart, and then I use various different flags to represent

14   the countries that's affected where the accounts are held.  And

15   I use various different arrows showing the flow of money,

16   whether it's going in -- what direction the money is flowing

17   into.  I've also indicated on the charts the dollar amounts and

18   the dates of transaction so it would be easier to follow in

19   terms of time period of when the transactions occurred.  And I

20   used also various symbols of banks and generic symbols

21   indicating figures of male or female.

22   Q.  So to be clear the transactions that are reflected on your

23   charts have been confirmed by you in your analysis of the bank

24   records and other documents?

25   A.  That's correct.

1          MS. LOZANO:  Mr. Barile I'd like to show Ms. October

2     and counsel and the court but not the jury at this time a

3     series of exhibits, if you can just scroll through the 36

4     exhibits, starting with -- and I'm going to ask you to take a

5     look at them, Ms. October, and whether you recognize them.

6     Starting with GX2601, 2602, 2602A, 2603, 2603A, 2604, 2605,

7     2606, 2607, 2608, 2609, 2610, 2611, 12, 2613, 2614, 2615, 2616,

8     2617A, B, D and E -- D, skip C, and E -- 2618, 2619, A, B, C,

9     D, E and F, 2620, 2621, 2622 and 23, 2626, 2627 and 2628.

10    Q.  Ms. October, do you recognize these 36 exhibits?

11    A.  Yes, I do.

12    Q.  Actually I think it was 37, whatever it was.

13          What are they?

14    A.  Those are visual charts that I created based on my

15    financial analysis.

16    Q.  And did you prepare those charts consistent with the

17    description that you just gave us about creating charts?

18    A.  That is correct.

19          But I would like to also add that the charts also

20    contain a source box and that source box references the bank

21    records or e-mails or the records that -- that supports the

22    chart.

23    Q.  So the other exhibits that you relied on to create the

24    chart?

25    A.  Correct.

1   Q.  And did you rely on different records for different

2   exhibits?

3   A.  Yes.

4   Q.  Does the chart -- well have you reviewed stipulations in

5   evidence regarding bank records and Bank of Ireland records?

6   A.  Yes.

7   Q.  And do all of the exhibits that are in your charts, are

8   they contained on either stipulation 52 or 68 or 53?

9   A.  That is correct.

10  Q.  Or otherwise are in evidence?

11  A.  Yes.

12  Q.  Does each chart fairly and accurately reflect a summary of

13  the financial analysis you conducted with respect to the

14  transactions contained in that chart?

15  A.  Correct.

16  Q.  And would these exhibits assist you in testifying today

17  about the financial analysis and tracing that you undertook in

18  connection with this investigation?

19  A.  Yes, it will.

20          MS. LOZANO:  I am now offering, your Honor, and I'm

21  not going to repeat all 36 numbers unless the Court would like

22  me to, I'm offering all of these charts into evidence.

23          THE COURT:  Any objection?

24          MR. GARVIN:  One moment, your Honor.

25          There is no objection.

1           THE COURT:  Very well.  Those exhibits will be

2     received.

3           (Government's Exhibits 2601, 2602, 2602A, 2603, 2603A,

4     2604, 2605, 2606, 2607, 2608, 2609, 2610, 2611, 2612,

5     signed2613, 2614, 2615, 2616, 2617A, B, D and E, 2618, 2619, A,

6     B, C, D, E and F, 2620, 2621, 2622, 2623, 2626, 2627 and 2628

7     received in evidence)

8     Q.  You mentioned that the defendant's private equity fund

9     accounts were named various iterations of Fenero.  Where were

10    those accounts located?

11    A.  They were located in the Cayman Islands.

12    Q.  Anywhere else?  Did he have Fenero accounts anywhere else?

13    A.  He also had Fenero accounts in Ireland.

14    Q.  And when you mentioned the four Fenero Cayman accounts,

15    what are you referring to?

16    A.  I'm referring to the Fenero Financial Investments, Fenero

17    Financial Investments I, Fenero Financial Investments II, and

18    Fenero -- sorry.  Fenero Equity Investments, Fenero Equity

19    Investments I, Fenero Equity Investments II and Fenero

20    Financial Switzerland.

21    Q.  And those were all Cayman-based accounts?

22    A.  Yes.

23    Q.  At what banks?

24    A.  At DMS Cayman and Deutsche Bank.

25    Q.  Did you have an understanding about the defendant's role in

1    the Fenero Equity Investments funds and Fenero Financial

2    Switzerland fund?

3    A.  Yes.

4    Q.  What was his role?

5    A.  I understand him to be the private equity manager for those

6    funds, for those accounts.

7    Q.  Individually or through some sort of corporate entity?

8    A.  Through corporate entities.

9    Q.  Which was what?

10   A.  The various financial Fenero accounts that I just

11   mentioned.

12   Q.  Well my question is you said that the defendant was the

13   general partner or manager of the funds.  Did he have a

14   corporate entity that served as the general partner or manager

15   or was it him individually?

16   A.  Him individually.

17   Q.  Are you familiar with an entity called MSSI BVI?

18   A.  Yes.

19   Q.  What was its role?

20   A.  That -- those entities were intermediary accounts that

21   received funds from the Fenero accounts and Mark Scott was the

22   CEO and/or director of those MSSI accounts.

23   Q.  So you earlier mentioned you traced approximately 400

24   million U.S. dollars into and then out of the defendant's

25   Fenero Funds through intermediary accounts.  And during that

1    process you identified international accounts as well, correct?

2    A.   Yes.

3    Q.   From and to what countries did you trace transfers related

4    to the Fenero Funds?

5    A.   From Singapore, from Hong Kong, from Germany and --

6    Q.   Go ahead.  Sorry.

7    A.   And Ireland.

8    Q.   And to where?

9    A.   To other Cayman-held accounts and Bank of Ireland.

10   Q.   Were there transfers involving Hong Kong?

11   A.   Yes.

12   Q.   I'm going to show you --

13           MS. LOZANO:  I'd like to pull up, Mr. Barile, 2627 and

14   publish that to the jury, please.

15   Q.   What did this slide chart depict?

16   A.   This chart depicts the overflow -- overall flow of funds

17   both incoming and outgoing and the various countries that were

18   either originators or beneficiaries concerning the

19   approximately four hundred million that moved through all of

20   these accounts.

21   Q.   So can you walk us through the color coding?  What do the

22   green arrows represent?

23   A.   The green arrows represent the 354 million euros and the

24   approximately 10 million U.S. dollars that funded the four

25   Fenero accounts held in the Cayman Islands.

1    Q.  And how are the four Fenero accounts held in the Cayman

2    islands depicted on this chart?

3    A.  It's depicted by the green arrows coming from Singapore,

4    Hong Kong, Germany and Bulgaria.

5    Q.  And ending where?  What's the icon for the Fenero Funds

6    account?

7    A.  Just a little blue bank symbol with the Cayman flag

8    underneath it.

9    Q.  Generally speaking in the Caribbean?

10   A.  In the Caribbean, yes.

11   Q.  What does the blue arrow represent?

12   A.  The blue arrows represent intercompany transfers from

13   Cayman Islands to Ireland.

14   Q.  And why all the intercompany transfers?

15   A.  Because they are still related to accounts that Mark Scott

16   controls so the Bank of Ireland accounts also are Fenero

17   accounts as well as the Cayman Island accounts are also Fenero

18   accounts.

19   Q.  What do the red arrows represent?

20   A.  The red arrows represent the disbursement of funds and

21   where the money ultimately ended up, so the beneficiary of

22   those funds and where the location of the accounts that

23   received those funds.

24          MS. LOZANO:  Your Honor, may I approach the witness

25   with an exhibit?

1            THE COURT:  Yes.

2   Q.  Ms. October, I'd like you to take a look at what is marked

3   as 2627-BU and ask you whether you recognize it.

4   A.  Yes, I do.

5   Q.  What is that?

6   A.  That's an enlarged copy of the exhibit that we are looking

7   at right now.

8   Q.  And aside from being enlarged is there anything different

9   from 2627-BU, different from 2627?

10  A.  No.

11          MS. LOZANO:  Your Honor I you offer 2627-BU into

12  evidence.

13          MR. GARVIN:  May we have a sidebar, your Honor.

14          THE COURT:  Sure.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          MR. GARVIN:  Your Honor, I did not object and they're

3    already into evidence each and every one of the 36 charts.  It

4    was my understanding that the enlargement itself was a

5    demonstrative aid.  I didn't understand that it was going to be

6    a repetition of what was already into evidence being admitted

7    again and if that demonstrative is admitted again then of

8    course it would go back into the jury room at the end of the

9    trial.

10          So I do not object to counsel using the demonstrative

11   aid for the visual effect with the jury but I do object to

12   having it entered as an exhibit as opposed to a demonstrative

13   aid when the exhibit itself is already into evidence.

14          MS. LOZANO:  Yes.  Your Honor, first of all, the

15   exhibit itself is in evidence so substantively there can't be

16   an objection to the substance of it.  And I did alert

17   Mr. Garvin and Mr. Devlin-Brown that I intended to offer the

18   blowup exhibits of specifically six different charts.  I think

19   it's important especially for this chart to have it up and

20   available for the jury to refer to as she's testifying with the

21   more intricate detailed charts that break down each arrow.

22          MR. GARVIN:  Again, I'm not objecting to the use of it

23   as a demonstrative exhibit.  I'm objecting to it being an

24   actual exhibit when the chart already has been introduced.

25          THE COURT:  And it's substantively identical.

1          MS. LOZANO:  It is.

2          THE COURT:  I'll let it in.

3          (Continued on next page)

1          (In open court)

2          (Government's Exhibit 2627-BU received in evidence)

3          MS. LOZANO:  Your Honor.

4          THE COURT:  I'm sorry.  The exhibit is received.  You

5    may proceed.

6    Q.  I'm going to leave that there Ms. October for you to refer

7    to while you testify.

8          MS. LOZANO:  Mr. Barile if we could now -- well, one

9    moment.

10   Q.  You mentioned that the four Fenero Cayman accounts were

11   opened at Deutsche Bank and DMS.  Who were the signatories on

12   those accounts?

13         MR. GARVIN:  Excuse me, your Honor.  May we have the

14   exhibit on the screen because all we're seeing is the back of

15   it.

16         THE COURT:  Sure.

17   Q.  Who was the signatory or who were the signatories on those

18   accounts?

19   A.  Mark Scott for all of them.

20   Q.  What is the significance of being a signatory on a bank

21   account?

22   A.  The signatory has full authority and control over the

23   account.  They can direct the bank to receive deposits and

24   direct the bank for withdrawals as well as direct the bank for

25   wires outside -- out and into the account.

1           MS. LOZANO:  Mr. Barile, could we now post Exhibit

2     2602.  And publish that to the jury as well.

3     Q.  Ms. October, let's take a look at chart 2602.  And first

4     could you please for this chart explain to us what the symbols

5     and the formatting represent, what you have used to represent

6     certain things on these charts.

7     A.  Sure.  So first I'll start with the flags.  The flags

8     represent where the account -- the country where the account is

9     held.

10          Then on the top of the box contained in each box is

11    the account number just representing the last four digits of

12    the account number and the financial institution for where that

13    account is held.

14    Q.  What's the name of the account?  Where is that found?

15    A.  The name of the account is above the box in bold with a

16    little symbol of an account.

17    Q.  And the arrows represent what?

18    A.  And the arrows in this case arrows are all pointing to the

19    four Fenero accounts listed on the bottom and they -- the

20    arrows represent incoming of funds and along the -- along the

21    arrow it's each transaction which entails the dollar amount and

22    the date of that transaction.

23    Q.  For that specific account to the one at the arrowhead?

24    A.  Correct.

25          MS. LOZANO:  If we could highlight or zoom in on the

1  sourced box in this chart.

2  Q.  Explain to me what that means.

3  A.  So the sourced box relates to each exhibit that I referred

4  to and the exhibit references -- is reference from a particular

5  bank record.

6  Q.  So let's talk about substance of this chart.

7           First of all, what is on the top box?  On the top of

8  these charts there's a box with bolded wording.  What does that

9  represent on your charts?

10  A.  That represents a description of what the chart entails.

11  So for this particular chart it's described as funding of the

12  four Fenero accounts.  The four blue-colored symbols with the

13  Cayman flag are receiving 354 million euros and 9,990,185 from

14  the time period of May to October 2016.

15  Q.  And for clarity's sake even though we're all looking at the

16  chart, clarity for the record, we are talking about the four

17  bottom accounts on the bottom named what?

18  A.  The four accounts on the bottom is Fenero Equity

19  Investments LP, Fenero Financial Switzerland LP, Fenero Equity

20  Investments Cayman I LP, Fenero Equity Investments II LP.

21  Q.  And which ones are the ones held at DMS, the two on the

22  left?

23  A.  The two on the left, accounts ending in 6102 and 84102.

24  Q.  And what are the accounts on the top, those nine accounts?

25  A.  (No response).

1   Q.   What do they represent?

2   A.   Those are the source of funds and they represent

3   OneCoin-related entities.

4   Q.   So just walk from left to right and please tell me the

5   names of these accounts and whether you know who the signatory

6   is on those accounts are?

7   A.   Yes.  So the IMS account held in at Commerce Bank in

8   Germany, the signatory is Rubenthal and Frank Ricketts.  And

9   the second one is IMS account held at OCBC in Singapore also

10  held by Rubenthal and Ricketts.

11          And the next IMS account held at Deutsche Bank in

12  Germany, the same signatories would be Rubenthal and Ricketts.

13          And going -- moving to the right the account ending

14  6682 in Singapore, IMS PTE; also Frank Ricketts and Rubenthal.

15          And moving forward B&N Consult held at DSK Bank is

16  Irina Dilkinska.

17          And Star Merchant account held in Hong Kong at DBS

18  Bank also Irina Dilkinska.

19          And the IMS PTE Limited held at OCB Singapore is Frank

20  Ricketts and Rubenthal.

21          And the two more -- and the Morgan Stanley Fates Group

22  account held in the United States is owned by Gilbert Armenta.

23          And the last one Fates Group held at Sabadell Bank

24  also in the United States; signatory is Gilbert Armenta.

25  Q.   And when we look at this chart, what is the most common

1   denomination in terms of per transfer?  How much is transferred

2   per transfer most commonly?

3   A.  What's most common is five million dollar --

4   five-million-euro transfers.

5   Q.  If we could look at 2602A.  What is that?  Is that the same

6   as 2602 except for one difference?

7   A.  So it's the same chart containing the same information with

8   the exception that each account has an aggregate amount and an

9   aggregate amount of money that came into those accounts as well

10  as the number of wires listed.

11  Q.  So just totals up all of the transactions that we saw in

12  2602?

13  A.  Correct.

14  Q.  So just going from left to right very quickly from IMS GmbH

15  the total of 35 million euros?

16  A.  Yes.

17  Q.  And how much from IMS Pte?

18  A.  Ten million.

19  Q.  And then what about IMS GmbH Deutsche Bank?

20  A.  Forty million.

21  Q.  How about into -- and we're talking about Fenero Equity

22  Investments LP account, we're still on the left side of the

23  chart -- it got from B&N Consult, how much?

24  A.  It received 15 million euros.

25  Q.  And how much did that Fenero Equity Investments LP receive

1   from IMS Pte United Overseas?

2   A.  55 million euros.

3   Q.  So now let's move over to Fenero Financial Switzerland LP

4   at DMS.  It received from IMS Pte how much?

5   A.  60 million.

6   Q.  The Deutsche Bank Fenero Equity Investments Payment One

7   received -- can you just go through what it received from B&N,

8   Star Merchant and IMS Pte?

9   A.  Sure.

10  Q.  Wait.  I'm sorry.  From IMS Pte.  Yes.

11  A.  It received 34.5 million euros.

12  Q.  From the --

13  A.  From the 6682 held in Singapore.

14  Q.  And how much from B&N?

15  A.  From B&N it was 4.5 million euros.

16  Q.  Star Merchant?

17  A.  Star Merchant was 95 million euros.

18  Q.  And the IMS Pte at OCBC?

19  A.  Five million euros.

20  Q.  And lastly, the Fenero Equity Investments II LP held at

21  Deutsche Bank received how much from each of the Fates Group

22  accounts?

23  A.  Approximately 10 million combined.

24         MS. LOZANO:  We can now move to 2603.  Publish that.

25  Q.  Ms. October, describe to us what this chart depicts.

1    A.   This is a summary chart which shows the same time period,

2    July 2016 through -- actually July 2018 that the account was

3    funded by the 354 million euros and approximately 10 million

4    that we saw on the previous slide that funded the four Fenero

5    Cayman accounts.  And then that money flowed into intermediary

6    accounts held at the Cayman and Bank of Ireland.  There were

7    three Cayman accounts and four Bank of Ireland accounts that

8    received funding from the four Cayman accounts.

9    Q.   So separate and apart from the original four Cayman

10   accounts that we saw on the previous chart?

11   A.   Correct.

12   Q.   And those intermediary accounts, who controlled those

13   accounts?

14   A.   Those were all controlled by Mark Scott.

15   Q.   Then we can go down to with two boxes on the bottom.

16   A.   Then I broke out both two boxes, one for domestic accounts

17   and the one to the right contained foreign accounts.  The

18   domestic accounts represent accounts held by Mark Scott or

19   affiliated entities of Mark Scott that received monies from the

20   accounts listed above.  And the foreign accounts represents

21   entities connected to OneCoin affiliates.

