1673

JBJ3SCO1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                              17 CR 630 (ER)

5    MARK S. SCOTT,

6                   Defendant.

7    ------------------------------x

8                                             New York, N.Y.
                                              November 19, 2019
9                                             9:00 a.m.

10   Before:

11                    HON. EDGARDO RAMOS,

12                                         District Judge

13
                         APPEARANCES
14

15   GEOFFREY S. BERMAN,
          United States Attorney for the
16        Southern District of New York
     CHRISTOPHER DiMASE
17   NICHOLAS FOLLY
     JULIETA V. LOZANO
18        Assistant United States Attorneys

19   COVINGTON & BURLING LLP
          Attorneys for Defendant
20   BY:  ARLO DEVLIN-BROWN
          KATRI STANLEY
21        -AND-
     DAVID M. GARVIN

22

23

24

25

JBJ3SCO1

1          (In open court; jury not present)

2          THE COURT:  Good morning, folks.  What do we have to

3     do this morning?  I got the three letters last night.  One from

4     the government on the issue of the good faith instruction, and

5     two from the defense on the Ruja Ignatova e-mail and the Apex

6     SEC investigation.

7          So let's take the good faith instruction first,

8     Mr. Devlin-Brown or Mr. Garvin.

9          MR. DEVLIN-BROWN:  Well, your Honor, I appreciated the

10    position of the Court last night that if it was inclined to

11    give a conscious avoidance instruction, it would offer a good

12    faith instruction.  I think the government's right that if

13    there's some language in the conscious avoidance instruction,

14    perhaps your Honor is not required to give it.  But I think it

15    would still be nice to give it and appropriate to give it.

16         I think the conscious avoidance instruction walks up

17    to a line that the Second Circuit has affirmed, but it walks up

18    to a line saying recklessness or something, and I think good

19    faith at least pushes that back a little and gives the defense

20    a way to sort of tell the jury, yeah, you are going to hear

21    about conscious avoidance, but you're also going to hear about

22    good faith.  So we'd request it.

23         MR. FOLLY:  Your Honor, I think two main points on

24    this.  The first, as we set forth in our letter, is that the

25    current instructions fully embody this very concept that is in

JBJ3SCO1

good faith.  It is simply articulating the requisite knowledge

and intent that is required to commit the crimes while adding

the words "good faith," and we think that's covered throughout

your Honor's current instructions.

         The other point is that the government would submit

that a standalone good faith instruction in this case is

actually a little bit confusing for the following reason:  The

key issue with respect to the money laundering charge is

whether or not the defendant knew that this money came from

some sort of unlawful activity.  And defense opened on that,

it's been clear throughout the trial that that is the primary

argument.  If the defendant knew that the money came from

unlawful activity, good faith has nothing to do with that.

It's either he knew or he didn't know.  And a standalone

instruction would just add confusion to what is currently a

very, very clear charge as to the relevant legal issues before

the jury.

         MR. DEVLIN-BROWN:  I would just respond to that, that

I think the good faith instruction is quite intelligible in the

context of this charge.  I think it would clearly mean good

faith belief that the money he was handling did not come from

criminal proceeds.  So again, I think it's preferrable to give

it as a separate instruction, it is a little bit more clear in

the separate instructions, it's right from Sands, it's given

routinely.  I don't really see why there is that much objection

JBJ3SCO1

1   to it.

2              THE COURT:  I think it's two sides of the same coin so

3   I'll leave it in.  With respect to the exhibits,

4   Mr. Devlin-Brown.

5              MR. DEVLIN-BROWN:  Well --

6              MR. FOLLY:  Before we close the loop on this last

7   point.  We might propose, if we are going to have a standalone

8   instruction, that there something that ties it back to

9   knowledge and intent.  In other words, something that says if,

10  however, you find that the defendant acted knowingly and with

11  the requisite intent that I have described, you cannot find

12  that he acted in good faith.

13             MR. DEVLIN-BROWN:  I mean, I think that's probably in

14  the charge many, many times.  I don't know that we need to

15  repeat it again here.

16             MR. FOLLY:  The only reason to repeat it is, again,

17  this issue of having a standalone charge that's not connected

18  directly to what it is relevant to, which is knowledge and

19  intent.  And we think making it clear that if the jury finds

20  that the defendant acted knowingly and with the requisite

21  intent, that the jury cannot find that he acted in good faith.

22             THE COURT:  I am going to leave it as is.

23             Exhibits.

24             MR. DEVLIN-BROWN:  So, yes, I'm happy to report that

25  my 3 a.m. letter at least or 2 a.m. had some impact on the

JBJ3SCO1

1    government who I believe is going to offer Defense Exhibit 103

2    as their own exhibit in their case.

3              THE COURT:  You wore them down.

4              MR. DEVLIN-BROWN:  You know, small things sometimes in

5    the morning help.

6              With respect to the other exhibit, the Apex orders, I

7    think the preferrable thing would have been able to establish a

8    stronger foundation through the witness on the stand.  But

9    reading through it afterwards, it really does seem that, and

10   again we had no 3500 on this.  But it really did seem to us,

11   based on Ms. Lozano's disclosures at the sidebar, that he had

12   read press about it.  And there was a reference to his policies

13   and practices may have changed.  I don't think that was

14   consistent with what he said on the stand.  I think he made

15   clear what triggered this was a loan coming in.  I think we

16   should have pursued it.

17             MS. LOZANO:  First of all, there is absolutely no

18   record in the settlement documents, in the testimony, in any of

19   the Apex documents that we have turned over to defense that the

20   Apex New York settlement had anything to do with any decision

21   made in Apex U.K.  And in fact, the reference to Mr. Spendiff

22   being aware of this settlement and knew that policies and

23   procedures had changed was qualified, and the government

24   informed defense about this, that Mr. Spendiff doesn't know

25   whether he knew that back in 2016.  He doesn't know, he doesn't

JBJ3SCO1

1    remember whether that was something that he knew then, or he

2    has learned since.  So there's absolutely nothing in the record

3    to tie together this unrelated settlement in the United States

4    that, by the way, there's also no suggestion that the -- what

5    the policy and procedure changes were that were prompted by

6    this settlement, and whether they would have had any impact in

7    the U.K., which is under a different regulatory regime.

8            Mr. Spendiff was very clear about the reasons that he

9    did pursue enhanced due diligence.  And it's inappropriate at

10   this time, since he is not here, to attempt to impeach him with

11   something that there's absolutely no factual record that he

12   even knew about at that point in time.  So that would be asking

13   the jury to speculate that some unrelated U.S. based settlement

14   had an impact.

15           And lastly, the suggestion that there was some

16   relationship between the U.K. and the U.S. office misapprehends

17   what the government's position was, which was there was no

18   substantial relationship related to these issues.  No

19   management relationship, no supervisory relationship.  Of

20   course they had a referral relationship, just like Apex U.K.

21   had with many other third-party service providers.  People

22   would refer them cases, they would refer cases to other people,

23   and there would be a fee splitting.

24           So, the government strongly objects to the admission

25   of these exhibits, because they would ask the jury to

JBJ3SCO1

1   speculate, and they are totally untethered to any facts in this

2   case.

3          THE COURT:  I'm not going to let them in.  I indicated

4   initially that I thought it was attenuated.  I still think it

5   is attenuated, and quite frankly, I am a little mystified about

6   the defense theory about these documents.  It seems to me that

7   Apex was told, at least with respect to two clients, and I

8   don't know how many clients Apex has, it's probably thousands,

9   that it was sloppy.  And if the theory is that, well, then they

10  cleared up their act, and guess what?  They came across

11  Mr. Scott.  I don't know how that helps you.  In terms of them

12  being sloppy and allowing things that they should not have

13  allowed to go on go on.  In any event, that's just my view of

14  the defense theory.

15         But I do think they are very far removed from the

16  facts of this case, and there are any number of questions that

17  I would have about the particulars of the other two cases

18  before it could conceivably come in.  That would create a

19  problem that we do not need, so these exhibits will not come

20  in.

21         MR. GARVIN:  Good morning, your Honor.  Your Honor, I

22  anticipate some time this morning that the defense will likely

23  move into evidence Defendant's Exhibits 158, 159, 160, and

24  Defense Exhibit 701.  Those are four tax returns for the period

25  of time 2015, '16, '17, and 2018.  I don't anticipate there the

JBJ3SCO1

1    is any objection to the 1040 tax returns of Mark Scott.  But we

2    will also be asking to introduce into evidence Mark Scott's

3    FBARs he filed for '16, '17 and '18.  Those are Exhibits 162,

4    163 and 164.  I also don't anticipate an objection.

5              But I do expect an objection when we attempt to

6    introduce the FBARs of David Pike for those same three years.

7    The issue is that Mr. Pike and Mr. Scott were allegedly

8    co-conspirators in this endeavor, and part of what we would

9    like to show is that the MSSI International bank accounts were

10   not kept a secret from the government.  And that either

11   Mr. Scott or Mr. Pike or the two of them reported those

12   accounts to the government, and we think that is relevant to

13   our defense that they were doing things in a transparent

14   fashion and doing things in the normal way that entities

15   function that are doing things properly.

16             I've already been advised by counsel that there is an

17   issue with the David Pike FBAR, because David Pike has not

18   testified, and therefore, how is that particular document

19   getting in.  Authenticity is not an issue.  The documents

20   actually came from the government to us.  So, to try to avoid

21   arguing this before the jury, I thought I should bring it up

22   now and let it be aired out.

23             THE COURT:  So, Mr. DiMase, there is no issue with

24   respect to Mr. Scott's FBARs and tax returns.

25             MR. DiMASE:  The 2018 tax return is not from the IRS;

JBJ3SCO1

it's from the accountant.  So, it may or may not represent the

final filed version, we'd like to take a look at that one.  But

otherwise we don't expect to have any objections to the tax

returns or the FBARs filed by Mr. Scott.

          We don't dispute the authenticity of the Pike FBARs.

They in fact were provided by the government to the defense so

the issue isn't whether they are authentic filings.

          The issue is whether Mr. Scott knew that Mr. Pike was

reporting that information.  They're filed by Mr. Pike.  To the

extent they are signed, they're signed by Mr. Pike.

Mr. Scott's name does not appear on them anywhere.  I don't

know what the evidence will be to connect it back to

Mr. Scott's state of mind.

          THE COURT:  Mr. Garvin?

          MR. GARVIN:  Your Honor, I think that it goes back to

they both used the same accountant and they are supposed to be

co-conspirators that are supposedly laundering money secretly.

And that it is abundantly clear that the bank accounts are

being listed by the alleged co-conspirators and filed with the

United States government.  The data is being supplied to the

same accountant, whether it's on Mr. Pike's return or

Mr. Scott's return.  So I think that the relevance issue

abundantly clear.

          THE COURT:  Theoretically, but the logical leap that

Mr. Scott knew what Mr. Pike was putting in his tax returns is

JBJ3SCO1

1    one that I am not prepared to make or ask this jury to make.

2    So Mr. Pike's tax returns will not come in or FBARs will not

3    come in.

4              MR. DiMASE:  Obviously, if they can provide a witness

5    that can indicate that Mr. Scott was aware, that would change

6    the landscape.

7              THE COURT:  Sure.

8              MR. GARVIN:  That was Mr. Pike's FBARs.  The tax

9    return for 2018 is numbered 701.

10             MR. DiMASE:  We'll take a look at.

11             It.  A couple of other quick issues, your Honor.  With

12   respect to Government Exhibit 533, could you pull that up,

13   Mr. Barile.

14             THE COURT:  I will need a copy of the clean indictment

15   from the government.

16             MR. DiMASE:  Yes, your Honor.  We'll take care of

17   that.  Sorry we didn't get that to you last night.

18             Your Honor, this is an e-mail that was the subject of

19   testimony from Mr. Wildner.  If you could go down to page two.

20   The third paragraph in the e-mail at the bottom of the page

21   starting with "Colm O'Driscoll has spoken with Mark Scott."

22             THE COURT:  Yes.

23             MR. DiMASE:  So, it is our position that the portion

24   of that sentence where it says "confirmed that the relationship

25   with IMS was a one-off transaction."  That that's not being

1    offered for the truth and it's not hearsay.  However, it does

2    appear that the statement Colm O'Driscoll has spoken with Mark

3    Scott and indicates this is what Mr. Scott reported, that would

4    constitute hearsay if offered for the truth.

5           So there's multiple layers here.  There's Mr. Scott's

6    statement, purported statement to Mr. O'Driscoll, which is not

7    true, it is not being offered for the truth, but then there is

8    the encompassing statement that Mr. O'Driscoll spoke to

9    Mr. Scott and Mr. Scott provided this information.

10          THE COURT:  So what do you want to do?

11          MR. DiMASE:  So we're not opposed to a limiting

12   instruction on that part of this e-mail, that the government is

13   not offering it for its truth but rather its effect on the

14   listener, i.e. the effect on BNY Mellon in their process of

15   deciding how to handle this compliance inquiry.

16          THE COURT:  What word exactly?

17          MR. DiMASE:  I think the Court can instruct the jury

18   that this should not be considered for its truth, or is not

19   being offered for its truth but only its effect --

20          THE COURT:  Just the entire exhibit?

21          MR. DiMASE:  I think it is really this particular

22   paragraph.  I mean, I defer --

23          MR. DEVLIN-BROWN:  I think given that the jury

24   probably won't understand the multiple levels of hearsay sort

25   of issue.  I think just something as simple as this is offered

JBJ3SCO1

1    to show the effect on Bank of New York Mellon, you shouldn't

2    take it for the truth of what Mr. Scott said to Mr. O'Driscoll

3    or what Mr. O'Driscoll said to Mr. Scott about the matter.

4              MR. DiMASE:  I think a simpler instruction, this is

5    not being offered for the truth, but it is being offered for

6    its effect on the listener is appropriate.

7              THE COURT:  Do you propose to bring this exhibit up

8    for the jury?

9              MR. DiMASE:  I think we should, otherwise I don't

10   think the jury will understand what the Court is referring to.

11             THE COURT:  I'm happy to do that.  Anything else?  Is

12   Ms. October here?

13             MR. DiMASE:  Yes.

14             Judge, there were a number of exhibits that were not

15   admitted yesterday or within the last couple of days which we

16   intended to admit.  The transcript does not reflect the

17   admission of those exhibits.  I think Mr. Folly has a similar

18   issue.  So, I'll let him speak while I'm looking for the

19   document.

20             THE COURT:  Okay.

21             MR. FOLLY:  Yes, your Honor.  It is a slightly

22   different issue.  We admitted, when we put the timeline which

23   was 2701 into evidence, all of the exhibits listed on it.  So

24   that the record is clear as to what was admitted, we'd like to

25   provide that list to the court reporter so that it accurately

JBJ3SCO1

1    reflects what came in.

2              THE COURT:  Can you show that to the defense.

3              MR. FOLLY:  We provided this to the defense last week.

4    We have not heard any objections, so we'd like it on the record

5    at this point.

6              THE COURT:  Very well.

7              MR. DEVLIN-BROWN:  Did you give an updated list last

8    night or maybe it was the same list?

9              MR. FOLLY:  As to the timeline, no changes there.

10             MR. DEVLIN-BROWN:  We agree those are in.

11             MR. DiMASE:  Just for the record, your Honor, the

12   exhibit issue, the transcript reflects that Exhibits 506 and

13   513, and Exhibits 517 and 537 are in evidence.  What I meant to

14   offer was 506 through 513, and 517 through 537.  So I would

15   offer those exhibits now.  They were shown to the witnesses at

16   the time.  I had an understanding that they were admitted into

17   evidence.  I don't think there is any objection.  These are the

18   BNY Mellon records.

19             THE COURT:  Any objection?

20             MR. DEVLIN-BROWN:  I don't think so.  But they're all

21   straight bank records?

22             MR. DiMASE:  These are the various e-mails and other

23   records admitted through the Bank of New York Mellon witness.

24             MR. DEVLIN-BROWN:  I don't think so, but maybe we can

25   just quickly take a look.

1686

JBJ3SCO1

1          THE COURT:  It's 9:30.  Why don't you guys do that

2     later.

3          MR. DiMASE:  That's fine.

4          THE COURT:  Let's get Ms. October in here.

5          (Continued on next page)

1          (Jury present)

2          THE COURT:  Good morning, ladies and gentlemen.  Thank

3    you as always for being so prompt.  We will now continue with

4    the direct examination of Ms. October.

5          Ms. October, you are reminded that you are still under

6    oath.  Ms. Lozano.

7          MS. LOZANO:  Thank you, your Honor.  At this time the

8    government offers pursuant to the stipulation GX 55, an e-mail

9    which is marked Government Exhibit 1441.  We're offering it.

10   I'm not publishing to the jury yet.

11         THE COURT:  Very well.  It will be received.

12         (Government's Exhibit 1441 received in evidence)

13         THE COURT:  Is it GX 55?

14         MS. LOZANO:  The stipulation, the electronic evidence

15   stipulation is GX 55.  This exhibit, e-mail is GX 1441.

16         THE COURT:  Very well.

17    ROSALIND OCTOBER,

18        called as a witness by the Government,

19        having been previously sworn, testified as follows:

20   DIRECT EXAMINATION (Continued)

21   BY MS. LOZANO:

22   Q.  Good morning, Ms. October.

23   A.  Good morning.

24   Q.  When we broke yesterday, you were speaking about your

25   analysis of bank records and reflections of loans and whether

1    there were reflections of loan repayments.  So, I want to ask,

2    I want to go back and ask you, did your review of the bank

3    records in this case reveal that certain payments were

4    represented as loan payments?

5    A.  Yes.

6    Q.  And you mentioned yesterday that your review of DMS records

7    reflected payments to Fenero from DMS that indicated they were

8    repayments of a loan?

9    A.  Correct.

10   Q.  Aside from those references in DMS records, did you see any

11   evidence in any other bank records of any repayments of any

12   reported loans?

13   A.  No, I did not.

14   Q.  I'd like to move on now to a different subject.  Well, same

15   subject.  Different part of it.

16          Your financial analysis of the Fenero Funds, did it

17   also involve review of transactions that went through Locke

18   Lord and escrow accounts held by Locke Lord?

19   A.  Yes, it did.

20   Q.  What is Locke Lord?

21   A.  Locke Lord is an international law firm, one of which,

22   where Mr. Scott was employed.

23          MS. LOZANO:  Mr. Barile, can we pull up and also

24   publish to the jury GX 2621.

25   Q.  Ms. October, please describe what this chart represents of

1    your financial analysis.

2    A.   This chart represents certain flows of money originating

3    from a RavenR account held in the United Emirates.   RavenR I

4    understand to be a OneCoin affiliated company.   And this four

5    transfers that occurred in September 2015.

6    Q.   Let me stop you right there.   When you use the term OneCoin

7    affiliated with RavenR, can you be more specific?   With whom is

8    it, your understanding with whom is it connected?

9    A.   Connected to Ruja Ignatova.

10   Q.   Okay.   Continue.

11   A.   So, moving from left to right, there is approximately $85

12   million with these four transfers that occurred in September

13   through October, going into a Zala Group account held at

14   Comerica.   Zala Group is owned by Gilbert Armenta.

15   Q.   Was he the signature on that account?

16   A.   Yes, he was.   And then after the money was deposited into

17   the Comerica account, held in Zala's name, it was then

18   subsequently transferred into two split payments to a Regions

19   Bank also held in the name of Zala Group which Gilbert Armenta

20   is the signatory for.   And those transfers happened in October

21   for 9,500,000 on October 21, and $4,445,051.75 the following

22   day, October 22 to the Regions account ending in 9143.

23   Q.   So let me just stop you right there.   There are two

24   different Regions bank accounts in the name of Zala Group, one

25   ending 9143, one ending 9135; is that right?

JBJ3SCO1                     October - Direct

1   A.  That is correct.

2   Q.  On the same day, October 21, 2015, the Comerica Zala Group

3   account sent the same amount to each those accounts?

4   A.  Right.  To each account.

5   Q.  The 9.5 million?

6   A.  The 9.5 million and the 4,445,000.

7   Q.  The next day?

8   A.  The next day.

9   Q.  That Comerica account sent the same amount, one to each of

10  the Zala accounts held at Regions?

11  A.  That is correct.

12  Q.  After that money was transferred to the two Regions bank

13  accounts, the 9143 and the 9135, where did you trace the money?

14  A.  After the Regions transfers, the money was transferred in

15  two payments to a Locke Lord account held at JPMC ending in

16  3546.

17  Q.  What date was that?

18  A.  So that occurred on February 2, 2016.

19  Q.  Approximately how much was transferred between those two

20  accounts?

21  A.  Approximately $5 million.

22  Q.  All right.  Then after that approximately $5 million hits

23  the Locke Lord JPMC account, what happened?  What do you find

24  with your tracing?

25  A.  Once the transfer was received into the JPMC account ending

1   in 3546, it was then subsequently transferred to a Northern

2   Trust account ending 8222 held in the name of Edwards Wildman

3   Palmer, which is also known as Locke Lord.  And that transfer

4   occurred on February 5, 2016 in the amount of $5,116,458.

5   Q.  And then what happens to that money after approximately two

6   weeks after?

7   A.  Approximately two weeks after, on February 18, 2016, the

8   same amount, $5,116,458 is transferred to a Zala Group account

9   held in the United Emirates, ending in 8004.

10  Q.  Do you know who the signatory of that account is?

11  A.  I believe it's Gilbert Armenta.

12  Q.  To be clear, the transfer from the Locke Lord JPMC to the

13  Northern Trust account is exactly to the penny the same amount

14  as the Northern Trust transfer to the Zala Group Emirates

15  account?

16  A.  It is exact.

17  Q.  One question.  There is a notation on this chart on upper

18  right hand corner that says N/K/A.  What does what mean?

19  A.  That's just shorthand for now known as Locke Lord LLP.

20          MS. LOZANO:  Mr. Barile, can we now publish 2614.

21  Q.  Ms. October, can you walk us through this chart, please,

22  and explain what it depicts.

23  A.  This chart depicts attempted and also successful transfers

24  of approximately 33.4 million euros.  So the transfers started

25  with an attempt at an account held at Kreissparkasse Steinfurt

1    in the name of IMS in Germany.  Ending in 6108.

2    Q.  Do you know who the signatory on that account is?

3    A.  I'm not sure.

4    Q.  Okay.  Walk us through what happens on March 31.

5    A.  On March 31 there was a 33.4 million euro transfer,

6    attempted transfer, notated by the dotted line to a Locke Lord

7    account held in the United Kingdom escrow account.  The

8    following day, the same amount, 33.4 million euros, was

9    transferred back to the IMS Kreissparkasse Steinfurt account

10   held -- IMS account ending in 6108.

11   Q.  Then after that, on April 5, 2016, what happens from the

12   Kreissparkasse Steinfurt account 6108?

13   A.  So on the same day of April 5, 2016, there were four

14   separate transfers, three separate 9 million euro transfers,

15   and one transfer for 6.4 million euros that was transferred to

16   another IMS account held at United Overseas Bank ending in

17   6682.

