JBK9SCO1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

          v.                              17 CR 630 (ER)

MARK S. SCOTT,

              Defendant.

------------------------------x

                                New York, N.Y.
                                November 20, 2019
                                9:00 a.m.

Before:

                    HON. EDGARDO RAMOS,

                                  District Judge

                       APPEARANCES

GEOFFREY S. BERMAN,
    United States Attorney for the
    Southern District of New York
CHRISTOPHER DiMASE
NICHOLAS FOLLY
JULIETA V. LOZANO
    Assistant United States Attorneys

COVINGTON & BURLING LLP
    Attorneys for Defendant
BY:  ARLO DEVLIN-BROWN
    KATRI STANLEY
    -AND-
DAVID M. GARVIN

JBK9SCO1

1          (Jury not present)

2          THE COURT:  Who will be doing the closing for the

3   government?

4          MR. FOLLY:  I will, your Honor.

5          MR. DEVLIN-BROWN:  Your Honor, I believe there are a

6   few outstanding exhibits the defense is seeking to admit.  A

7   couple there are no objections to but a couple there are.

8          THE COURT:  OK.

9          MR. DEVLIN-BROWN:  So maybe we can go through those,

10  if your Honor wishes.

11         THE COURT:  I'm ready when you are.

12         MR. DEVLIN-BROWN:  All right.  So one of them is

13  Defendant's Exhibit 519 which is the e-mail from Robert

14  Courtneidge to Mark Scott just attaching OneCoin Roadmap

15  Version 1.0.  I can hand it up if your Honor wants to take

16  another look but it's just a matrix of projects on OneCoin.

17         Not offered for the truth.  Offered to show that Mark

18  Scott had some awareness that Robert Courtneidge was working on

19  OneCoin-related matters.

20         We really don't have much of that in the record.  We

21  have that cryptocurrency report being forwarded.  This shows he

22  had somewhat broader awareness and it's relevant to his state

23  of mind.

24         This is one where the government has repeatedly I

25  think asked to think about it more and they've thought about it

JBK9SCO1

1    fully and now still don't want it.

2              Do you want a copy?

3              THE COURT:  Sure.

4              Mr. DiMase.

5              MR. DiMASE:  Judge, this goes back to our concern that

6    we articulated early in the trial about a sideshow that may be

7    confusing and sort of an -- and off the main topic of this

8    trial for the jury.  The involvement of Mr. Courtneidge and his

9    state of mind is not what is at issue in this trial.  And we

10   think that this kind of opens up a can of worms about what --

11   how Mr. Courtneidge fit in.  And I would say if this does come

12   in we would plan a very brief rebuttal to put in several

13   e-mails regarding Mr. Courtneidge's state of mind.  Because if

14   the jury is going to see that he's providing some information

15   like this to Mr. Scott they should also understand that he had

16   knowledge himself that OneCoin was likely fraudulent.  That

17   would be very brief.  It wouldn't require a witness.  But it

18   sort of underscores the point that this is a sideshow and it

19   should be excluded under 403.

20             MR. DEVLIN-BROWN:  Just briefly, your Honor.

21             I think this is not a can of worms; it's one worm.  We

22   were very selective about which Robert Courtneidge/Mark Scott

23   e-mails we wanted to introduce.  This is just the bare minimum.

24   It just shows he had some awareness Robert Courtneidge was

25   working on these matters.

JBK9SCO1

1             Mr. DiMase's representation that he might then put in

2    e-mails without Mark Scott about Mr. Courtneidge, we have a

3    bunch of those too.  I think they're overall helpful to us.

4             I think for Mr. DiMase to say that now on the verge of

5    summations when he's been thinking about this e-mail and

6    mulling it over for several days, I don't think it would be

7    appropriate to, this one thing comes in and then we have a lot

8    of e-mails between Courtneidge and Ruja Ignatova and Mr. Scott.

9             MR. DiMASE:  To be clear we're talking about two

10   e-mails in rebuttal, not all of these e-mails.  And we've been

11   saying this from the beginning that we had e-mails, we even

12   passed them to the Court at the beginning of the trial, that

13   show Mr. Courtneidge's knowledge that OneCoin was likely

14   fraudulent and was involved in money laundering.

15            If the defense wants to rely on things that

16   Mr. Courtneidge shared with Mr. Scott it is very relevant at

17   that point for them to know that Mr. Courtneidge was involved.

18   And it would be very limited.  Just two e-mails.  But that sort

19   of, again, underscores the point of this whole issue with

20   Mr. Courtneidge.

21            THE COURT:  I'll let them in.  Defense 519.

22            MR. DEVLIN-BROWN:  Does your Honor have a ruling on

23   Mr. DiMase's application, because if the non-Mark Scott e-mails

24   are coming in with Mr. Courtneidge, I think he's picking two

25   that are selective and may incorrectly suggest that

JBK9SCO1

1   Mr. Courtneidge knew there was a problem.

2           There's some e-mails early on where people tell him:

3   OneCoin, have you heard about it on the internet?  You have no

4   idea.

5           But then there's other e-mails that show him doing

6   work for months and months and months.

7           We would identify the ones we want to put in, if we're

8   opening that door to stuff that Mr. Scott's not even on.

9           MR. DiMASE:  Mr. Devlin-Brown is opening that door,

10  not the government.  We only plan to put in two e-mails.  One

11  of them is very much not what Mr. Devlin-Brown has described.

12  It's pretty clear that Mr. Courtneidge is aware that money

13  laundering is going on.  It's highly relevant for the jury to

14  understand Mr. Courtneidge's state of mind if they're going to

15  rely on him to show that Mr. Scott's state of mind was innocent

16  because he was speaking with Mr. Courtneidge.

17          We don't need to make this a mini-trial.  If what

18  Mr. Devlin-Brown wants to do is bring in even more e-mails,

19  then that further underscores the 403 concern that the

20  government has.

21          THE COURT:  I'll let this one in.  And allow the

22  government if they wish to put in those two but I think we

23  should leave it at that if you want to put it in.

24          MR. DEVLIN-BROWN:  Let me look at the two and we'll

25  see.

JBK9SCO1

1          THE COURT:  Very well.  Do you want this back?

2          MR. DEVLIN-BROWN:  Not especially.

3          We do have two more that we have a dispute with and I

4     can hand those up to the court.

5          THE COURT:  OK.

6          MR. DEVLIN-BROWN:  They are Exhibits 439 and 442,

7     Defense Exhibits.

8          THE COURT:  Mr. DiMase.

9          MR. DiMASE:  Your Honor, the government's position is

10    these two e-mails Defense Exhibits 442 and -- I'm sorry, 439

11    and 442 are littered with inadmissible hearsay to the

12    defendant's own self-serving statements in many cases very

13    obviously offered for the truth.  If the defendant wants to

14    take the stand and testify about his interactions with

15    Ms. Ignatova, he's of course free to do that but he can't

16    substitute his testimony with this inadmissible hearsay in

17    these two exhibits when they're offered by him for their truth.

18    So the government objects to the admission of these two

19    exhibits.

20          MR. DEVLIN-BROWN:  Our rationale, your Honor, is that

21    they're not being offered for the truth.  What this sort of

22    shows here is kind of a breakup between Mr. Scott and

23    Ms. Ignatova.  The government, I understand they have far

24    broader hearsay avoiding powers, you know, has put in lots of

25    stuff about sort of the end stage of the relationship between

JBK9SCO1

```
 1   Mark Scott and Ruja Ignatova.  What's important here and why
 2   it's not being offered for the truth is what it's being offered
 3   for is what each side is telling the other.  And I think it's
 4   significant that Mark Scott is communicating to Ruja Ignatova
 5   things in the nature of you're not giving me what I need to do
 6   this right.  Whether he believes that in his heart of hearts or
 7   not, that's what he's telling the person who's been sending him
 8   company information that the government says is indicative of
 9   money laundering.
10        The same goes back in the other direction when Ruja
11   Ignatova is telling Mark Scott she's not happy with him for not
12   moving quickly enough, for not doing things that she believes
13   needs to be done.  It's not whether in her heart of hearts
14   she's happy or what her reasons are but that she's
15   communicating that to Mark Scott and communicating -- so when
16   you take those two sides you have one person saying,
17   essentially Mr. Scott saying I need to do this right, I need to
18   do this more, and someone else pushing back and saying well,
19   too bad, do it my way or the highway.  And I think it's
20   relevant for that.
21        MR. DiMASE:  Your Honor, may I just say just for the
22   record Defendant's Exhibit 439 contains statements like:  You
23   stepped it up by bringing Joanna in and things are now better.
24   I have fixed the timing issue for smaller fund transfers by
25   continuously leaking capital to Ireland.  Now -- and then in
```

JBK9SCO1

1    Defendant's Exhibit 442 he says things like:  IG should be done

2    this week.  The brokers are conducting deep KYC and I have

3    Irish and Cayman counsel assisting.

4         Those are factual statements that are being offered by

5    the defendant for their truth, not for state of mind, and the

6    government, again, objects to these exhibits coming in.

7         THE COURT:  I'm not letting these two exhibits in.

8         Anything else?

9         MR. DEVLIN-BROWN:  I know -- two other things

10   actually, your Honor.  One is we had talked yesterday afternoon

11   about giving an instruction on the exhibit in which one DMS

12   employees says that Colm O'Driscoll spoke to Mark Scott who

13   communicated certain things.  I think we all were aligned and I

14   don't think we did it.  So I request that we do that maybe

15   right when they come out.

16        THE COURT:  OK.

17        MR. DEVLIN-BROWN:  I think it would be useful,

18   frankly, to give them the exhibit number or a -- put a screen

19   shot on so they -- it's been a couple of days.

20        MR. DiMASE:  That makes sense, your Honor.  We're

21   happy to put it up and we don't object to the instruction.

22        THE COURT:  What exhibit is it?

23        MR. DiMASE:  Government Exhibit 533.

24        MR. DEVLIN-BROWN:  And the only other thing, your

25   Honor, is we obviously made a Rule 29 application at the end of

JBK9SCO1

1    the government's case.  It's up to your Honor how much argument

2    you want to hear on it now.  But I would like to raise, if you

3    don't mind, at least the bank fraud issue.

4                THE COURT:  Very well.

5                MR. DEVLIN-BROWN:  We move it on both counts.

6                THE COURT:  Well we have ten minutes, so.

7                MR. DEVLIN-BROWN:  So --

8                MR. DiMASE:  Before we get to that may I ask

9    Mr. Devlin-Brown one thing?

10                (Counsel confer)

11                MR. DEVLIN-BROWN:  Before we get to that as well,

12   having reviewed Mr. DiMase's selection of Mr. Courtneidge's

13   e-mails, which we really don't think are complete, we don't

14   want to open that door either.  We won't offer Defendant's

15   Exhibit 519.

16                THE COURT:  Very well.

17                You wanted to be heard on the bank fraud?

18                MR. DEVLIN-BROWN:  Yes.

19                So, your Honor, we've always had concerns about the

20   bank fraud statute in the jury's mind despite, of course, your

21   Honor's instructions, becoming sort of a money-laundering-like

22   statute where the benefit to the government on bank fraud is

23   you don't have to prove that the reason behind any false

24   statement of Mr. Scott's was to conceal what he knew was

25   OneCoin criminal money, right.  It can be any sort of false

JBK9SCO1

1    statement made to induce a bank to return -- to get funds from

2    a bank or a customer of a bank.  So there is a sort of

3    pernicious thing that we worry about a little bit there, where,

4    oh, this mission statement to Apex, you know, plagiarized from

5    the internet, a few things are off there, don't worry about

6    whether that proves Mr. Scott knew that the money coming from

7    OneCoin was criminal because, you know what, some version of it

8    made it to DMS Bank and therefore it is bank fraud.

9          So that's why we have a concern.  The government's

10   proof just hasn't been there on bank fraud and it hasn't been

11   there on a number of elements.

12         But the thing that really gives concern is evidence

13   that Mr. Scott joined a conspiracy -- doesn't have to know all

14   the details, of course -- he has to join a conspiracy, the

15   object of which is to defraud an FDIC insured bank or to obtain

16   money or property from an FDIC insured bank account based on

17   misrepresentations, deception, etc.

18         And the government's theory, it was a little alarming

19   the other day in the charge conference, because the

20   government's theory on that has varied.  The bank fraud count

21   was added a month before indictment.  We requested particulars.

22   The government identified three transactions, two at

23   Sabadell one at Morgan Stanley -- sorry.  They identified the

24   Sabadell transaction, Morgan Stanley and DMS, reserving their

25   perceived right to prove other aspects of the bank fraud.

JBK9SCO1

1          At the charge conference they said they may argue he

2     had knowledge of the bank -- supposed bank fraud of OneCoin

3     victims saying the money was for educational packages.  There's

4     been zero evidence, zero on that theory.  I certainly don't

5     think they should be able to argue that.

6          Then they've suggested -- again this surprised us at

7     trial -- that another theory of bank fraud was the iCard

8     transaction at Locke Lord that Gilbert Armenta was sending

9     money into Locke Lord in order to launder it out to Ruja

10    Ignatova.

11         When we saw that occurred at trial we went through

12    what are hundreds and hundreds of pages of Gilbert Armenta 3500

13    material.  Gilbert Armenta, as we understand it, has a

14    cooperation agreement.  He had some issues with it.  His bail

15    has been revoked.  I don't know the full status.  But we saw in

16    the 3500 material at the bottom of one page a note which said

17    Gilbert Armenta -- I'm paraphrasing, I could perhaps get the

18    exact quote if it's helpful -- but in sum and substance that

19    Gilbert Armenta did not believe he was using Locke Lord and the

20    iCard transaction to launder money for Ruja Ignatova.

21         That seems to be the only statement we could find.  We

22    raised that with the government.  They said what you have is

23    what there is.  But that gives us concern that apparently their

24    cooperator has doubts about that transaction.

25         Then let me just go -- and I don't think there's any

JBK9SCO1

1    evidence that Mr. Scott, to the extent there was bank fraud on

2    that transaction by Gilbert Armenta had any knowledge of it.

3            So then that leaves us, your Honor, with what they

4    originally started with which is the two DMS -- sorry, the

5    Sabadell and Morgan Stanley transactions and then DMS.

6            Oh, it wasn't mentioned?  Sorry.  Just the

7    Sabadell and Morgan Stanley transactions.

8            So Sabadell and Morgan Stanley, the theory seems to be

9    that Gilbert Armenta made false representations to those banks

10   to encourage them to release money that he was transferring to

11   the Fenero Funds.  It's pretty thin, not sufficient evidence

12   that Gilbert made false statements.  There's notes and call

13   logs.  The Morgan Stanley witness didn't have an independent

14   memory.  But putting that to one side, there is zero evidence

15   that Mr. Scott had any communications with Mr. Armenta that

16   could even circumstantially be argued to support an inference

17   that Mr. Scott had some knowledge or awareness of a goal to lie

18   to those banks.  And I think what we just saw in the last two

19   days actually negates whatever circumstantial argument you

20   could make.  I mean it's proven now that Gilbert Armenta not

21   only didn't bring Mr. Scott in on exactly what he was doing

22   with Sabadell Bank.  He sent him a false bank letter from

23   Sabadell Bank and false wire transfers.  So that's not there.

24           The DMS theory seems to be that DMS was a customer of

25   Bank of New York Mellon.  Mr. Scott somehow caused fraud

JBK9SCO1

 1    through -- on Bank of New York Mellon by inducing them

 2    indirectly through DMS to allow DMS to make payments through a

 3    correspondent banking relationship.  I don't know that that

 4    even amounts to bank fraud.  I don't think we've heard anything

 5    about whether DMS actually had a bank account with Bank of New

 6    York Mellon where money would have flowed out of so it could be

 7    money from a customer of the bank.  But there's certainly no

 8    evidence that Mr. Scott had anything to do with that and the

 9    communications that your Honor is about to give an instruction

10    on happened months after the transactions.

11              THE COURT:  Let me hear from the government because we

12    have two minutes.

13              MR. DiMASE:  Judge, I won't make this long.  Viewing

14    the facts in the light most favorable to the government there's

15    plenty of evidence here to permit a rational jury to find that

16    the elements had been met.  This entire conspiracy was about

17    lying to banks in order to get funds through the banks.  That

18    does have some overlap with the money laundering conspiracy.

19    But there were FDIC insured banks.  Mr. Armenta's involvement

20    necessitated lying to banks.  Of course he knew that he

21    couldn't say OneCoin money when he was sending investments to

22    Fenero and he even got a subscription agreement from the

23    defendant, an investment subscription agreement.  So, of

24    course, Mr. Scott knew that Mr. Armenta was going to lie to the

25    banks whether or not there was specific conversation about it.

1851

JBK9SCO1

1    Much in conspiracy -- conspiratorial agreements is left unsaid

2    as the court will instruct the jury.  And this is a very clear

3    example of that.

4            With BNY Mellon there's a U.S. dollar account right

5    here in New York through which a number of U.S. dollar

6    transactions flowed straight from Fenero and Mr. Scott was the

7    one who provided the information, the wire details that helped

8    those transactions pass through the bank.  Whether it's his

9    account or DMS's correspondent account in New York is besides

10   the point.  The defendant need not lie to the bank directly.

11   The defendant can lie to somebody else and know that that will

12   be communicated to the bank and that is sufficient.

13           There are other arguments on the iCard and the

14   investors but I don't think it's necessary to get into those

15   here.  I think there's more than enough evidence to let this go

16   to the jury.

17           THE COURT:  Certainly relative to the evidence

18   concerning the money laundering conspiracy.  The evidence

19   concerning the bank card conspiracy is I think much less.  But

20   viewing all of the evidence in the light most favorable to the

21   government I think that there is enough to go to a jury.  So

22   the Rule 29 with respect to the bank fraud account is denied

23   obviously without prejudice to renew it after any verdict.

24           Is the jury here?  And is Ms. Julian here?

25           Is my most fervent hope that the presentation of

JBK9SCO1

1    evidence this morning will not be looking at a lot of e-mails

2    that we've seen ten times already during the trial.  But that's

3    just my hope.

4            MR. DiMASE:  Your Honor, I have about five documents

5    to show the witness on the stand and it will be out.

6            MR. DEVLIN-BROWN:  OK.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JBK9SCO1                         Julian - Cross

1          (Jury present)

2          THE COURT:  Ladies and gentlemen of the jury, good

3     morning.  Thank you, as always, for being so prompt.

4          We will now continue with the cross-examination of

5     Ms. Julian.

6          And Ms. Julian you are reminded that you are still

7     under oath.

8          Mr. DiMase.

9     MICHELLE JULIAN,

10         called as a witness by the Defendant,

11         having been previously sworn, testified as follows:

12    CROSS-EXAMINATION

13    BY MR. DiMASE:

14    Q.  Good morning.

15    A.  Good morning.

16    Q.  I just want to cover a couple of very brief topics with you

17    this morning.  Do you recall that yesterday you spoke about --

18    you testified about some e-mails involving a transaction

19    through the Locke Lord escrow account here in the United

20    States?

21    A.  Yes.

22    Q.  And that related to the iCard matter at Locke Lord.  Do you

23    recall testifying about that?

24    A.  Yes.

25         MR. DiMASE:  Let me pull up Government Exhibit 1406.

JBK9SCO1                          Julian - Cross

1               Can we pull up Government Exhibit 1374 first.

2      Q.  You didn't see this e-mail during your testimony yesterday,

3      correct?

4      A.  Correct.

5      Q.  This is an e-mail from Mark Scott to Gilbert Armenta on --

6      A.  Yes.

7      Q.  -- February 3, 2016?

8      A.  Yes.

9      Q.  Do you see that?

10              And so that would have been the day after the money

11     came to Locke Lord's escrow account, correct?

12     A.  Correct.

13     Q.  And Mr. Scott said to Mr. Armenta, can you read that for

14     the jury.

15     A.  "See below.  Wires in.  You can also send some for my PL

16     account in escrow if you like."

17     Q.  Then at the bottom of this e-mail it's those two same two

18     wires that had gone into the Locke Lord escrow account on

19     February 2 of 2016, correct?

20     A.  It appears so.

21     Q.  So let's now look at Government Exhibit 1376.  And this is

22     an e-mail dated February 15, 2016 from Mr. Scott to

23     Mr. Armenta?

24     A.  Yes.

25     Q.  And could you read the title of that e-mail?

JBK9SCO1                     Julian - Cross

1    A.  "And maybe best to communicate on this line about banks

2    etc."

3    Q.  Just to be clear.  Did Mr. Scott use his Locke Lord e-mail

4    address there or a different e-mail?

5    A.  He used a different e-mail.

6            MR. DiMASE:  Let's go to Government Exhibit 1406.

7            Actually you can pull this one down.  I apologize for

8    that.  It's 1405.  If you could pull that up Mr. Barile,

9    please.

10   Q.  This e-mail you did see on your direct examination,

11   correct?

12   A.  Correct.

13   Q.  And Mr. Devlin-Brown I believe had you read part of the

14   subject line.  Do you remember that?

15   A.  Yes.

16   Q.  Could you read the last part of that subject line please?

17   A.  "My ass on the line on this."

18   Q.  Could you read the second sentence of the first paragraph

19   there?

20   A.  "I am trying to help so we have clean documentation."

21   Q.  This is an e-mail from Mr. Scott to Mr. Armenta on

22   February 16 of 2016?

23   A.  Correct.

24   Q.  And just pulling up Government Exhibit 2621.

25           Now, you don't know where the money came from that

JBK9SCO1                          Julian - Cross

1   funded the two transfers into the Locke Lord account, right?

2   A.  Correct.  I do not.

3   Q.  Just focusing on the left side of this chart, those two

4   accounts there on this chart, the bottom and top and the UAE,

5   those are accounts for RavenR, correct?

6   A.  Yes.

7   Q.  And then it shows money coming into Zala Group?

8   A.  Yes.

9   Q.  And it shows money flowing from that account to two other

10  Zala Group accounts?

11  A.  Yes.

12  Q.  And then those two Zala Group accounts this chart shows

13  funded the Locke Lord account?

14  A.  Correct.

15  Q.  And ultimately the money as far as this chart shows winds

16  up in yet another Zala Group account in the United Emirates,

17  correct?

18  A.  Correct.

19          MR. DiMASE:  You can take that down briefly.

20  Q.  There is one very brief thing I want to cover.

21          You testified yesterday about the transfers made by

22  Mr. Armenta to the Fenero accounts.  Do you recall testifying

23  about e-mails in connection with that subject?

24  A.  I don't recall specifically the Fenero accounts but if you

25  could pull up an exhibit, please.

JBK9SCO1                    Julian - Cross

1    Q.  To keep it at a higher level.  About Mr. Armenta sending

2    money to Mr. Scott's accounts.  Do you recall reviewing some

3    e-mails about that?

4    A.  Yes.

5    Q.  And I think Mr. Devlin-Brown asked you if there was

6    anything in the e-mails that showed Mr. Scott telling

7    Mr. Armenta what to say.  Do you recall answering those

8    questions?

9    A.  I recall the questions, yes.

10   Q.  Let me show you Government Exhibit 1126.

11              MR. DiMASE:  Actually you can pull that down.

12   Q.  You didn't see this e-mail on your direct examination,

13   correct?

14   A.  Correct.

15   Q.  This is an e-mail from Mark Scott to Dave Duynhoven and

16   David Pike?

17   A.  Yes.

18   Q.  And it's dated July 13, 2016?

19   A.  Correct.

20   Q.  And it says "executed subscription package Fates Group

21   LLC."

22   A.  Yes.

23              MR. DiMASE:  Go to the first page of that document.

24   Q.  Is it fair to say that this is an application form for

25   Fenero Equity Investments LP?

JBK9SCO1                         Julian - Cross

1  A.  Yes.

2  Q.  And that's an investment agreement between the investor and

3  the Fenero investment funds in essence?

4  A.  It appears so.  But the top says application formed,

5  including additional language.

6  Q.  You see information on this first page about approved fund

7  investment warning and limited partner of the fund and so

8  forth.  Would that help you understand that this is essentially

9  an investment agreement?

10 A.  Can you scroll down?

11 Q.  Sure.

12 A.  To the next page, please.

13 Q.  Is it fair to say that this form describes Mr. Armenta as a

14 subscriber into the Fenero Funds?

15 A.  Yes.  It appears so.

16        MR. DiMASE:  Can we go to page 15.

17 Q.  And Mr. Armenta signed this form?

18 A.  Yes.

19 Q.  So did Mr. Scott?

20 A.  Yes.

21 Q.  So would you agree that Mr. Armenta had an understanding

22 that under the terms of this form he was to be sending money as

23 investments into the Fenero Funds?

24        MR. DEVLIN-BROWN:  Objection.

25        THE COURT:  Sustained.

JBK9SCO1                         Julian - Cross

1   Q.  Well this form called for Zala Group or Fates Group --

2   Fates Group to send money into the Fenero Funds as an

3   investment, correct?

4   A.  Possibly, yes.

5            MR. DiMASE:  Nothing further, your Honor.  Thank you.

6            THE COURT:  Any redirect?

7            MR. DEVLIN-BROWN:  No, your Honor.

8            THE COURT:  Ms. Julian, you may step down.

9            (Witness excused).

10           THE COURT:  Mr. Devlin-Brown, do you have another

11   witness?

12           MR. DEVLIN-BROWN:  No, your Honor.

13           There are two exhibits that we previously conferred

14   with the government about that we'd like to offer into evidence

15   now and just briefly publish to the jury.

16           THE COURT:  Very well.

17           MR. DEVLIN-BROWN:  Defendant's Exhibit 281 and 278.

18           THE COURT:  Any objection?

19           MR. DiMASE:  No, your Honor.

20           THE COURT:  Very well.  They will be received.

21           (Defendant's Exhibits 281 and 278 received in

22   evidence)

23           MR. DEVLIN-BROWN:  Could we just start with 281,

24   Ms. Stanley.  And this is an e-mail from Mark Scott to David

25   Pike dated May 26, 2016, subject "Important document for admin

JBK9SCO1                    Julian - Cross

1   KYC re:  OneCoin."

2            If we could turn to the next page, Ms. Stanley.

3            This is a document from Locke Lord titled

4   "Cryptocurrencies and Blockchain Technology Update.  Research

5   Note."  Prepared by Robert Courtneidge and Charlie

6   Clarence-Smith.  Maybe just show the table of contents page,

7   Ms. Stanley, which is the next page.

8            And we can take that off the screen.

9            And then if you could publish Defense Exhibit 278.

10           And this is another e-mail.  This one is from Dave von

11  Duynhoven to Mark Scott dated May 19, 2016 with subject

12  "Administration Agreement for Fenero II BVI."

13           If we could turn to the next page, Ms. Stanley.

14           And this is a, according to the document an

15  administration agreement between JP Fund Administration and

16  Fenero Equity Investments II LP.

17           We can take that off the screen, Ms. Stanley.

18           May we see the Court briefly at sidebar, your Honor?

19           THE COURT:  Sure.

20           (Continued on next page)

21

22

23

24

25

JBK9SCO1                        Julian - Cross

1          (At sidebar)

2          MR. DEVLIN-BROWN:  We have nothing further other than

3     the limiting instruction on 533 and I don't know if your Honor

4     wishes to put anything on the record with respect to Mr. Scott.

5     He's not going to testify.  Doesn't wish to testify.

6          THE COURT:  Did you want me to put something on the

7     record?

8          MR. GARVIN:  I don't think so.

9          MR. DEVLIN-BROWN:  I don't think it's necessary.  We

10    can represent we've spoken to him and he's decided.

11         MR. DiMASE:  I think it would be appropriate for the

12    court to allocute him about his decision not to testify; not in

13    the presence of the jury, obviously.  It doesn't have to be

14    right at this moment.  It probably should be before we have

15    summations.  But whether it's before or after the limiting

16    instruction I don't think that matters.

17         MR. DEVLIN-BROWN:  Do you want to call him to sidebar?

18         MR. DiMASE:  That's also fine.

19         THE COURT:  Is that OK with you?

20         MR. GARVIN:  I'd like to do it outside of the presence

21    of the jury.

22         THE COURT:  Maybe what we do is this -- do you have

23    any rebuttal?

24         MR. DiMASE:  No.

25         THE COURT:  So maybe we'll break now so that we can

JBK9SCO1                        Julian – Cross

1    set up for the summation and then we'll bring him over to the

2    sidebar.

3              MR. DEVLIN-BROWN:  So we'll just do the limiting

4    instruction and then we'll rest.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

JBK9SCO1                        Julian - Cross

1                (In open court)

2                THE COURT:  Will the government please put up the

3    exhibit that you wish me to instruct the jury on.

4                And the particular language.

5                MR. DEVLIN-BROWN:  I think it's the second page.

6                THE COURT:  Ladies and gentlemen, you may recall that

7    this exhibit was admitted at the request of the government and

8    that, like a couple of other exhibits that we discussed before,

9    this exhibit was not admitted for its truth, rather to show the

10   effect that it had or didn't have on the folks at BNY Mellon

11   Bank, OK.  So it can be considered for you for that purpose

12   only.

13               With that, Mr. Devlin-Brown anything else?

14               MR. DEVLIN-BROWN:  The defense rests, your Honor.

15               THE COURT:  Mr. DiMase, does the government have any

16   rebuttal?

17               MR. DiMASE:  No, your Honor.

18               THE COURT:  OK.  Ladies and gentlemen, that concludes

19   the evidentiary portion of the trial.  We will now move to

20   summations.

21               The government will sum up first and then if Mr. Scott

22   wants to sum he can go after that and if he does provide a

23   summation then the government can have a rebuttal.

24               But we're going to need just a couple of minutes to

25   set up the well of the court before that happens.  So we're

JBK9SCO1                          Julian - Cross

1    going to take a short break and we're going to bring you out as

2    soon as we're ready.

3              Don't discuss the case.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JBK9SCO1                         Julian - Cross

1           (In open court)

2           (Jury not present)

3           THE COURT:  Mr. Garvin, do you wish me to address

4   Mr. Scott directly?

5           MR. GARVIN:  Yes, your Honor.  That would be

6   appropriate.

7           THE COURT:  OK.  Mr. Scott, my understanding from your

8   attorneys is that you have made a decision not to testify; is

9   that correct?

10          THE DEFENDANT:  That is correct.

11          THE COURT:  Obviously this is a very important

12  decision.  I just want to make sure that you have had every

13  opportunity to discuss this decision with your attorneys.  Have

14  you had that opportunity?

15          THE DEFENDANT:  I have, your Honor.

16          THE COURT:  And do you understand that you have an

17  absolute right to testify if you wanted to?

18          THE DEFENDANT:  I do.

19          THE COURT:  And do you understand that if you do not

20  testify I will tell the jury that it cannot hold that against

21  you?

22          Do you understand that?

23          THE DEFENDANT:  I do understand that.

24          THE COURT:  Do you have any questions about your right

25  to testify?

