JBL3SCOF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                        17 CR 630 (ER)

MARK S. SCOTT,

         Defendant.

------------------------------x

                              New York, N.Y.
                              November 21, 2019
                              9:20 a.m.

Before:

                    HON. EDGARDO RAMOS,

                               District Judge

                    APPEARANCES

GEOFFREY S. BERMAN,
     United States Attorney for the
     Southern District of New York
CHRISTOPHER DiMASE
NICHOLAS FOLLY
JULIETA V. LOZANO
     Assistant United States Attorneys

COVINGTON & BURLING LLP
     Attorneys for Defendant
BY:  ARLO DEVLIN-BROWN
     KATRI STANLEY
     -AND-
DAVID M. GARVIN

1          (In open court; jury not present)

2          MR. DiMASE:  Good morning, your Honor.  We're very

3     sorry.  We didn't realize we were required to be here at 9 a.m.

4     today.

5          THE COURT:  Me either until I got in this morning and

6     saw the letter.  But we also need to get the exhibits together

7     and get them for the jury.

8          MR. DiMASE:  Yes.  The paralegals on our end are

9     burning a disc, we have a clean laptop.  We are hoping it will

10    be ready by 9:30, but if not 9:30, shortly thereafter.

11         MR. DEVLIN-BROWN:  On the exhibit issue, would the

12    idea be for the defense to put our exhibits on a USB drive and

13    put it on the same laptop?

14         MR. DiMASE:  However they'd like to do it, paper or

15    digital.  We do have a list of all of the exhibits which we're

16    happy to share with the defense.  They can check it, they can

17    look at the descriptions.  They are very sterile descriptions.

18    We tried to keep them that way.

19         THE COURT:  You described the exhibits?

20         MR. DiMASE:  Say it again?

21         THE COURT:  You described the exhibits?

22         MR. DiMASE:  It says, for example, "e-mail from Mark

23    Scott to Ruja Ignatova dated" whatever.  That's the level of

24    detail.  So that the jury can use it to try to find something

25    if they are looking for it.  Otherwise, it's kind of a useless

JBL3SCOF                         Deliberations

 1    document.  But there is no subject line.  There is no content.

 2                    THE COURT:  Let them see it.

 3                    MR. DEVLIN-BROWN:  Yes.  I haven't heard of that

 4    practice before.  It doesn't necessarily sound appropriate to

 5    have a extrajudicial document guiding them through the

 6    exhibits. And certainly I think we'd want to see it and have an

 7    opportunity to put our exhibits on there, and we are just

 8    hearing about this now.

 9                    MR. DiMASE:  That's fine.  There are so many e-mails

10    in this case.

11                    THE COURT:  I understand.  But you only have the

12    government exhibits on that list?

13                    MR. DiMASE:  Right now, yes, that's correct.  If the

14    defense wants to provide us with their list, we are happy to

15    incorporate it.  That's not an issue.

16                    MR. DEVLIN-BROWN:  We didn't know we were doing that.

17    But, we'll work it out, if you can maybe send us --

18                    MR. DiMASE:  If the Court prefers, we don't have to

19    send that back.

20                    THE COURT:  Let's not do that.  I'm more concerned

21    about getting them the actual exhibits that are in evidence as

22    soon as possible.

23                    MR. DiMASE:  Understood.

24                    Your Honor, we haven't fully researched the issues

25    raised in the defendant's letter of late last night.  So if the

JBL3SCOF                    Deliberations

1    Court is inclined to grant this request, we would ask for a

2    little bit more time.

3           But, in brief, based on what we have looked at, first

4    of all, this is way too late in the game.  This is basically

5    sandbagging the government after the closings.  The government

6    could have addressed these issues in the closing statements if

7    that was known to the government that this kind of request

8    would be made.  So, it's too late in the game for this kind of

9    instruction be given.

10          But more to the point, your Honor, these cases appear

11   to be pretrial motions, not jury instructions.  It is a

12   completely different context.  And in any event, there is ample

13   evidence in the record that this was not an extraterritorial

14   wire scheme that happened all outside the United States.

15   There's recording of Ruja discussing the opening of the U.S.

16   market.  That's in evidence.  There are two victims in the

17   United States who testified about investing and about the

18   promoters who introduced them to the wire fraud scheme here in

19   the United States.

20          In light of that evidence, this instruction just isn't

21   needed.  It doesn't add anything to the instructions that the

22   the Court has already given.  The issue of extraterritorial

23   wire fraud is not really an issue in this case.  And of course

24   there were also meetings, OneCoin meetings and conferences,

25   here in the United States as the witnesses testified.

1            MR. GARVIN:  Yes, your Honor.  Your Honor, when we

2       went through the jury instructions yesterday evening with

3       Mr. Scott, Mr. Scott said I'm confused, does that -- does that

4       mean that if Ruja Ignatova and their OneCoin scheme raised $100

5       million in China, but did not raise any of those proceeds from

6       the wire fraud in China from anyone located in the United

7       States, and IMS sent the $100 million to me in the Cayman

8       Islands, is that wire fraud under 1343 a crime in the United

9       States.  And I told him no.  He said, well, I'm reading pages

10      14 and 15 of these instructions, and it seems like it is.  And

11      I said, well, wire fraud in the United States is a domestic

12      type of statute.  It has been held not to have extraterritorial

13      reach.  There has to be some connection to the United States.

14           For example, if there was a wire fraud in the United

15      States and Mr. Horn sent his money to Mr. Mark Scott, even

16      though your account was in the Caymans, that would make wire

17      fraud a specified unlawful activity.  He said, well, I

18      appreciate that, but that never happened.  And the way that it

19      is written now, I could be convicted on crimes that occurred in

20      Germany or in Singapore, wire frauds that happened in those

21      jurisdictions, the proceeds of those wire frauds being sent to

22      Fenero in Cayman, never being sent to the United States.  And I

23      don't think that that's right.  Please move this Honorable

24      Court to try to solve that problem before the jury starts to

25      deliberate.

JBL3SCOF                    Deliberations

1              So, your Honor, I spent a few hours yesterday looking

2      at the cases.  And trying to in my own mind formulate what the

3      issues were.  And I can give the government a copy.  Your

4      Honor, may I approach to hand up a document?  It just basically

5      has some cites of cases and the issue as I -- but, ultimately,

6      I ended up relying primarily on the cases cited on the proposed

7      jury instruction and tried to formulate a supplemental

8      instruction that would cure the problem that at the same time

9      not be objectionable to the United States.

