UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- against -

MARK S. SCOTT,

Defendant.

No. S10 17 Cr. 630 (ER)

**Memorandum of Law In Support of Post-Trial Motions**

Arlo Devlin-Brown
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1046

David M. Garvin
Law Offices of David M. Garvin, P.A.
200 South Biscayne Boulevard
Suite 3150
Miami, FL 33131
(305) 371-8101

*Counsel for Mr. Scott*

## <u>TABLE OF CONTENTS</u>

Preliminary Statement.................................................................................................... 1

Rule 29 and Rule 33 Standard ........................................................................................ 2

The Government's Case.................................................................................................. 3

Argument ........................................................................................................................ 7

I.  The Court Should Enter A Judgment Of Acquittal On The Bank Fraud Conspiracy
    Count, Or, In The Alternative, Order A New Trial ................................................. 7

    A.  The Bank Fraud Charges ............................................................................... 7

    B.  The Bank Fraud Evidence.............................................................................. 8

    C.  The Bank Fraud Jury Charge ........................................................................ 9

    D.  Applicable Law ........................................................................................... 10

    E.  The Government Failed  To Prove Mr. Scott Engaged In A Conspiracy To
    Commit Bank Fraud, Necessitating A Judgment of Acquittal ........................... 12

        1.  The Government Failed To Prove That Mr. Scott Conspired With
        Gilbert Armenta To Defraud Sabadell or Morgan Stanley...................... 12

        2.  The Government Failed to Prove Mr. Scott Participated In Any
        Conspiracy to Defraud Bank of New York Mellon ................................. 19

        3.  The Government's Bank Fraud Theories Not Specified In Its
        Particulars Response Were Likewise Not Proven ................................... 22

    D.  At Minimum, A New Trial Should Be Granted On The Bank Fraud Count ....... 23

II.  The Court Should Issue a Judgment of Acquittal on The Money Laundering
     Conspiracy Count, Or, In The Alternative, Order A New Trial ...................................... 25

    A.  Applicable Law ........................................................................................... 25

    B.  The Government Failed To Prove The Existence Of A United States Wire
    Fraud, The Charged Specified Unlawful Activity ................................................ 28

    C.  The Government Failed To Prove That Proceeds Of Any Wire Fraud
    Scheme Were Invested In The Fenero Funds ....................................................... 30

    D.  The Government Failed To Prove That Mr. Scott Entered Into A
    Conspiracy To Launder OneCoin Wire Fraud Proceed........................................ 32

E.     The Government Failed To Prove Other Elements Of The Money
       Laundering Conspiracy ........................................................................... 33

F.     At Minimum, A New Trial Should Be Granted On The Money Laundering
       Conspiracy Count ................................................................................... 36

CONCLUSION ........................................................................................................... 37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of Am., N.A. v. Bear Stearns Asset Mgmt.*,
    969 F. Supp. 2d 339 (S.D.N.Y. 2013)...........................................................................15, 25

*Brass v. American Film Technologies, Inc.*,
    987 F.2d 142 (2d Cir. 1993)..............................................................................................15

*European Community v. RJR Nabisco, Inc.*,
    764 F.3d 129 (2d Cir. 2014)..............................................................................................28

*Ford v. Ahitow*,
    104 F.3d 926 (7th Cir. 1997) ...............................................................................................2

*Jackson v. Virginia*,
    443 U.S. 307 (1979)..............................................................................................................3

*Loughrin v. United States*,
    573 U.S. 351 (2014).....................................................................................11, 17, 20, 21

*Official Committee of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*,
    549 B.R. 56 (S.D.N.Y. 2016)............................................................................................21

*Regalado Cuellar v. United States*,
    553 U.S. 550 (2008)...........................................................................................................27

*RJR Nabisco, Inc. v. European Community*,
    136 S.Ct. 2090 (2016)..................................................................................................28, 30

*Shaw v. United States*,
    137 S.Ct. 462 (2016).....................................................................................................11, 17

*United States v. Aguiar*,
    737 F.3d 251 (2d Cir. 2013)................................................................................................3

*United States v. Autuori*,
    212 F.3d 105 (2d Cir. 2000)..............................................................................................28

*United States v. Blackmon*,
    839 F.2d 900 (2d Cir. 1988)..............................................................................................20

*United States v. Bouchard*,
    828 F.3d 116 (2d Cir. 2016)..............................................................................................11

*United States v. Budovsky*,
   2015 WL 5602853 (S.D.N.Y. Sept. 23, 2015)........................................................28

*United States v. Calderon*,
   944 F.3d 72 (2d Cir. 2019)....................................................................................18, 27

*United States v. Cassese*,
   428 F.3d 92 (2d Cir. 2005).........................................................................................3

*United States v. Dove*,
   884 F.3d 138 (2d Cir. 2018).....................................................................................24

*United States v. Espaillet*,
   380 F.3d 713 (2d Cir. 2004).......................................................................................2

*United States v. Finazzo*,
   850 F.3d 94 (2d Cir. 2017)....................................................................................15, 25

*United States v. Gasperini*,
   2017 WL 2399693 (E.D.N.Y. Jun. 1, 2017) ........................................................29, 30, 37

*United States v. Gotti*,
   459 F.3d 296 (2d Cir. 2006).....................................................................................27

*United States v. Hawit*,
   2017 WL 663542 (E.D.N.Y. Feb. 17, 2017) ............................................................28

*United States v. Hoke*,
   551 Fed.Appx.611......................................................................................................24

*United States v. Lebedev*,
   932 F.3d 40 (2d Cir. 2019).......................................................................................17

*United States v. Lorenzo*,
   534 F.3d 153 (2d Cir. 2008).....................................................................................32

*United States v. Ness*,
   565 F.3d 73 (2d Cir. 2009).......................................................................................27

*United States v. Rigas*,
   490 F.3d 208 (2d Cir. 2007).....................................................................................18

*United States v. Rodriguez*,
   727 Fed.Appx.24 (2d Cir. 2018)..............................................................................26

*United States v. Stavroulakis*,
   952 F.2d 686 (2d Cir. 1992).....................................................................................11

**Statutes**

18 U.S.C. § 20 ...................................................................................................................11

18 U.S.C. § 1343 ...............................................................................................................28

18 U.S.C. § 1344 ...........................................................................................7, 11, 12, 17, 21

18 U.S.C. § 1956(a)(1)(B)(i) ...................................................................................7, 25, 26

18 U.S.C. § 1956(a)(2)(B)(i) ...................................................................................7, 25, 33

18 U.S.C. § 1956(h) ...........................................................................................................32

18 U.S.C. § 1956(i) ............................................................................................................36

**Other Authorities**

Charles A. Wright, Fed. Prac. & Proc. Crim. § 461 (4th ed. 2013) ....................................2

Fed. R. Crim. P. 29 ..........................................................................................................2, 9

Fed. R. Crim. P. 33 ........................................................................................................3, 37

Privileged & Confidential / Work Product / Attorney-Client Communication / Draft

**Preliminary Statement**

Mark Scott was convicted of conspiracy to commit money laundering and conspiracy to commit bank fraud following an 11-day trial in which only two of the 17 Government witnesses had met Mr. Scott before his arrest, and each of them only once.  The evidence adduced through these witnesses and others – in large part innuendo and hearsay – was insufficient to support a conviction of on either count.  The Court should therefore enter a judgment of acquittal on both counts.

The failure of proof on the bank fraud conspiracy was particularly glaring.  The Government's principal bank fraud theory was that Gilbert Armenta, an alleged co-conspirator, provided his own banks with supposedly inaccurate information about why he, Armenta, was transferring his own money to the BVI-approved Fenero private equity funds (the "Fenero Funds") managed through  Mr. Scott.  There was *no* evidence whatsoever that Mr. Scott was aware of, much less agreed to, the making of these alleged misrepresentations, and substantial evidence of just the opposite: that Armenta went out of his way to *deceive* Mr. Scott about the funds he was investing in Fenero.  Nor did the trial evidence establish any other misrepresentations to FDIC-insured banks that Mr. Scott made, was aware of, or had anything whatsoever to do with.

The Government likewise failed to provide sufficient evidence to establish each element of the charged money laundering conspiracy.  Most notably, the Government, failed to prove that the monies invested in the Fenero Fund were proceeds of a domestic wire fraud scheme at all.  Rather, the Government's own evidence established that OneCoin was an operation run by people outside the United States and that its product was sold almost entirely to individuals outside the United States.  Such incidental ties to the United States are insufficient under the wire

fraud statute, and without a U.S. wire fraud, the funds at issue are not subject to the money laundering statute at all.  The failure of proof on the money laundering conspiracy extends to other elements of the offense as well, including the Government's failure to prove money from alleged U.S. OneCoin victims were even sent through the Fenero Funds, and lack of evidence that Mr. Scott knew that the funds were from criminal sources or that the that the purpose of the investments the Funds made was to conceal their source.

In addition, the jury instructions on both the bank fraud and money laundering counts were wrong on key points, permitting the jury to convict Mr. Scott based on conduct that would not violate the statutes in question.  Even if the Government had provided sufficient proof of the charged offenses – which it did not – a new trial would be required to cure these instructional errors.

