UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

  UNITED STATES OF AMERICA      :

                             :

        - v. -            :

                             :   S10 17 Cr. 630 (ER)

  MARK S. SCOTT,           :

                             :

          Defendant.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

## GOVERNMENT'S MEMORANDUM
## IN OPPOSITION TO DEFENDANT'S MOTION
## FOR A JUDGMENT OF ACQUITTAL OR A NEW TRIAL

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York

Christopher J. DiMase
Nicholas Folly
Assistant United States Attorneys
Julieta V. Lozano
Special Assistant United States Attorney

*- Of Counsel -*

**TABLE OF CONTENTS**

BACKGROUND ......................................................................................................... 1

I.  THE GOVERNMENT'S CASE AT TRIAL .......................................................... 1

    A.  Background on OneCoin ............................................................................... 2

    B.  OneCoin Is a Massive Fraud Scheme .......................................................... 4

    C.  Ruja's Flight ................................................................................................. 5

    D.  Gilbert Armenta Introduces Ruja to Scott ................................................... 6

    E.  Scott Sets Up the Fenero Funds ................................................................... 6

    F.  Scott's Use of the Fenero Funds to Launder OneCoin Proceeds ................. 8

    G.  Scott's Lies to Effectuate the Transfer of Ruja's OneCoin Fraud Proceeds ................. 9

    H.  Scott's Lies to United States Banks ........................................................... 13

    I.  Scott's Post-Arrest Lies ............................................................................. 14

    J.  Scott's Fraud Scheme Earnings and Lavish Spending ............................... 15

II.  APPLICABLE LAW ......................................................................................... 15

    A.  Motion for a Judgement of Acquittal under Rule 29 .................................. 15

    B.  Motion for a New Trial under Rule 33 ....................................................... 16

III.  THE DEFENDANT'S ARGUMENT THAT THE GOVERNMENT FAILED
      TO PROVE THAT THE DEFENDANT ENGAGED IN A MONEY
      LAUNDERING CONSPIRACY IS MERITLESS ....................................... 16

    A.  Applicable Law .......................................................................................... 17

    B.  The Jury's Verdict was Supported by Legally Sufficient Evidence Proving the
       Elements of the Crime Beyond a Reasonable Doubt ................................. 19

IV.  THE DEFENDANT'S ARGUMENT THAT THE GOVERNMENT'S
      EVIDENCE WAS INSUFFICIENT TO PROVE THAT SCOTT ENGAGED IN
      A BANK FRAUD CONSPIRACY IS MERITLESS ................................... 28

V.  THE DEFENDANT'S ARGUMENT THAT SECTION 1344 DOES NOT
     COVER THE CHARGED CONDUCT IS MERITLESS ........................... 32

VI.  THE COURT'S JURY INSTRUCTIONS ON COUNT TWO WERE PROPER .... 34

A.  There Was No Constructive Amendment of Count Two ............................................. 35

B.  The Court's Instruction on Material Misrepresentations Is Consistent with Recent
      Second Circuit Precedent ............................................................................................ 40

CONCLUSION ............................................................................................................................ 43

## TABLE OF AUTHORITIES

*Jackson v. Virginia*, 443 U.S. 307 (1979) ................................................................................ 16, 32

*Loughrin v. United States*, 573 U.S. 351 (2014) ............................................................................ 33

*United States v. Al Kassar,* 660 F.3d 108 (2d Cir. 2011) .............................................................. 25

*United States v. Armantrout*, 411 F.2d 60 (2d Cir. 1969) ............................................................. 42

*United States v. Autuori*, 212 F.3d 105 (2d Cir. 2000) .................................................................. 42

*United States v. Bohonus*, 628 F.2d 1167 (9th Cir. 1980) ............................................................. 42

*United States v. Bryser*, 838 F. Supp. 124 (S.D.N.Y. 1993) .......................................................... 42

*United States v. Budovsky*, 2015 WL 5602853 (S.D.N.Y. 2015) ................................................... 25

*United States v. Chavez*, 549 F.3d 119 (2d Cir. 2008) ................................................................... 16

*United States v. Colton*, 231 F.3d 890 (4th Cir. 2000) .................................................................. 42

*United States v. Danielson*, 199 F.3d 666 (2d Cir. 1999) .............................................................. 38

*United States v. Fed. Record Serv. Corp.* 1999 WL 335826 (S.D.N.Y. 1999) ............................ 42

*United States v. Ferguson*, 246 F.3d 129 (2d Cir. 2001) ............................................................... 16

*United States v. Gambino*, 59 F.3d 353 (2d Cir. 1995) .................................................................. 16

*United States v. Garcia*, 587 F.3d 509 (2d Cir. 2009) ................................................................... 17

*United States v. Gotti,* 459 F.3d 296 (2d Cir. 2006) ...................................................................... 24

*United States v. Heimann*, 705 F.2d 662 (2d Cir. 1983) ................................................................ 38

*United States v. Huezo*, 546 F.3d 174 (2d Cir. 2008) ............................................................... 17, 18

*United States v. Ionia Mgmt.*, 555 F.3d 303 (2d Cir. 2009) ........................................................... 38

*United States v. Keplinger*, 776 F.2d 678 (7th Cir. 1985) ............................................................. 42

*United States v. Lebedev,* 932 F.3d 40 (2d Cir. 2019) ................................................................... 34

*United States v. Nejad*, 2019 WL 6702361 (S.D.N.Y. 2019) ........................................................ 34

*United States v. Patino*, 962 F.2d 263 (2d Cir. 1992).................................................................. 38

*United States v. Perez-Ceballos,* 907 F.3d 863 (5th Cir. 2018)................................................... 34

*United States v. Petrossi* 2019 WL 4267874 (2d Cir. 2019) ....................................................... 41

*United States v. Ragosta*, 970 F.2d 1085 (2d Cir. 1992) ............................................................ 15

*United States v. Resendiz-Ponce*, 127 S.Ct. 782 (2007) ............................................................ 38

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007) ............................................................ 38, 40

*United States v. Salmonese*, 352 F.3d 608 (2d Cir. 2003) .......................................................... 38

*United States v. Sanchez*, 969 F.2d 1409 (2d Cir. 1992) ............................................................ 16

*United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013) ............................................................... 38, 40

*United States v. Wiseberg*, 727 F. App'x 1 (2d Cir. 2018) .......................................................... 17

*United States v. Yannai*, 791 F.3d 226 (2d Cir. 2015) ................................................................ 16

*United States v. Zarrab*, 2016 WL 6820737 (S.D.N.Y. 2016) ................................................ 33, 42

*United States v. Zongo*, 2017 WL 2297010 (S.D.N.Y. 2017) ...................................................... 15

## BACKGROUND

Scott was charged in a two-count Superseding Indictment, S10 17 Cr. 630 (ER) (the "Indictment"), with conspiracy to commit money laundering in violation of Title 18, United States Code, Section 1956(h), and conspiracy to commit bank fraud in violation of Title 18, United States Code, Section 1349.  The Indictment alleged that from at least in or about September 2015 through 2018, the defendant conspired to launder "approximately $400 million in proceeds of a wire fraud scheme involving a purported cryptocurrency known as 'OneCoin'" (the "OneCoin Scheme"). (Indictment ¶¶ 2-3).  Further, the Indictment alleged that the defendant and other co-conspirators lied to banks and other financial institutions worldwide—including within the United States—to cause those banks to transfer funds that were derived from the OneCoin Scheme into and out of accounts that were associated with certain purported investment funds.  (*Id.* ¶ 5).  The specific details of the defendant's offense conduct and the evidence presented at trial are set forth below.

## I.      The Government's Case at Trial

The Government's evidence at trial against the defendant was overwhelming.  The evidence included the testimony of seventeen witnesses, including but not limited to: one of OneCoin's top leaders, Konstantin Ignatov; victims of the OneCoin Scheme; a money laundering expert; employees from United States banks that were defrauded by Scott; a partner from Scott's former law firm, Locke Lord LLP; a former managing director at a fund administration firm that was used by Scott to unwittingly launder OneCoin Scheme proceeds; a financial intelligence analyst who traced the criminal proceeds; and a federal agent from the Internal Revenue Service – Criminal Investigations who was involved in a search and seizure of Scott's property and participated in Scott's post-arrest interview, in which Scott lied repeatedly about his involvement with OneCoin and Ruja Ignatova ("Ruja").  The Government's evidence also included numerous emails, including emails between Scott and key members of the OneCoin Scheme such as Ruja,

Irina Dilkinska, and Gilbert Armenta.   In addition, the Government's evidence included bank records and charts which detailed Scott's network of offshore bank accounts and depicted his laundering of OneCoin Scheme proceeds and his criminal earnings of over $50 million in OneCoin Scheme proceeds that he was paid for his role as a money launderer.

### A.  Background on OneCoin

At trial, the Government offered the testimony of cooperating witness Konstantin Ignatov ("Konstantin"), who is the brother of Ruja, one of OneCoin's co-founders.  Konstantin testified at length about the OneCoin Scheme.[1]  OneCoin was founded by Ruja and Sebastian Greenwood ("Greenwood").[2]  (Tr. 132).  Its head office is located in Sofia, Bulgaria.  (Tr. 131).[3]  OneCoin markets and sells a purported digital cryptocurrency by the same name.  (Tr. 132).  Approximately 3.5 million people have invested in OneCoin cryptocurrency packages.  (Tr. 133).  OneCoin took in over $2 billion in criminal proceeds.  (Tr. 134).  OneCoin began operating in the United States in or around 2015.  (GX 63, 204-C).

OneCoin markets its fake cryptocurrency, "OneCoin," through a global multi-level marketing ("MLM") network of OneCoin members.  (Tr. 173).  OneCoin has promoted various

---

[1]  In his memorandum of law in support of his Motion ("Def. Mem.," Dkt No. 218), the defendant mischaracterizes the recent disclosure letter sent by the Government to the defense regarding Konstantin and the payment of his legal fees.  The Government did not "permit" Konstantin to use OneCoin Scheme proceeds to pay for his legal fees.  (Def. Mem. at 3).  As noted in the Government's letter dated January 21, 2020 to defense counsel, the Government did not receive any specific information regarding the source of funds used to pay for Konstantin's legal fees until *after* the conclusion of Scott's trial.  Furthermore, as set forth in Exhibit B to the Government's January 21 letter, Konstantin believes that his girlfriend and his parents arranged for the payment of his legal fees, and that they took out loans and sold a piece of inherited land in order to pay for the legal fees.  Konstantin would therefore not have had an "added incentive to shade his testimony," as the defendant argues.  (Def. Mem. at 3).

