# COVINGTON

BEIJING   BRUSSELS   DUBAI   FRANKFURT   JOHANNESBURG
LONDON   LOS ANGELES   NEW YORK   PALO ALTO
SAN FRANCISCO   SEOUL   SHANGHAI   WASHINGTON

**Arlo Devlin-Brown**

Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
T  +1 212 841 1046
adevlin-brown@cov.com

March 24, 2020

By ECF and E-Mail
Honorable Edgardo Ramos
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

> Re:   ***United States v. Mark S. Scott***, **S10 17 Cr. 630(ER)**
>        **Motion for Reconsideration of Remand Order**

Dear Judge Ramos:

   We write on behalf of our client, Mark Scott, to request that the Court reconsider its order of March 12, 2020 to remand Mr. Scott pending his May 26, 2020 sentencing.  The order followed a misleading and one-sided *ex parte* submission made by the Government to the Court and provided to the defense only as the March 12th hearing started, leaving counsel for Mr. Scott inadequate opportunity to respond.  Among other crucial details omitted from the Government's submission: the 2016 Porsche Mr. Scott sold and the Cape Cod property that his contractor filed a lien on were *not* subject to the Post-Indictment Restraining Order issued by the Court that limited Mr. Scott's access to certain assets.  The Government failed to even mention the Restraining Order in its *ex parte* filing, much less inform the Court that the car and Cape Cod property at issue were not among the assets ordered restrained.

   In fact, there was no compelling reason to remand Mr. Scott prior to sentencing.  He has shown no inclination towards flight, and none of the issues identified by the Government in its *ex parte* submission suggest any such risk.  Nor does the Court-ordered return of the $750,000 Ms. Halle provided towards his bond change that analysis.  Ms. Halle was *not* one of the signers of Mr. Scott's bond – she simply provided funds for security – and Mr. Scott could post substitute security if necessary to address this issue, as detailed herein.  The two required financially responsible persons approved by the Government who signed the bond continue to provide the Court with ample security.

   Most crucially, incarcerating Mr. Scott in a pretrial detention facility with a highly dense and transient inmate population – and subsequently transferring him to such a facility in New York for sentencing – dramatically increases his risk of exposure to a deadly virus ███████████

**COVINGTON**

Indeed, courts in this district and elsewhere have recognized that COVID-19 presents an unprecedented risk to incarcerated defendants with underlying health conditions and have ordered them released on bail. Just last week, Judge Nathan in the Southern District of New York ordered that an incarcerated defendant be released on bail, citing the concerns over the unprecedented and highly dangerous nature of the COVID-19 pandemic. *See United States v. Stephens*, 15-cr-95 (AJN) (S.D.N.Y. Mar.19, 2020) at 3, attached as Exhibit A.

Accordingly, as set forth in more detail herein, the Court should permit Mr. Scott's continued release on bail pending sentencing.

***

A defendant is permitted continued release following conviction and prior to sentencing provided clear and convincing evidence demonstrates that he "is not likely to flee or pose a danger to the safety of any other person or the community." 18 U.S.C. 3143(a). The Second Circuit has noted that "the minimal process due a post-verdict defendant who seeks continued release pending sentencing is the opportunity to demonstrate that he satisfies the burden of proof established by § 3143(a)(1). In short, he is entitled to 'some kind of hearing' at which this issue can be fairly resolved." *United States v. Abuhamra*, 389 F.3d 309, 320-21 (2d Cir. 2004) ("*Ex parte* submissions may generally *not* be received in opposition to bail release because such submissions compromise both a defendant's due process right to a fair hearing and the public's interest in open criminal proceedings. An exception to this rule may be made only in cases in which there is a compelling need to maintain the secrecy of certain evidence, no alternative means of meeting that need exist other than *ex parte* submission. . . .) (emphasis in original)."[1]

