```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x

 3  UNITED STATES OF AMERICA,

 4            v.                          17 CR 630 (ER)

 5  MARK S. SCOTT,

 6            Defendant.
                                         Conference
 7  ------------------------------x

 8                                       New York, N.Y.
                                         March 30, 2020
 9                                       10:00 a.m.

10  Before:

11
                       HON. EDGARDO RAMOS,
12
                                         District Judge
13
                          APPEARANCES
14
    GEOFFREY S. BERMAN
15       United States Attorney for the
         Southern District of New York
16  BY:  NICHOLAS S. FOLLY
         CHRISTOPHER J. DiMASE
17       Assistant United States Attorneys

18  New York County District Attorney's Office
    BY:  JULIETA LOZANO, SAUSA
19
    COVINGTON & BURLING LLP
20  BY:  ARLO DEVLIN-BROWN
         KATRI STANLEY
21          -AND-
         DAVID M. GARVIN
22
    Also Present:
23  John Moscato, U.S. Pretrial Services
    Ronald Shimko, FBI
24

25
```

1          THE COURT:  This is Judge Ramos.  Good morning,

2     everyone.

3               (Case called)

4          THE DEPUTY CLERK:  Counsel, please state your name for

5     the record.

6          MR. FOLLY:  Good morning, your Honor.  This is

7     Nicholas Folly speaking.  We have Nicholas Folly, Christopher

8     DiMase, and Julieta Lozano for the United States.  And we also

9     have Special Agent Ronald Shimko of the FBI who is also on the

10    phone.

11         MR. DEVLIN-BROWN:  This is Arlo Devlin-Brown for

12    Mr. Scott.  And I'm joined by David Garvin, also for Mr. Scott.

13    And Katri Stanley from Covington is also on the line.

14         THE COURT:  Mr. Devlin-Brown, do you want to make a

15    representation concerning Mr. Scott's appearance?

16         MR. DEVLIN-BROWN:  I do, your Honor.  In light of his

17    current situation of incarceration in Florida, we've waived his

18    appearance for today.

19         THE COURT:  Who else is on?  Anyone from pretrial or

20    probation?

21         MR. MOSCATO:  Yes, your Honor.  This is John Moscato

22    from U.S. Pretrial Services.

23         THE COURT:  And I take the other participants are

24    members of the Fourth Estate.  Okay.

25         Mr. Devlin-Brown, this is your application.  I'll hear

 1    you.

 2              MR. DEVLIN-BROWN:  Thank you, your Honor.

 3              I want to start with the notion that the government

 4    has put forward in its filings and actually, Judge, put forward

 5    in similar language in other cases they've recently filed in

 6    this district that the Bureau of Prisons is "prepared to handle

 7    the risk."

 8              I just think that's facially absurd.  No one is

 9    prepared to handle the risks of this upcoming and ongoing

10    pandemic.  Certainly the public health system and private

11    health system in New York City and across the country is being

12    strained, and the idea that the Bureau of Prisons is going to

13    provided adequate care or be able to resist the devastating

14    impact of the spread of this disease because they have a policy

15    manual they created some years ago -- it just doesn't pass the

16    straight-face test.

17              This is the same Bureau of Prisons that couldn't get

18    the heat to work for weeks at a time in the freezing winter

19    last year.  MCC has its own issues.  It's been on lockdown.

20              The decision that your Honor makes is going to have

21    consequences because this disease is going to spread within the

22    Bureau of Prisons.  It already has.  These are close quarters.

23              Unless the staff of the Bureau of Prisons is going to

24    be prevented from returning home, they're going to bring it

25    into the prison system.  Even to the extent that the

1    Bureau of Prisons is able to address it, it's already posing

2    really severe problems on our ability to communicate with our

3    client.  And I'm sure it's going to for other lawyers as well.

4            The FDC in Miami has just gone on to a 24-hour

5    lockdown.  They've been on a modified lockdown until recently.

