UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- v. -<br><br>MARK S. SCOTT,<br><br>                    Defendant. | No. S10 17 Cr. 630 (ER) |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF POST-TRIAL MOTIONS**

Arlo Devlin-Brown
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1046

David M. Garvin
David M. Garvin, P.A.
200 South Biscayne Boulevard
Suite 3150
Miami, FL 33131
(305) 371-8101

*Counsel for Mr. Scott*

The Government's Opposition to Mark Scott's post-trial motions is miles wide but only inch deep. The Government fails to address Mr. Scott's key arguments, ignoring many of them entirely. Instead, it devotes considerable time to highlighting evidence that OneCoin was not a "real" cryptocurrency, and numerous other points not contested by the defense. Mr. Scott's arguments were far more targeted than that, and are left unanswered in the Government's indiscriminate response.

Specifically, with respect to the two theories of conspiracy to defraud FDIC-insured banks – one involving Gilbert Armenta and the second a transfer through a correspondent bank – the Government failed to establish that these transactions in fact constitute bank fraud under Supreme Court and Second Circuit precedent, much less that Mr. Scott had any involvement in knowingly making the allegedly false statements at issue. With respect to the money laundering conspiracy count, the Government failed to prove the commission of the charged specified unlawful activity – a wire fraud scheme *involving the United States* – much less that the monies deposited into the Fenero Funds accounts were proceeds of the specified crime of wire fraud. Further, the Government does not adequately address the erroneous jury instructions relating to these deficiencies that require, at minimum, a new trial.[1]

I. **The Government Failed To Prove Mr. Scott Conspired To Defraud FDIC-Insured Banks**

The Government's Opposition on the bank fraud count is peppered with generalized statements about lies to "banks and other financial institutions worldwide" and "banks around the world" (Opp. at 1, 6), implying that as long as defrauding an FDIC-insured bank was "one of

---

[1] Counsel for Mr. Scott respectfully requests permission to file a reply brief of 16 pages, in excess of the ten-page limit identified in the Court's local rules. The Government's Opposition of 42 pages was in excess of the Court's page limits.

1

the objectives" (Opp.at 28) of *any* of Mr. Scott's alleged co-conspirators, it has met its burden of proof. That is flat out wrong. Mr. Scott was charged in a stand-alone bank fraud conspiracy count with *himself* allegedly agreeing to defraud or lie to obtain money or property from a bank, "the deposits of which were then insured by the Federal Deposit Insurance Corporation." (S10 Indictment, p. 3.) The Government failed to establish that he agreed to anything of the sort.

The Government has advanced two principal theories of bank fraud at trial: (1) that Mr. Scott conspired with Armenta in Armenta's alleged lies to Armenta's own FDIC-insured banks relating to transfers to the Fenero funds; and (2) that Mr. Scott caused a supposedly inaccurate description of a loan transaction to be entered into a payment message to defraud an intermediary FDIC-insured correspondent bank, Bank of New York Mellon. *Neither* of these two transactions amounted to "bank fraud" as the statute and governing case law define it. Just as critically, the Government's Opposition fails to identify proof – because no such proof exists – that Mr. Scott was responsible for any misrepresentations associated with these transactions.[2]

  A.  **The Armenta Transfer Theory Of Bank Fraud Fails**

The evidence supporting the Armenta bank fraud transfer theory is summarized in both Mr. Scott's opening brief and the Opposition: Mr. Scott provided Armenta with account information that allowed Armenta to transfer money in his own accounts into the Fenero Funds. (Br. at 8; Opp. at 31-32.) Armenta allegedly falsely described these transfers to banks. This

---

[2] The Government also casually suggests that Mr. "Scott and his co-conspirators" tricked financial institutions into processing transactions for OneCoin because OneCoin victims in the United States were told to claim that they were paying for educational packages to avoid telling their banks that they were purchasing OneCoin. (Opp. at 19.) It is ludicrous to suggest that Mr. Scott was in any way involved in such a scheme. The Government introduced no evidence whatsoever to suggest that Mr. Scott had anything to do with decisions on what to tell OneCoin purchasers, or that he had any interaction with them or any alleged OneCoin promoters whatsoever.

conduct is not legally cognizable as bank fraud, and even if it were, there is no evidence that Mr. Scott conspired with Armenta in making these transfers.

