

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 15, 2020

**BY ECF / EMAIL**
Honorable Edgardo Ramos
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:    *United States v. Mark S. Scott*, S10 17 Cr. 630 (ER)

Dear Judge Ramos:

    The Government submits this sur-reply letter to briefly address several of the arguments raised in the defendant's reply brief ("Reply," Dkt. No. 275) in further support of his post-trial motion pursuant to Federal Rules of Criminal Procedure 29 and 33 (the "Motion," Dkt. No. 217). For the reasons set forth below, as well as in the Government's opposition brief ("Opposition," Dkt. No. 244), the Motion should be denied in its entirety.

    In his Reply, Scott argues that the Government failed to offer evidence that any of the misrepresentations made by Scott and/or his co-conspirators were "material," as required under the bank fraud statute, 18 U.S.C. § 1344.  (Reply at 8).  "To establish the existence of a scheme to defraud, the Government must prove the materiality of a defendant's false statements or misrepresentations." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017).  "To be 'material' means to have probative weight, i.e., reasonably likely to influence the [bank] in making a determination required to be made." *United States v. Rigas*, 490 F.3d 208, 234 (2d Cir. 2007).

    As a threshold issue, the Government was not required to prove that Scott or his co-conspirators made any materially false statements or misrepresentations, but only that Scott joined a conspiracy with that objective.   Nevertheless, the Government offered ample evidence that Scott and his coconspirators did in fact make numerous materially false representations during the course of the bank fraud conspiracy.   Many of those misrepresentations were designed to hide from banks the true origin of the funds being transferred into and out of bank accounts, as well as the purpose of the transfers into and out of the bank accounts.   For instance, funds that were transferred from a bank account controlled by co-conspirator Gilbert Armenta at a U.S. bank account at Morgan Stanley in the name of Fates Group were disguised as investments of $3 million into "ZIIXI" and $2 million into "XIII." (Tr. 844).   In order to successfully transfer this money to Scott's Fenero Funds, Armenta also falsely represented that the Fenero Funds were a private equity firm that invested in, among other things, renewable energy, such as windmills.  (Tr. 859-860).  The evidence at trial overwhelmingly demonstrated that these statements were false—the Fenero Funds were not real investments funds that made investments, but rather were a sophisticated money

laundering vehicle used to disguise Ruja Ignatova's OneCoin fraud scheme proceeds as legitimate investments and transfer the funds on her behalf.   In another set of misrepresentations, Scott and his coconspirators falsely represented that the transfer of $30 million on behalf of Ignatova was in fact a $30 million "loan" to CryptoReal, a company for which co-conspirator Martin Breidenbach was the purported UBO.   In reality, this transaction was not a real loan, but was disguised as a loan by Scott so that the banks and financial institutions would authorize the transfer, which was actually on Ignatova's (not Breidenbach's) behalf.   (*See* GX 1391, attached hereto as Exhibit A).

These misrepresentations were plainly material.   As the evidence at trial made clear, financial institutions around the world, including banks in the United States, were unwilling to knowingly engage in transactions involving OneCoin.   (*See* Tr. 229-231).   For example, after discovering that the Fenero Funds were linked to OneCoin, BNY Mellon's international risk committee discussed the issue and concluded that it was "not comfortable with payments/transactions coming from or going to" IMS, OneCoin, or Ruja Ignatova, among others. (Tr. 1392-1393; GX 518).   As a result, BNY Mellon directed DMS Bank not to have any further transactions through BNY Mellon's correspondent bank accounts with these entities.   (*See* Tr. 1441-42).[1]   Thus, Scott's misrepresentation that the $30 million transfer was a "loan" to CryptoReal on behalf of Breidenbach, was a material misrepresentation that hid from BNY Mellon the true nature of the transaction.

The misrepresentations made by Armenta to Morgan Stanley were also material.   As Morgan Stanley employee Senem Firuz testified at trial, Morgan Stanley had a review process in place for wires and could block wires that it deemed suspicious.   (Tr. 865).   Among other factors that were relevant to Morgan Stanley during that review process was "the purpose for which the money [was] being sent."   (*Id.*).   Armenta's numerous misrepresentations about the purpose of these wires were therefore "reasonably likely to influence" Morgan Stanley's decision to send the money to the Fenero Funds.   *Rigas*, 490 F.3d at 234.

