

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 31, 2020

**BY ECF/EMAIL**

The Honorable Edgardo Ramos
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:   ***United States v. Mark S. Scott*, S10 17 Cr. 630 (ER)**

Dear Judge Ramos:

The Government respectfully submits this memorandum pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure in support of its application for a preliminary order of forfeiture (the "Preliminary Order of Forfeiture," attached hereto as Exhibit 1) imposing a forfeiture money judgment in the amount of $392,940,000 as part of the sentence of defendant Mark S. Scott. As part of the Preliminary Order of Forfeiture, the Government seeks to forfeit Scott's interest in certain bank accounts, which constitute property involved in the money laundering offense Scott was convicted of at trial, and certain specific property and assets that are traceable to such property. For the reasons set forth below, the Court should impose the proposed Preliminary Order of Forfeiture, and also enter a post-conviction restraining order against Scott in order to ensure availability of those additional assets for forfeiture.

## I.      Procedural History

Superseding Indictment, S10 17 Cr. 630 (ER) (the "Indictment") charges Scott with conspiracy to commit money laundering in violation of Title 18, United States Code, Section 1956(h), and conspiracy to commit bank fraud in violation of Title 18, United States Code, Section 1349. The Indictment also contains the following forfeiture allegations: (i) as a result of committing the money laundering conspiracy offense charged in Count One, Scott shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), any and all property, real and personal, involved in said offense, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offense; and (ii) as a result of committing the bank fraud offense charged in Count Two, Scott shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(2)(A), any and all property constituting and derived from any proceeds that the defendant obtained directly or indirectly as a result of the bank fraud conspiracy. The Indictment also contains a substitute asset provision pursuant to 18 U.S.C. § 982, 21 U.S.C. § 853, and 28 U.S.C. § 2461.

On or about February 22, 2019, the Government filed a forfeiture bill of particulars (the "Bill of Particulars"), giving notice that certain property was subject to forfeiture as a result of the offense described in Count One of the Superseding Indictment, and as alleged in the forfeiture allegation therein.[1]  The Bill of Particulars is attached hereto as Exhibit 2.  On or about April 18, 2019, the Government obtained a restraining order for the following bank accounts: "a. All monies and funds contained in RBC Private Counsel (USA) Inc. account 3752442214, held by Mark S. Scott 2017 Trust . . . and all funds traceable thereto, including accrued interest; and b. All monies and funds contained in RBC Private Counsel (USA) Inc. account 3756283317, held by Mark S. Scott 2017 Trust . . . and all funds traceable thereto, including accrued interest."  (April 18, 2019 Restraining Order, attached hereto as Exhibit 3).  On or about July 15, 2019, the Government obtained another restraining order for the following bank account: "All monies and funds contained in J.P. Morgan Chase attorney IOLA trust account 339656032, held by James Nobles Esq. P.C. . . . and all funds traceable thereto, including accrued interest.  (July 15, 2019 Order, attached hereto as Exhibit 4).  The funds in these three bank accounts were alleged to constitute funds and criminal proceeds property involved in conspiracy to commit money laundering, in violation of Section 1956(h).

On November 21, 2019, the defendant was convicted at trial of Counts One and Two of the Indictment.  The defendant did not seek a finding by the jury as to forfeiture.  Sentencing is scheduled for October 9, 2020.

## II.    Scott's Laundering of OneCoin Scheme Proceeds

As the evidence showed at trial, from at least in or about September 2015 through 2018, the defendant conspired with Ruja Ignatova, and others, to launder approximately $392,940,000 in proceeds of a wire fraud scheme involving a purported cryptocurrency known as OneCoin (the "OneCoin Scheme").  Ignatova was one of the co-founders of OneCoin.  Scott—a U.S. citizen and attorney, employed for a portion of the relevant time period as a partner at an international law firm—organized and operated a series of investment funds known as the "Fenero Funds," which he used for the purpose of laundering OneCoin fraud proceeds.

As shown throughout trial, and in the attached affidavit of Senior Financial Intelligence Analyst Rosalind October (the "October Affidavit," attached hereto as Exhibit 5)[2], Scott used an international network of bank accounts, including the Subject Accounts, to launder approximately $392,940,000 in proceeds from the OneCoin Scheme on behalf of Ignatova.  Specifically, after Scott was introduced to Ignatova in September 2015, Scott began to set up a series of fake investment funds over the next several months.  Among other things, Scott incorporated MSS International Consultants (BVI), Ltd. ("MSSI LTD"), which was a fund manager registered in the British Virgin Islands.  (GX 2701).  MSSI LTD in turn owned and operated a series of fake investment funds, which were used to launder proceeds from the OneCoin Scheme, including the following purported investment funds: Fenero Equity Investments L.P. ("Fenero"), Fenero Equity

---

[1] At the time the Government filed the Bill of Particulars, the defendant was charged in the S6 17 Cr. 630 (ER) superseding indictment with one Count of conspiracy to commit money laundering.

[2] The Government Exhibits from trial referenced in this motion and in the October Affidavit are attached hereto as Exhibit 6.

Investments II, L.P. ("Fenero II"), and Fenero Financial Switzerland L.P. ("Fenero Switzerland"), each of which was an approved fund regulated in the British Virgin Islands. (*Id.*). MSSI LTD also owned and operated Fenero Equity Investments (Cayman) I, L.P. ("Fenero Cayman"), an investment fund organized in the Cayman Islands (together with the British Virgin Islands Fenero funds, the "Fenero Funds"). (*Id.*).

Scott operated offshore bank accounts in the Cayman Islands for each of the Fenero Funds (the "Fenero Fund Accounts"). (GX 2701). The Fenero and Fenero Switzerland accounts were held at DMS Cayman bank, and the Fenero Cayman and Fenero II accounts were held at Deutsche Bank Cayman. (*Id.*).

After Scott opened bank accounts in the names of each of the Fenero Funds, between May 2016 and October 2016, the Fenero Fund Accounts collectively received wire transfers totaling approximately €64 million and $10 million, which Scott represented as investments into the Fenero Funds. (GX 2602-A). These wire transfers originated from approximately 10 different bank accounts held at banks located in Singapore, Germany, Hong Kong, the United Kingdom, and the United States. (*Id.*). These bank accounts were registered under a set of shell corporations, including a set of affiliated companies with variations of the name International Marketing Services ("IMS"), as well as B&N Consult Ltd. ("B&N"), Star Merchant, and Fates Group. (*Id.*). IMS was owned by co-conspirator Frank Rickets; B&N was owned by co-conspirator Irina Dilkinska; and Fates Group was owned by co-conspirator Gilbert Armenta.

As the evidence showed at trial, while IMS, B&N, and Fates Group were "investors" into the Fenero Funds on paper, all of the money being transferred into Scott's funds in fact belonged to Ruja Ignatova and was derived from the OneCoin Scheme. (GX 1434). After the Fenero Funds received the above-described deposits, between approximately May 2016 and July 2018, the Fenero Fund Accounts funded approximately €282,000,000 in wire transfers to a series of Fenero Fund bank accounts held at the Bank of Ireland in the Republic of Ireland. (GX 2603, 2627). Scott also transferred tens of millions of Euros back to Bulgaria from the Fenero Funds, disguised as fake loans. (*See, e.g.*, GX 1388). Scott subsequently transferred approximately €185,000,000 from the Bank of Ireland to the accounts of another one of Ruja's money launderer's, named Aamer Abdulaziz. (GX 2627; Tr. 276).

As part of the money laundering scheme, Scott also transferred in excess of $50 million in proceeds of the OneCoin Scheme to other bank accounts on his behalf, and to fund the purchase of several houses, several luxury cars, a yacht, and numerous purchases of luxury jewelry and other personal property. (GX 2628; Tr. 294). Scott's purchases made with OneCoin fraud proceeds included, among others: a $2,850,000 home located at 133 Sunset Lane, Barnstable, MA; a $3,765,000 residence located at 31 Dale Avenue, Hyannis Port, MA (the "31 Dale Property"); an ownership interest in another residence located at 105 Sunset Lane, Barnstable, MA; a $245,269 Ferrari; a $218,898 2018 Porsche 911 GTRS2; a $119,529 2017 Porsche 911 Turbo; a $332,248 2016 Porsche 911R (the "2016 Porsche"); a $1,310,000 Sunseeker yacht; over a hundred thousand dollars in luxury watches; and over two hundred thousand dollars in jewelry and luxury bags. (GX 2620). Scott also used OneCoin Scheme proceeds to pay off over $1,000,000 for a condo that he owned in Coral Gables, FL.

### III.    Applicable Law

### A.  Directly Forfeitable Assets

Criminal forfeiture is "an aspect of sentencing." *Libretti v. United States*, 516 U.S. 29, 49 (1995).  Under Rule 32.2 of the Federal Rules of Criminal Procedure, once a criminal defendant is convicted of the offenses giving rise to the forfeiture allegations in an indictment, the district court must determine what property is subject to forfeiture and, if appropriate, enter a preliminary order of forfeiture "[a]s soon as practical after a verdict."  Fed. R. Crim. P. 32.2(b).  As an aspect of sentencing, criminal forfeiture is governed by the preponderance of the evidence standard. *United States v. Bellomo*, 176 F.3d 580, 595 (2d Cir. 1999).  Accordingly, the Government must prove by a preponderance of the evidence the amount of proceeds underlying the proposed personal money judgment, and the forfeitability of the specific properties listed in the Preliminary Order of Forfeiture.

Title 18, United States Code, Section 982(a)(1), subjects to forfeiture "any property, real or personal, involved in [a violation of 18 U.S.C. § 1956], or any property traceable to such property."  Property "involved in" a money laundering offense includes not only the illegal proceeds themselves, but also any property used to facilitate the laundering of such proceeds, such as business, business premises, untainted funds comingled with criminal proceeds, and bank accounts of corrupt businesses.  *See United States v. All Assets of G.P.S. Auto. Corp.*, 66 F.3d 483, 486 (2d Cir 1995) (affirming forfeiture of all assets of corporation that "served as a conduit for the proceeds of the illegal transactions"); *United States v. Schlesinger*, 261 F. App'x 355,  361 (2d Cir. 2008) (summary order) (same); *In re 650 Fifth Ave.*, 777 F. Supp. 2d 529, 567 (S.D.N.Y. 2011) ("The ability to forfeit a business entity which is used to facilitate the offense of money laundering is well established." (internal quotation marks omitted)); *United States v. Certain Funds on Deposit in Account No. 01-0-71417, Located at the Bank of New York*, 769 F. Supp. 80, 84 (E.D.N.Y. 1991) ("[18 U.S.C. § 981(a)(1)(A)] has been construed by the district courts as authorizing the forfeiture of an entire bank account or business which was used to 'facilitate' the laundering of money in violation of 18 U.S.C. § 1956." (citing cases)).

For money laundering charges, such as Count One of the Indictment, the Government may seek a money judgment up to the full value of the funds laundered by the defendant.  *United States v. Bermudez*, 413 F.3d 304, 305-306 (2d Cir. 2005).  Significantly, the scope of this forfeiture liability is specifically authorized by statute, and is not based on joint and several liability.  In imposing sentence on a person convicted of an offense in violation of Title 18, United States Code, Section 1956, the Court "shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property."  *Id.* at 306, 18 U.S.C. § 982.  Property "involved in" a money laundering offense very clearly constitutes at least the actual funds laundered.  *See In re 650 Fifth Ave and Related Props.*, 777 F. Supp. 2d 529, 570 (S.D.N.Y. 2011).  Furthermore, Section 982(b)(2) expressly states that defendant intermediaries who did not retain the funds laundered are nevertheless liable for forfeiture of substitute assets up the full amount of the laundered property, provided that the defendant "conducted three or more separate transactions involving a total of $100,000 or more in any twelve month period."  18 U.S.C. § 982(b)(2).  In short, a money laundering defendant like Scot—who laundered approximately $392,940,000  through  numerous  transactions  within  a  twelve-month  period  that  exceeded

$100,000—"must forfeit substitute assets up to the amount laundered, even if he merely handled the laundered property—*i.e.*, even if he never retained those funds." *Bermudez*, 413 F.3d at 306.

Finally, a money judgment is appropriate even if the defendant did not retain the proceeds of his crime or does not have the resources to pay the money judgment. *See, e.g.*, *Awad*, 598 F.3d at 78 (in a drug case, holding that the applicable forfeiture provision "permits imposition of a money judgment on a defendant who possesses no assets at the time of sentencing"); *United States v. Kalish*, 626 F.3d 165, 168 (2d Cir. 2010) (affirming the propriety of *in personam* money judgments arising under 21 U.S.C. § 853 by way of 21 U.S.C. § 2461(c) in wire and mail fraud case); *United States v. Vampire Nation*, 451 F.3d 189, 201-02 (3d Cir. 2006) (forfeiture judgment may be entered for the full amount of criminal proceeds, even if the defendant is unable to satisfy the judgment at the time of sentencing; otherwise, defendants would be able to "dissipate those proceeds and avoid liability for the ill gotten gains"); *United States v. Hall*, 434 F.3d 42, 59 (1st Cir. 2006) (district court may order the defendant to forfeit a sum of money equal to the drug proceeds that he earned but did not retain).

## B. Substitute Assets

To the extent the defendant is no longer in possession of the laundered funds, the Government is entitled to the collection of substitute assets up to the amount of the funds laundered, and equal to the $392,940,000 money judgment sought by the Government. Pursuant to 21 U.S.C. §§ 853(p)(1)(A) and (B), as relevant here, forfeiture of substitute assets is authorized where, as a result of act of the defendant's, *either* the funds cannot be located upon the exercise of due diligence *or* the property has been "transferred or sold to, or deposited with, a third party[.]" As the trial evidence made clear, a substantial portion of the funds laundered by Scott were subsequently sent by Scott to third parties on behalf of Ruja Ignatova, (*see, e.g.*, GX 2627; PSR ¶ 34), thereby satisfying the statutory requirements of Section 853(p)(1)(B). Therefore, on the basis of Section 853(p)(1)(B) alone, this Court is authorized to order forfeiture of substitute assets from the defendant. *See, e.g., Honeycutt*, 137 S. Ct. at 1634 ("Only if the Government can prove that *one* of these five conditions was caused by the defendant may it seize 'any property of the defendant up to the value of' the tainted property") (emphasis supplied).

## C. Post-Conviction Restraint

The All-Writs Act, Title 28, United States Code, Section 1651, provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). Further, "'there is a strong governmental interest in obtaining full recovery of all forfeitable assets.'" *Kaley v. United States*, 571 U.S. 320, 323 (2014) (quoting *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 631 (1989)). Accordingly, Courts in this Circuit have relied on the All-Writs Act to restrain assets pending sentencing in order to preserve those assets for forfeiture or restitution. In *United States v. Numisgroup Int'l Corp.*, the Court relied on the All-Writs Act to continue post-conviction, pre-sentencing restraint of substitute asset coins to ensure availability for restitution or forfeiture. 169 F. Supp. 2d 133, 137-38 (E.D.N.Y. 2001). "'There is no logic to the position that the Court is powerless to enter a restraining order after a jury has found a defendant guilty of participating in a large-scale fraud simply because sentencing has been delayed so that a pre-sentence report may be prepared.'" *Id.*

at 138 (quoting *United States v. Ross*, No. 92 CR 1001 (JSM), 1993 WL 427415, at *1 (S.D.N.Y. Oct. 15, 1993)).  Other courts have similarly ordered restraints on substitute assets post-conviction in order to ensure availability of those substitute assets for forfeiture.  *See*, *e.g.*, *United States v. Swenson,* 1:13–CR–91–BLW, 2014 WL 2506300, *2-4 (D. Idaho June 3, 2014); *United States v. Kilbride*, No. 05 Cr. 870 (PHX-DGC), 2007 WL 2990116, at *2 (D. Ariz. Oct. 11, 2007); *United States v. Wahlen*, 459 F. Supp. 2d 800, 803 (E.D. Wis. 2006).

## IV.    Discussion

### A.  Scott Must Forfeit the Full $392,940,000 That He Laundered

At trial, the Government clearly established that Scott set up and used the Fenero Funds to launder approximately $392,940,000 in OneCoin Scheme proceeds on behalf of Ruja Ignatova. (PSR ¶¶ 33 and 34).  As shown at trial (*see, e.g.*, GX 2602), and in the October Affidavit, all of those funds that Scott laundered were derived from the OneCoin Scheme.  (*See* October Affidavit ¶ 5).  Scott must forfeit the full value of the funds he laundered, i.e., $392,940,000.  *See United States v. Bermudez*, 413 F.3d at 306; 19 U.S.C. § 982(a)(1).  The Court should accordingly enter the Government's proposed Money Judgment in that amount.

### B.  The Subject Accounts Were Involved in the Money Laundering Offense And Are Subject to Forfeiture

As shown at trial, and as described above and in the October Affidavit, throughout the money laundering scheme, Scott used an elaborate series of financial transactions (sometimes referred to as "layering"), including fake "investments" into the Fenero Funds, purported "loans" that were in fact never repaid, and transfers through numerous bank accounts (including attorney trust accounts), to hide the source of money that funded transfers to third parties on behalf of Ignatova and also directly funded Scott's purchases of real property, cars, and other luxury items. As shown throughout the October Affidavit and in the accompanying charts, many of these transactions were conducted through Scott's direct use of the Subject Accounts.  Approximately $34,501,366.3 of the funds from the money laundering scheme remain in the Subject Accounts. As shown at trial, these transactions conducted by Scott were designed to conceal the source of the funds (*i.e.*, the OneCoin Scheme) and the ownership and control of those funds (*i.e.*, Ignatova). Scott's direct use of the Subject Accounts to launder the criminal proceeds from the OneCoin Scheme was indispensable to the money laundering conspiracy.  Without Scott's use of these accounts to layer the funds and obfuscate the origin of the funds, there could not have been a successful money laundering operation.  The Subject Accounts are accordingly subject to forfeiture under 18 U.S.C. § 982 as property that was involved in the charged money laundering offense that Scott was convicted of at trial.[3]

---

[3] The Government is not seeking forfeiture of the 9788 Iberia Account which is an attorney trust account in the name of Nicole Huesmann.  Because that account is an attorney trust account in the name of a third party, forfeiture of the entire 9788 Iberia Account could result in the forfeiture of the funds of third parties who have nothing to do with this prosecution (i.e., other clients of Ms. Huesmann).  However, by only seizing the amount of the check provided by Huesmann to the

In addition, as detailed throughout the October Affidavit, the funds in the Subject Accounts as well as all of the Specific Property are directly traceable to funds involved in the money laundering offense and are therefore also subject to forfeiture under 18 U.S.C. § 982(a)(1). Specifically, as shown in the October Affidavit and in the accompanying exhibits, all of funds that were transferred into the Subject Accounts originated from the OneCoin Scheme and were laundered by Scott. Furthermore, all of the Specific Property that is set forth in Appendix A was purchased with funds that originated from the OneCoin Scheme and were laundered by Scott. In other words, all of the specific property in Appendix A is either involved in the money laundering offense or "property traceable to" such property, and is therefore subject to forfeiture under 18 U.S.C. § 982(a)(1).

### C. Any Remaining Funds And Property Belonging To Scott Are Subject To Forfeiture As Substitute Assets

As shown at trial, Scott transferred a substantial portion of the funds that he laundered through the Fenero Funds to a number of third parties, many of which held foreign bank accounts. (*See, e.g.*, GX 2627). For example, Scott sent over €190 million to third parties in the United Arab Emirates, over €65 million to third parties in Bulgaria, and approximately $30 million to a third party in Hong Kong. (*Id.*). The Government is accordingly entitled to substitute assets in this case. *See* 21 U.S.C. §§ 853(p)(1)(A) and (B) (forfeiture of substitute assets is authorized where either the funds cannot be located upon the exercise of due diligence or the property has been "transferred or sold to, or deposited with, a third party[.]"). The Government is presently aware of the specific substitute assets listed below and in Appendix B which should be forfeited here. Notably, given that the appropriate amount of forfeiture is $392,940,000, there is no risk that by forfeiting the specific assets listed below the total amount of funds forfeited will exceed the amount that Scott is obligated to forfeit under the proposed Money Judgment. In other words, even if the Court were to order that Scott forfeit the funds in the Subject Accounts, the Specific Property, and the specific substitute assets listed below, Scott would still owe an additional sum of *hundreds of millions of dollars* before he would satisfy the proposed Money Judgment. The Government accordingly seeks the forfeiture of the following specific property as substitute assets, all of which are held at bank accounts at UBS bank:

| Account Name | Financial Institution | Account No. | Estimated Balance |
|---|---|---|---|
| Mark S. Scott 2017 Trust | UBS | PW XXX53 (converted to Account No. 1X B0014 YA) | $102,857.62 |
| Mark S. Scott 2017 Trust | UBS | PW XXX31 (converted to Account No. 1X B0031 YA) | $2,006,086.28 |
| Mark S. Scott College Fund 529 | UBS | Account No. PW B4734 03 | $160,834.00 |

Government, which represents the remaining funds Huesmann possesses on behalf of Scott, this risk will be eliminated.

| Mark S. Scott | UBS | Account No. PW A5494 03 | $236,750.81 |
|---|---|---|---|
| | | **Total** | $2,506,528.71 |

In addition to the funds in the chart listed above, the Government seeks the forfeiture of all of the items that were seized from Scott on the day of his arrest, which include, among other things, several luxury bags. All of those items are listed on Appendix B to this motion, and in the proposed Preliminary Order of Forfeiture.

Finally, even if the Court were to conclude that any of the Subject Accounts or the Subject Property are not subject to forfeiture pursuant to 18 U.S.C. § 982(a)(1), the Subject Accounts and the Subject Property would still alternatively be subject to forfeiture under 21 U.S.C. §§ 853(p)(1)(A) and (B).[4]

### D. The Court Should Enter a Post-Conviction Restraining Order Against Scott

The evidence introduced at trial and set forth in the October Affidavit prove that the defendant diverted and dissipated the proceeds of the scheme charged in the Indictment through a multitude of banks accounts in the name of shell companies and other entities that the defendant controlled. The proceeds were dissipated in a complex series of transactions substantially for the benefit of Scott and his co-conspirators, including Ruja Ignatova, that were designed to avoid detection. As the October Affidavit makes clear, only a small portion of the nearly $400 million in funds laundered by Scott have been identified and seized or restrained.

Moreover, based upon the Government's investigation to date, the defendant has continued to dissipate proceeds of the offenses of conviction, notwithstanding a Post-Indictment Restraining

---

[4] Moreover, the evidence presented at trial clearly established proceeds of at least $40 million stemming from the bank fraud offense charged in Count Two. As the testimony and exhibits admitted at trial proved, in July 2016, Scott transferred $30 million of OneCoin-derived funds from a Fenero account held at DMS Bank in the Cayman Islands—through a U.S. dollar correspondent bank account at Bank of New York Mellon in New York, NY ("BNYM")—to an account held by Barta Holdings at DBS Bank in Hong Kong. In connection with that transaction, Scott caused false wire remittance information to be provided to BNYM indicating that the funds represented a "loan for Cryptoreal." (Tr. 1474-77). In June and September 2016, Scott and Gilbert Armenta also arranged for the transfer of a total of $10 million of OneCoin-derived funds from U.S. bank accounts controlled by Armenta to a Fenero bank account held at Deutsche Bank in the Cayman Islands (Tr. 840-61; 908-17). As part of the broader phony investment fund scheme operated by Scott, and consistent with a Fenero investment agreement that Scott had Armenta execute (GX 1140), these transfers were falsely described to the originating U.S. banks, for example, as investments into "ZIIXI" and "XIII" (Tr. 844), and Fenero itself was falsely described as a private equity firm that invested in, among other things, renewable energy, such as windmills (Tr. 859-860).

Order applicable to "property or other interests . . . subject to forfeiture,"[5] various seizure warrants, and a forfeiture bill of particulars.  As detailed at length in the Government's letter seeking the defendant's remand, dated March 11, 2020: (1) *before* trial, (a) in or about June 2019, the defendant sold a Porsche that he bought with OneCoin victim money and that he knew was subject to seizure and forfeiture, and used the $250,000 in sale proceeds for himself; and (b) in or about August 2019, the defendant took out a $500,000 personal loan from his bond suretor based on the false promise that he would repay that loan within six months, which he failed to do; and (2) *after* trial, in or about December 2019, the defendant offered to mortgage two properties that he bought using OneCoin victim money (as proven at trial) and that he knew were subject to forfeiture in this case, and he actually mortgaged one of those two properties.  (*See* Doc. No. 317).  In addition, as described in paragraph 7(h) of the October Affidavit, in or about June 2018, Scott purchased a 2018 Porsche 911 GTRS2 using OneCoin proceeds.  The Government recently obtained evidence demonstrating that Scott sold that vehicle—which was parked in the driveway at his residence in Massachusetts when he was arrested—in or about January 2019, approximately four months after his arrest, for $192,000.[6]

Based upon the foregoing, there is reason to believe that the defendant has dissipated and will continue dissipating both criminal proceeds and substitute assets, which will frustrate the forfeiture of those assets.  The Government therefore requests that Court enter a post-conviction order restraining Scott's assets until the Court determines whether the those assets are properly forfeited to the United States pursuant to Section 853(p) and Rule 32.2(e) of the Federal Rules of Criminal Procedure.  *See, e.g., Swenson,*, 2014 WL 2506300 at *2-4; *Kilbride*, 2007 WL 2990116, at *2; *Wahlen*, 459 F. Supp. 2d at 803 (E.D. Wis. 2006); *Numisgroup Int'l Corp.*, 169 F. Supp. 2d at 139.  A proposed Post-Conviction Restraining Order is attached hereto as Exhibit 8.

---

[5]  That Restraining Order, attached hereto as Exhibit 7, was signed by Judge Broderick on September 4, 2018, and was produced to the defendant on or about September 21, 2018, stamped with control numbers MS_USAO_00000036 through MS_USAO_00000038.

[6]  The Government will provide to the Court records evidencing this sale in the event that the defendant disputes that this sale took place.  Those records were recently produced by the Government to the defendant.

## **Conclusion**

  For the foregoing reasons, the Government respectfully requests that the Court enter: (1) the proposed Preliminary Order of Forfeiture, imposing a personal money judgment in the amount of $392,940,000 and the forfeiture of certain specific assets as well as substitute assets; and (2) the proposed Post-Conviction Restraining Order against Scott.

<div style="text-align:right">

Very truly yours,

AUDREY STRAUSS
Acting United States Attorney

</div>

By:   _____/s/_____
    Christopher J. DiMase / Nicholas Folly
    Assistant United States Attorneys
    (212) 637-2433 / (212) 637-1060

Cc: David Garvin, Esq. (via ECF)
   Arlo Devlin Brown, Esq. (via ECF)

# **EXHIBIT 1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

                                        :

UNITED STATES OF AMERICA              :         PRELIMINARY ORDER OF
                                          FORFEITURE AS TO SPECIFIC
             -v-                 :         PROPERTY AND SUBSTITUTE
                                          <u>ASSETS/ MONEY JUDGMENT</u>

MARK S. SCOTT,                  :

                                       :         S10 17 Cr. 630 (ER)

                                       :

                            Defendant.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

         WHEREAS on or about October 8, 2019, the defendant Mark S. Scott (the

"Defendant") was charged in a two-count Superseding Indictment (the "Indictment"), with

knowingly and willfully committing money laundering, in violation of Title 18, United States

Code, Section 1956(h) (Count One), and conspiracy to commit bank fraud, in violation of Title 18,

United States Code, Section 1349 (Count Two) (Dkt. No. 143);

         WHEREAS, the Indictment included a forfeiture allegation as to Count One of the

Indictment, seeking forfeiture to the Government, pursuant to Title 18, United States Code, Section

982(a)(1), of any and all property, real and personal, involved in the offense charged in Count One

of the Indictment, or any and all property traceable to the such property, including but not limited

to a sum of money in Untied States currency representing the amount of property involved in the

offense charged in Count One of the Indictment;

         WHEREAS, the Indictment included a forfeiture allegation as to Count Two of the

Indictment, seeking forfeiture to the Government, pursuant to Title 18, United States Code, Section

982(a)(2)(A), of any and all property constituting, or derived from, proceeds the Defendant

obtained directly or indirectly, as a result of the commission of the offense charged in Count Two

of the Indictment, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of the offense;

WHEREAS, the Indictment also included a substitute asset provision providing notice that if as a result of the Defendant's actions or omissions forfeitable property is unable to be located or obtained, transferred or sold to a third party person, has been placed beyond the jurisdiction of the Court, substantially diminished value or has been commingled with other property which cannot be subdivided without difficulty, the United States will seek, pursuant to Title 21, United States Code, Section 853(p), the forfeiture of any other property of the Defendant;

WHEREAS, on or about November 21, 2019, the Defendant was found guilty, following a jury trial, of Counts One and Two of the Indictment;

WHEREAS, the Government seeks the forfeiture of various specific property, and entry of a forfeiture money judgment in the amount of $392,940,000 in United States currency, representing (i) property involved in the commission of the offense charged in Count One of the Indictment and/or (ii) the property constituting, or derived from proceeds traceable to the commission of the offense charged in Count Two of the Indictment that the Defendant personally obtained;

WHEREAS, the Court finds that the property involved in the commission of the offense charged in Count One of the Indictment has a total value of $392,940,000 in United States currency, and the property constituting, or derived from proceeds traceable to the commission of the offense charged in Count Two of the Indictment that the Defendant personally obtained had a total value of $40,000,000;

WHEREAS, the Court finds that the following property was involved in the commission of the offense charged in Count One of the Indictment:

a.  $2,455,686.10 in United States currency formerly on deposit in Account Number 85079788 held at Iberia Bank (formerly known as Sabadell United Bank) by Nicole J. Huesmann P.A.;

b.  Any and all funds on deposit in Account Number 40077102 held in the name of MSS International Consultants (BVI), Ltd., at DMS Bank and Trust Ltd;

c.  Any and all funds on deposit in Account Number 40077100 held in the name of MSS International Consultants (BVI), Ltd., at DMS Bank and Trust Ltd;

d.  Any and all funds on deposit in Account Number 10462701 held in the name of MSS International Consultants (BVI), Ltd., at First Caribbean International Bank;

e.  Any and all funds on deposit in Account Number 10465454 held in the name of DRP Holdings, Ltd., at First Caribbean International Bank;

f.  Any and all funds on deposit in Account Number 10465343, held in the name of MSS Marine Group, Ltd., at First Caribbean International Bank;

g.  Any and all funds on deposit in Account Number 10463883, held in the name of EGD Investment, Ltd., at First Caribbean International Bank;

h.  Any and all funds on deposit in Account Number 10465346, held in the name of Mumbelli Group Holding (Cayman), Ltd., at First Caribbean International Bank;

i.  Any and all funds on deposit in Account Number 2450478611, held in the name of HFT Holding Limited, at RBC Dominion Securities Global Ltd.;

j.  Any and all funds on deposit in Account Number CH3508565559929606901, held in the name of Mark S. Scott, at Dreyfus Sohne & Cie AG;

k.  $129,088.74 in United States currency formerly on deposit in Account Number 9190041054 held in the name of Mark S. Scott and Lidia V. Kolesnikova, at Cooperative Bank of Cape Cod;

l.      Any and all funds on deposit in Account Number 2840912613, held in the name of Mark S. Scott, at Northern Trust Company;

m.     Any and all funds on deposit in Account Number 2840909434, held in the name of Mark S. Scott, at Northern Trust Company;

n.     Any and all funds on deposit in Account Number 43-98797, held in the name of Mark S. Scott, at Northern Trust Company;

o.     Any and all funds on deposit in Account Number PWA5493, held in the name of Mark S. Scott, at UBS Financial Services;

p.     Any and all funds on deposit in Account Number PWB1979, held in the name of Mark S. Scott, at UBS Financial Services;

q.     Any and all funds on deposit in Account Number PWA9666, held in the name of Mark S. Scott and Lidia Kolesnikova, at UBS Financial Services;

r.     $2,449,467.9 in United States currency formerly on deposit in Account Number 4842-9048, held in the name of Mark S. Scott 2017 Trust at Wells Fargo Advisors;

s.     One 2017 Sunseeker 57 Predator Yacht, Hull No. "TAIMA," seized by the Internal Revenue Service ("IRS") on or about September 5, 2018;

t.     One 2017 Red Porsche 911 4S Turbo, bearing Vehicle Identification Number, WP0CD2A95HS178187 and containing License Plate Number HBNJ81;

u.     One 2018 White Porsche 911 GT2 RS, bearing Vehicle Identification Number, WP0AE2A91JS185471;

v.     All right, title and interest in real Properties located at 31 Dale Avenue, Hyannis Port, Massachusetts owned by MSSI 31 Dale Ave Property Group LLC, with all improvements, appurtenances, and attachments thereon;

w.    All right, title and interest in real Properties located at 105 Sunset Lane, Barnstable, Massachusetts 02630 owned by MSSI 105 Sunset Ln Property Group LLC, with all improvements, appurtenances, attachments thereon;

  x. All right, title and interest in real Properties located at 133 Sunset Lane Barnstable, Massachusetts 02630, with all improvements, appurtenances, and attachments thereon;

  y. The following items seized on or about September 5, 2018, from 133 Sunset Lane Barnstable, Massachusetts:

    i. One Panerai PAM 582 barometer wall clock;
    ii. One Panerai PAM 583 thermometer;
    iii. One Panerai PAM 584 hygrometer;
    iv. One Panerai PAM 585 wall clock; and
    v. One Ring with stone;

  z. All right, title and interest in real Properties located at 600 Coral Way, Suite/Floor 12, Segovia Tower, Coral Gables, Florida 33134, with all improvements, appurtenances, and attachments thereon; and

  aa. All monies and funds contained in J.P. Morgan Chase attorney IOLA trust account 339656032, held by James Nobles Esq. P.C., and all funds traceable thereto, including accrued interest

  bb. All monies and funds contained in RBC Private Counsel (USA) Inc. account 3752442214, held by Mark S. Scott 2017 Trust and all funds traceable thereto, including accrued interest;

  cc. All monies and funds contained in RBC Private Counsel (USA) Inc. account 3756283317, held by Mark S. Scott 2017 Trust and all funds traceable thereto, including accrued interest;

((a) through (cc), collectively, the "Specific Property");

   WHEREAS the Court finds that as a result of acts and/or omissions of the Defendant, the property involved in the commission of Count One of the Indictment and the proceeds traceable to the offense charged in Count Two of the Indictment that the Defendant personally obtained cannot be located upon the exercise of due diligence, with the exception of the Specific Property;

WHEREAS, the Court finds that the value of the Specific Property is substantially less than $392,940,000;

WHEREAS, the Government has identified the following additional assets in which the Defendant has an ownership interest:

a)  Any and all funds on deposit in Account Number 1X B0014YA held in the name of Mark S. Scott 2017 Trust, at UBS Financial Services;

b)  Any and all funds on deposit in Account Number 1X B0031YA held in the name of Mark S. Scott 2017 Trust, at UBS Financial Services;

c)  Any and all funds on deposit in College 529 Fund Account Number PW B4734 03, held in the name of Mark S. Scott FBO ███████, at UBS Financial Services;

d)  Any and all funds on deposit in Account Number PW A5494 03, held in the name of Mark S. Scott, at UBS Financial Services;

e)  The following property seized on or about September 5, 2018, from 600 Coral Way, Suite/Floor 12, Segovia Tower, Coral Gables, Florida 33134:

    i.    One Heckler & Koch 40 MM gun, Serial No.: 219-004106;

    ii.   One Heckler & Koch 45 MM gun, Serial No.: HKU004967;
    iii.  One Desert Eagle SOAE, Serial No.: DK0038257;
    iv.   One Smith and Wesson, Serial No.: DJW0604;
    v.    One Beretta Shotgun and leather case;
    vi.   One Luminor Panerai P068/400 BB1577049;
    vii.  One Black Hermes Birkin Bag; and
    viii.   One Orange Hermes Birkin Bag

f)  The following property seized by the Government on or about September 5, 2018, from 133 Sunset Lane Barnstable, Massachusetts 02630:
    i.    One Black Hermes purse,
    ii.   One Brown/Tan Hermes purse; and
    iii.  One Green Hermes purse

(a through f, collectively, the "Substitute Assets"); and

WHEREAS, pursuant to Title 21, United States Code, Section 853(g), and Rules

32.2(b)(3), 32.2(b)(6), and 32.2(c) of the Federal Rules of Criminal Procedure, the Government is now entitled, pending any assertion of third-party claims, to reduce the Specific Property and the Substitute Assets to its possession and to notify any person who reasonably appears to be a potential claimant of their interest therein;

NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED THAT:

1.      As a result of the offenses charged in Counts One and Two of the Indictment, to which the Defendant was found guilty, a money judgment in the amount of $392,940,000 in United States currency (the "Money Judgment") shall be entered against the Defendant.

2.      As a result of the offenses charged in Counts One and Two of the Indictment, to which the Defendant was found guilty, all of the Defendant's right, title and interest in the Specific Property and the Substitute Assets is hereby forfeited to the United States for disposition in accordance with the law, subject to the provisions of Title 21, United States Code, Section 853. Upon the entry of a Final Order of Forfeiture forfeiting the Specific Property and the Substitute Assets to the United States, and their liquidation to the extent they constitute real or personal property, the net proceeds of the Specific Property and the Substitute Assets shall be applied towards the satisfaction of the Money Judgment.

3.      Pursuant to Rule 32.2(b)(4) of the Federal Rules of Criminal Procedure, upon entry of this Preliminary Order of Forfeiture as to Specific Property and Substitute Assets/Money Judgment, this Preliminary Order of Forfeiture as to Specific Property and Substitute Assets/Money Judgment is final as to the Defendant, MARK S. SCOTT, and shall be deemed part of the sentence of the Defendant, and shall be included in the judgment of conviction therewith.

4.      The United States Department of Treasury (or its designee) are hereby authorized to deposit the payments on the Money Judgment into the Treasury Assets Forfeiture Fund, and the United States shall have clear title to such forfeited property

5.      All payments on the outstanding Money Judgment shall be made by postal money order, bank or certified check, made payable, in this instance to the United States Department of Treasury, and delivered by mail to the United States Attorney's Office, Southern District of New York, Attn: Money Laundering and Transnational Criminal Enterprises Unit, One St. Andrew's Plaza, New York, New York 10007 and shall indicate the Defendant's name and case number and the United States Department of Treasury shall be authorized to deposit the payments on the Money Judgment into the Treasury Assets Forfeiture Fund, and the United States shall have clear title to such forfeited property.

6.      The United States (or its designee) is hereby authorized to take possession of the Specific Property and to hold such property in its secure custody and control.

7.      Pursuant to Rule 32.2(b)(4) of the Federal Rules of Criminal Procedure, this Preliminary Order of Forfeiture as to Specific Property and Substitute Assets/Money Judgment is final as to the Defendant upon entry of this Preliminary Order of Forfeiture as to Specific Property and Substitute Assets/Money Judgment, and shall be deemed part of the sentence of the Defendant, and shall be included in the judgment of conviction therewith.

8.      Pursuant to Title 21, United States Code, Section 853(n)(1), Rule 32.2(b)(6) of the Federal Rules of Criminal Procedure, and Rules G(4)(a)(iv)(C) and G(5)(a)(ii) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, the United States shall publish for at least thirty (30) consecutive days on the official government internet forfeiture site, www.forfeiture.gov, notice of this Preliminary Order of Forfeiture as to Specific

Property and Substitute Assets/Money Judgment and notice that any person, other than the Defendant in this case, claiming an interest in the Specific Property and/or Substitute Assets must file a petition within sixty (60) days from the first day of publication of the notice on this official government internet site, or no later than thirty-five (35) days from the mailing of actual notice, whichever is earlier.

9.      The notice referenced in the preceding paragraph shall state that the petition shall be for a hearing to adjudicate the validity of the petitioner's alleged interest in the Specific Property and/or Substitute Assets, shall be signed by the petitioner under penalty of perjury, and shall set forth the nature and extent of the petitioners right, title or interest in the Specific Property and/or Substitute Assets and any additional facts supporting the petitioner's claim and the relief sought pursuant to Title 21, United States Code, Section 853(n).

10.      Pursuant to 32.2 (b)(6)(A) of the Federal Rules of Criminal Procedure, the Government shall send notice to any person who reasonably appears to be a potential claimant with standing to contest the forfeiture in the ancillary proceeding.

11.      Pursuant to Title 21, United States Code, Section 853(n), upon adjudication of all third-party interests, this Court will enter a Final Order of Forfeiture with respect to the Specific Property and Substitute Assets in which all interests will be addressed.

12.      Pursuant to Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure, upon entry of this Preliminary Order of Forfeiture as to Specific Property and Substitute Assets/Money Judgment the Office is authorized to conduct any discovery needed to identify, locate or dispose of property subject to forfeiture, including depositions, interrogatories, requests for production of documents and subpoenas, pursuant to Rule 45 of the Federal Rules of Civil Procedure.

13.     The Court retains jurisdiction to take additional action, enter further orders, and amend this and any future orders as necessary to implement and enforce this Preliminary Order of Forfeiture as to Specific Property and Substitute Assets/Money Judgment.

14.     The Clerk of the Court shall forward three certified copies of this Preliminary Order of Forfeiture as to Specific Property and Substitute Assets/Money Judgment to Assistant United States Attorney Alexander J. Wilson, Co-Chief of the Money Laundering & Transnational Criminal Enterprises Unit, United States Attorney's Office, One St. Andrew's Plaza, New York, New York 10007.

Dated: New York, New York
           _____, 2020

SO ORDERED:

_____
HONORABLE EDGARDO RAMOS
UNITED STATES DISTRICT JUDGE

# **EXHIBIT 2**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                    :
UNITED STATES OF AMERICA
                                                    :
           -v-                                              GOVERNMENT'S FORFEITURE
                                                    :        BILL OF PARTICULARS
MARK S. SCOTT,
                                                    :        S6 17 Cr. 630 (ER)
                                                    :
                         Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Pursuant to *United States* v. *Grammatikos*, 633 F.2d 1013, 1024 (2d Cir. 1980), the

Government respectfully gives notice that the property subject to forfeiture as a result of the

offense described in Count One of the Superseding Indictment, and as alleged in the Forfeiture

Allegation therein, includes the following:

   a.   $2,455,686.10 held at Iberia Bank (formerly known as Sabadell United
        Bank) Account Number 85079788 received from or on behalf of Mark. S.
        Scott and/or related companies, by Nicole J. Huesmann P.A.;

   b.   Any and all funds on deposit in Account Number 81141046 in Iberia Bank
        (formerly known as Sabadell United Bank) received from or on behalf of
        Mark. S. Scott and/or related companies, by Nicole J. Huesmann P.A.;

   c.   Any and all funds on deposit in Account Number 40077102 held in the
        name of MSS International Consultants (BVI), Ltd., at DMS Bank and Trust
        Ltd;

   d.   Any and all funds on deposit in Account Number 40077100 held in the
        name of MSS International Consultants (BVI), Ltd., at DMS Bank and Trust
        Ltd;

   e.   Any and all funds on deposit in Account Number 10462701 held in the
        name of MSS International Consultants (BVI), Ltd., at First Caribbean
        International Bank;

f.      Any and all funds on deposit in Account Number 10465454 held in the name of DRP Holdings, Ltd., at First Caribbean International Bank;

g.      Any and all funds on deposit in Account Number 10465343, held in the name of MSS Marine Group, Ltd., at First Caribbean International Bank;

h.      Any and all funds on deposit in Account Number 10463883, held in the name of EGD Investment, Ltd., at First Caribbean International Bank;

i.      Any and all funds on deposit in Account Number 10465346, held in the name of Mumbelli Group Holding (Cayman), Ltd., at First Caribbean International Bank;

j.      Any and all funds on deposit in Account Number 2450478611, held in the name of HFT Holding Limited, at RBC Dominion Securities Global Ltd.;

k.      Any and all funds on deposit in Account Number CH3508565559929606901, held in the name of Mark S. Scott, at Dreyfus Sohne & Cie AG;

l.      Any and all funds on deposit in Account Number 9190041054, held in the name of Mark S. Scott and Lidia V. Kolesnikova, at Cooperative Bank of Cape Cod;

m.      Any and all funds on deposit in Account Number 2840912613, held in the name of Mark S. Scott, at Northern Trust Company;

n.      Any and all funds on deposit in Account Number 2840909434, held in the name of Mark S. Scott, at Northern Trust Company;

o.      Any and all funds on deposit in Account Number 43-98797, held in the name of Mark S. Scott, at Northern Trust Company;

p.      Any and all funds on deposit in Account Number 45900306, held in the name of Maria Palacio, David R. Pike, and/or Francisco Palacio, at Ocean Bank;

q.      Any and all funds on deposit in Account Number PWA5493, held in the name of Mark S. Scott, at UBS Financial Services;

r.      Any and all funds on deposit in Account Number PWB1979, held in the name of Mark S. Scott, at UBS Financial Services;

s.      Any and all funds on deposit in Account Number PWA9666, held in the name of Mark S. Scott and Lidia Kolesnikova, at UBS Financial Services;

t.     Any and all funds on deposit in Account Number 4842-9048, held in the name of Mark S. Scott 2017 Trust, at Wells Fargo Advisors;

u.     One 2017 Sunseeker 57 Predator Yacht, seized by the Internal Revenue Service ("IRS") on or about September 5, 2018 (the "2017 Sunseeker");

v.     One 2016 White Porsche 911 GT3 RS, bearing Vehicle Identification Number WP0AF2A92GS195089 and containing License Plate Number DVADER3, (the "2016 Porsche");

w.     One 2017 Red Porsche 911 4S Turbo, bearing Vehicle Identification Number, WP0CD2A95HS178187 and containing License Plate Number HBNJ81, (the "2017 Porsche");

x.     One 2018 White Porsche 911 GT2 RS, bearing Vehicle Identification Number, WP0AE2A91JS185471, (the "2018 White Porsche");

y.     All right, title and interest in real Properties located at 31 Dale Avenue, Hyannis Port, Massachusetts owned by MSSI 31 Dale Ave Property Group LLC, with all improvements, appurtenances, and attachments thereon;

z.     All right, title and interest in real Properties located at 105 Sunset Lane, Barnstable, Massachusetts 02630 owned by MSSI 105 Sunset Ln Property Group LLC, with all improvements, appurtenances, attachments thereon;

aa.     All right, title and interest in real Properties located at 133 Sunset Lane Barnstable, Massachusetts 02630, with all improvements, appurtenances, and attachments thereon;

bb.     Any and all items of value seized on or about September 5, 2018, from 133 Sunset Lane Barnstable, Massachusetts 02630 (the "Sunset Lane Items of Value"), including but not limited to the following:

       i.     One Panerai PAM 582 barometer wall clock;
       ii.     One Panerai PAM 583 thermometer;
       iii.     One Panerai PAM 584 hygrometer;
       iv.     One Panerai PAM 585 wall clock;
       v.     One Luminor Panerai P068/400 BB1577049;
       vi.     3 Purses – One Black Hermes, One Brown/Tan Hermes, and One Green Hermes;
       vii.     One Ring with stone;

cc.   All right, title and interest in real Properties located at 600 Coral Way, Suite/Floor 12, Segovia Tower, Coral Gables, Florida 33134, with all improvements, appurtenances, and attachments thereon;

dd.   Any and all items of value seized on or about September 5, 2018, from 600 Coral Way, Suite/Floor 12, Segovia Tower, Coral Gables, Florida 33134 (the "Coral Way Items of Value"), including but not limited to the following:

   i.    One Black Hermes Birkin Bag;
   ii.   One Orange Hermes Birkin Bag;
   iii.  One Heckler & Koch 40 MM gun, Serial No.: 219-004106
   iv.   One Heckler & Koch 45 MM gun, Serial No.: HKU004967
   v.    One Desert Eagle SOAE, Serial No.: DK0038257
   vi.   One Smith and Wesson, Serial No.: DJW0604
   vii.  One Beretta Shotgun and leather case;

((a) through (dd) the "Specific Property")

Dated:      New York, New York
            February 22, 2019

                              Respectfully Submitted,
                              GEOFFREY S. BERMAN
                              United States Attorney


                        By: /s/ Christopher J. DiMase
                              CHRISTOPHER J. DIMASE
                              Assistant United States Attorney
                              Tel: (212) 637-2433

# **EXHIBIT 3**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | **TO BE FILED UNDER SEAL** |
| -v.- | **POST-INDICTMENT RESTRAINING ORDER** |
| MARK S. SCOTT, | **S6 17 Cr. 630** |
| Defendant. | |

      Upon the application of GEOFFREY S. BERMAN, United States Attorney for the
Southern District of New York, pursuant to Title 18, United States Code, Section 982 and Title
21, United States Code, Section 853, based on the Affidavit of Senior Financial Intelligence
Analyst Rosalind October, New York County District Attorney's Office, executed on April 18,
2019, and upon a finding of probable cause, that the Target Properties, defined below, are subject
to restraint and forfeiture pursuant to Title 18, United States Code, Section 982 and Title 21,
United States Code, Section 853,

      **IT IS HEREBY ORDERED** that MARK S. SCOTT, the defendant, and all attorneys,
agents, and employees, and anyone acting on the behalf of SCOTT, and all persons or entities in
active concert or participation with any of the above, and all persons or entities having actual
knowledge of this Order, shall not take any action prohibited by this Order.

      **IT IS FURTHER ORDERED** that MARK S. SCOTT, the defendant, and all attorneys,
agents, and employees, and anyone acting on the behalf of SCOTT, and all persons or entities in
active concert or participation with any of the above, and all persons or entities having actual
knowledge of this Order, shall not, directly or indirectly, transfer, sell, assign, pledge,
hypothecate, encumber, or dispose of in any manner; cause to be transferred, sold, assigned,
pledged, hypothecated, encumbered, disposed of in any manner; or take, or cause to be taken,
any action that would have the effect of depreciating, damaging, or in any way diminishing the

value of property or other interests belonging to, or owed to, or controlled in whole or in part by the defendant, which property or other interests are subject to forfeiture. The property and other interests hereby restrained include, but are not limited to, the following:

a.   All monies and funds contained in RBC Private Counsel (USA) Inc. account 3752442214, held by Mark S. Scott 2017 Trust ("Target Account-1"), and all funds traceable thereto, including accrued interest; and

b.   All monies and funds contained in RBC Private Counsel (USA) Inc. account 3756283317, held by Mark S. Scott 2017 Trust ("Target Account-2"), and all funds traceable thereto, including accrued interest (together with the property contained in Target Account-1, the "Target Properties");

which are alleged to constitute funds and criminal proceeds property involved in violation of 18 U.S.C. § 1956(h) (conspiracy to commit money laundering).

**IT IS FURTHER ORDERED** that the United States Attorney's Office for the Southern District of New York, in its discretion, is authorized to direct the release of assets restrained herein;

**IT IS FURTHER ORDERED** Any person or entity claiming an interest in the assets listed in this Order may contact the following Assistant United States Attorney to clarify the scope of the Order: Assistant United States Attorney Christopher J. DiMase, Telephone Number (212) 637-2433. Those persons or entities will not be deemed in violation of this Order for any transactions undertaken upon approval made by Assistant United States Attorney DiMase.

**IT IS FURTHER ORDERED** that this Restraining Order shall be binding upon the defendant, the attorneys, agents, and employees, and all persons in active concert or participation with any of the above, or any other person having actual knowledge of this Order, and that this Order shall remain in effect until further order of this Court;

2

**IT IS FURTHER ORDERED** that this Restraining Order and all papers submitted therewith shall be maintained under seal until such time as the unsealing of the above-captioned criminal Indictment, except that the United States Attorney's Office or its designee(s) may provide copies of this Order to any person in order to facilitate the execution of this Restraining Order, including any relevant financial institutions and/or the defendant; and

**IT IS FURTHER ORDERED** that service of a copy of this Order shall be made on the defendant or his attorney(s) by regular mail.

Dated: New York, New York
     April _18_, 2019

                    SO ORDERED:

                    _____
                    HONORABLE KIMBA M. WOOD, PART I
                    UNITED STATES DISTRICT JUDGE

# EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | **TO BE FILED UNDER SEAL** |
| -v.- | **POST-INDICTMENT RESTRAINING ORDER** |
| MARK S. SCOTT, | |
| Defendant. | **S6 17 Cr. 630** |

Upon the application of GEOFFREY S. BERMAN, United States Attorney for the

Southern District of New York, pursuant to Title 18, United States Code, Section 982 and Title

21, United States Code, Section 853, based on the Affidavit of Senior Financial Intelligence

Analyst Rosalind October, New York County District Attorney's Office, executed on April 18,

2019, and upon a finding of probable cause, that the Target Account, defined below, is subject to

restraint and forfeiture pursuant to Title 18, United States Code, Section 982 and Title 21, United

States Code, Section 853,

**IT IS HEREBY ORDERED** that MARK S. SCOTT, the defendant, and all attorneys,

agents, and employees, and anyone acting on the behalf of SCOTT, and all persons or entities in

active concert or participation with any of the above, and all persons or entities having actual

knowledge of this Order, shall not take any action prohibited by this Order.

**IT IS FURTHER ORDERED** that MARK S. SCOTT, the defendant, and all attorneys,

agents, and employees, and anyone acting on the behalf of SCOTT, and all persons or entities in

active concert or participation with any of the above, and all persons or entities having actual

knowledge of this Order, shall not, directly or indirectly, transfer, sell, assign, pledge,

hypothecate, encumber, or dispose of in any manner; cause to be transferred, sold, assigned,

pledged, hypothecated, encumbered, disposed of in any manner; or take, or cause to be taken,

any action that would have the effect of depreciating, damaging, or in any way diminishing the

value of property or other interests belonging to, or owed to, or controlled in whole or in part by the defendant, which property or other interests are subject to forfeiture. The property and other interests hereby restrained include, but are not limited to, the following:

        a.      All monies and funds contained in J.P. Morgan Chase attorney IOLA trust account 339656032, held by James Nobles Esq. P.C. (the "Target Account"), and all funds traceable thereto, including accrued interest;

which are alleged to constitute funds and criminal proceeds property involved in violation of 18 U.S.C. § 1956(h) (conspiracy to commit money laundering).

      **IT IS FURTHER ORDERED** that the United States Attorney's Office for the Southern District of New York, in its discretion, is authorized to direct the release of assets restrained herein;

      **IT IS FURTHER ORDERED** Any person or entity claiming an interest in the assets listed in this Order may contact the following Assistant United States Attorney to clarify the scope of the Order: Assistant United States Attorney Christopher J. DiMase, Telephone Number (212) 637-2433. Those persons or entities will not be deemed in violation of this Order for any transactions undertaken upon approval made by Assistant United States Attorney DiMase.

      **IT IS FURTHER ORDERED** that this Restraining Order shall be binding upon the defendant, the attorneys, agents, and employees, and all persons in active concert or participation with any of the above, or any other person having actual knowledge of this Order, and that this Order shall remain in effect until further order of this Court;

      **IT IS FURTHER ORDERED** that this Restraining Order and all papers submitted therewith shall be maintained under seal until such time as the unsealing of the above-captioned criminal Indictment, except that the United States Attorney's Office or its designee(s) may

provide copies of this Order to any person in order to facilitate the execution of this Restraining

Order, including any relevant financial institutions and/or the defendant; and

      **IT IS FURTHER ORDERED** that service of a copy of this Order shall be made on the

defendant or his attorney(s) by regular mail.

Dated: New York, New York
      July 15, 2019

                    SO ORDERED:

                    _____

                    HONORABLE EDGARDO RAMOS
                    UNITED STATES DISTRICT JUDGE

# **EXHIBIT 5**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | **AFFIDAVIT IN SUPPORT OF GOVERNMENT'S FORFEITURE MOTION.** |
| -v.- | |
| MARK S. SCOTT, | **S10 17 Cr. 630 (ER)** |
| Defendant. | |

STATE OF NEW YORK          )
COUNTY OF NEW YORK              :ss.:
SOUTHERN DISTRICT OF NEW YORK  )

Rosalind October, Senior Financial Intelligence Analyst, New York County District Attorney's Office, being duly sworn, deposes and says:

## I. Introduction

### A. Affiant

1.        I am a senior financial intelligence analyst with the Major Economic Crimes Bureau of the New York County District Attorney's Office, and I have been employed in this position since August 2013.  During that time, I have participated in numerous investigations of various financial crimes, including fraud and money laundering offenses.  I have been involved in the instant investigation since approximately early 2016, working together with Special Assistant United States Attorney ("SAUSA") Julieta V. Lozano, who has been cross-designated as a SAUSA to work on this matter with prosecutors from the United States Attorney's Office for the Southern District of New York.  I also testified at the trial of *United States v. Mark S. Scott*, S10 17 Cr. 630 (ER) (the "Scott Trial"), on or about November 18 and 19, 2019.  During my testimony, I was subject to cross-examination on behalf of Scott, through his lawyer, David Garvin, Esq.  My testimony from that trial is incorporated by reference herein as Exhibit A to this affidavit.

2.        This affidavit is submitted in support of the United States of America's

application for a Preliminary Order of Forfeiture, in which the Government seeks a money

judgment in the amount of $392,940,000, and the forfeiture of certain specific assets that were

derived from and/or involved in the laundering of criminal proceeds as alleged in the Indictment

and set forth in more detail below.  Throughout this affidavit I reference certain exhibits that

were introduced at the Scott Trial by the trial exhibit number, as well as certain new exhibits that

I have created based on my review of bank records, which I will refer to by the exhibit names

listed below.  The additional exhibits referred to in this affidavit are included for reference in the

chart below.  The charts below depict certain bank and brokerage accounts (the "Subject

Accounts") that were used in furtherance of Scott's money laundering, as well as certain

property (the "Subject Property") that was purchased from the proceeds of the OneCoin fraud

scheme:

**Bank Accounts ("Subject Accounts")**

| Bank | Account No. | Account Name | Exhibit | Restraining / Seizure Order Date | Estimated Balance | Tracing from OneCoin-related Accounts[1] |
|------|-------------|--------------|---------|----------------------------------|-------------------|------------------------------------------|
| Iberia Bank | 9788 | Nicole J. Huesmann PA ("9788 Iberia Account") | B | 9/17/2018 | $2,455,686.10 | $16,523,635 |
| DMS Bank | 7102 | MSS International Consultants ("7102 DMS Account") | C | 9/4/2018 | $0.00 | €2,429,927 |
| DMS Bank | 7100 | MSS International Consultants ("7100 DMS Account") | D | 9/4/2018 | $0.00 | $19,421,706 |
| FirstCaribbean International Bank | 2701 | MSS International Consultants ("2701 FirstCaribbean Account") | E | 9/4/2018 | $321,275.34 | $7,145,362 |
| FirstCaribbean | 5454 | DRP Holdings Ltd | F | 9/4/2018 | $0.00 | $390,630 |

---

[1] As described in detail below, the funds in this column represent funds that were transferred into and in some cases through the Subject Accounts.  These funds were originally sourced from OneCoin Funding Accounts and often passed through intermediary accounts controlled by Scott before being transferred into and through the Subject Accounts.

| Bank | Account | Name | Ref | Date | Amount 1 | Amount 2 |
|---|---|---|---|---|---|---|
| International Bank | | BVI ("5454 FirstCaribbean Account") | | | | |
| FirstCaribbean International Bank | ▮5343 | MSS Marine Group ("5343 FirstCaribbean Account") | GX 2628 | 9/4/2018 | $45,448.26 | $250,000 |
| FirstCaribbean International | ▮3883 | EGD Investment Ltd ("3883 FirstCaribbean Account") | GX 2628 | 9/4/2018 | $6,637.52 | $130,000 |
| FirstCaribbean International Bank | ▮5346 | Mumbelli Group Holding (Cayman) ("5346 FirstCaribbean Account") | F | 9/4/2018 | $39,770.66 | $100,000 |
| RBC Dominion Securities Global Ltd. | ▮8611 | HFT Holding Limited ("8611 RBC Account") | G | 9/4/2018 | $0.00 | $6,515,498 £5,775,072 |
| Dreyfus Sohne & Cie AG | ▮6901 | Mark S. Scott ("6901 Dreyfus Account") | GXs 2612 2628 | 9/4/2018 | $3,200,000.00 | £2,500,036 |
| Cooperative Bank of Cape Cod | ▮1054 | Mark S. Scott and Lidia V. Kolesnikova ("1054 Cooperative Account") | B and H | 9/4/2018 | $129,088.74 | $265,000 |
| Northern Trust Company | ▮2613 | Mark S. Scott PL ("2613 Northern Trust Account") | H | 9/4/2018; 10/15/2018 Revised | $2,613.84 | $1,245,592 |
| Northern Trust Company | ▮9434 | Mark S. Scott ("9434 Northern Trust Account") | H | 9/4/2018; 10/15/2018 Revised | $31,012.87 | $1,920,000 |
| Northern Trust Company | ▮8797 | Mark Stanley Scott ("8797 Northern Trust Account," collectively with the 2613 and 9434 Accounts, the "Northern Trust Accounts") | H | 10/15/2018 | $969,317.82 | $2,028,000 |
| UBS Financial Services | ▮1979 | Mark S. Scott, P.L. ("1979 UBS Account") | J | 9/4/2018 | $800,496.62 | $3,250,000 |
| UBS Financial Services | ▮9666 | Mark S. Scott and Lidia Kolesnikova ("9666 UBS Account") | J | 9/4/2018; 10/15/2018 Revised | $112,055.05 | $50,000 |
| UBS Financial | ▮5493 | Mark S. Scott 2017 | J | 9/4/2018 | $8,442,799.64 | $7,482,426 |

| Services | | Trust ("5493 UBS Account," collectively with the 1979 and 9666 UBS Accounts, the "UBS Accounts") | | | | |
|---|---|---|---|---|---|---|
| Wells Fargo Advisors | 9048 | Mark S. Scott 2017 Trust ("9048 Wells Fargo Account") | K | 9/4/2018 | $2,449,467.90 | $1,969,527 |
| RBC Private Counsel (USA) Inc. | 2214 | Mark S. Scott 2017 Trust ("2214 RBC Account") | G | 4/18/2019 | $9,241,352.00 | $9,712,122 |
| RBC Private Counsel (USA) Inc. | 3317 | Mark S. Scott 2017 Trust ("3317 RBC Account," collectively with the 8611 and 2214 RBC Accounts, the "RBC Accounts") | G | 4/18/2019 | $4,504,344.00 | $4,584,206 |
| J.P. Morgan Chase Bank | 6032 | James Nobles Esq. P.C ("6032 JPMC Account") | L | 7/15/2019 | $1,750,000.00 | $1,750,000 |
| | | | | **Total** | $34,501,366.3 | $84,733,704 £8,275,108 €2,429,927 |

## Cars and Yacht

| Description | Name | Date Seized | VIN / Hull Nos. |
|---|---|---|---|
| 2017 Sunseeker Predator yacht | "2017 Yacht" | 9/4/2018 | TAIMA |
| 2016 White Porsche 911 GT3 RS | "2016 Porsche" | Not Seized | WP0AF2A92GS195089 |
| 2017 Red Porsche 911 4S Turbo | "2017 Porsche" | 9/4/2018 | WP0CD2A95HS178187 |
| 2018 White Porsche 911 GT2 RS | "2018 White Porsche" | 9/28/2018 | WP0AE2A91JS185471 |
| 2018 Gray Porsche 911 GTRS2 | "2018 Gray Porsche" | Not subject to seizure warrant | WP0AC2A90JS175665 |

## Personal Property

| Description | Name | Date Seized |
|---|---|---|
| Ring with alleged diamond | "Diamond Ring" | 9/5/2018 |
| Panerai PAM 582 barometer | "Pam 582 Clock" | 9/5/2018 |

| wall clock | | |
|---|---|---|
| Panerai PAM 585 wall clock | "Pam 585 Clock" | 9/5/2018 |
| Panerai PAM 583 thermometer | "Pam 583 Thermometer" | 9/5/2018 |
| Panerai PAM 584 hygrometer | "Pam 584 hygrometer" | 9/5/2018 |

**Real Property**

| Address | Name |
|---|---|
| 31 Dale Avenue, Hyannis Port, MA 02601 | "31 Dale Avenue Property" |
| 105 Sunset Lane, Barnstable, MA 02630 | "105 Sunset Lane Property" |
| 133 Sunset Lane, Barnstable, MAs 02630 | "133 Sunset Lane Property" |
| 600 Coral Way, Suite/Floor 12, Segovia Tower, Coral Gables, FL 33134 | "600 Coral Way Property" |

3.      This affidavit is based on, among other sources of information: (i) my personal knowledge; (ii) information provided to me by other law enforcement officials at the Federal Bureau of Investigation, the Internal Revenue Service, the Manhattan District Attorney's Office, and the United States Attorney's Office for the Southern District of New York participating in the same investigation (collectively, the "Investigative Team"); (iii) the review and analysis of various bank account records, including financial records obtained from international law enforcement authorities pursuant to mutual legal assistance treaty ("MLAT") requests and other requests to foreign authorities, conducted by members of the Investigative Team; and (iv) my training and experience concerning the commission of financial crimes.  This affidavit does not include all the facts that I have learned during the course of my investigation.  Where dates, figures, and calculations are set forth herein, they are approximate.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

4.     As set forth below, I have learned during the investigation and prosecution of Mark S. Scott that Scott organized a series of investment funds under the umbrella of corporate entities named "MSS International Consultants," incorporated in the British Virgin Islands. Among other things, Scott incorporated MSS International Consultants (BVI), Ltd. ("MSSI LTD"), which was a fund manager registered in the British Virgin Islands.  MSSI LTD in turn owned and operated a series of purported investments funds held in variations of the name "Fenero" (collectively, the "Fenero Accounts").  The Fenero investment funds maintained bank accounts at banks located in the Cayman Islands and Ireland, and were funded with a total of approximately $378 million in fraud proceeds from an international pyramid fraud scheme (the "OneCoin Fraud Scheme").  During the course of this investigation I have learned that the Subject Accounts were used to send and receive funds from that scheme, and that the Subject Property was purchased with funds derived from that scheme.

## II. Financial Tracing

### A. Overview

5.     As I indicated during my testimony at the Scott trial, during the course of the investigation of OneCoin and Scott, I analyzed and traced funds related to bank accounts held by Scott.  (Tr. 1543-45).  In conducting that financial tracing I examined several different types of bank accounts, including private equity accounts, personal accounts, and corporate entity accounts.  (Tr. 1546).  As noted above, Scott's private equity accounts were held in the name of Fenero (*i.e.*, the Fenero Accounts).  (*Id.*).  Between in or around May 2016 and July 2018, approximately nine bank accounts funded deposits into the Fenero Accounts.  (Tr. 1547).  Those bank accounts were in the names of variations of the name International Marketing Services ("IMS"), B&N Consult Ltd. ("B&N"), Star Merchant Inc. Ltd. ("Star"), and Fates Group (collectively, the "OneCoin Funding Accounts").  (GX 2602-A).  Approximately $392,940,000

was transferred from the OneCoin Funding Accounts into the Fenero Accounts during that same

time period.  (*Id.*).  Through financial tracing, I have learned that the OneCoin Funding Accounts

received, either directly or indirectly, monies sent to OneCoin members purchasing trader

packages.

6.     During the course of the investigation, I have also traced funds that were received

into the Fenero Accounts and subsequently transferred out of the Fenero Accounts.  As set forth

in greater detail below, among other places, I traced those funds to a number of intermediary

accounts that were also controlled by Scott.  Specifically, after the equivalent of approximately

$392,940,000[2] (€354,000,000 and $9,990,185) was transferred into the Fenero Accounts, all of

the funds were subsequently transferred into intermediary bank accounts controlled by Scott in

the Cayman Islands and at Bank of Ireland in the Republic of Ireland.  (*See* GX 2603).  Funds

from accounts at the Bank of Ireland were in turn transferred to bank accounts around the world,

including to accounts in Bulgaria (€65,196,101) and the United Arab Emirates (€185,000,000).

(GX 2627).  Furthermore, the USD equivalent of approximately more than $50 million in funds

were transferred to accounts controlled by Scott, or for Scott's benefit.  (GX 2628).  Finally, as

set forth in greater detail below, I have learned through my tracing that Scott used funds that

originated from the OneCoin Funding Accounts and flowed through the Fenero Accounts, to

fund numerous purchases of real and personal property, including among others: a $2,850,000

home located at 133 Sunset Lane, Barnstable, MA (*i.e.*, the 133 Sunset Lane Property); a

$3,765,000 residence located at 31 Dale Avenue, Hyannis Port, MA (*i.e.*, the 31 Dale Property);

---

[2] Based on my review of the currency exchange rates during the period of time of Scott's money
laundering offenses (i.e., 2015 through 2018), I have learned that the average lowest exchange
rate during that time period was 1.11.  (*See* https://www.macrotrends.net/2548/euro-dollar-
exchange-rate-historical-chart). Specifically, the average exchange rates for 2015-2018 were
1.11, 1.11, 1.13, and 1.18 respectively.  Accordingly, $392,940,000 is a conservative estimate of
the USD equivalent of the funds laundered by Scott.

an ownership interest in another residence located at 105 Sunset Lane, Barnstable, MA (*i.e.*, the

105 Sunset Lane Property); payment of $1,000,794.66 to pay off the mortgage for a property

located at 600 Coral Way, Unit 12, Florida (the "600 Coral Way Property"); a $245,269 Ferrari

(the "Ferrari"); a $218,898 2018 Porsche 911 GTRS2 (*i.e.*, the 2018 White Porsche); a $119,529

2017 Porsche 911 Turbo (*i.e.*, the 2017 Porsche); a $332,248 2016 Porsche 911R (*i.e.*, the 2016

Porsche); a $1,310,000 Sunseeker yacht (*i.e.*, the 2017 Yacht); approximately $364,747 in luxury

watches; and approximately $243,400 in jewelry and luxury bags.  (GX 2620).

**B.  Scott's Purchases of Real and Personal Property with Funds from OneCoin Funding Accounts**

7.     As noted above, through my financial tracing I have learned that Scott used funds

that originated from the OneCoin Funding Accounts and flowed through the Fenero Accounts to

fund numerous purchases of real and personal property.  Specifically, Scott funded the following

purchases with funds that originated from the OneCoin Funding Accounts:

***Real Property***

**a.   133 Sunset Lane Property:**  On or about October 24, 2016, Scott purchased the

133 Sunset Lane Property with $2,850,000 in funds that originated from the OneCoin Funding

Accounts.  (Tr. 1697 – 1699; GX 2617-A and 2620).   Specifically, Scott transferred funds from

two accounts (the 7102 DMS Account and a Bank of Ireland account in the name of "Fenero

Tradenext Holding" ending in 4760 (the "4760 BOI Account")) through a series of intermediary

accounts, for the ultimate purchase of the 133 Sunset Lane Property for $2,850,000.  (GX 2617-

A).  Further, the 7102 DMS Account and the 4760 BOI Account were both funded by a Fenero

Account at DMS bank ending in 6102 (the "6102 DMS Account"), which was in turn funded by

several of the OneCoin Funding Accounts.  (GX 2604).

**b.   31 Dale Property:**  On or about September 20, 2017, Scott purchased the 31

Dale Property with $3,765,000.00 in funds that originated from the OneCoin Funding Accounts. (Tr. 1700-1703; GX 2617-D and 2620). Specifically, Scott transferred funds from the 4760 BOI Account and the 7100 DMS Account through an intermediary account, for the ultimate purchase of the 31 Dale Property for $3,765,000.00. (GX 2617-D). The 7100 DMS Account and the 4760 BOI Account were both funded by the 6102 DMS Account, which was in turn funded by several of the OneCoin Funding Accounts. (GXs 2602-A, 2604).

      **c.   105 Sunset Lane Property:**  On or about November 13, 2017, Scott, along with a third party, purchased the 105 Sunset Lane Property for a total purchase price of $2,310,000. (Tr. 1703-1705; GX 2617-E and 2620). Scott contributed $1,310,000 towards the purchase of the 105 Sunset Lane Property, which originated from the OneCoin Funding Accounts. Specifically, Scott transferred $1,310,000 funds from the 7100 DMS Account, through an intermediary account, for the ultimate purchase of the 105 Sunset Lane Property. (GX 2617-E). The 7100 DMS Account was funded by the 6102 DMS Account and Exhibit C, which was in turn funded by several of the OneCoin Funding Accounts. (GX 2604).

      **d.   600 Coral Way Property:** On or about October 16, 2016, Scott payed off the mortgage for the 600 Coral Way Property with a payment in the amount of $1,000,794.66, all of which originated from the OneCoin Funding Accounts. (Tr. 1699-1700; GX 2617-B and 2620). Specifically, Scott transferred funds from two Bank of Ireland Accounts in the name of Fenero Tradenext Holding ending in 8576 (the "8576 BOI Account") and ending in 5001 (the "5001 BOI Account") through a series of intermediary accounts, for the ultimate payment of $1,000,794.66 to pay off the mortgage for the 600 Coral Way Property. (GX 2617-B). The 8576 and 5001 BOI Accounts were both funded by the 6102 DMS Account, which was in turn funded by several of the OneCoin Funding Accounts. (GX 2604).

***Luxury Cars***

      **e.**   **The 2016 Porsche**: On or about June 15, 2017, Scott purchased the 2016 Porsche for $332,248.41.  (Tr. 1708-1709; GX 2619-C).  To make the purchase, Scott used funds that had originated from the OneCoin Funding Accounts.  Specifically, Scott transferred funds from the 7102 DMS Account, through two intermediary accounts controlled by Scott, for the ultimate purchase of the 2016 Porsche.  (GX 2619-C).  As noted above, the 7102 DMS Account was funded by the 6102 DMS Account, which was in turn funded by several of the OneCoin Funding Accounts.  (GX 2604).  The 2016 Porsche was subject to a seizure warrant but was sold by Scott on or about June 5, 2019 for approximately $250,000.

      **f.**   **The 2017 Porsche**: On or about February 10, 2017, Scott purchased the 2017 Porsche for $119,529.50.  (Tr. 1707-1708; 2619-B).  To make the purchase, Scott used funds that had originated from the OneCoin Funding Accounts.  Specifically, Scott transferred funds from the 4760 BOI Account, through an intermediary account, for the ultimate purchase of the 2017 Porsche.  (GX 2619-B).  As noted above, the 4760 BOI Account was funded by the 6102 DMS Account, which was in turn funded by several of the OneCoin Funding Accounts.  (GX 2604).  The 2017 Porsche was seized by the Government on or about November 4, 2018.

      **g.**   **The 2018 White Porsche**:  On or about August 29, 2018, Scott purchased the 2018 White Porsche for $617,426.46.  (Tr. 1710-1711; GX 2619-E)  To make the purchase, Scott used funds that had originated from the OneCoin Funding Accounts.  Specifically, Scott transferred funds from the 2701 FirstCaribbean Account and an account at Royal Bank of Canada ending in 3317 (the "3317 RBC Account"), through a series of intermediary accounts, for the ultimate purchase of the 2018 White Porsche.  (GX 2619-E).  The 2701 FirstCaribbean Account was funded by the 6102 DMS Account, which in turn was funded by several of the OneCoin Funding Accounts.  (GX 2604).  As reflected in Exhibit G, a number of Scott's intermediary accounts, including the 7100 DMS Account and the 2701 FirstCaribbean Account,

funded an account at RBC Dominion Securities ending in 8611 (the "8611 RBC  Account"), which in turn funded the 3317 RBC Account.  (*See* Exhibit G).  All of Scott's accounts that funded the 8611 RBC Account, were in turn funded by several of the OneCoin Funding Accounts.  (GX 2604; *see also infra* at ¶ 8(h)).

h.   **2018 Gray Porsche**: On or about June 11, 2018, Scott purchased the 2018 Gray Porsche for $218,898.87.  (*See* GX 2619-D).  As shown in GX 2619-D, Scott's purchase of the 2018 Grey Porsche was funded through a wire transfer from the 5493 UBS Account. Furthermore, as explained in detail below, and as depicted in GX 2619-D, the 5493 UBS Account was funded by a series of wire transfers from intermediary bank accounts controlled by Scott, including the 3317 RBC Account, *see infra* ¶ 8(l).  Furthermore, as noted below, the funds in all of the intermediary accounts that funded the 5493 UBS Account originated from OneCoin Funding Accounts, *see infra* ¶ 8(l).

### *Other Purchases*

i.   **The Yacht:** On or about March 21, 2017, Scott purchased the Yacht for $1,310,000.00.  (Tr. 1711-1713; GX 2619-F).  To make the purchase, Scott used funds that had originated from the OneCoin Funding Accounts.  Specifically, Scott transferred funds from the 5001 BOI Account to an intermediary account, for the ultimate purchase of the Yacht.  (GX 2619-F).  As noted above, the 5001 BOI Account was funded by the 6102 DMS Account, which was in turn funded by several of the OneCoin Funding Accounts.  (GX 2604).

j.   **Other Personal Property**:  As shown in Exhibit M, Scott used additional funds that originated from the OneCoin Funding Accounts to make purchases of expensive jewelry and other luxury items.  Specifically, on or about November 15, 2016, $121,000 was sent from an account at City National Bank of Florida ("CNB") ending in 0295 (the "0295 CNB Account") to fund the purchase of an emerald cut engagement ring.  On or about December 27, 2016, funds

from the 0295 CNB Account were used to fund the purchase of a luxury bag for $40,950.00 and

on or about March 17, 2017, funds from a Scott bank account at City National Bank of Florida

ending in 3236 (the "3236 CNB Account") were used to fund the purchase of another luxury bag

for $20,950.00.[3]  Furthermore, funds from the 0295 CNB Account were also used to fund

purchases of Panerai clocks on October 17, 2016 for $8,100.00.  Funds from another Scott

Account at City National Bank of Florida ending in 3008 (the "3008 CNB Account") funded the

purchase of additional Panerai clocks on October 28, 2016, in the amount 7,000.000.  As set

forth in GXs 2628 and 2611, I have determined through my financial tracing that the funds in the

3236, 0295, and 3008 CNB Accounts originated from a number of intermediary accounts that

were in turn funded by the OneCoin Funding Accounts.  (*See also* GXs 2605, 2604, 2605, 2607,

2609, 2610).

## C. Tracing of Additional Funds from OneCoin Funding Accounts to Other Bank Accounts

8.     In addition to the purchases noted above, through my financial tracing I have

learned that Scott used an intricate web of international bank accounts to transfer funds that

originated from the OneCoin Funding Accounts and flowed through the Fenero Accounts to a

number of other bank accounts.  Specifically, I have traced funds that originated from the

OneCoin Funding Accounts and were transferred, often through layers of intermediary accounts,

to and through the following bank accounts:

a.     **7102 DMS Account:** As shown in Exhibit C, between in or around June 2016

through April 2017, approximately €21,869,347.84 in funds were transferred in a series of wire

transfers from three of Scott's intermediary accounts, all in the name of "Fenero," to the 7102

---

[3] Based on my review of Hermes business records, I have learned that Scott made several additional purchases of Hermes bags before (and after) his arrest in this case.  Those purchase included, for example, the purchase of a Birkin bag on or about April 13, 2018, for $11,900.

DMS Account.  Specifically, the funds were routed through the 6102 DMS Account, another Fenero Account at DMS Cayman ending in 4102 (the "4102 Fenero Account"), a Fenero Account at Bank of Ireland ending in 9811 (the "9811 Fenero Account").  Furthermore, I have learned from my tracing that all of the funds that were transferred into the 7102 DMS Account from the three Fenero Accounts originated from several of the OneCoin Funding Accounts.  (GXs 2604 and 2605).

b.   **7100 DMS Account:** As shown in Exhibit D, between in or around September 2016 through March 2017, approximately €19,421,706.36 in funds were transferred in a series of wire transfers from five of Scott's intermediary accounts, all in the name of "Fenero," and DMS Cayman MSSI to the 7100 DMS Account.  Specifically, the funds were routed through the 6102 DMS Account, the 7102 DMS Account, the 4102 DMS Account, another Fenero Account at DMS Cayman ending in 3464 (the "3464  Fenero Account"), the 4760 BOI Account, and the 5001 BOI Account.  Furthermore, I have learned from my tracing that all of the funds that were transferred into the 7100 DMS Account from the five Fenero Accounts originated from several of the OneCoin Funding Accounts.  (GXs 2602 and 2604).

c.   **2701 FirstCaribbean Account:** As shown in Exhibit E, between in or around July 2016 through April 2018, the equivalent of approximately €7,145,362.54 in funds[4] were transferred in a series of wire transfers from seven intermediary accounts to the 2701 FirstCaribbean Account.  Specifically, the funds were routed through the 6102 DMS Account, the 3464 Fenero Account, the 7100 DMS Account, the 7102 DMS Account, the 0295 CNB Account, the 3008 CNB Account, and another account at City National Bank of Florida in the name of "Spero Holdings LLC" ending in 3443(the "3443 CNB Account").  Furthermore, I have

---

[4] These funds were a mix of both Euros and USD.

learned from my tracing that all of the funds that were transferred into the 2701 FirstCaribbean Account from these seven intermediary accounts originated from several of the OneCoin Funding Accounts.  (*See* GXs 2602, 2603-A, 2608, 2610, 2604, and Exhibit F).

  **d.   5454 FirstCaribbean Account:** As shown in Exhibit F, on or about April 7, 2017, and April 21, 2017, two wire transfers totaling $390,630.00 were sent to the 5454 FirstCaribbean Account.  The wire transfer on April 7, 2017 in the amount of $315,000.00, was sent from the 7100 DMS Account, and the wire transfer on April 21, 2017 in the amount of $75,630.00 was sent from the 2701 FirstCaribbean Account.  As set forth above, the funds in both of these accounts originated from several of the OneCoin Funding Accounts.  (GXs 2602, 2603-A, 2604, 2608).

  **e.   3883 FirstCaribbean Account:** As shown in GX 2628, in or around November 2016, the 3883 FirstCaribbean Account received a wire transfer in the amount of $130,000 from the 2701 FirstCaribbean Account.  As described above, the funds in the 2701 FirstCaribbean Account, *see supra* ¶ 8(c), originated from several of the OneCoin Funding Accounts.  (GX 2628).

  **f.   5346 FirstCaribbean Account**:  As shown in Exhibit F, on or about March 29, 2017, a wire transfer in the amount of $100,000 was sent from the 2701 FirstCaribbean Account to the 5346 FirstCaribbean Account.  As described above, the funds in the 2701 FirstCaribbean Account, *see supra* ¶ 8(c), originated from several of the OneCoin Funding Accounts.

  **g.   5343 FirstCaribbean Account:** Based on my review of bank records, I have learned that on or about March 29, 2017, the 2701 FirstCaribbean Account sent approximately $250,000 to the 5343 FirstCaribbean Account.  As explained above, the funds in the 2701 FirstCaribbean Account originated in the 6102 DMS Account, which in turn was funded by several of the OneCoin Funding Accounts.  (GX 2628).

h.   **RBC Accounts:** As shown in Exhibit G, the 8611 RBC Account received a number of wire transfers between November 2016 and March 2018 from the following three accounts: the 2701 FirstCaribbean Account; the 7100 DMS Account; and the 5001 BOI Account. The three transfers from the 7100 DMS Account totaled approximately $6,500,000; the one transfer from the 2701 FirstCaribbean Account was in the amount of €250,000.00; the four transfers from the 5001 BOI Account totaled £4,500,000.00 and €1,274,983.  Furthermore, as set forth above, *see supra* ¶¶ 8(b), 8(c), 7(d), the funds in each of those three accounts originated from several of the OneCoin Funding Accounts.  After the 8611 RBC Account received these incoming wires, numerous wires were sent out of the 8611 RBC Account to three additional RBC Accounts ("Intermediary RBC Accounts").  (Exhibit G).  After those wires were sent to the Intermediary RBC Accounts, additional wires were sent out of the Intermediary RBC Accounts to the 3317 RBC Account and the 2214 RBC Account.  (*Id.*).  Based on the tracing described in this paragraph, I have learned that all of the wire transfers depicted on Exhibit G originated from funds from several of the OneCoin Funding Accounts.

i.   **6032 JPMC Account:** As shown in Exhibit L, on or about October 10, 2018, approximately $1,750,000 was transferred from the 2214 RBC Account to an account at JPMC ending in 1037.  Approximately a month and a half later, on or about November 28, 2018, $1,750,000 was transferred out of the 1037 account to the 6032 JPMC Account.  As described in the preceding paragraph, I have traced the funds in the 2214 RBC Account to several of the OneCoin Funding Accounts.

j.   **6901 Dreyfus Account:** As shown in GX 2628, the 6901 Dreyfus Account received two wires from intermediary Fenero Accounts, totaling approximately £2.5 million. Specifically, based on my tracing, I have learned that these two wires occurred on or about in February and March 2017 and originated from 5001 BOI Account.  Furthermore, I have learned

15

from my tracing that the funds in the 5001 BOI account at Fenero originated from several of the OneCoin Funding Accounts. (*See* GXs 2612, 2628).

> **k.    Northern Trust Accounts**: Based on my financial tracing, I have learned that funds that originated from several of the OneCoin Funding Accounts were transferred through a series of intermediary accounts, and ultimately to the 2613 and 9434 Northern Trust Accounts. (*See* Exhibit H). Specifically, as to the 2613 Northern Trust Account, I have learned that between October 2016 and February 2017, the 2613 Account received approximately six wire transfers totaling approximately $1,230,000 from the 8576 and 4760 BOI Accounts, and the 2701 FirstCaribbean Account. In addition, between in or around April 2017 and April 2018, the 9434 Northern Trust Account received one wire transfer each from the 0295 CNB Account and the 3210 CNB Account, which in sum totaled approximately $1,650,000. As noted above, I have traced the funds in the 0295 CNB Account and determined that they originated from several of the OneCoin Funding Accounts. (*See supra* ¶ 7(j)). I have also learned through my tracing that between in or around April 2016 and May 2017, the 3210 CNB Account received approximately $6,674,000 from the 3236, 3008 and the 0295 CNB Accounts. Furthermore, as set forth above, the funds in the 3236, 3008 and the 0295 CNB Accounts originated from several of the OneCoin Intermediary Accounts. (*See supra* ¶¶ 7(j), 8(c)). I have also traced approximately $2,000,000 in funds that were sent on or about April 24, 2017 from the 2613 and 9434 Northern Trust Accounts to the 8797 Northern Trust Account. (*See* Exhibit H).

> **l.    The UBS Accounts:** As shown in Exhibit J, between in or around February 2016 and in or around June 2018, the UBS Accounts received numerous wire transfers that were transferred through a series of intermediary accounts controlled by Scott, all of which originated from OneCoin Funding Accounts. Specifically, as set forth on Exhibit J, the UBS Accounts received a series of eleven wire transfers from intermediary accounts totaling approximately

$7,453,552 that originated from the 7102 DMS Account; the 8576 BOI Account; the 5001 BOI Account; and a OneCoin Funding Account ending in 0015.  As set forth above, the funds in the 7102 DMS Account and the 8576 and 501 BOI Accounts all originated from OneCoin Funding Accounts.  Among the funds transferred to the 1979 UBS Account was a transfer in the amount of $1,000,000 on or about June 30, 2017 from the 9788 Sabadell Account.  On or about July 31, 2017, there was also a transfer of $500,000 from the 9788 Sabadell Account to the 5493 UBS Account.  As set forth in Exhibit B, I have traced more than $16,000,000 in funds that were transferred to the 9788 Sabadell Account in a series of wire transfers between in or around July 2016 through in or around May 2018.  Those funds originated from the following intermediary bank accounts: the 8576 BOI Account; the 4760 BOI Account; the 5001 BOI Account; the 7100 DMS Account; the 5343 FirstCaribbean Account; the 2701 FirstCaribbean Account; and the 7102 DMS Account.  (*See* Exhibit A).  As set forth above, each of those accounts was funded by several of the OneCoin Funding Accounts.

> **m. 9048 Wells Fargo Account:**  As shown in Exhibit K, between October 2016 and April 2018, twelve wire transfers totaling approximately $1,969,527 were sent from Scott-controlled accounts to the 9048 Wells Fargo Account.  Based on my financial tracing, I have learned that those funds originated from the 8576 and 5001 BOI Accounts and the 7100 DMS Cayman Account.  In some instances, the funds were transferred from those three accounts to intermediary accounts controlled by Scott before beings transferred to the 9048 Wells Fargo Account.  As noted above, *see supra* ¶¶ 7(d) and 8(b), the 8576 and 5001 BOI Accounts and the 7100 DMS Cayman Account were funded by transfers that originated from the OneCoin Funding Accounts.

> **n. 9788 Iberia Account:** As shown in Exhibit B, between in or around July 2016 and in or around May 2018, approximately $16,523,635 was sent in a series of wire transfers that

originated from numerous accounts controlled by Scott to the 9788 Iberia Account.  The
$16,523,625 in funds were sent to the 9788 Iberia Account from a number of accounts controlled
by Scott including the 8576, 4760, and 5001 BOI Accounts; the 7100 and 7102 DMS Accounts;
and the 2701 and 5343 FirstCaribbean Accounts.  As described above, I have learned from my
tracing that the funds in each of these accounts originated from several of the OneCoin Funding
Accounts.  Furthermore, as shown in Exhibit B, between in or around September 2016 and in or
around August 2018, approximately $14,414,828 was transferred out of the 9788 Iberia Account
in multiple wire transfers on behalf of Scott.  Among other things, those wire transfers were used
for the purchase of real estate, a car, jewelry, yacht and home improvements.  (*Id.*).  As noted in
Exhibit B, on or about October 31, 2017, the 9788 Iberia Account also received a wire transfer in
the approximate amount of $999,970.00 from an account at Dreyfus & Cie S.A., Switzerland in the
name of Marietta Halle.  Approximately twelve days later those funds were used to fund a portion of the
purchase of the 105 Sunset Lane Property.  (*See* GX 2619-E).  As noted above, Scott funded the
remainder of that purchase.  The difference between the $16,523,635 sent to the 9788 Iberia
Account and the $13,414,858 (excluding Ms. Halle's $999,970.00 in funds) transferred out of the
9788 Iberia Account on behalf of Scott is approximately $3,108,777.  Furthermore, based on my
review of a report of a law enforcement interview of Nicole Huesmann on or about September 5,
2018, I have learned that Huesmann informed the law enforcement agents that she still had
approximately $2.5 million of Mark S. Scott's money.  I have also learned from members of the
investigative team that those funds were provided from Huesmann to the Government in the
form of a check in the amount of $2,455,686.10.[5]

---

[5] As shown in Exhibit B, approximately $544,208.67 was sent in two wire transfers from the
9788 Iberia Account to another account in Huesmann's name at Iberia bank.  When that amount
is subtracted from $3,108,777, it equals $2,564,658.33, which is nearly the same amount that
Huesmann indicated she had remaining of Scott's money.  It therefore appears possible that

      **o.   1054 Cooperative Account:** As noted above, *see supra* ¶ 8(n), approximately

$14,414,828 was transferred out of the 9788 Iberia Account in multiple wire transfers on behalf

of Scott.  Among those wires, in May 2017, the 9788 Iberia Account sent a wire transfer in the

amount of approximately $250,000 to the 1054 Cooperative Account.  (*See* Exhibit B).  In

addition, or about January 17, 2019, approximately $15,000 was sent from an account in Scott's

name at Northern Trust ending in 1804 (the "1804 Northern Trust Account") to the 1054

Cooperative Account.  On or about June 15, 2018, $15,000 was sent to the 1804 Northern Trust

Account from the 9434 Northern Trust Account.  (*See* Exhibit H).

**D.  Substitute Assets**

      9.      I have conducted an investigation into any assets of the defendant's that constitute

proceeds of the offense or assets that may be available as substitute assets. During the course of

my investigation, I have learned about the following bank accounts in Scott's name at UBS bank

(the "Substitute Assets"):

| Account Name | Financial Institution | Account No. | Estimated Balance |
|---|---|---|---|
| Mark S. Scott 2017 Trust | UBS | PW XXX53 (converted to Account No. 1X B0014 YA) | $102,857.62 |
| Mark S. Scott 2017 Trust | UBS | PW XXX31 (converted to Account No. 1X B0031 YA) | $2,006,086.28 |
| Mark S. Scott College Fund 529 | UBS | Account No. ▮34 03 | $160,834.00 |
| Mark S. Scott | UBS | Account No. ▮94 03 | $236,750.81 |
| | | **Total** | $2,506,528.71 |

      10.      In addition, in order to locate any additional assets of the defendant, I conducted

asset searches utilizing the CLEAR law enforcement database. All asset searches I performed

---

those two transfers from the 9788 Iberia Account to the 1046 Iberia account were on behalf of
Scott.

yielded negative results.

11.     To date, the only assets of the defendant's that I have been able to locate, other

than the Subject Accounts and the Specific Property, are the Substitute Assets.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true

and correct.

Dated: New York, New York
        August 31, 2020

_____*Rosalind October*_____
ROSALIND OCTOBER
Senior Financial Intelligence Analyst
New York County District Attorney's Office

20

# **<u>EXHIBIT A</u>**

# In The Matter Of:

*UNITED STATES OF AMERICA, v.*

*MARK S. SCOTT,*

---

*November 18, 2019*

---

*Southern District Court Reporters*

Original File JBI9SCOF.txt

**Min-U-Script® with Word Index**

UNITED STATES OF AMERICA, v.
MARK S. SCOTT,

November 18, 2019

| JBI9SCO3 | October - Direct | Page 1538 |
| --- | --- | --- |

1 and the records contained on those disks into evidence.
2      MR. GARVIN: Also no objection.
3      THE COURT: They will be received.
4      (Government's Exhibits 68, 713, 828 received in
5 evidence)
6      MS. LOZANO: At this time the government -- and that
7 for the record was also signed, was a signed stipulation.
8      The next signed stipulation by the parties is
9 Government Exhibit 58 for property records, for real property
10 records that are contained on disk 3100. And the stipulation
11 details separate exhibit numbers for all of the records
12 contained on disk 3100.
13      The government now offers Exhibit 58 as well as the
14 disk 3100 as well as all of the records contained on that disk
15 detailed in the stipulation.
16      MR. GARVIN: No objection.
17      THE COURT: They will be received.
18      (Government's Exhibits 58 and 3100 received in
19 evidence)
20      MS. LOZANO: Additionally there is a signed
21 stipulation marked Government Exhibit 60, a stipulation
22 regarding searches and seizures. This stipulation details
23 certain exhibits that are being offered in connection with
24 searches of the defendant's residences.
25      At this time the government offers Exhibit GX60 as

| JBI9SCO3 | October - Direct | Page 1539 |
| --- | --- | --- |

1 well as the exhibits detailed therein which are GX105, 106,
2 107, 108, 113, 114, and 115 into evidence.
3      MR. GARVIN: No objection.
4      THE COURT: They will be received.
5      (Government's Exhibits 60, 105, 106, 107, 108, 113,
6 114, and 115 received in evidence)
7      MS. LOZANO: And lastly, this exhibit which is GX55
8 for electronic data has already been admitted into evidence.
9 And pursuant to the stipulation the government is offering
10 three e-mails in connection with Ms. October's testimony and
11 those e-mails are Government Exhibit 1356, Government Exhibit
12 1440, and Government Exhibit 1453 into evidence.
13      MR. GARVIN: No objection.
14      THE COURT: They will be received.
15      (Government's Exhibits 55, 1356, 1440 and 1453
16 received in evidence)
17 ROSALIND OCTOBER,
18      called as a witness by the Government,
19      having been duly sworn, testified as follows:
20 DIRECT EXAMINATION
21 BY MS. LOZANO:
22 Q. Good afternoon, Ms. October.
23 A. Good afternoon.
24 Q. Sorry about that.
25      Where do you work?

| JBI9SCO3 | October - Direct | Page 1540 |
| --- | --- | --- |

1 A. I currently work at the Manhattan district attorney's
2 office.
3 Q. In what capacity?
4 A. I am a senior financial intelligence analyst in the major
5 economic crimes bureau.
6 Q. And how long have you been the district attorney's office
7 in that role?
8 A. Approximately six years. Of those six years approximately
9 18 months I was a contractor with the Internal Revenue Service
10 but my location was at the district attorney's office.
11 Q. And you said you worked at the major economic crimes
12 bureau. Can you please describe the kind of work that the
13 major economic crimes bureau does in the district attorney's
14 office.
15 A. Sure. In the major economic crime bureau we handle large
16 long-term complex investigations involving white collar crimes,
17 money laundering crimes, tax fraud, various investor fraud.
18 Q. What are your responsibilities as a senior financial
19 intelligence analyst in the major economic crimes bureau?
20 A. Some of my responsibilities include open source research,
21 reviewing and analyzing bank records, reviewing records
22 obtained from MLATs, and conducting additional research and
23 reaching out to financial institutions for various follow-ups.
24      And that pretty much sums it up.
25 Q. Before you worked at the district attorney's office were

| JBI9SCO3 | October - Direct | Page 1541 |
| --- | --- | --- |

1 you working or were you in school?
2 A. I was working.
3 Q. Where were you working?
4 A. I worked at a few law firms.
5 Q. What is your educational background?
6 A. I have a bachelor's in accounting.
7 Q. During your time at the district attorney's office have you
8 had the opportunity to receive any kind of professional
9 training or continuing education?
10 A. Yes, I have.
11 Q. In what areas?
12 A. So I regularly attend financial crimes symposiums. Several
13 of them are held throughout the year. And those are hosted by
14 various other law enforcement agents and I -- it's a discussion
15 with law enforcement about emerging trends surrounding
16 financial crimes and just kind of like new typologies that we
17 should be looking for.
18      In addition to that I attend monthly meetings,
19 external fraud meetings held at various financial institutions
20 around the New York City area. And at those meetings we engage
21 with the financial institutions to also learn about some of the
22 things that they're seeing in terms of money laundering and
23 other typologies that they would bring to us that we would keep
24 abreast of during our daily search.
25 Q. I direct your attention to approximately February of 2016.

UNITED STATES OF AMERICA, v.
MARK S. SCOTT,

November 18, 2019

JBI9SCO3          October - Direct          Page 1542

1  Where were you working at that time?
2  A.  At the Manhattan district attorney's office.
3  Q.  Did you have the opportunity to be assigned an
4  investigation related to a cryptocurrency known as OneCoin?
5  A.  Yes.
6  Q.  How did that investigation begin in your office?
7  A.  The investigation came to us from a law enforcement tip
8  from the United Kingdom concerning some suspicious transactions
9  that were originating from a Mercury Effects Account held in
10  the name of Viola Asset Management.  Those transfers were
11  coming into a Florida-based account.  The owner was Gilbert
12  Armenta and the account names in question were Fates Group and
13  Zala Group.
14  Q.  After you began working on this case did there come a time
15  where the district attorney's office and United States
16  attorney's office began working together on the investigation?
17  A.  Yes.  Approximately 13 months into our investigation we
18  were working parallel investigations and it was more useful for
19  us to pool our resources together and to be able to collaborate
20  since we were investigating the same targets.
21  Q.  What was your role on the investigative team at that point?
22  A.  At that time I participated in reviewing some of the
23  e-mails from the search warrant.  And my primary role really
24  entailed financial tracing and reviewing thousands of bank
25  records and scheduling those accounts, looking through those

JBI9SCO3          October - Direct          Page 1543

1  accounts for other suspicious activity, having meetings with
2  the attorneys concerning those accounts and relaying my
3  findings to the attorneys on what are next steps if necessary
4  for additional subpoenas to be initiated and continuing the
5  financial tracing from those steps.
6  Q.  What do you mean when you use the term financial tracing?
7  Can you define for us what that means.
8  A.  Sure.  So financial tracing is really digging into the
9  records, looking for the originator.  Our concern is the source
10  of funds.  Where is the money coming from?  Who are the
11  beneficial holders of the accounts that's sending the money?
12  And where the money is ultimately going for, to the beneficiary
13  and for what purpose and the amounts of the transactions and
14  the time period of the transactions that would encompass
15  financial tracing.
16  Q.  What kind of records do you review as part of the financial
17  analysis or financial tracing that you do?
18  A.  So I generally look through the account opening documents
19  and I look through corporation records as well as bank
20  statements and the company wire details and brokerage accounts
21  as well and I look at property records.
22  Q.  When you say account records, is that for bank accounts?
23  A.  Yes.  For bank accounts that we received pursuant to
24  compliance from subpoena responses.
25  Q.  Where or do you receive also bank account records for

JBI9SCO3          October - Direct          Page 1544

1  international bank accounts?
2  A.  That is correct.  We have received what's called MLATs from
3  foreign jurisdictions for bank accounts that's held overseas.
4  Q.  In the course of tracing the flow of funds how do you
5  confirm that certain financial transactions occurred?
6  A.  Well whenever possible I like to look at the records from
7  both the originator and look at the records, if it's available,
8  for the beneficiary to see if there was a withdrawal from the
9  originator and then there's a deposit of some sort for the
10  beneficiary so the transaction is completed.
11  Q.  How do you confirm who the accountholder or owner of an
12  account is?
13  A.  Generally I go to look at the account opening documents and
14  contained in the account opening documents there's usually a
15  signatory card or also corporation records to indicate who the
16  beneficial owners of the accounts are.
17  Q.  How do you memorialize or document the financial analysis
18  that you do as part of an investigation?
19  A.  So I generally use excel spreadsheets and I parse out what
20  I would consider the relevant transactions from that
21  spreadsheet and just kind of keep a running tab of transactions
22  that we want to flag for -- to pursue like our financial
23  analysis.
24  Q.  Aside from the spreadsheets do you then summarize all of
25  the data that's contained in the spreadsheets in a more concise

JBI9SCO3          October - Direct          Page 1545

1  or digestible form?
2  A.  Yes, I do.  So from -- once I have the spreadsheet then I
3  use a software program to import that data into charts.  So the
4  charts are visual charts usually with a lot of arrows and icons
5  and showing the flow of funds.
6  Q.  I'd like to ask you a little bit about the investigation in
7  broad terms.  Generally speaking, kind of in a high level view,
8  what was the focus of your financial analysis in connection
9  with the investigation related to OneCoin?
10  A.  Well it -- with this investigation there were -- there were
11  multiple jurisdictions so where the funds were coming from,
12  from the various different countries was the focus and where
13  the money actually ended up.
14  Q.  In the course of that did you investigate and analyze
15  records related to any accounts held by Mark Scott?
16  A.  Yes, I did.  Extensively.
17  Q.  And in the flow of the OneCoin money that you analyzed,
18  where were Mr. Scott's accounts?
19  A.  (No response.)
20  Q.  Were they recipients or were they senders or both?
21  A.  Both.
22  Q.  And we'll get into more detail about that later.
23  Did your financial tracing in this case also involve
24  tracing funds that were sent by individuals who purchased
25  OneCoin funds and where the money went when they sent it to

UNITED STATES OF AMERICA, v.
MARK S. SCOTT,

November 18, 2019

1   OneCoin?
2   A.  That is correct.
3   Q.  Which individuals?
4   A.  So I looked at records in connection to Linda Cohen and a
5   William Horn.
6   Q.  Now you mentioned that you did analyze and receive records
7   for accounts related to Mark Scott.  What kinds of accounts
8   were those?
9   A.  So there were private equity accounts as well as personal
10  accounts and corporate entity accounts as well.
11  Q.  And when you mentioned private equity accounts was -- did
12  the defendant's private equity funds have a name?
13  A.  Yes.
14  Q.  And what was that name?
15  A.  They were part of the Fenero group.
16  Q.  And when you say the Fenero group, why do you use that
17  term?
18  A.  Because there's multiple Fenero accounts related to the
19  Fenero records.  There's a Fenero Financial, Fenero Financial
20  I, Fenero Financial II, Fenero Financial Switzerland.
21  Q.  Are there accounts in the name of Fenero Equity
22  Investments?
23  A.  And also Fenero Equity Investments as well and securities
24  trading.
25  Q.  I'm sorry?

1   A.  And securities trading.
2   Q.  Were you able to trace money transferred into and out of
3   the defendant's fund accounts between May of 2016 and
4   approximately July of 2018?
5   A.  Yes, I have.
6   Q.  And were you able to determine how many bank accounts
7   funded the defendant's private equity fund accounts during that
8   time?
9   A.  Yes.
10  Q.  How many?
11  A.  There were nine accounts that funded the -- funded four
12  narrow accounts.
13  Q.  So those nine accounts were not controlled by the
14  defendant?
15  A.  Correct.
16  Q.  Overall, big picture, how much during that period of time
17  was transferred from those nine accounts into and through the
18  defendant's Fenero Fund accounts?
19  A.  I calculated 354 million euros and approximately 10 million
20  U.S. dollars into the four Fenero accounts.
21  Q.  Can you estimate approximately how much that is all in, in
22  dollars?
23  A.  I'm sorry?
24  Q.  Can you approximate how much that amount, both the euro and
25  dollar together is in dollars?

1   A.  Collectively close to four hundred million.
2   Q.  Were you also able to trace the money out of Fenero Funds
3   accounts?
4   A.  Yes, I did.
5   Q.  And generally speaking, in broad strokes, where did you
6   trace that known money to?
7   A.  I was able to trace those funds into intermediary accounts
8   also controlled by Mark Scott.  It was MSS International
9   Consultants as well as other Fenero Bank of Ireland accounts.
10  And that money was further traced to U.S. accounts held in Mark
11  Scott's name as well as MSS International Consultants LLC.  And
12  money was also traced to Mark Scott's attorney's account,
13  Nicole Huesmann's IOLA account.  And then there was funds
14  traced also to foreign entities which were connected to OneCoin
15  individuals.
16  Q.  Specifically, for example, which OneCoin individuals are
17  you referring to?
18  A.  So a lot of the funds were traced to Ruja Ignatova, Irina
19  Dilkinska.
20  Q.  Are you aware, based on your involvement in this
21  investigation, who Ruja Ignatova is?
22  A.  Yes.  I understand her to be the leader at one time of
23  OneCoin.
24  Q.  Now you mentioned that in general when you conduct
25  financial analysis you create spreadsheets and then develop

1   charts or visuals?
2   A.  Yes.
3   Q.  In this case did you have the opportunity to create charts
4   reflecting your financial analysis?
5   A.  Yes, I have.
6   Q.  Please describe how you compared those charts.  And not
7   each one individually but just overall how you prepared those.
8   A.  I'm sorry.  Repeat.
9   Q.  Describe overall how you prepared those charts, the process
10  through which you prepared them?
11  A.  Oh, so like I testified earlier the information is coming
12  from my spreadsheet, my excel data, and then I put those into
13  the chart, and then I use various different flags to represent
14  the countries that's affected where the accounts are held.  And
15  I use various different arrows showing the flow of money,
16  whether it's going in -- what direction the money is flowing
17  into.  I've also indicated on the charts the dollar amounts and
18  the dates of transaction so it would be easier to follow in
19  terms of time period of when the transactions occurred.  And I
20  used also various symbols of banks and generic symbols
21  indicating figures of male or female.
22  Q.  So to be clear the transactions that are reflected on your
23  charts have been confirmed by you in your analysis of the bank
24  records and other documents?
25  A.  That's correct.

UNITED STATES OF AMERICA, v.
MARK S. SCOTT,

November 18, 2019

JBI9SCO3     October - Direct     Page 1550

1      MS. LOZANO: Mr. Barile I'd like to show Ms. October
2  and counsel and the court but not the jury at this time a
3  series of exhibits, if you can just scroll through the 36
4  exhibits, starting with -- and I'm going to ask you to take a
5  look at them, Ms. October, and whether you recognize them.
6  Starting with GX2601, 2602, 2602A, 2603, 2603A, 2604, 2605,
7  2606, 2607, 2608, 2609, 2610, 2611, 12, 2613, 2614, 2615, 2616,
8  2617A, B, D and E -- D, skip C, and E -- 2618, 2619, A, B, C,
9  D, E and F, 2620, 2621, 2622 and 23, 2626, 2627 and 2628.
10  Q.  Ms. October, do you recognize these 36 exhibits?
11  A.  Yes, I do.
12  Q.  Actually I think it was 37, whatever it was.
13      What are they?
14  A.  Those are visual charts that I created based on my
15    financial analysis.
16  Q.  And did you prepare those charts consistent with the
17    description that you just gave us about creating charts?
18  A.  That is correct.
19      But I would like to also add that the charts also
20  contain a source box and that source box references the bank
21  records or e-mails or the records that -- that supports the
22  chart.
23  Q.  So the other exhibits that you relied on to create the
24  chart?
25  A.  Correct.

JBI9SCO3     October - Direct     Page 1551

1  Q.  And did you rely on different records for different
2    exhibits?
3  A.  Yes.
4  Q.  Does the chart -- well have you reviewed stipulations in
5    evidence regarding bank records and Bank of Ireland records?
6  A.  Yes.
7  Q.  And do all of the exhibits that are in your charts, are
8    they contained on either stipulation 52 or 68 or 53?
9  A.  That is correct.
10  Q.  Or otherwise are in evidence?
11  A.  Yes.
12  Q.  Does each chart fairly and accurately reflect a summary of
13    the financial analysis you conducted with respect to the
14    transactions contained in that chart?
15  A.  Correct.
16  Q.  And would these exhibits assist you in testifying today
17    about the financial analysis and tracing that you undertook in
18    connection with this investigation?
19  A.  Yes, it will.
20      MS. LOZANO: I am now offering, your Honor, and I'm
21  not going to repeat all 36 numbers unless the Court would like
22  me to, I'm offering all of these charts into evidence.
23      THE COURT: Any objection?
24      MR. GARVIN: One moment, your Honor.
25      There is no objection.

JBI9SCO3     October - Direct     Page 1552

1      THE COURT: Very well.  Those exhibits will be
2  received.
3      (Government's Exhibits 2601, 2602, 2602A, 2603, 2603A,
4  2604, 2605, 2606, 2607, 2608, 2609, 2610, 2611, 2612,
5  signed2613, 2614, 2615, 2616, 2617A, B, D and E, 2618, 2619, A,
6  B, C, D, E and F, 2620, 2621, 2622, 2623, 2626, 2627 and 2628
7  received in evidence)
8  Q.  You mentioned that the defendant's private equity fund
9  accounts were named various iterations of Fenero.  Where were
10  those accounts located?
11  A.  They were located in the Cayman Islands.
12  Q.  Anywhere else? Did he have Fenero accounts anywhere else?
13  A.  He also had Fenero accounts in Ireland.
14  Q.  And when you mentioned the four Fenero Cayman accounts,
15    what are you referring to?
16  A.  I'm referring to the Fenero Financial Investments, Fenero
17    Financial Investments I, Fenero Financial Investments II, and
18    Fenero -- sorry.  Fenero Equity Investments, Fenero Equity
19    Investments I, Fenero Equity Investments II and Fenero
20    Financial Switzerland.
21  Q.  And those were all Cayman-based accounts?
22  A.  Yes.
23  Q.  At what banks?
24  A.  At DMS Cayman and Deutsche Bank.
25  Q.  Did you have an understanding about the defendant's role in

JBI9SCO3     October - Direct     Page 1553

1  the Fenero Equity Investments funds and Fenero Financial
2    Switzerland fund?
3  A.  Yes.
4  Q.  What was his role?
5  A.  I understand him to be the private equity manager for those
6    funds, for those accounts.
7  Q.  Individually or through some sort of corporate entity?
8  A.  Through corporate entities.
9  Q.  Which was what?
10  A.  The various financial Fenero accounts that I just
11    mentioned.
12  Q.  Well my question is you said that the defendant was the
13    general partner or manager of the funds.  Did he have a
14    corporate entity that served as the general partner or manager
15    or was it him individually?
16  A.  Him individually.
17  Q.  Are you familiar with an entity called MSSI BVI?
18  A.  Yes.
19  Q.  What was its role?
20  A.  That -- those entities were intermediary accounts that
21    received funds from the Fenero accounts and Mark Scott was the
22    CEO and/or director of those MSSI accounts.
23  Q.  So you earlier mentioned you traced approximately 400
24    million U.S. dollars into and then out of the defendant's
25    Fenero Funds through intermediary accounts.  And during that

UNITED STATES OF AMERICA, v.
MARK S. SCOTT,

November 18, 2019

---

JBI9SCO3          October - Direct          Page 1554

1   process you identified international accounts as well, correct?
2   A.  Yes.
3   Q.  From and to what countries did you trace transfers related
4   to the Fenero Funds?
5   A.  From Singapore, from Hong Kong, from Germany and --
6   Q.  Go ahead.  Sorry.
7   A.  And Ireland.
8   Q.  And to where?
9   A.  To other Cayman-held accounts and Bank of Ireland.
10  Q.  Were there transfers involving Hong Kong?
11  A.  Yes.
12  Q.  I'm going to show you --
13        MS. LOZANO: I'd like to pull up, Mr. Barile, 2627 and
14  publish that to the jury, please.
15  Q.  What did this slide chart depict?
16  A.  This chart depicts the overflow -- overall flow of funds
17  both incoming and outgoing and the various countries that were
18  either originators or beneficiaries concerning the
19  approximately four hundred million that moved through all of
20  these accounts.
21  Q.  So can you walk us through the color coding?  What do the
22  green arrows represent?
23  A.  The green arrows represent the 354 million euros and the
24  approximately 10 million U.S. dollars that funded the four
25  Fenero accounts held in the Cayman Islands.

---

JBI9SCO3          October - Direct          Page 1555

1   Q.  And how are the four Fenero accounts held in the Cayman
2   islands depicted on this chart?
3   A.  It's depicted by the green arrows coming from Singapore,
4   Hong Kong, Germany and Bulgaria.
5   Q.  And ending where?  What's the icon for the Fenero Funds
6   account?
7   A.  Just a little blue bank symbol with the Cayman flag
8   underneath it.
9   Q.  Generally speaking in the Caribbean?
10  A.  In the Caribbean, yes.
11  Q.  What does the blue arrow represent?
12  A.  The blue arrows represent intercompany transfers from
13  Cayman Islands to Ireland.
14  Q.  And why all the intercompany transfers?
15  A.  Because they are still related to accounts that Mark Scott
16  controls so the Bank of Ireland accounts also are Fenero
17  accounts as well as the Cayman Island accounts are also Fenero
18  accounts.
19  Q.  What do the red arrows represent?
20  A.  The red arrows represent the disbursement of funds and
21  where the money ultimately ended up, so the beneficiary of
22  those funds and where the location of the accounts that
23  received those funds.
24        MS. LOZANO: Your Honor, may I approach the witness
25  with an exhibit?

---

JBI9SCO3          October - Direct          Page 1556

1        THE COURT: Yes.
2   Q.  Ms. October, I'd like you to take a look at what is marked
3   as 2627-BU and ask you whether you recognize it.
4   A.  Yes, I do.
5   Q.  What is that?
6   A.  That's an enlarged copy of the exhibit that we are looking
7   at right now.
8   Q.  And aside from being enlarged is there anything different
9   from 2627-BU, different from 2627?
10  A.  No.
11        MS. LOZANO: Your Honor I I offer 2627-BU into
12  evidence.
13        MR. GARVIN: May we have a sidebar, your Honor.
14        THE COURT: Sure.
15        (Continued on next page)
16
17
18
19
20
21
22
23
24
25

---

JBI9SCO3          October - Direct          Page 1557

1        (At sidebar)
2        MR. GARVIN: Your Honor, I did not object and they're
3   already into evidence each and every one of the 36 charts.  It
4   was my understanding that the enlargement itself was a
5   demonstrative aid.  I didn't understand that it was going to be
6   a repetition of what was already into evidence being admitted
7   again and if that demonstrative is admitted again then of
8   course it would go back into the jury room at the end of the
9   trial.
10       So I do not object to counsel using the demonstrative
11  aid for the visual effect with the jury but I do object to
12  having it entered as an exhibit as opposed to a demonstrative
13  aid when the exhibit itself is already into evidence.
14       MS. LOZANO: Yes.  Your Honor, first of all, the
15  exhibit itself is in evidence so substantively there can't be
16  an objection to the substance of it.  And I did alert
17  Mr. Garvin and Mr. Devlin-Brown that I intended to offer the
18  blowup exhibits of specifically six different charts.  I think
19  it's important especially for this chart to have it up and
20  available for the jury to refer to as she's testifying with the
21  more intricate detailed charts that break down each arrow.
22       MR. GARVIN: Again, I'm not objecting to the use of it
23  as a demonstrative exhibit.  I'm objecting to it being an
24  actual exhibit when the chart already has been introduced.
25       THE COURT: And it's substantively identical.

---

UNITED STATES OF AMERICA, v.
MARK S. SCOTT,                                                                November 18, 2019

---

JBI9SCO3          October - Direct          Page 1558

1           MS. LOZANO: It is.
2           THE COURT: I'll let it in.
3           (Continued on next page)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

JBI9SCO3          October - Direct          Page 1559

1           (In open court)
2           (Government's Exhibit 2627-BU received in evidence)
3           MS. LOZANO: Your Honor.
4           THE COURT: I'm sorry.  The exhibit is received.  You
5     may proceed.
6  Q.  I'm going to leave that there Ms. October for you to refer
7     to while you testify.
8           MS. LOZANO: Mr. Barile if we could now -- well, one
9     moment.
10  Q.  You mentioned that the four Fenero Cayman accounts were
11     opened at Deutsche Bank and DMS.  Who were the signatories on
12     those accounts?
13           MR. GARVIN: Excuse me, your Honor.  May we have the
14     exhibit on the screen because all we're seeing is the back of
15     it.
16           THE COURT: Sure.
17  Q.  Who was the signatory or who were the signatories on those
18     accounts?
19  A.  Mark Scott for all of them.
20  Q.  What is the significance of being a signatory on a bank
21     account?
22  A.  The signatory has full authority and control over the
23     account.  They can direct the bank to receive deposits and
24     direct the bank for withdrawals as well as direct the bank for
25     wires outside -- out and into the account.

---

JBI9SCO3          October - Direct          Page 1560

1           MS. LOZANO: Mr. Barile, could we now post Exhibit
2     2602.  And publish that to the jury as well.
3  Q.  Ms. October, let's take a look at chart 2602.  And first
4     could you please for this chart explain to us what the symbols
5     and the formatting represent, what you have used to represent
6     certain things on these charts.
7  A.  Sure.  So first I'll start with the flags.  The flags
8     represent where the account -- the country where the account is
9     held.
10           Then on the top of the box contained in each box is
11     the account number just representing the last four digits of
12     the account number and the financial institution for where that
13     account is held.
14  Q.  What's the name of the account?  Where is that found?
15  A.  The name of the account is above the box in bold with a
16     little symbol of an account.
17  Q.  And the arrows represent what?
18  A.  And the arrows in this case arrows are all pointing to the
19     four Fenero accounts listed on the bottom and they -- the
20     arrows represent incoming of funds and along the -- along the
21     arrow it's each transaction which entails the dollar amount and
22     the date of that transaction.
23  Q.  For that specific account to the one at the arrowhead?
24  A.  Correct.
25           MS. LOZANO: If we could highlight or zoom in on the

---

JBI9SCO3          October - Direct          Page 1561

1     sourced box in this chart.
2  Q.  Explain to me what that means.
3  A.  So the sourced box relates to each exhibit that I referred
4     to and the exhibit references -- is reference from a particular
5     bank record.
6  Q.  So let's talk about substance of this chart.
7           First of all, what is on the top box?  On the top of
8     these charts there's a box with bolded wording.  What does that
9     represent on your charts?
10  A.  That represents a description of what the chart entails.
11     So for this particular chart it's described as funding of the
12     four Fenero accounts.  The four blue-colored symbols with the
13     Cayman flag are receiving 354 million euros and 9,990,185 from
14     the time period of May to October 2016.
15  Q.  And for clarity's sake even though we're all looking at the
16     chart, clarity for the record, we are talking about the four
17     bottom accounts on the bottom named what?
18  A.  The four accounts on the bottom is Fenero Equity
19     Investments LP, Fenero Financial Switzerland LP, Fenero Equity
20     Investments Cayman I LP, Fenero Equity Investments II LP.
21  Q.  And which ones are the ones held at DMS, the two on the
22     left?
23  A.  The two on the left, accounts ending in 6102 and 84102.
24  Q.  And what are the accounts on the top, those nine accounts?
25  A.  (No response).

---

UNITED STATES OF AMERICA, v.
MARK S. SCOTT,

November 18, 2019

JBI9SCO3          October - Direct          Page 1562

1   Q.  What do they represent?
2   A.  Those are the source of funds and they represent
3     OneCoin-related entities.
4   Q.  So just walk from left to right and please tell me the
5     names of these accounts and whether you know who the signatory
6     is on those accounts are?
7   A.  Yes.  So the IMS account held in at Commerce Bank in
8     Germany, the signatory is Rubenthal and Frank Ricketts.  And
9     the second one is IMS account held at OCBC in Singapore also
10    held by Rubenthal and Ricketts.
11          And the next IMS account held at Deutsche Bank in
12    Germany, the same signatories would be Rubenthal and Ricketts.
13          And going -- moving to the right the account ending
14    6682 in Singapore, IMS PTE; also Frank Ricketts and Rubenthal.
15          And moving forward B&N Consult held at DSK Bank is
16    Irina Dilkinska.
17          And Star Merchant account held in Hong Kong at DBS
18    Bank also Irina Dilkinska.
19          And the IMS PTE Limited held at OCB Singapore is Frank
20    Ricketts and Rubenthal.
21          And the two more -- and the Morgan Stanley Fates Group
22    account held in the United States is owned by Gilbert Armenta.
23          And the last one Fates Group held at Sabadell Bank
24    also in the United States; signatory is Gilbert Armenta.
25   Q.  And when we look at this chart, what is the most common

JBI9SCO3          October - Direct          Page 1563

1     denomination in terms of per transfer?  How much is transferred
2     per transfer most commonly?
3   A.  What's most common is five million dollar --
4     five-million-euro transfers.
5   Q.  If we could look at 2602A.  What is that?  Is that the same
6     as 2602 except for one difference?
7   A.  So it's the same chart containing the same information with
8     the exception that each account has an aggregate amount and an
9     aggregate amount of money that came into those accounts as well
10    as the number of wires listed.
11   Q.  So just totals up all of the transactions that we saw in
12    2602?
13   A.  Correct.
14   Q.  So just going from left to right very quickly from IMS GmbH
15    the total of 35 million euros?
16   A.  Yes.
17   Q.  And how much from IMS Pte?
18   A.  Ten million.
19   Q.  And then what about IMS GmbH Deutsche Bank?
20   A.  Forty million.
21   Q.  How about into -- and we're talking about Fenero Equity
22    Investments LP account, we're still on the left side of the
23    chart -- it got from B&N Consult, how much?
24   A.  It received 15 million euros.
25   Q.  And how much did that Fenero Equity Investments LP receive

JBI9SCO3          October - Direct          Page 1564

1     from IMS Pte United Overseas?
2   A.  55 million euros.
3   Q.  So now let's move over to Fenero Financial Switzerland LP
4     at DMS.  It received from IMS Pte how much?
5   A.  60 million.
6   Q.  The Deutsche Bank Fenero Equity Investments Payment One
7     received -- can you just go through what it received from B&N,
8     Star Merchant and IMS Pte?
9   A.  Sure.
10   Q.  Wait.  I'm sorry.  From IMS Pte.  Yes.
11   A.  It received 34.5 million euros.
12   Q.  From the --
13   A.  From the 6682 held in Singapore.
14   Q.  And how much from B&N?
15   A.  From B&N it was 4.5 million euros.
16   Q.  Star Merchant?
17   A.  Star Merchant was 95 million euros.
18   Q.  And the IMS Pte at OCBC?
19   A.  Five million euros.
20   Q.  And lastly, the Fenero Equity Investments II LP held at
21    Deutsche Bank received how much from each of the Fates Group
22    accounts?
23   A.  Approximately 10 million combined.
24          MS. LOZANO:  We can now move to 2603.  Publish that.
25   Q.  Ms. October, describe to us what this chart depicts.

JBI9SCO3          October - Direct          Page 1565

1   A.  This is a summary chart which shows the same time period,
2     July 2016 through -- actually July 2018 that the account was
3     funded by the 354 million euros and approximately 10 million
4     that we saw on the previous slide that funded the four Fenero
5     Cayman accounts.  And then that money flowed into intermediary
6     accounts held at the Cayman and Bank of Ireland.  There were
7     three Cayman accounts and four Bank of Ireland accounts that
8     received funding from the four Cayman accounts.
9   Q.  So separate and apart from the original four Cayman
10    accounts that we saw on the previous chart?
11   A.  Correct.
12   Q.  And those intermediary accounts, who controlled those
13    accounts?
14   A.  Those were all controlled by Mark Scott.
15   Q.  Then we can go down to with two boxes on the bottom.
16   A.  Then I broke out both two boxes, one for domestic accounts
17    and the one to the right contained foreign accounts.  The
18    domestic accounts represent accounts held by Mark Scott or
19    affiliated entities of Mark Scott that received monies from the
20    accounts listed above.  And the foreign accounts represents
21    entities connected to OneCoin affiliates.
22   Q.  And if you add up all of the credits in the domestic
23    accounts box and the foreign accounts box does that amount
24    equal the credits that you listed at the top part of the chart
25    between funding accounts and Fenero Cayman accounts?

UNITED STATES OF AMERICA, v.
MARK S. SCOTT,                                                                    November 18, 2019

JBI9SCO3          October - Direct          Page 1566

1  A.  Yes, it does.
2         MS. LOZANO: We can next move to 2604.
3         THE COURT: Before we do that, it's now 12:45.  So
4  we'll take our second break.
5         (Continued on next page)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

JBI9SCO3          October - Direct          Page 1567

1         (Jury not present)
2         THE COURT: Ms. October, you may step down.
3         (Witness excused)
4         Everyone can be seated.  Anything for me?
5         MR. GARVIN: No, your Honor.
6         MR. FOLLY: Your Honor, we just wanted to inquire
7  about the timing for the defense witness that we're taking out
8  of turn.  We had received an estimate of 1 p.m.  We just wanted
9  to check if that is still when we should plan to interrupt.
10        THE COURT: Is he here?
11        MR. FOLLY: This witness.
12        MR. GARVIN: I haven't left my chair but I had
13  anticipated it would be at approximately 1 p.m.  I'm going to
14  go check right now.
15        THE COURT: OK.  And how long will this person be on
16  the stand?
17        MR. GARVIN: Very short.  It's a character witness
18  basically, your Honor, so it's going to be fifteen minutes, I
19  think, at most.
20        THE COURT: OK.  I'll be back.  And we'll get just an
21  observation.  Do with it what you will.  The government told me
22  last week that they may have been able to close as early as
23  last Thursday and here we are.
24        How much longer?
25        MR. FOLLY: Your Honor, it's very difficult to predict

JBI9SCO3          October - Direct          Page 1568

1  the cross lengths.  Many of them exceed our expectation.
2         THE COURT: Cross has been much, much less than the
3  directs.
4         MR. FOLLY: Your Honor, we are on schedule within the
5  three-week timeframe that we estimated the case.  We believe
6  we'll either rest most likely tomorrow morning but certainly
7  not later than that.
8         THE COURT: OK.
9         (Recess)
10        THE COURT: So we'll take a half-hour break after we
11  break at 2:30 and then we convene for the jury conference and
12  the charge conference.
13        MR. GARVIN: Your Honor, I did contact the witness.
14  He's stuck in traffic but he anticipates being here by 1:30.
15  So we'll just ask for a sidebar when the time comes.
16        THE COURT: That's fine.  Does he know where he's
17  going?
18        MR. GARVIN: He has somebody that's driving him.
19        THE COURT: But does he know to come here?
20        MR. GARVIN: Certainly.
21        (Continued on next page)
22
23
24
25

JBI9SCO3          October - Direct          Page 1569

1         (Jury present)
2         THE COURT: Everyone please be seated.
3         Ms. Lozano.
4         MS. LOZANO: Thank you.
5         I think we were viewing GX2603.  Pull that up.
6  Q.  When we broke, Ms. October, I asked you whether totaling
7  all the amounts in the domestic accounts credits and the
8  foreign accounts credits would equal the credit line between
9  funding accounts and the Fenero payment accounts and you said
10  it would.
11        From a back-of-the-envelope calculation, I'm asking
12  you to relook at those numbers and tell me whether they
13  equal --
14        MS. LOZANO: I'm sorry.  Can you publish for the jury.
15  Q.  -- whether the numbers totaled up on the bottom boxes and
16  the -- equal a total credits between the funding accounts and
17  the Fenero Cayman accounts?
18  A.  No, it does not.
19  Q.  Why doesn't it?
20  A.  So based on my analysis in the domestic accounts there's
21  approximately 950,000 that goes back to -- from the U.S.
22  account back to the Cayman accounts.  There was three transfers
23  that goes back to the Cayman accounts.  And then from the
24  foreign accounts there's approximately 40 million that goes
25  back out to the intermediary accounts.

UNITED STATES OF AMERICA, v.
MARK S. SCOTT,

November 18, 2019

| JBI9SCO3 | October - Direct | Page 1570 |
|---|---|---|

1 Q. So they are counted in the totals here that ultimately --
2  they were sent back?
3 A. Correct.
4 Q. Let me ask you this. In the foreign accounts totaled
5  credits you described the accounts in there and I don't
6  remember you saying that there were accounts in there that were
7  controlled by Scott; is that correct?
8 A. There were a few accounts controlled by Scott contained in
9  the foreign totals, yes.
10 Q. What jurisdictions and what names were those accounts?
11 A. I believe there were in Switzerland and also the Cayman
12  Islands.
13 Q. Let me ask you one more question about this chart. You
14  indicated earlier that there were accounts in the name of MSSI
15  that were Scott-controlled. Where on this chart would those
16  accounts be housed or boxed?
17 A. Those could be contained in the domestic account box.
18 Q. And how about the intermediary accounts? Are there any
19  MSSI intermediary accounts?
20 A. Yes. So there's an MSSI international consultants BVI in
21  the intermediary box and in the domestic box is just MSSI
22  Consultants LLC.
23 Q. Now you also mentioned the name of an attorney or the name
24  Nicole Huesmann as an account that resides in the domestic
25  account box. Who is Nicole Huesmann?

| JBI9SCO3 | October - Direct | Page 1571 |
|---|---|---|

1 A. I understand her to be a real estate attorney for Mark
2  Scott.
3 Q. Let's now focus on one of the Fenero Cayman accounts and
4  break down that account.
5      MS. LOZANO: If we could go to 2604.
6 Q. Ms. October, what does this chart depict?
7 A. This chart depicts one of the four Fenero accounts and --
8 Q. When you say one of the four?
9 A. (No response).
10 Q. Just to be clear?
11 A. One of the four -- one of the four funding accounts held in
12  the Cayman Islands.
13 Q. The two in DMS and the two at DB?
14 A. Correct.
15 Q. At Deutsche Bank.
16 A. At Deutsche Bank and DMS Cayman. Also this is one of the
17  accounts that's held at DMS Cayman.
18 Q. And that is in the name of what?
19 A. In the name of Fenero Equity Investments LP.
20 Q. And the account number on this one is?
21 A. Ending in 6102.
22 Q. And this account received money from a selection of the
23  nine funded accounts; is that right?
24 A. That's correct.
25 Q. From which nine -- from which of the nine?

| JBI9SCO3 | October - Direct | Page 1572 |
|---|---|---|

1 A. It received monies from the IMS GmbH account, IMS Pte
2  account, B&N Consult.
3 Q. And who is the signatory for the 6102 Cayman Fenero Equity
4  Investments LP account?
5 A. That's Mark Scott.
6 Q. What does this chart represent in terms of a time period
7  for transfers?
8 A. So it represents a time period of June through August of
9  2016.
10 Q. For incoming?
11 A. For incoming, yes.
12 Q. And how about for outgoing from Fenero Equity Investments
13  LP?
14 A. From outgoing it covers the time period from June 2016
15  through February 2017.
16 Q. So how much total through your analysis did you trace
17  coming into Fenero Equity Investments LP from IMS GmbH, IMS Pte
18  and B&N Consult during that period of time?
19 A. From the three accounts, there's 155 million euros coming
20  into that account.
21 Q. Can you walk us through, please, where that money went
22  after it hit Fenero Equity Investments LP account?
23 A. Sure. The funds were later disbursed, we're going to go
24  from left to right. The left side in the blue circles with the
25  Cayman flag represents some of the intermediary accounts that

| JBI9SCO3 | October - Direct | Page 1573 |
|---|---|---|

1  received some of the funding and the one 4102 which transfers
2  from one of the four Fenero accounts that --
3 Q. So 4102, to be clear, is one of the four that received from
4  the nine IMS, B&N --
5 A. Correct.
6 Q. -- groupings.
7 A. Yes.
8 Q. So that gray line to the left that says transfer for wires
9  49,999,310, that represents what?
10 A. (No response).
11 Q. Why is it gray?
12 A. It's grayed out to avoid double counting. So the 155
13  million is already incorporated. So it's just a transfer to --
14  an intermediary transfer from one Cayman account to another
15  account. So the 49 million was already accounted for.
16 Q. So then let's go down and talk about the other accounts
17  listed here. There is a First Caribbean International MSSI
18  operating account. And it indicates that is a U.S. dollar
19  account?
20 A. Yes.
21 Q. How much did it receive from Fenero Equity Investments LP?
22 A. It received two transfers, approximately 78,000 euros.
23 Q. How about the MSS International Consultants BVI account,
24  7100. How much did that receive?
25 A. That was one of the intermediary accounts. It received one

UNITED STATES OF AMERICA, v.
MARK S. SCOTT,                                                    November 18, 2019

JBI9SCO3          October - Direct          Page 1574

1  transfer for 321,000 euros, approximately.
2  Q.  Then we have another DMS Cayman account.  This is an MSSI
3    International and it received it looks like a total of five
4    wires of varying amounts?
5  A.  Correct.
6  Q.  What is the icon with an American flag, what's that
7    account?
8  A.  That account is an account owned by Mark Scott held at City
9    National Bank.  So it's a U.S. account in Florida.
10 Q.  And it received two transfers, one of -- approximately 250
11   million euros -- I'm sorry 250,000 euros and one of 16,000
12   euros.
13      Then we move over to Lloyds Bank Payment Card
14   Technologies.  Can you just tell me what is that icon?  I can't
15   really make it out.
16 A.  The icon just represents a financial institution.
17 Q.  OK.  So how much did you trace going from Fenero Equity
18   Investments LP to Payment Card Technologies?
19 A.  $1,976,294.
20 Q.  84?
21 A.  84.
22 Q.  And 58 cents?
23 A.  And 58 cents yes.
24 Q.  On June 23, 2016?
25 A.  Yes.

JBI9SCO3          October - Direct          Page 1575

1  Q.  And then what's the one right above that to the right?
2  A.  To the right it's an account Barta Holdings held at a DBS
3    Bank in Hong Kong which received 35 million U.S. dollars on
4    July 13, 2016.  One transfer.
5  Q.  By the way did you ever see that money coming back into
6    Fenero Equity Investments, that 30 million?
7  A.  Not from the -- not from the Barta Holdings.
8  Q.  What about the Bank of Ireland Fenero Equity Investments
9    Ireland account?
10 A.  So that account was one of the intermediary accounts that
11   received one transfer totaling 960,000 euros on August 19,
12   2016.
13 Q.  And how about above that?
14 A.  Another intermediary account held at the Bank of Ireland in
15   the name of Fenero Equity Investments received 1.2 million
16   euros on September 22, 2016.
17 Q.  And now the top one on the right Bank of Ireland Fenero
18   Equity Investments Ireland ending 4760.  It received four
19   transfers.  Can you tell me approximately how much of those
20   four transfers totals together.
21 A.  A little over 60 million euros.
22 Q.  So is that the account that received the most from the
23   Fenero Equity Investments LP account?
24 A.  That is correct.
25 Q.  Now, did you do this same exercise for the three other

JBI9SCO3          October - Direct          Page 1576

1  Fenero Cayman accounts, the Fenero Financial Switzerland,
2    and -- held at DMS and then the two Fenero accounts, Fenero
3    Equity accounts at Deutsche Bank?
4  A.  Yes, I did.
5  Q.  And are those charts -- did you also do them by the way for
6    the intermediary accounts, some of which you've identified on
7    this chart, the MSSI International, the Bank of Ireland
8    accounts, did you do further tracing once the money hit there?
9  A.  Yes.  I created a chart, an individual chart for each
10   account representing the inflow and the outflow of funds.
11 Q.  And are those charts all in evidence?  Were those some of
12   the charts that you reviewed when you started testifying and we
13   moved into evidence?
14 A.  Yes.  They would be one of the 37 charts.
15 Q.  So let's look -- we're not going to look at all of them.
16   We're just going to look at one more representative sample
17   because they are all in evidence of 2607 and you can tell me
18   what that is.
19 A.  (No response).
20 Q.  Which -- was -- I'm sorry.  You tell me what it is.  Sorry.
21 A.  The 2607 is an illustration of one of the Bank of Ireland
22   intermediary accounts held in the name of Fenero Equity
23   Investments.  And the top part of the chart shows the arrows
24   coming into, pointing to the 4760 and represents the --
25   represents four of the DMS or MSSI accounts also held by Mark

JBI9SCO3          October - Direct          Page 1577

1  Scott as well as a transfer of approximately ten million
2    dollars from IG markets.
3  Q.  So up here on the left, just to connect up the chart we saw
4    before, up here on the top left is the DMS Cayman Fenero
5    Financial Switzerland account 4102.  And is that the account
6    that we saw tracing for, in our previous chart, which was 2604,
7    was that the one that we were focused on?
8  A.  I believe so.
9  Q.  And so this -- well can we just go back to 2604 for one
10   minute.
11      So that's -- this chart, 2604, is for DMS Cayman
12   Fenero Equity Investments ending 6102; is that right?
13 A.  Yes.
14 Q.  And then we have a transfer of approximately how much to
15   the Bank of Ireland 4760 account?
16 A.  Well there's four transfers: 7.3 million, 17 million, 40
17   million, and 400,000.
18 Q.  So now we can go back let's look at 2607 now.
19      So this account receives -- this Bank of Ireland
20   account which you consider an intermediary account receives
21   from how many different Fenero accounts?
22 A.  There's one, two, three, four -- four Fenero -- actually
23   five Fenero accounts but there's one on the left side -- on the
24   right side.
25 Q.  So all the way on the right side though is the Fenero

UNITED STATES OF AMERICA, v.
MARK S. SCOTT,
                                                          November 18, 2019

| JBI9SCO3 | October - Direct | Page 1578 |
| --- | --- | --- |

1    Equity investment 6102 that's we just saw on the chart?
2  A.  Correct.
3  Q.  So that's how it connects up?
4  A.  Yes.
5  Q.  So the arrow from the prior chart that went from 6102 to
6    4760, you then trace 4760 where that money went, right?
7  A.  Correct.
8  Q.  So let's take a look at this chart and you indicated there
9    is a -- an outgoing arrow to the left to MSSI International
10   consultants.  What is that?
11 A.  That's one of the intermediary accounts, MSSI International
12   consulting, ending in 7100, that received a transfer of
13   1,499,961.20 on February 22, 2017.
14         MS. LOZANO:  We can minimize that.
15 Q.  And then once the -- explain what the account to the right,
16   Bank of Ireland, Fenero Securities Trading, those arrows
17   represent those totals?
18 A.  Sure.  So the account ending in 9811 is also another
19   intermediary account.  And the dollar amounts in red represents
20   inflows of funds that that account received from the 4760 and
21   the blue arrow represents the 9811 transferring back to the
22   4760.  Three transfers.
23 Q.  So coming back to the center account.  You indicated via
24   arrows transfers to multiple different accounts.  Can you go
25   through just quickly and tell us what the names of those

| JBI9SCO3 | October - Direct | Page 1579 |
| --- | --- | --- |

1    accounts are and where they're located.
2  A.  So going from left to right there is an account, Ocean --
3    Ocean State Ventures Limited.  And that account I believe is
4    held in the United Kingdom.
5  Q.  And then there is Piraeus Bank?
6  A.  Piraeus Bank held in the name of Vida Home.  And that's
7    located in Bulgaria.
8  Q.  And then Invest Bank?
9  A.  Invest Bank LBD AD also is held in Bulgaria.
10 Q.  Peregrine Law Client Account at Metro Bank PLC.  Where is
11   that?
12 A.  I believe that's located in the United Kingdom.
13 Q.  And the Open Mark Bulgaria EOOD Invest Bank?
14 A.  Is an account held in Bulgaria.
15         And the Sabadell United Bank in the name of Nicole
16   Huesmann.  That's a US-based account.
17 Q.  There are four other US-based accounts with flags?
18 A.  Right.  So there's four other accounts with -- colored in
19   orange which represents those are accounts that Mark Scott is
20   the signatory on.  And those accounts are either held in the
21   name of Mark Scott or MSSI International Consultants and Mark
22   Scott PL.
23 Q.  Then we have Bank of Ireland IG Markets?
24 A.  Then you have -- yes.  So there's three Bank of Ireland
25   accounts.  This represents the intermediary accounts that

| JBI9SCO3 | October - Direct | Page 1580 |
| --- | --- | --- |

1    received transfers from the 4706.  The accounts are ending in
2    5001, 7958 and 8576.
3  Q.  Then the two icons, I guess, or structures, are Bank of
4    Ireland IG markets and Lloyds Bank Payment Card Technologies?
5  A.  Yes.
6  Q.  So we zoom out.  I'm not going to go through every one of
7    these numbers.  Each arrow, consistent with your other charts,
8    lists the wires that were sent and the amounts that each wire
9    to each of those individual accounts?
10 A.  Right.  So it lists every individual transaction by the
11   dollar amount and the transaction date.
12 Q.  OK.  And so I want to compare this chart to the overall
13   world chart so you can show me the -- before we move to it, I'm
14   going to ask you what arrow represents the top part of this
15   chart going to the Bank of Ireland account and what arrow or
16   arrows represent the bottom part of this chart, of the
17   intermediary account sending to accounts in Bulgaria, the
18   United States and Ireland.
19         MS. LOZANO:  So if we can go back to 2627.
20 Q.  The Ireland account received money according to your chart
21   from multiple Fenero payment accounts.  Where is that arrow
22   reflected on this chart?
23 A.  That would be reflected in the intercompany transfers, the
24   blue arrow.
25 Q.  And then once the money was received in the Fenero Equity

| JBI9SCO3 | October - Direct | Page 1581 |
| --- | --- | --- |

1    Ireland account as you just testified it was sent to multiple
2    accounts in different jurisdictions including Bulgaria, the
3    United Kingdom, Ireland, the United States.  Where are those
4    arrows?
5  A.  Those arrows would be indicated in red as the outgoing
6    funds.
7  Q.  And to be clear where is the Fenero Ireland account
8    represented on this chart?
9  A.  It's represented in -- with the Ireland flag.
10 Q.  So the blue icon looks like a bank with the Irish flag on
11   it?
12 A.  Yes.
13 Q.  And to be clear when you're saying those transactions that
14   we just looked at -- are represented by these arrows, these arrows
15   don't include -- I'm sorry.  Those transactions are not the
16   only transactions included in these arrows, right?
17 A.  Correct.
18 Q.  You can take that down.
19         Can we put back 2607.
20         We were talking about the transfers between Fenero
21   Equity Investments Ireland and Fenero Security Trading Ireland
22   account.  There seem to be transfers going both ways.  Is that
23   fair to say?
24 A.  That is correct.
25 Q.  Have you totaled up approximately how much was going from

UNITED STATES OF AMERICA, v.
MARK S. SCOTT,                                                                November 18, 2019

| JBI9SCO3 | October - Direct | Page 1582 |
| --- | --- | --- |

1   Fenero Equity Investments Ireland to Fenero securities trading?
2   A. It's approximately a hundred and 54 million euros.
3   Q. And how much was sent back?
4   A. Approximately 3.6 million euros.
5   Q. And did you trace the money, the 154 million that was sent
6   from Fenero Equity Investments Ireland to Fenero Securities
7   Trading LTD once it hit the Fenero securities trading LTD
8   account?
9   A. That is correct.  I did further tracing for that account.
10  Q. Where did the majority of that money end up being sent?
11  A. The majority of the funds which included transfers from two
12  other DMS accounts ultimately ended up in an account held at
13  Phoenix, Phoenix fund.
14         (Continued on next page)
15
16
17
18
19
20
21
22
23
24
25

| JBI3SCO4 | de la Portilla - Direct | Page 1583 |
| --- | --- | --- |

1   Q. If we could move to chart 2622 at this point.
2         MR. GARVIN: Your Honor, please the Court.  One very
3   short witness that we had talked about is here, and counsel
4   advises me this would be a good place for a temporary
5   interruption of this witness.
6         THE COURT: Ladies and gentlemen, as I'm sure you
7   observed, trials come in different bits and pieces.  Different
8   documents, different people.  Sometimes for the convenience of
9   a particular witness we take a witness out of turn so that he
10  or she can meet certain travel commitments.  So what we are
11  going to do now is suspend the testimony of Ms. October, you
12  may step down.  The defense will call a witness.  Government
13  hasn't rested.  But the defense going to call a witness out of
14  turn.  Okay?
15         Mr. Garvin.
16         MR. GARVIN: Your thank you, your Honor.  At this time
17  Mr. Scott will call Miguel Diaz de la Portilla.
18         THE COURT: Make sure Ms. October doesn't go far.
19  MIGUEL DIAZ de la PORTILLA,
20     called as a witness by the Defendant,
21     having been duly sworn, testified as follows:
22  DIRECT EXAMINATION
23  BY MR. GARVIN:
24  Q. Good afternoon, sir.
25  A. Good afternoon.

| JBI3SCO4 | de la Portilla - Direct | Page 1584 |
| --- | --- | --- |

1   Q. Would you please tell the ladies and gentlemen what your
2   occupation is, sir.
3   A. I'm an attorney.
4   Q. Just a little bit of your background.  Where did you go to
5   school at, sir?
6   A. Well, I was born and raised in Miami.  I went to school at
7   the University of Miami for undergrad, majoring in philosophy
8   and English literature.  Graduated from the University of Miami
9   School of Law in 1987.
10  Q. Upon leaving school, did you immediately become a lawyer or
11  did you endeavor in any other fields?
12  A. I immediately became a lawyer, and have been a practicing
13  lawyer, member of the Florida bar since 1987 in good standing.
14  Q. Can you please tell the ladies and gentlemen what law firm
15  you worked with presently.
16  A. I work with law firm by the name of Saul, Ewing, Arnstein &
17  Lehr.
18  Q. Can you give us a general idea of the type of practice you
19  have at that law firm?
20  A. Sure.  I am a land use and zoning lawyer.
21  Q. What does that mean?
22  A. What that basically means is I work with property owners
23  and developers to develop real estate, to develop property,
24  whether they be commercial projects or multifamily mixed use
25  projects.

| JBI3SCO4 | de la Portilla - Direct | Page 1585 |
| --- | --- | --- |

1   Q. How large of a firm is the firm that you currently work in?
2   A. I think we have approximately 415, 420 lawyers, something
3   like that.  The number changes, you know.
4   Q. Have you worked with other law firms prior to the law firm
5   you are working with now?
6   A. I have.
7   Q. Can you give us an example of some of the other law firms?
8   A. Sure.  I've, well, I worked at Duane Morris.  Duane Morris
9   is the based out of Philadelphia.  That's a bit larger, that's
10  about 800, 900 lawyers.  I worked at another local firm from
11  Miami that became a national firm, Adorno & Yoss, and I also
12  worked at a regional firm which I believe they have now have
13  offices in New York, that was called Becker Poliakoff.
14  Q. While working at Becker Poliakoff, did you happen to ever
15  meet a person by the name of Mark Scott?
16  A. I did.
17  Q. Mark, could you please stand up.
18         Is this the person that you're referring to, the Mark
19  Scott that you met?
20  A. Yes, although he is a little heavier now.
21  Q. Can you tell the ladies and gentlemen approximately what
22  year that was?
23  A. That was approximately 2007.
24  Q. Did you have an opportunity to work with Mark Scott either
25  while at Becker Poliakoff or subsequent?

UNITED STATES OF AMERICA, v.
MARK S. SCOTT,                                                      November 18, 2019

| JBI3SCO4 | de la Portilla - Redirect | Page 1606 |
|---|---|---|

1 correct?

2 A. I've never seen those documents until now.

3 Q. But, as a lawyer, have you ever come across a document that

4 had a typo in it, that had a wrong percentage, and that you

5 were forced to correct it before you presented it to the

6 ultimate party?

7 A. Of course. That's very common. Documents are amended all

8 the time.

9 Q. Sir, with regard to the people that were just mentioned and

10 the entities that were just mentioned, you have no knowledge or

11 exposure to any of them, correct?

12 A. No, I've never met any of them. I had never heard their

13 names until now.

14 Q. One person that you had a lot of exposure to would be

15 Mr. Mark Scott; is that correct?

16 A. Yes.

17 Q. And the fact that Mr. Scott supported you for your campaign

18 and made contributions totaling $3,000, would that in any way

19 be justification for you to get on this stand in front of this

20 honorable court, here in New York, and tell the ladies and

21 gentlemen of the jury something that wasn't 100 percent the

22 truth?

23 A. No, of course not. That's a ridiculous statement, and I am

24 an officer of the court. I am an attorney. I am an attorney

25 in good standing and have been so for 32 years. I served as a

| JBI3SCO4 | October - Direct | Page 1607 |
|---|---|---|

1 public servant. I think that was a noble calling and a noble

2 cause, and I served honorably in my time in the Florida Senate

3 and on the County Commission in Miami Dade County, and I'm very

4 proud of that service, and I'm very proud of my own reputation

5 for integrity and honesty.

6 Q. What is your opinion, sir, of the reputation of Mark Scott

7 for honesty and law-abidingness?

8 A. I've always known Mark to be an honest and law-abiding

9 person. Citizen.

10      MR. GARVIN: Thank you. I have no further questions.

11      THE COURT: Mr. de la Portilla, you may step down.

12      THE WITNESS: Thank you, your Honor.

13      THE COURT: Safe travels and let's get Ms. October

14 back on the stand.

15      (Witness excused)

16      THE COURT: Ms. October, welcome back.

17      THE WITNESS: Thank you.

18      THE COURT: And Ms. Lozano, you may proceed.

19      MS. LOZANO: Thank you, your Honor. Mr. Barile, can

20 we display 2622, please, and publish it to the jury.

21 BY MS. LOZANO:

22 Q. Ms. October, when we broke, you were discussing an entity

23 by the name of Phoenix Fund. Please explain to us what chart

24 2622 reflects.

25 A. So this chart reflects some of the intermediary transfers

| JBI3SCO4 | October - Direct | Page 1608 |
|---|---|---|

1 which consist of Cayman and Fenero Ireland accounts. Two

2 accounts from Fenero Ireland and one from the Cayman.

3 Collectively those three accounts submitted transferred 11

4 wires totaling $194 million from January to April 2017.

5 Q. To what account?

6 A. And that -- and those funds were transferred to the Fenero

7 Bank of Ireland account ending in 9811.

8 Q. Let me, before we go on to where the money went from there.

9 To be clear, in the Fenero Cayman accounts box and the Fenero

10 Cayman Fenero Ireland box, and the Fenero Bank of Ireland box,

11 the three middle boxes, who is the account holder for all of

12 those accounts?

13 A. Mark Scott.

14 Q. Once the 194 million euros were transferred to the Bank of

15 Ireland Fenero account ending 811, what did you trace, where

16 did you trace the money to?

17 A. I traced the funds going to Phoenix Fund Invest held in the

18 United Emirates. They were 11 wires totaling 185 million.

19 Q. You said that was located where?

20 A. In the United Emirates.

21 Q. All right. Were you able to trace the money from there or

22 is that where your tracing ended?

23 A. My tracing ended. I didn't have visibility into the

24 Phoenix Fund account.

25      MS. LOZANO: Mr. Barile, if we could display 2622, GX

| JBI3SCO4 | October - Direct | Page 1609 |
|---|---|---|

1 2622. I'm sorry. 2620. I'm sorry.

2 Q. Ms. October, what is this overwhelming chart?

3 A. So, this chart is an illustration of what I would call a

4 cascading flow of funds from where the initial funding happened

5 in the top box, from the nine -- the nine separate entities

6 that funded the four Cayman Fenero entities that I previously

7 testified to. That account received 354 million euros and

8 approximately 10 million USD. And that those funds were later

9 transferred to seven intermediary funds consisting of three

10 accounts held at DMS in the name of MSSI, and then there's four

11 Bank of Ireland accounts held in various forms of Fenero. And

12 then there's the accounts further going down is broken out into

13 two separate boxes, one for domestic transfers, and one for

14 foreign transfers. The foreign -- the domestic transfers are

15 accounts held in the name of Mark Scott, which is represented

16 by the orange colored circles with the American flag. And it

17 also includes the Nicole Huesmann account which received moneys

18 from either one of the Fenero or MSSI accounts. And

19 highlighted in the green text box are three accounts that

20 actually ended up sending money back to one of the intermediary

21 accounts, totaling approximately $950,000 U.S.

22 Q. Can we zoom out so we can see where that -- so you were

23 focusing on the green box on the left?

24 A. Yes.

25 Q. And where did you direct the arrow?

UNITED STATES OF AMERICA, v.
MARK S. SCOTT,                                                                November 18, 2019

| JBI3SCO4 | October - Direct | Page 1610 |
|---|---|---|

1  A.  So I directed it back to the intermediary box that the
2   funds went back into, one of those seven accounts.
3  Q.  Okay.  And is there an indication on the foreign
4   account box of such a return to the intermediary accounts?
5  A.  Yes.  So also highlighted in green are two accounts, one is
6   a Cowen account and IG Markets accounts.  Three wires from
7   Cowen totaling approximately 30 million euros, and two wires
8   from IG Markets totaling approximately 10 million euros, for a
9   total of about 40 million euros going back to one of the
10   intermediary accounts located above.
11  Q.  So do those fluorescent green boxes and lines back up, are
12   those the returns to the intermediary accounts that you were
13   discussing when you were explaining the differences in a prior
14   chart between the totals --
15  A.  Right.
16  Q.  -- reflected in the bottom and the total coming into the
17   four Fenero accounts?
18  A.  Correct.  And I'd like to continue with the foreign box.
19  Q.  Yes.
20  A.  I isolated by color coding the various different countries
21   that funds went, that funds went to.  So, the account on the
22   far left is highlighted as in bold accounts controlled by
23   Scott.  And those include two Cayman accounts, one held -- one
24   in the name of EDG Investments, held at First Caribbean.  And
25   HIT Holding held at RBC Dominion Securities, and then there is

| JBI3SCO4 | October - Direct | Page 1611 |
|---|---|---|

1   a Swiss account held in the name of Mark Scott that received
2   two wires totaling 2.5 million.
3  Q.  And those accounts, those three accounts are controlled by
4   the defendant?
5  A.  Those are all, those three accounts are all controlled by
6   Mark Scott.
7  Q.  The rest of the accounts that are in this box represent
8   what?
9  A.  So, the accounts represents various different countries
10   that were the beneficiaries of the funding from either the MSSI
11   or Fenero accounts, so we have other Cayman accounts, DRP
12   Holding, MSSI Marine, and Mumbelli, and moving towards the
13   right, there is a box of beneficiaries located in the United
14   Kingdom.  There is a four accounts located in that box with
15   indications of the dollar amounts for each account received,
16   and the name and the financial institutions where those
17   accounts are held.
18       And then all the way to the right, is in the orange is
19   three transfers that go to Bulgaria, totaling approximately $65
20   million and that includes Vida Home, LBJAD, and Openmark
21   Bulgaria.  Collectively, Bulgaria in these three accounts
22   received $65 million consisting of eight wires.  And scattered
23   independently are additional accounts that I talked about
24   earlier for Phoenix which received the 11 million in the UAE
25   which is in between the -- no, not that one.

| JBI3SCO4 | October - Direct | Page 1612 |
|---|---|---|

1  Q.  Between --
2  A.  In between the blue and the pink colored box.  That
3   represents the $185 million, million euros, that the Phoenix
4   Fund located in UAE received from one of the Fenero or MSSI --
5   one of the Fenero accounts.
6  Q.  And the account under that, under the Phoenix Fund, is
7   what?
8  A.  That's an account called titled Barta Holdings that
9   received a $30 million U.S. wire transfer at DBS Bank located
10   in Hong Kong.
11  Q.  Now, is it your understanding that that transfer related to
12   a purported loan?
13  A.  Yes, that's my understanding.
14  Q.  In your financial analysis of all of the records in this
15   case, did you find any evidence that that $30 million was ever
16   repaid to any of the Fenero or MSSI accounts or at all?
17  A.  My financial tracing did not indicate any return of those
18   funds.
19  Q.  So what I'd like to ask you, there were two accounts and I
20   believe they were highlighted in foreign account box with
21   green.  Cowen and IG Markets.  Fluorescent green.  And what is
22   your understanding about what Cowen International Limited is,
23   what kind of firm is it?
24  A.  My understanding is that it's an investment firm.
25  Q.  What about IG Markets General?

| JBI3SCO4 | October - Direct | Page 1613 |
|---|---|---|

1  A.  The same.
2  Q.  And aside from those two accounts that received money from
3   the Fenero and MSSI account, did you see any other evidence of
4   any other accounts for investment firms receiving money?
5  A.  No, I did not.
6  Q.  The return arrow for Cowen and IG represents a return to
7   Fenero or MSSI accounts?
8  A.  Yes.
9  Q.  Fenero accounts?
10  A.  Fenero accounts, yes.
11  Q.  Fenero accounts.
12       And in your financial analysis, were you able to
13   determine how much money total was sent into the Cowen and IG
14   Markets accounts and then how much was returned out?
15  A.  Yes.
16  Q.  What was that?  Break them down.  Do Cowen first and then
17   IG, please.
18  A.  Cowen consisted of three wires totaling $30 million.  And
19   the IG Markets consisted of two wires totaling $10 million.
20  Q.  Are we talking about dollars or euros?
21  A.  I'm sorry.  Euros.
22  Q.  What was returned to the Fenero account from Cowen?
23  A.  So it's 40,020,286.36 euros.
24  Q.  So, the difference between what was sent to these two
25   investment firms and what was sent back was a total of a little

UNITED STATES OF AMERICA, v.
MARK S. SCOTT,                                                         November 18, 2019

---

JBI3SCO4          October - Direct          Page 1614

1    over $20,000?
2  A.  20,286 euros.
3  Q.  Then I think we stopped at those two boxes.  What does the
4    bottom tier of boxes represent?
5  A.  So, the bottom tier of boxes represents the final
6    destination of funds, and what items were purchased by using
7    those lower funds.  So we go from the left side, the left side
8    represents a real estate box, and there are, there were three
9    real estate transfers, three real estate purchases, and one
10   condo where the mortgage was paid off using the funds.
11  Q.  To be clear, when you say that tier represents where the --
12   the purchases that were ultimately made, by whom?
13  A.  By Mark Scott.
14  Q.  Okay.  So what is the second box from the left?
15  A.  The second box from the left represents various other
16   purchases, which includes various different watches from a
17   number of different jewelers, various different handbags, there
18   is also a diamond bracelet that was purchased, and an emerald
19   cut engagement ring that was purchased for about $120,000.  And
20   a gift car, Mercedes Benz, for Nicole Huesmann.
21  Q.  Let's go to the next box and we'll talk more in detail
22   about all these purchases.  What does that box represent?
23  A.  This box represents 16 watches that was purchased from one
24   jeweler known as Time Piece in Florida.  And the watches range
25   from 5,000 to $35,000.

---

JBI3SCO4          October - Direct          Page 1615

1  Q.  Okay.
2  A.  Date range from January 2015 to about February of 2018.
3  Q.  Let's go to the last box on the bottom of the right.
4    What's in that box?
5  A.  The last box represents vehicles that were purchased for
6    Mr. Scott as well as a yacht purchased for Mr. Scott.
7  Q.  Vehicles purchased for Mr. Scott or by Mr. Scott?
8  A.  By Mr. Scott.
9  Q.  And for Mr. Scott?
10  A.  And for his use, yes.
11  Q.  All right.  How did you determine what purchases to include
12   in these bottom, the bottom tier of boxes?
13  A.  Based on the value of the purchases.  Of course I did not
14   include more of the lower end purchases, but what stuck out to
15   me was more of the higher end items purchased.
16  Q.  But the money that was used to make these purchases was
17   traced back to where?
18  A.  They were all, all traced back to the original source of
19   funds from the funding of the four -- one of the four Fenero
20   accounts.
21  Q.  From the nine accounts?
22  A.  From the nine accounts that funded the four Fenero accounts
23   that later funded transfers, multiple transfer to the
24   intermediary accounts, and then later additional tracing to
25   U.S. accounts, and then later tracing to purchase those various

---

JBI3SCO4          October - Direct          Page 1616

1    items.
2  Q.  Okay.  So if we can put that back up, actually Mr. Barile.
3    2620.
4        So, the items that are in the bottom tier, the
5    purchases that were made.  Your analysis traced all the way up
6    to that top tier, the nine accounts, the IMS, B&N, Star
7    Merchant and Fates accounts?
8  A.  That is correct.
9  Q.  In your review of bank records, we just talked recently
10   about a transfer to Barta for a purported loan.  In your review
11   of the bank records in this investigation, did you find any
12   evidence of payments repayments of any purported loans?
13  A.  Not -- not for Barta, but there was --
14  Q.  No.  Just for any purported loans?
15  A.  Yeah, so there was a loan, there was a -- a payment sent
16   for approximately 5 million euros from one of the Cayman
17   accounts, I believe it was ending in 4102, to DMS Governance.
18   And --
19  Q.  DMS is a bank?
20  A.  DMS -- the DMS Cayman is a bank.
21  Q.  Okay.
22  A.  And those transfers happened approximately in November of
23   2016.  And later in April of 2017, I noticed that there were
24   approximately four transfers back to that account.  The DMS
25   Cayman account, Fenero ending in 4102, for approximately $5.2

---

JBI3SCO4          October - Direct          Page 1617

1    million.
2  Q.  From Fenero to DMS?
3  A.  Yes.
4  Q.  Or from DMS to Fenero?
5  A.  No.  Repayment of the reference, repayment of loans.
6  Q.  So from DMS to Fenero.
7  A.  Back to the Fenero account, yes.
8  Q.  Aside from that, that $5 million out and then back in, did
9    you see any evidence in any of the other records of repayments
10   or payments of purported loans?
11  A.  No, I have not.
12        MS. LOZANO:  Your Honor, may I approach the witness?
13        THE COURT:  You may.
14  Q.  Ms. October, take a look at that and 2620-BU.  Do you
15    recognize that?
16  A.  Yes, I do.
17  Q.  What do you recognize that to be?
18  A.  That's an enlarged version of the chart that I just
19    recently testified to.
20  Q.  Aside from being larger in size, is it the same?
21  A.  Yes.
22        MS. LOZANO:  Your Honor, I'm offering 2620-BU.
23        MR. GARVIN:  The same objection as before.
24        THE COURT:  It will be received.
25        (Government's Exhibit 2620-BU received in evidence)

---

UNITED STATES OF AMERICA, v.
MARK S. SCOTT,

November 18, 2019

1    THE COURT: Before we go to that, I understand there
2  is a request from the jury.  We just have a few minutes left to
3  go, so we'll finish up now.  We'll see you back tomorrow
4  morning.  Don't discuss the case.
5    (Jury excused)
6    THE COURT: Ms. October, you can step down.
7    THE WITNESS: Thank you.
8    THE COURT: One or more of the jurors had to use the
9  facilities.  So we'll get back together at 3 o'clock?  And it
10  will be in this room.  Okay?
11    (Recess)
12    (In open court; jury not present)
13    THE COURT: How many more witnesses does the
14  government have?
15    MR. FOLLY: Your Honor, we have one remaining witness
16  after Ms. October.
17    THE COURT: How much longer is Ms. October?
18    MS. LOZANO: I estimate between 45 minutes and an hour
19  at most.
20    THE COURT: How long will the last witness be?
21    MR. FOLLY: Your Honor, approximately 45 minutes to an
22  hour.
23    THE COURT: Okay.  So, arguably you will rest
24  tomorrow.
25    MR. FOLLY: Yes, your Honor.

1    THE COURT: How long is the defense case going to be,
2  if you're able to make an estimate at this point?
3    MR. GARVIN: Your Honor, we may also rest tomorrow.
4  Coordinating the witnesses and filtering up, it's very possible
5  we may also rest tomorrow too.
6    THE COURT: Okay.  So everyone's here that's going to
7  be here?
8    MR. DEVLIN-BROWN: Yes.  Your Honor, Mr. Scott with
9  the Court's permission, he knows he has a right to be at every
10  court proceeding, but he'd rather be excused.
11    THE COURT: Okay.  You are excused.
12    As with the voir dire form, because I am going to be
13  giving this to the jury -- by the way, I am going to need from
14  the government a clean version of the indictment because I do
15  give the indictment, the verdict form, and jury instructions to
16  each of the jurors, so I want to put together a package for
17  them.  As with the voir dire form, I am happy to receive from
18  either side any comments, including typographical errors,
19  grammatical errors, etc.  Okay?
20    As the parties are aware, the first few pages are sort
21  of boilerplate, used on many occasions, and the last part is
22  also boilerplate.  I will be adding an instruction on
23  stipulations which is not currently in this draft.  If there is
24  any other instruction that you think needs goes to that latter
25  part, I'm happy to give it.

1    So let me just ask over the first few pages before we
2  get to the conspiracy counts, on page seven, any substantive or
3  other comment?
4    MR. DiMASE: These are very minor non-substantive
5  comments.  But on the first page I think the indictment charges
6  the defendant as Mark S. Scott.  On the very opening title
7  page.
8    THE COURT: Where are you?
9    MR. DiMASE: On the literally the first page.  It says
10  jury instructions.  On the top in the caption.
11    THE COURT: Okay.  Mark S. Scott.
12    MR. DiMASE: Right.  And all of our stipulations have
13  been under just 17 CR 630.  I don't know if we want to remain
14  consistent and take the superseder out.  If we do leave it in,
15  it should be S10 not S1.
16    THE COURT: Let's take it out.
17    MR. DiMASE: Okay.  On page seven, again, this is not
18  substantive, "Mr. Scott has pleaded not guilty to these
19  charges" probably should be indented.  It is supposed to be a
20  separate paragraph.
21    THE COURT: I'm sorry.  Page seven?
22    MR. DiMASE: Right above conspiracy count.  This is
23  just formatting.
24    THE COURT: Okay.
25    MR. DiMASE: On page eight, in the first full

1  paragraph.
2    THE COURT: Before you get to page eight.  Anything in
3  the introductory pages, Mr. Garvin or Mr. Devlin-Brown?
4    MR. DEVLIN-BROWN: No, your Honor.
5    THE COURT: Go ahead, Mr. DiMase.
6    MR. DiMASE: I think in the first full paragraph it
7  would be better the word "though" could be switched to "if."
8    MR. DEVLIN-BROWN: Where are we?
9    MR. DiMASE: Page eight, first full paragraph.
10  Starting with the word "indeed."
11    THE COURT: Always happy to take out "though."
12    MR. DiMASE: What's that, your Honor?
13    THE COURT: I'm always happy to take out the word
14  "though."
15    MR. DiMASE: I think "even though" suggests that the
16  crimes were not actually committed, when it's the government's
17  position that they were in fact committed.  So "even if" I
18  think is a better formation.
19    THE COURT: Okay.  Now to the section three, if there
20  is nothing else.
21    MR. DiMASE: We are at page 10, your Honor.  I guess
22  existence of conspiracy.  Page nine I guess.
23    MR. DEVLIN-BROWN: Right.
24    MR. DiMASE: I have a minor correction on page 10.
25  Capitalizing "government" in the third paragraph I think just

# In The Matter Of:

*UNITED STATES OF AMERICA, v.*

*MARK S. SCOTT*

---

*November 19, 2019*

---

*Southern District Court Reporters*

Original File JBJ9SCOF.txt

**Min-U-Script® with Word Index**

UNITED STATES OF AMERICA, v.
MARK S. SCOTT

November 19, 2019

| JBJ3SCO1 | Page 1685 |
|---|---|

1 reflects what came in.
2　　　THE COURT: Can you show that to the defense.
3　　　MR. FOLLY: We provided this to the defense last week.
4 We have not heard any objections, so we'd like it on the record
5 at this point.
6　　　THE COURT: Very well.
7　　　MR. DEVLIN-BROWN: Did you give an updated list last
8 night or maybe it was the same list?
9　　　MR. FOLLY: As to the timeline, no changes there.
10　　　MR. DEVLIN-BROWN: We agree those are in.
11　　　MR. DiMASE: Just for the record, your Honor, the
12 exhibit issue, the transcript reflects that Exhibits 506 and
13 513, and Exhibits 517 and 537 are in evidence. What I meant to
14 offer was 506 through 513, and 517 through 537. So I would
15 offer those exhibits now. They were shown to the witnesses at
16 the time. I had an understanding that they were admitted into
17 evidence. I don't think there is any objection. These are the
18 BNY Mellon records.
19　　　THE COURT: Any objection?
20　　　MR. DEVLIN-BROWN: I don't think so. But they're all
21 straight bank records?
22　　　MR. DiMASE: These are the various e-mails and other
23 records admitted through the Bank of New York Mellon witness.
24　　　MR. DEVLIN-BROWN: I don't think so, but maybe we can
25 just quickly take a look.

| JBJ3SCO1 | Page 1686 |
|---|---|

1　　　THE COURT: It's 9:30. Why don't you guys do that
2 later.
3　　　MR. DiMASE: That's fine.
4　　　THE COURT: Let's get Ms. October in here.
5　　　(Continued on next page)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| JBJ3SCO1 | October - Direct | Page 1687 |
|---|---|---|

1　　　(Jury present)
2　　　THE COURT: Good morning, ladies and gentlemen. Thank
3 you as always for being so prompt. We will now continue with
4 the direct examination of Ms. October.
5　　　Ms. October, you are reminded that you are still under
6 oath. Ms. Lozano.
7　　　MS. LOZANO: Thank you, your Honor. At this time the
8 government offers pursuant to the stipulation GX 55, an e-mail
9 which is marked Government Exhibit 1441. We're offering it.
10 I'm not publishing to the jury yet.
11　　　THE COURT: Very well. It will be received.
12　　　(Government's Exhibit 1441 received in evidence)
13　　　THE COURT: Is it GX 55?
14　　　MS. LOZANO: The stipulation, the electronic evidence
15 stipulation is GX 55. This exhibit, e-mail is GX 1441.
16　　　THE COURT: Very well.
17 ROSALIND OCTOBER,
18　　　called as a witness by the Government,
19　　　having been previously sworn, testified as follows:
20 DIRECT EXAMINATION (Continued)
21 BY MS. LOZANO:
22 Q. Good morning, Ms. October.
23 A. Good morning.
24 Q. When we broke yesterday, you were speaking about your
25　analysis of bank records and reflections of loans and whether

| JBJ3SCO1 | October - Direct | Page 1688 |
|---|---|---|

1　there were reflections of loan repayments. So, I want to ask,
2　I want to go back and ask you, did your review of the bank
3　records in this case reveal that certain payments were
4　represented as loan payments?
5 A. Yes.
6 Q. And you mentioned yesterday that your review of DMS records
7　reflected payments to Fenero from DMS that indicated they were
8　repayments of a loan?
9 A. Correct.
10 Q. Aside from those references in DMS records, did you see any
11　evidence in any other bank records of any repayments of any
12　reported loans?
13 A. No, I did not.
14 Q. I'd like to move on now to a different subject. Well, same
15　subject. Different part of it.
16　　　Your financial analysis of the Fenero Funds, did it
17　also involve review of transactions that went through Locke
18　Lord and escrow accounts held by Locke Lord?
19 A. Yes, it did.
20 Q. What is Locke Lord?
21 A. Locke Lord is an international law firm, one of which,
22　where Mr. Scott was employed.
23　　　MS. LOZANO: Mr. Barile, can we pull up and also
24　publish to the jury GX 2621.
25 Q. Ms. October, please describe what this chart represents of

UNITED STATES OF AMERICA, v.
MARK S. SCOTT                                                                                              November 19, 2019

| JBJ3SCO1 | October - Direct | Page 1689 |
| --- | --- | --- |

1    your financial analysis.
2    A. This chart represents certain flows of money originating
3    from a RavenR account held in the United Emirates. RavenR I
4    understand to be a OneCoin affiliated company. And this four
5    transfers that occurred in September 2015.
6    Q. Let me stop you right there. When you use the term OneCoin
7    affiliated with RavenR, can you be more specific? With whom is
8    it, your understanding with whom is it connected?
9    A. Connected to Ruja Ignatova.
10   Q. Okay. Continue.
11   A. So, moving from left to right, there is approximately $85
12   million with these four transfers that occurred in September
13   through October, going into a Zala Group account held at
14   Comerica. Zala Group is owned by Gilbert Armenta.
15   Q. Was he the signature on that account?
16   A. Yes, he was. And then after the money was deposited into
17   the Comerica account, held in Zala's name, it was then
18   subsequently transferred into two split payments to a Regions
19   Bank also held in the name of Zala Group which Gilbert Armenta
20   is the signatory for. And those transfers happened in October
21   for 9,500,000 on October 21, and $4,445,051.75 the following
22   day, October 22 to the Regions account ending in 9143.
23   Q. So let me just stop you right there. There are two
24   different Regions bank accounts in the name of Zala Group, one
25   ending 9143, one ending 9135; is that right?

| JBJ3SCO1 | October - Direct | Page 1690 |
| --- | --- | --- |

1    A. That is correct.
2    Q. On the same day, October 21, 2015, the Comerica Zala Group
3    account sent the same amount to each those accounts?
4    A. Right. To each account.
5    Q. The 9.5 million?
6    A. The 9.5 million and the 4,445,000.
7    Q. The next day?
8    A. The next day.
9    Q. That Comerica account sent the same amount, one to each of
10   the Zala accounts held at Regions?
11   A. That is correct.
12   Q. After that money was transferred to the two Regions bank
13   accounts, the 9143 and the 9135, where did you trace the money?
14   A. After the Regions transfers, the money was transferred in
15   two payments to a Locke Lord account held at JPMC ending in
16   3546.
17   Q. What date was that?
18   A. So that occurred on February 2, 2016.
19   Q. Approximately how much was transferred between those two
20   accounts?
21   A. Approximately $5 million.
22   Q. All right. Then after that approximately $5 million hits
23   the Locke Lord JPMC account, what happened? What do you find
24   with your tracing?
25   A. Once the transfer was received into the JPMC account ending

| JBJ3SCO1 | October - Direct | Page 1691 |
| --- | --- | --- |

1    in 3546, it was then subsequently transferred to a Northern
2    Trust account ending 8222 held in the name of Edwards Wildman
3    Palmer, which is also known as Locke Lord. And that transfer
4    occurred on February 5, 2016 in the amount of $5,116,458.
5    Q. And then what happens to that money after approximately two
6    weeks after?
7    A. Approximately two weeks after, on February 18, 2016, the
8    same amount, $5,116,458 is transferred to a Zala Group account
9    held in the United Emirates, ending in 8004.
10   Q. Do you know who the signatory of that account is?
11   A. I believe it's Gilbert Armenta.
12   Q. To be clear, the transfer from the Locke Lord JPMC to the
13   Northern Trust account is exactly to the penny the same amount
14   as the Northern Trust transfer to the Zala Group Emirates
15   account?
16   A. It is exact.
17   Q. One question. There is a notation on this chart on upper
18   right hand corner that says N/K/A. What does what mean?
19   A. That's just shorthand for now known as Locke Lord LLP.
20         MS. LOZANO: Mr. Barile, can we now publish 2614.
21   Q. Ms. October, can you walk us through this chart, please,
22   and explain what it depicts.
23   A. This chart depicts attempted and also successful transfers
24   of approximately 33.4 million euros. So the transfers started
25   with an attempt at an account held at Kreissparkasse Steinfurt

| JBJ3SCO1 | October - Direct | Page 1692 |
| --- | --- | --- |

1    in the name of IMS in Germany. Ending in 6108.
2    Q. Do you know who the signatory on that account is?
3    A. I'm not sure.
4    Q. Okay. Walk us through what happens on March 31.
5    A. On March 31 there was a 33.4 million euro transfer,
6    attempted transfer, notated by the dotted line to a Locke Lord
7    account held in the United Kingdom escrow account. The
8    following day, the same amount, 33.4 million euros, was
9    transferred back to the IMS Kreissparkasse Steinfurt account
10   held -- IMS account ending in 6108.
11   Q. Then after that, on April 5, 2016, what happens from the
12   Kreissparkasse Steinfurt account 6108?
13   A. So on the same day of April 5, 2016, there were four
14   separate transfers, three separate 9 million euro transfers,
15   and one transfer for 6.4 million euros that was transferred to
16   another IMS account held at United Overseas Bank ending in
17   6682.
18   Q. Do you know why -- first of all, what is that total for
19   April 5?
20   A. That totals 33.4 million dollars -- euros.
21   Q. And do you know why the 33.4 million dollars was not
22   transferred all in one transfer and it was broken up into four?
23   A. I do not know the reason for that.
24   Q. So, where does it go?
25   A. Once it is received into the 6682 IMS account, it is then

UNITED STATES OF AMERICA, v.
MARK S. SCOTT

November 19, 2019

JBJ3SCO1          October - Direct          Page 1693

1  transferred to the DMS Cayman bank ending in 6102 held in the
2  name of Fenero Equity Investments LP, and those transfers
3  happen in $5 million increments, 5 million euro increments,
4  starting from May 30, 2016 to June 7, 2016.
5  Q.  For a total of what?
6  A.  For a total of 35 million euros.
7  Q.  And the United Overseas Bank 6682, when it received the
8  33.4 million euros, how long had that account been opened?
9  A.  That account had only been opened for two months.
10 Q.  The 6682 United Overseas bank account, is that one of the
11 accounts that you identified as one of the original nine
12 accounts that funded the four Fenero Cayman accounts?
13 A.  That is correct, yes.
14 Q.  Do you know who the signatory for the IMS PTE at United
15 Overseas Bank is?
16 A.  Yes, I do.
17 Q.  Who is that?
18 A.  The account opening records reflect that it's held by Manon
19 Hubenthal and Frank Ricketts.
20       MS. LOZANO: I think we can move on now, Mr. Barile.
21 We can take that down.
22 Q.  Ms. October, you mentioned yesterday that you also analyzed
23 part of your financial tracing in this case bank records
24 related to two individuals who invested in OneCoin.  What were
25 the names of those individuals?

JBJ3SCO1          October - Direct          Page 1694

1  A.  Linda Cohen and William Horn.
2       MS. LOZANO: Mr. Barile, can we pull up GX 2626,
3  please.
4       Ms. Rivera, would be possible to erase the blue that's
5  on my screen?  Thank you.
6  Q.  Ms. October, what does this chart reflect?
7  A.  This chart reflects some transfers that I reviewed
8  concerning Linda Cohen which were transferred to Secure Point
9  360, and subsequently ended up in the accounts of IMS.
10 Q.  So walk us through.  She -- you traced how much money?
11 A.  $22,577.29.
12 Q.  Where did that money first come from?  Where did it
13 originate?
14 A.  So the records reflect that Linda Cohen has an account at
15 HSBC ending in 664, and then on February 17, 2016, she
16 transferred the $22,577.29 to a TD Bank account ending in 7544
17 in the name of Secure Point 360.
18 Q.  The HSBC bank account, do you know where that was held?
19 A.  That's a New York account, Manhattan account.
20 Q.  Manhattan?
21 A.  Yes.
22 Q.  Once the money, the 22,000 and change hit the Secure Point
23 360 TD account, where did you see it go?
24 A.  So, my analysis reflects that Secure Point maintains an
25 account with Bannockburn Global Forex, which is now known as

JBJ3SCO1          October - Direct          Page 1695

1  First Financial Bank.  When I reviewed the First Financial Bank
2  records, there is a Forex exchange.
3  Q.  A what exchange?
4  A.  A Forex exchange.
5  Q.  What is a Forex exchange?
6  A.  That's just a currency place that does currency conversions
7  for its customers and clients.
8  Q.  Okay.  It receives money in one currency and exchanges it
9  and sends it out in a different --
10 A.  Correct.  So, first my review of the First Financial
11 records shows that there were transfers to IMS account ending
12 in 6108, as well as transfers to IMS account ending in 6682.
13 So, my tracing showed that Mrs. Cohen's funds ended up in the
14 IMS bank accounts.
15 Q.  And that 6682 account, the IMS account, that's the one we
16 just saw in a previous chart was opened in February of 2016?
17 A.  Correct.
18 Q.  This same month?
19 A.  Correct.
20 Q.  Let's now turn, we can take this slide down.  Let's now
21 turn to where the money went after it was transferred to the
22 intermediary accounts.  Did you trace any of the funds that
23 flowed through the defendant's Fenero fund accounts to
24 purchases made by Mr. Scott?
25 A.  Yes, I have.

JBJ3SCO1          October - Direct          Page 1696

1  Q.  Generally speaking, what kind of purchases?
2  A.  So, there were purchases for real estate property, there
3  were purchases for a number of watches, time piece collections,
4  there were purchases for vehicles, inclusive of Ferraris and
5  Porsches, as well as a yacht.
6  Q.  Let's talk about the real estate.  How many property
7  purchases did you trace to funds originating from the nine
8  original funding accounts that sent money to the Fenero Funds,
9  the IMS, Star Merchant, B&N and Fates accounts?
10 A.  So, there were a total of five properties that benefited
11 from those funds.  Three of the properties went through
12 successfully.  There was one property that was an attempted
13 purchase, and then there was a condo where a mortgage was paid
14 off in connection to that property.
15 Q.  What did your tracing process for property purchases
16 entail?
17 A.  It entailed first reviewing the bank records, and tracing
18 the source of funds.  And it also entailed reviewing some
19 search warrant photos and it also entailed looking through
20 various property records.
21 Q.  When you say property records, describe what records you're
22 talking about.  Who keeps these records?
23 A.  Properties that -- property records that are public records
24 usually held by the county clerk or where the property is
25 domiciled, where the property is located, there is public

UNITED STATES OF AMERICA, v.
MARK S. SCOTT

November 19, 2019

JBJ3SCO1          October - Direct          Page 1697

1  records for those properties that consists of deeds and
2  mortgages and title records and also records with who the
3  owners of the properties are registered into.
4          MS. LOZANO: Mr. Barile, please pull up and publish to
5  the jury GX 2617-A.
6  Q.  Ms. October, please explain what this chart depicts.
7  A.  This chart illustrates a home located at 133 Sunset Lane in
8  Barnstable, Massachusetts, in the Cape Cod area.
9  Q.  Who owns that home?
10 A.  That is owned by Mark Scott.  And it was purchased on
11 October 24, 2016 for $2,850,000.  My tracing entailed that
12 these funds derived from the one of the intermediary accounts,
13 the DMS Cayman MSSI International Consultant, which sent a
14 transfer on September 6, 2016, of $529,750 to another MSS
15 International Consultants account, domestic account, held in
16 Florida at City National Bank ending in 3236.
17 Q.  Who was the signatory on that account?
18 A.  That is Mark Scott.  And the funds from the 3236 account at
19 City National Bank was then transferred 450,000 -- 460,000 of
20 it to his attorney's account, Nicole Huesmann IOLA account, on
21 September 7, 2016.
22 Q.  And then where did that money ultimately go?
23 A.  Well, the purchase of the property consisted of two
24 transfers, so, there was an additional transfer that came from
25 another intermediary account held at the Bank of Ireland ending

JBJ3SCO1          October - Direct          Page 1698

1  in 4760 in the name of Fenero Tradenext Trading, which
2  transferred also to Ms. Huesmann's account on October 3, 2016,
3  in the amount of $2.5 million to Ms. Huesmann's account.  Once
4  the money was in Ms. Huesmann's account, it was then used to
5  facilitate and finalize the purchase of 133 Sunset Lane with
6  two payments to a Kinlin Grover Realty Group in the amount of
7  $145,000 and $2,772,953.54 on October 21, 2016, to a Cowley &
8  Cummings IOLA real estate account.
9  Q.  According to the property records for this property, when
10 was it purchased; what was the date of the purchase?
11 A.  The date of the purchase was October 24, 2016.
12 Q.  What was the total purchase price?
13 A.  $2,850,000.
14 Q.  Now, I'd like to ask you about the arrow that goes from
15 attorney's bank account to Cape Cod Five Cents Savings.  There
16 is a notation there, "deposit for 133 Sunset Lane."
17          Where did that come from?
18 A.  That came from the wire details for that particular
19 transfer.
20 Q.  So then let me ask you, and this property is 133 Sunset
21 Lane?
22 A.  Yes, it is.
23 Q.  The two arrows that show money coming into Ms. Huesmann's
24 IOLA account for the benefit of the defendant have two
25 different notations.  The top one reads what?

JBJ3SCO1          October - Direct          Page 1699

1  A.  The top one reads loan to MSS for acquisition Biltmore Way.
2  Q.  And the bottom one reads?
3  A.  Escrow property partial payout of BN loan facility.
4  Q.  Given those -- where were those notations?
5  A.  Those notations would be included in the wire details.
6  Q.  Given those notations, how did you then determine that in
7  fact those moneys were used to buy this property and not
8  something on Biltmore Way?
9  A.  So, a review of Ms. Huesmann's account did not reflect any
10 purchases for a Biltmore Way or BN loan facility.  I'm not sure
11 what those are.  But given the time period of the flows of
12 funds, I used my judgment that those funds were actually used
13 for the 133 Sunset Lane property.
14 Q.  We can turn now to 2617-B.  Oh, I'm sorry.  Can we go back
15 to 2617-A for one minute.
16          Do you know what that photo comes from?
17 A.  That photo came from a search warrant, I believe.
18 Q.  Let's now go to 2617-B.  What is this chart?
19 A.  This chart reflects transfers of money to pay off a mortgage
20 mortgage for a condo owned by Mr. Scott located at 600 Coral
21 Way, Unit 12, in Florida.  The property records reflect that
22 there was a mortgage, and there was a mortgage for this
23 property and the purchase price was 1,580,000.  And that
24 occurred on January 14, 2015.  And my review of the records
25 shows that on October 16, 2016, that that -- the existing

JBJ3SCO1          October - Direct          Page 1700

1  mortgage was paid off in the amount of $1,794.66.  And further
2  down below in the blue box shows where the source of funds to
3  pay off that mortgage came from.
4  Q.  These were the two Bank of Ireland accounts in the name of
5  Fenero Tradenext Holding?
6  A.  Yes, so the two bank accounts, which is the one of the
7  seven intermediary accounts that each transferred 500,000 in
8  October 2016 to Nicole Huesmann's account.
9  Q.  After the second transfer, which was on October 17, two
10 days later, October 19, the mortgage was paid off according to
11 your analysis?
12 A.  Yes, that's correct.
13 Q.  This house is in the name of who?
14 A.  In Mark Scott.  It is a condo.
15 Q.  Was the mortgage in his name?
16 A.  Yes.
17 Q.  I'm sorry, not house.  Condo.  Where did you get this
18 picture?
19 A.  This is just a regular internet photo.
20 Q.  Let's turn now to 2617-D.  What is this house?
21 A.  This chart illustrates a property also owned by Mr. Scott
22 located at 31 Dale Avenue in Hyannis Port, Massachusetts.  Also
23 in the Cape Cod vicinity.
24 Q.  When was it purchased?
25 A.  This property was purchased September 20, 2017, in the

UNITED STATES OF AMERICA, v.
MARK S. SCOTT

November 19, 2019

JBJ3SCO1          October - Direct          Page 1701

1  amount of $3,765,000.
2  Q.  Where did that money, according to your tracing, where did
3  it come from and where did it go?
4  A.  The funds for this property came from two of the
5  intermediary accounts, one in the name of Fenero Trading
6  Holding ending in 4760, and which transferred to Nicole
7  Huesmann's account of $250,000.  And the second intermediary
8  account held in DMS Cayman in the name of MSS International
9  Consultants ending in 7100, made two separate transfers, one on
10  July 14, 2017 in the amount of $2 million, and the second
11  transfer on August 17, 2017 in the amount of $1 million.
12      So, Nicole Huesmann's account collectively received
13  three million -- $3.2 million into her account in three
14  different transfers.  And once the money was in her IOLA
15  account, there were four separate payments to facilitate the
16  final payments for the 31 Dale Avenue.
17  Q.  Those are the arrows?
18  A.  Those are the arrows going out.
19  Q.  To the right?
20  A.  To the far right which includes the O'Neill Real Estate,
21  Frank Horgan Insurance Agency, and John W. Kenney Client Trust
22  account.
23  Q.  Okay.  The bottom arrow on the left coming in has a
24  reference to 31 Dale Avenue, right?
25  A.  Yes.

JBJ3SCO1          October - Direct          Page 1702

1  Q.  The top arrow coming in and to the left has a reference to
2  Railroad Barnstable Property Development.  Do you know what
3  that is?
4  A.  I do not.
5  Q.  Why were you able to tie that money to the 31 Dale Avenue
6  property?
7  A.  So when I reviewed Ms. Huesmann's bank records, I did not
8  notice any payments that reference any payments that included a
9  Barnstable Railroad property.  So, based on my judgment and
10  given the time period of these transfers, I used my judgment
11  that is, these transfers were made for the 31 Dale Avenue
12  property.
13  Q.  And on the right, the arrows coming out of Ms. Huesmann's
14  account, does every one of those arrows include a notation, a
15  wire notation that references 31 Dale Avenue?
16  A.  Yes, all of them have reference on 31 Dale Avenue in some
17  form.
18  Q.  So let's now move to 2617-E.  Oh.  Actually can we go back
19  one more question about 2617-D and 31 Dale Avenue.
20      You mentioned that the total coming in was 3.25
21  million, but the total going out was the 3.7 and change million
22  to purchase the property.  Can you explain the differentials
23  there?
24  A.  Sure.  So, Ms. Huesmann's account also received additional
25  transfers from some of Mark Scott's accounts held at City

JBJ3SCO1          October - Direct          Page 1703

1  National Bank.  So, it was, given the time period of some of
2  those transfers, it was a little bit challenging to say exactly
3  that all of that money was used for this purchase.  So I only
4  collectively gathered the transfers that was in close proximity
5  to that particular real estate purchase date.
6  Q.  So you reflected on the chart only the transfers that you
7  feel confident are traced to the original nine funding
8  accounts?
9  A.  That's correct, yes.
10  Q.  Where did this picture come from, if you know?
11  A.  This picture came from an e-mail, Mark Scott's e-mail.
12  Q.  It was an e-mail that he had?
13  A.  Yes.
14      MS. LOZANO:  2617-E, please, Mr. Barile.
15  Q.  Ms. October, explain briefly what this chart represents.
16  A.  This chart represents another property home purchased by
17  Mr. Scott located at 105 Sunset Lane in Barnstable,
18  Massachusetts, also in the Cape Cod vicinity, which was
19  purchased on November 13, 2017, in the amount of $2,310,000.
20  Q.  And there is a notation here Scott contributed $1.310
21  million.  What, can you explain what that means?
22  A.  So my analysis of what this particular property reflected
23  that there were, there was a second individual that purchased
24  the property with Mr. Scott, a Marietta Halle.  So I extracted
25  her funds because it wasn't related to the transfers connected

JBJ3SCO1          October - Direct          Page 1704

1  to the nine accounts.
2  Q.  And the Fenero Funds?
3  A.  And the Fenero Funds.  So, her amount that she contributed
4  is extracted from the total price.  So I was only able to trace
5  actually the 1.3 million that Mark Scott's intermediary account
6  held at DMS Cayman in the name of MSSI International ending in
7  account 7100 made a transfer of 1,310,000 on October 30, 2017
8  to Ms. Huesmann's account.  The IOLA account.  And that IOLA
9  account made a transfer on November 12, 2017 in the amount of
10  2,211,380 to John Kenney Client Trust account.
11  Q.  In your review of property records, did you see anything
12  connecting John Kenney to the purchase of this property?
13  A.  Yes, John Kenney is listed in the property records as well
14  as Ms. Huesmann.
15  Q.  As one of the attorneys?
16  A.  As one of the attorneys, yeah, of the property.
17  Q.  You mentioned an attempted purchase.  Where is the general
18  vicinity; where was that property?
19  A.  That property was also in the Cape Cod location.
20  Q.  How much money was transferred in anticipation of that
21  attempted purchase?
22  A.  So, I noticed that around February of 2017, there were two
23  $500,000 transfers to Nicole Huesmann's account.
24  Q.  But that never happened?
25  A.  The property wasn't purchased.

UNITED STATES OF AMERICA, v.
MARK S. SCOTT

November 19, 2019

---

JBJ3SCO1          October - Direct          Page 1705

1  Q. We'll move on from property now. You also -- real
2  property.
3      You also mentioned that you traced Fenero Fund money
4  to purchases of watches by the defendant. How many watches
5  were you able to trace to the Fenero Funds in the original nine
6  funding accounts?
7  A. So, I traced 16 watches, just from one jeweler, Time Piece.
8  And then I traced a handful of additional watches that was
9  purchased from a variety of other jewelers, possibly maybe
10 another five or six watches.
11      MS. LOZANO: Mr. Barile, can you please display GX
12 2618.
13 Q. Ms. October, can you summarize for us what this chart
14 reflects?
15 A. This chart reflects the 16 watches that were purchased
16 for -- by Mr. Scott which originated from one of the -- either
17 one of the Fenero accounts or the MSSI Cayman accounts totaling
18 $281,800, and the 16 watches were purchased from the one
19 jeweler known as Time Piece.
20 Q. On the bottom of the chart, does the chart move from left
21 to right chronologically?
22 A. Yes, so it is a timeline chart, which reflects the date of
23 the property -- of the watch purchase, and also the arrow above
24 it shows from what account that money was -- what account the
25 watch was purchased from.

---

JBJ3SCO1          October - Direct          Page 1706

1  Q. So you traced all of these watches to one of four accounts
2  that are depicted on the top of this chart, the Northern Trust,
3  the City National Bank 3008, City National Bank 3236, and the
4  City National Bank --
5  A. 0295.
6  Q. -- 0295. What is depicted in the each box for each watch?
7  A. So, depicted in the box on the top is whatever was listed
8  in the wire description for the watch, and there is a generic
9  picture of a watch as well as the dollar amount of the
10 purchase, and the bottom part entails the date of that
11 purchase.
12 Q. What was the price range for these 16 watches?
13 A. It ranged from the lowest being $3,700, to the highest
14 being $35,995.
15 Q. What kind of watches were these?
16 A. There were a combination of Rolex watches, Omega watches
17 and Panerai watches as well.
18 Q. We can take that down, Mr. Barile.
19      You also mentioned purchases made with Fenero Fund
20 money by the defendant of multiple vehicles. I am going to ask
21 you about those now. If we can pull up GX 2619-A.
22      What does this chart depict?
23 A. This is a purchase of a Ferrari 599 GTB 2011, which was
24 purchased by Mr. Scott on November 8, 2016, in the amount of
25 $245,269.37.

---

JBJ3SCO1          October - Direct          Page 1707

1  Q. Okay. So I just want you to focus on the far left and the
2  far right. Where did this money originate, according to your
3  tracing?
4  A. The funds originated from one of the intermediary accounts
5  held at the Bank of Ireland in the name of Fenero Tradenext
6  Holding ending in 5001.
7  Q. And all the way on the right, where did the money end up?
8  A. The money ended up with a check payment to Braman
9  Motorcars.
10 Q. All right. Let's go now -- by the way, did that check,
11 your review of that check indicate the model?
12 A. Yes, it did. It was in the memo line, yes.
13 Q. Mr. Barile, please pull up 2619-B.
14      Ms. October, what does this chart represent?
15 A. This chart represents a Porsche 911 Turbo 2017 which was
16 purchased by Mr. Scott on February 10, 2017, in the amount of
17 119,529.50.
18 Q. Okay. And again, focusing just all the way on the left and
19 all the way on the right, where did the money originate?
20 A. The funds originated from one of the intermediary accounts
21 held at the Bank of Ireland in the name of Fenero Equity
22 Investment ending in 4760.
23 Q. And where did the money end?
24 A. It ended with a check payment to Braman Motorcars.
25 Q. Again, did that check indicate in any sort of way that the

---

JBJ3SCO1          October - Direct          Page 1708

1  purchase was for a Porsche 911 Turbo?
2  A. Yes, it did.
3  Q. Where does this photo come from, do you know?
4  A. This came from just -- I think this came from a search
5  warrant photo.
6  Q. Okay. Let's move on to 2619-C. What does this chart
7  depict?
8  A. This chart depicts a Porsche 911R 2016 purchased by
9  Mr. Scott on June 15, 2017, in the amount of $332,248.41.
10 Q. And the money originated from what account?
11 A. The money originated from one of the intermediary accounts
12 held at DMS Cayman in the name of MSS International Consultants
13 BVI Limited.
14 Q. And that transfer was a $500,000 transfer that went through
15 a couple of intermediary accounts?
16 A. Yes, so for the purchase of this property, there were
17 multiple transfers. So, the DMS Cayman account transferred on
18 June 14, 2017, $500,000 to Mark Scott -- MSS International
19 Consultants LLC, one of the domestic accounts held in Florida.
20 Q. Then it went to another?
21 A. Then it went --
22 Q. CNB Mark Scott account?
23 A. Correct. The same, the same bank, just under the name of
24 Mark Scott.
25 Q. Okay.

---

UNITED STATES OF AMERICA, v.
MARK S. SCOTT

November 19, 2019

| JBJ3SCO1 | October - Direct | Page 1709 |
|---|---|---|

1 A. Ending 0295.

2 Q. Then from there, where was the money sent for the ultimate

3 purchase of the vehicle?

4 A. To Braman Motorcars.

5 Q. At Sun Trust Bank?

6 A. Sun Trust Bank, yes.

7 Q. How did you determine from your financial analysis that the

8 purchase was for this kind of make and model of a car?

9 A. So, the it was indicated on the wire details.

10 Q. And the total purchase of that car was 332,248.41?

11 A. Yes, that's correct.

12 Q. We can move on now, Mr. Barile, to 2619-D.

13 Ms. October, what does this chart represent, which

14 vehicle?

15 A. This chart represents a purchase by Mr. Scott of a Porsche

16 911 GTRS 2018, on June 11, 2018, in the amount of 218,898.87.

17 Q. Where did this money originate, where did you trace the

18 purchase price to?

19 A. These funds came from a RBC account held in the name of

20 Mark Scott Trust 2017 ending in 3317 account number.

21 Q. Were you able to trace the money that was in 3317, where

22 that money came from?

23 A. Yes, I did.

24 Q. Where did that money come from?

25 A. It came from a series of transfers, but I was able to

| JBJ3SCO1 | October - Direct | Page 1710 |
|---|---|---|

1 transfer it back to another RBC account held in the name of HFT

2 Holding ending in 8611.

3 Q. You were able to trace it back to that?

4 A. I was able to trace it back to that, and then the 8611 was

5 also traced to the intermediary accounts and then traced

6 further up to one of the Fenero accounts and traced back up

7 further up originating from one of the nine accounts, either

8 Star Merchant, B&N Consultants, IMS or Fates.

9 Q. So this purchase was made on June 11, 2018. And where was

10 the purchase price of the $218,898.87 sent?

11 A. It was sent to Braman Motorcars held at Sun Trust.

12 Q. Mr. Barile, could we see 2619-E.

13 What is this chart, Ms. October?

14 A. This chart reflects a purchase of a 911 GT2 RS 2018

15 purchased by Mr. Scott on August 29, 2018, in the amount of

16 $617,426.46.

17 Q. And all the way on the left, to which two accounts did you

18 trace the purchase price for this vehicle?

19 A. The funds came from, the top one is one of the intermediary

20 accounts of MSS International Consultants BVI held at First

21 Caribbean ending in 2701. As well as the RBC account held in

22 the Cayman Islands in the name of Mark Scott 2017 Trust ending

23 in 3317.

24 Q. So the First Caribbean MSSI account sent $500,000 through a

25 series of Mark Scott controlled accounts, and the RBC account

| JBJ3SCO1 | October - Direct | Page 1711 |
|---|---|---|

1 sent $2 million through one other Mark Scott controlled

2 account?

3 A. That is correct.

4 Q. Ultimately, to whom was the purchase price paid?

5 A. Paid to Braman Motorcars.

6 Q. And this 3317 RBC account, is that the same account as you

7 just testified you traced to the RBC 8611 HFT Holdings account?

8 A. That is correct.

9 Q. All right. Was there any indication in any of the -- in

10 any of the bank records that this was the car that was being

11 purchased with these funds?

12 A. Yes. The wire details indicated the model of the car.

13 Q. Where did you get this photo?

14 A. This photo was taken from the search warrant.

15 Q. Let's now turn to 2619-F. Ms. October, tell us about this

16 chart.

17 A. This chart illustrates a purchase of a Sunseeker Predator

18 yacht that was purchased by Mr. Scott on March 21, 2017, in the

19 amount of $1,310,000.

20 Q. Where did that money originate, where did you trace that

21 money back to, what account?

22 A. The funds were traced to one of the intermediary accounts

23 held at Bank of Ireland, in the name of Fenero Tradenext

24 Holding ending in 5001.

25 Q. And that transfer for the amount of $1.3 million, was there

| JBJ3SCO1 | October - Direct | Page 1712 |
|---|---|---|

1 a notation on that wire?

2 A. Yes. The wire indicated boat purchase sent for MSSI Marine

3 Group Limited.

4 Q. Ultimately, were two payments made to cover purchase price

5 of this yacht?

6 A. Yes, there was, yeah.

7 Q. Where did those payments go?

8 A. There were two payments, one that went to Galat Yacht Sales

9 in amount of $130,000 with a reference in the wire indicating

10 deposit for 2016 Sunseeker Predator. And the second deposit,

11 second final payment was in the amount of 1,127,000 where the

12 reference in the wire indicated Sunseeker which was paid to a

13 Nautikos Florida LLC account.

14 Q. Do you know what Nautikos Florida is?

15 A. I understand it to be a business in the marine space that

16 sells boats.

17 Q. According to the documents and records you've reviewed, do

18 you know what the name of this yacht or vessel is?

19 A. Yes.

20 Q. What is that?

21 A. TMI -- T-A-I-M-A.

22 Q. Do we see that on the photo or partial?

23 A. Yes.

24 Q. The partial name of the photo there?

25 A. Yes.

UNITED STATES OF AMERICA, v.
MARK S. SCOTT

November 19, 2019

JBJ3SCO1                Октober - Direct                Page 1713

1  Q.  And what letters are missing so we see what --
2  A.  It's spelled T-A-I-M-A.  So the M is partially cut off and
3     the A.
4  Q.  Where does this photo come from?
5  A.  This came from a search warrant.
6  Q.  We can take that down.
7        As part of your financial analysis, did you prepare a
8     summary of the total value of transfers from the Fenero MSSI
9     accounts to Scott controlled accounts?
10  A.  Yes.
11  Q.  Can we pull up 2628, Mr. Barile, please.
12       What does this chart reflect?
13  A.  This chart reflects the nine funding accounts that
14     transfers money to the four Cayman Fenero accounts, then to the
15     seven intermediary accounts which included bank accounts held
16     in the name of MSSI in the Cayman Islands, as well as four Bank
17     of Ireland accounts held in the name of various names of
18     Fenero.  And those funds were transferred to accounts
19     controlled by Mark Scott, and also accounts to Nicole Huesmann
20     bank accounts, as well as the accounts that he shares with
21     David Pike, and the total sums of the money for these transfers
22     was approximately 52 million.
23  Q.  How much?
24  A.  52 million.
25  Q.  For the entire box?

JBJ3SCO1                October - Direct                Page 1714

1  A.  The entire box.
2  Q.  All in?
3  A.  All in.
4  Q.  How do you define in this chart and for yourself accounts
5     controlled or for the benefit of defendant Scott?
6  A.  Based on the account opening documents, and the signatory
7     card that the accounts listed Mr. Scott as either a director or
8     beneficial owner of these accounts.
9  Q.  How is this bottom box organized?
10  A.  So, it's organized with the orange circle and the American
11     flag as accounts that are domestic, were U.S. held, and then
12     there's flags that represents accounts that are held in the
13     Cayman Islands, and then moving, actually, then there is also
14     one account there is a Swiss account, so, the first box
15     represents all of only -- only Mr. Scott accounts.
16       And then the second box, the middle box has the orange
17     colored coding around it, represents accounts that's not held
18     in Mr. Scott's name, but accounts where he actually received
19     benefits from, and those would include the Nicole Huesmann
20     account, as well as the Williams Jet Tenders account, which
21     appeared to mention the name of the boat in the wire records.
22       And then to the far right, located in highlighted in
23     blue, are accounts that are shared with Scott and David Pike,
24     and there are two accounts in that box.
25       (Continued on next page)

JBJ9SCO2                October - Direct                Page 1715

1       MS. LOZANO:  All right.  I want to ask you if we could
2     actually put up, Mr. Barile, side-to-side 1441 now.
3  Q.  And Ms. October you mentioned -- you testified that some of
4     the intermediary accounts as well as the Fenero Fund Cayman
5     accounts were held at DMS?
6  A.  Correct.
7  Q.  So I'd like you to take a look at 1441.
8       Have you seen this before?
9  A.  Yes.
10  Q.  And what is it?
11  A.  It's an e-mail from Mark Scott on May 17, 2016.  From Mark
12     Scott to Mark Scott with the subject DMS wire details.
13       MS. LOZANO:  Can we scroll up to the second page of
14     it.  And I think we may need to rotate.
15  Q.  What is this, Ms. October?
16  A.  So this is a DMS Bank & Trust wire instructions sheet.
17  Q.  Does that indicate for account holders at DMS what
18     intermediary banks are going to handle their international
19     transfers?
20  A.  Yes, it does.
21  Q.  And on the left-hand column there's a column called
22     currency?
23  A.  Yes.
24  Q.  And the first one down it says USD.  What does that stand
25     for?

JBJ9SCO2                October - Direct                Page 1716

1  A.  That's US dollar.
2  Q.  The next column over says intermediary bank?
3  A.  Correct.
4  Q.  And for US dollars or accounts held at DMS what serves as
5     the intermediary bank?
6  A.  Bank of New York Mellon.
7  Q.  What is the address?
8  A.  Bank of New York Mellon New York, New York.
9  Q.  What is the address?
10  A.  I'm sorry.  One Wall Street, New York, New York.
11       MS. LOZANO:  I think we can take that down now.
12  Q.  So let's go back up to 2628.
13       Now you mentioned that this chart reflects a total of
14     approximately $53 million that the defendant received from the
15     Fenero Funds accounts?
16  A.  That is correct.
17  Q.  Are you familiar with the defendant's Fenero private equity
18     fund mission statement?
19  A.  Yes.
20       MS. LOZANO:  Mr. Barile, if we could pull up GX2201,
21     page 7.  Let's I guess go to 6 first so we can show the
22     witness.
23  Q.  Ms. October, do you recognize this?
24  A.  Yes.  It's the Fenero Equity Investments mission statement.
25  Q.  And was that document contained in some of the bank records

UNITED STATES OF AMERICA, v.
MARK S. SCOTT
November 19, 2019

JBJ9SCO2       October - Direct       Page 1717

1  that you've reviewed?
2  A.  Yes.
3  Q.  So let's go to the second page of this statement which is
4  the seventh page of the exhibit and on the top there is a
5  paragraph and in the middle of the paragraph there's a sentence
6  that starts "The fund manager receives," and then it has little
7  i, little two i, little three i.  So can you read to me that
8  entire sentence starting with, "The fund manager receives."
9  A.  The fund manager receives a management fee of one percent
10  per deposit in the fund; two, a one percent on the average
11  annual remaining cash value of the fund; third, an eight
12  percent carried interest pari passu with investors upon any
13  exit.
14  Q.  What is your understanding about the one percent management
15  fee that the defendant was entitled to under this agreement,
16  what was that one percent based on?
17  A.  The one percent based on -- it says based on the deposits
18  in the fund.
19  Q.  So the total deposits in the fund?
20  A.  The total deposits.
21  Q.  And what about number three, an eight percent carried
22  interest pari passu with the investors upon any exit.
23       Are you familiar with the term carried interest?
24  A.  Yes, I am.
25  Q.  What does that mean?

JBJ9SCO2       October - Direct       Page 1718

1  A.  Carried interest is additional income that a partner in a
2  private equity fund can receive from profits derived from those
3  deposits.
4  Q.  So to be clear the eight percent is calculated not on the
5  total money invested in the fund but only from the profit
6  earned?
7       MR. GARVIN:  Your Honor, I'm sorry.  Leading.
8       THE COURT:  Yes.  Don't lead, Ms. Lozano.
9  Q.  Explain to me what is the eight percent calculated from?
10  A.  The eight percent will be calculated based on the
11  investments and then the return on those investments, whatever
12  profits were gained and realized from those investments would
13  be the profits only would be distributed to the fund manager --
14  Q.  So to be clear --
15  A.  -- partner.
16  Q.  So to be clear is the eight percent calculated on the total
17  amount invested in the fund?
18  A.  No.
19       MS. LOZANO:  We can take that down.  And we can put
20  2628 back up.  Let's look at the bottom box.
21  Q.  Now you walked through and explained to us the kind of
22  coding of the accounts here and how they're depicted.  Can you
23  tell us where is the total amount that Mr. Scott -- that you
24  have credited to Mr. Scott for Scott-only controlled accounts?
25  A.  So it's located in the -- in bold on the left side, Scott

JBJ9SCO2       October - Direct       Page 1719

1  accounts total credit $29,339,608.08.  And then there's euros
2  of 1,146,576.86.  And then there's pounds of 8,275,109.60.
3  Q.  And those are all independent of each other?  Those aren't
4  kind of the same amount in different currencies?  Those are
5  different amounts in each currency; is that right?
6  A.  Different amount in each currency.
7       MS. LOZANO:  One moment, your Honor.
8       (Counsel confer)
9       MS. LOZANO:  Your Honor, one moment.  I have one more
10  thing left.
11       At this time, your Honor, may I approach the witness?
12       THE COURT:  You may.
13  Q.  Ms. October, I want to show you five different exhibits.
14  And the first one is 2602A-BU.  The next one is 2603-BU.  The
15  next one is 2622-BU.  The next one is 2628-BU.  And the last
16  one is 2620-BU?
17  A.  Yes.
18  Q.  Do you recognize all of those?
19  A.  Yes, I do.
20  Q.  What are they?
21  A.  They are various charts that I created to represent the
22  flow of money and flow of funds from the funding accounts to
23  accounts controlled by Mr. Scott.
24  Q.  And those -- are those exhibits the same as the exhibits
25  with those numbers except that they're bigger?

JBJ9SCO2       October - Cross       Page 1720

1  A.  That's correct.
2       MS. LOZANO:  I'm going to offer at this time, your
3  Honor, those five exhibits.
4       MR. GARVIN:  I believe the Court has already ruled on
5  this.  We have no objection.
6       THE COURT:  Very well.  They will be received.
7       (Government's Exhibits 2602A-BU, 2603-BU, 2622-BU,
8  2628-BU, 2620-BU received in evidence)
9       MS. LOZANO:  I have no further questions for this
10  witness.
11       THE COURT:  Cross-examination.
12       MR. GARVIN:  Thank you, your Honor.
13  CROSS-EXAMINATION
14  BY MR. GARVIN:
15  Q.  Good morning, Ms. October.
16  A.  Good morning, counsel.
17  Q.  My name is David Garvin.  I represent Mr. Scott in this
18  matter.
19       MR. GARVIN:  Mr. Barile, would you be nice enough,
20  sir, to put back onto the screen Government Exhibit 2201, page
21  7.  If you could please highlight the top portion of the page.
22  Q.  Ma'am, you were asked a few moments ago, and I wanted to
23  hit this while it was still fresh, about this particular
24  paragraph.  Do you recall that?
25  A.  Yes, I do.

UNITED STATES OF AMERICA, v.
MARK S. SCOTT

November 19, 2019

JBJ9SCO2          October - Cross          Page 1721

1 Q. OK. And there is a portion of it that says "At this time,
2  Fenero expects to fully invest and exit from its initial
3  investments within a five-year term."
4       Do you see that, ma'am?
5 A. Yes.
6 Q. And you understand based upon your experience and education
7  that private equity funds can have an expiration date, correct?
8 A. Correct.
9 Q. It is often called an exit date, correct?
10 A. Familiar with that, yes.
11 Q. And that indicates that the parties should expect their
12  money to be tied up for a period of time, correct?
13 A. Possible.
14 Q. And the parties that are investing into the private equity
15  funds normally understand that it is the administrator of the
16  fund that will decide upon the investments of that fund; isn't
17  that correct?
18       MS. LOZANO: Objection. Calls for someone else's
19 state of mind.
20       THE COURT: Overruled.
21 Q. You can answer, ma'am.
22 A. It's possible.
23 Q. And so this particular document goes on to say that the
24  fund manager receives a: One, management fee of one percent
25  per deposit in the fund; two, a one percent on the average

JBJ9SCO2          October - Cross          Page 1722

1  annual remaining cash value of the fund; and three, an eight
2  percent carried interest pari passu with the investors upon any
3  exit.
4       Do you see that, ma'am?
5 A. Yes, I do.
6 Q. And isn't it also clear that the percentages here, in
7  particular, will -- focusing on number two, will be added each
8  year; isn't that correct?
9 A. It says an average annual.
10 Q. Correct. So you would anticipate that that would mean that
11  the one percent is an annual fee; isn't that right?
12 A. Possible.
13 Q. So, if that is the case, that means, if it lasts for five
14  years, that portion by itself should total five percent,
15  correct?
16 A. Yes.
17 Q. Now, in addition to that, if someone decides that they want
18  to break the private equity firm and take their investment out,
19  they have to then negotiate with the fund manager as to what
20  the termination fee; isn't that true?
21 A. I would imagine so.
22 Q. Because otherwise it could be viewed as a breach of
23  contract; isn't that true?
24       MS. LOZANO: Objection.
25       THE COURT: Overruled.

JBJ9SCO2          October - Cross          Page 1723

1       THE WITNESS: It's possible.
2 Q. And you were not present when the parties in this
3  particular case broke this equity fund, were you?
4 A. I was not.
5 Q. In fact, this equity fund appears to have only been funded
6  between the months of June and October of 2016, correct?
7 A. That sounds right.
8 Q. And that the money began to be closed out of these accounts
9  as early as April 10 of 2017; isn't that correct?
10 A. That sounds possible.
11 Q. And by September of 2017 all of the funds had been
12  transferred out; isn't that true?
13 A. I would have to see something to recall the time period.
14 Q. Fair enough, ma'am.
15       We're going to go through each of those charts and
16  when we hit that one that may be helpful we can talk about it
17  then, OK?
18 A. Sure.
19 Q. So, we have a situation where we don't know what the final
20  percentage was that was negotiated and agreed upon to pay the
21  fund manager, do we?
22       MS. LOZANO: Objection.
23       THE COURT: Overruled.
24       THE WITNESS: It's outlined in the mission statement.
25 Q. Well we see under this mission statement it would be one

JBJ9SCO2          October - Cross          Page 1724

1  percent if it went in accordance to what is said here, it would
2  be one percent, five percent, and eight percent carried
3  interest Pari passu; isn't that right?
4       MS. LOZANO: Objection. Misrepresenting the evidence.
5       THE COURT: Overruled.
6       THE WITNESS: That's what it says here.
7 Q. And if the parties simply just stuck with what it said they
8  could end up with as much as 14 percent going to the fund
9  manager at the early termination of this fund; isn't that true?
10       MS. LOZANO: Objection. Based on what?
11       THE COURT: If she knows.
12       THE WITNESS: I'm not sure.
13 Q. Well if we just add one percent and five percent and eight
14  percent the simple math on that would be 14, correct?
15       MS. LOZANO: Objection. Mischaracterizes her
16  testimony.
17       THE COURT: If she knows.
18       Can you answer that question?
19       THE WITNESS: No.
20       THE COURT: Next question, Mr. Garvin.
21       MR. GARVIN: Yes.
22       Would you be kind enough, Mr. Barile, to put up the
23  first chart. I believe it's 2601, sir.
24 Q. Now I believe this is the first chart. And this chart
25  reflects funds that were paid during a period of time and that

UNITED STATES OF AMERICA, v.
MARK S. SCOTT

November 19, 2019

| JBJ9SCO2 | October - Cross | Page 1725 |
|---|---|---|

1  is designated as February 2016 through April 2016 to Mark
2  Scott; is that correct?
3  A.  Yes.
4  Q.  And that total is slightly under a million dollars; is that
5  right?
6  A.  That is correct.
7        MR. GARVIN: At this time I would like to move
8  Defendant's Exhibits into evidence, in particular, Defendant's
9  Exhibit 158, 159, 160, 701, being Mr. Scott's four tax returns.
10       MR. DEVLIN-BROWN: I think we have technical issues.
11  Can we use the hard copies.
12       MS. LOZANO: Your Honor, the government objects.  This
13  is outside the scope of the direct.  If they would like to
14  introduce it on their case they can.
15       Your Honor, may we have a sidebar on this?
16       THE COURT: No.  I'll allow you to use them now.
17       MR. GARVIN: Thank you.
18       (Defendant's Exhibits 158, 159, 160, 701 received in
19  evidence)
20       (Counsel confer)
21       MR. DiMASE: Your Honor we would object to the
22  admission of the fourth exhibit, the 2018 tax return for the
23  reasons that we described at the beginning of the day.  We
24  haven't seen it yet.  Just that one for now.
25       THE COURT: It will be received subject to connection.

| JBJ9SCO2 | October - Cross | Page 1726 |
|---|---|---|

1        MR. GARVIN: Thank you.  Your Honor, I believe he's
2  unable to pull it up electronically so we're going to try to
3  pull out the ELMO.
4        Can you please trigger the key for the lecturn?
5        Thank you, sir.
6  Q.  Now I'm placing now down on the court's ELMO system and I
7  am showing you now what is in evidence as Defendant's Exhibit
8  159.  Do you see that?
9  A.  Yes.
10  Q.  And you're familiar with the common 1040 tax return,
11  correct?
12  A.  Yes.
13  Q.  And the 1040 tax return that we are showing at this
14  particular instance to the ladies and gentlemen of the jury is
15  the 2016 return, correct?
16  A.  Yes.
17  Q.  And when we look down this tax return first we see in the
18  top notation it appears to be quite a large return because it
19  has 97 pages, correct?
20  A.  Yes.
21  Q.  And if we look at the income that's being reported for this
22  particular period of time -- would you be kind enough to read
23  what is on line 22 to the ladies and gentlemen of the jury?
24  A.  9,156,869.
25  Q.  Now, a few moments ago you had discussed with myself the

| JBJ9SCO2 | October - Cross | Page 1727 |
|---|---|---|

1  very first chart which was 2601, correct?
2  A.  I'm sorry.
3  Q.  2601?
4  A.  Yes.
5  Q.  We just discussed it a couple moments ago.
6        And on that particular chart the amount of money that
7  Mr. Scott received was one million dollars, correct?
8  A.  Close to a million, yes.
9  Q.  And I am directing your attention, ma'am, to line 17.  Do
10  you see line 17?
11  A.  Yes.
12  Q.  And the amount that Mr. Scott reported on line 17 is
13  over -- slightly over $2 million, correct?
14  A.  Correct.
15  Q.  And you are aware that Mr. Scott is a lawyer, right?
16  A.  Yes.
17  Q.  And that for at least a portion of 2016 Mr. Scott was
18  working as a lawyer at Locke Lord, right?
19  A.  Yes.
20  Q.  And that you would anticipate that his legal fees would be
21  reported on his tax return, correct?
22       MS. LOZANO: Objection.
23       THE COURT: Overruled.
24       THE WITNESS: I'm sorry?
25  Q.  You would anticipate that his legal fees would be reported

| JBJ9SCO2 | October - Cross | Page 1728 |
|---|---|---|

1  on his tax return, correct?
2  A.  His income.
3  Q.  And your chart makes reference to the fact that those
4  transfers had written on them the words legal expense; isn't
5  that right?
6  A.  Yes.
7  Q.  And so if we look at line 17 it is for schedule E; is that
8  right?
9  A.  Yes.
10  Q.  And also for S corporations which means small corporations,
11  right?
12  A.  Right.
13  Q.  And in this particular case, if we located schedule E, we
14  would be looking to see if his law income would be reported
15  there, correct?
16  A.  Right.
17  Q.  Now in addition to his law income you have discussed with
18  the ladies and gentlemen of the jury that Mr. Scott controlled
19  an entity known as MSS International Consultants BVI; isn't
20  that right?
21  A.  Yes.
22  Q.  And BVI is short for British Virgin Islands, correct?
23  A.  Yes.
24  Q.  And British Virgin Islands does not have an income tax
25  system for small business entities; isn't that correct?

UNITED STATES OF AMERICA, v.
MARK S. SCOTT

November 19, 2019

JBJ9SCO2          October - Cross          Page 1729

 1 A. I'm not sure.
 2       MS. LOZANO: Objection.
 3       THE COURT: Overruled.
 4 Q. Now, there is an opportunity, though, that if you have a
 5 small foreign entity that the taxpayer can tell the IRS that
 6 they're going to report the entity as if it was domestic and
 7 they call that a disregarded -- a report for foreign
 8 disregarded entities; isn't that true?
 9 A. I'm not sure.
10 Q. I'm putting down what's page 22 of the 97-page document.
11 In particular I'm making reference at this point to form 8858.
12       Do you see that, ma'am?
13 A. Yes, I do.
14 Q. And do you see that it says information return of U.S.
15 persons with respect to foreign disregarded entities?
16 A. Yes, I see that.
17 Q. And the name of the person who is filing the return it says
18 is Mark S. Scott, right?
19 A. Yes.
20 Q. And the name of the company that he's reporting as a
21 foreign disregarded entity is MSS International Consultants
22 BVI.
23       Do you see that?
24 A. I see that.
25 Q. Now, what effect that has is that any money that MSS --

JBJ9SCO2          October - Cross          Page 1730

 1 strike that. I'm sorry. I got ahead of myself -- that MSS
 2 International Consultants BVI is going to report as income
 3 will, in fact, appear on this United States tax return; isn't
 4 that true?
 5       MS. LOZANO: Objection. Counsel is testifying.
 6       THE COURT: Overruled.
 7       THE WITNESS: I'm not sure.
 8 Q. Well, if we look at this closely we will see that Mr. Scott
 9 has reported on line 12 almost an additional $7 million of
10 taxable income.
11       Do you see that, ma'am?
12 A. I see that.
13 Q. And you will agree with me, and somewhat facetiously, I'm
14 sorry, I can't help myself, that will buy a lot of watches,
15 right?
16 A. A lot of property.
17 Q. A lot of property, a lot of watches, a lot of boats, right?
18 A. I would assume so.
19 Q. There's nothing wrong with buying property or watches or
20 cars as long as you abide by the law, correct?
21 A. Correct.
22 Q. And one of the things you have to do to abide by the law is
23 you have to report your taxes, right?
24 A. Part of it.
25 Q. And you would also agree, would you not, based upon your

JBJ9SCO2          October - Cross          Page 1731

 1 experience that private equity fund managers make a whole lot
 2 of money; isn't that true?
 3 A. Some of them do.
 4 Q. And so it is not unusual to see a private equity manager in
 5 charge of a four-hundred-million-dollar equity fund earning
 6 seven, eight million dollars a year; isn't that true?
 7 A. Earning is subjective.
 8 Q. But it is -- the statement is true though, isn't it?
 9 A. Possible.
10       MR. GARVIN: Your Honor may I -- I see we're close to
11 what I think is the break.
12       THE COURT: We can break now. Ladies and gentlemen,
13 we'll take fifteen minutes. Don't discuss the case.
14       (Jury not present)
15       THE COURT: Ms. October, you may step down.
16       (Witness excused)
17       THE COURT: Everyone can be seated. Anything else?
18 Don't be late.
19       (Recess)
20       THE COURT: OK. Can we get Ms. October?
21       (Jury present)
22       THE COURT: Mr. Garvin.
23       MR. GARVIN: Thank you, your Honor.
24       Ms. Stanley, are you able to pull up Defendant's
25 Exhibit 701, please.

JBJ9SCO2          October - Cross          Page 1732

 1       Could you please go in, I think it's to page 14. Are
 2 you able to scroll down to page 14? Thank you. Please
 3 continue scrolling down if possible. I like to get to the
 4 first page of the return. I think it's two more pages. One
 5 more page, I believe. Looking for the first page of the
 6 return. OK. That indeed is the first page of the return.
 7 Q. Do you recognize this, ma'am, as Mark Scott's personal 1040
 8 for the year 2018?
 9 A. Yes, I do.
10 Q. You see that the format has changed because there was a
11 change by the Internal Revenue Service that year; is that
12 correct?
13 A. I'm not sure.
14 Q. And if we look in the center section we see that the return
15 was prepared by a CPA company; is that correct?
16 A. Yes.
17       MR. GARVIN: Ms. Stanley, would you be nice enough to
18 go to the next page, please.
19 Q. And this is the -- this page reflects the income that was
20 reported by Mr. Scott to the Internal Revenue Service; is that
21 correct?
22 A. It appears so.
23 Q. And if we look at line 10 it says taxable income,
24 $29,671,123. Do you see that ma'am?
25 A. Yes, I do.

UNITED STATES OF AMERICA, v.
MARK S. SCOTT                                                                November 19, 2019

JBJ9SCO2         October - Cross         Page 1733

1  Q.  And this would be in addition to what we had previously
2     seen reported by Mr. Scott in 2016; isn't that correct?
3  A.  (No response).
4  Q.  Is that correct, ma'am?
5  A.  I'm not understanding the question.
6  Q.  On Defendant's Exhibit 159 that we did right before the
7     break we saw that there was on line 22 9,156,869 reported as
8     taxable income in 2016, correct?
9  A.  Right.  I recall.
10 Q.  And now we're seeing in 2018 that he has reporting an
11    additional $29,671,123 of taxable income; isn't that correct?
12 A.  I see that.
13       MR. GARVIN:  You can take that down.  Thank you.
14 Q.  So just if we add those two together by themselves there
15    was approximately $39 million of taxable income reported by
16    Mr. Scott for the years 2016 and 2018; isn't that correct?
17 A.  That adds up.
18 Q.  Now, I'd like to shift back to talking about some of the
19    charts that you prepared.
20 A.  OK.
21       MR. GARVIN:  In particular perhaps Mr. Barile would
22    help us with putting up 2602, please.
23 Q.  At the top we have the total amount for the Fenero Funds,
24    correct?
25 A.  Yes.

JBJ9SCO2         October - Cross         Page 1734

1  Q.  And as we stated I believe a little bit earlier that this
2     time period covers May of '16 through October '16; is that
3     right?
4  A.  That's correct.
5  Q.  And that's the period of time that the -- excuse me.  The
6     four private equity funds were funded, correct?
7  A.  Right.
8  Q.  And so what we see in the far left-hand side is that there
9     is a bank account --
10       MR. GARVIN:  Could we please enlarge the top third.
11 Q.  Focusing now on what appears to be Commerzbank on the far
12    left-hand side.  Do you see that, ma'am?
13 A.  Yes.
14 Q.  Account ending in 2001?
15 A.  Yes.
16 Q.  And it would be accurate to say that Mr. Mark Scott was not
17    a signatory on that account; isn't that true?
18 A.  That's true.
19 Q.  If we go to the next account to the right ending in 7201 it
20    would be also true to say that Mr. Scott does not appear in any
21    of the bank records for that account as a signatory; isn't that
22    correct?
23 A.  I'm unable to answer that.
24 Q.  Well the records that you saw Mr. Scott was not a signatory
25    in any of the records that you saw; is that correct?

JBJ9SCO2         October - Cross         Page 1735

1  A.  I did not have the records for the account -- the OCBC
2     account ending in 7201.
3  Q.  Let's go to the next account, the Deutsche Bank account.
4     Would it be accurate to say that Mr. Scott was not a signatory
5     authority on that account?
6  A.  Correct.
7  Q.  And working our way across to try to pick up a little bit
8     of speed would it be accurate to say that Mr. Scott was not a
9     signatory on any of the accounts that are highlighted on the
10    screen now?
11 A.  I'm unable to answer that because we do not have the
12    records for the other OCBC account.
13 Q.  So we do know that Mr. Scott was not signatory on any of
14    the accounts here with the exception of OCBC because we simply
15    don't have those records; is that right?
16 A.  Correct.
17 Q.  Now, if you would be kind enough, sir, to highlight the
18    bottom third.
19       Now the bottom third it shows the four Fenero equity
20    accounts, correct?
21 A.  Yes.
22 Q.  And those accounts were held in Mr. Scott's name; isn't
23    that right?
24 A.  As a signatory, yes.
25 Q.  And all four of those accounts were -- fell under the MSSI

JBJ9SCO2         October - Cross         Page 1736

1     consultants or international consultants BVI entity; isn't that
2     right?
3  A.  I think so.
4  Q.  And Mr. Scott was the signatory for that account or entity
5     also; isn't that right?
6  A.  For the MSSI?
7  Q.  Yes, ma'am.
8  A.  Yes.
9  Q.  Now, I want to talk about the one over to the far
10    right-hand side.  Do you see the one that says Fates Group.
11    The far right-hand side it says the Fates Group.  Do you see
12    that, ma'am?
13 A.  Yes.
14 Q.  And do you -- would it be accurate to say that the money
15    that the Fates Group sent to the Fenero equity investments was
16    returned?
17 A.  Returned to who?
18 Q.  To Fates Group?
19 A.  To another Fates Group account, yes.
20 Q.  And every penny that we have --
21       MR. GARVIN:  If we could fade out to the normal
22    screen, please.  Thank you so much.
23 Q.  If we add these two Fates Groups together it comes pretty
24    close to $10 million, slightly less; is that correct?
25 A.  Close to 10 million, yes.

UNITED STATES OF AMERICA, v.
MARK S. SCOTT

November 19, 2019

JBJ9SCO2      October - Cross      Page 1737

1 Q. And the exact same amount, several months later, was
2   returned to Fates Group; isn't that correct?
3 A. I wouldn't say returned but it was transferred to another
4   Fates Group account.
5 Q. Well it was the -- money that came into Fenero Equity,
6   there was a specific amount and that exact same amount was
7   returned back to Fates Group?
8 A. I'm just uncomfortable with "returned." I would associate
9   returned with being returned to the exact same account. Not to
10   a different account.
11 Q. I see. OK. So I was using the term returned because it
12   went back to an account controlled by Fates Group but I
13   understand your point so I'll rephrase.
14      Was the money sent to an account that was controlled
15   by Fates Group?
16 A. Yes.
17 Q. And that money that it was sent to that was controlled by
18   Fates Group, isn't it accurate to say that Mr. Scott was not a
19   signatory on any of the Fates Group accounts?
20 A. I can't speak to that because I do not have the records for
21   the final destination for the Fates Group account.
22 Q. Have you seen Mr. Scott's name on any Fates Group account?
23 A. None that I reviewed, no.
24 Q. Thank you, ma'am.
25      Now, it would also be fair to say that each and every

JBJ9SCO2      October - Cross      Page 1738

1   one of the transactions that went to the first three Fenero
2   equity funds were in euros; isn't that right?
3 A. Euros, yes.
4 Q. And that none of these banks that we're listing here were
5   physically situated in the United States, correct?
6 A. None of the seven banks?
7 Q. Yes. The seven that have the -- you have flags that show.
8 A. Right. They're not in the United States with the exception
9   of the Fates Group.
10 Q. And the Fates Group as we have discussed for a few moments
11   now, those funds went to -- back to an account controlled by
12   the Fates Group although not the exact same account, correct?
13 A. Yes. A different Fates Group account.
14 Q. Now, I wanted to talk about the period of time here. This
15   covers approximately a five-month period of time, right?
16 A. Yes.
17 Q. And if we sat there and looked at the number of
18   transactions that occurred over that five months we would see
19   that each bank is sending less than ten wires in total. I have
20   not counted the one that says Star Merchant. Perhaps I should
21   have done that before I asked the question.
22      But let's start with the far left. It appears that
23   there's only six transfers there; is that correct?
24 A. I counted seven.
25 Q. I'll go with seven, if there's seven.

JBJ9SCO2      October - Cross      Page 1739

1      Over a five-month period of time that would be a
2   frequency on average of one a week or maybe even less
3   frequently, correct?
4 A. Well there was four in one day.
5 Q. I understand that. But I'm talking about when you put all
6   of these numbers out there it becomes kind of overwhelming. It
7   looks like, wow, there's a lot. But when you realize that this
8   covers a five-month period of time, the frequency or the
9   average frequency becomes a little bit more reasonable, would
10   you not agree?
11 A. I'm not following you.
12 Q. All right. Well I probably asked a really poor question so
13   I'll move on.
14      MR. GARVIN: Could we please see no. 2603. Thank you,
15   Mr. Barile.
16 Q. A few moments ago we were talking about Mr. Scott's tax
17   returns. You recall that?
18 A. Yes.
19 Q. And this period of time is from 2016 through 2018; is that
20   correct?
21 A. Yes.
22 Q. And I believe you stated when you discussed this particular
23   chart that the side that has the American flag, the domestic
24   accounts, most, if not all, of those funds went through a Mark
25   Scott controlled bank account; is that true?

JBJ9SCO2      October - Cross      Page 1740

1 A. Mark Scott's controlled account as well as Nicole Huesmann
2   account.
3 Q. And Nicole Huesmann, she's an independent lawyer, correct?
4 A. I believe so.
5 Q. And she, as part of her private practice, she represents
6   people who purchase and sell real estate, she does the
7   closings, right?
8 A. It appears so.
9 Q. And so it's not uncommon for a lawyer who does real estate
10   work to place deposits in their trust account until the closing
11   occurs, correct?
12 A. It's normal.
13 Q. And so we know that this 36,643,000 plus the million
14   146,000 euros went either through Mr. Scott's account or Nicole
15   Huesmann's account, correct?
16 A. Correct.
17 Q. But we also know that during this period of time Mr. Scott
18   reported over $37 million of taxable income on his tax returns,
19   correct?
20 A. From 2016 to 2018?
21 Q. Yes.
22 A. Yes.
23      MR. GARVIN: If we could please go to 2604, sir.
24 Q. Now, this chart shows where this particular fund sent money
25   to; is that correct?

UNITED STATES OF AMERICA, v.
MARK S. SCOTT

November 19, 2019

JBJ9SCO2                October - Cross                Page 1741

1  A.  Money going out and money coming in.
2  Q.  And so we have the account is being funded with $155
3    million; is that correct?
4  A.  Yes.
5  Q.  Now, let me start with that.  During your research did you
6    realize that each of these funds were supposed to have a cap of
7    one hundred million dollars?
8  A.  I'm sorry?
9  Q.  Each of the Fenero Funds had a cap of one hundred million
10    dollars?
11  A.  I'm unaware of that.
12  Q.  Are you familiar that when an equity fund has a cap, if it
13    gets overfunded it must either return the funds or transfer
14    those funds to another equity fund that is not over the cap?
15  A.  I'm familiar with that.
16  Q.  And so you've shown here that there was a transfer of
17    approximately $50 million that went to DMS Cayman to Fenero
18    Financial Switzerland.
19        Do you see that, ma'am?
20  A.  Yes.
21  Q.  But sitting here you don't know if that was done because
22    the DMS Cayman Fenero Equity Investments LP had exceeded its
23    cap?
24  A.  Right.  I'm not sure the reason.
25  Q.  Now, you have listed several transfers here and when you

JBJ9SCO2                October - Cross                Page 1742

1    did this would it be fair to say that you simply went to the
2    bank accounts and looked for transfers out and transfers in?
3  A.  Yes.
4  Q.  And that that process as a lawyer or as an accountant is
5    normally the easiest way to just follow the money, right?
6  A.  One of the ways.
7  Q.  And in this particular case we see that some of the funds
8    indeed went to another Fenero Financial equity fund and to the
9    right it also went to the Bank of Ireland Fenero Equity
10    Investments; is that true?
11  A.  Yes.  It went to three Bank of Ireland accounts.
12  Q.  And during your research and in preparation of your
13    testimony here today did you see the documentation that the
14    funds, the Fenero Funds were anticipating to invest in
15    distressed entities located in Europe and in particular the
16    United Kingdom and Ireland?
17  A.  If you can show me something to refresh my memory on that.
18  Q.  I don't remember the exact exhibit number but do you recall
19    reading the mission statement or any other documentation like
20    that?
21  A.  It might be contained in the mission statement but I would
22    need to look at the document to refresh my memory.
23  Q.  Well, when you looked at this you looked at the Bank of
24    Ireland documents, right?
25  A.  Yes.

JBJ9SCO2                October - Cross                Page 1743

1  Q.  And before the Bank of Ireland would accept any money they
2    would want to know what it is for, right?
3  A.  The purpose.
4  Q.  That's standard operating procedure, right?
5  A.  Yes.
6  Q.  And so what we do know here is that the Bank of Ireland
7    accepted the funds, correct?
8  A.  The funds were successfully transferred.
9  Q.  And we have some entries below that say DBS Bank Hong Kong
10    Barta Holdings LTD.  Do you see that?
11  A.  Yes.
12  Q.  Now, you understood that to be a loan; isn't that right?
13  A.  Yes, a loan for CryptoReal.
14  Q.  And you understood that CryptoReal was going to purchase
15    from an entity called Barta Holdings an oil field; isn't that
16    right?
17  A.  I'm familiar.
18  Q.  And are you also familiar that the parties that represented
19    Barta, the sellers, was Dr. Hui and Neil Bush, the son of
20    President George Bush?
21  A.  I'm only familiar with Dr. Makan, that he was listed on the
22    account opening records for Barta.
23  Q.  Did you look to see who was on the board of directors of
24    any of Dr. Hui's firms?
25  A.  No, I did not.

JBJ9SCO2                October - Cross                Page 1744

1  Q.  So sitting here today do you have any information that
2    Mr. Neil Bush, Dr. Hui, met in Hong Kong with Ruja Ignatova
3    about this very transaction?
4  A.  I don't have knowledge of that information.
5  Q.  Do you feel that that would have been important information
6    to put on your chart?
7        MS. LOZANO: Objection.
8        THE COURT: Sustained.
9  Q.  Now, ma'am, you said that you did not see the repayment of
10    that particular loan; is that correct?
11  A.  That's correct.
12  Q.  And do you know when that particular loan was due to be
13    repaid?
14  A.  No, I do not.
15  Q.  So if the due date on that particular loan, $30 million,
16    was due three or four or even five years after the closing, you
17    would not expect to see that repayment if you're limiting the
18    time period from June to August of 2016, would you?
19  A.  Right.
20  Q.  So let's go to the one next to that.  It says Payment Card
21    Technologies.  Do you see that?
22  A.  Yes.
23  Q.  Do you recognize that as an investment made by Fenero
24    Equity Funds?
25  A.  I'm not sure what the purpose of the wire was for.

UNITED STATES OF AMERICA, v.
MARK S. SCOTT                                                                November 19, 2019

| JBJ9SCO2 | October - Cross | Page 1745 |
| --- | --- | --- |

 1  Q. Well did you make any effort to determine if Payment Card
 2    Technologies, sometimes referred to as PCT, was a credit
 3    card-related business in which Fenero Equity Funds purchased a
 4    minority but controlling interest?
 5  A. I'm unaware of that.
 6  Q. Did you know when you made this chart whether or not any
 7    agreement with Payment Card Technologies required an initial
 8    deposit?
 9  A. No, I do not.
10  Q. Would it be fair to say that you do not know the purpose of
11    any of these transfers?
12  A. If there was no mention in the wire details, then I would
13    not know the purpose of the transfer.
14  Q. So your knowledge would be limited to whatever the wire
15    detail states?
16  A. Some of that and I also reviewed some e-mails but with
17    respect to these transfers it's limited to the wire and the
18    bank statements.
19  Q. OK. I appreciate that. I didn't want to keep on badgering
20    you. I'm sorry.
21       So then we'll take this down and we'll move, if we
22    could, I believe the next one is 2607. Thank you so much.
23       Do you recognize this particular chart as one that was
24    discussed during direct examination, ma'am?
25  A. Yes, I do.

| JBJ9SCO2 | October - Cross | Page 1746 |
| --- | --- | --- |

 1  Q. And I'm looking at the top part and we see the four Fenero
 2    Funds in blue; is that correct?
 3  A. Yes.
 4  Q. And can you tell the ladies and gentlemen of the jury what
 5    is IG Markets General LTD?
 6  A. It appears to be some type of investment management fund,
 7    management company.
 8  Q. And do you have any idea about who operates that fund?
 9  A. No, I do not.
10  Q. So we see in this particular case a number of lines that
11    come down to the very bottom and I want to go over that just a
12    little bit if I may.
13       So again what period of time is this covering? Is it
14    July 2016 through April 2017?
15  A. Yes.
16  Q. And April 2017, actually April 10, 2017 is when the four
17    funds started transferring the money out until they were
18    closed; is that correct?
19  A. That's about right.
20  Q. So this would be right up until the time that started to
21    occur; is that correct?
22  A. It falls within the time period.
23  Q. And so can you tell us what is the purpose of the transfer
24    to Julius Baer for what appears to be Ocean States Ventures?
25  A. I don't know the reason for the transfer.

| JBJ9SCO2 | October - Cross | Page 1747 |
| --- | --- | --- |

 1  Q. Do you know anything about that particular investment?
 2  A. No, I do not.
 3  Q. How about the next one to Vida Homes. Can you tell us
 4    about Vida Homes. What do they do?
 5  A. Based on some records that I reviewed it appears to be home
 6    purchases for Ruja Ignatova.
 7  Q. And do you know if those were investment properties or
 8    personal use properties?
 9  A. I do not.
10  Q. Let's talk directly across from it, it says Metro
11    Bank Peregrine law client. It seems to be another law firm,
12    isn't it?
13  A. It appears so.
14  Q. Do you know why Peregrine was receiving over $7 million?
15  A. I do not.
16  Q. We've already discussed the next one, Nicole Huesmann,
17    right, so let's go past her.
18       Do you see payment to the right in a red at the
19    bottom, you see the Payment Card Technologies. Your answer
20    would be the same as what we previously discussed, right?
21  A. Right.
22  Q. And finally there's one above it that says IG Markets
23    General. What was that investment for?
24  A. I do not know the purpose of the investment.
25  Q. Now when an equity fund closes or is terminated it is

| JBJ9SCO2 | October - Cross | Page 1748 |
| --- | --- | --- |

 1    customary that the equity fund will transfer any assets back to
 2    the original investors; isn't that true?
 3  A. That happens sometimes.
 4  Q. And the equity fund is not allowed to just keep everything,
 5    right?
 6  A. Right.
 7  Q. So in this particular case you did see that millions and
 8    millions of dollars were transferred back; isn't that correct?
 9  A. Transferred back to whom?
10  Q. Well, let's go over that a little bit. That's a good
11    point. I think that one of your charts showed that 185 million
12    went to another private equity firm called Phoenix; isn't that
13    true?
14  A. Yes.
15  Q. And so that really wouldn't be a transfer technically back
16    to the original investors. That would be more on the lines of
17    a lateral transfer to a separate equity fund; isn't that
18    correct?
19  A. Except I'm not sure what Phoenix Fund's business model is.
20  Q. Did you take the time to look them up on Google?
21  A. No, I did not.
22       MR. GARVIN: Would you be kind enough, sir, I think
23    we've spent enough time with that one.
24       Could we go to 2622.
25  Q. And I think that we were just talking about that one so it

JBJ9SCO2          October - Cross          Page 1749

1  kind of fell right into place.  This is the transfer history
2  for the funds that ended up with Phoenix Fund, right?
3  A.  Yes.
4  Q.  And it appears in this that it says February through
5  April 2017.  Would it be fair to say that all of the transfers
6  occurred -- I guess we have been using -- let me start over
7  again.
8       Reviewing this it appears that actually the last
9  transfer to Phoenix was on April 10, 2017; is that correct,
10  ma'am?
11  A.  That's correct.
12  Q.  So actually the transfers commenced according to this chart
13  as early as February 24 of 2017; is that right?
14  A.  That's correct.
15  Q.  And do you know if in or about that time that BNY Mellon
16  was speaking with DMS Bank & Trust about IMS, meaning
17  International Marketing?
18  A.  I'm not sure of that conversation.
19  Q.  And I think that you told us that you have little or no
20  information on Phoenix Fund's history; is that correct?
21  A.  I have some information.
22  Q.  Do you have any knowledge for instance as to how long
23  Phoenix Fund had been in business?
24  A.  No, I do not.
25       MR. GARVIN: We can take that down, please.

JBJ9SCO2          October - Cross          Page 1750

1       Could you please put up Exhibit 2620, please.  Thank
2  you.
3  Q.  Now this particular chart overlays pretty much everything
4  that happened during those two years, 2016 through 2018,
5  correct?
6  A.  Yes.
7  Q.  And the very, very bottom, those are the acquisitions or
8  purchases by Mr. Scott; isn't that correct?
9  A.  Correct.
10  Q.  And would it be fair to say and also accurate that these
11  purchases, some of them that you have listed occurred before
12  the Fenero Equity Funds were ever funded?
13  A.  Which one are you referring to?
14  Q.  I remember seeing in the watch category, which we'll
15  probably get to in the next exhibit, that there was a watch or
16  watches that were purchased before Fenero Equity Funds were
17  funded with the incoming money.  I think it actually said 2015.
18  A.  I would have to look at the -- I would have to see what
19  you're referring to.
20  Q.  I think we'll get to it.  You're not sitting here arguing
21  that Mr. Scott who was an equity partner in an international
22  law firm didn't make money before 2016, right?
23  A.  I'm not disputing that.
24  Q.  And you're not saying that Mr. Scott didn't have an
25  extensive watch collection before 2016, are you?

JBJ9SCO2          October - Cross          Page 1751

1  A.  I don't know what his watch collection consisted of prior
2  to this.
3  Q.  Well you do know that there was a search warrant executed
4  in this case, correct?
5  A.  Yes.
6  Q.  And you do know that the -- after the search warrant was
7  conducted that the United States reviewed some of the things
8  that it had and decided to return them, right?
9       MS. LOZANO: Objection.  May we approach?
10       THE COURT: Sustained.  Sure.
11       (Continued on next page)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

JBJ9SCO2          October - Cross          Page 1752

1       (At sidebar)
2       MS. LOZANO: Your Honor I believe counsel is trying to
3  elicit testimony about items that were seized and subsequently
4  returned as part of the search warrant.  Because the Court is
5  going to instruct the jury that these searches were proper and
6  lawful and the items obtained were lawfully obtained it is
7  totally inappropriate for counsel to make a suggestion that
8  items were seized that were unlawfully seized and returned and
9  it's just that should not be in front of the jury.
10       MR. GARVIN: I have no intention of doing any of that,
11  in fact, I thought I was going out of my way to make the
12  government look good because they saw that there was some
13  things that they decided to return.  All I was trying to
14  establish was that Mr. Scott had purchased some watches and
15  cars which I'm still working on prior to the years in issue and
16  if the government saw fit to return something it was probably
17  because they recognized it had been purchased before the period
18  of time.  The Court has already sustained the objection.  I
19  planned on moving -- just moving on, not with this issue
20  though.
21       THE COURT: OK.
22       (Continued on next page)
23
24
25

UNITED STATES OF AMERICA, v.
MARK S. SCOTT

November 19, 2019

---

JBJ9SCO2          October - Cross          Page 1753

1          (In open court)
2  Q.  So getting back on track a little bit.  So you recognize
3     that Mr. Scott was an equity partner in an international law
4     firm, correct?
5  A.  Correct.
6  Q.  And that that position pays very well; isn't that correct?
7  A.  I assume so.
8  Q.  And that there is perfectly nothing wrong with Mr. Scott
9     spending his money, assuming as long as he pays his taxes, on
10    things that he cherishes; is that correct?
11 A.  OK.
12 Q.  So there is nothing wrong with Mr. Scott having an
13    extensive watch collection before 2016; isn't that true?
14 A.  (No response).
15 Q.  I'm not pointing at the chart.
16 A.  OK.
17 Q.  There's nothing wrong with it?
18 A.  There's nothing wrong with it.
19 Q.  The same thing goes with German cars.  You know that
20    Mr. Scott was born in Germany, right?
21 A.  Right.
22 Q.  And you've done enough research now to realize that all of
23    these cars that you saw are German cars, right, at least with
24    the exception of the Ferrari, right?
25 A.  Right.

---

JBJ9SCO2          October - Cross          Page 1754

1  Q.  And I think that actually -- you will recall that actually
2     got traded in on something that was from Germany; isn't that
3     right?
4  A.  I don't recall.
5  Q.  And -- now let's talk about the boat.  There is nothing
6     wrong with having a boat in general, right?
7  A.  Right.
8  Q.  And there's definitely nothing wrong with having a boat if
9     you intend to use it for business development; isn't that true?
10 A.  I guess so.
11 Q.  Let's see if we can focus in a little closer.  Perhaps that
12    exhibit that I'm thinking about is 2618.  Perhaps that's the
13    one I'm thinking.
14        MR. GARVIN:  And would you be kind enough, Mr. Barile,
15    to focus on that entry to the far left.  Thank you, sir.
16 Q.  So this is the one that I was telling you kind of caught my
17    eye before.  You recognize the Fenero Funds received the
18    funding between June and October of 2016, correct?
19 A.  Right.  But there were other funding.
20        (Continued on next page)
21
22
23
24
25

---

JBJ3SCO3          October - Cross          Page 1755

1  Q.  This purchase occurred on November 23, 2015; isn't that
2     true?
3  A.  That's correct.
4  Q.  And this says that it came from Mark Scott PL.  That's his
5     law practice account, isn't it?
6  A.  Yes.
7  Q.  Those funds didn't come from Fenero Equity Funds; isn't
8     that true?
9  A.  It came from one of the IMS accounts.
10 Q.  No.  My question, ma'am, was those funds didn't come from
11    the Fenero Equity Funds; isn't that true?
12 A.  I believe it did.
13 Q.  The Fenero Equity Fund account was not funded until the
14    spring of 2016; isn't that true?
15 A.  That is correct.
16 Q.  Okay.  Now, way back on 2601, it showed that Mark Scott
17    received close to $1 million, and most of that money came from
18    IMS.  Do you recall that?
19 A.  Yes.
20 Q.  And is that why you are saying that you believe it came
21    from IMS, this particular money?
22 A.  I think so.
23 Q.  Okay.  We've already established, shown that the tax
24    returns shows that that million dollars was indeed reported by
25    Mr. Scott on his tax return; isn't that correct?

---

JBJ3SCO3          October - Cross          Page 1756

1        MS. LOZANO:  Objection.
2        THE COURT:  Sustained.
3  Q.  So the total amount of the watches that are here says
4     $281,000.  Do you see that?
5  A.  Yes.
6  Q.  It says that they are funds originating from Fenero MSSI,
7     correct?
8  A.  Correct.
9  Q.  But, that first watch that we just looked at, that was not
10    from either Fenero or MSSI, that was from Mark Scott PL; isn't
11    that correct?
12 A.  Traced back to IMS.
13 Q.  Right.  This says Fenero MSS.  It doesn't say IMS.
14 A.  Right.
15 Q.  Correct?
16 A.  Correct.
17 Q.  That's not accurate, correct?
18 A.  It's still part of the IMS funding.
19 Q.  I understand.  But, just so the ladies and gentlemen of the
20    jury are not confused.  The 281,000 did not come from Fenero or
21    MSSI.  In particular that 21,500 that we are talking about
22    right now came from Mark Scott PL.  Correct?
23 A.  That is correct.
24        MR. GARVIN:  Okay.  Now Mr. Barile, if you would be
25    kind enough to increase the size of the far left bottom watch.

---

UNITED STATES OF AMERICA, v.
MARK S. SCOTT

November 19, 2019

JBJ3SCO3          October - Cross          Page 1757

1  Yes.  Thank you, sir.
2  Q. And this watch also shows a date that is before the Fenero
3    Fund got funded, right?
4  A. Right, also IMS funds.
5  Q. All right.  So it did not come from Fenero Fund or MSSI,
6    right?
7  A. Correct.
8       MR. GARVIN: If you could please take that down, sir.
9  And I think we can take down the entire chart.  So, I want to
10  go back and try to go a little bit quicker with these next
11  couple.  Can we please put up 2621.
12  Q. This is the Locke Lord related issue, is it not?
13  A. Yes.
14  Q. So I'm starting on the far left-hand side, the funds get
15  started with Noor Bank RavenR.  Mr. Scott was not a signatory
16  for that account; is that correct?
17  A. I do not have records for the Noor account.
18  Q. Let's go to the one below it.  The Zala Group Comerica
19  Bank.  Mr. Scott was not a signatory for that either?
20  A. Correct.
21  Q. And I'm imagining your answer would be the same for the
22  Noor Bank below; is that right?  You don't have the records for
23  it?
24  A. I do not have the records for Noor Bank.
25  Q. Let's go to the right.  And it says Regions Bank Zala

JBJ3SCO3          October - Cross          Page 1758

1  Group.  Mr. Scott was not a signatory on that account; isn't
2  that right?
3  A. Right, correct.
4  Q. And the one below that has a different account number,
5  slightly, Regions Bank Zala.  Mr. Scott was not a signatory for
6  that either?
7  A. Correct.
8  Q. There are no records to show or -- excuse me.  Let me
9  rephrase that.
10      There are no records that you've seen in preparation
11  of your testimony here today that Mr. Scott participated in any
12  of these transfers; isn't that correct?
13  A. Well, he was only on the e-mails for the Locke Lord
14  transfers.
15  Q. Right.  Okay.  So, the transfers before?
16  A. Before.
17  Q. It's an accurate statement what I just said, right?
18  A. That I haven't seen, yes.
19  Q. So now let's go to Locke Lord account.  Who is the
20  signatory for the Locke Lord trust account?
21  A. I'm not sure.
22  Q. The two Locke Lord accounts that you have here, isn't it
23  accurate to say that Mr. Scott was not a signatory on either
24  one of those accounts?
25  A. I don't have the account opening records for either of the

JBJ3SCO3          October - Cross          Page 1759

1  Locke Lord accounts.
2  Q. Ultimately, the funds went to Zala Group at an account that
3  you have listed there in the Emirates; is that correct?
4  A. Yes.
5  Q. And isn't it also true that Mr. Scott is not a signatory on
6  that account?
7  A. I do not have records for that account as well.
8  Q. Thank you.  Could you please put up 2626, sir.  Thank you.
9      Would it be fair to say that you have not seen any
10  documentation whatsoever that Mr. Scott ever met Linda Cohen?
11  Isn't that true?
12  A. I have no documentation of that.
13  Q. And Mr. Scott, there is nothing with Mr. Scott's name to
14  suggest that he was involved in the funds being at HSBC Bank,
15  United States NA; isn't that correct?
16  A. Correct.
17  Q. And there's nothing to suggest that Mr. Scott was involved
18  when Linda Cohen transferred $22,577.29 to TD Bank; isn't that
19  correct?
20  A. I don't have any records for that.
21  Q. And Mr. Scott was not a signatory on the TD Bank account;
22  isn't that true?
23  A. Correct.
24  Q. And Mr. Scott was not a signatory on the bank account of
25  First Financial Bank, formerly Bannockburn Global Forex.  Isn't

JBJ3SCO3          October - Cross          Page 1760

1  that true?
2  A. That is true.
3  Q. And Mr. Scott was not a signatory authority on United
4  Overseas Bank that you have referenced there at 6682.  Isn't
5  that true?
6  A. That's correct.
7  Q. And Mr. Scott was not a signatory on the Kreisssparkasse
8  Steinfurt Bank number 6108.  Isn't that true?
9  A. Correct.
10  Q. From the records that we have on this particular chart,
11  Mr. Scott's name is nowhere, correct?
12  A. I did not see his name on any of the accounts on this
13  chart.
14  Q. Can we please take that down, sir.  Okay.
15      You had five exhibits and I am going to try do this
16  all in one time.  2617-A, B, D and E.  I guess it was four.
17  Maybe we skipped C.
18      Those were real estate transactions that Mr. Scott
19  participated in, correct?
20  A. Correct.
21  Q. And three of those real estate transactions actually went
22  to closing, correct?
23  A. Correct.
24  Q. One fell through, right?
25  A. Right.

UNITED STATES OF AMERICA, v.
MARK S. SCOTT

November 19, 2019

JBJ3SCO3          October - Cross          Page 1761

1 Q. So whatever deposit he put on that particular entity went
2   back into Nicole Huesmann's trust account, correct?
3 A. It was transferred -- it wasn't reflected on the chart, but
4   it was transferred back to Mr. Scott.
5 Q. He didn't lose that money?
6 A. Right.
7 Q. I say that just because I don't want to be double counting.
8 A. Right.
9 Q. So, and then there was the condominium that he lives in
10   that they paid off the mortgage that had a balance of about a
11   million dollars, correct?
12 A. Correct.
13 Q. So the three properties that were waterfront properties,
14   did you recognize at any point that those appeared to be
15   investment properties?
16 A. I'm not sure the purpose of those purchase.
17 Q. Did you see any of them were rented out?
18 A. No, I did not.
19 Q. There is nothing wrong with buying property that you think
20   will appreciate in value, is there?
21 A. I guess not, no.
22 Q. You have, you went through five vehicles which we've
23   already discussed, 2619-A through E.  Correct?
24 A. Correct.
25 Q. And you did recognize that some of those vehicles are

JBJ3SCO3          October - Cross          Page 1762

1   actually collectors items; isn't that right?
2 A. I'm not familiar with brand name cars, so I can't speak to
3   that.
4 Q. All right.  So, when you put up $600,000 for a Porsche 911
5   GT2 RS, you didn't think one way or the other that that might
6   be a car that's for investment purposes as opposed to actually
7   driving?
8       MS. LOZANO: Objection.
9       THE COURT: Sustained.
10 Q. So do you know if any of the cars are investor items or
11   not?
12 A. I do not know the purpose of the car.
13 Q. At one point during your testimony on direct you stated
14   that Mr. Scott had signature authority over all of the Fenero
15   Equity Investment bank accounts.  Do you recall that?
16 A. Yes.
17 Q. But, isn't it also true that during the period of time that
18   Apex was a fund manager, Mr. Scott did not have signature
19   authority over the Fenero Funds that Apex controlled?
20 A. I can't speak to that.  I'm not sure.
21 Q. Isn't it also true that the accounts that were controlled
22   by JP Fund Administrator -- I think it's JP Integra but I think
23   I've seen it written here as JP Fund Administrator on their
24   accounts -- they are the ones who had the signature authority
25   for the Fenero Equity Investment Fund, not Mr. Scott?

JBJ3SCO3          October - Redirect          Page 1763

1 A. I can't speak to that.
2 Q. So, when you told the ladies and gentlemen of the jury that
3   Mr. Scott had authority for all of the accounts, that was not
4   quite accurate.  Is that correct?
5 A. His name was on the signature cards for all of those
6   accounts.
7 Q. All right.
8       MR. GARVIN: Your Honor, may I confer with counsel for
9   one moment?  I think I may be done.
10       THE COURT: Very well.
11       MR. GARVIN: Your Honor, I have no further questions.
12   Thank you, ma'am.
13       THE WITNESS: Thank you.
14       THE COURT: Any redirect?
15       MS. LOZANO: Yes, your Honor.
16 REDIRECT EXAMINATION
17 BY MS. LOZANO:
18 Q. Ms. October, you were asked on cross-examination by counsel
19   about Fenero Fund mission statement, manager fees, and carried
20   interest.  Do you remember that?
21 A. Yes.
22 Q. To be clear, the 8 percent that's mentioned in the mission
23   statement is calculated on what?
24 A. I have to look at it again.  I'm sorry.
25 Q. Can we pull it up 2201, page seven.

JBJ3SCO3          October - Redirect          Page 1764

1 A. The 8 percent is carried interest pari passu with the
2   investors upon exit.
3 Q. And carried interest is, as you testified previously,
4   calculated on profit only, correct?
5 A. Profit only, yes.
6 Q. That percentage that is articulated in the mission
7   statement is the manager's percentage of the profit earned on
8   the investments, right?
9 A. Correct.
10 Q. And that's because this fee is meant to be an incentive for
11   managers --
12       MR. GARVIN: I object to the leading.
13       THE COURT: It's redirect.
14 Q. And that is because this fee is meant to be an incentive to
15   fund managers running real investment funds to earn returns or
16   profits for their investors, right?
17 A. That's accurate.
18 Q. Focusing -- we can take that down.  Thank you.
19       Focusing on, you mentioned that you saw evidence of a
20   loan given to DMS and repaid.
21 A. Yes.
22 Q. Is it fair to say that the repayment included some sort of
23   interest or profit?
24 A. Yes.
25 Q. Were there additional transactions that you identified in

UNITED STATES OF AMERICA, v.
MARK S. SCOTT

November 19, 2019

| JBJ3SCO3 | October - Redirect | Page 1765 |
|---|---|---|

1  the entirety of your financial analysis that identified profit
2  made by Fenero and returned to the investors?
3  A.  There was only one instance.
4  Q.  What was that?
5  A.  That was the return of, with IG markets and I'm sorry.  The
6  Cowen transfers.  I think there was a profit of either 29,000 or
7  26,000.  Somewhere in that range.
8  Q.  You were asked on cross-examination about -- I think can we
9  pull up 2604, please.  You were asked on cross-examination
10  about the $30 million being sent to Barta Holdings.
11  A.  Correct.
12  Q.  And you were asked whether during this time period, on the
13  chart, the June to August 2016, you had not seen repayment of
14  that loan?
15  A.  I did not.
16  Q.  I would ask you a different question.  During your analysis
17  of the entirety of the period bank records you analyzed from
18  May 2016 to July 2018, did you see evidence of repayment of
19  that loan?
20  A.  I did not.
21       MS. LOZANO: We can take that down, and if we can put
22  up first 2701, page five.  And if we can highlight I think we
23  want to go to the last page, actually.  If we could highlight
24  that bottom entry.
25  Q.  Ms. October, are you aware that the defendant was arrested

| JBJ3SCO3 | October - Redirect | Page 1766 |
|---|---|---|

1  in September of 2018?
2  A.  Yes.
3  Q.  Take that down.
4       Counsel asked you on cross-examination about the
5  defendant's 2018 tax returns, right?
6  A.  Yes.
7  Q.  Do you remember that?
8  A.  Yes.
9  Q.  So can we pull up DX 701, and scroll to page 13.  On this
10  form, how much in line one does the defendant claim as adjusted
11  gross income?
12  A.  29,695,405.
13  Q.  At the bottom could we please highlight the filing date of
14  October 15, 2019.
15       Ms. October, are you aware that October 15, 2019, is
16  approximately two weeks before this trial started?
17  A.  Yes.
18  Q.  Are you aware that that date, the filing of these tax
19  returns occurred approximately one year after the defendant was
20  arrested?
21  A.  Yes.
22       MS. LOZANO: One moment, your Honor.  I have no
23  further questions.  Thank you, Ms. October.
24       MR. GARVIN: One or two follow up.
25  RECROSS EXAMINATION

| JBJ3SCO3 | | Page 1767 |
|---|---|---|

1  BY MR. GARVIN:
2  Q.  Ms. October, you have a background with the IRS, correct?
3  A.  I worked for the IRS as a contractor for 18 months.
4  Q.  You know that October 15 is the deadline for filing a tax
5  return, correct?
6  A.  For extensions.
7  Q.  And that if you made money at all, at any point in time
8  during 2018, you have to file that tax return no later than
9  October 15, 2019, correct?
10  A.  Right.
11  Q.  If you file it on October 15, 2019, then you are complying
12  with the mandate of the Internal Revenue Service laws; isn't
13  that correct?
14  A.  Yeah.
15       MR. GARVIN: I have no further questions, thank you.
16       THE COURT: Ms. October, you may step down.
17       THE WITNESS: Thank you.
18       (Witness excused)
19       THE COURT: Government, please call your next witness.
20       MR. DiMASE: Your Honor, we have some exhibits to
21  introduce before the next witness.
22       THE COURT: Okay.
23       MR. DiMASE: First I'd like to offer again Exhibits
24  506 through 513, and 517 through 537.
25       MR. DEVLIN-BROWN: No objection.

| JBJ3SCO3 | | Page 1768 |
|---|---|---|

1       THE COURT: They will be received.
2       (Government's Exhibit 506 through 513, 517 through 537
3  received in evidence)
4       MR. DiMASE: I would also offer exhibits 1363 and
5  1125, and if counsel would like to see them we can show each of
6  them on the screen briefly.
7       MR. DEVLIN-BROWN: Could you.  Can we see them again.
8       MR. DiMASE: Sure.
9       MR. DEVLIN-BROWN: No objection.
10       THE COURT: They will be received.
11       (Government's Exhibit 1363, 1125 received in evidence)
12       MR. DiMASE: And the government also offers Exhibits
13  1226, 1289, 1134, and 1007.
14       MR. DEVLIN-BROWN: One second.  Would you mind going
15  back to 1226.  Can we see 1134 and 1007.
16       No objection, other than with respect to Government
17  Exhibit 1007, that also had been marked, as the Court knows, as
18  Defense Exhibit 103.  We'd like it introduced under both
19  numbers.
20       THE COURT: Very well.  Those exhibits will be
21  received.
22       (Government's Exhibit 1226, 1289, 1134, 1007 received
23  in evidence)
24       MR. DiMASE: We'd like to publish these to the jury.
25       THE COURT: Very well.

# __EXHIBIT B__



**Foreign Incoming Transfers**

8576
Bank of Ireland
Fenero Tradenext Holding
$500,000.00  10/12/2016

4760
Bank of Ireland
Fenero Tradenext Holding
$2,500,000.00  10/3/2016
$1,000,000.00  11/2/2016
$500,000.00  2/7/2017
$250,000.00  6/19/2017

5001
Bank of Ireland
Fenero Tradenext Holding
$500,000.00  11/2/2016
$250,000.00  11/2/2016
$350,000.00  2/1/2017
$350,000.00  2/7/2017
$350,000.00  2/10/2017
$1,300,000.00  2/22/2017

7100
DMS Cayman
MSS International Consultants BVI Ltd
$1,500,000.00  3/16/2017
$2,000,000.00  7/14/2017
$1,000,000.00  8/17/2017
$1,310,000.00  10/30/2017
$750,000.00  11/27/2017
$7,299.03  1/5/2018
$1,000,000.00  1/30/2018

5343
First Caribbean International Bank
MSSI Marine Group Ltd
$5,521.14  4/20/2018

2701
First Caribbean International Bank
MSS International Consultants BVI Ltd
$499,960.00  4/23/2018
$99,500.00  3/28/2018

**→ $15,982,280.17**

**→ $999,970.00  10/31/2017**
xxxx2901
LES FILS DREYFUS AND CIE S.A., SWITZERLAND
Marietta Halle

7102
DMS Cayman
MSS International Consultants BVI
$300,000.00  7/18/2016
$175,000.00  7/19/2016
$529,750.00  9/6/2016

**Domestic Incoming Transfers**

3236
CNB FL
MSS International Consultants LLC
$460,000.00  9/7/2016
$32,355.00  2/10/2017

3414
CNB FL
MSS International Consultants LLC
$6,500.00  9/1/2017
$6,500.00  9/29/2017
$6,500.00  10/30/2017
$6,500.00  12/1/2017
$6,500.00  1/10/2018
$3,500.00  3/1/2018
$3,500.00  4/2/2018
$3,500.00  4/30/2018

**$541,355.00 →**

0295
CNB FL
Mark Scott
$6,000.00  7/28/2016

$100,000.00  7/27/2016

3210
CNB FL
Mark S. Scott PL
$100,000.00  7/20/2016
$250,000.00  8/17/2016

**$220,000.00  8/18/2016 →**

9788
Sabadell United Bank
Nicole J. Huesmann PA

**$10,755,116.58 →**

**Real estate and Home improvements**

Stewart Title
$45,000.00  9/9/2016

Cenlar/sprincetn
$1,000,794.66  10/19/2016

Padgett Builders Inc
$67,689.26  5/5/2017
$14,349.07  6/6/2017
$6,689.69  9/5/2017

Kinlin Grover Realty Group
$5,000.00  8/4/2017

Horiuchi Solien Landscape Architects
$1,836.55  1/3/2018
$5,908.45  3/20/2018
$4,877.00  4/5/2018

LDA Architecture & Interiors
$17,095.33  10/27/2017
$10,870.52  12/11/2017
$11,555.05  1/3/2018
$16,469.15  1/29/2018
$41,143.13  3/30/2018
$14,840.85  5/17/2018
$12,827.00  7/3/2018
$12,814.50  7/31/2018

Carlos R and Nievesa Estrada
$84,255.68  9/13/2016

On Insur SA
$2,510.00  10/26/2016

Martha Castroza ADM Interiors
$15,000.00  4/28/2017
$6,000.00  5/24/2017
$13,532.00  6/16/2017
$12,500.00  7/25/2017
$14,999.00  8/8/2017
$9,487.00  8/31/2017

Oneill Real Estate Inc
$25,000.00  8/22/2017

J J Delaney Inc
$8,927.60  4/11/2018
$42,848.46  6/27/2018
$147,426.26  8/28/2018

Kinlin Grover Realty Group
$145,000.00  10/5/2016

Daniel Fernandez PA
$3,000.00  2/17/2017

Horgan Insurance Agency
$14,606.20  9/7/2017
$4,134.00  9/27/2017

Town of Barnstable
$8,167.91  10/12/2017
$12,932.37  10/12/2017
$175.40  12/11/2017
$13,635.87  1/8/2018
$7,299.03  1/8/2018
$9,193.99  3/27/2018
$13,635.86  5/17/2018
$13,284.12  7/10/2018

Wright National Flood Insurance
$892.00  1/8/2018

Crowley and Cummings IOLTA
$2,772,953.54  10/21/2016

Rockland Trust Company
Robert Paul Properties, Inc
$5,000.00  3/1/2017
$28,375.00  3/20/2017
$5,000.00  5/16/2017
$22,250.00  5/19/2017
$5,000.00  5/15/2017

John W Kenney Client Trust
$2,500.00  3/14/2017
$185,000.00  9/7/2017
$3,593,762.72  9/20/2017
$2,211,380.35  11/13/2017

Anderson & Jacoby
$1,572.30  9/8/2017
$977.43  5/23/2018

Miami-Dade County Tax Collector
$5,506.13  4/17/2018

**→ $2,125,000.00**

**Mark Scott other accounts**

3236
CNB FL
MSS International Consultants
$250,000.00  11/7/2016

1054
Cape Cod Cooperative Bank
Mark S. Scott
$250,000.00  5/1/2017

9493
UBS
Mark Scott
$500,000.00  7/31/2017

3803
Rockland Trust
MSS International Consultants
$125,000.00  7/23/2018

9979
UBS
Mark Scott
$1,000,000.00  6/30/2017

**$4,016.50  7/31/2018**

89354
Sabadell United Bank
Nicole J. Huesmann PA

**$354,905.28  5/18/2017**
**$189,303.43  10/30/2017**

**Car & Jewelry purchases**

Braman Motorcars
$144,712.11  3/9/2017

Buchwald Jewelers
$73,500.00  8/7/2017
$59,500.00  5/9/2018

**→ $277,712.11**

1046
Sabadell United Bank
Nicole J. Huesmann PA

**Boat transactions**

Check #8634
Deering Bay Marina Association
$1,690.05  6/1/2017

Galati Yacht Sales LLC
$130,000.00  2/15/2017

Nautikos Florida LLC
$1,127,000.00  3/21/2017

**→ $1,257,000.00**

**→ $1,690.05**

# **EXHIBIT C**



xxxx4102
DMS Cayman
Fenero Financial Switzerland LP

xxxx6102
DMS Cayman
Fenero Equity Investments LP

xxxx9811
Bank of Ireland
Fenero Securities Trading Ltd

€299,991.87  7/18/2016
€8,263,549.25  2/24/2017

€112,508.21  6/23/2016
€1,068,359.42  6/17/2016
€2,675,000.00  7/19/2016
€3,875,000.00  9/5/2016
€146,076.59  2/24/2017

€979,820.00  2/28/2017
€4,449,042.50  4/18/2017

Time Period: June 2016 - June 2017

Sourced from exhibits: 815, 704, 705 and 703.

**xxxx7102**
**DMS Cayman**
**MSS International Consultants BVI Ltd**

$1,335,004.68  9/6/2016
$8,876,778.87  2/27/2017
$1,026,534.77  3/10/2017

$450,000.00  6/21/2017

$169,127.52  6/17/2016
$371,309.55  7/4/2016
$273,972.60  7/18/2016
$160,476.85  7/19/2016
$473,625.39  9/6/2016
$500,000.00  6/14/2017

€177,777.78  6/23/2016

€2,500,000.00  7/19/2016

€2,250,000.00  9/5/2016

€452,898.55  7/1/2016

xxxx7100
DMS Cayman
MSS International Consultants BVI Ltd

xxxx3210
CNB FL
Mark S. Scott PL

xxxx3236
CNB FL
MSS International Consultants, LLC

xxxx3008
CNB FL
Mark Scott

xxxx4760
Bank of Ireland
Fenero Equity Investments (Ireland)

xxxx8576
Bank of Ireland
Fenero Equity Investments (Ireland)

xxxx2701
Firstcaribbean International Bank
MSSi FC Operating account

# __EXHIBIT D__



xxxx4102
DMS Cayman
Fenero Financial Switzerland LP
$1,004,130.00 9/29/2016
$221,800.00 10/7/2016
$241,194.12 10/12/2016
xxxx6102
DMS Cayman
Fenero Equity Investments LP
321,155.11 10/12/2016
xxxx7102
DMS Cayman
MSS International Consultants BVI Ltd
$1,335,004.68 9/6/2016
$8,876,778.87 2/27/2017
$1,026,534.77 3/10/2017
xxxx3464
DB International Limited
Fenero Equity Investments (Cayman) I, L.P.
$49,935.54 10/17/2016
$1,659,300.00 10/17/2016
$685,950.87 11/18/2016
xxxx5001
Bank of Ireland
Fenero Equity Investments (Ireland)
2,499,961.20 2/17/2017
xxxx4760
Bank of Ireland
Fenero Equity Investments (Ireland)
$1,499,961.20 2/22/2017
xxxx7100
DMS Cayman
MSS International Consultants BVI Ltd
Sourced from exhibits: 814, 705, 724, 704, 824, 716, 717 and 801
$500,000.00 11/16/2016
$1,000,000.00 5/22/2017
$1,000,000.00 11/27/2017
xxxx3236
CNB FL
MSS International Consultants LLC
$105,221.88 2/12/2018
xxxx7951
CNB FL
MSS International Consultants
$600,000.00 8/18/2017
$250,000.00 11/27/2017
xxxx3210
CNB FL
Mark S. Scott PL
$315,000.00 4/7/2017
xxxx5454
Firstcaribbean International Bank
DRP Holdings, LTD
$39,061.00 3/2/2017
xxxx6760
Citibank
Williams Jet Tenders
$500,000.00 10/11/2016
$3,000,000.00 2/28/2017
$1,000,000.00 5/22/2017
xxxx2701
Firstcaribbean International Bank
MSSi FC Operating account
$1,500,000.00 3/16/2017
xxxx9788
Sabadell United Bank
Nicole J. Huesmann IOTA Trust Account
$8,201.40 10/21/2016
xxxx4778
Firstcaribbean International Bank
Ogier
$3,000,000.00 11/11/2016
$500,000.00 1/5/2017
xxxx8611
RBC Dominion Securities Inc.

# <u>EXHIBIT E</u>



xxxx6102
DMS Cayman
Fenero Equity Investments LP

xxxx3464
DB International Limited
Fenero Equity Investments (Cayman) I, L.P.

xxxx7100
DMS Cayman
MSS International Consultants BVI Ltd

xxxx7102
DMS Cayman
MSS International Consultants BVI Ltd

xxxx3008
CNB FL
Mark S. Scott PL

xxxx0295
CNB FL
Mark Scott

xxxx3443
CNB FL
Spero Holdings LLC

€58,936.47   11/4/2016
€20,345.58   12/28/2016

€643,157.96   11/18/2016
€20,048.98   11/23/2016

$500,000.00   10/11/2016
$3,000,000.00   2/28/2017
$1,000,000.00   5/22/2017

€452,898.55   7/1/2016

$500,000.00   4/20/2018

$350,000.00   4/20/2018

$599,975.00   1/19/2017

xxxx2701
**First Caribbean International Bank
MSSi FC Operating account**

Sourced from exhibits: 818, 703, 702, 726, 826, 801,
817, 824, 825, 725, 706, 705, 724, 727 and 712

Time Period: July 2016 - July 2018

$250,000.00   4/20/2017
$250,000.00   4/21/2017

€250,000.00   12/29/2016

$75,630.00   4/21/2017

$250,000.00   10/27/2017

$175,000.00   8/31/2016
$175,000.00   10/12/2016
$125,000.00   10/13/2016
$20,905.08   12/22/2016
$325,000.00   8/28/2017

$500,000.00   1/31/2018

$100,000.00   3/29/2017

$130,000.00   11/16/2016

$250,000.00   3/29/2017

$500,000.00   6/20/2017

$500,000.00   6/22/2018
$422,650.00   6/27/2018
$499,960.00   7/26/2018

$150,000.00   5/14/2018

xxxx8611
RBC
HFT Holding Limited
(owned by Scott)

xxxx6545
Firstcaribbean International Bank
DRP Holdings, LTD

xxxx9288
CNB FL
Mumbelli Group
(Scott listed as signer)

xxxx3236
CNB FL
MSS International Consultants, LLC

xxxx5346
Firstcaribbean International Bank
Mumbelli Group Holding (Cayman), LTD
(Scott listed as Director)

xxxx0914
RBC
DMDJ Holdings LTD

xxxx3883
Firstcaribbean International Bank
EDG Investment, LTD
(Scott listed as Director)

xxxx5343
Firstcaribbean International Bank
MSSI Marine Group, LTD
(Scott listed as Director)

xxxx3414
CNB FL
MSS International Consultants, LLC

xxxx7951
CNB FL
MSS International Consultants

xxxx1812
Northern Trust
MSSI Natural Ventures Group LLC

xxxx2613
Northern Trust
Mark S. Scott PL

# **EXHIBIT F**



Transfers to Pike related accounts
Time Period: March 2016 - September 2018
Total Amount = $2,193,330.00

3883
First Caribbean International Bank
EGD Investment, LTD
(Pike listed as Director and COO) 25% UBO

5346
First Caribbean International Bank
Mumbelli Group Holding (Cayman), LTD
(Pike listed as Director) a/o 2/27/2017

22 wires from April 2017 - Aug 2018 totaling $553,969

9288
CNB FL
Mumbelli Group
(Pike listed as signer) a/o 3/3/2017; 8/29/2017

5454
First Caribbean International Bank
DRP Holdings, Ltd

2701
First Caribbean International Bank
MSS International Consultants BVI Ltd

$130,000.00  11/16/2016
$100,000.00  3/29/2017
$250,000.00  10/27/2017
$75,630.00  4/21/2017

7100
DMS Cayman
MSS International Consultants BVI Ltd

$315,000.00  4/7/2017

7951
CNB FL
MSS International Consultants LLC

$100,000.00  1/24/2018
$100,000.00  4/3/2018

$40,000.00  12/28/2017
$59,000.00  1/11/2018
$232,000.00  4/20/2018

3443
CNB FL
Spero Holdings
(Pike listed as Manager)

$50,000.00  6/21/2016
$12,000.00  8/31/2016
$25,000.00  9/8/2016
$35,000.00  10/13/2016
$115,000.00  10/13/2016
$200,000.00  10/13/2016
$250,000.00  11/17/2016
$93,500.00  11/28/2016
$45,000.00  1/31/2017
$140,000.00  2/27/2017

$10,000.00  9/27/2016
$55,000.00  10/10/2017
$29,000.00  4/26/2018

3236
CNB FL
MSS International Consultants LLC

$3,200.00  3/18/2016

$20,000.00  7/18/2016

3306
Check
Ocean Bank
David Pike

MSSI Natural Ventures Group LLC
Northern Trust
1812

$40,000.00  9/25/2018

Cashier check
David Pike

# **EXHIBIT G**



RBC Flow of funds
Time Period: November 2016 - June 2018

2701
First Carribbean
MSS International Consultants

7100
DMS Cayman
MSS International Consultants BVI Ltd

6619
RBC Dominion Securities
HFT Holding Limited
(closed Nov 2017)

3317
RBC Dominion Securities
Mark S Scott 2017 Trust
[Target account 2]

$90,096.05   11/24/2017
$4,008,813.27   11/24/2017 [Fixed Income]

€ 250,000.00   12/29/2016

$3,000,000.00   11/14/2016
$500,000.00   1/5/2017
$3,000,000.00   5/23/2017

$950,503.56   11/16/2016
$930,454.92   12/19/2016
$1,069,761.88   3/3/2017
$1,016,302.26   6/6/2017

$394,863.83   12/6/2017
$90,434.45   3/22/2018

5001
Bank of Ireland
Fenero Equity Investments (Ireland)

£4,000,000.00   11/16/2016
£ 500,000.00   12/22/2016
€ 999,983.00   2/21/2017
€ 275,000.00   3/9/2017

€ 999,983.00   2/22/2017
(return)

8611
RBC Dominion Securities
HFT Holding Limited
(closed Feb 2018)

$3,370,544.55   11/23/2017
$90,374.43   2/28/2018

3416
RBC Dominion Securities
Mark S Scott 2017 Trust
(closed Mar 2018)

5493
UBS
Mark Scott

$2,000,000.00
06/19/18

$2,500,000.00   11/16/2016
$1,250,000.00   12/20/2016
$1,250,000.00   1/24/2017
$661,415.92   3/7/2017
$1,000,000.00   6/6/2017

$15,498.94   2/23/2018

$2,975,680.72   12/6/2017

6712
RBC Dominion Securities
HFT Holding Limited
(closed Feb 2018)

$397,851.60   11/24/2017
$6,338,591.06   11/24/2017 [Securities]

2214
RBC Dominion Securities
Mark S Scott 2017 Trust
[Target account 1]

$1,750,000.00
10/10/18

James Noble, Esq. PC

# **EXHIBIT H**



Bank of Ireland
[redacted]08576
Fenero Equity Investments (Ireland)
10/14/2016 - $100,000.00
10/20/2016 - $65,000.00
11/9/2016 - 165,000.00
10/20/2016 - $100,000.00
First Caribbean International Bank
[redacted]2701
MSS International Consultants BVI Ltd
5/14/2018 - $150,000.00
5/18/2018 - $150,000.00
Northern Trust
[redacted]3803
MSS International Consultants
Bank of Ireland
[redacted]4760
Fenero Equity Investments (Ireland)
1/17/2017 - $250,000.00
2/7/2017 - $500,000.00
2/21/2017 - $1,000,000.00
2/21/2017 - $500,000.00
1/17/2017 - $750,000.00
2/1/2017 - $500,000.00
2/2/2017 - $1,000,000.00
3/9/2017 - $3,150,000.00
4/19/2017 - $4,000,000.00
4/20/2018 - $10,000.00
CNB FL
[redacted]008
Mark S. Scott PL
Northern Trust
[redacted]2613
Mark S. Scott PL
4/24/2017 - $500,000.00
5/30/2017 - $125,000.00
6/23/2017 - $56,148.21
7/24/2017 - $89,969.18
Northern Trust
[redacted]9353
Mark S. Scott
5/25/2017 - $125,000.00
6/28/2017 - $67,000.00
7/24/2017 - $95,824.63
Northern Trust
[redacted]9351
Mark S. Scott
5/30/2017 - $125,000.00
6/23/2017 - $53,397.89
7/24/2017 - $91,578.27
9/11/2018 - $28,000.00
Northern Trust
[redacted]9352
Mark S. Scott
Northern Trust
43-98797
Mark S. Scott
6/26/2017 - $10,000.00
8/4/2017 - $25,000.00
10/23/2017 - $150,000.00
12/15/2017 - $25,000.00
3/16/2018 - $15,000.00
4/6/2018 - $20,000.00
1/18/2017 - $25,000.00
2/3/2017 - $1,500,000.00
2/22/2017 - $1,500,000.00
4/17/2017 - $1,000,000.00
6/23/2017 - $192,000.00
7/24/2017 - $94,740.33
Northern Trust
[redacted]9350
Mark S. Scott
4/18/2017 - $500,000.00
CNB FL
[redacted]3210
Mark S. Scott PL
4/20/2017 - $1,500,000.00
4/24/2017 - $1,500,000.00
Northern Trust
[redacted]9434
Mark S Scott
6/15/2018 - $15,000.00
Northern Trust
[redacted]1804
Mark S Scott
4/20/2018 - $150,000.00
CNB FL
[redacted]0295
Mark Scott
10/19/2017 - $140,000.00
UBS
[redacted]4734
Mark Scott
1/17/2019 - $15,000.00
8/1/2018 - $7,000.00
JPMC
Lidia Kolesnikova
Cooperative Bank of Cape Cod
[redacted]1054
Mark S. Scott and Lidia V. Kolesnikova

# **EXHIBIT I**



Transfers to Ocean Bank account ███ 0306
Time Period: September 2016 - April 2018
Total Amount = $97,200.00

6674
United Overseas Bank
International Marketing Services

$149,900.00  3/10/2016

3008
CNB FL
Mark S. Scott PL

$100,000.00  4/3/2018

3443
CNB FL
Spero Holdings
(Pike listed as Manager)

7951
CNB FL
MSS International Consultants LLC

$40,000.00  3/4/2016

7102
DMS Cayman
MSS International Consultants BVI td

$25,000.00  9/8/2016
$140,000.00  2/27/2017

$10,000.00  9/27/2016
$55,000.00  10/10/2017
$29,000.00  4/26/2018

$529,750.00  9/6/2016

4760
Fenero Equity Investments
Bank of Ireland

$325,000.00  2/1/2017

3236
CNB FL
MSS International Consultants LLC

$3,200.00  3/18/2016

0306
Check
Ocean Bank
Maria Palacio, David R. Pike and/or Francisco Palacio

7100
DMS Cayman
MSS International Consultants BVI td

$105,221.88  2/12/2018

# **<u>EXHIBIT J</u>**



DMS Cayman
[redacted]7102
MSS International Consultants BVI Ltd
7/5/2016 - $410,000.00
7/18/2016 - $300,000.00
7/19/2016 - $175,000.00
FL
[redacted]3236
MSSI International Consultants LLC
7/5/2016 - $250,000.00
7/27/2016 - $100,000.00
7/20/2016 - $100,000.00
CNB FL
[redacted]3210
Mark S. Scott PL
9/28/2016 - $400,000.00
FL
[redacted]0295
Mark Scott
7/5/2016 - $100,000.00
10/4/2016 - $400,000.00
10/05/2016 -$500,000.00
10/05/2016 - $499,970
[redacted]8576
Fenero Equity Investments (Ireland)
10/5/2016 - $999,970.00
12/15/2016 - $250,000.00
Sabadell United Bank
[redacted]1863
Mark Scott
10/25/2016 - $1,000,000.00
Charles Schwab
[redacted]4052
Mark Scott
1/1/2017 - $1,003,552.81
2/21/2017 - $250,000.00
Bank of Ireland
[redacted]5001
Fenero Equity Investments (Ireland)
RBC Dominion Securities
[redacted]3317
Mark Scott
6/19/2018 - $2,000,000.00
UBS
[redacted]5493
Mark Scott
7/6/2018 - $2,000,000.00
UBS
[redacted]7731
Mark Scott
12/15/2016 -$250,000.00
2/8/2016 - $150,000.00
DBS Bank Ltd
[redacted]0015
International Marketing Services - Singapore
2/1/2016 - $425,000.00
CNB FL
[redacted]3008
Mark S. Scott PL
5/10/2016 - $50,000.00
UBS
[redacted]9666
Mark Scott
12/15/2016 - $500,000.00
Sabadell United Bank
[redacted]9788
Nicole J. Huesmann PA
7/31/2017 - $500,000.00
7/3/2017 - $1,000,000.00
5/1/2018 - $2,328,873.39
6/11/2018 - $218,898.87
8/29/2018 - $367,426.46
6/30/2017 - $1,000,000.00
12/19/2016 - $750,000.00
UBS
[redacted]1979
Mark S. Scott PL
Suntrust
Braman Motorcars
2/13/2017 - $1,000,000.00
5/5/2017 - $500,000.00

# **<u>EXHIBIT K</u>**



$250,000.00 2/21/2017
[redacted]1863
Sabadell United Bank
Mark Scott
[redacted]5001
Bank of Ireland
Fenero Equity Investment
[redacted]7100
DMS Cayman
MSS International Consultants BVI Ltd
$500,000.00 8/8/2017
$249,985.00 2/21/2017
$999,970.00 10/5/2016
$250,000.00 12/15/2016
$250,000.00 10/7/2016
$250,000.00 10/12/2016
[redacted]9463
Wells Fargo
Mark S. Scott
$250,000.00 10/14/2016
$100,000.00 10/14/2016
$30,000.00 10/28/2016
$75,000.00 2/22/2017
$75,000.00 3/13/2017
$75,000.00 4/6/2017
$100,000.00 5/17/2017
$300,000.00 9/18/2017
$50,000.00 1/16/2018
$204,000.00 4/12/2018
[redacted]8576
Bank of Ireland
Fenero Equity Investment
$249,985.00 10/7/2016
$375,000.00 10/13/2016
$250,000.00 10/14/2016
[redacted]3236
CNB FL
MSS International Consultants, LLC
[redacted]048
Wells Fargo
Mark S. Scott
$460,542.38 8/10/2017

# **<u>EXHIBIT L</u>**



# **<u>EXHIBIT M</u>**



3008
CNB FL

50295
CNB FL

3236
CNB FL

$121,000.00   11/15/2016 [Emerald cut Eng Ring]

60,500.00   12/14/2017 [Diamond bracelet]

Buchwald Jewelers

$8,100.00   10/17/2016 [Pam 582 and Pam 585]

$7,000.00   10/28/2016 [Pam 583 and 584]

$40,950.00   12/27/2016 [Black Etoupe 40]

$20,950.00   3/17/2017 [Orange Poppy Birkin 35]

Jaztime Inc

BV Inc

# **<u>EXHIBIT 6</u>**

**To:**        Irina Dilkinska[irina.dilkinska@ravenr.com]
**From:**      Mark S. Scott
**Sent:**      Thur 10/20/2016 10:52:03 AM
**Subject:**   Amended Loan
Scan0007.pdf

**GOVERNMENT EXHIBIT 1388**
17 Cr. 630 (ER)

Hi Irina,

There was a Euro 5.0 Mio distribution made as per the boss a few weeks ago.  We need to paper this deal for our administrator.

Please initial each page and execute the document.  Please e-mail me a scan copy and also courier the original.  It would be good to use the company stamp or get your signature certified.

Best,

Mark

**Mark S. Scott**
Chief Executive Officer

MSS International Consultants (BVI), Ltd.
BVI Registered and Approved Fund Manager

Ritter House
Wickhams Cay II, PO Box 3170
Road Town. Tortola
British Virgin Islands, VG1110

Email Address: msscott@msicbvi.com

Attention: MSS International Consultants (BVI), Ltd.

Tel. +1-305-587-4030

Fax +1 786-513-7770

CONFIDENTIALITY NOTICE:
This e-mail and any attached files from MSS International Consultants (BVI), Ltd. may contain information that is privileged, confidential and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you received this e-mail by accident, please notify the sender immediately and destroy this e-mail and all copies of it. We may scan and or monitor emails sent to and from our servers to ensure regulatory compliance to protect our clients and business.

MS_USAO_FT_025333

October 20, 2016

(1)      **B&N CONSULT EOOD AS LENDER**

**AND**

(2)      **MSS INTERNATIONAL CONSULTANTS (BVI), LTD AS BORROWER**

**FACILITY III AGREEMENT**

*nSS*

MS_USAO_FT_025334

**THIS FACILITY III AGREEMENT** (the **Agreement**) is entered into on October 20, 2016

**BY:**

**(1)**     **B&N CONSULT EOOD** a company under the laws of the Republic of Bulgaria and having its registered office at 6'A P.R. Slaveikov sq, Sofia, Republic of Bulgaria (the **Lender**); and

**(2)**     **MSS INTERNATIONAL CONSULTANTS (BVI), LTD** a company incorporated in the British Virgin Islands with company number 1907282 and having its registered office at Nemours Chambers, PO Box 3170, Road Town, Tortola, British Virgin Islands (the **Borrower**).

**WHEREAS**

**A.**     the Lender has already made available to the Borrower two term loan facilities for an aggregate loan amount €6,550,000 (the **Original Facility**) on and subject to the terms and conditions of two separate Facility Agreements, with the first one dated July 27, 2016 and a commitment letter, dated July 11, 2016, attached thereto.

**B.**     the Lender and the Borrower, based on further contemplation of administrative and other needs of both parties, have decide to enter into this subsequent Facility Agreement (**Facility III**)

**B.**     the Lender and Borrower agree that the Facility III shall also only be repayable upon the liquidation of Fenero Equity Investments L.P (**FEI**) and that any such repayment shall come only from the proceeds of such liquidation, calculated prior to any distributions.

**NOW IT IS HEREBY AGREED** as follows:

**1.**     **DEFINITIONS AND INTERPRETATION**

**1.1**     **Definitions**

In this Agreement, the following words and phrases have the following meanings:

**Advance :** the additional advance of €5,000,000 made or to be made by the Lender under this Agreement.

**Final Repayment Date :** the 1st anniversary of the date on which FEI is dissolved and all proceeds distributed, as long as sufficient funds are available from profits.  Otherwise new terms shall be found.

**Loan :** the aggregate principal amounts made from the Original Facility for the time being outstanding hereunder and comprising the Advance made pursuant to this Facility III Agreement.

**Repayment Date :** means the date on which Fenero Equity Investments L.P is dissolved in accordance with the laws of the British Virgin Islands.

### 1.2 Interpretation

**1.2.1** Any reference in this Agreement to:-

(a) this **Agreement** or to any other agreement or document shall, unless the context otherwise requires, be construed as a reference to this Agreement or such other agreement or document as the same may from time to time be amended, varied, supplemented, novated or replaced;

(b) the **assets** of any person shall be construed as a reference to all or any part of its business, operations, undertaking, property, assets, revenues (including any right to receive revenues) and uncalled capital;

(c) a **business day** is a reference to a day (other than a Saturday or Sunday) on which the banks are open for business in the British Virgin Islands;

(d) the **Lender** shall be construed as a reference also to its successors and/or assigns;

**1.2.2** Any reference in this Agreement to any statute or statutory provision shall, unless the context otherwise requires, be construed as a reference to such statute or statutory provision (including all instruments, orders or regulations made thereunder or deriving validity therefrom) as in force at the date of this Agreement and as subsequently re-enacted, amended, modified or consolidated.

## 2. THE FACILITY

**2.1** The Loan shall not at any time exceed €11,550,000 or such other amount as the Lender may consent to in writing (including by email) from time to time.

**2.2** The Loan shall be used by the Borrower or its affiliates for any such purpose as the Borrower shall in its sole discretion elect.

## 3. INTEREST

The Loan shall be non-interest bearing.

## 4. REPAYMENT

**4.1** The Borrower shall repay the Loan on the Repayment Date. Any prior Lump Sums shall be forgiven.

**4.2** The Borrower shall only be required to repay the Loan as an expense from the proceeds of Fenero Equity Investments LP due to it in accordance with the terms of the liquidation.

## 5. PAYMENTS

All sums payable by the Borrower under this Agreement shall be paid in full without any set-off, counterclaim, withholding or deduction and in cleared funds by no later than 11.00 a.m. on the day in question to such account as the Lender may have specified for this purpose.

MS_USAO_FT_025336

**6.        COSTS AND EXPENSES**

**6.1        Initial Costs and Expenses**

The Borrower shall reimburse the Lender for all costs and expenses (including legal fees) together with any taxes or other charges thereon incurred by it in connection with the negotiation, preparation and execution of this Agreement and the completion of the transactions contemplated in this Agreement and/or any amendment, variation of, novation of, supplement to, or waiver in respect of, this Agreement.

**6.2        Enforcement Costs and Expenses**

The Borrower shall, from time to time on demand of the Lender, reimburse the Lender for all costs and expenses (including legal fees) together with any taxes or other charges thereon incurred in or in connection with the preservation and/or enforcement of any of the rights of the Lender under this Agreement.

**7.        ASSIGNMENTS**

Neither the Borrower nor the Lender shall not be entitled to assign all or any of its rights under this Agreement.

**8.        NOTICES**

**8.1 General**

Any demand, notice or other communication or document to be made or delivered under this Agreement shall be made or delivered by telex, facsimile transmission (referred to as a **"fax"**) or otherwise in writing.  Each demand, notice, communication or other document to be made on or delivered to any party to this Agreement may (unless that other person has specified another address, telex or fax number) be made or delivered to that other person, in the case of the Lender at the address, telex or fax number (if any) set out in clause 22.2 below and, in the case of the Borrower set out in clause 22.3 below or, in either case to its registered office.  Any notice given by letter shall only be deemed to have been received at the time it is delivered to the other party's address as set out in this Agreement or as otherwise advised.  Any notice given by telex shall be deemed to have been received when despatched (answerback received) to the recipient's telex number most recently advised to the sender unless it is despatched by the sender after the recipient's normal working hours, in which case it shall not be deemed to have been received until the recipient's opening of business on the next business day.  Any notices given by fax shall only be deemed to have been received on the business day following the day on which it was transmitted and in proving such delivery it shall be sufficient to prove that the fax was followed by such machine record as indicates that the entire fax was sent to the relevant number.

**8.2 Notices to the Lender**

Any notices to be sent to the Lender pursuant to this Agreement should be sent to the Lender's address on file as set forth in the official registrar in its respective country.

**8.3 Notices to the Borrower**

Any notices to be sent to the Borrower pursuant to this Agreement should be sent to the Borrower's address on file as set forth in the official registrar in its respective country.

*hss*

MS_USAO_FT_025337

9.   **COUNTERPARTS**

Each Finance Document may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of the Finance Document.

10.   **LAW AND JURISDICTION**

10.1   **Law**

This Agreement shall be governed by, and construed in accordance with, the laws of the British Virgin Islands.

10.2   **Jurisdiction**

10.2.1   The Borrower irrevocably agrees, for the benefit of the Lender, that the courts of the British Virgin Islands shall have jurisdiction to hear and determine any suit, action or proceeding, and to settle any disputes, which may arise out of or in connection with this Agreement and, for such purposes, irrevocably submits to the jurisdiction of such courts.

10.2.2   The submission to the jurisdiction of such courts shall not (and shall not be construed so as to) limit the right of the Lender to take proceedings against the Borrower in any other court of competent jurisdiction nor shall the taking of proceedings in any one or more jurisdictions preclude the taking of proceedings in any other jurisdiction, whether concurrently or not.

[Remainder of page intentionally left bank. Signature page to follow.]

4

MS_USAO_FT_025338

**IN WITNESS** whereof the parties have executed this Facility III Agreement on the day and year first above written.

**THE BORROWER**

**EXECUTED** by                                                          )
**MSS INTERNATIONAL CONSULTANTS (BVI) LTD**

acting by its authorised signatory:                        )

                                                                               )
.................................................
Mark S. Scott, CEO                                              )


**THE LENDER**

**EXECUTED** by                                                          )
**B&N CONSULT EOOD AS LENDER**

acting by its authorised signatory:                        )

                                                                               )
.................................................
                                                                               )
Name:

Title:

MS_USAO_FT_025339

**GOVERNMENT EXHIBIT**

**1434**

17 Cr. 630 (ER)

| | |
|---|---|
| **To:** | Dr. Ruja Ignatova[ruja@onecoin.eu]; Karl Horsburgh[karlhorsburgh@gmail.com] |
| **From:** | Mark S. Scott |
| **Sent:** | Mon 12/19/2016 12:53:27 AM |
| **Subject:** | Re: MSS International Consultants |

Best Karl and I have a call tomorrow to discuss general hypotheticals. Thereafter we need to meet.

Who is Frank?


Mark S. Scott
Chief Executive Officer

MSS International Consultants (BVI), Ltd.
BVI Registered and Approved Fund Manager

Email Address: msscott@msicbvi.com
Tel. +1-305-587-4030
Fax +1 786-513-7770



Sent from my BlackBerry Priv - the most secure mobile device

**From:** ruja@onecoin.eu
**Sent:** December 18, 2016 18:22
**To:** karlhorsburgh@gmail.com
**Cc:** msscott@msicbvi.com; frank@sandstone.lu
**Subject:** Re: MSS International Consultants


Gentlemen
Pls do not copy me on mails like this. We discuss better personally or over the phone
R

Sent from my iPad, please excuse the brevity and possible mistakes

On 16 Dec 2016, at 12:20, Karl Horsburgh <karlhorsburgh@gmail.com> wrote:


I have reviewed our conversation and the corporate structure you gave me and have come up with the following conclusions:

MSS International Consultants (BVI) Ltd (MSS) is the general partner in 5 Fenero limited partnerships which in turn contain exclusively RI's money. MSS also has the relationships with the banks that currently run the bank accounts for the partnerships. MSS also is the shareholder of Fenero Equity Investments (Ireland) Limited which in turn owns three other Irish companies Fenero Tradenext which is dormant, Fenero PCT which issues a credit card and Fenero Securities which is in the process of opening

MS_USAO_FT_086307

brokerage accounts for Anton and Ivan to allow them to trade on stock exchanges. All of this has been financed by RI.

Our problem is that RI cannot appear as the BO of the structure and any change in the structure could cause the banks to close bank accounts if they were to find out about RI. However RI would like to ensure that her ownership of this structure is formalised and secured.

I therefore propose to create a Liechtenstein Foundation (LF) in which you will settle the shares of MSS. Initially, the beneficiary of the foundation will be a charity which will ultimately be changed to RI. The management of the LF will be one professional from Liechtenstein and two others nominated by us. We will then have the power to change the beneficiary in the future.

Any additional activity that you have with MSS will have to be moved to a new entity that you will create as you will have less of a problem creating something new and getting approval for it.

You will remain on the Board of MSS to ensure continuity and we will add two new board members who will be involved in any decisions on the management and transfer of funds in the structure.

Financial matters can be discussed at a later date when we agree on the course of action.

Kind regards, Karl
Mobile (Lux) +352 621 245 215
Office (Lux) +352 20211511

MS_USAO_FT_086308







**Funding of 4 Fenero Accounts totaling €354,000,000 and $9,990,185**
**Time Period: May - October 2016**

GOVERNMENT
EXHIBIT
2602
17 Cr. 630 (ER)

Sourced from exhibits: GX-812A-GX-812G, GX-813A-GX-813H, GX-809A, GX-810A, GX-811A-GX-811B, GX-816A-GX-816B, GX-820A-GX-820C, GX-720A-GX-720C, GX-806A-GX-806F, GX-808A, GX-711A-GX-711E, GX-716A-GX-716E, and GX-721A

GOVERNMENT
EXHIBIT
2602-A
17 Cr. 630 (ER)



**Funding of 4 Fenero Accounts totaling €354,000,000 and $9,990,185**
**Time Period: May - October 2016**

**IMS GmbH**
xxxx2001
Commerzbank

**IMS GmbH**
xxxx8901
Deutsche Bank

**IMS Pte**
xxxx7201
OCBC

**B and N Consult LTD**
xxxx9342
DSK Bank

**IMS PTE LTD**
xxxx0301
OCBC

**Fates Group**
xxxx1736
Sabadell United Bank

**IMS Pte**
xxxx6682
United Overseas Bank
(Account opened Feb 4, 2016)

**Star Merchant Inc Limited**
xxxx7960
DBS Bank (Hong Kong)

**Fates Group**
xxxx0653
Morgan Stanley

7 wires = € 35,000,000.00
Dates: June 2 - 8, 2016

8 wires = € 40,000,000.00
Dates: June 15 - August 1, 2016

11 wires = € 55,000,000.00
Dates: May 30 - July 29, 2016
[BNY Mellon - Manhattan] - Correspondent

6 wires = € 34,500,000.00
Dates: August 10 - October 27, 2016

16 wires = € 95,000,000.00
Dates: August 5 - October 20, 2016

2 wires = $5,000,000.00
Dates: June 30 - July 1, 2016
[Deutsche Bank - Manhattan] Correspondent

2 wires = € 10,000,000.00
Dates: June 20 - 21, 2016

3 wires = € 15,000,000.00
Dates: June 8 - 20, 2016

7 wires = € 60,000,000.00
Dates: September 9 - 30, 2016

1 wire = € 4,500,000.00
Date: August 11, 2016

1 wire = € 5,000,000.00
Date: October 5, 2016

1 wire = $4,990,185.00
Date: September 13, 2016
[Deutsche Bank - Manhattan] Correspondent

**Fenero Equity Investments LP**
**xxxx76102**

DMS Cayman
(Date Incorporated: March 31, 2016)
(Account opened June 2, 2016)
[Total credits = € 155 million]

**Fenero Financial Switzerland LP**
**xxxx84102**

DMS Cayman
(Date Incorporated: March 31, 2016)
(Account opened June 30, 2016)
[Total credits = €60 million]

**Fenero Equity Investments (Cayman) I, L.P.**
**xxxx3464**

DB International Limited
(Date Incorporated: May 5, 2016)
(Account opened August 2016)
[Total credits = € 139 million]

**Fenero Equity Investments II L.P.**
**xxxx3465**

Deutsche Bank Cayman Limited
[Total credits = $9,990,185]

Sourced from exhibits: GX-806A-GX806F,
GX-812A-GX-812G, GX-813-GX-813H, GX-809A,
GX-810A, GX-811A-GX-811B, GX-816A-GX-816B,
GX-820A-GX-820C, GX-720A-GX-720C, GX808A,
GX-711A-GX-711E, GX-716A-GX-716E and GX-721A

# Fenero MSSI Foreign and Domestic Incoming Transfers
# Time Period: May 2016 - July 2018

Sourced from exhibits: GX-818A-GX-818F, GX-814A-GX-814H, GX-815A-GX-815H,

GX-1701A-GX-1701B, GX-1702A-GX-1702C, GX-1703A-GX-1703C, GX-1704A-GX-1704C, GX-1705A - GX-1705C

## FUNDING ACCOUNTS

Credits: €354,000,000 and $9,990,185

GOVERNMENT
EXHIBIT
2603
17 Cr. 630 (ER)

## FENERO CAYMAN ACCOUNTS 

 INTERMEDIARY ACCOUNTS (CAYMAN AND BANK OF IRELAND) 



DOMESTIC ACCOUNTS
TOTAL CREDITS: $36,643,170.14
€1,146,576.86

FOREIGN ACCOUNTS
TOTAL CREDITS:
€309,718,932.35
$47,884,515.34
£10,775,145.88



**Fenero MSSI Foreign and Domestic Transfers**
**Time Period: May 2016 - July 2018**

FUNDING ACCOUNTS

GOVERNMENT
EXHIBIT
2603-A
17 Cr. 630 (ER)

Sourced from exhibits: GX-706A-GX-706E, GX-703A-GX-703F, GX-705A-GX-705G, GX-704A-GX-704F, GX-702A-GX-702E, GX-724A-GX-724F, GX-712A-GX-712F, GX-727A-GX-727G, GX-728A-GX-728E, GX-729A-GX-729B, GX-716A-GX-716E, GX-717A-GX-717G, GX-817A-GX-817F, GX-801A-GX-801D, GX-824A-GX-824F, GX-825A-GX-825F, GX-826A-GX-826F, GX-807A, GX-720A-GX-720C, GX-818A-GX-818F, GX-814A-GX-814H, GX-815A-GX-815H, GX-812A-GX-812G, GX-813A-GX-813H, GX-809A, GX-810A, GX-1701A-GX-1701B, GX-1702A-GX-1702C, GX-1703A-GX-1703C, GX-1704A-GX-1704C, GX-1705A - GX-1705C

Credits: €354,000,000 and $9,990,185

FENERO CAYMAN ACCOUNTS

INTERMEDIARY ACCOUNTS (CAYMAN AND BANK OF IRELAND)

3 wires = $950,000

3 wires = € 40,020,286.36

**Domestic Accounts Total Credits $36,643,170.14 / €1,146,576.86**

xxxx3008
CNB FL
Mark Scott
(12 wires = $8,146,059.68)

xxxx3414
CNB FL
MSS International Consultants, LLC
(1 wire =$500,000)

xxxx3236
CNB FL
MSS International Consultants, LLC
(18 wires = $6,974,655.08)

xxxx3210
CNB FL
Mark S. Scott PL
(4 wires = $1,800,000)

xxxx0295
CNB FL
Mark Scott
(1 wire = $ 499,970)

xxxx7951
CNB FL
MSS International Consultants
(2 wires = $605,221.88)

xxxx9463
Wells Fargo
Mark Scott
(4 wires = $1,250,000)

xxxx1812
Northern Trust
MSSI Natural Ventures Group LLC
(3 wires = $1,422,610)

xxxx2613
Northern Trust
Mark S. Scott PL
(6 wires = $1,245,592.50)

xxxx1863
Sabadell United Bank
Mark Scott
(1 wire = $250,000)
(2 wires = €1,146,576.86)

xxxx5788
Sabadell United Bank
Nicole J. Huesmann IOTA Trust Account
(16 wires = $13,910,000)

xxxx5760
Citibank
Williams Jet Tenders
(1 wire = $39,061)

**Foreign Accounts: Total Credits € 309,718,932.35 / $47,884,515.34 / £10,775,145.88**

Accounts controlled by SCOTT

xxxx3883
Firstcaribbean International Bank
EDG Investment, LTD
(1 wire = $130,000)

xxxx8611
RBC Dominion Securities Inc.
HFT Holding Limited
(4 wires = $6,515,498.94)
(4 wires = £5,775,072.93)

xxxx6901
Dreyfus Söhne & Cie AG
Mark Scott
(2 wires = £2,500,036.67)

Other Cayman Islands accounts = $748,831.40

xxxx5454
Firstcaribbean International Bank
DRP Holdings, LTD
(2 wires = $390,630)

xxxx5343
Firstcaribbean International Bank
MSSI Marine Group, LTD
(1 wire = $250,000)

xxxx1417
Bank Julius Baer and Co. Ltd.
Oceanscapes Ventures Limited
(1 wire = €3,250,000)

xxxx4778
Firstcaribbean International Bank
Ogier
(1 wire = $8,201.40)

xxxx5346
Firstcaribbean International Bank
Mumbelli Group Holding (Cayman), LTD
(1 wire = $100,000)

xxxx1866
Global Bank of Commerce
Fates Group LLC
(1 wire = $9,990,185)

xxxx3404
NBD Bank PJSC
Phoenix Fund Invest Llc
(11 wires = €185,000,467.50)

xxxx7212
DBS Bank - Hong Kong
Barta Holdings
(1 wire = $30,000,000)

xxxx3420
Emirates Islamic Bank
Adamana Group DMCC
(1 wire = €6,000,000)

United Kingdom = € 39,826,782.28 / £2,500,036.28

xxxx3273
Metro Bank PLC
Peregrine Law Client Account
(1 wire = €7,200,031.25)

xxxx5468
LLOYDS BANK
Payment Card Technologies
(3 wires = €2,500,036.28)

xxxx0162
RBC
DMD3 Holdings LTD
(1 wire = $500,000)

xxxx6336
HSBC Bank Plc
Locke Lorde UK LLP
(1 wire = €126,676.75)

xxxx4844
Barclays Bank
Cowen International Limited
(3 wires = €30,000,038)

xxxx2139
Bank of Ireland
IG Markets General Ltd.
(1 wire = €10,000,038)

Bulgaria = € 65,196,101.35

xxxx4994
Piraeus Bank Bulgaria AD
Vida Home
(2 wires = €7,500,044.35)

xxxx8700
Investbank
LBJ AD
(1 wire = €6,000,000)

xxxx7000
Investbank
Openmark Bulgaria EOOD
(5 wires = € 51,696,057)



Source of funds: IMS GmbH, IMS Pte and B and N Consult Ltd
Time Period: June - August 2016

GOVERNMENT
EXHIBIT
2604
17 Cr. 630 (ER)

Incoming = € 155 million

Transfer 4 wires = €49,999,310.00
July - August 2016

xxxx4102
DMS Cayman
Fenero Financial Switzerland LP

€ 7,300,000.00  6/14/2016
€ 17,000,000.00  9/22/2016
€ 40,000,000.00  10/14/2016
€ 400,000.00  10/17/2016

xxxx4760
Bank of Ireland
Fenero Equity Investments (Ireland)

xxxx6102
DMS Cayman
Fenero Equity Investments LP

€ 58,936.47  11/4/2016
€ 20,345.58  12/28/2016

£1,200,000.00 9/22/2016

xxxx2701
Firstcaribbean International Bank
MSSi FC Operating account
USD account

Outgoing Time Period: June 2016 - February 2017

xxxx5001
Bank of Ireland
Fenero Equity Investments (Ireland)

€ 321,155.11  10/12/2016

€ 960,000.00  8/19/2016

xxxx7100
DMS Cayman
MSS International Consultants BVI Ltd
USD account

€ 112,508.21  6/23/2016
€ 1,068,359.42  6/17/2016
€ 2,675,000.00  7/19/2016
€ 3,875,000.00  9/5/2016
€ 146,076.59  2/24/2017

$ 30,000,000.00  7/13/2016

xxxx8576
Bank of Ireland
Fenero Equity Investments (Ireland)

€ 249,307.11  9/6/2016
€ 16,324.87  1/27/2017

€ 1,976,284.58  6/23/2016

xxxx7102
DMS Cayman
MSS International Consultants BVI Ltd

xxxx7212
DBS Bank (Hong Kong)
Barta Holdings Ltd

xxxx3008
CNB FL
Mark Scott

xxxx5468
LLOYDS BANK
Payment Card Technologies

Sourced from exhibits: GX-812A-GX-812G,
GX-703A-GX-703F, GX-807A, and GX-720A-GX-720C



Source of funds: IMS Pte
Time Period: July - September 2016

GOVERNMENT
EXHIBIT
2605
17 Cr. 630 (ER)

Incoming = €60 million

Transfer 4 wires = € 49,999,310.00
July - Aug 2016

€ 1,500,000.00  9/29/2016

xxxx6102
DMS Cayman
Fenero Equity Investments LP

xxxx4102
DMS Cayman
Fenero Financial Switzerland LP

xxxx5001
Bank of Ireland
Fenero Equity Investments (Ireland)

€ 299,991.87  7/18/2016
€ 8,263,549.25  2/24/2017

Outgoing Time Period: July 2016 - July 2017

€ 12,000,000.00  9/29/2016
€  6,000,000.00  1/9/2017
€ 10,000,000.00  2/10/2017
€ 15,000,000.00  2/13/2017

xxxx7102
DMS Cayman
MSS International Consultants BVI Ltd

xxxx4760
Bank of Ireland
Fenero Equity Investments (Ireland)

€6,000,000  7/21/2017

$1,004,130.00  9/29/2016
$221,800.00  10/7/2016
$241,194.12  10/12/2016

€ 10,000,000.00  1/27/2017
€ 20,000,000.00  1/27/2017

xxxx7100
DMS Cayman
MSS International Consultants BVI Ltd
USD account

€ 10,000,000.00  2/3/2017

€ 10,000,000.00  2/14/2017

xxxx9811
Bank of Ireland
Fenero Securities Trading Ltd

xxxx7000
Investbank
Openmark Bulgaria EOOD

xxxx3420
Emirates NBD Bank
Adamana Group DMCC

xxxx4844
Barclays Bank
Cowen International Limited

Sourced from exhibits: GX-813A-GX-813H



GOVERNMENT
EXHIBIT
**2607**
17 Cr. 630 (ER)

xxxx4102
DMS Cayman
Fenero Financial Switzerland LP

€12,000,000.00   9/29/2016
€6,000,000.00   1/9/2017
€10,000,000.00   2/10/2017
€15,000,000.00   2/13/2017

xxxx7102
DMS Cayman
MSS International Consultants BVI Ltd

€2,500,000.00   7/19/2016

xxxx3464
DB International Limited
Fenero Equity Investments (Cayman) I, L.P.

€40,000,000.00   2/17/2017
€40,000,000.00   2/22/2017
€55,800,880.37   2/27/2017

xxxx2120
Lloyds Bank
IG Markets General Ltd.

€9,993,862.36   4/7/2017

xxxx6102
DMS Cayman
Fenero Financial Switzerland LP

€7,300,000.00   6/14/2016
€17,000,000.00   9/22/2016
€47,000,000.00   10/14/2016
€400,000.00   10/17/2016

Time Period: July 2016 – April 2017

€9,000,000.00   1/27/2017
€5,000,000.00   2/10/2017
€20,000,000.00   2/22/2017
€3,000,000.00   2/7/2017
€20,000,000.00   2/27/2017
€588,003.11   4/6/2017
€20,000,000.00   2/28/2017
€50,936.00   4/24/2017
€10,000,000.00   3/1/2017
€60,000,000.00   3/2/2017
€10,000,000.00   4/10/2017

xxxx9811
Bank of Ireland
Fenero Securities Trading Ltd

xxxx7100
DMS Cayman
MSS International Consultants BVI Ltd

$1,499,961.20   2/22/2017

xxxx4760
Bank of Ireland
Fenero Equity Investments (Ireland)

€3,250,000.00   11/11/2016

€2,500,025.35   7/25/2016
€5,000,019.00   9/29/2016

€6,000,000.00   12/21/2016

€7,200,031.25   6/16/2016

$2,500,000.00   10/3/2016
$1,000,000.00   11/2/2016
$500,000.00   2/7/2017
$250,000.00   6/19/2017

$10,000,019.00   2/13/2017
$11,696,000.00   2/14/2017

$350,000.00   1/19/2017
$325,000.00   2/1/2017

$500,000.00   4/18/2017

$250,000.00   1/17/2017
$500,000.00   2/7/2017

$750,000.00   1/17/2017
$500,000.00   2/1/2017
$1,000,000.00   2/2/2017
$3,150,000.00   3/9/2017

€7,500,019.00   1/23/2017
€2,500,019.00   1/24/2017

£1,000,000.00   1/17/2017
£500,000.00   4/5/2017

£1,000,000.00   10/5/2016
£500,000.00   1/17/2017
£250,000.00   1/24/2017
£350,000.00   2/1/2017
£1,000,000.00   2/2/2017
£750,000.00   2/7/2017

€9,975,000.00   1/10/2017
€50,000.00   2/13/2017

€700,000.00   10/6/2016
€400,000.00   10/19/2016
€5,000,000.00   11/2/2016
€8,370,000.00   1/11/2017
€4,000,000.00   2/22/2017
€2,903,650.00   3/6/2017

xxxx4994
Piraeus Bank Bulgaria AD
Vida Home

xxxx3273
Metro Bank PLC
Peregrine Law Client Account

xxxx9788
Sabadell United Bank
Nicole Huesmann IOLA

xxxx3236
CNB FL
MSS International Consultants, LLC

xxxx2613
Northern Trust
Mark Scott PL

xxxx2139
Bank of Ireland
IG Markets General Ltd.

xxxx7958
Bank of Ireland
Fenero Tradenext

xxxx1417
Bank Julius Baer and Co. Ltd.
Oceanscapes Ventures Limited

xxxx8700
Investbank
LBJ AD

xxxx7000
Investbank
Openmark Bulgaria EOOD

xxxx3210
CNB FL
Mark Scott

xxxx3008
CNB FL
Mark Scott PL

xxxx5468
LLOYDS BANK
Payment Card Technologies

xxxx5001
Bank of Ireland
Fenero Equity Investments (Ireland)

xxxx8576
Bank of Ireland
Fenero Equity Investments (Ireland)

Sourced from GX-1705A-GX-1705C, GX-716A-GX-716E,
GX-717A-GX-717G, GX-704A-GX-704F, GX-705A-
GX-705G, GX-703A-GX-703F and GX-712A-GX-712F



xxxx4102
DMS Cayman
Fenero Financial Switzerland LP

$1,004,130.00  9/29/2016
$221,800.00  10/7/2016
$241,194.12  10/12/2016

xxxx6102
DMS Cayman
Fenero Equity Investments LP

321,155.11  10/12/2016

xxxx7102
DMS Cayman
MSS International Consultants BVI Ltd

$1,335,004.68  9/6/2016
$8,876,778.87  2/27/2017
$1,026,534.77  3/10/2017

xxxx3464
DB International Limited
Fenero Equity Investments (Cayman) I, L.P.

$49,935.54  10/17/2016
$1,659,300.00  10/17/2016
$685,950.87  11/18/2016

xxxx5001
Bank of Ireland
Fenero Equity Investments (Ireland)

2,499,961.20  2/17/2017

xxxx4760
Bank of Ireland
Fenero Equity Investments (Ireland)

$1,499,961.20  2/22/2017

**GOVERNMENT EXHIBIT 2608**
17 Cr. 630 (ER)

xxxx7100
DMS Cayman
MSS International Consultants BVI Ltd

Sourced from exhibits: GX-814A-GX-814H, GX-705A-GX-705G, GX-724A-GX-724F, GX-704A-GX-704F, GX-824A-GX-824F, GX-716A-GX-716E, GX-717A-GX-717G and GX-801A-GX-801D

$105,221.88  2/12/2018

$315,000.00  4/7/2017

$500,000.00  10/11/2016
$3,000,000.00  2/28/2017
$1,000,000.00  5/22/2017

$1,500,000.00  3/16/2017

$8,201.40  10/21/2016

$3,000,000.00  11/11/2016
$500,000.00  1/5/2017

$500,000.00  11/16/2016
$1,000,000.00  5/22/2017
$1,000,000.00  11/27/2017

$600,000.00  8/18/2017
$250,000.00  11/27/2017

$39,061.00  3/2/2017

xxxx7951
MSS International Consultants

xxxx5454
Firstcaribbean International Bank
DRP Holdings, LTD

xxxx2701
Firstcaribbean International Bank
MSSi FC Operating account

xxxx4778
Firstcaribbean International Bank
Ogier

xxxx3236
CNB FL
MSS International Consultants LLC

xxxx3210
CNB FL
Mark S. Scott PL

xxxx6760
Citibank
Williams Jet Tenders

xxxx9788
Sabadell United Bank
Nicole J. Huesmann IOTA Trust Account

xxxx8611
RBC Dominion Securities Inc.



**xxxx6102**
DMS Cayman
Fenero Equity Investments LP

€58,936.47   11/4/2016
€20,345.58   12/28/2016

**xxxx3464**
DB International Limited
Fenero Equity Investments (Cayman) I, L.P.

€643,157.96   11/18/2016
€20,048.98   11/23/2016

**xxxx7100**
DMS Cayman
MSS International Consultants BVI Ltd

$500,000.00   10/11/2016
$3,000,000.00   2/28/2017
$1,000,000.00   5/22/2017

**xxxx7102**
DMS Cayman
MSS International Consultants BVI Ltd

€452,898.55   7/1/2016

**xxxx3008**
CNB FL
Mark S. Scott PL

$500,000.00   4/20/2018

**xxxx0295**
CNB FL
Mark Scott

$350,000.00   4/20/2018

**xxxx3443**
CNB FL
Spero Holdings LLC

$599,975.00   1/19/2017

**xxxx2701**
**First Caribbean International Bank**
**MSSi FC Operating account**

Sourced from exhibits: GX-818A-GX-818F,
GX-703A-GX-703F, GX-702A-GX-702E, GX-726A-
GX-726F, GX-826A-GX-826F, GX-801A-GX-801D,
GX-817A-GX-817F, GX-824A-GX-824F, GX-825A-
GX-825F, GX-725A-GX-725F, GX-706A-GX-706E,
GX-705A-GX-705G, GX-724A-GX-724F, GX-727A-
GX-727G and GX-712A-GX-712F

Time Period: July 2016 - July 2018

**GOVERNMENT**
**EXHIBIT**
**2609**
17 Cr. 630 (ER)

$250,000.00   4/20/2017
$250,000.00   4/21/2017

**xxxx0914**
RBC
DMDJ Holdings LTD

$100,000.00   3/29/2017

**xxxx5346**
Firstcaribbean International Bank
Mumbelli Group Holding (Cayman), LTD
(Scott listed as Director)

€250,000.00   12/29/2016

**xxxx8611**
RBC
HFT Holding Limited
(owned by Scott)

$130,000.00   11/16/2016

**xxxx3883**
Firstcaribbean International Bank
EDG Investment, LTD
(Scott listed as Director)

$75,630.00   4/21/2017

**xxxx6545**
Firstcaribbean International Bank
DRP Holdings, LTD

$250,000.00   3/29/2017

**xxxx5343**
Firstcaribbean International Bank
MSSI Marine Group, LTD
(Scott listed as Director)

$250,000.00   10/27/2017

**xxxx9288**
CNB FL
Mumbelli Group
(Scott listed as signer)

$500,000.00   6/20/2017

**xxxx3414**
CNB FL
MSS International Consultants, LLC

$175,000.00   8/31/2016
$175,000.00   10/12/2016
$125,000.00   10/13/2016
$20,905.08   12/22/2016
$325,000.00   8/28/2017

**xxxx3236**
CNB FL
MSS International Consultants, LLC

$500,000.00   1/31/2018

**xxxx7951**
CNB FL
MSS International Consultants

$500,000.00   6/22/2018
$422,650.00   6/27/2018
$499,960.00   7/26/2018

**xxxx1812**
Northern Trust
MSSI Natural Ventures Group LLC

$150,000.00   5/14/2018

**xxxx2613**
Northern Trust
Mark S. Scott PL



GOVERNMENT
EXHIBIT
2610
17 Cr. 630 (ER)

xxxx4102
DMS Cayman
Fenero Financial Switzerland LP

xxxx6102
DMS Cayman
Fenero Equity Investments LP

xxxx9811
Bank of Ireland
Fenero Securities Trading Ltd

€299,991.87  7/18/2016
€8,263,549.25  2/24/2017

€112,508.21  6/23/2016
€1,068,359.42  6/17/2016
€2,675,000.00  7/19/2016
€3,875,000.00  9/5/2016
€146,076.59  2/24/2017

€979,820.00  2/28/2017
€4,449,042.50  4/18/2017

Sourced from exhibits: GX-815A-
GX-815H, GX-704A-GX-704F, GX-705A-
GX-705G and GX-703A-GX-703F

Time Period: June 2016 - June 2017

**xxxx7102**
**DMS Cayman**
**MSS International Consultants BVI Ltd**

$1,335,004.68  9/6/2016
$8,876,778.87  2/27/2017
$1,026,534.77  3/10/2017

$450,000.00  6/21/2017

$169,127.52  6/17/2016
$371,309.55  7/4/2016
$273,972.60  7/18/2016
$160,476.85  7/19/2016
$473,625.39  9/6/2016
$500,000.00  6/14/2017

€177,777.78  6/23/2016

€2,500,000.00  7/19/2016

€2,250,000.00  9/5/2016

€452,898.55  7/1/2016

xxxx7100
DMS Cayman
MSS International Consultants BVI Ltd

xxxx3210
CNB FL
Mark S. Scott PL

xxxx3236
CNB FL
MSS International Consultants, LLC

xxxx3008
CNB FL
Mark Scott

xxxx8576
Bank of Ireland
Fenero Equity Investments (Ireland)

xxxx2701
Firstcaribbean International Bank
MSSi FC Operating account

xxxx4760
Bank of Ireland
Fenero Equity Investments (Ireland)





GOVERNMENT EXHIBIT 2611
17 Cr. 630 (ER)

Sourced from exhibits: GX-1703A - GX-1703C, GX-712A-GX-712F, GX-703A-GX-703F, GX-705A-GX-705G, GX-728A-GX-728E, GX-729A-GX-729B, GX-702A-GX-702E, GX-716A-GX-716E and GX-717A-GX-717G

**GOVERNMENT EXHIBIT 2612**
17 Cr. 630 (ER)

xxxx8576
Bank of Ireland
Fenero Equity Investments (Ireland)
£1,000,000.00  11/3/2016
£500,000.00  11/14/2016
£500,000.00  12/22/2016
£625,000.00  2/10/2017
£1,500,000.00  2/14/2017
£1,500,000.00  2/20/2017
£1,000,000.00  2/23/2017

xxxx4760
Bank of Ireland
Fenero Equity Investments (Ireland)
£1,000,000.00  10/5/2016
£500,000.00  1/17/2017
£250,000.00  1/24/2017
£350,000.00  2/1/2017
£1,000,000.00  2/2/2017
£750,000.00  2/7/2017

xxxx4102
DMS Cayman
Fenero Financial Switzerland LP
£1,500,000.00  9/29/2016

xxxx6102
DMS Cayman
Fenero Equity Investments LP
£1,200,000.00  9/22/2016

xxxx8611
RBC Dominion Securities Inc
HFT Holding Limited
£999,965.00  2/22/2017
[Refund of investment]

Time Period: September 2016 - March 2017

xxxx5001
**Bank of Ireland**
**Fenero Equity Investments (Ireland)**

€250,000.00  2/21/2017

€250,000.00  2/21/2017

$500,000.00  10/17/2016
$250,000.00  11/16/2016
€350,000.00  2/1/2017
€350,000.00  2/7/2017
€350,000.00  2/10/2017
€1,300,000.00  2/22/2017

£1,000,036.28  2/17/2017

£2,000,000.00  2/24/2017
£500,036.67  3/6/2017

€2,499,961.20  2/17/2017

£4,000,000.00  11/16/2016
£500,000.00  12/22/2016
€1,000,036.12  2/21/2017
€275,036.81  3/9/2017

xxxx9463
Wells Fargo
Mark Scott

xxxx1863
Sabadell United Bank
Mark Scott

xxxx9788
Sabadell United Bank
Nicole J. Huesmann IOTA Trust Account

xxxx5468
LLOYDS BANK
Payment Card Technologies

xxxx6901
Dreyfus Söhne & Cie AG
Mark Scott

xxxx7100
DMS Cayman
MSS International Consultants BVI Ltd

xxxx8611
RBC
HFT Holding Limited
(owned by Scott)

Sourced from exhibits: GX-1701A - GX-1701B, GX-801A-GX-801D, GX-728A-GX-728E, GX-729A-GX-729B, GX-716A-GX-716E and GX-717A-GX-717G



**GOVERNMENT EXHIBIT
2617-A**
17 Cr. 630 (ER)

Purchase of 133 Sunset Lane, Barnstable, MA
Date: October 24, 2016
Price: $2,850,000.00





$529,750.00
Proceeds of loan facility II
Expanstion Capital
09/06/16

xxxx7102
DMS Cayman
MSS International Consultants BVI Ltd

$460,000.00
Loan to MSS for acquisition
Bilmore Way
09/07/16

xxxx3236
CNB FL
MSS International Consultants LLC

$2,500,000.00
Escrow property partial payout
of BN Loan Facility
10/03/16

xxxx4760
Bank of Ireland
Fenero Tradenext Holding

**Attorney's bank account**

xxxx9788
**Sabadell / IberiaBank
Nicole J. Huesmann PA**

$145,000.00
Deposit for 133 Sunset Lane
10/05/16

Cape Cod Five Cents Savings
Kinlin Grover Realty Group

$2,772,953.54
10/21/16

Citizens Bank
Crowley and Cummings IOLTA

Sourced from exhibits: GX-815A-GX-815H,
GX-705A-GX-705G, GX-1705A - GX-1705C,
GX-716A-GX-716E, GX-717A-GX-717G, GX-3103,
GX-3119, GX-3120, GX-3121, GX-3111, GX-3112,
and GX-105



**GOVERNMENT EXHIBIT 2617-B**
17 Cr. 630 (ER)

Mark Scott pay off mortgage for 600 Coral Way, Unit 12, Florida
Original purchase price: $1,580,000.00 on January 14, 2015
Payoff amount: $1,000,794.66 on October 16, 2016

Sourced from exhibits: GX-1703A - GX-1703C, GX-1701A - GX-1701B, GX-716A-GX-716E, GX-3105, GX-3106, GX-3107, GX-3117, GX-717A-GX-717G, GX-3104





xxxx8576
Bank of Ireland
Fenero Tradenext Holding

$500,000.00
Escrow 133SL Additional retainer
10/12/16

xxxx5001
Bank of Ireland
Fenero Tradenext Holding

$500,000.00
10/17/16

**Attorney's bank account**

xxxx9788
**Sabadell / IberiaBank Nicole J. Huesmann PA**

$1,000,794.66
10/19/16

xxxx2190
Cenlarfsprincetn

Funds used to pay off mortgage



**GOVERNMENT
EXHIBIT
2617-D**
17 Cr. 630 (ER)

Purchase of 31 Dale Avenue, Hyannis Port, MA
Date: September 20, 2017
Price: $3,765,000.00



Sourced from exhibits: GX-1705A-GX-1705C,
GX-814, GX-716A-GX-716E, GX-717A-GX-717G
GX-717, GX-3113, GX-3114, GX-3115, GX-3116 and
GX-1356, GX-3101



**Attorney's bank account**

xxxx4760
Bank of Ireland
Fenero Tradenext Holding

$250,000.00
Additional cap contribution for
Railroad/Barnstable Property
development
06/19/17

xxxx7100
DMS Cayman
MSS International Consultants BVI Ltd

$2,000,000.00
Re: Purchase Coral Gables
07/14/17

$1,000,000.00
31 Dale Ave Acquisition
08/17/17

xxxx9788
**Sabadell / IberiaBank
Nicole J. Huesmann PA**

$5,000.00
31 Dale Ave Pur MSS
International and Folley
08/22/17

Oneill Real Estate Inc

$14,606.20
Flood and HO3 payment for 31
Dale Ave for MSS
09/07/17

Frank L Horgan Insurance Agency Inc

$185,000.00
Second deposit for MSS
purchase of 31 Dale Ave
09/07/17

John W Kenney Client Trust

$3,593,762.72
Purchase of 31 Dale Avenue
Cape Cod Massauchussets
09/20/17

Purchase of 105 Sunset Lane, Barnstable, MA
Date: November 13, 2017
Price: $2,310,000,00 / Scott contributed $1,310,000.00

**GOVERNMENT EXHIBIT 2619-E**
17 Cr. 630 (ER)

Sourced from exhibits:

GX-814A-GX-814H, GX-716A-
GX-716E, GX-717A-GX-717G,

GX-3102, GX-3108, GX-3109,
GX-3110



**Attorney's bank account**



xxxx7100
DMS Cayman
MSS International Consultants BVI Ltd

$1,310,000.00
10/30/17

xxxx2901
LES FILS DREYFUS AND CIE S.A., SWITZERLAND
Marietta Halle

$999,970.00
10/31/17



**xxxx9788**
**Sabadell / IberiaBank**
**Nicole J. Huesmann PA**

$2,211,380.00
11/12/17



John W Kenney Client Trust

Mark Scott purchase of Porsche, 911 Turbo 2017
Date: 2/10/2017
Price: $119,529.50



**GOVERNMENT
EXHIBIT
2619-B**
17 Cr. 630 (ER)



Porsche, 911 Turbo S VIN #WP0CD2A95HS178187



xxxx4760
Bank of Ireland
Fenero Equity Investment

$325,000.00
02/01/17

xxxx3236
CNB FL
MSS International Consultants, LLC

$119,529.50
02/10/17

Braman Motor Cars

Sourced from exhibits: GX-1705A - GX-1705C, GX-106 and GX-705A-GX-705G

Mark Scott purchase of Porsche, 911R 2016
Date: June 15, 2017
Price: $332,248.41


GOVERNMENT
EXHIBIT
2619-C
17 Cr. 630 (ER)



Porsche, 911R 2016, VIN #WP0AF2A92GS195089


xxxx7102
DMS Cayman
MSS International Consultants BVI Ltd

$500,000.00
06/14/17


xxxx3236
CNB FL
MSS International Consultants, LLC

$340,000.00
06/15/17


xxxx0295
CNB FL
Mark Scott

$332,248.41
06/15/17


Suntrust Bank
Braman Motorcars

Sourced from exhibits: GX-815A-GX-815H, GX-705A-GX-705G, and GX-702A-GX-702E

Mark Scott purchase of Porsche, 911 GTRS 2018
Date: June 11, 2018
Price: $218,898.87

**GOVERNMENT EXHIBIT**
**2619-D**
17 Cr. 630 (ER)



Porsche, 911 GTRS, VIN #WP0AC2A90JS175665



xxxx3317
RBC
Mark S. Scott 2017 Trust

xxxx5493
UBS
Mark S. Scott 2017 Trust

$218,898.87
06/11/18

Suntrust
Braman Motorcars

Sourced from exhibits: GX-804A-GX-804D and GX-718A-GX-718F

Mark Scott purchase of Porshe, 911 GT2 RS 2018
Date: August 29, 2018
Price: $617,426.46



**GOVERNMENT EXHIBIT 2619-E**
17 Cr. 630 (ER)

Porsche 911 GT2 RS 2018 VIN #WP0AE2A91JS185471



Sourced from exhibits: GX-818A-GX-818F, GX-706A-GX-706E, GX-707A-GX-707B, GX-705A-GX-705G, GX-702A-GX-702E, GX-718A-GX-718F, GX-804A-GX-804D, and GX-115

Mark Scott purchase of Sunseeker Predator boat
Date: March 21, 2017
Price: $1,310,000.00

GOVERNMENT
EXHIBIT
2619-F
17 Cr. 630 (ER)



Sunseeker Predator



Sourced from exhibits: GX-1703A - GX-1703C, GX-1440, GX-716A-GX-716E,
GX-717A-GX-717G and GX-107



Fenero MSSI Foreign and Domestic Transfers
Time Period: May 2016 - July 2018
xxxx2001 Commerzbank IMS GmbH 7 wires = €35 million June 2016
xxxx7201 OCBC IMS Pte 2 wires = €10 million June 2016
xxxx8901 Deutsche Bank IMS GmbH 8 wires = €40 million from June - Aug 2016
xxxx6682 United Overseas Bank IMS Pte
xxxx9342 DSK Bank B and N Consult LTD
xxxx0301 OCBC IMS PTE LTD 1 wire = €5 million Oct 2016
xxxx7960 DBS Bank (Hong Kong) Star Merchant Inc Limited 16 wires = €95 million from Aug - Oct 2016
xxxx0653 Morgan Stanley Fates Group 2 wires = $5 million from June - July 2016
xxxx1736 Sabadell United Bank Fates Group 1 wire = $4,990,185 Sept 2016
Total credits: € 354,000,000 and $9,990,185
xxxx6102 DMS Cayman Fenero Equity Investments LP
xxxx4102 DMS Cayman Fenero Financial Switzerland LP
xxxx3464 DB International Limited Fenero Equity Investments (Cayman) I, L.P.
xxxx3465 Deutsche Bank Cayman Limited Fenero Equity Investments II L.P.
3 wires = $950,000
xxxx7100 DMS Cayman MSS International Consultants BVI Ltd
xxxx2701 First Caribbean International Bank MSSi FC Operating account
xxxx7102 DMS Cayman MSS International Consultants BVI Ltd
xxxx5001 Bank of Ireland Fenero Equity Investments (Ireland)
xxxx9811 Bank of Ireland Fenero Securities Trading Ltd
xxxx8576 Bank of Ireland Fenero Equity Investments (Ireland)
xxxx4760 Bank of Ireland Fenero Equity Investments (Ireland)
xxxx6760 Citibank Williams Jet Tenders (1 wire = $39,061.00)
Total Domestic credits = $36,604,109.14 / €1,146,576.86
Total Foreign credits = € 309,718,932.85 / $47,884,515.34 / £10,775,145.88
3 wires = €40,020,286.36
xxxx7958 Bank of Ireland Fenero Tradenext (3 wires = €10,050,000)
Domestic Accounts
xxxx3008 CNB FL Mark Scott (12 wires = $8,146,059.68)
xxxx0295 CNB FL Mark Scott (1 wire = $ 499,970)
xxxx2613 Northern Trust Mark S. Scott PL (6 wires = $1,245,592.50)
xxxx3414 CNB FL MSS International Consultants, LLC (1 wire =$500,000)
xxxx3236 CNB FL MSS International Consultants, LLC (18 wires = $6,974,655.08)
xxxx3210 CNB FL Mark S. Scott PL (4 wires = $1,800,000)
xxxx7951 CNB FL MSS International Consultants (2 wires = $605,221.88)
xxxx9463 Wells Fargo Mark Scott (4 wires = $1,250,000)
xxxx1812 Northern Trust MSSI Natural Ventures Group LLC (3 wires = $1,422,610)
xxxx1863 Sabadell United Bank Mark Scott (1 wire = $250,000) (2 wires = €1,146,576.86)
xxxx9788 Sabadell United Bank Nicole J. Huesmann IOTA Trust Account (16 wires = $13,910,000.00)
Accounts controlled by SCOTT
Foreign Accounts
xxxx3883 Firstcaribbean International Bank EDG Investment, LTD (1 wire = $130,000)
xxxx8611 RBC Dominion Securities Inc. HFT Holding Limited (4 wires = $6,515,498.94) (4 wires = £5,775,072.93)
xxxx6901 Dreyfus Söhne & Cie AG Mark Scott (2 wires = £2,500,036.67)
Other Cayman Islands accounts = $748,831.40
xxxx5454 Firstcaribbean International Bank DRP Holdings, LTD (2 wires = $390,630)
xxxx4778 Firstcaribbean International Bank Ogier (1 wire = $8,201.40)
xxxx5343 Firstcaribbean International Bank MSSI Marine Group, LTD (1 wire = $250,000)
xxxx5346 Firstcaribbean International Bank Mumbelli Group Holding (Cayman), LTD (1 wire = $100,000)
xxxx3404 NBD Bank PJSC Phoenix Fund Invest Llc (11 wires = €185,000,467.50)
xxxx7212 DBS Bank - Hong Kong Barta Holdings (1 wire = $30,000,000)
xxxx1417 Bank Julius Baer and Co. Ltd. Oceanscapes Ventures Limited (1 wire = €3,250,000)
xxxx1866 Global Bank of Commerce Fates Group LLC (1 wire = $9,990,185)
xxxx3420 Emirates Islamic Bank Adamana Group DMCC (1 wire = €6,000,000)
United Kingdom = € 39,826,782.28 / £10,775,145.88
xxxx3273 Metro Bank PLC Peregrine Law Client Account (1 wire = €7,200,031.25)
xxxx6336 HSBC Bank Plc Locke Lorde UK LLP (1 wire = €126,676.75)
xxxx5468 LLOYDS BANK Payment Card Technologies (2 wires = € 2,945,579.50) (3 wires = £2,500,036.28)
xxxx4844 Barclays Bank Cowen International Limited (3 wires = €30,000,038)
xxxx0162 RBC DMDJ Holdings LTD (2 wires = $500,000)
xxxx2139 Bank of Ireland IG Markets General Ltd. (2 wires = €10,000,038)
Bulgaria = € 65,196,101.35
xxxx4994 Piraeus Bank Bulgaria AD Vida Home (2 wires = €7,500,044.35)
xxxx8700 Investbank LBJ AD (1 wire = €6,000,000)
xxxx7000 Investbank Openmark Bulgaria EOOD (5 wires = € 51,696,057)
Real estate purchases
Other Purchases
Luxury watch purchases from TimePiece
Luxury vehicles / boat purchases
Sourced from exhibits: GX-812A-GX-812G, GX-813A-GX-813H, GX-809A, GX-810A, GX-706A-GX-706E, GX-703A-GX-703F, GX-705A-GX-705G, GX-704A-GX-704F, GX-702A-GX-702E, GX-724A-GX-724F, GX-712A-GX-712F, GX-727A-GX-727G, GX-728A-GX-728E, GX-729A-GX-729B, GX-716A-GX-716E, GX-717A-GX-717G, GX-817A-GX-817F, GX-801A-GX-801D, GX-824A-GX-824F, GX-825A-GX-825F, GX-826A-GX-826F, GX-807A, GX-720A-GX-720C, GX-818A-GX-818F, GX-814A-GX-814H, GX-815A-GX-815H, GX-1701A - GX-1701B, GX-1702A - GX-1702C

GOVERNMENT EXHIBIT 2620
17 Cr. 630 (ER)



**Fenero MSSI Transfers to Scott Accounts
Time Period: May 2016 - July 2018**

GOVERNMENT
EXHIBIT
2628
17 Cr. 630 (ER)

## FUNDING ACCOUNTS

Sourced from exhibits: GX-706A-GX-706E, GX-703A-GX-703F, GX-705A-
GX-705G, GX-704A-GX-704F, GX-702A-GX-702E, GX-724A-GX-724F, GX-712A-
GX-712F, GX-727A-GX-727G, GX-728A-GX-728E, GX-729A-GX-729B, GX-716A-
GX-716E, GX-717A-GX-717G, GX-817A-GX-817F, GX-801A-GX-801D, GX-824A-
GX-824F, GX-825A-GX-825F, GX-826A-GX-826F, GX-807A, GX-720A-GX-720C,
GX-818A-GX-818F, GX-814A-GX-814H, GX-815A-GX-815H, GX-812A-GX-812G,
GX-813A-GX-813H, GX-809A, GX-810A, GX-1701A - GX-1701B, GX-1702A -
GX-1702C, GX-1703A - GX-1703C, GX-1704A - GX-1704C, and GX-1705A -
GX-1705C

Credits: €354,000,000 and $9,990,185

## FENERO CAYMAN ACCOUNTS 

 ## INTERMEDIARY ACCOUNTS (CAYMAN AND BANK OF IRELAND)

**Scott Accounts Total Credits: $29,339,608.08 / €1,146,576.86 / £8,275,109.60**




xxxx3008
CNB FL
Mark Scott
(12 wires = $8,146,059.68)

xxxx3414
CNB FL
MSS International Consultants, LLC
(1 wire = $500,000)


xxxx3236
CNB FL
MSS International Consultants, LLC
(18 wires = $6,974,655.08)

xxxx3210
CNB FL
Mark S. Scott PL
(4 wires = $1,800,000)


xxxx1863
Sabadell United Bank
Mark Scott
(1 wire = $250,000)
(2 wires = €1,146,576.86)


xxxx3883
Firstcaribbean International Bank
EDG Investment, LTD
(1 wire = $130,000)

xxxx6901
Dreyfus Söhne & Cie AG
Mark Scott
(2 wires = £2,500,036.67)

**Other credits for
Scott's benefit: $13,949,061**


xxxx9788
Sabadell United Bank
Nicole J. Huesmann IOTA Trust Account
(16 wires = $13,910,000)

**Scott and Pike
account credits: $350,000**

xxxx5343
Firstcaribbean International Bank
MSSI Marine Group, LTD
(1 wire = $250,000)


xxxx0295
CNB FL
Mark Scott
(1 wire = $ 499,970)

xxxx7951
CNB FL
MSS International Consultants
(2 wires = $605,221.88)

xxxx9463
Wells Fargo
Mark Scott
(4 wires = $1,250,000)

xxxx1812
Northern Trust
MSSI Natural Ventures Group LLC
(3 wires = $1,422,610)

xxxx2613
Northern Trust
Mark S. Scott PL
(6 wires = $1,245,592.50)

xxxx8611
RBC Dominion Securities Inc.
HFT Holding Limited
(4 wires = $6,515,498.94)
(4 wires = £5,775,072.93)

xxxx6760
Citibank
Williams Jet Tenders
(1 wire = $39,061)
[TAIMA Tender on behalf of MSSi Marine Group]


xxxx5346
Firstcaribbean International Bank
Mumbelli Group Holding (Cayman), LTD
(1 wire = $100,000)

**Timeline**

GOVERNMENT EXHIBIT 2701
17 Cr. 630 (ER)

| Date | Event Type | Description | GX |
|---|---|---|---|
| 9/30/2015 | ✉ | Armenta E-Mail introducing Scott to Ruja | 1004 |
| 10/4/2015 | ✉ | Scott meeting invitation re: Ignatova TC "to discuss money transfer/laundering issues" | 1006 |
| 12/9/2015 | ✉ | Scott E-Mail to Armenta, re: streamlining communication and next step[s] | 1012 |
| 1/29/2016 | ✉ | Scott E-Mail to Armenta, subject: Can we connect on Ruja please? Would like to start. Thanks. | 1022 |
| 1/31/2016 | ✉ | Ruja-Scott et al. E-Mails, re: payment of $425,000 to Scott and next steps | 1025 1032 4089 |
| 2/1/2016 | 🏛 | Scott receives $425,000 wire at City National Bank from International Marketing Strategies (IMS) | 1026 703-B 703-D |
| 2/2016 | 📇 | MSS International Consultants (BVI), Ltd incorporated in British Virgin Islands
Fenero Equity Investments, Ltd name reserved with BVI Financial Services Commission
Application for bank account submitted to FCIB | 1044 1045 1046-T 1050 1047 1052 2202 |
| 2/9/2016 - 2/14/2016 | ✈ | Scott travels to London and meeting scheduled with Ruja in London at Four Seasons Hotel | 62 1033 1034 1036 2501 |
| 2/11/2016 | ✉ | Scott E-Mail to Denitza Godeva, subject Re: AW: Phones | 1035 |
| 2/16/2016 | ✉ | Scott E-Mail to Denitza Godeva, subject re: passp copy | 1037 |
| 2/18/2016 | ✉ | Scott E-Mail to Ruja, subject: "wheels are in motion on structure…" | 1038 |
| 2/19/2016 | ✉ | Ruja E-Mail to Scott: "If I want to keep abt 50 m eur on your accts. How much will you charge me?" | 1040 |
| 2/19/2016 | ✉ | Scott E-Mail to Ruja: "I am setting up your transfers as investments into registered investments funds offshore" | 1041 |
| 02/19/2016 - 02/28/2016 | ✉ | Scott-Ruja E-Mails | 1042 1043-T 1046-T 1047 |
| 2/24/2016 | ✉ | Scott E-Mail to Appleby, attaching FirstCaribbean International Bank Questionnaire | 1048 |
| 3/1/2016 | 📇 | Fenero Equity Investments L.P. formed in British Virgin Islands | 1382 |
| 3/2/2016 | ✉ | Scott E-Mails Ruja: "Gilbert asked me about your new structure." | 1055 |
| 3/2/2016 - 3/3/2016 | ✈ | Scott travels to British Virgin Islands | 62 2501 |
| 3/2/2016 | ✉ | Scott E-Mails Ruja: "Your company and banking structure is nearly finished." | 1056-T |
| 03/04/2016 - 03/07/2016 | ✉ | Ruja, Scott, Courtneidge E-Mails: "I have some cash with me. Abt 220k GBP. Can you store it for me in London?" | 2004 |
| 3/6/2016 | ✉ | Scott E-Mail to Scott, attaching FeneroMissStatement.docx | 1411 |
| 3/10/2016 | ✉ | Irina Dilkinska-Scott E-Mails | 1060 1061 |
| 3/10/2016 | 🏛 | Scott receives $149,980 at City National Bank Florida        8008) from International Marketing Services account at United Overseas Bank in Singapore | 703-B 703-D |
| 3/13/2016 | ✉ | Scott E-Mails Bank of Ireland with Fenero documents, including Company Questionnaire | 1062 |
| 3/30/2016 | ✉ | Ruja E-Mails Scott, among other things, "As I indicated Mark we sent about 33 m euro yesterday to the uk account" | 2006 |
| 4/2016 | 📇 | Fenero Equity Investments (Ireland), Limited, Fenero Tradenext Holding Limited, Fenero Acquisition 1 Limited incorporated in Ireland;

Fenero Equity Investments (Cayman) I, L.P. and MSSI International Consultants (BVI), Ltd. are registered in Cayman Islands;

Application submitted to Deutche Bank Cayman Islands for Fenero Equity Investments LP | 1077 1382 1424 |
| 4/6/2016 | ✉ | E-Mails between Scott and Appleby | 1119 |
| 4/8/2016 | ✉ | Scott-Armenta E-Mails Armenta | 1067 |
| 4/13/2016 | ✉ | Ruja E-Mails Scott and Armenta subject: Next steps | 1069 |
| 4/20/2016 - 4/21/2016 | ✈ | Scott travels to Cayman Islands | 62 2501 |
| 4/22/2016 | ✈ | Scott travels to British Virgin Islands | 62 2501 |
| 4/25/2016 | ✉ | Pike E-Mail to DMS Bank, CC Scott | 1072 |

**Timeline**

| Date | Icon | Description | Ref |
|---|---|---|---|
| 4/26/2016 | ✉ | Dilkinska E-Mails Scott website: https://www.tyracpa.com/onecoin-is-a-scam/ | 4109 |
| 4/27/2016 | 🏛 | Scott receives $425,000 in his account at City National Bank Florid▮▮▮▮3008) from International Marketing Services account at Commerzbank in Germany | 703-B<br>703-D |
| 4/27/2016 | ✉ | David Pike E-Mails Deutsche Bank Application Forms | 1077 |
| 5/2016 | 🪪 | Fenero Equity Investments II, L.P. registered in British Virgin Islands, Fenero Financial Switzerland, L.P. formed in British Virgin Islands, Fenero Equity Acquisition 2 Limited incorporated in Ireland;<br><br>Applications for bank account for Fenero Equity Investments LP submitted to DMS;<br><br>Account opening documents submitted to Bank of Ireland for Fenero Equity Investments (Ireland), Limited, Fenero Tradenext Holding Limited;<br><br>Application submitted to Deutche Bank Cayman Islands for Fenero Equity Investments II LP | 1382<br>1081<br>1419<br>1420<br>1421<br>2202<br>3201<br>3203 |
| 5/3/2016 | ✉ | Scott-Ruja Email subject "OneCoin change banks again, now using US-based bank?" | 4099 |
| 5/4/2016 - 5/6/2016 | ✈ | Scott travels to Cayman Islands | 62<br>2501 |
| 5/10/2016 | ✉ | Scott engages Apex Fund Services Ltd. of London as Fund Administrator of Fenero Equity Investments L.P. | 2204 |
| 5/17/2016 | ✉ | Dilkinska E-Mails Scott documents related to INNOIN Ltd. | 1088 |
| 5/21/2016 | ✉ | Pike E-Mails Scott subject: IMS and Innoin | 1090 |
| 5/18/2016 - 5/20/2016 | ✈ | Scott travels to Cayman Islands | 62<br>2501 |
| 5/22/2016 | ✉ | Scott-Dilkinska E-Mails re: Subscription Package for B&N Consult | 1091 |
| 5/24/2016 | ✉ | Scott E-Mails Ruja re: Fenero Equity Investments L.P - Wire Details | 1093 |
| 5/24/2016 - 5/27/2016 | ✉ | E-Mails re: EUR 5M Transfer from IMS to Fenero Equity Investments | 1094 |
| 5/27/2016 | ✉ | Scott-Maya Antonova E-Mail re: Fenero Equity Investments L.P. - Wire Details | 4101 |
| 5/30/2016 | ✈ | Scott travels to London<br>Meeting set with Scott, Ruja and Greenwood in London at Four Seasons Hotel in London | 2017<br>2501 |
| 6/2016 | 🪪 | Fenero Equity Acquisition 3 Limited incorporated in Ireland, Fenero Equity Acquisition 1 Limited changes names to Fenero PCT Holdings Limited; Fenero Fintech Europe L.P. registered in the British Virgin Islands;<br><br>Fenero Tradenext Holding Limited and Fenero Equity Investments Ireland Limited bank accounts opened at Bank of Ireland<br><br>Bank account application for Fenero Financial Switzerland, L.P. submitted to DMS | 1382<br>1417<br>1418<br>1423<br>2200<br>3202<br>3204 |
| 6/2/2016 | 🏛 | Fenero Equity Investments LP accoun▮▮▮6102 at DMS Bank in Cayman Islands receives first wire from International Marketing Services for €4,999,985 | 812-B<br>812-F |
| 6/1/2016 - 6/13/2016 | ✉ | E-Mails re: PCT Agreement | 1106 |
| 6/2/2016 | ✉ | Scott E-Mails Armenta re: Wire Details for Fenero Deutsche Bank account | 1099 |
| 6/4/2016 | ✉ | Scott E-Mail to First Caribbean International Bank | 1100 |
| 6/6/2016 | ✉ | Scott forwards Dilkinska E-Mail from Ricketts re: Fenero Equity Investments L.P. - Missing Data for Subscription IMS Singapore | 1103 |
| 6/15/2016 - 7/9/2016 | ✉ | E-Mails re: Zimbabwe Bank | 1129 |
| 6/19/2016 - 6/21/2016 | ✈ | Scott travels to Cayman Islands | 62<br>2501 |
| 6/22/2016 | ✉ | Scott E-Mails Pike "Let's not e-mail this stuff....." | 1110 |
| 6/23/2016 | 🏛 | Fenero Equity Investments LP accoun▮▮▮6102 at DMS Bank in Cayman Islands sends €1,976,284.58 for capital contribution | 812-B<br>812-F<br>812-G |
| 6/29/2016 - 6/30/2016 | 🏛 | $2M and $3M wires from Fates Group LLC Morgan Stanley account to Fenero Deutsche Bank account | 810-A<br>711-C<br>1099 |
| 7/5/2016 | ✉ | Scott E-Mails with Ruja and Max von Arnim | 1118-T |
| 7/6/2016 | ✉ | Scott E-Mails with Anatoly Gorlov | 1120 |
| 7/7/2016 - 7/8/2016 | ✉ | Scott E-Mails with Ruja, Irina Dilkinska | 1122<br>1123<br>1127 |
| 7/8/2016 | ✉ | Konstantin Ignatov E-Mail to Armenta | 1126 |
| 7/8/2016 - 7/9/2016 | ✉ | E-Mails between Scott, Ruja, and Breidenbach | 1128<br>1130-T<br>1131 |
| 7/11/2016 | ✉ | Armenta E-Mail to Maya Antonova re: "transfer of 5mio USD from Zala to Fenero" | 1133 |

**Timeline**

| Date | | Description | Ref |
|---|---|---|---|
| 7/13/2016 | ✉ | Ruja E-Mail to Scott and garmenta@zala-group.com subject Urgent: Meeting next week | 1142 |
| 7/13/2016 | 🏛 | Fenero Equity Investments LP account ▓▓ 102 at DMS Bank in Cayman Islands sends $30,000,000 to Barta Holdings Ltd account at DBS Bank in Hong Kong | 812-B 812-G 62 |
| 7/20/2016 - 7/21/2016 | ✈ | Scott travels to Sofia, Bulgaria and meeting scheduled with Ruja and Armenta | 1154 2501 2021 1157 |
| 7/25/2016 | 🏛 | Fenero Equity Investments (Ireland) account ▓▓ 4760 at Bank of Ireland sends €2,500,00 to Vida Home at Piraeus Bank in Bulgaria | 1705-A 1705-B |
| 7/27/2016 | ✉ | Irina Dilkinska E-Mail to Scott, subject Loan Facility for Property purchase in Bulgaria, attaching signature page of loan agreement | 1383 |
| 6/27/2016 - 6/29/2016 | ✉ | Scott - Dilkinska et al. E-Mails | 1163 1164 1165 |
| 8/2/2016 | ✉ | Scott-Stoyna-Dilkinska E-Mails re: Star Merchant | 1178 |
| 8/3/2016 - 8/4/2016 | ✉ | Scott-Stoyna E-Mails re: changes to IMS wire authorization letters | 1190 |
| 8/4/2016 | ✉ | Scott-Pike E-Mails: letter of instruction attachments | 1194 |
| August 5-6, 2016 | ✉ | Scott-Ruja E-Mails re: "news on 30 m" | 1203 |
| 8/8/2019 | ✉ | Dilkinska E-Mails Scott IMS-OneCoin Agreements stating **1% fee** on incoming funds Scott modifies word document with IMS-OneCoin agreements to state **20% and 22%** on incoming fees Scott E-mails modified version of IMS-OneCoin agreements to Apex | 1207-T 1208 1209 1212 |
| 8/8/2016 | 🏛 | Fenero Equity Investments (Cayman) I, L.P. account ▓▓ 3464 at Deutche Bank Cayman Islands receives first wire from Star Merchant Limited in Hong Kong for €8,000,000 | 809-A |
| 8/9/2016 | ✉ | Pike-Scott E-Mails re: Prosperia | 1213 |
| 8/10/2016 | ✉ | Scott sends letter terminating engagement to Paul Spendiff at Apex Fund Services (UK) Ltd | 2288 |
| 8/11/2016 | ✉ | E-Mails re: Star Merchant | 1219 1220 |
| 8/15/2016 - 8/18/2016 | ✈ | Scott travels to Cayman Islands | 62 2501 |
| 8/17/2016 | ✉ | Scott-Dilkinska et al E-Mails subject Summary & next steps… | 1228 |
| 8/19/2016 | ✉ | Scott-Ruja E-Mail re: Fenero Switzerland Wire Details | 1229 |
| 8/25/2016 | 🏛 | Between June 2 and August 25, Fenero Equity Investments LP account ▓▓ 6102 at DMS Bank in Cayman Islands received €154,999,535 in wire transfers sourced from B and N Consult in Bulgaria and International Marketing Services in Singapore and Germany | 812-B |
| 9/2016 | 📑 | Fenero Securities Trading Limited registered in Ireland | 1426 |
| 9/8/2016 - 9/13/2016 | ✉ | E-Mails re: Star Merchant nominee director | 1239 1240 |
| 9/13/2016 | ✉ | Pike E-Mails Monthly Fenero Status Report | 1244 |
| 9/13/2016 | ✉ | Scott-Ignatov Email re: upcoming trip to Sofia, Bulgaria | 4015 4017 |
| 9/14/2016 | ✉ | Scott-Pike E-Mails re: incoming Start Merchant funds | 1246 |
| 9/14/2016 | ✉ | Scott-Pike re: Dr. R and Innoin | 1247 1392 |
| 9/14/2016 - 9/30/2016 | 🏛 | Fenero Financial Switzerland LP account ▓▓ 4102 at DMS Bank in Cayman Islands received €59,999,685 in wire transfers sourced from International Marketing Services in Singapore | 813-B |
| 9/16/2016 | ✈ | Scott travels to Sofia, Bulgaria and meeting scheduled with Ruja | 62 1250 4028 |
| 9/19/2016 | ✉ | Scott-Pike-Dilkinska E-Mails re: B&N letter | 1253 |
| 9/29/2016 | 🏛 | Fenero Equity Investments (Ireland) account ▓▓ 4760 at Bank of Ireland sends €5,000,019 to Vida Home at Piraeus Bank in Bulgaria | 1705-B |
| 10/6/2016 | ✉ | Scott forwards E-Mail to Pike | 1256 |
| 10/9/2016 - 10/11/2016 | ✈ | Scott travels to Cayman Islands | 62 2501 |
| 10/13/2016 | ✉ | Scott-Gary Gilford Email Chain | 4102 |
| 10/20/2016 | ✉ | Scott-Dilkinska E-Mail re: Amended Loan | 1388 |
| 10/25/2016 | ✉ | Scott-Ruja E-Mail | 1389 |
| 10/26/2016 - 10/27/2016 | ✉ | Ruja introduces Scott and Karl Horsburgh by E-Mail | 1267 |

**Timeline**

| Date | Icon | Description | Ref |
|---|---|---|---|
| 10/27/2016 | ✉ | Scott-Ruja E-Mails re: Karl | 4103<br>4104 |
| 10/28/2016 | 🏛 | Between August 8 and October 28, 2016, Fenero Equity Investments (Cayman) I, L.P. account ████5464 at Deutsche Bank in Cayman Islands receives €138,999,895 in wire transfers sourced from Star Merchant in Hong Kong, International Marketing Services in Singapore, and B and N Consult in Bulgaria | 809-A |
| 11/3/2016 | ✉ | Scott E-Mail Chain with Victor Rashev | 1390 |
| 11/11/2016 | 🏛 | Fenero Equity Investments (Ireland) account ████4760 at Bank of Ireland sends €3,250,000 to Oceanscape Ventures at Bank Julius Baer in Singapore | 1705-A<br>1705-B |
| 11/18/2016 | ✉ | Scott-Antonova E-Mails re: balances received transfers | 1391 |
| 11/23/2016 | ✉ | Scott E-Mails re: Fenero loan agreement | 1279 |
| 11/28/2016 | ✉ | Scott E-Mail to Ruja, subject Re: straighten up reporting | 1399 |
| 11/30/2016 | ✉ | Scott E-Mail chain with Karl Horsburgh and Ignatova, subject Confidential Documents | 1401 |
| 12/8/2016 | ✈ | Scott travels to London and meeting scheduled with Ruja | 62<br>2501<br>1282 |
| 12/18/2016 -<br>12/21/2016 | ✉ | Scott E-Mail chain with Karl Horsburgh and Ignatova, subject Re: MSS International Consultants | 1287<br>1434 |
| 12/21/2016 | 🏛 | Fenero Equity Investments (Ireland) account ████4760 at Bank of Ireland sends €6 million to LBJ AD at Investbank in Bulgaria | 1705-B |
| 12/23/2016 | ✉ | E-Mail chain with Scott and Pike re: Trinity due diligence | 1288 |
| 1/2017 | 📑 | Application materials submitted to DMS Bank Cayman Islands for Fenero Equity Investments (Cayman), I | 1422<br>1429 |
| 1/12/2017 | ✈ | Scott meeting with Ruja in Sofia, Bulgaria | 1293<br>4025 |
| 1/23/2017 | ✉ | Scott-Konstantin E-Mail re: Krypto cell | 4059-4062 |
| 1/23/2017 -<br>1/24/2017 | 🏛 | Fenero Equity Investments (Ireland) account ████44760 at Bank of Ireland sends €10 million to IG Markets | 1705-B |
| 2/3/2017 -<br>2/14/2017 | 🏛 | Fenero Equity Investments (Ireland) account ████4760 at Bank of Ireland, Fenero Financial Switzerland LP account ████102 at DMS Bank in Cayman Islands, and Fenero Securities Trading Limited account ████9811 at Bank of Ireland send €51,696,000 million to Openmark at Investbank in Bulgaria | 1705-A<br>1705-B<br>1702-A<br>1702-B<br>813-B<br>813-G |
| 2/23/2017 | ✉ | Scott-Ruja E-Mails re: Phoenix Fund Investment Agreement | 1302<br>1303 |
| 2/24/2017 | 🏛 | Fenero Securities Trading Limited account ████9811 at Bank of Ireland sends first €10 million to Phoenix Fund Invest at NBD Bank in Dubai | 1702-B |
| 3/1/2017 -<br>3/2/2017 | ✈ | Scott travels to Cayman Islands | 62<br>2501 |
| 3/31/2017 | ✉ | Scott-Irina E-Mail chain | 1312 |
| 4/1/2017 -<br>4/3/2017 | ✉ | Scott-Ruja and Scott-Dilkinska E-Mails | 1316<br>1317<br>1318<br>1319 |
| 4/10/2017 | 🏛 | Last transfer from Fenero Securities Trading Limited account ████9811 at Bank of Ireland to Phoenix Fund Invest at NBD Bank in Dubai, a total of sent €185 million sent across 11 separate wire transfers | 1702-B |
| 4/13/2017 | 🏛 | Fenero Equity Investments II L.P. account ████3465 at Deutsche Bank Cayman Islands returns $9,990,110 to Fates Group account at Global Bank of Commerce | 810-A |
| 4/13/2017 | 📑 | Last transaction occurs in account Fenero Equity Investments II L.P. account ████3465 at Deutche Bank Cayman Islands, resulting in 0.00 balance (approximately 11 months after Scott applies to open account) | 810-A |
| 4/24/2017 | ✉ | Scott-Ruja E-Mail Attaching Letter to Armenta | 1323 |
| 4/30/2017 | 📑 | Fenero Equity Investments (Ireland) account ████4760 at Bank of Ireland closed (approximately 12 months after account opened) | 1705-A |
| 6/21/2017 | 📑 | Fenero Securities Trading Limited account ████9811 at Bank of Ireland closed (approximately 6 months after account opened) | 1825 |
| 7/14/2017 | 📑 | Fenero Equity Investments LP account ████6102 at DMS Bank in Cayman Islands closed (approximately 15 months after Scott applies to open account) | 1416<br>812-C |

**Timeline**

| | | | |
|---|---|---|---|
| 8/22/2017 | | Fenero Financial Switzerland LP account ███4102 at DMS Bank in Cayman Islands closed (approximately 14 months after Scott applies to open account) | 813-C |
| 10/2/2017 | ✉ | Mason Hayes Letter to Scott | 1334 |
| 11/20/2017 | ✈ | Scott travels to Cayman Islands | 62 |
| 4/2018 | ✉ | Ignatov-Maya Text Messages re: Phoenix Funds<br>Ignatov-Dilkinska Text Messages re: Fenero | 3001<br>3001-A<br>3001-B<br>3001-C<br>3002-S |
| 6/2018 | ✉ | Scott-Dilkinska E-Mails<br>Ignatov-Dilkinska Text Messages re: Fenero, Scott, Phoenix | 1344<br>3003-S<br>3005-S |
| 9/2018 | | Scott Arrested | 60 |

# **EXHIBIT 7**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | **TO BE FILED UNDER SEAL** |
| -v.- | **POST-INDICTMENT RESTRAINING ORDER** |
| MARK S. SCOTT, | |
| Defendant. | **S6 17 Cr. 630** |

Upon the application of GEOFFREY S. BERMAN, United States Attorney for the

Southern District of New York, pursuant to Title 18, United States Code, Section 982 and Title

21, United States Code, Section 853, based on the Affidavit of Special Agent Kurt Hafer, United

States Attorney's Office , Southern District of New York, executed on September 1, 2018, and

upon a finding of probable cause, that the Target Properties, defined below, are subject to

restraint and forfeiture pursuant to Title 18, United States Code, Section 982 and Title 21, United

States Code, Section 853,

**IT IS HEREBY ORDERED** that MARK S. SCOTT, the defendant, and all attorneys,

agents, and employees, and anyone acting on the behalf of SCOTT, and all persons or entities in

active concert or participation with any of the above, and all persons or entities having actual

knowledge of this Order, shall not take any action prohibited by this Order.

**IT IS FURTHER ORDERED** that MARK S. SCOTT, the defendant, and all attorneys,

agents, and employees, and anyone acting on the behalf of SCOTT, and all persons or entities in

active concert or participation with any of the above, and all persons or entities having actual

knowledge of this Order, shall not, directly or indirectly, transfer, sell, assign, pledge,

hypothecate, encumber, or dispose of in any manner; cause to be transferred, sold, assigned,

pledged, hypothecated, encumbered, disposed of in any manner; or take, or cause to be taken,

any action that would have the effect of depreciating, damaging, or in any way diminishing the

value of property or other interests belonging to, or owed to, or controlled in whole or in part by the defendant, which property or other interests are subject to forfeiture.  The property and other interests hereby restrained include, but are not limited to, the following:

      a.     Any and all assets of MSS International Consultants (BVI), Ltd., including but not limited to: (i) all monies and funds contained in DMS Bank and Trust Ltd account ▮▮7102; (ii) all monies and funds contained in DMS Bank and Trust Ltd account ▮▮7100; and (iii) all monies and funds contained in FirstCaribbean International Bank account ▮▮2701;

      b.     Any and all assets of DRP Holdings, LTD, including but not limited to all monies and funds contained in FirstCaribbean International Bank account ▮▮5454;

      c.     Any and all assets of MSS Marine Group, Ltd., including but not limited to all monies and funds contained in FirstCaribbean International Bank account ▮▮5343;

      d.     Any and all assets of EDG Investment, LTD, including but not limited to all monies and funds contained in FirstCaribbean International Bank account ▮▮3883;

      e.     Any and all assets of Mumbelli Group Holding (Cayman), LTD, including but not limited to all monies and funds contained in FirstCaribbean International Bank account ▮▮5346;

      f.     Any and all assets of HFT Holding Limited, including but not limited to all monies and funds contained in RBC Dominion Securities Global LTD account ▮▮8611; and

      g.     All monies and funds contained in Dreyfus Söhne & Cie AG account ▮▮6901 held by MARK S. SCOTT, and all funds traceable thereto, including accrued interest (collectively, the "Target Properties");

all of which are alleged to constitute funds and criminal proceeds property involved in violation of 18 U.S.C. § 1956(h) (conspiracy to commit money laundering).

**IT IS FURTHER ORDERED** that the United States Attorney's Office for the Southern District of New York, in its discretion, is authorized to direct the release of assets restrained herein;

**IT IS FURTHER ORDERED** Any person or entity claiming an interest in the assets listed in this Order may contact the following Assistant United States Attorney to clarify the scope of the Order:  Special Assistant United States Attorney Julieta V. Lozano, Telephone Number (212) 335-4025.  Those persons or entities will not be deemed in violation of this Order for any transactions undertaken upon approval made by Special Assistant United States Attorney Lozano.

**IT IS FURTHER ORDERED** that this Restraining Order shall be binding upon the defendant, the attorneys, agents, and employees, and all persons in active concert or participation with any of the above, or any other person having actual knowledge of this Order, and that this Order shall remain in effect until further order of this Court;

**IT IS FURTHER ORDERED** that this Restraining Order and all papers submitted therewith shall be maintained under seal until such time as the unsealing of the above-captioned criminal Indictment, except that the United States Attorney's Office or its designee(s) may provide copies of this Order to any person in order to facilitate the execution of this Restraining Order, including any relevant financial institutions and/or the defendant; and

**IT IS FURTHER ORDERED** that service of a copy of this Order shall be made on the defendant or his attorney(s) by regular mail.

Dated: New York, New York
September 4, 2018

SO ORDERED:

_____
HONORABLE VERNON S. BRODERICK
UNITED STATES DISTRICT JUDGE, Part 1

# **EXHIBIT 8**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                           :

UNITED STATES OF AMERICA

                                       :       **POST-CONVICTION**

           - v. -                       **<u>RESTRAINING ORDER</u>**

                                         :

MARK S. SCOTT,                       17 Cr. 630 (ER)

                                         :

           Defendant.

                                         :
-------------------------------------------------------------x

       Upon the Indictment, S10 17 Cr. 630 (ER), and the conviction of defendant MARK S. SCOTT (the "defendant"), and the application of AUDREY STRAUSS, Acting United States Attorney for the Southern District of New York, by Nicholas Folly, Assistant United States Attorney, of counsel, pursuant to the All Writs Act, 28 U.S.C. § 1651(a);

       **IT IS HEREBY ORDERED** that:

       The defendant and all attorneys, agents, employees, and anyone acting on his behalf, and all persons or entities, acting in concert or participation with any of the above, shall not take any action prohibited by this Order; and

       **IT IS HEREBY FURTHER ORDERED** that the defendant, his attorneys, agents, employees, and anyone acting on their behalf, and all persons or entities acting in concert or participation with any of the above, and all persons and entities having actual knowledge of this order, shall not, directly or indirectly, transfer, sell, assign, pledge, hypothecate, encumber, or dispose of in any manner; cause to be transferred, sold assigned, pledged, hypothecated, encumbered, disposed of in any manner; or take, or cause to be taken, any action that would have the effect of depreciating, damaging, or in any way diminishing the value of the following property, except as approved by the Court and the Government:

all right, title and interest of MARK S. SCOTT, the defendant, in any and all property, or interests property, held in the name of, or for the benefit of, MARK S. SCOTT (collectively, the "Assets").

**IT IS HEREBY FURTHER ORDERED** that:

The defendant shall not use or permit the Assets to be used for any illegal activity, or in any manner that would invalidate insurance on the Assets or diminish the value of the Assets, neither shall they cause any alteration to the Assets without the prior written consent of the United States Attorney's Office.

**IT IS HEREBY FURTHER ORDERED** that this Restraining Order shall be binding upon the defendant, his attorneys, agents and employees, and all persons in active concert or participation with any of the above, or any other person having actual knowledge of this Order.

**IT IS HEREBY FURTHER ORDERED** that service of a copy of this Order shall be made forthwith on the defendant's attorneys by electronic mail following the filing of this Restraining Order.

Dated: New York, New York
_____, 2020

SO ORDERED:

_____
THE HONORABLE EDGARDO RAMOS
UNITED STATES DISTRICT JUDGE