UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- against -

MARK S. SCOTT,

Defendant.

No. S10 17 Cr. 630 (ER)

**MEMORANDUM OF LAW IN OPPOSITION TO GOVERNMENT'S FORFEITURE APPLICATION**

Arlo Devlin-Brown
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1046

David M. Garvin
Law Offices of David M. Garvin, P.A.
200 South Biscayne Boulevard
Suite 3150
Miami, FL 33131
(305) 371-8101

*Counsel for Mr. Scott*

# TABLE OF CONTENTS

Preliminary Statement ........................................................................................................... 1

Relevant Background ............................................................................................................ 2

Applicable Law .................................................................................................................... 4

Argument .............................................................................................................................. 5

I.   There Is No Basis For The Government's Requested $393 Million Money
     Judgment ...................................................................................................................... 5

     A.   The Money Judgment Should Be Limited To The Amount Of Money
          Transferred To The Fenero Funds Linked To The Alleged Domestic Wire
          Fraud Scheme ........................................................................................................ 5

     B.   The Government Failed To Establish That The Vast Majority Of Funds
          Transferred To The Fenero Accounts Were From Purchasers Of OneCoin ........... 9

     C.   A Money Judgment of $393 Million Would Violate Mr. Scott's Eight
          Amendment Rights ............................................................................................... 14

II.  The Government's Request To Seize Specific Property Should Be Denied ................... 16

III. The Government's Request To Seize Substitute Assets Should Also Be Denied ............ 18

CONCLUSION .................................................................................................................... 19

## TABLE OF AUTHORITIES

**CASES**                                                                                                           Page(s)

*European Community v. RJR Nabisco, Inc.*,
   764 F.3d 129 (2d Cir. 2014), *rev'd and remanded on other grounds*, 136 S. Ct.
   2090 (2016) ................................................................................................................1, 6

*Honeycutt v. United States*,
   137 S. Ct. 1626 (2017) ..............................................................................................11

*Marine Midland Bank, N.A. v. United States*,
   11 F.3d 1119 (2d Cir. 1993) ......................................................................................5

*Petroleos Mexicanos v. SK Eng'g & Const. Co.*,
   572 F. App'x 60 (2d Cir. 2014) .................................................................................6

*RJR Nabisco, Inc. v. European Community*,
   136 S. Ct. 2090 (2016) ...............................................................................................6

*United States v. Alamoudi*,
   452 F.3d 310 (4th Cir. 2006) .....................................................................................5

*United States v. All Assets Held at Bank Julius*,
   251 F. Supp. 3d 82, 103 (D.D.C. Apr. 27, 2017) ......................................................6

*United States v. Bajakajian*,
   524 U.S. 321 (1998) .................................................................................4, 14, 15, 16

*United States v. Capoccia*,
   503 F.3d 103 (2d Cir. 2007) ......................................................................................5

*United States v. Castello*,
   611 F.3d 116 (2d Cir. 2010) ....................................................................................15

*United States v. Christie*,
   249 F. Supp. 3d 739, 742 (S.D.N.Y. 2017) .........................................................5, 19

*United States v. Daugerdas*,
   892 F.3d 545 (2d Cir. 2018) ......................................................................................4

*United States v. Gasperini*,
   2017 WL 2399693 (E.D.N.Y. June 1, 2017) ............................................................6

*United States v. George*,
   779 F.3d 113 (2d Cir. 2015) ....................................................................................15

*United States v. Goldberg*,
661 Fed. Appx. 33 (2d Cir. 2016) ........................................................................5

*United States v. Jarvis*,
499 F.3d 1196 (10th Cir. 2007) ..........................................................................18

*United States v. Kenner*,
443 F. Supp. 3d 354, 365 (E.D.N.Y. 2020) .......................................................17

*United States v. Kramer*,
2006 WL 3545026 (E.D.N.Y. 2006) ...................................................................18

*United States v. Levesque*,
546 F.3d 78 ..........................................................................................................16

*United States v. McGinty*,
610 F.3d 1242 (10th Cir. 2010) ............................................................................4

*United States v. Nicolo*,
597 F. Supp. 2d 342 (W.D.N.Y. 2009) ................................................................18

*United States v. Perkins*,
994 F. Supp. 2d 272 (E.D.N.Y. 2014) .................................................................18

*United States v. Porcelli*,
865 F.2d 1352 (2d Cir. 1989) ................................................................................4

*United States v. Tanner*,
942 F.3d 60 (2d Cir. 2019) ..................................................................................11

*United States v. Viloski*,
814 F.3d 104 (2d Cir. 2016) ..........................................................................15, 16

*United States v. Webber*,
536 F.3d 584 (7th Cir. 2008) .................................................................................4

**STATUTES**

18 U.S.C. § 982 ...........................................................................................................4

18 U.S.C. § 982(a)(1) ..................................................................................................4

18 U.S.C. § 982(a)(2) ..................................................................................................4

18 U.S.C. § 982(b)(1) ..................................................................................................4

18 U.S.C. § 1343 .........................................................................................................6

18 U.S.C. §1956(a)(1) .................................................................................................5

21 U.S.C. § 853 ...........................................................................................................4

21 U.S.C. §853(p)(2) ...................................................................................................5

