

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 25, 2021

**BY ECF/EMAIL**

The Honorable Edgardo Ramos
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Mark S. Scott*, S10 17 Cr. 630 (ER)

Dear Judge Ramos:

The Government respectfully submits this reply memorandum in response to Scott's opposition to the Government's application for a preliminary order of forfeiture, and for a restraining order. (Dkt. 344 and 345, respectively). In his opposition to the Government's forfeiture application, Scott argues that the Government has failed: 1) to show through financial tracing that the funds laundered by Scott were in fact from the OneCoin fraud scheme; and 2) to establish that the funds laundered by Scott were proceeds of a legally sufficient specified unlawful activity, i.e., a wire fraud scheme in violation of 18 U.S.C. § 1343. In addition, Scott argues that a money judgment of $393 million would violate his Eighth Amendment rights. Finally, Scott argues that certain property is not subject to forfeiture as a specific asset, and that it is premature to address the forfeiture of substitute assets. Scott is wrong in all respects.

## I.    The $392,940,000 in Funds Laundered by Scott Were Derived from the OneCoin Wire Fraud Scheme

In his brief, Scott raises two related arguments in opposition to the Government's application for a preliminary order of forfeiture (the "Preliminary Order of Forfeiture") imposing a forfeiture money judgment in the amount of $392,940,000. First, Scott argues that the Government has failed to establish through financial tracing that the funds laundered by Scott were in fact from the OneCoin fraud scheme. (Dkt. 345 at 9-14). Second, Scott asserts that the Government has failed to prove that the funds laundered by Scott were proceeds of a legally sufficient specified unlawful activity, i.e., the wire fraud scheme. (Dkt. 345 at 5-9). In particular, Scott claims that in order to prove that certain funds were criminal proceeds from a wire fraud scheme in violation of 18 U.S.C. § 1343, the Government must establish that *all* of the funds that Scott laundered were from OneCoin customers *in the United States*. Scott's arguments are unsupported by the evidence and the law.

First, Scott's assertion that the Government has failed to establish that the "vast majority of funds transferred to the Fenero accounts were from purchasers of OneCoin" is completely

unsupported by the record.  As set forth below, the trial record showed that Scott was retained for the specific purpose of laundering OneCoin fraud scheme proceeds on behalf of Ruja Ignatova ("Ruja").  In particular, the following facts, among others, overwhelmingly show that the funds laundered by Scott were derived from the OneCoin fraud scheme (the "OneCoin Scheme"):

- OneCoin was founded by Ruja and Sebastian Greenwood.  (Tr. 132).  By the summer of 2014, Ruja and Greenwood began developing the concept and payout plan for OneCoin.  (GX 2101).

- From 2015 through 2017, Ruja's source of income was from running OneCoin.  (Tr. 217:6).  This was the same period during which Scott laundered funds on Ruja's behalf.  (*See* GX 2602-A).

- Ruja earned at least $500,000,000 from operating OneCoin before she disappeared in the fall of 2017 (Tr. 220:4); the money that Ruja earned came from OneCoin investors (Tr. 220:6).

- Gilbert Armenta, who was the boyfriend of Ruja and was also one of Ruja's main money launderers, assisted OneCoin with some of its banking problems.  (Tr. 130).  As of late 2015, Armenta had begun laundering OneCoin Scheme proceeds for Ruja.  (GX 2114, 2115).  Around that same time, Armenta introduced Mark Scott to Ruja.  (GX 2115, 1004).

- While International Marketing Services ("IMS"), as well as B&N Consult Ltd. ("B&N") and Fates Group, were "investors" in the Fenero Funds on paper, all of the money being transferred into Scott's funds in fact belonged to Ruja and was derived from the OneCoin Scheme.  (GX 1434).  IMS was owned by co-conspirator Frank Rickets; B&N was owned by co-conspirator Irina Dilkinska; and Fates Group was owned by co-conspirator Armenta.

- Scott and other co-conspirators understood and explicitly discussed the importance of hiding the link between the funds in the Fenero Funds and OneCoin.  (*See, e.g.*, Tr. 1771:4-6; GX 1042).

- OneCoin employees organized and coordinated the transfer of funds into the Fenero Funds.  (*See* GX 2701).  Scott also provided updates to Ruja and OneCoin's head of accounting regarding the total amount of money that he had received in the Fenero Funds on behalf of Ruja.  (GX 1399).  In another email to OneCoin's head of accounting and Dilkinska, another OneCoin employee, Scott provided a breakdown of all of the funds that the Fenero Funds had received on Ruja's behalf to date, which totaled EUR 306,089,78 and $40,990,185.  (GX 1391).

