UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                      :

                                                               :

     - v. -                                               :

                                                               :   S10 17 Cr. 630 (ER)

MARK S. SCOTT,                                        :

                                                               :

           Defendant.                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## GOVERNMENT'S MEMORANDUM
## IN OPPOSITION TO DEFENDANT'S SUPPLEMENTAL MOTION
## FOR A NEW TRIAL


AUDREY STRAUSS
United States Attorney
Southern District of New York


Nicholas Folly
Michael McGinnis
Assistant United States Attorneys

*- Of Counsel -*

## <u>TABLE OF CONTENTS</u>

BACKGROUND .................................................................................................... 1

I.   THE GOVERNMENT'S CASE AT TRIAL ............................................... 2

    A.  The OneCoin Scheme ........................................................................... 3

    B.  Scott's Knowing Participation in the Money Laundering Conspiracy ......... 6

    C.  The Testimony of Konstantin Ignatov ...................................... 13

    D.  Impeachment of Ignatov ........................................................ 15

II.   ███████████████   DISCLOSURE CONCERNING IGNATOV ...................... 16

III.   APPLICABLE LAW ....................................................................... 17

    A.  Rule 33 ......................................................................... 17

    B.  Motions for a New Trial Based on Perjury of a Government Witness ......... 18

IV.   SCOTT'S SUPPLEMENTAL MOTION FOR A NEW TRIAL SHOULD BE
    DENIED ................................................................................ 20

    A.  Ignatov's Perjured Testimony Was Not Material to the Jury's Verdict .......... 20

    B.  The Government Presented Overwhelming Evidence Independent of Ignatov's
    Testimony Establishing Scott's Guilt ................................................ 26

CONCLUSION ..................................................................................... 30

## **BACKGROUND**

The Government submits this brief in opposition to Scott's Supplemental Rule 33 Motion ("Supplemental Motion"), filed under seal on August 23, 2021.[1]  In his Supplemental Motion, Scott argues that he is entitled to a new trial under Rule 33 on the basis that cooperating witness Konstantin Ignatov testified falsely about throwing his laptop computer (the "Laptop") into a trash bin in Las Vegas in February 2019.  (Tr. 206).  Scott further alleges that the Government purposefully withheld this information from the defense.  To be clear, the prosecutors in this case first learned of these serious allegations only when Scott filed his Supplemental Motion.  Since then, the Government has investigated the allegations raised by the letter.  Specifically, the Government has spoken with Ignatov regarding the incident (who immediately admitted to the perjury) and to the U.K.-based law enforcement agent who first learned of the allegations against Ignatov.  The Government immediately turned over the notes from those interviews to the defense.

As explained below, Scott's Supplemental Motion should be denied for two reasons: (1) the perjured testimony, amounting to only a small piece of Ignatov's testimony and regarding an event that took place *after* the charged conspiracy and was unrelated to Scott's guilt, was not material to the jury's verdict; and (2) Ignatov's full testimony had limited relevance to the key issue in dispute at trial, i.e., Scott's knowing participation in the charged criminal conspiracies.  The Government presented overwhelming independent evidence of Scott's guilt, consisting of emails, chat messages, bank records, travel records, other witness testimony, and recordings, that supported the jury's verdict on that issue (and all of the other elements of the charged offenses).

---

[1] In light of defense counsel's sealed filing of the Supplemental Motion, the Government is filing this opposition brief under seal and will confer with defense counsel about whether they would consent to the Government filing a redacted version of its brief on ECF.

The jury's verdict should stand.

## I.     The Government's Case at Trial

At trial, the Government conclusively demonstrated the existence of an international wire fraud scheme (the "OneCoin Scheme") involving a purported cryptocurrency known as OneCoin (which Scott did not contest), as well as Scott's knowing participation in a massive conspiracy to launder the proceeds from that scheme (which Scott did contest).  The jury heard testimony from seventeen witnesses, including but not limited to: Ignatov; victims of the OneCoin Scheme; a money laundering expert; employees from United States banks that were defrauded by Scott; a partner from Scott's former law firm, Locke Lord LLP; a former managing director at a U.K. fund administration firm that was used by Scott to unwittingly launder OneCoin Scheme proceeds; a financial intelligence analyst who traced the criminal proceeds; and a federal agent from the Internal Revenue Service – Criminal Investigations who was involved in a search and seizure of Scott's property and participated in Scott's post-arrest interview, in which Scott lied repeatedly about his involvement with OneCoin and its leader, Ruja Ignatova ("Ruja").  The Government's evidence also included numerous emails, including emails between Scott and key members of the OneCoin Scheme such as Ruja, Irina Dilkinska, and Gilbert Armenta.   In addition, the Government's evidence included bank records and charts which detailed Scott's network of offshore bank accounts and depicted his laundering of OneCoin Scheme proceeds, and his own criminal proceeds.

Taken together, the evidence made clear that Scott had custom-built an elaborate money laundering vehicle for Ruja—fake investment funds—which he used to launder nearly $400 million of OneCoin Scheme proceeds on her behalf.  In exchange, Scott was paid over $50 million for his role as Ruja's money launderer.  The key issue in dispute at the trial was whether Scott

knew that the nearly $400 million that he had received from Ruja was derived from criminal activity.  As explained in more detail below, while Ignatov's testimony provided context for the jury to understand the OneCoin Scheme, Ignatov's testimony had little bearing on the issue of Scott's knowledge of the criminal nature of the proceeds.

### A.  The OneCoin Scheme

The Government's evidence overwhelmingly demonstrated the existence of the OneCoin Scheme at trial.  In the face of such overwhelming evidence, Scott did not contest the existence of the OneCoin Scheme.  (*See, e.g.*, defense opening, Tr. 62 (conceding the jury was "going to hear the FBI uncovered a massive fraud scheme"); defense closing, Tr. 1904 ("OneCoin is a scam. We're not going to fight that battle. We said that in the opening statement. Sounds like it's a scam.").  The Government's evidence showing that OneCoin was a scam was overwhelming.

First, the Government showed through contemporaneous emails, among other things, that: (1) Ruja and co-founder Sebastian Greenwood conceived of and built the OneCoin business fully intending to use it to defraud investors; (2) contrary to OneCoin's public representations, the value of OneCoin was determined internally and not based on market supply and demand; and (3) contrary to OneCoin's public representations, OneCoins were not in fact mined.  For example, on June 11, 2014, Ruja sent an email to Greenwood titled "The concept and the payplan of trashy coin," which concerned the OneCoin business plan:

> **I am in and no way back now**.  It might not be [something] really clean or that I normally work on or even can be proud of (except with you in private when we make the money) – but . . . I am especially good in this very borderline cases [sic], where the things become gray – and you as the magic sales machine – and me as someone who really can work with numbers, legal and back you up in a good and professional way – we could really make it big – like MLM meets bitch of wall street ;-)

* * *

3

> Your main sales argument is: **after 2 splits a member makes out of 5.000 USD 25.000 USD.  You should be able to sell this** ☺ . . . I also added an **Extra Bonus for all members joining the Presales** . . . they can do actually 3 splits.  Which means that they will actually **have 10x their investment**.  2 splits is 5x your money.  So of course, everybody who is greedy will go in with 5.000 USD.

