UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- against -

MARK S. SCOTT,

                              Defendant.

No. S10 17 Cr. 630 (ER)

---

**Reply Memorandum of Law In Further Support of  Mark Scott's Supplemental Rule 33 Motion For A New Trial**

Arlo Devlin-Brown
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1046

David M. Garvin
Law Offices of David M. Garvin, P.A.
200 South Biscayne Boulevard
Suite 3150
Miami, FL 33131
(305) 371-8101

*Counsel for Mr. Scott*

# TABLE OF CONTENTS

I.  Background .................................................................................................... 1

II.  Argument ..................................................................................................... 5

    A.  The Rule 33 Standard .......................................................................... 5

    B.  Konstantin's Extensive Perjury Deprived Mr. Scott of A Fair Trial .................... 8

        1.  The Laptop Perjury ...................................................................... 8

        2.  The Dilkinska Meeting Perjury ...................................................... 9

        3.  The Impact of the Perjury On The Jury's Verdict .................................. 11

    C.  The Court's Erroneous Exclusion Of Evidence That Konstantin's Testimony Was False Provides A Further Basis For A New Trial. ..................... 18

    D.  A New Trial Is Also Warranted Due To The Government's Failure To Correct The False Testimony, Both Before and After Trial ................................. 22

    E.  In Addition To Granting A New Trial, The Court Should Order A Hearing To Develop Further Facts Relating To The Disclosure Failures ......................... 29

III.  Conclusion .................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alvarez v. United States,*
    808 F. Supp. 1066 (S.D.N.Y. 1992)................................................................................6, 13

*Cardoso v. United States,*
    642 F. Supp. 2d 251 (S.D.N.Y. 2009)...................................................................................25

*Kyles v. Whitley,*
    514 U.S. 419 (1995)............................................................................................................27

*Mutual Life Ins. Co. v. Hillmon,*
    145 U.S. 285 (1892)...............................................................................................18, 21, 22

*Napue v. Illinois,*
    360 U.S. 264 (1959)......................................................................................................6, 7, 23

*Perkins v. LeFevre,*
    642 F.2d 37 (2d Cir. 1981).............................................................................................2, 23

*Strickler v. Greene,*
    527 U.S. 263 (1999)............................................................................................................24

*Taylor v. Lombard,*
    606 F.2d 371 (2d Cir. 1979)...............................................................................................23

*U.S. v. Paulino,*
    445 F.3d 211 (2d Cir. 2006)..................................................................................................7

*U.S. v. Thomas,*
    981 F. Supp. 2d 229 (S.D.N.Y. 2013)..............................................................................7, 25

*United States v. Asaro,*
    No. 14-CR-26 (ARR), 2015 WL 5841804 (E.D.N.Y. Oct. 7, 2015) .....................................19

*United States v. Badalamenti,*
    794 F.2d 821 (2d Cir. 1986)...............................................................................................21

*United States v. Best,*
    219 F.3d 192 (2d Cir. 2000).....................................................................................18, 20, 21

*United States v. Bin Laden,*
    397 F. Supp. 2d 465 (S.D.N.Y. 2005)................................................................................27

*United States v. Cicale*,
   691 F.2d 95 (2d Cir. 1982)......................................................................................21

*United States v. DeJesus*,
   806 F.2d 31 (2d Cir. 1986)......................................................................................20

*United States v. Delvecchio*,
   816 F.2d 859 (2d Cir. 1987)...............................................................................20, 21

*United States v. Ferguson*,
   246 F.3d 129 (2d Cir. 2001)......................................................................................5

*United States v. Gil*,
   297 F.3d 93 (2d Cir. 2002).................................................................................7, 27

*United States v. Meregildo*,
   920 F. Supp. 2d 434 (S.D.N.Y. 2013), *aff'd sub nom. United States v. Pierce*,
   785 F.3d 832 (2d Cir. 2015).....................................................................................27

*United States v. Morell*,
   524 F.2d 550 (2d Cir. 1975).....................................................................................27

*United States v. Nejad*,
   1:18-cr-00224-AJN Dkt. 348 ...................................................................................29

*United States v. Nejad*,
   487 F. Supp. 3d 206, 212 (S.D.N.Y. 2020)............................................................29

*United States v. Nersesian*,
   824 F.2d 1294 (2d Cir. 1987)..............................................................................20, 21

*United States v. Persico*,
   645 F.3d 85 (2d Cir. 2011) .............................................................................. *passim*

*United States v. Potapova*,
   No. 1:17-CR-206, 2018 WL 10320584 (N.D.N.Y July 3, 2018) .............................6

*United States v. Saffarinia*,
   424 F. Supp. 3d 46, 85 (D.D.C. 2020) ..................................................................25

*United States v. Sanchez*,
   969 F.2d 1409 (2d Cir. 1992)..............................................................................5, 23

*United States v. Seltzer*,
   227 F. 3d 36 (2d Cir. 2000).....................................................................................29

*United States v. Sperling*,
   726 F.2d 69 (2d Cir. 1984).......................................................................................21

*United States v. Stewart,*
    433 F.3d 273 (2d Cir. 2006) ................................................................6, 7, 12

*United States v. Triumph Capital Group, Inc.,*
    544 F.3d 149 (2d Cir. 2008) ........................................................................7

*United States v. Walker,*
    289 F. Supp. 3d 560, 565 (S.D.N.Y. 2018) ................................................6

*United States v. Wallach,*
    935 F.2d 445 (2d Cir. 1991) ............................................................. *passim*

*United States v. Williams,*
    No. 05-6036-CR(L), 2007 WL 3105760 (2d Cir. Oct. 23, 2007) ...........20

**Statutes**

28 U.S.C. § 530B(a) ............................................................................................7

**Other Authorities**

District Attorney of New York County, "Former Partner of Locke Lord LLP
    Convicted in Manhattan Federal Court of Conspiracy to Commit Money
    Laundering and Bank Fraud in Connection With Scheme to Launder $400
    Million of OneCoin Fraud Proceeds" (November 21, 2019) ...................28

United States Department of Justice, US Attorney's Office for the Southern
    District of New York, "Manhattan U.S. Attorney Announces Charges Against
    Leaders Of "OneCoin," A Multibillion-Dollar Pyramid Scheme Involving The
    Sale Of A Fraudulent Cryptocurrency" (March 8, 2019) ........................28

Federal Rule of Evidence 803(3) ............................................................ *passim*

N.Y. R. Prof. Cond. 3.3(a)(3) ..............................................................................7

Fed. R. Crim. P. 33 ................................................................................. *passim*

We submit this memorandum in reply to the Government's Opposition to Mark Scott's

Supplemental Motion for a New Trial, which alleged perjury by the Government's sole

cooperating witness, Konstantin Ignatov ("Konstantin").  Since our initial filing on August 23,

2021, defense investigation and Government disclosures have clearly established that: (1)

Konstantin perjured himself at trial, and testified falsely as to *the only occasion he met Mr. Scott*;

(2) that the Court, at the Government's urging, erroneously excluded evidence that would have

established that Konstantin's testimony about that meeting was false; and (3) that the

Government was aware, *during trial*, of compelling evidence that Konstantin had testified

falsely, yet failed to investigate the issue or disclose evidence it identified after trial clearly

establishing Konstantin's perjury.[1]  Separately and cumulatively, Konstantin's extensive perjury

and the Government's failure to promptly disclose his lies deprived Mark Scott of the fair trial to

which he was constitutionally entitled.  The interests of justice require that he be granted a new

one.

## I.    Background

The case against Mark Scott was centered around the testimony of a single cooperating

witness: Konstantin Ignatov, the brother of OneCoin's founder, Ruja Ignatova, and the face of

the organization after her disappearance.  It was Konstantin – and only Konstantin – who

testified that Mark Scott was a "money launderer" for OneCoin. (Tr. at 129–30).  And it was

Konstantin who testified in dramatic fashion to the sole meeting he ever had with Mr. Scott: a

July 20, 2016 encounter in Sofia in which Konstantin claimed that Mr. Scott met with OneCoin's

---

[1] Given these substantial new revelations and the legal issues presented by them, we respectfully request that the Court permit this filing in excess of the Court's individual rules governing the length of reply briefs.

alleged head money launderer, Irina Dilkinska, in a session so sensitive that OneCoin's offices were cleared of other personnel for this and only this occasion. (Tr. at 246).

