UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA      :

                                  :

        - v. -               :

                                  :   S10 17 Cr. 630 (ER)

MARK S. SCOTT,         :

                                  :

              Defendant.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# GOVERNMENT'S SUR-REPLY
# IN OPPOSITION TO DEFENDANT'S SUPPLEMENTAL MOTION
# FOR A NEW TRIAL

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Nicholas Folly
Michael McGinnis
Juliana Murray
Assistant United States Attorneys

*- Of Counsel -*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

I.  RELEVANT FACTUAL OVERVIEW ...................................................................... 2

    A.  Summary of the Government's Case at Trial ................................................. 2

    B.  The July 2016 Meeting ................................................................................ 4

    C.  The Greenwood Devices and Dilkinska's Travel to India ........................... 6

    D.  The Precluded Emails ................................................................................. 9

    E.  Ignatov's Possession of a Cellphone at the MCC ..................................... 11

    F.  The Supplemental Motion and Supplemental Reply ................................. 12

II.  THE RULE 33 STANDARD .................................................................................... 13

III.  SCOTT'S SUPPLEMENTAL MOTION FOR A NEW TRIAL SHOULD BE
    DENIED ................................................................................................................... 14

    A.  The Alleged Evidentiary Error Does Not Constitute a Manifest Injustice
        Warranting a New Trial ............................................................................. 15

    B.  Scott's Motion for a New Trial Based on Newly Discovered Evidence of Perjury
        Should be Denied ...................................................................................... 22

        1.  Applicable Law ............................................................................... 22

        2.  Discussion ...................................................................................... 26

            a.  Scott's Motion, Brought Over Two Years After He Was Convicted, is
                Untimely .............................................................................. 26

            b.  Scott's Motion Is Not Based on Newly Discovered Evidence ....... 27

            c.  The Evidence Does Not Demonstrate that Ignatov Committed Perjury
                regarding the July 2016 Meeting ................................................ 31

            d.  Scott's Claim Fails on the Merits................................................. 34

    C.  The Government's Purported Disclosure Violations Do Not Warrant a New Trial... 45

    D.  The Court Should Deny the Defendant's Request for an Evidentiary Hearing .......... 55

CONCLUSION................................................................................................................... 57

## TABLE OF AUTHORITIES

*Anderson v. Beland (In re Am. Express Fin. Advisors Secs. Litig.)*,
    672 F.3d 113 (2d Cir. 2011) ............................................................... 14, 21

*Brady v. Maryland*,
    373 U.S. 83 (1963) ............................................................................ 48

*Buari v. Kirkpatrick*,
    753 F. Supp. 2d 282 (S.D.N.Y. 2010) ............................................ 52

*Giglio v. United States*,
    405 U.S. 150 (1972) ................................................................... 48, 53

*Harris v. United States*,
    9 F. Supp. 2d 246 (S.D.N.Y. 1998) ............................................. 23, 28

*Kyles v. Whitley*,
    514 U.S. 419 (1995) ....................................................................... 49

*Napue v. Illinois*,
    360 U.S. 264 (1959) ....................................................................... 53

*Romero v. United States*,
    28 F.3d 267 (2d Cir. 1994) ............................................................. 36

*Saville v. United States*,
    451 F.2d 649 (1st Cir. 1971) .......................................................... 29

*Schwarz v. Connelly*,
    No. 15 Civ. 1501 (PGG), 2020 WL 5441289 (S.D.N.Y. Sept. 10, 2020) ........................................... 24

*Strickler v. Greene*,
    527 U.S. 263 (1999) ........................................................ 48, 49, 52, 54

*United States ex rel. Regina v. LaVallee*,
    504 F.2d 580 (2d Cir. 1974) ........................................................... 29

*United States v. Aiyer*,
    470 F. Supp. 3d 383 (S.D.N.Y. 2020) ........................................ 18-19

*United States v. Allums*,
    No. S6 15 Cr. 153 (VSB), 2020 WL 3790610 (S.D.N.Y. July 7, 2020) .................................. 28, 51-52

*United States v. Alston*,
    899 F.3d 135 (2d Cir. 2018) ....................................................... 49, 54

*United States v. Archer*,
    977 F.3d 181 (2d Cir. 2020) ....................................................... 13-14

*United States v. Avellino*,
    136 F.3d 249 (2d Cir. 1998) ................................................. 25, 49, 55

*United States v. Bagley*,
   473 U.S. 667 (1985) ........................................................................................ 48-49

*United States v. Behiry*,
   No. 16 Cr. 763-07 (LGS), 2020 WL 3547741 (S.D.N.Y. June 30, 2020) ..................... 27-28

*United States v. Bell*,
   584 F.3d 478 (2d Cir. 2009) ........................................................................ 19, 25-26

*United States v. Best*,
   219 F.3d 192 (2d Cir. 2000) ........................................................................ 10, 16, 18

*United States v. Bin Laden*,
   397 F. Supp. 2d 465 (S.D.N.Y. 2005) ........................................................................ 50

*United States v. Bourke*,
   No. 5 Cr. 510 (SAS), 2011 WL 6376711 (S.D.N.Y. Dec. 15, 2011) ........................... 26-27

*United States v. Bout*,
   144 F. Supp. 3d 477 (S.D.N.Y. 2015) ........................................................................ 55

*United States v. Bout*,
   666 F. App'x 34 (2d Cir. 2016) ........................................................................ 28

*United States v. Camacho*,
   No. S12 94 Cr. 313 (CSH), 1999 WL 1084229 (S.D.N.Y. Dec. 1, 1999) ..................... 27

*United States v. Campos*,
   No. 16 Cr. 395 (VEC), 2017 WL 4402579 (S.D.N.Y. Oct. 3, 2017) ........................... 18

*United States v. Canova*,
   412 F.3d 331 (2d Cir. 2005) ........................................................................ 13

*United States v. Cardascia*,
   951 F.2d 474 (2d Cir. 1991) ........................................................................ 18

*United States v. Coppa*,
   267 F.3d 132 (2d Cir. 2001) ........................................................................ 49

*United States v. Corley*,
   No. 13 Cr. 48 (AJN), 2020 WL 4676650 (S.D.N.Y. Aug. 11, 2020) ........................... 28

*United States v. Diaz*,
   176 F.3d 52 (2d Cir. 1999) ........................................................................ 50, 53

*United States v. Ferguson*,
   246 F.3d 129 (2d Cir. 2001) ........................................................................ 2, 13, 51

*United States v. Forbes*,
   790 F.3d 403 (2d Cir. 2015) ........................................................................ 55

*United States v. Gaggi*,
   811 F.2d 59 (2d Cir. 1987) ........................................................................ 49

*United States v. Gambino*,
    59 F.3d 353 (2d Cir. 1995) ................................................................................................. 25

*United States v. Gil*,
    297 F.3d 93 (2d Cir. 2002) ................................................................................................. 50

*United States v. Grossman*,
    843 F.2d 78 (2d Cir. 1988) ................................................................................................. 49

*United States v. Guang*,
    511 F.3d 110 (2d Cir. 2007) ................................................................................................. 2

*United States v. Harwood*,
    998 F.2d 91 (2d Cir. 1993) ................................................................................................. 18

*United States v. Helmsley*,
    985 F.2d 1202 (2d Cir. 1993) ................................................................................... *passim*

*United States v. Hernandez*,
    521 F. App'x 14 (2d Cir. 2013) ................................................................................... 24, 31

*United States v. Kaufman*,
    No. 19 Cr. 504 (LAK), 2021 WL 4084523 (S.D.N.Y. Sept. 8, 2021) ............................. 19

*United States v. Kenner*,
    272 F. Supp. 3d 342 (E.D.N.Y. 2017) ............................................................................... 14

*United States v. Locascio*,
    6 F.3d 924 (2d Cir. 1993) ............................................................................................ 25, 50

*United States v. Madori*,
    419 F.3d 159 (2d Cir. 1995) ............................................................................................... 48

*United States v. Meinster*,
    619 F.2d 1041 (4th Cir. 1980) ........................................................................................... 29

*United States v. Mejia*,
    948 F. Supp. 2d 311 (S.D.N.Y. 2013) ......................................................................... 19, 21

*United States v. Meregildo*,
    920 F. Supp. 2d 434 (S.D.N.Y. 2013) .................................................................... 50, 53-54

*United States v. Monteleone*,
    257 F.3d 210 (2d Cir. 2001) ......................................................................................... 24, 31

*United States v. Moore*,
    54 F.3d 92 (2d Cir. 1995) ................................................................................................... 23

*United States v. Morell*,
    524 F.2d 550 (2d Cir. 1975) ............................................................................................... 50

*United States v. Morin*,
    538 F. App'x 1 (2d Cir. 2013) ........................................................................................... 18

*United States v. Mostafa*,
  No. 19 Cr. 2520, 2021 WL 4771837 (2d Cir. Oct. 13, 2021) ............................................ 14

*United States v. Napout*,
  332 F. Supp. 3d 533 (E.D.N.Y. 2018) ............................................................................... 31

*United States v. Orena*,
  32 F.3d 704 (2d Cir. 1994) ................................................................................................ 25

*United States v. Owen*,
  500 F.3d 83 (2d Cir. 2007) ................................................................................................ 31

*United States v. Parkes*,
  497 F.3d 220 (2d Cir. 2007) .............................................................................................. 13

*United States v. Payne*,
  63 F.3d 1200 (2d Cir. 1995) ............................................................................ 36, 49-50, 52

*United States v. Persico*,
  645 F.3d 85 (2d Cir. 2011) ........................................................................... 10, 17, 18, 20

*United States v. Rosner*,
  516 F.2d 269 (2d Cir. 1975) .............................................................................................. 24

*United States v. Rowland*,
  No. 3:14 Cr. 79 2015 WL 800083 (D. Conn. Feb. 25, 2015) .......................................... 55

*United States v. Sanchez*,
  969 F.2d 1409 (2d Cir. 1992)................................................................................. 13-14, 25, 26

*United States v. Seabrook*,
  467 F. Supp. 3d 171 (S.D.N.Y. 2020) ............................................................................... 56

*United States v. Seabrook,*
  No. 10 CR 87 (DAB), 2013 WL 4754331 (S.D.N.Y. Aug. 26, 2013) ......................... 37-38

*United States v. Soto,*
  No. 12 Cr. 556 (RPP), 2014 WL 1694880 (S.D.N.Y. Apr. 28, 2014) ............................. 19

*United States v. Spencer*,
  4 F.3d 115 (2d Cir. 1993) ............................................................................................ 36-37

*United States v. Spinelli*,
  551 F.3d 159 (2d Cir. 2008) .............................................................................................. 48

*United States v. Stewart*,
  433 F.3d 273 (2d Cir. 2006) ......................................................................................... 24, 25

*United States v. Torres*,
  128 F.3d 38 (2d Cir. 1997) .......................................................................................... 23, 29

*United States v. Vargas-Cordon*,
  733 F.3d 366 (2d Cir. 2013) .............................................................................................. 19

*United States v. Wallach,*
    935 F.2d 445 (2d Cir. 1991) ............................................................................ *passim*

*United States v. White,*
    972 F.2d 16 (2d Cir. 1992) ..................................................... 22-23, 24, 35, 56

*United States v. Wong,*
    78 F.3d 73 (2d Cir. 1996) .......................................................... 25, 37, 51

*United States v. Zagari,*
    111 F.3d 307 (2d Cir. 1997) ......................................................................... 23

## PRELIMINARY STATEMENT

The Government submits this brief in opposition[1] to Scott's Reply in Support of his Supplemental Rule 33 Motion ("Supplemental Reply" or "Supp. Reply"), filed on December 15, 2021.  (Dkt. 433.)[2]  Following a three-week trial in November 2019, Scott was swiftly convicted on all counts by the jury after only four hours of deliberation.  Now, over *two years* after his conviction, Scott argues that a new trial is warranted to prevent a "manifest injustice" based on an evidentiary error made at the time of trial and known to the defense at the time of trial.  Scott does not even attempt to excuse his failure to raise the error in his initial Rule 33 Motion.  Scott further argues that a new trial is warranted based on alleged "newly discovered" perjury by a cooperating witness, of which he was aware at the time of trial and about which he cross-examined the witness.  Finally, Scott argues that he is entitled to a new trial because of alleged Government errors in the prosecution of the case.  Scott's scattershot of allegations are untethered to governing law, omit relevant facts, and fail on the merits.

As explained below, Scott's Supplemental Reply should be denied for multiple reasons: (1) the motion is time-barred, in part, because the motion raises issues known to the defense and not based on newly discovered evidence; (2) Scott cannot sustain his burden to demonstrate that cooperating witness Konstantin Ignatov's testimony regarding a July 20, 2016 meeting at OneCoin's offices in Sofia, Bulgaria (the "July 2016 Meeting") constituted perjury;[3] (3) neither

---

[1] This brief assumes familiarly with the Government's September 10, 2021 response to the Supplemental Motion.  (Govt. Mem. in Opp., Dkt. 412.)

[2] "Dkt." refers to a docket entry in this case; "Tr." refers to the transcript of the November 2019 trial of defendant Mark Scott; and "Govt. Ex." refers to an exhibit appended to this submission.

[3] As discussed at length in the Government's response to the defendant's supplemental motion for a new trial, unlike the allegedly perjured testimony about the July 2016 Meeting, the Government does not contest that Ignatov's testimony regarding the Laptop was perjury, but such testimony had nothing whatsoever to do with the facts relevant to the merits of the case.  (*See* Govt. Mem. in Opp., Dkt. 412, at 20-25.)

the Laptop testimony nor the allegedly perjured testimony regarding the July 2016 Meeting was material to the jury's verdict; and (4) the prosecution team made appropriate discovery disclosures, including of the material about which Scott now complains.   Simply put, the defendant's complaints do not present the "extraordinary circumstances" necessary to warrant a new trial. *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (citation omitted).

The Government presented overwhelming independent evidence of Scott's guilt, consisting of emails, chat messages, bank records, travel records, other witness testimony, and recordings.   In light of that overwhelming evidence, the Court should not have any "concern that an innocent person may have been convicted." *United States v. Guang,* 511 F.3d 110, 119 (2d Cir. 2007) (citations omitted).   The defendant thus falls far short of meeting the high bar that serves as the "ultimate test on a Rule 33 motion . . . whether letting [his] guilty verdict stand would be a manifest injustice." *Ferguson*, 246 F.3d at 134 (citation omitted).   Accordingly, the jury's verdict should not be disturbed.

