UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- against -

MARK S. SCOTT,

Defendant.

No. S10 17 Cr. 630 (ER)

**Sur-Sur-Reply Memorandum of Law In Further Support of  Mark Scott's Supplemental Rule 33 Motion For A New Trial**

Arlo Devlin-Brown
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1046

David M. Garvin
Law Offices of David M. Garvin, P.A.
200 South Biscayne Boulevard
Suite 3150
Miami, FL 33131
(305) 371-8101

*Counsel for Mr. Scott*

## <u>TABLE OF CONTENTS</u>

Preliminary Statement / Summary of Argument ............................................................... 1

Argument ............................................................................................................................. 3

I.      Konstantin's Perjury Warrants A New Trial ....................................................... 3

     A.      Konstantin's Perjury Extended To The July 20th Meeting .................... 3

         1.      The Preponderance of Evidence Standard Applies.................... 4

         2.      It Is More Likely Than Not That Konstantin's False Testimony
             About The July 20th Meeting Was Willful Rather Than Accidental ........ 4

         3.      The Court's Assessment Of Whether Konstantin's Testimony On
             The July 20th Meeting Was Perjury Or An Honest Mistake Must
             Take Into Consideration That Konstantin Is A Proven Liar ...................... 8

     B.      The Government's Absurd Claim That The Court Cannot Consider
        Whether The Perjury Extended To The July 20th Meeting Must Be
        Rejected................................................................................................... 10

         1.      "Newly Discovered Evidence" Of Perjury Was Required To File
             The Supplemental Motion, But The Court Can Consider All
             Available Evidence Of Perjury In Its Evaluation ..................................... 11

         2.      In Any Event, There Was "Newly Discovered Evidence" About
             The July 20th Meeting Itself ................................................................... 11

         3.      The "Excusable Neglect" Standard Applies. ........................... 15

     C.      A New Trial Should Be "Virtually Automatic" Because The Government
        Knew At Trial That Konstantin's Perjurious Testimony Was False .................. 17

         1.      *Wallach's* "Virtually Automatic" New Trial Standard Applies In
             All Cases Where The Prosecution Knows The Perjurious
             Testimony Was False, Including Cases Where The Prosecution
             Assumed The Falsity Was Unintentional ................................................. 17

         2.      The Government Admits That It "Should Have Known" That
             Konstantin's Testimony Was False, Triggering The "Virtually
             Automatic" New Trial Standard ............................................................. 20

     D.      Without Konstantin's Perjury-Infused Testimony, The Court Cannot Be
        Confident That The Jury Would Have Convicted ................................. 21

         1.      The Perjured Testimony Was Material, Including Because It Bore
             Heavily On Konstantin's Credibility ...................................................... 21

2.      Outside Of Konstantin's Testimony, The Government Presented Little Evidence That Mr. Scott Had The Required Criminal Intent ......... 25

II.     The Government's Failure To Correct Testimony That It Knew To Be False And Its Indefensible Effort To Block The Defense From Correcting That Testimony Likewise Warrant A New Trial ........................................................................ 29

A.      The Government Had A Duty To Correct Konstantin's False Testimony About The Dilkinska Meeting And Failed To Do So ............................................ 29

B.      The Government Baselessly Opposed The Defense's Effort To Admit Emails Necessary To Correct Konstantin's False Testimony By Falsely The Telling Court Second Circuit Law Precluded Their Admission.................... 30

C.      The Resulting Exclusion Of Erroneous Evidence Deprived Mr. Scott Of A Fair Trial ........................................................................................................ 32

D.      The Government's Claim That The Court Is Barred From Reviewing This Issue Is Baseless........................................................................................... 33

III.    The Government's Conduct Should Be Considered In Evaluating Whether A New Trial Should Be Granted ........................................................................ 34

A.      The Government Provides No Good Explanation For Why It Dumped Close to A Million Documents From The Greenwood Devices On Mr. Scott Only One Month Before Trial ............................................................... 35

B.      The Government Offers No Defense For Its Failure To Timely Disclose Konstantin's Breach Of His Cooperation Agreement Through Use Of A Contraband Cell Phone At The MCC ..................................................... 38

C.      The Government Minimizes Its Investigator's Misconduct ................................ 38

IV.     The Government's Claim That Konstantin Made An "Innocent Mistake" Cannot Be Credited Without A Hearing ........................................................ 39

V.      Conclusion .................................................................................................. 41

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                **Page(s)**

*Alvarez v. United States*,
   808 F. Supp. 1066 (S.D.N.Y. 1992)..................................................................................22, 23

*In re Am. Express Fin. Advisors Sec. Litig.*,
   672 F.3d 113 (2d Cir. 2011).....................................................................................................16

*Buari v. Kirkpatrick*,
   753 F. Supp. 2d 282 (S.D.N.Y. 2010)................................................................................29, 30

*Cardoso v. United States*,
   642 F. Supp. 2d 251 (S.D.N.Y. 2009)......................................................................................38

*Drake v. Portuondo*,
   553 F.3d 230 (2d Cir. 2009)............................................................................................ *passim*

*Giglio v. United States*,
   405 U.S. 150 (1972)..................................................................................................................17

*Mesarosh v. United States*,
   352 U.S. 1 (1956)......................................................................................................................19

*Mitchell v. United States*,
   526 U.S. 314 (1999)..................................................................................................................13

*Napue v. Illinois*,
   360 U.S. 264 (1959)....................................................................................................... *passim*

*Ortega v. Duncan*,
   333 F.3d 102 (2d Cir. 2003)......................................................................................................4

*In re Painewebber Ltd. P'ships Litig.*,
   147 F.3d 132 (2d Cir. 1998)....................................................................................................16

*Perkins v. LeFevre*,
   642 F.2d 37 (2d Cir. 1981)................................................................................................29, 32

*Salinas v. Texas*,
   570 U.S. 178 (2013)..................................................................................................................13

*United States v. Aguiar*,
   737 F.3d 251 (2d Cir. 2013).....................................................................................................33

*United States v. Agurs*,
   427 U.S. 97 (1976)....................................................................................................................18

*United States v. Al-Moayad*,
    545 F.3d 139 (2d Cir. 2008) ......................................................................... 33

*United States v. Aquart*,
    912 F.3d 1 (2d Cir. 2018) ............................................................................. 18

*United States v. Avellino*,
    136 F.3d 249 (2d Cir. 1998) ......................................................................... 23

*United States v. Behiry*,
    2020 WL 3547741 (S.D.N.Y. June 30, 2020) ............................................. 15

*United States v. Beras*,
    2005 WL 82037 (S.D.N.Y. Jan. 13, 2005) *aff'd*, 152 F. App'x 50 (2d Cir.
    2005) ............................................................................................................. 22

*United States v. Bourke*,
    2011 WL 6376711 (S.D.N.Y. Dec. 15, 2011) ............................................. 15

*United States v. Bout*,
    144 F. Supp. 3d 477 (S.D.N.Y. 2015) .......................................................... 15

*United States v. Brodwin*,
    292 F. Supp. 2d 484 (S.D.N.Y. 2003) .......................................................... 14

*United States v. Browne*,
    130 F. Supp. 2d 552 (S.D.N.Y. 2001) .......................................................... 24

*United States v. Camacho*,
    1999 WL 1084229 (S.D.N.Y. Dec. 1, 1999) ............................................... 15

*United States v. Caraballo*,
    2014 WL 3535348 (D. Vt. July 16, 2014) ................................................... 17

*United States v. Coppa*,
    267 F.3d 132 (2d Cir. 2001) ......................................................................... 35

*United States v. Dunnigan*,
    507 U.S. 87 (1993) ......................................................................................... 3

*United States v. Forbes*,
    790 F.3d 403 (2d Cir. 2015) ......................................................................... 13

*United States v. Frederick*,
    868 F. Supp. 2d 32 (E.D.N.Y. 2012) ........................................................... 34

*United States v. Gil*,
    297 F.3d 93 (2d Cir. 2002) ........................................................................... 35

*United States v. Glover*,
588 F.2d 876 (2d Cir. 1978)............................................................................30

*United States v. Grigsby*,
2007 WL 9747765 (E.D. Okla. Jan. 26, 2007), *aff'd*, 272 F. App'x 738 (10th
Cir. 2008) ......................................................................................................33

*United States v. Helmsley*,
985 F.2d 1202 (2d Cir. 1993)..........................................................................15

*United States v. Hsia*,
24 F. Supp. 2d 14 (D.D.C. 1998) .....................................................................35

*United States v. Kenner*,
272 F. Supp. 3d 342 (E.D.N.Y. 2017) .........................................................16, 17

*United States v. Litvak*,
808 F.3d 160 (2d Cir. 2015).............................................................................34

*United States v. Locasio*,
6 F.3d 924 (2d Cir. 1993).................................................................................23

*United States v. Lopez*,
2014 WL 5088868 (D. Del. Oct. 10, 2014) ......................................................33

*United States v. Martinez*,
844 F. Supp. 975 (S.D.N.Y. 1994) ...................................................................36

*United States v. Mejia*,
948 F. Supp. 2d 311 (S.D.N.Y. 2013)...............................................................33

*United States v. Monteleone*,
257 F.3d 210 (2d Cir. 2001)...............................................................................3

*United States v. Myton*,
2005 WL 1397208 (E.D.N.Y. June 14, 2005) ...................................................22

*United States v. Nejad*,
487 F. Supp. 3d 206, 224 (S.D.N.Y. 2020)........................................................40

*United States v. Orena*,
32 F. 3d 704 (2d Cir. 1994)..............................................................................23

*United States v. Persico*,
645 F.3d 85 (2d Cir. 2011)...............................................................................32

*United States v. Rivas*,
377 F.3d 195 (2d Cir. 2004)..............................................................................34

*United States v. Rivera*,
    201 F.3d 99 (2d Cir. 1999).................................................................13

*United States v. Roberts*,
    388 F.2d 646 (2d Cir. 1968).................................................................40

*United States v. Roberts*,
    978 F.2d 17 (1st Cir. 1992).................................................................16

*United States v. Saffarinia*,
    424 F. Supp. 3d 46 (D.D.C. 2020).................................................................35

*United States v. Sanchez*,
    969 F.2d 1409 (2d Cir. 1992).................................................................11, 39

*United States v. Scali*,
    2018 WL 3536082 (S.D.N.Y. July 23, 2018).................................................................16

*United States v. Seijo*,
    514 F.2d 1357 (2d Cir. 1975).................................................................22, 23

*United States v. Seltzer*,
    227 F.3d 36 (2d. Cir. 2000).................................................................40

*United States v. Siddiqi*,
    959 F.2d 1167 (2d Cir. 1992).................................................................12

*United States v. Soto*,
    2014 WL 1694880 (S.D.N.Y. Apr. 28, 2014).................................................................32

*United States v. Spencer*,
    4 F.3d 115 (2d Cir. 1993).................................................................26

*United States v. Spinelli*,
    551 F.3d 159 (2d Cir. 2008).................................................................40

*United States v. Spivack*,
    376 F. App'x 144 (2d Cir. 2010).................................................................29

*United States v. Stein*,
    440 F. Supp. 2d 315 (S.D.N.Y. 2006).................................................................16

*United States v. Stein*,
    488 F. Supp. 2d 350 (S.D.N.Y. 2007).................................................................36

*United States v. Stevens*,
    985 F.2d 1175 (2d Cir. 1993).................................................................36

