M4PPSCOO

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4         v.                17 CR 630-1 (ER)
                                        Oral Argument
5    MARK SCOTT,

6              Defendant.

7    ------------------------------x

8                        New York, N.Y.
                         April 25, 2022
9                        2:05 p.m.

10

     Before:
11
                         HON. EDGARDO RAMOS,
12
                         District Judge
13
                         APPEARANCES
14

15

     DAMIAN WILLIAMS,
16        United States Attorney for the
          Southern District of New York
17   BY:  CHRISTOPHER DiMASE
          NICHOLAS FOLLY
18        MICHAEL McGINNIS
          JULIANA NEWCOMB MURRAY
19        Assistant United States Attorney

20   COVINGTON & BURLING, LLP
          Attorneys for Defendant
21   BY:  ARLO DEVLIN-BROWN
          KATRI A. STANLEY
22             -and-
     DAVID M. GARVIN, P.A.
23   BY:  DAVID M. GARVIN

24

25

1      (In open court)

2      (Case called)

3      MR. FOLLY:    Good afternoon, your Honor.  Nicholas

4  Folly, Christopher DiMase, Michael McGinnis and Juliana Murray

5  on behalf of the government.

6      MR. DEVLIN-BROWN:    Good afternoon, your Honor, Arlo

7  Devlin-Brown, David Garvin and Katri Stanley for Mr. Scott,

8  who's seated to my left.

9      THE COURT:    Good afternoon to you all.  So how have

10  you been?

11      There is a lot to cover.  There are at least, I guess,

12  roughly speaking, two motions pending before the Court.  One

13  motion pursuant to rules 29 and 33 of the Federal Rules of

14  Criminal Procedure, based, in the first instance, on the

15  insufficiency of the evidence at trial, the impropriety of at

16  least one jury instruction, and that motion was later

17  supplemented, triggered by a number of incidents.  One, the

18  revelation that one of the government's cooperators testified

19  falsely at trial concerning testimony that he gave concerning

20  the disposal of a particular laptop, and another couple of

21  issues that have subsequently been expounded upon, including

22  testimony that he gave that is allegedly also perjurious

23  concerning the presence, or not, of a particular co-conspirator

24  at a meeting at which Mr. Scott was present in 2016, and the

25  use of a telephone while incarcerated, and I forget whether it

1    was MCC or MDC.

2              And another set of motions concern the forfeiture in

3    this case.

4              And so who wants to begin?  Mr. Devlin-Brown?

5              MR. DEVLIN-BROWN:    Certainly, your Honor.

6              THE COURT:    You can remain seated, and you can stay

7    seated.  Just bring the microphone as close to you as you can.

8              MR. DEVLIN-BROWN:    Certainly, your Honor.  So with

9    respect to the pending motions, does your Honor have any

10   preference into which order we take the motions?

11             And I should say, the forfeiture issues we're happy to

12   address questions today.  We hadn't thought that was the focus,

13   as we'd only get to those issues if there was a sentencing

14   but --

15             THE COURT:    That's absolutely -- at least in my mind,

16   that's exactly correct.  We can deal with the rule 33 and rule

17   29 motions.

18             MR. DEVLIN-BROWN:    Does your Honor have a preference

19   with respect to the order?

20             THE COURT:    I don't, although it makes sense to talk a

21   little bit about the sufficiency motion first because that can

22   trigger a conversation about the other issues.

23             MR. DEVLIN-BROWN:    Certainly, and Ms. Stanley will

24   address that.

25             THE COURT:    Absolutely.

1        MS. STANLEY:    As your Honor recalls, Mr. Scott filed

2    original post-trial motions in this matter on both rule 29 and

3    33 arguing for acquittal or, in the alternative, for a new

4    trial.  We want to turn to the principal arguments made in

5    those motions.  First, that there was insufficient evidence to

6    sustain a conviction against Mr. Scott on conspiracy to commit

7    bank fraud; and second, that there was an insufficient nexus to

8    the United States to render this a permissible domestic

9    application of the wire fraud statute, the specified unlawful

10   activity underlying the money laundering and conspiracy charge.

11       So let's look at the bank fraud.

12       THE COURT:    Ms. Stanley, before you get going, I just

13   want to make sure that I'm clear that no part of your motion is

14   premised on the thought that the OneCoin venture was legal, or

15   so far as Mr. Scott knew was legal, or maybe those are two

16   different things.

17       MS. STANLEY:    I think those are two different things.

18   Certainly with respect to the money laundering charge, we do

19   argue in our motions and plan to argue today that there was not

20   a sufficient nexus to the United States for the underlying wire

21   fraud activity.

22       THE COURT:    Okay.

23       MS. STANLEY:    First, with respect to the bank fraud

24   charge, when Mr. Scott was arrested in September 2018, he was

25   charged with one count of conspiracy to commit money

M4PPSCOO

1    laundering, and only a month before trial, the government added

2    a second count, conspiracy to commit bank fraud.

3            In response to a defense, counsel requests for the

4    particulars of the financial institutions against which

5    Mr. Scott had allegedly conspired to defraud under 18, U.S.C.

6    1344, the government identified three sets of transactions.

7    Two of the three we can group together as the Armenta

8    transfers, which involved actions taken by Gilbert Armenta's

9    defense funds of his own accounts at Morgan Stanley into

10   Mr. Scott's Fenero Fund.  The other pertained to a $30 million

11   loan from the Fenero Fund to an entity called CryptoReal.

12           In both instances, the government alleged that the

13   transaction descriptions provided to effectuate the transfers

14   were fraudulent.  We'd like to look at each of these sets of

15   transactions in turn to show why none constitute bank fraud or

16   even an attempt at bank fraud under the statute.

17           The Armenta transfers.  The government introduced

18   evidence showing that Mr. Armenta disguised the purpose and

19   nature of the transfers from his own accounts at Morgan Stanley

20   and Sabadell Bank into the Fenero Fund run by Mr. Scott in June

21   and September 2016.  But as a threshold matter, Mr. Armenta's

22   own actions do not constitute bank fraud.

23           Simply put, Mr. Scott is not aware of any conviction

24   for bank fraud involving an individual who provided an

25   inaccurate statement to his or her own bank in connection with

1    the transfer of that person's funds.  And the government cites

2    no case law to the contrary.

3           If we contrast this instance with the Second Circuit

4    case *Lebedev* in 2019, where the Second Circuit upheld the bank

5    fraud conviction of the defendant who provided false

6    information to financial institutions to induce them to process

7    customers' transactions and to obtain the funds in third-party

8    customer accounts.

9           What we have here is the opposite.  Mr. Armenta was

10   transferring his own money, and his transfers are more akin to

11   those in *Perez-Ceballos*, a Fifth Circuit case in which the

12   court held that the defendant's efforts to effectuate transfers

13   between her own accounts did not constitute bank fraud.

14          Second, separate from the question of whether

15   Armenta's own actions constitute bank fraud, those actions

16   certainly do not touch on any criminal activity on the part of

17   Mr. Scott.  Mr. Scott never had any contact with Sabadell or

18   Morgan Stanley, and so any bank fraud conspiracy theory on the

19   part of the government necessarily hinges on Mr. Scott's having

20   colluded with Mr. Armenta on what to tell the banks.  But there

21   was no evidence whatsoever that Mr. Scott had told Mr. Armenta

22   what to put or say, that they had, in any way, discussed it or

23   that Mr. Scott would necessarily know that Mr. Armenta would

24   have to lie to make the transfers, no e-mails, no purported

25   conversations on this topic, nothing in Mr. Armenta's 3500

1    materials, nothing.

2              In fact, the government did not even allege that

3    Mr. Scott and Armenta had engaged in such discussions, and its

4    statements here are conclusory.  For example, in the closing,

5    the government stated that:  Of course, Mr. Scott knew that

6    Mr. Armenta was going to lie to the banks; or in its

7    opposition, the government said that Mr. Scott understood that

8    Armenta would need to tell lies such as these United States

9    banks.  In other words, these statements by the government

10   presuppose the very thing that the government says they have

11   proved.  Furthermore, they're not true.

12             THE COURT:    Why is it conclusory if the

13   government's arguments are based on the totality of the

14   evidence that was presented at trial?  Which is to say that the

15   Fenero funds were not truly investment funds, but they're shell

16   corporations that were created by Mr. Scott for the purpose of

17   laundering OneCoin's money and that Mr. Scott was well aware

18   that Mr. Armenta was working hand in glove with Ms. Ignatova

19   and was, I believe, her primary money launderer?

20             So if all of that is true, and Mr. Scott was aware

21   that the funds that Mr. Armenta was going to be using and

22   referred to them as his funds, but if the government is saying

23   based on everything that's before you, the jury, you know that

24   these funds are the proceeds of the OneCoin scheme, why is the

25   government's argument conclusory?

1          MS. STANLEY:     Well, with respect to these specific

2     transfers, there was never any evidence of discussions that the

3     money in these accounts was necessarily the origins -- where

4     the origins of the money in these accounts necessarily came

5     from.  But furthermore, it's just not the case that Mr. Armenta

6     would have had to lie to effectuate these transfers to get them

7     through, nor would Mr. Scott have understood that he had to

8     lie.

9          So by the government simply saying that, you know,

10     this is Mr. Scott's understanding because they were part of the

11     conspiracy, that simply just was not true because Mr. Armenta

12     could have told the truth, that these were transfers he was

13     making to BVI registered private equity funds, as the Fenero

14     funds were.

15          So the idea that there exists a collusion or

16     conspiracy between Mr. Scott with respect to effectuating these

17     specific transfers from his accounts into the Fenero funds, it

18     just isn't there.

19          And, furthermore, you know, there is a real sort of

20     danger in conflating money laundering with bank fraud here,

21     sort of in response to your Honor's question, because the

22     specific information or misrepresentations that were told to

23     the banks, that's not bank fraud conspiracy for which Mr. Scott

24     should have been convicted because the evidence simply just

25     wasn't there.

1          THE COURT:    I take your point about conflating the two

2     offenses, and that's absolutely fair.  But wasn't there

3     testimony in evidence concerning the fact that banks and other

4     financial institutions wanted nothing to do with OneCoin?

5          And again, I forget exactly how Mr. Armenta fit into

6     all of this, but my understanding is that he was affiliated or

7     connected with the OneCoin scheme.  And if he were to tell the

8     truth and say, look, this is my money that I'm transferring,

9     wouldn't that have triggered some knowledge on the part of the

10    banks, well, this is obviously related to OneCoin and we want

11    nothing to do with it?

12          MS. STANLEY:    I think, with respect to this specific

13    point, that's why something we'll later come to is so

14    important, is that while there was testimony, as your Honor

15    described, that there were banks that did not want to deal with

16    OneCoin, and OneCoin had difficulty banking with certain banks,

17    the bank fraud charge is very specific as to meeting FDIC

18    insured banks have been defrauded or the object of the scheme

19    to defraud.

20          And so when the government put forth evidence as to

21    what a series of bank frauds were, it didn't pertain to banks

22    generally throughout the world that had apprehension,

23    hesitation about dealing with OneCoin or Ms. Ignatova's money,

24    it was specific as to these three FDIC insured institutions

25    that were defrauded, and that was the only evidence put on at

1    trial of possible banks that could have fit under the statute

2    to meet the definition of what the statute calls for with

3    respect to bank fraud.

4              And we can come to this later, but the point that your

5    Honor raises is likely one that the jury found confusion on, as

6    well, precisely because there was so much evidence during this

7    trial about many banks throughout the world.  Apex, which is

8    not an FDIC-insured institution, a separate fund administrator

9    with which Mr. Scott dealt, there was likely to be confusion

10   with respect to what specifically the charge was getting at.

11             So if I could just finish on the Armenta transfers,

12   just to make a brief point.

13             THE COURT:    Yes.

14             MS. STANLEY:    You know, contrary to this idea that

15   Mr. Armenta and Mr. Scott were in cahoots together to conspire

16   to commit a federal crime, quite on the contrary.  There was

17   ample trial evidence that Mr. Armenta lied repeatedly to

18   Mr. Scott about the investments that he was making into the

19   Fenero, and the accounts purportedly involved in those

20   transfers.

21             He sent forged documents from the banks that had the

22   transfers, claiming that he had certain accounts there that

23   didn't actually exist.  He sent fake wire instructions.  So

24   these are not activities of people who are conspiring together

25   to achieve a criminal purpose.

1      So the second aspect of the bank fraud charge

2   pertains, as I mentioned, to this investment in CryptoReal,

3   which was a $30 million transfer that Mr. Scott directed Apex

4   to facilitate from a Euro-denominated account at DMS Bank in

5   the Cayman Islands, to a bank in Hong Kong.  And DMS cleared

6   those through an intermediary bank, Bank of New York Mellon.

7      The government contends that the description that

8   Mr. Scott provided for this transaction, loan to CryptoReal

9   Investment Trust DBI Martin Breidenbach for acquisition of

10   Madagascar oil field --

11      THE COURT:    I'm sorry, Ms. Stanley, can I ask you to

12   slow down just a little bit.

13      MS. STANLEY:    Sure, yes.

14      -- was false.  As an initial problem with the

15   government's theory here, there is no evidence that the

16   description of the transaction that Mr. Scott provided to Apex

17   was fraudulent.  The government repeatedly saying that this

18   deal was fake does not make it so.  It put on no evidence that

19   the deal did not go through as planned and, in fact, the

20   government's evidence showed that there was an oil field for

21   purchase.

22      In fact, this follows a troubling pattern of the

23   government using the word "fake" to describe all aspects of

24   Mr. Scott's business dealings, using it 43 times in opening

25   summation and rebuttal.  But on the contrary, Mr. Scott was

1    provided documentation showing that this was a real deal, and

2    took comfort from his knowledge of the involvement of the Neil

3    Bush, who Mr. Scott was not permitted to call at trial as a

4    witness.

5            However, even if the descriptions were not accurate,

6    as the government contends, Mr. Scott played no role in

7    providing that description to an FDIC insured institution.

8    There was no evidence that Mr. Scott knew that this transaction

9    between two non-U.S. banks would be processed through a U.S.

10   intermediary.  Mr. Scott gave Apex the information and provided

11   no detail or further instruction about how that loan would be

12   processed.

13           So to come back to the point that I had started to

14   make before with respect to the Armenta transfers, the Court's

15   decision not to provide a limiting instruction, despite

16   Mr. Scott's request to state to the jury that the bank fraud

17   charge was confined to three banks on which evidence was

18   presented at trial, Morgan Stanley, Bank of New York Mellon and

19   Sabadell Bank, led to almost certain confusion on the part of

20   the jury.  This further necessitates a judgment of acquittal

21   or, in the alternative, a new trial.

22           At numerous points throughout trial and in its

23   briefing, the government spoke about Mr. Scott's and his

24   co-conspirators' intention to deceive banks around the world

25   and spoke of all the lies that he told to financial

1    institutions in running the Fenero Fund, but it is only bank

2    fraud if it is an FDIC insured institution that was the object

3    of the scheme, a point on which the jury was likely confused.

4              A limiting instruction, such as the one Mr. Scott

5    proposed, would have avoided this confusion, but because one

6    was not provided, the Court cannot have confidence that the

7    jury's verdict was based on the evidence of bank fraud as

8    presented at trial.

