UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

– *against* –

MARK S. SCOTT,

                              Defendant.

**OPINION & ORDER**

17-cr-630 (ER)

R<span>AMOS</span>, D.J.:

Mark Scott was convicted on November 21, 2019 of conspiracy to commit bank fraud and conspiracy to commit money laundering.  Before the Court are Scott's motions for a new trial pursuant to Federal Rules of Criminal Procedure 29 and 33.  For the reasons set forth below, the motions are DENIED.

## I.      FACTUAL BACKGROUND & PROCEDURAL HISTORY

### A.  The OneCoin Scheme

OneCoin was founded in 2014 by Ruja Ignatov ("Ruja") and Sebastian Greenwood.  Doc. 244 at 9.  It is headquartered in Sofia, Bulgaria and began operating in the United States in or around 2015.  *Id.* at 7.  OneCoin markets and sells a purported digital cryptocurrency by the same name.  *Id.*  Approximately 3.5 million people have invested in OneCoin cryptocurrency packages, and OneCoin has taken in over $2 billion in proceeds.  *Id.*  It is undisputed that OneCoin is a fake cryptocurrency:  it is in fact a global multi-level marketing pyramid scheme.  *See* Doc. 477 (Apr. 25, 2022 Hr'g Tr.) at 4:12–21; Trial Tr.[1] at 1904:17–18 (Def. Summation) ("OneCoin is a scam.  We're not going to fight that battle.").

---

[1] Docs. 185, 187, 189, 191, 193, 195, 197, 199, 201, 203, 205, 207, and 209 collectively comprise the full transcript of Scott's trial from November 4, 2019 to November 21, 2019.  The Court cites them collectively as "Trial Tr."

In other words, OneCoin was an elaborate fraud premised on innumerous misrepresentations.  For instance:

- OneCoin claimed that the cryptocurrency was "mined," and its value was based on market supply and demand:  as more members joined OneCoin, demand for the tokens, and therefore their price, grew.  Doc. 244 at 8.  The purported value of a OneCoin grew steadily, without ever decreasing, from €0.50 to approximately €29.95 in January 2019.  *Id.*  In fact, OneCoins were not mined, but were instead auto-generated and distributed to members as needed.  *Id.* at 9–10.  Moreover, the value of OneCoin was set internally, not based on market supply and demand.  *Id.* at 9.

- OneCoin alleged that it had a private "blockchain" (*i.e.*, digital ledger of tokens and transactions), which had even been externally audited.  *Id.* at 8.  In fact, the audit report was fake and had been created by OneCoin employees.  *Id.*

- OneCoin also purported that it would have public and foreign exchanges to allow investors to buy, sell, or trade OneCoins for fiat currency and that it would have an investment fund where investors could invest OneCoin in real assets.  *Id.* at 10.  In fact, none of these representations were true.  *Id.*

**B.  Scott's Involvement with OneCoin**

As financial institutions around the world began to recognize OneCoin as a fraud, they grew unwilling to provide banking services to OneCoin, preventing the organization from opening bank accounts in its name.  *Id.* at 11.  OneCoin needed to conceal the origin of its funds, as well as the purpose of the transfers into and out of its bank accounts.  *Id.* Gilbert Armenta, Ruja's boyfriend and a money launderer for OneCoin, introduced Scott to Ruja as someone who could provide a solution to OneCoin's banking troubles in 2015. *Id.*  Scott, a corporate lawyer who was then a partner at an internationally recognized law firm, had extensive experience representing private equity funds, and he leveraged that experience to construct an elaborate, sophisticated money laundering operation for OneCoin.  *Id.*

In April 2016, before Scott received any OneCoin funds, Irina Dilkinska, OneCoin's chief money launderer, sent Scott an email of an article by a U.S.-based certified public accountant who detailed many indicia that OneCoin was a fraudulent pyramid scheme.  Doc. 412 at 10–11.  Scott was also informed that banks around the

world had blocked OneCoin's accounts and that the City of London Police were investigating OneCoin.  *Id.* at 11.  Nonetheless, Scott agreed to work with OneCoin.

1.  *Scott Set Up the Fenero Funds and Concealed All Traces of OneCoin Involvement*

From late 2015 to early 2016, Scott set up a series of investment funds in the British Virgin Islands and Cayman Islands (collectively, "the Fenero Funds"), each with its own offshore bank account in the Cayman Islands.  Doc. 244 at 11–12.  From May to October 2016, the Fenero Funds received wire transfers of €364 million and $10 million in alleged "investments."  *Id.* at 13.  The transfers originated from approximately ten different bank accounts, all for various shell corporations owned by OneCoin co-conspirators, held at banks in Singapore, Germany, Hong Kong, the United Kingdom, and the United States.  *Id.*  On paper, the shell corporations were "investors" in the Fenero Funds, but the money they transferred into the Fenero Funds was in fact all money derived from OneCoin.  *Id.*  In total, Scott laundered approximately $400 million of OneCoin proceeds through the Fenero Funds.  *Id.* at 6.

Scott worked to meticulously conceal from the banks any connection between OneCoin and the purported investors in the Fenero Funds.  *Id.* at 15.  He knew that any reference to OneCoin would, in his words, "kill this for us."  Doc. 412 at 9.  Indeed, when a series of loans and suspicious transactions triggered Apex Group Ltd. ("Apex")—an investment fund administrator that Scott hired, which was responsible for conducting anti-money laundering and "Know Your Customer" checks—to conduct enhanced due diligence on the Fenero Funds in July and August 2016, Scott repeatedly lied to hide the connection between OneCoin and the Fenero Funds.  Doc. 244 at 15–16.  When Apex sought additional information on the source of wealth for the investors in the Fenero Funds, Scott drafted fraudulent letters of comfort for two other attorneys to put on their letterhead and sign, created and sent backdated wire instruction letters, and forged a series of agreements to attempt to justify the large volume of transfers to and from the

Fenero Funds.  *Id.* at 16–17.  Scott went so far as to instruct Dilkinska to sign the documents with different pens and e-sign others to hide the forgeries.  *Id.* at 17.  Apex concluded the documents Scott provided were fraudulent and created to conceal the relationship with OneCoin.  *Id.*  Apex also held a series of emergency meetings and began to notify government agencies concerning OneCoin's involvement.  *Id.* at 16.  When Apex continued to refuse Scott's request to transfer funds out of the Fenero Funds, Scott demanded a phone call with Apex, during which he continued to lie to Apex about the source of the money in the Fenero Funds.  *Id.* at 17–18.

   2.  *Scott Lied to U.S. Federally Insured Banks to Effectuate Transfers of OneCoin Proceeds Into and Out of the Fenero Funds*

   Three sets of fraudulent transactions were particularly relevant because of the involvement of U.S. federally insured banks.

   a.  *The CryptoReal Loan (July 2016)*

   In July 2016, Scott disguised the transfer of OneCoin funds by "loaning" $30 million from the Fenero Funds to CryptoReal Investments Trust Ltd. ("CryptoReal").  *Id.* at 18.  Scott and another lawyer, Martin Breidenbach, represented to Apex that Breidenbach was the ultimate beneficial owner of CryptoReal (though the transfer was in fact of Ruja's funds and on her behalf), and that the loan was for CryptoReal to purchase an oil field in Madagascar from Barta Holdings Ltd. ("Barta").  *Id.*  Because Apex transferred the funds in U.S. dollars ("USD") between CryptoReal's DMS Bank account in the Cayman Islands and Barta's DBS Bank account in Hong Kong, the transfer used a USD correspondent account at Bank of New York Mellon ("BNY Mellon") in Manhattan.  *Id. at* 18–19.  While neither Apex, DMS Bank (Cayman), or DBS Bank (Hong Kong) are federally insured, BNY Mellon is.  Doc. 218 at 26.

   b.  *The Armenta Investment Transactions (June & September 2016)*

   In June 2016, Scott received transfers totaling approximately $5 million into the Fenero Funds from a U.S. Morgan Stanley account in the name of "Fates Group LLC,"

which was controlled by Gilbert Armenta.  Doc. 244 at 19; *see also* Doc. 160, Ex. B (Gov't Oct. 7, 2019 Letter in Response to Scott's Request for Particulars).[2]  Similarly, in September 2016, Scott received a transfer into the Fenero Funds of approximately $5 million from an account at U.S. Sabadell also in the name of "Fates Group LLC."  *Id.* These transfers purported to be investments in the Fenero Funds, and Armenta represented to Morgan Stanley and Sabadell that the Fenero Funds were a private equity firm that invested in, among other things, renewable energy enterprises like windmills. Doc. 244 at 19.  Despite knowing that his Fenero Funds were not legitimate investment funds, Scott had Armenta sign an investment agreement purporting that the transfers to the Fenero Funds were for investment purposes.  *Id.* at 37 (citing GX[3] 1140).  The Government alleged that Scott was aware of and complicit in Armenta's misrepresentations and knew that the funds were in fact OneCoin proceeds, not legitimate investments.  *Id.*

### C. Indictment and Arrest

On August 21, 2018, Scott was charged in a one count indictment for conspiracy to commit money laundering, and an arrest warrant was issued the same day.  Docs. 6, 8. He was arrested on September 5, 2018.  Doc. 11.

