UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- against -

MARK S. SCOTT,

                              Defendant.

No. 17-CR-630

**SENTENCING MEMORANDUM ON BEHALF OF MARK SCOTT**

Arlo Devlin-Brown
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1046

David M. Garvin
Law Offices of David M. Garvin, P.A.
200 South Biscayne Boulevard
Suite 3150
Miami, FL 33151
(305) 371-8101

*Counsel for Mark S. Scott*

# TABLE OF CONTENTS

I.    Relevant Background ................................................................................. 3

    A.    Mark's Childhood ............................................................................. 3

    B.    Mark's Commitment to Family, Friends and Community .................................... 4

    C.    Mark's Serious And Chronic Health Problems .................................................... 8

        ■    ████████████████████████████████

        ■    ████████████████████████████████

        3.    Other Medical Conditions ........................................................................10

    D.    Mark's Professional Background And The Road To Ruja ..................................11

    E.    Mark's Arrest And Conviction ..........................................................................12

II.   A Sentence of Five Years Or Less Is Sufficient But Not Greater Than Necessary .........13

    A.    The Probation Department's Proposed Guidelines Calculation Is
        Erroneous...........................................................................................................13

        1.    The Probation Department Calculation And Recommendation ...............13

        2.    The Loss Calculation is Erroneous.........................................................14

        3.    Section 3B1.3 Does Not Apply ("Special Skill") ...................................18

        4.    Section 3C1.1 Does Not Apply ("Adjustment for Obstruction of
            Justice") ............................................................................................19

        5.    Mark's Correct Offense Level ................................................................21

    B.    Any Guidelines Calculation Driven by the $400 Million Loss Amount Is
        Worth Little Weight............................................................................................22

    C.    The Remaining § 3553(a) Factors Call for a Sentence of No More Than
        Five Years..........................................................................................................24

        1.    Mark's Offense Conduct Did Not Involve Operating The OneCoin
            Scam ....................................................................................................24

        2.    Mark's Personal Characteristics Warrant Leniency................................29

3.      A Sentence of Five Years Or Less Would "Provide [Mark] With
        Needed … Medical Care … In The Most Effective Manner" In
        Consideration of Section 3553(a)(2)(D)...................................................29

CONCLUSION ...........................................................................................................32

## PRELIMINARY STATEMENT

Mark comes before this Court a broken man whose life was completely upended from the moment he met Ruja Ignatova some eight years ago.  At that time, Mark was an equity partner at Locke Lord with a corporate transactional practice he had spent the better part of two decades developing at firms across Miami.  He was engaged to his now wife, and building a family was on the horizon.  And then a longtime client, Gilbert Armenta, introduced Mark to Ruja Ignatova, the wealthy founder of the cryptocurrency OneCoin.  Mark provided Ruja with transactional legal services through Locke Lord and then made the regrettable decision to leave the firm to set up a series of offshore private equity funds where Ruja placed a portion of her prodigious assets.  Mark asked little at the time about OneCoin, the source of Ruja's wealth generally, or the particular reasons why she – like many of the Uber rich – wanted funds held in various corporate entities with no obvious connection to her or her business.  Some of the ultrawealthy take these steps for lawful (if at times ethically questionable) purposes relating to privacy, estate planning and tax avoidance.  Others, of course, put distance between themselves and their money because their money comes from crime.

It is now apparent that Ruja's purposes fell into the latter bucket.  While Mark steadfastly maintains his innocence, the evidence is now clear that OneCoin was not a legitimate cryptocurrency and Mark deeply regrets his involvement with Ruja and feels only sympathy towards those she deceived.  Mark also is well aware that his willingness to accept at face value Ruja's claims to Mark and others that her wealth was from lawful sources[1] proved to be his own

---

[1] For example, the Government's own trial exhibits reflect that Ruja told Mark that OneCoin sought to operate only in jurisdictions where it could do so lawfully, and further told Mark that her diversified wealth include funds from "private equity like investments" unrelated to OneCoin.  DX 103 (GX 1007).

undoing.  In the more than five years that followed his arrest, his life has fallen apart.  Mark's

livelihood – the ability to practice law – has been taken from him.  The money he received from

Ruja – money he reported on his U.S. taxes and held in accounts under his name or the names of

companies clearly associated with him – has been seized, and the assets the government links to

it are all subject to forfeiture.  Mark is approaching *half a decade* under strict home confinement,

unable to leave his apartment except for medical or legal reasons.  His financial resources and

savings are depleted and a myriad of serious health problems, from ███████████████████

have crippled the strong and powerful man that the Court saw at trial in 2019.

We recognize of course that Mark has been convicted of money laundering, a serious

crime, and that this will weigh heavily at sentencing.  But through this submission, we seek to

provide the Court with both a fuller picture of Mark as a human being and a more finely

calibrated assessment of how his conduct, specifically, compares to the conduct of others

charged with OneCoin related offenses.  The sentencing letters submitted with this brief

showcase sides of Mark obscured during his criminal trial.  As for how Mark compares to his

convicted co-defendants, one factor stands out: apart from David Pike (who received a sentence

of probation), each of Mark's co-defendants was charged with and convicted of being part of the

OneCoin wire fraud scheme, of knowingly – and with intent to defraud – stealing what the

government calculates to be hundreds of millions of dollars from eager crypto investors who

bought a cryptocurrency that turned out to be bogus.  Mark was never charged with, much less

convicted of, the OneCoin wire fraud.  There is zero evidence he had anything to do with it, or

any knowledge of a scheme to deceive purchasers of the cryptocurrency.  The fact is that the

money laundering statutes reach those well beyond defendants involved in or even aware of the

specified unlawful activity from which the money is sourced.  A conviction for money

laundering requires only that a defendant know – or consciously avoid knowing – that that the funds at issue are the product of some form of illegal activity.  18 U.S.C. § 1956.  While transferring funds one believes are likely dirty in some sense is a serious criminal offense, it pales in comparison to purposefully ripping off unsuspecting investors of their hard-earned money.  Considering all of these factors, a sentence of no more than five years imprisonment – on top of more four years of home incarceration that Mark has already served – is sufficient but not greater than necessary.[2]

