UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

                v.

MARK S. SCOTT,

                Defendant.

17 Cr. 630 (ER)

## GOVERNMENT'S SENTENCING MEMORANDUM

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Nicholas Folly
Juliana N. Murray
Kevin Mead
Assistant United States Attorneys

- Of Counsel -

## TABLE OF CONTENTS

**Background** .................................................................................................................. 3

   **I.**   **Offense Conduct** ................................................................................................. 3

      **A.**   **Scott Set up the Fenero Funds for the Purpose of Laundering OneCoin Money** ... 4

      **B.**   **Scott Used the Fenero Funds to Launder OneCoin Proceeds** ................................. 6

      **C.**   **Scott's Misrepresentations to Effectuate the Transfer of OneCoin Fraud Proceeds** 7

         **1. Fake Mission Statement** ................................................................................. 7

         **2. Lies About the Identity of Investors and Their Source of Wealth** ......................... 8

         **3. Lies to U.S. Banks** ........................................................................................ 11

      **D.**   **Scott's Lavish Spending** ....................................................................................... 12

      **E.**   **Scott Lies to the IRS When He Was Arrested** ....................................................... 18

      **F.**   **Scott's Obstructive Use of OneCoin Funds After His Arrest** ................................. 18

   **II.**   **The Charges, Trial, Conviction, and the Guidelines Calculation** ............................. 19

   **III.**   **Scott's Meritless Objections to the Guidelines Calculations** ................................. 20

**Discussion** .................................................................................................................. 22

   **I.**   **Applicable Law** ................................................................................................ 22

   **II.**   **A Sentence of at Least 17 Years Is Warranted in This Case** ....................................... 23

      **A.**   **The Need for The Sentence To Reflect The Nature and Seriousness Of the Offense** 24

      **B.**   **Just Punishment** ................................................................................................. 30

      **C.**   **General Deterrence** ............................................................................................. 31

      **D.**   **Specific Deterrence** ............................................................................................ 33

      **E.**   **Scott's Personal Background and Character Do Not Justify a Sentence of Only Five Years** ...................................................................................................................... 34

      **F.**   **The Guidelines Provide a Useful Framework in this Case** ..................................... 37

      **G.**   **The Sentence of Five Years the Defendant Requests Would Result in an Unwarranted Disparity with Similarly Situated Defendants** .......................................... 38

   **III.**   **Restitution and Forfeiture** ................................................................................... 42

      **A.**   **The Court Should Not Order Restitution, Pursuant to Section 3663A(c)(3)** ........ 42

      **B.**   **The Court Should Enter a Forfeiture Order Against the Defendant** ................... 43

**Conclusion** .................................................................................................................. 44

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | 17 Cr. 630 (ER) |
| MARK S. SCOTT, | |
| Defendant. | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The Government respectfully submits this memorandum and accompanying exhibits in connection with the sentencing of defendant Mark S. Scott ("Scott" or the "defendant"), one of the most prolific money launderers ever prosecuted in this District.   Sentencing is scheduled for January 25, 2024, at 11:00 AM.   For the reasons that follow, a sentence of at least 17 years' imprisonment, which is well below the Guidelines of 600 months, is appropriate.

In 2014, Karl Sebastian Greenwood and Ruja Ignatova began to operate what would become one of the world's largest fraud schemes, when they co-founded OneCoin and began to distribute a fraudulent cryptocurrency with the same name.   The scheme duped millions of investors and raked in billions of dollars.   To succeed, the scheme required the assistance of a money laundering operation that could match the scale and sophistication of the fraud scheme.   In late 2015, Ignatova turned to Scott, who was a successful corporate lawyer working in Miami, FL as an equity partner at the law firm Locke Lord LLP, where he earned upwards of $1 million a year.   Scott was tasked with building a custom money laundering vehicle that could withstand the scrutiny of anti-money laundering staff at financial institutions around the world, and a growing number of law enforcement investigations.   Scott was uniquely equipped for this challenge: he used his know-how as a corporate lawyer with experience in private equity to disguise hundreds

1

of millions of dollars in illicit proceeds from the OneCoin scheme as legitimate "investments" into a series of offshore investment funds that he created.  In doing so, Scott erased the connection between the funds and Ignatova/OneCoin and was then free to send Ignatova's money anywhere she wanted.

Scott was motivated by greed.  He already had a luxurious lifestyle afforded to him by being an equity law firm partner, living in a $1.5 million condo in Coral Gables and earning upwards of a million dollars a year.  But for Scott, that wasn't enough.  So, Scott embarked on a quest to earn $50 million by the age of 50 by abusing the skills he acquired as a lawyer to orchestrate one of the world's largest money laundering operations.  By the time Scott was arrested, he had managed to reach his unthinkable goal, receiving more than $50 million in OneCoin fraud proceeds as payment for his global money laundering operation.

Despite orchestrating one of the largest money laundering operations ever, accepting zero responsibility for his actions, showing no remorse for the harm he caused, and committing new crimes while on bail, Scott now asks this Court to impose a sentence of imprisonment of just five years, orders of magnitude below the Guidelines of 50 years and Probation's recommendation of 20 years.  Although the Government recognizes the mitigating factors cited by the defendant, such as his medical issues, a *far* greater sentence is necessary to meet all the goals of sentencing.  Given the extraordinary breadth of the defendant's criminal conduct in this case and the need for just punishment, promotion of respect for the law, and adequate deterrence, a sentence of at least 17 years' imprisonment is necessary.

## Background

**I.     Offense Conduct**

### *OneCoin Fraud Scheme*

Having presided over the trial against Mark Scott and having sentenced three defendants who also participated in various facets of the OneCoin scheme, including most recently the scheme's co-founder, Greenwood, the Court is intimately familiar with the OneCoin scheme.  For this reason, the Government does not summarize the details of the scheme here, and instead relies on the description of the scheme as set forth in the Government's sentencing submission for Greenwood.  *See* Dkt. No. 570.  For ease of reference, the Government has included a brief summary of the OneCoin scheme below.

Co-defendants Greenwood and Ignatova conceived of and orchestrated a multibillion-dollar fraud scheme by which they defrauded millions of individual OneCoin investors (the "OneCoin Fraud Scheme").  Greenwood and Ignatova co-founded OneCoin Ltd. ("OneCoin") in 2014.  OneCoin was based in Sofia, Bulgaria.  (*See* June 22, 2020, final presentence investigation report ("PSR") ¶ 16).  OneCoin marketed and sold a fraudulent cryptocurrency by the same name. (PSR ¶ 18).  Between the fourth quarter of 2014 and the fourth quarter of 2016 alone, the scheme took in more than $4 billion from at least 3.5 million victims.  (PSR ¶ 16).

While Greenwood and Ignatova marketed OneCoin as a legitimate cryptocurrency like Bitcoin and deliberately drew the comparison between the two cryptocurrencies through their representations to investors and their marketing materials, OneCoin had no actual value and was conceived of by Greenwood and Ignatova as a fraud from day one.  The misrepresentations made by Greenwood and others to OneCoin investors were legion, and the cryptocurrency was worthless.  Among other things, OneCoin lied to its members about how its cryptocurrency was valued, claiming that the price of OneCoin was based on market supply and demand, when in fact

3

OneCoin itself arbitrarily set the value of the coin without regard to market forces. The purported value of a OneCoin grew steadily from €0.50 to approximately €29.95 per coin, as of in or about January 2019.  The purported price of OneCoins never decreased in value.

*Mark Scott's International Money Laundering Operation*

**A.  Scott Set up the Fenero Funds for the Purpose of Laundering OneCoin Money**

Due to the massive amount of illicit proceeds that Ignatova and others generated throughout the OneCoin Fraud Scheme, principals of OneCoin had to resort to a global network of money launderers who assisted them in laundering their OneCoin-derived proceeds.  As banks around the world began to catch on to the OneCoin Fraud Scheme, banks became unwilling to handle OneCoin fraud money. OneCoin could not open bank accounts in the name of "OneCoin," and instead had to hide the origin of the funds in those accounts, and the purpose of the transfers out of those accounts.  (PSR ¶ 26).

Gilbert Armenta, who was Ignatova's boyfriend, was initially one of her main money launderers and assisted OneCoin with some of its banking problems. As of late 2015, Armenta had begun laundering OneCoin fraud scheme proceeds for Ignatova. Around that same time, Armenta introduced Scott to Ignatova for the purpose of assisting Ignatova with the money laundering operation.  (PSR ¶ 27).

At the time of this introduction, Scott was a trained corporate lawyer with extensive experience in representing private equity funds.  Scott in turn leveraged that experience to construct a sophisticated money laundering vehicle for Ignatova, involving transfers of hundreds of millions of dollars of fraud scheme proceeds disguised as investments into a series of investments funds. Scott resigned from his position as a partner at Locke Lord in September 2016 to work full-time as a money launderer for Ignatova.  (PSR ¶ 28).

