**COVINGTON**

BEIJING  BOSTON  BRUSSELS  DUBAI  FRANKFURT
JOHANNESBURG  LONDON  LOS ANGELES  NEW YORK
PALO ALTO  SAN FRANCISCO  SEOUL  SHANGHAI  WASHINGTON

**Arlo Devlin-Brown**

Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
T  +1 212 841 1046
adevlin-brown@cov.com

By CM/ECF                                                          March 26, 2024

The Honorable Edgardo Ramos
United States District Judge
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007

Re:  *United States v. Scott*, No. 17-cr-630-1
(Letter-Motion for Release Pending Appeal)

Dear Judge Ramos:

Defendant Mark Scott has timely appealed from his convictions and sentence.  Notice of
Appeal, ECF 620; Am. Notice of Appeal, ECF 630.  On appeal, he will argue, among other
things, that those convictions rested on testimony that the Government admits was perjured; on
the exclusion of impeachment evidence on grounds the Government admits were erroneous; and
on insufficient evidence that (1) the alleged wire fraud conspiracy had a substantial U.S. nexus,
(2) Mr. Scott actually conspired to defraud an insured bank, or (3) Mr. Scott knew or could have
anticipated that a foreign bank would use a correspondent account in the Southern District of
New York to transfer money between two foreign countries.  Because his appeal raises
substantial questions that, if resolved in his favor, would require acquittal, a new trial, or a
noncustodial sentence, and because he is demonstrably neither a flight risk nor a risk to the
safety of others, Mr. Scott respectfully requests that this Court order him released on bail
pending appeal, subject to the same conditions under which he has been released without
incident for nearly four years.  *See* Bail Order, ECF 252 (Mar. 30, 2020).

I.      **LEGAL STANDARD**

The Bail Reform Act provides that a court "shall order the release" of "a person who has
been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an
appeal" if it finds that four conditions are met.  18 U.S.C. § 3143(b):

- **First**, "the defendant is not likely to flee or pose a danger to the safety of any other
  person or the community if released."  *Id.* § 3143(b)(1)(A).

- **Second**, "the appeal is not for the purpose of delay."  *Id.* § 3143(b)(1)(B).

**COVINGTON**

- ***Third***, the appeal "raises a substantial question of law or fact," *id.*, meaning a question "of more substance than would be necessary to a finding that it was not frivolous," or "a 'close' question or one that very well could be decided the other way," *United States v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985) (quoting *United States v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1985)).

- ***Fourth***, that question, if determined favorably to the defendant on appeal, is "likely to result in" reversal, new trial, a noncustodial sentence, or a sentence that is less than time served plus the expected duration of the appeal.  18 U.S.C. § 3143(b)(1)(B); *see also Randell*, 761 F.2d at 125 ("If a court does find that a question raised on appeal is 'substantial,' it must then consider whether that question is so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial." (quotation marks omitted)).[1]

Although the defendant must establish by clear and convincing evidence that he or she is not a flight risk or risk to the safety of others or the community, he need establish the other three factors by only a preponderance of the evidence.  18 U.S.C. § 3143(b)(1)(A); *United States v. Galanis*, 695 F. Supp. 1565, 1566 (S.D.N.Y. 1988); *see also United States v. Affleck*, 765 F.2d 944, 953 n.15 (10th Cir. 1985).  If the defendant demonstrates that these conditions are satisfied, the court must order him released pending appeal.  *United States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004).

