UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| United States of America,<br><br>            v.<br><br>Mark S. Scott,<br><br>         *Defendant.*<br><br>Lidia S. Kolesnikova,<br><br>         *Third Party Petitioner.* | 17 Cr. 630 (ER) |

**VERIFIED PETITION OF LIDIA S. KOLESNIKOVA
FOR DETERMINATION OF THIRD-PARTY INTEREST
IN PROPERTY SUBJECT TO FORFEITURE**

    Petitioner Lidia S. Kolesnikova ("Petitioner" or "Ms. Kolesnikova"), by and through her attorneys, Clarick Gueron Reisbaum LLP, hereby petitions the Court for an ancillary hearing, pursuant to 21 U.S.C. § 853(n), and asserts her interest as an innocent third party with respect to various properties subject to the Court's Preliminary Order of Forfeiture (Dkt. No. 612). In support, Petitioner states as follows:

**PRELIMINARY STATEMENT**

    1.    Ms. Kolesnikova respectfully submits this petition to the Court seeking an amendment to its Preliminary Forfeiture Order and the return of her property. While she acknowledges that her husband, Mark S. Scott, has been convicted of crimes and that, at the Government's request, the Court has forfeited nearly all of *his* assets. But the Government has also seized her property—including her home—in the process.

    2.    Ms. Kolesnikova has never been accused of, nor convicted of, any wrongdoing. Accordingly, she respectfully requests a hearing to assert her legitimate ownership interest in this

1

real property and other property, as detailed below, and that the Court amend its Preliminary Order of Forfeiture.

3. The Preliminary Order of Forfeiture lists twenty-nine categories of properties as "Specific Property," Dkt. No. 612 at 3-5 ¶¶ a-cc, and six categories of property as "Substitute Property," *id.* at 6 ¶¶ a-f. Ms. Kolesnikova asserts her interest in four assets designated as "Specific Property" and one asset designated as "Substitute Property."[1]

### 600 CORAL WAY—MS. KOLESNIKOVA'S PRIMARY RESIDENCE

4. Petitioner is a licensed real estate agent and has been working as an agent since 2009.

5. She and Mr. Scott began dating in 2011, before any of the conduct the Government contends constitutes his crimes.[2] By 2012, they were living together, and approximately two years later, they decided to find a new home to begin the next phase of their lives.

6. In January 2015, Ms. Kolesnikova found what she believed to be the perfect home: 600 Coral Way, Unit 12—a condominium in a building adjacent to where they were

---

[1] Given that Mr. Scott has sought a rehearing *en banc* to vacate his conviction, Ms. Kolesnikova expressly reserves her rights to challenge this Court's conclusion that the Government met its burden to show that any of the property listed in the Preliminary Order of Forfeiture is subject to forfeiture.

[2] The Superseding Indictment charged him with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h), and conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349. (Dkt. No. 318 at 1.) The Government argued that, "from at least in or about September 2015 through 2018, [Mr. Scott] conspired with Ruja Igantova [] to launder approximately $392,940,000 in proceeds of a wire fraud scheme involving a purported cryptocurrency known as One Coin[.]" (*Id.* at 2) The Government further argued that Mr. Scott "organized and operated a series of funds known as the 'Fenero Funds' [to] launder[] OneCoin fraud proceeds." (*Id.*)

already living together. They decided to purchase the property as a foundation for their future, with the intention of marrying and building a life in the new home.

7. Ultimately, they decided to purchase 600 Coral Way and she negotiated a $1.58 million purchase price; they purchased the property on January 14, 2015. She was initially left off the paperwork to purchase the condo only to streamline the loan process.

8. Mr. Scott paid approximately $150,000 as a downpayment. On information and belief, those funds originated from his earnings as an attorney and/or the proceeds from the sale of a property he acquired during his previous marriage.

9. As the real estate broker for the transaction, Ms. Kolesnikova was entitled to earn a commission of $47,400.00. Rather than collect her commission, she contributed that commission as a "credit" to the acquisition of the Property, as reflected under Section 200 of the Settlement Statement (HUD-1). In other words, Petitioner contributed money she personally earned as a real estate agent through her employment at Miami Residences directly to the purchase of 600 Coral Way, Unit 12.

