# EXHIBIT 11



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 31, 2020

**BY ECF/EMAIL**

The Honorable Edgardo Ramos
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:   *United States v. Mark S. Scott*, S10 17 Cr. 630 (ER)

Dear Judge Ramos:

    The Government respectfully submits this memorandum pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure in support of its application for a preliminary order of forfeiture (the "Preliminary Order of Forfeiture," attached hereto as Exhibit 1) imposing a forfeiture money judgment in the amount of $392,940,000 as part of the sentence of defendant Mark S. Scott. As part of the Preliminary Order of Forfeiture, the Government seeks to forfeit Scott's interest in certain bank accounts, which constitute property involved in the money laundering offense Scott was convicted of at trial, and certain specific property and assets that are traceable to such property. For the reasons set forth below, the Court should impose the proposed Preliminary Order of Forfeiture, and also enter a post-conviction restraining order against Scott in order to ensure availability of those additional assets for forfeiture.

**I.**     **Procedural History**

    Superseding Indictment, S10 17 Cr. 630 (ER) (the "Indictment") charges Scott with conspiracy to commit money laundering in violation of Title 18, United States Code, Section 1956(h), and conspiracy to commit bank fraud in violation of Title 18, United States Code, Section 1349. The Indictment also contains the following forfeiture allegations: (i) as a result of committing the money laundering conspiracy offense charged in Count One, Scott shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), any and all property, real and personal, involved in said offense, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offense; and (ii) as a result of committing the bank fraud offense charged in Count Two, Scott shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(2)(A), any and all property constituting and derived from any proceeds that the defendant obtained directly or indirectly as a result of the bank fraud conspiracy. The Indictment also contains a substitute asset provision pursuant to 18 U.S.C. § 982, 21 U.S.C. § 853, and 28 U.S.C. § 2461.

Case 1:17-cr-00630-ER    Document 688-2    Filed 07/11/25    Page 3 of 25
Case 1:17-cr-00630-ER    Document 318    Filed 09/01/20    Page 2 of 165

Page 2

On or about February 22, 2019, the Government filed a forfeiture bill of particulars (the "Bill of Particulars"), giving notice that certain property was subject to forfeiture as a result of the offense described in Count One of the Superseding Indictment, and as alleged in the forfeiture allegation therein.[1] The Bill of Particulars is attached hereto as Exhibit 2. On or about April 18, 2019, the Government obtained a restraining order for the following bank accounts: "a. All monies and funds contained in RBC Private Counsel (USA) Inc. account 3752442214, held by Mark S. Scott 2017 Trust . . . and all funds traceable thereto, including accrued interest; and b. All monies and funds contained in RBC Private Counsel (USA) Inc. account 3756283317, held by Mark S. Scott 2017 Trust . . . and all funds traceable thereto, including accrued interest." (April 18, 2019 Restraining Order, attached hereto as Exhibit 3). On or about July 15, 2019, the Government obtained another restraining order for the following bank account: "All monies and funds contained in J.P. Morgan Chase attorney IOLA trust account 339656032, held by James Nobles Esq. P.C. . . . and all funds traceable thereto, including accrued interest. (July 15, 2019 Order, attached hereto as Exhibit 4). The funds in these three bank accounts were alleged to constitute funds and criminal proceeds property involved in conspiracy to commit money laundering, in violation of Section 1956(h).

On November 21, 2019, the defendant was convicted at trial of Counts One and Two of the Indictment. The defendant did not seek a finding by the jury as to forfeiture. Sentencing is scheduled for October 9, 2020.

## II.    Scott's Laundering of OneCoin Scheme Proceeds

As the evidence showed at trial, from at least in or about September 2015 through 2018, the defendant conspired with Ruja Ignatova, and others, to launder approximately $392,940,000 in proceeds of a wire fraud scheme involving a purported cryptocurrency known as OneCoin (the "OneCoin Scheme"). Ignatova was one of the co-founders of OneCoin. Scott—a U.S. citizen and attorney, employed for a portion of the relevant time period as a partner at an international law firm—organized and operated a series of investment funds known as the "Fenero Funds," which he used for the purpose of laundering OneCoin fraud proceeds.

As shown throughout trial, and in the attached affidavit of Senior Financial Intelligence Analyst Rosalind October (the "October Affidavit," attached hereto as Exhibit 5)[2], Scott used an international network of bank accounts, including the Subject Accounts, to launder approximately $392,940,000 in proceeds from the OneCoin Scheme on behalf of Ignatova. Specifically, after Scott was introduced to Ignatova in September 2015, Scott began to set up a series of fake investment funds over the next several months. Among other things, Scott incorporated MSS International Consultants (BVI), Ltd. ("MSSI LTD"), which was a fund manager registered in the British Virgin Islands. (GX 2701). MSSI LTD in turn owned and operated a series of fake investment funds, which were used to launder proceeds from the OneCoin Scheme, including the following purported investment funds: Fenero Equity Investments L.P. ("Fenero"), Fenero Equity

---

[1] At the time the Government filed the Bill of Particulars, the defendant was charged in the S6 17 Cr. 630 (ER) superseding indictment with one Count of conspiracy to commit money laundering.

[2] The Government Exhibits from trial referenced in this motion and in the October Affidavit are attached hereto as Exhibit 6.

Case 1:17-cr-00630-ER    Document 688-2    Filed 07/11/25    Page 4 of 25
Case 1:17-cr-00630-ER    Document 318    Filed 09/01/20    Page 3 of 165

Page 3

Investments II, L.P. ("Fenero II"), and Fenero Financial Switzerland L.P. ("Fenero Switzerland"), each of which was an approved fund regulated in the British Virgin Islands. (*Id.*). MSSI LTD also owned and operated Fenero Equity Investments (Cayman) I, L.P. ("Fenero Cayman"), an investment fund organized in the Cayman Islands (together with the British Virgin Islands Fenero funds, the "Fenero Funds"). (*Id.*).

Scott operated offshore bank accounts in the Cayman Islands for each of the Fenero Funds (the "Fenero Fund Accounts"). (GX 2701). The Fenero and Fenero Switzerland accounts were held at DMS Cayman bank, and the Fenero Cayman and Fenero II accounts were held at Deutsche Bank Cayman. (*Id.*).

After Scott opened bank accounts in the names of each of the Fenero Funds, between May 2016 and October 2016, the Fenero Fund Accounts collectively received wire transfers totaling approximately €364 million and $10 million, which Scott represented as investments into the Fenero Funds. (GX 2602-A). These wire transfers originated from approximately 10 different bank accounts held at banks located in Singapore, Germany, Hong Kong, the United Kingdom, and the United States. (*Id.*). These bank accounts were registered under a set of shell corporations, including a set of affiliated companies with variations of the name International Marketing Services ("IMS"), as well as B&N Consult Ltd. ("B&N"), Star Merchant, and Fates Group. (*Id.*). IMS was owned by co-conspirator Frank Rickets; B&N was owned by co-conspirator Irina Dilkinska; and Fates Group was owned by co-conspirator Gilbert Armenta.

As the evidence showed at trial, while IMS, B&N, and Fates Group were "investors" into the Fenero Funds on paper, all of the money being transferred into Scott's funds in fact belonged to Ruja Ignatova and was derived from the OneCoin Scheme. (GX 1434). After the Fenero Funds received the above-described deposits, between approximately May 2016 and July 2018, the Fenero Fund Accounts funded approximately €282,000,000 in wire transfers to a series of Fenero Fund bank accounts held at the Bank of Ireland in the Republic of Ireland. (GX 2603, 2627). Scott also transferred tens of millions of Euros back to Bulgaria from the Fenero Funds, disguised as fake loans. (*See, e.g.*, GX 1388). Scott subsequently transferred approximately €185,000,000 from the Bank of Ireland to the accounts of another one of Ruja's money launderer's, named Aamer Abdulaziz. (GX 2627; Tr. 276).