22   Q.   And if you add up all of the credits in the domestic

23   accounts box and the foreign accounts box does that amount

24   equal the credits that you listed at the top part of the chart

25   between funding accounts and Fenero Cayman accounts?

1  A.  Yes, it does.

2          MS. LOZANO:  We can next move to 2604.

3          THE COURT:  Before we do that, it's now 12:45.  So

4  we'll take our second break.

5          (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  Ms. October, you may step down.

3           (Witness excused)

4           Everyone can be seated.  Anything for me?

5           MR. GARVIN:  No, your Honor.

6           MR. FOLLY:  Your Honor, we just wanted to inquire

7   about the timing for the defense witness that we're taking out

8   of turn.  We had received an estimate of 1 p.m.  We just wanted

9   to check if that is still when we should plan to interrupt.

10          THE COURT:  Is he here?

11          MR. FOLLY:  This witness.

12          MR. GARVIN:  I haven't left my chair but I had

13  anticipated it would be at approximately 1 p.m.  I'm going to

14  go check right now.

15          THE COURT:  OK.  And how long will this person be on

16  the stand?

17          MR. GARVIN:  Very short.  It's a character witness

18  basically, your Honor, so it's going to be fifteen minutes, I

19  think, at most.

20          THE COURT:  OK.  I'll be back.  And we'll get just an

21  observation.  Do with it what you will.  The government told me

22  last week that they may have been able to close as early as

23  last Thursday and here we are.

24          How much longer?

25          MR. FOLLY:  Your Honor, it's very difficult to predict

1    the cross lengths.  Many of them exceed our expectation.

2            THE COURT:  Cross has been much, much less than the

3    directs.

4            MR. FOLLY:  Your Honor, we are on schedule within the

5    three-week timeframe that we estimated the case.  We believe

6    we'll either rest most likely tomorrow morning but certainly

7    not later than that.

8            THE COURT:  OK.

9            (Recess)

10           THE COURT:  So we'll take a half-hour break after we

11   break at 2:30 and then we convene for the jury conference and

12   the charge conference.

13           MR. GARVIN:  Your Honor, I did contact the witness.

14   He's stuck in traffic but he anticipates being here by 1:30.

15   So we'll just ask for a sidebar when the time comes.

16           THE COURT:  That's fine.  Does he know where he's

17   going?

18           MR. GARVIN:  He has somebody that's driving him.

19           THE COURT:  But does he know to come here?

20           MR. GARVIN:  Certainly.

21           (Continued on next page)

22

23

24

25

1     (Jury present)

2          THE COURT:  Everyone please be seated.

3          Ms. Lozano.

4          MS. LOZANO:  Thank you.

5          I think we were viewing GX2603.  Pull that up.

6     Q.  When we broke, Ms. October, I asked you whether totaling

7     all the amounts in the domestic accounts credits and the

8     foreign accounts credits would equal the credit line between

9     funding accounts and the Fenero payment accounts and you said

10    it would.

11         From a back-of-the-envelope calculation, I'm asking

12    you to relook at those numbers and tell me whether they

13    equal --

14         MS. LOZANO:  I'm sorry.  Can you publish for the jury.

15    Q.  -- whether the numbers totaled up on the bottom boxes are

16    the -- equal a total credits between the funding accounts and

17    the Fenero Cayman accounts?

18    A.  No, it does not.

19    Q.  Why doesn't it?

20    A.  So based on my analysis in the domestic accounts there's

21    approximately 950,000 that goes back to -- from the U.S.

22    account back to the Cayman accounts.  There was three transfers

23    that goes back to the Cayman accounts.  And then from the

24    foreign accounts there's approximately 40 million that goes

25    back out to the intermediary accounts.

1    Q.   So they are counted in the totals here that ultimately --

2    they were sent back?

3    A.   Correct.

4    Q.   Let me ask you this.  In the foreign accounts totaled

5    credits you described the accounts in there and I don't

6    remember you saying that there were accounts in there that were

7    controlled by Scott; is that correct?

8    A.   There were a few accounts controlled by Scott contained in

9    the foreign totals, yes.

10   Q.   What jurisdictions and what names were those accounts?

11   A.   I believe there were in Switzerland and also the Cayman

12   Islands.

13   Q.   Let me ask you one more question about this chart.  You

14   indicated earlier that there were accounts in the name of MSSI

15   that were Scott-controlled.  Where on this chart would those

16   accounts be housed or boxed?

17   A.   Those could be contained in the domestic account box.

18   Q.   And how about the intermediary accounts?  Are there any

19   MSSI intermediary accounts?

20   A.   Yes.  So there's an MSSI international consultants BVI in

21   the intermediary box and in the domestic box is just MSSI

22   Consultants LLC.

23   Q.   Now you also mentioned the name of an attorney or the name

24   Nicole Huesmann as an account that resides in the domestic

25   account box.  Who is Nicole Huesmann?

1   A.  I understand her to be a real estate attorney for Mark

2   Scott.

3   Q.  Let's now focus on one of the Fenero Cayman accounts and

4   break down that account.

5          MS. LOZANO:  If we could go to 2604.

6   Q.  Ms. October, what does this chart depict?

7   A.  This chart depicts one of the four Fenero accounts and --

8   Q.  When you say one of the four?

9   A.  (No response).

10  Q.  Just to be clear?

11  A.  One of the four -- one of the four funding accounts held in

12  the Cayman Islands.

13  Q.  The two in DMS and the two at DB?

14  A.  Correct.

15  Q.  At Deutsche Bank.

16  A.  At Deutsche Bank and DMS Cayman.  Also this is one of the

17  accounts that's held at DMS Cayman.

18  Q.  And that is in the name of what?

19  A.  In the name of Fenero Equity Investments LP.

20  Q.  And the account number on this one is?

21  A.  Ending in 6102.

22  Q.  And this account received money from a selection of the

23  nine funded accounts; is that right?

24  A.  That's correct.

25  Q.  From which nine -- from which of the nine?

1  A.  It received monies from the IMS GmbH account, IMS Pte

2  account, B&N Consult.

3  Q.  And who is the signatory for the 6102 Cayman Fenero Equity

4  Investments LP account?

5  A.  That's Mark Scott.

6  Q.  What does this chart represent in terms of a time period

7  for transfers?

8  A.  So it represents a time period of June through August of

9  2016.

10  Q.  For incoming?

11  A.  For incoming, yes.

12  Q.  And how about for outgoing from Fenero Equity Investments

13  LP?

14  A.  From outgoing it covers the time period from June 2016

15  through February 2017.

16  Q.  So how much total through your analysis did you trace

17  coming into Fenero Equity Investments LP from IMS GmbH, IMS Pte

18  and B&N Consult during that period of time?

19  A.  From the three accounts, there's 155 million euros coming

20  into that account.

21  Q.  Can you walk us through, please, where that money went

22  after it hit Fenero Equity Investments LP account?

23  A.  Sure.  The funds were later disbursed, we're going to go

24  from left to right.  The left side in the blue circles with the

25  Cayman flag represents some of the intermediary accounts that

1    received some of the funding and the one 4102 which transfers

2    from one of the four Fenero accounts that --

3    Q.  So 4102, to be clear, is one of the four that received from

4    the nine IMS, B&N --

5    A.  Correct.

6    Q.  -- groupings.

7    A.  Yes.

8    Q.  So that gray line to the left that says transfer for wires

9    49,999,310, that represents what?

10   A.  (No response).

11   Q.  Why is it gray?

12   A.  It's grayed out to avoid double counting.  So the 155

13   million is already incorporated.  So it's just a transfer to --

14   an intermediary transfer from one Cayman account to another

15   account.  So the 49 million was already accounted for.

16   Q.  So then let's go down and talk about the other accounts

17   listed here.  There is a First Caribbean International MSSI

18   operating account.  And it indicates that is a U.S. dollar

19   account?

20   A.  Yes.

21   Q.  How much did it receive from Fenero Equity Investments LP?

22   A.  It received two transfers, approximately 78,000 euros.

23   Q.  How about the MSS International Consultants BVI account,

24   7100.  How much did that receive?

25   A.  That was one of the intermediary accounts.  It received one

1    transfer for 321,000 euros, approximately.

2    Q.  Then we have another DMS Cayman account.  This is an MSSI

3    International and it received it looks like a total of five

4    wires of varying amounts?

5    A.  Correct.

6    Q.  What is the icon with an American flag, what's that

7    account?

8    A.  That account is an account owned by Mark Scott held at City

9    National Bank.  So it's a U.S. account in Florida.

10   Q.  And it received two transfers, one of -- approximately 250

11   million euros -- I'm sorry 250,000 euros and one of 16,000

12   euros.

13          Then we move over to Lloyds Bank Payment Card

14   Technologies.  Can you just tell me what is that icon?  I can't

15   really make it out.

16   A.  The icon just represents a financial institution.

17   Q.  OK.  So how much did you trace going from Fenero Equity

18   Investments LP to Payment Card Technologies?

19   A.  $1,976,294.

20   Q.  84?

21   A.  84.

22   Q.  And 58 cents?

23   A.  And 58 cents yes.

24   Q.  On June 23, 2016?

25   A.  Yes.

JBI9SCO3                          October – Direct

1    Q.  And then what's the one right above that to the right?

2    A.  To the right it's an account Barta Holdings held at a DBS

3    Bank in Hong Kong which received 35 million U.S. dollars on

4    July 13, 2016.  One transfer.

5    Q.  By the way did you ever see that money coming back into

6    Fenero Equity Investments, that 30 million?

7    A.  Not from the -- not from the Barta Holdings.

8    Q.  What about the Bank of Ireland Fenero Equity Investments

9    Ireland account?

10   A.  So that account was one of the intermediary accounts that

11   received one transfer totaling 960,000 euros on August 19,

12   2016.

13   Q.  And how about above that?

14   A.  Another intermediary account held at the Bank of Ireland in

15   the name of Fenero Equity Investments received 1.2 million

16   euros on September 22, 2016.

17   Q.  And now the top one on the right Bank of Ireland Fenero

18   Equity Investments Ireland ending 4760.  It received four

19   transfers.  Can you tell me approximately how much of those

20   four transfers totals together.

21   A.  A little over 60 million euros.

22   Q.  So is that the account that received the most from the

23   Fenero Equity Investments LP account?

24   A.  That is correct.

25   Q.  Now, did you do this same exercise for the three other

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   Fenero Cayman accounts, the Fenero Financial Switzerland,

2   and –– held at DMS and then the two Fenero accounts, Fenero

3   Equity accounts at Deutsche Bank?

4   A.  Yes, I did.

5   Q.  And are those charts –– did you also do them by the way for

6   the intermediary accounts, some of which you've identified on

7   this chart, the MSSI International, the Bank of Ireland

8   accounts, did you do further tracing once the money hit there?

9   A.  Yes.  I created a chart, an individual chart for each

10  account representing the inflow and the outflow of funds.

11  Q.  And are those charts all in evidence?  Were those some of

12  the charts that you reviewed when you started testifying and we

13  moved into evidence?

14  A.  Yes.  They would be one of the 37 charts.

15  Q.  So let's look –– we're not going to look at all of them.

16  We're just going to look at one more representative sample

17  because they are all in evidence of 2607 and you can tell me

18  what that is.

19  A.  (No response).

20  Q.  Which –– was –– I'm sorry.  You tell me what it is.  Sorry.

21  A.  The 2607 is an illustration of one of the Bank of Ireland

22  intermediary accounts held in the name of Fenero Equity

23  Investments.  And the top part of the chart shows the arrows

24  coming into, pointing to the 4760 and represents the ––

25  represents four of the DMS or MSSI accounts also held by Mark

1    Scott as well as a transfer of approximately ten million

2    dollars from IG markets.

3    Q.  So up here on the left, just to connect up the chart we saw

4    before, up here on the top left is the DMS Cayman Fenero

5    Financial Switzerland account 4102.  And is that the account

6    that we saw tracing for, in our previous chart, which was 2604,

7    was that the one that we were focused on?

8    A.  I believe so.

9    Q.  And so this -- well can we just go back to 2604 for one

10   minute.

11         So that's -- this chart, 2604, is for DMS Cayman

12   Fenero Equity Investments ending 6102; is that right?

13   A.  Yes.

14   Q.  And then we have a transfer of approximately how much to

15   the Bank of Ireland 4760 account?

16   A.  Well there's four transfers:  7.3 million, 17 million, 40

17   million, and 400,000.

18   Q.  So now we can go back let's look at 2607 now.

19         So this account receives -- this Bank of Ireland

20   account which you consider an intermediary account receives

21   from how many different Fenero accounts?

22   A.  There's one, two, three, four -- four Fenero -- actually

23   five Fenero accounts but there's one on the left side -- on the

24   right side.

25   Q.  So all the way on the right side though is the Fenero

1    Equity investment 6102 that's we just saw on the chart?

2    A.   Correct.

3    Q.   So that's how it connects up?

4    A.   Yes.

5    Q.   So the arrow from the prior chart that went from 6102 to

6    4760, you then trace 4760 where that money went, right?

7    A.   Correct.

8    Q.   So let's take a look at this chart and you indicated there

9    is a -- an outgoing arrow to the left to MSSI International

10   consultants.  What is that?

11   A.   That's one of the intermediary accounts, MSSI International

12   consulting, ending in 7100, that received a transfer of

13   1,499,961.20 on February 22, 2017.

14             MS. LOZANO:  We can minimize that.

15   Q.   And then once the -- explain what the account to the right,

16   Bank of Ireland, Fenero Securities Trading, those arrows

17   represent and those totals?

18   A.   Sure.  So the account ending in 9811 is also another

19   intermediary account.  And the dollar amounts in red represents

20   inflows of funds that that account received from the 4760 and

21   the blue arrow represents the 9811 transferring back to the

22   4760.  Three transfers.

23   Q.   So coming back to the center account.  You indicated via

24   arrows transfers to multiple different accounts.  Can you go

25   through just quickly and tell us what the names of those

1    accounts are and where they're located.

2    A.  So going from left to right there is an account, Ocean --

3    Ocean State Ventures Limited.  And that account I believe is

4    held in the United Kingdom.

5    Q.  And then there is Piraeus Bank?

6    A.  Piraeus Bank held in the name of Vida Home.  And that's

7    located in Bulgaria.

8    Q.  And then Invest Bank?

9    A.  Invest Bank LBD AD also is held in Bulgaria.

10   Q.  Peregrine Law Client Account at Metro Bank PLC.  Where is

11   that?

12   A.  I believe that's located in the United Kingdom.

13   Q.  And the Open Mark Bulgaria EOOD Invest Bank?

14   A.  Is an account held in Bulgaria.

15          And the Sabadell United Bank in the name of Nicole

16   Huesmann.  That's a US-based account.

17   Q.  There are four other US-based accounts with flags?

18   A.  Right.  So there's four other accounts with -- colored in

19   orange which represents those are accounts that Mark Scott is

20   the signatory on.  And those accounts are either held in the

21   name of Mark Scott or MSSI International Consultants and Mark

22   Scott PL.

23   Q.  Then we have Bank of Ireland IG Markets?

24   A.  Then you have -- yes.  So there's three Bank of Ireland

25   accounts.  This represents the intermediary accounts that

1    received transfers from the 4706.  The accounts are ending in

2    5001, 7958 and 8576.

3    Q.  Then the two icons, I guess, or structures, are Bank of

4    Ireland IG markets and Lloyds Bank Payment Card Technologies?

5    A.  Yes.

6    Q.  So we zoom out.  I'm not going to go through every one of

7    these numbers.  Each arrow, consistent with your other charts,

8    lists the wires that were sent and the amounts that each wire

9    to each of those individual accounts?

10   A.  Right.  So it lists every individual transaction by the

11   dollar amount and the transaction date.

12   Q.  OK.  And so I want to compare this chart to the overall

13   world chart so you can show me the -- before we move to it, I'm

14   going to ask you what arrow represents the top part of this

15   chart going to the Bank of Ireland account and what arrow or

16   arrows represent the bottom part of this chart, of the

17   intermediary account sending to accounts in Bulgaria, the

18   United States and Ireland.

19        MS. LOZANO:  So if we can go back to 2627.

20   Q.  The Ireland account received money according to your chart

21   from multiple Fenero payment accounts.  Where is that arrow

22   reflected on this chart?

23   A.  That would be reflected in the intercompany transfers, the

24   blue arrow.

25   Q.  And then once the money was received in the Fenero Equity

1   Ireland account as you just testified it was sent to multiple

2   accounts in different jurisdictions including Bulgaria, the

3   United Kingdom, Ireland, the United States.  Where are those

4   arrows?

5   A.  Those arrows would be indicated in red as the outgoing

6   funds.

7   Q.  And to be clear where is the Fenero Ireland account

8   represented on this chart?

9   A.  It's represented in -- with the Ireland flag.

10  Q.  So the blue icon looks like a bank with the Irish flag on

11  it?

12  A.  Yes.

13  Q.  And to be clear when you're saying those transactions that

14  we just looked at are represented by these arrows, these arrows

15  don't include -- I'm sorry.  Those transactions are not the

16  only transactions included in these arrows, right?

17  A.  Correct.

18  Q.  You can take that down.

19          Can we put back 2607.

20          We were talking about the transfers between Fenero

21  Equity Investments Ireland and Fenero Security Trading Ireland

22  account.  There seem to be transfers going both ways.  Is that

23  fair to say?