18   Q.  Do you know why -- first of all, what is that total for

19   April 5?

20   A.  That totals 33.4 million dollars -- euros.

21   Q.  And do you know why the 33.4 million dollars was not

22   transferred all in one transfer and it was broken up into four?

23   A.  I do not know the reason for that.

24   Q.  So, where does it go?

25   A.  Once it is received into the 6682 IMS account, it is then

1    transferred to the DMS Cayman bank ending in 6102 held in the

2    name of Fenero Equity Investments LP, and those transfers

3    happen in $5 million increments, 5 million euro increments,

4    starting from May 30, 2016 to June 7, 2016.

5    Q.  For a total of what?

6    A.  For a total of 35 million euros.

7    Q.  And the United Overseas Bank 6682, when it received the

8    33.4 million euros, how long had that account been opened?

9    A.  That account had only been opened for two months.

10   Q.  The 6682 United Overseas bank account, is that one of the

11   accounts that you identified as one of the original nine

12   accounts that funded the four Fenero Cayman accounts?

13   A.  That is correct, yes.

14   Q.  Do you know who the signatory for the IMS PTE at United

15   Overseas Bank is?

16   A.  Yes, I do.

17   Q.  Who is that?

18   A.  The account opening records reflect that it's held by Manon

19   Hubenthal and Frank Ricketts.

20           MS. LOZANO:  I think we can move on now, Mr. Barile.

21   We can take that down.

22   Q.  Ms. October, you mentioned yesterday that you also analyzed

23   part of your financial tracing in this case bank records

24   related to two individuals who invested in OneCoin.  What were

25   the names of those individuals?

1    A.  Linda Cohen and William Horn.

2              MS. LOZANO:  Mr. Barile, can we pull up GX 2626,

3    please.

4              Ms. Rivera, would be possible to erase the blue that's

5    on my screen?  Thank you.

6    Q.  Ms. October, what does this chart reflect?

7    A.  This chart reflects some transfers that I reviewed

8    concerning Linda Cohen which were transferred to Secure Point

9    360, and subsequently ended up in the accounts of IMS.

10   Q.  So walk us through.  She -- you traced how much money?

11   A.  $22,577.29.

12   Q.  Where did that money first come from?  Where did it

13   originate?

14   A.  So the records reflect that Linda Cohen has an account at

15   HSBC ending in 664, and then on February 17, 2016, she

16   transferred the $22,577.29 to a TD Bank account ending in 7544

17   in the name of Secure Point 360.

18   Q.  The HSBC bank account, do you know where that was held?

19   A.  That's a New York account, Manhattan account.

20   Q.  Manhattan?

21   A.  Yes.

22   Q.  Once the money, the 22,000 and change hit the Secure Point

23   360 TD account, where did you see it go?

24   A.  So, my analysis reflects that Secure Point maintains an

25   account with Bannockburn Global Forex, which is now known as

1    First Financial Bank.  When I reviewed the First Financial Bank

2    records, there is a Forex exchange.

3    Q.   A what exchange?

4    A.   A Forex exchange.

5    Q.   What is a Forex exchange?

6    A.   That's just a currency place that does currency conversions

7    for its customers and clients.

8    Q.   Okay.  It receives money in one currency and exchanges it

9    and sends it out in a different --

10   A.   Correct.  So, first my review of the First Financial

11   records shows that there were transfers to IMS account ending

12   in 6108, as well as transfers to IMS account ending in 6682.

13   So, my tracing showed that Mrs. Cohen's funds ended up in the

14   IMS bank accounts.

15   Q.   And that 6682 account, the IMS account, that's the one we

16   just saw in a previous chart was opened in February of 2016?

17   A.   Correct.

18   Q.   This same month?

19   A.   Correct.

20   Q.   Let's now turn, we can take this slide down.  Let's now

21   turn to where the money went after it was transferred to the

22   intermediary accounts.  Did you trace any of the funds that

23   flowed through the defendant's Fenero fund accounts to

24   purchases made by Mr. Scott?

25   A.   Yes, I have.

JBJ3SCO1                          October - Direct

1    Q.   Generally speaking, what kind of purchases?

2    A.   So, there were purchases for real estate property, there

3    were purchases for a number of watches, time piece collections,

4    there were purchases for vehicles, inclusive of Ferraris and

5    Porsches, as well as a yacht.

6    Q.   Let's talk about the real estate.  How many property

7    purchases did you trace to funds originating from the nine

8    original funding accounts that sent money to the Fenero Funds,

9    the IMS, Star Merchant, B&N and Fates accounts?

10   A.   So, there were a total of five properties that benefited

11   from those funds.  Three of the properties went through

12   successfully.  There was one property that was an attempted

13   purchase, and then there was a condo where a mortgage was paid

14   off in connection to that property.

15   Q.   What did your tracing process for property purchases

16   entail?

17   A.   It entailed first reviewing the bank records, and tracing

18   the source of funds.  And it also entailed reviewing some

19   search warrant photos and it also entailed looking through

20   various property records.

21   Q.   When you say property records, describe what records you're

22   talking about.  Who keeps these records?

23   A.   Properties that -- property records that are public records

24   usually held by the county clerk or where the property is

25   domiciled, where the property is located, there is public

1    records for those properties that consists of deeds and

2    mortgages and title records and also records with who the

3    owners of the properties are registered into.

4               MS. LOZANO:  Mr. Barile, please pull up and publish to

5    the jury GX 2617-A.

6    Q.   Ms. October, please explain what this chart depicts.

7    A.   This chart illustrates a home located at 133 Sunset Lane in

8    Barnstable, Massachusetts, in the Cape Cod area.

9    Q.   Who owns that home?

10   A.   That is owned by Mark Scott.  And it was purchased on

11   October 24, 2016 for $2,850,000.  My tracing entailed that

12   these funds derived from the one of the intermediary accounts,

13   the DMS Cayman MSSI International Consultant, which sent a

14   transfer on September 6, 2016, of $529,750 to another MSS

15   International Consultants account, domestic account, held in

16   Florida at City National Bank ending in 3236.

17   Q.   Who was the signatory on that account?

18   A.   That is Mark Scott.  And the funds from the 3236 account at

19   City National Bank was then transferred 450,000 -- 460,000 of

20   it to his attorney's account, Nicole Huesmann IOLA account, on

21   September 7, 2016.

22   Q.   And then where did that money ultimately go?

23   A.   Well, the purchase of the property consisted of two

24   transfers, so, there was an additional transfer that came from

25   another intermediary account held at the Bank of Ireland ending

1    in 4760 in the name of Fenero Tradenext Trading, which

2    transferred also to Ms. Huesmann's account on October 3, 2016,

3    in the amount of $2.5 million to Ms. Huesmann's account.  Once

4    the money was in Ms. Huesmann's account, it was then used to

5    facilitate and finalize the purchase of 133 Sunset Lane with

6    two payments to a Kinlin Grover Realty Group in the amount of

7    $145,000 and $2,772,953.54 on October 21, 2016, to a Cowley &

8    Cummings IOLA real estate account.

9    Q.  According to the property records for this property, when

10   was it purchased; what was the date of the purchase?

11   A.  The date of the purchase was October 24, 2016.

12   Q.  What was the total purchase price?

13   A.  $2,850,000.

14   Q.  Now, I'd like to ask you about the arrow that goes from

15   attorney's bank account to Cape Cod Five Cents Savings.  There

16   is a notation there, "deposit for 133 Sunset Lane."

17        Where did that come from?

18   A.  That came from the wire details for that particular

19   transfer.

20   Q.  So then let me ask you, and this property is 133 Sunset

21   Lane?

22   A.  Yes, it is.

23   Q.  The two arrows that show money coming into Ms. Huesmann's

24   IOLA account for the benefit of the defendant have two

25   different notations.  The top one reads what?

1    A.  The top one reads loan to MSS for acquisition Biltmore Way.

2    Q.  And the bottom one reads?

3    A.  Escrow property partial payout of BN loan facility.

4    Q.  Given those -- where were those notations?

5    A.  Those notations would be included in the wire details.

6    Q.  Given those notations, how did you then determine that in

7    fact those moneys were used to buy this property and not

8    something on Biltmore Way?

9    A.  So, a review of Ms. Huesmann's account did not reflect any

10   purchases for a Biltmore Way or BN loan facility.  I'm not sure

11   what those are.  But given the time period of the flows of

12   funds, I used my judgment that those funds were actually used

13   for the 133 Sunset Lane purchase.

14   Q.  We can turn now to 2617-B.  Oh, I'm sorry.  Can we go back

15   to 2617-A for one minute.

16          Do you know what that photo comes from?

17   A.  That photo came from a search warrant, I believe.

18   Q.  Let's now go to 2617-B.  What is this chart?

19   A.  This chart reflects transfers of money to pay off a

20   mortgage for a condo owned by Mr. Scott located at 600 Coral

21   Way, Unit 12, in Florida.  The property records reflect that

22   there was a mortgage, and there was a mortgage for this

23   property and the purchase price was 1,580,000.  And that

24   occurred on January 14, 2015.  And my review of the records

25   shows that on October 16, 2016, that that -- the existing

1   mortgage was paid off in the amount of $1,794.66.  And further

2   down below in the blue box shows where the source of funds to

3   pay off that mortgage came from.

4   Q.  Those were the two Bank of Ireland accounts in the name of

5   Fenero Tradenext Holding?

6   A.  Yes, so the two bank accounts, which is the one of the

7   seven intermediary accounts that each transferred 500,000 in

8   October 2016 to Nicole Huesmann's account.

9   Q.  After the second transfer, which was on October 17, two

10  days later, October 19, the mortgage was paid off according to

11  your analysis?

12  A.  Yes, that's correct.

13  Q.  This house is in the name of who?

14  A.  In Mark Scott.  It is a condo.

15  Q.  Was the mortgage in his name?

16  A.  Yes.

17  Q.  I'm sorry, not house.  Condo.  Where did you get this

18  picture?

19  A.  This is just a regular internet photo.

20  Q.  Let's turn now to 2617-D.  What is this house?

21  A.  This chart illustrates a property also owned by Mr. Scott

22  located at 31 Dale Avenue in Hyannis Port, Massachusetts.  Also

23  in the Cape Cod vicinity.

24  Q.  When was it purchased?

25  A.  This property was purchased September 20, 2017, in the

1     amount of $3,765,000.

2     Q.  Where did that money, according to your tracing, where did

3     it come from and where did it go?

4     A.  The funds for this property came from two of the

5     intermediary accounts, one in the name of Fenero Trading

6     Holding ending in 4760, and which transferred to Nicole

7     Huesmann's account of $250,000.  And the second intermediary

8     account held in DMS Cayman in the name of MSS International

9     Consultants ending in 7100, made two separate transfers, one on

10    July 14, 2017 in the amount of $2 million, and the second

11    transfer on August 17, 2017 in the amount of $1 million.

12          So, Nicole Huesmann's account collectively received

13    three million -- $3.2 million into her account in three

14    different transfers.  And once the money was in her IOLA

15    account, there were four separate payments to facilitate the

16    final payments for the 31 Dale Avenue.

17    Q.  Those are the arrows?

18    A.  Those are the arrows going out.

19    Q.  To the right?

20    A.  To the far right which includes the O'Neill Real Estate,

21    Frank Horgan Insurance Agency, and John W. Kenney Client Trust

22    account.

23    Q.  Okay.  The bottom arrow on the left coming in has a

24    reference to 31 Dale Avenue, right?

25    A.  Yes.

1    Q.   The top arrow coming in and to the left has a reference to

2    Railroad Barnstable Property Development.  Do you know what

3    that is?

4    A.   I do not.

5    Q.   Why were you able to tie that money to the 31 Dale Avenue

6    property?

7    A.   So when I reviewed Ms. Huesmann's bank records, I did not

8    notice any payments that reference any payments that included a

9    Barnstable Railroad property.  So, based on my judgment and

10   given the time period of these transfers, I used my judgment

11   that this, these transfers were made for the 31 Dale Avenue

12   property.

13   Q.   And on the right, the arrows coming out of Ms. Huesmann's

14   account, does every one of those arrows include a notation, a

15   wire notation that references 31 Dale Avenue?

16   A.   Yes, all of them have reference on 31 Dale Avenue in some

17   form.

18   Q.   So let's now move to 2617-E.  Oh.  Actually can we go back

19   one more question about 2617-D and 31 Dale Avenue.

20        You mentioned that the total coming in was 3.25

21   million, but the total going out was the 3.7 and change million

22   to purchase the property.  Can you explain the differentials

23   there?

24   A.   Sure.  So, Ms. Huesmann's account also received additional

25   transfers from some of Mark Scott's accounts held at City

1    National Bank.  So, it was, given the time period of some of

2    those transfers, it was a little bit challenging to say exactly

3    that all of that money was used for this purchase.  So I only

4    collectively gathered the transfers that was in close proximity

5    to that particular real estate purchase date.

6    Q.  So you reflected on the chart only the transfers that you

7    feel confident are traced to the original nine funding

8    accounts?

9    A.  That's correct, yes.

10   Q.  Where did this picture come from, if you know?

11   A.  This picture came from an e-mail, Mark Scott's e-mail.

12   Q.  It was an e-mail that he had?

13   A.  Yes.

14           MS. LOZANO:  2617-E, please, Mr. Barile.

15   Q.  Ms. October, explain briefly what this chart represents.

16   A.  This chart represents another property home purchased by

17   Mr. Scott located at 105 Sunset Lane in Barnstable,

18   Massachusetts, also in the Cape Cod vicinity, which was

19   purchased on November 13, 2017, in the amount of $2,310,000.

20   Q.  And there is a notation here Scott contributed $1.310

21   million.  What, can you explain what that means?

22   A.  So my analysis of what this particular property reflected

23   that there were, there was a second individual that purchased

24   the property with Mr. Scott, a Marietta Halle.  So I extracted

25   her funds because it wasn't related to the transfers connected

JBJ3SCO1                          October - Direct

1    to the nine accounts.

2    Q.   And the Fenero Funds?

3    A.   And the Fenero Funds.  So, her amount that she contributed

4    is extracted from the total price.  So I was only able to trace

5    actually the 1.3 million that Mark Scott's intermediary account

6    held at DMS Cayman in the name of MSSI International ending in

7    account 7100 made a transfer of 1,310,000 on October 30, 2017

8    to Ms. Huesmann's account.  The IOLA account.  And that IOLA

9    account made a transfer on November 12, 2017 in the amount of

10   2,211,380 to John Kenney Client Trust account.

11   Q.   In your review of property records, did you see anything

12   connecting John Kenney to the purchase of this property?

13   A.   Yes, John Kenney is listed in the property records as well

14   as Ms. Huesmann.

15   Q.   As one of the attorneys?

16   A.   As one of the attorneys, yeah, of the property.

17   Q.   You mentioned an attempted purchase.  Where is the general

18   vicinity; where was that property?

19   A.   That property was also in the Cape Cod location.

20   Q.   How much money was transferred in anticipation of that

21   attempted purchase?

22   A.   So, I noticed that around February of 2017, there were two

23   $500,000 transfers to Nicole Huesmann's account.

24   Q.   But that never happened?

25   A.   The property wasn't purchased.

JBJ3SCO1                          October - Direct

1   Q.  We'll move on from property now.  You also -- real

2   property.

3             You also mentioned that you traced Fenero Fund money

4   to purchases of watches by the defendant.  How many watches

5   were you able to trace to the Fenero Funds in the original nine

6   funding accounts?

7   A.  So, I traced 16 watches, just from one jeweler, Time Piece.

8   And then I traced a handful of additional watches that was

9   purchased from a variety of other jewelers, possibly maybe

10  another five or six watches.

11            MS. LOZANO:  Mr. Barile, can you please display GX

12  2618.

13  Q.  Ms. October, can you summarize for us what this chart

14  reflects?

15  A.  This chart reflects the 16 watches that were purchased

16  for -- by Mr. Scott which originated from one of the -- either

17  one of the Fenero accounts or the MSSI Cayman accounts totaling

18  $281,800, and the 16 watches were purchased from the one

19  jeweler known as Time Piece.

20  Q.  On the bottom of the chart, does the chart move from left

21  to right chronologically?

22  A.  Yes, so it is a timeline chart, which reflects the date of

23  the property -- of the watch purchase, and also the arrow above

24  it shows from what account that money was -- what account the

25  watch was purchased from.

Q.  So you traced all of these watches to one of four accounts
that are depicted on the top of this chart, the Northern Trust,
the City National Bank 3008, City National Bank 3236, and the
City National Bank --

A.  0295.

Q.  -- 0295.  What is depicted in the each box for each watch?

A.  So, depicted in the box on the top is whatever was listed
in the wire description for the watch, and there is a generic
picture of a watch as well as the dollar amount of the
purchase, and the bottom part entails the date of that
purchase.

Q.  What was the price range for these 16 watches?

A.  It ranged from the lowest being $3,700, to the highest
being $35,995.

Q.  What kind of watches were these?

A.  There were a combination of Rolex watches, Omega watches
and Panerai watches as well.

Q.  We can take that down, Mr. Barile.

        You also mentioned purchases made with Fenero Fund
money by the defendant of multiple vehicles.  I am going to ask
you about those now.  If we can pull up GX 2619-A.

        What does this chart depict?

A.  This is a purchase of a Ferrari 599 GTB 2011, which was
purchased by Mr. Scott on November 8, 2016, in the amount of
$245,269.37.

JBJ3SCO1                          October - Direct

1    Q.  Okay.  So I just want you to focus on the far left and the

2    far right.  Where did this money originate, according to your

3    tracing?

4    A.  The funds originated from one of the intermediary accounts

5    held at the Bank of Ireland in the name of Fenero Tradenext

6    Holding ending in 5001.

7    Q.  And all the way on the right, where did the money end up?

8    A.  The money ended up with a check payment to Braman

9    Motorcars.

10   Q.  All right.  Let's go now -- by the way, did that check,

11   your review of that check indicate the model?

12   A.  Yes, it did.  It was in the memo line, yes.

13   Q.  Mr. Barile, please pull up 2619-B.

14        Ms. October, what does this chart represent?

15   A.  This chart represents a Porsche 911 Turbo 2017 which was

16   purchased by Mr. Scott on February 10, 2017, in the amount of

17   119,529.50.

18   Q.  Okay.  And again, focusing just all the way on the left and

19   all the way on the right, where did the money originate?

20   A.  The funds originated from one of the intermediary accounts

21   held at the Bank of Ireland in the name of Fenero Equity

22   Investment ending in 4760.

23   Q.  And where did the money end?

24   A.  It ended with a check payment to Braman Motorcars.

25   Q.  Again, did that check indicate in any sort of way that the

1   purchase was for a Porsche 911 Turbo?

2   A.  Yes, it did.

3   Q.  Where does this photo come from, do you know?

4   A.  This came from just -- I think this came from a search

5   warrant photo.

6   Q.  Okay.  Let's move on to 2619-C.  What does this chart

7   depict?

8   A.  This chart depicts a Porsche 911R 2016 purchased by

9   Mr. Scott on June 15, 2017, in the amount of $332,248.41.

10  Q.  And the money originated from what account?

11  A.  The money originated from one of the intermediary accounts

12  held at DMS Cayman in the name of MSS International Consultants

13  BVI Limited.

14  Q.  And that transfer was a $500,000 transfer that went through

15  a couple of intermediary accounts?

16  A.  Yes, so for the purchase of this property, there were

17  multiple transfers.  So, the DMS Cayman account transferred on

18  June 14, 2017, $500,000 to Mark Scott -- MSS International

19  Consultants LLC, one of the domestic accounts held in Florida.

20  Q.  Then it went to another?

21  A.  Then it went --

22  Q.  CNB Mark Scott account?

23  A.  Correct.  The same, the same bank, just under the name of

24  Mark Scott.

25  Q.  Okay.

1   A.   Ending 0295.

2   Q.   Then from there, where was the money sent for the ultimate

3   purchase of the vehicle?

4   A.   To Braman Motorcars.

5   Q.   At Sun Trust Bank?

6   A.   Sun Trust Bank, yes.

7   Q.   How did you determine from your financial analysis that the

8   purchase was for this kind of make and model of a car?

9   A.   So, the it was indicated on the wire details.

10  Q.   And the total purchase of that car was 332,248.41?

11  A.   Yes, that's correct.

12  Q.   We can move on now, Mr. Barile, to 2619-D.

13        Ms. October, what does this chart represent, which

14  vehicle?

15  A.   This chart represents a purchase by Mr. Scott of a Porsche

16  911 GTRS 2018, on June 11, 2018, in the amount of 218,898.87.

17  Q.   Where did this money originate, where did you trace the

18  purchase price to?

19  A.   These funds came from a RBC account held in the name of

20  Mark Scott Trust 2017 ending in 3317 account number.

21  Q.   Were you able to trace the money that was in 3317, where

22  that money came from?

23  A.   Yes, I did.

24  Q.   Where did that money come from?

25  A.   It came from a series of transfers, but I was able to

1    transfer it back to another RBC account held in the name of HFT

2    Holding ending in 8611.

3    Q.  You were able to trace it back to that?

4    A.  I was able to trace it back to that, and then the 8611 was

5    also traced to the intermediary accounts and then traced

6    further up to one of the Fenero accounts and traced back up

7    further up originating from one of the nine accounts, either

8    Star Merchant, B&N Consultants, IMS or Fates.

9    Q.  So this purchase was made on June 11, 2018.  And where was

10   the purchase price of the $218,898.87 sent?

11   A.  It was sent to Braman Motorcars held at Sun Trust.

12   Q.  Mr. Barile, could we see 2619-E.

13        What is this chart, Ms. October?

14   A.  This chart reflects a purchase of a 911 GT2 RS 2018

15   purchased by Mr. Scott on August 29, 2018, in the amount of

16   $617,426.46.

17   Q.  And all the way on the left, to which two accounts did you

18   trace the purchase price for this vehicle?

19   A.  The funds came from, the top one is one of the intermediary

20   accounts of MSS International Consultants BVI held at First

21   Caribbean ending in 2701.  As well as the RBC account held in

22   the Cayman Islands in the name of Mark Scott 2017 Trust ending

23   in 3317.

24   Q.  So the First Caribbean MSSI account sent $500,000 through a

25   series of Mark Scott controlled accounts, and the RBC account

1    sent $2 million through one other Mark Scott controlled

2    account?

3    A.   That is correct.

4    Q.   Ultimately, to whom was the purchase price paid?

5    A.   Paid to Braman Motorcars.

6    Q.   And this 3317 RBC account, is that the same account as you

7    just testified you traced to the RBC 8611 HFT Holdings account?

8    A.   That is correct.

9    Q.   All right.  Was there any indication in any of the -- in

10   any of the bank records that this was the car that was being

11   purchased with these funds?

12   A.   Yes.  The wire details indicated the model of the car.

13   Q.   Where did you get this photo?

14   A.   This photo was taken from the search warrant.

15   Q.   Let's now turn to 2619-F.  Ms. October, tell us about this

16   chart.

17   A.   This chart illustrates a purchase of a Sunseeker Predator

18   yacht that was purchased by Mr. Scott on March 21, 2017, in the

19   amount of $1,310,000.

20   Q.   Where did that money originate, where did you trace that

21   money back to, what account?