JBK9SCO1                          Julian - Cross

1           THE DEFENDANT:  No, your Honor.

2           THE COURT:  Do you want any additional time to discuss

3    this matter with your attorneys?

4           THE DEFENDANT:  No.  Thank you.

5           THE COURT:  Is there anything else that I should ask,

6    Mr. DiMase?

7           MR. DiMASE:  No, your Honor.

8           THE COURT:  Mr. Garvin?

9           MR. GARVIN:  No, your Honor.

10          THE COURT:  Very well.

11          How long will it take you folks to set up?

12          MR. DiMASE:  Five minutes, your Honor.

13          THE COURT:  OK.

14          (Recess)

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           THE COURT:  Let's get the jury.

3           (Jury present)

4           THE COURT:  Mr. Folly.

5           MR. FOLLY:  In September 2018, when Mark Scott was

6   arrested and interviewed by federal agents about OneCoin and

7   about Ruja, he lied.  When he was asked point blank if OneCoin

8   and Ruja had anything to do with his investment funds, he said

9   no.  No.  Those were his exact words, ladies and gentlemen.

10  Those were the words of this man, Mark Scott, the defendant,

11  after he was caught.

12          He lied through his teeth.  And he lied then because

13  he knew what he had known all along:  OneCoin was a fraud, and

14  the defendant had laundered $400 million of that fraud scheme

15  money right through his fake investment funds.

16          So Mark Scott went right back to his OneCoin playbook.

17  He told lie after lie so that he could hide any connection

18  between his fake investment funds and OneCoin and Ruja.

19          You heard about so many of those lies at this trial.

20  The lies to banks, the lies about fake investors, investors

21  that Scott claimed had nothing to do with OneCoin and nothing

22  to do with Ruja.  The lies about fake investments and the fake

23  paperwork that he used to try and make it all look real.

24          Scott lied every step of the way because he knew that

25  the money in his funds was from criminal activity.

1        Ladies and gentlemen, this summation is our

2    opportunity to walk through the key evidence that you've seen

3    and you've heard over the last few weeks and to show you how

4    all that evidence proves that the defendant is guilty as

5    charged.  And ladies and gentlemen, the evidence in this case

6    is overwhelming.

7        Before we jump into the evidence, I'm going to start

8    by giving you a brief overview of how we're going to review

9    that evidence here today.  First, we'll talk briefly about the

10   charges in this case; second, we'll talk about what's not

11   really in dispute in this case at all, OneCoin was a massive

12   fraud scheme; third, we'll talk about all the reasons you know

13   that Scott knew that the money he was laundering was dirty,

14   that it was from criminal activity; and fourth, we'll talk

15   about the lies that Scott and his conspirators told to banks to

16   get them to move that money.  Lies that they had to tell for

17   this money laundering operation to work.

18       Now, before we get to the evidence, let me take a

19   brief moment and talk to you about the charges in this case.

20   There are two charges, and Judge Ramos will give you detailed

21   instructions about the law a little bit later, and you should

22   follow those instructions that he gives you.

23       But in talking about the crimes that are charged here,

24   my hope is to give you a roadmap about what's in dispute in

25   this case, and how the evidence fits together to show that the

1    defendant is guilty of both the crimes he is charged with.

2              The first charge is money laundering conspiracy.  And

3    as Judge Ramos will explain to you later, the essence of the

4    money laundering charge is that the defendant agreed to launder

5    money that he knew came from criminal activity.  As I expect

6    you will also hear, a key part of the money laundering is that

7    it is designed to conceal or disguise the source or the

8    ownership of the money from that unlawful activity, like

9    through a fake investment fund as the defendant did in this

10   case.

11             The second charge is bank fraud conspiracy.  In

12   essence, that means that the defendant entered into an unlawful

13   agreement to get money from federally insured banks through

14   lies.

15             Now, ladies and gentlemen, for each of these crimes,

16   you must also find that there is venue in this district.  And

17   all that means is that something happened in Manhattan or

18   somewhere else in the district, in furtherance of the money

19   laundering and the bank fraud charges.  You saw examples of

20   that throughout this trial.  For example, Linda Cohen, the

21   victim who invested over $20,000 into the OneCoin fraud scheme,

22   after her son had told her about it, she wired money from a

23   bank right here in Manhattan.  And you also learned that

24   correspondent banks were used in New York to wire money on

25   behalf of Scott's fake investment funds.  Any of those

1    transactions is enough to establish venue in this district.

2              Now, I want to focus first on what's not in dispute in

3    this case.  OneCoin was a massive fraud scheme.  It was a fraud

4    scheme like few others.  The defense basically conceded this in

5    their opening, and you saw so much evidence of that all

6    throughout this trial.  And ladies and gentlemen, that's where

7    this story really begins.

8              You saw e-mails between the two co-founders of

9    OneCoin, Ruja Ignatova and Sebastian Greenwood, back in 2014

10   and 2015 as they came up with this scheme.  The concept was

11   very simple:  Tell everyone that OneCoin is going to be the

12   next bitcoin, that it's the next big cryptocurrency, that

13   everyone who invests is going to get rich.  Get those victims

14   to invest big, and then take the money and run.

15             And ladies and gentlemen, that's exactly what they

16   did.  Millions of victims, victims like William Horn and Linda

17   Cohen who you heard from at this trial.  Victims who were

18   saving for their retirement, victims who were saving for their

19   grandkids' college.  Victims who invested billions of dollars

20   in this fraud scheme.  OneCoin's entire business was fraud, and

21   ladies and gentlemen, business was very, very good at OneCoin.

22             But OneCoin also had a very big problem on its hands.

23   The OneCoin scam, as big as it was, and with all those victims,

24   was actually pretty obvious, and banks caught on very quickly.

25   And they did not want to be involved with doing transactions

JBK3SCO2                     Summation - Mr. Folly

1    involving large amounts of money from a big fraud scheme.

2             And you'll remember towards the very start of this

3    trial, you heard about this problem from Ruja's brother

4    Konstantin.  He explained to you that if banks knew that the

5    money was coming from OneCoin, they would freeze those bank

6    accounts.  That's why OneCoin needed money launderers.  And

7    you'll also remember from these e-mails that Ruja and Sebastian

8    were desperately trying to come up with a solution.  It was a

9    huge mess.

10            One of those solutions was Gilbert Armenta.  You see

11   that right here, that was Ruja's boyfriend and that was her

12   international money launderer.  But that simply was not enough,

13   Gilbert Armenta was not enough to fix this problem.  Ruja

14   needed a better way.  She needed a structure that she could use

15   to hide OneCoin from the banks.  And by the middle of

16   September 2015, as you see in this e-mail, Ruja had her eye on

17   a solution.  She had found someone who would help her with her

18   money laundering structure.

19            That someone, ladies and gentlemen, was Mark Scott.

20   And that structure was the Fenero investment funds.

21            Within a couple of weeks of that e-mail, Gilbert

22   Armenta introduced Mark Scott to Ruja.  Here's that

23   introduction e-mail.  You'll remember Gilbert was Ruja's money

24   laundering boyfriend, the same one who was arrested by the FBI

25   and began making secret recordings against Ruja.  Armenta had

JBK3SCO2                    Summation - Mr. Folly

1    also been a client of Mark Scott's for a decade.  So Armenta

2    made that introduction, and as you see in this e-mail, he told

3    Mark Scott "treat Ruja like family."

4         But before Scott could do anything, he needed that

5    structure.  He needed a vehicle he could use to launder Ruja's

6    money.  So by early 2016, Scott tells Ruja he's ready.  He's

7    ready to move.

8         Scott had figured out a solution.  Transfers of fraud

9    money disguised as investments.  That was Scott's solution.

10   Now why investment funds?  Scott was a trained lawyer in this

11   very area.  He was a partner at a law firm.  Scott knew how to

12   do this.  Scott knew how to make all of this look like it was

13   real.  So that's why Scott chose investments as the vehicle he

14   would use to launder Ruja's money.

15        So Scott got to work.  Trips to the Cayman Islands,

16   trips to the BVI, trips to Ireland, trips to Bulgaria, trips to

17   London.  Scott was very busy.  He got those investment funds

18   set up quickly, and Ruja's OneCoin money began pouring in.

19   Millions, tens of millions, and then hundreds of millions of

20   dollars went into those investment funds.  It was all OneCoin

21   money, and it was all Ruja's money.

22        On the other end, Scott sent the money wherever Ruja

23   wanted it.  Ruja needed that clean money.  You heard about that

24   from her brother Konstantin.  She had mansions all over the

25   world.  She had penthouses in London with indoor swimming

1    pools.  She had $20 million property in Dubai.  Ruja wanted to

2    spend that fraud money, so she needed Scott to clean it.  And

3    like the fraudsters at OneCoin, Scott was paid big, big money.

4    He got that money for taking the risk of laundering hundreds of

5    millions of dollars.  By the end of this, he got $50 million

6    just for laundering Ruja's money.

7         Let's back up for a moment and focus on what's really

8    in dispute in this case.  For the money laundering charge,

9    there is one key issue that is in dispute.  Did Mark Scott know

10   that Ruja's money came from unlawful activity?  That is the key

11   issue in dispute for the money laundering charge.  And the

12   answer, ladies and gentlemen, is yes.  Mark Scott absolutely

13   knew that all that money came from unlawful activity.

14        The answer is as obvious, ladies and gentlemen, as

15   this OneCoin fraud scheme.  Fabricated records, crypto phones,

16   sham investment agreements, fake loans, e-mails to Mark Scott

17   telling him that OneCoin was under criminal investigation by

18   the City of London police.  Ladies and gentlemen, there are so

19   many reasons, you can take your pick.  But today we're just

20   going to focus on seven key reasons that Mark Scott knew that

21   that money came from unlawful activity.

22        First, let's start with the lies.  Scott lied over and

23   over again in so many ways.  He lied because he had something

24   to hide, ladies and gentlemen.  And let's start with the

25   biggest lie of all.  The lie that Fenero, this investment fund,

1    was actually a real investment fund.  Total lie, ladies and

2    gentlemen.  This was a front company and it was being used to

3    hide two key things:  One, that all this money came from the

4    OneCoin fraud scheme.  And two, that all this money belonged to

5    Ruja.

6              Mark Scott said it himself right here in this e-mail.

7    This is what all the smoke and mirrors were about.  This was

8    just a facade.  This was not a real investment fund.  Smoke and

9    mirrors.

10             And let's go to the very beginning of this, ladies and

11   gentlemen.  Remember the mission statement?  The one Scott sent

12   to all those banks?  One he sent to his fund administrator?

13   Total lie.  It was literally copied and pasted from a website

14   online.  The defendant's mission statement was a copy and paste

15   job.

16             The defendant's so-called track record?  Copied and

17   pasted from Google.  That actually makes sense, ladies and

18   gentlemen.  Mark Scott wasn't an experienced investment

19   manager, and this was all just for show.  It was to make it

20   look like this was a real investment fund.  So Scott hopped on

21   Google and he copied and pasted his mission statement.  He

22   copied and pasted his track record.  That's what he did.

23             And while we're on the subject of this mission

24   statement, let's look at another lie in the mission statement.

25   This will become a theme.  The lie that Scott had a bunch of

1    investors that were lined up for this investment fund.

2             Ladies and gentlemen, the money was coming from one

3    person, and her name was Ruja Ignatova.  No middle market

4    companies, no rich families.  One person, Ruja Ignatova.  This

5    was all just a facade to make it look like Mark Scott had real

6    investors.

7             And look how he describes this when he's talking to

8    his partner David Pike.  You see it right here in this e-mail.

9    This was a game.  That's what Scott and his partner David Pike

10   called it.  A game.  And like I said, Scott, he played this

11   game very, very well.

12            Now the purpose of this game, the purpose of all these

13   smoke and mirrors, as I've said, was to hide OneCoin and to

14   hide Ruja.  That's what this all depended on.  And there's so

15   many examples of this, ladies and gentlemen.  Let's just look

16   at one example.  Ruja telling Scott think about the structure

17   needs to be able to bank and get accounts.  Nothing to do with

18   investing.  Nothing to do with investments.  Ruja did not care

19   about investing.  That wasn't her problem.  That wasn't her

20   concern.  She cared about cleaning hundreds of millions of

21   dollars.  That was her concern.  Needs to be able to bank and

22   get accounts.

23            And let's just take a step back for a moment, ladies

24   and gentlemen.  Why is this even a question or a concern?

25   Banking and getting accounts.  If this was about making real

1   investments, why would Ruja Ignatova be concerned about banking

2   and opening up accounts?  That makes no sense.  That only makes

3   sense because this was all just a front.  Because Ruja's money

4   was dirty, it was from a fraud scheme, so her top priority was

5   banking, opening up bank accounts, and being able to clean all

6   this money.  Not investing.

7          Let's look at this next one.  Here Ruja says to Scott,

8   "If I want to keep about 50 million euros on your accounts, how

9   much will you charge me?"  Once again, ladies and gentlemen,

10  nothing to do with investments whatsoever.  This is about money

11  laundering.  This is about getting Ruja's money from accounts

12  that might get closed to clean accounts that can withstand

13  scrutiny from banks.

14         You heard about this from Donald Semesky, the money

15  laundering expert.  He explained to you this concept of taking

16  money from illegal activity and distancing it from that illegal

17  activity.  Layering.  Giving it appearance that all the money

18  comes from a legitimate, lawful source, so that Ruja on the

19  other side can take that money and do what she wants with it.

20         And ladies and gentlemen, Scott was not confused about

21  any of this.  You can see that right here in this e-mail.  He

22  understood exactly what his job was.  He understood what he was

23  tasked with.  "I am setting up your transfers as investments

24  into registered investment funds."  Again, nothing to do with

25  investments.  Scott isn't talking to Ruja about some great

1    investment he's found in the next Apple or the next Facebook.

2    He's talking to Ruja about how to disguise her fraud money as

3    investments into a fake investment fund.  Nothing to do with

4    real investments.  Those are literally his words in this

5    e-mail.  "I'm setting up your transfers as investments."

6                Now, we'll come back to the subject of hiding the

7    OneCoin connection.  That's a big part of this case.  Defense

8    counsel suggested to you during their opening statement and

9    during the cross-examination of some of the witnesses that Mark

10   Scott actually wasn't really hiding the connection to OneCoin.

11               Ladies and gentlemen, the defendant has no burden in

12   this case.  The burden is always with the government, and we

13   embrace that burden.  But when defense counsel makes arguments

14   like that to you, you are entitled to scrutinize them and think

15   about them and ask yourselves if they make any sense

16   whatsoever.  And the answer here is clear:  Of course Mark

17   Scott was hiding the connection to OneCoin.  Let's just look at

18   a couple quick examples.

19               Here's Scott asking Ruja "How should we name the

20   fund?"  And look what he says.  Basically, it can be anything,

21   anything not associated with OneCoin.  Of course Mark Scott is

22   hiding the connection to OneCoin.

23               Let's look at another example.  "The link to OC will

24   kill us."  The link to OneCoin will kill us.  Scott's words,

25   he's obviously hiding OneCoin.  That's the entire point of all

JBK3SCO2                    Summation - Mr. Folly

1    of this.  Hide OneCoin, hide Ruja, because Mark Scott knows

2    OneCoin is a fraud scheme, and Ruja is the leader of that fraud

3    scheme.  Scott knows that, and that's why he's desperately

4    trying to hide that connection.

5            This theme continues.  You see that in this e-mail.

6    Scott says "I have created a structure on one hand, which

7    creates a super creditworthiness towards the outside which is

8    needed."  Super creditworthiness.  Why is Scott talking like

9    this?  Creditworthiness towards the outside?  Why does this

10   need to be said?  If Mark Scott, a partner at a top law firm,

11   is actually creating real investments, why is he talking about

12   super creditworthiness towards the outside?  Because that's the

13   very point of this.  Create a structure that looks real to the

14   outside, and can be used in secret to launder Ruja's money.

15           Now, like I said, this was the biggest lie of all.

16   The lie that these were real investment funds and that they had

17   real investors.  IMS, B&N, Irina Dilkinska, Gilbert Armenta.

18   Those were the people, those were the entities that Scott

19   claimed were the real investors into his fund.

20           But ladies and gentlemen, these were shell companies.

21   They were controlled by Ruja, and they were used by Scott to

22   launder the money.

23           Think about who these companies belonged to on paper.

24   Frank Ricketts, Irina Dilkinska, Gilbert Armenta.  Criminals.

25   Every one of them.  Those were who these shell companies

1   belonged to on paper.

2         Let's start with Frank Ricketts.  Konstantin, you'll

3   remember, told you about Frank Ricketts at this trial.  He was

4   the fraudster who gave Ruja all that advice about how she could

5   avoid getting arrested.  That was Frank Ricketts.  He's the one

6   running IMS, the company that transferred over 100 million

7   euros straight to Scott's investment funds.  That's IMS.  Frank

8   Ricketts.

9         Gilbert Armenta, we've already talked about him.  Not

10  much more needs to be said about him.  He was Ruja's

11  international money launderer.

12        Irina Dilkinska, you heard about her throughout this

13  entire trial.  She was basically running OneCoin's money

14  laundering department.  She had everything but a money

15  laundering business card.  That was Irina Dilkinska.  And

16  that's who is running the fake shell companies that are sending

17  Scott over 100 million euros.

18        Now there's one more.  Zhoulong Cai, the guy who was

19  supposedly running this company called Star Merchant.  Ladies

20  and gentlemen, he was the so-called director of Star Merchant.

21  This guy who looks like he's in high school was sending 95

22  million euros to Mark Scott's investment funds?

23        Ladies and gentlemen, look at this e-mail.  Zhoulong

24  Cai doesn't own a house.  Zhoulong Cai doesn't have his own

25  bank account.  It's right there in the e-mail that was sent to

JBK3SCO2                   Summation - Mr. Folly

1   Mark Scott.  And this is supposedly the real investor that is

2   sending Mark Scott nearly 100 million euros?  Absolutely

3   ridiculous, ladies and gentlemen.  Zhoulong Cai was a nominee.

4   They were paying this guy to put his name on the paperwork.

5   Scott knew that, he's right here on this e-mail, Scott

6   understood that this was all a cover to send Ruja's money

7   straight to Scott.

8           And remember, Semesky, he explained this concept of

9   shell companies to you.  Money launderers use those companies

10  to distance the money from its criminal source.  Every time you

11  transfer money through one of these companies, these shell

12  companies, you transfer the ownership to a new entity.  You

13  hide whose money it really is, and you hide where the money is

14  really going.

15          Now, ladies and gentlemen, it wasn't just Mark Scott

16  who was hiding that connection to OneCoin.  Everyone involved

17  in this was hiding that connection and started at the very

18  first part of this whole chain.  OneCoin fraudsters told the

19  victims don't reveal anything about OneCoin when you send those

20  wires.  Instead, tell banks that you're buying education

21  packages.  Not OneCoins.  Education packages.  It's right here,

22  and you heard about this at the trial.

23          From there, ladies and gentlemen, that money, that

24  money went to Scott's accounts in the Cayman Islands, money

25  that came straight from OneCoin victims and then to accounts

JBK3SCO2                    Summation - Mr. Folly

1    literally all over the world.  This is that layering that

2    Semesky told you about.  Distancing the money from its unlawful

3    source.  This, on this map, ladies and gentlemen, this is what

4    money laundering looks like.  This is not what investing looks

5    like.

6         Now it's pretty obvious, ladies and gentlemen, but I

7    just want to just emphasize one point about all this money

8    that's being transferred into the Fenero funds.  It's all, all

9    of it, Ruja's.  This is right at the center of Scott's lies.

10   He hid that.  And in case there's any confusion about whether

11   this money was actually all Ruja's, let's just look at one

12   example that makes it absolutely clear.  Here's this e-mail

13   involving Mark Scott.  It's from Karl Horsburgh.  And he sums

14   it all up.  He says basically, I get it.  You have these Fenero

15   Funds that exclusively contain Ruja Ignatova's money.  And the

16   problem is, Ruja cannot appear as the beneficial owner of all

17   that money.  If the banks find out it's Ruja's money, they will

18   close the accounts.

19        Ladies and gentlemen, this e-mail, sent directly to

20   Mark Scott, basically sums up the whole problem.  All of this

21   money in Scott's fund was Ruja's, he knew that, he knew it was

22   from OneCoin, but he lied because he had to solve this problem

23   for Ruja.  He knew she was a fraudster, and had to use his fake

24   investment funds to clean her money.

25        And ladies and gentlemen, look at the response by

1    Ruja.  It's telling.  She doesn't say What are you talking

2    about?  This isn't all my money, it's really Irina Dilkinska's

3    money.  It's really Gilbert Armenta's money.  I'm so confused,

4    why am I on this?  E-mail.  That's not what she says at all.

5    She says get me off this e-mail chain.  Do not put

6    incriminating things like this in writing.  If you want to talk

7    about this, you do it in person, you do it on the crypto phone,

8    but you do not put these types of things in e-mails.  That's

9    Ruja's response to that e-mail.

10        One final point on this, which again, is obvious.

11   Scott also knew the money wasn't just all Ruja's.  It was all

12   from OneCoin.  Ruja was the founder of OneCoin.  That was where

13   she was working.  Scott literally took trips to Sofia, Bulgaria

14   and walked right in to the OneCoin office to meet with Ruja.

15   So there's no question Scott knew that all this money was from

16   OneCoin.

17        He went to that birthday party, ladies and gentlemen,

18   that completely over-the-top event, just like every other

19   OneCoin event.  You saw the footage from that right here at

20   this trial.  Scott was there at that birthday party.  Scott

21   knew all of Ruja's money was from OneCoin.

22        Ladies and gentlemen, there are so many ways that you

23   know that these were all fake investments, that this was a fake

24   investment fund.  But let's focus on the most obvious one of

25   all.  Where are the investments?  Where are Scott's brilliant

1  investment ideas that he is getting paid $50 million to come up

2  with?

3          Ladies and gentlemen, you saw so many e-mails at this

4  trial, we just went through some of those e-mails.  What are

5  they not discussing in those e-mails?  Investing.  This is all

6  really about investing?  And all these e-mails, what are they

7  not discussing?  Investing.  A single idea from Mark Scott

8  about how to make Ruja money.  That's what they're not

9  discussing.

10         Of course that's not what they're discussing, because

11 that's not Mark Scott's job.  He is not getting paid to do real

12 investing.  He's getting paid to launder Ruja's money.

13         Just ask yourself this question:  What did Scott get

14 all that money for?  If this was about real investing, what did

15 Scott get all that money for?  Where are his brilliant

16 investment returns, returns on investment, where are they?

17 That's not what this is about.  It's about money laundering.

18         So instead of real investments, what did Scott do?  He

19 did things like fake loans.  You see that right here in this

20 e-mail.  And how do you know that this was a fake loan?  Scott

21 says it.  Look at his words in this e-mail.  There was a 5

22 million euro distribution made as per the boss a few weeks ago.

23 We need to paper this deal for the administrator.  Those are

24 Scott's words.  The boss, as you know, is Ruja.  That's the

25 boss.  Scott had wired 5 million euros where Ruja wanted it,

JBK3SCO2                    Summation - Mr. Folly

1    and now, after the fact, Scott had to come up with fake

2    paperwork to justify that wire.  So what does he do?  He comes

3    up with a fake loan agreement.  This is money laundering 101.

4    Transfer money, paper it with an agreement that justifies that

5    transfer.

6            These were not investments, ladies and gentlemen.

7    These were transfers of Ruja's dirty money wherever she wanted

8    it.  And Mark Scott, he knew that those loans were all fake.

9    Look at what he says in this next e-mail.  "All loans should be

10   considered available cash for obvious reasons."  Ladies and

11   gentlemen, when you make a real loan, when you loan money to

12   someone, and it's real, that money is not available to you

13   until they pay it back.  That's obvious.  That's common sense.

14   But when it's a fake loan, and there is a fake loan agreement,

15   and you're just sending the money where Ruja tells you to, the

16   money is available.  It's available cash.  Scott knew that.

17   You see it right here in this e-mail.

18           And also, ladies and gentlemen, look where the money

19   goes from the Fenero Funds.  185 million euros goes straight to

20   another one of Ruja's money launderers, Amer Abdulaziz.  You

21   heard about him from Konstantin.  He is the Dubai money

22   launderer who stole $100 million of that money, that fraud

23   money, and used tens of millions of dollars to buy racehorses.

24   That's Amer Abdulaziz.  That's who Scott is sending massive,

25   hundreds of millions of dollars to.

1          And also look at this map, ladies and gentlemen.  See

2     there is a red arrow straight back to Bulgaria.  55 million

3     euros straight back to Bulgaria.

4          So this is the first reason, ladies and gentlemen, you

5     know that this money was dirty.  You know that Scott knew, at

6     the time, that this money came from criminal activity.  He

7     created a massive hundred, multi-hundred million dollar fake

8     investment fund for that very purpose.

9          Ladies and gentlemen, reason number two.  Scott was

10    told, ladies and gentlemen, he was told that OneCoin was a

11    fraud scheme.  He was told that it was under criminal

12    investigation.  Look at this first e-mail.  April 2016, that's

13    when Scott got this e-mail, before a single penny had come into

14    the fake investment funds.  Scott was told OneCoin was a

15    massive fraud scheme.  And ladies and gentlemen, this was not

16    some random hater on the Internet.  This was a CPA.  This

17    article, we went through it.  It was well reasoned.  It was

18    detailed.  And it explained why OneCoin was a fraud scheme.

19    That's what Scott was told before he took in one dime of that

20    fraud money.  He knew, because he was told.

21         And it wasn't just that e-mail.  Here's another one,

22    it's from Gary Gilford, the guy who is running RavenR.  And

23    what did Gary tell him?  He told him about a criminal

24    investigation by the City of London police.  He told him about

25    OneCoin's history of having its bank accounts blocked globally.

JBK3SCO2                         Summation - Mr. Folly

1    You see that right here in this e-mail that went straight to

2    Mark Scott.

3            And ladies and gentlemen, let's not forget, Mark

4    Scott, he is a lawyer.  He knew exactly what these e-mails

5    meant.  He knew what it meant that OneCoin was under criminal

6    investigation.  He understood that article that explained why

7    OneCoin was a fraud scheme.

8            Ladies and gentlemen, reason number three.  The

9    actions and words of Scott's co-conspirators.  The people who

10   he committed these very crimes with.

11           Now, let's look at this text message here.  You'll

12   remember these text messages from Irina Dilkinska to Konstantin

13   Ignatov.  And they included this e-mail attachment from Frank

14   Schneider.  The e-mail attachment where Schneider warns Ignatov

15   that Mark Scott might be a highly placed U.S. law enforcement

16   source.

17           Ladies and gentlemen, there is no need for Frank

18   Schneider to be warning Ignatov about Mark Scott if Mark Scott

19   is on the outside of this conspiracy.  The only reason Frank

20   Schneider needed to warn Ignatov and Irina Dilkinska is because

21   Scott was on the inside.  And they were very worried that if

22   they told him the wrong thing, it could get them all in

23   trouble.  That's common sense.  You don't worry about someone

24   who knows nothing about the unlawful activities that you are

25   involved with.  You worry about someone who is on the inside.

1    And that's where Scott was.

2              And look at Irina's response to this.  It's also very

3    telling.  She says, whoa, wait, look, if Mark Scott was really

4    an -- if he was really an informant, I'd already be screwed.

5    That's Irina Dilkinska's response.  And you know why that is,

6    ladies and gentlemen.  You saw all those e-mails throughout

7    this trial.  Irina Dilkinska was hand in hand with Mark Scott

8    in all of this money laundering.  So her response makes a lot

9    of sense.  She says that can't be it.  Mark Scott is not an

10   informant.  Because if he was, in her words, she'd already be

11   in much deeper shit.

12             Let's go to reason number four.  Ladies and gentlemen,

13   crypto phones straight from Dubai.  Scott's refusal to speak on

14   Skype because it was very unsafe.  Scott's concerns about using

15   certain e-mail addresses.  Scott had something to hide, ladies

16   and gentlemen.  That is so obvious.  He knew what he was doing

17   was wrong, and he was trying to hide it.

18             And just take a step back for a moment.  This is not

19   the behavior of a real investment manager.  It is the behavior

20   of a criminal.  Ladies and gentlemen, before this trial, had

21   you ever heard of crypto phones from Dubai?  Of course not.

22   These are phones that criminals use to discuss their criminal

23   activity.  That's obvious.  And look who had these phones.

24   Look who in this operation had the crypto phones.  Mark Scott,

25   for starters, Ruja Ignatova, Gilbert Armenta, Sebastian

1    Greenwood, the key people in this operation are the ones that

2    had the crypto phones.

3            Ladies and gentlemen, it was not just crypto phones,

4    as you can see here.  Look, Scott refused to Skype.  He was

5    nervous about using particular e-mail addresses.  He didn't

6    want to discuss certain things in e-mail at all.  You see

7    example after example of that right here.

8            Ladies and gentlemen, look at Scott's actions.  They

9    are a window right into his mind.  They are a window into

10   exactly what he was thinking at the time he was involved with

11   Ruja and Irina Dilkinska and all of the other members of this

12   conspiracy.  They show you Scott knew at the time that he was

13   doing something wrong.  That he was involved in criminal

14   conduct.

15           Let's turn to the next reason, ladies and gentlemen,

16   Scott knew.  Just look at the money.  That's how you know Scott

17   knew.  Look at how much he was paid, and look what he did once

18   he got that money.

19           Scott received more than $50 million for cleaning

20   Ruja's money.  $50 million.  Money that came straight from the

21   OneCoin victims.

22           It's staggering.  50 million in less than two years.

23   Ladies and gentlemen, Scott was not paid all that money because

24   he was some superstar investor like Warren Buffet.  That is not

25   why Scott got that money.  Remember, Scott earned Ruja Ignatova

next to nothing, but he still got $50 million.  Why?  Does Ruja
Ignatova strike you as a person who is into charity?
Seriously.  When she brought her brother into this, she barely
gave him a raise from his salary driving a forklift.  That is
not a woman who is going to hand over $50 million to Mark Scott
for doing nothing.

          Ladies and gentlemen, Ruja paid Mark Scott $50 million
because he was taking an enormous risk.  He was laundering $400
million of Ruja's dirty OneCoin money.  That is why Ruja paid
him $50 million.

          And ladies and gentlemen, Mark Scott desperately
wanted every single cent of that money.  He was obsessed and he
was willing to break the law to get his hands on that money.
You saw his own words right here in this text message.  He says
"but I'm going for 50 by 50."  $50 million by age 50.  That was
Scott's goal.  And he got it.  He got it straight from the
massive fraud scheme.  50 million.

          And ladies and gentlemen, you also know why he wanted
all that money.  You saw at this trial what motivated him to
commit these crimes.  Was he doing well before?  Sure.  He was
a partner at a law firm.  But laundering money for Ruja, that
was Scott's ticket to a whole different level.  You saw that
throughout the trial, waterfront Cape Cod houses, Porsches, a
Ferrari, hundreds of thousands of dollars on watches.  A yacht.
This is what Scott desperately wanted, and this is what

1890

1    motivated him to commit these crimes.