10             I think I've pretty much described what is the

11     problem.  To be proceeds of a specified unlawful activity, if

12     that unlawful activity is wire fraud, then the proceeds of that

13     wire fraud have to started in the United States, at least a

14     portion of them.  And because if they are proceeds of a wire

15     fraud in Germany, because it's not an extraterritorial statute,

16     under 1343, cannot be the proceeds of an unspecified unlawful

17     activity.  And therefore, money laundering can't have occurred

18     if the specified unlawful activity is not present.

19             So, what we have here are charts that show vast

20     amounts of money coming from different parts of the world.  But

21     if those funds were from a wire fraud in those particular

22     countries, that is not a wire fraud under 1343 and not a

23     specified unlawful activity.  And if the jury convicts

24     Mr. Scott because it finds that OneCoin -- this is only an

25     example -- OneCoin committed a wire fraud in Singapore and

1    raised $100 million, and sent that $100 million to the Cayman

2    Islands to the Fenero Funds, that would be incorrect.

3           But we see that the way that things stand right now,

4    that actually might happen unless we can convince both the

5    United States and this Honorable Court that we have to prevent

6    that, because quite frankly, I don't think there is anybody in

7    this courtroom that would ever want to try this case twice.

8    And since the jury has not started to deliberate, I will note

9    that the United States yesterday saw a mistake that both

10   parties made, and got to the Court's attention, and the Court

11   was able to address it with counsel.

12          THE COURT:  That was a very different type of mistake.

13   That was just a failure to put in language that everyone agreed

14   should be in.  This is new.

15          MR. GARVIN:  Well, perhaps we will be able to agree to

16   some language, your Honor.  But, I think that it is a true

17   statement that since the Supreme Court has ruled and I think it

18   was -- I'm trying to use my --

19          MR. DiMASE:  Your Honor --

20          MR. GARVIN:  That was RJR Nabisco, that's at 136 S.Ct.

21   2090.  I believe that in that particular case, the Court

22   reversed the Second Circuit to make its decision.

23          But the case that we rely upon now, in European

24   Community, which is a Second Circuit case, 764 F.3d 129, it

25   says that "We therefore hold that a claim predicated on mail or

1  wire fraud involves sufficient domestic conduct when (1) the

2  defendant used domestic mail or wires in furtherance of a

3  scheme to defraud; and (2) the use of the mail or wires was a

4  core component of the scheme to defraud."

5         So, we see that there is a potential problem, we're

6  bringing it to this Honorable Court's attention, and hopefully,

7  or at least requesting that we attempt to address this problem

8  before the jury starts to deliberate.

9         MR. DiMASE:  Your Honor, just briefly.  First of all,

10  the time period for making these kinds of objections passed.

11  We're after the closings.

12         Secondly, this is a legal issue.  If the defendant

13  wanted to raise this as a legal defense in a motion to dismiss,

14  that time has passed.  That's what this case is about.  It is

15  not about the jury instructions, it is about pretrial motions.

16  So, the time to make a legal argument to this Court about

17  extraterritoriality has passed.

18         We are now at the jury instruction stage, and the jury

19  instructions are correct.  They correctly lay out the elements

20  of wire fraud, and I'll point the Court and counsel to page 15,

21  "The third and final element that the government must prove

22  beyond a reasonable doubt is that in the execution of that

23  scheme, one or more participants in the scheme used or caused

24  the use by others of interstate or foreign wires (for example,

25  wire transfers, phone calls, e-mail communications, or text

JBL3SCOF                    Deliberations

messages).  An interstate wire is a wire that passes between

two or more states.  A foreign wire is a wire that passes

between the United States and someplace outside the United

States."

        That is the jurisdictional element of wire fraud.   It

captures the concept of jurisdiction here in the United States.

And the jury has been properly instructed about that element.

The instructions by the defense are not instructions regarding

the elements of the crime.  They are not part of the typical

and standard instructions on wire fraud, and they do not need

to be given to the jury.

        MR. GARVIN:  Your Honor, may I respond to that very

briefly?

        THE COURT:  Sure.

        MR. GARVIN:  I don't agree with counsel that this is

limited to a pretrial motion to dismiss.  I believe also that I

recall that Mr. Devlin-Brown had moved for Rule 29, and as to

the money laundering aspect that was preserved.  And at this

point, I believe that the standard is that a request for a jury

instruction that is an accurate statement of the law, and prior

to the jury deliberating, should be considered by the Court.

And it is up to the Court to make a decision as to whether the

requested jury instruction would aid the jury in understanding

and applying the facts to the law.

        I'm repeating myself that the way that the pages 14

1    and 15 of the jury instructions are currently written, that

2    there is a significant chance that Mr. Scott could be convicted

3    on a wire fraud scheme that took place in Singapore, resulting

4    in OneCoin obtaining hundreds of millions of dollars, and

5    transferring those funds to the Cayman Islands into the Fenero

6    accounts.  And the proceeds of that illegal activity would not

7    have been sourced in the United States, would have no

8    connection to the United States, and could he could still be

9    found guilty.

10            THE COURT:  Is your argument premised on the fact that

11   no wire fraud activity took place in the United States?

12            MR. GARVIN:  My argument is premised on there appears

13   to be no evidence that the proceeds of a wire fraud that took

14   place in the United States --

15            THE COURT:  I understand that.  But, is it premised on

16   the fact that no wire fraud activity took place in the United

17   States?

18            MR. GARVIN:  No, I think that the government has put

19   on two witnesses, both Linda Cohen and Mr. Horn, that said

20   there was wire fraud activity that took place in the United

21   States.  Because they sent their funds as a result of what they

22   said were misleading or outright lies to them.  So, I don't

23   think that I can answer that that's my position, no, your

24   Honor.

25            THE COURT:  Okay.

JBL3SCOF                        Deliberations

1           MR. DEVLIN-BROWN:  Could I -- just sorry to tag team.

2   Could I make two quick points, your Honor?

3           THE COURT:  Absolutely.

4           MR. DEVLIN-BROWN:  Thank you.  So, I think the issue

5   that you just asked Mr. Garvin about, is not that there's no

6   conduct in the wire fraud scheme in the U.S.  The issue would

7   be if it's de minimus, and if 98 percent of the wire fraud

8   activity is aimed outside the United States, you have some

9   minor activity in the U.S.  That's the issue where the

10  extraterritorial reach of the statute could be questioned under

11  some of the law we cited.