### Rule 29 and Rule 33 Standard

Under Fed. R. Crim. P. 29, a district court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."   Rule 29 "tests the sufficiency of the evidence against the defendant, and avoids the risk that a jury may capriciously find him guilty though there is no legally sufficient evidence of guilt." 2A Charles A. Wright, *Fed. Prac. & Proc.* Crim. Sec. 461 (4th ed. 2013); s*ee also Ford v. Ahitow*, 104 F.3d 926, 938 (7th Cir. 1997) ("[T]he nature of the inquiry … in which the trial judge asks whether a reasonable jury could find guilt beyond a reasonable doubt, is no different from the consideration of the trial judge's inquiry in a motion for summary judgment…In that context, the judge asks whether a fair-minded jury could return a verdict on the evidence presented"). "The ultimate question is not whether [the court] believe[s] the evidence adduced at trial established the defendant's guilt beyond a reasonable doubt, but whether any rational trier of fact could so find." *United States v. Espaillet*,

380 F.3d 713, 718 (2d Cir. 2004); *Accord Jackson v. Virginia*, 443 U.S. 307, 319 (1979). However, "if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005) (citing *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002)).

Fed. R. Crim. P. 33(a) states, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). In deciding a Rule 33 motion, the Court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013).

### The Government's Case

The Government's case lasted 11 trial days and included the testimony of 17 witnesses but little on the core issue at the heart of both counts: evidence that Mark Scott knew that the funds invested into his BVI-registered private equity funds were proceeds of an alleged wire fraud scheme involving OneCoin.

The Government's evidence that OneCoin was engaged in *any* sort of illegal activity rested almost entirely on the testimony of cooperating witness Konstantin Ignatov, the brother of OneCoin founder Ruja Ignatova.[1] Ignatov testified that at the time of his sister's disappearance

---

[1] The Government recently disclosed – well after trial was over – that the Government apparently permitted Ignatov to use OneCoin-derived funds to pay over USD-equivalent $1.8 million in legal expenses, giving him added incentive to shade his testimony. *See* Declaration in Support of Post-Trial Motions by Arlo Devlin-Brown ("Devlin-Brown Declaration"), Ex. A (letter dated Jan. 21, 2020 from Government to defense counsel).

in October 2017 he believed that both the OneCoin blockchain, a hallmark feature of a genuine cryptocurrency, and an audit of the OneCoin blockchain, were real.  (Tr. at 351).  He also testified that  despite working at the OneCoin headquarters for years, he only learned definitively that OneCoin was not a genuine cryptocurrency when he heard Irina Dilkinska speak to that effect in May 2018. (Tr. at 353; Tr. at 359). He further testified that OneCoin's lack of a functioning blockchain was a closely guarded secret – only Ruja, and OneCoin's two IT employees were aware that the supposed "blockchain" was an elaborate fraud. (Tr. at 347).

The Government's evidence that OneCoin activities extended into the United States was extremely limited.  Ignatov, the Government's only cooperating witness, said *nothing* of any OneCoin activities in the United States.  Indeed, to show any contact with the U.S. whatsoever, the Government relied almost entirely on the testimony of two individuals who purchased OneCoin, William Horn and Linda Cohen.  Both testified that they purchased OneCoin based on the advice of friends and relatives.  Neither Horn nor Cohen ever met Mr. Scott or had any knowledge of him whatsoever. (Tr. at 104-105; Tr. at 815-816).  The Government provided no evidence that funds that Cohen and Horn invested in OneCoin were transferred to the Fenero Funds, and in fact, as discussed herein, the evidence shows that their funds were transferred elsewhere.   Likewise, the Government failed to show that funds from any United States residents, were transferred into any accounts Mr. Scott maintained or to which he had access. Indeed, the Government did not even establish that much of the money invested in the Fenero Funds necessarily originated from OneCoin purchasers at all.

There was no testimony by any witness that (1) Mr. Scott had anything to do with OneCoin sales, much less sales in the United States or (2) that Mr. Scott had any belief that OneCoin was violating any criminal laws.  The only non-law enforcement witnesses who even

4

interacted with Mr. Scott were Ignatov and a representative of fund administrator Apex, Paul Spendiff, and each of these witnesses met Mr. Scott only briefly once. Ignatov testified that he met Mr. Scott in July 2016 in the Sofia, Bulgaria offices of OneCoin, when Mr. Scott came for a meeting with Ruja. (Tr. at 245). He testified that Ruja asked him to call Irina Dilkinska into the meeting, and instructed him "to make sure that everybody on this floor leaves and goes home so that Irina, Mark, and Ruja are alone." (*Id*. at 246). Ignatov testified that the following week, Dilkinska told him that "she had to stay [at the meeting] a long time…until Mark Scott understood everything that has to be done or he has to do." (Tr. at 246-47).[2]  Beyond that, Ignatov's testimony consisted of other hearsay statements from regarding what other alleged co-conspirators, all unavailable to the defense, told him about Mark Scott.

The Government's only other non-law enforcement witness who interacted with Mark Scott was Paul Spendiff, an employee of a fund administration services company that Mark Scott hired. Spendiff testified that Mr. Scott's onboarding process with Apex went smoothly and as expected, without raising red flags. (Tr. at 523). Spendiff also acknowledged that documents provided to Mr. Scott with respect to investments by the Fenero Funds reflected ties to OneCoin– including to Ruja Ignatova and to a transaction paid for in large part with OneCoins,[3] agreeing

---

[2] There are substantial doubts that Ignatov testified truthfully on this point. Counsel for Mr. Scott located an email produced by the Government that Dilkinska sent to Mr. Scott on Sunday, July 17, 2016 saying in relevant part, "I am traveling for the whole week," making it improbable that she could have attended a July 20, 2016 meeting in Sofia. (DX 550). Mr. Scott offered this and another e-mail (DX 552) into evidence (*see* Dkt. 176) but the Court refused to admit the e-mails following the Government's objection. (Tr. at 398).

[3] *See, e.g.* GX 2247, Tr. at 601-02 (showing Dr. Ruja Ignatova as the authorized representative of CryptoReal in the Share Sale and Purchase agreement signed between Cryptoreal and Barta Holdings and referencing $340 million at a price of $7 per OneCoin); GX 2202, Tr. at 532 (identifying Irina Dilkinska as the limited of a B&N Consult Eood in subscriber documentation provided to Apex in May 2016); GX 2218 at 32, Tr. at 591) (identifying Najib Kassis as "The

that Mark Scott "didn't hide" the connection to Ms. Ignatova. (Tr. at 648).   Spendiff further

testified that even when Apex became suspicious of OneCoin, Mr. Scott repeatedly insisted that

he believed OneCoin to be legitimate, a sentiment he repeated several times on a telephone call

with Apex personnel that Apex secretly recorded.[4]   This is consistent with other evidence

showing that Mr. Scott believed OneCoin and the money he derived from it to be legitimate,

such as opening the Fenero Funds in his own name, and reporting associated income on his taxes

(DX 158, DX 159, DX 160, DX 701).

Beyond the minimal testimonial evidence, Government's case with respect to Mark

Scott's knowledge relied almost entirely on email and other documents involving individuals

who did not testify.  Armenta introduced Mr. Scott to Ignatova by email on Sept. 30, 2015 (GX

1004), when Mr. Scott was employed as a Partner at the law firm of Locke Lord.  In subsequent

email communication on October 13, 2015, Ignatova indicated that she was seeking advice that

"lets me operate my business as much as possible within legal frameworks," and that the "risk

[of] not being 'legal' in USA I would take extremely serious." (DX 103).  Documentary

evidence established that Mr. Scott created and registered four investment funds in the British

Virgin Islands and engaged fund administrators and law firms in doing so; (2) that these funds

took in money from four entities, IMS GmbH, IMS PTE, B&N Consult, and Star Merchant (GX

_____

Investor" in Payment Cloud Holdings Limited, and indicating a copy to be provided to Dr. Ruja
Ignatova, both contactable at @ravenr.com email addresses.

[4] GX 2302-TR at 7: Scott: "If you have internet and look up cryptocurrency, you look up
OneCoin, you will find things.  Like this company has like 400,000 members that pay into it.
[UI] It's basically in 120 countries.  Okay?  It should be enough for you to say , hey, [UI] profits
reach $1 billion a year."; at 10: "They are in several countries, they have huge operations.  They
are in an industry, as you can see from the write up from our board where it's very detailed
what's on with crypto, they are in some countries, some regulated, some unregulated, so they get
paid."; "You have [UI] and everybody involved, they're mostly Europeans, you've got these
Germans, IMS is run by Germans, in all countries.  So you have all that, you have this coming
from legitimate banks.  You have several verifications of this company, okay?"

2602); and (3) that Mr. Scott was aware that the funds in these accounts had some connection to Ignatova.  Documentary evidence also established Fenero Funds invested in various transactions, including in Payment Card Technologies (PCT), a payment processing company, and a loan allowing for an investment into Cryptoreal, a Madagascar oil field.  (*See* GX 2218, GX 2247). The Government did not offer any evidence that PCT and Cryptoreal were phony transactions without business purpose.