[2]  "GX" refers to a Government trial exhibit; "Tr." refers to the trial transcript.

[3]  OneCoin is still operating today.

different "trader packages" priced at, for example, between €100 and €100,000 euros, including "starter" packages, "tycoon trader" packages, and Power Packs. (Tr. 176-77; GX 100). Purchase of a trader package provides access to "educational materials" and "tokens." (Tr. 175-76). According to OneCoin's representations to the public, "tokens" are used to secure positions in OneCoin's "mining pools," depicted in promotional materials as computer hardware used to "mine" OneCoins. (Tr. 176).

OneCoin has falsely claimed that the value of OneCoin is based on market supply and demand. (Tr. 155-58). For example, in one set of OneCoin promotional materials, OneCoin falsely claimed that "as more and more members join, and the demand for tokens gets higher and higher it is only natural that the price of the tokens increases. With every new member joining One[coin], the demand grows and the price . . . grows." (GX 1001 at 19). OneCoin added that "as more and more new members join – the price again rises – again a split happens. Congratulations, you AGAIN doubled your money." *Id.*

The purported value of a OneCoin grew steadily from €0.50 to approximately €29.95 per coin, as of in or about January 2019. (GX 3007, Tr. 158). The price of OneCoins has never decreased in value. (Tr. 158).

OneCoin has claimed to have a private "blockchain," or a digital ledger identifying OneCoins and recording historical transactions. (GX 204). OneCoin's private blockchain may be contrasted with Bitcoin's blockchain, which is decentralized and public. (Tr. 165). In or around 2015, Ruja falsely represented to the public that the OneCoin blockchain had been audited by an external auditor. (Tr. 166). In reality, the audit report was fake and had been drafted by employees at OneCoin, despite the fact that it claimed to be an external audit. (Tr. 166-67).

### B.  OneCoin Is a Massive Fraud Scheme

In or around the summer of 2014, Ruja and Greenwood began developing the concept and payout plan for OneCoin.  Emails show that Ruja and Greenwood developed OneCoin's unsustainable compensation structure for the purpose of enticing people to invest in OneCoin trader packages, including the false promise that investors would make a five-fold or ten-fold investment return.  For example, on June 11, 2014, Ruja wrote to Greenwood concerning the OneCoin business plan:

> It might not be [something] really clean or that I normally work on or even can be proud of (except with you in private when we make the money) – but . . . I am especially good in this very borderline cases [sic], where the things become gray – and you as the magic sales machine – and me as someone who really can work with numbers, legal and back you up in a good and professional way – we could really make it big – like MLM meets bitch of wall street ;-)

> \* \* \*

> Your main sales argument is: **after 2 splits a member makes out of 5.000 USD 25.000 USD.  You should be able to sell this** ☺ . . . I also added an **Extra Bonus for all members joining the Presales** . . . they can do actually 3 splits.  Which means that they will actually **have 10x their investment**.  2 splits is 5x your money. So of course, everybody who is greedy will go in with 5.000 USD.

(GX 2101) (bold in original).

In another email on or about August 9, 2014, Ruja sent Greenwood her thoughts on an "exit strategy" for OneCoin.  The first option that Ruja listed was, "Take the money and run and blame someone else for this (standard approach, see Wenyard)."  (GX 2102).  As described in further detail below, Ruja later adopted this exit strategy, disappearing entirely from public view in or around October 2017, after defrauding millions of investors out of billions of dollars.

As noted above, contrary to OneCoin's public representations, the value of OneCoin is actually determined internally and not based on market supply and demand.  (Tr. 155-58, GX 3007, GX 2100).  Furthermore, contrary to OneCoin's public representations, OneCoins are not

mined but were instead auto-generated, and then distributed to members on an as-needed basis. (GX 2103).

OneCoin made numerous additional misrepresentations to investors in order to induce them to purchase OneCoins.  Among other false representations that OneCoin made the public were that: (1) OneCoin was going to have a public exchange where OneCoin investors could buy and sell OneCoins for fiat currency; (2) OneCoins could be used as a global currency; (3) OneCoin would have a foreign exchange (also known as "FX" or "forex") market where OneCoin investors could trade their OneCoins and other real currencies such as Euros and dollars for other currencies; and (4) OneCoin would have an investment fund where OneCoin investors could invest OneCoins in real assets.  (Tr. 181-83).  OneCoin indicated to the public that it would have a public exchange by a specific date on a number of occasions; to this date, OneCoin has never had a public exchange.  (Tr. 182).

### C.  Ruja's Flight

In or about October 2017, after learning that she was the subject of an FBI investigation, Ruja fled with a bodyguard on a one-way flight to Athens, Greece.  (Tr. 278-85).  Ruja has since made no appearances at any public OneCoin events, and has made no public statement regarding her whereabouts.  Ruja has not been seen or heard from by even her close family, including her brother Konstantin.  (Tr. 286).  Ruja made in excess of $500 million in OneCoin Scheme proceeds before her disappearance in October 2017.  (Tr. 220).  As set forth below, Scott laundered approximately $400 million of those proceeds for Ruja.

After Ruja's flight and disappearance, Ruja's brother Konstantin assumed high-level positions at OneCoin.  (Tr. 169, 201, 205).  Prior to Ruja's disappearance, Konstantin was Ruja's personal assistant at OneCoin.  (Tr. 169).  By in or about mid-2018, after Ruja had disappeared,

Konstantin assumed one of the top leadership positions at OneCoin.  (Tr. 201).

### D.  Gilbert Armenta Introduces Ruja to Scott

As banks around the world began to catch on to the OneCoin Scheme, banks became unwilling to handle OneCoin fraud money.  (Tr. 229).  OneCoin could not open bank accounts in the name of "OneCoin," and instead had to hide the origin of the funds in those accounts, and the purpose of the transfers into and out of those accounts.  (*Id.*).

Gilbert Armenta, who was the boyfriend of Ruja and was also one of Ruja's main money launderers, assisted OneCoin with some of its banking problems.  (Tr. 130).  As of late 2015, Armenta had begun laundering OneCoin fraud scheme proceeds for Ruja.  (GX 2114, 2115).  Around that same time, Armenta introduced the defendant, Mark Scott, to Ruja.  (GX 2115, 1004).

At the time of this introduction, Scott, who is a trained corporate lawyer, was a partner at the law firm Locke Lord LLP, and based in Miami, FL.  (GX 2201).  Scott had extensive experience in representing private equity funds.  (*Id.*).  Scott in turn leveraged that experience to construct a sophisticated money laundering vehicle for Ruja, involving transfers of hundreds of millions of dollars of OneCoin Scheme proceeds disguised as investments into a series of investments funds (collectively referred to as the "Fenero Funds").  (GX 2602, 2602-A).  Scott resigned from his position as a partner at Locke Lord in or about September 2016.

### E.  Scott Sets Up the Fenero Funds

After Scott was introduced to Ruja in September 2015, Scott began to set up a series of fake investment funds over the next several months.  Among other things, Scott incorporated MSS International Consultants (BVI), Ltd. ("MSSI LTD"), which was a fund manager registered in the British Virgin Islands.  (GX 2701).  MSSI LTD in turn owned and operated a series of fake

investment funds, which were used to launder proceeds from the OneCoin Scheme, including the following purported investment funds: Fenero Equity Investments L.P. ("Fenero"), Fenero Equity Investments II, L.P. ("Fenero II"), and Fenero Financial Switzerland L.P. ("Fenero Switzerland"), each of which was an approved fund regulated in the British Virgin Islands.  (*Id.*).  MSSI LTD also owned and operated Fenero Equity Investments (Cayman) I, L.P. ("Fenero Cayman"), an investment fund organized in the Cayman Islands (together with the British Virgin Islands Fenero funds, the "Fenero Funds").  (*Id.*).

Scott operated bank offshore accounts in the Cayman Islands for each of the Fenero Funds (the "Fenero Fund Accounts").  (GX 2701).  The Fenero and Fenero Switzerland accounts were held at DMS Cayman bank, and the Fenero Cayman and Fenero II accounts were held at Deutsche Bank Cayman.  (*Id.*).

Scott served as the Director of Fenero Equity Investments (Ireland), Limited, an entity formed in the Republic of Ireland on April 5, 2016.  (GX 2701).  Scott and a co-conspirator named Irina Dilkinska served as directors of two related companies also formed in Ireland: Fenero Tradenext Holding Limited and Fenero Pct Holdings Limited.  (GX 2701).  Among other things, Dilkinska was an employee at OneCoin who was responsible for managing shell companies for OneCoin that were used for money laundering.  (Tr. 131).  Dilkinska was one of the primary employees at OneCoin who assisted Scott with coordinating the laundering of OneCoin fraud proceeds.

Scott's friend, David Pike, served as a director of MSSI BVI and assisted Scott with the day-to-day operation of the Fenero Funds.  Among other things, Scott regularly gave directions to Pike about sending documents, including know-your-customer ("KYC") information, to banks and other financial institutions concerning the fake investors in the Fenero Funds.

7

### F.  Scott's Use of the Fenero Funds to Launder OneCoin Proceeds

After Scott was introduced to Ruja through email, Scott traveled to London in February 2016 and met with Ruja in person.  (GX 2701).  This was one of approximately six international trips that Scott took to meet with Ruja in 2016 and 2017.  (*Id.*).  After Scott opened bank accounts in the names of each of the Fenero Funds, between May 2016 and October 2016, the Fenero Fund Accounts collectively received wire transfers totaling approximately €364 million and $10 million, which he represented as investments into the Fenero Funds.  (GX 2602-A).  These wire transfers originated from approximately 10 different bank accounts held at banks located in Singapore, Germany, Hong Kong, the United Kingdom, and the United States.  (*Id.*).  These bank accounts were registered under a set of shell corporations, including a set of affiliated companies with variations of the name International Marketing Services ("IMS"), as well as B&N Consult Ltd. ("B&N"), Fates Group, and Star Merchant.  (*Id.*).  IMS was owned by co-conspirator Frank Rickets; B&N was owned by co-conspirator Irina Dilkinska; and Fates Group was owned by co-conspirator Gilbert Armenta.