Mr. Scott presents no great risk of flight, and never has. He has maintained and continues to maintain his innocence, as well as an unrelenting commitment to challenging the case through the legal system. Mr. Scott has never attempted, before or after his arrest, to hide his involvement with the private equity funds alleged to have laundered OneCoin money or move his assets outside the United States. Tellingly, Mr. Scott operated the private equity funds accused of laundering OneCoin money in his own name, reported his foreign accounts to the IRS, and filed tax returns covering his earnings, much of which he invested in real estate in the United States. He was at his home in the United States at the time of his arrest, long after OneCoin's founder had vanished as law enforcement investigated. He has appeared on time at every Court appearance and surrendered as scheduled when the Court unexpectedly ordered his remand. In short, he has done *nothing* before or after trial to remotely suggest that even while

---

[1] Mr. Scott had no such process on March 12th, when lengthy *ex parte* submissions from both the Government and counsel for Marietta Halle were unsealed moments before the hearing started. The Government sought Mr. Scott's detention based on interviews of Ms. Halle, a contractor performing work on Mr. Scott's home, and his Florida Pre-Trial services officer. *None* of these persons were available for examination in Court and the Government failed even to provide the defense with notes of what these individuals had supposedly told the Government in its interviews.

**COVINGTON**

challenging the Government's case at every stage of the process, he plans to abandon his wife and young child and flee the United States forever.

In deciding not to remand him following sentencing, the Court commented, "[Mr. Scott] has complied with every condition that was imposed on him . . . He, so far as I know, doesn't have criminal connections . . . He has been facing a significant sentence and from the outset, and that hasn't changed.  So, I do find by clear and convincing evidence that he is not a risk of flight."  (Trial Tr. at 2081).  Nothing in the Government's *ex parte* submission of March 11, 2020 or its argument in Court changes that analysis, or the Court's correct ruling after trial that clear and convincing evidence established that Mr. Scott did not present a risk of flight.

### Transactions Involving The 2016 Porsche and A Cape Cod Property

The Government's principal argument for Mr. Scott's remand relates to transactions he made with respect to two assets Mr. Scott is alleged to have purchased with money traceable to OneCoin.  But the Government's *ex parte* submission concerning these assets contained a striking omission.  The Government failed to disclose to the Court that *neither* the 2006 Porsche nor Cape Cod property were listed on or subject to the Post-Indictment Restraining Order the Government sought and obtained from the Court that identifies assets Mr. Scott was restricted from impairing.  *See* Post-Indictment Restraining Order dated September 4, 2018, attached as Exhibit B.  Simply put, neither asset was subject to any Court order directed to Mr. Scott at all.  Moreover, as discussed below, the particular transactions Mr. Scott engaged in concerning these assets do not remotely suggest a risk of flight.

<u>Mr. Scott's Sale of the 2016 Porsche</u>

The Government's first argument for detention is one the Court appropriately rejected at trial, relating to Mr. Scott's sale of a 2016 Porsche 911 GT3 RS that Government argues was purchased with OneCoin proceeds.  By way of background, federal agents arresting Mr. Scott seized several cars (including another Porsche), his boat, and various items of personal property, while leaving other cars and belongings untouched.  The Government did *not* at that time or anytime thereafter advise Mr. Scott or his counsel that they were seeking additional cars purchased by Mr. Scott, nor did they adhere to the proper steps to put Mr. Scott on notice of the issue by including the Porsche on the Post-Indictment Restraining Order identifying accounts and assets subject to seizure pursuant to 18 U.S.C. § 982 and 21 U.S.C. § 853.  *See United States v. Egan,* 2010 WL 3000000, at *1 (S.D.N.Y. July 29, 2010) ("Pursuant to § 853(e) (1)(A), at any time after an indictment has been filed, the Government may move for a restraining order in order 'to preserve the availability of property . . . for forfeiture under [section 853(a) ].'  A motion for a restraining order should be granted by the district court when there is 'probable cause to believe that the assets are forfeitable.'" (citing *United States v. Monsanto ("Monsanto III")*, 491 U.S. 600, 615 (1989))).