6    There are no legal visits.  Legal calls are hard to arrange.

7    And we have a lot of work to do of course to prepare for

8    sentencing, as well as the Rule 29 reply.

9            To step back a second, your Honor, the fact that the

10   Bureau of Prisons isn't really prepared to handle COVID doesn't

11   provide recourse to all defendants.  It's not a

12   get-out-of-jail-free card.

13           The vast majority of defendants in the prison system

14   have been sentenced already by the courts.  There is no real

15   remedy, short of compassionate release or other programs, to

16   assist those inmates.

17           But this is a different case.  This is an inmate who

18   is only there because his bail was canceled and because he's

19   waiting for sentencing.  This is a place where the Court can

20   make a difference.

21           And I think the analysis really is sort of

22   straightforward.  What damage will incarcerating Mr. Scott have

23   on his health, number one, measured against what the risk of

24   flight is.

25           Let me take both of those briefly, your Honor.  Not to

1    repeat the arguments in our letters, but on flight risk, I

2    would submit there really is no flight risk.  He has

3    consistently appeared in court every time he's been directed

4    to, including surrendering when your Honor directed him to

5    surrender to authorities in Miami.

6          And the government's arguments about his use of

7    access, which we can get into, and there are responses we have

8    to some of the things they say and the like.  But I think those

9    arguments are in a lot of ways besides the point at a time like

10   this.

11         They might have had more weight before.  But at a time

12   like this, really you look at those arguments with respect to

13   whether they suggest that Mark Scott is not going to obey a

14   court order to surrender to prison if he's sentenced to prison

15   ultimately, and they just don't suggest that at all.

16         I think the best example, your Honor, is someone who

17   is looking to flee does not, like Mr. Scott did, transfer

18   $300,000 from a Cayman Islands bank account to the U.S. to

19   protect real property in the U.S. that the government is

20   seeking to seize.

21         One can quibble, and the government has some valid

22   criticisms to some extent about these assets.  But there's

23   nothing about his use of these assets that poses a risk of

24   flight.

25         And posting a lien on his home is more than adequate

security to make up for the loss of the $750,000 that Marietta

Halle, his former business partner and friend, has had returned

to her.

There is at least $600,000 in equity above and beyond

what the government alleges is linked to OneCoin.  So that's

substantial.  But I think it's a weightier asset in a lot of

ways, your Honor, because Mr. Scott's wife and child live

there.

The government may say they would forfeit it anyway

and try to collect a million dollars from it.  But in Florida

in particular, it's very difficult to forfeit property where

there's a spouse who lives there.  And this would make a real

difference with Mr. Scott's wife signing away her interest in

this property to the extent that Mr. Scott should flee.

She'd also surrender her passport by the way.  So

that's flight, and I don't really think you have any

significant flight risk.  Then you measure it against the

health risk.  These are very serious risks.

Your Honor, one thing we got recently and forwarded to

you this morning was Bureau of Prisons data.  That confirms

that Mr. Scott does have a heart condition.  Actually, it's a

heart condition that hadn't been diagnosed before, atrial

fibrillation, and he needs more work done on that and further

evaluation.

To the extent the government is quibbling that his own

1  doctor letters are rather brief, these are letters from a

2  practicing physician who was treating him, not a paid expert

3  who can write lengthy letters.

4         To the extent they're not more fulsome, that's because

5  the diagnostic testing that Mr. Scott was going to undergo was

6  scheduled to occur and then he was sent to prison.  So there is

7  no question that he is a high-risk patient.

8         There's new data from WHO suggesting that cardiac

9  patients with underlying cardiac conditions are at a

10  significantly higher risk than the average population for

11  suffering complications from this disease.

12        Your Honor, I'm happy to answer any of the Court's

13  questions.  And I'd like to respond, to the extent there are

14  new points raised by the government.

15        But I think this really is a point where you can

16  balance risk of flight, which is minimal, to the damage to his

17  health that continuing incarceration will do right now.  And we

18  submit that your Honor should release him on bail.  He can get

19  the medical workup he needs.