1. **Armenta's Alleged Misrepresentations To His Own Banks To Transfer Funds Out Of Them Do Not Constitute Bank Fraud**

Armenta's transfer of funds from his own bank accounts to the Fenero Funds cannot be bank fraud because a person cannot commit "bank fraud" by transferring money from his or her own account. Section 1344 is clear that the scheme must be "to *obtain*" funds from a financial institution through deceit. As the money was already in accounts owned by Armenta, he cannot be said to have *obtained* funds as required by statute, particularly as he was transferring them *out* of his possession to a third party, the Fenero Funds that Mr. Scott controlled. Thus, he cannot be said to have "acquire (or attempt to acquire) bank property 'by means of' the misrepresentation," *Loughrin v. United States*, 573 U.S. 351, 363 (2014) – it was already in his possession. There is no precedent for using the bank fraud statute against depositors supposedly lying to a bank to obtain their own funds.

The Government asserts in its Opposition that "[n]either *Loughrin* nor the bank fraud statute itself requires evidence that the funds in question belonged to someone other than the individual making the misrepresentation to the bank." (Opp. at 33.) This is simply incorrect. Tellingly, the Government points to no cases in which a court has found bank fraud to cover statements an account holder makes to his own bank to transfer funds out of the account holder's account. The cases the Government does cite are unavailing. In *United States v. Nejad*, the district court declined to dismiss the indictment precisely because the charged scheme to "obtain" money in FDIC-insured accounts ultimately involved obtaining funds from accounts that *did not* belong to the defendant. 2019 WL 6702361 (S.D.N.Y. Dec. 6, 2019). Similarly, in *United States v. Lebedev*, 932 F.3d 40 (2d Cir. 2019), the defendant disguised the nature of his

3

transactions as part of a scheme to *obtain* the funds in third party customer's accounts.  Here, the Government's theory – and, more crucially, its evidence – was limited to Armenta's representations *to his own banks* to transfer funds *from his own accounts* maintained at the banks.

> 2. **There Is No Evidence Linking Mr. Scott To Any Misrepresentations Made By Armenta**

Even if Armenta's alleged misstatements to his own banks in transferring his funds was legally cognizable as bank fraud – which it is not – there is literally *no* evidence that Mr. Scott was involved in or aware of such misrepresentations, and the Opposition fails to conjure anything up.  As an initial matter, the record is clear on two points.  First, it is uncontested that Mr. Scott never had any communications whatsoever with any employee of an FDIC-insured bank in connection with anything having to do with the Fenero Funds.  Next, there is nothing in evidence that would indicate that Mr. Scott and Armenta had any sort of communication regarding what Armenta should tell his banks about transfers to Fenero Funds.  Indeed, the Government's argument is entirely disingenuous   Comprehensive notes from Armenta's proffer sessions produced as § 3500 material reflect that Armenta never implicated Mr. Scott *at all* in his alleged misrepresentations to banks.[3]

In the absence of any evidence that Mr. Scott was aware of the supposedly false statements Armenta provided to this banks – and the rejection of this claim by its own cooperating witness – the Government falls back on a vague assertion that "Scott *understood* that Armenta would need to tell lies such as these to United States banks in order to effectuate these

---

[3] Indeed, the notes of one of Armenta's proffer sessions with the Government indicate that Armenta stated one of his longtime business partners often "helped with draft language" and "is involved in any investments because he is a tidy advisor [who] crafts language."  *See* 3520-008.

4

transfers….") (Opp. at 32) (emphasis added).  But the Government's reasoning for such supposed "understanding" is defective and the evidentiary support for it entirely non-existent.

There is no evidence in the record that Mr. Scott would have known that the banks would have asked Armenta *anything* about his transfers out of his own accounts.  And even if that were to be assumed, there is certainly no evidence that Mr. Scott would have known that Armenta would have had to say anything other than "these are transfers to BVI-registered private equity funds," *which they indisputably were*.  The Government's allegations that these registered BVI private equity funds were used to launder money cannot and does not change that fact.