In his Reply, the defendant also reiterates his baseless claim that the Government failed to establish that the OneCoin scheme had a sufficient United States nexus to prove a domestic wire fraud scheme.[2]   (Def. Reply 10-12).   The defendant is wrong, as the evidence at trial clearly established a sufficient nexus between the OneCoin fraud scheme and the United States.   "A jurisdictional nexus exists 'when the aim of that activity is to cause harm inside the United States or to U.S. citizens or interests.'"   *United States v. Budovsky*, 13 Cr. 368 (DLC), 2015 WL 5602853, at *4 (S.D.N.Y. Sept. 23, 2015) (quoting *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011)).

At trial, the Government definitively established that OneCoin was not an extraterritorial wire fraud scheme, and provided ample evidence of the scheme's U.S. nexus.   Indeed, the trial

---

[1]   In his Reply, *see* footnote 5, Scott claims that "the Government falsely claims in its Opposition that after other unrelated transactions months later, BNY Mellon directed DMS Bank not to have any further transactions through BNY Mellon's correspondent bank accounts with' 'IMS, OneCoin, or Ruja Ignatova.'" (Opp. at 29).   Scott is incorrect.   As accurately set forth in the Opposition, BNY Mellon employee David Wildner testified at trial that DMS Bank was "directed not to have any transactions with these entities through Bank of New York Mellon's accounts . . . .even though all of them were not being added to the filter list."   (Tr. 1441-42).

[2]   The Government notes the irony of the defendant's contention, given that the defendant himself opposed the admission of the testimony from an additional intended U.S. victim of the OneCoin scheme.   (*See* Def. Mot. in Limine, Dkt. No. 154, at 4-5).

evidence established that OneCoin began operating in the United States in or around 2015 and that OneCoin specifically targeted U.S. victims. (*See* GX 63 ¶ 1(d), GX 204-C, GX 204-C-TR (transcript of Ignatova's July 4, 2015 recorded announcement of OneCoin's U.S. market opening)). Moreover, two U.S. victims, Linda Cohen and William Horn, testified at trial and described their investments in the scheme, the promoters who introduced them to OneCoin, and the losses they suffered as a result of their investments. (*See, e.g.*, Tr. 74, 84, 791, 799, 809-10; GX 731-A; GX 2803; GX 2811). Additionally, Horn testified that his family members, including his two younger brothers, sister and son, also purchased OneCoin packages. (*See, e.g.*, Tr. 79-80, 94). OneCoin's deliberate targeting of U.S. investors was further established at trial by testimony regarding OneCoin meetings and conferences held in the U.S., as well as U.S.-based promoters. (Tr. 66, 69-71). The scheme's connection to the United States was further established through TD Bank account records showing numerous wires transmitted by U.S. victims to that account for OneCoin package purchases. (GX 2812, GX 731-A at 35, 723-B, GX 723-E; Tr. 84, 801-02).

Finally, the defendant's claim—unsupported by any legal authority—that evidence of U.S. victim funds passing through the Fenero Funds was necessary to prove his guilt on Count One is meritless. First, the elements of that money laundering conspiracy offense simply do not require such proof. Indeed, the money laundering statute itself contemplates the use of U.S. banks to facilitate fraud schemes largely occurring abroad. *See* 18 U.S.C. § 1956(c)(7)(B) (defining various offenses "against a foreign nation" as specified unlawful activities under the statute); *see also United States v. Lazarenko*, 564 F.3d 1026, 1033-34 (9th Cir. 2009) ("the violation of Ukrainian law is the specified unlawful activity"); *United States v. Prevezon Holdings, Ltd.*, 251 F. Supp. 3d 684, 693 (S.D.N.Y. 2017) (holding that "[t]he use of [U.S.] correspondent banks in foreign transactions between foreign parties constitutes domestic conduct within [18 U.S.C.] § 2314's reach"). Second, even assuming arguendo that such evidence was required to prove Count One (which it was not), a rational trier of fact could have easily found that U.S. victim funds did in fact pass through the Fenero Funds. Between January and February 2016, William Horn wired money directly and indirectly to a German IMS account ending in 6108 (the "6108 Account"). (GX 2623). In February 2016, Linda Horn wired funds to a TD Bank account in the U.S., which in turn funded transfers to the 6108 Account and to a Singapore IMS account ending in 6682 (the "6682 Account"). (GX 2626). The 6682 Account directly funded the Fenero Funds beginning in May 2016. (GX 2602). Ignatova and Scott attempted a transfer of €33.4 million from the 6108 Account to a Locke Lord escrow account in March 2016. (GX 2614; Tr. 1691-93). After that transfer failed, in April 2016, the funds were transferred from the 6108 Account to the 6682 Account, which in turn directly funded the Fenero Funds. (*Id.*) Thus, the evidence presented at trial was more than sufficient to establish to a rational trier of fact that U.S. victim funds passed through the Fenero Funds.