**OTHER AUTHORITIES**

Eighth Amendment ..............................................................................................1, 2, 4

Exhibit A, "the Gannaway Declaration" ......................................................................1

Fed. R. Crim. P. 32.2(b)(1)(A) ...................................................................................4

IRS Criminal Investigation Special Agent .................................................................1

The New York Times ..................................................................................................19

Rule 29 .........................................................................................................................7

Rule 29 and Rule 33 .................................................................................................1, 2

TD 7544 .......................................................................................................................8

*Times*. https://www.thetimes.co.uk/article/police-drop-inquiry-into-4bn-onecoin-
    swindle-wxsjskr6q ...........................................................................................13

U.S. Const., Amend. 8 .................................................................................................4

**Preliminary Statement**

The Government's proposed forfeiture order (the "Proposed Forfeiture Order")
improperly seeks to convert what is at most approximately $49,000 of proceeds representing the
charged specified unlawful activity of domestic wire fraud into a $393 million dollar judgment
that vastly exceeds anything Mr. Scott ever received in connection with the charged conduct
and anything he could ever hope to pay.  The Proposed Forfeiture Order is unsupported by
forfeiture law, based on deeply flawed asset tracing, and would violate the excessive fines clause
of the Eighth Amendment.

As an initial matter, the Court may not even need to reach the issue of forfeiture.  Mr.
Scott filed post-trial motions on February 4, 2020, which were fully briefed by May 26, 2020,
under Rule 29 and Rule 33.  Should either motion be granted, the case will not proceed to a
sentencing where forfeiture issues will need to be addressed.

Notwithstanding this, we respectfully request that the Court consider this forfeiture
opposition now, as it continues to evaluate Mr. Scott's post-trial motions.  Mr. Scott's principal
argument for judgment of acquittal on the money laundering count is that the Government failed
to prove that the wire fraud scheme underlying the money laundering count had sufficient nexus
with the United States. *See, e.g., European Community v. RJR Nabisco, Inc.*, 764 F.3d 129, 140–
41 (2d Cir. 2014), *rev'd and remanded on other grounds*, 136 S. Ct. 2090 (2016) (holding that
the wire fraud statute does not apply extraterritorially).  This forfeiture opposition and
accompanying declaration by former IRS Criminal Investigation Special Agent and forensic
expert David Gannaway (Exhibit A, "the Gannaway Declaration") confirms this lack of nexus.
As detailed in the Gannaway Declaration, the evidence presented at trial identified only
approximately $49,000 in payments from U.S. residents among the billions the Government
claims was raised by OneCoin globally.  And even this $49,000 cannot be traced into the Fenero

Funds as detailed below.  The Government's failure to prove anything beyond this *de minimis* fundraising from U.S. residents is fatal to the underlying wire fraud scheme, and therefore the money laundering count.

Should the Court ultimately find it necessary to reach forfeiture questions – which Mr. Scott submits it should not – the Proposed Forfeiture Order should be rejected.  The Government's request for a breathtaking $393 million dollar judgment is backed by shoddy asset tracing that falls well short of the standard.  The reality is that the Government never identified the source – not at trial, not in its post-trial opposition, and not in its forfeiture application – of the vast majority of the approximately $393 million invested in the Fenero Funds. Nor did it identify running balances in any of the accounts through which this money passed.  The Government's tracing analysis fails to show that most of this sum was from OneCoin purchasers *at all,* much less that it was from victims of the charged U.S. wire fraud scheme underlying the money laundering count.  The $393 million figure likewise vastly exceeds fees paid by the Fenero Funds to Mr. Scott.[1]   A money judgment of this enormity would be so crippling to Mr. Scott and his family as to violate the Eighth Amendment prohibition on excessive fines.

## Relevant Background

On November 21, 2019, Mark Scott was convicted of conspiracy to launder the proceeds of a wire fraud violation and conspiracy to commit bank fraud following a two-and-a-half-week trial.  Mr. Scott has challenged his conviction by way of Rule 29 and Rule 33 motions presently pending with the Court. *See* Dkts. 218, 275.  Sentencing is currently scheduled for February 25, 2021.

---

[1] Even seeking forfeiture of all fees paid by the Fenero Funds to Mr. Scott would be manifestly unjust, as it does not account for the millions in taxes Mr. Scott paid on his earnings from the Fenero Funds (or the approximately $12 million now due to the IRS on income the Government is seeking for forfeiture).

The Government's evidence at trial established that Mr. Scott created a series of registered private equity funds in the British Virgin Islands in the first half of 2016 (the "Fenero Funds") and hired established fund administration companies to open associated Euro denominated non-U.S. bank accounts at Deutsche Bank and DMS Bank & Trust in the Cayman Islands.  These accounts (the "Fenero Accounts") received investments in the equivalent of approximately $393 million dollars.  The Government's evidence further established that the $393 million transferred to the Fenero Fund accounts came exclusively from nine specific bank accounts (the "Funding Accounts") at reputable non-U.S. financial institutions.  The Government's evidence likewise shows that Mr. Scott took steps to end his management of the Fenero Fund investments in approximately October 2016 (*see, e.g.,* GX 1389) and that the vast majority of money in the Fenero Fund Accounts was transferred to other parties by early 2017 (*see, e.g.,* GX 810-A). The evidence also demonstrated that Mr. Scott complied with regular reporting requirements in the U.S. and the British Virgin Islands, identifying these accounts to the IRS and paying taxes on income he ultimately received from them (*See* DX 158, DX 159, DX 160).