- Scott conceded in email correspondence with a fund administrator that funds that had been transferred into the Fenero Funds on behalf of IMS were sourced from OneCoin.  (GX 2281 (Scott wrote "Attached please find spot checks of one of the pooling accounts at Deutsche Bank where IMS collects and manages the payments of the

OneCoin customers. . . . . You will find pretty regular payment amounts ranging from a starter package to advanced packages and other extras. The majority are from payments made though the OneCoin Website where the purchaser secures a username that is included in the reference information of the transfer to later be able to reference that purchaser easier on the OneCoin platform.")).   Scott attached Deutsche Bank statements for the IMS bank account that reflected the OneCoin purchases he described in the email.  (*Id.*).

The above-described evidence demonstrates—far beyond a preponderance—that the funds that were transferred to the Fenero Funds and laundered by Scott through the Fenero Funds, which totaled $392,940,000, were derived from the OneCoin wire fraud scheme.[1]

Second, Scott also argues that the Government has failed to prove that the $392,940,000 that he laundered was derived from a legally sufficient specified unlawful activity, i.e., the OneCoin wire fraud scheme.  Specifically, Scott asserts, without citing to a single case, that the only funds subject to forfeiture are those that can be traced to OneCoin purchasers in the United States.  Scott is wrong.

At the outset, the Government has already proven at trial, *beyond a reasonable doubt*, that Scott participated in money laundering conspiracy and that the underlying specified unlawful activity was a wire fraud scheme involving interstate or international wires in the United States, and more particularly in the Southern District of New York.  Furthermore, the evidence at trial definitively established a sufficient nexus between the OneCoin fraud scheme and the United States.  "A jurisdictional nexus exists 'when the aim of that activity is to cause harm inside the United States or to U.S. citizens or interests.'"  *United States v. Budovsky*, 13 Cr. 368 (DLC), 2015 WL 5602853, at *4 (S.D.N.Y. Sept. 23, 2015) (quoting *United States v. Al Kassar,* 660 F.3d 108, 118 (2d Cir. 2011)).  Specially, the Government proved at trial that: 1) OneCoin began operating in the United States in or around 2015 (GX 63 ¶ 1(d); GX 204-C); 2) OneCoin meetings and conferences were held in the United States, and there were United States-based promoters (Tr. 66, 69-71); and 3) United States individuals transmitted wires internationally in connection with OneCoin's activities in the United States (GX 730A; Tr. 84).  Two United States victims also testified at trial and described their investments in the scheme, the promoters who introduced them

---

[1]  Although Scott faults the Government for not establishing through tracing analysis that all of the funds that passed through the IMS, B&N, Fates Group bank accounts were from the OneCoin Scheme, there is no such legal requirement.  It is well settled that circumstantial evidence, which the Government has submitted in an abundance here, can establish that property constituted proceeds of a crime.  *See, e.g.*, *United States v. Funds in Amount of $30,670*, 403 F.3d 448, 469 (7th Cir. 2005) (granting summary judgment to Government where "the totality of the evidence as a whole and in the appropriate context" supported forfeiture); *United States v. $174,206.00 in U.S. Currency*, 320 F.3d 658, 662 (6th Cir. 2003) (granting Government summary judgment that property was derived from crime based on claimant's tax returns reporting insufficient income); *United States v. One 2008 Chevrolet Tahoe4 C1500*, No. 09 Civ. 799 (JFK), 2011 WL 176887, at *10 (N.D. Ga. Jan. 19, 2011) (similar); *United States v. $433,980 in U.S. Currency*, 473 F. Supp. 2d 685, 690 (E.D.N.C. 2007) (granting summary judgment based on multiple circumstantial factors each only somewhat probative individually).

to OneCoin, and their ultimate losses related to their investments.  (*See, e.g.,* Tr. 74, 84, 791, 799, 809-10; GX 731A; GX 2803; GX 2811).  In combination with the Government's evidence regarding the fraudulent nature of OneCoin, nothing more was required in order for the Government to prove the existence of a wire fraud scheme that met the elements of 18 U.S.C. § 1343.