(GX 2101) (bold in original).  This email showed that Ruja and Greenwood developed OneCoin's unsustainable compensation structure for the purpose of enticing people to invest in OneCoin trader packages, including the false promise that investors would make a five-fold or ten-fold investment return.

In another email on or about August 9, 2014, Ruja sent Greenwood her thoughts on an "exit strategy" for OneCoin.  The first option that Ruja listed was, "Take the money and run and blame someone else for this (standard approach, see Wenyard)."  (GX 2102).  This email laid bare Ruja and Greenwood's intent, from the beginning, to defraud OneCoin investors.

Another set of emails demonstrated that, contrary to OneCoin's public representations, the value of OneCoin was determined internally and was not based on market supply and demand.  For example, on or about March 21, 2015, Ruja wrote an email to Greenwood, in which Ruja stated: "We can **manipulate the exchange** by simulating some volatility and intraday pricing."  (bold in original).  (GX 2110).  This email referred to the intention of Ruja and Greenwood to manipulate the price of OneCoin on OneCoin's private exchange to create the false appearance that the value fluctuated based on trading.

In another series of emails, Greenwood and Ruja discussed the fact that OneCoin was not actually engaged in mining, like a legitimate cryptocurrency, but was instead tricking investors into believing it was.  For example, in an email on or about August 11, 2014, Greenwood emailed Ruja with a set of steps to build the OneCoin currency, including, among others, "Get members to think that they are mining their OneCoin via crunching (exchanging) tokens for

4

OneCoin." (GX 2103). In an email the following day, on or about August 12, 2014, Greenwood emailed Ruja, "The so called 'mining' of coins is a concept that is very familiar in the industry and a story we can sell to the members." (GX 2104). In an email on August 13, 2014, in addressing the pros and cons of the proposed plan for OneCoin, Greenwood emailed Ruja, "We are not mining actually—but telling people shit." (GX 2106). In an email a year later, Ruja wrote to Greenwood, in an email titled "I am afraid this is an issue," "This is the implication from the big sales 4 weeks ago. 1.3 [billion] fake coins. We are fucked, this came unexpected [sic] and now seeds serious, serious thinking."

In another email, Ruja indicated to Greenwood how guilty she felt about perpetrating the OneCoin Scheme, writing that, "I am personally very unhappy—and feel that the future, regardless of what happens with onecoin is not really an exciting one—and nothing to be proud of. I have done mayn [sic] bad things in my life, many stupid things, many things that were borderline—but nothing that I was partly ashamed of—and it actually destroys part of who I am. The damage is done. I have to somehow live with it. But it is something that really upsets me[.]" GX 2107.

*Second*, the Government also presented testimony at the trial from victims in the United States who were defrauded by the OneCoin Scheme. For example, victim William Horn testified at the trial about being induced to invest tens of thousands of dollars on the belief that OneCoin was going to be bigger than Bitcoin. (Tr. 67-68). Other members of Horn's family, including his brothers, invested thousands of dollars in OneCoin as well. (Tr. 97). Horn and his brothers did not receive any of their investments back. (*Id.*). Another victim, Linda Cohen, also testified about being swindled by the OneCoin Scheme. Cohen learned about OneCoin from her son, who told her that it was a new currency that was going up in value. (Tr. 790). Cohen invested nearly $30,000 in OneCoin. Cohen has never been able to exchange OneCoin into cash, any other

currency, or use it to purchase anything of value.  (Tr. 807).  As a result of her investment in the OneCoin Scheme, Cohen has had to delay her retirement.  (Tr. 810).

Ignatov also testified regarding the fraudulent nature of OneCoin at the trial.  Among other things, Ignatov testified about false representations that OneCoin made to public, including that: (1) OneCoin was going to have a public exchange where OneCoin investors could buy and sell OneCoins for fiat currency; (2) OneCoins could be used as a global currency; (3) OneCoin would have a foreign exchange (also known as "FX" or "forex") market where OneCoin investors could trade their OneCoins and other real currencies such as Euros and dollars for other currencies; and (4) OneCoin would have an investment fund where OneCoin investors could invest OneCoins in real assets.  (Tr. 181-83).  Ignatov also testified that the value of OneCoin's was not determined by supply and demand, contrary to OneCoin's public representations that it was.  (Tr. 134).

### B.  Scott's Knowing Participation in the Money Laundering Conspiracy

At noted above, the key issue at trial was whether Scott knew that the money he received in the so-called Fenero Funds was derived from criminal activity (i.e., the OneCoin Scheme).  The Government presented overwhelming evidence that Scott knew that the money was from criminal activity.  That evidence, described in detail below, was almost entirely independent of Ignatov's testimony at the trial.

*First*, the Government presented evidence that the so-called Fenero Funds were not legitimate investment funds at all, but rather were used as an elaborate front company to successfully "clean" Ruja's criminal proceeds, by disguising them as "investments" and concealing two main things: (1) that the money in the funds came from OneCoin; and (2) that the money belonged to Ruja.  The evidence showing that the Fenero Funds were fake investment funds designed to disguise OneCoin Scheme proceeds as investments, included the following, among

other evidence:

- On or about October 27, 2016, Scott emailed Ruja, stating among other things, "Also, you don't need all of the entities anymore for your purposes. Much smoke and mirror for the set-up. Can be combined now." (GX 4104). The email, combined with the other evidence below, demonstrated Scott's understanding that the Fenero Funds were an elaborate façade ("smoke and mirror[s]") designed to hide the connection to Ruja and OneCoin.

- Evidence showing that the Fenero Funds mission statement that Scott sent to banks when opening accounts for his fake investment funds was copied and pasted from other websites. (GXs 3302, 3305, 1411). In addition, Scott's so-called "track record" in the Fenero Funds mission statement was plagiarized from other websites. (GXs 3301, 1411). Scott also falsely represented in the mission statement that he had lined up a "small investor base of wealthy families and middle market companies," and that the initial investors in Fenero had been represented legally by Scott ranging from three to twelve years and had closed in excess of $2,100,000,000 in transactions under Scott's business and legal guidance. (GX 2201). Those representations were all false: the evidence overwhelmingly established that all of the funds that were invested in the Fenero Funds were derived from the OneCoin Scheme and belonged to one "investor," Ruja.

- Scott's and Ruja's discussions about the Fenero Funds had nothing to do with investments; rather, they discussed successfully conducting financial transactions on Ruja's behalf by hiding the connection to OneCoin and Ruja. For example, in an email from Ruja to Scott on January 31, 2016, Ruja wrote: "Whatever we do. Think about that structure[,] needs to be able to bank and get accounts." (GX 1032). In a subsequent email, Scott confirmed his understanding of the true purpose behind the Fenero Funds, i.e., disguising the transfers of OneCoin fraud money as investments, emailing Ruja: "I am setting up your transfers as investments into registered investment funds off-shore." (GX 1041). Other email discussions between Scott, Ruja, Dilkinska, and others, made it obvious that Scott was not managing a real investment funds; notably, in those emails, Scott did not discuss ideas about potential investments, investment strategy, or returns on Ruja's investment. (*See, e.g.*, GXs 4104, 1056-T).