But Konstantin is a perjurer.  And his testimony about the Dilkinska meeting in Sofia was pure fiction.  Dilkinska was more than 3,000 miles away in New Delhi on the date in question, as travel records definitively prove. (*See* Stanley Decl., Exhibits H, I).  Worse, the Government was aware *during trial* that the story Konstantin was spinning for the jury about the Dilkinska meeting in Sofia was almost certainly false.  E-mails from the Government's discovery, which the defense identified for the Government while Konstantin was still testifying, made clear that Dilkinska was almost certainly *not* in her home city of Sofia when Mr. Scott visited OneCoin's offices there on Wednesday, July 20, 2016.  Among other things, Dilkinska had sent Mr. Scott an email, DX 550, on the Sunday prior, commenting that she would be "traveling for the whole week," which would of course have included Wednesday, July 20th. (*See* Stanley Decl., Exhibit A).

Once Konstantin was off the stand, the Government seemed willing to correct his false testimony, e-mailing the defense, "We do not continue to oppose the admission of DX 550." (*See* Stanley Decl., Exhibit C).  This was the right thing to do, and consistent with the Government's obligation to "not allow [false testimony] to go uncorrected when it has occurred . . . whether the subject of the falsehood goes to the merits of the case or only to the credibility of the witness." *Perkins v. LeFevre,* 642 F.2d 37, 40 (2d Cir. 1981).  Hours later, the Government inexplicably reversed course, e-mailing that it *would* oppose the introduction of DX 550, without offering any explanation. (*See* Stanley Decl., Exhibit C).  Defense counsel hastily prepared a letter to the Court seeking admission of DX 550. (Dkt. 176).  The Government did not brief a response or ask for additional time to do so.  Instead, the following day, the Government told the Court that the

DX 550 e-mail, despite its obvious reliability, had to be excluded as "clearly inadmissible hearsay." (Tr. at 1289). In its effort to keep this exculpatory evidence from the jury, the Government advanced an entirely baseless legal argument – claiming that the e-mail required "independent corroborating evidence" – that had been soundly rejected by the Second Circuit in *United States v. Persico,* 645 F.3d 85, 101 (2d Cir. 2011). (Tr. at 1288). The Court, crediting the Government's false claim about governing law, accepted this invitation to error. *See* Section, II.C, *supra.* Konstantin's false testimony about the Dilkinska meeting – testimony he doggedly stuck to over two days of cross-examination (Tr. 303–304, 396–398) – stood uncorrected.

Konstantin's collapse as a credible cooperator continued after trial concluded, though the Government hid his unraveling from the defense. First, in February of 2020, the Government discovered and seized Konstantin's contraband cell phone that had somehow been smuggled into the Metropolitan Correctional Center ("MCC"), and which Konstantin had been using for the three-month period immediately following trial. The Government told the defense nothing of this. Then, in June 2021, an investigator working with the Manhattan District Attorney's Office (which jointly investigated and prosecuted the OneCoin case alongside the U.S. Attorney's Office), received a highly credible report that Konstantin had perjured himself from a OneCoin whistleblower, Duncan Arthur, who had been providing reliable evidence to governmental authorities since July 2019. (*See* Stanley Decl., Exhibits D, J-4). Arthur reported that Konstantin had lied at the Scott trial when he claimed to have disposed of a OneCoin laptop in a trash bin on the Las Vegas strip when in fact Konstantin had provided it to Arthur himself to return to OneCoin. (*Id.*). Konstantin's girlfriend then arranged to have the evidence on the laptop destroyed. (Dkt. 412 at *17).

The Government failed to disclose this reported perjury just as it had failed to disclose Konstantin's illegal use of a personal phone while incarcerated, with the Manhattan DA investigator claiming, quite disturbingly, that he had "got busy with other things" and believed that Mr. Scott had been sentenced to jail already. (*See* Stanley Decl., Exhibit J-4).[2]

Worried that the authorities were doing nothing in response to his report of perjury, Arthur reached out to Mr. Scott's counsel to report Konstantin's lies about his laptop, and on August 23, 2021 Mr. Scott filed the instant motion. (Dkt. 410). The Government's Opposition conceded that Konstantin had lied about the laptop (Dkt. 412 at *20, fn. 3), but maintained that Konstantin's story about the Sofia meeting between Dilkinska and Scott should still be credited. (*Id.* at *20, fn. 2).

After the Government's Opposition was filed, a source provided the defense with a copy of Dilkinska's passport with stamps showing that she was in India on the date of the meeting (*See* Stanley Decl., Exhibit I), a passport that counsel for Dilkinska has confirmed is accurate. Counsel for Dilkinska then provided the Government with a video of Dilkinska herself flipping through the pages of the passport. Finally, on December 3, 2021, the Government informed defense counsel that Indian authorities had confirmed the accuracy of the passport stamps: Dilkinska arrived in India on July 19, 2016 and departed on July 22, 2016. (*See* Stanley Decl., Exhibit H). OneCoin's supposed head money launderer was most certainly not in Sofia on July 20, 2016, much less at a meeting in OneCoin's offices with Mark Scott, as Konstantin had told the jury.

---

[2] As told to the defense on October 21, 2021, the Government only recently obtained, at the defense's urging, permission to take possession of eight boxes of OneCoin materials that Duncan had provided the Manhattan DA investigator and UK investigators in July 2020, and which Duncan specifically told the investigator on June 29, 2021 contained materials that had been on the destroyed laptop.

There is no question that Mr. Scott was deprived of a fair trial.  The Government's sole cooperating witness, and the only witness to label Mr. Scott a money launderer, indisputably testified falsely, not just with respect to the disposal of the OneCoin laptop, but with respect to the fictitious Dilkinska meeting in Sofia.  And despite having clear evidence at the time of trial that Konstantin's testimony about that meeting was almost surely inaccurate, the Government back-pedaled on an agreement to admit an email necessary to correct the record, and then flatly misstated Second Circuit law in successfully urging the Court to keep this exculpatory e-mail out of evidence.  Finally, both during and after trial, the Government failed to live up to the high standards the Office is rightly held to by the Court.  It failed to investigate – despite a specific *Brady* request by counsel during trial – what was already compelling evidence that Konstantin had testified falsely about the Dilkinska meeting.  It failed to disclose for over a year – including to the Court in its Opposition to the instant motion – that Konstantin had breached his cooperation agreement by using a cell phone smuggled into the MCC.  And finally, the Government failed to disclose to the defense Arthur's compelling report that Konstantin had perjured himself about the destruction of a laptop.  Rule 33 provides wide latitude to the Court to order a new trial when the interest of justice requires.  It requires such a result here.

## II.     Argument

### A.       The Rule 33 Standard

Rule 33 permits district courts to vacate a judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33.  The rule provides district courts with "broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992).  "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Ferguson,* 246 F.3d 129, 134 (2d Cir. 2001).  Under this broad and deferential standard,

courts have granted new trials under Rule 33 to address each of the issues presented here: (1) perjurious testimony, (2) significant evidentiary errors, and (3) the failure to correct false evidence and/or violations of disclosure obligations.

Newly discovered evidence of perjury.  It is well settled that newly discovered evidence of perjury is one basis for a new trial.  Courts in this circuit apply two different standards to determine whether to grant a new trial based on newly discovered evidence that a Government witness likely perjured himself. *See United States v. Walker*, 289 F. Supp. 3d 560, 565 (S.D.N.Y. 2018).  "If the prosecution knew or should have known of the perjury prior to the conclusion of the trial, the conviction must be set aside where there is 'any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *United States v. Stewart*, 433 F.3d 273, 297 (2d Cir. 2006) (quoting *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991)).  "On the other hand, if the prosecution was not aware of the perjury, a defendant can obtain a new trial only where the false testimony leads to 'a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.'" *Id.* (quoting *Wallach*, 935 F.2d at 456). Where "[t]he jury's estimate of the truthfulness and reliability of a given witness may be determinative of guilt or innocence[,] . . . new evidence may not be 'merely cumulative or impeaching,' but critical." *Alvarez v. United States*, 808 F. Supp. 1066, 1092 (S.D.N.Y. 1992) (quoting *Napue v. Illinois*, 360 U.S. 264, 271 (1959)); see also *Wallach*, 935 F.2d at 458 (2d Cir. 1991) (quoting same).