## I.     Relevant Factual Overview

### A.     Summary of the Government's Case at Trial

At trial, the Government conclusively demonstrated the existence of an international wire fraud scheme involving a purported cryptocurrency known as OneCoin (the "OneCoin Scheme"), as well as Scott's knowing participation in a massive conspiracy to launder the proceeds from that scheme.   (*See* Govt. Mem. in Opp., Dkt. 412, at 2-6.)   The Government's evidence included testimony from 15 witnesses,[4] numerous emails (including between Scott and key members of the

---

[4] The Government's September 10, 2021 response to the Supplemental Motion misstated the number of witnesses at trial at 17.   (Govt. Mem. in Opp., Dkt. 412, at 2.)   In fact, the Government called 15 witnesses in its case in chief and the defendant called five witnesses (one of whom, Special Agent Ron Shimko, had also been a Government witness).

OneCoin Scheme), and bank records and charts detailing Scott's network of offshore bank accounts and reflecting his laundering of criminal proceeds. (*See* Govt. Mem. in Opp., Dkt. 412, at 2-6.) The Government presented overwhelming evidence that Scott knew that the money he received was derived from criminal activity (*i.e.*, the OneCoin Scheme) and presented evidence of the extraordinary steps Scott took to conceal the link between the money and OneCoin, which included forging documents, lying to a fund administrator and financial institutions, and lying to law enforcement. (Govt. Mem. in Opp., Dkt. 412, at 6-14.) In addition, the Government established at trial that Scott personally received more than $50 million in payments from OneCoin co-founder Ruja Ignatova ("Ruja"), a staggering sum of money that could only be explained through Scott's involvement in a criminal conspiracy. (Govt. Mem. in Opp., Dkt. 412, at 12.)

Konstantin Ignatov ("Ignatov"), Ruja's brother who became a OneCoin leader following Ruja's disappearance, testified at trial pursuant to a cooperation agreement with the Government. Ignatov's testimony included background information regarding OneCoin, testimony regarding the fraudulent nature of OneCoin, and testimony concerning how OneCoin solved banking issues through the use of a network of money launders. (*See* Govt. Mem. in Opp., Dkt. 412, at 13-15.) As described in greater detail below, Ignatov testified that he had only met Scott once and had limited direct interaction with Scott that consisted primarily of communications regarding logistics for meetings and travel. (*See* Govt. Mem. in Opp., Dkt. 412, at 14.) On cross-examination, Scott elicited various testimony from Ignatov that was helpful to Scott's defense. (*See* Govt. Mem. in Opp., Dkt. 412, at 14-15.) Ignatov was also heavily impeached on both direct and cross-examination, including regarding his lies to law enforcement, possible destruction of evidence, and commission of federal felonies involving fraud and deception. (*See* Govt. Mem. in Opp., Dkt. 412, at 15-16.)

### B.     The July 2016 Meeting

The defendant relies heavily on Ignatov's allegedly perjured testimony about the July 2016 Meeting in his Supplemental Reply.  Notwithstanding that Scott himself attended the July 2016 Meeting and therefore knew who attended the meeting, he failed to raise any claim relating to the alleged perjury in his original post-trial briefing.  (*See* Dkt. 218, 275, 280.)

Moreover, at trial, the Government made no mention at all of the July 2016 Meeting in its main summation.  Indeed, the Government barely even referenced Ignatov in its closing arguments to the jury, which instead focused on the independent and overwhelming evidence of Scott's knowledge that OneCoin was a fraud scheme.  In the defendant's summation, defense counsel only briefly addressed the July 2016 Meeting, suggesting that Ignatov "exaggerated the meeting," while at the same time noting that Ignatov did not learn what transpired during the meeting.  (Tr. 1926.)  In rebuttal, the Government simply pointed out that if Ignatov "wanted to get Mark Scott he could have done a heck of a better job . . . He could have put himself in the meeting."  (Tr. 1969.)

Only one of 15 witnesses called by the Government in its case-in chief at trial testified about the July 2016 Meeting, and that testimony was relatively brief.  Specifically, cooperating witness Konstantin Ignatov testified that he met the defendant in person on a single occasion, when the defendant attended the July 2016 Meeting with Ruja and Dilkinska at OneCoin's offices in Sofia, Bulgaria.  (Tr. 245-47.)  Ignatov testified that he was not present at the meeting itself, and that he was never told what was discussed at the meeting.  (Tr. 246-47; 305.)  Notably, Scott himself attended the July 2016 Meeting and therefore had actual knowledge of the attendees and of what happened during the meeting, whereas Ignatov did not participate in the meeting.

Ignatov's testimony relating to the July 2016 Meeting was corroborated by, among other things: (i) email communications regarding Scott's plans to meet with Ruja, Krasimir Yordanov

4

("Krasimir"), Gilbert Armenta, and others in Sofia, Bulgaria in July 2016, and travel arrangements in connection with the meeting (GX 1142, 1143, 1154, 1157; Tr. 241-43); (ii) travel records confirming that Scott traveled to Sofia between July 20 and July 21, 2016 (GX 62 at ¶ 3(l)); and (iii) contemporaneous chat messages between Scott and his then-girlfriend concerning his meetings with Ruja on July 20 and July 21, 2016.  (GX 3025-S at p. 10.)  Evidence not admitted at trial, but produced by the defendant to the Government pursuant to a pre-trial subpoena (and left unmentioned in the defendant's motion), also supported Ignatov's testimony.  Specifically, Scott created a digital calendar entry for a three-hour meeting on July 20, 2016, which was entitled "Dr. RI and Krasimir Re Forex.  *Irina Re transfers and governance.*  Review SH Agt for tradeNext"; based on the description, that meeting involved both Ruja ("Dr. RI") and Dilkinska ("Irina").  (*See* Govt. Ex. A (emphasis added).)  Moreover, the trial evidence clearly established that Scott traveled to Sofia again just two months later, from September 15 to September 17, 2016, to meet with Ruja and others.  (GX 62 at ¶ 3(n), 1250, 4015, 4017, 4026, 4027, 4028, 3025-S at p. 12 ("In Sofia . . . Did a huge deal with Ruja."); Tr. 248-51.)  Evidence not admitted at trial, but produced by the defendant to the Government pursuant to a pre-trial subpoena (and left unmentioned in the defendant's motion), shows that Scott met in person with Dilkinska during the September 2016 trip to Sofia.  Specifically, on September 13, 2016, Dilkinska emailed Scott and others, in part, "**I will talk to Mark when we meet (15th of September) – need to discuss with him some aspects regarding this matter**."  (*See* Govt. Ex. B (emphasis in original).)[5]

Defense counsel cross-examined Ignatov regarding Dilkinska's presence at the July 2016 Meeting.  On cross, in response to the question, "The part about Irina being at the meeting, are you

---

[5] This email and the calendar entry described above were reproduced to the defendant in December 2021, in advance of the filing of his Supplemental Reply.

a hundred percent sure about that?", Ignatov answered "Yes." (Tr. 397.) Shortly thereafter, Ignatov qualified his answer, stating "I think I'm pretty sure . . .", "I'm pretty sure she was", and "[a]s I told you I'm pretty sure she was [in Sofia]." (Tr. 398.) Defense counsel impeached Ignatov extensively and effectively on a number of other topics, in a lengthy cross-examination filling over 100 pages of trial transcript. (Tr. 300-64, 388-436.)

Following the jury's guilty verdict on both counts in the S10 Indictment, Scott requested a schedule for the filing of post-trial motions. The Court originally set a deadline of December 20, 2019, for the filing of any motions under Federal Rules of Criminal Procedure 29 and 33. (Tr. 2062.) The Court subsequently extended that deadline at the defendant's request to February 3, 2020. (Dkt. 184 & 212.) In his memorandum of law in support of his original post-trial motions, filed on February 3, 2020, the defendant did not raise any claim regarding Ignatov's alleged perjured testimony. (*See* Dkt. 218.) Nor did the defendant raise the issue in his original reply brief or sur-sur reply brief, filed on May 1, 2020, and May 22, 2020, respectively.[6] (*See* Dkt. 275, 280.)

### C.     The Greenwood Devices and Dilkinska's Travel to India

The defendant claims that the Government "only recently disclosed" certain evidence that he describes as *Brady* material. (Supp. Reply, Dkt. 433, at 24-25.) In fact, the Government disclosed materials contained on devices seized from Sebastian Greenwood (the "Greenwood Devices")—some of which reflected Dilkinska's travel to India in July 2016—more than one month *prior* to trial.[7]

---

[6] Indeed, the defendant only fleetingly referenced Ignatov's testimony regarding the July 2016 Meeting in a single footnote in his original memorandum of law, noting simply that "there [were] substantial doubts that Ignatov testified truthfully" about the meeting. (Dkt. 218 at 5, n.2.)

[7] The Government also disclosed certain Dilkinska border-crossing records that it recently obtained from Indian authorities—which confirm Dilkinska's travel to India in July 2016—promptly upon receipt.

As the Court is aware, in the months leading up to the November 2019 trial in this matter, there was significant litigation regarding the applicability of the attorney-client privilege to various communications obtained during the Government's extensive investigation of the OneCoin Scheme.  One set of devices containing potentially privileged materials was seized from Sebastian Greenwood (the "Greenwood Devices"), the co-founder of OneCoin, incident to his July 2018 arrest in Thailand.  Full extractions of the Greenwood Devices were first available to the case team in March 2019 and the Government commenced its privilege screen and responsiveness review. In July 2019, the Government produced in discovery certain non-privileged communications identified within the Greenwood Devices that involved the defendant.  On October 1, 2019, approximately one week after obtaining a privilege waiver from Greenwood,[8] the Government produced full extractions of the Greenwood Devices to the defendant in a searchable electronic format.  The Government did not intend to call Greenwood as a witness at trial, nor did it intend to offer into evidence any communications or documents contained on the Greenwood Devices.[9] The Government produced the complete contents of the Greenwood Devices following Greenwood's privilege waiver to ensure that the defendant had access to any material that might be used to impeach co-conspirator statements made by Greenwood—which the Government sought to admit against the defendant pursuant to Federal Rule of Evidence 801(d)(2)(E)—or to impeach other trial witnesses and hearsay declarants, *see* Fed. R. Evid. 806.   Though the

---

[8] On or about September 17, 2019, through counsel, Greenwood provided a written waiver of personal attorney-client privilege as to all communications contained in the Greenwood Devices. On or about September 23, 2019, again through counsel, Greenwood confirmed that he did not intend to assert attorney-client privilege on behalf of any of the OneCoin-related entities listed in the Order to Show Cause submitted to the Court.  (Dkt. 133.)

[9] Indeed, Greenwood did not testify, and no evidence from the Greenwood Devices was admitted at trial.

Greenwood Devices contained voluminous data, the defendant made no request for additional time to review them.[10]

Well over a month later, in the middle of trial, defense counsel emailed the Government seeking "any *additional* material that may reflect [Irina Dilkinska's] schedule, travel, or whereabouts" at the time of the July 2016 Meeting.  (*See* Stanley Decl., Dkt. 434, Ex. C at 2 (emphasis added).)  In its responses, the Government pointed the defense to specific materials already produced to the defendant, including the Greenwood Devices, and further stated that "if such information comes to our attention *that has not been produced* we will let you know."  (*Id.* at 1 (emphasis added).)

In or about late September 2021, nearly two years after trial, defense counsel informed the Government that it possessed evidence that Dilkinska likely was in India at the time of the July 2016 Meeting.  The defendant later produced to the Government scans of Dilkinska's Bulgarian passport, which appeared to contain Indian border-crossing stamps reflecting that Dilkinska had traveled to India from July 19 to July 22, 2016.[11]  (*See* Stanley Decl., Dkt. 434, Ex. I.)  The Government subsequently sought and obtained from Indian authorities official Indian border-crossing records confirming that travel, and promptly produced those records to the defense.  (*See See* Stanley Decl., Dkt. 434, Ex. H.)

Also, in or about late September 2021, the defendant again requested from the Government "*other* evidence the Government has access to tending to show [Dilkinska] was not in Sofia / was

---

[10] In August 2019, the defendant objected to a one-month adjournment of trial from October to November 2019.  (*See* Defendant's August 29, 2019 Letter, Dkt. 120; August 30, 2019 Conference Tr., Dkt. 121, at 11.)

[11] These scans were corroborated by a video of an individual flipping through a passport that appears to belong to Dilkinska, and which was provided to the Government and then produced to the defendant.

in India." (Govt. Ex. C (Email from Devlin-Brown, dated September 30, 2021) (emphasis added).)

Defense counsel theorized that the Government might possess previously unproduced evidence,

such as "[Dilkinska's] email account(s), or computers/servers she used . . . calendar entries or e-

mails . . . border control records in India . . . [or] credit card or travel records reflecting the trip."

(*Id.*)  The Government searched its records and found no such previously unproduced evidence.

However, the Government did locate a series of communications in the Greenwood Devices—

communications that the case team had not previously reviewed—establishing that Dilkinska was

in India at the time of the July 2016 Meeting (the "Greenwood Communications").[12]  Critically,

these communications were produced to the defendant over a month *before* trial, and therefore

were in the possession of the defendant at the time of trial.  Indeed, the communications were

contained on a set of devices that the Government directed the defendant to during trial, *i.e.*, the

Greenwood Devices.  Although the defendant already possessed these communications, the

Government reproduced them to the defense in October 2021.  (*See* Govt. Ex. D[13] (Email from

McGinnis to Devlin-Brown, dated October 21, 2021).)

### D.    The Precluded Emails

Like the claim of alleged perjury by Ignatov, the defendant only now—over two years after

trial—raises the Court's erroneous preclusion of two defense exhibits, notwithstanding that the

relevant facts were known to the defendant at the time of his original post-trial briefing.  (*See* Supp.

---

[12] For example, in a July 19, 2016 chat message between Ruja and Greenwood contained on one of the Greenwood Devices, Ruja remarked that Dilkinska was traveling in India for the week.  (*See* Stanley Decl., Dkt. 434, Ex. G-1, at lines 28762-63 (chats from "HRH"—short for "her royal highness," a nickname for Ruja—to Greenwood stating: "And cannot risk cash flow from non onecoin business *for india*.  I have acct. *Irina is there tjis [sic] week*.") (emphasis added).)

[13] The Greenwood Devices reports that were attached to Govt. Ex. D ("Report.xlsx," "E-mails.xlsx," and "Report.xlsx") are at Stanley Decl., Dkt. 434, Exs. G-1, G-2, and G-3.

Reply, Dkt. 433, at 18-22.)  Moreover, the controlling case on the evidentiary issue, cited at length by the defendant in his Supplemental Reply, was decided years before trial.