*United States v. Stewart*,
    433 F.3d 273 (2d Cir. 2006)..................................................................*passim*

*United States v. Stofsky*,
    527 F.2d 237 (2d Cir. 1975)................................................................22

*United States v. Thomas*,
    2014 WL 702107 (W.D.N.Y. Feb. 24, 2014) ......................................16

*United States v. Thomas*,
    981 F. Supp. 2d 229 (S.D.N.Y. 2013)..................................................37

*United States v. Triumph Cap. Grp., Inc.*,
    544 F.3d 149 (2d Cir. 2008).................................................................34

*United States v. Wallach*,
    935 F.2d 445 (2d Cir. 1991)...........................................................*passim*

*United States v. Williams*,
    1999 WL 1022491 (2d Cir. Oct. 25, 1999)............................................4

*United States v. Wong*,
    78 F.3d 73 (2d Cir. 1996)....................................................................40

**Statutes**

18 U.S.C. § 1956............................................................................................28

**Other Authorities**

Fed. R. Crim. P. 16 ...............................................................................35, 36

Fed. R. Crim. P. 33 ...........................................................................*passim*

Fed. R. Crim. P. 45(b)(1)(B)......................................................................16

Federal Rule of Evidence 803(3) ...............................................................31

**Preliminary Statement / Summary of Argument**

Mark Scott was convicted following a trial in which the Government relied on the testimony of its sole cooperating witness, Konstantin Ignatov ("Konstantin"), to prove the key issue in contention: "whether Scott knew that OneCoin was a fraud scheme." (Dkt. 445, Gov't. Sur-Reply, at 36).  Now, newly discovered evidence has conclusively shown that Konstantin committed perjury at least twice,[1] including about the only meeting he ever had with Mr. Scott, on July 20, 2016 ("the July 20th Meeting").  The evidence is also clear that the Government *knew during trial* that Konstantin was testifying falsely about the July 20th Meeting, failed to correct it, and, still worse, prevented defense counsel from correcting it by wrongly telling the Court that Second Circuit law precluded admission of an email that would have done so.  On top of it all, the Government engaged in a pattern of *Brady* violations both before and after trial that shielded its lying cooperator from much-needed scrutiny.

The Government's misguided efforts to protect its failed cooperator continue to this day, on full display in the Government's latest submission (Dkt. 445).  The Government defends Konstantin's concededly false testimony about Irina Dilkinska's presence at the July 20th Meeting as an innocent "mistake[]…in his memory about the date" (Dkt. 445 at 32), proposing that Konstantin was referring to a trip Mr. Scott made to Sofia on September 15, 2016 when, the Government claims, "Scott met in person with Dilkinska." (Dkt. 445 at 5).  The only trouble with the Government's latest defense of its lying witness: it is flat out false.  As discussed in Section I(A)(2), *the Government's own trial exhibits reflect that no such Scott-Dilkinska meeting took place on this September Sofia trip either.*  Or, for that matter, ever.  Konstantin's detailed

---

[1] The defense recently received, and is investigating, a credible report relating to further perjury by Konstantin.

testimony about Ruja telling him "to bring in Irina [Dilkinska]" once she arrived at OneCoin in Sofia and then telling Konstantin to send others home "so that Irina, Mark and Ruja are alone" (Tr. at 246-47) was not a "mistake[] in his memory about the date." (Dkt. 445 at 34). It was a lie about a meeting *that never occurred on any date*.

That the Government would tell this Court that Konstantin had confused the non-existent July 20th Scott-Dilkinska meeting with what was in fact an equally non-existent September 15th Scott-Dilkinska meeting when its own trial exhibits are to the contrary speaks volumes, a powerful illustration of why a new trial is necessary. It reflects an approach to Konstantin that has been on display throughout this prosecution: defend the cooperator's testimony from challenge, even when that testimony flies in the face of the facts, even at the expense of the Government's obligation to the truth. It explains why the Government, aware that Konstantin was testifying falsely about the July 20th Meeting *at the time of trial*, ignored its Constitutional duty to correct it. It is why the Government reflexively (and wrongly) resisted the defense's effort to introduce a reliable and admissible email (DX 550) (Dkt. 434, Stanley Decl., Ex. A) that proved that Dilkinska was almost surely *not* at the July 20th meeting as Konstantin was claiming.

Indeed, the Government's knowledge during trial that Konstantin was testifying falsely about Dilkinska's presence at the July 20th meeting makes a new trial "virtually automatic" under Second Circuit law, *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991), as discussed in Section I(C). While the Government repeatedly insists that it believed that Konstantin's perjurious testimony was simply a mistake, "where a prosecutor knew of 'false evidence,'" its awareness of "whether the witness's 'untruthfulness…constituted perjury' makes no 'material difference.'" *Drake v. Portuondo*, 553 F.3d 230, 553 n.7 (2d Cir. 2009) (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). Konstantin's perjury, and the Government's

2

willingness to let it go uncorrected, deprived Mr. Scott of a fair trial, and the only suitable remedy is to grant him a new one.

## Argument

### I.    Konstantin's Perjury Warrants A New Trial

A.    Konstantin's Perjury Extended To The July 20th Meeting

After several rounds of briefing,[2] there is no longer any dispute that (1) Konstantin perjured himself with respect to his disposal of a OneCoin laptop and (2) that Konstantin's testimony about Dilkinska's presence at the July 20th Meeting was in fact false.  As the Government concedes, Konstantin lied to the jury about what happened to the laptop, (Dkt. 412 at 20) and Dilkinska was over 3,000 miles away in India, and did not participate in the July 20th meeting at all. (Dkt. 445 at 6).  Notwithstanding this, the Government asks the Court to conclude that Konstantin was "was simply mistaken, rather than intentionally providing false testimony regarding the July 20th Meeting." (Dkt. 445 at 34).  But the overwhelming weight of the evidence – and certainly a *preponderance* of the evidence, the applicable standard – is that Konstantin's testimony about the non-existent Dilkinska-Scott encounter on July 20th was not a mistake but, like his perjurious testimony about the laptop, intentionally false. *See United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001) (citing *United States v. Dunnigan*, 507 U.S. 87 (1993)).

---

[2] As the Court is aware, the defense filed its initial Supplemental Motion for a new trial as a letter-brief on August 23, 2021 (Dkt. 410), when it was aware only of new evidence relating to the laptop perjury, and the Government responded on September 10, 2021 (Dkt. 412). Mr. Scott then obtained new evidence (the Bulgarian passport and Indian border crossing records) establishing that Konstantin also perjured himself about the July 20th Meeting, and filed a new 30-page brief (nominally a "Reply", Dkt. 433) based on these revelations, to which the Government responded on January 28, 2022 (Dkt. 445) with its 56-page "Sur-Reply" in opposition.

1.     The Preponderance of Evidence Standard Applies

While the Government asserts that the defense fails to meet its "burden" of showing that Konstantin's false testimony about the July 20th Meeting constituted perjury (Dkt. 445 at 1, 31-33), it omits *any* discussion as to what this "burden" entails.  In fact, the defense must only show "by a preponderance of the evidence that [the government's witness]… lied at [defendant's] trial," *Ortega v. Duncan*, 333 F.3d 102, 106 (2d Cir. 2003).  *See also United States v. Williams*, 1999 WL 1022491, at *1-2 (2d Cir. Oct. 25, 1999) ("[a] defendant who asserts the perjury claim [has] the burden of persuading [the court] by a preponderance of the evidence that [the perjury] took place") (internal citations omitted).  Under this governing standard, unmentioned in the Government's filing, the Court's job is simply to assess whether mistake or perjury is more likely.

2.     It Is More Likely Than Not That Konstantin's False Testimony About The July 20th Meeting Was Willful Rather Than Accidental

a)     The Government's Claim that Konstantin Likely Confused The July 20th Meeting With A Different Scott-Dilkinska Meeting Is Demonstrably False

In its Sur-Reply, the Government argues that Konstantin was likely "mistaken in his memory about the *date* of the meeting," (Dkt. 445 at 32), claiming that he confused the July 20th Meeting between Mr. Scott and Dilkinska with a meeting that took place a few months later. (*Id.* at 5) (emphasis in original).  To support this fanciful alternative, the Government makes much hay of an email (not offered at trial) in which Dilkinska wrote to David Pike, "**I will talk to Mark when we meet (15ᵗʰ of September) – need to discuss with him some aspects regarding**

**this matter.**[3] (Dkt. 445 at 34, Ex. B).  This e-mail, the Government tells the Court, "shows that Scott met in person with Dilkinska during the September 2016 trip to Sofia." (Dkt. 445 at 5).

This is almost certainly false.  And the Government knows it.  *The very trial exhibits cited by the Government in its Sur-Reply* (but, unlike its Exhibit B, *not* provided to the Court in its submission) demonstrate that it was *exceedingly unlikely that any Scott-Dilkinska meeting took place on this September trip*, and certainly not any meeting for which Konstantin was present or could have in any way confused with his detailed false testimony about Dilkinska joining Mr. Scott in OneCoin's offices on July 20th.  Rather, GX 4028 (attached hereto as Exhibit A) shows that while Mr. Scott arrived in Sofia on the afternoon of September 15th (departing only 40 hours later), he did not go to the OneCoin offices and that neither Dilkinska nor Konstantin were present for a meeting he had with Ruja on that trip at a private club.

In particular, the email exchanges in the Government trial exhibit GX-4028 reflect the following:

- Mr. Scott advises Konstantin on September 13th that he "will be arriving on Lufthansa flight 1426 from Frankfurt [Germany] in Sofia [Bulgaria] on Thursday [September 15th] landing at 1:00 pm."

- Konstantin confirms to Mr. Scott that he has scheduled a car service for him upon landing to take him directly from the airport to the Hilton hotel, where Mr. Scott had a room.

- Mr. Scott informs Konstantin "R[uja] and I [are] meeting at the Residence at 8:00 pm on Thursday [9/15/16] and Friday afternoon [9/16/16]."

- Konstantin informs Mr. Scott late in the morning of September 16th, "Ruja will send you the car at 5pm to bring you to the meeting."  Mr. Scott responds that this is fine because he "missed the first meeting" (i.e., the one planned for the night of September 15th at the Residence) "due to moving forward on a project and knew she is busy now."

---

[3] The Government's "emphasis in original" reference is misleading.  While the portion of the email quoted by the Government (as well as an unquoted portion) was in fact underlined, **the dramatic addition of bold** was but a flourish of the Government's invention.

- Konstantin informs Mr. Scott early in the afternoon on September 16th that "I have some Documents Irina wants to send you" and offers to send via a car or  "I can give it to you in person."  When Mr. Scott replies, "Whichever you prefer is fine," Konstantin responds, "Sent them via driver to you.  Please confirm when you received them!"

- Mr. Scott informs Konstantin that he "need[s] to be at the airport on Saturday [September 17th] for a 5:40 am flight."

The above sequence is very compelling evidence that Mr. Scott *did not meet Dilkinska on this short trip*.  Had Dilkinska met Mr. Scott in person, she herself could have given Mr. Scott the documents.  On top of this, the meeting took place at the Residence (a private club, Tr. at 250), not OneCoin's offices, and Konstantin did not attend, sending Dilkinska's documents to Mr. Scott by car service instead of "giv[ing] to [Mr. Scott] in person." (GX 4028)  Simply put, the great weight of the Government's evidence – of which it fails to tell the Court as it pushes a contrary theory – shows that there was no meeting between Mr. Scott and Dilkinska on the September trip, much less a meeting that took place at OneCoin or that Konstantin even witnessed.