9              Further, the only witness from a financial institution

10   to have actually met or even interacted with Mr. Scott, Paul

11   Spendiff at Apex, was not actually from an FDIC insured

12   institution, and yet, the government, in its opposition,

13   focuses much of its response on alleged lies that Mr. Scott

14   told to Apex.  Again, this does not meet the statutory

15   definition of bank fraud.

16             Finally, without a limiting instruction, the jury

17   likely conflated the bank fraud charge with the money

18   laundering charge and, thus, there is a substantial likelihood

19   that the defendant may have been convicted of an offense other

20   than the one charged.

21             Now, if you'd like, I --

22             THE COURT:    On the issue of Mr. Armenta lying to

23   Mr. Scott, as I recall, there was evidence presented at

24   trial -- and I guess I'm asking you to help me put this in some

25   sort of chronological order.  There was evidence presented at

1    trial that the folks running OneCoin were, at least once upon a

2    time, concerned that Mr. Scott was -- I believe the phrase

3    was -- a highly placed government informant.

4            Can you place in order for me when it was that these

5    purported lies were told to Mr. Scott by Mr. Armenta?

6            MS. STANLEY:    As is my recollection, those

7    conversations, which Mr. Armenta was not involved, as I think

8    you're referring to conversations between Irina Dilkinska and

9    Frank Schneider, came well after the lies that Mr. Armenta told

10    to Mr. Scott, which occurred around the same time that these

11    transfers were made.

12            THE COURT:    Okay.

13            MS. STANLEY:    We turn now to the other principal

14    argument in our original post-trial motion that pertains to the

15    money laundering conspiracy charge against Mr. Scott.

16            Specifically there was an insufficient nexus to the

17    United States to render this a domestic application of the wire

18    fraud statute.  Under U.S.C. -- 18 U.S.C. 1956, the laundered

19    funds need to have been proceeds of the specified unlawful

20    activity, which the government expressly charged as wire fraud.

21            Simply put, Supreme Court case law is clear that there

22    is no permissible extra-territorial application of the wire

23    fraud statute, and the government agreed.  Of course, this is

24    not true of every statute, and had Congress wanted the wire

25    fraud statute to cover extra-territorial conduct, it could have

1    drafted it as such, but it did not.

2                Because of the absence of clear indications that the

3    wire fraud statute applies extra-territorially, the statute

4    requires conduct core to the statute's focus to be tied to the

5    United States.  In this instance, however, the OneCoin scheme

6    had an insufficient nexus to the United States to meet this

7    jurisdictional threshold.

8                The entirety of the government's evidence tieing

9    OneCoin to the U.S. came from two witnesses, Linda Cohen and

10   William Horn, who testified that they invested a combined total

11   of approximately $54,000 in OneCoin.  This is a tiny, minuscule

12   fraction of what the government says OneCoin took in globally.

13               THE COURT:    Is there a de minimus aspect to the money

14   laundering statute?  In other words, if it's sufficiently

15   small, it doesn't count as money laundering?

16               MS. STANLEY:    The case law isn't clear as to if

17   there's a certain percentage required or doesn't specify as to

18   what the extent of the activity has to be.

19               MR. DEVLIN-BROWN:    At the risk of undermining the

20   great job my colleague is doing, as to your Honor's question

21   was the money laundering statute, and our argument here is not

22   about whether the money laundering statute has

23   extra-territorial reach.  It clearly does, but it has to be

24   proceeds of a specified unlawful activity.  Here, the

25   government said wire fraud.  Wire fraud doesn't have

1    extra-territorial reach.  With wire fraud, there has to be

2    sufficient U.S. conduct.  So that's the argument.

3            THE COURT:    Got it.

4            MS. STANLEY:    And as to whether there is a -- in the

5    wire fraud -- thank you for that important clarification.

6    Because as to whether there is sufficient guidance in the wire

7    fraud case law, to specifically pinpoint what the threshold is

8    of U.S. activity to render a domestic application, there isn't,

9    which is why when you look at the facts here of the evidence

10   that was presented at trial, those facts become so important.

11           There was no evidence of other purchasers from the

12   United States, apart from Linda Cohen and William Horn.  There

13   was no evidence presented to the jury of other purchases, no

14   evidence of U.S. employees of OneCoin, no evidence of U.S.

15   offices of OneCoin.  Therefore, the contacts with the United

16   States that the OneCoin wire fraud scheme was alleged to have

17   had is simply insufficient to render this a domestic wire fraud

18   scheme.

19           THE COURT:    Perhaps I wasn't clear.  Let me ask the

20   question this way.  If only $54,000 of the $400 million fraud

21   occurred in the U.S., are you arguing that that is not a

22   sufficient hook to bring the case within the jurisdiction of

23   the U.S. courts?

24           MS. STANLEY:    Yeah, we are certainly arguing that this

25   minimal amount of activity is an insufficient -- is an

1  insufficient jurisdictional hook, as your Honor has said, and

2  in particular, when we analogize -- because there is no clear

3  guidance as to what is sufficient.

4        To answer your Honor's question, in the absence of

5  clear guidelines when we analogize to other case law, for

6  example, the facts here demonstrates that their investments and

7  any possible activity in the United States that OneCoin

8  operated, was far too trivial to be integral to the scheme to

9  defraud.

10        THE COURT:    Also, wasn't there testimony by either one

11  or the other that not only did they invest but that they were

12  cajoled, I guess, into investing by family members and that

13  they, in turn, asked others to invest, et cetera?

14        MS. STANLEY:    There was testimony with respect to

15  Ms. Cohen, who said that she had been influenced to invest by

16  her son, who encouraged her to invest.  And Mr. Horn said that

17  he had invested at the persistence of an acquaintance, but

18  there is no evidence as to any directive directing activity in

19  the United States by OneCoin that induced either of the two to

20  invest.

21        And further, when we analyze the U.S. contacts of

22  OneCoin in this case to other cases at issue, for example, the

23  Second Circuit *Petroleos Mexicanos*, that was a case in which

24  the Second Circuit rejected application of the wire fraud

25  statute to --

1          THE COURT REPORTER:    I'm sorry.  Ms. Stanley, you are

2     going to have to slow down, please.

3          MS. STANLEY:    All right.  Even though the defendants

4     obtained over a $159 million of financing in the U.S.

5     transmitted seven false invoices for over 129 million through

6     New York and made payments to a trust in New York.  So --

7          THE COURT:    I'm sorry, and the name of that case was

8     *Petroleos Mexicanos*?

9          MS. STANLEY:    That's correct, yes.

10          The government can't escape its own evidence, as

11     presented at trial, that OneCoin was created by people outside

12     of the U.S., primarily marketed to and invested in by people

13     outside the U.S. and simply has not proved the existence of a

14     domestic wire fraud scheme.

15          Lastly, we'd like to touch on the argument that there

16     was no evidence showing that funds from the domestic wire fraud

17     scheme ended up in the Fenero Fund.  As noted, the only U.S.

18     investments from Horn and Cohen, those were the only U.S.

19     investments into OneCoin on which there was evidence at trial,

20     and there was no evidence whatsoever that those proceeds ended

21     up in the Fenero Fund.

22          With respect to Mr. Horn, the government doesn't even

23     try to make that argument.  With respect to Ms. Cohen, you

24     know, its own financial-tracing expert testified, Ms. Rosalind

25     October, admitted that she didn't have all of the records

1    underlying the accounts that sent money to the Fenero Fund, and

2    the government further confirmed this by a letter in response

3    to defense counsel's request.

4            And so there's simply not even a plausible tracing

5    analysis, but there was no tracing analysis put forth

6    whatsoever that would show that any of those monies from a U.S.

7    wire fraud scheme ended up into the Fenero Fund.  And we

8    further detail this in the Gannaway declaration that

9    accompanied Mr. Scott's December 2020 forfeiture briefing.

10           THE COURT:    So even if I were to find that the $54,000

11   out of the 400 million that two U.S. citizens were defrauded

12   here in the U.S., I should still find that Mr. Scott did not

13   violate the money laundering statute because none of those

14   $54,000 passed through Fenero?

15           MS. STANLEY:    We would principally argue that the main

16   basis on which your Honor should rule with respect to this

17   point really centers around the insufficient nexus to the

18   United States, but we also simply want to point out that, as an

19   additional matter, there was no evidence that whatever domestic

20   activity there was in the United States, that any of that money

21   ended up in Mr. Scott's Fenero funds.

22           THE COURT:    Okay.  So is that your argument with

23   respect to your initial motion?

24           MS. STANLEY:    Yes.

25           THE COURT:    So if we can, let's take these one at a

1　time.  So the government, please respond to that?

2　　　　　　　　MR. DiMASE:    Yes, your Honor.  It's Christopher

3　DiMase, for the record.

4　　　　　　　　Just so that the organization of the government's

5　argument is clear, I plan to argue the first set of motions,

6　and I believe that Mr. Folly, and perhaps some combination of

7　the other assistants, will argue the more recent motions and

8　that will be addressed, I guess, second.

9　　　　　　　　THE COURT:    Okay.  Very well.

10　　　　　　　　MR. DiMASE:    So I'm going to turn to the arguments in

11　reverse order, and start with the money laundering arguments

12　that were made just now.  What I would say as to both of them,

13　the defense is essentially asking the Court to create new law

14　out of whole cloth.  As the Court rightly recognized, no

15　de minimus limitation on the amount of money involved in a wire

16　fraud scheme to grant U.S. jurisdiction.  Nor is there any

17　statutory or other case law requirement that U.S. funds run

18　through a money laundering vehicle in order for a defendant to

19　be guilty of a money laundering charge.

20　　　　　　　　So let me take those in turn.  It is true, your Honor,

21　that something on the order of $50,000 of U.S. victim's funds

22　were proven at trial.  Ironically, the defense objected to a

23　third U.S. victim being called, which we named in our witness

24　list and we argued in motions in limine, and the Court

25　eventually precluded that third victim.  So it's somewhat

1    ironic that the defense now stands on the fact that there are

2    only two victims when they, themselves, moved to preclude a

3    third intended victim.

4              But that being said, their arguments completely

5    overlook additional and very critical evidence on the U.S.

6    jurisdictional hook here.  The government introduced a video

7    from July 4th of 2015, in which Ruja Ignatova, the principal

8    leader of OneCoin, announced the opening of the U.S. market for

9    OneCoin.  And that's Government Exhibit 204-C and accompanying

10   transcript 204-C-TR.  That, in and of itself, is sufficient,

11   along with the interstate wires that were sent by -- and

12   international wires that were sent by Mr. Horn and Ms. Cohen in

13   this scheme --

14              THE COURT:    By Mr. Who?

15              MR. DiMASE:    Mr. Horn and Ms. Cohen the two victims.

16   I'm sorry, your Honor -- to easily demonstrate a U.S.

17   jurisdiction here.

18              Moreover, those two victims did testify not only about

19   their own investments, but Mr. Horn testified about the

20   investments of several family members and friends.  He

21   testified about conferences related to OneCoin that took place

22   in the United States.  He talked about promoters of OneCoin

23   that were residing and promoting OneCoin in the United States.

24   And that, on top of the fact that the OneCoin principal

25   specifically opened the market to United States citizens, makes

1    clear that this had much more than even a de minimus touch on

2    the United States, were that even the law to begin with, which

3    it is not.

4              The law requires simply a scheme to defraud, to obtain

5    money or property, through false representations and promises,

6    and interstate or international wires in furtherance of that

7    scheme.  And those elements were clearly proven through the

8    testimony of these two victims, along with all of the other

9    evidence introduced in the case.

10             And I would note, your Honor, that there were TD Bank

11   records regarding U.S. bank accounts introduced into evidence

12   at the trial that actually showed numerous other investments by

13   U.S.-based OneCoin investors.  Now, they were not the subject

14   of specific testimony at the trial, but you've now got an

15   explicit opening of the market by Ruja Ignatova in the U.S.,

16   testimony from two victims who sent interstate or international

17   wires, conferences in the U.S., U.S. promoters and bank records

18   showing additional investments.  There's just simply no

19   question, your Honor, that there was a sufficient

20   jurisdictional nexus for the underlying wire fraud scheme here.

21             Turning to the second issue on the money laundering

22   count, there is no requirement in the money laundering statute

23   that any particular funds go through a money laundering

24   vehicle, or that those funds are the funds that are sought to

25   be concealed through the transactions at issue.

1          The core focus of the money laundering statute is

2    engaging in transactions with the goal of concealing the

3    illegal source of the funds.  It doesn't speak to where the

4    funds exactly come from, geographically.  It's simply the

5    evidence must show that the defendant knew that they were of a

6    criminal nature.  The defendant need not even know what crime,

7    under the clear case law and the elements that the Court

8    instructed the jury.  It's simply that -- and the way that the

9    elements read and the Judge -- that you instructed the jury was

10   that the defendant knew the proceeds or the funds represented

11   proceeds of some form of unlawful activity, not necessarily

12   which form of unlawful activity.

13          So the defense is trying to import an additional

14   element into the money laundering statute that the defendant

15   knows, geographically, where the funds come from.  The

16   government has to prove the underlying SUA, the specified

17   unlawful activity, here, wire fraud; has to prove that the

18   proceeds came from that SUA, here, the OneCoin scheme; and that

19   the defendant knew that these proceeds were somehow criminal in

20   nature.  That is all that the statute requires.

21          THE COURT:    But putting the defense's argument in its

22   most stark terms, and putting aside for a second your nexus

23   arguments, are you saying that even if all of the proceeds that

24   the specified unlawful activity was generated overseas and even

25   if all of that money was laundered overseas, it doesn't matter

1    that any U.S.-based victims had their funds laundered overseas,

2    and that would still be a basis for money laundering conviction

3    here?

4                MR. DiMASE:    Let me back up and parse that out a

5    little bit.  There still has to be some involvement in the

6    United States, in terms of the conspiracy, to have jurisdiction

7    over the money laundering charge.  And here, the government

8    presented evidence of transactions that passed through U.S.

9    correspondent banks.  So that is sufficient to put us in the

10   ambit of venue and jurisdiction on the money laundering charge.

11               But yet, to your second question, if all of the money

12   came from crimes committed overseas, could that substantiate a

13   money laundering offense?  The answer is, absolutely because

14   there are a number of specified unlawful activities that are

15   outlined in 1956(c), the money laundering statute, that pertain

16   to crimes committed overseas.

17               And the point of the money laundering statute, if you

18   go back to the legislative history, is to prevent the U.S.

19   banking system to be used in furtherance of some of these both

20   domestic and foreign criminal activities.  For example, one of

21   the specified unlawful activities is a bribery scheme, in

22   violation of foreign law.

23               And there have been cases tried in this courthouse

24   about bribery schemes in violation of foreign country's laws

25   that generated money that was then laundered through U.S.

1    correspondent bank accounts.  And so the fact that the crime

2    happened overseas isn't really the question.

3              THE COURT:    Okay.  But it's not enough that Mr. Scott

4    was here in the United States; something else had to have

5    happened here in the United States in order for there to be

6    jurisdiction, correct?

7              MR. DiMASE:    I think on the money laundering count,

8    because it's a conspiracy, any essential offense element would

9    be enough, any overt act in furtherance of that conspiracy.  So

10   Mr. Scott also took a number of steps in the United States in

11   furtherance of the scheme.