By superseding indictment, Scott was further charged with conspiracy to commit bank fraud on October 8, 2019.  Doc. 143.  Count Two read in full:

> From at least in or about September 2015 through in or about 2018, in the Southern District of New York and elsewhere, MARK S. SCOTT, the defendant, and others known and unknown, willfully and knowingly did combine conspire, confederate, and agree together and with each other to commit bank fraud, in violation of Title 18, United States Code, Section 1344.
>
> It was part and object of the conspiracy that MARK S. SCOTT, the defendant, and others known and unknown, willfully and

---

[2] The Government's October 7, 2019 letter was never filed on the docket, but it was emailed to the Court under seal when Scott attached it to his letter to the Court (Doc. 160).  The Court cites to the sealed exhibit.

[3] GX designates Government trial exhibits.  DX designates Defense trial exhibits.

knowingly, would and did execute and attempt to execute a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Corporation ("FDIC"), and to obtain moneys, funds, credits, assets securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations, and promises, to wit, SCOTT and others misrepresented and omitted material facts to banks and other financial institutions worldwide to cause those financial institutions, including FDIC-insured financial institutions in the United States, to transfer funds into and out of accounts associated with purported investment funds operated by SCOTT and others, in violation of Title 18, United States Code, Section 1344.

*Id.* ¶¶ 4–5.

### D.  Trial

Scott's trial lasted from November 5, 2019 to November 20, 2019.  In addition to hundreds of exhibits, including dozens of Scott's own emails, the Government also offered the testimony of dozens of witnesses.  Doc. 244 at 6–7.  These witnesses included OneCoin victims; a money laundering expert; employees and directors of financial institutions; and a financial intelligence analyst who traced OneCoin's criminal proceeds through the Fenero Funds.  *Id.*  The Government also offered testimony from Konstantin Ignatov ("Konstantin"), Ruja's brother and one of OneCoin's top leaders, who testified as a cooperating witness for the Government.  *Id.*

The bulk of Konstantin's testimony on direct examination concerned OneCoin's operations, including an explanation of its fraudulent multi-level marketing structure. Doc. 412 at 15–16.  Konstantin also testified at a high level as to OneCoin's difficulties obtaining banking services and its use of money launders, including Scott, to circumvent those issues.  *Id.* at 16.  However, Konstantin had only met Scott once and had no substantive conversations with him.  *Id.*  The sole meeting occurred during a July 20, 2016 meeting between Scott, Ruja, and Dilkinska at the OneCoin office in Sofia ("the Meeting").  Trial Tr. at 243:24–247:7.  Konstantin testified that Scott arrived at the office around noon and made small talk with Konstantin (who was at the time operating as

Ruja's personal assistant); Konstantin got Scott something to drink and then escorted him into Ruja's office, at which point Konstantin left. *Id.* at 245:19–23. Ruja then asked Konstantin to bring in Dilkinska; he did so, and then left again. *Id.* at 245:24–246:6. Ruja then "called [Konstantin] again and told [him] to make sure that everybody on this floor leaves and goes home so that Irina [Dilkinska], Mark [Scott], and Ruja are alone." *Id.* at 246:8–10. Konstantin testified this was the only time Ruja ever cleared out an office floor. *Id.* at 246:11–13. Konstantin left with the others and did not participate in the meeting. *Id.* at 246:14–247:7. Indeed, Konstantin testified that his only knowledge of the discussions at the Meeting came second-hand from Dilkinska and Ruja and was merely that it lasted a "a long time . . . until Mark Scott understood everything that has to be done or he has to do." *Id.* at 246:25–247:1.

Konstantin also testified concerning events that transpired when he traveled to the United States to attend OneCoin-related meetings in Las Vegas in February 2019. He testified that when he arrived at the airport, a OneCoin laptop he was carrying was seized and then returned by a border patrol officer a short time later. *Id.* at 205:4–206:16. After he got the laptop back, Konstantin testified he "put [the laptop] into a paper trash bag with other trash items, and [he] took it to a trash bin on a busy place in the Las Vegas Strip, and [he] threw it away into the trash bin there." *Id.* at 206:20–23. He said he did so because he "was afraid that somebody might find more evidence connecting [him] to OneCoin." *Id.* at 206:25–207:1.

On cross-examination, Scott extensively impeached Konstantin about Konstantin's purported dishonesty and especially about his limited interactions with Scott. Doc. 412 at 16–17 (citing Trial Tr. at 302–06, 324–46, 404–18). For instance, Scott confirmed that Konstantin had only met Scott once; never spoke with Scott by phone call, text message, or WhatsApp; and that their limited email communications were merely about logistics concerning meetings between Scott and Ruja. Trial Tr. at 301:22–307:4. Moreover, Konstantin's understanding that Scott was a money launderer

was based on information Dilkinska told him, but Konstantin did not have personal knowledge of Scott's involvement with OneCoin. *Id.* at 404:19–405:8. Additionally, Konstantin was not present for nor was ever told the content of the discussions at the Meeting. *Id.* at 304:19–305:14. And, when Scott's counsel thrice pressed Konstantin whether he was "a hundred percent sure that Ms. Dilkinska was at" the Meeting, Konstantin said he was "pretty sure" but not a hundred percent. Trial Tr. at 304:3–18.

Scott was found guilty of both counts on November 21, 2019. Doc. 182.

### E. Post-Trial

Scott moved for a judgment of acquittal or, in the alternative, a new trial pursuant to Federal Rules of Criminal Procedure 29 and 33 on February 4, 2020. Doc. 217. He alleged there was insufficient evidence to sustain a conviction on either count. *Id.* He further challenged whether venue was proper and alleged several errors with the jury instructions. *Id.*

On June 29, 2021, Duncan Arthur, a former OneCoin associate turned whistleblower, spoke briefly with and then emailed Matthew Winters, an investigator with the Manhattan District Attorney's Office (which had jointly investigated and prosecuted OneCoin alongside the U.S. Attorney's Office for the Southern District of New York), who was at that time assigned to work with the City of London Police. Docs. 433, 434-4, 434-15. Arthur reported that he had read Konstantin's testimony from Scott's trial, and that Konstantin had lied: specifically, he reported that Konstantin had not thrown the OneCoin laptop in the trash in Las Vegas as he testified but had in fact given it to Arthur to return it to OneCoin in Sofia. Doc. 434-4. Ten days later, on July 9, 2021, Arthur also reported Konstantin's perjury to Katri A. Stanley, a member of Scott's defense team at the law firm Covington & Burling LLP. Aug. 23, 2021 Stanley Decl. ¶¶ 1–2.

Based on Arthur's allegations, on August 23, 2021, Scott filed a supplemental motion for a new trial pursuant to Rule 33. Doc. 410. He argued that, had the jury

known that Konstantin lied about the laptop, it would not have credited Konstantin's testimony nor, consequently, found Scott guilty of either offense. *Id.* Although Winters said he intended to immediately forward Arthur's email to the FBI, he inadvertently failed to do so until August 25, 2021—after Scott's supplemental motion. Doc. 434-4. The supplemental motion Scott filed was thus the first time that prosecutors became aware of the falsity of Konstantin's testimony about the laptop. Doc. 412 at 18–19.

On reply in support of his supplemental motion, Scott further argued that Konstantin also lied about the Meeting because Dilkinska had in fact been in India at the time when Konstantin testified that she was in Sofia meeting with Scott and Ruja. Doc. 433 at 14–16. Scott alleged that, after the Government's opposition to his supplemental motion was filed, "a source" provided Scott with a copy of Dilkinska's passport, and the stamps therein showed that she was in India during the same time that Konstantin alleged she was at the Meeting. *Id.* at 9. And on December 3, 2021, the Government confirmed to Scott the accuracy of the passport stamps; Dilkinska had arrived in India on July 19, 2016 and departed on July 22, 2016. *Id.* Scott further asked that the Court take into consideration that Konstantin breached his cooperation agreement by using a contraband cellphone at the Metropolitan Correctional Center ("MCC") and that the Government delayed in disclosing the violation to Scott. *Id.* at 10; Doc. 461 at 46.

## II.   LEGAL STANDARDS

### A.  Rule 29

Federal Rule of Criminal Procedure 29(a) directs the Court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." To succeed on a Rule 29(a) motion, the defendant must show, "considering all of the evidence, direct and circumstantial, that 'no rational trier of fact could have found the defendant guilty beyond a reasonable doubt.'" *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (quoting *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003)). Where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly

possible, the court must let the jury decide the matter." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (citation omitted).  It is not the trial court's role to "substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (quoting *Curley v. United States*, 160 F.2d 229, 232 (D.C. Cir. 1947)).  Accordingly, a "court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004) (quoting *Guadagna*, 183 F.3d at 130).  In assessing the sufficiency of the evidence supporting a guilty verdict, the Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) (quoting *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008), *abrogated on other grounds by Dean v. United States*, 137 S. Ct. 1170 (2017)).  Therefore, a defendant challenging the sufficiency of the evidence that was the basis of his conviction at trial "bears a heavy burden" when bringing a Rule 29(a) motion.  *Id.* (quoting *United States v. Heras*, 609 F.3d 101, 105 (2d Cir. 2010)).  The jury's verdict "may be based entirely on circumstantial evidence." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995) (citation omitted); *see also United States v. Aleskerova*, 300 F.3d 286, 292–93 (2d Cir. 2002).