I.      **Relevant Background**

     A.      **Mark's Childhood**

     Mark was born on October 15, 1968 in a United States Army hospital in Frankfurt, Germany, the only child of an American father in the U.S. Armed Forces and a German mother whom his father met while stationed abroad.  PSR ¶ 77.  His parents separated when Mark was three years old, and he was raised in Germany by his mother and maternal grandparents.  PSR ¶ 79.  He and his mother were particularly close from an early age, and she provided him with a stable upbringing in a middle-class home environment.  PSR ¶¶ 79, 81.  Mark saw his father about twice a year until age 12, when he began returning to the U.S. to spend summers with his father in Massachusetts.  PSR ¶ 80. ███████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████

---

[2] The parties previously briefed their positions on the government's forfeiture requests.  Dkt. 318; Dkt. 345.  Even while maintaining his innocence, Mark has and remains willing to relinquish funds that he now recognizes are associated with a fraud scheme as part of a negotiated resolution.  Given the government's wildly unrealistic position that Mark should forfeit $400 million – many multiples of the amount Mark ever personally received for managing the funds the government has alleged are OneCoin-related – such a negotiated resolution has thus far proved impossible.

████████████████████████████████████████████████████████

███████████████████████████

In 1988, Mark graduated from Schule am Ried high school in Frankfurt, Germany.  PSR ¶ 99.  He then moved to the U.S. to attend college and later, law school.  PSR ¶ 82.  Like many, Mark initially struggled in deciding what path to take in life.  At first, he decided on a career in the military, wanting to follow in his father's footsteps.  He received a full R.O.T.C. U.S. Army scholarship to attend college at the University of Massachusetts-Amherst, but then transferred to Tufts University after one year.  PSR ¶ 100.  Though he continued with R.O.T.C. for two additional years while at Tufts, he ultimately chose not to join the Army after his father encouraged him to pursue a different path.  PSR ¶ 101; Ex. C-12 (Lidia Scott Letter 1).

### B.      Mark's Commitment to Family, Friends and Community

Mark had an unsuccessful first marriage ████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

███████████████        As one friend observed, Mark went through "hard times during his first marriage and divorce."  Ex. C-3 (Christian Bohn Letter).

A turning point came, however, when Mark met the love of his life, Lidia Kolesnikova Scott.  They married in September 2017 after a six-year relationship.  PSR ¶ 84.  With Lidia, Mark found the true companionship, familial stability, and affection that he had craved since an early age.  Robert Skorupa, a close friend of Mark who testified on his behalf at trial, recalls that at Mark and Lidia's wedding, when the pastor asked Lidia if she would take Mark's hand in marriage, "she responded with the greatest … affirmation of 'I do' that only a deserving person could possibly earn."  Ex. C-14 (Robert Skorupa Letter).

Any serious brush with the law is likely to put a strain on even the strongest of relationships, perhaps even more so when a marriage is fresh.  Mark was arrested only one year after he and Lidia were married.  PSR ¶¶ 44, 84.  But instead of the hardships of this period of their life breaking them, the past five years have only made their love stronger.  He and Lidia have grown even closer, and together they have built a loving home for their now six-year old son, ██████  Lidia describes Mark as "the most loving, kind, and caring human being" and "a wonderful husband and amazing father."  Ex. C-12 (Lidia Scott Letter 1).

In this long period of home incarceration, Mark has taken on as active a parenting role as possible ████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

Mark's friends have also noticed ██████████████████████

████  One tells of how parenting has "softened" Mark, adding that she has "never known [Mark] to be as happy as he is with his [] son."  Ex. C-11 (Kelsey Abernathy McLean Letter).

███████████████████████████████████████████████

████████████████████████████  "Mark has grown into quite a family man and I enjoy seeing him caring so much about ██████ as well as his wife Lidia," comments perhaps his oldest and best friend who has known Mark for over three decades.  Ex. C-9 (Alexander Lehnen Letter).

Mark has likewise been a loving and supportive son to his own parents.  Losing his father ███████████ when Mark was only 32, Mark focused on caring for his German mother who lived alone and had no other children.  One of Mark's biggest life regrets is that he was not able

5

to see his mother before she passed away in Germany in February 2021. ███████████
████████████████████████ and she was entirely dependent upon Mark during this period,

both emotionally and financially, especially as she became more sick and frail.  Mark was his

mother's health care proxy and legal guardian.  PSR ¶ 87.  He coordinated her medical care and

ensured that all of her needs were met, always following up to see that she had access to the

medications and treatments she needed as her illness progressed.  Ex. C-12 (Lidia Scott Letter 1);

Ex. C-13 (Lidia Scott Letter 2).  Following his 2018 arrest, however, Mark's travel privileges

were revoked, and by this point, his mother was too ill to come to the United States.  Sadly, she

died before they were able to see one another again after for more than four years of separation.

Mark suffered greatly from his inability to be there for her more meaningfully.  His mother was

only able to meet █████ twice when he was still an infant.

Mark's immense love for and devotion to his mother emerges as a common theme among

the letters from his family and friends.  One friend writes that he "will never forget with how

much energy and love [Mark] support[ed] his mother."  Ex. C-3 (Christian Bohn Letter).  Miguel

Diaz de la Portilla, another close friend of Mark who also testified on his behalf at trial,

remarked on Mark's "great devotion and care" for his mother.  Ex. C-5 (Miguel Diaz de la

Portilla Letter).  Another friend recalled Mark as a "devoted son, who has never allowed his

mother to lack for anything."  Ex. C-8 (Suyain George Letter).  Mark remains haunted by this

loss and will never have a feeling of closure with respect to her passing.

Mark has also remained a constant support to his friends and people closest to him,

always ready to assist.  Several friends describe difficult periods in their lives during which Mark

stepped up immediately to help. ████████████████████████████████
████████████████████████████████████████████

6

██████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████

One friend of Mark describes how Mark "has an enormous heart to help others no matter how complicated the situation may be." Ex. C-1 (Simon Baker Letter). Still others comment on how Mark "has always been there when I needed anything," Ex. C-3 (Christian Bohn Letter), and on how he has been "a generous caring friend to many over the years." Ex. C-8 (Suyain George Letter). Another expresses similar sentiments, saying that in the Frankfurt financial market, "Mark always enjoyed the reputation of someone that was always available to selflessly help anyone that asked him for support in private or professional matters." Ex. C-6. (Felix Eimer Letter). Says another, "Mark has always been there when I needed anything and he remains a close friend, even during these trying times." Ex. C-7 (Edward Feenane Letter).