Shortly after Scott was introduced to Ignatova in September 2015, Scott began to construct a money laundering vehicle for Ignatova. Scott started by setting up a series of fake investment funds. Among other things, Scott incorporated MSS International Consultants (BVI), Ltd. ("MSSI LTD"), which was a fund manager registered in the British Virgin Islands. MSSI LTD in turn owned and operated a series of fake investment funds, which were used to launder proceeds from the OneCoin Fraud Scheme, including the following purported investment funds: Fenero Equity Investments L.P. ("Fenero"), Fenero Equity Investments II, L.P. ("Fenero II"), and Fenero Financial Switzerland L.P. ("Fenero Switzerland"), each of which was an approved fund regulated in the British Virgin Islands. MSSI LTD also owned and operated Fenero Equity Investments (Cayman) I, L.P. ("Fenero Cayman"), an investment fund organized in the Cayman Islands (together with the British Virgin Islands Fenero funds, the "Fenero Funds"). (PSR ¶ 29).

Scott operated offshore bank accounts in the Cayman Islands for each of the Fenero Funds (the "Fenero Fund Accounts"). The Fenero and Fenero Switzerland accounts were held at DMS Cayman bank, and the Fenero Cayman and Fenero II accounts were held at Deutsche Bank Cayman. (PSR ¶ 30).

Scott served as the Director of Fenero Equity Investments (Ireland), Limited, an entity formed in the Republic of Ireland on April 5, 2016. Scott and co-defendant Irina Dilkinska served as directors of two related companies also formed in Ireland: Fenero Tradenext Holding Limited and Fenero Pct Holdings Limited. Among other things, Dilkinska was an employee at OneCoin who was responsible for managing shell companies for OneCoin that were used for money laundering. Dilkinska was one of the primary employees at OneCoin who assisted Scott with coordinating the laundering of OneCoin fraud proceeds. (PSR ¶ 31).

Scott's friend, co-defendant David Pike, served as a director of MSSI BVI and assisted Scott with the day-to-day operation of the Fenero Funds. Pike primarily played an administrative role for Scott.  Among other things, Scott regularly gave directions to Pike about sending documents, including know-your-customer ("KYC") information, to banks and other financial institutions concerning the fake investors in the Fenero Funds.  (PSR ¶ 32).

### B.  Scott Used the Fenero Funds to Launder OneCoin Proceeds

After Scott was introduced to Ignatova through email, Scott traveled to London in February 2016 and met with Ignatova in person. This was one of approximately six international trips that Scott took to meet with Ignatova in 2016 and 2017. After Scott opened bank accounts in the names of each of the Fenero Funds, between May 2016 and October 2016, the Fenero Fund Accounts collectively received wire transfers totaling approximately €364 million and $10 million, which Scott represented as legitimate investments into the Fenero Funds. These wire transfers originated from approximately 10 different bank accounts held at banks located in Singapore, Germany, Hong Kong, the United Kingdom, and the United States. Although the funds in these accounts were derived from OneCoin (which Scott knew), these bank accounts were registered under a set of shell corporations that disguised the origin of the funds, including a set of affiliated companies with variations of the name International Marketing Services ("IMS"), as well as B&N Consult Ltd. ("B&N"), and Fates Group. IMS was owned by co-conspirator Frank Rickets; B&N was owned by Dilkinska; and Fates Group was owned by Armenta.  (PSR ¶ 33).

While IMS, B&N, and Fates Group were "investors" into the Fenero Funds on paper, Scott knew that all of the money being transferred into Scott's funds in fact belonged to Ignatova and was derived from the OneCoin Scheme. After the Fenero Funds received the above-described deposits, between approximately May 2016 and July 2018, the Fenero Fund Accounts funded approximately €282,000,000 in wire transfers to a series of Fenero Fund bank accounts held at the

6

Bank of Ireland in the Republic of Ireland. Scott also transferred tens of millions of Euros back to Bulgaria from the Fenero Funds, disguised as fake loans.  At Ignatova's direction, Scott subsequently transferred approximately €185,000,000 from the Bank of Ireland to the accounts of one of Ignatova's other money launderers, Aamer Abdulaziz.  (PSR ¶ 34).  Through the use of the Fenero Funds, and the ensuing transfers, Scott successfully cleaned the funds, removing any connection to Ignatova or OneCoin and enabling Ignatova to move the funds where she pleased.

### C.  Scott's Misrepresentations to Effectuate the Transfer of OneCoin Fraud Proceeds

Throughout Scott's participation in the charged money laundering and bank fraud conspiracies, Scott and his co-conspirators made numerous misrepresentations to banks and financial institutions to cause them to unwittingly transfer proceeds from the OneCoin Fraud Scheme on behalf of Ignatova. Specifically, Scott and his co-conspirators misrepresented to banks and financial institutions the source of the funds they were transferring, and the purpose of those wire transfers, consistently hiding the connection to Ignatova and OneCoin.  (PSR ¶ 35).

#### 1.  Fake Mission Statement

In April 2016, Scott provided a Managing Director at Apex Group Ltd. ("Apex"), an investment fund administrator, with a document describing Fenero, its mission, investment strategy, and investor base (the "Mission Statement"). As a fund administrator for the Fenero Funds, Apex was responsible for, among other things, conducting anti-money laundering and KYC checks, reviewing the source of wealth for investors, and transferring the investors' money into the fund or its investments. The Mission Statement falsely stated, among other things, that:

> Fenero Equity Investments, L.P., is the first of a series of $100,000,000 open ended investment funds located in the British Virgin Islands (the "Fund" or "Fenero"), focusing on investments in the financial services industry in Europe. . . . Due to its small investor base of wealthy families and middle market companies (the "Initial Investors") and its narrow investment strategy, the Fund requires very little staff. . . . Fenero will always fully control its capital and conduct its own stringent "KYC" on investors and final due diligence on any target companies internally.

7

> Fenero has been created at the request of a select group of European based families and companies . . . . The Fund will basically be administered and managed in [the] form of a multi "Family Office" by MSS International Consultants (BVI), Ltd. . . . which is ultimately owned by Mark S. Scott . . . [who] currently is the Managing Partner of [the Law Firm], an Amlaw 50 firm, in Miami. The initial Investors of Fenero have been represented legally by Mr. Scott ranging from three (3) to twelve (12) years and have closed on in excess of $2,100,000,000 in transactions under Mr. Scott's business and legal guidance.

(PSR ¶ 36).

Many of the statements contained in the Mission Statement were false. For example, Scott plagiarized entire sections of the Mission Statement from other mission statements online, including representations in the "track record" section of the Mission Statement. In addition, Scott's representations in the Mission Statement about the initial investors into his fund and Scott's prior relationship with those so-called investors were also false. Furthermore, the subscription agreements for Scott's investors did not disclose that the investors, such as B&N and IMS, or the principals of those investor companies, Dilkinska, and Manon Hubenthal, were in any way connected to OneCoin and/or Ignatova. As noted above, all the money transferred through the Fenero Funds belonged to Ignatova and was derived from OneCoin.  (PSR ¶ 37).

### 2.   Lies About the Identity of Investors and Their Source of Wealth

Scott also made numerous misrepresentations to Apex in response to questions that were raised by Apex regarding the Fenero Funds' investors, and the source of wealth for those investors. In July and August 2016, Apex began conducting enhanced due diligence on the Fenero Funds. Among other issues that triggered the enhanced due diligence was a series of loans that Scott had made to himself from the Fenero Funds in a short time frame, as well as suspicious transactions involving IMS and B&N, and a lack of clarity as to the relationship between IMS and B&N. During its due diligence, Apex attempted to obtain additional information on the source of wealth for the investors in the Fenero Funds. Around this same time period, in late July 2016, Scott inadvertently

sent an email to Apex that contained a forwarded email from Dilkinska, with Dilkinska's OneCoin email address. That same email also revealed that there was a connection between Dilkinska and another Fenero Funds investor, Star Merchant. Prior to that email, Scott had successfully covered up any connection between the purported investors in the Fenero Funds and OneCoin. Upon learning of the connection between the investors in the Fenero Funds and OneCoin, Apex held a series of emergency meetings and also made a number of notifications to government agencies. (PSR ¶ 38).

While Apex was conducting enhanced due diligence, Scott took a number of steps designed to conceal the true connection between the Fenero Funds and OneCoin, and to convince Apex that it should continue to transfer funds out of the Fenero Funds as requested by Scott. Among other things, Scott and his co-conspirators doctored letters of comfort on behalf of two lawyers, created and sent backdated wire instruction letters to Apex, and forged a set of agreements between IMS and B&N.