Significantly, to establish that he warrants bail pending appeal, the defendant need not persuade the "trial court to certify that it is likely to be reversed."  *Randell*, 761 F.2d at 125 (quotation marks omitted).  Indeed, the court does not need to "predict the probability of reversal" at all.  *United States v. Silver*, 203 F. Supp. 3d 370, 376-77 (S.D.N.Y. 2016); *see also United States v. Bayko*, 774 F.2d 516, 523 (1st Cir. 1985).  Instead, bail pending appeal requires only that the defendant clear the relatively low bar of identifying a "close" or fairly debatable appellate issue.  *See Randell*, 761 F.2d at 125.  Accordingly, courts in this District have repeatedly granted bail even when they have viewed the defendants' arguments as unmeritorious.  *See, e.g.*, *United States v. Kaufman*, No. 19-cr-504 (LAK), 2021 WL 8055691, at *3 (S.D.N.Y. Oct. 27, 2021) (granting bail where judge deemed it "doubtful" but "not impossible" "that [the defendant] will succeed on [his appeal of] either count, let alone both"); Hr'g Tr. 55:13–17, *United States v. Gatto*, No. 17-cr-686 (LAK) (S.D.N.Y. Mar. 5, 2019), ECF No. 297 ("I need not be persuaded that any defendant is likely to prevail. I really don't have to say much more than that the arguments are not on their face ridiculous."); Hr'g Tr. 67:9–15, *United States v. Allen*, No. 14-cr-272 (JSR) (S.D.N.Y. Mar. 10, 2016), ECF No. 242 (granting bail pending appeal despite the district court's belief that "[there is] no issue on appeal," because issue raised was "not without some appellate interest"); *United States v. Rittweger*, No. 02-cr-122 (JGK), 2005

---

[1] This provision was subsequently amended to also authorize bail when resolution of the question in the defendant's favor would likely result in "(iii) a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process."  *See* Minor and Technical Criminal Law Amendments Act of 1988, § 7091, 102 Stat. 4181, 4410, *codified at* 18 U.S.C. § 3143(b)(1)(B).

**COVINGTON**

WL 3200901, at *4 (S.D.N.Y. Nov. 30, 2005) (court need not agree that appeal "will ultimately succeed or … has merit").

## II.    DISCUSSION

Mr. Scott readily satisfies each of these four criteria.

### A.    Factor 1:  Mr. Scott is not a flight or safety risk.

The record in this case clearly and convincingly establishes that Mr. Scott poses neither a realistic risk of flight nor a threat to the safety of others or the community.

As to flight risk, because he has surrendered his passport and any other travel documents, he cannot flee.  *See* Bail Order at 1, ECF 253.  Nor would he.  Fleeing would mean abandoning his wife (who also surrendered her passport as a condition of his release on bail) and son, who reside in Florida.  *Id.* at 1–2.  It would mean interrupting or halting ongoing medical testing and treatment.  And it would render him unable to challenge his convictions on appeal, which he is committed to doing.  *See Ortega-Rodriguez v. United States*, 507 U.S. 234, 239 (1993).  There is accordingly no reason to believe that Mr. Scott poses any flight risk.

Nor is there any reason to believe that Mr. Scott is a threat to others or to the community. He was not accused (much less convicted) of any violent offense.  Even assuming for the sake of argument that purely pecuniary "danger" can be relevant to the bail analysis, it is inconceivable that Mr. Scott could pose such a danger now that the OneCoin scheme is defunct, his alleged co-conspirators are largely in custody, he is largely confined to his home, and he can no longer engage in the practice of law.  *See* Bail Order, ECF 259.

Confirming the sufficiency of these conditions, Mr. Scott has neither fled the country nor posed any danger to others despite being released on bail for nearly the entire period since his initial arrest in September 2018.  *See* Bail Order, ECF 14.  While the Government protested four years ago that Mr. Scott would be an "enormous flight risk" and dissipate assets if released pending sentencing, Hr'g Tr. 8:2–11:7 (Mar. 30, 2020), ECF 269, those alarmist concerns never materialized.  If anything, Mr. Scott's release pending appeal poses *fewer* concerns because he has since received a sentence of imprisonment that, although substantial, is meaningfully shorter than that recommended by Probation or sought by the Government, Gov't Sentencing Br. at 2, ECF 607, and because of his ongoing acute medical issues, some requiring prompt treatment or further assessment.[2]  Because there is no realistic prospect that Mr. Scott will evade justice or pose any danger to others, he readily satisfies this first factor.