10. Their son was born in June of 2017. He currently lives with them at 600 Coral Way where Ms. Kolesnikova hopes to continue raising him in a stable and familiar environment.

11. On August 18, 2017, Mr. Scott and Ms. Kolesnikova obtained their marriage license and on September 25, 2017, they were married. At that time, they reaffirmed their agreement that the condominium was jointly theirs, as they reaffirmed that they were owning it as joint tenants in the entirety, consistent with their original understanding when they purchased it together in January 2015. It is also her understanding that, on October 30, 2018, she was added to the 600 Coral Way deed as a tenant, such that she has had a tenancy by the entirety in 600 Coral Way since at least that time.

12. On September 5, 2018, Mr. Scott was arrested and the vast majority of their assets were seized from properties in Florida and Massachusetts. *See* Dkt. No. 15 at 3. Those assets included personal effects, bank accounts, and residences.

13. On October 30, 2018, to ensure that Ms. Kolesnikova's interest in their marital home remained undisturbed, Mr. Scott executed a Florida quitclaim deed transferring all of his rights, title, and interest in the 600 Coral Way property to Petitioner.

14. Since Mr. Scott's arrest in September 2018, and using money she earns from her real estate practice, Ms. Kolesnikova—and Ms. Kolesnikova alone—has paid for all expenses associated with the condominium. Specifically, she has:

- funded the upkeep of the condominium, including through regular maintenance, improvements, air conditioning and other repairs, addressing water damage twice, and covering a special assessment of $10,000—totaling approximately $35,000 to date; and

- paid homeowner association (HOA) fees ranging from $2,5000 to $2,800 per month—totaling in excess of $180,000 to date.

15. In addition, on information and belief, she is now personally liable for approximately $200,000 in outstanding taxes for the property—meaning that she is in the head-spinning position of having Miami Dade County claim that she owns her home for tax purposes, while at the same time, the U.S. Attorney's Office claims that she has no rights to her home.

16. 600 Coral Way has been Petitioner's primary residence since she and Mr. Scott moved in around March 2015, and since at least 2018 (the first full tax year after they were married), she has intended for it to be her homestead, pursuant to the Florida Constitution's Homestead Exemption. She has duly registered the property for the Florida Homestead Tax Exemption since at least 2019. Her continuous occupancy since March 2015, and the formal designation of the property as her homestead, reflect her intent to claim and uphold all available protections afforded under Florida law.

17. The Preliminary Order of Forfeiture includes this asset as "Specific Property," as the Government asserted that this property was "involved in the commission of the offense charged in Count One of the Indictment and/or [] constitute[es], or derived from proceeds traceable to the commission of the offense charged in Count Two of the Indictment[.]" (Dkt. No. 612 at 2.)

18. As recited above, Ms. Kolesnikov has the following rights to the property.

19. First, the initial payments were entirely unconnected to any conduct found to be illegal because the purchase occurred in January 2015, before Mark began engaging in the purported criminal conduct in September 2015. (*See* ECF 318 at 2.) Accordingly, Ms. Kolesnikova's rights to this property vested before, and thus supersedes, the Government's. *See United States v. Daugerdas*, 892 F.3d 545, 548 (2d Cir. 2018).

20. Second, 600 Coral Way was, and remains, worth more than the $1,000,794.66 in alleged criminal proceeds that Mr. Scott paid toward the mortgage in 2016 (*i.e.*, the only payments that the Government claims were tied to OneCoin proceeds). It was worth more when Mr. Scott and Ms. Kolesnikova bought it (using funds unrelated to OneCoin proceeds) and it is worth more now (after Petitioner invested her own personal funds, again unrelated to OneCoin proceeds).