As part of the money laundering scheme, Scott also transferred in excess of $50 million in proceeds of the OneCoin Scheme to other bank accounts on his behalf, and to fund the purchase of several houses, several luxury cars, a yacht, and numerous purchases of luxury jewelry and other personal property. (GX 2628; Tr. 294). Scott's purchases made with OneCoin fraud proceeds included, among others: a $2,850,000 home located at 133 Sunset Lane, Barnstable, MA; a $3,765,000 residence located at 31 Dale Avenue, Hyannis Port, MA (the "31 Dale Property"); an ownership interest in another residence located at 105 Sunset Lane, Barnstable, MA; a $245,269 Ferrari; a $218,898 2018 Porsche 911 GTRS2; a $119,529 2017 Porsche 911 Turbo; a $332,248 2016 Porsche 911R (the "2016 Porsche"); a $1,310,000 Sunseeker yacht; over a hundred thousand dollars in luxury watches; and over two hundred thousand dollars in jewelry and luxury bags. (GX 2620). Scott also used OneCoin Scheme proceeds to pay off over $1,000,000 for a condo that he owned in Coral Gables, FL.

### III.    Applicable Law

#### A. Directly Forfeitable Assets

Criminal forfeiture is "an aspect of sentencing." *Libretti v. United States*, 516 U.S. 29, 49 (1995).  Under Rule 32.2 of the Federal Rules of Criminal Procedure, once a criminal defendant is convicted of the offenses giving rise to the forfeiture allegations in an indictment, the district court must determine what property is subject to forfeiture and, if appropriate, enter a preliminary order of forfeiture "[a]s soon as practical after a verdict." Fed. R. Crim. P. 32.2(b).  As an aspect of sentencing, criminal forfeiture is governed by the preponderance of the evidence standard. *United States v. Bellomo*, 176 F.3d 580, 595 (2d Cir. 1999).  Accordingly, the Government must prove by a preponderance of the evidence the amount of proceeds underlying the proposed personal money judgment, and the forfeitability of the specific properties listed in the Preliminary Order of Forfeiture.

Title 18, United States Code, Section 982(a)(1), subjects to forfeiture "any property, real or personal, involved in [a violation of 18 U.S.C. § 1956], or any property traceable to such property."  Property "involved in" a money laundering offense includes not only the illegal proceeds themselves, but also any property used to facilitate the laundering of such proceeds, such as business, business premises, untainted funds comingled with criminal proceeds, and bank accounts of corrupt businesses. *See United States* v. *All Assets of G.P.S. Auto. Corp.*, 66 F.3d 483, 486 (2d Cir. 1995) (affirming forfeiture of all assets of corporation that "served as a conduit for the proceeds of the illegal transactions"); *United States* v. *Schlesinger*, 261 F. App'x 355,  361 (2d Cir. 2008) (summary order) (same); *In re 650 Fifth Ave.*, 777 F. Supp. 2d 529, 567 (S.D.N.Y. 2011) ("The ability to forfeit a business entity which is used to facilitate the offense of money laundering is well established." (internal quotation marks omitted)); *United States* v. *Certain Funds on Deposit in Account No. 01-0-71417, Located at the Bank of New York*, 769 F. Supp. 80, 84 (E.D.N.Y. 1991) ("[18 U.S.C. § 981(a)(1)(A)] has been construed by the district courts as authorizing the forfeiture of an entire bank account or business which was used to 'facilitate' the laundering of money in violation of 18 U.S.C. § 1956." (citing cases)).

For money laundering charges, such as Count One of the Indictment, the Government may seek a money judgment up to the full value of the funds laundered by the defendant. *United States v. Bermudez*, 413 F.3d 304, 305-306 (2d Cir. 2005).  Significantly, the scope of this forfeiture liability is specifically authorized by statute, and is not based on joint and several liability.  In imposing sentence on a person convicted of an offense in violation of Title 18, United States Code, Section 1956, the Court "shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." *Id.* at 306, 18 U.S.C. § 982.  Property "involved in" a money laundering offense very clearly constitutes at least the actual funds laundered. *See In re 650 Fifth Ave and Related Props.*, 777 F. Supp. 2d 529, 570 (S.D.N.Y. 2011).  Furthermore, Section 982(b)(2) expressly states that defendant intermediaries who did not retain the funds laundered are nevertheless liable for forfeiture of substitute assets up the full amount of the laundered property, provided that the defendant "conducted three or more separate transactions involving a total of $100,000 or more in any twelve month period." 18 U.S.C. § 982(b)(2).  In short, a money laundering defendant like Scot—who laundered approximately $392,940,000 through numerous transactions within a twelve-month period that exceeded

Case 1:17-cr-00630-ER    Document 688-2    Filed 07/11/25    Page 6 of 25
Case 1:17-cr-00630-ER    Document 318    Filed 09/01/20    Page 5 of 165

Page 5

$100,000—"must forfeit substitute assets up to the amount laundered, even if he merely handled the laundered property—*i.e.,* even if he never retained those funds." *Bermudez*, 413 F.3d at 306.

Finally, a money judgment is appropriate even if the defendant did not retain the proceeds of his crime or does not have the resources to pay the money judgment. *See, e.g., Awad*, 598 F.3d at 78 (in a drug case, holding that the applicable forfeiture provision "permits imposition of a money judgment on a defendant who possesses no assets at the time of sentencing"); *United States v. Kalish*, 626 F.3d 165, 168 (2d Cir. 2010) (affirming the propriety of *in personam* money judgments arising under 21 U.S.C. § 853 by way of 21 U.S.C. § 2461(c) in wire and mail fraud case); *United States v. Vampire Nation*, 451 F.3d 189, 201-02 (3d Cir. 2006) (forfeiture judgment may be entered for the full amount of criminal proceeds, even if the defendant is unable to satisfy the judgment at the time of sentencing; otherwise, defendants would be able to "dissipate those proceeds and avoid liability for the ill gotten gains"); *United States v. Hall*, 434 F.3d 42, 59 (1st Cir. 2006) (district court may order the defendant to forfeit a sum of money equal to the drug proceeds that he earned but did not retain).

### B. Substitute Assets

To the extent the defendant is no longer in possession of the laundered funds, the Government is entitled to the collection of substitute assets up to the amount of the funds laundered, and equal to the $392,940,000 money judgment sought by the Government. Pursuant to 21 U.S.C. §§ 853(p)(1)(A) and (B), as relevant here, forfeiture of substitute assets is authorized where, as a result of act of the defendant's, *either* the funds cannot be located upon the exercise of due diligence *or* the property has been "transferred or sold to, or deposited with, a third party[.]" As the trial evidence made clear, a substantial portion of the funds laundered by Scott were subsequently sent by Scott to third parties on behalf of Ruja Ignatova, (*see, e.g.*, GX 2627; PSR ¶ 34), thereby satisfying the statutory requirements of Section 853(p)(1)(B). Therefore, on the basis of Section 853(p)(1)(B) alone, this Court is authorized to order forfeiture of substitute assets from the defendant. *See, e.g., Honeycutt*, 137 S. Ct. at 1634 ("Only if the Government can prove that *one* of these five conditions was caused by the defendant may it seize 'any property of the defendant up to the value of' the tainted property") (emphasis supplied).

### C. Post-Conviction Restraint

The All-Writs Act, Title 28, United States Code, Section 1651, provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). Further, "'there is a strong governmental interest in obtaining full recovery of all forfeitable assets.'" *Kaley v. United States*, 571 U.S. 320, 323 (2014) (quoting *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 631 (1989)). Accordingly, Courts in this Circuit have relied on the All-Writs Act to restrain assets pending sentencing in order to preserve those assets for forfeiture or restitution. In *United States v. Numisgroup Int'l Corp.*, the Court relied on the All-Writs Act to continue post-conviction, pre-sentencing restraint of substitute asset coins to ensure availability for restitution or forfeiture. 169 F. Supp. 2d 133, 137-38 (E.D.N.Y. 2001). "'There is no logic to the position that the Court is powerless to enter a restraining order after a jury has found a defendant guilty of participating in a large-scale fraud simply because sentencing has been delayed so that a pre-sentence report may be prepared.'" *Id.*

Case 1:17-cr-00630-ER   Document 688-2   Filed 07/11/25   Page 7 of 25
Case 1:17-cr-00630-ER   Document 318   Filed 09/01/20   Page 6 of 165

Page 6

at 138 (quoting *United States v. Ross*, No. 92 CR 1001 (JSM), 1993 WL 427415, at *1 (S.D.N.Y. Oct. 15, 1993)). Other courts have similarly ordered restraints on substitute assets post-conviction in order to ensure availability of those substitute assets for forfeiture. *See, e.g., United States v. Swenson,* 1:13–CR–91–BLW, 2014 WL 2506300, *2-4 (D. Idaho June 3, 2014); *United States v. Kilbride,* No. 05 Cr. 870 (PHX-DGC), 2007 WL 2990116, at *2 (D. Ariz. Oct. 11, 2007); *United States v. Wahlen*, 459 F. Supp. 2d 800, 803 (E.D. Wis. 2006).