24  A.  That is correct.

25  Q.  Have you totaled up approximately how much was going from

JBI9SCO3                      October – Direct

1    Fenero Equity Investments Ireland to Fenero securities trading?

2    A.  It's approximately a hundred and 54 million euros.

3    Q.  And how much was sent back?

4    A.  Approximately 3.6 million euros.

5    Q.  And did you trace the money, the 154 million that was sent

6    from Fenero Equity Investments Ireland to Fenero Securities

7    Trading LTD once it hit the Fenero securities trading LTD

8    account?

9    A.  That is correct.  I did further tracing for that account.

10   Q.  Where did the majority of that money end up being sent?

11   A.  The majority of the funds which included transfers from two

12   other DMS accounts ultimately ended up in an account held at

13   Phoenix, Phoenix fund.

14               (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1    Q.  If we could move to chart 2622 at this point.

2              MR. GARVIN:  Your Honor, please the Court.  One very

3    short witness that we had talked about is here, and counsel

4    advises me this would be a good place for a temporary

5    interruption of this witness.

6              THE COURT:  Ladies and gentlemen, as I'm sure you

7    observed, trials come in different bits and pieces.  Different

8    documents, different people.  Sometimes for the convenience of

9    a particular witness we take a witness out of turn so that he

10   or she can meet certain travel commitments.  So what we are

11   going to do now is suspend the testimony of Ms. October, you

12   may step down.  The defense will call a witness.  Government

13   hasn't rested.  But the defense going to call a witness out of

14   turn.  Okay?

15             Mr. Garvin.

16             MR. GARVIN:  Your thank you, your Honor.  At this time

17   Mr. Scott will call Miguel Diaz de la Portilla.

18             THE COURT:  Make sure Ms. October doesn't go far.

19    MIGUEL DIAZ de la PORTILLA,

20         called as a witness by the Defendant,

21         having been duly sworn, testified as follows:

22   DIRECT EXAMINATION

23   BY MR. GARVIN:

24   Q.  Good afternoon, sir.

25   A.  Good afternoon.

1   Q.  Would you please tell the ladies and gentlemen what your

2   occupation is, sir.

3   A.  I'm an attorney.

4   Q.  Just a little bit of your background.  Where did you go to

5   school at, sir?

6   A.  Well, I was born and raised in Miami.  I went to school at

7   the University of Miami for undergrad, majoring in philosophy

8   and English literature.  Graduated from the University of Miami

9   School of Law in 1987.

10  Q.  Upon leaving school, did you immediately become a lawyer or

11  did you endeavor in any other fields?

12  A.  I immediately became a lawyer, and have been a practicing

13  lawyer, member of the Florida bar since 1987 in good standing.

14  Q.  Can you please tell the ladies and gentlemen what law firm

15  you worked with presently.

16  A.  I work with law firm by the name of Saul, Ewing, Arnstein &

17  Lehr.

18  Q.  Can you give us a general idea of the type of practice you

19  have at that law firm?

20  A.  Sure.  I am a land use and zoning lawyer.

21  Q.  What does that mean?

22  A.  What that basically means is I work with property owners

23  and developers to develop real estate, to develop property,

24  whether they be commercial projects or multifamily mixed use

25  projects.

1    Q.  How large of a firm is the firm that you currently work in?

2    A.  I think we have approximately 415, 420 lawyers, something

3    like that.  The number changes, you know.

4    Q.  Have you worked with other law firms prior to the law firm

5    you are working with now?

6    A.  I have.

7    Q.  Can you give us an example of some of the other law firms?

8    A.  Sure.  I've, well, I worked at Duane Morris.  Duane Morris

9    is the based out of Philadelphia.  That's a bit larger, that's

10   about 800, 900 lawyers.  I worked at another local firm from

11   Miami that became a national firm, Adorno & Yoss, and I also

12   worked at a regional firm which I believe they have now have

13   offices in New York, that was called Becker Poliakoff.

14   Q.  While working at Becker Poliakoff, did you happen to ever

15   meet a person by the name of Mark Scott?

16   A.  I did.

17   Q.  Mark, could you please stand up.

18           Is this the person that you're referring to, the Mark

19   Scott that you met?

20   A.  Yes, although he is a little heavier now.

21   Q.  Can you tell the ladies and gentlemen approximately what

22   year that was?

23   A.  That was approximately 2007.

24   Q.  Did you have an opportunity to work with Mark Scott either

25   while at Becker Poliakoff or subsequent?

1  A.  Mostly subsequent.  I think we overlapped at Becker

2  Poliakoff for a few months.  He was transitioning out as I was

3  transitioning into Becker Poliakoff.  But I believe he worked

4  at K&L Gates after that.  While he was there we worked on a

5  number of matters.

6  Q.  When you say K&L Gates, is that a large law firm also?

7  A.  It is.

8  Q.  These large law firms that you have made reference to, to

9  be a partner in one of those law firms, do you undergo a

10  background check?

11          MR. DiMASE:  Objection.  May we have a sidebar.

12          THE COURT:  Okay.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  Yes?

3          MR. DiMASE:  Oh.  Apologies.  Your Honor, our

4     understanding is this was going to be a character witness.

5     This is definitely outside of the scope of that kind of

6     testimony.  And unless he's personally involved in the

7     diligence that's around checks done by law firms, I don't see

8     how it's relevant or how he can testify about it here.

9          MR. GARVIN:  Your Honor, the witness is here to talk

10    about character, and one of the things that factors into the

11    witness's opinion is he is going to ultimately have to state

12    either his opinion or what the reputation of Mr. Scott is in

13    the community of the law firm that he knows him.  And one of

14    the relevant factors, obviously, is the knowledge that any

15    lawyer that becomes a partner has a background check that they

16    have to clear.

17         THE COURT:  But I didn't know that.  What background

18    check are you talking about?

19         MR. GARVIN:  Oh.  I'm assuming the Court's not being

20    facetious.

21         THE COURT:  I am not being facetious.  I was a partner

22    at a firm.  I didn't undergo what I recognized to be a

23    background check.  I've been through background checks.  It is

24    a very distinct animal.

25         MR. GARVIN:  Maybe I am using the wrong term, your

1    Honor.  I think it's, that there is some due diligence that's

2    done to make certain that the person you are about to welcome

3    to your firm is not going to lead to an embarrassment because

4    of some blemish in his past.

5           MR. DiMASE:  It is not clear to me he would have been

6    involved in any of that, seen any of the reference letters or

7    had any personal knowledge.

8           MR. GARVIN:  I was just going to ask him if he had

9    general knowledge of it and keep on going.

10          MR. DiMASE:  I think the term "background check."

11          MR. GARVIN:  I apologize for using the wrong term if I

12   did.

13          THE COURT:  Just go through that very quickly.

14          MR. GARVIN:  I will.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2     BY MR. GARVIN:

3     Q.  Where we left off, I was asking or inquiring whether before

4     somebody is offered or invited to be a partner with these types

5     of firms, does the law firm generally review the person's

6     history to make sure that there is no blemishes that would

7     cause embarrassment.

8     A.  Yes.  All firms do their due diligence before they bring

9     anybody on, much less somebody at a partner level.  And the

10    larger firms are more diligent in their due diligence.

11    Q.  With regard to Mark, did you understand that Mark was

12    indeed an equity partner in the firms that you had mentioned?

13    A.  Yes.

14    Q.  Now, during the period of time you've known Mark Scott,

15    have you also had opportunities to socialize with Mr. Scott?

16    A.  Yes, I have.

17          MR. GARVIN:  If we could please, Ms. Stanley, place up

18    Defendant's Exhibit 132 only for the lawyers and the witness to

19    see.  It appears we are having a little bit of difficulty so

20    I'm going to approach counsel.

21          THE COURT:  Okay.

22          MR. GARVIN:  I don't believe there is any objection,

23    your Honor, so at this time the defense will move to admit

24    Exhibit 132 and ask to publish to the jury.

25          MR. DiMASE:  No objection, your Honor.

1          THE COURT:  No objection?  It will be received.

2          (Defendant's Exhibit 132 received in evidence)

3   Q.  Is this a picture of you and Mr. Scott?

4   A.  Yes, and my wife in the middle there.

5   Q.  Was this at a social function?

6   A.  It looks like it was at a social function.  I'm not sure if

7   that was Crystal Academy, it looks like it might have been.

8   Crystal Academy is --

9          MR. DiMASE:  Objection, your Honor.

10         THE COURT:  Overruled.

11         MR. DiMASE:  May we have a sidebar, your Honor?

12         THE COURT:  Okay.

13         MR. DiMASE:  I apologize.

14         (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1      (At the sidebar)

2      MR. DiMASE:  Your Honor, I believe this is a

3  completely improper attempt to circumvent the Court's ruling

4  about a prior good acts.  Crystal Academy is a charitable

5  foundation.  And I think what is going on here is that the

6  defendant is trying to elicit testimony the defendant attended

7  a charitable event.  That is not proper testimony from a

8  character witness.

9      MR. GARVIN:  First, counsel is completely wrong and

10  off base.  I had no idea he was going to mention the words

11  Crystal anything.

12      MR. DiMASE:  He was about to describe it.

13      MR. GARVIN:  All that other stuff is just completely

14  inappropriate because I'm not attempting to do anything.  But,

15  he was, from what I could tell, he was volunteering as to where

16  Mr. Scott and he were at at the time of the photograph.  I

17  don't know what is coming next, quite frankly.  But, I don't

18  think that was improper, other than to signify the amount of

19  time or their exposure together.

20      THE COURT:  Now we know he is at Crystal Academy.

21  Move on.

22      MR. GARVIN:  Sure.

23      (Continued on next page)

24

25

1         (In open court)

2              MR. GARVIN:  If we can please take that down,

3    Ms. Stanley.

4    Q.  Sir, would it be fair to also state, I think you said

5    earlier that you have worked on some projects with Mr. Scott?

6    A.  I have.

7    Q.  Can you describe some of the projects that you have worked

8    on with Mr. Scott.

9    A.  Well, one that comes to mind is a project for a group

10   called CGI and they have a hotel, condo project in the city of

11   Miami, at 1100 Biscayne Boulevard.  I, Mark was working on the

12   financing, I believe they did about a $20 million refinance or

13   something like that.  And I did land use and zoning work.  On

14   my side I basically increased the density for that project.

15   Later on I think there was another refi on that project and it

16   was rebranded under some other hotel flag, and I did the zoning

17   due diligence and the business use opinion.

18   Q.  When you say you worked on the density, would it be fair to

19   say that if the density zoning restrictions were not modified,

20   that the hotel project would not have been possible?

21   A.  Yeah, my recollection is I think that the allowed density

22   was about 150 units per acre, and I think we dealt with it for

23   about 300 for the hotel project to get the number of keys that

24   they needed or the number of hotel rooms that they needed.

25              MR. GARVIN:  Ms. Stanley, if we could please pull

JBI3SCO4                          de la Portilla - Direct

1  Defense Exhibit 133 only for the Court's view and the lawyers'
2  view, not for the jury at this point.  133.
3          Your Honor, I'm told by counsel that there is no
4  objection to 133 so at this time we would move it into
5  evidence.
6          THE COURT:  Very well.  133 will be received.
7          (Defendant's Exhibit 133 received in evidence)
8  Q.  Sir, does this show the portion of Biscayne Boulevard in
9  Miami, Florida, that you worked on the the project together?
10  A.  Yes.
11  Q.  There is an arrow there with the Marquis.  Is that one of
12  the buildings that were in issue?
13  A.  That's the building, that's the Marquis at -- the name's
14  changed since but it was Marquis.  That's the project at 1100
15  Biscayne Boulevard that I was just talking about.
16  Q.  Does the Me Hotel ring a bell?
17  A.  Me Hotel.  Correct.
18  Q.  What year was it that you said that you first met Mark
19  Scott?
20  A.  2007.
21  Q.  So, over the past 12 years, have you gotten to know Mark
22  Scott's character and reputation?
23  A.  I believe I have, yes.
24  Q.  Would it be fair to say that -- do you also know his
25  reputation in the legal community of those people who actually

1    have worked with or have knowledge of Mark Scott?

2    A.  I do.  He has a good reputation.

3    Q.  Can you tell the ladies and gentlemen of the jury what is

4    his reputation as to the character trait of honesty?

5    A.  He has a reputation as being an honest lawyer.

6    Q.  And what is his reputation as the character trait of being

7    a law-abiding citizen?

8    A.  He has the reputation of being a law-abiding citizen.

9          MR. DiMASE:  Objection.

10         THE COURT:  Overruled.

11   Q.  Sir, do you have a personal opinion of your own as to

12   Mr. Scott's character?

13   A.  I do.

14   Q.  Can you please tell the ladies and gentlemen of the jury

15   what that is.

16   A.  I think Mr. Scott is a person of good character.  In the 12

17   years I've known him, I've never known him to be anything other

18   than a person of good moral character.

19         MR. GARVIN:  Thank you, sir.  I have no further

20   questions.

21         THE COURT:  Any cross-examination?

22         MR. DiMASE:  Yes, your Honor.

23   CROSS-EXAMINATION

24   BY MR. DiMASE:

25   Q.  Good afternoon.

JBI3SCO4                          de la Portilla - Cross

1    A.   Good afternoon, sir.

2    Q.   So, Mr. de la Portilla -- am I pronouncing that correctly?

3    A.   Perfectly.  Better than Mr. Garvin.

4    Q.   Thank you.  You were asked some questions on direct

5    examination about your relationship with Mr. Scott over the

6    years, correct?

7    A.   Yes.

8    Q.   Okay.  And just to situate us a little bit.  Have you had

9    other positions, other than working at a law firm in your

10   career?

11   A.   Yes, I have.

12   Q.   Did you at some point, is it fair to say, serve as a

13   politician in Florida?

14   A.   I served as a county commissioner in Miami Dade County from

15   1993 to 2000.  And then after a 10-year hiatus, I served in the

16   Florida Senate for six years, from 2010 to 2016.

17   Q.   You were actually running for office again in 2016?

18   A.   I ran, but wasn't successful in reelection in 2016.

19   Q.   That would have been the September 2016 -- I guess the fall

20   2016 election cycle; is that fair to say?

21   A.   Right.  It was November 2016.

22   Q.   November 2016.  At that time, the maximum contribution

23   limit for any person to a campaign was $1,000; is that correct?

24   A.   Yes, that's the maximum contribution that any corporation

25   or individual can make, yes.

JBI3SCO4                         de la Portilla - Cross

1    Q.  And is it fair to say that the defendant gave you more than

2    the $1,000 through different entities for your campaign back in

3    2016?

4    A.  I don't remember the amount, but I think he may have raised

5    a total of four or $5,000 for the campaign.

6    Q.  Let me show you what has been marked as -- so you don't

7    recall the exact amounts as you sit here today; is that fair to

8    say?

9    A.  I don't, no.

10   Q.  Let me show you Government Exhibit 5003 for identification.

11   Just take a look at this and see if that helps refresh your

12   memory.

13        Did Mr. Scott make a donation of the maximum amount of

14   $1,000 to your campaign?

15   A.  Yes, that looks like exactly that.  That's a $1,000

16   campaign contribution.

17   Q.  That was from Mark Scott's personal account?

18   A.  I would assume so because it says Mark Scott on top.

19   Q.  Since these are not in evidence, I'll ask you not to read

20   from them.  But if they refresh your memory about the details,

21   that's fine.

22        This was on August 9 of 2016, correct?

23   A.  Correct.

24   Q.  Okay.  And he then made -- let me now show you what's been

25   marked for identification as Exhibit 5004.  On that same date,

1    does this refresh your memory on that same date, he made a

2    separate contribution of $1,000 from his Mark Scott PL account?

3    A.   Right.  The maximum being $1,000 per person or per entity.

4    Q.   So he made an additional $1,000 donation to your campaign

5    from the Mark S. Scott PL account, correct?

6    A.   Looks that way, yes, from what's in front of me that I

7    can't read from.

8    Q.   Let me show you now what's been marked as Government

9    Exhibit 5001.  Does that refresh your memory that he made a

10   third campaign contribution of $1,000 from a different entity?

11   A.   Right.  That's a different entity and there is another

12   $1,000 contribution.

13   Q.   That was on the same day, August 9 of 2016?

14   A.   It's dated the same day, yeah, hmm-hmm.

15   Q.   And I am going to come back to this contribution in a

16   minute, but you also received a donation that day from an

17   individual named David Pike.  Do you recall that?

18   A.   Yes.

19   Q.   Okay.  And just showing you what's been marked as

20   Government Exhibit 5002 for identification.  He and his wife

21   Maria Palacio made a donation of $500 to your campaign on the

22   same date, correct?

23   A.   Yes, David Pike and his wife contributed $500 to my

24   campaign.

25   Q.   Going back to the contribution from the second entity,

1    looking again at Government Exhibit 5001 for identification.

2    That does help refresh your memory that the one of the three

3    $1,000 contributions from Mr. Scott came from an entity called

4    MSS International Consultants LLC?

5    A.  Yes, that's the name of the entity.

6    Q.  So, he made one donation of $1,000 from his personal

7    account, correct?

8    A.  Yes.

9    Q.  One from his Mark Scott PL account, which is a separate

10   entity, correct?

11   A.  Correct.

12   Q.  And a third contribution of $1,000 from an entity called

13   MSS International Consultants LLC?

14   A.  That's right.

15   Q.  You don't know where the money in those accounts came from,

16   do you, Mr. de la Portilla?