22   A.   The funds were traced to one of the intermediary accounts

23   held at Bank of Ireland, in the name of Fenero Tradenext

24   Holding ending in 5001.

25   Q.   And that transfer for the amount of $1.3 million, was there

1    a notation on that wire?

2    A.   Yes.  The wire indicated boat purchase sent for MSSI Marine

3    Group Limited.

4    Q.   Ultimately, were two payments made to cover purchase price

5    of this yacht?

6    A.   Yes, there was, yeah.

7    Q.   Where did those payments go?

8    A.   There were two payments, one that went to Galat Yacht Sales

9    in amount of $130,000 with a reference in the wire indicating

10   deposit for 2016 Sunseeker Predator.  And the second deposit,

11   second final payment was in the amount of 1,127,000 where the

12   reference in the wire indicated Sunseeker which was paid to a

13   Nautikos Florida LLC account.

14   Q.   Do you know what Nautikos Florida is?

15   A.   I understand it to be a business in the marine space that

16   sells boats.

17   Q.   According to the documents and records you've reviewed, do

18   you know what the name of this yacht or vessel is?

19   A.   Yes.

20   Q.   What is that?

21   A.   TMI -- T-A-I-M-A.

22   Q.   Do we see that on the photo or partial?

23   A.   Yes.

24   Q.   The partial name of the photo there?

25   A.   Yes.

1    Q.  And what letters are missing so we see what --

2    A.  It's spelled T-A-I-M-A.  So the M is partially cut off and

3    the A.

4    Q.  Where does this photo come from?

5    A.  This came from a search warrant.

6    Q.  We can take that down.

7            As part of your financial analysis, did you prepare a

8    summary of the total value of transfers from the Fenero MSSI

9    accounts to Scott controlled accounts?

10   A.  Yes.

11   Q.  Can we pull up 2628, Mr. Barile, please.

12           What does this chart reflect?

13   A.  This chart reflects the nine funding accounts that

14   transfers money to the four Cayman Fenero accounts, then to the

15   seven intermediary accounts which included bank accounts held

16   in the name of MSSI in the Cayman Islands, as well as four Bank

17   of Ireland accounts held in the name of various names of

18   Fenero.  And those funds were transferred to accounts

19   controlled by Mark Scott, and also accounts to Nicole Huesmann

20   bank accounts, as well as the accounts that he shares with

21   David Pike, and the total sums of the money for these transfers

22   was approximately 52 million.

23   Q.  How much?

24   A.  52 million.

25   Q.  For the entire box?

JBJ3SCO1                          October – Direct

1    A.  The entire box.

2    Q.  All in?

3    A.  All in.

4    Q.  How do you define in this chart and for yourself accounts

5    controlled or for the benefit of defendant Scott?

6    A.  Based on the account opening documents, and the signatory

7    card that the accounts listed Mr. Scott as either a director or

8    beneficial owner of these accounts.

9    Q.  How is this bottom box organized?

10   A.  So, it's organized with the orange circle and the American

11   flag as accounts that are domestic, were U.S. held, and then

12   there's flags that represents accounts that are held in the

13   Cayman Islands, and then moving, actually, then there is also

14   one account there is a Swiss account, so, the first box

15   represents all of only -- only Mr. Scott accounts.

16          And then the second box, the middle box has the orange

17   colored coding around it, represents accounts that's not held

18   in Mr. Scott's name, but accounts where he actually received

19   benefits from, and those would include the Nicole Huesmann

20   account, as well as the Williams Jet Tenders account, which

21   appeared to mention the name of the boat in the wire records.

22          And then to the far right, located in highlighted in

23   blue, are accounts that are shared with Scott and David Pike,

24   and there are two accounts in that box.

25          (Continued on next page)

1              MS. LOZANO:  All right.  I want to ask you if we could

2    actually put up, Mr. Barile, side-to-side 1441 now.

3    Q.  And Ms. October you mentioned -- you testified that some of

4    the intermediary accounts as well as the Fenero Fund Cayman

5    accounts were held at DMS?

6    A.  Correct.

7    Q.  So I'd like you to take a look at 1441.

8              Have you seen this before?

9    A.  Yes.

10   Q.  And what is it?

11   A.  It's an e-mail from Mark Scott on May 17, 2016.  From Mark

12   Scott to Mark Scott with the subject DMS wire details.

13             MS. LOZANO:  Can we scroll up to the second page of

14   it.  And I think we may need to rotate.

15   Q.  What is this, Ms. October?

16   A.  So this is a DMS Bank & Trust wire instructions sheet.

17   Q.  Does that indicate for account holders at DMS what

18   intermediary banks are going to handle their international

19   transfers?

20   A.  Yes, it does.

21   Q.  And on the left-hand column there's a column called

22   currency?

23   A.  Yes.

24   Q.  And the first one down it says USD.  What does that stand

25   for?

1    A.  That's US dollar.

2    Q.  The next column over says intermediary bank?

3    A.  Correct.

4    Q.  And for US dollars or accounts held at DMS what serves as

5    the intermediary bank?

6    A.  Bank of New York Mellon.

7    Q.  What is the address?

8    A.  Bank of New York Mellon New York, New York.

9    Q.  What is the address?

10   A.  I'm sorry.  One Wall Street, New York, New York.

11            MS. LOZANO:  I think we can take that down now.

12   Q.  So let's go back up to 2628.

13            Now you mentioned that this chart reflects a total of

14   approximately $53 million that the defendant received from the

15   Fenero Funds accounts?

16   A.  That is correct.

17   Q.  Are you familiar with the defendant's Fenero private equity

18   fund mission statement?

19   A.  Yes.

20            MS. LOZANO:  Mr. Barile, if we could pull up GX2201,

21   page 7.  Let's I guess go to 6 first so we can show the

22   witness.

23   Q.  Ms. October, do you recognize this?

24   A.  Yes.  It's the Fenero Equity Investments mission statement.

25   Q.  And was that document contained in some of the bank records

1    that you've reviewed?

2    A.  Yes.

3    Q.  So let's go to the second page of this statement which is

4    the seventh page of the exhibit and on the top there is a

5    paragraph and in the middle of the paragraph there's a sentence

6    that starts "The fund manager receives," and then it has little

7    i, little two i, little three i.  So can you read to me that

8    entire sentence starting with, "The fund manager receives."

9    A.  The fund manager receives a management fee of one percent

10   per deposit in the fund; two, a one percent on the average

11   annual remaining cash value of the fund; third, an eight

12   percent carried interest pari passu with investors upon any

13   exit.

14   Q.  What is your understanding about the one percent management

15   fee that the defendant was entitled to under this agreement,

16   what was that one percent based on?

17   A.  The one percent based on -- it says based on the deposits

18   in the fund.

19   Q.  So the total deposits in the fund?

20   A.  The total deposits.

21   Q.  And what about number three, an eight percent carried

22   interest pari passu with the investors upon any exit.

23           Are you familiar with the term carried interest?

24   A.  Yes, I am.

25   Q.  What does that mean?

JBJ9SCO2                              October - Direct

1   A.  Carried interest is additional income that a partner in a

2   private equity fund can receive from profits derived from those

3   deposits.

4   Q.  So to be clear the eight percent is calculated not on the

5   total money invested in the fund but only from the profit

6   earned?

7            MR. GARVIN:  Your Honor, I'm sorry.  Leading.

8            THE COURT:  Yes.  Don't lead, Ms. Lozano.

9   Q.  Explain to me what is the eight percent calculated from?

10  A.  The eight percent will be calculated based on the

11  investments and then the return on those investments, whatever

12  profits were gained and realized from those investments would

13  be the profits only would be distributed to the fund manager --

14  Q.  So to be clear --

15  A.  -- partner.

16  Q.  So to be clear is the eight percent calculated on the total

17  amount invested in the fund?

18  A.  No.

19           MS. LOZANO:  We can take that down.  And we can put

20  2628 back up.  Let's look at the bottom box.

21  Q.  Now you walked through and explained to us the kind of

22  coding of the accounts here and how they're depicted.  Can you

23  tell us where is the total amount that Mr. Scott -- that you

24  have credited to Mr. Scott for Scott-only controlled accounts?

25  A.  So it's located in the -- in bold on the left side, Scott

1   accounts total credit $29,339,608.08.  And then there's euros

2   of 1,146,576.86.  And then there's pounds of 8,275,109.60.

3   Q.  And those are all independent of each other?  Those aren't

4   kind of the same amount in different currencies?  Those are

5   different amounts in each currency; is that right?

6   A.  Different amount in each currency.

7               MS. LOZANO:  One moment, your Honor.

8               (Counsel confer)

9               MS. LOZANO:  Your Honor, one moment.  I have one more

10  thing left.

11              At this time, your Honor, may I approach the witness?

12              THE COURT:  You may.

13  Q.  Ms. October, I want to show you five different exhibits.

14  And the first one is 2602A-BU.  The next one is 2603-BU.  The

15  next one is 2622-BU.  The next one is 2628-BU.  And the last

16  one is 2620-BU?

17  A.  Yes.

18  Q.  Do you recognize all of those?

19  A.  Yes, I do.

20  Q.  What are they?

21  A.  They are various charts that I created to represent the

22  flow of money and flow of funds from the funding accounts to

23  accounts controlled by Mr. Scott.

24  Q.  And those -- are those exhibits the same as the exhibits

25  with those numbers except that they're bigger?

1  A.  That's correct.

2          MS. LOZANO:  I'm going to offer at this time, your

3  Honor, those five exhibits.

4          MR. GARVIN:  I believe the Court has already ruled on

5  this.  We have no objection.

6          THE COURT:  Very well.  They will be received.

7          (Government's Exhibits 2602A-BU, 2603-BU, 2622-BU,

8  2628-BU, 2620-BU received in evidence)

9          MS. LOZANO:  I have no further questions for this

10  witness.

11          THE COURT:  Cross-examination.

12          MR. GARVIN:  Thank you, your Honor.

13  CROSS-EXAMINATION

14  BY MR. GARVIN:

15  Q.  Good morning, Ms. October.

16  A.  Good morning, counsel.

17  Q.  My name is David Garvin.  I represent Mr. Scott in this

18  matter.

19          MR. GARVIN:  Mr. Barile, would you be nice enough,

20  sir, to put back onto the screen Government Exhibit 2201, page

21  7.  If you could please highlight the top portion of the page.

22  Q.  Ma'am, you were asked a few moments ago, and I wanted to

23  hit this while it was still fresh, about this particular

24  paragraph.  Do you recall that?

25  A.  Yes, I do.

JBJ9SCO2                        October - Cross

1    Q.  OK.  And there is a portion of it that says "At this time,

2    Fenero expects to fully invest and exit from its initial

3    investments within a five-year term."

4            Do you see that, ma'am?

5    A.  Yes.

6    Q.  And you understand based upon your experience and education

7    that private equity funds can have an expiration date, correct?

8    A.  Correct.

9    Q.  It is often called an exit date, correct?

10   A.  Familiar with that, yes.

11   Q.  And that indicates that the parties should expect their

12   money to be tied up for a period of time, correct?

13   A.  Possible.

14   Q.  And the parties that are investing into the private equity

15   funds normally understand that it is the administrator of the

16   fund that will decide upon the investments of that fund; isn't

17   that correct?

18           MS. LOZANO:  Objection.  Calls for someone else's

19   state of mind.

20           THE COURT:  Overruled.

21   Q.  You can answer, ma'am.

22   A.  It's possible.

23   Q.  And so this particular document goes on to say that the

24   fund manager receives a:  One, management fee of one percent

25   per deposit in the fund; two, a one percent on the average

JBJ9SCO2                          October - Cross

1    annual remaining cash value of the fund; and three, an eight

2    percent carried interest pari passu with the investors upon any

3    exit.

4              Do you see that, ma'am?

5    A.  Yes, I do.

6    Q.  And isn't it also clear that the percentages here, in

7    particular, will -- focusing on number two, will be added each

8    year; isn't that correct?

9    A.  It says an average annual.

10   Q.  Correct.  So you would anticipate that that would mean that

11   the one percent is an annual fee; isn't that right?

12   A.  Possible.

13   Q.  So, if that is the case, that means, if it lasts for five

14   years, that portion by itself should total five percent,

15   correct?

16   A.  Yes.

17   Q.  Now, in addition to that, if someone decides that they want

18   to break the private equity firm and take their investment out,

19   they have to then negotiate with the fund manager as to what

20   the termination fee; isn't that true?

21   A.  I would imagine so.

22   Q.  Because otherwise it could be viewed as a breach of

23   contract; isn't that true?

24             MS. LOZANO:  Objection.

25             THE COURT:  Overruled.

1    THE WITNESS:  It's possible.

2    Q.  And you were not present when the parties in this

3    particular case broke this equity fund, were you?

4    A.  I was not.

5    Q.  In fact, this equity fund appears to have only been funded

6    between the months of June and October of 2016, correct?

7    A.  That sounds right.

8    Q.  And that the money began to be closed out of these accounts

9    as early as April 10 of 2017; isn't that correct?

10   A.  That sounds possible.

11   Q.  And by September of 2017 all of the funds had been

12   transferred out; isn't that true?

13   A.  I would have to see something to recall the time period.

14   Q.  Fair enough, ma'am.

15        We're going to go through each of those charts and

16   when we hit that one that may be helpful we can talk about it

17   then, OK?

18   A.  Sure.

19   Q.  So, we have a situation where we don't know what the final

20   percentage was that was negotiated and agreed upon to pay the

21   fund manager, do we?

22        MS. LOZANO:  Objection.

23        THE COURT:  Overruled.

24        THE WITNESS:  It's outlined in the mission statement.

25   Q.  Well we see under this mission statement it would be one

JBJ9SCO2                         October – Cross

1    percent if it went in accordance to what is said here, it would

2    be one percent, five percent, and eight percent carried

3    interest Pari passu; isn't that right?

4              MS. LOZANO:  Objection.  Misrepresenting the evidence.

5              THE COURT:  Overruled.

6              THE WITNESS:  That's what it says here.

7    Q.  And if the parties simply just stuck with what it said they

8    could end up with as much as 14 percent going to the fund

9    manager at the early termination of this fund; isn't that true?

10             MS. LOZANO:  Objection.  Based on what?

11             THE COURT:  If she knows.

12             THE WITNESS:  I'm not sure.

13   Q.  Well if we just add one percent and five percent and eight

14   percent the simple math on that would be 14, correct?

15             MS. LOZANO:  Objection.  Mischaracterizes her

16   testimony.

17             THE COURT:  If she knows.

18             Can you answer that question?

19             THE WITNESS:  No.

20             THE COURT:  Next question, Mr. Garvin.

21             MR. GARVIN:  Yes.

22             Would you be kind enough, Mr. Barile, to put up the

23   first chart.  I believe it's 2601, sir.

24   Q.  Now I believe this is the first chart.  And this chart

25   reflects funds that were paid during a period of time and that

 1    is designated as February 2016 through April 2016 to Mark

 2    Scott; is that correct?

 3    A.  Yes.

 4    Q.  And that total is slightly under a million dollars; is that

 5    right?

 6    A.  That is correct.

 7              MR. GARVIN:  At this time I would like to move

 8    Defendant's Exhibits into evidence, in particular, Defendant's

 9    Exhibit 158, 159, 160, 701, being Mr. Scott's four tax returns.

10              MR. DEVLIN-BROWN:  I think we have technical issues.

11    Can we use the hard copies.

12              MS. LOZANO:  Your Honor, the government objects.  This

13    is outside the scope of the direct.  If they would like to

14    introduce it on their case they can.

15              Your Honor, may we have a sidebar on this?

16              THE COURT:  No.  I'll allow you to use them now.

17              MR. GARVIN:  Thank you.

18              (Defendant's Exhibits 158, 159, 160, 701 received in

19    evidence)

20              (Counsel confer)

21              MR. DiMASE:  Your Honor we would object to the

22    admission of the fourth exhibit, the 2018 tax return for the

23    reasons that we described at the beginning of the day.  We

24    haven't seen it yet.  Just that one for now.

25              THE COURT:  It will be received subject to connection.

1          MR. GARVIN:  Thank you.  Your Honor, I believe he's

2    unable to pull it up electronically so we're going to try to

3    pull out the ELMO.

4          Can you please trigger the key for the lecturn?

5          Thank you, sir.

6    Q.  Now I'm placing now down on the court's ELMO system and I

7    am showing you now what is in evidence as Defendant's Exhibit

8    159.  Do you see that?

9    A.  Yes.

10   Q.  And you're familiar with the common 1040 tax return,

11   correct?

12   A.  Yes.

13   Q.  And the 1040 tax return that we are showing at this

14   particular instance to the ladies and gentlemen of the jury is

15   the 2016 return, correct?

16   A.  Yes.

17   Q.  And when we look down this tax return first we see in the

18   top notation it appears to be quite a large return because it

19   has 97 pages, correct?

20   A.  Yes.

21   Q.  And if we look at the income that's being reported for this

22   particular period of time -- would you be kind enough to read

23   what is on line 22 to the ladies and gentlemen of the jury?

24   A.  9,156,869.

25   Q.  Now, a few moments ago you had discussed with myself the

JBJ9SCO2                          October - Cross

1    very first chart which was 2601, correct?

2    A.  I'm sorry.

3    Q.  2601?

4    A.  Yes.

5    Q.  We just discussed it a couple moments ago.

6           And on that particular chart the amount of money that

7    Mr. Scott received was one million dollars, correct?

8    A.  Close to a million, yes.

9    Q.  And I am directing your attention, ma'am, to line 17.  Do

10   you see line 17?

11   A.  Yes.

12   Q.  And the amount that Mr. Scott reported on line 17 is

13   over -- slightly over $2 million, correct?

14   A.  Correct.

15   Q.  And you are aware that Mr. Scott is a lawyer, right?

16   A.  Yes.

17   Q.  And that for at least a portion of 2016 Mr. Scott was

18   working as a lawyer at Locke Lord, right?

19   A.  Yes.

20   Q.  And that you would anticipate that his legal fees would be

21   reported on his tax return, correct?

22           MS. LOZANO:  Objection.

23           THE COURT:  Overruled.

24           THE WITNESS:  I'm sorry?

25   Q.  You would anticipate that his legal fees would be reported

1   on his tax return, correct?

2   A.  His income.

3   Q.  And your chart makes reference to the fact that those

4   transfers had written on them the words legal expense; isn't

5   that right?

6   A.  Yes.

7   Q.  And so if we look at line 17 it is for schedule E; is that

8   right?

9   A.  Yes.

10  Q.  And also for S corporations which means small corporations,

11  right?

12  A.  Right.

13  Q.  And in this particular case, if we located schedule E, we

14  would be looking to see if his law income would be reported

15  there, correct?

16  A.  Right.

17  Q.  Now in addition to his law income you have discussed with

18  the ladies and gentlemen of the jury that Mr. Scott controlled

19  an entity known as MSS International Consultants BVI; isn't

20  that right?

21  A.  Yes.

22  Q.  And BVI is short for British Virgin Islands, correct?

23  A.  Yes.

24  Q.  And British Virgin Islands does not have an income tax

25  system for small business entities; isn't that correct?

1    A.  I'm not sure.

2              MS. LOZANO:  Objection.

3              THE COURT:  Overruled.

4    Q.  Now, there is an opportunity, though, that if you have a

5    small foreign entity that the taxpayer can tell the IRS that

6    they're going to report the entity as if it was domestic and

7    they call that a disregarded -- a report for foreign

8    disregarded entities; isn't that true?

9    A.  I'm not sure.

10   Q.  I'm putting down what's page 22 of the 97-page document.

11   In particular I'm making reference at this point to form 8858.

12             Do you see that, ma'am?

13   A.  Yes, I do.

14   Q.  And do you see that it says information return of U.S.

15   persons with respect to foreign disregarded entities?

16   A.  Yes, I see that.

17   Q.  And the name of the person who is filing the return it says

18   is Mark S. Scott, right?

19   A.  Yes.

20   Q.  And the name of the company that he's reporting as a

21   foreign disregarded entity is MSS International Consultants

22   BVI.

23             Do you see that?

24   A.  I see that.

25   Q.  Now, what effect that has is that any money that MSS --

1    strike that.  I'm sorry.  I got ahead of myself -- that MSS

2    International Consultants BVI is going to report as income

3    will, in fact, appear on this United States tax return; isn't

4    that true?

5             MS. LOZANO:  Objection.  Counsel is testifying.

6             THE COURT:  Overruled.

7             THE WITNESS:  I'm not sure.

8    Q.  Well, if we look at this closely we will see that Mr. Scott

9    has reported on line 12 almost an additional $7 million of

10   taxable income.

11            Do you see that, ma'am?

12   A.  I see that.

13   Q.  And you will agree with me, and somewhat facetiously, I'm

14   sorry, I can't help myself, that will buy a lot of watches,

15   right?

16   A.  A lot of property.

17   Q.  A lot of property, a lot of watches, a lot of boats, right?

18   A.  I would assume so.

19   Q.  There's nothing wrong with buying property or watches or

20   cars as long as you abide by the law, correct?

21   A.  Correct.

22   Q.  And one of the things you have to do to abide by the law is

23   you have to report your taxes, right?

24   A.  Part of it.

25   Q.  And you would also agree, would you not, based upon your

1    experience that private equity fund managers make a whole lot

2    of money; isn't that true?

3    A.   Some of them do.

4    Q.   And so it is not unusual to see a private equity manager in

5    charge of a four-hundred-million-dollar equity fund earning

6    seven, eight million dollars a year; isn't that true?

7    A.   Earning is subjective.

8    Q.   But it is -- the statement is true though, isn't it?

9    A.   Possible.

10            MR. GARVIN:  Your Honor may I -- I see we're close to

11   what I think is the break.

12            THE COURT:  We can break now.  Ladies and gentlemen,

13   we'll take fifteen minutes.  Don't discuss the case.

14            (Jury not present)

15            THE COURT:  Ms. October, you may step down.

16            (Witness excused)

17            THE COURT:  Everyone can be seated.  Anything else?

18   Don't be late.

19            (Recess)

20            THE COURT:  OK.  Can we get Ms. October?

21            (Jury present)

22            THE COURT:  Mr. Garvin.

23            MR. GARVIN:  Thank you, your Honor.

24            Ms. Stanley, are you able to pull up Defendant's

25   Exhibit 701, please.

JBJ9SCO2                       October – Cross

1     Could you please go in, I think it's to page 14.  Are

2     you able to scroll down to page 14?  Thank you.  Please

3     continue scrolling down if possible.  I like to get to the

4     first page of the return.  I think it's two more pages.  One

5     more page, I believe.  Looking for the first page of the

6     return.  OK.  That indeed is the first page of the return.

7     Q.  Do you recognize this, ma'am, as Mark Scott's personal 1040

8     for the year 2018?

9     A.  Yes, I do.

10    Q.  You see that the format has changed because there was a

11    change by the Internal Revenue Service that year; is that

12    correct?

13    A.  I'm not sure.

14    Q.  And if we look in the center section we see that the return

15    was prepared by a CPA company; is that correct?