2            Let's go to the next reason.  Reason six.  Scott's

3    forgeries, his fake documents, his backdated agreements.  This

4    is the sixth reason you know that Scott knew that all this

5    money came from criminal activity.  He was so desperate to make

6    this big lie believable to fund administrators, to banks, that

7    he was willing to forge documents, fake letters.  He was

8    willing to do all of that.  And it's damning evidence, because

9    you don't falsify records, you don't create fake agreements if

10   you're running real investments.  That's what you do when

11   you're trying to cover up and hide what you are really doing in

12   secret.  Laundering money.  That's what you do when you're

13   trying to cover it all up.

14           Now, ladies and gentlemen, I'm sure you remember Paul

15   Spendiff, the well-spoken witness who you heard from the first

16   week of this trial with the British accent.  He worked for one

17   of the fund administrators named Apex, and Mark Scott was his

18   client.  And at first, things went relatively smoothly.  But

19   within a few months, Apex began growing suspicious and

20   concerned.  They started raising some questions.  Things did

21   not quite smell right.  So they asked Mark Scott to provide

22   more information.  And that, ladies and gentlemen, is where

23   things got really bad for Mark Scott.  First thing that went

24   wrong is Scott forwarded by accident an e-mail.  What's the big

25   deal there?  It has Irina@OneCoin.  Scott had desperately tried

1    to hide any connection between the investors and OneCoin.  But

2    he slipped up, he sent this e-mail, and Paul Spendiff noticed

3    right away.  He got on Google, and within minutes he had

4    connected Irina Dilkinska to OneCoin.  And he had also

5    connected OneCoin to being a Ponzi scheme.

6         So Apex, they called emergency meetings, they made

7    disclosures to government agencies, and they started to ask

8    Scott hard questions.  And meanwhile, behind the scenes, on

9    Scott's side, he's totally panicking.  He's worried because

10   Apex is catching on, but ladies and gentlemen, he's also

11   arrogant.  He thinks that he's smarter than them, and he thinks

12   he can trick them.  So he starts to fake records.

13        Let's look at one example.  The backdated wire

14   instructions.  Why does Scott do this?  He needs some

15   justification, ladies and gentlemen, for the massive amount of

16   money that was transferred from IMS.  So Scott, he just makes

17   it up.  Backdated agreements, that's what Scott does.  And he

18   really wants this to work.  He really wants to pull one over on

19   Apex.  So he says how about use different pens so they don't

20   look so mechanically produced.  And then for the final touch,

21   with his buddy Pike, he says, okay, I want you to send them to

22   me and make them look scanned.  So that this doesn't all look

23   like what it really is, backdated agreements created after the

24   fact to justify the transfer of so much money from IMS.  And

25   that's not all Scott does, ladies and gentlemen.

1    MR. FOLLY: (Continuing)  The next thing he does is he

2    forges IMS agreements, contracts.  He just goes ahead and he

3    forges them.

4    Again, the reason is the same.  He needs some

5    justification for all this money that otherwise doesn't make

6    any sense.  So what does he do?  He changes one percent to

7    20 percent and 22 percent.

8    You can see it right here in this metadata.  It says

9    last modified by Mark Scott.  And then the next thing that

10   happens is Mark Scott sends the forged contracts straight to

11   Apex.

12   It did not end there, ladies and gentlemen, because

13   Apex saw straight through all of this.  You heard that from

14   Paul Spendiff.

15   So Apex was not going to move that money.  So Scott

16   demanded a call.  He demanded a call with Apex.  And on that

17   call Scott did exactly what he always did when it came to

18   OneCoin.  He lied and he lied again.

19   First, he said he didn't have OneCoin's money.  We've

20   talked about all the ways you know that Scott knew that was a

21   total lie.

22   Next, you can see it right here.  He pretends that

23   Irina Dilkinska was the real investor into his funds.  Another

24   one of Scott's favorite lies.  He pretends that Irina Dilkinska

25   is a superstar entrepreneur who had suddenly earned hundreds of

1   millions of dollars overnight; that Irina was inventing ways to

2   access to potential buyers for direct sales companies and that

3   that is where all this money came from.

4           Totally ridiculous.  Not even a very good lie, ladies

5   and gentlemen.  And Scott knew this was a lie.  Look at this

6   next e-mail.  It tells you exactly what Scott knew.  He was not

7   confused about Irina Dilkinska's money.  You see that.  He

8   says:  How will you show that you, Irina Dilkinska, personally

9   earned -- own tens of millions of dollars?  And have the banks

10  verify that?

11          No way.  Scott gets it.  There is no way Irina

12  Dilkinska could possibly justify all that money because it's

13  not hers.  It's Ruja Ignatova's.  And you see that right here

14  in this e-mail.

15          So Scott lied to Apex.  He tried to hide the

16  connection to OneCoin before Apex would shut everything down.

17          Ladies and gentlemen, one final point I want to make

18  about this chain of events in late July and early August 2016.

19  At the start of this trial you may remember the defense counsel

20  told you about a deal that the defendant supposedly liked

21  because he heard that Neil Bush was involved.  I expect he may

22  raise that again when he gets up here later.  But, ladies and

23  gentlemen, just remember one thing about that deal:  The

24  backdated agreements, the forged contracts that we were just

25  looking at.  That is the Neil Bush deal.  That's what Scott

1    does when he's nearly caught by Apex.  He forges documents.  He

2    backdates letters.  That's Scott's response because he knows

3    this is all just a cover for laundering Ruja's money.

4            Ladies and gentlemen, there are so many ways that you

5    know Scott knew that this money was criminal money that was

6    coming into his funds.  But the last one I want to focus on is

7    what Scott did and said when he was arrested, when he was

8    arrested by the FBI and the IRS and he was questioned about his

9    fake investment funds.  Scott lied through his teeth.  You saw

10   this yesterday.  So I just want to focus on a couple of the

11   many lies that he told during that postarrest interview.

12           To start, he was starting once again pretending that

13   Irina Dilkinska and Gilbert Armenta were the real investors in

14   these funds; not Ruja, Irina.  But he took it a step further.

15   He pretended he had forgotten Irina Dilkinska's last fame, the

16   person who had literally wired him over a hundred million euros

17   and he supposedly forgot all together who Irina Dilkinska was.

18           But Scott doubled down on his biggest lie of all that

19   he told every step of the way throughout this conspiracy.  When

20   he was asked directly:  And OneCoin and Ruja had nothing to do

21   with the Fenero Funds or any funds that you were involved with?

22   Look what he says:  No.  No.

23           Wow.  Ladies and gentlemen, you've sat through this

24   trial.  The Fenero Funds literally were Ruja Ignatova and

25   OneCoin.  That's entirely what they were.  All of the money was

JBK9SCO3                    Summation - Mr. Folly

1    from OneCoin and it all belonged to Ruja.  Scott knew that and

2    these lies that he told when he was arrested tell you

3    everything you need to know about Mark Scott.  When Scott gets

4    caught, when he's questioned about Ruja and OneCoin, he

5    completely lies.  He tries to hide any connection between Ruja

6    and OneCoin and his fake investment funds.  And he lies because

7    he knows that telling the truth would reveal his involvement in

8    the crimes that he's committed with Ruja.  It would reveal that

9    he was involved with money laundering.  It would reveal that he

10   was involved in lying to banks all over the world.  It would be

11   an admission of the crimes that he committed.  So he lies and

12   he tries to hide it and cover it up.

13          Ladies and gentlemen, I want to talk very briefly

14   about the bank fraud charge in this case, the bank fraud

15   conspiracy charge.  And much of the same evidence showing you

16   that Scott is guilty of the money laundering conspiracy also

17   shows you that he is guilty of the bank fraud conspiracy.  As I

18   mentioned earlier, in essence bank fraud conspiracy means that

19   the defendant entered an unlawful agreement to get money from a

20   federally insured bank through lies.

21          You saw so much evidence at this trial so I'm going to

22   highlight a few key pieces of that evidence.  Ladies and

23   gentlemen, in order for Scott and Ruja and all of their

24   conspirators in this operation to successfully move hundreds of

25   millions of dollars all around the world through bank accounts

1   all across the globe they had to lie.  That was at the heart of

2   what made any of this possible.

3           And you see it here.  Scott and his conspirators moved

4   the OneCoin fraud money all around the world.  Hong Kong,

5   Singapore, Cayman Islands, Ireland, UK, Germany, Bulgaria,

6   Dubai, and, of course, right here in the United States.  For

7   all of that to work everyone, including Mark Scott, had to lie.

8   That was the only way that this would work.

9           And the lies started at the very beginning when those

10  OneCoin fraudsters told the victims from the United States that

11  they could not tell the banks that they were paying for

12  OneCoins.  That's where the lies started.  Lies to banks to get

13  the banks to wire the money.

14          And of course the lies did not end there.  At every

15  single step in this chain more lies were told, lies to get the

16  banks to move the money.

17          And, of course, Scott's funds were one of the biggest

18  lies that was used to get the banks to sign off on moving the

19  money.  He lied to banks about who his real investors were.

20  We've talked about that at length.  He claimed the real

21  investors were Irina Dilkinska, Zhoulong Cai, people like that.

22  And he lied about where that money actually came from.  Each

23  time an investor sent Scott money Scott lied and claimed it was

24  another investment into the fake investment fund.

25          And some of those lies, ladies and gentlemen, were

1   told to federally insured banks in order to get them to

2   transfer the money.

3           So let's focus on just one example.  The money that

4   came from Gilbert Armenta.  The money from Gilbert Armenta that

5   was sent to Scott on behalf of Ruja.

6           Now, as I mentioned earlier, Gilbert Armenta was

7   already laundering a massive amount of money for Ruja.  And you

8   can see that here right on this chart.  You can see the money

9   from RavenR accounts, the OneCoin money that pours in to Zala

10  Group.  Tens of millions of dollars.

11          So Gilbert had a lot of Ruja's money.  And Scott knew

12  that.  You can see that on this next e-mail.

13          Ruja told Scott:  Gilbert has a lot of my money and

14  I'm planning on getting it home.  That's what Ruja told Scott.

15  And one of the ways that they planned to do that was by sending

16  it to Scott's fake investment fund disguised as a real

17  investment from Gilbert Armenta.

18          This was a total lie.  You can see that here on the

19  next slide.  Armenta sent millions of dollars to Scott's funds

20  disguised as those very fake investments.  And you can look at

21  the wire instructions.  You can look at the purpose that was

22  given for these wires.  They said things like asset management.

23  They said things like investment into ZIIXI.  Random letters.

24  Random letters.  Who knows what those meant?  But what we know

25  is that they were a lie.  This was not a real investment.  They

JBK9SCO3                    Summation - Mr. Folly

1    were transferring money for Ruja.  They were laundering OneCoin

2    money through these accounts.

3            And you can see in this next slide, ladies and

4    gentlemen, it's absolutely clear.  All this money was Ruja's.

5    After Armenta sends it he's communicating with Maya Antonova at

6    OneCoin about the status of the money.  There is no question

7    that money was OneCoin money and it was being moved for Ruja.

8            And, ladies and gentlemen, you know exactly why they

9    had to lie to the banks.  You heard about that in detail just

10   how seriously banks take these anti-money laundering matters.

11   You heard from an employee about the anti-money laundering

12   program at BNY Mellon.  115 to 120 people.  And their only job

13   is to detect transactions just like these involving money from

14   fraud schemes because banks obviously do not want to have any

15   involvement in transferring money that's fraudulent.

16           And you also saw what happened, ladies and gentlemen,

17   when the banks discovered that that money that was going to

18   Scott's funds was actually involved in OneCoin.  You saw

19   emergency meetings at Apex.  Anti-money laundering committee

20   meetings at BNY Mellon.  And there were consequences, ladies

21   and gentlemen, when the banks figured it out.  They would shut

22   it down.  They shut down the transactions and you can see that

23   right here in this e-mail.

24           Scott understood these risks.  He wasn't in the dark

25   about it.  He understood what they were facing.  And you see it

1    in this e-mail.  Here he says they know OC OneCoin OL OneLife

2    behind it.  May raise serious anti-money laundering issues.

3          Scott knew the issue.  He knew that they could not be

4    honest with the banks.  He knew that it was critical to lie in

5    order to move the money through the banks.

6          Ladies and gentlemen, I'm going to sit down in just a

7    minute but before I do I want to leave you with this.  When you

8    look at all the documents and all of those bank records that

9    you saw at this trial and all of that other evidence it might

10   seem like this case is complicated.  But it's really, really

11   not, ladies and gentlemen.  It's very simple.

12         Mark Scott was paid $50 million to launder Ruja's

13   dirty money.  He knew the money came from a fraud scheme and he

14   knew that in order for this to work they had to lie to everyone

15   in order to get the banks to transfer this money.  And some of

16   those banks were right here in the United States.

17         Mark Scott, ladies and gentlemen, he thought he was

18   smarter than everyone.  He thought that he could get away with

19   this.  He thought that through lies and deceit he could trick

20   everyone.  Banks, fund administrators, FBI agents.  Mark Scott

21   tried to trick them all.  But now, here in federal court, it's

22   time for Mark Scott to be held accountable for his actions.

23   Don't let him trick you, ladies and gentlemen.  There is only

24   one verdict consistent with all of the evidence in this case.

25   Mark Scott is guilty.

JBK9SCO3

<pre>
 1              THE COURT:  Thank you, Mr. Folly.

 2              Ladies and gentlemen, we'll take our break now.  We'll

 3    take ten minutes then we'll bring you out for the defense

 4    summation.

 5              (Jury not present)

 6              THE COURT:  Everyone can be seated.  Ten minutes.

 7              MR. DiMASE:  Judge, before we break.  Two quick

 8    things.  I sent an e-mail this morning regarding the jury

 9    instructions I don't know if the Court received that.

10              THE COURT:  That's been incorporated.

11              MR. DiMASE:  Thank you.

12              I just wanted to very briefly address something that

13    Mr. Devlin-Brown said before we started this morning.

14              THE COURT:  OK.

15              MR. DiMASE:  He had mentioned something about Gilbert

16    Armenta and something that Mr. Armenta said in proffer notes

17    that the defense received.  I just want to make it clear the

18    defense is able to or was able, I should say, to call

19    Mr. Armenta if they saw fit to do so if they wanted to put that

20    evidence before the jury.  Obviously something in proffer notes

21    in and of itself is inadmissible hearsay in court.  So I

22    just -- there was some discussion of that and I wanted to make

23    a clear record on that.

24              MR. DEVLIN-BROWN:  Well I don't think there's anything

25    more we can discuss about that.
</pre>

1          THE COURT:  No.  Not at all.  OK.

2          (Recess)

3          (Jury present)

4          THE COURT:  Now we will proceed with the defense

5   summation.

6          Mr. Devlin-Brown.

7          MR. DEVLIN-BROWN:  Thank you.

8          Good morning everybody.  So the prosecutors spent a

9   good amount of time this morning talking about lots of things

10  that are bad and terrible, starting with Ruja Ignatova, the

11  scam she pulled off, all her houses and boats, her total

12  disregard for victims.  They talked about shell companies and

13  nominee directors.  Things that sound, you know, to use the

14  technical term, sketchy.  But none of it matters unless -- none

15  of it matters at all unless the government can prove beyond a

16  reasonable doubt that Mr. Scott knew that the money coming in

17  to him from OneCoin was from a scam.

18         A lot of the other stuff, it's bad if he knew the

19  money coming in from OneCoin was a scam.  But if he didn't,

20  it's not a crime.  And the government has not proven that

21  Mr. Scott knew the money coming in to OneCoin was a crime.  And

22  the evidence doesn't show that.

23         Now, where is the evidence that Mr. Scott knew that

24  OneCoin was a fraud?  And you know it's hard in these trials,

25  right, it's been two weeks and a couple days.  We've all been

1    here.  I counted, hopefully I didn't get it off, but fifteen

2    witnesses from the government.  And then I went back and said

3    well how many of them actually knew Mr. Scott?  How many had

4    met Mr. Scott?  And it's two.  Mr. Spendiff and Mr. Konstantin

5    Ignatov.  Two witnesses.  They each met him once.  Mr. Ignatov

6    met him once and his memory was that he was a hundred percent

7    certain of was that Mr. Scott had spoken to him about what kind

8    of beverage he wanted.  Mr. Spendiff he testified he met him in

9    a hotel lobby to get some documents.

10          That's two witnesses each of who met him once.  Those

11   are the only people who came before you who had ever met

12   Mr. Scott.

13          And you know there is no magic number of witnesses.

14   That's I suspect in one of the Court's instructions.  And two

15   witnesses can be enough who saw someone once in an assault case

16   or something, right.  Two witnesses.  They both saw someone get

17   stabbed.  That's enough.  Two witnesses meeting a defendant

18   once.

19          But this isn't an assault case.  This case isn't

20   really even about what Mr. Scott did.  There is no question

21   what he did.  He set up these funds.  He took in money that he

22   knew -- I mean let's not make any dispute with that -- he knew

23   was linked to Ruja Ignatova through various companies and

24   people that he knew have links to Ruja Ignatova and he made

25   investments on their behalf and he told the banks what he told

JBK9SCO3                    Summation - Mr. Devlin-Brown

1    the banks.  He had a code for what he told the banks, sort of

2    an inner ethic and rationale as to what he should and shouldn't

3    say, we'll get to that.

4           But the point here is this case isn't about what

5    Mr. Scott did.  It's about what was going on in his mind.  And

6    two witnesses who met him once in a case -- it's not a civil

7    case.  It's not about whether he keeps a boat.  It's about his

8    liberty.  And two witnesses who met the guy once, for you, the

9    jury, to conclude beyond a reasonable doubt that he knew this

10   OneCoin money was a scam, it's not enough.

11          You know, the other thing that occurred to me, you

12   know, why does it seem like there's been more, right?  It's two

13   witnesses who met him once.  But it hasn't always appeared that

14   way in the testimony.  I mean one thing that the government did

15   through a number of witnesses was asked them about documents

16   they were not on, knew nothing about; you know, put up a

17   timeline of travel next to an e-mail that someone had never

18   seen and just have the witness kind of read it.  And we

19   probably got a little into that ourselves, just to respond.

20   But it kind of creates an impression sometimes that there's

21   more to it than there is.  And you know a lot of these e-mails,

22   a lot of these e-mails were from people like Irina Dilkinska,

23   people like Frank Schneider, people like even Ruja Ignatova.

24   And so their witnesses -- Gilbert Armenta, witnesses reading

25   e-mails from these people who are not those people.

1    I can't cross-examine an e-mail.  The defense can call
2    witnesses.  Both sides can call witnesses.  But only the
3    government has the burden of proof beyond a reasonable doubt.
4    And they haven't met their burden because instead of presenting
5    you with witnesses and evidence that actually proves what was
6    going on in Mr. Scott's head it's been a lot of e-mails from
7    people who aren't here to ask questions about.

8        I mean Irina Dilkinska, I'd love to ask her some
9    questions.  I don't know where to find her.

10       So what is the government left with?  Have they proven
11   anything at all?  They have lots of e-mails.  Some of them
12   sound bad.  I'll get to that.  They have lots of e-mails.  But
13   they don't have any context.

14       What have they proven and what haven't they?  Because
15   Mr. Folly stood up and said we've proven lots of things.  Some
16   of the things they have.

17       OneCoin is a scam.  We're not going to fight that
18   battle.  We said that in the opening statement.  Sounds like
19   it's a scam.  I mean Konstantin Ignatov talked about what it
20   was.  Victims bought it.  It seems like they don't really get
21   anything for their money.  So it sounds like it's a scam.

22       Have they proven some of the other things they've said
23   sort of casually.  You know, the Fenero Funds are fake, they're
24   fake funds.  Their evidence of that in part was that Mr. Scott
25   cut and pasted some of the corporate gobbledygook that went in

1    the mission statement from various websites.

2              He's been a private equity lawyer, a corporate lawyer

3    for 20 years.  And their evidence that its fake, these funds

4    that are registered and approved by various government bodies

5    that they're fake, is that -- so I don't know about that one.

6              Concealment.  That's a key issue in money laundering.

7    You have to prove, as Mr. Folly said and the Court will

8    instruct, that the purpose of the transfers was to conceal

9    money.

10             And something about this case has never really made a

11   lot of sense to me.  And that's that money coming in to

12   Mr. Scott was coming in from banks around the world, reputable

13   banks.  I mean money from one of the businesses was coming from

14   Deutsche Bank in Germany.  And so this theory that she had

15   dirty money and she had to send it to Mr. Scott to his banks in

16   the Caribbean, I don't quite get how that conceals it.

17             So they've proven some things.  Some things are

18   questionable.  But the point is none of it really matters.

19   None of it really matters unless they've proven what they

20   really have to prove and that is what is in Mr. Scott's head.

21   And that is that he knew OneCoin was criminal money.  And they

22   haven't done that.

23             So let me stop for a moment and remind us all sort of

24   why we're here.  You're the most important people here.  I mean

25   we're all sort of repeat players.  We bring our own

1    negotiations into this, our own biases, except for Judge Ramos

2    doesn't bring a bias.  But everyone else here is a repeat

3    player and you're not.  And there's a reason for that.  Because

4    you're going to go home later.  You don't have to think about

5    what the next case is.  You just have to think about the case

6    before you and whether the government has met its burden of

7    proving beyond a reasonable doubt.

8         And the judge will instruct you on what that means.

9    It's the highest standard there is in the law.  Proof beyond a

10   reasonable doubt must be so convincing that a reasonable person

11   would not hesitate to rely on it in making an important

12   decision, would not hesitate to rely on it.

13        This case is full of reasonable doubts, ladies and

14   gentlemen.  And we're going to go through them.

15        So I'd actually like to start with one of the last

16   things the government talked about which is the bank fraud

17   charge.  And I'm not starting with it because I think it's the

18   most important thing in the case.  You know they had it at the

19   end probably for their own reasons.  I think it's the least

20   important thing in the case.  But I think it has a lot of

21   potential to be confusing and distracting.  And let me explain

22   why.

23        I'm sure you're all going to listen to the Court's

24   instructions and follow them, but probably just sort of walking

25   into the jury thinking:  Oh, bank fraud, that's lying to banks,

1    right, like any time you're not truthful with the bank maybe

2    that's bank fraud.  That's not bank fraud.  That's not at all

3    bank fraud under the law.  Bank fraud is very different.  It

4    requires a couple things that are quite relevant here.

5           One, it requires that the object of the fraud, the

6    thing you're trying to defraud is either an FDIC insured bank

7    or a customer at a bank whose money and property you're trying

8    to get through deceit and lies.

9           So it's not what Mr. Scott may or may not have said to

10   Apex, which isn't a bank at all.  It's not what he said to Bank

11   of Ireland, which is not insured by the FDIC.  The bank fraud

12   case is about what was said to U.S. FDIC insured banks.

13          And I'd like to go through that.  The government

14   talked about sort of some theories as to what may have been

15   said to FDIC insured banks.  And the evidence on this one,

16   ladies and gentlemen, is clear.  They have not met their burden

17   beyond a reasonable doubt on bank fraud.  It's not even close.

18   And the sooner we can get this out of the case -- and you'll

19   deliberate as you want to deliberate, of course, but I think

20   it's a useful exercise to get it out because the money

21   laundering case is much more substantive.  So get rid of bank

22   fraud and then debate the case that really matters.

23          So bank fraud.  So the government's main theory of

24   bank fraud was that Gilbert Armenta transferred money into the

25   Fenero Funds.  He transferred I think ten million the evidence

1   was and then it came back to him.  He didn't complete the

2   investment.  And he transferred it from some of his bank

3   accounts in the United States.  There was Morgan Stanley.  You

4   heard the witness from Morgan Stanley.  Sabadell Bank as well.

5   And the bank fraud theory of the government there seems to be

6   that Gilbert Armenta lied to those banks.  And the judge will

7   tell you.  You'll listen to the instructions as to what sort of

8   lie has to count for bank fraud.  But their evidence is that

9   Gilbert Armenta lied to the banks and that Mr. Scott was in on

10  it; that Mr. Scott joined a conspiracy with Gilbert Armenta and

11  others perhaps but the object of which was to lie to these

12  banks, to trick them.

13          And there is no evidence that Mr. Scott and

14  Mr. Armenta had such a conversation or relationship or anything

15  in which Mr. Scott knew where Mr. Gilbert Armenta banked much

16  less what are you going to tell your bank about sending your

17  money to my fund.

18          I mean the government, they put up e-mails that are

19  sort of cryptic sometimes.  Probably not quoting them exactly

20  accurately but you know there was the one with "please," with

21  all the extra Es.  You're asking about this.  And sort of

22  e-mails that sound, you know, like interesting, right.

23          But that's not evidence.  The government wants you to

24  assume that because there are these cryptic e-mails that

25  there's not complete answers to, Gilbert Armenta is not here,

1    for one thing, that you should assume that the worst was said.

2    And that is not proof beyond a reasonable doubt.  That is not

3    evidence to speculate without any basis as to whether

4    Mr. Gilbert Armenta filled Mr. Scott in on what he was going to

5    tell these banks.

6              But it's more than that, ladies and gentlemen.  It's

7    far better than that for the defense, because the evidence is

8    actually affirmative that Gilbert Armenta lied to Mr. Scott,

9    lied to Mr. Scott about what he was doing with those banks

10   accounts.  You saw a little bit of that we presented yesterday.

11   And I want to, now that I'm here, be able to explain it a

12   little bit more.

13             So this is Gilbert Armenta, Government Exhibit 407.

14   September 12.  He's e-mailing someone at his bank, Sabadell

15   Bank, and he's -- this, I gather, is one of the government's

16   theories of what the lie was when he told the bank it's for

17   asset management.  They're asking him about his wire transfer.

18             Now, look, I think that's pretty weak.  Regardless of

19   how Gilbert Armenta got his funds, you know, they're his monies

20   in his accounts.  It's asset management.  He's sending it to an

21   investment fund.  Doesn't really sound like some great fraud.

22   But more to the point, are you supposed to assume that

23   Mr. Scott sort of coordinated with Gilbert Armenta on this

24   e-mail?  No.

25             So these are two Government Exhibits.  The one on the

JBK9SCO3                    Summation - Mr. Devlin-Brown

1    left, Government Exhibit 419, that's -- was in one of the

2    stipulations I believe or maybe it came in through the

3    Sabadell or now it's called Iberia bank employee.  But this is

4    a real bank document.  This is a real letter that was sent on

5    August 12, 2016 to Gilbert Armenta telling him that they were

6    going to close his accounts for Zala Group and Fates Group

7    after a month or so.  Lists the account numbers.  That was sent

8    to Gilbert Armenta.  It's on the stipulation.

9              The next exhibit on the right is on another

10   stipulation.  It's a document that was recovered from one of

11   the search warrants of e-mail accounts of Mark Scott.  And the

12   first page of it, which all of these exhibits will be

13   accessible to you in the jury if you want to take a look, I

14   don't have it on the screen now.  But the first page you may

15   remember was an employee of Gilbert Armenta forwarding the

16   document to Mark Scott.  And this letter is a bit different,

17   right?

18             It's got some extra accounts written down there.

19   Shureden Services.  Soleymew Management Services.  Water-Tidal

20   Services.  It's got some different language in there too.  It's

21   in yellow.  Any external transfers presently held pending or in

22   transit shall be returned and credited to accounts in due

23   course.

24             And I showed you yesterday some other things that

25   Gilbert Armenta sent, remember, with our paralegal who was

1    testifying both at the end of the day yesterday and today.  And

2    we saw forwarded from Gilbert Armenta to Mr. Scott supposed

3    wire transfer records from Sabadell Bank for Water-Tidal

4    Services and these other ones.

5          So, what kind of information was Gilbert Armenta

6    sending to Mr. Scott?  Well you remember Mr. Kishore on direct

7    who testified from Sabadell Iberia and it was actually kind of

8    an interesting moment in the testimony because he was shown

9    this second letter, 4108.  He was like no actually this doesn't

10   look like a letter from the bank.  I'm only aware of Zala and

11   Fates Group.  The other companies, he was not.

12         Then we have a defense stipulation marked as 1010,

13   making clear that Iberia Bank, which is now the bank that owns

14   Sabadell, couldn't find that copy -- a copy of that letter in

15   4108.  And then two is the real doozie.  They didn't have bank

16   accounts for those entities.

17         So that is a hundred percent clear, I submit, and we

18   don't have a burden, but that is a hundred percent clear that

19   Gilbert Armenta is actually affirmatively lying to Mr. Scott

20   about what's going on with his bank account.  And so the

21   government wants you to infer that in the relationship probably

22   in some other, you know, call that we don't have or something,

23   probably that Gilbert Armenta and Mark Scott conferred about

24   what Gilbert Armenta was going to say to Sabadell Bank.  That

25   makes no sense to speculate like that when you have evidence

1    like this.  That's not even close to beyond a reasonable doubt.

2             And so there's another thing, right, Morgan Stanley.

3    That was another bank account that Mr. Gilbert Armenta had.  He

4    sent some funds from there.  There's a note on the account form

5    that the witness explained.  It had been confirmed by the bank

6    employee that the wire transfer was authorized.  They spoke to

7    Gilbert Armenta.

8             There is a note in the report that says Confirm on LOA

9    monies are capital investment by the account owner in a new

10   company.

11            I believe no one had a specific recollection of that

12   call but it would have come from the client.  It would have

13   come from Gilbert Armenta.

14            And there are no documents anywhere in evidence, the

15   government hasn't shown them to you, they're not in evidence,

16   where Mr. Scott is on any communications with Morgan Stanley

17   bank.

18            And, look, if Gilbert Armenta is sending him fake

19   documents from Sabadell Bank you don't assume that:  Oh, with

20   Morgan Stanley it was probably, you know, they were of the same

21   mind and they probably got together about what Mr. Armenta was

22   going to say to the bank.

23            This is another thing he apparently said to the bank,

24   according to this exhibit, that he was investing in windmills.

25   I mean the government is tilting at windmills with this theory.

1    There is no evidence at all that Mr. Scott was part of any

2    representations that Mr. Armenta made to the bank.

3            This iCard transaction.  I don't want to spend a lot

4    of time on it because the government didn't either.  This was

5    one of those kind of confusing situations because the person

6    who was testifying about it was the records custodian from

7    Locke Lord, Mr. Reeder, who didn't really know much -- what, if

8    anything, this transaction was about.

9            So we introduced as Defense Exhibit 499A a bill which

10   shows that it's a real case, right.  I mean there's $69,000 --

11   you can't see it that well, but it's at the bottom -- in fees.