12          The only other point I want to clarify is to

13  Mr. DiMase's point that this would be a pretrial jurisdictional

14  motion.  I disagree with that.  Because Mr. Scott's not charged

15  with wire fraud.  He is charged with money laundering.  Money

16  laundering has a pretty broad jurisdictional reach.  We didn't

17  make a pretrial motion on that.  The issue is the SUA for money

18  laundering, which was specified as wire fraud in one of the

19  final superseding indictments.  There's two questions.  One is

20  whether there is sufficient evidence of the SUA, and we did

21  make a Rule 29 and we'd like the opportunity at whatever

22  appropriate point to fully brief that, because that would be

23  part of that, and the other issue is simply should the jury,

24  could the jury benefit from some further instructions on wire

25  fraud.

1          I think giving an instruction that tracks Second

2     Circuit language, I certainly don't think there is any problem

3     with that.  I think it could add clarity for the jurors and

4     could be to the benefit of all parties, frankly.

5          MR. DiMASE:  Judge, the defense knew from the

6     beginning of this case that wire fraud was the SUA.  We

7     disclosed that very early on.  So the argument that they only

8     found out at the time of the superseding indictment is not

9     accurate.  And they had a full opportunity, SUA is part of the

10    money laundering conspiracy charge, it is an element of the

11    charge.  It would be appropriate to move on a jurisdictional

12    basis to dismiss pretrial if that was the real concern here.

13         And as far as the facts of this case, I mean, I don't

14    know where the term de minimis is in the cases.  I am not sure

15    I saw that.

16         But in any event, the evidence in this case is clear

17    there was not a de minimis impact on the U.S.  There was plenty

18    of evidence about conferences here, about promoters here, about

19    people sending wires internationally as a result of those of

20    OneCoin's activities, of Ruja's opening of the U.S. market, I

21    mean, that hardly constitutes de minimus involvement with the

22    United States.

23         But the bottom line, the most important point is these

24    are the jury instructions given in this district on a regular

25    basis that accurately set forth the elements of wire fraud, and

JBL3SCOF                        Deliberations

the jurisdictional element requiring that wires pass between

U.S. states or internationally, which is the jurisdictional

element of wire fraud, is clearly defined in these jury

instructions.  And no further instruction is needed.

            THE COURT:  I'm not going to give the instruction.  I

think that as the parties agreed before last night, the

instruction that was given concerning wire fraud is an

appropriate instruction.  There is evidence in the record

concerning domestic transactions that are part of the alleged

wire fraud scheme.  I cannot characterize them as de minimus.

The two victim witnesses that did testify -- I'm sure more

could have testified, I assume -- each indicated that they were

part of a larger group of people that invested in OneCoin.

There was testimony by Mr. Horn about various conferences that

he went to, including one several states away.

            So there is certainly sufficient information for the

jury to determine that venue is appropriate here, and that

jurisdictionally there were or could have been wires, both

foreign and domestic wires, that traveled between states and

foreign jurisdictions.  So I don't think the instruction is

necessary.

            Now, get those exhibits ready.

            MR. DiMASE:  Your Honor, we have a copy of the list we

described which we can share with defense counsel, and I think

we may have another copy that we can share with the Court to

JBL3SCOF                         Deliberations

1    review as well to give a sense of what we prepared.

2              Judge, it turns out we have one copy.  We are getting

3    another copy.  We've provided it to the defense to look at.

4              THE COURT:  I don't need to see it if they are okay

5    with it.

6              MR. DiMASE:  Okay.

7              (Pause)

8              MR. GARVIN:  Your Honor, counsel was nice enough to

9    show us the government's list, but the defense objects to that

10   list with all those descriptions on there.  Our position is

11   that there should not be an index prepared by the government

12   that goes back with the jury that's not in evidence.

13             THE COURT:  Okay.  It will not go.

14             MR. DiMASE:  We do have a clean laptop and a disc

15   containing all of the government exhibits ready at this stage.

16             THE COURT:  Let's get it back to them.

17             MR. DiMASE:  Say it again?

18             THE COURT:  Let's get it back to them.

19             MR. DiMASE:  Okay, we also have printed copies of --

20   we also have printed copies of all of the e-mails.  We're happy

21   to send the printed copies along with the disc and the laptop.

22   The bank records are not printed out because it would be too

23   voluminous.  But we're fine just sending the CD or the CD and

24   the printed e-mails.

25             THE COURT:  Send them both.

1          MR. DiMASE:  Okay.

2          THE COURT:  And when are you guys going to be ready?

3          MR. DEVLIN-BROWN:  We are just making the final

4     redaction based on something yesterday, and we'll have a binder

5     of defense exhibits and a USB drive that presumably can go into

6     the same --

7          MR. DiMASE:  We can make sure it works.  That's not a

8     problem.

9          MR. DEVLIN-BROWN:  Okay.  Perhaps we can copy it on

10    the hard drive of the laptop?  Make it easier.

11         MR. DiMASE:  That's fine, if it works.  We can do that

12    with the disc as well.

13         THE COURT:  All the jurors are here.  So get that done

14    as soon as possible so we can get it into them.  I am going to

15    go upstairs, and let me know if you need me.

16         (Recess pending verdict)

17          (In open court; jury not present)

18         MR. GARVIN:  Your Honor, I apologize for not saying

19    this earlier, but it dawned on me that I may not have

20    adequately protected the record for Mr. Scott on that last

21    matter.  Because I didn't actually say that we objected to the

22    Court's instructions on pages 14 and 15 and the Court's ruling

23    on not supplementing it.  I'm not stating that to reargue it.

24    I just wanted to make sure, if someone ever reads the

25    transcript, I tried to protect it by stating that the defense

1    objects.  I appreciate the opportunity to put it on the record.

2              THE COURT:  Okay.  Where are you guys on the exhibits?

3              MR. FOLLY:  The paper versions we have ready on the

4    government's side.  I believe defense counsel's --

5              MR. DEVLIN-BROWN:  There is one we are adding, but we

6    can send this back and we're happy to put it in a folder and

7    send it later.  Whatever you prefer.

8              MR. FOLLY:  That's fine.  Separately, the laptop, we

9    are --

10             THE COURT:  What's going back?  So that binder?

11             MR. DEVLIN-BROWN:  Yes.

12             MS. LOZANO:  And these are all the e-mails.

13             THE COURT:  So let's roll that back so we can get it

14   in there, Ms. Guerrero.

15             What are these charts, some of these charts?

16             MS. LOZANO:  All of these are, yes, but they're also

17   on the disc.  We can send them back now or if they ask for

18   them.

19             THE COURT:  Let's get everything back.

20             MR. DEVLIN-BROWN:  I suppose we should put our box in

21   there as well.