## Argument

I.    **The Court Should Enter A Judgment Of Acquittal On The Bank Fraud Conspiracy Count, Or, In The Alternative, Order A New Trial**

### A.    The Bank Fraud Charges

On September 5, 2018, a single-count indictment was unsealed against Mr. Scott, charging him with Conspiracy to Commit Money Laundering under Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1956(a)(2)(B)(i) ("Count One").  On October 3, 2019, a mere 31 days before the start of trial, a second count was added in a superseding indictment, adding a charge of Conspiracy to Commit Bank Fraud under Title 18, United States Code, Section 1344 ("Count Two").[5]  The following day, counsel for Mr. Scott requested particulars from the Government  for, among other things "the identity of the financial institution(s) that were objects of the 'scheme and artifice to defraud,'" as laid out in 18 U.S.C. 1344(1); the identity of any "such financial institution from whom the conspirators sought to obtain 'moneys, funds, credits, assets, securities and other property'" as laid out in 18 U.S.C. 1344(2); and, the

---

[5] On October 8, 2019, the Government returned S10, which kept the same counts (Count One - Conspiracy to Commit Money Laundering; Count Two - Conspiracy to Commit Bank Fraud), but changed the time period of all charged conduct in question from "at least in or about 2016 through in or about 2018" (Dkt. 135, S8) to "at least in or about September 2015 through in or about 2018" (Dkt. 143, S10).

"material facts" that "Scott and other misrepresented and omitted" that are alleged to have

"caused . . . FDIC financial institutions in the United States to transfer funds in and out of

accounts associated with purported investment funds operated by Scott and others." (*See* Devlin-

Brown Declaration, Ex. B).

      In response, and while purportedly reserving its "right" to prove other transactions, the

Government  identified three transactions alleged to be part of the bank fraud conspiracy:

> (1) two wire transfers in or about June 2016 totaling approximately $5 million from a U.S. Morgan Stanley account in the name of "Fates Group LLC" to a Fenero Fund account in the Cayman Islands, purported to be an investment into the Fenero Funds; (2) a wire transfer in or about July 2016 of approximately $30 million from a Fenero Fund account in the Cayman Islands, through a Bank of New York Mellon correspondent account in New York, to a Hong Kong account in the name of "Barta Holdings Limited," purported to be an outbound investment from the Fenero Funds in the form of a "loan"; and (3) a wire transfer in or about September 2016 of approximately $5 million from a U.S. Sabadell United Bank account in the name of "Fates Group LLC" to a Fenero Fund account in the Cayman Islands, purported to be an investment into the Fenero Funds.

(*See* Dkt. 160, Ex. B.)

      **B.**    **The Bank Fraud Evidence**

      At trial, the Government called witnesses and offered documents relating to each of three

sets of bank transactions referenced in its particulars response.  The first and third transactions –

from Morgan Stanley and Sabadell United Bank respectively – involved funds that alleged co-

conspirator Gilbert Armenta had transferred to the Fenero Funds.  The Government introduced

bank records in which Armenta apparently described transfers as "investment into ZIIXI … and

XII" and "for asset management" respectively, but no evidence that Mr. Scott had any

communications with Armenta as to how the transactions would be described and, to the contrary,

evidence that Armenta lied to Mr. Scott more generally about purported transfers and investments

into his funds.  The second transaction involved a $30 million payment that Mr. Scott directed

Apex, a British Virgin Islands-based non-U.S. insured fund administrator, to process through the Fenero Funds account at non-U.S. insured DMS Bank in the Cayman Islands to non-U.S. insured DBS Bank in Hong Kong.  DMS Bank cleared the transfer through an intermediary bank, the Bank of New York Mellon (BONY).  The Government offered evidence that the transaction had been described as "Wire order for Oil Field Loan" in the wire details, but no evidence that this description was false, that it was material to BONY in serving as an intermediary to the transaction, or that Mr. Scott was even aware that such a description would be provided to BONY.

At the conclusion of the Government's case, counsel for Mr. Scott made an oral Rule 29 motion before the Court. (Tr. at 1845-50).  After hearing arguments from the defense and the Government, the Court concluded that while "[t]he evidence concerning the bank [fraud] conspiracy I think is much less," "viewing all of the evidence in the light most favorable to the Government I think there is enough to go to a jury," denying the Rule 29 bank fraud motion without prejudice to renew it after the verdict. (Tr. at 1851).

###    C.      The Bank Fraud Jury Charge

Prior to trial, Mr. Scott submitted a letter asking "that the Court require the Government to prove that the object of the Bank Fraud conspiracy involved one or more of the identified accounts and transactions" identified in its October 7, 2019 letter.  To that end, Mr. Scott submitted a proposed instruction on bank fraud that would require the jury to find that at least one of the three FDIC banks identified by the Government in its response was the subject of the charged bank fraud conspiracy.  *See* Dkt. 160-1, at 15.  At the final pre-trial conference held on October 28, 2019, the Court indicated that it would reserve judgment on the issues raised in defense counsel's letter until the charge conference.  (Tr. at 77).

In advance of the November 18, 2019 charge conference, the Court submitted a proposed instruction tracking the defense's request, which made clear to the jury that "[T]he Government has alleged that there were three FDIC financial institutions that were the object of the scheme: Morgan Stanley, Bank of New York Mellon, and Sabadell."  (Tr. at 1639).   The Government, objected, claiming that there were "other banks that are FDIC insured that have been the subject of testimony at this trial to which fraudulent statements were made in order to move money through those banks." *Id*.  The Government asserted that this "includes banks that handled the five million dollars through the Locke Lord accounts going to Dubai  . . . There was Northern Trust [] involved in that transaction, as was JPMorgan Chase….and in addition there are the banks that the victims sent money to after being told by the perpetrators of the wire fraud scheme to lie or withhold information about OneCoin and OneCoin packages and instead to say educational packages in their wires and that was part of the information that was provided to those banks to then cause the banks to send money through the system." (Tr. at 1639-40).

Mr. Scott protested the Government's belated identification of other conduct now alleged to be part of the bank fraud conspiracy, arguing that he could not defend against a "moving target" and that without specific identification of the three banks in the particulars letter, the jury would conflate the alleged money laundering offense with the charged bank fraud.  (Tr. at 1640).  Over the defense's objection, the Court modified its original proposed instruction deleting the sentence specifying that Morgan Stanley, Bank of New York Mellon, and Sabadell were the FDIC-insured banks at issue.  (Tr. at 1643).

**D.      Applicable Law**

The federal bank fraud statute provides that "whoever knowingly executes, or attempts to execute, a scheme or artifice-

(1) to defraud a financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both."

18 U.S.C. § 1344. A "financial institution" includes any federally insured bank. 18 U.S.C. § 20.

To prove a conspiracy to commit bank fraud, the Government must establish that the unlawful agreement involved a scheme either  to "defraud a financial institution," 18 U.S.C. § 1344(1) *or* a scheme to "obtain money or property" under custody or control of a financial institution, § 1344(2). *Loughrin v. United States*, 573 U.S. 351, 357 (2014) (rejecting the idea that 1344(2) can be interpreted as a mere subset of 1344(1)).

To prove a violation of § 1344(1), the Government must establish that "a defendant intended to defraud the financial institution *itself*." *United States v. Bouchard*, 828 F.3d 116, 125 (2d Cir. 2016) (holding scheme to defraud non-FDIC insured entity not actionable under bank fraud statute even though misrepresentations cause insured institution to suffer losses). *See also Loughrin*, 573 U.S. at  357  (§ 1344(1) "includes the requirement that a defendant intend to 'defraud a financial institution'; indeed, that is 1344(1)'s whole sum and substance."). Indeed, a scheme to defraud under § 1344(1) "must be one to deceive the bank *and* deprive it of something of value." *Shaw v. United States*, 137 S.Ct. 462, 469 (2016).  "[A] conviction under the 'scheme to defraud' clause of the bank fraud statute requires that the defendant engage in or attempt to engage in a pattern or course of conduct designed to deceive a federally chartered or insured financial institution into releasing property, with the intent to victimize the institution by exposing it to actual or potential loss." *United States v. Stavroulakis*, 952 F.2d 686, 694 (2d Cir. 1992).

11

To prove a violation of § 1344(2), the Government must prove "that the defendant intended[ed] 'to obtain any of the moneys … or other property owned by, or under the custody or control of, a financial institution.'" *Loughrin*, 573 U.S. at 355.  "[T]he text of 1344(2) already limits its scope to deceptions that have some real connection to a federally insured bank, and thus implicate the pertinent federal interest.  *See* S. Rep. No. 98-225, at 378 (1983) (noting that federal 'jurisdiction is based on the fact that the victim of the offense is a federally controlled or insured institution.')." *Id.* at 366.  A perpetration of fraud upon a non-FDIC insured bank or other third party creates liability under the bank fraud statute *only if* there is an understanding that the third party will relay the false statement to the bank "in the ordinary course of business." *Id.* at 363-364.

### E.  The Government Failed  To Prove Mr. Scott Engaged In A Conspiracy To Commit Bank Fraud, Necessitating A Judgment of Acquittal

The Government failed to introduce sufficient evidence that Mr. Scott conspired to defraud a an FDIC-insured bank or obtain money under custody or control of such a bank.  This failure of proof applies with respect to both the supposed victims of the bank fraud identified in the Government's response to the bill of particulars – Morgan Stanley, Sabadell and Bank of New York Mellon – as well as other bank fraud theories the Government articulated for the first time in the middle of trial.

1.  <u>The Government Failed To Prove That Mr. Scott Conspired With Gilbert Armenta To Defraud Sabadell or Morgan Stanley</u>

Two of the three bank fraud theories identified in the Government's particulars response involved $10 million in transfers Gilbert Armenta made from his own accounts at Sabadell Bank and Morgan Stanley to non-FDIC insured offshore accounts for the Fenero Funds.  But the Government offered *no* evidence that Mr. Scott was aware of or had anything whatsoever to do

with any misrepresentations Armenta may have made to these banks in accessing his own funds. Moreover, even Armenta's conduct does not constitute bank fraud.  Put simply, Armenta's statements about why he was transferring *his own* funds, even if misleading,  were not made for the purpose of defrauding a bank or "obtaining" funds: the funds were already his.