While IMS, B&N, Fates Group, and Star Merchant were "investors" into the Fenero Funds on paper, all of the money being transferred into Scott's funds in fact belonged to Ruja Ignatova and was derived from the OneCoin Scheme.  (GX 1434).  After the Fenero Funds received the above-described deposits, between approximately May 2016 and July 2018, the Fenero Fund Accounts funded approximately €282,000,000 in wire transfers to a series of Fenero Fund bank accounts held at the Bank of Ireland in the Republic of Ireland.  (GX 2603, 2627).  Scott also transferred tens of millions of Euros back to Bulgaria from the Fenero Funds, disguised as fake loans.  (*See, e.g.*, GX 1388).  Scott subsequently transferred approximately €185,000,000 from the Bank of Ireland to the accounts of another one of Ruja's money launderers, named Amer

Abdulaziz.  (GX 2627; Tr. 276).

### G.  Scott's Lies to Effectuate the Transfer of Ruja's OneCoin Fraud Proceeds

Throughout Scott's participation in the charged money laundering and bank fraud conspiracies, Scott and his co-conspirators made numerous misrepresentations to banks and financial institutions in order to cause them to unwittingly transfer OneCoin Scheme proceeds on behalf of Ruja.  Specifically, Scott and his co-conspirators misrepresented to banks and financial institutions the source of the funds they were transferring, and the purpose of those wire transfers.

For example, in or around April 2016, Scott provided a Managing Director at Apex Group Ltd. ("Apex"), an investment fund administrator, with a document describing Fenero, its mission, investment strategy, and investor base (the "Mission Statement").  As a fund administrator, Apex was responsible for, among other things, conducting anti-money laundering and KYC checks, reviewing the source of wealth for investors, and transferring the investors' money into the investment fund or its investments.  (Tr. 504).  The Mission Statement stated, among other things, that:

> Fenero Equity Investments, L.P., is the first of a series of $100,000,000 open ended investment funds located in the British Virgin Islands (the "Fund" or "Fenero"), focusing on investments in the financial services industry in Europe. . . . Due to its small investor base of wealthy families and middle market companies (the "Initial Investors") and its narrow investment strategy, the Fund requires very little staff. . . . Fenero will always fully control its capital and conduct its own stringent "KYC" on investors and final due diligence on any target companies internally.
>
> Fenero has been created at the request of a select group of European based families and companies . . . . The Fund will basically be administered and managed in [the] form of a multi "Family Office" by MSS International Consultants (BVI), Ltd. . . . which is ultimately owned by Mark S. Scott . . . [who] currently is the Managing Partner of [the Law Firm], an Amlaw 50 firm, in Miami.  The initial Investors of Fenero have been represented legally by Mr. Scott ranging from three (3) to twelve (12) years and have closed on in excess of $2,100,000,000 in transactions under Mr. Scott's business and legal guidance.  (GX 2201).

Many of the statements contained in the Mission Statement were false.  For example, Scott plagiarized entire sections of the Mission Statement from other mission statements online, including representations in the "track record" section of the Mission Statement.  (GX 3301, 3302, 3305, 1411).   In addition, Scott's representations in the Mission Statement about the initial investors into his fund and Scott's prior relationship with those so-called investors were also false. Furthermore, the subscription agreements for Scott's investors did not disclose that the investors, such as B&N and IMS, or the principals of those investor companies, Irina Dilkinska, and Manon Hubenthal, were in any way connected to OneCoin and/or Ruja.  (Tr. 557, 581, 586).  As noted above, all of the money transferred through the Fenero Funds belonged to Ruja and was derived from OneCoin.  (*See, e.g.*, GX 1434).

Scott also made numerous misrepresentations to Apex in response to questions that were raised by Apex regarding the Fenero Funds' investors, and the source of wealth for those investors. In or about July and August 2016, Apex began conducting enhanced due diligence on the Fenero Funds.  (Tr. 607).  Among other issues that triggered the enhanced due diligence were a series of loans that Scott made to himself from the Fenero Funds in a short time frame, as well as suspicious transactions involving IMS and B&N, and a lack of clarity as to the relationship between IMS and B&N.  (Tr. 607).  During its due diligence, Apex attempted to obtain additional information on the source of wealth for the investors in the Fenero Funds.  (Tr. 607).  Around this same time period, in late July 2016, Mark Scott inadvertently sent an email to Apex that contained a forwarded email from Irina Dilkinska, with Dilkinska's OneCoin email address.  (GX 2262; Tr. 613-614).  That same email also revealed that there was a connection between Dilkinska and another Fenero Funds investor, Star Merchant.  (Tr. 614).  Prior to that email, Scott had successfully covered up any connection between the purported investors in the Fenero Funds and OneCoin.  (Tr. 615).  Upon

learning of the connection between the investors in the Fenero Funds and OneCoin, Apex held a series of emergency meetings and also made a number of notifications to government agencies. (Tr. 617).

While Apex was conducting enhanced due diligence, Scott took a number of steps in an effort to conceal the connection between the Fenero Funds and OneCoin, and to convince Apex that it should continue to transfer funds out of the Fenero Funds as requested by Scott. Among other things, Scott and his co-conspirators fraudulent letters of comfort on behalf of two lawyers; created and sent backdated wire instruction letters to Apex; and forged a set of agreements between IMS and OneCoin. As to the fraudulent letters of comfort, Scott first sent a draft letter to a lawyer named Martin Breidenbach on August 2, 2016, and instructed Breidenbach to "put this letter on your letterhead, sign it . . . and e-mail the entire package to Mr. Spendiff." (GX 1177). The letter was intended to address Apex's concerns about the source of funds being transferred into the Fenero Funds on behalf of IMS, and the relationship between IMS and B&N. (GX 1177 at 5). The letter falsely stated, among other things, that "IMS and B&N collaborate on providing large sales and marketing companies in the direct sales industry with process and systems solutions and support" and that B&N had earned at least 130,000 Euros through its joint venture with IMS in the preceding twelve months (GX 1177 at 5). Breidenbach sent the fake letter, which had been drafted by Scott, to Apex. (GX 2266). On the same day, Scott sent a similar request to a Bulgarian lawyer named Viktor Rashev and asked Rashev to "put the attached letter on your firm's letterhead, sign it and send it to Mr. Spendiff." (Tr. 243; GX 1175). The letter, which Rashev signed and sent to Apex, stated among other things, that B&N had earned approximately 200,000 Euros in the prior 14 months and that B&N had earned its fees "for the use of B&N's proprietary consulting services, support and software solutions." (GX 2267). Rashev sent the letter to Apex that same day. (GX

11

2267).  Scott knew that these representations about the source of wealth for B&N and IMS were completely false.  (*See, e.g.*, GX 1312).  In reality, the money that was transferred through these shell companies into the Fenero Funds belonged to Ruja Ignatova, and was derived from OneCoin.

As noted above, one of the concerns raised by Apex was the relationship between IMS and B&N.  To address this concern, and to justify the flow of funds into the Fenero Funds on behalf of those entities, Scott backdated wire instruction letters and forged a set of agreements between IMS and OneCoin, which were then sent to Apex.  As to the backdated wire instruction letters, Scott instructed other co-conspirators from OneCoin, including Irina Dilkinska, to sign a set of fake wire authorization letters that justified the transfer of tens of millions of Euros on behalf of B&N.  Specifically, Scott instructed other co-conspirators, including Irina Dilkinska, that "It would also be great if you could sign some of the letters with a different pen so they do not look so mechanically produced.  Maybe Irina [Dilkinska] can print them wherever she is and sign and scan them back to you one at a time.  Maybe you can sign others in the office with her automatic signature."  The fake wire instruction letters were then sent to Apex.  (GX 2270).  Scott also forged a set of two agreements between OneCoin and IMS, changing the fee that IMS was supposed to receive under the agreements from 1% in the original agreements, to 20% and 22% in the forged agreements.  (GX 1209).  Scott then sent the forged contracts to Apex.  (GX 2276).  The terms of the forged contracts appeared to be designed as an attempt by Scott to provide support for the large volume of payments—purportedly for the purpose of licensing technology to OneCoin—made by the IMS companies to the Fenero Funds.

After receiving these materials from Scott, Apex continued to refuse Scott's request to transfer funds out of the Fenero Funds.  At that point, Apex had concluded that it had "been provided [by Scott] with fraudulent documents that hid the relationship with OneCoin."  (Tr. 731).

In a final attempt to try to convince Apex to transfer funds out of the Fenero Funds, Scott demanded a phone call with Apex.  During the resulting call, Scott continued to lie to Apex about the underlying source of wealth for the money transferred into the Fenero Funds.  For example, Scott falsely claimed that the money was actually derived by and belonged to Irina Dilkinska, stating that Dilkinska was "inventing ways to, how should I say, to materially [U/I] access to potential buyers for those direct sales companies.  That's her biggest strength that she's doing here."  (GX 2302-TR).

### H.  Scott's Lies to United States Banks

In order to successfully transfer funds that were derived from the OneCoin Scheme, Scott and his co-conspirators lied to United States banks, some of which were federally insured.  For example, in or about July 2016, Scott disguised the transfer of OneCoin fraud proceeds on Ruja's behalf in the form of a fake loan to CryptoReal Investments Trust Ltd. ("CryptoReal"), which was allegedly purchasing an oil field from Barta Holdings Limited ("Barta").  Under the terms of the purported deal, CryptoReal was going to borrow €30 million from Fenero.  (Tr. 597).  Scott and Martin Breidenbach represented to Apex that Breidenbach was the ultimate beneficial owner ("UBO") of CryptoReal.  (Tr. 597).  In an email dated July 12, 2016, Scott requested that Apex wire "an aggregate amount of 30 million dollars U.S.D. from our above-referenced account at DMS Bank to the party as follows, listed at DBS Bank Hong Kong, beneficiary Barta Holdings Limited, with an address in Hong Kong" and represented that the purpose of the wire was "Loan to CryptoReal Investment Trust LTD (BVI) Martin BVI)/Martin Breidenbach for acquisition of Madagascar Oil Field."  (Tr. 1477).  In reality, this money was not a real loan, but was being disguised as a loan so that the banks and financial institutions would authorize the transfer, which was actually on Ruja's behalf (not Breidenbach's).  (GX 1391).  The funds for this fake loan were

ultimately transferred through a U.S. dollar correspondent bank account at Bank of New York Mellon in Manhattan.  (Tr. 1475).