Having failed to seek a Court order restricting Mr. Scott from accessing the 2016 Porsche 911 GT3 RS , the Government falls back on the argument – as it did immediately following trial – that it produced a copy of a seizure warrant for this specific vehicle on October 18, 2018, more than a month after Mr. Scott's arrest.  *See* Exhibit C, attached.  What the Government fails to point out is that this was one of over a dozen warrants or warrant affidavits produced on that

**COVINGTON**

date, with the other warrants relating to physical property concerning items the Government had already been searched or seized.  The Government did not specify in the letter or anywhere else that this particular piece of property – unlike the other personal or real property – had not yet been seized by the Government, much less contain a request to Mr. Scott to cooperate in providing the vehicle to authorities.  Instead, the material was provided to counsel simply as Rule 16 discovery and treated by counsel as such, not as an subtle unstated request for Mr. Scott to turn over a vehicle.[2]

Failing to prove that Mr. Scott was aware that this car was subject to any pretrial restraint or even an order authorizing its seizure, the Government fell back in oral argument on the claim that Mr. Scott knew the car was purchased with "OneCoin money." (Tr. at 27)  But Mr. Scott was *presumed innocent* when he sold the car in June 2019, and remained so until the jury reached a verdict to the contrary in November of that year.  While Mr. Scott was of course restricted during this pre-conviction period from accessing any accounts or property subject to the Restraining Order, he was not required to presume his own guilt and not touch any property that the Government might subsequently seek to seize.

Moreover, Mr. Scott's actions, even if improper, do not suggest a flight risk.  Mr. Scott did not transfer the funds to offshore bank accounts as part of plan to amass overseas assets.  Rather, he transferred funds from the sale of the care to a U.S.-based bank account in his name which he simply used to pay his bills, which included paying to insure and maintain other assets that the Government had seized.

The Transactions Relating to the 31 Dale Avenue Property

The Government also claimed that Mr. Scott engaged in transactions relating to property at 31 Dale Avenue in Hyannis Port, Massachusetts that demonstrate a risk of flight.  The opposite is true.  As demonstrated below, all Mr. Scott did was secure emergency repairs to prevent a valuable home – which the Government now asserts it intends to seize – from washing away during a Cape Cod winter.  Protecting his United States-based real estate was not improper, helped rather than hindered the Government, and in any event, does not suggest a risk of becoming a fugitive.

The central facts around the transactions are as follows, supported by a letter from Mr. Scott's contractor, John "Jack" Delaney.  *See* Letter dated March 20, 2020 from John J. Delaney to Judge Ramos, attached as Exhibit D.  Mr. Scott purchased 31 Dale Avenue as an investment

---

[2] The Government's only new argument beyond the argument made post-trial is that the car was also included in a bill of particulars identifying property the Government intended to seek to forfeit should the defendant be convicted.  But a forfeiture bill of particulars is also not a substitute for a Court-issued Post-Indictment Restraining Order which restricts a defendant from accessing certain assets based on a showing of probable cause that the asset is proceeds of an offense.  Rather, a bill of particulars is a filing that the Government can submit at the direction of the court "to inform the defendant of the identity of the property that the government is seeking to forfeit…."  (Fed. R. Crim. P. 32.2, Committee Notes on Rules - 2009 amendment).  In short, it is a notice document, requiring no judicial showing whatsoever, in which the Government informs a presumptively innocent defendant of what he may forfeit should the Government prevail.

**COVINGTON**

property in September 2017.  The home needed extensive work to be habitable.  Among other problems, the home was situated below the current flood plain and consequently, the entire structure needed to be raised, a complex task requiring the engagement of a team of architects and engineers. *See* Ex. D at 1.  At only 25 feet from the ocean, the house also needed to be made "weather tight," requiring earth work, modifications to the foundation and framing, and replacing the walls, windows, and floors.  *Id.* at 1, 2.