20        And then if and when your Honor does sentence him to

21  time in prison, hopefully it will be a time when this pandemic

22  has passed and he'll be able to go to a facility that's able to

23  treat him.  That's all the defense is asking for here.

24        THE COURT:  Mr. Folly or Mr. DiMase.

25        MR. FOLLY:  Thank you, your Honor.  This is Nicholas

1    Folly.

2           Mr. Scott's actions throughout this case leave no

3    doubt that if he is released on bail, he's going to continue to

4    disregard court orders.  He's going to continue to commit

5    crimes.  That's what he's done.  His actions -- the proof is in

6    the pudding as they say.

7           He's altering on this risk of flight.  So I just want

8    to address those issues and also respond to some of the things

9    that Mr. Devlin-Brown just said.

10          Just for context, as we all know, this is a lawyer.

11   Mr. Scott is a lawyer.  He got charged for laundering $400

12   million.  $50 million of that money went straight into his

13   pocket.  He lied to federal agents when he was arrested.

14          And then after all of that -- after being charged,

15   after being brought to court, after being in jail for a brief

16   period of time -- he continued to commit serious federal

17   felonies while on bail.  That's undisputed.

18          These arguments that the defense is making are now

19   about the court and about money.  $300,000 was used by Scott to

20   renovate his property.  These are not arguments suggesting that

21   he did not do those things.  They are arguments that are

22   attempting to justify why he did them.

23          The bottom line is he used in excess of $500,000 of

24   OneCoin proceeds that were subject to multiple court orders

25   while on bail for whatever he chose to use them for.  Those are

serious crimes.

He can get charged based on the evidence that the government showed at trial showing that he knew that this money was directly derived from the OneCoin fraud scheme.  He could get charged separately for these crimes.

These aren't violations of the bail conditions in which he went to the store to get some milk without permission. These are serious offenses he committed while being subject to his bail conditions.

And then he got convicted at trial and continued to use assets under the forfeiture without any regard to the orders of this Court, for example, mortgaging properties, the Vale Avenue property that was subject to forfeiture.

So his actions show this is a defendant who is going to manipulate the system, violate the rule of law, lie to federal agents, defy court orders pertaining to seized assets, all in order to benefit himself and to avoid the consequences of his actions in this case.

Scott even made false promises to his own suretor and induced her to pay another $500,000 on top of the $750,000 that Scott had received from her to secure his fund which started this case.

And it's telling that his own close friend, who was his suretor who once had total trust in Scott and who was willing to front him $750,000, now has no confidence in him.

1           She has no confidence that he will return to court and

2    show up and is no longer willing to stand by that bond.

3    Your Honor, as a result of that, rightfully released her from

4    that obligation.

5           It's also telling that that same woman believes she

6    was ripped off by Scott for an additional $500,000 and has just

7    been told repeated lies by Scott about the money that Scott

8    owes her.

9           Then you have on top of that the fact that Scott is a

10   dual citizen of Germany.  He has access to offshore financial

11   accounts.  There is no question that he's an enormous flight

12   risk.

13          The moment he decides that he is better served by

14   fleeing than continuing to remain in the United States and

15   plead his case, the evidence suggests that he will do exactly

16   that.  There is no reason for him not to.

17          He's been convicted of two extremely serious crimes.

18   He faces a guideline sentence of 50 years.  He's in the process

19   of being disbarred.  His reputation has been tarnished.  So the

20   moment he decides he's better off living the rest of his life

21   in Germany where he doesn't face an enormous sentence, he's

22   going to do that.

23          And now he's also been in jail and seen what that's

24   like, again, at the beginning of this case up until now.  So

25   that simply adds to the risk of flight.  It does not mitigate

1    the risk of flight.

2            So it's not simply risk of flight.  It's also

3    financial danger.  I also articulated that.  That's one of the

4    grounds that your Honor found when we had the original bail

5    hearing is that he poses both a financial danger to the

6    community through his willingness to dissipate assets subject

7    to court orders and also an enormous risk of flight.