The only other support the Government's offers for its reasoning is that Armenta signed an investment agreement (GX 1140), which allegedly "demonstrated that Scott clearly knew that Armenta would falsely inform his bank that the purpose of the transfer was for some type of investment." (Opp. at 32.)  But the facts belie this assertion: this agreement was signed two weeks *after* the bank transfers in question (*see* GX 1140, p. 32), was never provided to Armenta's FDIC-insured banks, and, most fundamentally, does not remotely suggest that Armenta would be asked by his own banks why he had to transfer money or would have to lie in response.

Ultimately, the Government's argument collapses to this: Mr. Scott would have understood that Mr. Armenta would not have affirmatively told his banks that he was transferring the funds in order to launder criminal proceeds.  Any money laundering not affirmatively confessed is, in the Government's telling, inherently bank fraud.  The Government's interpretation would mean that anyone who is involved in a money laundering conspiracy that touches even remotely on U.S. banks is *per se* guilty of bank fraud as well, without any needed proof, because it would be "understood" that money launderers wouldn't tell

5

the banks about their criminal laundering.   Unsurprisingly, the Government fails to identify even a single case supporting such a theory.

Finally, the Government fails to respond at all to the most compelling evidence that Armenta would not have colluded with Mr. Scott on lies Armenta would tell his banks: the Government's *own* evidence that Armenta was lying to Mr. Scott about these very same banking transactions.  As set forth in Mr. Scott's opening brief, the Government was forced to reveal to defense counsel that the letter that Armenta sent Mr. Scott informing him that the accounts he had used to transfer funds to Fenero were closed was a *forgery*.  (Br. at 16; *see also* Tr. at 928, DX 1010.) Armenta even went so far as to send Mr. Scott entirely fake wire transfer confirmations indicating that $100 million had been transferred from those accounts into the Fenero Funds. (Br. at 16; *see also* DX 560, 561, 562.)   The notion that Armenta was plotting with Mr. Scott as to what Armenta should tell his banks about the transfers to the Fenero Funds at the very same time Armenta was concocting elaborate lies to Mr. Scott about his dealings with these banks is simply absurd.[4]  That is not a close call.

> B.     **The Description Of The CyrptoReal Loan Provided To Bank Of New York Mellon As An Intermediary Bank Does Not Constitute Bank Fraud**

The Government's alternative theory that Mr. Scott committed bank fraud through his supposed role in providing a description for a single transaction processed through a U.S. intermediary bank is even more attenuated, and not supported by the law or evidence.  This theory involves a payment initiated by Apex from a Euro-denominated account at DMS Bank in

---

[4] This was not the only evidence introduced at trial that Armenta lied to or withheld critical information from Mr. Scott.  For example, when Mr. Scott followed up with Armenta and Armenta's assistant, Giselle Valentin, in February 2016 about the status of funds sent to Locke Lord in relation to a transaction involving a company called iCard1, Armenta responded separately to Valentin, taking Mr. Scott off the email chain, "Don't respond to Mark." (DX 556)

6

the Cayman Islands, for which Apex was the sole signatory, to DBS Bank in Hong Kong, described as a "loan to Cryptoreal" in a memo line.  The Government claims this description was designed to deceive an intermediary FDIC-insured bank, Bank of New York Mellon, that played a tangential role in the transaction.  Neither the facts nor law support the Government here.

  As a starting point, the Government failed to prove that the description provided in the memo line of the transaction, "Loan to CryptoReal Investment Trust Ltd. (BVI)/Martin Breidenbach for Acquisition of Madagascar Oil Field" (GX 2240) was false at all, much less that Scott believed it to be so.  The Government's evidence showed that a loan agreement *was* entered into by CryptoReal Investments Trust Ltd. ("Cryptoreal"), of which Martin Breidenbach was the beneficial owner, to purchase an oil field from Barta Holdings Ltd. ("Barta").  Other than its repeating the assertion that this deal was "fake," (Br. at 35) the Government offered no evidence that the deal did not go through as planned, and even introduced evidence that showed an oil field was being purchased.  (*See, e.g.*, GX 2244, an email Mr. Scott provided Apex attaching an appraisal from an independent third-party appraiser, Sino-Infinite Appraisal Limited, of the oil field at the center of the transaction.)