          Respectfully submitted,

          GEOFFREY S. BERMAN
          United States Attorney

By:     /s/
          Christopher J. DiMase / Nicholas Folly / Julieta V. Lozano
          Assistant United States Attorneys / SAUSA
          (212) 637-2433 / -1060 / (212) 335-4025

# **EXHIBIT A**

**To:** Maya Antonova[maya@onelife.eu]; Kalina Bahchevanova[kalina@ravenr.com]; David R. Pike[drpike@msicbvi.com]
**Cc:** Maya Antonova[Maya@onecoin.eu]; Irina Dilkinska[irina.dilkinska@ravenr.com]
**From:** Mark S. Scott
**Sent:** Fri 11/18/2016 1:42:10 PM
**Subject:** RE: Balances and received transfers

Actually, fund an e-mail with the figures. She had asked me for available cash balances. Here the available cash minus expenses and government and admin withholds. All loans made are considered available cash for obvious reasons.

```
FEI.         338,938
FFS       94,293,528
FEI Cay I 137,287,800.12
FEI II     9,990,185.00 ($)
BOI Acct.  54,369,412 (FEI funds)

DMS Loan.   5,000,000
Crypto loan 30,000,000 ($)
Vida home   11,550,000
Oceanscape.  3,250,000

Legal defense retainer 1,000,000 ($)

TOTALS:
Euro 306,089,678
US$   40,990,185
```

We are closing on Cayman I this week so there will be deviation due to fees. Also the large shifts in rates could affect this calculation immediately by tens of thousands in the respective denomination.

---

**From:** Maya Antonova [mailto:maya@onelife.eu]
**Sent:** Friday, November 18, 2016 7:56 AM
**To:** Mark S. Scott <msscott@msicbvi.com>; Kalina Bahchevanova <kalina@ravenr.com>; David R. Pike <drpike@msicbvi.com>
**Cc:** Maya Antonova <Maya@onecoin.eu>; Irina Dilkinska <irina.dilkinska@ravenr.com>
**Subject:** Re: Balances and received transfers

Dear David,

Can you please send us your latest updated reconciliation file with all the balances?



GOVERNMENT EXHIBIT 1391
17 Cr. 630 (ER)

MS_USAO_FT_027437

Thanks,
Maya

On 17/11/2016 00:47, Mark S. Scott wrote:
> Hi Kalina,
>
> Thanks I hope you have received the confirmation of the wires by now. Sorry, we had first confirmed only to Irina.
>
> Best,
>
> Mark

Mark S. Scott
Chief Executive Officer

MSS International Consultants (BVI), Ltd.
BVI Registered and Approved Fund Manager

Email Address: msscott@msicbvi.com
Tel. +1-305-587-4030
Fax +1 786-513-7770


Sent from my BlackBerry Priv - the most secure mobile device

**From:** kalina@ravenr.com
**Sent:** November 15, 2016 08:27
**To:** msscott@msicbvi.com; drpike@msicbvi.com
**Cc:** Maya@onecoin.eu
**Subject:** Balances and received transfers


Dear David and Mark,

can you please send us the update transactions and balances per fund (the file David prepares).

We have some concerns that our last transfers did not arrive, so it will be very much appreciated.

Best regards,

Kalina