As detailed below, neither the Government's trial evidence nor any evidence submitted in connection with its forfeiture application established the source of vast majority of the approximately $393 million dollars transferred by the nine Funding Accounts to the Fenero Accounts. Additionally, while the Government specifically charged domestic wire fraud as the *only* SUA underlying the money laundering count, the Government offered evidence of only $49,210.64 in OneCoin purchases from U.S. individuals and did not establish that even this approximately $49,000 was transferred to the Fenero Fund Accounts, or even left the United States.

### Applicable Law

The statute governing the entry of forfeiture judgments in money-laundering cases permits that Court to order a person convicted to "forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." 18 U.S.C. § 982(a)(1).  It is "Congress's intent that forfeiture proceedings be used 'to recover all of the [defendant's] ill-gotten gains but not to seize legitimately acquired property.'" *United States v. Daugerdas*, 892 F.3d 545, 548 (2d Cir. 2018) (*United States v. Porcelli*, 865 F.2d 1352, 1365 (2d Cir. 1989).  The calculation of a forfeiture amount in criminal cases is usually based on the defendant's actual gain. *See United States v. McGinty*, 610 F.3d 1242, 1247 (10th Cir. 2010); *see also United States v. Webber*, 536 F.3d 584, 603 (7th Cir. 2008).[2]

The Eighth Amendment places a cap on forfeiture through its prohibition against excessive fines.  "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const., Amend. 8.  A forfeiture is unconstitutionally excessive "if it is grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998).

Forfeiture of specific property.  "If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense." Fed. R. Crim. P. 32.2(b)(1)(A).  The Second Circuit has held that

---

[2] For a person convicted of bank fraud, the applicable forfeiture statute requires that the Court shall order such person to "forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation." 18 U.S.C. § 982(a)(2).  18 U.S.C. § 982 further specifies that forfeiture of property under this section is governed by the provisions of 21 U.S.C. § 853, which require the forfeiture of "any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of" the offense. *See* 18 U.S.C. § 982(b)(1) (providing that forfeiture and seizures under § 982 are governed by 21 U.S.C. § 853).

the Government's burden is "to show a nexus between the illegal conduct and the seized property." *Marine Midland Bank, N.A. v. United States*, 11 F.3d 1119, 1126 (2d Cir. 1993). "For property to be traceable to an unlawful activity, the Government must establish a nexus between the forfeitable property or proceeds and the illegal activity by a preponderance of the evidence." *United States v. Goldberg,* 661 Fed. Appx. 33, 37 (2d Cir. 2016) (citations omitted); *see also United States v. Capoccia*, 503 F.3d 103, 115 (2d Cir. 2007).

Forfeiture of substitute assets. Where either the funds cannot be located upon the exercise of due diligence or the property has been "transferred or sold to, or deposited with, a third party," the Government may be entitled to substitute assets. The Government is authorized to seek forfeiture of substitute assets of the defendant up to the uncollected amount of the money judgment, *see* 21 U.S.C. §853(p)(2), "where, as a result of the Defendant's actions or omissions, [it] is unable to locate or obtain the specific proceeds of the defendant's offenses." *United States v. Christie*, 249 F. Supp. 3d 739, 742 (S.D.N.Y. 2017) (citing *United States v. Alamoudi*, 452 F.3d 310, 314 (4th Cir. 2006)).

## Argument

## I.    There Is No Basis For The Government's Requested $393 Million Money Judgment

### A.    The Money Judgment Should Be Limited To The Amount Of Money Transferred To The Fenero Funds Linked To The Alleged Domestic Wire Fraud Scheme

It is axiomatic that the federal money laundering statutes cover only those financial transactions that relate to "specified unlawful activity." *See* 18 U.S.C. §1956(a)(1). Specifically, as charged here, the Government was required to prove that the conspiracy Mr. Scott is accused of participating in involved financial transactions "which in fact involve[s] the proceeds of specified unlawful activity." *Id.*

Here, the Superseding Indictment charged Mr. Scott with conspiring to launder proceeds of a wire fraud scheme in violation of 18 U.S.C. § 1343.  As described in detail in Mr. Scott's Post-Trial motions, the Second Circuit has made clear that the wire fraud statute does *not* apply extraterritorially. *See* Dkt. 218 at 28–29; Dkt. 275 at 10–13; *see also European Community v. RJR Nabisco, Inc.*, 764 F.3d 129, 139 (2d Cir. 2014), *rev'd and remanded on other grounds*, 136 S. Ct. 2090 (2016) ("[W]e conclude that the wire fraud and money fraud statutes . . . do not overcome Morrison's presumption against extraterritoriality.").  Rather, it applies only to domestic offenses, such as fraud schemes targeted at United States investors.  And incidental activity in the United States is not enough.  Indeed, "if the conduct relevant to the focus occurred in a foreign country," the Supreme Court has cautioned, "then the case involves an impermissible extraterritorial application *regardless* of any other conduct that occurred in U.S. territory."  *See RJR Nabisco, Inc. v. European Community,* 136 S. Ct. 2090, 2101 (2016).  Accordingly, "[s]imply alleging that domestic conduct occurred cannot support a claim of domestic application." *Petroleos Mexicanos v. SK Eng'g & Const. Co.*, 572 F. App'x 60, 61 (2d Cir. 2014) (internal citations and markings omitted).  Instead, "domestic application of wire fraud" requires that "a defendant or coconspirator commits a substantial amount of conduct in the United States."  *United States v. Gasperini*, 2017 WL 2399693, at *8 (E.D.N.Y. June 1, 2017) (quoting *United States v. All Assets Held at Bank Julius*, 251 F. Supp. 3d 82, 103 (D.D.C. Apr. 27, 2017).