Given that the Government has clearly shown by a preponderance that $392,940,000 is the amount of money that Scott laundered during the course of the money laundering conspiracy, and that those proceeds were derived from a wire fraud scheme, $392,940,000 is the appropriate amount for the money judgment.  For money laundering charges such as Count One of the Indictment, the Government may seek a money judgment up to the full value of the funds laundered by the defendant.  *United States v. Bermudez*, 413 F.3d 304, 305-306 (2d Cir. 2005).  In imposing sentence on a person convicted of an offense in violation of Title 18, United States Code, Section 1956, the Court "shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property."  *Id.* at 306, 18 U.S.C. § 982.  Property "involved in" a money laundering offense very clearly constitutes at least the actual funds laundered.  *See In re 650 Fifth Ave and Related Props.*, 777 F. Supp. 2d 529, 570 (S.D.N.Y. 2011).  Furthermore, where, as here, the defendant did not retain all of the funds he laundered,[2] Section 982(b)(2) expressly states that the defendant is liable for forfeiture of substitute assets up to the full amount of the laundered property, provided that the defendant "conducted three or more separate transactions involving a total of $100,000 or more in any twelve month period."  18 U.S.C. § 982(b)(2).  In short, a money laundering defendant like Scott—who laundered approximately $392,940,000 through numerous transactions within a twelve-month period that exceeded $100,000—"must forfeit substitute assets up to the amount laundered, even if he merely handled the laundered property—*i.e.,* even if he never retained those funds." *Bermudez*, 413 F.3d at 306.

## II.    The Proposed Money Judgment Would Not Violate Scott's Eighth Amendment Rights

The defense's constitutional claim is equally meritless.  No court in the United States has ever held that forfeiture in the amount of criminal proceeds laundered by a defendant is unconstitutionally excessive.

"The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998).  The rule is that "a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *Id.*  The gross disproportionality standard "reserves a constitutional violation for only the extraordinary case." *Lockyer v. Andrade*, 538 U.S.

---

[2] As set forth below, the Government established at trial that a significant amount of the OneCoin Scheme proceeds that were laundered through the Fenero Funds were sent to Ruja and other members of the OneCoin Scheme.

63, 77 (2003).  The burden is on the defendant to prove the unconstitutionality of the forfeiture. *United States v. Castello*, 611 F.3d 116, 120 (2d Cir. 2010).

Four factors set out in *Bajakajian* guide the Court's analysis: "[1] the essence of the crime of the defendant and its relation to other criminal activity, [2] whether the defendant fit[s] into the class of persons for whom the statute was principally designed, [3] the maximum sentence and fine that could have been imposed, and [4] the nature of the harm caused by the defendant's conduct."  *Id.*  In addition, the Second Circuit has held that courts may consider "whether the forfeiture would deprive the defendant of his future ability to earn a living," but that courts should *not* consider "a defendant's personal circumstances."  *United States v. Viloski*, 814 F.3d 104, 107 (2d Cir. 2016).  Application of these factors establishes that forfeiture of the money laundering scheme's proceeds, that is, the exact amount of money that Scott laundered, is not grossly disproportional to his crime; in fact, it definitionally reflects the scope, sophistication, complexity, and duration of the crime.

The first *Bajakajian* factor requires consideration of "the essence of the crime of the defendant and its relation to other criminal activity."  *Id.* at 121.  Here, Scott operated a sophisticated, international, massive, multi-year money laundering operation involving numerous co-conspirators in the United States and abroad.  The money laundering scheme required multiple layers of deception at every turn in order to hide the origin of the funds (i.e., the OneCoin Scheme), and the owner of the funds (i.e., Ruja).  In order to launder the funds, Scott set up a series of fake investment funds, including the following purported investment funds: Fenero Equity Investments L.P. ("Fenero"), Fenero Equity Investments II, L.P. ("Fenero II"), and Fenero Financial Switzerland L.P. ("Fenero Switzerland"), each of which was an approved investment fund regulated in the British Virgin Islands.  (GX 2701).  MSSI LTD also owned and operated Fenero Equity Investments (Cayman) I, L.P. ("Fenero Cayman"), an investment fund organized in the Cayman Islands (together with the British Virgin Islands Fenero funds, the "Fenero Funds").  (*Id.*).  Scott operated bank offshore accounts in the Cayman Islands for each of the Fenero Funds (the "Fenero Fund Accounts").  (*Id.*).  The Fenero and Fenero Switzerland accounts were held at DMS Cayman bank, and the Fenero Cayman and Fenero II accounts were held at Deutsche Bank Cayman.  (*Id.*).