- Scott made it clear in emails that he understood that there should not be any connection between the money coming into the Fenero Funds and OneCoin. For example, when choosing the name for the investment fund, Scott explained that it "Can be anything…Anything not associated with sales or [OneCoin] should be as neutral as possible. I will give all entities that are holding funds very sterile names." (GX 1042). In another email to co-conspirator David Pike, Scott wrote, "The possible link to [OneCoin] will kill this for us. I will terminate the opportunity slowly and for several other reasons…"

- The evidence demonstrated that Scott knew that shell companies, such as B&N

7

Consult, International Marketing Strategies ("IMS"), Star Merchant, Zala Group ("Zala"), and Fates Group ("Fates," and collectively, the "Shell Companies"), were being used to disguise the nature and source of the money that was being transferred into the Fenero Funds.  Specifically, the Shell Companies were the "investors" in the Fenero Funds on paper.  In one of the more outlandish examples demonstrating that the Shell Companies were not legitimate companies/investors, Scott was informed that the director and ultimate beneficial owner of "Star Merchant," an entity that purportedly invested 95 million Euros in the Fenero Funds, did not have his own house or a personal bank account.  (GX 1178).  Another fake investor in the Fenero Funds was "B&N Consult," an entity purportedly owned by co-conspirator Irina Dilkinska, who worked at OneCoin, and frequently emailed Scott from a OneCoin email address.  The evidence showed that Scott knew that Dilkinska was in fact an employee at OneCoin, who helped Scott coordinate the money laundering operation.  (*See, e.g.*, GXs 1388, 1391, 2262).  Scott also knew that the money from Shell Companies IMS, Zala, and Fates, was derived from OneCoin.  (*See, e.g.*, GXs 1391, 2281).  Finally, Scott knew that the real owner of all of these funds was Ruja.  (*See, e.g.*, GX 1434).

- Scott used fake loans in order create a paper trail for the transfer of OneCoin Scheme proceeds out of the Fenero Funds on behalf of Ruja.  For example, in one email, Scott wrote to Dilkinska, "There was a 5 million Euro distribution made as per the boss a few weeks ago.  We need to paper this deal for our administer."  (GX 1388).  Scott attached an amended loan agreement to his email for Dilkinska to sign.  (*Id.*).  As the Government's money laundering expert at trial explained, "Papering is a term given to the creation of business documents to justify the transfer of money."  (Tr. 479).  The expert then provided the specific example of creating loan documentation.  That is precisely what Scott did here: created a loan agreement after the fact in order to justify the transfer of criminal proceeds.

*Second*, Scott was told, in elaborate detail, that OneCoin was a fraud scheme, and that it was under criminal investigation.  In April 2016, before Scott had received any of the OneCoin Scheme funds into Fenero, Scott was sent an email by Dilkinska that contained a link to an article by a CPA based in the United States, explaining in detail all the ways that OneCoin appeared to be a fraud scheme.  (GXs 4109, 4109-A).  Among other things, the CPA explained his professional opinion that "OneCoin [was] a sophisticated example of a classic pyramid and/or Ponzi scheme with just enough sheen of respectability and legitimacy to make it a long-ish con."  (GX 4109-A). The article also pointed out some obvious features that indicated that OneCoin was a fraud scheme: 1) OneCoins were entirely unusable—"no known entity makes a market for OneCoin or offers the

ability to cash out to fiat currency;" and 2) the OneCoin multilevel marketing program appeared to be mathematically unsustainable.  (GX 4109-A).  Scott was also informed that there was a history of OneCoin's bank accounts being blocked around the world, and that there was a City of London Police investigation into OneCoin.  (GX 4102).

*Third*, Scott took extraordinary steps, including forging documents, lying to a fund administrator named Apex, and lying to law enforcement, in order to cover up the link between the Fenero Funds and OneCoin.  With respect to Apex, Scott made numerous misrepresentations in response to questions that were raised by Apex regarding the Fenero Funds' investors, and the source of wealth for those investors.  In or about July and August 2016, Apex began conducting enhanced due diligence on the Fenero Funds.  (Tr. 607).  Among other issues that triggered the enhanced due diligence was a series of loans that Scott made to himself from the Fenero Funds in a short time frame, as well as suspicious transactions involving IMS and B&N, and a lack of clarity as to the relationship between IMS and B&N.  (Tr. 607).  During its due diligence, Apex attempted to obtain additional information on the source of wealth for the investors in the Fenero Funds.  (Tr. 607).  Around this same time period, in late July 2016, Scott inadvertently sent an email to Apex that contained a forwarded email from Irina Dilkinska, with Dilkinska's OneCoin email address.  (GX 2262; Tr. 613-614).  That same email also revealed that there was a connection between Dilkinska and another Fenero Funds investor, Star Merchant.  (Tr. 614).  Prior to that email, Scott had successfully covered up any connection between the purported investors in the Fenero Funds and OneCoin.  (Tr. 615).  Upon learning of the connection between the investors in the Fenero Funds and OneCoin, Apex held a series of emergency meetings and also made a number of notifications to government agencies.  (Tr. 617).

While Apex was conducting enhanced due diligence, Scott took a number of steps in an

effort to conceal the connection between the Fenero Funds and OneCoin, and to convince Apex that it should continue to transfer funds out of the Fenero Funds as requested by Scott.  Among other things, Scott and his co-conspirators (at Scott's direction) doctored letters of comfort on behalf of two lawyers; created and sent backdated wire instruction letters to Apex; and forged a set of agreements between IMS and B&N.  As to the doctored lawyer letters, Scott drafted fake letters of comfort on behalf of two different attorneys, and sent the letters to them with directions to put the letters on their letterhead, sign them, and send them on to Apex.  (GXs 1177 and 1175; Tr. 243).  The letters were intended to address Apex's concerns about the source of funds being transferred into the Fenero Funds on behalf of IMS, and the relationship between IMS and B&N. (GX 1177 at 5).  For example, one of the letters falsely stated, among other things, that "IMS and B&N collaborate on providing large sales and marketing companies in the direct sales industry with process and systems solutions and support" and that B&N had earned at least 130,000 Euros through its joint venture with IMS in the preceding twelve months (GX 1177 at 5).  Scott knew that these representations about the source of wealth for B&N and IMS were completely false. (*See, e.g.*, GX 1312).  In reality, the money that was transferred through these Shell Companies to the Fenero Funds belonged to Ruja Ignatova, and was derived from OneCoin.

As noted above, one of the concerns raised by Apex was the relationship between IMS and B&N.  To address this concern, and to justify the flow of funds into the Fenero Funds on behalf of those entities, Scott backdated wire instruction letters and forged a set of agreements between IMS and OneCoin, which were then sent to Apex.  As to the backdated wire instruction letters, Scott instructed other co-conspirators from OneCoin, including Irina Dilkinska, to sign a set of fake wire authorization letters that justified the transfer of tens of millions of Euros on behalf of B&N. Specifically, Scott instructed other co-conspirators, including Irina Dilkinska, that "It would also

10

be great if you could sign some of the letters with a different pen so they do not look so mechanically produced.  Maybe Irina [Dilkinska] can print them wherever she is and sign and scan them back to you one at a time.  Maybe you can sign others in the office with her automatic signature."  The fake wire instruction letters were then sent to Apex.  (GX 2270).  Scott also forged a set of two agreements between OneCoin and IMS, changing the fee that IMS was supposed to receive under the agreements from 1% in the original agreements, to 20% and 22% in the forged agreements.  (GX 1209).  The forged contracts were then sent by Scott to Apex.  (GX 2276).  The terms of the forged contracts appeared to be designed as an attempt by Scott to hide the true origin of the funds by providing support for the large volume of payments—purportedly for the purpose of licensing technology to OneCoin—made by the IMS Shell Companies to the Fenero Funds.