Evidentiary error.  Significant evidentiary error can also provide a basis for a new trial under Rule 33.  "In determining whether to vacate a conviction based on an evidentiary error, the focus is on whether the error caused or likely caused prejudice to the defendant." *United States v. Potapova*, No. 1:17-CR-206, 2018 WL 10320584, at *1 (N.D.N.Y July 3, 2018) (citing *United*

*States v. Shapiro*, No. 3:15-CR-155 (RNC), 2018 WL 2694440, at *4 (D. Conn. June 5, 2018)

(citing *U.S. v. Certified Envtl. Servs., Inc.*, 753 F.3d 72, 96 (2d Cir. 2014))).  An evidentiary error

not affecting substantial rights is "harmless" if the reviewing court can conclude with fair

assurance that the jury's judgement was not substantially swayed by the error. *See U.S. v.

Paulino*, 445 F.3d 211, 219 (2d Cir. 2006).

      <u>Presentment of false evidence / disclosure failures.</u>  Due process forbids the conviction of

criminal defendants through the use of false evidence when "known to be such by representatives

of the State." *Napue*, 360 U.S. at 269.  Moreover, "[t]he same result obtains" when prosecutors

allow false evidence "to go uncorrected when it appears," even when the prosecutors are not

responsible for soliciting it. *Id*.  Indeed, reversal is "virtually automatic" when the prosecution

permits the introduction of false testimony. *Stewart*, 433 F.3d at 297 (quoting *Wallach*, 935 F.2d

at 456).  Courts recognize that this standard serves the "dual purposes" of "discouraging

prosecutorial misconduct" and "providing relief from an unfair conviction." *Id*.  Indeed,

correcting false testimony is an ethical obligation.  The New York Rules of Professional Conduct

require all lawyers to undertake "reasonable remedial measures," including disclosure to the

tribunal, whenever a witness called by the lawyer has offered material evidence and the lawyer

comes to learn of its falsity. N.Y. R. Prof. Cond. 3.3(a)(3).  This rule binds federal prosecutors in

New York. *See* 28 U.S.C. § 530B(a).  Additionally, new trials are appropriately granted under

Rule 33 to address *Brady* violations. *See, e.g., United States v. Gil*, 297 F.3d 93 (2d Cir. 2002),

*United States v. Triumph Capital Group, Inc.*, 544 F.3d 149 (2d Cir. 2008), *U.S. v. Thomas*, 981

F. Supp. 2d 229 (S.D.N.Y. 2013).

**B.    Konstantin's Extensive Perjury Deprived Mr. Scott of A Fair Trial**

1.    <u>The Laptop Perjury</u>

As Mr. Scott previously put forth in his August 23, 2021 Supplemental Rule 33 Motion, Konstantin's perjury concerning the disposal of the laptop is a sufficient stand-alone basis for the Court to grant Mr. Scott a new trial.  That remains the case.

As an initial matter, that perjury is undisputed.  Konstantin testified that when he arrived in the United States in February 2019 to attend meetings related to OneCoin, a border patrol agent took his phone and computer. (Tr. at 205–06).  The agent kept his phone, he recounted, but gave him back his computer. (Tr. at 206).  Konstantin stated that he then "threw it away," and the Government asked him to "describe exactly" what he did with it.  He obliged, in vivid (if fictitious) detail, stating that he "put it in a paper trash bag with other trash items," "took it to a trash bin on a busy place in the Las Vegas Strip," and "threw it into the trash bin there." (*Id*.).

As the Government now concedes, none of what Konstantin testified to with respect to what he did with the laptop was true. (Dkt. 412 at *20, ("As an initial matter, the Government does not contest that Ignatov committed perjury[.]")).  The truth is that Konstantin gave the laptop to Duncan Arthur, a former employee of Ruja Ignatova's family office (RavenR), who brought the laptop back to Sofia, where it was subsequently destroyed by Konstantin's girlfriend. (*Id*. at *19).  As the Government acknowledged, Arthur reported this first to an investigator on the prosecution team in June 2021 (*See* Stanley Decl., Exhibit D), and later told defense counsel directly after the prosecution team failed to act on it, leading to the instant motion.  Arthur has re-confirmed his statements regarding the destruction of the laptop in a signed declaration accompanying this motion. (*See* Stanley Decl., Exhibit E).

Furthermore, Konstantin continues to lie to the Government with respect to what exactly it was that he destroyed.  When questioned by the Government on August 25, 2021 and

September 1, 2021, after Mr. Scott filed his Supplemental Rule 33 motion, Konstantin stated that "nothing important" was on the laptop (*See* Stanley Decl., Exhibit J-2, ¶11), only "a lot of pictures and music," as well as "[s]ome company presentations but those were also on YouTube." (*See* Stanley Decl., Exhibit J-1).  This flies in the face of common sense (so why destroy it?) and is again flatly contradicted by Arthur, who reviewed the laptop and saw that it "contained voluminous OneCoin files." (*See* Stanley Decl., Exhibit E, ¶15).  Specifically, Arthur stated that on the laptop were "many details about OneCoin's financial dealings in London, Dubai, Sofia, and the disposition of assets including bank accounts, investments related business ventures, valuables and real estate in billions of dollars." (*Id.*, ¶19).[3]

2.     The Dilkinska Meeting Perjury

It is now clear that Konstantin lied about something far more significant than the laptop. Minutes into his testimony, at the prodding of the Government, Konstantin placed Mr. Scott at a July 20, 2016 meeting at OneCoin's offices in Sofia, Bulgaria at which Irina Dilkinska and Ruja Ignatova were the sole other participants. (Tr. at 131).[4]  Dilkinska, Konstantin claimed, was "in charge of creating and managing fake companies for the company OneCoin," the purpose of which were to "create bank accounts . . . for the money laundering purposes." (*Id.*).

---

[3] Arthur is able to attest to the contents of the laptop because he and "several other associates" "examined the laptop files" before returning it to Konstantin and Ruja's mother, Veska Ignatova, in Sofia Bulgaria. (*Id.*, ¶¶12, 14).  Arthur also wrote that he believes much of the information on the laptop was contained in boxes that he had provided the DANY investigator and UK investigators in July 2020. (*See* Stanley Decl., Exhibit D).  The same boxes that the Government only recently agreed to take possession of to review for other material to be disclosed to the defense, per an October 21, 2021 email to defense counsel.

[4] There is no question as to the date of the meeting, which was the *only* time Konstantin ever met Mark Scott.  When Konstantin was under direct examination, the Government established through travel records and a related stipulation that Mark Scott arrived in Sofia on July 20, 2016 and departed the very next day. (GX 62; Tr. 243-44).  It introduced texts and other messages confirming he in fact visited OneCoin's offices on the afternoon of the 20th (GX 3025-S, Tr. 245; GX 2025-S), as Mr. Scott was only in Bulgaria for one day.

When the Government returned to the subject of the meeting later in Konstantin's testimony, Konstantin described his supposed recollection of the meeting – the only occasion on which he ever met Mr. Scott – in dramatic detail.  He recounted how Ruja instructed him to call Dilkinska into the meeting and then "make sure that everybody on this floor leaves and goes home so that Irina, Mark, and Ruja are alone." (Tr. at 246).  Konstanin said that this was "the only time" such extraordinary precautions had been taken in his time at OneCoin. (*Id.*).  He further testified that the following week, Dilkinska told him that "she had to stay [at the meeting] a long time . . . until Mark Scott understood everything that has to be done or he has to do." (Tr. at 246–47).  When Konstantin was questioned on cross-examination, Konstantin doubled down, asserting that he was "a hundred percent sure" that Dilkinska was present at the meeting with Mr. Scott on July 20, 2016. (Tr. at 396).

This too has now conclusively been established as an outright lie.  Dilkinska's passport has stamps showing that she entered India on July 19th and departed on July 22nd, two days *after* the Sofia meeting.  (*See* Stanley Decl., Exhibit I).  Indian authorities have confirmed this is accurate.  (*See* Stanley Decl., Exhibit H).  Konstantin had simply invented out of whole cloth a detailed and conspiratorial account of the sole meeting he ever had with Mr. Scott in a misguided effort to prove his mettle as cooperator.