During Ignatov's cross-examination, defense counsel used Defense Exhibit 550 ("DX 550") in an effort to impeach Ignatov's testimony regarding Dilkinska's presence at the July 2016 Meeting.  (Tr. 397-98.)  DX 550 was a July 17, 2016 email from Dilkinska to Scott stating in part that she was "travelling for the whole week."  When the defendant offered DX 550 into evidence, the Government objected to its admission, and the Court precluded the exhibit.  (Tr. 383-86, 397-98.)  Defense counsel later sought reconsideration of the Court's ruling on DX 550, and also sought to admit into evidence Defense Exhibit 552 ("DX 552"), a July 20, 2016 email from Dilkinska to Scott stating in part that she was "travelling too."  (Tr. 1285-92.)  During the ensuing argument, both parties discussed the effect of Federal Rule of Evidence 803(3) and the Second Circuit's decision in *United States v. Best*, 219 F.3d 192 (2d Cir. 2000), on the admissibility of DX 550 and DX 552.  Neither party cited or otherwise discussed the Second Circuit's decision in *United States v. Persico*, 645 F.3d 85 (2d Cir. 2011), and the defense did not contest the Government's mistaken position, based on its reading of *Best*, that Rule 803(3) had an independent corroboration requirement.  Ultimately, the Court precluded both DX 550 and DX 552, ruling that DX 552 was not "a statement of intent" within the meaning of Rule 803(3), and ruling (erroneously, in light of *Persico*) that DX 550 was inadmissible because it lacked independent corroboration.  (Tr. 1291-92.)

In his February 3, 2020 memorandum of law in support of his original post-trial motions, the defendant did not raise any claim of error regarding the Court's preclusion of DX 500 or DX 552, notwithstanding the fact that *Persico* was decided in 2011.  (*See* Dkt. 218.)  Nor did he raise the issue in his original reply brief or sur-sur reply brief, filed on May 1, 2020, and May 22, 2020,

10

respectively.[14]  (*See* Dkt. 275, 280.)

E.       **Ignatov's Possession of a Cellphone at the MCC**

Starting approximately one month after trial in this case, Ignatov possessed and used a contraband cellphone (the "Cellphone") in prison.  Ignatov's use of the Cellphone entirely post-dated trial and, in any event, the Government disclosed both the existence of the Cellphone and its contents to the defendant.

On or about February 28, 2020, well after Scott was convicted, Bureau of Prisons staff at the Metropolitan Correctional Center ("MCC") recovered the Cellphone from the vicinity of Ignatov's bunk at the facility.  Assistant United States Attorneys with the U.S. Attorney's Office for the Southern District of New York who were working on a separate investigation subsequently obtained a search warrant to search the contents of the Cellphone.  However, prosecutors on this case were not informed of the existence of the Cellphone until on or about October 28, 2020.  On or about November 20, 2020, Ignatov's attorneys provided a brief attorney proffer regarding the Cellphone; in sum and substance, Ignatov (through counsel) admitted to his possession and use of the Cellphone after the November 2019 trial of Mark Scott.  Over the following months, the case team regularly followed up on the status of the search of the Cellphone, which was not imaged or searched for a prolonged period due to a technical inability to access the contents of the Cellphone.

The case team first learned that Ignatov had falsely testified about the manner in which he disposed of the Laptop from allegations contained in the supplemental motion seeking a new trial filed by Scott on August 23, 2021 ("Supplemental Motion" or "Supp. Motion," Dkt. 410).  The

---

[14] Indeed, the only reference to DX 550 and DX 552 in the defendant's briefs was contained in a single footnote, in which the defendant noted that "the Court refused to admit the emails following the Government's objection."  (Dkt. 218 at 5, n.2.)

case team then took a series of steps to further investigate Ignatov's credibility, including by conducting several proffer sessions with Ignatov, seeking and obtaining additional documents and records from India (among other locations), and redoubling its efforts to obtain access to the contents of the Cellphone.  On or about October 8, 2021, Ignatov's attorneys provided several passcodes for the Cellphone in response to the Government's request for that information.  On or about October 12, 2021, the case team disclosed to Scott that the Cellphone had been seized from Ignatov in February 2020, provided notes from the November 2020 attorney proffer regarding the Cellphone, and informed Scott that the FBI was "attempting to access the data on the [Cellphone]." Less than two weeks later, on October 21, 2021, the Government produced the full, non-privileged contents of the Cellphone to defense counsel.  (*See* Govt. Ex. D.)  On November 5, 2021, the Government produced to defense counsel both draft translations of messages contained on the Cellphone and notes of an interview with Ignatov regarding the Cellphone.  (Govt. Ex. E[15] (Email from Folly to Devlin-Brown, dated November 5, 2021).)  The Government produced supplemental translation materials relating to the Cellphone on December 3, 2021.  (Govt. Ex. F (Email from McGinnis to Devlin-Brown, dated December 3, 2021).)  A review of the data on the Cellphone confirmed that Ignatov did not use the Cellphone until after the November 2019 trial of Scott.

### F.    The Supplemental Motion and Supplemental Reply

As noted above, Scott filed the Supplemental Motion on August 23, 2021, raising new grounds—not set forth in his original February 2020 post-trial motion—that he claims support a new trial under Rule 33.  (Supp. Motion, Dkt. 410.)  The Supplemental Motion focused on Ignatov's perjury regarding the Laptop.  (*Id.*)  Like Scott's timely post-trial motions, the

---

[15] The letter that was attached to Govt. Ex. E ("2021.12.3 Letter to Scott re Dilkinska Travel.pdf") is at Stanley Decl., Dkt. 434, Ex. H.

Supplemental Motion did not raise any claim of legal error with respect to the preclusion of DX 550 or DX 552, nor did it cite to the *Persico* case.  (*Id.*)  The Government responded to the Supplemental Motion on September 10, 2021.  (Govt. Mem. in Opp., Dkt. 412.)

On December 15, 2021, Scott filed the Supplemental Reply, in which he raises a host of new claims not advanced in the Supplemental Motion.  (Supp. Reply, Dkt. 433.)  In the Supplemental Reply, Scott argues, for the first time, that the Court should grant a new trial based on its erroneous preclusion of DX 550 and DX 552.  (*Id.*)  Scott also claims as grounds for a new trial that: (i) Ignatov provided intentionally false testimony about Dilkinska's attendance at the July 2016 Meeting; and (ii) the Government engaged in various purported discovery and disclosure violations related to the Laptop, the Greenwood Devices, and the Cellphone.  (*Id.*)

## II.    The Rule 33 Standard

Rule 33 provides, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  Given the deference owed to a jury's verdict, however, this Court has cautioned that district courts should exercise their Rule 33 authority only "'sparingly' and in 'the most extraordinary circumstances.'"  *Ferguson*, 246 F.3d at 134 (citations omitted).  Thus, a motion for a new trial should not be granted unless, after evaluating the "entire case," the district court is left with a "real concern that an innocent person may have been convicted."  *Id.* (citation omitted).  "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice."  *Id.*; *accord United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005) ("There must be a real concern that an innocent person may have been convicted."); *see also United States v. Parkes*, 497 F.3d 220, 233 (2d Cir. 2007) (collecting cases).  Thus, in assessing the evidence of conviction, a district court must find that "the evidence preponderates heavily against the verdict to such an

extent that it would be 'manifest injustice' to let the verdict stand." *United States v. Archer*, 977

F.3d 181, 188 (2d Cir. 2020) (discussing *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir.

1992)).

Under Rule 33, "[a]ny motion for a new trial grounded on any reason other than newly

discovered evidence must be filed within 14 days after the verdict or finding of guilty."  A court

may extend the timing of such motion only upon a finding of "excusable neglect."  *See* Fed. R.

Crim. P. 45(b)(1)(B); *see also United States v. Mostafa*, No. 19-2520, 2021 WL 4771837, at *2

(2d Cir. Oct. 13, 2021) ("[A]n extension of the Rule 33 deadline requires the movant to prove

'excusable neglect.'").  The Second Circuit has set forth four factors that the district court should

consider in determining whether the "excusable neglect" standard has been met:

> (1) the danger of prejudice to the party opposing the extension; (2) the length of
> the delay and its potential impact on judicial proceedings; (3) the reason for the
> delay, including whether it was within the reasonable control of the party seeking
> the extension; and (4) whether the party seeking the extension acted in good faith.

*Anderson v. Beland (In re Am. Express Fin. Advisors Secs. Litig.)*, 672 F.3d 113, 129 (2d Cir.

2011) (citations omitted); *United States v. Kenner*, 272 F. Supp. 3d 342, 419-20 (E.D.N.Y. 2017).

## III.    Scott's Supplemental Motion for a New Trial Should be Denied

As described below, Scott's claims are meritless.  His evidentiary claim is time-barred, and

any error was in any event harmless.  He is wrong that Ignatov committed perjury as to the July

2016 Meeting, and regardless, neither that testimony nor Ignatov's false testimony about how he

disposed of the Laptop affected the outcome of the trial, given the overwhelming independent

evidence of Scott's guilt.  Finally, the Government did not violate its *Brady* and *Giglio* obligations,

nor can Scott establish any prejudice as a result to the claimed disclosure issues.  Finally, there are

no material factual issues to be resolved, and a hearing is therefore not warranted.  In short, because

Scott cannot meet the exacting standard under Rule 33 to show that allowing his conviction to

14

stand would be a "manifest injustice," his motion for a new trial should be denied in its entirety.

**A.    The Alleged Evidentiary Error Does Not Constitute a Manifest Injustice Warranting a New Trial**

 **1.    Relevant Background**

As discussed above, during his direct examination, Ignatov testified regarding the July 2016 Meeting between Scott, Ruja, and Dilkinska.  Ignatov did not attend the July 2016 Meeting and did not testify regarding the substance of the meeting.  Scott does not dispute that he attended a meeting in Sofia, Bulgaria on July 20, 2016, with the founder of OneCoin, Ruja, which is highly corroborated by documentary evidence admitted at trial.  Rather, Scott argues that Dilkinska did not attend the July 2016 Meeting that he had with Ruja, contrary to Ignatov's testimony.

On November 7, 2021, defense counsel began his second day of the cross-examination of Ignatov.  During the morning conference, counsel raised with the Court the prospect of admitting DX 550, a July 17, 2016 email from Dilkinska stating: "I am travelling for the whole week."  Counsel argued that DX 550 was inconsistent with Ignatov's testimony the prior day concerning the July 2016 Meeting, because it suggested that Dilkinska did not attend the meeting.  After limited argument, the Court permitted counsel to show the document to Ignatov for purposes of refreshing his recollection regarding the July 2016 Meeting.  (*See* Tr. 383-386.)

During Ignatov's cross examination, counsel did not attempt to refresh Ignatov's recollection with DX 550 as the Court had permitted.  Rather, counsel pressured Ignatov on his certainty regarding Dilkinska's attendance at the July 2016 Meeting and then showed Ignatov DX 550.  After asking Ignatov to read the document to himself, counsel sought Ignatov's concession that Dilkinska did not attend the meeting.  Ignatov responded: "I'm pretty sure that she was [there]."  (Tr. at 398.)  Counsel did not ask Ignatov whether the document refreshed his recollection regarding the events in question.

Four days later, on November 11, 2019, defense counsel emailed the Government requesting that the Government "search" "any additional material that may reflect Irina's schedule, travel or whereabouts," and further asking whether the Government continued to oppose the admission of DX 550.  Initially, the Government indicated that it would no longer oppose the admission of DX 550, before later clarifying that it would continue to oppose the admission of both DX 550 and an additional email identified by the defense, DX 552 (July 20, 2016 email between Dilkinska and Scott in which Dilkinska states, "I am travelling too")]).

On November 11, 2019, at 11:29 p.m., Scott filed a motion with the Court seeking admission of both DX 550 and DX 552.  In his motion, Scott relied almost exclusively on *United States v. Best*, 219 F.3d 192, 198 (2d Cir. 2000), regarding the legal requirements for admission of the exhibits.  The next morning, at the first appearance before the Court, and before the Government had any opportunity to respond in writing, the defense pressed the issue with the Court, again seeking the admission of DX 550 and DX 552.  The Government continued to object. In making its objection, the Government focused on the analysis set forth in *Best*.  Specifically, in *Best*, to admit a declarant's statement of a non-declarant's future action, the Court required corroboration for the declarant's hearsay statement.  *See* 219 F.3d at 198 ("In several cases, this Court has discussed whether a declarant's out-of-court statement of intent was admissible in evidence against a person other than the declarant. . . . In each of these cases, we concluded that admissibility turned on whether there was independent evidence that connected the declarant's statement with the non-declarant's activities." (internal citations omitted).)

At argument, the Government provided the Court with a copy of *Best* and explained its understanding that *Best* required independent corroboration for the admission of the hearsay statement.  Because Ignatov was the witness on the stand, the Government identified the declarant

as Ignatov and the statement as related to Dilkinska's own actions.  Notably, the defense *did not* challenge this position (*i.e.*, that Ignatov was the relevant declarant).  To the contrary, counsel argued that "We are not trying to confirm *the declarant's* testimony.  We are trying to impeach *the declarant's* testimony." (Tr. at 1290 (emphasis added)).  In other words, the defense likewise identified Ignatov as the declarant for purposes of the *Best* analysis.  As a result, the Government, the defense, and the Court all implicitly agreed that the issue concerned whether corroboration was required for a declarant's statement of the future plans of a non-declarant, and *Best* held that corroboration was required.  (Tr. at 1292 ("The Court: In the cases cited by the defendant, the court required more.")).  Accordingly, the Court excluded both DX 550 (for lacking corroboration) and DX 552 (for failing to contain a statement of future intent and therefore falling outside the scope of Rule 803(3)). (*See* Tr. at 1290-91 ("The Court: I don't think 552 comes in at all because of the way that the e-mail is phrased because it's not a statement of intent.")).

In the Supplemental Reply, the defense now cites *United States v. Persico*, 645 F.3d 85, 101 (2d Cir. 2011).  The defense did not cite *Persico* in his initial argument regarding DX 550 and 552 on November 7, 2019, in the midnight motion papers regarding DX 550 and DX 552, on November 11, 2019, or at oral argument on the motion on November 12, 2019.  Moreover, the defendant failed to raise any claim of error relating to the preclusion of the exhibits in his original post-trial motion and reply, filed in February 2020 and May 2020, respectively, notwithstanding the fact that *Persico* was decided in 2011.

### 2.    Applicable Law

#### a.    Rule 803(3)

Rule 803 provides an exception to the blanket prohibition on hearsay for "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory,

or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed . . . ." Fed. R. Evid. 803(3). To satisfy Rule 803(3), "the statement must face forward, rather than backward." *United States v. Harwood*, 998 F.2d 91, 98 (2d Cir. 1993). This restriction "is necessary to prevent this exception from swallowing the hearsay rule." *United States v. Cardascia*, 951 F.2d 474, 487 (2d Cir. 1991).