Strikingly, there is no indication that Konstantin ever told the Government that he witnessed any sort of Dilkinska–Scott meeting in September 2016, nor does it seem the Government even bothered to ask him about it. [4]  Konstantin has consistently testified he met Mr. Scott only once – the July 20th Meeting in OneCoin's offices (Tr. at 130, 301-302, 397) – which means he did not encounter Mr. Scott, much less Mr. Scott and Dilkinska together, in September *or at any other time*. [5]  In short, the "mistake" alternative that the Government spins is

---

[4]  Based on its disclosures, the last time the Government questioned Konstantin on the topic of the Scott–Dilkinska meeting was on September 1, 2021, when he falsely insisted that his trial testimony about the July 20th meeting was accurate. (Dkt. 434, Stanley Decl. Ex. J-2 (3524-065).

[5]  Indeed, Konstantin has consistently stated he met Mr. Scott only once – at the July 20th Meeting in OneCoin's offices (Tr. at 130, 301-302, 397) – which means he did not encounter Mr. Scott, much less Mr. Scott and Dilkinska together, in September.

untethered from anything Konstantin has said and contradicted by its own evidence. Konstantin's detailed testimony about Dilkinska's physical presence[6] at a OneCoin meeting in Sofia with Mr. Scott on July 20th could not have been mistaken with the non-existent September 15th meeting or anything else; it could only have been perjury.

       b)       Konstantin Expressed Near Certainty In His False Testimony On Cross-Examination

The Government also argues that Konstantin's testimony on cross-examination about the July 20th Meeting was an innocent mistake because Konstantin "repeatedly indicated that he was less than certain about what he was testifying about." (Dkt. 445 at 33).  This is a gross mischaracterization.  Rather, the transcript reflects that Konstantin was strongly resistant to the notion he could have been mistaken, and the *very limited* hedging he engaged in is consistent with leaving a little wiggle room should defense counsel catch him in the lie.

On the first day of cross-examination, Konstantin reiterated that he met Mark Scott when Mr. Scott came to OneCoin in Sofia on July 20th; that Dilkinska arrived later to join a meeting already underway between Mr. Scott and Ruja; and, that Dilkinska spoke to Konstantin about the meeting "the week afterwards." (Tr. at 303-04).  He did not even slightly equivocate on these points.  He was then asked three times in short succession if he was "a hundred percent sure" of Dilkinska's presence at the meeting, and each time he did not back down, ultimately stating that he was "pretty sure" *and that by this he meant "almost a hundred percent" certain*. (Tr. at 304), a crucial definition of "pretty sure" that the Government omits from its discussion.

---

[6] On this, the Government claims that  Dilkinska could have "attended by phone, and told Ignatov about it later." (Dkt. 445 at 34).  Not only is there no evidence of this, but Konstantin was very clear in his testimony that the meeting was in person – Ruja and Mark first meeting alone in her office; Ruja then "calling [Konstantin] to bring in Irina" and Konstantin doing that; Ruja's request to Konstantin to send everybody home "so that Irina, Mark, and Ruja are alone." (Tr. at 246-47).

After Konstantin emerged from the first day of cross unscathed as to Dilkinska's presence at the meeting, he left even less room for doubt when defense counsel brought the subject up again on the second day of cross, which the Government largely ignores in its recounting.  Konstantin stated that his "memory is clear" with respect to the circumstances of the meeting, noting that "[i]t was the only time it happened" that Ruja asked that he clear out the floor so that she, Mr. Scott, and Dilkinska could meet. (Tr. at 396).  He then confirmed, without qualification, not once, but twice, that with respect to Dilkinska "being at the meeting," that he was "a hundred percent sure." (Tr. at 396-97).

Ultimately, the Government is splitting hairs.  Whether Konstantin was "a hundred percent  certain" or "almost a hundred percent" is of little moment.  That Konstantin would have had *any* confidence in a memory as to a non-existent meeting he claimed to have witnessed is inconsistent with innocent error and is entirely consistent with perjury.

<div style="margin-left:2em">

c)   The Court's Assessment Of Whether Konstantin's Testimony On The July 20th Meeting Was Perjury Or An Honest Mistake Must Take Into Consideration That Konstantin Is A Proven Liar

</div>

The Government's argument that Konstantin was likely "mistaken in his memory" (Dkt. 445 at 34) regarding the July 20th Meeting also ignores what is already known about Konstantin's credibility: it is worthless. "[T]he Government does not contest that Ignatov committed perjury" in his testimony about the OneCoin laptop (Dkt. 412, at 20), as detailed in Mr. Scott's original Supplemental Motion (Dkt. 410).  Konstantin likewise lied to the prosecutors, a federal crime, about the same subject in meetings with the Government.[7]  And,

---

[7] For example, notes from the Government's interview with Konstantin dated 8/8/19 state in relevant part, "After getting stopped was concerned that would be stopped again so threw away laptop. . . .Threw it in trash bin went out of Bellagio took a right towards LV sign and threw it in garbage.  Wrapped it in bag.  Worried about the gov't finding it." (Dkt. 410, Ex. C).

even after being forced to admit to perjuring himself about the destruction of the laptop, Konstantin has *continued* to insist implausibly that the laptop he took great pains to remove from the reach of investigators contained "nothing important," (Dkt. 434, Stanley Decl., Ex. J-2, ¶11), only "a lot of pictures and music," as well as "[s]ome company presentations but those were also on YouTube." (*Id.*, Ex. J-1).  This begs the question of why he got rid of it, were that true, and is undercut by the affidavit of Duncan Arthur, who reviewed the laptop and saw that it "contained voluminous OneCoin files." (*Id.*, Ex. E ¶15).

And, Konstantin's perjury on the Laptop and continuing lies about its contents are not the only provable falsehoods.  After breaching his cooperation agreement by illegally using a smuggled cellphone at the Metropolitan Correctional Center ("MCC"),  Konstantin claimed through his attorney that he used the phone only to "[c]omplain[] about [the] MCC" and "get pictures of [his kid]" but "didn't talk about case."  (See Dkt. 434, Stanley Decl., Ex. F).  As set out in Mr. Scott's prior filing, the Government's much delayed review of the phone *revealed numerous exchanges about the case*.[8]  The Government addresses this nowhere in its 56-page Sur-Reply, though, in its defense, there are many Konstantin lies of which to keep track.[9]

---

[8] For example, on February 10, 2020 an associate of Konstantin's left him a voice message in which he stated that "some books of [Konstantin's] sister [Ruja] were supposed to be taken out and burned and destroyed, but they were sent for recycling instead," noting that he was "mad, because this stuff was not supposed to come out." (Ex. B, 3524-070).  On February 20, 2020 an associate of Konstantin's texted him: "And why is Scot[t] under house arrest?"  Konstantin replied: "I don't know.  They are not putting him in."  Konstantin also told the associate"[t]hey [the Government] do not need me for anything any more [sic]," as "[t]hey have everything." (Ex. C, 3524-076 (Excerpts)).  There are numerous such exchanges relating to OneCoin and the investigation.

[9] Indeed, as the Court knows, the Government itself expressed grave concerns about Konstantin's history of lying to the U.S. Government in its opposition to his bail motion, S7 17 Cr. 630, Dkt. 90, citing a litany of false statements made in connection with his arrest and to Pretrial Services and concluding, "[h]e simply cannot be trusted." *Id.* at 1.

Konstantin, of course, has no reason to admit now that he also lied about the July 20th

Meeting – something that the Government has incentivized *by apparently leaving Konstantin's*

*cooperation agreement in place and telling him was now "in jeopardy"* after the laptop perjury

revelation.[10]  And the reasons Konstantin gave the Government for perjuring himself about the

laptop reveal his mindset.  He told the Government that he did not deviate in his testimony from

what he had said in trial prep about his disposal of the OneCoin laptop because he had been

"intimidated by Chris DiMase not believing part of his story at the beginning," and "didn't want

USG to think he was a liar." (Dkt. 434, Stanley Decl., Ex. J-1).  He further explained sticking to

the false story at trial by noting that it "[t]ook a lot to build [the] relationship and he didn't want

to jeopardize it." *Id*.  With his cooperation agreement in the balance, it is no surprise that when

the Government next met with Konstantin a week later to ask (for the first time, it appears) if he

had perjured himself about anything else, he responded that he "does not believe there were any

other specific instances aside from the Vegas computer thing that were false" and that he

"recall[ed] [the July 20th Meeting testimony] … exactly as described at trial." (Ex. D, 3524-

066).

    B.    <u>The Government's Absurd Claim That The Court Cannot Consider Whether The
Perjury Extended To The July 20th Meeting Must Be Rejected</u>

The Government argues, quite preposterously, that while the Court can consider

Konstantin's perjury about "the newly discovered evidence of Ignatov's additional bad conduct"

regarding the laptop (Dkt. 412 at 22), it is not permitted to consider whether his lies extended

---

[10]  The Government wrote in a September 22, 2021 email to defense counsel, "During our meeting with Konstantin Ignatov following the filing of your motion, we informed him that his cooperation agreement is in jeopardy and that he was obligated under his cooperation agreement to provide truthful information." (Ex. E, September 22, 2021 email from M. McGinnis to A. Devlin-Brown).

beyond this narrow subject in considering whether a new trial is warranted.  The Government is thrice-wrong, as set out below.

        1.        "Newly Discovered Evidence" Of Perjury Was Required To File The Supplemental Motion, But The Court Can Consider All Available Evidence Of Perjury In Its Evaluation

As an initial matter, and as the Government acknowledges, Mr. Scott's Supplemental Rule 33 Motion *was timely*, based as it was on "newly discovered evidence" provided by Duncan Arthur in July 2021 that Konstantin had perjured himself about the laptop. (Dkt. 412 at 22).  *See* Fed. R. Crim. P. 33 (requiring that "any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty").

The Government cites to no authority whatsoever for its claim that once a Rule 33 motion alleging perjury is timely filed, the Court must blind itself to all but the specific piece of newly discovered evidence in considering the scope of the perjury and its impact on the trial's fairness. (Dkt. 445 at 26-31).  Indeed, the Court has "broad discretion" under Rule 33 to set aside a verdict "to avert a perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992).  Given this flexible mandate, it stands to reason that the Court should consider whatever evidence is available to it regarding the scope of the perjury and its impact in the context of a timely motion.  Any other result would be arbitrary and unjust, and would do nothing to conserve judicial resources given that an assessment of the perjury is required in any event.

        2.        In Any Event, There Was "Newly Discovered Evidence" About The July 20th Meeting Itself

Even if Rule 33 required "newly discovered evidence" as to the July 20th Meeting specifically – which it does not – the Government's tortured claim that the defense did not obtain "newly discovered evidence" about the July 20th is nonsense.  The evidence cited in Mr. Scott's

Supplemental Reply (Dkt. 433, at 4) – a Bulgarian passport and Indian governmental records that for the first time conclusively demonstrated Dilkinska was in India on July 20, 2016, *was produced by the Government to the defense in December 2021*. (Dkt. 434, Stanley Decl., Exs. I, H).  These foreign government travel records of course "could not have been discovered [by the defense], exercising due diligence, before or during trial." *United States v. Siddiqi*, 959 F.2d 1167, 1173 (2d Cir. 1992).  Indeed, the Government only obtained this evidence through international law enforcement channels not available to the defense, and only after repeated prodding by defense counsel.