12             It also happens that transactions that were specific

13   to this conspiracy passed through New York correspondent banks,

14   in addition to the various steps he took here in the United

15   States.

16             THE COURT:    Okay.

17             MR. DiMASE:    But the point is, in this case, the SUA

18   is wire fraud, and so the government concedes that it would

19   have to prove a proper wire fraud predicate in order to convict

20   the defendant of a 1956 count.  And that's why the argument,

21   ultimately, as Ms. Stanley, who has conceded at the end, comes

22   back to whether there was a proper jurisdictional nexus on the

23   wire fraud offense.

24             And for all of the reasons that I've described, your

25   Honor, the evidence was overwhelming on that point and

1  certainly substantial enough, crediting every inference that

2  could be drawn in the government's favor, for the jury to find

3  that underlying wire fraud SUA was proven.  So that, unless the

4  Court has any questions on the --

5  THE COURT:    No.

6  MR. DiMASE:    -- money laundering offense, I'll turn to

7  the bank fraud offense.

8  So there are a couple of different arguments being

9  advanced by the defendant today regarding the bank fraud

10  offense.  One is that this conduct doesn't fall sort of within

11  the ambit of the crime; another is that the evidence, in any

12  event, wasn't sufficient to prove Mr. Scott's guilt; and the

13  third is some combination of a constructive amendment argument

14  and a juror confusion argument.  So let me take those in turn.

15  There is no legal support for this concept that the

16  funds that somebody seeks to obtain from a bank have to be

17  somebody else's funds in order to be guilty of a bank fraud

18  offense.  The prime or leading Supreme Court case on bank fraud

19  under the second subsection, 13442 is *United States v. Loughrin*

20  and it holds that the defendant -- that 13442 does not require

21  a showing that the defendant intended to defraud a federally

22  insured bank or other financial institution.

23  Instead, the government can prove a violation of that

24  statute by establishing that the defendant acquired bank

25  property by means of a misrepresentation.  In other words, the

1    government only has to prove that the defendant's false

2    statement was the mechanism naturally inducing a bank to part

3    with money in its control.

4              There's simply no requirement in the law, or in the

5    case law interpreting the law, that the money be somebody

6    else's money.  And in any event, in this case, it's as the

7    Court rightly pointed out during Ms. Stanley's argument, this

8    wasn't Mr. Armenta's money.  The whole argument is based on a

9    false premise.  The evidence at trial clearly established that

10   the money that Mr. Armenta was sending to Mr. Scott was Ruja's

11   money.

12             And if you look at -- I know you won't be able to do

13   this now, your Honor, but if you look the transcript later,

14   Government Exhibit 1056-T, that is a discussion preceding the

15   transfers between Mr. Scott and Ruja talking about getting

16   Mr. Armenta's money back to Ruja.  And that's what precedes

17   these transfers, a desire from Ruja, as the evidence showed, to

18   get her money back from Mr. Armenta.

19             And I think the Court asked some questions about

20   Armenta's sort of bigger-picture role in this, and you know,

21   it's clear from the evidence at trial that Mr. Armenta was

22   another money launderer for OneCoin.  He had his own

23   relationship with Ms. Ignatova.  There were some calls between

24   them that were introduced into evidence, even a romantic

25   relationship; that he was the one who introduced Mr. Scott to

1    Ms. Ignatova, and that he received a substantial amount,

2    hundreds of millions of dollars, of Ms. Ignatova's OneCoin

3    proceeds during the scheme.

4            So all of that was sort of the background, along with

5    these communications between Ruja and Mr. Scott about

6    transferring this money over.  So the evidence clearly

7    established it was not his money.  And so the idea that because

8    it wasn't -- because it was allegedly his money, there's no

9    bank fraud allegation, this is resting on that false premise to

10   begin with.

11           I would note that there is a case -- and I'm sorry,

12   let me back up.  And I think for that reason, it is very much

13   like *Lebedev*, which is the case cited by Ms. Stanley today,

14   where he hid the fact that there was an unlicensed Bitcoin

15   exchange operating from banks in order to transfer his

16   customers' funds, the same way that Mr. Armenta and Mr. Scott

17   hid the OneCoin aspect of all of this and the fact that they

18   were Ruja's money in order to transfer the funds.

19           That being said, the government did cite a case in its

20   opposition, *Nejad*, which is a sanctions case.  And in that

21   case, the Court held that even though the Venezuelan subsidiary

22   was transferring its own funds, so long as it was lying to get

23   the funds out of banks, that was sufficient to ground a bank

24   fraud offense.

25           So even if it were the case that the funds have to

1    be -- can't -- I'm sorry.  Even if it were the case that the

2    funds are your own, it's clear that a bank fraud offense can be

3    committed if you lie to the bank to get those funds out.

4            So let's talk about the sufficiency of the evidence

5    overall and the evidence that proved that Mr. Scott was guilty

6    of a bank fraud offense.  I do want to pass up one exhibit.

7    I'll just hand this to the Court's deputy, and I'll provide

8    some copies to counsel as well.  This was attached as Exhibit A

9    to the government's reply brief on the underlying motion.

10           So first, let's address the loan.  The evidence

11   admitted at trial was clear that the money was destined for

12   Ruja Ignatova and that it was her money, even as Mr. Scott and

13   others claimed that the loan was to go to somebody named Martin

14   Breidenbach.  So that's No. 1.

15           No. 2.  The defense says there's no evidence that  the

16   loan was not, in fact, a loan and, therefore, that it was a lie

17   to say so.  First of all, there are many, many other fake loan

18   documents that were admitted at trial to -- that paper

19   transactions, much like this one.

20           And in Government Exhibit 1391, Mr. Scott provides an

21   accounting of all of Ruja's money.  I think this is relevant to

22   many aspects of the motions that have been made by the

23   defendant.  But this is his e-mail to Irina Dilkinska, Kalina

24   Bahchevanova, Maya Antonova, all people who worked for OneCoin,

25   accounting for all of Ruja's money that he received.  And he

1    says she is asking for available cash balances, meaning Ruja

2    has asked me.  And he says:  Here are the available cash

3    balances.  All loans made are considered available cash for,

4    quote, obvious reasons.

5               And that, especially when you credit all of the

6    inferences in the government's favor, is an admission that the

7    loans weren't really loans; that they were just transfers back

8    to Ms. Ignatova.  And, in fact, the greater weight of all of

9    the government's evidence showed that this is how the scheme

10   worked.

11              Scott created funds, got fake investors, moved Ruja's

12   funds in through the fake investors, moved the funds out

13   through fake loans, fake transactions just like this one.  And

14   when Mr. Scott said this was a loan, to Martin Breidenbach, for

15   a oil field investment, the evidence, crediting all inferences

16   to the government's favor, shows that that was false.

17              And moreover --

18              THE COURT:    Does that account for the 30 million

19   crypto loan?

20              MR. DiMASE:    This is the 30 million crypto loan, yes.

21   That's what this entry on the e-mail refers to.  Because in the

22   evidence at trial and the instruction that was by the Bank of

23   New York Mellon, it was referenced as a $30 million crypto loan

24   for Martin Breidenbach.

25              And, your Honor, I think you were referring to the

1    line maybe seven down in the figures here, where it says

2    "crypto loan"?

3              THE COURT:    Correct.

4              MR. DiMASE:    Yes.  And, in fact, it says dollar sign

5    next to it, which shows that Mr. Scott understood this was a

6    dollar transaction.

7              These other -- just to be clear, the evidence at trial

8    showed that these other -- some of these other abbreviations,

9    FEI, FSS, those kind of stand for the various Fenero funds that

10   Mr. Scott was operating and money that would have been in those

11   funds.  BOI was Bank of Ireland.  BMS was a bank that he had

12   many of these funds at Vida Home and Oceanscape, there was

13   evidence at trial that those were also purported loans.

14             And so unless the Court has another question on that,

15   I can turn to the sort of fact that he told this to Apex,

16   rather than to Bank of New York Mellon directly.

17             THE COURT:    No, you can go ahead.

18             MR. DiMASE:    So there is evidence in the record that

19   Mr. Scott understood that Bank of New York Mellon, or some U.S.

20   bank, would be involved in this because of the dollar nature of

21   the transaction.  And he then told Apex to provide this

22   particular wire instruction, loan for Breidenbach for

23   CryptoReal, and the defense argues that that's insufficient

24   because it wasn't told directly to the bank.

25             But *Loughrin*, the Supreme Court court case I had

1    mentioned before, clearly holds that there does not have to be

2    an intent to defraud a federally insured bank, and that the

3    government need only prove that the statement was the mechanism

4    inducing a bank to part with money in its control.

5                And so, of course, Mr. Scott would have understood

6    that these wire instructions were going to have to be provided

7    to a U.S. correspondent bank in order to move this money

8    through.  The fact that he didn't tell it directly to Bank of

9    New York Mellon is legally insignificant under the prevailing

10   case law regarding bank fraud.

11               With respect to the Armenta transactions, your Honor,

12   again, I think that the defense argument glosses over some of

13   the critical evidence on those transactions.  As I said, there

14   was discussion earlier on of Ruja wanting her money back from

15   Scott.  That's Exhibit 1056C.

16               There is evidence specifically that Scott knew that

17   the funds from Armenta would come from the United States.

18   That's Exhibit 1360.  There's testimony that Armenta lied to

19   the banks about the source of funds and the nature of the

20   Fenero funds.  That's at, among other places, transcript cite

21   844 and 859 to 60.

22               And the evidence, especially crediting all reasonable

23   inferences to the government, clearly showed that Scott

24   understood Armenta would need to lie to the bank because, as

25   the Court pointed out, the whole purpose of these things, the

1    Fenero funds, was to obscure where the money was really coming

2    from, who owned it, who were the investors.

3             And he knew that, as part of that, Armenta would have

4    to pretend to be an investor in a legitimate fund, and that he

5    would send the money through the bank saying that he was an

6    investor and claiming that it was his money when it was, in

7    fact, Ms. Ignatova's money.

8             And the idea that the bank would have transferred the

9    funds if Armenta had told the whole truth is kind of

10   preposterous.  If he said, these are Ruja Ignatova's funds, the

11   head of OneCoin, and I am sending them purporting to be an

12   investor in the Fenero funds, which are legitimate investment

13   funds just disguised to be that, there's no way, obviously, the

14   bank would have sent that money.

15            He also had Mr. Armenta sign an investment agreement

16   as an investor in Fenero.  That's Government Exhibit 1140.  And

17   again, that's just more evidence of their collusion, where

18   Armenta would pretend on paper to be an investor in these fake

19   funds.

20            And then finally, Mr. Scott knew that at least one of

21   the transfers would pass through a correspondent bank in SDNY.

22   That can be found in transcript 917 and Exhibits 406 and 417.

23            Let me turn last, your Honor, to the constructive

24   amendment, slash, confusion point.  The core principle under --

25   the core purpose underlying the constructive amendment doctrine

1    is both that the defendant has appropriate notice, and that he

2    can plead guilty or not guilty to subsequent charges and

3    exercise any double jeopardy rights he might have.

4                    I don't think this was argued at length today, but it

5    is argued in the papers.  And the bottom line is that the

6    Court's decision not to instruct the jury that only three FDIC

7    banks were implicated here was appropriate.  It didn't change

8    the essential legal theory or evidence used to convict

9    Mr. Scott.

10                   And the core criminality was the same, whether you

11   limited it -- the charge to those three specific banks or to

12   FDIC insured banks.  And that was really the only question in

13   the jury instructions, whether FDIC insured banks should be

14   followed by these three specific banks.

15                   And I think it's very clear from the jury instructions

16   that the jury would not have been confused about the scope of

17   the bank fraud charge even without those three banks.  The jury

18   instructions said that the "object must be to tell lies to an

19   FDIC insured bank."  There's no ambiguity in that.

20                   No matter how many international financial

21   institutions were involved here, there's no ambiguity to the

22   jury's instructions clearly identifying the banks that were the

23   subject of that crime.  Whether it was just the three, four or

24   whatever was proven at the trial, it was very limited in the

25   instructions to FDIC insured banks.

1          And just on the bigger picture question of conflation

2     of these two offenses, the Court -- and this is laid out on

3     page 37 of the government's initial response.  I won't go

4     through it in detail, but the bottom line is the Court clearly

5     instructed the jury on the elements of the two offenses, and

6     they're not anywhere near the same.

7          The money laundering statute involved conducting

8     transactions with knowledge that they derived from criminal

9     activity, and proof that the proceeds actually came from an

10     underlying specified unlawful activity, with the intent to

11     conceal its source, nature, origin, et cetera; where the bank

12     fraud statute is clearly about making false representations to

13     a bank to obtain money or property under the control of that

14     bank, which is FDIC insured.

15          And so given the difference between elements and the

16     clear instructions that the Court provided to the jury on those

17     two crimes, there's just no way to reasonably conclude that the

18     jury would have been confused.

19          And I would note that, on this point, the defense

20     points to no specific evidence of juror confusion, like a jury

21     note where the jury expressed confusion regarding the

22     applicability of these counts or how to distinguish bank fraud

23     from money laundering.  The defense points to no such evidence.

24     They simply speculate, based on a clear record of appropriate

25     jury instructions, that the jury must have been confused

1  without really any evidence, your Honor.

2          One moment.

3          (Pause)

4          I'm happy to answer any other questions the Court may

5  have on these issues.

6          THE COURT:    No, no, that's fine.

7          So then let's move on to the supplemental motions, and

8  I think they involve three separate areas, one which arguably

9  took place entirely prior to trial, and that's the information

10  concerning Ms. Dilkinska and her whereabouts; one that took

11  place during the trial, that the government now concedes, that

12  Mr. Ignatov provided perjured testimony; and one area that

13  arguably took place entirely after the trial, and that's

14  Mr. Ignatov's use of the cell phone while incarcerated.

15          So Mr. Devlin-Brown or Ms. Stanley or Mr. Garvin, I'm

16  happy to hear you.

17          MR. DEVLIN-BROWN:    Thank you, your Honor.  I'll get us

18  started with that, and as I think you hear my arguments, really

19  the issues do blend together when you're considering our

20  application for a new trial.

21          And I actually want to start with and really focus

22  most of my argument on the *Wallach* case in the Second Circuit

23  and the standard articulated there.  I am going to come to some

24  of those other issues, but I think, unlike the sort of general

25  new trial standard, right, which is the court orders a new

1    trial when it's concerned there may be a perception of a

2    manifest injustice; so that's a very broad standard.

3            When a witness perjures himself, and when it's shown

4    to be perjury, as opposed to mistake, which we'll show here,

5    about the testimony regarding the July 20th meeting, when a

6    witness commits perjury, No. 1; and No. 2 when the government

7    has awareness at the time of trial that the witness is

8    testifying falsely, *Wallach* provides a very clear direction.

9    And it says that, in those cases, where those things are

10   established, a new trial is virtually automatic, that's a

11   quote, and it's required unless there is, quote, any reasonable

12   likelihood that the false testimony -- sorry, it's required if

13   there is any reasonable likelihood that the false testimony

14   could have affected the judgment of the jury.

15           So here, as we'll argue, the Court can't exclude

16   certainly the possibility that the jury was impacted by

17   Mr. Ignatov's, Konstantin Ignatov's, perjury and, therefore,

18   *Wallach* requires a new trial.  Now, we made other arguments,

19   your Honor, and I will get to some of those, but I think that

20   is where really the key dispute we have with the government is,

21   whether this virtually automatic new trial standard that

22   *Wallach* articulates applies here, and it does.

23           Before I get into that, that argument, though, I think

24   there's a threshold issue that I need to address, and that is

25   that the government makes an argument in its brief that there's

1   a time bar to the Court's consideration of the vast majority of

2   what we bring up.