The Court's "deference to the jury's findings is especially important" in conspiracy cases, "because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court." *Coplan*, 703 F.3d at 62 (quoting *United States v. Rojas*, 617 F.3d 669, 674 (2d Cir. 2010)).  "In order to convict a defendant of the crime of conspiracy, the government must show that two or more persons entered into a joint enterprise for an unlawful purpose, with awareness of

its general nature and extent." *United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010).

"The record must . . . permit a rational jury to find: (1) the existence of the conspiracy

charged; (2) that the defendant had knowledge of the conspiracy; and (3) that the

defendant intentionally joined the conspiracy." *United States v. Santos*, 541 F.3d 63, 70

(2d Cir. 2008) (internal citations omitted). To prove a defendant joined a conspiracy, the

government must show that he "knew of the conspiracy" and "joined it with the intent to

commit the offenses that were its objectives." *United States v. Ceballos*, 340 F.3d 115,

123 (2d Cir. 2003) (internal citations omitted); *see also United States v. Lange*, 834 F.3d

58, 76 (2d Cir. 2016) ("On a charge of conspiracy, the Government must prove

(1) knowing participation or membership in the scheme charged and (2) some knowledge

of the unlawful aims and objectives of the scheme." (internal quotation marks and

citation omitted)). "The government's proof of an agreement does not require evidence of

a formal or express agreement; it is enough that the parties have a tacit understanding to

carry out the prohibited conduct." *United States v. Nusraty*, 867 F.2d 759, 763 (2d Cir.

1989) (internal quotation marks and citation omitted). "The government need not prove

the defendant's familiarity with all of the conspiracy's details; it may demonstrate simply

the defendant's awareness of the 'general nature and extent' of the conspiracy." *United

States v. Anderson*, 747 F.3d 51, 61 (2d Cir. 2014) (citation omitted). "[T]he elements of

a conspiracy may be proved by circumstantial evidence." *United States v. Svoboda*, 347

F.3d 471, 477 (2d Cir. 2003) (citation omitted). For example, a defendant's "knowing

and willing participation in a conspiracy may be inferred from . . . [his] presence at

critical stages of the conspiracy that could not be explained by happenstance, or a lack of

surprise when discussing the conspiracy with others." *In re Terrorist Bombings of U.S.

Embassies in East Africa*, 552 F.3d 93, 113 (2d Cir. 2008) (quoting *Aleskerova*, 300 F.3d

at 293).

### B.  Rule 33

Federal Rule of Criminal Procedure 33 provides, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  "[M]otions for a new trial are disfavored in this Circuit," *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), and are granted "sparingly and in only the most extraordinary circumstances," *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (internal quotation marks and citation omitted).  The Second Circuit has observed that to order a new trial under Rule 33, courts must be satisfied that "it would be a manifest injustice to let the guilty verdict stand."  *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992) (quoting *United States v. Reed*, 875 F.2d 107, 114 (7th Cir. 1989)).

"The defendant bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is 'a real concern that an innocent person may have been convicted.'"  *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (quoting *Ferguson*, 246 F.3d at 134).  A new trial should not be granted when the court is "satisfied that competent, satisfactory, and sufficient evidence in the record supports the jury verdict."  *Ferguson*, 246 F.3d at 134.  In evaluating a Rule 33 motion, "[t]he district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation," of whether the defendant has met these onerous burdens.  *Id*.  Ultimately, "[Rule 33] motions are granted only in 'extraordinary circumstances,' and are committed to the trial court's discretion."  *United States v. Torres,* 128 F.3d 38, 48 (2d Cir. 1997) (internal citations and quotation marks omitted).

The Second Circuit has "frequently acknowledged that, even where newly discovered evidence indicates perjury," a Rule 33 motion "should be granted only with great caution and in the most extraordinary circumstances."  *United States v. Stewart*, 433 F.3d 273, 296–97 (2d Cir. 2006) (citations omitted).  Even if a witness has committed

12

perjury, "if the prosecution was not aware of the perjury [at the time of trial], a defendant can obtain a new trial only where the false testimony leads to a 'firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.'" *Id.* (quoting *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991)). Where, however, the prosecution "knew or should have known of the perjury prior to the conclusion of the trial, the conviction must be set aside where there is 'any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Id* at 297 (quoting *Wallach*, 935 F.2d at 456). And, where the prosecution *knowingly* introduces false testimony, reversal is "virtually automatic." *Id.* (quoting *Wallach*, 935 F.2d at 456).

Courts are especially reluctant to grant a new trial where the newly discovered evidence underlying a Rule 33 motion would function solely as additional impeachment material. "Relief under Rule 33 based on newly discovered evidence may be granted only upon a showing that . . . the evidence is not merely cumulative or impeaching; and . . . the evidence would likely result in an acquittal." *United States v. Forbes*, 790 F.3d 403, 406–07 (2d Cir. 2015) (citation omitted); *see also, e.g., United States v. Wong*, 78 F.3d 73, 79 (2d Cir. 1996) ("[N]ew impeachment evidence is not material, and thus a new trial is not required when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." (internal quotation marks and citation omitted)). Similarly, Rule 33 motions are not the appropriate vehicle to relitigate evidentiary disputes. *United States v. Soto*, No. 12-cr- 556 (RPP), 2014 U.S. Dist. LEXIS 60191, at *21 (S.D.N.Y. Apr. 28, 2014).

## III.   ANALYSIS

### A.  Scott's Motion for Acquittal or a New Trial Pursuant to Rule 29 on the Conspiracy to Commit Bank Fraud Count is Denied

To convict Scott on the charge of conspiracy to commit bank fraud, the Government had to prove that two or more persons entered a joint enterprise to commit

bank fraud, and Scott knowingly and intentionally joined the enterprise. *See Torres*, 604 F.3d at 65; *Santos*, 541 F.3d at 70. A defendant commits bank fraud when he "knowingly executes, or attempts to execute, a scheme or artifice (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false of fraudulent pretenses, representations, or promises." 18 U.S.C § 1344. A "financial institution" includes federally insured banks. 18 U.S.C § 20. A defendant need not specifically intend to deceive the financial institution to be convicted under § 1344(2) for obtaining bank property by means of a false representation. *Loughrin v. United States*, 573 U.S. 351, 356–57 (2014). The false representation may be made to a third party and need not be made to the bank nor even the entity with custody and control of the property obtained, so long as the false representation is the "means of" obtaining the property. *See id.* at 363–64. A defendant obtains property "by means of" a false representation when his false statement "is the mechanism naturally inducing a bank (or custodian) to part with its money." *Id.* at 365 (comparing a defendant passing a fraudulent check to a third-party to cash at the bank, which is bank fraud, to a defendant selling a counterfeit purse and receiving a check to cash at the bank as payment, which is not bank fraud, because the bank's involvement in the fraudulent scheme in the latter is fortuitous, and the misrepresentation need not ever reach the bank).

As discussed below, the Government satisfied its burden, and Scott's arguments to the contrary are unavailing. Accordingly, neither acquittal nor a new trial is warranted as to Count Two, conspiracy to commit bank fraud.

> 1. *The Government Provided Sufficient Evidence to Prove Scott Guilty of Conspiracy to Commit Bank Fraud*

In response to Scott's request for particulars, the Government identified that the transactions constituting bank fraud "include[d], but [we]re not limited to:" the July 2016 Fenero Funds loan to CryptoReal ("the CryptoReal Transaction") and the June and

14

September 2016 investments into the Fenero Funds by Fates Group LLC, an entity controlled by Gilbert Armenta ("the Armenta Transactions").  Doc. 160, Ex. B (emphasis in original).  Scott argues none of the three transactions constituted bank fraud.  Doc. 218 at 18–28.  The Court holds that the Government proved all three were bank fraud.

> ### a. The CryptoReal Transaction

Scott argues that the CryptoReal Transaction could not properly be the basis for a conspiracy to commit bank fraud conviction for three reasons.  First, the Government failed to prove that the loan was not in fact for an oil field in Madagascar—in other words, the Government failed to prove that there was a false representation.  Doc. 218 at 26.  Second, he argues that, even if the loan was not for the purchase of an oil field, he did not make the false representation to BNY Mellon nor know that any New York correspondent account would be used.  *Id.* at 26–28.  Finally, on reply, Scott also argues that the false representation was not material, in that BNY Mellon would have processed the loan transaction even if Scott had explicitly stated that the money was OneCoin's.  Doc. 275 at 9–10.

The Government responds that the transfer was not a loan for an oil field, and Scott knew of both the misrepresentation and the use of the BNY Mellon New York correspondent account.  Doc. 244 at 35.  Moreover, BNY Mellon would not have transferred the funds through its correspondent account had it known that the funds were affiliated with OneCoin.  *Id.* at 34; Doc. 281 at 2.

At trial, the Government presented evidence that the money the Fenero Funds transferred to CryptoReal was not a loan, and that Scott was aware of that, including an email from Scott to Dilinska and other OneCoin associates wherein Scott stated that the allegedly loaned money was "considered available cash for obvious reasons."  *See, e.g.*, Doc. 281 at 4–6 (GX 1391); *see also* Trial Tr. at 1884:10–17 (Gov't Summation) ("[W]hen you make a real loan, when you loan money to someone, and it's real, that money is not available to you until they pay it back.  That's obvious.  That's common

sense.  But when it's a fake loan, and there is a fake loan agreement, and you're just sending the money where Ruja tells you to, the money is available.  It's available cash.  Scott knew that.  You see it right here in this e-mail [GX 1391].").  In assessing the sufficiency of the evidence, the Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence."  *Coplan*, 703 F.3d at 62 (quoting *Chavez*, 549 F.3d at 124).  Accordingly, the Court finds that the Government sufficiently proved that Scott committed a false representation.