Finally, Mark has demonstrated a long-standing commitment to his community and the causes that are important to him. He generously offered hundreds of hours of pro bono legal advice to Crystal Academy, a school in Coral Gables, Florida for children with autism, which he helped to create, and served as its Chairman of the Board for several years until shortly before his arrest. Ex. C-4 (Crystal Academy Letter). He also donated monetarily to the school, covering the cost of the school's creation as well as the outfitting of an additional classroom. *Id.* And, he helped Crystal Academy become more well-known in the community by facilitating introductions to politicians and community leaders, some of whom went on to become quite involved in the school. *Id.*; Ex. C-5 (Miguel Diaz de la Portilla Letter). As recognition for these

efforts, among others, Mark received a Key to the City from Coral Gables in 2017.  Ex. C-12

(Lidia Scott Letter 1).

Mark has also been a frequent contributor to the Wounded Warrior project, through both

monetary donations and participation in charity events.  *Id.*  Mark's father was a U.S. Army

Major who served multiple tours of duty, including during the Korean War.  *Id.*  Despite his

father's premature passing, Mark has remained committed to this cause in his honor.  *Id.*

**C.**     **Mark's Serious And Chronic Health Problems**

Beginning soon after his November 2019 trial, Mark has been beset by a series of serious

medical issues which have greatly impacted his quality of life.  ████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

█     ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████





3.      <u>Other Medical Conditions</u>



### D.   Mark's Professional Background And The Road To Ruja

One year after graduating from Tufts University, Mark enrolled in law school at Boston University.  Mark graduated and began working in private practice following his graduation from law school in 1995.  PSR ¶ 102.  He then became something of a professional journeyman.  He worked at ten different firms over his 20-year legal career, never quite finding a place where he fit in.  Despite earning the respect of many of his colleagues, *see, e.g.,* Ex. C-1 (Simon Baker Letter); Ex. C-5 (Miguel Diaz de la Portillo Letter); Ex. C-6 (Felix Eimer Letter), he struggled to find long term satisfaction in any of the firms he served.  PSR ¶¶ 108-17.

When Mark was first introduced to Ruja Ignatova by email in September 2015 by a longtime client, Gilbert Armenta, GX 2114; GX 2115, she appeared to be a valuable client.  Mark knew very little about cryptocurrency, and had never heard of OneCoin.  But just as many of OneCoin's investors were drawn in by Ruja's flashy presentations and exciting promises, so, too, was Mark.  And, when Mark met Ruja in person, she had all the markings and confidence of someone who was already a successful businesswoman and entrepreneur.  Mark was never involved in any decisions about OneCoin's business strategy, nor was he privy to any internal

discussions on key topics such as whether OneCoin had a functioning blockchain.[4]  On the few occasions when Ruja had crypto-related legal questions, he referred her to a Locke Lord colleague, Robert Courtneidge, a crypto expert who never once raised any red flags to Mark about Ruja's operations and in fact considered taking equity in OneCoin.  GX 1017.  Rather, to Mark and so many others, OneCoin appeared to already be well established, and was a highly profitable enterprise bringing in vast amounts of money.  So when Ruja was interested in hiring Mark to set up various funds for her wealth, he jumped at the opportunity, a decision he now deeply regrets.

### E.      Mark's Arrest And Conviction

Mark was charged on August 21, 2018 in a one count indictment for conspiracy to commit money laundering, Dkt. 6, and arrested on September 5, 2018, Dkt. 11.  He was detained until September 13, 2018, when he was released on bail.  Dkt. 18.  A superseding indictment filed shortly before trial added an additional charge of conspiracy to commit bank fraud.  Dkt. 143.  Mark went to trial on both of those charges in November 2019, and, after an 11-day trial, was convicted on November 21, 2019 on both charges.  On March 13, 2020, Mark was remanded, PSR ¶ 7, and spent nearly three weeks at FDC Miami, much of it in lockdown and without being provided proper medical attention, before he was released on April 1, 2020 due to the COVID-19 pandemic.  *Id*.  As part of his conditions of release nearly four years ago, Mark was immediately placed under 24-hour home incarceration enforced by location monitoring technology.  PSR ¶ 8.

---

[4] As Konstantin Ignatov testified, the fraudulent nature of OneCoin's blockchain was a tightly guarded secret that even he was not privy to at first.  Tr. at 165; Tr. at 346-349.

Mark filed two rounds of post-trial motions.  On February 4, 2020, he filed Rule 29 and Rule 33 motions seeking a judgment of acquittal, or in the alternative, that the Court order a new trial, on both counts.  Dkt. 218.  On August 23, 2021, Mark filed a second Rule 33 motion upon learning that Konstantin Ignatov had perjured himself when testifying in Mark's case.  Dkt. 410; 461.  Following oral argument on April 14, 2022, this Court rendered a decision on the post-trial motions on September 14, 2023, denying Mark's Rule 29 and 33 motions and setting the case for sentencing.  Dkt. 577.

## II.     A Sentence of Five Years Or Less Is Sufficient But Not Greater Than Necessary

### A.     The Probation Department's Proposed Guidelines Calculation Is Erroneous

#### 1.     The Probation Department Calculation And Recommendation

Mark's offense level is calculated under the money laundering guideline, U.S.S.G. § 2S1.1.  PSR ¶ 57.  Because there were no underlying offenses for which Mark was convicted, the base offense level is determined to be eight plus the number of offense levels from the table in § 2B1.1 corresponding to the value of the funds laundered linked to the specified unlawful activity (here, wire fraud).  PSR ¶ 58.  Given that Probation accepted the government's position that all $400 million Mark was involved in handling was proceeds of the wire fraud SUA, it added 28-level increase, for a base offense level of 36.  *Id.*  Probation then added two levels for each of the applicable specific offense characteristics – a two-level increase for conviction under 18 U.S.C. § 1956 (per U.S.S.G. § 2S1.1(b)(2)), and a two-level increase because § 2S1.1(b)(2)(B) applies and the offense involved sophisticated laundering (per U.S.S.G. § 2S1.1(b)(3)).  PSR ¶¶ 59-60. Finally, Probation added five additional levels for Mark's role in the offense – three for his position as a manager/supervisor (per U.S.S.G. § 3B1.1(b)), and two for his use of a special skill as an attorney in a manner that significantly facilitated the commission or concealment of the

offense (per U.S.S.G. § 3B1.3).  PSR ¶¶ 62-63.  It also added a two-level obstruction of justice enhancement (per U.S.S.G. § 3C1.1).  PSR ¶ 64.