As to the doctored lawyer letters, Scott first sent a draft letter to a lawyer named Martin Breidenbach on August 2, 2016, and instructed Breidenbach to "put this letter on your letterhead, sign it . . . and e-mail the entire package to Mr. Spendiff." The letter was intended to address Apex's concerns about the source of funds being transferred into the Fenero Funds on behalf of IMS, and the relationship between IMS and B&N. The letter falsely stated, among other things, that "IMS and B&N collaborate on providing large sales and marketing companies in the direct sales industry with process and systems solutions and support" and that B&N had earned at least 130,000,000 Euros through its joint venture with IMS in the preceding twelve months. Breidenbach sent the fake letter, which had been drafted by Scott, to Apex. On the same day, Scott sent a similar request to a Bulgarian lawyer named Viktor Rashev and asked Rashev to "put the

attached letter on your firm's letterhead, sign it and send it to Mr. Spendiff." The letter, which Rashev signed and sent to Apex, stated among other things, that B&N had earned approximately 200,000,000 Euros in the prior 14 months and that B&N had earned its fees "for the use of B&N's proprietary consulting services, support and software solutions." Rashev sent the letter to Apex that same day. Scott knew that these representations about the source of wealth for B&N and IMS were completely false. In reality, the money that was transferred through these shell companies to the Fenero Funds belonged to Ignatova and was derived from OneCoin.  (PSR ¶ 39).

As noted above, one of the concerns raised by Apex was the relationship between IMS and B&N. To address this concern and justify the flow of funds into the Fenero Funds on behalf of those entities, Scott backdated wire instruction letters and forged a set of agreements between IMS and OneCoin, which were then sent to Apex. As to the backdated wire instruction letters, Scott instructed other co-conspirators from OneCoin, including Dilkinska, to sign a set of fake wire authorization letters that justified the transfer of tens of millions of Euros on behalf of B&N. Specifically, Scott instructed other co-conspirators, including Dilkinska, that "[i]t would also be great if you could sign some of the letters with a different pen so they do not look so mechanically produced. Maybe Irina [Dilkinska] can print them wherever she is and sign and scan them back to you one at a time. Maybe you can sign others in the office with her automatic signature." The fake wire instruction letters were then sent to Apex. (PSR ¶ 40).

Scott also forged a set of two agreements between OneCoin and IMS, changing the fee that IMS was supposed to receive under the agreements from 1% in the original agreements, to 20% and 22% in the forged agreements. The forged contracts were then sent by Scott to Apex. The doctored terms of the forged contracts appeared to be designed as an attempt by Scott to provide

support for the large volume of payments—purportedly for the purpose of licensing technology to OneCoin—made by the IMS companies to the Fenero Funds.  (PSR ¶ 40).

After receiving these materials from Scott, Apex continued to refuse Scott's request to transfer funds out of the Fenero Funds. At that point, Apex had concluded that it had "been provided [by Scott] with fraudulent documents that hid the relationship with OneCoin." In a final attempt to try to convince Apex to transfer funds out of the Fenero Funds, Scott demanded a phone call with Apex. During the resulting call, Scott continued to lie to Apex about the underlying source of wealth for the money transferred into the Fenero Funds. For example, Scott falsely claimed that the money was actually derived by and belonged to Irina Dilkinska, stating that Dilkinska was "inventing ways to, how should I say, to materially [U/I] access to potential buyers for those direct sales companies. That's her biggest strength that she's doing here."  (PSR ¶ 41).

### 3.  Lies to U.S. Banks

In order to successfully transfer funds that were derived from the OneCoin fraud scheme, Scott and his co-conspirators also lied to United States banks. For example, in July 2016, Scott disguised the transfer of OneCoin fraud proceeds on Ignatova's behalf in the form of a fake loan to CryptoReal Investments Trust Ltd. ("CryptoReal"), which was allegedly purchasing an oil field from Barta Holdings Limited ("Barta"). Under the terms of the purported deal, CryptoReal was going to borrow €30 million from Fenero. Scott and Martin Breidenbach represented to Apex that Breidenbach was the ultimate beneficial owner of CryptoReal. During the course of this deal, Scott and his co-conspirators also represented to Apex that Neil Bush was the authorized representative of Barta. In an email dated July 12, 2016, Scott requested that Apex wire "an aggregate amount of 30 million dollars U.S.D. from our above-referenced account at DMS Bank to the party as follows, listed at DBS Bank Hong Kong, beneficiary Barta Holdings Limited, with an address in Hong Kong" and represented that the purpose of the wire was "Loan to CryptoReal Investment Trust

LTD (BVI) Martin BVI)/Martin Breidenbach for acquisition of Madagascar Oil Field." In reality, this money was not a real loan, but was being disguised as a loan so that the banks and financial institutions would authorize the transfer, which was actually on Ignatova's behalf (not Breidenbach's). The funds for this fake loan were ultimately transferred through a U.S. dollar correspondent bank account at Bank of New York Mellon in Manhattan.  (PSR ¶ 42).

In another set of transactions, Scott received approximately $10 million into the Fenero Funds from accounts in the name of "Fates Group," controlled by Armenta in the United States. As described above, Armenta was Ignatova's boyfriend and was also one of Ignatova's money launderers. Scott was aware that the funds transferred by Armenta from Fates Group in fact belonged to Ignatova, were derived from the OneCoin fraud scheme, and were being disguised as investments into the Fenero Funds so that Armenta and Scott could transfer them on Ignatova's behalf. For example, one transfer of $5,000,000 from an Armenta controlled United States bank account at Morgan Stanley in the name of Fates Group was disguised as investments of $3 million into "ZIIXI" and $2 million into "XIII." On the basis of this misrepresentation, Morgan Stanley understood that ZIIXI and XIII were purportedly investment funds and that the purpose of the wire transfers was to invest in those funds. In order to successfully transfer the funds to Scott's Fenero Funds, Armenta also falsely represented that these Fenero Funds were a private equity firm that invested in, among other things, renewable energy, such as windmills.  (PSR ¶ 43).

### D.  Scott's Lavish Spending

As described in more detail below, the OneCoin scheme, including Scott's money laundering operation, inflicted immeasurable harm on millions of investors all over the world.  As investors lost billions of dollars from the OneCoin scheme, Greenwood, Ignatova, and their top money launderers, such as Scott and Armenta, used investor money to amass untold wealth and fund extravagant lifestyles.  As OneCoin's top money launderer, Scott earned in excess of *$50*

*million* in proceeds of the OneCoin Fraud Scheme.  Scott used this money to fund an extravagant

lifestyle.  For example, Scott used OneCoin fraud scheme proceeds to pay off over $1,000,000 for

a condo that he owned in Coral Gables, FL.  Scott also purchased a series of multimillion-dollar

homes in Cape Cod.  Scott's purchases included an oceanfront property for $3,765,000, located at

31 Dale Avenue, Hyannis Port, MA (the "31 Dale Property"), as shown in the images below:





Scott also purchased another oceanfront home for $2,850,000, located at 133 Sunset Lane,

Barnstable, MA:



Scott purchased an ownership interest in a third Cape Cod property for $1,310,000, located at 105 Sunset Lane, Barnstable, MA, shown below:



Scott's extravagance was not limited to oceanfront homes.  He also purchased a $1,310,000 Sunseeker yacht, a $245,269 Ferrari, a $218,898 2018 Porsche 911 GTRS2, a $119,529 2017

Porsche 911 Turbo, and a $332,248 2016 Porsche 911R (the "2016 Porsche"). Images depicting

Scott's yacht and some of the luxury cars he purchased are shown below:









Scott also used the illicit proceeds that he received from the scheme to purchase over a hundred thousand dollars in luxury watches and over two hundred thousand dollars in jewelry and luxury bags.  Images depicting some of those purchases are shown below:



All of these purchases were made with OneCoin Fraud Scheme proceeds that Scott received as payment for laundering $400 million in proceeds from the same scheme for Ignatova.

### E.  Scott Lies to the IRS When He Was Arrested

Scott was arrested on September 5, 2018. When Scott was interviewed by federal law enforcement agents, he made numerous false statements about who the investors in the Fenero Funds were and what the source of wealth for the investors was. For example, Scott stated that OneCoin and Ignatova had nothing to do with Fenero or any other funds that he was involved with. Scott also pretended during the interview that he did not know the full name of Irina Dilkinska, who had been one of his primary points of contact at OneCoin and one of his "investors" on paper.

### F.  Scott's Obstructive Use of OneCoin Funds After His Arrest

The Government obtained a seizure warrant for the 2016 Porsche on September 4, 2018, and produced that seizure warrant to Scott in discovery on October 10, 2018. In February 2019, the Government provided further notice of its intent to seize and forfeit the 2016 Porsche by including it in the Forfeiture Bill of Particulars (the "Forfeiture BOP"). Moreover, the evidence presented at trial clearly demonstrated that Scott was aware that he had used approximately $330,000 in OneCoin fraud proceeds to purchase the 2016 Porsche.  (PSR ¶ 49).

Notwithstanding that the 2016 Porsche was subject to both a seizure warrant and the Forfeiture BOP, and with full knowledge that he had purchased the car with OneCoin victim money, on June 5, 2019, Scott entered into a contract to sell the 2016 Porsche for $250,000. He sold the car the following day and received a wire for $250,000. About a month later, Scott provided a $25,000 down-payment on a new Porsche to a different car dealership. The dealership subsequently refunded that down-payment, and Scott did not ultimately purchase that vehicle. However, bank records show that starting immediately after the receipt of the 2016 Porsche sale

proceeds, Scott used the funds to, among other things, make substantial payments to several credit card companies.  (PSR ¶ 50).