---

[2] Mr. Scott is continuing to undergo medical testing and treatment for several serious medical conditions.  *See* Scott Sentencing Mem. at 8–11, ECF 606.  To allow adequate time for this testing and treatment in the event this motion is denied, Mr. Scott anticipates filing a request for a temporary adjournment of his surrender date, currently April 30, 2024.

COVINGTON

**B.      Factor 2:  Mr. Scott's appeal is not taken for the purpose of delay.**

Mr. Scott does not take this appeal for purpose of delay.  Mr. Scott has vigorously defended himself against the Government's charges and steadfastly maintained his innocence. As described in the following section, he asserts substantial appellate arguments that, if accepted, will likely require acquittal or, at minimum, a new trial.  Those arguments were preserved and are being raised on appeal in good faith.  *Cf. Galanis*, 695 F. Supp. at 1569 (appeal was taken in good faith and not for purpose of delay).  There are accordingly no grounds for concern that Mr. Scott is merely attempting "to delay the inevitable."  *United States v. Hart*, 906 F. Supp. 102, 105 (N.D.N.Y. 1995).

Nor does the record provide "evidence of dilatory tactics" by the defense.  *See United States v. Archer*, 813 F. Supp. 2d 339, 344 (E.D.N.Y. 2010); *see Hart*, 906 F. Supp. at 105. Sentencing was only briefly adjourned for Mr. Scott to treat serious medical issues relevant to his sentencing submission.  Following this Court's resolution of Mr. Scott's post-trial motions in September of last year, the parties agreed on an expeditious schedule for sentencing proceedings, which was subject to only a single adjournment in light of Mr. Scott's medical issues and a conflict on the part of his counsel.  Nov. 22, 2023, Mot. to Adjourn, ECF 596.  Absent any "pattern of dilatory defense tactics … or other extrinsic evidence of an intent to delay," and given Mr. Scott's denial of guilt and "sincere … belief that []he is innocent," Mr. Scott has also satisfied this second factor.  *See Hart*, 906 F. Supp. at 105.

**C.      Factor 3:  Mr. Scott's appeal presents substantial questions of law and fact.**

On appeal, Mr. Scott will raise multiple meritorious challenges to his convictions and sentence.  For purposes of this motion, however, it is enough to conclude that *at least one* of those challenges is *more likely than not* to present a *close or debatable* question.  For the reasons that follow, Mr. Scott readily clears that relatively low bar.

1.      ***This appeal presents a substantial issue regarding the Government's use of perjured testimony.***

At trial, the Government called to the stand Konstantin Ignatov ("Konstantin"), the brother of OneCoin principal Ruja Ignatova ("Ruja").  Tr. 125:21–22.  Konstantin testified that his cooperation focused mostly on Mr. Scott's trial and that he met with the prosecution team approximately 20 times.  Tr. 208:19.  After Konstantin pleaded guilty, he met with the Government primarily to prepare to testify against Mr. Scott.  Gov't Sentencing Ltr. at 5, *United States v. Ignatov*, No. 17-cr-630 (S.D.N.Y. Feb. 26, 2024), ECF 629.

Konstantin was the Government's star witness:  He was the sole cooperating witness and thus the only participant in the OneCoin fraud who testified about interacting with Mr. Scott.  As it promised in its opening, the Government relied on Konstantin to describe how the OneCoin scam worked, how OneCoin "rel[ied] on money launderers," and "Mark Scott's role moving OneCoin's money."  Tr. 41:19–22.  Konstantin testified for three days and repeatedly stated that Mr. Scott "was one of the main money launderers for OneCoin" and "for Ruja."  Tr. 130:1, 228:25.  And the Government relied on Konstantin to "add[] context" to what would otherwise

4

**COVINGTON**

have been an "endless stream of documents" reflecting communications between third parties. Tr. 190.