21. The Government seems to recognize this, arguing in connection with Mr. Scott's forfeiture dispute that Mr. Scott used the Fenero Fund proceeds *later*, only to pay down $1,000,794.66 remaining on the mortgage. The Government stated:

> In the event that the Court finds that the *entire* 600 Coral Way Property is not subject to forfeiture as property traceable to the offense, a portion of the property is still subject to forfeiture under § 982(a)(1). Specifically, the Government is still entitled to [a] the $1,000,794.66 that was indisputably derived from the OneCoin scheme, which Scott used to pay off the mortgage, or [b], if the value of

   the property has increased, a sum equal to $1,000,794.66 plus a proportional
   percentage of the increase in the value of the property.

(Dkt. No. 392 at 8) (emphasis in original).

   22. Accordingly, to the extent that Ms. Kolesnikova does not have rights to the entire property, the Government has already conceded that she has rights to the current value of the property minus [a] the approximately $1 million Mr. Scott used to pay off the mortgage plus [b] any proportional increase in the value of the property.[3]

   23. In addition, because she used funds totally unrelated to any crime to pay various expenses for the property since Mr. Scott's arrest, she is entitled to the value she has personally added to the property. *See Daugerdas*, 892 F.3d at 548 (it is not Congress's intent "to seize legitimately acquired property").

   24. Finally, to the extent that any portion of the condominium constitutes a substitute asset, Florida's Homestead Law prohibits the Government from seizing an innocent spouse's interest in the marital home. *See, e.g., United States v. Lee*, 232 F.3d 556, 562 (7th Cir. 2000) ("conclud[ing] that the attributes of tenancy by the entirety recognized by Florida law here should not have been overridden by the district court, and the house should have been considered unavailable for a substitute asset order"); *see also United States v. Kurland,* No. 20 Cr. 306 (NGG) (E.D.N.Y.), Dkt. No. 433 at 11-16 (noting that "[s]tate law determines a [third party] petitioner's legal interest in the property at issue"; and concluding that the Government "cannot forfeit [the innocent spouse's] right in the [marital home], which includes her right of

---

[3] The Government also previously argued that this remaining amount would be "subject to forfeiture as a substitute asset under 21 U.S.C. §§ 853(p)(1)(A) and (B)." Dkt. No. 392 at 8. But in that event, Ms. Kolesnikova's interest in such remaining amount would supersede the Government's because her rights to the condominium existed before September 5, 2018, when the indictment was issued. *See United States v. Daugerdas*, No. 09 Cr. 591 (WHP), 2020 WL 364601, at *5 (S.D.N.Y. Jan. 22, 2020). Accordingly, the Government would not be entitled to any such remaining amount.

survivorship," as "a person cannot convey, alter, or extinguish property interests that do not belong to him").

25. Thus, at the bare minimum, Ms. Kolesnikova has (1) a legitimate right to use the entire property until her death, and (2) an undivided ownership interest in any portion of the property exceeding the $1,000,794.66 identified by the Government as invested in the property using proceeds of the crime. Indeed, as detailed above, she has personally invested hundreds of thousands of dollars in this property. If the Court determines that the entire property belongs to the Government—despite the fact that only a portion of its value was acquired through criminal proceeds—she will lose her home and everything she has invested.

26. Moreover, her son, who has lived at 600 Coral Way his whole life, will lose the one remaining piece of stability in his young life, which has been completely upended through no fault of his own. To take his environment away from him would also be entirely unjust.

## BANK ACCOUNT

27. Ms. Kolesnikova asserts her interest in one bank account, UBS Account Number PW A9666. (*See* Preliminary Forfeiture Order at 4 ¶ q ("Any and all funds on deposit in Account Number PW A9666, held in the name of Mark S. Scott and Lidia Kolesnikova, at UBS Financial Services")).

28. This account is listed as "Specific Property," as the Government asserts that this property was "involved in the commission of the offense charged in Count One of the Indictment and/or [] constitute[es], or derived from proceeds traceable to the commission of the offense charged in Count Two of the Indictment[.]" (*Id.* at 2.)