## IV.     Discussion

### A.  Scott Must Forfeit the Full $392,940,000 That He Laundered

At trial, the Government clearly established that Scott set up and used the Fenero Funds to launder approximately $392,940,000 in OneCoin Scheme proceeds on behalf of Ruja Ignatova. (PSR ¶¶ 33 and 34). As shown at trial (*see, e.g.,* GX 2602), and in the October Affidavit, all of those funds that Scott laundered were derived from the OneCoin Scheme. (*See* October Affidavit ¶ 5). Scott must forfeit the full value of the funds he laundered, i.e., $392,940,000. *See United States v. Bermudez*, 413 F.3d at 306; 19 U.S.C. § 982(a)(1). The Court should accordingly enter the Government's proposed Money Judgment in that amount.

### B.  The Subject Accounts Were Involved in the Money Laundering Offense And Are Subject to Forfeiture

As shown at trial, and as described above and in the October Affidavit, throughout the money laundering scheme, Scott used an elaborate series of financial transactions (sometimes referred to as "layering"), including fake "investments" into the Fenero Funds, purported "loans" that were in fact never repaid, and transfers through numerous bank accounts (including attorney trust accounts), to hide the source of money that funded transfers to third parties on behalf of Ignatova and also directly funded Scott's purchases of real property, cars, and other luxury items. As shown throughout the October Affidavit and in the accompanying charts, many of these transactions were conducted through Scott's direct use of the Subject Accounts. Approximately $34,501,366.3 of the funds from the money laundering scheme remain in the Subject Accounts. As shown at trial, these transactions conducted by Scott were designed to conceal the source of the funds (*i.e.,* the OneCoin Scheme) and the ownership and control of those funds (*i.e.,* Ignatova). Scott's direct use of the Subject Accounts to launder the criminal proceeds from the OneCoin Scheme was indispensable to the money laundering conspiracy. Without Scott's use of these accounts to layer the funds and obfuscate the origin of the funds, there could not have been a successful money laundering operation. The Subject Accounts are accordingly subject to forfeiture under 18 U.S.C. § 982 as property that was involved in the charged money laundering offense that Scott was convicted of at trial.[3]

---

[3] The Government is not seeking forfeiture of the 9788 Iberia Account which is an attorney trust account in the name of Nicole Huesmann. Because that account is an attorney trust account in the name of a third party, forfeiture of the entire 9788 Iberia Account could result in the forfeiture of the funds of third parties who have nothing to do with this prosecution (i.e., other clients of Ms. Huesmann). However, by only seizing the amount of the check provided by Huesmann to the

Case 1:17-cr-00630-ER    Document 688-2    Filed 07/11/25    Page 8 of 25
Case 1:17-cr-00630-ER    Document 318    Filed 09/01/20    Page 7 of 165

Page 7

In addition, as detailed throughout the October Affidavit, the funds in the Subject Accounts as well as all of the Specific Property are directly traceable to funds involved in the money laundering offense and are therefore also subject to forfeiture under 18 U.S.C. § 982(a)(1). Specifically, as shown in the October Affidavit and in the accompanying exhibits, all of funds that were transferred into the Subject Accounts originated from the OneCoin Scheme and were laundered by Scott. Furthermore, all of the Specific Property that is set forth in Appendix A was purchased with funds that originated from the OneCoin Scheme and were laundered by Scott. In other words, all of the specific property in Appendix A is either involved in the money laundering offense or "property traceable to" such property, and is therefore subject to forfeiture under 18 U.S.C. § 982(a)(1).

### C. Any Remaining Funds And Property Belonging To Scott Are Subject To Forfeiture As Substitute Assets

As shown at trial, Scott transferred a substantial portion of the funds that he laundered through the Fenero Funds to a number of third parties, many of which held foreign bank accounts. (*See, e.g.*, GX 2627). For example, Scott sent over €190 million to third parties in the United Arab Emirates, over €65 million to third parties in Bulgaria, and approximately $30 million to a third party in Hong Kong. (*Id.*). The Government is accordingly entitled to substitute assets in this case. *See* 21 U.S.C. §§ 853(p)(1)(A) and (B) (forfeiture of substitute assets is authorized where either the funds cannot be located upon the exercise of due diligence or the property has been "transferred or sold to, or deposited with, a third party[.]"). The Government is presently aware of the specific substitute assets listed below and in Appendix B which should be forfeited here. Notably, given that the appropriate amount of forfeiture is $392,940,000, there is no risk that by forfeiting the specific assets listed below the total amount of funds forfeited will exceed the amount that Scott is obligated to forfeit under the proposed Money Judgment. In other words, even if the Court were to order that Scott forfeit the funds in the Subject Accounts, the Specific Property, and the specific substitute assets listed below, Scott would still owe an additional sum of *hundreds of millions of dollars* before he would satisfy the proposed Money Judgment. The Government accordingly seeks the forfeiture of the following specific property as substitute assets, all of which are held at bank accounts at UBS bank:

| Account Name | Financial Institution | Account No. | Estimated Balance |
|---|---|---|---|
| Mark S. Scott 2017 Trust | UBS | PW XXX53 (converted to Account No. 1X B0014 YA) | $102,857.62 |
| Mark S. Scott 2017 Trust | UBS | PW XXX31 (converted to Account No. 1X B0031 YA) | $2,006,086.28 |
| Mark S. Scott College Fund 529 | UBS | Account No. PW B4734 03 | $160,834.00 |

Government, which represents the remaining funds Huesmann possesses on behalf of Scott, this risk will be eliminated.

Case 1:17-cr-00630-ER    Document 688-2    Filed 07/11/25    Page 9 of 25
Case 1:17-cr-00630-ER    Document 318    Filed 09/01/20    Page 8 of 165

Page 8

| Mark S. Scott | UBS | Account No. PW A5494 03 | $236,750.81 |
| | | **Total** | $2,506,528.71 |

In addition to the funds in the chart listed above, the Government seeks the forfeiture of all of the items that were seized from Scott on the day of his arrest, which include, among other things, several luxury bags. All of those items are listed on Appendix B to this motion, and in the proposed Preliminary Order of Forfeiture.

Finally, even if the Court were to conclude that any of the Subject Accounts or the Subject Property are not subject to forfeiture pursuant to 18 U.S.C. § 982(a)(1), the Subject Accounts and the Subject Property would still alternatively be subject to forfeiture under 21 U.S.C. §§ 853(p)(1)(A) and (B).[4]

### D. The Court Should Enter a Post-Conviction Restraining Order Against Scott

The evidence introduced at trial and set forth in the October Affidavit prove that the defendant diverted and dissipated the proceeds of the scheme charged in the Indictment through a multitude of banks accounts in the name of shell companies and other entities that the defendant controlled. The proceeds were dissipated in a complex series of transactions substantially for the benefit of Scott and his co-conspirators, including Ruja Ignatova, that were designed to avoid detection. As the October Affidavit makes clear, only a small portion of the nearly $400 million in funds laundered by Scott have been identified and seized or restrained.