17   A.  No.  We raised, God, close to a million dollars for that

18   campaign.  So, no, I don't know.

19   Q.  What I am getting at is not your broader funding, which I

20   understand you had other contributors to, correct?

21   A.  A lot of other contributors.

22   Q.  Just with respect to these contributions, you don't know

23   where Mr. Scott obtained the funds that he used to make these

24   contributions to you, correct?

25   A.  No, no way of knowing that.

1    Q.  Mr. Scott you testified on direct examination has been a

2    partner at a number of law firms, correct?

3    A.  He has.

4    Q.  And he practiced as a lawyer for the entire period of time

5    that you knew him, correct?

6    A.  Yes.

7    Q.  And he, until recently, he had never been involved in

8    running an investment fund before; he practiced as a lawyer,

9    correct?

10   A.  I knew him as a practicing lawyer.

11   Q.  And it sounds like you've known him for a decent amount of

12   time at this stage; is that fair to say?

13   A.  I'm sorry, I didn't --

14   Q.  You said you met him in 2007?

15   A.  2007.  I've known him for 12 years.

16   Q.  Would you consider yourself to be a friend of his at this

17   stage?

18   A.  Yes.

19   Q.  And as a friend of his, you wouldn't want to obviously see

20   him get into any kind of trouble; is that fair to say?

21   A.  Of course not.

22   Q.  Now, let me talk about your knowledge of the facts of this

23   case.  You don't have any personal knowledge regarding the

24   facts of the case that's being considered here today, correct?

25   A.  I do not.

JBI3SCO4                        de la Portilla - Cross

1    Q.  You don't know what evidence was shown to the jury during

2    this trial, correct?

3    A.  I do not know that.

4    Q.  You don't know what the witnesses who testified said during

5    the trial, correct?

6    A.  I don't.

7    Q.  You haven't read e-mails that were shown to the jury in the

8    course of this trial, correct?

9    A.  No, I haven't seen any, any documents.

10   Q.  So you haven't seen bank records related to this case

11   either?

12   A.  I have not.

13   Q.  Or text messages?

14   A.  Nothing.

15   Q.  You don't have any personal knowledge about OneCoin,

16   correct?

17   A.  No, I don't.

18   Q.  You don't know anything about how it worked?

19   A.  No, I don't.

20   Q.  You've never been to OneCoin's offices in Sofia, Bulgaria,

21   have you?

22   A.  What's that?

23   Q.  Have you ever been to Sofia, Bulgaria?

24   A.  No, I've never been to Bulgaria.

25   Q.  Okay.  So you've never visited the offices of OneCoin in

JBI3SCO4                          de la Portilla - Cross

1   Sofia, Bulgaria; is that fair to say?

2   A.  No, because I haven't been to Bulgaria, I couldn't possibly

3   visit their offices in Bulgaria.

4   Q.  You never been to any OneCoin's offices; is that fair to

5   say?

6   A.  No.

7   Q.  Anywhere in the world?

8   A.  No.

9   Q.  You've never -- you don't know of the details regarding the

10  relationship between Mr. Scott and a woman named Ruja Ignatova,

11  correct?

12  A.  No.

13  Q.  You never met Ms. Ignatova?

14  A.  No.

15  Q.  You don't know the details of the relationship between the

16  defendant and a woman named Irina Dilkinska, correct?

17  A.  No.

18  Q.  You've never met Ms. Dilkinska, correct?

19  A.  I have not.

20  Q.  You've never used a crypto phone obtained from Dubai, have

21  you?

22  A.  No.

23  Q.  Okay.  Have you ever even heard of a crypto phone?

24  A.  I think I may have seen it in The Good Wife or something

25  like that.

1   Q.  Seen it what?

2   A.  Seen it on the television series called The Good Wife.

3   Q.  Okay.  But, other than that, you've never --

4   A.  No.

5   Q.  -- heard of it.

6        And you've never actually used a crypto phone before,

7   have you?

8   A.  No.

9   Q.  Let me show Government Exhibit 3005-S in evidence.  If we

10  can go to page six.  You never seen this e-mail before, right?

11  A.  No.

12  Q.  You don't know anything about concerns that the defendant

13  might have been an informant for law enforcement, correct?

14  A.  No, I've never seen that e-mail before.

15  Q.  But, to be clear, putting the the e-mail aside, you don't

16  know anything about concerns --

17        MR. GARVIN:  Your Honor, objection.  Can we have a

18  sidebar on this, please.

19        THE COURT:  Okay.

20        (Continued on next page)

21

22

23

24

25

1    (At the sidebar)

2    THE COURT:  Yes, sir.

3    MR. GARVIN:  Your Honor, we object to the line of

4    questioning on this particular exhibit.  It's outside of the

5    scope of direct, but more importantly, the way that the

6    question was asked, it assumed a fact that is not in evidence.

7    It made it sound like Mr. Scott was indeed a confidential

8    informant.  And so, we object to the questioning the way it was

9    phrased and move that it be stricken.

10    MR. DiMASE:  To be clear, the way it was phrased was

11    concerns that Mr. Scott may be an informant.

12    THE COURT:  I think he was just reading from the

13    e-mail.  But in any event, to the extent there is an objection,

14    the objection is overruled.  I'm not going to strike it.

15    MR. DiMASE:  I'll move on.  I have a few more exhibits

16    to show him and ask him if he's seen them, and then I'll be

17    done.  I don't have a lot more.

18    THE COURT:  Finish up.  He's already established

19    clearly that he knows nothing about the facts of this case.

20    MR. DiMASE:  Fair enough.

21    (Continued on next page)

22

23

24

25

1    (In open court)

2    BY MR. DiMASE:

3    Q.  Mr. de la Portilla, you don't know the details about what

4    the defendant said to any banks or financial institutions when

5    he was setting up his investment funds, right?

6    A.  I don't.

7    Q.  I will just show you two additional exhibits.  Government

8    Exhibit 1209, page three, on the left, and Government Exhibit

9    1212, page three, on the right.

10        You never seen these agreements before, correct?

11   A.  No.

12   Q.  You don't know how either of these agreements might have

13   gotten on to Mr. Scott's computer; is that fair to say?

14   A.  I never seen them, so no, I wouldn't have an idea.

15   Q.  It's fair to say you would not know how the percentage got

16   changed from 1 percent on the left document to 22 percent on

17   the right document; is that fair to say?

18   A.  I think it's fair to say, yes.

19   Q.  You don't know an entity named RavenR, correct?

20   A.  I don't.

21   Q.  You don't have any personal knowledge about the Fenero

22   Funds or how they operated, correct?

23   A.  No.

24   Q.  You don't know that the Fenero Funds were entirely funded

25   with OneCoin derived money, correct?

1   A.  I don't know that.

2   Q.  You don't know that all of the money came, ultimately, from

3   a woman named Ruja Ignatova, correct?

4           MR. GARVIN:  Objection.

5           THE COURT:  Overruled.

6   A.  No.

7   Q.  You don't have any knowledge about what happened the day

8   that the defendant was arrested, correct?

9   A.  I don't.

10  Q.  You don't have any personal knowledge about what the

11  defendant may have said or how he may have lied in that

12  meeting, correct?

13  A.  No.

14          MR. DiMASE:  One moment.  Nothing further, your Honor.

15          THE COURT:  Any redirect?

16          MR. GARVIN:  Yes, your Honor.  Thank you.

17  REDIRECT EXAMINATION

18  BY MR. GARVIN:

19  Q.  Sir, you were asked a few moments ago about two documents,

20  one was on the left-hand side of the screen that showed

21  1 percent, and the other one was on the right-hand screen that

22  showed 22 percent, it appeared to be the same document.  Is

23  that correct?

24  A.  Yes.

25  Q.  You said that you had no idea about the document at all,

1  correct?

2  A.  I've never seen those documents until now.

3  Q.  But, as a lawyer, have you ever come across a document that

4  had a typo in it, that had a wrong percentage, and that you

5  were forced to correct it before you presented it to the

6  ultimate party?

7  A.  Of course.  That's very common.  Documents are amended all

8  the time.

9  Q.  Sir, with regard to the people that were just mentioned and

10  the entities that were just mentioned, you have no knowledge or

11  exposure to any of them, correct?

12  A.  No, I've never met any of them.  I had never heard their

13  names until now.

14  Q.  One person that you had a lot of exposure to would be

15  Mr. Mark Scott; is that correct?

16  A.  Yes.

17  Q.  And the fact that Mr. Scott supported you for your campaign

18  and made contributions totaling $3,000, would that in any way

19  be justification for you to get on this stand in front of this

20  honorable court, here in New York, and tell the ladies and

21  gentlemen of the jury something that wasn't 100 percent the

22  truth?

23  A.  No, of course not.  That's a ridiculous statement, and I am

24  an officer of the court.  I am an attorney.  I am an attorney

25  in good standing and have been so for 32 years.  I served as a

1   public servant.  I think that was a noble calling and a noble

2   cause, and I served honorably in my time in the Florida Senate

3   and on the County Commission in Miami Dade County, and I'm very

4   proud of that service, and I'm very proud of my own reputation

5   for integrity and honesty.

6   Q.  What is your opinion, sir, of the reputation of Mark Scott

7   for honesty and law-abidingness?

8   A.  I've always known Mark to be an honest and law-abiding

9   person.  Citizen.

10          MR. GARVIN:  Thank you.  I have no further questions.

11          THE COURT:  Mr. de la Portilla, you may step down.

12          THE WITNESS:  Thank you, your Honor.

13          THE COURT:  Safe travels and let's get Ms. October

14  back on the stand.

15          (Witness excused)

16          THE COURT:  Ms. October, welcome back.

17          THE WITNESS:  Thank you.

18          THE COURT:  And Ms. Lozano, you may proceed.

19          MS. LOZANO:  Thank you, your Honor.  Mr. Barile, can

20  we display 2622, please, and publish it to the jury.

21  BY MS. LOZANO:

22  Q.  Ms. October, when we broke, you were discussing an entity

23  by the name of Phoenix Fund.  Please explain to us what chart

24  2622 reflects.

25  A.  So this chart reflects some of the intermediary transfers

1   which consist of Cayman and Fenero Ireland accounts.  Two

2   accounts from Fenero Ireland and one from the Cayman.

3   Collectively those three accounts submitted transferred 11

4   wires totaling $194 million from January to April 2017.

5   Q.  To what account?

6   A.  And that -- and those funds were transferred to the Fenero

7   Bank of Ireland account ending in 9811.

8   Q.  Let me, before we go on to where the money went from there.

9   To be clear, in the Fenero Cayman accounts box and the Fenero

10  Cayman Fenero Ireland box, and the Fenero Bank of Ireland box,

11  the three middle boxes, who is the account holder for all of

12  those accounts?

13  A.  Mark Scott.

14  Q.  Once the 194 million euros were transferred to the Bank of

15  Ireland Fenero account ending 811, what did you trace, where

16  did you trace the money to?

17  A.  I traced the funds going to Phoenix Fund Invest held in the

18  United Emirates.  They were 11 wires totaling 185 million.

19  Q.  You said that was located where?

20  A.  In the United Emirates.

21  Q.  All right.  Were you able to trace the money from there or

22  is that where your tracing ended?

23  A.  My tracing ended.  I didn't have visibility into the

24  Phoenix Fund account.

25          MS. LOZANO:  Mr. Barile, if we could display 2622, GX

1609

1     2622.  I'm sorry.  2620.  I'm sorry.

2     Q.  Ms. October, what is this overwhelming chart?

3     A.  So, this chart is an illustration of what I would call a

4     cascading flow of funds from where the initial funding happened

5     in the top box, from the nine -- the nine separate entities

6     that funded the four Cayman Fenero entities that I previously

7     testified to.  That account received 354 million euros and

8     approximately 10 million U.S.  And that those funds were later

9     transferred to seven intermediary funds consisting of three

10    accounts held at DMS in the name of MSSI, and then there's four

11    Bank of Ireland accounts held in various forms of Fenero.  And

12    then there's the accounts further going down is broken out into

13    two separate boxes, one for domestic transfers, and one for

14    foreign transfers.  The foreign -- the domestic transfers are

15    accounts held in the name of Mark Scott, which is represented

16    by the orange colored circles with the American flag.  And it

17    also includes the Nicole Huesmann account which received moneys

18    from either one of the Fenero or MSSI accounts.  And

19    highlighted in the green text box are three accounts that

20    actually ended up sending money back to one of the intermediary

21    accounts, totaling approximately $950,000 U.S.

22    Q.  Can we zoom out so we can see where that -- so you were

23    focusing on the green box on the left?

24    A.  Yes.

25    Q.  And where did you direct the arrow?

A.  So I directed it back to the intermediary box that the

funds went back into, one of those seven accounts.

Q.  Okay.  And is there also an indication on the foreign

account box of such a return to the intermediary accounts?

A.  Yes.  So also highlighted in green are two accounts, one is

a Cowen account and IG Markets accounts.  Three wires from

Cowen totaling approximately 30 million euros, and two wires

from IG Markets totaling approximately 10 million euros, for a

total of about 40 million euros going back to one of the

intermediary accounts located above.

Q.  So do those fluorescent green boxes and lines back up, are

those the returns to the intermediary accounts that you were

discussing when you were explaining the differences in a prior

chart between the totals --

A.  Right.

Q.  -- reflected in the bottom and the total coming into the

four Fenero accounts?

A.  Correct.  And I'd like to continue with the foreign box.

Q.  Yes.

A.  I isolated by color coding the various different countries

that funds went, that funds went to.  So, the account on the

far left is highlighted as in bold accounts controlled by

Scott.  And those include two Cayman accounts, one held -- one

in the name of EDG Investments, held at First Caribbean.  And

HIT Holding held at RBC Dominion Securities, and then there is

1    a Swiss account held in the name of Mark Scott that received

2    two wires totaling 2.5 million.

3    Q.  And those accounts, those three accounts are controlled by

4    the defendant?

5    A.  Those are all, those three accounts are all controlled by

6    Mark Scott.

7    Q.  The rest of the accounts that are in this box represent

8    what?

9    A.  So, the accounts represents various different countries

10   that were the beneficiaries of the funding from either the MSSI

11   or Fenero accounts, so we have other Cayman accounts, DRP

12   Holding, MSSI Marine, and Mumbelli, and moving towards the

13   right, there is a box of beneficiaries located in the United

14   Kingdom.  There is a four accounts located in that box with

15   indications of the dollar amounts for each account received,

16   and the name and the financial institutions where those

17   accounts are held.

18            And then all the way to the right, is in the orange is

19   three transfers that go to Bulgaria, totaling approximately $65

20   million and that includes Vida Home, LBJAD, and Openmark

21   Bulgaria.  Collectively, Bulgaria in these three accounts

22   received $65 million consisting of eight wires.  And scattered

23   independently are additional accounts that I talked about

24   earlier for Phoenix which received the 11 million in the UAE

25   which is in between the -- no, not that one.

1   Q.  Between --

2   A.  In between the blue and the pink colored box.  That

3   represents the $185 million, million euros, that the Phoenix

4   Fund located in UAE received from one of the Fenero or MSSI --

5   one of the Fenero accounts.

6   Q.  And the account under that, under the Phoenix Fund, is

7   what?

8   A.  That's an account called titled Barta Holdings that

9   received a $30 million U.S. wire transfer at DBS Bank located

10  in Hong Kong.

11  Q.  Now, is it your understanding that that transfer related to

12  a purported loan?

13  A.  Yes, that's my understanding.

14  Q.  In your financial analysis of all of the records in this

15  case, did you find any evidence that that $30 million was ever

16  repaid to any of the Fenero or MSSI accounts or at all?

17  A.  My financial tracing did not indicate any return of those

18  funds.

19  Q.  So what I'd like to ask you, there were two accounts and I

20  believe they were highlighted in foreign account box with

21  green.  Cowen and IG Markets.  Fluorescent green.  And what is

22  your understanding about what Cowen International Limited is,

23  what kind of firm is it?

24  A.  My understanding is that it's an investment firm.

25  Q.  What about IG Markets General?

1   A.  The same.

2   Q.  And aside from those two accounts that received money from

3   the Fenero and MSSI account, did you see any other evidence of

4   any other accounts for investment firms receiving money?

5   A.  No, I did not.

6   Q.  The return arrow for Cowen and IG represents a return to

7   Fenero or MSSI accounts?

8   A.  Yes.

9   Q.  Fenero accounts?

10   A.  Fenero accounts, yes.

11   Q.  Fenero accounts.

12       And in your financial analysis, were you able to

13   determine how much money total was sent into the Cowen and IG

14   Markets accounts and then how much was returned out?

15   A.  Yes.

16   Q.  What was that?  Break them down.  Do Cowen first and then

17   IG, please.

18   A.  Cowen consisted of three wires totaling $30 million.  And

19   the IG Markets consisted of two wires totaling $10 million.

20   Q.  Are we talking about dollars or euros?

21   A.  I'm sorry.  Euros.

22   Q.  What was returned to the Fenero account from Cowen?

23   A.  So it's 40,020,286.36 euros.

24   Q.  So, the difference between what was sent to these two

25   investment firms and what was sent back was a total of a little

1   over $20,000?

2   A.  20,286 euros.

3   Q.  Then I think we stopped at those two boxes.  What does the

4   bottom tier of boxes represent?

5   A.  So, the bottom tier of boxes represents the final

6   destination of funds, and what items were purchased by using

7   those lower funds.  So we go from the left side, the left side

8   represents a real estate box, and there are, there were three

9   real estate transfers, three real estate purchases, and one

10  condo where the mortgage was paid off using the funds.