16    A.  Yes.

17        MR. GARVIN:  Ms. Stanley, would you be nice enough to

18    go to the next page, please.

19    Q.  And this is the -- this page reflects the income that was

20    reported by Mr. Scott to the Internal Revenue Service; is that

21    correct?

22    A.  It appears so.

23    Q.  And if we look at line 10 it says taxable income,

24    $29,671,123.  Do you see that ma'am?

25    A.  Yes, I do.

1    Q.  And this would be in addition to what we had previously

2    seen reported by Mr. Scott in 2016; isn't that correct?

3    A.  (No response).

4    Q.  Is that correct, ma'am?

5    A.  I'm not understanding the question.

6    Q.  On Defendant's Exhibit 159 that we did right before the

7    break we saw that there was on line 22 9,156,869 reported as

8    taxable income in 2016, correct?

9    A.  Right.  I recall.

10   Q.  And now we're seeing in 2018 that he has reporting an

11   additional $29,671,123 of taxable income; isn't that correct?

12   A.  I see that.

13          MR. GARVIN:  You can take that down.  Thank you.

14   Q.  So just if we add those two together by themselves there

15   was approximately $39 million of taxable income reported by

16   Mr. Scott for the years 2016 and 2018; isn't that correct?

17   A.  That adds up.

18   Q.  Now, I'd like to shift back to talking about some of the

19   charts that you prepared.

20   A.  OK.

21          MR. GARVIN:  In particular perhaps Mr. Barile would

22   help us with putting up 2602, please.

23   Q.  At the top we have the total amount for the Fenero Funds,

24   correct?

25   A.  Yes.

1   Q.  And as we stated I believe a little bit earlier that this

2   time period covers May of '16 through October '16; is that

3   right?

4   A.  That's correct.

5   Q.  And that's the period of time that the -- excuse me.  The

6   four private equity funds were funded, correct?

7   A.  Right.

8   Q.  And so what we see in the far left-hand side is that there

9   is a bank account --

10          MR. GARVIN:  Could we please enlarge the top third.

11  Q.  Focusing now on what appears to be Commerzbank on the far

12  left-hand side.  Do you see that, ma'am?

13  A.  Yes.

14  Q.  Account ending in 2001?

15  A.  Yes.

16  Q.  And it would be accurate to say that Mr. Mark Scott was not

17  a signatory on that account; isn't that true?

18  A.  That's true.

19  Q.  If we go to the next account to the right ending in 7201 it

20  would be also true to say that Mr. Scott does not appear in any

21  of the bank records for that account as a signatory; isn't that

22  correct?

23  A.  I'm unable to answer that.

24  Q.  Well the records that you saw Mr. Scott was not a signatory

25  in any of the records that you saw; is that correct?

1   A.   I did not have the records for the account -- the OCBC

2   account ending in 7201.

3   Q.   Let's go to the next account, the Deutsche Bank account.

4   Would it be accurate to say that Mr. Scott was not a signatory

5   authority on that account?

6   A.   Correct.

7   Q.   And working our way across to try to pick up a little bit

8   of speed would it be accurate to say that Mr. Scott was not a

9   signatory on any of the accounts that are highlighted on the

10  screen now?

11  A.   I'm unable to answer that because we do not have the

12  records for the other OCBC account.

13  Q.   So we do know that Mr. Scott was not signatory on any of

14  the accounts here with the exception of OCBC because we simply

15  don't have those records; is that right?

16  A.   Correct.

17  Q.   Now, if you would be kind enough, sir, to highlight the

18  bottom third.

19        Now the bottom third it shows the four Fenero equity

20  accounts, correct?

21  A.   Yes.

22  Q.   And those accounts were held in Mr. Scott's name; isn't

23  that right?

24  A.   As a signatory, yes.

25  Q.   And all four of those accounts were -- fell under the MSSI

1    consultants or international consultants BVI entity; isn't that

2    right?

3    A.   I think so.

4    Q.   And Mr. Scott was the signatory for that account or entity

5    also; isn't that right?

6    A.   For the MSSI?

7    Q.   Yes, ma'am.

8    A.   Yes.

9    Q.   Now, I want to talk about the one over to the far

10   right-hand side.  Do you see the one that says Fates Group.

11   The far right-hand side it says the Fates Group.  Do you see

12   that, ma'am?

13   A.   Yes.

14   Q.   And do you -- would it be accurate to say that the money

15   that the Fates Group sent to the Fenero equity investments was

16   returned?

17   A.   Returned to who?

18   Q.   To Fates Group?

19   A.   To another Fates Group account, yes.

20   Q.   And every penny that we have --

21          MR. GARVIN:  If we could fade out to the normal

22   screen, please.  Thank you so much.

23   Q.   If we add these two Fates Groups together it comes pretty

24   close to $10 million, slightly less; is that correct?

25   A.   Close to 10 million, yes.

1    Q.  And the exact same amount, several months later, was

2    returned to Fates Group; isn't that correct?

3    A.  I wouldn't say returned but it was transferred to another

4    Fates Group account.

5    Q.  Well it was the -- money that came into Fenero Equity,

6    there was a specific amount and that exact same amount was

7    returned back to Fates Group?

8    A.  I'm just uncomfortable with "returned."  I would associate

9    returned with being returned to the exact same account.  Not to

10   a different account.

11   Q.  I see.  OK.  So I was using the term returned because it

12   went back to an account controlled by Fates Group but I

13   understand your point so I'll rephrase.

14          Was the money sent to an account that was controlled

15   by Fates Group?

16   A.  Yes.

17   Q.  And that money that it was sent to that was controlled by

18   Fates Group, isn't it accurate to say that Mr. Scott was not a

19   signatory on any of the Fates Group accounts?

20   A.  I can't speak to that because I do not have the records for

21   the final destination for the Fates Group account.

22   Q.  Have you seen Mr. Scott's name on any Fates Group account?

23   A.  None that I reviewed, no.

24   Q.  Thank you, ma'am.

25          Now, it would also be fair to say that each and every

1   one of the transactions that went to the first three Fenero

2   equity funds were in euros; isn't that right?

3   A.   Euros, yes.

4   Q.   And that none of these banks that we're listing here were

5   physically situated in the United States, correct?

6   A.   None of the seven banks?

7   Q.   Yes.  The seven that have the -- you have flags that show.

8   A.   Right.  They're not in the United States with the exception

9   of the Fates Group.

10  Q.   And the Fates Group as we have discussed for a few moments

11  now, those funds went to -- back to an account controlled by

12  the Fates Group although not the exact same account, correct?

13  A.   Yes.  A different Fates Group account.

14  Q.   Now, I wanted to talk about the period of time here.  This

15  covers approximately a five-month period of time, right?

16  A.   Yes.

17  Q.   And if we sat there and looked at the number of

18  transactions that occurred over that five months we would see

19  that each bank is sending less than ten wires in total.  I have

20  not counted the one that says Star Merchant.  Perhaps I should

21  have done that before I asked the question.

22          But let's start with the far left.  It appears that

23  there's only six transfers there; is that correct?

24  A.   I counted seven.

25  Q.   I'll go with seven, if there's seven.

1      Over a five-month period of time that would be a

2  frequency on average of one a week or maybe even less

3  frequently, correct?

4  A.  Well there was four in one day.

5  Q.  I understand that.  But I'm talking about when you put all

6  of these numbers out there it becomes kind of overwhelming.  It

7  looks like, wow, there's a lot.  But when you realize that this

8  covers a five-month period of time, the frequency or the

9  average frequency becomes a little bit more reasonable, would

10 you not agree?

11 A.  I'm not following you.

12 Q.  All right.  Well I probably asked a really poor question so

13 I'll move on.

14      MR. GARVIN:  Could we please see no. 2603.  Thank you,

15 Mr. Barile.

16 Q.  A few moments ago we were talking about Mr. Scott's tax

17 returns.  You recall that?

18 A.  Yes.

19 Q.  And this period of time is from 2016 through 2018; is that

20 correct?

21 A.  Yes.

22 Q.  And I believe you stated when you discussed this particular

23 chart that the side that has the American flag, the domestic

24 accounts, most, if not all, of those funds went through a Mark

25 Scott controlled bank account; is that true?

A.   Mark Scott's controlled account as well as Nicole Huesmann

account.

Q.   And Nicole Huesmann, she's an independent lawyer, correct?

A.   I believe so.

Q.   And she, as part of her private practice, she represents

people who purchase and sell real estate, she does the

closings, right?

A.   It appears so.

Q.   And so it's not uncommon for a lawyer who does real estate

work to place deposits in their trust account until the closing

occurs, correct?

A.   It's normal.

Q.   And so we know that this 36,643,000 plus the million

146,000 euros went either through Mr. Scott's account or Nicole

Huesmann's account, correct?

A.   Correct.

Q.   But we also know that during this period of time Mr. Scott

reported over $37 million of taxable income on his tax returns,

correct?

A.   From 2016 to 2018?

Q.   Yes.

A.   Yes.

          MR. GARVIN:   If we could please go to 2604, sir.

Q.   Now, this chart shows where this particular fund sent money

to; is that correct?

1   A.  Money going out and money coming in.

2   Q.  And so we have the account is being funded with $155

3   million; is that correct?

4   A.  Yes.

5   Q.  Now, let me start with that.  During your research did you

6   realize that each of these funds were supposed to have a cap of

7   one hundred million dollars?

8   A.  I'm sorry?

9   Q.  Each of the Fenero Funds had a cap of one hundred million

10  dollars?

11  A.  I'm unaware of that.

12  Q.  Are you familiar that when an equity fund has a cap, if it

13  gets overfunded it must either return the funds or transfer

14  those funds to another equity fund that is not over the cap?

15  A.  I'm familiar with that.

16  Q.  And so you've shown here that there was a transfer of

17  approximately $50 million that went to DMS Cayman to Fenero

18  Financial Switzerland.

19          Do you see that, ma'am?

20  A.  Yes.

21  Q.  But sitting here you don't know if that was done because

22  the DMS Cayman Fenero Equity Investments LP had exceeded its

23  cap?

24  A.  Right.  I'm not sure the reason.

25  Q.  Now, you have listed several transfers here and when you

1    did this would it be fair to say that you simply went to the

2    bank accounts and looked for transfers out and transfers in?

3    A.   Yes.

4    Q.   And that that process as a lawyer or as an accountant is

5    normally the easiest way to just follow the money, right?

6    A.   One of the ways.

7    Q.   And in this particular case we see that some of the funds

8    indeed went to another Fenero Financial equity fund and to the

9    right it also went to the Bank of Ireland Fenero Equity

10   Investments; is that true?

11   A.   Yes.  It went to three Bank of Ireland accounts.

12   Q.   And during your research and in preparation of your

13   testimony here today did you see the documentation that the

14   funds, the Fenero Funds were anticipating to invest in

15   distressed entities located in Europe and in particular the

16   United Kingdom and Ireland?

17   A.   If you can show me something to refresh my memory on that.

18   Q.   I don't remember the exact exhibit number but do you recall

19   reading the mission statement or any other documentation like

20   that?

21   A.   It might be contained in the mission statement but I would

22   need to look at the document to refresh my memory.

23   Q.   Well, when you looked at this you looked at the Bank of

24   Ireland documents, right?

25   A.   Yes.

1   Q.  And before the Bank of Ireland would accept any money they

2   would want to know what it is for, right?

3   A.  The purpose.

4   Q.  That's standard operating procedure, right?

5   A.  Yes.

6   Q.  And so what we do know here is that the Bank of Ireland

7   accepted the funds, correct?

8   A.  The funds were successfully transferred.

9   Q.  And we have some entries below that say DBS Bank Hong Kong

10  Barta Holdings LTD.  Do you see that?

11  A.  Yes.

12  Q.  Now, you understood that to be a loan; isn't that right?

13  A.  Yes, a loan for CryptoReal.

14  Q.  And you understood that CryptoReal was going to purchase

15  from an entity called Barta Holdings an oil field; isn't that

16  right?

17  A.  I'm familiar.

18  Q.  And are you also familiar that the parties that represented

19  Barta, the sellers, was Dr. Hui and Neil Bush, the son of

20  President George Bush?

21  A.  I'm only familiar with Dr. Makan, that he was listed on the

22  account opening records for Barta.

23  Q.  Did you look to see who was on the board of directors of

24  any of Dr. Hui's firms?

25  A.  No, I did not.

JBJ9SCO2                          October - Cross

1   Q.  So sitting here today do you have any information that

2   Mr. Neil Bush, Dr. Hui, met in Hong Kong with Ruja Ignatova

3   about this very transaction?

4   A.  I don't have knowledge of that information.

5   Q.  Do you feel that that would have been important information

6   to put on your chart?

7              MS. LOZANO:  Objection.

8              THE COURT:  Sustained.

9   Q.  Now, ma'am, you said that you did not see the repayment of

10  that particular loan; is that correct?

11  A.  That's correct.

12  Q.  And do you know when that particular loan was due to be

13  repaid?

14  A.  No, I do not.

15  Q.  So if the due date on that particular loan, $30 million,

16  was due three or four or even five years after the closing, you

17  would not expect to see that repayment if you're limiting the

18  time period from June to August of 2016, would you?

19  A.  Right.

20  Q.  So let's go to the one next to that.  It says Payment Card

21  Technologies.  Do you see that?

22  A.  Yes.

23  Q.  Do you recognize that as an investment made by Fenero

24  Equity Funds?

25  A.  I'm not sure what the purpose of the wire was for.

JBJ9SCO2                          October - Cross

1    Q.  Well did you make any effort to determine if Payment Card

2    Technologies, sometimes referred to as PCT, was a credit

3    card-related business in which Fenero Equity Funds purchased a

4    minority but controlling interest?

5    A.  I'm unaware of that.

6    Q.  Did you know when you made this chart whether or not any

7    agreement with Payment Card Technologies required an initial

8    deposit?

9    A.  No, I do not.

10   Q.  Would it be fair to say that you do not know the purpose of

11   any of these transfers?

12   A.  If there was no mention in the wire details, then I would

13   not know the purpose of the transfer.

14   Q.  So your knowledge would be limited to whatever the wire

15   detail states?

16   A.  Some of that and I also reviewed some e-mails but with

17   respect to these transfers it's limited to the wire and the

18   bank statements.

19   Q.  OK.  I appreciate that.  I didn't want to keep on badgering

20   you.  I'm sorry.

21         So then we'll take this down and we'll move, if we

22   could, I believe the next one is 2607.  Thank you so much.

23         Do you recognize this particular chart as one that was

24   discussed during direct examination, ma'am?

25   A.  Yes, I do.

JBJ9SCO2                          October - Cross

1  Q.  And I'm looking at the top part and we see the four Fenero

2  Funds in blue; is that correct?

3  A.  Yes.

4  Q.  And can you tell the ladies and gentlemen of the jury what

5  is IG Markets General LTD?

6  A.  It appears to be some type of investment management fund,

7  management company.

8  Q.  And do you have any idea about who operates that fund?

9  A.  No, I do not.

10  Q.  So we see in this particular case a number of lines that

11  come down to the very bottom and I want to go over that just a

12  little bit if I may.

13         So again what period of time is this covering?  Is it

14  July 2016 through April 2017?

15  A.  Yes.

16  Q.  And April 2017, actually April 10, 2017 is when the four

17  funds started transferring the money out until they were

18  closed; is that correct?

19  A.  That's about right.

20  Q.  So this would be right up until the time that started to

21  occur; is that correct?

22  A.  It falls within the time period.

23  Q.  And so can you tell us what is the purpose of the transfer

24  to Julius Baer for what appears to be Ocean States Ventures?

25  A.  I don't know the reason for the transfer.

JBJ9SCO2                         October - Cross

1    Q.  Do you know anything about that particular investment?

2    A.  No, I do not.

3    Q.  How about the next one to Vida Homes.  Can you tell us

4    about Vida Homes.  What do they do?

5    A.  Based on some records that I reviewed it appears to be home

6    purchases for Ruja Ignatova.

7    Q.  And do you know if those were investment properties or

8    personal use properties?

9    A.  I do not.

10   Q.  Let's talk about directly across from it, it says Metro

11   Bank Peregrine law client.  It seems to be another law firm,

12   isn't it?

13   A.  It appears so.

14   Q.  Do you know why Peregrine was receiving over $7 million?

15   A.  I do not.

16   Q.  We've already discussed the next one, Nicole Huesmann,

17   right, so let's go past her.

18            Do you see payment to the right in a red at the

19   bottom, you see the Payment Card Technologies.  Your answer

20   would be the same as what we previously discussed, right?

21   A.  Right.

22   Q.  And finally there's one above it that says IG Markets

23   General.  What was that investment for?

24   A.  I do not know the purpose of the investment.

25   Q.  Now when an equity fund closes or is terminated it is

1    customary that the equity fund will transfer any assets back to

2    the original investors; isn't that true?

3    A.   That happens sometimes.

4    Q.   And the equity fund is not allowed to just keep everything,

5    right?

6    A.   Right.

7    Q.   So in this particular case you did see that millions and

8    millions of dollars were transferred back; isn't that correct?

9    A.   Transferred back to whom?

10   Q.   Well, let's go over that a little bit.  That's a good

11   point.  I think that one of your charts showed that 185 million

12   went to another private equity firm called Phoenix; isn't that

13   true?

14   A.   Yes.

15   Q.   And so that really wouldn't be a transfer technically back

16   to the original investors.  That would be more on the lines of

17   a lateral transfer to a separate equity fund; isn't that

18   correct?

19   A.   Except I'm not sure what Phoenix Fund's business model is.

20   Q.   Did you take the time to look them up on Google?

21   A.   No, I did not.

22         MR. GARVIN:  Would you be kind enough, sir, I think

23   we've spent enough time with that one.

24         Could we go to 2622.

25   Q.   And I think that we were just talking about that one so it

JBJ9SCO2                        October - Cross

1    kind of fell right into place.  This is the transfer history

2    for the funds that ended up with Phoenix Fund, right?

3    A.  Yes.

4    Q.  And it appears in this that it says February through

5    April 2017.  Would it be fair to say that all of the transfers

6    occurred -- I guess we have been using -- let me start over

7    again.

8              Reviewing this it appears that actually the last

9    transfer to Phoenix was on April 10, 2017; is that correct,

10   ma'am?

11   A.  That's correct.

12   Q.  So actually the transfers commenced according to this chart

13   as early as February 24 of 2017; is that right?

14   A.  That's correct.

15   Q.  And do you know if in or about that time that BNY Mellon

16   was speaking with DMS Bank & Trust about IMS, meaning

17   International Marketing?

18   A.  I'm not sure of that conversation.

19   Q.  And I think that you told us that you have little or no

20   information on Phoenix Fund's history; is that correct?

21   A.  I have some information.

22   Q.  Do you have any knowledge for instance as to how long

23   Phoenix Fund had been in business?

24   A.  No, I do not.

25             MR. GARVIN:  We can take that down, please.

1                Could you please put up Exhibit 2620, please.  Thank

2     you.

3     Q.  Now this particular chart overlays pretty much everything

4     that happened during those two years, 2016 through 2018,

5     correct?

6     A.  Yes.

7     Q.  And the very, very bottom, those are the acquisitions or

8     purchases by Mr. Scott; isn't that correct?

9     A.  Correct.

10    Q.  And would it be fair to say and also accurate that these

11    purchases, some of them that you have listed occurred before

12    the Fenero Equity Funds were ever funded?

13    A.  Which one are you referring to?

14    Q.  I remember seeing in the watch category, which we'll

15    probably get to in the next exhibit, that there was a watch or

16    watches that were purchased before Fenero Equity Funds were

17    funded with the incoming money.  I think it actually said 2015.

18    A.  I would have to look at the -- I would have to see what

19    you're referring to.

20    Q.  I think we'll get to it.  You're not sitting here arguing

21    that Mr. Scott who was an equity partner in an international

22    law firm didn't make money before 2016, right?

23    A.  I'm not disputing that.

24    Q.  And you're not saying that Mr. Scott didn't have an

25    extensive watch collection before 2016, are you?

JBJ9SCO2                          October - Cross

1   A.  I don't know what his watch collection consisted of prior

2   to this.

3   Q.  Well you do know that there was a search warrant executed

4   in this case, correct?

5   A.  Yes.

6   Q.  And you do know that the -- after the search warrant was

7   conducted that the United States reviewed some of the things

8   that it had and decided to return them, right?

9            MS. LOZANO:  Objection.  May we approach?

10           THE COURT:  Sustained.  Sure.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JBJ9SCO2                          October – Cross

1                  (At sidebar)

2                  MS. LOZANO:  Your Honor I believe counsel is trying to

3       elicit testimony about items that were seized and subsequently

4       returned as part of the search warrant.  Because the Court is

5       going to instruct the jury that these searches were proper and

6       lawful and the items obtained were lawfully obtained it is

7       totally inappropriate for counsel to make a suggestion that

8       items were seized that were unlawfully seized and returned and

9       it's just that should not be in front of the jury.

10                 MR. GARVIN:  I have no intention of doing any of that,

11      in fact, I thought I was going out of my way to make the

12      government look good because they saw that there was some

13      things that they decided to return.  All I was trying to

14      establish was that Mr. Scott had purchased some watches and

15      cars which I'm still working on prior to the years in issue and

16      if the government saw fit to return something it was probably

17      because they recognized it had been purchased before the period

18      of time.  The Court has already sustained the objection.  I

19      planned on moving -- just moving on, not with this issue

20      though.

21                 THE COURT:  OK.

22                 (Continued on next page)

23

24

25

1          (In open court)

2    Q.  So getting back on track a little bit.  So you recognize

3    that Mr. Scott was an equity partner in an international law

4    firm, correct?

5    A.  Correct.

6    Q.  And that that position pays very well; isn't that correct?

7    A.  I assume so.

8    Q.  And that there is perfectly nothing wrong with Mr. Scott

9    spending his money, assuming as long as he pays his taxes, on

10   things that he cherishes; is that correct?

11   A.  OK.

12   Q.  So there is nothing wrong with Mr. Scott having an

13   extensive watch collection before 2016; isn't that true?

14   A.  (No response).

15   Q.  I'm not pointing at the chart.

16   A.  OK.

17   Q.  There's nothing wrong with it?

18   A.  There's nothing wrong with it.

19   Q.  The same thing goes with German cars.  You know that

20   Mr. Scott was born in Germany, right?

21   A.  Right.

22   Q.  And you've done enough research now to realize that all of

23   these cars that you saw are German cars, right, at least with

24   the exception of the Ferrari, right?

25   A.  Right.

JBJ9SCO2                          October - Cross

1   Q.  And I think that actually -- you will recall that actually

2   got traded in on something that was from Germany; isn't that

3   right?

4   A.  I don't recall.

5   Q.  And -- now let's talk about the boat.  There is nothing

6   wrong with having a boat in general, right?

7   A.  Right.

8   Q.  And there's definitely nothing wrong with having a boat if

9   you intend to use it for business development; isn't that true?

10  A.  I guess so.

11  Q.  Let's see if we can focus in a little closer.  Perhaps that

12  exhibit that I'm thinking about is 2618.  Perhaps that's the

13  one I'm thinking.