12   163 hours.  There's people billing time.  The description is

13   redacted but they're billing time.  It's actually not even in

14   Mark Scott.  So that's a real case.

15           And the government showed you some e-mails that

16   Mr. Scott was on.  This is one in which there's a conversation

17   about Gilbert Armenta who had put some funds into Locke Lord

18   for the iCard transaction that he was going to -- for whatever

19   reason he wanted them back.  So money was billed on the case

20   but some of this stuff he put in he wanted back.  And Mr. Scott

21   is asked in I believe the e-mail below this.  What's up?  And

22   he says he's not sure why the funds are being pulled back.  He

23   can forward it to the client.

24           And then you know there are e-mails.  We've each

25   showed you probably these a few times.  There's e-mails with

1  Giselle who is one of Gilbert Armenta's employees.  He's asking

2  questions about it.  Sometimes it's not clear what the answers

3  are.  But -- this is I think out of order in terms of how

4  they're appearing.  But there was one e-mail chain where she

5  says:  Don't respond to Mark.  And the answer is:  Understood.

6          Now, I don't know what's going on there.  But we don't

7  have the burden of proof.  And for the government to suggest

8  you should infer that there was some conversation about some

9  lie that Gilbert Armenta may have told to a bank to send money

10  here, there's just -- there's nothing there.

11          Then they talk about this other bank fraud theory

12  which is Bank of New York Mellon and this one is kind of

13  confusing.

14          So, just to be clear about this one.  So Bank of New

15  York Mellon we had a couple witnesses testify.  They are based

16  in New York.  They mostly don't do accounts for people.  They

17  do accounts for institutions, for other banks.  And so DMS,

18  which is based in the Cayman Islands, had an account with Mark

19  Scott and Apex actually was involved in sort of controlling

20  money in and out of that account for a while.

21          So Mark Scott has an account with DMS.  If DMS wants

22  to send money in dollars, then DMS sends those dollars via Bank

23  of New York Mellon in New York to some other bank.  There were

24  some charts.  Right.

25          And so Mr. Scott didn't have an account at Bank of New

1    York Mellon.  The idea that he defrauded Bank of New York

2    Mellon, where is there anything for it?  And this is what seems

3    to be the government's theory on it.

4         So, they showed a spreadsheet.  It had a number of

5    tabs, 536A.  Some of them were euro transactions, money like

6    coming into the Fenero Funds.  Those, I don't believe the

7    evidence shows went through Bank of New York Mellon in

8    New York.  Because dollar transactions have to clear there.  So

9    these are the dollar transactions.

10        And you'll see right away they take place in 2016.

11   And then what happens is -- we saw some of it actually just

12   this morning, right.  Bank of New York Mellon had some

13   questions about the transactions in 2017.  There is e-mail

14   evidence that in responding to those questions David Pike, who

15   I believe there's been testimony he was an assistant to

16   Mr. Scott at times.  He sent an e-mail to Colm O'Driscoll who

17   is the bank at DMS and the chain below is asking some

18   questions.  And he's essentially:  We told you this.  What's

19   the problem?

20        There is no evidence, ladies and gentlemen, no

21   evidence that Mr. Scott or Mr. Pike ever said anything to their

22   banker Colm O'Driscoll other than leave us alone.  There is no

23   evidence of that.

24        What there is evidence of is that another person at

25   the bank, Nanalie Cover at DMS Bank sends an e-mail in March of

1    2017 with an explanation for the transaction.  And it's not

2    appearing at the part of the bottom right now.  But in one

3    version of this e-mail anyway, the judge showed it to you this

4    morning or we showed it to you this morning, there was

5    something where Nanalie Cover says that Colm O'Driscoll says

6    that he got information from Mark Scott and it's, you know,

7    it's all OK, it's a onetime thing.

8           You were specifically instructed that you can't take

9    that for the truth of what was said, for whether Mark Scott

10   said anything to Colm O'Driscoll at all or who knows what Colm

11   O'Driscoll said to Nanalie Cover.  Why this was relevant and

12   admitted in evidence is Bank of New York Mellon was doing an

13   investigation.  So stuff they were learning was relevant to

14   their investigation.  But there is no proof, no proof at all

15   that Mr. Scott had anything to do with any representations made

16   to FDIC insured Bank of New York Mellon about its customer DMS

17   about transactions that had taken place already a long time

18   ago.

19          That's the bank fraud case.  And it's not.  It's just

20   not there.  And the sooner one can get that out of the case,

21   the sooner one can focus on money laundering.  Because I'm not

22   going to pretend I can just wave money laundering away because

23   that's a more serious allegation and I want to spend time on it

24   now.

25          I do want to say one more thing about Bank of New York

1      Mellon.  It's a little out of sequence but something the

2      government said made me think it was a good example to bring up

3      right now.  Remember how in the government's summation they

4      talked about Mr. Scott was told, right, Mr. Scott was told that

5      OneCoin was a fraud.  And their evidence for that was -- I

6      forget the exhibit number but it was a short e-mail from Irina

7      Dilkinska.  I believe the title was called false and misleading

8      or something like that, that had a link to a blogger where the

9      government read the article for ten or fifteen minutes.  That

10     was also by the way not offered for the truth of anything but

11     for the fact that Mr. Scott got it.

12             OK.  Yeah.  He got it.  There's evidence he got it.

13     Was there evidence he clicked on it?  No.

14             Was there evidence he ever followed up with it?  No.

15             So you can take that for what it's worth.  I submit

16     it's worth basically nothing.  Because Mr. Scott was getting

17     evidence from other sources.  He was getting evidence from

18     Deutsche Bank, which was sending payments into his fund from

19     various Ruja Ignatova entities.  HSBC was sending money.

20     That's what goes to Mr. Scott's state of mind.  That's what

21     goes to him thinking this seems legitimate.

22             And Bank of New York Mellon, the dates on this are

23     interesting as well.  March 2017.  Because you remember you

24     heard testimony, you know there was this big investigation.

25     They had a large anti-money laundering department.  And after

1   this big investigation what did they do?  Did they say OneCoin

2   is a scam, we're putting this on our filter?  No more money

3   ever going through touching OneCoin or Ruja Ignatova.  No.  He

4   testified no, they didn't do that.  They put IMS.

5   International Marketing Services in the filter.  They gave some

6   instruction to DMS that you ought to be careful essentially.

7   No evidence they ever gave any instruction to Mark Scott.

8         This is Bank of New York Mellon 2017.  They're not

9   even fully walking away from Ruja Ignatova at that point.

10        Mr. Scott -- well get into the timeline in a minute --

11  he has already decided he's returning his funds; that he

12  doesn't want to have anything further to do with any sort of

13  investments with Ruja Ignatova.  And by July of that year he's

14  out of it completely.

15        And so Bank of New York Mellon they hear some things.

16  They're suspicious.  They have an investigation.  They don't

17  even fully shutdown anything having to do with Ruja Ignatova

18  and they come in and testify as a witness.  Mr. Scott shuts

19  things down and he's indicted.

20        I know the government had seven reasons and if I had

21  known in advance I would have tried to do seven as well.  But

22  we have five reasons for reasonable doubt and although I kind

23  of made a little joke there it's not about the number of

24  reasons because, again, the defense doesn't have to prove

25  anything.  Like one reasonable doubt is enough.  We don't have

1    to have five.  And some of these have subparts also.  But we

2    don't have to have any specific number.  Any reasonable doubt,

3    anything that gives you pause before making a decision about

4    this man's liberty is a reasonable doubt.

5         So, I'm going to go through all five.  Some are pretty

6    short.  This one is very short.  But it's important.  I

7    mentioned it in my opening.

8         Mark Scott was not part of the OneCoin scam.

9         Wire fraud.  The OneCoin scam is wire fraud.  You're

10   going to hear the judge instruct about what that means.  But

11   it's lying to people to get their money or property.  Lying in

12   this case to people about what OneCoin was, whether it was

13   valuable.  Konstantin Ignatov pled guilty to that.  You know

14   basically selling people a bill of goods on OneCoin.

15        Mr. Scott wasn't even charged with that.  And there's

16   zero evidence that he had anything to do with that.  I mean at

17   one point in the government's summation they talked about what

18   the OneCoin fraudsters were saying to investors in the U.S.

19   They sort of have like a broad term.  Whoever those people are,

20   Mr. Scott isn't one of them.  He had nothing to do with

21   marketing OneCoin in the U.S. or in any other location.  He had

22   nothing to do, you saw I think on your screen, instructions to

23   write, it's an educational program or something to your bank.

24        There's zero evidence connecting him to that.  He was

25   not involved in the OneCoin scam.  So why is that a reasonable

JBK9SCO3                    Summation - Mr. Devlin-Brown

1    doubt?  Well, look, if you're doing the illegal business, if

2    you're doing the wire fraud, if you're scamming the people,

3    then obviously it's not a giant step to say, you know, the

4    money that you're doing from the scam you're involved in, you

5    know that's criminal money.

6              But Mr. Scott wasn't.  He wasn't involved in that.

7    And that means the government has to overcome something.  They

8    have to show that Mr. Scott, despite not being involved, not

9    even accused of being part of the scam on OneCoin to the

10   public, that he somehow knew that OneCoin money was criminal,

11   the money coming from Ruja Ignatova.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1      MR. DEVLIN-BROWN:  (Continuing) And this is the second

2  reasonable doubt.  Ruja kept the OneCoin scam very, very

3  secret.  So you remember -- well, before you divert your

4  attention to that.

5      You remember there was testimony about the blockchain,

6  right, that OneCoin had.  And a cryptocurrency, basically, no

7  blockchain, it's fake.  If it doesn't have that code that lets

8  people keep track of which coins are mined and where they're

9  going, it's nothing.  OneCoin's blockchain was fake.  I mean,

10  the government's right.  We're not, we don't have independent

11  knowledge of that, but it sure sounds fake.  Konstantin Ignatov

12  said it was fake.

13      But the public didn't know that.  They had auditors,

14  there was testimony.  They had auditors certify and put on the

15  OneCoin website that it was real.  And Ruja Ignatova kept that

16  scam secret even from her own brother.

17      So I thought this part of testimony was pretty

18  interesting.  Who, if anyone -- this is from the direct -- is

19  able to see transactions in OneCoin's blockchain?  Only Ruja

20  and the IT department.  And then I follow up on that on

21  cross-examination.  And he identified the people in the IT

22  department.  And they gave him like a computer demo of the

23  blockchain, a dog-and-pony show making it seem like it was all

24  real and it wasn't.  But they actually went to the trouble for

25  having a fake thing for people to look at.

1          And one of the things I thought was really interesting

2     from the cross-examination of Mr. Ignatov was he believed in

3     the blockchain until pretty, pretty late in the game.  I

4     understand initially he was essentially hired to be an

5     assistant to Ruja Ignatova, but after she disappeared in

6     October 2017, he became one of the leaders.  That was the

7     testimony.  So this is March 2018.  And I don't think I have it

8     on the screen here, but some time before March 2018 there had

9     been a raid by Bulgarian authorities and that caused

10    Mr. Ignatov to have some doubts about whether the blockchain

11    was real.  But then there was a report by a German lawyer

12    saying it was real and he thought, yeah, that convinced him or

13    gave him some comfort.  It wasn't until May of 2018 when he

14    finally learned from Irina that they weren't really mining

15    codes.  This was a secret.

16          Now we get to a point of logic really.  Right.  Which

17    is Mark Scott's not part of the OneCoin scam.  It's clear they

18    want to keep this thing secret, even within the company.

19    Right.  Ruja and the IT department have the access to it.  So

20    does it make sense that people doing that, when they're

21    contacting lawyers, bankers, people they don't know, would come

22    out and say, we're running a kind of a scam here, would you

23    help us with our money.  That's dumb.  That doesn't make any

24    sense.  Why would a criminal do that?  You want to make

25    yourself appear legitimate if you want to convince people to

1   handle your investments.

2         She didn't go to the banks around the world and say

3   this is a scam.  She presented it normally and legitimately.

4   You know that's what she did with Mark Scott as well.

5         I think the government showed you this one.  This is

6   pretty early on, the introduction from Gilbert Armenta, man of

7   mystery.  And then, we have setting up, is it convenient to

8   talk.  Then we have this thing.  Right.  I mean, you remember

9   this calendar entry that the government put into evidence.  TC

10  to discuss money transfer/laundering issues.  And it's like,

11  you know, put in your calendar anti-money laundering or

12  avoid -- have a little more descriptive entry.

13        There's no way, I submit, even if we had no other

14  evidence in the record, there is no way Ruja Ignatova, who

15  doesn't know Mark Scott and he puts in his calendar let's talk

16  about money laundering, that that doesn't make any sense.

17        Then in the case towards the end there was another

18  exhibit introduced, the government had it marked as an exhibit.

19  We did too.  This was one of the few times we said we want our

20  mark on it as well.  Because this is a very critical e-mail in

21  understanding the early relationship between Ruja Ignatova and

22  Gilbert Armenta.  Let me zoom in on a couple of things.

23        So she's reaching out to Mark Scott, she says thank

24  you for the good call.  This is October 13.  It was a pleasure

25  to speak to you.  They've already had that conversation in the

JBK3SCO4                    Summation - Mr. Devlin-Brown

1    calendar as money laundering call or whatever.  And I want to
2    be clear.  Ruja's not -- these things she is saying here are
3    not true.  She's lying.  I mean, OneCoin is a scam.  We are all
4    in agreement on that.  But that's not what she's telling Mark
5    Scott.  She's telling him she wants to hire him for asset
6    protection.  She has some personal assets she wants to protect
7    from risks.  She's tell him about OneCoin, it is a tricky
8    field, you know.  Sometimes people confuse it with Ponzi and
9    other illegal ways doing business.  I guess sometimes they're
10   spot on.  But, that's what she's telling Mr. Scott.  People
11   could confuse this.  She need hands on advice.  She's being I
12   think the way you might be if you're speaking to some lawyer
13   you're meeting for the first time to some degree, you know,
14   being outside legality in China does not concern me.  You know.
15   But, risk not being not legal in U.S.A. I would take extremely
16   serious.
17          That's what she's telling Mr. Scott.  Not because it's
18   true, but because that's what she wants Mr. Scott to think.
19   She talks about business assets and personal assets.  She talks
20   about other wealth.  She has shares in software ventures,
21   agricultural products, so on.  She talks about another lawyer
22   who is supposed to help her, and we are going to talk more
23   about that lawyer later.  Robert Courtneidge.  That name is I
24   think misspelled there.
25          So, then you know what happens after that, right after

1    she's introduced.  Mark Scott engages her services.  There's a

2    bill, again, the entries are redacted.  He bills from Locke

3    Lord.  They kept the scam a secret, and they kept it secret

4    from Mark Scott.

5         There is also no evidence, and now I am going to start

6    spending a little more time on things we've seen, but there is

7    no evidence that Mark Scott believed OneCoin was a scam.  Look,

8    there's -- there's evidence of e-mails where he's talking about

9    his understanding of what sort of KYC needs to be done and

10   things like that.  I am going to get to that.  But just focus

11   with me right now on where is the evidence that he believed

12   OneCoin was a scam.  That money from OneCoin was criminal

13   money.  Well, it didn't come from any witnesses.

14        You remember two witnesses, right, each met him once.

15   One of them, really the only one who could even theoretically

16   have some visibility into what's going on in Mark Scott's mind,

17   is Konstantin Ignatov.  Konstantin Ignatov, he testified, he

18   testified for one thing, they had many meetings with the

19   government in advance.  Both before and after he got his

20   cooperation agreement.  But he came in here and testified that

21   Mr. Scott was one of the main money launders for OneCoin.  Wow,

22   that's bad.  Right?  That's devastating testimony.

23        He also testified he met him once.  And maybe I spent

24   too much time on that meeting with him.  But, you know, that

25   meeting must have been the most vivid meeting ever.  He

1    purported to remember in detail, and some of the details were

2    conveniently pretty suspicious sounding.  He testified on

3    direct about how the meeting was originally with Ruja and then

4    Irina Dilkinska arrives and he brings her into the office, he

5    mentioned the part earlier about what beverage Mr. Scott

6    wanted.  And then Ruja comes out and says everyone go home.

7    That was the only time that happened ever.

8            Just didn't add up.  Really?  The one time, the one

9    time you meet him happens to be the one time she ushers

10   everyone out of the office?  And you know, they have separate

11   offices, as was the testimony.  The mom, there's lots of

12   offices.  They probably could have met somewhere else as well.

13   It just didn't make a lot of sense.

14           He sort of wavers on that on cross-examination.  Are

15   you 100 percent sure Ms. Dilkinska was at the meeting?  I'm

16   pretty sure seeing them.  I'm pretty sure they met in Sofia

17   because she told me the week afterwards that they spent a lot

18   of time together.  Then, elsewhere on cross I asked, So after

19   the meeting that Mark Scott had with your sister Ruja on

20   July 2016, did Irina tell you about what had occurred at the

21   meeting?  He said no.  You know, this is the one meeting.

22           And I actually, I feel some sympathy sometimes for

23   Konstantin Ignatov.  You maybe expect, I am a defense lawyer,

24   he lied, he was a horrible person.  I think he lied about that.

25   I think he exaggerated the meeting.  But he was also clearly

1    manipulated by his own sister.

2              So, Konstantin Ignatov.  He met once, and then I kind

3    of drew it out.  He didn't have phone calls, didn't have text,

4    didn't have WhatsApps.  He had e-mails, I think he had like 100

5    e-mails.  And it was clear that they were basically all about

6    planning trips.  Never anything about the Fenero Funds.  Never

7    anything about blockchain.  Never anything about anything that

8    could possibly shed light for you, the jury, into what

9    Mr. Ignatov knew about what was in Mr. Scott's mind.

10             So, he said he heard that Mr. Scott was a money

11   launderer.  As we kind of drilled down into it there may have

12   been office gossip kind of stuff, but really he heard it from

13   Irina Dilkinska.  And aside from his testimony that he heard it

14   from Irina Dilkinska, the government offered these exhibits.

15   And I think they're revealing for a couple of reasons.

16             So, one is the time.  June 14, 2018.  Mr. Ignatov

17   testified that Mr. Scott was, after early 2017, he didn't see

18   him around anymore.  He had no dealings with him.  And this is

19   June 14, 2018.  And Irina Dilkinska says about Mr. Scott, he

20   wants to know what's up with Phoenix so to help.  And then she

21   quotes him, purports to quote him anyway.  As to him wanting to

22   help, it is better to let me know what is going on.  We have

23   our audits going on in BVI and will submit to the financial

24   commission.

25             Well, we know what's going on from e-mails with

1   Mr. Scott and Irina Dilkinska at that time.  The government

2   showed you this e-mail.  At first glance, oh, it looks like

3   Mr. Scott's pretty much working with OneCoin in 2018.  But it's

4   actually forwarding a document for signatures from July 17 of

5   2017.  That's when Mr. Scott returned all the funds except for

6   a litigation reserve that he was holding.  And that's the only

7   thing that Mr. Scott and Ms. Dilkinska are talking about.

8   That's only thing that relates to these texts that

9   Mr. Konstantin says, you know, support that Mr. Scott is a

10  money launderer.

11         So I'll go through these quickly.  I don't know we

12  need to go line by line.  After he sends the e-mail, Irina

13  Dilkinska, apparently now going by Malena Fahient, says so you

14  want to tell me the remaining 1 million plus 250K were already

15  sent to Phoenix?  Mr. Scott replies not what I'm saying.  We

16  are holding legal escrow until all investigations over.  And

17  the funds at Phoenix are held by Phoenix as custodian for

18  investor, not by us.  Irina need full information on

19  investigation and status please.  We have no investigation at

20  this point.  You do.  And we are not sure if it will come our

21  way.  You do means who, company or me personally.  Again, I

22  don't know that we need to read about issues in Bulgaria.

23  Company's fine in Bulgaria.  This is what all that's going on

24  with Mr. Scott and anyone from OneCoin in 2018.  Which is they

25  are saying hey how about the 1 million, and he's saying, you

1  know, there's investigations.  There we go.  Okay.

2          So, you don't have anything from Konstantin Ignatov

3  that you could take at all to the bank that Mark Scott knew

4  that OneCoin was a scam.  But it's actually worse than that.  I

5  almost skipped over it, right, because it would be one thing,

6  it would be one thing if Konstantin Ignatov had taken that

7  witness stand and said, fair point, most of what I learned is

8  from Irina, but she's a reliable person.  And she's not here,

9  know but she's a reliable person.  I can vouch.

10         He said literally the opposite.  Now Irina Dilkinska

11 is not an honest person, is she?  No, she is extremely

12 dishonest.  That's my question.  She is extremely dishonest; is

13 that fair to say?  Yes.

14         Two pages later:  So you couldn't really trust a word

15 Ms. Dilkinska was telling you June 2018, right?  I had serious

16 doubts about it.  You certainly couldn't trust her about

17 anything important in your life?  No.

18         She didn't testify before you.  The person who

19 testified barely knows Mr. Scott.  What little he knows seems

20 to be from Irina Dilkinska who he thinks is a big liar.  That's

21 not worth any weight, any weight in your consideration as to

22 what was going on in Mark Scott's head.

23         So, also witnesses aren't the only evidence.  You

24 could have e-mails.  I mean, this is an e-mail that says what's

25 going on in someone's head.  Sebastian Greenwood, one of the

1   founders of OneCoin to Ruja Ignatova.  We are not mining

2   actually but telling people shit.

3         Sorry.  I got in trouble earlier this morning by not

4   reading the phrase "ass" to you yesterday in an e-mail that was

5   redirected on this morning.  So I am reading it out loud this

6   time.

7         This is another e-mail.  This says what's going on in

8   people's head.  Right.  You know, it's never good to have a

9   chart that says fake coins.  I mean that's pretty, pretty

10  clear.  There's nothing like that, there is nothing like that

11  from Mr. Scott.  There is just no evidence anything like that

12  what was going on in his head from witnesses, from e-mails,

13  from anywhere.

14        So, that's when the government starts pulling out

15  stuff that I just don't think is fair.  It's not fair for you

16  to speculate that, oh, you know, we must be missing the

17  evidence but it is there somewhere.  There is all this

18  testimony about the crypto phone.  And I forget who it was but

19  someone said, yeah, I heard that from The Good Wife.  These, I

20  find it sort of amusing.  It is a serious and amusing kind of

21  thing, like these high-tech products, they work better on TV

22  sometimes than real life.

23        These are the instructions.  Okay.  I am not going to

24  blow it up but pretty clear.  I mean, no problem.  And then you

25  have this kind of comical stuff.  Mark Scott, someone's entered

1    a password.  Ruja can't even get it to work in February 2016.

2    March now, he is asking her for the first time, do you have a

3    crypto number.  My PIN not working in January 2017.

4            This is what Mr. Ignatov said on direct.  People

5    around Ruja that were using crypto phones were always asking me

6    how they can make the crypto phones work when somebody doesn't

7    work the way they want to use it.

8            Who knows if they got this thing working.  But let's

9    say they got it working fine.  Why, I mean this is pretty

10   clear, lots of e-mails back and forth with Ruja, Mark Scott.

11   Why should you jump to some conclusion that the real, you know,

12   criminal conversations happened on these lines that we

13   supposedly don't hear.

14           They played for, you remember in the government case,

15   this panicky phone call between Gilbert Armenta and Ruja

16   Ignatova when Gilbert was working with the feds, and she said

17   something like, oh, you have to always talk on crypto phone or

18   something to that effect.  It's not safe.  And I don't know if

19   the point was, like, so you should assume Mr. Scott probably

20   had the same understanding about how to talk there.  I mean,

21   this was a very special situation.  Gilbert Armenta was in a

22   romantic relationship with Ruja Ignatova.  Ruja -- he is

23   working with the FBI.  Ruja Ignatova starts to suspect that

24   there is an FBI investigation.  There are bugs planted in his

25   office.  So yeah, that's a pretty panicky call, but it is a

1    special case.  So they do that.

2            Then they have this sort of evidence, which is just

3    not evidence.  Look at this car.  Right.  I mean, look, they

4    call it a yacht.  I think Ruja's was more a yacht, but this is

5    a big boat that he bought.  This isn't a great picture of the

6    house, but you remember there were some that were like up in

7    the air.

8            What does that prove?  What does that prove?  People

9    running investment funds get a lot of money.  They get a lot of

10   money, whether they are committing a fraud or whether they are

11   just running it.

12           And I wasn't going to come back to this, but I saw it

13   again in summation.  I mean why.  This is the picture of

14   Mr. Scott, 101.  Plenty of nice pictures on the Locke Lord

15   website.  This picture, I submit, this is a picture -- no

16   offense -- but if this is on your local news, you lock your

17   doors and you hide your kids.  None of this is evidence.

18           And Mr. Spendiff made that clear as well.  You looked

19   at the mission statement.  I know the funds varied and such

20   over time, but you could get in the neighborhood of 10 percent

21   when you put these things together, and a lot of fund managers

22   make a lot money.

23           So the case here really isn't just that Mark had no

24   reason to know, or rather, that there is no evidence that he

25   thought in his own mind that OneCoin was a scam.  There is lots

1    of evidence that he relied on things that would give someone

2    comfort that it wasn't a scam.  So remember, Deutsche Bank

3    sends the money from IMS into the Fenero Funds.  And Scott in

4    his call that he doesn't know is being recorded with Paul

5    Spendiff, that's one the things he points to is what's

6    comforting him.  Anyone can post any blog on the internet, but

7    money's coming in from a major bank.

8            HSBC, this is Government's Exhibit 1256.

9    October 2016.  Now, I think there are in the process of

10   shutting down this account, if you look maybe at the full

11   e-mail chains and they want Mr. Scott's help.  But this is

12   October 2016, back when he was doing things with Apex.  HSBC

13   seems to have accounts for a Ruja Ignatova linked company

14   called Innoin Limited.  That was actually one you may or may

15   not remember.  That was actually Innoin Limited, there were

16   e-mails between Mr. Scott and others that has Ruja Ignatova's

17   name on it.  Not sure we can do that one.

18           So, there is also evidence that would have given him

19   comfort and did give him comfort from Locke Lord.  You remember

20   Robert Courtneidge.  This is what Mr. Scott writes in this

21   e-mail with Michael Comiskey who was the like legal counsel

22   within Locke Lord about the $33 million potential transfer into

23   the escrow.  Robert Courtneidge has been advising her since

24   outset on currency and card issues, Robert would know more

25   about OneCoin, but I'm familiar.

1       Here is an e-mail from Ruja Ignatova.  Setting out,

2  Mark, you are doing our corporate legal structure.  And Robert

3  and I work on OneCoin as a cryptocurrency.  Not on corporate

4  structure but on questions like blockchain.  How to position

5  OneCoin as a payment method.

6       So, there is a division of roles at this law firm, and

7  Robert Courtneidge is the guy who knows crypto.  And that's

8  comforting to Mr. Scott.  There has been no evidence at all

9  that Robert Courtneidge ever told Mr. Scott or e-mailed him or

10  anything to say, you know, some red flags on this one.  So why

11  would Mr. Scott not have comfort that his law partner is doing

12  this.  He got a cryptocurrencies report, remember, from

13  Mr. Courtneidge.  I think we saw a version today.  He sent that

14  to some of the investment funds.

15       Then I think something was kind of interesting with

16  the $33 million attempted wire transfer.  Because the picture

17  that I think that initially kind of came across in the

18  government direct is, you know, they saw there was going to be

19  some transfers so Ruja Ignatova, really bad.  For one thing,

20  this is Michael Comiskey.  AML rules are stricter in the U.K.

21  than the U.S.  He is acknowledging that the rules around these

22  rules are tougher.

23       But then what I think really was interesting is the

24  impression that Locke Lord, Locke Lord saw something, right.

25  Just like the blogger and therefore Mark Scott should have been

JBK3SCO4                    Summation - Mr. Devlin-Brown

1    on notice.  There is nothing like that.  Locke Lord keeps

2    working with her.  There is an engagement letter from

3    October 2016 from James Channo, a partner.  The scope and

4    objectives review intragroup shareholders loan.  And then, I

5    mean, it went on into 2018.  May 24, 2018, they run a conflict

6    check on Ruja Ignatova, and they note in the bolded point, or

7    underlined point that there was negative news and world check

8    reports require PGL approval.  But they opened a matter for her

9    anyway.  This is after she fled, right.  July 2018.

10             The part at the bottom is interesting, right.  We may

11   need to consider transferring title of properties owned in the

12   U.K. in the name of your brother Konstantin.

13             So the picture the government has presented by taking

14   things sent to Mr. Scott that we don't know if he clicked on,

15   it sort of gives the impression that everyone is running from

16   OneCoin.  Like it's -- and that's a danger, again, of

17   hindsight.  But not everyone was doing that.  And Mr. Scott,

18   from the things he saw from Robert Courtneidge, from major

19   banks sending him money, he didn't think that way either.

20             So, I am going to get into what I think is frankly

21   some of the toughest stuff for us to get into in this case, and

22   that is what Mark Scott says in e-mails and other things, both

23   with the people he's working with linked to Ruja Ignatov and to

24   banks.  And the government's done a greatest hits of e-mail a

25   few times.  Summation we got some, we had a day of testimony by

1    an FBI agent who read them out.

2           And I have a couple reactions to it.  Three, really.

3    First, you know, I cringe.  Right.  Like, you had to write

4    paper the deal for the banks?  If you just written put all the

5    documentation together so the banks will approve the deal, that

6    sounds a lot better.  Paper the deal.  You happen to choose

7    words that the money launderer guy say were bad.  I cringed.

8           Then I have a bit of a there but for the grace of God

9    go I.  I don't know if someone took isolated things from --

10   this is not an invitation -- but took isolated things from my

11   e-mails and put them together, there would probably be stuff

12   that could make me really bad too, and I'm not bad.  So I

13   cringed.  That was one reaction.

14          Another reaction is it was unfair.  I thought it was

15   unfair in a lot of ways.  There was one exhibit they kept

16   showing you, you know, I don't think any person on the actual

17   e-mail testified, but it just popped up regularly.  It was the

18   e-mail in which Ruja Ignatova apparently asks Mr. Courtneidge

19   and Mr. Scott about whether it's okay to store a large amount

20   of British pounds in London.  And then there some chains like,

21   have you discussed this, did someone get back to her.  Yes.  We

22   did.  And they want you to assume, you know, so probably -- I

23   mean, I assume they want you to assume probably something bad

24   happened here.  Probably they did it.  That strikes me as

25   unfair because we don't know the rest of the story.  There is

1  no evidence of the rest of the story.  I can't cross-examine

2  that e-mail.

3           But the third thing they did, in addition to making me

4  cringe and feel they were unfair, is to paint a picture of Mark

5  that's actually remarkably consistent.  It's actually

6  remarkably consistent.  Because Mark doesn't vary.  He doesn't

7  vary from what he is telling people in 2016, what he's telling

8  Apex, even what he's telling the FBI.  He has this world view,

9  and he's consistent across the case.