22             THE COURT:  Is that an exhibit, the box?

23             MR. DEVLIN-BROWN:  All the records in it are, yes.  At

24   least it evens it out a little bit.

25             THE COURT:  Mr. Devlin-Brown, you had another binder

 1   that's going back you said?

 2           MR. DEVLIN-BROWN:  No, it's in there.

 3           THE COURT:  Okay.  Unless there is anything else, I'm

 4   going to absent myself.

 5           MR. DEVLIN-BROWN:  Thank you.

 6           (Recess pending verdict)

 7           (In open court; jury not present.  Time noted

 8   10:25 a.m.)

 9           THE COURT:  We have received two notes from the jury.

10   Court Exhibit 2, "Can we have an easel and sticky notes?"  And

11   Court Exhibit 3, "Are we allowed to see 2701 (the summary

12   timeline)?"

13           Is there a hard copy of the summary timeline that went

14   in or were those just e-mails?

15           MR. FOLLY:  Your Honor, we believe there is a hard

16   copy that was included in what went back.  But we can also

17   print an additional copy just to make sure.

18           THE COURT:  Okay.  Let's do that.  Actually let's

19   print up several copies.

20           MR. FOLLY:  Yes, your Honor.

21           THE COURT:  We will respond to these notes.  I don't

22   think there is any need to bring them out.

23           MR. DEVLIN-BROWN:  No.

24           MS. LOZANO:  No.

25           THE COURT:  We'll get you copies of these notes.  They

1   are not signed, by the way, so we don't know --

2            MS. LOZANO:  Your Honor, we have a few pads of sticky

3   notes.  I'm not sure if the Court has already provided that to

4   the jurors or not.

5            THE COURT:  We'll send those back.

6            MS. LOZANO:  Okay.

7            THE COURT:  How long do you think that will take?

8            MR. FOLLY:  Probably 10 minutes, your Honor.

9            THE COURT:  When they get here, just give them to

10  Ms. Guerrero and she'll take them in to the jury.

11           MS. LOZANO:  Okay.

12           (Recess pending verdict)

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court; jury not present)

2           THE COURT:  Is everyone here?

3           MR. GARVIN:  Yes.

4           THE COURT:  We have received a note from the jurors.

5    It will be marked Court Exhibit 4.  It reads "We have reached a

6    verdict."  Signed by the foreperson.

7           Before I bring the jury out, does either side wish me

8    to poll the jury?

9           MR. DEVLIN-BROWN:  Yes, your Honor.

10          THE COURT:  Very well.  The jury will be polled.

11   Ms. Rivera.

12          Just so the parties are aware, it is my custom to

13   speak with the jury briefly afterwards.  I don't discuss the

14   substance of the case.  I ask about the process and how, if at

15   all, we can make the process better for the jurors.

16          (Jury present.  Time noted 1:30 p.m.)

17          THE COURT:  Ladies and gentlemen, we have received a

18   note which has been marked Court Exhibit 4.  It reads "We have

19   reached a verdict."  And it's signed by your foreperson.

20          Who is the foreperson?

21          JUROR NO. 1:  I am, your Honor.

22          THE COURT:  Will you please stand up, sir.

23          Ms. Rivera, will you please get the verdict.

24          Ms. Rivera, please take the verdict.

25          THE DEPUTY CLERK:  As to Count One, conspiracy to

JBL3SCO4                    Verdict

1    commit money laundering, guilty or not guilty?

2              THE FOREPERSON:  Guilty.

3              THE DEPUTY CLERK:  Count Two, conspiracy to commit

4    bank fraud, guilty or not guilty?

5              THE FOREPERSON:  Guilty.

6              THE COURT:  Sir, you may be seated.  I'm now going to

7    ask a question of each of you.  The answer to the question is

8    yes or no.

9              Juror No. 1, is this your verdict?

10             JUROR NO. 1:  Yes.

11             THE COURT:  Juror No. 2, is this your verdict?

12             JUROR NO. 2:  Yes.

13             THE COURT:  Juror No. 3, is this your verdict?

14             JUROR NO. 3:  Yes.

15             THE COURT:  Juror No. 4, is this your verdict?

16             JUROR NO. 4:  Yes.

17             THE COURT:  Juror No. 5, is this your verdict?

18             JUROR NO. 5:  Yes.

19             THE COURT:  Juror No. 6, is this your verdict?

20             JUROR NO. 6:  Yes.

21             THE COURT:  Juror No. 7, is this your verdict?

22             JUROR NO. 7:  Yes.

23             THE COURT:  Juror No. 8, is this your verdict?

24             JUROR NO. 8:  Yes.

25             THE COURT:  Juror No. 9, is this your verdict?

1      JUROR NO. 9:  Yes.

2      THE COURT:  Juror No. 10, is this your verdict?

3      JUROR NO. 10:  Yes.

4      THE COURT:  Juror No. 11, is this your verdict?

5      JUROR NO. 11:  Yes.

6      THE COURT:  Juror No. 12, is this your verdict?

7      JUROR NO. 12:  Yes.

8      THE COURT:  So say you all.

9      Ladies and gentlemen, your job as jurors has now

10     ended.  And on behalf of the parties and the court system, I

11     want to thank you for your service.  I hope you appreciate what

12     an important role you play in our justice system.  It is a

13     defining aspect of our criminal justice system that when we

14     have these very difficult decisions to make, we literally turn

15     to our neighbors, and depend on your collective wisdom to help

16     us figure out these very, very difficult issues.  So thank you.

17     And I hope that when you return home, when you come

18     across friends and family members who lament the fact that they

19     received a letter to appear for jury duty, that you tell them

20     just how important it is, and how important it is that we all

21     take part in this process.

22     You are now relieved.  You can speak about this case

23     with whomever you want, or speak about it with no one.  Some of

24     the lawyers or some of the participants may want to ask you

25     questions as you leave.  If you wish to speak with them, feel

JBL3SCO5

1    free to do so.  If you do not want to speak with them, just

2    politely tell them so and go back to your normal life.

3              I am going to ask you for a couple of minutes to wait

4    in the jury room so I can come in.  Okay.

5              (Jury dismissed)

6              THE COURT:  Mr. Garvin or Mr. Devlin-Brown, did you

7    wish to make a motion?

8              MR. DEVLIN-BROWN:  We would renew our Rule 29 motion

9    and would like, if it's okay with the Court, until December 20

10   to brief a Rule 29, Rule 33 motion.

11             THE COURT:  Very well.  Anything from the government?

12             MR. DiMASE:  One moment.  We do have a bail

13   application, your Honor.  I don't know if you want to address

14   the jury first.  I imagine it's going to be opposed, so it may

15   take a little while to resolve.