The facts surrounding these transactions are as follows: Gilbert Armenta made two transfers of $5 million dollars each from his US-based Morgan Stanley and Sabadell accounts into the Fenero Funds in June and September 2016, respectively.  To effectuate these transfers, he provided what the Government alleged were false reasons for the transfers.  For the Morgan Stanley wires, Armenta apparently stated that the wires were for  "investment into ZIIXI … and XIII" (GX 1428), told a bank representative that "[t]he beneficiary is a private equity firm that invest[s], among other things in renewal energy (i.e. windmills)" and that he "is providing the working capital to buy." (GX 711E).  For the Sabadell wires, Armenta reported that they were "for asset management." (GX 407).  None of these purported reasons for the transfers were true, the Government claimed, because the ultimate motivation for the transfers was Mr. Armenta's supposed desire to invest in Fenero Funds as a way to repay a debt to Ruja Ignatova.

Under neither prong of § 1344 can Mr. Armenta's actions be understood to constitute bank fraud.  As an initial matter, the Government introduced no evidence to indicate or even suggest that Mark Scott either lied to Morgan Stanley or Sabadell Bank directly, or in fact had any direct or indirect contact with these banks.   The Government called witnesses from each bank, and both testified that neither bank had any record of any communications with Mr. Scott. (Tr. at 875, 928).

Given the complete lack of evidence of any interactions between Mr. Scott and these banks, the Government's bank fraud conspiracy theory concerning these banks must necessarily hinge on

Mr. Scott having colluded with Armenta to provide false reasons for the wire transfers going to the Fenero Funds from Armenta's accounts.  But there is zero evidence for this theory either, and much to undercut it.  Armenta, despite being a signed up cooperating witness, was not called by the Government at trial (and nothing in his voluminous § 3500 material even hints that Mr. Scott was involved in any representations Armenta made to these banks).  No other witness testified to Mr. Scott's involvement with these transfers and no emails or other evidence was introduced reflecting or even remotely suggesting that Mr. Armenta and Mr. Scott conspired to deceive Sabadell or Morgan Stanley.

There is nothing in the record to suggest that Mr. Scott told Mr. Armenta what to provide as the reason for the wire transfers – not for investment into renewable energy, nor windmills, nor into funds denominated with specific letters, nor for asset management.  The only evidence in the record about these transfers whatsoever are e-mails that, in the light most favorable to the Government, establish at best that Mr. Scott was told by Ruja Ignatova that Armenta owed her money (GX 1055) and that Mr. Scott was expecting Armenta to send money to the Fenero Funds, at least partially in U.S. dollars (GX 1099).

The Government, plainly aware of the lack of any evidence, invited the jury in its rebuttal to simply *assume* that Mr. Scott had some implicit understanding with Armenta that Armenta would lie to his U.S. banks in order to send money to the Fenero Funds:

> "[A] conspiracy oftentimes much is left to the unexpressed understanding.  So there doesn't need to be evidence that Mark Scott called up Gilbert Armenta and said: Hey man, tell them asset management; tell them investment in XGII.  You can draw that reasonable inference from the facts that Mr. Armenta knew that's what he had to do.  And you know why?  Because everybody knows…you can't say: Hey, this is OneCoin money, to send it over to these Fenero Funds.  The only way it worked was lying to the banks.  Mr. Scott knew that full well…" (Tr. at 1973).

> "So of course Mr. Scott knew that Mr. Armenta was going to lie to the banks whether or not there was a specific conversation about it." (Tr. at 1850).

But this a bridge too far.  Not only is there no evidentiary basis to support this inference; the Government's logic falls apart on itself.

First, there is no evidence that Mr. Scott knew in advance of the transfers that Mr. Scott was aware of that Armenta would send the funds from Sabadell, Morgan Stanley or for that matter *any federally insured financial institution*.  Indeed, with respect to the first funds sent by Armenta (through Morgan Stanley), GX 1099 reflects that Mr. Scott sent wire instructions indicating that Armenta could send *either* Euros or dollars, and that "Euro denominations are preferred."  (GX 1099).  A Euro transfer almost certainly would not have been from a U.S.-insured bank capable of being a victim of a bank fraud conspiracy, and even dollars could have been sent through a foreign bank or other institution not subject to the bank fraud statute.  Thus there is no basis to conclude that Mr. Scott knew money would come from an FDIC-insured bank period.

The Government's claim that Mr. Scott "knew that Mr. Armenta was going to lie" to these banks likewise makes no sense.  There is no evidence that Mr. Scott knew or had reason to believe that Mr. Armenta's banks would ask for the purpose of the transfer.  Nor does it follow that an answer to such a question would have to be a lie.  One truthful answer to the question "what it the purpose of the transfer" would be "to place funds with a BVI registered private equity fund."  The Government seems to be suggesting that *any* statement Mr. Armenta made short of  telling the bank he was seeking to launder criminal funds would be bank fraud by omission.  That would make every instance of money laundering a bank fraud when an FDIC bank was used in the laundering and that is not the law.  Mere omission of a fact "without more, is not tangible harm and therefore does not constitute a deprivation" of property.[6]

---

[6] *See, e.g., United States v. Finazzo*, 850 F.3d 94, 109 (2d Cir. 2017) (citing *United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994)).  Under common law, "fraud based on a failure to disclose" requires the plaintiff to "prove that the defendant had a duty to disclose.'"  *Bank of*

Not only is there no evidence that Armenta shared with Mr. Scott that he would lie to the banks involved, the Government's own evidence proves nearly the opposite: that Armenta was seeking to *deceive* Mr. Scott about transfers of funds into the Fenero Funds generally *and about the accounts used to fund the transfers*. Indeed, Armenta went so far as to forge a letter from Sabadell Bank and create false wire transfer documents for transfers that were never made, from accounts that did not exist. Mr. Kishore, the Government's Sabadell witness, was clear in stating that he did not recall having sent a letter, then forwarded by Mr. Armenta to Mr. Scott, indicating that Sabadell was closing five accounts of Mr. Armenta. (GX 4108, Tr. at 907-908). Specifically, he testified that he had "no idea" about three of the companies mentioned in the letter – Shureden Services, Soleymew, and Water-Tidal Services Limited. (Tr. at 928). There was a good reason for why Mr. Kishore couldn't recall having sent the letter or why the entity names were not familiar: it was later revealed that Mr. Armenta forged the letter entirely, going so far as to create fictitious names for accounts at Sabadell that he had never opened. (*See* DX 1010.) And, not only did Mr. Armenta create fictitious entities, he sent Mr. Scott entirely fake wire transfer confirmations indicating that $100 million USD had been transferred from those accounts into the Fenero Funds. (DX 560, 561, and 562). Thus, it strains credulity that the same person who sent Mr. Scott forged bank letters and fake wire transfer notices relating to deposits he made (or claimed he made) with the Fenero Funds would have colluded with Mr. Scott with respect to lies he would tell his own

---

*Am., N.A. v. Bear Stearns Asset Mgmt.*, 969 F. Supp. 2d 339, 351 (S.D.N.Y. 2013) (quoting *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)). *See also*, *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (stating that disclosure is required "where the party has made a partial or ambiguous statement, . . . when the parties stand in a fiduciary or confidential relationship with each other . . . and where one party possesses superior knowledge not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge'" (internal citations omitted)).

banks about the purposes of these transfers.  The evidence supports the opposite conclusion: Mr. Armenta kept Mr. Scott was kept in the dark as to his own banking relationships.

Furthermore, even if Mr. Armenta provided misleading reasons to his own banks as to why he wanted to transfer his own money, this does not amount to bank fraud. There is no evidence that Mr. Armenta carried out a scheme "to deceive the bank and deprive it of something of value" under §1344(1), *Shaw*, 137 S.Ct. at 469.  Unlike in *Shaw*, where the Court upheld a conviction of a defendant who made false statements to a bank and who "correctly believe[d] that those statements would lead the bank to release from that account funds that ultimately and wrongfully ended up in [the defendant's] pocket," *id.* at 467, here the funds were in Mr. Armenta's accounts at the very outset of the transaction.   Similarly, under § 1344(2), Mr. Armenta cannot be said to have "acquire[d]…bank property 'by means of' the misrepresentation." *Loughrin*, 573 U.S. at 363. The Government introduced no evidence to show that Mr. Armenta "acquired . . . bank property." *Id*.  If anything, Mr. Armenta was trying to do the very opposite of *acquiring* money – he was trying to part with it.

Mr. Scott is not aware of any conviction for bank fraud involving an individual who provided an allegedly inaccurate statement to his or her bank in connection with a transfer of that person's own funds.  In fact, even the most expansive applications of the bank fraud statute would not reach this conduct.  In *United States v. Lebedev*, 932 F.3d 40 (2d Cir. 2019), the Circuit upheld the bank fraud conviction of a defendant, the operator of an unlicensed money services website, who provided false information to financial institutions to induce them to process customers' transactions.  It reached this conclusion on the grounds that he had done so "with the intent to obtain funds under those institutions' custody and control; namely, funds in the customers' account." *Id.* at 49.  Mr. Armenta, on the other hand, through his transfers to the Fenero Funds,

undertook steps, through these transfers, to *part* with what started out as *his* money.  Once Morgan Stanley and Sabadell effectuated the transfers, the money in question was no longer in his control, and would not enter his control again.   In this respect Mr. Armenta's transfers are more similar to those that the defendant made in *United States v. Perez-Ceballos*, a Fifth Circuit case in which the court held that the Government had failed to prove that by effectuating transfers between her own accounts, she had "intended to 'obtain money from the victim institution' or 'otherwise exposed [the victim bank] to 'risk of loss.'" 907 F.3d 863, 868 (5th Cir. 2018) ("The $1.9 million that Perez-Ceballos transferred to and through Chase Bank was *her* money, which she had authority to withdraw freely).