In another set of transactions, Scott received approximately $10 million into the Fenero Funds from accounts in the name of "Fates Group," controlled by Gilbert Armenta in the United States.  As described above, Armenta was Ruja's boyfriend and was also one of Ruja's main money launderers.  Scott was aware that the funds transferred by Armenta from Fates Group in fact belonged to Ruja, were derived from the OneCoin fraud scheme, and were being disguised as investments into the Fenero Funds so that Armenta and Scott could move them on Ruja's behalf. (*See* GX 1056-T). For example, one transfer of $5,000,000 from an Armenta controlled United States bank account at Morgan Stanley in the name of Fates Group was disguised as investments of $3 million into "ZIIXI" and $2 million into "XIII."   (Tr. 844).   On the basis of this misrepresentation, Morgan Stanley understood that ZIIXI and XIII were purportedly investment funds and that the purpose of the wire transfers was to invest in those funds.  (Tr. 844 and 859). In order to successfully transfer the funds to Scott's Fenero Funds, Armenta also falsely represented that the Fenero Funds were a private equity firm that invested in, among other things, renewable energy, such as windmills.  (Tr. 859-860).

### I.  Scott's Post-Arrest Lies

When Mark Scott was arrested and interviewed by federal law enforcement agents, he made numerous false statements about who the investors in the Fenero Funds were and what the source of wealth for the investors was.  For example, Scott stated that OneCoin and Ruja had nothing to do with Fenero or any other funds that he was involved with.  (GX 601-TR).  As noted above, all of the money in the Fenero Funds belonged to Ruja and was derived from the OneCoin Scheme.

### J.  Scott's Fraud Scheme Earnings and Lavish Spending

In exchange for taking the risk of laundering hundreds of millions of dollars for Ruja, Scott was paid in excess of $50 million in proceeds of the OneCoin fraud scheme.  (GX 2628; Tr. 294). Scott's purchases made with OneCoin fraud proceeds included, among others: a $2,850,000 home located at 133 Sunset Lane, Barnstable, MA; a $3,765,000 residence located at 31 Dale Avenue, Hyannis Port, MA (the "31 Dale Property"); an ownership interest in another residence located at 105 Sunset Lane, Barnstable, MA; a $245,269 Ferrari; a $218,898 2018 Porsche 911 GTRS2; a $119,529 2017 Porsche 911 Turbo; a $332,248 2016 Porsche 911R (the "2016 Porsche"); a $1,310,000 Sunseeker yacht; over a hundred thousand dollars in luxury watches; and over two hundred thousand dollars in jewelry and luxury bags.  (GX 2620).  Scott also used OneCoin Scheme proceeds to pay off over $1,000,000 on a mortgage for a condo that he owned in Coral Gables, FL.

### **ARGUMENT**

## II.     Applicable Law

### A.  Motion for a Judgement of Acquittal under Rule 29

After the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal pursuant to Federal Rule of Criminal Procedure 29(c). "The Rule permits a district court to enter a judgment of acquittal on a count of conviction only if it finds that the evidence on that count is 'insufficient to sustain a conviction.'" *United States v. Zongo*, 15 Cr. 319, 2017 WL 2297010, at *1 (S.D.N.Y. May 24, 2017) (KMW) (quoting Rule 29). "It is a fundamental general principle that [defendants] challenging the sufficiency of the evidence underlying a conviction bear a very heavy burden." *United States v. Ragosta*, 970 F.2d 1085, 1089 (2d Cir. 1992) "In considering such a challenge, [the court] must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and

15

deferring to the jury's assessment of witness credibility, and its assessment of the weight of the evidence." *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008) (citations, quotation marks, and brackets omitted). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

### B.  Motion for a New Trial under Rule 33

Federal Rule of Criminal Procedure 33 provides, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  "[M]otions for a new trial are disfavored in this Circuit," *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), and are granted "sparingly and in only the most extraordinary circumstances," *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001).  In order for such a motion to have merit, the district court must conclude, taking into account all of the facts and circumstances of the case, that there is "a real concern that an innocent person may have been convicted."  *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *Ferguson*, 246 F.3d at 134; *see also United States v. Yannai*, 791 F.3d 226, 242 (2d Cir. 2015) ("A defendant's motion for a mistrial may be granted where something has occurred to interfere with the defendant's right to a fair trial.").  A new trial should not be granted when the court is "satisfied that competent, satisfactory, and sufficient evidence in the record supports the jury verdict." *Ferguson*, 246 F.3d at 134.

### III.  The Defendant's Argument that the Government Failed to Prove that the Defendant Engaged in a Money Laundering Conspiracy is Meritless

The defendant moves for a judgment of acquittal on the money laundering conspiracy charge, or in the alternative, for a new trial.  As detailed below, the jury's determination that the

defendant is guilty of 18 U.S.C. § 1956(h) was based on legally sufficient evidence that proved

his guilt beyond a reasonable doubt.  Nor do the facts and circumstances surrounding the jury's

guilty verdict provide any basis whatsoever for the drastic measure of granting of new trial.

Accordingly, the defendant's motion for a judgment of acquittal, or in the alternative, for a new

trial should be denied in its entirety.

### A.  Applicable Law

Count One of the Indictment charged the defendant with a multi-object money laundering

conspiracy under 18 U.S.C. § 1956(h).  The first object of the money laundering conspiracy is 18

U.S.C. § 1956(a)(1)(B)(i), or domestic concealment money laundering.  The second object of the

conspiracy is 18 U.S.C. § 1956(a)(2)(B)(i), or international concealment money laundering.

### 1.  18 U.S.C. § 1956(h) Elements

"The two elements of a money laundering conspiracy are the existence of a conspiracy

and that the defendant knowingly participated in it."  *United States v. Wiseberg*, 727 F. App'x 1,

5 (2d Cir. 2018) (citing *United States v. Garcia*, 587 F.3d 509, 515 (2d Cir. 2009)).  "Both the

existence of a conspiracy and a given defendant's participation in it with the requisite knowledge

and criminal intent may be established through circumstantial evidence," and "the government

need not show that the defendant knew all of the details of the conspiracy, so long as he knew its

general nature and extent."  *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008) (internal

quotations and citations omitted).

The Court properly instructed the jury that in order to find the defendant guilty on Count

One, the jury had to determine that the evidence established beyond a reasonable doubt "an

agreement or understanding between two or more people to commit a federal crime  . . . and that

the defendant knowingly and willfully became a member of the alleged conspiracy with the

intent to further its illegal purposes, that is, with the intent to commit the object of the charged

conspiracy." (Tr. 1986).

### 2. Object of the Money Laundering Conspiracy

The first object of the money laundering conspiracy charged in the Indictment is 18

U.S.C. § 1956(a)(1)(B)(i), domestic concealment money laundering, which imposes punishment

on:

> anyone who, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity[,] knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

*Huezo,* 546 F.3d at 178-79.

The Court appropriately instructed the jury on the elements of the object of 18 U.S.C.

§1956(a)(1)(B)(i). Specifically, the Court instructed the jury that in order to find the defendant

guilty, the jury was required to find the following elements beyond a reasonable doubt:

> (1) that the defendant conducted (or attempted to conduct) a financial transaction which must in some way or degree have affected interstate or foreign commerce;
> (2) that [the] financial transaction at issue involved the proceeds of specified unlawful activity, which here is alleged to be a wire fraud scheme;
> (3) that the defendant knew that the financial transaction involved the proceeds of some form of unlawful activity; and
> (4) that the defendant knew that the transaction was designed, in whole or in part, either to conceal or disguise the nature, location, source, ownership or control of the proceeds of the unlawful activity.

(Tr. 1990).

18

The Court properly instructed the jury on the elements of the first object of the charged money laundering conspiracy, domestic concealment money laundering, in violation of 18 U.S.C. § 1956(a)(2)(B)(i). Additionally, the Court instructed the jury that with respect to the second object of charged money laundering conspiracy, international concealment money laundering in violation of 18 U.S.C. § 1956(a)(2)(B)(i), the jury was required to determine that the evidence established beyond a reasonable doubt:

> (1) that the defendant knowingly transported, transmitted, or transferred a monetary instrument or funds from a place in the United States to or through a place outside the United States, or to a place in the United States from or through a place outside the United States;
> (2) that the defendant did so with knowledge that the monetary instrument or funds involved represent[ed] the proceeds of some form of unlawful activity; and
> (3) that the defendant knew that the transportation, transmission, or transfer was designed, in whole or in part, to conceal, or disguise the nature, [the] location, the source, the ownership, or control of the proceeds of specified unlawful activity.

(Tr. 1997).

### B. The Jury's Verdict was Supported by Legally Sufficient Evidence Proving the Elements of the Crime Beyond a Reasonable Doubt

The defendant attacks the jury's guilty verdict on several grounds, all of which are meritless.  Specifically, the defendant argues that the Government failed to establish that: (i) the defendant knew that OneCoin had a presence in the United States; (ii) the defendant knew that the transactions involved proceeds of an unlawful activity; (iii) the defendant knew that the purpose of the transactions was to conceal the source of the funds; (iv) the Government failed to prove that proceeds of the OneCoin scheme were invested into the Fenero Funds; and (v) the Government failed to prove existence of the wire fraud scheme alleged as the specified unlawful activity underlying the money laundering offense.  For the reasons set forth below, the defendant's arguments fail.

19

**1.  The Evidence at Trial Established that the Defendant Knew that the Transactions Involved Proceeds of an Unlawful Activity**

The defendant argues that the Government failed to offer sufficient evidence to prove the third element of the domestic concealment money laundering object, that the defendant knew that the financial transactions at issue involved proceeds of an unlawful activity.  (Def. Mem. 33).  Specifically, the defendant claims that the evidence established, at best, that he was aware that there were "questions about OneCoin."  (*Id.*)  The defendant is wrong, as the evidence at trial plainly established this element.