Mr. Scott hired Mr. Delaney to oversee and conduct the repairs.  To begin work, Mr. Scott paid Mr. Delaney $218,322.65 from September 2017 to September 1, 2018. *Id.* at 1.  Mr. Scott was arrested shortly thereafter, while the house was precariously elevated for the upcoming repairs, as reflected in photos provided by Mr. Delaney.  *See* Exhibit E, attached.  Mr. Scott told Mr. Delaney following his arrest that he would have to put the work on hold.  *See* Ex. D at 2.  Mr. Delaney, however, continued to send crews to maintain the property, and continued to pay the $5,750 monthly invoice for the rental of the cribbing and steel.  *Id.*  Simply leaving the structure in its current state was not an option, as at this point, it was "hanging 5 feet in the air with no floor whatsoever," situated a mere 25 feet from the ocean.  *Id.*

In November 2018, Mr. Scott instructed Mr. Delaney to do what was necessary to protect the house from the elements, and over the next six months, he wired payments to Mr. Delaney from various accounts, including one payment of $300,000 from an MSSI LLC (BVI) account in the Cayman Islands that the Government identified in its *ex parte* submission.  All of this money was used to make the necessary and essential repairs as described above. *Id.*  This money was exhausted by July 1, 2019, at which point Mr. Scott informed Mr. Delaney that he had no more money to give. *Id.*  Mr. Delaney then made the decision, on his own, to continue the work pursuant to their original agreement *"without any additional promise to be paid by Mr. Scott,"* because he wanted to protect his reputation for his good integrity in the community and did not want the money and work that had been put into the house to go to waste.  *Id.* at 3.

Mr. Delaney continued the essential work, and by October 2019, had advanced nearly $290,000. *Id.*  Knowing that Mr. Scott had lost at trial, he nonetheless approached Mr. Scott for payment in December 2019. *Id.*  Mr. Scott stated to him that he was unable to pay him this amount of money.  Thus, Mr. Delaney offered, and Mr. Scott agreed, to take a mortgage for $289,775.  *Id.*

The Government points to both the payment to the contractor and the mortgage of the property as suggesting risk of flight, but the logic falls flat.  As an initial matter, the property at issue was not subject to a post-indictment restraining order of any sort and there was neither a Court order or even Government request with respect to Mr. Scott's treatment of this property while charges were pending.  Simply put, there was *no* prohibition on Mr. Scott providing Mr. Delaney with a mortgage on this property.

Moreover as explained above, both the $300,000 payment and $289,775 mortgage were quite clearly done to *improve* the property—indeed, to protect it from a potential catastrophic loss had basic protective construction not been completed before the winter.  This did not harm the Government's interest in assets allegedly derived from OneCoin.  The house was purchased for $3,765,000 but is now worth an estimated $5,800,000 by virtue of the funds invested in the property.  *Id.* at 1, 3.

**COVINGTON**

It is the case that the Cayman Islands-based account Mr. Scott used to make the $300,000 payment was subject to the pre-trial restraining order, although the bank in question apparently did not know of such an order or care to enforce it.   Yet even this must be kept in perspective with respect to risk of flight.  The account was not a secret asset the Government knew nothing of, suggesting hidden wealth overseas (as the Government presented the matter in its *ex parte* filing).  This account was held openly in the name of MSS International Consultants (BVI), with Mark Scott as signer, and reported on FBARs to the United States.  And while not an excuse, it is worth noting that Mr. Scott may have assisted the Government by transferring the money from an overseas bank that had not followed the Government's restraining order towards the improvement of real property the Government intended to seize located in the United States.

Most tellingly, though, is what the transactions at issue say about Mr. Scott and his intent: if he had intended to flee, he would not have transferred assets from *outside* the United States into the United States to improve unmovable property.  He would have transferred his funds to some inaccessible place overseas.  Indeed, the fact that Mr. Scott continues to improve an asset in the United States even after trial is reflective of his optimism and commitment even post-trial.