8            The final point on that is that it's totally

9    inappropriate for Scott to try to use property that was paid

10   off primarily with OneCoin fraud proceeds as security for his

11   loan.  This is property that is subject to forfeiture.

12           Frankly, all of Scott's personal property is subject

13   to forfeiture as substitute assets.  Given that he laundered

14   $400 million as the government clearly showed at trial, that is

15   the amount of money that is going to be subject to forfeiture,

16   and that's by statute and also under clear Second Circuit

17   precedent.

18           So any of these personal assets, whether or not they

19   were purchased entirely with OneCoin fraud proceeds, would

20   still be subject to forfeiture as substitute assets.

21           So the notion that Mr. Scott should be allowed to use

22   a property that is the subject of forfeiture as the security

23   for his bond is totally inappropriate.  That would not address

24   any risk of flight.  That is essentially letting him put up

25   OneCoin victim proceeds as security for his bond which is

1    totally inappropriate.

2           The last point, your Honor, is all of this obviously

3    has to be weighed against the situation with COVID-19 and

4    Scott's health.  And that's where the real issue is because

5    obviously we're not in a position -- we cannot let every

6    defendant out of jail.  Each case must be taken in turn.  And

7    the question is whether Scott should be let out and on what

8    record he should be let out on.

9           What we have in front of us are two doctors' letters,

10   his primary care physician, that have limited explanation about

11   much of anything.  They state that Scott has some serious

12   health issues.

13          They provide no explanation of whether there are

14   specific risks that cannot be addressed by the BOP while Scott

15   is incarcerated.  They include no specific explanation of why

16   Scott is high risk.

17          A couple of sentences in a doctor's note from a

18   primary care physician is simply not an adequate showing for

19   the extraordinary relief that Scott is asking for which is to

20   be let out on bail with essentially no security, despite the

21   fact that he has committed serious felonies while on bail,

22   despite the fact that he is an enormous flight risk.

23          So for all of those reasons, the motion for

24   reconsideration should be denied.

25          THE COURT:  Mr. Devlin-Brown, do you wish to add

```
 1   anything?  Mr. Devlin-Brown?

 2            MR. DEVLIN-BROWN:  Sorry, your Honor.  I just wanted

 3   to briefly address a couple points that Mr. Folly made.

 4            Mr. Folly has said repeatedly that Mr. Scott violated

 5   multiple court orders by using these assets.  I think he's,

 6   again, overstated what's gone on here.

 7            Let me talk specifically about his reference to the

 8   Vale Avenue property that Mr. Scott issued a mortgage on for

 9   200 something thousand dollars to the contractor who, on his

10   own, completed work on the property to prevent it from being

11   damaged in the middle of construction.  So there were not

12   multiple court orders with respect to that property.  In fact,

13   there were no court orders.

14            I still haven't heard from the government why they did

15   not include that property in a post-indictment restraining

16   order as they did with numerous other assets that they wanted

17   to put Mr. Scott on notice of that he could not have any access

18   to.  They did not do that with the Vale Avenue property.

19            And that action Mr. Scott took -- again, would it have

20   been a better practice to consult the government to try to

21   protect that asset?  Yes.  But what he did there does not

22   suggest a risk of flight, and it does not pose losses to

23   OneCoin victims.

24            The contractor who did the work noted the property was

25   purchased for approximately $3 million and is worth now
```

approximately $5 million.  There were specific numbers he
referenced.  But essentially it's increased by $2 million
thanks to the efforts the contractor made to complete the
property.

         A couple of other things to address, your Honor.
Again, there's a reference to a supposed fraud on Marietta
Halle.  I want to make a couple points there.  First of all,
she was not a signer of the bond.  The bond was signed by two
financially responsible persons.  She simply put up $750,000 of
her own money.

         THE COURT:  You say that like it's nothing.  She put
up $750,000 of her own money.