  In fact, the Court took the transaction to be real *as a given* in quashing a subpoena calling for testimony by Neil Bush, who would have helped establish through testimony and documents admitted through him that an oil field was in fact being purchased with the proceeds of this payment. (Tr. at 1281) ("Now, what the source of those funds are, and ultimately how they were used, is again what is being litigated here, *not the fact that there was an oil field in which an interest was going to be purchased.*" (*Id.*) (emphasis added).  That the loan was made to a party with a relationship to Ruja Ignatova (whose name was openly included on transactions documents) does not mean that the description in a memo line relating to the transaction was

7

false.  Even if it was false, there is no evidence Mr. Scott knew.  Ultimately, it would be manifestly unjust to allow a conviction on bank fraud based on the oil field transaction being "fake" when Mr. Scott was deprived of an opportunity to introduce evidence that it was not.

Even if the memo line description was inaccurate, there is *no* evidence to suggest that Mr. Scott knew that anything he told Apex, the fund administrator, as to the purpose of the wire transfer, would be told to an FDIC-insured bank.  Mr. Scott, after providing Apex with all relevant transaction documents for the loan, told Apex to process a transaction from a Fenero Euro account held at DMS Bank in the Cayman Islands, by Apex, to DBS Bank in Hong Kong, with no instruction whatsoever as to how the transfer should be described. (Br. at 19.)  Nor is there any evidence Mr. Scott knew that the transfer description Apex selected would be provided to an FDIC-insured bank.  The Government points to the fact that Mr. Scott emailed himself an incoming wire instruction sheet from DMS Bank stating that incoming U.S. dollar wire transfers would be processed through Bank of New York Mellon. (Opp. at 30.)  However, the Government put on absolutely no evidence whatsoever that Mr. Scott knew that DMS would use BNY-Mellon as the correspondent bank to process outgoing euro to U.S. dollar Forex and wire transactions, much less that it would have to provide any wire description whatsoever to effectuate the transaction.

Finally, there was no evidence whatsoever that the description provided was material, or "likely to influence the [bank] in making a determination required to be made." *United States v. Rigas*, 490 F.3d 208, 234 (2d Cir. 2007).  A defendant must have "engaged in a deceptive course of conduct by making material misrepresentation" to sustain a conviction under the bank fraud statute. *See United States v. Calderon*, 944 F.3d 72, 85 (2d Cir. 2019) (citing *Neder v. United States*, 527 U.S. 1, 4 (1999)).  There is no evidence that the description of the transaction that

was included on the wire passing through BNY Mellon as an intermediary was part of some plot to trick BNY Mellon into releasing funds relating to the transaction. There was no evidence that BNY Mellon even considered anything on the wire description in deciding to process the transaction. Even had the wire transfer details read, "payment to Ruja Ignatova for OneCoin proceeds," this would likely not have raised alarms because neither was placed on a filter, even after post-transaction monitoring of other transfers that had been completed months later. (Tr. at 1487.)[5]

Mr. Scott has offered not only equally plausible, but *more* plausible explanations for the Government's theories of his alleged wrongdoing pertaining to bank fraud conspiracy. Therefore, "if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005) (citing *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002).

Finally, the Government's response to Mr. Scott's contention that it failed to sufficiently establish venue on a bank fraud conspiracy count based on the BNY-Mellon transfers falls flat. For conspiracy offenses, venue lies in any district in which an overt act in furtherance of the conspiracy was committed. *See* 18 U.S.C. § 3237(a). However, the Government points in its Opposition to only *one* alleged overt act taking place in the Southern District of New York as evidence of its foundation for venue – the fact that the CryptoReal transfer from DMS Bank in

---

[5] The Government falsely claims in its Opposition that after other unrelated transactions months later, BNY Mellon directed DMS Bank not to have any further transactions through BNY Mellon's correspondent bank accounts with" "IMS, OneCoin, or Ruja Ignatova." (Opp. at 29). In fact, David Wilder, head of BNY Mellon's anti-money laundering division, testified that the direction has applied only to International Marketing Services, and that BONY itself never placed a block on the Fenero Funds, Ruja Ignatova, or OneCoin. (Tr. at 1487.)