As argued in Mr. Scott's post-trial motions, the Government offered insufficient evidence of a domestic wire fraud scheme at trial, and a judgment of acquittal should therefore be entered on the money laundering count premised on a domestic wire fraud violation.  *See* Dkt. 218 at 29-30; Dkt. 275 at 10-14.  Specifically, the Government offered evidence of only two U.S. purchasers of OneCoin, whose combined $49,210.64 investments constituted only a tiny fraction

of the "billions of dollars in revenue" (Tr. at 37) that OneCoin allegedly took in globally.

Moreover, the Government failed to prove that even this *de minimis* sum was transferred to the

Fenero Funds as part of the charged money laundering conspiracy.

Yet even assuming that the evidence of a domestic wire fraud scheme was legally

sufficient to sustain the conviction – which Mr. Scott firmly disputes – such a conviction cannot

support the forfeiture of anything *other than proceeds of such a wire fraud scheme*.  At trial and

all points subsequently, the Government has only even attempted to trace money used to

purchase OneCoin packages into the Fenero Funds from two U.S. purchasers, Linda Cohen (*see*

GX 2626) and William Horn (*see* GX 2623).  Specifically, the Government's trial evidence

showed that Cohen and Horn purchased OneCoin packages in the amounts of $22,577.29 and

$26,633.35, respectively.  Prior to deliberations, the Court noted it assumed the Government had

more evidence of U.S. purchases, stating "I'm sure more could have testified, I assume." (Tr. at

2053).  Evidence the Government potentially could have presented but did not of course cannot

be considered in evaluating the adequacy of proof under Rule 29.  And now, at the forfeiture

stage, the fact remains that the Government still has *never* offered any additional evidence of

U.S. OneCoin purchases allegedly funneled through the Fenero Funds beyond this $49,210.64.

Indeed, the Government has failed to trace even this $49,210.64 of OneCoin purchases by

Cohen and Horn into the Fenero funds.  The Manhattan District Attorney's Office financial

analyst, Rosalind October, testified at trial that her "tracing showed that Mrs. Cohen's funds

ended up in the IMS bank accounts." (Tr. at 1695).  But this was simply inaccurate.  Nowhere at

trial, in its post-trial briefing, or in its forfeiture application does the Government provide any

plausible tracing or forensic methodology, including those previously accepted by the Southern

District of New York and the Second Circuit, that would show that Cohen's funds ended up in

7

the Fenero Funds.  There is furthermore no indication that Ms. October, for the many accounts in question, ever looked at running balances, a fundamental and necessary component of all financial tracing.  Nor did Ms. October, either at trial or in her instant declaration, ever establish a nexus between monies transferred to the Fenero Funds and proceeds of a domestic wire fraud scheme at all.[3]  At this late stage that can mean only one thing: the Government is unable to prove this point.

Indeed, the inability to trace funds from Cohen or Horn to the Fenero Funds is described in detail in the Gannaway Declaration.  At a high level, the Government established at trial that Cohen and Horn made transfers of $22,577.29 and $6,062.60 respectively to an account at TD Bank ending in 7544 (the "TD 7544 Account") in the name of SecurePoint Corporation, a payment services company, which the Government claimed to be the United States depository account of OneCoin, while offering no evidence as to this fact.  It also provided evidence that Horn made a payment of $20,570.75 into an account at Kreissparkasse Steinfurt ending in 6108 Account (the "Kreissparkasse 6108 Account").  But the Government never detailed how – if at all – these funds ever left the U.S. or could be traced through several other accounts, held in several foreign countries, into the Fenero Accounts.[4]  *See* Gannaway Declaration ¶¶ 1, 19, 20, 27, 28, 36.  The Government's tracing analysis does not simply fall short of the mark; it doesn't exist.  In any event, even if the tracing could be established, this $49,210.64 represents the

---

[3] Indeed, Ms. October acknowledged the lack of such rigorous tracing in her trial testimony, where she described the process as  "really digging into the records" (Tr. at 1543) and a parsing out of what *she* "would consider the relevant transactions from that spreadsheet and just *kind of keep* a running tab of transactions that *we* want to flag for -- to pursue like our financial analysis." (Tr. at 1544).