Scott used these fake investment funds to facilitate the laundering of nearly *four hundred million dollars*.  In doing so, he made numerous misrepresentations to banks and financial institutions in order to cause them to unwittingly transfer the proceeds from the OneCoin Scheme on behalf of Ruja.  Specifically, Scott and his co-conspirators misrepresented to banks and financial institutions the source of the funds they were transferring, and the purpose of those wire transfers.  For example, after a fund administrator grew suspicious of the financial activity in the Fenero Funds and began conducting enhanced due diligence on the Fenero Funds, Scott took a number of steps in an effort to conceal the connection between the Fenero Funds and OneCoin, and to convince Apex that it should continue to transfer funds out of the Fenero Funds as requested by Scott.  Among other things, Scott and his co-conspirators doctored letters of comfort on behalf of two lawyers; created and sent backdated wire instruction letters to Apex; and forged a set of agreements between IMS and B&N.  (GX 1177, GX 2266, Tr. 243; GX 1175, GX 2267).  Scott also forged a set of two agreements between OneCoin and IMS, changing the fee that IMS was supposed to receive under the agreements from 1% in the original agreements, to 20% and 22% in

the forged agreements.  (GX 1209).  The forged contracts were then sent by Scott to Apex.  (GX 2276).  Scott altered the terms of the forged contracts to provide support for the large volume of payments—purportedly for the purpose of licensing technology to OneCoin—made by the IMS companies to the Fenero Funds.  In light of his conduct, plainly, the total amount of money that Scott laundered represents the essence of his crime.  Because the core criminal conduct of Scott's money laundering conspiracy was a massive international money laundering and bank fraud scheme that was highly deceptive, spanned years, and involved numerous co-conspirators that he directed, the first *Bajakajian* factor weighs heavily in favor of full forfeiture of the funds he laundered.  *See Viloski*, 814 F.3d at 113 (first factor weighed in favor of forfeiture even though defendant was subordinate and it was not lucrative, as the conspiracy spanned years and involved repeated instances of fraud).

Second, Scott fits squarely into the class of persons for whom the money laundering and bank fraud statutes were principally designed.  *Bajakajian* at 122.  As the architect of a highly sophisticated, international money laundering operation, which deceived banks and financial institutions around the globe, Scott is clearly the kind of person to whom the money laundering and bank fraud statutes are directed.  Thus, the second *Bajakajian* factor also weighs in favor of full forfeiture.  *See also Viloski*, 814 F.3d at 114 (defendant fit squarely within class of persons for whom the federal fraud statutes were aimed—he used facilities of interstate commerce to engage in fraudulent schemes and then disguised the nature of the proceeds).

The third *Bajakajian* factor considers the maximum sentence and fine that could be imposed.  Here, the maximum sentence is the statutory maximum of 50 years, and the maximum statutory fine under 18 U.S.C. § 3571 is nearly $800 million.  This strongly suggests substantial culpability, and thus this factor weighs in favor of full forfeiture.  *See Viloksi*, 814 F.3d at 114; *United States v. Bonventre*, 646 Fed. Appx. 73, 91-92 (2d Cir. 2016) ($19 billion forfeiture judgment not excessive; defendant faced maximum of 100 years in prison for fraud and tax offenses in connection with scheme to defraud thousands of investors).

The next factor to consider is the nature of the harm caused by Scott's conduct.  Notably, the money Scott laundered represented the proceeds of a massive international fraud scheme that defrauded millions of investors out of more than $1 billion.  By laundering nearly $400 million, Scott helped Ruja to successfully steal that money straight from the pockets of the investors.  Scott also pocketed over $50 million of OneCoin investor funds himself, as his cut for laundering the money for Ruja.