After receiving these materials from Scott, Apex continued to refuse Scott's request to transfer funds out of the Fenero Funds.  At that point, Apex had concluded that it had "been provided [by Scott] with fraudulent documents that hid the relationship with OneCoin." (Tr. 731).  In a final attempt to try to convince Apex to transfer funds out of the Fenero Funds, Scott demanded a phone call with Apex.  During the resulting call, Scott continued to lie to Apex about the underlying source of wealth for the money transferred into the Fenero Funds.  For example, Scott falsely claimed that the money was actually derived by and belonged to Irina Dilkinska, stating that Dilkinska was "inventing ways to, how should I say, to materially [U/I] access to potential buyers for those direct sales companies.  That's her biggest strength that she's doing here."  (GX 2302-TR).

In his post-arrest statement, Scott again lied to federal agents about his fake investment funds.  At the outset, Scott tried to continue the charade that his real "investors" were Dilkinska and Armenta.  Scott also doubled down on the biggest lie that he had peddled throughout the entire

11

conspiracy: when asked directly if OneCoin and Ruja had anything to do with Fenero or any other investment fund he was involved with, Scott flat out denied it.  (GX 601).  Scott's lies in his post-arrest statement demonstrated his clear understanding that he had been involved in a criminal conspiracy.

*Fourth*, Scott received more than $50 million from Ruja, an enormous sum of money that could only be explained through Scott's involvement in a criminal conspiracy.  Scott had no investment experience and earned Ruja next to no money, and yet, he was still paid over $50 million.  (GX 2628).  The only explanation for that type of fee was that Scott was willing to take the risk of engaging in criminal conduct and being caught and going to jail.  Ruja's willingness to pay Scott this fee, despite his lack of investment experience, and the minimal profit he earned for her, was also a clear signal to Scott that the funds were derived from criminal activity.  The evidence at trial also showed that Scott was obsessed with making money.  In one text message he wrote that he was trying to make 50 million dollars by age 50.  (GX 3025-S).  Indeed, Scott used his millions of dollars from the scheme to fund his lavish lifestyle.  His purchases made with OneCoin fraud proceeds included, among others: a $2,850,000 home located at 133 Sunset Lane, Barnstable, MA; a $3,765,000 residence located at 31 Dale Avenue, Hyannis Port, MA; an ownership interest in another residence located at 105 Sunset Lane, Barnstable, MA; a $245,269 Ferrari; a $218,898 2018 Porsche 911 GTRS2; a $119,529 2017 Porsche 911 Turbo; a $332,248 2016 Porsche 911R; a $1,310,000 Sunseeker yacht; over a hundred thousand dollars in luxury watches; and over two hundred thousand dollars in jewelry and luxury bags.  (GX 2620).  Scott also used OneCoin fraud scheme proceeds to pay off over $1,000,000 for a condo that he owned in Coral Gables, FL.

*Fifth*, communications sent by Scott's co-conspirators indicated that Scott was on the inside

12

of the criminal conspiracy.  For example, in an email sent by co-conspirator Frank Schneider to Ignatov, Schneider warned Ignatov that Mark Scott might be a highly placed U.S. informant.  (GX 3005-S).  Specifically, Schneider wrote, "There is a potential problem with Mark that you need to know.  When we saw the presentations that the US authorities gave to an international working group called Operation Satellite in January 2017 . . . The US knew about Fenero, the transfers to Ireland and presumably also the transfers to Dubai.  The presentations mentioned GA, SG, R . . . But there was no mention of MS, none.  There was a mention that the US had a highly placed informant.  R and I concluded that this may well be MS [Mark Scott]." (*Id.*).  This email made it clear that Scott was on the inside of the conspiracy, and was privy to incriminating information that other co-conspirators did not want him to share with law enforcement.

*Sixth*, Scott took steps throughout the conspiracy to conceal his criminal communications. Among other steps, Scott was unwilling to communicate through Skype, because it was "very unsafe," (GX 4041), and instead communicated with Ruja through a special "crypto cell" from Dubai.  (GX 1035).  Scott also indicated to his co-conspirators that they should be careful about putting certain communications in writing through email.  (GX 1110).  Scott's methods of communication and statements about such communication methods demonstrated that he had something to hide and that he knew he was doing something wrong at the time he was doing it.

### C.  The Testimony of Konstantin Ignatov

Ignatov, who was Ruja's brother and became one of OneCoin's leaders after she disappeared, testified at trial pursuant to a cooperation agreement with the Government.  Ignatov provided testimony on the following topics, among other things: (1) background testimony concerning OneCoin, the products offered by OneCoin, and multilevel marketing structure used by OneCoin, (*See, e.g.*, Tr. 173-81); (2) testimony concerning the fraudulent nature of OneCoin,

(*See, e.g.*, Tr. 164-67, Tr. 181-83); and (3) testimony concerning OneCoin's issues with banking, and a high-level explanation of how OneCoin solved those issues through the use of a network of money launderers, including Mark Scott.  (*See, e.g.*, Tr. 227-39).

Ignatov had limited direct interaction with Scott; he only met him once, had no conversations of substance with him, and primarily communicated with him about logistics for meetings and travel.  As noted by defense counsel in the Supplemental Motion, Ignatov also testified at trial about the one time he met Scott, in Sofia, Bulgaria.  Specifically, Ignatov explained that Scott traveled to Bulgaria to meet with Ruja (a fact corroborated by emails and travel records), and that Scott in fact met with Ruja and Dilkinska in the OneCoin office (the "Meeting").  (Tr. 246).  Ignatov did not attend the meeting, and was never told what was discussed at the meeting. (Tr. 305).  Ignatov also testified more generally that Scott was one of the main money launderers for OneCoin.  (*See, e.g.*, Tr. 130).

The focus of defense counsel's cross-examination of Ignatov was on establishing facts that Scott believed demonstrated his innocence.  For example, defense counsel elicited the following, among other testimony, during cross-examination:

- Scott impeached co-conspirator Dilkinska through the cross-examination of Ignatov.  For example, Scott elicited testimony that by April 2018 Ignatov had serious questions about Dilkinska's honesty.  (Tr. 301, 420-22).

- As noted above, Scott sought to establish the limited nature of the contact between Ignatov and Scott.  For example, Scott elicited testimony that Ignatov had only met Scott once, never spoke with Scott on the phone, never exchanged text messages with Scott, never exchanged WhatsApp messages with Scott, and only communicated with Scott through email.  (Tr. 302-03).  Scott also elicited testimony that Ignatov had never communicated with Scott over email about the Fenero Funds, OneCoin's blockchain, or anything beyond logistics concerning meetings between Scott and Ruja.  (Tr. 306).

- Scott also elicited testimony regarding the one time that Ignatov met Scott, including that Ignatov's role was limited to setting up the meeting.  (Tr. 303).  Scott also elicited testimony that no one had told Ignatov what was discussed during the

14

meeting between Dilkinska, Scott, and Ruja.  (Tr. 305).