There is no question that Konstantin's testimony about the Dilkinska meeting was perjury rather than mistake.  First, as Konstantin acknowledged (Tr. at 130, 301–302, 397), the July 20th meeting was the *only* occasion on which he ever met with Mr. Scott, so it is not plausible that he could be confusing it with some other meeting when he witnessed Mr. Scott meet Dilkinska.  Second, the testimony Konstantin offered was rich in fabricated detail – Dilkinska arriving at the meeting after it had started, Ruja then directing everyone to leave, Dilkinska telling Konstantin

about it after – that it could not simply be a product of confused memory.  Third, Konstantin was

given multiple chances on cross-examination to retract his false testimony, including being

shown the email (DX 550) reflecting that Dilkinska almost certainly was not there. (Tr. at 397–

98).  Rather than admit even a possibility of mistake, Konstantin insisted repeatedly – over the

course of two days – that he was "100% certain" that Dilkinska was there. (Tr. at 396).  Finally,

any claim by Konstantin of mere mistake is worth very little given that he brazenly and

indisputably lied to the jury about the demise of the OneCoin laptop and has continued to lie to

the Government about the contents of the laptop he destroyed and what he used the contraband

phone for at the MCC.[5]  An admitted perjurer does not deserve the benefit of the doubt,

particularly when a defendant's right to a fair trial is at stake.

### 3.    The Impact of the Perjury On The Jury's Verdict

In its September 10, 2021 reply to Mr. Scott's motion, the Government minimized the

importance of Konstantin's perjured laptop testimony to what it called a "collateral" issue,

arguing that it "related to an event that took place long *after* the conduct alleged in the

Indictment, and the testimony had nothing to do with Scott whatsoever." (Dkt. 412 at *20).  But

Konstantin's second, now *confirmed* instance of false testimony can hardly be said to be on a

collateral issue.  The alleged meeting between Mr. Scott, Ruja, and Dilkinska was the *only* direct

face-to-face interaction that Konstantin had with Mr. Scott, and the *only* time during trial in

which the jury heard about any supposed meeting between Mr. Scott and Dilkinska to discuss

money laundering.  But even more to the point, these multiple confirmed instances of perjury

---

[5] Specifically, while Konstantin has insisted to the Government that the laptop contained little
beyond "pictures and music" (*See* Stanley Decl., Exhibit J-1), Duncan Arthur, who reviewed the
laptop before it was destroyed, confirmed it was a trove of OneCoin documents. (*See* Stanley
Decl., Exhibit E, ¶15).  And while Konstantin told the Government though his attorney that he
did not use the smuggled cellphone to discuss the case (*See* Stanley Decl., Exhibit F), the
Government's recent review of its contents has shown the opposite.

cast grave doubt on the entirety of Konstantin's testimony, including his claims that Mr. Scott was "one of the main money launderers for OneCoin." (Tr. at 130).

Mr. Scott's "conviction must be set aside where there is any reasonable likelihood that the false testimony could have affected the judgment of the jury," because the Government "should have known of the perjury prior to the conclusion of trial." *Stewart*, 433 F.3d at 297 (quoting *Wallach*, 935 F.2d at 456). The Government should have been suspicious of Konstantin's testimony when he started describing details he apparently had never mentioned in any of the approximately 20 meetings he had with the Government.[6] (Tr. at 208). Moreover, counsel for Mr. Scott promptly advised the Government that this testimony was false and, digging through the Government's productions, identified the next day two e-mails – marked as DX 550 and 552 – which, as described in more detail in section II.C., made clear that Dilkinska was traveling during the day in question. Mr. Scott also promptly made a specific *Brady* request targeted to this issue, asking that prosecutors provide "any additional material that may reflect Irina's schedule, travel or whereabouts" or "anything tending to show that Ignatov did not testify accurately on this subject." (*See* Stanley Decl., Exhibit C). Had the Government reviewed other records not readily accessible to the defense mid-trial (and which in fact the Government identified for the defense only on October 21, 2021), it would have found still more proof that Konstantin was lying.[7]

---

[6] Konstantin's detailed recounting of the alleged meeting appeared nowhere in the 3500 materials provided to defense counsel. Thus the Government was either equally surprised by Konstantin's new story on the stand or failed to disclose that he had previously changed his story from what had been reflected in the 3500 material.

[7] The exculpatory material included, among other things, a Viber message between Ruja Ignatova and Sebastian Greenwood on an image of a Greenwood phone that Dilkinska was in India during this period. (*See* Stanley Decl., Exhibit G-1).

Regardless of the standard applied,[8] however, Konstantin's perjurious testimony deeply prejudiced Mr. Scott and entirely undermines confidence in the jury's verdict.  Had the jury known that Konstantin had blatantly lied about the fictitious Sofia meeting with Dilkinska as well as the destruction of the OneCoin laptop, the entirety of Konstantin's testimony would almost certainly have been discredited.  And if Konstantin was so quick to lie on two occasions, the jury would have had grave reason to doubt Konstantin's broader testimony that Mr. Scott was a "money launderer."  Thus, "[g]iven the importance of this single credibility determination" of the Government's only cooperating witness, a jury would have viewed these two clear instances of perjury as "vital impeachment material" and discredited the witness accordingly.  (*See Alvarez*, 808 F. Supp. at 1093 (granting a new trial for the defendant after assessing the probable reaction of the jury to evidence that would have impeached the credibility of the witness but was unrelated to proving the offense at trial)).

Were the jury to disregard all of Konstantin's testimony – or at least all testimony inculpatory to Mr. Scott that was not otherwise corroborated – there can be *no confidence* it would have returned the same verdict.  In its Opposition, the Government runs away from Konstantin as its star (and only) cooperator, going so far as to claim that Konstantin's "testimony had little bearing on the issue of Scott's knowledge of the criminal nature of the proceeds." (Dkt. 412 at *3).  But such revisionist history does not withstand scrutiny.  Already in its opening statement, the Government set Konstantin as *the* witness who would tell the jury about Mr. Scott's alleged money laundering activity ("Ruja's brother will describe Mark Scott's role moving OneCoin's money." (Tr. 41)).  And in the opening minutes of Konstantin's testimony,

---

[8] If the prosecution was not aware of the perjury, a Court can order a new trial if it concludes that "but for the perjured testimony, the defendant would most likely not have been convicted." *See Wallach*, 935 F.2d at 456.

the Government elicited that Mr. Scott was "one of the main money launderers for OneCoin,"
who "worked with others," specifically, "Gilbert Armenta, and Amer Abdulaziz, Irina
Dilkinska[,] … and Ruja Ignatov[a]." (Tr. at 129–30).  Konstantin was in fact the *only* witness
who testified, based almost entirely on statements others supposedly made to him[9], that Scott
was a knowing participant in the conspiracy.

In addition to his conclusory testimony that Mr. Scott was "a money launderer," the now-
discredited Konstantin claimed that others involved in the conspiracy, particularly Irina
Dilkinska, told Konstantin that Mr. Scott was in on it.  Given that Konstantin identified
Dilkinska's "main work" as the "creation and management" of "shell companies" used to
launder funds (Tr. at 233–34), this testimony was particularly damning. Konstantin testified that
Dilkinska relayed the following:

- Konstantin said, "Irina told me Fenero is Mark Scott," and that he "learned that Fenero is
  one of the entities that is in charge of the money laundering." (Tr. at 272).

- Konstantin testified that several months after the (fictitious) July 2016 meeting between
  Mr. Scott and Dilkinska, he "heard [Irina Dilkinska] screaming on the phone . . . And she
  called . . . Mark Scott an idiot, that he fucked up totally and that he's useless." (Tr. at
  247).

- Konstantin testified that after Mark Scott was arrested, "two days later Irina came into the
  office, in Sofia, and she was panicking a lot, and she told me that – sorry my language –
  she's fucked now.  Because she's in all papers with Mark Scott, and when they got him
  they will also get her.  So that she's got a lot of problems now." (Tr. at 294).

- Konstantin stated that a few days later, "Irina came in and she was again very panicking,
  but this time she was very demanding.  And she demanded the lawyers to hand her out all
  of the documents of OneCoin so she can find every document she's in with Mark Scott,
  so that she can destroy them like she destroyed the documents she had at home." (Tr. at
  295)  He said that she said she "burned them all," referring to the documents she had at
  her house. (*Id*.)

---

[9]As argued at trial and in pretrial motions, Mr. Scott maintains that much of this hearsay was in
fact inadmissible.  (*See* Defense Response to Govt. Motion In Limine (Sealed) (October 25,
2019)).