Under Rule 803, "a declarant's statement of intention to do something with another person is admissible as evidence that the *declarant* acted in accordance with his stated intention." *Persico*, 645 F.3d at 101-02. By contrast, where the declarant's statement of intention is admissible to show that *a third party* acted in conformity with the statement, "admissibility turn[s] on whether there [is] independent evidence" of the third party's actions. *See Best*, 219 F.3d at 198.

### b.   Claims of Evidentiary Error Under Rule 33

Rule 33 motions are not vehicles to relitigate evidentiary disputes. *See United States v. Morin*, 538 F. App'x 1, 2-3 (2d Cir. 2013) ("The evidentiary rulings that form the basis of Morin's Rule 33 motion do not evince the kind of 'exceptional circumstances' suggesting 'a real concern that an innocent person may have been convicted.'" (internal citations omitted)); *see also United States v. Campos*, No. 16 Cr. 395 (VEC), 2017 WL 4402579, at *3 (S.D.N.Y. Oct. 3, 2017), *aff'd*, 763 F. App'x 97 (2d Cir. 2019) ("Mr. Campos, in essence, is seeking to 'use Rule 33 as a vehicle to relitigate pretrial rulings with which he disagrees,' but he fails to show that these rulings 'greatly prejudiced [him] so as to give rise to a concern that an innocent person may have been convicted.'" (citations omitted)); *United States v. Aiyer*, 470 F. Supp. 3d 383, 410 (S.D.N.Y. 2020) ("As an initial matter, to the extent that the defendant objects now to evidentiary rulings made by the Court prior to and during trial concerning the admissibility of ruble and zloty transactions and 'spoofing' or canceled trades, those arguments are improper on a Rule 33 motion absent 'manifest injustice.'"

18

(citation omitted)).

In the context of a motion made under Rule 33, a defendant must show more than mere evidentiary error.  Rather, "[w]here an evidentiary ruling is the basis of a defendant's Rule 33 motion, the question is not whether there was error in the evidentiary ruling, but whether there is 'manifest injustice' and a real concern that an innocent person may have been convicted." *United States v. Soto*, No. 12 Cr. 556 (RPP), 2014 WL 1694880, at *7 (S.D.N.Y. Apr. 28, 2014) ("This Court joins the majority of courts in this Circuit in finding that, in the absence of a manifest injustice, a Rule 33 motion is an inappropriate vehicle to relitigate the trial court's earlier evidentiary decisions."); *see also United States v. Kaufman,* No. 19 Cr. 504 (LAK), 2021 WL 4084523, at *23 (S.D.N.Y. Sept. 8, 2021) (denying motion for new trial based on exclusion of expert witness because "[t]he exclusion of [the expert's] testimony did not result in any miscarriage of justice or otherwise warrant a new trial"); *United States v. Mejia*, 948 F. Supp. 2d 311, 319 (S.D.N.Y. 2013) ("Even if the Court erred in excluding the hearsay testimony, Defendant still has not . . . demonstrated that it would be a 'manifest injustice' to let the verdict stand under Rule 33." (citation omitted)); *cf. United States v. Bell*, 584 F.3d 478, 486 (2d Cir. 2009) ("[w]e will [nevertheless] not grant a new trial unless we find that the introduction of inadmissible evidence was a clear abuse of discretion and was so clearly prejudicial to the outcome of the trial that we are convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.") (quoting *Phillips v. Bowen,* 278 F.3d 103, 111 (2d Cir. 2002))); *United States v. Vargas-Cordon*, 733 F.3d 366, 384 (2d Cir. 2013) ("We will grant a retrial for improper evidentiary rulings only where these rulings were so clearly prejudicial to the outcome of the trial that we are convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." (internal quotations and citations omitted).)

### 3. Discussion

Scott claims that the Court erred in excluding DX 550 and DX 552 and that such error warrants the exceptional remedy of a new trial. The Court should not grant a new trial motion on these grounds.

As an initial matter, with the benefit of additional time and briefing, the Government recognizes that DX 550 satisfies the requirements of Rule 803(3) as set forth in *United States v. Persico*, 645 F.3d 85 (2d Cir. 2011).[16] Nonetheless, such error does not warrant a new trial under Rule 33. Rather, the defendant's request for a new trial fails for two separate and independent reasons. First, the evidentiary claim raised in the Supplemental Reply, filed more than two years after trial, is time-barred. Second, the defendant cannot demonstrate that this evidentiary error constitutes a manifest injustice warranting a new trial. Indeed, counsel's failure to raise this claim at any point in the prior two years only underscores the lack of materiality attached to the excluded emails.

*First*, the defendant's motion is time-barred. As set forth above, Rule 33 requires new trial motions to be filed within 14 days of the verdict, except where such motions are based on newly discovered evidence. Because the defendant's challenge to the Court's evidentiary rulings was fully ripe at the time of trial, and is in no way dependent upon any newly discovered evidence,[17] the defendant was required to raise this claim of legal error within 14 days of the jury's verdict.

---

[16] As noted above, Scott did not cite or otherwise reference *Persico* at any point prior to the filing of the instant motion. DX 552 does not fall within the ambit of Rule 803(3) because it does not contain a statement of future intent, but rather states "I *am* travelling." Accordingly, the Court did not err in precluding DX 552 on that basis. (*See* Tr. at 1291 ("The Court: I don't think 552 comes in at all because of the way that the e-mail is phrased because it's not a statement of intent.").)

[17] Indeed, as noted above, the Second Circuit decided *Persico*—the controlling case cited by the defendant in his Supplemental Reply—in 2011, long before trial in this matter.

The defendant failed to do so, failed to seek leave to extend the time by which to file the motion, and fails to offer any explanation for doing so in the Supplemental Reply. Nor can the defendant meet the "excusable neglect" standard. *See Anderson*, 672 F.3d at 129 (citations omitted) (examining the "danger of prejudice," the length of the delay, the reason for the delay, and whether the party acted in good faith). The defendant failed to raise the issue for nearly two years and the defendant has provided no explanation or justification for the delay.[18] Indeed, the defendant previously filed a timely Rule 33 motion in this case, *see* ECF No. 218, which motion raised five separate grounds for a new trial. Yet, despite his prior request for a new trial, the defendant failed to challenge this evidentiary ruling. His belated attempt should not be entertained at this late juncture.

*Second*, the defendant cannot meet the relevant legal standard: evidentiary error giving rise to a manifest injustice. *See Mejia*, 948 F. Supp. 2d at 319 ("Even if the Court erred in excluding the hearsay testimony, Defendant still has not . . . demonstrated that it would be a 'manifest injustice' to let the verdict stand under Rule 33." (citation omitted)). As explained in detail below (in connection with Scott's claims of Ignatov's purported perjury), Dilkinska's presence at the July 2016 Meeting was immaterial to the jury verdict. Ignatov did not testify regarding what was said during the July 2016 Meeting and Dilkinska's presence or absence at the meeting was irrelevant to the central issue at trial—Scott's knowledge that OneCoin was a fraud scheme. The relevance of the July 2016 Meeting stems from the undisputed fact that Scott traveled halfway around the world to meet with Ruja at OneCoin's headquarters. As explained in detail below, the independent

---

[18] With respect to the other factors, the Government notes that the passage of time dims the Government's prospect of success at any future trial given the fading of memories. In especially large and complex cases, such as the instant, the Government is also hampered by the discontinuity of trial counsel due to the passage of time.

evidence of Scott's guilt—both outside of Ignatov's testimony and unrelated to the July 2016 Meeting—was overwhelming.  Any error in excluding defense exhibits indicating that Dilkinska was traveling at the time of the July 2016 Meeting was, at most, harmless error.

**B.**     **Scott's Motion for a New Trial Based on Newly Discovered Evidence of Perjury Should be Denied**

Scott's motion for a new trial based on "newly discovered evidence" is primarily a repackaged version of his evidentiary argument described above.  Principally, Scott argues that he is entitled to a new trial on the basis that Ignatov testified falsely regarding the Laptop, and separately, about Dilkinska's presence at the July 2016 Meeting.  The gravamen of Scott's argument pertains to the July 2016 Meeting.  As explained below, there is no basis for Scott to claim that his argument is based on newly discovered evidence; Scott knew before trial and during the trial that Ignatov's statements and testimony about the July 2016 Meeting were inaccurate, and he impeached Ignatov on this subject during cross-examination.  This is fatal to his claim.

**1.**     **Applicable Law**

The general standard governing motions for a new trial is set forth above.  By its terms, Rule 33 provides that while a "motion for a new trial grounded on newly discovered evidence must be filed within [three] years after the verdict or finding of guilty," "[a] motion for a new trial based on any reason other than newly discovered evidence must be filed within [fourteen] days after the verdict or finding of guilt."  Fed. R. Crim. P. 33.  Therefore, a motion brought more than fourteen days after verdict, as Scott's was here, must meet the threshold requirement of being based on newly discovered evidence.[19]

To meet this standard a defendant must establish that his claim rests on evidence that "could

---

[19] As discussed above in connection with DX 550 and DX 552, Scott has not attempted (and cannot meet) the excusable neglect standard.

not with due diligence have been discovered before or during trial." *United States v. White*, 972 F.2d 16, 20-21 (2d Cir. 1992), *cert. denied*, 506 U.S. 1026 (1992); *accord United States v. Torres*, 128 F.3d 38, 49 (2d Cir. 1997), *cert. denied*, 523 U.S. 1065 (1998); *United States v. Moore*, 54 F.3d 92, 99 (2d Cir. 1995), *cert. denied*, 516 U.S. 1081 (1996); *United States v. Helmsley*, 985 F.2d 1202, 1205-08 (2d Cir. 1993).  The burden is on a defendant to establish both a lack of awareness of the information and exercise of due diligence to discover it.  *See United States v. Zagari*, 111 F.3d 307, 322 (2d Cir. 1997) (citations omitted).

Beyond the time limitations for bringing a motion under Rule 33, motions seeking a new trial based on a claim of perjury require, among other things, a threshold showing that the alleged false testimony is newly discovered:

> First, the motion will not be granted unless the 'newly discovered evidence' could not with due diligence have been discovered before or during trial. . . .   Second, when the newly discovered evidence focuses on the perjury of a witness, a threshold inquiry is whether the evidence demonstrates that the witness in fact committed perjury. . . .   Third, the newly discovered evidence must be material. . . .   Fourth, consideration must also be given to whether the newly discovered evidence is cumulative, that is simply additional evidence to that which was presented at trial as to a fact, or unique evidence that tends to prove a fact at issue. . . .   [Fifth, the Court must consider] the effect the evidence would have on the jury's verdict had it been submitted at [the trial].

*White*, 972 F.2d at 20-21; *accord Moore*, 54 F.3d at 99; *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991), *cert. denied*, 508 U.S. 939 (1993).  Thus, "where at the time of trial a Rule 33 movant knew or by the exercise of due diligence could have discovered (and consequently demonstrated) a government witness's perjury . . . the evidence of perjury is not 'newly discovered' under the rule." *Harris v. United States*, 9 F. Supp. 2d 246, 255 (S.D.N.Y. 1998), *aff'd*, 216 F.3d 1072 (2d Cir. 2000); *see also Helmsley*, 985 F.2d at 1208 ("We have never permitted a successful collateral attack for a prosecutor's knowing use of false testimony based entirely on evidence of which the defendant was aware, or in the exercise of reasonable diligence should have been aware,

at trial . . . ."); *Schwarz v. Connelly*, No. 15 Civ. 1501 (PGG), 2020 WL 5441289, at \*9 (S.D.N.Y. Sept. 10, 2020) ("The law generally does not permit a collateral attack premised on prosecutorial misconduct, however, where the petitioner's argument is 'based entirely on evidence of which the defendant was aware, or in the exercise of reasonable diligence should have been aware, at trial.'") (quoting *Helmsley*, 985 F.2d at 1208).

When actual newly discovered evidence "focuses on the perjury of a witness, a threshold inquiry is whether the evidence demonstrates that the witness in fact committed perjury." *United States v. Stewart*, 433 F.3d 273, 297 (2d Cir. 2006) (citation omitted). "A witness perjures himself when he, 'gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory.'" *United States v. Hernandez*, 521 F. App'x 14, 16 (2d Cir. 2013) (quoting *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001)).

Once a finding of perjury has been made, the rule to be applied depends, in part, on the timing of the Government's awareness of the intentionally false testimony. Where the Government "knew or should have known of the perjury, the conviction must be set aside 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Wallach*, 935 F.2d at 456 (quoting *Perkins v. LeFevre*, 691 F.2d 616, 619 (2d Cir. 1982)); *accord White*, 972 F.2d at 21. However, "[w]here the Government was unaware of a witness' perjury, ... a new trial is warranted only if the testimony was material and 'the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.'" *Wallach*, 935 F.2d at 456 (quoting *Sanders v. Sullivan*, 863 F.2d 218, 226 (2d Cir. 1988)); *accord White*, 972 F.2d at 21; *United States v. Rosner*, 516 F.2d 269, 280 (2d Cir. 1975), *cert. denied*, 427 U.S. 911 (1976).

Relatedly, the Second Circuit has found newly discovered evidence that amounts to additional impeachment material to be immaterial where a witness was extensively impeached at trial.  *See, e.g.*, *United States v. Avellino*, 136 F.3d 249, 258 (2d Cir. 1998) ("where there has been disclosure of an abundance of evidence of a witness's long history of brutality, rapacity, and mendacity, the belatedly disclosed evidence suggesting that the witness perjured himself by concealing additional crimes may be immaterial"); *United States v. Gambino*, 59 F.3d 353, 366 (2d Cir. 1995) (although information that had not been disclosed prior to trial was "quintessential" impeachment material, it was not material because the jury had a "fair opportunity to evaluate the witness' credibility" on the basis of other impeachment material); *United States v. Orena*, 32 F.3d 704, 717 (2d Cir. 1994) (in light of jury's knowledge of witness's "horrendous history of criminal activity," disclosure that witness might have engaged in other illegal activity "would not significantly have improved [defendant's] ability to undercut [witness's] credibility"); *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993) (rejecting claim that newly disclosed evidence of witness's involvement in three murders required a new trial where witness had been cross-examined extensively at trial about 19 other murders).  Thus, "newly discovered evidence of perjury that serves only to impeach credibility is generally insufficient to justify a new trial." *Stewart*, 433 F.3d at 301; *see also United States v. Wong*, 78 F.3d 73, 82 (2d Cir. 1996) (holding that "the new evidence of [the witness's] perjury is the sort of cumulative impeachment material that is routinely held insufficient to warrant a new trial" (quotation marks omitted)).