The Government responds that the passport and India travel records were not "newly discovered evidence" because (1) Mr. Scott himself knew at the time of trial that Dilkinska was not at the meeting; (2) the defense already had DX 550 and DX 552 (the emails it tried and failed to admit at trial); and (3) there were additional electronic communications on a cellphone extraction of which the defense should supposedly have been aware at the time of trial. (Dkt. 445 at 27–31).  This argument fails for several reasons.

Most fundamentally, the Government's entire argument rests on a conceptual mistake.  It confuses knowledge of the *ultimate fact* – that Konstantin perjured himself when he testified that Ms. Dilkinska was present at the July 20th meeting – with knowledge of the newly discovered *evidence that proves that fact*.  A belief or even actual knowledge at the time of trial that Konstantin testified falsely about the July 20th Meeting is not the "newly discovered" evidence underlying this motion.  The newly discovered evidence that *proves this testimony was false* is the recently obtained and produced Bulgarian passport and Indian government travel documents.

Understood this way, the Government's convoluted construction collapses.  Yes, as the Government argues, Mr. Scott personally knew that Konstantin's testimony about Dilkinska's

presence at the meeting was false because "Scott attended the July 20th Meeting" (Dkt. 445 at 30).[11]  Criminal defendants almost always possess personal knowledge of key issues disputed in their cases.  Yet a defendant's mere knowledge of an *ultimate fact*, when uncoupled from his knowledge of the *specific evidence that tends to prove that fact*, cannot dictate whether evidence qualifies as "newly discovered." *See, e.g., United States v. Forbes*, 790 F.3d 403, 409 (2d Cir. 2015) (finding that when a defendant "is aware that Witness X saw someone else pull the trigger, but cannot locate Witness X to testify to that fact at trial," the witness's testimony would still be "newly discovered within the meaning of Rule 33" if the witness is located after trial).

The Government's reference to defense counsel's awareness during trial of less definitive circumstantial evidence indicating that Dilkinska likely was not in Sofia is equally unavailing.  As an initial matter, it is particularly rich for the Government to rely on Mr. Scott's awareness of emails (DX 550 and DX 552) suggesting Dilkinska would be "traveling" at the time of the July 20th Meeting when the Government – by misstating Second Circuit law – prevented Mr. Scott from introducing those emails to the jury. *See* Section II, *infra*.  Moreover, the fact that the Government recently identified and produced to the defense additional electronic communications (the "Greenwood Communications") buried in close to a half a terabyte of data, consisting of over 950,000 files from ten phones and tablets that the Government had since July 2018 and dumped on the defense a month before trial[12] is also irrelevant.  These communications, like DX 550 and DX

---

[11] Moreover, what the Government avoids articulating, though inherent in this argument, is that Mr. Scott would have had to waive his "absolute right not to testify" to prove Konstantin a liar. *Salinas v. Texas*, 570 U.S. 178, 184 (2013).  "[N]o negative inference from the defendant's failure to testify is permitted" at trial, and this extends to adverse inferences drawn in the post-trial phase, such as at sentencing. *See Mitchell v. United States*, 526 U.S. 314, 328 (1999); *see also United States v. Rivera*, 201 F.3d 99, 102 (2d Cir. 1999)).

[12] As discussed in Section III(A), the Government violated its discovery obligations by failing to disclose the materials on these device extractions in a timely or useable way.

552, were less definitive than the newly discovered Bulgarian passport and Indian official records proving that Dilkinska was in India at the time of the meeting, and would no doubt have been subject to the Government's same flawed hearsay objection.[13]

In fact, a simple review of the controlling authority on new trials based on witness perjury – *United States v. Wallach,* cited repeatedly by both parties – puts the lie to the Government's contention that "newly discovered evidence" as to perjury does not count if the defendant had any evidence of perjury at the time of trial.  In *Wallach*, the defense cross-examined a cooperating witness with documentary evidence suggesting that the witness committed perjury in testimony about his gambling activities. 935 F.2d at 455–56.  Later at trial, the defense separately "placed before the government and the court powerful evidence that [the witness] was lying," which the court held was inadmissible. *Id*. at 457.  It was only after trial that the Government disclosed to the defense *yet more evidence* establishing the perjury, and the defense relied on this new, post-trial disclosure to bring a motion relying on "newly discovered" evidence. *Id*.  The Second Circuit held that "[t]his additional information *in itself provides a sufficient basis* for granting the defendants a new trial." *Id*. at 458 (emphasis added).[14]

The facts in the present instance are analogous to *Wallach*.  As in *Wallach*, Mr. Scott *did* cross-examine the witness as to whether his testimony was false.  As in *Wallach,* Mr. Scott tried to

---

[13] The three communications on this topic identified by the Government in October 2021 were attached to Mr. Scott's Supplemental Motion as Dkt. 434, Stanley Decl., Exs. G-1, G-2, G-3.  One message was a July 18, 2016 calendar message to multiple recipients which stated, "Irina Dilkinska will be out of office from 18/07 to 22/07 included."  Another is a July 21, 2016 email from Ruja Ignatova to Sebastian Greenwood stating that "Irina travels I think today.  A third was a Viber message from Greenwood to Ignatova on July 19, 2016 stating, "And cannot risk cash flow from non onecoin business for india.  I have acct.  Irina is there t[h]is week."

[14] *See also United States v. Brodwin*, 292 F. Supp. 2d 484, 493 (S.D.N.Y. 2003) (finding that "the conclusions reached by experts . . . that [a co-defendant] was not sane at the time of the offenses charged" qualified as separate "newly discovered evidence," even though the facts underlying the experts' conclusions were "available before trial" and known to the defendants).

introduce "powerful evidence" (DXs 550 and 552) that the witness lied, which, as in *Wallach*, "the court held was inadmissible."  And, just as in *Wallach*, the Government produced further evidence that the witness testimony was false: here, the Bulgarian passport and India travel records.  And just as in *Wallach*, these further disclosures are "newly discovered evidence" even though the defense had other evidence pointing to perjury at time of trial.  The Government's brief entirely ignores *Wallach*, controlling authority with a materially identical fact pattern, pointing the court instead to a hodgepodge of inapposite cases where, unlike here,  the defense counsel knew at the time of trial of the *specific pieces of evidence it later asserted were "newly discovered."*[15]

3.    The "Excusable Neglect" Standard Applies.

In any event, the "excusable neglect" standard readily enables the Court to review whether the perjury extended to the July 20th Meeting.  While the Government asserts in conclusory fashion that Mr. Scott cannot satisfy this test (Dkt. 445 at 21, 22 n.19), even a passing review of the standard demonstrates he can.

---

[15]  *See* Dkt. 445 at 27-29, misciting the following cases in support of its position: *United States v. Helmsley*, 985 F.2d 1202, 1208 (2d Cir. 1993) (holding that the evidence demonstrating the alleged perjury was not newly discovered when it consisted entirely of material "known to the defense prior to the trial"); *United States v. Behiry*, 2020 WL 3547741, at *3 (S.D.N.Y. June 30, 2020) (concluding that testimony in an affidavit demonstrating the perjury of another witness was not newly discovered when, among other things, the defendant was "aware of the information in [the first witness's] affidavit before and during trial"); *United States v. Bout*, 144 F. Supp. 3d 477, 489–90 (S.D.N.Y. 2015) (finding that a witness's testimony suggesting that a separate government witness committed perjury was not "newly discovered" when the defendant was "well-aware before trial" of how the first witness would likely testify); *United States v. Bourke,* 2011 WL 6376711, at *9–10 (S.D.N.Y. Dec. 15, 2011) (concluding that the flight records which "indisputably established the inconsistencies" in a cooperating witness's testimony were not newly discovered when the defendant possessed them "years before the trial began"); *United States v. Camacho*, 1999 WL 1084229, at *10 (S.D.N.Y. Dec. 1, 1999) (finding that evidence was not newly discovered when it consisted entirely of "facts or evidence that were known or should have been discovered by [defendants] or their counsel at or before the time of trial").

A court can consider a Rule 33 filing "after the time expires if the party failed to act because of excusable neglect." Fed. R. Crim. P. 45(b)(1)(B).  Four factors are relevant to a finding of "excusable neglect":

> (1) the danger of prejudice to the party opposing the extension; (2) the length of the delay and its potential impact on judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the party seeking the extension; and (4) whether the party seeking the extension acted in good faith.

*In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 129 (2d Cir. 2011) (citations and quotations omitted).  Analysis of the four factors requires an "equitable" consideration of "all relevant circumstances." *In re Painewebber Ltd. P'ships Litig.*, 147 F.3d 132, 135 (2d Cir. 1998) (citation omitted)).  Thus, excusable neglect is a "flexible concept" and its "parameters are informed by, and roughly congruent with, the interests of justice." *United States v. Stein*, 440 F. Supp. 2d 315, 325 (S.D.N.Y. 2006) (quoting *United States v. Roberts*, 978 F.2d 17, 21 (1st Cir. 1992)).

The claims in Mr. Scott's Supplemental Reply clearly qualify under this standard.  There is absolutely no "prejudice to the [Government]" in addressing the meeting perjury claims *given that it is already responding to what it concedes is a timely motion addressed to the laptop perjury*.  Indeed, in its Sur-Reply, the Government identifies no prejudice whatsoever that would follow from the court's consideration of the meeting perjury, a situation in which courts routinely find the standard satisfied.[16]  Courts likewise apply this doctrine when, as here, "a

---

[16] *See United States v. Kenner*, 272 F. Supp. 3d 342, 420 (E.D.N.Y. 2017) (excusing a delay of more than a year when "no prejudice to the government in granting the extension"); *see also United States v. Scali*, 2018 WL 3536082, at *2 (S.D.N.Y. July 23, 2018) (excusing delay when prejudice to the government was "negligible" and the government itself identified "no prejudice to its ability to oppose this motion"); *United States v. Thomas*, 2014 WL 702107, at *4 (W.D.N.Y. Feb. 24, 2014) (excusing delay when the government "did not lose any claims or defenses as a result of the late filing, and therefore will not be prejudiced").

judgment has not yet been entered in Defendant's case," and there is "no adverse impact on the court's proceedings" associated with the motion. *United States v. Caraballo*, 2014 WL 3535348, at \*3 (D. Vt. July 16, 2014); *Kenner*, 272 F. Supp. 3d at 420. Mr. Scott has not yet been sentenced, and all of his other Rule 33 claims – including the closely related claim arising from Konstantin's perjury about the laptop – remain pending.  The Government offers no reason, and there is none, that these claims should not be addressed.

      C.    <u>A New Trial Should Be "Virtually Automatic" Because The Government Knew At Trial That Konstantin's Perjurious Testimony Was False</u>

          1.    *Wallach's* "Virtually Automatic" New Trial Standard Applies In All Cases Where The Prosecution Knows The Perjurious Testimony Was False, Including Cases Where The Prosecution Assumed The Falsity Was Unintentional

As the Second Circuit directs in *Wallach*, if "the prosecution knew or should have known of the perjury, the conviction must be set aside" where there is "*any reasonable likelihood that the false testimony could have affected the judgment of the jury*." *Wallach*, 935 F.2d at 456 (citations omitted) (emphasis added). *See also Giglio v. United States*, 405 U.S. 150, 154 (1972) ("A new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the jury.") (internal citations and quotations omitted).  Indeed, reversal is "virtually automatic" where "the government knowingly permitted the introduction of false testimony." *Wallach*, 935 F.2d at 456 (citing *Napue*, 360 U.S. 264 at 269).