3            The government takes the position that the

4   supplemental motion for a new trial was timely with respect to

5   the newly discovered evidence that the laptop was -- that

6   Mr. Ignatov perjured himself about the laptop.  And your Honor

7   recalls that was disclosed when Mr. Duncan Arthur, who assisted

8   the government in investigations, first reported it to a

9   Manhattan DA investigator working in London.  And then when he

10  didn't get any traction on that, reported it directly to us.

11           So the government's position is, that's fine, that's

12  newly considered evidence.  You can consider the perjury about

13  that, which has been admitted to, but the Court's barred from

14  considering whether Mr. Konstantin Ignatov's perjury extended

15  to the July 20th, 2016, meeting, where he testified, now

16  indisputably inaccurately, that Ms. Dilkinska was there.

17           That argument is completely wrong, but unless the

18  Court waives me away now and says, I've already looked at that,

19  I'm rejecting it, I think I need to go through it, at least

20  briefly, because, obviously, it's consequential if the Court

21  were to decide that these issues are time barred.

22           THE COURT:    You can address it briefly.

23           MR. DEVLIN-BROWN:    Okay.  I will.  So, first, there's

24  really three arguments, and we outline them in our brief.  But

25  the first argument is that the government here concedes, right,

1       that the motion challenging Mr. -- asking for a new trial based

2       on Konstantin Ignatov's perjury is timely.  It's timely with

3       respect to the laptop.

4               Their position is, you have to have not just newly

5       discovered evidence about the laptop to make a timely motion,

6       but newly discovered motion about anything you're now asking

7       the Court to consider the perjury extended to.  They point to

8       no authority for that.  They point to no good reason why that

9       should be the case or in the interest of justice.  So we don't

10      think it's necessary to show newly discovered evidence about

11      each aspect of the perjury, including Ms. Dilkinska's lack of

12      attendance at that July 20th meeting.  That's the first point.

13              The second point, which I think is the most

14      fundamental one, your Honor, is there was newly discovered

15      evidence about Dilkinska not attending the July 20th, 2016,

16      meeting.  At the time of trial, right, there were these

17      e-mails, which we'll talk about later, Defense Exhibits 550 and

18      552, which strongly suggested that Dilkinska was not at that

19      meeting.  These are the e-mails where she's saying she's

20      traveling all week.

21              As your Honor recalls, the government opposed our

22      efforts to admit those into evidence by misciting Second

23      Circuit law, and they now concede that was an erroneous

24      decision the Court made as a result.  But we have those

25      e-mails.

40

M4PPSCOO

1          However, after trial and, in fact, after the initial

2    supplemental motion was filed based on the disclosure by Duncan

3    Arthur that there was perjury concerning the laptop, a source

4    came forward with a copy of Ms. Dilkinska's passport.  It had

5    stamps on it showing that she was in India.  The government

6    sufficiently authenticated that to produce it to us, and then

7    obtained and produced travel records, Indian government

8    records, showing she was in India on those dates.  That's all

9    newly discovered.  That's hugely significant.

10          THE COURT:    Well, I mean, it's newly discovered, but

11    it was arguably discoverable prior to trial because you had

12    information sufficient to establish, at least in your mind,

13    that Ms. Dilkinska -- I'm sorry if I'm mispronouncing her

14    name -- was not at that meeting and, therefore, you could have

15    looked at her travel records or whatever else.

16          I mean, there's any number of steps you could have

17    taken.  I understand that there's a time limit, right, because

18    you're preparing for trial.  But it's newly discovered because

19    it came out now, but it was discoverable at the time.  And so

20    how should I account for that?

21          MR. DEVLIN-BROWN:    Yeah, I think, your Honor, the

22    government does cite various cases where, you know, there's

23    some information the defense, with diligence, could have found

24    out during the course of its investigation.  But it ignores the

25    cases where there's witness perjury because there, the law is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    very clear.

2              And what the government's doing is confusing the

3    defendant's knowledge of the facts.  Like, the defense team,

4    yes, we knew, as often happens in a trial, this witness is

5    lying.  We knew that fact.  We had some evidence, actually,

6    to -- admissible evidence, it turns out, that would have helped

7    prove that fact.  But we didn't have the most powerful pieces

8    of evidence and, you know, we could not have gone to the Indian

9    government and gotten that dispositive evidence during trial

10   or, frankly, any time.  That's a government-to-government law

11   enforcement channel.

12             But actually, your Honor, I think all you really need

13   to do to resolve this is read *Wallach*.  That's the leading

14   Second Circuit case.

15             THE COURT:    Maybe I'll hear differently, but I don't

16   understand the government to be conceding that Mr. Ignatov

17   perjured himself on that point.  I mean --

18             MR. DEVLIN-BROWN:    The government --

19             THE COURT:    Go ahead.

20             MR. DEVLIN-BROWN:    The government's position, which

21   we'll come to, because it really is the meat of it, is that he

22   did testify inaccurately.  Like, there's zero question that

23   Irina Dilkinska was in India on that date, zero question.  I

24   don't think the government is going the dispute that.  Their

25   argument is that it was a mistake, Mr. Ignatov made a mistake.

1          But the difference to whether the Court can consider

2     the newly discovered evidence, Wallach is very instructive

3     because it almost exactly mirrors the facts of what happened to

4     Mr. Scott.  In *Wallach* there was a cooperator who perjured

5     himself, lied about his gambling addiction and how he continued

6     gambling even when he said he didn't.

7          And the defense in that case cross-examined Wallach at

8     trial about that -- not Wallach, but the witness at trial; so

9     they tried because they knew it was false.  And then, as the

10     Court says, they actually offered what the Court described as

11     powerful evidence at the trial in the form of some gambling

12     records that he was lying.  The Court didn't admit it.  It was

13     intrinsic evidence for impeachment.  No argument there, that

14     that ruling was wrong.

15          Then after the trial, the government disclosed

16     additional evidence that made clear that this person was lying,

17     and in fact, they prosecuted their own cooperator for perjury.

18     And it didn't even come up in *Wallach*, the Court didn't even

19     consider the suggestion that this was somehow time barred, and

20     that's exactly what happened here.

21          Mr. Scott knew there was a lie from the outset.  We

22     cross-examined Mr. Ignatov.  We tried our best, with the

23     exhibits we had, which were not admitted.  But then, can you

24     think of a better piece of evidence that she was not there,

25     dispositive proof she was in India?  That's what we couldn't

1    get then.

2              We made a Brady request in the middle of trial saying,

3    government, please give us anything in your own records or

4    identify, if you can, evidence that she wasn't there.  But

5    there's no way we could have gotten that during trial.

6              THE COURT:    There's a suggestion in the government's

7    papers, and I, quite frankly, don't recall what happened, where

8    I believe I gave you the opportunity, if you wished to use

9    those Exhibits 550 and 552 or 7 to refresh Mr. Ignatov's

10   recollection, and you didn't take me up on that invitation.  Is

11   that actually what happened during the trial?

12             MR. DEVLIN-BROWN:    No.  I recall that as well, your

13   Honor, and we looked at the transcript.  And the government --

14   I mean, not the government.  The defense moved to refresh his

15   recollection.  The government opposed.  Your Honor wisely ruled

16   that fettuccini can refresh recollections, and I then showed

17   those exhibits to Mr. Ignatov and asked him:  Does that refresh

18   your recollection, or similar words, and he said:  Nope, my

19   testimony is the same.  So we crossed.  We tried to get those

20   in.  This is newly discovered evidence.

21             But the third point as to why the Court should

22   consider all of this is the excusable neglect doctrine.  I

23   don't think you need to reach that doctrine.  The government

24   cites it briefly and says, oh, it doesn't apply.  We analyze in

25   our papers why it does, but the excusable neglect doctrine is

1    basically an efficiency doctrine.  Right?  It's balancing the

2    need for the Court to consider issues of perjury with the need

3    for finality, et cetera.

4            This is an obvious case.  I mean, the Court is

5    considering, in this motion, timely issues with perjury with

6    respect to a laptop.  The idea that it would prejudice anyone

7    to also consider this newly discovered evidence that we have at

8    the same time we're arguing about, at the same hearing, of

9    perjury regarding Dilkinska's presence at the meeting, of

10   course it should be considered, and the excusable neglect

11   doctrine, should you need to reach it, gives it it's due in

12   law.

13           But I'll put the timeliness issue and whether the

14   Court can consider all of this to the side for now.  I'm happy

15   to answer the Court's questions, of course.

16           THE COURT:    No, you can go ahead.

17           MR. DEVLIN-BROWN:    And turn, really, to *Wallach*.  So

18   the principal argument we make for a new trial, and it's not

19   the only one, but it's based on *Wallach*.  And *Wallach*

20   identifies what it calls two discrete standards "that courts

21   should apply when assessing whether a new trial should be

22   granted based on witness perjury."  And *Wallach* says, "where

23   the government knowingly permitted the introduction of false

24   testimony," a new trial is "virtually automatic."

25           And they go on to say if the prosecution knew or

1    should have known of this at the time of trial, conviction must

2    be set aside if, quote -- this is the standard, "if any

3    reasonable likelihood that the false testimony could have

4    affected the judgment of the jury."

5            So whether that standard applies is of great

6    significance to your Honor's consideration of this motion

7    because if that applies, this virtually automatic reversal

8    standard, then we're not talking about plain error and what all

9    the other evidence might have been or harmless error.  We're

10   talking about a standard that says, unless your Honor can say

11   there's no chance that this even could have affected the

12   judgment of the jury, he needs a new trial.

13           So the government says that standard does not apply.

14   We say it does.  And there's two arguments the government

15   raises, and I want to take on both of them.  So your Honor

16   alluded to the first one a moment ago.  The government's first

17   argument is that, sure, his testimony about the July 20th

18   meeting with Dilkinska was false, it was factually wrong, but,

19   they say, it was an innocent mistake and, therefore, it's not

20   perjury.

21           And the reason that's significant is we agree with the

22   government on this.  That whole *Wallach* standard, it only

23   applies if the witness committed perjury by a preponderance of

24   the evidence.  If the witness committed perjury, then it

25   applies.  If it doesn't, if it was an innocent mistake, we may

1    have other new trial claims because there's still due process

2    concerns and other issues, but *Wallach* only applies if it's

3    perjury, and we'll address that.

4              And then the government's second argument, their

5    second qualm about applying this standard, is they say that

6    even if it was perjury by Mr. Ignatov, the *Wallach* virtually

7    automatic reversal doesn't apply because the government had to

8    know that the testimony was intentionally false at the time of

9    trial.

10             And here, the government admits it in their papers.

11   They say they should have known that the testimony was

12   inaccurate at the time of trial.  They actually did know, but

13   let's take should have known because *Wallach* says it's the same

14   thing.  They say they should have known, but they did not know

15   it was intentionally false, and they're wrong on that count.

16             And I'll spend some time on that too because *Wallach*

17   and the cases it cites, do not require and do not make a

18   distinction between what the government's obligations are when

19   it knows its witness is intentionally testifying falsely or

20   when its witness is testifying falsely perhaps by mistake.

21   There's no distinction, and we'll go through that.

22             But let me first do the first issue the government

23   raises, which is their claim that it was mistake and not

24   perjury.  And the Court decides that by a preponderance of the

25   evidence.  The case law is clear.  We cited it in our papers.

1       And so I'm not going go through the entirety of the

2 argument that we make in our papers on this, but I think the

3 evidence is quite clear, certainly a preponderance that this

4 was false testimony on purpose by Mr. Konstantin, it was

5 perjury and not a mistake.

6       The first argument is that a mistake is just

7 implausible here because Konstantin was clear that he met Mark

8 Scott only one time, and he met him in the Sofia offices of

9 OneCoin.  And the government pinpointed that meeting down to

10 the hour with all of their WhatsApp messages and flight records

11 and everything else.  It was on July 20th, 2016, in the

12 afternoon.

13       And Mr. Konstantin gave detailed testimony that

14 Mr. Scott came to the offices, was ushered in to see Ruja

15 Ignatova, Konstantin's sister; and that later Irina Dilkinska

16 arrived; that Mr. Konstantin Ignatova brought her in to where

17 Mr. Scott and Ms. Ignatova was meeting; that Ruja did something

18 she'd never done -- that's why it stood out to him -- she'd

19 never done before, which is tell Konstantin:  Send everyone

20 home who's on that floor.  Like, this was a sensitive meeting.

21       And then he recounts how Dilkinska, after the meeting,

22 talked to him about it and said:  Oh, my God -- I'm

23 paraphrasing -- but we had to stay there so long because Mark

24 Scott just couldn't get it.  So it was detailed testimony, and

25 it couldn't be confused with another meeting.  It's the only

1   time that Mr. Konstantin ever met Mr. Scott.

2   And I don't want to dwell on this right now because

3   it's a little fact intensive, but the point I think is

4   significant.  The government, in its final brief, in what I

5   consider a desperate effort to suggest that Mr. Konstantin may

6   have been confused rather than perjuring himself, they said,

7   no, no, look, Mr. Scott met Irina Dilkinska in September of

8   2016.  And they suggested -- they said Konstantin may have just

9   been confused about the date.

10   And that's part of the problem here, your Honor.

11   There's no indication that the government went back and talked

12   to Konstantin and said, hey, was there another meeting with

13   Dilkinska and Mr. Scott in September?  They just posit it

14   because they found an e-mail, not admitted at trial, I don't

15   think -- well, putting whether it was or was not, there was an

16   e-mail at trial where there was talk between David Pike and

17   Dilkinska that Dilkinska was going to see him on a specific

18   date in September.  But the government's own evidence --

19   THE COURT:    I'm sorry, see who?

20   MR. DEVLIN-BROWN:    That Irina Dilkinska was going to

21   meet Mr. Scott on September 15th of 2016; so there's an e-mail

22   where there's talk about a meeting.  But then, if you look at

23   the government's own evidence in its brief, it's clear, almost

24   certainly, that there was no such meeting because it was a

25   two-day trip that Mr. Scott -- and we -- we'll tell you the

1    page of the brief just so you can have it handy after, pages 5

2    and 6 of our final brief, which I hate to call the sur surreply

3    but that's just the way the facts evolved; so there was a lot

4    of briefing.

5            So Mr. Scott was there for two days.  You have flight

6    records and things that show that.  He was supposed to meet

7    with Ruja Ignatov, not in the OneCoin offices, but at The

8    Residence, which is a private club, on the two nights that he

9    was there.

10            You then see in the e-mail chain that Mr. Scott didn't

11    make the first meeting at all.  He was working on another

12    project.  He was then going to go to the only meeting he has

13    with Ruja at The Residence, and Konstantin is arranging a car.

14            And then they exchange dialogue, where Konstantin

15    says, in substance, hey, Irina Dilkinska has papers to give

16    you.  Do you want me to bring them to you personally or at the

17    meeting?  And they decided instead Konstantin was just going to

18    put it in the car that he's sending, the car service that he's

19    sending to pick up Mr. Scott.

20            So you read that in its entirety, the government's own

21    exhibit, and there's virtually no chance -- they didn't even

22    appear to ever ask their witness about it -- that Mr. Scott met

23    with Ms. Dilkinska on that trip, much less a meeting at

24    OneCoin's offices, much less a meeting that Konstantin Ignatova

25    attended or could have confused with any of this.