Further, Scott's awareness of the use of a New York correspondent account is irrelevant, as he need not have specifically intended to deceive BNY Mellon to be convicted under § 1344(2).  *See Loughrin*, 573 U.S. at 356–57.  Nonetheless, the Government also presented evidence that Scott knew that an international USD transaction like the CryptoReal Transaction would use a U.S. correspondent account.  *See, e.g.*, Trial Tr. at 1471–77 (Direct Testimony of David Wildner, U.S. Head of Anti-Money Laundering and Counterterrorist Financing for BNY Mellon) (discussing multiple Fenero Fund transactions involving BNY Mellon correspondent accounts in New York); Doc. 244 at 35 (citing GX 1441, a May 2016 email Scott sent himself of incoming wire instructions from DMS bank, indicating that USD transactions would be processed through BNY Mellon's correspondent account in New York).  Crediting every inference that could have been drawn in the Government's favor, the Court finds that the Government sufficiently proved that Scott was aware of the involvement of a New York correspondent account in the CryptoReal Transaction.

Finally, the Government further offered testimony that, when BNY Mellon discovered OneCoin was operating through the Fenero Funds and other proxies, it prohibited the use of its accounts in connection with further transactions with several of those proxies.  Trial Tr. at 1429:20–1444:11 (Wildner Direct).  Accordingly, Scott is

incorrect that, had he told BNY Mellon that the transaction was "payment to Ruja Ignatova [sic] for OneCoin proceeds," the bank would nonetheless have processed the transaction.  *See* Doc. 275 at 10.  As a result, crediting every inference in the Government's favor, the Court finds that the Government sufficiently proved that Scott's false representation was material.

Consequently, the Government provided sufficient evidence that a reasonable juror could find Scott guilty of conspiracy to commit bank fraud as to the CryptoReal Transaction.  *See Espaillet*, 380 F.3d at 718; *Autuori*, 212 F.3d at 114.  The Court will not substitute its own determination of the weight of the evidence and reasonable inferences for that of the jury, and Scott's motion as to the CryptoReal Transaction is therefore denied.  *Guadagna*, 183 F.3d at 129.

  b. *The Armenta Transactions*

Scott argues that the Armenta Transactions could not properly be the basis for conspiracy to commit bank fraud for several reasons.  First, he argues that the transactions and any associated misrepresentations were made solely by Armenta, and Scott was neither aware of, nor in any way colluding with, Armenta with regards to the misrepresentations.  Doc. 218 at 18–21.  In fact, Scott alleges Armenta was lying even to Scott about the transactions.  *Id.* at 22–23.  Furthermore, Scott argues that even Armenta's conduct itself did not constitute bank fraud because (1) he was not trying to "obtain" bank property but rather to transfer out his own property, (2) any misrepresentations were mere minor omissions, and (3) the misrepresentations were not material.  *Id.* at 23–24.  Scott relies on *United States v. Perez-Ceballos*, 907 F.3d 863 (5th Cir. 2018) in support of his argument that Armenta's transactions could not constitute bank fraud if he merely sought to part with his own funds.  *Id.* at 24.

The Government responds that Scott was aware of and complicit in Armenta's lies.  Doc. 244 at 36–37.  Further, the Government argues that the money was Ruja's, not Armenta's; but, even if it had been Armenta's money, Scott's reliance on *Perez-Ceballos*

is misplaced because as long as the funds were in the bank's custody, it was still bank fraud to lie in order to induce the bank to process the transfer. *Id.* at 37–39. Moreover, the banks would not have processed the alleged investment transactions had Scott and Armenta been honest about the relationship with OneCoin. *Id.*

  i.  *Scott Conspired with Armenta to Make False Representations to Morgan Stanley and Sabadell in Order to Obtain Property in the Banks' Custody and Control*

The Government adduced sufficient evidence at trial to find that Scott conspired with Armenta to commit bank fraud. At trial, the Government presented evidence that Scott worked with Armenta to effectuate the transactions and was aware of the misrepresentations made to Morgan Stanley and Sabadell. Scott knew that the Fenero Funds were not legitimate investment vehicles, knew that banks were refusing to process transactions involving OneCoin, and knew that the origin of the funds in Armenta's Fates Group accounts was OneCoin (because Scott himself was the one to direct the transfer to Armenta). Doc. 244 at 36–37; *see also* Trial Tr. at 842:5–865:24 (Direct Testimony of Senem Firuz, Project Manager in Risk & Control for Morgan Stanley); 915:6–924:18 (Direct Testimony of Moshe Kishore, Commercial Relationship Banker at Iberia Bank, F/K/A Sabadell). Accordingly, Scott knew Armenta would only be able to transfer the OneCoin funds if Armenta lied to the banks. *Id.* Indeed, the fact that Scott had Armenta sign an investment agreement purporting that the transfers to the Fenero Funds were for investment purposes, despite knowing that his Fenero Funds were not legitimate investment funds, demonstrates Scott's knowledge of and complicity in Armenta's misrepresentations to the banks. *See* Doc. 244 at 37 (citing GX 1140)

Further, the Court finds unavailing Scott's arguments that Armenta's representations were not false, but rather merely minor omissions. *See* Doc. 218 at 21–22. Scott suggests that, under the Government's theory, "any statement Mr. Armenta made short of telling the bank he was seeking to launder criminal funds would be bank fraud by omission." *Id.* at 21. But Scott and Armenta did not merely fail to inform

18

Sabadell and Morgan Stanley about the true nature of the transactions.  As noted above, they also affirmatively misrepresented that the Fenero Funds were legitimate private equity funds which were meant to invest in endeavors such as windmills and renewable energy.  Moreover, the false representations were also material in that the banks would not have processed the transactions had Scott and Armenta disclosed their relationship with OneCoin.  Doc. 281 at 2 (citing Trial Tr. at 229–31 (Konstantin Direct)); *see also* Trial Tr. at 842:5–865:2 (Firuz Direct); 915:6–924:18 (Kishore Direct).

Accordingly, crediting every inference in the Government's favor, the Court finds that the Government sufficiently proved that Scott conspired with Armenta to make false representations to Morgan Stanley and Sabadell to induce the banks to effectuate the transfers to the Fenero Funds.

### ii.   *Scott's Reliance on* Perez-Ceballos *is Misplaced*

Scott's argument that a bank fraud conviction was not proper because Armenta transferred money out of his own account, rather than transferring the bank's money into his account, is without merit.  Scott argues the transactions are like those in *Perez-Ceballos*, which were held to be insufficient to sustain a conviction for bank fraud.  Doc. 218 at 24.

Perez-Ceballos induced a federally insured bank to transfer her funds from her account at that bank to a brokerage account, the latter of which was not federally insured and which she had procured by extensive misrepresentations.  *Perez-Ceballos*, 907 F.3d at 865–66.  She was indicted for money laundering, as well as for bank fraud on the theory that her procurement of the brokerage account by misrepresentation exposed the insured bank to a risk of loss under 18 U.S.C. § 1344(1).  *Id.*  The jury acquitted Perez-Ceballos of money laundering but found her guilty of bank fraud.  *Id.*  The Firth Circuit reversed her bank fraud conviction on two bases:  (1) the Government failed to adduce evidence that any false statements were made to the insured bank, and (2) Perez-Ceballos did not expose the bank to any risk of loss where the Government's theory was predicated

on the funds being proceeds of money laundering, but Perez-Ceballos was acquitted of the money laundering charge. *Id.* at 868–69.

Besides the fact that *Perez-Ceballos* is not controlling in the Second Circuit, the Court finds Scott's conviction dissimilar from Perez-Ceballos' in several significant ways. First, Perez-Ceballos was charged only with bank fraud under 18 U.S.C. § 1344(1), defrauding a financial institution, and the Fifth Circuit therefore never considered whether her actions constituted bank fraud under § 1344(2), obtaining bank property by false representations. *Id.* at 867–68. Scott, however, was indicted under both theories, meaning a conviction could lie under either § 1344(1) or § 1344(2) (Doc. 143, ¶¶ 4–5); and the Government's arguments focus primarily on the latter (Doc. 244 at 37–39). Second, Scott does not argue that the alleged misrepresentations were not made directly to Morgan Stanley and Sabadell. *See* Doc. 218 at 21–22. Nor was he acquitted of money laundering. Doc. 182. Moreover, the critical deficiencies in Perez-Ceballos' prosecution for bank fraud were the Government's failures to adduce sufficient evidence of the false representations and risk of loss—not that the underlying transactions involved Perez-Ceballos' own funds, as Scott argues. *Compare Perez-Ceballos*, 907 F.3d at 868, *with* Doc. 218 at 24; *see also United States v. Nejad*, No. 18-cr-224 (AJN), 2019 WL 6702361, at *14 (S.D.N.Y. Dec. 6, 2019) (citing *United States v. Lebedev*, 932 F.3d 40 (2d Cir. 2019)) (holding that a voluntary transfer of funds from one's own account can constitute a scheme to obtain funds under the bank's custody and control and thus be the basis for a bank fraud conviction).