Probation's calculations resulted in a total offense level of 47, which exceeds the Sentencing Guidelines Table's maximum of 43.  U.S.S.G. § 5A.  Mark is therefore considered to have a total offense level of 43.  PSR ¶ 68.  Mark has no prior criminal convictions, resulting in a total criminal history score of I.  PSR ¶¶ 71-72.  A total offense level of 43 with a criminal history score of I results in a Guidelines range of life imprisonment, which exceeds the statutory maximum of 600 months (20-year maximum term of imprisonment under 18 U.S.C. § 1956(h); 30-year maximum term of imprisonment under 18 U.S.C. § 1349).

Rather than recommend a sentence at the statutory maximum, however, Probation has recommended a sentence of 240 months followed by a total of five years of supervised release. PSR, p. 35.  Probation cited Mark's lack of criminal history, extensive history of gainful employment, familial obligations, and age as reasons warranting a non-Guidelines sentence. PSR, p. 36.

### 2.  The Loss Calculation is Erroneous

The money laundering guideline calculation arrived at by the Probation Department is based on the premise that the $400 million of funds at issue, allegedly all derived from OneCoin investors, was entirely the product of the specified unlawful activity charged in the indictment: wire fraud.  But as a co-defendant previously argued to the Court, that analysis is legally wrong. The U.S. wire fraud statute does not apply extraterritorially, and the proceeds of the wire fraud SUA used as the foundation of the money laundering guideline must therefore be limited to the funds obtained from victims of fraud perpetrated in the U.S.  That number – never precisely established by the government – is but a tiny fraction of the $400 million total.

The Second Circuit's decision in *United States v. Azeem*, 946 F.2d 13 (2d Cir. 1991) compels this conclusion.  In *Azeem*, the Second Circuit determined that the district court was in error when its calculation of the Guidelines was based on consideration of heroin trafficking to the United States and Egypt.  *Id.* at 18.  Azeem and his accomplices trafficked one kilogram of heroin from Pakistan to New York, and three kilograms from Pakistan to Cairo.  *Id.* at 14-15.  In applying Section 1B1.3, which establishes the relevant conduct used to determine the Guidelines range, the district court included the total quantity of drugs trafficked into both New York and Egypt.  *Id.*  On appeal, the defendant argued that the sentencing court should not have included the Egypt transaction "because 1) it was not part of the same crime and 2) it was not a crime against the United States."  *Id.*

While the Second Circuit found that the two transactions were, in fact, part of the same course of conduct, rejecting the first argument, it "agree[d] that the Cairo transaction should not have been included in the base offense level calculation because it was not a crime against the United States."  *Id.* at 16.  Accordingly, the Second Circuit held that the district court should have calculated the Guidelines range based only on the amount of heroin imported into New York, rather than also factoring in the amount imported into Egypt, despite both transactions being part of the same scheme.  *Id.* at 16-17.

Although *Azeem* involved narcotics offenses, it applies to offense levels generally, because the Second Circuit based its reasoning on an interpretation of Section 1B1.3.  *Id.* at 17. The court reasoned that because the Guidelines does not explicitly reference foreign crimes in Section 1B1.3(a)(2), whereas it does explicitly reference foreign activity elsewhere (*see, e.g.*, U.S.S.G § 1B1.3(a)(2)), the silence in Section 1B1.3(a)(2) indicates that foreign criminal conduct should *not* be included in base offense levels.  Indeed, in *United States v. Chunza-Plazas*, the

Second Circuit applied the rule of *Azeem* in a fraud case relating to fraudulent alien registration cards, holding that the defendant's illegal activities in Colombia were not crimes against the United States, and therefore should not be included in the guideline calculation. 45 F.3d 51, 57 (2d Cir. 1995).

Accordingly, only funds that were proceeds of a *domestic* wire fraud scheme should count towards loss amount when calculating Mark's Guidelines calculation. In *Morrison v. Nat'l Australia Bank Ltd.*, the Supreme Court held that a statute must affirmatively indicate extraterritorial conduct in order for it to cover foreign conduct. U.S. 247, 255 (2010). The wire fraud statute does not provide any affirmation indication that it applies extraterritorially, and the Second Circuit has therefore found that it only reaches domestic conduct. *Eur. Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129 (2d Cir. 2014), *rev'd* on other grounds, 579 U.S. 325 (2016).

In the government's case against Mark, the only evidence whatsoever of losses linked to a domestic wire fraud scheme came through the testimony of two U.S. purchasers of OneCoin, William Horn and Linda Cohen. Horn, of Cookeville, Tennessee, testified that he purchased close to $27,000 in OneCoin packages. Tr. at 74; Tr. at 84. Cohen, of New York, NY, also testified that she invested about $22,000 in OneCoin packages, in addition to a $5,000 check she wrote to her son to invest on her behalf. Tr. at 791; Tr. at 799. The government did not offer any reliable or adequate tracing evidence to show that even this combined approximate $49,000 investment was even transferred to the Fenero Funds. Dkt. 345 at 3. Nor did it offer any additional evidence – either at trial or any point since – of revenue generated from OneCoin sales in the U.S., despite claiming that OneCoin received "billions of dollars in revenue." Tr. at 37.

In his post-trial motions, Mark argued that the *de minimis* investment of approximately $49,000 was insufficient to prove the existence of a domestic wire fraud scheme. Dkt. 218 at 28-

30.  The Court disagreed.  Dkt. 577 at 25-27.  But even accepting for the sake of argument that

approximately $49,000 in U.S. investor funds were among the proceeds at issue in the money

laundering conspiracy, those are the only such funds traced to victims of a domestic wire fraud

scheme.  Under *Azeem*, that amount – not the entirety of funds sent to OneCoin by people around

the world – is the amount that should drive the Guidelines calculations.

Even if foreign investment in OneCoin could be considered as part of the loss amount,

the government has never established the source of the lion's share of this money invested in the

Fenero funds came from OneCoin investors at all, even if there was evidence that Ruja was

involved in various inflows.  Analysis of the underlying (albeit incomplete) bank records

included in the government's evidence for the nine funding accounts that sent money to the

Fenero Funds showed that it was possible to determine in the case of only three of those accounts

that there was any evidence of those accounts having received OneCoin purchases.  *See, e.g.* Dkt.