Moreover, in April 2019, Scott transmitted a wire of approximately $300,000 from an account held in the name of MSS International Consultants BVI, held at First Caribbean International Bank in the Cayman Islands (the "Cayman Account"), to a contractor. The payment was for work on the 31 Dale Property, which, as described above, Scott had purchased with OneCoin Scheme proceeds. The Cayman Account was subject to a restraining order obtained by the Government on September 4, 2018, and produced to the defendant in discovery on September 21, 2018. Like the 2016 Porsche, the Cayman Account was also included in the Forfeiture BOP, filed by the Government in February 2019, and the funds in that account were derived from OneCoin victims.  (PSR ¶ 51).

## II.     The Charges, Trial, Conviction, and the Guidelines Calculation

On or about October 8, 2019, a grand jury sitting in this District returned Superseding Indictment S10 17 Cr. 630 (ER), charging Scott with conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h), and conspiracy to commit bank fraud, in violation of Title 18, United States Code, Section 1349.  Scott was convicted on November 21, 2019, following a jury trial.

The PSR calculated an advisory guidelines range, pursuant to the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G."), of 600 months' imprisonment.  Specifically, Probation calculated the Guidelines as follows: a base offense level of 36 pursuant to U.S.S.G. § 2S1.1 and 2S1.1(a)(2), because the defendant laundered more than $250 million but less than $550 million; a two-level enhancement pursuant to U.S.S.G. § 2S1.1(b)(2), because the defendant was convicted under 18 U.S.C. § 1956; a three-level adjustment pursuant U.S.S.G. § 3B1.1(b), because the defendant was a manager or supervisor and the criminal activity involved five or more

participants or was otherwise extensive; a two-level adjustment pursuant to U.S.S.G. § 3B1.3, because the defendant used a special skill, namely his skill as an attorney, in a manner that significantly facilitated the commission or concealment of the offense; and a two-level adjustment pursuant to U.S.S.G. § 3C1.1, because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction.  This calculation resulted in a total offense level of 47.  With a criminal history Category of I this yielded an adjusted offense level of 47 (four points above the maximum applicable Guideline of 43).  However, because the statutorily authorized maximum sentence for Counts One and Two is 50 years' imprisonment, pursuant to U.S.S.G. § 5G1.1(a), the PSR calculated the Guidelines sentence as 50 years' imprisonment.  In the PSR, Probation recommended a below-Guidelines sentence of 20 years.

## III.    Scott's Meritless Objections to the Guidelines Calculations

In his sentencing memorandum, dated January 9, 2024 ("Scott Mem."), the defendant objects to significant portions of Probation's Guidelines calculations.  Scott's objections are baseless and should be rejected.

First, Scott protests Probation's calculation of the base offense level, which is based on Scott's laundering of approximately $400 million.  (PSR ¶ 58).  In support of his position, Scott repeats an argument that was extensively litigated by co-defendant Sebastian Greenwood before this Court, *see* Dkts. 516, 519, 522, 523, and 530, namely that "the proceeds of the wire fraud SUA used as the foundation of the money laundering Guidelines must therefore be limited to the funds obtained from victims of fraud perpetrated in the U.S." (Scott Mem. 14).  This argument is wrong, as this Court has already held.  *See* Dkt. 539.  The base offense level is therefore correctly calculated at 36.

Second, Scott argues that Section 3C1.1 does not apply to the two instances in which Scott obstructed justice after being charged in this case by attempting to dissipate assets that came from OneCoin fraud scheme proceeds and which were subject to forfeiture.  (Scott Mem. 19-20).  Scott's argument boils down to a single point: that the Government has failed to prove by a preponderance of the evidence that he knew that there was any "lawful authority that would have barred this conduct."  (*Id.* 20).  Scott's argument, which is based on nothing but his say-so, is meritless.

Scott's conduct was obstructive in several ways, all of which he knew at the time he engaged in the conduct.  The two acts of obstruction Scott committed after he was charged in this case are as follows: (1) after Scott was indicted in this case, he sold the 2016 Porsche, which he had purchased with OneCoin fraud proceeds, for $250,000; and (2) Scott transmitted a wire of approximately $300,000 from a Cayman Islands bank (i.e., the Cayman Account), which constituted proceeds from the OneCoin Fraud Scheme.  As to the 2016 Porsche, Scott had purchased the Porsche with OneCoin proceeds, and knew it was evidence of his crime.  His sale was therefore a blatant act of obstruction.  Scott also knew that the Porsche and the $300,000 were subject to seizure; the Government had listed both in the Forfeiture BOP.  The Cayman Account was also subject to a restraining order.  Scott's sale and transfer of funds were also both separate felonies under 18 U.S.C. § 1957, which bars anyone from engaging in a monetary transaction in criminally derived property of a value greater than $10,000.  In light of all of this, Scott's argument that he believed these transactions were permissible is belied by the record.  The obstruction enhancement clearly applies here.

Finally, Scott argues that he did not use his skills as an attorney in a manner that "increase[d] his chances of succeeding or of avoiding detection."  (Scott Mem. 18) (citing *United States v. Fritzson*, 979 F.2d 21, 22 (2d Cir. 1992)).  Scott is correct that the enhancement should

not apply here, but not for the reasons stated in his submission.  Because Scott was a manager or supervisor in the offense, which he does not contest, three levels are added pursuant to U.S.S.G. § 3B1.1(b).  In light of that role adjustment, no additional adjustment may be employed for Scott's use of a special skill pursuant U.S.S.G. § 3B1.3.[1]

Based on the foregoing, the adjusted offense level is 45.  Because this is a rare instance where the total offense level is in excess of 43, pursuant to U.S.S.G. § 5G1.1(a), the offense level is 43, as correctly set forth in the PSR, *see* PSR ¶ 68.

## Discussion

## I.  Applicable Law

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States v. Booker*, 543 U.S. 220, 252 (2005). Thus, the applicable Sentencing Guidelines range "will be a benchmark or a point of reference or departure" when considering a particular sentence to impose. *United States v. Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005). In furtherance of that goal, a sentencing court is required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' the pertinent Sentencing Commission policy statements, the

---

[1] If the Court were to conclude that a role adjustment is not appropriate, the special skill enhancement clearly would apply.  As shown at trial, Scott leveraged his skills as an attorney to successfully launder $400 million of OneCoin fraud proceeds.  At the time Scott was introduced to Ignatova, "Scott was a trained corporate lawyer with extensive experience in representing private equity funds.  Scott in turn leveraged that experience to construct a sophisticated money laundering vehicle for Ruja Ignatova, involving transfers of hundreds of millions of dollars of fraud scheme proceeds disguised as investments into [the Fenero Funds]."  (PSR ¶ 28).  Scott's skills as an attorney therefore significantly facilitated his commission and concealment of the charged offenses.  Absent the role adjustment, the enhancement under U.S.S.G. § 3B1.3 would be appropriate.

need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims."
*Booker*, 543 U.S. at 259-60 (citations omitted).

Along with the Guidelines, the other factors set forth in Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

## II. A Sentence of at Least 17 Years Is Warranted in This Case

A sentence of at least 17 years would be fair and appropriate in this case, given the nature and circumstances of Scott's unprecedented offense, the need to impose just punishment and promote respect for the law, the need for adequate deterrence, and the history and characteristics of the defendant, including the mitigating factors cited in the defendant's sentencing submission.

A. **The Need for The Sentence To Reflect The Nature and Seriousness Of the Offense**

In 2015, Scott was faced with a choice: assist the leader of one of the world's largest fraud schemes by laundering hundreds of millions of dollars, or continue to live a law-abiding life as a practicing lawyer who was paid upwards of $1,000,000 a year.  Scott chose to work full time as Ignatova's money launderer.  In doing so, he engaged in incredibly serious and sophisticated criminal conduct, conduct for which he has failed to accept responsibility and for which he has not shown an ounce of remorse.  His punishment must match the seriousness of his crime.