As Mr. Scott learned at and after trial, however, Konstantin was also a liar who perjured himself at least twice while on the stand when he fabricated detailed accounts of two separate events:

- ***First***, he testified falsely and in great detail that after being detained by federal agents at the U.S. border, he sought to conceal his connections to OneCoin by throwing a OneCoin laptop away by wrapping it in a paper bag and leaving it in a trash can on the Las Vegas Strip.  Tr. 206:20–207:1.  In reality, he returned the laptop to OneCoin—a fact of which OneCoin whistleblower Duncan Arthur first apprised the Government and then, after the Government failed to inform the defense, also reported to Mr. Scott's counsel.  Scott Suppl. Reply at 3, 8, ECF 433.  The Government admits this testimony was perjury.  Gov't Opp'n at 20 & n.3, ECF 412.

- ***Second***, Konstantin also testified falsely and in similarly ornate detail about a meeting that Mr. Scott had in Sofia, Bulgaria in 2016.  Konstantin testified that Mr. Scott attended a meeting in OneCoin's offices; that Ruja called Konstantin to bring OneCoin money launderer Irina Dilkinska into the meeting; that Ruja instructed him to "make sure that everybody on [the office] floor leaves and goes home so that Irina, Mark, and Ruja are alone," something she had never done before; and that Irina subsequently complained that "she had to stay … for a long time … until Mark Scott understood everything that has to be done or he has to do."  Tr. 245–47.  On cross-examination, Konstantin repeatedly reiterated that he was "almost a hundred percent" or even "a hundred percent sure" that Ruja summoned Dilkinska into the meeting.  Tr. 304:18, 396:23–25.  Yet this testimony, too, was false:  As her passport makes clear, Dilkinska was in fact in India when Mr. Scott was in Bulgaria.  The Government admits this testimony was false at least in part, and that it should have known about that falsity, though it disputes whether the testimony was *intentionally* false as opposed to reflecting that Konstantin's elaborate fantasy about the Sofia meeting may have reflected only a "mistake[] in his memory regarding the exact circumstances … of the meeting."  Gov't Sur-Reply at 34, 38, ECF 445.

After learning about this perjury, Mr. Scott filed a Rule 33 motion supplementing his initial motion for acquittal or a new trial.  *See* Suppl. Mot. for New Trial, ECF 410; Post-Trial Mot., ECF 217.  This Court declined to conduct an evidentiary hearing and concluded that neither instance of perjury was grounds for a new trial because, in the Court's view, (1) the laptop perjury was relatively insignificant and there was no "reasonable likelihood" that it affected the jury's verdict, and (2) the meeting testimony was not shown to have been intentionally false and in any event was unlikely to have affected the jury's verdict.  Order on Rule 29 and Rule 33 Motions ("Post-Trial Order") at 31–32, 34–37, ECF 577.

Mr. Scott respectfully submits that his appeal presents at least three substantial issues regarding the Government's use of false testimony to obtain his conviction, in violation of the Fifth Amendment's Due Process Clause.  *See Napue v. Illinois*, 360 U.S. 264, 269 (1959);

5

**COVINGTON**

*United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991), *abrogated on other grounds by Ciminelli v. United States*, 598 U.S. 306 (2023).

  ***First***, there is a substantial argument that this Court erred in resolving factual disputes critical to Mr. Scott's *Napue* claim without conducting an evidentiary hearing.  In briefing on his post-trial motions, Mr. Scott requested an evidentiary hearing to ascertain (among other things) whether Konstantin gave intentionally false testimony about the meeting and when the Government learned about his perjury.  Suppl. Rule 33 Mot. 7, ECF 410; Suppl. Reply at 30, ECF 433; *see infra* Part II.C.2.  This Court denied that request for an evidentiary hearing on the ground that, in its view, there was "no dispute as to the relevant facts."  Post-Trial Order at 32 n.7.  But there very clearly *were* disputes about facts crucial to the defense motion: whether Konstantin willfully perjured himself about the meeting or instead testified falsely but mistakenly; and whether the Government was aware at trial of that testimony's falsity.  The Court resolved these factual disputes, concluding that Mr. Scott had not proven that Konstantin's false testimony was intentional (even though Mr. Scott was not allowed to question Konstantin under oath on this subject), *id.* at 33–34, and accepting that the Government was not aware of this falsity at trial, *id.* at 36.[3]  There is a substantial argument that this Court erred by declining to hold an evidentiary hearing and instead crediting the Government's unsupported assertions about what it knew and speculation about Konstantin's intent.  *See United States v. Spinelli*, 551 F.3d 159, 166 (2d Cir. 2008) (court erred in crediting prosecutors' affidavits that they were unaware of perjury without conducting evidentiary hearing and giving defendant opportunity to challenge those statements).