29. Ms. Kolesnikova seeks the entire amount in this account or, at a minimum, all funds therein exceeding $50,000.

30.     On information and belief, at the advice of a UBS private wealth specialist, Ms. Kolesnikova and Mr. Scott jointly opened this account in 2017 and she remains a joint owner with full rights of survivorship. The Government's own expert has acknowledged that, at the time of seizure, the account contained $112,055.05—but that only $50,000 of those funds were allegedly traceable to OneCoin-related accounts. (*See* Dkt. No. 318 (Affidavit in Support of Government's Forfeiture Motion) at 3.)

31.     Given this admission, the Government has conceded that at least $62,055.05 in this account is untainted. As the owner of the account, Ms. Kolesnikova's rights to these "legitimately acquired" funds are clear. *Daugerdas*, 892 F.3d at 548.

## PERSONAL ITEMS

32.     Ms. Kolesnikova asserts her interest in five luxury handbags. (*See* Preliminary Forfeiture Order at 6 ¶ e ("vii. One Black Hermes Birkin Bag" and "viii. One Orange Hermes Birkin Bag"; ¶ f: "i. One Black Hermes purse, ii. One Brown/Tan Hermes purse, and iii. One Green Hermes purse")).

33.     These items are included as "substitute assets" in the Preliminary Forfeiture Order (*see id.*), such that the Government has conceded that it was unable to trace the purchase of these items to the proceeds of any crime.

34.     These handbags were purchased between 2014 and 2018, before Mr. Scott's indictment in September 2018.

35.     Accordingly, in light of the fact that Ms. Kolesnikova possessed these handbags before Mr. Scott's indictment in 2018, her rights to these handbags supersede the Government's interest and should be returned to her. *See Daugerdas*, 2020 WL 364601, at *5; *United States v.*

*Peterson*, 820 F. Supp. 2d 576, 585 (S.D.N.Y. 2011), *aff'd sub nom. United States v. Crew*, 537 F. App'x 3 (2d Cir. 2013).

36.     Ms. Kolesnikova intends to sell these items to try to maintain her home and provide for her son's education.  Depriving her of these assets—particularly when the Government has conceded that they no connection to any alleged wrongdoing—only worsens the financial hardship that she and her son already face.

37.     In addition to these handbags, Ms. Kolesnikova asserts her rights to her engagement ring, which was seized by the Government on the assertion that it was purchased with funds linked to the alleged criminal conduct.  (*See* Preliminary Forfeiture Order at 5 ¶ y(z).)  Given that she has the right to challenge in this proceeding both the legal and factual bases of the Government's assertion, Ms. Kolesnikova will argue that the Government failed to establish a direct connection between criminal funds and the ring's purchase; she will also establish that the ring became her personal property on or before criminal proceedings were instituted.

### **IMPROVEMENTS TO THE 133 SUNSET LANE PROPERTY**

38.     Ms. Kolesnikova also seeks reimbursement for the improvements she made to 133 Sunset Lane, Barnstable, Massachusetts, using her personal funds.

39.     Even assuming that the Government met its burden to prove that Mr. Scott paid for this property with OneCoin proceeds such that the entire property should be forfeited (Preliminary Forfeiture Order at 5 ¶ x ("All right, title and interest in real Properties located at 133 Sunset Lane Barnstable, Massachusetts 02630, with all improvements, appurtenances, and attachments thereon")), the Government has no legitimate claim to benefit from the improvements she made to the property using her own funds.

9

40. Specifically, even though Petitioner and Mr. Scott could not use the property due to Mr. Scott's travel restrictions, Ms. Kolesnikova nevertheless spent over $50,000 on the property's upkeep since approximately October 2018, including by making payments for electricity, gas, maintenance work, extermination services, roof repairs, water and sewage bills, and other essential costs. She also provided approximately $20,000 in legal fees for the defense of a civil lawsuit against easement rights asserted by several persons over portions of the 133 Sunset Lane property's backyard and beach, which would have decimated the property value, likely cutting it in half. Without these contributions—which she funded entirely with earnings from her real estate job and through the sale of some personal property—the property would have fallen into disrepair and thus lost significant value. If the Government succeeds in forfeiting the property, it will have gained at least hundreds of thousands of dollars in equity that she preserved.