Moreover, based upon the Government's investigation to date, the defendant has continued to dissipate proceeds of the offenses of conviction, notwithstanding a Post-Indictment Restraining

---

[4] Moreover, the evidence presented at trial clearly established proceeds of at least $40 million stemming from the bank fraud offense charged in Count Two. As the testimony and exhibits admitted at trial proved, in July 2016, Scott transferred $30 million of OneCoin-derived funds from a Fenero account held at DMS Bank in the Cayman Islands—through a U.S. dollar correspondent bank account at Bank of New York Mellon in New York, NY ("BNYM")—to an account held by Barta Holdings at DBS Bank in Hong Kong. In connection with that transaction, Scott caused false wire remittance information to be provided to BNYM indicating that the funds represented a "loan for Cryptoreal." (Tr. 1474-77). In June and September 2016, Scott and Gilbert Armenta also arranged for the transfer of a total of $10 million of OneCoin-derived funds from U.S. bank accounts controlled by Armenta to a Fenero bank account held at Deutsche Bank in the Cayman Islands (Tr. 840-61; 908-17). As part of the broader phony investment fund scheme operated by Scott, and consistent with a Fenero investment agreement that Scott had Armenta execute (GX 1140), these transfers were falsely described to the originating U.S. banks, for example, as investments into "ZIIXI" and "XIII" (Tr. 844), and Fenero itself was falsely described as a private equity firm that invested in, among other things, renewable energy, such as windmills (Tr. 859-860).

Order applicable to "property or other interests . . . subject to forfeiture,"[5] various seizure warrants, and a forfeiture bill of particulars.  As detailed at length in the Government's letter seeking the defendant's remand, dated March 11, 2020: (1) *before* trial, (a) in or about June 2019, the defendant sold a Porsche that he bought with OneCoin victim money and that he knew was subject to seizure and forfeiture, and used the $250,000 in sale proceeds for himself; and (b) in or about August 2019, the defendant took out a $500,000 personal loan from his bond suretor based on the false promise that he would repay that loan within six months, which he failed to do; and (2) *after* trial, in or about December 2019, the defendant offered to mortgage two properties that he bought using OneCoin victim money (as proven at trial) and that he knew were subject to forfeiture in this case, and he actually mortgaged one of those two properties.  (*See* Doc. No. 317).  In addition, as described in paragraph 7(h) of the October Affidavit, in or about June 2018, Scott purchased a 2018 Porsche 911 GTRS2 using OneCoin proceeds.  The Government recently obtained evidence demonstrating that Scott sold that vehicle—which was parked in the driveway at his residence in Massachusetts when he was arrested—in or about January 2019, approximately four months after his arrest, for $192,000.[6]

Based upon the foregoing, there is reason to believe that the defendant has dissipated and will continue dissipating both criminal proceeds and substitute assets, which will frustrate the forfeiture of those assets.  The Government therefore requests that Court enter a post-conviction order restraining Scott's assets until the Court determines whether the those assets are properly forfeited to the United States pursuant to Section 853(p) and Rule 32.2(e) of the Federal Rules of Criminal Procedure.  *See, e.g., Swenson,*, 2014 WL 2506300 at *2-4; *Kilbride*, 2007 WL 2990116, at *2; *Wahlen*, 459 F. Supp. 2d at 803 (E.D. Wis. 2006); *Numisgroup Int'l Corp.*, 169 F. Supp. 2d at 139.  A proposed Post-Conviction Restraining Order is attached hereto as Exhibit 8.

---

[5]  That Restraining Order, attached hereto as Exhibit 7, was signed by Judge Broderick on September 4, 2018, and was produced to the defendant on or about September 21, 2018, stamped with control numbers MS_USAO_00000036 through MS_USAO_00000038.

[6]  The Government will provide to the Court records evidencing this sale in the event that the defendant disputes that this sale took place.  Those records were recently produced by the Government to the defendant.

Case 1:17-cr-00630-ER    Document 688-2    Filed 07/11/25    Page 11 of 25
Case 1:17-cr-00630-ER    Document 318    Filed 09/01/20    Page 10 of 165

Page 10

## Conclusion

For the foregoing reasons, the Government respectfully requests that the Court enter: (1) the proposed Preliminary Order of Forfeiture, imposing a personal money judgment in the amount of $392,940,000 and the forfeiture of certain specific assets as well as substitute assets; and (2) the proposed Post-Conviction Restraining Order against Scott.

Very truly yours,

AUDREY STRAUSS
Acting United States Attorney

By:   ____/s/_____
Christopher J. DiMase / Nicholas Folly
Assistant United States Attorneys
(212) 637-2433 / (212) 637-1060

Cc:   David Garvin, Esq. (via ECF)
Arlo Devlin Brown, Esq. (via ECF)

# EXHIBIT 12

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 25, 2021

**BY ECF/EMAIL**

The Honorable Edgardo Ramos
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

     Re:    *United States v. Mark S. Scott*, S10 17 Cr. 630 (ER)

Dear Judge Ramos:

     The Government respectfully submits this reply memorandum in response to Scott's opposition to the Government's application for a preliminary order of forfeiture, and for a restraining order. (Dkt. 344 and 345, respectively). In his opposition to the Government's forfeiture application, Scott argues that the Government has failed: 1) to show through financial tracing that the funds laundered by Scott were in fact from the OneCoin fraud scheme; and 2) to establish that the funds laundered by Scott were proceeds of a legally sufficient specified unlawful activity, i.e., a wire fraud scheme in violation of 18 U.S.C. § 1343. In addition, Scott argues that a money judgment of $393 million would violate his Eighth Amendment rights. Finally, Scott argues that certain property is not subject to forfeiture as a specific asset, and that it is premature to address the forfeiture of substitute assets. Scott is wrong in all respects.

**I.    The $392,940,000 in Funds Laundered by Scott Were Derived from the OneCoin Wire Fraud Scheme**

     In his brief, Scott raises two related arguments in opposition to the Government's application for a preliminary order of forfeiture (the "Preliminary Order of Forfeiture") imposing a forfeiture money judgment in the amount of $392,940,000. First, Scott argues that the Government has failed to establish through financial tracing that the funds laundered by Scott were in fact from the OneCoin fraud scheme. (Dkt. 345 at 9-14). Second, Scott asserts that the Government has failed to prove that the funds laundered by Scott were proceeds of a legally sufficient specified unlawful activity, i.e., the wire fraud scheme. (Dkt. 345 at 5-9). In particular, Scott claims that in order to prove that certain funds were criminal proceeds from a wire fraud scheme in violation of 18 U.S.C. § 1343, the Government must establish that *all* of the funds that Scott laundered were from OneCoin customers *in the United States*. Scott's arguments are unsupported by the evidence and the law.

     First, Scott's assertion that the Government has failed to establish that the "vast majority of funds transferred to the Fenero accounts were from purchasers of OneCoin" is completely

Case 1:17-cr-00630-ER    Document 688-2    Filed 07/11/25    Page 14 of 25
Case 1:17-cr-00630-ER    Document 392    Filed 08/25/21    Page 2 of 13

Page 2

unsupported by the record.  As set forth below, the trial record showed that Scott was retained for the specific purpose of laundering OneCoin fraud scheme proceeds on behalf of Ruja Ignatova ("Ruja").  In particular, the following facts, among others, overwhelmingly show that the funds laundered by Scott were derived from the OneCoin fraud scheme (the "OneCoin Scheme"):

- OneCoin was founded by Ruja and Sebastian Greenwood.  (Tr. 132).  By the summer of 2014, Ruja and Greenwood began developing the concept and payout plan for OneCoin.  (GX 2101).

- From 2015 through 2017, Ruja's source of income was from running OneCoin.  (Tr. 217:6).  This was the same period during which Scott laundered funds on Ruja's behalf.  (*See* GX 2602-A).

- Ruja earned at least $500,000,000 from operating OneCoin before she disappeared in the fall of 2017 (Tr. 220:4); the money that Ruja earned came from OneCoin investors (Tr. 220:6).

- Gilbert Armenta, who was the boyfriend of Ruja and was also one of Ruja's main money launderers, assisted OneCoin with some of its banking problems.  (Tr. 130).  As of late 2015, Armenta had begun laundering OneCoin Scheme proceeds for Ruja.  (GX 2114, 2115).  Around that same time, Armenta introduced Mark Scott to Ruja.  (GX 2115, 1004).