11  Q.  To be clear, when you say that tier represents where the --

12  the purchases that were ultimately made, by whom?

13  A.  By Mark Scott.

14  Q.  Okay.  So what is the second box from the left?

15  A.  The second box from the left represents various other

16  purchases, which includes various different watches from a

17  number of different jewelers, various different handbags, there

18  is also a diamond bracelet that was purchased, and an emerald

19  cut engagement ring that was purchased for about $120,000.  And

20  a gift car, Mercedes Benz, for Nicole Huesmann.

21  Q.  Let's go to the next box and we'll talk more in detail

22  about all these purchases.  What does that box represent?

23  A.  This box represents 16 watches that was purchased from one

24  jeweler known as Time Piece in Florida.  And the watches range

25  from 5,000 to $35,000.

 1    Q.  Okay.

 2    A.  Date range from January 2015 to about February of 2018.

 3    Q.  Let's go to the last box on the bottom of the right.

 4    What's in that box?

 5    A.  The last box represents vehicles that were purchased for

 6    Mr. Scott as well as a yacht purchased for Mr. Scott.

 7    Q.  Vehicles purchased for Mr. Scott or by Mr. Scott?

 8    A.  By Mr. Scott.

 9    Q.  And for Mr. Scott?

10    A.  And for his use, yes.

11    Q.  All right.  How did you determine what purchases to include

12    in these bottom, the bottom tier of boxes?

13    A.  Based on the value of the purchases.  Of course I did not

14    include more of the lower end purchases, but what stuck out to

15    me was more of the higher end value of items purchased.

16    Q.  But the money that was used to make these purchases was

17    traced back to where?

18    A.  They were all, all traced back to the original source of

19    funds from the funding of the four -- one of the four Fenero

20    accounts.

21    Q.  From the nine accounts?

22    A.  From the nine accounts that funded the four Fenero accounts

23    that later funded transfers, multiple transfer to the

24    intermediary accounts, and then later additional tracing to

25    U.S. accounts, and then later tracing to purchase those various

1  items.

2  Q.  Okay.  So if we can put that back up, actually Mr. Barile.

3  2620.

4          So, the items that are in the bottom tier, the

5  purchases that were made.  Your analysis traced all the way up

6  to that top tier, the nine accounts, the IMS, B&N, Star

7  Merchant and Fates accounts?

8  A.  That is correct.

9  Q.  In your review of bank records, we just talked recently

10 about a transfer to Barta for a purported loan.  In your review

11 of the bank records in this investigation, did you find any

12 evidence of payments repayments of any purported loans?

13 A.  Not -- not for Barta, but there was --

14 Q.  No.  Just for any purported loans?

15 A.  Yeah, so there was a loan, there was a -- a payment sent

16 for approximately 5 million euros from one of the Cayman

17 accounts, I believe it was ending in 4102, to DMS Governance.

18 And --

19 Q.  DMS is a bank?

20 A.  DMS -- the DMS Cayman is a bank.

21 Q.  Okay.

22 A.  And those transfers happened approximately in November of

23 2016.  And later in April of 2017, I noticed that there were

24 approximately four transfers back to that account.  The DMS

25 Cayman account, Fenero ending in 4102, for approximately $5.2

1    million.

2    Q.  From Fenero to DMS?

3    A.  Yes.

4    Q.  Or from DMS to Fenero?

5    A.  No.  Repayment of the reference, repayment of loans.

6    Q.  So from DMS to Fenero.

7    A.  Back to the Fenero account, yes.

8    Q.  Aside from that, that $5 million out and then back in, did

9    you see any evidence in any of the other records of repayments

10   or payments of purported loans?

11   A.  No, I have not.

12          MS. LOZANO:  Your Honor, may I approach the witness?

13          THE COURT:  You may.

14   Q.  Ms. October, take a look at that and 2620-BU.  Do you

15   recognize that?

16   A.  Yes, I do.

17   Q.  What do you recognize that to be?

18   A.  That's an enlarged version of the chart that I just

19   recently testified to.

20   Q.  Aside from being larger in size, is it the same?

21   A.  Yes.

22          MS. LOZANO:  Your Honor, I'm offering 2620-BU.

23          MR. GARVIN:  The same objection as before.

24          THE COURT:  It will be received.

25          (Government's Exhibit 2620-BU received in evidence)

JBI3CO4

```
1          THE COURT:  Before we go to that, I understand there
2    is a request from the jury.  We just have a few minutes left to
3    go, so we'll finish up now.  We'll see you back tomorrow
4    morning.  Don't discuss the case.
5          (Jury excused)
6          THE COURT:  Ms. October, you can step down.
7          THE WITNESS:  Thank you.
8          THE COURT:  One or more of the jurors had to use the
9    facilities.  So we'll get back together at 3 o'clock?  And it
10   will be in this room.  Okay?
11         (Recess)
12         (In open court; jury not present)
13         THE COURT:  How many more witnesses does the
14   government have?
15         MR. FOLLY:  Your Honor, we have one remaining witness
16   after Ms. October.
17         THE COURT:  How much longer is Ms. October?
18         MS. LOZANO:  I estimate between 45 minutes and an hour
19   at most.
20         THE COURT:  How long will the last witness be?
21         MR. FOLLY:  Your Honor, approximately 45 minutes to an
22   hour.
23         THE COURT:  Okay.  So, arguably you will rest
24   tomorrow.
25         MR. FOLLY:  Yes, your Honor.
```

1          THE COURT:  How long is the defense case going to be,

2     if you're able to make an estimate at this point?

3          MR. GARVIN:  Your Honor, we may also rest tomorrow.

4     Coordinating the witnesses and filtering up, it's very possible

5     we may also rest tomorrow too.

6          THE COURT:  Okay.  So everyone's here that's going to

7     be here?

8          MR. DEVLIN-BROWN:  Yes.  Your Honor, Mr. Scott with

9     the Court's permission, he knows he has a right to be at every

10    court proceeding, but he'd rather be excused.

11         THE COURT:  Okay.  You are excused.

12         As with the voir dire form, because I am going to be

13    giving this to the jury -- by the way, I am going to need from

14    the government a clean version of the indictment because I do

15    give the indictment, the verdict form, and jury instructions to

16    each of the jurors, so I want to put together a package for

17    them.  As with the voir dire form, I am happy to receive from

18    either side any comments, including typographical errors,

19    grammatical errors, etc.  Okay?

20         As the parties are aware, the first few pages are sort

21    of boilerplate, used on many occasions, and the last part is

22    also boilerplate.  I will be adding an instruction on

23    stipulations which is not currently in this draft.  If there is

24    any other instruction that you think needs goes to that latter

25    part, I'm happy to give it.

JBI3CO4

1    So let me just ask over the first few pages before we

2    get to the conspiracy counts, on page seven, any substantive or

3    other comment?

4    MR. DiMASE:  These are very minor non-substantive

5    comments.  But on the first page I think the indictment charges

6    the defendant as Mark S. Scott.  On the very opening title

7    page.

8    THE COURT:  Where are you?

9    MR. DiMASE:  On the literally the first page.  It says

10   jury instructions.  On the top in the caption.

11   THE COURT:  Okay.  Mark S. Scott.

12   MR. DiMASE:  Right.  And all of our stipulations have

13   been under just 17 CR 630.  I don't know if we want to remain

14   consistent and take the superseder out.  If we do leave it in,

15   it should be S10 not S1.

16   THE COURT:  Let's take it out.

17   MR. DiMASE:  Okay.  On page seven, again, this is not

18   substantive, "Mr. Scott has pleaded not guilty to these

19   charges" probably should be indented.  It is supposed to be a

20   separate paragraph.

21   THE COURT:  I'm sorry.  Page seven?

22   MR. DiMASE:  Right above conspiracy count.  This is

23   just formatting.

24   THE COURT:  Okay.

25   MR. DiMASE:  On page eight, in the first full

1     paragraph.

2             THE COURT:  Before you get to page eight.  Anything in

3     the introductory pages, Mr. Garvin or Mr. Devlin-Brown?

4             MR. DEVLIN-BROWN:  No, your Honor.

5             THE COURT:  Go ahead, Mr. DiMase.

6             MR. DiMASE:  I think in the first full paragraph it

7     would be better the word "though" could be switched to "if."

8             MR. DEVLIN-BROWN:  Where are we?

9             MR. DiMASE:  Page eight, first full paragraph.

10    Starting with the word "indeed."

11            THE COURT:  Always happy to take out "though."

12            MR. DiMASE:  What's that, your Honor?

13            THE COURT:  I'm always happy to take out the word

14    "though."

15            MR. DiMASE:  I think "even though" suggests that the

16    crimes were not actually committed, when it's the government's

17    position that they were in fact committed.  So "even if" I

18    think is a better formation.

19            THE COURT:  Okay.  Now to the section three, if there

20    is nothing else.

21            MR. DiMASE:  We are at page 10, your Honor.  I guess

22    existence of conspiracy.  Page nine I guess.

23            MR. DEVLIN-BROWN:  Right.

24            MR. DiMASE:  I have a minor correction on page 10.

25    Capitalizing "government" in the third paragraph I think just

1    to keep consistent.  I think both defendant and government have

2    been capitalized throughout.

3             THE COURT:  Okay.

4             MR. DiMASE:  On page 11 I have a substantive comment.

5             THE COURT:  Very well.

6             MR. DiMASE:  I don't know if Mr. Devlin-Brown has

7    anything else.

8             MR. DEVLIN-BROWN:  On page 10 and 11, but if you want

9    to finish your comment.

10            MR. DiMASE:  No, go ahead.

11            MR. DEVLIN-BROWN:  So, we put this in our request and

12   your Honor rejected it, but just for the record, we suggested

13   deleting the phrase "either spoken or unspoken."  And we also

14   suggested deleting "in a very real sense in the context of a

15   conspiracy, actions often speak louder than words."  That may

16   be correct I think in conspiracies involving narcotics or other

17   things.  I think it's impossible to have a conspiracy of this

18   nature if nothing is ever spoken, and therefore I think

19   deleting it would be appropriate.

20            THE COURT:  Okay.  I've considered that and included

21   it.  Next.

22            MR. DiMASE:  On page 11, under objects of the

23   conspiracy.  The government's proposal did not have the first

24   line, and that's because I don't believe that an object is an

25   element per se.  It's sort of a part of the first element.  So,

1     what we would propose is that the line start with the word

2     "the" at the top of the first line, "the object of a conspiracy

3     is the illegal goal the co-conspirators agreed or hoped to

4     achieve." This is all under the first element that a conspiracy

5     existed and that there was an agreement of two or more people

6     to commit a crime.

7                I don't think the object itself represents a separate

8     element.

9                THE COURT:  So take out the entire first line after

10    the word "the."

11               MR. DiMASE:  Up to the word "the" which should be

12    capitalized, and it would best read "The object of a conspiracy

13    is the illegal goal the co-conspirators agree or hope to

14    achieve."

15               THE COURT:  So that sentence "the object of a

16    conspiracy is the illegal goal."

17               MR. DiMASE:  I think that would be appropriate, your

18    Honor.

19               THE COURT:  Okay.  I'll make that change.  Anything

20    else on that page from either side?

21               MR. DEVLIN-BROWN:  No, not from defense.

22               THE COURT:  And continuing on, what else do you have,

23    Mr. DiMase?

24               MR. DiMASE:  At the bottom of page 12, your Honor, and

25    into the top of page 13.  Just two edits to make this more

1    understandable.

2              The first I would propose is to switch one and two.

3    So that one is a transaction which in any way or degree affects

4    interstate or foreign commerce.  And two would be a transaction

5    involving a financial institution...

6              And the reason I would propose that is two fold.

7    First, that would track the actual language of the statute in

8    that order.  And second, two contains the word "financial

9    institution," which is then defined in the next sentence.  That

10   definition is only pertinent to -- well.  The new two, I should

11   say.  That definition is only pertinent to that subdivision.

12   There are two different kinds of financial transactions or it's

13   defined in two ways.

14             Does that make sense?

15             THE COURT:  I'm happy to make that change.  Any

16   objection?

17             MR. DEVLIN-BROWN:  No, your Honor.

18             MR. DiMASE:  We would just also suggest adding to the

19   beginning of the sentence I instruct you that an FDIC insured

20   bank constitutes a financial institution for purposes of the

21   second type of financial transaction I just described.

22             THE COURT:  I'm sorry.  You lost me there.  Where are

23   you?

24             MR. DiMASE:  I'm at the top of page 13.

25             THE COURT:  Okay.

1          MR. DiMASE:  The sentence that says "I instruct you

2     that an FDIC insured bank constitutes a financial institution."

3          THE COURT:  Yes.

4          MR. DiMASE:  I just think it would be appropriate to

5     preface that sentence with something like "for purposes of the

6     second type of financial transaction I have described."

7     Because it does, that definition is not relevant to the other

8     type of financial transaction.  In other words, the word

9     "financial institution" only appears in one of the two

10    definitions in the prior paragraph, which will now be the

11    second definition.

12         THE COURT:  Okay.

13         MR. DEVLIN-BROWN:  I mean, particularly if you're

14    flipping one and two, and only what will be now two says

15    financial institution, I don't think any further clarification

16    is necessary.  I think the term is only used once, so that's

17    how you are defining it.

18         MR. DiMASE:  I'll explain the reason why we think it

19    is important.  If there were not a bank fraud charge in this

20    case, which had a lot more focus on the issue of FDIC

21    insurance, then I would agree.

22         THE COURT:  It is innocuous.  I'll leave it in.

23         MR. DiMASE:  Okay.  Our next edit is not until page

24    15.

25         MR. DEVLIN-BROWN:  Your Honor, a small edit on 12 and

JBI3CO4

1      then I regret that I forgot a proposal on page eight.

2                On 12, in the concealment money laundering, under

3      second, we would request that it says "which here is alleged to

4      be a wire fraud scheme."  Rather than "is a wire fraud scheme."

5                MR. DiMASE:  That makes sense.

6                THE COURT:  "Which here is alleged to be."

7                MR. DEVLIN-BROWN:  Yes.  Yes, your Honor.

8                THE COURT:  Okay.

9                MR. DEVLIN-BROWN:  And the change on page eight that

10     we would propose is to remove the last paragraph of the

11     conspiracy count language which starts "Congress has deemed it

12     appropriate to make a conspiracy standing alone."  The purpose

13     of the law of conspiracy really doesn't seem necessary.  The

14     purpose isn't there for other laws, so we would suggest

15     removing it.

16               THE COURT:  Any objection?

17               MR. DiMASE:  Your Honor, I think this is pretty

18     standard language on conspiracy charges.  We would request that

19     it remain in the charge.

20               THE COURT:  It is standard and I will keep it in.

21     Next?

22               MR. DiMASE:  I'm at page 15.

23               THE COURT:  Okay.

24               MR. DiMASE:  Your Honor, I would suggest adding "wire

25     transfers" to the parenthetical in the second full paragraph.

JBI3CO4

1    Since obviously there's substantial evidence in this case

2    regarding wire transfers in furtherance of the wire fraud

3    scheme, and that doesn't appear in this list of examples.

4              THE COURT:  I will include that.  So that will be, for

5    example, phone calls, wire transfers, e-mail communications,

6    etc.

7              MR. DiMASE:  That's fine.  We can leave text messages

8    too.

9              THE COURT:  Yes.  Okay.  Next?

10             MR. DEVLIN-BROWN:  We're on page 16 is our next issue.

11             THE COURT:  Okay.

12             MR. DEVLIN-BROWN:  So, your Honor, we had proposed

13   that -- both -- we proposed that at the end of instruction

14   element three, the Court wrote "it is sufficient that the

15   defendant believed the proceeds came from some unlawful

16   activity."

17             You know, the statute itself makes clear, and that's

18   why we included it, that it has to be a felony under the law of

19   some state, the United States, or foreign country.  The reason

20   I say that is because there are some of these articles about

21   bitcoin that suggest sort of regulatory -- not bitcoin --

22   OneCoin that suggests regulatory type issues.  And I want the

23   jury to understand that he has to have some awareness, not just

24   maybe that bitcoin -- or OneCoin isn't in compliance with the

25   evolving regulations everywhere, but it is producing money that

JBI3CO4

is proceeds of a crime, a felony.

         MR. DiMASE:  I guess I'm not clear on what the
specific language Mr. Devlin-Brown suggests.

         THE COURT:  The specific language is in the letter he
submitted.

         MR. DEVLIN-BROWN:  While Mr. DiMase is looking,
perhaps I could just add a little bit.

         MR. DiMASE:  Sorry.

         THE COURT:  I think we're waiting for you to tell us
the specific language.

         MR. DEVLIN-BROWN:  I'm sorry, I'm sorry.  So the
specific language that we had proposed was "To satisfy this
element, the government must prove that the defendant knew that
the property involved in the transaction represented proceeds
from some form, but not necessarily which form, of activity
that constitutes a felony under state, federal, foreign law.
Thus, the government does not have to prove that the defendant
specifically knew that the property involved in the transaction
represented the proceeds of the wire fraud scheme or any other
specific offense.  The government only has to prove that the
defendant knew it represented the proceeds of some illegal
activity that was a felony."

         And I note that the Sand instruction does refer to
there being a felony.  That unlawful activity is a felony.  And
the statute itself, as I said, I can quote it now, refers to an

JBI3CO4

1     activity that "constitute a felony under state, federal or

2     foreign law" in its definition of unlawful activity.