14          MR. GARVIN:  And would you be kind enough, Mr. Barile,

15  to focus on that entry to the far left.  Thank you, sir.

16  Q.  So this is the one that I was telling you kind of caught my

17  eye before.  You recognize the Fenero Funds received the

18  funding between June and October of 2016, correct?

19  A.  Right.  But there were other funding.

20          (Continued on next page)

21

22

23

24

25

1    Q.   This purchase occurred on November 23, 2015; isn't that

2    true?

3    A.   That's correct.

4    Q.   And this says that it came from Mark Scott PL.  That's his

5    law practice account, isn't it?

6    A.   Yes.

7    Q.   Those funds didn't come from Fenero Equity Funds; isn't

8    that true?

9    A.   It came from one of the IMS accounts.

10   Q.   No.  My question, ma'am, was those funds didn't come from

11   the Fenero Equity Funds; isn't that true?

12   A.   I believe it did.

13   Q.   The Fenero Equity Fund account was not funded until the

14   spring of 2016; isn't that true?

15   A.   That is correct.

16   Q.   Okay.  Now, way back on 2601, it showed that Mark Scott

17   received close to $1 million, and most of that money came from

18   IMS.  Do you recall that?

19   A.   Yes.

20   Q.   And is that why you are saying that you believe it came

21   from IMS, this particular money?

22   A.   I think so.

23   Q.   Okay.  We've already established, shown that the tax

24   returns shows that that million dollars was indeed reported by

25   Mr. Scott on his tax return; isn't that correct?

JBJ3SCO3                        October – Cross

1       MS. LOZANO:  Objection.

2       THE COURT:  Sustained.

3  Q.  So the total amount of the watches that are here says

4  $281,000.  Do you see that?

5  A.  Yes.

6  Q.  It says that they are funds originating from Fenero MSSI,

7  correct?

8  A.  Correct.

9  Q.  But, that first watch that we just looked at, that was not

10  from either Fenero or MSSI, that was from Mark Scott PL; isn't

11  that correct?

12  A.  Traced back to IMS.

13  Q.  Right.  This says Fenero MSS.  It doesn't say IMS.

14  A.  Right.

15  Q.  Correct?

16  A.  Correct.

17  Q.  That's not accurate, correct?

18  A.  It's still part of the IMS funding.

19  Q.  I understand.  But, just so the ladies and gentlemen of the

20  jury are not confused.  The 281,000 did not come from Fenero or

21  MSSI.  In particular that 21,500 that we are talking about

22  right now came from Mark Scott PL.  Correct?

23  A.  That is correct.

24       MR. GARVIN:  Okay.  Now Mr. Barile, if you would be

25  kind enough to increase the size of the far left bottom watch.

1    Yes.  Thank you, sir.

2    Q.  And this watch also shows a date that is before the Fenero

3    Fund got funded, right?

4    A.  Right, also IMS funds.

5    Q.  All right.  So it did not come from Fenero Fund or MSSI,

6    right?

7    A.  Correct.

8            MR. GARVIN:  If you could please take that down, sir.

9    And I think we can take down the entire chart.  So, I want to

10   go back and try to go a little bit quicker with these next

11   couple.  Can we please put up 2621.

12   Q.  This is the Locke Lord related issue, is it not?

13   A.  Yes.

14   Q.  So I'm starting on the far left-hand side, the funds get

15   started with Noor Bank RavenR.  Mr. Scott was not a signatory

16   for that account; is that correct?

17   A.  I do not have records for the Noor account.

18   Q.  Let's go to the one below it.  The Zala Group Comerica

19   Bank.  Mr. Scott was not a signatory for that either?

20   A.  Correct.

21   Q.  And I'm imagining your answer would be the same for the

22   Noor Bank below; is that right?  You don't have the records for

23   it?

24   A.  I do not have the records for Noor Bank.

25   Q.  Let's go to the right.  And it says Regions Bank Zala

1    Group.  Mr. Scott was not a signatory on that account; isn't

2    that right?

3    A.  Right, correct.

4    Q.  And the one below that has a different account number,

5    slightly, Regions Bank Zala.  Mr. Scott was not a signatory for

6    that either?

7    A.  Correct.

8    Q.  There are no records to show or -- excuse me.  Let me

9    rephrase that.

10          There are no records that you've seen in preparation

11   of your testimony here today that Mr. Scott participated in any

12   of these transfers; isn't that correct?

13   A.  Well, he was only on the e-mails for the Locke Lord

14   transfers.

15   Q.  Right.  Okay.  So, the transfers before?

16   A.  Before.

17   Q.  It's an accurate statement what I just said, right?

18   A.  That I haven't seen, yes.

19   Q.  So now let's go to Locke Lord account.  Who is the

20   signatory for the Locke Lord trust account?

21   A.  I'm not sure.

22   Q.  The two Locke Lord accounts that you have here, isn't it

23   accurate to say that Mr. Scott was not a signatory on either

24   one of those accounts?

25   A.  I don't have the account opening records for either of the

1    Locke Lord accounts.

2    Q.   Ultimately, the funds went to Zala Group at an account that

3    you have listed there in the Emirates; is that correct?

4    A.   Yes.

5    Q.   And isn't it also true that Mr. Scott is not a signatory on

6    that account?

7    A.   I do not have records for that account as well.

8    Q.   Thank you.  Could you please put up 2626, sir.  Thank you.

9              Would it be fair to say that you have not seen any

10   documentation whatsoever that Mr. Scott ever met Linda Cohen?

11   Isn't that true?

12   A.   I have no documentation of that.

13   Q.   And Mr. Scott, there is nothing with Mr. Scott's name to

14   suggest that he was involved in the funds being at HSBC Bank,

15   United States NA; isn't that correct?

16   A.   Correct.

17   Q.   And there's nothing to suggest that Mr. Scott was involved

18   when Linda Cohen transferred $22,577.29 to TD Bank; isn't that

19   correct?

20   A.   I don't have any records for that.

21   Q.   And Mr. Scott was not a signatory on the TD Bank account;

22   isn't that true?

23   A.   Correct.

24   Q.   And Mr. Scott was not a signatory on the bank account of

25   First Financial Bank, formerly Bannockburn Global Forex.  Isn't

JBJ3SCO3                          October – Cross

1    that true?

2    A.   That is true.

3    Q.   And Mr. Scott was not a signatory authority on United

4    Overseas Bank that you have referenced there at 6682.  Isn't

5    that true?

6    A.   That's correct.

7    Q.   And Mr. Scott was not a signatory on the Kreissparkasse

8    Steinfurt Bank number 6108.  Isn't that true?

9    A.   Correct.

10   Q.   From the records that we have on this particular chart,

11   Mr. Scott's name is nowhere, correct?

12   A.   I did not see his name on any of the accounts on this

13   chart.

14   Q.   Can we please take that down, sir.  Okay.

15          You had five exhibits and I am going to try do this

16   all in one time.  2617-A, B, D and E.  I guess it was four.

17   Maybe we skipped C.

18          Those were real estate transactions that Mr. Scott

19   participated in, correct?

20   A.   Correct.

21   Q.   And three of those real estate transactions actually went

22   to closing, correct?

23   A.   Correct.

24   Q.   One fell through, right?

25   A.   Right.

1    Q.  So whatever deposit he put on that particular entity went

2    back into Nicole Huesmann's trust account, correct?

3    A.  It was transferred -- it wasn't reflected on the chart, but

4    it was transferred back to Mr. Scott.

5    Q.  He didn't lose that money?

6    A.  Right.

7    Q.  I say that just because I don't want to be double counting.

8    A.  Right.

9    Q.  So, and then there was the condominium that he lives in

10   that they paid off the mortgage that had a balance of about a

11   million dollars, correct?

12   A.  Correct.

13   Q.  So the three properties that were waterfront properties,

14   did you recognize at any point that those appeared to be

15   investment properties?

16   A.  I'm not sure the purpose of those purchase.

17   Q.  Did you see any of them were rented out?

18   A.  No, I did not.

19   Q.  There is nothing wrong with buying property that you think

20   will appreciate in value, is there?

21   A.  I guess not, no.

22   Q.  You have, you went through five vehicles which we've

23   already discussed, 2619-A through E.  Correct?

24   A.  Correct.

25   Q.  And you did recognize that some of those vehicles are

1    actually collectors items; isn't that right?

2    A.  I'm not familiar with brand name cars, so I can't speak to

3    that.

4    Q.  All right.  So, when you put up $600,000 for a Porsche 911

5    GT2 RS, you didn't think one way or the other that that might

6    be a car that's for investment purposes as opposed to actually

7    driving?

8              MS. LOZANO:  Objection.

9              THE COURT:  Sustained.

10   Q.  So do you know if any of the cars are investor items or

11   not?

12   A.  I do not know the purpose of the car.

13   Q.  At one point during your testimony on direct you stated

14   that Mr. Scott had signature authority over all of the Fenero

15   Equity Investment bank accounts.  Do you recall that?

16   A.  Yes.

17   Q.  But, isn't it also true that during the period of time that

18   Apex was a fund manager, Mr. Scott did not have signature

19   authority over the Fenero Funds that Apex controlled?

20   A.  I can't speak to that.  I'm not sure.

21   Q.  Isn't it also true that the accounts that were controlled

22   by JP Fund Administrator -- I think it's JP Integra but I think

23   I've seen it written here as JP Fund Administrator on their

24   accounts -- they are the ones who had the signature authority

25   for the Fenero Equity Investment Fund, not Mr. Scott?

JBJ3SCO3                          October - Redirect

A.  I can't speak to that.

Q.  So, when you told the ladies and gentlemen of the jury that

Mr. Scott had authority for all of the accounts, that was not

quite accurate.  Is that correct?

A.  His name was on the signature cards for all of those

accounts.

Q.  All right.

          MR. GARVIN:  Your Honor, may I confer with counsel for

one moment?  I think I may be done.

          THE COURT:  Very well.

          MR. GARVIN:  Your Honor, I have no further questions.

Thank you, ma'am.

          THE WITNESS:  Thank you.

          THE COURT:  Any redirect?

          MS. LOZANO:  Yes, your Honor.

REDIRECT EXAMINATION

BY MS. LOZANO:

Q.  Ms. October, you were asked on cross-examination by counsel

about Fenero Fund mission statement, manager fees, and carried

interest.  Do you remember that?

A.  Yes.

Q.  To be clear, the 8 percent that's mentioned in the mission

statement is calculated on what?

A.  I have to look at it again.  I'm sorry.

Q.  Can we pull it up 2201, page seven.

JBJ3SCO3                    October - Redirect

1   A.  The 8 percent is carried interest pari passu with the

2   investors upon exit.

3   Q.  And carried interest is, as you testified previously,

4   calculated on profit only, correct?

5   A.  Profit only, yes.

6   Q.  That percentage that is articulated in the mission

7   statement is the manager's percentage of the profit earned on

8   the investments, right?

9   A.  Correct.

10  Q.  And that's because that fee is meant to be an incentive for

11  managers --

12          MR. GARVIN:  I object to the leading.

13          THE COURT:  It's redirect.

14  Q.  And that is because this fee is meant to be an incentive to

15  fund managers running real investment funds to earn returns or

16  profits for their investors, right?

17  A.  That's accurate.

18  Q.  Focusing -- we can take that down.  Thank you.

19          Focusing on, you mentioned that you saw evidence of a

20  loan given to DMS and repaid.

21  A.  Yes.

22  Q.  Is it fair to say that the repayment included some sort of

23  interest or profit?

24  A.  Yes.

25  Q.  Were there additional transactions that you identified in

1    the entirety of your financial analysis that identified profit

2    made by Fenero and returned to the investors?

3    A.   There was only one instance.

4    Q.   What was that?

5    A.   That was the return of, with IG markets and I'm sorry.  The

6    Cowen transfers. I think there was a profit of either 29,000 or

7    26,000.  Somewhere in that range.

8    Q.   You were asked on cross-examination about -- I think can we

9    pull up 2604, please.  You were asked on cross-examination

10   about the $30 million being sent to Barta Holdings.

11   A.   Correct.

12   Q.   And you were asked whether during this time period, on the

13   chart, the June to August 2016, you had not seen repayment of

14   that loan?

15   A.   I did not.

16   Q.   I would ask you a different question.  During your analysis

17   of the entirety of the period bank records you analyzed from

18   May 2016 to July 2018, did you see evidence of repayment of

19   that loan?

20   A.   I did not.

21        MS. LOZANO:  We can take that down, and if we can put

22   up first 2701, page five.  And if we can highlight I think we

23   want to go to the last page, actually.  If we could highlight

24   that bottom entry.

25   Q.   Ms. October, are you aware that the defendant was arrested

1   in September of 2018?

2   A.  Yes.

3   Q.  Take that down.

4           Counsel asked you on cross-examination about the

5   defendant's 2018 tax returns, right?

6   A.  Yes.

7   Q.  Do you remember that?

8   A.  Yes.

9   Q.  So can we pull up DX 701, and scroll to page 13.  On this

10  form, how much in line one does the defendant claim as adjusted

11  gross income?

12  A.  29,695,405.

13  Q.  At the bottom could we please highlight the filing date of

14  October 15, 2019.

15          Ms. October, are you aware that October 15, 2019, is

16  approximately two weeks before this trial started?

17  A.  Yes.

18  Q.  Are you aware that that date, the filing of these tax

19  returns occurred approximately one year after the defendant was

20  arrested?

21  A.  Yes.

22          MS. LOZANO:  One moment, your Honor.  I have no

23  further questions.  Thank you, Ms. October.

24          MR. GARVIN:  One or two follow up.

25  RECROSS EXAMINATION

JBJ3SCO3

1    BY MR. GARVIN:

2    Q.  Ms. October, you have a background with the IRS, correct?

3    A.  I worked for the IRS as a contractor for 18 months.

4    Q.  You know that October 15 is the deadline for filing a tax

5    return, correct?

6    A.  For extensions.

7    Q.  And that if you made money at all, at any point in time

8    during 2018, you have to file that tax return no later than

9    October 15, 2019, correct?

10   A.  Right.

11   Q.  If you file it on October 15, 2019, then you are complying

12   with the mandate of the Internal Revenue Service laws; isn't

13   that correct?

14   A.  Yeah.

15            MR. GARVIN:  I have no further questions, thank you.

16            THE COURT:  Ms. October, you may step down.

17            THE WITNESS:  Thank you.

18            (Witness excused)

19            THE COURT:  Government, please call your next witness.

20            MR. DiMASE:  Your Honor, we have some exhibits to

21   introduce before the next witness.

22            THE COURT:  Okay.

23            MR. DiMASE:  First I'd like to offer again Exhibits

24   506 through 513, and 517 through 537.

25            MR. DEVLIN-BROWN:  No objection.

JBJ3SCO3

1          THE COURT:  They will be received.

2          (Government's Exhibit 506 through 513, 517 through 537

3    received in evidence)

4          MR. DiMASE:  I would also offer exhibits 1363 and

5    1125, and if counsel would like to see them we can show each of

6    them on the screen briefly.

7          MR. DEVLIN-BROWN:  Could you.  Can we see them again.

8          MR. DiMASE:  Sure.

9          MR. DEVLIN-BROWN:  No objection.

10          THE COURT:  They will be received.

11          (Government's Exhibit 1363, 1125 received in evidence)

12          MR. DiMASE:  And the government also offers Exhibits

13    1226, 1289, 1134, and 1007.

14          MR. DEVLIN-BROWN:  One second.  Would you mind going

15    back to 1226.  Can we see 1134 and 1007.

16          No objection, other than with respect to Government

17    Exhibit 1007, that also had been marked, as the Court knows, as

18    Defense Exhibit 103.  We'd like it introduced under both

19    numbers.

20          THE COURT:  Very well.  Those exhibits will be

21    received.

22          (Government's Exhibit 1226, 1289, 1134, 1007 received

23    in evidence)

24          MR. DiMASE:  We'd like to publish these to the jury.

25          THE COURT:  Very well.

1           MR. DiMASE:  Can we publish 1007, please.

2           This is an e-mail from at the bottom Dr. Ruja Ignatova

3      to Mark Scott copying Irina Dilkinska.  Subject "legal brief."

4      Dated October 13, 2015.  In which Ignatova says:  "Dear Mark,

5      thank you for the good call.  It was a pleasure to speak to

6      you.  I copy Irina Dilkinska on this e-mail.  She is the head

7      of legal in our company and will be able to provide you with

8      all background information on the companies and documents.  As

9      I spoke with Gilbert I told him we have several needs to

10     address.  One.  Asset protection.  The business is profitable

11     and I have some personal assets that I want to protect from

12     several risks, be it a lawsuit, be it divorce and so on.  Two.

13     Business, OneCoin.  Here we are in two tricky fields.  One is

14     network marketing, which people often confuse with Ponzi and

15     other illegal ways of doing business.  Every market is

16     different.  Some markets need a license to operate.  We take

17     sometimes deliberate risks to operate in markets without

18     licenses.  I would like to protect the network part wherever I

19     can.  Cryptocurrency, the legislation and regulation is

20     changing fast.  The U.S. now classified cryptocurrency as

21     commodities.  We need to know which regulations we need to

22     comply, which changes to make, etc.  I would like as much as

23     possible to split my business legally in cryptocurrency, the

24     coins.  Network company in Gibraltar, Dubai, for biggest cashes

25     in, and operations company called One Network Services in

JBJ3SCO3

1    Sofia, Bulgaria.  Restructuring would be easy as this companies

2    have no real assets except the IT system and database.  I need

3    hands on advice, something that let me operate my business as

4    much as possible within legal frameworks and biggest risks are

5    reduced.  Being outside legality in China does not concern me.

6    But risk not being "legal" in U.S.A. I would take extremely

7    serious.  I'm sure you get my point.  Other businesses.  We

8    have several other businesses which I treat differently as

9    personal assets.  Some private equity like investments.  Here

10   I'm also looking for anonymity and asset protection.  I have

11   shares in some software ventures, agriculture projects and so

12   on.  Gilbert told me we would work together also with another

13   lawyer Robert Courtneidge.  Please let me know your thoughts on

14   how we could work together and approach the problems also

15   charges, etc.  Best, Ruja."

16        To which Mr. Scott then forwards this e-mail to Mark

17   Scott from his Locke Lord e-mail account writing "FYI" and

18   Mr. Armenta responds "Yes, good for you.  Call me, please.  All

19   the best.  Gilbert Armenta."

20        Let's go to Exhibit 1289.  At the top, just focusing

21   on the top two e-mails, this is an e-mail dated December 13,

22   2016 from NajibKassis@RavenR.com to Mark S. Scott copying Max

23   von Arnim and David Pike.  Subject "KYC for potential

24   investment."

25        "Hi Mark, please find attached our investment memo.

JBJ3SCO3

We have preliminary approval for the investment and will get
final sign off once we pass KYC.  Best, Najib."

           To which Mr. Scott responds to David Pike on 12/29/16,
"The possible link to OC will kill this for us.  I will
terminate the opportunity slowly and for several other
reasons."

           Showing Government Exhibit 1134 in evidence.  This is
an e-mail from at the bottom Mark Scott -- I'm sorry from
Irina@OneCoin to Mark Scott copying Ruja@OneCoin.  "Good
evening, Mark.  Please find all I have for the company in
question.  Let me know if I can be of any help further."  To
which Mr. Scott responds on -- that was July 6, 2016.  To which
Mr. Scott responds on July 7, "Do we have any general
information on the oil field at all?"  Dr. Ruja Ignatova
responds to Mark Scott copying Irina Dilkinska, "Yes, you need
it?  Best regards, Dr. Ruja."

           Take that down.  And finally Government Exhibit 1226.
If we can go to the second page.  That e-mail right there,
Mr. Barile.  An e-mail from Irina Dilkinska at RavenR to Mark
Scott and David Pike copying Joanna Allinson at RavenR.  Funds
coming to DB.  August 12, 2016.  "Mark, funds are coming from
IMS Singapore.  Please as I have asked in my e-mail to you
earlier today send me the exact information.  What date do you
want on the letter?  Confirm if letter must be from BN.  What
is the amount that I have to put in the letter?  Is the payment

JBJ3SCO3

1    addressed to Cayman."

2            The next e-mail up in the thread Mark Scott responds

3    to Irina Dilkinska and David Pike copying Joanna Allinson on

4    August 12, 2016.  "Hi Irina, this is not going to work so

5    easily.  The moneys have to be allocated to the investors that

6    are signing the subscription packages.  We can't just use IMS

7    as the central bank.  How are we going to explain assignments

8    from one source to multiple parties?  I suggest that we assign

9    all the incoming funds to one investor.  I would suggest BN as

10   DD is almost complete pending your packages sent to me.  I

11   suggest another authorization letter from BN to IMS dated last

12   week asking to transfer the euro 20 mio in tranches for all the

13   funds still coming from IMS.  We should have know this before.

14   We thought every other subscriber than BN sending their own

15   funds such as Star did.  Best, Mark."

16           One moment.  Thank you, your Honor.  We have one more

17   exhibit to offer and then we'll call the our next witness.

18           MR. FOLLY:  The government offers Government Exhibit

19   3305 if we can just publish that to the parties.

20           MR. DEVLIN-BROWN:  Can we just speak for a second.  No

21   objection, other than what we may have raised previously on

22   this one.

23           THE COURT:  Very well.  It will be received.

24           (Government's Exhibit 3305 received in evidence)

25           MR. FOLLY:  Your Honor, at this time the government

JBJ3SCO3                    Fata - Direct

1    calls Special Agent Kristine Fata.

2                THE COURT:  Mr. Folly.

3                MR. FOLLY:  Thank you, your Honor.

4     KRISTINE FATA,

5         called as a witness by the Government,

6         having been duly sworn, testified as follows:

7    DIRECT EXAMINATION

8    BY MR. FOLLY:

9    Q.  Good afternoon.

10   A.  Good afternoon.

11   Q.  Where do you work?

12   A.  I work with IRS Criminal Investigations.

13   Q.  What is your title there?

14   A.  I'm a special agent.

15   Q.  How long have you been a special agent?

16   A.  For approximately 20 years.

17   Q.  What are some of your main duties and responsibilities as a

18   special agent for IRS Criminal Investigations?

19   A.  I'm responsible for conducting criminal investigations of

20   violations of federal tax laws and related financial crimes.

21   Q.  As part of your duties, do you also participate in searches

22   and seizures?

23   A.  I do.

24   Q.  Can you explain what that means.

25   A.  A search warrant or a seizure warrant is issued by a U.S.

1   magistrate.  I go to the location and execute the search

2   warrant or the seizure warrant where we take custody of

3   whatever items are listed in either of those.

4   Q.  What types of tasks do you typically perform during

5   searches and seizures?

6   A.  I can, if it is a seizure warrant, I would go and identify

7   what the item is, make sure it matches what's listed in the

8   seizure warrant and then fill out required paperwork.  Leave a

9   copy of the warrant at the location, and arrange and take

10  custody of that, that property.

11          And a search warrant, we'd go into the residence or

12  business, whatever the location is, and perform a safety sweep

13  of the location, and then search the areas that we are allowed

14  to search, and seize whatever items are listed in that search

15  warrant.