10          And his world view, when you read all these e-mails

11  together, is this:  That Ruja Ignatova, it's clear she wants

12  confidentiality and that Mark is going to provide it as much as

13  he can.  He is not going to lie about OneCoin if asked, but

14  he's going to provide it, and he also has what is frankly a

15  pretty narrow conception of what KYC is.  Of what know your

16  customer stuff is.  I mean, you see it again and again.  Right.

17  His view, right, is money is coming to me from company X.  So,

18  company X, is it legally incorporated?  Is it on the register

19  of this country?  Does it have shareholders?  Do the

20  shareholders have their documents in order?  That's scrutiny he

21  provides.

22          And it's interesting, the money laundering expert I

23  think was actually very helpful.  He made clear these so-called

24  shell companies the government is talking about, there is

25  nothing illegal about creating them.  There is nothing illegal

1   about having nominee directors.  These things by themselves are

2   not illegal.  They can be used for illegal things, but they are

3   not illegal.

4            And Mr. Scott's world view consistently is that's my

5   job.  I make sure the company sending me the money has its

6   things in order.  That's my job.  It's not to go beyond that

7   and say, you know, who is the client of the company who may be

8   influencing the decisions.  Is he going to win banker of the

9   year and get a job in the Bank of New York Mellon compliance

10  department?  No, he's not.  But, that's not what this is about.

11  This is about a trial for his life.  Or for -- it's not about

12  whether he had the correct understanding of what kind of know

13  your customer stuff he should do.

14           This is one of those things that fits in the category

15  it only matters if.  You can have a code like that, a view like

16  that is what I think due diligence should be, because I want to

17  protect people's confidentiality.  And maybe that's right or

18  maybe it's wrong.  But it's only money laundering, it's only

19  money laundering if the reason you are doing that is because

20  you are trying to conceal money that you know comes from a

21  crime.  That you know comes from a crime.  And that's a leap

22  that the government wants you to take that really just is not

23  supported.

24           So, I want to just show you some of these e-mails.

25  The government probably showed you some.  I want to flash

1    through them because this is the consistent worldview.

2           Hi Ruja, let me know from which company and which

3    country the first 50 million are paid.  I must prepare here

4    basic KYC -- I won't read them all.  He asks questions.  Is all

5    money originate from one company or several are private.

6    Unfortunately -- this is the middle paragraph -- KYC is kept

7    very low.  I have to leave it up to you.  If companies transfer

8    the funds I need the articles of association, a copy of the

9    passport of the undersigning party.

10          This is consistent.  This is what he says again and

11   again and again.  The lawyers are going through the KYC now to

12   comply with their obligations, optimize it for banks.  And I

13   think is his worldview too:  We have to do it right.

14          In Mark Scott's mind, I submit, that's doing it right.

15   He has similar communications with Irina Dilkinska, making sure

16   that the documents come together.  I think you get -- I'm not

17   meaning to rush you, but i also don't want to delay things too

18   much.  He keeps asking those questions again and again.

19          And the reason you know it's his code is you are going

20   to see it's consistent.  It happens again and again.  And you

21   are going to learn that really from Apex.  Because I think Paul

22   Spendiff was a very, he was an excellent witness to have here.

23   Not because he knows anything about what's going on really in

24   Mark Scott's head, but because that relationship blew up, I

25   think it revealed Mark's true colors, and his true colors were

1   totally consistent with the worldview he's articulated from day

2   one.

3           So this is the form in Government 2209, the

4   subscription form for BNY Consult EOOD.  It lists the owner,

5   the director, and there were questions I remember on direct

6   examination, general nature of company partnership's

7   operations.  Sales and marketing consulting.  You know, that's

8   consistent.  B&N, IMS, they were working, it seems, with Ruja

9   Ignatova's OneCoin.  Which is of course sold through

10  educational packages, has to be marketed.  Maybe they were

11  working with other customers too.  It says general nature.

12  Right?  It doesn't say list everything.  There is no place

13  write OneCoin in there.  So it is a narrow view, but it's not a

14  lie.

15          But this is why it paints the picture.  Because that's

16  what you have, sorry, back in when the subscription first comes

17  on.  But then, when it comes to it, when they're really getting

18  heated up, he doesn't hesitate to bring in OneCoin.  He says

19  OneCoin is a client of IMS.  He sends, remember the bank

20  statements, which in one of the only more theatrical moments

21  that I tried to pull off at trial.  I am doing it again.  That

22  was not on purpose.  These statements, when printed out, they

23  filled a box.  He was not hiding OneCoin.  He wasn't going to

24  volunteer it, but he wasn't at the end of the day going to say,

25  no, it's not that.  He answers the questions.  IMS runs

1    separate accounts, received and manage the sale of proceeds of

2    OneCoin.

3              So, I am going to go through the Apex story in a

4    little bit more detail.  But I want to press pause one more

5    time.  Because, one of the things the government said in its

6    summation was words to the effect of do you see any legitimate

7    deals?  Do you see anything legitimate going on here?

8              I remember those charts from Ms. October, there were

9    lots of things, there was all sorts investments all sorts of

10   entities.  We don't have the burden of proof.  If the

11   government wants to prove that everything Mr. Scott did was a

12   sham, that there were no real investments, they're welcome to

13   that.  I didn't -- I saw lots of entities on that list.  Lots

14   of deals that I knew nothing about that.  There was no

15   testimony about them.

16             When you look narrowly at things, and you think about

17   Apex, you think oh my God, this whole Fenero Funds thing blew

18   up.  We didn't hear any problems with JP Integra, there was

19   another fund administrator that worked Mr. Mr. Scott.  First

20   Caribbean Bank, they had accounts with Mr. Scott, didn't hear

21   anything problematic there.  Deutsche Bank Cayman had accounts

22   with Mr. Scott.  Didn't hear anything problematic about the

23   relationships there.  Even Bank of Ireland, which they did

24   not -- I mean, Bank of Ireland, I submit, cared so little about

25   what Mr. Scott said that they weren't going to come over here

1    and testify about it.

2             So, there was something else about Apex that I think

3    the government got wrong in their summation.  They said that

4    the whole explosion happened when Mark Scott accidently, they

5    said, forwarded something with the OneCoin e-mail address.

6    That's not what the cause of the explosion was.  The evidence

7    is very clear.  Mr. Spendiff testified that on Friday, July 29,

8    he had some meetings and that resulted in a determination that

9    they were going to do enhanced due diligence on the Fenero

10   Funds, then they worked over the weekend.  Exhibit on the

11   right, Government Exhibit 2262.  This is Saturday, July 30.

12   The day after they send that enhanced due diligence request.

13   This is the e-mail that Mark Scott forwards, a day after

14   they've started their request.  That's the one with OneCoin.eu.

15   And by the way, cc'd is Ruja Ignatova.  This is not, I would

16   submit, hiding names.  And Mr. Spendiff was clear on that when

17   we went through the evidence.  Mr. Scott didn't hide Ruja

18   Ignatov's name did he?  Right.  No, he did not.  Right.  And I

19   remember asking him about the two deals because it was only two

20   that Apex did with Ms. Ignatova.  I mean, with the Fenero

21   Funds.  And in both of those, Ruja Ignatova's name was on it

22   somewhere.

23             In the first deal, which involved -- by the way, the

24   government said all the deals are bogus.  I don't remember

25   seeing any proof that the investment in PCT Holdings, a credit

1    card company, was bogus.  I didn't see any evidence of that.

2    And Irina Dilkinska's name is on there.  Payment Cloud Holdings

3    Limited, that's the same company.  In the documentation

4    prepared by this law firm, Ruja Ignatova's e-mail address is on

5    there for investor.  RavenR is on there.

6           The other deal, the Neil Bush deal, and also, pause

7    again.  The government says that's all bogus.  There's been no

8    evidence that that oil field deal wasn't real.  There's been no

9    evidence that Neil Bush wasn't in fact traveling to China and

10   being part of this transaction.  So this was the oil field

11   deal.  The second one.  And it was structured as a loan, but

12   underlying the loan there was going to be a purchase of an oil

13   field.  And the company that created to do that?  Cryptoreal.

14   Crypto.  If you are trying to hide your cryptocurrency

15   connection, that's probably not a great one.  But he sends

16   that.

17          And then this was probably my favorite.  Ruja

18   Ignatova, listed there on the bottom, signs it.  And to top it

19   all off, it's going to be paid for in those OneCoins.  So

20   Mr. Scott was not hiding Ruja Ignatova.

21          So, what happens next at Apex is really, as I said,

22   what shows the true colors.  And I submit that Mr. Scott and

23   Mr. Spendiff are a little like oil and water.  This was like a

24   classic case, you could sort of see coming what was coming.

25   Because Mr. Spendiff testified that they had these concerns,

1    right, about OneCoin.

2              Well, actually, first, before he saw the e-mail about

3    OneCoin he had concerns about due diligence and wanted to do a

4    thorough review of the funds.  The next day, he got that e-mail

5    with OneCoin.  Then he went back and saw there was actually

6    some other ones.  And then he testified he didn't tell

7    Mr. Scott what his concerns were.  And he explained that by the

8    phrase "tipping off," which forbids once you've made a type of

9    notification, from discussing or notifying parties involved in

10   the transactions about the fact you've notified these agencies.

11   And I remember asking him again and again, like, where does it

12   say here -- I mean, I get you can't tip someone off we've filed

13   some report.  Where does it say you can't say can you tell us

14   more about OneCoin because we are seeing that name a lot.  Or

15   we are going to have to press pause on this thing for a week or

16   so.  It doesn't say you have to string someone along, which I

17   submit is exactly what happened.

18             I don't want to go through all the documents, but I

19   don't think we need to in the interest of time.  But, Friday,

20   July 29, that's when the enhanced due diligence kicks off.  And

21   at the very bottom, by the way, we are not paying any money out

22   of Fenero Funds until this is cleared up.  Apologize for any

23   inconvenience.

24             THE COURT:  Mr. Devlin-Brown, I have to stop you for a

25   minute.  Can we just have a talk at sidebar.

1            MR. DEVLIN-BROWN:  Sure, your Honor.

2            (At the sidebar)

3            THE COURT:  We've gotten a call from Danielle Love

4    Manning that her baby is sick and getting sicker.  And so, I

5    propose to let her know that, and let us know what if anything

6    she needs to do.  Okay.

7            MR. DEVLIN-BROWN:  Very good.

8            (In open court)

9            THE COURT:  Ladies and gentlemen, we are going to take

10   a very quick break.  And I'll want to speak with one of the

11   jurors.

12           (Jury excused)

13           (In the robing room)

14           THE COURT:  Hi, Ms. Love.  We got a call from your

15   nanny.  You have a baby?  The baby is sick.  And she wants you

16   to know that, and so, just letting you know.  I take it you

17   don't have your phone.  You want to leave?

18           JUROR NO. 10:  I don't know.  Depending how sick she

19   is.

20           THE DEPUTY CLERK:  I believe what she said was that

21   the symptoms from this morning are persisting.

22           JUROR NO. 10:  Oh.  Is there a way I can call my

23   husband or something?

24           THE COURT:  Yes.  You can use the phone in there.  Is

25   there a phone in there?

1       THE DEPUTY CLERK:  Yes.

2       (In open court; jury not present)

3       THE COURT:  I can talk to the lawyers, it doesn't have

4   to be on the record.

5       (Sidebar discussion off the record)

6       (Pause)

7       THE COURT:  Mr. Devlin-Brown, can I inquire as to how

8   much more you think you have?

9       MR. DEVLIN-BROWN:  I think about 15 to 20 minutes.

10      THE COURT:  Okay.  We're bringing the jury back out.

11      (Jury present)

12      THE COURT:  Thank you for your indulgence, ladies and

13  gentlemen.  Mr. Devlin-Brown.

14      MR. DEVLIN-BROWN:  Thank you, ladies and gentlemen.

15      So, we were talking about Paul Spendiff and Apex and

16  Mr. Scott.  And this conflict they really got into in the last

17  week or so of their relationship.  A conflict that I submit to

18  you is explained by Apex and Paul Spendiff developing certain

19  concerns that they didn't really want to tell Mr. Scott.  And

20  so they strung him along, and they asked question after

21  question, and I think the reason is, they were hoping Mr. Scott

22  would put them out of their misery and fire them.  You heard

23  Mr. Spendiff testify it is actually very difficult for a fund

24  administrator to fire their client that they're managing

25  because it's supposed to protect investors.  I think that's

1    what he wanted.

2           And there is also an indemnity provision which could

3    have cost him a lot of money.  I am not going to try to explain

4    that one again because I think I confused myself when I was

5    asking questions about that.

6           He was concerned if he broke off with Mr. Scott and

7    sent him on his way, he could get sued, and Mr. Scott was

8    certainly threatening to sue him.  He was talking about

9    payments due.  So I don't think we need to dwell on this,

10   because I think people have the picture.  These are all in

11   evidence.  But, you can just sort of see the frustration

12   mounting.

13          So, the whole thing started right on July 29 and then

14   Mr. Spendiff and Apex work over the weekend, they'd asked

15   Mr. Scott for a bunch of things on July 29.  He responds over

16   the weekend.  This print in this is small, and really the point

17   of showing it to all of you was it seems like a lot more

18   questions.  So, they asked questions, they give suggestions.

19   Maybe you have something from Locke Lord.  Mr. Scott sends

20   something I think.  Let's see just the timing of that.  The

21   very next day.  It goes on and on and, oh.  This is why I

22   showed you that.  So this Cryptoreal oil deal.  You see 30

23   million due day of signature of contract and 30 million due

24   within 20 days?  That's bringing you right into early August.

25   Right.  So Mr. Scott starts agitating, we need to pay this

1    bill.  And we are getting unbelievable pressure.  Original

2    closing date for second tranche was August 4.  And he's just

3    getting stalled and stalled and stalled.

4         And so, ultimately, right, at the beginning of the

5    relationship, this is what is being filled out on the

6    subscription document.  Ultimately, they're speaking, talks

7    about OneCoin on the call.  He becomes completely open about

8    OneCoin.  He sends those documents.  That box of documents from

9    IMS which show purchases of customers of the OneCoin packages.

10   And that's essentially how that ends.

11        But I think we didn't play much of the call when Mr.

12   Spendiff was here.  It was a long day.  I am not going to play

13   it for you now either.  But it is in evidence.  There is a

14   transcript, 2302-TR.  There is the audio itself.  And I submit

15   to you that on that call, under this intense pressure,

16   Mr. Scott sticks by exactly what his position has been all the

17   along.  And that is that I've given you the information on my

18   clients, on IMS and B&N.  Those are my clients.  He tells Mr.

19   Spendiff, I don't have OneCoin money too.  He tells him it's

20   not, I don't have OneCoin money.  I have money from IMS, from

21   other companies.  If they get money from OneCoin, that's their

22   issue.  And he doesn't say anything in here either, by the way,

23   that suggests he thinks OneCoin is a fraud.  There is nothing

24   in there at all.  And it's revealing, again, of his true

25   colors.  And the view he had, right or wrong, not that anything

1   about OneCoin being a problem, but right or wrong, his view

2   that the information you provide to banks and others is the

3   information about the companies investing with you, you don't

4   have to go beyond that.  You tell them if they ask you, but you

5   don't have to go beyond that.

6          The government brought up the post-arrest statement

7   that Mr. Scott made.  So he was arrested early in the morning,

8   he goes down to -- I forget if it was the FBI or the local

9   police department.  Wherever it was.  And it's early in the

10  morning, and I think the testimony was they talked to him for

11  an hour or more.  You heard some sound clips.  It's totally

12  proper, the government is entitled to pick what they play.

13  That's what the rules provide.  So that's absolutely proper.

14  But, from these snippets, even what you hear here, Mr. Scott is

15  consistent.  He is maybe not at his finest hour, but you hear

16  these same things.

17         You remember the question or the part that Mr. Folly

18  read of really the only thing in here that I think could be

19  called a problem.  And the question was so Fenero was not

20  involved with OneCoin at all?  And Mr. Scott says no.  Then

21  Agent Eckel says not at all?  And he says, I mean no contracts

22  or anything so far as I know.  That's the worldview he's always

23  sort of had.  OneCoin's not involved.  They might fund my

24  client, but it's not OneCoin.  Then Agent Fata says, okay,

25  funded by OneCoin.  No, not that I know of.  We have no

1    documents that would say that.  Then he starts talking about

2    KYC.

3            I am not presenting this as Mr. Scott's finest hour.

4    But walked in, voluntarily, talked to the agents, on the day of

5    his arrest, on a day -- put away 20/20 hindsight.  Right at

6    that point when he is being arrested, he sure knows there is

7    some problems with OneCoin, at least enough to get him

8    arrested.  And so it's not his finest hour.  But you can still

9    see, even here, even here that same worldview that keeps coming

10   out.

11           Just very quickly, the Apex situation, I didn't

12   mention the things signed with different pens or the contract

13   that was changed.  Two quick points on that.  One is, you have

14   to see that in the context of what was happening which was

15   constant requests by Apex, to get us stuff, get us stuff.  And

16   Mr. Scott's trying to make them happy.  Whatever he gives them

17   doesn't seem to make them happy, because they don't really want

18   to do anything with him.  So, yes, he changes a 1 percent on a

19   contract to 20.  And he signs a bunch of authorization letters.

20   These are from his clients, right.  Where is the evidence that

21   1 percent was the wrong -- was the correct amount?  20 percent

22   is a higher number.  That's I think more realistic.  Where is

23   the evidence he didn't get permission from his client to change

24   it?  These are his own clients.

25           So, after the Apex situation, the worldview that

1   Mr. Scott has, Mark's code, that explains kind of how things
2   end I think as well.  Because Mark does have within this sort
3   of code limits to what he is going to do.
4          So take a look at this exchange, it's September 2016.
5   And Mr. Scott asks Hi Irina, I need to understand status of
6   Innoin's KYC.  It has not yet passed KYC.  We'll discuss with
7   David and get back to you.  He asks why can't it invest for
8   itself.  Why does it have to invest with B&N.  She says Hi
9   Mark, because the KYC.  Not sure I understand.
10         This goes back and forth a bit.  Sorry.  There is --
11   Irina is making suggestions.  And not a good idea.  Do we even
12   have enough for Innoin to accept it as an investor?  Then there
13   is a response, Dr. R, I assume that's Ruja, ceased to be
14   director, she was replaced by Fernando.  But the shareholder of
15   the company remains Dr. R in HK for all banking purposes etc.
16   The onus is on the director.  David Pike asks a question.  Not
17   good, he has problems in Germany, and this is DB.  Are you
18   going to handle the conversation?
19         We don't know how it's handled one way or the other.
20   Here is another example.  We talked about this one during the
21   testimony.  Ruja Ignatova wants to park 2.5 million in a
22   Zimbabwe bank.  He asks for background.  Sorry.  I may have --
23   I think we may have put the wrong snippet from the slides, but
24   this is in 1129, and Mr. Scott ultimately rejects the deal,
25   says it's too risky for his funds.  But this one I think is

1  actually really illustrative of what's going on in the

2  relationship between Ruja Ignatova and Mark Scott.  By the time

3  you get to October of 2016.  Because now he is just frankly

4  being belittled.

5          So, he writes to one of these people at RavenR to ask

6  to schedule a visit for PCT, that's the card issuer company

7  that he bought.  Again just for compliance purposes, no

8  discussion.  And Ruja, Mark, I don't remember to have been

9  asked about this meetings.  I don't see a need for this.  Thank

10  you.  And he responds, we really need something for the

11  regulator, let's please discuss.  We can, as you say, discuss.

12  PCT know exactly who their investor is.  No need to bother and

13  confuse people.  If regulator has issues I can go somewhere

14  else.  I am not sure why this is an issue, Mr. Scott says.

15  Najib can sit down with David for us to have a record.

16  Otherwise, let's sell the investment to your other option.  I

17  can't hold it without reporting it.

18          And that prompts Ruja Ignatova's final response:  What

19  is the update on the trust?  When we started this you said you

20  had no issue.  Now it is an issue.  I am not happy that a part

21  of this now I have to handle and in the meantime I have risk

22  that something might happen to you or my money.  It cannot

23  always be delayed.  Get a written report from PCT and that's

24  it.

25          This is around when things start to end.  And you can

JBK3SCO4                         Summation - Mr. Devlin-Brown

1    see that here Mr. Scott says in the middle paragraph as to the

2    general risk concern I agree.  I will deliver you proposed

3    transfer of all capital.  He describes how he thinks it should

4    be done.  And he says at the ending in there I will structure

5    it so I can be removed.

6             I think the government and defense are largely in

7    agreement here.  This is Ruja Ignatova, she has some snippy

8    e-mails that were sent.  This is my money, send it back.  I

9    don't care about your niceties, I need it.  And eventually, he

10   does that.  This is in February 2017.  He makes arrangements to

11   send the money to Phoenix Investments, gets sign off from the

12   companies that sent the funds in.  This happens around the same

13   time.  You remember this e-mail.  There was a London police

14   investigation that was reported and referred to in

15   October 2016.  And there was this e-mail that Mr. Konstantin

16   testified about.

17            (Continued on next page)

18

19

20

21

22

23

24

25

1      MR. DEVLIN-BROWN:  (Continuing)  Because these folks

2  at RavenR who Mr. Konstantin said always seemed like

3  professionals.  They're starting to get a little nervous.

4  RavenR, right.  They're managing OneCoin's money.  Ruja's money

5  anyway.  They're starting to get a little bit worried and

6  Mr. Konstantin said:  You know what, I didn't really hear from

7  Joanne Allison much after that.  I think the implication, I

8  don't know what actually happened, but you could think I don't

9  know if I want to work there anymore.

10      And you know what the same implication is there for

11  Mark Scott.  Remember after there's lots of e-mails.  Ruja is

12  trying to schedule appointments.  Mr. Scott is making excuses.

13  He's out of this.  He's out of this.  He's returned the money

14  by -- he's made this arrangement in February or March.  All of

15  the money except a legal retainer is returned by July 2017 and

16  he is out of it.  He is out of it.

17      You know, Mr. Scott, I said at the beginning of this

18  trial, is a stubborn man.  He's a stubborn man.  He had a view

19  of the way things should be done.  He had a view of what was OK

20  and what was not OK.  But he had a breaking point.  And it was

21  enough.  And he left.

22      And, again, others leave and they can be patted on the

23  back.  Good job.  And Mr. Scott is in this situation.

24      So I'm coming to an end here.  And I'm leaving you

25  with the most cryptic reason why you should have reasonable

1    doubt.

2            And that is Mark is a lion.  So when I was thinking

3    about this case, and I've been thinking this for a while.

4    There is a parable:  The wicked flee when no man pursueth; but

5    the righteous are bold as a lion.  And I keep -- that's been

6    going on in my mind for a while.  I keep thinking of Mr. Scott

7    as the lion here.  That's the right parable.  Because Ruja

8    Ignatova, you know, October 2017.  She's not in the U.S. but

9    she -- she's gone.  She knows what's going on.  She vanished.

10   Agent Shimko I believe testified they can't find her.

11           What about Mark Scott?  A little over a year ago.

12   Where is he arrested?  His house in Cape Cod.  In his name.

13   You know.  They go after his yacht in his name, his boat,

14   whatever.  His bank account is in his name.  He stayed.  But

15   this isn't just about that moment of arrest.  It's really not.

16           Remember I told you in the opening statement that one

17   of the challenges in this case was you're going to have to get

18   inside Mark Scott's head, right.  And try to figure out what's

19   going on.  And it's the government's burden to prove that what

20   was going on there was that he knew the money coming in to him

21   was illegal.

22           That's going to be hard.  It's going to be hard

23   especially with 20/20 hindsight.  You know, we saw those

24   OneCoin videos and they look kind of absurd now.  Some have

25   high production values.  But they look absurd.  And you hear

1    the government's evidence and you hear the victims and you see

2    these pictures -- I mean it looks disgusting now.  But it's

3    hard to go back in time and see what were people actually

4    thinking about it at the time.  And the judge is going to I

5    think say something in his instructions at some point.  It's a

6    phrase that everyone knows, really:  Actions can sometimes

7    speak louder than words.  And I think that's absolutely true

8    because Mark has sort of been the lion the whole way through

9    this, you know, right or wrong about his views on things.  He

10   has been the lion.  He set up all these funds not in some

11   sketchy location.  He went to the BVI.

12            And I made sure to ask the witnesses about this

13   because I don't know what preconceptions people have about the

14   British Virgin Islands.  It's a very popular location for

15   private equity funds.  It's reputation as being a sketchy place

16   has changed dramatically over the years.  They report tax

17   information to the U.S. authorities.  That's where he set up.

18            Remember, Mark Scott hired Apex.  I tried to get

19   Mr. Spendiff to say, you know, you're probably one of the

20   better administrators.  He was polite.  He didn't say that.  He

21   goes out and hires a firm like Apex to police his investors.

22   He sets it up in a place that has real regulations.  He gets

23   all of the government approvals done and he puts his own name

24   on everything.

25            I mean you had all these complicated charts, right.

1    But it's all like Mark Scott to Mark Scott to Mark Scott to

2    Mark Scott.  Sorry.  Someone through his attorney, you know, to

3    buy some properties.  But this is not a guy who was hiding

4    anywhere.  And he reported his foreign bank accounts to the

5    U.S. authorities.  Mr. Garvin showed you his tax returns.  I

6    mean it wasn't in 2018 either.  He filed -- they're all in

7    evidence.  Tax returns.  Every single year reporting his income

8    to the IRS.

9            You know the wicked flee when no one pursues and the

10   righteous are bold as a lion.  And someone who thinks that

11   OneCoin is a scam, why are they doing this.  Why are they doing

12   this?  Why are they making themselves such a mark?

13           And I submit because he didn't think, he didn't think

14   OneCoin was illegal.  He thought what he was doing was right.

15           I'm reminded, this is the final slide I will show you,

16   I remember when the government showed it at the beginning of

17   the case and some people are prescient, right.  Dr. Ruja

18   Ignatova to Sebastian Greenwood:  Exit strategy.  My thoughts.

19   Option one.  Take the money and run and blame someone else for

20   this.  You know, here's looking at you, Ruja, wherever you are.

21           And I have one more one more animal and then I'm going

22   to sit down because this occurred to me too.

23           So there's lions, right, and in ancient Israel there

24   was this tradition at the end of every year where the holy

25   people would sort of take the sins that are on the public and

JBK9SCO5

 1    cast them down onto a goat.  Literally a goat.  Then they would

 2    send that goat out to wander the desert to his death.  And the

 3    people would feel better; the goat, maybe not.  And that word

 4    is actually still used today, scapegoat.

 5           And I think you know when you're sitting here and when

 6    you go into the room and deliberate, OneCoin was a scam.  There

 7    is no question about it.  People lost money.  You know should

 8    Mr. Scott keep his boat?  I don't know.  This isn't a civil

 9    case.  This is a criminal case where Mr. Scott is facing very

10    real consequences.  It's about proving beyond a reasonable

11    doubt, if the government can do it, that what was going on in

12    his mind at the time when he was doing all these things in his

13    own name was that he knew the money from OneCoin was illegal.

14           It's really about the two witnesses who each met him

15    once.  It's about a lot of e-mails that no one knows the

16    meaning of.

17           And you know I think when you go back in there,

18    there's goats and there's lions.  And you have to kind of

19    decide which animal is Mr. Scott.  What's really true to his

20    nature and what kind of animal he's going to be.  Because I

21    submit to you, ladies and gentlemen, based on all of the

22    evidence Mr. Scott did not know OneCoin funds were illegal.

23    That's the issue on trial.  And he is not guilty.  Thank you.

24           THE COURT:  Thank you, Mr. Devlin-Brown.

25           Ladies and gentlemen, we'll take another ten minutes,

1    brief break so that the government can set up for its rebuttal.

2              (Jury not present)

3              THE COURT:  Everyone can be seated.  I take it,

4    Mr. DiMase, you'll be doing the rebuttal?

5              MR. DiMASE:  That's correct.

6              THE COURT:  I want to get a sense as to the time.

7    About how long do you think you'll be?

8              MR. DiMASE:  I would say 30 to 45 minutes.  No longer

9    than that.  Possibly less than 30.

10             THE COURT:  Because I'm trying to figure out whether I

11   can do the charge this afternoon.  Are you going to go well

12   beyond a half-hour, then I may not be able to.  But we'll see

13   where we go.  OK.

14             (Recess)

15             (Jury present)

16             THE COURT:  Mr. DiMase.

17             MR. DiMASE:  Thank you, your Honor.

18             Mark Scott's worldview is to lie and cheat and profit

19   off of the backs of other people.  Mark Scott is not a lion.

20   Mark Scott is a liar.

21             MR. DEVLIN-BROWN:  Objection.

22             THE COURT:  Overruled.

23             MR. DiMASE:  To call him a scapegoat, a partner at an

24   international law firm who earned $50 million for laundering

25   OneCoin fraud money.  The man who masterminded all of those

1    transfers, all over the world to hide Ruja's money, to call him

2    a scapegoat.  Absurd.

3            Mark Scott would have you believe, in his worldview,

4    that he was duped; that he was fooled into committing crimes by

5    other people.  He'd have you believe that despite the fact that

6    he is a partner at a law firm, that he had received an e-mail

7    detailing this fraud scheme and exactly how it worked.  All of

8    his lies, his false documents, his cryptophone, the fact he

9    made no real investments, the fact that he earned $50 million

10   for nothing, and the fact that he lied to the FBI.  He wants

11   you to believe he had no idea that he was just a babe in the

12   woods just investing his investors' money.

13           And he has to say that because there are only two

14   options here, ladies and gentlemen.  One, he thought these

15   investment funds were real and he was really investing Ruja's

16   money or the investors' money, purportedly; or second, that he

17   set up the funds for the exact purpose that they were used for:

18   To launder the money.

19           The only question is whether Mr. Scott, a trained

20   professional, a man who was in the inner circle with Ruja

21   Ignatova, knew that OneCoin was a fraud and that the Fenero

22   Funds were there to launder its proceeds.  And the fact is,

23   ladies and gentlemen, it's Mark Scott who has been doing the

24   duping.  His worldview is that he can lie and commit crimes as

25   long as he can get away with it.

1           There's a third witness who met Mr. Scott that you

2      didn't hear about.  Remember, there were two.  And that's agent

3      Christine Fata.  You know why the defense didn't mention

4      Mr. Scott's meeting with that witness?  Because Mr. Scott lied

5      when he was arrested.

6           There is a mountain of evidence in this case that

7      Mr. Scott not only knew but he set up the funds for that exact

8      purpose, that it was all, in his own words, smoke and mirrors.

9           Now, I'm not going to have time to address every point

10     that Mr. Devlin-Brown made given the length of time I have here

11     today.  And for example there are a few things I want to just

12     quickly go through.  I mean who knew Mr. Scott at this trial

13     who testified?  Completely irrelevant.  You have seen tens if

14     not hundreds of e-mails of the defendant himself.  That there

15     were two or three witnesses who met Mr. Scott, and many more

16     that were affected by his conduct but didn't meet him directly,

17     has no bearing on the outcome of this case.  You have the

18     evidence.