16             THE COURT:  Okay.  So then give me five minutes.

17             MR. DiMASE:  Thank you.

18             (Recess)

19             (In open court)

20             THE COURT:  Mr. DiMase.

21             MR. DiMASE:  Yes, your Honor.  At this stage we are

22   seeking the remand of the defendant.  I'm prepared to argue if

23   the Court is ready to go forward.

24             THE COURT:  Okay.

25             MR. DiMASE:  Your Honor, the circumstances have

JBL3SCO5

dramatically changed for Mr. Scott at this point, and the law

recognizes the difference between individuals who are released

on bail pending trial and bail circumstances pending sentence.

Specifically, Section 3142 regarding bail pending

trial, the standard there is the defendant shall be released on

recognizance or bond unless the judicial officer determines

that such release will not reasonably assure the appearance of

the person or endanger the safety of any other person.

Whereas the standard flips entirely for bail pending

sentence under Section 3143, which provides that the defendant

shall be detained unless the judicial officer finds by clear

and convincing evidence that the person is not likely to flee,

or pose a danger to the safety of a person or the community.

And the government's argument here is that the

defendant cannot show by clear and convincing evidence that he

does not pose a serious flight risk.

Obviously, Mr. Scott had every right to go to trial.

He obviously believed he had a chance at succeeding.  He has

now been convicted.  The circumstances are therefore entirely

different with respect to his state of mind around flight.  He

faces very, very substantial jail time in this case.  Prior to

the superseder --

THE COURT:  I haven't done the guidelines analysis,

Mr. DiMase.  Have you?

MR. DiMASE:  We did the guidelines analysis prior to

JBL3SCO5

1    the superseder with the additional 30 years.  So, the defendant

2    now faces a statutory maximum of 50 years' imprisonment between

3    the 20 years on the money laundering count and the 30 years on

4    the bank fraud count.  When we calculated the guidelines on the

5    money laundering count alone, the lower end of the guidelines

6    was above 20 years, meaning that the guideline sentence

7    therefore became 20 years because that was the statutory

8    maximum.

9         So for purposes of this proceeding, at least 20 years

10   is the guidelines range that Mr. Scott now faces.  And that is

11   driven largely by the massive amount of money that was involved

12   in the underlying scheme, and in the laundering, frankly.

13        So, he faces a very substantial amount of prison time,

14   and here the concerns, the very real concerns about this

15   defendant's likelihood of flight, Mr. Scott has access to

16   international funds that are stored in accounts all over the

17   world.  As the Court knows from this trial, he set up an

18   international network of bank accounts, both related to the

19   Fenero Funds and also for himself.  And the government has not

20   yet been able to trace all of the money that Mr. Scott earned

21   from the offenses here.

22        THE COURT:  Do you believe he has accounts that you

23   are not aware of?

24        MR. DiMASE:  We believe he does have accounts in

25   Switzerland at a minimum.  There may be other accounts in the

JBL3SCO5

1    Cayman Islands that he has as well.  So, yes.  We believe he

2    does have accounts that we are not aware of.

3           THE COURT:  What's the basis of that?

4           MR. DiMASE:  Well, one big issue, your Honor, is $50

5    million was traced to him in some way or another coming to

6    accounts, but only a portion of that was ultimately identified

7    and seized by the government.  So there are substantial amounts

8    of money that are missing from that large amount of money that

9    he earned through the criminal conduct.

10          THE COURT:  What percentage of that were you able to

11   either seize or track?

12          MR. DiMASE:  I think it might be in the ballpark of

13   half.  Between –– but some of it has been seized in terms of

14   bank accounts, some has been seized in terms of property

15   purchased with criminal proceeds such as Porsches, houses.  My

16   ballpark estimate is somewhere in the ballpark of 25 million.

17          THE COURT:  Okay.

18          MR. DiMASE:  And the concern is the access to a

19   significant amount of money that he could use to both flee and

20   also to live off of if he does flee.

21          The second serious issue here is the defendant's

22   foreign ties.  His mother lives in Germany.  He is a German

23   citizen.  And as we have discussed in prior proceedings before

24   this Court, it is the government's understanding that Germany

25   will not extradite its own citizens back to the United States.

JBL3SCO5

1    So, basically, that means all that Mr. Scott has to do is find
2    a way to get to Germany using the money that the government has
3    not been able to seize, and he can basically live the rest of
4    his life free from the sentence imposed by this Court.
5              THE COURT:  Do you have his passports?
6              MR. DiMASE:  I believe that the government does have
7    his passports.  But, that takes me to the next point, the
8    conduct of the co-conspirators in this case.  There is
9    substantial evidence of the use of false passports by
10   co-conspirators in this case, the use of encrypted phones and
11   other encrypted messaging services, connections to organized
12   crime.  And your Honor, as the Court knows very well at this
13   stage, one of the people in this case has already disappeared
14   without a trace, the person that Mr. Scott coordinated closely
15   with in conspiring to commits the crimes.
16             THE COURT:  He is in a very different situation than
17   Ms. Ignatova.  The government doesn't know where she is.  There
18   was some intimation that she had Russian connections.  So far
19   as I know, Mr. Scott does not.
20             MR. DiMASE:  The concern, your Honor, is he's part of
21   the same network of people who have access to fake passports,
22   crypto phones.  The evidence shows he used a crypto phone in
23   the course of this conduct.  And he has the ability to flee to
24   a place where he cannot be extradited from.  That is a serious
25   risk of flight concern.

JBL3SCO5

1          THE COURT:  But defense also pointed out in the

2     various points that he did all of this in his own name.  He

3     created the Fenero accounts, he bought the homes, he bought the

4     cars, etc.  So he wasn't engaging in the same type of

5     countersurveillance, if you will, as the co-conspirators.

6          MR. DiMASE:  He did it in his own name because he

7     thought he could get away with it, and he thought he could get

8     away with it at this trial, and that's why he went to trial.

9     Now he's been convicted, he faces certain punishment, and he

10    has the ability to flee, the incentive to flee, and a place to

11    go where he cannot be extradited from.

12         But this takes me to the last point which relates to

13    his conduct while on bail.  And the government sort of raised

14    this to the attention of the Court previously by virtue of a

15    restraining order.

16         Mr. Scott, after he was arrested in this case, sent

17    $1.75 million to an attorney who is no longer on the defense

18    team.  And he claimed in the paperwork that he provided the

19    banks that that was for a legal retainer, the entire $1.75

20    million.  The government subsequently restrained that money.