Finally, the purported misrepresentations made by Armenta to Morgan Stanley and Sabadell banks to not rise to the level of materiality required under the bank fraud statute.  "The wire and bank fraud statutes do not criminalize every deceitful act, however trivial . . . . To sustain a conviction under these statutes, the Government must prove that the defendant in question engaged in a deceptive course of conduct by making *material* misrepresentations." *United States v. Calderon*, 944 F.3d 72, 85 (2d Cir. 2019) (citing *Neder v. United States*, 527 U.S. 1, 4 (1999)).  "To be 'material' means likely to influence the [bank] in making a determination required to be made." *United States v. Rigas*, 490 F.3d 208, 234 (2d Cir. 2007).  "All of these specifications of the materiality inquiry target the same question: would the misrepresentation actually matter in a meaningful way to a rational decisionmaker?" *Calderon*, 944 F.3d at 86.  No evidence was introduced indicating that the content of the wire transfer instructions was in any way dispositive to the bank in allowing for the wire transfers to go through.

Lastly, even if Mr. Scott's alleged involvement in the Armenta transfers constitute conspiracy to commit bank fraud, which the Government failed to prove, the Government failed

to establish venue on this count because it failed to prove that there was an act in furtherance of the conspiracy that took place within the Southern District of New York.  While the Government pressed Firuz on where the Morgan Stanley benefit account was located, she could only say that she knew it was in New York, but "[did] not know what part of New York." (Tr. at 853).

2.  <u>The Government Failed to Prove Mr. Scott Participated In Any Conspiracy to Defraud Bank of New York Mellon</u>

The Government similarly did not prove its alternative hypothesis on bank fraud conspiracy that it articulated in its October 7, 2019 particulars letter – the July 2016 wire transfer of approximately $30 million from a Cayman Islands Fenero Fund account to a Hong Kong account in the name of "Barta Holdings Limited" that went through a Bank of New York Mellon correspondent account.

The facts surrounding this transaction are as follows: on July 12, 2016, Mr. Scott sent an email to Paul Spendiff at Apex, with the subject line "URGENT - Wire order for Oil Field Loan. Additional supportive document from borrower also attached." (GX 2240)  The email attached a letter requesting that Apex wire $30 million from a Fenero Fund DMS Bank in the Cayman Islands to DBS Bank in Hong Kong, beneficiary "Barta Holdings Limited."  (*Id*.)  The purpose was indicated as "Loan to CryptoReal Investment Trust Ltd. (BVI)/Martin Breidenbach for Acquisition of Madagascar Oil Field." After conducting its own diligence on the transaction, Apex "sent the money upon the instructions of the defendant." (Tr. at 604-05).

When Apex initiated the wire transfer on July 13, 2016, "this transaction also processed through DMS's U.S. dollar correspondent bank account at Bank of New York Mellon in Manhattan" (Tr. at 1475), was then "credited to the account of DBS Bank Hong Kong Limited at BNY Mellon's New York branch," (Tr. at 1475), en route to its final destination at the Barta Holdings account at DBS Bank in Hong Kong.  (GX 563 A, Tab 2 (Fenero Equity Investments -

USD)).  The "Payment Details" recorded on the spreadsheet indicate "Loan for Cryptoreal." *Id.* While neither Apex Financial Services, DMS Bank (Cayman), or DBS Bank (Hong Kong) is FDIC-insured, the New York branch of Bank of New York Mellon (the correspondent bank) is.

The initial – and fatal – problem with the Government's theory is that the Government offered no compelling evidence that the description provided for the transaction "Loan for Cryptoreal" was inaccurate.  In fact, the evidence introduced by the Government points to the transaction being precisely this very thing.  First, the Government introduced into evidence an executed share and purchase agreement between Barta Holdings and Cryptoreal, sent to Apex by Mr. Scott. (GX 2247).  Next, Mr. Spendiff testified that he "reached out to Mr. Breidenbach to understand that he was comfortable with us moving the money to a third party because ultimately he would be liable for the loan." (Tr. at 602).  Additionally, Mr. Spendiff testified that Mr. Breidenbach followed up in an email specifically directing Apex to wire the $30 million loan directly to the seller. (Tr. at 603).

The second fatal problem with the Government's theory is that even if the wire transfer description were inaccurate – which it was not – Mr. Scott played no role in providing that description to an FDIC-insured bank.  The only entity with which Mr. Scott interacted with respect to this transaction is Apex, which is not an FDIC-insured financial institution, a requirement for a finding of bank fraud under both sub-sections of the statute.  "Where the victim is not a bank and the fraud does not threaten the financial integrity of a federally controlled or an insured bank, there seems no basis in the legislative history for finding coverage under section 1344(a)(2)." *See United States v. Blackmon*, 839 F.2d 900, 906 (2d Cir. 1988).  There is similarly no evidence that Mr. Scott knew that Apex would provide his wire details to DMS when it gave instructions to transfer the money or that DMS would in turn pass this on to

BNY-Mellon "in the ordinary course of business." *Loughrin,* 573 U.S. at 366.  The information

that Mr. Scott provided, which was then twice passed around in the global equivalent of a game

of telephone, can hardly be considered a "deception[] that ha[s] *some real connection* to a

federally insured bank" as required under 1344(2). *Id.* (emphasis added).  And finally, there is

insufficient evidence showing that Mr. Scott even *knew* that a U.S., FDIC-insured bank, would

be correspondent bank used to process the transfer from DMS Bank in the Cayman Islands to

DBS Bank in Hong Kong.[7]

   Even if Mr. Scott did know that this single transaction would pass through a U.S.

correspondent bank that would be insufficient to sustain a conviction. This is insufficient to show

"purposeful availment of New York's dependable and transparent banking system" on the part of

Mr. Scott.  *See Licci ex rel Licci Lebanese Canadian Bank SAL*, 732 F.3d 161, 168 (2d Cir.

2013) (citations omitted).  In *Licci*, the Second Ciruit held that purposeful availment (on the part

of the defendant bank in question) could be shown by a "a foreign bank's repeated use of a

correspondent account in New York on behalf of a client – in effect, a 'course of dealing.'" *Id.*

Mr. Scott's May 2016 email to himself, referenced above, at best shows a possible awareness of

the intermediary bank, but this is in no way a bank that Mr. Scott selected or opted to have any

dealings with.  Thus, Mr. Scott's use of BNY-Mellon as a correspondent bank was purely

"coincidental or adventitious."  *Id.*  Such limited use of an account for what are but nominal

amounts in the broader fraud scheme can hardly constitute "repeated use of a correspondent

account." *Id.*  And, even if the Government had been able to show mere awareness on the part of

---

[7] While the Government pointed at trial to a May 2016 email that Mr. Scott sent himself
containing the DMS Bank & Trust instructions sheet, some two months before the transaction in
question (GX 1441), that document dealt with *incoming* wires to DMS. There is no evidence that
Mr. Scott knew that DMS Bank would use BONY for outgoing dollar-denominated transactions.

Mr. Scott that DMS Bank processed its US-dollar transactions through the New York branch of

Bank of New York Mellon, there is no evidence that Mr. Scott "purposely select[ed] and use[d] a

correspondent bank account to effectuate a particular transaction," a factor that the court found to

be dispositive in favor of a finding of personal jurisdiction in *Official Committee of Unsecured*

*Creditors of Arcapita v. Bahrain Islamic Bank*, 549 B.R. 56, 68 (S.D.N.Y. 2016).

      3. <u>The Government's Bank Fraud Theories Not Specified In Its Particulars Response</u>
           <u>Were Likewise Not Proven</u>

As previously noted, the Government offered three theories of bank fraud in its October

7, 2019 particulars letter response to defense counsel's request for particulars.  While it stated in

the letter that its possible theories of bank fraud were not limited to the ones outlined in its letter,

it was not until during the course of trial that the Government even suggested two others, neither

of which had any merit or was sufficiently proven.  First, the Government elicited testimony

through Locke Lord records custodian Charles Reeder about $5.1 million dollars that moved in

and out of Locke Lord's operating and trust accounts (both held at FDIC-insured banks) in

February and March of 2016. (GX 2035).  The Locke Lord client was Gilbert Armenta, and the

funds were intended for a potential investment in a company called ICard.  Through financial

tracing, the Government showed that the money that came in and out of Locke Lord, originating

from Zala Group accounts, was money that originated from, and ultimately went back to,

accounts associated with Ruja Ignatova.  (GX 2621).  But that proves nothing with respect to

bank fraud.  The Government failed to offer evidence that Mr. Scott made or agreed to the

making of misrepresentations to the FDIC insured banks with respect to these transactions. The

very limited evidence offered with respect to iCard established that it was an open legal matter at

Locke Lorde (DX 449) and that Armenta sought to keep Mr. Scott in the dark about much of the

transaction. *See* DX 556 (e-mail in which Armenta instructs his assistant "Don't respond to

Mark," following his request for transaction information).  There was no evidence whatsoever that Mr. Scott knew that Armenta's funds originated with Ruja Ignatova, nor that he believed the funds transfer surrounding iCard related to anything but a business transaction carried out by a longtime client.