As the trial evidence detailed above demonstrates, OneCoin was created to be, and operated as a fraud scheme.  The defendant and his co-conspirators, including Armenta, Ruja, Pike, and Dilkinska, worked collaboratively to move OneCoin proceeds through numerous accounts throughout the world with the goal of returning the money to Ruja, while simultaneously concealing any connection between the money and OneCoin or Ruja.  The trial evidence clearly established that the defendant was fully aware that the funds he received from OneCoin were proceeds of an unlawful activity.  First, the defendant was in fact told that OneCoin was a fraud scheme.  In April 2016, he received an email from a CPA forwarded to him by Dilkinska, stating in no uncertain terms that OneCoin was a fraud scheme, and outlining the many bases for that conclusion.  (Tr. 1885, 1975).  The defendant also knew that financial institutions were unwilling to bank OneCoin funds.  (Tr. 229).  In addition, Gary Gilford, one of Ruja's employees at RavenR, specifically informed the defendant that the City of London Police ("CoLP") had initiated a criminal investigation into OneCoin, and that multiple OneCoin bank accounts throughout the world had been frozen by various financial institutions.  (GX 4102).

Second, the evidence at trial established that the defendant's co-conspirators were concerned that he might be a high-placed informant for the United States authorities.  (GX 3005-

20

S).  This concern reveals that the defendant was a trusted insider with knowledge about the conspiracy and its purpose.  *See Huezo,* 546 F.3d at 182 ("Based on the complexity and scale of the money laundering scheme, common sense and experience would support an inference that the principals in the conspiracy would not have trusted an outsider (with no knowledge of their criminal purpose) to transport $1 million in laundered funds . . .").

Third, the evidence at trial proved that the defendant earned an enormous amount of money for laundering OneCoin proceeds for Ruja.  All told, the defendant laundered approximately $400 million in OneCoin proceeds, and took approximately $50 million (or 12.5%) for himself, despite earning essentially no profit for his so-called investors.  (Tr. 1764-65).  That fee is extraordinary and not what would be expected for legitimate investment fund management. (*See* Tr. 294 ("She said that for the risk [Scott] took, he got paid a lot of money.  And if somebody in OneCoin is talking about a lot of money, as I mentioned today, it is something in the higher million range")).  Thus, the jury could reasonably infer that the reason the defendant kept for himself such a significant amount was that he had taken an enormous risk by laundering Ruja's money.

Lastly, the defendant's knowledge that the transactions involved the proceeds of unlawful conduct was proven by the defendant's own lies, misrepresentations, and involvement in forging documents.  The evidence at trial established that the defendant repeatedly and regularly falsified documents in connection with the receipt and transfer of OneCoin proceeds by the Fenero Funds. For example, the defendant created fake attorney comfort letters from attorneys Martin Breidenbach and Viktor Rashev to provide to Apex.  (GX 1177; GX 1175; Tr. 243).  The defendant forged contracts between IMS and OneCoin in order to justify the enormous amounts of money being sent to the Fenero Funds.  (GX 1209).  And the defendant worked with

Dilkinska and Pike to create fake back-dated wire transfer instructions to provide to Apex.  (GX

2270).  From this evidence alone, it was entirely reasonable for the jury to conclude that the

defendant knew that he was dealing with the proceeds of an unlawful activity.  Legitimate

investment funds whose transactions involve proceeds from lawful activities do not forge

documents and create false records on a routine basis.

Based on this evidence, among other evidence presented at trial, a rational trier of fact

could have found that the defendant was aware that the money he transferred through the Fenero

Funds was sourced from illegal conduct.

### 2.   The Defendant Knew that the Purpose of the Transactions Was to Conceal the Source of the Funds

The defendant claims that the Government also failed to prove that he knew that the

Fenero Fund transactions were designed to conceal or disguise the nature, location, source,

ownership or control of the proceeds of the unlawful activity.  (Def. Mem. 34-35).  The

defendant's claim is belied by the overwhelming evidence showing that the defendant was aware

that the purpose of the transaction was to conceal the source of the funds.  In fact, as soon as he

began working for Ruja, the defendant engaged in a pervasive and deliberate campaign to mask

any connection between the Fenero Funds and Ruja or OneCoin.  First, he set up the Fenero

Funds as investment vehicles, even though their purpose was to receive Ruja's money and send it

right back to her through the use of fake "investors" and shell companies.  (Tr. 557, 581, 586,

614, 615).  The defendant wanted to conceal any connection between Fenero and OneCoin; he

did not want the fund name to relate to OneCoin, or the fund structure to be connected to Ruja

(GX 1434).  As the defendant explained in an email "the link to OneCoin will kill us."  (GX

1289).  The defendant also created a fake Fenero Mission Statement, which contained language

that he cut and pasted from documents found on the internet.  (GX 2201, 3301, 3302, 3305,

1411).  The defendant knew that Fenero would not be engaged in investments, and he told Ruja

as much, writing in an email to her "I am setting up your transfers as investments into registered

investment funds."  (GX 1041).  However, the trial evidence was devoid of any communications

between Ruja (or anyone at OneCoin) and the defendant regarding any investment strategy for

Ruja's money, or other investment-related contact that would be expected in the context of a

legitimate investment fund.

The defendant created and used a highly complex and sophisticated structure to receive

OneCoin proceeds and return them to Ruja, layering the funds through multiple international

bank accounts and "papering" the transactions to conceal their true nature and the source of the

money.  (GX 2602, 2602-A).  This conduct is consistent with the technique described by the

Government's money laundering expert, Donald Semesky ("Semesky").  Semesky described

layering as the process money launderers used to transfer illicit proceeds through multiple

accounts in an effort to obscure the nature and origin of the transactions.  (Tr. 460).  Semesky

also explained that money launderers frequently engage in the practice of "papering," or creating

false documents to justify or support transfers of illicit funds.  (Tr. 479).

Also, as detailed above, the defendant forged documents associated with Fenero in an

effort to conceal any relationship between Ruja or OneCoin and Fenero.  He created fake

attorney comfort letters, forged contracts between IMS and OneCoin, and falsified back-dated

wire instructions in order to conceal from Apex and others the connection between Fenero and

OneCoin.  (GX 1177; GX 1175; GX 1209; GX 2270).  Specifically, these documents included

fake back-dated wire instructions from B&N to justify to Apex the transfer of millions of Euros

on behalf of B&N.  (GX 2270).  The defendant also forged agreements between IMS and

OneCoin in order to provide support for the enormous amounts of money that were flowing into

Fenero.  (GX 1209; GX 2276).   Additionally, the defendant prepared fake loan documents to disguise the transfer of OneCoin proceeds on Ruja's behalf.  (*See, e.g.,* GX 1391; Tr. 1477; GX 1388).  Those loans, the defendant explained to Ruja, "are considered available cash for obvious reasons."  (GX 1391).

Finally, the evidence at trial established that even after he was arrested on money laundering charges, the defendant continued lying in an effort to conceal the funding source for the Fenero Funds.  During his post-arrest interview, the defendant repeatedly denied any connection between OneCoin and Ruja and the Fenero Funds.  (GX 601-TR).

Based on the above evidence, a rational juror certainly could find that the Government had proven beyond a reasonable doubt that the defendant knew that the purpose of the financial transactions at issue was to conceal the source of the funds.  *See United States v. Gotti,* 459 F.3d 296, 337-38 (2d Cir. 2006) (jury permitted to infer from circumstantial evidence, such as a "highly complex and surreptitious" process, the use of third parties to disguise the true owner, or unusual secrecy, that defendant knew that the purpose of the transaction was to conceal the source of the funds) (internal citations and quotations omitted).

### 3.   The OneCoin Fraud Scheme Qualifies as a Specified Unlawful Activity

The defendant additionally claims that the Government failed to prove "any wire fraud with sufficient nexus to the United States occurred."  (Def. Mem. 29).  The defendant is wrong, as the evidence at trial clearly established a sufficient nexus between the OneCoin fraud scheme and the United States.  "A jurisdictional nexus exists 'when the aim of that activity is to cause harm inside the United States or to U.S. citizens or interests.'"  *United States v. Budovsky*, 13 Cr. 368 (DLC), 2015 WL 5602853, at *4 (S.D.N.Y. Sept. 23, 2015) (quoting *United States v. Al Kassar,* 660 F.3d 108, 118 (2d Cir. 2011)).

24

At trial, the Government definitively established that OneCoin was not an extraterritorial wire scheme.  OneCoin began operating in the United States in or around 2015.  (GX 63 ¶ 1(d), 204-C).  Two United States victims, Linda Cohen and William Horn, testified at trial and described about their investments in the scheme, the promoters who introduced them to OneCoin, and their ultimate losses related to their investments.  (*See, e.g.,* Tr. 74, 84, 791, 799, 809-10; GX 731A; GX 2803; GX 2811).  The evidence at trial also included testimony regarding OneCoin meetings and conferences held in the United States, as well as United States-based promoters.  (Tr. 66, 69-71).  The Government also introduced evidence at trial that United States individuals transmitted wires internationally in connection with OneCoin's activities in the United States.  (GX 730A; Tr. 84).

Additionally, the Court appropriately instructed the jury regarding the elements of wire fraud.  These instructions included the following language regarding the jurisdictional element of wire fraud:

> The third and final element that the government must prove beyond a reasonable doubt is that in the execution of that scheme, one or more participants in the scheme used or caused the use by others of interstate or foreign wires (for example, wire transfers, phone calls, e-mail communications, or text messages).  An interstate wire is a wire that passes between two or more states.  A foreign wire is a wire that passes between the United States and someplace outside the United States.

(Tr. 1997).

Thus, the trial evidence established a sufficient jurisdictional nexus between the OneCoin fraud scheme and the United States, and the jury was appropriately instructed on the elements of wire fraud.