### Mr. Scott's So-Called "Fraud" Against Ms. Halle

The Government brazenly asserts that Mr. Scott "defrauded" Ms. Halle by borrowing $500,000 from her in August 2019 (which Mr. Scott put towards legal fees) while stating at the time that he would pay her back six months later (February 27, 2019).[3]  Every loan default is not a "fraud," as the Government should know.  The Government offered zero evidence – none at all – that Mr. Scott did not intend at the time he obtained the loan to repay it.  The fact that he missed the six month time frame by a mere *two weeks* at the time he was remanded says nothing about his intent when he borrowed the funds.  Had Mr. Scott, presumed innocent, been acquitted at trial he would have had substantial assets to repay the loan.  And, as Mr. Scott himself explained in his email to Ms. Halle on August 11, 2019, he had or was expecting funds to repay the loan irrespective of the trial outcome from various sources, including accounts at UBS that the Government did *not* seize but the bank has refused to release, which the Government knows is accurate.  *See* Exhibit D to Government's Ex Parte Letter to Court dated March 11, 2020.  Scott likewise represented that funds were payable to him from a former business partner and from an expected divorce settlement from a former client; there is no evidence these statements were false.

In fact, Ms. Halle's affidavit, released to the defense only once the hearing had started (and she was not of course subject to cross-examination) does not identify any fraud with respect to the $500,000 loan.  Rather, Ms. Halle vaguely explains that she noticed unspecified "various and sundry inconsistencies" in with respect to an unrelated investment she made with Mr. Scott which she then asserts "morphed into misrepresentations." *See* Halle Aff. at ¶ 7.  Some of the

---

[3] The Government is also silent on Mr. Scott's use of the $500,000, but that too is telling.  He did not transfer the money abroad or use it in any way suggestive of an intent to flee.  He did the opposite, using the funds to pay legal fees to challenge the charges against him.

**COVINGTON**

information she provides is simply inaccurate, such as her suggestion that Mr. Scott offering her valuable watches, bags and jewelry as collateral would violate the Post-Indictment Restraining Order.[4]   The defense understands that Ms. Halle would no longer like to post the cash necessary to secure Mr. Scott's bail – a request the Court has granted – but the fact that these friends and business partners had a falling out does not mean that Mr. Scott engaged in fraud.  At most, it means that Mr. Scott should be given an opportunity to find adequate substitute security for the bond, something that he is prepared to do as a condition of release.[5]

### Countervailing Serious Medical Considerations

As set forth above, none of the Government's allegations against Mr. Scott remotely suggest that he is preparing to flee.  Even read in the light most favorable to the Government, the evidence at best suggests that Mr. Scott has been less than diligent about financial transactions with assets allegedly linked to OneCoin, but the *way* he has used those assets – such as protecting from potential destruction a home the Government may seek to forfeit – shows an optimism and commitment inconsistent with becoming a fugitive.

Measured against the Government's weak arguments for flight are the vast and increasing damage the sudden detention to Mr. Scott will have on his health, not just in the near term but throughout his incarceration.

---

[4] In fact, while Government agents seized various watches, jewelry and other assets from Mr. Scott in connection the execution of search warrants, the Government later returned much of this property, a substantial amount of which had been purchased prior to Mr. Scott's involvement with OneCoin.

[5] For example, a recent appraisal of Mr. Scott's residence at 600 Coral Gables establishes a market value of $1,605,000, and there is no mortgage on the property.  Even assuming for the sake of argument that the Government assets that the entirety of the $1,264,000 used to pay off the mortgage was traceable to OneCoin, the additional equity in the apartment could be used to secure the bond.