         MR. DEVLIN-BROWN:  It's not nothing, your Honor.  It's
not nothing at all.  But what it means in terms of what would
need to be done to make the bond whole again -- it's not that
there needs to be new signers.  It's that there's something
that needs to replace the security there.

         What went wrong between Mr. Scott and Ms. Halle is
very complicated.  They were business partners, but again the
government repeats that Mr. Scott repeatedly told her lies
about money owed.  And there's just no evidence of that.

         This $500,000 was borrowed not so he could send it
offshore to run away but to pay for legal fees.  And he
provided explanations when he made that arrangement with
Ms. Halle as to what sources of funds he hoped to have to pay

1    her back.  The government hasn't shown any evidence that these

2    were fraudulent statements or untrue at the time.

3            So I don't think the Court can really take anything

4    away from the interactions with Ms. Halle, other than that

5    she's no longer willing to put up the cash and therefore we

6    should look at what other security could substitute for it.

7            Again, I think the government is overstating the

8    challenges with putting up his house that he and his wife

9    jointly own that was purchased, by the way, before his

10   involvement with OneCoin, and it has equity in it independent

11   of OneCoin.

12           The government's position that Mr. Scott can't use any

13   substitute assets either would make him unable to have funds to

14   live on or to do anything in terms of posting a bond, and

15   that's just not the law.  The assets that they've identified as

16   proceeds of an offense -- they can put restraints on those, but

17   substitute assets they cannot.

18           Just the last point, your Honor, which I think is

19   important, is the risk of flight to Germany.  Your Honor,

20   Mr. Scott was born in Germany and grew up there as a kid.  His

21   whole life is here in the United States.

22           Could he somehow, even though it's really hard to

23   travel these days, somehow magically get to Germany with no

24   passport bringing his wife and child or abandoning them

25   forever?

 1                   You can never say, your Honor, there's no risk of

 2      anything.  But I submit that the risk of that, based on

 3      everything we've seen from Mr. Scott, including his commitment

 4      to fighting this case through the legal system and his

 5      willingness to self-surrender when your Honor ordered it

 6      before, that the risk of him disappearing to Germany is much

 7      less than the risk of him suffering serious health

 8      complications because he's in pretrial detention where he

 9      doesn't need to be before he's sentenced.  That's the balance

10      your Honor has to strike, and I think the answer is that he

11      should be released.

12                   I just want to give Mr. Garvin an opportunity, since

13      we're not together, in case I've missed anything, if that's all

14      right with your Honor.

15                   THE COURT:  Sure.

16                   Mr. Garvin.

17                   MR. GARVIN:  Thank you, your Honor.  Good morning.

18      Your Honor, there are only a few minor items I'd like to touch

19      upon.

20                   The first is that through CorrLinks, Mark Scott had

21      very limited ability to communicate with Mr. Arlo Brown and

22      myself.  And in those communications, he has told us that he

23      still has not received medicines that he requested for

24      controlling his blood pressure and, in addition, that the

25      guards now, to protect the guards from getting the virus, have

1    gone to a skeleton staff.

2           So in addition to a complete lockdown where they're

3    only allowed out of their cells during meals -- the meal-time

4    threat of spread is there anyway.  Part of the reason why

5    they've gone to a complete lockdown is to enable the

6    Bureau of Prisons to go to a skeleton staff to decrease the

7    risk to the guards.

8           Shifting to the condo, Mr. Folly argued that there is

9    no equity that can be used in the condo by Mr. Scott.  I don't

10   believe that is accurate because when the government is talking

11   about substitute assets, those assets, the substitute amount,

12   becomes vested at the time of conviction.

13          In this particular case, that condo was purchased

14   prior to the case being commenced.  In the state of Florida

15   where there is tenants by the entireties, it is further

16   complicated.