the Cayman Islands was processed through a correspondent bank in New York en route to DBS Bank in Hong Kong. (Opp. at 31, fn. 6.) It does not cite to any cases that even suggest that the single use of a correspondent bank can be considered sufficient. And, there is simply no evidence that Mr. Scott's conduct in any way rises to the standard that the law requires: he cannot be said to have "intentionally or knowingly cause[d] an act in furtherance of the charged offense to occur" in the S.D.N.Y., nor was it "foreseeable that such an act would occur there." *See United States v. Svoboda*, 347 F.3d 471, 483 (2d. Cir. 2003). As noted above, there is no evidence that Mr. Scott had knowledge that the wire description he provided Apex would pass through a bank in Manhattan. This lack of evidence requires dismissal on venue grounds alone.

## II. The Government Failed To Prove A Domestic Wire Fraud Scheme or That Mr. Scott Laundered Funds From Proceeds of Domestic Wire Fraud

To sustain a conviction under the money laundering statute, 18 U.S.C. § 1956, the Government was required to prove, as a threshold matter, that the funds it alleged had been laundered were proceeds of a specified unlawful activity, which the Government expressly charged as wire fraud in the Superseding Indictment. While not contesting that the wire fraud statute, 18 U.S.C. § 1343, requires conduct core to the statute's focus to be tied to the United States, *see RJR Nabisco v. European Community*, 136 S.Ct. 2090, 2094 (2016), the Government's Opposition fails to identify evidence establishing that the OneCoin scheme had a sufficient nexus to meet this jurisdictional threshold.

The Government called only two witnesses about OneCoin connections to the United States, William Horn and Linda Cohen. They testified that they invested a combined total of approximately $54,000 in OneCoin (Tr. at 74, 84, 791, 799.) This is not only a miniscule amount, and a tiny fraction (.000027%) of what the Government alleged was a criminal scheme that took in over $2 billion in criminal proceeds globally (Opp. at 2), but also a meaningless

10

number of people compared to alleged investors in the rest of the world.[6]  The Government did not offer evidence of *any other U.S. purchases of OneCoi*n, or any evidence supporting that OneCoin had offices or employees in the United States, emphasizing instead OneCoin's office in Sofia, Bulgaria and events that took place in London and elsewhere in the world.  Indeed Konstantin – the Government's only testifying cooperating witness – could not identify any U.S. operations of OneCoin.  To treat this miniscule amount of domestic activity involved in the case as a sufficient jurisdictional nexus would be to impermissibly treat "the presumption against extraterritorial application [as] a craven watchdog." *See Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 266 (2010).

      Second Circuit case law makes clear that such a minimal U.S. connection is insufficient. "Events merely incidental to the violation of a statute do not have primacy for the purposes of the extraterritoriality analysis." *Bascunan v. Elsaca*, 927 F.3d 108, 122 (2d Cir. 2019) (citing *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2138 (2018)) (internal quotations omitted).  "Simply alleging that domestic conduct occurred cannot support a claim of domestic application." *Petroleos Mexicanos v. SK Eng'g & Const. Co.*, 572 F. App'x 60, 61 (2d Cir. 2014) (internal citations and markings omitted). *See also United States v. Prevezon Holdings Ltd.*, 122 F. Supp. 3d 57, 72 (S.D.N.Y. 2015) ("For purposes of wire fraud as the relevant SUA, the Government has only pleaded one domestic contact by the perpetrators of the larger fraud, and it was not sufficiently central to the overall fraud scheme to convert this foreign scheme into a domestic one.")

---

[6] The Government stated in summation: "And ladies and gentlemen, that's exactly what they did. Millions of victims, victims like William Horn and Linda Cohen who you heard from at this trial……Victims who invested billions of dollars in this fraud scheme." (Tr. at 1870.)