[4] The summary charts that the Government introduced with respect to these transfers, GX 2623 and GX 2626, for Horn and Cohen, respectively, present an extremely misleading picture of what possibly happened to Horn and Cohen's transfers after each made the initial deposit.  While the charts give the clear impression that these funds ended up in the Funding Accounts, the charts' omission of the many subsequent transfers obscures the reality that, absent any tracing analysis, there is simply no way to determine this. *See* Gannaway Declaration, ¶¶ 21, 29.

maximum amount of U.S. wire fraud proceeds the Government could establish that Mr. Scott

allegedly laundered.  That is a far cry from the unsupported $393 million the Government seeks.

### B.   The Government Failed To Establish That The Vast Majority Of Funds Transferred To The Fenero Accounts Were From Purchasers Of OneCoin

Even assuming that the Government could seek forfeiture of deposits into the Fenero

Funds linked to OneCoin purchases with no nexus to the United States, which it cannot, the fact

remains that the Government did not establish the source of the lion's share of the $393 million

transferred to the Fenero Accounts, much less prove it came from individuals defrauded by

OneCoin.

As noted at the outset, the Government identified nine Funding Accounts responsible for

a total of approximately $393 million in funds to the Fenero Accounts. *See* October Affidavit

(Ex. 5 to Gov't. Br. at 6), GX 2602.  Yet, as detailed in the Gannaway Declaration and below,

the Government has offered no evidence connecting the vast majority of money transferred from

the Funding Accounts to payments from purchasers of OneCoin, much less purchasers from the

United States.  The failure to establish the source of the funds is a crucial first step in any tracing

analysis, and the Government has simply ignored it, seeking to seize $393 million without a

showing of where it came from.  This failure to identify the source of funds in the nine Funding

Accounts is described in more detail in the Gannaway Declaration at ¶¶ 37-41.

The Funding Accounts can be grouped into three distinct categories.  The first of these

categories is accounts for which *no* documentation was provided whatsoever:

- *OCBC Account ending in 7201 (the "OCBC 7201 Account").*  This account is in the name of IMS Pte.  There were transfers totaling €10,000,000 into the Fenero Funds.

- *OCBC Account ending in 0301 (the "OCBC 0301 Account").*  This account is in the name of IMS Pte.  There was one transfer of € 5,000,000 into the Fenero Funds.

In a letter dated April 15, 2020, counsel for Mr. Scott, prompted by several inconsistencies discovered in the financial records and summary charts underlying the Government's contentions, requested records for these accounts from the Government, and the Government replied that they were not in its possession.  Without these underlying bank records or anything to indicate the source of funds in, or the balances of, the accounts, there is not enough information to identify these funds as proceeds of a wire fraud scheme.  Thus, as the Government has not proven a connection between the funds in the account and OneCoin activity, the combined €15,000,000 deposited from the OCBC 7201 Account and the OCBC 0301 Account into the Fenero Funds must be excluded from the asset forfeiture calculation.

The second category of Fenero Fund Accounts is comprised of accounts for which the Government has provided *some* bank records, but from which it is not possible to determine, much less prove by a preponderance of the evidence, that the funds therein are proceeds of any fraud scheme linked to OneCoin, much less the domestic wire fraud SUA charged in the Superseding Indictment:

- *DSK Bank account ending in 9342 (the "DSK 9342 Account").* This account is in the name of B and N Consult LTD.  There were transfers totaling €19,500,000 to the Fenero Funds.  However, documents for this account were provided in a foreign language, and the Government did not provide a translation.  There is only limited information on these documents in English, from which is insufficient to draw any conclusions.  Thus, as the Government has not proven a connection between the funds in this account and OneCoin activity, the €19,500,000 deposited from the DSK 9342 Account into the Fenero Funds must be excluded from the asset forfeiture calculation.

- *DBS account ending in 7960 (the "DBS 7960 Account").*  This account is in the name of Star Merchant Inc. Limited and was opened on April 29, 2016 by Cai Zhoulong.  There were transfers totaling €95,000,000 to the Fenero Funds.  However, the account statements do not show the source of any transfers into the accounts, and only show dates and amounts.  As such, the €95,000,000 deposited from the DBS 7960 Account into the Fenero Funds must be excluded from the asset forfeiture calculation.

As a subset of this second category (accounts for which some records were provided, but for which it is still not possible to link the funds in these accounts to the specified unlawful activity of wire fraud underlying the money laundering conspiracy count in the indictment), are two accounts linked to Gilbert Armenta, a longtime client of Mr. Scott and identified by the Government as a OneCoin co-conspirator:

- _Morgan Stanley account ending in 0653 (the "Morgan Stanley 0653 Account")._  This account is in the name of Fates Group and was opened on February 8, 2016.  There were transfers totaling $5,000,000 into the Fenero Funds.  Nothing in the underlying bank records ties the funds in the Morgan Stanley 0653 Account to OneCoin, and therefore, the $5,000,000 deposited from this account into the Fenero Funds must be excluded from the asset forfeiture calculation.

- _Sabadell account ending in 1736 (the "Sabadell 1736 Account")._  This account is in the name of Fates Group and was opened by Gilbert Armenta on March 8, 2016.  There were transfers totaling $5,000,000 into the Fenero Funds.  Nothing in the underlying bank records ties the funds in the Sabadell 1736 Account to the OneCoin fraud scheme, and therefore, the $5,000,000 deposited from this account into the Fenero Funds must be excluded from the asset forfeiture calculation.