Finally, a money judgment in the amount of $392,940,000 would not deprive Scott of his "future ability to earn a living"—a factor the Court may, but is not required, to consider as part of its proportionality analysis.  *Viloski*, 814 F.3d at 111-112.  Given that the Government is seeking forfeiture here in the form of a money judgment, any claim otherwise is not credible.  The Government is not seeking to seize, for example, a business that serves as Scott's sole source of potential income.  Scott has presented not a shred of evidence that a money judgment would prevent him from earning a living upon his release from prison.  *See Viloski*, 814 F.3d at 114-115 (noting that defendant presented no evidence that forfeiture judgment would deprive him from

earning a living upon release from prison, and rejecting defendant's argument that court should consider his age, health, or poor financial state).[3]

Lastly (and significantly), there is no case holding that a forfeiture judgement in the amount of the proceeds of a defendant's crime is an Eighth Amendment violation. This is unsurprising. Indeed, as the Second Circuit observed in *Bonventre*, in which it upheld a $19 billion forfeiture judgment, "[w]here . . . forfeiture ordered is in an amount equivalent to the undisputed, actual proceeds of the fraud . . . we cannot conclude that the order was grossly disproportional to the gravity of his offense." 646 Fed. Appx. at 92. As far as the Government is aware, Eighth Amendment violations have been found only where (1) "facilitating" or "involved in" forfeiture resulted in forfeiture of otherwise legitimate property that was dramatically more valuable than the underlying crime proceeds (*e.g.*, the forfeiture of a car worth more than four times the maximum fine for a state drug crime, *see Timbs v. Indiana*, 139 S. Ct. 682 (2019)); or (2) there were no crime proceeds at all, as in *Bajakajian*, 524 U.S. at 338. Here, the Government is seeking to forfeit the exact amount of money that the defendant laundered during the money laundering conspiracy, all of which was derived from the OneCoin Scheme. Thus, a ruling in the defendant's favor on this point would not only be contrary to law, but unprecedented.

## III.      The 600 Coral Way Property Is Subject to Forfeiture Under 18 U.S.C. § 982(a)(1)

As set forth in the August 31, 2020 affidavit of Rosalind October, over one million dollars that was laundered by Scott was eventually used to pay off the mortgage for a condo at 600 Coral Way, Coral Cables (the "600 Coral Way Property") on behalf of Scott. Specifically, on or about October 16, 2016, Scott paid off the mortgage for the 600 Coral Way Property with a payment in the amount of $1,000,794.66, all of which originated from OneCoin Scheme funded accounts. (Dkt. 318 at 44 (citing Tr. 1699-1700; GX 2617-B and 2620)). Scott does not dispute these facts, but instead claims that because Scott had paid for a portion of the 600 Coral Way Property prior to using ~$1M in OneCoin Scheme proceeds to pay the remainder of the mortgage, only $1 million of equity in the property is subject to forfeiture. (Scott Opp. at 17-18). Specifically, Scott argues the Government has failed to introduce any "evidence whatsoever" that shows that Scott's use of OneCoin Scheme proceeds that he laundered through the Fenero Funds, and subsequently used to pay off the mortgage on his home, "was in any way designed to facilitate or disguise his participation in this venture." Scott is wrong.

As the Government previously explained in motion *in limine* briefing in this case, Scott's money laundering activities were not limited to the funds that he funneled through the Fenero Funds and sent back on Ruja's behalf. Scott's money laundering concealment activities also extended to his own attempts to successfully transfer money on his own behalf out of the Fenero Funds, i.e., to pay himself his cut of the OneCoin Scheme proceeds that he received for laundering the $400 million ("Scott's Funds"). Scott relied on the same money laundering techniques to achieve both ends. This Court reached a similar conclusion in denying Scott's motion *in limine* to preclude the Government from presenting at trial evidence concerning Scott's Funds. In doing so,

---

[3] Notably, the Second Circuit, consistent with every other Circuit, has explicitly held that courts may *not* consider Scott's personal circumstances, including his financial situation, age, and health, in its constitutional proportionality analysis. *Viloski*, 814 F.3d at 112.

the Court noted that "I do agree with the Government that this is direct evidence of the offense that is charged." (Dkt. 170 at 55).

Scott's purchase of the 600 Coral Way Property is no different. The purchase was one of numerous instances in which Scott used the Fenero Funds to conceal and hide the origin of OneCoin Scheme proceeds, and further used the purchase of real property as an additional layer of obfuscation.[4] Specifically, Scott sent two wires, each in the amount of $500,000, from Fenero accounts at the Bank of Ireland, to his attorney's account, who in turn sent the funds to pay off the mortgage. This series of transfers, including the mortgage payout on the 600 Coral Way Property, was designed to conceal the nature and origin of the funds (i.e., criminal proceeds), consistent with Scott's modus operandi throughout the entire money laundering conspiracy. The entire 600 Coral Way Property is accordingly subject to forfeiture pursuant to 18 U.S.C. § 982(a)(1), along with all of the specific property in Appendix A.[5]