- Scott elicited testimony from Ignatov that Ignatov had never seen any email communications between Scott and Greenwood or Ruja discussing any aspects of the OneCoin Scheme.  (Tr. 324-334).  Scott also elicited testimony from Ignatov that Ignatov did not have any knowledge as to whether Dilkinska ever told Scott that OneCoin was a fraud.  (Tr. 418).

- Scott elicited testimony demonstrating that when Ignatov joined OneCoin as an employee, he did not know that it was a fraud scheme.  (Tr. 345).  Further, Scott elicited testimony that Ruja never told Ignatov that OneCoin was a fraud scheme, and that Ruja had provided Ignatov with some assurances when he asked questions about OneCoin's blockchain and whether it was legitimate.  (Tr. 346).

- Scott elicited testimony that prior to Ruja leaving OneCoin in October 2017, Ignatov had believed that an audit of OneCoin had been a real audit, and that Ignatov also believed that OneCoin's blockchain was real.  (Tr. 350).

- Scott elicited testimony that while Ignatov was incarcerated (prior to cooperating), he had emailed family and friends to tell them that he was innocent.  (Tr. 361).

- With respect to Ignatov's understanding that Scott was a money launderer, Scott elicited testimony that that understanding was based on information that Dilkinska had told him.  (Tr. 404).  Scott also elicited testimony that Ignatov did not have personal knowledge as to certain things that Dilkinska discussed with him in text messages regarding Scott.  (Tr. 405-413).

- Scott elicited testimony that at the time Ignatov saw an issue of Forbes with Ruja on the cover, Ignatov believed it was real (as opposed to a paid promotion, which it turned out to be).  (Tr. 427).

In sum, Scott used much of his cross-examination of Ignatov to elicit testimony that was helpful to his defense.

### D.  Impeachment of Ignatov

In addition, during his testimony, Ignatov was heavily impeached regarding his lies to law enforcement, purported destruction of evidence, and commission of several federal felonies, including those that involved fraud and deception.  For example, Ignatov testified that when he entered the United States in February 2019, he was questioned by border patrol agents at the airport.  Ignatov admitted that he lied in answering the agent's questions about who he worked for

and the purpose of his visit.  (Tr. 206).  Ignatov also admitted that he again lied during his post-arrest interview "[a]bout almost everything."  (Tr. 208).  Finally, Ignatov admitted that he had participated in a conspiracy to commit wire fraud, a conspiracy to commit money laundering, and a conspiracy to commit bank fraud.  (Tr. 209).  Ignatov also explained that those crimes involved making false representations to investors in order to get their money.  (*Id.*).  Ignatov also confirmed his understanding that he was obligated to be truthful under the terms of his cooperation agreement, and that if he was not truthful in testifying, it would risk his cooperation agreement.  (Tr. 211).

Ignatov was also impeached during the course of cross-examination.  For example, defense counsel suggested through cross-examination that Ignatov was lying when he testified that Dilkinska had been present at the Meeting.  (Tr. 398 ("Q. Mr. Ignatov, Irina Dilkinska was not at that meeting with Mr. Scott was she?"); ("Q. She wasn't even in Sofia, was she?").

**II.     █████████████     Disclosure Concerning Ignatov**

Prior to Scott's filing of his Supplemental Motion on August 23, 2021, none of the prosecutors in this case had any knowledge regarding the false nature of Ignatov's testimony at trial regarding the disposal of the Laptop.  Scott's Supplemental Motion raised two allegations that the prosecutors in this case promptly investigated: (1) that Ignatov had testified falsely at trial that he had placed his Laptop in a paper trash bag with other trash items, took it to a trash bin on the Las Vegas strip, and threw it into a trash bin; and (2) that █████████ had informed an investigator at the City of London Police, who was on secondment from the Manhattan District Attorney's Office (the "Investigator"), about the false testimony in or around June 2021.  Upon learning of the allegations in Scott's Supplemental Motion, the prosecutors in this case took immediate steps to investigate them.

As to the allegation regarding Ignatov's false testimony, Ignatov admitted during a meeting

with law enforcement on August 25, 2021, that he had testified falsely regarding the Laptop. Specifically, Ignatov stated, consistent with ███████ statement to Scott's counsel, that Ignatov had given his Laptop to ██████ on the day they were supposed to leave the United States, with instructions to give the Laptop back to Ignatov when they arrived in Bulgaria.  However, Ignatov was arrested at the airport before departing from the United States.  Ignatov later learned that ██████ gave the Laptop to his mother in Bulgaria, who in turn gave it to Ignatov's girlfriend, who destroyed it.

As to ██████ claim that he had shared this information with the Investigator in June 2021, the prosecutors in this case also learned of the accuracy of this allegation.  Specifically, prosecutors spoke with the Investigator on August 25, 2021, who informed them that he had received this information from ██████ on or about June 29, 2021.  The Investigator spoke briefly with ██████ on that date, and gave ██████ instructions to put his information into an email.  ██████ sent the Investigator an email on that date that stated, among other things, that Ignatov had falsely testified about throwing away the Laptop in Las Vegas, and that Ignatov had in fact put the Laptop in ██████'s bag. (*See* Exhibit A, attached hereto).  The Investigator had planned to forward this email to the FBI, but regrettably forgot to do so.  The email was not shared with the prosecutors or any other U.S.-based members of the prosecution team until after Scott filed his Supplemental Motion.

III.   **Applicable Law**

A.  **Rule 33**

Rule 33 provides, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  Given the deference owed to a jury's verdict, however, this Court has cautioned that district courts should exercise their Rule 33 authority only "'sparingly' and in 'the most extraordinary

circumstances.'"  *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (citations omitted).

Thus, a motion for a new trial should not be granted unless, after evaluating "the entire record of

the trial," the District Court is left with a "real concern that an innocent person may have been

convicted."  *Id.*  "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand

would be a manifest injustice."  *Id.*; *accord United States v. Canova*, 412 F.3d 331, 349 (2d Cir.

2005) ("There must be a real concern that an innocent person may have been convicted"); *see also*

*United States v. Parkes*, 497 F.3d 220, 232 (2d Cir. 2007) (collecting cases).

### B.  Motions for a New Trial Based on Perjury of a Government Witness

In cases involving perjury by a Government witness, the law provides two different

standards for the granting of a new trial under Rule 33, depending on the Government's awareness

of the witness's perjury:

> Whether the introduction of perjured testimony requires a new trial depends on the
> materiality of the perjury to the jury's verdict and the extent to which the
> prosecution was aware of the perjury.  With respect to this latter inquiry, there are
> two discrete standards of review that are utilized.  Where the prosecution knew or
> should have known of the perjury, the conviction must be set aside if there is any
> reasonable likelihood that the false testimony could have affected the judgment of
> the jury. . . .  Where the government was unaware of a witness' perjury, however,
> a new trial is warranted only if the testimony was material and the court is left with
> a firm belief that but for the perjured testimony, the defendant would most likely
> not have been convicted.

*United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991); *accord United States v. Spinelli*, 551

F.3d 159, 166 (2d Cir. 2008); *United States v. Torres*, 128 F.3d 38, 48-49 (2d Cir. 1997) ("[I]f the

prosecution was unaware of the perjury, the defendant must . . . show that the jury probably would

have acquitted in the absence of the false testimony.").