- Konstantin testified that Dilkinska said that "for the risk [Mr. Scott] took, he got paid a lot of money." (Tr. at 294).

The above testimony about what Dilkinska supposedly told Konstantin went *squarely* to Mr. Scott's knowledge that he was handling criminal proceeds and was deeply inculpatory. It was uncorroborated. And it came solely from the mouth of a perjurer.

Konstantin likewise testified that many of the individuals on the other side of transactions involving the Fenero Funds were knowing participants in the money laundering scheme – evidence that, if Konstantin was to be credited, tended to suggest that Mr. Scott was similarly situated. The Government relied heavily on Konstantin's testimony to make just this argument in summation. The examples of Frank Ricketts, Amer Abdulaziz, and Gilbert Armenta are all illustrative:

- Undisputed evidence showed that Ricketts was the signer on several accounts that sent money to the Fenero Funds. But it was only through Konstantin's testimony that the Government was able to provide evidence that Ricketts was a criminal, with Konstantin stating that he was a "very high ranked member of the OneLife network" whom "many people were after . . . [for] fraud." (Tr. at 291–92). Konstantin also claimed that Ricketts acted as "Ruja's consultant [on] how she can avoid law enforcement, and how she can avoid prosecution [b]ecause Frank Ricketts himself had a lot of problems with prosecutions, but [he] never really got in jail for it, and always got away with it." (Tr. at 293). Indeed, the Government relied on this testimony to draw this link in summation, arguing, "Konstantin, you'll remember, told you about Frank Ricketts at this trial. He was the fraudster who gave Ruja all that advice about how she could avoid getting arrested. That was Frank Ricketts. He's the one running IMS, the company that transferred over 100 million euros straight to Scott's investment funds. That's IMS. Frank Ricketts." (Tr. at 1879).

- The same is also true of Amer Abdulaziz, owner of the Phoenix Investment Fund, where Mr. Scott sent money from the Fenero Funds. Konstantin testified that Abdulaziz was "one of the main money launderers for Ruja" who "stole at least 100 million" euros. (Tr. at 228). He also testified that he learned that "Abdulaziz took the money he stole and he started to buy a lot of racing horses for more than 25 million euros." (Tr. at 268). As was similarly true of Ricketts, Konstantin was the *only* witness who could provide any inculpatory testimony about Abdulaziz, and again the Government reminded the jury of that testimony in its closing arguments, "And also, ladies and gentlemen, look where the money goes from the Fenero Funds. 185 million euros goes straight to another one of Ruja's money launderers, Amer Abdulaziz. You heard about him from Konstantin. He

is the Dubai money launderer who stole $100 million of that money, that fraud money, and used tens of millions of dollars to buy racehorses. That's Amer Abdulaziz. That's who Scott is sending massive, hundreds of millions of dollars to." (Tr. at 1884).

- Finally, Konstantin provided inculpatory details on Gilbert Armenta, the very person who *introduced* Mr. Scott to Ruja, that no other witness was able to provide. Konstantin testified that Armenta was "Ruja's boyfriend and her business partner and he was one of the main money launderers," who worked with "Mark Scott." (Tr. at 236). And again, the Government relied on Konstantin's testimony in summation, reminding the jury, "you heard about . . . Gilbert Armenta. You see that right here, that was Ruja's boyfriend and that was her international money launderer." (Tr. at 1871).

The Government relied heavily on Konstantin's testimony that Mr. Scott's counterparties were criminals in its closing arguments, asserting, "Think about who these companies belonged to on paper. Frank Ricketts, Irina Dilkinska, Gilbert Armenta. Criminals." (Tr. at 1878). [10]

In its Opposition, the Government claims that there was sufficient other evidence, apart from Konstantin's testimony, to convict Mr. Scott. But this is false. Much of the Opposition is devoted to showcasing the evidence that OneCoin was a fraud scheme – something Mr. Scott never contested at trial. Other evidence showed that Mr. Scott was at times secretive about Ruja's ties to the money invested in his funds. But that was not proof that he knew the money came from criminal sources. There are many reasons for which wealthy people would seek such anonymity. The Government's key hurdle at trial was proving that Mr. Scott knew that the Ruja-linked funds came from OneCoin and that OneCoin was a fraud. Apart from Konstantin's testimony, the evidence in the trial does not show this. It was Konstantin, and Konstantin alone, who identified Mr. Scott as a money launderer in the eyes of the jury.

The Government's claimed evidence of Mr. Scott's knowledge that OneCoin was a scam beyond Konstantin's testimony does not withstand scrutiny. The Government had no witnesses,

---

[10] Such statements were even more damaging to Mr. Scott in light of him being precluded from offering testimony showing that other counterparties to transactions, including Neil Bush, did not wittingly act as money launderers for OneCoin or Ruja Ignatova. (*See, e.g.,* Tr. at 1281).

e-mails, or anything else showing that Mark Scott thought OneCoin was a fraud.  Tellingly, the

Government relied heavily at trial on an article emailed to Mr. Scott written by a CPA alleging

that OneCoin was a scam – an article it read in its entirety to the jury – but of which it has no

proof that Mr. Scott actually read, much less responded to. (*Id*. at 8).  In any event, the

information was presented to Mr. Scott as defamatory in the e-mail forwarding it, sent with the

subject line, "media and false accusations." (GX-4109).  Additionally, the Government relies on

Mr. Scott's supposed awareness of a City of London Police ("COLP") investigation into

OneCoin (that was ultimately closed without action) to show that this meant that Mr. Scott knew

the funds were criminal, which of course is proof only of an investigation into a cryptocurrency,

hardly a rarity. (Dkt. 412 at *9; GX-4102).  (Mr. Scott ended his involvement with OneCoin

shortly thereafter in any case).  Further, the Government fails to mention that one of the key

points that gave Mr. Scott confidence that OneCoin was not a scam: The accounts that sent

money to the Fenero Funds (including some that took OneCoin deposits directly) were held at

respected global banks, including Deutsche Bank and Morgan Stanley. (*See, e.g.,* Tr. at 640).

In sum, absent credible testimony from Konstantin, the Court cannot have any confidence

whatsoever that the jury would have been able to reach a guilty verdict against Mr. Scott.  Not

only is there more than "any reasonable likelihood that the false testimony could have affected

the judgment of the jury" (the standard used if the prosecution should have known of the false

testimony prior to the conclusion of trial), *Wallach*, 935 F.2d at 456, the singular importance of

Konstantin's testimony compels the Court to conclude that Mr. Scott "most likely would not

have been convicted" "but for the perjured testimony" (the standard used if the prosecution was

not aware of the perjury), *id*. at 459.

### C.     The Court's Erroneous Exclusion Of Evidence That Konstantin's Testimony Was False Provides A Further Basis For A New Trial.

The fact that there is new evidence that the Government's sole cooperating witness perjured himself on a key issue is reason enough for a new trial. *Wallach*, 935 F.2d at 456.  But here, the Court's erroneous ruling, made at the Government's urging, to exclude a defense exhibit (DX 550) that would have established that Konstantin's testimony was false at the time of trial compounded the harm to Mr. Scott, and provides an additional basis for a new trial under the Court's broad authority to order a new trial where the "interests of justice" so require. Fed. R. Crim. P. 33.

DX 550 was an e-mail chain starting on Monday, July 11, 2016, when Mr. Scott wrote to Dilkinska requesting that she sign a letter and send a copy of the scan back to him. (*See* Stanley Decl., Exhibit A).  Dilkinska replied to Mr. Scott on Sunday, July 17, 2016, that this had already been done, further stating, "Will ask my colleagues to send the original to you this week as I am traveling for the whole week." (*See id*.).