"[M]otions for a new trial based on the identification of perjured testimony should be granted only with great caution and in the most extraordinary circumstances." *Sanchez*, 969 F.2d at 1414.  A court should not grant a new trial based on perjured testimony "unless the judge is prepared to answer 'no' to the following question: 'Am I satisfied that competent, satisfactory and

sufficient evidence in this record supports the jury's finding that this defendant is guilty beyond a reasonable doubt?'" *Bell*, 584 F.3d at 483 (quoting *Sanchez*, 969 F.2d at 1414). Further, "[i]n making this assessment, the judge must examine the totality of the case. All the facts and circumstances must be taken into account. An objective evaluation is required. There must be a real concern that an innocent person may have been convicted." *Id.* (quoting *Sanchez*, 969 F.2d at 1414).

### 2.     Discussion

#### a.     Scott's Motion, Brought Over Two Years After He Was Convicted, is Untimely

In his Supplemental Reply, Scott inexplicably argues for the first time that he is entitled to a new trial based on Ignatov's inaccurate testimony regarding the July 2016 Meeting. The original deadline for Scott's post-trial motions was January 20, 2020. At the request of Scott, with the Government's consent, the Court adjourned Scott's deadline to February 3, 2020. (Dkt. 212.) Scott filed his post-trial motions on that date, failing to raise any claim based on alleged false testimony regarding the July 2016 Meeting. Nearly two years later, Scott filed a motion raising such a claim for the first time. (Dkt. 433.) Scott's claim regarding the July 2016 Meeting must be denied as untimely.

Scott, who himself attended the July 2016 Meeting, knew that Dilkinska was not present at that meeting and that Ignatov's testimony (and proffer statements) were therefore inaccurate. "[Scott] therefore had actual knowledge of the discrepancy between [Ignatov]'s recollection and the facts of [Dilkinska's physical presence at the July 2016 Meeting] immediately upon hearing [Ignatov]'s testimony. Thus, [Scott] was on notice of [Ignatov]'s inconsistencies *at the time they were made.*" *United States v. Bourke*, No. S2 05 Cr. 510 (SAS), 2011 WL 6376711, at *10 (S.D.N.Y. Dec. 15, 2011), *aff'd*, 488 F. App'x 528 (2d Cir. 2012) (denying Rule 33 motion as

untimely when defendant was aware of alleged perjurious testimony at the time of trial); *see also United States v. Camacho*, No. S12 94 Cr. 313 (CSH), 1999 WL 1084229, at *10 (S.D.N.Y. Dec. 1, 1999) (denying part of defendant's motion for new trial based on perjury as untimely where based on facts known to counsel at time of trial).  Scott's position at trial and his attempt to impeach Ignatov regarding the July 2016 Meeting only reinforce Scott's actual knowledge.  For example, while being mindful of privilege, counsel for Scott stated *during* Ignatov's testimony that "I'm not going to reveal privileged communications with my client.  But I did not believe [Dilkinska] was likely at that meeting and, lo and behold, found this on the database last night.  So I think he testified—I mean he testified in great detail about this meeting and I think it's false." (Tr. 386:19-23.)  Scott cannot now claim that he has newly discovered this alleged perjury.

Furthermore, given Scott's possession of the email records that he tried to introduce at trial, as well as the materials contained on the Greenwood Devices, Scott was also able to argue that the Government knew, or should have known, of the falsity of Ignatov's testimony immediately upon hearing that testimony and certainly by the time he made his first Rule 33 motion.  Thus, Ignatov's alleged perjurious testimony regarding the July 2016 Meeting cannot possibly be considered "newly discovered evidence" for purposes of Rule 33, or newly discovered evidence that the Government knew of such false testimony.  Without any newly discovered evidence, Scott's motion for a new trial is untimely and should be denied.

### b.      Scott's Motion Is Not Based on Newly Discovered Evidence

Scott's motion must also be denied because the allegedly perjurious nature of the testimony in question was known to the defense at the time of trial or discoverable by due diligence.  *See Harris*, 9 F. Supp. 2d at 253–57 (collecting Supreme Court and Second Circuit cases); *United States v. Behiry*, No. 16 CR. 763-07 (LGS), 2020 WL 3547741, at *3 (S.D.N.Y. June 30, 2020)

(denying Rule 33 motion for new trial where defendant was aware at trial of facts showing that two witnesses potentially testified falsely about the defendant's presence on an incriminating video, but only learned after the trial of additional similar information from another witness that indicated the witness statements were false); *United States v. Corley*, No. 13 Cr. 48 (AJN), 2020 WL 4676650, at *5 (S.D.N.Y. Aug. 11, 2020) (denying defendant's motion for a new trial based on newly discovered evidence in part based on defendant's possession of such evidence before trial); *United States v. Bout*, 666 F. App'x 34, 38 (2d Cir. 2016) (affirming district court's denial of Rule 33 motion where defendant would have known of inconsistent testimony at time of trial and offered no evidence of his attempts to secure evidence showing the same); *see also United States v. Allums*, No. S6 15 Cr. 153 (VSB), 2020 WL 3790610, at *6 (S.D.N.Y. July 7, 2020) (denying Rule 33 motion where the facts underlying defendant's motion were known at the time of trial and could not therefore be considered newly discovered evidence), *aff'd sub nom. United States v. Jones*, 858 F. App'x 420 (2d Cir. 2021).

Notwithstanding Scott's allegation that the Government should have known about Ignatov's inaccurate testimony, his claim fails because *he* knew or should have known at the time of Ignatov's testimony that the testimony was inaccurate.  *See Helmsley*, 985 F.2d at 1205-06. Scott, who himself attended the July 2016 Meeting, was aware of the very inaccuracy he now claims is "newly discovered."  Indeed, Scott impeached Ignatov on this very point during the trial:

> Q:    Mr. Ignatov, Irina Dilkinska was not at that meeting with Mr. Scott was she?
> A:    I'm pretty sure she was.
> Q.    You're still confident that she was?
> A.    Yes.
> Q.    She wasn't even in Sofia, was she?

A.      As I told you I'm pretty sure she was.

(Tr. 398:11-17.)

In *Helmsley*, after the defendant was convicted of criminal tax violations, she alleged that the Government knowingly presented false testimony that she misled her tax accountants. The Second Circuit affirmed the district court's decision to dismiss her claim without a hearing for lack of newly discovered evidence. The Court first noted that "[a] post-trial motion under Fed. R. Crim. P. 33 based on newly discovered evidence must be supported by evidence 'discovered after trial . . . that . . . could not, with the exercise of due diligence, have been discovered sooner.'" 985 F.2d at 1206 (quoting *United States v. Slutsky*, 514 F.2d 1222, 1225 (2d Cir. 1975)). The Court then held that "[n]ormally the requirement that a collateral attack must be supported by evidence not available by reasonable diligence at trial applies to claims of a prosecutor's knowing use of false testimony." *Id.* The Court went on to observe: "We have never permitted a successful collateral attack for a prosecutor's knowing use of false testimony based entirely on evidence of which the defendant was aware, or in the exercise of reasonable diligence should have been aware, at trial." *Id.* at 1208; *see also United States ex rel. Regina v. LaVallee*, 504 F.2d 580, 583 (2d Cir. 1974) ("Appellants should not be permitted first to claim before the jury that a promise was made, without calling the person who purportedly made the promise, and then only after the first tactic has failed, to call that person as a witness in a habeas corpus proceeding in an attempt to obtain a new trial. A defendant may not obtain a new trial on the basis of evidence which he could have discovered by reasonable diligence"); *Torres*, 128 F.3d at 48-49; *United States v. Meinster*, 619 F.2d 1041, 1045 (4th Cir. 1980); *Saville v. United States*, 451 F.2d 649, 651 (1st Cir. 1971).

A noted above, Scott attended the July 2016 Meeting, and therefore knew at the time of trial that Ignatov's testimony about Dilkinska's presence at the meeting was inaccurate. Beyond

his actual knowledge, Scott also possessed documents (DX 550 and DX 552) suggesting that Ignatov testified inaccurately.  Scott possessed still more documents obtained from the Greenwood Devices establishing that Ignatov testified inaccurately.  (Stanley Decl., Dkt. 434, Exs. G-1, G-2, and G-3.)  Neither the underlying factual inconsistency nor the materials necessary to impeach the witness are newly discovered.  And indeed, Scott cross-examined Ignatov about the July 2016 Meeting, and suggested during his summation that Dilkinska did not attend the meeting.  Scott cannot now claim that Ignatov's purportedly perjurious testimony is "newly discovered."[20]

Neither can Scott demonstrate that he exercised due diligence in ferreting out the allegedly perjurious testimony, even assuming he was not fully aware of the inaccuracy (which he was).  Scott was put on notice regarding Ignatov's statements about the July 2016 Meeting a month before trial, when the Government produced Ignatov's 3500 material.  The notes of Ignatov's first proffer session clearly reflect that he stated that, on the one occasion when he met Scott, Scott attended a meeting with Ruja and Dilkinska.  *See* 3524-17 ("SCOTT met with RUJA and IRINA a few years ago . . . IRINA and RUJA w[ere] present at the meeting.").  Scott has failed to demonstrate that he took any action in the month after these proffer notes were disclosed before trial to obtain evidence

---

[20] The Second Circuit has recognized only one narrow exception to this rule, which does not apply here.  In *Helmsley*, the Court stated that there may be "at most a limited exception to the normal requirement of due diligence with respect to collateral attacks based on a prosecutor's knowing use of false testimony" that "arises where the prosecutor is claimed not merely to have been aware of circumstances indicating the falsity of a witness's testimony but to have been directly involved as a participant in the transaction about which the witness has allegedly lied" and where there is "at least some evidence of the prosecutor's knowledge of the perjury that was not available at trial."  985 F.2d at 1207-08.  The harm in such cases is caused "'not so much by unawareness that [the witness's] testimony may have been perjured as by inability to respond effectively in view of the [the prosecutor's] silence.'"  *Id.* at 1207 (quoting *United States ex rel. Washington v. Vincent*, 525 F.2d 262, 268 n. 9 (2d Cir. 1975), cert. denied, 424 U.S. 934 (1976)).  The prosecutors in this case were not participants in the transaction about which the witness allegedly lied, *i.e.*, the July 2016 Meeting.  Accordingly, the limited exception described in *Helmsley* has no relevance to this case.

demonstrating that Dilkinska was not present at the meeting.  *See, e.g.*, *United States v. Napout*, 332 F. Supp. 3d 533, 564 (E.D.N.Y. 2018), *aff'd*, 963 F.3d 163 (2d Cir. 2020) (finding that defendant failed to demonstrate due diligence to obtain travel record evidence that called into question cooperating witness's testimony, when defendant took no steps to obtain such evidence before trial or during trial despite being put on notice about disputed testimony before trial and during trial).

In sum, Scott's motion should be denied because he cannot meet the threshold showing of newly discovered evidence, and because, in any event, he has also failed to demonstrate that he exercised due diligence as required under the law.[21]

### c.   The Evidence Does Not Demonstrate that Ignatov Committed Perjury regarding the July 2016 Meeting

Scott has also failed to demonstrate that Ignatov committed *perjury* regarding the July 2016 Meeting.   As noted above, "[a] witness perjures himself when he, 'gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory.'"  *Hernandez*, 521 F. App'x at 16 (quoting *Monteleone*, 257 F.3d at 219).  Scott has not made such a showing here.

---

[21] To the extent that Dilkinska's passport records and the India travel records can separately be viewed as "newly discovered evidence," despite Scott's knowledge of Ignatov's inaccurate testimony during the trial, Scott has failed to show that he attempted to obtain such records during the trial.  Scott therefore cannot establish that he exercised due diligence to obtain the evidence that he now claims is newly discovered.  Any challenges that Scott would have faced in obtaining such evidence cannot save his claim either.  The Second Circuit has made it clear that even in circumstances where evidence was impossible to obtain at trial (such as when a witness invoked privilege), that fails to demonstrate that the evidence was newly discovered when it became available after trial, but the defendant was aware of it during the trial.  *See United States v. Owen*, 500 F.3d 83, 89 (2d Cir. 2007) (holding that "We have never before held that a new trial may be granted pursuant to Rule 33 on the basis of evidence that was known by the defendant prior to trial, but became newly available after trial, and we decline to do so here.").

31

At the outset, Scott mischaracterizes Ignatov's testimony regarding the July 2016 Meeting. First, he repeatedly states that Ignatov testified that he was "a hundred percent sure" that Dilkinska was present at the July 2016 Meeting, without providing the broader context of Ignatov's testimony, which makes it abundantly clear that Ignatov was less than one hundred percent certain. Second, Scott argues that "[t]here is no question that Konstantin's testimony about the Dilkinska meeting was perjury rather than mistake," while ignoring (and omitting from his brief altogether) key facts that demonstrate that Ignatov was likely mistaken in his memory about the *date* of the meeting, and clearly did not intend to provide false testimony.

At the outset, Ignatov repeatedly indicated on cross-examination that although he was confident, he was not completely certain that Dilkinska was present at the July 2016 Meeting. For example, he testified as follows:

> Q:   Are you a hundred percent sure that Ms. Dilkinska was at that meeting?
> A:   I'm pretty sure seeing them that they—I'm pretty sure that they met in Sofia because she told me that week afterwards that they spent a lot of time together.
> Q:   Are you a hundred percent sure that she was at that meeting with Mr. Scott?
> A:   I'm pretty sure, yes.
> Q:   So I just want to be very clear because pretty sure can mean something different than a hundred percent sure. Were you a hundred percent sure or do you have some question in your mind about whether Ms. Dilkinska was there?
> A:   I'm pretty sure that Ruja called me to bring her up at that meeting.
> Q:   So that's not a hundred percent, right?
> A:   This is almost a hundred percent.

(Tr. 304.) Scott ignores this entire line of testimony in his brief. Far from testifying to total certainty, Ignatov, in the face of unrelenting cross-examination on this topic, repeatedly indicated that he was not "one hundred percent certain," as Scott now claims. Scott, however, knew that Ignatov's testimony was inaccurate, and returned to this topic during cross-examination the next day, once more trying to catch Ignatov in a "lie." The following exchange took place:

Q:     You also testified on direct, didn't you, that after the meeting in Sofia the following week Irina told you that during that meeting with Mr. Scott she had to stay a long time until Mark Scott understood.  Do you remember testifying to that on direct?

A:     This was the part I told you yesterday I'm pretty sure about it.  Yes.