The Government repeatedly insists that this standard applies only where the Government is aware at the time of trial that the perjured testimony was both false *and intended to be false*, meaning that it would apply only if the Government knew "that Ignatov *intentionally testified falsely* about the July 20th Meeting." (Dkt. 445 at 38) (emphasis in original).  This is wrong. While the "threshold inquiry" is that the evidence must "demonstrate[s] that the witness in fact committed perjury," *United States v. Stewart*, 433 F.3d 273, 297 (2d Cir. 2006), for *Wallach* to

apply at all, *the prosecution is only required to understand at the time of trial that the testimony was false, regardless of the witness's intent*, for the "virtually automatic" reversal standard to apply.[17]

This conclusion is supported by the language used in *Wallach* and its progeny. The *Wallach* court held that the "virtually automatic" reversal standard applies where the prosecution "knowingly permitted the introduction of false testimony," without additionally requiring the prosecution to have known that the testimony was intentionally false. The Second Circuit repeated this formulation in *Stewart*, holding that the applicability of the "virtually automatic" reversal test is "based on the extent of the government's awareness of the *false testimony* prior to the conclusion of the trial." *Stewart*, 433 F.3d at 297 (emphasis added). *See also United States v. Aquart*, 912 F.3d 1, 20 (2d Cir. 2018) ("[T]he court must assess the materiality of the false statements, applying one of two standards [set out in *Wallach*] depending on the prosecution's *awareness of the falsehoods* at the time of trial.") (emphasis added). This of course makes sense, and is consistent with the "dual purpose" of the *Wallach* standard applicable to the knowing introduction of false testimony: to "discourag[e] prosecutorial misconduct and provid[e] relief from an unfair conviction." *Stewart*, 433 F.3d at 297 (citing to *United States v. Agurs*, 427 U.S. 97, 104 (1976)).

---

[17] The Government also repeatedly suggests that the Court can only grant a Rule 33 motion based on Konstantin's perjury if there is "a real concern that an innocent person may have been convicted." (Dkt. 445 at 2, 13, 18, 26). This misstates the law. While concerns about the conviction of the innocent of course provide a basis for a new trial and are part of the general rubric of Rule 33 law, this is *not the standard for Rule 33 motions based on perjury*, which is set out clearly in *Wallach*, and does not require the Court to second guess actual guilt or innocence. Rather, under *Wallach* the question is whether the perjury could have tainted the process to the point where confidence in the jury's verdict is shaken.

The Government's claim that the "virtually automatic" new trial standard in *Wallach* applies only to cases where the Government knows the testimony is *intentionally* false is also at odds with *Napue v. Illinois*, 360 U.S. 264, 269 (1959), and would be inconsistent with constitutional due process requirements.  In *Napue*, the prosecutor failed to correct the intentionally false testimony by a key Government witness that he had not received any consideration in exchange for his testimony.  "A conviction obtained through [the] use of false evidence, known to be such by representative of the State, must fail" as a violation of due process rights, the Supreme Court held, noting this applies equally when the prosecution "although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* at 269.  Notably, the *Napue* court did not rest its decision on the Government knowing that the testimony was *intentionally* false; knowledge that the evidence is false is sufficient to trigger the constitutional violation.

Indeed, the Second Circuit has reaffirmed *Napue*'s holding.  In *Drake v. Portuondo*, the Second Circuit reversed the denial of the defendant's habeas petition based on the prosecution's knowing use of false testimony by its expert witness. 553 F.3d at 242.  As here, the prosecution claimed it did not know at the time of trial that the false testimony constituted perjury because "[it] may have been the result of confusion or mistake." *Id.* at 242 n.7.  The Second Circuit rejected this, holding that the prosecution's awareness of "whether the witness's 'untruthfulness…constituted perjury' makes no 'material difference' where the issue is a conviction 'on tainted testimony.'" *Id.* (citing *Napue*, 360 U.S. at 269) (quoting *Mesarosh v. United States*, 352 U.S. 1, 9 (1956)).

The same follows here.  It makes "no material difference" if the Government supposedly thought at the time of trial that Konstantin's false testimony about the July 20th Meeting was just

"confusion or mistake." *Drake*, 533 F.3d at 242 n.7.  The Government permitted testimony it

knew to be false to go to jury, precisely what the *Wallach* court sought to "discourage" in

adopting the "virtually automatic" new trial standard where the Government "knowingly

permitted the introduction false testimony." *Wallach*, 935 F.2d at 456.  Ultimately, the

Government offers *no justification or argument of any kind* as to why prosecutors should be

given a pass if they know at the time of trial that a witness who in fact perjured himself was

testifying falsely but can claim ignorance as to whether the witness's false testimony was

intentional.  Indeed, such reading would disincentivize prosecutors from correcting trial

testimony they know to be false in the many perjury cases where they can claim to be unsure of

the witness's intentions.

> 2.    The Government Admits That It "Should Have Known" That Konstantin's Testimony Was False, Triggering The "Virtually Automatic" New Trial Standard

Given that the Second Circuit requires only that the prosecution be "aware[] of the *false*

*testimony* prior to the conclusion of the trial," *Stewart* 433 F.3d at 297 (emphasis added) – not

the intent behind it –  a new trial is "virtually automatic," required where there is "any reasonable

likelihood that the false testimony could have affected the judgment of the jury," *Wallach*, 935

F.2d at 456 (citations omitted).

Crucially, the Government *itself admits* that "there is evidence that the Government

should have known . . . that Ignatov's [sic] had misremembered certain details about the July

2016 Meeting and that his testimony about Dilkinska being present at the meeting was

inaccurate." (Dkt. 445 at 38).  It not only *should have known* the testimony was false.  It *did*

know.  As discussed in Mr. Scott's previous submission (Dkt. 433 at 18-19), and in Section II(B)

of this submission, defense counsel identified two emails, DX 550 and DX 552, while

Konstantin was on the stand, both of which showed that Dilkinska was almost certainly not

present in Sofia on July 20, 2016. [18]  But the Government's resort to "should have known" makes

no difference as *Wallach* is clear that the "virtually automatic" new trial standard applies both

when the prosecution "knew or should have known" of the false testimony.  *See Wallach*, 935

F.2d at 456.  Accordingly, the Court must evaluate Mr. Scott's Rule 33 perjury on the basis of

whether there is a "reasonable likelihood that the false testimony could have affected the

judgment of the jury." *Wallach*, 935 F.2d at 456.

> D.   Without Konstantin's Perjury-Infused Testimony, The Court Cannot Be
>      Confident That The Jury Would Have Convicted

Under the *Wallach* standard used for when the Government knowingly permitted the

introduction of false testimony, as was the case here, a new trial is "virtually automatic,"

required if there is any "reasonable likelihood that the false testimony could have affected the

judgment of the jury." *Wallach*, 935 F.2d at 446. *Wallach* also provides an alternative avenue for

when "the government was unaware of a witness's perjury," in which case "a new trial is

warranted only if the testimony was material and the court is left with a firm belief that but for

the perjured testimony, the defendant would most likely not have been convicted." *Id.* (internal

citations and quotations omitted).  Mr. Scott prevails under either standard.

> 1.   The Perjured Testimony Was Material, Including Because It Bore Heavily
>      On Konstantin's Credibility

The Government argues that the two specific instances of proven perjury – the

destruction of the laptop and Dilkinska's presence at the July 20th Meeting – were not important

---

[18] In the Government's minimizing explanation, it "should have known" that the testimony was
inaccurate because it possessed (but had not reviewed) certain electronic devices belonging to
Greenwood that contained communications suggesting Dilkinska was traveling in this period.
(Dkt. 445 at 38). While all of this is true, the Government ignores that the material on the
Greenwood devices w*as no different in kind than the emails in DX 550 and DX 552*, which the
Government had actual knowledge of during trial, and which also made clear that Konstantin's
claim that Dilkinska was at the meeting was almost certainly false.

subjects of testimony, and therefore would not have "affected the outcome of the trial." (Dkt. 445 at 14).  But this myopic view fails the basic test of common sense, and is unsupported in the case law.  The Second Circuit has long held that courts must assess the "materiality" of perjury not only by "focusing on the importance of the testimony in proving the elements of the charge" but also in "evaluating the credibility of a witness." *United States v. Beras*, 2005 WL 82037, at *2 (S.D.N.Y. Jan. 13, 2005) *aff'd*, 152 F. App'x 50 (2d Cir. 2005).  *See also United States v. Myton*, 2005 WL 1397208, at *5 (E.D.N.Y. June 14, 2005) (citing *United States v. Stofsky*, 527 F.2d 237, 246 (2d Cir. 1975) (stating that perjury "can be material in two ways," for it bears on both the "factual elements of the government's case," as well as "the witness's credibility").

On the first point, the materiality of Konstantin's testimony regarding the July 20th meeting is clear, as it concerned the *only* meeting that Mr. Scott was alleged to have had with OneCoin's alleged head money launderer, Dilkinska.  Konstantin himself ascribed great significance to this non-existent meeting, falsely testifying that once Dilkinska arrived at OneCoin, Ruja instructed him to call Dilkinska into the meeting and then "make sure that everybody on this floor leaves and goes home so that Irina, Mark, and Ruja are alone," (Tr. at 246) something he said was so exceptional that it was "the only time" this happened in the entirety of his time at OneCoin. (*Id.*).

Even more importantly, however, if the jury knew that Konstantin, as a Government cooperator, had lied to them about both the laptop and the Dilkinska meeting, it "'would have exerted a compelling impact on his credibility as to the unsubstantiated aspects of his testimony.'" *Alvarez v. United States*, 808 F. Supp. 1066, 1093 (S.D.N.Y. 1992) (quoting *United States v. Seijo*, 514 F.2d 1357, 1363-64 (2d Cir. 1975)).  While the Government is quick to dismiss Konstantin's perjury as "mere impeachment evidence," which it says would be

cumulative, both the Supreme Court and the Second Circuit have recognized that the jury's assessment of credibility may determine a defendant's fate. *Napue*, 360 U.S. at 271 ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence.")  As such, the Second Circuit has found that "despite the presence of other impeaching material available to the jury … [newly discovered evidence of perjury] would have exerted a compelling impact on [the witness's] credibility as to the unsubstantiated aspects of his testimony" and thus "cannot be said to constitute merely cumulative impeaching material." *Seijo*, 514 F. 2d at 1363-64.  *See also Alvarez*, 808 F. Supp. at 1093 ("The jury was squarely faced with the hard question of whom to believe.  Given the importance of this single credibility determination, I hold that the newly discovered evidence…is vital impeachment material and not 'merely cumulative.'" (internal citations omitted)).  In the present matter, Konstantin was the Government's *sole* cooperating witness, the *sole* person to testify as to OneCoin's inner workings, and the *sole* person to label Mr. Scott a "money launderer."  As such, the jury's estimate of Konstantin's credibility was crucial to its assessment of Mr. Scott's guilt.