1          It's just speculative nonsense that's largely

2     disproven by the government's own evidence, but that's what

3     they offer as to why it was a mistake.  So that's the first

4     argument.  It's implausible this detailed testimony was a

5     mistake.

6          The second argument -- and I don't want to belabor it

7     because you'll read the transcript and it speaks for itself, at

8     least portions of the transcript we cite in our briefs, you're

9     probably not going to read the entire trial.  But Konstantin

10    Ignatova was repeatedly crossed about this multiple days.

11         He varied between saying he was a hundred percent

12    certain that Dilkinska was at that meeting, and then he was

13    almost a hundred percent certain.  He didn't equivocate.  He

14    didn't equivocate even after being shown e-mails that would

15    make someone who was perhaps mistaken, at least temper their

16    testimony.  Oh, wow, here's Defense Exhibit 550 showing that

17    she was going to be traveling that week.  He did not hesitate

18    one iota.

19         And then, you know, there's another thing when your

20    Honor is assessing did Konstantin make a mistake or did he

21    perjure himself to make that sole meeting he saw with Mr. Scott

22    seem much more dramatic.  And that third factor is you don't

23    consider what Mr. Ignatov says, you know, as if he just came

24    into this room and there's no track record for him.  He has a

25    track record.

1 　　　　He's admitted to perjuring himself already in this

2 trial.  He perjured himself about the laptop.  He couldn't get

3 out of that one.  Duncan Arthur said, no, no, no, that laptop

4 that Konstantin said he threw in the trash, I took it back to

5 OneCoin personnel.  So he lied about that already.  He lied to

6 the government about it repeatedly in prep.

7 　　　　He continues to lie about the laptop.  He absurdly

8 says to the government that, oh -- again, I'm paraphrasing --

9 but, sorry, the laptop is gone, but it just had pictures and

10 some presentations that were on YouTube from the company

11 anyway.  Duncan Arthur looked at it, said it has voluminous

12 OneCoin files.  And it also is absurd, right, that if it just

13 has pictures, you don't need to worry about it being

14 discovered.

15 　　　　He had a cell phone in the MCC, which was a breach of

16 his cooperation agreement.  Through his attorney, he lied to

17 the government and said, oh, the cell phone was just for

18 complaining about the MCC, didn't talk about the case at all.

19 When the government finally got the password from Mr. Ignatova

20 and reviewed the cell phone, he talks about the case a lot.

21 　　　　We cite a couple exam peoples in our papers.  There's

22 a pretty disturbing conversation between him and a source what

23 he leaves in the voicemail about whether certain papers that

24 Ruja Ignatov wanted to be destroyed were, in fact, thrown away.

25 So he has a track record of continuing to lie, and that has to

1   be taken into account by the Court as well.

2            But here's the other point, your Honor.  So I think,

3   certainly, that if you were considering by a preponderance of

4   the evidence against what we've said, purposeful lie to

5   embellish the sole meeting, that makes much more sense than

6   mistake.  But if the Court disagrees and takes the government's

7   position, it can't do that without offering us a hearing

8   because -- so essentially, the choices are, the Court should

9   accept that he perjured himself, at least for purposes of this

10  motion, or it needs to give us a hearing because it's a

11  disputed factual issue, and it's hugely material.

12           Whether it was perjury or an accident means *the*

13  *Wallach* standard applies, with that standard that I discussed

14  before of a virtually automatic reversal, or it doesn't apply.

15  So that's -- your Honor, of course, is familiar with hearing is

16  required when there's material disputed factual issues, but the

17  Second Circuit has actually addressed it exactly in this

18  context.

19           There is U.S. v. Spinelli, S-p-i-n-e-l-l-i.  These

20  cases are cited at the end of our final brief in the discussion

21  about a hearing.  So that was a case where in the District

22  Court there was a question about whether this virtually

23  automatic reversal *Wallach* standard applied.  There was a

24  disputed factual issue.

25           The prosecutors in that case put in affidavits, and

1     the District Court said, no, the virtually automatic standard

2     doesn't reply.  I'm going to rely on the prosecutor's

3     affidavits, and the Second Circuit said, no.  They said

4     "because the defense had no opportunity to challenge the

5     prosecutor's statements, we cannot affirm on the basis of that

6     finding."

7                 So that's the bottom line on this issue, your Honor.

8     I think the record is sufficient that he perjured himself, but

9     if not, we do want a hearing with Mr. Konstantin being present

10    and being called to address these issues.

11                THE COURT:    What about if I were to determine -- let's

12    see what the government has to say, but if I were to determine,

13    well, I'll grant you that Mr. Ignatov lied about the laptop,

14    and I find by a preponderance that he lied about the meeting in

15    July 2016, but given the rest of the evidence at trial, so

16    what?

17                I can rule in your favor on that issue and still find

18    that a new trial, or even a hearing, is not required because

19    the strength of the evidence is sufficient for me to have a

20    great level of confidence that an innocent man was not

21    convicted.

22                MR. DEVLIN-BROWN:    So I'm going to get into the

23    details of the strength of the evidence in a bit, but the short

24    answer to your Honor right there is, you wouldn't be applying

25    the standard of, am I convinced an innocent man has not been

1    convicted?  That's a general standard for rule 33.

2                That might be the standard under *Wallach* if you find

3    that the virtually automatic reversal standard doesn't apply.

4    But if the virtually automatic reversal standard applies, which

5    it's meant -- and I'll get into it -- it's meant to penalize

6    the prosecutors.  Right?  It's meant to give an added incentive

7    for prosecutors not to permit testimony that they know at the

8    time of trial is false to go uncorrected.  So --

9                THE COURT:    So do I have to find by a preponderance

10   that Mr. Ignatov lied and, further, find by a preponderance

11   that the government knew?

12               MR. DEVLIN-BROWN:    Right.  So that's the second

13   disputed factual issue, not that the government knew.  I don't

14   think there really -- the government concedes in its papers

15   that they should have known.  They point to stuff on these

16   Greenwood electronic devices that they never looked at, but if

17   they had, they should have known.

18               THE COURT:    Okay.

19               MR. DEVLIN-BROWN:    And I can get to this, too.  They

20   knew.  Defense Exhibit 550 and 552 provides very clear evidence

21   that Irina Dilkinska was almost certainly not at that meeting.

22   550 was -- the meeting is on a Wednesday.  550, Defense

23   Exhibit, is where Dilkinska's e-mailing Scott saying, I'll be

24   traveling the entire week.  So you would think that that means

25   through the following Wednesday.

1                    And then the second e-mail, 552, is as Mr. Scott

2        saying, hey, I'm on the airplane.  I'm coming down and landing,

3        and she's saying:  I'm traveling too.

4                    So those two things strongly suggest that she -- I

5        mean, more than strongly suggest.  I think almost prove, there

6        could be some tiny doubt, but they very strongly lead to the

7        conclusion that she was not at that meeting.

8                    And the government, they don't like to talk about the

9        significance of those e-mails, but they say, hey, we should

10       have known.  They have conceded in their brief, we should have

11       known based on the Greenwood devices.  And "should have known"

12       is just as good, your Honor.

13                   I mean *Wallach* essentially applies a conscious

14       avoidance standard to the government here.  It talks about

15       "knowing" or "should have known" and says that the government

16       can't "consciously avoid recognizing the obvious" in that case

17       that its witness was not telling the truth.

18                   So where does the government really quibble here?

19       This is, I think, probably the most significant legal issue for

20       your Honor to consider in evaluating this because the

21       government says -- they don't provide any cases, they don't

22       analyze it.  But they say in their papers that *Wallach* doesn't

23       apply because the government, according to them, has to know,

24       not at the time of trial, not just that the testimony was false

25       but that it was intentionally false.

1          So in other words, the government's position is

2    *Wallach* says this rigorous standard applies only when the

3    government knows its witness is actually, intentionally

4    perjuring himself, as opposed to being mistaken.  And that's

5    just wrong.

6          Now, I will concede that if you read all of the Second

7    Circuit case law that talks about *Wallach* -- there's Wallach,

8    there's *Stewart*, there's some others noted in our brief --

9    there's not always a lot of rigor when it's not the central

10   issue in the language used by the Second Circuit.  Sometimes

11   they say the government's awareness of perjurious testimony.

12   Sometimes they say the government's awareness of false

13   testimony.

14         For example, *Stewart* describes the standard as being

15   "based on the government's awareness of false testimony prior

16   to the conclusion of trial."

17         *Wallach* says both things.  It says the virtually

18   automatic reversal standard applies when the government is

19   aware that the testimony at trial was false.  In another place

20   it refers to the government's awareness that the testimony was

21   perjurious; so I think the government is hanging its hat on

22   that.

23         Look, in one place *Wallach* says the government's

24   awareness at the time of the trial that the testimony was

25   perjurious, they have to know it was perjurious.  But look at

1    the cases cited in *Wallach*, your Honor.  Why does *Wallach* adopt

2    this more rigorous standard?

3            It starts citing back to the Supreme Court's cases --

4    these are all in our brief -- like *Napue v. Illinois*, *Mooney v.*

5    *Holohan*.  These are cases that establish the proposition of

6    constitutional law, which I should add is also an ethics

7    standard, that the prosecution is not permitted to proceed to a

8    verdict on a case based on false testimony.  It can't call a

9    witness who is testifying falsely, and these cases say if it's

10   aware of false testimony, it has to correct it.  It has an

11   obligation to correct it.

12           That's what that line of cases say.  And you know

13   what, your Honor, nowhere in that line of cases, nowhere in

14   that line of cases do courts draw a distinction between the

15   prosecutor's obligations when it knows false evidence is going

16   to the jury but could plausibly say, I think the witness is

17   making a mistake, versus cases where the prosecutor says, I

18   know false evidence is going to the jury and I think the

19   witness is saying it on purpose.

20           Because, you know what?  It doesn't matter.  A jury is

21   supposed to decide based on testimony that is truthful.  And

22   when prosecutors know testimony is not truthful, even if they

23   think it's mistaken, that's their duty to correct it.  So I

24   think if you look at those cases, it's clear that *Wallach* is

25   saying if there's witness perjury, and if that falsity of the

1      witness' testimony is known by the government at the time of

2      trial, this rigorous standard applies, and there should be

3      virtually automatic reversal if there's any reasonable

4      likelihood the false testimony could influence the jury.

5              So that's essentially it, your Honor.  I'll move to

6      just one or two other arguments before I leave, but just if

7      you're evaluating under that standard, as I think you should,

8      as I think the Second Circuit requires, I don't think it's a

9      close call.  Look at the facts of *Wallach* again, right?

10             *Wallach* reversed when the cooperator lied about how

11     long he kept gambling.  It's not even an illegal activity.  He

12     just wasn't telling the truth about how long he gambled, and

13     *Wallach* says that's a big deal because he said he had turned

14     over a new leaf.  This is a case where the sole cooperating

15     witness perjured himself about the -- indisputably about the

16     laptop, and also lied to the jury about the only meeting he

17     ever had with Mark Scott.

18             And I don't think you could possibly exclude the

19     possibility that the jury relied on that, and if the jury had

20     known he perjured himself in a way where he's inventing details

21     about a meeting to make Mr. Scott look worse, that would call

22     into question a huge amount of his testimony because, as your

23     Honor recalls -- and I can get more into the evidence points

24     later.

25             But as your Honor recalls, he said Mr. Scott, he's one

1     of the money launderers for OneCoin.  He related all of these

2     terrible things that people supposedly told him about Mark

3     Scott.  And the jury might start to wonder, if he's proven to

4     have lied about the one meeting he knew, you know what, I

5     wonder if this guy is embellishing?  I wonder if this guy is

6     shading things?  And if you're thinking about it that way, I

7     don't think there's any chance that there's a fair trial.

8              Now, I'm proposing, if it's all right with your Honor,

9     to -- the government, in both of their briefs, talks about all

10    of the overwhelming evidence.  If *Wallach* applies, I don't

11    think we really need to get into each piece.  I do have some

12    responses to all of their evidence.  It's up to your Honor.

13             THE COURT:    No.  I'd rather just deal with the

14    discrete issues.

15             MR. DEVLIN-BROWN:    Okay.

16             THE COURT:    So let me turn to --

17             MR. DEVLIN-BROWN:    Just one more minute before --

18             THE COURT:    Okay.

19             MR. DEVLIN-BROWN:     -- I sit down, and I can come back

20    to the evidence later.

21             So *Wallach* is our principal argument, but I don't want

22    to forget the error in excluding 550 and 552, which I think

23    today I feel it's even more significant than when briefing the

24    matter because looking through all of these testimonies, all of

25    these cases about perjurious testimony at trial, where the

 1   government has some awareness of its falsity, all of these

 2   *Wallach* cases, I've never seen one like this, which is where

 3   not only is that the case, but there's actually evidence,

 4   there's exhibits, the government's own reliable exhibits, that

 5   tend to show -- that would correct the issue, that would go a

 6   long way to correcting the falsity that the government is aware

 7   is being shared with the jury.

 8               And I've never seen a case where the government

 9   opposes that.  This cites Second Circuit law, and that

10   exculpatory evidence on that point is kept out wrongly, and

11   that -- again, that's why these other issues matter because --

12   and that is, I think, one of the more problematic things here.

13   The government knew -- I'm not going to say they knew he

14   perjured himself, that his intent was there, but they knew that

15   testimony was almost certainly false.

16               They knew there were these reliable e-mails that would

17   have let Mr. Scott argue to the jury that Konstantin Ignatov is

18   telling you the false things about Irina Dilkinska being at

19   that meeting.  She almost certainly wasn't there.  They have an

20   obligation, under the Constitution, to find a way to correct

21   that false testimony.  The defense gave them.  Right?  Let's

22   put those in.

23               They opposed that, and I think the teaching point from

24   that, the principle from that, is that if the government, when

25   it has a duty to correct false testimony is going to oppose

1    reliable e-mails that would correct it and say that they're

2    hearsay, it better be certain beyond a reasonable doubt because

3    it has an obligation to correct that false testimony, and the

4    government didn't live up to it here.  Instead, they miscited

5    Second Circuit law, and it was kept out.

6              THE COURT:    But I mean, putting aside for a minute the

7    law -- if I can do that from where I'm sitting -- we all were

8    aware of those e-mails.  And the government, obviously, made a

9    determination that those e-mails did not definitively disprove

10   Mr. Ignatov's testimony or anticipated testimony.  And I

11   agreed, in the moment, that those e-mails did not definitively

12   disprove the testimony.

13             So why isn't that enough for me to determine, at this

14   point, that the government did not knowingly allow perjured

15   testimony to go to the jury?

16             MR. DEVLIN-BROWN:    With respect, your Honor, that was

17   not the Court's reasoning.  The Court's reasoning, right -- we

18   had offered the e-mails.  We thought we had an agreement from

19   the government to admit 550.  They said they would, and then

20   they reversed course on the same day.  There's e-mail traffic

21   where, without explanation, they reversed course.

22             So we briefed the issue.  They come into court.  Your

23   Honor says, are you prepared to discuss it?  They say, yes, and

24   they argued that a portion of a case, which we didn't discuss,

25   imposed a requirement under Second Circuit law that, even

1   though typically statement of a plan, a future plan is

2   admissible as a hearsay exception, it requires some sort of

3   independent corroboration before it can be admitted.