Consequently, the Government provided sufficient evidence that a reasonable juror could find Scott guilty of conspiracy to commit bank fraud as to the Armenta Transactions, and Scott's motion as to these transactions is also denied. *See Espaillet*, 380 F.3d at 718; *Autuori*, 212 F.3d at 114; *Guadagna*, 183 F.3d at 129.

### 2.  Venue was Proper

Scott further argues that the Government failed to establish that venue was proper on the bank fraud count because it failed to prove an act in furtherance of the conspiracy took place within the Southern District of New York.  Doc. 218 at 25.  This argument is without merit.  In a conspiracy prosecution, "venue is proper in any district in which an overt act in furtherance of the conspiracy was committed by any of the coconspirators," or where it was reasonably "foreseeable that such an act would occur."  *United States v. Svoboda*, 347 F.3d 471, 483–84 (2d Cir. 2003) (internal quotation marks and citations omitted).  For purposes of bank fraud, venue is proper where the transfer of funds through in-district bank accounts at financial institutions was part of the fraud scheme. *See United States v. Korolkov*, 870 F. Supp. 60, 63–64 (S.D.N.Y. 1994).  The Government need only establish venue by a preponderance of the evidence.  *United States v. Milton*, No. 21-cr-478 (ER), 2021 U.S. Dist. LEXIS 222150, at *8 (S.D.N.Y. Nov. 15, 2021) (citing *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989)).

Here, the CryptoReal transaction was processed through BNY Mellon's Manhattan correspondent account.  Trial Tr. at 1472:15–1475:13 (Wildner Direct Testimony).  The Armenta Transaction involving Sabadell likewise went through a Manhattan correspondent account.  Trial Tr. at 913:5–14 (Kishore Direct Testimony). Moreover, the Government adduced evidence that Scott was aware that international USD transactions would use U.S. correspondent accounts.  *See, e.g.*, Trial Tr. at 1471–77 (Wildner Direct Testimony); Doc. 244 at 35 (citing GX 1441).  Accordingly, a reasonable jury could find that the Government established venue as to Count Two.  *See Espaillet*, 380 F.3d at 718; *Autuori*, 212 F.3d at 114; *Guadagna*, 183 F.3d at 129.

### 3.  The Jury Instructions Were Proper, and No Constructive Amendment Occurred

Finally, Scott argues that he is entitled to acquittal or a new trial under Rule 29 because the Court failed to instruct the jury (1) which financial institutions were federally insured and (2) that an omission can only constitute a material misrepresentation for

purposes of bank fraud where there is a duty to disclose.  Doc. 218 at 29–31; Doc. 275 at 16–17.  He alleges that the Government "invited jurors to convict on other bank fraud theories, never charged or specified in the Government's particulars letter," thus risking constructive amendment of the indictment, because the Court failed to instruct the jury that the Government's theory of bank fraud related only to Morgan Stanley, BNY Mellon, and Sabadell.  Doc. 275 at 16.  Scott expressed particular concern that the jury may have been confused by the abundance of evidence concerning Apex.  Doc. 477 at 9:20–10:10, 12:13–13:15.

Under the Fifth Amendment Grand Jury Clause, "a defendant has the right to be tried only on charges contained in an indictment returned by a grand jury."  *United States v. Wozniak*, 126 F.3d 105, 109 (2d Cir. 1997).  "[W]hen the charge upon which the defendant is tried differs significantly from the charge upon which the grand jury voted," a constructive amendment occurs, and reversal is required.  *United States v. Khalupsky*, 5 F.4th 279, 293 (2d Cir. 2021).  "To prevail on a constructive amendment claim, a defendant must demonstrate that either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment."  *United States v. Salmonese*, 352 F.3d 608, 620 (2d Cir. 2003) (quoting *United States v. Frank*, 156 F.3d 332, 337 (2d Cir. 1998)); *see also United States v. D'Amelio*, 683 F.3d 412, 416, 419 (2d Cir. 2012) (holding that constructive amendment occurs where the evidence or jury instructions at trial created a "substantial likelihood" that the defendant was convicted of a crime "distinctly different" from that for which he was indicted).  The Second Circuit has "consistently permitted significant flexibility in proof, provided that the defendant was given notice of the core of criminality to be proven at trial."  *United States v. Banki*, 685 F.3d 99, 118 (2d Cir. 2012) (quoting *United States v. Rigas*, 490 F.3d 208, 228 (2d Cir. 2007)).  Thus, the defendant must show that "the challenged evidence or jury instructions tied a defendant's conviction to 'behavior

*entirely separate* from that identified in the indictment.'"  *United States v. Bastian*, 770 F.3d 212, 223 (2d Cir. 2014) (emphasis added) (quoting *United States v. Danielson*, 199 F.3d 666, 670 (2d Cir. 1999)).

Here, the indictment does not limit the objects of the bank fraud conspiracy to BNY Mellon, Sabadell, and Morgan Stanley.  *See* Doc. 143, ¶¶ 4–5.  Thus, Scott has not demonstrated a "substantial likelihood" that he was convicted of a crime "distinctly different" or "entirely separate" from that for which he was indicted.  *See Bastian*, 770 F.3d at 223; *D'Amelio*, 683 F.3d at 416, 419.  And the Government's letter of particulars, to which Scott cites, stated that "[w]hile the Government has no obligation to prove any particular transaction or misrepresentation, these transactions include, but are not limited to [the CryptoReal Loan and Armenta Transactions]."  Doc. 160, Ex. B (emphasis in original).  Accordingly, through the letter, Scott was provided notice of the core of the criminality to be proven at trial, and the Government did not exceed the "significant flexibility in proof" it was accorded.  *See Banki*, 685 F.3d at 118.  Moreover, at the charge conference, though the Court declined to specify in the jury instructions that the only three objects of the bank fraud scheme could be Morgan Stanley, BNY Mellon, and Sabadell, it did instruct the jury that bank fraud could only arise in connection with a federally insured financial institution.  Trial Tr. at 1639:1–1643:25 (Charge Conference); *see also id.* at 2006:10–18 (Jury Instructions).  Consequently, the jury instructions did not permit the jury to find Scott guilty of conspiracy to commit bank fraud based upon any conduct related to Apex.

Finally, the Court also finds unavailing Scott's arguments that the jury instructions were in error because the Court did not instruct that omissions could be false representations for purposes of bank fraud only where a duty to disclose existed.  The law does not limit false representations by omission only to those in situations where there is a duty to disclose.  *See United States v. Zarrab*, No. 15-cr- 867 (RMB), 2016 U.S. Dist. LEXIS 153533, at *42–45 (S.D.N.Y. Oct. 17, 2016).  The jury instructions were thus

proper.  Accordingly, neither acquittal nor a new trial is warranted based on alleged error in the instructions.

### B.  Scott's Motion for Acquittal or a New Trial Under Rule 29 on the Conspiracy to Commit Money Laundering Count is Denied

To have convicted Scott of the crime of conspiracy to commit money laundering, the Government must have proven that two or more persons entered a joint enterprise to commit either[4] domestic or international concealment money laundering, and Scott knowingly and intentionally joined the enterprise.  *See Torres*, 604 F.3d at 65; *Santos*, 541 F.3d at 70.  A defendant commits domestic concealment money laundering when he:

> knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—. . . knowing that the transaction is designed in whole or in part—to conceal or disguise the nature, the location, the ownership or the control of the proceeds of specified unlawful activity.

18 U.S.C. § 1956(a)(1)(B)(i).  A defendant commits international concealment money laundering when he:

> transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—. . . knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

18 U.S.C. § 1956(a)(2)(B)(i).  Under either theory, the Government must prove beyond a reasonable doubt that the defendant knew that (1) the property, funds, or monetary instrument at issue were the proceeds of unlawful activity, and (2) the transaction,

---

[4] Scott was indicted under both theories of conspiracy to commit money laundering.  Doc. 143 ¶¶ 1–3.  The jury could therefore find Scott guilty under either theory, without needing to find him guilty as to both, so long as it was unanimous as to which of the two types was proven.  Trial Tr. at 1989:18–1990:4 (Jury Instructions).

transportation, transmission, or transfer was designed to conceal or disguise the nature, location, ownership, or control of the proceeds.  *See United States v. Odiase*, 788 F. App'x 760, 762 (2d Cir. 2019) (citing *United States v. Huezo*, 546 F.3d 174, 178–79 (2d Cir. 2008)); *United States v. Ness*, 565 F.3d 73, 77 (2d Cir. 2009).  Both types of concealment money laundering also require that the funds at issue be proceeds of specified unlawful activity—here, wire fraud.  The elements of wire fraud are "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of . . . wires to further the scheme."  *United States v. Calderon*, 944 F.3d 72, 85 (2d Cir. 2019) (alteration in original) (quoting *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004)).

Scott argues that he is entitled to an acquittal or new trial because the Government failed to prove:  (1) the existence of wire fraud because it failed to establish a sufficient nexus to the United States, and wire fraud has no extraterritorial application; (2) that Scott's transactions with the Fenero Funds were the proceeds of wire fraud; (3) that Scott knew the transactions were proceeds of wire fraud; and (4) that Scott knew the transactions were designed to conceal or disguise the proceeds.  *See* Doc. 218 at 34–42. Scott further challenges that the Court erred in failing to instruct the jury that wire fraud may not be based on entirely extraterritorial acts.  *Id.* at 42–43.  The Government argues that it satisfied its burden of proof as to each element of conspiracy to commit money laundering and the underlying wire fraud, and that the jury instructions were proper. Doc. 244 at 25–32.