345 at 12 (detailing how IMS accounts at Commerzbank, Deutsche Bank, and United Overseas

Bank opened by Frank Ricketts, Elisabeth Hubenthal, and others were the only funding accounts

definitively showing evidence of deposits by OneCoin purchasers).

Given both the legal limitations imposed by *Azeem* restricting wire fraud loss to U.S.

victims and the government's lack of proof that most of the $400 million was from OneCoin

investors of any stripe, Probation's $400 million loss calculation cannot stand.  The reality is that

the government has to date only established losses of $49,000 that should be considered under

this guideline.  This would result in adding only six additional levels, rather than 28, for a base

offense level of 14, rather than 36. § 2B1.1.[5]

---

[5] Mark acknowledges that Sebastian Greenwood raised related arguments in a pre-sentencing
motion in which he argued that the Court conduct its Sentencing Guidelines analysis based only
(continued…)

3.      Section 3B1.3 Does Not Apply ("Special Skill")

Probation's proposed enhancement under 3B1.3 for use of a special skill, PSR ¶ 63,

likewise does not apply.   Mark did not use his skills as an attorney in a manner that "increase[d]

his chances of succeeding or of avoiding detection," *United States v. Fritzson*, 979 F.2d 21, 22

(2d Cir. 1992), as is required for this adjustment to be appropriately applied.  In fact, he hardly

used his skills as an attorney *at all* in his commission of the offenses.  The fact that he previously

represented private equity funds as an attorney does not mean he has expertise to create or

structure such funds on his own, much less run them; the undersigned has represented private

equity funds but would not have the first idea as to how to set up such a fund, and certainly not in

foreign legal regimes.  Mark had never before endeavored to establish funds of his own and the

government has offered no evidence whatsoever that Mark's prior work as an attorney related in

any way to his role in the offense.

Cases in this district where the Second Circuit has upheld application of the special skill

enhancement for an attorney differ vastly from Mark's.  In *United States v. Sampson,* for

example, the Second Circuit upheld the district court's assessment that the "enhancement was

warranted because a lot of what [the defendant] did actually involve his status as an attorney."

898 F.3d 287, 313 (2d Cir. 2018) (internal citations omitted).  In *Sampson*, the defendant "relied

on his skills as an attorney in his endeavors to obstruct justice" by relying on knowledge of how

criminal cases developed and the criminal justice system more generally, when witnesses would

be identified, and how the USAO worked, among other actions.  *Id.*  In contrast, none of what

Mark did as manager of the Fenero Funds relied on his skills as an attorney at all, nor did his

---

on Greenwood's U.S. criminal conduct.  *See Greenwood*, 17-cr-630 (ER), Dkt. 516, 522, and
523.  Following oral argument, on April 12, 2023, the Court denied that motion.  Dkt. 538.

actions as fund manager involve his status as an attorney.  Rather, he had to rely on the counsel

and advice of outside law firms to get much of the work done.  GX 1333; GX 1334.

In fact, the government's arguments at trial entirely undercut the application of this

enhancement here.  The government argued that Mark sought to avoid detection by Apex by

doing things such as altering the dates on documents and using different pens to suggest different

signatures.  Even crediting the government's most negative inferences from this conduct, none of

this has anything whatsoever to do with legal skills.  Dkt. 244 at 12.  Simply put, the government

did not show that Mark's "skills as [an] attorney[] were integral to the fraud scheme," *United

States v. Rybicki*, 38 Fed. Appx. 626, 633 (2d Cir. 2002), and the enhancement should not apply.

4.     Section 3C1.1 Does Not Apply ("Adjustment for Obstruction of Justice")

Probation recommends that Mark receive a two-level enhancement under Section 3C1.1,

which requires the defendant to have "willfully obstructed or impeded, or attempted to obstruct

or impede, the administration of justice with respect to the investigation, prosecution, or

sentencing of the instant offense of conviction, and [] the obstructive conduct related to [] the

defendant's offense of conviction and any relevant conduct; or [] a closely related offense."  This

enhancement likewise does not apply.

In support of this enhancement, Probation points to Mark's June 2019 sale of a 2016

Porsche ("the Porsche").  However, application of this enhancement is groundless because the

Second Circuit has long held that specific intent is required for it to apply, and government has

never proven that Mark did not know the car was subject to forfeiture at the time of the sale,

which in fact he did not.  *See United States v. Defeo*, 36 F.3d 272, 276 (2d Cir. 1994)

(obstruction is "appropriate only upon a finding that the defendant had the 'specific intent to

obstruct justice, i.e., that the defendant consciously acted with the purpose of obstructing

justice'");  *United States v. Thomas-Hamilton*, 907 F.2d 282, 286 (2d. Cir. 1990) (refusing

obstruction enhancement for defendant's threats of bodily injury because there was "simply no indication whatsoever that [the threat] was made with the purpose of obstructing justice"); *United States v. Stroud*, 893 F.2d 504, 507-08 (2d Cir. 1990).

For the government to prove that Mark obstructed justice by selling the 2016 Porsche, it would have to demonstrate that Mark was aware of a Court order or some other lawful authority that would have barred this conduct.  But the government's own actions in this case prove the *opposite*.  The government obtained a post-indictment restraining order barring Mark from selling certain assets that it claimed were subject to forfeiture, including several cars *but not the Porsche at issue*.  Obtaining such a restraining order is *the* lawful method the government routinely applies to bar defendants from selling assets that it has demonstrated to a court are potentially subject for forfeiture.  *See, e.g., United States v. Cosme*, 796 F.3d 226, 229-30 (2d Cir. 2015) (following arrest, government seized the defendant's luxury cars and obtained a pre-trial restraining order to maintain custody of them); *United States v. Egan*, No. 10 Cr. 191 (JFK), 2010 WL 3000000, at *1 (S.D.N.Y. July 29, 2010) (Government obtained restraining order for defendant's residences and bank and investment accounts).  Mark was aware of and complied with the restraining order.  That is and should be the end of it.