Scott's money laundering operation was extraordinarily sophisticated.  To start the operation, he incorporated MSSI LTD, a fund manager registered in the British Virgin Islands.  In turn, he used MSSI LTD to own and operate a series of investment funds, the Fenero Funds, each of which was an approved fund regulated in the British Virgin Islands.  Scott used MSSI to own and operate a Fenero Fund organized in the Cayman Islands.  Scott also served as the Director of Fenero Equity Investments (Ireland), Limited, an entity formed in the Republic of Ireland, as well as two related companies also formed in Ireland.  Finally, Scott operated offshore bank accounts in the Cayman Islands for each of the Fenero Funds, which he used to facilitate the transfer of hundreds of millions of dollars of OneCoin Fraud Scheme proceeds disguised as investments.  Whereas most people would not even know where to begin in order to set up an offshore investment structure like this, Scott's extensive skills as a corporate lawyer enabled him to set all of this up in a period of months.  The complex web of accounts that was used just to transfer the money *into* Scott's fake investment funds is set forth in the chart below:



Once Scott had disguised the OneCoin investor funds as investments into Scott's Fenero Funds, Scott then transferred the money back out to himself, as his cut from the scheme, and to other accounts, on behalf of Ignatova.  A simplified chart depicting the flow of funds after they landed in the Fenero Cayman Accounts is shown below:



What makes Scott's conduct in this case doubly serious is that not only did he launder money that he knew was from unlawful activity through a highly sophisticated money laundering vehicle that he had built, but he laundered money *that he knew was from a massive global fraud scheme*. In other words, contrary to his argument in his sentencing submission, where he maintains his innocence and claims that he did not know that OneCoin was a scam, the evidence shows the exact opposite. First, the defendant was in fact told that OneCoin was a fraud scheme. In April 2016, Dilkinska forwarded him an email with a link to an article written by a CPA, stating in no uncertain terms that OneCoin was a fraud scheme, and outlining the many bases for that conclusion. (Tr. 1885, 1975).[2] The defendant was a sophisticated lawyer and could easily discern from the CPA's analysis that the funds he was set to receive were flowing from a massive global

---

[2] "Tr." refers to the trial transcript from the trial of Mark Scott, *see United States v. Mark Scott*, 17 Cr. 630 (ER).

fraud scheme.  Making the fraud all the more apparent, the defendant also knew that financial institutions were unwilling to bank OneCoin funds.  (Tr. 229).  In addition, Gary Gilford, one of Ignatova's employees at RavenR, specifically informed Scott that the City of London Police ("CoLP") had initiated a criminal investigation into OneCoin, and that multiple OneCoin bank accounts throughout the world had been frozen by various financial institutions.  (GX 4102).

Second, Scott's knowledge that OneCoin was a fraudulent scheme is borne out by his own lies and misrepresentations.  The evidence at trial established that Scott repeatedly and regularly lied and falsified documents in connection with the receipt and transfer of OneCoin proceeds by the Fenero Funds in order to hide the connection to OneCoin and Ignatova.  Scott's co-defendant David Pike described the aim of what Scott was attempting to do in an email to Scott on August 9, 2016, writing: "They are going to make a move too soon and send up flags that will disrupt *the delicate process of attempting to scrub Ruja* [if] they keep this up.  You are playing a very delicate game quite well.  I am impressed."  (GX 1213).  In another email, Scott wrote to Ignatova about potential names for the funds, writing that the name could be "[a]nything not associated with sales or [OneCoin] should be as neutral as possible."  (GX 1042).  In another email, Scott wrote to Pike about a potential investment, "[t]he possible link to [OneCoin] will kill this for us.  I will terminate the opportunity…"  (GX 1289).  In another email to Scott, an individual wrote, "Our problem is that [Ruja Ignatova] cannot appear as the [beneficial owner] of the structure and any change in the structure could cause the banks to close bank accounts if they were to find out about [Ruja Ignatova]."

Moreover, as described above, when Scott inadvertently forwarded an email to Apex that indicated that Dilkinska was connected to OneCoin, and Apex began to ask questions about the connection, Scott took extraordinary steps to attempt to hide the true origin of the money.  For

example, Scott directed his co-conspirators to create back-dated wire instructions, and he forged IMS contracts to make it appear that IMS was owed far more money under its contract than it was. When it was clear that Apex did not believe Scott, Scott continued to lie.  During a September 8, 2016 call, Scott stated, "I don't have OneCoin's money . . . I don't have OneCoin money."  (GX 2302-TR).  Scott also pretended that Irina Dilkinska was the actual source of the money, falsely claiming that "she's inventing ways to, how should I saw, to materially [u/i] access to potential buyers for those direct sales companies.  That's her biggest strength that she's doing here."

Finally, when Scott was arrested and interviewed by federal law enforcement agents, he continued to try to hide the connection between the money in his funds, and Ignatova and OneCoin. When asked, "And OneCoin and Ruja had nothing to do with Fenero or any other funds that you were involved in?"  He falsely claimed, "No. No."  All of these lies and misrepresentations clearly indicate that not only did Scott understand that he was laundering funds from an unlawful activity, but he specifically knew that the unlawful activity was the OneCoin Fraud Scheme.

Scott's knowledge that was he was laundering the proceeds from the OneCoin Fraud Scheme, and thereby helping to keep the scheme going, makes his conduct is this case significantly worse.  The impact of the OneCoin Fraud Scheme was made apparent in the victim impact statements submitted to the Court in connection with the sentencing of Greenwood, *see* Dkt. 570. For example, ▮▮▮▮▮▮▮▮ ("Victim-1") described the devastating financial and emotional impact of the fraud:

> In early 2019… I tried to resign but whatever funds the organization held of mine were immediately taken. **The immediate financial hardship was very difficult.**
>
> …
>
> **As the true nature of the organization became apparent and I realised that I had been manipulated I became depressed and withdrawn. I actually became physically sick. I felt incredibly embarrassed, humiliated and disheartened.**

**The shock of discovery adversely impacted my mental health. Four years were suddenly lost.**

(*See* Dkt. 570, Exhibit F) (emphasis added).

Another investor, ▇▇▇▇▇▇▇ ("Victim-2"), explained the severe impact that the OneCoin

Fraud Scheme had on him and his family:

> In the years of 2016 to 2019 I wanted to invest money to make my retirement year more better for me and my wife…. With the hope of a high return investment and hope of reaching our dreams of financial freedom we took the plunge. We sent one 1000 USD to a number block change. Then it was showing we were making hundreds to thousand per day on [their] platform. Then we wanted to withdraw some of our money and that is when the experience took a bad turn. They asked for money for all different excuses the need to set up a program to deposit money back into my blockchain. Tell me that I have to pay all the fees upfront then saying it does not work and they have to try something else. **This went off and on for over three years until all of our savings were gone. It caused a lot of sleepless night and marriage conflicts with me and my wife. This whole issues has cause so much stress that I do not ever how if we will get our finances back too [sic] where they were.**

(*See* Dkt. 570, Exhibit G) (emphasis added).

The victims who testified at the November 2019 trial of Scott also explained the devastating

impact of the OneCoin Fraud Scheme.  For example, Linda Cohen, a victim who testified at the

Scott Trial, stated that because of the $28,000 investment she lost on OneCoin, she was still

working at the age of 76, despite wanting to retire.  (*See* Scott Trial Tr. at 809-10).  William Horn,

another OneCoin victim who took the stand at the Scott Trial, testified that he took $20,000 from

his daughter's educational fund, and sold a necklace, an old pickup truck, and a generator to

finance nearly $30,000 in OneCoin investments, only to lose it all; even more, he unwittingly

induced close family members to invest in OneCoin as well—"the ones that could ill afford to lose

the money"–and they never again saw a dime of those funds.  (*See* Scott Trial Tr. at 79, 89-91, 94,

97).  A BBC podcast that explored the global reach of the scheme, "The Missing Cryptoqueen,"

included an interview of a victim in Uganda who sold off his most valuable possessions—three goats—in order in invest in worthless OneCoin.[3]  In short, the financial damage inflicted by the OneCoin Fraud Scheme devastated the lives of millions of investors all over the world.

Scott created a highly sophisticated money laundering vehicle that he knew was being used to launder the proceeds from the OneCoin Fraud Scheme, proceeds that came from victims just like those described above.  He laundered $400 million in funds from that scheme and lined his pockets with $50 million of that victim money.  The seriousness of this conduct demands a sentence of at least 17 years' imprisonment.

### B. Just Punishment

As noted above, the scale of Scott's money laundering operation was nearly unprecedented, and was accompanied by a litany of aggravating factors: (1) Scott was motivated by greed through and through and used the hard-earned money of OneCoin investors to fund his over-the-top lifestyle; (2) Scott knew that the money he was laundering was the proceeds of an international fraud scheme; (3) Scott used the knowledge and skill he had acquired as a corporate lawyer to facilitate his money laundering operation; (4) Scott went to extraordinary lengths to avoid getting caught, including conducting nearly all of the relevant financial transactions overseas, using encrypted communication channels such as a special encrypted cell phone, his own email server, and WhatsApp, while avoiding other channels such as Skype, that he deemed "unsafe;" (5) Scott attempted to use his status as a lawyer to shield his illegal communications with Ignatova from discovery by law enforcement authority, often labeling such communications "Attorney Client

---

[3]  *See* The Missing Cryptoqueen Podcast, Episode 8: The Technology and the Dream, available at https://www.bbc.co.uk/programmes/p07sz990, at timestamp 1:40-3:20.

Privileged Communication," and variations of the same; and (6) Scott, to this day, has failed to accept responsibility for his actions.

The need for just punishment for Scott's abhorrent conduct is an additional factor that justifies a sentence of at least 17 years' imprisonment.