  ***Second***, there is also a substantial argument that this Court applied an incorrect materiality standard to assess the significance of Konstantin's perjury.  The Second Circuit has explained that "[w]here the prosecution knew or should have known of the perjury, the conviction must be set aside 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury'" and "if it is established that the government knowingly permitted the introduction of *false testimony*[,] reversal is 'virtually automatic.'"  *Wallach*, 935 F.2d at 456 (emphasis added; quoting first *United States v. Agurs*, 427 U.S. 97, 103 (1976), and second *United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir. 1975)).[4]  The Government argued

---

[3] Indeed, there is no indication that the Government interviewed Konstantin about whether his testimony was intentionally false or merely mistaken, nor did the Government represent to the Court that Konstantin had provided them with an innocent explanation.  *See* Gov't Sur-Reply at 34, ECF 445 (speculating without reference to the record that Konstantin might have confused the Sofia meeting with some other meeting, or that Dilkinska may have attended the meeting by phone).  Furthermore, Konstantin testified that he met Mr. Scott in person only once, Tr. 130:24, which renders implausible the Government's theory that Konstantin may have confused the dates and specific circumstances of *two* separate meetings.

[4] The Second Circuit has also articulated a slightly different four-part test for determining whether perjured testimony demands a new trial.  *See United States v. Ferguson*, 676 F.3d 260, 282 (2d Cir. 2011).  This approach considers whether: (1) "the witness actually committed perjury"; (2) "the alleged perjury was material"; (3) "the government knew or should have known of the alleged perjury at the time of trial"; and (4) "the perjured testimony remained undisclosed during trial."  *Id.* (quoting *United States v. Zichettello*, 208 F.3d 72, 102 (2d Cir. (continued…)

**COVINGTON**

that "virtually automatic" reversal is appropriate only when the prosecution uses testimony it knows is *intentionally false* and not merely mistaken, and the Court appears to have adopted that view. *Compare* Gov't Sur-Reply at 38, ECF 445, *with* Post-Trial Order at 36. But that distinction is in considerable tension with the Second Circuit's explanation that it makes "no material difference" to a *Napue* claim whether the false testimony on which the prosecution knowingly relies is intentionally false or merely the result of confusion or mistake. *Drake v. Portuondo*, 553 F.3d 230, 242 n.7 (2d Cir. 2009) (quotation marks omitted). Courts outside the Second Circuit have also emphasized that what matters for a *Napue* claim is whether the testimony used by the prosecution is *false*, not whether it is necessarily *perjury*. *E.g.*, *United States v. Alahmedalabdaloklah*, 94 F.4th 782, 830 (9th Cir. 2024); *Juniper v. Davis*, 74 F.4th 196, 211 (4th Cir. 2023); *see also* 6 Wayne E. LaFave et al., Criminal Procedure § 24.3(d) (4th ed. 2023) ("[I]t matters not whether the witness giving false testimony is mistaken or intentionally lying."). There is thus a substantial question about the proper standard for analyzing the materiality of false testimony when there are questions about both whether that testimony constituted perjury and the Government's knowledge of the witness's intent.