41. It would be unequitable to allow the Government to benefit from her upkeep of the property, which she funded herself and without the use of criminal proceeds. *See, e.g., Peterson*, 820 F. Supp. 2d at 584 (forfeiting funds used to "renovate" and "pay for the upkeep" of real properties, where those funds constituted criminal act proceeds); *see also United States v. Totaro*, 345 F.3d 989, 996 (8th Cir. 2003) (holding that where a real property's "mortgage, real estate taxes and upkeep" were paid with criminal proceeds, equity in that property equivalent to the criminal proceeds used is forfeitable).

42. Ms. Kolesnikova also waived her real estate agent commission fee of approximately $75,000 and credited that fee to the purchase of the property. Because that fee is also unrelated to any criminal proceeds, she is entitled to recoup that investment as well.

## MS. KOLESNIKOVA'S PETITION IS TIMELY

43.     To the best of her knowledge and recollection, Ms. Kolesnikova never received notice from the Government that it was time for her to contest the Court's Preliminary Forfeiture Order in an ancillary proceeding.

44.     While Petitioner understood that property was putatively seized by the Government in 2018 and that the Government has claimed ownership over the property various times since then, she also understood that, at the appropriate time, the Government would notify her that she finally had an opportunity to assert her interest to the property.  Indeed, the Court specifically directed the Government to provide notice to people like her (who have a clear and publicly recorded interest in any of the seized property) in its Preliminary Notice Order—something the Government has not yet done.  (*See* Preliminary Order of Forfeiture at ¶ 10 ("the Government **shall** send notice to any person who reasonably appears to be a potential claimant with standing to contest the forfeiture in the ancillary proceeding") (emphasis added).)

45.     Petitioner, through counsel, has also reviewed Forfeiture.gov, the official Government website for public notices of asset forfeiture.  Petitioner was unable to locate any current or historical record of a notice regarding this property within the past year.

## RESERVATION OF RIGHTS

46.     On March 17, 2018, Mr. Scott sought a rehearing *en banc* in the Second Circuit Court of Appeals to vacate his conviction, in light of an intervening decision by the U.S. Supreme Court and because the Government failed "to prove that use of domestic wires was central to the alleged foreign scheme." *United States v. Scott*, 23-7199, Dkt. No. 90.1 at 1-2. Given the pending appeal, Petitioner expressly reserves her rights to challenge this Court's conclusion that the Government met its burden to show that any of the so-called "Specific

11

Property," Forfeiture Order at 5, is traceable to the proceeds of any crime, or that any of the so-called "Substitute Property," *id.* at 6, is subject to forfeiture.

*     *     *

Dated: March 20, 2025  
       New York, New York

CLARICK GUERON REISBAUM LLP

By:    /s/ *Ellen Blain*  
      Ellen Blain  
      220 Fifth Avenue, 14th Floor  
      New York, NY 10001  
      Phone: (212) 633-4310  
      Email: eblain@cgr-law.com

*Counsel for Petitioner Lidia S. Kolesnikova*

## VERIFICATION

I, Lidia S. Kolesnikova, declare under penalty of perjury under the laws of the United States of America that, to the best of my knowledge, that the statements contained in this filing are true as to my own knowledge, except as to matters stated to be alleged upon information and belief, and as to those matters, I believe them to be true. To the extent information is alleged upon information and belief, the Government has possession of – or has rendered me incapable of accessing – materials relevant to certain of my claims.

Executed on this 20th day of March, 2025

_____
Lidia S. Kolesnikova

Subscribed and sworn to me before this 20th day of March, 2025

_____
Notary Public

STATE OF FLORIDA
COUNTY OF Miami-Dade
The foregoing instrument was acknowledged before me by means of ( X ) physical presence or ( ___ ) online notarization this 20th day of March, 20 25
By: Lidia V. Scott
Personally Known _____ OR produced identification X
Type of Identification Produced FL Driver's Lic