- While International Marketing Services ("IMS"), as well as B&N Consult Ltd. ("B&N") and Fates Group, were "investors" in the Fenero Funds on paper, all of the money being transferred into Scott's funds in fact belonged to Ruja and was derived from the OneCoin Scheme.  (GX 1434).  IMS was owned by co-conspirator Frank Rickets; B&N was owned by co-conspirator Irina Dilkinska; and Fates Group was owned by co-conspirator Armenta.

- Scott and other co-conspirators understood and explicitly discussed the importance of hiding the link between the funds in the Fenero Funds and OneCoin.  (*See, e.g.*, Tr. 1771:4-6; GX 1042).

- OneCoin employees organized and coordinated the transfer of funds into the Fenero Funds.  (*See* GX 2701).  Scott also provided updates to Ruja and OneCoin's head of accounting regarding the total amount of money that he had received in the Fenero Funds on behalf of Ruja.  (GX 1399).  In another email to OneCoin's head of accounting and Dilkinska, another OneCoin employee, Scott provided a breakdown of all of the funds that the Fenero Funds had received on Ruja's behalf to date, which totaled EUR 306,089,78 and $40,990,185.  (GX 1391).

- Scott conceded in email correspondence with a fund administrator that funds that had been transferred into the Fenero Funds on behalf of IMS were sourced from OneCoin.  (GX 2281 (Scott wrote "Attached please find spot checks of one of the pooling accounts at Deutsche Bank where IMS collects and manages the payments of the

Case 1:17-cr-00630-ER      Document 688-2      Filed 07/11/25      Page 15 of 25
Case 1:17-cr-00630-ER      Document 392      Filed 08/25/21      Page 3 of 13

Page 3

OneCoin customers. . . . . You will find pretty regular payment amounts ranging from a starter package to advanced packages and other extras. The majority are from payments made though the OneCoin Website where the purchaser secures a username that is included in the reference information of the transfer to later be able to reference that purchaser easier on the OneCoin platform.")).  Scott attached Deutsche Bank statements for the IMS bank account that reflected the OneCoin purchases he described in the email.  (*Id.*).

The above-described evidence demonstrates—far beyond a preponderance—that the funds that were transferred to the Fenero Funds and laundered by Scott through the Fenero Funds, which totaled $392,940,000, were derived from the OneCoin wire fraud scheme.[1]

Second, Scott also argues that the Government has failed to prove that the $392,940,000 that he laundered was derived from a legally sufficient specified unlawful activity, i.e., the OneCoin wire fraud scheme.  Specifically, Scott asserts, without citing to a single case, that the only funds subject to forfeiture are those that can be traced to OneCoin purchasers in the United States.  Scott is wrong.

At the outset, the Government has already proven at trial, *beyond a reasonable doubt*, that Scott participated in money laundering conspiracy and that the underlying specified unlawful activity was a wire fraud scheme involving interstate or international wires in the United States, and more particularly in the Southern District of New York.  Furthermore, the evidence at trial definitively established a sufficient nexus between the OneCoin fraud scheme and the United States.  "A jurisdictional nexus exists 'when the aim of that activity is to cause harm inside the United States or to U.S. citizens or interests.'"  *United States v. Budovsky*, 13 Cr. 368 (DLC), 2015 WL 5602853, at *4 (S.D.N.Y. Sept. 23, 2015) (quoting *United States v. Al Kassar,* 660 F.3d 108, 118 (2d Cir. 2011)).  Specially, the Government proved at trial that: 1) OneCoin began operating in the United States in or around 2015 (GX 63 ¶ 1(d); GX 204-C); 2) OneCoin meetings and conferences were held in the United States, and there were United States-based promoters (Tr. 66, 69-71); and 3) United States individuals transmitted wires internationally in connection with OneCoin's activities in the United States (GX 730A; Tr. 84).  Two United States victims also testified at trial and described their investments in the scheme, the promoters who introduced them

---

[1]  Although Scott faults the Government for not establishing through tracing analysis that all of the funds that passed through the IMS, B&N, Fates Group bank accounts were from the OneCoin Scheme, there is no such legal requirement.  It is well settled that circumstantial evidence, which the Government has submitted in an abundance here, can establish that property constituted proceeds of a crime.  *See, e.g., United States v. Funds in Amount of $30,670*, 403 F.3d 448, 469 (7th Cir. 2005) (granting summary judgment to Government where "the totality of the evidence as a whole and in the appropriate context" supported forfeiture); *United States v. $174,206.00 in U.S. Currency*, 320 F.3d 658, 662 (6th Cir. 2003) (granting Government summary judgment that property was derived from crime based on claimant's tax returns reporting insufficient income); *United States v. One 2008 Chevrolet Tahoe4 C1500*, No. 09 Civ. 799 (JFK), 2011 WL 176887, at *10 (N.D. Ga. Jan. 19, 2011) (similar); *United States v. $433,980 in U.S. Currency*, 473 F. Supp. 2d 685, 690 (E.D.N.C. 2007) (granting summary judgment based on multiple circumstantial factors each only somewhat probative individually).

Case 1:17-cr-00630-ER     Document 688-2     Filed 07/11/25     Page 16 of 25
Case 1:17-cr-00630-ER     Document 392     Filed 08/25/21     Page 4 of 13

Page 4

to OneCoin, and their ultimate losses related to their investments. (*See, e.g.,* Tr. 74, 84, 791, 799, 809-10; GX 731A; GX 2803; GX 2811). In combination with the Government's evidence regarding the fraudulent nature of OneCoin, nothing more was required in order for the Government to prove the existence of a wire fraud scheme that met the elements of 18 U.S.C. § 1343.

Given that the Government has clearly shown by a preponderance that $392,940,000 is the amount of money that Scott laundered during the course of the money laundering conspiracy, and that those proceeds were derived from a wire fraud scheme, $392,940,000 is the appropriate amount for the money judgment. For money laundering charges such as Count One of the Indictment, the Government may seek a money judgment up to the full value of the funds laundered by the defendant. *United States v. Bermudez*, 413 F.3d 304, 305-306 (2d Cir. 2005). In imposing sentence on a person convicted of an offense in violation of Title 18, United States Code, Section 1956, the Court "shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." *Id.* at 306, 18 U.S.C. § 982. Property "involved in" a money laundering offense very clearly constitutes at least the actual funds laundered. *See In re 650 Fifth Ave and Related Props.*, 777 F. Supp. 2d 529, 570 (S.D.N.Y. 2011). Furthermore, where, as here, the defendant did not retain all of the funds he laundered,[2] Section 982(b)(2) expressly states that the defendant is liable for forfeiture of substitute assets up to the full amount of the laundered property, provided that the defendant "conducted three or more separate transactions involving a total of $100,000 or more in any twelve month period." 18 U.S.C. § 982(b)(2). In short, a money laundering defendant like Scott—who laundered approximately $392,940,000 through numerous transactions within a twelve-month period that exceeded $100,000—"must forfeit substitute assets up to the amount laundered, even if he merely handled the laundered property—*i.e.,* even if he never retained those funds." *Bermudez*, 413 F.3d at 306.

## II.     The Proposed Money Judgment Would Not Violate Scott's Eighth Amendment Rights

The defense's constitutional claim is equally meritless. No court in the United States has ever held that forfeiture in the amount of criminal proceeds laundered by a defendant is unconstitutionally excessive.

"The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). The rule is that "a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *Id.* The gross disproportionality standard "reserves a constitutional violation for only the extraordinary case." *Lockyer v. Andrade*, 538 U.S.

---

[2] As set forth below, the Government established at trial that a significant amount of the OneCoin Scheme proceeds that were laundered through the Fenero Funds were sent to Ruja and other members of the OneCoin Scheme.

Case 1:17-cr-00630-ER    Document 688-2    Filed 07/11/25    Page 17 of 25
Case 1:17-cr-00630-ER    Document 392    Filed 08/25/21    Page 5 of 13

Page 5

63, 77 (2003). The burden is on the defendant to prove the unconstitutionality of the forfeiture. *United States v. Castello*, 611 F.3d 116, 120 (2d Cir. 2010).