3               If it helps, it's in the docket at 160-1.

4               THE COURT:  What's the the date of your letter?

5               LAW CLERK:  October 23.

6               MR. DEVLIN-BROWN:  October 23 of 2019.  It was a

7     letter that then attached --

8               THE COURT:  Yes.

9               MR. DiMASE:  I do have a proposal, your Honor.

10              THE COURT:  Okay.

11              MR. DiMASE:  I think we may have another copy if you'd

12    like it.

13              THE COURT:  If you could, that would be great.

14              MR. DiMASE:  I have it here.  You're good?  You'd like

15    it?

16              THE COURT:  Okay.

17              MR. DiMASE:  So, as a matter of law, I don't think

18    that the proposal is wrong.  But I think the language on

19    request number 15, which is the next page of the defense's

20    submission, would cover the concept, and we can insert that

21    here.  In other words, to say "the proceeds came from some form

22    of unlawful activity that constitutes a felony under state,

23    federal or foreign law."  And that can be added to the end of

24    the paragraph on page 16.

25              THE COURT:  Yes.

JBI3CO4

1         MR. DiMASE:  But not necessarily which form of

2    unlawful activity.

3         THE COURT:  Right.

4         MR. DiMASE:  It would be some form of unlawful

5    activity that constitutes a felony under state, federal or

6    foreign law, but not necessarily which form of unlawful

7    activity.  Although, that's above.

8         THE COURT:  I mean, I would be inclined to put it at

9    page 16, but first paragraph or second paragraph?

10        MR. DiMASE:  I think right now we are on the second

11   full paragraph of page 16.  I am just noticing that the first

12   paragraph also says "though not necessarily which form."  But I

13   don't know that it is harmful to say that twice.

14        THE COURT:  So to the second paragraph I'll add that

15   language at the end.  "That constitutes a felony under state,

16   federal or foreign law."

17        MR. DiMASE:  We would ask "but not necessarily what

18   form of unlawful activity" as well.

19        THE COURT:  That's in there.  Okay.  Next?

20        MR. DiMASE:  In light of the addition, we would also

21   ask at an appropriate point in the instructions the Court

22   instruct the jury that wire fraud is a felony.  I think that's

23   appropriate.

24        THE COURT:  Okay.

25        MR. DiMASE:  We can find a place for that.

JBI3CO4

1    MR. DEVLIN-BROWN:  Our next change is on page 19.

2    THE COURT:  Anything before that, Mr. DiMase?

3    MR. DiMASE:  No.

4    THE COURT:  Okay.  Mr. Devlin-Brown.

5    MR. DEVLIN-BROWN:  A minor suggestion.  In the

6    second-to-last sentence before one comes to Count Two, where it

7    says "or control of the proceeds," we would propose "of the

8    wire fraud scheme proceeds" for clarity.

9    THE COURT:  I'm sorry, I don't know where you are.

10   The first full paragraph on page 19?

11   MR. DEVLIN-BROWN:  It's the very end of the

12   international concealment money laundering elements two and

13   three.  Right before one comes to Count Two.  Unless there is

14   some different --

15   THE COURT:  What line above Count Two conspiracy to

16   commit bank fraud?

17   MR. DEVLIN-BROWN:  It is three lines up.

18   THE COURT:  Okay.

19   MR. DEVLIN-BROWN:  So, where it says "conceal or

20   disguise the nature, location, source, ownership or control of

21   the proceeds."

22   THE COURT:  That's not three lines up from that

23   heading.

24   MR. DEVLIN-BROWN:  Two lines up, I'm sorry.

25   THE COURT:  Okay.

JBI3CO4

1    MR. DEVLIN-BROWN:  So "wire fraud scheme" is all we

2    suggest inserting.

3    THE COURT:  "Control of the proceeds of the wire fraud

4    scheme"?

5    MR. DEVLIN-BROWN:  That's fine as well.

6    THE COURT:  Is that what you are asking?

7    MR. DEVLIN-BROWN:  Of the wire fraud proceeds.  "Wire

8    fraud scheme proceeds."

9    MR. DiMASE:  I think "of the wire fraud scheme" makes

10   sense to add.  That's already in this paragraph about four

11   sentences up.

12   THE COURT:  "Proceeds of the wire fraud scheme."

13   Okay.  Next?

14   MR. DiMASE:  Your Honor, I do think that might, that

15   addition might change the meaning of the sentence which

16   contradicts an earlier part of the charge.  Because it ends

17   with that the defendant knew this was the purpose.  He doesn't

18   need to know that there were proceeds of the wire fraud scheme

19   in particular.  So I think that language is intentionally left

20   out in that sentence, as we've already established he only

21   needs to know they are proceeds of some form of felonious

22   activity.  So I think that doesn't belong there.

23   THE COURT:  Okay.  I will not include it.  It is in

24   the paragraph.  Next.

25   (Continued on next page)

1          MR. DiMASE:  What is your next?

2          MR. DEVLIN-BROWN:  It is 21.

3          MR. DiMASE:  Why don't we turn to that.

4          MR. DEVLIN-BROWN:  So this is something we had

5    submitted in our request as well, your Honor, but do want to

6    reiterate, which is in the existence of scheme or artifice

7    section on page 21, go to the fourth paragraph, the concealment

8    of material facts.  We had proposed "where there is a duty to

9    disclose them."

10         Fraud can be based on false statements.  It can be

11   based on half-truths where you make some statement and need to

12   say something else to correct it but the pure omission theory

13   of fraud only exists where there's a duty to speak or where

14   you've said something already that will make it a half-truth.

15         For example, I mean this is a silly example, but if

16   you fill out a credit card application, your income, it might

17   be material that you're leaving your job in two weeks but there

18   is no duty to write that down anywhere and, therefore, that's

19   not a fraud if you're making that amount of money now.

20         And I think that's really gets to the heart of the

21   defense here is that Mr. Scott's position is he answered

22   questions truthfully, did not speak in half-truths, and did not

23   omit anything that he had a duty to share.  But his view and

24   the defense's view is there was no duty to volunteer that

25   OneCoin, for example, had connections to some of the funds

JBI9SCO5

1    going into Fenero or to Ruja Ignatova.  So it's an important

2    point for us.  I think it's consistent with the law that we had

3    cited when we submitted the request to charge.

4             MR. DiMASE:  Your Honor, I think there's a difference

5    between that part of the law which requires a duty and, on one

6    hand, and statements made in response to that duty and then the

7    intentional concealment or act of concealment of material facts

8    which can rise to the level of material omission or

9    misrepresentation.

10            In other words, if you are intentionally and actively

11   not sharing information you know would be material to the fact

12   finder, particularly in the context of sharing other facts like

13   half-truths, the law is very clear that that can rise to the

14   level of the kind of misrepresentation contemplated.  And I

15   would cite to *Zarrab* -- I mean *Autuori* and *Zarrab*, the Second

16   Circuit case, under the mail fraud statute, it is just as

17   unlawful to speak half-truths or to omit to state facts

18   necessary when the statements made in light of circumstances

19   under which they were made not misleading, and then *Zarrab* goes

20   on to say the language of the bank fraud statute should be

21   broadly construed so as to --

22            THE COURT:  Slowly.

23            MR. DiMASE:  Anyone engaged in a scheme or artifice to

24   defraud, including the scheme to actively conceal material

25   information through deceptive conduct with intent to mislead

1    and suppress the truth even in the absence of an independent

2    legal duty to disclose such information.  And the Second

3    Circuit very recently in *Petrossi*, in an unpublished opinion

4    from September 2019, upheld instructions that are very similar

5    to the ones the Court has included in this charge under a

6    similar theory.

7            We wouldn't oppose the addition of a word like

8    "intentional" concealment or "active" concealment, something

9    along that line to make this clearer that it isn't accidental

10   omission or something of that nature.  But I think that this

11   sentence here accurately describes the state of the law on this

12   issue otherwise.

13           MR. DEVLIN-BROWN:  If I could add a little, your Honor

14   on this point.

15           THE COURT:  Sure.

16           MR. DEVLIN-BROWN:  The first part of the description

17   of *Zarrab* that Mr. DiMase read, it did say omission of material

18   facts, but it was in the context of half-truths or so as not

19   making something else hearsay and misleading.  The portion at

20   the end did not have that same qualification, although it did

21   say it had to be deceitful.

22           The law in this area, frankly, is a little bit muddled

23   and not all of the cases that have approved instructions in the

24   circuit actually address this particular issue.  It's not a

25   core issue in a lot of cases.

1    But if you backout to what I think is a pretty bedrock

2    principle of fraud cases, the issue of a fraud is not whether

3    the other party would like to know material information.  It's

4    that you only have to share that information if you have either

5    made a half-truth kind of statement or you therefore that

6    creates its own duty, or where there's some duty to disclose.

7    And I'm going to say the case wrong, but the *Lithac* case, the

8    Second Circuit case involving the trading of some sort of

9    financial instruments, that was an issue in that case because

10   when you have arm's length contracts, for example, or sales

11   agreements, you don't have to necessarily disclose material

12   facts that the other side of the transaction would want to

13   know.  I mean if you're buying a car, the car dealer doesn't

14   have to disclose everything.  You don't have to disclose

15   everything.  So there really -- there's only fraud where there

16   is some underlying duty or obligation.  That's I think a pretty

17   bedrock principle.  I think the cases we had cited support

18   that.

19          MR. DiMASE:  The government's position is this comes

20   back to the concept of deceptive nondisclosures; not where you

21   have an affirmative duty to disclose and you say something

22   that's inaccurate where you know you absolutely have a duty to

23   say something truthful there about that particular issue.

24          This is about a deceptive nondisclosure, an

25   intentional withholding of information to mislead the other

1    side, to actively conceal material information, to

2    intentionally do so.  So that is the distinction the government

3    is drawing here.

4           THE COURT:  So what if I were to add the intentional

5    concealment or the affirmative concealment of material facts?

6           MR. DEVLIN-BROWN:  I think the deceptive concealment

7    would at least make some notion of fraud into it, but we do

8    think the instruction we propose is really the best one.

9           MR. DiMASE:  We think "intentional" makes sense, your

10   Honor.  That's our position.

11          THE COURT:  I will put "intentional."

12          Next.

13          MR. DEVLIN-BROWN:  Sort of related, your Honor, on the

14   next page of the instruction -- sorry.

15          THE COURT:  Page 22?

16          MR. DEVLIN-BROWN:  I think so.  I have a pagination

17   issue.  It's actually at the bottom of page 21.

18          So the deception need not be premised upon spoken or

19   written words alone paragraph.

20          THE COURT:  Yes.

21          MR. DEVLIN-BROWN:  Sands does not include the omission

22   of words.  And I suggest we don't include it here as well.

23   It's a tricky enough concept.  We had proposed a broader change

24   in the preceding paragraph.  But with putting "omission" again

25   without any of the context I think has the potential to create

JBI9SCO5

1 the same problem and confusion.  Sands doesn't use it.  I don't

2 think it's needed here.

3     THE COURT:  Mr. DiMase.

4     MR. DiMASE:  We would propose just adding the word

5 "intentional" before the word "omission."

6     THE COURT:  "Intentional omission of words."

7     Next.

8     MR. DiMASE:  I thought we were at the bottom of the

9 first full paragraph where it was intentional omission of

10 material facts.  Is that not --

11     THE COURT:  Well I mean, yeah, I'm going to put in

12 intentional in that second sentence of the last full paragraph

13 on page 21.  "The arrangement of the words, the intentional

14 omission of words, or the circumstances in which they are

15 used."

16     MR. DiMASE:  OK.  That's fine, your Honor.

17     THE COURT:  Next.

18     MR. DiMASE:  I guess we should do the same thing on

19 page 22 at the end of that paragraph.  "Fraudulent half-truths

20 or intentional omissions of material facts."

21     THE COURT:  OK.  Next.

22     MR. DiMASE:  We have something on page 24, your Honor.

23 I don't know if Mr. Devlin-Brown has something before that.

24     MR. DEVLIN-BROWN:  I don't.

25     THE COURT:  OK.

1        MR. DiMASE:  So this is an issue that was briefed.

2   The federally insured financial institution.  The government

3   has elicited evidence at the trial regarding other banks that

4   are FDIC insured that we believe are part of the bank fraud

5   scheme and so we would request that this entire second-to-last

6   sentence be removed.

7        THE COURT:  "The government has alleged that there

8   were three FDIC financial institutions," that one?

9        MR. DiMASE:  Right.  And then it names three

10  institutions.  I think the issue is there are other -- I can

11  point to specific examples if the Court would like, but there

12  are other banks that are FDIC insured that have been the

13  subject of testimony at this trial to which fraudulent

14  statements were made in order to move money through those

15  banks.  That includes banks that handled the five million

16  dollars through the Locke Lord accounts going to Dubai.

17        THE COURT:  These are FDIC insured banks?

18        MR. DiMASE:  Yes.  There was Northern Trust was

19  involved in that transaction, as was JPMorgan Chase.  And the

20  money eventually goes out of those banks, out to an account in

21  Dubai on the other end of the Locke Lord transaction.  And in

22  addition there are the banks that the victims sent money to

23  after being told by the perpetrators of the wire fraud scheme

24  to lie or withhold information about OneCoin and OneCoin

25  packages and instead to say educational packages in their wires

1  and that was part of the information that was provided to those

2  banks to then cause the banks to send money through the system.

3          THE COURT:  OK.

4          MR. DiMASE:  And in our view that's all part of one

5  larger money laundering conspiracy.

6          MR. DEVLIN-BROWN:  This illustrates a concern we've

7  had ever since the government superseded in a bank fraud

8  conspiracy 30 days before trial.

9          Mr. Scott was involved outside of the United States

10 and his funds were outside of the United States and all of the

11 banking for Fenero in terms of what it was doing with money

12 that Ruja Ignatova had sent occurred outside the United States.

13 For that reason we asked the government after the indictment

14 was filed to provide some particulars.  The government

15 identified these three banks and the various transactions.  The

16 government was quite clear, I think they even probably

17 underlined it, that they reserved the right to change that and

18 to add other things at trial.  We reserved the right to object

19 to it.  And, in fact, we expressed this concern in the cover

20 letter to our voir dire.  These are moving targets that if we

21 had known, for example, that there was an issue with the

22 I-card-related transaction in Locke Lord, we would have

23 prepared to defend that aspect of the bank fraud.  Maybe we

24 would have called JPMorgan Chase.  That was all news to us in

25 the middle of the trial; whereas, I think the three banks that

JBI9SCO5

1   they articulated I at least get what the theory is.  With

2   Sabadell and with Morgan Stanley, these are payments that

3   Gilbert Armenta transferred from accounts under his control

4   there to Mr. Scott's Fenero Funds and the theory is Gilbert

5   Armenta made false representations, Mr. Scott had something to

6   do with that; OK, we get that, we can defend it.  Bank of New

7   York Mellon, the theory is a little different.  It's that DMS

8   the bank in the Caribbean, had a correspondent banking

9   relationship with Bank of New York Mellon; that payments went

10  through DMS that Mr. Scott had indirectly caused to be deceived

11  or he caused Bank of New York Mellon, I'm sorry, the FDIC

12  insured bank, to be deceived through representations to DMS.

13          So we can deal with that.  But to hear things now like

14  OneCoin victims sent money to banks where Mr. Scott had

15  absolutely nothing to do with that conduct is too much of a

16  moving target.  There's too much potential for confusion from a

17  money laundering case where the object actually has to be --

18  you have to know the money is illegal; which you don't for bank

19  fraud; and you have to have an intent to conceal it.

20          So I think the bank fraud charge kind of becomes like

21  Konstantin pled guilty to.  You know, I understood it,

22  essentially he testified twice, bank fraud and money laundering

23  to be the same thing.  I think that's going to be a real

24  problem for the jury here.  I think we need to have some

25  specifics.

1642

JBI9SCO5

1          MR. DiMASE:  Your Honor I'll just hand up the

2    government's letter if you don't mind.

3          THE COURT:  OK.

4          MR. DiMASE:  As the government wrote in that letter

5    the government has no obligation to prove any particular

6    transaction or misrepresentation.  These transactions include

7    but are not limited to, which is underlined, and then it refers

8    to the three banks that we've been discussing.

9          Just -- sorry?

10         THE COURT:  This language we got from the government,

11   correct?

12         MR. DiMASE:  No, I don't believe so.  It was not from

13   us.

14         THE COURT:  OK.

15         MR. DiMASE:  So I don't think -- I think the

16   government was very clear that it was not constraining itself

17   to those three institutions in its letter and I would just --

18   two different points.  One is it's important to understand the

19   close link of these transactions to the OneCoin scheme.  The

20   five million dollars that goes through Locke Lord is -- we have

21   a chart that will be coming in tomorrow that shows that that

22   money was sourced from OneCoin funds that came into

23   Mr. Armenta's accounts.  It's very similar to the two Fates

24   Group transactions.  It's just not going to the Fenero Funds.

25              And with respect to the victims, this is all happening

JBI9SCO5

1   in 2016 during the period of time Mr. Scott is alleged to be

2   conspiring with others to launder the money and the funds of

3   the victims find their way to IMS accounts in Germany.

4         So it's not like these are totally disconnected from

5   the money laundering scheme.  They are going into the IMS

6   accounts.  Those IMS accounts are at least in one instance

7   directly funding the Fenero accounts and there can be many,

8   many people involved in a conspiracy.  Just because Mark Scott

9   doesn't know the person who told Linda Cohen don't say

10  educational packages doesn't mean that they aren't

11  participating in the same bank fraud conspiracy.