16  Q.  Did there come a time when you participated in a search and

17  seizure at a residence of Mark Scott?

18  A.  Yes.

19  Q.  When was that?

20  A.  That was September 5 of 2018.

21  Q.  Did you also participate in the arrest of Mark Scott on

22  that same day?

23  A.  Yes, I did.

24  Q.  Do you see Mark Scott in the courtroom here today?

25  A.  Yes, I do.

1    Q.  Can you identify him by indicating where he is seated and

2    an article of clothing he's wearing?

3    A.  He's at that table.  He's just stood up wearing a suit.

4              MR. FOLLY:  Let the record reflect the witness has

5    identified the defendant Mark Scott.

6              THE COURT:  The record will so reflect.

7    Q.  Before we go through the details of the events on the day

8    of the arrest, can you provide an overview of what happened on

9    that day?

10   A.  I attended a preoperational briefing at the Barnstable

11   Police Department.  And after that, we went to execute the

12   arrest of Mark Scott, and then I went to seize Mark Scott's

13   yacht.  And I went back to his house to seize a Porsche.

14   Q.  What was your first task on the day of his arrest?

15   A.  To assist in the arrest.

16   Q.  You mentioned that the day began with a pre-operation

17   meeting?

18   A.  Yes.

19   Q.  Approximately when was that?

20   A.  Approximately 5:30 in the morning.

21   Q.  What happened after that pre-operation meeting?

22   A.  After that, we went to Mark Scott's residence, which is

23   where I believed he was at that time.  But as we were traveling

24   there, at some point we learned that he wasn't at that

25   location.  So, we pulled over into a marina that wasn't far

JBJ3SCO3                              Fata - Direct

1    from the police station, and we waited there until we had more

2    information.

3    Q.  Were you alone or were you with other law enforcement

4    officers?

5    A.  No, other officers and agents.

6    Q.  What was the next thing that happened?

7    A.  Then we learned Mark Scott was going to be driving on that

8    road at some point.  And he was pulled over, and we executed

9    the arrest, we arrested him.

10   Q.  What happened after Mark Scott was placed under arrest?

11   A.  He was driven back to the police station, and then I

12   interviewed him with another agent at the police station.

13   Q.  Was that the Barnstable Police Station?

14   A.  Yes.

15   Q.  You mentioned that after you got back to that Barnstable

16   Police Station, that you participated in an interview of the

17   defendant; is that correct?

18   A.  Yes.

19   Q.  Were you alone or were you with anyone else for that

20   interview?

21   A.  No, I was with an FBI agent.

22   Q.  What was that FBI agent's name?

23   A.  James Eckel.

24   Q.  Is that interview video recorded?

25   A.  It was.

JBJ3SCO3                          Fata - Direct

1   Q.  If you could look next to you at the disc which is marked

2   with Government Exhibit's 601A, 601B, 601C, 601D, 601F, 601G,

3   and 601H, as well as 601-TR.  Do you recognize that disc with

4   the exhibits I just listed?

5   A.  I do.

6   Q.  How do you recognize them?

7   A.  I reviewed it and I initialed it.

8   Q.  What is contained on that disc?

9   A.  They are videos of parts of the interview, and there is a

10  transcript of the interview.

11          MR. FOLLY:  The government offers the exhibits on that

12  disc that I just listed.

13          MR. GARVIN:  Your Honor, we have nothing other than

14  what we raised in limine, so we have no objection.

15          THE COURT:  Very well.  They will be received.

16          (Government's Exhibit 601A, 601B, 601C, 601D received

17  in evidence)

18          (Government's Exhibit 601F, 601G, 601H, 601-TR

19  received in evidence)

20          MR. FOLLY:  Before we turn to the videos that are

21  referenced on that disc, Mr. Barile, if you could publish

22  what's in evidence as Government Exhibit 2284 at page two.  If

23  you could enlarge that first paragraph.  It is an e-mail from

24  Mark Scott to Paul Spendiff on August 10, 2016.  The second

25  sentence of the e-mail reads, "Money is not held on behalf of

JBJ3SCO3                          Fata - Direct

1    OneCoin clients, it is OneCoin's money."

2              You can take that down.

3              Mr. Barile, if you could publish 601A along with the

4    portion of the transcript from 601-TR.

5              (Video recording playing)

6              MR. FOLLY:  Mr. Barile, if you could publish 601B and

7    the transcript for that.

8              (Video recording playing)

9              MR. FOLLY:  Mr. Barile, if you could publish 601C.

10             (Video recording playing)

11             THE COURT:  Let's take our second break.  15 minutes.

12   don't discuss the case.

13             (Jury excused)

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1      THE COURT:  Agent, you may step down.  Everyone can be

2  seated.

3      Just so you know, they asked again whether we were on

4  track to finish this week.  We told them yes.  They didn't

5  believe us.  Just so you know.  Anything else?

6      We do have the jury charge.  If there are going to be

7  any other changes, if you see any typos or grammatical errors,

8  get them to chambers by no later than 5 o'clock this evening.

9  We're going to go with what you have otherwise.  Please get me

10  a copy of the indictment.

11      I take it there is no objection to the verdict form?

12      MR. DEVLIN-BROWN:  Other than the issue I raised

13  orally, but I'm not going to write on it.

14      THE COURT:  Very well.  Don't be late.

15      MR. FOLLY:  We wanted to inquire, does the defense

16  intend to put any additional witnesses on today?

17      MR. GARVIN:  Yes.  As we said yesterday, we have two

18  people from out of town that are in the hallway.  They've been

19  here all morning.  One of them has been here since Saturday.

20  So we're hoping as soon as the government rests to put them on

21  very quickly.  I expect them to be shorter than Mr. de la

22  Portilla was yesterday.  And I'm hoping to have both of them

23  out the door before 2:30 because they have airplanes.

24      THE COURT:  They will be out of the door at 2:30.

25  Whether they come back is another matter.

JBJ3SCO3                          Fata - Direct

1      (Recess)

2           MR. DiMASE:  The government has a proposed change to

3    the jury instructions.

4           THE COURT:  Okay.  What is it?

5           MR. DiMASE:  On page 21, your Honor.

6           THE COURT:  Okay.

7           MR. DiMASE:  And in paragraph four here.

8           THE COURT:  Yes.

9           MR. DiMASE:  We would propose adding after the

10   intentional concealment of material facts, the following

11   language.  We would propose to add "which made what was said

12   under the circumstances misleading."

13          THE COURT:  Any objection to that?

14          MR. DEVLIN-BROWN:  I believe this is an issue we

15   raised yesterday.  We prefer our language and would stand by

16   that, but I think this better than what the Court had before.

17          THE COURT:  So this is like the third line up from the

18   bottom of that paragraph?  "The intentional concealment of

19   material facts which made what was said under the circumstances

20   misleading."

21          MR. DiMASE:  That's correct and I'm taking that

22   language, your Honor, from the District Court case in Petrossi

23   which was upheld by the Second Circuit in September of 2019.

24          (Jury present)

25          THE COURT:  Mr. Folly.

1          MR. FOLLY:  Thank you, your Honor.  Mr. Barile, if you

2     could now publish 601D along with the transcript.

3          (Video recording playing)

4          MR. FOLLY:  If we could publish 601F.

5          (Video recording playing)

6          MR. FOLLY:  Go to 601G.

7          (Video recording playing)

8          MR. FOLLY:  And 601H.

9          (Video recording playing)

10          MR. FOLLY:  At this time government offers Government

11     Exhibit 1307 if we can show that first to the parties only.

12          MR. DEVLIN-BROWN:  No objection.

13          THE COURT:  1307 will be received.

14          (Government's Exhibit 1307 received in evidence)

15          MR. FOLLY:  You can publish that to the jury and zoom

16     in on the top two e-mails, Mr. Barile.  Bottom e-mail, the

17     first e-mail in the chain is from Irina Dilkinska to Mark Scott

18     dated March 28, 2017.  It say "Thank you.  Please advise on the

19     transfers and situation.  Regards, Irina."

20          In response, Mark Scott writes, "We cannot move for a

21     while.  We just received another request for additional source

22     of wealth for you, Starz and Frank Ricketts.  I am speaking to

23     our attorneys on how to block.  Things are not looking good.  I

24     am asking the boss to hold still.  They know pretty sure OC/OL

25     behind it.  May raise serious AML anti-money laundering

1    issues."

2            You can take that down.

3    Q.  Special Agent Fata, after the interview was completed, what

4    happened next on that same day?

5    A.  Then I went to the Hyannis marina to seize Mark Scott's

6    yacht.

7    Q.  What happened when you went to seize the yacht?

8    A.  I spoke to the dockmaster, another individual that worked

9    there, they showed me where the yacht was.  I went and took

10   photographs of the yacht.  Pulled out some paperwork, and left

11   copies of the paperwork.

12   Q.  Did you in fact execute the seizure of the yacht?

13   A.  Yes.

14   Q.  How did that work?

15   A.  I served the seizure warrant, and I filled out the

16   paperwork.

17   Q.  Did you take any photographs while you were at the marina?

18   A.  Yes, I did.

19           MR. FOLLY:  Mr. Barile, if you could publish for the

20   witness and the jury what's in evidence as Government Exhibit

21   107.

22   Q.  Ms. Fata, do you recognize that?

23   A.  I do.

24   Q.  What is shown in that?

25   A.  That is Mark Scott's yacht.

1  Q.  After executing the seizure of Mark Scott's yacht, what did

2  you do next?

3  A.  Then I went to his residence to execute the seizure of Mark

4  Scott's Porsche, one of the Porsches.

5  Q.  Where was that residence located?

6  A.  That was at 133 Sunset in Barnstable, Massachusetts.

7  Q.  At the time you arrived at Scott's residence, were there

8  other law enforcement officers already there?

9  A.  There were.

10  Q.  What were they doing at that time?

11  A.  They were finishing up the search warrant of the residence.

12  Q.  What did you do when you arrived at Scott's residence?

13  A.  I took photos of the Porsche.  There were two that were

14  there so I checked the VIN number, took photographs of it, and

15  I waited for the tow truck driver to come and transport it.

16          MR. FOLLY:  Mr. Barile, if could you publish for the

17  witness what's been marked as Government Exhibit 106.

18  Q.  Special Agent Fata, do you recognize this?

19  A.  I do.

20  Q.  What is it?

21  A.  It's Mark Scott's Porsche.

22  Q.  How do you recognize it?

23  A.  I took that photo.

24          MR. FOLLY:  Your Honor, this may already be in

25  evidence, but if it's not, the government offers Government

1    Exhibit 106.

2                MR. GARVIN:  No objection.

3                THE COURT:  106 will be received.

4                (Government's Exhibit 106 received in evidence)

5                MR. FOLLY:  If we can publish that to the jury.

6    Q.  Special Agent Fata, if you could read aloud what's listed

7    on the license plate of the car.

8    A.  MSSI-2.

9                MR. FOLLY:  Mr. Barile, if you can publish what's in

10   evidence as Government Exhibit 105 for the witness and the

11   jury.

12   Q.  Special Agent Fata, do you recognize what's shown in this

13   series of photographs?

14   A.  I do.

15   Q.  What is shown in them?

16   A.  That's Mark Scott's residence in Barnstable.

17   Q.  Is that the same residence where you executed the seizure?

18   A.  Yes.

19               MR. FOLLY:  Mr. Barile, if you could publish through

20   these photographs.  We can take that down.

21   Q.  Special Agent Fata, after you finished with the seizure of

22   the Porsche, what happened at that point?

23   A.  I asked the -- I left copies of the warrant in the kitchen,

24   on the counter, and I asked the agents if they needed any help

25   but they were just about done, and as I was walking out, there

JBJ3SCO3                          Fata - Cross

1   was a gentleman that was walking up to the house, and his name

2   was David Pike and I interviewed him.

3   Q.  Special Agent Fata, aside from your participation with the

4   seizures and the arrest that you have been describing to us,

5   have you had any additional involvement in this investigation

6   of Mark Scott?

7   A.  No.

8           MR. FOLLY:  No further questions.

9           THE COURT:  Any cross-examination?

10          MR. GARVIN:  A little bit, yes, your Honor.

11  CROSS-EXAMINATION

12  BY MR. GARVIN:

13  Q.  Good afternoon, Special Agent Fata.

14  A.  Good afternoon.

15  Q.  When you went to Mark Scott's on the day to execute the

16  search warrant and the arrest warrant, I believe you testified

17  that Mr. Scott was not home.  Is that correct?

18  A.  That's correct.

19  Q.  It would be accurate to say that usually the execution of

20  search warrants are done very early in the morning if possible;

21  is that correct?

22  A.  That's correct.

23  Q.  And the reason for that is you want to make sure that the

24  person is home, right?

25  A.  It depends on the case.

1   Q.  In this particular instance, you were headed that way, it

2   was approximately 5 o'clock in the morning, correct?

3   A.  No.

4   Q.  What time was it?

5   A.  I believe it was close to 6 o'clock.

6   Q.  Okay.  So --

7   A.  Or a little after 6 o'clock.

8   Q.  I'm sorry for talking over you.  Go ahead.

9   A.  Or a little after 6 o'clock.  I know it wasn't 5 a.m.

10  Q.  Approximately 6 o'clock, and you got word on the radio that

11  Mr. Scott was not there, correct?

12  A.  No.  I didn't have a radio.  I heard from somebody I called

13  or some other law enforcement officer, but we didn't have a

14  radio.

15  Q.  Somebody notified you to slow up, I think you said you

16  pulled over, to slow up because he wasn't there?

17  A.  Yes.

18  Q.  So, when you finally did see Mr. Scott, did you understand

19  that he had not been sleeping for quite a while?

20  A.  No.

21  Q.  When they executed the search warrant, did you see his CPAP

22  equipment because he has sleep apnea?

23  A.  I wasn't at the house.

24  Q.  Did the other agents inform you that Mr. Scott suffers from

25  sleep apnea?

JBJ3SCO3                          Fata - Cross

1    A.  No.

2    Q.  When you arrived there, and you saw Mr. Scott, when you saw

3    his -- as we saw on the pictures there, when you saw his

4    general demeanor, the look in his eyes, did you ever ask him

5    when the last time it was that he slept?

6    A.  That was not a question I asked him.

7    Q.  Did it ever come up that he looked like or appeared to be a

8    person who had sleep deprivation?

9    A.  No.

10   Q.  Since that time that you executed the warrant, have you now

11   learned that, indeed, he does suffer from sleep apnea?

12   A.  No.

13   Q.  How long was the interview that we just saw excerpts of?

14   A.  Approximately one hour.

15   Q.  During that period of time, did you at any time tell

16   Mr. Scott to speak with you was a one-time opportunity?

17              MR. FOLLY:  Objection, your Honor.

18              THE COURT:  Sustained.

19   Q.  Did you --

20              MR. GARVIN:  Your Honor, may I have a sidebar?

21              THE COURT:  Sure.

22              (Continued on next page)

23

24

25

1          (At the sidebar)

2          MR. GARVIN:  Your Honor, I was going to the

3   credibility of the witness, she told Mr. Scott "So this is your

4   one opportunity.  You have a small child at home.  You have

5   your wife.  I'm sure you have a life that you want to live.

6   This is your one opportunity to help yourself.  So just think

7   about that for a moment before you answer."

8          Now, my question was to her, did you tell Mr. Scott

9   that this was his one opportunity.  And I was exploring to see

10  if the witness was going to answer yes or no.  Because if the

11  witness answered no, then I intended to impeach her and show

12  what her credibility was or I think that might affect her

13  credibility.

14         I don't believe there is a reason not to ask her what

15  she said to the defendant.  I'm not asking what the defendant

16  said or going into any of the search, but I do think this is

17  something that is permissible in cross-examination.

18         MR. FOLLY:  Your Honor, two points.  One is that the

19  issue of what portions of the video are admissible at this

20  trial has been litigated.  There was briefing, there was

21  argument.  The ruling stands on that.  There is no reason to

22  revisit that ruling.

23         The second piece of this is that the video, to the

24  extent anything is going to be discussed with this witness,

25  speaks for itself.  It's video recorded.  The portions that are

JBJ3SCO3                          Fata - Cross

1    in, are in.  And for those reasons, there should not be

2    questions about portions of the video that are not before this

3    jury and will not be coming before this jury.

4            THE COURT:  The purpose for which you said you were

5    going to use it, Mr. Garvin, that same could be said of any

6    question that she asked, right?  So you can get in that fashion

7    any aspect of that transcript that has been litigated in the

8    past.

9            MR. GARVIN:  Well, we litigated before, your Honor,

10   because we were trying to put in statements that were favorable

11   to Mr. Scott.  And we said that that was under the rule of

12   completeness.

13           I'm not trying to put in anything that Mr. Scott said

14   here, sir.  I'm only trying to see if she will concede what she

15   told Mr. Scott, and I'm only limiting it actually to whether or

16   not they told him it was his one-time opportunity, because

17   quite frankly, I don't believe it was his one opportunity.  I

18   thought, I think they were being less than candid with

19   Mr. Scott, and I think the fact that they were being less than

20   candid with Mr. Scott is something the jury can take into

21   consideration.

22           THE COURT:  I am going to stick by the prior ruling.

23           MR. GARVIN:  Yes, sir.

24           (Continued on next page)

25

1           (In open court)

2    BY MR. GARVIN:

3    Q.  Just a few more questions, ma'am.

4    A.  Sure.

5    Q.  During your interview with Mr. Scott, it would be fair to

6    say that he did answer most all of the questions that were

7    posed to him.  Is that correct?  I'm only limiting it to what

8    we saw on the screen here.

9    A.  Yes.

10   Q.  Okay.  And even though it did seem to take some time for

11   him to respond, didn't it, did it appear that way to you while

12   you were watching this video?

13   A.  No.

14           MR. GARVIN:  No further questions, thank you.

15           THE COURT:  Any redirect?

16           MR. FOLLY:  No redirect, your Honor.

17           THE COURT:  Agent Fata, you may step down.

18           (Witness excused)

19           THE COURT:  Does the government have another witness?

20           MR. FOLLY:  Your Honor, we do not have any additional

21   witnesses.  We'd ask just momentarily if the jury could step

22   out and we could raise a couple issues with your Honor.

23           THE COURT:  Very well.  Ladies and gentlemen, we are

24   going to take a quick break and we'll bring you back out when

25   we're done.

JBJ3SCO3

1          (Jury excused)

2          THE COURT:  Everyone can be seated.  Does the defense

3     wish to make a motion?

4          MR. DEVLIN-BROWN:  Has the government rested?

5          MR. FOLLY:  Your Honor, there is just two issues we

6     wanted to flag.  With the Court's permission, with defense

7     counsel's permission, we'd just request that we can correct the

8     splicing of the videos that were played to the jury.  There is

9     a couple instances where there is like a half sentence that got

10    cut off on the actual video which is reflected on the text.

11    And we'd just like to make those revisions today so that the

12    actual exhibit available to the jury, if they would like it, is

13    the corrected version of that.

14          THE COURT:  Okay.

15          MR. DEVLIN-BROWN:  No problem with that, of course,

16    other than the prior objections.

17          MR. FOLLY:  Your Honor, the second issue is just with

18    respect to those exhibits listed on the timeline.  I know we

19    keep revisiting this.  But we just want to make sure that they

20    are clearly reflected in the record as being admitted into

21    evidence.  And we've been speaking with court reporter about

22    the best way of doing that so the court reporter can avoid

23    manually having to type in every single exhibit that is listed

24    there.  As long as there is a clear record on this, the

25    government does not have any issue, but we want to make sure

JBJ3SCO3

1    that that is in.

2              THE COURT:  Can we make that an exhibit?

3              MR. FOLLY:  We would be happy to, your Honor.

4              THE COURT:  Does that take care of it?

5              MR. DEVLIN-BROWN:  Maybe a court exhibit, your Honor.

6    I don't know it should be sent back to the jury.

7              THE COURT:  I would be happy to make it a court

8    exhibit as long as there is no objection to its contents.

9              MR. GARVIN:  No objection, your Honor.

10             THE COURT:  We'll make it Court Exhibit No. 1.

11             What else?

12             (Court Exhibit 1 received in evidence)

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

JBJ9SCO4

1            MR. FOLLY:  Your Honor, there's nothing additional

2    from the government for purposes of addressing any motion.

3    We're happy to rest here but we would, obviously, like to rest

4    in front of the jury.

5            THE COURT:  I thought that's what we were going to do.

6            Does the government rest?

7            MR. FOLLY:  Yes, your Honor.

8            THE COURT:  OK.

9            MR. DEVLIN-BROWN:  We do make such a motion.

10           With your Honor's permission, we have the two

11   character witnesses.  We could discuss it after they leave.

12           THE COURT:  Very well.  Bring the jury back up.  My

13   intention is let them go early and tell them we're going to sum

14   up tomorrow assuming that these two witnesses -- hold on,

15   Ms. Rivera.

16           MR. DEVLIN-BROWN:  We do plan to publish some exhibits

17   tomorrow morning and perhaps have our own paralegal take the

18   stand and go through them but it's not going to be more than a

19   half-hour or so exercise.  It's not an all-day affair.

20           THE COURT:  Can that happen today?

21           Assuming these two witnesses are off in a half-hour?

22           MR. DEVLIN-BROWN:  It could.  We could start it.  We

23   also have some exhibits we want to move into evidence.

24           THE COURT:  Well let's see -- we can go to 2:30 today.

25   But we're summing up tomorrow and I think the parties really

JBJ9SCO4

1    need to think about making it a one-hour or

2    one-hour-and-fifteen-minute summation because otherwise the

3    jurors are going to start to get very angry.  Let's bring them

4    back out and the government can rest.

5              (Continued on next page)

JBJ9SCO4                           Zaffuto - Direct

1          (Jury present)

2              THE COURT:  Mr. Folly.

3              MR. FOLLY:  Your Honor, at this time the government

4      rests.

5              THE COURT:  Ladies and gentlemen, the government has

6      completed its presentation of the evidence.  As you know

7      Mr. Scott does not have to put on a case at all.  He already

8      has put on a witness.  We will ask him now whether he plans to

9      call any other witnesses.

10             Mr. Garvin.

11             MR. GARVIN:  Yes, your Honor.  Mr. Scott would call

12     Warren Zaffuto.

13             THE COURT:  Sir, please step forward.  Come over here

14     to my left.  Step up into the witness stand.  And watch your

15     step.

16     WARREN ZAFFUTO,

17          called as a witness by the Defendant,

18          having been duly sworn, testified as follows:

19             THE COURT:  Mr. Garvin.

20             MR. GARVIN:  Thank you, your Honor.

21     DIRECT EXAMINATION

22     BY MR. GARVIN:

23     Q.  Good afternoon, Mr. Zaffuto.

24     A.  Good afternoon.

25     Q.  Could you please tell the ladies and gentlemen of the jury

1   what your occupation is, sir?

2   A.   I'm an attorney.

3   Q.   And how long have you been an attorney?

4   A.   I graduated from law school in 2000 and I've been working

5   down in Florida since about 2003, 2004.

6   Q.   A little bit over fifteen years?

7   A.   I believe that's correct, yes.

8   Q.   And can you tell the ladies and gentlemen some of the law

9   firms that you have worked with, sir?