19          I'm not going to focus on iCard.  You know what that's

20     about.  The evidence makes it clear.  The e-mails make it

21     clear.  You know where that money came from and where it went.

22          Bank of New York Mellon whether they shutdown OneCoin

23     or not, they took the right steps.  You heard that.  And they

24     did exactly what Mr. Scott should have done.  Not take a dime.

25     And as soon as you find out stop and report it to the

1    authorities.  That's what Bank of New York Mellon did.

2             This idea of the blockchain.  It's just a red herring.

3    You don't need to know anything about the blockchain to know

4    that OneCoin was a scam.  Double your money overnight?

5    Konstantin Ignatov knew well before he learned about the

6    blockchain issues that OneCoin was a total fraud.  The CPA knew

7    way before and so did Scott, knowing anything particular about

8    the blockchain.

9             And the idea that Scott told Paul Spendiff or any

10   other bank that OneCoin was behind this money is preposterous.

11   I don't know what trial Mr. Devlin-Brown sat through.  The

12   entire point of this exercise was to hide that from the banks,

13   the fund administrators and other people.

14            Mr. Scott knew what this was about.  Look who brought

15   him into it.  Gilbert Armenta, the same person that the defense

16   is saying is a huge liar.  We agree.  That's why Mr. Scott

17   worked with him, to launder OneCoin money.  And that's the guy

18   who brought him into this scheme.

19            And even assuming if he didn't know it in that first

20   e-mail that you saw that Mr. Devlin-Brown focused on he sure

21   did know pretty soon after that.  All of the e-mails you saw

22   show he knew what he was doing, what he was getting into.  And

23   he read that e-mail.  The idea that Mr. Scott, a trained

24   lawyer, whose job it is to do diligence, investigate things,

25   follow up on facts, would get an e-mail that says OneCoin is a

JBK9SCO5                        Mr. DiMase - Rebuttal

1    scam before taking in four hundred million dollars of its money

2    and not read it?  That is bananas.  He read it.  He already

3    knew but he read it.  He knew exactly what he was getting into.

4           This box of IMS statements by the way that Mr. Scott

5    had, you know how many hundreds of OneCoin victim deposits are

6    in here?  He had this entire box of documents.

7           You don't need hindsight.  Double your money

8    overnight.  OneCoin is a scam.  And all of the other evidence

9    in this case.  Mark Scott knew.

10          Let's talk for a minute about the idea of the

11   appearance of legitimacy of these funds, the idea of KYC, this

12   issue of Mark Scott's worldview.  Mr. Scott is a trained

13   lawyer.  He knows exactly what KYC and due diligence is.  He

14   knows and knew what those banks were after.  Who was sending

15   that money in.  He knew it.  And this whole system, the whole

16   investment fund structure was designed to confuse and hide from

17   the banks who this money really belonged to so that he could

18   move Ruja's money through those banks and clean it.

19          The purpose of it was to look legitimate.  That was

20   the whole point.  Just like Don Semesky the money laundering

21   expert told you and just because other banks and other lawyers

22   and entities around the world were handling OneCoin money

23   proves nothing because you know what OneCoin and Mark Scott

24   did.  They lied to everybody.

25          And when they got caught, it got shut down.  See Apex.

1    See Bank of New York Mellon.  That's why they had to do it.

2    They were playing a delicate game and, as Mr. Pike said,

3    Mr. Scott did it well.

4            Even in the closing statement today Mr. Devlin-Brown

5    takes two totally inconsistent positions.  Yes.  It was Ruja's

6    money.  The defense is not contesting that.  But he holds on to

7    this idea that IMS and B&N were clients.  We all know that's

8    fake.  They weren't real.  B&N did nothing.  IMS did nothing.

9    Star Merchant did less than nothing, the guy who didn't have a

10   house or a bank account.  They were shells.  They were shells.

11   They were nominees.  The whole thing was fake in order to move

12   money through these banks and financial institutions and

13   launder it.  That's what this was.  But it was meant to look

14   real.

15           By the way, if it were real or this was really about

16   anonymity, about privacy for Ruja, Mr. Scott had quite an

17   opportunity to explain that to the FBI and the IRS.  But you

18   know what he did.  He lied.  Because he knew what he was doing

19   was criminal.

20           So let's talk for a moment about how you know it was a

21   criminal business and not a legitimate one.  So let's say you

22   go into your office on a daily basis to your job and you want

23   to get your boss on the phone.  What do you do?  You pick up

24   the phone and you dial him.  If you're Mark Scott, what do you

25   do?  You pick up a cryptophone, you dial a complex alphanumeric

JBK9SCO5                          Mr. DiMase - Rebuttal

1   code and you reach Ruja.  OK.  To avoid law enforcement

2   detection.

3          So you're going on a business trip for work, right.

4   In a legitimate business you book your flight to the place

5   you're going.  If the company will pay direct you're going to

6   take that.  Mr. Scott, if you look at Exhibit 1270, what did he

7   do?  Well he didn't want Sofia showing up on his travel records

8   because that's where OneCoin was located and he was concerned

9   about that.  And if you look at his travel records you'll see

10  that he booked through places like Frankfurt to hide where he

11  was going.  That is not legitimate.

12         You find out your colleague is talking behind your

13  back at work.  In a legitimate business that's a case of office

14  gossip.  In Mr. Scott's business, it's a countersurveillance

15  operative claiming that you're an informant.  That's because

16  Mr. Scott was involved and knew things about the criminality of

17  OneCoin.  He was in the inner circle.

18         And hopefully this one doesn't happen to any of you.

19  But if you're in a legitimate business and the FBI asks to

20  speak with you, you tell them the truth.  You have nothing to

21  hide.  Not Mr. Scott.

22         There are other examples, hiding from his law firm

23  that he was doing this.  Getting paid outside of the usual

24  channels.  The list goes on and on.  Mr. Scott knew that this

25  was a criminal business.

1           Let's get a little bit more specific.  What are the

2   ways you know that this was a fake investment fund?  Well he

3   copied and pasted his track record -- I mean you can go and

4   pull stuff off the internet to make your life easier, no need

5   to reinvent the wheel, but your track record, what you've done

6   to copy and paste that.  Absurd.

7           No evidence that he ever came up with a real

8   investment idea, anything that he did was directed to him by

9   Ruja.  Send the money here.  That's not an investment -- that's

10  not an investment manager.

11          All of the lies, and Mr. Folly went through many of

12  them.  It wasn't don't offer, don't deny.  That's nonsense.

13  Don't buy that.  Mr. Scott affirmatively lied again and again

14  and again in answer to detailed and specific questions from

15  banks.  He made a concerted effort to hide where the money came

16  from and whose it was.  That was the point.  It's not

17  complicated.  The money was dirty.  And the defendant lied

18  because he knew it.

19          Papering.  And I won't go through all the examples.

20  You saw a during this trial.  But fake documents.  Time after

21  time.  Falsifying documents.  You don't do that in a legitimate

22  investment fund.  You don't need to.

23          And this idea of Paul Spendiff delaying or causing

24  some issue by waiting and holding back on transfers.  You know

25  what.  Paul Spendiff did exactly what we'd want someone in his

1    position to do.  He figured it out.  And he put an end to it.

2    That's what Paul Spendiff did.

3          Finally, the fees.  I'm not going to dwell on this.

4    But you all know it doesn't make any sense.  One-eighth of the

5    amount of the money that went into the funds, one-eighth, $50

6    million.  For not earning a cent.  Or barely earning a cent

7    anyway.  He wasn't getting paid for making money because he

8    didn't make any.

9          It's preposterous.  That those were real fees.  He got

10   paid for taking a big risk, laundering the money.

11         Let's talk for a minute about this concept that he

12   stopped.  Let's look at when the money started going back.

13   Because in January and February of 2017 there was an inquiry by

14   Bank of New York Mellon and -- involving DMS Bank and his

15   accounts there.  And then later there was an inquiry by Bank of

16   Ireland.  And now we see all of the money flowing on back.

17         Look at Government Exhibit 1307.  Look at the top of

18   this e-mail.  In March of 2017.  Does this look like someone

19   who stopped?  Things are not looking good.  I'm asking the boss

20   to hold still.

21         He's still doing it and he's putting it on pause

22   because he's under investigation.  And all of the money when it

23   went back, it went back to people Ruja said it should go to and

24   those were other money launderers.  Amer Abdulaziz.  Back to

25   Gilbert Armenta.  Back to people at Ruja's direction.

1    Let's look while we're at it at the top of Exhibit

2    1344.  Mr. Devlin-Brown went through this e-mail but he didn't

3    show the top e-mail.  This is in June of 2018.  Any issue you

4    have in EU can be traced to BVI.

5    Mr. Scott knew that if there was a problem in Bulgaria

6    and in Europe it was going to come and haunt him.

7    And while we're at it, why don't we show the top of

8    Government Exhibit 1129.  Another e-mail that counsel didn't

9    show you.  The very top of the thread.

10    Take the money in and keep the structure sterile and

11    on course.

12    Money laundering, ladies and gentlemen.

13    So Mr. Devlin-Brown spoke briefly about reasonable

14    doubt.  And I just want to say reasonable doubt is -- there's

15    nothing mystical or magical about it.  It's the same standard

16    that gets applied in courtrooms across this country every

17    single day.  It's been the same burden since this country was

18    founded and everyday juries reach verdicts.  The government

19    embraces that burden here.

20    And you should know reasonable doubt isn't about one

21    piece of evidence at a time.  It's all of the evidence.  Look

22    at all of the evidence together and resist the defense's

23    suggestion that you look one at a time:  At the blockchain, at

24    one e-mail.  That's not what this is about.

25    Let me just address a few of the arguments that

1    Mr. Devlin-Brown made specifically.  One is about the

2    credibility of some of the witnesses.  He talked about people

3    who weren't even witnesses at this trial.  Armenta, Dilkinska,

4    who he said have lied.  Yeah, they've lied.  They lied with

5    Mr. Scott.  They lied to him.  These are the people that

6    Mr. Scott was in bed with committing money laundering and he

7    knew exactly who Mr. Armenta was, his client of ten years.

8           And more importantly, you don't really have to rely on

9    their statements.  Almost everything that they said, those two

10   people, that came into evidence is reflected in e-mails or

11   other evidence that corroborates exactly what they said.

12          Even the things that aren't exactly corroborated like

13   Irina's statement after she got arrested or after Mark Scott

14   got arrested that she was freaking out and wanted to destroy

15   the documents.  Use your common sense.  Does that make sense?

16   Of course it does.  You saw Irina Dilkinska's name over all

17   sorts of documents in this case and that reaction is completely

18   understandable.

19          And with respect to Mr. Ignatov and his credibility.

20   Look, if you he wanted to get Mark Scott he could have done a

21   heck of a better job.  Mr. Devlin-Brown himself said he didn't

22   say what happened in the meeting.  That's because he wasn't in

23   the meeting.  He could have put himself in the meeting.  He

24   could have said Mark Scott knew every single thing and that we

25   talked about money laundering the whole time.  That's not what

JBK9SCO5                          Mr. DiMase – Rebuttal

1    he did.  If that's what he was here to do, to lie to get Mark

2    Scott in trouble, that testimony made no sense.  The testimony

3    did make sense because there was a time when Mr. Ignatov came

4    into a position of power and at that point he needed to know

5    what was going on.  And it makes perfect sense that the other

6    people at OneCoin would tell him at that stage.

7             The idea that Mr. Scott, turning to another defense

8    argument, can rely on this law firm's diligence, you should

9    throw that in the trash.  It's a total distraction.  First of

10   all, it's not what this case is about.  It's not about Locke

11   Lord and whether they did something wrong.  It's about Mark

12   Scott who was flying to Sofia, on a cryptophone with Ruja,

13   coordinating on a daily basis with leaders of the scheme.  Mark

14   Scott.

15            Locke Lord wasn't getting e-mails from people like

16   Gary Gilford or ongoing police investigations.  And Locke Lord

17   is a firm trying to make money.  They're not the government.

18   They're not an investigative body.

19            And let's not forget Mr. Scott himself hid his

20   involvement in the Fenero Funds from the firm and then he wants

21   you to believe that because the firm continued to do business

22   with them that that gives him comfort?  That's ridiculous.

23            He himself was hiding things from Locke Lord and this

24   case isn't about Locke Lord.  It's about Mark Scott.

25            It's not about Robert Courtneidge either.

1       And just as a quick aside on him, that was the same

2   guy on the e-mail about 220,000 pounds of cash.  And, look,

3   whether or not they did anything with that money, if you get an

4   e-mail like that you know something is very wrong.  That is a

5   huge red flag and that was way before a single dime of money

6   went into the Fenero Funds.

7       And that opinion that you saw, the quote/unquote

8   opinion that cryptocurrency paper, not one word in it about

9   OneCoin.

10      And on the issue of anonymity.  Again, this isn't

11  about privacy.  Ruja is a big person.  But if Beyoncé wanted to

12  open an account with a shell company she could, you know, to

13  get privacy.  But when the bank asks where the money comes

14  from, they're going to know.  They're going to find out.  There

15  is no need to lie.  That's not a matter of privacy.

16      Ruja, on the other hand, couldn't walk into a bank and

17  get an account and put money in it.  That's why she needed Mark

18  Scott.  It wasn't about anonymity or privacy.  It was about

19  hiding the source of the money to put it through the banks, to

20  clean it for Ruja.  That's what it was about.

21      And if it was about anonymity, if it was about privacy

22  why didn't Mark Scott say that to the FBI?  Why didn't he say I

23  did handle OneCoin money.  It was Ruja's.  She just wanted some

24  privacy.

25      Now, I'm not going to focus on this tax issue.  This

JBK9SCO5                      Mr. DiMase - Rebuttal

1    is not a tax case.  He's not charged with fraudulent tax

2    filings.  That is a distraction.  But I would note to you that

3    $29 million of what he made was reported in October 2019, two

4    weeks before this trial started, long after Mr. Scott knew that

5    the government was involved.  There's not much more to say

6    about that.

7            Well let me say one more thing.  Mr. Scott didn't want

8    this all to fall apart because he didn't report things on his

9    taxes.  I mean he was buying cars and houses and everything

10   else.  He was living out in the open with this money.  He --

11   the IRS could show up any day and ask where the money came from

12   and he'd be stuck.  He set up a fund to make it look legitimate

13   and he filed his taxes to make it look legitimate, to get away

14   with it.

15           Let me spend a minute on the bank fraud charge and

16   tell you about one other legal concept that I want you to keep

17   in mind and then I'll wrap up.

18           So, on this bank fraud idea the judge is going to

19   instruct you that a bank fraud conspiracy is an agreement to

20   commit a scheme to defraud an FDIC insured bank, to get the

21   money out of the bank.

22           No one has to lie to a bank directly as long as the

23   lie that's told is intended to cause the bank to disburse

24   funds.  And there is no law that says it has to be the

25   defendant's account or the defendant's company's account or

JBK9SCO5                        Mr. DiMase - Rebuttal

1    anything like that.  And the bank you're going to hear doesn't

2    have to get hurt.  It's about lying to cause the bank to

3    disburse the money that they would not otherwise disburse.

4         And how does that fit here?  Well, the defendant got

5    everyone holding Ruja's money onboard with one big lie:  Fenero

6    is an investment fund and that the money coming in was

7    investments and that the money going out was investments.  That

8    was the lie at the heart of this case.

9         And with that lie there were a lot of smaller lies.

10   Partial payment for subscription.  Loan for CryptoReal.

11   Investment management.  Asset management.  Investment in XG.

12   All of the little lies that had to be told by the banks

13   consistent with that one big lie, to move the money around.

14        Now, you're going to hear from the judge that a

15   conspiracy oftentimes much is left to the unexpressed

16   understanding.  So there doesn't need to be evidence that Mark

17   Scott called up Gilbert Armenta and said:  Hey, man, tell them

18   asset management; tell them investment in XGII.

19        You can draw the reasonable inference from the facts

20   that Mr. Armenta knew that's what he had to do.  And you know

21   why?  Because everybody knows Mark Scott, Gilbert Armenta, you

22   can't say:  Hey, this is OneCoin money, to send it over to

23   these Fenero Funds.  The only way it worked was lying to the

24   banks.  Mr. Scott knew that full well.  That's what his whole

25   scheme was about.

1          And on top of that there's a subscription agreement,

2    investment agreement that Mr. Scott and Mr. Armenta both signed

3    that papers the whole transaction as an investment.  And, of

4    course, Mr. Armenta would lie to banks in a manner consistent

5    with that agreement, the agreement that Mr. Scott put together

6    for the funds.  That's it.

7          And on the Bank of New York Mellon lies, those came

8    directly from Mark Scott.  You may remember the loan for

9    CryptoReal wire instruction that he sent to Apex.  And he put

10   that right in there.  And that's the same lie that's in the

11   payment message that goes through Bank of New York Mellon that

12   gets it through.  $30 million.  That was Mark Scott's lie.

13   That wasn't a loan.  You all know that's not a loan from the

14   evidence you saw in this case.  And that was a lie.  And it

15   came directly from Mark Scott and he knew the money would flow

16   through that correspondent account because the wire

17   instructions that he e-mailed to himself said U.S. dollar

18   transactions go through Bank of New York Mellon in New York,

19   New York.

20         The OneCoin victim wires and the use of the Locke Lord

21   escrow accounts also at U.S. FDIC insured banks fit the same

22   pattern.  And just because Mr. Scott doesn't know what somebody

23   is telling a U.S. victim to say to the bank doesn't mean

24   they're not part of the exact same conspiracy with the exact

25   same goal.  You don't have to know who everyone else is or what

1    everyone else is doing in a conspiracy as long as you all share

2    in the same illegal object:  To lie to the U.S. banks to move

3    the money around.  That's what happened.

4         OK.  So let me talk to you about this one other legal

5    concept to keep in the back of your mind and then I'll

6    conclude.

7         The judge is also going to instruct you about the

8    theory of conscious avoidance.  Now the government has

9    presented to you evidence to show that the defendant knew that

10   OneCoin was a fraud and that he was laundering Ruja's dirty

11   money.  But even he didn't know for certain, he's still guilty

12   if he was aware there was a high probability that OneCoin was a

13   fraud and took deliberate and conscience steps to avoid

14   confirming that fact.

15        And there were warning signs all over the place.  This

16   is the idea of conscious avoidance that I expect Judge Ramos

17   will talk to you about.

18        He's a trained lawyer.  And OneCoin screams fraud.

19   Doubling your coins and your value overnight.  The CPA article.

20   The article about Gary Gilford and the ongoing police

21   investigation.  The fact that OneCoin bank accounts are being

22   closed left and right.  Scott knew but at a minimum he

23   deliberately closed his eyes to what was obvious.  So if he

24   ever got caught and this trial ever happened he could say that

25   he was duped.  He wasn't.

1          Ladies and gentlemen, Mark Scott is not a lion.  Mark

2     Scott is a liar, a liar who thought he could get away with it.

3     He was well educated.  He was professional.  He had the

4     knowhow.

5          Can you put up 4101, please.  Thank you.

6          4104.

7          His smoke and mirrors were better than most.  They

8     were designed to withstand scrutiny, to look real.  That was

9     the whole point.  But the e-mails he thought you would never

10    see, the phonecall he thought you would never hear, the bank

11    accounts he thought would never be traced, they are all before

12    you now along with all of the other evidence in this case.  And

13    as hard as he tried, the defendant has been unmasked for who he

14    really is, not an investment manager but a money launderer, a

15    money launderer who earned over $50 million on the backs of

16    people like Linda Cohen and William Horn, and people like them

17    all over the world who saw their money disappear into thin air.

18    He's not a scapegoat.  He's a trained professional who took

19    advantage of his skills to earn millions of dollars of criminal

20    proceeds.  And when he got a chance to explain himself to the

21    FBI and the IRS he did what he always did, what is consistent

22    with his worldview.  He lied.

23         As Scott himself told Ruja, the time for smoke and

24    mirrors is over.  It is now time for you, the jury, to hold the

25    defendant accountable for his crimes.  Mark Scott, the

1    defendant, is guilty.

2              THE COURT:  Thank you, Mr. DiMase.  Ladies and

3    gentlemen, we're going to take a brief five-minute break to get

4    ready for the charge.  Thank you for your indulgence in

5    agreeing to say a little longer.

6              (Jury not present)

7              MR. FOLLY:  Your Honor it sounded like from what you

8    said there at the end that the jury has agreed to stay later.

9    Is that what's going on?

10             THE COURT:  Yes.  We're going to do the charge now.

11             MR. DEVLIN-BROWN:  Your Honor, just one issue I wanted

12   to raise briefly.  I didn't want to object unnecessarily during

13   the rebuttal.  But Mr. DiMase twice said words to the effect

14   of:  And if Mr. Scott had anything to say about anonymity or

15   privacy he would have spoken to the FBI.  I think he chose his

16   words carefully because he didn't ever use the words anonymity

17   or privacy to the FBI.  But I think he said things that we

18   would certainly argue support that.  All I'm asking for, your

19   Honor, is an instruction from the court that the government has

20   the right to select the portions to play and you shouldn't

21   infer anything one way or the other about what Mr. Scott may

22   have said in any other statement.

23             THE COURT:  Isn't the entire thing in?

24             MR. DEVLIN-BROWN:  His postarrest?  Oh, no.  A

25   fraction of it.

1          THE COURT:  Do counsel have a -- copies of the package

2     that we're giving the jury?

3          MR. FOLLY:  Your Honor, one question.  After the Court

4     charges the jury is the jury going to stay and begin

5     deliberating?

6          THE COURT:  I doubt it.  I mean they agreed to stay

7     until three o'clock.  I'm likely going to go a little bit

8     beyond three o'clock.  I'll tell them beginning tomorrow they

9     can stay as long as they like.

10         MR. DiMASE:  Your Honor, is this issue resolved?

11         THE COURT:  I'm not going to give an additional

12     instruction.

13         (Jury present)

14         THE COURT:  Everyone please be seated but be careful

15     when you're seated because there's a binder on your chair.

16         So, ladies and gentlemen, I am about to read you the

17     charge.  It is traditional that the charge is read to the jury.

18     There are some very important concepts in here and the words

19     that are used in the law are very important so it simply will

20     not do for judges to ad-lib the law.  What you have in the

21     binder are three documents.  You have exactly what I'm going to

22     read to you now.  So you have the charge.  You can read along

23     with me or if you just want to listen you're free to do that.

24     Whatever makes you most comfortable.  And you will be allowed

25     to take this with you as you deliberate, so you have the charge

1    as you deliberate.

2            Also in the binder is the indictment.  As I will

3    instruct you, the indictment is not evidence at all.  It is

4    simply the accusation that was brought against Mr. Scott.

5            And you also have a verdict form which at the end of

6    deliberations your foreperson will sign and read it out here in

7    court.  And you only have to sign only one verdict form but you

8    each have a copy of it.

9            Now I have what I believe to be a mellifluous voice

10   but that is not an opinion widely shared.  My wife describes it

11   as an annoying drone.

12           I think at some point during this reading, it will

13   take me about an hour-and-a-half or so or less, if you feel the

14   need to stand up and stretch by your seat I will not take

15   offense.  OK.  So now let me begin the reading.

16           JUROR:  Your Honor, can we write on this?

17           THE COURT:  Oh, yes.  That's yours.

18           Members of the Jury, we have almost reached that point

19   where you are about to begin your final function as jurors

20   which, as you all appreciate, is one of the most important

21   duties of citizenship in this country.

22           My instructions to you will be in four parts.  First,

23   I will give some introductory instructions about the role of

24   the court and of the jury, and about the presumption of

25   innocence and the government's burden of proof.  Second, I will

describe the charges and the law governing those chargings,

which you will apply to the facts as you find them to be

established by the proof.  Third, I will give you instructions

concerning the evaluation of evidence, and the fourth and final

section of these instructions will relate to your

deliberations.

I will first describe the role of the court and of the

jury.

It is my duty to instruct you as to the law, and it is

your duty to accept these instructions of law and apply them to

the facts as you determine them.  If an attorney stated a legal

principle different from any that I state to you in my

instructions, it is my instructions you must follow.  You

should not single out any instruction as alone stating the law,

but you should consider my instructions as a whole when you

retire to deliberate.  You should not be concerned about the

wisdom of any rule that I state.  Regardless of any opinion you

may have about what the law may be or ought to be, it would be

a violation of your oath to base your verdict on any view of

the law other than that which I give you.

You, the Members of the Jury, are the sole and

exclusive judges of facts.  You pass on the evidence, determine

the credibility of witnesses, resolve such conflicts as there

may be in the testimony, draw whatever reasonable inferences

you decide to draw from the facts as you determine them, and

1    determine the weight of the evidence.  In doing so, remember

2    that you took an oath to render judgment impartially and

3    fairly, without prejudice or sympathy or fear, based solely on

4    the evidence and the applicable law.

5            The fact that the prosecution is brought in the name

6    of the United States of America entitles the government to no

7    greater consideration than that given to any other party to

8    this litigation.  By the same token, the government is entitled

9    to no less consideration.

10           The defendant, Mark S. Scott, has pleaded not guilty

11   and has denied every charge against him.  That means the

12   government has the burden to prove him guilty beyond a

13   reasonable doubt.  That burden of proof never shifts to

14   Mr. Scott.  A defendant in a criminal case never has the burden

15   to call any witnesses or produce any evidence.  Even though

16   Mr. Scott has presented evidence in his defense, it is not his

17   burden to prove himself not guilty.  It is always the

18   government's burden to prove each of the elements of the crimes

19   charged beyond a reasonable doubt.

20           In other words, Mr. Scott starts with a clean slate.

21   He is presumed innocent of all charges against him, and he must

22   be presumed to be innocent by you throughout your

23   deliberations, until such time, if ever, that you, as a jury,

24   unanimously find that the government has proven him guilty

25   beyond a reasonable doubt.  The presumption of innocence alone

1    requires you to acquit Mr. Scott if the government fails to

2    prove him guilty beyond a reasonable doubt.

3          Since, in order to convict the defendant of a given

4    charge, the government is required to prove that charge beyond

5    a reasonable doubt, the question then is:  What is a reasonable

6    doubt?  The words almost define themselves.  It is a doubt

7    based upon reason.  It is doubt that a reasonable person has

8    after carefully weighing all of the evidence.  It is a doubt

9    that would cause a reasonable person to hesitate to act in a

10   matter of importance in his or her personal life.  Proof beyond

11   a reasonable doubt must, therefore, be proof of a convincing

12   character that a reasonable person would not hesitate to rely

13   upon in making an important decision.

14         A reasonable doubt is not caprice or whim.  It is not

15   speculation or suspicion.  It is not an excuse to avoid the

16   performance of an unpleasant duty.  The law does not require

17   that the government prove guilt beyond all possible doubt:

18   Proof beyond a reasonable doubt is sufficient to convict.

19         If, after fair and impartial consideration of the

20   evidence, you have a reasonable doubt as to the defendant's

21   guilty with respect to a particular charge against him, you

22   must find the defendant not guilty of that charge.  On the

23   other hand, if after fair and impartial consideration of all of

24   the evidence, you are satisfied beyond a reasonable doubt of

25   the defendant's guilt with respect to a particular charge

1   against him, you should find the defendant guilty of that

2   charge.

3          The defendant in this matter, Mr. Scott, has been

4   formally charged in what is called an indictment.  An

5   indictment is not evidence.  It is simply an accusation.  It is

6   no more than the means by which a criminal case is started.  It

7   is not proof of a defendant's guilt.  You are to give no weight

8   to the fact that an indictment has been returned against the

9   defendant.

10         Before you begin your deliberations, you will be

11  provided with a copy of the indictment.  I will summarize the

12  offenses charged in the indictment and then explain in detail

13  the elements of each offense.  Each charge is called a count.

14         The indictment contains two counts.  Each count must

15  be considered separately.

16         Count One alleges that from at least in or about

17  September 2015, up to and including in or about 2018 the

18  defendant conspired or agreed with others to commit money

19  laundering; that is, to engage in financial transactions in

20  order to conceal and disguise the nature, location, source,

21  ownership, and control of the proceeds of a fraud scheme

22  involving a purported cryptocurrency known as OneCoin.

23         (Continued on next page)

24

25

1    THE COURT:  (Continuing) Count two alleges that from

2    at least in or about September 2015, up to and including in or

3    about 2018, the defendant conspired or agreed with others to

4    commit bank fraud, by misrepresenting and omitting material

5    facts to banks and other financial institutions worldwide to

6    cause those financial institutions, including Federal Deposit

7    Insurance Corporation insured financial institutions in the

8    United States, to transfer funds into and out of accounts

9    associated with purported investment funds operated by the

10   defendant and others.

11   You must consider each count separately, and you must

12   return a verdict of guilty or not guilty for each count.

13   Whether you find the defendant guilty or not guilty as to one

14   offense should not affect your verdict as to the other offense

15   charged.  Mr. Scott has pleaded not guilty to these charges.

16   As I just mentioned, the two counts of the indictment

17   charge the defendant with the crime of conspiracy.  A

18   conspiracy is a kind of criminal partnership -- a combination

19   or agreement of two or more persons to join together to

20   accomplish some unlawful purpose.

21   The crime of conspiracy is to violate a federal law is

22   an independent offense.  It is separate and distinct from the

23   actual violation of any specific federal laws, which the law

24   refers to as "substantive crimes."

25   For example, Count One of the indictment alleges what

1   is called a multi-object conspiracy, which charges that the

2   objectives of the conspiracy were to commit two different types

3   of money laundering.  A conspiracy to commit money laundering

4   is an entirely distinct and separate offense from the actual

5   commission of money laundering.  If a conspiracy exists, even

6   if it should fail in its purpose, it is still punishable as a

7   crime.

8          Indeed, you may find a defendant guilty of the crime

9   of conspiracy to commit money laundering even if the

10  substantive crimes which were the object of the conspiracy were

11  not actually committed.

12         Congress has deemed it appropriate to make conspiracy,

13  standing alone, a separate crime even if the conspiracy is not

14  successful.  This is because collective criminal activity poses

15  a greater threat to the public safety and welfare than

16  individual conduct, and increases the likelihood of success of

17  a particular criminal venture.

18         You will note that the indictment alleges that certain

19  acts occurred on or about various dates.  It is not necessary,

20  however, for the government to prove that the alleged crimes

21  were committed on exactly those dates.  The law requires only

22  that the government prove beyond a reasonable doubt a

23  substantial similarity between the dates and months alleged in

24  the indictment and the dates and months established by the

25  evidence.

JBK3SCO6                          CHARGE

1      It is also not essential that the government prove

2 that the charged crimes started and ended at those times

3 specified in the indictment.  It is sufficient if you find that

4 the conspiracies and substantive crimes charged existed for

5 some time, for some of the time within the period set forth in

6 the indictment.