21         He then sent another approximately million dollars

22    through that same attorney's accounts, and then had it sent

23    back to him on the other end, which is very reminiscent of some

24    of the conduct that was the subject of this trial, the use of

25    escrow accounts to hide the illegal source of funds.

JBL3SCO5

1        But, more to the point, in April of this year,

2   Mr. Scott began negotiating the sale of a Porsche.  The

3   government sought the seizure of three Porsches.  When

4   Mr. Scott was arrested, one of those Porsches was seized.

5   Within a month of his arrest, a second Porsche was seized from

6   a dealership where the car was still being held by the dealer.

7   And the government is now in possession of those two vehicles.

8        The third car, which is the subject of a seizure

9   warrant that was provided to the defendant in discovery in

10  October of 2018, was sold by the defendant earlier this year,

11  even though he had the seizure warrant that showed that it was

12  subject to seizure by the government.

13       The government found out about this last night from a

14  SAR —- from a filing that was made by a bank.  And we now have

15  reason to believe he knowingly violated an order of the court

16  by dissipating an asset that he knew was the subject of a

17  seizure warrant.  Selling it to use the funds for himself.  He

18  earned $250,000 for that Porsche.  And he appears to have used

19  it for a variety of different expenses, including to pay credit

20  cards, for personal expenses, and other things.

21       So, this is a defendant who has access to substantial

22  funds in an international network of accounts who has got

23  foreign ties including to a country where he has citizenship

24  and he cannot be extradited, who is part of a network of

25  co-conspirators who have a demonstrated track record of using

JBL3SCO5

1    false passports, encrypted messaging services, and one of whom

2    has completely disappeared.  And, while on bail, the defendant

3    has flagrantly violated orders of this court.

4            All of these things under the statute governing bail

5    pending sentence show that the defendant cannot meet his burden

6    that there is clear and convincing evidence that he will not

7    flee.

8            And for those reasons, your Honor, the government

9    seeks detention at this stage.

10           THE COURT:  Okay.

11           MR. GARVIN:  Your Honor, in response to some of the

12    comments that counsel has made --

13           THE COURT:  Can you bring the microphone closer,

14    please.

15           MR. GARVIN:  Yes, sir.  Counsel stated that Mr. Scott

16    was born in Germany and has the ability if he can get back to

17    Germany not to be deported from Germany.

18           Mr. Scott had surrendered his German passport, and

19    knew from the time that this case started the amounts that were

20    involved were extremely large, and he also knew what effect

21    that would have on the federal sentencing guidelines.  But he

22    has complied with all the requests of the probation department.

23    In fact, Mr. Juan Nuñez spoke with me on at least one occasion,

24    and I brought it to the attention of the Court, that Mr. Nuñez

25    did not oppose taking the GPS ankle bracelet off of Mr. Scott.

JBL3SCO5

1      THE COURT:  What are his current bail conditions?

2      MR. GARVIN:  Well, I think it's two and a half million

3   is the bond, your Honor.  I was not present for the bond

4   hearing.

5      MR. DEVLIN-BROWN:  I believe it was $750,000 cash

6   secured.

7      THE COURT:  What else?  Travel restrictions, ankle

8   bracelet?

9      MR. GARVIN:  Yes.  Ankle bracelet, travel restriction,

10  and I believe he has a curfew, too, and he has to give a

11  schedule a week in advance of where he is going to be the next

12  week.  And if there are any changes in that schedule, he has to

13  contact Mr. Nuñez in advance.

14      With regard to his mother, your Honor, his mother has

15  terminal cancer.  Mr. Scott would not be going back to Germany

16  to be with his mother, because unfortunately, that is not

17  likely to be what will be health-wise permitted in the next

18  several months.  The person who makes arrangements for his

19  mother is Mr. Scott by telephone, and she relies upon that,

20  despite her grave condition.

21      With regard to the money, we presented evidence that

22  Mr. Scott has reported his taxes, his 2016 return he paid

23  significant taxes.  And that the United States has seized

24  virtually everything with regard to bank accounts and real

25  property.  Of course, those items now have liens upon them.

JBL3SCO5

1   They cannot be transferred.

2            And I think that we then really have to deal with the

3   sale of this vehicle.  And your Honor, we would say that when

4   the United States took all the other vehicles, and they did not

5   take this one, Mr. Scott was under the impression that that

6   vehicle was not subject to the Court's order.  And the reason

7   why that vehicle was sold was because he was out of money and

8   he needed to continue to pay his expenses just to survive.  So,

9   that would be inconsistent with someone who has a vast amount

10  of cash stowed away that he would have to sell an asset to be

11  able to --

12           THE COURT:  Were you aware of the seizure warrant?

13           MR. GARVIN:  No, sir.  I was not.

14           THE COURT:  The government represents that it was

15  provided in discovery.

16           MR. DiMASE:  I'll hand a copy to the defense as well,

17  and hand this up to the Court.

18           MR. GARVIN:  I don't dispute it was provided in

19  discovery, your Honor.  But, honestly, there were half a

20  million to a million pages of documentation produced in

21  discovery, and since the seizure had taken place previously, at

22  a time when I was not retained in the case, I did not see it

23  nor did I read it.

24           THE COURT:  Okay.

25           MR. GARVIN:  I would also say, your Honor, that it

just seems fundamentally unfair to say that Mr. Scott has ever

been connected with any type of organized crime.  I understand

that Ruja Ignatova, there was some evidence during trial that

she may have left because she had contacts with some people

that were of Russian descent.  That had absolutely nothing to

do with Mr. Scott.

Mr. Scott has been with his wife and two-year-old baby

son this entire time.  He's known this entire time the gravity

of the situation.  He has done everything that he's been told

to do willingly.  He's cooperated with his probation officer.

Whenever he's called to be someplace, he's there.

And in reality, I fully anticipate, your Honor, that

based upon his prior conduct, that you could anticipate that

Mr. Scott would continue to comply with probation.  But also,

will continue to fight for his innocence in the proper and

legal fashion.

I think that Mr. Scott will -- I mean, even at this

very late stage, he was filing motions with the court and

protecting the record for appeal.

I would also say, your Honor, that there's more to

interplay about letting Mr. Scott self-report to his

sentencing.  I think that it's not wasted on this Court that

when the Bureau of Prisons categorizes a defendant as to the

type of facility that they are going to place him in, one of

the things that they take into consideration is whether the

JBL3SCO5

person was permitted to voluntarily surrender to his

sentencing.  And that is going to affect Mr. Scott for an

extended period of time.