Lastly, the Government suggested at the jury charge conference and again in rebuttal that the fact that OneCoin victims lied on the wire transfers to in order to be able to invest in OneCoin in the first place constituted evidence of Mr. Scott's guilt on the count of conspiracy to commit bank fraud.  This theory is frankly absurd.  In the first instance, there was no indication that Mr. Scott had any awareness of any U.S. wire fraud scheme whatsoever.  Thus, there was similarly no evidence that Mr. Scott would have known that U.S. investors were being instructed to tell banks that they were purchasing "educational packages" or even that they were told to say anything at all.  In fact, Mr. Scott had no knowledge that there were even OneCoin sales coming from the U.S.  Thus, what the Government said in rebuttal is flat out wrong.  ( "[J]ust because Mr. Scott doesn't know what somebody is telling a U.S. victim to say to the bank doesn't mean they're not part of the exact same conspiracy with the exact same goal….To lie to the U.S. banks to move the money around. That's what happened.") (Tr. at 1974-75).  Mr. Scott *was not even charged* with being part of the alleged wire fraud scheme involving OneCoin sales and there was no evidence that he had any role whatsoever in OneCoin sales, much less what U.S. or any other investors would be told to communicate to their banks when transferring money.

## D.    At Minimum, A New Trial Should Be Granted On The Bank Fraud Count

The Court's failure to instruct the jury that only the three banks identified in the October 7, 2019 particulars letter could be the basis of a bank fraud conspiracy conviction warrants, at a minimum, a new trial.  Because both conspiracy to commit money laundering and conspiracy to

commit bank fraud were charged, without more specific instruction as to what the FDIC-insured institutions were, there was too great a risk of jury confusion that the jury might convict on a theory of bank fraud that would not meet the definition under the law.

By expanding the bank fraud theory beyond the particulars letter sent to the defense approximately one month in advance of trial, the Government also constructively amended the indictment. "A constructive amendment occurs when the charge upon which the defendant is tried differs significantly from the charge upon which the grand jury voted." *United States v. Dove*, 884 F.3d 138, 146 (2d Cir. 2018). "To prevail on a constructive amendment claim, a defendant must demonstrate that either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." *United States v. Hoke*, 551 Fed. App'x. 611, 613 (2d Cir. 2014 (quoting *United States v. Frank*, 156 F.3d 332, 337 (2d Cir.1998)). Thus, there is no assurance that the jury verdict is based on a viable theory of bank fraud.

In addition, the Court's decision to not grant defense counsel's instruction that omissions only amount to material misrepresentations under the bank fraud statute when there is a duty to disclose resulted in unfair prejudice to Mr. Scott that can also only be cured by granting him a new trial. In its request to charge, the Government proposed the following statement: "Deceitful statements of half-truth, the concealment of material facts, and the expression of an opinion not honestly entertained may constitute false or fraudulent representations under the statute." (Dkt. 157). Counsel for Mr. Scott sought inclusion of the phrase "where there is a duty to disclose them" after the word "facts," citing case law that states the same. (Tr. at 1633). After hearing

24

oral argument on the issue, the Court declined to add the phrase proposed by Mr. Scott, but added the word "intentional" before "concealment." (Tr. at 1637).

Failure to instruct that omissions only rise to the level of materiality when there is a duty to disclose misstates the law, and thus resulted in unfair prejudice to Mr. Scott because it may have allowed the jury to convict on a theory that Armenta, when making transfers from his Morgan Stanley and Sabadell accounts into the Fenero Funds, allowed the jury to convict on a theory that he should have volunteered to the banks that the money being transferred originated from a criminal source. *See, e.g., Finazzo*, 850 F.3d at 109.  Under common law, "fraud based on a failure to disclose" requires the plaintiff to "prove that the defendant had a duty to disclose." *Bank of Am., N.A. v. Bear Stearns Asset Mgmt.*, 969 F. Supp. 2d 339, 351 (S.D.N.Y. 2013) (citing *Brass v. Am. Film Techs.*, Inc., 987 F.2d 142, 150 (2d Cir. 1993)).  Here, no such instruction was given, leading jurors to possibly think that a failure on the part of Armenta to mention a connection to OneCoin might implicate Mr. Scott.

## II.    The Court Should Issue a Judgment of Acquittal on The Money Laundering Conspiracy Count, Or, In The Alternative, Order A New Trial

The Court should likewise grant a judgment of acquittal on the money laundering conspiracy count because the Government failed to prove each element of the charged offense. The Government's failures were multiple, including failing to demonstrate a sufficient contact between OneCoin and the United States to establish a wire fraud, failing to prove that any funds from United States OneCoin investors were transferred to the Fenero Funds, and failing to show that the purpose of investments from the Fenero Funds was to conceal the source of the funds. These failings, among others, require a judgment of acquittal on the money laundering conspiracy count.

### A.    Applicable Law

Mr. Scott was tried for conspiracy under both prongs of the money laundering statute, 18

U.S.C. § 1956(a)(1)(B)(i) and 1956(a)(2)(B)(i).  To prove Count One, the Government was

required to establish beyond a reasonable doubt the following elements for either type of money

laundering.  The elements for domestic concealment money laundering, §1956(a)(1)(B)(i), are:

> (1) that the defendant conducted (or attempted to conduct) a financial transaction which
> must in some way or degree have affected interstate or foreign commerce;
> (2) that financial transaction at issue involved the proceeds of specified unlawful activity,
> which here is alleged to be a wire fraud scheme;
> (3) that the defendant knew that the financial transaction involved the proceeds of some
> form of unlawful activity; and
> (4) that the defendant knew that the transaction was designed, in whole or in part, either
> to conceal or disguise the nature, location, source, ownership or control of the proceeds
> of the unlawful activity.

Tr. at 1990. "The substantive offense of 'transaction money laundering' in violation of 18

U.S.C. § 1956(a)(1)(B)(i) requires proof of both knowledge that the property involve represents

the proceeds of unlawful activity and knowledge that the transaction is designed to conceal or

disguise the proceeds." *United States v. Odiase*, 788 Fed. App'x. 760, 762 (2d Cir. 2019)

(quoting *United States v. Huezo*, 546 F.3d 174, 178-79 (2d Cir. 2008)).  "A conviction under this

provision 'requires proof that the purpose or intended aim of the transaction was to conceal or

disguise a specified attribute of the funds.'" *United States v. Rodriguez*, 727 Fed. App'x. 24, 29

(2d Cir. 2018) (citing *Huezo*, 546 F.3d at 179).

The elements for international concealment money laundering, §1956(a)(2)(B)(i), are:

> (1) that the defendant knowingly transported, transmitted or transferred a monetary
> instrument or funds from a place in the United States to or through a place outside the
> United States, or to a place in the United States from or through a place outside the
> United States;
> (2) that the defendant did so with knowledge that the monetary instrument or funds
> involved represent the proceeds of some form of unlawful activity; and
> (3) that the defendant knew that the transportation, transmission, or transfer was
> designed, in whole or in part, to conceal, disguise the nature of the action, location, the
> source, the ownership, or control of the proceeds of specified unlawful activity.

Tr. at 1997. "[A] conviction under Section 1956(a)(2)(B)(i) must be based on evidence that the defendant: (i) attempted to transport the funds across the United States border; (ii) knew that those funds 'represent[ed] the proceeds of some form of unlawful activity;' and (iii) knew that such transportation was designed to 'conceal or disguise the nature, the location, the source, the ownership, or the control' of the funds." *United States v. Ness*, 565 F.3d 73, 77 (2d Cir. 2009) (quoting *Regalado Cuellar v. United States*, 553 U.S. 550, 561 (2008)). "A conviction of concealment money laundering requires evidence of intent to disguise or conceal the transaction, whether from direct evidence, like the defendant's own statements, or from *circumstantial evidence*, like the use of a third party to disguise the true owner, or *unusual secrecy*." *United States v. Gotti*, 459 F.3d 296, 338 (2d Cir. 2006) (citations omitted). "The statutory text makes clear that a conviction requires proof that the transportation's purpose -- not merely its effect -- was to conceal or disguise one of the listed attributes: the funds ' nature, location, source, ownership, or control." *Regalado Cuellar*, 553 U.S. at 557. Both types of concealment money laundering contain the requirement that the funds at issue be "proceeds of specified unlawful activity," (§ 1956(a)(1)(B)(i)(2); § 1956(a)(2)(B)(i)(3)).

The charged specified activity in the indictment was wire fraud. The elements of wire fraud are:

> (1) that there was a scheme or artifice to defraud others of money or property by materially false or fraudulent pretenses, representations or promises; (2) that one or more participants in that scheme knowingly and willfully devised or participated in the scheme or artifice to defraud, with knowledge of its fraudulent nature and with specific intent to defraud; and (3) that in the execution of that scheme, one or more participants in that scheme used or caused the use by others of interstate or foreign wires.