**4. The Defendant's Claim that the Government Failed to Prove that Proceeds of the OneCoin Wire Fraud Scheme were Invested into the Fenero Funds is Without Merit**

The defendant claims, with no authority, that the Government was required to, and failed to establish, that any funds derived from OneCoin sales in the United States were transferred directly to the Fenero Funds.  (Def. Mem. 30-32).  However, this is not a required element under of the money laundering conspiracy offense charged in Count One of the Indictment.  Rather, the Government was required to prove beyond a reasonable doubt the elements as set forth by the Court in its instructions to the jury.  (Tr. 1990, 1992).  The Government presented ample evidence that proceeds of the OneCoin wire fraud scheme were transferred into, and laundered through the Fenero Funds.  At trial, the Government established that between May 2016 and October 2016, the defendant received wire transfers totaling approximately €364 million and $10 million from approximately 10 different bank accounts held at banks located in Singapore, Germany, Hong Kong, the United Kingdom, and the United States.  (GX-2602-A).  These bank accounts were held in the name of shell companies, including IMS, B&N, and Fates Group.  (*Id.*)  At trial, the Government established that all those funds belonged to Ruja and derived from the OneCoin fraud scheme.  (GX 1343).

Moreover, the evidence at trial established that victim Linda Cohen wired money for a OneCoin package to a U.S.-based account designated to collect OneCoin purchase funds.  The evidence further established that the U.S.-based OneCoin depository account subsequently transferred funds to an IMS account in Singapore that ultimately transferred funds to Fenero.  (GX 2626; GX 2602).

Finally, as described above, the Government proved the underlying specified unlawful activity, i.e., a wire fraud scheme involving interstate or international wires in the United States and more particularly in the Southern District of New York.

26

**5.    The Jury Heard Overwhelming Evidence Establishing that the Defendant Entered into the Money Laundering Conspiracy**

The defendant claims that the Government failed to establish that he entered into the money laundering conspiracy because there was no evidence that he knew that OneCoin had a presence in the United States.[4]  (Def. Mem. 33).  The defendant is wrong.  At trial the Government was not required to establish that the defendant knew that OneCoin had a presence in the United States.  Rather, in terms of intent, the Government was only required to prove: (i) that the defendant knew that the financial transactions involved the proceeds of *some* form of unlawful activity; and (ii) that the defendant knew that the funds involved in a transportation, transmission, or transfer represented the proceeds of *some* form of unlawful activity.  (Tr. 1990, 1992).  While the Government was required to, and did establish that the funds the defendant laundered were proceeds of the OneCoin wire fraud scheme, the Government was not required to prove that the defendant knew (i) that the money constituted proceeds of that fraud scheme, or for that matter, or any particular scheme; or (ii) that the OneCoin fraud scheme had a presence in the United States.  (GX 2602; GX 2602-A).  Rather, as the Court properly instructed the jury, "the Government must prove beyond a reasonable doubt that the defendant knew that the financial transactions at issue involved the proceeds of some form of unlawful activity, but not necessarily which form of unlawful activity."  (Tr. 1999).[5]  Accordingly, the defendant's claim is not a proper basis for a judgment of acquittal or a new trial.

---

[4]  The defendant also claims that the OneCoin wire fraud scheme does not qualify as a specified unlawful activity, and thus it is "impossible" for the defendant to have conspired launder OneCoin proceeds.  (Def. Mem. 33).  This argument is entirely meritless, as discussed above.

[5]  The Government was also required to establish a violation of the federal wire fraud statute, 18 U.S.C. § 1343, including proof that a wire in furtherance of the OneCoin Scheme was transmitted between two states in the United States, or between the United States and a place outside of the United States.  As discussed above, the Government established through evidence presented at trial that victims in the United States were induced to purchase OneCoin trader packages based

Accordingly, as described above, the evidence presented at trial was legally sufficient and a rational juror could have found the essential elements of money laundering conspiracy beyond a reasonable doubt.  *See Jackson,* 443 U.S. at 319.

### IV.    The Defendant's Argument that the Government's Evidence Was Insufficient to Prove That Scott Engaged in a Bank Fraud Conspiracy is Meritless.

The defendant also argues that the Government "failed to introduce sufficient evidence that Mr. Scott conspired to defraud a an [sic] FDIC-insured bank or obtain money under [the] custody or control of such a bank."  (Def. Mem. 12).  As the Court properly instructed the jury at trial, the two elements of conspiracy are: (1) the existence of the conspiracy, *i.e.*, "an agreement or understanding between two or more people to commit a federal crime;" and (2) that "the defendant knowingly and willfully associated himself with and participated in the conspiracy." (Tr. 1986-87).  The Court also properly instructed the jury on the three elements of substantive bank fraud, in violation of Title 18, United States Code, Section 1344, which was the object of the conspiracy charged in Count Two: "First, that there was a scheme to defraud a bank or a scheme to obtain money owned by or under the custody or control of a bank, by means of materially false or fraudulent pretenses, representations or promises; second, that the defendant executed or attempted to execute the scheme with the intent either to defraud the bank or to obtain money or funds owned by or under the custody or control of the bank; and third, that the bank involved was federally insured."  (Tr. 2001).  The evidence at trial plainly met these elements.

As the evidence described above makes clear, Scott, Armenta, Ruja, Dilkinska, Pike, Konstantin, and others, were participants in a criminal conspiracy.  The only relevant question,

---

on misrepresentations, and in fact purchased such OneCoin packages through interstate and international wire transfers.

then, is whether one of the objectives of that conspiracy was to obtain funds that were under the custody or control of a federally insured bank. Viewing the evidence in the light most favorable to the Government, the evidence at trial clearly demonstrated that Scott and his co-conspirators agreed to deceive banks around the world—including federally insured banks in the United States—in order to get those banks to transfer funds under the banks' control that they would not otherwise have transferred, but for the defendant's and his co-conspirators' lies and deception. Nothing more is required under the law.

As the evidence at trial made clear, financial institutions around the world, including banks in the United States, were unwilling to knowingly engage in transactions involving OneCoin. (*See* Tr. 229-231). For example, as noted above, when Apex discovered that the money in the Fenero Funds was linked to OneCoin, Apex held emergency meetings, made disclosures to Government authorities, and refused to engage in any further transactions on behalf of the Fenero Funds. (Tr. 617). BNY Mellon's response was similar; after discovering that the Fenero Funds' were linked to OneCoin, BNY Mellon's international risk committee discussed the issue and concluded that it was "not comfortable with payments/transactions coming from or going to" IMS, OneCoin, or Ruja Ignatova, among others. (Tr. 1392-1393; GX 518). As a result, BNY Melon directed DMS Bank not to have any further transactions through BNY Mellon's correspondent bank accounts with these entities. (*See* Tr. 1441-42).

To get around this problem, Scott and his co-conspirators deceived financial institutions and tricked them into unwittingly processing transactions involving OneCoin. For example, OneCoin victims from the United States were instructed that they could not tell their banks they were paying for OneCoin when they made OneCoin purchases. (Tr. 82; GX 2811). Instead, the victims were told to claim they were paying for educational packages. (*Id.*). Konstantin also

explained that OneCoin resorted to the use of shell companies in order to receive and transfer funds associated with the OneCoin Scheme.  (Tr. 229-231).

The evidence at trial demonstrated that Scott was also aware that banks were unwilling to knowingly transfer funds that were derived from OneCoin.  (*See, e.g.*, GX 1307).  In order to deceive banks and financial institutions about the source of the money in the Fenero Funds (i.e., OneCoin Scheme proceeds), Scott and his conspirators used shell companies such as B&N, IMS, Star Merchant, and Fates Group to transfer monies into the Fenero Funds disguised as "investments."  (*See* GX 2602, 2602-A). Scott then used the façade of his Fenero investment structure to make "investments" and to transfer those funds out of the Fenero Funds.  In order to effectuate this scheme, Scott and his co-conspirators lied to financial institutions around the world.

As described above, the lies told by Scott and his co-conspirators to banks and financial institutions included lies to federally insured United States banks.  For example, in July 2016, Scott disguised the transfer of OneCoin Scheme proceeds on behalf of Ruja in the form of a fake $30 million "loan" to CryptoReal, a company for which Breidenbach was the purported UBO.  In reality, this transaction was not a real loan, but was being disguised as a loan so that the banks and financial institutions would authorize the transfer, which was actually on Ruja's behalf (not Breidenbach's).  (GX 1391).  The evidence at trial showed that Scott was aware that this transaction was being conducted in United States dollars, and therefore that the transaction would be conducted through a U.S. dollar correspondent bank, which it was.  (Tr. 1477, 1475).  Indeed, in May 2016, Scott emailed himself a copy of an incoming wire instruction sheet for DMS Bank, which indicated that incoming U.S. dollar wire transfers would be processed through a BNY Mellon correspondent bank account located in Manhattan, New York.  (GX 1441).  Crediting "every inference that could have been drawn in the government's favor" from this evidence,

*Chavez*, 549 F.3d at 124, a juror could have reasonably concluded that Scott knew that the fake

loan to CryptoReal—which was a USD transaction—would involve the deception of a United

States bank in Manhattan.[6]

Scott also worked with Armenta to transfer OneCoin Scheme proceeds on behalf of Ruja

that were disguised as investments into the Fenero Funds.  At the outset, Scott understood that

Armenta had over $150 million of Ruja's OneCoin Scheme proceeds, and that Ruja wanted Scott

to work with Armenta in order to get some of that money back to Ruja.  (*See, e.g.*, GX 1056-T).