[6]

[7] Center for Disease Control and Prevention, *Coronavirus Disease 2019*, "People who are at higher risk for severe illness." (Mar. 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html

**COVINGTON**

        Courts in the Southern District have joined courts and prison systems all over the country in taking steps to reduce their inmate population in this time of crisis.[8]  As mentioned, above, only days ago, Judge Nathan chose to grant release on bail to an incarcerated defendant due to coronavirus concerns, citing the "unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic." (See Ex. A, at *3).  She noted both the potential for heightened risk of transmission among inmates should an outbreak develop, as well as the increased difficulty that COVID-19 related jailhouse meeting and visitor restrictions pose on the defendant's ability to confer with counsel.  This is similarly a concern at the Miami FDC, where Mr. Scott is housed and legal visits are not currently permitted.   Defense counsel needs to be able to confer with Mr. Scott regarding a reply brief on the post-trial motions and sentencing issues.   Judge Nathan's opinion cited the latest available figures for the number of confirmed COVID-19 cases in New York State -- 2,382 as of March 18th -- as evidence of how quickly the disease was spreading. Only five days later, the number of confirmed cases in New York state now stands at a staggering 20,875.[9]   In another recent case in the S.D.N.Y., Judge Broderick released an inmate on bail pending sentencing on drug charges, following a request of his lawyers citing concerns over COVID-19 given that the defendant was in a high-risk group.[10]

[8] "Jails Release Prisoners, Fearing Coronavirus Outbreak," *Wall Street Journal Online*, Mar. 22, 2020,  https://www.wsj.com/articles/jails-release-prisoners-fearing-coronavirus-outbreak-11584885600

[9] New York State Department of Health, *Information on Novel Coronavirus*; *County by County Breakdown of Positive Cases,* https://coronavirus.health.ny.gov/county-county-breakdown-positive-cases

[10] *United States v. Vizzari*, 19-cr-767 (S.D.N.Y. Mar. 20, 2020), Dkt. 18, 21.

**COVINGTON**

Furthermore, the devastating disease *is already inside* the nation's prisons system -- including in Florida's prisons, where Mr. Scott is presently housed.   Already one week ago, Miami-Dade corrections officials confirmed that someone in their custody had tested positive and was in isolation in one of the prison's housing units.[11]  While this is a different facility than the one Mr. Scott is housed in, given the rapid spread of the disease, this can hardly be an isolated case.  Likewise, in New York, an inmate at the Metropolitan Detention Center tested positive for COVID-19 over the weekend.[12]  At Rikers Island, 21 inmates and 17 employees have already tested positive as well.[13]  Mr. Scott would need to be transferred to a New York facility prior to sentencing, placing his health further at risk.

***

For the reasons set forth above, Mr. Scott should be granted continued release on the existing bond until sentencing.  As noted above, the bond was signed by two individuals approved by the Government, and Ms. Halle was not herself a signer.  Mr. Scott could provide security for the bond by posting the Coral Gables, FL residence that he and his wife own, valued at $1,605,000 and with no mortgage outstanding. *See* Exhibit H, attached.  Additionally, Ms. Scott will surrender her passport and that of their son.  Such release does not present a risk of flight and is needed to protect Mr. Scott's health during this unprecedented epidemic.

Respectfully Submitted,

/s Arlo Devlin-Brown
Arlo Devlin-Brown


David M. Garvin
200 South Biscayne Boulevard
Suite 3150
Miami, FL 33131
(305) 371-8101

---

[11] "Miami-Dade Prisoner Tested for COVID-19," *NBC Miami*, Mar. 16, 2020.  Available: https://www.nbcmiami.com/news/local/miami-dade-prisoner-tested-for-covid-19/2205725/

[12] "New York Has Roughly 5% of Coronavirus Cases Worldwide," *New York Times*, Mar. 22, 2020, https://www.nytimes.com/2020/03/22/nyregion/coronavirus-new-york-update.html

[13] "21 Inmates, 17 Employees Test Positive for COVID-19 on Rikers Islands: Officials," *NBC News New York*, Mar. 21, 2020, https://www.nbcnewyork.com/news/coronavirus/21-inmates-17-employees-test-positive-for-covid-19-on-rikers-island-officials/2338242/