17          Even without that complication, Lydia Scott, Mark

18   Scott's wife, has a claim for 50 percent of the equity in that

19   home.  And that is the equity that we seek to use to replace

20   Marietta Halle's $750,000 that she posted.

21          I don't believe that it is something that can be

22   prohibited by the government's claim for substitute assets.

23   And I do believe the case law is Second Circuit case law that

24   establishes that.

25          So for those reasons, your Honor, I do believe that

1   this really is a situation of risk of flight versus risk of

2   health.   In Mr. Scott's condition with his heart condition and

3   all of the other factors and the heart condition being

4   confirmed by the medical staff at the FDC, if Mr. Scott is

5   unfortunate enough to contract the COVID virus at this stage,

6   it will not be simply a matter of being ill for a period of

7   time.   It is highly likely that it will be life threatening.

8          Now the question then becomes if we came back here 30

9   days from now and we said unfortunately Mr. Scott has come down

10  with the COVID virus, with the benefit of hindsight, what would

11  we have done differently.   And I think the answer would be

12  resoundingly we should have let him go home under an order that

13  he's not to leave his premises when we had the opportunity.

14         Judge, this is a case where everyone wishes that we

15  would have taken this thing more seriously eight weeks ago and

16  had taken steps then that would have saved lives today.   I just

17  would implore the Court not to throw Mark Scott on that pile.

18  Thank you.

19         THE COURT:   Thank you, all.

20         First of all, I just want to note that I believe that

21  Mr. Scott richly earned his admission into federal custody.   I

22  find that the various excuses/explanations that are provided

23  concerning his use of assets which he knew or should have known

24  were subject to forfeiture, especially being the very

25  sophisticated lawyer that he is, just ring very, very hollow.

1          I thought it was important that Ms. Halle, despite the

2     fact that she was not a signatory on the bond, that she

3     provided $750,000, which was a very important part of why he

4     was released in the first place.

5          I do find it important that she lost confidence in

6     Mr. Scott for reasons sufficient to herself.  She knows him

7     better than any of us do.  I had no difficulty finding that he

8     should have been incarcerated the last time we were together.

9          Things have changed.  A very important part of that is

10    the fact that all of us are sitting by ourselves in various

11    offices, even as we have this conference concerning Mr. Scott.

12         The COVID-19 is now in the various federal facilities,

13    including the ones in New York.  Mr. Scott is a sick man.  I

14    don't doubt the fact, given his respiratory issues with sleep

15    apnea and atrial fibrillation, that he is a seek individual and

16    at greater risk of becoming seriously ill if he were to

17    contract the virus, not to mention his age.

18         And notwithstanding I'm sure the very valiant efforts

19    of the Bureau of Prisons, there's only so much social

20    distancing that one can do while in prison.  So that does

21    fundamentally alter the calculus of whether one is in custody

22    or not.

23         And I find on balance, that Mr. Scott ought to be

24    released on home incarceration, at least for a period of 60

25    days.  And we can re-examine where we are then because of his

1    heightened risk of serious medical complications if he were to

2    contract the virus.

3            So I will release him to 24-hour home incarceration

4    and using the guidance that's been provided by our probation

5    and pretrial services officers.  That will be enforced by

6    location monitoring technology as determined by pretrial

7    services, and he may only leave his home for necessary medical

8    services.

9            All other leave from the residence must be submitted

10   through defense counsel for the Court's approval.  He shall be

11   permitted to self-install the monitoring equipment under the

12   direction and instruction of pretrial services.  He shall not

13   be released until all conditions are met, including the

14   availability of location monitoring equipment.

15           This order shall be effective for a period not to

16   exceed 60 days, at which time the need for continued release

17   under the compelling reason that release was ordered shall be

18   revisited by the Court.

19           Within two weeks of his release, he must purchase or

20   secure an iPhone with FaceTime capabilities for remote or

21   virtual monitoring by pretrial services.

22           When home visits are scheduled by pretrial services,

23   to the best of his ability, Mr. Scott shall comply with

24   pretrial services requests to remove all cohabitants of the

25   residents prior to the visit.