The *Petroleos* case is particularly instructive. In it, the Second Circuit rejected application of the wire fraud statute to a largely foreign scheme even though the defendants obtained over $159 million of financing in the United States, transmitted seven false invoices for over $129 million through New York, and made payments through a trust in New York. *See Petroleos Mexicanos,* 572 F. App'x. Those are far greater U.S. ties to the alleged fraud scheme than presented in this case, which identified only two isolated investors from the United States whose total investment was far too trivial to be "integral . . . to the scheme to defraud." *United States v. Gasperini*, 2017 WL 2399693, at *8 (E.D.N.Y. Jun. 1,2017), (quoting *United States v. All Assets Held at Bank Julius*, 251 F. Supp. 3d 82, 103 (D.D.C., Apr. 27, 2017) (citations omitted).

On top of this, the Government failed to present any evidence that Horn or Cohen made these purchases as a result of any wire fraud scheme targeted at United States investors. Horn made an initial investment in OneCoin after repeated pestering by an acquaintance; Cohen was convinced to purchase OneCoin by her son.[7] (Tr. at 68, 789.) As a result, the trial record is devoid of any evidence establishing what the victims were told, or even that there was a conspiracy to defraud OneCoin purchasers in the United States. The Government failed to call any other witness who could testify to OneCoin involvement in the United States during the 13-day trial. The minimal domestic conduct as testified to by Cohen and Horn is simply insufficient to support a conclusion that there was a scheme to defraud in the United States. *See Laydon v.*

---

[7] There was no indication in either her testimony at trial or in her 3500 material provided by the Government that Cohen was in any way influenced or persuaded to invest by anyone other than her son, or that she had even so much as a conversation about investing with anyone known to be associated with OneCoin. (*See* 3535-001, Linda Cohen Interview Memo, Oct. 7, 2019: "COHEN told her son she did not think it was a good idea however her son did, so she agreed to put in the money.")

*Mizuho Bank, Ltd.*, 2015 WL 1515487, at *8 (S.D.N.Y. Mar. 31, 2015) (rejecting application of wire fraud statute when allegations were "far too attenuated to sufficiently plead that the scheme to defraud came about in the U.S.").[8]

Even if the Government had proven a wire fraud with sufficient United States nexus, it failed to prove that any transactions involving the Fenero Funds involved proceeds of such United States activity. On this point, the Government misstates its obligations, stating that it was "required to . . . establish that the funds the defendant laundered were proceeds of the OneCoin fraud scheme." (Opp. at 27.) Again, the Government is simply wrong. It is not enough for the Government to have shown that *OneCoin* proceeds went into the Fenero Funds; it must show that the conspiracy involved transferring proceeds of the specified unlawful activity to the Fenero Funds. In this context, the specified unlawful activity is the *domestic* application of the wire fraud statute (in other words, proceeds of a scheme targeted to the United States). The witness that the Government put on the stand to explain funds flows, IRS Agent Rosalind October, presented no evidence or analysis showing that any money whatsoever from U.S. investors went to the Fenero Funds. She explained only that "financial tracing is really digging into the records, looking for the originator." (Tr. at 1543.) An analysis far more rigorous than mere "digging" is required to constitute evidence that could form the basis for a money laundering conspiracy conviction.

---

[8] In the alternative, to the extent that there was evidence of any OneCoin conspiracy in the United States, it was clearly a separate conspiracy from the alleged wire fraud scheme underlying the money laundering indictment. If there was in fact a wire fraud conspiracy in the United States to induce U.S. investors to invest in OneCoin, the Government introduced no evidence that Mr. Scott was in any way involved with it or in contact with any of its members, or played any role in handling proceeds of these activities.

Simply put, the Government failed to show money from *any* U.S. investors in OneCoin being transferred to Fenero.  With respect to Horn, the Government does not even suggest that the Fenero Funds received any of his money.  For Cohen, the Government dances around the issue, stating only that the U.S.-based "OneCoin depository account" into which Cohen wired money "subsequently transferred money to an IMS account in Singapore that ultimately transferred funds to Fenero." (Opp. at 26.)  This statement does not establish that *Cohen's* funds went to IMS nor does it indicate that *Cohen's* funds subsequently went to Fenero.  Indeed, the so-called "OneCoin depository account" where Cohen sent her money appears to have been an account operated by a payment processor handling a wide range of payments. (*See* GX 723-B.) Money was transferred from that account to what appears to be a foreign exchanges services account.   There was no evidence that the person identified as the account owner of either account had anything to do with OneCoin.