Indeed, because Mr. Scott ultimately rejected the investment Mr. Armenta sought to make in the Fenero funds and returned the funds to Mr. Armenta, these funds should be excluded from the forfeiture calculation on this additional ground.[5]  _See Honeycutt v. United States_, 137 S. Ct. 1626 (2017) ("A defendant may not be held jointly and severally liable for property that his co-conspirator derived from the crime but that the defendant himself did not acquire.").  To the extent the Government is seeking to recover this sum, it should do so from Mr. Armenta.

The final category of Funding Accounts are accounts for which the bank statements indicate that at least some of the funds are linked to OneCoin based on the wire descriptions.

---

[5] While the Second Circuit held in _United States v. Tanner_, 942 F.3d 60 (2d Cir. 2019) that the Supreme Court's bar in _Honeywell_ against joint and several forfeiture for co-conspirators "applies only to co-conspirators who never possess the tainted proceeds of their crimes," that case did not involve a situation like here where an investment was rejected and returned.  A more expansive application of _Tanner_ would be inconsistent with _Honeywell._

However, these amounts should also be excluded from the asset forfeiture calculation because the Government never traced the money in these accounts or ever alleged that there is *any* connection to the *domestic* wire fraud scheme that necessarily must constitute the specified unlawful activity in the indictment.

- *Commerzbank account ending in 2001 (the "Commerzbank 2001 Account").* This account is in the name of IMS International Marketing Services GmbH and was opened and was opened by Frank Robert Ricketts, Kathrin Epping, and Helke Maria Schmidt on March 6, 2016. There were transfers totaling €35,000,000 into the Fenero Funds. Many of the wire descriptions for transfers into this account mention OneCoin and appear to be individuals purchasing trader packages. However, these is no indication that any of these individuals are located in the United States, or that the transfers originated from the United States. Thus, the money in this account has not been shown to be proceeds of a *domestic* wire fraud scheme. Accordingly, the €35,000,000 deposited from the Commerzbank 2001 Account into the Fenero Funds should be excluded from the asset forfeiture calculation.

- *Deutsche Bank account ending in 8901 (the "Deutsche Bank 8901 Account").* This account is in the name of IMS International Marketing Services GmbH and was opened and was opened by Elisabeth Manon Hübenthal, Helke Maria Schmidt, and Kathrin Epping on April 11, 2016. There transfers totaling €45,000,000 into the Fenero Funds. Many of the wire descriptions for transfers into this account mention OneCoin and appear to be individuals purchasing trader packages. However, these is no indication that any of these individuals are located in the United States, or that the transfers originated from the United States. Thus, the money in this account has not been shown to be proceeds of a *domestic* wire fraud scheme. Accordingly, the €40,000,000 deposited from the Deutsche Bank 8901 Account into the Fenero Funds should be excluded from the asset forfeiture calculation.

- *The United Overseas Bank account ending in 6682 (the "United 6682 Account").* This account is in the name of IMS Pte and was opened on February 4, 2016 by Frank Robert Ricketts and Elisabeth Manon Hübenthal. There were transfers totaling €149,500,000 to the Fenero Funds. Some of the descriptions for the amounts deposited into this account appear to show activity related to purchases of OneCoin packages. However, the Government has never alleged that any of these purchasers were made by U.S. investors As such, the €149,500,000 deposited from the United 6682 Account into the Fenero Funds must be excluded from the asset forfeiture calculation.

Indeed, even if the Government had charged Mr. Scott with laundering proceeds of a foreign fraud offense rather a domestic wire fraud – which it did not – it has failed to offer evidence that OneCoin's operations violated the laws of the countries where the purchases

reflected in the only two Funding Accounts with a OneCoin link took place.  Indeed, despite the Government's claim that OneCoin was a global fraud scheme, it has not demonstrated that *any* other country charged OneCoin with criminal violations of offenses outside the United States, Indeed, OneCoin was operating openly across Europe and elsewhere while the Fenero Funds were in operation.[6]

Rather than do *any* tracing of the source of funds in the Funding Accounts, the Government relies entirely on the argument that certain of the accounts were associated with alleged co-conspirators.  Specifically, the Government argues that "IMS was owned by co-conspirator Frank Rickets [sic]; B&N was owned by co-conspirator Irina Dilkinska; and Fates Group was owned by co-conspirator Gilbert Armenta." (Gov't. Br. at 3).  This argument fails. For one thing, while the Government claims that IMS Funding is owned by Ricketts, there is no evidence he is the signer on several of the IMS accounts, undermining this claim.[7]  The B&N Account, which the Government states is "owned by . . . Dilkinska," is the account for which untranslated statements were provided in a foreign language.

However, even if the account ownership as described by the Government were supported by the evidence, that still falls far short of the Government's burden to prove that the source of funds in these accounts were proceeds of the charged wire fraud scheme.  The fact that these accounts may be associated with individuals associated with OneCoin does not by itself prove

---

[6] For example, in December 2019, the City of London police concluded its investigation into OneCoin without any arrests or prosecutions.  *See* Jonathan Ames, "Police drop inquiry into $4bn OneCoin Swindle," December 24, 2019, *The Times*. https://www.thetimes.co.uk/article/police-drop-inquiry-into-4bn-onecoin-swindle-wxsjskr6q.