In the event that the Court finds that the *entire* 600 Coral Way Property is not subject to forfeiture as property traceable to the offense, a portion of the property is still subject to forfeiture under § 982(a)(1). Specifically, the Government is still entitled to the $1,000,794.66 that was indisputably derived from the OneCoin scheme, which Scott used to pay off the mortgage, or, if the value of the property has increased, a sum equal to $1,000,794.66 plus a proportional percentage of the increase in the value of the property. In addition, the remainder of the property would be subject to forfeiture as a substitute asset under 21 U.S.C. §§ 853(p)(1)(A) and (B).

---

[4] Other instances in which Scott used similar money laundering concealment techniques to fund purchases on his own behalf include the following, among others: 1) In November 2016, Scott purchased a $245,269 Ferrari car. In doing so, Scott routed the money from the bank account of one of the Fenero Funds, to his attorney's bank account, to a Cayman Island bank account, and then directly to the seller of the Ferrari; 2) in February 2017, Scott routed $850,000, in two separate wires, from Fenero Fund bank accounts, to his lawyer, for the purchase of another property in Barnstable, MA. The purchase fell through and was not completed; 3) in March 2017, Scott purchased a $1,310,000 Sunseeker yacht, and routed all of the funds from one of the Fenero Fund bank accounts, to his attorney's bank account, and on to the seller; 4) in September 2017, Scott purchased a $3,765,000 residence located at 31 Dale Avenue, Hyannis Port, MA. In making that purchase he again routed a portion of the money directly from one of the Fenero Fund bank accounts, through his lawyer's bank account, and then into a client trust account for the seller. Scott routed an additional portion of the money for the purchase directly from the Cayman Island bank account of the general partner of the Fenero Funds, "MSS International Consultants BVI Ltd." ("MSSI BVI"), through his lawyer's bank account, and on to the seller; and 5) in November 2017, Scott purchased (along with a third-party) another residence located at 105 Sunset Lane, Barnstable, MA by routing his share of the purchase price through a MSSI BVI Cayman Island bank account, to his lawyer, and then on to the seller.

[5] The Government inadvertently did not include Appendices A and B in its forfeiture motion, but has attached both of them here.

**IV.    The Government's Request Regarding the Forfeiture of Substitute Assets is Not
Premature**

        In Scott's final argument, he urges this Court to delay its finding regarding substitute
assets on the basis that the "the Government's interest in substitute assets . . . vests only when the
Court enters a judgment of conviction." (Scott. Opp. at 18).[6]  Scott's argument is misplaced and
there is no need for further delay in determining what substitute assets are subject to forfeiture.

        Scott first argues that the Government's application to seize substitute assets is premature
because the Government's interest in the substitute assets has not vested.   But whether the
Government's interest in substitute assets has vested is irrelevant to the Court's entry of a
preliminary order of forfeiture as to those substitute assets, which is governed solely by the
requirements of Section 853(p) and Federal Rule of Criminal Procedure 32.2.   Section 853(p)
contains no separate time limitation or requirement of entry of a judgment of forfeiture for
substitute assets as distinct from forfeiture of tainted property, and Rule 32.2 states that the
forfeiture of substitute assets may be ordered "at any time."  Rule 32.2(e)(1).  The cases cited by
Scott regarding the vesting of the Government's interest relate to pretrial restraint of substitute
assets, not their post-trial forfeiture or restraint, and so have no bearing here.  Indeed, some courts
have held that the Government's interest vests only at the time of the entry of the preliminary order
of forfeiture itself.   *See United States v. Egan*, 654 F. App'x 520, 521 & n.1 (2d Cir. 2016)
(assuming that the government's interest vests, "at the very latest, upon entry of [a preliminary]
order of forfeiture concerning that property").   Necessarily, if entry of such an order may itself be
what causes the Government's interest to vest, the vesting of that interest cannot be a pre-requisite
for entry of the order.  The Court is thus fully empowered to determine: 1) whether the Government
has met the statutory requirements for the forfeiture of substitute assets under 21 U.S.C. § 853(p);
and if so, 2) whether certain assets identified by the Government are subject to forfeiture as
substitute assets.