Relatedly, this Court has found newly discovered evidence that amounts to additional

impeachment material to be immaterial where a witness was extensively impeached at trial.  *See,*

*e.g., United States v. Avellino*, 136 F.3d 249, 258 (2d Cir. 1998) ("where there has been disclosure

18

of an abundance of evidence of a witness's long history of brutality, rapacity, and mendacity, the belatedly disclosed evidence suggesting that the witness perjured himself by concealing additional crimes may be immaterial"); *United States v. Gambino*, 59 F.3d 353, 364-65 (2d Cir. 1995) (although information that had not been disclosed prior to trial was "quintessential" impeachment material, it was not material because the jury had a "fair opportunity to evaluate [the witness's] credibility" on the basis of other impeachment material); *United States v. Orena*, 32 F.3d 704, 717 (2d Cir. 1994) (in light of jury's knowledge of witness's "horrendous history of criminal activity," disclosure that witness might have engaged in other illegal activity "would not significantly have improved [defendant's] ability to undercut [witness's] credibility"); *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993) (rejecting claim that newly disclosed evidence of witness's involvement in three murders required a new trial where witness had been cross-examined extensively at trial about 19 other murders).

"[M]otions for a new trial based on the identification of perjured testimony should be granted only with great caution and in the most extraordinary circumstances." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). A court should not grant a new trial based on perjured testimony "unless the judge is prepared to answer 'no' to the following question: 'Am I satisfied that competent, satisfactory and sufficient evidence in this record supports the jury's finding that this defendant is guilty beyond a reasonable doubt?'" *United States v. Bell*, 584 F.3d 478, 483 (2d Cir. 2009) (quoting *Sanchez*, 969 F.2d at 1414). Further, "[i]n making this assessment, the judge must examine the totality of the case. All the facts and circumstances must be taken into account. An objective evaluation is required. There must be a real concern that an innocent person may have been convicted." *Id.* (quoting *Sanchez*, 969 F.2d at 1414).

19

## IV.    Scott's Supplemental Motion for a New Trial Should be Denied

In his Supplemental Motion, Scott argues that Ignatov's testimony "was absolutely central to the Government's evidence that Mr. Scott engaged in any kind of illegal activity," and thus the extraordinary remedy of a new trial is required under Rule 33.  (Supp. Mot. 2).[2]  Scott is wrong.

As set forth below, Ignatov's perjured testimony was not material to the jury's verdict; the testimony related to an event that took place long *after* the conduct alleged in the Indictment, and the testimony had nothing to do with Scott whatsoever.  Further, had the jury known Ignatov committed perjury on a collateral issue, it would not have discredited the rest of his testimony, which was heavily corroborated.  Finally, the Government presented overwhelming evidence independent of Ignatov's testimony concerning Scott's commission of the charged conspiracies. In particular, the Government presented overwhelming evidence outside of Ignatov's testimony regarding the key issue at trial, Scott's knowing participation in those conspiracies.  Indeed, the Government's summation focused almost exclusively on this independent evidence.

### A.  Ignatov's Perjured Testimony Was Not Material to the Jury's Verdict

As an initial matter, the Government does not contest that Ignatov committed perjury when he testified at Scott's trial that he: "put [the Laptop] into a paper trash bag with other trash items . . . took it to a trash bin on a busy place in the Las Vegas Strip and . . . threw it into the trash bin there."  (Tr. 206).[3]  As noted above, Ignatov has admitted to the Government that he actually

---

[2] In his Supplemental Motion, Scott also raises his prior argument that Ignatov lied at trial about Dilkinska's presence at the Meeting, and asserts that the Court erred in precluding Scott's admission of certain emails concerning Dilkinska.  The record on that issue remains unchanged and the Court properly denied Scott's written application to admit those emails at trial on the basis that they contained inadmissible hearsay.  Scott has offered no basis to revisit that decision here.  Notably, unlike the Laptop, Ignatov maintains that his testimony regarding the meeting was truthful and Scott has not raised any new evidence casting doubt on that testimony.

[3] Because the Government does not contest that Ignatov perjured himself—the only conceivable basis for a hearing here—Scott's alternative request for a hearing should be denied.  Scott's

gave the Laptop to ███████ in order for ███████ to transport it on the flight to Bulgaria.[4]
Nevertheless, as set forth below, Ignatov's false testimony was not material to the jury's verdict
and the record does not demonstrate that "but for the perjured testimony, the defendant would most
likely not have been convicted." *Wallach*, 935 F.2d at 456.

First, the perjured testimony had nothing whatsoever to do with the "facts relevant to the
merits of the case." *See United States v. White*, 972 F.2d 16, 20-21 (2d Cir. 1992) ("the importance
of such evidence [showing that the witness committed perjury] is, of course, lessened when the
perjury involves some collateral matter concerning the witness, rather than testimony about facts
relevant to the merits of the case"). Notably, Ignatov's testimony about the Laptop concerned an
event that took place long *after* the timeframe of the offenses charged in the Indictment, which
were alleged to have taken place from 2015 through 2018. Further, the subject matter of Ignatov's
false testimony (i.e., his supposed placement of the Laptop in a trash bin) had nothing to do with
the bank fraud and money laundering charges at issue at the trial. Indeed, the relevance of the
testimony was limited to impeachment; it showed that Ignatov had tried to avoid getting in trouble
by destroying evidence of his participation in the OneCoin Scheme.[5]

---

sudden request for a hearing on his other post-trial claims similarly should be rejected out of
hand. Scott never asserted that there was any basis for a hearing in the year-and-a-half period
since he filed his motion; further, his entirely conclusory allegation that the testimony of the
Government's financial analyst, Rosalind October, has been called into "serious question," is
unfounded and is an insufficient basis to justify a hearing.

[4] Scott does not allege, nor is there any evidence to support, that the Government knew of the
perjury at the time of the trial.

[5] Notably, given the similarity between what Ignatov actually did with the Laptop, and what he
claimed he did at trial, the defense was afforded a substantially similar opportunity to cross-
examine Ignatov on the bad conduct of attempting to hide evidence from law enforcement. The
important difference, as discussed at length below, is that the jury had no indication that Ignatov
lied about what he had done with the Laptop.

Furthermore, as described in detail above, Ignatov's testimony, in its totality, was corroborated by substantial other evidence, including, among other things: (1) emails between Ruja and Greenwood clearly demonstrating that OneCoin was a fraud scheme; (2) testimony from victims demonstrating the same; (3) contemporaneous text messages (and an email attachment) between Ignatov, Dilkinska, and Frank Schneider, that showed the link between Scott and OneCoin and Ruja, and indicated that Scott was an insider who participated in the criminal conspiracies; (4) extensive independent evidence entirely disconnected from Ignatov's testimony, showing that Scott was a knowing participant in the conspiracies; (5) Scott's post-arrest statement; (6) emails between Scott and Ignatov; (7) a recording of Gilbert Armenta that corroborated Ignatov's testimony that Ruja had been spying on Armenta and had learned he was cooperating with law enforcement; ; (8) travel records showing Scott's travel to Bulgaria, among other places; and (9) OneCoin promotional videos showing Ruja and Greenwood in the act of carrying out the OneCoin Scheme. *See United States v. Payne*, 63 F.3d 1200, 1210 (2d Cir. 1995) (concluding that disclosed evidence would not "likely have placed the government's evidence against Payne in such a different light as to undermine our confidence in the outcome of the trial"); *Romero v. United States*, 28 F.3d 267, 268 (2d Cir. 1994) (finding that "the remaining proof is sufficient to sustain [the defendant's] conviction"); *United States v. Spencer*, 4 F.3d 115, 119 (2d Cir. 1993) ("[T]he district court correctly found persuasive independent evidence supported the defendant's conviction.").