Mr. Scott sought to introduce DX 550 principally pursuant to Federal Rule of Evidence 803(3), which provides a hearsay exception for statements of the declarant's "then-existing state of mind," such as "motive, intent, or plan." Rule 803(3) codified the longstanding common law rule of *Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285, 295–96 (1892), holding that statements of intent may be introduced "to prove that the declarant thereafter acted in accordance with the stated intent." *United States v. Best*, 219 F.3d 192, 198 (2d Cir. 2000); *see also* Fed. R. Evid. 803 Advisory Committee's Note to Paragraph 3 (1972) ("The rule of *Mutual Life Ins. Co. v. Hillmon* . . . allowing evidence of intention as tending to prove the doing of the act intended, is, of course, left undisturbed.").  This rule provides a clear and well-recognized basis for introducing hearsay evidence that a declarant made a future plan to show that the declarant acted in accordance with

the plan. *See, e.g., Persico,* 645 F.3d at 101 (finding that "[u]nder 803(3), the jury could draw the inference that [the declarant] acted in furtherance of his stated intent to go meet Persico" after the declarant told his wife over the phone "he was going to Brooklyn on the afternoon of May 26 [1999] to meet with Persico."); *United States v. Asaro*, No. 14-CR-26 (ARR), 2015 WL 5841804, at *10 (E.D.N.Y. Oct. 7, 2015) ("Katz's own hearsay, as told to his wife, who repeated it to the police, is admissible as an 803(3) statement of his then-existing intent to meet Joey Allegro at the drug store. It is admissible to show that he acted in conformity with that intent by going to a location expecting to meet Allegro."))

DX 550 was clearly admissible as a statement of a future plan, as Mr. Scott argued in his mid-trial brief (Dkt. 176): Dilkinska, a Sofia-based declarant, was telling Mr. Scott about her future plan (to travel that upcoming week), and Mr. Scott was offering it as circumstantial evidence that Dilkinska did in fact travel that week, meaning she would not have been in her home city of Sofia as Konstantin had claimed.

The Government did not brief the issue.  Instead, when asked for its position in Court, the Government claimed that, despite the plain language of Rule 803(3), the Second Circuit required "independent evidence" that the hearsay declarant had acted in accordance with that plan. (Tr. at 1287–89).  The Court accepted the Government's claim as to the Second Circuit law on the issue and refused to admit DX 550 for lack of "independent evidence" corroborating Dilkinska's statements that she was traveling. (Tr. at 1292).  The Court did so despite concluding that "the text of 803(3) would appear to clearly establish the admissibility of [DX] 550," absent the need for corroborating evidence. *Id*. at 1291.[11]

---

[11] Mr. Scott also sought admission of DX 552, which the Court also rejected on the grounds that it was "not a statement of intent" under Rule 803(3). (Tr. at 1291).  Read in context, however, Dilkinska's statement in DX 552 that "I am travelling too" clearly reflects future plans.  (*See*

The Government's claim that the Second Circuit required "independent evidence" before admitting a statement of a future plan by a non-declarant as to that non-declarant's plan was false. In fact, the Second Circuit had soundly rebuffed that very argument. In *Persico*, the Second Circuit made clear that an "independent corroboration" requirement applies only when the hearsay statement is offered to show that a "*third person* . . . acted in accordance with an intention attributed to him by the declarant." (emphasis added) 645 F.3d at 101. On the other hand, the Circuit made clear, no corroboration is necessary when the statement is offered solely as evidence that "the *declarant* acted in accordance with his stated intention" – exactly the purpose for which the defense proposed to admit DX 550. *Id.*; *see* Tr. at 1285, 1290–91.[12]

The facts in *Best* – the only case cited by the Government in its inaccurate and apparently extemporaneous exposition on Second Circuit law – illustrate the distinction. The Government in *Best* sought to introduce a hearsay statement in which the declarant (a cooperating witness) said that he intended to call the defendant and discuss the submission of fraudulent claims to a government agency. *Best*, 219 F.3d at 197. But the Government in *Best* offered the statements not just as proof that the *declarant* later took actions consistent with his intent (the permissibility of doing so which was not in dispute), but also as proof that the *defendant*, a non-declarant third

---

Stanley Decl., Exhibit B). In the email, she is responding to a request for information from Mr. Scott, and her statement in the present progressive tense, "I am travelling too," explains why she will be delayed in responding to Mr. Scott's request *in the future*. The clear implication is that Dilkinska is expressing a *continuing, forward-looking* intent to travel.

[12] *See also United States v. Williams*, No. 05-6036-CR(L), 2007 WL 3105760, at *2 (2d Cir. Oct. 23, 2007) ("A declarant's out-of-court statement of intent may be introduced to prove that the declarant acted in accordance with that intent."); *Delvecchio*, 816 F.2d at 863 ("A declarant's out-of-court statement of intent may be introduced to prove that the declarant acted in accordance with that intent."); *Nersesian*, 824 F.2d at 1325 ("Hearsay statements reflecting a declarant's intentions or future plans are admissible against the declarant to prove subsequent acts under Fed. R. Evid. 803(3)."); *United States v. DeJesus*, 806 F.2d 31, 35 (2d Cir. 1986) ("Under [Rule 803(3)], hearsay statements reflecting a declarant's intentions or future plans are admissible to prove subsequent acts.").

party, *actually spoke* with the declarant on the phone about the claims at issue. *Id*. at 197–98.  It

was the use of such hearsay statements to establish the plan of a *non-declarant* that the Second

Circuit said required "independent evidence."  Indeed, every case relied on in *Best* for this rule

about future plans of non-declarants involved the Government attempting to introduce statements

in which the hearsay declarant said that he intended to meet with the defendant as part of a drug

transaction as proof not just of the declarant's plan to meet but also as proof that the non-

declarant defendant *actually attended* the proposed meeting at the specified time and location.

*See United States v. Delvecchio*, 816 F.2d 859, 862–63 (2d Cir. 1987); *United States v.

Nersesian*, 824 F.2d 1294, 1324–25 (2d Cir. 1987); *United States v. Badalamenti*, 794 F.2d 821,

825–26 (2d Cir. 1986); *United States v. Sperling*, 726 F.2d 69, 73–74 (2d Cir. 1984); *United

States v. Cicale*, 691 F.2d 95, 103–04 (2d Cir. 1982).[13]

This fact pattern is wholly inapposite to the statements in DX 550, in which Dilkinska,

the hearsay declarant, states that "I am traveling for the whole week."  (*See* Stanley Decl.,

Exhibit A).  Neither this statement (or its reaffirmation in DX 552), or the surrounding context,

mention or necessarily involve the activities of a third-party.  The statements are, in effect, "I

---

[13] There is some question as to whether "independent corroboration" is required even in the limited circumstances the Second Circuit has required it: as evidence of action of a non-declarant.  In *Hillmon* itself, the Supreme Court allowed the admission of a statement of intent as proof that both (1) the declarant subsequently took actions consistent with his intent and (2) a *third party* took actions consistent with the declarant's intent. *See* 145 U.S. at 295–96 (finding that Walter's statement of intent to travel with Hillmon "made it more probable both that he did go *and that he went with Hillmon* than if there had been no proof of such intention" (emphasis added)).  But with the adoption of the Federal Rules of Evidence, the Second Circuit identified a "difficult issue" as to whether *Hillmon*'s holding addressing third parties survived in the text of Rule 803(3). *Cicale*, 691 F.2d at 103. The Advisory Committee notes to the original version of the Rule 803(3) concluded that *Hillmon* would be "left undisturbed." Fed. R. Evid. 803 Advisory Committee's Note to Paragraph 3 (1972).  But a House Committee Report stated that Rule 803(3) should be "construed to limit the doctrine of *Mutual Life Insurance Co. v. Hillmon* . . . so as to render statements of intent by a declarant admissible only to prove his future conduct, *not the future conduct of another person*." H.R. Rep. 93-650, at 13–14 (1973) (emphasis added).

intend to travel this week," and *not*, "I intend to travel this week *with Person A*."  Mr. Scott

offered DX 550 and 552 only to show that Dilkinska, the declarant, acted in accordance with her

plan and traveled during the week ahead, not that anyone else did anything else.  So limited,

there is no danger that the statements would invite an inference that "[a] third person . . . acted in

accordance with an intention attributed to him by the declarant" – the sole concern that would

trigger the need for independent corroboration. *Persico,* 645 F.3d at 101.  Instead, both of

Dilkinska's statements are readily admissible under the traditional *Hillmon* rule, embodied in

Rule 803(3), that a declarant's statement of intent may be offered "as evidence that the declarant

acted in accordance with his stated intention." *Id*. at 101. *Persico*, 645 F.3d at 100–01 (holding

that statements of intent are "admissible as evidence that the declarant acted in accordance with

his stated intention").  In short, Dilkinska said she planned to travel that week; the jury could

have considered this as evidence she actually did.