Q:     So you're pretty sure after the meeting Irina told you she had to stay a long time until Mark Scott understood.  That's the part you were pretty sure about?

A:     Yes.

Q:     The part about Irina being at the meeting, are you a hundred percent sure about that?

A:     Yes.

Q:     You're a hundred percent sure?  Because I did ask you a number of questions on cross-examination about whether you were a hundred percent sure or pretty sure, right?

A:     Yes.

Q:     And I think you settled on you were almost a hundred percent sure.  That's what you testified yesterday on cross-examination?

A:     Yes.  I think I'm pretty sure so I don't—I recall this happening.

. . .

Q:     Mr. Ignatov, Irina Dilkinska was not at that meeting with Mr. Scott was she?

A:     I'm pretty sure she was.

Q:     You're still confident that she was?

A:     Yes.

Q:     She wasn't even in Sofia, was she?

A:     As I told you I'm pretty sure she was.

(Tr. 396-98.)

In the context of his full testimony, it is clear that although Ignatov was confident, he was not unequivocal about Dilkinska's presence at the July 2016 Meeting.  Ignoring all this testimony, Scott flatly asserts that "when Konstantin was questioned on cross-examination, Konstantin doubled down, asserting that he was 'a hundred percent sure' that Dilkinska was present at the [July 2016 Meeting]."  (Supp. Reply, Dkt. 433, at 10.)  The very fact that Ignatov repeatedly indicated that he was confident but less than certain, strongly undercuts Scott's claim of perjury.  If Ignatov had the "willful intent to provide false testimony," he would not have repeatedly indicated that he was less than certain about what he was testifying about.  Rather, he would have just stuck with the "lie."

33

There is also additional evidence showing that Ignatov may have been mistaken in his memory regarding the exact circumstances, including the timing, of the meeting. For example, as noted above, Scott's contemporaneous calendar entry indicates that he was scheduled to meet with both Ruja and Dilkinska on the date of the July 2016 Meeting. (*See* Govt. Ex. A.) Furthermore, the trial evidence showed that Scott traveled to Sofia again just two months later, to meet with Ruja *and* Dilkinska. (*See* Govt. Ex. B, in which Dilkinska wrote: "**I will talk to Mark when we meet (15th of September) – need to discuss with him some aspects regarding this matter**") (emphasis in original).) In light of this evidence, it appears that Ignatov was mistaken about some of the details of the July 2016 Meeting (*e.g.*, Dilkinska may have attended by phone, and told Ignatov about it later); or the timing of the meeting (*e.g.*, Ignatov was referring to a meeting that actually took place two months later). When viewing this evidence in its totality, these facts indicate that Ignatov was simply mistaken, rather than intentionally providing false testimony regarding the July 2016 Meeting. Because Scott cannot demonstrate that Ignatov committed perjury (as opposed to being mistaken regarding certain details of the meeting), Scott's claim fails.

### d.  Scott's Claim Fails on the Merits

As explained above, Scott has failed to establish that his claim is timely, that it is in fact based on newly discovered evidence, or that Ignatov committed perjury as to the July 2016 Meeting. As a result, Scott's claim fails. However, even assuming *arguendo* that Scott could meet these threshold requirements, Scott's claim fails on the merits. "Whether the introduction of perjured testimony requires a new trial depends on the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury." *Wallach*, 935 F.2d at 456. Where, as here, the Government was unaware of the witness's perjury, "a new trial is warranted only if the testimony was material and the court is left with a firm belief that but for the

perjured testimony, the defendant would most likely not have been convicted." *Id.* (citation omitted).   As set forth herein, Ignatov's testimony regarding the July 2016 Meeting was not perjury, Ignatov's perjurious testimony regarding the Laptop was not material to the jury's verdict, and the record does not demonstrate that "but for the perjured testimony, the defendant would most likely not have been convicted." *Id.*   Likewise, even if the Government is deemed to have been aware of the allegedly perjured testimony regarding the July 2016 Meeting, Scott's claim cannot meet even the lesser showing that there exists "any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Id.* (citation omitted).

### i.      The Allegedly Perjured Testimony was Immaterial

First, the allegedly perjured testimony had little to do with the "facts relevant to the merits of the case*." White*, 972 F.2d at 20-21 ("the importance of such evidence [showing that the witness committed perjury] is, of course, lessened when the perjury involves some collateral matter concerning the witness, rather than testimony about facts relevant to the merits of the case"). Notably, Ignatov's testimony about the Laptop concerned an event that took place long *after* the timeframe of the offenses charged in the Indictment, which were alleged to have taken place from 2015 through 2018.   Further, the subject matter of that false testimony had nothing to do with the bank fraud and money laundering charges at issue at the trial.   Indeed, the relevance of the testimony was limited to impeachment; it showed that Ignatov had tried to avoid getting in trouble by destroying evidence of his participation in the OneCoin Scheme.   As to Ignatov's testimony about the July 2016 Meeting, Ignatov did not attend the meeting.   He testified only about the fact and surrounding circumstances of the meeting, and not its substance.   (*See* Tr. 305) (Ignatov admitted that no one told him what had occurred during the July 2016 Meeting).   Indeed, Scott effectively   neutralized   Ignatov's   testimony   regarding   the   July   2016   Meeting   by   clearly

35

establishing through cross-examination, and arguing in closing, that Ignatov did not know what was discussed during the meeting. (Tr. 304-05, 339, 1926.) In addition, it was undisputed that Scott met with Ruja, the leader of the OneCoin Scheme, during that meeting. For these reasons, whether Dilkinska was present at the July 2016 Meeting or not was not material to the key issue in dispute at trial, whether Scott knew that OneCoin was a fraud scheme.

Furthermore, as described in detail in the Government's prior brief (*see* Dkt. 412 at 3-13), Ignatov's testimony, in its totality, was corroborated by substantial independent evidence, including, among other things: (1) emails between Ruja and Greenwood clearly demonstrating that OneCoin was a fraud scheme; (2) testimony from victims demonstrating the same; (3) contemporaneous text messages (and an email attachment) between Ignatov, Dilkinska, and co-conspirator Frank Schneider, that showed the link between Scott and OneCoin and Ruja, and indicated that Scott was an insider who participated in the criminal conspiracies; (4) extensive independent evidence entirely disconnected from Ignatov's testimony, showing that Scott was a knowing participant in the conspiracies; (5) Scott's numerous false exculpatory statements in his post-arrest interview; (6) emails between Scott and Ignatov; (7) a recording of Gilbert Armenta that corroborated Ignatov's testimony that Ruja had been spying on Armenta and had learned he was cooperating with law enforcement; (8) travel records showing Scott's travel to Bulgaria, among other places; and (9) OneCoin promotional videos showing Ruja and Greenwood in the act of carrying out the OneCoin Scheme. *See United States v. Payne*, 63 F.3d 1200, 1210 (2d Cir. 1995) (concluding that disclosed evidence would not "likely have placed the government's evidence against Payne in such a different light as to undermine our confidence in the outcome of the trial"); *Romero v. United States*, 28 F.3d 267, 269 (2d Cir. 1994) (finding that "the remaining proof is sufficient to sustain [the defendant's] conviction" (citation omitted)); *United States v.*

*Spencer*, 4 F.3d 115, 119 (2d Cir. 1993) ("[T]he district court correctly found that persuasive independent evidence supported the defendant's conviction." (quotation marks omitted)).

### ii. The Allegedly Perjured Testimony Constitutes Cumulative Impeachment

Second, the additional evidence of Ignatov's bad conduct was cumulative of the extensive impeachment testimony and evidence concerning Ignatov that was introduced at trial. As set forth above, Ignatov testified at great length on both direct and cross examination about his prior crimes, including his participation in a years-long fraud scheme that was built on a mountain of lies, as well as his lies to law enforcement when he was interviewed by border agents and during his post-arrest interview. The perjured testimony would have therefore been cumulative and would not have had a material impact on the jury's evaluation of Ignatov's credibility or resulted in the jury's discrediting of Ignatov's entire testimony, particularly considering how well corroborated he was at trial. *See Wong*, 78 F.3d at 82 (holding that "the new evidence of [the witness's] perjury is the sort of cumulative impeachment material that is routinely held insufficient to warrant a new trial" (quotation marks omitted)).

### iii. Scott's Motion Fails Under Any Legal Standard

With respect to the July 2016 Meeting, Scott also argues that the prosecution was aware of the perjury and therefore the applicable legal test is whether there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. *Wallach*, 935 F.2d at 456. Even if this standard were to apply, which it should not, Scott's claim fails on the merits.

As a threshold issue, the evidence does not support Scott's assertion that the Government "knew or should have known" of the allegedly perjured testimony. As described above, Ignatov did not commit perjury regarding the July 2016 Meeting, so the prosecution could not have known

about it.[22]  *See United States v. Seabrook*, No. 10 CR 87 (DAB), 2013 WL 4754331, at *5 (S.D.N.Y. 2013) (finding that defendant's claim that Government knew of alleged perjury was "fatally deficient for several reasons. . . . First . . . [the witnesses] did not commit perjury, so the Government could not have known about it.").

But even assuming that the Court were to conclude that Ignatov did intentionally provide false testimony, Scott's argument that the prosecution knew or should have known, at the time of trial, that Ignatov intentionally testified falsely is without merit.  At most, there is evidence that the Government should have known—based on the Greenwood Communications, which the Government possessed but had not reviewed at the time of trial—that Ignatov's had misremembered certain details about the July 2016 Meeting and that his testimony about Dilkinska being present at the meeting was inaccurate.  But the facts make it clear the Government did not know, and did not have reason to know, that Ignatov *intentionally testified falsely* about the July 2016 Meeting.  For starters, Ignatov stated in his first proffer with the Government that Dilkinska and Ruja had both been at the meeting with Scott.  In addition, Ignatov had no motive to lie about Dilkinska's presence at that meeting, which Ignatov did not even attend, and therefore could not testify to the substance of.  Further, there was corroborating evidence indicating that Scott had met with Ruja *and* Dilkinska on the date in question, which lent credibility to Ignatov's statements. (*See* Govt. Ex. A).  The defendant ignores this evidence, and instead points to the fact that counsel told the Government that the testimony was false and showed the Government DX 550 and DX 552.  But even viewing those exhibits in the light most favorable to Scott, at most those exhibits indicated that Dilkinska might have been traveling at the time of the July 2016 Meeting, and

---

[22] Scott makes no assertion that the Government knew or should have known about Ignatov's false testimony regarding the Laptop, and the more lenient standard therefore applies to that claim.

therefore that Ignatov's testimony might have been inaccurate.  Those exhibits did not demonstrate that Ignatov, who had been fully forthcoming with the Government up until that point in time, had willfully testified falsely (*i.e.*, committed perjury) about the July 2016 Meeting.  Further, unlike defense counsel, who had access to a witness who attended the July 2016 Meeting (*i.e.*, Scott), the Government did not have access to any comparable witness statements indicating that Ignatov's testimony was inaccurate.  Finally, no one knew at the time that Ignatov had committed perjury about the Laptop, a fact that Scott now claims is relevant to assessing whether Ignatov intentionally testified falsely about the July 2016 Meeting.  All of these facts undercut Scott's assertion that the Government should have known, at the time of the trial, that Ignatov had intentionally given false testimony.

However, even if the Government knew or should have known about Ignatov's alleged perjury, Scott's claim still fails on the merits.  Scott claims that he is entitled to a new trial because Ignatov offered the following testimony, which the jury would have disbelieved in its entirety if it had known about the alleged false testimony: (1) Scott was a "money launderer;" (2) others involved in the conspiracy, "particularly Irina Dilkinska," told Ignatov that Scott was a "in on it," (Supp. Reply, Dkt. 433, at 14); and (3) many of the individuals involved in transactions involving the Fenero Funds were also knowing participants in the money laundering scheme.  As an initial matter, Ignatov's testimony regarding these topics is wholly divorced from his testimony regarding either the Laptop or the July 2016 Meeting (*i.e.*, the allegedly perjured testimony).  The relevant legal inquiry concerns whether *the perjured testimony* could impact the result.  *See Wallach*, 935 F.2d at 456 (setting forth the legal standard where the prosecution was aware of the perjury as "any reasonable likelihood *that the false testimony* could have affected the judgment of the jury" (emphasis added and citation omitted)).  Scott attempts to use the perjured testimony to attack the

entirety of Ignatov's testimony, but that is not the appropriate inquiry under *Wallach*. Accordingly, the Court should reject Scott's attempts to cast doubt on the remainder of Ignatov's testimony. Nonetheless, even examining the remaining testimony, Scott greatly overstates the importance of this testimony and ignores the evidence introduced at trial corroborating Ignatov's testimony on these points. Each point is addressed below.

Scott's first argument is that the revelation about the July 2016 Meeting would have cast doubt on all of Ignatov's testimony, including that Scott was a "money launderer." At the outset, Ignatov's labeling of Scott as a money launderer did not discharge the jury of its duty to independently determine that Scott was indeed a money launderer under the elements of the money laundering conspiracy charge in Count One. Ignatov's description of Scott did not go directly to any of those elements, and it certainly did not speak to the key question at issue at trial: whether Scott knew that the money he received on behalf of Ruja was derived from unlawful activity. Scott greatly overstates the importance of this limited testimony, and indeed the Government did not rely on this label in its summation or rebuttal.

Furthermore, Scott established on cross-examination that Ignatov's knowledge of Scott was greatly limited. Specifically, Scott established the following during cross-examination of Ignatov:

- Ignatov only met Scott once and never spoke with him on the telephone or exchanged text messages with him (Tr. 302);
- Ignatov only emailed with Scott about travel and other logistics, and never emailed with Scott about the Fenero Funds, OneCoin's blockchain, or anything else having to do with OneCoin (Tr. 306);
- Ignatov did not attend any meetings among the top salespeople at OneCoin, (Tr. 319);
- Ignatov had no knowledge of what took place during meetings between Ruja and Scott (Tr. 339);
- Ignatov did not know OneCoin was a fraud scheme when he joined, and did not know for a considerable period of time after he joined (Tr. 344);

40

- Ruja never told Ignatov that OneCoin's blockchain was fake (Tr. 346);
- Prior to Ruja's disappearance in October 2017, Ignatov had believed that the blockchain audit was real (Tr. 350); and
- Ignatov was not aware of whether either Ruja or Dilkinska informed Scott about the fraudulent nature of the OneCoin Scheme (Tr. 324, 336, 339, 418-20).