Further, the cases that the Government cites in support of the proposition that cumulative impeachment evidence cannot support a new trial are fundamentally different from the one at hand.  Each of them are mob cases in which the "newly discovered evidence" chiefly related to additional bad acts in a cooperating witness's extensive criminal history that had already been probed in detail at trial.[19]  Newly discovered evidence of a cooperating witness's perjury

---

[19] *See, e.g., United States v. Orena*, 32 F. 3d 704, 717 (2d Cir. 1994) (cooperating witness's perjury about his involvement in drug trafficking was immaterial in light of the "ample evidence (which was presented to the jury) of [the witness's] horrendous history of criminal activity," including involvement in several murders); *United States v. Locasio*, 6 F.3d 924, 949 (2d Cir. 1993) (cooperating witness's perjury about his involvement in three murders was "cumulative" when the witness had "already confessed to numerous crimes, including murders, and was subject to withering cross examination for those actions"); *see also United States v. Avellino*, 136

*unrelated to his own prior crimes*, however, is quite different, as it speaks to new and dishonest intent on the part of the witness separate and apart from any recognition of the past conduct addressed through his cooperation agreement.  Indeed, evidence that a witness is testifying falsely in a way that makes the defendant seem more culpable (as Konstantin's lies about Dilkinska's presence at the meeting did) is of the highest relevance to a jury assessing whether a witness's status as a cooperator is shading his testimony against the defendant.

The Second Circuit has emphasized a similar point in *Wallach*.  In that case, a cooperating witness lied to the jury about his gambling activities after purportedly undergoing a "moral transformation" after signing his cooperation agreement:

> Had it been brought to the attention of the jury that [the witness] was lying after he had purportedly undergone a moral transformation and decided to change his ways, *his entire testimony may have been rejected by the jury*. It was one thing for the jury to learn that [the witness] had a history of improprieties; *it would have been an entirely different matter for them to learn that after having taken an oath to speak the truth he made a conscious decision to lie.*

*Wallach*, 935 F.2d at 457 (emphasis added).  This court has also recognized the same distinction. In *United States v. Browne*, the court granted a new trial when newly discovered evidence revealed that a key cooperating witness in a securities fraud case had perjured himself and had in fact continued to commit securities fraud even though he testified that "he had abandoned his life of crime once he signed his cooperation with the government," specifically stating that "'[t]here came a point in my life when I decided I didn't want to lie and cheat anymore.'" *United States v. Browne*, 130 F. Supp. 2d 552, 554 (S.D.N.Y. 2001).  Konstantin testified that his obligations

---

F.3d 249, 258 (2d Cir. 1998) (cooperating witness's perjury with respect to past criminality was immaterial when the witness had already testified about his involvement in "[m]urder, high-jacking, burglary, arson, gambling" and  "murder, counterfeiting, loansharking, extortion, labor racketeering, ... illegal union racketeering, threats, [and] assaults" (citations omitted)).

under his cooperation agreement were "[t]o be truthful in the meetings, to meet as often as the government wants me to with them, and to be truthful here in my testimony." (Tr. at 210). That he would then invent a fictitious story to make the sole meeting he ever had with Mr. Scott look that much worse would have grievously undermined his credibility.

> 2.   Outside Of Konstantin's Testimony, The Government Presented Little Evidence That Mr. Scott Had The Required Criminal Intent

As with its original Opposition (Dkt. 412), the Government Sur-Reply goes on at length about the supposedly "overwhelming evidence" that the Court marshalled in support of its case, citing to its "testimony from 15 witness, numerous emails…, and bank records and charts detailing Scott's network of offshore bank accounts." (Dkt. 445 at 2-3). But what the Government continues to ignore is that the vast majority of this evidence neither corroborated Konstantin's unreliable testimony nor went to what the Government recognizes was "the key issue in dispute at trial " (Dkt. 412 at 1): "whether Scott knew that OneCoin was a fraud scheme." (Dkt. 445 at 36).

Indeed, nothing the Government writes changes the fact that Konstantin was the *only* witness to testify that Mr. Scott knew OneCoin funds were fraudulent, branding Mr. Scott a "money launderer[]" for OneCoin in the opening moments of his testimony, Tr. at 129-30,[20] an assertion largely based on what Konstantin claimed others had told him. (Dkt. 433 at 14). And,

---

[20] The Government argues that "Ignatov's labeling of Scott as a money launderer did not discharge the jury of its duty to independently determine that Scott was indeed a money launderer under the elements of the money laundering conspiracy charge in Count One." (Dkt. 445 at 40). This is quite rich, as the Government clearly coached Konstantin to repeatedly call him a "OneCoin money launderer" even though that phrase is absent from the extraordinary trove of contemporaneous communications among co-conspirators obtained in the investigation. Indeed, Mr. Scott unsuccessfully sought to bar the Government from using inflammatory labels such as "money launderers" to refer to particular people given that Mr. Scott was charged with the crime of "money laundering," which obviously has a precise legal definition. (October 25, 2019, Opp. to Gov't Motions *In Limine*) (Undocketed)).

Konstantin's total lack of direct or indirect insight into what Mr. Scott thought is precisely what made his extensive testimony about the criminal activities of the individuals with whom Mr. Scott interacted during the course of running the Fenero Funds (such as Dilkinska, Frank Ricketts, Gilbert Armenta, and Amer Abdulaziz) so valuable to the Government's case.  In the absence of *any* corroborating testimony about Mr. Scott's knowledge of OneCoin's fraudulent nature, the Government relied on Konstantin's description of Mr. Scott's alleged co-conspirators to explicitly invite the jury to make an inference about what dealing with such people might say about Mr. Scott, arguing in closing: "Think about who these companies belonged to on paper. Frank Ricketts, Irina Dilkinska, Gilbert Armenta.  Criminals.  Every one of them." (Tr. at 1878).

Nor was Konstantin corroborated on his testimony that Mr. Scott was a OneCoin money launderer.  The eight categories of "substantial independent evidence" to which the Government points as corroborating the "totality" of Konstantin's testimony (Dkt. 445 at 36) speak to facts that were never in dispute, and have little to do with Mr. Scott at all (let alone any supposed knowledge he had of OneCoin's fraudulent nature).  For example, this "corroborating" evidence is described by the Government as  "emails between Ruja and [Sebastian] Greenwood clearly demonstrating that Onecoin was a fraud scheme"; "testimony from victims demonstrating the same"; "OneCoin promotional videos showing Ruja and Greenwood in the act of carrying out the OneCoin scheme"; and, "a recording of Gilbert Armenta [showing]…that Ruja had been spying on Armenta and had learned he was cooperating with law enforcement." *Id.*  This can hardly be characterized, as the Government would have it, as "persuasive independent evidence [that] supported the defendant's conviction." *United States v. Spencer*, 4 F.3d 115, 119 (2d Cir. 1993).

Outside of Konstantin's testimony, there remains *no* direct evidence that Mr. Scott knew of OneCoin's criminal nature in the thousands of emails and terabytes of data that the Government has mined through and collected.  Mr. Scott was not on any emails of the sort that the Government introduced between Ruja and Greenwood, in which Greenwood affirms to Ruja that "We are not mining actually -- but telling people shit," (GX 2106) or where Ruja muses that her thoughts on an "exit strategy" is to "[t]ake the money and run and blame someone else for this." (GX 2102).  There were no communications in which Mr. Scott hints at any awareness that OneCoin was lying to its customers, or even in which OneCoin's operations were explained to him.  And the very few new points the Government makes in what is largely a rehash[21] of the "overwhelming evidence" claims made in its original Opposition (and addressed in Mr. Scott's Reply, Dkt. 433 at 16-17), do not change that its case as to Mr. Scott's criminal knowledge was dependent on Konstantin.  For example, the Government points the Court to what it calls "the most damning fact of all," that "*all of the money Scott received was on behalf of Ruja.*" (Dkt. 445 at 43) (emphasis in original).  But blue chip global financial institutions also held and transferred tens of millions of OneCoin funds during the charged conspiracy (GX 2602-A) and are not

---

[21] For example, the Government yet again draws attention to a text message in which Dilkinska told Konstantin that Mr. Scott was unlikely to be an informant because if he were, she "would be in much deeper shit" because she was "in all papers with which [Scott] was working." (Dkt. 445 at 42; Tr. at 265).  Such a message may corroborate Konstantin's assertions that *Dilkinska* understood herself to be partaking in illegal activities, but says nothing of what Mr. Scott thought.  The same is true for Frank Schneider's email to Konstantin warning him that Mr. Scott "might be a highly placed U.S. informant." (GX 3005-S, Dkt. 412 at 13).  Far from "mak[ing] it clear that Scott was on the inside of the conspiracy," (Dkt. 412 at 13), such emails suggest that *others* understood their acts to be criminal and that Mr. Scott might report those acts, but not that Mr. Scott himself contemporaneously knew OneCoin was a fraud.

accused of wrongdoing.  Nor, to the defense's knowledge, has the Government brought charges against individuals managing Ruja's investments through her U.K. Family Office, RavenR. [22]

Ultimately, the Government's case as to Mr. Scott's knowledge that OneCoin was a fraud scheme beyond Konstantin came down to a smattering of e-mails and other documents that meant very little without a witness like Konstantin to link them together. [23]  In fact, the Government *admitted as much* in a side bar after the defense objected to the Government's use of Konstantin as a vehicle through which to display and read to the jury a dizzying assortment of documents, many of which Konstantin had never seen.  In defending this approach, the Government argued that Konstantin had "personal knowledge of the participants in the emails" and presenting them through him would "help the jury view the evidence with some context surrounding it, so it's not just at some portion of the trial in an endless stream of documents with no testimony surrounding them." (Tr. at 189-90).  The Government said so itself: without Konstantin, its case against Mr. Scott as to knowledge would have been little more than an "endless stream of documents" entirely devoid of any "context." This would hardly have been enough to sustain a conviction.

---

[22] While Mr. Scott did not typically volunteer that Ruja was personally associated with the various companies investing in the Fenero Funds, that does not mean that he knew that her OneCoin money came from a fraud.  While it may be distasteful that wealthy individuals use opaque corporate structures to keep their assets private or to avoid or evade taxes, it does not follow that anyone handling such funds should understand that they *are proceeds of a crime*, which the Government must prove under 18 U.S.C. § 1956.

[23] For example, in arguing that Konstantin was not the sole source of evidence that Mr. Scott's counterparties were criminals, the Government can point only to a scattershot of emails and text messages, such as a 2015 email in which Ruja tells Greenwood that "[tomorrow] we start testing pay out with Gilbert) (*Id.* at 43), or a 2018 text message Konstantin sent to another OneCoin employee in which he attached a picture of Amer Abdulaziz at a racetrack and wrote "This fffff is in Ascot-having fun with our $" (*Id.* at 44).  But of course, such messages only make sense (to the extent that they do at all) with the background on these individuals that Konstantin provided.

II.   **The Government's Failure To Correct Testimony That It Knew To Be False And Its Indefensible Effort To Block The Defense From Correcting That Testimony Likewise Warrant A New Trial**

A.   The Government Had A Duty To Correct Konstantin's False Testimony About The Dilkinska Meeting And Failed To Do So

The Government had a clear obligation under the law and the ethical standards governing prosecutors to "not allow [false testimony] to go uncorrected when it has occurred . . . whether the subject of the falsehood goes to the merits of the case or only to the credibility of the witness." *Perkins v. LeFevre*, 642 F.2d 37, 40 (2d Cir. 1981).  The Government admits that it "should have known…that Ignatov's [sic] had misremembered certain details about the July 2016 Meeting and that his testimony about Dilkinska being present at the meeting was inaccurate." (Dkt. 445 at 38).  And yet it took no steps whatsoever to correct it, nor does it even attempt to defend or justify its failure to fulfill this obligation.  This was a clear violation of its "fundamental obligation to ensure that the testimony he elicits is true." *United States v. Spivack*, 376 F. App'x 144 (2d Cir. 2010).