4           And your Honor said something to the effect, and I

5   don't want to quote you, but something to the effect of, you

6   know, I guess that that's somewhat strength.  That's not what

7   you said, but it's certainly was not on the merit of I don't

8   think these e-mails are significant.  It was, I guess that's

9   Second Circuit law.  If you don't have this independent

10  corroborative evidence, you can't put them in.

11          And then as to what the government's determination

12  about those e-mails was, I don't know.  I don't know why they

13  reversed course on allowing one of them to come in, but I think

14  if you read those e-mails, there's no conclusion you can have

15  other than that they cast very, very substantial doubt on the

16  accuracy of Konstantin's testimony that Irina Dilkinska was at

17  a meeting on a week where she had e-mailed Mark Scott saying

18  that I'll be traveling all week.

19          THE COURT:    Okay.

20          MR. DEVLIN-BROWN:    And I suggest -- I want to be

21  clear.  I don't think the government purposely misstated Second

22  Circuit law.  Not saying that at all, but I think the

23  government here did not want their witness' credibility to be

24  called into question.  Maybe they thought it was a collateral

25  issue.  I don't know.

1                    I don't know why they opposed those e-mails and didn't

2      let the defense just argue that the guy wasn't telling the

3      truth.  But that's why, and I'll sit down, more down after

4      this.  But this is just the final piece why some of these other

5      points we make about the phone at the MCC and all those things

6      add up.

7                    Because I think what you have here, your Honor, is a

8      pattern where the government prioritized protecting its

9      cooperating witness, which is a fine thing to do, to a degree,

10     but they prioritized it over their obligation to only allow

11     truthful testimony to go to the jury and to allow the defense

12     every opportunity to make sure it does.

13                    So when they dumped -- and I don't want to get bogged

14     down in details, unless someone wants me to later -- but when

15     they dumped ten devices from Greenwood on the defense a month

16     before trial, that had almost a million pages and maybe had

17     some evidence that could have helped us disprove it, that was a

18     problem.  The conduct that they undertook at trial that was

19     already described, that was a problem.

20                    When, after trial, Konstantin breaches his cooperation

21     agreement and has a phone in the MCC, and that wasn't disclosed

22     to the defense, and there's case law saying a breach after

23     trial should be disclosed, that would have at least let us

24     start to pull strings.  Right, your Honor?  It's not a hugely

25     material point, but it would have allowed us to do that.

1              They didn't disclose that.  They didn't look at the

2    contents of it, and then most egregiously, right, there is an

3    investigator, who is part of the Manhattan DA's office detailed

4    to the City of London Police, who gets a credible report from a

5    guy who has provided reliable information to law enforcement

6    saying, hey, this witness lied, the government witness lied at

7    Mark Scott's trial, and doesn't disclose that to the defense?

8    That's part of a problematic pattern, and that, in addition to

9    really the core point in *Wallach* is why a new trial is in the

10   interest of justice.

11             THE COURT:    Thank you, Mr. Devlin-Brown.

12             Mr. Folly?

13             MR. FOLLY:    Yes, your Honor.  With the Court's

14   indulgence, can we request just a two-minute break so that I

15   can run up and use the facilities?

16             THE COURT:    Absolutely.

17             MR. FOLLY:    Thank you.

18             THE COURT:    Five minutes.

19             (Recess)

20             THE COURT:    Everyone, please be seated.

21             Mr. DiMase?

22             MR. DiMASE:    Thank you, your Honor.  Mr. Folly will be

23   arguing this next piece, but I just wanted to correct one very

24   minor error in my argument earlier.  I referred to page 37 of

25   our responsive brief in the first set of motions for the

1    elements of the two offenses the Court instructed the jury on,

2    bank fraud conspiracy and money laundering conspiracy.  It

3    should actually be pages 38 and 39, in case the Court is using

4    this transcript as a reference point later.

5                THE COURT:    Okay.  Mr. Folly?

6                MR. FOLLY:    Thank you, your Honor.

7                THE COURT:    Let me ask a quick question to see if we

8    can't just all go home now.  Does the government consent to

9    having a hearing on these issues?

10               MR. FOLLY:    Your Honor, we do not consent to having a

11   hearing on these issues, and we do not think that a hearing is

12   necessary to resolve the motion in front of the Court.  There's

13   two independent reasons for that, which I'll be happy to

14   address them, but I think it will be easier after I've done

15   sort of the core arguments on the merits.

16               THE COURT:    Very well.  Go ahead.

17               MR. FOLLY:    I'm primarily going to address Scott's

18   core arguments regarding perjury and the duty to correct.  As

19   the Court just heard, his primary basis at this stage for a new

20   trial rests on two pieces of testimony from the cooperating

21   witness, Konstantin Ignatov.

22               The first is testimony, as you know, about the manner

23   in which he got rid of a laptop, which was an incident that

24   took place after the conspiracy and was not connected to any of

25   the issues at trial.  And the second is testimony about a

1  meeting that Ignatov himself did not attend between Ruja

2  Ignatova and Mark Scott in July 2016.

3          Scott's motion fails on several threshold issues,

4  which I'm going to go through briefly in just a moment.  But to

5  be very clear at the outset, even if the Court were to find in

6  Scott's favor on all of these threshold issues, his claim fails

7  on the merits because the false testimony was not material to

8  the jury's verdict under governing law.

9          Independent evidence, evidence completely separate

10  from Ignatov's testimony, supports Scott's conviction.  Just to

11  put all of this in context, Ignatov offered limited testimony

12  at all against Scott that went to the core issue that was in

13  dispute at this trial, which was whether Scott knew that the

14  proceeds he was laundering came from unlawful activity.

15          For example, it was undisputed that Ignatov only met

16  Scott once, never spoke with him on the phone, never texted

17  with him, never attended any meetings with him, never e-mailed

18  with him about anything other than travel and logistics, and

19  had no knowledge, none, of what Ruja or Irina Dilkinska or

20  other co-conspirators had discussed with Scott about OneCoin

21  being a fraud scheme.

22          So Ignatov, at the trial, had essentially nothing to

23  say on the critical issue that was in dispute at trial, whether

24  Scott knew that the money that he was dealing with came from

25  unlawful activity.  Instead, at trial, the government proved

1    that, and proved all the elements against Scott, through the

2    use of independent evidence.

3              I also want to just put the false testimony into

4    context itself.  The laptop testimony clearly had nothing to do

5    with Mark Scott, and he does not claim otherwise.  He doesn't

6    claim that in his briefs, and he hardly mentioned it here

7    today.

8              The second piece of inaccurate testimony about the

9    July 2016 meeting was also immaterial to the jury's verdict

10   under governing law.  Again, it's undisputed that Scott met

11   with Ruja, the actual leader of the OneCoin fraud scheme, in

12   Sofia, Bulgaria, at the OneCoin office.

13             The only alleged inaccurate portion of his testimony

14   concerned the presence of Dilkinska at that meeting in

15   July 2016, and as we now know, she was in India at the time of

16   the meeting.  But it's essential to keep what he said about the

17   meeting in context.  He was not told what was said at the

18   meeting.  At any point in time, he did not testify to what was

19   said at the meeting.

20             So the question is simply whether his inaccurate

21   memory about Dilkinska being present at that meeting was

22   material to the jury's verdict.  As I'll explain later, it

23   clearly was not.  It had nothing to do whatsoever with Scott's

24   knowledge that OneCoin was a fraud scheme.

25             And there was a mountain of independent evidence at

1    trial, which was the evidence that the government relied on in

2    its summation arguments to the jury showing that Scott was

3    guilty, which supported, clearly supported Scott's conviction.

4              So just to speak briefly on those threshold issues we

5    discussed in our brief.  The first one is on this issue of

6    timeliness.  We just want to underscore, Scott knew, with the

7    exception of a laptop, Scott knew about the false testimony at

8    the time of the trial.  He attended the meeting in question; so

9    he knew the moment he received the 3500 material that Ignatov

10   was incorrect in his assertion that Dilkinska was present at

11   that meeting.

12             He also had a basis to file his motion regarding the

13   erroneous preclusion of the exhibit that he claims was

14   wrongfully excluded at the trial, the government exhibits, the

15   e-mails from Dilkinska.  And his delay in not filing those

16   motions and not including arguments in his underlying motion

17   originally, simply underscores the lack of merit and

18   materiality on both of those issues.

19             The second threshold issue is regarding whether this

20   evidence is newly discovered and whether Scott satisfies the

21   first element of this test, which is the due diligence

22   requirement.  He's utterly failed to show, as required by that

23   first element, that he exercised any diligence, yet alone due

24   diligence, to find the evidence he now claims is newly

25   discovered.  That failure is fatal to his claim because it's

1    required under the case law.

2            Scott participated in the July 2016 meeting and he,

3    therefore, had actual knowledge about the discrepancy between

4    Ignatov's recollection of the meeting and the actual facts of

5    the meeting, including the fact that Dilkinska was not there, a

6    full month before trial.  That was when the government turned

7    over Ignatov's 3500 material that stated that Dilkinska was at

8    that meeting with Ruja and Scott.

9            And to just underscore the deficiency in his claim

10   that this was all newly discovered years after the trial, Scott

11   actually cross-examined Ignatov on this very point at the

12   trial, suggesting to the jury and Ignatov that Dilkinska was

13   not even in Sofia, Bulgaria, at the time of the meeting.  So

14   that evidence is clearly not newly discovered evidence.

15           But even if we assume the evidence regarding the

16   passport and the India travel records is newly discovered, it

17   still completely fails on that threshold's first element

18   regarding due diligence.  As I mentioned, he was put on notice

19   a full month before the trial about the statements about the

20   July 2016 meeting.  The notes clearly reflected that Ignatov

21   had told the government that Dilkinska and Ruja were both

22   present at that meeting with Scott, and because Scott attended

23   the meeting, he knew immediately that that was inaccurate.

24   That's the very same topic he now brings his perjury claim on.

25           Yet, he's offered no evidence in any of his

1    submissions, or here today, that he took any steps, after

2    receiving the 3500 material a month before trial or during the

3    trial, to identify the evidence he now claims is newly

4    discovered.

5            He's also offered no evidence that he reviewed

6    materials that he had in his possession a month before the

7    trial, which would have contained evidence showing that

8    Dilkinska was in India at the time of the meeting.  Again,

9    that's precisely the type of evidence he's now claiming was

10   newly discovered.

11           And just to put aside the concept of due diligence,

12   which is the legal requirement here, he's failed to show he

13   exercised any diligence in attempting to locate this evidence.

14   The burden in this motion is on Scott.  It's his motion, and

15   he's failed to show he took any steps in the whole month before

16   the trial, or during the three-week trial, to locate any of

17   this evidence.

18           He also has misstated the factual record on this

19   issue.  He says in his brief that it was the government that

20   originally found Dilkinska's passport records, and he uses that

21   as an argument to demonstrate that it was impossible for him,

22   the defendant, not the government, to identify records of this

23   type at any point in time.

24           It was actually Scott that found the passport records

25   originally and shared them with the government.  This

1   completely undercuts this unsubstantiated claim that the type

2   of evidence that's in dispute here was categorically

3   unattainable by him before or during the trial.

4          At bottom, he knew about the inaccurate testimony

5   before the trial.  He knew about the inaccurate statements to

6   the government that were contained in the 3500 material.  He

7   took no steps to find the very evidence that he now claims was

8   newly discovered, and that is inconsistent with what's required

9   under the law.

10         If a defendant, like Scott, knows about inaccurate

11  statements by a witness, the law requires that he take due

12  diligence, he take reasonable steps to find evidence disproving

13  those statements if he wants to later make a claim that the

14  evidence is newly discovered.  And that ensures both that the

15  interests of justice are protected but also that the finality

16  of judgments are protected, which are both inherent in the rule

17  33 analysis.  To conclude that Scott here somehow satisfied the

18  due diligence standard by doing absolutely nothing, would turn

19  the law on its head.

20         Your Honor, the third issue is with respect to Scott's

21  failure to show that Ignatov committed perjury.  The law is

22  clear.  Testimony that results from confusion, mistake or

23  faulty memory is not perjury.  And as Scott conceded during his

24  argument, the whole body of law that he is relying on is

25  perjury law.  It concerns situations where there is

1    intentional, false testimony, and the record does not support

2    that conclusion here.

3              First, just to put Ignatov's testimony in context,

4    it's important to look at what he actually testified to at the

5    trial.  We tried to quote the full transcript portions in our

6    brief so that it was clear, and when you look at it, it's clear

7    he was relying on a memory to which he was less than certain of

8    at the time of his testimony.

9              Scott pressed him again and again and again:  Are you

10   a hundred percent certain?  He was trying to catch him in a

11   lie; so he asked that question:  Are you a hundred percent

12   certain?  He repeatedly couched his answers saying he was

13   pretty sure.  He said he was almost sure.  He said he thought

14   he was pretty sure.

15             It was clear he was confident, but it was also clear

16   that he was not unequivocal, the way Scott describes his

17   testimony here today.  This undercuts his claim of perjury.  It

18   shows that his testimony wasn't absolute but, rather, he was

19   relying on a memory that he was less than certain of.

20             It also simply doesn't make sense that he would

21   intentionally lie about something and say anything other than

22   he was certain that that thing he was lying about had happened.

23   I'd also just note that he was testifying about an event that

24   had taken place several years before; so it would make sense

25   that his memory would not have been perfect on that issue.

1          Secondly, Scott ignores completely the broader context

2   of Ignatov's testimony, the unchallenged truthful version of

3   his testimony, which shows again that he was not intentionally

4   testifying falsely.

5          The undisputed accurate portion of Ignatov's testimony

6   was just as damning for Mark Scott as the disputed inaccurate

7   version.  This isn't a situation where Ignatov testified about

8   something that made Mark Scott so much more guilty than the

9   truthful version of his testimony.

10          It's undisputed that Scott attended the meeting --

11   that's not disputed -- at the OneCoin office -- that's not in

12   dispute -- with Ruja Ignatova, the leader of the OneCoin fraud

13   scheme -- that is also not in dispute.  The only portion of

14   testimony in dispute is whether Dilkinska, who was not the

15   leader of the fraud scheme, was present at that meeting.

16          Given that the truthful version of the story was that

17   Scott met with the boss of the whole criminal operation,

18   Ignatov had nothing to gain by falsely testifying and

19   intentionally testifying that Dilkinska was also there.

20          That's all the more true given that no one told

21   Ignatov what was discussed at the meeting.  No one told him

22   whether, at the meeting, someone said to Scott:  OneCoin is a

23   big fraud scheme.  Nothing like that came out at the trial.  He

24   did not know what was discussed at the meeting and, therefore,

25   his incentive to say Dilkinska was at the meeting was zero.

1    These are all threshold requirements that Scott has to

2    overcome in order to prevail on this motion.  He can't overcome

3    any of them, but even if he could, his claim still fails on the

4    merits.  And there's been considerable discussion here today of

5    which test the Court should apply and whether this is a

6    situation where the government knew or should have known or did

7    not know, and I'm going to go through that in some detail

8    because I think it's particularly important to put it into the

9    correct legal framework.

10    There's two potential materiality tests that can apply

11    here.  One is the situation where the government did not know

12    about the perjury during the trial, and the second is the

13    situation where the government knew or should have known.

14    The first test is the test that applies here because

15    the government did not know, nor should it have known, that

16    Ignatov perjured himself at this trial.  And under that test, a

17    new trial is only warranted if the testimony, the disputed

18    testimony, was material and the Court is left with a firm

19    belief that, but for the perjured testimony, the defendant

20    would most likely not have been convicted.