The Court finds that the Government adduced sufficient evidence at trial to find that Scott knowingly concealed or disguised proceeds of wire fraud through the Fenero Funds transactions.  Scott first argues that the Government's sole evidence of domestic wire fraud was the testimony of two U.S. OneCoin victims, who collectively wired OneCoin approximately $50,000.  Doc. 218 at 35–36.  But as the Government estimated OneCoin's sales at millions (if not billions) of dollars, such a miniscule percentage of

OneCoin sales in the United States is insufficient because a domestic application of wire fraud requires that a "substantial amount of conduct [occur] in the United States." *Id.* (citing *United States v. Gasperini*, No. 16-cr-441 (NGG), 2017 WL 2399693, at *8 (E.D.N.Y. June 1, 2017)).  Scott misrepresents the trial evidence.  The Government's evidence demonstrated that OneCoin was not a purely extraterritorial wire fraud scheme; rather, it included testimony from two U.S. victims of OneCoin about their investments in the scheme and the promoters who introduced them to OneCoin, testimony regarding OneCoin meetings and conferences in the United States promoting OneCoin (including a trip by Konstantin to Las Vegas to conduct OneCoin-related meetings), and individuals transmitting wires internationally in connection with OneCoin's U.S. activities.  *See, e.g.*, Trial Tr. at 73:20–75:12, 79:17–84:16 (Direct Testimony of William Horn, OneCoin victim) (testifying that he made multiple wire transfers for OneCoin packages from his account at the American Bank and Trust of the Cumberlands, and he told the bank, per OneCoin's instructions, that the wire was for educational material); Trial Tr. at 791:8–18, 796:4–797:23, 798:22–802:23, 809:15–810:2 (Direct Testimony of Linda Cohen, OneCoin victim) (testifying that she purchased multiple OneCoin packages from her HSBC bank account and that the loss of the money she sent to OneCoin prevented her from retiring).  Accordingly, OneCoin's use of United States wires constitutes an execution of the wire fraud scheme in the United States.  *See Bascuñán v. Elsaca*, 927 F.3d 108, 122 (2d Cir. 2019) ("We therefore hold that a claim predicated on mail or wire fraud involves sufficient domestic conduct when (1) the defendant used domestic mail or wires in furtherance of a scheme to defraud, and (2) the use of the mail or wires was a core component of the scheme to defraud."); *United States v. Hayes*, 99 F. Supp. 3d 409, 421 (S.D.N.Y. 2015) (citing *Pasquantino v. United States*, 544 U.S. 349, 371 (2005) and collecting cases involving international wire fraud schemes prosecuted in the United States based on their use of interstate wires in furtherance of the fraudulent scheme).  Scott's cited authority does not require that the Court parse the percentage of fraudulent

26

proceeds obtained in the United States, as compared to abroad.  Rather, it simply states that a fraud carried out entirely outside the United States, with absolutely no domestic nexus except a tangential and limited use of some U.S. wires, is insufficient for domestic application of wire fraud.  *Gasperini*, 2017 WL 2399693, at *8.  And here, OneCoin specifically targeted victims in the United States and carried out elements of its fraudulent scheme in the United States (Trial Tr. at 73:20–75:12, 79:17–84:16 (Horn Direct), 791:8–18, 796:4–797:23, 798:22–802:23, 809:15–810:2 (Cohen Direct)), which is sufficient for domestic application of wire fraud, *Hayes*, 99 F. Supp. 3d at 421.  Thus, the Government sufficiently proved a nexus to the United States.

Second, Scott argues that the Government needed to establish that the transfers into the Fenero Funds were specifically of the proceeds of the wire fraud against OneCoin's *U.S.* victims.  Doc. 218 at 36–38.  But Scott cites no authority in his principal brief, nor on reply, for the assertion that the Government was required to conduct financial tracing at such a level of detail.  *See id.*; Doc. 275 at 14–15.  This alone is reason to reject Scott's argument.  Moreover, the Government offered evidence at trial that both Horn and Cohen wired money to a U.S.-based OneCoin depository account, which subsequently directly and indirectly transferred money to the Fenero Funds.  *See* Doc. 281 at 3; Trial Tr. at 1691:21–1695:19 (Direct Testimony of Rosalind October, Senior Financial Analyst in the Major Economic Crimes Bureau of the Manhattan District Attorney's Office).[5]  The Court thus need not decide whether Scott's conviction would have been deficient had the Government not offered such evidence.

Third, Scott argues that the Government failed to prove he knew that the Fenero Funds transfers were the proceeds of unlawful activity (*i.e.*, wire fraud).  Doc. 218 at 39–40.  Specifically, he argues that, because wire fraud has no extraterritorial application,

---

[5] Based on the same mistaken arguments that the Government failed to demonstrate that the U.S. victims' money was traceable to the Fenero Funds, Scott also argues in passing that the Government failed to sufficiently establish venue under 18 U.S.C. § 1956(i).  Doc. 218 at 42.  Because a reasonable juror could have credited the Government's evidence tracing the victims' funds, Scott's argument as to venue fails.

only OneCoin's conduct in the U.S. and its proceeds therefrom was cognizable as unlawful for purposes of a money laundering conviction. *Id.* at 40. Consequently, Scott argues that the Government therefore needed to prove that he specifically knew that the transfers were of proceeds from OneCoin's *U.S.* activities, but it failed to prove that Scott knew OneCoin had any U.S. connection. *Id.* Again, Scott cites no authority for the proposition that the OneCoin funds were proceeds of unlawful activity only insofar as the wire fraud was against U.S. victims, nor that the Government therefore needed to prove his knowledge at such a level of detail. And, again, this alone is reason enough to reject Scott's argument. Moreover, the argument is inconsistent with the law. First, to satisfy its burden to prove scienter under the money laundering statute, the Government needed only to prove that Scott knew he was "dealing with the proceeds of some crime, even if he [did] not know precisely which crime." *United States v. Prevezon Holdings Ltd.*, 122 F. Supp. 3d 57, 74 (S.D.N.Y. 2015) (internal brackets omitted) (quoting *United States v. Tillman*, 419 F. App'x 110, 111–12 (2d Cir. Apr. 15, 2011) (summary order)). Therefore, even if the only the money cognizable as proceeds of wire fraud was that obtained from the U.S. victims, the Government did not need to prove that Scott knew the Fenero Funds transfers were proceeds specifically of wire fraud (*i.e.*, from U.S. victims), as opposed to other unlawful activity. *See id.* And the Government presented ample evidence that Scott knew that OneCoin funds were the product of fraud and criminal activity.[6] *See* Doc. 244 at 25–27. Furthermore, wire fraud considers the larger fraudulent scheme, not merely individual transactions, and global money laundering and fraud schemes with domestic actors, wires, or effects can thus be properly reached through the wire fraud statute. *See United States v. Napout*, 963 F.3d 163, 180–81 (2d Cir. 2020); *Bascuñán*, 927 F.3d at 123.

---

[6] Scott maintains that he believed OneCoin was a reputable organization. Doc. 218 at 39–40. But, on a Rule 29 motion, the Court must view the evidence in the light most favorable to the Government and credit every inference that could have been drawn in the Government's favor. And a reasonable juror could easily have found that Scott knew OneCoin was a fraud, so the Court will not disrupt the jury's assessment of the weight of the evidence. *See id.; Espaillet*, 380 F.3d at 718.

Consequently, Scott is incorrect that only the money from U.S. victims was cognizable as the proceeds of wire fraud where the global OneCoin scheme was indisputably fraudulent and intentionally targeted, in part, the United States, using U.S. wires and with at least some U.S.-based actors.  Accordingly, the Government need not have proven that Scott knew the Fenero Fund transfers were proceeds of OneCoin's U.S. activity.

Fourth, Scott argues that the Government failed to prove that he knew the Fenero Funds transactions were designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the unlawful activity.  Doc. 218 at 40–42.  But the Government offered overwhelming evidence at trial that Scott meticulously concealed any connection between the Fenero Funds and OneCoin because he recognized that, in his words, "the link to OneCoin will kill us."  Doc. 244 at 27–28 (citing GX 1041, 1289, 1434).  And Scott created a highly complex and sophisticated structure to receive and transfer OneCoin proceeds, involving layering the funds through multiple international bank accounts and forging papers to create an inaccurate paper trail that concealed the transactions' true nature and source—conduct the Government's expert described as prototypical money laundering behavior.  *See id.* (citing GX 1175, 1177, 1209, 1388, 1391, 2270, 2276, 2602, 2602-A); Trial Tr. at 459:12–461:21, 463:13–481:9 (Direct Testimony of Donald Semesky, Anti-Money Laundering Compliance and Investigations Independent Consultant).  Accordingly, crediting every inference that could have been drawn in the Government's favor, the Court finds that the Government sufficiently proved that Scott knew the transactions were designed to conceal the nature, source, and ownership of the funds.