The government has previously argued that its failure to list the Porsche in a restraining order should be excused because it obtained a warrant to seize the Porsche that was produced in the millions of pages of discovery and because it filed a bill of particulars signaling an intent to seize the Porsche if it prevailed at trial.  These excuses should be rejected, particularly where, like here, it is the government's burden to demonstrate that Mark had a specific intent to obstruct.  An unexecuted seizure warrant, never served on Mark, his counsel, or anyone else is a nullity, whether or not produced under Rule 16.  And a bill of particulars is a notice provision

signaling the government's intent with respect to certain assets *if it prevails at trial*; it does not operate as a self-executing pre-trial restraint on assets and the government has never offered any authority to the contrary.

Finally, Mark's transparency around the transaction is telling; he sold the Porsche in a registered sale and accepted the funds into his own bank account.  A man who had *knowingly* violated the government's restriction on transfer of the Porsche would surely attempt to conceal the sale.  This notion is reflected in other obstruction cases in which the Second Circuit has emphasized defendants' attempts to lie or otherwise conceal in determining intent to obstruct justice.  *See, e.g., United States v. Stewart*, 686 F.3d 156, 175 (2d Cir. 2012) (obstruction enhancement was proper where defendant falsely contended that she believed Special Administrative Measures—which she had violated—did not apply to her; defendant's efforts to conceal her violation of the measures were telling);  *United States v. Malki*, 609 F.3d 503, 511 (2d Cir. 2010) (defendant lied to the court and deleted cellphone and email records just before and after being questioned by federal agents).  Mark, in contrast, did not conceal the existence or sale of the Porsche, demonstrating that he did not know it was subject to forfeiture.

5.    Mark's Correct Offense Level

As argued above, the base level offense should be 14 (a starting point of eight, plus six additional points corresponding to the approximately $50,000 in domestic wire fraud proceeds that were laundered through the Fenero Funds).  With this offense level and without inclusion of the "special skill" or obstruction enhancements, the correct offense level is 21, resulting in a Guidelines range of 37-46 months.

B.      **Any Guidelines Calculation Driven by the $400 Million Loss Amount Is Worth Little Weight**

We are aware of course that the Court has previously rejected a similar legal argument by defendant Greenwood to use only losses suffered by U.S. investors victims of the wire fraud scheme in calculating Guidelines losses.  Greenwood Dkt. 538.  Should the Court arrive at the same conclusion here, it should then dramatically discount the Guidelines calculation as it has virtually no relation to Mark's culpability.

As a starting point, of course, the Guidelines range is only one of the sentencing factors and is not entitled to any extra weight.  *Gall v. United States*, 552 U.S. 38, 49-50 (2007) (A court "may not presume that the Guidelines range is reasonable."  *Id.*; *see also Nelson v. United States*, 555 U.S. 350, 352 (2009) ("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.").  Rather, the court "must make an individualized assessment based on the facts presented."  *Gall*, 552 U.S. at 50.

On top of this, numerous courts in this district have recognized that the Guidelines loss table can lead to absurd sentencing ranges.  *See, e.g., United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) ("By making a Guidelines sentence turn, for all practical purposes, on [the amount of loss], the Sentencing Commission . . . effectively guaranteed that many such sentences would be irrational on their face.");  *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) ("[T]he calculations under the [fraud] guidelines have so run amok that they are patently absurd on their face.");  *United States v. Johnson*, 2018 WL 1997975, at 4 (E.D.N.Y. Apr. 27, 2018) (finding it "particularly galling that [loss] is often more or less solely responsible for a white-collar offender's Guidelines sentence" when the "loss enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime.")

In sentencing Armenta, this Court also expressly recognized that the Guidelines range was a poor starting point for the analysis, noting that "100 years in jail for this type of activity is probably preposterous on its face." *Armenta*, 17-cr-556 (ER), Dkt. 76, Tr. at 62. The Court expressed similar sentiments during oral argument on Greenwood on the *Azeem* issue, stating, "I have said on the record on previous occasions that in my view the Guidelines table concerning financial frauds are inflated. And although I am of course and will calculate the Guidelines as accurately, correctly, and I will consider them, if the maximum term that Mr. Greenwood is facing is 60 years, I can't foresee that he will be sentenced to anything close to approaching 60 years." *Greenwood*, 17-cr-630 (ER), Dkt. 539, Tr. at 38. This is even more true when Mark was not accused of much less convicted of causing any loss at all; the Guidelines loss amount here is simply used to identify the amount of funds subject to the charged money laundering conspiracy.[6]

To illustrate the absurdity of the loss table in this context, even violent and dangerous acts involving explosives and terrorism result in enhancements only half as large as those called for by Probation calculation here. *See e.g.*, U.S.S.G. §§ 2K2.1(b)(3)(A) (fifteen-level enhancement for firearms offense involving a portable rocket or missile), 2K1.5(b)(1) (fifteen-level enhancement for boarding aircraft with an explosive "without regard for the safety of human life"), 2J1.2(b)(1)(c) (twelve-level enhancement if obstruction of justice related to a

---

[6] On top of this, sentencing statistics demonstrate that district judges nationwide recognize the multiple flaws in the loss table when sentencing defendants for money laundering offenses. In 2021, for money laundering offenses, approximately 40% (or 409) of the 1,028 defendants sentenced under § 2S1.1 received a sentence below the guidelines range. *See* U.S. Sent. Comm'n, 2021 Annual Report and Sourcebook of Federal Sentencing Statistics, 10 at 46, 101; *see also* Mark H. Allenbaugh, "Drawn from Nowhere": A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data, 26 Fed. Sent'g Rep. 19, 19 (2013) ("[T]he Commission's sentencing data … suggest that loss is an unsound measure of the seriousness of many offenses, with the result that judges are increasingly willing to go below the Guidelines when they impose sentences in white-collar cases.").

terrorism offense).  The idea that a sentence that is *literally off the Guideline table* and would call for life imprisonment but for the statutory maximums is even a remote approximation of the penalty a non-violent first time offender should face for allegedly moving money from a fraud scheme he is not even accused of participating is patently absurd.  The Court must therefore scrutinize with particular care the remaining § 3553(a) factors.