### C. General Deterrence

The enormity and audacity of Scott's crimes and the crimes of his co-conspirators have understandably captured the attention of the public, both within and outside the United States.[4] Thus, the deterrent message and effect of the sentence imposed by the Court in this case will resonate significantly with any individual (or institution) tempted to engage in conduct like Scott's. The need for deterrence is especially important here, where Scott was a trained lawyer, who used

---

[4] *See, e.g.*, New York disbars ex-Big Law partner as crypto scheme sentencing nears, Reuters, November 2, 2020, https://www.reuters.com/article/cryptoscheme-disbar-idUSL1N2HO521/; OneCoin lawyer found guilty in 'crypto-scam,' BBC, November 21, 2019, https://www.bbc.com/news/technology-50509299; 'Cryptoqueen' Lawyer Denied New Trial on OneCoin Fraud, Bloomberg, September 18, 2023, https://www.bloomberg.com/news/articles/2023-09-18/cryptoqueen-s-lawyer-denied-new-trial-despite-her-brother-s-lies; Bogus 'Bitcoin killer' cryptocurrency founder pleads guilty, Associated Press News, December 16, 2022, https://apnews.com/article/business-manhattan-fraud-429904f53ead84144532eb3a282a7845; Luc Cohen, Reuters, 'Cryptoqueen' associate pleads guilty in U.S. over OneCoin fraud, December 16, 2022, https://www.reuters.com/legal/cryptoqueen-associate-pleads-guilty-us-over-onecoin-fraud-2022-12-16/, Jasmine Anand, India Today, OneCoin's co-founder pleads guilty, likely to face 60 years in prison: Report, https://www.indiatoday.in/cryptocurrency/story/onecoins-co-founder-pleads-guilty-likely-to-face-60-years-in-prison-report-2311398-2022-12-20, David Z. Morris, Fortune, Is OneCoin the Biggest Financial Fraud in History?, https://fortune.com/crypto/2019/11/06/is-onecoin-the-biggest-financial-fraud-in-history/, BBC's the Missing Cryptoqueen podcast, https://www.bbc.co.uk/sounds/brand/p07nkd84; Jamie Bartlett, The Missing Cryptoqueen: The Billion Dollar Cryptocurrency Con and the Woman Who Got Away with It (2022); Brad Hamilton, New York Post, Inside the life and crimes of the new addition to the FBI's 10 Most Wanted Ruja Ignatova, August 10, 2022, https://nypost.com/2022/08/10/the-life-and-crimes-of-ruja-ignatova-new-to-fbis-10-most-wanted-ruja-ignatova/; Hannah J. Davies, The Guardian, The Missing Cryptoqueen: the hunt for a multi-billion-dollar scam artist, Nov. 4, 2019, https://www.theguardian.com/tv-and-radio/2019/nov/04/the-missing-cryptoqueen-the-hunt-for-a-multi-billion-dollar-scam-artist

his specialized skills and training to operate a global money laundering scheme.  Deterring would-be money launderers, who can often participate in schemes like this at a safe distance from the day-to-day operation of the fraud scheme itself, is critical.  Without money launderers like Scott, schemes like the OneCoin scheme would falter and fail.  This case is a perfect illustration.  By the fall of 2015, Greenwood and Ignatova were discussing the severe issues they were confronting with bank accounts associated with OneCoin.  For example, Greenwood emailed Ignatova in September 2015, "we are in desperate need to fix proper bank . . . . What are your plans here pls? [Two banks] will be over when all funds have a new home, what plans or future is there here right now?"  The banking problems that Ignatova faced were so severe that she was willing to pay someone like Scott $50 million to launder her money.  Without his help, and the help of other money launderers like him, the scheme would have collapsed.  A sentence of at least 17 years is needed to deter others from helping to prop up similar schemes in the future through sophisticated and large-scale money laundering operations.

Further, money laundering operations like Scott's are difficult to detect and prosecute and it is therefore of critical importance that the resulting punishment sends a message sufficient to deter others.  The successful investigation and prosecution of Scott required substantial coordination and assistance from the international law enforcement community, considerable time and resources to trace hundreds of millions of dollars through a maze of bank accounts around the world, countless interviews in the United States and overseas, and search and seizure warrants for dozens of email accounts. Making the scheme even more difficult to investigate and prosecute, Scott and his co-conspirators also went to great lengths to avoid law enforcement detection, for example, using special encrypted phones to avoid the possibility that law enforcement would tap their phones.

Not only was Scott's scheme difficult to detect, but it was *highly* lucrative, earning him $50 million, and assisting his accomplices in laundering $400 million. Once uncovered, a lucrative scheme like this one should be sternly punished. *See United States v. Eddy Alexandre*, 22 Cr. 326 (JPC), Dkt. 107 at 102 ("People in society must realize that the commission of such massive investment schemes have real victims, and when that happens there will be real consequences. There is a value for would-be fraudsters to [know] that if they choose to engage in fraud, they may be caught and face serious consequences. And economic-based fraud that requires sophistication, planning and deliberation, such as the crime here, is the sort of more rational and calculated crime for which general deterrence is likely to have a stronger impact); *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it.").

A sentence of at least 17 years' imprisonment is necessary here to achieve general deterrence.

**D. <u>Specific Deterrence</u>**

With respect to specific deterrence, Scott's conduct cannot be explained away as an aberration and it is notable and concerning that since his arrest, he has failed to accept responsibility for his actions, and worse, has committed additional crimes while on bail. Scott's conduct was not a one-time transgression occurring on a single day. Rather, his scheme unfolded over a period of several years, required extensive and meticulous planning, and was highly calculated. Indeed, to pull off this money laundering operation, Scott had to: incorporate MSSI LTD in the British Virgin Islands, form Fenero Equity Investments L.P. in the British Virgin Islands, form multiple additional Fenero entities in Ireland and the British Virgin Islands, register

Fenero and MSSI Ltd. in the Cayman Islands, apply for Fenero bank accounts in the Cayman Islands, apply for Fenero bank accounts in Ireland, engage the services of fund administrators such as Apex, facilitate dozens and dozens of global financial transactions into and out of the Fenero accounts, travel to London to meet with Ignatova three times, travel to the British Virgin Islands three times, travel to the Cayman Islands eight times, travel to Bulgaria to meet with Ignatova three times, and travel to Ireland to set up additional Fenero accounts.  It is clear that Scott committed countless hours to planning and executing this global money laundering operation.

Further, Scott's willingness to commit new crimes and obstruct justice after being charged in this case underscore the need for specific deterrence.  After being charged in this case, and knowing full well that the funds he had laundered for Ignatova came from the pockets of OneCoin victims, and were subject to forfeiture, Scott was undeterred and dissipated over $500,000 in OneCoin proceeds.  First, he sold a Porsche that he had purchased with OneCoin proceeds for $250,000, which he then spent.  Second, he used $300,000 in OneCoin proceeds to pay for work on one of the properties in Cape Code that he had purchased with illicit proceeds.  These funds were subject to forfeiture, and further, the use of these funds was unlawful.  Scott used the funds nonetheless.

For all these reasons, a sentence of at least 17 years is necessary to deter Scott and to protect the public from further crimes of the defendant.

**E.  Scott's Personal Background and Character Do Not Justify a Sentence of Only Five Years**

The Court should of course consider Scott's personal history and characteristics, including his poor health, but the defendant's contention that a sentence of five years is appropriate goes too far.  Scott was one of the most prolific money launderers that has ever been prosecuted.  The scope and sophistication of his money laundering operation were nearly without precedent.  His utter

failure to accept any responsibility for his inexcusable conduct also counsels in favor of a significant sentence. To be clear, absent the mitigating factors cited in the defendant's sentencing submission, including his age and his medical condition, a Guidelines sentence would be fully warranted here.  The notion that a sentence of five years is sufficient to meet the needs of sentencing should be firmly rejected.

Furthermore, much of the defendant's history and characteristics before and after the offense conduct in this case cut both ways.  In his submission, Scott argues that he is a devoted father and husband, supportive of his friends, and committed to his community.  But any kindness that Scott has displayed in other aspects of his life pales in comparison to the selfishness and callous disregard he showed when he laundered $400 million in funds that was derived from victims of the OneCoin Fraud Scheme and is further outweighed by other aspects of his background and character.

Scott's conduct was not driven by financial need or desperation, and he does not claim otherwise.  Scott was handed every possible opportunity.  Scott's mother "provided him with a stable upbringing in a middle-class home environment."  (Scott Mem. 3).  Scott received a full R.O.T.C. U.S. Army scholarship to attend college at the University of Massachusetts-Amherst, but then transferred to Tuft University after one year, where he graduated with a B.S. degree in 1991. Scott then earned his J.D. from Boston University School of Law, where he graduated in 1995.

After graduating from law school, Scott spent most of his career as a lawyer specializing in corporate law, including private equity.  Prior to orchestrating the charged money laundering operation, Scott spent his entire career working for law firms in the United States and overseas. For example, from April 2010 to December 2012, the defendant was an equity partner for a law firm in Miami, FL, and London, England.  From 2013 to 2014, Scott was an equity partner for a

different law firm in Miami, FL.  More recently, in the lead up to this money laundering scheme, Scott was an equity partner at Locke Lord, where he helped open the firm's Miami office, and earned between $800,000 and $1.2 million annually.  In short, Scott had it made.  His annual income put him in the top 1% of annual income for the entire country.  *See, e.g.*, Here's how much you need to earn to be in the top 1% of every US state, Business Insider, November 29, 2016, https://www.businessinsider.com/top-one-percent-every-us-state-2016-11.   But it just wasn't enough.