*Third*, even if Mr. Scott were not entitled to "virtually automatic" reversal of his convictions, there is also a substantial question about the correctness of this Court's materiality analysis. As noted, under *Wallach*, where the prosecution relied on testimony that it knew or should have known was false, a new trial is required "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." 935 F.2d at 456 (quotation marks omitted). Although this Court stated that standard, it also concluded that Konstantin's perjury was immaterial partly because it was not "primarily determinative of Scott's guilt," or because the Court was not persuaded that letting Mr. Scott's guilty verdict stand would lead to "manifest injustice." Post-Trial Order at 32 (discussing laptop perjury); *id.* at 36–37 (discussing meeting perjury). There is a substantial question about whether the materiality standard applied by this Court comports with *Napue* and *Wallach*.

In any event, it is at least debatable whether this Court correctly concluded that Konstantin's perjury was merely cumulative impeachment evidence. Konstantin testified at length and played a key role in implicating Mr. Scott, as he was the only cooperating witness to testify about Mr. Scott's supposed role in the OneCoin scheme, as well as the only witness to testify that Mr. Scott attended a meeting in Sofia in which he discussed money laundering with Dilkinska. There is accordingly at least *some* reasonable likelihood of a different result if the jury had known that Konstantin was a fabulist. *See Napue*, 360 U.S. at 269 ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence …."); *Stofsky*, 527 F.2d at 246 ("[T]he witness's credibility could very well have been a factor of central importance to the jury, indeed every bit as important as the factual elements of

2000)); *see also United States v. Kirk Tang Yuk*, 885 F.3d 57, 89 (2d Cir. 2018) (same); *United States v. Blakstad*, No. 21-2859, 2023 WL 2668477, at *3 & n.3 (2d Cir. Mar. 29, 2023) (summary order) (same, but noting that "the Court has employed a variant of this test using only the second and third factors"); *United States v. Stewart*, 433 F.3d 273, 297 (2d Cir. 2006) (referring to a "threshold inquiry" into "whether the evidence demonstrates that the witness in fact committed perjury"). To the extent there is any uncertainty about the correct standard to be applied when determining whether the prosecution's use of perjury requires a new trial, that uncertainty only underscores that Mr. Scott's appeal presents a substantial question.

**COVINGTON**

the crime itself ….").  Evidence that Konstantin lied about the meeting was also material and not cumulative impeachment because Konstantin stuck doggedly to his story that Dilkinska was present there.  Tr. 304:18 ("almost a hundred percent" sure she was there); *id.* 396:23–25 ("a hundred percent sure").  Finally, there is a substantial question whether this Court erroneously considered Konstantin's separate instances of perjury piecemeal rather than considering the cumulative impact of those instances of perjury.  *See Juniper*, 74 F.4th at 244–45 (materiality of *Napue* material analyzed cumulatively).  The Government's use of perjured testimony to convict Mr. Scott thus presents *multiple* substantial questions for appeal.

> 2.     ***This appeal presents a substantial issue regarding the erroneous exclusion of evidence showing Konstantin's perjury.***

This case also presents a closely related question about whether this Court erred in excluding evidence that would have showed the jury that Konstantin was lying.  As the Government was aware, Dilkinska had emailed Mr. Scott three days before his visit to Sofia that she would be "traveling for the whole week."  ECF 434-1 (DX 550).  After initially consenting to admission of that email—which provided powerful evidence that Konstantin was lying when he claimed that Dilkinska was present for the Sofia meeting—the Government inexplicably reversed course and objected to its introduction on the grounds that Dilkinska's statement that she would be traveling was inadmissible hearsay absent independent corroborating evidence that Dilkinska did, in fact, travel that week.  Tr. 1287:11–14.  Relying on the Government's representations about Second Circuit precedent, this Court agreed and excluded the email.  Tr. 1292:4–5.  As the Government finally admitted in its sur-reply, ECF 445 at 20, however, the exclusion of that email was error, because the Second Circuit has held that the Rule 803(3) exception to the hearsay rule does not require independent corroborating evidence when an out-of-court statement is introduced to establish the declarant's *own* intent, plan, or motive.  *United States v. Persico*, 645 F.3d 85, 101–02 (2d Cir. 2011).