Four factors set out in *Bajakajian* guide the Court's analysis: "[1] the essence of the crime of the defendant and its relation to other criminal activity, [2] whether the defendant fit[s] into the class of persons for whom the statute was principally designed, [3] the maximum sentence and fine that could have been imposed, and [4] the nature of the harm caused by the defendant's conduct." *Id.* In addition, the Second Circuit has held that courts may consider "whether the forfeiture would deprive the defendant of his future ability to earn a living," but that courts should *not* consider "a defendant's personal circumstances." *United States v. Viloski*, 814 F.3d 104, 107 (2d Cir. 2016). Application of these factors establishes that forfeiture of the money laundering scheme's proceeds, that is, the exact amount of money that Scott laundered, is not grossly disproportional to his crime; in fact, it definitionally reflects the scope, sophistication, complexity, and duration of the crime.

The first *Bajakajian* factor requires consideration of "the essence of the crime of the defendant and its relation to other criminal activity." *Id.* at 121. Here, Scott operated a sophisticated, international, massive, multi-year money laundering operation involving numerous co-conspirators in the United States and abroad. The money laundering scheme required multiple layers of deception at every turn in order to hide the origin of the funds (i.e., the OneCoin Scheme), and the owner of the funds (i.e., Ruja). In order to launder the funds, Scott set up a series of fake investment funds, including the following purported investment funds: Fenero Equity Investments L.P. ("Fenero"), Fenero Equity Investments II, L.P. ("Fenero II"), and Fenero Financial Switzerland L.P. ("Fenero Switzerland"), each of which was an approved investment fund regulated in the British Virgin Islands. (GX 2701). MSSI LTD also owned and operated Fenero Equity Investments (Cayman) I, L.P. ("Fenero Cayman"), an investment fund organized in the Cayman Islands (together with the British Virgin Islands Fenero funds, the "Fenero Funds"). (*Id.*). Scott operated bank offshore accounts in the Cayman Islands for each of the Fenero Funds (the "Fenero Fund Accounts"). (*Id.*). The Fenero and Fenero Switzerland accounts were held at DMS Cayman bank, and the Fenero Cayman and Fenero II accounts were held at Deutsche Bank Cayman. (*Id.*).

Scott used these fake investment funds to facilitate the laundering of nearly *four hundred million dollars*. In doing so, he made numerous misrepresentations to banks and financial institutions in order to cause them to unwittingly transfer the proceeds from the OneCoin Scheme on behalf of Ruja. Specifically, Scott and his co-conspirators misrepresented to banks and financial institutions the source of the funds they were transferring, and the purpose of those wire transfers. For example, after a fund administrator grew suspicious of the financial activity in the Fenero Funds and began conducting enhanced due diligence on the Fenero Funds, Scott took a number of steps in an effort to conceal the connection between the Fenero Funds and OneCoin, and to convince Apex that it should continue to transfer funds out of the Fenero Funds as requested by Scott. Among other things, Scott and his co-conspirators doctored letters of comfort on behalf of two lawyers; created and sent backdated wire instruction letters to Apex; and forged a set of agreements between IMS and B&N. (GX 1177, GX 2266, Tr. 243; GX 1175, GX 2267). Scott also forged a set of two agreements between OneCoin and IMS, changing the fee that IMS was supposed to receive under the agreements from 1% in the original agreements, to 20% and 22% in

the forged agreements. (GX 1209). The forged contracts were then sent by Scott to Apex. (GX 2276). Scott altered the terms of the forged contracts to provide support for the large volume of payments—purportedly for the purpose of licensing technology to OneCoin—made by the IMS companies to the Fenero Funds. In light of his conduct, plainly, the total amount of money that Scott laundered represents the essence of his crime. Because the core criminal conduct of Scott's money laundering conspiracy was a massive international money laundering and bank fraud scheme that was highly deceptive, spanned years, and involved numerous co-conspirators that he directed, the first *Bajakajian* factor weighs heavily in favor of full forfeiture of the funds he laundered. *See Viloski*, 814 F.3d at 113 (first factor weighed in favor of forfeiture even though defendant was subordinate and it was not lucrative, as the conspiracy spanned years and involved repeated instances of fraud).

Second, Scott fits squarely into the class of persons for whom the money laundering and bank fraud statutes are principally designed. *Bajakajian* at 122. As the architect of a highly sophisticated, international money laundering operation, which deceived banks and financial institutions around the globe, Scott is clearly the kind of person to whom the money laundering and bank fraud statutes are directed. Thus, the second *Bajakajian* factor also weighs in favor of full forfeiture. *See also Viloski*, 814 F.3d at 114 (defendant fit squarely within class of persons for whom the federal fraud statutes were aimed—he used facilities of interstate commerce to engage in fraudulent schemes and then disguised the nature of the proceeds).

The third *Bajakajian* factor considers the maximum sentence and fine that could be imposed. Here, the maximum sentence is the statutory maximum of 50 years, and the maximum statutory fine under 18 U.S.C. § 3571 is nearly $800 million. This strongly suggests substantial culpability, and thus this factor weighs in favor of full forfeiture. *See Viloksi*, 814 F.3d at 114; *United States v. Bonventre*, 646 Fed. Appx. 73, 91-92 (2d Cir. 2016) ($19 billion forfeiture judgment not excessive; defendant faced maximum of 100 years in prison for fraud and tax offenses in connection with scheme to defraud thousands of investors).

The next factor to consider is the nature of the harm caused by Scott's conduct. Notably, the money Scott laundered represented the proceeds of a massive international fraud scheme that defrauded millions of investors out of more than $1 billion. By laundering nearly $400 million, Scott helped Ruja to successfully steal that money straight from the pockets of the investors. Scott also pocketed over $50 million of OneCoin investor funds himself, as his cut for laundering the money for Ruja.

Finally, a money judgment in the amount of $392,940,000 would not deprive Scott of his "future ability to earn a living"—a factor the Court may, but is not required, to consider as part of its proportionality analysis. *Viloski*, 814 F.3d at 111-112. Given that the Government is seeking forfeiture here in the form of a money judgment, any claim otherwise is not credible. The Government is not seeking to seize, for example, a business that serves as Scott's sole source of potential income. Scott has presented not a shred of evidence that a money judgment would prevent him from earning a living upon his release from prison. *See Viloski*, 814 F.3d at 114-115 (noting that defendant presented no evidence that forfeiture judgment would deprive him from

Case 1:17-cr-00630-ER     Document 688-2     Filed 07/11/25     Page 19 of 25
Case 1:17-cr-00630-ER     Document 392     Filed 08/25/21     Page 7 of 13

Page 7

earning a living upon release from prison, and rejecting defendant's argument that court should consider his age, health, or poor financial state).[3]

Lastly (and significantly), there is no case holding that a forfeiture judgement in the amount of the proceeds of a defendant's crime is an Eighth Amendment violation. This is unsurprising. Indeed, as the Second Circuit observed in *Bonventre*, in which it upheld a $19 billion forfeiture judgment, "[w]here . . . forfeiture ordered is in an amount equivalent to the undisputed, actual proceeds of the fraud . . . we cannot conclude that the order was grossly disproportional to the gravity of his offense." 646 Fed. Appx. at 92. As far as the Government is aware, Eighth Amendment violations have been found only where (1) "facilitating" or "involved in" forfeiture resulted in forfeiture of otherwise legitimate property that was dramatically more valuable than the underlying crime proceeds (*e.g.*, the forfeiture of a car worth more than four times the maximum fine for a state drug crime, *see Timbs v. Indiana*, 139 S. Ct. 682 (2019)); or (2) there were no crime proceeds at all, as in *Bajakajian*, 524 U.S. at 338. Here, the Government is seeking to forfeit the exact amount of money that the defendant laundered during the money laundering conspiracy, all of which was derived from the OneCoin Scheme. Thus, a ruling in the defendant's favor on this point would not only be contrary to law, but unprecedented.