12        To turn to the other point which I took as the real

13  concern that was laid out in the defendant's letter, the

14  concern was that the jury will think that they can convict on a

15  bank fraud charge because of lies told to foreign banks and

16  that is not -- I think the jury instructions make quite clear

17  that the lie must be told or at least the object of the

18  conspiracy is to tell lies to FDIC insured banks to cause those

19  banks to cough up money.  And that's the law and we have no

20  objection to that instruction, obviously, but to limit it to

21  just the three institutions in this letter, which made very

22  clear that it was not limited to that evidence, we don't think

23  is appropriate.

24        THE COURT:  I'll take it out.  That sentence comes

25  out.

1          Next.

2          MR. DEVLIN-BROWN:  On page 25.

3          THE COURT:  Yep.

4          MR. DEVLIN-BROWN:  The first full paragraph.  So we

5     obviously objected to a conscious avoidance instruction in our

6     submission and continue to object to it.  But if the Court is

7     going to overrule that objection and provide such an

8     instruction, we suggest a few minor modifications.

9          THE COURT:  OK.  Let's ask the government if they

10    still want one.

11         MR. FOLLY:  Yes, your Honor.  We still believe it

12    would be appropriate to include it and we would request that it

13    stays in.

14         THE COURT:  OK.  Mr. Devlin-Brown.

15         MR. DEVLIN-BROWN:  So in the instruction that your

16    Honor provides on, again, the first full paragraph of 25, we

17    propose making the deletion in the -- starting in the third

18    line from the end of that paragraph.  So right now it says,

19    "confirming this fact, such as."  We would suggest deleting

20    "such as."  "Confirming this fact by purposefully closing his

21    eyes to it," and then omitting the clause "or intentionally

22    failing to investigate it."  And I think that's really

23    important here in a case where the government has spent

24    probably ten or fifteen minutes with a witness on the stand

25    reading a blogger's critical posts about OneCoin that Mr. Scott

1    received a link to.  If you have this phrase in there,

2    "intentionally failing to investigate," I mean conscious

3    avoidance is always very dangerous but to make it that specific

4    would suggest that Mr. Scott had a duty upon getting something

5    like that to conduct such an investigation and that is not what

6    the law requires.  He's not a bank.

7             MR. FOLLY:  Your Honor, we do believe "such as" would

8    be appropriate.  But we would not object to removing

9    "intentionally failing to investigate it."

10            THE COURT:  So I will take out that clause, "or

11   intentionally failing to investigate it."

12            Next.

13            MR. DEVLIN-BROWN:  We next have 27.

14            THE COURT:  OK.

15            MR. DEVLIN-BROWN:  So the dual-intent-no-defense

16   instruction, which I don't believe the government had proposed,

17   I believe that's an addition from the Court, we don't think

18   it's warranted in this case.  I mean I understand the sort of

19   case where this makes sense and to me that's a case where you

20   have someone's defense, you know, maybe I lied to the bank to

21   get the loan but I always was going to pay it back and it was

22   only to help my sister avoid -- raise money for chemotherapy

23   where essentially the defendant is arguing they had some noble

24   or charitable purpose and then this sort of instruction serves

25   to remind the jury that they could have whatever noble or

JBI9SCO5

1   charitable purpose they want, but if they still acted to

2   deceive a bank or commit wire fraud or whatever, they're

3   guilty.

4        I don't think it makes sense in a case like this.  I

5   mean he either knew he was laundering criminal money or he

6   didn't.  There is not a halfway defense we've sort of mounted

7   where something like this would be warranted.

8        MR. DiMASE:  We don't object to the removal of this

9   paragraph, although I think this would -- and so it sounds like

10  the parties are in agreement on that.

11       THE COURT:  OK.

12       MR. DiMASE:  This may be an appropriate time to

13  address the government's letter of last night or maybe the

14  Court wants to wait until the end but regarding the issues

15  around privileged communications and client confidentiality.

16       THE COURT:  Well let me have -- Mr. Devlin-Brown, have

17  you had a chance to review that letter?

18       MR. DEVLIN-BROWN:  Yes.  Absolutely, your Honor.

19       So on privileged communications I think we're

20  generally in agreement, although the way the government

21  suggested handling it I think is problematic.

22       What we would suggest doing is in the instruction on

23  all of the evidence properly obtained or something -- you know

24  what I'm hopefully referring to.

25       THE COURT:  Use of evidence obtained pursuant to

searches and seizures?  It's at page 28.

MR. DEVLIN-BROWN:  Yes.

So I think it's fine for the jury to be instructed
that you've seen e-mails that say attorney-client privilege.
You should know that no one's rights were violated in -- you
know, I'm -- providing these e-mails and they're properly
before you.  That was a pretty inarticulate way of trying to
phrase that.  But my concern with what the government sort of
suggested which is along the lines of these communications are
not privileged, that I think is -- implies or could imply to
the jury that the parties to those communications did something
wrong by writing it.

THE COURT:  I guess the resolution of this issue
depends on whether or not you're going to argue to the jury
that he made certain decisions or did certain things because of
attorney-client privilege.

MR. DEVLIN-BROWN:  I'm not going to argue that.  And
I'm not sure I'm going to argue it at all, frankly.  But there
is significance to something being marked attorney-client
privilege even if it turns out later a court decides by
probable cause anyway that it's not because it may advance that
the parties at least thought they were speaking privately at
the time, thought they were speaking in a protected context,
which arguably makes it -- I think that's a fair argument.
That makes it more likely that they were candid because they

were doing it in a privileged communication.  I don't know of a

particular thing I necessarily want to argue that way but

that's the context.

THE COURT:  I mean I'm happy to do it in an innocuous

way as possible.  Are there any communications that were not

attorney-client between Ms. Ignatova and Mr. Scott?

MR. DEVLIN-BROWN:  There might be some with

Ms. Dilkinska.  Right.  Gilbert Armenta, I believe.  And Diane

Cook from his office may have sent one of the communications

with -- I don't remember if it said attorney-client privilege

but it said top secret, confidential, something like that.

MR. DiMASE:  I guess the concern is just that not

only -- the e-mails say what they say.  The jury is going --

obviously has read or heard the subject lines of the e-mails.

But I think there was some insinuation, whether intentional or

not, that there was some kind of violation of the privilege.

And I just am concerned about that.

THE COURT:  I think the appropriate place to put it is

in this section at page 28, "Use of evidence obtained pursuant

to searches and seizures," and I will include some language and

get it to you overnight to the effect that you saw certain

e-mails between Mr. Scott and others that were marked

attorney-client privilege.  You are instructed that no one's

substantive rights or attorney-client rights were violated as a

result of putting this evidence before you.  Something along

1   those lines.

2           MR. DEVLIN-BROWN:  I think that's fine, your Honor.

3           MR. DiMASE:  I think if something to the effect of:

4   And you can properly consider the evidence, that's the focus I

5   think the government would want so that there isn't any concern

6   about the jury thinking they can't rely on these materials

7   because they might have been privileged.

8           THE COURT:  OK.

9           MR. DiMASE:  But -- so that's half of the -- that's

10  one-half of the issues raised in the letter.  The other issue

11  raised in the letter relates to the opening statement of

12  Mr. Devlin-Brown which gives us some concern about what

13  arguments he might make in closing statements around client

14  confidentiality as a defense to criminal activity.  And,

15  obviously, the rules are very clear that you're not allowed to

16  engage in criminal activity as a lawyer.  And, in fact, one of

17  the instances in which a lawyer is permitted to disclose

18  otherwise confidential information of clients is in order to

19  prevent them from committing crimes.

20          So we just don't want the jury to be left with the

21  impression or the misimpression that a client could somehow

22  bind an attorney through confidentiality to engage in crimes or

23  that relying on the concept of client confidentiality permits

24  the attorney to commit crimes somehow or is a defense to

25  crimes.  It's clearly not.  I don't know how exactly we get

1    that point across to the jury.

2              THE COURT:  I don't know you could put it in the

3    instructions.  I mean the representation has been that they are

4    not going to argue that.

5              Am I mishearing you, Mr. Devlin-Brown?

6              MR. DEVLIN-BROWN:  No.  I think the government's

7    position is by stating that Mr. Scott was an attorney and that

8    Ruja Ignatova was his client that somehow that's all in play.

9    I think I stayed well away from any line.

10             The problem with the government's suggestion that

11   there be an instruction is the instruction is more complicated

12   than the government suggests.  Of course confidentiality does

13   not excuse a crime.  That's clear.  We would never suggest

14   that.  Lawyers have duties not to assist their clients in

15   committing crimes.

16             But Rule 1.6 of the New York Rules of Professional

17   Conduct do impose a duty of confidentiality that's broader than

18   attorney-client privilege on attorneys not to share

19   confidential information without -- that could embarrass the

20   client, damage the client in any way, absent certain

21   exceptions.  One is to avoid committing a crime.

22             The court rejected our suggestion of having an expert

23   explain where those lines are.  I suppose the court could

24   explain 1.6.  I don't think we're going to put it into play

25   where you need either instruction.  And maybe if there's some

JBI9SCO5

1    problem we could address what would be appropriate after

2    summation.

3        MR. DiMASE:  Your Honor, just to be clear, I'll read

4    the concerning portion of the opening.  "Mark Scott provided

5    the information about the legal..."

6        THE COURT:  Slowly.

7        MR. DiMASE:  "Mark Scott provided the information

8    about the legal entities that were sending him funds.  He did

9    not go out of his way and volunteer that, by the way, these

10   funds have connections to Ruja and OneCoin.  The evidence is

11   going to show that Ruja demanded confidentiality.  She was a

12   private person.  Mark Scott was an attorney.  And he did not

13   reveal information about OneCoin..." quote "...as a matter of

14   practice."

15       And that "as a matter of practice" is what connects

16   his being attorney, her being a client, and adding

17   confidentiality back to some concept that he is somehow

18   obligated not to disclose that even in the context of criminal

19   activity.  And so that seems like an appropriate argument.  And

20   if that same sort of argument is going to be made at closing I

21   think some kind of curative instruction would be needed at that

22   stage.

23       THE COURT:  That's an appropriate argument or

24   inappropriate?

25       MR. DiMASE:  Inappropriate, I would say, because it

1    connects directly that concept of client confidentiality to a

2    defense to criminal conduct; that Ruja didn't have

3    confidentiality; she was his clients; he was his lawyer; he did

4    not disclose it, quote, as a matter of practice.

5           I think the only inference to be drawn from that is he

6    didn't -- because she demanded confidentiality as his client,

7    as a lawyer.

8           MR. DEVLIN-BROWN:  So I don't agree with the

9    characterization and don't know that you need to strip out the

10   fact that actually he was a lawyer and she was a client.

11          I think the line that would be inappropriate is for me

12   to make any suggestion that the ethics rules, that the legal

13   rules forbid him or restricted him from sharing this

14   information.  I don't think I've done that.  I'm not planning

15   to do that in summation.

16          THE COURT:  I will include anything but I'm still

17   having a difficult time understanding what the theory was in

18   the first place, Mr. Devlin-Brown.  I understand the context of

19   a car sale or a home sale maybe.  But the whole point of know

20   your customer and anti-money laundering is to get at the

21   ultimate beneficial owner.  And if you're not going to be

22   providing that information then the whole thing is a farce.  So

23   I don't see how that ethical rule gets you anywhere.

24          But we'll be listening very carefully to your

25   summation.  If you trigger something that requires me to tell

JBI9SCO5

1    the jury that at this doesn't provide a defense, that argument

2    doesn't provide a defense, then I'll have to tell them.  But I

3    don't intend on including it now based on your representations.

4            Next.

5            MR. DiMASE:  On page 28, your Honor.

6            THE COURT:  Yep.

7            MR. DiMASE:  I think the term that's used in the

8    second paragraph there is "the undercover law enforcement

9    agents."  I don't know if that's meant to refer to somebody in

10   Mr. Armenta's position.  It makes it sound like there was an

11   undercover FBI agent or something of that nature and there is

12   no evidence of that in the case.  So --

13           MR. DEVLIN-BROWN:  We're fine with deleting that.

14           THE COURT:  I'm sorry.  Where are you?

15           MR. DiMASE:  Second paragraph on page 28, your Honor.

16           THE COURT:  The second full paragraph.  OK.

17           MR. DiMASE:  Right.  Just one sentence.

18           THE COURT:  So what do you want to change?

19           MR. DiMASE:  Just to remove it, I think.

20           THE COURT:  The entire sentence?

21           MR. DiMASE:  I would say so.  That would be our

22   position.

23           THE COURT:  OK.

24           MR. DEVLIN-BROWN:  No objection to that.

25           THE COURT:  Out it comes.

1      MR. DEVLIN-BROWN:  In the same instruction, your

2  Honor, we would suggest "was lawfully obtained," sorry.

3      In the sentence that reads, "Including evidence

4  obtained pursuant to searches and the recorded meetings and

5  conversations played during trial, this was lawfully obtained,"

6  would suggest inserting "by the government" and then striking

7  "and no one's rights were violated and that the use of this

8  evidence is entirely lawful."

9      I think that's appropriate here because I don't know

10  that there's been a record made clear one way or the other as

11  to whether Apex violated any laws.  It may depend on where

12  Mr. Scott was located and surreptitiously recording him.  So I

13  wouldn't want the imprimatur of that was a hundred percent OK.

14      And I think the real issue and the real reason for an

15  instruction like this is to make sure the government is not

16  punished.  And we have no issue with the government having

17  properly obtained those communications.

18      THE COURT:  So you want me to take out -- put in "by

19  the government" where it says "was lawfully obtained" and take

20  out the next clause, that no one's rights were violated?

21      MR. DEVLIN-BROWN:  It says "by the government" right

22  now?

23      THE COURT:  No.  No.  No.  I'm including that.

24      MR. DEVLIN-BROWN:  Yes.  Exactly.  Exactly, your

25  Honor.

JBI9SCO5

1    MR. DiMASE:  We have no objection to the addition of

2    the words "by the government" but I think the idea that no

3    one's rights were violated is an important concept in this

4    instruction, that should stay.  I think the words "by the

5    government" make clear that that's the universe of evidence

6    that's being addressed here.

7    THE COURT:  Right.

8    MR. DiMASE:  And in any event the defense never

9    objected to the admissibility of that call on the ground that

10   it was illegally obtained.

11   THE COURT:  I think it's clear from the context that

12   no one's rights were violated refers to the government.  So I'm

13   going to leave it in.

14   MR. DiMASE:  So you'll add --

15   THE COURT:  I'm going to leave it in.  Leave in that

16   no one's rights were violated.

17   Next.

18   MR. DiMASE:  I don't have anything until 32.

19   MR. DEVLIN-BROWN:  On 29 the uncalled witnesses

20   instruction.  I don't see us really arguing this but I don't

21   think it's correct, the second sentence, that each side had an

22   equal opportunity or lack of opportunity to call any of these

23   witnesses.  We don't have the power to obtain witnesses who are

24   outside the United States.  Putting aside that the government

25   had unexpected issues in one case too with the Bank of Ireland,

JBI9SCO5

1    we would have enjoyed speaking to some of the UK-based

2    personnel who were at Apex or Locke Lord.  We weren't able to

3    subpoena documents from Apex UK.  We're not able to get

4    witnesses from there.  Again, I don't think we're going to

5    argue it but I just don't think this is an accurate statement.

6              MR. FOLLY:  Your Honor, the government's position is

7    that should stay in.  It references having equal opportunity or

8    lack of such opportunity.  It's a very, very common instruction

9    and it's appropriate and we don't want any suggestion that

10   witnesses who weren't called at this trial somehow the defense

11   counsel, you know, didn't have such opportunity to call them.

12             THE COURT:  OK.  I'm leaving it in.

13             Is Mr. Scott going to testify?

14             MR. GARVIN:  Your Honor, as of right this second the

15   answer is no but we have a scheduled meeting for him when we

16   leave here to make a final decision.

17             THE COURT:  Very well.

18             Do you care one way or the other whether we put in

19   anything about his testimony or lack of testimony?

20             MR. DEVLIN-BROWN:  Assuming he does not testify we

21   would like the instruction the court has proposed.

22             THE COURT:  Very well.

23             MR. DiMASE:  On a note outside of the instructions we

24   just ask that defense counsel inform us after that meeting what

25   decision they've reached.

JBI9SCO5

1              MR. GARVIN:  We'll be happy to do that.

2              THE COURT:  OK.

3              MR. DiMASE:  So my next is on 32.  I don't know if

4    counsel has any other prior to that.

5              THE COURT:  Very well.

6              MR. DEVLIN-BROWN:  Go ahead.

7              MR. DiMASE:  I just wasn't sure if your Honor ever

8    asked any questions of a witness.  There may have been one

9    occasion.

10             THE COURT:  Once.

11             MR. DiMASE:  OK.  So we'll leave it in.

12             My next edit is not until page 36.

13             THE COURT:  Anything before then, Mr. Devlin-Brown?

14             MR. DEVLIN-BROWN:  No, your Honor.

15             THE COURT:  OK.  36.

16             MR. DiMASE:  In the first sentence under accomplice or

17   cooperating witness testimony.  I think it's just one witness

18   there.  I think it should be "You heard from a witness who

19   testified that he was."