10  A.   Sure.   First I clerked after law school at some point for

11  two different judges.   Then I moved to Florida.   I think I

12  moved to Florida sometime in 2003.   I worked for a labor

13  employment law firm specializing in that area.   Do you want the

14  name of the firm?

15  Q.   Yes, please.

16  A.   Fisher Phillips is the name of the firm.   I probably was

17  there a couple of years.

18          And then I moved to a firm called Duane Morris.   And I

19  was there approximately eight -- eight or nine years.   And I

20  think I began at Duane Morris sometime in 2005.

21          And then after Duane Morris I went and worked for a

22  firm in Hollywood, Florida.   The name of the firm is Phillips

23  Cantor.   I can't recall the entire name.   And I was there

24  approximately a year-and-a-half, two years.

25          And then left there and went and worked for another

1   firm called Keller Landsberg in Fort Lauderdale.  Was there for

2   approximately a year-and-a-half, two years as well.

3           And after that I started my own law firm.

4   Q.  And you said that you clerked for some judges.  I'm not

5   sure that everybody understands what that means.  Could you

6   very briefly explain that.

7   A.  Sure.  At some point -- I think in the year 2001, 2002 I

8   believe is the timeline.  I went to work as a law clerk for a

9   federal magistrate judge in Laredo, Texas.  Essentially I

10  assisted the judge in different matters.  And I did that for

11  one year.

12          And then after that I went and worked for another

13  judge, a U.S. district court judge in El Paso, Texas and did

14  that approximately one year as well.

15  Q.  Now you mentioned that you worked for the law firm of Duane

16  Morris.  How large of a firm is that?  How many lawyers does it

17  have?

18  A.  I think at the time I was there I would say it was quite

19  large.  I don't know what the size of it is now.  But I think

20  when I was there it was probably in excess of five hundred,

21  between five hundred and a thousand attorneys I believe.

22  Somewhere in that neighborhood.  I really don't know.  But

23  certainly I think it was more than five hundred.

24  Q.  Did there come a time, sir, when you met a gentleman by the

25  name of Mark Scott?

1    A.  Yes.

2    Q.  Is this the Mark Scott that we're talking about?

3    A.  Yes.

4    Q.  And will you please explain to us how did you come to meet

5    Mr. Scott?

6    A.  Well, actually I was thinking about this today.  I think

7    the very first time I met Mark, Mark was at a different firm.

8    I was at a holiday function.  My wife worked at the same firm

9    that Mark worked at prior to coming to Duane Morris.  And just

10   a brief encounter.  I met him at a holiday party.

11           But I got to know Mark when he came to work at Duane

12   Morris.  I was an associate there.  And Mark was a partner.

13   Q.  And did you just give us a very brief distinction what is

14   the distinction or interplay between an associate and a partner

15   at Duane Morris?

16   A.  Sure.  I was -- I did litigation and which is trial work,

17   that type of work.  Mark was a corporate attorney and a

18   partner.  He was basically I guess you could say my supervisor

19   in a certain sense, maybe not my direct supervisor but he

20   certainly, on certain cases would be considered that I think.

21   And an associate is -- I don't know how to describe the

22   distinction but it's more of an employee versus an owner I

23   guess maybe is the way of distinguishing.

24   Q.  Did you have opportunities while Mark was there to work

25   together with Mark on certain legal projects?

1    A.  I did.  Mark, as a corporate attorney, had matters that

2    would come up from time to time and he needed litigation

3    attorneys to handle.  And sometimes he would come to me,

4    sometimes through other partners, but sometimes directly to me

5    on a handful of different cases through my time at Duane Morris

6    and then I would help either the partner that was in charge or

7    help -- or just handle the matter myself.

8    Q.  Is there any specific matters that you can think of sitting

9    here today that you worked with Mark on?

10   A.  Mark had -- I don't recall the name of the client but Mark

11   had a German client that was dealing what we call a Hague

12   Convention case.  It was a case that was deciding not custody

13   of a child but where the child should be, whether the child

14   should be here in the United States or back in Germany, and I

15   assisted on that case.  And Mark was involved heavily in that

16   case.

17   Q.  In working with Mark did you formulate the character of

18   Mark?  In plain words, did you come to know his character?

19   A.  Yeah, I believe so.  I always thought of Mark as a good

20   attorney, a very -- a good advocate for his clients.  He -- as

21   somebody who was junior to him, he was somewhat demanding, but

22   I understood that and respected that and thought of him in a

23   positive light.

24   Q.  Now I want to say ask you, you say somewhat demanding.  Are

25   we talking about in a rude fashion or --

JBJ9SCO4                        Zaffuto - Direct

1   A.  Not at all.  Not at all.

2           Again, I think Mark always tried to do good by his

3   clients and so he expected you to work as hard as he did.  And

4   I think there's absolutely nothing wrong with that.  I consider

5   it a positive trait, not a negative.  And was never rude.  Mark

6   was always professional.

7   Q.  And how many years would you say that you were able to work

8   on and off with Mark on various projects?

9   A.  You know, I can't -- unfortunately I can't recall.  I know

10  I joined Duane Morris in 2005.  I believe that was the year.

11  And I left sometime in I believe January of 2014, I believe.

12  And I don't recall when Mark joined Duane Morris but I would

13  say at least probably out of that time at least a couple of

14  years.

15  Q.  During that period of time did you form an opinion with

16  regard to Mark's character as it relates to honesty and respect

17  for the law?

18  A.  Yes.  I did.  I would say that I viewed Mark as I mentioned

19  before a good attorney and I saw him as an honest person, a

20  straight shooter, never doubted that.

21  Q.  Were you familiar with his reputation in the law firm

22  amongst all of the other lawyers who knew him?

23  A.  Well, I know he had a -- I guess I would say he had a

24  reputation for being a -- exactly what I just said, which is

25  being a straight shooter, doing well for his client, being

JBJ9SCO4                          Zaffuto - Cross

1    somewhat of a demanding partner but not in a negative way,

2    always looking to do well for his clients and serve his clients

3    well which is why he was being paid.

4    Q.  Sir, you understand that you are called here to give your

5    opinion as to what they call a character witness for Mr. Scott?

6    A.  Yes.

7    Q.  And with regard to Mr. Scott's honesty, what is your

8    opinion?

9    A.  I believe he's an honest person.

10              MR. GARVIN:  I have no further questions, sir.  Thank

11   you.

12              THE COURT:  Cross-examination.

13   CROSS-EXAMINATION

14   BY MR. FOLLY:

15   Q.  Good afternoon, sir.

16   A.  Hi.

17   Q.  I'm just going to ask you a couple of brief questions.

18   A.  Sure.

19   Q.  You don't know anything about the facts of this case,

20   correct?

21   A.  Very little.  I did Google to see what was going on but I

22   maybe read one article and didn't really stick to me so I

23   don't.

24   Q.  So putting aside, sir, what you Googled, you don't know

25   anything else about the facts of this case, correct?

JBJ9SCO4                          Zaffuto - Cross

1    A.  Not really, no.  I may have discussed it with Mister --

2    with Mark's attorney briefly but otherwise no.

3    Q.  And you also don't know anything about the evidence that

4    has been presented to this jury over the course of the last

5    several weeks, correct?

6    A.  No.  No.  I don't know anything.

7               MR. FOLLY:  No further questions, your Honor.

8               MR. GARVIN:  Your Honor, we have no redirect.

9               THE COURT:  Sir, you may step down.

10              THE WITNESS:  Thank you, your Honor.

11              (Witness excused)

12              THE COURT:  Mr. Garvin, did you have another witness?

13              MR. GARVIN:  Yes, Robert Skorupa.  And I believe

14   Ms. Stanley went to retrieve him.

15              MR. FOLLY:  Your Honor, may we approach for a quick

16   moment before the next witness?

17              THE COURT:  Sure.

18              (Continued on next page)

19

20

21

22

23

24

25

1          (At sidebar)

2          MR. FOLLY:  Your Honor, the government's view is that

3     honesty is absolutely an appropriate character trait but we

4     veered with the last two character witnesses into respect for

5     the law and law abiding and we don't believe that that's an

6     appropriate character trait to be having a witness offer

7     testimony to a jury about.

8          THE COURT:  They were quick references but Mr. Garvin

9     try to stick to the traditional catechism.

10         MR. GARVIN:  Yes, sir.  Also I have been told that

11    Mr. Skorupa went to the men's room, your Honor.

12         MR. DEVLIN-BROWN:  Could we maybe take one quick issue

13    now and hopefully he's back.

14         Your Honor may recall during the government's case we

15    cross-examined Agent Shimko and we wanted to ask him

16    essentially two further questions, whether he was also familiar

17    through his role as a case agent as to whether Mr. Armenta

18    attempted to contact under law enforcement direction Mr. Scott

19    by text, by voice mail, and those contacts were not returned.

20    And the reason that's important is to show that Mr. Scott is

21    not involved with these people, doesn't want to be involved as

22    of September, October 2017.

23         THE COURT:  So what do you want to --

24         MR. DEVLIN-BROWN:  I believe there's an objection.

25         MR. DiMASE:  Yes.

1          MR. DEVLIN-BROWN:  So that would be a quick witness we

2     could do.

3          MR. DiMASE:  Yes.  The issue, your Honor, is unlike

4     the two calls that the government put into evidence that

5     Mr. Armenta made to Ms. Ignatov very early in the case, the

6     agents were not with Mr. Armenta when he made the call to Mark

7     Scott -- to Mark Scott's voice mail I guess I should say and

8     they were not with him when he texted back and forth with Mark

9     Scott.  The call -- the voice mail call was recorded on an FBI

10    system so I don't know that there's any issue about it being

11    inauthentic but the evidence that Mr. Devlin-Brown seeks to

12    admit regarding the lack of a return call is completely

13    hearsay.  It's not anything within the agent's personal

14    knowledge.  Mr. Armenta was living in Florida at the time

15    recording calls at the direction of the agents not in their

16    presence, texting --

17         THE COURT:  I'm sorry.  Was he or was he not recording

18    calls at the direction of the agents?

19         MR. DiMASE:  He recorded this voice mail at the

20    direction of the agents.  They were not present with him in

21    Florida when he did so.  He texted Mr. Scott at the direction

22    of the agents.  He -- the agents were not with him when he did

23    so.  They did not observe it.  They don't know whether there

24    are additional text messages after that series of text

25    messages.  I mean they can't testify to personal knowledge

JBJ9SCO4                    Zaffuto - Cross

1        about or lack of contact after those messages.

2                MR. DEVLIN-BROWN:  The government has produced both

3        the voice mail and the text.  They were gathered in the

4        government's investigation.  I don't need to offer them into

5        evidence.  I can try to ask the question to make clear to your

6        personal knowledge was there a call back or was there a

7        response to the text.

8                MR. DiMASE:  Well that's exactly the issue.  That's

9        the inadmissible part.  It's hearsay.  It comes completely from

10       the witness, not from the agent.  The lack of a call back is

11       information that the witness would know.  If they want to call

12       Mr. Armenta they can.

13               MR. DEVLIN-BROWN:  I think I'm being very limited in

14       what I'm trying to get out with Mr. Armenta.  I think almost

15       everything a case agent says in some trials is hearsay and it's

16       permitted because it's part of the investigation and I think

17       it's just an important point.

18               THE COURT:  So what -- so you want to ask him?

19               MR. DEVLIN-BROWN:  I want to ask him in addition to

20       the -- you testified on the government case about calls placed

21       by Gilbert Armenta to Ruja Ignatova.  Did you also -- did the

22       FBI also direct the call to be placed to Mr. Scott?  Yes.

23       Did -- it went to voice mail?  Yes.  What about the text

24       message?  Yes.  We received a text message.  Did Mr. Scott

25       respond to either of those as far as you know?

1      THE COURT:  To your knowledge.

2      MR. DEVLIN-BROWN:  To your knowledge.  Something to

3  that effect.

4      THE COURT:  I'll allow that.

5      MR. DEVLIN-BROWN:  If Mr. Skorupa is still in the

6  bathroom I can do it right now.

7      (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           MR. DEVLIN-BROWN:  The defense calls government Agent

3      Shimko.

4           THE COURT:  Mr. Shimko, you were previously put under

5      oath in this case.  You are still under oath, OK.

6           THE WITNESS:  Understood.

7      RONALD SHIMKO,

8           called as a witness by the Defendant,

9           having been previously sworn, testified as follows:

10     DIRECT EXAMINATION

11     BY MR. DEVLIN-BROWN:

12     Q.  Good afternoon, Agent Shimko.  How are you?

13     A.  Good afternoon.  Good.  How are you?

14     Q.  So when I was last speaking to you on the witness stand

15     during the government's case you testified, didn't you, about

16     calls that Gilbert Armenta placed to Ruja Ignatova when he was

17     cooperating with government investigators?

18     A.  Correct.

19     Q.  And in addition to the calls that you and other agents

20     directed him to place to Ms. Ignatov, I'm talking about the

21     time period say September, October 2017, OK?

22     A.  Yes.

23     Q.  So in addition to the calls that you directed him to place

24     to Ms. Ignatov during that time period did you also direct him

25     to reach out to other people of interest in the investigation?

1     A.  Yes.

2     Q.  And are you aware that -- well, did you or other agents

3     suggest that Mr. Armenta reach out to Mr. Scott by voice --

4     reach out to Mr. Scott?

5     A.  Not in September or October of 2017.

6     Q.  Was in that in January of 2018?

7     A.  I believe that's correct, yes.

8     Q.  And did the agents direct Mr. Armenta to reach out to

9     Mr. Scott by phone in that period?

10    A.  Yes.

11    Q.  And based on your understanding was a voice mail left?

12    A.  Yes.

13    Q.  And based on your understanding from the investigation are

14    you aware of Mr. Scott ever returning Mr. Armenta's call?

15    A.  I am not aware, no.

16    Q.  And are you aware from the investigation that Mr. Armenta

17    reached out by text message as well to Mr. Scott?

18    A.  Yes.  It was a WhatsApp message.

19    Q.  And again based on what you know as an investigator, any

20    record of Mr. Scott ever responding other than perhaps to say

21    don't want to talk?

22    A.  Other than that, I don't have an understanding of another

23    message.

24              MR. DEVLIN-BROWN:  No further questions.

25              MR. DiMASE:  Very brief cross-examination.

1           THE COURT:  OK.

2      CROSS-EXAMINATION

3      BY MR. DiMASE:

4      Q.  Agent Shimko, the calls that Mr. Armenta placed to

5      Ms. Ignatov that were played for the jury during this trial, is

6      it fair to say that those were from approximately September of

7      2017?

8      A.  Correct.

9      Q.  And is it fair to say that Ms. Ignatov disappeared in

10     October of 2017?

11     A.  That's correct.

12     Q.  And is it fair to say that there were subsequent public

13     coverage on the internet of Ms. Ignatov's disappearance?

14     A.  Yes.

15     Q.  And by the way has the FBI or the IRS been able to locate

16     Ms. Ignatov since that time?

17     A.  Not currently.

18     Q.  And the messages and calls that you indicated that

19     Mr. Scott -- Mr. Armenta had with Mr. Scott, that was

20     approximately three to four months after Ruja's disappearance

21     in January of 2018, correct?

22     A.  Correct.

23     Q.  And -- one moment.

24            (Counsel confer)

25            MR. DiMASE:  Nothing further.

JBJ9SCO4                        Skorupa - Direct

 1          MR. DEVLIN-BROWN:  Nothing further.

 2          THE COURT:  Agent Shimko, you may step down.

 3          THE WITNESS:  Thank you.

 4          (Witness excused)

 5          THE COURT:  Call your next witness, please.

 6          MR. GARVIN:  Yes, your Honor.  Robert J. Skorupa.

 7          THE COURT:  Sir, please step all the way forward.

 8  Please watch your step.  There may be wires on the floor.  And

 9  you're going to come all the way around to my left and step up

10  into the witness stand here right next to me.

11          THE WITNESS:  Good morning, your Honor.

12          Good afternoon.

13          THE COURT:  Step up into the witness stand.  Remain

14  standing.

15  ROBERT SKORUPA,

16      called as a witness by the Defendant,

17      having been duly sworn, testified as follows:

18          THE COURT:  Mr. Garvin.

19          MR. GARVIN:  Thank you, your Honor.

20  DIRECT EXAMINATION

21  BY MR. GARVIN:

22  Q.  Good afternoon, Mr. Skorupa.

23  A.  Good afternoon.

24  Q.  Can you please tell the ladies and gentlemen of the jury

25  what's your occupation, sir?

1    A.  I'm a practicing attorney.

2    Q.  And did there come a time when I called you and asked if

3    you could be a character witness on behalf of Mr. Mark Scott?

4    A.  That's correct.

5    Q.  And can you please give the ladies and gentlemen a little

6    bit of an understanding of your background.  Let's start where

7    you live.

8    A.  I live in Boston, Massachusetts, Back Bay area.

9    Q.  Did you go to school in Boston or could you tell us where

10   you got your education?

11   A.  I was born and bred in Rhode Island, went to college at

12   Northeastern University in Boston and I've been pretty much

13   there ever since.

14   Q.  And where did you go to law school?

15   A.  I went to get a juris doctorate from Suffolk Law School in

16   Boston and I participated in a negotiation project at Harvard

17   Law School in Cambridge, Massachusetts.

18   Q.  What year did you become a lawyer?

19   A.  1978.

20   Q.  And do you have any children, sir?

21   A.  I have two sons.

22   Q.  And what are their occupations?

23   A.  One is a computer scientist, computer science person.  And

24   the other one is a state police officer in Massachusetts.

25   Q.  Are you in private practice, sir?

1    A.   Yes, I am.  I work for -- I practice -- sole practitioner.

2    Q.   And how long have you been in private practice, sir?

3    A.   I don't know exactly.  I used to practice with my brother

4    and he passed away in the middle '80s and I think about since

5    that time.

6    Q.   So over 20 years?

7    A.   Yes.

8    Q.   Did there come a period of time when you met Mr. Mark

9    Scott?

10   A.   Yes.  I've known Mark Scott since 1990s, 25 years.

11   Q.   And have you had an opportunity to socialize with

12   Mr. Scott?

13   A.   Certainly.

14   Q.   And tell us how it came about that you had the opportunity

15   to meet Mr. Scott, if you recall.

16   A.   To meet?

17   Q.   To meet him.

18   A.   We met socially through mutual friends.  Back in --

19   sometime in mid 1990s.  He lived in Boston at the time or in

20   the Boston environs and I did as well.  And we became friends

21   and we remained good friends ever since.

22   Q.   Do you happen to know where Mr. Scott was born and raised?

23   A.   Well, I know part of his life his father was a U.S. soldier

24   and his mother was German.  And one time in Germany he pointed

25   out an American military base, of what used to be an American

JBJ9SCO4                          Skorupa - Direct

1    military base where his parents lived when he was young.

2    Exactly where -- whether he was born in Germany or the United

3    States, I'm not sure.

4    Q.  Did you share any friends with Mr. Scott that were of

5    German nationality?

6    A.  Yes.  As a matter of fact that's I believe how I was

7    introduced to him through a friend of mine who was German and

8    Mark speaks German from his youth and that's how we were

9    introduced.

10   Q.  Did you ever have occasion to represent Mark?

11   A.  Yes.  Mark's father was from Massachusetts which is one of

12   the states that I practice in.  And his father passed away some

13   time around the year 2000 and I represented him in the probate

14   of his father's estate.

15   Q.  During the estate -- well let me rephrase that.

16          Do you know whether or not Mark has had an affinity

17   towards watches and German automobiles?

18          MS. LOZANO:  Objection.  This is not character

19   evidence.

20          THE COURT:  Overruled.

21          THE WITNESS:  Well I would say -- I don't mean to be

22   glib but everyone has an affinity for nice automobiles and

23   watches and Mark certainly has always had one and the other.

24   As a matter of fact, I represented him during the probate.  One

25   of the issues was his father's car and his father's watch,

1    which represented to him the loss of his father.  And so he was

2    very concerned about getting those and keeping those.

3    Q.  All right.  And during the period of time that you have

4    known Mark and you have represented Mark have you had time to

5    form an opinion as to Mark's character?

6    A.  Absolutely.

7    Q.  And do you know of Mark's reputation amongst the community

8    that you know Mark who they also know Mark?

9    A.  Mark has always had a reputation and was recognized as a

10   standup individual, smart, well-meaning, and the people that

11   have known him over the years are still friends with him which

12   I think is a sign of friendship.

13   Q.  You have traveled with Mr. Scott; is that true?

14   A.  Well I haven't traveled with him but I've -- there are

15   times I worked in Germany for a bit and I'd see him there and

16   occasionally into Florida.  He moved to Florida at some point

17   after I met him and I would see him when I was down in Florida,

18   you know, we'd get together and have lunch or do things.

19   Q.  In your representation of him and your knowledge of him, is

20   there any part of his reputation that would cast doubts in your

21   mind with regard to Mark Scott's integrity?

22   A.  I would say none.

23   Q.  Sir, finally, I would just simply ask:  Do you have an

24   opinion with regard to Mark Scott as to whether he is an honest

25   person?

JBJ9SCO4                         Skorupa - Cross

1   A.  I absolutely do.

2   Q.  And can you please tell the ladies and gentlemen what your

3   opinion is.

4   A.  I've known Mark for a very long time and I'd say throughout

5   that period he's a person of the highest integrity.

6           MR. GARVIN:  Thank you, sir.  I have no further

7   questions.

8           THE WITNESS:  Thank you.

9           THE COURT:  Any cross-examination?

10          MS. LOZANO:  Yes, your Honor.

11  CROSS-EXAMINATION

12  BY MS. LOZANO:

13  Q.  Good afternoon, Mr. Skorupa.

14  A.  Good afternoon.

15  Q.  You don't have any personal knowledge regarding the facts

16  of this case, do you?

17  A.  No.  I've read and seen some things in the press but I have

18  no personal knowledge.

19  Q.  And you aren't familiar with the evidence that has been

20  presented at this trial, correct?

21  A.  Other than which I have seen something occasionally

22  mentioned in the press or, no, I have no personal knowledge of

23  what has been presented here at trial.

24  Q.  And you don't have any personal knowledge about OneCoin or

25  how it worked, correct?

1    A.  I'm not sure what that is, one, please?

2            MS. LOZANO:  Thank you.  I have no further questions,

3    your Honor.

4            MR. GARVIN:  Very briefly.

5    REDIRECT EXAMINATION

6    BY MR. GARVIN:

7    Q.  Your Honor -- I mean excuse me.  Mr. Skorupa, you do

8    recognize that you are in a federal court, right?

9    A.  Oh, absolutely.

10   Q.  And you have alluded to that you must have read something

11   in the newspaper; is that correct?

12   A.  About the issue at trial?  Yes.  I've read --

13           MS. LOZANO:  Objection, your Honor.

14           MR. GARVIN:  I don't want you to say what you read.

15   That wasn't the question.  I apologize, probably asked --

16           THE WITNESS:  The answer is yes.

17   Q.  The point is the fact that there has been something written

18   in the press or the fact that we are here in a federal

19   courthouse, does that change your opinion whatsoever as to what

20   the character of Mark Scott is and whether doing something that

21   was not honest would be out of character for him?