7      Count One:  Conspiracy to commit money laundering.

8 Elements of a conspiracy.

9      Let us now turn to the charges against Mr. Scott.  As

10 I noted earlier, Count One charges Mr. Scott with conspiracy to

11 commit money laundering in violation of 18 U.S.C. -- that's

12 United States Code -- Section 1956(h).  To meet its burden of

13 proof as to Count One, the government must establish beyond a

14 reasonable doubt each of the following elements:

15      First, that the conspiracy charged in Count One of the

16 indictment existed; that is, that there was an agreement or

17 understanding between two or more people to commit a federal

18 crime, which in this case is money laundering; and second, that

19 the defendant knowingly and willfully became a member of the

20 alleged conspiracy, with the intent to further its illegal

21 purposes -- that is, with the intent to commit the object of

22 the charged conspiracy.

23      If you find from your consideration of the evidence

24 that each of these elements has been proved beyond a reasonable

25 doubt, then you should find the defendant guilty.  If, on the

JBK3SCO6                      CHARGE

1    other hand, you find from your consideration of the evidence

2    that any of these elements has not been proved beyond a

3    reasonable doubt, then you should find the defendant not

4    guilty.

5            Now let us separately consider the two elements:

6    First, the existence of the conspiracy, and second whether the

7    defendant knowingly and willfully associated himself with and

8    participated in the conspiracy.

9            Some of the words and phrases you just heard have

10   special meanings under the law.  I will now go through each of

11   these elements in more detail to help explain what each element

12   means, including the words with specialized meaning.  When you

13   are applying the elements I just listed, you must use the

14   definitions of the words I instruct you to use.

15           The first element which the government must prove

16   beyond a reasonable doubt to establish the offense of

17   conspiracy is that the conspiracy actually existed, that is,

18   that two or more persons knowingly and willfully entered into

19   the unlawful agreement charged in the indictment.  The essence

20   of the crime of conspiracy is the unlawful combination or

21   agreement to violate the law.  As I mentioned earlier, the

22   ultimate success of the conspiracy, or the actual commission of

23   the crime that is the object of the conspiracy, is not relevant

24   to the question of whether the conspiracy existed.

25           In order for the government to satisfy this element,

1    you need not find that the alleged members of the conspiracy

2    sat around together and entered into any express or formal

3    agreement.  Similarly, you need not find that the alleged

4    conspirators stated in words or writing what the scheme was,

5    its object or purpose, or every precise detail of the scheme or

6    the means by which its object or purpose was to be

7    accomplished.  What the government must prove is that there was

8    a mutual understanding, either spoken or unspoken, between two

9    or more people to cooperate with each other to accomplish an

10   unlawful act.

11          You may, of course, find that the existence of an

12   agreement to commit an unlawful act has been established by

13   direct proof.  However, common sense tells you that when

14   people, in fact, enter into a criminal conspiracy, much is left

15   to the unexpressed understanding.  Conspiracy by its very

16   nature is characterized by secrecy.  It is therefore rare that

17   a conspiracy can be proven by direct evidence of an explicit

18   agreement.

19          You may, however, infer the existence of the

20   conspiracy from the circumstances of the case and the conduct

21   of the parties involved, if you find that the evidence

22   justifies such an inference.  In a very real sense, then, in

23   the context of a conspiracy charge, actions often speak louder

24   than words.  In this regard, you may, in determining whether an

25   agreement existed here, consider the actions and statements of

JBK3SCO6                          CHARGE

all those whom you found or find to be participants as proof

that a common design existed on the part of the persons

involved in the conspiracy to act together to accomplish an

unlawful purpose.

So first, you must determine whether or not the proof

established beyond a reasonable doubt the existence of the

conspiracy charged.  In considering the first element, you

should consider all of the evidence that has been admitted with

respect to the conduct and statements of each alleged

co-conspirator, which may include not only the defendant, but

other co-conspirators as well, and such inferences as

reasonably may be drawn from the evidence.

The object of a conspiracy is the illegal goal the

co-conspirators agree or hope to achieve.  Count One of the

indictment charges that there were two objectives of the

conspiracy, both of which involved concealment money

laundering.  I will explain both of these in more detail in a

moment.  You need not find that the defendant agreed to

accomplish both types of money laundering.  An agreement to

accomplish either one either of the objects is sufficient.  In

other words, if you find that the defendant agreed to commit

either form of concealment money laundering, the illegal

purpose element of a conspiracy will be satisfied.  You must,

however, be unanimous that the government has proven beyond a

reasonable doubt at least one of these two alleged objectives

JBK3SCO6                        CHARGE

1     of the conspiracy.  You must also be unanimous as to which of

2     the two types has been proven.  With that in mind, I will now

3     proceed to discuss the elements of each form of the concealment

4     money laundering.

5               The first type of concealment money laundering occurs

6     when a defendant conducts a financial transaction knowing that

7     the transaction was designed, in whole or in part, to conceal

8     or disguise the proceeds of a specified unlawful activity.

9     Here, the specified unlawful activity is wire fraud.  In order

10    to prove concealment money laundering, the government must

11    establish the following four elements beyond a reasonable

12    doubt:

13              First, that the defendant conducted (or attempted to

14    conduct) a financial transaction which must in some way or

15    degree have affected interstate or foreign commerce;

16              Second, that financial transaction at issue involved

17    the proceeds of specified unlawful activity, which here is

18    alleged to be a wire fraud scheme;

19              Third, that the defendant knew that the financial

20    transaction involved the proceeds of some form of unlawful

21    activity; and

22              Fourth, that the defendant knew that the transaction

23    was designed, in whole or in part, either to conceal or

24    disguise the nature, location, source, ownership or control of

25    the proceeds of the unlawful activity.

JBK3SCO6                          CHARGE

1          The first element of concealment money laundering is

2     that the defendant conducted a financial transaction.  The term

3     "conducts" includes the action of initiating, concluding or

4     participating in initiating or concluding a transaction.

5          The term "financial transaction" means a transaction

6     which in any way or degree affects interstate or foreign

7     commerce and involves the movement of funds by wire or other

8     means, or involves one or more money instruments, (2) a

9     transaction involving a financial institution which is engaged

10    in, or the activities of which affect, interstate or foreign

11    commerce in any way or degree.  For purposes of the second type

12    of financial transaction I have just described, I instruct you

13    that an FDIC insured bank constitutes a financial institution.

14         A "transaction involving a financial institution"

15    includes a deposit, withdrawal, transfer between accounts,

16    exchange of currency, loan, extension of credit, purchase or

17    sale of any stock, bond, certificate of deposit, or other

18    monetary instrument, use of a safe deposit box or any other

19    payment, transfer, or delivery by, through or to a financial

20    institution by whatever means.  The term "funds" includes any

21    currency, money or other medium of exchange that can be used to

22    pay for goods and services.

23         Interstate commerce includes any transmission,

24    transfer or transportation of goods or services, both tangible

25    and intangible, communications and/or persons between persons,

1   places or entities located in one state (including the District

2   of Columbia) and persons, places or entities located in another

3   state, regardless of whether done for a business purpose or

4   otherwise.

5          Foreign commerce means the same thing, except it is

6   between a person, place or entity in the United States and a

7   person place or entity in a foreign country.

8          In determining whether someone is engaged in or

9   whether his activities affect interstate or foreign commerce,

10  the involvement in interstate or foreign commerce can be

11  minimal.  Any involvement at all will satisfy this element.

12         You do not have to decide whether the effect on

13  interstate or foreign commerce was harmful or beneficial to a

14  particular business or to commerce in general.  The government

15  satisfies its burden of proving an effect on interstate or

16  foreign commerce if it proves beyond a reasonable doubt any

17  effect, whether it was harmful or not.

18         In addition, it is not necessary for the government to

19  show that the defendant actually intended or anticipated an

20  effect on interstate or foreign commerce by his actions or that

21  commerce was actually affected.  All that is necessary is that

22  the natural and probable consequences of the acts the defendant

23  agreed to take would affect interstate or foreign commerce.

24         The second element of concealment money laundering

25  which the government must prove beyond a reasonable doubt is

1    that the financial transactions must involve the proceeds of

2    specified unlawful activity.  Here, the specified unlawful

3    activity is wire fraud, in violation of 18 U.S.C. Section 1343.

4           I instruct you, as a matter of law, that the term

5    "specified unlawful activity" includes wire fraud.  I'll give

6    you the elements of wire fraud in just a moment.

7           The term "proceeds" means any property, or any

8    interest in property that someone acquires or retains as

9    profits resulting from the commission of the specified unlawful

10   activity.

11          The elements of the substantive crime of wire fraud,

12   which is the specified unlawful activity, are:

13          First, that there was a scheme or artifice to defraud

14   others of money or property by materially false or fraudulent

15   pretenses, representations or promises;

16          Second, that one or more participants in that scheme

17   knowingly and willfully devised or participated in the scheme

18   or artifice to defraud, with knowledge of its fraudulent nature

19   and with specific intent to defraud; and

20          Third, that in the execution of that scheme, one or

21   more participants in that scheme used or caused the use by

22   others of interstate or foreign wires.

23          As to the first element, a "scheme or artifice" is

24   simply a plan for accomplishment of an object.  "Fraud" is a

25   general term.  It includes all the possible means by which a

1   person seeks to gain some unfair advantage over another person

2   by false representations, false suggestion, false pretenses or

3   concealment of the truth.  Thus, a scheme to defraud is merely

4   a plan to deprive another of money or property by trick,

5   deceit, deception or swindle.

6            As to the second element, the government must

7   establish beyond a reasonable doubt that one or more

8   participants in the fraud scheme devised or participated in the

9   fraudulent scheme knowingly and with the specific intent to

10  defraud.  To "devise" a scheme to defraud is to concoct or plan

11  it.  To "participate" in a scheme to defraud means to associate

12  oneself with it with a view and intent toward making it

13  succeed.  To act knowingly means to act voluntarily and

14  deliberately, rather than mistakenly or inadvertently.

15           The third and final element the government must prove

16  beyond a reasonable doubt is that in the execution of that

17  scheme, one or more participants in that scheme used or caused

18  use by others of interstate or foreign wires (for example, wire

19  transfers, phone calls, e-mail communications, or text

20  messages).  An interstate wire is a wire that passes between

21  two or more states.  A foreign wire is a wire that passes

22  between the United States and someplace outside the United

23  States.

24           The use of the wire need not itself be a fraudulent

25  representation.  It must, however, further or assist in some

1    way in carrying out the scheme to defraud.  It is not necessary

2    that any of the participants in the wire fraud scheme be

3    directly or personally involved in any wire communication, as

4    long as the communication is reasonably foreseeable in the

5    execution of the alleged scheme to defraud in which the

6    participants participated in.

7            Only the wire communication must be reasonably

8    foreseeable, not its interstate or foreign component.  Thus, if

9    you find that the wire communication was reasonably

10   foreseeable, and the interstate or foreign wire communications

11   actually took place, then this element is satisfied, even if it

12   was not foreseeable that the wire communication would cross

13   state or national lines.

14           The third element of concealment money laundering

15   which the government must prove beyond a reasonable doubt is

16   that the defendant knew that the financial transactions at

17   issue involved the proceeds of some form, though not

18   necessarily which form, of unlawful activity.

19           Keep in mind that it is not necessary for the

20   defendant to believe that the proceeds came from the wire fraud

21   scheme; it is sufficient that the defendant believed that the

22   proceeds came from some unlawful activity that constitutes a

23   felony under state, federal, or foreign law.  I instruct you

24   that wire fraud is a felony under the federal law.

25           The fourth and final element of concealment money

1   laundering concerns the purpose of the transaction.

2   Specifically, the government must prove beyond a reasonable

3   doubt that the defendant conducted financial transactions with

4   knowledge that the transactions were designed, in whole or in

5   part, to conceal or disguise the nature, location, source,

6   ownership or control of the proceeds of the specified unlawful

7   activity.

8              As I have previously instructed, to act knowingly

9   means to act purposely and deliberately and not because of

10  mistake or accident, mere negligence, or other innocent reason.

11  That is, the acts must be the product of the defendant's

12  conscious objective.  If you find that the evidence establishes

13  beyond a reasonable doubt that the defendant knew the purpose

14  of the particular transaction in issue, and that the

15  transaction was either designed to conceal or disguise the true

16  origin of the property in question, then this element is

17  satisfied.

18             However, if you find that the defendant knew of the

19  transaction, but did not know that it was either designed to

20  conceal or disguise the true origin of the property in

21  question, but instead thought that the transaction was intended

22  to further an innocent transaction, you must find that this

23  element has not been satisfied and find the defendant not

24  guilty.

25             For the fourth element to be satisfied, the defendant

JBK3SCO6                          CHARGE

need not know which specified unlawful activity he was agreeing
to help conceal.  He need only know that a purpose of the
financial transaction was concealing the nature, location,
source, ownership or control of the funds.

          I will now discuss the second object of the conspiracy
charged in Count One of the indictment, which involves another
form of concealment money laundering.

          In order to prove the crime of international
concealment money laundering, the government must establish
beyond a reasonable doubt each of the following three elements:

          First, that the defendant knowingly transported,
transmitted or transferred a monetary instrument or funds from
a place in the United States to or through a place outside the
United States, or to a place in the United States from or
through a place outside the United States;

          Second, that the defendant did so with knowledge that
the monetary instrument or funds involved represent the
proceeds of some form of unlawful activity; and

          Third, that the defendant knew that the
transportation, transmission, or transfer was designed, in
whole or in part, to conceal, disguise the nature of the
action, location, the source, the ownership, or control of the
proceeds of specified unlawful activity.

          The first element that the government must prove
beyond a reasonable doubt is that the defendant transported,

transmitted or transferred or attempted to transport, transmit

or transfer a monetary instrument or funds from a place in the

the United States to or through a place outside the United

States (or to a place in the United States from or through a

place outside the United States).

        The term "monetary instrument" means coin or currency

of the United States or of any other country, travelers'

checks, personal checks, bank checks, money orders, investment

securities in bearer form or otherwise in such form that title

thereto passes upon delivery, and negotiable instruments in

bearer form or otherwise in such form that title thereto passes

upon delivery.

        The term "funds" refers to money or negotiable paper

that can be converted into currency.

        "Transport," "transmit" and "transfer" are not words

that require a definition.  You should give them their

ordinary, everyday meaning.  The government need not prove that

the defendant physically carried funds or monetary instruments

in order to prove that he is responsible for transferring or

transporting or transmitting.  All that is required is proof

that the defendant caused the funds or monetary instruments to

be transported or transferred or transmitted by another person

or entity.

        The second and third elements of the crime

constituting the second object of the money laundering

JBK3SCO6                    CHARGE

conspiracy charged in Count One refer to concepts previously

defined with respect to the first object of Count One, namely

the term "some form of unlawful activity," and the concept of

concealment of or disguising the location, source, ownership or

control of the proceeds of specified unlawful activity.  The

same definitions and instructions provided previously apply to

these terms as they appear in connection with the second object

of Count One.

          As I told you before, the government must prove beyond

a reasonable doubt that the defendant knew that the financial

transactions at issue involved the proceeds of some form of

unlawful activity, but not necessarily which form of unlawful

activity.

          With respect to concealment, as that concept relates

to this second object of the conspiracy charged in Count One,

the government must prove beyond a reasonable doubt that the

defendant transported, transmitted, or transferred the property

involved in the transaction with knowledge that the

transportation, transfer, or transmission was designed to

conceal or disguise the nature, location, source, ownership, or

control of the proceeds of the wire fraud scheme.  I've already

provided you with the definition of wire fraud, and you should

apply that same definition here.  As I instructed you before,

as a matter of law, the term "specified unlawful activity"

includes wire fraud.  Proof only that the funds were concealed

1  is not sufficient to satisfy this element.  Instead, the

2  government must prove that the purpose of the transportation,

3  transfer, or transmission was to conceal or disguise the

4  nature, location, source, ownership or control of the proceeds,

5  and that the defendant knew that this was the purpose of the

6  transportation, transfer or transmission.

7          Count Two charges the defendant with conspiring to

8  commit bank fraud in violation of 18, United States Code,

9  Section 1349.

10         I have already instructed you as to the elements of

11 the conspiracy, and you should follow those instructions here.

12         In order to find the defendant guilty of this count,

13 you must find that the government has proven the following

14 elements beyond a reasonable doubt:

15         First, that the charged conspiracy existed; and

16         Second, that the defendant intentionally joined and

17 participated in this conspiracy during the applicable time

18 period.

19         In determining whether a conspiracy to commit bank

20 fraud existed, you must consider the principles regarding the

21 the existence of the conspiracy I set out earlier in these

22 instructions.  In this instance, the unlawful object or purpose

23 of the conspiracy charged in Count Two is to commit bank fraud.

24         It is the conspiratorial agreement to do the crime

25 that is at issue; it is a distinct and separate offense from

2001

1    the substantive crime of bank fraud.  And, it follows, it is

2    unnecessary for you to find that the crime of bank fraud

3    actually occurred, although bank fraud, as I will define it,

4    must be the object of the conspiracy, whether or not it

5    succeeded.

6         It is sufficient to establish the existence of the

7    conspiracy, as I've already said, if, from the proof of all the

8    relevant facts and circumstances, you find beyond a reasonable

9    doubt that the minds of at least two alleged co-conspirators

10   met in an understanding to accomplish by the means alleged the

11   object of the conspiracy.

12        The object of the conspiracy in charged in Count Two

13   is bank fraud.  The elements of bank fraud are as follows:

14        First, that there was a scheme to defraud a bank or a

15   scheme to obtain money owned by or under the custody or control

16   of a bank, by means of materially false or fraudulent

17   pretenses, representations or promises;

18        Second, that the defendant executed or attempted to

19   execute the scheme with the intent either to defraud the bank

20   or to obtain money or funds owned by or under the custody or

21   control of the bank; and

22        Third, that the bank involved was federally insured.

23        You will note that there is no requirement that

24   interstate or international wire communications were used in

25   connection with a bank fraud.

JBK3SCO6                          CHARGE

1              The first element of bank fraud is that there was a

2    scheme to defraud a bank or a scheme to obtain money owned by

3    or under custody or control of a bank, by means of materially

4    false or fraudulent pretenses, representations or promises.

5    This element requires proof of the existence of only one of

6    these.  That is, either that there existed a scheme to defraud

7    a bank or a scheme to obtain property under the custody or

8    control of a bank by means of materially fraudulent pretenses,

9    representations or promises.

10             In order to prove the first theory of bank fraud, that

11   there was a scheme to defraud a bank, the government must prove

12   beyond a reasonable doubt that there was a pattern or course of

13   conduct concerning a material matter designed to deceive a

14   federally insured bank into releasing property.

15             In order to prove the second theory of bank fraud, the

16   government must prove beyond a reasonable doubt that there was

17   a scheme to obtain money or property owned by or under the

18   custody and control of a bank by means of false or fraudulent

19   pretenses, representations or promises.  A representation is

20   fraudulent if it was falsely made with the intent to deceive.

21   Deceitful statements of half-truths, intentional concealment of

22   material facts, and the expression of an opinion not honestly

23   entertained may constitute false or fraudulent representations

24   under the statute.

25             The deception need not be premised upon spoken or

JBK3SCO6                        CHARGE

1    written words alone.  The arrangement of the words, the

2    intentional omission of words, or the circumstances in which

3    they are used may convey a false and deceptive appearance.  If

4    there is intentional deception, the manner in which it is

5    accomplished does not matter.

6           A fraudulent representation must relate to a material

7    fact or matter.  A material fact is one that would reasonably

8    be expected to be of concern to a reasonable and prudent person

9    in relying upon the representation or statement in making a

10   decision.  This means that if you find a particular statement

11   of fact to have been false, you must determine whether that

12   statement was one that a reasonable person might have

13   considered important in making his or her decision.  The same

14   principle applies to fraudulent half-truths or intentional

15   omissions of material facts.

16          In considering this element of bank fraud, it is

17   unimportant whether a bank actually relied on a

18   misrepresentation.  It is sufficient if the misrepresentation

19   is one that is merely capable of influencing the bank's

20   decision.

21          It is not necessary for the government to prove that

22   the financial institutions actually lost money or property as a

23   result of the scheme, or that the defendant intended for the

24   financial institutions to lose money or property.  A scheme to

25   defraud a bank also exists when a bank is provided false or

1    fraudulent information that, if believed, would prevent the

2    bank from being able to make informed economic decisions about

3    what to do with its money or property.  For example, if the

4    government proves beyond a reasonable doubt that because of the

5    scheme, the financial institutions entered into transactions

6    that they would otherwise not have entered into, then the

7    government will have met its burden of proof as to this

8    element.

9            The second element of bank fraud is that the defendant

10   executed, attempted to execute, or participated in the scheme

11   or artifice knowingly, willfully, and with the intent to

12   defraud a bank or that the defendant executed or attempted to

13   execute the scheme knowingly and willfully and with the intent

14   to obtain money or funds owned or under the custody or control

15   of the bank.

16           A person acts "knowingly" if he acts voluntarily and

17   deliberately and not mistakenly or inadvertently.  A person

18   acts "willfully" and "intentionally" if he acts purposely and

19   voluntarily and with the specific intent to disobey or

20   disregard the law.

21           This element requires that the defendant engaged in or

22   participated in the scheme alleged with an understanding of its

23   fraudulent or deceptive character and with an intention to help

24   it succeed.  It is not required that defendant participate in

25   or have knowledge of all of the operations of the scheme.  The

JBK3SCO6                          CHARGE

1    guilt of the defendant is not governed by the extent of his

2    participation.  It is also not necessary that the defendant

3    originated the scheme to defraud or that the defendant

4    participated in the alleged scheme from the beginning.  A

5    person who comes in at a later point with knowledge of the

6    scheme's general operation, although not necessarily all of its

7    details, and intentionally acts in a way to further the

8    unlawful goals, becomes a member of the scheme and is legally

9    responsible for all that may have been done in past in

10   furtherance of the criminal objective and all that is done

11   thereafter.

12          Even if the defendant participated in the scheme to a

13   lesser degree than others, he is nevertheless guilty as long as

14   the defendant became a member of the scheme to defraud with

15   knowledge of its general scope and purpose.

16          The questions of whether a person acted knowingly

17   willfully and with intent to defraud are questions of fact for

18   to you determine, like any other fact question.  These

19   questions involve the state of mind of the defendant.

20          Direct proof of knowledge and fraudulent intent is

21   often unavailable.  Indeed, it is not typical that a person

22   writes or states that as of a given time in the past he or she

23   had committed an act with fraudulent intent.  Such direct proof

24   is not required.  The ultimate facts of knowledge and criminal

25   intent, though subjective, may be established by circumstantial

1    evidence, based upon a person's outward manifestations, words,

2    conduct, acts, and all surrounding circumstances disclosed by

3    the evidence and the rational or logical inferences that may be

4    drawn therefrom.

5           When deciding whether the defendant possessed or

6    lacked an intent to defraud, you need not limit yourself just

7    to what the defendant said, but you may also look at what the

8    defendant did and what others did in relation to the defendant

9    and, in general, everything that occurred.

10          The third element of the crime of bank fraud is that a

11   financial institution in question was federally insured at the

12   time of the scheme.  This simply means that the financial

13   institution was a bank insured by the Federal Deposit Insurance

14   Corporation or a credit union with accounts insured by the

15   National Credit Union Share Insurance Fund during the time

16   frame alleged in the indictment.  The government need not show

17   that the defendant knew that a financial institution was

18   federally insured to satisfy this third element.

19          I told you earlier that Mr. Scott in various respects

20   must have acted knowingly in order to be convicted.   In

21   determining whether Mr. Scott acted knowingly with respect to

22   the substantive crimes or the objectives of the conspiracy, you

23   may consider whether he deliberately closed his eyes to what

24   otherwise would have been obvious.  That is what the phrase

25   "conscious avoidance" refers to.

1          As I told you before, acts done knowingly must be the

2    product of a person's conscious intention.  They cannot be the

3    result of carelessness, negligence, or foolishness.  But a

4    person may not willfully and intentionally remain ignorant of a

5    fact that is material and important to his or her conduct in

6    order to escape the consequences of criminal law.  We refer to

7    this notion of intentionally blinding yourself to what is

8    staring you in the face as "conscious avoidance."

9          An argument by the government of conscious avoidance

10   is not a substitute for proof of knowledge.  It is simply

11   another factor that you, the jury, may consider in deciding

12   what a defendant knew.  Thus, if you find beyond a reasonable

13   doubt that Mr. Scott was aware that there was a high

14   probability that a fact was so, but that Mr. Scott deliberately

15   and consciously avoided confirming this fact, such as by

16   purposely closing his eyes to it, then you may treat this

17   deliberate avoidance of positive knowledge as the equivalent of

18   knowledge.

19         With respect to the conspiracy counts, you must also

20   keep in mind that there is an important difference between

21   intentionally participating in the conspiracy, on the one hand,

22   and knowing the specific object or objects of the conspiracy on

23   the other.  You may consider conscious avoidance in deciding

24   whether Mr. Scott knew the objective or objectives of a

25   conspiracy.  That is, whether Mr. Scott reasonably believed

JBK3SCO6                        CHARGE

1    that there was a high probability that a goal of the conspiracy

2    was to commit the crimes charged as objects of that conspiracy

3    and deliberately avoided confirming that fact but participated

4    in the conspiracy anyway.  But conscious avoidance cannot be

5    used as a substitute for finding that Mr. Scott intentionally

6    joined the conspiracy in the first place.  It is logically

7    impossible for a defendant to intend and agree to join a

8    conspiracy if he does not actually know it exists, and that is

9    the distinction I am drawing.

10              In sum, if you find that Mr. Scott believed there was

11   a high probability that a fact was so and that the defendant

12   deliberately and consciously avoided learning the truth of that

13   fact, you may find that he acted knowingly with respect to that

14   fact.  However, if you find that he actually believed that the

15   fact was not so, then you may not find that he acted knowingly

16   with respect to that fact.  You must judge from all of the

17   circumstances and all of the proof whether the government did

18   or did not satisfy its burden of proof beyond a reasonable

19   doubt.

20              If the defendant believed in good faith that he was

21   acting properly, even if he was mistaken in that belief, and

22   even if others were injured by his conduct, there would be no

23   crime.  The burden of establishing lack of good faith and

24   criminal intent rests on the government.  A defendant is under

25   no burden to prove his good faith; rather, the government must

1   prove bad faith or knowledge of falsity beyond a reasonable

2   doubt.  If you find that the government has proven beyond a

3   reasonable doubt that the defendant acted knowingly and with

4   the requisite intent, you must find that he did not act in good

5   faith.

6          Federal law provides rules that govern where, that is,

7   in what district, a criminal prosecution may be brought by

8   government.  These are known as "venue" rules.  In addition to

9   all of the elements I have described, you must also decide

10  whether any act in furtherance of each of the charged crimes

11  occurred within the Southern District of New York, which

12  includes all of Manhattan, the Bronx, and Westchester,

13  Rockland, Putnam, Dutchess, Orange and Sullivan Counties.  This

14  means that, with regard to each count, you must decide whether

15  the crime charged in a particular count, or any act committed

16  to further or promote the crime, occurred within the Southern

17  District of New York.

18         I note that on this on issue of venue and on this

19  issue alone, the government need not prove its position beyond

20  a reasonable doubt.  It is sufficient if the government proves

21  venue by a mere preponderance of the evidence.  To prove

22  something by a preponderance of the evidence means to prove

23  that it more likely true than not true.  It is determined by

24  considering all of the evidence and deciding which evidence is

25  more convincing.  Thus, the government has satisfied its venue

1    obligations if you conclude that it is more likely than not

2    that the crime charged or any act in furtherance of the crime

3    you are considering for a particular count occurred in the

4    Southern District of New York.

5              If you find that the government has failed to prove

6    this venue requirement by a preponderance of the evidence with

7    respect to any of the charges in the indictment, then you must

8    acquit the defendant of that charge.

9              Proof of motive is not a necessary element of any of

10   the crimes with which the defendant is charged.  Proof of

11   motive does not establish guilt, nor does the lack of proof of

12   motive establish that the defendant is not guilty.  If the

13   guilt of the defendant is shown beyond a reasonable doubt, it

14   is immaterial what the defendant's motive for the crime or

15   crimes may be, or whether the defendant's motive was shown at

16   all.  The presence or absence of motive is, however, a

17   circumstance which you may consider as bearing on the intent of

18   the defendant.

19             You have heard reference in the arguments of defense

20   counsel in this case to the fact that certain investigative

21   techniques were or were not used by law enforcement

22   authorities.  There is no legal requirement that law

23   enforcement agents investigate crimes in a particular way or

24   that the government prove its case through any particular

25   means.  While you are to carefully consider the evidence

JBK3SCO6                          CHARGE

1    presented, you need not speculate as to why law enforcement

2    used the techniques they did or why they did not use other

3    techniques.  The government is not on trial, and law

4    enforcement techniques are not your concern.  Your concern is

5    to determine whether or not, based on the evidence or lack of

6    evidence, the guilt of the defendant has been proven beyond a

7    reasonable doubt.

8            You have heard testimony about evidence seized in

9    connection with certain searches or seizures conducted by law

10   enforcement officers, and in particular, of e-mail evidence

11   obtained pursuant to court approved search warrants.  You have

12   also heard recorded calls and conversations that were offered

13   into evidence during this trial.  I instruct you that all of

14   the evidence in this case, including evidence obtained pursuant

15   to searches and the recorded meetings and conversations played

16   during this trial, was lawfully obtained by the government, and

17   that no one's rights were violated, and that the use of this

18   evidence is entirely lawful.

19           Whether you approve or disapprove of the recordings of

20   calls or conversations or of the uses of searches to obtain

21   evidence should not enter into your deliberations, because I

22   instruct you that the use of this evidence is entirely lawful.

23   Therefore, you must give this evidence your full consideration,

24   along with all the other evidence in the case, as you determine

25   whether the government has proved the defendant's guilt beyond

 1   a reasonable doubt.

 2          You have also seen exhibits containing written

 3   communications between Mr. Scott and others that were labeled

 4   "attorney-client privilege" or "highly confidential" or the

 5   like.  I instruct you that those exhibits were also lawfully

 6   obtained by the government, and that no one's rights were

 7   violated by their use at this trial.  This evidence may also be

 8   properly considered by you.

 9          You have heard testimony from a government witness who

10   pled guilty to charges arising out of the same facts as this

11   case.  You are instructed that you are to draw no conclusions

12   or inferences of any kind about the guilt of Mr. Scott from the

13   fact that a prosecution witness pled guilty to similar charges.

14   That witness's decision to plead guilty was a personal decision

15   about his own guilt.  It may not be used by you in any way as

16   evidence against or unfavorable to Mr. Scott.

17          In connection with the recordings that you have heard,

18   you were given transcripts of the conversations to assist you.

19   I told you then, and I remind you now, that the transcripts are

20   not evidence.  It is the recordings that are evidence.  The

21   transcripts were provided as an aid to you while you listened

22   to the tapes.  It is for you to decide whether the transcripts

23   correctly present the conversations as they are heard on the

24   tapes you have listened to.  If you perceive any differences

25   between the recording and the transcript, it is the recording

1    that controls.