So, I think that we have addressed each of the items

that counsel has stated.  But, as far as what are his reasons

to stay here, because everyone that he loves is here.  His

wife, his child, his only son, his mother has terminal cancer,

going -- there is no one for Mr. Scott to go with.  And the

properties, to the extent that they were purchased prior to

this incident, would be all located here also.

So for all those reasons, we would respectfully ask

that this Honorable Court keep Mr. Scott on the same conditions

of bond and permit him to voluntarily surrender at the time of

his sentencing.

MR. DEVLIN-BROWN:  Can I just add two things briefly,

your Honor.  In terms of the missing money that they haven't

been able to trace.  This is the first we're hearing about it,

and obviously, I don't have to share that.  But when they are

seeking to remand someone based on money that they think is out

there, we don't have an opportunity to respond.  They obviously

traced it into certain accounts.  They could say where they

lost the trail, maybe we have an answer to that.  But we should

at least have the opportunity before the Court makes some

assumption that there is millions and millions out there that

Mr. Scott has access to.

JBL3SCO5

1           I can address the 1.75 million that was transferred to

2     Mr. Nobles at the beginning of the case, because I was involved

3     at that point.  As your Honor may know, there was a lengthy

4     seizure warrant, series of seizure warrants, post-indictment

5     restraining order perhaps as well, identifying certain accounts

6     at banks, not identifying others.  In the early days when

7     Mr. Scott is trying to see if he has some money that is not

8     subject to a seizure warrant, he identified some to be used for

9     counsel, to be used to pay his mother's medical expenses.

10    Transferred it to Mr. Nobles.  The government called us

11    afterwards and say, oh, that's a problem, that account.  We

12    said, oh, it wasn't on your seizure list.  Do you want to tell

13    us any others that are not on your list that we should take

14    care of?  And so I think that's completely understandable.

15          The car, we are just hearing about this now as well.

16    I'd like some opportunity to investigate that.  I guess the

17    government heard about it last night.  I think it's quite

18    reasonable that Mr. Scott may not be parsing every piece of

19    discovery that comes through for various car meddles.  They

20    took several Porsches, they didn't take another.  His funds

21    have been intermingled.  I think before one jumps to

22    conclusions there, one should have an opportunity.

23          This is the last thing I'll say.  It is really a big

24    picture kind of perspective.  Say what you want about

25    Mr. Scott, and the jury has spoken about their views of

JBL3SCO5

Mr. Scott.  But there really is no dispute, I don't think,
that, first of all, he cut off contact with these people in
October, by October 2017 or earlier.  Yes, there is those
e-mails in June where they are fighting about this million
dollar legal retainer, which the government has seized.

        But he's came back here, he planted his roots here
while Ruja and others are flying all over the world.  And he is
committed, I mean, he has been from the outset committed to
fight this.  He is going to continue to do that.  Rule 29, 33,
your Honor, sentencing, he is going to make arguments.  The
guidelines, certainly any case like this, are not the only
factor.  Appeal, and if he loses all of that, he is going to do
his time and he's going to come back to his family and his
baby.  He's never shown a sign of anything other than wanting
to stay here and deal with this, and that remains as true today
as it was yesterday.

        MR. DiMASE:  Your Honor, I just want to make a couple
of quick points.  First of all, we've had situations in other
cases where defendants have obtained a passport in
circumstances just like this and fled.  So it is not
impossible.

        THE COURT:  How many times?

        MR. DiMASE:  I don't know exactly how many times, but
it happened recently in one Mr. Folly's cases.

        MR. FOLLY:  I can speak to this.  This has happened to

JBL3SCO5

me twice in the last two years where there were situations
where defendants, even who are on location monitoring, cut the
bracelet, got a passport, and left the country, and were never
heard from again.

It is not difficult to get a passport, your Honor.
That is not a difficult challenge.  So I'll let Mr. DiMase
continue.  But this would be something that is very easy to
get.  A passport is not an obstacle and neither is a GPS
bracelet.  You can cut the bracelet.  The monitoring does not
get triggered, it's not like the police show up the moment the
bracelet gets cut.  You have at least a day to easily abscond
after cutting your bracelet, so that would not be sufficient
here.

MR. DEVLIN-BROWN:  Just --

MR. DiMASE:  Your Honor, with respect to this car,
this is a crime.  It is a felony crime with or without the
order.  I mean, Mr. Scott knew where the money came from that
he used to buy that car.  He knew it was OneCoin derived.  And
he bought it and then he sold it.  And that's a transaction
using criminal proceeds.  It is a violation of Section 1957.
It is a separate crime from the order.

The order is the bigger point.  This order was
produced with a letter that very specifically described the
Porsche that was subject to the seizure warrant.  It wasn't
hidden in 1,000 pages of discovery.  And it's quite clear from

what Mr. Devlin-Brown said that Mr. Scott was very focused on

what was the subject to seizure and not, because he was looking

around at his different accounts, trying to find out where the

unseized money was.  He knew this Porsche was under a seizure

warrant, and he sold it anyway.  He committed a crime and

violated the Court's order while on bail, several months before

trial in this case.  And he continued to launder what he knew

was criminal money.

I mean, this is not somebody who can be trusted to

reappear after having been convicted and facing the time that

he is facing now.  This, I mean, this is a serious violation of

both the law and the Court's order.  And it is just something

that you --

THE COURT:  Was it turned over in discovery or was it

a standalone letter that was sent to his lawyers?

MR. DiMASE:  Your Honor, I don't know if you can see

the letter in front of you.  That's the letter the government

produced this warrant with.  And we have produced the warrant,

and the warrant has the VIN number in it, the warrant has the

type of vehicle in it, where it's registered, the license

plate. In the first paragraph of this letter, the discovery

letter in which this order was produced, it was very clearly

specified what the different things being seized were.

And the bigger picture is he knew, he knew exactly

where the money came from to buy this Porsche, just like the

JBL3SCO5

other Porsches, just like the houses, just like all of the

other things that Mr. Scott invested in with OneCoin money, and

he sold it.  He sold it even though there was a seizure warrant

for it, the government had authority to take it.  He never

offered to give it to us, that's for sure.  And the fact that

we would stop looking for an asset that was subject to a

seizure warrant, that's why he thought it was okay, that

doesn't -- have the ring of truth at all.

For what it's worth, the government attempted to find

it, through an EZ Pass lookup, through license plate reader

lookups, we attempted to find this vehicle.  He had it all

along.  He had it the day he got this and then he sold it for

$250,000.