(Tr. at 1993); *see also United States v. Calderon*, 944 F.3d 72, 85 (2d Cir. 2019) ("The essential elements of wire fraud are (1) a scheme to defraud, (2) money or property as the object of the

scheme, and (3) use of wires to further the scheme." (internal citations and quotations omitted);

Though the wire fraud statute does not define "scheme to defraud," but it has been described as a

plan to deprive a person "of something of value by trick, deceit, chicane or overreaching." *See*

*United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (quoting *McNally v. United States*,

483 U.S. 350, 358) (1987)).

>   **B.     The Government Failed To Prove The Existence Of A United States Wire
>           Fraud, The Charged Specified Unlawful Activity**

Following the Supreme Court's guidance in *Morrison v. Nat'l Australia Bank Ltd.* that a

statute has no extraterritorial application if it gives no clear and affirmative indication of any,

561 U.S. 247, 254 (2010), the Second Circuit reached the conclusion that the wire fraud statute

does not have extraterritorial application. *See European Community v. RJR Nabisco, Inc.*, 764

F.3d 129, 139 (2d Cir. 2014) ("[W]e conclude that the wire fraud and money fraud statutes…do

not overcome *Morrison*'s presumption against extraterritoriality."); *see also United States v.*

*Hawit*, 2017 WL 663542, at *4 (E.D.N.Y. Feb. 17, 2017), ("As the parties recognize, the federal

wire fraud statute, 18 U.S.C. § 1343, does not apply extraterritorially.").

Instead, wire fraud is a domestic offense, and can occur only where there is a sufficient

nexus between the alleged fraud scheme and the United States. "If the conduct relevant to the

statute's focus occurred in the United States, then the case involves a permissible domestic

application even if other conduct occurred abroad; but if the conduct relevant to the focus

occurred in a foreign country, then the case involves an impermissible extraterritorial application

regardless of any other conduct that occurred in U.S. territory." *See RJR Nabisco, Inc. v.*

*European Community*, 136 S.Ct. 2090, 2101 (2016); *see also United States v. Budovsky*, 2015

WL 5602853, at *4 (S.D.N.Y. Sept. 23, 2015) ("A jurisdictional nexus exists 'when the aim of

that activity is to cause harm inside the United States or to U.S. citizens or interests.'") (quoting

*United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011)).   Indeed, a "domestic application

of wire fraud" requires that "(1) a defendant or coconspirator commits a substantial amount of

conduct in the United States, (2) the conduct is integral to the commission of the scheme to

defraud, and (3) at least some of the conduct involves the use of U.S. wires in furtherance of the

scheme to defraud." *United States v. Gasperini,* 2017 WL 2399693, at *8 (E.D.N.Y. Jun. 1,

2017), (quoting *United States v. All Assets Held at Bank Julius*, 251 F. Supp. 3d 82, 103

(D.D.C., Apr. 27, 2017).

The Government failed to prove any wire fraud with sufficient nexus to the United States

occurred.  A senior leader of OneCoin, Konstantin Iganatov, testified extensively about

OneCoin's operations but failed to identify any OneCoin sales in the United States.  The *entirety*

of the Government's evidence of OneCoin purchases in the U.S. was presented through two

American witnesses who wired money from U.S.-based accounts into domestic and foreign

accounts associated with OneCoin.   William Horn, of Cookeville, Tennessee, testified that he

purchased close to $27,000 in OneCoin packages. (Tr. at 74, 84).  Linda Cohen, of New York,

NY, also testified that she invested about $22,000 in OneCoin packages, in addition to a $5,000

check she wrote to her son to invest on her behalf. (Tr. at 791, 799).

In short, despite claiming that OneCoin received "billions of dollars in revenue" (Tr. at

37), the Government identified barely $50,000 in OneCoin sales to the United States. There was

*no* evidence presented to the jury of any other U.S. purchases of OneCoin at all.[8] And even if

---

[8] The extent of any other U.S. OneCoin sales beyond the evidence the Government presented at
trial is an open question, but it is telling that the Government, in an affidavit filed in connection
with a seizure warrant filed in this case (and produced to the defense as MS_USAO_00000084),
stated that 1.45% of OneCoin "members" were from the United States. Assuming that the U.S.
purchasers invested amounts in proportion to buyers elsewhere, this would mean that only
approximately $5.8 million of the $400 million that Mr. Scott was accused of having conspired

other U.S. individuals had purchased OneCoin, the Government would be required to prove that

their purchases were linked to a scheme to defraud.  Given that OneCoin was sold through a

multilevel marketing structure, we have no idea what representations were made to non-

testifying purchasers in the United States relating to OneCoin and whether they were in fact

victims of a wire fraud scheme.   The reality is that OneCoin was created by people outside of

the U.S.  and sold almost entirely to people outside of the U.S..  Thus, such transactions cannot

be a valid domestic application of the U.S. wire fraud statute, as the "conduct relevant to the

[statute's] focus occurred in a foreign country," *RJR Nabisco, Inc.*, 136 S.Ct. at 2101, nor was

there a "substantial amount of conduct in the United States," *Gasperini,* 2017 WL 2399693, at

*8.

## C.     The Government Failed To Prove That Proceeds Of Any Wire Fraud Scheme Were Invested In The Fenero Funds

Even if the sale of a *de minimis* amount of OneCoin to U.S. residents was sufficient to

make OneCoin a wire fraud scheme, which it was not, the Government failed to prove that

proceeds from such a domestic wire fraud scheme were invested in the Fenero Funds.

As noted above, the Government offered evidence of only approximately $50,000 in

transfers from two U.S. residents, Cohen and Horn.  Yet the Government failed to prove that any

of these funds were transferred into the Fenero Funds.  On February 17, 2016, Cohen wired

$22,577.29 from an HSBC account ending in 7664 to SecurePoint Corporation's TD Bank

account ending in 7544 (GX 731A).  The Government claimed that Cohen's funds were

transferred to United Overseas Bank and Kreissparkasse Steinfurt (GX 2626) and that United

Overseas Bank subsequently transferred funds to Fenero (GX 2602).  But this is simply false.

---

to launder came from domestic investors.  Critically, though, the Government failed to offer
evidence of U.S. sales in even this amount.

The first wire from TD Bank #7544 to United Overseas Bank occurred on 3/17/2016 (GX-730-A, row 166). At the time that Cohen wired money into TD Bank, the balance in the account was approximately $1.1 million USD.  And, between the time when Cohen wired money into TD Bank and when TD wired money to United Overseas Bank, the TD Bank account had various withdrawals totaling at least $2,478,661.22. The Government failed to identify any accounting method or principle of asset tracing that would establish that any of Ms. Cohen's funds went to United Overseas Bank, let alone to the Fenero Funds.  And the Government failed to introduce any evidence or analysis proving such flow of funds.

The Government did not suggest, much less introduce evidence proving, that funds invested by William Horn were transferred to the Fenero Funds.  On January 20, 2016, Horn transferred $20,570.75 from his bank account at American Bank and Trust in Tennessee to the bank account of IMS GMBH bank account number 6108 in Kreissparkasse Steinfurt bank in Germany. (GX 2803).  *There were no transfers between this account and the Fenero Funds.*  On February 25, 2016, Mr. Horn wired $6,062.60 from his account in People's Bank & Trust to Securepoint Corporation's bank account number 7544 at TD Bank. (GX 2811).  Depending on the tracing methodology used, these funds either ended up in the IMS GMBH bank account number ending in 6108 at Kreissparkasse Steinfurt, which did not send funds to Fenero, or as payments to unknown individuals.  The Fenero Funds did not even start accepting investments until late May of 2016.

Indeed, the Government's failure of proof as to U.S. OneCoin money traced into the Fenero Funds went beyond Cohen and Horn.  The Government did not offer into evidence bank

statements for all of the eight accounts[9] that fed money into the four registered Fenero private

equity fund accounts (GX 2602), and none of the accounts they did provide showed incoming

payments from accounts in the United States.  In fact, the Deutsche Bank statements provided to

Mr. Scott by  Manon Hubenthal from an IMS account showed debits from exclusively from non-

U.S. customers. (GX 2281).  None of this stopped the Government from once again misstating

the evidence in summation, falsely claiming that money from U.S. investors "went to Scott's

account in the Cayman Islands, money that came straight from OneCoin victims and then to

accounts literally all over the world." (Tr. at 1880-81).   But the reality is that the Government

failed to show that funds from *any* OneCoin sales in the United States – the only place where

OneCoin could have violated the wire fraud statute – to any accounts controlled by Mr. Scott.

**D.    The Government Failed To Prove That Mr. Scott Entered Into A Conspiracy To Launder OneCoin Wire Fraud Proceed**

 "To convict a defendant as a member of a conspiracy, the Government must prove that

the defendant agree[d] on the essential nature of the plan . . . and that there was a conspiracy to

commit a particular offense and not merely a vague agreement to do something wrong." *United*

*States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (internal citations and quotation marks

omitted).  Mr. Scott was not charged with a substantive violation of the money laundering

statute.  He was charged with conspiracy under 18 U.S.C. § 1956(h).  The statutory language

provides punishment for "[a]ny person who conspires to commit any offense defined in this

section…."  "The offense of conspiring to launder money, in violation of 18 U.S.C. § 1956(h),

requires proof that the defendant 'knowingly engaged in the conspiracy with the specific intent to

---

[9] The Government's witness who testified on funds tracing, Rosalind October testified that she "did not have the records for the account -- the OCBC account ending in 7201" that was shown on GX 2602 as being one of the accounts that invested into the Fenero Funds. (Tr. at 1735).

commit the offenses that were the objects of the conspiracy." *Odiase,* 788 Fed. App. at 762

(citing *Huezo,* 546 F.3d at 180)).   In other words, in order to agree to commit the substantive

offenses, Mr. Scott would have had to have had knowledge of the essential elements of the

substantive offense.  He would have had to know that the funds were proceeds of felonious

activity and that the funds were the proceeds of the specified unlawful activity alleged in the

indictment -- here the wire fraud scheme.  Because there was a complete failure of proof that Mr.