In order to accomplish this, Scott worked with Armenta to transfer approximately $10 million from

accounts in the name of "Fates Group," controlled by Gilbert Armenta in the United States, to

Scott's fake investment funds.  Scott knew that these funds were going to come from bank accounts

in the United States.  (*See, e.g.*, GX 1360).  As noted above, one transfer of $5,000,000 from an

Armenta-controlled United States bank account at Morgan Stanley in the name of Fates Group

---

[6] Scott's additional argument that "the Government failed to establish venue on [Count Two] because it failed to prove that there was an act in furtherance of the conspiracy that took place within the Southern District of New York" is likewise without merit.  (Def. Mem. 18-19). "[V]enue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue."  *United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003); *see also United States v. Kirk Tang Yuk*, 885 F.3d 57, 69-70 (2d Cir.), cert. denied sub nom. *Thomas v. United States*, 139 S. Ct. 342, 202 L. Ed. 2d 225 (2018), and cert. denied, 139 S. Ct. 342, 202 L. Ed. 2d 225 (2018) ("Actual knowledge that an overt act was committed in the district of prosecution is not required, however: venue will lie if a reasonable jury could find that it was 'more probable than not' that the defendant 'reasonably could have foreseen' that part of the offense would take place in the district of prosecution." (quoting *United States v. Davis*, 689 F.3d 179, 189 (2d Cir. 2012)).  A reasonable jury could have easily found that venue was met for Count Two.  As noted above, the funds for the fake CryptoReal loan were transferred through a U.S. dollar correspondent bank account at Bank of New York Mellon in Manhattan.  (Tr. 1475).  That transaction was also initiated by Scott.  (Tr. 1477, 1474). Furthermore, the evidence at trial demonstrated that Scott knew that at least one of the transfers from Armenta's accounts to a Fenero Fund account would likely pass through a correspondent bank in Manhattan, New York.  (Tr. 915-916; GX 1412).  Indeed, when that transaction was subsequently processed, it passed through a correspondent bank account in Manhattan, New York.  (Tr. 917; GX 406, 417).

was disguised as investments of $3 million into "ZIIXI" and $2 million into "XIII."  (Tr. 844).  In order to successfully transfer the funds to Scott's Fenero Funds, Armenta also falsely represented that the Fenero Funds were a private equity firm that invested in, among other things, renewable energy, such as windmills.  (Tr. 859-860).  Scott understood that Armenta would need to tell lies such as these to United States banks in order to effectuate these transfers for several reasons.  First, the entire notion that the transfers from Armenta's accounts to Scott were for the purpose of investing was false—the evidence at trial made clear that the Fenero Funds were a fake investment fund structure created and used by Scott for the purpose of transferring and hiding OneCoin Scheme proceeds on Ruja's behalf.  Furthermore, Scott had Armenta sign an investment agreement, demonstrating that Scott clearly knew that Armenta would falsely inform his bank that the purpose of the transfer was for some type of investment, which it was not.  (GX 1140).  Finally, Scott understood that Armenta would lie to get the $10 million transferred to the Fenero Funds because, as described above, Scott knew that banks would not transfer the funds if they knew the true nature of the funds and purpose of the transfers.

In light of all of this evidence, a rational trier of fact could have found the essential elements of bank fraud conspiracy beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. at 319.

## V.  The Defendant's Argument that Section 1344 Does Not Cover the Charged Conduct is Meritless

The defendant also argues that the evidence demonstrating that his co-conspirator, Gilbert Armenta, lied to banks in order to transfer money into the Fenero Funds cannot amount to bank fraud, because the money belonged to Armenta.  (Def. Mem. 17-18).  As a threshold matter, this argument is based on an entirely faulty premise—that the OneCoin proceeds contained in Armenta's U.S. accounts at Morgan Stanley and Sabadell United Bank belonged to Armenta.  The evidence at trial clearly demonstrated that those funds belonged not to Armenta, but to Ruja, and

that Armenta was responsible for laundering the funds back to Ruja through the defendant's fraudulent Fenero investment funds.  *See United States v. Zarrab*, No. 15 CR 867 (RMB), 2016 WL 6820737, at *11-*12 (S.D.N.Y. Oct. 17, 2016) (denying motion to dismiss bank fraud conspiracy count where defendant was alleged to have "participated in a scheme to structure transactions" involving funds controlled by sanctioned entities, such as Iran, "for the purpose of evading sanctions, by wiring funds to or from non-[sanctioned] entities").

Regardless, the defendant's argument lacks any legal support.  18 U.S.C. § 1344(2)— which was pled as an object of the bank fraud conspiracy charged in Count Two—prohibits the knowing execution of a "scheme or artifice . . . to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises."  The Supreme Court has squarely held Section 1344(2) does not require a showing that "a defendant intended to defraud a federally insured bank or other financial institution."  *Loughrin v. United States*, 573 U.S. 351, 355, 356-57 (2014) ("nothing in the [Section 1344(2)] clause . . . demands that a defendant have a specific intent to deceive a bank").  Rather, the Government may prove a violation of Section 1344(2) by establishing that the defendant "acquire[d] (or attempt[ed] to acquire) bank property 'by means of' [a] misrepresentation."  *Id.* at 362-63.  In other words, the Government need only prove that "the defendant's false statement [was] the mechanism naturally inducing a bank (or custodian of bank property) to part with money *in its control*."  *Id.* at 363 (emphasis added).

Neither *Loughrin* nor the bank fraud statute itself requires evidence that the funds in question belonged to someone other than the individual making the misrepresentation to the bank. Instead, all that is required is proof of a scheme to "obtain any . . . . funds . . . *under the custody or control of . . . .a financial institution*, by means of false or fraudulent pretenses, representations, or

promises."  18 U.S.C. § 1344(2) (emphasis added); *see United States v. Nejad*, No. 18-CR-224 (AJN), 2019 WL 6702361, at *14 (S.D.N.Y. Dec. 6, 2019) ("[T]hough the Venezuelan subsidiary allegedly willingly transferred its *own funds* to Clarity and Stratus Turkey, the Indictment still states a scheme to obtain funds in the Venezuelan subsidiary's account.  This satisfies the requirement that a Section 1344(1) or 1344(2) scheme be one to obtain money from a bank.") (emphasis added).  Thus, even if the funds at issue belonged to Armenta (which they did not), the evidence would have established a bank fraud violation.

The authority cited by the defendant is not to the contrary.  In *United States v. Lebedev*, the Second Circuit upheld a bank fraud conviction despite the fact that, in the transactions at issue, the defendant's customers willingly purchased Bitcoin from the defendant.  932 F.3d 40, 49 (2d Cir. 2019).  Just like Scott and Armenta, Lebedev disguised the nature of the transactions—in Lebedev's case, by hiding that fact that he was operating an unlicensed Bitcoin exchange—to cause the bank to process the transactions and part with funds under its custody and control.  *Id. United States v. Perez-Ceballos*, also cited by the defendant, involved only an alleged violation of Section 1344(1), requiring proof of a scheme to defraud the bank itself.  *See* 907 F.3d 863, 867-68 (5th Cir. 2018) (analyzing sufficiency of the evidence under 18 U.S.C. § 1344(1)).  In that context, the Fifth Circuit concluded that the defendant's transfer of her own money through the victim bank did not involve defrauding that bank.  *Id.* at 868.  More to the point, in contrast with the instant case, the court in *Perez-Ceballos* found that "the government failed to adduce evidence that [the defendant] made any false statements to [the bank]."  *Id.*

## VI.    The Court's Jury Instructions on Count Two Were Proper

The defendant also seeks a new trial on Count Two of the Indictment based on what he claims were improper jury instructions in connection with the bank fraud conspiracy charged in that count.  First, he claims—relying on the "constructive amendment" doctrine—that the Court's

failure to instruct the jury that only certain United States banks "could be the basis of a bank fraud conspiracy conviction warrants, at a minimum, a new trial." (Def. Mem. 23). Second, he asserts that the Court's instruction concerning the circumstances under which an omission could constitute a material misrepresentation for purposes of the bank fraud offense "resulted in unfair prejudice to Mr. Scott" that can also only be cured by granting him a new trial. (Def. Mem. 25). These claims are meritless. There was no constructive amendment of the bank fraud conspiracy charged in Count Two, and the Court's instruction defining a material misrepresentation was entirely consistent with the law. Accordingly, the Court should deny the defendant's motion for a new trial on these grounds.

### A.  There Was No Constructive Amendment of Count Two

The defendant maintains that "[b]y expanding the bank fraud theory beyond the particulars letter sent to the defense approximately one month in advance of trial, the Government . . . constructively amended the indictment." (Def. Mem. 24). He is mistaken.

#### 1.  Relevant Background

##### a.  The Bank Fraud Conspiracy Charge

Count Two of the Indictment charged that:

> From at least in or about September 2015 through in or about 2018, in the Southern District of New York and elsewhere, MARK S. SCOTT, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit bank fraud, in violation of Title 18, United States Code, Section 1344.
> It was a part and object of the conspiracy that MARK S. SCOTT, the defendant, and others known and unknown, willfully and knowingly, would and did execute and attempt to execute a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Corporation ("FDIC"), and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations, and promises, to wit, SCOTT and others

> misrepresented and omitted material facts to banks and other finan-
> cial institutions worldwide to cause those financial institutions, in-
> cluding FDIC-insured financial institutions in the United States, to
> transfer funds into and out of accounts associated with purported
> investment funds operated by SCOTT and others, in violation of Ti-
> tle 18, United States Code, Section 1344.

(Doc. No. 143, ¶¶ 4-5).

### b. The Government's October 7 Letter

In response to a request for certain particulars regarding Count Two, on October 7, 2019, the Government provided the defendant with a letter (the "October 7 Letter") stating, among other things:

> While the Government has no obligation to prove any particular
> transaction or misrepresentation [in connection with the bank fraud
> conspiracy charged in Count Two], these transactions include, <u>but
> are not limited to</u>:  (1) two wire transfers in or about June 2016 to-
> taling approximately $5 million from a U.S. Morgan Stanley ac-
> count in the name of "Fates Group LLC" to a Fenero Fund account
> in the Cayman Islands, purported to be an investment into the Fenero
> Funds; (2) a wire transfer in or about July 2016 of approximately
> $30 million from a Fenero Fund account in the Cayman Islands,
> through a Bank of New York Mellon correspondent account in New
> York, to a Hong Kong account in the name of "Barta Holdings Lim-
> ited," purported to be an outbound investment from the Fenero
> Funds in the form of a "loan"; and (3) a wire transfer in or about
> September 2016 of approximately $5 million from a U.S. Sabadell
> United Bank account in the name of "Fates Group LLC" to a Fenero
> Fund account in the Cayman Islands, purported to be an investment
> into the Fenero Funds.

(emphasis in original)[7].

### c. The November 18 Charge Conference

The Court held a charge conference on November 18, 2019, during which it addressed the defendant's request for the inclusion of the following sentence in its jury instruction on the third

---

[7]  In light of the content of the October 7 letter, the Government respectfully requests that Exhibit A be filed under seal.

element of bank fraud (namely, the requirement that the financial institution be federally insured): "The Government has alleged that there were three FDIC financial institutions that were the object of the scheme: Morgan Stanley, Bank of New York Mellon, and Sabadell." (Tr. 1639-43).