1          And Mr. Scott must report and disclose to pretrial

2     services when any cohabitant of the residence, including

3     himself, may be symptomatic of any illness.

4          I will require that Mrs. Scott also submit her

5     passport to pretrial services.

6          I will ask the government.  Do you want him to put up

7     the Coral Gables apartment?

8          MR. FOLLY:  Your Honor, I think we would ask that it

9     be put up.

10         THE COURT:  Very well.  The apartment will be put up.

11         Mr. Garvin, how long will that take?

12         MR. GARVIN:  Your Honor, I think that we might be able

13    to accomplish that in 48 hours.  Because everybody is working

14    remotely, we have to prepare a mortgage in favor of the

15    government.  I'm not a real estate attorney.  So I'll have to

16    seek guidance on that.

17         THE COURT:  Okay.

18         MR. DEVLIN-BROWN:  This is Mr. Devlin-Brown.  I think,

19    given all the uncertainties, we might want more than 48 hours,

20    or I think we'll probably be back here in 48 hours.  I also

21    would like clarification from the Court.

22         When you say "put up the property," does that mean a

23    mortgage in the amount of $750,000?

24         Is the Court ordering the mortgage to be in a higher

25    amount?

1          Whatever the case is, we just want to get it right.

2          THE COURT:  Well, right now what's the cash bail that

3    was in place before he was remanded?

4          MR. DEVLIN-BROWN:  $750,000.

5          THE COURT:  What was the total amount?  $750,000 to

6    secure it.

7          But what was the total amount?

8          MR. DEVLIN-BROWN:  I believe it was $2.5 million, your

9    Honor.

10         THE COURT:  Okay.  Then the apartment should be put up

11   to secure the $2.5 million.  I'm not going to require that that

12   be done before he's released.  So he can be released when the

13   other conditions are met, but I will direct counsel to post

14   that property as soon as possible.

15         MR. GARVIN:  Your Honor, if I may interject.  In lieu

16   of doing a mortgage, given the Court's ruling, it may be

17   simpler just to do a deed made out to the United States

18   government that can be recorded in the event that he breaches

19   any condition.

20         MR. DiMASE:  Your Honor, it's Chris DiMase.  Actually,

21   I think that's the only way it can be done, in light of the

22   restrictions on the use of primary residences in Florida.  I

23   actually dealt with this very issue in another case.

24         So the only way to do it is to execute a mortgage deed

25   in the government's favor that can be filed at some point down

1   the road.  Florida is not going to allow a lien or another

2   encumbrance on the primary residence.

3         MR. GARVIN:  I don't think you meant to say "mortgage

4   deed."  I apologize for interrupting you here, Chris.  I think

5   it would be in the form of either a warranty deed or a

6   quitclaim deed, not a mortgage.  There is no other lien that

7   can be placed on that.

8         MR. DiMASE:  I think it can only be up to the value of

9   the property itself.  So I think if it's $1.6 million, it could

10  probably only be $1.6 million as opposed to $2.5 million,

11  although Mr. Garvin may have some other understanding.

12        MR. GARVIN:  Yes.  What I'm saying is that there is no

13  prohibition to a husband and wife selling their property for

14  any price that they want, even a dollar.

15        So what I would propose is that we would have a

16  warranty deed that would be made out to the United States

17  signed by both the husband and the wife, and then that document

18  would be simply recorded if there was any violation of the

19  bond.

20        You wouldn't have to go through a mortgage and then a

21  foreclosure and all of that.  You simply record the deed, and

22  the deed would be in the possession of the government.

23        THE COURT:  Very well.  Any questions?

24        MR. GARVIN:  No, sir.  Not from Mr. Scott's side.

25        MR. DiMASE:  No, your Honor.

1              THE COURT:  So, Mr. Garvin and Mr. Devlin-Brown,

2     please move expeditiously to prepare the warranty deed, period.

3     We're adjourned.  Thank you, folks.

4              (Adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25