Ultimately, the Government bore the burden of proving each element of the charges beyond a reasonable doubt.  The mere suggestion that money from only one U.S. investor made its way to the Fenero Funds, without an explanation provided as to how, does not come close to meeting this burden.  Thus, in the absence of any evidence that Mr. Scott received or conspired to receive transfers from U.S. investors, he could not have committed the charged money laundering conspiracy alleging the laundering of proceeds of a domestic wire fraud scheme.

**III.    In The Alternative,  A New Trial as Required Under Rule 33**

In the alternative, the Court should grant a new trial on both counts pursuant to Rule 33 due to errors in the jury instructions.

On the count of money laundering conspiracy, the Court failed to instruct the jury, as requested and required, that the specified unlawful activity, wire fraud, must have a domestic

nexus. After the charge had been read to the jury but before deliberations began, counsel for Mr. Scott filed a letter motion with the court requesting a supplemental jury instruction to avoid "leav[ing] the jury with the impression that the crime of wire fraud may be applied solely on extraterritorial acts." (Dkt. 181.) This was particularly necessary given the international scope of what the Government presented as the OneCoin fraud scheme, as the jury heard evidence of accounts in the United States, Middle East, Asia, Europe, and the Caribbean. Without this instruction, the jury could have convicted Mr. Scott without even realizing that a wire fraud scheme with sufficient ties to the U.S. is a requirement of the money laundering statute. Accordingly, a new trial is necessary to correct this error.

The jury instructions were deficient with respect to the charge of bank fraud conspiracy, in that they failed to offer a limiting instruction specifying that the jury could only convict on one of the theories that the Government advanced in its October 7, 2019 Bill of Particulars letter. (Dkt. 143.) Those theories related to three banks: Morgan Stanley, Bank of New York Mellon and Sabadell; accordingly, that Mr. Scott had requested – and the Court had initially agreed – that the bank fraud instruction should identify these as the FDIC-insured banks at issue. By inexplicably opposing this instruction, the Government invited jurors to convict on other bank fraud theories, never charged or specified in the Government's particulars letter, creating a "substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." *See United States v. Vilar*, 729 F.3d 62, 81 (2d Cir. 2013); *accord United States v. Ionia Mgmt.*, 555 F.3d 303, 310 (2d Cir. 2009). In its Opposition claiming this could not have occurred, the Government ignores that it suggested at trial that the jury should be permitted to convict based on exceedingly weak bank fraud theories never identified in the Particulars letter, and that the Government does not even defend as viable in its

15

Opposition.[9]  Likewise, the Government's claim that it is "exceedingly unlikely that . . . jurors would have confused the elements of bank fraud with the very different elements of money laundering" (Opp. at 39) rings hollow in light of the fact that the Government repeatedly suggested in its jury argument that the money laundering and bank fraud activities were essentially the same, ignoring that bank fraud applied only to FDIC-insured institutions.

## Conclusion

For the reasons set forth above, the Court should grant Mr. Scott's motion for acquittal or, in the alternative, order a new trial.

/s/ Arlo Devlin-Brown

Arlo Devlin-Brown
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1046

David M. Garvin
David M. Garvin, P.A.
200 South Biscayne Boulevard
Suite 3150
Miami, FL 33131
(305) 371-8101

*Counsel for Mr. Scott*

---

[9] At the November 18, 2019 charge conference, the Government claimed that there were "other banks that are FDIC-insured that have been the subject of testimony at this trial to which fraudulent statements were made in order to move money through those banks," "including banks that handled the five million dollars through the Locke Lord accounts going to Dubai," citing Northern Trust and JPMorgan Chase.  It additionally claimed that there were "banks that the victims sent money to after being told by the perpetrators of the wire fraud scheme to lie or withhold information about OneCoin and OneCoin packages." (Br. at 10, Tr. at 1639-40.)