[7] Of the five accounts referencing "International Marketing Services" or "IMS," there is evidence to connect Ricketts to only two of them (the Commerzbank 2201 Account and the United 6682 Account). As for the other three IMS accounts: for the Deutsche Bank 8901 Account, Ricketts's name does not appear on any of the account documentation; and, for the OCBC 7201 and 0301 Accounts, no documentation was provided to establish Ricketts, or anyone else, as the owner.

that the funds in the accounts related to OneCoin, much less that they were "proceeds" of the charged wire fraud SUA.  For example, in the case of Ricketts, the Government's sole cooperating witness to testify at Mr. Scott's trial, Konstantin Ignatov, stated that Ricketts had previously owned a company called SiteTalk which Ricketts had sold to Ignatov's sister, Ruja Ignatova.  Furthermore, one of the accounts shown to be associated with Ricketts, the United 6682 Account, was opened on October 22, 2013.  This predates even the conception of OneCoin, and thus it is entirely plausible that the proceeds in this account could have come from any of Ricketts' other ventures.

Indeed, it is not even sufficient for the Government to show that the accounts are linked to Ruja Ignatova, because accepting funds from Ms. Ignatova can only support a money laundering conviction if those specific funds were proceeds of the charged domestic wire fraud scheme *and* if Mr. Scott believed them to be proceeds of some crime.  The Government has not established either point.  As Ms. Ignatova e-mailed Mr. Scott shortly after being introduced to him, she had "several other businesses" besides OneCoin including "private equity like investments," "software ventures," and "agricultural projects."  DX 103.

Ultimately, it is not the job of Mr. Scott to show where the money in these accounts originated; rather, for purposes of asset forfeiture, it is the Government's job to prove if it can that the proceeds in the Fenero Fund Accounts were from an illegal wire fraud scheme.  Simply put, it has failed to do so.

### C.    A Money Judgment of $393 Million Would Violate Mr. Scott's Eight Amendment Rights

Finally, a money judgment of $392,940,000 against Mr. Scott would violate the Eighth Amendment's prohibition against excessive fines.  A forfeiture is unconstitutionally excessive "if it is grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*,

524 U.S. 321, 334 (1998). To arrive at such a determination, the court must apply a two-step

inquiry: "At the first stage, we determine whether the Excessive Fines Clause applies at all."

*United States v. Viloski*, 814 F.3d 104, 109 (2d Cir. 2016).  "If we conclude that it does, we

proceed to the second step and determine whether the challenged forfeiture is unconstitutionally

excessive." *Id.*

In the present case, the Excessive Fines Clause applies because the forfeiture provisions

attach "[a]s a result of committing the offense[s] alleged in" Counts One and Two. *See*

Superseding Indictment (Dkt. 143 at 4).  Next, to reach a finding on gross disproportionality, in

the second step of the analysis the court applies what have become known as the *Bajakajian*

factors: "(1) the essence of the crime of the defendant and its relation to other criminal activity,

(2) whether the defendant fits into the class of persons for whom the statute was principally

designed, (3) the maximum sentence and fine that could have been imposed, and (4) the nature of

the harm caused by the defendant's conduct." *United States v. George*, 779 F.3d 113, 122 (2d

Cir. 2015) (quoting *United States v. Castello*, 611 F.3d 116, 120 (2d Cir. 2010)).

The first and fourth factors of this test weigh strongly in Mr. Scott's favor.  With respect

to the first factor, Mr. Scott was *not charged with* and indisputably had no underlying

involvement in the OneCoin wire fraud scheme concocted and orchestrated by Ruja Ignatova and

Sebastian Greenwood outside of the United States. *See, e.g.,* GX 2101, GX 2102.  There was no

evidence admitted at trial, and none exists, linking Mr. Scott in any way to the development,

marketing, or operation of OneCoin.  The Government offered no evidence establishing that Mr.

Scott had actual knowledge that OneCoin was fraudulent, and to the extent there was sufficient

evidence to sustain a conviction – which Mr. Scott vigorously disputes – it can only be on a

theory that Mr. Scott consciously avoided learning that the money invested into his funds was

proceeds of some crime.  This puts him in a different category than that of his alleged co-conspirators who, unlike Mr. Scott, were charged with participating in the OneCoin wire fraud scheme that is the basis for the money laundering charge.

With respect to fourth factor, the Government has not demonstrated any harm specifically caused by Mr. Scott's conduct.  The only two OneCoin investors to testify at trial, Cohen and Horn, both confirmed that they had never even previously heard of or met Mr. Scott. (Tr. at 104-105; Tr. at 815-816).  They bought OneCoin months before Mr. Scott even opened the Fenero Funds.  Thus, with or without Mr. Scott's involvement, Cohen and Horn, would today find themselves in exactly the same financial position.  Money laundering is of course a serious offense and does harm society, but any damage Mr. Scott caused by accepting investments linked to Ruja Ignatova pales in comparison to the damage she and her co-conspirators are accused of doing in selling a cryptocurrency they allegedly knew to be bogus.