        On the first issue, Scott argues that the Court has failed to meet the statutory requirements
of Section 853(p) because the Government cannot show that that it has been "unable to locate or
obtain the specific proceeds of the defendant's offenses." (Scott Opp. at 18-19).  Scott is wrong.
Section 853(p) provides several ways to establish that the Government is entitled to forfeit
substitute property, only one of which Scott has addressed.  For example, the Government has
clearly shown that Scott transferred a substantial portion of the funds that he laundered through
the Fenero Funds to a number of third parties, many of which held foreign bank accounts.  (*See*,

---

[6]  Scott also opposes the Government's motion for a post-conviction restraining order against
Scott.  At the outset, the Government rejects Scott's assertion that it directed UBS to block Scott
from accessing certain UBS accounts or otherwise engaged in any improper conduct related to
those accounts.  Further, even if the Court were to conclude that UBS's decision to restrain Scott's
funds was improper, the funds would still be subject to forfeiture at this stage.  *See, e.g., United
States v. Cosme*, 796 F.3d 226, 236 (2d Cir. 2015) (noting that "it is settled law that 'even when
the initial seizure is found to be illegal, the seized property can still be forfeited'") (internal
citations omitted).  Finally, given that sentencing is presently scheduled in just two weeks, the
Government's request to enter a restraining order is effectively moot and can be more appropriately
resolved at this stage through the Court's imposition of forfeiture at sentencing.

e.g., GX 2627).  Among other transactions, Scott sent over €190 million to third parties in the United Arab Emirates, over €65 million to third parties in Bulgaria, and approximately $30 million to a third party in Hong Kong.  (*Id.*).  The Government is accordingly entitled to substitute assets in this case.  *See* 21 U.S.C. §§ 853(p)(1)(A) and (B) (forfeiture of substitute assets is authorized where either the funds cannot be located upon the exercise of due diligence *or* the property has been "transferred or sold to, or deposited with, a third party[.]").

Once the Court has found that the Government is entitled to forfeit substitute assets from Scott, the next question is whether certain assets identified by the Government are subject to forfeiture.  The Government is presently aware of the specific substitute assets listed in Appendix B, and Scott has offered no asset-specific grounds on which any of those assets are not subject to forfeiture.  Accordingly, all of them should be ordered forfeited, as set out in the Government's proposed Preliminary Order of Forfeiture.  When the Government has established the forfeitability at or before the time of sentencing, as it has here, there is no legal basis or practical reason to defer the forfeiture of substitute assets until a later time, rather than ordering them forfeited along with the forfeiture of tainted assets, and entry of a money judgment, all of which will become final at the time of sentencing and entry of the judgment.

Very truly yours,

AUDREY STRAUSS
Acting United States Attorney

By:  _____/s/_____

Christopher J. DiMase / Nicholas Folly
Assistant United States Attorneys
(212) 637-2433 / (212) 637-1060

Cc:  David Garvin, Esq. (via ECF)
     Arlo Devlin Brown, Esq. (via ECF)

**Appendix A**
Subject Accounts and Subject Property

**Subject Accounts**

| Bank | Account No. | Account Name |
|------|-------------|--------------|
| Iberia Bank | 85079788 | Nicole J. Huesmann PA |
| DMS Bank | 40077102 | MSS International Consultants |
| DMS Bank | 40077100 | MSS International Consultants |
| FirstCaribbean International Bank | 10462701 | MSS International Consultants |
| FirstCaribbean International Bank | 10465454 | DRP Holdings Ltd BVI |
| FirstCaribbean International Bank | 10465343 | MSS Marine Group |
| FirstCaribbean International | 10463883 | EGD Investment Ltd |
| FirstCaribbean International Bank | 10465346 | Mumbelli Group Holding |
| RBC Dominion Securities Global Ltd. | 2450478611 | HFT Holding Limited |
| Dreyfus Sohne & Cie AG | CH3508565559929606901 | Mark S. Scott |
| Cooperative Bank of Cape Cod | 9190041054 | Mark S. Scott and Lidia V. Kolesnikova |
| Northern Trust Company | 2840912613 | Mark S. Scott PL |
| Northern Trust Company | 2840909434 | Mark S. Scott |
| Northern Trust Company | 43-98797 | Mark Stanley Scott |
| UBS Financial Services | PWB1979 | Mark S. Scott, P.L. |
| UBS Financial Services | PWA9666 | Mark S. Scott and Lidia Kolesnikova |
| UBS Financial Services | PWA5493 | Mark S. Scott 2017 Trust |
| Wells Fargo Advisors | 4842-9048 | Mark S. Scott 2017 Trust |
| RBC Private Counsel (USA) Inc. | 3752442214 | Mark S. Scott 2017 Trust |
| RBC Private Counsel (USA) Inc. | 3756283317 | Mark S. Scott 2017 Trust |
| J.P. Morgan Chase Bank | 339656032 | James Nobles Esq. P.C. |