Second, the newly discovered evidence of Ignatov's additional bad conduct was cumulative of the extensive impeachment testimony and evidence concerning Ignatov that was introduced at trial. As set forth above, Ignatov testified at great length on both direct and cross examination about his prior crimes, including his participation in a years-long fraud scheme that

was built on a mountain of lies, as well as his lies to law enforcement when he was interviewed by border agents and during his post-arrest interview.  The perjured testimony would have therefore been cumulative and would not have had a material impact on the jury's evaluation of Ignatov's credibility or resulted in the jury's discrediting of Ignatov's entire testimony, particularly in light of how well corroborated he was at trial.

Nevertheless, in his Supplemental Motion, Scott argues that the evidence of Ignatov's perjury is not merely cumulative or impeaching, but "critical."  (Supp. Mot. 6) (citing *United States v. Wallach*, 935 F.2d 445, 458 (2d Cir. 1991), among other cases).   *Wallach* is wholly distinguishable from the instant case.

In *Wallach*, the Government's primary witness committed perjury in the trial of three defendants convicted of engaging in a pattern of racketeering activity in connection with their efforts to lobby for government contracts.  The witness testified that he previously had been involved in illegal gambling activities but had stopped his compulsive gambling one year before the trial.  After the trial, the parties learned that the witness had in fact gambled during that year. *Wallach*, 935 F.2d at 455.  The Second Circuit held that the Government "knew or should have known" about the perjury and ordered a new trial pursuant to that standard.  *Id.* at 457.  As noted above, there is no such allegation or supporting evidence here.  However, the Court also explained that, "even assuming that the government had no knowledge of the perjury at the time of trial, we believe that reversal would still be warranted."  *Id.* at 458.  The Court based its reasoning in *Wallach* on several key factors, none of which are present here.

First, the Court in *Wallach* concluded that the cooperator who had committed perjury was one of two witnesses at trial who had "provided the foundation upon which the prosecution built its entire case.  They offered the only testimony that directly linked the defendants with the

23

admittedly illegal conduct . . . their testimony was, to say the least, critical to the Government." *Id.* at 455.  In light of the centrality of the cooperator's testimony, the Court concluded, "as a matter of law that had the jury been aware of [the cooperator's] perjury it probably would have acquitted the defendants."  *Id.* at 458.  As explained below, there is no basis to reach that conclusion here.

Second, the Court focused on the fact that the Government, through its redirect and its closing argument, made much of the cooperator's motive for telling the truth.  For example, one of the prosecutors stated in closing: "The government submits to you that Mr. Moreno and Mr. Guariglia are credible witnesses and you should credit their testimony for a number of reasons. First of all, they have confessed to their crimes, they have admitted their crimes, and they have pleaded guilty to serious felony counts. They entered into cooperation agreements with the government and those agreements are in evidence....You heard the terms of those agreements when they testified.  If they perjured themselves, if they give false testimony in this trial, then the deal is off. . . . *That I submit gives them a powerful motive to tell the truth when they testified at this trial*."  *Id.* at 459 (emphasis in original).  The Court found that this type of vouching was one additional reason to set aside the jury's verdict.

Unlike the cooperating witness in *Wallach*, Ignatov was nowhere near the only testimony/evidence that directly linked Scott to the charged crimes, nor was Ignatov's testimony "essential to the government's case."  *Id.*  Ignatov's limited evidentiary value is of crucial importance in making the assessment of whether to order a new trial.  *See, e.g.*, *United States v. Biaggi*, 823 F. Supp. 1151, 1158 (S.D.N.Y. 1993), aff'd, 48 F.3d 1213 (2d Cir. 1994) (distinguishing *Wallach* in denying a motion for a new trial because the witness in question was not the centerpiece of the Government's case and the witness's testimony was corroborated by other evidence); *United States v. Karlov*, 534 F. App'x 38, 41 (2d Cir. 2013) (rejecting defendant's

argument, under *Wallach*, that cooperating witness was the sole witness to implicate him in the charged conspiracy, and finding that cooperator's continuing criminality as well as his perjury in not disclosing that activity would have been cumulative of other evidence of criminality and mendacity already before the trial jury, and insufficient to show that but for the perjured testimony, defendant would likely not have been convicted).

Indeed, Ignatov's testimony regarding Scott, was limited.  As defense counsel repeatedly pointed out during cross-examination, Ignatov knew next to nothing about Scott.  Ignatov met Scott once, had no incriminating conversations or communications with Scott, did not communicate at all with Scott on the phone, or through text messages or encrypted chat messages, and had no direct knowledge on the key issue in the case, *i.e.*, whether Scott knew that OneCoin was a fraud scheme.  For that very reason, Ignatov's testimony was barely mentioned by the Government in its summation arguments to the jury.  (*See* Tr. 1868-99, 1959-77).  And, as set forth below, there was overwhelming independent evidence not related to Ignatov's testimony that established Scott's guilt beyond a reasonable doubt.

Furthermore, the Government did not come close to vouching for Ignatov's credibility in arguments to the jury in a comparable way to *Wallach*.  In fact, as noted above, the Government barely referenced Ignatov is its closing arguments to the jury.  For all of these reasons, the new information concerning Ignatov was not material, was cumulative impeachment evidence, and would not have altered the jury's verdict.[6]

---

[6] Another point of distinction from *Wallach* is that in *Wallach*, the jury was *not* instructed to carefully evaluate the testimony of the cooperating witness who perjured himself, a fact that the Court noted in its opinion granting a new trial.  In this case, however, the jury was specifically instructed by the Court that accomplice testimony such as Ignatov's should be "scrutinized with special care and caution."  (Tr. 2022).

### B. The Government Presented Overwhelming Evidence Independent of Ignatov's Testimony Establishing Scott's Guilt

As set forth below, because of the overwhelming independent evidence of guilt, the defendant cannot establish that "but for the perjured testimony, the defendant would most likely not have been convicted." *Wallach*, 935 F.2d at 456; *see also United States v. Sanchez*, 969 F.2d 1409 (2d Cir. 1992) ("Even in a case where perjury clearly has been identified, however, we have indicated our reluctance to approve the granting of a new trial unless we can say that the jury probably would have acquitted in the absence of the false testimony."). In his Supplemental Motion, Scott ignores the key evidence establishing Scott's guilt independent of Ignatov's testimony.[7] The key issue in dispute at Scott's trial was whether Scott knew that the funds he received in the Fenero Funds were derived from unlawful activity. This was a case entirely about Scott's knowledge and Ignatov offered no direct evidence on that issue. As noted above, for that reason, the Government placed little reliance on Ignatov's testimony in its closing arguments to the jury. For the same reason, the Court should reject Scott's assertion that absent Ignatov's testimony, the other evidence establishing Scott's knowing participation in the conspiracies, and his guilt, was insufficient. *See generally United States v. Burden*, 600 F.3d 204, 214 (2d Cir. 2010)

---

[7] Notably, the defendant's submission argues that this court apply a four-part test. (*See* Def.'s Suppl. Mem. at 4.) and cites to *United States v. Bout*, 144 F. Supp. 3d 477 (S.D.N.Y. 2015). The test cited by the defendant is not the correct test and is not the test set forth in *Bout*. Crucially, the defendant omits the full test required in *Bout*. In *Bout*, the Court observed that a new trial requires a "five-part" showing, including "(5) the evidence would likely result in an acquittal." *Id.* at 483. While the Court in *Bout* later discusses a four-part test to determine whether a defendant meets the *threshold* requirements for a Rule 33 claim, the Court in *Bout* is clear that the defendant should be granted a new trial in situations where the Government is unaware of the perjury only if "'the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.'" *Bout*, 144 F. Supp. 3d at 484 (alterations in original) (quoting *Wallach*, 935 F.2d at 456). The full standard in *Bout* is consistent with the caselaw set out in *Wallach* and its progeny and cited in this opposition.