The Court's erroneous decision to exclude these exhibits – particularly in light of the now

clear evidence that Dilkinska had *in fact* traveled and was in India during the supposed Sofia

meeting – provides further grounds for a new trial for Mr. Scott.  Had Mr. Scott been able to

admit these emails into evidence, the jury would have understood that Konstantin was at best,

wrong, and more likely, flatly lying.  It then would have regarded Konstantin's highly prejudicial

hearsay testimony, about both Mr. Scott and others of co-conspirators, with the suspicion it

warranted.  Without this testimony, the jury would not have been able to convict Mr. Scott, as

described in Section II.B(3).  The only remedy that could correct this error would be a new trial.

### D.     A New Trial Is Also Warranted Due To The Government's Failure To Correct The False Testimony, Both Before and After Trial

The fact that Konstantin perjured himself on the Scott-Dilkinska meeting and that the

Court (at the Government's urging) erroneously excluded evidence that would have shown the

likely falsity of Konstantin's testimony at trial are reasons enough to grant a new trial.  But the Government's own conduct here – its refusal to correct testimony that at the time of trial it knew was likely false, its refusal to further investigate the issue, and its failure after trial to disclose evidence that Konstantin was not credible – provides an additional basis on which to order a new trial so as "to avert a perceived miscarriage of justice." *Sanchez*, 969 F.2d  at 1413.

First, the Government knew that DX 550 showed that Konstantin's testimony was likely false at the time of trial, and yet failed to correct it.  "Due process requires not only that the prosecutor avoid soliciting false testimony, but that he not conceal it, and that he not allow it to go uncorrected when it has occurred . . . whether the subject of the falsehood goes to the merits of the case or only to the credibility of the witness." *Perkins*, 642 F.2d at 40.  The Government knew that the key content of that email – that Dilkinska was "traveling the whole week" – directly contradicted crucial testimony of its star witness regarding the alleged meeting, but did nothing to correct this error when defense counsel identified the false testimony and emails contradicting it. *See Taylor v. Lombard*, 606 F.2d 371, 375 (2d Cir. 1979) (the prosecutor "has the responsibility and duty to correct what he knows to be false" (quoting *Napue*, 360 U.S. at 269–70 (1959))).

In fact, the Government did worse than nothing; it inexplicably backtracked after indicating over email on November 11, 2019 that it would not oppose the admission of DX 550, (*See* Stanley Decl., Exhibit C) and then when Mr. Scott filed his motion in an attempt to correct this error, it inaccurately stated the law to the Court in the hopes it would rule in its favor. (Tr. at 1288).  The Government should not have opposed the introduction of DX 550 as it was reliable evidence from the Government's own production necessary to correct false testimony from the Government's sole cooperating witness.  At minimum, before opposing what was obviously

reliable and exculpatory evidence on dubious hearsay grounds, the Government should have made certain it was right.  The Government did neither, urging the Court to keep out exculpatory evidence based on an argument soundly rejected by the Second Circuit, as discussed in Section II.C.

The Government likewise took no steps to review its files or otherwise investigate whether Konstantin had testified falsely despite the fact that both that DX 550 strongly suggested the testimony was erroneous and that the defense made a specific *Brady* request for such information.  Under *Brady v. Maryland*, the Government may not withhold evidence that is favorable to a criminal defendant. 373 U.S. 83, 87 (1963).  The Government violates *Brady* if it suppresses evidence, either willfully or inadvertently; the evidence is favorable to the accused; and prejudice ensued. *See Strickler v. Greene,* 527 U.S. 263, 281 (1999).  Here, defense counsel made a written *Brady* request in a November 10, 2019 e-mail, asking for "any additional material that may reflect Irina's schedule, travel or whereabouts" or "anything tending to show that Ignatov did not testify accurately on this subject." (*See* Stanley Decl., Exhibit C).  Defense counsel reiterated the request in open court the next day: "We've asked the government if they have anything further, we found these documents, we've asked if they have anything further in their files that would reflect where Irina Dilkinska was.  They've said[,] not that they have been able to identify." (Tr. at 1286).  Had the Government searched its files, it would have identified further contemporaneous and reliable electronic communications, only recently disclosed, showing that Dilkinska was not in Sofia and indeed was in India. (*See* Stanley Decl., Exhibits G-1, G-2, G-3).[14]  The Government could also have done what it did only after this motion was

---

[14] One message was a July 18, 2016 calendar message to multiple recipients which stated, "Irina Dilkinska will be out of office from 18/07 to 22/07 included."  Another is a July 21, 2016 email from Ruja Ignatova to Sebastian Greenwood stating that "Irina travels I think today."  A third

filed: contact foreign authorities it had been working with in the investigation for travel records. The Government's failure to investigate the issue following this *Brady* request should not be countenanced. "The more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist." *United States v. Thomas*, 981 F. Supp. 2d 229, 240 (S.D.N.Y. 2013).[15]

In addition, the Government suppressed evidence it developed after trial that went directly to Konstantin's credibility. The fact that Konstantin was illegally using a contraband cellphone while incarcerated at the MCC, a sure breach of his cooperation agreement, was clearly something the Government should have promptly disclosed. *See, e.g., Cardoso v. United States*, 642 F. Supp. 2d 251, 263 (S.D.N.Y. 2009) (finding that the Government violated *Brady* by failing to disclose a breach of cooperation agreement to defendant prior to sentencing). Instead, the prosecutors on this case waited nearly two months after the instant motion, and an entire year after they say they first learned of it themselves, to disclose that in late February 2020, a contraband phone that Konstantin had used while incarcerated at the MCC had been seized. Konstantin also lied to the Government about what was on the phone, claiming through his attorney that there was "no discussion of the case, just complaints about MCC and pictures of

---

was a Viber message from Greenwood to Ignatova on July 19, 2016 stating, "And cannot risk cash flow from non onecoin business for india. I have acct. Irina is there t[h]is week." (*See* Stanley Decl., Exhibits E-1, E-2, E-3).

[15] The Government did produce to the defense a copy of Greenwood electronic devices in a difficult-to-access format a month prior to trial, even though the prosecution team had access to the materials approximately six to seven months earlier, in March 2019. In any event, "The Government cannot meet its *Brady* obligations by providing … 600,000 documents and then claiming that [the defendant] should have been able to find the exculpatory information[.]" *United States v. Saffarinia*, 424 F. Supp. 3d 46, 85 (D.D.C. 2020) (quoting *United States v. Hsia*, 24 F. Supp. 2d 14, 29-30 (D.D.C. 1998).

[his] kid." (*See* Stanley Decl., Exhibit F) The Government provided contents of the phone to defense counsel on October 21, 2021, which reflect a good amount of "discussion of the case."

Finally, the Government violated its duties when an investigator on the prosecution team received a credible report of Konstantin's perjury in June 2021 and yet failed to take *any action whatsoever*. (*See* Dkts. 410, 412).  The Manhattan D.A. investigator was already very familiar with the source, Duncan Arthur, as he had already proven himself a credible source of information to UK and U.S. law enforcement when he came forward a year prior to share OneCoin related documents to which he had access. (*See* Stanley Decl., Exhibit J-4).[16]  With his June 2021 call to the investigator, Arthur was coming forward to identify his own involvement in an effort by Konstantin that successfully kept evidence out of the reach of U.S. authorities and back into the hands of OneCoin insiders.  As has been already recounted, contrary to throwing away his laptop into a bin on the Las Vegas strip, as he had testified to in great detail while on the stand, Konstantin gave the laptop to Arthur to take with him as he left the U.S. to return to the OneCoin headquarters in Bulgaria.  Arthur had no reason to come forward, at potential  risk to his own safety, other than to want to correct the truth.

 The investigator asked Arthur to put his concerns in an email, which he promptly did that same day.  (*See* Stanley Decl., Exhibits D, J-3, J-4).  But, shockingly, the investigator did nothing.  He only told other members of the prosecution team *after* Mr. Scott filed his Supplemental Rule 33 Motion on August 23, 2021 and he was questioned on the matter by the AUSAs on the case in New York.  (*See* Stanley Decl., Exhibit J-3).  When he first spoke with

---

[16] In June 2020, the investigator met Arthur at the City of London Police headquarters to first discuss the OneCoin-related materials, and then again in July 2020, at a storage facility in Richmond, a suburb of greater London, to take possession of the eight boxes, which the investigator later inventoried.

them on August 25th, the reasons he provided were: "Meant to forward it to SA Shimko but got

sidetracked"; "[F]orgot to send it"; "[W]as doing other things and email slipped his mind"; "MS

matter had concluded and [investigator] didn't put much weight in email." (*Id.*).[17]  Had Arthur

not made the decision to follow up with counsel to Mr. Scott to separately inform them of

Konstantin's perjury, it seems likely that Mr. Scott would never have found out.