Scott demonstrated on cross-examination that Ignatov had no firsthand knowledge regarding the key issue at trial: Scott's knowledge.  Further, as set forth in detail in the Government's prior brief (*see* Dkt. 412 at 3-13), the Government introduced overwhelming evidence independent of Ignatov's testimony that proved Scott's knowledge.

Next, Scott argues that Ignatov's testimony regarding the statements of Dilkinska was particularly damaging, and asserts that the jury would have discredited his testimony in its entirety had it known about the alleged perjury.  Scott's arguments on this point fail for three reasons: (1) Ignatov testified that he had no knowledge of what Dilkinska had discussed with Scott about the criminal nature of OneCoin; (2) Dilkinska was heavily impeached during the trial; and (3) Ignatov's key testimony regarding Dilkinska and Scott was well corroborated.

During Ignatov's cross-examination, Scott established that Ignatov had no knowledge of what Dilkinska had shared with Scott about the criminal nature of OneCoin.  For example, Scott established that Ignatov had no knowledge as to whether Dilkinska ever told Scott that OneCoin was a fraud, or if Dilkinska had ever told Scott that OneCoin was not actually mining coins.  (Tr. 418-420.)  Scott also established that Ignatov knew nothing about what Dilkinska had told Scott about the money that OneCoin or OneCoin-affiliated companies were sending to him.  (Tr. 420.)

Scott also established that Dilkinska's statements should be viewed with great caution.  Specifically, Ignatov testified that Dilkinska was an extremely dishonest person; that Ignatov believed Dilkinska was stealing money from OneCoin; that Dilkinska was hiding information about OneCoin's finances; that Dilkinska had forged two powers of attorney; and that by June

2018 Ignatov could not trust Dilkinska about anything important in his life.  (Tr. 420-422).  In sum, Scott established on cross-examination of Ignatov a wealth of evidence demonstrating that Dilkinska's statements should be scrutinized with great care by the jury.

Furthermore, contrary to Scott's argument that Ignatov's testimony regarding Dilkinska's statements "was uncorroborated" and "came solely from the mouth of a perjurer," there was ample independent evidence at trial corroborating Ignatov on these points.  Scott ignores this evidence entirely.  For example, Scott focuses on two sets of statements made by Dilkinska to Ignatov after Scott was arrested.  In essence, Ignatov testified that after Scott's arrest, Dilkinska came to him in a panic and indicated that she was concerned about getting in trouble herself.  Ignatov's testimony on this general point (*i.e.*, Dilkinska's belief that she had committed crimes with Scott), is fully corroborated.  For example, in one text message exchange between Dilkinska and Scott, Dilkinska indicated that it was unlikely that Scott was an informant because if Scott were, Dilkinska "would be in much deeper shit" because she was "in all papers with which [Scott] was working."  (Tr. 265.)  The jury therefore would have likely still credited Ignatov's testimony (and did not need to rely on this testimony at all) in light of this substantial corroboration.

Scott also cites to Ignatov's testimony that Dilkinska told Ignatov that Scott was paid a large amount of money for the risk that Scott took.  Again, Dilkinska's belief that she had committed crimes with Scott was established through independent evidence.  Further, there was overwhelming evidence establishing that Scott had been paid an outsized amount of money for his work for Ruja—indeed, Scott received approximately $50,000,000, despite having no investment track record and failing to earn Ruja a meaningful amount of money.  (GX 2628.)

Finally, Scott's argues that Ignatov testified "that many of the individuals on the other side of transactions involving the Fenero Funds were knowing participants in the money laundering

scheme—evidence that, if Konstantin was to be credited, tended to suggest that Mr. Scott was similarly situated." (Supp. Reply, Dkt. 433, at 15.) This argument is meritless.

At the outset, Scott ignores the most damning fact of all on this topic: *all of the money Scott received was on behalf of Ruja*. (*See*, *e.g.*, GX 1434.) The undisputed evidence at trial, fully independent of Ignatov's testimony, established that Ruja was the mastermind of the conspiracy. Thus, it was far more probative that Scott met with Ruja; communicated with Ruja through encrypted communications (such as a crypto phone); received nearly $400 million dollars on her behalf, and was paid over $50 million by Ruja, than it was that Ruja sent Scott money through intermediaries who were also in on the conspiracy.

Even if this testimony regarding co-conspirators who sent Scott money were as important as Scott claims it was, Ignatov was corroborated by independent evidence. As to Dilkinska, the jury saw overwhelming independent evidence at trial that she was a member of the conspiracy, including numerous contemporaneous emails between Scott and Dilkinska and the text message with Ignatov cited above. As to Armenta, the jury learned that: Armenta had a romantic relationship with Ruja; Armenta was arrested in 2017 and began cooperating with the Government; Armenta made recordings against Ruja, which Ruja learned about; and that within a month, Ruja disappeared. (Tr. 118-119; 123; 1809.) The jury also saw emails indicating that as early as 2015, Ruja and Greenwood were working with Armenta to solve their banking issues. (*See* GX 2114) ("[tomorrow] we start testing pay outs with Gilbert); GX 2115 ("Gilbert promised me to cash them out")). The jury could easily conclude based on all this evidence that Armenta was a member of the conspiracy.

The Government also introduced corroborating evidence regarding Abdulaziz. For example, Ignatov testified that Abdulaziz was a money launderer for Ruja who stole at least 100

million Euros from Ruja and used some of it to buy racehorses.   At trial, the Government introduced a text message between Ignatov and another employee at OneCoin in which Ignatov sent a picture of Abdulaziz at a racetrack and wrote "This fffff is in Ascot-having fun with our $." (GX 3004.)  This evidence corroborated Ignatov's testimony considerably.

Scott also ignores a fundamental point of the Government's proof at trial, which was fully independent of Ignatov's testimony: Scott pretended that third parties such as Irina Dilkinska, Gilbert Armenta, Frank Ricketts (who operated the "IMS" entities), and Zhoulong Cai (who did not have his own house or bank account) were the *actual* investors in Fenero, rather than individuals who used shell companies for the purpose of sending Ruja's money to Scott.  Scott and Ruja went to great lengths to set up an elaborate investment structure that looked real and made it appear on paper that these were his investors.  In reality, these fake investors were using shell companies to send Scott money on behalf of Ruja.  This evidence showing Scott's obfuscation of the link to Ruja and OneCoin was highly probative of Scott's knowledge that he was receiving criminal proceeds of behalf of Ruja.

Scott dedicates just one paragraph of his entire brief to address this mountain of independent evidence at trial, which showed that Scott was a knowing participant in the conspiracy.  The Government's closing marshaled this evidence in great detail and with next to no reliance on the July 2016 Meeting, or Ignatov generally.  The Government also set forth in detail much of this evidence in its prior brief.  (*See* Govt. Mem. in Opp., Dkt. 412, at 3-13.)  This evidence demonstrates that there is no reasonable likelihood that the false testimony could have affected the judgment of the jury.  As such, even under the less stringent standard articulated by Scott, Scott's motion still fails.

**C.      The Government's Purported Disclosure Violations Do Not Warrant a New Trial**

Next, the defendant argues that the Court should order a new trial, pursuant to Rule 33, based on various purported disclosure violations.  As explained in detail below, Scott cannot sustain his burden to show either a disclosure violation or any prejudice flowing from the timing of the Government's disclosures in this case.

First, Scott appears to claim that the Government's alleged "failure to investigate" Dilkinska's July 2016 whereabouts following a mid-trial request from the defense constitutes a *Brady* violation.  (Supp. Reply, Dkt. 433, at 24-25.)  That is wrong.  Scott's brief primarily discusses disclosures that he in fact had—and was able to use—at trial.  The Government produced the Greenwood Devices to the defense on or about October 1, 2019, more than one month before trial.  (Supp. Reply, Dkt. 433, at 24-25 and n.14-15; Stanley Decl., Dkt. 434, Exs. G-1, G-2, and G-3.)  Scott's reliance on border crossing records for Dilkinska, which the Government disclosed on or about December 3, 2021, is misguided—those materials were not in the Government's possession until nearly *two years after trial* and the Government promptly disclosed the records upon receipt.

Second, Scott alleges that the Government purportedly failed to disclose *Brady* and *Giglio* material related to the credibility of a cooperating witness, pointing to material that significantly post-dates the November 21, 2019 trial verdict—specifically, information discovered October 2020 (regarding the Cellphone) and in June 2021 (regarding the Laptop).  (Supp. Reply, Dkt. 433, at 20-29.)  This argument is also entirely without merit.  The Government did not obtain information regarding the Laptop and Cellphone until well after trial; moreover, once the Government came into possession of information on those topics, the Government *did* disclose the materials to the defendant.  The defendant cannot show any disclosure violation, and further cannot

demonstrate any prejudice at trial resulting from the timing of the Government's disclosure of materials it obtained post-trial.  The defendant glosses over the stringent standard for the relief he requests because he cannot meet it.

### 1.    Relevant Background

*First*, as described above, Ignatov testified during trial about the July 2016 Meeting between Ruja, Dilkinska, and Scott at OneCoin's office in Sofia, Bulgaria.  (Tr. 131, 245-47.)  On cross-examination, Scott attempted to demonstrate that Ignatov was lying about details of the meeting, including in particular Dilkinska's attendance.  (Tr. 303-05; Govt. Mem. in Opp., Dkt. 412, at 16.)  During trial, on November 10, 2019, defense counsel emailed the Government to request that the Government search for and identify "any additional material that may reflect Irina's schedule, travel or whereabouts."  (Stanley Decl., Dkt. 434, Ex. C at 2.)  In response, the Government directed defense counsel to previously produced *Giglio* for Dilkinska including, "among other materials, all of the proffer notes of Armenta, Ignatov, and Greenwood," "their various cellphones and electronic devices," and email search warrant returns, and indicated that it was "not aware of other materials in our possession besides those referenced herein that would contain additional *Giglio* material for Irina Dilkinska."  (*Id.* at 1-2.)

*Second*, as explained in the Government's opposition to Scott's Supplemental Motion, the Government was unaware prior to Scott's filing of his Supplemental Motion on August 23, 2021 that: (i) Ignatov had testified falsely at trial about having discarded the Laptop; and (ii) an individual named Duncan Arthur had informed an investigator with the City of London Police, who was on secondment from the New York District Attorney's Office (the "Investigator"), about the false testimony.  (Govt. Mem. in Opp., Dkt. 412, at 16; Supp. Reply, Dkt. 433, at 1-2.)  The Government promptly investigated both claims.  On August 25, 2021, just two days after Scott

filed his Supplemental Motion, the Government spoke with the investigator at the City of London Police (the "Investigator") about Arthur's allegation and learned that the Investigator had received information regarding the Laptop from Arthur on or about June 29, 2021, and had directed Arthur to memorialize the information in an email, which Arthur did.  (Govt. Mem. in Opp., Dkt. 412, at 17, Ex. A.)  The Investigator intended to forward Arthur's email to the FBI, but forgot to do so. Accordingly, the U.S.-based prosecution team received Arthur's email only after contacting the Investigator in August 2021 to discuss the allegations in Scott's Supplemental Motion.  (Govt. Mem. in Opp., Dkt. 412, at 17.)

On October 21, 2021, the Government provided a written response to various specific requests Scott had made in connection with his Supplemental Motion.  The Government's email attachments included, among other things, communications from the Greenwood Devices (which, as described above, the Government had produced in their entirety approximately one month before trial).  (*See* Govt. Ex. D.)  The Government also advised defense counsel that it had requested border-crossing information from Indian law enforcement reflecting Dilkinska's travel during the relevant time period in 2016 and was awaiting a response.  (*Id.*)  On December 3, 2021, mere days after the Government received a response from Indian law enforcement, the Government disclosed the substance of border-crossing records confirming that Dilkinska had been in India between July 19, 2016 and July 22, 2016.  (Stanley Decl., Dkt. 434, Ex. H.)

*Third*, in an October 12, 2021 letter to defense counsel, the case prosecutors disclosed that they had learned in or around October 2020 that the Cellphone had been seized from Ignatov in or about February 2020.  (Stanley Decl., Dkt. 434, Ex. F.)  The Government's October 12, 2021 disclosure regarding the Cellphone included notes from an attorney proffer with Ignatov's counsel that took place weeks after the prosecutors in this case had learned about the existence and seizure

47

of the Cellphone.  (*Id.*)  As described above, the Government produced the full, non-privileged contents of the Cellphone to defense counsel on October 21, 2021.  (*See* Govt. Ex. D.)  On November 5, 2021, the Government produced to defense counsel both draft translations of messages contained on the Cellphone and notes of an interview with Ignatov regarding the Cellphone.  (*See* Govt. Ex. E.)  The Government produced supplemental translation materials relating to the Cellphone on December 3, 2021.  (*See* Govt. Ex. F.)  A review of the data on the Cellphone confirmed that Ignatov did not start using the Cellphone until on or about December 19, 2019, approximately one month *after* Scott was convicted at trial.

### 2.      Applicable Law

#### a.      New Trial Based on *Brady* and *Giglio* Violations

The Government has a duty to disclose evidence favorable to the accused that is material to guilt.  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  This duty covers not only exculpatory evidence but also impeachment information for Government witnesses.  *Giglio v. United States*, 405 U.S. 150, 154 (1972).  "Impeachment evidence is evidence having the potential to alter the jury's assessment of the credibility of a significant prosecution witness."  *United States v. Madori*, 419 F.3d 159, 170 (2d Cir. 1995) (internal quotation marks omitted).

To establish a *Brady* or *Giglio* violation, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *see also United States v. Spinelli*, 551 F.3d 159, 164 (2d Cir. 2008) (a *Brady* violation will result in a new trial only "if the undisclosed information is 'material,' within the exacting standard of materiality established by the governing case law").  Evidence is material when "there is a reasonable probability that, had the evidence been disclosed

to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "A 'reasonable probability' of a different result is . . . shown when the Government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *Bagley*, 473 U.S. at 678); *accord United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001). There "is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. at 281. "[A]s long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner." *Coppa*, 267 F.3d at 144.

The Government "obviously is not required to disclose before or during trial information that it only learned after trial was over." *United States v. Alston*, 899 F.3d 135, 147-48 (2d Cir. 2018) (rejecting argument that a cooperating witness's post-trial jailhouse misconduct was *Brady* material and concluding that defendant did not suffer prejudice at trial, because the defendant could not have cross-examined the cooperating witness about misconduct that the cooperating witness had not yet committed); *see also Avellino*, 136 F.3d at 255. Moreover, where the defendant is aware of the essential facts constituting the exculpatory evidence, there is no *Brady* violation. *See United States v. Grossman*, 843 F.2d 78, 85 (2d Cir. 1988) ("No *Brady* violation occurred here because *Brady* does not require the government to turn over exculpatory evidence 'if the defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence.'" (quoting *United States v. Gaggi*, 811 F.2d 47, 59 (2d Cir. 1987))); *United States v. Payne*, 63 F.3d at 1208 ("[E]vidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney 'either knew, or should have known, of the

49

essential facts permitting him to take advantage of [that] evidence.'" (quoting *United States v. Zackson*, 6 F.3d 911, 918 (2d Cir. 1993))).