The Government's only response here is to argue that "there is some authority in this Circuit suggesting that a witness's *mistaken* testimony is not even 'false' for purposes of determining whether the government was constitutionally required to 'correct' it." (Dkt. 445 at 52, n.24, citing *Buari v. Kirkpatrick*, 753 F. Supp. 2d 282, 295 (S.D.N.Y. 2010) (citations omitted)).  The Government is wrong, and Second Circuit law is clear.  As discussed in Section I(C)(1), the Second Circuit held in *Drake* – a case the Government simply ignores – that it is irrelevant whether the witness's "false testimony may have been the result of confusion or mistake," 553 F.3d at 242, n.7, when evaluating the Government's obligation is to "not allow [false testimony] to go uncorrected when it has occurred." *Perkins*, 642 F.2d at 40.  *Buari*, the district court case cited by the Government, does not even say what the Government says it does.

In the very sentence of *Buari* that follows the one to which the Government cites, the district

court acknowledges contrary authority. *See Buari*, 753 F. Supp. at 295 ("Even if [the] testimony

were not perjurious, but simply mistaken … the government still would have a duty under the

Fourteenth Amendment not knowingly to allow false testimony to go uncorrected.") (citing

*United States v. Glover*, 588 F.2d 876, 879 (2d Cir. 1978).  And in any event *Drake* controls.

B.   The Government Baselessly Opposed The Defense's Effort To Admit Emails
Necessary To Correct Konstantin's False Testimony By Falsely Telling Court
Second Circuit Law Precluded Their Admission

If the Government was not going to abide by its duty to correct false testimony, it at least

should not have prevented the defense from doing so.  But instead, it did the opposite, opposing

defense efforts to admit DX 550 and 552.  And worse, it achieved this ambition by misstating

Second Circuit law to this Court.  Notably, none of the crucial facts have been disputed.

First, DX 550 (and DX 552) were reliable emails from the Government's own production

that demonstrated that Konstantin's claim that Dilkinska was at the July 20th Meeting was

almost certainly false.  DX 550 was a Sunday, July 17, 2016 email from Dilkinska to Scott in

which, responding to Mr. Scott's request that she sign a letter and send a copy of the scan back to

him, she stated, "Will ask my colleagues to send you the original to you this week as I am

traveling for the whole week." (Dkt. 434, Stanley Decl., Ex. A). This email that made clear that

Dilkinska was almost certainly not going to be at the Wednesday, July 20, 2016 meeting in

Sofia.[24]

Second, the Government now concedes that at the very least, DX 550 was admissible.  It

also concedes that it misstated Second Circuit law in opposing its admission, calling this a

---

[24] DX 552 is a July 20, 2016 email from Dilkinska to Mr. Scott in which she states, "Sorry for this but I am travelling too" to explain why she had been delayed in making a request of Mr. Scott for certain information. (Dkt. 434, Stanley Decl., Ex. B)

"mistaken position," Dkt. 445 at 10.   But rather than accept responsibility for its erroneous argument to exclude evidence that would have demonstrated its cooperator was testifying falsely, the Government offers a range of unbecoming blame-shifting excuses, none of which are persuasive.

For one thing*,* the Government falsely suggests that it was forced to articulate its argument as to DX 550 before it was ready to do so, with "the defense press[ing] the issue with the Court" on the morning after it filed its motion seeking admission of DX 550 and 552, and "before the Government had any opportunity to respond in writing." (Dkt. 445 at 16).   Not at all. The transcript reflects that before the jury had arrived on the morning of November 15, 2019, the Court referred to the defense submission and said "Are folks prepared to discuss it?" (Tr. at 1285).   The Government did not ask for time to put in a written response or further research the issue (and there was no immediate  time pressure, as Konstantin was already off the stand). Instead, the Government immediately told the Court, "Your Honor, we are prepared to discuss it," before handing the Court a printed copy of *United States v. Best*." (*Id.*).   And of course the Government had known since at least November 11, 2019  – four days earlier – that that Mr. Scot sought to admit DX 550 into evidence.  It had plenty of time to get the law right before asking the Court to deny admission of an email necessary to correct false testimony from its cooperator.

Additionally, the Government complains that the defense did not correct "the Government's mistaken position." (Dkt. 445 at 10).  The fact is that Mr. Scott's submission (Dkt. 173) *correctly* stated the law, noting that DX 550 was admissible under Federal Rule of Evidence 803(3), which provides a hearsay exception for statements of the declarant's "then-existing state of mind," such as "motive, intent, or plan."  It was the Government, in its apparently

extemporaneous and ill-researched oral argument that claimed that *Best* – a case that had been *correctly* cited by the defense for the proposition that DX 550 was not hearsay – imposed an "independent corroboration requirement." (Dkt. 433 at 19, Tr. at 1287-89).  This was the first time *ever* that the defense had heard the Government articulate this fallacious argument, and was not therefore at the time aware it was directly contradicted by *United States v. Persico*, 645 F.3d 85 (2d Cir. 2011).  It was – and remains – the responsibility of prosecutors, *particularly if they are seeking to exclude reliable evidence necessary to correct false statements by a cooperator,* to be certain that the law supports them.[25]

C.     The Resulting Exclusion Of Erroneous Evidence Deprived Mr. Scott Of A Fair Trial

The Government's failure of its duty to correct false testimony and then erroneously preventing the defense from correcting that testimony is a serious matter on its own.  *See Perkins*, 642 F.2d at 40 (noting the obligation of prosecutors to "not allow [false testimony] to go uncorrected when it has occurred").  The Court's resulting erroneous exclusion of DX 550 made the impact far more consequential.  Had it been admitted, it would have entirely impeached Konstantin's testimony as to the July 20th Meeting and substantially diminished his credibility more broadly.  While the Government is of course correct that not every "mere evidentiary error" supports a new trial (Dkt. 445 at 19), district courts routinely consider such claims in evaluating new trial motions.  *See, e.g., United States v. Soto*, 2014 WL 1694880, at *6–7 (S.D.N.Y. Apr.

---

[25] Nor does the Government even bother to address the troubling oddity in the Government's approach to DX550: its reneging, without explanation, on an agreement with defense counsel the day before to *not* oppose the introduction of this exhibit. (Dkt. 434, Stanley Decl., Exhibit C). The Government's only response is Orwellian, describing this complete reversal as "clarifying" its prior position.

28, 2014); *United States v. Mejia*, 948 F. Supp. 2d 311, 319 (S.D.N.Y. 2013).  And there are instances in which evidentiary error even standing alone establishes a "manifest injustice."[26]

Moreover, this was no mere error.  The exclusion of DX 550 was an error urged by the Government, misstating Second Circuit law, in an effort to exclude admissible evidence to correct the false testimony of a cooperating witness that the Government knew was inaccurate and had a constitutional duty to correct.  It is that toxic combination that gives rise here to the "manifest injustice" warranting a new trial. *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013). *See also United States v. Al-Moayad*, 545 F.3d 139, 178 (2d Cir. 2008) (ordering a new trial when the "cumulative effect" of the trial court's errors "deprived the defendants of a fair trial," and noting that "[t]he 'cumulative unfairness' doctrine is also firmly embedded in this Circuit's precedents").

D.     The Government's Claim That The Court Is Barred From Reviewing This Issue Is Baseless

Finally, the Government's claim that the Court cannot consider issues around the Court's erroneous decision to exclude DX550, like its argument that the Court should ignore evidence that Konstantin had perjured himself about the July 20th meeting, is baseless. As discussed in Section I(B)(1), once a timely motion for a new trial is made based on newly discovered evidence of witness perjury, the Court is not narrowly restricted from considering the ways in which this perjury may have resulted in a "manifest injustice" warranting a new trial.  The Bulgarian passport and Indian travel records obtained and produced by the Government in

---

[26] *See, e.g., United States v. Lopez*, 2014 WL 5088868, at *2 (D. Del. Oct. 10, 2014) (ruling that the erroneous admission of a defendant's prior conviction under Rule 404(b) warranted a new trial under Rule 33); *United States v. Grigsby*, 2007 WL 9747765, at *1 (E.D. Okla. Jan. 26, 2007), *aff'd*, 272 F. App'x 738 (10th Cir. 2008) (ruling that the erroneous admission of testimony about a defendant's prior acts of sexual abuse warranted a new trial under Rule 33).

December 2021 clearly establish Konstantin as a two-time perjurer, which has a direct impact on the significance of the prosecution's failure to abide by its constitutional duty to correct the false testimony at trial, its misstatements of controlling law in an effort to prevent the defense from doing the prosecution's job for it, the Court's resulting erroneous ruling on DX 550, and the impact of this ruling.[27]

### III. The Government's Conduct Should Be Considered In Evaluating Whether A New Trial Should Be Granted

The Government spends considerable time addressing Mr. Scott's arguments concerning the Government's disclosure violations, but misses their significance.  The failings pointed out in Mr. Scott's brief are not the "scattershot of allegations" that the Government claims (Dkt. 445 at 1), but reflect a pattern that goes to the heart of this matter: the Government's actions and omissions before, during, and after trial, enabled its sole cooperator to perjure himself and for that perjury to escape note. The Government's conduct is of course a part of the Rule 33 consideration as to whether "the interests of justice so require[s]" that the Court grant a new trial, Fed. R. Crim. P. 33(a).  *See Ferguson*, 246 F.3d at 134. *See, e.g., United States v. Triumph Cap. Grp., Inc.*, 544 F.3d 149, 165 (2d Cir. 2008) (ordering a new trial for *Brady* violations when "[t]he government could not explain at oral argument why the [exculpatory evidence] [was] withheld"); *United States v. Rivas*, 377 F.3d 195, 200 (2d Cir. 2004) (ordering a new trial for

---

[27] In any event, the "excusable neglect" standard discussed in I(B)(3), *supra*, provides further grounds for the Court to consider this issue in the context of a concededly timely motion on closely related issues.  Indeed, Mr. Scott could of course challenge the Court's erroneous exclusion of DX 550 in any appeal of the trial conviction. *See, e.g., United States v. Litvak*, 808 F.3d 160, 179 (2d Cir. 2015) (reversing for evidentiary error that was not raised in the defendant's Rule 33 motion).  Thus, consideration of the perjury-related evidentiary issue on Rule 33, before any potential appeal, would contribute to the "efficient resolution of defendant's claim." *United States v. Frederick*, 868 F. Supp. 2d 32, 44 (E.D.N.Y. 2012) (finding excusable neglect when it was more efficient to address an ineffective assistance claim on Rule 33 than on a subsequent habeas petition)

*Brady* violations when "[t]he Government's 'tactical reason[ ]' for non-disclosure" was "totally

unacceptable"); *United States v. Gil*, 297 F.3d 93, 107 (2d Cir. 2002) (ordering a new trial for

*Brady* violations when the government had not "undertaken to justify its failure to find and

timely deliver" the exculpatory evidence, and when there was "no obvious explanation for this

failure in light of the defendant's numerous requests for such documents").  It should be

considered here.