21    So on the issue of whether the government knew or

22    should have known, I'm going to walk through that part in some

23    detail.  First, as I just explained, there is no evidence that

24    Ignatov intentionally testified falsely at the trial about this

25    meeting with Dilkinska, and because of that, there's no reason

1      the government should have known that he was committing

2      perjury.

3              The second, and most basic, reason is that at the time

4      of the trial, the government did not know, nor should it have

5      known, that Ignatov intentionally testified falsely.  The only

6      evidence -- and this is what Scott is relying on in full.  You

7      heard it here today.  The only evidence the government was

8      aware of, that even suggested Ignatov's testimony might not be

9      accurate -- not that it was intentional false testimony, but

10     that it might not be accurate -- were those two e-mails that he

11     referenced here in argument today.

12             The e-mails did not, as he represented to the Court

13     during argument, indicate that Dilkinska was, quote, traveling

14     all week.  They indicated that she was traveling.  The first

15     e-mail was sent on a Sunday, which preceded the meeting that

16     took place later that week, on a Wednesday, and it indicated

17     that she was going to be traveling that week.  That's what the

18     e-mail said.

19             The second e-mail, sent at 5:18 the day of the

20     meeting, she wrote "I am traveling too."  That was it.  The

21     e-mails gave no indication of where Dilkinska was traveling,

22     whether it was to a neighboring city, whether it's to another

23     country, for how long she was going to be gone, when she would

24     return, or whether she intended to miss the meeting that she

25     was scheduled to attend with Mark Scott.  That is the extent of

1  what the government knew about during the trial.

2         And just to read the language that's in the e-mails,

3  in one government exhibit -- defense exhibit, I apologize,

4  Dilkinska wrote to Mark Scott:  "Will ask my colleagues to send

5  the original to you this week as I am traveling the whole

6  week."  And that was written on a -- that was on a Sunday.  The

7  meeting took place, again, on that Wednesday.

8         And in the second e-mail, she indicated that she

9  was -- she said:  "But I am traveling, too, and because of this

10  there is the present delay of my request to you."

11         The entire argument advanced by Mark Scott is based on

12  the *Wallach* case.  That's the primary case.  You heard it from

13  Mr. Devlin-Brown, that's the primary case that they are relying

14  on for the proposition that here, on these facts, on these

15  limited e-mails that simply said that Dilkinska was traveling

16  for the whole week, that the government should have known about

17  the false testimony, based on *Wallach*.

18         This case is nothing like *Wallach*, nothing.  The facts

19  in *Wallach* were clear, unambiguous evidence that the government

20  was aware of, at the time of the trial, showing that the

21  government's cooperator's testimony was false, and also, that

22  the cooperator had a clear motive to falsify that testimony.

23         The evidence available to the government during the

24  trial in *Wallach* showed that the cooperator had lied when he

25  said he had stopped gambling and that he had continued gambling

1    while cooperating with the government.

2                For example, the cooperator admitted that he had

3    signed $65,000 in gambling credit lines.  There were casino

4    records showing that the cooperator had gambled.  He had a

5    known history of compulsive gambling.  He had been inconsistent

6    in his explanation of why he had gambling credit lines, and

7    there were proffered statements from the casino manager

8    indicating that he had gambled, all while he had been

9    cooperating.

10                The witness also had a clear motive to lie.  He was

11   covering up additional bad conduct that he had engaged in and

12   not disclosed while he was cooperating with the government.  So

13   there, yes, the court concluded that, on those facts, the

14   government should have known about his false testimony saying

15   that he had stopped gambling.

16                Here, at most, there were ambiguous e-mails from a

17   third party that indicated that Dilkinska planned to travel or

18   was traveling the week of the meeting for an unspecified period

19   of time to an unspecified location.

20                Scott paints those e-mails as being black-and-white

21   notice to the government that Ignatov's testimony was

22   intentionally false testimony, but it's equally plausible,

23   looking at those e-mails and looking at them with what was

24   known at the time of the trial, which is very different than

25   what's known now, that Irina Dilkinska traveled back to Sofia,

1    Bulgaria, and attended the meeting.

2              Furthermore, there was also the absence of a motive to

3    lie, which existed in *Wallach*, where the cooperator was

4    motivated to cover up the fact that he had been engaging in

5    additional bad conduct while cooperating with the government

6    that he had failed to disclose.

7              Simply put, this evidence, this record does not

8    support the standard established in *Wallach* for when the

9    government should have known about perjury, and that's exactly

10   what that standard in *Wallach* represents.

11             There's an important additional point to clarify on

12   the law here.  We heard a lot today about this "virtually

13   automatic" language that's contained in *Wallach*.  The only

14   situation where reversal of a trial is virtually automatic is

15   where the government had actual knowledge, actual knowledge of

16   a witness' false statement at the time of the trial and relied

17   on it, nonetheless.

18             There's no facts in this record to indicate that the

19   government had actual knowledge at the time of the trial that

20   Ignatov had perjured himself about either of the claims that

21   are now being advanced as perjury.  Even in *Wallach*, on those

22   very clear facts that I recited to the Court a moment ago, the

23   Court's conclusion there is not that the government actually

24   knew, it's that the government should have known about the

25   perjury.  Even in *Wallach*, where those facts clearly showed, in

1    a way that the facts here did not, that the testimony was

2    false.

3              The bottom line here is because the government did not

4    know, and should not have known, about any of the alleged

5    perjury by Ignatov, the verdict can only be set aside if the

6    Court is left with a firm belief that, but for the perjured

7    testimony, the defendant most likely would not have been

8    convicted.  Scott comes nowhere near meeting that test here.

9              There's also a second test that applies if the

10   government knew or should have known about the perjury, and

11   even under that standard, Scott still cannot prevail, and he

12   still cannot make a showing that the perjured testimony was

13   material under that test.

14             Under that test, he'd have to show a reasonable

15   likelihood -- and that's what's required, a reasonable

16   likelihood -- that the false testimony -- and here, that's the

17   testimony about the laptop and Dilkinska's presence at that

18   July 2016 meeting -- could have affected the judgment of the

19   jury.

20             The limited testimony that's in dispute here had

21   nothing to do with what was at issue at the trial, Scott's

22   knowledge of whether the money he was laundering was from

23   unlawful activity.  And to put it a different way, Ignatov's

24   testimony about the laptop and about Dilkinska's presence at

25   that meeting was not probative in any way on the key issue in

1    dispute at trial.

2             Your Honor, the key point here, and it's one that is

3    fundamentally glossed over in all of the briefing from Scott,

4    is that all of the independent evidence at this trial --

5    evidence that had nothing to do with Ignatov's testimony about

6    the meeting or the laptop and had nothing to do actually with

7    Ignatov's testimony at all during the trial -- proved that

8    Scott knew that this money was from unlawful activity beyond a

9    reasonable doubt.

10           And the Second Circuit has been very clear on this

11   point, where, as here, there is independent support of the

12   defendant's conviction, the subsequent discovery of perjury

13   does not warrant a new trial.

14           I want to highlight some of that independent evidence

15   here because it's so important in resolving this motion.

16   Again, this is evidence that had nothing to do with Ignatov's

17   testimony at the trial.

18           Just to look at the big picture, what we established

19   at trial is that Scott, who had zero investment managing

20   experience whatsoever -- he was a lawyer at the time -- took in

21   nearly $400 million of Ruja's money, which he knew all came

22   from OneCoin, and he sent it wherever she directed him to.  And

23   the evidence showed that the elaborate investment structure

24   that Scott painstakingly set up, was a facade.  He even

25   admitted in one of the e-mails that it was all smoke and

1    mirrors for the setup.

2             The evidence showed, again, that Scott, who was a

3    trained lawyer, was told in explicit detail why OneCoin was a

4    fraud scheme, and then he proceeded to take in nearly $400

5    million of OneCoin funds, and along the way, lied to financial

6    institutions all over the world, forged documents, back-dated

7    paperwork, even lied to federal agents, all in an effort to

8    hide any connection between those funds and the true source of

9    the money, which was Ruja and OneCoin.

10            And all of that evidence pointed to one logical

11   conclusion, he knew he was engaged in criminal conduct.  He

12   knew that the money he was dealing with came from unlawful

13   activity.

14            Now, I just want to quickly go through some of the key

15   evidence, independent evidence that established these points.

16   The first is the most basic point, and this evidence has

17   nothing do with Ignatov's testimony.

18            The investment funds, at their core, were fake.  These

19   were fake investment funds that Scott went through an

20   excruciating level of time and resources to set up.  He had no

21   investment experience.  Again, on its face, it made no sense

22   that someone who had no track record for investing was able to

23   convince another person to give them $400 million of their

24   money.

25            The only explanation for someone being willing to hand

1  over 400 million -- nearly $400 million to someone with no

2  investment experience and no team of trained investment

3  advisers, who had a track record showing they could earn the

4  person money, is that that person got their money from unlawful

5  activity.  That was readily apparent to Scott.  He knew what

6  his experience was, and he knew how much money he was getting.

7  The other point on that is, Ruja and Scott basically

8  never discussed investments at all in their correspondence.

9  What they discussed was how they could successfully transfer

10  money from one place to the next, at Ruja's direction.  And

11  Scott summarized this in an e-mail.  He said:  I'm setting up

12  the transfers as investments.  That's what he said.

13  This had nothing to do with investing.  It was a

14  sophisticated vehicle to hide and disguise the true ownership

15  and control of this money, and successfully transfer it

16  wherever Ruja directed him.

17  There's other smaller examples.  Scott makes it clear

18  that they cannot name the investment fund entities with

19  anything associated with OneCoin.  In a different e-mail, he

20  wrote that the possible link to OneCoin was going to kill that

21  particular transaction for them.  It's also notable that all of

22  the money that was Ruja's and came from OneCoin, always came to

23  Scott through intermediary shell companies that had nothing to

24  do with OneCoin and had nothing to do with Ruja on their face.

25  Another key area of evidence showing at the trial that

1    Scott knew -- key evidence that was totally independent of

2    Ignatov's testimony -- is the lengths to which Scott went to

3    cover up the link between the money in his funds and OneCoin

4    and Ruja.  Again, when you go through this cover up and you put

5    it in context of him being a trained lawyer, it's staggering.

6            He orchestrated fake letters of comfort on behalf of

7    two lawyers.  This was in a situation where Apex, the fund

8    administrator for the funds, had basically figured out that

9    there was some very suspicious activity going on with the

10   funds, and they started asking Scott questions, hard questions.

11           So Scott, again, he orchestrated fake letters of

12   comfort on behalf of two lawyers, drafted them for the lawyers,

13   and told the lawyers to put them on their letterhead.  And what

14   those letters of comfort contained was, again, outright lies

15   about the source of wealth for the money in the Fenero funds,

16   lies that were clearly designed to hide the fact that the money

17   was from OneCoin and that the money belonged to Ruja.  That was

18   the common theme among these lies.

19           He also orchestrated back-dated wire instructions.

20   Again, this was during the same time period.  He instructs

21   other co-conspirators to sign a set of fake wire authorization

22   letters to justify the transfer of tens of millions of Euros

23   after the fact.

24           And what's remarkable here is he was so concerned that

25   someone was going to discover that these were fake

1    authorization letters, he actually went through the trouble of

2    instructing the co-conspirators to sign the letters with

3    different pens, to print them out and scan them back one at a

4    time, to use an electronic signature in certain instances, all

5    so that the wire instruction letters looked real, so that they

6    looked like they were actual wire instruction letters and so

7    that nobody figured out that this was all just a big sham.  It

8    was a big charade to cover up where the money was coming from

9    and who it actually belonged to.

10            Scott even forged agreements.  He manually changed the

11   terms of contracts.  He went in and changed the amounts, for

12   example, of certain agreements and made the amount owed under

13   the agreements approximately 20 times higher.  And the forgery

14   was clearly designed, again, to provide some paper

15   justification for the large volume of payments he was receiving

16   because he had falsely represented that these were licensing

17   technology to OneCoin, that's what these fees represented.

18            None of this worked.  Apex saw straight through it and

19   concluded that Scott had given them fraudulent documents that

20   hid the relationship to OneCoin.  So Scott took it a step

21   further.  Got on the phone with Apex, on a recorded call that

22   came in at the trial, and he started making outlandish claims

23   to Apex about where the money came from.  He said things like,

24   Dilkinska was inventing ways to materially access to potential

25   buyers for direct sales companies.  Total nonsense, made no

1   sense, was a clear outright lie, and it was actually, again,

2   just another instance where he was trying to cover up the true

3   source of wealth and the fact that the money came from OneCoin

4   and was Ruja's money.

5   Most tellingly, at the end of all of this, when the

6   gig was up and he got arrested, he still lied.  He lied

7   straight to the face of federal agents and said, unequivocally,

8   that OneCoin and Ruja didn't have anything to do with Fenero or

9   any other investment fund that he was involved with.

10   Again, this is all independent evidence that has

11   nothing to do with Ignatov's testimony at the trial.  I

12   mentioned earlier Scott was -- this is another category of

13   evidence that showed he knew.  He was explicitly told this was

14   a fraud scheme.  He was sent an article that contained a link

15   to an article by a CPA in the U.S. that explained, in a great

16   level of detail actually, why OneCoin appeared to be a fraud

17   scheme.  It appeared to be a pyramid or a Ponzi scheme, and it

18   listed a number of reasons that supported that conclusion, and

19   one of them was totally obvious, the OneCoins were entirely

20   unusable.

21   He was also told that OneCoin was under investigation

22   by the City of London Police.  Again, these are obvious

23   indicators that Scott knew and understood that the money he was

24   getting from OneCoin was from a fraud scheme.

25   His compensation also made that clear.  Again, he was

1    paid more than $50 million.  He had no investment track record.

2    He had no investment experience, and someone paid him $50

3    million in a situation where he essentially earned them no

4    money.  Top portfolio managers and legitimate asset managers in

5    the United States don't make that kind of money, but the idea

6    that someone would give a rookie, who had no track record,

7    nearly $400 million for them to invest, and then pay them

8    $50 million when they didn't earn them any profit, made no

9    sense on its face and was incredible evidence showing to the

10   jury that the only explanation for this investment structure

11   was that Scott was intentionally using it to move money from an

12   unlawful scheme.

13            It also gave the jury powerful evidence of Scott's

14   motive.  He used that money that he got to buy multi-million

15   dollar homes.  He bought expensive Porsche cars.  He bought a

16   yacht.  He bought other luxury items.  Again, all of that

17   evidence has nothing to do with Ignatov's testimony.

18            Your Honor referenced earlier in the argument one of

19   the documentary pieces of evidence that came in at the trial,

20   where Frank Schneider, in writing, in a very explicit message

21   that required no interpretation from Ignatov on the stand, he

22   warned Ignatov that Mark Scott was a potential confidential

23   informant.  And this message, it spoke for itself.  It referred

24   to Mark Scott by the name "Mark," by the initials MS.  There

25   was no ambiguity there, and again, it indicated he might be a

1    highly placed confidential informant.

2              Why did that matter?  It mattered because if Scott had

3    actually been on the outside of this conspiracy and didn't know

4    what was going on, Frank Schneider would not have said there

5    might be a problem with Mark Scott.  It only made sense that

6    there might be a problem with Mark Scott if he was privy to

7    incriminating information.  That's the only way that it makes

8    sense that there might be a problem if it turns out he's a

9    highly placed confidential informant.