Finally, the Court also finds unavailing Scott's arguments that the jury instructions were in error because it did not grant his request for a supplemental jury instruction that "in order for proceeds to be the proceeds of a specified unlawful activity, the funds have to be proceeds of a fraudulent scheme that occurred in the United States."  Doc. 181 (Nov. 20, 2019 Def. Request for Suppl. Jury Instruction) at 2; Doc. 218 at 43.  But, as

discussed above, such a jury instruction misstates the law.  *See Napout*, 963 F.3d at 180–81; *Bascuñán*, 927 F.3d at 123; *Prevezon Holdings Ltd.*, 122 F. Supp. 3d at 74.  The jury instructions were thus proper.  Accordingly, neither acquittal nor a new trial is warranted based on alleged error in the instructions.

Thus, crediting every inference that could have been drawn in the Government's favor, the Court finds that the Government sufficiently proved that Scott was guilty of conspiracy to commit money laundering.  Scott's motion for an acquittal or new trial under Rule 29 is denied.

### C.  Scott's Motion for a New Trial Pursuant to Rule 33 is Denied

In addition to the grounds for relief under Rule 29, Scott's opening motion also requests a new trial under Rule 33 in the interests of justice.  *See* Doc. 218.  By supplemental motion, Scott further moves for a new trial in light of the new evidence of Konstantin's perjury and post-trial misconduct.  Doc. 410.  The Court finds Scott's Rule 33 arguments meritless and declines to exercise its discretion to order a new trial, as it does not have "a real concern that an innocent person may have been convicted."  *See McCourty*, 562 F.3d at 475; *Torres,* 128 F.3d at 48.

### 1.  *Konstantin's Perjury Regarding the Laptop Does Not Warrant a New Trial*

At trial, Konstantin testified that, when he traveled to the United States to attend OneCoin-related meetings in Las Vegas in February 2019, a OneCoin laptop was seized and then returned by a border patrol officer.  Trial Tr. at 205:9–207:7.  Upon its return, Konstantin testified he put the laptop into a paper trash bag with other trash items and threw it into a trash bin on a busy place in the Las Vegas Strip.  Trial Tr. at 206:20–23.  In the summer of 2021, Scott discovered Konstantin had lied about throwing away the laptop, as Konstantin had in fact given it to one of his associates, Duncan Arthur, to return to Bulgaria.  Doc. 434-4.  Scott argues this newly discovered evidence of perjury entitles him to a new trial because Konstantin was a key government witness, the jury would not have credited any of Konstantin's testimony had it known of this perjury, and it

therefore would not have found Scott guilty.  Doc. 410.  The Government, however, argues that Konstantin's testimony regarding the disposition of the laptop—which occurred after Scott's crimes—was not material to the jury's verdict, and Scott extensively impeached Konstantin at trial, so evidence of any perjury related to the laptop would merely have been cumulative.  Doc. 412.

Rule 33 motions, including those based on newly discovered evidence of perjury, are disfavored and granted only sparingly and with great caution in the most extraordinary circumstances.  *Stewart*, 433 F.3d at 296–97; *Ferguson*, 246 F.3d at 134; *Gambino*, 59 F.3d at 364.  Accordingly, where the Government was unaware of the perjury at the time of trial, the motion will be denied absent a "firm belief" the defendant would most likely not have been convicted but for the perjury.  *Stewart*, 433 F.3d at 296–97 (quoting *Wallach*, 935 F.2d at 456).  If the Government knew or should have known of the perjury before the conclusion of the trial, the motion will be granted if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury."  *Id* at 297 (quoting *Wallach*, 935 F.2d at 456).  And, if the Government knew of the perjury when offered, reversal is "virtually automatic."  *Id.* (quoting *Wallach*, 935 F.2d at 456).  Moreover, Rule 33 motions will not be granted where the newly discovered evidence is merely cumulative or impeaching.  *Forbes*, 790 F.3d at 406–07; *Wong*, 78 F.3d at 79.

The Government does not dispute that Konstantin's testimony regarding the laptop was perjurious (not merely mistaken), nor that the perjury is newly discovered, and Scott could not have discovered the perjury before or during the trial.  *See* Doc. 412 at 22. Additionally, Scott does not argue that the Government knew of Konstantin's perjury, merely that it *should* have known (Doc. 433 at 17), though the Government argues that it did not and could not have known of the perjury before Arthur's disclosure in the summer of 2021 (Doc. 445 at 60–61).  Accordingly, at minimum, Scott must establish a

"reasonable likelihood" that Konstantin's perjury regarding the laptop could have affected the jury's verdict. *See Stewart*, 433 F.3d at 297. He has failed to do so.

The entirety of Konstantin's testimony regarding the laptop was such a small part of his testimony as to be negligible—covering, at most, one or two pages of his testimony, which spanned over three hundred pages in the trial transcript. *Compare* Trial Tr. at 205:25–207:1 (laptop testimony), *with* 125:4–446:23 (Konstantin Direct, Cross, Redirect, and Recross). Moreover, the disposition of the laptop was a purely collateral matter and was thus unlikely to have impacted the jury's determination of Scott's guilt. In fact, given that Konstantin's testimony focused primarily on the nature and conduct of OneCoin's operations rather than of Scott's participation, and given the overwhelming additional evidence that the Government presented at trial (as discussed above), the Court does not find that Konstantin's testimony, even taken as a whole, was primarily determinative of Scott's guilt. The Court's conclusion is reinforced by Scott's extensive impeachment of Konstantin, including on much more significant topics more relevant to the jury's determination of Scott's guilt. *See, e.g.*, Trial Tr. at 301:22–307:4 (Konstantin had limited interaction with Scott, was not present at the Meeting nor ever told what was discussed, and he could not be "a hundred percent sure" that Dilkinska was present); 404:19–413:18 (Konstantin lacked personal knowledge of Scott). The newly discovered evidence of perjury concerning the laptop would therefore have been merely cumulative or impeaching and is not a basis to grant Scott a new trial. *See Forbes*, 790 F.3d at 406–07; *Wong*, 78 F.3d at 79. Accordingly, Scott's motion for a new trial pursuant to Rule 33 on the basis of the newly discovered evidence of Konstantin's perjury regarding the laptop is denied.[7]

---

[7] Scott asks in the alternative for an evidentiary hearing. Doc. 410 at 7. The Court does not find that such hearing is necessary as there is no dispute as to the relevant facts and therefore denies the request.

*2. No Other Basis for a New Trial Under Rule 33 Exists*

Scott makes several other wide-ranging arguments under Rule 33, none of which the Court finds availing.  Scott argues that Konstantin also perjured himself with regard to the Meeting—the July 20, 2016 meeting between Scott, Ruja, and Dilkinska at the OneCoin office in Sofia.  Doc. 433 at 14–16; *see also* Doc. 461 at 11–18.  Although Konstantin did not participate in the Meeting, nor consequently testify regarding what was discussed, he did testify that after Scott arrived at the office, he made small talk with Scott and escorted him into Ruja's office; Ruja then had Konstantin bring in Dilkinska, clear the floor, and leave.  Trial Tr. at 245:19–246:15.  Scott argues this testimony has "now conclusively been established as an outright lie" because Dilkinska was in India between July 19 and July 22, as corroborated by her passport stamps and the Indian authorities, and Konstantin's testimony was too detailed to be a mistake.  Doc. 433 at 15.  And the alleged perjury impacted the jury's verdict because the Meeting was the only time Konstantin met Scott face-to-face and the only alleged meeting between Scott and Dilkinska, so the jury would not have found Scott guilty without Konstantin's testimony.  *Id.* at 16, 22.

Scott also argues that he made a specific *Brady* request the day after Konstantin's testimony for information regarding the Meeting and Dilkinska's whereabouts, but the Government inadequately responded and instead opposed the introduction of two emails ("the Emails") into evidence that would have made clear that Dilkinska was in India during the Meeting.  *Id.* at 17.  Relatedly, Scott argues the Court's exclusion of the Emails was erroneous and provides a further basis for a new trial.  *Id.* at 23–27.  Accordingly, Scott argues that Konstantin's perjury and the Government's failure to correct require a new trial.  *Id.* at 27–30.  Finally, Scott also argues that Investigator Winters' delay in forwarding Arthur's information to the Government and to Scott, as well as the Government's delay disclosing Konstantin's post-trial breach of his cooperation

agreement via his use of an illicit phone at the MCC, further warrant a new trial in the interests of justice.  *Id.* at 30–34.

The Government responds that Scott has not established that Konstantin perjured himself about the Meeting, rather than being merely mistaken about the exact details of the timing; and the alleged perjury is cumulative impeachment that does not require a new trial.  Doc. 445 at 38–51.  Further, at least one of the Emails was properly excluded, but the Emails and passport stamps are, in any event, not "newly discovered," and evidentiary disputes are not proper bases for Rule 33 motions.  *Id.* at 25–29.  Moreover, it argues it did not violate any of its disclosure obligations regarding Dilkinska's whereabouts during the Meeting.  *Id.* at 58–59.  Nor did it suppress or withhold any information regarding the laptop or MCC phone but in fact acted promptly.  *Id.* at 60–61.