**C.    The Remaining § 3553(a) Factors Call for a Sentence of No More Than Five Years**

1.    Mark's Offense Conduct Did Not Involve Operating The OneCoin Scam

Mark is unique among all of his co-defendants other than David Pike in that he was never charged with – much less convicted of – the underlying wire fraud that is the heart of the charged OneCoin scam.  Greenwood, Armenta, Dilkinska, and Konstantin – but not Mark -- were each charged with and convicted of participating in a wire fraud scheme to deceive OneCoin investors by selling a fake cryptocurrency, resulting in what the government has calculated to be hundreds of millions in terrible losses to these victims.  OneCoin was the brainchild of Ruja Ignatova and Sebastian Greenwood, who began developing the concept and payment plan for OneCoin during the summer of 2014.  Dkt. 244 at 4.  Ruja, Greenwood, and then Konstantin Ignatov enticed potential investors with false promises that they could make a ten-fold investment return, and falsely represented that the value of OneCoin was based on market supply and demand.  *Id*. Dilkinska and Armenta belonged to the small secretive group that, too, knew that OneCoin was a fake cryptocurrency, and worked closely with Ruja to perpetrate the continuing fraud.  Armenta Dkt. 570 at 5; Dilkinska Dkt. 525.  In the end, investors ended up losing all of their money as Ruja carried out the exit strategy that she proposed to Greenwood by email in August 2014: "Take the money and run and blame someone else for this (standard approach, see Wenyard)." *Id*. at 4; GX 2102.

Mark, on the other hand, was never even charged with participating in the OneCoin wire fraud scheme.  He was charged exclusively with conspiring with others to launder money traced to OneCoin and a zero-loss bank fraud relating to allegedly false statements to FDIC-insured banks to transfer these funds.  A defendant can be convicted of money laundering conspiracy without any evidence that the defendant knows that the funds he or she is handling stem a particular underlying fraud scheme.  18 U.S. § 1956.  The government need only show that the defendant knows – or consciously avoids knowing – that the funds are from some sort of criminal activity.  *See, e.g., United States v. Quinones*, 635 F.3d 590, 594 (2d Cir. 2011).  The government can prove a money laundering case through circumstantial evidence that the defendant acted in a way that suggested the defendant knew he or she was dealing with dirty money, without showing any evidence that the defendant knew of much less was involved in the underlying criminal activity.

Indeed, that is how the government sought to prove its case here.  Not one of its witnesses said Mark had anything to do with OneCoin or had any awareness of misrepresentations it made to crypto purchasers to obtain money.  No documentary evidence reflected Mark knew that OneCoin was scamming investors either.  Instead, the government relied on circumstantial evidence that Mark behaved in a way consistent with someone who knew he was handling dirty money: setting up funds and making transfers allegedly to disguise that the funds at issue were associated with Ruja or OneCoin.  Dkt. 244 at 11-12.  The government argued to the jury that that Mark's behavior proved he knew that the money he was handling was dirty (Tr. at 1867; Tr. at 1873; Tr. at 1881); the defense argued that Mark's concern for privacy relating to the source of the investments was equally consistent with other objectives (security, tax avoidance) that, distasteful or not, did not demonstrate he knew that the source of

25

funds was illegal (Tr. at 1901; Tr. at 1905; Tr. at 1924).  The jury apparently accepted the inferences the government asked it to draw, and concluded that Mark must have known (or consciously avoided learning) that the money he was handling was in some manner dirty.  But there was no evidence or argument that Mark knew that OneCoin was making misrepresentations to those who purchased the cryptocurrency or had other involvement in the wire fraud scheme with which all co-defendants other than David Pike were charged.[7]

      While moving money one has reason to believe is dirty is of course a serious crime, it is worlds apart from participating in a scheme to defraud, by the government's telling, hundreds of thousands of people of hundreds of millions of dollars by selling them a product known to be worthless.  Mark received money into the Fenero Funds for approximately six months, from May to October 2016, before withdrawing from this role.  Dkt 244. at 13. This set Mark apart from co-defendants who have been charged with participating the OneCoin scheme itself for many years, who have been sentenced thus far between five and twenty years (and with the upcoming sentence of Irina Dilkinska statutorily capped at ten years).  The only other person not charged with participation the wire fraud scheme, David Pike, was sentenced to only probation.  Considering this variance in offense conduct, Mark should not be sentenced to more than five years imprisonment.

---

[7] The only evidence the government has pointed to support a claim that Mark actually knew OneCoin was a fraud is risible.  Chiefly, the government has pointed to a random blog post "from a CPA" questioning OneCoin's bonafides, noting that Irina Dilkinska forwarded it to him in April 2016.  Dkt. 244 at 20; Tr. at 1885, Tr. at 1975.  What the government omits is that Dilkinska e-mailed it to Mark in his role as a lawyer saying it was defamatory, and that there is zero evidence Mark read the article or ever responded.  *Id.*  Similarly, the Government has cited the fact that a RavenR employee in London told Mark that the City of London Police ("COLP") was investigating OneCoin, Dkt. 224 at 20.  Notwithstanding that many crypto companies are investigated without charges, the government leaves out that COLP ultimately dropped that investigation, citing "insufficient evidence to support criminal proceedings."  *See* https://www.bbc.com/news/technology-53721017.

a)      Sebastian Greenwood

Greenwood was one of two masterminds behind the OneCoin fraud scheme.  As the government described, Greenwood "was at the top of the pyramid" and was "the global spokesperson for OneCoin." *Greenwood*, 17-cr-630 (ER), Dkt. 570 at 16.  He was responsible, along with Ignatova, for founding the company and for coming up with the elaborate and sophisticated scheme that they used to manipulate and deceive investors." *Id.*  In addition, he was a "prolific salesperson" and "near an equal" to Ignatova who "was the person responsible for OneCoin's rapid growth and success." *Id*.  Nearly four years after he was extradited to the United States, Greenwood pled guilty to three counts: wire fraud, in violation of 18 U.S.C. § 1343; conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; and, conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956.  *Greenwood*, 17-cr-630 (ER), Dkt. 508.  This Court sentenced Greenwood to 20 years.  *Greenwood*, 17-cr-630 (ER), Dkt. 583.

b)      Gilbert Armenta

Just as with Greenwood, the criminal conduct to which Armenta pled guilty was far more extensive than the conduct for which Mark was convicted, and Armenta possessed a deeper knowledge of OneCoin's inner workings in a way that Mark never did.  The government stressed Armenta's knowledge of "the deception, victimization, and plight of OneCoin investors" came as early as December 2015, as disgruntled investors showed up in person at his Florida office after he was publicly linked to the scheme.  *Armenta*, 17-cr-556 (ER), Dkt. 570 at 5.  In addition to OneCoin-related conduct, Armenta pled guilty to crimes involving paying bribes to officials in Mexico as well as to crimes relating to concealment of illegal gambling payments, showing a longtime pattern of disregard for the law.  *Id*. at 6.  He also engaged in threats of violence.  In one particularly troubling series of events, Armenta repeatedly threatened Christopher Hamilton after he came to believe that Hamilton had stolen sone $32 million in OneCoin money that

27

Armenta had transferred to him.  *Id*. at 5.  In an attempt to extort Hamilton for the return of the

funds, Armenta hired "debt collection specialists" and made clear that he was willing to

authorize the use of force and threats of violence to collect payment from Hamilton.  *Id*.  During

one recorded meeting in August 2017, Armenta said that he had people watching Hamilton

"every day," that he had pictures of Hamilton's daughter, wife, and Hamilton himself, and that

Hamilton was "under surveillance."  *Id*. at 5-6.