Moreover, it could not be clearer what motivated Scott to perpetrate this egregious scheme: greed.  As described above, Scott reveled in the opulent lifestyle that being the top money launderer for the leader of OneCoin afforded him.  In a text message to his wife, Scott explained: "I am going for 50 at 50."  (GX 3025-S).  In other words, Scott wanted $50 million by the age of 50, and was willing to orchestrate a massive money laundering operation in order to get it.  Scott does not address any of this in his sentencing submission, instead citing to his "long-standing commitment to his community and the causes that are important to him," including pro bono legal advice to Crystal Academy (run by his friend and co-defendant, Pike), and monetary donations to the same. Although it may be true that Scott was generous to his close friend, that type of generosity pales in comparison to the callous indifference he displayed towards the financial suffering he enabled by laundering $400 million in OneCoin Fraud Scheme proceeds and taking more than $50 million of those proceeds for himself.  His continued use of victim proceeds even after being charged in this case further underscores his selfishness.

Despite the incredible success Scott had achieved before OneCoin as a lawyer, Scott still was motivated by an unquenchable greed to commit the instant offense. Unlike a defendant who may feel he has no way out from poverty other than by committing crimes, Scott lived an

exceptionally successful life. He was simply greedy for more.  And he was willing to do anything it took to have such a life, including using his skills and talents as a lawyer to launder an extraordinary amount of money.  For a defendant who was given so many opportunities and achieved so much success—unlike many disadvantaged defendants that come before the Court— to nevertheless choose to commit such an egregious scheme reflects an uncommon level of greed. In that way, Scott's successful background makes his crimes more deserving of punishment, not less.

The Government recognizes Scott's medical issues are relevant and should be considered at sentencing.  And for that reason, the Government is seeking a substantial variance from the Guidelines here, which call for a sentence of 50 years' imprisonment.  The Government has also considered the time that Scott has spent on home incarceration.  While the Government recognizes that home incarceration has placed some restrictions on Scott's liberty, the comparison to prison goes too far.  Scott has been free to live with his loved ones, in the comfort of his home, with regular visits outside of his home for medical and legal appointments.  Even considering these mitigating factors, a sentence of at least 17 years is still warranted.

### F.  The Guidelines Provide a Useful Framework in this Case

Contrary to the defendant's argument that "any Guidelines calculation driven by the $400 million loss amount is worth little weight," Scott Mem. 22, the Guidelines here provide a useful framework for fashioning an appropriate sentence, especially given that the defendant himself laundered $400 million that he knew was proceeds from the OneCoin Fraud Scheme, and he received payment of $50 million for that laundering.  Here, the amount of money laundered by Scott serves as a suitable starting place for assessing his culpability because it serves as a useful— though certainly not dispositive—proxy for viewing the magnitude of Scott's crime. This is

especially so in this case, where it was Scott who conceived of and operated the money laundering vehicle that was used to launder $400 million, money that came directly from more than 3 million victims of the OneCoin Fraud Scheme, and that will never be recouped by those victims.  Given this, there can be no question about the scope of the harm that the defendant intended to, *and did*, inflict by laundering this money.  Notably, even if Scott were only held liable for the amount of money that he pocketed from the scheme ($50 million), the resulting Guidelines of 210-262 months would still be enormous, and above the sentence the Government is seeking.

As a result, the criticism sometimes leveled at the loss Guidelines in other types of fraud cases—namely, that they purportedly overstate the loss relative to the defendant's true culpability—ring hollow in this case.  Here, the defendant conceived of and orchestrated a money laundering operation that successfully laundered $400 million in proceeds from a global fraud scheme, causing financial harm that is accurately and fairly captured in the loss table.

G. **The Sentence of Five Years the Defendant Requests Would Result in an Unwarranted Disparity with Similarly Situated Defendants**

A sentence of five years' imprisonment would create unwarranted disparities with similarly situated defendants.  As noted above, Scott's crime was far from average.  He used his skills as a highly successful corporate lawyer to custom-build a money laundering vehicle that could withstand the scrutiny of global financial institutions and law enforcement, in order to launder $400 million in proceeds of an egregious fraud scheme.  Scott did so in exchange for an enormous payday: $50 million.  To be clear, the Government is seeking a sentence of at least 17 years' imprisonment not because of the Guidelines loss table, but because such a sentence appropriately balances Scott's personal characteristics, the seriousness of his crimes, the impact of his crimes on the public, and the need for specific and general deterrence to prevent similar sophisticated white-collar crimes in the future.

38

Given the incredible sophistication of Scott's money laundering operation, the enormous amount of money that he laundered, and the massive amount of money he was paid, it is unsurprising that there are few if any similarly situated money launderers that have been prosecuted in this district (or anywhere).   However, looking at the sentences imposed in other similarly large, sophisticated, and anomalous white-collar cases in this District may nonetheless be instructive.   For example, in *United States v. Bernard Ebbers*, 02 Cr. 1144 (VEC), Ebbers, who was the former President and CEO of WorldCom, Inc., received a sentence of 25-years' imprisonment based on his scheme to deceive the investing public and the SEC concerning WorldCom's true operating performance and financial results, which eventually caused a loss of more than $2 billion after the fraud was disclosed.   There, the Court was faced with significant mitigating factors, including the defendant's age of 63 years old, and the defendant's poor health, including cardiac-related conditions.   The Court concluded "that this sentence is likely to be a life sentence for Mr. Ebbers, [but found] that a sentence of anything less would not sufficiently reflect the seriousness of this crime." (*See United States v. Ebbers*, 02 Cr. 1144 (BSJ), sentencing transcript at 60:3-6).   Judge Jones sentenced Ebbers to a below-guidelines term of imprisonment of 25 years.   (*See id.* at 61:1-6.3).

Other cases in this District involving notably smaller schemes have warranted far greater sentences than the sentence of five years requested by Scott.   For example, in *United States v. Mark Mazer et al.*, the so-called "CityTime" fraud, the defendants defrauded the City of New York City of well over $100 million.   Notably, in that case, the financial harm caused by the defendants was a fraction of what it was here.   Further, while the most culpable defendant in that case lined "his own pockets to a breathtaking degree rarely seen in any fraud or kickback case," his personal profit of approximately $30 million is significantly less than Scott's.   After being convicted at trial,

39

the three leading defendants in that case received sentences of 20 years' imprisonment.  Those sentences are instructive here.

Unlike Ebbers and the defendants in the *Mazer* case, Scott did not orchestrate the fraud scheme himself in this case, and the Government is accordingly seeking a lower sentence.  Scott was the money launderer.  But absent Scott's services (and the services of other sophisticated money launderers), the fraud scheme could not have succeeded.  Money was the lifeblood of the scheme, and Scott ensured that Ignatova had access to it.  The enormous payment of $50 million he received is clear evidence of how vital he was to the success of the scheme.  Scott should be sentenced accordingly given his important role in ensuring the success of the OneCoin Fraud Scheme.

Finally, the sentences imposed on Scott's co-conspirators are also instructive.  The Court imposed a sentence of five years' imprisonment on Gilbert Armenta.  That sentence was consistent with the Government's recommendation, which took into account Armenta's extensive historical and proactive cooperation.  Armenta exposed himself to a risk of harm as result of that cooperation, and the Government characterized his efforts at cooperation as "extraordinary."  *See United States v. Armenta*, 17 Cr. 556 (ER) Dkt. 71 at 6.  While those efforts were blunted by his violation of his cooperation agreement, Armenta was still deserving of enormous credit for his cooperation, which counseled in favor of the sentence of five years he received.  Scott, on the other hand, has not only not cooperated in this case, but he has failed to accept any responsibility for his crimes.  Armenta's case, and the appropriate sentence there, is not comparable to Scott's.

The Court also imposed a sentence of 20 years' imprisonment on Greenwood.  Greenwood's offense conduct was undoubtedly worse than Scott's.  He hatched the OneCoin scheme with Ignatova, and he played an active role in facilitating that scheme, as OneCoin's most

prominent salesperson.  However, Greenwood's case presented a set of mitigating factors that significantly eclipse the mitigation cited by the defendant. ████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Given the absence of comparable mitigating factors for Scott, a similar sentence should be imposed.  Nonetheless, the Government has recommended a sentence that is meaningfully lower, in part to reflect the difference in their respective criminal conduct.

Finally, Scott compares his conduct to that of Pike and Dilkinska, both of whom played far lesser roles in the OneCoin scheme.  As noted above, Pike, at Scott's direction, assisted Scott with administrative tasks.  Moreover, Pike was not charged with money laundering (only bank fraud) and was not alleged to have knowledge that OneCoin was a fraudulent scheme.  He also was not a lawyer and did not leverage any sophisticated knowledge and training to commit the crime.  Pike earned approximately $2 million during the scheme, a mere fraction of the $50 million earned by Scott.  His Guidelines range of 6-12 months reflected their severely differing levels of culpability in this scheme.  Any comparison between the two of them is misplaced.