Without deciding whether the exclusion of the email was erroneous, this Court rejected Mr. Scott's challenge to this ruling on the grounds that evidentiary disputes were not properly raised on Rule 33 motions, that the exclusion could not have affected the jury's verdict because Konstantin disclaimed knowledge of the substance of the meeting, and because letting the verdict stand would not result in manifest injustice.  Post-Trial Order at 37.  But evidentiary error *is* proper ground for appeal, and the email is significant not because it clarifies what was discussed at the meeting but because it refutes Konstantin's perjured testimony that Dilkinska attended the Sofia meeting and supposedly instructed Mr. Scott about money laundering.  Particularly in combination with the *Napue* claims discussed above, the question of whether the exclusion of that email—which the Government has already conceded was erroneous—was harmless error presents a substantial issue for appeal.

> 3.     ***This appeal presents substantial issues regarding whether the Government presented sufficient evidence to convict Mr. Scott.***

Among other issues, the appeal also presents a substantial question regarding whether the Government presented sufficient evidence to convict Mr. Scott of money-laundering and bank-fraud conspiracy.

COVINGTON

***First***, there is a substantial question whether the Government presented adequate evidence of a substantial U.S. nexus for the alleged wire fraud—the specified unlawful activity charged by the Government with respect to the money-laundering conspiracy. Without evidence of a substantial U.S. nexus, the money-laundering conspiracy conviction rests on an impermissible extraterritorial application of the wire fraud statute. Since the Supreme Court's decision in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), courts have pared back the extraterritorial application of federal law. In keeping with *Morrison*, the Second Circuit has concluded that the wire-fraud statute, 18 U.S.C. § 1343, does not apply extraterritorially. *Eur. Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 141 (2d Cir. 2014), *rev'd and remanded on other grounds*, 579 U.S. 325 (2016). Because that statute is not extraterritorial, it applies only to conduct with a substantial U.S. nexus.

It is at the least questionable whether the Government proved any substantial U.S. nexus in this case, which involved a Bulgarian cryptocurrency scheme that targeted almost entirely non-U.S. persons. Indeed, in this allegedly multibillion-dollar scam, the Government's sole evidence of a U.S. nexus was testimony from two U.S. individuals who invested a combined $54,000 in the scam, and Konstantin's testimony that he once traveled to the United States "to have some meetings with some people from the network." Tr. 74, 84, 205–07, 791, 799. While this Court accepted that any use of U.S. wires constitutes a sufficient domestic application of the statute, Post-Trial Order at 26, there is at least a substantial question about whether a greater U.S. nexus is required in this case, in which almost all the activity of which the Government presented evidence took place overseas, as well as which conduct is properly deemed the "focus" of the statute. *Morrison*, 561 U.S. at 266 (noting that "it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States," and that "the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case"); *United States v. Gasperini*, No. 16-cr-441 (NGG), 2017 WL 2399693, at *7–8 (E.D.N.Y. June 1, 2017) (holding that wire fraud statute applies only when there is "substantial" domestic conduct but observing that courts are split on the proper focus of this inquiry). That relatively novel and unsettled question thus presents substantial grounds for appeal.

***Second***, the Government also failed to adduce sufficient evidence to enable the jury to convict Mr. Scott of bank fraud. As Mr. Scott explained at length in his initial post-trial motion, the Government failed to put on evidence that Mr. Scott deceived or conspired to deceive any FDIC-insured bank, as the statute under which he was convicted requires; that the description of the purpose of the transfer that allegedly defrauded BNY Mellon was actually incorrect; or that the Armenta transactions actually misled a bank to obtain something owned by the bank or in the bank's custody or control. Mem. of Law in Supp. of Post-Tr. Mots. at 12–23, ECF 218.