### III.     The 600 Coral Way Property Is Subject to Forfeiture Under 18 U.S.C. § 982(a)(1)

As set forth in the August 31, 2020 affidavit of Rosalind October, over one million dollars that was laundered by Scott was eventually used to pay off the mortgage for a condo at 600 Coral Way, Coral Cables (the "600 Coral Way Property") on behalf of Scott. Specifically, on or about October 16, 2016, Scott paid off the mortgage for the 600 Coral Way Property with a payment in the amount of $1,000,794.66, all of which originated from OneCoin Scheme funded accounts. (Dkt. 318 at 44 (citing Tr. 1699-1700; GX 2617-B and 2620)). Scott does not dispute these facts, but instead claims that because Scott had paid for a portion of the 600 Coral Way Property prior to using ~$1M in OneCoin Scheme proceeds to pay the remainder of the mortgage, only $1 million of equity in the property is subject to forfeiture. (Scott Opp. at 17-18). Specifically, Scott argues the Government has failed to introduce any "evidence whatsoever" that shows that Scott's use of OneCoin Scheme proceeds that he laundered through the Fenero Funds, and subsequently used to pay off the mortgage on his home, "was in any way designed to facilitate or disguise his participation in this venture." Scott is wrong.

As the Government previously explained in motion *in limine* briefing in this case, Scott's money laundering activities were not limited to the funds that he funneled through the Fenero Funds and sent back on Ruja's behalf. Scott's money laundering concealment activities also extended to his own attempts to successfully transfer money on his own behalf out of the Fenero Funds, i.e., to pay himself his cut of the OneCoin Scheme proceeds that he received for laundering the $400 million ("Scott's Funds"). Scott relied on the same money laundering techniques to achieve both ends. This Court reached a similar conclusion in denying Scott's motion *in limine* to preclude the Government from presenting at trial evidence concerning Scott's Funds. In doing so,

---

[3] Notably, the Second Circuit, consistent with every other Circuit, has explicitly held that courts may *not* consider Scott's personal circumstances, including his financial situation, age, and health, in its constitutional proportionality analysis. *Viloski*, 814 F.3d at 112.

Case 1:17-cr-00630-ER    Document 688-2    Filed 07/11/25    Page 20 of 25
Case 1:17-cr-00630-ER    Document 392    Filed 08/25/21    Page 8 of 13

Page 8

the Court noted that "I do agree with the Government that this is direct evidence of the offense that is charged." (Dkt. 170 at 55).

Scott's purchase of the 600 Coral Way Property is no different. The purchase was one of numerous instances in which Scott used the Fenero Funds to conceal and hide the origin of OneCoin Scheme proceeds, and further used the purchase of real property as an additional layer of obfuscation.[4] Specifically, Scott sent two wires, each in the amount of $500,000, from Fenero accounts at the Bank of Ireland, to his attorney's account, who in turn sent the funds to pay off the mortgage. This series of transfers, including the mortgage payout on the 600 Coral Way Property, was designed to conceal the nature and origin of the funds (i.e., criminal proceeds), consistent with Scott's modus operandi throughout the entire money laundering conspiracy. The entire 600 Coral Way Property is accordingly subject to forfeiture pursuant to 18 U.S.C. § 982(a)(1), along with all of the specific property in Appendix A.[5]

In the event that the Court finds that the *entire* 600 Coral Way Property is not subject to forfeiture as property traceable to the offense, a portion of the property is still subject to forfeiture under § 982(a)(1). Specifically, the Government is still entitled to the $1,000,794.66 that was indisputably derived from the OneCoin scheme, which Scott used to pay off the mortgage, or, if the value of the property has increased, a sum equal to $1,000,794.66 plus a proportional percentage of the increase in the value of the property. In addition, the remainder of the property would be subject to forfeiture as a substitute asset under 21 U.S.C. §§ 853(p)(1)(A) and (B).

---

[4] Other instances in which Scott used similar money laundering concealment techniques to fund purchases on his own behalf include the following, among others: 1) In November 2016, Scott purchased a $245,269 Ferrari car. In doing so, Scott routed the money from the bank account of one of the Fenero Funds, to his attorney's bank account, to a Cayman Island bank account, and then directly to the seller of the Ferrari; 2) in February 2017, Scott routed $850,000, in two separate wires, from Fenero Fund bank accounts, to his lawyer, for the purchase of another property in Barnstable, MA. The purchase fell through and was not completed; 3) in March 2017, Scott purchased a $1,310,000 Sunseeker yacht, and routed all of the funds from one of the Fenero Fund bank accounts, to his attorney's bank account, and on to the seller; 4) in September 2017, Scott purchased a $3,765,000 residence located at 31 Dale Avenue, Hyannis Port, MA. In making that purchase he again routed a portion of the money directly from one of the Fenero Fund bank accounts, through his lawyer's bank account, and then into a client trust account for the seller. Scott routed an additional portion of the money for the purchase directly from the Cayman Island bank account of the general partner of the Fenero Funds, "MSS International Consultants BVI Ltd." ("MSSI BVI"), through his lawyer's bank account, and on to the seller; and 5) in November 2017, Scott purchased (along with a third-party) another residence located at 105 Sunset Lane, Barnstable, MA by routing his share of the purchase price through a MSSI BVI Cayman Island bank account, to his lawyer, and then on to the seller.

[5] The Government inadvertently did not include Appendices A and B in its forfeiture motion, but has attached both of them here.

Case 1:17-cr-00630-ER    Document 688-2    Filed 07/11/25    Page 21 of 25
Case 1:17-cr-00630-ER    Document 392    Filed 08/25/21    Page 9 of 13

Page 9

## IV.    The Government's Request Regarding the Forfeiture of Substitute Assets is Not Premature

In Scott's final argument, he urges this Court to delay its finding regarding substitute assets on the basis that the "the Government's interest in substitute assets . . . vests only when the Court enters a judgment of conviction." (Scott. Opp. at 18).[6] Scott's argument is misplaced and there is no need for further delay in determining what substitute assets are subject to forfeiture.

Scott first argues that the Government's application to seize substitute assets is premature because the Government's interest in the substitute assets has not vested. But whether the Government's interest in substitute assets has vested is irrelevant to the Court's entry of a preliminary order of forfeiture as to those substitute assets, which is governed solely by the requirements of Section 853(p) and Federal Rule of Criminal Procedure 32.2. Section 853(p) contains no separate time limitation or requirement of entry of a judgment of forfeiture for substitute assets as distinct from forfeiture of tainted property, and Rule 32.2 states that the forfeiture of substitute assets may be ordered "at any time." Rule 32.2(e)(1). The cases cited by Scott regarding the vesting of the Government's interest relate to pretrial restraint of substitute assets, not their post-trial forfeiture or restraint, and so have no bearing here. Indeed, some courts have held that the Government's interest vests only at the time of the entry of the preliminary order of forfeiture itself. *See United States v. Egan*, 654 F. App'x 520, 521 & n.1 (2d Cir. 2016) (assuming that the government's interest vests, "at the very latest, upon entry of [a preliminary] order of forfeiture concerning that property"). Necessarily, if entry of such an order may itself be what causes the Government's interest to vest, the vesting of that interest cannot be a pre-requisite for entry of the order. The Court is thus fully empowered to determine: 1) whether the Government has met the statutory requirements for the forfeiture of substitute assets under 21 U.S.C. § 853(p); and if so, 2) whether certain assets identified by the Government are subject to forfeiture as substitute assets.