20             MR. DEVLIN-BROWN:  No objection.

21             THE COURT:  OK.

22             MR. DiMASE:  My next edit is on 38.

23             THE COURT:  OK.

24             MR. DiMASE:  Again that's just number of witnesses.

25   In the first sentence under expert witnesses.  My understanding

1    is that the defense is still not planning to call any

2    additional expert witnesses in which case it would be "permit a

3    witness to express opinions."

4              THE COURT:  I'll make that change.

5              Next.

6              MR. DiMASE:  On page 39.

7              THE COURT:  Yep.

8              MR. DiMASE:  I think it should be in the first title

9    there it should be "use of informants."

10             THE COURT:  I'm sorry.  Use of?

11             MR. DiMASE:  In the title of -- in bold and

12   underlined.

13             THE COURT:  Right.  Right.

14             MR. DiMASE:  "Use of informants."

15             And we would propose in the second line just to say

16   "confidential" again rather than "such."  Just because

17   confidential source has a particular meaning.

18             THE COURT:  So you want me to put "Informants or

19   confidential sources."

20             MR. DiMASE:  Either that or "informants or

21   confidential sources."  Either way is I think fine.

22             THE COURT:  OK.  Done.

23             MR. DiMASE:  On page 40, under number of witnesses.  I

24   had government capitalized for consistency purposes.

25             THE COURT:  One more time.

JBI9SCO5

| 1 | MR. DiMASE:  Under number of witnesses in the third
| 2 | line it says government and I think it's been capitalized
| 3 | throughout so I just thought we could capitalize it there as
| 4 | well.
| 5 | THE COURT:  OK.
| 6 | MR. DEVLIN-BROWN:  And on that one we had preferred
| 7 | the instruction we submitted which included some additional
| 8 | language about the fact that a party has called more witnesses
| 9 | should not necessarily be given more weight.  It's in our
| 10 | instructions.  I can repeat it if your Honor wishes or --
| 11 | MR. DiMASE:  Is that different than what's in the
| 12 | first sentence already?
| 13 | MR. DEVLIN-BROWN:  It's on --
| 14 | THE COURT:  I do remember that.  I'm not including all
| 15 | of that.
| 16 | MR. DEVLIN-BROWN:  OK.
| 17 | MR. DiMASE:  I think the word "defendant" in that
| 18 | paragraph should also be capitalized for consistency purposes
| 19 | in the second sentence.
| 20 | THE COURT:  OK.
| 21 | Now I indicated that I would be putting in an
| 22 | instruction on stipulations.  The government also requested
| 23 | instructions on character testimony, summary charts, so I'll
| 24 | include those as well.  It will be very standard language.
| 25 | You'll get it later this evening.

JBI9SCO5

1              Anything else, Mr. Devlin-Brown?

2              MR. DEVLIN-BROWN:  Yes, your Honor.

3              So I'm sorry this is sort of coming now.  But in light

4    of the fact that the Court is going to give a conscious

5    avoidance instruction we would like to propose a good faith

6    instruction which I literally had right here and I can hand up

7    in a moment hopefully.  It's the one from Judge Sand.  We'd

8    also like to propose while we're looking for that a character

9    evidence instruction also from Judge Sand.  I can hand that up.

10             THE COURT:  OK.

11             MR. DEVLIN-BROWN:  And finally a theory of the defense

12   instruction which I understand if either the court or

13   government wants some further time to look at that because

14   we've just completed that.

15             Good faith we're looking for.

16             (Handed up)

17             MR. DiMASE:  Your Honor, just with taking one at a

18   time.  The theory of the defense it looks to me like a

19   summation.  Mr. Devlin-Brown and his colleagues are more than

20   free to make these arguments in the summation, but it's not an

21   appropriate instruction to the jury.

22             MR. DEVLIN-BROWN:  I would disagree with both of those

23   things.  A theory of the defense instruction is not that

24   unusual.  There's a basis for providing it.  It has to be

25   provided, in fact, somewhere within the charge, whether it's a

1   separate instruction or otherwise.  There's really in these

2   sentences -- in each of these paragraphs, one for each count,

3   one sentence as to what the defense theory is and the rest is

4   sort of reminding people how that fit in, in terms of proof

5   beyond a reasonable doubt.  But those are the defense theories

6   with respect to both money laundering and bank fraud.  I

7   suppose we should delete the specific FDIC financial

8   institutions given the Court's prior ruling but we think it's

9   appropriate.

10          The rational, as Mr. Garvin reminds me, is often the

11   government sort of has a theory of the accusation which is the

12   indictment, so really don't see this as a summation.

13          MR. DiMASE:  The indictment is a required charging

14   instrument to initiate a case.  We have no choice in filing

15   that in order to initiate a case.

16          This is just argument dressed up as a jury

17   instruction.  The law is the law and the parties can make

18   arguments based on the law about what the facts show.  I mean

19   that he's raised the defense that he was unaware that the

20   monies invested in the Fenero Funds were proceeds of an

21   unlawful activity because he did not believe at the time that

22   OneCoin was engaged in criminal activity.  Mr. Scott himself

23   hasn't even testified.  And that may be the theory but it seems

24   very inappropriate to put that in black and white in a jury

25   instruction.  It's obviously fair game for argument.

JBI9SCO5

1          THE COURT:  I'm not going to include the

2     theory-of-defense instruction.

3          What about the other two, Mr. DiMase?

4          Character evidence I'm going to put in.  It's just a

5     matter of whether I accept this language or standard language

6     that I've used before.

7          What about good faith?

8          MR. FOLLY:  Your Honor, this particular instruction we

9     would definitely oppose and don't think it's appropriate here.

10     We, having only first seen this right now, if your Honor is

11     inclined to include this would just ask for this evening to

12     write something on this.  But we don't think it's appropriate

13     here as currently written.

14          THE COURT:  I'm giving the conscious avoidance

15     instruction so I would consider including this.  But if you

16     want to put something in, I'm happy to consider it.

17          MR. FOLLY:  Yes.  We'd like at least the evening to do

18     that.

19          THE COURT:  OK.  Very well.  And again as I indicated

20     I'm going to put in something on summary charts and

21     stipulations.

22          Anything else?

23          MR. DiMASE:  Your Honor, just a couple nonsubstantive

24     edits at the end of the charge.  Page 43.

25          THE COURT:  Yep.

1    MR. DiMASE:  Under right to see exhibits and hear

2    testimony.  So we've written here that "documentary but not the

3    physical or audiovisual exhibits will be sent to you in the

4    jury room."  One concern about that is a lot of the bank

5    records are on disks at the moment.  And so I just don't know

6    whether --

7    THE COURT:  Are you going -- by you I mean the

8    government -- will you be providing a laptop computer that can

9    go into the jury room?  I know that's been done in other cases

10   where a computer that doesn't have internet access, they just

11   put in a disk and look at the evidence.

12   MR. DiMASE:  We can do that, your Honor.

13   THE COURT:  OK.

14   MR. DiMASE:  So that may solve the problem.

15   THE COURT:  OK.

16   MR. DiMASE:  The next point is on page 45 at the top.

17   I think the instructions refer to the defendant throughout as

18   the defendant.  I think here at the top of the page it refers

19   to him as Mr. Scott maybe because in another instruction there

20   were multiple people involved.  So we would just propose

21   changing that to "the defendant."

22   THE COURT:  I think he's referred to as Mr. Scott in

23   other places.

24   MR. DiMASE:  OK.  Either way is obviously fine.

25   The second sentence is more concerning.  Not

JBI9SCO5

1    concerning but I think it can be changed because it says "with

2    regard to a particular defendant."  We only have one defendant

3    here so I think that can be removed.

4            THE COURT:  So "with regard to a particular defendant"

5    comes out.

6            MR. DiMASE:  And I think either way we need to change

7    "are" to "is" after Mr. Scott there.

8            THE COURT:  Right.

9            MR. DiMASE:  And the only other note I had, and this

10   is not really something that would need to be covered in these

11   instructions, but I think it would be appropriate to the extent

12   that the jury is deliberating overnight into a next day to give

13   the same instructions about research online, social media posts

14   and things of that nature to the deliberating jurors, but we

15   can deal with that at a later time.

16           THE COURT:  OK.  I think that does it.  So I will turn

17   this around and get it to you later this evening.  It looks

18   like we'll have tomorrow afternoon at least if there's any

19   further discussions that need to take place.  And summations

20   beginning as early as Wednesday, correct?

21           MR. DEVLIN-BROWN:  That's fine, your Honor.

22           MR. FOLLY:  Your Honor, just one more point with

23   respect to the jury instructions.  The government would request

24   that they are read before the closings.  Our understanding is

25   the defendant would like them read after the closings.

1        One point on timing, as we may also be in a situation,

2   depending on how things unfold, where we're looking to fill

3   time and it seems like one way of doing that before starting

4   the closings would be to read the instructions.

5        THE COURT:  Well the instructions right now they are

6   48 pages.  You figure two minutes per page.  So that's going to

7   be like an hour-and-a-half or maybe a little bit more, so it's

8   a chunk of time.

9        Mr. Devlin-Brown.

10       MR. DEVLIN-BROWN:  Your Honor's proposal was

11   intriguing in theory.  In practice I think we would really

12   prefer the instructions to be read after the rebuttal as it's

13   done in most cases.

14       THE COURT:  If there is no agreement then I just

15   revert to the traditional method so I'll do it after.

16       MR. DEVLIN-BROWN:  One other point of clarification.

17   On the verdict form did your Honor say you were going to submit

18   a verdict form?

19       THE COURT:  No.  I asked you guys to submit.  I got

20   one from the government.  It's very straightforward.  Just how

21   do you find on Count One?  Guilty or not guilty?  How do you

22   find on Count Two?  Guilty or not guilty?  It seems to me to be

23   fine.

24       MR. DEVLIN-BROWN:  With respect to the money

25   laundering conspiracy in particular where your Honor instructs

1    that the jury needs to be unanimous as to which of the two

2    money laundering theories, we would request that the jury have

3    to identify which of the two.  And I think while that may not

4    be as required for the bank fraud theories I think that would

5    be our preference.

6         In terms of not guilty, guilty.  We would like not

7    guilty first but that's obviously -- maybe you'll be one of the

8    judges that flips it around but maybe you don't.

9         THE COURT:  Unlikely.

10        MR. FOLLY:  Your Honor, we don't think that the

11   specific objects need to be listed on the verdict sheet.  It's

12   clear on the instructions what's required of the jury and we

13   don't believe that's needed as to the verdict sheet itself.

14        THE COURT:  OK.

15        Mr. Devlin-Brown, if you want to submit something I'm

16   happy to consider it but I am inclined to go with the

17   government's submission.  OK.

18        MR. DEVLIN-BROWN:  Yes.  The only other thing I just

19   raise for tomorrow is we're now going to look obviously at

20   everything that's been admitted into the case.  We're probably

21   going to want to admit some defense exhibits that haven't been.

22   There's some we proposed a few times and the government wants

23   to look at them more.  And there's some others that we'll try

24   to raise and get some consensus on overnight but I think that

25   will have to be one of the activities probably tomorrow as well

JBI9SCO5

1    is going through disputes on any defense exhibits.

2            MR. DiMASE:  Just to be clear I believe the

3    outstanding issues are the two Courtneidge exhibits?

4            THE COURT:  The two what?

5            MR. DiMASE:  Robert Courtneidge e-mails that have not

6    yet been admitted but have been offered.

7            And then the objection regarding the Colm O'Driscoll

8    statements about what Mark Scott said.  Is there anything else

9    that I'm not --

10           MR. DEVLIN-BROWN:  Not that I can think of at the

11   moment but we'll let you know.

12           THE COURT:  OK.

13           MR. DiMASE:  And the only other issue we wanted to

14   discuss was timing.  Could you just give us one moment to speak

15   to counsel?

16           THE COURT:  Sure.  Here is your letter back.  Or your

17   copy.

18           (Counsel confer)

19           MR. DiMASE:  Judge we were just conferring about

20   tomorrow's schedule.  So we have the remainder of Ms. October's

21   direct.  We have a short, a relatively short agent who is going

22   to testify about the defendant's postarrest statement.  And we

23   may have a couple of exhibits to publish but we certainly don't

24   anticipate this going through the day.  We are very likely to

25   rest in the morning, unless there's a very long cross of

JBI9SCO5

1   Ms. October we're not anticipating.  It sounds like there might

2   only be two defense witnesses who could be very short character

3   witnesses.  So there is a possibility I think that we could be

4   finished with both the government's case and defense case

5   before 2:30.  And we were just looking to the court for

6   guidance.  It's our preference I think to have a set time for

7   closings where all three will happen in a row on the same day

8   and to just do that on Wednesday if the Court is open to that

9   idea even if it means potentially ending at 1:30 tomorrow.  I

10  just don't know how long things will go.

11          THE COURT:  The way you people have been trying the

12  case I don't think there's going to be any problem getting

13  through most of the day without both sides resting.

14          I'm happy to work with you if it turns out that things

15  do finish up a lot earlier.  We'll start with summations,

16  hopefully, Wednesday morning.

17          And I think I indicated at the outset that I don't put

18  time limits on lawyers for arguments.  But I think you should

19  consider limiting yourselves -- the opening summation and the

20  defense summation should not be more than I would say an hour

21  and fifteen, an hour and twenty minutes.  And I say that if you

22  want this jury to have ample time to deliberate and have a

23  verdict by Friday.  I think that's a possibility.  You don't

24  unhappy jurors.  And if they're not done by Friday, then

25  they're into the holiday week and might not be so happy.  It is

JBI9SCO5

1      what it is.  But I would consider that in how you draft the

2      length of your summations.  OK.

3              MR. DEVLIN-BROWN:  We'll do our best, your Honor.  We

4      may shorten summation to some degree tomorrow, depending on

5      timing of everything else, by publishing some exhibits with or

6      without a witness, just reading some key exhibits, because I

7      think we haven't obviously put on a case and therefore haven't

8      sort of done that through the trial but if we could do it

9      before summations, summations will be short.

10             THE COURT:  OK.  That's fine.  So have a good night

11     and we'll get you something this evening.  Probably not at

12     midnight.

13             (Adjourned to November 19, 2019 at 9 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                     INDEX OF EXAMINATION
 2   Examination of:                          Page
 3   DAVID WILDNER
 4   Direct By Mr. DiMase . . . . . . . . . . .1470
 5   Cross By Mr. Garvin  . . . . . . . . . . .1481
 6   Redirect By Mr. DiMase . . . . . . . . . .1493
 7   Recross By Mr. Garvin  . . . . . . . . . .1496
 8    JACOB PECHET
 9   Direct By Mr. DiMase . . . . . . . . . . .1499
10   Cross By Mr. Devlin-Brown  . . . . . . . .1523
11   ROSALIND OCTOBER
12   Direct By Ms. Lozano . . . . . . . . . . .1542
13    MIGUEL DIAZ de la PORTILLA
14   Direct By Mr. Garvin . . . . . . . . . . .1586
15   Cross By Mr. DiMase  . . . . . . . . . . .1597
16   Redirect By Mr. Garvin . . . . . . . . . .1608
17                     GOVERNMENT EXHIBITS
18   Exhibit No.                          Received
19    1742    . . . . . . . . . . . . . . . . .1461
20    4101    . . . . . . . . . . . . . . . . .1474
21    54, 1900    . . . . . . . . . . . . . . .1498
22    53, 1700    . . . . . . . . . . . . . . .1499
23    1713, 1728, 1730, 1742 through 1744  . . .1500
24    1750, 1752, 1754, 1775, 1781    . . . . . .1500
25    1786, 1799, 1804, 1816 through 1818  . . . .1500
```

```
 1   4111    . . . . . . . . . . . . . . . . .1505

 2   1701A through B, 1702A through B    . . . .1517

 3   1703A through C, 1704A through B    . . . .1517

 4   1705A through B   . . . . . . . . . . . . .1518

 5   52, 701, 702, 708, 710, 712, 716, 714,  . . .1540

 6            718, 720, 721, 723, 728, 730,

 7            731, 801, 806, 807, 809, 811,

 8            812, 816, 817, 819, 820, 821,

 9            and 822

10   68, 713, 828 . . . . . . . . . . . . . . .1541

11   58 and 3100   . . . . . . . . . . . . . . .1541

12   60, 105, 106, 107, 108, 113, 114, and . . . .1542

13            115

14   55, 1356, 1440 and 1453   . . . . . . . . .1542

15   2601, 2602, 2602A, 2603, 2603A, 2604, . . . .1555

16            2605, 2606, 2607, 2608, 2609,

17            2610, 2611, 2612, signed2613,

18            2614, 2615, 2616, 2617A, B, D

19            and E, 2618, 2619, A, B, C, D,

20            E and F, 2620, 2621, 2622,

21            2623, 2626, 2627 and 2628

22   2627-BU   . . . . . . . . . . . . . . . . .1562

23   2620-BU   . . . . . . . . . . . . . . . . .1620

24

25
```

```
 1                          DEFENDANT EXHIBITS

 2     Exhibit No.                                     Received

 3       256    . . . . . . . . . . . . . . . . . .1529

 4       239    . . . . . . . . . . . . . . . . . .1531

 5       258    . . . . . . . . . . . . . . . . . .1532

 6       621    . . . . . . . . . . . . . . . . . .1532

 7       705    . . . . . . . . . . . . . . . . . .1533

 8       132    . . . . . . . . . . . . . . . . . .1593

 9       133    . . . . . . . . . . . . . . . . . .1596

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```