22           MS. LOZANO:  Objection, your Honor.  Outside the scope

23   of cross.

24           THE COURT:  Overruled.

25           THE WITNESS:  In my opinion based upon the character

1    of Mr. Scott he's much more likely to have been the victim of

2    something like this rather than have been involved as a person

3    that participated in it.

4            MR. GARVIN:  Thank you, sir.  I have no further

5    questions.

6            MS. LOZANO:  Your Honor, may we approach?

7            THE COURT:  Sure.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          MS. LOZANO:  Your Honor the cross-examination was

3    limited only to questions that established this witness had no

4    knowledge about the facts of this case except what he reads in

5    papers and counsel inappropriately used it as an opportunity to

6    allow the witness to testify about character evidence yet again

7    even though the cross-examination was simply about his lack of

8    knowledge.  And he used -- and he used the opportunity to

9    characterize that character testimony as he believed Mark Scott

10   to be a victim.  That isn't character evidence.  That isn't

11   whether he's truthful or not.

12         MR. GARVIN:  Your Honor, the questions on redirect

13   were appropriate.  They asked questions that elicited testimony

14   about what he read in the newspaper and I asked him if that

15   changed his opinion as to Mark Scott's character.

16         MS. LOZANO:  We ask that it be stricken.

17         THE COURT:  I'm not going to strike it.

18         (Continued on next page)

19

20

21

22

23

24

25

```
 1              (In open court)

 2              MR. GARVIN:  Your Honor, I have no further questions

 3  of Mr. Skorupa.

 4              THE COURT:  Anything else, Ms. Lozano?

 5              MS. LOZANO:  No, your Honor.

 6              THE COURT:  Sir, you may step down.

 7              THE WITNESS:  Thank you, your Honor.

 8              THE COURT:  Safe travels.

 9              THE WITNESS:  Thank you.

10              (Witness excused)

11              THE COURT:  Mr. Garvin, do you want to call your next

12  witness.  Or Mr. Devlin-Brown.

13              MR. DEVLIN-BROWN:  May I confer with counsel for just

14  a moment.

15              THE COURT:  Yes.

16              (Counsel confer)

17              MR. DEVLIN-BROWN:  Your Honor the defense calls

18  Michelle Julian.

19              THE COURT:  Please watch your step and please remain

20  standing when you step up into the witness stand.

21  MICHELLE JULIAN,

22       called as a witness by the Defendant,

23       having been duly sworn, testified as follows:

24

25
```

JBJ9SCO4                    Julian - Direct

 1    DIRECT EXAMINATION

 2    BY MR. DEVLIN-BROWN:

 3    Q.   Good afternoon Ms. Julian, where do you works?

 4    A.   Covington & Burling.

 5    Q.   Where do I work?

 6    A.   Covington & Burling.

 7    Q.   What's your job?

 8    A.   Senior litigation paralegal.

 9    Q.   And are you a paralegal assigned to this case?

10    A.   I am not.

11    Q.   Have you still helped out from time to time a little bit?

12    A.   Yes.

13    Q.   Have we met at all about what the questions I'm going to

14    ask you today?

15    A.   We have not.

16    Q.   Are you nervous about that?

17    A.   No.

18    Q.   OK.  Good.  So I'd like to show you -- well I'd like to

19    show them to the government.  I'd like to admit three defense

20    or four defense exhibits at this time, Defense Exhibits 499A,

21    560, 561, and 562.

22            MR. DiMASE:  Your Honor with redactions that we've

23    agreed to on 499A we have no objection.

24            THE COURT:  Very well.  They will be received.

25            (Defendant's Exhibits 499A, 560, 561, and 562 received

JBJ9SCO4                        Julian - Direct

1    in evidence)

2    Q.  So Ms. Julian, I'd like to see if we can put a few

3    documents on the screen.

4            MR. DEVLIN-BROWN:  Ms. Stanley, do you think you can

5    do the government documents too.  If you could publish

6    Government Exhibit 2035, please.

7    Q.  So Ms. Julian if you see towards the bottom of the document

8    there's a date.  Could you read that out, please?

9    A.  February 2, 2016.

10   Q.  And line item 3 says client matter.  Number.  Could you

11   just read the number.

12   A.  1515005.00011.

13   Q.  And above that there's a matter name.  Do you see that?

14   A.  Yes.

15   Q.  iCard?

16   A.  Yes.

17   Q.  What's the client's name here?

18   A.  It looks like Zala.

19           THE COURT:  Can the jury see that?

20           MR. DEVLIN-BROWN:  Ms. Stanley, I'll ask one more

21   question.

22   Q.  It says print name at the bottom.  Do you see Mark Scott

23   there?

24   A.  I do, yes.

25           MR. DEVLIN-BROWN:  Could we publish Defense Exhibit

1    499A, please.  Just the first page, please, Ms. Stanley.

2              I could always use the document.  Maybe we should just

3    use the document.  If someone could press lecturn.

4              Does it work now, Ms. Stanley?  I guess unpress

5    lecturn.

6              I can just do this, I think.

7              THE COURT:  I'm sorry.  What's happening?

8              MR. DEVLIN-BROWN:  I'm trying to figure that out as

9    well.  I'm happy to do it on this as well.  OK.  Let's try

10   that.

11   Q.  So this is Defense Exhibit 499-A.  And I would like to show

12   you client information.  Do you see what it says under client

13   information, Ms. Julian?

14   A.  Yes.

15   Q.  Could you read that out?

16   A.  Zala Group Limited.

17   Q.  And matter description.  Do you see that?

18   A.  Acquisition of iCard.

19   Q.  And there is a client number listed there.  Do you see

20   that?

21   A.  Yes.

22   Q.  And is that the same number that you read out a moment or

23   two ago?

24   A.  Yes.

25   Q.  And I guess it doesn't list the matter number on this

1   document that you see?

2   A.   Correct.

3   Q.   And I'd like to go down towards the bottom of the document

4   where it says fees.  Do you see fees?

5   A.   Yes.

6   Q.   How much is the fees?

7   A.   $69,882.50.

8   Q.   Do you see a number under trust balance?

9   A.   Yes.

10  Q.   What's that?

11  A.   $825,335.98.

12  Q.   And you have this exhibit -- you've seen it before, right?

13  A.   I have not.

14  Q.   It's in the binder in front of you though?

15  A.   Right.  Yes.

16  Q.   And is it fair to say -- you don't need to flip through it.

17  But it's a number of pages of billing records for this client

18  matter?

19  A.   Yes.

20          MR. DEVLIN-BROWN:  We can take that off the screen.

21          And I think we're going to show some government

22  exhibits now so I don't know if it's easier.

23          So I think we just need to turn off the lecturn.

24          So if we could publish Government Exhibit 1378.

25  Great.

JBJ9SCO4                          Julian - Direct

1    Q.  So this is -- if we could go to the e-mail that's in the

2    middle of the page there.  It's from Mark Scott at Locke Lord

3    to Giselle.  Could you read the paragraph, "As to the escrow

4    refund."

5    A.  "As to the escrow refund, do these amounts include the

6    funds for the iCard purchase price?  If we do this, I have to

7    inform them of those fact.  Just want you to be aware.  Also,

8    where did the funds originate from when we received them?  Same

9    bank we are sending the back to?"

10   Q.  Do you see the response from Gilbert Armenta on top, "Mark

11   really.  You're asking these questions regarding iCard and bank

12   information really?"

13   A.  Yes.

14           MR. DEVLIN-BROWN:  If we could publish Government

15   Exhibit 1405, please.

16   Q.  So the subject of the e-mail:  "Call with this wire stuff

17   don't have your assistant give me vague instructions."  I don't

18   need to read the last sentence.  That's the subject line for

19   the entirety of this chain right?

20   A.  Yes.

21   Q.  And at the very bottom of the chain is an e-mail from

22   GArmenta at Zalagroup.com to MSS -- MS.law at Gmail.com.  "On

23   the line for what, Mark.  You make sound like there is issue.

24   There was not vague instructions."

25           Now if we can go to the top e-mail of the response.

1   A.   Beginning with "Hi Gilbert"?

2   Q.   Yes.  Why don't you read the first two paragraphs, if you

3   don't mind.

4   A.   "Not sure why you are treating me like the enemy lately?  I

5   am trying to help so we have clean documentation.  It is an

6   internal firm thing.  Same as when you deal with a bank.

7            "And as to iCard, you have an escrow obligation.  As

8   agent we are obligated to report when you pull the funds.

9   Maybe best for you to send them a note and copy me."

10  Q.   OK.  And the next paragraph says, "As to other funds, I

11  can't have an assistant instruct me to wire millions of

12  dollars.  Need for you, all caps, to e-mail me that says you

13  need to deploy them differently than expected."

14           MR. DEVLIN-BROWN:  If we could now publish Government

15  Exhibit 2042 in evidence and just start with the first page for

16  a moment.

17  Q.   And, Ms. Julian, is this the same client matter that we saw

18  originally, 1515005.00011?

19  A.   Yes.

20  Q.   And who is it signed by or what's the print name anyway?

21  A.   Mark Scott.

22  Q.   And do you see also a name under second partner's

23  signature?

24  A.   Yes.

25  Q.   And the client matter is Zala iCard on line one, right?

JBJ9SCO4                    Julian - Direct

1   A.  Yes.

2              MR. DEVLIN-BROWN:  If we could now go to page four of

3   the exhibit, please.

4              And just highlight the middle e-mail, Ms. Stanley,

5   from Mark Scott to Adriana Salcedo.

6   Q.  If you could read that one out, Ms. Julian.

7   A.  "Thanks.  Not sure why funds are being pulled back?  I have

8   to assume that the financial requirements of the purchase

9   target have changed or will simply be used for another

10  transaction that is more urgent.  I can forward the client

11  request as well.

12             MR. DEVLIN-BROWN:  If we could take this off the

13  screen and publish what is already in evidence as Defense

14  Exhibit 556.

15  Q.  And let me just start with the bottom e-mail on February 16

16  from Mark Scott to Giselle and if you could read the second

17  paragraph.

18  A.  "As to the escrow refund, do these amounts include the

19  funds for the iCard purchase price -- excuse me, the iCard1

20  purchase price?  If we do this, I have to inform them of those

21  fact.  Just want you to be aware.  Also, where did the funds

22  originate from when we received them?  Same bank we are sending

23  the back to?"

24  Q.  And if you could see at the very top of the e-mail

25  there's -- well there's some more communication, and at the

1    very top you see the second e-mail from Gilbert Armenta to

2    GValentin, "Don't respond to Mark"?

3    A.  Yes.

4    Q.  And you see the response there, "Understood"?

5    A.  Yes.

6    Q.  And let's move to a different series -- a different

7    transaction.

8           MR. DEVLIN-BROWN:  If we could publish please,

9    Ms. Stanley, Government Exhibit 1099.

10   Q.  And what's the date of this document, Ms. Julian?

11   A.  June 2, 2016.

12   Q.  And do you see it reads at the beginning, "In furtherance

13   of my earlier message to you, please find below the wire

14   details for one of the investment funds as announced"?

15   A.  Yes.

16   Q.  And do you see -- this e-mail is from Gilbert -- from Mark

17   Scott to Gilbert Armenta?

18   A.  Yes.

19   Q.  Do you see anything in this e-mail about how Gilbert

20   Armenta should describe the funds he is sending from his bank?

21   A.  (No response).

22   Q.  Other than the information about what the banks are

23   themselves?

24   A.  I do not.

25           MR. DEVLIN-BROWN:  If we could go to Government

1    Exhibit 711-E, please, which is in evidence.

2    Q.  And if you could just read the bank name at the top of

3    this, Ms. Julian.

4    A.  Fates Group LLC.

5    Q.  And -- no.  Right below that.

6    A.  Morgan Stanley Wealth Management.

7    Q.  And if we could flip to page -- well actually look at the

8    very bottom.  Can you make out that handwriting?

9    A.  It looks like the signature for Gilbert Armenta.

10   Q.  Correct me if I'm wrong but it looks like it reads,

11   "Confirmed with Luis Mercado at 1 p.m. on June 29, 2016.  Spoke

12   to Gilbert Armenta," and it leaves a phone number?

13   A.  Yes.

14           MR. DEVLIN-BROWN:  Then if we could turn to page four

15   of this document, please, Ms. Stanley.

16   Q.  Do you see the notes section.  It says, "Confirm on LOA.

17   Monies are capital investment by the account owner in a new

18   company."

19   A.  Yes.

20   Q.  You don't see Mark Scott on this particular document, do

21   you?

22   A.  I do not.

23           MR. DEVLIN-BROWN:  We could take this off the screen,

24   please.  And one more transaction.

25           Could we show Government Exhibit 419, please.

1        And Ms. Stanley do you have the capability of a side

2   by side?

3        Mr. Barile, are you able to take the reigns.  What I'd

4   like to do is put Government Exhibit 4108 next to it, please.

5   Q.  If we could go to the second -- well actually so Government

6   Exhibit 4108 there's an e-mail header from Diane Cook.  Do you

7   see that Ms. Julian?

8   A.  Yes.

9   Q.  And it's to Mark Scott?

10  A.  Yes.

11  Q.  And it says, "Mark, please find attached a scan of a letter

12  that is being sent to you at the instruction of Gilbert"?

13  A.  Yes.

14        MR. DEVLIN-BROWN:  If we could go to page 2 of 4108,

15  Mr. Barile, and put that side-by-side with 419.

16  Q.  So do you see any differences between these two letters,

17  Ms. Julian?

18  A.  Yes.  The first difference is the bank addresses.

19  Q.  But what do you mean by bank addresses?

20  A.  Government Exhibit 419 it's a Broward Boulevard Suite 1900

21  and 408 is -- it also includes other entities as well.

22  Q.  So the one on the left just has Zala Group and Fates Group.

23  Do you see that?

24  A.  Yes.

25  Q.  The one on the right has also Soleymew Management LTD,

1    Water-Tidal Services LTD, and looks like I skipped the one

2    above it, Shureden Services LTD?

3    A.  Yes.

4    Q.  And do you see the language is also a little bit different

5    in the document?

6    A.  Right.  And Exhibit 419 also includes a series of numbers

7    which are not included in the 108.

8          MR. DEVLIN-BROWN:  If we could leave this on the

9    screen.  I'd like to read Defendant's Exhibit 1010 which is a

10   stipulation between the parties.

11         THE COURT:  OK.

12         MR. DEVLIN-BROWN:  If it's OK I'll skip the preamble.

13   But the stipulation is that:  A representative of Iberia Bank,

14   if called to testify, would state the following.

15         One.  Iberia Bank was unable to identify a copy of the

16   letter on the second page of Government Exhibit 4108 purporting

17   to be a letter from Sabadell United Bank in its records.

18         Two.  Sabadell United Bank did not maintain bank

19   accounts for three of the five entities listed in Government

20   Exhibit 4108; namely, Shureden Services LTD, Soleymew

21   Management LTD, and Water-Tidal Services LTD.

22   Q.  Do you see that?  Well, nevermind.

23         It is further stipulated and agreed that this

24   stipulation, which is marked as Defense Exhibit 1010, may be

25   received in evidence as a defense exhibit at trial.  So we'd

1  offer 1010.

2              THE COURT:  There being objection, it will be

3  received.

4              MR. DiMASE:  No objection.

5              (Defendant's Exhibit 1010 received in evidence)

6              MR. DEVLIN-BROWN:  Thank you very much, Mr. Barile.

7              Ms. Stanley, can I call on you one more time.  And

8  we're almost done.

9              Could we put Defense Exhibit 560 on the screen,

10  please.  That's great, Ms. Stanley.

11  Q.  So the bottom e-mail here is from Gilbert Armenta to Mark

12  Scott; is that right?

13  A.  Yes.

14  Q.  And it purports to be forwarding an e-mail from Sabadell --

15  is it not on the screen?

16              MR. DEVLIN-BROWN:  Publish now.  Is it published?  No.

17  Not to the jury.

18              You're good?  Thank you.

19  Q.  The bottom e-mail -- so we just point out where it's

20  Gilbert Armenta forwarding something to Mark Scott, right?

21  A.  Yes.

22  Q.  And then the e-mail below that purports to be from Sabadell

23  United Bank.  And if you read a few lines down, outgoing wire

24  transfer?

25  A.  Yes.

JBJ9SCO4                          Julian - Direct

1   Q.  And I think we may need to go to the second page to see the

2   amount.

3           But before we do that, as long as -- you see the title

4   of the account here, Shureden Services LTD?

5   A.  Yes.

6   Q.  Is that one of the accounts that you heard on the

7   stipulation as Sabadell Bank having no record of having such an

8   account?

9   A.  I believe so.

10  Q.  If we could go to the next page.  And do you see they have

11  a transfer amount, according to that, is $25 million?

12  A.  Yes.

13          MR. DEVLIN-BROWN:  And if we could just publish 561 as

14  well, please, Ms. Stanley.

15  Q.  And do you see this is a similar looking e-mail from

16  Gilbert Armenta to Mark Scott in the middle of the page?

17  A.  Yes.

18  Q.  Similar wire transfer information?

19  A.  Yes.

20  Q.  Do you see this is supposedly from Soleymew Management

21  Limited?

22  A.  Yes.

23  Q.  And was that one of the entities -- I can just read

24  paragraph two of Defendant's Exhibit 1010.  Sabadell United

25  Bank did not maintain bank accounts for three of the five

1   entities listed in Government Exhibit 4108 Shureden Services

2   LTD, Soleymew Management LTD, and Water-Tidal Services LTD.

3               MR. DEVLIN-BROWN:  And just one more exhibit,

4   Ms. Stanley, which is 562.

5   Q.  Is this the same sort of wire transfer or purported wire

6   transfer being sent from Gilbert Armenta to Mark Scott this

7   time on behalf of Water-Tidal Services LTD?

8   A.  Yes.

9               MR. DEVLIN-BROWN:  Just check with cocounsel.

10              (Counsel confer)

11              MR. DEVLIN-BROWN:  No further questions, your Honor.

12              THE COURT:  Very well.  Ladies and gentlemen, that

13   brings us to the end of the day.  We'll break here.  We'll get

14   back together tomorrow morning to start at 9:30.  Please have a

15   wonderful evening.  Do not discuss the case and do not read

16   anything about the case.  Have a good night.

17              MR. DiMASE:  Judge, if the jury is willing to stay I

18   think I have a very brief cross of this witness but it's up to

19   the court and the jury, obviously.

20              THE COURT:  Let's let the jury go.

21              MR. DiMASE:  OK.

22              (Continued on next page)

23

24

25

1            (Jury not present)

2            THE COURT:  Ms. Julian, you may step down.

3            (Witness excused)

4            THE COURT:  I saw one of the jurors start to gather

5       her stuff and a look of consternation came over her face when

6       you stood up.

7            MR. DiMASE:  Understood.  My cross will still be short

8       tomorrow.

9            THE COURT:  Yes.  So what about scheduling?  Is this

10      the last witness, Mr. Devlin-Brown?

11           MR. DEVLIN-BROWN:  It is the last witness.  I don't

12      know if your Honor wishes to ask Mr. Scott if he wishes to

13      testify, and if you want to confer first we can before that.

14      But the only other thing, aside from Mr. Scott potentially,

15      would be a handful probably of additional defense exhibits.  I

16      will give the ones we may want to offer in the morning to the

17      government and we can hopefully iron out any objections and

18      just we offer them very quickly in the morning.  It wouldn't

19      take more than ten minutes and we don't necessarily need to

20      publish all of them.

21           THE COURT:  OK.

22           (Defendant and counsel confer)

23           MR. DEVLIN-BROWN:  And Mr. Scott would just like to

24      wait overnight to make a final decision.

25           THE COURT:  Very well.  So we'll see you tomorrow

1    morning.  Don't be late.

2              I take it that we'll be done with this witness like in

3    five or ten or fifteen minutes, correct?

4              MR. DEVLIN-BROWN:  I'm done already.  Do you want me

5    to bring her back?

6              MR. DiMASE:  Yes.

7              MR. DEVLIN-BROWN:  Sure.

8              MR. DiMASE:  Although -- yes.

9              THE COURT:  OK.  And we're going to get all the

10   summations in tomorrow, please, please edit.  And certainly the

11   rebuttal summation should be no more than a half-hour or so.

12             MR. DEVLIN-BROWN:  Music to my ears.

13             THE COURT:  Again, any last comments on the jury

14   charge by no later than five o'clock this evening.

15             (Adjourned to November 20, 2019 at 9 a.m.)

16

17

18

19

20

21

22

23

24

25

1       INDEX OF EXAMINATION

2   Examination of:                              Page

3    ROSALIND OCTOBER

4   Direct By Ms. Lozano . . . . . . . . . . . .1687

5   Cross By Mr. Garvin  . . . . . . . . . . . .1720

6   Redirect By Ms. Lozano . . . . . . . . . . .1763

7   Recross By Mr. Garvin  . . . . . . . . . . .1767

8    KRISTINE FATA

9   Direct By Mr. Folly  . . . . . . . . . . . .1773

10   Cross By Mr. Garvin  . . . . . . . . . . . .1785

11   WARREN ZAFFUTO

12   Direct By Mr. Garvin . . . . . . . . . . . .1795

13   Cross By Mr. Folly . . . . . . . . . . . . .1801

14   RONALD SHIMKO

15   Direct By Mr. Devlin-Brown . . . . . . . . .1807

16   Cross By Mr. DiMase  . . . . . . . . . . . .1809

17   ROBERT SKORUPA

18   Direct By Mr. Garvin . . . . . . . . . . . .1810

19   Cross By Ms. Lozano  . . . . . . . . . . . .1815

20   Redirect By Mr. Garvin . . . . . . . . . . .1816

21   MICHELLE JULIAN

22   Direct By Mr. Devlin-Brown . . . . . . . . .1820

23

24

25

```
 1                    GOVERNMENT EXHIBITS

 2   Exhibit No.                          Received

 3    1441     . . . . . . . . . . . . . . .1687

 4    2602A-BU, 2603-BU, 2622-BU, 2628-BU,  . . . .1720

 5        2620-BU

 6    506 through 513, 517 through 537   . . . . .1768

 7    1363, 1125    . . . . . . . . . . . . . .1768

 8    1226, 1289, 1134, 1007    . . . . . . . .1768

 9    3305     . . . . . . . . . . . . . . .1772

10    601A, 601B, 601C, 601D    . . . . . . . .1777

11    601F, 601G, 601H, 601-TR    . . . . . . .1777

12    1307     . . . . . . . . . . . . . . .1781

13    106    . . . . . . . . . . . . . . . . .1784

14                    DEFENDANT EXHIBITS

15   Exhibit No.                          Received

16    158, 159, 160, 701 . . . . . . . . . . .1725

17    499A, 560, 561, and 562   . . . . . . . .1820

18    1010     . . . . . . . . . . . . . . .1831

19                    COURT EXHIBITS

20   Exhibit No.                          Marked

21    1   . . . . . . . . . . . . . . . . . .1792

22

23

24

25
```