2            We have, among the exhibits received in evidence, some

3    documents that are redacted.  "Redacted" means that part of the

4    document or recording was taken out.  You are to concern

5    yourself only with the part of the item that has been admitted

6    into evidence.  You should not consider any possible reason why

7    the other part of it has been deleted.

8            You may not draw any inference, favorable or

9    unfavorable, towards the government or Mr. Scott from the fact

10   that any person in addition to Mr. Scott is not on trial here.

11   You may also not speculate in any way as to reason or reasons

12   why other persons are not on trial.  Those matters are wholly

13   outside your concern, and have no bearing on your function as

14   jurors.

15           There are several persons whose names you have heard

16   during the course of the trial but who did not appear here to

17   testify.  I instruct you that each party had an equal

18   opportunity or lack of opportunity to call any of these

19   witnesses.  Therefore, you should not draw any inferences or

20   reach any conclusions as to what they would have testified to

21   had they been called.  Their absence should not affect your

22   judgment in way.

23           You should, however, remember my instruction that the

24   law does not impose on a defendant in a criminal case the

25   burden or duty of calling any witness or producing any

evidence.

The defendant did not testify in this case.  Under our
Constitution, a defendant has no obligation to testify or to
present any evidence, because it's the government's burden to
prove a defendant guilty beyond a reasonable doubt.  The burden
remains with the government throughout the entire trial and
never shifts to a defendant.

A defendant is never required to prove that he is
innocent.  Therefore, you must not attach any significance to
the fact that he fact did not testify.  No adverse inference
against the defendant may be drawn by you because he did not
take the witness stand, and you may not consider it against the
defendant in any way in your deliberations in the jury room.

There has been evidence that the defendant made
statements to law enforcement authorities.  Evidence of these
statements was properly admitted in this case and may be
properly considered by you.  You are to give the evidence of
such statements such weight as you feel it deserves in light of
all the evidence.  Whether you approve or disapprove of the use
of these statements may not enter into your deliberations.  I
instruct you that no one's rights were violated, and that the
government's use of this evidence is entirely lawful.

You are to consider only the evidence in the case.
The evidence in this case is the sworn testimony of the
witnesses, the exhibits received in evidence, and the

JBK3SCO6                        CHARGE

1   stipulations to which the parties have agreed.  Anything you

2   may have seen or heard about this case outside the courtroom is

3   not evidence and must be entirely disregarded.

4           Exhibits which have been marked for identification but

5   not received into evidence may not be considered by you as

6   evidence.  Only those exhibits received into evidence may be

7   considered as evidence.

8           It is for you alone to decide the weight, if any, to

9   be given to the testimony and stipulations you have heard and

10  the exhibits you have seen.  Testimony that I have excluded or

11  stricken is not evidence and may not be considered by you in

12  rendering your verdict.

13          You are not to consider as evidence questions asked by

14  the lawyers.  It is the witnesses' answers that are evidence,

15  not the questions.  Arguments by the attorneys are not evidence

16  because the attorneys are not witnesses.  What they have said

17  to you in their opening statements and in their summations is

18  intended to help understand the evidence to reach your verdict.

19  If, however, your recollection of the evidence differs from the

20  statements made by the advocates in their opening statements or

21  summations, it is your recollection that controls.

22          Finally, any statements or rulings that I may have

23  made do not constitute evidence.  Because you are the sole and

24  exclusive judges of the facts, I do not mean to indicate any

25  opinion as to what the facts are or what the verdict should be.

JBK3SCO6                        CHARGE

1   The rulings I have made during the trial are not any indication

2   of my views.  Also, you should not draw any inference from the

3   fact that I may have on occasion asked certain questions of

4   witnesses.  Those questions were intended only to clarify or

5   expedite, and are not any indication of my view of the

6   evidence.  In short, if anything I have said or done seemed to

7   you to indicate an opinion relating to any matter you need to

8   consider, you must disregard it.

9         There are two types evidence that you may properly use

10  in reaching your verdict.  One type of evidence is called

11  direct evidence.  One kind of direct evidence is a witness's

12  testimony about something he knows by virtue of his or her own

13  senses -- something the witness has seen, felt or touched or

14  heard.  Direct evidence may also be in the form of an exhibit.

15        The other type of evidence is circumstantial evidence.

16  Circumstantial evidence is evidence that tends to prove one

17  fact indirectly by proof of other facts.  Here is a simple

18  example of circumstantial evidence:

19        Assume that when you came into the courthouse this

20  morning, the sun was shining and it was a nice day.  Assume

21  that the courtroom blinds are drawn, and you cannot look

22  outside.  As you are sitting here, someone walks in with an

23  umbrella that is dripping wet.  Somebody else then walks in

24  with a raincoat that is also dripping wet.  Now, you cannot

25  look outside the courtroom and you cannot see whether or not it

JBK3SCO6                           CHARGE

1    is raining, so you have no direct evidence of that fact.  But

2    on the combination of the facts that I have asked you to

3    assume, it would be reasonable and logical for you to conclude

4    that between the time you arrived at the courthouse and the

5    time that these people walked in, it had started to rain.

6             That is all there is to circumstantial evidence.  You

7    infer on the basis of reason and experience and common sense

8    from an established fact the existence or non-existence of some

9    other fact.

10            Many facts such as a person's state of mind can only

11   rarely be proved by direct evidence.  Circumstantial evidence

12   is of no less value than direct evidence.  You are to consider

13   both direct and circumstantial evidence.  The law makes no

14   distinction between the two, but simply requires that before

15   convicting a defendant, you, the jury, must be satisfied of the

16   defendant's guilt beyond a reasonable doubt from all of the

17   evidence in the case.

18            I have used the term "infer," and the lawyers in their

19   arguments have asked you to draw inferences.  When you draw an

20   inference, you conclude, from one or more established facts,

21   that another fact exists, and you do so on the basis of your

22   reason, experience, and common sense.  The process of drawing

23   inferences from facts in evidence is not a matter of guesswork,

24   suspicion, or speculation.  An inference is a reasoned, logical

25   deduction or conclusion that you, the jury, may draw, but are

not required to draw from the facts which have been established

by either direct or circumstantial evidence.  In considering

inferences, you should use your common sense and draw from the

facts which you find to be proven whatever reasonable

inferences you find to be justified in light of your

experience.

        Now for the important subject of evaluating testimony.

How do you evaluate the credibility or believability of the

witnesses?  The answer is that you use your plain common sense.

There is no magic formula by which you can evaluate testimony.

You should use the same tests for truthfulness that you would

use in determining matters of importance in your everyday

lives.  You should ask yourselves, did the witness impress you

as honest, open and candid?  Or was the witness evasive and

edgy as if hiding something?  How did he or she appear -- that

is, his or her bearing, behavior, manner and appearance while

testifying?  How responsive was the witness to the questions

asked on direct examination and on cross-examination?  You

should consider the opportunity the witness had to see, hear

and know about the things about which he or she testified, the

accuracy of his or her memory, his or her candor or lack of

candor, his or her intelligence, the reasonableness and

probability of his or her testimony, its consistency or lack of

consistency with other credible evidence, and its corroboration

or lack of corroboration by other credible evidence.

1          In short, in deciding credibility, you should size the

2     witness up in light of his or her demeanor, the explanations

3     given, and all of the other evidence in the case.  Always

4     remember to use your common sense, good judgment, and life

5     experience.

6          Few people recall every detail of every event

7     precisely the same way.  A witness may be inaccurate,

8     contradictory, or even untruthful in some respects, and yet

9     entirely believable and truthful in other respects.  It is for

10    you to determine whether such inconsistencies are significant

11    or inconsequential.

12         If you find that a witness is intentionally telling a

13    falsehood, that is always a matter of importance you should

14    weigh carefully.  If you find that any witness has willfully

15    testified falsely as to any material fact, that is as to an

16    important matter, the law permits you to disregard completely

17    the entire testimony of that witness upon the principle that

18    one who testifies falsely about one material fact is likely to

19    testify falsely about everything.  You are not required,

20    however, to consider such a witness as totally unbelievable.

21    You may accept so much of his or her testimony as you deem true

22    and disregard what you feel is false.

23         You are not required to accept testimony even though

24    the testimony is uncontradicted and the witness's testimony is

25    not challenged.  You may decide because of the witness's

2020

1    bearing or demeanor or because of the inherent improbability of

2    the testimony, or for other reasons sufficient to yourselves,

3    that the testimony is not worthy of belief.  On the other hand,

4    you may find, because of a witness's bearing and demeanor and

5    based upon your consideration of all the other evidence in the

6    case, that witness is truthful.

7            By the processes which I have just described, you, as

8    the sole judges of the facts, decide which of the witnesses you

9    will believe, what portions of their testimony to accept, and

10   what weight you will give to it.

11           In deciding whether to believe a witness, you should

12   also specifically note any evidence of bias, hostility, or

13   affection that the witness may have toward one of the parties.

14   Likewise, you should consider evidence of any other interest or

15   motive that the witness may have in cooperating or not

16   cooperating with a particular party.  If you find any such

17   bias, hostility, affection, interest, or motive, you must then

18   consider whether or not it affected or colored the witness's

19   testimony.

20           You should also take into account any evidence that a

21   witness may benefit or suffer in some way from the outcome of a

22   case.  Such interest in the outcome may create a motive to

23   testify falsely and may sway a witness in a way that advances

24   his or her own interests.  Therefore, if you find that any

25   witness whose testimony you are considering may have an

1    interest in the outcome of this trial, then you should bear

2    that factor in mind when evaluating the credibility of his or

3    her testimony and accept it with great care.

4            Keep in mind, though, that it does not automatically

5    follow that testimony given by an interested witness is to be

6    disbelieved.  There are many people who, no matter what their

7    interest in the outcome of a case may be, would not testify

8    falsely.  It is for you to decide, based on your own

9    perceptions and common sense, to what extent, if at all, the

10   witness's bias or interest has affected his or her testimony.

11   You are not required to disbelieve any interested witness; you

12   may accept as much of his or her testimony as you deem

13   reliable, and reject as much as you deem unworthy of

14   acceptance.

15           You have heard a witness who testified that he was

16   actually involved in the crimes charged in the indictment.

17   Experience will tell that you the government frequently must

18   rely on the testimony of witnesses who admit participating in

19   the alleged crimes at issue.  The government must take its

20   witnesses as it finds them, and frequently must use such

21   testimony in a criminal prosecution because otherwise it would

22   be difficult or impossible to detect and prosecute wrongdoers.

23           The testimony of such accomplices and cooperating

24   witnesses is properly considered by the jury.  If accomplices

25   could not be used, there would be many cases in which there was

1    real guilt and conviction should be had, but in which

2    convictions would be unobtainable.

3           For these very reasons, the law allows the use of

4    accomplice testimony.  Indeed, it is the law in federal courts

5    that the testimony of an accomplice may be enough in itself for

6    conviction, if the jury believes that the testimony establishes

7    guilt beyond a reasonable doubt.

8           Because of the possible interest an accomplice may

9    have in testifying, the accomplice's testimony should be

10   scrutinized with special care and caution.  The fact that a

11   witness is an accomplice can be considered by you as bearing

12   upon his or her credibility.  However, it does not follow that

13   simply because a person has admitted to participating in one or

14   more crimes, he or she is incapable of giving a truthful

15   version of what happened.

16          Like the testimony of any other witnesses, accomplice

17   witness testimony should be given such weight as it deserves in

18   light of the facts and circumstances before you, taking into

19   account the witness's demeanor, candor, the strength and

20   accuracy of a witness's recollection, his or her background,

21   and the extent to which his or her testimony is or is not

22   corroborated by other evidence.  You may consider whether the

23   accomplice witnesses, like any other witnesses called in this

24   case, have an interest in the outcome of the case, and if so,

25   whether it has affected their testimony.

You heard testimony from a witness who has an agreement with the government. I must caution you that it is of no concern of yours why the government made an agreement with a witness. Your concern is whether a witness has given truthful testimony here in this courtroom before you.

In evaluating the testimony of accomplice witnesses, you should ask yourselves whether the accomplices would benefit more by lying or by telling the truth. Was his or her testimony made up in any way because he or she believed or hoped that he or she would somehow receive favorable treatment by testifying falsely? Or did he or she believe that his or her interests would be served by testifying truthfully? If you believe that the witness was motivated by hopes of personal gain, was the motivation one which would cause him or her to lie, or was it one which would cause him or her to tell the truth? Did this motivation color his or her testimony?

If you find that the testimony was false, you should reject it. However, if, after a cautious and careful examination of the accomplice witness's testimony and demeanor upon the witness stand, you are satisfied that the witness told the truth, you should accept it as credible and act upon it accordingly.

In this case, I permitted a witness to express opinions about certain matters that are at issue. Such testimony, which we refer to as "expert testimony," was

JBK3SCO6                          CHARGE

1    presented to you on the theory that someone who is experienced

2    and knowledgeable in the field can assist you in understanding

3    evidence or in reaching an independent decision on the facts.

4    In weighing expert testimony, you may consider that witness's

5    qualifications, his opinions, the reasons for testifying, as

6    well as all of the other considerations that ordinarily apply

7    when you are deciding whether or not to believe a witness's

8    testimony.  You may give the opinion testimony whatever weight,

9    if any, you find it deserves in light of all of the evidence in

10   the case.

11        You should not, however, credit the opinion testimony

12   just because I allowed the witness to testify as an expert, nor

13   should you substitute the expert's opinion for your own reason,

14   judgment and common sense.  The determination of the facts in

15   this case rests solely with you.

16        You have heard testimony of law enforcement officials.

17   The fact that a witness may be or may have been employed by the

18   government as a law enforcement official or employee does not

19   mean that his or her testimony is necessarily deserving of more

20   or less consideration or greater or lesser weight than that of

21   other witnesses.

22        At the same time, in considering the credibility of

23   such a witness, you are entitled to consider whether the

24   testimony may be colored by a personal or professional interest

25   in the outcome of the case.

1              It is your decision, after reviewing all the evidence,

2     whether to accept the testimony of the law enforcement or

3     government employee witnesses and to give that testimony

4     whatever weight you find it deserves.

5              There has been testimony before you about the use of

6     informants or confidential sources.  Informants or confidential

7     sources are frequently used by the government to obtain leads

8     and to gain introduction to people suspected of violating the

9     law.  There are certain types of crimes where, without the use

10    of informants or confidential sources, detection would be

11    extremely difficult.  Because this law enforcement technique is

12    entirely lawful, your personal view on its use, whether you

13    approve or disapprove is beside the point and must not affect

14    your evaluation of the evidence in the case.

15             Let me put it another way.  If you are satisfied

16    beyond a reasonable doubt that the defendant committed the

17    charged offense that you are considering, you should find him

18    or her guilty even though you believe that his or her

19    apprehension came about in some measure by the government's use

20    of informants or confidential sources.

21             You have heard evidence during the trial that

22    witnesses have discussed the facts of the case and their

23    testimony with lawyers before the witnesses appeared in court.

24    Although you may consider that fact when you are evaluating a

25    witness's credibility, you should keep in mind that there is

nothing either unusual or improper about a witness meeting with

lawyers before testifying so that the witness can be aware of

the subjects he will be questioned about, focus on those

subjects, and have the opportunity to review relevant exhibits

before being questioned about them.  Such consultation helps

conserve your time and the Court's time.  In fact, it would be

unusual for a lawyer to call a witness without having had such

a consultation beforehand.

        Again, the weight you give to the fact or the nature

of the witness's preparation for his or her testimony and what

inferences you draw from such preparation are matters

completely within your discretion.

        The fact that one party called more witnesses and

introduced more evidence than the other does not mean that you

should find the facts in favor of the side offering the most

witnesses.  The burden of proof is always on the government.

The defendant is not required to call any witnesses or offer

any evidence since he is presumed to be innocent.

        You have heard testimony that the defendant made

statements in which he claimed that his conduct was consistent

with innocence and not with guilt.  The government claims these

statements in which the defendant attempted to exculpate

himself are false.

        If you find that the defendant gave a false statement

in order to divert suspicion from himself, you may infer -- but

2027

JBK3SCO6                          CHARGE

1   you need not -- that the defendant believed that he was guilty.

2   You may not, however, infer on the basis of this alone that the

3   defendant is in fact guilty of the crimes for which he is

4   charged.

5           Whether or not the evidence as to a defendant's

6   statements show that the defendant believed he was guilty, and

7   the significance, if any, to be attached to any such evidence

8   are matters for the jury to decide.

9           During the course of this trial, there has been

10  testimony that the defendant has a reputation for honesty and

11  truthfulness in his community.  That testimony bears upon the

12  defendant's character.  Character testimony should be

13  considered together with all the other evidence in the case in

14  determining the guilt or innocence of the defendant.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

JBK9SCO7                         Charge

1          THE COURT:  (Continuing)  Evidence of good character

2     may in itself give you a reasonable doubt where, without such

3     evidence, no reasonable doubt would have existed.  But, if on

4     all the evidence, including the character evidence, you are

5     satisfied beyond a reasonable doubt that the defendant is

6     guilty, a showing that he previously enjoyed a reputation of

7     good character does not justify or excuse the offense and you

8     should not acquit the defendant merely because you believe he

9     is a person of good repute.

10          The testimony of character witnesses is not to be

11     taken by you as the witness's opinion as to the guilt or

12     innocence of a defendant.  Indeed, the character witnesses

13     testified that he was not aware of the facts of this particular

14     case.  The guilt or innocence of the defendant is for you alone

15     to determine, and that should be based on all of the evidence

16     you have heard in the case.

17          Now, some of the exhibits that were admitted into

18     evidence were in the form of charts and summaries.  For these

19     charts and summaries that were admitted into evidence, you

20     should consider them as you would any other evidence.

21          There have also been a number of summary charts and

22     exhibits which were shown to you but which were not admitted

23     into evidence.  At the time that they were shown to you, I had

24     noted this fact to you.  For these charts and exhibits that

25     were not admitted into evidence, they severe merely as

1    summaries and analyses of testimony and documents in the case

2    and are here to act as visual aids for you.  It is the

3    underlying evidence and the weight which you attribute to it

4    that gives value and significance to these charts.  To the

5    extent that the charts conform to what you determine the

6    underlying facts to be, you should accept them.  To the extent

7    the charts differ from what you determine the underlying

8    evidence to be, you may reject them.

9            In this case you have heard evidence in the form of

10   stipulations of testimony.  A stipulation of testimony is an

11   agreement between the parties that, if called as a witness, the

12   person would have given certain testimony.  You must accept as

13   true the fact that the witness would have given that testimony.

14   However, it is for you to determine the effect to be given that

15   testimony.

16           In addition, you have also heard evidence in the form

17   of stipulations of fact.  A stipulation of fact is an agreement

18   between the parties that a certain fact is true.  You must

19   regard such agreed-upon facts as true.

20           Under your oath as jurors you are to evaluate the

21   evidence calmly and objectively, without sympathy or prejudice.

22   You are to be completely fair and impartial.  You are to be

23   guided solely by the evidence in this case and the crucial

24   bottomline question that you must ask yourselves as you sift

25   through the evidence is:  Has the government proven the

1    elements of the crimes charged beyond a reasonable doubt?

2              It would be improper for you to consider, in deciding

3    the facts of the case, any personal feelings you may have about

4    the race, religion, national origin, sex, disability, or age of

5    any party or witness or any other such irrelevant factor.  It

6    would be equally improper for you for allow any feelings you

7    might have about the nature of the crimes charged to interfere

8    with your decision making process.  All parties are entitled to

9    the same fair trial at your hands.  They stand equal before the

10   law and they are to be dealt as equals in this court.  If you

11   let fear or prejudice or bias or sympathy interfere with your

12   thinking, there is a risk that you will not arrive at a true

13   and just verdict.

14             If you have a reasonable doubt as to the defendant's

15   guilt with respect to a particular count, you should not

16   hesitate to render a verdict of acquittal on that charge.  But,

17   on the other hand, if you should find that the government has

18   met its burden of proving the defendant's guilt beyond a

19   reasonable doubt with respect to a particular count, you should

20   not hesitate because of sympathy or any other reason to render

21   a verdict of guilty on that charge.

22             In determining whether the government has proven the

23   charges beyond a reasonable doubt, you should not consider the

24   question of possible punishment, in the event you are to find

25   the defendant is guilty as charged.  The duty of imposing a

1    sentence rests exclusively upon the court.  Your function is to

2    weigh the evidence in the case and to determine whether or not

3    the defendant is guilty beyond a reasonable doubt solely upon

4    the basis of such evidence.

5          Therefore, I instruct you that you cannot allow a

6    consideration of the punishment which may be imposed upon a

7    defendant, if he is convicted, to influence your verdict in any

8    way, or in any sense enter into your deliberations.

9          Now, concerning deliberations.  You will soon retire

10   to decide the case.  It is your duty to consult with one

11   another and to deliberate with a view to reaching an agreement.

12   Each of you must decide the case for yourself, but you should

13   do so only after consideration of the case with your fellow

14   jurors.  Your verdict and the answers to each of the questions

15   on the verdict form must be unanimous.  Discuss and weigh your

16   respective opinions dispassionately, without sympathy,

17   prejudice, or favor toward either party, and adopt that

18   conclusion which in your good conscience appears to be had in

19   accordance with the truth.

20         As you deliberate, please listen to the opinions of

21   your fellow jurors and ask for an opportunity to express your

22   own views.  Every juror should be heard.  No one juror should

23   hold center stage in the jury room and no one juror should

24   control or monopolize the deliberations.  You should all listen

25   to one another with courtesy and respect.  If, after stating

1   your view, and if after listening to your fellow jurors, you

2   become convinced that your view is wrong, do not hesitate

3   because of stubbornness or pride to change your view.  On the

4   other hand, do not surrender your honest convictions and

5   beliefs concerning the weight or effect of the evidence solely

6   because of the opinions of your fellow jurors or because you

7   are outnumbered or for the mere purpose of returning a verdict.

8   Your final vote must reflect your conscientious belief as to

9   how the issues should be decided and your verdict must be

10  unanimous.

11         You are not to is discuss the case until all jurors

12  are present.  Nine or ten or even eleven jurors together is

13  only a gathering of individuals.  Only when all of the jurors

14  are present do you constitute a jury, and only then may you

15  deliberate.

16         If any of you took notes during the course of the

17  trial, you should not show your notes or discuss your notes

18  with any other juror during your deliberations.  Any notes you

19  have taken are to be used solely to assist you and are not a

20  substitute for the transcript of the testimony, which has been

21  taken down verbatim by the court reporters.  The fact that a

22  particular juror has taken notes entitles that juror's views to

23  no greater weight than those of any other juror.  And please

24  remember that if notes were taken during the lawyers'

25  arguments, the lawyers' arguments are not evidence.

1          Now the documentary but not the physical or

2     audiovisual exhibits will be sent to you in the jury room.  If

3     you want any of the testimony read back, that can be arranged.

4     Please appreciate that it is not always easy to locate the

5     testimony that you might want, so be as specific as possible as

6     to what witness and what portion of that witness's testimony

7     you would like to hear.

8          Any communication with the court should be made in

9     writing, signed by your foreperson and given to the marshal,

10    who will be outside the jury room while you deliberate.  I will

11    respond to any questions or requests you have as promptly as

12    possible, either in writing or by having you return to the

13    courtroom so I can speak with you in person.  In any event, do

14    not tell me or anyone else how the jury stands on any issue

15    until after a unanimous verdict is reached.  So do not ever

16    indicate, in a note or otherwise, what the vote is or which way

17    the majority is leaning or anything like that.

18         Your first task when you retire to deliberate is to

19    select by your own vote one of you to sit as your foreperson.

20    You are free to select any foreperson you like.  The foreperson

21    does not have any more power or authority than any other juror,

22    and his or her vote or opinion does not count for any more than

23    any other juror's vote or opinion.  The foreperson is merely

24    your spokesperson to the court.  The foreperson will preside

25    over your deliberations and will be your spokesperson here in

JBK9SCO7                          Charge

1    court.  He or she will send out any notes, and when the jury

2    has reached a verdict, he or she will notify the marshal that

3    the jury has reached a verdict, and he or she will come into

4    open court and give the verdict.  During your deliberations,

5    please communicate with the court only in writing and only

6    through your foreperson.

7            The foreperson will receive a verdict form on which to

8    record your verdict.  It lists the questions that you must

9    resolve based on the evidence and the instructions that I have

10   given you.  And when the foreperson has completed the form, he

11   or she must sign his or her name, and form will be marked as a

12   court exhibit.

13           Now the most important part of this case, Members of

14   the Jury, is the part that you as jurors are about to play as

15   you deliberate on the issues of fact.  It is for you, and you

16   alone, to decide whether the government has proved beyond a

17   reasonable doubt each of the essential elements of the crimes

18   with which Mr. Scott is charged.  If the government has

19   succeeded on a particular count, your verdict should be guilty

20   as to that count; if it has failed, your verdict should be not

21   guilty.  I know you will try the issues that have been

22   presented to you according to your oath that you have taken as

23   jurors.  In that oath you promised that you would well and

24   truly try the issues in this case and render a true verdict

25   according to the law and the evidence, impartially and fairly,

without prejudice or sympathy.  Your function is to weigh the

evidence in the case and determine whether the government has

proved beyond a reasonable doubt the guilt of the defendant of

the crimes charged in the indictment.

As I previously stated, your verdict must be

unanimous.  Again, if at any time you are not in agreement, you

are not to reveal the standing of the jurors -- that is, the

split of the vote -- to anyone including me at any time in your

deliberations.  At this time, the regular jurors will begin

their deliberations or tomorrow morning.  Nevertheless, the

alternate jurors are not quite excused.  While the jury

conducts its deliberations you do not have to be in court but

you should give Ms. Rivera your phone numbers where you can be

reached, because it is possible that one or more of you could

be needed to deliberate if a regular juror is unable to

continue.

Ms. Rivera will call you if deliberations are

completed without our needing you so that you will know that

you are completely finished.  Between now and then, you must

continue to observe all of the restrictions I have instructed

you on throughout the trial.  That is, you must not discuss

this case with anyone, including your fellow alternate jurors,

the regular jurors, other people involved in the trial, members

of your family, friends, coworkers, or anyone else.  You may

not communicate with anyone about the case on your cellphone,

JBK9SCO7                    Charge

1    through e-mail, text messaging or by way of other social

2    networking websites such as Facebook and LinkedIn.  Do not at

3    all speak with any of the parties, the witnesses, or the

4    attorneys.  Do not permit anyone to discuss the case with you.

5    Do not friend or follow one another or any participant in the

6    trial on Facebook, Twitter, LinkedIn or any social networking

7    website.  Do not even remain in the presence of anyone

8    discussing the case.  If anyone approaches you and tries to

9    talk to you about the case, please report that to me, through

10   Ms. Rivera immediately.

11          Do not listen to or watch or read any news reports

12   concerning this trial if there were to be any; do not do any

13   research on the internet or otherwise; and do not visit any

14   places mentioned during the trial or conduct any investigation

15   of your own, including on social media.  Should you be asked to

16   participate in reaching a verdict in the case, the only

17   information you will be allowed to consider in deciding this

18   case is what you learned here in the courtroom during the

19   trial.

20          I'm sorry that you will probably miss the experience

21   of deliberating with the jury, but the law provides for a jury

22   of twelve persons in this case.  So, before I let you go, I

23   just need to have a word with the attorneys at sidebar and I'll

24   be right with you.

25          (At sidebar)

1            THE COURT:  Any substantive misstatements?

2            MR. DiMASE:  Not a misstatement but one addition that

3    I didn't realize hadn't made it into the final charge.  I

4    apologize.  I think the parties agree that on page 21 in the

5    fourth paragraph under evidence of a scheme or artifice that at

6    the end of the phrase "intentional concealment of material

7    facts," the phrase "which made what was said under the

8    circumstances misleading."

9            THE COURT:  I thought we put that in there.

10           MR. DiMASE:  I know that the Court did discuss adding

11   it and agreed to add it.  I just don't see it in the charge.

12           MR. DEVLIN-BROWN:  We didn't see it there either and

13   hoped it would be added.  I think we are both in agreement.  It

14   could be are read, that paragraph, and then corrected maybe

15   overnight.

16           MR. DiMASE:  Corrected in whatever is given to the

17   jury when they're deliberating.  Thank you.

18           (In open court)

19           THE COURT:  Forgive me, ladies and gentlemen.  There

20   was something that I meant to include and it will be included.

21   We'll give you an updated version.  At page 21.  In the last

22   full paragraph than begins "In order to prove the second

23   theory," if you go to the third line from the bottom.  The last

24   sentence should read:  Deceitful statements of half-truth, the

25   intentional concealment of material facts which made what was

1    said under the circumstances misleading and the expression of

2    an opinion not honestly entertained may constitute false or

3    fraudulent representations under the statute.  OK.  So the part

4    that was missing was "the intentional concealment of material

5    facts which made what was said under the circumstances

6    misleading."  And I will get you an updated version.  OK.  And

7    with that, Ms. Rivera.

8              (Marshal sworn)

9              THE COURT:  Now, ladies and gentlemen, I assume that

10   you will not with want to begin deliberations this evening.

11   You can if you want to but I assume that you will not.

12             Now I will stick with our original schedule, 9:30 to

13   2:30.  So don't begin deliberating until all of you are in the

14   room.  And if one of you has to go outside to make a phonecall

15   or smoke a cigarette or whatever, then you should stop

16   deliberating until all twelve of you are in the room.  We will

17   not bring you out to make sure all twelve of you are here.

18   We'll know.  But you can stay as long as you want.  You don't

19   have to leave at 2:30.  You can stay as long as you want.  I

20   think we'll have a regular lunch starting tomorrow.

21             If you have a note we will -- I will make sure that we

22   get back to you as soon as possible but I will be giving the

23   lawyers a lunch period, so approximately from 12:30 to 1:30, if

24   you have a note, it may take us a little longer to get back to

25   you, but we'll get back to you as soon as we can.  Until then

have a wonderful evening. Do not discuss the case until you are all present in the jury room tomorrow.

(At 3:13 p.m., the jury was excused to commence deliberations at 9:30 November 21, 2019)

THE COURT: OK. You can all sit down or leave. By the way, I told the jury that I would give you guys a lunch hour. I lied. If we get a note you should be like within five minutes, OK. Unless there's anything else.

MR. DEVLIN-BROWN: No, your Honor.

MR. DiMASE: No.

(Adjourned to November 21, 2019 at 9:30 a.m.)

1                      INDEX OF EXAMINATION

2   Examination of:                              Page

3   MICHELLE JULIAN

4   Cross By Mr. DiMase  . . . . . . . . . . . .1853

5                      DEFENDANT EXHIBITS

6   Exhibit No.                              Received

7    281 and 278   . . . . . . . . . . . . . . .1859

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25