And here is the kicker.  Mr. Scott put a $25,000

deposit on another Porsche with that money.  That's what he

did.  He went to Braman Motorcars where he got the other

Porsches, and he put a $25,000 deposit on a more expensive

Porsche.  So the idea he needs it to pay his expenses and

that's the only reason he did it is also undermined by the

evidence here.

That goes along with all the other issues, the Germany

connections, the other people in this case, the access to

funds.  But this is a person who cannot be trusted.  He lied to

banks, he lied to financial institutions all over the world, he

violate the Court's order.  He can't be trusted to come back

1    facing the sentence that he's facing.

2         MR. DEVLIN-BROWN:  If I could just address a couple of

3    things, your Honor.  First of all, on the bracelet issue.  My

4    understanding, and this is speaking to Mr. Scott, if it even

5    slips off, if something goes wrong with the connection, he gets

6    a call immediately from pretrial services.  That's happened

7    once.  I am not sure it takes a day is up to date with the

8    latest technology.

9         On the vehicle, again, it's hard to respond to all of

10   this instantly, and I know the government just learned

11   yesterday.  They could have told us this morning perhaps.  We

12   could have maybe tried to have a response to this.

13        But I can say a couple of things.  Number one, there

14   is a difference between producing documents in discovery and

15   giving someone, their attorney, the attorney for someone or a

16   defendant, serving a warrant on them like you must restrain

17   this property or vehicle.  Because, for example, we got things

18   the very first day, in terms of seizure warrants, and then they

19   were subsequently Bates stamped and produced in discovery.  So,

20   parsing out which may have been produced the first time in

21   discovery and which were not, that's not necessarily easy to

22   do.

23        Also, at this time in the case, I mean, I was getting

24   discovery, I was in the process of transitioning out of the

25   case Mr. Garvin and Mr. Nobles.  I provided them with the

JBL3SCO5

1   discovery.  I can't, sitting here right now, say if I forwarded

2   this to Mr. Scott or not.  But I think before we say guilty of

3   a federal crime, we should have a chance to like investigate

4   that perhaps.

5          And then, in terms of this $25,000 deposit on the

6   Porsche, I would like to get more information on that as well.

7   My understanding is that deposit was returned.

8          The point is, there is no reason, I mean, that's a

9   little bit the tail wagging the dog, this Porsche.  And it's

10  not fair or appropriate to send someone to jail now without

11  giving us an opportunity to explore that issue.

12         The bigger point is he's never shown any sign, any

13  sign of not wanting to face the music on this, and that

14  continues.

15         THE COURT:  As I understand his current bail

16  conditions, he can be in either one of his homes, correct?

17         MR. DEVLIN-BROWN:  Yes, your Honor.

18         THE COURT:  I'm not going to remand Mr. Scott.  What I

19  will do is I will limit him to one home and impose home

20  detention.  I do find by clear and convincing evidence, based

21  on everything that I have seen, including the evidence in this

22  case, that I can't get into Mr. Scott's head, but the evidence

23  that I saw was fairly overwhelming.  They had to understand at

24  least at a real level that there was a very real possibility

25  that he would be convicted.  That has come to pass.

JBL3SCO5

Notwithstanding that, he was here every day.  So far as I know, he complied with every condition that was imposed upon him.

There is a lot of questions concerning the car in my mind.  Not to say that I'm excusing what happened, but there are a lot of questions there, especially in a case that's this large.  So I'm not going to make a determination or make a finding at this point that Mr. Scott has broken the law.

And to the extent that the government wants to attribute or ascribe the sort of connections and the types of activities that Ruja Ignatova and others in this case took part in, I just don't see Mr. Scott in the same category with respect to that.  He, so far as I know, doesn't have criminal connections.  So far as I know, was not involved -- outside of the co-conspirators -- with either the mafia or the Hells Angels or the Russian mob or anything else.  He was the lawyer in America that was laundering the money.  So I don't see those connections and I don't ascribe those connections to him.

He has been facing a significant sentence and from the outset, and that hasn't changed.

So I do find by clear and convincing evidence that he is not a risk of flight.  But again, I will strengthen those conditions.  He's limited to one home.

Which home will it be?

MR. DEVLIN-BROWN:  Florida.

THE COURT:  Florida, and he will be on home detention.

JBL3SCO5

1   With the ankle bracelet, obviously.  Anything else?

2              MR. DEVLIN-BROWN:  Just one moment.

3              Your Honor, he's planning to return to Florida

4   tomorrow at some point.  And I guess the process will be to

5   check in with pretrial services there to make these

6   arrangements.

7              THE COURT:  Very well.

8              MR. DiMASE:  Your Honor, we would ask for home

9   incarceration as opposed to home detention in this case.

10             THE COURT:  I don't know what the appropriate

11   terminology is, but if that's the appropriate terminology then

12   home incarceration.  There are a couple of different

13   categories.

14             MR. DiMASE:  Home incarceration is basically you

15   cannot leave your home, period.  That's what home incarceration

16   is.  Home detention, I believe there can be reasons that

17   somebody --

18             THE COURT:  Home incarceration, but he has to come out

19   for sentencing, for example.

20             MR. DiMASE:  He would obviously be allowed to attend

21   required court appearances.  But home incarceration is a more

22   strict version of it.

23             Is that what the Court is ordering?

24             THE COURT:  Yes.  Whatever the strictest level of home

25   detention is, that's what I am ordering.

JBL3SCO5

1              MR. DEVLIN-BROWN:  Presumably if he had medical

2     appointments or things of that nature.

3              THE COURT:  He has to see them, obviously.

4              Okay?  Anything else?

5              MR. GARVIN:  Not from the defense.

6              MR. DiMASE:  We'll confer with counsel about an

7     appropriate schedule for responding.  In my experience often

8     these things get pushed off a little while.  So we'll speak

9     with them about setting the appropriate schedule and submit

10    that to the Court.

11             THE COURT:  Very well.

12             MR. DiMASE:  Thank you.

13             THE COURT:  While I'm at it, I want to thank counsel

14    for all of your courtesies throughout this trial.  You've been

15    very, very well prepared and have made this process very smooth

16    for all concerned, so I thank you for that.

17             MR. DiMASE:  One other thing.  I think it would be

18    appropriate also to set a sentencing date at this stage, even

19    if it gets moved.

20             THE COURT:  Three months out.

21             THE DEPUTY CLERK:  February 21 at 10 a.m.

22             THE COURT:  Okay.  We are adjourned.  You have a lot

23    of stuff in the jury room, so make arrangements to have that

24    taken care of.

25             MR. FOLLY:  We will.  Thank you, Judge.
                 (Adjourned)