Scott knew about any United States connection with OneCoin, and because wire fraud is a

domestic offense, it is impossible for Mr. Scott to have conspired to commit money laundering

with regard to the proceeds of wire fraud.

**E.      The Government Failed To Prove Other Elements Of The Money Laundering
          Conspiracy**

The Government also failed to offer sufficient evidence on the other elements of money

laundering.  With respect to the third requirement of domestic concealment money laundering,

the Government did not prove that Mr. Scott *knew* that the financial transaction involved

proceeds of an unlawful activity.  At best, taking the evidence in the light most favorable to the

Government, the Government proved that Mr. Scott knew that there were questions about

OneCoin, not that it was illegal.   In closing and rebuttal, the Government cited only two

concrete examples: the article written by a CPA and OneCoin critic that Dilkinska forwarded to

Mr. Scott, flagging it as defamatory (*see* Tr. at 1885, 1975), and the email from RavenR

employee Gary Gilford to Mr. Scott referencing the City of London Police investigation and a

history of frozen accounts. (GX 4102).  As for the article, there is no evidence that Mr. Scott

even read it, had any reason to trust the source or author, or that he even replied to Dilkinska as

to its contents.  As for the email from Mr. Gilford, it only references an investigation into

33

OneCoin that was "currently" happening but in no way mentioned that any kind of conclusive findings had been reached one way or the other.[10]

Rather, the jury saw much evidence that gave Mr. Scott comfort that he was dealing with a reputable organization, including assurances from Ignatova herself.  For example, in their initial communications that set the tone for the relationship going forward, Ignatova indicated to Mr. Scott that she was seeking advice that "lets me operate my business as much as possible within legal frameworks," and that the "risk [of] not being 'legal' in USA I would take extremely serious." (DX 103). Additionally, there was evidence that Mr. Scott took comfort that Deutsche Bank handled accounts linked to OneCoin.  While the Government argued that there was widespread awareness that OneCoin was problematic during the events at issue in 2016, the Government's own witnesses contradicted this point  Additionally, David Wilder, head of Bank of New York Mellon's anti-money laundering division, testified that even after a thorough investigation into transfers from Mr. Scott that it had processed, the bank never placed a filter on the Fenero Funds, Ruja Ignatova, or OneCoin  (Tr. at 1487), which it presumably would have done had its AML investigation come to such a conclusion.  In addition, there was substantial evidence that Mr. Scott had not concluded that OneCoin was fraudulent, including the fact that he set up the Fenero Funds under his own name, identified his foreign bank accounts and reported Fenero Fund related income on his tax returns (DX 158, DX 159, DX 160, DX 701).

The Government also failed to prove that Mr. Scott knew that the transactions were designed to conceal or disguise the nature, location, source, ownership or control of the proceeds

---

[10] In fact, the investigation concluded in November 2019 with the COLP deciding to drop the matter entirely.  *See* "Police drop inquiry into 4bn OneCoin swindle," The Times (Dec. 24, 2019),  https://www.thetimes.co.uk/article/police-drop-inquiry-into-4bn-onecoin-swindle-wxsjskr6q.

of the unlawful activity.  In fact, the Government did not even prove that the investments made by the Fenero Funds were not legitimate, despite using the word "fake" to describe all aspects of Mr. Scott's business dealings 43 times in opening, summation, and rebuttal.[11]  Paul Spendiff, fund administrator at Apex, testified that Apex conducted diligence on the transaction and allowed it to go through, (Tr. at 650), and the evidentiary record reflected that he was supplied with ample documentation to this effect. (GX 2218).  And while the Government alleged repeatedly that the second transaction approved by Apex, a $30 million loan for investment into an oil field in Madagascar, was also fraudulent (Tr. at 1882),  it provided no evidence to back up this assertion.

On the other hand, Mr. Scott was impeded from showing its legitimacy by the Court's decision to quash the subpoena requiring that Neil Bush testify.  (Tr. at 1281).  While the Court's reasoning appeared to be that the deal itself was not at issue, but rather the source of the proceeds that funded it,[12] this was a distinction lost on the jury because of the Government's repeated assertions that the deal itself was fake.  Thus, had the defense been permitted to call Mr. Bush to

---

[11]The Government sought to overcome this lack of evidence by suggesting to the jury that Mr. Scott lied to banks and others, even when the Government knew its own evidence contradicted the point.   For example, the Government presented travel records showing Mr. Scott traveling to and from Miami, Florida and Istanbul, Turkey, from March 15 - 26, 2016 (GX 62) to raise the suggestion that Mr. Scott was not being truthful when he told the Bank of Ireland that he was meeting with investors in Austria during that week (GX 1713; Tr. at 1502).  However, the Government had evidence showing that this was demonstrably false, as hotel records and American Express bills clearly place Mr. Scott in Austria during the relevant time period. *See* Devlin-Brown Declaration Ex. C, MS_USAO_FT_189928 (Confirmation email to Mark Scott for March 17-23, 2016 at the Grand Park Hotel in Vienna, Austria); MS_USAO_0031212_027518 (American Express record showing a payment of $3,287.23 on March 23, 2016 at the Grand Park Hotel).

[12] Tr. at 1281, out of the presence of the jury. The Court: "Now, what the source of those funds are, and ultimately how they were used, is again what is being litigated here, not the fact that there was an oil field in which an interest was going to be purchased.  So, I don't see how Mr. Bush can add to the relevant elements of Mr. Scott's defense, and at the end of the day I believe that quash is appropriate."

testify, the jury would have heard evidence that he was a close associate of Dr. Hui (the Hong Kong businessman at the heart of the deal ultimately responsible for the oil field investment); that Mr. Bush attended an in-person meeting with Ruja and Dr. Hui; that he personally received $300,000 in payment from Ruja for his involvement and participation; and, that he signed a Share Purchase Agreement giving him the option to buy an interest in the deal. (Tr. at 1263, 1268).  Furthermore, counsel for Mr. Scott had planned to introduce additional supporting documentation through Mr. Bush, which they were prevented from doing because of the decision to quash the subpoena.[13]

The government also failed to introduce sufficient proof to establish venue in the Southern District of New York under 18 U.S.C. § 1956(i).  In summation, the Government cited to two factors which it said were sufficient to establish venue: (1) Linda Cohen wiring money from a Manhattan bank to invest in OneCoin; and (2) "that correspondent banks were used in New York to wire money on behalf of Scott's fake investment funds." (Tr. at 1869).  However, neither of these is sufficient.  First, with respect to the Cohen transfer, as previously established, the Government did not prove that any of the funds invested by Cohen into OneCoin ended up in any of the Fenero Funds, precluding finding venue under 1956(i)(B).  Next, with respect to the correspondent banking transactions that were processed through the Fenero Funds, there is scant legal authority to suggest that this is sufficient, and the Second Circuit has yet to address this issue.

## F.    At Minimum, A New Trial Should Be Granted On The Money Laundering Conspiracy Count

---

[13] *See* Devlin-Brown Declaration, Ex. D, Share Subscription Agreement, signed by Hoifu Petroleum and Mr. Bush, for an option to acquire 1% of Madagascar Southern Petroleum Company for $13.6 million dollars; emails indicating that Mr. Bush received a $300,000 USD payment from Dr. Ruja Ignatova relating to his participation in the deal.

The Court's failure to accept counsel for Mr. Scott's supplemental jury instruction also warrants, at a minimum, a new trial pursuant to Rule 33 on the count of conspiracy to commit money laundering.   After the charge had been read to the jury but before deliberations began, counsel for Mr. Scott filed a letter motion with the court requesting a supplemental jury instruction pertaining to wire fraud, the specified unlawful activity underlying the money laundering conspiracy count to avoid "leav[ing] the jury with the impression that the crime of wire fraud may be applied solely on extraterritorial acts." (Dkt. 181).

Counsel for Mr. Scott proposed that the Court explain wire fraud using the language of the district court in *Gasperini*: "A fraud scheme occurs within the United States only 'when (1) a defendant or coconspirator commits a substantial amount of conduct in the United States, (2) the conduct is integral to the commission of the scheme to defraud; and (3) at least some of the conduct involves the use of U.S. wires in furtherance of the scheme to defraud.'" (*Id.*).  The Court declined to give this instruction.

As set forth in section II(B), above, a violation of the wire fraud statute requires a sufficient nexus to the United States, which OneCoin did not have.  Mr. Scott's proposed instruction would have made this clear to the jury and the failure to provide the instruction created a serious risk that the Mr. Scott was convicted based on conduct that does not in fact violate United States law.  A new trial is necessary to address this error.

## **CONCLUSION**

For the above reasons, we request that the Court grant acquittal on both counts, or in the alternative, a new trial.

Respectfully Submitted,

Dated: February 3, 2020

/s/ Arlo Devlin-Brown

Arlo Devlin-Brown
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1046

David M. Garvin
Law Offices of David M. Garvin
200 South Biscayne Boulevard
Suite 3150
Miami, FL 33131
(305) 371-8101

*Counsel for Mr. Scott*