During the charge conference, the Government argued, among other things, that "there are other banks that are FDIC insured that have been the subject of testimony at this trial to which fraudulent statements were made in order to move money through those banks." (Tr. 1639). The Government also cited the clear language in its October 7 Letter, and noted that it "was very clear that it was not constraining itself to those three institutions in [that] letter." (Tr. 1642). The defendant conceded that the Government had in its October 7 Letter "reserved the right" to prove other transactions at trial, but argued that "specifics" were needed to prevent jury confusion between the bank fraud and money laundering charges. (Tr. 1640-41). The Government pointed out that one of the defendant's primary concerns had been that "the jury will think that they can convict on a bank fraud charge because of lies told to foreign banks," and that the Court's jury instructions addressed that point by making abundantly clear that "the lie must be told or at least the object of the conspiracy is to tell lies to FDIC insured banks . . . ." (Tr. 1643). After hearing from both sides on the issue, the Court denied the defendant's request to give an instruction limiting the jury's consideration of the bank fraud conspiracy charge as to the three particular banks listed above. (Tr. 1643).

### 2.  Applicable Law

A constructive amendment to the indictment occurs where "the presentation of evidence [or] jury instructions . . . so modif[ied] essential elements of the offense charged that there is a *substantial* likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." *United States v. Vilar*, 729 F.3d 62, 81 (2d Cir. 2013) (internal

quotation marks and emphasis omitted) (emphasis added); *accord United States v. Ionia Mgmt.*, 555 F.3d 303, 310 (2d Cir. 2009). At bottom, the constructive amendment doctrine is rooted in "the 'two constitutional requirements for an indictment: first, that it contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, that it enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *United States v. Rigas*, 490 F.3d 208, 228 (2d Cir. 2007) (quoting *United States v. Resendiz-Ponce*, 127 S.Ct. 782, 788 (2007)).

The Second Circuit has "consistently permitted significant flexibility in proof, provided that the defendant was given *notice* of the *core of criminality* to be proven at trial." *Rigas*, 490 F.3d at 228 (internal quotation marks and footnote omitted) (emphases in original). "In short, not all modifications constitute constructive amendments." *United States v. Salmonese*, 352 F.3d 608, 621 (2d Cir. 2003); *see also United States v. Heimann*, 705 F.2d 662, 666 (2d Cir. 1983) ("[P]roof at trial need not, indeed cannot, be a precise replica of the charges contained in an indictment . . ."). In assessing whether a constructive amendment has occurred, "[t]he critical determination is whether the allegations and the proof 'substantially correspond.'" *United States v. Danielson*, 199 F.3d 666, 670 (2d Cir. 1999) (quoting *United States v. Patino*, 962 F.2d 263, 266 (2d Cir. 1992)).

### 3. Discussion

The Court's jury instructions on Count Two were accurate and clear, and—contrary to the defendant's baseless claim (*see* Def. Mem. 23-24)—clearly delineated the distinct elements of bank fraud, thereby distinguishing the conspiracy charged in Count Two from the money laundering conspiracy charged in Count One. The Court properly instructed the jury on the elements of bank fraud, namely, (1) "that there was a scheme to defraud a bank or a scheme to obtain money owned by or under the custody or control of a bank, by means of materially false or

fraudulent pretenses, representations or promises"; (2) "that the defendant executed or attempted to execute the scheme with the intent either to defraud the bank or to obtain money or funds owned by or under the custody or control of the bank"; and (3) "that the bank involved was federally insured." (Tr. 2001). Those elements differ substantially from the elements of concealment money laundering, which—as the Court properly instructed the jury—require: (1) "that the defendant conducted (or attempted to conduct) a financial transaction which must in some way or degree have affected interstate or foreign commerce"; (2) "that [the] financial transaction at issue involved the proceeds of specified unlawful activity, which here is alleged to be a wire fraud scheme"; (3) "that the defendant knew that the financial transaction involved the proceeds of some form of unlawful activity"; and (4) "that the defendant knew that the transaction was designed, in whole or in part, either to conceal or disguise the nature, location, source, ownership or control of the proceeds of the unlawful activity." (Tr. 1990). The Court's decision not to include an instruction limiting the federally insured banks to be considered by the jury in no way made the Court's bank fraud instructions difficult to understand or follow. Moreover, contrary to the defendant's baseless suggestion (*see* Def. Mem. 24), it is exceedingly unlikely that, as a result of the Court's decision, jurors would have confused the elements of bank fraud with the very different elements of concealment money laundering.

Nor did the evidence presented at trial result in a "constructive amendment" of Count Two. The conspiracy charged in Count Two alleged as its object the execution—by the defendant and others—of a scheme to obtain funds under the custody and control of federally insured U.S. banks, by means of false and fraudulent representations. (Indictment ¶ 5). The plain language of the charge gave the defendant clear notice of the "core of criminality to be proven at trial." *Rigas*, 490 F.3d at 228. The October 7 Letter, upon which the defendant relies heavily, made abundantly clear

39

that "the Government ha[d] no obligation to prove any particular transaction or misrepresentation" in connection with Count Two, and that the list of three transactions set forth in the Letter was not exhaustive.   The Court's decision not to instruct the jury that the Government alleged misrepresentations only as to certain U.S. banks under Count Two did not alter the "core of criminality" as charged in that count.   Moreover, the Government's presentation of evidence regarding efforts to obtain funds from FDIC-insured banks other than those banks specifically identified in the October 7 Letter "substantially correspond[ed]" with the theory outlined in Count Two.   *See Danielson*, 199 F.3d at 670.   Put simply, there is no likelihood, let alone a "substantial likelihood that the defendant [was] convicted of an offense other than that charged in the indictment."   *Vilar*, 729 F.3d at 81.

Accordingly, the defendant's motion for a new trial on this ground should be denied.

### B. The Court's Instruction on Material Misrepresentations Is Consistent with Recent Second Circuit Precedent

The Court's jury instruction regarding how the jury could consider omissions in the context of material misrepresentations proving a scheme to defraud was proper and entirely consistent with Second Circuit law.

With respect to the consideration of material omissions, the Court instructed the jury as follows:

> Deceitful statements of half-truth, the intentional concealment of material facts which made what was said under the circumstances misleading, and the expression of an opinion not honestly entertained may constitute false or fraudulent representations under the statute.

(Tr. 2037-38).[8]   The Court further instructed the jury:

---

[8]   The Court initially left out from this instruction the phrase "which made what was said under the circumstances misleading."   (*See* Tr. 2002).   At the conclusion of the jury charge, at the request of the parties, the Court clarified this part of the charge, and added that phrase.   (*See* Tr.

> The deception need not be premised upon spoken or written words alone.  The arrangement of the words, the intentional omission of words, or the circumstances in which they are used may convey a false and deceptive appearance.  If there is intentional deception, the manner in which it is accomplished does not matter.
>
> A fraudulent representation must relate to a material fact or matter . . . [I]f you find a particular statement of fact to have been false, you must determine whether that statement was one that a reasonable person might have considered important in making his or her decision.  The same principle applies to fraudulent half-truths or intentional omissions of material facts.

(Tr. 2002-03).

The defendant correctly notes that the Court: (1) declined to include in its instruction a statement that an omission could only be considered by the jury as a misrepresentation where there was a "duty to disclose"; and (2) added the word "intentional" before "concealment" in the phrase "intentional concealment of material facts."   But the defendant entirely ignores the Court's clarification that only an "intentional concealment of material facts *which made what was said under the circumstances misleading* . . . may constitute false or fraudulent representations under the statute."  (Tr. 2037-38).  That precise language was upheld by the Second Circuit shortly before the trial in *United States v. Petrossi*, No. 18-1685-CR, 2019 WL 4267874 (2d Cir. Sept. 10, 2019) (upholding jury instructions in which the trial court instructed the jury that the defendant's "omission of certain facts must have made his affirmative representations to investors under the circumstances misleading").  Indeed, the charge ultimately given the Court was largely modeled on the charge given by the trial judge in *Petrossi*.

Moreover, the reasoning of the *Petrossi* court is well supported by other precedent on the issue.  *See, e.g.*, *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000) ("Under the mail fraud

---

2037-38) ("There was something that I meant to include and it will be included . . . [T]he part that was missing was 'the intentional concealment of material facts which made what was said under the circumstances misleading.'  And I will get you an updated version.").

statute, it is just as unlawful to speak 'half truths' or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.") (internal brackets omitted); *United States v. Zarrab*, No. 15 CR 867 (RMB), 2016 WL 6820737, at *13 (S.D.N.Y. Oct. 17, 2016) ("'[T]he language of the bank fraud statute should be broadly construed so as to reach anyone engaged in a scheme or artifice to defraud, including a scheme to actively conceal material information through deceptive conduct, with the intent to mislead and suppress the truth, even in the absence of an independent legal duty to disclose such information.'") (quoting *United States v. Colton*, 231 F.3d 890, 903 (4th Cir. 2000), and citing *United States v. Keplinger*, 776 F.2d 678, 697-98 (7th Cir. 1985)); *United States v. Bryser*, 838 F. Supp. 124, 125 (S.D.N.Y. 1993) ("Deceptive nondisclosures . . . are covered by [the federal criminal fraud statutes].") (citing *United States v. Bohonus*, 628 F.2d 1167, 1171-72 (9th Cir. 1980); *United States v. Armantrout*, 411 F.2d 60 (2d Cir. 1969)); *United States v. Fed. Record Serv. Corp.*, No. 99 CIV. 3290 (BSJ), 1999 WL 335826, at *17 (S.D.N.Y. May 24, 1999) ("Fraudulent omissions may violate the mail fraud statute as much as do fraudulent misstatements.").

In sum, the Court's instructions on the jury's consideration of materially fraudulent omissions were legally correct and well supported by Second Circuit law.  Accordingly, there is no basis to grant the defendant a new trial on this ground.

## **CONCLUSION**

For the foregoing reasons, the defendant's Motion should be denied in its entirety.

Dated:  New York, New York
        March 23, 2020

                                        Respectfully submitted,

                                        GEOFFREY S. BERMAN
                                        United States Attorney

                            By:    s/_____
                                        Nicholas Folly /Christopher J. DiMase
                                        Assistant United States Attorneys
                                        (212) 637-1060 / 2433

                                        Julieta V. Lozano
                                        Special Assistant United States Attorney
                                        (212) 335-4025

43