Finally, the Second Circuit has cautioned against a too rigid application of the *Bajakajian* factors and has said that "court may consider . . . whether the forfeiture would deprive the defendant of his livelihood, i.e., his 'future ability to earn a living.'" *Viloski*, 814 F.3d at 111 (quoting *United States v. Levesque*, 546 F.3d 78, 85) (1st Cir. 2008)).  A personal money judgment of $393 million dollars is a sum so great that only a literal billionaire might be able to pay this in his lifetime.  Simply put, imposition of this money judgment would materially deprive Mr. Scott of the opportunity to pursue *any* livelihood and penalize him on a scale far beyond any money he personally received with any connection to OneCoin.

## II.        The Government's Request To Seize Specific Property Should Be Denied

In addition to seeking a money judgment of approximately $393 million, the Government seeks in the Proposed Forfeiture Order to seize specific property allegedly linked to OneCoin. This application should be denied.

With respect to the specific property identified in the Proposed Forfeiture Order, the Government's argument is premised on the notion that every penny flowing into the accounts of the Fenero Funds – some of which it then sought to trace to Mr. Scott – is proceeds of the charged wire fraud scheme.  As argued above, the Government has identified only $49,201.64 of investments from U.S. purchasers of OneCoin that even arguably could have flowed in to the Fenero Funds, and has failed to identify any source for the vast majority of transfers from the Funding Accounts to the Fenero Accounts.  Given the failing, the Government is not entitled to seize specific property simply because it has linked the specific property to the Fenero Funds.

Even putting this aside, the Government has sought to seize certain assets as specific property beyond the value of any funding of that asset linked to the Fenero Funds.  In particular, the Government puts forth in its Proposed Forfeiture Order that Mr. Scott should forfeit "[a]ll right, title and interest in real Properties located at 600 Coral Way, Suite/Floor 12, Segovia Tower, Coral Gables, Florida 33134."  This property was purchased for $1.58 million on January 14, 2015 (GX 2617-B), prior to when Mr. Scott first met Ruja Ignatova.  Now, however, the Government argues that because Mr. Scott is alleged to have "used OneCoin Scheme proceeds to pay off over $1,000,000" of a mortgage for this property (Gov't. Br. at 3), it should now be subject to forfeiture, completely ignoring that Mr. Scott's initial investment in it pre-dates his involvement in Fenero.

A recent appraisal establishes a market value of $1,605,000 for this property (*See* Dkt. 245, Ex. H).  "While 'the mere pooling or commingling of tainted and untainted funds in an account does not, without more, render the entire contents of the account subject to forfeiture[,]' forfeiture of such commingled funds 'is proper when the government demonstrates that the defendant pooled the funds to facilitate or 'disguise' his illegal scheme.' *United States v. Kenner*,

443 F. Supp. 3d 354, 365 (E.D.N.Y. 2020) (quoting *United States v. Nicolo*, 597 F. Supp. 2d

342, 351 (W.D.N.Y. 2009)).  The Government has introduced no evidence whatsoever to suggest

that Mr. Scott's use of his earnings derived from the Fenero Funds to pay off the mortgage on his

home was in any way designed to facilitate or disguise his participation in this venture.

Accordingly, at the very most, only the approximately $1 million of equity in this property

linked to the mortgage payoff should be subject to forfeiture.

**III.    T**he Government's Request To Seize Substitute Assets Should Also Be Denied

The Government also seeks to seize certain substitute assets to satisfy the money

judgment, and this request should also be denied.  As a threshold matter, the Government's

anticipated need to pursue forfeiture of substitute assets from Mr. Scott is based on its calculation

of a money judgment amount nearing $393 million.  However, for the reasons thus far explained,

this calculation is flawed.  The Government identified, at most, $49,210.64 of illegal wire fraud

proceeds that went to the Fenero Funds.

This application is likewise at best premature.   As an initial matter, the Government's

interest in substitute assets – as opposed to assets traceable to the offense – vests only when the

Court enters a judgment of conviction.  "Forfeiture of substitute property cannot occur until after

the defendant's conviction and a determination by the trial court that the defendant's act or

omission resulted in the court's inability to reach [the forfeitable property]." *United States v.*

*Perkins*, 994 F. Supp. 2d 272, 275 (E.D.N.Y. 2014) (quoting *United States v. Jarvis*, 499 F.3d

1196, 1204 (10th Cir. 2007)). *See also United States v. Kramer*, 2006 WL 3545026 at *8

(E.D.N.Y. 2006) (finding that the Government's interest in substitute property vests, at the

earliest, when defendant is convicted).  Moreover, without the size of any monetary judgment or

issues of forfeiture of direct assets resolved by the Court, the Government cannot make the

showing that has been "unable to locate or obtain the specific proceeds of the defendant's

offenses." *Christie*, 249 F. Supp. 3d at 742 (S.D.N.Y. 2017) (citation omitted).  The Government

has made no such showing, and accordingly, its request must be denied.

## <u>CONCLUSION</u>

For the reasons stated above, the Government's Proposed Forfeiture Order should be

denied.


Respectfully Submitted,

Dated: December 7, 2020


/s/ Arlo Devlin-Brown

Arlo Devlin-Brown
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1046

David M. Garvin
Law Offices of David M. Garvin
200 South Biscayne Boulevard
Suite 3150
Miami, FL 33131
(305) 371-8101


*Counsel for Mr. Scott*