**Cars and Yacht**

| Description | VIN / Hull Nos. |
|-------------|-----------------|
| 2017 Sunseeker Predator yacht | TAIMA |
| 2017 Red Porsche 911 4S Turbo | WP0CD2A95HS178187 |
| 2018 White Porsche 911 GT2 RS | WP0AE2A91JS185471 |

**Personal Property**

| Description |
| --- |
| Ring with alleged diamond seized on or about September 5, 2018 from 133 Sunset Lane Barnstable, Massachusetts 02630 |
| Panerai Pam 582 Clock seized on or about September 5, 2018 from 133 Sunset Lane Barnstable, Massachusetts 02630 |
| Panerai Pam 585 Clock seized on or about September 5, 2018 from 133 Sunset Lane Barnstable, Massachusetts 02630 |
| Panerai Pam 583 Clock seized on or about September 5, 2018 from 133 Sunset Lane Barnstable, Massachusetts 02630 |
| Panerai Pam 584 Clock seized on or about September 5, 2018 from 133 Sunset Lane Barnstable, Massachusetts 02630 |

**Real Property**

| Address |
| --- |
| 31 Dale Avenue, Hyannis Port, MA 02601 |
| 105 Sunset Lane, Barnstable, MA 02630 |
| 133 Sunset Lane, Barnstable, MAs 02630 |
| 600 Coral Way, Suite/Floor 12, Segovia Tower, Coral Gables, FL 33134 |

### Appendix B
Substitute Assets (Bank Accounts)

| Account Name | Financial Institution | Account No. |
|---|---|---|
| Mark S. Scott 2017 Trust | UBS | PW XXX53 (converted to Account No. 1X B0014 YA) |
| Mark S. Scott 2017 Trust | UBS | PW XXX31 (converted to Account No. 1X B0031 YA) |
| Mark S. Scott College Fund 529 | UBS | Account No. PW B4734 03 |
| Mark S. Scott | UBS | Account No. PW A5494 03 |

Substitute Assets Already Seized

| Asset Description | Date Seized | Location of Seizure |
|---|---|---|
| One Heckler & Koch 40 MM gun, Serial No.: 219-004106 | September 5, 2018 | 600 Coral Way, Suite/Floor 12, Segovia Tower, Coral Gables, Florida 33134 |
| One Heckler & Koch 45 MM gun, Serial No.: HKU004967 | September 5, 2018 | 600 Coral Way, Suite/Floor 12, Segovia Tower, Coral Gables, Florida 33134 |
| One Desert Eagle SOAE, Serial No.: DK0038257 | September 5, 2018 | 600 Coral Way, Suite/Floor 12, Segovia Tower, Coral Gables, Florida 33134 |
| One Smith and Wesson, Serial No.: DJW0604 | September 5, 2018 | 600 Coral Way, Suite/Floor 12, Segovia Tower, Coral Gables, Florida 33134 |
| One Beretta Shotgun and leather case | September 5, 2018 | 600 Coral Way, Suite/Floor 12, Segovia Tower, Coral Gables, Florida 33134 |
| One Luminor Panerai P068/400 BB1577049 | September 5, 2018 | 600 Coral Way, Suite/Floor 12, Segovia Tower, Coral Gables, Florida 33134 |
| One Black Hermes Birkin Bag | September 5, 2018 | 600 Coral Way, Suite/Floor 12, Segovia Tower, Coral Gables, Florida 33134 |
| One Orange Hermes Birkin Bag | September 5, 2018 | 600 Coral Way, Suite/Floor 12, Segovia Tower, Coral Gables, Florida 33134 |
| One Black Hermes Purse | September 5, 2018 | 133 Sunset Lane Barnstable, Massachusetts 02630 |
| One Brown/Tan Hermes Purse | September 5, 2018 | 133 Sunset Lane Barnstable, Massachusetts 02630 |
| One Green Hermes Purse | September 5, 2018 | 133 Sunset Lane Barnstable, Massachusetts 02630 |