(noting that evidence must be construed in the "light most favorable to the government, giving credit to every inference the jury might have drawn in the government's favor").

As detailed above, *see supra* at 6-13, there was substantial, detailed testimony and evidence establishing that Scott knowingly participated in the charged conspiracies.  That evidence included the following categories of evidence: 1) evidence that the so-called Fenero Funds were not legitimate investment funds at all, but rather were used as elaborate front companies that were custom-built by Scott to clean Ruja's money by hiding that the money in the Funds came from OneCoin and that the money belonged to Ruja; 2) Scott was explicitly told that OneCoin was a fraud scheme, and that it was under criminal investigation; 3) Scott took extraordinary steps, including forging documents, lying to a fund administrator, and lying to law enforcement, in order to cover up the link between the Fenero Funds and OneCoin; 4) the outsized fees received by Scott, that totaled more than $50 million, particularly given Scott's lack of investment experience and the limited profit he made for Ruja, were indicative of the payment for Scott's participation in criminal activity; and 5) Scott took steps throughout the conspiracy, such as communicating through a special "crypto" phone, as well as other encrypted forms of communication, that indicated that Scott was trying to conceal his criminal communications.

The Government also introduced substantial evidence, fully independent from Ignatov's testimony, regarding Scott's participation in the bank fraud conspiracy.  The evidence at trial showed that to successfully transfer funds that were derived from the OneCoin Scheme, Scott and his co-conspirators lied to United States banks, some of which were federally insured.  For example, in or about July 2016, Scott disguised the transfer of OneCoin fraud proceeds on Ruja's behalf in the form of a fake loan to CryptoReal Investments Trust Ltd. ("CryptoReal"), which was allegedly purchasing an oil field from Barta Holdings Limited ("Barta").  Under the terms of the

purported deal, CryptoReal was going to borrow €30 million from Fenero.  (Tr. 597).  Scott and Martin Breidenbach represented to Apex that Breidenbach was the ultimate beneficial owner ("UBO") of CryptoReal.  (Tr. 597).  In an email dated July 12, 2016, Scott requested that Apex wire "an aggregate amount of 30 million dollars U.S.D. from our above-referenced account at DMS Bank to the party as follows, listed at DBS Bank Hong Kong, beneficiary Barta Holdings Limited, with an address in Hong Kong" and represented that the purpose of the wire was "Loan to CryptoReal Investment Trust LTD (BVI) Martin BVI)/Martin Breidenbach for acquisition of Madagascar Oil Field."  (Tr. 1477).  In reality, this money was not a real loan, but was being disguised as a loan so that the banks and financial institutions would authorize the transfer, which was actually on Ruja's behalf (not Breidenbach's).  (GX 1391).  The funds for this fake loan were ultimately transferred through a U.S. dollar correspondent bank account at Bank of New York Mellon in Manhattan.  (Tr. 1475).

In another set of transactions, Scott received approximately $10 million into the Fenero Funds from accounts in the name of "Fates Group," controlled by co-conspirator Gilbert Armenta in the United States.  Scott was aware that the funds transferred by Armenta from Fates Group in fact belonged to Ruja, were derived from the OneCoin fraud scheme, and were being disguised as investments into the Fenero Funds, so that Armenta and Scott could move them on Ruja's behalf. (*See* GX 1056-T). For example, one transfer of $5,000,000 from an Armenta-controlled United States bank account at Morgan Stanley in the name of Fates Group was disguised as investments of $3 million into "ZIIXI" and $2 million into "XIII."   (Tr. 844).   On the basis of this misrepresentation, Morgan Stanley believed that ZIIXI and XIII were investment funds and that the purpose of the wire transfers was to invest in those funds.  (Tr. 844 and 859).  In order to successfully transfer the funds to Scott's Fenero Funds, Armenta also falsely represented that the

Fenero Funds were a private equity firm that invested in, among other things, renewable energy, such as windmills.  (Tr. 859-860).

In sum, Ignatov's testimony had limited bearing on the key issue at trial—Scott's knowledge—and the Government presented overwhelming independent evidence at trial establishing Scott's knowledge, as well as all of the elements of the charged crimes.  This overwhelming independent evidence of knowledge dooms Scott's request for a new trial.  *See e.g. United States v. Anderson*, 689 F. App'x 53, 57 (2d Cir. 2017) (upholding denial of new trial because finding "[t]hat stray pieces of testimony over the course of a six-week trial may have been false does not show how Anderson would likely have been acquitted in the absence of such testimony."); *United States v. Lespier*, No. CRIM. 398CR102AHN, 2006 WL 533792, at *9 (D. Conn. Mar. 1, 2006), *subsequently aff'd*, 266 F. App'x 5 (2d Cir. 2008) (denying new trial where perjured testimony "was not the sole or essential source of evidence concerning [defendant's] order to kill . . . ."); *see also United States v. Devery*, 935 F. Supp. 393, 412 (S.D.N.Y. 1996), *aff'd sub nom. United States v. Torres*, 128 F.3d 38 (2d Cir. 1997) (declining to order new trial because "the fact that Torres lied to the government about money he concealed is clearly a collateral matter, stemming not from the money laundering charges brought against the defendants or from his dealings with the defendants as described at trial, but rather from his own relationship with the government as a cooperating witness after he had agreed to cooperate as a witness. The perjury does not contradict any factual aspect of the government's case.").

## **CONCLUSION**

For the foregoing reasons, Scott's Supplemental Motion should be denied.[8]

Dated:  New York, New York
        September 10, 2021

                                        Respectfully submitted,

                                        AUDREY STRAUSS
                                        United States Attorney

                             By:    s/_____
                                    Nicholas Folly / Michael McGinnis
                                    Assistant United States Attorneys
                                    (212) 637-1060 / 2305

---

[8] Given that the Government does not contest that Ignatov perjured himself—the only conceivable basis for a hearing here—Scott's alternative request for a hearing should be denied. Scott's sudden request for a hearing on his other post-trial claims similarly should be rejected out of hand.  Scott never asserted that there was any basis for a hearing in the year-and-a-half period since he filed his motion; further, his entirely conclusory allegation that the testimony of the Government's financial analyst, Rosalind October, has been called into "serious question," is entirely unfounded and is clearly an insufficient basis to justify a hearing.