     While the federal prosecutors themselves are not to blame, the government is imputed to

have knowledge of all evidence in the hands of the "prosecution team," *see United States v. Gil*,

297 F.3d 93, 106 (2d Cir. 2002), which broadly encompasses police and investigating agents

associated with the case, *see Kyles v. Whitley*, 514 U.S. 419, 438 (1995), as well as anyone else

with sufficient investigative responsibilities to render them an "arm of the prosecutor." *United

States v. Morell*, 524 F.2d 550, 555 (2d Cir. 1975).  This can include members of law

enforcement who are "not strategic decision-makers," but who nonetheless "submit to the

direction of the prosecutor and aid in the Government's investigation." *United States v.

Meregildo*, 920 F. Supp.2d 434, 441 (S.D.N.Y. 2013), *aff'd sub nom. United States v. Pierce*,

785 F.3d 832 (2d Cir. 2015); *see also United States v. Bin Laden*, 397 F. Supp. 2d 465, 481–84

(S.D.N.Y. 2005) (finding that members of the U.S. Marshals Service's Witness Security Program

were members of the prosecution team when they "installed and continuously operated . . .

video-teleconference equipment" in order to "further the Government's investigation").

---

[17] In fact, the investigator had not one, but *two* opportunities to relay Arthur's allegations.  The
day after he spoke to and received an email from Arthur, he received an email from his COLP
counterpart, forwarding an email that Arthur had sent him on the same subject, in which Arthur
stated, "K lied under oath."  The investigator's London counterpart asked him, "Would you be
okay to pass it on to the investigating team?"  The investigator replied that Arthur had reached
out to him as well and that he would forward to the FBI agent on the case.  But again, he did no
such thing. (*See* Stanley Decl., Exhibit J-4).

Not only does Second Circuit case law affirm that the DANY investigator was a member of the prosecution team, the very facts of this case confirm this as well.  DANY and the SDNY jointly investigated and prosecuted this case, with SAUSA Julieta Lozano of the New York County District Attorney's Office appearing alongside AUSAs Christopher J. DiMase and Nicholas Folly at trial.  And, at the time of Mr. Scott's arrest and conviction, press releases put out by both DOJ and DANY were aligned in acknowledging and appreciating the extensive collaboration between the two offices.  In fact, DANY ███████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████ along with "Senior Financial Intelligence Analyst Rosalind October," who testified at the trial of Mr. Scott.[18]  Notably, and as raised in Mr. Scott's original post-trial motions (Dkts. 218, 275) and Forfeiture Opposition (Dkt. 345), October falsely testified to the supposed accuracy of summary charts purporting to show funds flowing to Mr. Scott from U.S. OneCoin investors.  Just as it failed to correct Konstantin's perjurious testimony on Scott's supposed meeting with Dilkinska, the Government also failed to correct several of October's statements which it knew necessarily to be false.[19]

---

[18] *See* District Attorney of New York County, "Former Partner of Locke Lord LLP Convicted in Manhattan Federal Court of Conspiracy to Commit Money Laundering and Bank Fraud in Connection With Scheme to Launder $400 Million of OneCoin Fraud Proceeds" (November 21, 2019); Available: https://www.manhattanda.org/former-partner-of-locke-lord-llp-convicted-in-manhattan-federal-court-of-conspiracy-to-commit-money-laundering-and-bank-fraud-in-connection-with-scheme-to-launder-400-million-of-onecoin-fraud-proceed/.  *See also* United States Department of Justice, US Attorney's Office for the Southern District of New York, "Manhattan U.S. Attorney Announces Charges Against Leaders Of "OneCoin," A Multibillion-Dollar Pyramid Scheme Involving The Sale Of A Fraudulent Cryptocurrency, (March 8, 2019); Available: https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-announces-charges-against-leaders-onecoin-multibillion-dollar

[19] As an initial matter, Ms. October did not detail any plausible tracing or forensic methodology, and did not possess adequate bank account data that would have allowed her to conclude, as she testified, that her "tracing showed that Mrs. Cohen's funds ended up in the IMS bank accounts." (Tr. at 1695).  Further, the Government did not even have complete financial records for six of

Ultimately, there were a "cascade of failures to timely disclose related materials … some of which were not disclosed until after the trial in this case had concluded." *United States v. Nejad*, 487 F. Supp.3d 206, 212 (S.D.N.Y. 2020).  In that case, the Government recognized that the defendant "would have pursued different investigative, litigation, and trial strategies" but for the Government's mistakes and "determined that it would not be in the interests of justice to further prosecute that case." *See United States v. Nejad*, 1:18-cr-00224-AJN Dkt. 348, June 5, 2020.  The facts here of course are different.  But the Government's failure to correct Konstantin's false testimony at trial regarding the Dilkinska meeting, its misstatement of Second Circuit law in an effort to exclude reliable evidence that would have shown that testimony was false, and its continued disclosure failures after trial call are likewise unacceptable.  A new trial should result.

### E.   In Addition To Granting A New Trial, The Court Should Order A Hearing To Develop Further Facts Relating To The Disclosure Failures

As has been established, there is clearly a sufficient basis for a new trial without a hearing.  In addition to ordering a new trial, the Court should hold a hearing to investigate factual issues relating to the Government's failure to comply with its disclosure obligations to determine what other relief – including dismissal of the indictment – may be appropriate. *See, e.g., United States v. Seltzer*, 227 F. 3d 36, 42 (2d Cir. 2000) (upholding "the inherent power of the district court . . . to police the conduct of attorneys as officers of the court").

---

the nine foreign bank accounts that sent money to the Fenero Funds (and in the case of two accounts, had no records at all), even though Ms. October testified that summary charts she prepared were based on "bank records and other documents." (Tr. 1549).  Mr. Scott has detailed these and other failings with the tracing analysis in greater detail in Dkts. 218, 275, 345, and 345_1-345_4).

Mr. Scott respectfully requests that the Court inquire on several key issues in an

evidentiary hearing, including the following:

- What steps, and the timing of such steps, the Government took in response to Mr. Scott's *Brady* request of November 10, 2019 seeking information about Ms. Dilkinska's whereabouts on July 20, 2016.

- Why the Government backtracked on an agreement not to oppose DX 550 over the course of six hours on November 11, 2019, as reflected in the e-mail at Stanley Decl., Exhibit C.

- When the prosecution team learned that Konstantin had illegally used a contraband cellphone at the MCC and what consideration – if any – was given to disclosure of this breach of the cooperation agreement to the Court and defense.

- What role the Manhattan DA investigator who suppressed evidence of the Konstantin perjury played in the OneCoin prosecutions.

- What steps the Government took to secure custody of OneCoin boxes provided to the DANY investigator and COLP in the UK by Duncan, which Duncan stated contained material that had been on destroyed laptop.

- The basis for testimony by DANY financial analyst October claiming that "the transactions that are reflected on [her] charts have been confirmed by [her] in [her] analysis of the bank records and other documents" (Tr. at 1549) as well as that "each chart fairly and accurately reflect[s] a summary of the financial analysis [she] conducted with respect to the transactions contained in that chart." (Tr. at 1551).

After a hearing on these issues, Mr. Scott may seek additional relief, including dismissal

of the indictment with prejudice, as warranted.

## III.   Conclusion

A new trial should be ordered in the interests of justice for the reasons stated herein.[20]

---

[20] Mr. Scott also reminds the Court that his original post-trial motions (Dkts. 218, 275) are still pending and provide additional grounds for relief.  Specifically, these motions principally argue a failure of proof on the bank fraud conspiracy charge due to the lack of evidence that Mr. Scott made, or was aware of, any misrepresentations to FDIC-insured banks.  These motions also argue that the charged conduct lacks sufficient nexus to the United States to constitute wire fraud, the specific unlawful activity that underlies the money laundering conspiracy charge.

Respectfully Submitted,

Dated: December 15, 2021

/s/ Arlo Devlin-Brown

Arlo Devlin-Brown
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1046

David M. Garvin
Law Offices of David M. Garvin
200 South Biscayne Boulevard
Suite 3150
Miami, FL 33131
(305) 371-8101