### b.    The "Prosecution Team"

In the Second Circuit, a prosecutor's constructive knowledge only extends members of the "prosecution team." *United States v. Gil*, 297 F.3d 93, 106 (2d Cir. 2002); *accord United States v. Morell*, 524 F.2d 550, 555 (2d Cir. 1975); *United States v. Bin Laden*, 397 F. Supp. 2d 465, 481 (S.D.N.Y. 2005). "Whether someone is part of the prosecution team depends on the level of interaction between the prosecutor and the agency or individual." *United States v. Meregildo*, 920 F. Supp. 2d 434, 441 (S.D.N.Y. 2013), *aff'd sub nom. United States v. Pierce*, 785 F.3d 832 (2d Cir. 2015). "Interacting with the prosecution team, without more, does not make someone a team member. Instead, under the totality of the circumstances, the more involved individuals are with the prosecutor, the more likely they are team members." *Id*. at 441-42 (citation omitted). Factors to consider include, among others, "whether the individual actively investigates the case, acts under the direction of the prosecutor, or aids the prosecution in crafting trial strategy." *Id.* at 442 (citing *United States v. Diaz*, 176 F.3d 52, 106-07 (2d Cir. 1999)). In cases where an individual's involvement in the investigation is "minor," even the presence of many factors does not warrant imputation. *Id.*; *see also Locascio*, 6 F.3d at 949 (declining to "infer the prosecutors' knowledge simply because some other government agents knew about [a] report" where there was "no evidence that the prosecution team in the instant case was aware of" the report).

### 3.    Discussion

For the reasons that follow, the defendant's motion for a new trial based on alleged disclosure violations should be denied. As described in detail herein, the Government satisfied its obligations under *Brady* and *Giglio*. The defendant had the Greenwood Devices in his possession

in advance of trial, and the other materials the defendant relies on in his Supplemental Reply—which the Government also disclosed—did not come into the Government's possession until after trial.  Accordingly, the defendant's motion fails as a matter of law, and he cannot show "the most extraordinary circumstances" that would justify the relief he seeks.  *Ferguson*, 246 F.3d at 134.

> ### a.  The Government Disclosed Materials Regarding Dilkinska's Whereabouts Prior to Trial

In moving for a new trial based on alleged disclosure violations, Scott highlights several pieces of evidence from that pre-trial discovery and claims that the Government "only recently disclosed" certain of those electronic communications "showing that Dilkinska was not in Sofia and indeed was in India." (Scott Reply Mem. at 24-25, n.14.)  Scott's contention is both misleading and inaccurate.

As the Government's October 21, 2021 email makes clear, Exhibits G-1 through G-3 (which were attached to the October 21 email) in fact "were produced to [Scott] prior to trial." (Govt. Ex. D.)  Scott's argument fails as a matter of law because the Government did not "fail[] to disclose favorable evidence" in its possession.  *Wong*, 78 F.3d at 79 (citation omitted).  Evidence showing that Dilkinska was not in Sofia, Bulgaria at the time of the July 2016 Meeting was in Scott's possession at least more than a month before trial—the Government's pretrial disclosures included emails, calendar invitations, and various cellphone extractions,[23] and the Government directed Scott's counsel to these materials in November 2019 in response to Scott's mid-trial request for *Giglio* materials for Dilkinska.  (Stanley Decl., Dkt. 434, Ex. C at 2.)  Accordingly, the ability to locate that information "was equally available to all trial counsel."  *United States v.*

---

[23] Scott's claim that the Greenwood Devices were produced in a "difficult-to-access" format is baseless; the device extractions were produced in a searchable electronic format and were disclosed promptly upon completion of a privilege review.

*Allums*, 15 Cr. 153 (VSB), 2020 WL 3790610, at *8 (S.D.N.Y. 2020).

Moreover, beyond the fact that Scott possessed the evidence about which he now complains, Scott had actual knowledge regarding the facts at issue. As explained above, Scott was aware that Ignatov testified incorrectly regarding the July 2016 Meeting. Because Scott had actual knowledge (in addition to his possession of the relevant documents), Scott cannot now assert a *Brady* claim. *See Payne*, 63 F.3d at 1208 ("[E]vidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence." (internal quotations and citations omitted)).

The only materials Scott points to that the Government did not disclose in advance of trial are the Dilkinska border-crossing records from the Indian authorities which, as described above, the Government sought from Indian authorities nearly two years after trial, in October 2021, at the defendant's request, and which the Government disclosed to Scott shortly after receipt. (*See* Stanley Decl., Dkt. 434, Ex. H.) Simply put, the Government did not violate its duty to disclose impeachment evidence regarding Dilkinska's whereabouts, and Scott suffered no prejudice that would warrant a new trial. *See Strickler*, 527 U.S. at 281-82.[24]

---

[24] The defendant also contends that the "failure to correct" Ignatov's allegedly perjured testimony regarding the July 2016 Meeting amounted to an ethical violation by the prosecutors in this case. (Supp. Reply, Dkt. 433, at 7, 22-24.) That is wrong. First, as set forth above, although Ignatov was mistaken regarding certain details about the July 2016 Meeting, his testimony was not perjury—indeed, on cross-examination, he qualified his prior testimony about Dilkinska's presence at the meeting, stating (at least seven times) that he was "pretty sure" she was there. (*See supra* at 28-31; Tr. at 304, 396-98.) "[T]here is some authority in this Circuit suggesting that a witness's *mistaken* testimony is not even 'false' for purposes of determining whether the government was constitutionally required to 'correct' it." *Buari v. Kirkpatrick*, 753 F. Supp. 2d 282, 295 (S.D.N.Y. 2010) (citing *Mills v. Scully*, 826 F.2d 1192, 1195-96 (2d Cir. 1987) (emphasis added)). Second, a prosecutor's failure to correct false testimony rises to the level of a Fourteenth Amendment violation only if "it can be said that there was a reasonable likelihood that the testimony affected the judgment of the jury or that it may have had an effect on the outcome of the

### b.   The Government Did Not Suppress or Withhold Information About Ignatov's Laptop

As discussed in the Government's response to the Supplemental Motion, the Government first became aware of Ignatov's perjury regarding the Laptop when Scott filed his August 23, 2021 Supplemental Motion, which presented information about Duncan Arthur.[25]  (Govt. Mem. in Opp., Dkt. 412, at 16-17.)   Scott now claims that the Government "violated its duties" because prosecutors in this case were unaware that Arthur had spoken to the Investigator approximately eight weeks before the Supplemental Motion was filed.  (Supp. Reply, Dkt. 433, at 26.)  That claim is meritless.

First, under the totality of the circumstances, the Investigator who spoke with Arthur is not a member of the "prosecution team."  The Investigator was on secondment from the New York County District Attorney's Office to the City of London Police ("COLP") since at least 2016 and had minimal involvement in the OneCoin investigation, consisting largely of serving as a liaison between U.S. and foreign law enforcement.  The Investigator's role certainly did not rise to the level of investigating the case, actively participating in meetings, or crafting trial strategy.  *Diaz*, 176 F.3d at 107.  Accordingly, the prosecutors in this case were not "presumed to have knowledge" of Arthur's conversation with the Investigator, because the constructive knowledge of prosecutors

---

trial."  *Id.* at 295 (citing *Giglio*, 405 U.S. at 154); and then *Napue v. Illinois*, 360 U.S. 264, 271 (1959).  As discussed in detail above, neither circumstance exists here.  Dilkinska's presence at the July 2016 Meeting was collateral to the central issue at trial—Scott's knowledge that OneCoin was a fraud scheme—and thus did not affect the jury's verdict.

[25] Duncan Arthur provided approximately eight boxes containing various OneCoin materials (the "U.K. Boxes") to the Investigator and other U.K. authorities in or about July 2020—more than six months after trial.  (Supp. Reply, Dkt. 433, at 26 n.16.)  The case team obtained the U.K. Boxes in or about January 2022, reviewed their contents, and produced the entire contents of the U.K. Boxes to Scott on or about January 26, 2022.  Contrary to Arthur's recollection, *see* Supp. Reply, Dkt. 433, at 9 n.3, the Government found no evidence of the Laptop or its contents in the U.K. Boxes.

"is not limitless."  *Meregildo*, 920 F. Supp. 2d at 440 (citation omitted).

However, even assuming that the Investigator was a member of the prosecution team, Scott was not prejudiced by any delay in disclosing Arthur's report about the Laptop.  Arthur in fact contacted defense counsel independently, so Scott had the benefit of Arthur's information in filing his Supplemental Motion.  Moreover, the very fact that the Government disclosed the Laptop information and that Scott was able to utilize the information to file a post-trial motion defeats any *Brady* or *Giglio* claim, because it unambiguously shows that he has not been prejudiced.

### c.    The Government Timely Disclosed the Cellphone

The prosecutors in this case first learned about the existence of the Cellphone in October 2020 (nearly one year after Scott's conviction), and discussed Ignatov's use of the Cellphone with Ignatov's counsel soon after.  The Government provided notes of its discussion with Ignatov's counsel and the complete contents of the Cellphone to Scott on October 12, 2021, and supplemented that production with translations of messages from the Cellphone on November 5, 2021 and December 3, 2021.  The contents of the Cellphone reflect that Ignatov used the Cellphone between December 19, 2019 and February 28, 2020—that is, *starting* approximately one month *after* Scott was convicted at trial.  Accordingly, the Government did not "suppress" the Cellphone, because the evidence did not exist until after Scott's trial had ended.  *Alston*, 899 F.3d at 147-48.  Simply put, Ignatov's post-trial use of the Cellphone, even if "potentially worthy impeachment evidence, . . . is not *Brady* material."  *Id.* at 148.  Moreover, even assuming *arguendo* that the Government had suppressed the Cellphone between October 2020 and October 2021 (which it did not), such suppression could not legally amount to a *Brady* or *Giglio* violation because no prejudice ensued.  *Strickler*, 527 U.S. at 281-82.

54

**D.      The Court Should Deny the Defendant's Request for an Evidentiary Hearing**

In summary fashion, Scott asks the Court to conduct an evidentiary hearing regarding what he describes as "factual issues relating to the Government's failure to comply with its disclosure obligations to determine what other relief – including dismissal of the indictment – may be appropriate."   (Reply Mem. at 29.)   As described above, the record of the Government's disclosures presents no material facts in dispute that would warrant an evidentiary hearing.  (*See* Govt. Mem. in Opp., Dkt. 412, at 30 n.8.)   The other alleged "key issues" that Scott raises as purported bases for an evidentiary hearing are not material facts in dispute and likewise do not warrant an evidentiary hearing.  Accordingly, Scott's request for a hearing should be denied.

**1.      Applicable Law**

Where a district court determines that evidence "is not newly discovered as a matter of law," it may deny a Rule 33 motion without holding an evidentiary hearing.  *United States v. Forbes*, 790 F.3d 403, 411 (2d Cir. 2015); *accord United States v. Bout*, 144 F. Supp. 3d 477, 484 (S.D.N.Y. 2015) (citation omitted).  A district court may order a post-trial evidentiary hearing to explore a potential *Brady* violation "only when a defendant has offered more than mere speculation that a violation may have occurred."  *United States v. Rowland*, No. 3:14 Cr 79, 2015 WL 800083, at *3 (D. Conn. Feb. 25, 2015), *aff'd*, 826 F.3d 100 (2d Cir. 2016); *see also Avellino*, 136 F.3d at 261 ("In the absence of a proffer by Avellino of any nonspeculative basis for inferring that, in response to the plea withdrawal motion, the government had not made available to him all pertinent material in its possession, it was well within the discretion of the court to conclude that no evidentiary hearing was necessary."); *United States v. Helmsley*, 985 F.2d at 1209-10.

**2.      Discussion**

As described in detail above, the Government does not dispute that Ignatov perjured

himself regarding the Laptop.  That perjured testimony, however, did not affect the outcome of the trial.  *See United States v. Shaw*, 354 Fed. App's 439, 446 (2d Cir. 2009) (holding that district court did not err in declining to conduct an evidentiary hearing where "perjured testimony did not affect the outcome of the trial and . . . the prosecution had no knowledge that the witness intended to perjure himself").  Accordingly, there is no factual dispute regarding Ignatov's perjury that would warrant an evidentiary hearing.

Scott also seeks an evidentiary hearing based on the conclusory assertion that the Government generally "fail[ed] to comply with its disclosure obligations."  (Supp. Reply, Dkt. 433, at 29.)  As an initial matter, a hearing is clearly not warranted regarding two of the issues he cites as the basis for his request—the Investigator's role in the OneCoin prosecutions (described herein) and the steps the Government has taken to obtain the U.K. Boxes (the contents of which have now been produced)—because there are no disputed facts that are material to the resolution of the Supplemental Motion regarding those topics.  *White*, 972 F.2d at 20.  More generally, Scott's vague assertion regarding alleged disclosure violations by the Government are "insufficiently specific, . . . insufficiently substantiated, [and] insufficiently tied to the relevant time period" to warrant a hearing.  *United States v. Seabrook*, 467 F. Supp. 3d 171, 179-80 (S.D.N.Y. 2020).  As outlined above, the prosecutors in this case did not fail to comply with disclosure obligations under Rule 16, *Brady*, or *Giglio*, and Scott's filings in support of his motion contain no specific allegations to the contrary.  Accordingly, the speculative request for an evidentiary hearing should be denied.  *See United States v. Helmsley*, 985 F.2d 1202, 1209–10 (2d Cir. 1993) (explaining that a hearing on a new trial motion is unwarranted where "[t]he moving papers themselves disclosed the inadequacies of the defendants' case, and the opportunity to present live witnesses would clearly have been unavailing" (quoting *United States v. Slutsky*, 514 F.2d 1222, 1226 (2d Cir.

56

1975)).

## **CONCLUSION**

For the foregoing reasons, and the reasons set for in the Government's response to Scott's

Supplemental Motion, the defendant's motion should be denied in its entirety.

Dated:  New York, New York
        January 28, 2022

                            Respectfully submitted,

                            DAMIAN WILLIAMS
                            United States Attorney

                   By:    s/
                            Nicholas Folly / Michael McGinnis /
                            Juliana Murray
                            Assistant United States Attorneys
                            (212) 637-1060 / -2305 / -2314