    A.    <u>The Government Provides No Good Explanation For Why It Dumped Close to A
Million Of Documents from the Greenwood Devices On Mr. Scott Only One
Month Before Trial</u>

The Government is correct that – as it just figured out (and then informed Mr. Scott) –

there were messages on electronic devices belonging to Sebastian Greenwood that, like DX 550

and DX 552, tended to show Dilkinska was not at the July 20th Meeting (the Greenwood

Communications).[28] (Dkt. 445 at 6).  But the Government violated *Brady* and Rule 16 by

producing the content from those devices – over 950,000 files amounting to nearly a half a

terrabyte of data – only one month before trial, and a difficult-to-access form.  "*Brady* material

must be disclosed in time for its effective use at trial." *United States v. Coppa*, 267 F.3d 132, 135

(2d Cir. 2001).  This did not happen.  Further, "[t]he Government cannot meet its *Brady*

obligations by providing … 600,000 documents and then claiming that [the defendant] should have

been able to find the exculpatory information[.]" *United States v. Saffarinia*, 424 F. Supp. 3d 46,

85 (D.D.C. 2020) (quoting *United States v. Hsia*, 24 F. Supp. 2d 14, 29-30 (D.D.C. 1998)).

The Government offers no good reason for producing this *Brady* material only a month

before trial, and buried among nearly a million other files on the same devices.  The Government

took possession of what appear to be ten different phones and tablets ("the Greenwood Devices")

---

[28] The Greenwood Communications are described at n.13.

in connection with Greenwood's July 2018 arrest. (Dkt. 445 at 7).  Notwithstanding its duty to provide discovery to Mr. Scott following his arrest in September 2018, the Government did not fully extract data from these devices until March 2019 (Dkt. 445 at 7).  And in Rule 16 discovery, it produced o*nly 13 documents from the close to one million files contained on these devices in a production dated July 2019*. (Dkt. 445 at 7).[29]

The Government's explanation for this radically limited Rule 16 production is a confession of its discovery violation.  The Government admits that it reviewed and produced only those documents on the Greenwood Devices that were *direct communications with Mr. Scott*. (*Id*.)  But even aside from *Brady*, the Government's duty under Rule 16 discovery is not limited to communications involving the defendant.  It includes all materials "within the government's possession, custody, or control" if "the item is material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E).[30]

The Government appears to have ignored entirely its obligation to review the Greenwood Devices for discoverable material until, a month before trial, perhaps aware of its failure, it simply decided to dump these and other devices (such as Konstantin's cell phone) on the defense.  And the Government's excuses as to why it waited until October to provide this ring

---

[29] The production letter dated July 28, 2019 which accompanied these emails did not identify these communications as coming from Greenwood's devices, nor was this evident from the Bates stamp on the documents themselves.

[30] Discovery is "material to preparing the defense" under Rule 16 "if it could be used to counter the [G]overnment's case or to bolster a defense." *United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993); *see also United States v. Stein*, 488 F. Supp. 2d 350, 356-57 (S.D.N.Y. 2007) ("The materiality standard [of Rule 16] normally is not a heavy burden; rather, evidence is material as long as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal.")  Further, "[t]he Government should interpret the language of Rule 16 broadly to ensure fairness to the defendant." *United States v. Martinez*, 844 F. Supp. 975, 982 (S.D.N.Y. 1994).

hollow.  In its Sur-Reply, the Government seems to blame Mr. Scott with a vague reference to the

"significant litigation regarding the applicability of the attorney-client privilege to various

communications obtained during the Government's extensive investigation of the OneCoin

Scheme," (Dkt. 445 at 7).  But this litigation involved Mr. Scott's argument that certain of his

communications with Ruja were privileged and should not be released to the prosecution team; he

never asked the prosecution to withhold evidence from him.  There is simply no reason that the

Government could not have either (1) produced all material on the Greenwood Devices that did not

bear any indicia of privilege much earlier (which may be everything – the Government has

declined to respond to Mr. Scott's question as to whether anything on those devices was even

arguably privileged)[31] or (2) reviewed the devices for non-privileged materials that were

discoverable and produced those materials.[32]

     The Government's failure to identify the Greenwood Communications until the fall of 2021

is even more troubling given the defense's mid-trial *Brady* request for "any additional material that

may reflect Irina's schedule, travel or whereabouts." (*See* Dkt. 434, Stanley Decl., Ex. C)).  The

law is clear "the more specifically the defense requests certain evidence, thus putting the

prosecutor on notice of its value, the more reasonable it is for the defense to assume from the

nondisclosure that the evidence does not exist." *United States v. Thomas*, 981 F. Supp. 2d 229, 240

(S.D.N.Y. 2013).

---

[31] Counsel for Mr. Scott specifically asked the Government to "identify what potentially privileged material was identified on those devices by the taint team or trial team that required a privilege waiver before this production could be made," (Ex. F, February 22, 2022 Letter from Defense Counsel to Government), and the Government obfuscated in its response, noting only that it requested "that the filter team review communications on the Greenwood Devices that directly involved Scott." (Ex. G, February 25, 2022 Letter from Government to Defense Counsel).

[32] None of the three communications that the Government identified in October 2021 involving Dilkinska's whereabouts on July 20, 2016 were even potentially privileged.

B.      The Government Offers No Defense For Its Failure To Timely Disclose
        Konstantin's Breach Of His Cooperation Agreement Through Use Of A
        Contraband Cell Phone At The MCC

The Government likewise did not properly address Konstantin's breach of his

cooperation agreement regarding his use of a cell phone that had been illegally smuggled into the

MCC (and purchased using his girlfriend's money).  As Mr. Scott noted in his prior filing (Dkt.

433 at 25), the prosecutors on this case waited nearly two months after Mr. Scott filed his

Supplemental Motion, and an entire year after they first learned of it themselves, to disclose that

in late February 2020, a contraband phone that Konstantin had used while incarcerated at the

MCC had been seized.  This sure breach of his cooperation agreement should have triggered the

Government to disclose this violation promptly, as it was required to do by authority cited in Mr.

Scott's prior brief that the Government failed to address.  *See, e.g., Cardoso v. United States,* 642

F. Supp. 2d 251, 263 (S.D.N.Y. 2009) (finding that the Government violated *Brady* by failing to

disclose a breach of cooperating agreement to defendant prior to sentencing).

The Government's vague excuses for its delay offered in its submission (blaming a

"technical inability to access the contents of the Cellphone," (Dkt. 445 at 11)) ring hollow and

raise as many questions as they do answers.  It appears that the delay was not "technical" at all –

the Government inexplicably did not ask its cooperating witness for the password to this phone

until October 8, 2021. *See* Ex. G.

C.      The Government Minimizes Its Investigator's Misconduct

Finally, the Government minimizes the egregious failure on the part of its own

investigator, on secondment from the Manhattan District Attorney's Office to the City of London

Police, to choose to keep to himself the credible report he received from Duncan Arthur that

Konstantin committed perjury, claiming the investigator was not technically part of the

prosecution team (though he was credited as such in press releases announcing Mr. Scott's

conviction, Dkt. 433 at 28, n.18), and arguing that Mr. Scott was not ultimately prejudiced (ignoring that this was only because Arthur fortuitously contacted defense counsel).

Here too the Government misses the broader point.  While particular disclosure failures, standing alone, may not each be material, the broader picture painted here is clear.  The Government failed to timely produce documents on the Greenwood Devices that would have enabled the impeachment of Konstantin, failed mid-trial to correct testimony by Konstantin that the Government knew was almost certainly false, and then blocked the defense from correcting the testimony by misstating Second Circuit law.  With the trial over, the Government did not disclose or promptly act upon increasing evidence that its cooperator had engaged in further misconduct (the MCC cellphone) and committed perjury (the Arthur disclosures).  And finally, in its Sur-Reply, the Government seeks to defend Konstantin's false testimony about the July 20th Meeting by claiming he likely confused it with a September 15th Scott-Dilkinska meeting (Dkt. 445 at 5), even when its own trial exhibits all but rule this out.

Ultimately, there is a difference between a trial where a witness gets away with perjury despite the Government acting consistently with its duties at each critical juncture, and a trial where false testimony then known to the Government is left uncorrected because of the Government's disclosure failures and unfounded efforts to block the introduction of admissible evidence needed to correct the testimony.  Both may be regrettable, but the second scenario gives rise to "a perceived miscarriage of justice" *Sanchez*, 969 F.2d at 1413, because a party charged with responsibility for prosecuting a defendant firmly but fairly has failed in its obligations.

## IV. The Government's Claim That Konstantin Made An "Innocent Mistake" Cannot Be Credited Without A Hearing

In its Sur-Reply, the Government introduced a material factual dispute: it has claimed that Konstantin did not perjure himself with respect to the July 20th Meeting, and rather, was

innocently mistaken as to the date. (Dkt. 445 at 34; *id.* at 52, n.4).   Thus, the Court is faced with two choices.  It can assume in Mr. Scott's favor that Konstantin did perjure himself with respect to the July 20th meeting,[33] or it can order a hearing (in which Konstantin would of course be required to testify) to resolve the factual dispute about Konstantin's intent.  The one thing it cannot do is what the Government apparently asks – resolve the disputed factual issue as to Konstantin's intent against the movant without a hearing. *See United States v. Stewart*, 433 F.3d 273, 206 (2d Cir. 2006); *United States v. Roberts*, 388 F.2d 646, 649 (2d Cir. 1968) (holding that "[a]n evidentiary hearing was required" where there was "a clear-cut issue of fact raised by defense counsel's affidavit," that, if resolved in defendant's favor, could warrant relief).

Further, Mr. Scott has raised other factual issues that directly relate to Government misconduct. (Dkt. 433 at 29-30).  It is not necessary to resolve these issues in order for the Court to grant a new trial, which is warranted regardless, but should be held so that the Court can further assess what remedies might be appropriate.  Beyond ordering a new trial or dismissing the case, the Court has inherent and statutory authority to evaluate allegations of misconduct and impose sanctions. S*ee United States v. Nejad*, 487 F. Supp. 3d 206, 224 (S.D.N.Y. 2020); *United States v. Seltzer*, 227 F.3d 36, 42 (2d. Cir. 2000).

Such a hearing should address the investigator's misconduct in not disclosing the report regarding the laptop perjury and why the Government backpedaled, mid-trial, on its earlier agreement not to oppose admission of DX 550, which would have allowed for correction of

---

[33] The Second Circuit has extended the benefit to the movant in cases where the defendant has alleged the Government knew about a witness's perjury. *See, e.g., United States v. Spinelli*, 551 F.3d 159, 166 (2d Cir. 2008) ("Even if we were to assume, despite the prosecutors' contrary affidavits, that they did know Gioia was testifying perjuriously…"); *United States v. Wong*, 78 F.3d 73, 82 (2d Cir. 1996) (Even assuming, as the district court did, that the government knowingly introduced the perjured testimony…).

cooperator testimony it knew at the time was almost certainly false.  A hearing should also address the Government's lack of a satisfactory  or even sensical explanation for its failure to produce *Brady* and other discoverable material from the Greenwood Devices in a timely fashion and for not reviewing a contraband prison phone belonging to its cooperator for over a year after the prosecutors learned of it.

## V.   Conclusion

For the above reasons, the Court should grant Mr. Scott a new trial. [34]

---

[34] In addition to this motion, Mr. Scott's original post-trial motions (Dkts. 218, 275) are still pending and provide additional grounds for relief.  Specifically, these motions principally argue a failure of proof on the bank fraud conspiracy charge due to the lack of evidence that Mr. Scott made, or had awareness of, any misrepresentations to FDIC-insured banks.  These motions also argue that the charged conduct lacks sufficient nexus to the United States to constitute wire fraud, the specific unlawful activity that underlies the money laundering conspiracy charge.