10             And Dilkinska's response to that, which again was in

11    writing that came in at the trial, was:  Actually, that doesn't

12    make sense because if Scott was an informant, I would already

13    be in trouble.  Again, that response only makes sense if Mark

14    Scott knows about the incriminating information that would have

15    eventually gotten Dilkinska into trouble.

16             Your Honor, the last point, just very, very quickly on

17    this independent evidence that came in at the trial.  Scott

18    took considerable steps throughout the conspiracy to hide his

19    criminal communications.  He said he was unwilling to

20    communicate through certain types of communication channels,

21    referring to them as "unsafe."

22             And it's notable he was communicating with Ruja, the

23    undisputed leader of the fraud scheme, through a special

24    crypto -- so-called crypto cell phone from Dubai.  Again, that

25    evidence came in.  It was in e-mails.  It did not rely on

1    Ignatov in order for the jury to learn and understand about his

2    use of these secret modes of communication.

3            Your Honor, all of this independent evidence, evidence

4    that had nothing to do with Ignatov's testimony about the

5    meeting or about the laptop, or really about any of his

6    testimony, shows that Scott's claim fails on the merits.  It

7    fails because he cannot show that the false testimony affected

8    the outcome of the trial under the governing case law.

9            Put simply, if the jury had learned about the truth

10   about the laptop, if it had learned about the truth about the

11   meeting, it would not have created a reasonable doubt that did

12   not otherwise exist, in light of this mountain of independent

13   evidence that we just went through.

14           And, your Honor, just to go back to the main case that

15   Scott relies on, which is this *Wallach* case, the case there is

16   completely incomparable to the case here, and the central

17   difference is that in that case, the cooperator's testimony was

18   critical to the government.  He was the centerpiece of the

19   government's case.  He provided the direct link between the

20   defendants and the illegal conduct, and that is not the case

21   here.

22           Scott's testimony, as I just mentioned, was limited --

23   I apologize.  Ignatov's testimony as to Scott was limited.  He

24   met him once, never even spoke to him on the phone, didn't know

25   what other co-conspirators had discussed with him about the

1    criminal nature of OneCoin.  On this single issue that was in

2    dispute at this trial, Ignatov offered essentially nothing.

3              Your Honor, it's notable -- so that we're not saying

4    this from a position of looking back in hindsight and trying to

5    frame it differently now that we're looking backwards.  It's

6    notable that when you read the government's closing arguments

7    in this case, the evidence that's relied on is the independent

8    evidence, not testimony that was coming from Ignatov, and

9    certainly not testimony that had anything to do with these

10   issues that now are in dispute.  The core of the government's

11   case was the independent evidence.

12             That's completely fatal to his claim and it's,

13   unfortunately, your Honor, it's really, it's glossed over in

14   the papers.  It's the core issue, but it's completely fatal to

15   his claim.

16             Your Honor, the final argument concerns the 14th

17   Amendment claim, which it's a separate claim Scott raises

18   concerning alleged -- essentially alleged prosecutorial

19   misconduct.  His claim rests on a faulty premise, which we've

20   discussed at length, which is that the government actually knew

21   during the trial of Ignatov's false testimony and chose to not

22   correct the record on that point.

23             There's two obvious reasons that this separate 14th

24   Amendment claim fails here.  The first, which we've discussed,

25   your Honor, is that the government did not actually know of

1    Ignatov's false testimony at the time of the trial, which is

2    what is required under the case law he cites in his brief.

3            He relies on the *Drake* case, which lists element

4    No. 1 is that the prosecution actually knew of the false

5    testimony.  And again, here, the only evidence that cast any

6    doubt on the accuracy of the testimony were the two e-mails

7    we've discussed at length, that was it.

8            This is in total contrast to *Drake*, which he relies

9    on.  There, the prosecutor had actual knowledge the testimony

10   was false because the witness there testified falsely that he

11   had first learned about the facts of that case the night before

12   his testimony, and it turns out the prosecutor had actually had

13   an hour-long call with that witness two weeks before that

14   testimony.  So there was no dispute, the prosecutor actually

15   knew during the trial that the testimony was false.

16           The circumstances here are totally incomparable.  The

17   only evidence, again, that Scott is relying on to suggest the

18   government knew during the trial were those two e-mails, and

19   that does not come close to the standard that is set forth in

20   the *Drake* case that he relies on.

21           The second point, your Honor, is the one we've already

22   addressed at great length here today, but part two of the *Drake*

23   test is the materiality test, which mirrors the test in *Wallach*

24   for situations where the government knew or should have known

25   about the perjury.

1          And, your Honor, the test that's articulated in *Drake*

2     is, one, the prosecution actually knew of the false testimony;

3     and, two, there is any reasonable likelihood that the false

4     testimony could have affected the judgment of the jury.

5          Your Honor, the additional point that's been raised

6     here today is whether a hearing is required, and there's two

7     separate reasons why the hearing is not required here.  The

8     first is, as we noted earlier, there is a threshold issue

9     concerning due diligence.  And the record, as it stands here,

10     is that Scott exercised no diligence in the month leading up to

11     the trial, or during the trial, to find the evidence that he is

12     now claiming could not have been discovered through the

13     exercise of due diligence.

14          He knew about the inaccurate testimony a month before

15     the trial.  He knew during the trial.  The record is clear on

16     this point, and there's no additional need for a hearing in

17     order for the Court to make that finding.

18          But more importantly, your Honor, even if the Court

19     were to find in Scott's favor on all of the threshold

20     arguments, or that the Court were to assume arguendo on all of

21     the threshold arguments that this evidence is newly discovered,

22     and that he has satisfied the due diligence prong, and that the

23     government did know about the false testimony at the time of

24     the trial, he's failed to demonstrate a reasonable likelihood

25     that the false testimony could have affected the judgment of

1     the jury.

2                    There is no hearing that is needed for the Court to

3     make that finding.  The trial record is complete, and it shows

4     through independent evidence that Scott's claim fails on the

5     merits.  In this situation, your Honor, a hearing is,

6     therefore, completely unnecessary.

7                    And, your Honor, with respect to the first point that

8     I raised, the record is clear on that point.  There's no

9     additional fact finding that's necessary, and for that reason,

10    a hearing is not necessary here.

11                   THE COURT:    Okay.

12                   MR. FOLLY:    If we could just have one moment to confer

13    before closing out our argument, and then we will get back to

14    the Court.

15                   THE COURT:    Okay.  One moment, and then one minute.

16                   MR. FOLLY:    Thank you.

17                   (Pause)

18                   Your Honor, there were a few additional issues that

19    came up in the briefing, unless the Court has any specific

20    questions about those issues, we will rest on what's contained

21    in our brief.

22                   THE COURT:    Very well.  Thank you, Mr. Folly.

23                   Mr. Devlin-Brown or Ms. Stanley, I'll give you five

24    minutes to respond, if you wish.  Don't feel the need to take

25    me up on it.

1          MR. DEVLIN-BROWN:    Yes, thank you, your Honor, and

2     I'll be as efficient about this as possible.  I want to cover a

3     couple of issues that the government just spoke to.

4          The first was the question of which *Wallach* test to

5     apply, and the government said some, frankly, confusing things

6     about that, but the Court can simply look to *Wallach*.  It

7     refers to the two discrete standards that apply, and where the

8     prosecution knew or should have known -- that's in Wallach,

9     should have known -- that the testimony was false at the time

10    of trial, the conviction needs to be set aside, unless there's

11    any reasonable likelihood that the false testimony could have

12    affected the judgment of the jury.

13          That's the test, known or should have known.  The

14    government suggested that we sort of made up that the

15    government admitted they should have known.  They didn't.  It's

16    on page 38 of their surreply.  They write, and it's a little

17    mealy-mouthed, but it's an admission.  At most, there is

18    evidence that the government should have known, based on the

19    Greenwood communications, which the government possessed but

20    had not reviewed at the time of trial, that Ignatov had

21    misremembered certain details about the July 20th meeting, and

22    then his testimony about Dilkinska's being present was

23    inaccurate.  So they do acknowledge that and, in fact, it

24    wasn't, as the government just said, based on Defense Exhibits

25    550 and 552.  It was also based on these Greenwood e-mails.

1           The second thing that I want to address just briefly

2     is the timeliness argument again, because one thing the

3     government said was, you know, as soon as we have the 3500, we

4     could have conducted some sort of investigation.  The 3500, in

5     the vaguest way possible, referenced Konstantin's testimony

6     about this meeting, but it didn't give a date.  It didn't say

7     July 20, 2016.

8           The government marshaled various things at the time of

9     trial that made it clear that Konstantin was committing to that

10     date and, of course, the defense did take steps.  We found

11     Defense Exhibit 550 and 552.  But there's' a whole bunch of

12     other reasons why the timeliness argument that the government

13     makes are relevant, and we will rest on our papers.

14           On the perjury issue, the government is just wrong

15     here.  I mean, they have a view that this was a mistake, not

16     perjury.  We have a view, which is at least equally plausible,

17     I think much more than equally plausible, that Konstantin

18     purposely embellished a detail the only meeting he had with

19     Mr. Scott.

20           And the law is clear there, the *Spinelli* case cited in

21     our brief, the Court needs to assume it's perjury because that

22     is so material to which *Wallach* standard applies, or it needs

23     to have a hearing, or the Second Circuit is going to assume

24     it's perjury or send it back for a hearing.  So it seems, I

25     suggest the Court just look at the end of our brief.  I think a

1     hearing is necessary, unless the Court is just going to assume,

2     for purposes of argument, it's perjury.

3              And then the final point I want to address, and I'll

4     address this briefly, your Honor, but the government spent a

5     great deal of time talking about the supposedly overwhelming

6     evidence.  The first point I'll say, which is the most

7     important, which is, if the rigorous *Wallach* test applies,

8     which it does, then we're talking about any reasonable

9     likelihood the false testimony could have affected the judgment

10    of the jury.

11             And you have Konstantin Ignatov, the sole cooperating

12    witness, lying about the meeting, the only meeting he had with

13    Mr. Scott, where he did, contrary to the government's

14    representation, report hearing details about the meeting from

15    Irina Dilkinska, namely that it took Mr. Scott a very long time

16    to understand what was being discussed.

17             And his credibility, if he's going to lie about the

18    sole meeting he ever had with Mr. Scott, then he's going to lie

19    about a number of other things, the jury would have readily

20    concluded.  And I just refer you to our papers in our original

21    reply, your Honor.

22             Konstantin was crucial, not just to establishing --

23    not just saying Mr. Scott was a money launderer, using the

24    exact term that was the subject of the conviction, but relaying

25    all sorts of negative evidence of what people supposedly told

1    him.  And he also served a very important point of which the

2    government said at sidebar, and we note in our last brief,

3    which is that without him, their case was a bunch of paper.  He

4    was the one that enabled them to put it together.

5            But to the substance, beyond Mr. Konstantin, of what

6    the government's case was, I would just ask the Court to focus

7    very specifically on the money laundering statute, which

8    requires Mr. Scott to know that he was dealing with proceeds of

9    a felony.  And the government's only theory of that, was he

10    knew OneCoin was a fraud.

11            The only direct evidence, other than Mr. Konstantin,

12    they offer there, direct evidence -- and I know circumstantial

13    evidence counts; I'll get to that in a moment.  But looking at

14    the direct evidence they meet with in every brief is a CPA

15    blogger -- I guess his being a CPA is highly relevant -- sent

16    Mr. Scott -- no, sorry, wrote an article that OneCoin was a

17    scam, and that Irina Dilkinska forwarded to Mr. Scott in an

18    e-mail saying its was defamatory and asking for Mr. Scott to

19    help.  No evidence that he ever read it.  And that there was an

20    investigation that he knew about at OneCoin.

21            You could say that about almost any cryptocurrency out

22    there, that someone thinks it is a scam and has written about

23    it, and there are investigations all over the place, some of

24    which go somewhere, some of which don't.

25            When you put away that direct evidence, your Honor,

1    what you're left with is circumstantial evidence, and I want to

2    give the government, for this purpose, all the benefit of the

3    doubt, in the light absolutely the most favorable to them, they

4    have a good case.  Giving them all the credit, that Mr. Scott

5    knew all the funds were associated with Ruja Ignatova, was

6    going to send them where Ruja Ignatova wanted, but that is at

7    least as consistent with the theory of innocence, which is

8    money laundering in the sense that people use colloquially.

9            It could be just as plausible that he's helping

10   Ms. Ignatova, a newly minted crypto millionaire, keep her funds

11   out of her name, keep it in shell companies.  People do it all

12   sorts of times, all sorts of reasons, good, bad and gray.

13           And for the government's core theory of proving that

14   he knew OneCoin itself was a fraud, there's very little, and

15   when you take away Konstantin Ignatov, there's almost nothing.

16           But ultimately, your Honor, and I know I don't have

17   time so I won't rebut each of the points they make.  And I

18   think we do it direct in our brief, such as the Frank Schneider

19   exchange.

20           Ultimately, our argument isn't that the government

21   shouldn't be able to present evidence to a jury of all of these

22   things and argue whatever it wants.  Our argument is the trial

23   we had was fundamentally unfair because Konstantin Ignatov, the

24   sole cooperating witness, perjured himself about the only

25   meeting he had with Mr. Scott, as well as the laptop.  The

1  government had knowledge at the time that the perjury was --

2  that this testimony was almost certainly false, from

3  government -- Defense Exhibits 550 and 552.

4          They inexplicably reversed position as to an initial

5  agreement that the government -- that the defense could offer

6  550, and they let testimony that they knew was almost certainly

7  false go uncorrected, and that is unfair, your Honor.  That's

8  contrary to the fundamental duties of prosecutors to ensure

9  that the jury bases its conviction only on true testimony.

10          So let the government put in all its evidence again,

11  but let's do it in a trial where the perjuring cooperating

12  witness is either not testifying, or is revealed to be the

13  perjurer he is, and where the defense has the information

14  disclosed properly by the prosecution that enabled that to be

15  shown to the jury.  Thank you.

16          THE COURT:    Thank you, Mr. Devlin-Brown.

17          And thank you, all.  I will take it under advisement.

18          Is someone ordering the transcript?

19          MR. FOLLY:    Yes.

20          MR. DiMASE:    Your Honor, just one other matter.  This

21  is not substantive.  It's scheduling.

22          THE COURT:    Okay.

23          MR. DiMASE:    I believe right now the sentencing is

24  sort of scheduled sine die, and so we don't have a particular

25  date.  I was wondering if the Court wanted to set an actual

1  sentencing date at this stage or leave it in that posture.  I

2  note it for the record.

3  THE COURT:    Is the PSR complete?

4  MR. DiMASE:    Yes, your Honor.  It is.

5  THE COURT:    Yes, we can.

6  MR. DiMASE:    And the forfeiture briefing is,

7  obviously, fully briefed at this point.

8  THE COURT:    Right.  Mr. Devlin-Brown?

9  MR. DEVLIN-BROWN:    We think the Court should address

10  these motions because if any of the motions are granted,

11  frankly, there will either be no sentencing at all, there will

12  be a new trial first, or there will be a different sort of

13  sentencing, perhaps.  So I think we should take things one step

14  at a time.

15  THE COURT:    So I will not show my hand.  We won't set

16  the sentencing for now.

17  MR. DEVLIN-BROWN:    Thank you.

18  (Adjourned)

19

20

21

22

23

24

25