> a.  *Scott Has Not Established that Konstantin Committed Perjury with Regards to the Meeting, nor that the Government Knew of the Alleged Perjury, or that a New Trial is Warranted Because of It*

The Court does not find that Scott has established Konstantin's testimony regarding the Meeting was perjurious; but, even if it was, the Court does not find that Rule 33 requires a new trial.  Newly discovered[8] evidence of perjury may be the basis for a new trial under Rule 33.  *See Stewart*, 433 F.3d at 296–97.  "A witness commits perjury if he gives false testimony concerning a material matter with the willful intent to provide

---

[8] The Government argues that Scott's arguments as to the Meeting are untimely because Scott attended the Meeting and therefore knew all along that Konstantin's testimony about Dilkinska's presence was mistaken.  Doc. 445 at 33.  Because Scott was on notice of the facts at the time of the testimony during trial, it argues that the evidence of Konstantin's purported perjury cannot now be newly discovered and therefore is not timely.  *Id.* at 33–38.  Scott responds that newly discovered evidence is required to file a timely Rule 33 motion (here, Arthur's new evidence about the laptop), but once a timely motion has been filed, he can raise arguments other than those about the new evidence, and the Court therefore need not find that evidence of the purported Meeting perjury is newly discovered.  Doc. 461 at 19.  But Scott argues that Dilkinska's passport *is* new evidence, which the Government only disclosed to Scott in December 2021 and which Scott could not have previously discovered through the exercise of due diligence because it was obtained through international law enforcement channels not available to the defense.  *Id.* at 20.

Ultimately, the Court need not decide whether Scott's argument is untimely notwithstanding the timeliness of his broader Rule 33 motion because the argument is, in any event, not meritorious.  But the Court emphasizes that the Government's position is without merit.  The Government has not shown that Scott had access to Dilkinska's passport at trial nor even that it knew the passport would be relevant evidence.

false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory." *United States v. Ng Lap Seng*, No. 15-cr-706 (VSB), 2018 U.S. Dist. LEXIS 83441, at *46–47 (S.D.N.Y. May 9, 2018) (quoting *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001)). The defendant bears the burden to prove perjury by a preponderance of the evidence. *Id.* at *47 (citing *Cunningham v. Bennett*, No. 02-cv-4635 (ARR), 2005 WL 1162475, at *8 (E.D.N.Y. May 16, 2005)). Scott has not done so here. While the passport stamps and confirmation from the Indian authorities do evidence that Konstantin's testimony was wrong about Dilkinska being in Sofia at the Meeting, they do not necessarily prove that the testimony was perjury—that Konstantin gave false testimony *with willful intent*. Konstantin indicated on cross that he was "pretty sure" that Dilkinska was there, but he did not answer in the affirmative when Scott repeatedly asked if he was "a hundred percent sure." Trial Tr. at 304:3–18. And the Government points to evidence suggesting that Konstantin may have merely been mistaken of the date of the meeting—that Scott met with Ruja and Dilkinska in September 2016, not July 2016, or Dilkinska attended by phone rather than in person. Doc. 445 at 41. In turn, Scott insists that it is "exceedingly unlikely" that Scott met Dilkinska in September 2016, even considering the evidence to which the Government points. Doc. 461 at 13. But, even if it is true that Scott did not meet Dilkinska in September 2016, the Court remains unpersuaded that Scott has satisfied his burden of proving by a preponderance of evidence that Konstantin willfully lied about the Meeting. Accordingly, Scott is not entitled to a new trial based on this alleged perjury. *See Np Lap Seng*, 2018 U.S. Dist. LEXIS 83441, at *46–48.

Moreover, even if Konstantin *had* perjured himself with respect to his testimony about the Meeting, "[p]erjury in and of itself is insufficient to justify relief under Rule 33"; the defendant must further establish the requisite level of materiality (which depends on the extent of the Government's knowledge of the perjury). *Ng Lap Seng*, 2018 U.S. Dist. LEXIS 83441, at *47–48. Here, Scott argues that the Government knowingly

offered false testimony and a new trial is therefore "virtually automatic" under *Wallach*.
Doc. 461 at 25–29.  And, while the Government suggests that *at most* it should have
known Dilkinska was not in Sofia on July 20, 2016, but it insists it did not know
Konstantin intentionally testified falsely.  Doc. 445 at 45.  Scott responds that the
language of *Wallach* does not require that Government knew Konstantin *intentionally*
testified falsely, so long as it knew the testimony was false (even if accidental), and he
further argues that *Wallach* is triggered even if the Government merely *should have*
known the testimony was false.  Doc. 461 at 25–29.  But *Wallach* says:

> Where the prosecution knew or should have known of the perjury,
> the conviction must be set aside "if there is any reasonable likeli-
> hood that the false testimony could have affected the judgment of
> the jury."  Indeed, if it is established that the government knowingly
> permitted the introduction of false testimony reversal is "virtually
> automatic."

935 F.2d at 456 (internal citations omitted).  Accordingly, the plain language of *Wallach*
belies Scott's arguments that reversal is virtually automatic even if the Government only
should have known of even unintentionally false testimony.  *See id.*  Reversal is therefore
not "virtually automatic" here, and the Court instead considers whether Scott has
established that there exists "any reasonable likelihood that the false testimony could
have affected the judgment of the jury."  *Id.*

But the Court does not find such likelihood exists.  On cross, Scott elicited from
Konstantin his lack of definitive certainty of Dilkinska's presence at the Meeting, and,
even on direct, Konstantin only ever testified that the Meeting occurred but provided no
information as what was discussed at the Meeting.  *See* Trial Tr. at 246:14–247:7, 304:3–
18.  Moreover, ample other evidence existed both of Scott's involvement with Ruja and
Dilkinska and, more generally, of his guilt.  *See, e.g.*, Doc. 445 at 48–51.  Consequently,
the newly discovered evidence of Konstantin's alleged Meeting-related perjury would, at
most, have been cumulative impeachment material.  *See Forbes*, 790 F.3d at 406–07
("Relief under Rule 33 based on newly discovered evidence may be granted only upon a

showing that . . . the evidence is not merely cumulative or impeaching; and . . . the evidence would likely result in an acquittal." (quotation marks omitted)); *Wong*, 78 F.3d at 79 ("[N]ew impeachment evidence is not material, and thus a new trial is not required when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." (internal quotation marks omitted)).  The Court does not believe "it would be a manifest injustice to let the guilty verdict stand," *Sanchez*, 969 F.2d at 1414, and is "satisfied that competent, satisfactory, and sufficient evidence in the record supports the jury verdict," *Ferguson*, 246 F.3d at 134.

> ### b. Neither the Court's Exclusion of the Emails Nor the Government's Alleged Disclosure Violations Require a New Trial

Scott's arguments as to the exclusion of the Emails and his allegations of the Government's disclosure violations are no more successful.  First, the Court notes that Rule 33 motions are not the appropriate vehicles to relitigate evidentiary disputes.  *See Soto*, 2014 U.S. Dist. LEXIS 60191, at *21.  Accordingly, it need not reconsider at this time whether the Emails were properly excluded.  Second, the Court does not find that the exclusion, even if in error, had any impact on the jury's verdict since, as discussed above, Konstantin disclaimed any knowledge of the substance of the Meeting.  And Scott has not satisfied the requirement to show under Rule 33 "a manifest injustice."  *See United States v. Mejia*, 948 F. Supp. 2d 311, 319 (S.D.N.Y. 2013) ("Even if the Court erred in excluding the hearsay testimony, Defendant still has not met his 'heavy burden' under Rule 29, [*United States v.*] *Broxmeyer*, 616 F.3d [120,] 125 [(2d Cir. 2010)], nor demonstrated that it would be a 'manifest injustice' to let the verdict stand under Rule 33, *Sanchez*, 969 F.2d at 1414.").

Finally, Scott makes three accusations of Government misconduct with respect to its disclosures:  (1) the Government's delay in disclosing pretrial one of its batches of pretrial *Brady* materials with documents from Greenwood's electronic devices, (2)

Winters' delay forwarding Arthur's statement concerning Konstantin's laptop, and (3) the Government's delay disclosing Konstantin's use of the MCC phone in violation of his cooperation agreement.  Doc. 461 at 42–47.  Although he does not argue that any of the three instances of alleged misconduct independently require a new trial under Rule 33, he asks the Court to consider his other Rule 29 and Rule 33 arguments in light of this "pattern" of misconduct.  *Id.* at 42.  Even if the Court were to find that the Government did not disclose the Greenwood documents, Arthur's statement, or Konstantin's use of a cellphone in the MCC as expeditiously as it could have, Scott has not established that any of those delays prejudiced him or rendered the jury's verdict unjust.  Thus, the Court does not find that these three allegations of misconduct, even if true, alter its holdings as to Scott's arguments for acquittal or for a new trial.

Accordingly, none of Scott's arguments satisfy his heavy burden under Rule 33 to convince the Court that "a real concern that an innocent person may have been convicted."  *McCourty*, 562 F.3d at 475 (quoting *Ferguson*, 246 F.3d at 134).  Considering the totality of the circumstances, *see Ferguson*, 246 F.3d at 134, the Court does not find that "it would be a manifest injustice to let the guilty verdict stand," *Sanchez*, 969 F.2d at 1414 (citation omitted).  Rather, the Court is "satisfied that competent, satisfactory, and sufficient evidence in the record supports the jury verdict." *Ferguson*, 246 F.3d at 134.

## IV.   CONCLUSION

For the reasons set forth above, Scott's motions are DENIED.  The Clerk of Court is respectfully directed to terminate the motions, Docs. 218 and 410.

It is SO ORDERED.

Dated:   September 14, 2023
         New York, New York

_____
EDGARDO RAMOS, U.S.D.J.