Although Armenta attempted to cooperate by providing the government with information

relating to OneCoin, he committed further crimes while on bail damaging his credibility to the

point where he could no longer be called as a witness.  First, while on bail with his sentencing

still pending, he arranged for the secret sale of a private jet funded through OneCoin, in violation

of his cooperation agreement.  *Id*. at 8.  Furthermore, he committed illegal conduct involving the

unlawful negotiation of a $5 million U.S. Treasury refund check in a scheme to pocket deposited

money that he had no claim on.  *Id*. at 9.  As a result of these "flagrant violations," the

Government declined to seek a downward departure under Section 5K1.1.  *Id*. at 8.

        c)      Irina Dilkinska

On November 9, 2023, Irina Dilkinska pled guilty to one count of conspiracy to commit

wire fraud and one count of conspiracy to commit money laundering.  As detailed in her

Indictment, Dilkinska "helped to operate [the OneCoin] international fraud scheme…by, among

other things, managing the scheme's proceeds and evading law enforcement investigations into

the scheme."  *Dilkinska*, 17-cr-630 (ER), Dkt. 525 at 2.  Per her plea agreement, she can only be

sentenced to a maximum of five years on each count.  Although Dilkinska "assisted in running

[OneCoin's] day-to-day operations"[8] and was based in its Sofia, Bulgaria headquarters, she will face a maximum sentence of ten years.  Given her leadership role in the same laundering scheme Mark was convicted of and, unlike Mark, her admitted guilt in the OneCoin wire fraud scheme, any sentence the Court imposes on Mark should be considerably below that imposed on Dilkinska.

> 2.   Mark's Personal Characteristics Warrant Leniency

Section 3553(a)(1) also instructs the court to consider the "history and characteristics of the defendant."  This too sets Mark apart.  Unlike certain of his co-defendants, the relatively limited time that Mark spent creating private equity funds used in the charged money laundering scheme was an aberration on an otherwise law abiding and well-lived life.  Prior to his commission of the offenses, Mark was gainfully employed as a lawyer for over 20 years; a respected member of his community who gave back to the causes he cared about in the form of his skills, time, and money; and was, and still is, a beloved father, husband, and friend.  As set forth in section I.B, Mark has been a devoted husband, parent and son, a friend to many, and was highly respected in his community.  The crime he was convicted of represents only one aspect of his life, and the Court should consider these other positive aspects in setting an appropriate sentence.

> 3.   A Sentence of Five Years Or Less Would "Provide [Mark] With Needed … Medical Care … In The Most Effective Manner" In Consideration of Section 3553(a)(2)(D).

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

[8] https://www.justice.gov/usao-sdny/pr/head-legal-and-compliance-multibillion-dollar-cryptocurrency-pyramid-scheme-onecoin.







31

███████████████████████████████████████████████████

████████████████████████████████████████

There is no question that the Bureau of Prison's ability to treat complex medical conditions such as these is limited. *See, e.g.*, NPR, December 12, 2023, "Lawmakers push for federal prison oversight after reports of inadequate medical care" (describing lawmakers' response to NPR reporting that at least 4,950 people had died in BOP custody in the last decade, often from "treatable conditions that are not diagnosed or treated in a timely way within the prison system.");[10]  PandemicOversight.gov (describing how 69% of BOP facilities surveyed reported a staffing shortage of nurses during the pandemic);[11]  *United States v. Chavez*, 2024 WL 50233 (S.D.N.Y. Jan. 4, 2024) ("describing how "the MDC is notoriously and in some instances, egregiously slow in providing necessary medical and mental health treatment to inmates – especially where such care requires the attention of outside providers").  Likewise, it is well established that courts can and should consider the health conditions of the defendant and the ability of the BOP to treat such conditions in arriving at an appropriate sentence.  *See, e.g., United States v. Johnson*, 512 Fed.Appx. 55, 56 (2d Cir. 2013).

## CONCLUSION

Mark deeply regrets that he ever met Ruja Ignatova, and he comes before the Court convicted of laundering her money.  While he maintains his innocence and exercised his Constitutional right to a jury trial, he recognizes based on evidence the government presented

---

[10] https://www.npr.org/2023/12/12/1218627629/lawmakers-push-for-federal-prison-oversight-after-reports-of-inadequate-medical-.

[11] https://www.pandemicoversight.gov/oversight/our-publications-reports/health-care-staffing-shortages.

about OneCoin to which he was never before privy that OneCoin was indeed a scam, and that those who invested in it were innocent victims.

Mark also recognizes that he has been convicted of conspiring with others to launder funds the government has linked to OneCoin, and that this is a serious offense for which the Court will impose a meaningful sentence.  At the same time, unlike his co-defendants, Mark was never charged with or convicted of defrauding OneCoin victims, and an appropriate sentence should be calibrated to his role in the offense, the fact that it is an aberration in his half-century of a life well-lived, and based on his unique characteristics, including serious medical problems. He has already served four years under strict home incarceration.  An additional sentence of five years imprisonment would result in total incarceration in one form or another approaching a decade, a punishment sufficient but not greater than necessary to serve the goals of sentencing.

Dated: New York, New York

January 9, 2024

/s/ Arlo Devlin-Brown

Arlo Devlin-Brown
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1046

David M. Garvin
Law Offices of David M. Garvin, P.A.
200 South Biscayne Boulevard
Suite 3150
Miami, FL 33151
(305) 371-8101

*Counsel for Mark S. Scott*