As to Dilkinska, although she was alleged to have participated in the fraud scheme as well as the money laundering operation, her conduct was *substantially* less serious than Scott's. While Dilkinska worked in the OneCoin office, she was not an active promoter for OneCoin.  Moreover, Dilkinska's role in the money laundering operation was important but far more limited than Scott's.  Unlike Scott, she was not the architect of a sophisticated money laundering vehicle that was used to launder $400 million.  The Government's decision to offer her a plea agreement with

41

a ten-year statutory maximum sentence underscores how much less culpable Dilkinska was than Scott, as does the level of compensation that Dilkinska received during the scheme. She was paid a modest salary in connection with her employment at OneCoin (likely under $100,000) and was never paid anywhere near the kind of money that the most culpable members of the scheme were paid, such as Ignatova, Scott, Greenwood, and Armenta.

## III. Restitution and Forfeiture

### A.  The Court Should Not Order Restitution, Pursuant to Section 3663A(c)(3)

Due to the difficulties that would be associated with fashioning a restitution order in this case, the Court should not enter a restitution order against the defendant, consistent with the Court's prior decisions in the sentencings of co-defendants Armenta and Greenwood.

Title 18, United States Code, Section 3663A(c)(3) provides that restitution shall not be applied in certain types of cases such as the instant case (i.e., a fraud case), if the Court determines that:

> (A) the number of identifiable victims is so large as to make restitution impracticable; or
> (B) determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

The Government submits that both factors are met here. As noted above, between the fourth quarter of 2014 and the fourth quarter of 2016 alone, the scheme took in more than $4 billion from at least 3.5 million victims. Further, the scheme targeted OneCoin investors throughout the world. Calculating investor losses would require identifying each of these millions of investors and determining how much they each invested. Although a small subset of investors has come forward and identified themselves to the Government, the vast majority have not. Moreover,

obtaining this information would be even more difficult in this case given the passage of time and the absence of accurate contact information for most of the victims.

For these reasons, the Government respectfully submits that it would be, as a practical matter, impossible to fashion a restitution order in this case and, in any event, the need to do so does not outweigh the complication and prolongation of the sentencing process. Therefore, the Government respectfully requests that the Court decline to enter a restitution order.

**B.   The Court Should Enter a Forfeiture Order Against the Defendant**

The Government filed its forfeiture submission on August 31, 2020, which it incorporates herein by reference.   (*See* Dkt. No. 318).   In that submission, the Government submitted a preliminary order of forfeiture, imposing a forfeiture money judgment in the amount of $392,940,000, and forfeiting Scott's interest in certain bank accounts, which constitute property involved in the money laundering offense Scott was convicted of at trial, and certain specific property and assets that are traceable to such property.   For all the reasons set forth in the Government's prior submission, the Government respectfully requests that the Court enter the proposed Preliminary Order of Forfeiture.[5]

---

[5] The Government cited to Appendix A and B in its forfeiture submission, but inadvertently did not attach those documents.  Appendix A and B are attached hereto as Exhibit A.

## Conclusion

For the reasons set forth above, the Government respectfully submits that a sentence of at least 17 years' imprisonment is necessary and appropriate in this case.


Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: s/ Nicholas Folly                         
Nicholas Folly
Juliana Murray
Kevin Mead
Assistant United States Attorneys
(212) 637-1060

Cc:    Defendant (by ECF)

# Exhibit A

## Appendix A
### Subject Accounts and Subject Property

## Subject Accounts

| Bank | Account No. | Account Name |
|------|-------------|--------------|
| Iberia Bank | ████9788 | ████████████ |
| DMS Bank | ████7102 | MSS International Consultants |
| DMS Bank | ████7100 | MSS International Consultants |
| FirstCaribbean International Bank | ████2701 | MSS International Consultants |
| FirstCaribbean International Bank | ████5454 | DRP Holdings Ltd BVI |
| FirstCaribbean International Bank | ████5343 | MSS Marine Group |
| FirstCaribbean International | ████3883 | EGD Investment Ltd |
| FirstCaribbean International Bank | ████5346 | Mumbelli Group Holding |
| RBC Dominion Securities Global Ltd. | ████8611 | HFT Holding Limited |
| Dreyfus Sohne & Cie AG | ████████████6901 | Mark S. Scott |
| Cooperative Bank of Cape Cod | ████1054 | Mark S. Scott and ████████ |
| Northern Trust Company | ████2613 | Mark S. Scott PL |
| Northern Trust Company | ████9434 | Mark S. Scott |
| Northern Trust Company | ████8797 | Mark Stanley Scott |
| UBS Financial Services | ████1979 | Mark S. Scott, P.L. |
| UBS Financial Services | ████9666 | Mark S. Scott and Lidia Kolesnikova |
| UBS Financial Services | ████5493 | Mark S. Scott 2017 Trust |
| Wells Fargo Advisors | ████9048 | Mark S. Scott 2017 Trust |
| RBC Private Counsel (USA) Inc. | ████2214 | Mark S. Scott 2017 Trust |
| RBC Private Counsel (USA) Inc. | ████317 | Mark S. Scott 2017 Trust |
| J.P. Morgan Chase Bank | ████6032 | ████████████ |

## Cars and Yacht

| Description | VIN / Hull Nos. |
|-------------|-----------------|
| 2017 Sunseeker Predator yacht | TAIMA |
| 2017 Red Porsche 911 4S Turbo | WP0CD2A95HS178187 |
| 2018 White Porsche 911 GT2 RS | WP0AE2A91JS185471 |

**Personal Property**

| Description |
| --- |
| Ring with alleged diamond seized on or about September 5, 2018 from 133 Sunset Lane Barnstable, Massachusetts 02630 |
| Panerai Pam 582 Clock seized on or about September 5, 2018 from 133 Sunset Lane Barnstable, Massachusetts 02630 |
| Panerai Pam 585 Clock seized on or about September 5, 2018 from 133 Sunset Lane Barnstable, Massachusetts 02630 |
| Panerai Pam 583 Clock seized on or about September 5, 2018 from 133 Sunset Lane Barnstable, Massachusetts 02630 |
| Panerai Pam 584 Clock seized on or about September 5, 2018 from 133 Sunset Lane Barnstable, Massachusetts 02630 |

**Real Property**

| Address |
| --- |
| 31 Dale Avenue, Hyannis Port, MA 02601 |
| 105 Sunset Lane, Barnstable, MA 02630 |
| 133 Sunset Lane, Barnstable, MAs 02630 |
| 600 Coral Way, Suite/Floor 12, Segovia Tower, Coral Gables, FL 33134 |

### Appendix B
Substitute Assets (Bank Accounts)

| Account Name | Financial Institution | Account No. |
|---|---|---|
| Mark S. Scott 2017 Trust | UBS | PW XXX53 (converted to Account No. ████4 YA) |
| Mark S. Scott 2017 Trust | UBS | PW XXX31 (converted to Account No. ████31 YA) |
| Mark S. Scott College Fund 529 | UBS | Account No. ████34 03 |
| Mark S. Scott | UBS | Account No. ████04 03 |

Substitute Assets Already Seized

| Asset Description | Date Seized | Location of Seizure |
|---|---|---|
| One Heckler & Koch 40 MM gun, Serial No.: 219-004106 | September 5, 2018 | 600 Coral Way, Suite/Floor 12, Segovia Tower, Coral Gables, Florida 33134 |
| One Heckler & Koch 45 MM gun, Serial No.: HKU004967 | September 5, 2018 | 600 Coral Way, Suite/Floor 12, Segovia Tower, Coral Gables, Florida 33134 |
| One Desert Eagle SOAE, Serial No.: DK0038257 | September 5, 2018 | 600 Coral Way, Suite/Floor 12, Segovia Tower, Coral Gables, Florida 33134 |
| One Smith and Wesson, Serial No.: DJW0604 | September 5, 2018 | 600 Coral Way, Suite/Floor 12, Segovia Tower, Coral Gables, Florida 33134 |
| One Beretta Shotgun and leather case | September 5, 2018 | 600 Coral Way, Suite/Floor 12, Segovia Tower, Coral Gables, Florida 33134 |
| One Luminor Panerai P068/400 BB1577049 | September 5, 2018 | 600 Coral Way, Suite/Floor 12, Segovia Tower, Coral Gables, Florida 33134 |
| One Black Hermes Birkin Bag | September 5, 2018 | 600 Coral Way, Suite/Floor 12, Segovia Tower, Coral Gables, Florida 33134 |
| One Orange Hermes Birkin Bag | September 5, 2018 | 600 Coral Way, Suite/Floor 12, Segovia Tower, Coral Gables, Florida 33134 |
| One Black Hermes Purse | September 5, 2018 | 133 Sunset Lane Barnstable, Massachusetts 02630 |
| One Brown/Tan Hermes Purse | September 5, 2018 | 133 Sunset Lane Barnstable, Massachusetts 02630 |
| One Green Hermes Purse | September 5, 2018 | 133 Sunset Lane Barnstable, Massachusetts 02630 |