***Third***, the deficiencies in the Government's proof were particularly stark with respect to venue for the bank-fraud count. In general, "venue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue." *United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003). And venue is proper in conspiracy cases "in any district in which an overt act in furtherance of the conspiracy was committed by any of the coconspirators." *Id.* (quotation marks omitted). But there is at minimum a substantial question whether the Government satisfied either test. This Court concluded that venue in this

COVINGTON

District was proper on that count because banks processed two wires through correspondent accounts in this District.  Post-Trial Order at 21.  But Mr. Scott did not direct those wires to be routed through the United States.  Nor was there any evidence that he had any knowledge or control over which correspondent accounts these banks used to process these wires, whether they were located in the Southern District of New York, or whether they were even located in the United States.  Although a prosecution witness testified that the transactions "would … have been transacted through a corresponding account in New York," Tr. 1472:19–21, there was *no evidence* about whether it was foreseeable to anyone that a wire from a Cayman Islands bank to a Hong Kong recipient would necessarily flow through correspondent accounts *in Manhattan*.  Accordingly, there is also a substantial question about whether there is venue in this District with respect to the bank-fraud count.  *See United States v. Bezmalinovic*, 962 F. Supp. 435, 438–39, 441 (S.D.N.Y. 1997) (no venue for bank fraud claim where defendant prepared and submitted false application, received proceeds, and deposited checks in Eastern District, and banks processed checks in Southern District).

> ### D.        Factor 4:  These issues are integral to Mr. Scott's convictions and sentence.

Finally, these substantial issues are material because resolution of them in Mr. Scott's favor would likely result in a judgment of acquittal or a new trial.

*First*, as to his *Napue* claims, it is tautological that resolution of those claims in his favor would result in a new trial.  Prejudice is an element of a *Napue* claim, and the ordinary remedy for a *Napue* violation is vacatur of a conviction and a new trial.  *United States v. Mangano*, No. 16-cr-540 (JMA), 2022 WL 59697, at *22 (E.D.N.Y. Jan. 6, 2022).  Thus, if the Second Circuit concludes that this Court erred in denying Mr. Scott a new trial based on the Government's use of perjured testimony, Mr. Scott will necessarily receive (at minimum) a new trial.

*Second*, the Government has already conceded that the exclusion of Dilkinska's email stating that she would be traveling at the time Mr. Scott visited Sofia was erroneous.  The question for appeal is thus whether that error was harmless.  If that question is resolved in Mr. Scott's favor—*i.e.*, if the Court of Appeals concludes that the exclusion of the email was not harmless error—then he would again, by definition, be entitled to a new trial.

*Third*, if the Second Circuit were to conclude that insufficient evidence supported Mr. Scott's money-laundering-conspiracy and bank-fraud-conspiracy convictions, the proper remedy would be a judgment of acquittal, which necessarily satisfies the fourth factor for bail pending appeal.  *Burks v. United States*, 437 U.S. 1, 10–11 (1978).  If the Court of Appeals were to conclude that the evidence were insufficient to convict on the money-laundering count, leaving in place only a conviction for an alleged bank-fraud conspiracy in which no bank suffered losses, Mr. Scott would have a strong argument that he should receive a noncustodial sentence.  *See* 18 U.S.C. § 3143(b)(1)(B)(iii); USSG §§ 2B1.1, 2X1.1, tbl.  And if the Court of Appeals were to conclude only that the evidence was insufficient to establish venue for the bank-fraud count, that error would nevertheless require retrial in another district where venue is proper.  *Smith v. United States*, 599 U.S. 236, 243 (2023).  Thus, in any event, the resolution in Mr. Scott's favor of the substantial questions raised above will likely result in relief that satisfies the fourth and final factor.

**COVINGTON**

## III.     CONCLUSION

For these reasons, Mr. Scott respectfully requests that this Court order him released on bail pending appeal, subject to all current conditions of release.

Respectfully submitted,


<u>/s/ Arlo Devlin-Brown</u>

Arlo Devlin-Brown
S. Conrad Scott
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018

*Counsel for Defendant*
*Mark S. Scott*

11