On the first issue, Scott argues that the Court has failed to meet the statutory requirements of Section 853(p) because the Government cannot show that that it has been "unable to locate or obtain the specific proceeds of the defendant's offenses." (Scott Opp. at 18-19). Scott is wrong. Section 853(p) provides several ways to establish that the Government is entitled to forfeit substitute property, only one of which Scott has addressed. For example, the Government has clearly shown that Scott transferred a substantial portion of the funds that he laundered through the Fenero Funds to a number of third parties, many of which held foreign bank accounts. (*See*,

---

[6] Scott also opposes the Government's motion for a post-conviction restraining order against Scott. At the outset, the Government rejects Scott's assertion that it directed UBS to block Scott from accessing certain UBS accounts or otherwise engaged in any improper conduct related to those accounts. Further, even if the Court were to conclude that UBS's decision to restrain Scott's funds was improper, the funds would still be subject to forfeiture at this stage. *See, e.g., United States v. Cosme*, 796 F.3d 226, 236 (2d Cir. 2015) (noting that "it is settled law that 'even when the initial seizure is found to be illegal, the seized property can still be forfeited'") (internal citations omitted). Finally, given that sentencing is presently scheduled in just two weeks, the Government's request to enter a restraining order is effectively moot and can be more appropriately resolved at this stage through the Court's imposition of forfeiture at sentencing.

e.g., GX 2627). Among other transactions, Scott sent over €190 million to third parties in the United Arab Emirates, over €65 million to third parties in Bulgaria, and approximately $30 million to a third party in Hong Kong. (*Id.*). The Government is accordingly entitled to substitute assets in this case. *See* 21 U.S.C. §§ 853(p)(1)(A) and (B) (forfeiture of substitute assets is authorized where either the funds cannot be located upon the exercise of due diligence *or* the property has been "transferred or sold to, or deposited with, a third party[.]").

    Once the Court has found that the Government is entitled to forfeit substitute assets from Scott, the next question is whether certain assets identified by the Government are subject to forfeiture. The Government is presently aware of the specific substitute assets listed in Appendix B, and Scott has offered no asset-specific grounds on which any of those assets are not subject to forfeiture. Accordingly, all of them should be ordered forfeited, as set out in the Government's proposed Preliminary Order of Forfeiture. When the Government has established the forfeitability at or before the time of sentencing, as it has here, there is no legal basis or practical reason to defer the forfeiture of substitute assets until a later time, rather than ordering them forfeited along with the forfeiture of tainted assets, and entry of a money judgment, all of which will become final at the time of sentencing and entry of the judgment.

                                    Very truly yours,

                                    AUDREY STRAUSS
                                    Acting United States Attorney

                    By:     ___/s/_____
                                    Christopher J. DiMase / Nicholas Folly
                                    Assistant United States Attorneys
                                    (212) 637-2433 / (212) 637-1060

Cc:   David Garvin, Esq. (via ECF)
       Arlo Devlin Brown, Esq. (via ECF)

## Appendix A
Subject Accounts and Subject Property

### Subject Accounts

| Bank | Account No. | Account Name |
|------|-------------|--------------|
| Iberia Bank | 85079788 | Nicole J. Huesmann PA |
| DMS Bank | 40077102 | MSS International Consultants |
| DMS Bank | 40077100 | MSS International Consultants |
| FirstCaribbean International Bank | 10462701 | MSS International Consultants |
| FirstCaribbean International Bank | 10465454 | DRP Holdings Ltd BVI |
| FirstCaribbean International Bank | 10465343 | MSS Marine Group |
| FirstCaribbean International | 10463883 | EGD Investment Ltd |
| FirstCaribbean International Bank | 10465346 | Mumbelli Group Holding |
| RBC Dominion Securities Global Ltd. | 2450478611 | HFT Holding Limited |
| Dreyfus Sohne & Cie AG | CH3508565559929606901 | Mark S. Scott |
| Cooperative Bank of Cape Cod | 9190041054 | Mark S. Scott and Lidia V. Kolesnikova |
| Northern Trust Company | 2840912613 | Mark S. Scott PL |
| Northern Trust Company | 2840909434 | Mark S. Scott |
| Northern Trust Company | 43-98797 | Mark Stanley Scott |
| UBS Financial Services | PWB1979 | Mark S. Scott, P.L. |
| UBS Financial Services | PWA9666 | Mark S. Scott and Lidia Kolesnikova |
| UBS Financial Services | PWA5493 | Mark S. Scott 2017 Trust |
| Wells Fargo Advisors | 4842-9048 | Mark S. Scott 2017 Trust |
| RBC Private Counsel (USA) Inc. | 3752442214 | Mark S. Scott 2017 Trust |
| RBC Private Counsel (USA) Inc. | 3756283317 | Mark S. Scott 2017 Trust |
| J.P. Morgan Chase Bank | 339656032 | James Nobles Esq. P.C. |

### Cars and Yacht

| Description | VIN / Hull Nos. |
|-------------|-----------------|
| 2017 Sunseeker Predator yacht | TAIMA |
| 2017 Red Porsche 911 4S Turbo | WP0CD2A95HS178187 |
| 2018 White Porsche 911 GT2 RS | WP0AE2A91JS185471 |

**Personal Property**

| Description |
|---|
| Ring with alleged diamond seized on or about September 5, 2018 from 133 Sunset Lane Barnstable, Massachusetts 02630 |
| Panerai Pam 582 Clock seized on or about September 5, 2018 from 133 Sunset Lane Barnstable, Massachusetts 02630 |
| Panerai Pam 585 Clock seized on or about September 5, 2018 from 133 Sunset Lane Barnstable, Massachusetts 02630 |
| Panerai Pam 583 Clock seized on or about September 5, 2018 from 133 Sunset Lane Barnstable, Massachusetts 02630 |
| Panerai Pam 584 Clock seized on or about September 5, 2018 from 133 Sunset Lane Barnstable, Massachusetts 02630 |

**Real Property**

| Address |
|---|
| 31 Dale Avenue, Hyannis Port, MA 02601 |
| 105 Sunset Lane, Barnstable, MA 02630 |
| 133 Sunset Lane, Barnstable, MAs 02630 |
| 600 Coral Way, Suite/Floor 12, Segovia Tower, Coral Gables, FL 33134 |

### Appendix B
Substitute Assets (Bank Accounts)

| Account Name | Financial Institution | Account No. |
|---|---|---|
| Mark S. Scott 2017 Trust | UBS | PW XXX53 (converted to Account No. 1X B0014 YA) |
| Mark S. Scott 2017 Trust | UBS | PW XXX31 (converted to Account No. 1X B0031 YA) |
| Mark S. Scott College Fund 529 | UBS | Account No. PW B4734 03 |
| Mark S. Scott | UBS | Account No. PW A5494 03 |

Substitute Assets Already Seized

| Asset Description | Date Seized | Location of Seizure |
|---|---|---|
| One Heckler & Koch 40 MM gun, Serial No.: 219-004106 | September 5, 2018 | 600 Coral Way, Suite/Floor 12, Segovia Tower, Coral Gables, Florida 33134 |
| One Heckler & Koch 45 MM gun, Serial No.: HKU004967 | September 5, 2018 | 600 Coral Way, Suite/Floor 12, Segovia Tower, Coral Gables, Florida 33134 |
| One Desert Eagle SOAE, Serial No.: DK0038257 | September 5, 2018 | 600 Coral Way, Suite/Floor 12, Segovia Tower, Coral Gables, Florida 33134 |
| One Smith and Wesson, Serial No.: DJW0604 | September 5, 2018 | 600 Coral Way, Suite/Floor 12, Segovia Tower, Coral Gables, Florida 33134 |
| One Beretta Shotgun and leather case | September 5, 2018 | 600 Coral Way, Suite/Floor 12, Segovia Tower, Coral Gables, Florida 33134 |
| One Luminor Panerai P068/400 BB1577049 | September 5, 2018 | 600 Coral Way, Suite/Floor 12, Segovia Tower, Coral Gables, Florida 33134 |
| One Black Hermes Birkin Bag | September 5, 2018 | 600 Coral Way, Suite/Floor 12, Segovia Tower, Coral Gables, Florida 33134 |
| One Orange Hermes Birkin Bag | September 5, 2018 | 600 Coral Way, Suite/Floor 12, Segovia Tower, Coral Gables, Florida 33134 |
| One Black Hermes Purse | September 5, 2018 | 133 Sunset Lane Barnstable, Massachusetts 02630 |
| One Brown/Tan Hermes Purse | September 5, 2018 | 133 Sunset Lane Barnstable, Massachusetts 02630 |
| One Green Hermes Purse | September 5, 2018 | 133 Sunset Lane Barnstable, Massachusetts 02630 |